# U.S. District Court
# Eastern District of Oklahoma (Muskogee)
# CRIMINAL DOCKET FOR CASE #: <u>6:04−cr−00115−RAW</u>−1

Case title: United States of America v. Barrett
Other court case numbers:  12−7086 10th Circuit

OK/ED 6:09−cv−105−JHP

Related  Case:  6:19−cv−00152−RAW

Magistrate judge case number:  6:04−mj−00100

Date Filed: 11/09/2004
Date Terminated: 03/28/2019

Assigned to: Judge Ronald A.
White

Appeals court case number:
06−7005

## Defendant (1)

**Kenneth Eugene Barrett**
*TERMINATED: 03/28/2019*

represented by **Joan M. Fisher**
Federal Public Defender − Sacramento
801 "I" St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−5706
Email: joan.fisher@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community*
*Defender Appointment*

**Bret A. Smith**
PO Box 2250
Muskogee, OK 74402
918−687−0011
Fax: 918−687−8490
Email: bretsmith@sbcglobal.net
*TERMINATED: 12/29/2005*
*Designation: CJA Appointment*

**Carrie L. Ward**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Email: carrie_ward@fd.org

*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405−521−9600
Fax: 405−521−9669
Email: dbautry77@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**John David Echols**
624 S Denver Ave, Ste 201
Tulsa, OK 74119
918−299−3802
Email: john@jdechols.com
*TERMINATED: 05/05/2005*
*Designation: CJA Appointment*

**Mark Henricksen**
600 W Walker Ave, Ste 201
Oklahoma City, OK 73102
405−609−1970
Fax: 405−609−1973
Email: mark@henricksenlaw.com
*TERMINATED: 04/03/2008*
*Designation: CJA Appointment*

**Roger Hilfiger**
Cook & Hilfiger
PO Box 791
Muskogee, OK 74402
918−683−4445
Fax: 918−683−1828
Email: rogeratty@swbell.net
*TERMINATED: 04/03/2008*
*Designation: CJA Appointment*

**Tivon Schardl**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−6656
Email: tim.schardl@fd.org
*TERMINATED: 05/14/2019*
*Designation: Public Defender or Community Defender Appointment*

**Pending Counts**                    **Disposition**

| | |
|---|---|
| 18:924(c)(1)(A) and (j): Use and carry a firearm during and relation to drug trafficking crimes and possess a firearm in furtherance of such drug trafficking offenses, resulting in death.<br>(1s) | Life without the possibility of release. Special Assessment in the amount of $100.00. |
| 18:924(c)(1)(A) and (j): Use and carry a firearm during and relation to a crime of violence and possess a firearm in furtherance of such crime of violence.<br>(2s) | Life without the possibility of release. Special Assessment in the amount of $100.00. |
| 21:848(e)(1)(B): Intentionally killing, during the commission of a drug trafficking crime, a State Law Enforcement Officer, engaged in the performance of his official duties.<br>(3s) | Sentence of death. Special Assessment in the amount of $100.00. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:924(c)(1)(A) and (j) – Use and carry a firearm during and relation to drug trafficking crimes and possess a firearm in furtherance of such drug trafficking offenses, resulting in death<br>(1) | Dismissed on Government motion. |
| 18:924(c)(1)(A) and (j) – Use and carry a firearm during and relation to a crime of violence and possess a firearm in furtherance of such crime of violence<br>(2) | Dismissed on Government motion. |
| 21:848(e)(1)(B) – Intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties<br>(3) | Dismissed on Government motion. |

**Highest Offense Level**

**(Terminated)**

Felony

**Complaints**                                          **Disposition**

None

---

**Plaintiff**

| | | |
|---|---|---|
| **United States of America** | represented by | **Christopher J. Wilson** |

US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. Michael Littlefield**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
Email: mike.littlefield@usdoj.gov
*TERMINATED: 09/07/2007*
*LEAD ATTORNEY*

**Jeffrey B. Kahan**
US Department of Justice − Capital Case
Unit
1331 F St NW, Rm 345
Washington, DC 20530
202−305−8910
Fax: 202−353−9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/23/2004 | 1 | | COMPLAINT against Kenneth Eugene Barrett ; Counts 1 through 8 [ 6:04−m−100 ] (nrh, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/24/2004) |

| | | | |
|---|---|---|---|
| 09/23/2004 | | | ARREST Warrant issued for Kenneth Eugene Barrett by Mag. Judge Steven P. Shreder [ 6:04−m −100 ] (nrh, Deputy Clerk) (Entered: 09/24/2004) |
| 10/01/2004 | 2 | | APPLICATION for WRIT OF HABEAS CORPUS AD PROSEQUENDUM by plaintiff USA as to Kenneth Eugene Barrett to appear 10/25/04 at 10:00 a.m. [ 6:04−m −100 ] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/01/2004) |
| 10/04/2004 | 3 | | ORDER by Mag. Judge Steven P. Shreder granting plaintiff's application for WRIT OF HABEAS CORPUS AD PROSEQUENDUM [2−1] for Kenneth Eugene Barrett to appear 10/25/04 at 10:00 a.m. (cc: all counsel) [ 6:04−m −100 ] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/05/2004) |
| 10/04/2004 | | | WRIT OF HABEAS CORPUS AD PROSEQUENDUM issued for Kenneth Eugene Barrett to appear 10/25/04 at 10:00 a.m. [ 6:04−m −100 ] (cjt, Deputy Clerk) (Entered: 10/05/2004) |
| 10/25/2004 | 4 | | ARREST Warrant returned executed as to defendant Kenneth Eugene Barrett; defendant arrested on 10/22/04 [ 6:04−m −100 ] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/25/2004) |
| 10/25/2004 | | | INITIAL APPEARANCE MINUTES before Hon. Steven P. Shreder. Government present by U.S. Attorney Sheldon Sperling and Assistant U.S. Attorney D. Michael Littlefield. Defendant BARRETT present in person and by appointed counsel, John Echols. No objection by plaintiff to the financial affidavit and appointment of counsel. Court appoints, at the request of the Federal Public Defender, John Echols and Roger Hilfiger to represent defendant in this matter. Court Reporter: taped proceeding (S−1). Court Room Deputy: ct. Defendant acknowledged receipt of copy of Complaint and advised court he had discussed it with his attorney. Defendant advised of right to counsel and constitutional rights. Defendant advised the court he wished to waive his preliminary hearing. Waiver to be executed following these proceedings. Issue of bond is moot as defendant is here on a writ. Counsel for defendant's oral request that defendant remain in custody in Muskogee pending initial proceedings. Defendant is ordered detained pending further proceedings and remanded to custody of the U.S. Marshal. (SPS) [ 6:04−m −100 ] (cjt, Deputy Clerk) (Entered: 10/25/2004) |
| 10/25/2004 | 5 | | MINUTE ORDER before Mag. Judge Steven P. Shreder: The defendant Kenneth Eugene Barrett completed an affidavit as to financial ability to employ counsel on 10/25/04, and upon review, the Court finds that the affiant is financially unable to obtain counsel. In accordance with 21 U.S.C., Section 848(q)(4)(A)(i), and at the request of the Federal Public Defender's Office, John David Echols and Roger Hilfiger are hereby appointed to represent the defendant Kenneth Eugene Barrett in all proceedings herein. (SPS) (cc: all counsel) [ 6:04−m −100 ] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/25/2004) |
| 10/25/2004 | 6 | | WAIVER OF PRELIMINARY HEARING by defendant Kenneth Eugene Barrett [ 6:04−m −100 ] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/25/2004) |
| 10/25/2004 | 7 | | MINUTE ORDER before Mag. Judge Steven P. Shreder: The defendant, Kenneth Eugene Barrett, having waived preliminary hearing on 10/25/04, the court therefore finds probable cause to believe that a crime was committed and |

| | | | |
|---|---|---|---|
| | | | the defendant committed it and orders defendant bound over for further proceedings. (SPS) (cc: all counsel) [ 6:04–m –100 ] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/25/2004) |
| 10/25/2004 | | | CJA Form 30 (Appointment of Counsel John Echols) on behalf of defendnat Kenneth Barrett. (SPS 10/25/04) (smg, Deputy Clerk) (Entered: 11/18/2004) |
| 10/25/2004 | | | CJA Form 30 (Appointment of Counsel – Roger Hilfiger) on behalf of defendant Kenneth Eugene Barrett. (SPS 10/25/04) (smg, Deputy Clerk) Modified on 11/18/2004 (Entered: 11/18/2004) |
| 11/08/2004 | 8 | | AMENDED MINUTE ORDER before Mag. Judge Steven P. Shreder: The defendant Kenneth Eugene Barrett completed an affidavit as to financial ability to employ counsel on 10/25/04, and upon review, the Court finds that the affiant is financially unable to obtain counsel. In accordance with 21 U.S.C., Section 848(q)(4)(A)(i), John David Echols is hereby appointed at the request of the Federal Public Defender's Office, and, at the direction of the Court, Roger Hilfiger is hereby appointed to represent the defendant Kenneth Eugene Barrett in all proceedings herein. (SPS) (cc: all counsel) [ 6:04–m –100 ] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/08/2004) |
| 11/09/2004 | 9 | | INDICTMENT by USA Counts filed against Kenneth Eugene Barrett (1) count(s) 1, 2, 3 (trl, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/10/2004) |
| 11/09/2004 | | | ORDER by Judge Steven P. Shreder directing warrant of arrest be issued for defendant (SPS) (trl, Deputy Clerk) (Entered: 11/10/2004) |
| 11/09/2004 | | | ARREST Warrant issued for Kenneth Eugene Barrett (Copy of indictment & arraignment notice attached) (trl, Deputy Clerk) (Entered: 11/10/2004) |
| 11/09/2004 | | | NOTICE Arraignment set for 2:00 p.m. on 11/17/04 as to Kenneth Eugene Barrett before Judge Steven P. Shreder, 3rd Floor Hearing Room, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (trl, Deputy Clerk) (Entered: 11/10/2004) |
| 11/17/2004 | 10 | | APPEARANCE for defendant Kenneth Eugene Barrett by Attorney John David Echols (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/17/2004) |
| 11/17/2004 | 11 | | UNOPPOSED MOTION for permission to file motions and other pleadings regarding the funding of the defense under seal and to conduct all related hearings ex–parte and without notice to the government by defendant Kenneth Eugene Barrett (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/17/2004) |
| 11/17/2004 | | | ARRAIGNMENT MINUTES before Hon. Steven P. Shreder. Government present by Asst. U.S. Attorney D. Michael Littlefield. Defendant BARRETT present in person and with previously appointed counsel Roger Hilfiger and John David Echols. Court Reporter: km. Court Room Deputy: ct. Defendant acknowledges receipt of copy of indictment and read and discussed it with counsel. Defendant advised of constitutional rights, charges, possible penalties, and right to counsel, and is duly arraigned; not guilty plea entered as to counts 1, 2 and 3 of the indictment. Jury trial set for 1/3/05. The defendant has 11 days in which to file motions with government having 5 days to respond. Defendant's counsel advised they would be requesting additional time for jury trial. Defendant advised the court the issue of bond is moot. Defendant |

| | | | |
|---|---|---|---|
| | | | is remanded to custody of the U.S. Marshal. (SPS) (cjt, Deputy Clerk) (Entered: 11/18/2004) |
| 11/18/2004 | 12 | | ARREST Warrant returned executed as to Kenneth Eugene Barrett on 11/17/04 (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/19/2004) |
| 11/22/2004 | | | NOTICE: Jury Trial is set for 1/3/05 at 9:00 a.m. for Kenneth Eugene Barrett before Judge Ronald A. White at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (cjt, Deputy Clerk) (Entered: 11/22/2004) |
| 11/23/2004 | 13 | | ORDER by Judge Ronald A. White GRANTING defendant Barrett's unopposed motion for permission to file motions and other pleadings regarding funding of the defense under seal and to conduct all related hearings ex−parte and without notice to the government. [11−1] [11−2] (cc: all counsel) (nrh, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/23/2004) |
| 11/29/2004 | 14 | | JOINT MOTION for scheduling conference and a revised scheduling order based upon the complexity of this potentially capital case (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/29/2004) |
| 11/29/2004 | 15 | | UNOPPOSED MOTION for an order permitting his counsel to bring computers and related electronic equipment into the courthouse for use during hearings and/or trial by defendant Kenneth Eugene Barrett (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/29/2004) |
| 11/29/2004 | 16 | | FIRST EX PARTE MOTION for order concerning the funding of Mr. Barrett's defense filed under seal by defendant Kenneth Eugene Barrett (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/29/2004) |
| 11/30/2004 | 17 | | MINUTE ORDER before Judge Ronald A. White reassigning case to District Judge James H. Payne. (RAW) (cc: all counsel) (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/30/2004) |
| 12/01/2004 | 18 | | MINUTE ORDER before District Judge James H. Payne, Granting the Joint Application for Scheduling Conference, and SUSPENDING the motion deadlines and trial setting announced by the Magistrate Judge on 11/17/04. A Scheduling Conference is set 12/8/2004 at 9:30 a.m. before District Judge James H. Payne, Second Floor, South Courtroom, at the U.S. Courthouse, Fifth & Okmulgee Streets, Muskogee, Oklahoma. The Court will also take up, at that time, the motion of defendant for an order permitting his counsel to bring computers and related electronic equipment into the courthouse for use during hearings and/or trial. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/01/2004) |
| 12/01/2004 | 19 | | SEALED ORDER by District Judge James H. Payne regarding defendant's motion for order concerning the funding of Mr. Barrett's defense. (cc: defense counsel only) (pyb, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 12/01/2004) |
| 12/08/2004 | 20 | | SEALED MOTION by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 12/08/2004) |

| 12/08/2004 | 21 | | SEALED MINUTE ORDER before Mag. Judge Steven P. Shreder [20–1] (SPS) (cc: all counsel) (cjt, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV–09–105–JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 12/08/2004) |
|---|---|---|---|
| 12/08/2004 | | | SCHEDULING CONFERENCE: Government present by Assistant U.S.Attorney D. Michael Littlefield. Defendant Kenneth Eugene Barrett present in person and by appointed counsel John David Echols and Roger Hilfiger. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG) Court advises counsel that if a motion is a "joint" motion, then both government and defense counsel must sign it. Court directs that defense counsel file another motion regarding bringing in of computers, etc., and be specific as to exactly what counsel desires to bring in, the brand of the computer, printer, etc., the serial numbers, the names of the attorneys who will be using the equipment and exactly why these items are necessary and exactly what hearing or trial they will be used in. Court reminds counsel that photographs may not be taken, nor may counsel record anything in the courtroom. Statements of government regarding scheduling of trial and how long it will take to get certification to pursue the death penalty from the U.S.Attorney General, Litigation Section. Government counsel believes it will take through February, 2005 to get certification, and that trial would be best set in June of 2005. Statements of defense counsel regarding trial setting and motions that need to be addressed first regarding jurisdiction, double jeopardy, statute of limitations as to certain counts, and certain suppression issues. Counsel for defense believes June, 2005 is too early, especially if they are to be given the State Court Trial Transcript of the second trial. Court suggests some of these motions could be taken care of while awaiting decision of U.S.Attorney General regarding pursuit of death penalty. Court asks attorneys to consider joining Judge White during the juror qualifications for the death penalty, while Judge White qualifies a jury for a death penalty case. Perhaps the jurors could at least be qualified, generally, as to the death penalty issues, so that jury selection would be shorter in duration when Defendant Barrett's case is ready to try. Court advises that it will try to follow the actions taken by Judge Seay when he tried a death penalty case several years ago. Court directs that two Attorneys from the U.S.Attorney's office be assigned to this case, so there will be no delays, should one or the other not be able to continue or be present at certain hearings. ENTERING ORDER: Court takes the Scheduling under advisement and will enter a Scheduling Order hopefully by Friday, 12/10/04. (JHP) (pyb, Deputy Clerk) (Entered: 12/08/2004) |
| 12/09/2004 | | | SEALED BUDGET CONFERENCE MINUTES before Honorable Steven P. Shreder. Defendant BARRETT present by appointed counsel John David Echols. Law Clerk: sr. Courtroom Deputy: ct. Court Reporter: km. (SPS) (cjt, Deputy Clerk) (Entered: 12/13/2004) |
| 12/11/2004 | 22 | | SCHEDULING ORDER by District Judge James H. Payne: Defendant shall file all motions not related to death penalty issues by 1/7/05; Government response due 1/20/05. Government to file notice of intention to seek the death penalty by 2/15/05. If government files notice of intention to seek the death penalty, defendant shall have until 3/1/05 to file any motions related solely to death penalty issues and government shall respond by 3/15/05. All discovery shall be exchanged by 5/11/05. Requested Voir Dire and Jury Instructions are |

| | | | |
|---|---|---|---|
| | | | due 6/6/05. Trial Briefs shall be filed by 6/24/05, or defendant shall file a notice of intent to enter a plea by noon on 6/24/05. JURY TRIAL is set for 7/11/05 at 9:00 a.m. for Kenneth Eugene Barrett , before Hon. James H. Payne, Second Floor, South Courtroom, at the U. S. Courthouse, Fifth & Okmulgee Streets, Muskogee, Oklahoma. The time between 12/8/04 and 7/11/05 shall be excluded for purposes of calculating time within which the trial of teh offenses involved herein must commence for the reasons set forth above. 18 U.S.C. Section 3161(h)(8). (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/11/2004) |
| 12/29/2004 | 23 | | SECOND SEALED EX PARTE MOTION for Authorization to purchase a partial transcript of Mr. Barrett's 2004 State Court Jury Trial by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) Modified on 12/30/2004 (jcb, Deputy Clerk). (Entered: 12/29/2004) |
| 12/29/2004 | 24 | | THIRD SEALED EX PARTE MOTION for Approval of "Pre−Authorization" Budget for the defense by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/29/2004) |
| 12/30/2004 | 25 | | FOURTH EXPARTE (SEALED) MOTION for authorization for counsel to travel to Washington, D.C., for conference with the Attorney General's Representative concerning authorization for seeking the death penalty in this case by defendant Eugene Barrett (pyb, Deputy Clerk) Modified on 12/30/2004 (jcb, Deputy Clerk). (Entered: 12/30/2004) |
| 12/30/2004 | 26 | | SEALED MINUTE ORDER before District Judge James H. Payne GRANTING defendant's sealed ex parte motion for authorization for counsel to travel to Washington, D.C., for conference with the Attorney General's Representative concerning authorization for seeking the death penalty in this case [25−1] (JHP) (cc: defense counsel only) (pyb, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 12/30/2004) |
| 12/30/2004 | | | NOTICE: STATUS CONFERENCE is set for 1/7/05 at 11:00 a.m. for Kenneth Eugene Barrett before Judge James H. Payne, Second Floor, South Courtroom, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (pyb, Deputy Clerk) (Entered: 12/30/2004) |
| 01/06/2005 | 27 | | MINUTE ORDER before District Judge James H. Payne: Counsel are hereby advised that the Honorable Ronald A. White, U. S. District Court Judge, will qualify the jury panel which will be used to empanel a jury in this case. Counsel herein will be allowed to submit proposed jury questionnaires by 12:00 p.m. on January 11, 2005. This matter is hereby set for hearing regarding the jury questionnaires before Judge White, on January 14, 2005 at 9:00 a.m. The Court will mail out the final jury questionnaires on January 14, 2005, and the questionnaires will be due back by January 21, 2005. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/06/2005) |
| 01/07/2005 | 28 | | MOTION to dismiss the 11/9/04 Indictment, based upon the combined application of double jeopardy, collateral estoppel, and the statute of limitations , with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/07/2005) |
| 01/07/2005 | 29 | | |

| | | | |
|---|---|---|---|
| | | | MOTION to dismiss the 11/9/04 Indictment based upon the complete failure of the Government to follow the Petite Policy , with combined brief,by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/07/2005) |
| 01/07/2005 | 30 | | UNOPPOSED APPLICATION for extension of deadline for presenting defense motions not related to the death penalty by defendant Kenneth Eugene Barrett. No objection by the Government. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/07/2005) |
| 01/07/2005 | 31 | | MINUTE ORDER before District Judge James H. Payne: [30−1] Counsel failed to mention need for continuance to file motion to suppress even though he had filed Defendant's unopposed application for extension this morning at 9:22 a.m., immediately before the two scheduled hearings before this court. Such matters are appropriate issues for discussion at a status hearing as was set this morning. Reluctantly, the court will grant the motion and continue the filing deadline until January 12, 2005. Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel. Filing a motion for continuance on the date the pleadings are due is not acceptable and will not be tolerated in the future. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/07/2005) |
| 01/07/2005 | | | SEALED HEARING: Defendant's appointed counsel John Echols and Roger Hilfiger present. Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG. Hearing sealed by Order of the Court. Counsel agree that defendant's presence is not necessary. 10:15 a.m. to 11:15 a.m. (JHP) STATUS CONFERENCE: Government present by U.S.Attorney Sheldon Sperling, and Assistant U.S.Attorney D. Michael Littlefield. Defendant present by appointed counsel John Echols and Roger Hilfiger. Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG. Arguments of counsel regarding defense request to purchase transcript of second State Court trial of this defendant, and discussion held as to when, if granted, the transcript should be ordered. Government does not desire a transcript, but if defense is allowed to have same, then government would need a copy. Arguments of counsel for government and defendant as to the propriety of qualifying a death penalty jury by Judge White, for both Judge White's death penalty case and Judge Payne's death penalty case. Discussion also held as to how long it will actually take to be certified by the Attorney General for seeking the death penalty. Court is adised by defense counsel that it could take between 4 and 6 months. Government advises that their information is that it could be done in 90 days. Court advises that this fact may impact the ability of the Court and parties to actually try the case July 11, 2005, as well as the length of time it will take to get the State Court transcript, if allowed. Counsel advised that Judge White will have a hearing on 1/14/05 regarding jury questionnaires in the Fields death penalty case, and counsel in this case will be allowed to attend, if desired. ENTERING ORDER granting the parties until Wednesday, January 12, 2005, close of business, to file motions regarding death penalty jury qualifications. (JHP) Court will make a determination as soon as possible on the transcript issue. (JHP) (11:20 a.m. to 1:20 p.m.) (pyb, Deputy Clerk) (Entered: 01/07/2005) |
| 01/11/2005 | 32 | | MINUTE ORDER before District Judge James H. Payne: The deadline for submitting proposed jury questionnaires is extended to noon, February 11, |

| | | | |
|---|---|---|---|
| | | | 2005. Both parties shall submit proposed procedures regarding the qualification of the death penalty jury panel by March 11, 2005. Both parties shall submit trial briefs, which shall inter alia address anticipated evidentiary issues, by April 8, 2005. Both parties shall submit proposed jury instructions by May 13, 2005. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/11/2005) |
| 01/12/2005 | 33 | | MOTION to suppress evidence and statements , and for Jackson−Denno hearing with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Additional attachment(s) added on 1/25/2013: # 1 Main Document) (jcb, Deputy Clerk). (Entered: 01/12/2005) |
| 01/12/2005 | 34 | | MOTION for order to include copies of State Court Records as Addendum to defendant's motions to dismiss by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/12/2005) |
| 01/14/2005 | 35 | | MINUTE ORDER before District Judge James H. Payne granting motion of defendant Barrett for order to include copies of State Court Records as Addendum to defendant's motions to dismiss [34−1] (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/14/2005) |
| 01/14/2005 | 36 | | MINUTE ORDER before District Judge James H. Payne referring to Mag. Judge Steven P. Shreder the defendant's motion to suppress evidence and statements and for Jackson−Denno hearing [33−2], motion to dismiss the 11/9/04 Indictment based upon the complete failure of the Government to follow the Petite Policy [29−1], and the motion to dismiss the 11/9/04 Indictment, based upon the combined application of double jeopardy, collateral estoppel, and the statute of limitations [28−1], for hearings and Report and Recommendations. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/14/2005) |
| 01/18/2005 | | | NOTICE: Setting hearing on defendant Kenneth Eugene Barrett's motion to suppress evidence and statements and for Jackson−Denno hearing [33−2], motion to dismiss the 11/9/04 Indictment based upon the complete failure of the Government to follow the Petite Policy [29−1], and motion to dismiss the 11/9/04 Indictment, based upon the combined application of double jeopardy, collateral estoppel, and the statute of limitations [28−1] for 1/26/05 at 11:00 a.m. before Magistrate Judge Steven P. Shreder at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (cjt, Deputy Clerk) Modified on 01/18/2005 (Entered: 01/18/2005) |
| 01/19/2005 | 37 | | PRAECIPE by plaintiff USA and ISSUING 6 blank subpoenas for witnesses to appear on behalf of the government on 1/26/05 at 9:00 a.m., U.S.Cthse., Muskogee, Oklahoma. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/19/2005) |
| 01/19/2005 | 38 | | SEALED ORDER by Mag. Judge Steven P. Shreder re: defendant's Ex Parte Motion for Approval of "Pre−Authorization" Budget for the Defense [24−1] (cjt, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** |
| 01/24/2005 | 39 | | MOTION for leave to file responses out of time , and motion for extension of time to file responses by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/24/2005) |

| | | | |
|---|---|---|---|
| 01/24/2005 | 40 | | MINUTE ORDER before Mag. Judge Steven P. Shreder granting government's motion for leave to file responses out of time [39–1] [39–2] and extending the response deadlines to 1/25/05 at 12:00 Noon. (SPS) (cc: all counsel) (cjt, Deputy Clerk) Modified on 01/24/2005 (jcb, Deputy Clerk). (Entered: 01/24/2005) |
| 01/25/2005 | 41 | | RESPONSE by plaintiff USA to motion to dismiss the 11/9/04 Indictment based upon the complete failure of the Government to follow the Petite Policy [29–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/25/2005) |
| 01/25/2005 | 42 | | RESPONSE by plaintiff USA to motion to dismiss the 11/9/04 Indictment, based upon the combined application of double jeopardy, collateral estoppel, and the statute of limitations [28–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/25/2005) |
| 01/25/2005 | 43 | | RESPONSE by plaintiff USA to motion to suppress evidence and statements [33–1], and motion for Jackson–Denno hearing [33–2] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/25/2005) |
| 01/25/2005 | 44 | | FIRST REVISED MOTION for an order pemitting defendant counsel to bring computers and related electronic equipment into the Courthouse for use during hearings and/or trial by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/25/2005) |
| 01/25/2005 | 45 | | ORDER by District Judge James H. Payne granting defendant's First Revised motion for an order pemitting defendant counsel to bring computers and related electronic equipment into the Courthouse for use during hearings and/or trial [44–1], [15–1]. Counsel is reminded that none of the equipment brought into the courthouse should be used for recording purposes. (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 01/25/2005) |
| 01/26/2005 | | | MINUTES OF HEARING ON DEFENDANT'S MOTIONS TO DISMISS AND MOTION TO SUPPRESS before Honorable Steven P. Shreder. Plaintiff present by USA Sheldon Sperling and AUSA D. Michael Littlefield. Defendant BARRETT present in person and by appointed counsel John David Echols and Roger Hilfiger. Courtroom Deputy: ct. Court Reporter: km. Discussion of motions and discovery issues. Government's evidence. Defendant offers no further evidence. Parties rest. Court directed defendant to file replies to the government's responses by 2/11/05 and government has until 2/18/05 to file further responses if necessary. After reviewing the briefs of the parties, the Court will determine if additional evidence will need to be presented. (SPS) (cjt, Deputy Clerk) (Entered: 01/28/2005) |
| 01/31/2005 | 46 | | SEALED FIFTH EX PARTE MOTION concerning the funding of Mr. Barrett's Defense by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/01/2005) |
| 02/01/2005 | 47 | | SEALED ORDER by Mag. Judge Steven P. Shreder regarding defendant's Fifth Ex Parte Motion concerning the funding of Mr. Barrett's Defense [46–1] (cjt, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed in CIV–09–105–JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 02/01/2005) |
| 02/07/2005 | 48 | | MOTION to submit questionnaire to members of the jury panel by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: |

| | | | |
|---|---|---|---|
| | | | 02/07/2005) |
| 02/07/2005 | 49 | | MOTION to compel production of the identity of confidential informant and allowing discovery concerning the confidential informant by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/07/2005) |
| 02/07/2005 | 50 | | MOTION SIXTH EXPARTE (SEALED) concerning the funding of Mr. Barrett's defense by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/07/2005) |
| 02/07/2005 | 51 | | MOTION SEVENTH EXPARTE (SEALED) concerning the funding of Mr. Barrett's defense by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/07/2005) |
| 02/09/2005 | 52 | | SUPERSEDING indictment by USA; counts filed against Kenneth Eugene Barrett (1) count(s) 1s, 2s, 3s (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/09/2005) |
| 02/09/2005 | | | ORDER by Mag. Judge Steven P. Shreder for the issuance of a Warrant for the arrest of defendant Kenneth Eugene Barrett. (pyb, Deputy Clerk) (Entered: 02/09/2005) |
| 02/09/2005 | | | ARREST Warrant issued for Kenneth Eugene Barrett by Mag. Judge Steven P. Shreder (pyb, Deputy Clerk) (Entered: 02/09/2005) |
| 02/09/2005 | | | NOTICE: ARRAIGNMENT is set on the Superseding Indictment, for 2/15/05 at 2:00 p.m., as to Kenneth Eugene Barrett before U.S.Magistrate Judge Steven P. Shreder, Third Floor Hearing Room, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (pyb, Deputy Clerk) (Entered: 02/09/2005) |
| 02/11/2005 | 53 | | MOTION for leave to submit questionnaire to jury panel members by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/11/2005) |
| 02/11/2005 | 54 | | REPLY Brief by defendant Kenneth Eugene Barrett concerning the complete failure of the government to follow the Petite Policy [29–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/11/2005) |
| 02/11/2005 | 55 | | REPLY brief by defendant Kenneth Eugene Barrett concerning the combined application of double jeopardy, collateral estoppel, and the statute of limitations [28–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/11/2005) |
| 02/11/2005 | 56 | | REPLY brief by defendant Kenneth Eugene Barrett concerning the suppression of evidence and statements [33–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/11/2005) |
| 02/11/2005 | 57 | | EIGHTH SEALED, EX PARTE MOTION for order concerning the funding of Mr. Barrett's defense by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/11/2005) |
| 02/11/2005 | 58 | | MINUTE ORDER: At the direction of District Judge James H. Payne, it is hereby ordered that: Defendant Barrett's CJA20, APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL comes before the |

| | | | |
|---|---|---|---|
| | | | Court by John Echols and Roger Hilfiger. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original Application and supporting documents. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/11/2005) |
| 02/15/2005 | 59 | | NOTICE by plaintiff USA of intent to seek death penalty as to defendant Kenneth Eugene Barrett regarding Counts 1 and 2 of the Superseding Indictment. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/15/2005) |
| 02/15/2005 | 60 | | NOTICE by plaintiff USA of intent to seek death penalty as to defendant Kenneth Eugene Barrett regarding Count 3 of the Superseding Indictment. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/15/2005) |
| 02/15/2005 | | | ARRAIGNMENT ON SUPERSEDING INDICTMENT: Government present by Assistant U.S.Attorney D. Michael Littlefield. Defendant BARRETT present in person and by appointed counsel John D. Echols and Roger Hilfiger. (Before U.S.Magistrate Judge Steven P. Shreder. Courtroom Deputy PB. Taped proceeding: S−5.) Defendant acknowledges receipt of copy of Superseding Indictment, and has gone over same with counsel. Defendant advised of right to counsel, constitutional rights, charges and possible penalties, and is duly arraigned and enters a plea of not guilty as to counts 1, 2, and 3 of the Superseding Indictment. Defendant will have 11 days to file motions, with government having 5 days thereafter to respond. JURY TRIAL is set 7/11/05. Parties are ordered to file Requested Jury Instructions, Voir Dire, and Verdict forms by 5/13/05 at 12:00 noon, AND counsel must submit Trial Briefs or Notice of Intent to Plea by 4/8/05. Trial Briefs of each party should include the estimated length of trial and the number of anticipated witnesses. The defendant is to remain in the custody of the U.S.Marshal's Service. (SPS) (pyb, Deputy Clerk) Modified on 02/16/2005 (Entered: 02/15/2005) |
| 02/15/2005 | 421 | | NOTICE: JURY TRIAL on the Superseding Indictment is set 7/11/05 at 9:00 a.m. for KENNETH EUGENE BARRETT before Judge James H. Payne, South Courtroom, Second Floor, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK Parties are ordered to file Requested Jury Instructions, Voir Dire, and Verdict forms by 5/13/05 at 12:00 noon, AND counsel must submit Trial Briefs or Notice of Intent to Plea by 4/8/05. Trial Briefs of each party should include the estimated length of trial and the number of anticipated witnesses. (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/15/2005) |
| 02/16/2005 | 61 | | ARREST Warrant returned executed as to Kenneth Eugene Barrett on 2/15/05 (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/16/2005) |
| 02/16/2005 | 62 | | RESPONSE by plaintiff USA to motion to compel production of the identity of confidential informant [49−1], and motion allowing discovery concerning the confidential informant [49−2] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/16/2005) |
| 02/18/2005 | 63 | | SUR−REPLY by plaintiff to defendant's reply brief concerning the motion to suppress evidence and statements [33−1] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/22/2005) |

| | | | |
|---|---|---|---|
| 02/18/2005 | 64 | | SUR–REPLY by plaintiff to defendant's reply brief concerning the combined application of double jeopardy, collateral estoppel, and the statute of limitations [28–1] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/22/2005) |
| 02/18/2005 | 65 | | SUR–REPLY by plaintiff to defendant's reply brief concerning the complete failure of the Government to follow the Petite Policy [29–1] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/22/2005) |
| 02/22/2005 | 66 | | ORDER by District Judge James H. Payne denying defendant's motion to compel production of the identity of confidential informant [49–1], and denying motion allowing discovery concerning the confidential informant [49–2] (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/22/2005) |
| 02/22/2005 | | | SEALED LETTER (copy) from Hon. James H. Payne to defense counsel John David Echols regarding the eight ex parte budget requests. (pyb, Deputy Clerk) (Entered: 03/02/2005) |
| 02/24/2005 | 67 | | UNOPPOSED MOTION for extension of deadline for presenting defense motions concerning the death penalty by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/24/2005) |
| 02/25/2005 | 68 | | MINUTE ORDER before District Judge James H. Payne GRANTING defendant Barrett's motion for extension of deadline for presenting defense motions concerning the death penalty [67–1]: Accordingly, the deadline for filing motions concerning the death penalty is extended until 3/7/05, and Government's response will be due by 3/15/05. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/25/2005) |
| 02/28/2005 | | | SEALED LETTER from John David Echols to Hon. James H. Payne in answer to the 2/22/05 letter of Judge Payne regarding ex parte litigation budget requests. (pyb, Deputy Clerk) (Entered: 03/02/2005) |
| 03/07/2005 | 69 | | MOTION to Strike the "Future Dangerousness" aggravator from all counts as unconstitutionally vague , and alternative motion to subject this aggravator to a Daubert Hearing prior to allowing it to be presented at trial , with combined brief. by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) Modified on 03/12/2005 (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 70 | | MOTION to strike the death penalty notice , and for order to bar the death penalty for Count 3, based upon the limitations of 18 U.S.C. Section 3591 with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 71 | | MOTION to require the Government to elect as to all three counts among the alleged "Gateway" factors , with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 72 | | MOTION to strike the death penalty notices , and bar the death penalty for all counts based upon the lack of a nexus between the homicidal acts and the underlying drug offenses , with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 73 | | |

| | | | |
|---|---|---|---|
| | | | MOTION to strike the "Future Dangerousness" Aggravator from all counts, as unconstitutionally vague , and alternative motion to subject the Aggravator to a Daubert Hearing Prior to allowing it to be presented at trial with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 74 | | MOTION to strike the "Substantial Planning and Premeditation" Aggravator from all counts as a denial of due process of law , with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 75 | | MOTION to strike the "Victim Impact" Aggravator from all counts as a denial of due process of law , with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 76 | | MOTION to strike the "Grave Risk of Death to Additional Person[s]" aggravator from all counts as a denial of due process of law , with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 77 | | MOTION to strike the "Grave Risk of Death to Additional Person[s]" Aggravator from all counts as a denial of due process of law , with combined brief by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 78 | | MOTION to declare the Federal Death Penalty Scheme unconstitutional, and in violation of the Eighth Amendment prohibition against cruel and unusual punishment and as a violation of the Apprendi–Ring–Blakely Doctrine , with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) Modified on 03/10/2005 (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 79 | | MOTION to strike the death penalty notice as to all counts based upon his having been previously acquitted of having intentionally killed Mr. Eales, of having intentionally shot Mr. Hamilton with the intent to kill, and of having the intent to kill anyone else , with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) Modified on 03/10/2005 (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 80 | | MOTION for a bill of particulars concerning the Government's notices of intent to seek the death penalty and for similar notice under the Fifth and Sixth Amendments by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 81 | | BRIEF by defendant Kenneth Eugene Barrett in support of Mr. Barrett's motion for a Bill of Particulars concerning the Government's notices of intent to seek the death penalty and for similar notice under the Fifth and Sixth Amendments. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/07/2005 | 82 | | MINUTE ORDER before District Judge James H. Payne Referring the defendant's motions filed 3/7/05, pleading numbers 69 through 80, to U.S.Magistrate Judge Steven P. Shreder for hearings and Findings and Recommendations. (JHP) (cc: all counsel) (pyb, Deputy Clerk) Modified on 03/12/2005 (jcb, Deputy Clerk). (Entered: 03/07/2005) |
| 03/09/2005 | 83 | | |

| | | | |
|---|---|---|---|
| | | | UNOPPOSED APPLICATION for permission to file two motions out of time by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/09/2005) |
| 03/10/2005 | 84 | | MINUTE ORDER before District Judge James H. Payne granting defendant Barrett's motion for permission to file two motions out of time [83−1] (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/10/2005) |
| 03/10/2005 | 85 | | MOTION to strike the "Gateway" Aggravators alleging "Intentional" conduct from all counts as a denial of due process of law with combined brief, by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) Modified on 03/10/2005 (jcb, Deputy Clerk). (Entered: 03/10/2005) |
| 03/10/2005 | 86 | | MOTION to strike as to Counts One and Two the "Risk of Death to more than one Person" Aggravator which alleges only that Mr. Barrett acted "Knowingly" by defendant Kenneth Eugene Barrett with combined brief. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/10/2005) |
| 03/10/2005 | 87 | | MINUTE ORDER before District Judge James H. Payne Referring Defendant Barrett's Motions filed 3/10/05, pleadings numbered [85−1] and [86−1] to U.S.Magistrate Judge Steven P. Shreder for hearings and Findings and Recommendations. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/10/2005) |
| 03/10/2005 | 88 | | MOTION for extension of time in which to respond to "Death Penalty" motions of defendant Kenneth Eugene Barrett by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/10/2005) |
| 03/11/2005 | 89 | | MINUTE ORDER before Mag. Judge Steven P. Shreder granting government's motion for extension of time in which to respond to "Death Penalty" motions of defendant Kenneth Eugene Barrett. Accordingly, the government's response deadline is extended until 3/21/05 [86−1] [85−1] [80−1] [79−1] [78−1] [77−1] [76−1] [75−1] [74−1] [73−1] [73−2] [72−1] [72−2] [71−1] [70−1] [70−2] [69−1] [69−2]. (SPS) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/11/2005) |
| 03/11/2005 | 90 | | PROPOSED PROCEDURES for Jury Selection by defendant Barrett. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/12/2005) |
| 03/11/2005 | 91 | | UNOPPOSED MOTION for Second Scheduling Conference by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/12/2005) |
| 03/11/2005 | 92 | | MOTION for procedures for panel qualification and voir dire and inclusion of capital questions during Pretrial voir dire and Memorandum of Law in Support, by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/12/2005) |
| 03/12/2005 | 93 | | MINUTE ORDER: At the direction of District Judge James H. Payne, it is hereby ordered that: Defendant Barrett's CJA 30 Death Penalty Proceedings−−Appointment of and Authority to Pay Court Appointed Counsel, as to appointed counsel Roger Hilfiger, submitted 3/8/2005, is hereby REFERRED to U.S.Magistrate Judge Steven P. Shreder for hearings and |

| | | | |
|---|---|---|---|
| | | | Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate Judge said original Application and supporting documents. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/12/2005) |
| 03/14/2005 | 94 | | REPORT AND RECOMMENDATION recommending denial of defendant's motion to dismiss the 11/9/04 Indictment, based upon the combined application of double jeopardy, collateral estoppel, and statute of limitations, and defendant's motion to dismiss the 11/9/04 Indictment based upon the complete failure of the Government to follow the Petite Policy by Mag. Judge Steven P. Shreder (cc: all counsel, with receipts) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Additional attachment(s) added on 2/7/2013: # 1 main) (acg, Deputy Clerk). (Entered: 03/14/2005) |
| 03/15/2005 | 95 | | RECEIPT for Report and Recommendation of U.S. Magistrate Judge Shreder by plaintiff. Received 3/14/05. Objections due 3/28/05. (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/16/2005) |
| 03/17/2005 | 96 | | MINUTE ORDER: At the direction of District Judge James H. Payne, it is hereby ordered that Defendant Barrett's CJA 30 Death Penalty Proceedings−−Appointment of and Authority to Pay Court Appointed Counsel, as to appointed counsel John Echols, submitted 3/15/2005, is hereby REFERRED to U.S. Magistrate Judge Steven P. Shreder for hearings and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate Judge said original Application and supporting documents. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/17/2005) |
| 03/18/2005 | 97 | | SEALED ORDER by District Judge James H. Payne DENYING sealed motion of defendant numbered [57−1]; DENYING in part and GRANTING in part sealed motion of defendant numbered [51−1]; DENYING in part and GRANTING in part sealed motion of defendant numbered [50−1], and DENYING sealed motion of defendant numbered [23−1]; further finding moot sealed motions numbered 16 , 24 , and 46 . (cc: all counsel) (pyb, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 03/18/2005) |
| 03/18/2005 | 98 | | MINUTE ORDER before District Judge James H. Payne: This matter is hereby set for an additional ex parte hearing on the issue of defense counsel's need for a copy of the second state court trial transcript on 3/22/05 at 1:00 p.m. Immediately following said hearing, this Court will hold a second status and scheduling conference herein. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/18/2005) |
| 03/21/2005 | 103 | | RECEIPT by Defendant for Findings and Recommendation of U.S.Magistrate Judge Shreder filed 3/14/05. Received 3/16/05. Objections due 3/30/05. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/23/2005) |
| 03/22/2005 | 99 | | RESPONSE by plaintiff USA to motion to strike as to Counts One and Two the "Risk of Death to more than one Person" Aggravator which alleges only that Mr. Barrett acted "Knowingly" [86−1], motion to strike the "Gateway" Aggravators alleging "Intentional" conduct from all counts as a denial of due process of law [85−1], motion for a bill of particulars concerning the |

| | | | |
|---|---|---|---|
| | | | Government's notices of intent to seek the death penalty and for similar notice under the Fifth and Sixth Amendments [80–1], motion to strike the death penalty notice as to all counts based upon his having been previously acquitted of having intentionally killed Mr. Eales, of having intentionally shot Mr. Hamilton with the intent to kill, and of having the intent to kill anyone else [79–1], motion to declare the Federal Death Penalty Scheme unconstitutional, and in violation of the Eighth Amendment prohibition against cruel and unusual punishment and as a violation of the Apprendi–Ring–Blakely Doctrine [78–1], motion to strike the "Grave Risk of Death to Additional Person[s]" Aggravator from all counts as a denial of due process of law [77–1], motion to strike the "Grave Risk of Death to Additional Person[s]" aggravator from all counts as a denial of due process of law [76–1], motion to strike the "Victim Impact" Aggravator from all counts as a denial of due process of law [75–1], motion to strike the "Substantial Planning and Premeditation" Aggravator from all counts as a denial of due process of law [74–1], motion to strike the "Future Dangerousness" Aggravator from all counts, as unconstitutionally vague [73–1], motion to subject the Aggravator to a Daubert Hearing Prior to allowing it to be presented at trial [73–2], motion to strike the death penalty notices [72–1], motion bar the death penalty for all counts based upon the lack of a nexus between the homicidal acts and the underlying drug offenses [72–2], motion to require the Government to elect as to all three counts among the alleged "Gateway" factors [71–1], motion to strike the death penalty notice [70–1], motion for order to bar the death penalty for Count 3, based upon the limitations of 18 U.S.C. Section 3591 [70–2], motion to Strike the "Future Dangerousness" aggravator from all counts as unconstitutionally vague [69–1], motion to subject this aggravator to a Daubert Hearing prior to allowing it to be presented at trial [69–2] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/22/2005) |
| 03/22/2005 | | | SEALED HEARING: Defense counsel John D. Echols and Roger Hilfiger present. Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter Susan Sweeney. Law Clerk DG. Arguments of defense counsel. Request of counsel for extension of time on trial briefs, etc. Discussion held regarding the Court's order on the budget. ENTERING ORDER directing defendant to further brief the issues of this hearing by 4/4/05. Defendant to further brief the issues of the budget by 4/11/05. (JHP) Court will discuss the briefing deadlines, etc., with all counsel at the Status Conference which follows this hearing. (JHP) STATUS CONFERENCE: Government present by counsel D. Michael Littlefield, Assistant U.S.Attorney and U.S.Attorney Sheldon J. Sperling. Defense counsel Roger Hilfiger and John D. Echols present. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter Susan Sweeney. Law Clerk DG.) Discussion held as to briefing schedule and other schedules. Court will enter orders Striking jury trial and briefing deadlines. (See Minute Order following these minutes). The Court intends that the second state court transcript shall be ordered and should be completed in 60 days. The court plans to move the Jury Trial to August 1, 2005. The Court Reporter is to submit a statement to defense counsel, and defense counsel shall complete a CJA voucher and submit same to Court for approval, with the statement of the Court reporter. (JHP) (pyb, Deputy Clerk) (Entered: 03/23/2005) |
| 03/22/2005 | 100 | | ENTERING ORDER STRIKING the deadline for filing trial briefs or notice of intent to plea by 4/8/05, the deadline for discovery exchange of 5/11/05, and |

| | | | |
|---|---|---|---|
| | | | the deadline for submitting voir dire and requested jury instructions of 5/13/05. JURY TRIAL set 7/11/05 is hereby STRICKEN. The Court will enter a written Order resetting Jury Trial and deadlines. (JHP) (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/23/2005) |
| 03/23/2005 | 101 | | ORDER by District Judge James H. Payne setting the following REVISED SCHEDULES: All discovery shall be exchanged by June 10, 2005. Requested Voir Dire and Jury Instructions are due July 6, 2005. Trial Briefs shall be filed by July 22, 2005, or the defendant shall file a notice of intent to enter a plea by noon on July 22, 2005. JURY TRIAL is set for 8/1/05 at 9:00 a.m. for Kenneth Eugene Barrett , before Hon. James H. Payne, Second Floor, South Courtroom, U.S. Courthouse, Fifth & Okmulgee Streets, Muskogee, OK. Court finds the interests of justice are better served by delaying the trial, and the time between 7/11/05 and 8/1/05 shall be excluded. (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/23/2005) |
| 03/23/2005 | 102 | | SEALED ORDER by District Judge James H. Payne reconsidering defendant's Ex Parte Motion for Authorization to Purchase a Partial Transcript of Defendant's 2004 State court Jury Trial. Court authorizes purchase of transcript. (cc: all counsel) (pyb, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 03/23/2005) |
| 03/30/2005 | 104 | | OBJECTIONS by defendant to Magistrate Shreder's 3/14/05 Report and Recommendation concerning, Inter Alia, the Petit Policy and Double Jeopardy [94−1] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 03/30/2005) |
| 04/01/2005 | 105 | | REPORT AND RECOMMENDATION recommending denial of the motion to suppress evidence and statements, except as to the guns seized under but not specified in the drug search warrant, with regard to which the motion should be granted by Mag. Judge Steven P. Shreder (cc: all counsel, with receipts) (cjt, Deputy Clerk) Modified on 04/01/2005 (jcb, Deputy Clerk). (Entered: 04/01/2005) |
| 04/01/2005 | 106 | | SEALED REPORT AND RECOMMENDATION on interim requests for attorneys' fees and costs by Mag. Judge Steven P. Shreder (cc: defendant's counsel with receipts) (cjt, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 04/01/2005) |
| 04/04/2005 | 107 | | MOTION NINTH EXPARTE (SEALED) concerning the funding of Mr. Barrett's defense by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/05/2005) |
| 04/04/2005 | 108 | | RECEIPT by plaintiff for Report and Recommendation of U.S. Magistrate Judge Shreder filed 4/1/05. Received 4/1/05. Objections due 4/15/05. (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/05/2005) |
| 04/06/2005 | 109 | | RECEIPT for defendant as to Attorney Hilfiger for Report and Recommendation on Request for Compensation of U.S. Magistrate Judge Shreder filed 4/1/05. Received 4/4/05. Objections due 4/18/05. (cjt, Deputy Clerk) Modified on 04/06/2005 (jcb, Deputy Clerk). (Entered: 04/06/2005) |

| | | | |
|---|---|---|---|
| 04/06/2005 | 110 | | RECEIPT by defendant for Report and Recommendation of U.S. Magistrate Judge Shreder filed 4/1/05. Received 4/5/05. Objections due 4/19/05. (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/06/2005) |
| 04/06/2005 | 111 | | RECEIPT for defendant as to Attorney Echols for Report and Recommendation on Request for Compensation of U.S. Magistrate Judge Shreder filed 4/1/05. Received 4/5/05. Objections due 4/19/05. (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/06/2005) |
| 04/06/2005 | 112 | | ADDENDUM to 4/4/05 NINTH EX PARTE MOTION concerning funding by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/06/2005) |
| 04/06/2005 | 113 | | MOTION TENTH EXPARTE (SEALED) concerning the funding by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/06/2005) |
| 04/07/2005 | 114 | | RESPONSE by plaintiff to defendant's objection to Magistrate Shreder's 3/14/05 Report and Recommendation [94−1] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/08/2005) |
| 04/13/2005 | 115 | | ORDER by District Judge James H. Payne adopting the REPORT AND RECOMMENDATION of U.S.Magistrate Judge recommending denial of defendant's motion to dismiss the 11/9/04 Indictment, based upon the combined application of double jeopardy, collateral estoppel, and statute of limitations, and defendant's motion to dismiss the 11/9/04 Indictment based upon the complete failure of the Government to follow the Petite Policy [94−1], and denying defendant's motion to dismiss the 11/9/04 Indictment based upon the complete failure of the Government to the Petite Policy [29−1], and denying motion to dismiss the 11/9/04 Indictment, based upon the combined application of double jeopardy, collateral estoppel, and the statute of limitations [28−1] (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Additional attachment(s) added on 2/7/2013: # 1 main) (acg, Deputy Clerk). (Entered: 04/13/2005) |
| 04/14/2005 | 116 | | SEALED APPLICATION for ex parte conference on defense budget and funding by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) Modified on 04/15/2005 (jcb, Deputy Clerk). (Entered: 04/15/2005) |
| 04/19/2005 | 117 | | OBJECTIONS by defendant to Magistrate Shreder's 4/1/05 Report and Recommendation concerning defendant's motion to suppress [105−1] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/20/2005) |
| 04/19/2005 | 118 | | MOTION EXPARTE (SEALED) ELEVENTH concerning funding of defendant's defense by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/20/2005) |
| 04/25/2005 | 119 | | MINUTE ORDER: At the direction of District Judge James H. Payne, it is hereby ordered that: Defendant KENNETH EUGENE BARRETT's CJA20, APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL as to Roger Hilfiger, submitted 4/9/05 by counsel, comes before the Court. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original Application and supporting documents. (JHP) (cc: |

| | | | |
|---|---|---|---|
| | | | all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/25/2005) |
| 04/26/2005 | 120 | | MINUTE ORDER before District Judge James H. Payne STRIKING defendant's motion to strike the "Future Dangerousness" Aggravator from all counts, as unconstitutionally vague and alternative motion to subject the Aggravator to a Daubert Hearing Prior to allowing it to be presented at trial, pleading #73, as it is identical to defendant's motion filed on the same date, and numbered pleading #69. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/26/2005) |
| 04/26/2005 | 121 | | MINUTE ORDER: Directing defense counsel to review defendant's motions numbered 76 and 77 (copy attached hereto) and advise the Court if the two motions are actually separate motions, or if they are the same. The wording in both motions is identical, down through paragraph 7 on page 2, and the wording is slightly different after paragraph 7. Counsel is to advise if, perhaps, it was intended that only one of these motions be filed. Counsel is directed to advise the Court if this is the case, and advise which motion is to be the remaining motion, or if both are necessary. This advice to the Court should be submitted by 5/5/05. advise the Court (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/26/2005) |
| 04/26/2005 | 122 | | RESPONSE by plaintiff USA to Defendant Barrett's Objection to Magistrate Shreder's 4/1/05 Report and Recommendation concerning defendant's motion to suppress [117−1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/26/2005) |
| 04/28/2005 | 123 | | SEALED MINUTE ORDER before Mag. Judge Steven P. Shreder regarding [119−1]. (SPS) (cc: all counsel) (cjt, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 04/28/2005) |
| 05/05/2005 | 124 | | ORDER by District Judge James H. Payne adopting and affirming the Magistrate Judge's REPORT AND RECOMMENDATION and Ordering that the Defendant Kenneth Eugene Barrett's Motion to Suppress Evidence and Statements and for a Jackson−Denno Hearing [Docket No. 33] is denied, except as to the guns seized under but not specified in the drug search warrant, with regard to which the motion is granted. 105 (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Additional attachment(s) added on 2/7/2013: # 1 main) (acg, Deputy Clerk). (Entered: 05/05/2005) |
| 05/05/2005 | 125 | | NOTICE by defendant Kenneth Eugene Barrett regarding Duplicate Pleadings. Pleading Number 77 is a draft of Pleading Number 76 and, therefore, only Pleading Number 76 should be ruled on. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/05/2005) |
| 05/05/2005 | 127 | | MINUTE ORDER before District Judge James H. Payne: Pursuant to Notice Regarding Duplicate Pleadings, the defendant's motion to strike the "Grave Risk of Death to Additional Person[s]" Aggravator from all counts as a denial of due process of law [Docket No. 77−1] is STRICKEN, as same is a duplicate of defendant's Motion filed same date as Docket Number 76. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/05/2005) |
| 05/05/2005 | 128 | | SEALED ORDER by District Judge James H. Payne adopting the U.S. Magistrate's SEALED REPORT AND RECOMMENDATION on interim |

| | | | |
|---|---|---|---|
| | | | requests for attorneys' fees and costs [106−1], DENYING defendant's NINTH EXPARTE (SEALED) Motion [107−1], GRANTING defendant's motion TENTH EXPARTE (SEALED) and allowing John Echols to withdraw [113−1], DENYING defendant's EXPARTE (SEALED) ELEVENTH Motion [118−1], DENYING defendant's motion for ex parte conference on defense budget and funding [116−1] and [126−1] (cc: all counsel) (pyb, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 05/05/2005) |
| 05/05/2005 | | | SEALED TELEPHONE CONFERENCE: Roger Hilfiger, appointed counsel for defendant Barrett, present. Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter MB. Law Clerk DG. 4:10 p.m. to 4:25 p.m. Court and counsel discuss future procedures in light of Orders entered this date. (JHP) (pyb, Deputy Clerk) Modified on 05/06/2005 (Entered: 05/06/2005) |
| 05/05/2005 | | | CJA Form 30 (Attorney Payment Voucher − Roger Hilfiger) as to Kenneth Eugene Barrett (Interim #1)(JHP 5/5/05) (smg, Deputy Clerk) (Entered: 05/09/2005) |
| 05/05/2005 | | | CJA Form 30 (Attorney Payment Voucher − Roger Hilfiger) as to Kenneth Eugene Barrett (Interim #2)(JHP 5/5/05) (smg, Deputy Clerk) (Entered: 05/09/2005) |
| 05/05/2005 | | | CJA Form 30 (Attorney Payment Voucher − Roger Hilfiger) as to Kenneth Eugene Barrett (Interim #3)(JHP 5/5/05) (smg, Deputy Clerk) (Entered: 05/09/2005) |
| 05/05/2005 | | | CJA Form 30 (Attorney Payment Voucher − John Echols) as to Kenneth Eugene Barrett (Interim #1)(JHP 5/5/05) (smg, Deputy Clerk) (Entered: 05/09/2005) |
| 05/05/2005 | | | CJA Form 30 (Attorney Payment Voucher − John Echols) as to Kenneth Eugene Barrett (Interim #2)(JHP 5/5/05) (smg, Deputy Clerk) (Entered: 05/09/2005) |
| 05/06/2005 | 129 | | SEALED MINUTE ORDER before District Judge James H. Payne regarding Sealed Minute Order [123−1], entered on 4/28/05, and Sealed Minute Order [119−1], entered on 4/25/05. (JHP) (cc: all counsel) (pyb, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 05/06/2005) |
| 05/13/2005 | 130 | | MINUTE ORDER before District Judge James H. Payne Appointing Bret Allan Smith as co−counsel for defendant Kenneth Eugene Barrett (written order to follow). (JHP) (cc: all counsel) (nrh, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/13/2005) |
| 05/13/2005 | 131 | | MINUTE ORDER before District Judge James H. Payne SETTING status conference on 5/18/05 at 12:00 noon as to Kenneth Eugene Barrett, to be held in chambers. All counsel of record are directed to be present. However, defendant Barrett does not need to be present for this conference. (JHP) (cc: all counsel) (nrh, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/13/2005) |
| 05/13/2005 | | | |

| | | | |
|---|---|---|---|
| | | | AMENDED NOTICE: The STATUS CONFERENCE set for 5/18/05 at 12:00 noon, for Kenneth Eugene Barrett before Judge James H. Payne, WILL BE HELD IN THE SOUTH COURTROOM, Second Floor, rather than in chambers, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK. Defendant Barrett does not need to be present for this conference. (cc: all counsel) (pyb, Deputy Clerk) (Entered: 05/13/2005) |
| 05/13/2005 | 132 | | MOTION for Change of Appointed Counsel by defendant Kenneth Eugene Barrett (Handwritten Motion by defendant. Copies to Government and present Counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/14/2005) |
| 05/13/2005 | | | CJA Form 30 (Attorney Payment Voucher – Roger Hilfiger) as to Kenneth Eugene Barrett (5/13/05)(Interim #4) (smg, Deputy Clerk) (Entered: 05/26/2005) |
| 05/13/2005 | | | CJA Form 30 (Appointment of Counsel Bret A. Smith) on behalf of defendant Kenneth Eugene Barrett. (JHP 5/13/05) (smg, Deputy Clerk) (Entered: 06/15/2005) |
| 05/17/2005 | 133 | | SEALED ORDER by District Judge James H. Payne re: appointment of Brett Alan Smith as co–counsel for defendant Barrett. (cc: Defense counsel and faxed) (pyb, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV–09–105–JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 05/17/2005) |
| 05/18/2005 | | | STATUS CONFERENCE before Judge James H. Payne. Plaintiff present by counsel D. Michael Littlefield, Assistant U.S. Attorney and Sheldon J. Sperling, U.S. Attorney. Defendant KENNETH EUGENE BARRETT not present in person however present by appointed counsel Roger Hilfiger and Bret Allan Smith. Courtroom deputy: lw. Court reporter: mb. Court announced Bret Smith has been appointed as counsel in light of the withdrawal of Mr. Echols with Mr. Hilfiger to be designated as lead counsel and Mr. Smith to be designated as co–counsel. Court addressed jury panel qualification currently set for 7/5/05 in another death penalty case pending in this district. Court inquired of counsel as to their response to conducting the qualification of the panel as to that case and this case with selection of the juries to follow qualification in each case. Plaintiff responded with its concerns and requested each case be treated separately from the beginning with qualification to its conclusion. Plaintiff also advised Court of scheduling conflict U.S. Attorney Sperling would have as he is counsel of record in both cases. Defendant responded with his concerns including jury panel being qualified and jury selected 30 to 60 days prior to this case going to trial. Plaintiff agreed with this concern. Court addressed current schedule and inquired as to the status of the preparation of the state proceedings transcripts. Defendant advised the state court reporter stated that a lot of the work might have to be contracted out, that the court reporter was concerned about payment of this additional expense and that it may be the middle to the end of June before the transcripts are completed. Court advised counsel if the problem is payment that could be worked out and directed counsel to advise the court reporter. Defendant anticipated he will not be ready for trial until September, 2005. Plaintiff was not opposed to September, 2005 trial setting. Court inquired as to estimate of trial time. Plaintiff estimated 3 to 4 weeks Stage One. Defendant agreed with this estimate. Court advised at this time it intends to see that jury qualification |

| | | | |
|---|---|---|---|
| | | | is conducted as to both death penalty cases beginning 7/5/05. Court further advised it will consider issues addressed today surrounding jury selection. Court advised it had reviewed the juror questionnaire proposed by Judge White and finds it is in conformity with the submissions from counsel in this case. Court advised if they wished to brief any of the issues addressed today regarding jury qualification and jury selection that they may do so by 5/25/05. Court addressed pending pro se motion by defendant for change of appointed counsel. Court defendant's counsel to meet with defendant and advise the Court. If the Court finds a hearing is necessary, it will set one at that time. Additionally, Court addressed pending motions that had been referred to the magistrate and Findings should be forthcoming. Court addressed pending motions regarding the juror questionnaire and finds those requests had been met with the proposed juror Motions GRANTED. (JHP) Court advised it would entertain motion for continuance of trial and requested counsel to address issue of speedy trial if such a motion should be submitted. Plaintiff inquired as to extension of other pending deadlines. Court responded it would entertain a motion for that as well. (JHP) (law, Deputy Clerk) Modified on 05/25/2005 (Entered: 05/18/2005) |
| 05/18/2005 | 134 | | MINUTE ORDER before District Judge James H. Payne: Pursuant to the announcement in open court, defendant's motion to submit questionnaire to members of the jury panel filed 2/7/05 [48–1], plaintiff's motion for leave to submit questionnaire to jury panel members filed 2/11/05 [53–1] and the plaintiff's motion for procedures for panel qualification and voir dire and inclusion of capital questions during pretrial voir dire filed 3/11/05 [92–1], as it relates to panel qualification, are hereby GRANTED. The juror questionnaire prepared by the court will be utilized as it incorporates all questions necessary to adequately qualify a death penalty jury panel. (JHP) (cc: all counsel) (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/18/2005) |
| 05/23/2005 | 135 | | MOTION pro se for Change of Appointed Counsel by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/23/2005) |
| 05/23/2005 | 136 | | MINUTE ORDER before District Judge James H. Payne denying as moot, defendant's motion for Change of Appointed Counsel [132–1] filed 5/13/05, in light of the new motion by defendant filed this date, pleading #135. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/23/2005) |
| 05/24/2005 | 137 | | ORDER by District Judge James H. Payne denying defendant Barrett's pro se motion for Change of Appointed Counsel [135–1] (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/24/2005) |
| 05/26/2005 | 138 | | MOTION for Continuance of Jury Trial by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/27/2005) |
| 06/01/2005 | | | NOTICE: HEARING set for 6/6/05 at 4:00 p.m. on Motion of Defendant Kenneth Eugene Barrett to continue jury trial 138 before Judge James H. Payne, Second Floor, South Courtroom, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (pyb, Deputy Clerk) (Entered: 06/01/2005) |
| 06/02/2005 | | | |

| | | | |
|---|---|---|---|
| | | | TELEPHONE CONFERENCE CALL: Before Hon. James H. Payne. Courtroom Deputy PB (by telephone). Court Reporter: Glen Darrough. Law Clerk Denise Graham. Government present by telephone, by D. Michael Littlefield, Assistant U.S.Attorney. U.S.Attorney Sheldon Sperling, not present. Defense counsel Roger Hilfiger and Bret A. Smith present, also by telephone. Defendant not present. Court advises counsel that the purpose of this telephone conference is to discuss the juror questionnaires mailed by Judge White for his death penalty case and for this death penalty case. Copies of the questionnaires that have been submitted to date are now available for counsel. Court advised counsel that the privacy of the jurors was of utmost importance. One set will be given to defense counsel, and Roger Hilfiger will keep them in his office and be responsible for them. The Court instructs the Clerk to release the juror questionnaire copies this date to counsel for defendant and for the government. There are approximately 200 ready for distribution. The Court instructs counsel that the questionnaires are not to be allowed outside of the offices of Roger Hilfiger and Michael Littlefield. Court referred to the letter which Judge White sent out with the questionnaires, and noted that Judge White was cautious in advising the potential jurors that the information they are supplying is going to be protected by the Court from the public. The purpose of this restrictive use of the questionnaires is to protect the privacy of those selected for jury duty. Counsel will be responsible for preserving these questionnaires until the trial is completed. At the completion of the trial, counsel are directed to return the questionnaires to the Court Clerk for possible destruction. Counsel for govt. and deft. requested that the Court allow them to maintain the questionnaires until all avenues of appeal have been exhausted. Court not inclined to do that, but will keep the original questionnaires and should the need arise, counsel may make motion for the Court to reproduce the questionnaire needed for appellate purposes. Counsel for govt. and deft. do not object to returning the questionnaires at end of trial, as long as they may make such motion to have them reproduced if needed during the appeal process. Roger Hilfiger advises that Mr. Smith has talked to defendant, Mr. Barrett, and he is cooperating with them again. Court still wants to have the hearing Monday, 6/6/05 at 4:00 p.m. All counsel will be present. Question as to whether or not to return defendant to O.S.P. in McAlester, Oklahoma. Court and counsel agree that defendant will be needed during voir dire and jury qualification of Judge White's death penalty case in July, and that defendant should remain in Muskogee. Court directs Clerk to call U.S.Marshal's office and advise them that defendant needs to stay in Muskogee, and that an order can be entered if necessary. Court advises that Judge White will do the qualification for defendant Barrett as well as defendant Fields in July, as to the death penalty issue only, but that the actual jury selection for the Barrett case will take place at time of trial for defendant Barrett, and will be taken from the panel qualified in July, 2005. Telephone conference concluded. (JHP) (pyb, Deputy Clerk) (Entered: 06/02/2005) |
| 06/02/2005 | 139 | | ENTRY OF APPEARANCE for defendant Kenneth Eugene Barrett by Attorney Bret A. Smith. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 06/03/2005) |
| 06/06/2005 | 140 | | ORDER REGARDING JUROR QUALIFICATION PROCESS by District Judge James H. Payne (cc: all counsel and faxed to all counsel, including counsel in CR−03−73−WH, USA vs. Fields) (pyb, Deputy Clerk) (jcb, Deputy |

| | | | |
|---|---|---|---|
| | | | Clerk). (Entered: 06/07/2005) |
| 06/06/2005 | | | HEARING ON DEFENDANT'S MOTION TO CONTINUE TRIAL: Government present by Assistant U.S.Attorney D. Michael Littlefield. Defendant KENNETH EUGENE BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter GW. Law Clerk DG) Court addressed the motion of defendant to continue trial and questioned defendant as to whether or not the problems that had occurred between defendant and counsel had been resolved, and defendant advised he was cooperating with counsel and speaking with them. Court admonishes defendant to continue to cooperate with counsel, as it is vital to his defense. Defense counsel advises that the work done by the Court Reporter, Mr. Woods, on the state court transcript to date failed due to a malfunction in his equipment. He has obtained other equipment and hired a person to help him. There are eight days of testimony of witnesses which have been ordered and Mr. Woods believes he can have it done before the end of the month, but Mr. Hilfiger believes it will be the end of June if that soon as Mr. Woods has other jobs to do as well. Arguments of counsel regarding delay of trial. Government advises of the need for Mr. Sperling to be off September 2 and 3, 2005. Court will direct counsel to contact court reporter and get the transcript started, and advise him that vouchers for payment of the transcript will be approved upon receipt. Court inquires as to whether or not defendant will be willing to sign a Waiver of Speedy Trial. Defendant will agree. Court will continue the trial as follows: Defendant to submit his waiver of speedy trial. Jury selection will begin August 29, 2005 at 9:00 a.m. and the actual jury trial will be continued until September 6, 2005.Counsel should be receiving an Order by the Court tomorrow advising of the procedure for qualifying the jury panel for a death penalty case in this case and in the death penalty case before Judge White. Individual questioning of jurors will take place in a sealed courtroom. Twenty jurors a day will be qualified to serve in a capital case. Counsel inquired if the current deadlines for trial briefs, etc. will remain. Court directs counsel to check the deadlines and file a motion to extend these deadlines, if needed. Defense advises that the court reporter in the state court case will give them a witness list and the day that the witnesses testified. Transcript may just be given complete to counsel, rather than in separate parts as it is completed. Court will allow Sheldon Sperling to be away September 2, 2005, and will allow Mr. Littlefield to proceed with further jury selection, if the process has not been completed by that time. (JHP) (pyb, Deputy Clerk) (Entered: 06/07/2005) |
| 06/07/2005 | 141 | | WAIVER OF A SPEEDY TRIAL by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 06/08/2005) |
| 06/08/2005 | 142 | | MINUTE ORDER: By District Judge James H. Payne: Defendant's Motion for Continuance of Jury Trial is hereby GRANTED. 138 The availability of death as a potential penalty for the charged counts impose significant additional duties and responsibilities upon the parties. The public interest will best be served by ensuring the defendant's trial complies with all of the requirements of due process. JURY TRIAL set 8/1/05 is HEREBY STRICKEN AND RESET AS FOLLOWS: Jury Selection and qualification will begin August 29, 2005, at 9:00 a.m., and continue until a jury has been selected. Actual Jury Trial will begin September 6, 2005, at 9:00 a.m. All before Hon. James H. |

| | | | |
|---|---|---|---|
| | | | Payne, South Courtroom, Second Floor, at the U. S. Courthouse, Fifth & Okmulgee Streets, Muskogee, Oklahoma. The time between August 1, 2005, and August 29, 2005, shall be excluded for purposes of calculating time within which the trial of the offenses involved herein must commence. 18 U.S.C. Section 3161(h)(8). (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 06/08/2005) |
| 06/10/2005 | 143 | | MOTION to reset schedule dates by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 06/10/2005) |
| 06/14/2005 | 144 | | MINUTE ORDER before District Judge James H. Payne GRANTING Defendant's motion to reset schedule dates [143–1]: Accordingly, the following schedules are hereby entered: Discovery cut–off date is now July 12, 2005; Requested Instructions are now due August 5, 2005, and Trial Briefs are now due August 22, 2005. (JHP) (cc: all counsel) (seal) Modified on 06/14/2005 (jcb, Deputy Clerk). (Entered: 06/14/2005) |
| 06/27/2005 | 145 | | MOTION for Reconsideration of the Court's Order Regarding Juror Qualification Process by plaintiff USA as to Kenneth Eugene Barrett (nrh, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 06/27/2005) |
| 06/27/2005 | 146 | | MINUTE ORDER before District Judge James H. Payne Government's Motion for Reconsideration of the Court's Order Regarding Juror Qualification Process filed 6/27/05 (Docket Entry #148) is GRANTED. Upon reconsideration, the Court hererby resets the juror qualification process in this matter to begin 8/29/05 at 9:00 a.m., with jury selection and trial to follow immediately thereafter. Further, a status conference will be held on 7/15/05 at 10:30 a.m. in the before Judge James H. Payne, 2nd floor south courtroom at the U. S. Courthouse, 101 N. 5th, Muskogee, OK. [145–1] (JHP) (cc: all counsel) (nrh, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 06/27/2005) |
| 06/28/2005 | 147 | | REPORT AND RECOMMENDATION by U.S.Magistrate Judge Steven P. Shreder, recommending denial of defendant's motions as follows: 86 Motion to strike as to Counts One and Two the "Risk of to more than one Person" Aggravator which alleges only that Mr. Barrett acted "Knowingly"; 85 Motion to strike the "Gateway" Aggravators alleging "Intentional" conduct from all counts as a denial of due process of law; 80 : Motion for a bill of particulars concerning the Government's notices of intent to seek the death penalty and for similar notice under the Fifth and Sixth Amendments; 79 Motion to strike the death penalty notice as to all counts based upon his having been previously acquitted of having intentionally killed Eales, of having intentionally shot Mr. Hamilton with the intent to kill, and of having the intent to kill anyone else; 78 Motion to declare the Federal Death Penalty Scheme unconstitutional, and in violation of the Eighth Amendment prohibition against cruel and unusual punishment and as a violation of the Apprendi–Ring–Blakely Doctrine; 76 Motion to strike the "Grave Risk of Death to Additional Person[s]" aggravator from all counts as a denial of due process of law; 75 Motion to strike the "Victim Impact" Aggravator from all counts as a denial of due process of law; 74 Motion to strike the "Substantial Planning and Premeditation" Aggravator from all counts as a denial of due process of law; 72 Mmotion to strike the death penalty notices, and motion to bar the death penalty for all counts based upon the lack of a nexus between the homicidal acts and the underlying drug offenses; 71 Motion to require the Government to elect as to all three counts |

| | | | |
|---|---|---|---|
| | | | among the alleged "Gateway" factors; <u>70</u> Motion to strike the death penalty notice, and motion for order to bar the death penalty for Count 3, based upon the limitations 18 U.S.C. Section 3591; <u>69</u> Motion to Strike the "Future Dangerousness" aggravator from all counts as unconstitutionally vague, and motion to subject this aggravator to a Daubert Hearing prior to allowing it to be presented trial ; parties have ten (10) days to file objections from date of receipt of the Report and Recommendation. (cc: all counsel, and faxed to all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 06/29/2005) |
| 06/30/2005 | <u>148</u> | | RECEIPT by Government of copy of Report and Recommendation of Judge Shreder, filed 6/28/05. Received 6/29/05. Objections by Government due 7/15/05. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 06/30/2005) |
| 07/07/2005 | <u>149</u> | | PRAECIPE AND ISSUING 50 blank subpoenaes by plaintiff USA , for witnesses to appear 8/29/05 at 9:00 a.m., on behalf of Government, U.S.Cthse., Muskogee, OK. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/07/2005) |
| 07/07/2005 | <u>150</u> | | RECEIPT by defendant of copy of Report and Recommendation of U.S.Magistrate Judge Steven P. Shreder, filed 6/28/05. Deft. Received same on 6/30/05. Objections due 7/15/05. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/07/2005) |
| 07/08/2005 | | | CJA Form 30 (Attorney Payment Voucher – Roger Hilfiger) as to Kenneth Eugene Barrett (Interim #5)(JHP 7/8/05) (smg, Deputy Clerk) (Entered: 09/06/2005) |
| 07/12/2005 | <u>151</u> | | RECEIPT by defense counsel of copy of Report and Recommendation of U.S.Magistrate Judge Steven P. Shreder, filed 6/28/05. Received 7/5/05. Objections due 7/19/05. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/12/2005) |
| 07/12/2005 | <u>152</u> | | OBJECTIONS by defendant Kenneth Eugene Barrett regarding Magistrate Shreder's June 28, 2005 Report and Recommendation concerning Defendant's motions challenging the Federal Death Penalty [147–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/12/2005) |
| 07/15/2005 | | | STATUS CONFERENCE: Government present by Assistant U.S.Attorney D. Michael Littlefield. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Court Reporter KM. Courtroom Deputy PB. Law Clerk DG) Parties announce ready. Court inquires as to progress of State Court Transcript. Defense counsel advises that the court reporter has done 5 days of the 9 days ordered. Court reporter wants to be paid and the payment is in progress. Defense anticipates the transcript should be completed around the first of August. Court inquires if discovery is complete. Government advises that there are still items being produced to defense, and both govt. and defense agree there is no dispute or problems with the ongoing discovery. Govt. To complete the model and show to defense, but has made defense aware of its contents. Govt. has had to get a new expert regarding procedures and tactics on entry and will get defense a copy of the curriculum vitae along with a report when concluded. Counsel advise an extension of discovery deadline is not necessary. Defense has asked for an opportunity to view the Bronco, which is in storage in Oklahoma City and govt. will make arrangements for same to be viewed. Court advises that it |

| | | | |
|---|---|---|---|
| | | | plans to do general jury qualification of jury panel in McAlester, Oklahoma on 8/22/05, and have the prospective jurors complete the death penalty questionnaire at that time. Court plans to use the Southern jury panel for this trial. When the jurors are generally qualified, and have completed the questionnaire, then 20 jurors at a time will come to Muskogee Courthouse for individual, specific qualification beginning 8/29/05, and then the actual voir dire and jury selection to be done 9/06/05. Objections by defense as to the timing and request that trial be continued in order to give counsel more time to study the jury questionnaires. Counsel will be utilizing assistance of public defender's offices and will need to enter the jurors into a computer program for study, and will need at least 10 days to enter the data. Government requests extension also, due to unavailability of U.S.Attorney Sheldon Sperling the first and second of September, 2005. Defense advises that discussions with defendant have been had as to continuing the matter until November, 2005. No objections by counsel as to method of general qualification and of filling out questionnaires at that time. ENTERING ORDER: Court directs counsel to file a motion to continue if desired by close of business on Wednesday, July 20, 2005, and the Court will consider it.(JHP) Counsel inquires as to whether or not counsel and defendant need to be present for general qualification. Court advises that if counsel and defendant are present for the general qualification, it will be strictly as observers. Counsel and defendant are to be present during the individual, specific qualification. Court inquires how long to try the first stage. Government has 30–40 witnesses for the first stage of trial, and anticipates it will take 2–3 weeks, or 12–15 working days. Govt. advises it also has the drug charges to pursue as well as the death penalty charges. Defendant advises that if govt. uses all witnesses, it will not take defense long, but that defense intends to use all the witnesses govt. has listed, that govt. does not call. As to the second stage, government anticipates 2–3 days, and defendant anticipates 2–3 days, for a total of at least 5 days. Counsel inquires if there will be a break between the first and second stages. Court agrees there should be, and depending on when the first stage is completed, it will determine how long a break, perhaps a week. ENTERING ORDER Directing counsel to return the copies of the old questionnaires used for Judge White's death penalty case by noon on Monday, 7/18/05. (JHP) ENTERING ORDER directing Government, by close of business on Wednesday, 7/20/05, to disclose who its case agent will be, in order to put the agent's name in the questionnaires, and to advise defense as well. (JHP) Counsel inquire as to whether or not the jurors not used in Judge White's death penalty case, and the southern jury pool could be combined. Court advised that those jurors were told at the beginning of Judge White's general qualification that in the case they were present for, the defendant had already plead guilty. Court will consider using both panels. Status Conference concluded. (JHP) (pyb, Deputy Clerk) (Entered: 07/18/2005) |
| 07/18/2005 | 153 | | ORDER by Judge James H. Payne, Adopting the Report and Recommendation of U.S.Magistrate Judge Steven P. Shreder filed 6/28/05, and DENYING defendant's motions numbered 69–72, 74–76, 78–80, and 85–86, in all respects. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Additional attachment(s) added on 2/7/2013: # 1 main) (acg, Deputy Clerk). (Entered: 07/18/2005) |
| 07/19/2005 | 154 | | MOTION (pro se) for use of law library by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/20/2005) |

| | | | |
|---|---|---|---|
| 07/19/2005 | 155 | | MEMORANDUM by plaintiff identifying individuals at counsel table (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/20/2005) |
| 07/20/2005 | 156 | | MOTION for continuance of jury trial by defendant Kenneth Eugene Barrett with attached Waiver of Speedy Trial (cjt, Deputy Clerk) Modified on 07/20/2005 (jcb, Deputy Clerk). (Entered: 07/20/2005) |
| 07/20/2005 | 157 | | MEMORANDUM by defendant identifying individuals at counsel table (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/20/2005) |
| 07/22/2005 | 158 | | ORDER by District Judge James H. Payne denying defendant's pro se request for use of law library [154–1] (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/22/2005) |
| 07/22/2005 | 159 | | ORDER by District Judge James H. Payne granting defendant's motion for continuance of jury trial [156–1] in an abbreviated form. Accordingly, the jury trial set August 29, 2005, is hereby stricken and reset as follows: General Jury Panel Qualification st 8/18/05 at 10:00 a.m. at the Southeast Expo Center, McAlester, Oklahoma; Individual Death Qualification of Potential Jurors will begin 9/12/05 at 9:00 a.m. in the South Courtroom, Muskogee, Oklahoma. Jury selection will begin 9/26/05 at 9:00 a.m. with testimony to begin immediately following the empaneling of a jury, for Kenneth Eugene Barrett . The time between 8/29/05 and 9/26/05, shall be excluded for purposes of the Speedy Trial Act, 18 USC Section 3161(h)(8). Proposed voir dire questions for use in both the death qualification stage of jury selection and during general jury selection, proposed jury instructions for both the first and second stages of this trial, and trial briefs containing all issues which counsel can reasonably anticipate will arise during the trial including, but not limited to, individual voir dire, general voir dire, number of witnesses, and length of trial, are due on 8/29/05. Pursuant to Local Criminal Rule 57.3, this Court deems this to be a "sensational case" and specifically proscribes all lawyers appearing in the case, their employees and/or agents, from making extrajudicial statements to the news media if there is a reasonable likelihood that such statement would have a prejudicial effect on jury qualification and selection. (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/22/2005) |
| 07/26/2005 | 160 | | PRAECIPE by plaintiff USA and ISSUING 50 blank subpoenaes for witnesses to appear on behalf of USA on 9/26/05 at 9:00 a.m., U.S.District Court. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/26/2005) |
| 07/26/2005 | 161 | | NOTICE by plaintiff USA of Scheduling Conflict. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/26/2005) |
| 07/29/2005 | 162 | | NOTICE OF SCHEDULING CONFLICT by defendant Kenneth Eugene Barrett of appointed counsel Bret A. Smith. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 07/29/2005) |
| 08/05/2005 | | | NOTICE: STATUS CONFERENCE is set for 8/12/05 at 11:00 a.m. for Kenneth Eugene Barrett before Judge James H. Payne, Courtroom 1, Room 230, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK. Defendant will need to be present. (cc: all counsel) (pyb, Deputy Clerk) Modified on 08/05/2005 (Entered: 08/05/2005) |
| 08/08/2005 | | | |

| | | | |
|---|---|---|---|
| | | | NOTICE: THE LOCATION OF THE STATUS CONFERENCE set for 8/12/05 at 11:00 a.m. for Kenneth Eugene Barrett , HAS BEEN CHANGED from Courtroom 1, Room 230, to the THIRD FLOOR HEARING ROOM, before Judge James H. Payne at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (pyb, Deputy Clerk) (Entered: 08/08/2005) |
| 08/12/2005 | | | STATUS CONFERENCE: Government present by U.S.Attorney Sheldon J. Sperling and Assistant U.S.Attorney D. Michael Littlefield. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter MB. Law Clerk DG) Scheduling Plan for General Qualification: Court advises counsel the plan for general qualification of jurors, as follows: Court will have four sessions of general qualification beginning August 18, 2005: 60–80 jurors are to appear on 8/18/05 at 10:00 a.m. and be generally qualified; 60–80 jurors are to appear 8/18/05 at 2:00 p.m. and be generally qualified; 60–80 jurors are to appear 8/19/05 at 10:00 a.m. and be generally qualified; 60–80 jurors are to appear 8/19/05 at 1:00 p.m. and be generally qualified. After each group is generally qualified, they will be given questionnaires to fill out and give to the Clerk. The Court has given counsel for each side a copy of the script it intends to use and the questionnaire it intends to pass out. After discussion of the script and questionnaire, the Court directs that any objection or changes to the script or the questionnaires are to be filed by noon on Tuesday, August 16, 2005 and the Court will make a decision as to changes and the questionnaire will then be sent to the printer. Government desires to be present for the general qualification. Defendant does not intend to be present. Court will have government sit off to the side and will not be introduced and will not participate in the general qualification process. Court inquires as to length of trial: Stage One: Government: 10–15 trial days, with 41 witnesses, which include 7–10 experts. Defendant: An additional 5 days at the most for defense evidence. Stage Two if the trial passes Stage One: Government: 3–5 trial days. Defendant: Less than 5 trial days. Court concludes that the trial could take a total of 30 trial days maximum. Government advises that Mike Littlefield will handle Stage 1 primarily, and Sheldon Sperling will handle Stage 2 primarily. Court inquires as to state court transcript: Defense has 6 days of 13 days of testimony. Hopefully the court reporter will complete days 7 and 8 and possibly day 9 by the end of the weekend. Court reporter has been paid. Further Scheduling Plan: On 9/12/05, the individual jury questioning will begin, with about 20 jurors per day. The Court expects to take about 8 days to complete the individual questioning. On Monday, September 26, 2005, the Court will begin the final voir dire and hopefully the jury selection will be completed in one day, with the government to begin its evidence as to Stage One on September 27, 2005, with the trial continuing on September 28, 2005. On September 29, 2005 a previous engagement will prevent the trial from proceeding on that day. Court will make a decision as to whether or not to resume testimony on September 30, 2005. Discussion held regarding the conflict involving Michael Littlefield and Bret Smith, with arguments before the Tenth Circuit on a case they are both involved in, scheduled for October 4, 2005 in Oklahoma City. Court will talk to Tenth Circuit and see if the matter may be continued, and will advise counsel. Court will be unavailable from October 10, 2005 through October 17, 2005 and the matter will have to be continued during that time. Court will |

| | | | |
|---|---|---|---|
| | | | discuss the length of trial with prospective jurors during the individual questioning period. The Court plans to go from 9:00 a.m. to 5:00 p.m. each day in session, unless counsel would prefer 8:30 a.m. to 2:30 p.m. on certain days, due to the length of the trial. Court will go longer if an expert needs to testify and it will be necessary to complete the testimony after 5:00 p.m., but counsel shall advise the court in advance, in order to advise the jury. Counsel again reminded that trial briefs and requested jury instructions are due by 8/29/05, and the Court requires both. Defense counsel encouraged to submit vouchers each month for fees to be paid in a timely fashion. (JHP) (pyb, Deputy Clerk) (Entered: 08/13/2005) |
| 08/16/2005 | 163 | | MOTION to Modify Juror Questionnaire by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/16/2005) |
| 08/16/2005 | 164 | | RESPONSE ON JUROR QUESTIONNAIRE by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/16/2005) |
| 08/16/2005 | 165 | | MINUTE ORDER: The government's motion to modify juror questionnaire (Docket No. 173) is granted as to the request to strike the words "Federal Defender's office" from proposed question number 49; the following words will be inserted therein "the Law Offices of Roger Hilfiger or Bret Smith." Additionally, since both parties, have requested that proposed question number 48 be stricken from the questionnaire, said motion is granted. Finally, as to the government's request in regard to proposed question number 40, the Court denies the request as the name reflected on the questionnaire mirrors that contained in the Superseding Indictment. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/16/2005) |
| 08/17/2005 | 166 | | SEALED MINUTE ORDER before District Judge James H. Payne (JHP) (cc: all counsel) (pyb, Deputy Clerk) Modified on 5/30/2006–UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 08/17/2005) |
| 08/22/2005 | 167 | | MINUTE ORDER before District Judge James H. Payne: The Court hereby notifies counsel that copies of the juror questionnaire which were completed by prospective jurors on August 18 and 19, 2005, are now available for counsel to pick in the office of the Court Clerk. Counsel are advised that the privacy of the jurors is of the utmost importance. One set of copies will be given to the office of the United States attorney and one set to Roger Hilfiger, to be kept in their respective offices. In the event either party intends to provide the questionnaires to a jury consultant, counsel will be responsible for ensuring that the information contained in the questionnaires is safeguarded from disclosure in the same manner as would be required for information deemed privileged by the attorney–client privilege. Counsel will be responsible for preserving these questionnaires until the trial is completed. At the completion of the trial, counsel are directed to return the questionnaires to the Court Clerk. The Court Clerk will maintain the original juror questionnaires as part of the record herein. In order to protect prospective jurors privacy, said questionnaires shall be sealed. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/22/2005) |
| 08/29/2005 | 168 | | MINUTE ORDER before District Judge James H. Payne Granting oral request of defendant for extension of time until noon, on 8/30/05, to file his trial brief. |

| | | | |
|---|---|---|---|
| | | | (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/29/2005) |
| 08/29/2005 | 169 | | PROPOSED JURY INSTRUCTIONS for Guilt Phase submitted by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/29/2005) |
| 08/29/2005 | 170 | | PROPOSED CAPITAL JUROR QUALIFICATION QUESTIONS by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/29/2005) |
| 08/29/2005 | 171 | | TRIAL Brief by plaintiff USA (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/29/2005) |
| 08/29/2005 | 172 | | PROPOSED JURY INSTRUCTIONS submitted by plaintiff USA (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/29/2005) |
| 08/30/2005 | 173 | | SEALED OBJECTIONS by defendant Kenneth Eugene Barrett, regarding Sealed Minute Order #166. (pyb, Deputy Clerk) Modified on 08/30/2005 Modified on 5/30/2006–UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 08/30/2005) |
| 08/30/2005 | 174 | | TRIAL BRIEF by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/30/2005) |
| 08/30/2005 | 175 | | SEALED BRIEF by plaintiff USA regarding Minute Order #166. (pyb, Deputy Clerk) Modified on 5/30/2006–UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 08/30/2005) |
| 08/30/2005 | 176 | | PRAECIPE by plaintiff USA and ISSUING 30 blank subpoenaes for witnesses to appear on behalf of the Government to testify on 9/26/05 at 9:00 a.m., USDC/ED–OK, Muskogee, Oklahoma. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/30/2005) |
| 08/30/2005 | 177 | | MINUTE ORDER before District Judge James H. Payne: The parties are hereby advised that following the Sealed Hearing set Wednesday, 8/31/05, the Court intends to conduct a Pretrial to discuss various issues including: 1: The assignment of numbers for each juror, to protect their privacy; 2: Whether three jurors whose identity will be revealed to the attorneys by the Court Clerk, should be excused from further jury service herein; 3: Issues contained in the trial briefs; 4: Whether the Court should, if the jury returns a guilty verdict on all counts, have a bifurcated sentence hearing; and 5: Any other issues counsel may need to discuss with the Court. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 08/30/2005) |
| 08/31/2005 | | | SEALED HEARING: Government present by U.S.Attorney Sheldon Sperling. Defendant Kenneth Eugene Barrett present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG) Parties announce ready. Sealed hearing conducted. Full minutes of this hearing, along with the exhibits are in a sealed envelope attached to a Minute Sheet for this date in the criminal file. (JHP) UNSEALED CRIMINAL PRETRIAL: Government present by U.S.Attorney Sheldon Sperling. Defendant Kenneth Eugene Barrett present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law ClerK |

DG) Parties announce ready. Court advises that it intends to bring 10 jurors into the courtroom at 9:00 a.m. and 10 and 1:30 p.m. At each of these times, the case will be called, the Court will ask the attorneys to identify themselves on the record and then the Court will read a brief prepared statement to each group of 10 jurors. During this statement, the Court would like to give the jurors a brief summary of what this case is about. The attorneys are requested to get together, and by next Tuesday, September 6, file an agreed statement summarizing the charges against the defendant. If counsel can also agree upon items that should be included in this statement, then include that also. Court noticed that defendant filed a proposed introduction. The Court anticipated that trial briefs would contain all of the legal and evidentiary issues which might arise in this trial. While generic briefs have been filed regarding certain issues, there is no indication to the court what facts might be involved in these issues. For instance, in the government's brief, the government says the "deft. Made a self–serving statement after his arrest" and the defendant should not be allowed to introduce the statement as part of the defense case because the statement will be hearsay. The brief, however, does not identify what the statement was, when it was made, etc. These issues are important in determining if the statement was, in fact, hearsay and whether the statement was self–serving would be a legal decision that the court will have to make before deciding whether or not the statement is admissible as an exception to the hearsay rule. The brief does not, however, appear to be a motion in limine. Similarly, the government has generic language about the use of rule 404(b) evidence, but no 404(b) notice has ever been filed in this case. If the government intends to file such a notice, it should be filed by Tuesday, 9/6/05. In regard to use of transcripts from previous state jury trials: witnesses refusal to make themselves "available" for defense subpoena – rule 804 of the Federal Rules of Evidence defines "unavailability of a witness" – the Court is not going to decide whether or not prior witnesses are unavailable until it hears the evidence regarding attempts at service or other factors contained within this rule. But, the defendant has plenty of notice when the testimony is going to begin in this case and should have the ability to subpoena every potential witness immediately. The Court will not look favorably upon some decision to not subpoena someone just because defense believes they will be a government witness and then when the government doesn't call that person defense counsel is then unable to find the person. The Court will not hesitate to declare a witness unavailable if convinced that the defendant has made reasonable and timely efforts to obtain the appearance of a witness at this trial. Defense advises that he is in the process of subpoenaing all witnesses, and will not rely upon the government to subpoena these people. There are some witnesses that have advised, in previous trials, that they will not accept a subpoena from the defense and will not appear to testify on behalf of the defense. Government advises that it will try to work with defense in facilitating these matters. In defendant's brief, there was an objection to the use of a camouflaged dummy in the courtroom, although there does not appear to be a motion in limine in this regard. If a proper foundation is laid for the admission of such an exhibit, it will be treated just like any other exhibit. It can be displayed to the jury upon its admission and then it will be removed from the jury's view (unless another witness later refers to the exhibit and it has to be shown to the jury to understand that witnesses' reference to the exhibit). Regarding the history of the state court trials and revealing same to the jury: Discussion by counsel. Court advises that it feels it would be

appropriate that when a witness gives conflicting testimony to previous testimony in the state court proceedings, counsel may ask the witness if he/she recalls testimony previously given on a certain day, state the page and line number and then read the previous testimony, and the court feels that no references should be made to the "first" and "second" trials. Government advises that if it intends to go beyond these types of references, and wishes to include certain historical context of previous cases, it will advise the court before–hand. Regarding defendant's request to limit attendance at trial of uniformed OHP agents: Discussion by counsel. Court: It is the court's job to ensure that the defendant receives a fair trial, however, if you kill an OHP trooper and you are put on trial, you must expect that the audience would include OHP troopers and possible other law enforcement officers interested in the outcome of the proceedings. While efforts to intimidate jurors or any other court personnel would violate the most elementary principles of a fair trial, at the same time, the defendant has a right to a "public trial" and this court will do everything to ensure that this trial is open to the public. Further, none of the spectators will be allowed to carry their weapons into this courtroom. Because the court was unaware, just from background of this case, that an unusual number of spectators might be drawn to this trial, the court has made arrangements to send a live feed of the proceedings in this courtroom to the third floor hearing room. The only concern about this procedure is that the parties will have to ensure that they have no witnesses who are subject to any rule of sequestration anywhere on the third floor. If the rule is invoked, the court will instruct the witnesses that they are not to be on the third floor. But the parties will also have to monitor their own witnesses who may not be in the courtroom to hear this court's ruling. This will also allow any spectators who are not in court when we begin, or who might need to leave the courtroom before we stop, to go up to the third floor instead of continually having individuals coming and going from the courtroom. Concerns have been raised by both counsel's briefs regarding jury instructions if a sentencing hearing becomes necessary. Court is considering possibility of bifurcating the sentencing proceedings. If this were done, we could instruction on the Title 21 count first, and after the jury has reached a decision on that sentence, we could instruct on the Title 18 counts. Counsel may brief this issues further, with authorities cited, by Friday, September 9, 2005, as to the bifurcation of the sentencing issues. Court advises that during individual juror qualification, it intends to cover the following issues: – death qualification – time requirements – publicity – and 18 U.S.C. 3593(f)special precautions against discrimination relating to race, color, religious beliefs, national origin or sex of the defendant or any victim. Jurors will be asked to sign a certificate stating none of these factors were involved in reaching his or her individual decision. In regard to victim impact evidence: In the court's experience in reviewing habeas death penalty cases, inevitably a victim says something that they shouldn't during their testimony. In an effort to avoid any potential problems, the Court would like the government to submit a summary of the anticipated victim impact evidence in this case. After discussion of when to submit the summary, the court requests that same be submitted 4–5 days before the beginning of the sentencing phase. Court anticipates taking a break between the first phase, the guilt phase, and the second phase, the sentencing phase. Court inquires as to status of second state jury trial transcript. Defense advises that there are still 5 pages of testimony not submitted, but the court reporter has promised to begin working on same Friday, 9/2/05. Court advises that it

| | | | |
|---|---|---|---|
| | | | will begin, as scheduled, the individual juror qualification process on 9/12/05, and the Court needs to know by then if there needs to be a delay in actual start of the trial, or if the Court needs to declare the rest of the second state court transcript unavailable. Court admonishes defense counsel to submit pay vouchers for payment of their work. (JHP) (pyb, Deputy Clerk) (Entered: 09/01/2005) |
| 09/02/2005 | | | NOTICE: SETTING a telephonic conference on 9/6/05 at 2:00 p.m. as to Kenneth Eugene Barrett to be conducted with all counsel of record by James H. Payne. (cc: all counsel) (nrh, Deputy Clerk) (Entered: 09/02/2005) |
| 09/06/2005 | 178 | | SEALED ORDER by District Judge James H. Payne regarding Minute Order #166. This Order to remain sealed until verdict is reached in this case. (cc: all counsel) (pyb, Deputy Clerk) Modified on 5/30/2006 –UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 09/06/2005) |
| 09/06/2005 | 179 | | PRAECIPE by plaintiff USA and ISSUING 20 blank subpoenaes on behalf of government for witnesses to appear 9/26/05 at 9:00 a.m., US Cthse., Muskogee, OK. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/06/2005) |
| 09/06/2005 | 180 | | NOTICE by plaintiff USA of Intent to Offer Evidence of Other Crimes pursuant to Rule 404(b) of the Federal Rules of Evidence. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/06/2005) |
| 09/06/2005 | | | TELEPHONE CONFERENCE CALL MINUTES: Government present by telephone, by U.S.Attorney Sheldon Sperling and Assistant U.S.Attorney D. Michael Littlefield. Defendant BARRETT not present, but appointed counsel Roger Hilfiger and Bret Smith present by telephone. Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter MB. Law Clerk DG. Court advises counsel that in regard to the jury attendance sheet and the random draw of jurors to begin coming in on September 12, 2005, that jurors #75 and #163 could not attend on 9/12/05, but could be present on 9/15/05. Therefore, the Court has substituted juror #75 with juror #176, and juror #163 with juror #179 for attendance on 9/12/05. Court plans to use the same methods for any other jurors who have date conflicts, and that counsel will be provided with a list of jurors attending the next day's session, by 4:00 p.m. on the day before. Court reminds counsel that the joint statement of the issues is due by close of business today. Defense counsel requested permission to enter the building through the handicapped entrance during the times when so many people and prospective jurors would be entering at the front door. Court advised that it would try and arrange that. Government advised that it would be filing a 404(b) notice in this matter today. (JHP) (pyb, Deputy Clerk) (Entered: 09/06/2005) |
| 09/07/2005 | 181 | | JOINT STATEMENT OF THE CASE (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/07/2005) |
| 09/08/2005 | | | NOTICE: STATUS HEARING is set for 9/9/05 at 1:00 p.m. for Kenneth Eugene Barrett before Judge James H. Payne, Courtroom 1, Room 230, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK. The hearing will not be sealed, and defendant will need to be present. (cc: all counsel) (pyb, Deputy Clerk) (Entered: 09/08/2005) |

| | | | |
|---|---|---|---|
| 09/09/2005 | 182 | | RESPONSE by defendant Kenneth Eugene Barrett Regarding Bifurcation of Sentencing, with Combined Brief. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/09/2005) |
| 09/09/2005 | 183 | | REVISED MOTION for order Permitting Computers and Related Electronic Equipment into the Courthouse for use by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/09/2005) |
| 09/09/2005 | 184 | | MINUTE ORDER before District Judge James H. Payne granting defendant's revised motion for order Permitting Computers and Related Electronic Equipment into the Courthouse for use [183–1]. Defendant must provide the U.S.Marshal with the serial numbers of each computer to be brought into the courthouse, prior to bring the computers in. None of the equipment to be brought into the courthouse shall have recording capabilities, or used for such purpose. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/09/2005) |
| 09/09/2005 | | | STATUS/PRETRIAL CONFERENCE: (1:26 p.m. to 2:54 p.m.)Government present by U.S.Attorney Sheldon Sperling, and Assistant U.S.Attorney D. Michael Littlefield. Also present on behalf of the Government are Darren Lee, Special Agent for D.E.A. and Ben Rosser, Special Agent for O.S.B.I. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter GW. Law Clerk DG and JA) Court has directed clerk to provide counsel with copies of the script it plans on using as each group of 10 jurors are brought in each day. Court is not going to use the joint statement of the case which counsel presented. Court does not believe it is proper to present the facts to the jury at this time; rather, that will occur during opening statements and/or the actual presentation of evidence. On pages 4–5 of the script, the Court will simply tell the jury the charges against the defendant. Court specifically not going to tell the jury that the defendant has been previously charged or that certain relevant events have been subject of other legal proceedings in another court. None of the juror questionnaires indicate that the jury has ever heard of the defendant or the victim. If someone has to be impeached with previous testimony, the way to do that is to say, "Isn't it true that you have previously testified under oath, on such and such day, regarding these facts or this matter? During your previous testimony, were you asked this question and did you give this answer?" Counsel directed to advise their witnesses as to this issue. Counsel has been provided with a list of jurors who will be called the first week and the order in which they will be called. One juror has been excused for 9/13/05, and we will only have 19 jurors that day. The juror's assigned numbers have been placed on the juror list, and counsel will only make reference to the juror by their assigned numbers. The Court will conduct the individual juror qualification proceedings with questions, and then will give each side 3 minutes for follow–up questions. The juror will then be asked to leave the courtroom and counsel can make any challenges regarding the juror's qualification to serve. The court will attempt to finish each juror within 15 minutes. Court and counsel agree that the counsel questioning may alternate with each juror. Court refers to government's brief at page 33, referencing previously submitted briefs addressing a broad range of issues pertaining to the death penalty and the anticipated second stage in this case, rather than addressing these issues in the trial brief. ENTERING ORDER: Court directs that, by Wednesday, 9/14/05, |

close of business, the government shall supplement its trial brief to advise the court of all previous briefs and the pages within those briefs which it feels is relevant to the trial of this case. If the defendant wishes to supplement their brief , they shall have the same period of time to do so. (JHP) On 9/26/05, after the jury list is again randomized, the Court plans on calling 64 jurors. Each side will have 1 hour and 15 minutes for general voir dire questioning. Then counsel will approach the bench and exercise any challenges for cause. However many additional jurors are needed will be called for ward and each side will have 10 minutes to ask any follow up questions of new jurors, then the Court will excuse the jurors until 1:30 p.m. At approximately 1:00 p.m., or as soon as the Clerk is ready for you to exercise peremptory challenges, we will do so. Each side will be given 23 peremptory challenges and the remaining 18 jurors will comprise the jury panel. The panel will not be told who the six alternate jurors are, but the last jurors called forward, in the order they were called forward will be the alternate jurors. If possible, after the 18 jurors have been selected, the Court intends to begin opening statements. Each side will be given 1 hour for opening statements, and then we will be ready to begin testimony first thing 9/27/05. We will do jury selection in Courtroom 1, and on 9/27/05 will start the trial in Courtroom 2, and continue the trial in Courtroom 2 on 9/28/05, and possibly a half a day on 9/29/05. Court will be in recess on 9/30/05. Counsel is directed to give the Court Security Officers a list of those who will be entering through the basement door. Arguments of counsel for government and defendant regarding advising jurors of previous court proceedings. Court will consider reading the last full paragraph on page 2 of the joint statement of the case on file herein. Request by counsel for both sides for more time to voir dire prospective jurors on 9/26/05 of up to 2 hours each. Court will consider same. Request by counsel for microphone to pass to the jurors. Court has ordered same. Government intends to use transcript of testimony of Trooper Rick Manion, from Madill, OK, who is now deceased, and intend to rework the testimony to comply with the Court's orders, and will provide defense with a copy as revised. Defendant renews his objection to the use of stun belts. Arguments of counsel. Court refers all questions regarding use of the stun belt to the U.S.Marshal, as well as defendant's request for a hair cut. Defense requests the names of witnesses for the Government that government believes should be withheld for safety of these witnesses. Arguments of counsel. Government intends to file motions in this regard this date. Defense advises it still does not have all of the state court transcript and the court reporter may not be able to complete it anytime soon, as there is a trial docket staring in Sequoyah County on 9/12/05. Court inquires if counsel requests a continuance on that basis. Court directs counsel to advise by Monday, 9/12/05, if a continuance is needed, in order to be able to tell the prospective jurors when the trial will start. Discussion by Court and counsel as to bifurcation of sentence stage of trial. Neither side feels it is necessary to bifurcate these counts for sentencing stage. Defense has briefed the issue of bifurcation, and the Government intends to do the same. Arguments of defense and government regarding expert witness for defendant. Court directs defense to provide government with expected testimony of this witness. If the matters will involve possibility of psychiatric evaluation, the Court MUST know as soon as possible, as these matters would seriously delay the trial in this case. Discussion of model replica of area of the search and shooting, which government intends to use as a model and as an exhibit to go to the jury. Defense has no objection to its use in courtroom for display. (JHP) (pyb,

| | | | |
|---|---|---|---|
| | | | Deputy Clerk) (Entered: 09/10/2005) |
| 09/09/2005 | 185 | | SEALED APPLICATION for protective order by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) Modified on 09/13/2005 Modified on 5/30/2006–UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). Modified on 5/30/2006–UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 09/10/2005) |
| 09/09/2005 | 186 | | SEALED MOTION for order delaying the production of witness names by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) Modified on 5/30/2006 – UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 09/10/2005) |
| 09/12/2005 | 187 | | MINUTE ORDER before District Judge James H. Payne granting government's motion for protective order [185–1] (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/12/2005) |
| 09/12/2005 | 188 | | MINUTE ORDER before District Judge James H. Payne regarding Government's Sealed Motion for Order Delaying the Production of Witness Names [186–1] : The Government's Motion is set for SEALED EX PARTE HEARING 9/13/05 immediately following the conclusion of the individual juror qualification proceedings, before Hon. James H. Payne, Courtroom 1, at the U.S.Courthouse, Fifth & Okmulgee Streets, Muskogee, Ok. (JHP) (cc: all counsel) NOTE: Copies of this Minute Order were only distribute to U.S.Attorney's office. pb (pyb, Deputy Clerk) Modified on 09/13/2005 (jcb, Deputy Clerk). (Entered: 09/12/2005) |
| 09/12/2005 | 189 | | SEALED APPLICATION for protective order by plaintiff USA as to Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 09/12/2005 Modified on 5/30/2006 – UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 09/12/2005) |
| 09/12/2005 | 190 | | SEALED ORDER by District Judge James H. Payne granting plaintiff's application for protective order [189–1] (cjt, Deputy Clerk) Modified on 5/30/2006 – UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 09/12/2005) |
| 09/12/2005 | 191 | | SEALED APPLICATION for WRIT OF HABEAS CORPUS AD TESTIFICANDUM by plaintiff USA as to Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 5/30/2006 – UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 09/12/2005) |
| 09/12/2005 | | | INDIVIDUAL JUROR QUALIFICATIONS: Government present by U.S.Attorney Sheldon Sperling, and Assistant U.S.Attorney D. Michael Littlefield, and Case Agents Darren Lee and Ben Rosser. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger, and Bret Smith, and Assistant Angie Cole. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG & JA) Parties announce ready. Ten prospective jurors brought in group into courtroom at 9:00 a.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. NINE prospective jurors are qualified and ONE prospective juror excused in the morning session. (A.M. Session ended at 12:35 p.m.) TEN prospective jurors brought in group into |

| | | | |
|---|---|---|---|
| | | | courtroom at 1:30 p.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. EIGHT prospective jurors are qualified and TWO prospective jurors are excused in the afternoon session. (JHP) SEALED HEARING: All parties present with counsel. Court gives sealed report to the parties. (JHP) Individual questioning of jurors continued until 9:00 a.m. on 9/13/05. (JHP) (P.M. Session ended at 5:08 p.m.) (pyb, Deputy Clerk) (Entered: 09/12/2005) |
| 09/13/2005 | | | SEALED HEARING: 8:23 A.M. TO 9:20 A.M.: Government present by U.S.Attorney Sheldon J. Sperling, and Asst. U.S.Attorney D. Michael Littlefield. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law clerks DG & JA) Hearing on sealed motion of government. Hearing concluded. (Held in Fourth Floor Courtroom #3) Courtroom 1: INDIVIDUAL JUROR QUALIFICATIONS: Government present by U.S.Attorney Sheldon Sperling, and Assistant U.S.Attorney D. Michael Littlefield, and Case Agents Darren Lee and Ben Rosser. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger, and Bret Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG & JA) Parties announce ready. (9:39 a.m.) Govt. Advises that it has spoken with defense counsel in regard to the sealed hearing this morning, and thinks the matter has been resolved. Court advises that that matter was sealed, and the Court will take it up at a later time. (9:42 a.m.) Ten prospective jurors brought in group into courtroom at 9:58 a.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Prospective Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. Ten prospective jurors are qualified and none are excused in the morning session. (A.M.session ended at 12:54 p.m.) Ten prospective jurors brought in group into courtroom at 1:39 p.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Prospective Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. Nine prospective jurors are qualified and one prospective juror is excused in the afternoon session. (JHP) Session ended at 5:47 p.m. (JHP) SEALED HEARING: (5:56 p.m.) Defendant present with counsel. Government counsel present. Discussion by Court and counsel as to sealed hearing this a.m. Government advises that it has spoken with defense counsel as to the sealed motion to withhold identity of certain witnesses, and that hopefully the matter has been resolved. Government requests until 9/14/05 to advise the court fully of the arrangements to disclose the names and allow defense an opportunity to interview said witnesses. Court, by agreement of counsel, finds this hearing can be UNSEALED. Court directs that the government has until close of business on 9/14/05 to advise if further hearings are necessary, or if the undisclosed witnesses will be disclosed to defense and satisfactory arrangements have been made for defense to interview these witnesses. ENTERING ORDER Continuing said cause until 9:00 a.m. on 9/14/05. (JHP) (6:06 p.m.) (pyb, Deputy Clerk) (Entered: 09/13/2005) |
| 09/13/2005 | 192 | | UNOPPOSED MOTION for order permitting use of computers and related electronic equipment during hearings and/or trial by plaintiff USA as to |

| | | | |
|---|---|---|---|
| | | | Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/13/2005) |
| 09/13/2005 | 193 | | MINUTE ORDER before District Judge James H. Payne granting government's unopposed motion for order permitting use of computers and related electronic equipment during hearings and/or trial [192−1]. Government must provide the U.S.Marshal with the serial numbers of each computer to be brought into the courthouse, prior to bringing the computers in. None of the equipment to be brought into the courthouse shall have recording capabilities, or be used for such purpose. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/13/2005) |
| 09/14/2005 | | | INDIVIDUAL JUROR QUALIFICATIONS: Government present by U.S.Attorney Sheldon Sperling, and Assistant U.S.Attorney D. Michael Littlefield, and Case Agents Darren Lee and Ben Rosser. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger, and Bret Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG & JA) Parties announce ready. Ten prospective jurors brought in group into courtroom at 9:16 a.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. Seven prospective jurors are qualified and three prospective juror excused in the morning session. (A.M.session ended at 12:26 p.m.) Ten prospective jurors brought in group into courtroom at 1:41 p.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. Nine prospective jurors are qualified and one prospective juror is excused in the afternoon session. (JHP) (5:50 p.m.) After juror questioning concluded: Court advises that one juror will not be present on 9/15/05 and the Clerk directed to give counsel copies of the list for 9/15/05. Also, there will only be 19 jurors appearing on Friday, 9/16/05. Government announces that it has reached an agreement with defendant as to disclosure of final witnesses. Government agrees to give the names, addresses, locations and "terms" of agreement given to these witnesses in exchange for their testimony on Monday, 9/19/05, and make these witnesses available to defense in the office of U.S.Attorney, on Thursday, 9/22/05. Defendant agrees with this procedure. Government advises that there are two incarcerated witnesses and government will make these two available to defendant when they are writted here. Defendant agrees. Court advises that the original motion of the government, pleading #186 will remain sealed. In regard to the sealed application of the government for issuance of a Writ of Habeas Corpus Ad Testificandum (Pleading #191), the Court will leave the writ sealed at this time. Government to advise the Court by close of business Monday, 9/19/05, if the application can be unsealed, and the writ will not be issued until Court hears from Government. (JHP) ENTERING ORDER continuing said cause until 9:00 a.m. on 9/15/05. (JHP) (6:10 p.m.) (pyb, Deputy Clerk) Modified on 09/15/2005 (Entered: 09/14/2005) |
| 09/14/2005 | 194 | | SUPPLEMENT TO TRIAL BRIEF by plaintiff USA (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/14/2005) |

| 09/15/2005 | | | INDIVIDUAL JUROR QUALIFICATIONS: Government present by U.S.Attorney Sheldon Sperling, and Assistant U.S.Attorney D. Michael Littlefield, and Case Agents Darren Lee and Ben Rosser. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger, and Bret Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG & JA) Parties announce ready. Nine prospective jurors brought in group into courtroom at 9:20 a.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. Eight prospective jurors are qualified and one prospective juror excused in the morning session. (A.M.session ended at 12:32 p.m.) Ten prospective jurors brought in group into courtroom at 1:30 p.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. Nine prospective jurors are qualified and one prospective juror is excused in the afternoon session. (JHP) (6:06 p.m.) ENTERING ORDER Continuing said case until 9:00 a.m. on 9/16/05. (JHP) (pyb, Deputy Clerk) (Entered: 09/15/2005) |
| 09/16/2005 | | | INDIVIDUAL JUROR QUALIFICATIONS: Government present by U.S.Attorney Sheldon Sperling, and Assistant U.S.Attorney D. Michael Littlefield, and Case Agents Darren Lee and Ben Rosser. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger, and Bret Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG & JA) Parties announce ready. Nine prospective jurors brought in group into courtroom at 9:08 a.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. Six prospective jurors are qualified and three prospective jurors are excused in the morning session. (A.M.session ended at 11:57 a.m.) Ten prospective jurors brought in group into courtroom at 1:41 p.m. Court gives group a brief description of the case, the charges, and proceedings to be held. Prospective jurors sworn to answer questions concerning qualifications. Prospective Jurors escorted out, and are brought in one at a time for individual questioning by court and counsel. Eight prospective jurors are qualified and two prospective jurors are excused in the afternoon session. Court advises that this concludes the individual juror questioning phase. Court advises that it wishes to excuse the two prospective jurors (#40 and #178) that had travel plans. Discussion by counsel. (Court did not excuse either juror in open court) Both sides request court to excuse juror #242. Court grants and excuses Juror #242. (JHP) Entering Order setting further Criminal Pretrial for 9/20/05 at 2:00 p.m. Court wishes to discuss the script for 9/26/05, and desires a report on disclosure of witnesses. (JHP) Court states for the record that few spectators actually attended the individual questioning, and counsel concurs. Request of government to have the sealed writ issued, and will reveal to defendant the name of the person. If don't get it issued, the Marshal may not be able to get witness here by Friday of next week. Court grants upon agreement of the parties, signs the Order for Writ and directs the Clerk to issue same. (JHP) (5:31 p.m.) (pyb, Deputy Clerk) (Entered: 09/19/2005) |

| | | | |
|---|---|---|---|
| 09/16/2005 | 195 | | SEALED ORDER by District Judge James H. Payne granting government's motion for SEALED WRIT OF HABEAS CORPUS AD TESTIFICANDUM [191–1] AND ISSUING sealed Writ. (pyb, Deputy Clerk) Modified on 5/30/2006 –UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 09/19/2005) |
| 09/19/2005 | | | NOTICE: FURTHER CRIMINAL PRETRIAL CONFERENCE is set for 9/20/05 at 2:00 p.m. for Kenneth Eugene Barrett before Judge James H. Payne, Courtroom 1, Room 230, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (pyb, Deputy Clerk) (Entered: 09/19/2005) |
| 09/19/2005 | | | NOTICE: CHANGING TIME ONLY of FURTHER CRIMINAL PRETRIAL set 9/20/05, from 2:00 p.m. to 1:45 p.m. for Kenneth Eugene Barrett before Judge James H. Payne, Courtroom 1, Room 230, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (pyb, Deputy Clerk) (Entered: 09/19/2005) |
| 09/20/2005 | 196 | | PRAECIPE by defendant Kenneth Eugene Barrett and ISSUING 9 subpoenaes, for witnesses to appear on behalf of defendant on 9/26/05 at 9:00 a.m., U.S.Cthse., Muskogee, Ok. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/20/2005) |
| 09/20/2005 | 197 | | PRAECIPE by defendant Kenneth Eugene Barrett AND ISSUING 6 subpoenaes for witnesses to appear on behalf of defendant on 9/16/05 at 9:00 a.m., at the U.S.Courthouse, Muskogee, Oklahoma. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/20/2005) |
| 09/20/2005 | 198 | | PRAECIPE by defendant Kenneth Eugene Barrett AND ISSUING 5 subpoenaes for witnesses to appear on behalf of defendant on 9/16/05 at 9:00 a.m., at the U.S. Courthouse, Muskogee, Oklahoma. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/20/2005) |
| 09/20/2005 | | | FURTHER CRIMINAL PRETRIAL: Government present by U.S.Attorney Sheldon Sperling, and Assistant U.S.Attorney D. Michael Littlefield, and Case Agents Darren Lee and Ben Rosser. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger, and Bret Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG & JA) Parties announce ready. Court has 6 issues to go over with counsel. 1. Court inquires if all government witnesses have been disclosed to defendant, and government advises it has done so as to the guilt phase. Government advises that deft. has presented a psychological report which the government would like to present to another psychologist to look at and may be a potential witness during the mitigation phase. 2. Court inquires as to testimony of 404(b) evidence and directs that if there is no notice of this evidence, the testimony may not be allowed. 3.Court advises it does not intend to read the statement of the case, and does intend to read a redacted superseding indictment, which takes out the special findings. Court advises that if counsel can supply a stipulation to the statements in the statement of the case, court will read it as a stipulation. 4. Court directs, again, that no mention be made of prior trials in this matter. 5. Court directs counsel in regard to voir dire questions, and advises that the counsel's questions should not cover something already asked and answered in the questionnaires or the individual questioning. Court advises that the prospective jurors coming in on 9/26/05 have already been death penalty qualified, as well as time–qualified. Court |

will give counsel a hour and fifteen minutes each side for voir dire, but hopes counsel will keep it to an hour. 6. Court advises that the jury voir dire and challenges for cause will take place in Courtroom 1. After completion of voir dire and cause challenges, the jurors will exit the courtroom and go to courtroom 2 to wait. Court and counsel will do the peremptory challenges in courtroom 1 outside of hearing of jury. Upon completion of the peremptory challenges, court and counsel will move into Courtroom 2, call the 18 jurors remaining after the challenges and have them leave the courtroom with the jury clerk. Then the Court will excuse the jurors not chosen. At that time the 18 jurors to serve in this case will be brought in, probably to courtroom 2, and be sworn, and counsel will do opening statements. On 9/27/05 and 9/28/05, the trial will begin and be held in courtroom 2. When the trial resumes on 10/3/05, we will be in Courtroom 1. Statements by government regarding 6 issues. Statements by defendant regarding 6 issues. Arguments of counsel, questions by court regarding previous trials. Court will watch during voir dire and allow counsel more time if it is necessary. Court to consider issue of statement of case. Government will need to use the model of the area in opening statements. Court will allow both counsel for each side to split the voir dire questioning. The matter of arguments before the Tenth Circuit on 10/4/05 has been resolved, and therefore the trial will continue on that date. Counsel directed to brief the issue of mention of prior trials and testimony by close of business Thursday, 9/22/05. If counsel can do a stipulation as to this matter, provide same to court for consideration. Any further issues to be brief should be done by 9/22/05 close of business. Court provides counsel with copies of the redacted Superseding Indictment it intends to read. Government requests labels be made with juror names as was done in the Fields case. Clerk advises it has been done and the labels will be passed out 9/26/05. (JHP) (pyb, Deputy Clerk) (Entered: 09/23/2005) |
| 09/21/2005 | 200 | | PRAECIPE by defendant Kenneth Eugene Barrett AND ISSUING one supboena, for witness to appear on behalf of defendant on 9/26/05 at 9:00 a.m., U.S.Courthouse, Muskogee, Oklahoma. (pyb, Deputy Clerk) Modified on 09/23/2005 (jcb, Deputy Clerk). (Entered: 09/22/2005) |
| 09/22/2005 | 199 | | REQUEST for Additional Time for Voir Dire by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/22/2005) |
| 09/22/2005 | 201 | | MOTION in limine regarding "Future Dangerousness" by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/22/2005) |
| 09/22/2005 | 202 | | MOTION in limine regarding victim impact evidence by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/22/2005) |
| 09/22/2005 | 203 | | MOTION for advance notice of anticipated witnesses and brief in support by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/22/2005) |
| 09/22/2005 | 204 | | MOTION in limine regarding substantial planning and premeditation aggravating factor by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/22/2005) |
| 09/22/2005 | 205 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER before District Judge James H. Payne Directing the Government to file Expedited Responses, by close of business on 9/23/05, to the following motions of defendant: motion in limine regarding substantial planning and premeditation aggravating factor [204–1]; motion for advance notice of anticipated witnesses [203–1]; motion in limine regarding victim impact evidence [202–1]; motion in limine regarding "Future Dangerousness" [201–1]; motion for Additional Time for Voir Dire [199–1] (JHP) (cc: all counsel) (pyb, Deputy Clerk) Modified on 09/22/2005 (jcb, Deputy Clerk). (Entered: 09/22/2005) |
| 09/22/2005 | 206 | | NOTICE OF INTENT TO OFFER EVIDENCE OF OTHER CRIMES by plaintiff USA. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/23/2005) |
| 09/22/2005 | | | CJA Form 30 (Attorney Payment Voucher – Roger Hilfiger) as to Kenneth Eugene Barrett (Interim #6)(JHP 9/22/05) (smg, Deputy Clerk) (Entered: 09/26/2005) |
| 09/22/2005 | | | CJA Form 30 (Attorney Payment Voucher – Roger Hilfiger) as to Kenneth Eugene Barrett (Interim #7)(JHP 9/22/05) (smg, Deputy Clerk) (Entered: 09/26/2005) |
| 09/22/2005 | | | CJA Form 30 (Attorney Payment Voucher – Bret A. Smith) as to Kenneth Eugene Barrett (Interim #1)(JHP 9/22/05) (smg, Deputy Clerk) (Entered: 09/26/2005) |
| 09/23/2005 | 207 | | SEALED MINUTE ORDER before District Judge James H. Payne (JHP) (cc: all counsel) (pyb, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, #67 filed 9/11/09 in CIV–09–105–JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 09/23/2005) |
| 09/23/2005 | 208 | | SEALED NOTICE OF EXPERT EVIDENCE OF A MENTAL CONDITION PURSUANT TO FEDERAL RULES OF CRIMINAL RULE 12.2 by defendant Kenneth Eugene Barrett. (Ordered sealed 9/23/05, by the Court. See Minute Order #210) (pyb, Deputy Clerk) Modified on 09/23/2005 (jcb, Deputy Clerk). (Entered: 09/23/2005) |
| 09/23/2005 | 209 | | ADDENDUM by defendant Kenneth Eugene Barrett to Defendant's Trial Brief. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/23/2005) |
| 09/23/2005 | 210 | | MINUTE ORDER before District Judge James H. Payne: The Court, upon review of defendant's Notice of Expert Evidence of a Mental Condition pursuant to Fed.Rules of Crim.Procedure, Rule 12.2, and the attached risk assessment, [208–1], feels that said Notice and attachment should be filed under SEAL and not be made a public document. Therefore, said Notice, pleading 208, is hereby ordered SEALED. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/23/2005) |
| 09/23/2005 | 211 | | RESPONSE by plaintiff USA to defendant's motion for advance notice of anticipated witnesses [203–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/23/2005) |
| 09/23/2005 | 212 | | MOTION for order to present voir dire questions electronically , and for order to authorize the use of electronic prsentation equipment or paper handouts to perspective jurors by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/24/2005) |

| | | | |
|---|---|---|---|
| 09/23/2005 | 213 | | RESPONSE by plaintiff USA to defendant's motions filed 9/22/2005: motion for Additional Time for Voir Dire [199–1]; motion in limine regarding "Future Dangerousness" [201–1]; motion in limine regarding victim impact evidence [202–1]; motion in limine regarding substantial planning and premeditation aggravating factor [204–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/24/2005) |
| 09/23/2005 | 214 | | SEALED RESPONSE by plaintiff USA regarding Defendant's Notice of Expert Evidence of a mental condition pursuant to F.R.C.P.12.2 [208–1], AND ... (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/24/2005) |
| 09/23/2005 | 214 | | ... SEALED MOTION for psychiatric examination of defendant by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) (Entered: 09/24/2005) |
| 09/26/2005 | | | JURY SELECTION: COURTROOM 1:Government present by U.S.Attorney Sheldon J. Sperling, and Assistant U.S.Atty. D.Michael Littlefield. Govt. Agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith, and assistant Angie Cole. (Before Hon. James H. Payne. Courtroom Deputy PB & LW. Court Reporter KM. Law Clerks DG & JA) Counsel for govt. and deft. present, along with defendant. (9:22 a.m. to 9:50 a.m.) Court makes rulings on pending motions: ENTERING ORDER: It is the order of the Court that the joint statement of the case is not admissible during first stage of trial. Both parties shall refrain from any reference to any prior proceedings against this defendant. Counsel shall also strongly admonish their witnesses not to say anything about specific prior proceedings against this defendant. Further, the government shall refrain from any mention of prior proceedings against this defendant in the sentencing stage of this trial. Defendant shall refrain from any mention of prior proceedings against this defendant in the sentencing stage of this trial. Defendant may, however, introduce his prior conviction and the resulting 30–year sentence as a mitigating factor Defendant may not use this evidence to raise "residual doubts" about the defendant's guilt or for any other purpose, (JHP) ENTERING ORDER denying defendants motion for additional time for voir dire. Counsel will have one hour and fifteen minutes each side. (JHP) ENTERING ORDER: In regard to defendant's Motion for Advance Notice of Anticipated Witnesses, the government has agreed to advise defense counsel of witnesses they anticipate calling on the next day throughout the trial. Accordingly, with the understanding that the government is going to try to accommodate defense counsel's request, the defendant's request is denied. (JHP) ENTERING ORDER: Regarding Defendant's Notice of Expert Evidence of a Mental Condition: Court orders defendant to submit to a mental examination by an expert or experts of the government at the Muskogee County Jail wherein he is currently being housed by the United States Marshal. This examination shall take place during the week of October 10, 2005, and should be concluded prior to the beginning of the second stage herein. (JHP) ENTERING ORDER: GRANTING defendant's Motion in Limine Regarding "Future Dangerousness", and Orders the government to confine its discussion of defendant's future dangerousness to evidence indicative of how he might act in prison. (JHP) ENTERING ORDER: regarding defendant's motion in limine regarding "Substantial Planning and Premeditation" Aggravating Factor: The court overrules in part defendant's motion in limine regarding "Substantial Planning and Premeditation. (JHP) ENTERING ORDER: Regarding Defendant's Motion Regarding Notice of |

| | | | |
|---|---|---|---|
| | | | Evidence in Support of Aggravating Factors, Courts do not ordinarily consider the sufficiency of the evidence via pre−trial motion unless exceptional circumstances exist, to−wit: (1) the operative facts are disputed; (2) the court conducts an evidentiary hearing; and (3) the government does not object to the court's consideration of the evidence. However, to the extent that the government has additional information that speaks directly to defendant's future dangerousness in prison, or to defendant's alleged "substantial planning and premeditation", the court Orders the government to provide such notice to defendant no later than five days prior to the beginning of the sentencing stage of the trial. Defendant may then re−urge any objections to the relevance of proffered evidence, if necessary. ENTERING ORDER: Regarding defendant's motion in limine regarding Victim Impact Evidence: Both of the notices of the government of intent to seek the death penalty filed herein put the defendant on notice that the government intends to introduce victim impact evidence which will show the "defendant caused injury, harm, or loss to the victim, the victim's family, and the victim's friends as demonstrated by the victim's personal characteristics as an individual human being and the impact of the death upon the victim's family and friends." Defendant's motion in limine is OVERRULED at this time. Defendant may renew his objection to any evidence deemed irrelevant at the time such evidence is offered. (JHP) (10:05 a.m.) Govt. Counsel present. Deft. present with counsel. 81 prospective jurors entered courtroom for jury selection. 64 prospective jurors called forward. Court reads indictment to prospective jurors. Voir dire by court and counsel. One juror challenged for cause by Court. Prospective jurors exit courtroom at 3:28 p.m. Court to allow counsel a recess to determine their peremptory challenges. At 5:06 p.m. Court, govt. counsel, defendant and defense counsel present in courtroom with court reporter and law clerks. Counsel makes 23 peremptory challenges each side. (5:50 p.m.) COURTROOM 2: (6:15 p.m.) All prospective jurors present. Govt.counsel, defendant and defense counsel present. Eighteen jurors (12 jurors and 6 alternates) called and placed in jury box. Petit jury duly sworn to serve in this case. Remaining prospective jurors excused. Court gives final preliminary instructions. Counsel will each have 1 hour for opening statements. Court will be in session 9/27/05 and 9/28/05, and will recess until October 3, 2005. ENTERING ORDER continuing said cause until 10:00 a.m. on 9/27/05. (JHP) (6:35 p.m.) (pyb, Deputy Clerk) (Entered: 09/27/2005) |
| 09/27/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG) Parties announce ready. ENTERING ORDER: In regard to offering of evidence of other crimes, the Court will wait until it actually hears evidence or the efford to present evidence before making a definitive ruling. Court requests defendant to submit any limiting instruction that is appropriate. (JHP) Jury in box. Opening statements of the parties. Defendant requests the rule of sequestration. Government's evidence. ENTERING ORDER Continuing said cause until 9:00 a.m. on 9/27/05. Jurors to report a little before 9:00 a.m. so that the trial may continued at 9:00 a.m. on 9/27/05. (JHP) (pyb, Deputy Clerk) (Entered: 09/27/2005) |
| 09/27/2005 | 215 | | RESPONSE AND OBJECTION by defendant Kenneth Eugene Barrett to |

| | | | |
|---|---|---|---|
| | | | Government's Notice of Intent to Offer evidence of other crimes and brief in support [206–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/28/2005) |
| 09/28/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG) Jury in the box. Parties announce ready. Further Government's evidence. (Bench conference during testimony of Trooper John Hamilton regarding previous trial transcripts and use of those transcripts for impeachment purposes. Counsel supplied court with copies of parts of the previous transcripts. Court still admonishes counsel to refer to such matters as "testifying under oath at a previous time" rather than in any form of court proceedings.) Continued Government's evidence. ENTERING ORDER continuing said cause until 9:00 a.m. on 10/3/05. (JHP) (pyb, Deputy Clerk) (Entered: 09/30/2005) |
| 09/28/2005 | 217 | | PROPOSED LIMITING JURY INSTRUCTION regarding Rule 404(b) evidence, submitted by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/30/2005) |
| 09/28/2005 | 218 | | PROPOSED LIMITING JURY INSTRUCTION regarding Rule 404(b) evidence, submitted by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/30/2005) |
| 09/29/2005 | 216 | | ORDER by District Judge James H. Payne granting motion for psychiatric examination of defendant [214–1] and medical examination ordered for Kenneth Eugene Barrett (cc: all counsel, and attorney Scott Woodward, First Asst. U.S. Attorney in ND/OK) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/29/2005) |
| 09/30/2005 | 219 | | AUTHORIZED INDIVIDUAL OATH by Scott Woodward (nrh, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/30/2005) |
| 09/30/2005 | 220 | | AUTHORIZED INDIVIDUAL OATH by Douglas A. Horn (nrh, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/30/2005) |
| 09/30/2005 | 221 | | AUTHORIZED INDIVIDUAL OATH by Nita Wittman (nrh, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 09/30/2005) |
| 10/03/2005 | | | NOTICE: SEALED HEARING is set for 10/3/05 at 12:15 p.m., for Kenneth Eugene Barrett , with only defense counsel present, before Judge James H. Payne at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK. Defendant does not need to be present. (cc: all counsel) (pyb, Deputy Clerk) (Entered: 10/03/2005) |
| 10/03/2005 | | | FURTHER JURY TRIAL: (9:14 a.m.) Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG) All parties present. Outside of hearing of jury. Court advises counsel that it would be best to submit the prior trial transcripts to the court to be marked as Court's exhibits, to make the record complete. Court will write a letter to Sequoyah County, OK to see if they will submit the |

| | | | |
|---|---|---|---|
| | | | transcripts. Counsel will help if necessary. Jury in the box. Further Government's evidence. Noon recess at : 12:32 p.m. (JHP) SEALED BUDGET HEARING MINUTES before Honorable James H. Payne. Defendant BARRETT present by appointed counsel Roger Hilfiger and Brett Smith. Law Clerks: dg and ja. Courtroom Deputy: ct. Court Reporter: km. (JHP) FURTHER JURY TRIAL: (1:56 p.m.) All parties present with counsel. Jury in box. Continued Government's Evidence. Jury excused for the evening at 5:34 p.m. Outside of hearing of jury: Court admonishes counsel for both sides as to continued testimony of witness James Horn. Court to look up Rule 702, and directs counsel to do the same, and see if any further testimony from this witness is really necessary, or allowed. ENTERING ORDER Continuing Jury Trial until 9:00 a.m. on 10/4/05. (JHP)(5:40 p.m.) (pyb, Deputy Clerk) (Entered: 10/04/2005) |
| 10/04/2005 | 222 | | AUTHORIZED INDIVIDUAL OATH of J.Randall Price, Ph.D. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/04/2005) |
| 10/04/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG) All parties present. Outside of hearing of jury. Court discusses with both sides its concern about testimony of witness James Horn and if it is relevant. Arguments of counsel. After discussions, court will allow continued cross by defense and continued direct of government, and will take the matter under advisement as to whether the Court will strike the testimony of this witness. Jury in box. Further government's evidence. (Outside hearing of jury: Govt.reports possible contact of a juror with a witnessWitness will be present 10/5/05 and Court will take the matter up at that time.) Further government's evidence. ENTERING ORDER continuing said cause until 9:00 a.m. on 10/5/05. (JHP) (pyb, Deputy Clerk) (Entered: 10/04/2005) |
| 10/05/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG) IN CHAMBERS: (9:14 a.m. to 9:25 a.m.) Govt.counsel, deft.counsel present, with court reporter and courtroom deputy. Court and counsel discuss Juror #46 and his conversation with witness Trooper Darst. Court and counsel discuss health condition of Juror #24. Discussion held as to whether or not to poll all jurors individually as to Juror #46. Court will take under advisement. (JHP) COURTROOM: SEALED HEARING: (9:26 a.m. to 10:02 a.m.) Govt.cnsl. present. Deft.present with counsel. ENTERING ORDER excusing Juror #24. (JHP) Sworn testimony of Trooper Darst regarding conversation with Juror #46. ENTERING ORDER excusing Juror #46 by agreement of the parties. (JHP) Courtroom UNSEALED. COURTROOM: (10:18 a.m. to 12:00 noon) Jury in box. Govt.cnsl.present, and deft.present with counsel. Continued Government's evidence. Noon recess. (JHP) IN CHAMBERS: 1:25 p.m. to 1:31 p.m.) Counsel for both sides present. Govt.counsel advises of conversation outside the building with Juror #85 and Trooper Billy Poe, a witness in this case. Court will hold sealed hearing.(JHP) IN COURTROOM: SEALED HEARING: (1:45 p.m. to 2:01 p.m.) Govt.counsel present. Deft.present with counsel. Juror #85 brought into |

| | | | |
|---|---|---|---|
| | | | courtroom and is questioned by court and counsel as to conversation with Trooper Billy Poe. ENTERING ORDER: Court is satisfied with explanation of Juror 85 and the juror will not be excused. (JHP) Court notes for the record defendant's objection. Oral motion of defendant for mistrial because of conversations by jurors with witnesses. ENTERING ORDER overruling defendant's oral motion for mistrial. (JHP) Courtroom UNSEALED. COURTROOM: (2:19 p.m. to 5:13 p.m.) Jury in box. Govt.coounsel present. Defendant present with counsel. Continued Government's evidence. ENTERING ORDER continuing said cause until 9:00 a.m. on 10/6/05. (JHP) (pyb, Deputy Clerk) (Entered: 10/06/2005) |
| 10/06/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG) Outside of hearing of jury: Govt.counsel present. Deft.present with counsel. Govt. discusses calling witness Kevin Ottwell and his testimony and exhibits. Arguments of counsel. Court directs counsel to see if the issue can be agreed upon, and the matter is taken under advisement for the time being. Jury in box. Further Government's evidence. In regard to Government's Exhibit #82, at bench conference, same was offered and defense counsel requested it be amended. No objection from Government. Govt. Offers Exhibit #82 as amended, no objection by defendant, and exhibit is admitted by court without objection, as amended. Jury excused at 5:05 p.m. for the evening, to return at 9:00 a.m. on 10/7/05. Outside of hearing of jury: Government offers exhibits 202,203 and 204, which are certified records of the Court Clerk of Sequoyah County, Oklahoma, regarding criminal charges against defendant. Defendant does not object. Exhibits admitted without objection. In regard to Government Exhibit #129, offered during testimony of Dr. Distefano, government will have further information for defendant as to the chain of custody after the evening break and the matter may be worked out by agreement. Court will rule on this matter, if counsel cannot agree. Court is aware that a ruling is still necessary on the request of defendant to strike the testimony of Witness James Horn. Court and counsel to meet 15 to 20 minutes before 9:00 a.m. to discuss these matters on 10/7/05. ENTERING ORDER Continuing said cause until 9:00 a.m. on 10/7/05. (JHP) (pyb, Deputy Clerk) Modified on 10/07/2005 (Entered: 10/07/2005) |
| 10/07/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter KM. Law Clerk DG) Outside of hearing of jury: Govt.counsel present. Deft.present with counsel. Court takes up testimony of govt.witness James Horn. Arguments of counsel. Court will strike testimony and will advise the jury of same this date. Court and counsel discuss Govt.Exhibit #102, a short video clip played to the jury. Counsel agrees this exhibit is admitted and Court admits same for the record, and advises that it can be played by the jury if they so desire. Govt. To make video tape available. Court submits an instruction for counsel to look at. No objections from either side. Court going to read same to jury and mark the instruction as Court's Exhibit 1. Regarding Govt. Exhibits 202–204, govt. requests permission to publish same. Granted by Court. In |

| | | | |
|---|---|---|---|
| | | | regard to Government's Exhibits 83–86, Court has reviewed same and will wait for testimony, but feels that these exhibits would be admissible. (JHP) JURY IN BOX. All parties present with counsel. Continued government's evidence. OUTSIDE OF HEARING OF JURY: Arguments of Government regarding Government's Exhibits 129 and 111. Arguments of defense re: chain of custody. Court will look at case submitted. If Government will submit the citation, or anything else, by way of briefing, for filing by close of business on Wednesday, October 12, 2005, and the defense may respond by close of business on Thursday, October 13, 2005. Govt.Exhibits #129 and #111 under advisement. JURY IN BOX: Court reads Instruction to jury and strikes testimony of government witness James Horn. (JHP) Continued government evidence and testimony. ENTERING ORDER continuing said cause until 9:00 a.m. on 10/18/05. (JHP) (pyb, Deputy Clerk) (Entered: 10/11/2005) |
| 10/18/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter G.E. Law Clerk DG) Parties announce ready. Jury in box. Further Government's evidence. ENTERING ORDER continuing said cause until 10/19/05 at 9:00 a.m. (JHP) (pyb, Deputy Clerk) (Entered: 10/19/2005) |
| 10/19/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter GE. Law Clerk DG) All parties present with counsel. Jury in box. Further Government's Evidence. ENTERING ORDER continuing said cause until 9:00 a.m. on 10/20/05. (JHP) (pyb, Deputy Clerk) Modified on 12/05/2005 (Entered: 10/20/2005) |
| 10/20/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter GE. Law Clerk DG) All parties present with counsel. Jury in box. Further Government's Evidence. At afternoon break Government requested Sealed Hearing, outside of jury. ENTERING ORDER releasing jury until 9:00 a.m. on 10/21/05, with counsel to report for sealed hearing at 8:30 a.m. on 10/21/05. (JHP) SEALED HEARING: Outside of hearing of jury. Govt. Counsel present. Deft. Present with counsel. Govt. Requested courtroom be sealed, and same has been done. Arguments of counsel regarding testimony of witness Charles Sanders. Court directs further action by counsel and then report to Court at 8:30 a.m. on 10/21/05 as to their findings and agreements, if any. Government requests Court to enter Findings of Fact regarding the Batson issue. Court directs Govt. To submit Proposed Findings by close of business on Monday, 10/24/05. Defense counsel asks for further sealed hearing regarding budget matters. Government and defendant excused. (Full minutes in sealed envelope attached to Minute Sheet for this trial. )(JHP) FURTHER SEALED HEARING: Defense counsel Roger Hilfiger and Bret Smith present. Court Reporter, Courtroom Deputy, Law Clerks and Court present only. Statements of counsel |

| | | | |
|---|---|---|---|
| | | | and orders of Court. (Full minutes in sealed envelope attached to Minute Sheet for this trial) (JHP) (pyb, Deputy Clerk) Modified on 12/05/2005 (Entered: 10/22/2005) |
| 10/21/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter GE. Law Clerk DG) All parties present with counsel. SEALED HEARING: Arguments of counsel regarding testimony of witness Sanders. Agreement reached as to what questions defense may ask the witness. Defendant requests a day or a half day between end of Government's evidence and start of defendant's evidence. Court will consider. Government request permission to bring in one witness out of time to accommodate the schedule of the witness. Deft. does not object. Granted by court. Sealed hearing concluded. (No sealed minutes on this hearing) (JHP) IN OPEN COURT: Jury in box. All parties present with counsel. Further Government's Evidence. OUTSIDE OF HEARING OF JURY: Oral motion of defendant to renew motion to suppress drug evidence. ENTERING ORDER: In order to have the motion to renew properly before the court, and allow government to properly respond, defendant shall file a motion by close of business on Monday, 10/24/05, with the government to respond by close of business on Wednesday, 10/26/05. (JHP) JURY IN BOX: Continued Government's evidence. ENTERING ORDER Continuing said cause until 9:00 a.m. on 10/24/05. (JHP) (pyb, Deputy Clerk) Modified on 12/05/2005 (Entered: 10/22/2005) |
| 10/21/2005 | 223 | | PRAECIPE by defendant Kenneth Eugene Barrett AND ISSUING one subpoena, for witness to appear on behalf of the defendant on 10/26/05 at 9:00 a.m., U.S.Cthse., Muskogee, OK. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/22/2005) |
| 10/21/2005 | 224 | | PRAECIPE by defendant Kenneth Eugene Barrett AND ISSUING one subpoena, for witness to appear on behalf of defendant on 10/26/05 at 9:00 a.m., U.S.Cthse., Muskogee, OK. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/22/2005) |
| 10/24/2005 | 225 | | MOTION to allow digital camera in courthouse by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/24/2005) |
| 10/24/2005 | 226 | | MINUTE ORDER before District Judge James H. Payne granting defendant's motion to allow digital camera in courthouse [225–1] for the purpose of photographing Government's Exhibit No. 1, the model of the scene. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/24/2005) |
| 10/24/2005 | 227 | | PRAECIPE by defendant and issuing 2 subpoenas for 10/28/05 at 9:00 a.m. (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/24/2005) |
| 10/24/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter G.E. Law Clerk DG) Parties announce ready. Jury in box. . Court advises that Juror #75 has been |

| | | | |
|---|---|---|---|
| | | | excused due to illness. Juror #55, the next alternate, will now be permanent juror. Court reads stipulation by the parties regarding testimony of government witness Kelley Karnes, and advises jury there will be an instruction. Further Government's evidence. ENTERING ORDER continuing said cause until 10/25/05 at 9:00 a.m. Outside of hearing of jury: Government advises that it has ordered the transcript regarding the Batson challenge issue, and will not file any findings at this time. If, after review of the transcript the govt. feels it is necessary, it will file something at that time. (JHP) (pyb, Deputy Clerk) Modified on 10/25/2005 (Entered: 10/24/2005) |
| 10/24/2005 | 228 | | MOTION/REQUEST to Reurge Defendant's Motion to Suppress the Drug Search Warrant by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/24/2005) |
| 10/25/2005 | | | BENCH Warrant issued for Brandie Zane Price for failure to appear pursuant to subpoena for jury trial on 10/25/05 by District Judge James H. Payne (cjt, Deputy Clerk) Modified on 10/26/2005 (Entered: 10/25/2005) |
| 10/25/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter G.E. Law Clerk DG and JA) Parties announce ready. Jury in box. Further Government's evidence. (At bench conference, Government advises that the power point presentation of witness Iris Dalley will be used for demonstrative purposes only, but that certain photographs from the presentation will be offered as additional government exhibits. No objection from defendant. Granted by Court. ) (Outside of hearing of Jury: Government requests Bench Warrant be issued for witness Brandie Zane Price, as witness has not honored the subpoena issued for her. Court grants and directs bench warrant be issued. At later time, outside of hearing of jury, Government advises that witness Price may possibly be on her way as directed. Govt. Requests permission to ask for the withdrawal of the Bench Warrant if witness does appear. Granted by Court). ENTERING ORDER continuing said cause until 10/26/05 at 9:00 a.m. (JHP) (Outside of hearing of jury: Deft. requests permission to do some of his direct with witness Iris Dalley, or else be allowed to call her back when government has rested and defense begins evidence. Government does not object to the direct of this witness at this time. Granted by Court. Government advises it will rest either Wednesday or Thursday. Court, depending on when Government rests, is considering a recess until Monday, 10/31/05, to start defendant's evidence. Defense advises that two of his witnesses will not be available until 10/31/05, and that defendant's evidence should be completed in two days.) (JHP) (pyb, Deputy Clerk) (Entered: 10/26/2005) |
| 10/26/2005 | 229 | | MINUTE ORDER before District Judge James H. Payne: Granting the oral request of United States Attorney Sheldon Sperling and withdrawing the bench warrant issued 10/25/05 to Brandie Zane Price. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/26/2005) |
| 10/26/2005 | 230 | | PRAECIPE by defendant and issuing 1 subpoena for 10/31/05 at 9:00 a.m. (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/26/2005) |
| 10/26/2005 | 231 | | |

| | | | |
|---|---|---|---|
| | | | RESPONSE by plaintiff USA to motion of defendant to Reurge Defendant's Motion to Suppress the Drug Search Warrant [228–1] (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/26/2005) |
| 10/26/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter G.E. Law Clerk DG)JURY IN BOX: Govt. counsel present. Defendant BARRETT present with counsel. Continued Government's evidence. OUTSIDE OF HEARING OF JURY: Government withdraws Bench Warrant as to witness Brandie Zane Price. Witness appeared and warrant is not necessary. Court will enter Minute Order withdrawing Bench Warrant. (JHP) Continued Government's evidence. BENCH CONFERENCE – Court directs photos of Government's Exhibit #1, the model of the property be taken reflecting the different positions of the automobiles and made Court exhibits. Govt. and deft. Counsel to be present for photos and try to agree on positioning of vehicles. If court rejects one or the other theory as to positioning, that side can use the photos as an offer of proof. This should be done to make the record complete, as the transcript cannot reflect the positioning of the cars as has occurred during testimony. The Government's Exhibit #1 is for demonstrative purposes only. (JHP) Continued government's evidence in presence of jury. Court reads instruction to the Jury regarding witness Iris Dalley's PowerPoint Presentationthat it is for demonstrative purposes only. Government is directed to provide the Clerk with a copy of the PowerPoint Presentation, and directs the Clerk mark same as Court's Exhibit #3, for the record. BENCH CONFERENCE: Defendant only wants the parts of Witness Dalley's PowerPoint presentation that were used to be submitted. Govt. agrees. Government advises that it intends to take certain photos from the presentation and mark them as separate exhibits and offer them into evidence. Deft. does not object. Defendant objects to testimony of government's witness Brandie Price as being cumulative as testimony will be about using drugs with defendant, and that has already been testified to by several others. Govt. advises she did not use drugs with the defendant and her testimony will be different. Defendant withdraws the objection. Continued government's evidence is presence of Jury. ENTERING ORDER Continuing said cause until 9:00 a.m. on 10/27/05. (JHP) OUTSIDE OF HEARING OF JURY: Court inquires as to whether progress is being made to finish government's evidence. Govt. advises it has two more witnesses after witness Higgs, and they will be short testimony regarding the red phosphorous. Govt. thinks can finish direct of witness Higgs within an hour, and deft. thinks can finish cross within an hour. Court advises if government does not finish on 10/27/05, that it will start again at 8:30 a.m. on 10/28/05 and go straight through until 1:00 p.m. and then recess for the weekend, with no lunch break. Court directs Clerk to mark the Instruction read to the Jury regarding Iris Dalley as Court's Exhibit #4. Government requests two days to get the PowerPoint Presentation of Iris Dalley to the Court to be marked as a Court's exhibit. Granted by Court. Government will bring the photos from the Power Point Presentation on 10/27/05 for admission into evidence before it rests. (JHP) (pyb, Deputy Clerk) (Entered: 10/27/2005) |
| 10/27/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon |

| | | | |
|---|---|---|---|
| | | | Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter G.E. Law Clerk DG and JA) Parties announce ready. Jury in box. Further Government's evidence. OUTSIDE OF HEARING OF JURY: Arguments of counsel regarding chain of custody of Government's Exhibit #129. Govt. To bring in Crystal Rhodes to testify regarding chain of custody. Court requests witness Higgs' testimony stops until witness Rhodes testifies. Court requests other witnesses be used until witness Rhodes arrives. Govt. Offers photos from Iris Dalley powerpoint presentation, and defendant adds some photos to the list. Court ADMITS Government's exhibits 221–229, 229A, 230–236, 236A, 237–241, 241A, 242–246, 246A, 247–252, 252A, 253–259, 259A, 260–265, 265A, 266–275, 275A, 278, 278A, 279–280, 280A, 281–283, 283A, 284–285, 285A, 286–288 and 288A, and may consider giving an instruction to the jury as to these exhibits . After further arguments of counsel, Government RE–OFFERS Govt. Exhibit #129, the lethal fragment, defendant objects, and Court OVERRULES the objection, and ADMITS the Govt. Exhibit #129, over the objection of the defendant, and notes defendant's objection. (JHP) Jury in box. All parties present with counsel. Continued Government's evidence. GOVERNMENT RESTS at 4:57 p.m. (BENCH CONFERENCE: By agreement, defendant will present his oral Rule 29 motion on Monday, October 31, 2005 at 8:45 a.m. Court will recess until Monday, 10/21/05.) ENTERING ORDER continuing said cause until 9:15 a.m. on Monday, October 31, 2005, for the jury, and Court, counsel and defendant will begin at 8:45 a.m. for defendant's motions. (JHP) Jury exited courtroom. Court advises counsel that in regard to the defendant s request to reurge the motion to suppress the drug evidence, the Court will need a transcript of the hearing on the motion to suppress, and same will have to be ordered. (JHP) (pyb, Deputy Clerk) (Entered: 10/28/2005) |
| 10/28/2005 | | | Marshal's return on: BENCH WARRANT: Returned unexecuted as to witness Brandie Zane Price, per Minute Order withdrawing same, which was entered 10/26/05. (pyb, Deputy Clerk) (Entered: 10/28/2005) |
| 10/31/2005 | 232 | | SEALED MOTION to modify order approving budget of 3/18/05 by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 10/31/2005) |
| 10/31/2005 | 233 | | PRAECIPE by defendant and issuing 2 subpoenas for 11/1/05 at 9:00 a.m. (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/31/2005) |
| 10/31/2005 | 234 | | MINUTE ORDER: At the direction of District Judge James H. Payne, it is hereby ordered that: Defendant Barrett's CJA 30 Death Penalty Proceedings––Appointment of and Authority to Pay Court Appointed Counsel, as to appointed counsel Roger Hilfiger, submitted 10/1/2005, for the period covering 8/1/05 to 8/31/05, is hereby REFERRED to U.S. Magistrate Judge Steven P. Shreder for hearings and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate Judge said original Application and supporting documents. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/31/2005) |
| 10/31/2005 | 235 | | MINUTE ORDER: At the direction of District Judge James H. Payne, it is |

| | | | |
|---|---|---|---|
| | | | hereby ordered that: Defendant Barrett's CJA 30 Death Penalty Proceedings−−Appointment of and Authority to Pay Court Appointed Counsel, as to appointed counsel Roger Hilfiger, submitted 10/1/2005 for the period covering 9/1/05 to 9/30/05, is hereby REFERRED to U.S. Magistrate Judge Steven P. Shreder for hearings and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate Judge said original Application and supporting documents. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/31/2005) |
| 10/31/2005 | 236 | | MINUTE ORDER: At the direction of District Judge James H. Payne, it is hereby ordered that: Defendant Barrett's CJA 30 Death Penalty Proceedings−−Appointment of and Authority to Pay Court Appointed Counsel, as to appointed counsel Bret Smith, submitted 10/17/2005 for the period covering 9/1/05 to 9/30/05, is hereby REFERRED to U.S. Magistrate Judge Steven P. Shreder for hearings and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate Judge said original Application and supporting documents. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 10/31/2005) |
| 10/31/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Court Reporter G.E. Law Clerk DG and JA) Parties announce ready. Jury in box. OUTSIDE OF HEARING OF JURY: Oral Rule 29 motion of defendant for judgment of acquittal. Arguments of counsel. ENTERING ORDER: Overruling defendant's oral motion for Rule 29 judgment of acquittal. (JHP) JURY IN BOX. All parties present with counsel. Defendant's evidence. ENTERING ORDER continuing said cause until 11/01/05 at 9:00 a.m. (JHP) OUTSIDE OF HEARING OF JURY: Parties announce that they are working on a stipulation regarding the blood spatters found under the window in the house, that the lab test results revealed that the blood belonged to defendant Barrett, and therefore, witness Joann Kihega, will not need to be brought back for further testimony. Court directs counsel to provide the stipulation in writing and the Court or counsel can read same to the jury. Defendant advises that he should finish before noon on 11/1/05. Court advises that it will take the better part of the afternoon to work on the jury instructions, and make a record, and then the closing arguments and instructions can be done on Wednesday morning, and then submit the case to the jury. Counsel directed to advise the court tomorrow as to how long they want for closing arguments. (JHP) (pyb, Deputy Clerk) (Entered: 11/01/2005) |
| 11/01/2005 | 237 | | SEALED PSYCHOLOGICAL EVALUATION/RISK ASSESSMENT prepared by J. Randall Price, Ph.D., ABPP, ABPN (SEALED) received for Kenneth Eugene Barrett. NO COPIES distributed until further order of the Court. VIDEOTAPE interview included and placed in sealed envelope with Report. (pyb, Deputy Clerk) Modified on 11/01/2005 (jcb, Deputy Clerk). ***Modified on 12/1/2016 to reflect Pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, received from 10th Circuit and STORED IN CLERK'S OFFICE 2ND |

| | | |
|---|---|---|
| | | FLOOR VAULT (See Pleading #268 in CIV–09–105–JHP, LETTER from Circuit Court)*** (cjt, Deputy Clerk). ***Modified on 5/10/2019 to reflect #237 Sealed Psychological Eval with VIDEOTAPE and #265 Sealed Notice with DISK returned to 10th Circuit (See Pleading #485 in CIV–09–105–RAW, LETTER to Circuit Court)*** (cjt, Deputy Clerk). (Entered: 11/01/2005) |
| 11/01/2005 | 238 | SEALED materials extracted per Court Order from Dr. Randall Price's Report of Psychological Evaluation/Risk Assessment Tendered to Defense Cousnel and Government Counsel. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Additional attachment(s) added on 1/31/2013: # 1 Main Document) (jcb, Deputy Clerk). (Entered: 11/01/2005) |
| 11/01/2005 | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Ctrm.1 Court Reporter G.E. Law Clerk DG and JA) Parties announce ready. Jury in box. Court reads jury stipulation as to testimony of witness Joan Kihega regarding blood testing of blood found under east window in east room of Barrett residence, and that same matched blood of defendant Barrett. Further Defendant's evidence. OUTSIDE OF HEARING OF JURY: Defendant Barrett advised of his constitutional right to testify or not to testify. Defendant advises court he will not testify. JURY IN BOX: Defendant rests. Government's rebuttal. Government rests. Defendant has no surrebuttal. All parties rest. Jury excuses jury until a little before 8:30 a.m. on 11/2/05, and advises that there will be instructions and closing arguments on 11/2/05 and the case will then be submitted to the jury by about 1:00 p.m. Menues will be given to jurors on 11/2/05 for ordering lunch. ENTERING ORDER continuing said cause until 11/02/05 at 8:30 a.m. (JHP) OUTSIDE OF HEARING OF JURY: Court directs counsel to look over the proposed Court's jury instructions and advise when they are ready to make a record. Govt. requests alternates not be released, and be directed to stay for the penalty phase of this case. Court agrees. Counsel desires to have 1 hour 45 minutes for closing. Defense requests they be allowed to split their time between counsel Hilfiger and Smith. Granted by Court. Govt. Advises counsel Littlefield will have 1 hour and counsel Sperling will have 45 minutes. Counsel to meet with the court in chambers to make record on instructions. (2:04 p.m.) OUTSIDE OF HEARING OF JURY, IN COURTROOM: (6:40 p.m. to 7:00 p.m.) All counsel present, with court reporter, courtroom deputy and law clerks. Court and counsel make partial record on jury instructions, and verdict forms. Court directs counsel to submit any further proposed interrogatories to the Law Clerk Denise Graham on 11/2/05 by 9:30 a.m.. Court directs that final record on instructions, verdict forms and interrogatories will start at 10:30 a.m. on 11/2/05, and the jury is to be told to be ready to resume at 1:00 p.m. Clerk is directed to call jurors and delay their reporting until 1:00 p.m. on 11/2/05. Counsel will submit pictures of the demonstrative aid, the model of the home and surrounding property of defendant, on 11/2/05, to be made Court's exhibits. (JHP) (pyb, Deputy Clerk) Modified on 11/02/2005 (Entered: 11/02/2005) |
| 11/02/2005 | 239 | |

| | | | |
|---|---|---|---|
| | | | PROPOSED JURY INSTRUCTIONS FOR SPECIAL INTERROGATORIES submitted by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/02/2005) |
| 11/02/2005 | 418 | | TRANSCRIPT of proceedings for the following date(s): 1/26/05 (Re: Hearing on motions as to defendant Kenneth Eugene Barrett) by court reporter Karla McWhorter (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/02/2005) |
| 11/02/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Ctrm. 1 Court Reporter G.E. Law Clerk DG and JA) IN COURTROOM, OUTSIDE OF HEARING OF JURY: 11:25 a.m. to 12:12 p.m.) Govt. and Deft. Counsel both present. Further record made as to Jury Instructions, Verdict Forms and Special Interrogatories. Objections of counsel and arguments. Court to take the objections under advisement and will meet back later. Counsel to provide the Court with handwritten, typed, or verbal objections to specific instructions and interrogatories by 12:30 and Court will make rulings, and set Final Record as to Jury Instructions, etc. (JHP) IN CHAMBERS: (1:29 p.m. to 1:50 p.m.) Court and Counsel make final record on jury instructions, verdict forms and special interrogatories. Court agreed to amend Jury Instruction #15 and will get counsel a copy of the amended instruction. (JHP) IN COURTROOM: (2:04 p.m. to 2:18 p.m.) Jury in the box. Govt. Counsel present. Defendant BARRETT present with counsel. Court advises jury that it has taken longer to prepare the instructions than anticipated, and it is too late to submit the case to the jury this afternoon. ENTERING ORDER continuing said cause until 8:30 a.m. on 11/3/05. Jury to report a little before 8:30 a.m. Court will do instructions at that time, and counsel will do closing arguments. The case should be submitted to the jury around 1:00 p.m. and the jury will be provided lunch and then begin deliberations. (JHP) Jury excused for the day. Outside of hearing of jury: Court advises that the back podium will be used for closing, and if counsel desires to approach the model, Govt. Exhibit 1, during closing arguments, the wireless microphone will be available for them to use. The digital images taken of the Government's exhibit 1, model, will be submitted to the Clerk for marking as Court's Exhibits 7–17. Counsel will be allowed to use these digital images during closing, but may not indicate to the jury that they are Court's exhibits. These exhibits are for the purpose of preserving the record for appeal purposes if necessary. Each side will be given 1 hour 45 minutes for closing. Counsel directed to advise the Clerk as to how it is to be split and how much warning time is desired. Counsel and defendant excused until 8:30 a.m. on 11/3/05. (JHP) (pyb, Deputy Clerk) (Entered: 11/02/2005) |
| 11/03/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Ctrm. 1 Court Reporter G.E. Law Clerk DG and JA) Parties announce ready. Jury in box. COURT INSTRUCTIONS read to jury. Closing arguments of government and defendant. Bailiff sworn and jury retires to deliberate at 1:49 p.m. Court advises that Defendant's Exhibit #214, the jeans of defendant Barrett, worn on |

| | | | |
|---|---|---|---|
| | | | the night of the incident, are not to be sent to the jury, as same have been unsealed and might present a health hazard. Alternates taken to a separate room to await the verdict. Court receives note from jury foreperson, Jimmy Bennett, (Marked Court's Exhibit #19) requesting a copy of the Jury Instructions, Verdict Forms and Special Interrogatories for each jury. Granted by Court. Copies taken to the jury. Upon oral request of Government Counsel D. Michael Littlefield, the Court directs the Clerk to advise the jury that if they wish to see Government's Exhibit #1, the exemplar model of the Barrett premises, they can knock on the door and a Court Security Officer will make arrangements to take them into the Courtroom to examine the exhibit. Counsel Littlefield advised that Defense Counsel Roger Hilfiger has no objection to the request. Court recesses at 1:53 p.m. until jury reaches a verdict. (JHP) IN COURTROOM: 6:21 p.m. Govt. Counsel present, deft. Present with counsel. Court advises it has received a note from the jury, marked as Court Exhibit 21. Counsel to bench to review the note and discuss same and procedures for answering the question. JURY IN BOX at 6:31 p.m., All parties present. Alternates also present. Court advises jury that in regard to the note sent, the jury is instructed to return to the deliberation room and read the instructions. Court is confident that the answer to the jury's question is contained in the instructions. Jury retires at 6:35 p.m. Recess at 6:36 p.m. (JHP) IN COURTROOM: 10:13 p.m. to 10:18 p.m.: Govt. Counsel present. Deft. Present with counsel. Jury in Box. ENTERING ORDER Continuing said cause until 9:00 a.m. on 11/4/05, for further jury deliberations. Jury is released for the evening, and are to report to the jury room by 9:00 a.m. on 11/4/05, and are not to begin deliberations until all are present. Counsel to advise court as to how they can be reached when a verdict has been reached. (JHP) (pyb, Deputy Clerk) (Entered: 11/04/2005) |
| 11/04/2005 | | | FURTHER JURY TRIAL: (9:00 a.m.) Jury reconvenes to continue delibertions. IN COURTROOM: (11:12 a.m. to 11:28 a.m.) Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Ctrm. 1 Court Reporter G.E. Law Clerk DG and JA) Jury in box. Court advises it has received a note from Foreperson Jimmy Bennett, that the jury has reached a verdict. VERDICT: Jury unanimously finds Defendant KENNETH EUGENE BARRETT guilty as to Counts 1, 2 and 3 of the Superseding Indictment. (Pleading follows Minutes) SPECIAL INTERROGATORY – Count One: Jury unanimously finds, beyond a reasonable doubt that the Defendant, Kenneth Eugene Barrett, in the act of killing David Eales, committed murder. (Pleading follows minutes) SPECIAL INTERROGATORY – Count Two: Jury unanimously finds, beyond a reasonable doubt that the Defendant, Kenneth Eugene Barrett, in the act of killing David Eales, committed murder. (Pleading follows minutes) Jurors polled by showing of hands. Government and defendant do not request further polling. ENTERING ORDER Continuing said cause, for penalty phase, until November 9, 2005 at 9:00 a.m. (JHP) (Jurors exited courtroom.) The Court directs the Clerk to maintain the exhibits in this trial for both sides, until the conclusion of the penalty phase. ENTERING ORDER: Directing government to provide the Court with a summary of its evidence to be presented regarding victim impact. (JHP) Govt. advises it can have same by close of business |

| | | | |
|---|---|---|---|
| | | | today, or first thing tomorrow. ENTERING ORDER: Directing Defendant to notify the Court by the morning of Wednesday, 11/9/05, as to whether or not defense will use Rule 12.2 evidence. (JHP) Defense advises it should make that decision by Monday, 11/7/05. Court in recess. (JHP) (pyb, Deputy Clerk) (Entered: 11/04/2005) |
| 11/04/2005 | 240 | | JURY INSTRUCTIONS by District Judge James H. Payne (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/04/2005) |
| 11/04/2005 | 241 | | VERDICT as to Kenneth Eugene Barrett : Jury unanimously finds defendant BARRETT guilty as to Counts 1, 2 and 3 of the Superseding Indictment. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/04/2005) |
| 11/04/2005 | 242 | | SPECIAL INTERROGATORY, Count One: Jury unanimously finds beyond a reasonable doubht that the Defendant, Kenneth Eugene Barrett, in the act of killing David Eales, committed murder. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/04/2005) |
| 11/04/2005 | 243 | | SPECIAL INTERROGATORY– Count 2: Jury unanimously finds, behond a reasonable doubt, that the Defendant, Kenneth Eugene Barrett, in the act of killing David Eales, committed murder. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/04/2005) |
| 11/04/2005 | 244 | | SEALED MINUTE ORDER before District Judge James H. Payne GRANTING defendant's motion to modify order approving budget of 3/18/05 [232–1] as set forth in the motion to modify. (JHP) (cc: all counsel) (pyb, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV–09–105–JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 11/04/2005) |
| 11/04/2005 | 245 | | MINUTE ORDER before District Judge James H. Payne: The parties are directed to file any updated jury instructions for the second stage by close of business on Monday, 11/7/05. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/04/2005) |
| 11/04/2005 | 246 | | SEALED APPLICATION for protective order by plaintiff USA as to Kenneth Eugene Barrett (pyb, Deputy Clerk) Modified on 5/30/2006 –UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 11/07/2005) |
| 11/07/2005 | 247 | | SEALED MINUTE ORDER before District Judge James H. Payne granting government's sealed motion for protective order [246–1], and directing that the Governments's Motion for Protective Order, the Government's Brief, and this Minute Order be sealed. (JHP) (cc: all counsel) (pyb, Deputy Clerk) Modified on 5/30/2006 – UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 11/07/2005) |
| 11/07/2005 | 248 | | SEALED BRIEF by plaintiff USA (pyb, Deputy Clerk) Modified on 5/30/2006 – UNSEALED per Minute Order, #358 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 11/07/2005) |
| 11/08/2005 | | | TELEPHONIC NOTICE: STATUS CONFERENCE is set for 3:30 p.m. on 11/8/05 for Kenneth Eugene Barrett before Judge James H. Payne, (In Chambers) at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK. Defendant does not need to be present. (called: all counsel) (pyb, Deputy |

| | | | |
|---|---|---|---|
| | | | Clerk) (Entered: 11/08/2005) |
| 11/08/2005 | 249 | | PROPOSED JURY INSTRUCTIONS–SENTENCING PHASE submitted by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/08/2005) |
| 11/08/2005 | 250 | | PRAECIPE AND ISSUING 1 subpoena by defendant Kenneth Eugene Barrett, for witness to appear 11/9/05 at 9:00 a.m., to testify on behalf of defendant, U.S.Cthse., Muskogee, OK. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/08/2005) |
| 11/08/2005 | | | STATUS CONFERENCE: Government present by U.S.Attorney Sheldon Sperling. Defense counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. In Chambers. Court Reporter G.E. Law Clerk DG and JA) Court has discussion with counsel off the record regarding penalties that can be rendered; the government's victim impact statements and testimonycounsel reached agreement as to what would be presented; and aggravating factors. Government to advise the court first thing on 11/9/05 if it desires to make a record on the aggravating factors discussed. Court will be available by 8:30 a.m. Govt. will be prepared to make an oral motion to withdraw certain parts of the aggravating factors issues on 11/9/05, if not in writing. Defendant advises he does not plan to use any mental health issues as part of his defense, and will not have a psychiatrist testify. Deft. To file a motion in limine first thing on 11/9/05, and Court will have a HEARING on said motion at 9:00 a.m. on 11/9/05. Jury to report to begin further proceedings by 10:00 a.m. Court will allow 30 to 40 minutes for opening statements for each side. (JHP) (pyb, Deputy Clerk) (Entered: 11/08/2005) |
| 11/09/2005 | 251 | | PRAECIPE by defendant and issuing 6 subpoenas for 11/14/05 at 9:00 a.m. (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/09/2005) |
| 11/09/2005 | 252 | | MOTION in limine as to Government Witnesses on Future Dangerousness, regarding testimony of Kevin Otwell, Larry Lane, Shannon Smith and Sheldon Fair by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/10/2005) |
| 11/09/2005 | 253 | | ORDER by District Judge James H. Payne overruling Defendant's Motion/Request to Reurge Defendant's Motion to Suppress the Drug Search Warrant [228–1] (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/10/2005) |
| 11/09/2005 | | | HEARING ON PRELIMINARY INSTRUCTIONS AND DEFENDANT'S MOTION IN LIMINE AS TO GOVERNMENT WITNESSES ON FUTURE DANGEROUSNESS: IN CHAMBERS: Government present by U.S.Attorney Sheldon Sperling. and Assistant U.S.Attorney D. Michael Littlefield. Defense counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. In Chambers. Court Reporter G.E. Law Clerk DG and JA) Court and counsel make record on Court's preliminary instructions to be given to the jury regarding the penalty phase. Deft. requests an additional general admonition concerning emotions of the audience during testimony. Court will give an additional admonition. Arguments of counsel regarding what testimony is permitted as to victim impact. Court admits Government's photo exhibits 302, 306, 307, 309, 312, 316 and 318 for use regarding victim impact. Government requests leave to bring witness Vicky Lyons back to |

| | | | |
|---|---|---|---|
| | | | testify, in order to offer Government's Exhibit #56. Defendant objects. Arguments of Counsel. Defendant's objection sustained. Court will not allow the exhibit. Arguments of counsel as to government's further exhibits regarding victim impact statements in writing. Court allows Government's Exhibits 324, and 326. Government's exhibit #329 is under advisement by the Court. Arguments of counsel and discussion by Court as to Aggravating Factors: Court and counsel reach an agreement as to aggravating factors. Arguments of counsel regarding defendant's motion in limine as to Government witnesses on future dangerousness. ENTERING ORDER: Granting in part and Denying in Part defendant's Motion in Limine as to Government Witnesses on future dangerousness as follows: Court will allow the testimony of witnesses Larry Lane and Shannon Smith, only to the extent to show defendant's attitude toward law enforcement in prison; therefore, that portion of the motion is overruled; Court grants the motion as to witness Sheldon Fare, and will not allow that testimony; Court advises that while drug trafficking business could be relevant, the evidence is redundant and government may not put same on; Defendant's motion in limine as to witness Kevin Otwell is grantedgovernment may not put his testimony on; as to the testimony of Travis Crawford and Johnny Philpot, their testimony is admissible through the testimony of the former wife of defendant and Gelene Dotson. If the former wife and the mother, Gelene Dotson, testify, then witnesses Johnny Philpot and Travis Crawford may testify for impeachment purposes if necessary. Court will allow testimony of Stanley Philpot and Johnny Philpot as their testimony shows a threat to law enforcement. (JHP) Deft. Requests that the Rule of Sequestration remain in effect. Court will grant, but will allow family members of the victim to remain in courtroom. (JHP) (Times for these In Chambers hearings: 9:34 a.m. to 11:50 a.m. and 1:04 p.m. to 1:17 p.m.) IN COURTROOM: (1:40 p.m.) Jury in box. Govt. Present by U.S.Atty. Sheldon J. Sperling and Asst. U.S.Atty. D. Michael Littlefield. Govt. Agents Darren Lane and Ben Rosser present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret Smith. (Courtroom Deputy PB. Ctrm.1. Court Reporter GE. Law Clerks DG and JA) Court reads preliminary instructions to jury regarding penalty phase of this case. Opening Statement of Government. Defendant reserves his opening statement until testimony on behalf of defendant begins. Government's Evidence as to Penalty Phase: Government offers all previously marked and admitted exhibits and testimony from the guilt phase of the trial. No objection by defendant. Admitted by Court. ENTERING ORDER Continuing said cause until 9:00 a.m. on 11/10/05. (JHP) (pyb, Deputy Clerk) (Entered: 11/10/2005) |
| 11/10/2005 | 254 | | PRAECIPE AND ISSUING 8 named witness subpoenaes and 5 blank subpoenaes by defendant Kenneth Eugene Barrett, for witnesses to appear 11/14/05 at 9:00 a.m., U.S. Cthse., Muskogee, Oklahoma. (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/10/2005) |
| 11/10/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Ctrm. 1 Court Reporter G.E. Law Clerk DG and JA) Jury in box. Further Government's evidence regarding |

| | | | |
|---|---|---|---|
| | | | penalty phase BENCH CONFERENCE: Court and counsel discuss exhibits. Deft. Objects to Govt. Exhibit # 329. Govt. agrees this exhibit should be a demonstrative aid only, as the witness read same into the record. Court STRIKES Govt. Exhibit #329 as an admitted exhibit and directs same can be admitted for demonstrative purposes only. Government's exhibit #312 is withdrawn by govt. Govt. further withdraws its Exhibit #312. Govt. and defendant agree and Court grants the request that Government's exhibits 324 and 326 are also STRICKEN as admitted exhibits, and are to be admitted for demonstrative purposes only, as these exhibits were also read to the jury by witnesses. (End of Bench Conferences) Government rests as to penalty phase at 11:08 a.m. ENTERING ORDER continuing said cause until Monday, 11/14/05 at 9:00 a.m. Jury to check in a little before 9:00 a.m. (JHP) OUTSIDE OF HEARING OF JURY: Oral motion of defendant for mistrial regarding victim impact testimony. Arguments of counsel. Statements of Court. ENTERING ORDER overruling defendant's oral motion for mistrial. (JHP) Deft. Advises that his case as to penalty phase will take about 2 days. (JHP) (pyb, Deputy Clerk) (Entered: 11/16/2005) |
| 11/14/2005 | 423 | | PARTIAL TRANSCRIPT of proceedings for the following date(s): 11/10/05 (Re: jury trial, penalty phase) by court reporter Greg Eustice (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/14/2005) |
| 11/14/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Ctrm. 1 Court Reporter G.E. Law Clerk DG and JA) Jury in box. Opening statement by Defendant. Defendant's evidence. ENTERING ORDER continuing said cause until 11/15/05 at 9:00 a.m. (JHP) (pyb, Deputy Clerk) (Entered: 11/15/2005) |
| 11/15/2005 | 255 | | MOTION in limine regarding testimony of Robert Gude by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/15/2005) |
| 11/15/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Ctrm. 1 Court Reporter G.E. Law Clerk DG and JA) OUTSIDE OF HEARING OF JURY, AND IN THE COURTROOM: HEARING on Defendant's Motion in Limine regarding testimony of defense witness Robert Gude. Arguments of counsel, questions of court. Counsel reached an agreement as to the testimony of withness Gude and the motion is moot. (JHP) IN COURTROOM: JURY IN BOX. Govt. Counsel present. Deft. Present with counsel. Further Defendant's evidence. Defendant advises he does not wish to testify in this penalty phase. Defendant rests. Government requests until tomorrow to present it's rebuttal. ENTERING ORDER continuing said cause until 9:00 a.m. on 11/16/05. (JHP) (pyb, Deputy Clerk) (Entered: 11/15/2005) |
| 11/16/2005 | 256 | | MOTION in limine regarding Government's Rebuttal Witnesses Joshawa Arnold, Stan Philpot, John Philpot, George Bormann, Michael Hendricks, |

| | | | |
|---|---|---|---|
| | | | Rick Carter, Tommy Burger and Rick Fargo by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/16/2005) |
| 11/16/2005 | | | FURTHER JURY TRIAL: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Ctrm. 1 Court Reporter G.E. Law Clerk DG and JA) IN COURTROOM – OUTSIDE OF HEARING OF JURY: Govt. cnsl.present. Deft. present with counsel. HEARING on Defendant's Motion in Limine regarding Government's Rebuttal Witnesses, Joshua Arnold, Stan Philpot, John Philpot, George Bormann, Michael Hendricks, Rick Carter, Tommy Burger, and Rick Fargo. Court directs that it be allowed to hear testimony of witness Joshua Arnold before ruling on this motion. Government's Evidence and Witness. Arguments of counsel and questions of court. ENTERING ORDER Granting in Part and Denying in Part Defendant's Motion in Limine regarding Government's Rebuttal Witnesses: As to witness Joshua Arnold, the motion is sustained, and this witness will not testify before the jury. The testimony is more prejudicial than probative. As to witnesses Beorge Bormann, Michael Hendricks, Rick Carter, Tommy Burger and Rick Fargo, the motion is overruled and witnesses may testify. Court has not sustained the motion in limine as to any witnesses mentioned therein, except for witness Joshua Arnold. (JHP) IN COURTROOM – JURY IN BOX: Govt.cnsl.present. Deft.present with counsel. Government's Rebuttal Evidence regarding Penalty Phase. (BENCH CONF: Arguments of counsel regarding testimony of witnesses as to incident that occurred this date at lunch break. Court will not allow the testimony.) Government rests. No Surrebuttal by defendant. All parties rest. ENTERING ORDER continuing said cause until 9:30 a.m. on 11/17/05, for jury to return. (JHP) Outside of hearing of jury: Court will submit the proposed jury instructions to counsel and counsel to examine them and then the record will be made with regard to the instructions. Discussion held as to how long for closing arguments. Court will allow up to 90 minutes. Counsel to advise more precisely in the morning. Recess at 2:17 p.m. until counsel prepared to make record on the instructions. (JHP) At a later time, Court directed that the record on jury instructions would be held at 8:30 a.m. on 11/17/05. Court recessed for evening. (JHP) (pyb, Deputy Clerk) (Entered: 11/17/2005) |
| 11/17/2005 | | | FURTHER JURY TRIAL–PENALTY PHASE: Government present by U.S.Attorney Sheldon Sperling, and Asst.U.S.Atty. D.Michael Littlefield. Government agents Darren Lane and Ben Rosser also present. Defendant BARRETT present in person and by appointed counsel Roger Hilfiger and Bret A. Smith. (Before Hon. James H. Payne. Courtroom Deputy PB. Ctrm. 1 Court Reporter G.E. Law Clerk DG and JA) IN COURTROOM–OUTSIDE OF HEARING OF JURY: Govt. Cnsl. present. Deft. counsel present with deft. Court and counsel make record on jury instructions, verdict forms and special interrogatories for Counts 1, 2 and 3. IN COURTROOM: Jury in box. Govt.cnsl. present. Deft. present with counsel. Instructions read to jury by Court. Closing arguments of counsel. OUTSIDE OF HEARING OF JURY: There was a verbal outburst by defendant during closing arguments and defendant was removed from the courtroom at that time. Court and counsel discuss need to do an instruction to the jury regarding the defendant's |

statements. Deft. brought before the court and advises the court , after the incident during closing arguments, that he does not desire to be in the courtroom anymore, and does not wish to be present when a verdict is reached. Granted by court, but court directs defense counsel to speak with defendant again before the verdict is reached, in the event defendant changes his mind. JURY IN BOX: Court gives jury an instruction as to the incident with defendant during closing arguments, and same is marked as Court's Exhibit #24. Court gives final closing instruction. Bailiff sworn and jury retires to deliberate at 4:19 p.m. (JHP) IN COURTROOM – 12:31 a.m. Govt. counsel present. Defendant's counsel present. Deft. NOT present by choice. Court advises it has received note from the jury, marked Court's Exhibit 28, stating they had reached a verdict. Court inquires of defense counsel if defendant wishes to be present and is advised that defendant does not wish to be present for the verdict. JURY IN BOX. PENALTY PHASE SPECIAL VERDICT FORM: Count 1: Life in prison without possibility of release; Count 2: Life in prison without possibility of release; Count 3: Death Sentence. Verdict read in open court. Court directs Verdict be filed of record. Jury polled by showing of hands. Deft. requests jurors be polled individually. Court polled jurors individually. Court directs counsel to approach bench and review all pages of the verdict form. Govt. and Deft. have no further record to make with regard to the Verdict. ENTERING ORDER directing each party to withdraw their respective trial exhibits, the same to be kept and maintained for possible appeal purposes. (JHP) Court directs the notes taken by the jurors be shredded by the Clerk. Jury and alternates excused. Govt. requests permission to retrieve exhibits on 11/18/05. Granted by court. ENTERING ORDER: that Defendant is to remain in the custody of the U.S.Marshal's Service. Sentencing is set for 12/7/05 at 10:00 a.m. (JHP) (1:03 a.m.) (pyb, Deputy Clerk) Modified on 11/21/2005 (Entered: 11/18/2005) |

| 11/17/2005 | 257 | | JURY INSTRUCTIONS––SENTENCING PHASE by District Judge James H. Payne (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/18/2005) |
| 11/17/2005 | 258 | | PENALTY PHASE SPECIAL VERDICT as to Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 11/18/2005) |
| 11/21/2005 | | | NOTICE: SENTENCING is set for 12/7/05 at 10:00 a.m. for Kenneth Eugene Barrett before Judge James H. Payne, Courtroom 1, at the U.S. Courthouse, 5th and Okmulgee Streets, Muskogee, OK (cc: all counsel) (pyb, Deputy Clerk) (Entered: 11/21/2005) |
| 12/02/2005 | | | Marshal's return on: Writ of Habeas Corpus Ad Testificandum executed as to witness CHARLES E. SANDERS, as follows: Rec'd.witness from Stringtown on 9/19/05, delivered witness to CCA, Tulsa, OK. Rec'd witness from CCA, Tulsa, and delivered him to Muskogee Fed.Court on 10/19/05. Rec'd witness from Muskogee Fed.Court and delivered him to CCA, Tulsa on 10/19/05. Rec'd. witness from CCA, Tulsa, and delivered him to Muskogee Federal Court on 10/20/05. Recd. witness from Muskogee Federal Court and delivered him to CCA Tulsa on 10/20/05. Rec'd witness from CCA Tulsa and delivered him to Muskogee Federal Court on 11/9/05. Rec'd. witness from Muskogee Federal Court and delivered him to CCA Tulsa, on 11/9/05. (pyb, Deputy Clerk) (Entered: 12/02/2005) |

| | | | |
|---|---|---|---|
| 12/02/2005 | | | Marshal's return on: 10/22/04 writ executed as to Kenneth Eugene Barrett by receiving custody of defendant from OSP and delivering to Muskogee County Jail (cjt, Deputy Clerk) (Entered: 12/02/2005) |
| 12/06/2005 | 259 | | MINUTE ORDER before District Judge James H. Payne ; STRIKING sentencing set 12/7/05 and RESETTING SENTENCING for 12/20/05 at 2:00 p.m., for Kenneth Eugene Barrett , before Hon. James H. Payne, Courtroom 1, at the U.S. Courthouse, Fifth & Okmulgee Streets, Muskogee, Oklahoma. (JHP) (cc: all counsel) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/06/2005) |
| 12/07/2005 | 260 | | REQUEST for appointment of appellate counsel , and to continue Sentencing date by defendant Kenneth Eugene Barrett (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/07/2005) |
| 12/07/2005 | 261 | | SEALED MINUTE ORDER before Mag. Judge Steven P. Shreder regarding CJA compensation (SPS) (cc: all counsel) (fe, Deputy Clerk) Modified on 12/07/2005 Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 12/07/2005) |
| 12/07/2005 | 262 | | SEALED MINUTE ORDER before Mag. Judge Steven P. Shreder regarding CJA compensation (SPS) (cc: all counsel) (fe, Deputy Clerk) Modified on 12/07/2005 Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 12/07/2005) |
| 12/07/2005 | 263 | | ORDER by District Judge James H. Payne granting defendant's motion for appointment of appellate counsel [260−1], appointing Attorney Mark Henricksen, and instructions as to expenses and payment. Counsel is directed to provide Court with a budget for review by 12/14/05, covering services which counsel anticipates incurring before this Court. Counsel to submit a completed CJA Form 30, with billing statement, within 30 days following sentencing herein, to Office of Federal Public Defender. (cc: all counsel, and FAXED copy to Mr. Henricksen, with instructions to file an entry of appearance) (pyb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/08/2005) |
| 12/07/2005 | | | CJA Form 30 (Appointment of Counsel – Mark Henricksen) on behalf of defendant Kenneth Eugene Barrett. (JHP 12/7/05) (smg, Deputy Clerk) Modified on 01/13/2006 (Entered: 01/13/2006) |
| 12/09/2005 | 264 | | SEALED APPLICATION for protective order by plaintiff USA as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/12/2005) |
| 12/09/2005 | 265 | | SEALED NOTICE by plaintiff with attached disk (cjt, Deputy Clerk) Modified on 12/12/2005 (jcb, Deputy Clerk). Modified on 12/1/2016 to reflect Pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, received from 10th Circuit and STORED IN CLERK'S OFFICE 2ND FLOOR VAULT (See Dkt. #268 LETTER from Circuit Court filed in 09cv105−JHP)*** (cjt, Deputy Clerk). ***Modified on 5/10/2019 to reflect #237 Sealed Psychological Eval with VIDEOTAPE and #265 Sealed Notice with DISK returned to 10th Circuit (See Pleading #485 in CIV−09−105−RAW, LETTER to Circuit Court)*** (cjt, Deputy Clerk). (Entered: 12/12/2005) |

| | | | |
|---|---|---|---|
| 12/09/2005 | 266 | | SEALED PROTECTIVE ORDER by District Judge James H. Payne granting motion for protective order [264–1] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/12/2005) |
| 12/12/2005 | 267 | | MINUTE ORDER before District Judge James H. Payne: The government is hereby ordered to advise this Court by 12:00 Noon on 12/13/05: (1) whether the items filed under seal herein on 12/9/05 are relevant to any issue pending before this Court and if so, how, including all authority relied upon by the government; and (2) if the items are relevant to the issue of sentencing what action, if any, is the Government requesting this Court take based upon these items? The Defendant shall have until 12:00 Noon on 12/14/05 to file any response they feel is necessary. The Clerk shall provide a copy of the Notice filed by the Government on 12/9/05 which does not contain a certificate of mailing to defense counsel. (JHP) (cc: all counsel) (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/12/2005) |
| 12/13/2005 | 268 | | RESPONSE by plaintiff pursuant to minute order of 12/12/05 [267–2] [265–1] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/13/2005) |
| 12/13/2005 | 269 | | REQUEST for resetting sentencing date by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/13/2005) |
| 12/13/2005 | 270 | | ENTRY OF APPEARANCE for defendant Kenneth Eugene Barrett by Attorney Mark Henricksen (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/13/2005) |
| 12/13/2005 | 271 | | MOTION to extend deadline for submitting litigation budget by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/13/2005) |
| 12/13/2005 | 272 | | MINUTE ORDER before District Judge James H. Payne granting defendant's motion for resetting sentencing date [269–1] . The Sentencing set for 12/20/05 at 2:00 p.m. is STRICKEN and RESET for 12/19/05 at 2:00 p.m. for Kenneth Eugene Barrett at the U.S. Courthouse, 5th & Okmulgee Streets, Muskogee, OK. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/13/2005) |
| 12/13/2005 | | | CJA Form 30 (Attorney Payment Voucher – Roger Hilfiger) as to Kenneth Eugene Barrett (Interim #8)(JHP 12/13/05) (smg, Deputy Clerk) (Entered: 12/14/2005) |
| 12/13/2005 | | | CJA Form 30 (Attorney Payment Voucher – Roger Hilfiger) as to Kenneth Eugene Barrett (Interim #9)(JHP 12/13/05) (smg, Deputy Clerk) (Entered: 12/14/2005) |
| 12/13/2005 | | | CJA Form 30 (Attorney Payment Voucher – Bret A. Smith) as to Kenneth Eugene Barrett (Interim #2)(JHP 12/13/05) (smg, Deputy Clerk) (Entered: 12/14/2005) |
| 12/14/2005 | 273 | | MINUTE ORDER before District Judge James H. Payne granting motion of defendant's counsel Mark Henricksen to extend deadline for submitting litigation budget [271–1] until close of business on 12/15/05. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/14/2005) |
| 12/15/2005 | 274 | | SEALED EX PARTE PRELIMINARY LITIGATION BUDGET submitted by Mark Henricksen for defendant Barrett (cjt, Deputy Clerk) (jcb, Deputy |

| | | | |
|---|---|---|---|
| | | | Clerk). (Entered: 12/15/2005) |
| 12/15/2005 | 275 | | SEALED MINUTE ORDER before District Judge James H. Payne regarding Defendant's Ex Parte Litigation Budget [274–1] (JHP) (cc: all counsel) (cjt, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV–09–105–JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 12/15/2005) |
| 12/15/2005 | | | CJA Form 30 (Attorney Payment Voucher – Roger Hilfiger) as to Kenneth Eugene Barrett (INTERIM #10)(JHP 12/15/05) (smg, Deputy Clerk) (Entered: 12/16/2005) |
| 12/15/2005 | | | CJA Form 30 (Attorney Payment Voucher Roger Hilfiger) as to Kenneth Eugene Barrett (INTERIM #11)(JHP 12/15/05) (smg, Deputy Clerk) (Entered: 12/16/2005) |
| 12/15/2005 | | | CJA Form 30 (Attorney Payment Voucher – Bret Smith) as to Kenneth Eugene Barrett (INTERIM #3)(JHP 12/15/05) (smg, Deputy Clerk) (Entered: 12/16/2005) |
| 12/19/2005 | | | SENTENCING before Judge James H. Payne. Government present by USA Sheldon Sperling and AUSA Michael Littlefield. Defendant BARRETT present in person and with appointed counsel Roger Hilfiger, Bret Smith and Mark Henricksen. Courtroom Deputy: ct. Court Reporter: Greg Eustice. Court advised the parties it has made preliminary arrangements to appoint Mark Henricksen in regard to possible appeal. Counsel Roger Hilfiger advised the Court defendant does need appointed counsel and requested Henricksen be appointed because of his appellate knowledge. Mark Henricksen will continue as lead appellate counsel with Roger Hilfiger to remain as counsel to assist in the appeal process as needed. (JHP) Discussion of sealed pleadings filed, Nos. #264, #265, #266, and minute order #267, and response of government, #268, indicating they are not relevant to the issues regarding sentencing. No response by defendant was filed. No objection by plaintiff or defendant if pleadings stricken, so long as they remain in the record. Court orders pleadings stricken, to remain part of the record. (JHP) Discussion of copies of jury questionnaires provided to counsel. Court directed counsel to return the copies of jury questionnaires by 1/10/06 except for those pertinent for possible appeal purposes. Court orders defendant's counsel to submit all claims for attorney fees outstanding by 1/10/06. No statements of defendant or his counsel. JUDGMENT AND COMMITMENT: Pursuant to 18 United States Code Sections 924(c)(1)(A) and (j), the Federal Death Penalty of 1994, appearing in 18 United States Code Sections 3591 3596, the special findings of the jury returned on and the jury's unanimous vote recommending that the defendant shall be sentenced to death and two terms of life imprisonment without the possibility of release, it is the judgment of this Court that the defendant, Kenneth Eugene Barrett, is hereby committed to the custody of the Bureau Prisons to be imprisoned on Counts 1 and 2 for a term of LIFE without the possibility of release. It is the of this Court that the defendant, Kenneth Eugene Barrett, is sentenced to DEATH on Count 3. The sentences imposed in each of these counts shall run consecutive to each other. The defendant is committed to the custody of the Attorney General for the United States until exhaustion of all appellate procedures. When the sentence is to be implemented, the Attorney General shall release the defendant to the custody of a United States |

| | | | |
|---|---|---|---|
| | | | Marshal, who shall supervise implementation of the sentence in the manner prescribed by the law. It is further ordered that the defendant shall pay to the United States a Special Assessment of $100 on Counts 1, 2, and 3, for a total of $300. Said assessment shall be paid through the United States Court Clerk for the Eastern District of Oklahoma, and is due immediately. Payment of a fine in this case has been considered but will not be imposed based upon the defendant's current financial profile. Defendant advised right to appeal within 10 days. Defendant is remanded to custody of the U.S. Marshal. Bret Smith is directed to file a motion to withdraw as counsel and the Court will grant same. (JHP) (cjt, Deputy Clerk) Modified on 12/28/2005 (Entered: 12/20/2005) |
| 12/19/2005 | 276 | | MINUTE ORDER before District Judge James H. Payne as to defendant Kenneth Eugene Barrett: The Court orders sealed pleadings #264, #265 and #266, the Court's Minute Order, #267, and the government's response thereto, #268, be stricken, to remain part of the record. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/20/2005) |
| 12/19/2005 | 277 | | MINUTE ORDER before District Judge James H. Payne: Counsel are directed to return the copies of jury questionnaires by 1/10/06 except for those pertinent for possible appeal purposes. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/20/2005) |
| 12/19/2005 | 278 | | MINUTE ORDER before District Judge James H. Payne: Counsel for defendant Kenneth Eugene Barrett are directed to submit all claims for attorney fees outstanding by 1/10/06. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/20/2005) |
| 12/21/2005 | 279 | | MOTION to withdraw attorney Bret A. Smith by defendant Kenneth Eugene Barrett (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/21/2005) |
| 12/28/2005 | 281 | | MOTION for payment of transcripts at government's expense by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/28/2005) |
| 12/28/2005 | 280 | | APPEAL Notice to USCA by defendant Kenneth Eugene Barrett regarding [285−1]; fees ifp; Preliminary Record on Appeal Forwarded to Circuit (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/29/2005) |
| 12/28/2005 | | | CJA Form 30 (Attorney Payment Voucher − Bret Smith) as to Kenneth Eugene Barrett (JHP 12/28/05) (smg, Deputy Clerk) (Entered: 12/29/2005) |
| 12/29/2005 | 282 | | MINUTE ORDER before District Judge James H. Payne granting motion to withdraw by attorney Bret A. Smith on behalf of defendant Kenneth Eugene Barrett [279−1]. (JHP) (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/29/2005) |
| 12/29/2005 | 283 | | MOTION FOR LEAVE TO DISMISS with ORDER thereon by District Judge James H. Payne dismissing the original indictment (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/29/2005) |
| 12/29/2005 | 284 | | ORDER by District Judge James H. Payne granting defendant's motion for payment of transcripts at government's expense [281−1] (cc: all counsel) (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 12/29/2005) |
| 12/29/2005 | 285 | | JUDGMENT AND COMMITMENT as to Kenneth Eugene Barrett, sentencing Kenneth Eugene Barrett (1) count(s) 1s, Life without the possibility |

| | | | |
|---|---|---|---|
| | | | of release. Special Assessment in the amount of $100.00; Kenneth Eugene Barrett (1) count(s) 2s, Life without the possibility of release, Special Assessment in the amount of $100.00; Kenneth Eugene Barrett (1) count(s) 3s, Sentence of death, Special Assessment in the amount of $100.00. case terminated by District Judge James H. Payne (cc: all counsel) (cjt, Deputy Clerk) (acg, Deputy Clerk). (Entered: 12/29/2005) |
| 01/05/2006 | 286 | | MINUTE ORDER: At the direction of District Judge James H. Payne, it is hereby ordered that the CJA 31 Death Penalty Proceedings Ex Parte Request for Authorization and Voucher Expert and Other Services submitted by defendant's counsel Roger Hilfiger, is hereby REFERRED to U.S. Magistrate Judge Steven P. Shreder for hearings and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate Judge said original Application and supporting documents. (JHP) (cc: all counsel) (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/05/2006) |
| 01/05/2006 | 287 | | SEALED ORDER by Magistrate Judge Steven P. Shreder regarding request for payment of investigator's fees and expenses. (cc: all counsel) (fe, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV−09−105−JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 01/05/2006) |
| 01/09/2006 | 288 | | APPEAL Designation of Record requested by Kenneth Eugene Barrett regarding [280−1] (cjt, Deputy Clerk) PDF(s) added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/09/2006) |
| 01/09/2006 | 289 | | APPEAL Transcript Order Form (TOF) by court reporter Glen Dorrough; est completion date 2/6/06; as to defendant Kenneth Eugene Barrett requesting 6/2/05 telephone conference call [280−1] (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/09/2006) |
| 01/09/2006 | | | LETTER to Tenth Circuit with copy of transcript order from from Glen Dorrough (cjt, Deputy Clerk) (Entered: 01/09/2006) |
| 01/10/2006 | 290 | | RETURN OF JUROR QUESTIONNAIRES by defendant Barrett (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/11/2006) |
| 01/12/2006 | | | LETTER to Federal Public Defender's Office forwarding CJA 30 Voucher of Roger Hilfiger for 12/1/05 to 1/10/06. (cjt, Deputy Clerk) (Entered: 01/12/2006) |
| 01/12/2006 | 291 | | MINUTE ORDER before District Judge James H. Payne: The Court's review of the copies of the juror questionnaires returned to the clerk reveals that the defendant has returned all but 64 of the 242 juror questionnaires, while the government has only returned 33 of the 242 juror questionnaires. Questionnaire #111, which defense counsel indicated they wished to retain, was not included within the box of questionnaires which was returned to the Court Clerk's Office. No explanation has been provided by the government of its need to retain such a large number of the questionnaires. The government is given ten (10) days to identify for the record the actual juror questionnaires, by number, retained and explain why they need to retain 209 of those questionnaires or to return all additional questionnaires which are not needed for appeal purposes. Once all retained questionnaires have been properly identified for the record, the Court Clerk will be directed to destroy the copies |

| | | | |
|---|---|---|---|
| | | | returned by counsel. Counsel are reminded, however, that the Court Clerk is maintaining the original juror questionnaires until all appeals have been exhausted. (JHP) (cc: all counsel) (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/12/2006) |
| 01/17/2006 | | | APPEAL NUMBER received from USCA regarding [280–1] as to defendant Kenneth Eugene Barrett (Appeal Number: 06–7005) (cjt, Deputy Clerk) (Entered: 01/17/2006) |
| 01/17/2006 | 301 | | SEALED RESPONSE by defendant to Magistrate's Order regarding request for payment of investigator's fees and expenses of defendant [287–1] (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/08/2006) |
| 01/18/2006 | 292 | | APPEAL Transcript Order Form (TOF) by court reporter Gala Watkins; est completion date 2/4/06; requesting 6/6/05 Hearing on Motion to Continue; and 9/9/05 Status/Pretrial Conference [280–1] (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/18/2006) |
| 01/18/2006 | | | LETTER to 10th Circuit with copy of transcript order form filed 1/18/06 from Gala Watkins (cjt, Deputy Clerk) (Entered: 01/18/2006) |
| 01/19/2006 | 293 | | SEALED REPORT AND RECOMMENDATION regarding investigator compensation by Magistrate Judge Steven P. Shreder (cc: all counsel) (fe, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV–09–105–JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 01/19/2006) |
| 01/20/2006 | 294 | | APPEAL Transcript Order Form (TOF) by court reporter Greg Eustice; est completion date 2/18/06; requesting 5/5/05 sealed telephone conference; 5/18/05 status conference and motions hearing; 8/12/05 status conference; notation made by court reporter that 9/6/05 telephone conference cannot be transcribed by him [280–1] (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/20/2006) |
| 01/20/2006 | 295 | | APPEAL Transcript Order Form (TOF) by court reporter Greg Eustice; est completion date 2/18/06; requesting portions of jury selection, trial proceedings, including sealed hearing, in camera hearings and proceedings of other nature, sentencing hearing proceedings beginning 9/26/05 through 11/17/05; 11/8/05 status conference; 11/9/05 hearing on preliminary instructions and defendant's motion in limine [280–1] (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/20/2006) |
| 01/20/2006 | | | LETTER to Tenth Circuit with copies of transcript order forms filed 1/20/06 from Greg Eustice (cjt, Deputy Clerk) (Entered: 01/20/2006) |
| 01/24/2006 | 296 | | APPEAL Transcript Order Form (TOF) by court reporter Karla McWhorter; est completion date 2/27/06; requesting: 10/25/04 initial appearance; 11/17/04 arraignment; 12/8/04 scheduling conference; 1/7/05 sealed hearing and status conference; 1/26/05 motions hearing and motion to dismiss and motion to suppress; 2/15/05 arraignment on superseding indictment; 7/15/05 status conference; 8/31/05 sealed hearing and unsealed criminal pretrial; 9/12/05, 9/13/05 (including sealed hearing), 9/14/05, 9/15/05, 9/16/05 individual juror qualifications; 9/26/05 through 11/17/05 jury selection, trial, including sealed hearing, in camera hearings and proceedings of other nature, sentencing hearing [280–1] (cjt, Deputy Clerk) Modified on 01/25/2006 PDF added on |

| | | | |
|---|---|---|---|
| | | | 5/23/2006 (sms, Deputy Clerk). (Entered: 01/24/2006) |
| 01/25/2006 | | | LETTER to Tenth Circuit with copy of transcript order form filed 1/24/06 from Karla McWhorter (cjt, Deputy Clerk) (Entered: 01/25/2006) |
| 01/25/2006 | 297 | | RECEIPT by defendant of Magistrate's Report and Recommendation on Request for Investigator Compensation; received by counsel Mark Henricksen on 1/23/06; objections due 2/6/06 (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/25/2006) |
| 01/25/2006 | | | CJA Form 30 (Attorney Payment Voucher – Roger Hilfiger) as to Kenneth Eugene Barrett (JHP 1/25/06)(Final) (smg, Deputy Clerk) (Entered: 01/26/2006) |
| 01/30/2006 | 298 | | APPEAL Transcript Order Form (TOF) by court reporter Susan Sweeney; est completion date 2/10/06 requesting 3/22/05 sealed hearing and status conference [280–1] (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 01/30/2006) |
| 01/30/2006 | | | LETTER to 10th Circuit with copy of transcriipt order form filed 1/30/06 from Susan Sweeney (cjt, Deputy Clerk) (Entered: 01/30/2006) |
| 02/01/2006 | 422 | | TRANSCRIPT of proceedings for the following date(s): 6/2/05 (Re: Telephone conference as to defendant Kenneth Eugene Barrett [280–1]) by court reporter Glen R. Dorrough (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/01/2006) |
| 02/03/2006 | 425 | | TRANSCRIPT of proceedings for the following date(s): 6/6/05 (Re: Hearing on defendant Kenneth Eugene Barrett's motion to continue trial [280–1]) by court reporter Gala Watkins (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/03/2006) |
| 02/03/2006 | 419 | | TRANSCRIPT of proceedings for the following date(s): 9/9/05 (Re: Status/Pretrial Hearing as to defendant Kenneth Eugene Barrett [280–1]) by court reporter Gala Watkins (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/03/2006) |
| 02/03/2006 | 299 | | RECEIPT by defendant of Magistrate's Report and Recommendation on Request for Investigator Compensation; received by counsel Roger Hilfiger on 1/21/06; objections due 2/3/06 (cjt, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 02/03/2006) |
| 02/06/2006 | 300 | | APPEAL Transcript Order Form (TOF) by court reporter Martha Butler est completion date 2/2/06 regarding 9/6/05 Telephone Conference [280–1] (nsb, Deputy Clerk) PDF added on 5/23/2006 (sms, Deputy Clerk). (Entered: 02/07/2006) |
| 02/06/2006 | 424 | | TRANSCRIPT of proceedings for the following date(s): 9/6/05 Telephone Conference (Re: [280–1] ) by court reporter Martha Butler (nsb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/07/2006) |
| 02/08/2006 | 302 | | SEALED ORDER by District Judge James H. Payne as to SEALED REPORT AND RECOMMENDATION regarding investigator compensation by defendant [293–1] (cc: defendant's counsel) (cjt, Deputy Clerk) Modified on 9/15/2009 to reflect **document UNSEALED by Order, Doc #67 filed 9/11/09 in CIV–09–105–JHP** (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: |

| | | | |
|---|---|---|---|
| | | | 02/08/2006) |
| 02/08/2006 | | | CJA Form 30 (Attorney Payment Voucher – Mark Henricksen) as to Kenneth Eugene Barrett (JHP 2/8/06) (smg, Deputy Clerk) (Entered: 02/13/2006) |
| 02/15/2006 | 420 | | SEALED TRANSCRIPT filed by court reporter Susan L. Sweeney of Motion Hearing Conducted on 3/22/05 (Vol. I of II) (trl, Deputy Clerk) Modified on 02/15/2006 (jcb, Deputy Clerk). (Entered: 02/15/2006) |
| 02/15/2006 | 426 | | TRANSCRIPT (Vol. II of II) of Status Conference conducted on 3/22/05 filed by court reporter Susan L. Sweeney (trl, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 02/15/2006) |
| 03/02/2006 | 303 | | SUBPOENA returned unexecuted as to J. Randall Price,Kathy Thomas, Carlos Sandoval, Robert Jerome, Clark Wackerly, Bill DeWeese, Kelli Eales, Nancy Stalcup, Lake Arrington, Frank Atkinson, Ada Blount, Hattie Dodson, Dayla Ward (pjw, Deputy Clerk) Modified on 3/13/2006 to reflect correct file date (sms, Deputy Clerk). (Entered: 03/03/2006) |
| 03/02/2006 | 304 | | SUBPOENA returned Executed as to Joshua Arnold, Kelly Beach, Juan Beal, George Boreman, Rodney Burris, Michael Callery, Scott Chafin, Cindy Crawford, Phyllis Crawford, Travis Crawford, Iris Dalley, Robert Darst, RF Distefano, Bobbie Eales, Bernell Edwards, Sheldon Fair, Danny Farris, Michael Foreman, Dennis Franchini, Rick Fargo, Paul Gordon, Delena Goss, Raymond Greninger, Lyndell Griffin, Shawn Griffey, Alvin Hahn, John Hamilton, Steven Hash, Mike Hendricks, Terrance Higgs, Gene Hise, James M Horn, Dan Howard, Jon Huntington, Robert Jerome, Clint Johnson, Joann Kihega, Vicky M Lyons (jcb, Deputy Clerk) PDF added on 3/14/2006 (sms, Deputy Clerk). Modified on 3/14/2006 to reflect correct file date (sms, Deputy Clerk). (Entered: 03/06/2006) |
| 03/02/2006 | 305 | | SUBPOENA returned Executed as to Larry Lane, Lynette Lee, Bill Lipe, Alan Franklin Lloyd, David W Love, Vicki Lyons, April Marcangeli, DJ Mann, Jim L McBride, Craig Nixon, Danny Oliver, Kevin Ottwell, Douglas Perkins, Kerry Pettingill, Gary Philpot, Johnny Philpot, Stanley Philpot, Billy Poe, Ryan L Porter, Brandie Zane Price, George Randolph, BD Robbins, Ben Rosser, Janice Sanders, Tommy Sanders, Lee Schoeffler, Gerald Skowronski, Shannon Smith, Za Smith, Bryan Swim, Bob Thomas, Kevin Wilson, Rachel Wilson, William Wood (jcb, Deputy Clerk) Modified on 3/13/2006 to correct file date (sms, Deputy Clerk). (Entered: 03/06/2006) |
| 03/06/2006 | 306 | | ORDER from Circuit Court *granting Karla McWhorter's request for extension of time until 3/31/06 to file transcripts* (Re: Appeal Transcript Deadline(s) Set/Reset) as to Kenneth Eugene Barrett (nsb, Deputy Clerk) (Entered: 03/08/2006) |
| 03/09/2006 | 307 | | NOTICE of Change of Address as to Kenneth Eugene Barrett (acg, Deputy Clerk) (Entered: 03/09/2006) |
| 03/30/2006 | 309 | | TRANSCRIPT of Proceedings of Arraignment Hearing held on 11/17/2004 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 1–5) (Re: Minutes – Miscellaneous,,,,,,,,,,,, 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (nsb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/10/2006) |

| | | | |
|---|---|---|---|
| 03/30/2006 | 310 | | SEALED TRANSCRIPT of Proceedings of SEALED Hearing held on 12/9/2004 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 1–48) (Re: Minutes – Miscellaneous, 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (nsb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/10/2006) |
| 03/30/2006 | 311 | | TRANSCRIPT of Proceedings of Status Conference held on 7/15/2005 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1–28) (Re: Minutes – Miscellaneous,,,,,,,,,,,,,,,,,,,, 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (nsb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/10/2006) |
| 03/30/2006 | 314 | | TRANSCRIPT of Proceedings of Court's Rulings on Motions held on September 26, 2005 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1–20) Re: Minutes – Miscellaneous 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (jcb, Deputy Clerk) Modified text on 1/26/2011 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 04/18/2006) |
| 04/04/2006 | 308 | | JUDGMENT AND COMMITMENT Returned Executed as to Kenneth Eugene Barrett (neh, Deputy Clerk) (Entered: 04/04/2006) |
| 04/11/2006 | 312 | | TRANSCRIPT of Proceedings of Initial Appearance held on 10/25/04 before Magistrate Judge Steven P. Shreder (Court Reporter: ks) (Pages: 1–11) (Re: Initial Appearance Minutes 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/11/2006) |
| 04/11/2006 | 313 | | TRANSCRIPT of Proceedings of Arraignment on Superseding Indictment held on 2/15/05 before Magistrate Judge Steven P. Shreder (Court Reporter: ks) (Pages: 1–7) (Re: 280 Notice of Appeal to Circuit Court, Arraignment on Superseding Indictment Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/11/2006) |
| 04/18/2006 | 315 | | TRANSCRIPT of Proceedings of Transcript of Status Conference held on January 7, 2005 before Court Clerk (Court Reporter: Karla S. McWhorter) (Pages: 1–57) (Re: 280 Notice of Appeal to Circuit Court, Minutes – Miscellaneous, as to Kenneth Eugene Barrett (jcb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/18/2006) |
| 04/18/2006 | 316 | | SEALED TRANSCRIPT of Proceedings of Sealed Ex Parte Hearing held on January 7, 2005 before Court Clerk (Court Reporter: Karla S. McWhorter) (Pages: 1–31) (Re: 280 Notice of Appeal to Circuit Court, Minutes – Miscellaneous as to Kenneth Eugene Barrett (jcb, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/18/2006) |
| 04/21/2006 | 317 | | TRANSCRIPT of Proceedings of Pretrial Hearing held on 9/20/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1–26) (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Additional attachment(s) added on 2/13/2013: # 1 Main Document) (jcb, Deputy Clerk). (Entered: 04/24/2006) |
| 04/21/2006 | 318 | | TRANSCRIPT of Proceedings of Sealed Ex Parte Budget Hearing held on 10/3/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1–9) (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth |

| | | | |
|---|---|---|---|
| | | | Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/24/2006) |
| 04/25/2006 | 319 | | SEALED TRANSCRIPT of Proceedings of Sealed Motion hearing held on 9/13/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1–24) (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/25/2006) |
| 04/25/2006 | 320 | | TRANSCRIPT of Proceedings of Status Conference held on 8/12/05 before Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–22) (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/26/2006) |
| 04/25/2006 | 321 | | SEALED TRANSCRIPT of Proceedings of Sealed Telephone Conference held on 5/5/05 before Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–11) (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/26/2006) |
| 04/26/2006 | 322 | | TRANSCRIPT of Proceedings of Status Conference and Motions Hearing held on 5/18/05 before Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–27) (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 04/26/2006) |
| 05/01/2006 | 323 | | TRANSCRIPT of Proceedings of Jury Trial held on 9/26/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1–171, Volume I of XXVII) (Minutes, 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 5/26/2006 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 05/02/2006) |
| 05/01/2006 | 324 | | TRANSCRIPT of Proceedings of Jury Trial held on 9/27/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 172–393, Volume II of XXVII) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 5/26/2006 (cjt, Deputy Clerk). (jcb, Deputy Clerk). (Entered: 05/02/2006) |
| 05/01/2006 | 325 | | TRANSCRIPT of Proceedings of Jury Trial held on 9/28/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 394–665, Volume III of XX) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/02/2006) |
| 05/01/2006 | 326 | | TRANSCRIPT of Proceedings of Jury Trial held on 10/3/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 666–919, Volume IV of XX) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/02/2006) |
| 05/01/2006 | 327 | | TRANSCRIPT of Proceedings of Jury Trial held on 10/4/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 920–1179, Volume V of XX) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/02/2006) |
| 05/01/2006 | 328 | | TRANSCRIPT of Proceedings of Jury Trial held on 10/5/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1180–1385, Volume VI of XX) (Re: Minutes, 280 Notice of Appeal to Circuit Court) as to |

| | | | |
|---|---|---|---|
| | | | Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/02/2006) |
| 05/01/2006 | 329 | | TRANSCRIPT of Proceedings of Jury Trial held on 10/6/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1386–1625, Volume VII of XX) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/02/2006) |
| 05/09/2006 | 330 | | TRANSCRIPT of Proceedings of Sealed Hearing held on 8/31/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1–116) (Re: 280 Notice of Appeal to Circuit Court, Minutes – Miscellaneous) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/10/2006) |
| 05/09/2006 | 331 | | TRANSCRIPT of Proceedings of Individual Juror Qualification for Purposes of Stage One Proceedings held on 9/12/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1–250) (Re: 280 Notice of Appeal to Circuit Court, Minutes – Miscellaneous) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/10/2006) |
| 05/09/2006 | 332 | | TRANSCRIPT of Proceedings of Individual Juror Qualification for Purposes of Stage One Proceedings held on 9/13/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 251–535) (Re: 280 Notice of Appeal to Circuit Court, Minutes – Miscellaneous) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/10/2006) |
| 05/09/2006 | 333 | | TRANSCRIPT of Proceedings of Individual Juror Qualification for Purposes of Stage One Proceedings held on 9/14/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 536–843) (Re: 280 Notice of Appeal to Circuit Court, Minutes – Miscellaneous) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/10/2006) |
| 05/12/2006 | 334 | | TRANSCRIPT of Proceedings of Individual Juror Qualification for Purposes of Stage One Proceedings held on 9/15/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 844–1137) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/15/2006) |
| 05/12/2006 | 335 | | TRANSCRIPT of Proceedings of Individual Juror Qualification for Purposes of Stage One Proceedings held on 9/16/05 before Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 1137–1392) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Additional attachment(s) added on 2/14/2013: (jcb, Deputy Clerk). (Entered: 05/15/2006) |
| 05/15/2006 | 427 | | TRANSCRIPT of Proceedings (Unredacted) of Unsealed Criminal Pretrial Hearing held on 8/31/2005 before District Judge James H. Payne (Court Reporter: Karla McWhorter) (Pages: 120 – 141) A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: Minutes of |

| | | | |
|---|---|---|---|
| | | | Unsealed Criminal Pretrial Hearing) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 02/13/2013) |
| 05/18/2006 | 336 | | TRANSCRIPT of Proceedings of Jury Trial (Volume VIII of XX) held on 10/7/05 before Judge James H. Payne (Court Reporter: Karla S. McWhorter) (Pages: 1626–1851) (Re: Minutes – Miscellaneous and 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (law, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/19/2006) |
| 05/22/2006 | 337 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 10/18/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 1849–2068, Volume 9 of 27) (Re: Minutes, 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 338 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 10/19/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 2070–2327, Volume 10 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 339 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 10/20/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 2329–2565, Volume 11 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 340 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 10/21/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 2567–2822, Volume 12 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 341 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 10/24/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 2824–3095, VOLUME 13 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 342 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 10/25/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 3097–3324, VOLUME 14 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 343 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 10/26/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 3326–3553, VOLUME 15 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 344 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 10/27/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 3555–3834, VOLUME 16 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy |

| | | | |
|---|---|---|---|
| | | | Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 345 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 10/31/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 3836–4070, VOLUME 17 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 346 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/1/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 4072–4202, VOLUME 18 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 347 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/2/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 4204–4247, VOLUME 19 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 348 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/3/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 4249–4415, VOLUME 20 of 27) (Re: Minutes, 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 349 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/4/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 4417–4425, VOLUME 21 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 350 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/9/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 4427–4627, VOLUME 22 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 351 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/10/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 4629–4700, VOLUME 23 of 27) (Re: Minutes, 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 352 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/14/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 4702–4941, VOLUME 24 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 353 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/15/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 4943–5152, VOLUME 25 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |

| | | | |
|---|---|---|---|
| 05/22/2006 | 354 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/16/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 5154–5283, VOLUME 26 of 27) (Re: 280 Notice of Appeal to Circuit Court, Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 355 | | TRANSCRIPT of Proceedings of Jury Trial Proceedings held on 11/17/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 5285–5458, VOLUME 27 of 27) (Re: Minutes, 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/22/2006 | 356 | | TRANSCRIPT of Proceedings of Sentencing Hearing held on 12/19/05 before Judge James H. Payne (Court Reporter: Greg Eustice) (Pages: 1–11) (Re: Minutes, 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (jcb, Deputy Clerk). (Entered: 05/22/2006) |
| 05/24/2006 | 357 | | LETTER re: Transcript(s) Filed. The record is complete for appeal purposes. The Court Clerk's office will forward the record on appeal as soon as possible. (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (jcb, Deputy Clerk) (Entered: 05/24/2006) |
| 05/30/2006 | 358 | | MINUTE ORDER by Judge James H. Payne: The Court orders pleading numbers 166, 173, 175, 178, 185, 186, 189, 190, 191, 195, 246, 247 and 248 to be unsealed as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 05/30/2006) |
| 05/30/2006 | 359 | | MINUTE ORDER by Judge James H. Payne: The Court orders the original videotape to be transmitted to the Tenth Circuit Court of Appeals with the original record (Re: 237 Sealed Medical Evaluation) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 05/30/2006) |
| 05/30/2006 | 360 | | MINUTE ORDER by Judge James H. Payne: THe Court orders the original CD to be transmitted to the Tenth Circuit Court of Appeals with the original records (Re: 265 Notice) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 05/30/2006) |
| 06/06/2006 | 361 | | RECORD on Appeal Sent to Circuit Court (Record includes: Consisting of 3 Volumes of Pleadings, 3 Volumes of Sealed Pleadings, 47 Volumes of Transcripts, 6 Sealed Transcripts and 1 Sealed Presentence Report (60 volumes total) (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (jcb, Deputy Clerk) (Entered: 06/06/2006) |
| 08/30/2007 | 362 | | DECISION from Circuit Court affirming the decision of the district court and dismissing the Appeal (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 08/30/2007) |
| 08/30/2007 | 363 | | JUDGMENT from Circuit Court (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 08/30/2007) |
| 09/06/2007 | 364 | | MOTION to Remove Counsel by United States of America as to Kenneth Eugene Barrett (Sperling, Sheldon) Modified on 9/7/2007 to change text (dma, Deputy Clerk). (Entered: 09/06/2007) |
| 09/07/2007 | 365 | | MINUTE ORDER by Judge James H. Payne: Granting 364 Government's MOTION to Remove Counsel as to Kenneth Eugene Barrett (cjt, Deputy |

| | | | |
|---|---|---|---|
| | | | Clerk) (Entered: 09/07/2007) |
| 10/23/2007 | 366 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been filed on 10/12/07 (U.S. Supreme Court Case Number: 07–7066) (Re: 280 Notice of Appeal to Circuit Court) as to Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 10/23/2007) |
| 03/19/2008 | 368 | | SEALED MOTION for Order Sealing Certain Ex Parte Motions by defendant Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/27/2008) |
| 03/19/2008 | 369 | | SEALED MINUTE ORDER by Judge James H. Payne: 368 (cjt, Deputy Clerk) (Entered: 03/27/2008) |
| 03/19/2008 | 370 | | SEALED EX PARTE MOTION for Appointment of Counsel construed by Court as MOTION for Substitution of Counsel(cjt, Deputy Clerk) (Entered: 03/27/2008) |
| 03/26/2008 | 367 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been denied on 3/17/08 (Re: 280 Notice of Appeal to Circuit Court ) as to Kenneth Eugene Barrett (With attachments)(cjt, Deputy Clerk) (Entered: 03/27/2008) |
| 03/27/2008 | 371 | | SEALED ORDER by Judge James H. Payne 370 (cjt, Deputy Clerk) (Entered: 03/27/2008) |
| 04/01/2008 | 372 | | ATTORNEY APPEARANCE (CJA) by David B. Autry on behalf of Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 04/01/2008) |
| 04/02/2008 | 373 | | ATTORNEY APPEARANCE (FPD) by Tivon Schardl on behalf of Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 04/02/2008) |
| 04/03/2008 | 374 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to this Court's Order of 3/27/08, David B. Autry and Assistant Federal Public Defender, Eastern District of California, Tivon Schardl, are hereby substituted as counsel of record in place of former counsel, Mark Henricksen and Roger Hilfiger as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 04/03/2008) |
| 04/16/2008 | 375 | | SEALED EX PARTE PRELIMINARY LITIGATION BUDGET submitted by David Autry for defendant Barrett (cjt, Deputy Clerk) . (Entered: 04/17/2008) |
| 04/22/2008 | 376 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: It is hereby recommended that the Proposed Litigation Budget (Docket No. 375 ) submitted under seal by counsel for the Defendant be approved. It is further recommended that said budget and the Court's sealed order dated March 27, 2008 (Docket No. 371 ) govern the payment for costs and attorneys' fees herein unless the Court approves any amendment to the budget upon application by counsel for the Defendant demonstrating good cause therefor. (tah, Deputy Clerk) (Entered: 04/22/2008) |
| 07/03/2008 | 377 | | SEALED ORDER by Judge James H. Payne: Re 375 371 (cjt, Deputy Clerk) (Entered: 07/03/2008) |
| 10/16/2008 | 379 | | SEALED MINUTE ORDER by Judge James H. Payne (cjt, Deputy Clerk) (Entered: 10/16/2008) |
| 10/24/2008 | 380 | | SEALED DOCUMENT re 379 (cjt, Deputy Clerk) (Entered: 10/24/2008) |

| | | | |
|---|---|---|---|
| 12/01/2008 | 381 | | RECORD on Appeal Returned from Circuit Court as to Kenneth Eugene Barrett. Returned record includes: Volumes 1, 2 and 3 – Pleadings; Volume 4 through 6 – Sealed Pleadings; Volumes 7 through 61 – Transcripts and Presentence Report (61 Volumes total). Broke down same. (Re: 280 Notice of Appeal to Circuit Court ) as to Kenneth Eugene Barrett (jcb, Deputy Clerk) (Entered: 12/11/2008) |
| 02/09/2009 | 382 | | MOTION Emergency Order Tolling Time by Kenneth Eugene Barrett (Schardl, Tivon) (Sealed attachments added on 2/12/2009 per Minute Order 388 : # 1 Declaration of Tivon Schardl) , # 2 Declaration of David Autry) # 3 REDACTED Declaration of David Autry) (cjt, Deputy Clerk). (Entered: 02/09/2009) |
| 02/09/2009 | 383 | | MOTION to Seal Document(s) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/09/2009) |
| 02/10/2009 | 384 | | MINUTE ORDER by District Judge James H. Payne: Directing defendant's counsel to submit Declarations of Counsel, referred to in 383 Defendant's Motion to File Declaration Under Seal, to the Court in camera for its consideration as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 02/10/2009) |
| 02/10/2009 | 385 | | MINUTE ORDER by District Judge James H. Payne: Telephonic Motion Hearing set for 2/11/2009 at 03:30 PM (Central Standard Time) in Chambers, Room 201, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne Re: 382 Defendant's Emergency MOTION To Toll Time as to Kenneth Eugene Barrett. Counsel for the Government is directed to appear in person. Counsel for defendant may appear by telephone. (cjt, Deputy Clerk) (Entered: 02/10/2009) |
| 02/11/2009 | 386 | | MINUTES of Proceedings – held before District Judge James H. Payne: Motion Hearing held on 2/11/2009 as to Kenneth Eugene Barrett (Re: 382 MOTION Emergency Order Tolling Time ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (Entered: 02/12/2009) |
| 02/11/2009 | 388 | | MINUTE ORDER by District Judge James H. Payne: granting 383 Defendant's Motion to File Declaration Under Seal as to Kenneth Eugene Barrett (1) (cjt, Deputy Clerk) (Entered: 02/12/2009) |
| 02/11/2009 | 389 | | MINUTE ORDER by District Judge James H. Payne: Government's response to 382 defendant's Emergency MOTION to Toll Time is due by 2/23/09; defendants reply deadline is 2/26/09. The Federal Defender's office is directed to submit the time records discussed in the ex parte portion of the hearing under seal at the time they file their reply. (cjt, Deputy Clerk) (Entered: 02/12/2009) |
| 02/12/2009 | 387 | | SUPPLEMENT (Re: 382 MOTION Emergency Order Tolling Time ) as to Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/12/2009) |
| 02/23/2009 | 390 | | RESPONSE in Support of Motion (Re: 382 MOTION Emergency Order Tolling Time ) by United States of America as to Kenneth Eugene Barrett (Sperling, Sheldon) (Entered: 02/23/2009) |
| 02/26/2009 | 391 | | REPLY to Response to Motion (Re: 382 MOTION Emergency Order Tolling Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/26/2009) |

| | | | |
|---|---|---|---|
| 02/26/2009 | 392 | | MOTION to Seal Document(s) *Declarations of Counsel and Federal Defender Administrative Officer* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/26/2009) |
| 02/27/2009 | 393 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Court's previous 389 Minute Order, the Court grants 392 Defendant's Motion to Seal Declarations Ex Parte and Under Seal as to Kenneth Eugene Barrett. (cjt, Deputy Clerk) (Entered: 02/27/2009) |
| 02/27/2009 | 394 | | SEALED SUPPLEMENTAL DECLARATION (Re: 382 Emergency Motion to Toll Time) (cjt, Deputy Clerk) (Entered: 02/27/2009) |
| 02/27/2009 | 395 | | SEALED SUPPLEMENTAL DECLARATION (Re: 382 Emergency Motion to Toll Time)(cjt, Deputy Clerk) (Entered: 02/27/2009) |
| 02/27/2009 | 396 | | SEALED SUPPLEMENTAL DECLARATION (Re: 382 Emergency Motion to Toll Time) (cjt, Deputy Clerk) (Entered: 02/27/2009) |
| 02/27/2009 | 397 | | ORDER by District Judge James H. Payne: denying 382 Defendant's Emergency Motion to Toll Time as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 02/27/2009) |
| 03/10/2009 | 398 | | MOTION to Seal Document(s) *Exhibits*, MOTION for Protective Order by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/10/2009) |
| 03/11/2009 | 399 | | ORDER by District Judge James H. Payne: granting 398 Defendant's Motion to File Exhibits Under Seal and granting 398 Defendant's Motion for Protective Order as to Kenneth Eugene Barrett. (cjt, Deputy Clerk) (Entered: 03/11/2009) |
| 03/11/2009 | 400 | | MOTION to Reconsider (Re: 399 Ruling on Motion to Seal Document(s), Order on Motion for Protective Order ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 03/11/2009) |
| 03/11/2009 | 401 | | AMENDED ORDER by District Judge James H. Payne: granting 398 Defendant's Motion to File Exhibits Under Seal and MOTION for Protective Order (Re: 399 Order) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/11/2009) |
| 03/11/2009 | 402 | | MINUTE ORDER by District Judge James H. Payne: granting 400 Motion to Reconsider as to Kenneth Eugene Barrett by filing of the Amended Order. (cjt, Deputy Clerk) (Entered: 03/11/2009) |
| 03/16/2009 | 403 | | MOTION Vacate Sentence and for New Trial by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/16/2009) |
| 03/16/2009 | 404 | | EXHIBITS IN SUPPORT OF MOTION (Re: 403 MOTION Vacate Sentence and for New Trial ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Additional attachment(s) added on 3/17/2009: # 4 Exhibits 61–70) and corrected text (cjt, Deputy Clerk) (Entered: 03/16/2009) |
| 03/17/2009 | 405 | | CORRECTED MOTION Vacate, Set Aside, or Correct the Sentence under 28 USC 2255 and Motion for New Trial (to include verification)(Re: 404 MOTION EXHIBITS TO MOTION, 403 MOTION Vacate Sentence and for New Trial ) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on |

| | | | |
|---|---|---|---|
| | | | 3/17/2009 to edit text (cjt, Deputy Clerk). (Entered: 03/17/2009) |
| 03/17/2009 | 406 | | CERTIFICATE of Service as to Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 03/17/2009) |
| 03/19/2009 | 407 | | ***Remark: All future documents regarding Petitioner's 2255 Motion to Vacate should be filed in CIV–09–105–JHP as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/19/2009) |
| 09/11/2009 | 408 | | TRANSCRIPT of Proceedings of Hearing on Government's Motion for Order Delaying the Production of Witness Names and Request for Protective Order held on 9/13/2005 before District Judge James H. Payne (Court Reporter: K.McWhorter) (Pages: 1–24, VOLUME I of II) (Re: 9/13/2005 Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (filed pursuant to Order [Doc #66] filed in CIV–09–105–JHP, Barrett v. USA) (jcb, Deputy Clerk). (Entered: 09/11/2009) |
| 09/11/2009 | 409 | | TRANSCRIPT of Proceedings of Hearing on Government's Motion for Order Delaying the Production of Witness Names and Request for Protective Order held on 9/13/2005 before District Judge James H. Payne (Court Reporter: K.McWhorter) (Pages: 24–32, VOLUME II of II) (Re: 9/13/2005 Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (filed pursuant to Order [Doc #66] filed in CIV–09–105–JHP, Barrett v. USA) (jcb, Deputy Clerk). (Entered: 09/11/2009) |
| 12/04/2009 | 411 | | AMENDED MOTION to Vacate, Set Aside, or Correct Sentence under 28 USC Sec. 2255 by Kenneth Eugene Barrett (Re: 405 CORRECTED MOTION to Vacate Sentence) (Filed in CIV–09–105–JHP, Doc #95) (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 01/15/2010 | 410 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Defendant Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/26/2010 | 412 | | ORDER by District Judge James H. Payne: Striking 405 MOTION to Vacate Sentence and 403 Corrected MOTION to Vacate Sentence) as to Kenneth Eugene Barrett (Filed in CIV–09–105–JHP, Doc #146) (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 09/03/2010 | | | CJA 30 Authorization to Pay David B. Autry in Death Penalty Proceedings as to Kenneth Eugene Barrett (JHP 9/3/10) (smg, Deputy Clerk) (Entered: 09/14/2010) |
| 08/02/2012 | 413 | | TRANSCRIPT of Proceedings of Sealed Hearing held on 9/12/2005 (Court Reporter: K.McWhorter) (Pages: 1–7) (Re: Minutes) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 8/16/2012 to reflect unsealed per 414 Minute Order (cjt, Deputy Clerk). (Entered: 08/02/2012) |
| 08/16/2012 | 414 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: unsealing 413 Transcript of Proceeding as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 415 | | OPINION AND ORDER by District Judge James H. Payne: denying 411 Motion to Vacate as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 416 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 417 | | JUDGMENT by District Judge James H. Payne on 2255 Motion to Vacate as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/19/2015 | 428 | | DECISION from Circuit Court Reversing and Remanding death sentence for evidentiary hearing; Affirming in all other respects; denying motion for certificate of appealability – Decision of the District Court (awaiting mandate) as to Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) Modified text on 8/19/2015 (cjt, Deputy Clerk). (Entered: 08/19/2015) |
| 08/19/2015 | 429 | | JUDGMENT from Circuit Court (Re: 428 USCA Decision) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 08/19/2015) |
| 10/26/2015 | 430 | | MANDATE letter from Circuit Court (Re: 428 USCA Decision) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 10/28/2015) |
| 05/11/2016 | 431 | | NOTICE of Conditional Filing as to Kenneth Eugene Barrett (Fisher, Joan) (Entered: 05/11/2016) |
| 05/11/2016 | 432 | | Second MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 by Kenneth Eugene Barrett. (With attachments)(Fisher, Joan) (Entered: 05/11/2016) |
| 05/11/2016 | 433 | | EXHIBIT(S) *4 through 20* (Re: 432 Second MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 ) as to Kenneth Eugene Barrett (With attachments) (Fisher, Joan) (Entered: 05/11/2016) |
| 05/11/2016 | 434 | | EXHIBIT(S) *21 through 40* (Re: 432 Second MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 ) as to Kenneth Eugene Barrett (With attachments) (Fisher, Joan) (Entered: 05/11/2016) |
| 05/11/2016 | 435 | | EXHIBIT(S) *41 through 57* (Re: 432 Second MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 ) as to Kenneth Eugene Barrett (With attachments) (Fisher, Joan) (Entered: 05/11/2016) |
| 05/11/2016 | 436 | | EXHIBIT(S) *VERIFICATION OF SECTION 2255 MOTION TO VACATE* (Re: 432 Second MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 ) as to Kenneth Eugene Barrett (Fisher, Joan) (Entered: 05/11/2016) |
| 05/16/2016 | 437 | | Redacted EXHIBIT(S) *9, 10, 20, 26, 41, 46, 47, 48, 49 and 50* (Re: 432 Second MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 ) as to Kenneth Eugene Barrett (With attachments) (Fisher, Joan) (Entered: 05/16/2016) |
| 05/19/2016 | 438 | | MINUTE ORDER by District Judge James H. Payne: 432 Defendant/Movant's Second Section 2255 Motion to Vacate as to Kenneth Eugene Barrett is denied |

| | | | |
|---|---|---|---|
| | | | as this Court has no jurisdiction to consider said motion. (cjt, Deputy Clerk) (Entered: 05/19/2016) |
| 05/20/2016 | 439 | | Third MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 by Kenneth Eugene Barrett. (Fisher, Joan) (Entered: 05/20/2016) |
| 05/20/2016 | 440 | | NOTICE CONDITIONAL FILING (Re: 439 Third MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 ) as to Kenneth Eugene Barrett (Fisher, Joan) (Entered: 05/20/2016) |
| 05/23/2016 | 441 | | MINUTE ORDER by District Judge James H. Payne: 439 Defendant/Movant's Third Section 2255 Motion to Vacate as to Kenneth Eugene Barrett is denied as this Court has no jurisdiction to consider said motion. (cjt, Deputy Clerk) (Entered: 05/23/2016) |
| 06/24/2016 | 442 | | ORDER from the Tenth Circuit, re: motion for authorization to file second or successive 2255 as to Kenneth Eugene Barrett (dma, Deputy Clerk) (Entered: 06/24/2016) |
| 11/07/2016 | 443 | | ORDER from Circuit Court: denying authorization to file proposed second Sec. 2255 motion (Re: 442 Order) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 03/22/2017 | 444 | | SEALED TRANSCRIPT of Proceedings of Sealed Hearing held on 10–20–2005 (Court Reporter: Karla McWhorter) (Pages: 1–4) (Re: Minutes – Miscellaneous) as to Kenneth Eugene Barrett (ksm, Court Reporter) (Entered: 03/22/2017) |
| 03/04/2019 | 445 | | MINUTE ORDER by Court Clerk: Pursuant to the recusal of Judge James H. Payne and at the direction of the Court, this case is reassigned to Judge Ronald A. White. All documents filed in this case in the future shall reflect the new case number CR–04–115–RAW as to Kenneth Eugene Barrett. (cjt, Deputy Clerk) (Entered: 03/04/2019) |
| 03/28/2019 | 446 | | OPINION AND ORDER by Judge Ronald A. White affirming in part and denying in part Report and Recommendation (Dkt. # 467 filed in CIV–09–105–RAW); Petitioner's 2255 motion is denied as it relates to his claim of ineffective assistance of counsel during the penalty phase of trial as to Kenneth Eugene Barrett (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 03/28/2019 | 447 | | JUDGMENT by Judge Ronald A. White for respondent, United States of America, and against petitioner, Kenneth Eugene Barrett, on his challenge to the legality of his sentence. (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 03/28/2019 | | | ***Judgment entered (see document number 447 ) as to Kenneth Eugene Barrett (sms, Deputy Clerk) (Entered: 05/21/2019) |
| 05/14/2019 | 448 | | NOTICE OF SUBSTITUTION AND ATTORNEY APPEARANCE (FPD) by Carrie L. Ward on behalf of Kenneth Eugene Barrett (Ward, Carrie) (Entered: 05/14/2019) |
| 05/14/2019 | 449 | | MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 *Under McCoy* by Kenneth Eugene Barrett. (With attachments)(Fisher, Joan) Civil case 6:19–cv–00152–RAW opened. (Entered: 05/14/2019) |
| 05/15/2019 | 450 | | |

| | | | |
|---|---|---|---|
| | | | ERRATA/CORRECTION (Re: 449 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 *Under McCoy* ) as to Kenneth Eugene Barrett (tls, Deputy Clerk) (Entered: 05/17/2019) |
| 06/11/2019 | 451 | | ORDER from Circuit Court denying authorization to file second or successive 2255 motion (Re: 449 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 *Under McCoy*, 450 Errata/Correction to Document) as to Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 06/13/2019) |
| 11/29/2019 | 452 | | ORDER from Circuit Court LIFTING the abatement and GRANTING Movant authorization to file a second or successive 2255 motion in district court challenging his § 924(c) conviction and sentence under Davis as to Kenneth Eugene Barrett. (Re: 442 Order) (With attachments)(tls, Deputy Clerk) (Entered: 12/03/2019) |
| 12/13/2019 | 453 | | MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 under United States v. Davis by Kenneth Eugene Barrett. (Fisher, Joan) (Entered: 12/13/2019) |
| 01/03/2020 | 454 | | MINUTE ORDER by Judge Ronald A. White: directing Government to file a Response no later than 1/17/2020 as to Kenneth Eugene Barrett. (Re: 453 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 under United States v. Davis) (tls, Deputy Clerk) (Entered: 01/03/2020) |
| 01/15/2020 | 455 | | RESPONSE in Opposition to Motion (Re: 453 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 under United States v. Davis ) by United States of America as to Kenneth Eugene Barrett (With attachments)(Kahan, Jeffrey) (Entered: 01/15/2020) |
| 02/07/2020 | 456 | | REPLY to Response to Motion (Re: 453 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 under United States v. Davis ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/07/2020) |

COPY

FILED

MAY 0 1 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By:_____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,        )
          Plaintiff,             )
                                 )
VS.                              )          NO. CR-04-115-P
                                 )
KENNETH EUGENE BARRETT,          )
          Defendant.             )

*     *     *

JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE, and a jury

SEPTEMBER 26, 2005

VOLUME I OF XXVII

K.M.

*     *     *

A P P E A R A N C E S:

FOR THE PLAINTIFF:        MR. SHELDON J. SPERLING
                          United States Attorney
                          MR. D. MICHAEL LITTLEFIELD
                          Assistant United States Attorney
                          1200 West Okmulgee Street
                          Muskogee, Oklahoma 74401

FOR THE DEFENDANT:        MR. ROGER HILFIGER
                          620 West Broadway
                          Muskogee, Oklahoma 74401

                          MR. BRET A. SMITH
                          Attorney at Law
                          315 North 5th Street
                          Muskogee, Oklahoma 74401

COURT REPORTER:           KARLA S. McWHORTER
                          UNITED STATES COURT REPORTER
                          P. O. Box 2251
                          Muskogee, Oklahoma 74402

Do we have the addresses or hometowns?

THE CLERK:  I have some.

THE COURT:  At this point we are going to read the names and perhaps not the addresses but hometowns, but if you have any question, such as, if that's the Joe Smith that you think lives across the street, raise your hand and we will try to clarify that.  So I will now ask the clerk to read those names.

THE CLERK:  Bob Thomas, Quantico, Virginia; Clint Johnson, Sallisaw; Randy Turman, Vian; John Hamilton, Muskogee; Raymond Greninger, Pryor; James M. Horn, Stillwater; Steven Hash, Wagoner; Ricky Manion; Danny Oliver, Vian; Gene Hise, Vinita; Robert Darst --

THE COURT:  Paula, just a moment.  A gentleman raised his hand, yes, sir.  Why don't you stand up?  I don't mean to point you out, but it is so we can all hear you.

Sir, first give us your juror number.  We will try to relax this a little bit.  I'm not trying to put you on the spot.

JUROR 116:  116 is my number.

THE COURT:  And your question was...

JUROR 116:  Well, I thought when you called someone that we were -- we should --

THE COURT:  Yes, you should.

JUROR 116:  Okay.  I am pretty well acquainted with Ricky Manion, Oklahoma Highway Patrol.

THE COURT:  Okay.  How are you acquainted with him?

JUROR 116:  He grew up in my hometown, Atoka.

THE COURT:  Is he someone that you have seen recently?

JUROR 116:  No, I haven't.  I was in the automobile wrecker business and the Highway Patrol there -- we worked quite a few accidents together.

THE COURT:  When was the last time you worked with him?

JUROR 116:  Oh, I want to say probably 10 or 15 years.

THE COURT:  Do you work with him now?

JUROR 116:  Oh, no.

THE COURT:  How long has it been since you worked with him?

JUROR 116:  How long has it been since I worked with him?  I'm not sure, but it's been several years, probably 10 or 15 years.

THE COURT:  You are perhaps aware that he is deceased.  Are you aware of that?

JUROR 116:  No.

THE COURT:  He is -- he will perhaps be a

witness in this case through recorded testimony.

JUROR 116:  I see, okay.  No, I wasn't aware he was deceased.

THE COURT:  So I take it by that that you obviously haven't had any contact with him recently?

JUROR 116:  Exactly.

THE COURT:  And the question I would ask -- and you did exactly what you are supposed to by letting us know you know him, that you are acquainted with him, and he will, through his recorded testimony, perhaps be a witness in this case.  If he is, could you set aside your previous work experience with him and consider his testimony fair and impartial?  Could you do that?

JUROR 116:  Sure, sure.

THE COURT:  Okay.  Thank you.  I appreciate you making us aware of that.

Yes, sir or yes, ma'am.  If you will stand and give us your juror number.  The clerk will hand you the microphone.

JUROR 132:  132?

THE COURT:  Would you state it again?

JUROR 132:  132.

THE COURT:  Yes, ma'am?

JUROR 132:  I was also just barely acquainted with Manion because I worked at the post office and just

because he was a customer at the post office.  I knew him and then I knew when he had the accident and was killed because I worked in the same city where he lived.

THE COURT:  And the same question I asked of the other juror -- and I think it's appropriate you bring that to our attention for the purposes of this trial.  Could you be fair and impartial to both parties and in considering his testimony?

JUROR 132:  Yes, sir.

THE COURT:  And there is someone else?  Yes.  If you will wait until we get the mike to you and then state your number.

JUROR 207:  207 is my number.  Rick Manion was my cousin and the -- and the guy that was killed was my brother-in-law's son-in-law.

THE COURT:  Are you making --when you make that remark, are you making reference to this case?

JUROR 207:  Yes, sir.

THE COURT:  You may be excused.  You can just have a seat in the back of the courtroom.  That was number 207.

THE CLERK:  Juror number 58, please come forward.

THE COURT:  Number 127?

JUROR 127:  I too knew Mr. Manion from living in Madill.

THE COURT:  Did you know him just from living in the community?

JUROR 127:  And also he and my sister-in-law and wife were classmates together in high school or knew each other growing up in Atoka.

THE COURT:  Was he someone that visited in your home or someone you talked with about his work or anything like that?

JUROR 127:  No, no.

THE COURT:  Could you be fair and impartial to both parties in this case, considering your background?

JUROR 127:  Yes.

THE COURT:  Thank you.  Number 31.

JUROR 31:  You know, I didn't realize this was going to cause -- my son was Rick's best friend and also the one that was in charge of his funeral services.  I know the family, I have been around them quite a few times in my son's home.

THE COURT:  You live in the same community where he lived?

JUROR 31:  Oh, no, sir, my son did.  I live in Ardmore, sir.

THE COURT:  Okay.  Did you know -- except through your son, did you know Mr. Manion?

JUROR 31:  I didn't hear...

THE COURT: Except through your son, except for your son's relationship, did you know Mr. Manion?

JUROR 31: I have been around -- no, sir. Well, I -- I didn't run with him, but I had been in my son's home several times that him and his family was present.

THE COURT: And it's appropriate that you bring that to our attention. I anticipate that his past testimony could be a part of this trial. Could you -- having that relationship with Mr. Manion, could you be fair and impartial to both parties?

JUROR 31: Absolutely, yes, sir.

THE COURT: Okay. Thank you. The clerk will continue with the reading of the witness list.

THE CLERK: Robert Darst.

JUROR 58: Number 58. I sell feed, fertilizer and vet products to him on a weekly basis.

THE COURT: He is a customer of yours; is that correct?

JUROR 58: Uh-huh.

THE COURT: Is he someone who is a close friend or -- I imagine a lot of your customers are, but do they visit in your home?

JUROR 58: No, no, friends when he comes in. We all sit around and talk.

THE COURT: He has been listed as a potential

witness in this case.  Anything about your relationship with him that would keep you from being fair and impartial to both parties in this case?

JUROR 58:  No, uh-huh.

THE COURT:  Okay.  Thank you.

THE CLERK:  Billy Poe, Hugo; Cary Pettingill, Oklahoma City; Karen Jean Real, Fort Worth, Texas; Randall Weaver, Fort Smith, Arkansas; Charles Sanders, Stringtown; Travis Crawford, Sallisaw, Johny Philpot, Sallisaw; Stanley Philpot, Sallisaw; Vicki Lyons, Tahlequah; April Marcangeli, Oklahoma City; Ryan Porter, Oklahoma City; Craig Nixon, Albequerque, New Mexico; Kevin Wilson, DEA, Juan Beal, Pittsburg County; Cindy Crawford, Sallisaw; Toby Barrett, Sallisaw; David Love, Vista, California; Lyndell Griffin, Quantico, Virginia; Gerald Skowronski, Chicago, Illinois.

JUROR 44:  Lyndell Griffin.

What is your juror number, please, sir?

JUROR 44:  44, Lyndell Griffin, he is from Oklahoma.  He is my first cousin.

THE COURT:  When you -- that's a relative.  Is he someone that -- when you say first cousin, you are a lot younger than I am.  First cousins, I have some first cousins who unfortunately -- I will reveal in front of this whole jury -- I haven't seen or talked to maybe in

15 or some 20 years.  Is this a cousin you meet with --

JUROR 44:  I see him every Thanksgiving.

THE COURT:  Is there any special relationship between the two of you that would cause you to give his testimony some special credence?  That is, could you be fair and impartial in considering his testimony?

JUROR 44:  Yes.

THE COURT:  Thank you for bringing that to our attention.

THE CLERK:  Gerald Skowronski, Chicago, Illinois;  R.F. Distefano, Oklahoma City; Donita J. Mann, Tulsa; Jon Huntington, Tulsa; Dr. William Wood, Sallisaw; Kelly Karnes, Sequoyah County; Ben Rosser, OSBI; Michael Callery, Sallisaw; Frank B. Parks, Tulsa; Lee Schoeffler, Tulsa; Iris Dalley, McAlester; Terrance Higgs, Oklahoma City; Danny Farris, Tahlequah; Douglas Perkins, Oklahoma City; Joann Kihega, Oklahoma City.

THE COURT:  Spell that maybe for us.

THE CLERK:  K-I-H-E-G-A.  Michael Foreman, Longwood, Florida; Brandie Zane Price, Van Buren, Arkansas; Dennis Reimer, Tahlequah; Kevin Ottwell, Tulsa; Alan Franklin Loyd, Sallisaw; Scott Chafin, Oklahoma City; Jim L. McBride, McAlester; Za Smith, Tulsa, Oklahoma; Lynette Lee, Tulsa; Larry Lane, Sallisaw; Bill Lipe, Tulsa; George Randolph, Oklahoma

City; B.D. Robbins, Oklahoma City; Shawn Griffey, Sallisaw; Paul Gordon, Wellston, Oklahoma; Gary Philpot, Sallisaw, Bryan Swim, Tahlequah; Delena Goss, Tahlequah; Dennis Franchini, Tulsa; Kelly Beach, Tulsa; Alvin Hahn, Sallisaw; Tommy Sanders, Sallisaw; Janice Sanders, Sallisaw; Carolyn Joseph, Sallisaw; Dayla Ward, Sallisaw; Phyllis Crawford, Sallisaw; Ada Blount, Sallisaw; Hattie Dodson, Sallisaw; Dan Howard, Tulsa; Rodney Burris, Oklahoma City; Graham Ford, Iraq on military duty; Rachel Wilson Welch, Tulsa; Robert Jerome, Tulsa; Shannon Smith, Sallisaw; Sheldon Fair, Sallisaw; Ted Epler, Sallisaw; Bobbie Eales, McAlester; Bill DeWeese, Harrisburg, Pennsylvania; Frank Atkinson, Edmond, Oklahoma; Kelly Eales, McAlester; Nancy Stalcup, S-T-A-L-C-U-P, Oklahoma City; Lake Arrington, White Deer, Texas; Kathy Thomas, Stillwater; Carlos Sandoval, Muskogee; Clark Wackerly, Muldrow; Cynthia Burrow, Sallisaw; Abby Stites, Sallisaw; J. Randall Price, Fort Worth; Gelene Dotson; Cloyce V. Choney; Loyd S. Cobb; Doris Barrett, Ernie Barrett; Stephen Barrett, Gelene Dodson again; Jeannie Russell; Steve Leedy; Eddie Walker, Muskogee; Johnny Philpot, Sequoyah County; medical personnel at St. Francis Hospital; and Department of Corrections Case Manager.

THE COURT:  I would inquire of counsel, in that

97

last generic description, are there any names that we know of that we could inform?

MR. HILFIGER:  No, Your Honor, not at this time.

THE COURT:  Thank you for listening closely to those names.  That's an important part of this process.

On your juror questionnaire, some of you indicated you had served on civil or criminal cases in the past. I need to remind those of you who served on a civil case that's a different standard of proof in a civil case. In a criminal case it is different.  In a criminal case the burden is on the government beyond a reasonable doubt. In a civil case, you will remember, it's preponderance of the evidence, a lesser standard.

Let me ask this question, and this is where you can -- if it's a yes answer, raise your hand.  Have you previously read or heard anything about the alleged facts of this case?

Yes, sir.

JUROR 83:  I have got a lot of friends that are troopers and I have heard a little bit about it.

THE COURT:  That is good enough.  And the question I have of you is if you sit as a juror in this case, can you put that information, whatever it is that you have learned, aside and make any decision you are called on to make in this case just on the evidence you

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 0 1 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By:_____
Deputy Clerk

UNITED STATES OF AMERICA,           )
            Plaintiff,              )
                                    )
VS.                                 )          NO. CR-04-115-P
                                    )
KENNETH EUGENE BARRETT,             )
            Defendant.             )

\*     \*     \*

JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE, and a jury

SEPTEMBER 27, 2005

VOLUME II of XXVII
K.M.

\*     \*     \*

A P P E A R A N C E S:

FOR THE PLAINTIFF:          MR. SHELDON J. SPERLING
                            United States Attorney
                            MR. D. MICHAEL LITTLEFIELD
                            Assistant United States Attorney
                            1200 West Okmulgee Street
                            Muskogee, Oklahoma 74401

FOR THE DEFENDANT:          MR. ROGER HILFIGER
                            620 West Broadway
                            Muskogee, Oklahoma 74401

                            MR. BRET A. SMITH
                            Attorney at Law
                            315 North 5th Street
                            Muskogee, Oklahoma 74401

COURT REPORTER:             KARLA S. McWHORTER
                            UNITED STATES COURT REPORTER
                            P. O. Box 2251
                            Muskogee, Oklahoma 74402

I N D E X

PAGE

PROCEEDINGS COMMENCING 9/27/05...................... 172

OPENING STATEMENT BY MR. LITTLEFIELD................ 185

OPENING STATEMENT BY MR. HILFIGER.................. 217

RULE OF SEQUESTRAION INVOKED........................ 239

WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:

    ROBERT THOMAS

        Direct examination by Mr. Littlefield..... 241
        Voir dire examination by Mr. Hilfiger..... 246
        Direct continued by Mr. Littlefield....... 246
        Voir dire examination by Mr. Hilfiger.... 250
        Direct continued by Mr. Littlefield....... 259
        Cross-examination by Mr. Hilfiger........ 277
        Redirect examination by Mr. Littlefield... 294
        Recross-examination by Mr. Hilfiger....... 298

    CLINT JOHNSON

        Direct examination by Mr. Littlefield..... 301
        Cross-examination by Mr. Hilfiger........ 321
        Voir dire examination by Mr. Littlefield.. 346
        Cross continued by Mr. Hilfiger.......... 347
        Redirect examination by Mr. Littlefield... 353
        Recross-examination by Mr. Hilfiger....... 359
        Further Redirect examination by
                            Mr. Littlefield.... 361
        Further Recross-examination by
                            Mr. Hilfiger...... 361

    RANDY TURMAN

        Direct examination by Mr. Littlefield..... 363
        Voir dire examination by Mr. Smith........ 381
        Direct continued by Mr. Littlefield....... 381
        Voir dire examination by Mr. Smith........ 387
        Direct continued by Mr. Littlefield....... 387

PROCEEDINGS CONCLUDING 9/27/05...................... 393

COURT IN SESSION

THE COURT:  Let the record reflect counsel for the Government is present.  The defendant and counsel are present for the defendant.

Before I bring the jury in, I have reviewed the defendant's response and objection to Government's intent to offer evidence of other crimes and brief in support that was filed this morning at 9:12.  Generally, I want to announce to counsel that I've considered the response and the objection, and I -- it's the Court's thought that I'll wait until I actually hear the evidence or the effort to present the evidence, before making a definitive ruling.  I would request that the defendant submit any limiting instruction you think might be appropriate, when that evidence comes.  And I make this announcement now so that you may -- it's not my intention to limit the opening arguments as a result of the objection to the Government's notice of intent to offer evidence of other crimes.  I think it's best dealt with at the time it's presented.  Of course, I would caution counsel for the Government to approach the bench for conference when that evidence -- when an effort to introduce that evidence is appropriate.

Anything now from the Government, before I bring the jury in?

MR. LITTLEFIELD:  Yes, Your Honor.

MR. SPERLING:  If the Court please, I'd like to amplify one thing.  There was a <u>Batson</u> challenge, and one of the reasons we are reluctant sometimes, Your Honor, to more fully explicate our reasoning, is that jury selection had not yet then been complete.  But I want to state for the record that our selection process had narrowed that choice down to jurors numbers 44, 55, and 134.

In our contemplation and as rationale, Your Honor, we recalled first that with regard to the juror who was ultimately struck, that we had to repeatedly ask him to speak up, both at the individual voir dire and then at the general voir dire.  I frankly feared that I had alienated him by asking him to speak up, and honestly did not hear a substantial number of his responses with regard to our questioning.

Important to our decision, though, is that juror number 44 reflected that his cousin is a DEA chemist who is going to testify in this case, although he testified appropriately and responded appropriately that he would be able to fairly consider that statement, our conclusion was that he certainly would not be, at least at first blush, adverse to that testimony.

Number 55, Your Honor, interacts with law

enforcement officers in his security and surveillance job, and we note also that he is apparently Native American, at least he works for a Native American casino.

In our decision, also, we elected to keep number 24, despite his reported illness.

I just wanted to state that as amplification for the previous justification. We accepted the Court's ruling and believed it well-founded at the time, and still do.

THE COURT: For the defense, any comment for the record?

MR. HILFIGER: Well, at this time, the only response we have is we just think he's trying to rehabilitate the mistake he made. We have nothing further on the record, though, for argument.

THE COURT: You may bring the jury in.

(JURY IN)

THE COURT: Good morning, members of the jury. You will recall yesterday that you took the oath to be jurors. Now I'm going to give you some preliminary instructions to guide you in your participation in this trial. It is very important to the administration of justice that you fully understand and faithfully perform these duties.

It is my duty to determine all of the law applicable to this case and to inform you of that law by these instructions and by the instructions that I will give you after all evidence has been received.  It is your duty to accept and follow all of these instructions as a whole, not accepting one or more of these instructions and disregarding the others.

It will be your duty to determine the facts of this case from the evidence presented by the parties in open court.  You and you alone are the judges of the facts. You will then have to apply those facts to the law as I will give it to you.  You must follow that law whether you agree with it or not.

You should not allow sympathy or prejudice to influence your decision.

Your decision should be based upon probabilities and not possibilities.  It may not be based upon speculation or guesswork.

Nothing the Court may say or do during the course of this trial is intended to indicate or should be taken by you as indicating what your verdict should be.

The evidence from which you will determine the facts will consist of the testimony of witnesses, documents and other items received into the record as exhibits, and any facts to which the attorneys agree or

stipulate or that the Court may instruct you to accept as true.

The production of evidence in court is governed by rules of law.  Attorneys have an obligation to their clients to make an objection when they believe that the evidence being offered is improper under the rules governing evidence, and it may -- and it is my duty to rule on these objections.  You should not be influenced by the objection or by the Court's ruling on it.  If I say the objection is sustained, ignore the question.  If I say the objection is overruled, you may consider the testimony or evidence covered by the objection.

If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Certain things are not evidence and must not be considered by you.  These things include:

(1) Statements, arguments, and questions by the attorneys are not evidence.  The statements, remarks, and arguments of the attorneys are intended to help you in understanding the evidence and applying the law, but they are not evidence.  If any statement, remark or argument of an attorney has no basis in the evidence, then you should disregard it.

(2) The attorneys' objections and my rulings upon

these objections, together with the reasons for these objections and rulings, are not evidence and should not be considered by you.

(3) Testimony that the Court has excluded or told you to disregard is not evidence and must not be considered.

(4) Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded.  You are to decide this case solely on the evidence presented here in this courtroom.  I probably should expand that. This courtroom or the other courtroom or any courtroom we're assigned to during this trial.

There are two kinds of evidence, direct and circumstantial.  Direct evidence is proof of a fact such as the testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  I will give you further instructions on these, as well as other matters, at the end of the case, but will -- but keep in mind that you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe and which witnesses not to believe, and how much of any witness' testimony to accept or reject.  I will give you some guidelines for determining the credibility of the witnesses, at the end of the case.

This is a criminal case.  You must presume that the defendant is innocent of the crime with which he is charged.  Thus, the defendant, although accused of a crime in the indictment, begins this trial with a clean slate.  That is, with no evidence against him.

The burden is always on the Government to prove guilt beyond a reasonable doubt.  This burden never shifts to the defendant, for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.  The defendant is not even obligated to produce any evidence by cross-examining the witnesses of the Government.

It is not required that the Government prove guilt beyond all possible doubt.  The test is one of reasonable doubt.  A reasonable doubt is a doubt based upon the reason and common sense, the kind of doubt that would make a reasonable person hesitate to act.  Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

Those of you who are familiar with civil cases will have heard of proof by a preponderance of the evidence. That burden of proof does not apply to a criminal case and you should, therefore, put it out of your mind.

Now I have a few words about your conduct as jurors.

First, I instruct you that during this trial, you are not to discuss this case with anyone or permit anyone to discuss it with you.  Until you retire to the jury room at the end of the case to deliberate your verdict, you simply are not to talk about this case.

Second, do not read or listen to anything relating to this case in any way.  If anyone should try to talk to you about this case, bring it to the Court's attention immediately.

Third, do not try to do any research or conduct any investigation about this case on your own.

Finally, do not form any opinions about this case until all of the evidence has been presented to you. Keep an open mind until you start your deliberations at the end of the case.

A question sometimes arises as to whether individual members of the jury will be permitted to take notes during the trial.  If you would like to take notes during the trial, you may.  On the other hand, you are not required to take notes.  Each of you will be provided a folder containing paper and a pen, when we begin to take evidence in this case.  I had my staff place your juror number on the individual folders.  If

you do decide to take notes, be careful not to get so involved in note taking that you become distracted. And remember that your notes will not necessarily reflect -- all of your notes will not necessarily reflect what was said, so, your notes should be used only as memory aides. Therefore, you should not give your notes precedence over your independent recollection of the evidence. You should also not be unduly influenced by the notes of other jurors. At the end of the day or if a break is taken for lunch, you will need to check your folders in with the courtroom deputy before you leave the jury room. The folders will be placed in a locked safe until time for the court to resume, at which time they will be returned to you. My point is that no one will know what your thoughts are until you have issued a verdict in this case. Do not take any notes with you when you leave the courthouse. Finally, do not discuss the contents of your notes until you begin your deliberations.

The trial will now begin. First, each side may make an opening statement. An opening statement is neither evidence nor argument. It's an outline of what that party intends to prove, offered to help you follow the evidence.

Next, the Government will present its witnesses,

and the defendant may cross-examine them.  Then the defendant will present any witnesses that they may have, and the Government may cross-examine them.  However, as I have previously instructed you, the defendant is not required to present any witnesses.

Thereafter, the attorneys will make their closing arguments, to summarize and interpret the evidence for you, and the Court will give you instructions on the law.  You will then retire to deliberate on your verdict.

Our general plan, during the course of this trial, will be to begin at 9:00 a.m. and recess at 5:00.  It could happen that we will go later some evenings.  This evening, I've told the attorneys that we will go until 5:30.  Likewise, on some days, due to the Court's other commitments, we may recess early.  We'll take a 15 break normally in the middle of the morning, and then we'll go until the noon hour.  We're going to be off 30 minutes this morning, because we started late, and I anticipate the arguments will be an hour from each, from the Government and the defendant.  We'll, likewise, take a break in the afternoon.  I'll try to schedule breaks at convenient intervals, depending upon whether it is anticipated that a witness' testimony may be concluded prior to a break.

If -- and this is important, so that you understand you have some control. I've told you, you are judges of the facts. You're equal officers of the Court with these attorneys. If there's some reason you need a break, that I've pushed too long, all you have to do is raise your hand and say, "Judge, it's time for a break. I need a break," and we we'll take a break. So, keep that in mind. Obviously, I'd like to take one break in the morning and one break in the afternoon, but if we need more than that or you feel a need for a break before the Court moves for a break, well, feel comfortable. Because I anticipate we'll be here several days, working with each other, so, I want you to feel relaxed and not hesitate to do that, if it's appropriate.

I'll advise the Government, you may now -- I might -- on scheduling, you remember tomorrow is a full regular day. We'll start at 9:00 and go until 5:00. We will not be in session on Thursday and Friday, and then the following week, we'll start bright and early Monday morning. I anticipate the following week it will be 9:00 to 5:00 for five straight days. And then the following week starts with a federal holiday. We'll be off that day and the rest of that week -- I'll remind you of that -- and then we'll be in session. But

tomorrow, we're here the full day, off two days, full week, off a week, and then we'll start back.

We'll hear the Government's opening statement.

My clerk's reminded me of one other thing.  We have -- I think -- this is not my courtroom.  I hate to admit the acoustics are probably better in this courtroom than what I call the beautiful ceremonial courtroom.  But if anyone has any difficulty with your hearing devises or need a hearing device, raise your hand and let us know, because it's very important that you hear everything that is said here in this courtroom.

You may proceed, Mr. Littlefield.

OPENING STATEMENT,

BY MR. LITTLEFIELD:

May it please the Court, ladies and gentlemen of the jury, my 80 year old daddy used to teach speech, and I took one of his classes -- or a number of his classes, and one of the things I remember him telling me was that if you're not nervous before you give a speech, there's something wrong with you.  And I want to tell him that I'm okay, because I'm really nervous today.  I'm almost scared to death.  But we're going to muddle through.

This is my opening statement.  It is my opportunity to explain to you what I anticipate the

Government's evidence will be in this trial. I have heard of a trial compared to many things, and the thing I think best illustrates it is it's kind of like a jigsaw puzzle. When you have a jigsaw puzzle, you have a bunch of pieces that are just a mishmash of stuff, and they don't make any sense until you put them together. And when you put them together, those pieces give you a clear, comprehensive picture. And a trial is kind of like that. You get a bunch of pieces. You get evidence that comes in, in a disjointed, oftentimes, fashion, and a lot of times it doesn't make any sense until you put it together. And this is my opportunity to preview those pieces, the evidence that you'll receive from this trial. And it is my anticipation that as those pieces come in, you will see that those pieces, the evidence that you receive in this trial, will establish beyond a reasonable doubt all of the essential elements of the three crimes charged against that defendant in this case.

You will find, I anticipate, and the evidence will demonstrate that Kenny Barrett, during the commission of drug trafficking crimes, used and carried a firearm and possessed a firearm in furtherance of those crimes, and used that firearm to cause the death of a human being, David Rocky Eales. That he used those firearms and

carried those firearms and possessed those firearms in relation to and during a crime of violence, the shooting of Rocky Eales, and the shooting of Buddy Hamilton, which resulted in the death of Mr. Eales.  And that during the commission of drug trafficking crimes -- and we'll detail those crimes -- he shot and killed a state law enforcement officer who was involved in and carrying out his official duties as a state law enforcement officer.

In order to present that evidence, I anticipate the first witness is an individual by the name of Bob Thomas. Mr. Thomas will testify that he is a crime scene or a model expert working in Quantico, Virginia, for the FBI. He'll tell you in May of this year, he came to Oklahoma and spent two days on the property that -- where Kenny Barrett's residence is located.  And he surveyed and measured, took hundreds of pictures, and got all of that information together and built a model.  And I anticipate we'll bring that model into this courtroom. You'll see it's a three foot by seven foot model.  And you will hear the testimony in the trial that will detail that this occasion, this incident involved three vehicles entering onto the property where Mr. Barrett's residence was located.  And that during the drive up, the lead vehicle, a Bronco, which was occupied by Buddy Hamilton

as the driver and Rocky Eales as the passenger, received gunfire, and that ultimately Mr. Eales was killed as a result of the gunfire into that Bronco.  And that model will cover the entire path of that Bronco on the property.

You will hear that that model is to scale, and you will see that there is a cutout of the first floor of Barrett's residence.  And you will hear that the scale of that property is 3/8 of an inch on the model to a foot.  And it shows elevation changes.  And you will see that on that model, on the eastern edge, is a driveway, and from that driveway, entry was made onto the residence.  A ditch was passed through, and about halfway between the ditch and the house, the Bronco began receiving gunfire.

I anticipate that Mr. Thomas will tell you that he measured from the threshold of the front door of the house to where the entry was made off the driveway, and he'll tell you the measurement.  It's slightly less than 60 yards.  About 59 yards.  He will tell you that he measured the elevations.  And you'll be able to see the elevation changes on that model.  And he will tell you the bottom of the ditch -- from the bottom of the ditch to the porch of the house, the front porch, there's an elevation change of seven feet.  One standing on that porch will be looking down to the entry where that Bronco came.

And he will tell you that he measured the dimensions of the house to an eighth of an inch, and he used those dimensions in constructing the house.  And he will tell you that the dimensions of the house -- that the house, including the front porch, was approximately 20 feet by 20 feet.  He will tell you that there are four rooms on the bottom floor of that house, and you'll see them on the model to scale, accurate and to scale.  And he will tell you the dimensions of the two front rooms of the house.  That the -- and he will discuss that the front porch, for example, from the inside of the threshold of the front door, to the edge of the porch on the south side, was five feet one inches.  He will tell you between the two rooms on the south side of the house, the two front rooms of the house, was a wall with an opening, passageway between the two rooms.  And he will tell you that from the threshold to the back -- or to the beginning of that door, was four feet eleven and a half inches.  And he will tell you that that doorway was two feet and five inches wide.  And from the back of that door between those two rooms, to the front of the porch, was a distance of less than 12 feet.

He will tell you that model's accurate.  He'll show you trees on the model.  He'll show you where the ditch was.  He'll show you the house and its location in

relation to the rest of the property, and you'll see that that's the scene, the scene of this incident.

The second witness I anticipate calling is going to be Clint Johnson. Mr. Johnson will testify he is today a Drug Task Force Agent for District 27, the D.A.'s Office, and he has been so since I think 1996. He will tell you that in 1999, he was occupying that position, and he was familiar with Kenneth Eugene Barrett. Mr. Johnson's district incorporates Wagoner, Cherokee, Adair and Sequoyah Counties. And he will tell you that in January of 1999, an arrest warrant was issued for Kenneth Eugene Barrett for failure to appear at a trial. And he will tell you that that warrant was still outstanding for Kenneth Eugene Barrett in September of 1999.

He will tell you the week prior to September the 24th, 1999, that he spoke to a confidential informant, and he took the information from that informant, a person he had used in the past, and he went to a district judge in Sequoyah County and obtained a search warrant for the residence of Kenneth Eugene Barrett.

And he will tell you that that search warrant had certain special provisions, provisions normally not given in search warrants. He will tell you it was a 24 hour a day, or a nighttime, search warrant. Most search warrants require execution between 6:00 in the morning

and 10:00 at night.  They're daytime warrants, in the state of Oklahoma.  But this warrant was for 24 hours a day.  And he will also tell you that the Court issued, based upon the information he gave the judge, a no knock search warrant.  The police did not have to knock and announce who they were before entering the residence.

Mr. Johnson will tell you in the three plus years he had been working as a Drug Task Force Agent, that he and other local officers -- when he got a warrant, in virtually every case, that warrant was executed and served by Mr. Johnson and other local law enforcement officers.  He will tell you he remembers only one exception prior to this date, and that was an exception in which he felt a great deal of danger that was beyond the capabilities of his local law enforcement officers and him to safely execute.  And in that previous incident, they went to the Oklahoma Highway Patrol Tactical Entry Team.  He will tell you in this incident, they went to Oklahoma Highway Patrol Tactical Entry Team.  And the Tactical Entry Team, because of the risk, determined that they would make the entry.

Mr. Johnson will tell you that on September the 22nd, 1999, he and Frank Loyd met two of the officers from that tact team, at the Sallisaw airport, and they gave them a floor plan model.  They gave them

information about Mr. Barrett's background, the arrest warrant, a copy of the search warrant, and they advised them of the risk attendent to executing the warrant. He will tell you that they advised that neighbors of Mr. Barrett's, were Mr. Barrett's family members. And he will advise that you the Tactical Entry Team flew over, did an aerial view of Mr. Barrett's residence on that day.

Mr. Johnson will tell you that he met with the Tactical Team members during their preparation, for just a very short time, on the afternoon of September 23rd, at Camp Gruber, 1999. And he was advised to meet with local law enforcement, have them gather at Dwight Mission Road and I-40, for the entry to take place. He will tell you they were assembled there at 12:30, 12:20 in the morning, on September the 24th, 1999, and the Tactical Team arrived, and the Tactical Team advised, "Give us two minutes, two minute head start, and then you follow in." And that's what they did. The Tactical Team left. Johnson and the local officers remained for two minutes, and then proceeded to Barrett's house.

Mr. Johonson will advise you when he was there, he learned that an officer was down, that officers had been hit. He's been trained in CPR. He grabbed a medical bag. He got with Delena Goss, who was the Sheriff of Cherokee

County at the time, who was a licensed trauma nurse, and they attended to Rocky Eales, as he was loaded into a Bronco and taken to meet an ambulance at Dwight Mission Road and I-40.  And Mr. Johnson will tell you that they attempted CPR, and they attempted lifesaving measures on Rocky Eales, and got no response.  He will tell you that Mr. Eales was removed from the Bronco and placed in an ambulance and taken to the Sallisaw hospital, where he was pronounced dead.

The third witness I anticipate calling is an individual by the name of Randy Turman.  And Randy Turman will tell you he knows Kenny Barrett.  He associated with Mr. Barrett during the summer months of 1999.  And Mr. Turman will tell you that he was a meth cook, that he cooked methamphetamine and used methamphetamine, and that he cooked it for a number of years, and, in fact, he has a charge pending against him for cooking methamphetamine. And he will tell you where he learned to cook.  He learned to manufacture methamphetamine from the defendant, Kenny Barrett, in the summer of 1999.  And he will tell you that Mr. Barrett cooked in that house.  And we'll show you on the model that I mentioned awhile ago, the location where Barrett cooked in that house.  And you will see photographs that show syringes hidden in that house, and Mr. Turman will identify the location.  You

will see equipment, you will see chemicals, tubing and glassware, that Mr. Turman will tell you was used by Mr. Barrett in manufacturing methamphetamine. He will tell you that Mr. Barrett used and had available for distribution, methamphetamine. And he will tell you also that Mr. Barrett had a number of guns. And he will identify some of those guns. He will identify what he calls an AR-15, which you'll learn, eventually, in the trial, is technically a .223 Colt Sporter Rifle. And Mr. Turman will identify that. He'll identify a shotgun that, in fact, he sold to Barrett. And he'll identify a .22 Browning pistol semi-automatic, and a 9mm pistol, that Mr. Barrett often carried in his waistband.

And he will also tell you that Mr. Barrett, during the summer of 1999, was aware of the arrest warrant which had been issued in January of 1999, and that Mr. Barrett would not leave his property because he was concerned if he left, he would be arrested by law enforcement on that arrest warrant. He'll tell you Barrett hung around the house.

And he will also tell you that Barrett anticipated that at some point in time, law enforcement was going to come to his residence to execute that arrest warrant, and Barrett announced his intentions. I anticipate Mr. Turman will testify that Barrett stated that, "When they

come, when the cops come, I intend to take out as many of them as I can before they take me out."

And Mr. Turman will tell you of an incident about a month prior to September of 1999, in which he was at Mr. Barrett's residence in the nighttime, in the evening, and an individual came moving into the yard at rapid speed, stopping, skidding gravel, and got out saying, "The cops are on my tail, they'll be here any minute," and Mr. Turman will tell you what Mr. Barrett did when he got that information.  That Mr. Barrett went into the house and retrieved his rifle.  Mr. Turman will tell you he was scared.  He hid.  The cops didn't show that night, but Mr. Turman never went back.

You will hear about the execution of this entry, by the Oklahoma Highway Patrol Tactical Team, and you will hear background about the Tactical Teams of the Oklahoma Highway -- I want to say O.H.P. -- about O.H.P.'s tact teams.  You'll hear that they divide the state in half. There's an eastern half and a western half tact team. This entry was performed by the eastern half.  And you will hear background about these guys.  You will hear that this was a highly trained, professional unit.  That they met one time a month for two days, every month, for training, with the exception of two months.  Once in the spring and once in the fall, they met for a week and had

training on tactical entries.  You will hear that the team had been together for an extended period, and the average membership, the average amount of time these team members had been with this team, was in excess of 10 years.  That they executed a number of type -- specialized operations, one of which was entries into residences for search warrants which were too dangerous for local law enforcement to handle.  In fact, before they would execute the entry in a search warrant, they had to make a determination that was something that required their expertise, that it couldn't be handled by local law enforcement.

You will hear how they decided, in fact, to do this entry, and how Buddy Hamilton, who was the team leader of this operation, and Raymond Greninger met at Sallisaw airport with Clint Johnson and Frank Loyd.  How they received a model.  How they flew over and took aerial photos, and how the team assembled at Camp Gruber September the 23rd, 1999.  And how they brainstormed, got together and worked a plan of entry up to enter this location.  They showed the photographs, they gave the background, they described the potential danger, and they developed a plan.

Their original plan was for three vehicles to make entry.  But first off, they initially planned to submit

or introduce a creek team into this operation.  A creek team, they'll tell you, is a team of observers who are on the ground at the scene prior to the entry, in radio communication, to give real time current information about what's going on.  And, also, with the creek team, is what they call a sniper, or a counter sniper, someone to provide protection for the entry team, if it's necessary.

And you'll hear that before they went into this operation, they'd done the fly over, but they wanted to make sure it was safe, and, so, they did a drive-by. And you'll hear that the Barrett residence is located on a dead-end road.  So, they got Buddy Hamilton's Bronco, which is unmarked, removed all of the antennas, it's heavily tinted so you can't see inside, and about 4:00 or 5:00 on the afternoon of the 23rd, they drove up the road, past Barrett's residence, stopped, stayed a couple of minutes, and drove back by.  And you'll hear what they saw during the drive-by.  You'll hear that they saw that there was a metal gate across the front of Barrett's residence, and it had a double log chain around it, so they knew they couldn't go in that way.  You will hear that they observed that the houses were closer together than it looked like from the air.  And you will hear that they saw a number of dogs running loose in the area.

And because of all of these factors, the -- and that there was a lack of cover for a creek team to come in and enter and hide safely -- and you will hear because of these factors, they determined that inserting a Creek Team was inappropriate, and they changed their plan.

You'll hear how they set up the house, practiced the entry, how they prepared for this entry, and how they prepared their plan. And you'll hear that the plan was changed. Because of the gate across the front, they decided to make entry from the east side that I mentioned awhile ago, that driveway, through a ditch, and into the yard. And that there were three teams, three vehicles that were going to enter. The first was the Bronco driven by Hamilton in which Rocky Eales was a passenger. The second was a Bronco also unmarked, driven by Raymond Greninger, in which Rick Manion was the passenger. The third was a Crown Victoria black and white with a light bar across the top, a regular old trooper car, driven by Steve Hash, with Danny Oliver as the passenger. Those three vehicles, when they turned on the driveway -- you'll see aerial photos that show the entry along the road in the south, and where the driveway turns back. The plan was to turn the emergency lights on those vehicles when they turned on the driveway. Buddy Hamilton saw someone, as they

approached, in the yard -- it was later determined it was Toby Barrett -- and his attention was diverted to Barrett, and Mr. Hamilton failed to turn his lights on. But immediately behind him, in the second Bronco, that came on the property immediately behind Mr. Hamilton, was Raymond Greninger.  Raymond Greninger's visor lights were turned on, the kind that flash in the visor. Raymond Greninger, I believe his headlights, wigwag headlights, were turned on as emergency lights. Immediately behind Greninger, in the entry operation, was the black and white Crown Victoria driven by Steve Hash.  And when Steve Hash's vehicle got on the driveway, its overhead light bar was turned on.  And you will see a videotape taken at 3:17, I believe, a.m., on September the 24th, 1999, and Hash's vehicle is parked right where it ended up, and you will see the lights still on, and them just rolling through the yard at Kenny Barrett's residence.  And you will hear what happened.

You will hear that as Hamilton exited the ditch, as Greninger was entering the ditch, and as Hash was getting ready behind them, in a line, to go up to Barrett's house, which was immediately in front of them, some seven feet above them in elevation, that Hamilton's vehicle began receiving gunfire.  And Hamilton looked around, trying to find the source of fire, looked towards Toby,

who was the only person he could see, and he went towards Toby.  You'll learn that Toby was taken into custody by Robert Darst and Hise, who were at the front gate, and moved behind vehicles, out of the line of fire, provided safety.  You'll hear that Hamilton went toward Toby because he thought that Toby might be the source of fire.  He was the only person he could see.  The firing started about 30 yards from the house.  And as Hamilton got closer, the firing intensified.

And you will hear that when a .223 round passes through an intermediate or intervening target, it fragments.  And you'll hear Hamilton got hit in the eye, in the face, with rounds passing through the windshield. You'll hear he had a fragment in the orbit of his left eye, and he doesn't know how he got there but ultimately he ended up immediately in front of Kenneth Barrett's residence.

You will hear the other officers who were able to observe testify that they saw the glass and the fragments and the dust and the debris flying off of Hamilton's Bronco.  And they saw the lights reflecting off of it, the emergency lights, as the fire was hitting that Bronco.  And you will hear that Rocky Eales attempted to retreat from that Bronco, and that as he opened the door, he was hit with three shots.  And you will see the

analysis of the trajectories of the Bronco, that demonstrate the shots that hit him.  You will hear that Rocky was hit here, fatally, here in the left flank, and again on the right elbow.  And you will hear testimony read from Rick Manion, who testified in a previous proceeding and his testimony was recorded, and he will testify about seeing Rocky stumble to the back of that Bronco, and he could tell Rocky was hit.  And you will hear Manion saying you could see the lights coming off the glass and the Bronco and Rocky's body, as he stumbled to the back and went down.  Manion went to Rocky and said, "Are you hurt bad?"  And Rocky said his last words, "I'm hit bad."

You'll hear that Buddy Hamilton threw a flash bang and managed to get out of the Bronco.  Got another wound to the shoulder.  And you will hear that Rocky -- not Rocky, that Manion looked inside and saw, standing by the door that I mentioned between the two rooms, a man holding a rifle.  You will hear that Hamilton looked inside, from the cover of the Bronco, and saw a man holding a rifle, and Hamilton fired inside.  The man stepped inside the east room, Manion went around to the right side of the house, and fired two bursts through a window.  And they heard a scream, and a person went down. Rocky -- excuse me -- Buddy went into that house and

grabbed the person by the hair and dragged him out, and you'll hear it was the defendant, Kenny Barrett. And you will hear that when Barrett got outside his -- he was on his belly with his arms underneath him and his hands were going down, and they pulled them back and cuffed him and restrained him, and where his hands were reaching, in his waistband, was a loaded Smith and Wesson 9mm pistol. Even when he was taken into custody, he was still reaching for a gun. And you'll see that pistol in the front yard.

Rocky was then attended to, and as I mentioned, was taken to the hospital. Barrett was restrained. Officers went inside the house to make sure no one else was present. And you will hear those officers testify that the only individual that was inside that house, the house from which they will testify the shots were coming, the shots that hit the Bronco, the shots that hit Buddy, and the shots that killed Rocky, the only person inside that residence was the defendant, Kenneth Eugene Barrett, the person holding that firearm as viewed by Rick Manion.

The crime scene was secured and OSBI, who did an investigation. And you will see the fruits of -- hear about their investigation, and hear about the fruits. You'll see numerous, numerous photographs. You will see items that were seized. You will hear about shell

casings.  And you will hear that there were 16 shell casings found in the living room, and another six found around the front porch and -- on around the front porch. And that those 16 shell casings were .223 casings.  You will hear about .45 shell casings found in the front yard.  You will hear about a couple of three or four projectiles that were seized.  And you will hear about 9mm shell casings around the east side of the house, where Manion fired his H & K 9mm submachine gun.  You will hear that weapons were seized.  The .223 Colt Sporter rifle, that was held by Barrett inside the residence, was seized.  The 9mm Smith and Wesson in the front yard, was seized.  The shotgun was seized.  A Browning .22 was seized inside the residence.  Buddy Hamilton's .45 Sig Sauer was taken.  The 9mm H & K submachine gun was taken.  And those firearms -- the rest of the troopers' firearms were either turned in or collected.

You will hear OSBI did ballistics analysis.  You will also hear that at the autopsy, Rocky was pronounced dead by the shot that passed through -- satellites having passed through an intermediate target, into the center wall of his chest, and a particle -- a fragment lacerated his aorta, and he bled to death.  And that fragment was recovered.  And right by that fragment, was the jacket

from the shell that entered his chest, and that was seized and turned over to the OSBI.

And you will hear the analysis of the firearms. Kenny Barrett had a shot pulled from his leg. It was fired by Rick Manion's 9mm H & K submachine gun. A projectile was found in the east room. It was fired by Buddy Hamilton's Sig Sauer. Two casings were found from Buddy's .45, out by the Bronco. Several casings from the 9mm fired by Rick Manion, were found by the pickup on the east side of the house. The 16 shell casings inside the house, the six .223 casings that were found around the front porch, were all fired by that .223. And one projectile -- one projectile is what we're here about. The jacket pulled from Rocky Eales' chest was compared to a jacket fired by that .223 Colt Sporter rifle, that was found between the two doors inside the house, and that comparison revealed that that jacket found in Rocky's chest was fired by Kenny Barrett's gun. The fatal bullet was fired by that man, and the gun that man held. He killed Rocky Eales. He killed Rocky Eales.

You will hear that the officers conducting the warrant, conducting the entry, had different responsibilities, and they were in different positions and at different locations, and were viewing different things in line with what their responsibilities were in

that entry, and they have a different perspective on things. And you will see there are some variations. You will also recognize that they underwent a very traumatic incident, one in which two of their members were shot and a close associate was killed. And you will see that their memories are still impacted.

Raymond Greninger, who was in the second vehicle, the driver, still carries a blank from the time he entered the ditch until the time he stopped. The only thing he remembers in that time period is that shots were being fired.

Buddy Hamilton initially did not remember shooting his .45 two times into the house.

Steve Hash, I believe, still remembers seeing the fire coming out of the house, and the glass coming off the front of the windshield, but he can't hear the sound. He can see it, but he can't hear it.

Danny Oliver didn't remember the flash bang. Knows it was thrown, big noise, big flash, he's a blank. And you'll hear why.

James Horn will testify that he has been involved in a number of fire fights. He was in Nam. James Horn was an FBI agent, was with the first SWAT team they ever organized. James Horn is a trained psychologist and deals with individuals who go through traumatic

132

experiences, such as the Oklahoma City bombing, and such as this incident. And he will tell you it is absolutely common for officers to have blanks in their memory, and that they may go weeks or months before they hear something or see something that triggers a recollection that they had forgotten. And he says sometimes parts of it never come back. And he will tell you that is an absolutely natural, normal human reaction and human response to dealing with and facing this type of situation, and you will see it exists in these officers.

Kenny Barrett's gun, that .223 Colt Sporter, you'll see it, and you'll see photographs of it, and you will discern, you'll note that there are three magazines taped together in a wide configuration. Each one of those magazines holds 30 shots. You top it off by putting a shot in the chamber, and you've got 91 shots.

Vicki Lyons of the OSBI, seized that rifle, and Vicki Lyons will tell you she counted how many rounds were left in the magazines. And she'll tell you there were 72 unfired rounds in that weapon, in the magazines and the chamber. You take 17 -- or you take the 91 and subtract the 72 and it leaves you the number 19. And you will hear that 19 shots were fired on that occasion. You will hear that there were 18 shots into the Bronco, and you will see the trajectories of those shots, the

bulk of which were at the driver, Buddy Hamilton, but there were four shots that passed through the passenger door. And you will see the trajectories of those shots that went through the passenger door as it would have been right in front of the front door of Kenneth Barrett's residence.

Iris Dalley has prepared a demonstration with an individual the size of Rocky Eales, wearing a uniform and all the equipment Rocky would have been wearing, and photographed that individual as he was turning to get out of the Bronco, and you will see where the trajectories that go through the passenger door match up with that model, that individual's body, and you will see that of those -- three of those four shots, the trajectories are consistent with the wounds in Rocky Eales' body. And you will see on one of those trajectories -- on one of those trajectories, it ends up, part of it -- remember it fragments -- part of the fragments end up in the passenger seat. And at that point of entry of the fragment into the passenger seat, there was blood. And OSBI seized it, and they took it to the lab, and they compared it with the blood that was taken from Rocky's body at the Medical Examiner's Office, and they did a DNA analysis, and you will hear the conclusion, that the blood on the passenger seat, along

the trajectory, was Rocky Eales' blood.  Rocky Eales, when he's sitting in the passenger seat, as it comes in on this path approaching the house, his right side is exposed to Kenneth Barrett.  His left side would not be exposed to that house, except for one point, and that's when the vehicle stopped in front of the house and he turned to exit out of the passenger door.

THE COURT:  Mr. Littlefield, I apologize.  We're going to have to take just a short recess.

If everyone would please remain as the jury goes to this exit.  It should be less than ten minutes.

(BRIEF RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect the Government's counsel is here, the defendant is present with counsel.  I don't have counsel.

(PAUSE)

THE COURT:  Now the record should reflect that defendant is present with counsel.

You may continue your opening.

OPENING STATEMENT, CONT'D,

BY MR. LITTLEFIELD:

Thank you.  I'm trying to remember where I was talking about, and I think I was talking about Vicki

Lyons from the OSBI.  She retrieved the .223, and there were 72 rounds in the magazines and in the weapon, 91 rounds when that was fully loaded.  And you will hear testimony that 18 rounds went into the Bronco, and one additional round hit Rocky Eales in the elbow.  The .223 casings, 16 found in the living room, six in and around the front porch, every one of them matched to the Colt Sporter, and, of course, the jacket found inside the chest of Rocky Eales was determined to have been fired from that Colt Sporter.  No question, the shot fired that murdered, that killed, that ended the life of Rocky Eales came from the gun that was Barrett's gun, the gun he was seen holding inside the house.

You will hear that clearly this was a crime of violence.  As that vehicle approached, before anything was done by the troopers except drive onto the yard, under the authority and command of a judge of the state of Oklahoma, they started receiving fire.  They were under the judge's direction and the Court Order, and they got shot as a consequence.  Buddy Hamilton hit two times with two different shots, once in the face, the eye, and the left shoulder.  Rocky hit three times.  It was clearly a crime of violence committed on these individuals with the firearms, and it was clearly drug trafficking crimes, as well.

After the OSBI completed their search, their homicide search, the Drug Enforcement Administration officers from McAlester executed the state warrant, because the state officers had been through a traumatic situation, had been up all night, couldn't do the warrant.  So, D.E.A. did the warrant.  And they'll tell you what they found.  They found -- you will hear evidence that in Kenny Barrett's right pocket, was a substance which was tested, and it was red phosphorus. You will hear that to manufacture, to cook methamphetamine, you need three primary ingredients: red phosphorus, iodine crystals, and pseudoephedrine. Red phosphorus, 50 grams, was in that man's pocket.  And you will hear testimony that it tested positive for meth. You'll hear that when you cook meth with those three substances, the iodine converts the pseudo into methamphetamine, and the red phosphorus is a catalyst that causes that reaction.  The red phosphorus is not consumed.  It can be retrieved and used again.  And if it's used once, when -- and it continues to be used, it will test positive for methamphetamine.  It shows it's been used before, and the red "P" in his pocket -- the red phosphorus in his pocket tested positive for methamphetamine.

In a camera, in a collapsible accordion camera in

137

the east room of that house, was a bottle of iodine crystals containing 144 grams.  Behind a ceiling tile in the east room of that house, was a baggie that contained 1,426 pseudoephedrine pills, 188 grams of pure pseudoephedrine, enough to cook over 90 grams of pure methamphetamine.  Over three ounces of pure meth.

And you will see, in the garage, toluene, mineral spirits, Coleman fuel, you will see tubing, and you will see glassware that is used to cook methamphetamine. Randy Turman will show you where he cooked, and you'll determine there was a meth lab.  You will see baggies, multiple baggies, for distributing methamphetamine. Scales found at Barrett's property, on the site.  You will see 40 plus syringes -- it's either 42 or 46, I forgot -- but you're going to see 40 plus syringes that were found hidden at Barrett's residence, from the D.E.A. You will hear testimony of witnesses that said Barrett cooked, that Barrett always had meth, that Barrett provided bumps, that Barrett sold meth.  And you will hear testimony that this man, on the night he was taken into custody, in his rear pocket, had 21, 100 dollar bills.  Shade tree mechanic with 21, 100 dollar bills in his pocket.  And you will determine that clearly he was involved in drug trafficking crimes, manufacturing meth, distributing meth, using meth, maintaining a place where

meth could be manufactured, distributed, and used, and these drug trafficking crimes were central to the search warrant, and central to the murder of Rocky Eales.

And you will also hear from the evidence and see from the evidence that you observe that Kenny Barrett premeditated, intended, planned, conducted, committed this crime willfully, with premeditation and with planning. For weeks and even months prior to this occasion, Kenny Barrett planned for it, and he prepared for it. Kenny Barrett knew that there was an arrest warrant outstanding for him. Kenny Barrett knew that if he left his place, he would be arrested, and, so, he stayed there. Kenny Barrett knew that at some point in time, law enforcement officers were going to come onto his property, and he planned for it and prepared for it.

You will see, on the front gate, a sign that he painted giving the warning. That sign says, "Keep Out. I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot." Kenny Barrett locked the gate when he anticipated people were going to come.

You will hear testimony about Kenny Barrett, when he locked the gate, the only entry was from that drive on the east side of the house, and you will see that -- you will see the model that shows the first floor, and

you'll see a photograph of what existed on the second floor.  It was a loft area in which there was a bed, and there was a window up there, and in that window, looking to the east at that driveway and through that ditch where the officers came, Kenny Barrett had placed a spotter scope, so he could observe what was coming from the east.

Kenny Barrett intended to do what he did, thought about it, and told people.  Kenny Barrett told Randy Travis -- or Randy Turman -- Randy Travis wasn't his friend -- told Randy Turman what his expectation was. He told him that he anticipated that the cops were going to come, and if they did, he was going to take out as many of them as he could before they got him.  Kenny told Charles Sanders that, "I'm going to kill the first one through the door."  Kenny Barrett told Brandie Price, the very week of this incident, "If you're here when they come, you better grab a gun or hit the floor." Kenny Barrett spoke to his cousin, Travis Crawford, and told him -- told his -- well, actually, I'm going to talk about Travis' girlfriend at the time, now Travis' wife. In the weeks prior to the incident, he said, "If the cops come, all hell's going to break loose."

You will hear that on the night in question, immediately prior, on the 23rd, in the early evening

hours -- remember I mentioned Mr. Hamilton will testify about the drive through and the Bronco -- and you will hear testimony that Kenny Barrett observed that Bronco and discerned what it was, and that he was putting the logging chain around the gate to prevent entry through the front gate, the gate with the sign, "Keep Out." And he told -- he told, "That was a cop car." Kenny Barrett said, "They may well be coming." And Kenny Barrett said, "If they come, all hell is going to break loose." Less than 12 hours prior, he was prepared.

You will see a photograph of inside the residence, in that east room, and on the table -- on the table in that east room, in the southeast room in the house, you'll see a box of empty .223 -- .223 cartridge box, emptied, sitting there, because the rifle had been loaded up to the max.

You will hear testimony of the individuals that will say that Kenny always, always had a gun with him. When he went out to his garage area, he carried a gun with him. The 9mm, it was always in his waistband. The .223 rifle, that was his favorite weapon -- that it was his favorite weapon, and that he kept it leaning against the desk which was located right there at the edge of the east room, some five, six feet from the front door.

Kenny Barrett knew they were going to come, and

Kenny Barrett planned and prepared for what he was going to do when they got there.  Kenny Barrett had intentions and expectations, and he announced those intentions and expectations to multiple people, and when the time came, he acted upon those announced intentions and expectations.  He shot two, he took out as many as he could before they got him.

You will hear testimony that anytime someone drove up, and Kenny didn't recognize them, the first thing he did was retrieve a gun.  He was always ready, he was always prepared, and he intended to do what he would do.

I got interrupted awhile ago.  I'm trying to find out -- oh, yeah, one other item.  And you will see from the model, and you will see from the evidence, that when the officers entered that property lawfully, under the Order of the Court, when they entered that property from that east driveway, with their lights on, that Kenny Barrett had to know.  You will see the position of those vehicles, as demonstrated on the model, and the troopers will tell you.

Buddy Hamilton will place his vehicle as to where it was located when the shots were first fired.  You will see then Raymond Greninger, who was in the second vehicle, with his visor lights on, and he will place his vehicle where it was in relation to Buddy Hamilton's vehicle.  And then you

will see the third vehicle, the Crown Victoria, black and white, and Steve Hash, who drove that vehicle, will place that vehicle where it was in relation to Buddy and Rocky's vehicle and in relation to Raymond Greninger and Rick Manion's vehicle. And you will see -- remember the elevation change. That house is on the highest point of that property. That front porch is 21 inches, a foot and three-quarters, above the ground. That house is seven feet higher than the bottom of the ditch. When the officers came in, they're coming up. And you've got his body above it, standing, looking down, looking down from an elevated position. And you will see that those three vehicles, with the second vehicle and the third vehicle's emergency lights on, are lined right up. And as -- and you will see the relationship of the porch to the point of entry and the path that was followed. And you will see that it is inescapable that one could not fire a shot into that Bronco without seeing the vehicles immediately behind it, all lit up with their emergency lights on.

Kenny Barrett had to know that it was law enforcement. Kenny Barrett could not have not known that it was law enforcement. You will see the videotape about how bright those lights were, you'll see the positioning of the vehicles, and you will finally see the location

where Barrett was standing when he fired the fatal shots at Rocky.  You will see that standing by that door -- standing by the door between the southwest room and the southeast room of his residence, he's standing immediately in front of -- immediately looking out the door, and you'll see where the Bronco was parked, and you will see that when Rocky Eales exited to retreat to the rear of the Bronco for cover, his body was positioned right in front of the door, right in front of Kenny Barrett.  And you will see that Kenny Barrett was standing from an elevated position, within 17 feet, at the most, of Rocky, as he was getting out of that vehicle -- as far as from me to you -- with a rifle.  And he aimed with that rifle, and it was like target practice.  Couldn't miss.  And he didn't.  And that's why we're here today.

And at the end of this trial, I believe, based upon the evidence, you're going to find that all three counts have been proven beyond a reasonable doubt, and that he is, in fact, guilty of unlawfully, with premeditation, taking the life of Rocky Eales.

Thank you.

THE COURT:  For the defense.

MR. HILFIGER:  Thank you, Your Honor.

OPENING STATEMENT,

BY MR. HILFIGER:

Ladies and gentlemen, I appreciate your patience and your attendance here.  And I know this is going to be a little bit of a lengthy trial.  You're going to have to listen to us for a long time, and I know you're going to try to -- there's a lot of people involved.  Everything that you need to understand from all of this testimony, is going to be less than two minutes.  Less than two minutes.  The tragedy itself took 10 seconds or less, according to the testimony.  It never should have happened, but there's a lot of reasons it never should have happened.

If this is a puzzle, you're going to see that this puzzle fits together differently than what the prosecutor says.  The prosecutor has a lot of theories and a lot of ideas and a lot of suppositions.  The physical evidence doesn't back it up.  Why this happened and how it happened will probably never be fully explained during this trial.  How the tragedy happened within this little short 10 second span, it will be explained differently by the different people that are on the scene, depending on their viewpoint, but it will also be explained differently by one or two people depending at which time they're telling you the story.

You, the jury, are never going to be able to know the exact truth beyond a reasonable doubt, because of the different stories, the investigation tactics that took place, and the Government cannot disprove that Kenny Barrett acted in self-defense. When he first saw that unmarked, white Ford Bronco coming across his yard and toward his house from the area that is caught -- going right toward the area where his son had called him from, and then coming directly to the front porch, almost, if not butting up to the porch with the bumper of that car.

You will hear from some witnesses that some time, from a few days to a few months before this tragedy took place, that these people had been to Kenny Barrett's house in rural Sequoyah County. This is in -- the house is in a small community, family community. There're six or eight houses out there. They're occupied by his mother, his aunts, his uncles, relatives, mostly, out in this little area. There's one road going in. It's a dead-end road. It comes from the west. That's where the traffic comes from. You don't expect the traffic from the east, because there's no road from the east.

These people who you're going to hear testify, saying that they were out there a few days or a few months before this incident, these are people that haven't said anything to law enforcement for six years

now, about Kenny Barrett.  But now, because of inducements and enticements and promises by the prosecutors, to the district attorneys, to the individuals themselves, they're telling these people, "We're going to    help you, you help us."  And because of that, they're basically going to tell you that at some time before the incident, they were at the house of Kenny Barrett's, drugs were there, Kenny Barrett was aware of an outstanding warrant, and he was not going to be taken in without a fight.  Watch their testimony with skepticism, because every one of them have got some kind of promise from the Government.

This night really had its beginnings with Clint Johnson.  As you're told, he was a drug -- Drug Task Force Investigator with Sequoyah County.  He contacted Allen Loyd, they made contact with Danny Oliver.  Allen Loyd is another Drug Task Force man.  They made contact with Danny Oliver, who is a former Highway Patrol tact team member, and now he's working with the Cherokee County Drug Task Force.  And they wanted to get hooked up with this elite tact team, Highway Patrol tact team. Johnson was informed -- when he tried to get the tact team involved in this thing, he was informed that in order to get the tact team involved, you're going to have to get a search warrant.  So, subsequently, he did.  He obtained the search warrant so the tact team would be

Johnson obtained this search warrant with what is known as a confidential informant, a C.I., a paid informant.  This C.I., Johnson has kept secret from everybody for close to six years now.  He's kept it a secret from the judges, the prosecutors, other police officers, other Drug Task Force members, for almost six years.

This search warrant was unusual in that it was a daytime/nighttime/anytime, no knock search warrant. That means it could be served at any time, without any warning.

You will find from the testimony that as elite as this tact team was, and as highly efficient and well trained as this tact team was, the commander of this tact team says he has never executed a daytime/nighttime/ anytime search warrant, no knock search warrant, during the nighttime.  This was the first time that this commander, a commander of over 14 years of this elite tact team, had ever served this type of warrant at nighttime.

With that warrant, that search warrant that Clint Johnson got, Kerry Pettingill, the commander of the Highway Patrol tact team, committed to have his elite team to take the lead and serve this search warrant and arrest Kenny Barrett at his home.  The eastern tact team

members -- and I'm going to tell you their names because you're going to hear them so much -- Kerry Pettingill, Commander, Jim McBride, Assistant Commander, John Buddy Hamilton, he was the leader of the tact team for this particular event, David Rocky Eales, he was the second leader for this particular event, Raymond Greninger, Ricky Manion, Steve Hash, Gene Hise, Robert Darst, and Billy Poe, all of these guys had been working together for many, many years.  They had coordinated their efforts on many, many searches and arrests, but according to Pettingill, this is the first one they had ever served, no knock, anytime, at night.

They began to gather at Camp Gruber -- that's here in Muskogee County -- to go over their operation.  They went over this operation.  They used this with the information given to them by Clint Johnson.  However, you'll find that Clint Johnson didn't give them all of the information that they needed, because Clint Johnson didn't know that information.  Clint Johnson didn't even have a picture of Kenny Barrett.  Clint Johnson couldn't even tell them what Kenny Barrett looked like.  Clint Johnson had never even met Kenny Barrett.  Clint Johnson had never even been to the home of Kenny Barrett, or even been out there.  And yet Clint Johnson, along with Alan Loyd, gave them the information.  The information came

Loyd, gave them the information.  The information came from this confidential informant.  But they -- you know, there's no picture of Kenny Barrett.  They had a general idea of his age and body description, but they couldn't recognize him.  They were not given any information about who lived out there.  It was just, "You're going to get Kenny Barrett."  They weren't aware that Kenny Barrett had an 18 year old son that lived there, Toby Barrett.

There was no running water in the house.  The person they relied on to get this information couldn't tell them anything about whether there was running water in the house.  Thus, there was no exigency in having to get in to get that house and secure the house because drugs would be flushed down the stool or thrown down the drain. There wasn't any running water.  There wasn't any sewer system in that house.

And lastly, they were not aware that Kenny Barrett had a mechanic shop out there and worked on cars, and on cars until all times of the night.  And, thus, on this night, they weren't ready for Kenny Barrett to be awake.

Hamilton, Greninger, and a pilot did a fly over of that area.  You'll see pictures.  Hamilton, Greninger, and Manion, in the late afternoon before the execution of the search warrant, did a drive-by of Kenny Barrett's house.  Now, remember, there's only one entry on this

road.  They did a drive-by in a vehicle that Hamilton felt was sufficiently able to go past that house without being recognized as a law enforcement vehicle.  It didn't have any markings on it, didn't have any light bars on it, it had -- the windows were covered, they were in civilian clothes, and they went by that house in an unmarked, white Ford Bronco, not concerned that they would be recognized as law enforcement.

That evening, while doing further planning on the raid, they decided on a plan that would start out at 12:30 a.m., and yet not one of them can tell you the reason why 12:30 a.m. was picked.  They will tell you that most of their warrants they execute in the early morning, break of dawn, but this one they picked 12:30 a.m., and they can't give you a reason why.  It was just "Let's do it at that time."

Next, they could not come in the gate because during the drive-by, they saw that the gate was locked.  And, so, they couldn't come in the gate and they had to figure out another way to come in.  So, they -- they did not know how hard it would be to break that gate open, so, they decided they would come down a private drive that was next to Kenny Barrett's house -- not a road that vehicles went on a private drive.  They go down to the side of Kenny Barrett's house, to the east side of

Kenny Barrett's house, and they would cross a ditch -- not a road that cars go on, not a road that you see vehicle traffic go on, maybe ATV's can go on it -- and they would come in from the side of the house at 12:30 in the morning, with two -- the two front lead vehicles -- this wasn't a chance deal, this was a decision they made -- the two front lead vehicles would be white, unmarked Ford Broncos, one of which they went by the house earlier in the day. And they would park these vehicles -- now, this is the plan, not what happened -- they would park these vehicles to the south and east of the house, with a third marked Highway Patrol car coming behind them with emergency flashing lights going on, and a fourth marked Highway Patrol car would park outside the gate on the county road, with or without his emergency lights on, depending on which patrolman you're talking to. That was the plan. And the fourth Highway Patrol car was to watch the gate and see that nobody came out of the house. And a fifth unmarked Suburban would be driven by the -- Pettingill with McBride, the commander and assistant commander, and they would go in the driveway of the mother's house, which was next-door, so they could stop anybody coming from the house going to the mother's house.

With the cars in position, the plan -- this is the

plan -- was to go to the front door with a ram, announce their presence, and beat in the door to take care -- to take control of the house and to arrest Kenny Barrett. That's the plan.

In order for that plan to be performed, the action of the plan presumed that Kenny Barrett would be in the house with the door shut and not aware -- or even asleep -- of cars coming into his yard at an unusual time of night and from an unusual direction.  They discussed using a creek team to sneak up and stay around the house and to keep everybody informed of who is at the house and what is going on at the house.  That creek team -- the idea of the creek team was that the creek team would send the messages out that somebody's asleep, somebody's here, you can come now, don't come now.  They didn't have that creek team.  The tact team, because of the area, whatever, that they didn't want to use a creek team. There may have been discussion, there may not have been discussion, depending on which highway patrolman you want to listen to and hear, about, you know, surrounding the house, about just calling out, you know, "We've got you surrounded, Kenny Barrett, come on out."  But the tact team didn't want to do that.  The tact team wanted to attack, come in down the side, and come across that ditch at 12:30 in the morning, with the lead vehicles being

unmarked cars, without emergency lights.  Now, that was the plan, without any contingency plan or alternatives.

Pettingill, the commander of the tact team and a member for 14 years, cannot ever recall his tact team serving a nighttime, no knock warrant before.

The tact team left Camp Gruber that night.  They met up with local law enforcement on Dwight Mission Road, which is off I-40, outside of Sallisaw.  At that particular time, the tact team became aware that this wasn't just an execution of a search warrant done by the tact team.  It would include far, far more people than they had ever anticipated on a mission like this.  There was a parade of law enforcement people and their friends that were going to go right along.  This was a mission that was to be carried out by the Sequoyah County law enforcement.  The sheriff was there, his brother, the chief of police of Sallisaw, was there, another brother, who was a park ranger, he was there, the sheriff of Cherokee County was there, the D.A. for Cherokee County was there, and two assistant D.A.s in Sequoyah County were there.  Clint Johnson was there.  Alan Loyd was there.  There were nine or ten other people -- I'm including those in the nine or ten -- that were there to go along, all to search this house, 20 by 20 house, 400 square feet of house.  There were so many there that when

the tact team saw them, they requested that that group hang back. "There's just too many people here. Hang back for two minutes before we proceed on to Kenny Barrett's house."

The tact team was off, led by Buddy Hamilton -- he was the group leader for this particular attack -- with Rocky Eales in the front passenger seat, and they were in the same white, unmarked Ford Bronco that this -- that earlier in the evening had gone in front of Kenny Barrett's house on this county road. They were followed by Greninger and Manion in another white Ford, unmarked Bronco, then by Hash and Oliver, who are in a regular black and white Highway Patrol marked unit, and then that was followed by Hise, Darst, and Poe, who were in the fourth unit, regular black and white unit, and then Pettingill and McBride in another unmarked unit. So, out of the five cars, three were unmarked.

As they travelled down the county road in front of Kenny Barrett's house, their plan began to unravel. The lead car, Hamilton, noticed lights were on in the house. At some point, they noticed -- still on the county road, before they ever made their turn, they noticed someone's out in the front yard. Who is that person? Because, remember, they didn't have any idea what he looked like. It later turned out to be Toby Barrett in the front yard.

But they didn't know that.  The front door was open to the house, eliminating any element of surprise, eliminating their ability to ram the door and announce their presence.

Hamilton stuck with the initial plan.  He went on. He was looking back.  He turned down the road and ran into a post, and he had to back up and make that turn again, something he forgot to tell anybody about until about two years after that incident, when he was questioned about how come his front bumper guard was all bent.  Well, he proceeded on down the drive, and he proceeded to cross the ditch.  Another problem.  The ditch was deeper than anticipated.  So, this white, Ford Bronco, unmarked, with no emergency lights, no warning, hits that ditch, and it has to gun the car, rev the engine to get out of that ditch, coming on a trail -- not a road that was used by cars, but on a trail -- up the side of the house, not along the normal driveway up to the house.  This was not according to the original plan, for he was to go to the corner of the house.

He sees the man in the yard.  Again, not knowing who it is, he directs his car directly toward that man in the yard.  He's gunning the car coming out of the ditch, and he's heading right toward what turns out to be later, Toby Barrett, out in the yard.  Toby Barrett is -- does

see the cars.  Toby Barrett yells to his dad.  He doesn't know what the cars are.  Doesn't know who they are.  He yells to his dad.

Hamilton says as he's coming out of the ditch, which is 170, 180 feet away, that he starts receiving gunfire to his windshield, but he couldn't see where it was coming from.  He continued directly into what he says is the gunfire, with the rapid gunfire on him.  His headlights --  as he's heading toward where Toby Barrett is, his headlights are shining on Toby Barrett, then he makes a turn to the house, headlights shining right on the house and into the house, but not any emergency lights, not any siren, not any warning that this is law enforcement.  We're here on a warrant.  The only thing that can be seen is going in that house, is Hamilton driving that car, unmarked, with his headlights shining first on Toby and then into the house.

Hamilton says that as he drove right up to the porch of the house -- he doesn't want to say he ever touched that house, but other testimony indicates that he did touch the house, that he hit the porch -- he ducks and leans over in the car.  He threw a diversionary device, which is called a flash bang, makes a lot of noise, makes a lot of sound.  The diversionary device was actually thrown over to the side of the house, between the house

and where Toby Barrett is, and Hise and Darst.  After he's out of the car, he fires two shots into the doorway of the house.  Now, at first, he denied he fire any shots.  Months later, he has this sudden recollection that he did fire shots.  But it sort of turns out that this sudden recollection, he'll tell you, that the -- the testimony is going to show -- came to him when a prosecutor told him, "Hey, we've got an OSBI analysis here that says these bullets came from your gun."  And then, all of a sudden, he remembers firing the shots.  And not only firing the shots, but where he fired them, and the recollection of seeing a person in there and, "Oh, yeah, I know now that I did fire those shots."  Well, that's Hamilton.

Now, Greninger and Manion are behind Hamilton.  They left the private drive -- there's a county road, there's a private drive, and there's a trail.  They left the private drive, which is to the east of Kenny Barrett's house, and as they did so, Manion turns on the emergency lights.  But they're not light bars on the top; they're lights -- they're wigwag lights, and they're following behind and blocking any view, because of Hamilton's vehicle.  Greninger heard gunfire after he was leaving the ditch.  Now, remember, he's behind Hamilton.  And he starts hearing gunfire after he leaves the ditch and

before he stops.  And when he stops, he sees Hamilton's car facing the house on the front porch, and he and Manion leave their car -- Manion on the passenger side, Hamilton on the driver side -- and Manion went to Eales, and by the time they got their car there, Manion says that Eales was already out on the ground behind the first unmarked Ford Bronco, and was already severely wounded.  And then Manion says that he went to the side of the house, the east side of the house, and fired five or six -- two bursts of bullets with his 9mm automatic, into the east window of the house.  That's according to Manion.  However, according to ballistics, you're going to see that not only did Manion fire five or six rounds into the east window of the house, but before he even got to the east window, he fired one or two bullets down south of the house, one going right down by the doorway of the house.  But Manion never acknowledges that he fired anything other than those in the window of the house.  But the ballistics and the casings indicate that had to happen different.

Hash and Oliver are in the third car.  Now, Hash and Oliver are the ones that are in a marked car.  And Hash says that, "We are following behind.  We are bumper to bumper with Hamilton and Greninger."  And he saw both of the Broncos going through the ditch, rocking and

hitting it hard.  But Hash didn't hear any gunfire until he was coming out of the ditch.  So, Hash says "After the first Bronco went through, after the second Bronco went through, and then when I come out of the ditch, that's when I hear gunfire, and that was coming out of the front door, it was very rapid, and at that time, the Hamilton Bronco was up against the front porch of the house."

Hise and Darst were in the fourth car.  The fourth car stopped at the gate in front of the house, the gate that normally all of the traffic comes in when it's going to come in.  They stopped at that gate about the time that they say they saw Hash's car turning up the private drive.  Hise -- the car out there at the gate -- his car did not have the emergency lights on.  Although the plan was -- depending on who you talk to -- for him to have his emergency lights on, to be shown from the outside of the house.  Both Hise and Darst -- the timing that they're talking about is that both Hise and Darst got out of their car, they crossed the fence and the gate, and they went on foot about 130 feet into the yard. While Hamilton, Greninger, and Hash's car were going down that same distance, they were running on foot, where they engaged a man in a yard, which they later determined was Toby Barrett.

At the time they engaged the man in the yard, the gunfire had not -- right before the time they engaged that man in the yard, the gunfire had not started yet. But they will tell you that at the time they engaged Toby Barrett, that's when they first heard gunfire, and at that time, the Hamilton, unmarked Bronco was coming directly toward Toby Barrett and heading toward the house, not out at the ditch. And that they saw that Hamilton Bronco go toward the house, right up to the porch, before stopping at the porch. The gunfire that Hash and Hise -- no, I take that back. The gunfire that Hise and Darst testify it was very rapid, all one group of gunfire. It was almost like automatic, and it lasted maybe 10 to 12 seconds.

From that time, Hise -- from the time that Hise pulled up to the gate and stopped, until the time he took Greninger's car with Eales to the hospital, was less than two minutes. One man was dead, two were injured, including Kenny Barrett.

Now, the testimony will show that none of the Highway Patrolmen saw Kenny Barett on the porch that night. Most only will initially say -- well, most initially said -- you'll find that these people have given statements under oath at least three times -- no, most of them have given statements under oath three

times, some of them maybe just once or twice, but each time in their initial statements, most will only say they saw -- the most they saw was smoke and fire from the doorway.  And you'll also see, from the initial statements, every one of them denied firing their guns, except for Manion, and it was only months later, after Buddy Hamilton was confronted and told that he had two casings that came from his gun and a bullet that matched his pistol, did he acknowledge that he fired his pistol, and then he remembers firing.

Pettingill, the commander of the unit, initially denied being able to see anybody firing from the doorway, and it was only years later that he stated that he now remembers an image of a person in the doorway, firing.

Immediately afterwards -- you're going to find this from the testimony -- that the Highway Patrol -- the commander of the Highway Patrol told each tact team member, "Write down what happened.  Do this on the spot. Write it down, we'll gather it up."  And they then tried to take -- attempted to take these statements from each one there, but a private attorney representing the Highway Patrol Association took all of those written statements, and didn't give them to the investigators. The Highway Patrol interviews were stopped, and the investigation of the Highway Patrol actions were hampered

by the Highway Patrol.

According to forensic reports, Rocky Eales had three wounds, two of which were shattered bullets, that were shattered because of hitting an intervening object, probably the car door.  One of the shattered bullets was the one -- one of the fragments from the shattered bullets was one of the ones that caused the death of Rocky Eales.  One wound to his left arm, was probably a direct hit from no intervening object.

The OSBI physical examination shows that there are 16 casings in the house, all located within an area that you would expect for the .223 to eject bullets when the person is standing in the house, inside -- not in the doorway, but back behind the doorway, in the room of the house.  There are 16 casings, and there's one bullet. Also, there are an additional five or six casings outside the house, at a location where nobody would even put Kenny Barrett.  These were casings that didn't have anything to do with this night.

The testimony and the physical evidence from OSBI is going to show that Kenny Barrett would have been inside the house, in the living room, and able to see only from the living room out in a -- in an arc, that he would only be able to see one car, and that was the white, unmarked Ford Bronco which crossed in front of the door

and headed straight to the house.

The physical evidence from the OSBI will show that all of the shots to the Bronco occurred in a range of less than 30 feet, while the Bronco was traveling directly toward the house, without any warning that it was a law enforcement car, or any warning that the occupants of the car were law enforcement.

The testimony and the physical evidence will show that the execution of this no knock, nighttime search warrant went aery, and without any alternate plan, the lead vehicle in this mission gave cause for Kenny Barrett to fire upon an unknown, unidentified car and person or persons in an unknown, unidentified and unmarked Bronco, that came into his side yard, off a trail not used by traffic, at a time that you wouldn't expect to see anybody, 12:30 a.m. in the morning, on September 24th, 1999.

Kenneth Barrett's actions were a reaction to an unknown force in self-defense of his son, himself, and the protection of his property.  And all of his actions in firing at the Ford Bronco were without malice aforethought, intention, or premeditation.  This was not murder.  Now, at the conclusion of all the evidence, we'll ask you jurors to follow the law and acquit Kenny Barrett.

Kenny Barrett wasn't given the opportunity to submit to the arrest warrant or the bench warrant for his failure to appear.  The law enforcement never identified themselves.  Kenny Barrett is not guilty of murder by reason of self-defense.  Kenny Barrett may have been guilty of other things, but he's not guilty of murder in connection with the charges in this this indictment.

Thank you, ladies and gentlemen.

THE COURT:  Members of the jury, it is a little after 12:15.  We'll take our noon recess at this time.  I'll ask you to be back at 1:30.

Remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you.  I think I have neglected to mention -- one of the attorneys discussed it in voir dire -- the attorneys, during this trial, will avoid talking with you.  So, if you see them in these hallways -- we have public hallways here, or elevators, and they're not their normal, friendly selves, it's because they know it's not appropriate for them to talk with you or even appear to be talking with you.  So, one or two of them are pretty arrogant, anyway, but they're not generally.  I'm trying to make a joke.  They're not generally arrogant, but they will avoid attempting to talk with you, and they will avoid you during this trial.  So, if you'll

understand that.  And if you'll be back, then, at 1:30.

I'll ask everyone in the courtroom to please remain seated as the jury leaves for the noon break.

(JURY OUT)

THE COURT:  Let the record reflect the jury has departed the courtroom.  The parties are present with counsel.

Anything to bring up outside the hearing of the jury at this time, for the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  For the defendant?

MR. HILFIGER:  No, Your Honor.

THE COURT:  Neither of you have, at this point, requested the Rule.  Any intention to request the Rule?

MR. LITTLEFIELD:  I think the defense is, and that's fine.  We'll abide by it, recognize it.

THE COURT:  If there are those present in the courtroom now that have been notified that you are to testify in this matter, you should remove yourself from the courtroom until called as a witness, and also remain outside the hearing of the proceedings inside the courtroom.

I'll depend on counsel, after the trial starts, if you have potential witnesses that enter the courtroom, to notify the Court as soon as you recognize them.

MR. SPERLING: There's an exception for victims, Your Honor, and we would ask that that statutory --

THE COURT: There is an exception for victims, but I think if there are second stage or first stage, either one, the Rule covers it. Plus, also, you need to be reminded that there is a live feed of this proceeding, on the third floor. That's in the third floor hearing room. So, our clerk is making efforts to keep people away from that room. But there is a live feed there, in case we had a crowd here that this courtroom would not accommodate. So, you need to keep that in mind, when talking with your witnesses.

Anything else?

MR. HILFIGER: Not from the defense, Your Honor.

MR. SPERLING: Not at this point, Your Honor.

(LUNCH RECESS)

COURT IN SESSION

(JURY IN)

THE COURT: Let the record reflect that the jury's in the box, counsel for the Government is present, the defendant and counsel is present.

The Government may call your first witness.

MR. LITTLEFIELD: Bob Thomas.

THE COURT: Before we start -- and I'll solicit the jurors' help -- with the hearing devices, I think we're discovering they need to be probably charged up even during the noon hour. So, if you'll leave those with the clerk, we'll do that, and then this evening, for sure, so that maybe we'll not have these interruptions.

Sir, if you would raise your right hand and be sworn.

ROBERT THOMAS, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q     State your name for the record, please, sir.

A     My name is Robert Thomas.

Q     Mr. Thomas, where do you reside?

A     I reside in Woodbridge, Virginia, Northern Virginia, just outside of D.C.

Q     And how are you currently employed, sir?

A     I work for the FBI in their new laboratory building in Quantico, Virginia.

Q     And what function do you perform for the FBI, sir?

A     Well, my job title's -- I'm a Visual Information Specialist. The key role that I have there is to reconstruct crime scenes.

Q     Okay. How did you go about becoming a Visual

Information Specialist?

A       I always built models as a kid, as a lot of people do.  I found out, coming out of high school, that there was a school -- a college in Canton, Ohio, that offered a degree in engineering modeling.  So, I pursued that, and I obtained an Associate's Degree in engineering modeling.  Subsequent to that, I found myself obtaining a job at an engineering firm in Columbus, Ohio.  The engineering firm, they were pretty much the forensic engineering, they were -- they did a lot of investigations for automobile accidents, they did a lot of product liability cases.  They needed somebody to make some demonstrative evidence pieces and exhibits to be used in court.  They hired me.  I sat up and ran their model shop for 17 years.

Q       Okay.  And after leaving the private forensic engineering firm, when did you receive or become employed by the Federal Bureau of Investigation, sir?

A       I started with the FBI in November of 2002.

Q       Okay.  During the term of your employment with the FBI, have you built models for courtroom use?

A       Yes, I have.

Q       Can you identify any models that you have -- that you have constructed for the FBI, that the jury might be familiar with?

A     Well, the one that's current right now, I built a model of the Pentagon, which you will probably see after the first of the year, that's going to be used in the sentencing phase in the Moussaoui trial.

Q     Okay.

MR. LITTLEFIELD:   Your Honor, I would ask that he be declared an expert in the purpose of crime -- building models of crime scenes and crime scene construction.

THE COURT:   Comment from the defense?

MR. HILFIGER:   No, Your Honor, we don't object.

THE COURT:   That will be the order of the Court.  I find he is an expert, for the record.

BY MR. LITTLEFIELD:

Q     Did you have occasion -- was it requested that you come to Oklahoma for the purpose of building a crime scene model in regards to the Kenneth Barrett case?

A     Yes, I was.

Q     Okay.  And when was it that you came to Oklahoma, sir?

A     Two of us, another Visual Information Specialist and I, came out in May, the latter part of May of this year.

Q     Okay.  And how -- what information did you have and how did you go about constructing -- well, let me

ask you this:  Did you build the model that is in front of you marked as Government's Exhibit 1?

A      Yes, I did build this.

Q      What was involved in building that model?

A      Initially, I was sent photos that were taken of the crime scene, at the time of the crime scene in '99. Subsequent to that, we made a trip to the crime scene, the other Visual Information Specialist and myself.  We took along survey gear, and we surveyed the site.  We also took along dimensional devices.  We had a laser dimensional device, we also had tape measures and such, and we hand measured things such as the building involved, and fence posts, and things of that nature. Along with that, we had some photographs of aerials that were taken at the time.  We had photographs that we used of the premises, the buildings, everything about it, that were taken at the time of the incident.

Q      Okay.  How long did you and the other Information Specialist spend at that scene, in preparing that model?

A      We were on scene for two complete days.

Q      Okay.  And in doing so, did you take photographs?

A      I did.  I took about 200 photographs.

Q      Did you take any photographs that showed the perspective from the porch of that residence, looking back to the east?

A     In going through my photographs, I determined that one of the photographs that I had taken, of the 200, I was standing on the west side of the porch, looking straight down the front of the house, in an easterly direction, towards the east driveway.

Q     Okay.  Let's set directions.  Where is north on that model?

A     I am sitting north of the model.  That would be west; this would be east.

Q     Okay.  Would you look at what has been marked -- and I think it will be displayed on the screen -- Government's Exhibit Number 3?  I think that the -- the screen for the witness, I'm not sure if it's been turned on yet.

      Do you recognize that, sir?

A     I do.

Q     And what is that?

A     That is the photo I just told you about that I took on scene.

Q     Does that accurately depict the view that you see when you're standing on the west edge of Mr. Barrett's porch, that residence, looking toward the east?

A     Yes, it does.

      MR. LITTLEFIELD:  Move admission of what has been marked as Government's Exhibit Number 3.

THE COURT:  Any objection?

MR. HILFIGER:  One question -- just one question for him.

THE COURT:  You may.

VOIR DIRE EXAMINATION,

BY MR. HILFIGER:

Q      This is what it looked like on what day?

A      That would be on May 24th, 2005.

Q      Six months -- or four months ago, May 24th, 2005, is what it looked like?

A      Yes.

MR. HILFIGER:  Okay.  No objection.

THE COURT:  It will be admitted without objection.

MR. LITTLEFIELD:  May it be displayed, Your Honor?

THE COURT:  It may.

DIRECT EXAMINATION, CONT'D,

BY MR. LITTLEFIELD:

Q      I note that if you look -- you see the yellow and white coffee can, sir?

A      Yes.

Q      Okay.  And if you look above that, do you see -- is there -- do you see a driveway or entry area that is depicted on the model itself?

A       Yes, I do.

Q       Is that low, sir?

A       That's on the east side of the property.

Q       And in the photograph, where is it in relation to the porch and the trailer house that you view across that driveway?

A       Due east.

Q       Okay.  East -- we are looking east in this; is that correct?

A       We are facing east, yes.

Q       What is the item that is the yellow item on the tripod that you see in the middle of the driveway, sir?

A       That's my surveying equipment.

Q       Now, when you -- when you surveyed this model -- and we can turn it off for just a second -- when you surveyed this model, what were you looking for in order to build a model, when you were surveying out at that land?

A       Well, one of the purposes of the model was to show elevation differences in the topography of the scene.  When we go to survey, we need to establish points -- where to set up the equipment so that you would have a line of sight, so that you could take the dimensions that are needed.  That happened to be one of three.

Q       Okay.  And were you able to determine changes in

elevation at the scene?

A      Yes, I was.

Q      Okay.  Let me ask you:  Does that model accurately depict the conditions that you observed at the scene in May of 19 -- or May of 2005?

A      Yes, sir, it does.

Q      And were you able to compare that model with the aerial photographs that you observed, that were taken in relation to the -- in September of 1999?

A      Yes, I did.

Q      Okay.  And does that -- are there items that you observed, landmark items -- that were -- would have been on the scene on both occasions?

A      Yes, there were.

Q      What?

A      Well, in order to determine spatial relationships between different objects and to make sure that I could depict the scene accurately, I did look for some benchmarks that I knew were permanent benchmarks.

First was the house.  I observed a house.  I noticed that it obviously hadn't been moved recently.  The second was the road itself.  It's a permanent road, It's gravel, it's solid, it's there.  The third were the trees that were around there.  There weren't many, but there were a handful, so that we took dimensions of the

trees, and we noted them on the survey, their location.

Q      Okay.  Did you compare the location of the trees in May of 2005, with their location as to where they were in the photographs that you observed that were taken in September of 1999?

A      Yes, the trees that were -- I'm very confident that the trees that I observed in 2005, were the same trees that were in photographs that were taken in 1999.

Q      And does that accurately depict the condition of the entryway as it existed --

A      Yes.

Q      --- in 1999?

A      To the best of my knowledge, yes.

Q      Okay.

        MR. LITTLEFIELD:  Judge, I'm going to move admission of Government's Exhibit Number 1, at this point in time.

        THE COURT:  Any objection?

        MR. HILFIGER:  The question will be for demonstrative purposes?

        MR. LITTLEFIELD:  As an exhibit.

        MR. HILFIGER:  As an exhibit?  Then I have voir dire on it, Judge, to determine whether or not this is an accurate depiction of what he says it is.

        THE COURT:  You may.

MR. HILFIGER:  May I approach the witness to give him this laser?

THE COURT:  You may.

MR. HILFIGER:  Would you put 103 up, or the -- the one you had up there?

VOIR DIRE EXAMINATION,

BY MR. HILFIGER:

Q     Now, as I understand it, on this particular picture, where can you -- use the laser to point on this picture where you're saying the ditch was or is?

A     I observed this -- what I'm pointing to right now is my tripod equipment.  That is placed approximately 20 feet south of the ditch entry, which would put it about there.

Q     Okay.  In other words, you can't -- is the ditch as it was in May of 2005, a physically -- physically able to see?

A     From this vantage point, because of the overgrowth of grasses and such, no.

Q     Okay.  Now, one point, you say -- is the house an accurate model of the house?

A     Yes, sir, it is.

Q     I notice right here that there's a board on the west side of that post; is that right?

A     Yes.

Q       Do you show that board on that porch?

A       May I get up and look?

        THE COURT:  You may.

BY THE WITNESS:

A       No, sir, that particular board is missing.

BY MR. HILFIGER:

Q       Okay.  Was there a particular reason that that board is missing?

A       No, sir.

Q       So, that doesn't reflect what the house looks like, then?

A       It's an approximate representation.

Q       Approximate representation.  It's not an exact replica, is it?

A       Yes, sir, it is, for spatial relationships.

Q       Okay.  But the relationship doesn't have anything to do with the porch?  Let me --

        MR. LITTLEFIELD:  I'm going to object.  I don't think that was a question.

        THE COURT:  Sustained.

BY MR. HILFIGER:

Q       Let me show --

        MR. HILFIGER:  Would the clerk please hand him Defendant's Exhibit 105?  It should be -- it should be in a group of pictures toward the back, 105.

BY MR. HILFIGER:

Q    Now, other than the cars in that picture, do you recognize that?  Is that one of the pictures that you looked at?

A    Yes, sir, I had a photocopy of this picture.

Q    And you used this picture, to some extent, to determine what's there?

A    It was one of several, yes, sir.

MR. HILFIGER:  Your Honor, we move to introduce Defendant's Exhibit 105.

MR. LITTLEFIELD:  I have no objection.  It's also marked as a Government exhibit, as well.

THE COURT:  It will be admitted without objection.

MR. HILFIGER:  Could you display it?

BY MR. HILFIGER:

Q    Now, when you did this exhibit, are you -- you took pictures in May of 2005 -- the vegetation, what is it supposed to represent?  The vegetation on here, what is it supposed to represent?

A    The heavier vegetation, the taller vegetation, represents this area in here and on this side of the path.

Q    Okay.  So -- but represents the vegetation that you say, based on your viewing of these pictures, was there

in 1999; is that right?

A        There were similarities, yes, sir.

Q        Okay.  I see you have four trees; is that right?
Four trees there?

A        No, sir, there's five.

Q        Well, I don't see the fifth one, but I -- you've got four trees there.  Where are the four trees in this picture?

        MR. LITTLEFIELD:  Well, I object.  He says there's five, not four.

BY MR. HILFIGER:

Q        Well, where are the five trees in this picture?

        THE COURT:  The question is five, where are the five trees, for clarification of the record.

BY THE WITNESS:

A        Three of the trees are clustered right in this area, sir, and those are the trees that I have right in here.

BY MR. HILFIGER:

Q        Okay.

A        These two trees here are in this area, and they are almost indiscernible in this photograph.

Q        And is there a photograph that you used to determine those two trees?

A        These trees were placed by my survey points.

Q       Okay.  But there wasn't -- was there a photograph that you used to determine the location of those trees?

A       Of those trees, no, sir.

Q       Was there a current photograph that you used to determine those trees?

A       Yes, sir.

Q       Okay.  And are those trees representing what the trees looked like in 1999, or what they looked like in 2005?

A       They were my best guess, my best estimation, judging by the size of the trees that existed in 1999, which were the three trees.  These other trees were of the same type, or similar type, same size.  I had to use my best judgment to determine that they also existed in 1999.

Q       Okay.  So, basically, what it was, was a guess; right?

A       Educated guess.

Q       A guess, still, nonetheless.

        Well, let's talk about the ditch area.  The ditch area, which is this area right here, what did you use to determine the slope, the height and everything of the ditch area right here on your model?

A       As far as the slope and the height, they were all determined by the survey that I took on-site.

Q    Okay.  The survey, though, was something that was done in May of 2005; right?

A    That is correct, sir.

Q    So, the survey did not -- of this ditch right here, doesn't take into account any washing that occurred in the last six years?

A    I have no knowledge of any of that, sir.

Q    It didn't take into account any; did it?

A    No way to take into account for that.

Q    So -- so, on this model -- this model area right here where the ditch is, right there, between the two sets of trees, that model is sort of another educated guess by you of what the ditch may have looked like back then, not based on the picture or anything like that; is that right?

A    No, sir, that's not right.  I used several photographs, this being one of them, to determine what the scene looked like back in 1999.  Combining that with the evidence that I took as far as measurements and the survey that I took in 2005, I had to determine what my best judgment was, what the scene looked like in 1999.

Q    Okay.  Did you place any posts in the yard area?

A    No, sir, I did not.

Q    Was there a reason you didn't place any posts in the yard area?

A       To my knowledge, none existed on this portion of the yard area at the time.

Q       Okay.

        MR. HILFIGER:  Would the clerk please hand Defendant's Exhibit Number 104?

BY THE WITNESS:

A       I have it.

BY MR. HILFIGER:

Q       Was that one of the pictures that you used?

A       I had a photocopy of that one, as well.

Q       Okay.  Would you look by the black and --

        MR. HILFIGER:  Your Honor, I move to introduce Defendant's Exhibit Number 104.

        MR. LITTLEFIELD:  No objection.

        THE COURT:  Admitted without objection.

        MR. HILFIGER:  Would you display 104?

        THE COURT:  The one that was just up there was Defendant's Exhibit 105?

        MR. HILFIGER:  Yes, Your Honor.

BY MR. HILFIGER:

Q       Okay.  Do you see the black and white -- this right here?

A       Yes, sir.

Q       Do you see yellow tape that's going around here?

A       I do.

Q      Do you see that little point right there?

A      Yes, sir.

Q      Do you know what that is?

A      No, sir.

Q      Would it surprise you if it was a post?

A      It wouldn't surprise me, sir.

Q      But do you show the post on the -- on your scene?

A      I do not.

Q      Was there a reason you didn't show the post on your scene?

A      I had no knowledge that there was a post that existed there at the time, and I'm not sure that the scope of this model would have included that post.

Q      Well, where does that post show right there?

A      I'm sorry, what's the question?

Q      Right there.

A      I don't understand the question.

Q      Well, on the model, where would that post be?

A      I don't believe it would be on the model.

Q      Okay.  You're thinking it would, be, what, too far off east -- I mean, west or south?

A      Probably both.  At least west.  I believe that post is definitely west of what's indicated on the model.

Q      Okay.  So, where that black and white is right there, it wouldn't be able to be shown in this scene; is

that right?

A    I'm not sure where that black and white was, so, I don't know, sir.

Q    But that post right there, you're saying it's not on the scene?

A    The post is not on the scene.

Q    If the post isn't on the scene, the black and white couldn't be on the scene; is that right?

A    Not necessarily, sir.  That black and white is north of the post.  It could very well have been on the scene.  I don't know -- I don't know exactly where that post was.  It did not exist in 2005.  I could not take any dimensions of it.

Q    And that's why you didn't put it on there?

A    Yes, sir.

MR. HILFIGER:  May I have just a moment?

THE COURT:  You may.

(PAUSE)

MR. HILFIGER:  Your Honor, I've finished my voir dire.  I object to the use of this as an exact replica.  I think I pointed out that there is -- for demonstrative evidence, I am not objecting to it.  As an exact replica, I do object.

THE COURT:  Response?

MR. LITTLEFIELD:  Yes, Judge.  He said it

accurately depicts the spatial relationships of the primary landmarks.  It does not have to be an exact duplication.  It's the spatial relationships of the appropriate items.  One post missing from the porch or showing it extending out even with the post, does not change the accuracy of this document.

THE COURT:  Government's Exhibit 1 will be admitted over objection of the defense.

MR. LITTLEFIELD:  May I approach just a second, Judge?

THE COURT:  You may.

DIRECT EXAMINATION, CONT'D,

BY MR. LITTLEFIELD:

Q     Mr. Thomas, I just handed you -- or provided you two vehicles that were a part of Government's Exhibit Number 1.  Are you familiar with those vehicles, sir?

A     Yes, sir, they are representations of the Crown Victoria trooper vehicle and the white Bronco.

Q     Okay.  And there's also, immediately to the east side of the residence, a blue pickup.  Do you see that, as well, sir?

A     Yes, sir.

Q     Advise the jury and the Court how those vehicles were constructed.

A     These vehicles were constructed on a rapid

prototyping machine, it's called a stereolithography machine. Basically what it does is it takes a file -- a computer file that is a three-dimensional file, and it is a scan of the particular object to be made. Now, it's all computer gee whiz stuff, and this machine basically is a bat of resin with a laser attached to it. It's built up vertically in layers. The laser makes a pass over the vat of liquid resin, plastic. Wherever there is a point, at that particular level that the computer file program says there should be a point -- for instance, a spot on the tire, which would be the first points that they hit -- it would -- the laser would fire at that particular point and cure the resin. It would make another pass, and wherever those points happened to be on that laser, it would solidify the resin. This goes on and makes layer after layer after layer. Eventually it builds up a solid object. And that's how these were produced.

Q     In regards to that, what is the scale of Government's Exhibit Number 1, sir?

A     It is three-eighths of an inch on the model equals one foot full size. It's also 1/32 of the size. One foot equals 32 feet.

Q     Okay. Now, are those vehicles, the blue pickup, the two Broncos, and the black and white Crown Victoria,

187

to scale as it exists at this scene?

A    Yes, sir, everything in this scene is 1/32. Three-eighths of an inch equals a foot.

Q    Okay.  You mentioned previously doing measurements and topography.  Would you look to what's been marked -- and I'll ask it be displayed -- Government's Exhibit Number 2, sir?  And it will show up on your screen.  And is that displayed -- do you see what's been marked as Government's Exhibit Number 2?

A    Yes, sir, it's a photograph I took of this particular model.

Q    Okay.  And is that after it was completed and show the model as it was finished in its construction?

A    Yes, sir, minus the vehicles.

Q    Okay.

        MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit Number 2.

        THE COURT:  Any objection?

        MR. HILFIGER:  No objection.

        THE COURT:  It will be admitted without objection.

        MR. LITTLEFIELD:  I would ask that it be displayed.

        THE COURT:  You may.

BY MR. LITTLEFIELD:

Q       We're looking at Government's Exhibit Number 2 as it is now displayed, as you're looking down into it. What is the line that goes diagonally, in a slant from left to right, on the right-hand side of the model? You see it there and it's shown up there.

A       This line?

Q       That's correct.

A       That's the gravel driveway on the east side of the property.

Q       And where is the turn in shown on the model -- on the photograph?

A       This turn in.

Q       And where's the ditch located?

A       The ditch -- the bottom of the ditch is approximately in that area.

Q       Okay.  Did you take measurements from the residence to the turn in from the driveway?

A       Yes, I did.

Q       Okay.  And how far -- from what points did you measure?

A       I measured from the west side of the -- west edge of the road to the center of the threshold of the front door.

Q       Okay.  And the center of the threshold is in

relation to where -- where, in relation to those steps,

sir, that you can see?

A       A little over five feet.

Q       Where is it in relation?

A       That's the front steps there, and it's directly

behind there, approximately that area.

Q       So, from the edge of the road to the center of

that door?

A       Yes, sir.

Q       How far is it from the center of that door to the

edge of the road, where the turn in was made?

A       A little over 174 feet.

Q       Okay.  Did you also determine -- you mentioned

determination of elevations.

A       No, sir, I did not.

Q       Elevations and changes in elevation?

A       Changes in elevations, yes, sir.

Q       Did you make a determination as to where the

highest point on this property is?

A       The highest point on this particular -- on the

model --

Q       Yes.

A       -- property on the model, is the back end of the

Barrett residence.

Q       Okay.

A     Which would be up in that area.  It's fairly level up in there, so, it's all within a couple of inches.

Q     And does the slope that is shown on the model, is it to scale and accurate as to the slope that's out there, that you surveyed?

A     Yes, sir.

Q     How much higher is the residence, the house, than the bottom of the ditch?

A     The top of the porch, where you would be standing, the deck of the porch to the bottom of the ditch, is approximately seven feet.

Q     How high is the porch above the ground?

A     The porch is 21 inches higher than the ground.

Q     So, a foot and three-quarters?

A     Yes, sir.

Q     And did you also -- when you did the interior of the house, did you also photograph it, sir?

A     Yes, sir.

Q     Would you look at what's been marked as Government's Exhibit Number -- and I'm going to ask that it be displayed -- 175?

      Do you recognize that, sir?

A     Yes, sir.  That's a photograph that I took of -- looking down into the residence -- the Barrett residence.

Q     Okay.  And was that after its construction?

A      Yes, sir.

MR. LITTLEFIELD:  We'll move admission of Government's Exhibit 175.

THE COURT:  Any objection?

MR. HILFIGER:  No objection.  That's of the model?

THE WITNESS:  It's a photo of the model.

MR. HILFIGER:  No objection.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  Ask it be displayed.

BY MR. LITTLEFIELD:

Q      And -- now, what does this photograph show and what does the model show in regards to the residence, sir?

A      It shows the interior layout of the residence.

Q      Is that the entirety of the residence?

A      Minus the front porch, yes, sir.

Q      What about on top of this?

A      There was a loft area underneath the roof on the second floor, that was not depicted on the model.

Q      So, that's not a part of the --

A      That's first floor only.

Q      Okay.  Did you measure dimensions in regards to the rooms and the areas within this residence?

A      Yes, sir, I did.

Q       Okay.  How wide is the front porch, from the south edge to the threshold of the door?

A       That would be 61 inches.  A little over five feet.

Q       Okay.  And that would have been measured to -- can you point to the point where you measured -- you can't see the front of the porch, but where did you measure to, to get the 61 inches?

A       I measured to the center of the front door, this being the south edge of the house.

Q       Okay.  Now, the south wall -- you see the two rooms --

A       Yes, sir.

Q       -- on the south side of the house?

A       Yes, sir.

Q       What access is available between those two rooms?

A       There is an opening, it looks like a door opening but there is no door, it's just an archway.  It's located about four foot 11 from the front door, it's 29 inches wide.

Q       Okay.  So, from the front wall, it's four feet eleven inches, and it is how many inches wide?

A       Twenty-nine inches from that point.

Q       Okay.  What are the dimensions of the southwest room?

A       I have them in my notes, if I may refer to them?

Q      I don't have --

MR. LITTLEFIELD:  Do you have any objection, if he could refer to his notes?

THE COURT:  You may.

BY THE WITNESS:

A      Would you please repeat the question?

BY MR. LITTLEFIELD:

Q      What are the dimensions of the southwest room? The one that the front door goes into.

A      Yes, sir.  This dimension -- this is the southwest room.

Q      Is that the west or the east?

A      I'm sorry, this is the southwest room.

Q      Okay.

A      This dimension, going east/west, is ten foot seven and 3/16 of an inch.

Q      Okay.

A      The north/south dimension, this way, is eight foot eight and 5/8 inches.

Q      By what, again?

A      Eight foot eight and 5/8 inches.

Q      Okay.  And on the southeast room, what are the dimensions of the southeast room?

A      This being the southeast room, this north/south dimension right here is eight foot eight and 15/16 of

an inch, and the east/west dimension this way would be seven foot ten and 7/8 inches.

Q    I note that there are some stairs between the southeast and northeast rooms.

A    Yes, sir.

Q    And those obviously were constructed on the model.

A    They are on the model, yes, sir.

Q    Was there anything unique about those stairs?

A    Yes, sir, there was.

Q    What was that?

A    There was a break line, a division line about halfway up the staircase.  It was hinged at the top, so that you could hinge the top half of the stairs upward.

Q    Okay.

MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 7 be displayed.  Yeah, Government's Exhibit 7, please, and it's not in evidence.

BY MR. LITTLEFIELD:

Q    Do you see Government's Exhibit Number 7?

A    Yes, sir.

Q    Are you familiar with that?

A    Yes, sir.

Q    And what is that -- what is that a photograph of?

A    We're looking at the break line, where the top half would join the bottom half when closed.

MR. LITTLEFIELD:  Move admission of
Government's Exhibit Number 7.

THE COURT:  Any objection?

MR. HILFIGER:  No objection.

THE COURT:  It will be admitted without
objection.

MR. LITTLEFIELD:  I would ask that it be
displayed.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q     And where's the break line?

A     This line right here is where the top half
separates from the bottom half.

Q     Okay.  And in the model, do you, by any means,
show -- what's in that area where the break line is and
where the stairs separate?  What's underneath there?

A     At the time I was there, it was just an empty
cavity.

Q     Do you display that on the model?

A     I do.

MR. LITTLEFIELD:  Judge, I'd ask that he be
allowed to go around and show it where it's indicated
and how it works, on the model itself.

THE COURT:  You may.

BY THE WITNESS:

A       That area is right in here, and if you take your finger, you can hinge those steps up.

BY MR. LITTLEFIELD:

Q       Okay.  When you did your survey, is this the only area that you performed in the survey?

A       No, sir, I surveyed pretty much the entire Barrett residence and property, including the mother's residence.

MR. LITTLEFIELD:  Judge, may I step back to my desk just a second?

THE COURT:  You may.

MR. LITTLEFIELD:  I would ask that Defendant's Exhibit Number 105 be displayed.

THE COURT:  You May.

MR. LITTLEFIELD:  Well, let me go about it a different way.  I'd ask that Government's Exhibit Number 69 be displayed.

BY MR. LITTLEFIELD:

Q       Do you see it?

A       No, sir.

Q       Okay.  Do you see it now?

A       Yes, sir.

Q       Is that the same photograph that was Government's Exhibit Number 105 you saw awhile ago?

A       I believe it is, sir.

Q    Okay.

MR. LITTLEFIELD:  I'm going to move admission of Government's Exhibit 69.

THE COURT:  Any objection?

MR. HILFIGER:  No objection.

THE COURT:  It will be admitted without objection.

MR. LITTLEFIELD:  Okay.  I'd ask that Government's Exhibit Number 69 be displayed.

BY MR. LITTLEFIELD:

Q    And can you take -- does this accurately depict the whole area and the structures you saw when you were out there?

A    Yes, sir.

Q    Okay.  The structures are in the same place?

A    Yes, sir.

Q    If you look at the bottom right-hand corner, do you see the roof of a mobile home, a trailer?

A    Yes, sir.

Q    Are you familiar with who was living there when you were out there in 2005, of May?

A    To my understanding, it was Mrs. Barrett.

Q    Okay.  When you say Mrs. Barrett, do you know what the relationship was with the defendant?

A    I think -- I believe it was the defendant's mother.

Q      Okay.  And this structure -- do you see the tree that's kind of in the center of the photograph there?

A      Yes, sir.

Q      What's just to the left of that tree, which would be just to the north and east of it, right in there?

A      This area?

Q      Yes, sir.

A      There are several structures, many of them have been joined together.  Basically it's a garage area, a workshop area.  Back here is a small trailer.

Q      Okay.

A      Camping trailer.

Q      Now, in regards to the area that's shown here, approximately where did your -- does the model take up?  What area?

A      The model pretty much along this line, back out to that road, incorporates that portion of the road, and then back into here.

Q      Okay.  Do you see the trees that are shown on the north side of the ditch in this photograph?

A      Those trees right there.

Q      Okay.  And can you see where the trees are that are on the south side of the ditch?

A      They're in this area.

Q      Okay.  So that you didn't extend far south of those

trees that's on the south side of the ditch?

A     No, sir, I did not.

Q     And you didn't extend far beyond the trees that are on the north side of the ditch?

A     No, sir.

Q     Okay.  You see the black and white unit that's parked immediately to the east?

A     That, sir?

Q     Yes, sir.

A     Yes, sir.

Q     And the area where it crosses, where the tire tracks and the path crosses through, where's the ditch in that area?

A     The ditch is this shadow line that runs along this way.

Q     Okay.  And from the -- from the perspective of the front porch, if one's looking down the front porch, how much of those tire tracks is one able to see?

        MR. HILFIGER:  Your Honor, I object.  He's asking for speculation on something that he can't -- because he's looking at a picture.

        MR. LITTLEFIELD:  Okay.  Let me rephrase it.

        THE COURT:  Question rephrased.  Question withdrawn.

BY MR. LITTLEFIELD:

Q     Is this photograph taken from the perspective of looking directly down the porch?

A     No, sir, it's not.

Q     Is its perspective -- does its perspective show accurately what one views looking towards the east, down the porch line?

A     One could project lines down there and get a good idea of what would be visible.

Q     Okay.  The trees that are north of the ditch, when one looks down the porch line, are those trees clearly in sight?

A     Yes, sir.

Q     Do you note at the top of Government's Exhibit Number 69, where the road turns off into the ditch?

A     Right here, sir.

Q     No, not -- I'm sorry.  Where the county road turns off into the drive?  Let me rephrase that.

A     That would be right here.

Q     Did you photograph that area, as well?

A     I did, sir

          MR. LITTLEFIELD:  I would ask that Government's Exhibit -- what's been marked as Government's Exhibit Number 98 be displayed to the witness.

BY MR. LITTLEFIELD:

Q    Do you recognize that, sir?

A    Yes, sir.  That's looking north up that east driveway.

Q    And does that accurately reflect the condition of the driveway that leads north, off of which the turn in to the ditch is made?

A    As I observed on that day, yes, sir.

Q    Okay.  Where was this -- approximately where was this photograph taken from?

A    I was standing on the north edge of the south -- southern road -- south road.

Q    The county road?

A    The county road, yes, sir.

        MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit Number 98.

        MR. HILFIGER:  One voir dire.

        The date that is shown on that, that is the date that that picture was taken?

        THE WITNESS:  It is.

        MR. HILFIGER:  May 24th, 2005?

        THE WITNESS:  It is.

        THE COURT:  It will be admitted without objection.  That was 5?

        MR. LITTLEFIELD:  No, 98.

THE COURT:  98?

MR. LITTLEFIELD:  Yes, Your Honor.

BY MR. LITTLEFIELD:

Q       When we looked at Government's Exhibit Number 3, and you pointed to your survey -- is it station, the yellow thing on the tripod?

A       The tripod, yes, that's -- where that was sitting, is called a station.

Q       Okay.  And is it visible in this photograph, as well, and if so, would you show the jury?

A       Yes, sir, it is visible, and it is right there.

Q       Okay.

MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q       Your trip was made in what month of what year?

A       May of 2005.

Q       Okay.  And you weren't at the scene on September the 24th, 1999, were you?

A       That's correct.

Q       Okay.  And this is based upon your observation of the photos, what you learned, and what you saw when you were there?

A       Yes, sir.

Q       Okay.  And the elevation and everything else is

to scale and accurate?

A     Yes, sir, it is.

Q     Okay.

          MR. LITTLEFIELD:   Pass the witness.

          MR. HILFIGER:   Would you display Government's Exhibit Number 3, please?   It's already been admitted, I believe.

                    CROSS-EXAMINATION,

BY MR. HILFIGER:

Q     Now, Mr. Thomas, that's your picture taken in May of 2005; is that right?

A     That's correct.

Q     Now, you're looking down that porch, are you saying you're looking in a easterly direction?

A     Roughly, directly east, yes, sir.

Q     Okay.  Now, this tree right here, is that tree depicted on your model?  And do you see I'm talking about this tree right here?

A     Yes, sir.

Q     Where is it depicted on your model?

          MR. HILFIGER:   Can I move over just a little bit?

          THE COURT:   You may.

          MR. HILFIGER:   I still can't see five trees. Okay.

BY THE WITNESS:

A       One, two, three, four, five.

BY MR. HILFIGER:

Q       Okay.  Let's use those numbers again.  Okay?  Now, which tree is this tree, on the one you said we're going like this, this is one, right here; right?

A       Yes, sir.

Q       That's two?

A       Yes, sir.

Q       That's three?

A       Correct.

Q       And then was the one behind it four?

A       Yes.

Q       That's four behind it, and that's five?

A       Yes.

Q       Okay.  Now, which tree is that one, this one up here?

A       I believe we're looking at more than one tree in this photograph.

Q       Okay.  Which trees?

A       I believe that's three, four, and five.

Q       Okay.  So, this whole group right here is three, four, and five?

A       I believe so.

Q       Well, you're the one that took the picture?

A       Yes, sir.

Q       You're the one that drew the model?

A       Yes, sir.

Q       Who else -- who would be better to tell us, rather than believing, making sure that that's three, four, and five?

A       Just using this photograph, I would be the best one to tell you.

Q       Okay.  And where are you saying the ditch is to that, then?  Right here?  Because five -- isn't that right, tree five, right there, is right on the edge of the ditch; isn't it?  And three, four, and five, the ditch has got to be right there?

A       Yes, sir.  It's a couple of feet off the ditch, yes, sir.

Q       Okay.  Would you look at Government's --

                MR. HILFIGER:  Could you display Government's Exhibit Number 98?  I apologize, Number 60 -- let me make sure -- Number 69.

BY MR. HILFIGER:

Q       So, if we look at Number 69, then here's the porch, and there's the ditch, right there; is that right?

A       Yes, sir.

Q       Now, where would that Highway Patrol unit be in regard to the line of sight from that porch to that

ditch?

A        I wasn't there at the time.  I couldn't tell you.

Q        Well, let's just -- there's the porch; right?

A        Yes, sir.

Q        There's the ditch; right?

A        Yes, sir.

Q        Can you draw a line from the porch to the ditch?

A        Yes, sir.

Q        Which side of the line is that car on?

A        North side.

Q        North side; isn't it?

A        Yes, sir.

Q        Now, if we go back to Number 3, now, where would the Highway Patrol unit that we were looking at, where would that be -- would it be to the left of this porch?

A        Yes, sir.

Q        Okay.

A        Well, I'm not quite sure.

Q        It would be more to the left than it would be to the center or to the right; wouldn't it?

A        Yes.

Q        Okay.  Now, go back to 69.  Let me talk about these posts just a second.  You used this picture; didn't you?

A        Yes.

Q        You didn't see that post there; did you?

A        I saw it.  I didn't --

Q        You didn't use anything about it, though?

A        No.

Q        Did you use that post right there?

A        No, sir.

Q        Would that post help you locate the location of that Highway Patrol unit?

A        It would.

Q        But you didn't feel it was necessary?

A        I didn't have any way of measuring it.

Q        Did you go out here and notice whether there was any depression right there, where the post was?

A        I did walk the whole area, and, no, I did not notice any depression.

Q        You didn't find a depression there?

A        No, I did not.

Q        Would you agree with me that from this angle, that this post would be on your model?

A        Which post, again?

Q        This post.

A        It's possible.

Q        Okay.  On the house, the interior of the house, you had couches and stuff like that laid in there.  What did you use to determine the size of the couch and -- because

there wasn't the same furniture in there in May of 2005; was there?

A    Some was the same; some wasn't.

Q    What did you determine was the same, and how did you determine it was the same?

A    I had photographs supplied to me that were taken at the time of the incident or the day after, and I used those.  There were things such as speaker cabinets, that had names on them, that were still existent in the house when I was there.

Q    Okay.  So, we know what was used and what wasn't.

MR. HILFIGER:  Would you display Number 175 there?

BY MR. HILFIGER:

Q    Okay.  What, in the southwest room here, did you use to determine the size of the couch?

A    I had some documents that were given to me.  They were sketches, they were drawings made up by an investigator for, I believe, the first trial.

Q    Was it an investigator named Vicki Lyons?

A    I'm not sure.

Q    Vicki Jones?

A    I don't know, sir.

Q    Did you notice anything on any of those sketches that were done, the words "not to scale"?

A      Yes, sir, I did notice that.

Q      Okay.  Did that -- what did that mean?

THE COURT:  Counsel -- let me see both counsel.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

MR. HILFIGER:  I know exactly what you're talking about.  I passed -- I went on, but it's doing no harm.  The elephant is there.

THE COURT:  Well, I don't want the elephant there.

MR. HILFIGER:  But, I mean, it wasn't my witness, and I didn't mean to have him bring it out.

THE COURT:  I know, but just every time you do it, I'm going to bring you up here, because I don't want it in the record.

MR. HILFIGER:  If you will notice, I moved right on.

THE COURT:  I know you did.  I don't think there is any harm, but it --

MR. LITTLEFIELD:  And I had warned him not to mention it.  He didn't testify at any previous trial, but I still alerted him.  I'm -- I understand what Mr. Hilfiger is saying.  I can't help but believe innocently --

THE COURT:  I think it's all innocent, but I

just want to keep everybody alert.

(END OF BENCH CONFERENCE)

BY MR. HILFIGER:

Q      Okay.  So, we were talking about this couch, you took that from a depiction?  I mean, the measurements on the couch and everything, you took it from a depiction that was on a drawing; is that right?

A      No, sir, not entirely.  The drawing you -- that I observed, told me that there was a couch there, and where it was positioned, roughly.  I had other photographs taken of the scene at the time, looking through the door and such, in taking interior shots, that I used to help determine spatial relationships of how large the couch was and where it was positioned.

Q      Okay.  So, did you use anything -- you took these pictures in May of 2005.  Did you use the couch that was out there?

A      No, sir.

Q      Okay.  Next, on this table here, what did you use to determine the size and location of that table?

A      Photographs and, again, that sketch that we've drawn out.

Q      Okay.  Any other furniture in here?  What's this right here?

A      That's a T.V. stand.

Q       A stand, not the T.V. itself?

A       I believe there was a T.V. on it at the time.  I didn't have a photo that showed it.  All I had was the -- the depiction that there was a T.V. and a T.V. stand there.  So, I put in basically a square block, roughly the size ratio, to show that's where it would be located.

Q       Okay.  Again, not an exact replica of what you thought was in there; right?

A       Could not be.  I never had dimensions, never had -- could never take dimensions.

Q       Same thing with that table?

A       Yes, sir.

Q       Same thing with that couch?

A       Spatial relationships only.

Q       Okay.  Do you know if that's the arrangement of those items of furniture on September 24th, 1999?

A       To the best of my knowledge, yes, sir.

Q       These other rooms, how far did you go on these other rooms?  Like, did you just make it look nice, or did you use -- did you put things in there for a reason?

A       I put them -- again, I put them in there for spatial relationships, how much room I thought they took up, judged from photographs.  I had the depiction that was -- that showed that there was a couch that took up pretty much that east wall.  I could tell from the photos

that it was a shade of blue, so, I painted my model couch a shade of blue, just to show there was a blue couch that took up most of the room.

Q     Did you see a desk right there?

A     There is a desk in the model.  Not right there, no, sir.

Q     Did you -- any pictures show a desk right there?

A     Not that I could determine.

Q     Where did you put your desk?

A     The desk is right there.

Q     Okay.  What about coverings on windows?  Is this model intended to show and represent what the coverings on the windows were, or did you not consider that?

A     I did not want to put coverings on the windows.

Q     Well, I mean, was that just something you decided on your own?

A     There were discussions with the U.S. Attorney.

Q     Okay.  Did the discussion say "Don't put coverings on the windows"?

A     They said they weren't necessary.

Q     Okay.  They weren't necessary.  You realized, though, and you saw pictures that every one of these windows had coverings on them; didn't you?

A     Yes, sir.

Q     And pretty heavy coverings?  They weren't sheer

curtains; were they?

A      No, sir.

Q      Now, let's get back to your vegetation stuff out here.  On this -- on the vegetation level, are you telling us -- this Court and the jury that this vegetation on this scene represents an accurate depiction of what the vegetation was like on September 24th, 1999?

A      Judging by the photos I had in my possession, I wanted to place vegetation in such a way that would denote there was lighter vegetation and heavy vegetation, and I had to use, again, spatial relationships taken from aerial photographs, to place them on the model. These were not to depict each bush, bush by bush.

Q      Well, if someone in this trial testifies as to their location on this property by vegetation, are you telling this Court and the jury that that vegetation there accurately represents it, so that where he says he is because of certain vegetation, that this model represents that?

A      I believe you would get a clear idea of where -- what he was talking about.

Q      Okay.  But you're not saying it's an accurate representation of that?

A      I'm saying it's accurate.  I am saying I did not

make each bush exactly the same size as the bushes that existed in 1999.

Q    This area right here that I'm pointing to, that's sort of in the low part of the vegetation --

A    Yes, sir.

Q    -- in the pictures, it's depicted as yellow -- yellow flowers.  Do you recall that?

A    It had a yellowish tint to it, yes.  I didn't know what they were.

Q    Is that -- is that accurate?  That particular part of the vegetation, are you saying that's accurate?

A    In what way, sir?

Q    In its location.

A    Yes, sir.

MR. HILFIGER:  Would you go back to 69, Government's Exhibit 69?

BY MR. HILFIGER:

Q    Now, I didn't understand, in this Government's 69, where you're telling trees one and two are.  Can you point to trees one and two?

A    They don't stand out real well in this photograph because of the distance it was taken, but trees one and two are in that general area.

Q    But you don't see a tree at all in that general area; do you?  Can you point to anything that looks like

a tree?  Can you point to something --

MR. LITTLEFIELD:  I'm going to object.  This is the same question that he asked about, and he asked exactly about those two trees in his voir dire.  It's been asked and answered.

MR. HILFIGER:  I'll withdraw the question.

THE COURT:  Question withdrawn.

BY MR. HILFIGER:

Q     Was there a particular reason -- when you surveyed, you surveyed an area that covered from this point all down the road and up this private drive and back here; didn't you?

A     Yes, sir.

Q     Was there a particular reason that your model didn't depict all that?

A     There were a couple of reasons, I discussed with the U.S. Attorney.  In order to make the model a reasonably large enough scale to show any kind of detail, whatsoever, we had to reduce the area that was going to be modeled, due to physical size of the courtroom itself.  The model would just be so large, if I had done all that area in this particular scale, we'd have to move some of this furniture out of the way.  Now, if I wanted to depict the entire area that I surveyed, which is pretty much reflected in this photograph, in order to

make it a manageable model, the scale of it would be reduced so much that it might take away from the detail.

Q    Okay.  And I understand that you -- this is a 3/8 -- 1/32 depiction that's 3/8 inch to one foot; is that right?

A    Yes, sir.

Q    So, does that mean that if we measure something -- if there is a distance measured, for example, where somebody says something was so many feet away, if we take that and convert that at the rate of 3/8 inch per foot, then we can find it on this model; is that right?

A    If it's --

Q    If it's in this area?

A    Yes.

Q    And, likewise, if we measure something on this model, and want to place it, you know, how many feet away it was, we would use that same calculation; is that right?

A    Yes.

MR. HILFIGER:  Would the clerk please hand Defendant's Exhibit Number 1?

BY MR. HILFIGER:

Q    Would you look at that?  Would that be a way -- after you're gone, if we want to make a calculation, would that be a way to calculate that?

A     It seems a long way to go about it.  That's not how I would do it, but I believe it is.

Q     And it would be a way to convert both from scale model to feet, from feet to scale model; is that right?

A     Again, it's not how I would do it, but I believe it will work.

        MR. HILFIGER:  I move to introduce Defendant's Ehxibit Number 1.

        MR. LITTLEFIELD:  Judge, may I ask a voir dire question in regards to Defendant's Exhibit Number 1?

        THE  COURT:  Go ahead.

        MR. LITTLEFIELD:  Do you notice the bottom half converting item -- model to inches to feet at location, is that the appropriate calculation one would use on the bottom half?

                        (PAUSE)

        THE WITNESS:  It's not a method I'd use, so, I'm just not familiar with this.

        MR. LITTLEFIELD:  Do you know if that would even work or not, convert inches on the model to feet at the location?

        THE WITNESS:  Frankly, I don't understand what this is.

        MR. LITTLEFIELD:  I object.

BY MR. HILFIGER:

Q      Well, let me ask you this, then:  How would you convert inches here to feet?

A      Inches here to feet?

Q      Inches here to feet.

A      Whatever I measure here in inches, I would multiply times 32, because the ratio between the model and actual size is one to 32.  It's 1/32 of the actual size.  So, the way I would go about it, I'd measure anything I want to measure in here, in inches, multiply it times 32. That's going to give you real inches, real size inches. If you wanted to convert that to feet, I would take that number and divide by 12.

Q      Okay.  Now -- but on your scale model here, what is this little -- this little marker right here, what does that say?

A      May I get up?

        THE COURT:  You may.

BY THE WITNESS:

A      It says "Kenneth Barrett's residence, Sequoyah County, Oklahoma, scale 3/8 of an inch equals one foot."

BY MR. HILFIGER:

Q      Okay.  So, for every foot, that's 3/8 of an inch; is that right?

A      Three-eighths of an inch on the model equals a

foot.

Q       Go ahead and sit back down.

        So, if you took a model -- the model, and you went 3/8 of an inch, that's a foot, 3/8 of an inch, that's a foot, 3/8 of an inch, that's a foot; isn't that right?

A       Yes, sir.

Q       And that's how you've got it set here.  You didn't say 1/32; did you?

A       No, sir, I did not.

Q       I'm just trying to figure out how we're going to calculate this, if we want to find out the distance of something in feet from that model.  You say just multiply it by 32?

Q       Keep everything in inches.  Multiply whatever you want to -- measure anything you want to measure on the model, multiply times 32.  If you want to convert -- that will give you inches in real life.  If you want to convert that number to feet and inches, divide that number by 12.

Q       Okay.  And that would get us from the model to the feet?

A       To life size feet.

Q       How do we get life size feet to model?

A       You would take the feet in life size, divide by 32, that would give you feet on model.  If you wanted to

convert that to inches, multiply it times 12.

Q    And this doesn't do the same thing?

A    It's still not real clear to me, sir.

MR. HILFIGER:  Okay.  I'll withdraw the exhibit.

I have no further questions.

THE COURT:  Further direct?

MR. LITTLEFIELD: I would ask that Government's Exhibit Number 69 be displayed.

REDIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q    You talked about the Crown Vic that's over the crown of the roof to the east, do you recall, on direct?

A    Yes.

Q    And I think you indicated whether that's north or south of the porch line.  Do you recall?

A    I indicated it was north of a line drawn from the center of the ditch to the porch.

Q    Okay.  Now, in regards to that, are you talking -- which portion of the porch are you talking about, south edge or north edge?

A    It doesn't matter, it's north -- from that line, from the center of the ditch to the porch, anywhere on the porch, that vehicle would be north of that line.

221

Q     Okay.  Would you look to --

      MR. LITTLEFIELD:  And I'm going to ask to be displayed, Defendant's Exhibit Number 104.

BY MR. LITTLEFIELD:

Q     Do you see the same vehicle?

A     Yes, I do.

Q     Now, does it appear to be north or south of the porch line?  If one's looking straight down the line of the porch, does it appear to be north or south?

A     Well, that's a different viewpoint.

Q     I understand that.  If that vehicle hasn't been moved, and it's the same vehicle, of course, does it appear to be north or south of the porch line in Defendant's Exhibit 104?

A     If I understand the question right, you're asking me if you take a line sighting down the porch, and extend it, as such?

Q     Yes.

A     That vehicle would be south of that line.

Q     If we go back to Government's Exhibit Number 69 now.  And you're talking about it being north or south of the porch line, and you're talking about it in relation to the center of the ditch, where are you talking about on the ditch?

A     The question asked of me, asked me to draw a line

from the center of the ditch here to the porch.

Q      Okay.  And from that perspective, it's north of that line?

A      Correct.

Q      Okay.  If one is looking straight east down the porch line, the perspective view that was displayed in Government's Exhibit Number 3 -- do you recall Government's Exhibit Number 3?

A      Yes.

Q      Is that vehicle visible where it is displayed in Government's Exhibit Number 69?

A      I believe it would be.

Q      Okay.  And does the location from which this photograph or any photograph is taken, have some -- does it do anything to perspective and location or appearance of location of items?

A      Well, it distorts them.

Q      The post that's next to the black and white unit, do you see the one that you were talking about?

A      This post?

Q      Uh-huh.

A      Yes.

Q      Does it appear to be -- where does it appear to be in relation to the front of the cabin in Government's Exhibit Number 69?

A      In this photo, I would say it's directly in front of the cabin.

Q      Okay.  Now, look at Government's -- or Defendant's Exhibit 104.  Okay.  Do you see the same post that we looked at in Government's Exhibit Number 69?

A      That post.

Q      Okay.  Does it now appear, from this photograph, to be in front of the cabin?

A      No, it does not.

Q      Why?

A      From this angle that we're viewing, it would appear that it is west of the cabin -- the line of the cabin.

Q      And what's the explanation why it looks like it's in front in one photograph, and not in the other?

A      Well, it's a line of sight issue.  When you're not taking photographs of something direct on, you could throw off, I believe it's called parallax, in the photography field.  It throws a distortion into the angle of visibility.

Q      Go back to Government's Exhibit 103 -- I mean, Government's Exhibit 3, I'm sorry.  From what point of view was this photograph taken?

A      I was standing west of the porch, looking east.

Q      Okay.  If one wants to know what one sees down the porch line of the photographs that were taken, which

of the three photographs should one be looking at:
Government's Exhibit 69, Defendant's 104, or
Government's Exhibit 3?

A       I would use Government's Exhibit 3.

            MR. LITTLEFIELD:   Pass the witness.

                    RECROSS-EXAMINATION,

BY MR. HILFIGER:

Q       And using Government's Exhibit Number 3, how would
you know where the Highway Patrol car was?

A       In using this photograph?

Q       Yes.

A       I would have to study all of the evidence and,
again, spatial relationships, using known landmarks --

Q       And in order to get -- to determine that, you're
going to have to look and see where these trees are;
right?

A       Yes.

Q       And how are you standing here?  Are you standing
closer to this side, and is your angle on this picture
more like this, as opposed to down like that?

A       I don't understand that question, sir.

Q       Are you standing straight on to the porch?

A       At one point on the porch, I am, yes.

Q       Well, but this is not parallel with the picture;
is it?

A      No, sir.

Q      Which indicates you're taking the picture like that, as opposed to standing straight up and down on the porch; isn't that true?  Your parallax, remember?

A      Yeah.  I don't understand your question.

Q      Well, again, this picture is not -- you're not -- you're saying standing straight on looking down; isn't that right?  And you're not standing straight on looking down.

A      Compared to what, sir?  Relative to what?

Q      Not relative to anything.  Absolute, you're not standing straight on to this porch and looking straight east.

A      Yes, I am, sir.

MR. LITTLEFIELD:  I don't hear a question there.  It sounded like a statement.

THE COURT:  Any further questions?

MR. HILFIGER:  Just a moment.

(PAUSE)

BY MR. HILFIGER:

Q      And I hate to belabor it, but I think it is important.

THE COURT:  Okay.  Ask a question.

BY MR. HILFIGER:

Q      Government's -- Defense 104, please.  Now, this is

the picture that you say that the Highway Patrol unit looks like it's south of the center line.  And that's the ditch right there; isn't it?

A     Yes.

Q     Right here?

A     That's -- yes, sir.

Q     South of that line, going from north there to the porch?

A     No, sir, that's not what I said.

Q     What'd you say?

A     I said if you extended the line along the house, from that corner of the house to that corner of the house, stood over here and sighted along there, and extended that line out this way, the vehicle would be south of that line.

Q     Based on that picture?

A     Based on all the pictures.

Q     Oh, okay.  And you're saying the other picture doesn't make any difference, that puts it north of the line?

A     We're talking about two different lines here.

Q     Okay.

          MR. HILFIGER:  I have no further questions.

          MR. LITTLEFIELD:  No more -- no additional questions, Judge.  I would ask that the witness be

allowed to be excused.

MR. HILFIGER:  I have no objection.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.

You may call your next witness.

MR. LITTLEFIELD:  Clint Johnson.

CLINT JOHNSON, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q     State your name for record, please, sir.

A     Clint Johnson.

Q     Mr. Johnson, how are you employed?

A     I'm a supervising agent, field supervisor for District 27 Drug Task Force, which encompasses Cherokee, Wagoner, Adair and Sequoyah Counties.

Q     How long have you been a Drug Task Force Agent for the District Attorney's Office of Cherokee, Wagoner, Adair and Sequoyah Counties, sir?

A     Approximately the last nine years.

Q     Beginning when?

A     '96.

Q     And in that regard, do you recall September of 1999?

A     Yes, sir, I do.

Q     Were you familiar with Kenneth Eugene Barrett in

September of 1999?

A     Yes, sir.

          MR. LITTLEFIELD:  May I return to my desk just a second, Judge?

          THE COURT:  You may.

          MR. LITTLEFIELD:  I would ask that the witness be shown what's been marked as Government's Exhibit Number 87.

BY MR. LITTLEFIELD:

Q     Do you see that, sir?

A     Yes, sir.

Q     And are you familiar with that document?

A     Yes, sir.

          MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit Number 87.

          THE COURT:  Any objection?

          MR. HILFIGER:  No objection.

          THE COURT:  It will be admitted without objection.

          MR. LITTLEFIELD:  And I'd ask that it be displayed.

          THE COURT:  You may.

BY MR. LITTLEFIELD:

Q     What is that document, sir, Government's Exhibit Number 87?

A       That's an arrest warrant.

Q       For who?

A       Kenneth Eugene Barrett.

Q       And does it show when that arrest warrant came into existence?

A       Yes, sir, it does.

Q       When?

A       28th day of January, 1999.

Q       Were you familiar with the existence of this arrest warrant for Kenneth Eugene Barrett, in September of 1999?

A       Yes, sir.

Q       Okay.  Did you speak to anyone in relation to a possible law enforcement action to be taken against Mr. Barrett or his residence, in September of 1999?

A       Yes, sir, I did.

Q       And what initiated law enforcement's action in September of 1999, in regards to Mr. Barrett and his residence?

A       I had the arrest warrant and a search warrant for his residence.  Obtained a search warrant.

Q       You obtained a search warrant?

A       Yes, sir.

Q       And what caused you to obtain a search warrant?

A       I spoke to a confidential informant.

Q       Okay.  And about whom did the confidential

informant give information?

A      Kenneth Eugene Barrett and his residence.

Q      And at what location did you receive information relating to Mr. Barrett, from this confidential informant?

A      Mr. Barrett's residence.

Q      Okay.  I'm not going to go into the specifics of what the information was provided by the informant, but with the information that you received from the informant, what did you do with that in regards to law enforcement action, in attempting to take action against Mr. Barrett's residence?

A      I prepared an affidavit for a search warrant and presented it to the judge.

Q      Okay.  And the judge was a district judge or associate district judge where?

A      I believe it was in Sequoyah County.

Q      And after providing the affidavit for a search warrant for Mr. Barrett's residence, was a search warrant obtained, sir?

A      Yes, sir.

Q      I'd ask you to look at Government's Exhibit Number 88.  I think it's --

          MR. LITTLEFIELD:  I would ask that he be provided the notebook at this point in time, that

contains Government's Exhibit Number 88.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q     Have you examined it?

A     Yes, sir.

Q     Is it a single page or multiple page document?

A     It's multiple, a two-page document.

Q     Okay.  Is that, in fact, the search warrant you received commanding you or authorizing a search of the residence of Kenneth Eugene Barrett?

A     Yes, sir.

MR. LITTLEFIELD:  Move admission of Government's Exhibit Number 88.

THE COURT:  Any objection?

MR. HILFIGER:  No, Your Honor.

THE COURT:  It will be admitted without objection.

BY MR. LITTLEFIELD:

Q     And is it now displayed, both pages, on the screen?

A     Yes, sir.

Q     Okay.  Are those -- that is, in fact, the search warrant?

A     Yes, it is.

Q     When was the warrant issued?

A     20th day of September, 1999.

Q    Okay.  Now, was there anything unique about this search warrant, atypical or different from most of the search warrants that you had obtained in your essentially three years as a Drug Task Force Agent?

A    Yes, sir.

Q    What provisions were unique?

A    It was a day or night and a no knock search warrant.

Q    Okay.  And the typical search warrant is what kind?

A    It's a knock and announce, daytime search warrant.

Q    Okay.  When is daytime, under the laws of Oklahoma?

A    Six o'clock a.m. until ten o'clock p.m. at night.

Q    Okay.  So, it can be served after dark but it has to be served before what hour?

A    Ten o'clock p.m.

Q    Was there any kind of time restriction on this?

A    No, sir.

Q    And when you approach a residence with a typical search warrant, what do you have to do when you approach the residence and arrive to execute the warrant?

A    Knock and announce, "Police, search warrant."

Q    Okay.  When this search warrant is executed, when one attempts to serve and enter the residence with this warrant, what kind of -- do you have to do as far as announcing?

A      You don't have to.  It's a no knock search warrant.

Q      Okay.  I'm done -- leave that out.  Do you have any idea how many search warrants you had performed, sought, received, and caused to be executed by this time in your career, in September of '99, an approximation?

A      Over 200.

Q      Okay.  Of the 200, up to this point, who was it that served those warrants?

A      Myself and other officers.

Q      Were there any exceptions, prior to this warrant in September of '99, of you and other officers serving -- local officers serving the warrant?

A      I believe -- I can recall one.

Q      And when -- Okay.  Who served the one other warrant that was an exception, which you didn't serve out of your previous warrants?

A      Oklahoma Highway Patrol Tactical Team.

Q      What reason did you seek assistance of execution from the Oklahoma Highway Patrol Tactical Team, in that previous warrant that you and local officers didn't serve?

A      It goes beyond our capabilities.

Q      In regards to what?

A      They're highly trained and specialized in real high risk search warrants, and that's why we would call them

Q      Okay.  Did you make a decision as to whether this warrant for Kenneth Eugene Barrett's house -- residence, which was issued on September the 20th, 1999, as to whether or not you and local law enforcement would serve it, or if you'd seek assistance from someone else?

A      Seek assistance.

Q      From who?

A      Oklahoma Highway Patrol Tactical Team.

Q      Why?

A      It was a high risk search warrant that was beyond our capabilities.

Q      And, in fact, who was contacted?

A      I believe Trooper -- I'm sorry, Danny Oliver and Kerry Pettingill.

Q      And do you know what relationship Mr. Danny Oliver either currently had -- I mean in September of '99 -- or had previously had with the Oklahoma Highway Patrol Tactical Team?

A      Yes, I do.

Q      What was it?

A      He was the leader of the Oklahoma Highway Patrol Tactical Team at one point.

Q      Okay.  He wasn't in September of 1999?

A      No, sir, he was not.

Q      What position did he occupy then?  Do you recall?

A      I believe he was with the Cherokee County Sheriff's Department.

Q      Okay.  And Kerry Pettingill, do you know what position he had?

A      Yes, sir.

Q      What was that?

A      He was the leader -- or the captain of the Oklahoma Highway Patrol Tactical Team, the leader of them.

Q      You requested their assistance?

A      Yes, sir.

Q      What decision was made by the Tactical Team as to whether or not they would render assistance in securing this residence for the execution of this warrant?

A      That it was high risk beyond --

Q      What decision was made by them?

A      They would do it.

Q      They would do what?

A      They would do the warrant.

Q      Okay.  Who did you first meet with in regards to setting up -- giving the information, passing the warrant, et cetera, in preparation of this warrant being executed and served?

A      We met with Trooper Hamilton, Trooper Greninger, and Ken Stafford, who's the O.H.P. pilot.

Q      And when you say "We met with Hamilton and

236

Q     And when you say "We met with Hamilton and Greninger and Ken Stafford," where did the meeting take place and who's the "we"?

A     The "we" would be myself and at the time was Agent Alan Loyd with the Drug Task Force, and we met at the Sallisaw airport.

Q     Okay.  And why did Agent Alan Loyd -- you were with the Drug Task Force?

A     Yes.

Q     And what was Mr. Loyd's position at the time?

A     He was my supervisor at the time.

Q     Okay.  And how personally familiar were you with Kenny Barrett and his residence at that time?

A     I was not.

Q     How familiar was Mr. Loyd?

A     Mr. Loyd had advised me that he was there --

        MR. HILFIGER:  Your Honor, I'm going to object as hearsay, what Mr. Loyd said.

        THE COURT:  Sustained.

BY MR. LITTLEFIELD:

Q     Do you know if Mr. Loyd had been at Barrett's residence?

A     Yes, sir.

Q     When you got there, what kind of information did you provide the Highway Patrol tactical officers,

Hamilton and Greninger, who were going to serve the warrant?

A     The information that we had on Mr. Barrett, all of the information that we could provide to them.

Q     Okay.  Was there any information provided in regards to the way the residence was laid out?

A     Yes, sir, there was.

Q     And how was that communicated to the Highway Patrol team?

A     Agent Loyd had a cardboard diagram of Mr. Barrett's residence, and that was turned over to Oklahoma Highway Patrol Tactical Team.

Q     The location -- the specific location -- what information was communicated to the Tactical Team with regard to the specific location of Barrett's place?

A     That it was in a rural area, dead-end road, all of the information that we could give them, we gave them, at that point.

Q     What were they told about the neighbors?

A     Yes.

Q     What were they told about Mr. Barrett's neighbors?

A     There were several family members that lived in the area, and it was a wide open spot, barely any coverage or anything around the residence.

Q     I'm sorry, what?

A     Barely any coverage around the residence.

Q     Okay.  Do you know if the Highway Patrol officers did any aerial surveillance of Barrett's residence on that date?

A     Yes, sir, they did.

Q     I'm sorry?

A     Yes, sir, they did.

Q     Mr. Stafford, Ken Stafford, was there for what purpose?

A     To pilot the Oklahoma Highway Patrol plane, along with Trooper Greninger and Trooper Hamilton and Agent Alan Loyd, over Barrett's residence.

Q     So, a fly over was done but you didn't participate?

A     That's correct.

Q     And I'm not asking what information specifically, but you've already advised it was a high risk warrant. Was the information that detailed it was a high risk warrant, communicated to those officers?

A     Yes, sir, it was.

Q     When was the next time you met with the officers in regards to the execution of the warrant on this residence?

A     It would have been on the 23rd of September.

Q     And approximately when was that?

A     It was during the daytime hours.  I can't recall.

Q      Do you remember if it was morning or afternoon?

A      I'm wanting to say it was about noontime, somewhere through there.

Q      How long were you there?

A      Fifteen, 20 minutes, at the most, probably.

Q      Where did you meet with them?

A      At Camp Gruber.

Q      Okay.  And at that point in time, had you learned when the search -- what time they had chosen to execute the warrant?

A      No, sir, I didn't.

Q      When did you learn, the best you can recollect?

A      At approximately 7:30 that night, on September 23rd.

Q      Okay.  And in that regard, what were you told as to when it would be and where you were supposed to meet and what you were supposed to do?

A      Supposed to meet at the I-40 exit and Dwight Mission Road, approximately 12:20 to 12:30 hours in the morning.

Q      On the morning --

A      On the 24th.

Q      Okay.  And what was the O.H.P. Tactical Team's function supposed to be in regards to going to this place and in relation to that warrant?

A        To execute the search warrant and secure the area.

Q        Okay.  After they secured the area, who was going to perform the search?

A        Myself and my team.

Q        Okay.  And by the way, the arrest warrant, Government's Exhibit 87, what did you do with that or a copy of that warrant in relation to the O.H.P. Tactical Team?

A        They were given a copy of it.

Q        In regards to the search warrant, Government's Exhibit 88 which was displayed, what did you do with that in regards to the Oklahoma Highway Patrol Tactical Team?

A        They were given a copy of it, also.

Q        Local law enforcement got together.  Where and at what time?

A        It was at the Sequoyah County Courthouse at the Sheriff's Department, at approximately 11:00 that night.

Q        And how did it go about that local law enforcement assembled at that location?

A        I had called my partner at the time, my supervisor, Alan Loyd, who, in turn, I believe, advised Sheriff Philpot that we were going to need a search team.  Everybody met there.

Q        Okay.  Do you recall how many assembled at the

Sheriff's Office?

A      No, sir, I don't.  Probably six or seven.

Q      Okay.  And from that location, if they got there at 11:00 -- how far is it to I-40 and Dwight Mission Road?  And I'm not going to ask you exactly to the tenth of a mile, but approximately how far is it from the Sheriff's -- you know, the courthouse, out to where you were to rendezvous with the O.H.P. Tactical Team?

A      Maybe four -- probably four miles, give or take, somewhere through there.

Q      It wouldn't take you 20 minutes to get there?

A      No, sir.

Q      What did you do in the interim, between 11:00 and when you had to leave to meet with the tactical entry team at 12:20, 12:30?

A      I don't believe everybody had made to it Sheriff's Office at 11:00 -- exactly at 11:00.  We waited around for some people to show up and stuff, sat around.

Q      When were the members of the team advised that it was going to be Kenny Barrett's place that was being searched?

A      On the 22nd.

Q      Okay.  And when I say the search team, I'm talking the sheriff and the people that assembled at the Sheriff's Office.

A      They weren't advised until we got to Dwight Mission and I-40 Road.

Q      Okay.  So, it was basically -- what'd you tell them?  Before you left the Sheriff's Office, what did they know?

A      They knew to suit up, which when we suit up, we put on tactical vests and get ready.  Told them to meet us at Dwight Mission and I-40 Road, we'll explain to them what's going on from that point.

Q      Okay.  Who, in local law enforcement, knew that Barrett's place was being searched?

        MR. HILFIGER:  Your Honor, I'm going to object.  That calls for a conclusion that he's not able to give.  He's asking for who else knew.

        MR. LITTLEFIELD:  I'll withdraw it.

        THE COURT:  Question withdrawn.  You may rephrase.

BY MR. LITTLEFIELD:

Q      Who, in local law enforcement, did you inform that Kenny Barrett's place was going to be searched, prior to advising the members of the search team at Dwight Mission Road?

A      It would have been myself, Agent Loyd, my director, which would have been Robbie Cowen, and my District Attorney at the time, which would have been Diane Barker

Harrold.

Q       What happened after you all got out to Dwight Mission Road?

A       We waited a few minutes, and Oklahoma Highway Patrol Tactical Team arrived.

Q       And what direction did the Tactical Team give you all, your members of your team, in regards to what you were supposed to do while they were going to the site to secure the premises so that you all could execute the search?

A       We were to give them a two minute head start.

Q       Okay.  Did they take off?

A       Yes, sir.

Q       And how long did you all wait before you followed?

A       Two minutes.

Q       And from your rendezvous point, after they left, when you all started, where did you go?

A       Traveled to Mr. Barrett's residence.

Q       Okay.  When you got there -- who was amongst the local law enforcement in the group that went?  Who was in the lead vehicle?

A       Myself and Agent Alan Loyd.

Q       What did you learn when you got to Kenny Barrett's?

A       That two troopers -- or two troopers were down and one was hurt pretty bad.

Q       In response to that, what did you do?

A       Grabbed my medical bag from the back of my truck, took off toward the house, and was yelling for Delena Goss.

Q       Who was Delena Goss?

A       Delena Goss was the sheriff of Cherokee County at the time.

Q       Why were you hollering for Delena Goss from Cherokee County, as opposed to Johnny Philpot from Sequoyah County?

A       Delena Goss used to be -- before she became sheriff, was the trauma R.N. for Tahlequah City Hospital.

Q       Okay.  And you took the medical bag, hollered at Delena, and where did you go?

A       Straight to the downed officer, right behind a Bronco -- or right toward the back of the Bronco, up toward the residence.

Q       I'm sorry?

A       Toward the residence.

Q       How close was the Bronco to the residence?  Do you recall?

A       No, sir, I don't.  I mean, it was pretty close. It was right in front of the residence.

Q       Okay.  What happened -- do you know who the officer was, the downed officer that you all rendered assistance

to?

A      Yes, sir.

Q      Who?

A      Trooper Eales.  Trooper Rocky Eales.

Q      Okay.  And what was done to render assistance to Trooper Eales by yourself and Ms. Goss?

A      Myself and Ms. Goss started performing CPR and first aid on Trooper Eales.

Q      Did he remain at the scene, or how was -- what effort was made to get him out and get him medical care?

A      We had loaded him up in the back of a white Bronco, and one of the troopers drove us out while we were performing CPR and first aid in the back of the Bronco.

Q      How far did you and Sheriff Goss go in the back of that Bronco, while you were rendering emergency first aid to Mr. Eales?

A      From Mr. Barrett's residence to Dwight Mission and I-40.

Q      What happened at Dwight Mission and I-40?

A      That's where we were met by an ambulance.

Q      What happened at that point?

A      That's when the paramedics took over, put Mr. Eales in the back of an ambulance and transported him on to the hospital.

Q      What'd Sheriff Goss do when they put him in the

back of the ambulance?

A       I believe she rode in the ambulance with him.

Q       And after Trooper Eales was placed in the ambulance and taken to the hospital, where did you go, and the trooper that was in that Bronco?

A       I rode in the passenger side, and we traveled to the Sallisaw City Hospital.

Q       Okay.  And did you hear what Trooper Eales' condition was when you got to the hospital?

A       Yes, sir.

Q       What?

        MR. HILFIGER:  Your Honor, I'm going to object. Again, that's hearsay.

        MR. LITTLEFIELD:  Okay.  I'll withdraw it.

BY MR. LITTLEFIELD:

Q       During the time that you and Sheriff Goss attempted to -- or attempted to render CPR and first aid on the way to the hospital -- or on the way to meet the ambulance, what kind of response were you getting from Mr. Eales?

A       No response.

Q       What kind of pulse?

A       None.

Q       What kind of breathing?

A       None.

Q       Did you quit?

A      No, sir.

MR. LITTLEFIELD:  May I have a second, Judge?

THE COURT:  Yes.

(PAUSE)

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross-examine.

Mr. Hilfiger, we'll take a recess at this time, for about 15 or 20 minutes.

Everyone will please remain as the jury leaves the courtroom.

(JURY OUT)

THE COURT:  Let the record reflect that the jury has departed the courtroom.

Anything from the Government outside the hearing of the jury?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  No, Your Honor.

(BRIEF RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect the jury is in the box, the defendant and counsel is present, the Government is present with counsel.

You may cross-examine.

CROSS-EXAMINATION,

BY MR. HILFIGER:

Q     Mr. Johnson, the arrest warrant that's Government's Exhibit Number 87, when did you first become aware of that arrest warrant in relation to the September 19th, or whenever it was you got the search warrant?

A     I don't recall that.  Probably somewhere within a week or two weeks prior to.

Q     So, you're telling us that it was only a week or so before that, that you found out about the arrest warrant?

A     I think I found out about the arrest warrant -- the day I pulled it up was maybe a week or two before the actual search warrant or something.

Q     I see from this it shows it was January 28th, 1999.

A     Yes, sir.

Q     So, that was some nine months before this?

A     Yes, sir.

Q     And you didn't become aware of it prior to a week or so before?

A     No, sir, I said I think I was aware of it, but I didn't pull it up until a week or two prior to this.

Q     My question was:  When did you become aware of it?

A     I don't recall.

Q      Would it have been more than a month or so?

A      Again, I don't recall.  I just remember being advised that Mr. Barrett had a warrant for his arrest.

Q      Where did you get that advice from?

A      Agent Alan Loyd.

Q      Okay.  And I see that this -- the judge doesn't sign on this, does he?

A      No, sir.

Q      It's the clerk that signed on the warrant?

A      Yes, sir.

Q      And it's a warrant for a failure to appear at a court hearing; isn't that right?

A      Yes, sir.

Q      And in a failure to appear at a court hearing, does it mean he's out on bond?

A      Yes, sir.

Q      And is a bondsman normally contacted to get the person in?

A      I don't know if they are or not.  I never contact one.

Q      You didn't contact one?

A      No, sir.

Q      You didn't try to contact one?

A      No, sir.

Q      Had you ever met Kenny Barrett prior to September

24th, 1999?

A      No, sir.

Q      Had you ever seen him?

A      No, sir.

Q      Had you ever been to his house?

A      No, sir.

Q      So, any information you got about Kenny Barrett, came from other people; is that right?

A      From Agent Loyd, yes, sir.

Q      Okay.  So, your information on Kenny Barrett came from Agent Loyd?

A      That's correct.

Q      What about the confidential informant?

A      Him too, also.

Q      Okay.  How long had you been working with this confidential informant?

A      Maybe a year and a half.

Q      Not just on Kenny, then?

A      That's correct.

Q      Working with him on other people?

A      That's correct.

Q      He was a paid informant?

A      Sometimes paid, and I also believe he had some charges that they were being assisted on.

Q      Being assisted.  In other words, he got favorable

treatment; is that right?

A    Yes, sir.

Q    Favorable treatment from your office or from the D.A.'s Office?

A    It would be from the D.A.'s Office.

Q    Was he working for you, or was he working for Alan Loyd, this confidential informant?

A    Myself.

Q    Were you -- did you pay him?

A    I had paid him, yes, sir.

Q    Have you ever told anybody how much you paid him for this particular project on Kenny Barrett?

A    I don't recall if I paid him on this particular project or not.

Q    Was there some other gratuity that you gave to him, like favorable treatment on a case?

A    That, I'm -- I can't recall, sir.  He had -- the informant had some charges that they were trying to get some assistance with.

Q    "They," being him?

A    Him, yes, sir.

Q    Have you ever revealed who the informant was?

A    To Mr. Littlefield, yes, sir.

Q    And that's just been recently?

A    Probably -- approximately, pretty close to a year

ago.

Q       Pretty close to a year ago.   Prior to that, you had not revealed it to anybody; is that correct?

A       Correct.

Q       Was that something you decided on your own, or at the request of the informant?

A       That's something that the law stated that I didn't have to reveal the informant.

Q       Okay.  And since September 24th, 1999, have you given favorable treatment to that informant?

A       I don't recall that.  I don't know of any favorable treatment, but I think there might have been a time after that, that I gave him some money.

Q       Some money?

A       Yes, sir.

Q       Do you know whether or not you sought out, with the D.A.'s Office in Sequoyah County, a request for favorable treatment for the informant, after September 24th, 1999?

A       I don't recall that, sir.

Q       The search warrant that you obtained, Government's 88, when did you initiate -- begin working on that search warrant?

A       It probably would have been on the 20th, I believe.

Q       On the 20th?

A       Is whenever I typed it up, yes, sir.

Q      Well, did you -- when did you get the information that you put into that?

A      It would have been within the previous 72 hours, I believe it was more like 24 hours prior to that, that I put the information in there.

Q      Okay.  Prior to making application for this search warrant, had you made any contact with the Highway Patrol?

A      No, sir.

Q      Had you made contact with other persons, requesting they make contact with the Highway Patrol?

A      No, sir, that I don't recall.

Q      Did you know then Danny Oliver?

A      Yes, sir.

Q      Prior to the 20th of September, did you make any contact with Danny Oliver to get a hold of the Highway Patrol?

A      I don't remember if I did.  I remember talking to Danny Oliver about this, but I don't know if it was on the 20th or some time in there.

Q      Prior to -- did you talk to Alan Loyd about using the Highway Patrol Tact Team?

A      Yes, sir, I did.

Q      Did you talk to him prior to the 20th?

A      I believe I might have, yes, sir.

Q     And was there any information that -- in order to get the tact team -- you needed to get?

A     No, sir.

Q     You got the search warrant first?

A     I had the search warrant, and I provided it to the tact team whenever I met with them.

Q     Okay.  You never had any contact with the tact team or people having contact with the tact team, requesting the search warrant, prior to this date of September 20th?

A     I might have spoke to Danny Oliver.  I can't recall if it was on the 20th or before.  But I was never advised that they had to have a search warrant to go to Mr. Barrett's residence.

Q     Okay.  Now, as I understand it, you said that this search warrant's unique.  You've served over 200 -- and everything I'm telling you about -- talking to you about is September, 1999, and before, right now.

A     Okay.

Q     You'd served over 200 search warrants; is that right?

A     That's correct.

Q     How many have you served that were day/night/no knock search warrants?

A     I can't recall that.  I mean, I know I had maybe one or two others.

Q      Okay.  Out of the 200, you may have served one or two others yourself --

A      Yes, sir.

Q      -- that were day/night/no knocks?

A      Yes, sir.

Q      So, they're very unusual?

A      Yes, sir.

Q      And the other search warrant served by the Highway Patrol Tact Team that you talk about, was it a day/night/no knock?

A      Yes, sir, I believe it was.

Q      Okay.  Was it served by Pettingill and his group?

A      Yes, sir, it was.

Q      Okay.  And about when was that in relation to this one?

A      Somewhere around '98, I believe.

Q      So, about a year before?

A      Yes, sir, somewhere through there.

Q      And you're sure that Pettingill was aware that that was a no knock, that he served?

A      I believe so.  You'd have to ask Mr. Pettingill.

Q      Okay.  Did you go with that tact team on that particular search?

A      Yes, sir, I did.

Q      From the day that you got this search warrant,

which was on September 20th -- and you got it at 11:38 a.m.; is that right?

A      Yes, sir.

Q      So, when did you start preparing this search warrant?

A      It would have been the same day, on the 20th.

Q      Okay.  And you say you got the information within 24 hours before that?

A      Yes, sir.  Well, within the last 72, but I believe on this particular one, it was within the last 24 hours.

Q      Now, September the 20th was a Monday.  Would you have got the information on Sunday?

A      Yes, sir.

Q      Okay.  And would you have got the information during the day or during the night?

A      I don't recall that.

Q      And the -- all the information that you got for this, is basically from your confidential informant; is that right?

A      That's correct.

Q      Now, when you used this search warrant and then you met with the tact team -- and the first part of the tact team you met with, was Hamilton and Greninger, right, and the pilot?

A      Yes, sir.

Q      Did you have any conversations with anybody else, prior to meeting with them, anybody else on the Tact Team, prior to meeting with them?

A      I believe Mr. Pettingill and Trooper -- or Danny Oliver, is the other two people that I spoke with.

Q      Was that a telephone conversation?

A      Yes, sir, it would have been.

Q      And you remember when you talked to them in relation to when you met with Hamilton and Greninger?

A      No, sir, I don't.

Q      Now, you said you provided information to them, all that you had; is that right?

A      Yes, sir.

Q      The information you provided to Hamilton and Greninger, was it just the information that you got from this search warrant, or was there some additional information that you provided?

A      There was additional information.

Q      And where'd you get that information?

A      Agent Loyd provided it.

Q      Okay.  So, do you know whether or not Agent Loyd had ever been out to that residence?

A      Yes, sir.

Q      He had?

A      Yes, sir.

Q    Within what period of time?

A    That, I don't know.

Q    Do you know whether -- had Agent Loyd been in the residence?

A    Yes, sir, I believe he had.

Q    Okay.  So, do you know this cardboard diagram -- who prepared that cardboard diagram?

A    Agent Loyd.

Q    And you're saying it was -- was it based on information from him being out there?

A    Yes, sir.

Q    And not the confidential informant?

A    That's correct.

Q    Now, who told them -- who told the Highway Patrol Tact Team, or Hamilton and Greninger, about the area and the neighbors and the neighborhood?

A    That would have been Agent Loyd.

Q    You didn't provide any of that information?

A    I think I spoke about it a little bit, but it came from Agent Loyd.

Q    Well, I mean, would you have known that information?

A    Just from Agent Loyd.

Q    Okay.  And after the -- then later on, you provided additional information showing what this -- why this was

high risk, to the Highway Patrol?

A      Just when we met at the airport.

Q      Okay.   What advice did you give them to tell them that this was high risk?

A      That we received information about Mr. Barrett and his threats to law enforcement, and him carrying firearms, and that he was going to kill law enforcement officers when they showed up at his residence.

Q      Anything against the law about Mr. Barrett carrying firearms?

A      It depended on the situation at the time.

Q      Well --

A      He had a felony arrest warrant for him.

Q      He had a felony arrest warrant?

A      Yes, sir.

Q      He didn't have a felony conviction; did he?

A      No, sir.

Q      So, if he doesn't have a felony conviction, he could carry a firearm; isn't that right?

A      Yes, sir.

Q      Is there any limitation on the number of firearms he can have?

A      No, sir.

Q      Just he can't have an automatic firearm?

A      That's correct.

Q      And did you, at that time -- were you aware that the sheriff had been out to check that firearm?

MR. LITTLEFIELD:  Objection, irrelevant, and it also assumes facts not in evidence.

THE COURT:  Sustained.

BY MR. HILFIGER:

Q      Had you had any -- had you had any conversations with Sheriff Philpot about his contacts with Kenny Barrett?

MR. LITTLEFIELD:  I -- I'm not going to object to that question.

BY THE WITNESS:

A      No, sir.

BY MR. HILFIGER:

Q      What other information did you have that he's high risk?

A      That he was going to kill law enforcement officers, that he was making methamphetamine at the residence, which also makes it a substantial risk to law enforcement personnel due to explosive hazards when you're dealing with methamphetamine labs, and just all the information we received about him going to kill law enforcement officers.  That makes it high risk.

Q      Okay.  And did you receive this information from more than the confidential informant?

A     Yes.

Q     How many more?

A     I received it from Agent Loyd.

Q     Who had received it from the confidential informant?

A     No, sir.  I believe that there were several people that came into the sheriff's office, reporting to the sheriff that Mr. Barrett was shooting across the road all the time, and they was wanting something done about it. And we received several tips that Mr. Barrett was going to kill law enforcement, from several -- several different people advised us of that.

Q     Okay.  And what relation -- what time relation was this to the September 24th?

A     Previous six months.

Q     Six months before this?

A     Approximately six months, yes, sir.

Q     And what precipitated getting the search warrant at this particular date, then?  You'd been having this information for the last six months.

A     People were coming to the sheriff's office, complaining about Mr. Barrett firing across the road, shooting his weapon off all hours of the night and day, and they wanted something done.  That was some of the complaints they were getting.  And then the law

enforcement threat.  That's what -- one of the things that we had to get the search warrant for.  Also the methamphetamine that was being kept at the residence.

Q     Was there anything that precipitated doing it in the last -- you know, within 48 hours or 72 hours of actually getting this search warrant?

A     I had --

Q     Any of those things that you just discussed precipitated you deciding that we need to get this search warrant right now?

A     When I received information, that's whenever I got the search warrant, that's when I obtained it.

Q     Okay.  Was it from this individual, confidential informant?

A     Correct.

Q     Were you aware of any type of drive by done by the tact team, or part of the tact team, prior to the search warrant execution?

A     No, sir, I was not.

Q     Did the tact team -- how did you happen to meet the tact team on September 23rd?

A     We drove to Camp Gruber.

Q     I mean, did somebody inform you to be there?

A     No, we knew they were there.  Myself and Agent Loyd knew they were there, and we drove out to make

sure everything was going fine for them, see if they needed anything else.

Q    Okay.  And then, as I understand it, the sheriff's office wasn't advised of anything about who was going to be on this search -- I mean, who the search warrant was for, until you met at Dwight Mission Road; is that right?

A    That's correct.

Q    And to your knowledge, the only people you told about it was Loyd, Alan Loyd, Assistant District Attorney Robbie Cowen, and District Attorney Dianna Barker Harrold?

A    Yes, sir, and also Carey Pettingill and Danny Oliver.

Q    Pettingill was part of the team, though?

A    Correct, yes, sir.

Q    Now, how many cars went out to Dwight Mission Road, not including the tact team?

A    Probably four to five, somewhere in there.

Q    Who all was there, not including the tact team?

A    Myself, Agent Loyd.

Q    What was your position, you and Loyd?  What were you supposed to do?

A    We were going to be the searching officers of the residence.

Q      Okay.  Who else?

A      Sheriff Philpot.

Q      What was his position?

A      They was going to be my search team.

Q      He was part of the search team?

A      Yes, sir, and perimeter team.

Q      Did you make request for him, or did he just jump in there on his own?

A      I made a request for him.

Q      Okay.  Who else?

A      Stan Philpot.

Q      What was his position?

A      The -- he was a park ranger at the park by Marble City.

Q      Okay.  But what was his position on this --

A      He was also perimeter.  He was going to be part of my search team.

Q      Perimeter -- what do you mean by perimeter?

A      If the Oklahoma Highway Patrol needed anything, due to this being a high risk search warrant, if something went wrong, then we'd have other officers there to help out.

Q      Okay.  Who else was there?

A      The Chief of Police, I believe it was Gary Philpot.

Q      Are they all related?

A      Yes, sir.

Q      How are they related?

A      Brothers.

Q      Okay.  What was his position?

A      Same thing, perimeter, search team.

Q      Who else was there?

A      There were a couple of deputies, also.  I can't recall their names.

Q      At least two?

A      Yes, sir.

Q      Who else?

A      That's all I can recall at this time.

Q      Was anybody from Cherokee County there?

A      No, sir, not -- I don't believe at the sheriff's office.

Q      Okay.  What about Delena Goss?

A      No, sir.

Q      She wasn't at Dwight Mission Road?

A      I thought you were talking about at the sheriff's department.  Yes, she was at Dwight Mission Road and I-40.

Q      I'm talking about people that met at Dwight Mission Road.

A      Okay.  I thought you meant the sheriff's office.

I apologize.  Delena Goss, Sheriff of Cherokee County, she was there.

Q      What was her position?

A      She was there because a couple of her officers were on the scene.  She always responded -- anytime a search warrant was being executed, she would come out on about 90 percent of them, anytime her guys were involved in one.

Q      Okay.  What guys of her's were involved?

A      Brian Swim and Danny Oliver.

Q      Was Brian Swim's -- so, was Delena Goss -- did you have her set up to do something in this, or was she just there?

A      She came with District Attorney Dianne Barker Harrold.

Q      Just accompanying Dianna Barker Harrold?

A      And I --

Q      Was she just accompanying Dianna Barker Harrold, or did she have a particular job working in this thing?

A      She was going to be part of the perimeter.

Q      Did you tell her that?

A      I believe it was understood that away.

Q      How was it understood?

A      That she would help out.  Anytime we'd do a search warrant and she'd show up on one to assist us, she would do perimeter most of the time.

Q    But she wasn't instructed to do it?

A    Correct.

Q    What about Brian Swim, what was his job?

A    You'd have to ask Mr. Swim that.  I believe -- you'd have to ask Mr. Swim that, but I believe Danny Oliver is the one who brought Mr. Swim with him.

Q    So, you don't know what Mr. Swim was supposed to do?

A    I just know he was there.

Q    What about Dianna Barker Harrold?

A    She was there as my boss.  I can't tell her to stay away.  And the second thing, a picture is worth a thousand words, and the prosecutor sometimes likes to come out and see the scene, when they're prosecuting a case.  So, that's what she was doing there.

Q    Okay.  Were also any other Assistant D.A.'s -- any Assistant D.A.'s out there?

A    Yes, sir.

Q    Who was that?

A    Robbie Cowen.

Q    Where's he assistant?

A    He was assistant in Sequoyah County D. A.'s Office.

Q    What was his part in this?

A    He was my boss, and he wanted to be there, I guess for the same reason Ms. Barker Harrold wanted to be there.

Q      Just to be there?

A      Be there for prosecution aspect of the search warrant.

Q      Okay.  Who else was there?

A      That's all I can recall at this point.

Q      Was there another Assistant D. A. there?  Was Lynn Anderson there?

A      Yes, sir, he was.

Q      What was his particular position there?

A      I don't know.  He was with Mr. Cowan.

Q      They were just out there; weren't they?

A      Correct.

Q      So, one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen people were on this second team.  Does that sound about right?

A      Yes, sir.

Q      Pretty good deal of people; wasn't there?

A      Yes, sir, it was.

Q      In addition to that, you had how many people were on the tact team?

A      I don't know how many they had.  You'd just have to ask them.

Q      So, did the tact team say any -- were you directing the second group?

A      Yes, sir, I was.

Q       Okay.  And were you in charge of the second group?

A       I would have been, yes, sir.

Q       Would you be the one telling people what to do?

A       Yes, sir.

Q       Well, if you felt like there were too many people there, would you be the one saying, "Hey, we don't need this many?"

A       I needed my search team, and the rest of them were my bosses that I can't tell them to leave, or I would probably be gone.

Q       Okay.  So, you didn't have control over that; did you?

A       That's correct.

Q       Because of the number of people there, the Tact Team told you to wait a couple of minutes.  They didn't want you right on their tail; did they?

A       I don't know if it was because of the number of people there.  They just advised me to give them a two minute head start.

Q       Okay.  And when you gave a two minute head start, how close did you keep to the two minutes?

A       Right on two minutes.

Q       Okay.  So, you started right after the two minutes were up; right?

A       Yes, sir.

Q      And at what speed did you go to get there?

A      I couldn't tell you what speed I was traveling, but I was traveling fast.

Q      Faster than the speed limit?

A      Yes, sir.

Q      Emergency speed?

A      Oh, no, I wouldn't say emergency speed, but I was traveling probably faster than the speed limit.

Q      Okay.  And were the other people keeping up with you?

A      Yes, sir.

Q      And the way you get to this place, without going through all of the detail, but there's a road that goes across a creek, it's got a bridge on it, and you go about a mile -- I'm way past Dwight Mission now.

A      Okay.

Q      You turn off Dwight Mission and you go back east for some distance; right?

A      Yes, sir.

Q      And then the paved road goes to the north?

A      That's correct.

Q      And then you come on a -- the county road.  It's a dirt road?

A      A dirt/gravel road, yes, sir.

Q      Okay.  Now, when you got to -- have you seen any

pictures of -- overhead pictures of the area?

A     Yes, sir, I have.

Q     Would you recognize them if you saw them?

A     Yes, sir.

Q     Well, let me ask you some more questions first, then.

When you got onto the dirt road -- well, when did you first see anything with the first -- with the Tact Team?  Where were you?  What was your location?

A     Just about to the -- right there where the pavement hits the dirt road.

Q     Where the turn goes back to the north?

A     The turn goes back north and you go straight on a dirt road.  That's whenever I first observed anything to do with the Tactical Team.

Q     Okay.  And at that point, do you know how far behind you were, as far as time?

A     No, sir, I don't.

Q     Would you look at Defendant's Exhibit 103, please?

MR. HILFIGER:  Would you hand him the book, Defendant's Exhibit 103?

BY THE WITNESS:

A     103?

BY MR. HILFIGER:

Q     Yes.  Do you see it?

A       Yes, sir.

Q       Do you recognize that?

A       Yes, sir, I do.

Q       Can you sort of orient yourself where the paved road is and the county road is?

A       Yes, sir.

Q       Is that an accurate depiction of the area?

A       Yes, sir.

MR. HILFIGER:  Your Honor, we move to introduce Defendant's Exhibit Number 103.

MR. LITTLEFIELD:  Can I have a couple of voir dire questions?

THE COURT:  You may.

VOIR DIRE EXAMINATION,

BY MR. LITTLEFIELD:

Q       Do you have any idea when this photograph was taken?

A       No, sir, I don't.

Q       And the automobiles and the vehicles depicted there, is that the group that traveled with you or -- who all's involved in these automobiles that show up?

A       I couldn't tell you who all showed up.  There was -- after all the incident took place, there were several O.H.P. troopers, several other persons showed up at the scene.

Q     Several what?

A     Several other persons showed up at the scene.

Q     How long did the entry team -- or not the entry team, the local law enforcement that traveled with you, remain at the scene?

A     Some of them stayed until I had left, and some of them had already gone by the time I got back from the hospital.

Q     Okay.  And that was all at nighttime?

A     Yes, sir.

Q     Is this a nighttime photograph, or a daytime photograph?

A     It's a daytime.

          MR. LITTLEFIELD:  May I have just a second, Judge?

          THE COURT:  You may.

                    (PAUSE)

          MR. LITTLEFIELD:  No objection.

          THE COURT:  Defendant's Exhibit 103?

          MR. HILFIGER:  Yes.

          THE COURT:  It will be admitted without objection.

                CROSS-EXAMINATION, CONT'D,

BY MR. HILFIGER:

Q     Now, this is daytime.  All those cars weren't

there; isn't that right?

A     There was probably a few of them there, but I can't recall which ones.

Q     Okay.  The basic thing I was wanting to ask about this, is this the road, the paved road going up here, that makes the turn?

A     Yes, sir.

Q     And then this -- this road right here goes off and it's a dirt or gravel county road going down that way; is that right?

A     That's correct.

Q     And you can barely see it, but do you recognize that as being Kenny Barrett's house, or the area?

A     Yes, sir.

Q     Okay.  Now, you came up from this direction here?

A     That's correct.

Q     Okay.  Now, at what point did you first see the tact team?  Where were you?  And I think there's a pointer up there, if you want to --

A     I was approximately in this location right here.

Q     Right where you're just getting off the road; is that right?

A     That's correct.

Q     And what did you see?

A     I could see the lights flashing up here, and also

I could -- I caught the glimpse of what appeared to be taillights, or some kind of lights, going in right off the road up there.

Q     Okay.  And it appeared to be taillights that you saw at first, the first thing you saw?

A     That's what I believed it to be, yes, sir.

Q     Okay.  And it was turning in someplace, you don't know where, though?

A     Off this road right up here, somewhere up in here.

Q     Did you make a determination -- and you went on down that road; is that right?

A     Yes, sir, I did.

Q     And when you got down that road, did you make a determination of where that car turned in, or could you tell?

A     I believe I did, yes, sir.

Q     And where was that?

A     Into the gate.  Into the driveway.

Q     Going into Kenny Barrett's residence?

A     That's correct.

Q     And at that time, you'd never seen Kenny Barrett's residence; is that correct?

A     That's correct.

Q     And you went in a driveway going up into his area?

A     No, sir, I did not.

Q    Okay.  What did you -- oh, you didn't drive in; did you?

A    That's correct.

Q    Where did you park?

A    You can't see it very well on this, but just right up past his entrance to his gate right there.

Q    Okay.  On the gravel road?

A    That's correct.

Q    The county road?

A    That's correct.

Q    And when you got out of your car, where did you go?

A    Ran up the entrance here, up toward the front of the house.

Q    Okay.  Let's look at Exhibit 105, Defendant's Exhibit 105.  Okay.  Can you recognize or orient yourself on this picture?

A    Yes, sir, I can.

Q    Now, again, all of those cars weren't there; were they?

A    No, sir.

Q    Can you see approximately in this picture where your car was stopped?

A    It would have been right into this area, right in here.

Q      Right in where all of that heavy brush is?

A      That's correct.

Q      And then where did you go?

A      I came through this area here, and came right to the back of that Bronco that was setting right in this area somewhere.

Q      Okay.  The Bronco that you came to, how did you happen to get to that particular Bronco?  Why did you come to that particular Bronco?

A      When I came up the driveway, I observed two officers carrying another officer, and I helped grab a hold of him, and we placed him on the back of that Bronco.

Q      And the Bronco that you're talking about is not in this picture; isn't that right?

A      That's correct.

Q      You didn't see Rocky Eales laying on the ground, then; is that right?

A      That's correct.

Q      When you came -- by the time you got there, did you -- or even coming up there, did you hear any shots at all?

A      No, sir, I did not.

Q      And did you -- what did you do as far as -- did you do anything to assist in taking the Bronco out of there?

A     I had jumped into the front seat of the Bronco --

MR. LITTLEFIELD:  Objection, it's beyond the scope of the question.  It asked for a simple yes or no, not what he did but did he.

THE COURT:  Rephrase the question.  And, sir, if you'll wait --

BY MR. HILFIGER:

Q     Did you do anything as far as assisting in getting the Bronco out of there?

A     No, sir.

Q     Did you attempt to do anything?

A     Yes, sir.

Q     What was that?

A     Get in the front seat of the vehicle and drive, and one of the other troopers advised me he would take it.

Q     Okay.  And then you went to the back of the vehicle; is that right?

A     That's correct.

Q     Do you know who the other person was that took the Bronco out of there?

A     No, sir.

Q     How much time would you say -- you started with a two minute lapse between leaving Dwight Mission and -- between the tact team leaving Dwight Mission and your team leaving Dwight Mission; right?

A    Correct.

Q    When you got here, how much time do you think had elapsed?  Were you still at a two minute interval?

A    I couldn't tell you.

Q    The car that you saw the taillights go in first, did you see that car in this -- in this area here?

A    All I saw was the taillights.  I don't know which vehicle it was.

Q    Okay.  Okay.

MR. HILFIGER:  I have no further questions on this.

THE COURT:  May he redirect?

MR. HILFIGER:  No, I didn't have any further questions.  Let me make --

THE COURT:  Oh, I thought you meant you were through.

MR. HILFIGER:  I meant on that particular picture.

THE COURT:  Oh, you're not through.  You may continue.

(PAUSE)

MR. HILFIGER:  No further questions.

REDIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q    The information about the danger that Barrett

constituted to law enforcement, was provided to the troopers by who?

A        Agent Loyd.

Q        Okay.  You were asked about the illegality of possessing a firearm.  Are you aware of whether or not it is lawful to obtain or receive a firearm while charges are pending against somebody?

A        Yes, sir.

Q        And what's the law in that regard?

A        Well, while you're under indictment, you can't possess or receive a firearm.

Q        Okay.  And additionally, is it lawful to possess a firearm -- you mentioned information about cooking and manufacturing and selling methamphetamine.  What's the status of possession and use of a firearm if one's involved in drug trafficking crimes?

A        Felony charge.  You can't possess a firearm in the commission of a felony.

Q        In regards to the 13 people that were identified that were a part of local law enforcement, what part did those 13 people, including yourself, have to do with the entry, the original entry, onto Barrett's residence?

A        None.

Q        As that 13 team group, however many vehicles, was driving, who was in the lead vehicle?

A       Myself and Agent Loyd.

Q       Okay.  What advice did you receive in regards to your speed, as you were proceeding from Dwight Mission Road to Barrett's residence?

A       Agent Loyd kept advising me to slow down.

Q       Did you?

A       No, sir.

Q       Okay.  Was there any delay during that trip?

A       Yes, sir, there was.

Q       What was the delay?

A       A train.

Q       And what happened in regards to the train?

A       We got caught by a train, approximately a minute -- a minute or so.

Q       And you mean there was a railroad track?  Where was it in relation to the road?

A       It was right straight across Dwight Mission Road. I mean, you'd go right across Dwight Mission Road, you'd have to cross the tracks to continue on Dwight Mission Road.

Q       And you had to wait for that train?

A       That's correct.

Q       And that was how long a delay?

A       I would say a minute, maybe a little more.

Q       I'm going to show him Defendant's Exhibit 103.

Do you know what these are down here, those vehicles there?

A     They appear to be news camera vehicles.

Q     Okay.  Where were you when you saw the taillights?

A     In this area right in here.

Q     Okay.  And the taillights were pulling -- if we put up 105 real quick, which is also Government's Exhibit 69 -- where was that vehicle going?  Where were those taillights headed?

A     Into this right here.

Q     Okay.  And if you look at this area right here, do you see the item right at the tip of my pen?

A     Yes, sir.

Q     Do you know what that was?

A     I believe that was the gate.

Q     Okay.  And do you know how that gate got there?

A     It was ran through.

Q     By what vehicle?

A     One of the O.H.P. units.

Q     Do you know if it was the one that the taillights you saw?

A     That's -- I believe it was.

Q     Okay.  And when you got up there, how many Broncos were out in front of the residence when you arrived and ran up there with your medical bag?

A     I remember two.

Q     The one that you said that you got into, that you assisted in loading Rocky into to take him to meet the ambulance, was it the closer or the farther of the two vehicles, from the residence -- the two Broncos?

A     It was the farther.

Q     And where was Rocky loaded in that second Bronco?

A     In the back.

Q     Okay.  And then you climbed in and then went into the rear and accompanied Sheriff Goss to the hospital?

A     That's true.

Q     Or the ambulance?

A     Correct.

Q     How clear were the taillights that you saw from the corner intersection, pulling into his driveway?

A     They weren't real clear.  There was a little dust, but I could still see the glow of them going -- as it was going that way.

Q     Okay.  Now, which part of this, on 103, is paved road?

A     This part right here.

Q     Okay.  And the road that goes on from the paved road, where it turns back to the left or north, the road goes on to the east, toward Mr. Barrett's house, what kind of road is it?

A     Dirt and gravel road.

Q     Okay.  And through the dust, you could see the taillights?

A     Yes, sir.

Q     What other kind of lighting did you see in the area around his house?

A     You could see the glow of red and blue lights up in this area, as we were approaching.

Q     Where were you when you first saw the red and blue lights reflecting?

A     I'd say somewhere right in this area, right down here somewhere.  It was along this road.

Q     Was it clearly visible?

A     Yes, sir.

Q     Have you traveled highway late at night and seen automobiles pulled over?

A     Yes, sir.

Q     What kind of lights was it you were seeing, the red and blue?

A     Overhead lights on a police car.

        MR. LITTLEFIELD:  Can I have just a second, Judge?

        THE COURT:  You may.

                (PAUSE)

        MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Further cross?

MR. HILFIGER:  Yes, sir, please.

RECROSS-EXAMINATION,

BY MR. HILFIGER:

Q     So, as I understand, on this Defendant's Exhibit Number 103, you're saying somewhere right around -- to match it up with something, this entranceway, this driveway here, which is the first house down that gravel road, is about where you say you saw red and blue?

A     I'd say somewhere right through here.  I couldn't tell you exactly the point, but you couldn't see the light bar, you could just see a glow.

Q     You could see a glow?

A     Yes, sir.

Q     When you say you're seeing a light, what you're seeing is the glowing; isn't that true?

A     Yes, sir.

Q     And from how many cars, did you see that glow?

A     I couldn't tell you that.  I can tell you what I observed when I pulled up.

Q     What did you observe when you pulled up?

A     Several vehicles up there with lights on.

Q     Okay.  With red and blue lights on?

A     Yes, sir.

Q     How many vehicles with red and blue lights on?

A       There was one sitting right in here, that was a black and white O.H.P. vehicle with their top lights going.

Q       Yes, sir.

A       I'm wanting to say there was another one down here, that I observed, but I can't recall exactly -- I just remember that one right there.

Q       That's the only one you remember that had red and blue lights going; isn't it?

A       I'm sorry?

Q       That's the only one that had a light bar that had red and blue lights going?

A       I remember seeing other lights, but I can't remember where they were parked at, but I remember that one vividly.

Q       And you had a clear view of that car; didn't you?

A       No, sir, I didn't, until I came around.

Q       When you came in the yard?

A       Yes, sir.

Q       You had a clear view of it?

A       Yes, sir.

Q       Did you see any other red and blue car -- any other marked car that had red and blue lights going?

A       I can't recall that.

Q       Okay.

MR. HILFIGER:  I have no further questions.

THE COURT:  Any further direct?

MR. LITTLEFIELD:  Yes, sir.

REDIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q    Do you recall if there was emergency lights on the vehicle, the Bronco that Rocky's body was carried to -- Rocky's person was carried to and you got in to drive?

A    Yes, sir, there was.

Q    What was on?

A    The visor light.  There was a visor light in it.

Q    And how does that emergency light reflect?

A    Red and blue.

MR. LITTLEFIELD:  Pass the witness.

MR. HILFIGER:  I have nothing further.

(PAUSE)

MR. HILFIGER:  Just one more on that particular question.

RECROSS-EXAMINATION,

BY MR. HILFIGER:

Q    Did you ever give an interview to Vicki Jones?

A    Yes, sir, I did.

Q    And in the Vicki Jones interview, did you ever tell her that you saw red and blue lights from the Bronco?

A    I don't recall if I did or not.

Q    If you would have told her that, would it have shown in the interview?

A    If I told her, yes, probably.

Q    And you did talk to -- when did you talk to Vicki Jones?

A    The morning of the shooting.

Q    And was everything fresh in your mind at that time?

A    No, sir.

Q    Fresher than it is now?

A    I was under a lot of stress at that time, and I don't -- there were some points of it that I didn't remember at that time.

Q    Okay.  So, you're saying you may not have told her about this?

A    I may not have told her about the red and blue lights.  I don't know if I talked to her about that or not.

MR. HILFIGER:  I have no further questions.

THE COURT:  Any further questions?

MR. LITTLEFIELD:  No further questions.  I would ask that he be excused.  I understand that he's received a defense subpoena.  We'd certainly make sure he's available, if he needs to come back.

MR. HILFIGER:  We don't have any -- you know, we're not asking that he be excused from the trial,

altogether.  I mean, he can just be contacted.  I think he made arrangements to contact him.

THE COURT:  What's the name of the person -- the interview person you just mentioned?

MR. HILFIGER:  It's Vicki Jones.  She's also known as Vicki Lyons, L-Y-O-N-S.

THE COURT:  Thank you.  You may step down, with the understanding you'll be subject to recall.

THE WITNESS:  Thank you.

THE COURT:  You may call your next witness.

MR. LITTLEFIELD:  Randy Turman.

RANDY TURMAN, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q     State your name for the record, please, sir.

A     Randy Turman.

Q     Mr. Turman, do you see that model in front of you that's Government's Exhibit Number 1?

A     Yes, sir.

Q     Are you familiar with that place?

A     Yes, sir.

Q     How are you familiar with it?

A     I was there.

Q     Okay.  Do you know Kenny Barrett?

A     Yes, sir.

Q     And do you see Kenny Barrett in the courtroom today?

A     Yes, sir.

Q     Can you advise -- point to him and tell the Court and the jury what he's wearing today?

A     He's right there.  He's wearing a -- I guess it's kind of a light blue shirt.

Q     Has he got a -- in relation to the tables, which table is he by, if either one of them?

A     That table there.

Q     Okay.  And sports coat or not?

A     No.

        MR. LITTLEFIELD:  Ask the record reflect that the witness has identified the defendant, Kenneth Eugene Barrett.

        THE COURT:  Record will so reflect.

BY MR. LITTLEFIELD:

Q     How'd you know Mr. Barrett?

A     I met him through my sister.

Q     Okay.  And do you recall where you met Mr. Barrett?

A     At his home.

Q     This place here?

A     Yes, sir.

Q     And did you have occasion to learn about an incident that occurred at Mr. Barrett's house in which

there was a shooting incident involving law enforcement?

A      Yes, sir.

Q      When was it in relation to the shooting, that you met Mr. Barrett?

A      I guess it was, like, three or four months prior to that, maybe longer.

Q      Okay.  Where are you from, sir?

A      Vian, Oklahoma.

Q      You lived there all of your life?

A      Since about '78.

Q      And have you ever used drugs?

A      Yes, sir.

Q      What kind?

A      Methamphetamines.

Q      And when was it that you became involved in the use of methamphetamines?

A      Probably in -- I'd say '86 or '87.

Q      '86?

A      Or '87.

Q      Okay.  Some 13 years, 14 years before this incident?

A      No, it was -- I only did it for five years, so, it was in '96 or '97, I believe.

Q      Okay.  What would you do -- why were you going to Mr. Barrett's place?  After your sister introduced you

to him out there, why did you go there?

A     Oh, just go visit, friend, work.  I painted a Mustang for him and just kind of hung out there.

Q     Okay.  And I'm going to display Government's Exhibit Number 69.  You'll see it on the screen there.  It's also displayed up here, so the jury can see it.  Do you see this screen over here, sir?

A     Yes, sir.

Q     Okay.  Where was it that you worked painting the Mustang?

A     It would be in the shop.  When you pull directly through the gate, you pull straight into the shop, where those pickups are parked up there, the shop's right in front of them.

Q     Okay.  Take your finger and touch the screen at the shop -- the screen you've got right there.

A     It's right here.

Q     Tap it on the screen.  Try it again, see if we can do it again.  Just tap it.  Okay.  Is that the shop building?

A     Yes, sir.

Q     All right.  And was working on a Mustang the only thing you did there, or what else was done at Barrett's residence when you went there?

A     Mostly just hung out and did dope, you know.

Q      When you say "did dope," what kind of dope?

A      Methamphetamines.

MR. SMITH:  Your Honor, I'm going to object to this continued line of questioning based on what we talked about earlier.

THE COURT:  Counsel approach.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY:)

MR. SMITH:  He's fixing to get into that 404(b) information that we talked about earlier, Judge, and I thought he was going to approach and make a record on that before he did.  But that's where he is, I believe.

MR. LITTLEFIELD:  It is, it is.  Judge, this individual will say he obtained methamphetamine there, he used methamphetamine there, he'll describe Barrett cooking methamphetamine, providing and selling methamphetamine to others, that he had syringes available for use, and made those available.

THE COURT:  Do you think it's 404(b)?

MR. LITTLEFIELD:  No.  Actually, as I said in the motion, I think it just intertwines inextricably with the charges.  One of the charges is maintaining a place for the use, distribution, and manufacture, for the purpose of use, distribution and manufacture.

THE COURT:  We're going to be talking about a

period of time close to this event?

MR. LITTLEFIELD:  He said it was in the summer of 1999, three to four months, and it continued up through that summer.

MR. SMITH:  It's inflammatory, Judge, it's overly prejudicial.  He's not out there when the warrant is obtained -- well, let me say this:  We asked to visit with Turman, and he wouldn't talk to us.  So, I'm just gathering on what Mr. Littlefield has said by way of a offer, about a paragraph, in which he told us what this gentleman is going to say.  It's my understanding based on that, he's not going to be able to testify that he was there shortly before this warrant was issued, which took place on the 26th of September.  That's why we think it's overly prejudicial and it's not probative.

THE COURT:  Of course, I don't know what he's going to testify to, for it to be intrinsic.  I mean, the three months before --

MR. LITTLEFIELD:  It would be in the summertime before -- continuing up until about the month before when -- and I mentioned the incident in the opening statement, where the individual came into the yard, said, "The cops are right behind me," he grabbed a gun.  It's all through the period of late spring into summer.  Does he know about the gun?  He's the one

that drove up.  He was there when the individual drove up and observed Barrett --

MR. SMITH:  Was that a month before this?

MR. LITTLEFIELD:  It was approximately a month before.  He can't put his finger on it.  He says it's late summer, about a month before.  He also will identify the guns, he's familiar with them.  He saw Barrett with the shotgun.

MR. SMITH:  But that doesn't make the incident that may have happened with somebody pulling up in a driveway, any more probative, Judge.  He did show him the shotgun back in -- earlier, ten months before. There wasn't anything about that transaction that was the problem, but not being able to recall a date and time...it says there he was at the house and somebody comes pulling up.  This is overly prejudicial.  We expect him to know what guns there were out there, if he was at Barrett's house.  That's no surprise.

THE COURT:  This incident about -- the incident about somebody pulling up and saying, "The police are after me," how long before this incident --

MR. LITTLEIFELD:  It was approximately a month, Judge.

THE COURT:  This witness is going to testify to that?

MR. LITTLEFIELD:  Yes, sir.  He says he was out there from the late spring through the summer, that he saw him cook dope, saw the drug usage, et cetera, heard Barrett talking about the warrant, knew it was outstanding, said Barrett wouldn't leave, said he excepted the cops to come out there.

THE COURT:  When was the warrant issued?

MR. LITTLEFIELD:  January of '99.  He was out there in the spring -- late spring and summer of '99.  Judge, he also -- he also will say that -- you know, he said, "I was out there for a period of three to four months."  He just said that.

THE COURT:  Did he live out there?

MR. LITTLEFIELD:  No, he went out there and spent time out there.  He lived in Vian.  He went back and forth.

THE COURT:  Daily?

MR. LITTLEFIELD:  Not daily, but several times a week, on multiple -- numerous occasions.

THE COURT:  Was he involved in cooking dope, too?

MR. LITTLEFIELD:  He was out there when Barrett cooked it.  I don't think he cooked it himself, but he observed Barrett cook it.  He will tell what kind of equipment he used, where Barrett cooked it -- observed

him cooking it.

THE COURT:  Was there evidence following, the search, that there was meth out there, following the -- I'm jumping ahead, but is there going to be evidence that ties it --

MR. LITTLEFIELD:  There was residue of meth in some syringes, there was meth found in a straw in the trailer back behind, there was --

THE COURT:  The night of the --

MR. LITTLEFIELD:  The next day.  This was found by the D.E.A.

THE COURT:  Following the death --

MR. LITTLEFIELD:  Yes, sir.  There was the laboratory out there.  There was red phosphorus in Barrett's pocket that was laced with meth.  There was pseudoephedrine hidden in the ceiling.  There was iodine crystals.  There was an empty iodine crystal bottle in his trash.  There were towels with residue on them.  There were used syringes.  There was glassware, tubing, a tube with tape on it, that Turman will say that's what he used to gas his dope.  There was toluene, mineral spirits, Coleman fuel, all of those items he says that's his chemicals.

MR. SMITH:  Judge, this stuff was spread out all over.  The meth that he talks about in a straw, the

evidence is going to say was in a trailer that Toby Barrett was staying in.  There's no quantity of meth in this case, at all.  There are trace amounts of meth.  That's it.  And it comes out of a syringe or it comes out of a straw that was in Toby's trailer.  That's the problem.  They're trying to do two things.  They want to throw this in front of this jury and rev them up and get them inflammed about this cooking dope.  There wasn't an active laboratory out there.  This stuff is spread out everywhere.

THE COURT:  What was the warrant for, failure to appear?

MR. LITTLEFIELD:  The arrest warrant was failure to appear for a C.D.C., delivery of controlled dangerous substance.

MR. SMITH:  A '97 charge.

THE COURT:  And was the controlled dangerous substance meth?

MR. LITTLEFIELD:  Yes, sir.  It was a sale that was made to an undercover agent, Kevin Atwell, Oklahoma Bureau of Narcotics.

MR. SMITH:  That is two years old.  That charge was two years old, two years previous.

MR. LITTLEFIELD:  So, that really -- that charge really doesn't have anything to do with the intrinsic of

this thing.  It has to do with -- except it does, because it -- and it does because they were out there on a dual function.  They were serving a search warrant and also attempting to serve an arrest warrant, if he was there.  The -- our count talks about killing a law enforcement officer --

THE COURT:  What now are you --

MR. LITTLEFIELD:  The third count talks about killing a law enforcement officer engaged in his official duties while either committing drug crimes or attempting to avoid apprehension and prosecution for drug crimes.  So, to the extent that they were serving an arrest warrant for a drug charge, that was an attempt to avoid apprehension and prosecution for that outstanding arrest warrant.

THE COURT:  I'll -- I'm going to let him testify.  It sounds like it's intrinsic.  However, until I hear it, I won't know.  If it's 404(b), and if the defense wants a 404(b) instruction, bring me an instruction in the morning and we'll talk it before we begin.

MR. LITTLEFIELD:  Judge, the additional deal is that to prove maintaining a place and we cited some law.  You can't show a one shot incident.  You have to show continuing use.  We have to show that it was for a period.  We're not going way back with the exception of

the one --

THE COURT:  I don't have any reason to say -- on cross-examination -- he's going to get crossed pretty heavy.

MR. LITTLEFIELD:  I can't tell you that, either, because I don't know.  I can only tell you what he has been advised.

MR. SMITH:  How do you want to handle our objection to it?  I can object every time he asks him a question, but can we just show a continuing objection to it?

THE COURT:  No, I just want you to object when you think it's --

MR. SMITH:  Okay.

(END OF BENCH CONFERENCE)

MR. LITTLEFIELD:

Q     How much prior to -- I don't know know the exact date, but how much prior to the shooting incident was it that you went out to Barrett's and were hanging out there?

A     Three or four months.

Q     Okay.  And when you did methamphetamine there, who supplied the meth?

MR. SMITH:  Your Honor, I'm going to object to that question.

THE COURT:  Overruled.  You may answer.

BY MR. LITTLEFIELD:

Q      Who supplied the meth?

A      Kenny.

Q      How did you obtain it from Kenny?

A      Well, sometimes I would buy it, sometimes I would trade stuff for it, or sometimes I would work it out, like on the Mustang.

Q      Okay.  At this time, back in the three or four months leading up to September 24 of '99, how were you using methamphetamine?

A      How was I using it?

Q      Yes.

A      Just snorting it.

Q      Do you know if other people used methamphetamine at Kenny Barrett's during the time that you were there?

MR. SMITH:  Objection, Your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A      Yeah.

BY MR. LITTLEFIELD:

Q      And how are you aware that other people used methamphetamine at Kenny Barrett's during the time that you were there?

A      Because we did it together.

Q      Who else did it when you were there?

A      I can't remember their names.

Q      Okay.  Do you know where these other people, who you don't remember their names, where they got methamphetamine?

MR. SMITH:  Your Honor, I'm going to object. This is really stretching it.  He doesn't know the names of these people, now he's going to talk about where they would get their dope?

MR. LITTLEFIELD:  Let me reask it.

THE COURT:  The question's withdrawn.  The objection's sustained.

BY MR. LITTLEFIELD:

Q      Did you see where these other people obtained the drugs that they used at Kenny Barrett's?

A      No.

Q      Okay.  Mr. Turman, did you ever manufacture methamphetamine?

A      Yes, sir.

Q      Have you ever heard it called cook meth?

A      Yes, sir.

Q      How did you learn how to cook meth?

A      I -- basically just hanging around Kenny's, learning the basics, you know, and then -- I mean, he didn't just sit down and teach me how to cook it, I mean,

you know, it didn't take -- it wasn't really hard to figure out.  There was three ingredients, and then I just kind of went off on my own, cooking.

Q      Okay.  Did you ever see meth cooked or manufactured at Kenny Barrett's?

            MR. SMITH:  Your Honor, I'm going to object, time frame.

            THE COURT:  Sustained.

BY MR. LITTLEFIELD:

Q      During the three or four months leading up to September the 24th, 1999, did you ever see Kenny Barrett cook or manufacture methamphetamine at his residence?

A      Yes, sir.

Q      Okay.  Where was it that Kenny Barrett would cook or manufacture his meth?

A      The only time I ever seen him do it was in the cabin.

Q      Okay.

            MR. LITTLEFIELD:  And I'm going to ask that Government's Exhibit Number 175 be displayed to this witness.

BY MR. LITTLEFIELD:

Q      Have you seen this photograph previously, sir?

A      Yes, sir.

Q      Okay.  And what does that depict?  What does it

show?

A       It just shows the inside of the cabin.

Q       And are you familiar with it?

A       Yes, sir.

Q       Okay.  Where was it that Mr. Barrett would cook inside the cabin, sir?  Where did you see him manufacture meth?

A       Right there.

Q       Okay.  And how would he go about cooking back there?  Did he have anything he'd use to assist in his cooking back in that room?

A       Just a hot plate and a hose and a gallon jug.

Q       Okay.  Do you know how Kenny Barrett -- when he used it, how he used it?

A       Yes, sir.

Q       How did he use it?

A       Needle.

Q       And where would he get the needles?  I mean in the residence.  I'm not asking at Walgreens or Wal-Mart, but where, in the residence, were the needles kept?

A       In the -- in his desk, I believe.  In his desk.

Q       Okay.  Can you --

            MR. LITTLEFIELD:  Judge, I'd ask that -- the witness to walk around and look at the model itself and see if he can see the location of the desk in that

model?

THE COURT:  You may.

BY THE WITNESS:

A     Yes, sir.

BY MR. LITTLEFIELD:

Q     And go ahead and go back.

Where, in the photograph, is that desk located, where he kept his needless?

A     Right here.

Q     Okay.

MR. LITTLEFIELD:  I'd ask that Government's Exhibit Number 57 be displayed.  And it's not in evidence yet.

BY MR. LITTLEFIELD:

Q     Do you recognize that photograph, sir?

A     Yeah, I've seen it.

Q     Are you familiar with where that is in Mr. Barrett's residence, and have you seen those items there previously?

A     Not in that exact spot.

Q     Okay.  Then let's move on.

MR. LITTLEFIELD:  I'd ask that Government's Exhibit Number 63 be shown to the witness.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q      Do you recognize that, sir?

A      Yes, sir.

Q      And do you know where that photograph was taken and if it accurately depicts the circumstances and conditions?

A      No, sir.

Q      Are you familiar with what is shown in that photograph?

A      Yes, sir.

Q      Have you seen those items in that location before?

A      I really don't know what location that is, but I've seen those items there.

Q      Okay.

        MR. LITTLEFIELD:   Move admission of what's been marked Government's Exhibit 63.

        MR. SMITH:   Your Honor, he's not competent to sponsor that exhibit.

        THE COURT:   Sustained.

        MR. LITTLEFIELD:   Okay.

BY MR. LITTLEFIELD:

Q      Would you look at Government's Exhibit 64?   Do you recognize the items displayed in Government's Exhibit 64?

A      Yes, sir.

Q      And have you seen those items before at Kenny Barrett's residence?

A       Yes, sir.

Q       Okay.  What is --

        MR. LITTLEFIELD:  Or move admission of Government's Exhibit Number 64.

        MR. SMITH:  Brief voir dire, Your Honor?

        THE COURT:  You may.

                        VOIR DIRE EXAMINATION,

BY MR. SMITH.

Q       Sir, the photo that's depicted in Exhibit 64, when was that taken?

A       I have no idea.

Q       Where was it taken?

A       I can't say for sure.  I don't know.  I mean --

        MR. SMITH:  That's fine, sir.

Your Honor, we'd object to that admission.

        THE COURT:  Any further questions?

        MR. LITTLEFIELD:  Yes.

                        DIRECT EXAMINATION, CONT'D,

BY MR. LITTLEFIELD:

Q       Do you recognize where these items -- have you seen these items before at Barrett's residence?

A       Yes, sir.

Q       And did you know where they were when you saw them?  When you saw them, did you know where they were?

A       They was in a tool box --

Q      Don't answer where they were.  Did you know where they were?

A      No.

Q      Let me rephrase it.  Follow my question.  When you saw them and looked at them, did you know where they were located, as you looked at them?

        MR. SMITH:  Objection, asked and answered.

BY THE WITNESS:

A      Yes, at the time that I saw them, I did.

BY MR. LITTLEFIELD:

Q      How does this photograph compare to their location -- what you see in this photograph, how does it compare to the location in which you saw them, when you saw them?

A      I don't understand the question.

Q      Okay.  Does this look like the condition they were in, in the place they were in, when you'd see them, or does it look different?

A      It looks like, yeah, the same.

        MR. LITTLEFIELD:  I'd move admission.

        MR. SMITH:  Your Honor, we would object.  We don't have any time frame.  We don't know where this particular item was located.

        THE COURT:  Sustained.

BY MR. LITTLEFIELD:

Q      Look at Government's Exhibit Number 65.  Do you

recognize that photograph?

A      Yes, sir.

Q      Do you recognize the items in that photograph?

A      Yes, sir.

Q      Do you recognize where those items are located in that photograph?

A      Yes.

Q      Have you seen them before?

A      Yes, sir.

Q      Are they located where you'd seen them?

A      Yes, sir.

Q      When did you see them?

A      When I was in his shop.

MR. LITTLEFIELD:  Move admission of Government's Exhibit 65.

MR. SMITH:  Your Honor, I'm going to object on the same grounds.  He didn't take this photo.  I don't think he knows when the photo was taken.  I don't think he's competent to sponsor this exhibit.

THE COURT:  Objection overruled.

MR. LITTLEFIELD:  I'd ask that it be displayed.

BY MR. LITTLEFIELD:

Q      What does this photo show?

A      It shows mineral spirits, toluene, paint thinner.

Q      Where were these items -- where did you see these

items at Barrett's residence?

A       In his shop, in the cabinet.

Q       What did he use these items for?

A       To pull dope with, to make methamphetamines.

Q       Now, did -- did you ever see tubing at his residence?  Did you ever see tubes, tubing?

A       What kind of tubing?

Q       Tubing used to manufacture -- in the manufacture of meth.

A       Yes, sir.

Q       And describe the tubing that you saw, the tubes, the tubing that you saw at Kenny Barrett's residence, that he'd use when he manufactured meth.

A       The only tubing that I seen was the only time that I ever seen him cooking, was in that little room, and he had a big hose, webbed hose, and we run it across the wall, and I helped him tie it up, and then that's the only time that I ever seen that or was with him when he did that.

Q       And when you manufactured methamphetamine -- when you talk about pulling dope, what are you talking about, when you say pulling dope?

A       That's the final -- that's what they say -- when you get it cooked, then you powder it off.

Q       Okay.

A     You use toluene or gun scrubber or something like that, to pull -- which is -- toluene's a top puller, and then you've got gun scrubber's a bottom puller, and it pulls your dope out, and then you gas it.

Q     Okay.  You say that if you use toluene, it's a top puller?

A     Yes, sir.

Q     Okay.  And what's that mean?

A     That means that it pulls the dope to the top of the cook.

Q     Okay.

A     Once you pH it and you put your puller in there, the toluene is the top puller and it pulls it to the top of your dope, then you strain it off and powder it off.

Q     When you cooked, were you a top puller or a bottom puller?

A     Bottom puller.

Q     Okay.  And you mentioned you used gun scrubber?

A     Yes, sir.

Q     Where'd you learn to use gun scrubber?

A     From a girl by the name of Donna.

Q     Okay.  And you mentioned that Mr. Barrett, when he cooked in that back room, you had a hose.  And where did the hose go, from what to what?

A    It run from his cook to a gallon jug of water.

Q    And do you know if Mr. Barrett had glassware available, jugs and stuff, in which to utilize for his cooking of methamphetamine?

A    He didn't have them in the room.  He just had the cook.

Q    Okay.  Did he have them at the residence at anyplace?

A    Yes.

Q    Where did he keep it?

A    He kept it out by the fence, in between him and his mother's place.

Q    And was it just sitting out in the open, or contained in anything, or what?

A    It was in a big water trough.

MR. LITTLEFIELD:  Ask that the witness be shown Government's Exhibit Number 66.

BY MR. LITTLEFIELD:

Q    And do you recognize what is displayed in Government's Exhibit Number 66?  Do you recognize that item?

A    Yes, sir.

Q    What is that?

A    That's glassware.

Q    Is that the glassware in the trough about which

you just previously spoke?

A      Yes, sir.

Q      Okay.

MR. LITTLEFIELD:   Move admission of Government's Exhibit Number 66.

MR. SMITH:   Brief voir dire, Judge?

THE COURT:   You may.

VOIR DIRE EXAMINATION,

BY MR. SMITH:

Q      When was the last time you saw that particular wash tub, sir?

A      Probably -- I don't know the exact date.   Probably a couple of months before the shooting took place.

Q      And you don't know when that picture was taken?

A      No, sir.

Q      You don't know who took that picture?

A      No.

Q      And you can't tell us whether or not some of the items in that have changed since you saw it, between then and looking at that picture; can you?

A      No, sir.

MR. SMITH:   We would object, Your Honor.

THE COURT:   Any further questions?

DIRECT EXAMINATION, CONT'D,

BY MR. LITTLEFIELD:

Q     Does that picture look like what you saw at Kenny Barrett's house, where he kept his glassware?

A     Yes, sir, but it was -- it had -- it was all jars, all glass, when I seen it, and the water in it was white.

Q     Okay.

        MR. LITTLEFIELD:  I'll withdraw the offer.

        THE COURT:  Offer withdrawn.

BY MR. LITTLEFIELD:

Q     You ever out there when Mr. Barrett gassed methamphetamine during a cook?

A     Yes, sir.

Q     And what kind of equipment did Mr. Barrett use to gas the methamphetamine?

A     Just use -- sometimes he'd use a gas container, which has got a hose running off of it, you'd pour muriatic acid in there and drop aluminum foil in there and it'd create a gas, and that's how you powdered the dope.

Q     Okay.  Is that how he did it?

A     Yes, sir.

Q     How did he attach the gas -- or the hose to the gas tank, that he put the muriatic acid in?

A     With black tape.

Q      Okay.  Look back at 63.  Do you see an item -- do you see an item in there with which you are familiar, that you know what it is?

A      Yes, sir.

Q      And when did you see that item?

A      When he was gassing the meth, when he was turning it into powder.

Q      Where did he powder it?

A      In the shop.

Q      Do you know -- can you recognize, by looking at what's around that photograph, where this photo was taken?

A      No, sir.

Q      Okay.  When Kenny Barrett cooked methamphetamine, what ingredients did he use to cook meth?  What were the primary ingredients that went into the cook?

A      I never seen him mix the cook.

Q      Okay.  Did you ever obtain any chemicals for him?

A      No, sir, just ephedrine pills.

Q      Well, you -- okay.  How did you come about obtaining ephedrine pills for Mr. Barrett?

A      I would go get them for him at the store.

Q      And how did you know -- what would happen, that would cause you to go obtain ephedrine pills for Mr. Barrett?

A       He would give me money, and I'd go get them for him.

Q       What conversation was there?  Did he just give you money and all of a sudden you'd go, or was there a discussion?

A       He didn't ever want to leave, and he'd just ask me if I'd go get them for him, and I'd say yes, I'd go get them for him.

Q       What kind of quantities of ephedrine pills would you get for him?

A       Buy flats, sometimes two, mostly one.

Q       Where would you go to get the flats?

A       On 59 Highway, some little store up there.  I don't remember the name.

Q       I'm sorry, I can't hear you.

A       On 59 Highway, going towards Stilwell, at some concrete block store up there.  I don't remember the name of it.

Q       Okay.  And when you say a flat, what do you mean? What are you talking about?

A       Twelve bottles.

Q       How much did -- do you have to pay for the 12 bottles of ephedrine tablets that you'd get at that store?

A       Ninety-eight dollars a flat.

Q    And from -- and did you make any profit or what, when Barrett -- when Mr. Barrett would give you the money to go obtain the flats, what happened?

A    I'd just go get them and bring them back to him.

Q    Any change?

A    Do what?

Q    Did he give you 98 bucks exactly, more, or --

A    Yes, sir.  Yes, sir.

Q    And do you know what he did with those ephedrine tablets?

A    I -- he cooked meth.

Q    Okay.  Did you ever discuss cooking meth with him? Ever have any conversations about it?

A    Not really.

Q    Okay.  Do you know what ingredients he -- did he ever tell you what ingredients were necessary, besides the ephedrine tablets that you got?

A    No, he never just out and out told me, I just kind of figured it out on my own from listening --

Q    Listening to who?

A    Just listening to people talk that come around.

Q    What people?

A    Just people that come around there.

Q    Come around where?

A    At Kenny's.

Q     What was the conversation that you listened to?

MR. SMITH:   Your Honor, that's calling for hearsay.   He's talking about other people.

MR. LITTLEFIELD:   Let me rephrase it.

THE COURT:   Question withdrawn.

MR. LITTLEFIELD:   I'll withdraw it.

BY MR. LITTLEFIELD:

Q     During the conversations, did Mr. Barrett ever say anything about what he was using to cook his methamphetamine?

A     Mostly the only thing I ever knew about was the ephedrine and all.   That's mostly what I knew.

Q     Okay.

THE COURT:   Mr. Littlefield, it's 5:30.   We'll stop now for the day.

Members of the jury, if you'd remember my previous admonition not to discuss this among yourselves or allow anyone else to discuss it with you.   That includes any family members you may have contact with over the evening.   Remember, also, I do not have any way of knowing whether there's news coverage, but if there is, do not read, watch, or listen to anything dealing with this case.   I'd ask you to be back just shortly before 9:00.   Check in, in the clerk's office, and then go to your jury room.   We'll try to start right at 9:00 in

the morning.

If you'll remember, too -- my clerk is right here. If you'd give your notebooks to the clerk, as you walk out, we'll have them ready for you in the morning.

I'd ask everyone to please remain seated as the jury leaves the courtroom.

(JURY OUT)

THE COURT:  Let the record reflect that the jury has exited the courtroom.

Anything on behalf of the Government to take up outside the hearing of the jury at this time?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defense?

MR. SMITH:  No, Your Honor.

(PROCEEDINGS RECESSED UNTIL SEPTEMBER 28, 2006)

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 0 1 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By:_____

Deputy Clerk

UNITED STATES OF AMERICA,           )
              Plaintiff,            )
                                    )
VS.                                 )           NO. CR-04-115-P
                                    )
KENNETH EUGENE BARRETT,             )
        Defendant.                  )

\*       \*       \*

JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE, and a jury

SEPTEMBER 28, 2005

VOLUME III of XXVII   K.M.

\*       \*       \*

A P P E A R A N C E S:

FOR THE PLAINTIFF:        MR. SHELDON J. SPERLING
                          United States Attorney
                          MR. D. MICHAEL LITTLEFIELD
                          Assistant United States Attorney
                          1200 West Okmulgee Street
                          Muskogee, Oklahoma 74401

FOR THE DEFENDANT:        MR. ROGER HILFIGER
                          620 West Broadway
                          Muskogee, Oklahoma 74401

                          MR. BRET A. SMITH
                          Attorney at Law
                          315 North 5th Street
                          Muskogee, Oklahoma 74401

COURT REPORTER:           KARLA S. McWHORTER
                          UNITED STATES COURT REPORTER
                          P. O. Box 2251
                          Muskogee, Oklahoma 74402

I N D E X

                                                                    PAGE

PROCEEDINGS COMMENCING 9/28/05......................... 394

WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:

    RANDY TURMAN

        Direct continued by Mr. Littlefield.......... 396
        Cross-examination by Mr. Smith............... 417
        Redirect examination by Mr. Littlefield...... 445
        Recross-examination by Mr. Smith............. 448

    TRAVIS DON CRAWFORD

        Direct examination by Mr. Littlefield........ 450
        Cross-examination by Mr. Smith............... 467
        Redirect examination by Mr. Littlefield...... 487

    JOHN HAMILTON

        Direct examination by Mr. Littlefield........ 489
        Voir dire examination by Mr. Hilfiger........ 559
        Direct continued by Mr. Littlefield.......... 559
        Cross-examination by Mr. Hilfiger............ 565

PROCEEDINGS CONCLUDING 9/28/05......................... 665

COURT IN SESSION

(JURY IN)

THE COURT: Let the record reflect the jury's in the box, counsel for the Government's present, defendant and counsel are present.

The witness may take the stand.

RANDY TURMAN, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION, CONT'D,

BY MR. LITTLEFIELD:

Q Mr. Turman, you realize you're still under oath from the proceeding yesterday and this proceeding today?

A Yes, sir.

MR. LITTLEFIELD: I'd ask that Government's Exhibit Number 69 be displayed -- pardon me, 63 be displayed for the witness. It's not in evidence.

BY MR. LITTLEFIELD:

Q Do you see it?

A Yes.

Q Do you recognize any objects in Government's Exhibit Number 63, that you saw at Kenny Barrett's, when you were at his residence in the summer of '99?

A Yes, sir.

Q And what do you recognize?

A The tool box and the hose.

Q What was the hose used for?

A       For gassing.

Q       Okay.

THE COURT:   Counsel, is that Exhibit 63?

MR. LITTLEFIELD:   That was 63, yes.

I'd ask that Government's Exhibit Number 69 be displayed to the witness.

BY MR. LITTLEFIELD:

Q       Sir, do you recognize what that is an aerial photograph of?

A       Yes, sir.

Q       And I think you even talked about that yesterday?

A       Yes, sir.

Q       Okay.  I'd ask you to look up in the -- where was the main entry to Barrett's place?

A       Right here.

Q       Okay.  And what was there, if anything, that would have restricted access at that location?

A       Just a metal gate.

Q       Okay.  And do you see the metal gate in the photograph anyplace?

A       Yes, sir, it's laying on the ground right there.

Q       Okay.  What would Barrett do with that gate to restrict access?

A       He would shut it.

Q       Okay.  And how -- when he would shut it, how would

he secure it?

A      He would just chain it.

Q      Okay.  Was there any kind of warning located on that gate, about individuals that might come onto his property?

A      Yes, sir.

Q      And what was that?

A      There was a sign, but I don't recall what it said.

Q      Were you familiar with the sign?

A      Yes, sir, it was on the gate all the time.

          MR. LITTLEFIELD:  I would ask that Government's Exhibit 104 -- and it's back behind, I believe -- be displayed to the witness.  It's not in evidence yet, so don't expose it to the jury, but look at it, please.

BY MR. LITTLEFIELD:

Q      Do you recognize what that is, sir?

A      Yes, sir.

Q      What is that?

A      That's the sign on the gate.

          MR. LITTLEFIELD:  Move admission of Government's Exhibit Number 104.

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  It will be admitted without objection.  That's Exhibit 104?

          MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Exhibit 104 admitted without objection.

MR. LITTLEFIELD:  And I would ask that it be provided to the witness.

BY MR. LITTLEFIELD:

Q     You can take it, Mr. Turman.  And hold it up so the jury can see it.  Okay.  The writing is in what color, sir?

A     Yellow.

Q     Is it the same intensity, or has it faded over time?

A     It looks the same to me.

Q     Okay.  What does it say?

A     It says "Keep Out.  I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot."

MR. LITTLEFIELD:  Pass that back to the clerk, if you would, sir.

BY MR. LITTLEFIELD:

Q     By the way, are you familiar with the price of drugs in Sequoyah County?

A     Yes, sir.

Q     What's an ounce of methamphetamine go far?

A     About 1800 dollars.

Q     An ounce?

A        An ounce, yeah.

Q        And how much does an eight ball?

A        Two fifty.

Q        Two dollars and 50 cents?

A        Two hundred 50 dollars.

Q        I think you indicated yesterday you would get pills?

A        Yes, sir.

Q        You called them flats?

A        Yes, sir.

Q        Did Mr. Barrett go out and get pills?

A        No, sir.

Q        Why not?

        MR. SMITH:  Your Honor, objection.  That calls for speculation on his part, as to what Mr. Barrett would do.

        THE COURT:  Sustained.

BY MR. LITTLEFIELD:

Q        Did Mr. Barrett ever comment -- how often did Mr. Barrett leave his property during the summer of '99, when you were out there?

A        I never seen him leave his property.

Q        Did he ever comment about leaving his property or why he wouldn't?

A        Yes, sir.  He said he had a warrant for his arrest,

and that he just didn't want to have no conflicts with the law.  He was afraid that if he got out there, that he would --

MR. SMITH:  Objection, Your Honor, that's not responsive.

THE COURT:  Sustained.

BY MR. LITTLEFIELD:

Q     What did he say in regards to any concerns he might have had as to what would happen if he left?

A     That he would probably have conflict with the law.

Q     In that regard, did Mr. Barrett ever make any statement as to any anticipation of whether the law was going to come to his place or not?  Did he ever say anything about whether he expected the law to come out here?

A     Well, he expected them every day.

Q     How do you know that?

A     Because he was -- he would always say, you know -- he was just always afraid.

Q     Okay.  Did he have any firearms?

A     Yes, sir.

Q     What kinds of firearms did he have?

A     He had a AR-15, a 9mm, a .22 pistol, and a double-barrel 12-gauge shotgun, that I know of.

Q     Okay.  I'm sorry?

A    That I knew of.

Q    Okay.  Do you know anything about the shotgun?

A    Yes, sir.

Q    How do you know about the shotgun?

A    It used to belong to me.

Q    Okay.

          MR. LITTLEFIELD:  I'd ask that Government's Exhibit Number 47 be displayed to the witness.

BY MR. LITTLEFIELD:

Q    Do you recognize what's shown in that photograph, sir?

A    Yes, sir.

Q    What is that?

A    It's a double-barrel Coach shotgun, 12-gauge.

Q    And are you familiar with that shotgun?

A    Yes, sir.

Q    And how are you familiar with that?

A    I bought it brand new at Draco's in Webbers Falls.

Q    And what did you do with it?

A    I sold it to Kenny.

Q    Is that the shotgun that you sold to Mr. Barrett?

A    Yes, sir.

          MR. LITTLEFIELD:  Move admission of Government's Exhibit Number 47.

MR. SMITH:  Your Honor, I've got to handle the cross.  To me, it's pretty hard to determine whether that's a particular shotgun, without seeing any serial numbers or seeing it up close.  But I don't mind addressing that in cross, if you want to reserve my objection to it.

THE COURT:  I don't know how much further counsel plans to go with this --

MR. LITTLEFIELD:  With this photograph, not any further.

THE COURT:  Okay.  Well, we'll reserve your objection until cross-examination.

MR. LITTLEFIELD:  Okay.

THE COURT:  Exhibit 47 is not admitted at this time.

MR. LITTLEFIELD:  I understand that.

I'd ask that the witness be provided Government's Exhibit Number 127.  It's behind the -- it's in one of the boxes.  It's in the longer box.

THE COURT:  Did you say 127?

MR. LITTLEFIELD:  127.

BY MR. LITTLEFIELD:

Q    Mr. Turman, will you examine the contents of that box, the item that's marked Government's Exhibit 127?

A    Yes, sir.

Q      Do you recognize that?

A      Yes, sir.

Q      And what is that, sir?

A      It's a Stagecoach 12 barrel (sic), double-barrel shotgun.

Q      Do you recognize that shotgun?

A      Yes, sir.

Q      And how do you recognize it?

A      Because it used to belong to me.

MR. LITTLEFIELD:  Move admission of Government's Exhibit Number 127.

MR. SMITH:  Mo objection, Your Honor.

MR. LITTLEFIELD:  You can remove it from the box.

THE COURT:  It will be admitted without objection.

MR. LITTLEFIELD:  I'm sorry.  My apologies, Your Honor.

BY MR. LITTLEFIELD:

Q      And have you seen today, a photograph of that shotgun?

A      Yes, sir.

Q      And which photograph?  Do you remember what exhibit number it was?

A      No, sir, but it's right here in front of me.

Q      There now?

A      Yes, sir.

Q      Is that photograph shown in -- is that the shotgun in 47, that you're holding there, Government's Exhibit 127?

A      Yes, sir.

MR. LITTLEFIELD:  Move admission again of Government's Exhibit 47.

MR. SMITH:  No objection, Your Honor.

THE COURT:  It will be admitted without objection.

MR. LITTLEFIELD:  Okay.  You can set that back in the box, and I'm finished with it.

BY MR. LITTLEFIELD:

Q      You mentioned, I believe, an AR-15?

A      Yes, sir.

MR. LITTLEFIELD:  I'd ask that what's been marked as Government's Exhibit Number 17, it's a photograph, be displayed to the witness.

BY MR. LITTLEFIELD:

Q      And do you recognize that item, sir?

A      Yes, sir.

Q      And what is that?

A      It's a Colt Sporter AR-15.

Q      Do you recognize it?

A     Yes, sir.

Q     Whose Colt Sporter AR-15 is displayed in Government's Exhibit Number 17?

A     It's Mr. Barrett's.

Q     And how do you recognize that specific firearm, sir?

A     I seen it several times at his house and in his hands, and I recognize it by the clips, the way the clips are taped together.

MR. LITTLEFIELD:  I would ask that the witness be provided with Government's Exhibit Numbers 125 and 128.  They should be over in that area.

No, I don't think that's it.  I think -- may I approach?

THE COURT:  125 and 128?

MR. LITTLEFIELD:  Yes, sir.

THE COURT:  You may approach.

BY MR. LITTLEFIELD:

Q     You mentioned the way -- something about the clips?

A     Yes, sir.

Q     What are you talking about when you say the clips?

A     That's the way they was taped together, black taped together.

Q     Okay.  Would you look at what is marked as

Government's Exhibit Number 125?  It's to your left.  Do you recognize what those are, sir?

A    Yes, sir.

Q    What are those?

A    They're clips to an AR-15.

Q    Okay.  And are those clips taped together, as Mr. Barrett had taped the clips that you were referring to together, in that fashion, or were they taped together in that fashion?

A    Yes, sir.

Q    Does that appear to be the same clips?

A    Yes, sir.

        MR. LITTLEFIELD:  Move admission of what's marked as Government's Exhibit 125.

        MR. SMITH:  No objection, Judge.

        THE COURT:  125 admitted without objection.

BY MR. LITTLEFIELD:

Q    And when you're talking about taped together, can you hold them up and show the jury and explain what you're referring to?

A    Well, there's three clips.  There's one in the middle and two on each side, and they're black taped together.

Q    Okay.  And would you look at what's been marked as Government's Exhibit Number 128, please, sir?

And do you recognize that?

A      Yes, sir.

Q      And what is that?

A      It's a Colt Sporter AR-15.

Q      Okay.  Do you recognize that particular Colt Sporter rifle?

A      Yes, sir.

Q      Whose was that?

A      Mr. Barrett's.

MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit 128, Your Honor.

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  Go ahead and display it, please.

And, Your Honor, I would now move admission of the photograph, which is Government's Exhibit Number 17.

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.  17 admitted without objection.

MR. LITTLEFIELD:  And I would ask that it be displayed to the jury.

BY MR. LITTLEFIELD:

Q      You mentioned a 9mm.  What kind of firearm was that, the 9mm?

A        It was a handgun.

Q        Okay.  When you say a handgun, revolver, or did it have a clip in it?

A        It was a clip, automatic.

Q        Okay.

MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 122, which is back in the box behind, be shown -- displayed to the witness.

BY MR. LITTLEFIELD:

Q        Do you see what has been marked as Government's Exhibit Number 122?

A        Yes, sir.

Q        And do you recognize it, sir?

A        Yes, sir.

Q        What is that?

A        It's a Smith and Wesson 9mm pistol.

Q        And do you recognize that specific Smith and Wesson 9mm pistol?

A        Yes, sir.

Q        How do you recognize it?

A        It belongs to Mr. Barrett.  I mean, he used to carry it in his britches all the time.

MR. SMITH:  Your Honor, I'm going to object. That's not responsive as to how he knew it was that particular pistol.  To me, that's identification marks

on a pistol, the description of it.

THE COURT:  Argument, Counsel?

MR. LITTLEFIELD:  Your Honor, I asked him how he knew that was it.  He said it belonged to Mr. Barrett, he used to carry it in his pants all the time, he recognized it, he was familiar with it.

THE COURT:  I think the answer is nonresponsive.  You may rephrase the question.

BY MR. LITTLEFIELD:

Q      You indicated it belonged to Mr. Barrett?

A      Yes, sir.

Q      Where would you see it in relation to Mr. Barrett?

A      Right here in his britches.  He carried it right here all the time.

Q      Okay.  And were you familiar with that pistol when you were out there in the summer of 1999?

A      Yes, sir.

Q      How often -- when you were out there with Mr. Barrett, how often did he have that pistol?

A      He went everywhere with it.

Q      Okay.

MR. LITTLEFIELD:  Again, I would move admission of Government's Exhibit Number 122.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And I would ask that the witness display that.

BY MR. LITTLEFIELD:

Q     And where was that loaded?  When you put shells in it, where did you put the shells in it?

A     Right here, the clip.

Q     Okay.

MR. LITTLEFIELD:  I would ask that he, again, return that to the clerk.

BY MR. LITTLEFIELD:

Q     Did you ever go out to the garage with Mr. Barrett?

A     Yes, sir.

Q     And what would you do in the garage area?

A     Work on cars.

Q     When you went in the garage, how was Mr. Barrett armed, if in any way?

A     With the pistol in his britches.

Q     The Colt Sporter rifle, Government's Exhibit Number 128, where was that kept?

A     In his cabin.

Q     And are you familiar with the location of where it was kept in the cabin?

A     Yes, sir.

MR. LITTLEFIELD:  I would ask that

Government's Exhibit Number 175, which has been admitted into evidence, be displayed to the witness.

BY MR. LITTLEFIELD:

Q      And do you recognize what 175 is a photograph of?

A      Yes, sir.

Q      What is that?

A      It's of Mr. Barrett's cabin.

Q      Is that an accurate floor plan of the first floor of Mr. Barrett's cabin?

A      Yes, sir.

Q      Where did Mr. Barrett keep that Colt Sporter rifle in his cabin?

A      When I seen it, it was kept leaned up on this desk right here by the window.

Q      Okay.  About the area where you marked?

A      Yes, sir.

Q      Okay.  You stated Mr. Barrett expressed to you an expectation that the laws were going to come to his place?

A      Yes.

Q      What, if anything, did Mr. Barrett say that he was intending to do if the laws came to his place?

A      There was going to be a shootout.

Q      What'd he say?

A      He said that he hoped that it would be Frank Loyd or Johnny Philpot, first ones through the gate, and he

was going to take out as many as he could before they got him.

Q    Okay.  Do you recall the last time that you were at Mr. Barrett's prior to -- let me rephrase that and withdraw it.

Do you recall approximately when a shooting took place at Mr. Barrett's?  Do you remember that happening and hearing about it?

A    Yes, sir.

Q    Okay.  When, prior to that -- how much prior to that was about the last time -- the last time you were there?

A    I would say, give or take, a month or two.

Q    Okay.  Do you recall anything that happened the last time you were at Mr. Barrett's residence?

A    Yes, sir.

Q    What happened the last time that you were at Mr. Barrett's residence?

A    It was about 11:30 or 12:00 at night.  An older man come driving through the gate in excessive speed, and got out of the car and said he just got through running from the law --

MR. SMITH:  Your Honor, I'm going to object.  It's hearsay.

MR. LITTLEFIELD:  It's not offered for the

truth.

THE COURT:  What's it offered for?

MR. LITTLEFIELD:  An explanation for what Mr. Barrett did and said in response to the statement.

THE COURT:  Rephrase the question, and the witness don't answer the question until counsel's had an opportunity to object.

BY MR. LITTLEFIELD:

Q     When the individual drove through the gate at excessive speed, what did he do when he stopped his vehicle?

A     He got out of his vehicle.

Q     Did he have a comment, and to whom -- did he have a comment when he got out of his vehicle?

A     Yes, sir.

Q     To whom did he make the comment?

A     Mr. Barrett.

Q     What was the comment?

MR. SMITH:  Your Honor, again, I'm going to reurge my objection on hearsay, and also the 404(b)2 evidence.

THE COURT:  Overruled.  You may answer.

BY MR. LITTLEFIELD:

Q     What was the comment?

A     The comment was that he just got through outrunning

the laws, and that they would probably be following him through the gate anytime.

Q      Okay.  After that older man made that statement, what did Mr. Barrett do?

A      He went in his cabin and got his Colt Sporter.

Q      Okay.  What did you do?

A      I just stood there.

Q      Did the laws come that night?

A      No, sir.

Q      How long did you hang around that night after this incident?

A      Probably a couple of hours.

Q      Did you ever go back to Mr. Barrett's?

A      No, sir.

        MR. LITTLEFIELD:  May I have a second, Your Honor?

        THE COURT:  You may.

                        (PAUSE)

BY MR. LITTLEFIELD:

Q      The firearms you looked at, are those capable of firing right now, or can you tell that they have been rendered safe by the Marshal's Office?

A      They're safe, as far as I can tell.  There's no clips or no --

        MR. LITTLEFIELD:  Your Honor, I would ask for

the record to reflect that those -- and advise the Court that those have all been rendered safe through the Marshal's Office.

THE COURT:  I haven't examined them.  I haven't had a conversation with the Marshal that's indicated they have been.  I trust they have been.  That's the normal practice of the Court, that the Marshal would -- let me inquire of the Marshal:  Has the Marshal made these weapons safe?

MARSHAL:  Yes, Your Honor.

THE COURT:  You may proceed.  I trust that report.

BY MR. LITTLEFIELD:

Q     I think I asked you about an ounce and an eight ball.  Do you know the cost of a gram?

A     A hundred dollars.

Q     In regards to those firearms, did you ever see them fired during the time you were out there, practice firing, shooting at different items?

A     Yes, sir.

Q     What firearms did you observe being fired at Mr. Barrett's during the summer of '99?

A     I never seen him fire the pistol, but I seen him fire the Colt Sporter.

Q     Okay.  And how often?

A       Once, that I can remember.

Q       Okay.  Was there a location -- you identified where the 9mm and the Colt Sporter were kept.  Was there a location where firearms -- or any location where firearms were kept in Mr. Barrett's residence, and if so, where?

A       The only other firearms that I knew that was kept anywhere, was in the gun cabinet in the living room.

Q       Okay.  And you mentioned a .22 pistol?

A       Yes, sir.

Q       Do you know what kind of pistol that was?

A       No, sir.

Q       Did you see it?

A       Yes, sir.

Q       Where was it kept?

A       I have no idea.

Q       Okay.

        MR. LITTLEFIELD:  Can I have just a second?

        THE COURT:  You may.

                   (PAUSE)

        MR. LITTLEFIELD:  Pass the witness.

        THE COURT:  You may cross-examine.

        MR. SMITH:  Thank you, Your Honor.

                   CROSS-EXAMINATION,

BY MR. SMITH:

Q     Mr. Turman, when is the first time you and I met?

A     Over at the District Attorney's Office.

Q     The United States Attorney's Office?

A     Yes, sir.

Q     And when was that?

A     Three or four days ago.

Q     Last Friday; wasn't it?

A     Yes, sir.

Q     And who was present whenever I met you?

A     Me, you, and Mike, and this man sitting right there.

Q     Mr. Littlefield?

A     Yes, sir.

Q     Mr. Hilfiger?

A     Yes, sir.

Q     Who else?

A     And I'm not for sure about those two gentlemen right over there.

Q     Okay.  The two investigators?

A     Yes, sir.

Q     Okay.  Wasn't anybody threatening you; was there?

A     No, sir.

Q     Okay.  And at that time you refused to talk to me; didn't you?

A     Yes, sir.

Q      You wouldn't talk to Mr. Hilfiger; would you?

A      No, sir.

Q      And we explained to you at that time that we were representing Kenny Barrett?

A      Yes, sir.

Q      That he was fighting for his life?

A      Yes, sir.

Q      And we wanted to know what it was that you could tell us that you were going to testify to?

A      Yes, sir.

Q      You didn't give us an opportunity to check out any of your story; did you?

A      No, sir.

Q      These people you talked about, these events that you say went on out there, there's no way we can verify that stuff went on, because you wouldn't tell us ahead of time; would you?

A      No.

Q      How many written statements have you given about the nature of the testimony that you provided over the past two days to this jury?

A      None, that I know of.

Q      Okay.  Sir, you testified yesterday that you were familiar with Government's Exhibit Number 1, that model; weren't you?

A     The model right here?

Q     Yes, sir.

A     Yes, sir.

Q     That's one of the first questions asked of you; wasn't it?

A     Yes, sir.

Q     Tell us why you're so familiar with it?

A     Because I've been there.

Q     You had also been in the United States Attorney's Office, looking at evidence in this case, prior to giving your testimony; hadn't you?

A     Yes, sir.

Q     You had seen that model in their office; hadn't you?

A     Yes, sir.

Q     You had talked to them about the nature of your testimony; hadn't you?

A     Yes, sir.

Q     Sir, Government's Exhibit Number 175, that was admitted into evidence yesterday, was shown to you?

A     Yes, sir.

Q     And you were familiar with that exhibit; weren't you?

A     Yes, sir.

Q     Because you had seen it prior to coming to court

in here?

A     Yes, sir.

Q     You were prepared to testify; weren't you?

A     I don't know what you mean by prepared.

Q     Well, you were shown evidence about things that you were going to be asked questions about; weren't you?

A     I was shown stuff that I had seen or been around and seen in the past.

Q     Can you tell me any other evidence that you had seen while you were at the U.S. Attorney's Office, that relates to this case and your testimony?

A     Just the Colt Sporter and the shotgun and the .22 pistol.

Q     Now, you said that it was three to four months before the shooting incident, whenever you were out at Kenny Barrett's residence?

A     Yes, sir.

Q     But then you talked about being there up to a month before the shooting incident?

A     Give or take.  I don't know exactly dates and times, you know.  I was on methamphetamines then, and at that time, you don't really care about time and --

Q     Wait a second.  Wait a second.  I do care, sir. This man's fighting for his life over here.

        MR. LITTLEFIELD:  Objection, Judge.  We don't

need the "fighting for his life."  That's not a question.  It's a comment here.

MR. SMITH:  I don't mind striking the comment, Judge.

THE COURT:  The comment's stricken.  Rephrase the question.  The question's withdrawn.

BY MR. SMITH:

Q    Sir, I need you to be as accurate as you can about dates, times, and places and events, during this trial. Can you do that?

A    I'm sorry, but I can't.  I don't remember the dates and times.  I understand that he's fighting for his life. I wasn't saying that I didn't care about his dates and times.  At the time, I didn't care.  You know, it didn't dawn on me to remember dates and times.

Q    No, sir, but when you testified yesterday, you didn't say, "Mr. Littlefield, I'm not sure of these dates and times, because I was so jacked up on methamphetamine, I can't really tell you."  That's not what you said; was it?

A    No, sir, but I --

Q    Wait a second, it's a yes or no answer.

A    No.

Q    You told us dates in reference to months, three to four months, and a month before, but now you're saying,

"Well, I don't really know;" is that correct?

A    I'm saying I don't know the dates and the times.

Q    Who have you met with prior to coming up here and giving your testimony, in preparation?

A    Mr. Littlefield.

Q    Have you met with Sheriff Philpot?

A    No, sir.

Q    Who else have you met with?

A    Just Mr. Littlefield.

Q    No investigators?

A    Them investigators was in the office at the time.

Q    There's Mr. Lane, there's Mr. Rosser.  What other investigators have you talked to?

A    None.

        MR. LITTLEFIELD:  Objection, Judge, assumes facts not in evidence.  He didn't say he talked to any of the investigators.  He said he talked to me.  He said they were present.

        THE COURT:  Objection overruled.

BY MR. SMITH:

Q    Did you have a conversation with either one of these gentlemen?

A    Just Mr. Littlefield.

Q    Not with Mr. Lane or Mr. Rosser?

A    No, sir.

Q     But they were present and listening and taking notes, I assume?

A     Yes, sir.

Q     Okay.  Now, the fact of the matter is -- and you testified a little bit about it yesterday -- you met Mr. Barrett through your sister; correct?

A     Yes, sir.

Q     He was dating your sister, Samantha, and that's how you met him?

A     I don't know if they was dating, but she was out there quite often.

Q     And in February of '99, you did sell him that Coachman double-barrel shotgun; didn't you?

A     Yes, sir.

Q     For 200 dollars; didn't you?

A     I don't remember the price.

Q     And like you testified to, you bought that at Draco's in Webbers Falls?

A     Yes, sir.

Q     Let me ask you something:  Anything unique about that double-barrel shotgun?

A     There was -- what was unique about it has been taken off.  There was a gold leaf on one side, and R.T. on the other side.

Q     Which has to do with engraving, that sort of

thing?

A      Yes, sir.

Q      Other than that, it's just a shotgun; right?

A      Yes, sir.

Q      Are you familiar with guns?

A      Yes, sir.

Q      That Colt Sporter .223, they got them for sale down there at Draco?

A      Yes, sir.

Q      They got them for sale at Wal-Mart?

A      Not that I know of.

Q      You don't have to have any sort of special license to own that gun; do you?

A      Yeah, you have to be 21 years old and go through a history and background check that they have.

Q      You've got to be able to pass a background check?

A      Yes, sir.

Q      But you don't have to possess a special license to own that Colt Sporter, based on your understanding; is that correct?

A      No, sir.  No, sir.

Q      An individual that passes a background check can go to Draco and buy that gun?

A      Yes, sir.

Q      Now, we talked a little -- you did, yesterday,

about painting a Mustang; correct?

A      Yes, sir.

Q      It was a 1970 model Mustang; right?

A      Yes, sir.

Q      You were out there for about a week, working on that car; weren't you?

A      Yes, sir.

Q      And Kenny Barrett paid you $300.00 to paint that Mustang, not dope, as you testified to yesterday?

A      No, sir, that's not true.

Q      You painted the vehicle green; didn't you?

A      Yes, sir.  There was cash and drugs.

Q      Sir, if you would be responsive to my questions.

A      Okay.

Q      Sir, in August of '99, you were out there at Kenny Barrett's; weren't you?

A      Yes, sir.

Q      In August of '99, you were out there selling a Lincoln Arc Welder; weren't you?  Do you remember that?

A      No, sir, it was not a Lincoln Arc Welder, it was a Lincoln Mig Welder.

Q      Mig Welder, you're exactly correct.  110 volt?

A      Yes, sir.

Q      Also sold him a four core radiator; didn't you?

A      Yes, sir.

Q      And some other auto parts?

A      I don't remember no other auto parts, just the radiator and the Lincoln Mig Welder.

Q      Well, Kenny Barrett paid you $400.00 for those; didn't he?

A      At that time, yes, sir, he did.

Q      Tell us the reason you were out there selling those things to Kenny Barrett.

A      Because I just got out of jail, and I needed money to pay my lawyer and probation.

Q      You were out on $89,000 bond; weren't you?

A      No, sir, it was $98,000.

Q      And you needed to raise approximately $10,000 bond for yourself; didn't you?

A      No, I'd already paid my bond.  That's how I was out.

Q      Then in April of '05, you sent word through your sis, who was having a conversation with Kenny Barrett; didn't you?  Remember that?

A      No, sir.

Q      You don't remember telling your sis, Samantha, that you wanted to purchase a four by four or four-wheel drive pickup that was out there at Kenny Barrett's house, that he owned?

A      No, sir.

Q    And that he told you no, he wasn't going to sell it to you?

A    No, sir.

Q    Now, you said that you've only done drugs for five years?

A    Yes, sir.

Q    At first you said '86, '87, but then I think you corrected yourself to say '96 and '97; is that right?

A    Yes, sir.

Q    Let's talk a little bit about your prior drug use. You smoked marijuana?

A    Yes, sir.

Q    Sold marijuana?

A    No, sir.

Q    How much marijuana did you smoke?

A    Well, when I used to smoke weed, I smoked about a quarter ounce every two days.  But I ain't smoked weed in 15, 20 years.

Q    Well, I guess I'm confused, because you said you only did drugs for five years.

A    No, I said I did methamphetamines for five years.

Q    So, you're experienced with other drugs.  That other drugs you're talking about, is before the meth use?

A    Just the marijuana.

Q    Just the marijuana.  Okay.  And that was a quarter

ounce?

A      Yes, sir.

Q      Every two days?

A      Yes, sir.

Q      Okay.  Cocaine, you ever use cocaine?

A      Occasionally.

Q      When did you use cocaine?

A      Once at Barrett's house, and a few times prior to that.

Q      Two times prior in your life, is all --

A      A few times.

Q      A few times?

A      A few times prior to that.

Q      How'd you like to do cocaine?

A      Snort it.

Q      Did you ever inject it?

A      No, sir.

Q      That's a little too heavy duty for you?

A      Yes, sir.

Q      How about methamphetamine?  That's the one that you've been doing for five or six years, and then you quit; is that right?

A      That was my choice of drug when I was doing drugs.

Q      And you told us you liked to snort it?

A      Yes.

Q      That's the only way you've ever done it?

A      Yes, sir.

Q      Never have tried it any other way?

A      Just smoke and I'd snort it.

Q      Smoked it?

A      Yes, sir.

Q      That gives you a little different sensation than snorting it; doesn't it?

A      It's about the same.

Q      It's not more intense?

A      No, sir.

Q      It's not quicker acting?

A      No, sir.

Q      Okay.  Tell me, whenever you would do methamphetamine, would you go on a binge?

A      No, sir.

Q      So, you'd just do a bump and then that's alls you'd want to do?

A      That's all -- I got ready to do another bump, when I was on the drugs.

Q      Tell me the longest that you have ever stayed up at one time continuously while you were doing methamphetamine?

A      Four days.

Q      Without any sleep at all?

A    Without any sleep at all.

Q    And when was that?

A    '99.

Q    When, in '99?

A    I have no idea.

Q    Because when you do methamphetamine, you lose all track of time; don't you?

A    You really don't lose it, you just don't care about the time.

Q    And whenever you're staying up for four days, you start becoming a little psychotic; don't you?

A    No, sir, I didn't.

Q    You could handle it?

A    I could handle it.

Q    During that four days time, how much methamphetamine do you think that you did?

A    Probably a gram and a half, something like that.

Q    Now, you also told us yesterday that you're an experienced cook?

A    Yes, sir.

Q    That you learned how to cook from Donna Johnson?

A    No, I never said I learned how to cook from Donna Johnson.

Q    Sir, do we need to have it read back from the record?

A        Yes, you do, because what I said about Donna Johnson was I learned about the gun scrubber puller.

MR. SMITH:  One minute, Your Honor.

BY MR. SMITH:

Q     Sir, what I have in my notes is --

MR. LITTLEFIELD:  Objection.

THE COURT:  Overruled.

MR. SMITH:  I'll strike that, Judge.

BY THE WITNESS:

A     And I never said her last name --

THE COURT:  Sir, there's no question, so, don't talk until you're asked a question.

THE WITNESS:  Yes, sir.

BY MR. SMITH:

Q     You were talking about Donna Johnson yesterday, in cooking dope and gun scrubber; weren't you?

A     I mentioned the name Donna, but I never mentioned nobody's last name yesterday.

Q     So, maybe I, because I know who you're talking about, put Johnson on it, but you said Donna; didn't you?

A     Yes, sir.

Q     That's fair enough.  That's a fair statement; isn't it?

A     Yes, sir.

Q      So, you did learn how to cook dope from Donna?

A      No, sir.

Q      Now, you said you're a bottom puller?

A      Yes, sir.

Q      For those of us that have never cooked methamphetamine before, why don't you tell us what that means?

A      I explained that yesterday.

Q      I don't guess I understood it.  Can you do it again?

A      Gun scrubber is a bottom puller.  It pulls the dope to the bottom, that way when you turn the jug upside down, when you strain it through your filters, the dope and the scrubber comes out together.  When you use a top puller like toluene, or anything that's a top puller, you've got to siphon it off with a hose, and I didn't like doing that, because I'd sometimes get it in my mouth or whatever.  And gun scrubber evaporates when it hits the air, so, therefore, it's cleaner dope.

Q      So, you're real familiar with cooking dope; aren't you?

A      Yes, sir, I've been arrested for cooking dope.

Q      We're going to talk about that in a second.

       How many times you cooked dope?

A      Several.

Q    What's several?

A    I have no idea.  Several.  For the last five years.

Q    A hundred times?

A    I have no idea.  I never counted.

Q    Well, let me ask it this way:  You said you cooked dope over the past five years; right?

A    Yes, sir.

Q    And would it be your practice to cook dope once a week, twice a week, once a day?  You tell us what your practice was.

A    About once a week.

Q    Okay.  So, if we have 50 weeks in a year over five years, that's 250 times, the way I figure it.

A    Possibly, yeah.  Like I said, I never counted.  I wasn't proud of the fact, and I still ain't proud of the fact today, that I cooked dope.

Q    I don't blame you for not being proud of it, sir, because you have manufactured dope within a thousand feet of a school; haven't you?

A    No, sir.

Q    You have manufactured dope in the presence of a minor child under the age of 12; haven't you?

A    No, sir.

Q    And, sir, you have manufactured dope while possessing a firearm?

A       Yes, sir.

Q       In fact, you manufactured methamphetamine while possessing a firearm, an AK-47, that had the serial numbers obliterated; didn't you?

A       No, sir.

Q       Well, you've been charged with all those crimes; haven't you?

A       I have been charged with alternating a serial number on a firearm, it was a SKS where it was dropped and hit on a nine, and it looked like that it was tried to be changed, but it hadn't.

Q       And on that case, you're currently out on bond on another $100,000; aren't you?

A       No, 120,000.

Q       And the status of that case is what?

A       There's -- there's nothing, no status.  I've done been to court, and it's done been taken care of.

Q       It's over with?

A       As far as I know.

Q       Have you looked at the records?

A       No, sir.

Q       Do you want to look at them?

A       I don't know what good it would do me.

Q       I've got them right here.  I've looked at them. You want to look at them?

A     I probably wouldn't understand them.

Q     It's not over with --

A     The last time I went to court on that was two years ago, and I have never been -- made another court date. That was when Kelly Karnes was fired from the sheriff's department.  He brought in bogus charges on me  --

MR. LITTLEFIELD:  Objection, Judge.  It's not responsive to the question.

THE COURT:  Sustained.

BY MR. SMITH:

Q     You just bring up a point for me.  In that case, two witnesses for the State are Frank Loyd and Kelly Karnes; right?

A     Yes, sir, that I know of.

Q     Well, that you know of.  They were listed on the charge sheet; weren't they?

A     They were there when I was arrested.

Q     And Frank Loyd's the one that you're up here telling the jury that Kenny Barrett was talking about?

A     Yes, sir.

Q     Now, if I understand your testimony correctly, you said you never saw Kenny Barrett mix drugs for a cook?

A     No, sir.

Q     That's not what you testified to yesterday?

A     I said -- yeah, that's what I testified to.  I

never seen him mix --

Q     You're saying that's a correct statement; right?

A     Yes.

Q     I want to take you back, sir, to the event where you were painting the Mustang.

A     Yes, sir.

Q     Okay.  If you would, look at the screen.  Show me what's up there in the upper left-hand corner.

A     In the sack or the box?

Q     Yeah, on the top left sack or box or whatever it is.

A     It looks like a paint gun turned upside down.

Q     Do you recognize that paint gun?

A     Yes, sir.

Q     That's the one that you used; wasn't it?

A     No, sir.  I used my own.

Q     What's this right here?

A     That's Kenny's.

Q     What is that right there?

A     Where?  Oh, that's M.S.E.

Q     What is M.S.E.?

A     I really have no idea.

Q     What does that word --

A     That's enamel reducer.

Q     Excuse me?

A        That's enamel reducer.

Q        What's that used for?

A        For mixing paint.

Q        Okay.  What's this right here?

A        Mineral spirits.

Q        What's that right there?

A        That's used for pulling dope.

Q        What's it called?

A        Mineral spirits.

Q        What's that called, where I've got -- look at where I've got my pointer.

A        Paint thinner.

Q        Okay.  What are these cans up here?  Do you know?

A        I have no idea.

Q        The fact of the matter is, sir -- well, excuse me. Do you know what this is right here?

A        Yes, sir.

Q        What is that?

A        That's a door.

Q        Okay.  So, what is this?

A        It's a cabinet.

Q        All right.  All of this stuff was in a cabinet, inside the garage; correct?

A        Yes, sir.

Q        And in that, paint, paint thinner, paint guns,

materials that you used that Kenny Barrett used on vehicles out there on his property?

A      Yes, sir.  And the toluene was used to pull dope with.

Q      That's not what I asked you, sir.  If you could confine your answers to my questions --

A      Yes, sir.

Q      -- this will go a lot smoother.

A      Yes, sir.

        MR. SMITH:  One minute, if I may, Your Honor.

        THE COURT:  You may.

BY MR. SMITH:

Q      Sir, because I don't cook dope, and I don't paint cars, this talk about toluene last night sent me to the computer.  Do you know what else toluene is used for, other than pulling dope?

A      Yes, sir.

Q      What's it used for?

A      Toluene is used for paint thinner, too.

Q      You use that not only to thin paint, but to prepare vehicles for painting; don't you?

A      Yes, sir.

Q      Sir, back to your charges there a minute ago, you've also been known to steal; haven't you?

A      No, sir.

Q       Never been charged --

A       Never been charged with no theft of any kind.

Q       Sir, do you show what I've caused to be displayed upon your monitor?

A       Yes, sir.

Q       And I will -- just so you know, because it doesn't look like the normal -- well, let me ask you this: You're familiar with what an Information looks like?

A       Yes, sir.

Q       Because you've been charged.  So, you know what it looks like.

        MR. LITTLEFIELD:  Judge, I'm going to object to charges, specific acts of conduct that have not been proven as convictions.

        MR. SMITH:  Your Honor, my comment would be, this is impeachment.

        MR. LITTLEFIELD:  It's improper.  I believe it's Rule 609.  I'm sorry, it's 609, 608, 608(b), I'm sorry.

        THE COURT:  Objection sustained.

BY MR. SMITH:

Q       Sir, you've been divorced; haven't you?

A       Yes, sir.

Q       Have you been -- that was in '97?

A       Yes, sir.

Q      And from what I can gather, you got the kids?

A      Yes, sir.

Q      How many kids were there?

A      Three.

Q      All right.  And they continue to live with you?

A      Yes, sir.

Q      And this is during the period of time that you were manufacturing methamphetamine?

A      Yes, sir.

Q      Now, let's talk about deals that we've got. Okay?  What promises have been made to you to induce you, to entice you, to have you come up here and give your testimony today?

A      No promises.

Q      Nothing has been discussed with you that the federal government would not file federal firearms charges against you for cooking dope and having a firearm?

A      No, sir.

Q      Have they given you immunity from prosecution for those offenses?

A      No, sir.

Q      How about the obliterated serial number on the weapon, did you all talk about that?

A      No, sir.

Q      Anybody ever threatened you to take the kids away because of your prior conduct, or if you didn't come up here and testify?

A      No, sir.

Q      Are you a paid informant?

A      No, sir.

Q      Have you ever been?

A      No, sir.

Q      Now, sir, whenever I was looking through your records -- and I had to do quite a bit of searching on it, because I found some different names.  Let's talk about those just a minute.

Randall Owen Turman, is that your name?

A      Yes, sir.

Q      Randy Turman, is that your name?

A      Yes, sir.

Q      Randy Holan Turman, is that your name?

A      No, sir.

Q      You don't know why that shows up on your identifiers?

A      No, sir.

Q      Why do you have an FBI number?

A      I don't have no FBI number.

Q      Yes, sir, you do.

A      Not that I know of.  I don't even know what that

is.

Q     Do you know what a tweeker is?

A     That's an expression for somebody that uses drugs.

Q     And what does that expression mean?

A     I really don't know.  I ain't never looked it up in the dictionary.

Q     No, sir, but you know what the slang of it is, as it's used in the drug community; don't you?

A     I've heard it used several times, but I don't know what the meaning of it is.

Q     What was it that you liked about meth?

A     I used it for a tool, to get stuff done.

Q     It motivated you?

A     Motivated me.

Q     You've told me you're not an informant.  You've told me that there haven't been any deals offered to you.

A     Yes, sir.

Q     Then I don't understand why you don't visit with me ahead of time, so I can verify your stories.  Can you tell me why?

A     Because I figured what --

        MR. LITTLEFIELD:  Judge, I'm going to object. That's been asked and answered.  He's already talked to him.

THE COURT:  Overruled.

BY MR. SMITH:

Q      You can answer the question, sir.

A      Because I figured what questions needed to be answered, could be answered right here.

Q      You didn't want to give me time to check into your stories; did you?

A      It didn't have nothing to do with that.

Q      Why don't you tell me?

A      I just didn't figure I needed to talk to nobody until I got right here.

Q      Now, wait a second.  You talked to the Government. You told us that.

A      Yes.

Q      You just didn't want to talk to Mr. Barrett or his lawyers?

A      It wasn't nothing personal.

Q      I don't take it as personal to me, sir.  What I'm trying to figure out is, if we're being fair and we have nothing to hide and we haven't had any deals made to us, then why aren't you a little more forthcoming so that we can verify your story?

A      Because I -- what questions I needed to answer to you was right here, and I'm -- you know, that's -- that's all I can say.

Q    Well, you're an admitted meth cook for five years?

A    Yes, sir, and I'm not proud of that.

Q    And you want us to believe that everything that you told us up here today about Kenny Barrett is the truth; is that correct?

A    I swore to tell the truth and that's what I'm doing, is telling the truth.

MR. SMITH:  Pass the witness, Your Honor.

THE COURT:  Redirect?

REDIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q    When these incidents about which you've testified occurred at Kenny Barrett's residence, who all was present?

A    Me, Kenny, and Shawn Moore.

Q    In the incident about painting the 1975 -- or the 1970 Mustang, were you paid 300 dollars?

A    No, sir, I was paid money and methamphetamines.

Q    Okay.

MR. LITTLEFIELD:  I'd ask that 65 be displayed.

BY MR. LITTLEFIELD:

Q    Do you see what's in the bottle, the jar?

A    Yes, sir.

Q    What is that?

A    I don't know for sure.

Q     Can you read the label?

A     No, sir.  Does it say concentrated juice or --
I have no idea, sir.

Q     Okay.  Do you know how Coleman fuel is used, if so,
in the manufacture of meth?

MR. SMITH:  Your Honor, that's outside the
scope.

THE COURT:  Overruled.  You may answer.

BY THE WITNESS:

A     It's used as a top puller.

BY MR. LITTLEFIELD:

Q     Okay.  How are mineral spirits used?

A     It's used as a top pull.

Q     How is toluene used?

A     As a top puller.

Q     Can paint thinner be used?

A     No, sir.

Q     Can enamel -- M.S.E. deal, can that be used?

A     No, sir.

Q     Okay.  Did Kenny Barrett use toluene in cooking
meth?

A     Yes, sir.

Q     Did Kenny Barrett use mineral spirits in cooking
meth?

A     As far as I know, I never seen him use mineral

spirits.

Q      How about Coleman fuel?

        MR. SMITH:  Your Honor, I'm going to object and ask that that be rescinded from the record.  He's never seen it.

        THE COURT:  You may explain that objection further.  What was the --

        MR. SMITH:  He was asking if he'd ever seen him use mineral spirits, and he said yes, then he said, "Not that I've ever seen."  It's an assumption.

        MR. LITTLEFIELD:  The question --

        THE COURT:  The answer is stricken.  You may rephrase the question.

BY MR. LITTLEFIELD:

Q      Can mineral spirits be used in cooking meth?

A      Yes, sir.

Q      Have you seen Mr. Barrett use it in cooking meth?

A      Not mineral spirits.

Q      Okay.  Can toluene be used in cooking meth?

A      Yes, sir.

Q      And have you seen Mr. Barrett use toluene?

A      Yes, sir.

        MR. SMITH:  That's been asked and answered.

        THE COURT:  Objection overruled.  You may proceed.

BY MR. LITTLEFIELD:

Q      Is there a term used for someone in -- for someone who testifies on behalf of the Government, in Sequoyah County?

A      Yes, sir.

Q      What's that term?

A      A rat.

Q      Any other terms?

A      A snitch.

Q      Do you have any concerns about testifying for the Government in this case?

A      Yes, sir.

MR. LITTLEFIELD:  May I have a second?

THE COURT:  You may.

(PAUSE)

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may recross.

MR. SMITH:  Thank you, Your Honor.

RECROSS-EXAMINATION,

BY MR. SMITH:

Q      Sir, yesterday, when asked how you were paid to paint that Mustang, you said with drugs; correct?

A      Yes, sir, I guess.  I don't know.  I really don't remember.  I was paid with drugs and cash.

Q      That's what you said today.  Yesterday, you said

drugs, correct, or do you --

A      I said I did work for drugs.  I've worked for drugs.  I didn't say particularly Mustang/drugs.

Q      You don't have a recollection whenever you were talking to Mr. Littlefield about painting that Mustang and how you were paid, that you said you were paid with drugs?

A      Not that I recall.  I never said that.  I said I was paid with -- I did work for drugs, is what I said.

Q      You deny that you were paid the $300?

A      I was paid -- I didn't say I wasn't paid $300.  I was paid 300 -- I was paid methamphetamines and money, for painting the car.

Q      You didn't tell me earlier, when I asked you about Kenny Barrett paying you $300 for that Mustang, and you said no?

A      Yes, sir, I did say that.

Q      And now you're saying you don't deny that you were paid $300?

A      No.  No.  I said I was paid drugs -- methamphetamines and money for painting the car.  There was never no $300 paid.  It was part money and part drugs.

              MR. SMITH:  Pass the witness, Judge.

         One second, Judge.

(PAUSE)

MR. SMITH:  That's all we have of this witness, Judge.

THE COURT:  Anything further from the Government?

MR. LITTLEFIELD:  No, Your Honor.  I would ask that he be excused, released.

THE COURT:  Any objection to this witness being excused?

MR. SMITH:  No, sir.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.

Call your next witness.

MR. LITTLEFIELD:  Travis Crawford.

TRAVIS DON CRAWFORD, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q     State your name for the record.

A     Travis Don Crawford.

Q     Mr. Crawford, in what community do you reside? What town you live in?

A     Sallisaw.

Q     How long have you lived in the Sallisaw area, sir?

A     Thirty-nine years.

Q     How old are you?

A       Forty-one.

Q       Do you know Kenny Barrett?

A       Yes, sir.

Q       How do you know Mr. Barrett?

A       He's my first cousin.

Q       How are you a cousin to Mr. Barrett?

A       Our mothers are sisters.

         MR. LITTLEFIELD:  I'd ask that what's been marked as Government's Exhibit 184 -- it's not in evidence -- be displayed to this witness.

BY MR. LITTLEFIELD:

Q       Can you see that on the screen in front of you, sir?

A       Yes, sir.

Q       And are you familiar with that area which is displayed in that aerial photograph?

A       Yes, sir.

Q       And what does that photograph -- what area does that display?

A       McKee.

Q       I'm sorry?

A       McKee.

Q       And what's in McKee?

A       All my family.

Q       Do you recognize your family's residences in

Government's Exhibit 184?

A      Yes, sir.

Q      Does it accurately show the relationship of your relatives, in Government's Exhibit 184, one residence with the other?

A      Yes, sir.

Q      Is Mr. Barrett's residence, where he was living in September of 1999, also displayed in Government's Exhibit 184?

A      Yes, sir.

          MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit 184.

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Admitted without objection.

          MR. LITTLEFIELD:  I'd ask that it be displayed.

BY MR. LITTLEFIELD:

Q      And if you touch that screen -- and you just need to tap it one time, because it's kind of like a teleprompter, sometimes the first time they use it, they go a little ballistic with it -- touch one time where Mr. Barrett's cabin, shack, residence was located, sir.  Do you see it on the photograph?

A      Yes, sir.

Q      Can you touch it, just tap it with your finger?

A      It's right there.

Q      Okay.  And we can remove that.  Just above it, or atop of it, as we're looking at the photograph, do you see a trailer house?

A      Yes, sir.

Q      Whose trailer house is -- and I'm kind of looking whopper jawed, but as I'm looking at it, above or to the left of it, down the road?

A      His mother's trailer.

Q      Okay.  And how is Kenny's mother related to you?

A      She's my aunt.

Q      Okay.  Can you tap where his mother's trailer is located on that photograph?  Try and touch right on top of it.

A      I think right there.

Q      Okay.  Where's your mother live?

A      No, right there is my mom's house.  That's Jolene's, right there.

Q      Okay.  So, when you say "Jolene," who is Barrett's mother?

A      Jolene.

Q      Okay.  So, where the arrow is, is whose trailer? Up there where you see the arrow, whose trailer --

A      Yes, sir.

Q      Okay.  Whose mother lives there where the arrow is?

A       Kenny's mother.

Q       And where the little dot is, is -- where you touched, is where your mother lives?

A       Yes, sir, I believe it's right there.

Q       Okay.  If you go -- which way -- do you know which way north is in that photograph?

A       This away, maybe.

Q       Okay.  So, you put two arrows down?

A       I could be turned around.

Q       I'm sorry?

A       I said I could be turned around.

Q       If you look -- do you see the county road that runs in front of Barrett's and his mother's residence?

A       Yeah, this road here?

Q       Yes, sir.  If you go directly across the road from his mother's residence, do you see a house with a red roof with some trees around it, directly across the road from his mother's residence?

A       Are you talking about over here?

Q       Yes, sir.  Do you know whose place that is?

A       Yeah, that's my great-aunt's house.

Q       And who is that?

A       Ada Blount.

Q       Okay.  Do you see the arrow that's pretty much in the center of that picture?

A      Yes, sir.

Q      As I'm facing that picture, there are trailers to the right and to the left of that arrow, as the jury's looking at it and as I'm looking at it on here.  Do you know whose trailer it is to the right?

A      This one?

Q      Yes, sir.

A      My sister's.

Q      And what's her name?

A      Gwen Holt.

Q      Gwen what?

A      Holt.

Q      Okay.  And the trailer to the left of that arrow, do you know whose trailer that one is?

A      Alvin Hahn.

Q      Is he related?

A      His wife is.

Q      And immediately below, as we look at that photo, is a house.  Do you know whose residence or whose house that is?

A      Are you talking about right here?

Q      Yes, sir.

A      That's Tom and Janice Sanders.

Q      Are Tom and Janice Sanders related to Mr. Barrett and yourself?

A      Yes, sir.

Q      And how are Tom and Janice Sanders related to --

A      Janice's mom and my mom are sisters.

Q      Okay.  So, your mom --

A      My mom and Janice's mom are sisters.

Q      Okay.  And do you see the drive right before, that goes back to the right, right before your sister Gwen's trailer?

A      Yes, my grandma's driveway.

Q      Okay.  And whose -- the residence on the right-hand side of the picture, whose place is that?

A      I don't understand.

Q      If you take that drive down.

A      Down the road?  That's my grandma's house.  Are you talking about right here?

Q      Yes, sir.

A      Yes, that's my grandma's house.

Q      Okay.  So, is there anyone that lives in this area right in here, amongst all these places that we're talking about, that aren't related to Kenny Barrett?

A      No, sir.

Q      How long have you known Mr. Barrett?

A      All my life.

Q      Have you ever been arrested?

A      No, sir.

Q       Do you have any charges pending against you at all?

A       No, sir.

Q       Have you used methamphetamine?

A       Yes, sir, I have.

Q       And for how long a period have you been or were you a meth user?

A       Fifteen years.

Q       And are you still using?

A       No, sir.

Q       How long have you been clean?

A       Nine months.

Q       Do you recall back in 1999, when the incident that we're here about happened?

A       Yes, sir.

Q       During the summer of 1999, the months leading up to this incident, did you have occasion to ever be at Mr. Barrett's residence?

A       Yes, sir, he's family.

Q       Do you recognize -- do you see that model that's out in front of you, sitting in front of the witness table, that's marked as Government's Exhibit Number 1, do you recognize that, sir?

A       Yes, sir.

Q       And does that -- what does that display?

A       Kenny's house and then their land and then my

grandma's land.

Q    Do you recognize that blue pickup that's on there?

A    Yes, sir.

Q    Whose pickup was that?

A    It was Kenneth's.

Q    I'm sorry, you're going to need to --

A    It's Kenny's.

Q    And where was that pickup kept?

A    Parked right there.

Q    Okay.  Is that normally where it was located?

A    Sometimes it was parked out in the shed, when he worked on it.

Q    Okay.  Oftentimes at that location?

A    Uh-huh.

Q    And have you looked at that model, sir?

A    Yes, sir.

Q    Does it appear to be accurate?

A    Pretty much so.

Q    Okay.  From whom did you get methamphetamine, when you were using, back in '99?

A    I've done some at his house.

Q    When you say "his house," whose house?

A    Kenny's.

Q    When you did methamphetamine at Kenny's house, who provided it to you?

A       I don't know, because it was always put on a mirror.  I don't know who had it, where it come from. I actually never seen it come out of his pocket.

Q       Okay.  Do you know where it came from?

A       No, sir.

Q       Do you know who provided it to you, who gave you the mirror that had the meth on it?

A       It was still -- it was sitting in the house.

Q       Where?

A       In Kenny's house.

Q       Where was it sitting?  What location in the house?

A       In the bedroom, by the stereo right there.

Q       When you say the bedroom --

MR. LITTLEFIELD:  I'd ask that Government's Exhibit Number 175 be displayed.  And you'll see it up there and also on the screen beside you.

BY MR. LITTLEFIELD:

Q       Mr. Crawford, when you say the bedroom, which room are you referring to?

A       Where that blue couch is.

Q       Is it the -- okay.  Is it at the bottom or the top part?

A       The top right there, the left-hand side.

Q       Okay.  In that room where the blue couch was?

A       Uh-huh.

Q      Okay.   And where would the mirror with meth be located in that room?

A      It sat on a little shelf right there in that corner.

Q      Okay.   You're married to a lady by the name of Cindy or Cynthia?

A      Cynthia.

Q      What was your relationship with her in '99?

A      She was my girlfriend.

Q      And was Cynthia using methamphetamine back then?

A      Yes, sir.

Q      Okay.   Did you ever go to Mr. Barrett's with Cynthia or Cindy?

A      Yes, sir.

Q      Were drugs ever provided at Mr. Barrett's house, to yourself and Cindy?

A      Yes, sir.

Q      By who?

A      Like I say, I don't know.   We'd be out working, doing something, working on cars or anything, we'd come back in, it would be laying there.

Q      Okay.   How did you use methamphetamine in the summer of '99?

A      Snorted.

Q      Tell the jury what, if any, use Kenny Barrett had

of methamphetamine during that time period?

A    He used a needle.

MR. LITTLEFIELD:  I'd ask that Government's Exhibit Number 128 be provided to the witness.  And It's the Colt Sporter.

BY MR. LITTLEFIELD:

Q    Mr. Crawford, would you remove the contents from that box?

MR. LITTLEFIELD:  And 128, while -- Paula, 128, while you're up.  I'm sorry.  If you could also get it.

THE CLERK:  That is 128.

MR. LITTLEFIELD:  Pardon me, 125.

BY MR. LITTLEFIELD:

Q    Mr. Crawford, do you recognize Government's Exhibit 128, sir?

A    Yes, sir.

Q    And what is that?

A    Clips.

Q    No, the --

A    Oh, this is 128?

Q    128, 125.

A    AR-15.

Q    And have you seen that before, sir, that firearm?

A    Yes, sir.

Q     Where?

A     Kenny's residence.

Q     I'm sorry?

A     Kenny's residence.

Q     And where, in the residence, was that firearm kept?

A     Usually leaned up against the wall.

Q     In which room?

A     Living room -- bedroom.

Q     Can you touch where it was leaned against the wall, on the screen?

A     Usually right in here, or right there.

Q     Okay.  And if you'd look at Government's Exhibit 125, which is to your left there, can you pick it up and look at it?  Do you recognize what those are, sir?

A     Yes, sir.

Q     Have you seen those before, or items which look like those before?

A     These are the only ones I've seen.

Q     And where would you see those, sir?

A     In the rifle.

Q     You need to --

A     In the rifle.

Q     Okay.  And you can pass those back to the clerk.

      By the way, you know Kenny Barrett.  Is he in the courtroom today?

A       Yes, sir.

Q       Where is he?

A       Sitting right there in the green shirt.

        MR. LITTLEFIELD:  I'd ask the record to reflect that the witness has identified the defendant.

        THE COURT:  The record will so reflect.

BY MR. LITTLEFIELD:

Q       Do you recall the evening -- do you recall when the Oklahoma Highway Patrol trooper was shot at Mr. Barrett's residence?

A       I remember when it happened.

Q       Okay.  The night before, or the late afternoon before, where were you?

A       I was at my mother's house.

Q       Okay.  And let's go back to 184.  Which one is your mother's house, again?  Touch it again for us.

A       I believe here.

Q       Okay.  And as you were there, about what time of day was it?

A       Somewhere around 5, 5:30, 6:00.  I don't know exactly what time it was.

Q       Okay.  What were you doing -- where were you at your mother's residence?

A       Sitting on the back porch.

Q       Okay.  Had you been inside previous, or were you

out on the back porch the whole time?

A    I'd been inside.

Q    Okay.  And you went out on the back porch?

A    Uh-huh.  We was there eating dinner.

Q    What happened?

A    I just come outside to sit on the back porch for a little bit after we'd eat dinner.  My dad was smoking a cigarette.  And that's when I seen that white Blazer come up from the bottoms.

Q    When you say from the "bottoms," what are you talking about?

A    Coming up from this away, going that way.

Q    Okay.  Going from -- where you put the arrows, is that east or west or what?

A    I'm thinking east.

Q    Okay.  And was it heading -- was that vehicle heading east or west?

A    No, it was coming out, going west.

Q    Okay.  And when you say it was a white Blazer, are you familiar -- do you know exactly what kind of vehicle it was?

A    No, I just knew it was a white Blazer.  Because the neighbors down the road has one just like it, and he owns land down there.

Q    If you look, do you see those vehicles in front

of you, those little white vehicles?

A    Uh-huh.

Q    How do those look compared to the vehicle that passed by, that you're referring to?

A    Pretty close, but the windows weren't tinted.

Q    Okay.  What happened as that vehicle drove down the road in a westerly direction?

A    I seen my cousin going to the gate.

Q    When you say your cousin, who?

A    Kenneth.

Q    Okay.  And where was the gate located?

A    Kind of the west side, right there by the road.

Q    Okay.  And when your -- and when did Kenneth Barrett go to the gate in relation to the white vehicle passing?  Was it before it got to there, or after it passed on by?

A    After it passed by, about past my mom's house.  It was right in about there, I guess.

Q    That's where the vehicle was?

A    Yeah.

Q    Okay.  And when Mr. Barrett went to the gate, what did he do?  What'd you see him doing?

A    I thought he'd closed the gate, but they said it was already closed.

Q    Okay.  You think he was closing the gate?

A      Yeah.

Q      Okay.  What did you do?

A      I just talked to him.

Q      Did you holler or go down there?

A      I walked down there to him, talked to him.

Q      Okay.  And what did Mr. Barrett say when you got down there, about that vehicle -- the vehicle that went past?

A      That he knew those was laws.

Q      Did he say anything else?  What did you say when he said he knew that they were the law?

A      Yeah.  I knew there was a warrant out for him. I said those probably right there -- they're going to come back and serve that warrant.

Q      What did he say?

A      He said D.G.F.

Q      What do you mean by D.G.F.?

A      He just -- I guess he was just tired of it all, said he didn't --

Q      What's D.G.F. mean?

A      Don't give a fuck.

Q      After Mr. Barrett said D.G.F., what did he say then?

A      He said he was going out in a blaze of glory.  But he said that a thousand times, not just then.

Q     Okay.

MR. LITTLEFIELD:  May I have a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examine.

CROSS-EXAMINATION,

BY MR. SMITH:

Q     Mr. Crawford, you said you've never been arrested before?

A     No, sir.

Q     Do you consider being arrested for child support --

A     Yes, sir.

Q     -- part of that?

A     Yeah.  I thought he was talking drug related.

Q     Well, I didn't hear a modifier on that, when Mr. Littlefield asked you that question.  He said, "Have you ever been arrested before?"

A     Well, yes, sir, I have, for child support, for one night, yes, sir.

Q     You currently owe child support; don't you?

A     Yes, sir, I do.

Q     How many thousands of dollars?

A     Eleven thousand.  But I've been paying on it.

Q     Four kids?

A     Yes, sir.  Well, two.

Q     Ever been arrested for anything else?

A     No, sir.

Q     Got any hot checks out there, that you've been arrested for?

A     Yeah, maybe 30 years ago, 20 something years ago.

Q     Okay.  So, are you qualifying your answer to a certain period of time here, as to when or why you've been arrested?

A     Well, no, because I can't remember those checks. It's been a long time ago and I've used a lot of dope. My mind's not sharp like it always has been.

Q     Well, sir, when you do dope, that has a tendency to affect your memory; doesn't it?

A     Sure, it does.

Q     And because of that, when we found out you were going to be a witness, we asked to talk to you; didn't we?

A     Yes, sir.

Q     Last Friday, you were supposed to come up and talk to us.  Remember that?

A     Yes, sir.  And I was pouring concrete and would have lost my job.  And I've got four kids to take care of.

Q     Did Mr. Littlefield tell you that we made

ourselves available on Saturday and Sunday to talk to you?

A     I never heard that, sir.

Q     Did he tell you that I was going to ask my investigator to come out there and see you?

A     Yeah, Johnny said he might come by.

Q     Johnny Philpot?

A     Yes, sir.

Q     Johnny Philpot's been talking to you about this case; hasn't he?

A     No, sir, he sure ain't.

Q     Well, then how did you --

A     He's just come to my house and said these defense lawyers may be here to see you.

Q     So, wasn't that talking about this case?

A     I'm sure that's what it was about, was the case.

Q     Again, I'm confused.  Are you modifying your answer somehow?

A     No, sir.

Q     Well, so, you admit Johnny Philpot was out there talking to you about defense lawyers for Kenny Barrett wanting to talk to you?

A     Well, yeah, I guess so, because he said you all would probably be by to see me.  I'm sure that's what he was talking about.  I don't understand what you're

saying.

Q      If you don't understand, you just tell me, and I'll rephrase it for you.  Is that fair enough?

A      No problem.

Q      Do you have any deals coming up here and testifying today?

A      No, sir.

Q      Been threatened with any sort of prosecution if you don't come up here and testify?

A      No, sir.  I was just subpoenaed to be here. That's why I'm here doing this.

Q      Doing this as a good citizen?

A      I've been here.

Q      Do you work?

A      Yes, sir.

Q      Pay taxes?

A      Yes, sir.

Q      Got any tax problems?

A      No, sir.

Q      You and Kenny Barrett have known each other for a long time; haven't you?

A      Yes, sir, we have.

Q      You've hunted together?

A      Yes, sir.

Q      Fished together?

A     Yes, sir, we've done a lot together.

Q     Done a lot of things; haven't you?

A     Uh-huh.

Q     Now, on the exhibit that was projected out there, showing the outlying property owners, those are your relatives?

A     Yes, sir.

Q     If somebody comes out there, is there some reason that they ought to be fearful of your aunts and uncles and those sort of folks?

A     No, that's a bunch of hogwash.  We're not vigilantes, just like the paper said.

Q     The fact they're Kenny Barrett's relatives doesn't make that a dangerous area; does it?

A     No, it doesn't.  It sure don't.

Q     As a matter of fact, you take offense to that; don't you?

A     Yes, sir, I do.

Q     Because they are good people; aren't they?

A     Yes, sir, they are, they're my family.  And Kenny's a good person.  He's my family.

Q     Have you seen Kenny since 1999?

A     No, sir, I sure haven't.

Q     You said you've used dope for how many years?

A     Fifteen.

Q     You like to snort it?

A     Yes, sir.

Q     Now, whenever you do dope, it tends to effect your recollection of things; doesn't it?

A     Well, sure, it does.  That stuff's evil.

Q     Excuse me?

A     I said that stuff's evil.  It's of the devil.  The devil does tricky things.

Q     Distorts your perception on things?

A     Yes, sir.

Q     Kenny Barrett was known to work on a lot of vehicles out there at his house?

A     Yes, sir, he's a dang good mechanic.  He's worked on mine, my dad's, my family's.

Q     As a matter of fact, that Blazer you were describing, wasn't a Blazer, it was a white Bronco; wasn't it?

A     Uh-huh.

Q     And it's depicted, if we -- if I want to show the photographs -- it was out there on Kenny's property, or he'd been working on it, in September of '99; wasn't it?

A     Yes, sir.

Q     And whose vehicle was that?

A     Kevin Adams.

Q     Who?

A       Kevin Adams.

Q       It was a known vehicle in the area?

A       Yes, sir, it sure was.

Q       Kenny Barrett shoot around that house?

A       No.  He'd shoot targets and stuff, yes, sir.

Q       So, it wouldn't be any surprise to you that there would be brass laying out there in that yard; would there?

A       Oh, no, no doubt at all.

Q       You would expect to find what types of brass, for what weapons?

A       All I've ever seen is, like, maybe a .22 round or something like that.  I've seen AR-15 rounds.  He'd shoot at skunks stayed underneath his house, yeah, stray dogs come up there, messing with his pups, yes, sir.

Q       You'd find .223 rounds in the yard?

A       Yes, sir, I found all of them.

Q       How about 9mm rounds?

A       Yes, sir.

Q       Now, this isn't that there were so many of them you'd trip over them?

A       Oh, no.  There may have been one or two or three laying around, yes, sir.

Q       Here or there?

A       Here or there, yes, sir.

Q   Scattered about?

A   Uh-huh.

Q   Now, this AR-15, are you familiar with it?

A   Yes, sir.

Q   We call it an AR-15.  It's not an AR-15; is it?

A   No, sir.

Q   It's a Colt Sporter; isn't it?

A   Yes, sir.

Q   Nothing illegal about that gun?

A   Sure ain't.  It's not a fully automatic.

Q   It's not a fully automatic, is that what you said?

A   That's right.

Q   This lady over here's going to get real mad at us, if we keep this up.  You need to let me completely ask my question before you answer, because --

A   No problem.

Q   -- it's very difficult for her to take down both of us.

A   I apologize for that.

Q   And I do, too.  So, we'll do a little better.  Okay?

A   Yes, sir.

Q   Have you ever shot that Colt?

A   No, sir.

Q   You been around Kenny when he shot it?

A       Yes, sir.

Q       You've been around him when he shot that .22?

A       Yes, sir.

Q       9mm?

A       Yes, sir.

Q       Where would you all go hunting at?

A       Down at the high banks.  We would just shoot signs, stuff like that, put bottles up and shoot them.

Q       Sir, I've asked to be displayed Exhibit Number 69.  It's previously been admitted into evidence.  Can you orient yourself with that photograph?

A       I don't understand what you're saying.

Q       Do you know what that's a photo of?

A       Yes, sir.

Q       Do you know what vehicle that is right there?

A       I couldn't tell you.

Q       You don't know if that's your cousin's?  Was it your cousin that had the Bronco, or your uncle?

A       No, Kevin Adams is a neighbor down the road.

Q       What's his name?

A       Kevin Adams.

Q       Okay.  You don't know if that's Kevin's vehicle or not?

A       I couldn't tell you from here, sir, no.  Them things all look alike to me.

Q      Was it a white Bronco?

A      Yes, it was white.  I don't know if it was a Bronco or what it was.

Q      Where did Kevin live?

A      He lives about a mile down west from us.

Q      Okay.  So, back this way, coming off the map; right?  In other words, these vehicles, if we're going to go west, would be back this way?

A      Yes, sir.  Yes, sir.

Q      So, on past the intersection?

A      On past the intersection.

Q      He come out there to your house?

A      Not my house.

Q      Did he come out there to Kenny's house?

A      Yes, sir.

Q      Okay.

A      He worked --

Q      Excuse me?

A      He worked on his vehicles.  Like I say, he worked on all our vehicles.

Q      Did he work?

A      Did he work?

Q      Yeah.

A      Yeah, he's a darn good mechanic.  Yes, sir, he worked.

Q      How'd that cabin get out there?

A      How'd that cabin get out there?  He built it.

Q      Himself?

A      No, I helped him.

MR. SMITH:  One second, Your Honor.

(PAUSE)

THE COURT:  Counsel, let's take the morning recess.  We've been going awhile.

I'll ask everyone to please remain as the jury leaves the courtroom for the morning recess.  We'll be in recess for about 15 minutes.

(JURY OUT)

THE COURT:  I'd ask the witness to step out into the hallway, please.

(WITNESS COMPLIED)

THE COURT:  The jury's departed the courtroom. Anything to take up outside the hearing of the jury, for the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defense?

MR. SMITH:  No, Your Honor.  I did provide you with an instruction that covered --

THE COURT:  Yes, I have considered the instruction and chosen not to give it.

We'll be in recess.

(BRIEF RECESS)

<u>COURT IN SESSION</u>

(JURY IN)

THE COURT:  Let the record reflect that the jury's in the box, counsel for the Government is present, the defendant is present with counsel.

You may proceed.

MR. SMITH:  Thank you, Your Honor.

<u>CROSS-EXAMINATION, CONT'D,</u>

BY MR. SMITH:

Q     Mr. Crawford --

A     Yes, sir?

Q     -- you said earlier that you were on the back porch with your father smoking a cigarette?

A     My father was smoking a cigarette.  I don't smoke.

Q     Okay.  Out there, he's smoking?

A     Yes, sir.

Q     This vehicle goes by, and you recognize it as containing law enforcement; correct?

A     I never seen the vehicle go by.  I seen it come out.

Q     That's what I'm talking about, going back to the west.

A     Yes, sir.

Q     And you recognized it as containing law

enforcement?

A     Yes, sir, I guess they were laws.  I never seen them in my life.  I knew it wasn't Kevin Adams.

Q     And this was an unmarked vehicle?

A     Yes, sir.

Q     No antennas?

A     No antennas.

Q     No spotlights?

A     No spotlights.

Q     No state tag?

A     I didn't see the tag.  I didn't look that far.

Q     Tinted windows?

A     No tinted windows.

Q     And how many people could you see inside the vehicle?

A     I seen two people in the vehicle.

Q     How did you see them dressed?

A     What?

Q     How were they dressed?

A     Civilian clothes.

Q     So, how do you know that that was the law?

A     I don't know that was the law.

Q     Okay.  But then you went down to Kenny Barrett to tell him, "Hey, the law's out here, they're probably coming to get you"?

A       No, sir, I never said that.

Q       But you did tell us that you had that conversation with him, and he says, "I don't really care if it is or isn't the law, I'm going to go down in a blaze of glory," that's what you said; right?

A       Yes, sir.

Q       I think you also said that he'd made similar comments thousands of times before?

A       Yes, sir.

Q       In what ear and out the other, as far as you were concerned; wasn't it?

A       Yes, sir.  I've heard a million people say that, in the dope world.

Q       Yeah.

A       I'm going out in a blaze of glory.

Q       They boast about stuff like that; don't they?

A       Yes, sir, because you're drugged up.

Q       You didn't take it to mean one way or the other; did you?

A       No, sir.

Q       Now, you're absolutely positive, as you sit here today, that Kenny Barrett subsequently locked that gate?

A       Yeah, I guess he locked the gate.

Q       Wait a second.  Let's be very clear on this.

A       I never seen Kenny Barrett lock the gate.  I never

seen him put a chain around the gate.

Q      Hold on.  Let me ask the questions.  I ask the questions, you answer them.

Whenever you went down there, was the gate open?

A      I thought it was open.

Q      I want you to tell us if you know.  If you don't know, I want you to tell us that.

A      I don't recall.

Q      You don't know if the gate was locked, either; do you?

A      I don't recall.

Q      Have you ever provided a written statement to law enforcement about the things that you testified to here today?

A      No, sir.

Q      Where have you been for the past six years?

A      Finishing concrete.

Q      So, six years go by and now, all of a sudden, up pops Travis Crawford as it relates to Kenny Barrett.  What causes that to come about?

A      Run that by me again.

Q      Six years after the event, here you are, up here telling a story about Kenny Barrett.  We haven't heard anything about you for six years.  What's happened?

A      One reason I'm here is because I'm subpoenaed to

be here.

Q    And you never talked to anybody previously about this?

A    No, sir.

Q    So, how did you wind up -- how does anybody know that you've even got anything to offer about this situation?

A    That's what I want to know, why I was subpoenaed.

Q    At the gate, you said that you didn't tell Kenny anything about "That was the law that just drove by and they're probably coming to get you."  You didn't say that?

A    No, sir.

Q    Was there any conversation about the law then?

A    Well, I assumed it was the laws, you know, because it wasn't Kevin Adams.

Q    Hold on a second.  The same admonition I gave you a moment ago.

        MR. LITTLEFIELD:  I'm going to -- Mr. Smith shouldn't be giving the admonitions.  That's the Court's prerogative.

        MR. SMITH:  I can change my phrasing, Judge.

        THE COURT:  Let me interject.

    Mr. Crawford, I want you -- and it goes back to the beginning, you're a little bit too quick to answer

the question.  Wait 'til the question is fully asked before you answer.

THE WITNESS:  Yes, sir, Your Honor.

THE COURT:  You'll note, you've been here long enough to know that there may be an objection, so -- you don't have to wait a long time, but you'll note if there's an objection, and if there is, you'll stop.

THE WITNESS:  Yes, sir.  This is my first time.

THE COURT:  Okay.  And then you have a tendency to start answering before the question's asked, and that makes it impossible for the court reporter to pick it up.

THE WITNESS:  Okay.  I apologize.

THE COURT:  I know you could perhaps be nervous, so, just relax and wait until the question's finished and then answer it.

THE WITNESS:  Yes, sir, Your Honor.

THE COURT:  You may proceed.

MR. SMITH:  Thank you, Your Honor.

BY MR. SMITH:

Q     Sir, again, what I need to know from you is not a guess or a suspicion or I think.  I need to know either you know it or you don't.  Fair enough?

A     Yes, sir.

Q     So, as it relates to whether or not there were law enforcement officers inside of that white Bronco, you do

know for a fact that was the case, or you don't know?

A    I do not know if those were laws in that vehicle.

Q    All right.

(PAUSE)

BY MR. SMITH:

Q    So, when you're down there having that conversation with Kenny, at the gate, was there a conversation about law enforcement?

A    Yes, sir.

Q    So, was it you telling him, "I think that might have been law enforcement that was out there"?

A    I might have said that could be laws, but like I say, I wasn't for sure, you know.  It was a strange vehicle, two strange men.  I know all Sequoyah County laws, you know.  Them being from another county, I couldn't have said.

Q    And that's where what I want to call a flippant remark, just a, "I don't care.  If I go down, I'm going down in a blaze of glory;" right?

A    Uh-huh.

Q    Okay.  Would that be yes?  Is that a yes?

A    Yes.

Q    Now, you knew that Kenny did not have a particular affection for the sheriff over there; didn't you?

A    Yes, sir.

Q      You knew Kenny when he was 17 years old; didn't you?  Is that a yes?

A      Yes, sir.

Q      And you knew of a problem that he had with Sheriff Johnny Philpot when he was 17 years old?

A      Sure do.

Q      You knew that he got his nose busted by the sheriff?

A      Yes, sir.

        MR. LITTLEFIELD:  I'm going to object to that. That assumes facts not in evidence, and it's certainly remote.

        THE COURT:  Overruled.  You may answer.

BY MR. SMITH:

Q      You do know about that, sir?

A      Yes, sir, I sure do.

Q      Do you know what the event was that caused the sheriff to get on to Kenny and bust him in the nose about, what Kenny had supposedly done?

A      That, I do not know, sir.

Q      Okay.  What about Frank Loyd?  Had Kenny told you that Frank Loyd had been pestering him?

A      No, sir.

Q      He didn't tell you he'd been putting any pressure on him or anything?

A    No, sir, not that I recall.

Q    How many conversations had you had with Sheriff Philpot?  You said he came out to the house to tell you about I might be wanting to try to talk to you, and Mr. Hilfiger, an investigator.  Outside of that, how many other conversations had you had with him about this case?

A    Well, he has not discussed none of the trial with me.

Q    I understand that.  How many conversations have you had with him?

A    I don't understand what you're saying.

Q    Other than the time -- when did he come and tell you that I wanted to visit with you?

A    I don't recall what night that was, sir.

Q    Is there something wrong with your memory?

A    Yes, sir, there sure are.  Yes, sir.

Q    So, can we trust that you remember events from six years ago?

A    Yeah, I would hope you could.  You know, I --

Q    You can't seem to remember a week ago.

A    Well, I -- no, I can't remember what night that was.  I don't exactly remember.

Q    Can you remember how many other conversations you've had with Sheriff Philpot?

A    No, sir, I couldn't.

Q       Have you had any conversations with other agents of the federal government?

A       No, sir, I sure have not.

        MR. SMITH:  Pass the witness, Judge.

        THE COURT:  Redirect.

                REDIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q       Who was it that talked to you about this case and your testifying?

A       You did, Mr. Littlefield.

Q       And prior to me speaking to you in regards to testifying about this case, who, from law enforcement, had talked to you about what you knew about this case?

A       No one.

Q       Okay.  And when I came to talk to you, did I give you any kind of document in regards to appearance in this courtroom, and if so, what was it?

A       No, sir, you didn't.

Q       Did I, at some point, give you a document about appearing here, requiring you to be here?

A       Yes, sir, I had to be here.  I got subpoenaed.

Q       Okay.  If you -- do you have a telephone at your house so that you can be contacted?

A       No, sir, I sure don't.

Q       And how are you contacted in regards to advising

you when you need to be here?  Who is it that is the person that let's you know?

A     Johnny or Lance and Judy Bergman, when you call over there.

Q     So, if I need to get in touch with you and ask you a question, or somebody from our office says you need to be here on such and such a day, who gets the message to you?

A     The Bergmans.

Q     Or?

A     Johnny Philpot, or you.

Q     Okay.  And other than that, have you had any contact with Mr. Philpot about being up here or what you were going to say or anything else?

A     No, sir.

Q     Okay.  When that white vehicle drove by going west, who is it that first introduced the topic that that might be the law?

A     I don't recall if it was me or him.

Q     Okay.  Was that brought up?

A     It seems that it was brought up, but I don't recall who --

Q     Who initiated it?

A     Yes, sir.

          MR. LITTLEFIELD:  Can I have just a second?

Pass the witness

MR. SMITH:  Nothing further, Judge.

THE COURT:  May this witness be excused?  Does the defendant have any objection?

MR. SMITH:  No, Your Honor.

THE COURT:  Sir, you may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You are excused.

You may call your next witness.

MR. LITTLEFIELD:  John Hamilton.

JOHN HAMILTON, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION,

BY MR. LITTLEFIELD:

Q     State your name for the record, please, sir.

A     John Hamilton.

Q     Mr. Hamilton, how old are you?

A     Forty-five.

Q     Okay.  And how are you employed?

A     By the Oklahoma Highway Patrol.

Q     Okay.  You may need to lean forward and speak into the microphone.

A     Oklahoma Highway Patrol.

Q     Okay.  And what is your current assignment with the Oklahoma Highway Patrol, sir?

A     I'm a bomb technician with the bomb squad.

Q      And how long have you been a bomb technician?

A      Eight years.

Q      Is that a full-time or a part-time assignment?

A      Full-time assignment now.

Q      Okay.  When you say "now," has it always been a full-time assignment?

A      No, sir.

Q      And what time period was it a part-time assignment?

A      Prior to July 1, 1999.

Q      19 what?

A      '99.

Q      How long have you been a trooper?

A      I'm in my twenty-first year.

Q      Prior to going full-time as a bomb technician, did you have any other area of specialty with the Oklahoma Highway Patrol?

A      Yes, sir.

Q      And what was that?

A      Tactical team.

Q      Describe for the jury what the tactical team is.

A      Our tactical team is comprised of two teams, an east and a west team.  We assisted law enforcement agencies throughout the state in service of warrants, man hunts, prison riots, disasters of any kind.

Q      Okay.  And when did you become a member of -- let

me strike that.  You say there are two teams.  How are those two teams set up in regards to the state?

A     We have a commander, an assistant commander, a team leader, two assistant team leaders, and on each team, there are eleven members which are comprised of a team leader, two assistant team leaders, and two squads.

Q     Okay.  Is it just two teams for the whole state, or do they split the state?  Is it divided?  How is that done?

A     The eastern part of the state is divided by I-35.

Q     Okay.  So, you were a member of the west or east tact team?

A     East.

Q     When did you become a member of the tact team?

A     1986.

Q     Okay.  Eleven members on the team?

A     Yes, sir.

Q     Back in '99, what would be the average experience in the tactical team, of the eleven members, how long average -- if you put them all together and lumped them and divided by 11, how long do you think the average service had been on that tact team at that time?

A     Approximately ten years.

Q     Okay.  You'd been longer than that?

A     Yes, sir.

Q    What kind of training do the members of the Tact Team have that allows them the proficiency in the specialized areas?

A    We train in firearms, we go to schools, we train two days a month and two weeks a year.

Q    So, every month, how much training did you -- the tact team have?

A    Sixteen hours.

Q    Okay.  Two full work days?

A    Yes, sir.

Q    Okay.  And you said something about two weeks a year.  What do you mean by that?

A    We train for a week long training period in the spring, and a week long training period in the fall.

Q    Okay.  You mentioned several different types of responsibilities the tact teams give.  Let's focus on the assistance the tact team provides to local law enforcement in regards to search warrants.  Okay?

A    Yes, sir.

Q    What kind of assistance does the tact team, or did they back in '99, provide to local law enforcement in regards to the execution of search warrants?

A    A lot of agencies did not have the manpower or the equipment to do those type of services with, and they would request us to do that, or assist them with

it.

Q      Okay.  How often in an average year, during this time period, would the tact team for the eastern half of Oklahoma assist local law enforcement in the execution of search warrants?

A      I don't know the exact number.  It was several times a year, that we were requested to do that.

Q      Okay.  Who made the decision within the organizational structure of the Oklahoma Highway Patrol, as to whether or not the tact teams would provide assistance to local law enforcement in regards to search warrants?

A      The commander of the tactical team.

Q      And who was it at that time?

A      Lieutenant Pettingill.

Q      Do you know how the information would be communicated to him?  If I'm a -- if I'm a cop in Tahlequah, Oklahoma, and I'm wanting to run a search warrant, and I'm wanting assistance from the Oklahoma Highway Patrol, what am I supposed to do to see if I can get assistance?

A      They would contact either Lieutenant Pettingill or a member of our team.  They would provide some type of information to Lieutenant Pettingill, and he would assign or ask one of us or several of us to help collect

some information and get that back to him so he could evaluate that.

Q     Okay.  Are you familiar with any kind of restriction or requirement -- what kind of operations it was that the tact team would be involved in and assist in?  Is there any kind of specialized situation that was necessary before the tact team would decide to handle the operation?

A     If something was a danger or a violent person, drugs, something that would involve numbers of people, where the agency that gave us that information did not have the personnel or the equipment to do it, they would ask us for that help.

Q     Okay.  Typical everyday search warrant for a residence, to see if it had a lab, were those the kinds of things that typically the tact team would be involved in?

A     No, sir.

Q     Okay.  Do you know Clint Johnson?

A     Yes, sir.

Q     And did you know him back in '99?

A     Yes, sir.

Q     Did you know Frank Loyd back in 1999?

A     Yes, sir.

Q     Okay.  Had -- prior to September of 1999, had the

eastern half -- the eastern tact team assisted them in the execution of previous warrants?

A     Yes, sir.

Q     And in regards to the previous operations which the tact team had provided assistance to Mr. Johnson and Mr. Loyd, how would you describe your satisfaction with the quality of work and the quality of information that they had provided on previous occasions?

A     Their information had always been truthful and accurate.

Q     Okay.  Did you receive any communication, prior to September 24, '99, in regards to the necessity or the possibility of executing or assisting in the execution of a warrant for the Drug Task Force in District 27, specifically Mr. Johnson or Loyd?

A     Yes, sir.

Q     And, Mr. Hamilton, do you recall where you got the first information from that there was a possibility that you all might assist Mr. Johnson and Mr. Loyd in the execution of a warrant?

A     Lieutenant Pettingill asked myself to meet the investigators in Sallisaw on the 22nd of September, 1999.

Q     Okay.  And who was the other trooper that was advised to meet with Mr. Loyd and Mr. Johnson?

A     Trooper Greninger.

Q      And Mr. Greninger's first name is --

A      -- Raymond.

Q      And did you and Mr. Greninger, in fact, meet with Mr. Johnson, Mr. Loyd on, I think you said September 22nd of '99?

A      Yes, sir.

Q      Where did that meeting take place?

A      Sallisaw airport.

Q      And did you all drive there, or how did you all get to the Sallisaw airport?

A      We drove.

Q      Okay.  Was there anyone else from the Oklahoma Highway Patrol that met you and Greninger and Loyd and Johnson at the Sallisaw airport?

A      Yes, sir.

Q      Who?

A      An O.H.P. pilot, Ken Stafford.

Q      Okay.  And why was Mr. Stafford directed to meet you all at the Sallisaw airport?

A      We were going to fly over the area in question and look at it from the air.

Q      Okay.  I'm not going to ask you specifically what was said by Mr. Johnson or Mr. Loyd, but generally can you describe the type of information they provided you in regards to this operation?

A    They gave the name of the suspect.

Q    Okay.

A    Location.

Q    Okay.

A    Described his demeanor, said he was a reclusive person.

Q    Okay.  Was there any discussion of a threat or the nature of it -- without going into the specifics of it, any discussion about threat to law enforcement?

A    There was a threat to law enforcement, and that he --

Q    I don't want to go into the specifics.  I'm just asking was there some discussion about any threat that might be there?

A    Yes, sir.

Q    Okay.  What about the -- you said the location.  Was there any discussion -- and, again, I'm not asking specifically what was said, but was there any discussion in regards to the terrain and the way the neighborhood existed?

A    Yes, sir.

Q    Okay.  When your team takes on an operation such as this, what do you need to know in regards to the layout or floor plan or the way the structure in which you're going to make entry is set up?

A       We need to know who we're going after, where they're located, what type of a structure it is, a diagram or floor plan of that structure is very helpful.

Q       Did you receive a diagram or floor plan, or anything such as that, in relation to this location that they were talking about you all taking on the responsibility of entering?

A       Yes, sir.

Q       And what was that and who provided it?

A       We had a cardboard mockup of the residence that Kenneth Barrett lived in.

Q       Who provided that?

A       Mr. Loyd provided that.

Q       Okay.  And was a fly over performed?

A       Yes, sir.

        MR. LITTLEFFIELD:  I'd ask that Government's Exhibit Number 174 be displayed to the witness.  It is not yet in evidence, I don't believe.  You should see it on the screen.

BY MR. LITTLEFIELD:

Q       Sir, do you recognize what has been marked as Government's Exhibit 174?

A       Yes, sir.

Q       And are you familiar with this location and --

it's an aerial photo, and it's perspective or view from

the air?

A      Yes, sir.

Q      Is Government's Exhibit 174 an accurate -- is it accurate in what it displays?

A      Yes, sir.

MR. LITTLEFIELD:  Move admission of Government's Exhibit Number 174.

MR. HILFIGER:  No objection.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that it be displayed.

BY MR. LITTLEFIELD:

Q      And are you now -- are you now familiar with this location?

A      Yes, sir.

Q      Okay.  Where is Mr. Barrett's residence?  And you can -- Mr. Hamilton, you can touch that screen with your fingertip, and touch that location.  It's going to leave a mark.  So, if you would kind of tap right on it.  Okay.  You put a blue mark just to the side of a building.  What is that building that that mark's just to the left side of?

A      That building is the residence that we were to serve the search warrant on.

Q      Okay.  Does this look -- with the exception of all

the vehicles, does this look like what it looked like when you all flew over?

A    Yes, sir.

Q    Okay.  In that regard, what, if anything, did you and Trooper Greninger do in regards to documenting and having that perspective from the air of this residence available for the other members of the team?

A    We photographed it, we took a video of it, but the video was not well enough to show, because of the shakiness of the aircraft.  So, we took the photographs, we took several of them, and submitted them to Lieutenant Pettingill and the team.

Q    Okay.  At the point that you had met with Mr. Loyd and Mr. Johnson, you got the floor plan, the model, you got the back -- you know, the information, had a decision to go been made by the Oklahoma Highway Patrol, to render assistance, at that point in time?

A    No, sir.

Q    What did you have to do with that information prior to or in order to have permission or a decision made to go forward with the operation?  What had to happen?

A    We turned over our photographs to Lieutenant Pettingill, we briefed him on the information the investigators had given us, and he was to make that decision.

Q      And was there an ultimate decision, and what was it?

A      There was an ultimate decision to assist on that operation.

Q      Okay.  When the Oklahoma Highway Patrol Tactical Team assisted law enforcement in a search warrant circumstance, or a search warrant situation, what were you all to do?  What was you all's responsibility, and then what would local law enforcement do in relation to what you did?

A      We were to go in and secure the properties, secure the suspects, secure the scene, and then any additional resources would come in and process it for whatever we were looking for.  In this case, methamphetamine.

Q      Okay.  Would you all handle the search?

A      No, sir.

Q      So, you all would make entry and make sure it was secure, and then what would you do with the location?

A      We would hold the scene until the remaining parties would arrive to process the scene for whatever we were looking for.

Q      Okay.  And would you all hang around during the search, or would you leave once you'd secured it and turned it over to local law enforcement?

A      We would leave.

          MR. LITTLEFIELD:  I'd ask Government's Exhibit

Number 87 be displayed.

BY MR. LITTLEFIELD:

Q      Do you recognize this document, sir?

A      Yes, sir.

Q      And what is that?

A      A warrant.

Q      What kind:  search, arrest, what?

A      Arrest warrant.

Q      For whom?

A      Kenneth Barrett.

Q      Have you seen this document before?

A      Yes, sir.

Q      And when did you first see it?

A      We were given a copy of this before we went on the search warrant.

Q      Okay.  When did you become aware that in addition to a search warrant, there was an arrest warrant for Kenneth Barrett?

A      Investigators Johnson and Loyd had told me about it.

Q      Is this when you met them at the airport?

A      Yes, sir.

Q      Okay.  And was that part of the information that you communicated to Lieutenant Pettingill?

A      Yes, sir.

Q      Okay.  But actually this was placed in hand, you got a copy of this, when?

A      Prior to us leaving on the operation the night of the 24th of September.

Q      Okay.  Would you look at Government's Exhibit Number 88?  Do you recognize that document, as well, sir?

A      Yes, sir.

Q      And what is that?

A      Search warrant.

Q      And when did you receive the search warrant?

A      Prior to going to his residence on the operation.

Q      Okay.  So, when you all actually went to Mr. Barrett's residence to perform entry, just -- how long prior to it was it that you got the arrest warrant and the search warrant?

A      I don't recall the exact number of hours, but it was quite some time, maybe even a day before.

Q      Okay.  When was it that you learned, after reporting to Lieutenant Pettingill, that this operation was a go?

A      Shortly thereafter, we were told to report to Camp Gruber on the 23rd of September.

Q      Okay.  And did you all meet out at Camp Gruber?

A      Yes, sir.

Q      Okay.  Who all met out there?

A     The members of the east tactical team, except for two.

Q     Why were two members not present?

A     One was on vacation in Michigan or Minnesota, and the other one was in a school.

Q     So, there were how many members of the -- actual members of the tactical team that reported to Camp Gruber?

A     Nine.

Q     Okay.  Who was the team leader back in September of 1999?

A     Trooper Lee.

Q     Okay.  Where -- was Trooper Lee at Camp Gruber, or was he elsewhere?

A     Elsewhere.

Q     Where?  Do you recall?

A     Vacation.

Q     Okay.  You all were two short -- two individuals short?

A     Yes, sir.

Q     How was that gap or that shortage of two personnel dealt with in regards to this operation?

A     We brought another member from the west team over.

Q     Who was that?

A     Jim McBride.  Lieutenant McBride.

Q      Do you know what his position was with the west team?

A      He was an assistant commander.

Q      And that's one replacement.  Who was the second replacement?

A      Danny Oliver.

Q      Were you familiar with Mr. Oliver --

A      Yes, sir.

Q      -- at this point in time?

A      Yes, sir.

Q      And how were you all familiar -- you familiar with Mr. Oliver in September of 1999?

A      Mr. Oliver had previously been a member of the Oklahoma Highway Patrol and the tactical team.

Q      Which tact team, east or west?

A      East.

Q      What position had Danny Oliver occupied with the Eastern Oklahoma Highway Patrol Tact Team?

A      Team leader.

Q      How long had he been team leader?

A      Several years.

Q      Okay.  How familiar were the nine members of the tactical team with Mr. Oliver and his ability to perform operations in a tactical entry?

A      Very well.

Q      Okay.  How -- what was Mr. -- are you familiar with what Mr. Oliver's occupation was or position was in September of 1999?

A      Yes, sir.

Q      What was it?

A      He worked for the Drug Enforcement Administration, as a Task Force Agent.

Q      Okay.  And what local law enforcement agency was he connected with, that allowed him to be assigned as Task Force Agent to the D.E.A.?

A      I believe it was Cherokee County Sheriff's Office.

Q      I'm sorry?

A      Sheriff's Office.

Q      Okay.  How confident were the members in Danny Oliver's ability to handle whatever he needed to do in this operation?

A      Very confident.

Q      You all met at Camp Gruber.  About what time did you assemble?

A      Noon on the 23rd.

Q      When this kind of assignment is given to the tactical team, you're going to enter a place and secure it, secure any individuals inside, and then turn it over to local law enforcement, how do you all go about planning an operation?

A     We take the information that we have, sometimes we have to augment that with information of our own, and we did develop a plan from that.

Q     I'm sorry, I'm having trouble hearing you.  Lean forward, please.

A     We take the information that we have or whoever we've collected it from, in this case, Investigators Johnson and Loyd.  Sometimes we have to augment that with information of our own, and then we develop a plan from that.

Q     Okay.  And when you all developed this plan -- is it -- who was the team leader who led this operation?

A     I was the team leader this day.

Q     Okay.  When the plan is being formulated, how -- who comes up with it?  How is it developed?

A     We take considerations and recommendations from all members of the team.  The final call to go would have been Lieutenant Pettingill's, as well as approval of the plan.

Q     Okay.  Do you just put the plan out and say, "Here's what it is," or what?

A     We put the information out there, everybody has equal say in what may or may not take place, and we start to pick it apart, what will work, what won't work, what's good, what's bad, and we continue to work on it until we

come up with a plan that's good for all of us.

Q    Okay.  If somebody objects to a particular item that is a part of the plan, what happens?  If I'm one of your team, and I say, "I don't like the way you're talking about doing this," what happens when my objection is lodged?

A    We discuss it.  We come up with an alternative plan, or we go ahead and work on that plan and fine tune it even more to where it is acceptable to everybody.

Q    Okay.  Was a plan developed for this operation?

A    Yes, sir.

Q    And you had the aerial photographs.  What part did they have in developing the plan?

A    I had aerial photographs, as well as the cardboard mockup.  We looked it over, looked at the terrain, the features from the aerial photographs, the cardboard mockup, and we decided on how we would approach.

Q    Okay.  Initially, how were you all intending to approach this residence?  From what direction?

A    We thought we would put a creek team out or an observation team, but we wanted to get a closer look or a better look at that --

Q    Okay.  When you all first set your plan, were you going to come in from the north, the west, the south, the east?  What means of access did you initially

consider as far as approaching the residence?

A      I believe the first plan was from the south.

Q      Okay.

MR. LITTLEFIELD:   And could we put 174 up again?

BY MR. LITTLEFIELD:

Q      And do you see it -- where were you planning to enter -- the teams enter and approach from, when you were going to come from the south?

A      We were going to -- may I touch the screen?

Q      Sure.

A      We were going to walk in from the south and approach from this area.

Q      Okay.  Where would you have left the vehicles, if the entry team had approached from the south?

A      We would have had to leave them quite a bit of distance away, or had somebody drop us off.

Q      Okay.  You mentioned a creek team.  What does a creek team do?

A      They get into an area, they observe it, they advise us of what is going on at the time.  If any activity --

Q      How does the creek team communicate to the other members of the team, if they're on-site and doing real time observation?

A      Radio communication or cell phone.

Q      Okay.  What kind of limitations are there in the radio communication?

A      There has to be a system to where our radios will be able to communicate.  Hills, trees, any type of terrain features that could block that signal, we may not be able to hear them.  Somebody's got to be close to the team on the ground, in order to hear that communication.

Q      Okay.  And if the creek team is out there and they're discovered, is there a term "extraction team," or some term similar to that?

A      That's what the purpose is, if the person is monitoring the radio, they could go in and get them out.

Q      Okay.  The individual that's monitoring the radio and in communication with the creek team and who's in a position where they could be removed if it becomes necessary, how far, typically, does that individual need to -- or how close does that individual need to be with the creek team in order to accomplish the communication and the extraction, if that becomes necessary?

A      The person needs to be very close.  If they get in a compromising situation, they have to be able to get help to them quickly.

Q      Okay.  Beyond providing real-time observation, to let the entry team know what's going on at that location,

is there another function that the creek team performs?

A       Yes, sir.

Q       And what's that?

A       Sniper team.

Q       Okay.  And when I think of sniper, I think of that Tom Berringer movie where they're going out trying to shoot the bad guys.  What's the purpose of what you're calling the sniper team, in this creek team operation, for the tactical team?

A       Provide long cover for the entry team, once we get on the property.

Q       Okay.  It's not just -- do they just walk up and shoot the bad guy right off the bat?

A       No, sir.

Q       Okay.  How many people -- well, let me show you Government's Exhibit Number 175.  And it's going to be displayed.  Do you see that photograph, Government's Exhibit Number 175?

A       Yes, sir.

Q       And are you familiar with what that is a photograph of?

A       Yes, sir.

Q       What is it?

A       The model.

Q       Okay.  The model you all had, the cardboard model,

do you know what happened to it?

A    I do not know.

Q    Okay.  Don't have it available?

A    No, sir.

Q    How accurately did the cardboard model come in matching what we've got here?

A    It was very close.

Q    Okay.  Was it sufficiently accurate to provide you all with what you needed to know to make entry into this residence?

A    Yes, sir.

Q    Okay.  Were you -- what information were you provided about the size of this place, by Mr. Johnson and Loyd?

A    The residence was very small.

Q    And did that have any bearing on you all's plan as to entry into the building itself?

A    Yes, sir.

Q    What bearing did that have?

A    We knew we couldn't put a whole team in there, because of the size of it, we could just put part of a team or a squad in there.

Q    And how many people were you planning -- you all planning to send in?

A    We were going to do the entry with five and enter

with four.

Q      Okay.  When you say entry with five, how would --
was there any special -- what, if any, special provision
was there in regards to this warrant and the entry into
the residence?

A      It was a no knock warrant.

Q      Okay.  And did you all typically serve no knock,
or knock and announce warrants?

A      Knock and announce.

Q      When you knock and announce, what do you do?

A      We knock on the door, announce "Police," enter.

Q      Okay.  How much time do you give them before you
enter, after you say "Police"?

A      A reasonable amount of time for them to get to
the door.

Q      Okay.  In this case, when it's a no knock warrant,
how -- if everything had worked properly, how would
entry have been perfected?

A      We had a --

Q      Or effected or affected, whichever, how would it
have been done?

A      We would have went through the door and secured
the property.  We would not have knocked and announced.

Q      How would you have gone through the door, had it
been closed?

A       With a ram.

Q       Okay.  Who was the man who would have the ram?

A       Trooper Hash.

Q       Okay.  You talked about approaching from the south, sending in a creek team.  Was there anything done prior to going out there and executing the plan, that modified the original plan, and if so, what was that?

A       We decided to do a drive-by in a vehicle.  We wanted to get a closer look from the ground versus looking at photographs from the air.

Q       Okay.  And what vehicle was taken to do the drive-by?

A       My vehicle.

Q       What was your vehicle?

A       My vehicle was a white, 1995 Ford Bronco.

Q       Okay.  You've got some models in front of you. Tell the jury and Court how accurate those are in their portrayal -- do they look like your Bronco?

A       They look like my Bronco, several radio antennas on it.

Q       What did you do in regards to those antennas, going to do the drive-by?

A       I removed the antennas.

Q       Was there any emblems of law enforcement on that vehicle?

A      No, sir.

Q      Were they tinted, the windows?

A      Yes, sir.

Q      What kind of clothing did you wear when you did the drive-by?

A      Civilian clothes.

Q      Who went on the drive-by?

A      Troopers Greninger, Manion, and myself.

Q      And describe for the jury the road that passes in front of Mr. Barrett's residence, the place that you ultimately entered the next morning?

A      The road is an east/west, gravel, county road, normal width.

Q      Is it a through road, or what?

A      No, sir, it's a dead-end.

        MR. LITTLEFIELD:  I would ask that Government's Exhibit 184 be displayed to the witness.

BY MR. LITTLEFIELD:

Q      Do you see Government's Exhibit 184?

A      Yes, sir.

Q      And do you recognize what that shows from the air?

A      Yes, sir.

Q      Which is the county road that you all did your drive-by on?  Can you point to the county road that you all drove by on?

A      Yes, sir.

Q      Okay.  And how much farther does that road go before it dead-ends?

A      Not very far.  Maybe a half a mile.  I'm not sure.

Q      Okay.  You all drove by, and then what'd you do?

A      Stayed at the end of the road where it dead-ended, turned around, and came back out.

Q      Okay.  So, you went from west to east and then turned around and went back out east to west?

A      No, sir -- yes, sir, west to east and turned around east to west.

Q      Okay.  About what time of the day was it that you all made this drive-by?

A      We left Gruber around 5:00 p.m.

Q      Would have got down to Mr. Barrett's residence about what time?

A      5:30.

Q      Okay.  And when you got there, did your drive-by, what bearing did your observations have on your original plan?

A      We noticed there were -- there was no really high ground to observe anything from.  There were a lot of weeds, a lot of vehicles around the structure.  There wasn't a good point to observe anything from, and a lot of animals, also, such as dogs.

Q      When you send a creek team out, what do they need to have in order to approach a place and be able to safely observe it without being compromised?

A      They've got to have some good cover.

Q      What did you see in regards to cover around Barrett's residence, that -- that the creek team could have used?

A      Nothing.

Q      Okay.  You mentioned animals.  What kind of animals?

A      Dogs.

Q      And what was it about the dogs that impacted your plan?

A      The dogs start barking at any sound or whatever sound that they hear, and then that could compromise our team, could alert the suspect.

Q      Were the dogs fenced, restrained, or running loose?

A      Running loose.

Q      Did that have any impact?

A      Yes, sir.

Q      In what way?

A      Same thing.  We were afraid the dogs may come up or alert on our team out there, and compromise them.

Q      Okay.  If we go back to Government's Exhibit Number 174, do you see down in the -- do you see the red

pickup down there on the county road?

A    Yes, sir.

Q    Do you know the direction that is from the residence, north, east, south, west?

A    South.

Q    Okay.  Immediately north of that, there's a black vehicle, appears to be parked diagonally in the drive. What was in that area, when you did the drive-by?

A    A gate.

Q    And what was the condition of the gate?

A    The gate was shut with a chain and a pad lock around it.

Q    Okay.  What, if any, bearing did that have on your original plan for the entry?

A    We had to find an alternate route to enter the property from.

Q    Okay.  So, after you all did the drive-by, you and Greninger and Rick Manion --

A    Yes, sir.

Q    -- where'd you all go?

A    Back to Gruber.

Q    And when you got back to Gruber, did you report anything to the other team members, and if so, what did you report?

A    Yes, sir, we did report something different.  The

terrain didn't lend itself to what we wanted to do with our creek team. We advised them of the gate and we had to find an alternate route, which we did, and of the animals, also.

Q      Okay. By the way, had you received any information regarding the neighbors that lived around Mr. Barrett?

A      Yes, sir.

Q      And what was that?

A      To the west of Barrett's home, his mother lived.

Q      What other information about family in that area had you received?

A      Several other family members and relatives lived around him, also.

Q      Did you know which ones were which, as far as which locations around him were family members?

A      No, sir.

Q      Okay. Did you know where his mother's residence was?

A      Yes, sir.

Q      Okay. When you did your aerial, in regards to where the neighbors were in relation to Mr. Barrett's residence, did the perspective change in that regard, when you did the drive-by and observed it on the ground?

A      Yes, sir.

Q      And what did you see on the ground that appeared

to be different from how you viewed it in the air, as far as the relation of the neighbors to Barrett's residence?

A     The houses were much closer from the ground, and looked like they were going to be a problem for us if we tried to get in from the ground.

Q     Okay.  When you went back, was the team advised of your observations?

A     Yes, sir.

Q     And you said you had to find an alternate entry?

A     Yes, sir.

Q     What changes did you make and did the team make in the original plan that you'd come up with that afternoon?

A     We were going to use a vehicular approach, use a different driveway to the east of Barrett's property, and enter from that direction.

Q     Okay.  If we go back to -- let's look at Government's Exhibit 192.  And it's not in evidence yet. Do you recognize that photograph, sir?

A     Yes, sir.

Q     And does that accurately depict the surrounding area around Kenny Barrett's on the -- September 24th of 1999?

A     Yes, sir.

Q     Okay.  And does it show where the ultimate entry

was determined to have been made from?

A      Yes, sir.

MR. LITTLEFIELD:  Move admission of Government's Exhibit 192.

THE COURT:  Objection?

MR. SMITH:  No objection.

THE COURT:  Exhibit 192 will be admitted without objection.

MR. LITTLEFIELD:  And I'd ask that it be displayed.

THE COURT:  Counsel, it's noon.  Let's take the noon recess.  And I'll ask everyone to remain seated as the jury leaves for the noon recess.  I'll ask you to be back at 1:15, from your lunch break.  You may now exit the courtroom.

(JURY OUT)

THE COURT:  I would ask that the witness step down, excuse himself to the hallway, if you would, please.

(WITNESS COMPLIED)

THE COURT:  First the Government, anything to take up outside the hearing of the jury at this time, for the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  For the defense?

MR. HILFIGER:  No, Your Honor.

(LUNCHEON RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, the defendant is present with counsel.

You may continue your examination of the witness.

DIRECT EXAMINATION, CONT'D,

BY MR. LITTLEFIELD:

Q     Mr. Hamilton, we were talking about you having completed the drive-by and what you observed.  When you got back to Camp Gruber, what did you advise the team?

A     We told the team about the gate, which was locked, the terrain, the animals, close proximity of other homes, and that we didn't think we would be able to get a creek team in there.

Q     Okay.  In what other ways did the drive-by alter the plan, if any, beyond the elimination of the creek team?

A     We knew we were going to have to have a different route to approach the house from.  It would take too long to get out, cut the gate -- or cut the chain off the gate.  So, we chose an alternate route.

Q     Would you look again at 192, Government's Exhibit

192?  And did the team determine or select the alternate

route?

A       Yes, sir.

Q       And is that displayed on Government's Exhibit

Number 192?

A       Yes, sir.

Q       And can you take your finger and draw a line on the

route that you all, as a team, selected to utilize, once

you came back from the drive-by?

A       We came from the west on the county road, traveled

east, turned into the driveway northbound, the bare spot

that goes through the weeds, we turned left, and

approached the residence.

Q       Okay.  That was the plan?

A       Yes, sir.

Q       Okay.  How many vehicles -- you've already said

there were 11 members on the team.  Were all 11 members

going to participate?

A       Yes, sir.

Q       How many vehicles were going to make the entry

from the east?

A       Three.

Q       What vehicles were going to -- what vehicles were

going to be a part of the three that were coming from

the east?  Who was in them?

A      The lead Bronco, myself and Trooper Eales.

Q      Who was the driver of the lead Bronco?

A      I was.

Q      Okay.  Second vehicle?

A      Trooper Greninger and Trooper Manion.  Greninger was the driver of the second Bronco.

Q      Okay.

A      And the third vehicle, a black and white O.H.P. unit driven by Trooper Hash, along with Danny Oliver.

Q      Okay.  The fourth vehicle, who was going to be in that?

A      The fourth vehicle was another O.H.P. unit.  It was manned by Troopers Poe, Darst, and Hise.

Q      And where was that fourth vehicle to go?

A      At the gate in front of Barrett's home.

Q      Okay.  I'm going to ask you to look at Government's Exhibit Number 69.  And can you see in that area where Hise, Darst, and Poe's vehicle was to go to?

A      Yes, sir.

Q      And can you mark that area with your finger, again?

A      Where that vehicle is diagonally, they were going to be just outside, south side of that gate.

Q      That's where the gate was?

A      Yes, sir.

Q      Okay.  The fifth vehicle, who was going to be in that vehicle?

A      Fifth vehicle was a gray Suburban driven by Lieutenant Pettingill and Lieutenant McBride.

Q      Okay.  Rick Manion was the passenger in the second vehicle or -- with Raymond Greninger?

A      Yes, sir.

Q      What happened to Manion, subsequent to this incident?

A      He was killed in a motorcycle accident.

Q      In regards to this plan, was there a -- was there a plan in relation to emergency lighting on the vehicles?

A      Yes, sir.

Q      The entry team, what was to be -- what was to happen in regards to the emergency lighting on those vehicles?

A      The marked O.H.P. units, which was driven by Trooper Hash, was to activate his emergency lights.

Q      When?

A      As they left the county road.

Q      Onto what?

A      Into the private driveway.

Q      Okay.  What about the black -- or the two white Broncos?

A      There was no plan to activate their lights.

Q      Okay.  Any other vehicles, do you recall, were supposed to turn on their lights?

A      The O.H.P. units were to activate their lights, their overheads.  I believe Trooper Hash's vehicle is the only one that had overhead.

Q      Okay.  On the entry into the residence, you all had the floor plan.  What, if anything, was done to prepare for what everybody's responsibilities were in regards to the entry?

A      Once we had our entry team chosen, we rehearsed, at Camp Gruber, our entry.

Q      How did you go about rehearsing it?  What'd you do to prepare for it and make sure everybody knew what they were doing and what they were going to do when they got there?

A      We were in a building at Camp Gruber.  We would arrange the furniture according to the floor plan that we had received, and we would practice our entry.

Q      Okay.  Was any kind of consideration given to the type of structure and the proximity -- that you were going to enter, and the proximity of the neighbors, in order to assure the safety of team members and neighbors that were close by?

A      We tried to set our units up to prevent anyone from either interfering or accidentally coming into that area,

as well as our entry team.

Q     Okay.  What about weaponry chosen?

A     We chose rather than to have our rifles that we normally carry, which were HK 53's, we chose 9mm's and handguns.

Q     Okay.  And what difference did the use of 9mm's, handguns have in regards to or as opposition to the HK 53?

A     The velocity and power of the bullet is not as strong, won't travel as far, won't penetrate walls of homes.

Q     Okay.  When you all went on the operation -- did you all see Johnson and/or Mr. Lloyd at any time during that day?

A     Yes, sir.

Q     Where?  On the 23rd, I'm talking about.  Where did you see them?

A     It would have been the 24th, that we saw them.

Q     Did you see them -- did they come by Gruber at any point in time?

A     No, sir.

Q     Okay.  You saw them at Gruber, or saw them on the 24th?

A     Yes, sir.

Q     Where'd you see them?

A     Shortly after midnight, underneath the overpass at Dwight Mission Road and I-40.

Q     Okay.  And had that been prearranged, that they were supposed to meet you there?

A     Yes, sir.

Q     Why were you to meet with them?

A     They were going to conduct a search.  All we were there for was serve the warrant, secure the premises.

Q     Okay.  What happened when you got to them and saw them at Dwight Mission and I-40?

A     We asked them to give us a two minute separation time, give us enough time to get to the property, secure it, and then they were to come in and conduct the search.

Q     Okay.  How confident were you that two minutes was enough?

A     We were very confident.

Q     And how many -- in the 12 years you'd been on the tact team, up to this point, somewhere in that range, how many of these kinds of operations had you been involved in?

A     Several.

Q     Okay.  Several, that's five or ten, or over a 12 year period, how many do you think you would have been doing?

A     Fifteen to 20.

Q       One a year?  Two a year?

A       Two to three a year.

Q       Okay.  You all took off from 40 and Dwight Mission?

A       Yes, sir.

Q       Who was the lead vehicle?

A       I was.

Q       Followed by who?

A       Trooper Greninger.

Q       And then the third was?

A       Trooper Hash.

Q       At what point in time -- the entry team was in which vehicles?

A       The first three vehicles.

Q       Who was on the -- who were the five that were on the entry team?

A       Trooper Eales, Manion, Greninger, Hash, and myself.

Q       And Danny Oliver was with Hash?

A       Yes, sir.

Q       What was Mr. Oliver's responsibility?

A       Security.

Q       What was he supposed to do when they got there, to provide security?

A       He was going to stay on the outside of the house.

Q       Which area of the house, east, north, south, west?

A       Just on the outside of it, as we made entry, to make sure there wasn't anyone else around, he would provide security for us while we went in the house.

Q       What if somebody was in the house and were attempting to leave in the area where Mr. Oliver was located, what was he to do in that regard?

A       He was to secure them.

Q       Was there security provided by anyone else at the scene?

A       Yes, sir.

Q       And who was that?

A       The remainder of the team:  Poe, Hise, Darst, Lieutenant Pettingill, McBride.

Q       Okay.  You said that Hise, Poe, and Darst went to the gate on the south edge of the property?

A       Yes, sir.

Q       Was security provided, as far as a sniper type person, by anybody?

A       Yes, sir.

Q       And who was that?

A       Trooper Poe.

Q       Okay.  And where was Poe supposed to go to provide security?

A       At the gate.

Q       Now, what was Darst and Hise's assignment?

A     They were to catch any runners, anybody that would flee from the house, going west toward the mother's house.

Q     Okay.  So, where were they -- when they arrived at that area you've marked up there, where were they supposed to go to provide security to the west?

A     They were going to enter the property north of the gate.

Q     Okay.  Move to the north?

A     Yes.

Q     Okay.  And that would be -- in looking at this, which direction were they to have gone?

A     North would be in the driveway and in this area.

Q     Okay.  And Pettingill and McBride were in the last vehicle.  What kind of vehicle was it?

A     Suburban.

Q     And where were they to go?

A     The mother's driveway.

Q     Okay.  Can you see the area in this photograph to where they were supposed to have gone?

A     I don't see the driveway, but the mother's house is the trailer house right there.

Q     Okay.  And they were to pull in that driveway?

A     Yes, sir.

Q     As you made the approach -- well, one other deal

before I get there.  Who was occupying the sniper position?

A    Trooper Poe.

A    When was he supposed to get there in relation -- and go to his position, where he could provide cover and protection for the entry team?  When was he supposed to arrive at that location, in comparison to you all making entry off the drive?

A    As we're entering the property by way of the private drive, he should have already been at the gate and out of the vehicle, to provide cover at that point.

Q    Okay.  So, when you all are coming on, he should be out there getting ready to provide cover?

A    Yes, sir.

Q    Anything happen as you went by the property on the county road, on the south side?

A    I observed a white male in the front of the house.

Q    When you say "in the front of the house," what do you mean by that?

A    He was on the ground, in front of the house.

Q    Can you see an area approximately where he is or where that white male was located, on Government's 69?

A    Approximately that area.

Q    Okay.  And what was that person doing when you observed him?

A     Standing in the yard.   Just standing.

Q     Okay.   How carefully were you attempting to observe that person as you were going on eastbound down the road?

A     Our information was that Barrett --

Q     No, my question is:   How carefully were you observing that person -- attempting to observe that person?   How close observation were you paying as you were moving eastbound down the road?

A     I wanted to watch him, keep my eye on him.

Q     Were you doing that?

A     Yes, sir.

Q     As you were driving?

A     Yes, sir.

Q     Okay.   Anything happen when you hit the corner and made the -- or reached the corner there and made the turn into the driveway?

A     Yes, sir.

Q     Describe that, please.

A     We'd driven by this area earlier.   There were high weeds.   I'm trying to watch the individual in the yard. As I attempted to make the turn into the driveway, I overshot the driveway and hit my brakes and slid into a post, backed up, continued on into the driveway.

        MR. LITTLEFIELD:   I'd ask that Government's Exhibit Number 98 be displayed.

BY MR. LITTLEFIELD:

Q     Do you recognize that area that's shown in that photograph, sir?

A     Yes, sir.

Q     What is that?

A     The driveway where we entered from the county road.

Q     Okay. Do you observe the post that you hit when you first tried to make -- when you first made that turn?

A     Yes, sir.

Q     Can you --

THE COURT:  Has 98 been introduced?

MR. LITTLEFIELD:  Yes, it was admitted through Thomas.

BY MR. LITTLEFIELD:

Q     Can you mark that?

A     (complied)

Q     Okay. As you moved on up -- when you hit the post, what did you do?

A     Backed up, continued on into the driveway.

Q     Okay. And as you proceeded north on the driveway, what were you able to observe in Barrett's yard?

A     Still observed the male standing in the yard.

Q     What was that person doing?

A     The person was still standing.

Q     Okay. Did you make the turn?

A      Yes, sir.

Q      And who was the first person that went through the ditch?

A      I was.

Q      Now --

        MR. LITTLEFIELD:  Judge, I would ask that the witness be allowed to go down and utilize the model. I'm going to ask him to use the vehicles, and I'm going to have him down there for a few minutes.

        THE COURT:  You may.

        MR. LITTLEFIELD:  With the Court's permission, may I ask him some questions while he is there?

        THE COURT:  Yes.

BY MR. LITTLEFIELD:

Q      Mr. Hamilton, you'll need to speak up, because you're not amplified now.

        How -- how -- had everything gone as planned, where would the first vehicle that you were occupying have gone and stopped in entering?  Where would you have stopped your vehicle?  Where had you planned to go and stop?

A      After entering the property somewhere around the southeast corner of the home.

Q      And where was Greninger's vehicle, the second Bronco, to have gone?

A      Somewhere on the northeast corner of the home.

Q      Okay.  And where would Steve Hash, with the black and white -- I think you can grab that microphone -- where would Steve Hash's vehicle have gone?

A      Trooper Hash would be in this area right here.

Q      And when entry was made by -- after the vehicles are parked and the officers exit, how would the house have been approached and entry made?

A      The entry team was going to approach from this area, get onto the porch, line up on this door, and make entry through the front door of the home.

Q      Okay.  Now, take those -- if you would, take those vehicles back and put them back on the road.

       When you entered, I note there is the ditch there. Had you seen that ditch previously?

A      Yes, sir.

Q      Okay.  Was what happened when you crossed the ditch and hit the ditch, as you had expected?

A      The ditch was deeper than we anticipated.  As I crossed the ditch in the Bronco, it struck my rear bumper.

Q      And does the rear bumper of that vehicle strike when you hit the model?

A      Yes, sir.

Q      Okay.  Where was -- did you notice where Greninger

was at this time, as you were entering?

A        He was behind me.  I don't know how close.

Q        Where was your attention devoted?

A        On the subject in front of the home.

Q        Okay.  Would you take your Bronco, the one you were driving, and show the jury the path you were following?

A        I followed the path --

Q        Now, let's go back as you come out of the ditch.  You followed the path you followed.  After you exited the ditch, what happened to you all in that Bronco?  What did you notice, observe, learn was happening?

A        Shortly after we came out of the ditch, we started getting hit by gunfire.

Q        Can you place the Bronco in the area where it was when you began receiving gunfire into that Bronco?

A        It was approximately in that area right there.

Q        Where it is now?

A        Yes, sir.

Q        Okay.  Describe the -- was the gunfire hitting on the Bronco?

A        The gunfire was hitting approximately head level, middle of the windshield.

Q        Could you, at that point, determine where the gunfire was coming from?

A        No, sir.

Q     When you began receiving gunfire, what did you do?

A     Continued on towards the house.  We had one suspect or one subject in front of the house.  That's where my threat was, and that's where my attention was directed, and we were proceeding toward him.

Q     Why did you go toward the person standing in the yard, when you were receiving the gunfire?

A     That was my only threat.  That's the only person I saw.  We were told -- the information was --

Q     No, I don't want to go into what you were told.  Okay?  That's the person you saw.  Who did you think would have been shooting at you?

A     Barrett.

Q     Okay.  As far as what you were observing, who did you think that would have been?

A     Barrett.

Q     Did you think it was the person that was out in the yard that you saw?

A     Yes, sir.

Q     Okay.  And what did you drive towards?

A     I drove towards that subject.

Q     Okay.  Show -- as you continued, after you began receiving gunfire, describe what was happening regarding the gunfire on that vehicle?

A     Little by little, the windshield started to

disappear, glass fragments were going everywhere.  The gunfire intensified, the closer we got to the home.

Q      Okay.  At any point, did you get hit?

A      Yes, sir.

Q      Where, on your person, did you receive wounds from the gunfire?

A      My left eye and my left shoulder.

Q      Okay.  Initially, before you stopped, what wounds did you receive?

A      I knew I was hit in the face --

Q      Okay.

A      -- with something, and after the vehicle stopped, I was hit in the shoulder.

Q      Okay.  Show the path -- show the jury the path that you followed after you began receiving gunfire and it began to intensify?

A      Gunfire started here.  I drove the vehicle on towards the house, made somewhat of a half-moon motion and ended up in front of the home, like that.

Q      Okay.  I think you can return the mike.  You might take it up with you, but I think -- can you turn it off? I think I can have you answer questions now from the seat.

        Did the person that you saw in the yard remain standing, or did that person move at all?

A      That person moved.

Q     Which direction did that person move?

A     West.

Q     Okay.  And how was it that you managed to end up at that location where you ended up?

A     I don't know.  I drove the vehicle.  I was trying to get out of the gunfire, not knowing where it was coming from, and that's where the vehicle stopped.

Q     Okay.  When the vehicle came to rest at that location, what did you do?

A     I fell between the seats -- ducked over between the seats.

Q     Would have been to your right?

A     To my right.

Q     Okay.

A     The vehicle had bucket seats, so, I'm in between them.  I had a diversionary device --

Q     Okay.  Were you still receiving fire at that -- was the vehicle still receiving fire at that point in time?

A     Yes, sir.

Q     Okay.  Mr. Eales was the passenger?

A     Yes, sir.

Q     Did Mr. Eales remain in the vehicle?

A     No, sir.

Q     What kind of protection did Mr. Eales have, as you

all approached?

A      Trooper Eales had personal body armor, he had an additional ballistic vest.

Q      Okay.

A      As well as a shield, ballistic shield, in between his legs.

MR. LITTLEFIELD:  I would ask that Government's Exhibit 103 be displayed to the witness.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q      Do you recognize what's been marked as Government's Exhibit 103?

A      Yes, sir.

Q      What is that?

A      Ballistic shield.

Q      That is the ballistic shield Rocky had?

A      Yes, sir.

MR. LITTLEFFIELD:  Move the admission of Government's Exhibit 103.

MR. HILFIGER:  No objection.

THE COURT:  It will be admitted.

BY MR. LITTLEFIELD:

Q      Can you --

MR. LITTLEFIELD:  Judge, I'd ask that he step out so he can display that.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q      Go ahead and sit back down.  Keep that shield with you, if you could.

How is the passenger of that Bronco, in this case, Mr. Eales, carrying that shield with him as the entry is made?

A      As the entry is made?

Q      As the vehicle entry is made?

A      He has it placed between his legs.  His legs are spread apart.  This is placed between his legs and he's holding onto it.  He's going to be the point man during the entry.  He's taking this in to protect himself as well as the rest of the team.

Q      Okay.  And when one has that, holding it, and it's between their legs, what do you have to do to get out of the vehicle with that shield?

A      You have to turn, get the shield out first, and then get out of the vehicle.

Q      Is that seat such that you could demonstrate the move that has to be made?

A      Placed between his legs, such as this?

Q      Yes, sir.

A      This is not wide enough as the car of a door would be.

Q      Yes, sir.

A      But you're going to have to get the shield out, and then the rest of your body with it.

Q      Okay.

A      In order to exit.

Q      Okay.  As you were down, what did Mr. Eales, Rocky, do?

A      He exited the vehicle.

Q      While Rocky was exiting the vehicle, was the gunfire still going?

A      He was seeking additional cover.  The gunfire was on his side of the vehicle.

Q      Okay.  Could you still hear the gunfire as he was exiting?

A      I don't recall hearing the gunfire.

Q      Okay.  Okay.  You know he got out?

A      Yes, sir.

Q      You said something about a distraction device. There's also, I think somebody said, a flash bang.  Same thing?

A      Diversionary device, flash bang, all the same thing.

Q      Was there one in your vehicle?

A      Yes, sir.

Q      What was done with it?

A       I had one on my vest.  I pulled it off.  It acts similar to a hand grenade, other than it's just a flash and a bang.  It does not deploy any fragmentation.  It's not for any offensive weapon.

I threw it out the window, and the device deployed with a loud rapport and a bright flash.  There was stoppage of the gunfire, and then I exited the vehicle.

Q       So, the gunfire was still going prior to your throwing the flash bang?

A       Yes, sir.

Q       And when you threw the flash bang, did it go off and flash and bang?

A       Yes, sir.

Q       And when was it you got out?

A       After it deployed.  After it went off.

Q       What happened when you climbed out of your vehicle?

A       Got out of my vehicle, went to the back of the Bronco --

Q       What about injuries -- in regards to your injuries?

A       I believe that was the second time I was hit.  When I got out of the vehicle, I was shot in the back of the left shoulder.

Q       Can you point to where you received that wound?

A       (complied)

Q       Okay.  You got hit in the left shoulder.  Then

where'd you go?

A       To the rear of the vehicle -- my vehicle.

Q       Okay.  And when you got there, what did you observe?

A       Trooper Eales on the ground, face down.

Q       Okay.  Was anyone with him at the time?

A       Trooper Manion.

Q       Okay.

        MR. LITTLEFIELD:  Judge, I'd ask that he -- if he would be allowed to get up and point to the location where Trooper Eales and Trooper Manion were located, and return back to his seat?

        THE COURT:  You may.

BY THE WITNESS:

A       Troopers Manion and Eales and myself were somewhere in this area right here, right close proximity -- close behind the Bronco.

BY MR. LITTLEFIELD:

Q       Okay.  At any point after you went back and saw Trooper Eales on the ground, Trooper Manion and you with him, at any point, was your attention called back to the residence?

A       Yes, sir.

Q       When was that?

A       When the gunfire started again.

Q     Okay.  And where did you go when the gunfire started again?

A     To the left front fender of my unit.

Q     Could you tell at this point in time where the gunfire was coming from?

A     No, sir.

Q     Why did you go to the left front of your unit -- left front fender?

A     There was nobody around me.  It had to be coming from the residence, but I could not see any muzzle flash --

Q     Okay.  Okay.  So, you went up to the front -- left front of the unit.  Did you see where Manion went, at all, at that point?

A     He went to the east end of the house.

Q     Okay.  When you got up to the left front, what did you see?

A     I observed a man standing in the interior doorway of the residence, the front part of his body, holding a rifle.  The rifle was pointed down towards the ground.

Q     Okay.

MR. LITTLEFIELD:  I'm going to ask that Government's Exhibit 175 be displayed.

BY MR. LITTLEFIELD:

Q     And do you recognize what that is, sir?

A     Yes, sir.

Q     Okay.  Do you see the front door that opens up to the porch, in that photograph of the model?

A     Yes, sir.

Q     And where's the front door?

A     (gestured)

Q     You said an interior doorway.  Do you see where that's located on the model?

A     Yes, sir.

Q     And can you mark that area, where you saw the man with the rifle, kind of -- I think you said pointing it down?

A     (complied)

Q     Okay.  You've got him in the living room.  Did he stay in the living room?

A     No.  He's in this doorway.  I'm just seeing part of his body.

Q     Okay.  So, he's part in that room and part in the other room, he's at the threshold?

A     Yes, sir.

Q     Okay.  What did you do then when you saw him holding the rifle, standing in that doorway?

A     I had my sidearm.  I fired two rounds.

Q     Did you hit him?

A     No, sir.

Q       Did you initially recall, when you reported this, that you had fired two rounds?

A       No, sir.

Q       When was it that you recalled that you fired two rounds?

A       Prior to a previous proceeding.

Q       Up to that point, you had no recollection of it?

A       No, sir.

Q       After you fired your two rounds, what happened in regards to that man that was at the doorway?

A       He fell face down through the doorway, dropping his rifle.  Fell on the ground.

Q       Head going which way?

A       West.

Q       Towards the living room area?

A       Yes, sir.

Q       Where were his legs?

A       In the east room.  The room behind him, in the threshold he was standing in.

Q       Okay.  When the man went down, what did you do?

A       I entered the house.

Q       Did you say anything to the man at that point?

A       I believe I told him to get up.  He said he could not.

Q       Did he describe why he was unable to get up?

A       He said he was shot.

Q       Okay.  When the man didn't get up, what did you do?

A       I grabbed him and took him outside.

Q       Did you have to go inside, or was he -- were you able to reach him from the porch?

A       I had to go inside.

Q       How'd you grab him?

A       By the hair.

Q       He was face down?

A       Yes, sir.

Q       Grabbed him by the hair?  And what'd you do after you grabbed him by the hair?

A       Grabbed him by the hair with my left hand, took him outside.

Q       How'd you take him outside?

A       I drug him.

Q       Okay.  Still face down?

A       Yes, sir.

Q       And when you got him outside, where'd you go with him?

A       I released him on the ground.

Q       Okay.  When you -- when you got -- when you first came out, you're on the porch; is that correct?

A       Yes, sir.

Q       And how did he get down to the ground?

A     I was still dragging him.

MR. LITTLEFIELD:  I would ask that the witness be shown what's been marked as Government's Exhibit Number 21.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q     Do you recognize that, sir?

A     Yes, sir.

Q     And does that -- what does that display?  What area does that display?

A     The porch in front of the Barrett home.

Q     And is that the area -- well, let's go back to Government's Exhibit 12.  I'll show you that instead. Let me display that.  Do you see that one?

A     Yes, sir.

Q     Does it show the area where you dragged the person who was inside the house, to where you took that person?

A     Yes, sir.

Q     Does it accurately depict it?

A     Yes, sir.

MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit 12.

THE COURT:  Any objection?

MR. HILFIGER:  No objection.

THE COURT:  It will be admitted without

objection.

BY MR. LITTLEFIELD:

Q     When you came out dragging him by the hair while he was face down, where did you end up taking him to?

A     That area right there.

Q     Okay.  Was he still face down?

A     Yes, sir.

Q     Anyone come to your assistance in securing custody of the person that you were dragging?

A     Yes, sir.

Q     Who?

A     Troopers Hash and Manion.

Q     And were you still there while the person was taken into custody and subdued?

A     Once I released him to Hash and Manion, I left all three of them and went back to Trooper Eales.

Q     Do you recognize the individual that you saw inside the house, that you brought out?

A     Yes, sir.

Q     Is he present in the courtroom today?

A     Yes, sir.

Q     I'd ask that you point to him and tell the jury what he's wearing today.

A     Sitting at that table, long-sleeved green shirt with a white undershirt, mustache, blonde hair.

MR. LITTLEFIELD:  I'd ask the record to reflect that the witness has identified the defendant.

THE COURT:  The record will so reflect.

BY MR. LITTLEFIELD:

Q     Mr. Hamilton, you mentioned seeing a rifle in the hands of the man.  When you went inside, did you observe that rifle?

A     Yes, sir.

Q     I'd ask you to look at what's been marked as Government's Exhibit Number 15, please, sir.  Do you recognize what is depicted in that photograph?

A     Yes, sir.

Q     What is it?

A     The rifle that fell on the ground, that Barrett was holding when he was shot.

Q     Okay.  And, in fact, is that the location where it fell?

A     Yes, sir.

MR. LITTLEFIELD:  Move admission of Government's Exhibit Number 15.

THE COURT:  Any objection?

MR. HILFIGER:  No, Your Honor.

THE COURT:  It will be admitted without objection.

BY MR. LITTLEFIELD:

Q       Where's the rifle?

A       Interior doorway of the home.

Q       Is that the doorway to which you were earlier referring?

A       Yes, sir.

Q       Would you look at Government's Exhibit Number 17? Did you notice anything about the magazines at that time?

A       No, sir.

Q       Okay.  Is that the rifle?

A       Yes, sir.

Q       Mr. Hamilton, would you look to Government's Exhibit Number 67?  It's not in evidence yet.  You described the shots hitting your windshield as you were approaching.  Did you see the windshield of your vehicle that night?

A       Yes, sir.

Q       Would you look at -- do you see Government's Exhibit Number 67?

A       Yes, sir.

Q       Do you recognize what that is, sir?

A       Yes, sir.

Q       What is it?

A       The windshield of my Bronco.

Q       Okay.  Does that show the shots that you were receiving as you were approaching?

A     Yes, sir.

MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit Number 67.

MR. HILFIGER:  No objection.

THE COURT:  It will be admitted without objection.

BY MR. LITTLEFIELD:

Q     Which direction were those shots traveling, sir? Could you tell where they were coming, as they were entering the vehicle?

A     A slight angle from my right to left.

Q     Okay.  From -- like this?

A     Yes, sir.

MR. LITTLEFIELD:  Judge, I'd ask that Exhibit 128 be shown to him.

BY MR. LITTLEFIELD:

Q     Do you recognize 128, sir?

A     Yes, sir.

Q     What is that?

A     The rifle that Mr. Barrett was holding in his home.

Q     After Mr. Barrett was taken into custody and -- where did you go?

A     To Trooper Eales.

Q     Okay.  What was being done with Rocky?

A     At that point, we tried to render first aid,

trying to get a response from him, took his helmet off, took his vest off.

Q    Okay.  Were you getting any response?

A    None.

Q    You mentioned a vest.  What kind of protection were you all wearing?

A    Had our personal body armor on.  Trooper Eales had two vests on that night.

Q    Okay.  Describe your personal body armor, the kind that you were wearing.

A    Personal body armor is made out of Kevlar, has Velcro closures on the shoulders and around the stomach area.  To take it off, you just remove the Velcro, take the vest off, or cut it off.

Q    Is that body armor that you all had that night, sufficient to stop a high velocity round?

A    No, sir.

Q    Now, Mr. Eales had on a second vest?

A    Yes, sir.

        MR. LITTLEFIELD:  I'd ask that he be shown Government's Exhibit 106.

BY MR. LITTLEFIELD:

Q    Do you recognize that, sir?

A    Yes, sir.

Q    What is it?

A      This would have been the outer protection vest that Trooper Eales was wearing.

Q      Okay.  And is it -- what kind of material is it made out of?

A      Ceramic plates.

Q      After people started attemping to attend to Trooper Eales, you'd seen one person in that residence and removed him.  How certain were you that that residence at that point was secure?

A      We weren't.

Q      What was done to secure it?

A      After rendering aid to Trooper Eales, we knew that the residence had to be cleared.  Troopers Manion, Greninger, and myself, and there was one other, which I don't recall at this point, entered the residence to clear it of any additional -- if there were any suspects.

Q      Was the bottom of the house checked to make certain that no one was in the bottom of the house?

A      They were beginning to do that.

Q      Okay.  Were you aware that there was an upstairs -- an access to the upstairs in that residence?

A      Yes, sir.

Q      Okay.  What was done to -- or what happened in regards to clearing and securing the upstairs?

A      One of the team members had called for a mirror.

We use that so we don't have to access the stairs ourselves, we can look up into an area with a mirror, without exposing ourselves.

Q      Okay.  Who went to get the mirror?

A      I did.

Q      What happened when -- did you get a mirror and bring it back in?

A      Yes, sir.

Q      What happened when you got back in with the mirror?

A      I got back in with the mirror, handed to it Trooper Greninger, and he noticed the wounds on me.

Q      At that point, what did Greninger do with you?

A      He took my handgun from me, asked for someone to come get me out of there.

Q      And, in fact, were you taken anyplace and first aid rendered to you?

A      Yes, sir.

Q      Where were you taken?

A      At first to Sequoyah -- Sequoyah County or Sallisaw Memorial Hospital.  I don't remember the name of it.

Q      How long did you stay at the Sallisaw hospital?

A      Not long.  It was after 1:42 in the morning.

Q      And from Sallisaw, where did you go?

A      St. Francis.

Q    How'd you get to St. Francis?

A    Helicopter.

Q    Do you know who that helicopter was originally called for?

A    Yes, sir.

Q    Who?

A    Trooper Eales.

Q    You flew instead to St. Francis?

A    Yes.

Q    What kind of treatment did you have there?

A    X-rays, MRI's, minor surgery on my shoulder.

Q    Okay.

        MR. LITTLEFIELD:  I'd ask that Government's Exhibit Number 90 be displayed.

BY MR. LITTLEFIELD:

Q    Do you recognize that?

A    Yes, sir.

Q    And what is that -- what does that show?

A    Where I was shot.

Q    Okay.  Does it accurately depict the wound to your face and the condition of your eye?

A    Yes, sir.

        MR. LITTLEFIELD:  Move admission of Government's Exhibit Number 90.

        THE COURT:  Any objection?

MR. HILFIGER:  Could we just have one question -- voir dire?

THE COURT:  You may.

VOIR DIRE EXAMINATION,

BY MR. HILFIGER:

Q    When was that picture taken, if you know?

A    After I got out of the hospital.

Q    How long after the 24th of September?

A    It was at least three days.

MR. HILFIGER:  No objection.

THE COURT:  Be admitted without objection.

DIRECT EXAMINATION, CONT'D,

BY MR. LITTLEFIELD:

Q    Would you look to Government's Exhibit Number 91? And what does Government's Exhibit Number 91 show?

A    The wound to my face.

Q    Okay.  What happened to your left eye?  I mean, in regards to the injury itself, not the treatment, but what

was the injury to your left eye?

A    Fragments went into my eye, and they remain there now.

Q    Still there?

A    Yes, sir.

Q    Okay.  Does 91 show the bleeding and all in your

eye, from the trauma of the injury?

A      Yes, sir.

MR. LITTLEFIELD:  Move admission of Government's Exhibit Number 91.

MR. HILFIGER:  Can I ask the same question as to that?

Was that picture taken about the same time as the other picture?

THE WITNESS:  Yes, sir.

MR. HILFIGER:  No objection.

THE COURT:  Admitted without objection.

BY MR. LITTLEFIELD:

Q      Mr. Hamilton, did you suffer any vision problems as a consequence of the wound to your left eye?

A      Yes, sir.

Q      And how long -- what was the nature of the vision problems?

A      Blurred vision, what they call floaters.

Q      How long did that condition continue?

A      I still have it.

Q      What was your rank in 1999, with the Oklahoma Highway Patrol?

A      Trooper with the Highway Patrol, assistant team leader on the Tactical Team.

Q      And what is it now?

A     I'm no longer with the Tactical Team.  I'm still a trooper.

Q     Okay.  Do you have an assigned rank?

A     Nothing other than trooper.

Q     Okay.  When did you leave the Tactical Team?

A     May of this year.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

(PAUSE)

BY MR. LITTLEFIELD:

Q     Mr. Hamilton, how long did you remain at the scene before they took you to render aid for your injuries?

A     When I returned with the mirror from my unit, Trooper Greninger summoned someone to take me to the hospital, and that was my last contact with the scene.

Q     Okay.  And when -- you said -- what happened to your pistol?

A     Trooper Greninger took it.

Q     Okay.  Who got to the hospital first, you or Rocky?

A     I did.

Q     Okay.  Could you tell where Rocky's injuries were located, as they were removing the vest and the turtle shell or the ceramic vest, cutting off his clothing?

A     Yes, sir.

Q      Where were the wounds located?

A      I noticed an entry wound on his side.

Q      What area of his side?

A      Left side and around the -- below his pectoral muscle, rib area.

Q      How low down?

A      Somewhere in the middle of it.

Q      Okay.  And who was rendering aid?

A      At what point?

Q      When you first -- when you saw him -- first saw him.

A      Trooper Manion and myself.

Q      Okay.  And after you left and came back, after you left and took Mr. Barrett -- took Barrett into custody and then returned, who was rendering aid?

A      Manion, Hise, and myself.

Q      Okay.  When you got back, was Rocky breathing, after taking Barrett into custody?

A      We turned him over, tried to get a response, he took two deep breaths, and never said another word.

Q      Did he breathe anymore?

A      Twice.

Q      And after that, no additional breaths?

A      No.

Q      Was CPR rendered?

A      Yes, sir.

Q      By whom?

A      Trooper Manion and Hise.

Q      Mr. Hamilton, I note you put that Bronco almost at the front porch.  Would you look to Government's Exhibit Number 5?  It's going to be displayed to you.  It's not in evidence yet.  Do you see that, sir?

A      Yes, sir.

Q      Okay.  And do you see the area immediately to the left of the front porch as you would be facing the house, and just south of the front porch?

A      Yes, sir.

Q      Do you know what that area is there, the discoloration?

A      There's some kind of fluid that has leaked from my vehicle.

Q      Okay.  Are you familiar -- where, in relation to that fluid, was your vehicle?

A      Almost touching the porch, forward of where it is right now.

Q      Forward -- when you stopped -- when you drove up to the house, where was your vehicle in relation to that fluid spot?  It's not on, so, you can't touch it.  Where was it?  Just describe where it was in relation to that fluid spot.

A      My vehicle was directly above that fluid spot.

Q      Okay.

        MR. LITTLEFIELD:  I'm going to move admission of Government's Exhibit 5.

        MR. HILFIGER:  No objection.

        THE COURT:  Admitted without objection.

BY MR. LITTLEFIELD:

Q      And I note there's an arrow here over the fluid spot.  Is that the fluid spot about which -- that discoloration, is that about which we were speaking?

A      Yes, sir.

Q      Okay.  And your vehicle was where in relation to that?

A      Directly above that.

Q      Okay.  Do you notice the black object just over the yellow crime scene tape?

A      Yes, sir.

Q      What is that?

A      The ballistic shield that was on display up here awhile ago.

Q      Okay.  And if you look just to the right, as you look at the photograph of the driver's door, what is that black stuff and the white stuff there on the ground?  Do you know?

A      I don't know.

Q      Okay.  Would you look to what's been marked Government's Exhibit 10?

Do you recognize what that shows, sir?

A      Yes, sir.

Q      What is that?

A      The discoloration next to the porch.

Q      Okay.  From a different perspective?

A      Yes, sir.

Q      And does that display the location at which your vehicle came to rest when it approached the house, or where it stopped during the approach?

A      Yes, sir.

Q      Where was it in relation to this discoloration?

A      Above it.

Q      Okay.

MR. LITTLEFIELD:  Move admission of Government's Exhibit 10.

MR. HILFIGER:  No objection.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  May I have just a second, again, Your Honor?

THE COURT:  You may.

(PAUSE)

MR. LITTLEFIELD:  Pass the witness.

CROSS-EXAMINATION,

BY MR. HILFIGER:

Q      Mr. Hamilton, I've never talked to you before; have I?

A      No, sir.

Q      You've thought about this -- this matter many times in the last six years; haven't you?

A      Yes, sir.

Q      Let me just talk to you a little bit about this -- on the planning on this event.  How many times -- you said you do about one or two a month, of these executions -- well, that the tact team gets together; is that right?

A      Yes, sir.

Q      And how many times can you recall that you've ever done a day/night/no knock warrant, prior to September 24th, 1999?

A      I think twice.

Q      Twice before?

A      Yes.

Q      And you had been -- Officer Pettingill was your commanding officer, is that right, on the tact team?

A      Yes, sir.

Q      And had he always been the commanding officer on your tact team?

A      No, sir.

Q      Who had done it before?

A      Prior to Lieutenant Pettingill, it was Lieutenant John Haney.

Q      And how much -- when you did these no knocks, who did you do them under?

A      Both.

Q      So, if Pettingill -- you said Pettingill did a no knock/daytime/nighttime warrant before?

A      Yes, sir.

Q      Okay.  Do you know about when that was in relation to this?

A      No, sir.

Q      Who else was on the tact team at the time that that was done?

A      I don't recall the exact members at that time.

Q      Was that the one that Pettingill you say was on, was that done at night or during the day?

A      I do not recall that, either.

Q      On this particular night, as I understand it -- I mean, for planning on this particular event, what kind of uniform did you wear?

A      During the planning, or the execution of it?

Q      No, for the event itself.

A      OD green uniform with shoulder patches similar to this, except they were subdued, they were black and

green instead of gold and brown.  We had a badge on our chest that was embroidered with yellow, State Trooper across the back -- back of our uniform.

Q    What's the purpose of wearing the camouflaged uniform?

A    It wasn't camouflaged.

Q    What did you call it?

A    OD green.

Q    What's the purpose of the OD green uniform?

A    It's just a uniform we had to wear.  That's what we chose to wear as a team.

Q    Does it show up well at night?

A    It can.

Q    It can if you shine a light on it?

A    It's subdued.

Q    It's subdued.  What does subdued mean?

A    Not as visible as others.

Q    It's not as visible as the uniform you have on now; is it?

A    No, sir.

Q    And that's the purpose of it, so if you're on a creek team or something like that, you wear that uniform; don't you?

A    Yes, sir.

Q    And the reason you wear it is because why?

A      We don't want to be discovered.

Q      You don't want to be seen.  It's harder to see you in that uniform; isn't it?

A      Yes, sir.

Q      Now, I'll try not to go through everything on each -- on your plan and everything.  We understand the order that you had in the cars.  And each person had some duty to do in your plan.  I'm not talking about what happened, I'm talking about in the plan itself.  Okay?

A      Yes, sir.

Q      And your duty -- what was your duty in the plan, other than driving the lead car in?

A      I was going to be the second person in the entry team.

Q      Okay.  What about Mr. Eales?

A      Trooper Eales had the shield.  He was going to be the first man in the door.

Q      Mr. Greninger?

A      I believe he was fourth.

Q      He was the fourth man?

A      Yes, sir.

Q      Who was the third man?

A      Manion.

Q      And then what was Mr. Hash's position?

A      Last.

Q    Last man in?

A    Yes.

Q    So, he'd be the fifth man in?

A    Yes, sir.

Q    And then Mr. Oliver?

A    Security.

Q    Security.  And he stays outside?

A    Yes, sir.

Q    Now, we have Hise.  What was his position?  What was his duty?

A    He was on -- at the car, on the road, by the gate.

Q    Was he supposed to stay in the car?

A    No, sir.

Q    Okay.  What was his duty?

A    Catch any runners that may be going west toward the mother's house.

Q    Okay.  Was he supposed to be in the yard or on the -- by the car?

A    It depends on what he observed.

Q    Okay.  Was there a position that he was supposed to take up?

A    By the car.  That's the only place he had any cover.  If he had been standing out in the middle of the yard, he was wide open.

Q    Okay.  So, he was supposed to stay by the car?

That was plan. I'm not saying what happened.

A    Unless he sees someone running from the residence.

Q    And then he goes?

A    Yes, sir.

Q    Mr. Darst?

A    Same as Mr. Hise.

Q    And Mr. Poe?

A    He was the sniper.

Q    Now, these cars were all Oklahoma Highway Patrol cars; right?

A    They were all owned by the Department of Public Safety Highway Patrol. The Broncos were as depicted up here.

Q    Okay. Did you have emergency lights on your car?

A    I had a visor light and deck lights. And the deck lights showed to the rear, the visor light was over the passenger side of the vehicle, on the visor, sun visor.

Q    Tell me what a visor light looks like.

A    It's a red and blue light, real thin, small.

Q    And how do you activate that?

A    With a switch from inside the vehicle.

Q    From where?

A    Either one of the front seats, you could do that from.

Q    I didn't understand you.

A     Either one of the front seats, you can activate the lights from.

Q     You move the visor down?

A     Yes, sir.

Q     Okay.  So, it doesn't activate until it comes down?

A     No, it will activate in the up position.

Q     And any other light on your -- on the Bronco?

A     Deck lights.

Q     And the deck lights are the ones in the back; right?

A     Yes.

Q     And they just shine to the back?

A     Yes, sir.

Q     Were both Broncos -- have the same lighting?

A     Yes, sir.

Q     And what about the one black and white driven by Hash?

A     He had the full complement of lighting, light bar, deck lights.

Q     What other -- when you say full complement, is that it?

A     I don't know if his had grill lights at that time or mirror lights.  I know he had a light bar and he had deck lights.

Q     What about Hise?

A    I believe his unit was slick on top and had no overhead lighting.  He just had deck lights and a light that projected to the front.

Q    Okay.  Now, I got a little mixed up on what lights were supposed to come on.

THE COURT:  Mr. Hilfiger, let's take a break.

If you'll remember my admonition not to discuss this among yourselves, allow anyone else to discuss it with you.

Everybody please remain as the jury exits.

(JURY OUT)

THE COURT:  The witness would excuse yourself to the hall, please, sir.

(WITNESS COMPLIED)

THE COURT:  The record should reflect that the jury and the witness have left the courtroom.

Anything to take up outside the hearing of the jury, for the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defendant?

MR. HILFIGER:  Just one little item, I guess I can think of.  On the transcripts, if we're going to do something for impeachment, does the Court want something?

THE COURT:  That's a loaded question.

MR. HILFIGER:  Does the Court want a

transcript?  Because I've got some -- problem I have is, I've only got one set of transcripts, but they're not the full set.  Do you want something at your bench?

THE COURT:  If there are no objections, and it goes very smoothly, I don't need any.

Does the Government have transcripts?

MR. LITTLEFIELD:  I have some here.  I don't think I have extras.

THE COURT:  Well, I'm not asking for extras. I just want to be sure

MR. LITTLEFIELD:  I believe I do.  I believe I have --

THE COURT:  As you -- I appreciate the warning, Mr. Hilfiger.  I don't know that I can do anything about it other than just limp along.  I'd like to have -- I'd liked to have had some notice.  But we'll take a 15 minute recess.  My goal would be to try to take 15 or 20 minutes and try to go until 5:00.  Whether this jury will let me do that or not, I'm not sure.

(BRIEF RECESS)

(JURY IN)

COURT IN SESSION

THE COURT:  Let the record reflect the jury's in the box, counsel for the Government's present, defendant is present with counsel.

You may proceed.

I might announce in regard -- let me see counsel a moment.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

THE COURT:  Mr. Smith tells me he has a copy of the transcript of Manion's testimony in the previous trial.

MR.SMITH:  No, Hamilton's.

THE COURT:  What did I say?

MR. SMITH:  Manion.  It's Hamilton.

THE COURT:  Hamilton.  I haven't looked at it. I do have that there to the extent that --

MR. HILFIGER:  I think it's preliminary, first trial, second trial, I think.

THE COURT:  I think this is --

MR. HILFIGER:  Yes, I think it's all three of them.

THE COURT:  Do you anticipate going into all three of those?

MR. HILFIGER:  Well, today, the last hour is (inaudible).  Given we have the two day break, that we're going to break, we will have it for sure by Monday.

THE COURT:  Well, I don't know how long it's going to take.  You know what I have then.

MR. HILFIGER:  Well, I'm assuming -- if I could --

THE COURT:  You can look at it.

MR. HILFIGER:  I believe that's how he's got it split up, because that's what I have done.

THE COURT:  You can look at it, too.

MR. HILFIGER:  Yeah, he has -- not on that, but there are other interviews that were done, everything with Hamilton.

THE COURT:  Is there any work product in there?

MR. HILFIGER:  No, there's no work product.

MR. LITTLEFIELD:  There is Government work product, but five, six and seven are the three transcripts.

THE COURT:  Do you want to look at that and see --

MR. LITTLEFIELD:  No.  I understand what he's got and what he's doing.

THE COURT:  Okay.

(END OF BENCH CONFERENCE)

THE COURT:  You may continue with your cross examination.

CROSS EXAMINATION CONT'D

BY MR. HILFIGER:

Q     I think we had -- at this particular time, we're

still talking about the plan, Mr. Hamilton.  Okay?

A    Yes, sir.

Q    Was there a determination made as to when you were going to go?

A    Yes, sir.

Q    Okay.  And when did you do that type of planning, make the determination when you were going to go?

A    After we had developed a plan of what we were going to do, we decided on a time.

Q    Okay.  And what day of the week was this?  Isn't -- I know it was 12:30.  Let's talk about the day when all the -- the drive-by and all, what day of the week was that?

A    I think it was Wednesday.

Q    It was a Wednesday?  Okay.  And, so, on Wednesday evening, you were at Camp Gruber?

A    Yes, sir.

Q    Wednesday evening, while you were at Camp Gruber, you were developing a plan; is that right?

A    Yes, sir.

Q    And was the time selected first, last, or do you know when was the time selected?

A    The time would have been last.

Q    That was one of the last things you put up in the plan; is that right?

A      Yes, sir.

Q      In developing the time -- determining the time, did you -- what things did you take into consideration to determine what time you were going to go?

A      I don't recall any specific thing about what time, other than Trooper Eales wanted -- he was the one who had the main input on the time.

Q      What was his input on the time?

A      He wanted to go at 12:30 at night, because he wanted to get back home to his family.

Q      Okay.  Did anybody else discuss why a particular time, other than Trooper Eales?

A      No, sir.

Q      So, would you say Eales was the one responsible for selecting the time, as far as suggesting what time?

A      He suggested it, but we all agreed on the time to go.

Q      And simply because he wanted to get home?

A      Yes, sir.

Q      Did anybody else talk about any alternative times?

A      I'm sure they did, yes.

Q      Can you recall that?

A      We agreed on that time.  I can't remember a specific time that any one person talked about.

Q      Did you discuss going later in the morning, or

earlier, however you want to -- after 12:30, like, closer to dawn?

A     No.  Most daytime warrants are served early in the morning.  We didn't want to get close to that time line.

Q     Why?

A     They expect us to come at that time.

Q     Okay.  So, you're saying you didn't want to do the early morning warrant search -- an early morning search because you felt like the people would be expecting you to come early morning; is that right?

A     Yes, sir.

Q     And that was discussed?

A     Yes, sir.

Q     Was there any discussion as to Kenny Barrett and his status, at any particular time out there, like would he be asleep, awake, working, not working?

A     We never knew his status.

Q     That's because you weren't told any information; isn't that right?

A     No, it's because he's a drug user, and we didn't know when he would sleep, when he would be awake, if he was up, down, high, or in between.

Q     Okay.  But that was the information Clint Johnson gave you; right?

A     Yes, sir.

Q     Or Frank Loyd?

A     That was some of the information we had.

Q     Was any of the information -- did you get any information as to his work status?

A     No, sir.

Q     Did you know if there was a garage out there?

A     Yes, sir.

Q     Did you know that he did mechanic work?

A     No, sir.

Q     Nobody told you that?

A     No, sir.

Q     In fact, did anyone on the tact team itself have any independent information as to Kenny Barrett and his activities, other than your drive-by and aerial fly over?

A     No, sir.

Q     Everything you were relying on was from Clint Johnson and from Loyd; is that right?

A     Yes, sir.

Q     And do you know where they got their information?

A     No, sir.

Q     And as I understand it, you -- you made a statement that you've done previous -- tact team has done previous things for Sequoyah County, is that right, previous from 1999?

A     Yes, sir.

Q    How many times?

A    I don't know.

Q    More than a couple?

A    Yes, sir.

Q    For Clint Johnson?

A    It wasn't for Clint Johnson.  It was either for the sheriff's office, the task force.

Q    Well, Clint Johnson was with the task force; wasn't he?

A    Yes, sir.

Q    Would anything that the task force done, come through Clint Johnson?

A    It did not have to.  It could have come through the sheriff's office.

Q    Would Clint Johnson be aware of any tact team operation?

A    He could be.

Q    But you'd think -- but would it be -- what about Loyd, would he be aware of any tact team operation?

A    He could be, also.

Q    If Clint Johnson was only aware of one or two other times, would that be about right, the using of the Tact Team?

A    I don't know.

Q    You don't know.  You, yourself, say that you were

personally involved in more than a couple, is that right, in Sequoyah County?

A    Yes, with the task force, in their area, whether it be Cherokee County, Sequoyah County, Adair County, in that area.

Q    Okay.  You're talking about the task force area; is that right?

A    Yes, sir.

Q    And the only information you got was the name; is that right?

A    Yes, sir.

Q    Kenny Barrett.  You got the location, how to get there; is that right?

A    Yes, sir.

Q    You got his demeanor, reclusive type person, and you got that he was a threat -- he had threatened law enforcement?

A    And a physical description.

Q    And a physical description.  And the physical description was basically what?  Height?

A    Height, weight, hair length.

Q    Color of hair?

A    Race.  Yes, sir.

Q    Color of eyes?

A    No, sir.

Q      So, if there were more than one person out there, would you feel that you'd have had some problem on who to arrest?

A      No, sir.

Q      Why not?

A      We would secure all of the subjects there, and we would determine who we had and who, if any, was our person that we were after.

Q      Okay.  And how would you determine that from the first tact team group?

A      I don't understand.

Q      Anybody in that first 11 know Kenny Barrett?

A      No, sir.

Q      Nobody recognized him?  You didn't have a picture of him; did you?

A      No.

Q      You didn't have any kind of detailed drawing of him, or anything like that, artist sketch or anything?

A      No, sir, but that's happened before, though.

Q      Was there any discussion of other people being there?  This was in the planning stage, now.

A      There's always that possibility

Q      Did you discuss it in the planning stage?

A      Yes, we discussed that as a possibility.

Q      Okay.  And what was -- was there any planning

considerations taken -- any planning strategies taken into consideration, should other people be there?

A      Yes, sir.

Q      And what were those?

A      That's why Troopers Poe and -- I'm sorry, Troopers Hise and Darst were going to be stationed where they were at, to catch any runners, whether they be Barrett or someone that was at his residence.

Q      Okay.  And was this -- these people lined up to do this prior to your determination of how you were going to go into the house?

A      Were they going to be staged?

Q      Yes.

A      Yes.

Q      What alternate plans did you discuss, if any?

A      Once we determined our plan, that was the one we went with.

Q      Okay.  In order to determine your plan, did you talk about other plans?

A      The one I previously testified to, the creek team.

Q      The creek team, was that the only plan?

A      Yes, sir.

Q      You never talked about any other plans at all?

A      No, sir.

Q      Did you talk about surrounding and using the P.A.

system?

A    That was not a good alternative.

Q    Did you talk about it?

A    No, sir.

Q    Why didn't you discuss that?

A    There's no cover.  He had the elevated ground. It's a bad alternative.  We had nothing to protect us but weeds, to call him out or attempt to call him out on a P.A. system, where he's made threats against law enforcement, we're not covered out there.  We would have been --

Q    Okay.  So, it's your testimony, then, today, that you didn't even discuss use of a P.A. system to call him out?

A    No, sir.

Q    That's not your testimony?

A    No, sir, we did not discuss it.

Q    Okay.  You did not discuss it.  And then it was just the creek team and going in through the side road, is that right, through the private drive and across the ditch, that's the only two alternatives -- that's the only two plans that you even considered; is that right?

A    Yes, sir.

Q    Did you talk about the -- in the planning stage, did you talk about the number of people that were going

to be coming in the second group, to assist you?

A     No, sir.

Q     Were you aware that there was going to be a second group coming?

A     Yes, sir.

Q     Did you know how many?

A     No, sir.

Q     Now, when you went to Dwight Mission Road and met there at Dwight Mission Road and I-40, and met those -- met the second team, was there any consideration as to the numbers of people there?

A     There was a larger group than I anticipated.

Q     Had you ever had that large a group before, for this small of a building to secure?

A     Yes, sir.

Q     You had.  Is it regular for D. A.'s and assistant D.A.'s to go with you?

A     No, sir.

Q     What did you do to your plan because of the additional people?

A     We told them to give us a two minute separation and by then we would have the area secure and they could come in and do the search.

Q     When you were planning -- this house was sort of in a rural area, although it's got a community there;

right?

A    Yes, sir.

Q    When you're in the planning stages, was there any discussion -- because you weren't going right in the gate; right?

A    Correct.

Q    And even -- well, one -- the road that you were taking really wasn't even a road; was it?

A    A driveway.

Q    It was a driveway for cars?

A    The one we turned off the county road onto, yes, it was.

Q    The one you turned off on to go onto Barrett's property, was that for cars?

A    There had been cars driven in and out of it.

Q    Had you ever seen cars driven in and out of it, other than the three that bumped the ditch?

A    No.

Q    And your Bronco is sort of a high rider; isn't it?

A    Yes, sir.

Q    And O.H.P. unit, something happened to the black and white; didn't it?

A    I don't know.

Q    When it hit that ditch?

A    We all hit the ditch.

Q      Would that indicate to you that's not normally used for cars?

A      I don't know.  Vehicles had been driven in and out of it.  It was a well worn path.

Q      It was a path.

Did you discuss -- because you were going off what's not normally the road, into the yard, did you discuss anything about property owner's right against intrusions?

A      No, sir.

Q      Were you aware that there's any Oklahoma law about property owners having a right to protect their property from intruders?

A      There are laws.

Q      Were you aware of that?

A      We weren't intruding.

Q      Were you aware that there are laws in Oklahoma that a person can protect his property?

MR. LITTLEFIELD:  Objection to the relevance.  It's also been asked and answered.  It's irrelevant, because these were not intruders.

THE COURT:  Any argument, Counsel?

MR. HILFIGER:  Judge, the determination of whether or not they are intruders depends upon the person on the property.

THE COURT:  It's also asking this witness to speculate about the law, and I sustain the objection.

BY MR. HILFIGER:

Q      When you met with those people at Dwight Mission Road, you left, had a two minute head start; is that right?

A      Yes, sir.

Q      How fast did you travel?

A      Normal speed.

Q      What's normal speed?

A      The speed limit, slightly above.  We weren't in a great hurry.

Q      Did you -- how close did you stay to each other, your five cars?

A      I don't know.

Q      Do you keep track of the ones behind you?

A      I know they're behind me.

Q      But you don't know how far behind you?

A      No, sir.

Q      Would you say that each one of the cars were the proper length behind you according to Oklahoma traffic laws?

A      I can't say.  I don't know.

Q      Well, did you see them in your rear-view mirror?

A      Yes, I did.

Q      What is the proper length?  Do you know that?

A      No, sir.

Q      A car length for every ten miles, is that something like it?

A      I don't know.

Q      You don't know that?  You're a Highway Patrol officer and you don't know that?

A      No, sir.

Q      When you arrived and came down this county road, did you see outside lighting at all by the Barrett property?

A      I don't believe so.

Q      Okay.

        MR. HILFIGER:  Would the clerk please hand Exhibit 102 -- Defendant's Exhibit 102 to Mr. Hamilton?

BY MR. HILFIGER:

Q      Do you recognize that exhibit?

A      Yes, sir.

Q      Is it a representation -- a photo of -- an aerial photo of the Barrett property, of the whole area around there?

A      Yes, sir.

        MR. HILFIGER:  We move to introduce Exhibit 102.

        MR. LITTLEFIELD:  No objection.

THE COURT: It will be admitted without objection, Defendant's 102.

BY MR. HILFIGER:

Q      Can you oreint yourself on that?

A      Yes, sir.

Q      Okay.  I believe there's a laser up there, or you can use the screen, whichever one you want to do.

       This road to the left, this road right here, what road is that?

A      County road.

Q      Where does the road lead to down here?

A      I don't know.

Q      Did you go down there that afternoon?

A      No, sir.

Q      You didn't go down this road this afternoon -- that afternoon?

A      No, sir.

Q      What road did you go down?  I'm sorry, this road right here; is that right?

A      Yes, sir.

Q      Where does that road right there lead to?

A      A dead-end.

Q      How far down does it dead-end?

A      Approximately half mile.

Q      Does it dead-end to a creek or something, just --

A     It just dead-ends.

Q     So, traffic doesn't -- there's not an ability of traffic coming out this way, other than coming down this way; right?

A     Not that I know of.

Q     Where does this road go to right here, this drive?

A     To a house.

Q     And it dead-ends, too, at the house; doesn't it?

A     Yes, sir.

Q     So, the only entry from the outside, down through here, is this county road; is that right?

A     Yes, sir.

Q     And that's Kenneth Barrett's house?

A     Yes, sir.

Q     Okay.  Now, you saw -- you don't know whether you saw lighting there; is that right?

A     Yes, sir.

Q     What kind of vegetation did you see there?

A     Weeds approximately four to five feet high.

Q     And where were the weeds approximately four to five feet high?

A     Next to the road, up toward Barrett's home.

Q     Let me show you Exhibit number 104 -- Defendant's Exhibit Number 104.  Do you recognize this?

A     Yes, sir.

Q    These weeds right here, do you know how high those are?

A    Approximately four to five feet high.

Q    Four to five feet high.  Does it block your view from the road to the Barrett house?

A    No, I could see it.

Q    From the road, you could still see it?

A    Yes, sir.

Q    Had a clear view of it?

A    Not as clear as wide open terrain, but I could see it.

Q    Okay.  Let me have you look at Exhibit Number 105, Defendant's Exhibit.  Is that a different view of the same vegetation up and down through there?

A    Yes, sir.

Q    And you say you can see right through that; is that right?

A    I can't see right through it, but I have a view of the home.

Q    You had a view of the home, but the vegetation sort of blocks a very good view; doesn't it?

A    Yes, sir.

Q    Okay.  And according to the plan, as I understand it, this gate was locked, and according to the plan, you say that Hise was supposed to stop on just the outside

of the gate?

A     Yes, sir.

Q     So, he would be stopping on the north side of the road?

A     South.

Q     Which way is south?  Going that way; isn't it?

A     Yes, sir.

Q     Well, where these cars are, would be on the south side of the road; wouldn't it?

A     Yes, sir.

Q     Now, when you were talking to Mr. Littlefield, you said he was supposed to stop right there where that black car was.

A     He can stop there.  There's a gate there.

Q     Well, but --

A     Or there was a gate there.

Q     My understanding was that you said that he was supposed to stop just on the other side of the gate.

A     That's correct.

Q     Okay.  Which side of the road was he supposed to stop on?

A     We didn't discuss that.

Q     That wasn't discussed at all?

A     No, sir.

Q     So, then I'm wrong in saying -- when you pointed

521

to where the black car was and said that's where he was supposed to stop; is that right?

A     He was supposed to stop on the outside of the gate, in the road.

Q     In the road, but not necessarily next to the gate?

A     No, sir.

Q     Okay.  There wasn't a plan as to which side of the road he was supposed to stop on?

A     No, sir.

Q     Now, as you were coming down that county road, at what point -- you can use the laser or you can point -- at what point down the road did you see a person in the yard?  Where were you?  I'm not asking where the person was.

A     Approximately in the road, in that area.

Q     Just on the other -- just east of the gate?

A     Approximately.  I don't know exactly the spot in the road I was at.  That is approximately where I was at.

Q     But where you're pointing is just east of the gate; isn't that right?

A     That's where that is pointing.

Q     And as I understand it, you -- point to where you say that you saw the man in the yard.

A     (witness complied)

Q        Okay.  Do you see a post here?

A        Yes, sir.

Q        And do you see a post there?

A        Yes, sir.

Q        And you're saying that the man you saw was somewhere between those two posts, not directly between them but in the area of those two posts; is that correct?

A        Yes, sir.

Q        And when you saw that man that you later determined -- did you determine who it was?

A        No, sir.

Q        Okay.  When you saw that man in the yard, was there any communication to anybody else about the man in the yard, or anything like that, when you saw the man?

A        I may have said something to Trooper Eales.  That would have been all.

Q        You didn't call, radio -- make radio contact, or anything like that?

A        No, sir.

Q        When you saw the person in the yard, could you tell whether or not that person became aware of you?  I mean, was he looking at you or your car or in your direction?

A        He was looking in my direction.

Q      Okay.  When you saw him looking in your direction, did you consider any alternative plan would be necessary, or did you just go right along with the same plan?

A      We went ahead with the plan.

Q      Okay.  The whole idea on your plan is that you're sneaking up on somebody; isn't it?

A      We wanted to catch him off guard.

Q      Right.  I mean, there wouldn't be need to, you know, come up on the porch and bust in the door, if the people are out in the yard; would there?

A      No, sir.

Q      And if the people are already aware that you're coming, don't you have to do something to change that plan?

A      No, they already know we're coming.  There's no need to go to an alternate plan at that point.

Q      Okay.  So, there's no need to go to an alternate plan, is that what you're telling us?

A      Yes, sir.

Q      What action, if any, did you see that person do as you were driving by?  Did he move?

A      He stood there.

Q      Just stood there and looked?

A      Yes.

Q      And you were the first car, and you -- and he

looked in your direction, is what you're telling us; is that right?

A   Yes, sir.

Q   At this time, was your car regularly lit for nighttime driving?  Did you have headlights on?

A   Yes, sir.

Q   What'd you have them on, high beam, low beam?

A   I don't know.

Q   Okay.  You didn't have any other kind of lights on; did you?

A   No, sir.

Q   Now, as you were going down -- you made a turn; is that right?

A   Yes, sir.

Q   And I understand that you say that you were --

MR. HILFIGER:  Government's Number 69, please.

BY MR. HILFIGER:

Q   I apologize, Mr. Hamilton, that's not the one I was looking for.  But you were making a turn, and you went wide on the turn?

A   Yes, sir.

Q   And what caused you to go wide on the turn?

A   Trying to watch two things at once.

Q   And one of the two things being?

A   The subject in the yard.

Q      How fast were you going at that turn?

A      I don't know.  Approximately 20 miles an hour.

Q      Now, as I understand it, this was just an instantaneous stop, is that right, when you hit the post?

A      I slid into the post.

Q      You slid into the post?

A      I applied my brakes, it was on a gravel road, slid a little ways, struck the post.

Q      Okay.  And then just quickly backed up?

A      Yes, sir.

Q      And took back off?

       I'm sorry, Number 98.  Now, is this -- was the vegetation like this at that time, at that corner?

A      As best I recall, yes.

Q      Okay.  Again, the regular vegetation on this corner, is it four to five feet high, higher, lower?

A      About that level.

Q      And you were able to -- as you were going down that county road and made that turn, were you able to keep the subject that was between those posts in your eyesight the whole time, or did the vegetation ever stop you?

A      I was able to watch him.

Q      Vegetation didn't bother your ability to see him; is that right?

A      Sure, it bothered me, but I was able to watch him.

Q      Was there any light in that yard?

A      I don't recall any.

Q      What other lights were in that area?

A      House lights were on, the door was open, the area in front was illuminated somewhat.

Q      From the front door; is that right?

A      Yes, sir.

Q      You came down the drive -- and I'm putting this Exhibit Number 104 back on -- you came down the drive, and you turned into the ditch; is that right?

A      Yes, sir.

Q      And that ditch is right about at that point; is that right?

A      Yes, sir.

Q      Now, on this picture -- and came out of the ditch. Now, when you went into the ditch, can you tell us where Greninger's car was?

A      Behind me.

Q      Behind you where?

A      Behind me.  I don't know where he's at.  He's behind me.

Q      Do you know whether he's on this private drive someplace, or was he turning, too?

A      I don't know.

Q      You don't know where Greninger was; is that right?

A       He's behind me, that's all I know.

Q       Other than behind you.

        Do you know where Hash's car is?

A       Behind Greninger.

Q       Okay.  But do you know where -- if it's on the private drive, or back here on the county road?

A       Hash would be on the private drive.

Q       He'd be on the private drive; is that right?

A       Yes.

Q       So, when you're turning -- I'm saying you've already got your turn in, okay, at this point, your car is right here, it hasn't hit the ditch yet.  Okay?

A       Okay.

Q       Greninger's back here on the private drive, and Hash is back on the private drive; is that right?

A       I believe so, yes.

Q       Okay.  Did you see any emergency lighting?

A       No, sir.

Q       What was the plan as far as Hash's car on emergency lighting?  When?

A       To activate his lights as they left the county road.

Q       As they left the county road.

        And you're saying that you're here, Greninger's here someplace, and Hash is on the private drive, he's

left the county road?

A      I don't know exactly where he's at.  That's where I think he is.

Q      I understand.  Did you see any emergency lights?

A      No, sir.

Q      Now, when you're coming out of this ditch, how soon is it, on this picture, when you come out of this ditch, do you say you first saw fire?

A      I never saw fire.

Q      I mean, not -- when you first got fired upon?

A      Approximately --

Q      You're saying at that point?

A      Approximately in that area there.

Q      Did you -- in relation to the yellow flowers -- can you see the yellow flowers here?

A      Yes, sir.

Q      Did you ever tell anybody under oath where you received fire in relation to the yellow flowers?

A      It was somewhere in that area right there.

Q      Was there some description as to how you located that area with the yellow flowers?

A      Not that I recall.

Q      You don't?

        MR. HILFIGER:  If I may have just a moment, Your Honor?

THE COURT:   You may.

(PAUSE)

BY MR. HILFIGER:

Q      In 2004, in February of 2004 -- I apologize, in September, October of 2002, did you have an occasion to testify or to give a statement under oath on -- that's shown on page 1379, and it's lines 18 -- 15 to 23, it says your answer is:

"There's the ditch.  When we started coming out of the ditch, we started receiving gunfire.  We were being shot in my Bronco, the lead vehicle at this point.

QUESTION:  "You're indicating to the left of that ditch area that I think we can all identify on the photograph, which is to the right side, about a third of the way up, to the left of that, there are some yellow flowers.  You're saying really about the highest point of the yellow on that photograph; am I right?

ANSWER:  "Yes, sir."

Did you give those answers to those questions?

A      Yes, sir.

Q      And where would the highest point -- would that be the highest point on those flowers?

A      Probably.  I don't know.

Q      Well, you answered the question; didn't you?

A      I did.

Q      And you said the highest -- you responded yes to the highest point on the flowers.  Is your answer today different than it was then?

A      No, sir.

Q      It's the same.  Where's the highest point on those yellow flowers?  Would that be the highest point?

A      Yes, sir.

Q      So, where do you have your pointer?

A      That is where I touched the screen, sir.  That's where the arrow came on.  If I move my finger just a bit up here, it goes one way or the other.

Q      So, where the pointer is, is wrong right there?  It should be right here; is that right?

A      Yes, sir.

Q      Okay.  Now, let's look down to the model.  Where's the highest point on that vegetation, on the model?  Isn't it right there?

A      In this area right here.

Q      Right where you -- point again, now.

A      (complied)

Q      It's right there; isn't it?

A      (No response)

Q      Where did you place the Bronco this morning?

A      In this area right here.

Q      You moved it a little closer, didn't you, to the

house?  This is the area, right here, that you're saying that you first received fire; is that right?

A     Yes, sir.

Q     And is that what your testimony is today, that whatever you said to Mr. Littlefield and wherever you placed the Bronco, that's really the area that you're saying you first received the fire?

A     This area right in here.

Q     Is that the highest area?

A     I don't know.  That's the area that I approximate where the fire came from.

Q     Okay.  Now -- and that first fire that you received, you are telling us that came -- the center of the windshield, between passenger and driver, center of the windshield, about eye level?

A     Yes, sir.

Q     And it came at what kind of an angle?

A     Right to left.  My right to left, as I was driving.

Q     As you were driving, right to left; is that right?

A     Yes, sir.

Q     When you first heard the gunfire -- not heard the gunfire, when you first saw the window get hit, where were Greninger -- where was Greninger's car?

A     Behind me somewhere.

Q     You don't know whether he'd even got into the ditch

yet; do you?

A     No, sir.

Q     You don't know where Hash's car was; do you?

A     No, sir.

Q     Do you know where Hise's car was?

A     No, sir.

Q     Other than where you were, you didn't know what was going on; did you?  I mean, you didn't know where everybody else was located?

A     No, sir.

Q     Now, did you look to see if you could see anybody with a rifle or firearm?

A     The only person I saw was the subject in the yard.

Q     And did he have a firearm?

A     Not that I could tell.

Q     When you saw the subject in the yard -- not when you saw it, but when you first received fire, did you do anything to change your plan?

A     No, sir.

Q     The fire was coming from the front of you; right?

A     Yes, sir.

Q     So, you knew, to some extent, that the person wasn't on your left or your right or behind you; isn't that right?

A     I don't know where he is.

Q    Well, you knew it wasn't right or left of you, because it came from the front; isn't that true?

A    It came from the right to the left.

Q    But it didn't come from your left door; did it?

A    No, sir.

Q    It didn't come from your right door; did it?

A    No, sir.

Q    It didn't come from your back; did it?

A    No, sir.

Q    It came from the front of you; didn't it?

A    Yes, sir.

Q    Now, did you try to do anything to take an evasive action at that time?

A    None other than the direction I showed you awhile ago, that my Bronco took.

Q    Okay.  Was that -- and that direction that your Bronco took at that time, was mainly to go after that person that was standing in the yard; wasn't it?

A    That was the subject -- the only subject that I saw.

Q    Right.  Did you look on the porch?

A    No, sir.

Q    You didn't look on the porch?

A    I'm a little busy at this point.  I'm getting shot at and --

Q       You're trying --

A       -- the only person I see, is the one in the yard.

Q       Okay.  The only person you see is the one in the yard; isn't that true?

A       Yes, sir.

Q       You didn't see anybody in the house; did you?

A       No, sir.

Q       How many shots -- and the first shots are in the windshield; is that right?

A       Yes, sir.

Q       How many shots did you receive?

A       I don't know.

Q       From this point, where you're saying that you received -- started receiving shots; right?

A       Yes, sir.

Q       Did you -- if you'll look -- you've got a trail there on the model, and can you see a little trail here?

A       Yes, sir.

Q       Did you pretty much stay on that trail, or did you go over into any of the vegetation?

A       I believe I stayed on that trail.

Q       Okay.  So, from the time you first got the shots -- was it a continuous rain of shots, up until the time you hit the porch, or did they stop, start, stop?

A       It seemed as though they were continuous.

Q      So, you're saying it was a continuous rain of shots from this point, up until the time you came into the porch; is that right?

A      Yes, sir.

Q      Now, I see when you put your model up here, did your front tire hit the step?

A      I don't know.

Q      And you've always been very careful, I notice, every time you've given something under oath, to say that you you almost came -- you came close to the porch, you almost touched the porch.  At some point, did somebody tell you that you did touch the porch?

A      No, sir.

Q      You didn't have anything -- nobody from OSBI talked to you about it; is that right?

A      No, sir.

Q      So, it was a continuous rain of fire until you came right in there and stopped; is that right?

A      Yes, sir.

Q      Now, how did you come to a stop?

A      Using my brakes.

Q      Were you -- how fast were you going, going in there?

A      I don't have any idea.

Q      Were you upright and watching where the firing

was coming from?

A      I didn't know where the firing was coming from.

Q      Was it still coming into the windshield?

A      Yes, sir.

Q      So, it was still coming from the front of you; is that right?  Coming from the front of you?

A      Yes, sir.

Q      And did you do anything to notify anybody at that particular -- from the time right here, on in, that you were law enforcement?

A      No, sir.

Q      You had some type of emergency lighting on your car; didn't you?

A      Yes, sir.

Q      Did you turn it on?

A      No, sir.

Q      Did Eales turn it on?

A      No, sir.  We had no opportunity to turn it on. We're getting shot at, at this point.

Q      Did you have a siren in your car?

A      Yes, sir.

Q      Did you do anything to turn the siren on?

A      No, sir.  We're getting shot at, at this point. I'm not reaching for my siren.

Q      So, there was nothing you did to notify anybody

that you were law enforcement; is that right?

A     That's right.

Q     Now --

MR. HILFIGER:  Will the clerk please hand Mr. Hamilton the shield that I think is back there?

(CLERK COMPLIED)

BY MR. HILFIGER:

Q     Now, go ahead and sit down, Mr. Hamilton, and take that in there with you.

As you were driving in, did you notice how Mr. Eales was holding that?  Would you say -- was he holding it, just letting it sit on the floor?

A     I don't know.

Q     You don't?

A     I don't believe he was holding it up the whole way from Camp Gruber.  I believe he let it rest on the floor.

Q     I'm particularly talking about coming in here.  Was he holding it up?

A     I don't know.

Q     Would you hold it up a little bit?  How high do you have to hold it to get the sign "State Trooper" to show outside the windshield of the car?

A     I'm not sure that you would have enough room to get it up high enough.

Q     You can't see -- you've got "State Trooper" written

on the front of that; don't you?

A      Yes, sir.

Q      But as you're sitting in the car with that shield there, you can't show "State Trooper" to anybody outside that windshield; can you?

A      That's not the purpose of it.

Q      I understand that.  So, that wasn't shown to anybody; was it?

A      No, sir.

Q      You also have a light on the front of that; don't you?

A      Yes, sir.

Q      Was that light turned on?

A      No, sir.

Q      How heavy is that shield?  Do you know in pounds?

A      Twenty pounds, maybe.

Q      And as I -- as I saw in what you said in order to get out, you have to take the shield out first; is that right?  Is that the only way you can get out?

A      No, sir, you can get out before the shield.

Q      I didn't understand.

A      No, there's several ways you could get out.

Q      Okay.  But you only showed Mr. Littlefield one way you could get out; is that right?

A      That's the way I would get out.

Q     That's the way you'd get out.  Did you see how Mr. Eales got out?

A     No, sir.

Q     So, there are other ways to get out, other than the one way that you showed Mr. Littlefield; aren't there?

A     Yes, sir.

Q     Could you get out with the shield protecting you?

A     If you had enough time.

Q     Do you know when Mr. Eales got out of the car in relation to where your car was?

A     No, sir.

Q     Your car -- are you saying that Mr. Eales got out of the car after your car stopped right at the porch, or could he have gotten out before that?

A     I don't think he baled out while I was moving.  He was still there.

Q     Okay.  You're saying that the car had to stop first, is that right, before he got out, in your recollection of what's going on?

A     Stopped or near a stop.

Q     When you came -- when you hit your brakes, did you just -- did you just roll up to the house, or did you apply them hard and skid, or anything like that?

A     I don't remember.

Q     Did you ever tell anybody that you did skid, before?

A     Yes, sir.

Q     You did?

A     (No response)

Q     And was that just a guess on your part?  You were under oath when you told them that; weren't you?

A     Yes, sir.

Q     Were you just guessing that you skidded?

A     I don't know if I did or not.  I said I could have skidded.  I don't know if I applied my brakes and they locked up, the grass was slick, what kind of conditions there were.  I don't know.

Q     Do you know whether there was any indication out there on that grass that your tires locked up or skidded?

A     I don't know.

Q     You just made that statement; isn't that right?

A     Yes, sir.

Q     And you're telling us you said it in a way of "I could have done that"?

A     Yes, sir.

Q     You were just speculating; is that right?

A     Yes, sir.

Q     When you stopped at the house, right there at the

porch -- I'm sorry, go ahead and set that shield back down.  I apologize.

THE COURT:  Mr. Hilfiger, we're going to take about 10 minutes.

If everyone would please remain seated as the jury leaves.

(JURY OUT)

(BRIEF RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect the jury's in the box, counsel for the Government is present, the defendant and his counsel are present.

You may continue.

CROSS-EXAMINATION, CONT'D,

BY MR. HILFIGER:

Q    As you -- do you know how many shots that you received from the yellow flowers until the time that you got out of your vehicle?

A    No, sir.

Q    From the yellow flowers until the time you got out of your vehicle, was it a continuous number of shots, continuous, or did it stop, start, stop, start?

A    Continuous.

Q    Continuous.

When did you first make any kind of determination of the -- where the shots were coming from?

A     After the vehicle stopped, Trooper Eales and I had exited the vehicle, I discovered him on the ground. While we were on the ground, we knew that the shots were coming from the house.

Q     Okay.  So, until you got out of the car and got behind the car, you -- you didn't have any idea where the shots were coming from; is that right?

A     Yes, sir.

Q     Now, as you approached the house where you've got, sort of, the Bronco going now, you had your headlights on; is that right?

A     Yes, sir.

Q     Do you know whether those headlights were on high beams or low beams?

A     I don't know.

Q     Do you have any kind of determination?

A     I don't know.

Q     Have you ever told anybody under oath what you thought they were on?

A     I don't recall.

Q     You can't recall?

A     No.

Q     If you'd told somebody under oath in February of

2000, that they were probably on high beams, would you deny that?

A      No, sir.

Q      Would that generally be true, that you'd think they were on high beams?

A      Yes, sir.

Q      And high beams mean that they shine more light higher up; don't they?

A      Further and higher up.

Q      Further and higher up.

And as you're coming into that house, the height of that Bronco, the headlights are above the porch; aren't they?

A      I don't know.

MR. HILFIGER:  May the witness step out here to look at the Bronco and the model that's there?

THE COURT:  You may.

BY MR. HILFIGER:

Q      Can you see where the headlights on the Broncos are?

A      Yes, sir.

Q      Are they shining above the porch?

A      They're not shining at all, but they're not --

Q      Well, the headlight level is above that porch; is that right?

A     Yes, sir.

Q     Now -- and you're saying -- how you've got that Bronco is, you've got the front right tire right at the steps; is that right?

A     Yes, sir.

Q     And is that how you say that that Bronco rested?

A     That's close.  That's approximate.

Q     That's close.  So, you're saying that the front right tire went to the steps; is that right?

A     I don't know exactly the inch and foot, but that is close.  That is approximate.

Q     So, it would be incorrect if the Bronco -- if the whole part of the Bronco was to the left of the steps, would not be correct, according to what you recall?

A     No, it would be incorrect.  It's in that general area.  It could be to the left of the step.

Q     Okay.  Go ahead and sit down.

      Again, I'm not trying to get you on whether you're touching the porch or not.  My concern was whether you're to the left of the porch or whether you're sort of on the -- I mean, left of the steps or your tires are going toward the steps.  You're saying it could be left of the steps; is that right?

A     Yes, sir.

Q     What did you do when the car came to a stop?

Q      What did you do when the car came to a stop?

A      Threw the diversionary device out the window.

Q      Did you do anything else before that, regarding the car?

A      Went down between the seats.

Q      No.  Regarding the car, did you do anything before that?

A      Not that I recall.

Q      Did you put it in park?

A      I don't recall.

Q      You don't recall if you put it in park?

A      No, sir.

Q      Could you have just left it in gear?

A      I could have.

Q      Okay.  So, you could have just left that car in gear, in which case, if it's in gear, what's going to happen to it?

A      It will either sit and idle in gear, go forward, or go back.

Q      It was an automatic; wasn't it?

A      Yes, sir.

Q      And you had it -- the motor was running.  You didn't turn the motor off when you stopped; did you?

A      No, sir.

Q      And you don't know whether you left it in gear or

put it in park?

A       No, I don't.

Q       Okay.  And when I'm talking about the motor -- I hate to back up and get way off on this, but I'm going to take you back to the ditch again.  Did you have to do anything unusual -- not unusual, but more than just a little bit of gas to get that car out of that ditch?

A       Not to get it out of the ditch, no.

Q       Did you have to rev the motor and speed up a little bit to get it -- get your bumper off the ground?

A       Well, accelerated when we got into the ditch and coming out of it.

Q       Okay.  And when you accelerated, does that mean you have to push down on the gas?

A       Yes, sir.

Q       Motor roars a little bit?

A       Yes, sir.

Q       And you took off a little fast; didn't you?

A       I don't know how fast we took off.  We took off more than the speed at which we entered the ditch at.

Q       Okay.  Now let's get back up here at the house.  So, the car may -- definitely had the motor running, it may have been in gear.  And what gear would it have been in?

A       Drive.

Q     Drive?

A     Yes, sir.

Q     It may have been in gear with the motor on, and then where did you -- what did you do?

A     I ducked between the seats.

Q     You ducked between the seats.  Was the gunfire still going on when you ducked between the seats?

A     Yes, sir.

Q     Okay.  And then what's your next recollection that you did?

A     Threw the diversionary device out of the driver side window.

Q     Okay.  Now, how does that diversionary device work, as far as how do you get it activated?

A     It has a safety pen in it, that is attached to a pull ring.  You pull the ring, holding onto a handle or what they call a spoon.  Once you throw it, the spoon leaves the rest of the device, and that activates a primer inside of the device, and deploys.

Q     Are you -- how did you -- would you show the jury in which hand did you hold the diversionary device?

A     Left hand.

Q     Are you left-handed or right-handed?

A     I use either.

Q     You are ambidextrous?

A      Yes, sir.

Q      So, you held the diversionary device in your left hand.  Which hand -- what did you do to use the pull ring out -- to get the pull ring out?

A      Pulled it with my right hand.

Q      Okay.  And then you -- then what did you do?

A      Out the window, and threw it forward of my vehicle.

Q      Okay.  So, you're saying that you got that diversionary device with your left hand, and the motion you're making, is you're making an up motion across the front of the vehicle; is that right?

A      Yes, sir.

Q      Were you concentrating on where you thought you wanted that diversionary device to go?

A      Yes, sir.

Q      And where were you wanting that diversionary device to go?

A      I wanted it to go out of the vehicle, somewhere to the --

Q      Definitely out of the vehicle?

A      Yes, sir.

Q      But were you wanting it to go in the house or toward the house?

A      Toward the house.

Q      Toward the house.  And, so, that was the motion

you're saying you made?

A      Yes, sir.

Q      What did you do with the pen?

A      Dropped it.

Q      Dropped it there in the car?

A      I don't know where I dropped it.

Q      But all of this occurred, you say, while you were in the car?

A      Yes, sir.

Q      And what kind of windows, automatics or roll up and down?

A      Roll up and down.

Q      So, you had to hand roll it down?

A      Yes, sir.

Q      How far down did you roll it?

A      I don't know.

Q      And did you roll it back up after you finished?

A      No.

Q      You didn't.  You left it down?

A      Yes, sir.

Q      Would you look at Number 5?  Is that window -- is that window in the shape it was when you got out of the car?

A      I don't know.

Q      Well, did you do anything to change the window,

when you got out of the car?

A      No, sir.

Q      Can you tell whether that window's up or down?

A      Halfway down.

Q      It's halfway down.

So, when you threw the diversionary device out the window, you didn't even have the window all of the way down; did you?

A      No, sir.

Q      How much of your arm did you have to stick out the window to throw that diversionary device?

A      I don't know.

Q      You don't remember that; do you?

A      No, sir.

Q      And would it surprise you at all if that diversionary device was found over to the west side of the house?

A      No, sir.

Q      But the motion you made wouldn't indicate it would go there; would it?

A      Those things can bounce off of anywhere.

Q      Okay.  Did you take the pen with you?

A      I dropped it.

Q      You dropped it there in the car?

A      I dropped it somewhere.

Q    After you -- how long was it after you threw the
diversionary device, before you were able to get out of
the car?

A    When it deployed, I got out of the car.

Q    Okay.  I guess -- what kind of time span is that?

A    A couple of seconds.

Q    Was the -- was the gunfire still going on?

A    No, there was a stoppage in the gunfire.

Q    There was a stoppage in the gunfire.  And you ran
to the back of the car; is that right?

A    Yes, sir.

Q    Now, were you right behind the car, or were you
some distance from the back of the car?

A    At what point?

Q    When you ran back there.

A    I was fairly close to the vehicle.

Q    Okay.  Where was Eales?

A    Behind the vehicle.

Q    Okay.  Now, my understanding, that you pointed
behind the vehicle.  About how far behind the vehicle
was he?  Was he just right behind it?

A    He wasn't very far behind it.

Q    What's very far?

A    I don't know.

Q    You can't recall?

A       Six feet.  I don't know.

Q       Six feet or so?

A       I don't know.  That's just an approximate.

Q       Okay.  And while you were back there, did you hear other gunfire?

A       The gunfire started again, yes.

Q       Okay.  So, the diversionary device goes off, and after the diversionary device goes off, gunfire starts again; is that right?

A       While I was at the back of the vehicle with Trooper Eales.

Q       Yes, while you're at the back of the vehicle.

        Was that second set of gunfire that you're talking about, was it coming from the same -- did it make the same sounds, as far as loudness?  Did it seem like it was coming from the same rifle or gun, or was there any difference in it?

A       I don't know.

Q       Could you tell?

A       No, sir.

Q       Did you listen?

A       I knew there was gunfire.  That's all I was concerned with.

Q       Okay.  And at the time you heard that gunfire, where was Manion?

A    He was there beside Trooper Eales and myself.

Q    So, the three of you were there at that time?

A    Yes, sir.

Q    Okay.  And where was Greninger?

A    I don't know.

Q    He wasn't there with you?

A    No, sir.

Q    And then did Manion -- of the two of you, you and Manion, did one of you leave?  Which one left first?

A    I don't know who left first.

Q    What did you do next?

A    Went to the front left fender of the Bronco.

Q    All right.  And at that time, what did you see?

A    Looked inside the house, saw an individual, Barrett, standing in the interior doorway of his house, holding a rifle.

Q    Okay.  And when you -- you fired at him; right?

A    Yes, sir.

Q    And when you fired, can you remember where you aimed?

A    Center mass.  Center mass.  In this area right here.

Q    Okay.  But you didn't see his chest, though; right?

A    I saw the front part of his body.

Q    Okay.  And was the door all of the way open,

closed, anything in between, or could you tell?

A      Open.

Q      Open.  And -- but you didn't hit him; right?

A      No, sir.

Q      Now, as to -- and is that the first time -- when you're over the left front fender of your Bronco, was that the first time that you saw Kenny Barrett?

A      Yes, sir.

Q      Could you tell whether he was coming out, going back, could you make any determination?

A      He appeared to be stationary.

Q      Stationary.  Okay.

Now, at some point, you said that you didn't realize that you had fired your gun; is that right?

A      Yes, sir.

Q      And after this -- after this incident, you talked to a number of people; didn't you?

A      Yes, sir.

Q      And these -- some of them, you talked to that night?

A      Later that morning.

Q      Later -- well, okay.  I'm sorry.  Later on in the morning, you talked to some of them; is that right?

A      Yes, sir.

Q      Who can you recall you talked to?

A      Agent Franchini with OSBI.

Q      And when you talked to Agent Franchini, did you tell him anything about firing your weapon?

A      No, sir.

Q      At the time you talked to Agent Franchini, were you aware that you fired your weapon?

A      No, sir.

Q      At the time you talked to Agent Franchini, did you even know -- were you aware that you had even seen Kenny Barrett?  Did you tell him that you saw Kenny Barrett in the house?

A      I didn't know it was Kenny Barrett.  I saw an individual in the house.

Q      You told Franchini that you saw an individual in the doorway; is that right?

A      Yes, sir.

Q      But you didn't know that you fired your gun; is that right?

A      Yes, sir.

Q      And then -- can you recall who you talked to next and about when, concerning this incident?

A      A few days later, Agent Beach with OSBI.

Q      That's Kelly Beach?

A      Yes, sir.

Q      You talked to him?

A      Yes, sir.

Q      And this was a few days later?

A      Yes, sir.

Q      Did you tell him anything about firing your weapon?

A      No, sir.  His questions to me were about what type of equipment I had, and he came to my residence and picked up my bulletproof vest.

Q      Then you talked to another Highway Patrol investigator?

A      Lieutenant Gordon.

Q      Gordon?  Paul Gordon?

A      Yes, sir.

Q      How long after the incident did you talk to Lieutenant Paul Gordon?

A      A month, a little over, six weeks, something like that.

Q      November sometime?

A      Yes, sir.

Q      And did you tell Paul Gordon that you'd fired your weapon?

A      No, sir.

Q      At that time, did you know if you'd fired your weapon?

A      I did not know.

Q      And at some time did you -- you have some type of

meeting or discussion that included -- in Oklahoma City, that included Ricks, who was the head of the Highway Patrol?

A     Yes, sir.

Q     And who was involved in that?  Were you by yourself or wasn't there a group of you?

A     Yes, sir.

Q     How many in the tact team?

A     It may have been all of us.  Assistant Chief, Commissioner Ricks.

Q     And when you talked to the commissioner, at that time, did you tell him -- tell him anything about firing your weapon?

A     No, sir.

Q     You didn't know you did; did you?

A     No, sir.

Q     Now, when you -- in this meeting with Commissioner Ricks, just about -- if not all of you, the whole Tact Team was there, that was there in September; right?

A     Yes, sir.

Q     And did you discuss what each one did?

A     At what meeting?

Q     At the one with the Commissioner Ricks.

A     We conducted a debriefing, and we discussed our involvement in the mission.

Q      Right.  Right.  In the debriefing, it wasn't a debriefing each individual was talked to; was it?  Wasn't it the whole group of you?

A      Yes, sir.

Q      And then the whole group of you, you got to listen to what each other person said; isn't that right?

A      Yes, sir.

Q      So, you not only got to hear what -- they not only got to hear what your viewpoint was and what you said happened and when it happened, but you also got to hear their viewpoints; didn't you?

A      Yes, sir.

Q      So, you got to hear their slant of how this thing came about; didn't you?

A      Yes, sir.

Q      Prior to that -- prior to it, not after that -- in any of these others, like, with Kelly Beach or Franchini or Paul Gordon, were any of these other debriefings or discussions, were they group discussions, or individual?

A      No, sir, individual.

Q      Okay.  So, Commissioner Ricks, it was a group discussion; wasn't it?

A      Yes, sir.

Q      And did you learn anything from Commissioner Ricks -- I mean, not from him, but during that discussion --

about you firing your weapon?

A      No, sir.

Q      Nobody said anything about it?

A      No, sir.

Q      Because you hadn't told anybody you fired your weapon; isn't that right?

A      Correct.

Q      How many people can you recall even said that their weapons were fired?

A      One.

Q      That was Manion; wasn't it?

A      Yes, sir.

Q      Now, you came along in -- you said you recalled firing your weapon.  Is that really an accurate statement, or did someone tell you that there was information, ballistics reports that said your weapon had been fired and they found the bullets?

A      Both of your statements are correct.  I remembered, and they provided me with that --

Q      Was it sort of instantaneous, just as soon as they said, "Hey, we've got ballistics reports," then all of a sudden, "Oh, I remember"?

A      No, sir.

Q      Well, before you were given and told that there were ballistics reports that linked a bullet and

cartridge to your gun, who had you told that you fired your weapon?

A     No one.

Q     Absolutely no one; was it?

A     (No response)

Q     So, you're saying you had this recollection, but you didn't tell anybody about it; is that right?  Until after you were confronted with the fact that OSBI reports linked your gun to some bullets; isn't that right?

A     Yes, sir.

Q     Was there a reason that you didn't tell anybody?

A     I didn't recall.

Q     Well, but you're telling us now, though, you recalled before you were told about the OSBI report; is that what you're telling us?

A     I recalled before any previous proceedings, and they also provided me with that information.  As I said awhile ago, both of your statements are correct.

Q     Okay.  Here's the question I'm asking:  Did your recollection that you had fired your weapon come before you received the information that ballistics says they have cartridges -- a cartridge and a bullet that came from your weapon?

A     No, sir.

Q     Okay.  So, your recollection didn't occur until after they told you that; isn't that true?

A     Yes, sir.

Q     And your recollection came about because they told you that; isn't that true?

A     I don't know.

Q     Well, did you have to -- after they told you that, "Hey, we've got a ballistics report here that says your .45 fired two shots," did you all of a sudden say, "Yeah, I remember that now"?

A     No, sir.

Q     Did you have to ponder it for awhile?

A     Yes, sir.

Q     How long did you have to ponder it?

A     I don't recall how long.

Q     Hours?  Minutes?  Days?

A     I don't recall.

Q     So, your recollection was only done because someone told you, you had fired that gun; isn't that right?

A     I recalled when I fired the weapon.

Q     After OSBI told you they had ballistics reports?

A     Yes.

Q     Okay.  Now let's talk about -- would you look at -- now, this hasn't been admitted -- Number 127, please? Would you look at that?

Can you -- do you know what that is?

A    Yes, sir.

Q    What is that?

A    That's the bumper and the push guards on my Bronco.

Q    Does that accurately depict after the accident?

A    Yes, sir.

MR. HILFIGER:  Your Honor, we move for introduction of Defendant's Exhibit Number 127.

MR. LITTLEFIELD:  No objection.

THE COURT:  It will be admitted without objection.

BY MR. HILFIGER:

Q    Okay.  In the upper one, in this picture, this is the bumper guard right here; isn't it?

A    Both of them are.

Q    This is the one that was bent; isn't it?

A    Yes, sir.

Q    It was bent on that night of September 24th, 1999; wasn't it?

A    Yes, sir.

Q    Now -- and you say it was bent because you ran into a post; isn't that right?

A    Yes, sir.

Q    When did you first tell anybody about running into that post?

A      I don't recall.

Q      Did you tell them in the year 2000?

A      I don't recall.

Q      Did anybody confront you saying that they felt like you ran into the porch?

A      No, nobody confronted me.  Somebody had a theory that we hit the porch -- or I hit the porch of the house, and I told them that I hit a post.

Q      Okay.  And when did that come about?

A      I do not recall.  I don't know.

Q      Did you tell anything about that -- hitting that post in any of your under oath statements made in September of 2000?

A      I don't know.  2000?  September of 2000?

Q      September of 2000.  I'm sorry.  I'm sorry.  In February of 2000.

A      There was never a question asked of me, and I didn't tell anybody about it, about hitting a post, no.

Q      Okay.  In September of 2000 -- September, October of 2002, you were under oath and made statements concerning this incident; isn't that true?

A      Yes, sir.

Q      And during that time period, did you tell anybody about hitting the post?

A      I don't recall.

Honor?

THE COURT:  You may.

(PAUSE)

BY MR. HILFIGER:

Q      Prior to your under oath statement in September, October of 2002, did you ever give an under oath statement explaining that you ran off the road and hit the post?

A      I do not recall.

Q      You don't recall that?

A      (No response)

MR. HILFIGER:  May I approach the bench, Your Honor, on a question?

THE COURT:  You may.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY:)

MR. HILFIGER:  I've got impeachment stuff here on page 380 of the second trial, lines 1 through 15, and the problem is, if I try to impeach him, I don't know what I'm going to say.  When I say prior to -- prior to the trial -- it was the first trial -- the first trial. The trial was in September, October.

THE COURT:  Okay.  Page 380, what line?

MR. HILFIGER:  Well, going from line 1 down to 15, and it's going to when he first explained -- when he

first told about running into the post, and his answer is, "Prior to trial."  Then he went, "Was the trial -- was the first trial?"  And the answer was, "The first trial."  The trial was in September and October of 2002.  That was a question in the last statement.  I just -- I don't know how I'm going to do that, unless I put in words other than what was said.

(PAUSE)

THE COURT:  What's the issue?

MR. HILFIGER:  The issue is, he says when he told people he ran off and hit that post because what -- the issue is, he says -- he's telling us now he doesn't know when he did it, when he told it.  He didn't tell them until about a week or so before the first trial, and it was only after he was confronted by OSBI, with them saying he ran into the porch and that's when it was bent, and the point is -- the point that I'm trying to get to is I'm saying I don't know when he told them about it.  I'm just trying to show that this is just another matter, just like the gun issue, that he didn't tell anybody about until about a year and a half, two years later.

THE COURT:  Any comment?

MR. LITTLEFIELD:  He could read it by saying, I think, first proceeding.  The other thing he might do

is approach the witness with that and ask him if it refreshes his recollection as to when he first recalled it.

THE COURT:  Yeah.

MR. HILFIGER:  I don't have a problem with that.

THE COURT:  Okay.  And instead of using the word "trial," just use "proceeding," and we'll see how it goes.  You can approach him with this testimony, to see if it --

MR. HILFIGER:  Let me approach him with the testimony first.

MR. LITTLEFIELD:  The problem is, the questions that were asked -- and I think he called attention to it.  He talked to OSBI, he talked to Jack Gordon.  He testified in a preliminary hearing, he testified at the first trial.

MR. HILFIGER:  I never said preliminary hearing.

MR. LITTLEFIELD:  I know you didn't.  But I'm saying right now in front of the Court and he testified at the second trial.  The question is:  Do you recall when you said it?  And amongst all of those times, he doesn't recall when he said it.  That's the only answer he gave.  I think that's the problem, is amongst these

many times, he doesn't remember specifically which time.

THE COURT:  Well, you can refer to all of these things, whether it's a preliminary hearing, whether it's a prior proceeding where he testified under oath.  You can give the dates.

MR. HILFIGER:  But my concern is, if I read, "Did you say this and did you say that," do you change what is actually in the reading, what is actually being said?

THE COURT:  Well, for instance, what are you talking about?

MR. HILFIGER:  His answer -- well, his answer to the question is -- his answer is, "Prior to trial." Number 6, "The first trial."  And then number 137, "I don't know how long before the trial it was."  Now, I don't mind doing what Mr. Littlefield suggested, and try it that way.

THE COURT:  Okay.

MR. HILFIGER:  I'll give him the book and see if I can ask him to read that to himself, and then see if that refreshes his memory.

THE COURT:  You can see if it refreshes his recollection.  I think that I will allow both of you to go -- this may be unorthodox with the court reporter. Go over there with the court reporter and tell him he's

not to refer to the first or second trial.

MR. LITTLEFIELD:  He has previously been advised of that.

THE COURT:  Okay.  You can go do it again.

(END OF BENCH CONFERENCE)

(THE FOLLOWING WAS HELD OUTSIDE

THE HEARING OF THE JURY)

MR. HILFIGER:  Mr. Hamilton, I'm just going to ask you to read from line 21, where John Echols is cross-examining you, on page 369, down through line 15 on page 380, and see if that refreshes your recollection of when you first told about the post.  Starting here, so you will --

(PAUSE)

THE WITNESS:  To where?

MR. HILFIGER:  Yeah, to about right there. Does that refresh your recollection?

THE WITNESS:  Yes.

MR. HILFIGER:  Okay.

MR. LITTLEFIELD:  As I instructed you previously, you are not to mention the prior trials.  Do you understand?

THE WITNESS:  Yes.

MR. LITTLEFIELD:  That's why we're doing this.

MR. HILFIGER:  I'm trying to find out when it

was.

THE WITNESS:   (nodded affirmatively)

(END OF CONFERENCE)

BY MR. HILFIGER:

Q      Mr. Hamilton, I -- you read a portion of something you gave under oath concerning the post and your recollection of that post -- I mean, and your hitting that post.  Now, after talking to you about -- after you reading that, do you know when you first informed anybody that you had hit that post?

A      2002.

Q      In 2002?

A      Yes.

Q      And was there -- at that particular time, how was it brought to your attention that there was concern about that -- about that post, and your hitting that post?

A      There was concern about how the push guard got bent on the front of my vehicle, and they -- somebody thought that I hit the porch, and that's when I told them I hit the post.

Q      Okay.  And that was the first time that you'd told any of the authorities that you'd hit the post; isn't that right?

A      Yes, sir.

Q      Two, almost three years later; isn't that right?

A      Yes, sir.

Q      And you had had numerous conversations, debriefings, been under oath, and had never told anybody, until 2002 -- until September, October of 2002; is that right?

A      Yes, sir.

Q      Was there any reason why you didn't tell somebody about that prior to that?

A      There was no reason to tell them about it.

Q      You didn't feel that was a significant event?

A      It was not.

Q      The success or the ability to succeed on this mission required you to get in there stealthily, to this cabin or house, and execute this warrant, hopefully without notifying people prior to going in there; isn't that right?

A      There was a subject standing in the yard that saw us drive down the county road, directly in front of his house.

Q      Right.  And hitting that post and stopping and backing up, that made a change in how quickly and everything you could get in to do your job in executing that warrant; isn't that right?

A      It stopped the flow of my vehicle.  Nobody else was affected by it but me.

Q      Nobody else had to stop?

A      No, sir.

Q      Now, did you report the damage to the Highway Patrol?

A      No, sir.

Q      Isn't that part of the procedure, to do that?

A      That's the least of my concern.  We have a dead trooper.

Q      No, I mean, a month later, two months later, six months later.

A      No.

Q      You didn't do it?

A      (No response)

Q      Okay.  Now, you went in and took -- well, before you went in, you had -- did you hear Officer Manion shoot his -- what'd he have, H.K.?

A      H.K. MP-5.

Q      And that's an automatic weapon; isn't it?

A      All of our weapons are automatic.

Q      And did that also have a silencer on it?

A      Yes, sir.

Q      And on a silencer, you -- does it significantly reduce the sound?

A      Yes, sir.

Q      And on the silencer -- on the silencer, were you

still able to hear his shots?

A     Yes, sir.

Q     And did you hear the firing of the gun, or did you hear, like, windows breaking, or something like that?

A     It would have been the cycling of the bolt.

Q     The cycling of the bolt's what you heard?

A     Yes, sir.

Q     And did you know where Manion was when you heard that?

A     East end of the house.  East side of the house.

Q     East side of the house?

       Do you know whether Manion fired any other rounds other than around by the window of the house?

A     No, sir.

Q     You don't know?

A     I don't know.

Q     Now -- and by the way, Manion's accident was a motorcycle accident that occurred how much time after this?

A     2001, May.

Q     When you went in the house and you grabbed Mr. Barrett by the hair and pulled him out, did he -- did you try to get him up or just pull him?

A     I told him to get up.  He said he could not.

Q     Okay.  So, you pulled him on out.  And when you

pulled him on out --

MR. HILFIGER:  Would you show Government's Number 12, please?

BY MR. HILFIGER:

Q      How did you get him out from the door down to this ground?  What route did you take?

A      I don't know what route I took.  I just got him out and got him on the ground, released him.

Q      Released him?

A      Released him.

Q      Released him.  Okay.

       Did you come down the stairs, or did you come off the porch?

A      I don't know.

Q      You don't remember that?

A      No.

Q      Did you come -- would there have been any reason for you to go all of the way down the end of the porch on the east side?

A      No, sir.

Q      You would have come out the quickest way to get down there; is that right?

A      Yes, sir.

Q      And this area right around here where the -- sort of the shadow -- cross shadow is, that's where you're

saying that you had him?

A    Right there where the pistol is on the ground.

Q    Right there?

A    Yes, sir.

Q    And that's the marker for where you released him to other officers; is that right?

A    Yes, sir.

Q    Did you do anything to search him?

A    No, sir.

Q    Do you know, as part of police procedure, do you do searches of persons?

A    Yes, sir.

Q    And as part of your procedure on searching people, if you find something that's contraband or you think is contraband, what do you do with it?

A    Seize it.

Q    Do you ever put it back in their pockets?

A    No, sir.

Q    There wouldn't be any call to do that; would there?

A    No, sir.

Q    Would you find that unusual, if that was done?

A    Maybe.

Q    Now, you have a Bronco -- is that white model that's on the counter right in front of you, is that the same model as your Bronco?  I mean, the model that's in

front of the house, as far as dimensions, sizes and everything?  Does it look the same?

A       To scale, it does look the same.

Q       Okay.  And behind you are a couple of -- on the floor behind you, are a couple of dowels.  Over to your right on the floor.  On the floor.  No, right down there.

Now -- and there's some Scotch tape down there.  Do you see it?

A       (nodded affirmatively)

Q       Would you place the dowel on the top of that car, the Bronco in front of you, showing the approximate angle -- and I know it's approximate -- the approximate angle that you think the bullets came at you when you first received fire?

A       Okay.

Q       Now, will you get some Scotch tape?  It's down there.  Probably to get that, it's going to take a little coordination.  Probably have to put two pieces on there so it won't move around.

A       (witness complied)

MR. HILFIGER:  Now, if I may -- may I have him come around and place that Bronco where he says he first received fire?

THE COURT:  You may.

THE WITNESS:  I can do it from here.

THE COURT:  That will be fine.

BY MR. HILFIGER:

Q      Okay.  Where's that dowel pointing?

A      Over here.

Q      To the back of the house; isn't it?

A      Yes, sir.

Q      So, according to where you're saying you first received fire, the fire had to come from somewhere around the back of that house; is that right?

A      I don't know where the fire came from.

Q      You don't know where the fire came from.  You know -- you're saying that's where you first received fire; is that right?

A      Yes, sir.

Q      Now, did you ever -- were you ever aware of fire coming out of any window, or anything like that?

A      No, sir.

Q      The only opening that you saw, was a door opening; isn't that right?

A      Yes, sir.

Q      Will you move that car -- that Bronco until you get to a point where that dowel stick is showing into the door?

A      (witness complied)

Q      Now, at that particular point, was your car heading

in that direction?  What was your route to the house?

A      This route right here.

Q      Okay.  Now, take that car on that same route, and tell me when you first get -- that's the first point, isn't it, that that dowel is showing coming from the door; isn't that right?

A      Yes, sir.

Q      And am I right that that's the approximate angle -- I know it's not exactly 100 percent -- that's the approximate angle that you say the first shots through the windshield occurred; isn't that right?

A      You asked me to give an approximate angle.  They came from the right to the left.

Q      Right.

A      Whether it's a dowel rod or a weapon, I don't know where the shots came from.

Q      I understand that.

A      That is just an approximate.

Q      Okay.  As far as the route of travel of that Bronco, that's an approximation, too?

A      Yes, sir.

Q      And you say that Bronco -- that's the approximate route you took that Bronco up to that point; isn't that right?

A      Yes, sir.

Q       Now, for the record, please describe where you put that Bronco. And --

MR. HILFIGER: May I approach the witness?

THE COURT: You may.

BY MR. HILFIGER:

Q       Have you ever used a ruler before?

A       Yes, sir.

Q       Okay. This is inches, on the top here. I'd ask that you come off -- I'll give you this and I'll go back. With that ruler, would you go to the east corner of the porch -- the southeast corner of the porch, and measure in inches from that corner to the left front tire of the car?

A       As it sits right now?

Q       As it sits right now.

A       Left front tire?

Q       Left front tire. You're going to do a couple of measurements here.

A       Eight inches.

Q       It's eight inches?

A       Yes.

Q       Now measure from that same point to the right front tire.

A       Seven inches.

Q       Now, in order to lock in that point, would you

measure from the southwest corner of the porch -- you'll have to move the other Bronco -- to the left front tire? To the left front tire.  Right.  No, you're going to have to measure it from the corner to where the tire is.

A     You can't get even with the end of the porch, like up -- it may be off a little bit.  Do you want me to get it down here like this, the left front tire?

Q     I want it like that.

A     Okay.  Twelve inches.

Q     Measure to the right front tire.

A     Twelve inches.

Q     Thank you.

      Now, one more measurement.  Would you measure from the -- and this is going -- you're going to have to use it two or three times -- from the east corner -- southeast corner of that porch, to where you say the Bronco was when you first received fire?

A     Approximately 38 inches.

Q     Thank you.

            MR. HILFIGER:  May I have just a moment, Your Honor?

            THE COURT:  You may.

                        (PAUSE)

BY MR. HILFIGER:

Q     Now, as part on this -- on this mission that you

went, did you -- as a part of the preparation for this mission, did each one of the tact team members have weapons to carry on this mission?

A       Yes, sir.

Q       What weapons did you personally carry?

A       I had a shotgun in my vehicle, an HK 53, Sig Sauer .45 pistol, and an MP-5.

Q       MP-5's automatic?

A       MP-5 and the 53 are both automatic.

Q       Okay.  And the Sig Sauer is a .45, that's the one that you shot, that you forgot about?

A       Yes, sir.

Q       And what else did you have?

A       Shotgun.

Q       Shotgun.  And those were just your weapons; is that right?

A       Yes, sir.

Q       Now, in preparation for this mission, did you load those weapons?

A       Yes, sir.

Q       And how did you load them as far as putting the -- I don't mean put it in this way, put in this way -- how many bullets did you put in the weapons?

A       They were fully charged.

Q       And when you say "fully charged," how do you --

what is a fully charged weapon, in your mind?

A       To capacity.

Q       Okay.   What's to capacity?   The magazine in the chamber?

A       Yes, sir.

Q       Okay.   So, each weapon was ready to fire and was fully charged?

A       Yes, sir.

Q       Everyone had one in the chamber?

A       The shotgun did not.

Q       The shotgun did not.

        Okay.   Now, as far as -- do you know what the other members of the tact team carried in their weapons?

A       They would be the same.

Q       Every one of the other tact team members carried the same MP-5, HK 53, .45, and a shotgun?

A       There were only two of us that had MP-5's.   Their weapons would be the HK 53 and the .45.   Those were all weapons that we -- that every member of the team carried, that were similar.

Q       Okay.   Now, what about as far as the other people, was there some instruction given to the other tact team members as to how they should load their weapons?

A       We always take fully charged weapons in on a mission.

Q      Okay.  So, each -- each person, part of your Tactical Team operations is that you -- each one of you fully charge your weapons?

A      Yes, sir.

Q      And to your knowledge, everybody had a consensus of opinion that fully charged meant all magazines full and one in the chamber?

A      Yes, sir.

Q      So, if anybody fired a weapon, you'd just have to go back and count how many's missing, to determine how many shots were fired; is that right?

A      That's one way to determine it.

Q      Well, what's another way?

A      How many bullets end up at a target somewhere.

Q      Well, if you don't find all of the bullets, you can just count what's left in the magazine and what's in the chamber; can't you?

A      Sometimes.

Q      But the idea is everybody is fully charged before they go out there; is that right?

A      Yes, sir.

Q      And that includes Mr. Manion; is that right?

A      Yes, sir.

Q      How many does an MP-5 hold?

A      I'm not sure.  Twenty-five, I believe, per

magazine.

Q       Per magazine.  And do the MP-5's -- do you have, on your MP-5, more than one magazine?

A       I did at times.

Q       On September 24th, 1999, did you have, on your MP-5, more than one magazine?

A       I don't recall.  I could have.

Q       It wouldn't be unusual?

A       No, sir.

Q       And those magazines, are they taped together, tied together, or how are your magazines set up?

A       They're joined with a metal clip.

Q       Okay.  And is it two magazines?

A       Two.

Q       Two magazines.  So, you'd have, in your MP-5, your capacity would be 51 bullets; would that be right?

A       Yes, sir.

Q       What about Mr. Manion, do you know whether he had magazines tied together?

A       I don't know.

Q       Would his MP-5 be the same capacity as yours, as far as per magazine?

A       If he had them tied together, yes.

Q       No, no, per magazine?

A       Yes, sir.

MR. HILFIGER:  May I have just a moment?

THE COURT:  You may.

(PAUSE)

BY MR. HILFIGER:

Q     Let me hand you what's marked as Defendant's Exhibit Number 136.  Do you recognize that?

A     It looks like a set of keys.

Q     Do you recognize the vehicle?

A     Floorboard, looks like in the Bronco, similar to the Bronco I was driving.

Q     To your Bronco?

A     Yes, sir.

Q     Do you know what your keys looked like for that Bronco?

A     I don't recall all the keys that I had on my key ring.

Q     Okay.

THE COURT:  What exhibit number was that?

MR. HILFIGER:  136.

BY MR. HILFIGER:

Q     But you don't recognize whether that's your Bronco or not?

A     No, sir.

MR. HILFIGER:  I'll withdraw that.

BY MR. HILFIGER:

Q       Let me hand you what's been marked as 145.  Do you recognize that?

A       My picture's blurry.  Okay, right there.

Q       Do you recognize that?

A       Yes, sir.

Q       Is that your Bronco?

A       No, sir.

Q       Do you recognize what's shown in there?

A       Yes, sir.

Q       Is that something that was outside there that night, to your knowledge?

A       That's a weapon similar to the ones we carry, that we are issued.

Q       Okay.

        MR. HILFIGER:  I move to introduce Defendant's Exhibit Number 145.

        MR. LITTLEFIELD:  I object.  He can't identify it, where it's from.

        MR. HILFIGER:  That's -- I'll withdraw it, if they object to it.

        THE COURT:  Withdrawn.  Exhibit withdrawn.

BY MR. HILFIGER:

Q       Where did -- in your Bronco, when you were going out on that mission that night, where did you put your weapons?

A      I carried the .45 on my side, the shotgun was in the rear of the vehicle, the MP-5 was between the seats, the .53 would have been in the rear of the vehicle.

Q      In the trunk, you're talking about?

A      No, it doesn't have a trunk.

Q      What about your clips, the magazines for the MP-5, the ones that were clipped together?

A      The ones that were affixed to the weapon itself would be in the weapon.  Extra magazines would be somewhere else.

Q      Okay.

                    (PAUSE)

BY MR. HILFIGER:

Q      Do you know whether -- in addition -- you named shotgun, MP-5 and a Sig Sauer, and the HK 53.  Do you know whether or not there was any -- did you have a grenade launcher out there?

A      We have a 203.

Q      What is a 203?

A      It fires different rounds, whether it be gas, smoke, or some other type of round.

Q      What's the common name for a 203?

A      203.

Q      That's how they call them?

A      Yes, sir.

Q    It's not called any kind of a launcher, or anything like that?

A    The manufacturer may have a different name, but it's referred to by us as a 203.

Q    And who carried that?

A    Typically it was the youngest guy on the team, or the youngest member of the team.  He was to man that weapon.

Q    Who was the youngest member of the team?

A    I don't recall who it was at that time.

Q    You didn't have it in your vehicle?

A    No, sir.

Q    As I understand it, you never -- that night, you never saw a person -- never saw a person firing any weapon; is that right?

A    That's correct.

Q    Did you ever see any person on the porch of that house?

A    No, sir.

Q    Did you -- other than Toby Barrett out in the front yard -- you found out later it was Toby Barrett -- did you ever see any person anyplace in the yard, other than the tact team members?

A    No, sir.

MR. HILFIGER:  I have no further questions.

THE COURT:  Redirect.

Let me see counsel at the bench for just a moment.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY:)

THE COURT:  I guess the first question is, how long do you anticipate being?

MR. LITTLEFIELD:  I don't think it's going to be real long, Judge.  If he gets through, are you going to release him, or is he -- we've got him under subpoena.

THE COURT:  Do you?

MR. HILFIGER:  Yeah.

MR. LITTLEFIELD:  I'm not going to -- don't hold me to it.  Once I get started, I'm not going much more than 20 minutes, if that long.

THE COURT:  If he's going to take 20 minutes, then you might take 15 or something. (INDICATING TO MR. HILFIGER)  I don't think I -- okay.  We'll quit for the day.

MR. LITTLEFIELD:  No, I'm -- I'm giving you the longer estimate.

THE COURT:  No, no, he's probably going to be longer than I thought.  If we could release him, I would, but I don't think we can.

(END OF BENCH CONFERENCE)

THE COURT:  Members of the jury, we're going

remember that we're going to be in recess Thursday and Friday. We'll start back Monday morning at 9:00. During this recess, remember my admonition not to discuss this matter with anyone, including fellow jurors. Do not allow yourself to be involved with any news coverage, if there is any news coverage of this case. Don't read about it, don't listen to anything, don't watch any television, just keep your minds free and open, if at all -- I know it's not humanly possible -- if could you forget about this until Monday morning, that would be perfect, but we're all human, you'll be thinking about it. Do not talk about it. Don't involve yourself in any discussion with anyone. I know there will be some -- those of you who have families at home, a long three or four days, do not discuss it with them. If they ask you about it, you just cannot talk about it.

I'll ask now that you leave your notepads with my clerk as you go out.

And everyone else in the courtroom please remain seated as the jury leaves.

(JURY OUT)

THE COURT: Officer Hamilton, you may be excused today and you're recognized back for Monday morning at 9:00.

Let the record reflect that the jury has departed

the courtroom.  Counsel for the Government is present, the defendant is present with counsel.

Anything from the Government to take up outside the hearing of the jury?

MR. SPERLING:  One matter, Your Honor.  We have a proposed order concerning a matter that's under seal I'd like to submit to Your Honor.  I submitted this to defense counsel, and there is no objection.

THE COURT:  If you would, submit it to the clerk.

MR. SPERLING:  I have one, and it's a duplicate of the original.  It's not a photocopy.

THE COURT:  Anything else from the Government?

MR. LITTLEFIELD:  Nothing else, Your Honor.

THE COURT:  For the defense, anything outside the hearing of the jury?

MR. HILFIGER:  No, Your Honor.

THE COURT:  I might advise Mr. Smith, I'll return your copy of the transcripts for your use.  I now think I have one.  Thank you.

I think I made it clear, but next week, five full days.  The plan would be a normal nine to five.  If you have a need to go beyond five, if you'll let me know so I can tell the jury we're going until late.  I have encouraged the jury to make arrangements -- those that

live long distances, to seek arrangements here in Muskogee. I don't know whether they've done that or not. But next week, the plan will be a full week of testimony. I'll look toward to seeing you then.

(PROCEEDINGS RECESSED UNTIL OCTOBER 3, 2005)

FILED

MAY 0 1 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By:_____

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,        )
            Plaintiff,           )
                                 )
VS.                              )        NO. CR-04-115-P
                                 )
KENNETH EUGENE BARRETT,          )
            Defendant.           )

*       *       *

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE, and a jury

OCTOBER 3, 2005

VOLUME IV OF XXVII

K.M.

*       *       *

A P P E A R A N C E S:

FOR THE PLAINTIFF:        MR. SHELDON J. SPERLING
                          United States Attorney
                          MR. D. MICHAEL LITTLEFIELD
                          Assistant United States Attorney
                          1200 West Okmulgee Street
                          Muskogee, Oklahoma 74401

FOR THE DEFENDANT:        MR. ROGER HILFIGER
                          Attorney at Law
                          620 West Broadway
                          Muskogee, Oklahoma 74401

                          MR. BRET A. SMITH
                          Attorney at Law
                          315 North 5th Street
                          Muskogee, Oklahoma 74401

COURT REPORTER:           KARLA S. McWHORTER
                          UNITED STATES COURT REPORTER
                          P. O. Box 2251
                          Muskogee, Oklahoma 74402

I N D E X

PAGE

PROCEEDINGS COMMENCING 10/03/05...................... 666

WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:

    BUDDY HAMILTON CONT'D

        Redirect examination by Mr. Littlefield... 672
        Recross-examination by Mr. Hilfiger....... 685
        Further Redirect examination
                            by Mr. Littlefield.... 702


    RAYMOND GRENINGER

        Direct examination by Mr. Littlefield..... 702
        Cross-examination by Mr. Hilfiger......... 765
        Redirect examination by Mr. Littlefield... 821
        Recross-examination by Mr. Hilfiger....... 833
        Further Redirect examination by
                            Mr. Littlefield.... 841
        Further Recross-examination by
                            Mr. Hilfiger....... 842

    JAMES HORN

        Direct examination by Mr. Littlefield..... 843
        Cross-examination by Mr. Smith............ 863

PROCEEDINGS CONCLUDING 10/03/05...................... 919

<u>**COURT IN SESSION**</u>

(JURY OUT)

THE COURT:  Let the record reflect that counsel for the government is present, the defendant is present with counsel.

Before I bring the jury in, I just wanted to alert counsel to the issue dealing with transcripts.  My concern is -- and I know neither of you can anticipate when impeachment is appropriate until the witness has testified. My concern -- one of my concerns is, since we have -- we have more than one transcript perhaps to be concerned about, but it's my thought that perhaps -- perhaps the Court should file transcripts of these proceedings so -- as a court exhibit for the record.  I know that generally counsel will ask a question, give the witness an opportunity to respond by saying something to the effect of you previously testified under oath and read the question, but it occurs to me that that might not be a sufficient record.  So it's my -- I just want to get your thinking.  It's my thought that perhaps we should file -- the Court should obtain with the assistance of both counsel and before the trial is over -- and I'm not saying I need it to proceed with the trial, but I think hopefully before the conclusion of the trial, between the Court and the two parties we could file the original transcripts or

copies of the original transcripts for the record.

Any comment from the government?

MR. LITTLEFIELD:  Can I have a second, Judge?

(PAUSE)

MR. LITTLEFIELD:  Your Honor, I think we have provided a disk for all -- that contains the transcripts of all prior proceedings.  I think we provided that to the Court on Friday.  I think that they can be retrieved from that.

THE COURT:  I'm aware of that.  That's one source.

MR. HILFIGER:  Did you provide both preliminary hearing and first trial transcripts, Mr. Littlefield, or just second trial transcripts?

MR. LITTLEFIELD:  I think I provided all three.

MR. HILFIGER:  The only thing I have is the disk for part of the first trial transcripts and the other -- the preliminary and the second trial transcripts have all been split up at this time.  But the hard copies, I don't know why we couldn't maybe make a motion from the Court in Sequoyah County to provide those and have copies made.  I mean, that might be an easier --

THE COURT:  That's what I had in mind, just because they would be certified and if -- if both parties could look into what, if any, problems we would have with

getting those filed in Sequoyah County filed here, I think that would be the best solution.

MR. LITTLEFIELD:  The only other -- the only --

THE COURT:  I will relief you of that burden, at least initially.  I will draft a letter to the Court there and see if they will forward those transcripts to us.  If I need your assistance -- that's my plan to do that.

MR. LITTLEFIELD:  the only question that arises in my mind in that regard is that I don't think that the transcript of the second trial has been completed in its entirety.

MR. HILFIGER:  No.  If it has, it has only been completed in the last 48 hours, so I have my doubt it has been completed.

MR. LITTLEFIELD:  As a consequence of that, I don't know if the defense wants the full transcript from the second trial or not.

THE COURT:  Well, I'm not going to do it today or tomorrow, but before the trial is over is what I'm -- I'm trusting that as we go through the trial, I will be provided with whatever I need during the witness's testimony.  I have the testimony of Hamilton, of John Hamilton, for January 26th, 2004.

MR. HILFIGER:  You just have that one from the second trial?

THE COURT:  Yes.  I'm not saying I don't have the -- I might have the --

MR. HILFIGER:  If that's the transcript, that's not a big enough one.  Mr. Smith, I thought, provided the preliminary hearing, affidavits, the first trial and second trial Friday or not Friday, but Tuesday or Wednesday.

THE COURT:  Yes, and I gave it back to Mr. Smith, thinking I had everything.

MR. HILFIGER:  May I ask the Court this?

THE COURT:  You may.

MR. HILFIGER:  Do you have pages in the 1300s and the 1400s or just 300s?

THE COURT:  300s.

MR. HILFIGER:  Okay.  You have the second trial. You don't have the first trial.

THE COURT:  I'm not necessarily saying that I need the transcripts during your cross examination, if you make use of them, but it will just be slower.  So I may have to ask you to approach the bench so that I can see -- see the language, but if -- if what Mr. Smith gave me would be of assistance, perhaps if you can retrieve it on a break or at noon or something.

Anything else before we bring the jury in, from the government?

MR. LITTLEFIELD:  Nothing from the government.

MR. HILFIGER:  No, Your Honor.

(JURY IN)

THE COURT:  Let the record reflect that the jury is in the box, the government's counsel is present, the defendant is present with counsel.

Good morning, members of the jury.  Good to have you back.

You will note that since you were here, I have invited some additional judge help into the courtroom.  We have Judge Campbell, whose portrait is hanging here, who was the first chief judge of this district in the early 1900s. And he was followed by Judge Williams on my right.  We will be hanging some more in this courtroom, another one should appear sometime during this trial, so I -- it's a project the Court has been working on for several years. I just wanted you to be aware your surroundings have changed a little bit.

The witness may take the witness stand.  You may proceed.

BUDDY HAMILTON, PREVIOUSLY SWORN

REDIRECT EXAMINATION CONT'D

BY MR. LITTLEFIELD:

Q     Mr. Hamilton, you are now -- what's your responsibility with the Oklahoma Highway Patrol now?

A       I'm a bomb technician on the bomb squad.

Q       Okay, you will need to speak into the microphone.
And you have been doing that job full-time for how long?

A       Since July of 1999.

Q       How long has it been since you have enforced traffic
regulations?

A       Prior to July of '99.

Q       When you were doing traffic enforcement, did you
know all of the laws, rules and regulations of the state
of Oklahoma?

A       No, sir, there are hundreds of them.

Q       How did you -- if somebody violated the law, how did
you know specifically what that law was when it was
violated?  When you pulled somebody over back in early '99
and earlier, how did you know they had committed a
violation and pulled them over?

A       You memorize the laws that are most familiar or the
ones you come into contact with the most and the rest of
them you look up in the law book in Title 47.

Q       And how do you do that when you are on the road?
When you need to look something up, how are you able to
do that?

A       You have reference material with you.  You can look
it up.

Q       You were asked questions last week about the law on

the distance following -- one vehicle following another. Did you remember the distance the law specified in the state?

A     No, sir.

Q     Okay.  Have you since looked it up?

A     Yes, sir.

Q     How far -- does the law prescribe a specific distance between vehicles as far as how close you would be before you followed too close?

A     It is described as a certain distance that you must follow, it is reasonable and prudent.  It's a judgment call on the officer.

Q     In regards to the approach, was there a concern about vehicles following you too close?

A     No, sir.

Q     What were you -- as you came down the county road, made your turn and then entered the property there, what was your focus?  Where was your focus directed?

A     On the suspect in the yard.

Q     Speaking of the suspect, I think you were asked some questions about that.  Have you since learned that that was Toby Barrett, which was Kenny Barrett's son?

A     Yes, sir.

Q     At the time the shots were first fired, how close were you to Toby Barrett?

A        Approximately 30 yards away.

Q        You were asked about reporting the damage to the bumper, to the Bronco on the front of the bumper.  Do you recall being asked those questions?

A        Yes, sir.

Q        Where did you spend the next several days after this incident?

A        In the hospital.

Q        Which one?

A        St. Francis.

Q        Okay.

          MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 67 be displayed.

          THE COURT:  You may.

BY MR. LITTLEFIELD:

Q        You didn't report the damage to the bumper?

A        No, sir.

Q        Did you report the damage to the windshield?

A        No, sir.

Q        You were asked questions about the information you had received about Mr. Barrett, whether or not he did mechanic work.  Did you receive information in that regard from Mr. Johnson and Mr. Loyd, that you recall?

A        No, sir.

Q        What kind of importance would that have been to you

in this mission, whether Mr. Barrett did or did not do mechanic work?

A      No importance.

Q      Had you -- had you done warrants, search warrants, previously in which you received information from Mr. Johnson and Mr. Loyd?

A      Yes, sir.

Q      And what was the quality of the information they provided you in the past?

A      It was always right on, it was correct and truthful.

Q      In this case did they provide you any information which was incorrect or improper?

A      No, sir.

Q      You were asked questions in regards to the importance of making entry without -- well, under surprise, without your presence being known to the individuals at the location you searched.  Is that important and, if so, how important is it?

A      It's always best if we can enter with surprise. We catch -- we try to catch the suspect off guard and eliminate anything that he might try to do against us.

Q      Okay.  On previous occasions have you gone to locations in which the element of surprise obviously did not exist at the time of your arrival?

A      Yes, sir.

Q    What was done in the previous occasions when individuals were in the yard, individuals were up and obviously observed you?  What did you all do in regards to performing the warrants that you had in your possession?

A    We were able to and did successfully serve the warrants and we may have had a foot pursuit or or something like that afterwards, but we were successful in apprehending the suspect.

Q    Okay.  How many times previous to this incident had you approached the property, been obviously observed and stopped the execution of the search warrant or arrest warrant, whichever one you had?

A    None.

Q    Mr. Hamilton, you placed the vehicle approximately in that location last week, if you are looking at Government Exhibit 1.

A    Yes, sir.

Q    How accurate is that location?  How close do you believe that is of where you were when the shots were first fired?

A    It's close, but I don't know exactly.  I don't know the exact placement.  I don't know the exact angle of the shots or the exact inch of where my vehicle was at the time the first shot was received.

          MR. LITTLEFIELD:  Your Honor, may I approach the

model?

THE COURT:  You may.

MR. LITTLEFIELD:  And may I ask questions from here for a moment?

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q     Mr. Hamilton, you placed this dowel rod on this vehicle?

A     Yes, sir.

Q     And if you look now -- can you lean back and see the direction of the dowel rod as far as the projectory that you indicated last Wednesday?

A     Yes, sir.

Q     How close is that to where you put it and where that vehicle was placed when you put the dowel rod on there?

A     That's close to where I put it.

Q     In fact, I think you indicated that this dowel rod points to the back of the residence?

A     Yes, sir.

Q     And does it appear to point in the direction of the back of the residence now?

A     It does.

Q     Okay.  Were you -- how certain were you as to exactly how much the vehicle was turned to the right or to the left at this location?

A       I did not know.

Q       If you turn it that much to the left, where does the dowel rod point?

A       Middle of the house.

Q       Exactly -- what kind of training have you had in projectory analysis?

A       None.

Q       What were you trying to do when you placed the dowel rod on that vehicle in regards to establishing projectory?

A       Give an indication of the angle that I thought at the time the shots were coming from.

Q       Okay.  Do you know exactly where the shots were coming from?

A       No, sir.

Q       And at the time you first started -- the vehicles first got those shots, started getting hit, were you able to locate the shooter?

A       No, sir.

Q       Could this projectory be off a little ways one way or the other?

A       It could be off a lot.

Q       If you move it that much, where would that have the shots coming from?

A       Out in the open field.

Q     If you move it from there to there, where would the shots be coming from?

A     Close to the front porch of the house.

Q     The vehicle was placed approximately here on Wednesday.  What is the possibility of that vehicle being at that location when the first shots were fired?

A     There is no way that happened.

Q     In fact, how far was that vehicle to have entered onto the property had no shots been fired?  Where were you to have stopped?

A     Had no shots been fired, we were to stop on the other side of the blue pickup at the southeast corner of the house.

Q     Tell me when I'm at the right location.

A     Approximately right there, a little closer to the blue pickup, yes, sir.

Q     Had no shots been fired prior to reaching this location, is there any possibility of a vehicle reaching the location where I have my hand now?

A     No, sir.

Q     Mr. Hamilton, can you estimate the speed at which you were traveling when the shots began?

A     Approximately 15, 20 miles an hour.

Q     And you -- you indicated, I think, just a moment ago that Toby Barret was approximately how far from you?

A       30 yards.

Q       And he was located where in relation to the house when you first saw him?

A       Southwest of the house.

Q       How long did it take at that speed to travel from where the shots were first being fired until you came to rest on the porch?

A       Very few seconds.

Q       Approximately --

A       Approximately five seconds.

Q       Have you received training as far as your law enforcement background as to what to do when you -- if and when you receive fire in and at your vehicle?

A       Seek cover.

Q       I'm sorry?

A       Seek cover.

Q       And from a driver's position, how would one seek cover.  If you are receiving shots in the front windshield, where do you go to seek cover?

A       To the inside of the vehicle, between the seats.

Q       When that vehicle was stopped at the front of the residence just to the left of those steps, where were you located in that vehicle?

A       Between the seats.

Q       Sitting up, laying down or what, in what position?

A     Laying down.

Q     Do you know exactly when you got to that point?

A     No, sir.

Q     How many injuries had you received before you ended up down between the seats?

A     Several.

Q     To where?

A     Left eye, shoulder.

Q     When did you receive the shoulder injury?  When do you think you got that?

A     To the front part of the shoulder on approach, to the rear of my shoulder at some time when I got out of the vehicle.

Q     Okay.

         MR. LITTLEFIELD:  I want to ask that Government's Exhibit 184 be shown to this witness.  And it's in evidence.  Do you see Mr. Barrett's house in this photograph, sir?

A     Yes, sir.

Q     You were asked about establishing a perimeter and discussion of establishing a perimeter.  What is necessary to establish a perimeter?

A     Manpower and the guarantee of security to our back.

Q     When a perimeter is established, how many sides have to be covered of the site -- around which a perimeter

is established?

A       A perimeter is 360 degree coverage, all around you.

Q       What kind of cover was available at that location on the north side of the residence?

A       None.

Q       What was on the north side of the residence?

A       A large open field.

Q       Okay.  What kind of coverage was available to the east of the residence?

A       Well, there are a few weeds there, but that doesn't provide anything but concealment, not cover at all.

Q       Along this south side, where would a perimeter -- where could a perimeter have been established around the south side?

A       Same thing, no concealment, no coverage.

Q       In regards to the west, what kind of perimeter could have been established there?

A       None.

        MR. LITTLEFIELD:  Judge, I'm going to ask that we go back to 192, Government's Exhibit 192.

        THE COURT:  You may.

BY MR. LITTLEFIELD:

Q       Where could a perimeter have been established along the west side?

A       The west side?

Q      The west side, sir.

A      Somebody could have hid in the garage, but it was unknown at that point if anyone was in the garage, so that wouldn't a good option.  No perimeter could be set on that side either.

Q      If one established a perimeter in those weeds on the east side, what would you have done about what was behind you?

A      We knew there there was a trailer house behind us. We wouldn't know if they were watching us, if they had a gun on us.  We had no way of knowing that.

Q      If one had established a perimeter along the south side, on the road behind those weeds, what would you have known about what was behind you at that point?

A      We would not have known anything.  There were houses to the south, east and west of us.

Q      In regards to the houses south, east and west of you, what had you been informed as far as who occupied those residences and their relationship to Mr. Barrett?

A      Relatives of Kenny Barrett.

Q      Did you know -- at that point did you know what those relatives' attitudes were towards Kenny Barrett and towards his not having appeared on the warrant or on the case that was set for trial where he failed to appear?

A      Sympathetic to him, not wanting to allow him to

answer for anything that he had done wrong.

Q      Did you know when you first approached whether Mr. Barrett was even at the residence or not?

A      No, sir.

Q      Did you learn where the shots were coming from at any point in time during your entry?

A      No, sir.

Q      Where were they coming from when the vehicle was parked in front of the porch?

A      From the house, inside the house.

        MR. LITTLEFIELD:  Can I have just a second, Judge?

        THE COURT:  You may.

                (PAUSE)

        MR. LITTLEFIELD:  Pass the witness.

                RECROSS EXAMINATION

BY MR. HILFIGER:

Q      Mr. Hamilton, so in July you became a full-time bomb technician, is that right, of '99?

A      Yes, sir.

Q      So you weren't a part of the tact team or your duties with the tact team just changed?

A      I was on both.

Q      Okay.  Now, as I understand it, you got -- you said you got some information on Kenny Barrett from Clint

Johnson and Alan Loyd.  Did you get any information from anybody else?

A    No, sir.

Q    When you say information, is that the same thing as intelligence?

A    Yes, sir.

Q    And did you -- were you satisfied with the intelligence you got?  After the incident was over, were you satisfied with the intelligence you got?

A    Well, when you Monday morning quarterback things, you can see where things can always be better, but at the time that's the intelligence we had, that's what we acted on, that's what we planned with, and that's how we operated off the mission.

Q    In fact, as far as intelligence, in the interview with Gordon or one of the interviews that you had with the troopers, you said the intelligence could have been better; isn't that right?

A    It can always be better on any operation.

Q    In fact, on any operation now, the tact team wants to do its own intelligence; isn't that true?

A    We prefer that.

Q    You prefer that.  And that's based on what happened in this case, isn't it?

A    Not just this case.

Q        Okay.  But your idea is you don't want to rely on somebody else's intelligence, do you?

A        As I said, we would like to gather our own.

Q        Okay.  And part of that information -- you said you didn't get any information that was incorrect or improper; is that right?

A        Yes, sir.

Q        But you just didn't get enough information, enough intelligence, did you?

A        Yes, we did.

Q        Did you get intelligence that there wasn't any concern about the back of the house because that door was blocked shut, nailed shut?

A        I had no info on that.

Q        Well, you had a way of knowing if somebody had told you about that, isn't that right?

A        I guess if someone had come forward and told us that door was shut, we would know that.

Q        Well --

A        Other than somebody somebody being in there, we would not know that information.

Q        Well, did you understand the confidential informant had been in there?

A        Yes, sir.

Q        The confidential informant didn't say anything about

it, did he?

A      Maybe he nailed it shut that night, I don't know.

Q      You didn't have the ability to ask the confidential informant, did you?

A      No, sir.

Q      The only person -- the only thing you received was what Clint Johnson and Alan Loyd gave you; isn't that true?

A      That's true.

Q      You didn't ask anything?  Did you ask if there was running water?

A      That does not matter, if there was running water at a house that we are going to serve a search warrant on.

Q      Did you ask?

A      No, I did not.

Q      You didn't see that as an important factor?

A      It is absolutely not a factor.

Q      Is it a factor to know ingress and egress from a house?

A      (NO RESPONSE)

Q      If you are going to search a house, do you want to know the ways into the house and the ways out of the house?

A      If we are going to search a house?  No, that is not important either.

Q      You need to know how to get in, don't you?

A      We knew how to get in.

Q      So you need to know how to get in the house, don't you?

A      We knew how to get in.

Q      The question is:  You need to know how to get into the house; isn't that true?

A      Yes.

Q      Okay.  Do you also need to know if there is other ways out of the house so you can block those entrances and exits?  Don't you think that's an important thing to know?

A      That was the purpose of our team.  We were going to surround the house and cover it and make entry.

Q      Okay.  But you needed to know that there were other ways out of the house, right?

A      You always need to know the floor plan of the home.

Q      And did you get that information?

A      Yes, we did.

Q      The information that the door was shut and locked, did you get that information?

A      No, we didn't.

Q      Now, did I understand it -- at what point did you say you first saw Toby Barrett, or who you later found out was Toby Barrett?

A      I saw him from the county road just as we were driving in front of the house.

Q       Okay.  And as you came down that private drive, you kept your eyes on Toby Barrett; isn't that true?

MR. LITTLEFIELD:  Objection, that's cumulative. He asked all of this in -- in his initial cross.

THE COURT:  Overruled, overruled.

BY MR. HILFIGER:

Q       And when you came across that ditch, you were looking at Toby Barrett?

A       Yes, sir.

Q       And isn't it true that you have previously stated under oath that you drove your car toward Toby Barrett?

A       Yes, sir.

Q       And that's why you changed your direction and instead of going up and parking to the southeast of that house, you changed your direction because you saw Toby Barrett there; isn't that true?

A       I can't say that that is true.  I saw the suspect, I went in that general direction.  By that time, we were getting fired upon and had been hit several times.

Q       But isn't it true that you -- that your car was driving toward Toby Barrett; isn't that true?

A       I was going toward that suspect, yes.

Q       And at that time -- at the time -- and you made that determination to go toward Toby Barrett before you even got fired upon; isn't that true?

A      No, sir.

Q      When did you -- what were you going to do with Toby Barrett when you saw him out there?

A      That was the only threat I had.  I thought that that was Kenneth Barrett.

Q      So you went toward that person; isn't that true?

A      Yes, I did.

Q      Okay.  And that is the reason you didn't stop out at the southeast corner of the house; isn't that true?

A      No, sir.

Q      Now, when your coming down this road, the county road, and you saw the man out there, did you ever -- who had the authority to call off that mission if they thought there was some danger?

A      Any one of the team members.

Q      Including the team leader?

A      Yes, sir.

Q      And you are the team leader?

A      Yes, sir.

Q      You are at the front of the pack; is that right?

A      Yes, sir.

Q      You could have called off that mission?

A      Yes, sir.

Q      Did you ever consider calling off that mission?

A      No, sir.

Q       You just kept going even though things had changed; is that true?

A       We did.

Q       Was that because you didn't have any plan, any alternate plan for abortion?

A       No, sir, it's because we are not sure that everybody is going to get the message.  People may be exiting their cars at this time, they may not hear the radio traffic, they may not hear the plan to abort it.  Half of them would be in the yard, half of them would be somewhere else. The pace of the entry is quick at this point.  We are trying to get in and everybody may not hear the information. Then we are scattered, then we are divided, then we have a real problem.

Q       Well, would --

        MR. HILFIGER:  Would you please put up -- I think it's 184.

BY MR. HILFIGER:

Q       Okay.  This is Government's 184.  Are you oriented to this?

A       Yes.

Q       Where you are?

A       Yes.

Q       This is -- this is the county road right here, right?

A       Yes, sir.

Q    This is the gate right here to Kenny's place, right?

A    Yes, sir.

Q    And as I understand it, when you first saw the person in the yard, you were right about there, right?

A    Approximately, yes.

Q    You were the first car, right?

A    Yes, sir.

Q    The other cars were behind you back here, right?

A    Right.

Q    You were the lead car -- the three cars would come down here and turn and go in.  So you know that the other two cars are behind you, the other Bronco and the black and white.  They hadn't gotten to their position yet, had they?

A    No, sir.

Q    So they couldn't have stopped, they couldn't be getting out of the car, could they?  When you first saw Toby Barrett in the yard, they wouldn't have been getting out of their car, they hadn't reached their positions yet. You knew that, didn't you?

A    There is no reason for us to abort at that point. There is a suspect standing in the yard, standing still. Why should we abort?

Q    Because he knows you are there now.

A    He is not doing anything.  He is standing still.

Q     Okay.  Would there -- well, let me go on with this.
Is it true that the other two cars behind the first three,
the entry team, the other two cars hadn't gotten to their
position yet, had they?

A     No, sir.

Q     So all of these reasons you gave for not aborting
the mission, when you first saw Toby in the front yard,
don't hold water at this time, does it?

A     You have given the reasons to abort.  I have not
given any.

Q     Okay.  And in your mind the mission was set and you
are not doing anything to stop it; isn't that right?

A     There was no reason to stop it.

Q     Did you have any medical unit plan on this mission?

A     Yes, sir.

Q     And where was the medical unit?

          MR. LITTLEFIELD:  Beyond the scope, objection.
I didn't ask anything about that.

          THE COURT:  Overruled.

BY THE WITNESS:

A     We had frequencies to area ambulances, we had
ambulance service numbers that we could contact in case
something happened.

BY MR. HILFIGER:

Q     Were you aware that Delena Goss was going to be

there before you met up at Dwight Mission Road?

A      I was not aware.

Q      At the time -- at any time before your car was facing that porch, you know, right on that porch, were you aware of where the shots were coming from before your car hit that porch or approached the porch?

A      No.

Q      Now, as I understand, you said one of the things you are supposed to do when the shots were fired -- when shots were fired, you are supposed to seek cover; is that right?

A      You want to get some cover between you and the gun fire.

Q      Okay.  And did you say that when the shots were fired you sought cover?  Did you say that?

A      Yes, sir.

Q      And what did you do to seek cover when the shots were fired?

A      Leaned to my right between the seats and the inside of the vehicle.

Q      Okay.  So --

          MR. HILFIGER:  May I approach, Your Honor, the model?

          THE COURT:  You may.

BY MR. HILFIGER:

Q      Is that approximately where you say the car was when

the shots were fired?

A    Well, a little bit further east.

Q    A little further back toward the ditch?

A    Yes, sir?

A    Yes, sir.

Q    Right here?

A    Yes, sir.

Q    So you are saying at that point you sought cover?

A    No, sir.

Q    Well, I thought you said that when the shots were fired you sought cover and leaned into the car?  Did I not understand you correctly?

A    No, sir.

Q    Oh, okay.

A    As the first shots started coming through the windshield, I didn't lean to my right and go between the seats at that point.  It was not until we got closer to the house.

Q    At what point did you lean to the right and seek cover?

A    I don't know at what point I leaned to the right and sought cover.  I know that when I was in front of the house, I leaned between the seats and sought cover. Barrett was still shooting.

Q    But you don't know when you -- was that the first

time you leaned to the right and sought cover, when you were at the house?

A    As I said, I don't know when I leaned to the right and sought cover.  I know the shots were coming through the windshield and that's the only place I could see cover, was to get out of the line of fire.

Q    At what point do you say you did that though?

A    I didn't say.  I said I don't know.

Q    Okay.  So there is a blank between the time that car is where it is now and the time the car was at the porch that you are saying you leaned between the seats and sought cover?  Is that right?

A    A blank.

Q    A memory blank, you don't know when you did it?

A    I don't know when I did it, no, I don't.

Q    Okay.  But you know you did it before you got to the porch?

A    I know it wasn't on the opening shots that Barrett fired.

Q    So you didn't seek cover --

A    I didn't do it immediately as he started opening fire.

Q    Okay.  At what point can you remember doing it?

A    When I was stopped in front of the house.

Q    Okay.  Did you stop first and lean or were you still

driving when you leaned and sought cover?

A      I was stopped.

Q      You were stopped.  So what you just told Mr. Littlefield about seeking cover when you first got shot, that's not true, is it?

A      No, it is true.

Q      Well --

A      It is in a matter of a few seconds here when Barrett starts shooting and we have got to -- I have got to decide to do something.  When I got stopped, then I go between the seats.

Q      Okay.  So from that point where the car is now until the time the car was on the porch or right up next to the porch or near the porch or whatever you classify it as, you did not lean down between the car seats; is that right?

A      No.  I couldn't have gotten shot in the face if I was leaned down between the car seats.  I couldn't have got shot in the shoulder if I was leaned down between the car seats.  I had to be behind the wheel driving upright for Barrett to shoot me.

Q      Okay.  And that's what I mean.  You didn't -- you are saying you didn't seek cover until you got to the porch; is that true?

A      I didn't get between the seats until I got to the porch.

Q      Okay.  And you said on your -- talking about the perimeters, one of the problems on the perimeters was that the family was around or the community around there -- that you had gotten some knowledge that they had -- that they had knowledge on the warrants and they were sympathetic to Kenny Barrett; is that true?

A      No, I didn't say anything about them having knowledge on the warrants.  I don't know if they knew about the warrants or not.

Q      You were told about that?

A      No, sir.

Q      Your information or your intelligence didn't say anything about whether they had any information on warrants for --

A      They just told us that family was around Barrett, that they lived all around him.

Q      And that's the limitation.  This other stuff that you told Mr. Littlefield about the family being sympathetic and that they weren't going to do anything to bring him in, that's just stuff you sort of made up, isn't it?

A      No, sir.

Q      Did somebody tell you that?

A      Yes, sir.

Q      Who told you that?

A    Clint Johnson.

Q    Clint Johnson told you that?  That was part of the information?

A    Yes, sir.

Q    And did he tell you where he got that information?

A    No, sir.

Q    You didn't ask?

A    No, sir.

Q    One question I forgot to ask.  You had an HK-53?

A    Yes, sir.

Q    And does that fire 223 rounds?

A    Yes, sir.

Q    And is that what was loaded in that, in your HK-53?

A    It won't load anything else.

Q    Okay.  Now, Mr. Hamilton, you're a witness here today in this matter.  As a Highway Patrolman, you have been a witness in other cases not involving this incident, haven't you?

A    Yes, sir.

Q    Many times?

A    Yes, sir.

Q    And in those cases as a witness, you were always a witness -- when you were a witness in those cases you didn't really care about the outcome of the case; isn't that true?

A       You always care about the outcome of the case.

Q       You want it to go like you want, like your testimony would be; is that right?

A       No, you want it to go -- if people violate the law, you want them to answer for it.

Q       In this case you have a little extra incentive, don't you?  A friend of yours died; isn't that true?

A       He did.

Q       And isn't it true that you -- that you want your testimony to help get Kenny Barrett convicted; isn't that true?

A       My testimony is honest and truthful and it's for the jury to decide.

Q       Whether it's bias or not -- it's up to the jury to decide whether you are bias in this case, isn't it?

A       Yes, sir.

Q       And you do want to be bias because Kenny Barrett -- because Rocky Eale's was your friend; isn't that true?

            MR. LITTLEFIELD:  Objection, that's argumentative, Judge.

            THE COURT:  Sustained.

            MR. HILFIGER:  No further questions.

            THE COURT:  Any further questions of this witness?

            MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.

FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     What -- did the failure to abort your mission and your decision to continue entry into that yard justify you all being shot at?

A     No, sir.

MR. LITTLEFIELD:  Pass the witness.

MR. HILFIGER:  No questions.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  I would ask that he be.

THE COURT:  The defendant have any objection? Has he been subpoenaed?

MR. HILFIGER:  Your Honor, at this time we don't -- we had him under subpoena and at this time we will release him, subject to recall, and we will notify him.

THE COURT:  Sir, with that admonition, you may step down.  Thank you for your testimony.

You may call your next witness.

MR. LITTLEFIELD:  Raymond Greninger.

RAYMOND GRENINGER, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     State your name for the record, please, sir.

A        Raymond Greninger.

Q        You need to lean into that microphone and speak into it.  The acoustics aren't real good in here.  If you don't talk into the microphone, you are going to be hard to hear.

A        Okay.

Q        And you are employed as what, sir?

A        I'm a trooper with the Oklahoma Highway Patrol.

Q        And how long have you been employed by the Highway Patrol?

A        I'm working on my 22nd year.

Q        What area are you assigned to now, sir?

A        I'm a full-time bomb technician for the state of Oklahoma.

Q        And is that the same job Mr. Hamilton has now?

A        Yes, sir.

Q        So there are two of you doing the same thing in this part of the state?

A        Actually there is five of us in this part of the state.  We actually have ten people there full-time.

Q        How long have you been a bomb tech?

A        Since July of 1997.

Q        Were you full-time as a bomb tech when you started out or how did you start out in that regard?

A        No, sir.  When we first started out it was a part-time job that we got on the squad, we did it part time.

We had other traffic duties or patrol duties.  We took care of them and then when we had a call out, then we would go and take care of it and we would go back and do our other duties.

Q      How long have you been full-time as a bomb tech?

A      Since July of 1999.

Q      Was that your only assignment or did you have some other functions that you served with the Highway Patrol after July of 1999, and I'm talking about the tact team?

A      Yes, sir.  I was -- after July of '99, I was also a member of the Highway Patrol eastern tactical team.  I got in that, I believe, in 1989, and also I was a traffic trooper up until the point that we went into full-time bomb technician as an assignment.

Q      Okay.  You indicated, I think you said, '89 is when you started with the tact team?

A      Yes, sir, I believe so.

Q      How often did the tact team train?

A      We trained two days a month and then two weeks out of the year.

Q      Okay.  And how many members were on the tact team for the eastern half of the state?

A      We had an eleven man squad on the east side of the state.

Q      What kind of experience was on that squad in 1999?

A       Are you asking --

Q       The years of service.

A       The years of service?  It was very extensive.  There was a lot of experience there.

Q       Were you one of the oldest member?  I'm not talking age but as far as time of service, or were there others that had been there longer than your ten years?

A       Yes, there were others.  I would have been the junior or the lowest year person at that time.

Q       When did you leave the team?

A       I believe it was in 2001, like December of 2001.

Q       Your aware of why we are here?

A       Yes, sir, I am.

Q       When did you first receive information about this particular operation, mission, whatever you want to call it?

A       It would have been some time, I believe, on the 22nd.

Q       Okay.  And what was the information that you received?

A       The information was that we were looking into assisting the Sequoyah County Sheriff's Office and District 27 Task Force to execute a search and arrest warrant at a residence in Sequoyah County.

Q       And where in response to this were you assigned to

go to, any certain location for any purpose, and, if so, where and what was that purpose?

A    Yes, sir.  We were advised to respond to the Sallisaw airport and meet with Clint Johnson and Frank Loyd, I believe were their names, and meet with them there. Also, we met an O.H.P. pilot and used an airplane and to do an aerial flyover of the residence that we are talking about.

Q    Okay.  When you say we were convened at that location, who met with Mr. Johnson and Mr. Loyd at the airport from the O.H.P.?

A    It was myself, Trooper Hamilton, and our O.H.P. pilot.

Q    And what happened at the airport?

A    At the airport we got the basic information of the mission that they were asking us to do and we did a -- got into the airplane and did a flyover.

Q    Okay.  Would you look at Government's Exhibit 184? It's going to be displayed there.  It's also going to be on the screen.  Do you recognize what that is, sir?

A    Yes, sir, I do.

Q    And what is that?

A    That is the location or the area where we were going to execute the warrants.

Q    Had a decision been made that we are absolutely

going to do this operation when you met them at the Sallisaw -- when you met Johnson and Loyd at the Sallisaw airport?

A      No, sir, it had not.

Q      What kind of information about this location and the occupant of the residence did you receive that had input into the determination of whether the O.H.P. tactical team would do this operation or not?

A      We obtained the information from the people involved and we look at the area, we look at the manpower, we look at the dangerousness or the type of mission that it is and whether they have the capability to do it.  We look at the area where it's at, anything that would not -- that they would not be able to do themselves.

Q      Okay.  Typically, does the -- back when you were a member of the tactical team from '89 to 2001, did the tactical team handle every warrant that came down the pike?

A      No, sir.

Q      What kind of warrants was it that the O.H.P. tactical team did?

A      We did high risk warrants.

Q      And based upon the information you received was a decision made as to ultimately whether or not the tactical team needed to do this operation, this entry for the local law enforcement officials?

A      At the airport at that time?

Q      At any --

A      At any point?  Yes, sir, it was.  There was a decision made.  The information we got we had to relate back to Major Pettingill and ultimately he was the final decision maker of whether we would do it or not.

Q      And did you do it?

A      Yes, sir, we did.

Q      What was your opinion as to whether this was an appropriate mission for the tactical team or this was a mission that could have been handled by local law enforcement?

A      It was a high risk mission that they didn't have the manpower, the capability, and I felt that we could do it.

Q      Okay.  In regards -- you all did a flyover and saw it on the 21st, 22nd, whatever day it was, several days in advance?

A      Yes, sir.

Q      Any photographs taken?

A      Yes, sir.

Q      What about the layout, the the floorplan of the residence so that you would know what to expect inside that residence if you determined, which you ultimately did, to make entry to that residence?  Did you get any information in regards to that?

A      Yes, sir.  They had made a scale model or not a scale model but they had made a little cardboard cutout model of the residence that we looked at there that day also.

Q      Going ahead in time, did you ever -- did you ever go into that residence?

A      Yes, sir, I did.

Q      And saw the floor plan as it was laid out, actually before your eyes?

A      Yes, sir, I did.

Q      How accurate was the model that was provided by Mr. Loyd and Mr. Johnson in regards to what you ultimately saw at that location?

A      It was pretty accurate.

Q      In regards to the information you received from Johnson and Loyd, what, if any, information did you receive about other residents of this area in and around Barrett's residence?

A      The residences in and around it were either associates or relatives of Mr. Barrett, was the information that we got.

Q      Did that come into play in any way in the decision to ultimately do this operation?

A      Well, that just increased the level of the high risk of the warrant.

Q      In regards to the warrant itself, were you made aware of what type of warrants were -- were subject to Mr. Barrett and that location?

A      Yes, sir.

Q      What type of warrants were there?

A      There was a search warrant and there was an arrest warrant for Mr. Barrett.

Q      Was there any special provision attached to the search warrant or provisions and, if so, what were they?

A      Yes, sir, it was a no/knock search warrant.

Q      Okay.  And the typical search warrant, what is the provision in regards to knocking?  What are you supposed to do?

A      You have to announce that you are present.

Q      When you announce -- when you knock and announce, what is said?

A      You have to identify yourself as a police officer, law enforcement, and wait a reasonable amount of time.

Q      Okay.  You all did high risk warrants.  Were you restricted or did you limit the warrants you served to only those which were no/knock?

A      No, sir.

Q      Even if you consider them high risk, you all knocked and announced we are police, if it's not a no/knock warrant?

A    Yes, sir.  If that's the type of warrant that was signed by the judge and given to us, yes, sir, we would.

Q    When was the service -- was there any kind of limitation on when the search warrant could be served in this particular case?  I mean, as far as the time of day.

A    Time of day?  No, sir, it was -- it was -- it could be served at any time of day, that's why it was a day or night no/knock search warrant.

Q    Okay.  Was that typical of the warrants that had been served in the past by the tactical entry team for the eastern half of the state?

A    No, sir.

Q    What hours do you recall -- do you recall what hours a daytime warrant can be served lawfully in the state of Oklahoma?

A    I believe -- I believe it's six o'clock in the morning, but I'm --

Q    Okay.  And do you know how late -- do you recall how late qualifies?

A    No, I don't recall.

Q    How long has it been since you have done a search?

A    With -- probably five years.

Q    Even if it was a daytime warrant, does it require the sun to be up to serve it or can you go in when it's dark and the sun is set or the sun hasn't come up?

A      The time frame -- the actual time is what you have to wait for.  So, you know, sometimes -- in different months it may not be totally daylight when you go.

Q      Okay.  Typically, do you serve them in the morning as opposed to nighttime, evening hours?

A      It would just depend on the particular warrant that you had, when you got it, and what the parameters were, what was the intelligence that you had, so...

Q      Okay.  So a decision was made to do this operation.  Where did you all meet in preparation?  Where did the team meet?

A      We met at Camp Gruber at Green Leaf State Park there just on the south edge of Camp Gruber.

Q      And what kind of location was it that the team assembled in?

A      It's like a military type deal off by itself.

Q      This warrant was served shortly after midnight on the 24th of September.  When did you all get together as a team?

A      We got together on the morning of the 23rd, sometime in the morning, the morning hours.

Q      Okay.  And what did you do when you got to Grubber in regards to the preparation for the execution of this warrant?

A      When we arrived at Gruber, we were briefed by

Trooper Hamilton and Lieutenant or Major Pettingill, given the information, intelligence that they had at that point, and we sat down and formulated an initial plan.

Q     Okay.  Was the model -- was the cardboard model that Mr. Loyd or Mr. Johnson, whichever, had provided to you available to the team in formulating the plan?

A     Yes, sir.

Q     Okay.  You indicated you had taken aerial photographs.  What was their availability?

A     They were available also.

Q     And after the briefing, the viewing of the model, looked at the aerial photos, how did the team formulate the plan initially for the entry to Mr. Barrett's residence?

A     Initially we discussed it as a team, made some recommendations.  We come up with a plan, we presented them to Trooper Hamilton, who would be our team leader on that mission, and Major Pettingill for their approval.

Q     When you say recommendations, how did you go about making them?  How does a team or how does the team go about making the plans?

A     Well, if I'm part -- if I'm going to be a part of the entry team on the mission, my focus is going to be on making the entry, how to do it, how many people we are going to need for the size of the residence and what we

are going to do.  If a person is a security or a sniper, an element or a part of the creek team, then they make recommendations for that and everybody puts their input in and we come up with a plan based on everybody's level of experience that we are going to use for that particular mission.

Q     Okay.  Can somebody say I don't like this, I don't like this operation, or let's say that -- let's narrow it.  If there's part of the entry plan that somebody has a problem with, what can one of the team members do in regards to that problem?

A     You can let him know.  You can talk about it because a lot of times two heads are better than one.  One person may miss something and another one have another idea.  You take the two of them and you make the best plan you can from the information, the intelligence that you have.

Q     Has that happened in prior planning, that somebody will say, wait a minute, let's thinks about this and the plan changes based upon the suggestion?

A     Yes, sir.

Q     What about a flat out decision not to make the entry? Has that ever happened previously, either previously or after this in regards to any entry plans that you recall where somebody said I have got a problem with this, I don't think we ought to do it?

A    No, sir.

Q    You don't recall any of those?

A    I don't recall any of those.

Q    Okay.  You mentioned the creek team.  Was that part of the initial plan?

A    Yes, sir, it was.

Q    And what was the initial plan in regards to the insertion of the creek team?

A    The initial plan was that we would insert a creek team somewhere to provide real time intelligence or information or get notice of what they are seeing at the target location as the team approaches to give them some real time information.

Q    And do you recall who originally was going to compromise (sic) the creek team in this operation?

A    I'm sorry?  I don't understand.

Q    Do you recall who -- a creek team initially -- I think you said that there -- was there a creek team initially in this --

A    Yes, sir, there was.

Q    Do you recall who was going to be on the creek team initially?

A    Yes, sir, I do.  It was Trooper Manion and Trooper Poe.

Q    Which way were they planning to enter?  Do you

recall?

A      I believe they were going to come in from the south and get on the south side of the residence, into that area.

Q      Okay.  And the residence faces which direction, do you recall?

A      The residence faces south.

Q      Okay.  So they would have been coming in -- which way is south on this photo?

A      It would be that direction.

Q      Off to the left, as I'm looking at it?

A      Yes, sir.

Q      Okay.  What was your function in this operation?

A      I was going to be part of the entry team element.

Q      And how many people were going to enter this residence?

A      We had -- it was set up for four.  It would be -- there would two security personnel if something would happen and we would need more that they could also assist us.

Q      And who was going to comprise the creek team?

A      The creek team?

Q      Yes.

A      It was going to be Trooper Poe and Trooper Manion.

Q      I'm sorry, the entry team.  I apologize.

A      The entry team was going to be Trooper Hamilton,

Trooper Eales, Trooper Manion and myself.

Q      How was the door going to be breached?

A      We had the ram, which is a device you can strike and open the door with, if it would have been needed.

Q      Okay.  And who was the ram guy?

A      I believe that was going to be Trooper Hash, who was part of the security element that we also had that I was talking about, which was the other two people, Danny Oliver and Trooper Hash.  They were going to come up and they were also going to provide outside perimeter security for us and if we needed more assistance they would also be there to assist with that.

Q      Oliver wasn't a member of the team, was he?

A      Not at that time, no, sir.

Q      How long had -- what previous experience did Mr. Oliver have with the team?

A      Danny was a member of the -- of our tactical team and a member of the Highway Patrol and was retired.

Q      How long had he been a member of the tactical team? You had been there ten years at the time of this mission. How much of the ten years that you had been on the tactical team had Mr. Oliver, Danny Oliver, been on the tactical team?

A      Every day.

Q      How long previous to this had he retired?  I know

you can't give me the exact date or month, but approximately.

A       Previous to this mission?

Q       Yes, sir.

A       Probably somewhere around a year and a half, two years.

Q       Okay.  And what position did he occupy with the tactical team when he had been a member?

A       He was our team leader.

Q       Do you know if he was still in law enforcement at the time?

A       Yes, sir, he was.

Q       How big was this location, this residence that -- did you have any idea how big the place was that you were going to secure for a subsequent search by local law enforcement?

A       Yes, sir, it was small.

Q       What impact did that have on the entry team?

A       It had an impact as to the number of people that we would need just because of the size of the location.  If it would have been bigger, then we may have needed more people.

Q       Did you typically have a four people entry team or often times had it been a larger entry team?

A       Well, typically the team was divided into a five

man entry team and a five man tracking or security team and then a team leader and -- but we were trained vice versa to where if they were on a mission that we needed more people to go out into the woods and do tracking maneuvers, we could flow the entry people into that or vice versa.  If we were going into a large structure and we needed the whole element of entry people, we could also do that.  So we cross trained on everything that we did.

Q    Okay.  Did -- the plan changed -- did the plan change in any way after it had been formulated?

A    After the original plan --

Q    Yes, sir.

A    Yes, sir, it did.

Q    And did the -- how did it change?

A    It changed because --

Q    Let me rephrase that.  Let me just withdraw that. What was done additional after the plan was formulated?

A    Okay.  Trooper Manion, Trooper Hamilton and myself did a drive-by of the residence to get some real time look at the terrain and the features from eye level.  From looking at that --

Q    Well, how did you -- about what time was the drive-by?

A    Sometime in the afternoon hours.

Q    Okay.  You have done the flyover with Mr. Hamilton?

A      Yes, sir.

Q      How much different did it look on the ground just when you were right there as opposed to what you were seeing in the air?

A      The proximity of the houses and the residence and everything in the area was a lot tighter than it looked. It looked more spread out from the air and it looked a lot tighter from the ground after driving by.

Q      Did that have any impact -- on your decision as far as everything being closer in than it looked from the air?

A      Yes, sir.

Q      Anything else that you observed as you did the drive-by that caused the plan to be changed?

A      Not that I recall.

Q      Do you recall anything about dogs?

A      Yes, sir.  Well, there were dogs running from the other residences.  From the particular residence there, we didn't see any dogs, but in the area we did see some animals, yes, sir.

Q      And what restraints did you observe on the dogs as you did the drive-by?

A      I don't recall any.

Q      What, if any, impact did the dogs have that were in the neighborhood on the decision as far as the creek team?

A      It would run the risk of compromising the creek

team.  It would put them in a position of -- they could be compromised or unsafe.  You know, their safety was a concern at that point.

Q     For a creek team to be effective, what do they need as far as being able to get to a location and surveil it and be safe and effective?

A     They need to be able to get to the location unnoticed, unchallenged, and be able to observe the area to get -- to provide real time information to the team.

Q     Could they have stood out in the road and observed?

A     Well, yes, sir.

Q     Would that have been a good idea?

A     No, sir.

Q     What else do they need besides being able to get there?

A     Well, they need cover and concealment, they need, you know -- they need all of the factors to be able to get there without being noticed or compromised.

Q     What kind of cover was there or concealment for a creek team that you observed that would have provided them with the security and safety that would enable you to put them in position for them to observe in real time Mr. Barrett's residence?

A     Very little.  As you can see on that photo, it's very well open.

Q      When you got back -- by the way, what did you use to do the drive-by, what vehicle?

A      We used Trooper Hamilton's vehicle, which was a white unmarked Ford Bronco.

Q      And was there anything done to it to avoid detection as a law enforcement vehicle and, if so, what?

A      Yes, sir.  It has antennas, which are used for the radios, and we removed the antennas off of it.

Q      Other than the antennas, is there anything about the vehicle that is visible from the exterior that would identify that as a law enforcement vehicle as opposed to a civilian Bronco?

A      No, sir.

Q      Okay.  When you got back after doing the drive-by, what was reported to the team and how did the plan change?

A      From the intelligence that was gathered, the way that the area looked, proximity, the closeness versus what we were looking at on the aerial photos, the plan changed when we decided that the creek team was running too great of a risk of compromise to put them out and we choose not to use the creek team.

Q      Okay.  If you put a creek team out, how is contact maintained with them?

A      Radio.

Q      What kind of range does the radio have that the creek

team would have utilized?

A      They are handheld walkie-talkies, so they are -- whatever distance that it would have and the radios that we have, trying to operate -- they were a secure net radio to where you could click them over to secure where they could not be picked up by scanners and when you clicked them over to secure, the range was limited.

Q      Approximately how far could you get out there?

A      Line of sight, maybe a half a mile, if you didn't have interference and things like that, depending on the terrain.

Q      The radio that is a half mile maybe away and is receiving their transmissions, where is that located? What kind of -- who is out there?

A      It would have to be somebody -- somebody else in a vehicle or with another radio or whatever somewhere to receive the transmission from the creek team.

Q      How secure did you feel looking at this area that a vehicle that wasn't from that area could be left out there parked and not be discovered and potentially compromise the mission?

A      I didn't believe it could happen.

Q      What was done in regards to the creek team when you all got back after doing this drive-by?

A      It was decided not to put a creek team out.

Q      By the way, when you drove by on that county road
in front of Barrett's residence, what did you observe out
in front of the residence?

A      Right beside the road there was a gate with a padlock
on it that was a lock -- that was locked.  There was -- as
you went up, there was -- I believe there were two people
that was out doing something there in the front yard
around the vehicle.

MR. LITTLEFIELD:  I would ask that what has been
marked as Government's Exhibit 55 -- I don't think it is
in evidence yet -- be displayed to the witness?

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q      Do you see government Exhibit 55?  It's on the
monitor to your left.

A      Yes, sir, I do.

Q      Do you recognize what that is?

A      Yes, sir, that's the gate that was in front of the
residence.

Q      Okay.  It's not in front of the residence in that
photograph?

A      No, sir, it's not.

Q      Do you know how it got from up and secure to in this
location?

A      Yes, sir, I do.

Q    How did it get like this?

A    It was -- after the shooting incident occurred, Trooper Hise drove his vehicle through the gate in an attempt to get on the property to assist with the removal of Trooper Eales.

Q    Okay.  Is this, in fact, the gate that was in front of the Barrett residence?

A    Yes, sir, it is.

MR. LITTLEFIELD:  Move admission of what has been marked as Government's Exhibit 55.

THE COURT:  Any objection?

MR. HILFIGER:  No objection.

THE COURT:  It will be admitted without objection.

MR. LITTLEFIELD:  May I ask it to be displayed?

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q    And do you see in the center of the gate -- I guess that's the top -- the plaque, that board?

A    Yes, sir, I believe so.

Q    Okay.  Have you -- did you see that on that night as you did the drive-by?

A    That afternoon?

Q    Yes.

A    Yes, sir.

Q        And what was that?

A        That's a sign with some writing on it.

Q        I would ask that Government's Exhibit Number 104 be provided.

(COMPLIED)

Q        And do you recognize that, sir?

A        Yes, sir, that is the sign in the photograph.

Q        Essentially, without reading it verbatim, what does that tell you?

A        It tells you that -- it is -- it gives you the information that it just -- it tacks more on to the high risk warrant that we were going to execute.

Q        What does it say will happen if someone enters that residence?

A        It says I'll shoot.

Q        Okay.  Hand that back to the clerk.

What happened in regards to this creek team when you got back to Camp Gruber?

A        We decided that it wouldn't be used and -- you know, we decided there, but Trooper Manion was part of the drive-by and that was part of the things that he was looking at, was could we put in a creek team, and it was a consensus of the team it would be a riskful adventure to put them out.

Q        The creek team was not used.  Manion was going to be

on the creek team.  What happened in regards to Manion's position on this mission?

A    He was put on the entry team element.

Q    And the other member of the creek team, Mr. Poe, what was his position with the creek team going to be? Had he been on the creek team, what was his function as a member of that creek team?

A    His function would have been with Trooper Manion and they would have went out at that particular time to provide real time intelligence and information as the team was making an approach.

Q    Did he have any other function besides providing real time intelligence?

A    Yes, sir, he was also a sniper.

Q    What's a sniper in regards to the -- what is a sniper supposed to be doing?

A    A sniper is there to -- if there's a threat that would carry the use of deadly force into the rest of the element, then they could take a shot and attempt to stop it before it put other people in harm's way.

Q    Okay.  Snipers -- is somebody in a sniper or a security position in virtually all of your entries?

A    Yes, sir, we try to.

Q    How many times has a sniper in the ten years -- the ten plus -- I guess twelve years you were a member of the

tact team, how many times was a sniper -- how many times has a sniper fired?

A     You mean --

Q     Actually used deadly force.

A     In a mission that actually takes a shot?  Never.

Q     Where originally -- or had there been a decision originally, the first plan, as to how entry was to be made to Barrett's residence?

A     Yes.  We were going to make an approach from -- because of the gate that was --

Q     Well, I said originally.  Before the drive-by, where were y'all going to come in from, originally?

A     Originally we were going to come down the road -- if the creek team and the sniper team could have made it in and unsecured or cut the lock on the gate or -- and provided us access, we would have tried to make access in there by the gate.

Q     Okay.  So let's put 184 back up again.  If this is the gate here, prior to learning that it was locked and unavailable, where would you all have entered?

A     Prior to --

Q     Prior to you all discovering that that gate was locked --

A     We were going to approach from the west, which would be the top of the screen, and come down and attempt to

make entry into the property there where the gate was.

Q     Okay.  After you observed the gate was locked and the creek team wasn't going to be in there, how was the entry going to be made?

A     It was going to come down the road from the west, from the top of the screen, and drive down past the residence and into the road that you can see and you can see a little path or an avenue there, we were going to come into it and make it through that.

Q     Okay.  Is this the path you were going to take after you changed the plan?

A     Correct.

Q     Government's Exhibit Number 1 -- you were a part of the entry team.  Did that ever change?

A     No, sir.

Q     What kind of vehicle did you have?

A     I had a white Ford Bronco like trooper Hamilton's.

Q     And who was going to be the first vehicle in along that path?

A     It would be Trooper Hamilton, his vehicle, and with him Trooper Eales.

Q     The second vehicle would be?

A     My vehicle, which I would be driving and the passenger would be Trooper Manion.

Q     And the third vehicle was going to be what?

A     The third vehicle would be a black and white patrol vehicle driven by Trooper Hash with the passenger of Danny Oliver.

Q     The fourth vehicle, what was it to be?

A     It was going to be a black and white patrol vehicle driven by Trooper Hise and the passengers were Trooper Poe and Trooper Darst.

Q     And where was Hise's vehicle to go on the final plan?

A     In the final plan, it was to approach and stop in the vicinity of the front gate.

Q     Okay.  Now, Mr. Poe was a sniper in the original plan.  What was Mr. Poe's function in the final plan?

A     He was still going to provide that role.  The plan was for -- that when they got stopped, he was going to step out and attempt to provide cover at that point.

Q     What were Poe and -- I mean, Darst and Hise to do?

A     Trooper Hise and Trooper Darst were going to attempt to get over to the -- it would be the west side of the residence over between the trailer house or the other residence and the residence that we were going to execute the warrant on.

Q     Why were you putting Darst and Hise there?

A     Because the intelligence or the information that we had was that he may attempt to get from his residence to the residence next door.

Q      Did you know whose residence was next door?

A      Yes, sir.

Q      Whose?

A      His mother.

Q      And the final vehicle was to be occupied by who?

A      It would be Major Pettingill and Lieutenant McBride.

Q      Where was Lieutenant McBride from?  I don't mean what town, but was he normally with the eastern tactical team?

A      No, sir.  He was -- he was assigned on the western or the western tactical team, but a lot of times we would do missions and combine people.

Q      Okay.  What was the function of Mr. Pettingill and -- and McBride?

A      Major Pettingill was the team commander and Lieutenant McBride was an assistant or he was the team leader and assistant team commander and he functioned in the same role.

Q      Where were they to go?

A      They were to pull into the driveway of his mother's residence and also attempt to secure the residence or cut off the path to allow him to get over to that residence and, in essence, would create a barricade or possibly stop a hostage situation with his mother.

Q      Okay.  When y'all came down the road, what were you

supposed to do when you turned from the road onto this driveway?

A     We were supposed to make a left turn onto that road.

Q     Okay.  Did anything happen as you approached it?

A     Off the county road onto that?

Q     Yes, sir.  What happened?

A     Trooper Hamilton, he overshot the ditch and had to back up and continue on.

Q     What did you do when he stopped to back up?

A     I just slowed down.  It was a real quick type maneuver.  I slowed down, he backed up, and then we continued on.

Q     When you got on that driveway heading to the north and east, what did you do in regards to your lighting?

A     I personally?

Q     What did do you or what was done in your vehicle in regards to the lightning?

A     Trooper Manion activated the emergency lights that I had on my vehicle on that road, that strip in between -- as we were pulling onto the property.

Q     What emergency lighting was on -- in your vehicle and was turned on by Trooper Manion?

A     My vehicle had a -- it's a red and blue flashing strobe-type light on the sunvisor and headlights were wig-wag, which made them flash on and off, and there was

a -- there was a lighting type bar to the rear of the vehicle that was activated.

Q    Where are the lights located on the sunvisor?

A    They are -- they fit on the sunvisor where you don't see them and when you flip it down they become visible.

Q    And when you say wig-wag lights, what -- what does that do?

A    It makes the headlights alternate or flash to make it more apparent, more visible so that you can see it.

Q    And both of those items were turned on?

A    Yes, sir, by Trooper Manion.

Q    When you made the turn onto the property, at that location were your emergency lights on on your vehicle?

A    Yes, sir.

Q    Where was your focus?

A    I was driving the vehicle, so my focus was watching Trooper Hamilton's vehicle to be aware of where we are going and --

Q    Okay.

        MR. LITTLEFIELD:  Your Honor, I would ask that the witness be allowed to leave the witness box and go to the model, Government's Exhibit Number 1.

        THE COURT:  You may, sir.

        MR. LITTLEFIELD:  And would you take the lead vehicle -- Judge, I would ask that he be allowed to take

the tape and the rod off of it.

THE COURT:  You may.

(PAUSE)

BY MR. LITTLEFIELD:

Q     Would you take that vehicle and position it -- do you see the ditch there?

A     Yes, sir.

Q     Okay.  Now, position it at the ditch.  You will need to speak up and project so that everyone can hear.  And show the jury the path that Mr. Hamilton followed.

Q     Okay.  He came through the road, made this turn, came through this ditch.

Q     When he hit the ditch, where was your vehicle?

A     My vehicle was coming behind him in that area.

Q     Okay.  What did you notice when Mr. Hamilton hit the ditch?

A     As you can see, even on the model, as it comes through and it starts to hit, the rear bumper actually bottoms out and I can remember seeing the bumper bottom out on the ditch.  It was a lot deeper than what I had anticipated and from what we could see.

Q     How far did Mr. Hamilton go until you hit the ditch?  And can you put him approximately where he was when you made the entry into the ditch?

A     He would have continued on out of the ditch and as

soon as he cleared it, I knew that it was deep.  I had seen that he had bottomed out and I attempted my approach or I made it and went through the ditch right behind him.

Q      Where did Mr. Hamilton's vehicle go?

A      It continued to approach on towards the residence.

Q      Go ahead and show the route that he followed.

A      It would have been somewhere...

Q      And where did he end up?

A      He ended up -- his vehicle ended up in this area right in there.

Q      Did you notice something happening between the point where you are there and -- with Mr. Hamilton's vehicle and the point where it is located now?  And if so, what?

A      As we made our approach, I remember or I seen somebody or a figure out in the front yard or out in the front part of the residence to the side.

Q      When you say you saw someone in the front yard as you made your approach, where were you located when you first saw the figure --

Q      Somewhere on the -- still coming into that road making my turn.

Q      On the driveway, okay.  And where was the person you saw in the front yard?

A      It would have been over in this area.

Q      Just off the model south and west of the residence?

A      Somewhere in that area.

Q      Did you notice something -- did you know something had gone awry with your plan?

A      When -- from this point to where we go through, I remember the Bronco bottoming out and up until the approach to where we came up to here and came to a stop, I still have a blocked memory, you know, somewhat through there as to what happened.  As we approached, somewhere between the ditch and here, I started hearing the gun fire.

Q      Okay.  Do you know exactly where your vehicle was when you first started hearing gun fire?

A      No, sir, I do not.

Q      Do you know where Mr. Hamilton's vehicle was when you first started hearing gun fire?

A      No, sir, I do not.

Q      Where did your vehicle go to?

A      My vehicle left the ditch and we came up and we stopped somewhere in this area right in there.

Q      Okay.  And did -- you heard gun fire.  Were you able to detect what was being fired upon?

A      As I say, somewhere into this point where we came to a stop -- and I don't know exactly whether it was -- but as we pulled up, I can see smoke and debris and I think at that point I think it's -- I don't know whether it's dirt or dust.  I can hear it going off.  It sounds like it is

extremely fast, rapid like, like automatic weapons fire. I'm sure what I was seeing was the debris of the windshield as it was exploding off of the vehicle.

Q      Off of whose vehicle?

A      Off of Trooper Hamilton's vehicle.

Q      Was it -- after it came to a stop or did you notice it prior to it coming to a stop?

A      It was somewhere in there and whether he was still moving or not, I'm not really sure.

Q      Was there anything that you noticed about the debris coming off of the vehicle?

A      It was -- it was just like it was smoke, it was just -- I mean, it was coming out.

Q      Anything about colors?

A      It was -- yeah, it was a white or a grayish-color type.

Q      Did you see anything reflecting off it at any time?

A      Not that I recall.

Q      Okay.  Do you see the blue pickup immediately east of the residence?

A      Yes, sir, I do.

MR. LITTLEFIELD:  Judge, I would ask that he -- for a minute, he be allowed to return to the witness stand.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q     Do you recall the location of that blue pickup?

A     Yes, sir, I do.

Q     And where is it -- where was it on the night or the early morning hours of September 24th in relation to the blue pickup and where it is positioned now?

A     It was pretty much in that position.

Q     Okay.  Would you look to what has been marked as Government's Exhibit Number 4?  It's not in evidence yet. Do you recognize what is shown in that photograph, predominantly shown in the photograph?

A     Yes, sir, I do.

Q     What is that?

A     That is the blue pickup.

Q     And is that the location in which -- where it was when y'all came up?

A     Yes, sir.

        MR. LITTLEFIELD:  Move admission of what has been marked as Government's Exhibit Number 4.

        MR. HILFIGER:  No objection.

        THE COURT:  It will be admitted without objection.

        MR. LITTLEFIELD:  I would ask that what has been marked as Government's Exhibit 11 be displayed to the witness.  Again, it is not in evidence.

BY MR. LITTLEFIELD:

Q      Do you recognize that, sir?

A      Yes, sir.

Q      And what is that?

A      That's the same pickup.

Q      Okay.  And is it -- again, does that show -- it's location?

A      Yes, sir, it does.

MR. LITTLEFIELD:  Move admission of what has been marked as Government's Exhibit 11.

MR. HILFIGER:  No objection.

THE COURT:  Admitted without objection.

BY MR. LITTLEFIELD:

Q      When you came to a stop at that location, what did you do?

A      When I came to a stop at that location, I was -- of course, I stopped the car, put the car -- put the vehicle in park and got it stopped to where it was safe to exit.

Q      And your passenger was Trooper Rick Manion?

A      Yes, sir.

Q      And as you were stopping, what was Manion doing?

A      Manion was exiting the vehicle.

Q      Who got out first?

A      Trooper Manion did.

Q      Where did Trooper Manion go?

A      He came -- got out of the vehicle and came to the

back corner area of Trooper Hamilton's Bronco.

Q     Did you see what was happening at Trooper Hamilton's Bronco as you came up, beyond the glass and debris flying off of it?

A     Yes, sir, I did.  Trooper Eales had exited the vehicle and made it to the back corner and he had dropped there on the ground.  Trooper Manion was heading out and down to him and he was yelling man down, man down, we need help.

Q     What did you do in response to that?

A     Well, I came out of the vehicle.  I was making my approach.  I made it up to him or close to him.  I seen -- I knew -- I stepped back to my vehicle and grabbed the radio mike and advised that we needed help, man down, we need help.

Q     Did you get close enough at that time to see what Rocky's condition was, what Trooper Eale's condition was?

A     I -- yes, sir, I knew that he was hurt.  I knew that he was injured.  I knew that -- I mean, from the gunshots going off, I knew that he was probably hit with a gunshot wound.

Q     Could you tell how bad it was at that point?

A     Not at that point, no, sir.  I just knew from the -- that from Rick's voice that it didn't look good.

Q     What was Rick saying?

A    He was yelling man down, man down, we need help, stay with me Rocky.

Q    Did you know where Buddy was at that time?

A    No, sir, I did not.

Q    Are you familiar with diversionary or distraction devices known as flash bangs?

A    Yes, sir, I am.

Q    How large a sound or how visible are flash bangs when they go off?

A    They are pretty loud.  Their intent is to exhibit a light and a sound to divert the attention or to actually stun the person or give you the option to be able to move or get out or whatever you have to do.

Q    Do you recall the flash bang going off that night?

A    I remember hearing it going off in the sequence of events.  I don't really know exactly when during the time frame that I remember hearing it go off.

Q    When did you first see Buddy?

A    The first time I remember seeing Buddy was after I came back around from my vehicle, after I grabbed the mike and yelled that we needed help, was trying to notify the people to get us some help coming.  I come back around the front of my vehicle, was coming back to the location where Rocky and Trooper Manion were and when I got to that location, Trooper Manion had made a move and was moving

over to the side of the blue pickup.

Q     Okay.  Manion goes to the blue pickup?

A     Yes, sir.

Q     And you were...

A     I'm coming back around the front of my vehicle and I'm getting in between the two Broncos.

Q     Okay.  And where did you see Buddy, the first time, outside of his vehicle?

A     Okay.  I start moving towards Trooper Manion to provide security and assistance with him and as I look across, Buddy is standing and stepping up on the front porch with his weapon pointed at the front door and that was the first time that I seen him.

Q     Could you tell where the gunshots were coming from at any point in time that were striking the vehicle that was driven by Mr. Hamilton and occupied by Trooper Eales?

A     No, sir, I could not.

Q     Where did Trooper Manion go?

A     Trooper Manion went over to the side of the blue pickup.

Q     And when you say side, which side, right or passenger side?

A     Passenger side.

Q     And how far down the passenger side of that vehicle did Trooper Manion go?

A       To the hood area.

Q       When Trooper Manion is at the hood area of that blue pickup, where were you?

A       I was coming from the front of my vehicle over to -- towards the rear of that vehicle or pickup truck going to --

Q       Did -- sorry.

A       It would be to the rear of the blue pickup and the front of my Bronco.

MR. LITTLEFIELD:  Judge, may I ask that I be allowed to go back to the location itself and indicate where Mr. Hamilton was?

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q       Point to and show the jury the location where Trooper Manion went.

A       Trooper Manion would have been in this area here.

Q       Speak up a little bit more.

A       Trooper Eales was down in this area here.  Trooper Manion went to this area of the blue pickup.

Q       And where did you go?

A       I came back around, after I had yelled, and in between he was moving to this area.  I came and started to move to the location to where he was and I made it to this area right in here.

Q      And where did you observe Buddy Hamilton, Trooper Hamilton?

A      Trooper Hamilton was coming up the porch area of the vehicle or -- correction, the porch area of the residence right in this area.

Q      Okay.  Was he actually on the porch?

A      He was -- I think he was on the steps.  He was right in the front area, but he was moving up to the porch when I first seen him.  I don't know whether he was exactly on it at that point or not.

Q      Okay.  Go ahead and return.

                         (COMPLIED)

BY MR. LITTLEFIELD:

Q      After Trooper Manion got to the front of that pickup, what did he do?

A      He stopped and fired two short bursts through the window.

Q      Okay.  When you say the window, where -- if you look at Government's --

        MR. LITTLEFIELD:  I'll ask that Government's Exhibit 11 be displayed again.

BY MR. LITTLEFIELD:

Q      Which window did he shoot in?

A      It would be the window right above the hood of the blue pickup.

671

Q      And when he fired the two bursts, what weapon did he have?

A      He had a MP5H.

Q      What millimeter?

A      9mm.

Q      What happened when those two shots were fired?  Did you hear anything?

A      No, sir, at that point I didn't hear anything. From where I was, I looked across and I seen Trooper Hamilton stepping up to the porch.  He has got his weapon pointed toward the front door.  I can see him saying something, but I can't hear what he is saying.  I see the angle that Trooper Manion is sitting at and I started yelling stop shooting Rick, stop shooting, Buddy is going in.  I was concerned if Buddy stepped in the door and Rick fired again that Buddy would get caught in the cross fire and get hit.

Q      Did Trooper Manion stop firing?

A      Yes, sir, he did.

Q      Was his -- could you hear his gunfire when you said he fired two bursts?  Was it suppressed?

A      Yes, sir, it was suppressed, but, yes, I could hear the bolt dropping on the weapon.

Q      After that, what did you observe in regards -- from your location at the back of the pickup?

A       After that Trooper Hamilton stepped inside the residence.  At that point Trooper Manion and I started moving back and Trooper Hamilton was dragging the defendant outside.

Q       Did anyone -- who went to the defendant and Trooper Hamilton to provide assistance in securing the person that Hamilton was bringing outside the residence?

A       I don't -- it was -- I'm not sure.  I think it was Trooper Manion, was the one, and him and Trooper Hamilton were securing or taking care of the defendant.

Q       Where did your attention go?

A       My attention immediately went back to -- I knew that Rocky was injured.  I didn't know at that point how bad, but I knew that we had to get him out of the front yard and I immediately observed that Major Pettingill had moved his vehicle over and I ran back to him.  I seen that somebody had come up and was providing some sort of treatment to Rocky and I went back to Major Pettingill and told him we needed an ambulance, we needed an ambulance.  He advised me to get him in one of those white Broncos and get him out of there to the hospital.

Q       Which Bronco?

A       Trooper Hamilton's Bronco first.  I attempted to roll the back glass down to get the tailgate down.  From the inside, it -- there is a switch by the air conditioner,

but the back glass wouldn't go down.  I attempted to roll the back glass down from the outside, but the back glass wouldn't go down and I took my -- the butt of my rifle and beat the back glass out attempting to get that down because on a Bronco you have to reach inside and pull up on the latch to be able to get it down.  At that point it dawned on me it was inoperable, that it wasn't going to -- that I wasn't going to be able to get it.

Q      What did you do then?

A      I went to my Bronco.  I got the back glass down, I got the tailgate down and I started yelling at them to bring Rocky over there and put him in my Bronco.

Q      What happened next?

A      At that point the other people arrived, Delena Goss, who is the sheriff of Cherokee County.  She was -- she had shown up and she is an R.N.  She jumps into the back and start providing care to Rocky.  I came back around and was getting in to drive and realized I didn't know where the hospital was.  Clint Johnson came by and I grabbed Clint.  I said do you know where the hospital is and he said yes.  I said get in there and drive and get him to the hospital.

Q      Then where did you go?

A      My focus at that point was -- is that the residence -- that we hadn't secured it yet.  We didn't know if

anybody else was inside it.  During this time I had observed that Trooper Poe had made it up to the driver's side hood of Buddy's Bronco and he was providing cover to the residence to make sure that nobody else came out.  We went there and we made entry into the residence to make sure that there was nobody else inside.

Q      When you got inside the residence, who did the -- who entered the residence to secure it?

A      It was myself, Trooper Poe, Trooper Manion, and I believe Danny Oliver.

Q      Did you notice anything as you walked into the front room of the residence on the floor?

A      There was -- there was shell casings in the doorway, there was a rifle, there was -- laying kind of in one room though the doorway.

Q      Okay.  Would you look at what has been marked as Government's Exhibit Number 13?  Where were the shell casings that you saw in the front room?

A      They are in the area where the cards are.

Q      Numbers --

A      1 through --

Q      No, I'm not going to ask you -- when you say cards, are the cards the ones that have numbers on them?

A      Correct.

Q      Okay.  Would you look at Government's Exhibit Number

15?   You mentioned a rifle in the doorway.  Do you see the item which has the card marked number 11?

A      Yes, sir.

Q      Do you recognize that, sir?

A      Yes, sir, that's the weapon.

Q      How did you go about securing the ground floor?

A      We made entry into the rooms and physically looked at them to make sure nobody was there.

Q      And was anyone on the ground floor?

A      No, sir.

Q      Were you aware of anything upstairs and, if so, what?

A      Yes, sir.  I knew there was a loft area upstairs that was supposed to be the sleeping quarters or the -- whatever it was used for.

Q      And how did you learn about a loft area upstairs?

A      During the intelligence gathering from the people, I believe Clint and -- Clint Johnson and Frank Loyd, somewhere in their conversation it became --

Q      Did you learn about how the upstairs was accessed?

A      I believe so.  I do know that we found a stairwell inside, which would be through those -- it would be in a closet, there was a stairwell that went up.

            MR. LITTLEFIELD:  I would ask Government's Exhibit 175 be displayed.  And it is in evidence.

BY MR. LITTLEFIELD:

Q      Do you see the stairs you are talking about?

A      Yes, sir.

Q      And you can actually tap that screen?  Would you tap the location where you are talking about?

A      There.

Q      Is that the area you are talking about?

A      Yes, sir, that's the stairwell.

Q      When -- how -- how were you all able to secure or ascertain if anyone was upstairs in that loft area without going up those stairs?  How did y'all go about doing that?

A      Trooper Manion was there at the stairwell and we needed a mirror, which is a mirror on a stick, is basically what it is, where you can hold it up and you can look in the mirror and you can see where you don't have to actually stick your head and your body up in there.

Q      How did you all go about retrieving the mirror so that Trooper Manion could look up and check to verify that no one was in the loft?

A      I yelled outside that we needed a mirror and one was brought in to us.

Q      By who?

A      By Trooper Hamilton.

Q      What did you do with the mirror?

A      I gave the mirror to Trooper Manion.

Q       When did you see in regards to Mr. -- to Trooper Hamilton?

A       I noticed that Buddy had some blood and some visible wounds to his facial area and I -- I attempted to get him some help.

Q       And did you notice any other location besides the face where Hamilton had suffered injury?

A       Well, when I -- when he came up and I took the mirror, he was holding his weapon in his hand and I took the weapon out of his hand and I placed it into my waist band.  At that point, just for his safety, just --

Q       No.  My question is:  Did you notice any other location besides his face where Trooper Hamilton had injuries?

A       At that point I reached up and I seen his face and I reached up and I touched him on the shoulder and I was looking at his face and when I did he flinched and from there I noticed that he had some other injuries.

Q       Okay.  You said he had his gun in his hand?

A       Yes, sir.

Q       What did you do in regards to the gun?

A       I took the weapon out of his hand and I placed it in my waist band.

Q       What did do you with Buddy Hamilton at that point?

A       I took him out of the residence.  I told him -- I

said Buddy you have been hit, you are injured.  I said you need to get to the hospital.  I took him out, took him out across the front yard.  We went by Major Pettingill. I told Major Pettingill that Buddy was hit and that I was going to take him out.  I took him out to the roadway. There was a -- I believe it was a Ram Charger driven by -- I believe it was one of the deputies, Brian Swim, and I put him inside that vehicle and I told him to get him to the hospital.

Q      And what did they do?

A      They left the scene and took him to the hospital.

Q      You had Hamilton's pistol, his revolver.  Was it an automatic or what?

A      Yes, sir, it was a semi-automatic pistol.

Q      His pistol in your waist band.  What did you do at that point?

A      I returned back up to the residence.  Major Pettingill was there.  I advised him that we had gotten Buddy out of there.  I advised him that I had Buddy's weapon and he advised me to take it over and lay it on the porch and when the investigators got there to advise them that was -- that I had placed it there.

Q      Okay.

MR. LITTLEFIELD:  I would ask that the witness be shown what is marked as Government's Exhibit Number 22.

It's not in evidence yet.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q     Do you recognize what is displayed in Government's Exhibit Number 22, sir?

A     Yes, sir, I do.

Q     And what is that?

A     That is Trooper Hamilton's weapon.

Q     How did it -- how did it get where it is shown in that photograph?

A     I placed it there.

MR. LITTLEFIELD:  I would move admission of Government's Exhibit Number 22.

MR. HILFIGER:  No objection.

THE COURT:  It will be admitted without objection.

BY MR. LITTLEFIELD:

Q     After you placed it there, what else -- did you do anything else with his weapon?

A     No, sir, I did not.

Q     What happened next?  Has Rocky left yet?

A     Yes, sir.

Q     Has Buddy left yet?

A     Yes, sir.

Q     Was the house cleared?

A     Yes, sir.

Q      How many people came out of the house that were not officers?  How many civilians were inside that house?

A      One.

Q      Did you see that person that was pulled out and removed from the house?

A      Yes, sir.

Q      Do you recognize -- is he in the courtroom today and do you recognize him?

A      When he came out, he was -- they took him out and they dropped -- or they dropped the person there in the front yard and I never actually that night seen his face.

Q      Okay, okay.

MR. HILFIGER:  Your Honor, may we approach?

THE COURT:  You may.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

MR. HILFIGER:  We have been going two and a half hours and Mr. Barrett has just informed me that he has got to go to the bathroom real bad.

THE COURT:  Okay, okay.

(END OF BENCH CONFERENCE)

THE COURT:  Ladies and gentlemen, we will take the morning recess.  I'll ask you to remember my admonition not to discuss the case among yourselves or allow anyone else to discuss it with you.

Everyone remain seated as the jury exits out this door to my right.

(JURY OUT)

(SHORT RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect the jury is in box, the defendant is present with counsel, the government is present.

You may continue with your examination.

MR. LITTLEFIELD:  Thank you, Your Honor.

DIRECT EXAMINATION CONT'D

BY MR. LITTLEFIELD:

Q      When you went to Rocky, who was administering to him?  Did you ever see who was there administering to him?

A      After --

Q      Back at the rear of car, after things started settling down, before he was taken away...

A      As I went and put the tailgate down on my Bronco and they brought him over there -- so actually going to where he -- where they were administering to him, I was never in that area, except to go by.

Q      Was there -- what protective clothing or protection did Rocky have?

A      He was wearing a ballistic vest and then another

vest over the top of that.

MR. LITTLEFIELD:  I would ask that what has been marked as Government's Exhibit 118 be displayed to the witness.  It should be in that box.

BY MR. LITTLEFIELD:

Q     Do you recognize that item, sir?

A     Yes, sir, that's a ballistic vest.

THE COURT:  What is that exhibit number?

MR. LITTLEFIELD:  118.  Move admission of what has been marked as Government's Exhibit Number 118.

THE COURT:  Any objection?

MR. HILFIGER:  No objection.

THE COURT:  Admitted without objection.

BY MR. LITTLEFIELD:

Q     What kind of protection is that capable of providing?

A     Some handgun projectiles.  It has a -- the plate in the center protects against some rifle projectiles, but mainly handgun.

Q     Is it capable -- is that the type of vest that you all have?

A     Yes, sir, that's it.

Q     Is it capable of providing protection from a 223 round?

A     No, sir.

683

MR. LITTLEFIELD:  I would ask that he be shown what has been marked as Government's Exhibit 106.

BY MR. LITTLEFIELD:

Q       You can look at it.  Do you recognize that particular item, sir?

A       Yes, sir.

Q       What is Government's Exhibit -- what has been marked as Government's Exhibit 106?

A       That's a ceramic-style plated vest.

Q       And how do you recognize that particular vest?

A       It was worn by Trooper Eales.

Q       Was it worn by Trooper Eales on this mission?

A       Yes, sir, it was.

Q       Okay.  Do you know if that would have provided protective -- protection from a 223 round had he taken a direct hit in that?

A       Yes, sir, it would have.

Q       Okay.  Would you look to what has been marked as Government's Exhibit 107?  Do you recognize that, sir?

A       Yes, sir, I do.

Q       What is that?

A       It's a cavaliar ballistic-style helmet.

Q       Is that the type of helmet that was worn by you all during this particular mission?

A       Yes, sir, it was.

Q      Okay.

MR. LITTLEFIELD:  Move admission of what has been marked as Government's Exhibit 107.

THE COURT:  Any objection?

MR. HILFIGER:  No objection.

THE COURT:  Judge, I'm not sure if I moved admission of 107.  I move it's admission as well.

THE COURT:  Admitted without objection.

BY MR. LITTLEFIELD:

Q      Trooper, how long did you remain at the scene out there before you went to any other location?

A      I was -- it was a period of time after it happened. It was probably an hour 30 minutes, 45 minutes, maybe even longer.  Time just kind of slowed down.

Q      During the performance of this mission -- as you were pulling up, the shots were being fired and the activity was on-going.  What was happening with time then?

A      It slows down.  It seems like what happens -- you know, really quickly it seems like it just kind of takes a longer period of time for anything to happen.

Q      Trooper Hash was driving the black and white.  Did you see where he ended up?

A      Yes, sir, I did.

Q      Can you place the black and white?

MR. LITTLEFIELD:  I would ask, with the Court's

permission, that --

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q    You may go around.  Will you place the black and white unit that Trooper Hash was driving at the location from which he came and where he ended up?

A    He would have came the same way, came through the ditch and came back and stopped somewhere in this area.

Q    Return to your seat, if you would.

(COMPLIED)

MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 192 be displayed.

THE COURT:  192 for identification?

MR. LITTLEFIELD:  It's been admitted.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q    Do you see Trooper Hash's vehicle in that photograph, sir?

A    Yes, sir, I do.

Q    Is that where he ended up?

A    Yes, sir, it is.

Q    Okay.  What was the condition -- you turned on your emergency lights when you made entry -- before you made entry through the ditch?

A    Yes, sir.

Q       What was the condition of Trooper Hash's emergency lights?

A       They were on.

Q       How do you know that?

A       I noticed them in my rear view mirror as we were going through, that his lights were on.

Q       What kind of emergency lights were on Trooper Hash's Crown Victoria?

A       He has a standard light bar.  He also has the wig-wags in the back and the strobe headlights.

Q       Okay.  And were they all flashing?

A       Yes, sir.

Q       Okay.  This Crown Vic that is in the model has an overhead light bar.  Is that the location it was in on Trooper Hash's?

A       Yes, sir.

Q       Okay.  Could you clearly see the overhead lights working from Trooper Hash's vehicle?

A       Yes, sir.

Q       Have you seen a videotape that was taken of the area on the night -- during the early morning hours of September 24th, 1999?

A       Yes, sir, I have.

Q       And have you viewed an excerpt of it?

A       Yes, sir, I have.

Q       Is that excerpt accurate?

A       Yes, sir, it is.

Q       Does it show the effect of Trooper Hash's lights?

A       Yes, sir.

MR. LITTLEFIELD:  I would move admission of what has been marked as Government's Exhibit 102 and request the Court's permission to play that for the jury.

THE COURT:  Any objection?

MR. HILFIGER:  No objection.

THE COURT:  You may.

MR. LITTLEFIELD:  Judge, I would ask that the lights be -- if they could be dimmed while the exhibit is played?

THE COURT:  Okay.

BY MR. LITTLEFIELD:

Q       Did you see Trooper Hamilton's vehicle in that excerpt of the video?

A       Yes, sir, I did.

Q       Okay.  How -- do you know how it got back to where it was from the porch?

A       No, sir, I do not.

Q       The black and white, the Crown Vic, that was over west of Trooper Hamilton's vehicle in that videotape, do you know whose black and white that was?

A       That was the one without a light bar on it, that

would have been Trooper Hise's.

Q       How did Trooper Hise's black and white unit, without the light bar, get to that location?

A       He drove it through the gate, which was the gate that we saw earlier.  He drove it through that gate when everything had transpired to get up to attempt to render aid to Rocky.

Q       And when Rocky was taken out in your Bronco, how did that Bronco exit the yard?

A       I believe it went back out and went through the gate out onto the county road.

Q       The ballistic vest that was viewed in that videotape, do you know who that ballistic -- who had that ballistic vest during this operation?

A       The ballistic shield that was --

Q       The ballistic shield, yeah, thank you.

A       Yes, Trooper Eales had that.

        MR. LITTLEFIELD:  I'm trying to find the number, Judge.  It's 103.  I think it's right behind you.  I would ask that that be provided.

        THE COURT:  Government's Exhibit 103?

        MR. LITTLEFIELD:  Yes, sir.

BY MR. LITTLEFIELD:

Q       Do you recognize what that is, sir?

A       Yes, sir, I do.  It's a ballistic shield.

Q       How is that carried when one is carrying it as a passenger in the Bronco?

A       It was -- it would be sitting in front of you. He would have been sitting in the seat and it would have been held like this.

Q       And what would be the normal fashion to exit a vehicle with that ballistic shield?

A       To come out of the Bronco, he would have probably had to come out first and spin with it.

Q       Okay.  And the location where that was, was that where it was when Rocky got shot and went to the back?

A       Yes, sir.

Q       Okay.  Did you also notice Mr. Hamilton's firearm on the porch in that -- in that video?

A       Yes, sir, I did.

Q       Okay.  Up to this point, when you started in '89 and up until '99, do you have any idea how many missions or search warrants and arrest activities you had gone on?

A       It would have been several.

Q       Okay.  Are we talking about ten or more than that?

A       More than that.

Q       An average year, how many operations would the eastern team do?

A       Probably -- it's just an estimation.  To go back, probably anywhere from five to ten, maybe more.  On some

years it's just -- it just depends on the year and what the situation dictates.

Q       Okay.   In the ten years leading up to this mission that you had been on the team and however many operations you had done, how many times prior to this had officers fired weapons in securing premises for local law enforcement to a execute search warrant?

A       On our team, none.

Q       Prior to this incident had you gone onto residences for the purpose of securing them and obviously been observed by the people who were at those locations?  Had you ever come up to some place prior to this and you could tell those people saw you coming?

A       Yes, sir.

Q       Had you aborted in those prior missions or did you continue the operation?

A       We continued.

Q       In those missions, all of them, those where you were discovered before you got on the property or those where you were able through the element of surprise to get there before they recognized you were law enforcement, how many times had your team been fired upon prior to September the 24th, 1999?

A       None.

         MR. LITTLEFIELD:   May I have just a moment,

Judge?

THE COURT:  Yes, you may.

(PAUSE)

MR. LITTLEFIELD:  Thank you.

(PAUSE)

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Mr. Hilfiger, I plan to go about thirty minutes and then we will take a noon break.

CROSS EXAMINATION

BY MR. HILFIGER:

Q     Mr. Greninger, you have been a member of this eastern tact team since 1989 through 1999; is that right?

A     Yes, sir.

Q     Okay.  And during -- during that time, you served five to ten warrants a year.  How many no/knocks have you served during that time?

A     I believe one.

Q     This one?

A     No, sir, one other one besides this one.

Q     And that one other no/knock, it was served when -- when this case -- that other no/knock, was that served when Mr. Pettingill was commander for the team?

A     I believe so.

Q     Okay.  And was that no/knock a daytime/nighttime search or service or was it limited to daytime?

A       I don't recall.

Q       Can you recall, sir, at any time any nighttime no/knock warrants other than the one with Mr. Barrett this time?

A       I guess I don't understand your question.  I remember we served one.  You asked where -- whether it was a daytime/nighttime...

Q       Right, anytime search warrant.

A       Anytime?  I don't recall whether that one was, so I guess -- or whether it was or not.  I don't remember.  I remember where it was, but I don't remember what it was.

Q       Do you remember when you served it?

A       No, just sometime --

Q       I'm not talking about in years, but I'm talking about when you served it, in the day or night?

A       It was early in the morning.

Q       Early in the morning.  Like a dawn type situation?

A       It was -- yeah, early in the morning.  I can't recall the exact time.

Q       Was there any consideration for serving this particular warrant early in the morning?

A       As far as the time to serve it?

Q       Yes.

A       It was -- yeah, all times were considered.

Q       Was there -- in your recollection, everybody

discussed it, talked about it, right?

A     Correct.

Q     Was there any particular person that you can recall that brought up serving it at this time and what reason was given for --

A     Yes, sir.

Q     Who brought it up?

A     Trooper Eales.

Q     And what was the reason?

A     That if we served it at 12:30, that he could go home to his wife and kids earlier.

Q     But it didn't have anything to do with a tactical need out there?

A     The tactical aspect of it was always considered, yes, sir.

Q     Okay.  But the reason 12:30 was picked didn't have anything to do with tactical -- any tactics out there, did it?

A     Well, yes, sir.  The tactical -- the tactics were always considered and the time -- I mean, that was one of the reasons that Rocky gave, but there is always a tactical consideration as to the time.

Q     What tactical considerations were discussed as to the 12:30 time?

A     The tactical considerations were that it was us

picking the time versus somebody else picking the time.
So it would be -- you know, we wanted to have the element
of surprise, but it doesn't mean you are always going to
have it.  So the tactical consideration is always -- is
considered.

Q      Okay.  Can you recall any specific things that were
discussed as to the tactical consideration at that time
for the 12:30 time?

A      Yes, sir.  We were going to serve a search warrant
that amounted to drugs.  We talked about the consideration
of how people that are under methamphetamine -- you know,
when do they sleep?  Can you guarantee that they are asleep
at 12:30 versus 5:30 versus noon?  And we came up with a
determination that 12:30 was a time -- the time wasn't
given to us by the judge, that we could pick the time, and
we chose that time under those considerations.

Q      Okay.  In the plan that you had, was there a -- was
there a discussion as to the emergency lights?

A      Yes, sir.

Q      The plan -- I'm not talking about the operation.

A      Yes, sir.  In the planning stages on the day before,
yes, sir.

Q      Okay.  And what was your understanding of the plan
as to who all was supposed to have emergency lights on?

A      That we were going to activate our emergency lights.

Q      When you say "we were going to," who is "we"?

A      The vehicles were going to activate their emergency lights.

Q      In fact, all five vehicles were going to activate their emergency lights, weren't they?

A      Yes, sir, the best I recall.

Q      Now -- and all five vehicles -- I mean, even though Hamilton has an unmarked car, he does have in his vehicle some emergency lights, doesn't he?

A      Yes, sir, he does.

Q      Are they the same as yours?

A      Yes, sir, they were.

Q      The visor?

A      Yes, sir.

Q      Red and blue flashing lights?

A      Correct.

Q      Wig-wag lights?

A      Correct.

Q      And the wig-wag lights don't do red and blue, they just flash on and off; isn't that right?

A      Correct.

Q      And then rear lights in the -- that just shine out the back?

A      Correct.  I believe that the rear brakelights wig-wagged also or strobed out and then there was rear

deck lights.  They were a square box that -- the best I recall, they may have been blue and yellow out the back, but they hung from the top of the -- from the back of the Bronco.

Q     Okay.  And in the operation of the plan, did you ever see Hamilton -- any of his emergency lights on?

A     No, sir.

Q     And yours, you have the same set-up on yours, right?

A     Correct.

Q     You didn't turn them on, Manion turn them on?

A     Correct.

Q     Where is the switch -- is it one switch to turn both sets on or is it one switch for wig-wags and one switch for the red and blue?

A     Yes, there was multiple switches.

Q     Multiple switches.  Where are those switches located?

A     They were located right in the center.  There's a radio stack and they were right in the center between the passenger and the driver seat of the vehicle.

Q     Okay.  And at what point are you saying that Manion turned on the emergency lights?

A     Somewhere on that access road prior to coming onto the property.

Q     Okay.  And are you talking about -- are you talking about some place in that area or back here further?

A       Somewhere up into that area right in there.

Q       Okay.  If Manion's testimony is that he turned them on as you were turning off the drive onto the trail, would he be more correct as to where those lights came on or would you be more correct?

A       When you say off of the drive onto the trail, I don't understand where you are talking about now.

Q       The white road right here, which would be the drive, and that's the trial...

A       Correct.

Q       If his testimony was that that -- that he turned them on going off the drive onto the trial, would that be more accurate?

A       I would say they are pretty much the same is the way --

Q       Okay.  So you are not saying back further up south of the drive they were turned on?

A       I told -- what I said was I don't know exactly.  Somewhere in there prior to entering the property...

Q       Okay.  What about -- and you have testified as to Hash's vehicle, he had his lights on.  Do you know when his lights came on?

A       No, I don't.

Q       He was -- how far behind you was his car as you were going down the private drive?  And the private drive

I'm talking about is -- I'm referring to this white road out here to the east.  That's the private drive.

A      Right.

Q      When did you first notice his lights on?

A      As we were coming onto the property, but where he actually turned them on, I don't know.

Q      Okay.  Now, what about Hise's car.  Hise's car is not on the model.

                    (PAUSE)

            MR. HILFIGER:  May I have just a moment, Your Honor?

            THE COURT:  You may.

                    (PAUSE)

BY MR. HILFIGER:

Q      Now, do you recognize the picture?

A      Yes, sir.

Q      Hise's car is out here some place.  Of course, this is a daytime picture.  He wasn't there at that time.  Hise was supposed to parked out here at the gate, wasn't he?

A      Yes, sir.  The gate would have been in that direction, the way you are going with the laser pointer.

Q      Did you -- did Hise activate his emergency lights prior to the shooting?

A      I don't believe so.

Q      And Pettingill, his car is on further to the west,

right?

A      Correct.

Q      Did you see Pettingill's emergency lights on?

A      No, sir, I didn't see them on.

Q      So the plan was for everybody to turn them on.  In the execution of the plan, only two people turned them on, correct?

          MR. LITTLEFIELD:  Objection.  He said he didn't see them.  He didn't say whether they were -- whether others were on or not.

          THE COURT:  That was the testimony.  He didn't say they didn't turn them on, he just said he didn't see them.

BY MR. HILFIGER:

Q      Okay.  You couldn't see the lights?

A      No.

Q      And you were --- the whole time you were in this area, were you able to see Pettingill's or Hise's lights before they came into the property?

A      No, sir, I was not.

Q      Now, when you were planning this operation on the 23rd, which would be the afternoon -- and that's when you first got there.  Do you know what day of the week that was?

A      No, I don't recall.

Q      Was there any consideration given to going at any time other than at night?

A      No, sir.

Q      Because of that, did you give any -- did you have any type of night vision equipment with you, any guns or binoculars or anything like that?

A      Not that I recall.

Q      And when you went out there during the daytime, during the afternoon, did you see any lighting out there, you know, any poles or anything like that that would have nighttime lighting?

A      I don't recall seeing any.

Q      Because of that and because of the -- you know, because the operation was going to be at night, did you consider that sometimes some kind of night vision assistance would be helpful or was that even discussed?

A      I don't recall.

Q      You don't recall --

A      I don't recall whether we did or not.

Q      You talked about different plans.  Did you ever consider coming in from the -- from the west?

A      From the west?

Q      Let me put Defendant's Exhibit Number 103 up here. Can you orient yourself on that?

A      Yes, sir.

Q      And this is -- this is going east down the county road.  There is the driveway right there.  Did you ever consider coming from the west and going over that way?

A      Through the driveway, the trailer house?

A      Yes.

Q      No, sir, we didn't.

Q      And as you said you did consider putting up some kind of perimeter but decided that wouldn't work; is that right?

A      Putting up some sort of perimeter?

Q      Well, you talked about putting up some kind of -- one of the alternate plans was you talked about putting cars out here and, you know, a creek team coming up and sort of securing the whole area.  Was that ever considered?

A      Today, did I testify to that?  I don't believe I testified to that.

Q      No, I asked you that.

A      Oh, okay.  I guess I don't understand your question, what you are asking.  Do you mean --

Q      Well, did you consider -- you said you considered going in the gate.  When did that come about?  I'll back up just a second.

A      Okay.  The original plan early that morning was -- from the aerial photos, we knew there was a driveway into that residence.  That's when the original plan was to go

through that driveway onto that property.  After the drive-by of that residence and that gate was locked and was secured to where we couldn't get through it, that's when the alternate plan was developed of going onto the private drive and coming in through the other location where you could see that it looked like that was the avenue that they had been using to enter and exit the property that we were talking about.

Q     And the gate -- coming in the gate off of the county road was only -- would only then be between you, Manion, and Hamilton, is that right, the people that knew the area?

A     No.

Q     Did you discuss it with the whole group that night after you did the drive-by?

A     To change the plan?

Q     No, no.  Did you ever have a discussion about going in the gate to -- the gate that you found out was locked after the drive-by, did you ever have a discussion with the whole group about going in that gate?

A     Yes, sir.

Q     And that discussion then was cut -- you stopped that discussion because of the gate being locked; is that right?

A     The discussion that we had was the original plan,

which was that morning when we arrived.  When we came back from the drive-by, we relayed that information or the team had another meeting.  We relayed the intelligence, the information that we had, and then from there that plan was modified into the plan that we attempted to execute.

Q      Okay.  I didn't understand.  You had a meeting that morning before you did anything else; is that right?

A      Yes, sir.

Q      Okay.  With a whole group of you?

A      When we arrived at Camp Gruber, we had a meeting. That was when we started to formulate the initial plan. After obtaining more intelligence from the drive-by, we had another meeting and then we modified the initial plan into the plan that we chose to execute.

Q      Okay.  Did you have a discussion about surrounding the property and using the P.A. system or the bullhorn or something to call the individual out?

A      No, sir.  It's always -- there wasn't really a discussion, but that is always an option, that if you are compromised, it's just kind of -- that's just a tactical consideration.  If you get to that point, the lead vehicle would determine, for whatever reason, that -- or the team leader would execute it at that point or Major Pettingill could have said we are going to do that.  That's always an option that is always available to you.

Q       But it was not something that you recall discussing that day?

A       I don't recall a specific discussion or talking about it, but that's just -- on the tactical side of, that's always something that you -- that could happen.

Q       On the operation of the plan now, were there particular clothes that you wore for the operation of this plan that are different from the regular uniform?

A       Yes, sir.  You mean different than this uniform?

Q       Yes, sir.

A       Yes, sir.

Q       And what was the purpose of those clothes?

A       To provide cover, concealment, they are just -- whatever.  They were just tactical clothes.  They are just a different uniform that we all wore that were different than the other uniforms that we had.

Q       Part of this is -- the clothes that you wore, you refer to them as camouflage?

A       Yes, sir.  I mean, there is camouflage or they are B.D.U.'s.  There is O.D. green, there is all different colors that they come.

Q       Is that referring to all the same uniform?

A       Yes, sir.

Q       O.D. green is one type of thing and camouflage is another?

A      Yeah, they are different.

Q      Okay.  So you have uniforms that you refer to as camouflage uniforms and uniforms that you refer to as O.D. green uniforms?

A      Well, there are different colors of uniforms.  When you are talking about uniforms, you just throw out a broad question and I'm just trying to explain the type of uniforms that are out there that teams wear.

Q      Okay.  On this particular night, did your team select a particular uniform to wear?

A      Yes, sir.

Q      What --

A      Well, we wore the uniform that we had available.

Q      And what uniform is that?

A      I believe it was the camo uniform.

Q      The what?  You called it a camo uniform?

A      It was a military style B.D.U. type uniform, is what it was.

Q      What is B.D.U.?

A      That's the term that they use for that particular style of uniform.

Q      Do you know what B.D.U. stands for?

A      No, I don't.

Q      But you refer to it as a camo uniform?

A      That's what you refer to it as.  That's..

Q       Well, I didn't -- the purpose of the uniform is it makes it a little harder to see?

A       Correct.

Q       And that's part of what you want, isn't it?  You don't want them to be openly visably, do you?

A       No, sir, not -- if you can keep from it.

Q       Now, when you -- on these warrants -- I think you talked to Mr. Littlefield about this.  You said on the no/knock warrants, it's not necessary for you to announce your presence, who you are; is that right?

A       Correct.

Q       At some point do you feel the necessity to announce who you are, even though you are not required to?

A       I guess I don't understand.

Q       Well, at some point when you bust into a person's house, even though you are not required to, do you feel it's necessary to let that person know or people know that you are law enforcement?

A       Yes, sir.  I guess from what your question -- the no/knock warrant is the actual warrant to breach the door to give you access to it.  Once you arrive in it, then you are going to start yelling, police, police, search warrant, or you are going to identify yourself.

Q       And that's to let them know that you have got some authority to be there; isn't that right?

A     Correct.

Q     I mean, you are letting them know you are not a burglar running into the house or you are not a robber coming in to get them; isn't that right?

A     Yes, sir.  I -- your -- I -- from where you are going, the no/knock warrant only gives you access to the door.  Then if it's a regular warrant, then you are going to announce yourself before you knock and give a reasonable amount of time.  You have to show -- once you make access inside it, then you are going to announce who you are or the uniform that you are wearing dictates.  It has your breast badge, your stuff.  So... if that answers your question -- I guess I'm confused as to what you are really asking.

Q     Okay.  On this particular night -- and I'll jump to that real quick.

A     Okay.

Q     What did you do to announce you were law enforcement and when did you do that?

A     What did I do personally?

Q     Yeah.  What did Officer Greninger do to announce that he was law enforcement and when did you do that?

A     I personally did not do anything.

Q     Okay.  Now, when was it you first saw what you later determined to be Toby Barrett -- well, at some point you

realized the person out in the yard was Toby Barrett; is that right?

A    Correct.

Q    You first saw him when you were on the private drive; is that right?

A    We were somewhere -- yeah, as we were making -- I seen a silhouette of somebody moving.

Q    Okay.  Prior to that time did you have any -- did you hear any radio transmissions or C.B. transmissions or any kind of trasmissions from the other Highway Patrol officers saying that somebody is in the yard?

A    Not that I recall.

Q    Would your radio have been on so you could have heard those things?

A    Yes, sir.

Q    How far were you able to follow that figure that you saw in the yard?  You said you saw some shadow or figure or something when you were coming down the private drive?

A    I seen a silhouette or it appeared to be somebody moving in the front yard.

Q    Did you lose sight of that person coming down that private drive and turning into the ditch?

A    Yes, sir.

Q    At what point did you lose sight of it?

A    Somewhere on that private drive coming in because my

focal point was driving.

Q     Okay.  So you lost track of it before you got to the ditch, would you say?

A     Somewhere in that area.

THE COURT:  Okay.  Mr. Hilfiger, let's stop for the noon recess.  I'll remind the jury to not discuss this case among yourselves or allow anyone else to discuss it with you.  Don't allow yourself to be involved with any news reports of this case, if there are any.

I'll ask that you be back at 15 minutes until two, 1:45.  I'll ask everyone in the courtroom to please remain seated as the jury exits the courtroom.

(JURY OUT)

THE COURT:  Let the record reflect that the jury has departed the courtroom.  Anything to take up outside the hearing of the jury on behalf of the government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  The defendant?

MR. HILFIGER:  No, Your Honor.

(NOON RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect that the jury is in the box, counsel for the government is present, defendant and counsel are present.  The witness is back

in the box.

You may continue with your cross examination.

MR. HILFIGER: Thank you, Your Honor.

CROSS EXAMINATION CONT'D

BY MR. HILFIGER:

Q Mr. Greginger, I think we were talking about -- we were talking about you seeing Toby Barrett and losing track of Toby Barrett about the time you pulled into the -- off the private drive on the -- is that -- do you recall that?

A Correct.

Q When you hit that -- the next thing you can tell us is the ditch. When you hit this ditch, did you have to do anything extra to your car to get through that ditch? Did you anticipate that ditch in any way?

A Yes, sir, I anticipated the ditch was deeper than what we had thought because I -- I had witnessed Trooper Hamilton's bumper strike the ground as it kind of bottomed out there. So I just kind of accelerated and went through it.

Q Okay. So you accelerated before you hit the ditch?

A About the same time, yes, sir. When we were there -- when I was there I knew I had to accelerate to make it through the ditch.

Q Now, as you were coming through the ditch, can you

tell us where you recall each one of the cars were or is that about the time you sort of have a memory lapse?

A    You mean, as far as Trooper Hamilton's vehicle was in front of me and Trooper Hash's vehicle was behind me?

Q    How far in front of you was Hamilton's vehicle?

A    Probably -- you mean when I was coming through and he was coming out?  He was accelerating.  Distance wise?  A car length, two car lengths, you know, somewhere in that neighborhood.

Q    Okay.  Now, were you following essentially the same tracks that Hamilton did coming out of the ditch or do you remember that?

A    I really don't recall.

Q    Do you know anything about -- Hash's car was behind you.  Do you know where he was behind you?

A    He was a distance behind me.

Q    Okay.  Was it something you can actually recall or you just know he was back there?

A    I know he was back there.  I remember, you know, looking in the rear view mirror, so I know he was there.

Q    And what about Hise?  Do you know anything about where his car was?

A    Not that I visiblely seen.  I know where it was supposed to have been.

Q    Did you see it?

A       No, sir, I did not at that point.

Q       And what about Mr. Pettingill?

A       No, sir, I didn't see it.

Q       Do you know whether Hise -- at the time you guys were coming out of the ditch, do you know whether Hise and Pettingill were even in position at that time?

A       No, sir, I didn't actually see them.

Q       Okay.  Do you know if they were supposed to be in position at that time?

A       I would assume so.

Q       Now, I -- what was your understanding that the people in Hise's car were supposed to do in relation to this operation?

A       My understanding was that Trooper Poe was supposed to assume a position to provide cover.  He was going to be the -- the sniper element or the element to provide cover.  Trooper Darst and Trooper Hise were going to move to the area over to this side, it would be on this side, and prevent or put a -- to cut down an area of escape should he try to make it over to his mother's residence.

Q       Okay.  Do you recognize this view, which is marked as Government's Exhibit Number 69?

A       Yes, sir.

Q       And where the black car is or the dark car right there, that's the gate?

A    Correct.

Q    Okay.  Now, is that the area in the plan -- is that the area where Hise was supposed to be?

A    Yes, sir.

Q    I mean, his car, not --

A    Yes, sir, that is where he was supposed to stop.

Q    And where was Poe supposed to be?  And you can -- there is a laser right there to your right, right here on -- it looks like a pen.  You can point it up here or you can hit the screen where you say Poe was supposed to be.

A    He was going to be somewhere -- take a position somewhere right into that area.

Q    Okay.  And was there cover there for him or did you -- I mean, was that discussed, what cover he was going to use?

A    That would have been -- he would have -- as he pulled up, he would have found cover or picked cover available to him when he arrived.

Q    Okay.  So it wasn't something that you got -- only you and Manion and Hamilton had actually been out there, right?

A    Correct.

Q    So you didn't tell him what cover was there; is that right?

A      Well, I mean, from the photographs that were available, he could look at it and have an idea, but he would actually have to pick the location that he was going to go to himself.

Q      And cover -- is cover something that you are talking about for protection or is cover something for camoflauge?

A      For protection.

Q      So Poe is supposed to be somewhere in this area here?

A      Correct.

Q      And he has -- what kind of rifle did he have?

A      They have a 308 rifle and also he would have an HK rifle like ours also.

Q      HK-53?

A      Correct.

Q      And what does that fire?

A      223.

Q      223?

A      Correct.

Q      And you had an HK-53?

A      Correct.

Q      And that fired 223's?

A      Correct.

Q      Now, was it your understanding under the plan that Hise and Darst were supposed to remain here or were they supposed to actually filtrate back down in here?

A     They were going to -- it was my understanding they were going to move over to this area somewhere and if there was a person or a runner, they were going to attempt to take them down prior to making entry onto that property.

Q     Okay.  So they were -- before you guys even got in position, Hise and Darst were supposed to be down here?

A     Well, actually, it was supposed to all kind of fall together at the same time or -- you know, as close as you can.

Q     Okay.  And can you locate on here where you think you -- you are right around in here some place when you saw Toby Barrett, the person you later determined to be Toby Barrett?

A     I saw a silhouette.  I don't know -- I did not know at that time it was Toby Barrett.

Q     Right.  Can you show us about where you think that silhouette was in this area here?

A     It would have been just somewhere over in -- out in this area, somewhere out in there towards the front and to -- it was hard to tell from the angle whether it was directly in front or actually to the side, but somewhere out toward the area of the front of the residence.

Q     And when you say a silhouette, are you just talking about a black shadow?  You couldn't see a face?

A     No.

Q    There wasn't enough light there to see a person, just a shadow type thing that you are talking about?

A    Well, when you call it a silhouette, the silhouette is a body, which would be a person.  It should show that it was somebody.  To be able to identify and tell you that it was Toby Barrett or who it was, no, I could not identify who it was.

Q    And from -- as I understand it, you are saying from the point you started coming out of that ditch until about where you are saying your car is now, you really don't have a recollection of what went on; is that right?

A    Exactly.  From when I went through the ditch, I remember Buddy's Bronco bottoming out there and then I remember making my approach to a stop, but in between I still have some blockage that I don't remember.

Q    Okay.  But that is basically what I'm saying, from the ditch to where your car is, can you remember anything about what happened during that time?

A    No.

Q    Okay.  Now, is there -- and I see where you positioned your car there.  Is there -- well, first, have you gone over this model with the U.S. Attorney's office and looked at it with the U.S. Attorney's office?

A    Yes, sir.

Q    When was -- prior to today, when was the last time

that you went over this model with the U.S. Attorney's office?

A      Approximately two weeks ago.

Q      You weren't here last week?

A      Not that I recall.

Q      And when you went over the model with the U.S. Attorney's office, did you discuss the location of the car?

A      Yes, sir.

Q      Did you have any assistance in locating where the cars would be?

A      No, sir.

Q      You did this on your own?

A      Yes, sir.

Q      Did anybody give you any prompts in telling you that, oh, that car couldn't be there or that car couldn't be there?

A      No, sir, they did not.

Q      So your placement -- when you place your Bronco, which is the second one, there -- when you place that Bronco in the position that you have got it, that is -- that's -- what are you using to locate that Bronco in that position?  What are you referring -- what in your mind are you referring to to say this is where it was?

A      Because I -- I took the tailgate down.  We loaded

Rocky onto it and I don't remember moving the vehicle. I don't remember anything else and it has to be in close proximity because it was a short distance and that's where I remember coming to a stop.

Q      Okay.  But I'm -- you know, are you -- do you recall anything about the location of the blue pickup in relation to where your car was?

A      I just remember stopping somewhere in that location and the blue pickup was in that location.

Q      Okay.  Do you remember anything about how close or how far you were from the house, which corner of the house or anything like that?

A      Do you mean exact distances?  That's an approximation of where I believe that I came to a stop. If you are asking was 13 feet from that corner of the house, no, sir, I don't know an exact distance.

Q      No, I was just asking you what you used to focus on to make your determination that that is the location where your car ended up.

A      That's the best of my memory today.

Q      Okay.  Was that the planned location for your car? I'm not talking about the operation.  I'm talking about when you were back at Camp Gruber and you were discussing this car is going to go in here and stop and this car is going to go in here and stop.  Where was the planned

location for your car?

A      The planned location, the way I remembered it, was that Trooper Hamilton was going to stop, which it wasn't a planned location to stop in front of the residence there. They were going to be back and we were just going to kind of stop off for him as we went through.

A      Okay.

Q      So you are saying the planned location for Hamilton was where?

A      It would have been back a little ways.  I mean, the planned location wasn't for it to be sitting at the front porch.  The planned location would have been probably where mine is sitting or just a little bit further back. He would have stopped and I would have stopped and Hash would have stopped.

Q      And then when you would have stopped, would you have stopped at his rear bumper or are you going to pull up beside?

A      I would have adjusted to where he stopped, at what location, and what terrain I had and where it was that we stopped.

Q      Okay.  So what you are telling us then is that you -- in your mind, your understanding was that there wasn't an ascribed location in the plan of where you were supposed to stop; is that right?

A       What I'm telling you is that the location was going to be prior to where they are sitting now, but I was going to -- I would just have responded off of Buddy, where he stopped.  If I would have had room to where I could have pulled to the side or behind or just wherever, I would have just responded off of of him where he stopped.  We were going to move from there and move up to the doorway.

Q       Now, when you -- when you came in, I understood that -- were you at a stopped position when you say that you saw the glass or -- let's see how you described it.  When you saw the debris coming off the Hamilton vehicle, which was white or grayish in color, your recollection is -- was your vehicle stopped at that time or was it still moving?

A       I was coming to a stop.

Q       Okay.  So your -- would you say that when you saw that you were somewhere in the area where your Bronco is now shown?

A       Probably, yes, sir.

Q       Okay.  Now, when you saw that debris coming off Hamilton's vehicle, what was his position in relation to yours?  And what I'm talking about now is, was his position going toward the house, was the front end of his car going into the house or was he with his back end to you or any other position?  Can you tell me what position was his car

in when you saw the debris coming off of his vehicle?

A      You have kind of confused me.  If I'm sitting there, it would be -- you know, I would be in that position or moving up to that position.  So it would be pretty much -- or you know, as it was coming up.  I don't know for sure if it was still rolling or pretty much in that position.

Q      And I'm not asking to you draw a conclusion.  I'm asking if you can really recall his position.

A      Yes, sir, I can recall it was somewhere in that position.

Q      Okay.  And I guess the point I was trying to make was were your cars like this or -- you know, where you are sort of going along and his rear bumper and your front bumper are like this when you first saw the debris or are you saying his car was not perpendicular or going perpendicular to your car?  Do you know what I'm talking about?

A      Yes.  If I understand what you are asking and the way that the question -- and the way that you worded it was, was when I first started remembering it was the vehicles in this position.  And my answer was, yes, they were pretty much in that position.  So if that's the case, to answer your question, they couldn't have been straight. They would have been in the position that we are looking at or very similar.  He may have been moving up.

Q      Okay.  So he was -- he was similar to the position he is in now.  He may have been a little bit further back from the porch when you first saw him?

A      Correct.  We are still moving, he is still moving. So it's going to be similar to that, from what I first recall or I first remember.

Q      Now, when you got -- when you stopped in that position, Manion got out first.  Is that my understanding?

A      Correct, because I was driving.

Q      And he ran to the back of the Hamilton Bronco.

A      Manion was exiting the vehicle.  When he actually got out -- whether I was stopped or not, he did exit the vehicle prior to me because I had to stop the vehicle.  I had to put the vehicle in park and then exit it, so he was out before me and he was coming around and he came down to where Rocky was -- was coming out, back to the back where Rocky dropped at the back corner of the Bronco.

Q      And was there gunfire going on at that time?

A      Yes, sir.

Q      Did you -- and after Manion went to where Eales was, then did you go to where Eales was?

A      I started to move to that location.  I didn't make it all of the way there.  I made it almost there and Rick was yelling man down, we need help, stay with me, Rocky, and I stepped back to my Bronco and opened the door and

yelled on the radio.

Q     Okay.  And as far as where your Bronco is, you are saying that's the approximate position that that Bronco was; is that right?

A     To the best of my recollection today.

Q     Just so we can sort of keep track of it, would you mind --

        MR. HILFIGER:  May I approach the witness and give him a ruler, Your Honor?

        THE COURT:  You may.

BY MR. HILFIGER:

Q     Just so we can keep track, here is a ruler.  This is the inch side up here.  Okay?

        MR. HILFIGER:  May the witness please go down and do some measurements on that model for me?

        THE COURT:  He may.

BY MR. HILFIGER:

Q     What I would like you to do, Mr. Greninger, so we can position that car, is from the southeast corner of the porch measure to the right front tire of your car in inches?

A     It would be approximately about one and a half inches.

Q     Okay.  Now, from that same corner, measure to the right rear tire.

A      It would be about nine and a half inches.

Q      Okay.  And from the southeast corner of the bottom step, measure to the left rear tire -- left front tire.  I'm sorry.

A      It would be about ten and a quarter inches.

Q      Okay.  Now, one other measurement.  Measure from the front of your car to the nearest part -- nearest portion of the Hamilton Bronco.

A      The numbers aren't real clear on here.

Q      No, they aren't.

A      That would be about seven inches.

Q      You may take a seat.

(COMPLIED)

BY MR. HILFIGER:

Q      Do you know approximately -- I'm not trying to trick you or anything -- how much that distance is between the front of your car and the rear of Eales' car?

A      No, I don't.

Q      I mean, of Hamilton's car.

A      No, I don't.

Q      But Manion was able to make that distance.  Did you see whether any firing was done toward Manion when he was running from -- or I guess he was running from your car to Hamilton's car?  Was there any apparent gunshots fired at Manion?

A     I never seen exactly where the gunfire was coming from, so I don't know.

Q     When you got out of your car and started over there, did you see any -- did you have any sensation of gunfire coming to you?

A     There was gunfire going off.  Where it was going, I don't know because I didn't see where it was going.

Q     Okay.  And you were back -- when you made your call, was it a cell phone, C.B., radio, what was it?

A     Radio.

Q     Radio call.  And after you made your radio call, where did you go?

A     I exited the vehicle, I came back around to the front, was moving back to where -- toward where Trooper Manion was.  Trooper Manion had left Trooper Eales and was moving over to the area of the blue pickup.

Q     Okay.  And what you are talking about here is Manion's back here at the back of this car and he is moving over toward this pickup; is that right?

A     Correct.

Q     Did you -- at that point where were you located?

A     I was coming back around from the driver's side of my Bronco --

Q     Okay.  So you were in this open area right here also?

A     I was coming -- yes, sir, I was between the two.

I started to move toward where Trooper Manion had went and I looked across and that's when I observed Trooper Hamilton.

Q     Okay.  I'll get to that in just a second.  Okay?  At that particular time, when Manion is going toward the pickup and you were coming back toward Hamilton's Bronco, did you have any sensation of any gunshots or gunfire coming toward you guys?

A     There again, I -- there was -- there was still -- there was some gunfire, but where it was going I really didn't know at that point.

Q     Now, at any time -- were you watching -- who were you watching when you were there?  Were you sort of getting the whole scene or were you watching anybody in particular?  When you were -- you made your phone call, your radio call.  You are coming back toward the Hamilton vehicle.  Who are you looking at?

A     I'm looking at -- I'm attempting to scan the whole area to look for threats.  That's when I observed Trooper Manion had moved and that's when I observed Trooper Hamilton moving up on the porch.  So I'm just trying to scan the whole area.

Q     Okay.  Now, when -- at this point had the flash bang gone off or do you know?

A     I don't remember.

Q    Okay.   When Trooper Manion -- he had a rifle, right?

A    Correct.

Q    And what kind was his?

A    It was an HK 9mm or it's --

Q    Is that an --

A    It's an H&K-5 9mm.

Q    And did you see Manion running with that rifle or walking or how was he getting from between the Broncos and where the pickup was?

A    When I observed him he was towards the back and he was moving quickly over to that area and he stopped.

Q    Okay.   He stopped where?

A    He stopped over towards the front passenger side of the pickup.

Q    Now, while he was in movement from -- between the Broncos to the pickup, can you tell us how he was holding that firearm?

A    No, I can't.

Q    Can you recall?

A    No, I can't.

Q    Did that particular firearm have a suppressor on it?

A    Yes, sir, it did.

Q    Does a suppressor -- I understand a suppressor suppresses sound.   Does it suppress anything else, muzzle flash or --

A       I don't know.

Q       Would you be able to see a muzzle flash off an MP-5 that has a suppressor on it or do you have any idea?

A       When it was dark, you would probably see some, but I don't know it for a fact.

Q       Okay.  Did you see any muzzle flash on Manion's MP-5 before he got in position over by the hood of the pickup?

A       No, I did not.

Q       Do you know whether Manion fired any rounds from that MP-5 before he got over in front of that pickup?

A       No, I do not.

Q       Could he have fired rounds from that MP-5 and you not have been aware of it?

A       Yes, he could have.

Q       Now, did you see anybody else out there with an MP-5 9mm that was actually physically using it?

A       No, sir, I did not.

Q       Now, as -- so he went over here to the pickup and you say that you saw Hamilton -- and as I understand it, you say he was getting ready to go up the steps?

A       He was towards the front part of the step, yes, sir.  He was getting ready to step up on the porch.  He had his weapon pointed toward the front door.

Q       So you are saying that Hamilton was on the right

side of the Bronco as you are facing the Bronco?

A        To the best I recall, yes, sir.

Q        Did you ever see Hamilton over on the left side of the pickup?  I mean, not the pickup, but the left side of the Bronco.

A        No, sir, I did not.

Q        Did you ever see Hamilton back behind the Bronco where Manion and Eales were?

A        No, sir, I did not.

Q        Did you see Hamilton fire his .45?

A        No, sir, I did not.

Q        Did you see -- when Hamilton was on the porch or -- no, not on the porch, but at that location where he was getting ready to go on the porch, do you know at that time whether the flash bang had been set off?

A        I remember hearing it going off in the chain of sequence of events.  I don't remember where it was on all of it, but I would assume that it had.

Q        What was the status of the door on the -- on this house or cabin or, you know, whatever when Hamilton was getting ready to go up those steps or on the porch?

A        I believe it was open.

Q        Okay.  Was it open all of the way or part of the way or do you recall?

A        I don't know.  I wasn't in a position to actually

see whether it was all of the way open or not at that time.

Q    So at that particular time are you closer to your vehicle or to Hamilton's vehicle?

A    Well, I'm back towards -- I'm coming around and I'm back into the corner, that southeast corner that we were talking about over by the blue pickup.  I'm somewhere in there between my Bronco and the back end of the pickup.

Q    Okay.  And while you were at the -- at that position, is that when you saw Manion -- was Manion at the front of the pickup at that time?

A    He was moving to the front of the pickup, yeah.

Q    At that particular time had he fired his MP-5, to your knowledge?

A    Yes, he had.

Q    He had already fired it in the window?

A    Yes, he had.

Q    Okay.  Let me back up.  Where were you when you first -- when Manion fired his MP-5 into the window?

A    I was coming around the front of my Bronco to the location that we are talking about.

Q    Okay.  To the southeast corner --

A    Yeah, somewhere in that location there.

Q    Did you see anybody else out there at the front of that pickup with Manion or close to Manion?

A       No, I did not.

Q       Do you know who Danny Oliver is?

A       Yes, sir, I do.

Q       You would recognize him if you saw him?

A       Yes, sir, I would.

Q       He was in the next car behind you, wasn't he?

A       Yes, sir, he was.

Q       Can you recall if Danny Oliver was standing by that pickup?

A       I did not see him.  I'm not telling you that he wasn't there, but I'm just saying I did not see him.

Q       Were you in such a position that if he was there, would you have been able to see him?

A       I don't know.  I didn't see him.  My focus was looking across there and I saw Rick and Buddy and I did not see anybody else standing there.  He could have been over on the other side in a shadow or in the darkness or he could have been standing there and I just missed him. I did not see him.

Q       But you saw Manion okay?

A       I knew -- yes, I saw where Rick went and I also -- I then turned my focus toward Buddy and I was afraid Buddy was going to get in the cross fire and my focus was to keep Rick from shooting.

Q       And that's when you said -- you said, Rick --

A     Yeah, I said, "Don't shoot, Buddy is going in, don't shoot."

Q     Okay.  Now, from the time your memory recalls, you know, when you get out of this car, stop your car, as far as the gunshots coming from the house, was there any stoppage of the shots and then restart or was it one continuous --

A     No, there was a stoppage.

Q     There was?

A     Yes, sir, I believe so.

Q     Okay.  Can you recall when that was?

A     No, sir.

Q     Can you recall where you were when you heard that?

A     No, sir.

Q     Have you ever heard the term zone fire?

A     No, sir.

Q     Can you -- the number of shots, do you have any idea how many shots were fired?  How many groups of shots were fired, not counting Manion?  I'm talking about coming from the house.  Can you recall that?

A     Several.

Q     Okay.  Well, you said you heard shots and then there is stoppage and then you heard shots again.

A     Correct.

Q     Okay.  So would that be -- and I'm -- you heard one

group of shots, stoppage, and then another group of shots?

A    Correct.

Q    Did you hear any of the other shots, any other groups of shots?

A    Not that I recall.

Q    In the first group of shots, how many individual shots did you hear?

A    They were rapid, it sounded like an automatic weapon. To give you a number, I don't know.

Q    Okay.  What about the second group?

A    The same thing, I don't know.

Q    And as far as Manion's shots, did you actually hear the gun firing or was it some other sound associated with the MP-5 that occurred?

A    Well, you could hear the bolt drop, the sound.  It makes a suppressed sound.  It does not totally cut the sound out.

Q    Okay.  As to Hash's car that is behind you there, in order -- you placed it there.  Did you -- what did you utilize in determining where you placed that car? I mean, what did you look at on the model to determine how that car should be placed?

A    That's just an approximation as to where I remember it being that night.  Just the area -- that's just where I remember sitting it or where I remember it being in that

area.

Q     Okay.  Would you look at Defendant's Exhibit Number 117?  It will show on your screen.

MR. HILFIGER:  It has not been admitted yet.

BY MR. HILFIGER:

Q     Do you recognize that?  Don't tell me what it is. Do you recognize it?

A     No, sir, I don't.

Q     Okay.  Now do you recognize it?

A     Yes, sir, I do.

Q     And is that an accurate picture of the area from that viewpoint?

A     Yes, sir.

MR. HILFIGER:  Your Honor, we would move to introduce Exhibit Number 117.

MR. LITTLEFIELD:  No objection.

THE COURT:  Admitted without objection.

BY MR. HILFIGER:

Q     Now, as to this -- can you see what this is right here?  Does that look like it's tire tracks?

A     Yes, sir.

Q     Whose car went in there before Hash's car did?

A     My -- my vehicle and Trooper Hamilton's vehicle.

Q     Would you say these tire tracks right here go right up to Hash's car, that one and that one?

A       Yeah.   It's kind of hard to see, but I guess so.

Q       Okay.   And -- so does it appear that Hash's car, when he came in, actually came in a little -- a little bit off to the -- that direction, which would be north from where these tire tracks are?

A       Yes, sir.

Q       Now, you have got Hash's car though located on the south side of that trail, don't you?

A       It's over on that area.   From there I -- from that picture that you are showing me, I -- I can't tell for sure where it's located there.   It does appear to be a little closer than I have it.

Q       A little bit closer --

A       To the pickup.

Q       Your car there appears to be closer to this vegetation --

A       My car is gone.

Q       I'm not talking about your -- your model car, where you placed your model black and white, it does appear to be closer because there is a set of tracks right there in between Hash's car and the vegetation, isn't there?

A       Correct.   It looks like --

Q       Can you get a car between where Hash's -- where the model Hash's car is and the vegetation?

A       I don't understand.   Can you get a car between --

Q     In this area right here, can you place the car between that without getting it on the vegetation?

A     It depends on what vegetation you are talking about, I guess.  From the picture that you are showing me to look at, I don't -- I don't understand what vegetation we are talking about.

Q     I'm talking about this vegetation right here.

A     From the picture I'm looking at, it looks like the vegetation all kind of runs together right there.  I don't see a clear defined road that you are -- or there that you are talking about from what I'm seeing.

Q     Okay.  So you are -- you are saying the placement of that car, as far as you are concerned, is about where it was in the picture?

A     I'm saying that's the best to my recollection, that that is where it was and that's an approximation.  I didn't pin point it that night and that wasn't my hundred percent focus as to where that car was sitting, but that's the best I recall it being.

Q     Okay.  Now, after this incident, did you participate in interviews concerning this incident?

A     Yes, sir.

Q     Who all did you interview?

A     I didn't interview anybody.

Q     No.  Who all interviewed you?

A      Who interviewed me?  That night we talked to George Randolph, who is a lieutenant with the Highway Patrol. There was an interview that was done with the OSBI, there was an interview that was done with the internal affairs division of the Highway Patrol.

Q      Now, was that all that night?

A      No, no.  The only one that was conducted that night was the initial one that was -- which was done with Lieutenant Randolph.

Q      Okay.  Was that -- and was that one tape recorded?

A      I don't believe so.

Q      Did you -- at any time were you told to make a writing, to put your recollections down of what occurred?

A      Yes, sir.

Q      And did you do that?

A      I started to.  I was told to by Lieutenant McBride there at the scene that night.  I started to write one down and wrote just a little bit and it just wasn't -- I just wasn't able to write anything down at that particular time.

Q      And did you give your writing to somebody?

A      Yes, sir, I did.

Q      And was that somebody connected with the investigation?

A      It was an attorney with the Oklahoma State Trooper's

Association.

Q       And that's a private group, isn't it, the Oklahoma Highway Patrol Association?

A       It's the trooper's association, yes, sir.

Q       It's not a government funded group?

A       No, sir, it's not.

Q       Jerry James is a private attorney with that group?

A       Correct.

Q       And you gave your statement to him; is that right?

A       Correct.

Q       You didn't give it to any governmental agency?

A       No, sir.

Q       Now, when did you talk to OSBI?

A       It was probably -- I don't remember the exact date, but it was at a later period, it was after the -- after the funeral.

Q       Ten days or something like that?

A       Somewhere in that time frame.  I...

Q       When you talked to Mr. Randolph, was that a one on one interview or was that a group?

A       That was one on one.

Q       And the OSBI was one on one; is that right?

A       Correct.

Q       And then the internal affairs, was that Paul Gordon?

A       Yes, sir.

Q      Was that a one on one?

A      Yes, sir.

Q      And then subsequent to that or at any time, did you have group discussions or interviews, whatever you call them, where more than a couple of the tact team members got together and discussed this incident?

A      Yes, sir.

Q      And when was that?

A      That was sometime after.  Again, I don't remember the exact date.  It was with the commissioner of the Department of Public Safety, Bob Ricks, and the assistant chief, Jerry Casen.

Q      Okay.  And in that particular -- at that particular time, who all was there?  Was everybody from the tact team there?

A      Yes, sir, I believe so.

Q      Hamilton, you, Manion, Hash -- was Oliver there?  He was not on the tact team at --

A      I don't believe he was there.

Q      Hise was there?

A      The best I recall, I think everybody was there. I don't -- and I don't recall anybody being on vacation or gone or anything.  I'm not saying that it wasn't, but I don't recall anybody.  I think everybody was there.

Q      And at this particular -- at this particular time,

was this sort of a free session in the sense that each one of you sort of told what you saw and what you heard, what you remembered about the incident?

A    Yes, sir.

Q    And the other eight or nine of you were able to listen to what everybody else heard and saw; is that right?

A    Yes, sir.

Q    And did -- was Hamilton able to listen to everybody? He was there?

A    I -- I don't -- like I say, I think everybody was there, but I'm not totally sure that everybody was there.

Q    But you were able to hear everybody's viewpoint that was there that day?

A    Correct, correct.

Q    And then -- did you have any other of those type of sessions with anybody else?

A    Yes, sir.  You mean -- we had some with Jim Horn and Cathy Thomas.

Q    Okay.  Jim Horn is a psychologist or something?

A    No, actually he -- I'm not sure what his title is. He is a retired FBI agent that -- and he has a -- he is part of a -- he is a critical incident stress management or debriefing person.

Q    Okay.  And this was to take care of any P.T.S.D. or any kind of trauma that the highway -- each of the highway

patrolman may have suffered as a result of this incident; is that correct?

A     Correct.

Q     And when you talked to Horn, other people -- other people on this tact team were there?

A     Correct.

Q     And, again, was this a discussion where each one of you gave viewpoints and told what you remembered, what you saw and things like that?

A     It was the -- correct.

Q     So you would be influenced by what someone else said and somebody else would be influenced by what you said; isn't that right?

A     Well, no -- I guess.  From what you are saying, to be influenced...no, I don't see it as being influenced, but I could hear what they were saying.  From what I seen and what -- from my perspective it, to go through the trauma, to make it to where it's acceptable to live with Rocky being murdered in the front yard, we were there to deal with it, but to influence me by somebody else, no, sir, I don't agree with that.

Q     Okay.  And I'm not -- I don't mean to put it that way, that they were trying to influence you in any way, but they are telling you what their perspective is, what they saw, and sometimes you could fit that into what you

thought you saw; isn't that true?

A     No, it's not fitting it into what I saw.  Mine, again, is what I saw and that's what I remember that night and to -- the way I take your question is that my testimony was -- was influenced and changed by something somebody else said.  And, no, sir, no, sir, that's not what occurred, but, yes, I was there and I could hear what they said.

Q     You were at the scene -- were you at the scene when Paul Gordon took that videotape?

A     No, sir, I was not.

Q     You hadn't already left?

A     Yes, sir.

Q     At the time you left that scene, where was Hamilton's Bronco?

A     Hamilton's Bronco was in this position.

Q     Did you see on the videotape the location of Hamilton's Bronco?

A     Yes, sir, I did.

Q     Was that the location that you saw Hamilton's Bronco when you left?

A     No, sir, it was not.

Q     Do you have any idea who moved that Bronco?

A     No, sir, I do not.

Q     Did you look -- look in the Bronco or in the front

seat of the Bronco or anything to see anything like car keys to the Bronco, whether it was in gear or not in gear? Did you make any notes of any of that in the Bronco?

A     When I -- I was inside the Bronco, I attempted to roll the back glass down on the Bronco.  I do not remember removing the keys on the Bronco, but I have owned Broncos myself personally and to roll the back glass or attempt to roll the back glass down you have to have the -- a separate key from the ignition key.  So, like I said, I don't remember removing the keys or taking the key out of the ignition, but to be able to attempt to roll it down, I probably did.  And then it still wouldn't function and I knocked the back glass out.  So inside of it -- I was inside it, but to document where everything was sitting, that was not a priority and, no, sir, I did not document everything and where it was sitting.

Q     And you are saying it has a separate key to get that window down.  Was it a key that was on the set of keys that was in the ignition or do you remember that?

A     I do not remember.  I'm just telling you to attempt to roll it down, it is the -- the ignition key is a square key.  The back glass key is a round key.  So to attempt to take it down, I may have taken the keys out of the car, but I do not recall doing it.

Q     Okay.  But you didn't move the car?

A       No, sir, I did not move the car.

Q       Could you tell whether the -- whether the car was in park or was it in gear?

A       No, sir, I did not look.

Q       Do you have any -- in any of these discussion groups, did anybody else say anything about moving the -- moving Hamilton's Bronco?

A       No, sir, they did not.

Q       Would there be any reason after you have already taken Buddy Eales out in your Bronco -- not you, but --

A       Excuse me, sir.  It's Rocky Eales.

Q       I'm sorry.  After they have already taken Rocky Eales out in your Bronco, would there be any reason at that time to move Hamilton's Bronco?

A       Would there be any reason for me to move it?

Q       Yes.

A       No, sir, there would be none for me to move it.

Q       Did you see anybody take Kenny Barrett out of the house that night?

A       Yes, sir.  As I testified previously, Trooper Manion -- excuse me -- Trooper Hamilton brought him outside the residence.

Q       Okay.  And when that -- when he came out, where were you located?

A       I was over to the corner where we discussed earlier.

In that same time or that same area, we were starting to move toward the front door when Buddy stepped in.

Q      Okay.  And when Mr. Hamilton brought him out, did he bring him down the stairs or just come off the porch?

A      I don't know.

Q      You can't recall that?

A      He brought him -- whether they came off the steps or they were six inches to the right or left, I don't know. They came off the porch into the area on the passenger side, over into that area, of the Bronco and that's where he dropped him.

Q      And the Bronco you are referring to is Hamilton's Bronco?

A      Yes, sir, to the passenger side of the Bronco that is toward the porch.

Q      You -- and getting back to Mr. Eales' ballistic shield that he had, when you hold that ballistic shield up and you are driving -- or as a passenger in that car, are there any identifying marks on that ballistic shield that could be seen from the outside showing that it's law enforcement?

A      It says police on the front of it, but it would be depending on where or how it was being held inside.

Q      Well, as you held it before, could you tell whether or not "police" would be visible from the outside?

A    It would have been hid by this probably the way I held it.

Q    Okay.  And is that approximately the height that the front dash is on the Bronco or the Bronco front -- or is it even higher than that?

A    It would probably be a little higher.

Q    So if we can't see it here, you wouldn't be able to see it in the Bronco, would you?

A    Depending on how he was holding it, which I couldn't see.  If it was held on the floor, no, you couldn't see it.

MR. HILFIGER:  May I have just a moment?

THE COURT:  You may.

(PAUSE)

MR. HILFIGER:  I have no further questions.

THE COURT:  Redirect.

(PAUSE)

THE COURT:  Mr. Littlefield, before we start, we need to -- we are going to take a short break.  If you will remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you.

Everyone please remain seated as the jury leaves the courtroom.

(JURY OUT)

THE COURT:  Let the record reflect that the jury has left the courtroom.  Anything to take up outside the

hearing of the jury?

MR. LITTLEFIELD:  Not from the government, Your Honor.

MR. HILFIGER:  No, Your Honor.

THE COURT:  We will bein recess for 15 minutes.

(SHORT RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect that the jury is in the box, government counsel are present, the defendant and his counsel are present.

You may continue.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     When you were a part of the plan of this operation, what was your focus in regards to the plan, what portion of it?

A     My focus would have been primarily to the entry phase, that would have been my primary objective to fill with this particular operation.

Q     How closely were you focused on what the members of the team were doing at the front gate?

A     I -- that would have been something that I would have heard, but it would not have been, you know, my primary focal point of the plan.  That would have been

their portion of the plan and what they were going to be doing to execute it to get the whole plan to come together.

Q      How certain are you as to whether or not Trooper Hise had his lights on at the front gate?

A      I knew that my lights were supposed to be on and the other ones, the best I recall, but it was -- everybody was going to turn them on, but I'm not -- I guess I'm not totally sure, but that's the best I recall.

Q      You mentioned that you believed you had done one other no/knock and nighttime warrant in two years previously.

A      I said that we had done one other no/knock warrant and I didn't remember the actual parameters of what the warrant actually said.

Q      Daytime or nighttime?

A      I would assume on a no/knock that it would have been -- it would have all of parameters because it has -- you have to have special circumstances and --

Q      When you say parameters, what are you speaking of?

A      I'm talking about times to execute the warrant.

Q      Okay.

A      So the parameters -- I would assume that it was, but to remember that particular warrant that I -- that I read it and to be able to tell you yes or no...I don't remember exactly on that.

Q      All right.  You don't recall what time it was executed?

A      I believe it was early in the morning.  Like I said, I --

Q      Was there anything particularly eventful about that previous warrant?

A      No, sir, it went off pretty much the way it was supposed to.  I took the subjects into custody and they went to jail and later to trial.

Q      Other than the time of day at which this warrant was executed, what difference was there in the means of entry between this particular -- the service of this warrant and the other ones you had done previously over the years?

A      I mean, basically nothing.  We did -- we went through the same parameters.  We initiated the plan, we used the intelligence, we adjusted the plan, and we executed the plan.

Q      In regards to the execution of the plan, what bearing, as far as the entry you made, did the fact that it was a no/knock warrant have?

A      Actually nothing.

Q      Had this been a knock and announce warrant, would you have done anything different on entering the property?

A      No, sir.

Q      Assume for a minute that no shots would have been

fired, that you all would have been able to pull up and go to the front door, under knock and announce what would you have done at the front door?

A     We would have paused at the front door, we would have knocked on the front door, we would have announced that we were the police with a search warrant, we would have waited a reasonable amount of time and then we would have entered the residence either by the door was unlocked and we opened it or if it was locked, we would have hit it with a ram and opened the door and searched for the subject.

Q     Okay.  This being a no/knock warrant, what step would you have left out?

A     The knock and announce at the front door.

Q     Would it have changed the clothing you wore?

A     No, sir.

Q     Would it have changed in any way the procedures you utilized to enter onto the property?

A     No, sir, no, sir.

Q     Under either circumstance, knock and announce or no/knock, what requirement is there that the emergency lights be lit on the vehicles when they enter the property?

A     There is none.

Q     Why were they on?

A     Basically they were -- they were turned on to show

that we were the police, to give some -- because red and blue lights are associated with law enforcement.

Q     When you do -- when you have done other warrants in the past, did you turn the lights on when you entered the property on those previous occasions?

A     Yes, sir.

Q     When you are talking about the execution of a daytime versus a nighttime warrant, can you issue or can you execute what is classified as a daytime warrant when it's dark, nighttime actually?

A     Yes, sir.

Q     How do you do that?

A     The parameters that are given by the courts or you can execute them from a given time.  I believe it's six o'clock in the morning until -- I believe it's until ten in the evening.  So -- and depending on what time of year it is, what time it gets daylight -- it doesn't necessarily mean that it has to be daylight.  It just means that it has to be six o'clock -- in between the hours of six o'clock and ten o'clock.

Q     Okay.  So you could have a daytime warrant in October and go in at six o'one and what is the condition going to be at six o'one a.m.?

A     It's probably going to be dark or depending on daylight savings time...

Q       Okay.  And you could have a -- you could be going in at six o'clock in the morning in June and what are the conditions going to be?

A       It would be daylight, I would assume.

Q       Okay.  Six o'clock a.m., it's going to be --

A       Yeah.

Q       And if you -- if you took a daytime warrant and executed it at 9:30 at night in December, it's a daytime warrant, but what are the conditions going to be when you go in?

A       It would be dark.

Q       Would you be any different in your entry on other -- under that circumstance, a daytime warrant at 9:30 at night, than you were here as far as what you did?

A       No, sir.

Q       You were asked why didn't you -- did you ever -- did you ever announce that you were the police.  When did you have an opportunity to announce that you were the police?

A       Never.

Q       Why?

A       Because as the mission started taking place, the rounds started going off.  There was never an opportunity to announce that I was a law enforcement officer.

Q       For you to have stood out and hollered, hey, I'm the cops, we are coming on, we have a search warrant, prior

to the rounds being fired, where would you have had to have stood, opened your door and made that announcement?

A     Somewhere where I would have been exposed to gunfire.

Q     When you did the other operations, the five to ten that you had done for the ten years previous, what did you wear in regards to clothing on those operations?

A     We used the -- wore the B.T.U. style uniforms.

Q     Members of the team always wear the same style of uniform?

A     They were similar.  There may have been -- some times some would have O.D. green on and some would have camoflauge on.  It would depend on the particular uniform and basically the funding and the stuff that -- we would wear what we had at the particular time.

Q     Did the other -- in the other operations that you had done prior to this, was the same -- did the same hold true in regard to the uniforms you wore?

A     Yes, sir.

Q     Did you get fired on in those other operations?

A     No, sir.

Q     When Mr. Manion went over to Rocky at the back of the Bronco, was there gunfire going on then?

A     Yes, sir, I believe so.

Q     You stated on cross examination that you don't recall seeing Buddy to the left of or behind the Bronco.

Do you recall saying that?

A       Yes, sir, I do.

Q       Does that mean that Rocky was never to the left of the Bronco?

A       No, sir, it does not.

Q       I may have said Rocky.  Does that mean that Buddy was never on the left of the Bronco?

A       No, sir, it does not.

Q       In fact, if Buddy exited the Bronco, where would he have had to exit the Bronco?

A       He would have actually had to come from the left side or the driver's side of the vehicle.

Q       You also indicated that you do not recall seeing Buddy to the rear of the Bronco where Rick Manion or Rocky were.  Does that mean that Buddy was never there behind the Bronco?

A       No, sir, it does not.

Q       You said that the Bronco was inoperable, the Bronco that was driven by Buddy.

A       Yes, sir, I assume that it was inoperable.  I attempted to get the windows down and the back glass down to be able to put Rocky in it and I couldn't get anything to function.  So I assumed at that point that it was inoperable.

Q       And did you go back to the scene the next day?

A     Yes, sir, the next morning.

Q     Did you notice -- and when you went back the next morning, there was some discussion about the Bronco had moved or had been moved.  Was it at that other location when you went back the next morning?

A     Yes, sir, it was at the location like the pictures have it, it had moved back.

Q     Okay.  Well, if you look at Government's Exhibit 5 --

      MR. LITTLEFIELD:  And I ask that it be displayed.

BY MR. LITTLEFIELD:

Q     Is that where -- do you see it?

A     Yes, sir.

Q     Was that where it was the next morning?

      MR. HILFIGER:  Your Honor, I'm going to object unless he is going to introduce that in evidence.

      MR. LITTLEFIELD:  It's in evidence.

BY MR. LITTLEFIELD:

Q     Is that where it was the next morning?

A     Yes, sir, I believe so.

Q     Did you notice -- look by the front porch.  Did you notice that out there the next morning?

A     I don't recall now.  I'm sure it was there.  It's in the picture, but I don't recall actually walking up and observing it.

Q     I note there is crime scene tape around.  How close

did you get?

A      We -- actually the OSBI and the internal affairs came and Rick and I went back and just gave them an idea -- kind of did a walk through as to kind of what transpired to give them an idea on their investigation.

Q      When that Bronco approached -- from the time it entered over there by the trailer, drove up and ended up by those front steps, what portion of Rocky's body would have been facing the house?

A      It would have been the right side.

Q      Okay.  Do you know where Rocky's wounds were received to his body?

A      Yes, sir, I do.

Q      Where?

A      On the left side kind of underneath the arm, in between -- in between the vest and the shoulder plate and it went down on the left side.

Q      Following -- knowing the path that that Bronco would have traveled from the entry to where it stopped on the porch, at what point, if any, would Rocky's left side have been exposed to the gunfire?

A      None that I can see.

Q      At what point during the entire incident would Rocky's left side have been exposed to the gunfire?

                    MR. HILFIGER:  Your Honor, I object.  That

calls for supposition.  I don't know if this witness has expertise capable enough to give testimony on that subject.

THE COURT:  Argument, Counsel.

MR. LITTLEFIELD:  I don't think it requires an expert to know how a person's body would have had to have been positioned to receive gun wounds coming from the left side.

MR. HILFIGER:  It's not that he is an expert, Your Honor.  This witness has never said he recognized where the gunshots were coming from.

THE COURT:  Rephrase the question.  Officer, if you will wait until counsel has an opportunity to object before you answer.

THE WITNESS:  Yes, sir.

BY MR. LITTLEFIELD:

Q     Other than -- other than the troopers, where was the only gun that could have been used to shoot Rocky located?

A     The only one I seen was inside the residence.

Q     And Toby was in the front yard?

A     Correct.

Q     What happened to him?

A     He was taken down by, I believe, Trooper Hise and Trooper Darst.

Q     When you say "taken down", what do you mean?

A     He was arrested or he was taken down and handcuffed

there in the yard and eventually taken into custody.

Q    Okay.  And the other person who was at the scene that was not law enforcement was who?

A    I'm sorry, I...

Q    The other person, besides Toby, who was at that location that was not law enforcement was who?

A    It was Mr. Barrett.

Q    And where was Mr. Barrett --

MR. HILFIGER:  Your Honor --

BY MR. LITLTEFIELD:

Q    -- when he was taken into custody?

A    He was inside the residence and brought out to the front yard.

Q    Okay.  And where were any firearms found at the scene that were not -- that did not belong to law enforcement?

A    Inside the residence.

Q    At what point was Mr. Eales' left side exposed to that residence during the entire incident, if it was ever exposed?

MR. HILFIGER:  Your Honor, again, that calls for supposition.  I don't think he is capable of making it because he has never identified when -- the only time he saw Mr. Eales or identified him outside the car was at the back of the car.

THE COURT:  The witness may answer, if he knows. Objection overruled.

BY THE WITNESS:

A     Could you ask the question again?

BY MR. LITTLEFIELD:

Q     At what point was Mr. Eales' left side exposed to the residence?

A     It would have been when he was exiting the vehicle.

Q     And prior to his exit from the vehicle, where had Mr. Eales been located the entire time?

A     In the passenger seat of the first Bronco.

Q     Did the color of clothing that he had on have anything to do with that?

A     Nothing.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

(PAUSE)

MR. LITTLEFIELD:  Pass the witness.

RECROSS EXAMINATION

BY MR. HILFIGER:

Q     Mr. Greninger, did you see Mr. Eales leave that car?

A     He was --

Q     Did you see Mr. Eales leave that car?

A     He was coming out of the vehicle coming towards the

back of the vehicle.

Q      Did you see him exit the car?

A      No, sir, I --

Q      How do you know how he exited that car?

A      I would assume that he came out --

Q      How do you know how he got out of that car?  You don't, do you?

A      I don't know.  I would assume that he came out -- I mean, a logical person could tell if you have -- if the door has been opened, then you are going to exit out of the vehicle.

Q      Okay.  You are going to exit out the door.  How does he exit out the door?  Is there only one way that a person can get out of that car?

A      No, sir.

Q      There are many ways that a person can get out of that car, isn't there?

A      Correct.

Q      And you -- in order to answer the question to Mr. Littlefield as to what point was Eales exposed to his left side, you are assuming something you don't even have any idea of; isn't that true?  You don't know how Eales got out of that car, do you?

A      I would assume that he --

Q      The question is:  You do not know how Mr. Eales got

out of that car?  Yes or no?

A       No.

Q       You don't know whether he put his right foot out first, do you?

A       No, sir.

Q       You don't know whether he got out in a turning motion, do you?

A       No, sir.

Q       You are assuming that, aren't you?

A       Yes, sir.

Q       And you didn't see him get out, did you?

A       No, sir.

Q       When he got out, do you know where that shield was as he was getting out of the car?

A       It was inside the vehicle, so I assume that it came out.

Q       Okay.  Do you know how that shield came out?

A       I would assume from Mr. Eales.

Q       Do you know how it came out?

A       I would assume Mr. Eales would have brought it out.

Q       But you don't know that, do you?

A       There was nobody else there, so he would have had to have brought it out.

Q       Do you know whether he brought it out holding it in front of him?

A    No, sir.

Q    Do you know whether he threw it out and then got out?

A    No, sir.

Q    Do you know whether he got out first and then drug it out later?

A    I would assume from the injury, again, that he had that I don't think he probably drug it out later, but I don't know that for a fact.

Q    You don't know that, do you?

A    No, sir, I don't.

Q    You are not telling this jury anything you know, you are just guessing.  Isn't that what an assumption is?

A    I assume so.

Q    You guess that assumption is a guess; is that right?

A    Yes, sir.

Q    Now, why do you guys have a car -- and I'm talking about Hash's car -- that has such an unusual coloring scheme, it's black and it's white and it has a state of Oklahoma emblem on it?

A    Why do we have one?

Q    Yeah.

A    Because it's the vehicle that he drives and it's an Oklahoma Highway Patrol car.

Q    You identify it as an Oklahoma Highway Patrol car, don't you?

A     Yes, sir.

Q     And when people see it, they know it's a Highway Patrol car, don't they?

A     Yes, sir.

Q     And they recognize it as a Highway Patrol car; isn't that true?

A     Yes, sir.

Q     That's the reason you have light bars on there, you have the emblem on there, you have the black and white in a particular coloring scheme; isn't that right?

A     Yes, sir.  We also have cars without light bars and we also have cars that are different colors.

Q     Right.  But those particular cars -- you are doing it so you let people know, hey, I'm the Highway Patrol, I'm law enforcement; isn't that right?

A     Correct.

Q     And when you enter on a person's property, there may not be any requirement for you to put your emergency lights on, but you do it because you want to let them know that, hey, this is law enforcement, this isn't some robber that is coming out and trying to get in your house; isn't that true?

A     Correct, that's why we did it here.

Q     That's why you turn on your lights; isn't that right?

A     Correct.

Q      Does your car have some -- some kind of sound system in it?

A      Yes, sir.

Q      A P.A. system?

A      Yes, sir.

Q      It has a siren?

A      Yes, sir.

Q      Can you blow the siren?

A      Yes, sir.

Q      Can you announce on the P.A. system --

A      Yes, sir.

Q      -- police?

A      Yes, sir.

Q      Now, you don't have to do like Mr. Littlefield asked you about, drive up there and get out of the car and say, hey, I'm a police officer.  You have a P.A. system in your car, don't you?

A      Yes, sir.

Q      You could have turned that on the minute you saw somebody out there in that yard, couldn't you've?

A      Yes, sir.

Q      You could have turned your lights on the minute you saw somebody out there in that yard?

A      Yes, sir, and basically we did or I did in my car.

Q      In your car you did?

A       I wasn't driving Mr. Hamilton's car.

Q       You didn't see any lights on in Mr. Hamilton's car, did you?

A       No, sir, I did not.

Q       Did he have a P.A. system in his car?

A       Yes, sir.

Q       Did Hise have a P.A. system in his car?

A       Yes, sir.

Q       Did Hash have one in his car?

A       Yes, sir.

Q       And did Pettingill have one in his car?

A       Yes, sir.

Q       Was there anything stopping any of you from saying, police, we are here on a search warrant, come out?

A       The area.

Q       What stopped you from doing that?  Why did the area stop you from doing that?

A       Because the area that we were in was a known area for associates and relatives and if we would have stopped at that point, we would have also risked notifying everybody else and run a risk of being caught in the crossfire or caught in a compromising position.

Q       You assumed that the relatives were going to come out shooting at you?  Is that what you are talking about?

A       Well, you are running the risk of being compromised

from both sides at that point.

Q       You couldn't turn your sirens on?

A       You could have turned them on, yes, sir.

Q       So there were ways that you, Mr. Greninger, you yourself, could have said, we are the police besides getting out of your door and saying, hey, we are the police?

A       And we did that.

Q       Just with the lights?

A       Just with the lights, yes, sir.

Q       Back over here on the private drive?

A       Yes, sir, before we entered the property or at the time we were entering, somewhere in that area.

Q       But, to your knowledge, nobody else did?

A       Trooper Hash did.

Q       Other than Trooper Hash?

A       To my knowledge -- I never actually seen them.  It wasn't a focal point, so I don't know whether -- Trooper Hamilton didn't have his on, but as far as Trooper Hash or -- I'm sorry, excuse me.  As far as Trooper Hise or Major Pettingill, I never actually observed them turn theirs on or not.

Q       To your knowledge, was everybody's P.A. system and siren system working?

A       As far as I know, yes, sir.

Q     But it was not used?

A     Yes, sir.

          MR. HILFIGER:  I have no further questions.

          THE COURT:  Any further direct?

          MR. LITTLEFIELD:  Yes, sir.

                    FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     Why was Hash's vehicle determined to be the third in line?

          MR. HILFIGER:  Your Honor, I would object. That is way outside the recross.

          THE COURT:  Overruled.  You may.

BY MR. LITTLEFIELD:

Q     Do you recall the question?

A     Yes, sir.  It was because it did -- it was a black and white Highway Patrol car with a light bar on it.

Q     And what was the decision in regards to Hash's light bar?

A     It was to provide the red and blue lights associated with a police car being exactly like the red and blue lights on my visor.

Q     Did your not announcing on the P.A. system authorize Kenny Barrett to shoot Rocky Eales?

A     No, sir, it did not.

          MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Further cross examination?

FURTHER RECROSS EXAMINATION

BY MR. HILFIGER:

Q     Did your not announcing on the P.A. system or by use of the siren prevent Kenny Barrett from knowing that you were law enforcement?

MR. LITTLEFIELD:  Objection, that's speculation. I withdraw the objection.

THE COURT:  Objection withdrawn.  You may answer.

BY THE WITNESS:

A     I'm sorry.  Would you repeat the question?

BY MR. HILFIGER:

Q     Did your not using the P.A. system or announcing through the siren system on your cars prevent Kenny Barrett from knowing that you were law enforcement?

A     No, sir, I don't believe so.

MR. HILFIGER:  I have no further questions.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, sir.

THE COURT:  Defense have any objection to this witness being excused?

MR. HILFIGER:  Your Honor, we have him subpoenaed, I believe.  He will be subject to recall. We will let him know a day or so ahead of time.

THE COURT:  Sir, thank you for your testimony.

You may step down.

You may call your next witness.

MR. LITTLEFIELD:  James Horn.

JAMES H. HORN, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q      State your name for the record, please, sir.

A      James H. Horn.

A      Mr. Horn, how are you employed?

A      I'm self-employed.  I have a consulting and training business focusing on forensic behaviorial science, trauma in particular, in Stillwater, Oklahoma.

Q      How long have you had that particular business, sir?

A      Since I retired from the FBI in January of 1996.

Q      Let me ask you about your educational background, sir.  Could you provide it to us?

A      Yes, sir.  I have a Bachelor of Science degree from Oklahoma State University and a Master of forensic science degree from George Washington University in Washington D.C.

Q      What was your field of study at O.S.U.?

A      Psychology.

Q      Okay.  And when you finished college, what did you do then, sir?

A      I was a Marine Corps infantry officer for three years.

Q      Where?

A      I did two tours in Vietnam and finished up at the Marine Corps base in Palms, California.

Q      In that period of time, you mentioned something about trauma.  During the periods that you were in Vietnam, did you have occasion to deal with firefights, shooting incidents while you were at Vietnam?

A      Yes, sir, I was an infantry officer.  So I was a platoon manager, assistant batallion operation's officer and executive officer of an infantry company and then a company commander of an infantry company.  In my second tour I was a batallion civil affairs officer.

Q      How did that -- how did those duties result in your exposure to gunfire and firefights?

A      My assignment for the first seven months was around De Nang and my principle exposure was to rocket attacks by the Viet Cong around the base with some sniper incidents, some smaller contacts, but then from January until the summer of 1969, I was up near the D.M.Z. and over along the ocean border with the Third Marine Division.  We were regularly engaged in combat with the North Vietnamese.

Q      What, if any, declarations did you receive as a result of your service in the U.S. military?

A      The Silver Star, two Navy accommodation medals for combat, a purple heart, combat action Vietnam cross of

gallantry with a silver star.

Q    After your military service, have you had any other employment associated with the government, sir?

A    Yes, sir.  I went into the FBI right out of the Marine Corps and again it was along that same line, I was selected for the first swat team of the FBI.  Most of us were military background in that first swat team training program and I was a part of the FBI swat program through the Lake Placid winter olympics in 1980, when we were a part of the anti-terrorist force.

Q    Have you also had occasion to serve with the FBI's behavioral unit, sir?

A    I did.  I was assigned there from 1983 until 1994 at Quantico Virginia FBI academy.

Q    In regards to trauma from shooting incidents, has the FBI developed any type of program in dealing with officers and agents who are exposed to traumatic situations, sir?

A    Yes, and I was actually privileged to start that in the field when I was in the Denver division before I went to the FBI academy when I wrote a policy for post-shooting trauma for the Denver division back in 1981.  I believe that was the first post-trauma incident policy that was ever written in the FBI.

Q    After you wrote that policy in Denver, then what

happened in regards to the Bureau?

A        Transferred in '83 to the behavioral science unit at the FBI academy as criminal profiler of unsolved violent criminal offenses, and then I taught for a couple of years there.  In 1987 they asked me to take over as the program manager of the FBI critical incident program.

Q        What is the critical incident program of the FBI?

A        The critical incident program of the FBI, when I inherited it in '87, was our efforts to handle our employees who were involved in critical incidents, whether they were shootings or hurricanes or earthquakes or suicides or whatever in such a way to minimize the impact and help them recover as much as possible from the trauma of their experiences.

Q        And how long did you manage the critical incident program for the Federal Bureau of Investigation?

A        From '87 until '94.

Q        During that time period do you have any idea approximately how many critical incidents that you dealt with?

A        Approximately 60 incidents.  Like I said, everything from two earthquakes in California to Hurricane Andrew and Hugo to numerous shooting incidents throughout the country.

Q        Were you -- did you -- were there any shooting incidents with which jurors or people in this courtroom

might be familiar with which you dealt and dealt with the individuals who were there during the shooting incidents?

A       Well, the most famous for sure would be the attempt to assassinate Reagan.  My involvement with that with the Secret Service came sometime afterward when I was helping them develop their post-critical incident seminars and develop their post-shooting program.  So I was asked to help them run their first post-critical incident seminar and we had attendees there from the assassination attempt.

Q       And were they the Secret Service agents who were present during the attempt itself?

A       Yes, sir.

Q       Are there any other situations with which people in this courtroom might be familiar in which you have dealt with individuals who would be suffering from the trauma of their exposure to a traumatic or stressful situation or circumstance?

A       Well, certainly in Oklahoma everybody is aware of the Oklahoma City bombing.  That happened seven months after I transferred back to the Oklahoma City division and actually was assigned to my hometown there in Stillwater when that happened.  I found very quickly that we, in Oklahoma, were unprepared to deal with --

        MR. SMITH:  Your Honor, I'm going to object.  That's not responsive.  He said the Oklahoma City bombing

and then started this narrative.

THE COURT:  Objection overruled.  You may continue.

BY THE WITNESS:

A      I found we were ill-equipped and unprepared and didn't have the proper people to work with trauma victims in the nature of a bombing.  So that actually helped me to decide to retire so we could develop some programs.  What we used was the model of the FBI's post-critical incident seminars which I have done 20 of at the FBI academy and we modified that to work with the survivors or victims of the Oklahoma City bombing.  We conducted 72 of those four day workshops.  I personally facilitated over 50 of those workshops.  We had about 750 people that came through those workshops.

Q      Have you received any board certification, sir?

A      I have through the American Academy of Experts in traumatic stress.

Q      Okay.  And what -- what are you board certified as?

A      Emergency crises response.

Q      Okay.  Do you have any board -- have you received an expert in -- are you a board certified expert in the area of traumatic stress, sir?

A      Yes, sir.

Q      Okay.  Have you previously testified in any

proceedings in regards to traumatic stress?

A    Yes.

Q    How about federal proceedings?

A    Yes.  I have been involved in -- been used in that context in a federal grand jury in Kansas City because we had a bombing -- an arson suspect, who was also a serial murder suspect.

Q    Have you previously been certified or qualified as an expert in the field of traumatic stress in a courtroom, sir?

A    In state?

Q    In any courtroom.

A    Yes.

Q    Okay.

MR. LITTLEFIELD:  Your Honor, I would ask that Mr. Horn be certified as an expert witness in the area of traumatic stress.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  That will be the order of the Court.

BY MR. LITTLEFIELD:

Q    What does exposure to trauma do in regards to an individual's ability to relate and recall the incidents and circumstances, sir?

A    It all depends on the degree of exposure on whether

or not there were injuries or fatalities.  Those are all factors in there.  Also, I have found from my experience that one of the greatest factors is also your personal feeling of mortality and vulnerability.  Perhaps you think you also might be seriously hurt or killed, but we see a wide range of effects, short-term, long-term, sometimes immediate effects, sometimes delayed effects on people's ability to recall events from incidents.  When I ran the FBI's critical incident --

Q    Okay, I was going to get there.  You have had a great deal of exposure to law enforcement shooting incidents as a consequence of your dealing with the critical incident program of the FBI.

A    Certainly, because I was an instructor at the FBI academy as well.  So those were all law enforcement officers from around the world and those classes -- so I often spoke and worked with them about their critical incidents whether they were bombings or shootings, as well as the FBI incidents.

Q    Let's focus on a shooting or a situation in which there has been a shooting involved --

A    Okay.

Q    -- with law enforcement officers in which one of the law enforcement officers was killed and another was wounded.  How would those factors impact the traumatic

experience and the stress upon those individuals who had been participants in that kind of activity?

A    Well, when I responded to those kinds of incidents there was always an extreme aggravation by the loss and injury to fellow police or fellow agents and I agree with Dr. Jim Sewell's work down in Florida that the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty.  So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive.

Q    Which of these people -- which of the participants is most likely to be impacted in this kind of circumstance?

A    Well, there's an element that also comes into play in trauma, particularly when it is sudden and unexpected, the Oklahoma City bombing for example, but in a shooting incident it is same thing, it is sudden and unexpected and you have no chance to prepare.  Hopefully your training is good and the training takes over and you perform well and I -- and I generally have seen that.  Sometimes they perform perfectly, but it doesn't mean the impact isn't there.  We call that autopilot because they are so well-trained that they are able to go ahead and function tactically and complete their mission, but long-term the impact can be extreme regardless of their ability to perform.

Q      Okay.  Let me go through a couple of circumstances. Would it be unusual for an individual who had been a participant -- for a law enforcement officer who had been a participant in a tactical circumstance in which one of the members of the tactical team had been killed to not have a recollection of firing his weapon?

A      I don't think I would say it wouldn't be unusual, but it is certainly known and I can think of right off the bat four such cases and I just was told about another one yesterday in a current shooting in Minnesota and that's the same situation.  The psychologist working that, retired police officer Denny Conroy, was the one that told me about that.

Q      In your personal experience have you -- are you aware of circumstances in which an officer had been involved in such a situation and absolutely had no recollection of firing his gun?

A      Absolutely.  I'll use this agent's name with his permission.  His name was Ralph Tucker and he was involved in a swat team operation against a bank robber in St. Louis.  It was probably in '90, January, I believe, of '90.  They went in to arrest a bank robber, who was in the back room waiting for him in the dark.  He opened up and he killed the lead agent with a shot to the head and he wounded two more.  Ralph was able to cover and manuever

and provided a statement to the inspection division in the shooting inquiry that he had done such but had not fired his shotgun, which was loaded with rifle slugs.  Two weeks later the inspector called me with what he considered to be a dilemma in that Ralph had provided this statement that he hadn't fired his weapon and he said we just got the ballistics report and not only did Ralph fire the gun, but he fired it three times and two of those rounds were what we call K5 or fatal type shots and the other was also a significant hit.  I told him that it was possible that could happen because we've had so many instances of people not recalling how many times they fired their weapon and certainly not knowing how many times they have been shot at.  So even when he was confronted with this information, he could not remember it. Ralph later called me 18 months later, after he had been reassigned to the east coast, to tell me that he had been running on the beach and for some reason when his foot hit the sand he heard rack boom, rack boom, and it came back to him.  For some reason there was a trigger there that brought it back, but it took him 18 months to recall ever firing his weapon and it's significant because a shotgun or a rifle slug has a lot of kick and usually you will have a bruised shoulder if you fire that thing several times and he just couldn't remember it.  I think, again,

the impact on people to perform based on their training -- he performed well, but I think everybody, as they described it to me, knew this was a fatal wound to their colleague and I think there is a significant type of trauma and maybe a little amnesia that can go along with that when you are exposed to something like that.

Q     You mentioned a trigger.  Is it unusual for an individual who has been in this type of situation to have no recollection and then something triggers it and they recall differently, they recall something that they had forgotten or just had no recollection of?

A     They might have some recollection, but not -- there might be details left out and I know from working with our people after these incidents that when you debrief them psychologically or when you have them at a workshop and they are discussing it, it's not unusual for information to come back in their minds.  When I inherited our program in 1987, one of our biggest problems was the fact that our inspection division did not understand that.  So when agents were providing them with inconsistent statements and having inconsistent memories, they took exception to that and we tried several different ways to educate our inspection division unsuccessfully because some of our agents were saying the way they were treated after their incident was worse than the incident itself, than being in

shooting.  So we were to some degree bayonetting our wounded.  We actually were able to correct that problem. We did it through a video, which I was directed to develop, and it was only a 20 minute video and from that point on every inspector had to watch this video before you were allowed to interview anybody involved in a shooting.  Even if you had done this ten times before, this is a new shooting, you've got to watch the video again before you have go to interview anyone.  Because of the information on there, they finally got the message, and especially since we used one of our FBI heroes in this video who spoke for seven minutes.  We also found they listened very well to him.  I actually extracted some of the information about these traumatic memory inconsistencies from that video that I would like to share with you, if that's all right.

Q     Okay.

A     Because I think this will help explain exactly what we told them so that they would understand the nature of traumatic memories.  Here's -- in regards to --

        MR. SMITH:  Your Honor, before we continue, this is clearly not responsive to his question.

        THE COURT:  Objection overruled.

BY THE WITNESS:

A     Special nature of memories formed during traumatic

situations.  This is a quote word for word.  This is Dr. David A. Sauskey (sic), the Bureau's psychiatrist at the time, on the video speaking.  "There is a widespread and entirely erroneous belief the human memory operates somewhat like a video recorder in that tapes of all we have experienced are stored somewhere within our brains ready to be retrieved under the right circumstances.  The reality of the human memory is quite different.  The recording and the retrieval of memories are significantly influenced by emotional factors, including fear and anger, and are modified continuously as they are recalled under different circumstances.  Consequently, agents who have been involved in shooting incidents often do not have accurate memories of these incidents.  This may include how many shots were fired, the position of various people in vehicles, and how much time the incident took.  This inaccuracy may be hard for the agent and the inspector to accept, especially in light of the fact that agents are trained in and are experts in observing, remembering, and recording events in their day-to-day work.  As an inspector, you must be aware that honest reports by involved agents may be inaccurate and/or incomplete. And this is the reality of their memories and it's what they will report to you if you let them tell their stories honestly."

He talked a little more there about, you know, the adversarial relationship that can exist there.

Q     Okay, okay.  In that regard --

A     Yes.

Q     -- how long should one wait before talking to an individual who has been involved in a traumatic shooting incident?

A     Our guidelines were and are in the FBI -- because I recently checked to see if this was still the same.  It's a case by case, individual by individual basis, depending on the amount of shock or impact that they have.  Some people are clear-headed and ready to talk, particularly if there are no casualties after a shooting, but the key words there are when they have had a chance to recompose themselves, then that's the time to do it.  That may be a relatively short period of time after they have been removed from the scene or it could be days.

Q     Okay.  Is it unusual for a person to recall facts later that they initially did not recall?

A     No, no.  My experience has been if I would talk to people at one day, three days, and five days that you would get the modifications that Dr. Sauskey talked about right here.

Q     Would you expect or would you find it unusual that an individual who had participated in a traumatic incident

in which a -- that a law enforcement officer had participated in a traumatic incident in which one of the individuals with whom they worked as a team were shot and killed, would you find it unusual for an individual to, for example, see shots but not be able to hear them?

A    No.   There is tremendous perception distortions, auditory and visual distortions, time distortions, slow motion types of experiences.  I have talked to people who did not hear a shotgun go off that their partner fired. He didn't hear it and it went off twelve inches from his head.  He did not know his partner had fired that weapon. Other people aren't aware of what others are doing because they may be focused on the fact that -- in fact, one Denver officer told me he knew he was dead and he was going to be killed, so he never heard anything that his partner said and his partner saved his life by neutralizing the offender there, but he never heard it.

Q    How far was his partner away when he made the statements that the officer who thought he was going to die never heard?

A    I'm going to guess and say maybe from here to the jurors, within that range right there, but pretty close to that.

Q    Is it unusual that members of a unit such as I have described will have some periods of blank that haven't

come back six years later?

A      No.  We found -- one of the worst shootings in history was April 11th of '86 in Dade County, Florida. We found a need to learn from that and grow from that and improve our program and our tactics and everything.  We created or wanted to make a video.  So we brought the survivors of that shooting, where we lost two agents and we had -- we had five wounded, three critically.  We brought the survivors to the academy and we reenacted this thing and it was -- it was amazing how much -- as the actual participants would help in guiding us to recreate the shooting to make it accurate, several times they would say I just remembered something else that I didn't remember before, and this was 18 months later.

Q      Would it be unusual -- well, you know what a flash bang is.  It makes a lot of noise?

A      (NO RESPONSE)

Q      I can't hear you.

A      Do I know what one is?

Q      Yeah, yeah.

A      Yes.

Q      And if a person is within 20 yards of a flash bang, should they be able to see and hear a flash bang if there's nothing in the way?

A      At night?

Q      Yes.

A      Particularly at night, yes.

Q      Would it surprise you that some members of the team don't recall seeing or hearing a flash bang?

A      Nothing really surprises me any more in these incidents because it depends, I think, a lot on their focus.  You might, for example, perceive a threat over here and if you look over there you could be so focused on that that nothing that happens over here might be perceived.

Q      Would you expect some inconsistencies from the statements of individuals who have been participants in an incident such as what we are involved in here?

A      Yes.  In fact, to tell you the truth, I would be suspicious if there weren't inconsistencies.  It's an investigative technique where you go in -- if you have 22 suspects to interview, as I did one time at the federal correctional institution in Englewood on a stabbing case and I interviewed 22 of them and three of them had exactly the same story, those are the three people who got convicted of that crime because they were the ones who did it because they had contrived to tell exactly the same story.  So it wasn't an honest -- it wasn't an honest memory retrieval.  They wanted to make sure they told the same story.  So I'm a little more suspicious if you have

people telling exactly the same story than if you have some variations there because, you know, we are all different. For me to be right here and somebody to be a few feet away, we can have a very, very different experience in the same critical incident, whether we are in a bombing or whether we are in a shooting, because of what we are focused on.

Q      How much does the nature of the experience have to do with the ability to relate and recall consistently the entirety of that incident?

A      The nature of the incident?

Q      How much does that -- the nature of the incident and the nature of the trauma have to do with one's ability to recollect and recall?

A      By nature, you mean the seriousness of it?

Q      Yes, yes.

A      Well, you know, generally speaking, the more serious it is the harder time they have recalling something.  It's like accidents.  A lot of times people don't remember their accidents.  It's probably good that they don't.

Q      You were a member of the first FBI swat team?

A      Yes.

Q      What is the relationship between members of a swat team, one to the other, as far as the team members?

A      It's very much -- particularly if you are involved in critical incidents, it's very akin to the relationship

I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond.  You become instant friends and you probably just stay that way the rest of your life because of that experience.

Q    In that regard, if an officer shooting relates to a member of a tactical team, is that going to increase the difficulties of -- that we are talking about today or is that going to minimize it or what impact, if any impact, is it going to have?

A    I have never seen it where it didn't increase the impact that it had on the participants when it's a colleague.

        MR. LITTLEFIELD:  May I have just a second, Judge?

        THE COURT:  Yes.

                    (PAUSE)

BY MR. LITTLEFIELD:

Q    Would it surprised you -- let me rephrase it.  What would be your reaction, based upon your knowledge and your experience, to an individual who at one point describes not seeing an individual who was participating in a circumstance and later, two years later, 18 months later, recalls seeing an individual in a location where he

previously did not recollect seeing that individual?

A     Just -- you know, because I have heard so many of these variations -- I mean, I would go right back to this statement and say he is giving you his honest recall and it varies from time to time and based upon the resolution or the experience of emotions, so -- I mean, that doesn't surprise me to hear those things because I have heard so many of them.

Q     Okay.  Is that consistent with your experience as to individuals who have undergone these traumatic and stressful situations?

A     Yes, yes, it is.

          MR. LITTLEFIELD:  Pass the witness.

          THE COURT:  You may cross examine.

          MR. SMITH:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. SMITH:

Q     Mr. Horn, my name is Bret Smith.

A     Good to meet you.

Q     Do you recall the other day that I asked to visit with you about the nature of your testimony?

A     During the break?

Q     Excuse me?

A     During the break, yes, I do.

Q     And you declined to visit with me, didn't you?

A       Yes.

Q       And you have not shared with us the contents of what you just read from that videotape, the excerpts that you read to us here before today?

A       That's correct.  I did this last night.

Q       Okay.  Sir, I see that you do have a Master's degree in forensic science, but you are not a psychologist?

A       Correct.

Q       And when I look at your professional experience, particularly as it relates to your military service, --

A       Uh-huh.

Q       -- I notice that when you are with the -- when you are in De Nang with the force logistic command, you were a member of an M.P. unit; is that correct?

A       That's correct.

Q       That was in 1968?

A       Yes.  We did no M.P. duties.

Q       In 1969 -- and that wasn't my question.  If there is something you need to follow-up with, I'll try to give you that opportunity, but to keep from us rambling and just getting into a narrative answer, if you could answer just my question, we may get through this little quicker.

A       Sure.

Q       In 1969, when you are a batallion civil affairs officer, you are assigned to the 1st M.P. Battallion

in De Nang, correct?

A     Correct.

Q     In 1970, you are assigned to the 1st M.P. Batallion in De Nang, correct?

A     That's the same assignment.

Q     Okay.  Well, that was when you were the commanding officer of the company.

A     No, no, I was a commanding officer in (inaudible) Company 2nd Batallion, 9th Marines, 3rd Marine division, and that was a 70 day C.O. assignment in the spring of 1969.  My second tour I was a civil affairs officer.

Q     I will display to you what you have given to me and then I'll ask you if that's not what this says.

                    (PAUSE)

Q     Sir, have you seen what I have displayed to you?

A     Yes.

Q     Does that look like a copy of your c.v. that you have previously given to us?

A     Yes, yes.

Q     Okay.  Down towards the bottom, sir, where we are talking about professional experience, --

A     Yes.

Q     -- do you see where I'm reading from, 1970 it says you were the commanding officer of Company C, 1st M.P. Batallion --

A    My last three days in Vietnam, yes, that's correct, three days.

Q    Sir, you made the c.v., I didn't.

A    That's correct, for three days, yeah.

Q    Is that what that says?

A    That's what it says.

Q    And then, sir, if you will look below that, you will see in 1970 you are an operations training officer from the (inaudible) Marshal's office; is that correct?

A    That's correct.

Q    Thank you, sir.  Sir, I do realize that you are certified in traumatic stress and based on what I have read about you, you are highly qualified, but I do want to ask you a few more questions about some of your affiliations.

A    Sure.

Q    Sir, I noticed on the c.v. that you provided to us that you are the state director of O.K. Cops, correct?

A    Correct.

Q    What you have described that as the Oklahoma Chapter of Concerns of Police Survivors; is that true?

A    Yes.

Q    And you still are the state director of that organization?

A    Yes.

Q      Okay.   I also noticed, sir, that you received an honor from them in 2001 from the Concerns of Police Survivors and that was the National Distinguished Service Award, wasn't it?

A      The national organization, yes.

Q      Okay.   Then, sir, you have given numerous presentations and I notice that most of those are to police groups; is that true?

A      Yeah.   The workshops are everybody and we have been doing 9-11 workshops for the last couple of years, as well as the O.K. bomb workshops.   That's everybody from prosecutors to medical examiners to paramedics, police/fire.

Q      That involved a whole host of folks, didn't it?

A      Yes, it did.

Q      I'm going to ask you some specifics about some presentations that you have given though.   Okay?

A      Sure.

Q      I want to talk about one presentation that you gave which was to the Concerns of Police Survivors and the topic was trauma of law enforcement death.

A      Yes.

Q      You did that in Harrisburg.   Do you recall that?

A      Yes.

Q      Another one I have that you gave was to Concerns of Police Survivors entitled parents retreat and it looks

like you have done that five different years.

A     Yes, I just got back last night from another one.

Q     Then, sir, I see where you have given a presentation on parents of murdered children, national conference in Tulsa in 1999.  Did you do that, sir?

A     Yes.

Q     Okay.  Sir, I see that you have given a presentation called post-shooting trauma, Oklahoma Highway Patrol, year 2000.  Did you do that, sir?

A     Yeah, I'm sure I did, if I put it on there.  I don't remember which presentation that was.

Q     That was my next question.  Was that with the tact team?

A     I don't recall.  Is there a date on there.

Q     2000 is what you put on your c.v.

A     Yeah, yeah, post-shooting trauma.  I have had many -- many actions and classes and contacts with O.H.P.

Q     Well, I've just seen two that you have listed on your presentations.  Was that just a partial listing of your presentations?

A     Oh, absolutely, a fraction, a fraction.

Q     But you don't recall whether the one in 2000 was with this tact team that is the subject of this proceeding up here --

A     Well, I think that -- , I'm not sure which one that

was, you know, because I do -- I have done maybe 500 classes, so...

Q      That's fair enough, sir.  If you don't recall, you can just tell us that.

A      Yeah, yeah.

Q      Then we know where we stand.  Fair enough?

A      Sure.

Q      Okay.  Then, sir, I do see in 2002, Oklahoma Highway Patrol peer support, that you gave a presentation --

A      Correct.

Q      Do you recall that event?

A      (NO RESPONSE)

Q      Do you recall that event, sir?

A      Yes.

Q      All right, sir.  Now, a review of the records indicates to me that this is your third time to testify regarding this shooting incident; is that correct?

A      Yes.

Q      Okay.  And in your opinion has the scope of your testimony changed over those three opportunities that you have had to testify?

A      The scope?  No, I think I'm here for the same purpose, scope.

Q      Feel like you are being consistent with what you have said before; is that correct?

A      Yes.

Q      Sir, there are some records that we obtained from you and two of those were for previous payment of services.  Do you recall those?

A      Previous what?

Q      Payment for services.

A      Okay, yes.

Q      And in one of those the description that indicated what the purpose for you testify was, was the dynamics of critical incidents and reactions.  Do you recall that?

A      Yes.

Q      Including memory policies and processing?

A      Uh-huh.

Q      Do you recall what you charged and what you were paid for that testimony?

        MR. LITTLEFIELD:  Objection to previous testimony, what he was paid on a previous occasion.

                        (PAUSE)

        THE COURT:  Objection sustained.

BY MR. SMITH:

Q      Sir, I have a second statement that you had submitted that had a description of the services that you have provided, your second opportunity to testify. Do you recall that?

A      Uh-huh.

Q      Does it have the same description that I just read from the first one or does it vary a little bit?

A      I would have to look at it and see -

MR. LITTLEFIELD:  Objection again to the relevance of how it was described.

THE COURT:  Objection overruled.

BY MR. SMITH:

Q      Would you like to look at it, sir?

A      I would have to look at both of them to compare. You want to know if they are the same?

Q      I'm going to see see if she can display those to you on a split screen.  If they are not big enough, let me know.

A      Okay.

A      I see one.

MR. SMITH:  Your Honor, I can't see it on the screen here, but I think I can continue on, if Mr. Horn can see it.  I can see the face of the document.

THE COURT:  I can see it.

BY MR. SMITH:

Q      Mr. Horn, can you see them?

A      Yes.

Q      Can you see both of them or just the one that is labeled D-1 or do you know --

A      I can read D-1.  I can sort of make out D-2 at the

bottom.

Q      Okay.  Have you read what is referred to as D-1, the top one?

A      Yes.

Q      I'm going to have her slide up D-2 to make sure you can read all of this.  Have you had a chance to review that, sir?

A      I can't quite make all of it out, but yeah.

Q      Let me direct you to the second part of that, the second sentence.  I'm looking at it over this lady's shoulder, but it says that Mr. Horn testified as to the reactions of the Oklahoma Highway Patrol Tactical Team in the shooting of a federal officer.  That's what the description says.  Would you agree with that?

                        (PAUSE)

A      I don't see federal officer on there.  I can barely read this.

Q      It's to the shooting of a fellow officer.

A      Fellow?

Q      Fellow officer.  Would you like to see the hard copy?

A      Yes, I can see it, I can see that.

Q      You can see that?

A      Yes.

Q      Okay.  Now, back to what I was referring to, that's a little bit different than what our description was in

D-1, wasn't it?

A      Yeah.   I didn't fill one of those out?

Q      No, sir, I'm not --

A      That was filed out by them, not by me.

Q      This is a submission for the payment of services as an expert.

A      That's correct.   I filled out --

Q      Mr. Horn, this lady is going to get frustrated with both of us.   We need to try not to talk over one another. Okay?   Is that fair?

MR. LITTLEFIELD:   In that regard, Judge, then I'm going to object because he is not letting him finish his answers.   He is asking the question, he has answered the question.   If he doesn't like it, he jumps in on it.

THE COURT:   We are all speeding up here toward the end of the day.   So let's -- I'm not rushing anybody. Take your time.   Ask your question and -- and Mr. Horn, if you will wait until he gets through asking the question and then answer it.   So you can ask your next question now.

BY MR. SMITH:

Q      This is a submission for you to receive payment for services as an expert to witness as relates to this shooting incident; is that true?

A      It looks like it, yes.

Q     Do you have any reason to doubt that's what it is?

A     Well, I didn't submit them.  I didn't fill those out.

Q     Well, I got them in your -- in receipt of your materials.  They are in your materials.

A     Well, who provided them to you?

Q     The government.  Do you have any reason though to question those?

A     Those are filed out by the agency that asks me to testify.

Q     Okay.

A     They filed in the blanks.  That's not my handwriting in D-1.

Q     We can move on, sir.  I think we've cleared up any discrepancy.

      Let me ask you this:  You talk about -- in that second description there was a description about -- let me get that back out here.  You talk about the reaction of the tact team to the shooting of a fellow officer.

A     Yes.

Q     You know you didn't really get that specific in your previous testimony, did you?

A     Well, in regards to what specifically?

Q     Well, even today, specifically.  Have you told us anything that these tact team members have told you in your counseling sessions?

A     No.

Q     Okay.  In fact, you can't do that, can you?

A     That's correct.

Q     Because you have counseled members of this tactical team after this operation; is that correct?

A     I provided peer support for them.

Q     And this peer support that you are talking about is what sort of a debriefing, sir?

A     It's called a critical incident stress debriefing where we get them together, we sit down and it's not a critique of the incident, it's not about details of the incident, it's about their involvement, the impact it had on them, the hard parts, the worst parts for them, and we give them some stress management ideas and some coping ideas.  It's an attempt to allow them to emotionally -- emotionally unwind and then recover, start their healing process after their involvement in a traumatic incident.

Q     So what I'm gathering from you, sir, is the services that you provide those witnesses who are testifying in this Court is for P.T.S.D. type services, Post-Traumatic Stress type services; is that correct?

A     Well, our goal is to stop them from developing P.T.S.D.  Post-Traumatic Stress Disorder is treated by mental health professionals.

Q     What I'm getting at, sir, also is that you didn't do

anything in terms of a factual debriefing, did you?  That wasn't your job.

A     Not with them, no.

Q     That's what I'm talking about, with them.  I'm not talking about any other groups, I'm not talking about the Oklahoma City bombing.

MR. LITTLEFIELD:  Judge, I'm going to object. That's argumentative, the nature of the question.  There is not even a question there.

THE COURT:  That's been -- just so you both understand, that has been characteristic of this whole witness, both sides.

I'll overrule the objection.  You may continue.

MR. SMITH:  And I'll be mindful, Your Honor. I certainly will be.

BY MR. SMITH:

Q     Sir, the testimony that I'm talking about is with the members of the Oklahoma Highway Patrol tactical team, each squad that you visited with.  Okay?

A     Uh-huh.

Q     Fair enough?

A     Uh-huh.

Q     Now, whenever you meet with officers, like you did when you met with these officers, --

A     Uh-huh.

Q      Did you have them sign a confidentiality agreement?

A      No, I didn't.

Q      Okay.  Did anybody --

A      The mental health professionals may have.

Q      You had another lady with you, right?

A      A mental health professional.

Q      Identify her for us so we know who we are talking about.

Q      Dr. --

THE COURT:  Mr. Smith, we need to take a recess.

MR. SMITH:  Okay.

THE COURT:  Remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you.  We will be in recess for about ten minutes.

(JURY OUT)

THE COURT:  Let me see counsel.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

THE COURT:  In case we are failing to communicate, this older gentleman on the front keeps waving his hand needing to go to the restroom.  That's what is going on.  I didn't mean to interrupt you.

MR. SMITH:  That's fine.

THE COURT:  We just have no choice.

(SHORT RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect that the jury is in the box, counsel for the defendant is present, the government is present with counsel.

You may continue with this witness.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION CONT'D

BY MR. SMITH:

Q    Mr. Horn, just prior to the break, we were discussing confidentiality.  Do you recall that?

A    Yes, sir.

Q    And whenever you visit with officers -- let's talk about these officers.  When you visited with these officers in that debriefing session, when was it?

A    I couldn't give you a date.

MR. LITTLEFIELD:  Your Honor, I'm -- it's beyond the scope because I never asked anything about the specifics of this case.  I asked him about his area of expertise and areas in regards to his expertise, hypotheticals in that regard, in regards to a broad range of officers.  If Mr. Smith wants to ask about these, I don't have an objection to his going beyond the scope, but the form of the question certainly should change in

regards to leading.

THE COURT:  In regards to what?

MR. LITTLEFIELD:  In regards to leading.  If he wants to adopt him as a witness and go beyond the scope, I'm not going to object to that, but I would object to the form of the question, if he continues in that way.

THE COURT:  I think I understand your objection. Rephrase the question and don't answer the question until counsel has had an opportunity to object.

BY MR. SMITH:

Q    Sir, when did you visit with the members of the Oklahoma Highway Patrol Tactical Team east squad as it relates to this shooting incident?

THE COURT:  You may answer.

A    I couldn't give you a date for that.  I know it was -- I believe it was actually the second debriefing that was actually conducted and I wasn't there for the first one.  That's my recollection.

Q    Do you recall in terms of months or years how long it would have been after the incident?

A    Probably -- I don't know, maybe a month or two, a long time ago.

Q    And it is common, sir, is it not, whenever you are doing these debriefing sessions that one of the first things that an officer is given is a confidentiality

agreement?

A      Yes.

Q      And the reason for that confidentiality agreement, sir, is because that officer -- you want him to be very forthcoming in the debriefing, don't you?

A      Yes.

Q      And one of the ways that you can assure that an officer is being forthcoming during that debriefing is to tell them this will not be revealed in a courtroom or to anybody else, correct?

A      That's right.

Q      The relationship that you have with that individual, therapist/client, doctor/patient, it's the same type of thing?

A      I'm going to amend that answer because confidentiality doesn't extend to the courtroom, privilege does.  So confidentiality is a promise that you are not going to reveal it.  In a court type situation, if you are put in a situation where you have to reveal that, you have to reveal that.  Confidentiality is a policy, you know, it's an internal policy, it's an agreement within that group.  It's very different from privilege.

Q      And you had such an agreement?

A      Confidentiality.

Q      You didn't tell any of the members of that tactical

team I'm going to conduct your debriefing, but then I'm going to go to court and testify about what it is that you told me?

A      Of course not.

Q      Okay.  And, in fact, as the professional that is involved in your role as an expert witness talking about stress and the effect trauma has on individuals, you run the risk of creating a conflict for yourself, don't you?

A      If I talk about what they said in that debriefing, yes.

Q      Well, that is my point.  You are not going to tell us anything that those officers revealed to you, any specifics of what they told you about this incident?

A      No.

Q      Okay.  So what you are telling us is what we have heard in generalities.  Based on the research that you have done, this is what I expect to find with individuals who are suffering from a traumatic event.

A      Yes.

Q      Okay.  Now, your role here today is as an expert witness, correct?

A      Yes.

Q      How much have you been paid to-date as it relates to testimony involving this incident?

A      From this court?

Q        Everything, as it relates to this incident.

A        I would have to look at the bills to tell you.
Probably both of those were around -- I don't know 2700,
3 -- I think the one you showed was $3100.00 for one of
them.

Q        And the other one was 3800?  Does that sound
familiar?

A        It could be.  I would have to look at it.

Q        Do you want to look at it?

A        I wouldn't dispute that.

Q        Okay.  And were you paid for the debriefing sessions
that you had with those officers?

A        No.

Q        Okay.  Some of that or I guess all of it was done
voluntarily?

A        Yes.

Q        Without compensation?

A        Correct.

Q        Do you expect to be paid for your compensation --
excuse me.  Strike that.  Do you expect to be paid for the
time that you are giving us here in front of this jury
today and possiblly tomorrow and the time that you were
here last week?

A        For my services, yeah, for this trial, yes.

Q        There's nothing inappropriate about that?

A      Right.

Q      How much do you charge, sir?

A      $125.00 an hour.

Q      Okay.   And how much time do you think you have got to-date on this latest involvement?

A      Probably 30 hours.

Q      Okay.   Sir, are you familiar with the research on the effects of trauma suffered as a result of combat, which is going to be in the military or law enforcement shootings?

A      Some, yes.   There is a great deal of it.

Q      There is a lot of research on the subject, isn't there?

A      Yes.

Q      Okay.   And, sir, although I realize there are exceptions to virtually every rule, in general have you found the research to be consistent in what is remembered, forgotten, and recovered from a traumatic event?

A      Fairly, but my focus really isn't on the research because my focus is on response, so I leave the research to the psychologists, to the psychiatrists and let them do their job and I do my job, which is quite different than focusing on what the research says.   I work with the individuals in each individual case.

Q      Okay.   Now, who is R.M. Soloman?

A       Roger M. Soloman, psychologist.

Q       And you have conducted research with Dr. Soloman?

A       I have worked with Roger a lot and we have taught together and we did start some research together that he has published.

Q       Did a pilot study even?

A       Yes.

Q       Did a pilot study, did research on the very subject that I just asked you about a second ago, right?

A       Right.

Q       So you do do that, you do do research?

A       Limited, very limited.  I do some.  I collect data. I collected data for Dr. John Campbell for his dissertation, yeah.

Q       So although there may be a certain area that you are more interested in or tend to focus in, you also do the research side of it too?

A       I have done some, yes.  I haven't been involved in research for some time now, but I have in the past.

Q       Okay.  Do you believe, sir, that educating law enforcement officers about the impact that trauma has on a memory...do you believe that that is important?

A       Yes, I do.

Q       In fact, that's what the research says, doesn't it?

A       Yes, it does.

Q    Do you also believe, sir, that the jurors in this case -- they are relying upon individuals' memories of traumatic events and that they need to understand the impact that trauma has on a memory?

A    Yes.

Q    It would be very helpful for them, would it not?

A    Yes, in trying to piece the puzzle together.

Q    Are you familiar with Dave Grossman and Bruce -- is it Siddle or Siddel?

A    Grossman, I am, you know.

Q    Are you --

A    Is it S-E-I --

Q    S-I-D-D-E-L.

Q    I have seen the name, that's about it.

Q    All right.  Are you familiar with Grossman's article about critical incident amnesia?

A    No.

Q    You haven't ever seen that?

A    I don't think so.  I don't recall it.

Q    That's one of the things I was wanting to show you the other day, so we'll just kind of muddle through this.

        MR. LITTLEFIELD:  I'll object to the commentary.

        THE COURT:  Sustain.

BY MR. SMITH:

Q    Sir, I would like to ask you a statement from

Dr. Grossman and then ask if you agree with that.  Can I do that?

A      Sure.

Q      Okay.  If you would like to see it while I'm doing this, I can display it to you or I can read it to you. If you want to see it, just tell me.  Is that fair?

A      Yeah, I would.

Q      Okay.

A      I would like to see it.

Q      Okay.

        MR. SMITH:  Go ahead and display it.

BY MR. SMITH:

Q      Is that big enough for you to read, sir?

A      It was, now it's a little small.

Q      Okay.  How is that, sir?

A      Good.

Q      Okay.  What I have marked as number 5 on that article, would you read that to the ladies and gentlemen of the jury, please?

        MR. LITTLEFIELD:  I'm going to object.

        THE COURT:  What's the objection?

        MR. LITTLEFIELD:  It's not in evidence, it is just -- he just asked him to read some statement that has no basis or background.  It's hearsay.

        THE COURT:  Argument, Counsel.

MR. SMITH:  Your Honor, it's -- this gentleman has introduced statements -- excerpts from a video that is produced by the FBI.  This is material that is researched in the area.  He knows Dr. Grossman and I think it's within his area of expertise and I would like for him to comment on what Dr. Grossman is writing about.

THE COURT:  Any reason you do not want to introduce it into evidence?

MR. SMITH:  No, sir, that's fine.

THE COURT:  Do you want to offer it?

MR. SMITH:  I'll offer it, Your Honor.

MR. LITTLEFIELD:  Objection, hearsay, Your Honor.

MR. SMITH:  It's treatise material, Your Honor.

THE COURT:  Well, it hasn't been identified as that by this witness yet.  I don't recall -- I can't see the top of it.  You mentioned two -- you may, with this witness, attempt to establish a foundation, if you choose to, to see if it is admissible.

MR. SMITH:  Yes, sir, Your Honor.

BY MR. SMITH:

Q     Sir, do you know who Dave Grossman is?

A     I'm aware of the name, yes.

Q     Does he do research in the area that trauma has upon memory?

A     It looks like it.  Perhaps he does some from this

article.

Q    You have never read any of his material before?

A    Not that I recall, no.

Q    Where is he from?

A    I don't know.

Q    You don't know if he teaches anywhere?

A    No.

Q    You don't know anything about him?

A    No.

MR. SMITH:  Well, Your Honor, perhaps I should do this without offering it.  Maybe I'll just ask the witness to read it to himself and I'll ask him some questions about it.

(PAUSE)

THE COURT:  Any objection?

MR. LITTLEFIELD:  I don't have any objection to him allowing him to read it.  I'm not going to -- just to ask him a question, but I'm not going to ask him -- I do have an objection to him saying do you agree with this part or this part or this part.

THE COURT:  Okay.  Well, I'll -- you may read it and then you may ask a question.

(PAUSE)

BY MR. SMITH:

Q    Can you see all of what is bracketed with number 5,

sir?

A      Yes.

Q      Okay.  Tell me when you are finished reading that.

(PAUSE)

A      I'm finished with 5, yes.

Q      Okay, sir.  Let me first ask you, sir, does this involve an area within which you are familiar, the subject of --

A      As far as memory and trauma?

Q      The subject of Dr. Grossman's article.

A      Well, I have a lot of experience in talking to people and listening to their memories of these critical incidents, yes.

Q      Okay.  So would I be safe to say that you tend to agree with what has been bracketed by number 5 there?

A      Can you put it back up?

Q      Yes, sir.

MR. LITTLEFIELD:  Judge, I'm going to object to his asking if he agrees or disagrees with a bracketed portion.  I think he needs to ask him his position in regards to a particular issue.

THE COURT:  Let me see you both at the bench.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

THE COURT:  Let me just tell you, first, I don't

have a clue why the government called this witness.  I mean, I don't know what his expertise is.  I mean, I don't think a foundation has been laid.  We didn't really -- he didn't -- it could be a Daubert issue about -- I don't think you can cross examine him about that article unless he is willing to say it's a learned treatises that he is familiar with and then you can introduce the document.  If he doesn't know anything about it, then you can't ask him questions about it.  It doesn't sound like anything that would be relevant to anything here, but I want to let you know what I think at this point before we go much further with it.

MR. SMITH:  I -- and just to be fair to the government, Judge, I think I can get there the same way by asking specific questions.  I was just going to give him an opportunity to look at it and read it.

THE COURT:  I've been listening to him and I don't know -- I don't think he fits within that instruction about experts.  They can take it for whatever value they want, but I don't know what he is -- I don't know what his expertise is.  So...I'm not real excited about it either way, but I don't know what there is to cross examine him about that article.

MR. SMITH:  I understand.

THE COURT:  Okay.

(END OF BENCH CONFERENCE)

THE COURT:  You may proceed.

MR. SMITH:  Thank you, Your Honor.

BY MR. SMITH:

Q    Sir, can you tell me what critical incident amnesia refers to?

A    In in this article?

Q    Just in general.

A    Well, the inability to remember details after a critical incident.

Q    And, again, the critical incident can be something such as a shooting, correct?

A    Yes.

Q    And would you agree that a failure to understand that phenomenon by people such as instructors or investigators can have problems, can create problems?

A    Yeah, and that was our point in this -- in the video.

Q    Something that we all need to be very aware of, isn't it?

A    Yes.

Q    We all being very aware of as those that are seeking to get statements or conduct an investigation after an incident.  Would you agree with that?

A    Yes, yes.

Q      Okay.  How do you think that you can guard against -- other than what you have told us in that article, how do you guard against this critical amnesia as it relates to the investigation debriefing?

A      Well, one thing you do is you give them a break before you try to interview them.  That's where the problem comes from.  When you are trying to force information before they have regained their composure, then you are asking for problems there.

Q      Okay.  And I want to talk to you in a little bit about protocol.  Okay?  Do you know what I mean when I say that?  When --

A      Critical incident protocal?

Q      Yes, sir.

A      Yes.

Q      But what I'm gathering from you've just told us is that whenever an individual suffers some sort of a traumatic event, such as an officer involved in a shooting, that the first thing we need to do is remove him from that incident, correct?

A      That's S.O.P. pretty much right there, yes.

Q      The first thing, let's do that, correct?

A      Sure.

Q      And then we want to check out his welfare, correct?

A      Yes.

Q    Make sure he is not injured?

A    Right.

Q    And then let's give him time to come down from this adrenaline rush, high, what have you, that they are suffering, correct?

A    Yes.

Q    Why don't you describe for the ladies and gentlemen of the jury, if you don't mind, what effects adrenaline have on individuals involved in a fight or flight situation?

A    Well, it's a hormone which is created by the adrenal glands and it makes us quicker, faster, stronger.  It's literally from the days of the caveman where we had to engage saber-toothed tigers.  So you can get super human strength and be quicker and faster and increase your chances of survival and we are still stuck in those same bodies.  The tigers are gone, but the adrenaline isn't.

Q    Sir, a police officer isn't the only one that creates that adrenaline type situation when he is involved in one of those situations, is he?

A    No, it's a human response.

Q    Just a layman is subject to that same phenomenon, isn't he?

A    Yes.

Q       So what we want to do is allow him to come down off of that high or that peak so they can calm down, quit shaking, so to speak, and have their faculties about them, so to speak, correct?

A       Yes.

Q       Now, you have testified about the effects of a traumatic stressful event upon perceptions of persons --

A       Uh-huh.

Q       -- that happen to be involved in incidents and upon their ability to recall certain details, right?

A       Okay.

Q       I mean, that's what you have testified to earlier, that's just a little different way of stating it; do you agree?

A       Yes.

Q       And you train law enforcement agencies about that very thing, don't you?

A       Yes.

Q       You have done numerous trainings with them?

A       Many.

Q       Okay.  Is there a specific or a particular amount of time that you recommend before you conduct a factual briefing of an individual that is involved in a critical incident?

A       It all depends on their condition and whether or

not they have regained their composure.  It's a case-by-case basis, individual basis.  It should be.

Q    So if I understand what you are telling us, sir, based on what you recommend and what you train and what you teach, that a law enforcement officer could tell their story about what happens when they feel rested?

A    Recomposed, not necessarily rested.

Q    Well, that is a subject of it though, that is one of the things we like to see them get is some rest, isn't it?

A    Yeah.

Q    24 hours after the event?

A    Unfortunately after these incidents a lot of people can't sleep for two or even three days, so sometimes it's very hard to get rested.  Sometimes that adrenaline does not slow down for several days.

Q    Sometimes it take awhile?

A    Yeah.

Q    But in any event, we want them to be less emotional when they are being conducted into that factual debriefing; is that right?

A    That's the way most interviewers are most comfortable.  For me, it doesn't make any difference if they are emotional or not, but, yes, for most people they do want them to have come down from some of the emotions.

Q    Well, if the emotions are so strong that they have

a hard time relating to you, then obviously you are not going to get anything out of them; is that right?

A      Their emotions are so strong they have a hard time relating to me.

Q      If they are so strong, if they are so upset, so visably upset about that traumatic incident, it's not going to do you any good to try to debrief them factually, is it?

A      Usually not.

Q      And that's when you put your arm around them and say, gosh, this is a horrible deal, right?

A      Yes, right.

Q      And that could be clergy, it could be a professional like you or it could be their fellow officer, right?

A      You bet.

Q      Now, when you said that it could -- coming off of this adrenaline rush, letting them calm down, that that could be a few hours or a few days, correct?

A      Yes.

Q      Whenever it lasts a couple of days, doesn't that make it pretty difficult to conduct a factual debriefing?

A      Yes, it compounds the problem.

Q      Yes, sir.  Now, are citizens generally allowed that kind of discretion as to when they are going to answer questions about a critical incident, a shooting incident?

MR. LITTLEFIELD:  Objection to relevance.

THE COURT:  What's the objection?

MR. LITTLEFIELD:  To relevance.

THE COURT:  Overruled.  You may answer.

BY THE WITNESS:

A      Well, my focus hasn't been on citizens, but this -- you know, I think it's reasonable to allow them the same opportunity to come down.  It makes sense.  I'm more focused on emergency service personnel.

Q      Sir, you have been a police officer for how many years of your career?

A      I was an FBI agent for a little over 25 years.

Q      You have conducted several investigations?

A      Right.

Q      Several factual debriefings?

A      Right.

Q      And those included civilians as well as law enforcement --

A      Are you talking about psychological debriefings?

Q      No, no, factual, factual debriefings.

A      That's a conflict of terms for me because to me a debriefing in my work in traumatic stress is a critical incident stress debriefing and that's where we are not so much interested in critiquing and facts, but in helping them resolve their emotional response to these

incidents.

Q    When you are dealing with an individual, a civilian who has been involved in a shooting incident, are they allowed the luxury of a couple of hours or a couple of days before they have to submit to questioning by law enforcement?

A    Well, like I said, I don't deal with civilians.

Q    Okay.  Let me try it another way, sir, if I may. I go home tonight and find my neighbor, who I'm particularly close to, murdered.  I call the police and they show up.  Do you think they are going to allow me to go kick back and maybe have a cocktail before I talk to them about what I've seen?

A    I don't know.

Q    Or do you think they want to get right to the heart of the matter?

A    You know, that's -- probably, I suppose.  I can't speak for the police, how they are going to handle the situation though.

Q    Probable or very likely?

A    I have been in the business long enough to see everything from one extreme to the other.  So it's pretty hard to speculate what somebody is going to do in any one situation.

Q    Are you aware of any incident where there has been

a critical incident shooting and where a civilain may have witnessed something and where they said, I tell you what, when you feel like talking to us down the road, you just come look me up?  It doesn't happen, does it?

A      The investigators?

Q      Yeah.

A      Oh, I have seen -- particularly like in tellers, bank robberies, where they were traumatized and they were definitely given time to unwind, to relax, to recompose before they were interviewed, yes.

Q      Have they -- I'm sorry, I didn't mean to step on you.

A      That's all right.

Q      Were you finish?

A      Yeah.

Q      Days?

A      No, no, I don't think so.  I think, you know, you would be hoping to get the necessary information.  In a case like that you are looking for a description, important information that can help solve a case.  So you are hoping to get some information, but probably not a detailed interview until they have recovered emotionally.

Q      And we are going to get into protocol and that's going to tell us why we do things the way we do them in a factual debriefing.  But the point is, you want to talk to them as soon as they are able to talk to you about a

description, about certain basic facts, let's get this investigation under way, right?

A     Description, yeah.

Q     All right, sir.  Now, in order to help the jury insure that they understand some of the basics of memory, both keeping it and losing it, when trauma occurs, will you help me try to educate them about that?

A     Be glad to.

Q     Okay, sir.  Can you tell me what contamination of memory means?

A     Contamination of memory?  Contamination of memory could -- could -- well, I guess we are somewhat in a hypothetical here, but contamination of memory could occur because of confusion from interference of contradictory facts or appearances of some situation that occurred, you know, something people didn't understand, I suppose, would be one example.

Q     Let me give you another example and see if you would agree with it as being contamination of memory.  Okay?

A     Okay.

Q     Let's say we have a group of individuals who are involved in a critical incident.

A     Uh-huh.

Q     And they all get together and talk about it before they are individually interviewed.

A      Uh-huh.

Q      Would that be something that falls along the line of contamination of memory?

A      It could be, but in a debriefing -- in the debriefing, we find when we do that it helps fill in the pieces of the puzzle for a more complete picture.

Q      And, again, we are talking about protocol, but when they talk about contamination of memory as it relates to protocol, what are the experts concerned about?  Are they not, sir, concerned about the fact that the memory of that individual may not be his memory, that it may be the groups' memory because it has been contaminated because they all got a chance to talk about it as a group before they gave an individual statement?

A      It could be.

Q      That is what we are talking about when we are talking about contamination of memory, isn't it?

A      If you say so.

Q      I'm not the expert.  Do you say so?

A      Well, I think it's possible, yes.

Q      All right, all right, sir.  Now, tell me, contamination of memory, how does it occur in traumatic memories?

A      You mean like in the example that you just gave?

Q      Yes, sir.

A        Well, that would be an example.

Q        Any other examples?

A        (NO RESPONSE)

Q        Let me help you out here.

A        You are kind of asking me to make up stuff here. I'm not sure where are you are going with it.

Q        No, sir, I'm not asking you to make up anything. I'm asking for some examples based on your experience in the field.  That's what I'm asking for.

A        Well, I haven't seen much contamination of memory in my experience in this field in the last 30 plus years.

Q        Okay.  Would an individual looking at somebody else's statement that they may have written out prior to them giving a statement, would that be a contamination of memory?

A        Only if it changed their recall and their memory.

Q        Sure.

A        Then it would be, wouldn't it?

A        If it changed their recall and their memory, yes, it would probably be that.

Q        Okay.  And what we are getting at and what you started talking about just a moment ago is that there are some writers in this field of the critical incident stress debriefing -- which is the field I'm talking about -- that believe that group meetings --

MR. LITTLEFIELD: I'm going to object to that because that's hearsay now, Judge.

THE COURT: Sustained.

BY MR. SMITH:

Q    I'm going to see if you will agree with this, sir, with what I'm going to tell you -- with what I'm going to represent is what I have seen as research in the field. If you don't agree with it, just tell us.

MR. LITTLEFIELD: That's an inappropriate way to go about asking the question.

THE COURT: Sustained.

BY MR. SMITH:

Q    Group meetings in the context of critical incident stress debriefing are helpful to kind of get to the bottom line of what happen, aren't they?

A    No, that's not the purpose of critical incident stress debriefing.

Q    I didn't ask what the purpose was. I asked --

A    Well, if you conduct it properly, then the answer is no.

Q    Okay. So you don't think that they are helpful, group meetings, that they are helpful for individuals involved in a critical stress --

A    Critical incident stress debriefings? Is what you are talking about?

Q     Yes, yes, sir.

A     Yeah, I think it can help fill in some pieces of the puzzle, but primarily, once again, you are focused on helping them deal with their emotional responses.  It's not a critique of an incident and that's a separate distinct entity.

Q     I don't think I said anything about a critique of the incident.  What I'm asking is, is a group debriefing as it relates to critical incident stress debriefing, a group meeting, is that helpful?

A     I think it's very helpful.

Q     Okay.  And that's what you did in Stillwater with these tact team members, correct?

A     What we did in Stillwater was critical incident workshops, yes.

Q     Is that different than critical stress debriefing?

A     Well, it's an expanded version of it because it takes place over a two or four day period.

Q     Is that different from critical stress debriefing?

A     Yes.

Q     Because it's more detailed?

A     It's prolonged over days instead of a couple of hours.

Q     And this was done in a group setting?

A     Yeah, for the Oklahoma City bombing.

Q     And the -- I'm talking about the tact team, I'm talking about the -- I'm not talking about the bombing. I'm talking about these officers that came to Stillwater.

A     Right.

Q     Do we need to go back to what we just talked about --

A     The debriefing that I particated in was out east here somewhere.  I don't even recall specifically where we set that thing up.  Now -- but that was the -- as I recall, that was the second debriefing and I wasn't available for the first one.  I came to the second one and that was out in eastern Oklahoma.  We came to them, as I recall.

Q     Wherever it was, sir, it was a group meeting for a critical incident stress debriefing, was it not?

A     Yes.

Q     And any time you have one of those, because everybody is in a group talking about what happened, you run the risk of contaminating the individuals' memories about the specific events, don't you?

A     If you go into a critique of specific details, but that is not the design of a critical incident stress debriefing.

Q     I didn't ask about the design.  What I said was, you run the risk of contaminating their memories because you are in a group session for what you have told us may

be as long as three or four days.  I'm talking about what happened.

A      And in the workshop versus the debriefing, yeah, but, once again, if you do a debriefing properly, your minimizing any risk of contamination.

Q      If you follow the protocol, correct?  And we are going to talk about that in a little bit.

A      Sure.

Q      Can you tell me what the term confabulation means?

A      Yeah, it means to make it up.

Q      Are you familiar with Dr. Michael Rivard?

A      R-I...

Q      -- V-A-R-D.

A      No.

Q      Dr. Park Deats?

A      Yes.

Q      Dr. Park Deats is --

A      -- a forensic psychiatrist.  He was the government's principal psychiatric witness in the Hinkley case, the attempted assassination of Reagan, with a law degree from Virginia.  He is a brilliant psychiatrist and lawyer and one of my mentors.

Q      So you wouldn't have any problem with us discussing some of his work, would you?

A      Well, he is -- he is way over my head.  He is an

expert psychiatrist and lawyer and I'm neither one of those.

Q      Okay.  He is a known authority in the field?

A      Yes.

Q      And somebody who you would feel comfortable reading his work and commenting on what he is trying to tell us?  Could you help explain what it is he says in his paper, you think?

A      Maybe, if it's not over my head.  I'm not a psychiatrist and some of the psychiatrists I have dealt with can't talk in language that laymen can understand.

Q      I have seen that in what I have read in this, sir.

A      Right.

Q      And that's why I'm asking, with you being an expert in the field, do you think you would feel qualified to help explain some of those difficult concepts that he may have in his article?

A      Again, my expertise is in emergency response, not in psychiatry.

Q      Let me read a topic of his article and see if you may feel qualified to comment.

A      Okay.

Q      It is called, "Acute Disassociation of Responses in Law Enforcement Officers Involved in Critical Shooting Incidents, the Clinical and Forensic Implications."  Is

that within your area of expertise?

A     No, I'm not an expert -- that's psychopathology. I'm not a psychologist or a psychiatrist.

Q     I understand that, sir.  You are a master's level educated expert in this field, correct?

A     In emergency response, yes, emergency crises response.

Q     Do you subscribe to Forensic Science --

A     Magazine?

Q     Forensic Science Magazine.

A     No.

Q     Okay.  Let me ask you, what is acute traumatic disassociation?

A     I can't give you the SM-4 definition of that.  I just know that the association is when a person is pretty much outside of themselves in an incident and feels like it is totally unreal, as if they are separated from their body and acute is -- means that it's brief or instant, you know, short term usually as opposed to chronic.

Q     When we are talking about acute traumatic disassociation, do you have an opinion as to whether or not that could affect an individual officer's ability to give a full detailed account of the critical incident?

A     Yeah, I think Dr. Sauskey would say that's part of what he is talking about here, when he describes how the memories are inconsistent and they change.  They can

even change from interview to interview.

Q      Okay.  So what is disassociation and how does it affect an officer's appraisal of a traumatic event?

A      Well, again, I think -- I think we are getting into the field of psychology here and I'm not a psychologist.

Q      You can't tell me how disassociation can affect an officer's appraisal of a traumatic event?

A      Actually, I wouldn't want to answer that question because I would want a psychologist to answer that question. That's not my field.

Q      Sir, at some point we are going to break for the night, but did you realize in this article that I had on Park Deats that in reference number 38 your work with Mr. Soloman is indicated in this paper?

A      It's indicated in a lot of articles.

MR. LITTLEFIELD:  I'm going to object to Mr. Smith testifying as to what is in the article.  It is not in evidence.

MR. SMITH:  I asked if he was -- if he realized that that was a footnote part of this article, Your Honor.

THE COURT:  Objection overruled.

BY MR. SMITH:

Q      Did you realize --

A      I haven't seen the article.

Q      Okay.  I'll send that home with you because I want

to ask you some questions about it, depending on when we break; is that fair?

A     Sure.

Q     Okay.  Now, there has been several studies on acute traumatic disassociation.  Would you agree with that? Have you seen them?

A     No.

Q     You have not seen them?

A     No.

Q     All right.  Are you familiar with any of them?  Are you familiar with what they are saying, what they are telling us?

A     Not with that, not pulling it out of the air, I'm not.

Q     Okay.  Let me ask you about -- has it been your experience that officers have perceptional disturbances when relating these critical incidents?

A     You mean perceptional distortions?  Yes.

Q     In fact, that can be a majority of them, correct? It can be an awful lot of them?

A     Yeah, I think in quite a few cases -- I don't -- I don't know -- maybe a majority, maybe not.  I think the training is maybe reducing a little bit of that, but it's pretty common, it's very common.

Q     It's not near as common though for officers to

report memory loss for part of the incident though, is it?

A    It's less common.

Q    Would you agree with me, sir, that clear memory for an event becomes -- your ability to relate clear memory for an event, you have more difficulty with that with the more time that passes?

A    Say that again.

Q    Your ability to recall details of an event, of a critical incident, your ability to do that really diminishes the more time that goes by, doesn't it?

A    Probably in most cases.

Q    I mean, that's really not a psychological phenomenon?

A    Right.

Q    We all know six years after the event, I'm going to have a hard time remembering something as opposed to thirty minutes ago.

A    Yes.

Q    You would agree with that, wouldn't you?

A    Yeah.

Q    Okay.  Do you know Daniel Shack?

A    Shack?  No.

Q    Okay.  Tell us about your experience in dealing with people in combat and talking about flashbacks that some of these individuals have.  Have you ever done any work in that area?

A       I have been in -- in the Vietnam Veterans Outreach Program where we had group discussions about our experiences in Vietnam and that some of the people in there had pretty severe Post-Traumatic Stress Disorder.

Q       And they told you about some of their experiences, particularly about the nature of this flashback that they might be having?

A       Yes.

Q       And you have found, as you conducted those debriefings, that sometimes what they are telling you has both real and unreal elements in it?

A       Yeah.  I think the -- when you are trying to especially put something together from 35 years ago -- it's like one of our guys right now is writing a book, a two year book, he was part of the 2nd Batallion Marines Company, and he has found that everybody that sends in their recall of an incident, a specific day 35 years later, that not one of the stories is the same even though they might have been in the same fox hole together.

Q       Is it limited to 35 years?

A       Well, no.

Q       It's not, is it?

A       No.

Q       And what can happen is -- would you agree with me that some of these -- and what I'm talking about as a

veteran is that sometimes flashbacks and remembering things that may have happened or may not have happened may relate to their worst fears that they hold, that they have?

A     It could.

Q     Okay.  Have you found something different?

A     No.  I said it could.

Q     Okay.  Now, I talked about these models for protocol awhile ago for critical incident stress debriefings.

A     Yes.

Q     And you described somewhat of a protocol and this education that you give instructors, correct?

A     Yes.

Q     Whose model is yours based on?

A     I wrote a model in 1981 for the Denver division based upon a three day class I attended in Dallas put on by Smith & Wesson called post-shooting trauma and a psychologist ran that.  There were 13 of us in there and we wrote -- we wrote, you know, -- in fact, I was ordered by the boss to write a policy for the Denver division as a condition for going to that class.  So I based it on the information I gleemed out of that three day seminar.

Q     Okay.  Part of what we like to do when we talk about this group session in a critical incident stress debriefing is to kind of get everybody's recollection of what

occurred; is that true?

A     Trying to get individual accounts in the first person of where they were, you know, what happened, how it effected them, what kind of reactions they are having, yes.

Q     Okay.  And some individuals that are hearing this, who are being told by somebody else -- through somebody else's perception could take it wrong.  Do you agree with that?

A     I haven't seen that.  I have seen it be very enlightening for people.

Q     You haven't ever seen --

A     Taking it wrong?  You mean, offensive or --

Q     Well, I mean, just because it's being told through somebody else's perspective and that if they then adopt that as the truth, it doesn't necessarily mean it's the truth, does it?  In other words, our perception can differ.

A     Those are our explicit instructions in these debriefings, that each person is allowed to remember their incident from their viewpoint, from their experiences, exactly as best as they remember it and that no one will judge or criticize anybody else for how they react or what they think or what they felt or what they believed.

Q     Even if some of those other members of that group

believe they may have reached the wrong conclusion?

A    Hypothetically you are saying, if --

Q    Sure.

A    If you think somebody else reached the wrong conclusion?  You are nonjudgmental, yeah, rule number one.  Yeah, let them -- let them have their own experience.

Q    We talked a little bit about Mr. Grossman.  Are you familiar with his protocol?

A    No.

Q    Okay.  Let me ask your opinion on some people that may be involved in traumatic situations.  You told us, I think -- I think this paraphrases it a little bit.  The greater the stress the greater potential there will be for memory problems to occurr?

A    The greater the trauma, yes.

Q    You agree with that, don't you?

A    Yes.

Q    And that officers who may be involved in one of these situations, critical incident stress, may have difficulty transferring that information into long-term memory?

A    They could.

Q    I mean, that's the memory loss, right?

A    That's -- yeah, that's possible.  Again, like I say,

we see -- we see every scenario, every possibility. Everybody is different.

Q    And we talked a little bit about fixation, which is a term I'm going to put on it.  I think what you -- you were talking about the gunshots going off beside the head.

A    Uh-huh, I talked about focus.

Q    Yeah.

A    Yeah.

Q    And that fixation, focus --

A    I'm talking --

Q    Are you -- you and I --

A    That's extreme concentration, you know, extreme concentration where you can concentrate so much that you see nothing else around you, hear nothing else around you. And on the other hand, the bizarre thing is depth perception can be all disorted.  You might fire your weapon and it fires like a cannon, you might fire your weapon and it's silent, even if you see the flash coming out of the barrell.  Perception distortion is one of the most bizarre things that I know of.

Q    So when I talk about fixation, are you and I talking about the same thing, what you just related to the jury?

A    To focus on something, being affixed on it, yes.

Q    And often times when you have this post-incident amnesia, it can result in a failure to remember the

majority of the information that happened during the event. Would you agree with that?

A    I don't know that I have ever seen the majority of the information, unless they were completely -- unless they were completely disabled psychologically by the incident, but certainly there are holes, there are things they can remember commonly.

Q    Have you found it to be the case that after an individual has had an opportunity to go back to his environment that he is familiar with, his family, his home, and has had a chance to get a good night's sleep and unwind, that that next day is really an excellent opportunity to gain from them what they recall about that critical incident?

A    It certainly can be in a lot of cases.

Q    Is that --

THE COURT:  Let's stop there for the evening. Members of the jury, remember my admonition not to discuss this case with anyone, avoid any news reports.  Keep your minds free and open until you return in the morning. I'll ask now that everyone remain seated as the jury leaves for the evening recess.  We will start again in the morning at nine.

(JURY OUT)

THE COURT:  The witness may step down.

THE WTINESS:  Thank you, sir.

Let the record reflect that the jury has departed the courtroom.  The witness has stepped down.  I'm not -- I think I said it at the bench to both parties, I'm not sure what the government intended to accomplish with this witness and I'm not sure what the cross examination is attempting to accomplish, but I think we have lost this jury on this witness.  So I just -- I would ask you to keep that in mind.  I don't know what usefulness can be recaptured by either one of you, but I don't know that I -- from the bench's perspective, I don't know how much more there is to gain with this witness.

(PAUSE)

THE COURT:  To be a little more specific, I'm not -- as I look at Rule 702, I'm not even sure he has given an opinion.  His testimony -- I think the government in this case perhaps appropriately avoided him not basing his testimony on facts or data in this case.  He hasn't talked about any principles or methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts in this case because he really hasn't talked about the facts in this case.  I mean, I think he has attempted to avoid talking about the facts in this case.  I'm going to look at 702 and refresh my memory about experts, but I'm just

concerned.  I thought with the foundation that the government laid with the witness, his experience, I was -- his experience I think puts him in the category of people that could be an expert.  He has got the education, he has got the experience, and he has got education -- he is not a psychiatrist.  He calls himself a forensic person.  His field of expertise may be so narrow I just don't understand it, but so far I'm concerned about what his testimony has done that has improved the jury's ability to understand this case.

So with that admonition, I'll see you in the morning. We will start at nine o'clock.

(RECESSED UNTIL OCTOBER 4, 2006)

Page 920

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

FILED

MAY - 1 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By:_____
Deputy Clerk

UNITED STATES OF AMERICA,      )
          Plaintiff,           )
                               )
                               )
VS.                            )          NO. CR-04-115-P
                               )
KENNETH EUGENE BARRETT,        )
          Defendant.           )

\*      \*      \*

JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE, and a jury

OCTOBER 4, 2005

VOLUME V OF XXVII

K.M.

\*      \*      \*

A P P E A R A N C E S:

FOR THE PLAINTIFF:       MR. SHELDON J. SPERLING
                         United States Attorney
                         MR. D. MICHAEL LITTLEFIELD
                         Assistant United States Attorney
                         1200 West Okmulgee Street
                         Muskogee, Oklahoma 74401

FOR THE DEFENDANT:       MR. ROGER HILFIGER
                         Attorney at Law
                         620 West Broadway
                         Muskogee, Oklahoma 74401

                         MR. BRET A. SMITH
                         Attorney at Law
                         315 North 5th Street
                         Muskogee, Oklahoma 74401

COURT REPORTER:          KARLA S. McWHORTER
                         UNITED STATES COURT REPORTER
                         P. O. Box 2251
                         Muskogee, Oklahoma 74402

COURT IN SESSION

(JURY OUT)

THE COURT:  Let the record reflect that counsel for the government is present, the defendant is present with counsel.  Before we bring the jury in, I wanted to discuss Mr. Horn and see what the intentions of the parties are.  After listening to his -- what I think is most of his testimony, there is -- there is -- not having had an opportunity to visit this in as much depth as I would like, but generally a judge is in the role of a gate keeper in regard to expert testimony.  What -- the case law demands that the trial judge judge the expert's testimony and evaluate whether the testimony is sufficiently tied to the facts of the case so that it will help or aid the jury in resolving a factual dispute.

Now, I may have misunderstood what Mr. Horn's testimony was from the perspective of either the government or the defendant, but I, I don't think he did that.  What his testimony revolved around was whether -- whether or not -- perhaps it -- well, it revolved around a lot before we got through yesterday, but whether -- whether a witness's memory lapses effects the credibility of the testimony, is what we are really dealing with.  I mean, that's what I -- that's the best I could try to summarize what impact he might have on this jury.  I mean,

his comments about the credibility of those witnesses who are -- because of their trauma associated with their experience that they may have had lapses in their testimony.  Of course, as I think he tried to explain, because of his role as a professional, he couldn't -- he couldn't reveal or deal with the facts actually communicated to him by the officers who had been involved in what they -- in what is obviously a traumatic situation. So I -- my concern -- I just wanted to discuss it with counsel before we proceed with this witness.  I'm not -- I'm not convinced he is aiding the jury in making any factual determination that they are called on to make. Whether the witnesses' memory lapses effects the credibility of the testimony is a question for the jury, and not one for an expert witness.

So I -- I don't know what the government's thoughts about -- I'm not -- I'm not to the point that I necessarily want to strike his testimony, but looking at it after the fact, I'm not sure he qualifies as an expert.

The government, any comment?

MR. LITTLEFIELD:  Yes, Your Honor.  Initially I do think he qualifies as an expert based upon his study in regards to his graduate -- or his undergraduate and graduate studies, as well as his experience in dealing

with critical incidents, traumatic stress, and its impact on recollection.  So from that perspective, I think, yes, he does.

As to aiding the jury in regards to facts that are presented, I asked a series of hypothetical questions that are specific to testimony which has been given and testimony that we anticipate would be given.  It wasn't just memory lapses, but it related to memory lapses, it related to perceptions in regards to auditory perceptions, time perceptions.  It also related to recall of incidents over a period of time and the fact that due to traumatic -- exposure to these traumatic incidents that individuals often times will have a memory lapse for a period and some item on down the line may well trigger a recollection which was lost for an extended period.  And that circumstance exists in regards to several of the witnesses who will testify at this trial.  For example, Buddy Hamilton testified -- or he has testified that initially he did not recollect firing his gun and was advised that ballistics revealed that he had and it triggered his recollection.  Danny Oliver, I anticipate, will advise that he had no initial recollection of the flash bang going off, but with the passage of time that has come back to him and it took awhile.  Kerry Pettingill at one point stated, initially --

THE COURT:  No, no, I understand what -- but here is -- here is the dilemma that I -- and I think the jury has got -- has to be dealing with this too.  As I understood his testimony, he can't talk about the facts in this case.  The normal -- the normal expert would come in and he or she would in this circumstance say I have interviewed these four witnesses.  I made myself very familiar with what -- I have talked to investigators, I have a great picture of what happened, and then he would say do you have an opinion about whether or not these four or five witnesses -- if their testimony had lapses, whether that's abnormal or normal under these traumatic situations.  He didn't say that.  In fact, what he says is I can't talk about these facts because that's -- that's confidential and I -- and I appreciate that.  I mean, that's his discipline and that may be what he does, but I don't know whether he can help this jury unless he is able to put it in that context and say in this case I'm familiar with the facts.  I have studied the investigation, I have interviewed these four people, I have seen what their statements were before, I have seen what their refreshed testimony after being -- after they have settled down is and it's my opinion that...and I know that's a rough outline of what you would expect from -- from what I would call the more traditional expert.  I think he

has -- I think he has an unusual person with an unusual background with -- and is published, but I just -- the way the testimony is presented, I'm  --I'm at a loss to see how it is helping this jury.

MR. LITTLEFIELD:  I understand what the Court is asking and I think he could do that.  I think that he has done that from the perspective of the hypotheticals because he has been faced with those situations or presented those situations and in his experience in dealing with individuals who have suffered from trauma arising from those kind of incidents, he explains that that is an appropriate response and I don't really perceive that there is any substantial difference between saying that individuals who are faced with this kind of situation will often times have a memory lapse, something triggers it, and they will recall something, for example, that they initially did not recall.  And I don't see how that is substantially different or how that would be of any less benefit to this jury than saying I have reviewed the case files, I have seen the initial reports of, for example, Buddy Hamilton and that is -- and I don't --

THE COURT:  No, I just respectfully disagree with you.  I think that it's more precise than that.  I mean, he can't just come in and talk about generalities. What we are trying is this case and these facts that

support or don't support the government's case against this defendant.  I don't know whether it's -- whether there is anything relevant, unless it's tied to the facts in this case and these four -- these three or four witnesses and their experiences with this case.  I think it's not inappropriate to set up his qualifications by talking about things he has done, things he has done in Vietnam or things he has done as an FBI agent to show support for his conclusions he has reached with these two or three or four witnesses in this case that may or may not have lapses in memory.  That would be okay, but he has got to tie it to this case.  Here is my concern:  What I thought he testified to was that I can't do that because I'm in a confidential relationship with these witnesses. I can't talk about this case.  If he can't talk about this case, then my question is, can he give any relevant testimony?

MR. LITTLEFIELD:  Number one, I don't think he said he could not talk about this case.  He said he could not talk about his specific interviews with these individuals.  That did not --

THE COURT:  Listen, listen.  If you go back to just a normal -- say we had a psychiatrist and that's as close as can I get to him, a psychiatrist or a psychologist, that is testifying or -- or maybe that's

not a good example.  I'll give you some room there.  A physician testifying about a -- somebody's broken leg or a broken hip or something.  When they come in to testify as an expert, they are going to say I have examined his or her records, I have seen the x-rays, I have seen the reports, I have seen the hospital stay, the notes of the doctors that took care of him, and I have an opinion based on that.  Here I'm not -- I don't know what he has based his opinion on that has to do with this case.

MR. LITTLEFIELD:  And in taking your doctor's illustration, it may well be that that doctor would testify as to the specific injury of that individual, which is an issue.  He would also, however, based upon his experience and training discuss items that do not appear from the medical records that are items that are his opinions based upon his experience, his expertise and his judgment.  For example, long-term prognosis.  And it wouldn't necessarily be based specifically on the injury, it would be based on his knowledge of the field and his exposure to that type of situation and that type of circumstance.  In those type of questions, he would be asked his opinion based upon his expertise and would be allowed to testify as to such.  And that's what I believe he has done in regards to his opinion of the specifics that were asked in regards to an individual, for example,

who initially said I didn't see a silhouette in the door, I saw only firing, and subsequently had a recall that there was a silhouette in the door.  And I anticipate that Kerry Pettingill will testify as to that.

THE COURT:  I understand that, but he hasn't taken it witness by witness in this case, as I expected he would have, and said I had a -- I know that witness number one had a lapse in memory.  I have interviewed him, I have seen the past reports as he talked about -- you know, the initial investigation, I saw those reports.  I have now talked to him and there is a lapse in his memory and it's attributed to the traumatic experience he had.  He doesn't say that.

MR. LITTLEFIELD:  That's true, he has not said that.  And, Judge, he has -- when the question was asked in regards to his confidentiality and his inability to reveal, it was based upon his specific interviews of these individuals in that clinical setting in regards to the critical incident and the trauma and in assisting them in that critical incident situation.  He did not testify and was not asked have you reviewed reports, have you reviewed records and asked the specifics on the individuals.  That was my choice, in part because I did not want to invade the province of the jury by asking him specific questions about is Kerry Pettingill's, for example, credibility

based on the memory lapse and based on the substantive recollection.

THE COURT:  I don't think you have asked that question, but you have to -- he has to -- we may not need him at all is one thought that comes to my mind.  All we are really -- the only purpose you have him here for, that I can tell, would be to deal with what -- and I'm not sure there is any memory lapses at all.  I mean, I'm not suggesting there are or there aren't, but apparently there is some thought of a memory lapse in some of the witnesses and he is here to explain that.  I'm not sure that's appropriate, unless he goes into each one of the cases -- each one of those witness's factual background so the jury knows what he is talking about.  I understand your flirting with the jury's province to determine whether or not they are credible witnesses, but if we are going to -- if we are going to elevate this because of the trauma that they went through, which is perhaps a reason to do that, the norm would say the jury is the judge of whether they are credible.  We have, in this case, perhaps a significant factual deviation in that the government wants to apparently use this witness to explain the different factual reports maybe that these witnesses have given.  I mean, I'm not clear about that yet.  I haven't heard enough of the testimony to know, but if

that's what is going on, then one thought is maybe this testimony is premature, but I'm just not convinced that he is, at this point, adding anything to...

MR. LITTLEFIELD:  And I can understand what Your Honor is saying in regards to whether the -- whether it's premature.  That may be as much the problem as anything.  However, the hypotheticals with which he was presented and to which he responded are what I anticipate the testimony will be.  The issue in regards to an expert witness is does he have knowledge about something that a normal person would not have and does the imparting of that knowledge -- will that aid the jury.  Most indivi- duals certainly have -- certainly have some exposure to memory loss, certainly have some exposure, but I don't think that the average juror has the kind of background in regards to exposure to traumatic incidents, and specifically exposure to critical stress instances or situations involving officer shootings.  This guy does and he has studied and experienced --

THE COURT:  But the problem with what you are talking about is that almost is a -- this is a poor, poor choice of words, but that's almost a side issue in this case.  The credibility of those witnesses is what you are really talking about and that's not what is on trial.  I mean, that's not the issue.

MR. LITTLEFIELD:  I understand that, but --

THE COURT:  You have come forward with witnesses and they have described, to the best of their ability -- and I think that, you know, the testimony has illustrated that what was going on out there that night was a traumatic experience for all of those that were present.  I understand there has been cross examination where they were -- the defense was able to illustrate that some of the witness's versions of the facts changed. Of course, you have practiced law long enough to know that that's not unusual to have witnesses -- have different witnesses see the same -- that's a -- that's one of the first things we are confronted with in law school, is ten people see the same incident and report ten different versions.  Here we have introduced the issue of trauma and then when -- and also when time passes witnesses versions of what happened changes.  Here this case has the introduction of the issue of the trauma that these witnesses went through as an explanation of perhaps why this happened.  Whether or not you need an expert to tell the jury that or not is a question I have got.  I mean, I just don't know whether that's -- at the very least, I think it's premature.  At the worst, I don't know that he said anything that is helpful to this jury.

MR. LITTLEFIELD:  In regard to premature, I

think that has been addressed in regards to the -- to the fact or by the fact that it was presented in a hypothetical circumstance and that it will assist them in understanding those situations when they arise with other officers.  Certainly in regards to Mr. Hamilton's recollection, the lack of a recollection of firing the gun and then recalling it at a later time -- that was specifically on point because that's what Hamilton testified to.

In regards to Greninger's testimony that I have a blank from the time I hit the ditch until I stopped, the only thing I recall in that time period is that I heard gunfire -- where it was, I don't know.  And that was specifically what Greninger testified to and he explained that.

I understand Your Honor's statement in regards to every one knows that different people who are in different circumstances see different things, but it is specifically impacted by the situation of a traumatic incident and even more so by a traumatic incident involving a police officer shooting and Mr. Horn testified about that.

As to the issue of whether or not it addresses the facts that are specifically in issue in this case, that is did Mr. Barrett shoot Rocky Eales and what were the circumstances of the shooting.  Certainly his testimony

does not go directly to that point, but I don't think it has to because the rule does not require that an expert address the ultimate issue in the case.  It only requires that it assist -- that the testimony and the opinion of the expert assist the jury in understanding the evidence that is going to be presented.  And the rule itself states that it will assist the tryer of fact to understand the evidence or determine a fact in issue.  And that's, I believe, specifically what Mr. Horn's testimony does do because the evidence, as it's presented, will show some conflicts, will show some recollections that have been restored, will show some inconsistencies and will show that in some cases there are blanks that are not even remembered.

THE COURT:  Well, I just respectfully disagree with you because I don't know how his testimony can show that if he doesn't talk about the facts associated with each one of those witnesses.

MR. LITTLEFIELD:  Because --

THE COURT:  He wants to say I'm not a psychiatrist -- which I think he is not.  He is a forensic person who deals with traumatic experiences that police officers have.  I appreciate that, but what is relevant to this jury is what is their memory, how does their memory of what they are testifying to impact a decision the jury

has to make.  And he hasn't been able to -- either for professional reasons or ethics of his profession or maybe -- or maybe neither one of you asked those questions, but if he can't talk about the facts in this case, what he -- what you are asking him to do or what has been asked of him is to say -- to give testimony about his experiences that apparently relate to these -- I mean, it's similar to what these witnesses went through, but he has -- but he has either not -- he has either not testified specifically about the experiences of these witnesses and left this -- and is leaving the jury to draw these conclusions, well, if it happened in Vietnam, if it happened in Oklahoma City, if it happened in other traumatic situations he has dealt with as an FBI agent, it must be true here.

MR. LITTLEFIELD:  I think he has gone beyond that, Judge, because he -- because he does explain here is what trauma does and here is how it impacts.  And that is consistent with what has happened in regards to these officers.

THE COURT:  But he hasn't testified -- unless I missed something, he hasn't taken each one of these witnesses that has the memory lapse or the loss of -- well, the last witness who testified, his testimony was he had a blank about that period of time.  I don't --

and as a person listening to that testimony and the whole description of all of the things that were going on -- so you understand, I don't think that needs any expert. I mean, that sounds like a -- when he is sitting there testifying I'm saying, well, that's a reasonable explanation. I mean, all of the things that that fellow was doing, running around trying to save a man's life and shots being fired and you -- and you said what happened during that period of time, I don't remember -- I think a jury understands that.

MR. LITTLEFIELD: That may -- Judge, that's the critical point and that's the question. You, as a reasonable person, do so. The problem is that we are assuming or presuming that those jurors do so.

THE COURT: And the question is -- and you were right. I didn't ask him specifically about that, but he has talked specifically about cop shooting trauma and that's beyond the normal person's experience and I think beyond the normal person's understanding of its impact, and he has explained that. The question then becomes, will his testimony assist the jury in understanding the evidence. And while you may see it and while you may understand it, you can -- I certainly can't be certain that every one of those jurors does. And if his testimony assists them or aids them in understanding that evidence,

as it is coming in, then under the rule his testimony should be admitted as expert testimony.  And I guess that's where we come down to.

THE COURT:  Okay.  Let me hear what the defense has to say.

MR. SMITH:  Your Honor, I think we all know why Mr. Horn is here and it is because of the discrepancies in the testimony and they want to reconcile that with the jury because they do have a problem and to bring somebody in and to tell the jury, you know, you ought to believe what they are saying, even though they have told different versions or recall things that they didn't recall because this is a traumatic incident...well, how many traumatic incidents do we have in criminal cases in federal court?  I mean, every time somebody is on trial you could open up this -- what I'm going to call Pandora's box.  This fellow, Judge, is prohibited from testifying. He is in a clinical relationship.  There are ethical guidelines that do not permit them to take on the role as expert witness revealing the details of their interviews with those particular -- in this instance, highway patrolmen.  There is a confidentiality agreement that those officers signed at the beginning of that interview process telling them that only under two circumstances will this information be revealed by me.

One is if you are a danger to yourself and the other is if you have committed a serious crime.  Other than that -- because they want full disclosure, it cannot be revealed.  We have not been provided any interviews, any reports as it relates to Mr. Horn's debriefing of these particular individuals and he is not going to give those to us.  We can't discover those and to enable him now to come in and say that this is what they told me and this is why I believe they are telling the truth and this is why you ought to believe them because it's traumatic is invading the province of the jury and I think, Judge, inviting error in this case.  His testimony does not comport with 703 and I think it should be stricken.

I certainly don't think he should be allowed to go any further because I could imagine the next scenario would be those individual gentlemen will say I'll waive that confidentiality, let him bring this on in, because they realize how critical this is to the government's case.

Those jurors are sitting over there -- they can weigh the evidence.  We all have common experiences that we bring into the courtroom and it's not going to be any surprise to them, whether they have been in the military and have dealt with the combat fatigue syndrome or what have you.

I mean, these are real experiences.  It's like the Court said, it just makes sense.  A lot of these things, yeah,

I don't remember all of those details.  That just makes sense.  So, no, we do think that he should not be permitted to go further with revealing the details of his clinical interviews.  And I think the Court should consider striking his testimony.

THE COURT:  Mr. Littlefield.

MR. LITTLEFIELD:  He didn't talk about the interviews.  Yesterday he was -- I asked the Court that he be qualified as an expert.  There was no objection.  He testifies.  Mr. Smith spends an hour approximately cross examining him.  He doesn't at any point say, Judge, we don't think this man is an expert.  We move to strike his testimony.  At no point does he say we don't think this evidence will aid the tryer of fact, we move to strike his testimony.  Only today after the Court raises the question is he saying, well, we now don't think he is an expert and we don't think it's fair and we don't like the way the evidence was presented.  We think it ought to be stricken, and I think that's inappropriate.

Judge, it -- I was trying to think of an illustration and it may not be the best one, but I was thinking of an accident reconstruction.  You have got a guy who has been trained in physics, who has dealt with the accident reconstruction circumstances and he comes in to testify in regards to accident reconstruction.  He will apply his

knowledge and his physics to certain facts that may aid a jury in a case, and he can do that in a couple of different ways.  For example, he may be asked the question, based on your training, experience, knowledge, the laws of physics, how long does it take an automobile going 'X' number of miles an hour to stop, and he can answer that question.  And it doesn't have to be the specific vehicle in this case, it is just based upon his experience, his exposure and his training.  And I think that that is what we have done in this particular circumstance because there are items that the normal person doesn't understand and doesn't know, that when you have a traumatic shooting incident involving police officers, it goes beyond the normal trauma.  It results in differences as far as the recollection, as far as auditory and other perceptions that don't normally happen in part because of the brotherhood that he explained exists with these teams.  And he testified as to how this kind of circumstance relates to an individual witness's ability to recall, to perceive.  He spoke about the auditory focus or the specific focus and how much more tight it is than in a normal situation, that the perception is often times drawn to something that is right in front of you and you won't see it anywhere else.

THE COURT:  Just a moment.

(PAUSE)

THE COURT:  Under Rule 16(g), under expert witnesses, was there any exchange of summaries of testimony before trial?

MR. LITTLEFIELD:  Yes, because he testified twice previously and those prior testimonies were provided.

THE COURT:  Well, under Rule 16(g), at the defendant's request the government must give the defendant a written summary of any testimony that the government intends to use under Rule 702, 703 or 705 of the Federal Rules of Evidence in its case-in-chief.  Was that done or requested?

MR. SMITH:  Well, what he has testified to so, far, Judge, yes, because that is consistent with those other two trials.  To go and talk about these clinical interviews, certainly not.

THE COURT:  Okay.  Well, what I'm going to direct that we do is -- I don't want to hear any more from this witness because of the -- because of what I said.  I'm still concerned about whether he even qualifies as an expert.  The government is correct in that the defense didn't object to it and consented that he was an expert.  I hadn't heard the testimony.  I have now heard the testimony and I think for the purposes of this trial,

I'm concerned that his testimony is not being helpful to the jury.  It would have to be -- he would have to testify starting from the beginning to testify as a normal expert would be called on to testify.  He just has not in this case done that to this point.  Now that I have heard his testimony, I'm concerned about whether he qualifies as an expert for what he has been -- I mean, I just don't see that his testimony about memory lapses is something that is beyond the ability of the jury to deal with.

Now, perhaps in rebuttal or something like that, it may be, but at this point, I don't think -- from what I have heard, that his testimony is helpful to this jury.

THE COURT:  Well, that's one of the questions Your Honor must answer and I acknowledge that.  As I said a while ago -- and I'm not trying to argue with the Court. I do see it from a different perspective and I do believe that it's helpful because of the specialized area, but I understand the Court's ruling.

THE COURT:  And I don't know what your response is.  And I guess, as I'm learning now, I now know that apparently this witness was in a clinical setting with some of these officers.  It almost could be that because he has been in a clinical setting, he is not the person to bring this testimony because he goes to a point -- and if what counsel reported to me is correct, that he is duty

bound or ethically bound not to talk about what they talked about in those sessions, then he is somewhat hamstrung from being able to describe the facts from each one of those witnesses and if you come to the conclusion that his testimony would help this jury understand why these witnesses' testimony and the statements have fluctuated factually over the -- if that's a proper issue for an expert to talk about, which I think is the government's position, the foundation for it is so wishy-washy that it's impossible for this jury to understand what he is talking about.

MR. LITTLEFIELD:  And I understand -- I understand what Your Honor is saying, that you have a problem because it is not based upon the interview of these specific witnesses.

THE COURT:  Or the facts of this case.  Your example you gave about the reconstructionist...his reconstruction is going to be based on the facts of that accident.  Here --

MR. LITTLEFIELD:  That's true.  And I think he has testified in regards to the facts of this case.  It wasn't addressed as the shooting incident of Kenny Barrett at Kenny Barrett's residence.  It was addressed as officer shootings in which an officer was right there involved in a shooting incident and how does that impact

the recollection.

THE COURT:  But you -- here is the problem the Court has with going out -- it's like the rule is very -- this will sound off the wall, but the rule is very strict in product liability cases.  Frequently plaintiffs will want to bring in GM pickups that have had 150 rollover accidents or something of that nature to show the jury that is a propensity of these vehicles.  Generally, that's not admissible because each one of those cases is so different, the facts are so different.  And I think that has an analogy here.  I know he has experience with traumatic experiences where officers have been shot or been in shootings where people were shot or whatever.  Those are all traumatic situations that require a very deep investigation and it's not possible in this setting to allow either one of you to bring in 10 or 15 shootings and show all of the facts, unless they are identical.  That's what the rule is -- that's what the rule is in product liability.  You have the problem that they are not identical but very, very close.  The Court has to guard which ones you let the jury hear about.  And here, every time we talk about another shooting, there is just -- it just builds because, as we know, there are not any two traumatic events like that that are -- they are close in that somebody was shot, but the circumstances, unless

they are very, very close, are not admissible.  And I think that's -- that's the danger I see here.  That's why I want to stop at this point, unless you have got something -- that's my inclination, is to stop and go on. Whether I tell them to strike the testimony ultimately or not, I haven't made that decision.

MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.

(PAUSE)

MR. LITTLEFIELD:  I have one concern -- as I visit with co-counsel, I have one concern in regard to the position the Court has left it right now and that is that cross examination is not completed.  If the Court strikes the testimony and advises the jury that they should not consider it, then I don't think there would be a problem with no additional cross examination.  If the Court stops it and does not strike it, with cross examination being incomplete, then I think we have a problem unless Mr. Horn comes back for additional cross examination at some further time.  My concern, Judge, is when we -- when we have closing arguments in this case and the defense talks about the witnesses who have testified, I promise you this jury is going to hear about inconsistencies between witnesses, they are going to hear about inconsistencies internally with the witnesses' testimony

from one proceeding to another, they are going to hear and...

THE COURT:  Let me stop you and go to counsel. Is there any additional cross examination of this witness?

MR. SMITH:  Judge, I had some prepared and I'm going to guess it's probably 30 minutes worth.  And if I could make another comment -- but he is in mid-stream, so you may want me to wait.

THE COURT:  No, you can make another comment.

MR. SMITH:  It refers back to the accident reconstructionist as an expert witness, who may also -- who may also be a fact witness, Judge, and how would we take what that accident reconstructionist says...yeah, I saw that accident, I saw how it happened and here is this computer program I have made that shows how it happened and not only how it happened, but this guy is at fault.  That essentially is what they are asking to do here, if we expand this into their individual interviews. The way it is right now is one thing and that's consistent with the previous testimony, but to go beyond this, I think is doing exactly what we are talking about because he does have clinical knowledge.  He is a fact witness and now he is going to be an expert witness and he has got that dual role and he can't reconcile those, and I did

ask him about that yesterday.

THE COURT:  You have heard counsel indicate that it would be inappropriate for me to stop the testimony now without giving you an opportunity to cross examine. The two choices the Court has is allow you to cross examine or strike the testimony.

MR. SMITH:  And I guess, Judge -- I would think the best approach in that would be -- is if the Court is not going to strike his testimony right now, is to take that under advisement and if you decide not to strike his testimony, then reopen it for cross examination at a later date because I think what I'm gathering, from what you have told us, is you have heard enough at this point and you are worried that -- you know, whether it is helpful to the jury.  So if I cross examine him for another 30 minutes, you are just going to have more of that develop that you are concerned about right now.  I don't know if that causes a problem.  I would have to visit with Mr. Hilfiger, but I would think that would be a logical solution, is take the -- is to take it under advisement and then if we open it back up, we could just pick up where we left off.

THE COURT:  I'm going to take it under advisement and allow -- and reserve your right to cross examine and I'll make a decision about whether to strike

the testimony.

Let's bring the jury in.

MR. HILFIGER:   Judge, can I ask you something? I drank too much coffee.   May I take a quick break?

THE COURT:   You may.   We will take five minutes.

(SHORT RECESS)

COURT IN SESSION

(JURY OUT)

THE COURT:   Let the record reflect counsel for the government is present, the defendant and counsel are present.

After short reflection, I think it would be better to go ahead and let the defendant finish cross examination of this witness and I'll take under advisement whether to strike it.

MR. LITTLEFIELD:   I'm not sure if -- may I step out?   I'm not sure if he is still here.

THE COURT:   I think we stopped him.

MR. LITTLEFIELD:   You stopped him?   Will I be able to redirect at that point?

THE COURT:   Well, it depends on what your redirect is.

MR. LITTLEFIELD:   Well, that depends on what the cross is.

THE COURT:   I know, that's why I'm....

(JURY IN)

THE COURT:  Everyone please remain seated as the jury comes in.

Let the record reflect the jury is in the box, counsel for the government is present, defendant and counsel are present.

You may have the witness retake the stand.  You may continue with your cross examination.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q     Mr. Horn, good morning, sir.

A     Good morning.

Q     Whenever we adjourned, we were talking about memory recovery after a night sleep.

A     Yes.

Q     Do you recall that?

A     Yes.

Q     Would you agree, sir, that the best memory recall and evidence is typically 24 hours after that or at least within -- or to give an individual time to calm down and get rested and then you interview them the next day?

A     Pretty much.  I think the recovery time varies from individual to individual and event to event.

Q     And you would agree with me, sir, that time is not

a friend of memory?

A     In most cases.

Q     Okay.  I mean, if it was, we would just wait another six years, wouldn't we?

A     Well, of course, things that are very significant in your life or very important tend to be remembered.

Q     Okay.  Would you agree with me, sir, that interviewers should make a conscious effort not to contaminate a person's memory by suggesting ideas about the crime or suspects?

A     Yes.

Q     Okay.  And, sir, you talked yesterday on direct about this prison stabbing and there was, what, some 22 different people involved or something?

A     Yes.

Q     Now, those interviews, were they conducted in a group setting or conducted individually?

A     Individually.

Q     Okay.  Now, we talked a little bit about fixation and focusing.  Do you remember that discussion?

A     Yes.

Q     How does that relate to tunnel vision?

A     Well, tunnel vision is very similar because in tunnel vision you may be so focused on an individual or an object, particularly if it's threatening to you, that

you pretty well exclude everything else in your environment. You can be totally unaware of everything else in your environment if you have tunnel vision.

Q    And that can be particular to that individual?

A    Yes.

Q    And it can be auditory or noise, right?

A    Yes, you can have auditory blocking or enhancement, perceptional distortions, all sorts of --

Q    Same thing with light or sight, correct?

A    Yes.

Q    Okay. Now, often times -- and we talked a little bit about this fight or flight reflex. What happens -- when an individual can be in a tunnel vision situation, would you agree with me that they would go to this autopilot condition?

A    Quite often they do.

Q    And what they are doing when they do that, sir, would you agree with me that they are reacting based on their instincts and/or their training?

A    Yes.

Q    Okay. Now, would you tend to agree with me, sir, that the greater the trauma the greater the impact that that can have on memory distortion?

A    Yes.

Q    Okay. And, sir, would you please tell the jury

whether any of the following would be key factors in memory distortion?

A    Okay.

Q    All right?  The first would be the perception of the threat or danger, that is being attacked?

A    Yes.

Q    Could that affect memory distortion?

A    Memory distortion?  It could.

Q    Okay.  How about the suddenness of the threat and the time that you have to respond?

A    Sudden unexpectedness is -- can definitely be a factor.

Q    Okay.  And how about the degree of participation, that is the physical effort that an individual may engage in that particular incident?  In other words, how involved they are.  Does that have anything to do with it?

A    How directly involved?

Q    Yes, sir.

A    Yes.

Q    That can be a factor, can it not?

A    Yes, it can.

Q    And then, sir, finally, tell us whether or not an individual who was physically injured, shot, whether that could have an impact?

A    It can.

Q      Now, this applies to humans as a whole; is that correct?

A      Yes.

Q      In other words, it's not particular to police officers?

A      Correct.

Q      It could be a rape victim?

A      Yes.

Q      Or it could be a person being attacked in their home, couldn't it?

A      Yes.

Q      Okay.  Sir, can you agree that where individual testimony and physical findings differ regarding, say, a shooting, that we ought to rely on those physical findings?

A      I think you try to find the right balance between the two, but physical evidence is pretty powerful.

Q      And that's part of what you described yesterday with the agent that was shooting the shotgun...

A      Yes.

Q      Because we knew how many rounds he had, so you could count what was left over, right, regardless of what his testimony may have been, true?  Is that a physical finding that you would --

A      Yes, ballistics, ballistics showed that he had

fired his weapon.

Q     Okay.  And based on your research, whenever you have a traumatic event we know memory is going to be distorted, isn't it?

A     Not all of the time, but that can be one of the reactions.

Q     Okay.  Would you agree with me, sir, that an officer involved in a shooting that results in a death, let's say of his partner, that that officer's perception can be distorted by the traumatic event itself?

A     Yes.

Q     Okay.  Would you agree, sir, that the officer's memory may be further distorted if he has some feelings of guilt, such as responsibility for that death?  Could that further distort his perception and his memory?

A     It would certainly aggravate the grief.  Memory -- that would be a toss up, as to whether or not that might further cause problems with memory, I think.

Q     Now, you conducted an interview session with members of the tact team, correct?

A     Interviews?

Q     Debriefings, whatever...correct?

A     Yes, I was there for a debriefing.

Q     Okay.

A     It is very much different than an interview though.

Q        Was Pettingill or Trooper McBride involved in those?

A        I believe there were some team members that were not there.  I believe they were probably there.  That's been years and I'm not sure exactly for sure all of the ones that were there and all of the ones that weren't, but my guess is they were there.

Q        Okay.  And, sir, you are not going to reveal to us, to the jury, what it was specifically that those officers told you in that session?

        MR. LITTLEFIELD:  Well, that's cummulative of yesterday.  He asked --

        THE COURT:  You may answer.

BY THE WITNESS:

A        To tell you the truth, I don't recall specific lines that anybody shared in that debriefing because that's -- that's not something that I find memorable.  After doing hundreds and hundreds of these, they pretty much melt together.  So I can honestly tell you that I couldn't tell you specifically what an individual said in that debriefing.

Q        Okay.  And because of that you have not expressed an expert opinion in this matter regarding those particular officers' mental recall about the specifics of this shooting, have you?

A      Say that again.

Q      You have not expressed an expert opinion in this matter regarding the officers' mental recall about the specifics of this shooting that we are dealing with here? You haven't --

A      Pardon?

Q      You haven't done that, have you?

A      Well, if I am testifying as an expert witness, I guess what I'm saying are expert answers.

Q      Okay.  Let me clarify here, if I can, just to make sure we are talking about the same thing.  I'm talking about regarding these particular officers that are testifying in this case about this shooting.  You are not here --

A      Okay, okay.  Specifically about individual comments about what they said?

Q      That's correct, sir.

A      Correct, you are right.

Q      And you can't testify to that, can you?

A      No.

            MR. SMITH:   Pass the witness.  Your Honor, I might ask for a brief conference?

            MR. LITTLEFIELD:  May I have just a second?

            THE COURT:  You may.

                       (BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

MR. SMITH: Your Honor, that was -- this is the same line of questioning that I had prepared yesterday but I just didn't get to that point. I think now we are at that point and based on our conversation, I didn't want to make my motion in front of the jury, but I do now. I think it should be stricken.

MR. LITTLEFIELD: And, Judge, I think that's absolutely inappropriate to have brought him in, brought in front of the jury and asked those questions for the purpose of striking it. If he was wanting to strike it, he should have done it before he brought the jury back, before he asked that line of questioning.

Judge, I -- the whole purpose of this is to answer the question would this assist the jury in receiving evidence and it does not have to be case specific for it to be able to assist the jury. Your Honor is talking about you as a reasonable human would understand that these guys have lapses of memory, have testimony coming back, but we can't be sure that this jury will understand that and we can't be sure that they will understand how the traumatic incident would impact the ability of the witnesses to recall. This witness has testified based upon his experience, based upon his expertise as to how these factors arise from this type of traumatic incident

and can impact their recollection, can --

THE COURT:  Well, let me ask you, before we get there, are you going to redirect?

MR. LITTLEFIELD:  Well, I mean, if -- yes, there are some questions.

THE COURT:  You still have a chance to rehabilitate him.  Counsel is going to argue that he should be stricken because he can't express an opinion about any of the individuals.

MR. LITTLEFIELD:  I understand that.  And, Judge, if we leave it right there, I'm not going to ask him about his opinions about the individuals because I don't have to.

THE COURT:  Okay.  Well --

MR. LITTLEFIELD:  I would ask him additional questions, yes, based upon the subject matters that were opened in cross examination, but as I understand --

THE COURT:  Well, whatever questions you want to ask him, ask him for the record.

MR. SMITH:  If I may respond about the appropriateness of this?  We made a decision, in trying to not bring a person up here to rebut him, to develop out of him what we could find useful and move on down the road and not have an expert come up and tell the other side of the stories per se.

THE COURT:  You are making a motion now to strike his testimony?

MR. SMITH:  Yes, sir.  I don't think, based on his last answer --

THE COURT:  Okay.  Let's go on.

MR. LITTLEFIELD:  May I have just a second, Judge?

THE COURT:  You may.

(PAUSE)

MR. LITTLEFIELD:  Judge, before cross, may I consult with the witness just briefly, or before I redirect?  I'm sorry.

THE COURT:  You may.

(PAUSE)

(END OF BENCH CONFERENCE)

(OFF THE RECORD DISCUSSION BETWEEN

MR. LITTLEFIELD, MR. SPERLING, AND MR. SMITH)

MR. LITTLEFIELD:  May we approach.

THE COURT:  You may.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

MR. LITTLEFIELD:  Your Honor, I appreciate the opportunity to consult with the witness in advance.  I asked Mr. Horn -- I then wanted to advise Mr. Smith before I did it, but I asked Mr. Horn have you interviewed or

reviewed investigative reports in this particular matter, have you reviewed testimony that was previously elicited from these individuals or statements elicited from these individuals under oath.  He said he had.  I said let me give you an example.  Did you review the initial testimony of Kerry Pettingill in which he said I did not see a silhouette or the additional statement in his subsequent testimony in which he stated that he viewed a -- as he looked at the porch, he viewed a silhouette firing the gun. He said he did.  I said, now, would your testimony be -- what would your testimony be if I asked you, is this an example of a memory restored by a triggering mechanism or would you believe that it was a memory restored by a triggering mechanism and he said, yes, I would believe that that is what happened in this particular circumstance.  That's why I wanted to bring Mr. Smith up here to advise him before I asked that question.

THE COURT:  Mr. Smith?

MR. SMITH:  That is as improper as it gets.  The guy is a factual witness and he is up here as an expert. He is not a factual witness.  That is invading the province of the jury.  There is no question about it.

MR. LITTLEFIELD:  It's not.  He is not testifying as a factual witness.  He is testifying based upon his review of the investigative reports, the previous

statements of these individuals.

MR. SMITH:  But he is contaminated by the fact that he is a factual witness.  I mean, you can't remove that.  They know that they have been involved in this debriefing and now he is going to say this other stuff, yeah, it explains it --

THE COURT:  I'm not really sure what he is going to testify to.  He is going to say --

MR. LITTLEFIELD:  He reviewed investigative reports, he reviewed previous testimony or previous statements under oath, testimony of these witnesses, and that the statement -- and I asked him a specific example. If I ask you did Kerry Pettingill, I will have initially a statement that he did not see a silhouette in the door, as they approached the house, that he only saw the gun firing, a barrel and fire coming off of it, and that subsequently in a later proceeding saying that he saw a silhouette in the door when the gun was being fired, is that an example of the -- a triggering mechanism expanding recall or giving additional recall based upon a triggering mechanism.  He said, yes, he believes that that is an illustration of where somebody had a restored recollection based upon a triggering mechanism.

THE COURT:  What is he going to say if the defense on recross goes into all of the other lapses and

things?  Is he going to know about that?

MR. LITTLEFIELD:  I would -- you mean every one of them.

THE COURT:  Yes.

MR. LITTLEFIELD:  It depends on which one will be addressed.  The problem is if -- I'm not sure if Mr. Smith is prepared to.

THE COURT:  I don't know either.  I was just --

MR. LITTLEFIELD:  I think if he is asked about specifics -- as to specifics, he would certainly recall some.  Now, I can't tell you that he would remember every one of them.  You know, it would be a case by case -- did you have occasion to look, for example, to Raymond Greninger's inability to recall for the time that he crossed the ditch until he came to park?  I don't know if you recall that specifically or not.  I imagine he would recall Buddy Hamilton's initial statement that he did not fire his gun and then his subquent testimony that he did recall firing his gun.  You know, I -- all of the specific items -- you know, my preference would be to leave it as it is because I covered those with the hypothetical questions and that's, you know, where my concern is and where respectfully I -- you know, I disagree with where I think the Court is coming from because I do think as it has been presented it would assist the jury and I don't

want to open up the door to go into all of that.  It was -- and that's why I presented the hypothetical situations, which I think covers it.  And honestly, my preference would not be to go into the specifics on any of those particular situations because I don't want to open Pandora's box.  My thought is it is opening a can of worms, but -- but I think that this matter and the nature of his testimony, as it has been given, does assist the jury in looking at how this kind of situation can impact recollection.

As to his expert experience and in regards to Mr. Smith's statement about not calling an expert, Judge, I -- you know, I -- I mentioned yesterday about the question of the scope of cross examination and going outside the scope and Bret did so and I didn't object to it.  I let him go into those areas.  I mean, he got the answers that he would have gotten from an expert, I think, had he called one.  For example, does this impact -- would this impact a citizen whose house is invaded and those kind of questions and I think Mr. Horn answered -- as anticipated, he would answer it appropriately, which had some bearing on why they weren't planning on calling an expert.  You know, he -- yeah, adrenaline in the flight or fight or fight or flight deal, yeah, it would have an impact on a citizen.  Certainly a home invasion could have an impact.  So from that standpoint, I didn't try and

object --

THE COURT:  Do you want to object to the proposed question?

MR. SMITH:  Sure I do, Judge.  I mean, it's -- one thing is, how do you separate the factual --

MR. LITTLEFIELD:  That's not what I'm considering.  I'm just considering the transcripts.

MR. SMITH:  How can he do that?  He is the wrong witness for them to be able to develop that testimony because he is contaminated.  Now -- and that's what my question was going to be.  He said he doesn't want to get into that.  Does he intend to or --

MR. LITTLEFIELD:  And I asked him about the critical incident debriefings in which he participated. I think he just answered Mr. Smith that those -- he has done so many of them that those run together and he doesn't remember the specifics.  He would also testify in regards to --

THE COURT:  If he doesn't remember the specifics, how can he testify?  I mean, from the critical incident briefing --

MR. LITTLEFIELD:  That's not where he is getting the information from.  He is basing his opinion on --

THE COURT:  Then where is he getting it from?

MR. LITTLEFIELD:  Case reports and having reviewed the transcripts of the previous testimony, such as the preliminary hearing.  He also, Judge, would testify that when you do the critical incident debriefings, when you do the kind of things that he did with these individuals, the purpose of it is not to cover the specific facts in detail.  I think he testified for Mr. Smith yesterday there were seven steps in that kind of meeting and the initial one is when you talk about the facts, but what you do is just cover it in a very broad range discussion of generalities just to set the stage. It doeosn't go into any kind of extensive detail.

THE COURT:  I'm going to sustain the objection.

MR. LITTLEFIELD:  Okay.  And that's why I wanted to approach and that's why I wanted to approach the bench in advance.

(END OF BENCH CONFERENCE)

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     Yesterday you spoke about having previously received payments.  I wrote the amount down roughly of -- of roughly $3,100.00 and $3,800.00.  Do you recall that in your testimony in that regard on cross examination?

A     Yes.

Q     Was the source of those payments from the federal

government in regards to your testimony in this case?

A      No.

Q      By the way, as to the $3,100.00 and the $3,800.00 that you received, did you keep that entire quantity of money that you received?

MR. SMITH:  Your Honor, I don't think that is appropriate.

THE COURT:  Sustained.

BY MR. LITTLEFIELD:

Q      Did you make a gift of any portion of those proceeds?

MR. SMITH:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. LITTLEFIELD:

Q      There was some questioning in regards to contamination of memory.

A      Yes.

Q      And you were asked about a meeting with these officers as a group in regards to assisting in dealing with the trauma with which they had -- or which they had experienced.  Do you recall that?

A      Yes.

Q      And what kind of meeting was that?  What was that called?

A      It was called a critical incident stress debriefing.

Q      And what is the focus of a critical incident stress

debriefing, sir?

A     The focus is on trying to help these people, trying to stabilize them to mitigate the impact, to sort of see how they are doing, to give them some information, some stress management information to help them deal with recovering from what they have been through.

Q     Okay.  In regards to contamination, you were asked questions regarding the critical incident stress debriefing as to whether or not there was discussion of the incident as a part of that debriefing.  Do you recall that?

A     Yes.

Q     How detailed is the discussion of the facts of the incident in a critical incident stress debriefing, sir?

A     Very shallow as far as the incident and the details of what happened.

Q     You mentioned a certain number.  How many numbers do you go through or levels do you go through in the critical incident stress debriefing, sir?

A     Seven phases.

Q     And the discussion of the facts or the general overview of the facts would be which of the seven phases?

A     The second.

Q     Okay.  And what percentage of the critical incident stress debriefing is the focus on the facts?

A    Well, it's very small because they are basically giving you an overview of what kind of a situation they responded to, fire, flood, shooting, bombing, whatever.

Q    In regards to details, is every individual's role in that critical incident discussed in the critical incident stress debriefing?

A    Their general role, yes.

Q    Is specifically what they did discuss in the critical incident stress debriefing?

A    Briefly, but not in any detail.

Q    Okay.  Is there sufficient information given in the critical incident stress debriefing -- and it's a discussion -- an overview of the factual scenario -- to result in a substantial amount of contamination?

A    Not that I have ever seen, no.

Q    You discussed a adrenline or fight and flight, I think is what it was referred to.  You were asked some questions in regards to whether or not that circumstance could also apply to a civilian.

A    Yes.

Q    And you indicated it could?

A    Yes.

Q    Okay.  Does the citizen's or civilian's role in the circumstance impact the extent of and the nature of an adrenaline that that citizen may have or civilian may have

in a critical incident?

A    It could.

Q    Okay.  If a civilian, who is in a critical incident, is anticipating or expecting the incident to occur, what impact is that likely to have on the extent of adrenaline that that civilian would be the recipient of?

A    Well, I think any time you know something is going to happen you have a chance to prepare mentally for it, as opposed to someone who doesn't know that something is about to happen, especially sudden and unexpectedly.

Q    Okay.  If the civilian is the initiator of the incident, that is, the individual who makes the initial determination as to whether there would be shooting or not, what impact would that have on the extent of the adrenaline under which that civilian would suffer?

A    Well, again, I think if you initiate it, then I think again you have the advantage of control or knowing something is going to happen; therefore, you're less likely to have the same amount of adrenaline rush that somebody might experience being on the receiving end, I think.

Q    Again, you were asked questions in regards to the impact that adrenaline would have on a person who was attacked in their home.  Do you recall answering those questions on cross?

A      Yes.

Q      What impact would the expectation that someone was coming to your home, even before they appeared, have on whether or not that would impact the recollection of the civilian?  If I'm in my home and I anticipate someone is coming, I expect in advance that they are coming and, in fact, they come, how would that impact me as far as my adrenaline rush, my ability to relate and recall and my ability to respond?

A      Uh-huh.  Well, again, I think it has less of an impact when you have -- when you are forewarned, when you are prepared mentally for something that is about to happen and especially if you are going to initiate it.

Q      What impact would the extent of preparation have as far as whether it's more extensive or less extensive for that circumstance?

A      Well, it's like training, that's the purpose of training.  The more you train, then the calmer you are going into an otherwise chaotic type of situation.

Q      Okay.  If an individual has been expecting for an extended period and has been preparing for that incident for an extended period, are they likely to have high levels of stress, anxiety or adrenaline in that circumstance?

A      Well, they could certainly have some pregame type

of gitters, I think, but I think they are less likely to have the same level when they are preparing and they know in advance what is going to happen, what they are going to do.

Q     When a person is focused, the tunnel vision type circumstance, so that other items outside their focus are beyond their perception, on the area of focus is there a problem in regards to what they are focusing on or is that typically clear?

A     Usually that's pretty clear, that's all you are focused on, all you are looking at.

Q     Okay.

          MR. LITTLEFIELD:  May I have just a second, Judge?

          THE COURT:  Yes.

                    (PAUSE)

          MR. LITTLEFIELD:  Pass the witness.

          THE COURT:  You may.

          MR. SMITH:  Thank you, Your Honor.

                    RECROSS EXAMINATION

BY MR. SMITH:

Q     Mr. Horn, you talked about those seven steps and that's part of that protocol that we want to have to insure that an individual's memory is not contaminated; is that true?

A       Yeah, that's not the purpose of a critical incident stress debriefing, yes.

Q       No, I understand that, sir.

A       Yeah.

Q       The purpose of the critical stress debriefing is to help bring them down, help them deal with the grief, the situation at hand, correct?

A       Yes, yes.

Q       And typically you have that situation after you have already had a factual debriefing, after the investigators have already gone in and determined what those individual's statements are, correct?

A       My experience is it has gone both ways and I have worked with investigative teams and I always let the investigative team make the decision.  Sometimes they have us go first, sometimes after and particularly in the FBI when I was doing these.

Q       And the concern is when you are the --

        MR. LITTLEFIELD:  Judge, I'm going to object. It's cummulative and also beyond the scope.  I didn't ask about that in relation to the investigation.  All I asked about was what was contained in the critical stress debriefing itself.

        MR. SMITH:  They are both hand in hand, Judge.

        THE COURT:  Overruled.  You may continue.

BY MR. SMITH:

Q      And that is a concern, is it not, sir, for the factual investigator if he doesn't get to go first, the memory contamination?

A      It could be.

Q      Yeah.  Because I would want to talk to an individiual before he has had a chance to talk to everybody else involved as a factual investigator, correct?

A      As an interviewer, yeah.

Q      I mean, I understand that wasn't your role in this case.  You weren't concerned about the facts of this specific case, were you?

A      Not in regards to the critical incident stress debriefing, no.

Q      Right.  That wasn't your job, that was not your role, correct?

A      Not in the debriefing.

Q      Okay.  Now, when we talk about the fight or the flight, the adrenaline an individual may suffer whenever they feel like they are being attacked, it all depends on that person's perception, does it not?

A      Yes.

Q      As to who is the attacker and who is the attackee?

A      Yeah, you can -- you can always spin anything your

own way, yeah, so from that perspective, yes.

Q    So the things we talked about just a moment ago, you and I as they pertain to a homeowner, it all depends on the perception of that individual, does it not?

A    As far as his reaction or her reaction is concerned, yes.

Q    And the same thing that you said about being mentally prepared and knowing that somebody may be coming, again we have to know what that individual is operating from because it is individualized, correct?

A    Yes.

Q    Okay.

        MR. SMITH:  Pass the witness, Judge.

        MR. LITTLEFIELD:  No additional questions.

        THE COURT:  May this witness be excused?

        MR. LITTLEFIELD:  Yes, sir.

        THE COURT:  Defense, may this witness be excused?

        MR. SMITH:  Yes, sir.

        THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.  Call your next witness.

        MR. LITTLEFIELD:  Steve Hash.

    STEVEN EUGENE HASH, PLAINTIFF'S WITNESS, SWORN

                    DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Good morning.

A    Good morning.

Q    State your name for the record, please, sir.

A    Steven Eugene Hash.

Q    Okay.  And Mr. Hash, how are you employed?

A    I'm employed by the Oklahoma Highway Patrol.

Q    What function do you serve with the Highway Patrol, sir?

A    I'm a road trooper.

Q    I'm sorry?

A    I'm a road trooper, Highway Patrol.

Q    And how long have you been a road trooper?

A    21, almost 22 years.

Q    And that is how long you have been with the Highway Patrol, sir?

A    Yes, sir.

Q    Do you have a rank or are you just a trooper?

A    I'm just a trooper.

Q    In regards to your responsibilities with the Highway Patrol, have you, during your term of service as a trooper, fulfilled any other job functions or roles with the Highway Patrol?

A    Yes, sir, I was on the tact team for almost 17 years.

Q    How long?

A    Almost 17 years.

Q      Okay.  And when did you begin your service with the tact team, sir?

A      In 1987.

Q      And when did that conclude?

A      About two months ago.

Q      Okay.  The way -- how does the O.H.P., the Department of Public Safety, divide up the tactical teams within the state, sir?

A      We have got two teams.  We have got an east team and the west team divided by I-35.

Q      And you were -- and you are with which team, sir?

A      The east team.

Q      And was it -- was that the division you were with the entire peroid of time that you served as a member of the tactical team?

A      Yes, sir.

Q      Okay.  How often then did you all train?

A      Every month and then one week for -- one week in the spring, one week in the fall, sir.

Q      And your monthly training was -- lasted how long?

A      One week or just two days monthly.

Q      What type of training was received by yourself and other members of the tactical team at those one -- was it two day or one day sessions?

A      Two days during the month.

Q      What kind of training was covered?

A      Just anything and everything.  Building entry --

Q      I'm sorry, I'm really having trouble understanding you.

A      Building entry, we do tracking, we do automatic weapons fire, just everything you can think of.

Q      Okay.  Do you recall the incident that occurred in the early morning hours of September 24, 1999?

A      Yes, sir.

Q      When did you first become aware that you -- that the eastern tactical team was going to be involved in the execution of a search warrant?

A      I had a day shift on the 23rd.  I clock out at seven o'clock and sometime before or sometime after seven I was notified that -- to go to Camp Gruber in Muskogee County and meet up there.

Q      And did you go to Camp Gruber?

A      Yes, sir.

Q      And approximately what time did you arrive at Camp Gruber, sir?

A      It was after ten that morning.

Q      Okay.  When you got there how was the circumstance and situation presented to the members of the team in regards to what was going to happen and how were you all going to deal with it?

A     We were told we had an arrest warrant, search warrant for Mr. Barrett's residence in Sequoyah County and after that we just did the preplanning.  We had some photographs --

Q     What kind of photographs did you have?

A     Aerial photographs.

Q     What other information did you have about the location that impacted the plan that was developed by the troopers?

A     Just the area, numerous houses around the area and that there was kin folk around the area.

Q     You are going to have to slow down.  You are mumbling.  I'm really having trouble.

A     Just that he had a lot of kin folk in the area there around his house and it's a flat area.

Q     Okay.  When you make an entry into a building, what do you need to know in relation to the building?

A     We try to get the layout of the house, how many rooms, the front door, back door, stuff like that.

Q     Okay.  Did you receive information in regards to the layout of Mr. Barrett's premises?

A     Yes.  We had a mock -- a cardboard mock building, a small scale building that one of the drug agents provided that was just like his house.

Q     Okay.  Would you -- did you ever make entry into

Mr. Barrett's house?

A     Yes, sir.

Q     Would you look to Government's Exhibit 175?  It will be displayed just to your left there on the screen. Do you see the -- Government's Exhibit 175?

A     Yes, sir.

Q     Okay.  And can you advise the jury as to how accurate the layout that you got from the drug agents is to the floorplan of Mr. Barrett's house as is shown in Government's Exhibit Number 175?

A     If I remember right, the furniture wasn't in the mockup we had, but the rooms were similar to what is shown there.

Q     Okay.  And did the model that was provided from the drug agents -- was that sufficient to assist you in what you needed to know about executing this warrant?

A     Yes, sir.

Q     Okay.  What kind of warrants did the tact team accept to -- as far as search warrants?

A     Usually it was a high risk warrant.

Q     After the floorplan was shown, the fact that kin folk lived around Mr. Barrett and the terrain was discussed and you saw the aerial photographs, was a plan formulated in regards to the entry?

A     Yes, sir.  We discussed several ways of getting to

the house and we finally agreed on a rapid approach using the vehicles.

Q     Was that the final plan or the rapid approach was the --

A     I believe it was the final plan.

Q     Was there a plan that was formulated during the afternoon?

A     Just using the rapid approach, driving up to the house.

Q     Okay.  Do you recall any discussion about a creek team?

A     Yes, sir, we talked about whether we should put one out or could put one out.

Q     And was there any determination initially as to whether or not a creek team would be used?

A     We wound up not using them.  We were afraid they were going to be left in a bad disadvantage, no help, couldn't get any help to them if something went bad.

Q     What caused the determination to not use the creek team?  Do you recall?

A     All of the houses around, like I said, and the flat terrain.  It was --

Q     Well, how was that information learned about the terrain and everything else that resulted in your decision not to utilize the creek team?

A      Buddy and -- I can't remember if it was Rick or Raymond or Rick and Rocky, I'm sorry, did a driveby on the house and came back and decided not to.

Q      Okay.  Ultimately where was the entry going to be made?

A      At the front door.

Q      Okay.  And I -- okay.  How were y'all going to get positioned to get to the front door?

A      We were going to drive our vehicles up, park close to the east side of the house and on foot walk up to the door.

Q      Okay.  Would you look to --

            MR. LITTLEFIELD:  And I'm going to ask that Government's Exhibit Number 69 be displayed.

BY MR. LITTLEFIELD:

Q      Do you recognize Government's Exhibit Number 169, sir?

A      Yes, sir, I do.

Q      Okay.  If you touch the screen -- if you just tap it, it will leave a mark where you tap it.  Can you tap Mr. Barrett's residence on --

            THE COURT:  Counsel, just for the record, it's 69, not 169.

            MR. LITTLEFIELD:  I apologize if I said that, yes, 69.

BY MR. LITTLEFIELD:

Q      Tap the screen where Mr. Barrett's residence is.

A      (COMPLIED)

Q      You need to tap it again.

A      (COMPLIED)

Q      Okay.  And do you -- which way is east, right, left, bottom or top?  Do you recall or have you got a problem with directions or not?

A      It would be more -- probably more to the left than the top area.

Q      Okay.  Does that show the area of approach?  Can you see how you were going to approach in that photograph, sir?

A      Yes, sir.

Q      And how were you going to approach the residence?  How was the entry team to approach it?

A      All of the cars -- you can see the cars out on the dirt road.  That was our approach area at the very top of the screen.  Right there is where you see a white road, it's a gravel road.  We came in that driveway at the top of the screen and you will see a -- just a dirt path, a dirt path that leads up to -- that's my patrol car sitting there it looks like.

Q      Where is your patrol car?  Can you tap on it?

A      (COMPLIED)

Q       Okay.   Who was the first vehicle in the entry team?

A       The lead vehicle was dirven by Buddy Hamilton and Rocky Eales was riding with him.

Q       The second vehicle?

A       Yes, the second vehicle was Raymond Greninger and he had Rick Manion with him.

Q       Okay.   And what kind of vehicles were Buddy Hamilton and Raymond Greninger driving?

A       They were driving Ford Broncos, full size Broncos.

Q       And that is your vehicle, the third vehicle?

A       Yes, sir.

Q       Okay.   And who was your passenger?

A       I had Agent Danny Oliver with me.

Q       Okay.   In discussion of the entry to this residence, how many people were going to actually -- and you said awhile ago that the entry was going to be made through the front door.   How many people were going to go through the front door, sir?

A       All together it would be five of us.

Q       And when you say five of us, were you included in the entry?

A       Yes, sir, I was.   I would have been the last one through the door.

Q       What was your role as the fifth man to go through the door?

A      The first thing I was to do was get the front door open.  I was the entry man, the ram man with the door entry tool.  Then I would just drop back and would be the last man in if they needed me.

Q      So you might or might not have gone in, depending upoon whether it was necessary, but you were the one who was going to bust the door open?

A      Yes, sir.

Q      You said a ram tool?

A      Yes, sir.

Q      What was your ram tool?

A      It's a piece of pipe, probably two and a half foot long.  It's got a square end on it and it's used for ramming doors, opening, if needed.

Q      Okay.

            MR. LITTLEFIELD:  May I have just a second to consult, Your Honor?

            THE COURT:  You may.

                            (PAUSE)

BY MR. LITTLEFIELD:

Q      As you approached, what was to be done in regards to emergency lighting, sir?

A      Turn our red lights on, overhead lights, grill lights, whichever we had before we got to the residence.

Q      Okay.  Where -- I mean, were you going to do it at

Camp Gruber, were you going to do it at I-40, Dwight Mission Road? Where were those lights to be initiated?

A    There at the county road before we turned in the driveway.

Q    Okay.

MR. LITTLEFIELD:  Your Honor, I would ask that the witness be allowed to step down and go to Government's Exhibit Number 1.

THE COURT:  You may, sir.

MR. LITTLEFIELD:  And may I approach also?

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q    And Trooper Hash, you don't have any amplification, so you are going to need to speak real clearly. We may have some amplification, a microphone.

(PAUSE)

Q    Can you retreive the microphone from the clerk?

A    (COMPLIED)

Q    All right. And would you -- I have started those vehicles. Would you show the position where the first vehicle, which was occupied by Trooper Hamilton and Trooper Eales, was supposed to make entry onto that property? Can you take that vehicle and actually place it in the ditch?

A    Yes, sir. This is the driveway here, this is the

driveway -- I think the driveway -- it's just a dirt path leading up to the Barrett residence.  I don't know how far you want me to go with that.

Q      Go ahead and place it in the ditch.

A      (COMPLIED)

Q      And would you place Trooper Greninger's Bronco as to where it was in relation to Trooper Hamilton's Bronco? How far back -- where it would have been when Buddy's vehicle was right there?

A      Just almost bumper to bumper, real close.

Q      Okay.  And where were you, sir?

A      I was still in the driveway when he got in the ditch, just real close.

Q      Where did you initiate -- be sure and speak into the microphone.  Where did you initiate your emergency lights, sir?

A      Back here on the county road.

Q      Where was it in relation to the turn-in?

A      Right about the turn-in.

Q      Who actually turned the light switch on in your vehicle?

A      I did.

Q      And who was the passenger in your vehicle?

A      Danny Oliver.

Q      After Mr. Hamilton passed through, where would he

have been at the time Trooper Greninger was in the ditch?

A       Well, when he cleared it -- about the time he cleared it is when Raymond got into the ditch.

Q       And where was your vehicle at that point?

A       I was starting to turn in.

Q       Did you observe or what did you observe in relation to the ability of the two Broncos to cross that ditch, sir, as you are approaching?

A       Well, they hit it hard.  I was uncertain whether or not Buddy's bumper hit the front side.  It rocked, just rough.

Q       Okay.  When you saw the two Broncos rocking as they were going through the ditch, what went through your mind in regards to your ability to clear that ditch?

A       I figured I better hit it pretty hard or it would be a problem.

Q       Would you position the two Broncos as to their location, the best you can, where they were when you were going through the ditch?

A       Well, they were accelerating out.

Q       What happened when you hit the ditch, sir?

A       It was rough.  I had some smoke tear gas laying between the seats and it bounds all over the place, everywhere.

Q       Okay.  In fact, was there any damage to your

vehicle?

A      Yes, sir.  I wound up --

Q      I'm sorry, but you are going to have to speak up.

Q      I had some spring coils collapse down and they had to tow it off.

Q      As this entry is being made, did anything unexpected happen?

A      Just about that time, about the time I hit the ditch and I was coming out of the ditch, we had shots getting fired on us.

Q      Where were you when you first detected that shots were being fired on you all?

A      About the time I was clearing the ditch, coming out of the ditch.

Q      Where was Trooper Greninger's vehicle?  Were you in that position exactly or at -- moved in any way -- I want you to place your Crown Vic there where it was, the best you can, when you first heard the shots being fired?

A      I was coming out of the ditch and they were pulled a little bit ahead of me.

Q      When that happened could you tell where the shots were coming from?

A      The first time I saw the shots or that fire was coming out -- where it was coming from was around the front door of the house.

Q    Where was your vehicle when you first ascertained that the shots were coming from the front door of the house?

A    I was driving some place between there to where I stopped at.  They had come on up ahead and I stopped in here some place.

Q    Okay.  So it was when you stopped that you first ascertained that the shots were coming from the front door?

A    No, not stopped.  I knew where they were coming from.

Q    My question is, when did -- when was it that you first could tell that the shots were coming from the front door?

A    Some place between the ditch -- just in this area.

Q    Okay.  And what was the original plan as far as where the vehicles were to park, sir?  Had there not been any shots, where would the vehicles -- where were the vehicles supposed to have gone?

A    Well, the plan, I'm pretty sure, was to go and park in that area, approach the house.

Q    Okay.  And could you position the vehicles where they ended up?

A    Well, mine wound up just about where it is now, but Buddy's wound up on the left side of the porch area

and Raymond's was in here.  I really don't -- I can't say exactly where, but it was around that area.

Q     Is that as close as you can recall, as to the location of Raymond's?

A     Yes, sir.

Q     Okay.  Go ahead and return -- go ahead and turn the microphone back to the clerk there and return to the stand, sir.

A     (COMPLIED)

Q     I would ask that Government's Exhibit 192 be displayed.  Do you see Government's Exhibit Number 192?

A     Yes, sir.

Q     And the vehicle out to the right side, the black and white out to the right side of the Barrett place there, Barrett's house, whose vehicle is that?

A     It looks like my vehicle.

Q     Okay.

A     It looks like my vehicle.

Q     As you approached it, what did you do with your lights?

A     On the county road --

Q     No.  I mean, as you approached it to come up and park there, what did you do with your lights?

A     I left them on.

Q     From the time you left the county road until you

stopped there, were they on the whole time?

A    Yes, sir.

Q    Did you turn them off at any point in time?

A    I never did.

Q    You indicated you were the ram man?

A    Yes, sir.

Q    And you described the tool.  Where was that tool kept?

A    I had it to my left-hand side between the door and the car seat.  I had it resting there.

Q    Okay.  And when you pulled up, do you recall what happened to that ram tool?

A    I got the door open and I kicked the ram off to one side.

Q    As you look at the black and white there in 192, can you see the ram tool?

A    (NO RESPONSE)

Q    We are going to go ahead and bring this into focus.  That's a little too close.  Can we take it back a little ways?

      Okay.  Can you see the ram tool now?   I understand it is somewhat pulled out of focus?

A    Yes, sir, I'm sure it's there beside the door.

Q    Okay.  And where is it -- is it standing up, on the ground or what?

A       Resting along side of my car, the side of the car.

Q       Okay.  You mentioned -- and put your hand over the area approximately where you observed the shots coming from, where you were when you saw the shots coming from the house?  Describe to the jury what you saw at the front door when you were learning where the shots were coming from.

A       A lot of smoke, flash.

Q       When you say flash, what are you talking about?

A       Gunshot.

Q       I'm sorry?

A       Gunshots.

Q       And what would cause that flash?  What is that called?

A       Gunshots, somebody shooting a gun, firing a weapon.

Q       Are you familiar with night firing?

A       Yes, sir.

Q       And how far does the muzzle flash go?  How far out visible is it?

A       The flash is probably about two foot out from the barrel.  It's visible from a long distance.

Q       Okay.  By the way, what were the lighting conditions that night?

A       It was -- it had been a beautiful night.  It was a full moon, no clouds.  It had been a pretty night.

Q       When you see the muzzle flash and smoke coming out of the front door, what was the position of Mr. Hamilton's Bronco?

A       He was approaching the front of the house and drove up to the house.

Q       Okay.  How far back was Mr. Hamilton's Bronco when you were seeing the flame or the flash and smoke coming out of the front door?

A       It started off just about where my car is sitting there.

Q       Okay.  And I think you moved that Bronco along a path.  Is the path that you approached from the path that Buddy was driving?

A       Yes, sir.

Q       Okay.  Where in that path that you described was it that -- or what was getting hit by the gunfire?

A       Well, at the time when Buddy was driving up I saw something ricochetting -- well, not ricochetting, but -- it's hard to describe what it was.  I didn't know what it was.  It was paint and windshield coming off the front of the truck.  I didn't know at the time.  It was just a poof because I didn't know at the time.  I know what it is now.

Q       How do you know what it is now?

A       After I figured out we had been shot up.

Q       What was it that you were seeing?  Can you describe

it?

A      It was just on the front of the truck -- it was the front windshield area and the hood area, just a white poof.  You could see twinkling.  If you have ever seen twinkling -- it was the windshield is what it was.

Q      Twinkling in the air --

A      Blasts.

Q      And was there any color that you discerned to that twinkling?

A      Yes, it was white.

Q      Where was Buddy's vehicle, the lead Bronco, when you saw the twinkling and the puffs coming from the windshield area?  How far from the house was it?

A      Probably -- I would say 20, 25 yards.

Q      Did you see anyone in the area of the front -- out in the front yard?

A      At some time I did see a man on the -- it would be the far side, this side of the house.

Q      Okay.  When was it that you saw that person?

A      While I was doing my approach.  I glanced and saw him.

Q      Okay.  Which portion of your approach was it that you saw the individual out in the front yard?

A      About the time -- probably before we all got stopped right there.  I remember seeing somebody standing

out there.  I think he had his hands out.

Q     In the photograph which is displayed, where was the individual you saw in the front yard?

A     He was around to the -- it would be -- I'm sorry, that's in the wrong place.

Q     Well, now I have got two lines.  Can you erase it and do it again?  Where you tap it is where it's going to mark.

A     (COMPLIED) Right close to that area.

Q     Okay.  And what was that individual doing?

A     You know, I just -- I just remember seeing him. You know, his hands weren't out.  He was just standing there.

Q     Okay.  When you saw the individual out in that location in the front yard, were the shots already being fired, had they started yet?

A     Yes, sir.

Q     Okay.  And you pulled up to that area where your vehicle is located?

A     Yes, sir.

Q     And when you stopped, what did you do?

A     I kicked the ram off, got it out of my way.  I got out and had a shotgun in a sling over my back.  I got the shotgun off my back and I went to the -- it would be the east side of the house where the blue pickup is sitting.

Q     Yes, sir.

A     I went from there -- all of the time this is going on, the flashes look like someone is backing up into the house.  I could see he was backing up.  I thought maybe he was going toward the back door.  So I went close toward the house, checked it real close, just glanced and went back up to that blue pickup.

Q     Okay.  Describe what you were seeing at Buddy's vehicle as it was there at the front and as you got out of the house.  What was happening in and around Mr. Hamilton's Bronco?

A     While I was getting out, getting parked and then getting out, I saw Rocky get out of the passenger side and run to the back of the truck.

Q     How did Rocky exit the vehicle?

A     Very rapidly.

Q     Okay.  I mean -- describe it.  Did he back out, right side out to the left, do you recall that?

A     From the passenger side he kicked out and he went to this side, the right side.

Q     Okay.  Would you describe it as normal exit from the passenger side, abnormal or what?

A     No, he was at a run.

Q     He was what?

A     At a run, he was moving fast trying to get behind

the vehicle.

Q    And did you notice anything about Rocky's movement as he got out of the vehicle and moved towards the rear?

A    No, except for moving rapidly to the rear of the vehicle.

Q    Did you see what happened when he got to the rear?

A    No, I did not.

Q    Where were you going?

A    Towards that east side of the house.

Q    Okay.  In regards to that blue pickup that is there, it's also located on the model and you saw its location on the model.  How accurately is it positioned as it is depicted on the model?

A    That's it.

Q    Okay.  Your passenger was Danny Oliver?

A    Yes, sir.

Q    As you exited your Crown Vic, did you see where Mr. Oliver went?

A    No, I did not.

Q    Okay.  What was Mr. Oliver's role to have been? Had entry gone normal -- you said five people were to enter.  What was Mr. Oliver's role to have been?

A    Just an extra man if we needed him.  He was going to do security for us.

Q    Where was he to do security?

A    Just outside of the building, around my car, around the front, wherever he was, he was just an extra man.

Q    Okay.  The third vehicle or the fourth vehicle, who was that?

A    That's Major Pettingill and Lieutenant McBride.

Q    You were three.  Who was beside you?

A    Oh, Gene Hise was in a patrol car behind me.

Q    Okay.  And do you recall who were the passengers, if any, with Mr. -- with Trooper Hise?

A    Darst, Robert Darst and Billy Poe.

Q    And what roles, if you recall, were Darst and Hise to occupy once they came to that location?

A    They stopped in front of the house, out in front of the house.  They were to catch any runners that ran towards his mother's house.

Q    And where were they to go on the property in order to be able to catch runners going towards the mother's house?

A    You really can't see it from there, but it would be --

Q    Where were they ultimately to end up?  Can you see where they were to end up in Government's Exhibit 192?

A    No, I can't.

Q    Let's put Government's Exhibit 69 back up.  Do you

see where Hise's vehicle was to have stopped, sir?

A      Yes, sir, just right in that area.

Q      Okay.  And there is a black vehicle at the -- on the shaft of your arrow?

A      Yes, sir.

Q      Where in relation to that black vehicle were Hise and his vehicle to have stopped?

A      Just in that area.  There was a gate where that vehicle is sitting, there was a gate that was shut.

Q      Okay.  Darst and Hise, you said, were to pick up runners going to mother's.  Do you know where the mother's residence was located?

A      It was described to us as this house here.

Q      Okay.  And where were they to have gone in the yard?

A      Over to the fence or just wherever they were needed.

Q      Okay.  Now, can you see the area in this where the individual was out in the yard when the shots were being fired?

A      Yeah, he was some place -- he was right in that area.  He might have been closer to the front of that truck.

Q      Did you ever see Darst and Hise on the west side as you were doing your activities on the east side?

A      No, I really don't think I did.

Q      Okay.  As you went to the east side to provide cover

and security, what officers, if any, did you observe in performance of their duties?  You already said you saw Rocky moving rapidly toward the back of the vehicle.  Did you see any other officer in the area?

A      I went back up toward that blue truck and Rick Manion was there by the blue truck.  He was looking in one of the windows.

Q      And were you guarding any of the windows?

A      Yes, sir.  Rick had the window just directly in front of him.  There was an upstairs window and another window to my right.  I was trying to watch those windows and watch the back of the house.

Q      Okay.

          MR. LITLTEFIELD:  I would ask that Government's Exhibit Number 11 be displayed for the witness.

BY MR. LITTLEFIELD:

Q      Do you recognize what is shown in that photograph?

A      Yes, sir.

Q      Is that, in fact, the east side of the house, the blue pickup?

A      Yes, sir.

Q      Was the area in which you were located contained in this photograph?

A      Yes, sir.

Q      Where were you located, sir?

A       Just -- back it up a little bit.  Just this area right in between -- I backed up where I could see that window, the window to my right.

Q       How far back from the pickup were you standing in order to see the -- to the right and the window up above?

A       I just didn't step back maybe a foot, two foot, just where Rick wasn't in my line of view.

Q       Okay.  And you said Trooper Manion came around to that side?

A       Yes, sir, he was there when I -- we all got there about the same time.

Q       And where did Trooper Manion go?

A       He was in this area here.

Q       And where was he in relation to the pickup truck?

A       Just right beside it on the passenger side.

Q       Okay.  How far from it was he?

A       Just right beside the truck.

Q       Just right there?

A       Right there.

Q       And your focus was where, sir?

A       I would say -- I knew Rick had that window in front of us, I was trying to watch the windows that weren't covered.

Q       Okay.  As you were watching the upstairs window and I think you said one on the right --

A       Yes, sir.

Q       What happened in relation to Trooper Manion's weapon?

A       I heard him fire his weapon and I could see he had shot through the window, the curtains moved.  He shot twice, just a couple of rounds each time.

Q       Okay.  When Trooper Manion fired the shots through -- is it that window you can see right there?

A       Yes, sir.

Q       When he fired the shots into that window, what were you able to observe, if anything?

A       After he had fired the shots, after I heard the gun go off, I looked down and there was a window in front of me and I saw the curtains move and I saw a shadow of a person fall on the inside.

Q       Okay.  Did you hear anything at that point?

A       Yeah, I heard somebody holler and somebody in front of the house was saying either come out or get down or somebody was hollering something.  I can't remember which one it was.

Q       Could you recognize the voice as to who it was that was hollering come out or whatever it was?

A       Yeah, I was thinking it was Buddy.  I'm pretty sure it sounded like Buddy.

Q       Okay.  Then what happened?

A       Raymond Greninger hollered at Rick and told Rick

don't shoot him or that Buddy was going in the house.

Q       Speaking of Trooper Manion's weapon, what was he firing?

A       It's an MP-5 submachine gun.

Q       Okay.  And are you able to hear the fire?

A       It's a suppressed weapon, it's pretty quiet, but you can hear the bolt slapping as it feeds the rounds in. It's about like a .22 rifle going off, something like that.

Q       And when Raymond said Buddy is going in, what did you and Trooper Manion do, sir?

A       We came around the rear of the truck, went up on the porch, made it in the front door and Buddy was coming -- had hands on Mr. Barrett bringing him out.

Q       Who had his hands on Mr. Barrett bringing him out?

A       Buddy Hamilton.

Q       And how was Buddy bringing Mr. Barrett out?

A       He had his hands on him.  He had his hand in his hair and was dragging him out towards the front door.

Q       Okay.

        MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 12 be displayed.

BY MR. LITTLEFIELD:

Q       Do you recognize that photograph, sir?

A       Yes, sir.

Q       What is shown in it?

A        The front of the Barrett house and one of our shields, entry shields.

Q        Okay.  Does that show the area where Trooper Hamilton dragged Mr. Barrett out?

A        Yes, it shows the front door, yes.

Q        And where did Mr. Barrett end up as Trooper Hamilton dragged him out?

A        He wound up -- we were in this area here, maybe a little bit further out towards the shield.

Q        A little further which way?

A        Back here toward the shield, the black shield.

Q        Okay.  Were you there when Mr. Barrett was dragged out to approximately that location?

A        Yes, sir.  Buddy --

Q        I'm sorry?

A        Buddy had his hands on him in the front room and was bringing him out toward the front door.  Buddy had one hand with a pistol in his hand and I had one hand on my shotgun and I grabbed him just by an arm and we drug him on outside and dropped him about where the arrow is.

Q        Who was it that dragged him out, yourself, Mr. Hamilton or was it both of you?

A        It was a combination. Rick Manion got his hands on him there some place and we all three drug him.

Q        Was Mr. Barrett on his side, back, face up, face

down or do you recall?

A    Face down.

Q    How long was his hair?

A    Long, over the shoulders probably.

Q    Okay.  What was Mr. Barrett's condition?  Had he been shot?  Could you tell?

A    I did find out, yeah.

Q    Do you recognize the person who Buddy was dragging out and you assisted to drag out into the front yard being present in the courtroom today?

A    Yes, sir.  He's sitting right there in the blue shirt between two lawyers.

Q    Okay.

MR. LITTLEFIELD:  I would ask that the record reflect that the witness has identified the defendant, Kenny Barrett.

THE COURT:  The record will so reflect.

BY MR. LITTLEFIELD:

Q    When Mr. Barrett was placed in the front yard out there, where were his hands?

A    His hands were -- when he was drug out his hands were still under him.

Q    Was he still face down?

A    Yes, sir.

Q    Did you notice any kind of movement of his hands?

A       Just when we were pulling his hands out from underneath him trying to get him handcuffed.

Q       What, if any, search was done on him for weapons when he was drug out?

A       Yeah, when we drug him or he was drug out, dropped off, Buddy was on his right-hand side by the shoulder area.  Rick asked for a set of handcuffs and I gave my handcuffs to Rick.  They got his hands behind him, cuffed him.  Rick rolled him up on his right side, did a quick -- just a pat down, frisked him, and he pulled a pistol out from underneath him and tossed it to the side.

Q       Did you see the pistol?

A       Yes, sir.

Q       Describe it.

A       It looked like a Smith & Wesson.  I don't know if it was a chrome or nickel or --

Q       I'm sorry?

A       It was a shiny color.

Q       If you will look at Government's Exhibit 12, do you see the Smith & Wesson that was pulled out of his waist band?

A       No, sir, I don't see it.

Q       I'm sorry?

A       I don't see it in this, no.

Q       Do you see the shadows where there is the cross?

A      Yes, sir.

Q      What do you see in that area?

A      Let me put my glasses on.  It looks like a gun.

Q      Okay.  Tap, if you would, what looks like a gun.

A      Right over in the middle...

Q      Is the arrow covering it now?

A      Yes, sir.

Q      And where in relation to that arrow was it that the Smith & Wesson was tossed by Manion?

A      It was tossed right about that area right there.

Q      Okay.

        MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 122 be displayed to the witness.  It's up there.  Government's Exhibit 122, it's the firearm.

                        (PAUSE)

BY MR. LITTLEFIELD:

Q      Do you see Government's Exhibit 122, sir?

A      Yes, sir, I do.

Q      Go ahead and hold it up.  Do you recognize that?

A      That looks like the gun he had.

        MR. LITTLEFIELD:  I would ask that you hand it back to the clerk.

BY MR. LITTLEFIELD:

Q      When Mr. Barrett's hands were underneath his body as he was out in the front yard, were they still or was

he doing something with them?

MR. HILFIGER:  Your Honor, that has already been asked and he answered that.  He said no movement.

MR. LITTLEFIELD:  I don't think he did.

THE COURT:  Overruled.  You may answer.

BY THE WITNESS:

A     His arms -- he had -- Rick had to pull his arm out from underneath him to get him handcuffed.

Q     Okay.  Were you involved in patting down Mr. Barrett?  You said that Trooper Manion pulled the firearm from the front of his waist band.  Were you involved with patting him down?

A     Yes, sir.  Rick had rolled him, like I said, up on his right side and did a search on his left side.  After Rick brought him back down, I rolled him up on his left side and patted him down on this left side and didn't find any weapons.

Q     Did you -- as you patted him, did you feel anything that -- in any of his pockets?

A     Yes, sir, there was what felt like a pill bottle in his right front pocket.

Q     Okay.  When you say right front, pants, shirt or what?

A     Pants pocket.

Q     And it felt like a what?

A      Like a pill bottle, a small pill bottle.

Q      Did you do anything with the pill bottle?

A      No, sir.

Q      After Mr. Barrett was cuffed and was out in the front yard, what was done in order to watch and maintain security over his person?

A      Well, after he was cuffed and left on the ground, I kept -- I maintained custody of him until the sheriff's deputy and sheriff personnel got there.

Q      And when the sheriff's deputies arrived, to whom was Mr. Barrett's custody surrendered?

A      Sheriff Philpot.

Q      And who turned Mr. Barrett over to Sheriff Philpot?

A      I did.

Q      When you went out there what functions were the tactical team supposed to perform on this mission?

A      We were going to do the entry and secure the residence.

Q      Okay.  And were you going to search?

A      No, we were not.

Q      After the residence was secured, what was going to be done with the residence in regards to the local law enforcement officers?  What were you all going to do as far as the residence was concerned with local law enforcement?

A     We were going to turn it over to the local agency and we would be leaving.

Q     Was there any other basis for you all's going out there besides the search warrant?

A     I had an arrest warrant for him.

Q     For who?

A     Mr. Barrett.

Q     When you were standing there with custody over Mr. Barrett had the entire residence been checked and cleared so that it was certain that all was safe?

A     It was searched after he was handcuffed.  Danny Oliver, I believe, and Raymond, they went in and secured the residence.

Q     Okay.  Did you see Rocky during this period of time?

A     Yes, sir, sometime during that I -- I heard somebody say we had a man down and I looked back at the Bronco and Rocky was down at the back of the Bronco.

Q     Okay.  And what was -- where was he?

A     He would be to the right rear behind the Bronco.

Q     Okay.  On the ground or what?

A     On the ground.

Q     What attention was being devoted to Rocky at that time?

A     Well, I walked back toward him and Rick Manion at some time got there, Raymond or Gene Hise got there with

him.   They started stripping -- pulled his helmet off, they pulled his vest off, and they were talking to him.

Q     Did you hear what they were saying?

A     They were just trying to tell him to hold on.

Q     I'm sorry?

A     They were telling him to hold on.

Q     Was there an attempt at that time being made to provide medical attention?

A     They were doing what we call triage, just checking out his injuries and they were waiting on the medical personnel to get there.

Q     What happened in regards to Rocky and in relation to see that medical care was provided to him?

A     Part of our training is we train for evacuation of wounded.  We were trying to get him loaded up and the plan was load him up in the Bronco and get him to either a hospital or an ambulance, some place to get medical treatment.

Q     Do you recall the attempts, if any, to load him up in the Bronco in which he had been a passenger?

A     The talk was Manion -- I'm sorry -- Raymond Greninger tried to get the back door open.  He couldn't get the back door open.  Gene Hise said he would go get his car and he went out to get his car.  In the meantime, we got into Raymond's car and put him in the back of it.

939

Q    If you look back to Government's Exhibit Number 192 -- and do you see Gene Hise's vehicle in Government's Exhibit 192?

A    Yes, sir, I believe that's it sitting directly in front of the porch.

Q    Can you tap it?

A    (COMPLIED)

Q    Okay.  When was Gene Hise's vehicle placed in that location, Trooper Hash?

A    He went out and got it, drove it through the gate and drove it to that location.

Q    What was the condition of the metal gate when y'all arrived out there?

A    It was closed.

Q    And to get his vehicle in there, what did Trooper Hise have to do in relation to that gate?

A    He drove through it.

Q    And after he drove through it, how was Rocky transported?

A    While he was doing that, they got him around the back of Raymond's truck and had him loaded up and took him out.

Q    Were you out there with Mr. Barrett when the residence was cleared and secured by Oliver, Manion, Greninger and the others?

A       He was within my sight, yes.

Q       And while the attempts were made to clear it, were you there with him at that location?

A       Yes, sir, he was always in my sight.  I never got probably five foot from him.

Q       Okay.  Did the building get cleared, secured?

A       Yes, sir.  I heard one of them say so --

Q       I'm sorry?

A       I heard one of the officers say it was clear when they came back out.

Q       After they went in to clear it, did they come out with any other individuals inside that building?

A       No, sir.

Q       Okay.  When you went in the residence to help Buddy pull Mr. Barrett out, did you observe anything as far as weaponary?

A       Yes, sir.  I remember seeing a rifle laying in the floor.

Q       Okay.  I'm going to ask that 175 be displayed again. Do you recognize where the front room is?

A       Yes, sir.

Q       Okay.  And can you tap the area of the front door?

A       (COMPLIED)

Q       Okay.  Where was Mr. Barrett when you first saw him as Rocky was -- either had or was taking him -- I'm sorry,

I said Rocky -- when Buddy Hamilton either had him or was taking him into custody?

A     It would be the area closer to the wall, probably dragging him out toward the front door.

Q     You mentioned seeing a rifle.

A     Yes, sir.

Q     Where was the rifle located, sir?

A     I can't remember if it was -- right around this door area in between the two rooms.  I can't remember if it was on the right-hand farthest room or the front room.  I just glanced.

Q     Can you tap the approximate area where that rifle was located?

A     Just there.

Q     Okay.  And is that where the doorway is, sir?

A     Yes, sir.

Q     Did you notice anything in that front room that reflected the firing of that rifle?

A     There was some brass laying all around the floor.

Q     When you say brass all around the floor, what are we talking about?

A     Spent rounds, the brass off the ammo.

Q     I would ask that you look at Government's Exhibit 175.  Did you see Goverment's Exhibit 175?

A     Yes, sir.

Q     Do you know what room the individual who took this photograph would have been standing in when they took the photograph?

A     The front room.

Q     Okay.  And the rifle, which you were referring to, do you see it?  And how would one identify it in that photograph?

A     It's got a number 11 in front of it.

Q     Would you look to what has been -- and it's not in evidence -- marked as Government's Exhibit Number 14? And you indicated that you observed spent brass.  Do you see where the spent brass was located in what has been marked as Government's Exhibit Number 14?

A     Well, it looks like about where all of the markers are.

MR. HILFIGER:  Your Honor, I'm going to object to him testifying about a picture that has not been introduced.

MR. LITTLEFIELD:  I asked him where it was, not to identify the specific picture, but if he recognized where it was in that photograph.

THE COURT:  Rephrase the question.

BY MR. LITTLEFIELD:

Q     Does that photograph display the area in which you saw the spent brass?

A     Yes, sir.

Q     In fact, can you see the spent brass that you observed or some of the items of spent brass that you observed in that photograph?

A     I suppose it's where the markers are.

Q     Can you see them in the picture themselves?

A     That looks like brass, yes.

Q     Is that where the spent brass was?

A     Yes, it was all over the floor.

MR. LITTLEFIELD:  I'm going to move admission of Government's Exhibit 14.

MR. HILFIGER:  No objection.

THE COURT:  It will be admitted without objection.

BY MR. LITTLEFIELD:

Q     And is that where the -- or where in relation to the spent brass do we see the markers?

A     It looks like it is right on the brass.

Q     Okay.

MR. LITTLEFIELD:  May I have just a second, Judge?

BY MR. LITTLEFIELD:

Q     Oh, let me ask one other area.  Do you know what Buddy's condition was?

A     Well, after Barrett was handcuffed, Buddy stood up

and put his hand to his face and I heard Raymond --
sometime during that time Raymond told him, hey, Buddy,
you've been hit.  He had a red spot coming off his
eyebrow and a red spot on his shoulder, his right shoulder,
blood.

Q     Okay.  And what was done with Buddy?

A     Raymond got his gun.  He still had his gun in his
hand.  He took his gun away from him and laid it on the
porch.

Q     Where on the porch did he lay it?

A     It would be to -- well, if you are going in the
front door, it would be on the right-hand side away from
the door.

Q     Okay.  What was done with Buddy, as far as
medical attention?

A     They walked him back -- there was a lot going on.
They had walked him back toward one of the cars and they
were looking at him and just waiting on the ambulance to
get there and then he was transported out.

Q     Okay.

          MR. LITTLEFIELD:  Could I have just a second,
Judge?

          THE COURT:  You may.

                    (PAUSE)

BY MR. LITTLEFIELD:

Q      As to this search warrant, what kind of a warrant was it?

A      It was a no knock.

Q      And in a no knock, what are you obligated to do before entering a residence when you have been given a no knock warrant by the Court?

A      Just enter the residence.

Q      Okay.  What requirements, if any, are there about announcing who you are when you have a no knock warrant?

A      None.

Q      Practically, what announcement do you make, if you make any, and when is it made if you are executing a no knock warrant?

A      As soon as we get the door open or enter the residence, we start telling everybody to get down and search warrant, police, search warrant.

Q      And that's when?

A      As we enter the residence.

Q      When?

A      As we enter the residence.

Q      Okay.  In a warrant in which -- one that is not a no knock -- that's a double negative, I guess.  What are you required to do if you just have a normal warrant in regards to announcing?

A      We knock and announce.

Q     And when is that announcement made, hey, we are the police, we have a search warrant and we are here to secure the premises?

A     As we get to the residence, get to the front door, knock on the door and announce.

Q     Your unit was to perform, I think you said, high risk situations?

A     That's the majority of what we do, yes.

Q     What was the practice of your unit in regards to announcing before entering the property?  I mean, even going on the property in regards to these high risk search warrants...

A     It depended on what type of warrant we were serving.

Q     Well, if you had a search warrant --

A     Yes.

Q     Let's say it's a knock and announce.  Would you stop before ever entering onto the property itself -- and I'm not talking about residence, but the property -- and announce that you were the police and that you were going to come on the property and then we are going to knock on the door?

A     No, that's not required, no.

Q     I'm sorry?

A     That's not required, no.

Q     Are you restricted from stopping at the edge of the

property and saying, hey, we are the police, we are coming in, we are going to search?

A      No.

Q      Would you want to announce that you're the police before entering the property in these high risk circumstances?

A      High risk?  No.

Q      Why?

A      That would be an extra risk and more time to get whatever they are going to do together to do it.

Q      When you turned the lights on or the lights on your vehicle, that's before you entered the property?

A      Yes, sir.

Q      Why do you turn the lights on before you enter the property?

A      Just to make sure that they knew that we were -- who we were, police officers, law enforcement officers.

Q      What lights were turned on by yourself?

A      I have a patrol car, just like the model, with the overhead lights.

Q      Are the overhead lights the only emergency lighting on your vehicle?

A      On that car, yes, they were.

Q      Are there rear lights?

A      There are, but I don't know whether I turned them

on or not.

Q       How about wig-wag headlights?

A       I did not have wig-wag, no.

Q       Okay.  Did you notice on Mr. Greninger's car whether he had emergency lighting on?

A       On his type of vehicle the lights are in the front and I was behind him so I couldn't see them if they were.

Q       Okay.  Well, do you recall as you were out in the yard whether his lighting was turned on or not?

A       No, I can't say I did, no.

Q       I'm sorry?

A       No, I didn't, I can't say I did.

Q       What were you paying attention to when you were in the front yard?

A       During the shooting or after the shooting or...

Q       During the shooting what were you paying attention to?

A       The front of the house.

Q       After the shooting, after Mr. Barrett was obtained or in custody, what were you paying attention to?

A       The houses to the east of us and the houses to the north of us, all of the houses around.  They were still a threat to us.

Q       Why did you perceive the houses around you as a threat to you?

A      Family members.

Q      Okay.  In the previous circumstances -- was there any restriction on when this warrant could be executed as far as time of day?

A      No.

Q      Okay.  Is that normal?

A      On a no knock high risk warrant, you can do it any time.

Q      Are there occasions -- have you all also done, on the tactical team, warrants that require -- what qualifies under Oklahoma law as a daytime execution?

A      We have, yes.

Q      And do you recall what times under Oklahoma law are daytime for the purpose of executing a warrant?

A      It's six a.m. or daylight until ten p.m., I believe is what it is.

Q      And if you executed a search warrant at nine o'clock at night -- well, let's go the other way.  Let's say six o'clock in the morning in the middle of December, is it going to be bright light outside or is it going to be nighttime still at six in the morning?

A      Yeah, it will still be dark.

Q      When you executed warrants that were even -- that were daytime warrants when it was still dark, still nighttime outside, did you all follow the same procedures

as far as turning on the lights when you entered the property?

A     Yes, we usually do, yes.

Q     And in those prior circumstances where you executed a, quote, "daytime warrant" when it was dark outside and you had your lights on, did y'all ever get shot at previously?

A     No, we had not.

Q     Do you recall an incident -- any incident prior to this in which you all were required to return fire?

A     No, sir.

MR. LITTLEFIELD:  May I have a second, Judge?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  It's a little bit after noon.  We will take the noon recess.  I'll ask the jury to be back here at 1:15.  If you will remember my admonition not to discuss this matter or allow anyone to discuss it with you.

Everybody please remain seated as the jury leaves.

(JURY OUT)

THE COURT:  Officer Hash, you may also stand down.

(WITNESS OUT)

THE COURT:  The jury has departed the courtroom

and the witness has departed the courtroom.

Anything outside the hearing of the jury on behalf of the government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  The defendant?

MR. HILFIGER:  No, Your Honor.

(LUNCH RECESS)

COURT IN SESSION

THE COURT:  Let the record reflect counsel for the government is present, the defendant is present with counsel.  I'm advised that there is a matter that the government would like to bring to the Court's attention.

MR. LITTLEFIELD:  That is correct, Your Honor. Last night, Ms. Speaker, our witness coordinator, was speaking to some of the anticipated witnesses trying to apprise them of the schedule and spoke to Trooper Robert Darst and -- and Mary Jo is here so she can advise you specifically of the contact.  Essentially, Trooper Darst reported that -- I believe it's juror number 46 saw him at a -- at some kind of deer hunting show or something of that nature and asked him a question in regards to when are you going to be up in Muskogee.  Darst apparently figured out that he was a juror, realized he shouldn't make contact, moved off, didn't discuss the case.  Mary Jo

can give you more details as to what Trooper Darst indicated to her.  I'm getting it third hand, but I wanted to make the Court aware of that contact.

And then I would also ask -- there were a couple of matters in regards to Trooper Hash that I realized over lunch that I hadn't asked -- had an opportunity or neglected to ask him and would ask to have an opportunity briefly just to reopen direct before we go to cross examination.

THE COURT:  Comment from the defense on the contact.

MR. HILFIGER:  Without more, it's sort of hard to say.  My initial inclination is I believe that he is an alternate, sitting as an alternate.  My concern is how this contact was made, if this was a -- if the contact was on his initiation, I have got a real concern about whether that's something proper he should have been doing and because of that, I have concern whether he ought to be sitting on this jury.  And the other problem, I don't -- I will just inform you of this.  When I was coming up to court -- and I didn't bring my juror questionnaire with me.  So I don't know -- my recollection was -- and this is totally recollection from two weeks ago or whenever, but my recollection was that when the names were announced I can't recall anybody really recognizing

the name Darst.  I remember there were other highway patrol people they recognized, but Darst wasn't.  That is sort of why I've got a problem with it.  How did he recognize that person if he hadn't recognized him before?  And I may be wrong on that.  I don't have my questions, so I can't see if that particular one did say that he knew Darst.  And then the other problem I have is if he is the one that initiated the contact, then I have concern that he may be doing things outside of the jury panel that he shouldn't be doing and that he shouldn't be on the jury.

MR. LITTLEFIELD:  I can -- Ms. Speaker can tell better than I exactly what was communicated to her by Trooper Darst.

THE COURT:  Come forward.

MS. SPEAKER:  What Mr. Littlefield said is correct.  Trooper Darst told me he was at some sort of a show.  I think it dealt with dear hunting.  Trooper Darst had seen some of that juror's family members earlier leaving the show and as he was leaving the show he ran into the juror and the juror asked him when he was going to be going to Muskogee.  Trooper Darst didn't know he was a juror, but figured it out after that comment was made and he left the show immediately and they did not discuss anything.  Trooper Darst said they didn't discuss anything about what had happened in court or what was going to

happen in court.  He simply was asking when are you going to be going to Muskogee.

THE COURT:  Okay.  Thank you.  I'm going to ask my clerk to bring the questionnaires in.

THE COURT:  Let me see counsel at the bench just a second.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

THE COURT:  First, can the court reporter hear?  That's the name --

MR. LITTLEFIELD:  That's the name that was reported to me.  It was reported, but I announced it by number in open court.

THE COURT:  Okay.  For the record, I'll provide counsel with a copy of the juror questionnaire.  I have not looked at it yet.  I'll let you look at it.

(PAUSE)

MR. LITTLEFIELD:  Well, I don't think the questionnaire had Darst's name.

MR. HILFIGER:  What I'm saying is that the day of the general voir dire when we went through the witness names and everything, I -- I can't really recall.  I know I made notes on my sheet, my big sheet, but I can't recall that name being mentioned.  The only name of a highway patrolman mentioned was Manion.

THE COURT:  That's the only one I recall.

MR. HILFIGER:  That's the only one I recall. You know, some people said they knew highway patrolmen, but they didn't give us a name.  That's why I was sort of surprised --

MR. LITTLEFIELD:  I think -- and I don't want to -- I didn't handle voir dire, but I -- someone mentioned that it was the same one that indicated he had meals at Manion's place or vice versa.  It was the same person.  I don't know that fact a fact.

MR. HILFIGER:  The one whose son died, who was at Manion's funeral?

MR. LITTLEFIELD:  Yes.

MR. HILFIGER:  That's not the same person as this guy, if that's what you are talking about.  The guy that said that his son was at Manion's funeral --

MR. LITTLEFIELD:  This was one that said Manion's family had supper there or something like that.

MR. HILFIGER:  Yeah, right.  That's not the same person.  The person who had -- the person -- this is the the person whose son was at Manion's funeral and had Manion's family over to his house or something.

MR. LITTLEFIELD:  Darst, I anticipate, will be here tomorrow and could be asked about this incident outside the presence of the jury.  I have got a little bit

of a problem with Mary Jo trying to report hearsay. That's the best I can do at this point, but I will advise that Darst is going to be here tomorrow.

MR. HILFIGER:  I don't have any problem putting this on hold because really I'm just sort of trying to recall from memory what questions were asked and -- I may not have made any note of it, but I just couldn't remember anybody saying they knew Darst.

MR. LITTLEFIELD:  And I am doing it as an officer of the court because it was something that needed to be addressed, but I certainly wanted to call it to the Court's attention.

THE COURT:  I had my clerk take pretty extensive notes and his name is not -- his name does not come up in the voir dire in any anything that we recall.

MR. HILFIGER:  That's my recollection.  That's why I was sort of surprised that he would approach Darst and say when are you coming up because he didn't act like he knew anybody.

MR. LITTLEFIELD:  Darst will be here tomorrow.

THE COURT:  It may be good to have a session with him outside the hearing of the jury and give you an opportunity to ask questions about it before we make a decision to excuse him.

MR. LITTLEFIELD:  Yeah, I certainly -- at this

point I don't have a problem with the Court asking him questions.

MR. HILFIGER:  All right.

MR. LITTLEFIELD:  And another deal is I did remember a couple of matters that I wanted to bring up with Hash that I neglected to ask.  I would ask to reopen briefly for direct.

THE COURT:  Okay.  Just -- let's don't go over what it takes to have a search warrant or --

MR. LITTLEFIELD:  I'm not going to kill that tree.  Judge, he --

THE COURT:  Cumulative, you understand that word?

MR. LITTLEFIELD:  I do.  Whether he saw shots or did not hear shots --

THE COUR:  No, no, I understand, but some of it was cumulative.

(END OF BENCH CONFERENCE)

THE COURT:  It's my understanding that the government wishes to recall Steven Hash; is that correct?  Not recall him, but reopen the direct?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Okay.  You may.  We will ask that the jury be brought in.

(JURY IN)

THE COURT:  Let the record reflect that the jury is in the box, counsel for the government is present, the defendant is present with counsel.

You may continue your direct examination.

### FURTHER DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     Trooper Hash, when you exited the vehicle, were you able to determine whether shots were still being fired?

A     Yes, sir, I remember seeing the flash and the flame of gunshots.

Q     As you were seeing the flash when you got out, when you saw the shots fired, what were you hearing in regards to those shots?

A     Well, it was weird because I wasn't hearing anything. I could see it, but I -- I don't know, I just -- I don't know.

Q     During other points, during other times of this incident, were you hearing the shots?

A     Yes, sir.  I do remember hearing shots, but I just don't -- as I said, when I got out of the car I was looking at the door.  I could see it, but I couldn't hear it.  I don't know if I -- I'm around gunshots quite a bit, gunfire.  I have been on the range all of the time, but I just couldn't -- I have thought that was strange.

Q       Okay.  Were you in a position to see the shots being fired as Trooper Eales was exiting that vehicle?

A       Yes, sir.

Q       And what were you seeing in regards to the shots as Trooper Eales exited the vehicle?

A       The same thing, the flash and flame coming out from the front door area.  I could see the muzzle blasts pretty good when I first got out of the car.  I knew he was backing up into the house, that it was getting bigger.  I knew he was backing up just from experience.

Q       Okay.

MR. LITTLEFIELD:  Pass the witness.

CROSS EXAMINATION

BY MR. HILFIGER:

Q       Mr. Hash, as I understand it, you didn't get -- instead of going to your regular duty on September 23rd, you came here, is that right, or were you just coming off your duty?

A       No, I got to -- six o'clock in the morning is when I went to work.  I actually worked a crash before I went to Camp Gruber and sometime during that time I got notified to be at Camp Gruber.

Q       Sometime after seven o'clock in the morning?

A       Yes, yes, sir.

Q       You were present when there was some kind of a

planning session going on on September 23rd in the morning, is that right, or were you aware of a planning session in the morning?

A    I think really when I was in there or whenever I started into it was after lunch time, is when we got into it.

Q    Okay.  At that particular time was everybody there from the Highway Patrol Tact Team?

A    After lunch?

Q    Yes.

A    I believe so, yes.

Q    Do you know whether you had -- was anybody from the local law enforcement there, other than -- other than Oliver?

A    Clint Johnson showed up at some time.

Q    At the planning session after lunch?

A    Sometime during that time, yes, sir.

Q    Now, was there -- in the -- did you have another planning session later on?

A    Yeah -- I don't know, I don't remember.

Q    Well, would you have had a planning session after you -- after Hamilton and Manion and Greninger did the drive-by?

A    Yeah, we filtered in and out, people coming in and out all of the time, tact team people.  I don't remember

whether there was an actual meeting where we got together at one time or not.

Q    When was it you decided, you know, to eliminate the creek team?

A    Sometime that afternoon.  I can't say exactly at what time.  I don't know.

Q    Okay.  Was it again at a time when the full group met?

A    Yes.

Q    Okay.  And at that -- well, at that time was there a determination as to lighting on the cars?

A    Yes, sir.

Q    And what was your understanding of the use of emergency lights on the cars?

A    That we were going to turn them on from when we got on the property.

Q    And you say we were going to turn them on?

A    I know I was --

Q    Who is we?

A    I know I was supposed to turn them on.

Q    Well, was there any discussion about anybody else turning them on?

A    I don't recall.

Q    You don't recall whether --

A    No.

Q      -- there was other discussion as to other people turning them on?

A      I think there was, but I can't tell you 100 percent, no.

Q      Okay.  Who would have been in charge of that, making that determination?

A      On whether we were going to do it or not?

Q      On who was supposed to turn on lights.

A      The team members and Captain -- Major Pettingill.

Q      It wasn't the kind of thing like you said, well, I'm going to turn mine on or -- well, I'm not going to turn my on?

A      It was --

Q      There was some plan, wasn't there?

A      We were told to turn them on, but I can't tell you who said -- I don't remember whether it was Pettingill or Rocky, as assistant team leader, or who --

Q      So you were told to turn them on and you are saying when you were told to turm them that it refers to all five cars?

A      I really couldn't tell you, no.  I know what I was supposed to do and I did what I was supposed to do.

Q      And in previous times you have testified -- you have said in answer to that question you were -- we were told to turn them on; isn't that true?

A       I probably did, yes, sir.

Q       Okay.  You just never defined who we was?

A       Yes, sir.

Q       When you -- you were understanding or did you understand that besides your group, there was going to be another group coming?

A       A group following us, yes, sir.

Q       And before you met that group, did you have any idea of who was coming and how many were going to be in that group?

A       I did not know.

Q       And when you got to Dwight Mission Road, how many people did you see there?

A       Probably been a dozen.

Q       A dozen?

A       Yes, sir.

Q       Is that what you were expecting?

A       No.

Q       Were you expecting more or less?

A       Less.

Q       Did you feel that that had any -- gave any reason to change your plans?

A       No, I really don't know what they were suppose to be doing.

Q       What now?

A       I don't know why they were there or what they were supposed to be doing.  I didn't get out of the car to talk to them.  We left shortly thereafter.

Q       You didn't talk to any of that second group?

A       No.

Q       At Dweight Mission?

A       No.

Q       As far as you know, were there any changes in your plan because of that second group?

A       No.

Q       The large --

A       None that I was told about, no.

Q       As I understand it, your first indicate of somebody outside that house was when you were on down that private drive; is that right?

A       I did hear somebody talk -- say over the radio there was somebody down the drive and when I was clearing that ditch I saw him, just glanced and knew somebody was there but I didn't know --

Q       So what I'm talking about is when you are down at that -- this is a private drive, this white road.  Okay?

A       Yes, sir.

Q       Do you see?

A       Yes, sir.

Q       And you are saying that it wasn't until you got to

that turn in right there that you had any knowledge either by hearing it or by seeing it of somebody in the yard?

A     Someplace in there.  I just can't say exactly where it was at.

Q     Okay.  Now, were you able to tell whether the -- whether anybody else had emergency lights on other than you?

A     I would say Raymond -- excuse me -- Raymond and Buddy's trucks had lights in the front, flashing lights in front of me and I just can't -- I can't say.  I didn't see it.

Q     That's the basic answer is you couldn't tell if anybody else had lights on?

A     I did not know.

Q     Emergency lights, I'm referring to.

A     That's correct.

Q     Including Pettingill and Hise's car?

A     No.

Q     Were you in a position -- when you were down here getting in this ditch were you in a position where you could see Hise's car or Pettingill's car?

A     I'm sure I could, but I wasn't paying attention to them.

Q     You were sort of focused going on that trail?

A     Yes, sir.

Q      Now, when you -- you were shown this model, the overhead view of the house.  I think it's Government's Exhibit Number 175.  Would you show it, please?  You compared that to the cardboard cutout that was given you, the layout that was given you or given to your tact team at Camp Gruber that you used; is that right?

A      Yes, sir.

Q      Now, you said that the cardboard layout didn't have furniture in it.  Did the cardboard layout have the rooms cut out like that?

A      I'm pretty sure it did.  I know there were rooms inside, yes.

Q      And as I understood it, you said you had a layout of the house and you had a layout of the house that included a front door and a back door?

A      Yes, sir.

Q      Okay.  Were you told anything about a back door on this house?

A      Yeah, there was a back door.

Q      There was a back door?

A      Yes.

Q      Were you told whether that back door was operable or not?

A      They did not tell us that, did not, no.

Q      You weren't told that, were you?

A       No.

Q       Now, this -- aerial number 69, do you recognize that?

A       Yes, sir.

Q       And I know this is daytime, but is that an accurate representation of where your car was?

A       Yes, sir, I never moved it.

Q       Okay.  And on that -- well, let me go on to something else and I'll come back to that.  Let's talk about this model up here.  My understanding is --

                    MR. HILFIGER:  If he may step down to the model, Your Honor?

                    THE COURT:  He may.

BY MR. HILFIGER:

Q       Would you take the two Broncos and the marked unit and put them back over here and then we will sort of -- right, put them back in the corner.  And on your marked unit, go ahead and take it out.  Without -- just doing one Bronco at a time, let's take that first Bronco in.  Take that on in and show us what route that Bronco took to go through the ditch.  That's Hamilton's Bronco?

A       Yes, sir.  Across the ditch...

Q       Now, at that point you didn't hear any fire, right, gunfire?

A       No, sir.

Q     Didn't see any gunfire?

A     No, sir.

Q     Take the Bronco and drive it along the route that you think Hamilton went on, if you were able to tell what route he went on.

A     (COMPLIED)

Q     And as you are going on that route, your left set of tires are not touching the green; is that right?

A     On his --

Q     On his vehicle.  I'm looking at what you are doing on your travel --

A     He was in more of the brown, black, the main part of the road.

          MR. HILFIGER:  May I approach?

          THE COURT:  You may.

BY MR. HILFIGER:

Q     I'm referring -- there is -- we have here a dark green right here, right?

A     Yes, sir.

Q     And then there's a lighter brown green or something like that?

A     Yes, sir.

Q     As Hamilton's vehicle came in on this route, can you tell whether his left front tire stayed on this brown green or did they get into this dark green?

A      I can't tell you, I don't know.

Q      You don't know?

A      No.

Q      Okay.  Where did that vehicle go on down, Hamilton's vehicle go on down?

A      It swung out a little bit left, kind of wide left and ended about right there.

Q      Okay.  Now, the next vehicle, same thing, crossed the ditch --

A      Same thing.  I don't know about the green or not -- and was coming in there.

Q      Okay.  Now, on -- on your vehicle, where did you go through?

A      Same thing, I went through -- I wound up in here some place.

Q      Now, what about your vehicle?  Did you follow the same trail and tracks as the Hamilton and Greninger vehicles?

A      I stayed mostly in what would be a path through there.

Q      What now?

A      I stayed in what would be the main path through there.

Q      So you are saying that your -- you stayed in the same path that at least Greninger stayed in?

A     Yes, sir.

Q     Is that right?

A     Yes, sir.

Q     Will you look at Exhibit Number -- Defendant's Exhibit Number 117, please?

THE COURT:  Do you want him to stay there or move?  If it would be okay, I would like him to stay there, Your Honor, because I'm going to have to come back.

THE COURT:  Okay, okay.

BY MR. HILFIGER:

Q     Now, on this 117, do you see these tracks here?

A     Yes, sir.

Q     And that track right there?

A     Yes, sir.

Q     Now, does that look like a track that some other car went in right before you?

A     It looks like somebody went there.

Q     Through there before you went through, right?

A     Yes.

Q     And that's your track?

A     Yes, sir.

Q     And you are to the right of that track; is that right?

A     That looks right, yes, sir.

Q     Other than Hamilton and Greninger, do you know any other vehicle that went in there before you?

A     No, I do not.

Q     So would you say that you went to the right of that track right there?

A     Yes, sir.

Q     Is tat what you are showing on the model?

A     It looks like it.

Q     It does?

A     I stayed in the main path and that's what I see there.

Q     Okay.  Then -- but now, as you said, Hamilton and Greninger didn't get on the dark green?

A     To the best of my memory, no, they didn't.

Q     And will you acknowledge that your car is to the right -- a car length -- I mean a car width to the right of that track right there?

A     Probably half, yes.

Q     Okay.  Now, let's back up these cars a little bit. At some point you said where the cars were when you -- the first one we want to talk about was when you first heard the gunshots.  Did you hear or see them first?

A     I heard them first.

Q     You heard them first.  Okay.  And align those cars up like you think they were when you first heard the

gunshots.

A     It was either in the ditch or coming out right or left.  I don't remember which one it was, but probably about that right there.

Q     Okay.  And at the time you first heard the gunshots, were you able to see anything?

A     Yes, during that time, yes.

Q     And what were you -- what did you see?

A     Still moving, we were still moving --

Q     I'm sorry.  Can you -- I cannot hear you.

A     Whenever he swung out wide --

Q     No, move that car back where you say it was when you first heard the gunshots.

A     That's where I heard the gunshots, right about that area.

Q     At that time did you see anything related to those gunshot?

A     Sometime during that time, but I can't tell you -- like I said everything is moving.

Q     What did you see related to the gunshots?

A     I heard the gunshots and while we were still moving is whenever I got to seeing the paint and the glass coming off Buddy's truck.

          THE COURT:  Let's have Officer Hash turn around so the jury can hear him.  I think the jury is having

trouble hearing him.  Yeah, like that.

BY MR. HILFIGER:

Q     So you are saying you heard the gunshots.  At the time you heard the gunshots, did you see any muzzle flash?  And I'm talking about when you first heard the gunshots.

A     Yeah, when I first heard gunshots -- whenever I was coming out of the ditch, my car was right there and I could hear it.  We were moving fast, but while Buddy is -- he swung out wide to the left, swung out wide to the left and I could see his truck paint and glass coming off of it.  I looked up on the front porch and I could see somebody.  It was all going on at one time.

Q     So you said Hamilton swung wide to the left?

A     Yes, sir.

Q     And that's when you saw stuff coming off of the hood?

A     About the time he was curving back in I could see it.

Q     Okay.  Put the car where you say it was when you saw stuff coming off the hood.

A     We were all moving probably right -- I had just come out.

Q     Okay.  Now, at that particular point your showing the back of the car -- of Buddy's car to your car; is that right?

A      I probably wasn't that close, some place in -- like I said, we were moving fast.

Q      And can you even see the hood of Hamilton's car?

A      Not until he starts to curve in, no.

Q      Well -- so at that point you couldn't see this stuff coming off the hood, could you?

A      No, but you have gun flashes coming off the front porch.  I knew what was going off.

Q      Let me back up and please try to speak into this microphone.  You first heard the gunfire.  You couldn't see anything.  Now, at this -- now, at this point I'm saying, when is the first time you saw something related to that gunfire?  And you are saying that's it right there?

A      Some place in there while everybody is moving.  Like I said, I could see flashes and --

Q      So the next thing you saw was flashes; is that right?

A      The first thing -- first thing was I heard it and then I saw the gun flashes.

Q      So the first thing is the sound?

A      Yes, sir.

Q      Nothing else?

A      (NO RESPONSE)

Q      Next was the gun flash; is that right?

A      Yes, sir.

Q     And where did you -- where were you when you saw the gun flash, right where you are now?

A     Yes, sir, coming out of the ditch, out of the ditch or coming out of the ditch when I got to hearing it.  Right about some place before I got stopped is when I saw everything else going on.

Q     Okay.  Now, at this point where are you saying you saw the gun flash?

A     Where was I or --

Q     Where was the gun flash?

A     The gun flash was up on the front porch.

Q     Would you sort of step to the end of that model and look down there?  Can you see the front door from the back -- from your car?

A     All of those vehicles were moving, yes, I could. They weren't sitting stationery.  I'm sorry.

Q     Okay.  And it wasn't until after the vehicles moved out of the way that you could see the muzzle flashes?

A     It was all going on at one time.

Q     It was just going like that, wasn't it?

A     Yes, sir, seconds.

Q     Okay.  And at what point was this -- was Hamilton's Bronco when you saw the hood and this -- when you saw the hood and this -- and this paint and windshield coming off? At what place was Hamilton's Bronco when you were able to

see paint and windshield coming off?

A    He swung out -- let's see, he swung out wide back in the curve here and it was some place in there before he got stopped --

Q    Okay.  When he was heading to the house is when you actually saw the paint and the windshield stuff; isn't that right?

A    Yes, sir.

Q    And then that car ended up to the left -- put it where it ended up.

A    (COMPLIED)

Q    And put Greninger's where you think his ended up and put yours where you think yours ended up?

A    (COMPLIED)

Q    Okay.  Good ahead and sit down.  I want to talk to you some more.

     Now, at this point is when you got out of the car -- let me ask you this:  Did you stop your car or did the car have a malfunction that caused it to stop on its own?

A    No, I was on the brakes, I stopped the car.

Q    But I guess later on you couldn't get it going again?

A    It wasn't drivable, no.

Q    Okay.  When you went into this ditch area with your car, isn't it true that you went a little bit further

than the other two cars did before you turned in?

A      Are you talking about on the driveway going into that path?

Q      Yeah, going into the -- where you went into the ditch.  Isn't that why you've got a different set of tracks than the other two cars did?

A      No.  I don't understand what you are trying to say. I'm sorry.

Q      Well, you will acknowledge on that one picture, 117, that your tire tracks aren't the same as the tire tracks to the left, are they?

A      I can't tell whether they are overlapping or --

Q      Can you see whether or not -- I can't show you on that, but can you see that that is a tire track and that's a tire track there?

A      Yes, sir, and I see another one too.

Q      What?

A      I see another track in there too.  There is one, two...

Q      That's your track right there and that's your track right there?

A      I can't say.  I don't know if that's mine or not.

Q      Okay.  Well, go to 192, I believe it is.

                         (PAUSE)

Q      For the purposes of this, look at Government's

Exhibit Number 69.  On this 69, would you agree that's your car right there, right there?

A     Yes, sir.

Q     And that is taken in the daytime.  You acknowledge that this car hasn't been moved since the time you stopped it?

A     I didn't move it, no.

Q     What?

A     I did not move it, no.

Q     Okay.  Now if I lay a straight edge down at the edge of that porch and over to the center of that ditch, would you say that's the center of the ditch and the edge of the porch?  I'm talking about the edge nearest to the house.  Would you agree with that?

A     Pretty close probably.

Q     It's pretty close.  Which side of that line is your car on?

A     The left side.

Q     What?

A     The left side.

Q     The left side.  Do you know which direction this picture is on the left side, which way is that?

A     My car is east of the house.

Q     You are east of the house, north or south?  That line is going there -- this line right here, which way

is this, north of that line or south of that line?

A       Maybe north of that line.

Q       North of that line.  And all of that car is north of that line, isn't it?

A       Yeah.  Your ruler needed to be moved a little bit different, or I thought it did.

Q       I can't hear you.

A       I thought your ruler needed to be moved a little bit, but it was close.

Q       Okay.  Well, which way do you -- you tell me.  There is the center --

A       It's squared up with the roof.  You see the roof line?

A       Okay.

Q       Move it like that?

A       The opposite direction.

Q       Un?

A       The opposite.

Q       Like this?

A       Yes, sir.

Q       That's squared up to the roof.  You are still more to the north of the line, aren't you?

A       Yes, sir.

Q       Okay.  Now  --

MR. HILFIGER:  May I approach the model, Your

Honor?

THE COURT:  You may.

BY MR. HILFIGER:

Q     Now, let's look where you have got your car now, Mr. Hash.  If I put this dowel in the center of that road and put this down here, your car is going to be north of that line, isn't it, if this is north?

A     Move that dowel over to the -- where the patrol sitting straight down on the edge of it.

Q     What now?

A     Move it to the -- that looks like it is straight in front of the house, pretty close to being straight in front of the house.

Q     Okay.  And you will acknowledge that when your -- with that line between the house edge on the porch and the ditch your car is north of that line; is that right?

A     It appears so.

Q     What?

A     It appears so on the picture, yes.

Q     Now, when your north of that line -- when you are north of what that line is, what can you see in the doorway?

A     Sitting there looking at the model, looking at the model?

Q     Yeah.

A    What can I see in the doorway?

Q    From your car.

A    Flashes coming out whenever --

Q    You can just see the flash?

A    Yes, sir.

Q    Did you ever see anybody on the porch?

A    No, sir, I did not.

Q    Did you ever see any silhouette of anybody on the porch?

A    No, sir, I did not.

Q    Did you ever see any body part of anybody on the porch?

A    I don't believe so, no.

Q    And you got out of your car and ran to the back of the pickup; is that right?

A    Yes, sir.

Q    Now, when you got up to the pickup, who was there?

A    When I first got to the truck, there was nobody there.  I went to the -- I did a quick peak to the back, went back to the truck, and then Rick was there --

Q    I'm sorry, I can't hear you.

A    When I left patrol car, I ran to the truck.  I did a quick peak near the back of the house, a quick peak just toward the back of the house, and I went to the passenger side of the pickup and Rick was there.  It was

all about the same time.

Q      Okay.  And when you got there, Rick was there?

A      Yes, sir.

Q      Do you know whether Rick Manion had -- what kind of weapon did he have, if you know?

A      9mm submachine gun.

Q      Called an MP-5?

A      Yes, sir.

Q      Do you know whether or not he fired his weapon prior to getting to that pickup?

A      I do not know.

Q      He came -- you came from the back of the house up to the pickup; is that right?

A      We are just talking about a few feet.  It's a small house.

Q      Yeah.  Do you know which area he came from?

A      I know he was in Raymond's truck.

Q      Somewhere out by Greninger?

A      Yes.

Q      The only shot -- did you see Manion fire before or after other than at the window?  Did you see Manion fire any shots at all?

A      The only shots I knew he fired is when I was standing right beside him on the passenger side of that pickup.

Q      And when he fired those shots, did -- how did he

fire the shots using that MP-5?

A       It's fully automatic.

Q       Okay.  Did he -- how did he hold the MP-5 in relation to that pickup?  Was he touching the pickup?

A       No, he was leaned over -- over the hood, leaned up over the hood.

Q       Okay.  Well, did he use his elbow as a rest on the --

A       No, I don't believe so, no.

Q       So he was just holding it up?

A       Yes, sir, just squeezed it up and fired.

Q       Okay.  And prior to him firing that MP-5, were you able to see in that window?

A       I could see the light reflecting in the front of the house.  I knew there was a light on in the front room. I don't remember seeing any movement.  Like I said, I took my eyes off when I was looking from the -- to see the other windows, when I was looking at the other windows. I don't know what he saw.

Q       Okay.  So you didn't see any movement in there?

A       No.

Q       Were the -- how were the windows covered as far as being able to see through the windows?

A       I know for -- there were blinds, light-colored blinds.  I don't know if there was anything else over them or not.

Q      Could you see -- you knew the lights were on in the house, right?

A      At least the front room light, yes, sir.

Q      Could you see -- could you see any lighting in the bedroom or -- I'm sorry, I called that a bedroom.  Did you see any lighting in that room?

A      The door was open between the living room and the bedroom there and there was a light and you could see light through there.

Q      And after Manion did those shots, where did Manion go?

A      About that time is when I think it was Raymond that hollered that Buddy was going in and we came around from the rear of the truck and up on the porch.

Q      Okay.  Were you able to see anything that Hamilton did prior to going into house from the time his -- from the time the Bronco stopped there at the porch until the time Hamilton was in the house?  Were you able to follow Hamilton at all?

A      No.

Q      You didn't have any vision on him, did you?

A      No, I did not.

Q      Do you know how close that Bronco was to the porch?

A      It was just right up on the porch.

Q      Could it have been touching the porch?

A    It could have been, yes.

Q    In watching that Bronco going toward the porch, could you tell whether the Bronco stopped on its own or whether it hit the porch?

A    I'm thinking he had his brakes on.  I'm thinking he was on his brakes, but I never had thought of it.

Q    You never thought about it?

A    No.

Q    When you came back around did you -- you went into the house?

A    Yes, sir, just --

Q    And at the time you went in, Hamilton was already in the house?

A    Yes, sir.

Q    And how -- how far in did you go?

A    Just a step, two steps.  It's a small room.

Q    Okay.  At that time Hamilton was already starting to bring Kenny Barrett out, dragging him out, right?

A    Yes, sir.

Q    At that time you grabbed Kenny Barrett's arm?

A    Yes, sir.

Q    And helped Hamilton pull him out?

A    Yes, sir.

Q    Now, when you came outside, how did you come off that porch?

A     It's a small porch, like a double step, a double -- it was hard to get off.  We got off of it...

Q     Would you look at Number 12, Government's Number 12, please?  Can you see that?

A     Yes.

Q     Do you see the steps there?

A     Yes, sir.

Q     Can you tell whether -- did you come off the steps or did you just drop off the porch?

A     I think we took a double step off.  I don't really know.  I don't know if he ever touched the steps or not. I know I came off the porch.

Q     Is there any way you would have come further down on this porch down here?

A     Not that far down if we did, no.

Q     You would have come out that door and somewhere either there or come off those steps --

A     Right in there, yes, sir.

Q     If there is any blood on that step -- those steps, would that indicate you came down the steps?

A     More than likely, yes.

Q     But you didn't come down here at all, did you?

A     I don't believe so, no.

Q     I mean, as far as bringing Kenny Barrett down there.

A     No.

Q    And when you got Kenny Barrett out here in this yard some place -- and this is where the Smith & Wesson is. So where was Kenny -- where was Kenny Barrett in relation to where the Smith & Wesson ended up?

A    From the screen here -- I could see a scuff mark at the end of the -- it would be the right end of the porch area.  I think it's right in that area.

Q    I didn't hear what you said.

A    Yes, sir, probably a little bit more back to your left.

Q    Over here?

A    Yeah, just some place right there at the end of the steps, right in that area.

Q    Okay.  So it was right down at the end of the steps where you say Kenny Barrett was?

A    Some place there.

Q    And the Bronco is not there now.  Was the Bronco still there when you brought Kenny Barrett out?

A    Yes, sir.

Q    And do you know how close to the Bronco you were when you brought -- I mean, how close did you put Kenny Barrett down next to the Bronco?

A    I could probably reach over and touch it, pretty close.

Q    So you were close enough you could touch the Bronco?

A    Yes, sir.

Q    And as I understand it, you didn't notice any movement of Kenny Barrett's hands or arms other than what Manion did pulling his arms back around behind him; is that right?

A    Yes, sir, he had his arms up under him.  We pulled them out.

Q    And Manion pulled them out.  You didn't see any movement of them or anything like that?

A    No, no.

Q    And then at that point, Manion is the one -- whose handcuffs did he use?

A    Mine.

Q    Manion used your handcuffs to handcuff him and then he took the gun out, the pistol out; is that right?

A    Yes, sir.

Q    When you went in that house, did you do anything to move any of that brass around that you saw in the floor?

A    Not unless I kicked it or -- I can't say I didn't, but I didn't do anything intentionally, no.

Q    Okay.  And did -- were you -- were you able to see the brass or is that just something that you are recognizing today?

A    No, I --I knew what it was.  It was laying there and there was some out in the front yard too.

Q      Okay.  There was some out in the front yard?

A      Yes.

Q      Do you know whether any 223 was out in the front yard?

A      No, I remember seeing -- I think it was .45 rounds and brass.  I can't recall 223.

Q      Okay.  You can't recall 223 in the front yard, can you?

A      I don't know whether I did or didn't.  No, I can't say.

Q      But you saw .45 rounds in the front yard?

A      45, yeah.

Q      On talking about -- these search warrants that you were able to -- that you have done in the past and everything, tThere is a reason that you tell people that you are the police, isn't there?

A      Yes, sir.

Q      And why is that?

A      To let them know who we are.

Q      What?

A      To let them know who we are.

Q      Even if have you a no knock warrant, you still tell them at some point who you are, don't you?

A      Yes, sir, we still identify ourselves.

Q      And you may have authority to go in there, but you

need to let them know that authority, don't you?

A    No, sir, I don't.

Q    You don't think it's necessary at some point to let them know who you are?

A    If I have got an arrest warrant, I can arrest them -- if they are going to be arrested, they are going to be arrested.  If I am in uniform, they ought to know who I am.

Q    For a practical matter don't you tell them who you are?

A    Yes, sir.

Q    And if you don't tell them who you are, how do they know that you are some lawful authority?

A    Red lights, uniform.  I don't believe he has ever seen anybody around his neighborhood who looked like we did.

Q    And that's the purpose for you having lights on your car too, isn't it?

A    Yes, sir.

Q    And that's the purpose you have sirens on your car, isn't it?

A    The siren I use more for chasing people, pursuits.

Q    Pursuits to let people know you have got some lawful authority?

A    Yes, sir.

Q      When you came around and first realized that there was somebody in the yard, somebody was -- somebody saw you or saw people coming, did you think there was any need at that time to let them know who you are?

A      Black and white patrol car with red lights on top flashing, they should have known who I was.

Q      Okay.  So the person out in the yard should have known who you were?

A      Anybody with any vision, anybody in my vision should have known who we were.

Q      Anybody in your vision.  In other words, anybody that could see your car?

A      Yes, sir.

Q      And if they couldn't see your car, they wouldn't know who you were, would they?

A      You are right.

Q      Right?

A      Right.

Q      I mean, they saw Buddy Hamilton's car, but what was on Buddy Hamilton's car that would tell people he is a law enforcement officer?

A      Red lights, if he had them on.

Q      Red lights if he had them on.  And if he testified he didn't have them on, what would tell them he is a police officer?

A    I didn't testify he didn't have them on.

Q    What?

A    I did not testify he didn't have them on.

Q    I said if he testified that he didn't have them on, what would he have on his car to tell them he is a police officer?

A    Nothing outside of antennas and looking like a patrol car.  I don't know if he had spotlights on his truck or not.  I can't recall.

Q    Okay.  What was on Greninger's car that would tell somebody that he was a police officer?

A    HIs was the same as Buddy's.

Q    After this incident, you -- did you go down to Sallisaw?

A    Yes, sir.

Q    And how much later did you go down to Sallisaw?

A    Before daylight.

Q    So you hung around out there for a while?

A    Yes, we stayed there until we transported -- we stayed there until we were transported out.  I didn't have a car to drive.

Q    And did you give any -- were you told to make any statement, a written statement by anybody from the tact team?

A    Lieutenant McBride.

Q       What did he tell you to do?

A       Write a statement.

Q       Did you write a statement?

A       Yes, sir.

Q       And what did you do with the statement that you wrote?

A       I wound up giving my statement to attorney Gary James.

Q       Gary James is a private attorney for your trooper association, isn't he?

A       He is counsel for O.S.T.A., yes, my private attorney.

Q       He is not an attorney associated with law enforcement, is he?

A       I would say O.S.T.A. is associated with law enforcement.  He not an attorney with the state government, is he?

A       No.

Q       He is not with the federal government?

A       No.

Q       He is not with the local government?

A       No.

Q       He represents your trooper association?

A       Members, yes.

Q       And you gave that statement to them?

A     Yes, sir.

Q     Did you interview with George Randoph?

A     Yes, sir.

Q     And did you give him a statement?

A     Very brief of what happened, yes.

Q     At any time before you talked to Randolph did you sign any kind of an agreement?

A     The agreement I signed -- I don't remember when I did it, some place down at the office, but I don't remember when.

Q     Okay.  What now?

A     I think it was a guarantee.

Q     A guarantee agreement?

A     Yes, a guarantee waiver.

Q     Was that signed that night?

A     I don't recall whether I did or didn't.  I know it was signed, but I don't know when I did it.

Q     It was signed before you talked to anybody, isn't that right?

A     As far as I know, yes.

Q     I'm handing you what's as Defendant's Exhibit Number 14.  Do you recognize that?

A     Yes, sir.

Q     Is that your signature?

A     It appears so, yes.

Q      Are you number -- trooper number 344?

A      No, sir, I'm number 720.

Q      So maybe that's not yours then?

A      The one I'm looking at is.

Q      Oh, I'm sorry.  I'm looking at the wrong one here.
I apologize.  That's your signature?

A      Yes.

Q      Do you recall --

A      On that one?

Q      No, on this one.  I'm sorry.

A      Yes, sir.

Q      Do you remembing signing that?

A      No, I don't.

Q      What?

A      No, I don't.

Q      Do you deny that you signed that?

A      I don't deny it.  I just don't remember it.

Q      You don't remember signing it?

A      No.

Q      9-24-99?

A      September 24, 1999, yes, sir.

Q      Would you have signed that down in Sallisaw?

A      Yes, sir.

Q      Does that -- do you recall meeting with a George
Randolph?

A      Yes, sir.

MR. HILFIGER:  Your Honor, I would move to introduce Defendant's Exhibit Number 147.

MR. LITTLEFIELD:  No objection.

THE COURT:  It will be admitted without objection.

BY MR. HILFIGER:

Q      What's the purpose of that agreement?

A      Disciplinary advice of right.

Q      And you referred to it as a guarantee agreement?

A      Yes, sir.

Q      That's one where they basically say that they have a right to, for internal investigations -- that they can talk to you and that they can't use that against you in any criminal action?  Is that what your understanding of it is?

A      Yes, sir.

Q      And you sign that before you talk to anybody on an internal investigation where a shooting is involved; isn't that right?

A      Yes, sir, that's the way it's supposed to go.

Q      What?

A      That's the way it's supposed to go, yes.

Q      And after you signed that, did you talk to Randolph?

A      I don't remember when I signed it, I'm sorry.

Q       Okay.  Did you have any other interviews with any other -- with any OSBI agents?

A       Not that night, no.

Q       Okay.  At some time in the next couple of weeks, did you have interviews with OSBI?

A       I believe it was the 25th, that Saturday morning, in the early morning hours, I interviewed with Huntington and Smith, I believe is what her name was.

Q       Jon Huntington and Sue Smith?

A       Yes.

Q       And did you -- did you give any written statements to them?

A       No, I did not.

Q       Did you have any interview with a Mr. Gordon?

A       Yeah, sometime in November of '99, I think.

Q       Now, the interview with Mr. Gordon, was that an interview or with other tact team members there at that time?

A       No, just myself and Gordon.

Q       Did you have any meeting after this incident in which tact team members discussed this incident?

A       Well, we had a debrief with the commissioner two or three weeks after the shooting.

Q       Was that in Oklahoma City?

A       Yes, sir.

Q      And were the tact team members all there?

A      Yes, sir.

Q      And did each of you discuss with the other -- I mean with Mr. Ricks and whoever was there what you did, what you saw?

A      Just bearly, just basic information, what happened.

Q      And how it occurred?

A      About what happened, yes.

Q      And did you discuss where your cars were and who was driving what and --

A      I don't think we got that detailed.

Q      What about -- did you ever have any kind of a meeting with Mr. Horn and Cathy Thomas and another psychologist?

A      Yes.

Q      And was that with the tact team members?

A      Yes.

Q      Did you discuss anything about what occurred out there and who was doing what?

A      We discussed more what we saw and some of the things that happened, yes.

Q      And it was a discussion such that whatever you said the other tact team members could hear your viewpoint, is that right, of what you saw and what you did?

A     Yes, sir.

Q     And Buddy Hamilton was there, right?

A     Yes.

Q     And Officer Pettingill was there, right?

A     Yes.

Q     Was Lieutenant McBride there?

A     I don't think so.

Q     Was he at the Ricks debriefing, Lieutenant McBride?

A     I believe he was, yes.

Q     And at that debriefing was there any interchange where each other could hear what the other person saw and did?

A     About what we did or what we saw?

Q     What you saw.

A     What we saw.

Q     Okay.  Mr. Hash, how long did you know Trooper Eales?

A     14, 15 years.

Q     You were pretty good friends with him?

A     Yes, sir.

Q     Is that right?

A     Yes, sir.

Q     You have testified before in other cases on other matters?  And I'm not talking about this incident.

A     Yes, sir.

Q      In which you have been a trooper associated with stops, car stops and things like that; is that right?

A      Yes, sir.

Q      And in those particular types of deals you didn't have any real desire one way or the other how the outcome of the case was, did you?

A      No, sir.

Q      In this case you do though, don't you?

A      I had a friend of mine murdered, yes, sir, I do.

Q      I can't understand you.

A      I said I had a friend of mine murdered, yes, sir, I do.

Q      That's how you feel about it?

A      Yes, sir.

Q      And you have a bias in this case, don't you?

A      Yes, sir.

Q      And does that bias affect how you are testifying today?

A      No, sir.

Q      Even to -- any little bit, it doesn't affect it?

A      No, sir.

Q      Because you have a certain attitude that you want something to happen in this case, don't you?

A      No, sir, I'm a professional.  What is going to happen is what is going to happen.

MR. HILFIGER:  I have no further questions.
Oh, wait just a second.

(PAUSE)

BY MR. HILFIGER:

Q      Mr. Hash, on the -- when you did a search of Kenny Barrett out there in front of the cabin or house or whatever it was, what was the purpose of that search?

A      To see if there was any other weapon on him.

Q      You said today that you found something on him?

A      I said I felt something on him.

Q      You felt something on him?

A      Yes, sir.

Q      And you actually described something that you felt, didn't you?

A      Yes, sir.

Q      Now, when you testified -- well, when you talked to the OSBI, you didn't tell them about that, did you?

A      I was never asked, no.

Q      They never asked?

A      No, sir.

Q      When you talked to Mr. Gordon during his interview, you never told him anything about finding anything, did you?

A      It was never asked, no.

Q      Never asked.  And where did you say today that you --

that you felt that particular object?

A      If I remember right, it was the right front pocket.

Q      You said the right front pocket?

A      I believe so, yes, sir, on his right side, I'm thinking front pocket.

Q      Would you have ever -- something like in February of 2004, would you have said anything different as to which pocket you found it in?

A      It was on the right side.  That's all I recall. I'm sure -- I'm thinking it's the right front pocket.

                         (PAUSE)

BY MR. HILFIGER:

Q      At that time would you have told under oath that you found something in his right side back pocket?

A      I remember it was the right side.  I think it was right front, but I can't tell you right now.

Q      Today you are saying right front?

A      I'm saying it's the right side, I know for certain, but right front is where I think it was.

Q      Would you recall whether you said a different pocket back in February of 2004?

A      No, I really don't recall.  I know it was the right side.

Q      If I gave you your statement, would you look at it and see if that's correct?

A       If it's in a statement, I probably did say it, but all I remember right now is it was on the right side, but I thought it was the right front.

Q       So you are not denying right now you told somebody before right side back pocket?

A       I really can't tell you, no.

MR. HILFIGER:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. HILFIGER:

Q       Is this what you are talking about?

A       Yes, sir.

Q       Do you agree that that's what you said in February of 2004?

A       Basically it was the right side.  Whether it was the front or back pocket, I don't know.  I remember checking the front pocket.  I don't know if I said back pocket.  I checked his back pocket, right side. I checked both pockets.  I don't know if that's what you mean or not, what you are asking right there.

Q       Okay.  But it says his right side back pocket?

A       Right side, period, back pocket, period.

Q       You made some indication that at some point when you were out of your car that you felt like the person firing out the door was backing up in the house; is that true?

A     Yes, sir.

Q     Where were you when -- where were you located when you made that observation?

A     Like I said, I could see muzzle flashes -- as I was coming to a stop, I could see muzzle flashes further out on the porch and when I got stopped and looked back up, I could see it was backing up into the house.

Q     Because the muzzle flash -- you could see less of the muzzle flash, is that why?

A     The muzzle flash starts out narrow and widens. When I first saw it I could see the entire muzzle flash. When I got out of the car all I could see was more or less just the end of the smoke rolling out.

Q     Indicating to you that the person firing that weapon was backing up into the house?

A     Yes, sir.

Q     Okay.

        MR. HILFIGER:  I have no further questions.

        THE COURT:  Redirect.

                REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     Let's talk about Defendant's Exhibit 117.  Do you recall looking at this photograph on cross examination?

A     Yes, sir.

Q     There we go.

A     Yes, sir.

Q     You were asked about the tire tracks, this tire track, this tire track, and this tire track here.

A     Yes, sir.

Q     Is this your tire track here?

A     I really can't say.

Q     Okay.  Now, you were also asked about this tire track and whether it was your tire track.  If one follows that tire track, is that your tire track?

A     I can't tell whether I'm over straddling that or whether that's mine or not.

Q     What about this tire track here?

A     I'm straddling that one.

Q     In regards to the tire track where apparently the left tire went through here, an individual -- do you know when this tire track was made?

A     No, sir.

Q     Do you know if it was made on the night of September 23rd or if it might have been made on some previous occasion or the early morning of September 24th?

A     No, I have no idea.

Q     In regards to visability from the porch of the house, would this tire track from a vehicle which would have made this tire track be more or less visable than a vehicle which made this tire track?

A    It would be more visable.

Q    Okay.  You were asked about where your vehicle was parked in relation to the front porch?

A    Yes, sir.

Q    Okay.

MR. LITTLEFIELD:  May I approach the model, Your Honor?

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q    In regards to this dowel rod, if one places this dowel rod along the porch line, is your vehicle north or south of that dowel rod?

A    South.

Q    And, in fact, in regards to the porch line, is the ditch entirely north or south?

A    South.

Q    You were asked about having to be in someone's vision -- your vehicle having to be in someone's vision in order for that vehicle to be seen.  What do the lights on the top light bar do when they are turned on?

A    They rotate and light up a wide area.

Q    And what kind of beam do they display?

A    A red beam, a blue beam, a wide spinning beam.

Q    Does the beam reflect outwards?

A    Yes, sir.

Q      Does one have to see your vehicle to be able to see the beams of your vehicle as they are rotating and reflecting?

A      No.

Q      You were out there during the early morning hours of September 24th of 1999.

A      Yes, sir.

Q      And how long do you believe that you stayed out there prior to going into Sallisaw after the shooting?

A      I really can't -- I have no idea, before daylight.

Q      Did you have an occasion to see how your beams of light coming off your light bar were reflecting through the yard?

A      Yes, sir.

MR. LITTLEFIELD:  Your Honor, I would ask that he be displayed Government's Exhibit Number 102 and ask that the lights be turned off.

THE COURT:  You may.

(GOVERNMENT'S EXHIBIT 102

WAS SHOWN AT THIS TIME)

MR. LITTLEFIELD:  The lights can come back on.

BY MR. LITTLEFIELD:

Q      Does one have to be looking at your vehicle to see the lights as it goes through that yard?

A      No, sir.

Q    Was your vehicle visible from the area of the porch?

A    Yes, sir.

Q    When you met with -- when you and other members of the team met with Commissioner Ricks, how close did the detail approach of what you've testified to today?

A    Just basic information.

Q    Did the other members discuss detail?

A    No, sir.

Q    When you met with Mr. Horn, were the details discussed anywhere near the details with which you have gone into today?

A    No, sir.

Q    You mentioned seeing full .45 rounds in the front yard.

A    Yes, sir.

Q    And where were they located?

A    It would be right in -- the right-hand side of Mr. Barrett.  I knelled over one time and they were laying right there on the ground in front of me.

Q    Where were they in relation to the ballistics shield?  Do you recall?

A    I'm thinking they were closer to the house than to the ballistic shield.

Q    Do you know where they came from?

A    Yes, sir, I do.

Q      Where did they come from?

A      Apparently Rocky's gun.

Q      How did they come out of Rocky's gun?

A      Part of his magazine split.  There was a magazine that had come apart, a pistol magazine, it was on the ground also --

Q      I'm sorry, what?

A      It had come apart, it was on the ground.

Q      And do you know why Rocky's magazine came apart?

A      No, sir, I don't.

          MR. LITTLEFIELD:  May I have just a second, Your Honor?

          THE COURT:  You may.

          MR. LITTLEFIELD:  Pass the witness.

                    RECROSS EXAMINATION

BY MR. HILFIGER:

Q      You went in the house and -- and how far in the house were you?

A      A step, two steps, it was a small room.

Q      Could you see in that house -- when you were in the house, could you see the reflection or the lights on your car?

A      I was inside the house.

Q      Yes.  When you were in the house could you see the red and blue lights on the car?

A    I really couldn't tell you if I did or didn't.

Q    What?

A    I couldn't tell you whether I did or didn't.

Q    You don't know whether you did?

A    I don't.

Q    Do you have any recollection of seeing the red and blue lights off your car when you were in that house?

A    No, I don't.

Q    What?

A    No.

Q    When you looked in that window over there by the pickup, isn't it true that there was a heavy blanket on that window?

A    I don't know.  I remember blinds.  I remember seeing some blinds because I remember seeing the blinds move after Rick shot, but I couldn't tell you what else was in there.

Q    But you weren't able to see in the house though, were you?

A    Through the glass, no, I couldn't.

Q    What?

A    Like looking through that glass?  No, I couldn't.

Q    You could not see through that glass, there was something on the other side of that glass; isn't that true?

A    Yes, sir.

Q    And it prevented you from seeing into the house?

A    Like I said, I could see a shadow and the silhouette fall or something that dropped that looked like a person that fell.

MR. HILFIGER:  Would you please show Government's 102?  You can stop it, can't you?  Can we the shut the lights down too?

THE COURT:  Yes.

(GOVERNMENT'S EXHIBIT 102

WAS SHOWN AT THIS TIME)

BY MR. HILFIGER:

Q    Stop it.  Can you see the red and blue lights on your car?

A    I could, but can't on that --

Q    What?

A    I could, but I can't on that shot right there, no.

Q    You cannot see them on that shot?

A    No.

Q    If you are looking at that car, you can't see the reflection of that red and blue on that windshield, can you?

A    If you flip back, I can see them flip around, but I can't really there, no.

MR. HILFIGER:  I have no further questions.

THE COURT:  Any further direct?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Defense, any objection to this witness being excused?

MR. HILFIGER:  We don't have any objection to him being excused.

THE COURT:  Officer, thank you for your testimony.  You may step down.  You may be excused.  Call your next witness.

MR. LITTLEFIELD:  Your Honor, we are going to offer the testimony of Trooper Manion.  That's going to be read.

THE COURT:  You may proceed.

<u>RICKY MANION, PLAINTIFF'S WITNESS, SWORN</u>

<u>DIRECT EXAMINATION</u>

(QUESTIONS WERE READ BY MR. LITTLEFIELD

AND ANSWERS WERE READ BY MR. SPERLING)

Q     Good morning.

A     Good morning.

Q     Would you tell the Court your name, please?

A     Ricky Manion.

Q     Mr. Manion, how are you employed, please?

a     I'm a state trooper with the Oklahoma Highway Patrol.

Q      How long have you been so employed?

A      Almost 18 years.

Q      And are you assigned to any specialized duties in the O.H.P.?

A      Yes, I have been a member of the tactical team for 13 years.

Q      And I want to call your attention to 23, September, 1999.  Were you so assigned on that date?

A      Yes, I was.

Q      Did you have occasion to participate in an operation and plan occuring in Sequoyah County, Oklahoma?

A      Yes, I did.

Q      When were you first notified about this operation?

A      I believe I was notified on the 23rd of September, to report to Camp Gruber at Braggs, Oklahoma.  No, I'm sorry, I was notified the 22nd.

Q      All right.  And did you report then on the 23rd?

A      Yes, I did.

Q      And can you tell us where you went?

A      I went to Camp Gruber at Braggs, Oklahoma.

Q      And what occurred -- what first occurred there in terms of preparation for the operation?

A      We were briefed by Trooper Hamilton concerning the operation of what we would be doing.  We looked at a videotape, an aerial videotape of the location and

also aerial photographs and also a model of the residence. We made our plan and rehearsed it and he also did a drive-by.

Q    And was the mission defined at this meeting?

A    Yes, it was.

Q    What were to you do?

A    We were to serve -- execute a warrant on a residence there.  We were looking for a subject by the name of Kenneth Barrett.

Q    Now, had you had any contact with Mr. Barrett prior to this occasion?

A    No, I had not.

Q    Where -- where is your principle assignment in the state?

A    I'm stationed at Troop B in Madill, Oklahoma, in Marshal County.

Q    How many officers were participating in this operation?

A    I believe there were nine troopers and one other officer, Danny Oliver, who is assigned to the D.A. Task Force.

Q    And did Mr. Oliver have any previous affiliation with the O.H.P.?

A    Yes.  He retired from the Highway Patrol and he was also the team commander for several years of the

tactical team.

Q      How long did you remain at Camp Gruber on the 23rd?

A      I arrived at approximately noon and we left out some time around midnight that night.

Q      Other than the briefing and observing the video and the other items that you testified to, what else did you do in preparation?

A      We rehearsed our plan.  We rehearsed the -- the assignment, who was assigned to do what inside the residence, who would be in certain positions, as far as lining up, who would be next in line.

Q      Can you more fully describe the rehearsal?  Was it a physical rehearsal of the vehicles?

A      Yes, it was a physical rehearsal.  We didn't use the vehicles, but we started at the parking lot.  We made an entry into a door at a building there at Camp Gruber.  We arranged the tables, as best we could, to represent the building that we would be entering.  We did that several times for probably an hour or so rehearsing our movement.

Q      Was there any discussion of -- of the order of the vehicles as they would approach this residence?

A      Yes.  After -- we did a drive-by and we changed our plan somewhat to accommodate the situation there at the residence.

Q      Did you participate in the drive-by?

A     Yes, I did.

Q     And when did that occur?

A     Early afternoon of the 23rd.

Q     What parts of your plan were in place prior to the drive-by that were altered or changed after the drive-by?

A     Our first plan was that we would send in four observers to go in and place the residence under surveillance for approximately an hour and a half and then the team would do a -- would execute the warrant, come in and secure the residence.

Q     And what happened in the drive-by that caused that part of the plan to change?

A     We observed that the front gate that we planned on driving through was locked and heavily chained, had padlocks on it also.  There were several dogs in the area that we could see running loose that we felt would compromise the observers.  Also, the closeness of the houses in that area was closer than what the pictures showed.  So we felt that we would be unable to put four observers in to -- to watch the residence because we felt they would be compromised by the animals and by the closeness of the residents.

Q     So what then was the final plan as to the approach of the residence?

A     The final plan was that we would come in from the

east driveway, we would bypass the gate and leave a unit there at the gate and then the other units, that had the officer in them that was making the entry, would come in from the east side and make entry.

Q      Were you one of the officers assigned to make the entry?

A      Yes.

Q      And in terms of the -- of the order of the vehicles, what was your position to be?

A      I was in the second vehicle as a passenger.  My position in going into -- making the entry was the third in line.  It would be a four man entry team and I would be the third in line.

Q      The third person?

A      The third person in the line.

Q      Did you have specific duties that you were to undertake in the entry process?

A      Yes.  I was to secure the living room and the kitchen area.

Q      Prior to entering into the operation, can you tell us what kind of equipment that you had -- you personally had as to what you were wearing and your weaponary?

A      My clothing was the fatigue pants, O.D. green fatigue pants, and I had on a black t-shirt that had an emblem of our badge on it and has Highway Patrol Tactical

Team on the other side and state trooper written across the back of it.  I was also wearing a badge around my neck on a chain.  I had a --

Q    Was that a metal type badge?

A    Yes, this badge here.

Q    The lettering on the back of the shirt, what size were the letters?

A    It covers almost the whole back.

Q    Okay.  And what else were you wearing in this operation?

A    I was wearing a protective helmet, protective goggles and my gun belt.

Q    Did you have any protective armor about your torso?

A    Yes, I was wearing a bullet proof vest under the shirt.

Q    Now, is that underneath the shirt, the T-shirt?

A    Yes, it is.

Q    What level of protective vest did you have?

A    I believe it's referred to as 2A.

Q    Where did you go from Camp Gruber when your team left that location?

A    We went to Dwight Mission Road exit and met with the Drug Task Force there.

Q    How long did you remain at that location?

A    Just two to three minutes.

Q       What did you do then?

A       We went to the objective.

Q       And how many team vehicles were there in the prosession?

A       There was the three that made entry into the property, one that stayed at the gate, and another vehicle who pulled in to the subject's mother's residence, so there were five total of our vehicles.

Q       Who did you meet with at Dwight Mission Road and Interstate 40?

A       Some of the Drug Task Force people, local people there.

Q       Did you have any duties or assignments with regard to this -- pardon me.  Did they have any duties or assignments with regard to carrying out the operation?

A       Yes.  They were to follow us in.  Our duties simply were to secure the house and anybody in it and they would conduct the search warrant.

Q       Was there any discussion or planning as to how they would participate in the procession of the vehicles to that location?

A       Yes.  They was to give us approximately two minutes lead time and they was to follow us in.

Q       All right.  Now, let me ask you, as you approached the -- the target location or the residence, what do you

recall happening?  What did you do?

A      As we turned in, I was a passenger in the second vehicle.

Q      Who was driving?

A      Trooper Ray Greninger.

Q      All right.  And what happened?

A      We were following Trooper Hamilton and Trooper Eales.  As we turned in off of the drive, just before we turned in I activated the -- the red lights on Trooper Greninger's vehicle.

Q      What kind of lighting system did -- what emergency lighting system did he have?

A      He had visor strobes, red and blue visor strobes.

        MR. LITTLEFIELD:  The Court then stated, "I'm going to interject a question.  It's up -- you've talked a couple of times about visor strobes.  I don't know what those really are, so I'm going to inquire.  Would you please describe for me exactly what that is and how they would be visible?"

A      It's two lights that are attached to the visor that are used for unmarked, undercover vehicles.  They are about four inches across and when you activate them you pull the visor down so that they are visible through the front windshield.

        MR. LITTLEFIELD:  The Court stated, "Okay."

The question was asked:  "Could we have just the back lights in the room, please?  Thank you."

And then, "If the Court, please I'm going to project up what we have previously marked as Government's Exhibit 192.  It has been admitted."

BY MR. LITTLEFIELD:

Q      Trooper Manion, do you recognize what is depicted by the photograph?

A      Yes, I do.

Q      What that is, please?

A      It's the Barrett residence.

Q      I would like you to show the judge, if you would, please, how you made your approach in your vehicle with Trooper Greninger into this location?

A      We come up this road and turned in here and turned here -- (indicating) -- there was a depression or a ditch there.  As we approached right here, I turned on the lights before we turned off that driveway.

Q      All right.  We are on the right center of the photograph, would you agree, and it depicts a white surface roadway?

A      Yes.

Q      Was that a gravel roadway?

A      It's a gravel roadway.  It leads to another house.

Q      And about mid point on the right side of the

photograph, you have indicated a dirt --

A     Right here.

Q     -- driveway; is that right?

A     This driveway right here.

Q     How far were you behind the other two vehicles?

A     There was only one vehicle in front of us and we were directly behind it when we turned off there, less than a car length.

Q     What kind of vehicle was -- were you and Trooper Greninger in?

A     A white Bronco.

Q     And what happened then after you made the turn off of the gravel roadway, the white gravel roadway into the other road?

A     When Trooper Hamilton passed this area right here, he saw that there was a fairly deep ditch.  As he come out of it --

Q     You have just indicated -- if I may, there is an area of lightly covered vegetation kind of a greenish yellow.

A     Here.

Q     And up at -- and up at the upper end of that, is that where you have indicated or where you are indicating on the photograph?

A     Right here, I believe.

Q      Thank you.

A      As he come out of that area, I heard gunfire at that point.

Q      Would you describe more fully what you heard?

A      I heard two to three shots directed toward us from the house.  As we come around this area here --

Q      Now, you are back on the county road?

A      Yes.

Q      Before we -- before we come into here -- as we come along this road here, there is a house back here that's not depicted in this picture and that's where Lieutenant Pettingill and Lieutenant McBride stopped at the mother's house.  As we come around this corner, Lieutenant Pettingill said, "There's someone in the yard, they are in the yard."

Q      You heard him on radio?

A      I heard him on the radio say that.

Q      What did you do?

A      After I turned on the lights, I started looking for someone in the yard.  This area here seemed like it was pretty well lit up, but this area back here was kind of dark.  So started looking for the subject that was in the yard around the house.  I couldn't see him.

Q      Okay.  Let me back up with you just a moment.  At what point in the entry did you activate this light?

A      Okay.   After Lieutenant Pettingill said there's someone in the yard and before we turned off -- before we turned off this road here onto this road, I activated the lights.

MR. LITTLEFIELD:   Whereupon, the defendant's attorney indicated: "Your Honor, would the record please reflect he has indicated on the white surface roadway before turning onto the -- to the darker trail?"   And the Court stated, "There's no problem," at which point the defense attorney thanked the Court and a question was asked.

BY MR. LITTLEFIELD:

Q      Was the activation of the lights of these vehicles in any way a part of your plan?

A      Yes.

Q      Had it been discussed?

A      Yes, it was.   We always turn on lights before we make an entry into anybody's property or pull up in front of the house.   We always take a marked unit with us that depicts -- it is the black and white highway patrol car.

Q      How many marked units did you have in this group?

A      One -- I'm sorry, two.

Q      How are those units lighted, what kind of equipment in terms of lighting did they have?

A      Steve Hash's, Trooper Hash's unit behind us had a

full light bar that goes across the car on the outside. Where the gate was in front of the house, that's where trooper Poe and Trooper hash -- I'm sorry -- Trooper Hise and Trooper Darst deployed.  I believe they was in Hise's unit and his is a - his doesn't have a light bar, but it has grill lights, corner strobes and a windshield light.

Q      All right.  So after you heard the gunfire, the three shots, --

A      Yes.

Q      -- you said that you were looking for a figure in the yard.

A      Yes.

Q      What happened then?

A      As Trooper Hamilton got closer to the house, there was more concentrated gunfire directed toward his vehicle. As he approached this area in front of the house, I could see a great deal of smoke coming from the house, along with being able to hear the gunfire from -- coming from the house from what we know -- knew to be a front door directed into the windshield.

Q      If I may, I'm going to put up now Government's Exhibit Number 94, also previously admitted in these proceedings.

(PAUSE)

MR. LITTLEFIELD:  And I would move admission of Government's Exhibit 94.  I don't believe it has been admitted yet, but I think by agreement it would be admitted the purpose of this testimony.

MR. HILFIGER:  No objection.

THE COURT:  Exhibit 94 will be admitted without objection.

BY MR. LITTLEFIELD:

Q     And I would ask if you if you recognize what is depicted by this photograph.

A     That is the Barrett residence.

Q     It's a closer view of what we have just been discussing?

A     Yes.

Q     All right.  Now, you just indicated that you had seen smoke.  Can you tell us again where that was?

A     It come from -- directly from the front door.

Q     And where were you positioned when you saw the smoke?

A     We was coming down the driveway and we parked our unit approximately right here.

Q     Had you parked the unit before you saw the smoke?

A     No.

Q     What happened after you and Trooper Greninger parked this unit, what did you do?

A       As we was coming to a stop, I could see Trooper Eales -- I could see Rocky getting out of his vehicle. As we come to a stop, I exited the unit and went immediately to Trooper Eales.

Q       Now, I want to ask you this:  Had you observed any other of your units activate any emergency lights?

A       Yes.  As we approached and Trooper Eales was getting out of the vehicle, I can distinctly remember the red and blue strobes reflecting off of him.

Q       Now, which strobes, your strobes?

A       Our strobes and also the strobes from behind us from Trooper Hash's top light.  I could see the red and blue lights reflecting off the smoke that was coming from the house.  I could see it reflecting off of Trooper Eales and the white Bronco that they was in.

Q       Where was Trooper Eales when you first observed him as you approached?

A       He was getting out of the vehicle.

Q       Is the vehicle shown in this photograph?

A       Yes, this vehicle here.  It had rolled back somewhat. It was closer to the front porch?

Q       All right.  What happened then when you saw him get out of the vehicle?

A       As he started getting out of the vehicle, I could see that he was injured because he was moving slowly and

very deliberately.  As he started to the back of the Bronco, I exited my vehicle and went to Rocky.  As we got to the back of the Bronco, I met him there.  At that time we were still taking gunfire, so we were behind the Bronco.

Q      Who was behind the Bronco at that time?

A      Myself and Trooper Eales.

Q      What did you do then?

A      At that time Trooper Eales went to his knees and I grabbed him by the back of the shirt and helped lay him on the ground as he went face down.  As he did that, I heard a commotion in this area over here.

Q      Now, you are showing over on the left?

A      On the left side, the left side of the property.

Q      And there appears to be a driveway?

A      Yes, over here.

Q      At the top?

A      In this area some place.  As I looked to the west, I could see a man on the ground being handcuffed by the other members of the team, who I later found out to be Hise and Trooper Darst.

Q      And you were still under fire when you made that observation?

A      Yes, we were still taking gunfire here.  At the same time I noticed the commotion here.  I heard a flash bang go off over in this area.

Q      Show us again the area.

A      Here on the west side of the porch.

Q      Okay.  It looks like you are indicating about the southwest corner?

A      It was right at the corner of the porch, right here.

Q      All right, thank you.  As the flash bang went off, Trooper Hamilton came to the rear of the vehicle.

Q      Do you know where he had been prior to the flash bang going off?

A      He was in the driver's seat.

Q      All right.  What happened then when he came back?

A      When he came to the rear of the vehicle and I looked at him, I could see blood on his face and he had a lump protruding from the left side of his face.  He also had blood on his shoulder, his left shoulder, and his shirt was popped up.

Q      Now, in terms of the gu fire, had it ceased at that time?

A      There was still gunfire directed out the front door of the residence.

Q      What happened then when Trooper Hamilton came toward the rear of the Bronco?

A      When he come around the rear of the vehicle and I saw him, I said, Buddy, you are hit and he goes I'm hit twice, but I'm Okay.

Q     What did you do?

A     I peeked around the side of the vehicle.

Q     Can you show us which side or tell us which side?

A     I peeked around the left rear corner or the right rear corner, I'm sorry.

Q     All right.  And I looked into the front door, which was open or almost open or fully open.  When I looked into the door, there was lights on in the house and I saw a white male holding an AR-15 in his hand and stepped sideways into this east room on the east side of the house.  As he stepped into that room, he took the rifle with him.

Q     Could you say -- tell us how he was carrying the rifle?

A     It was pointed at an approximate 45 degree angle, maybe a little past a 45 degree angle toward ground holding it down toward his side.

Q     With which hand?

A     With his right hand.

Q     Did you get a good look or did you get a look at the face of this individual?

A     No, I could not see his face.  I could see that he was fairly slender, longish light-colored hair.

Q     Now, you were looking through the front door?

A     Yes.

Q    And on the photograph, you said earlier -- you testified earlier that the vehicle was actually in a different position.  Can you show us where you would actually have been when you looked in?

A    I would probably have been right about here, right at the right front of the Bronco before -- before it rolled back.

Q    All right.  How much of the figure or body of this person could you see through that front door?

A    I could see his whole body.

Q    And then what happened after that?

A    When I saw him step into that room, Trooper Greninger is out here at his unit calling for help on the radio.  As I saw him step into that room, I yelled he is going to the east side of the house, he is in the east room.

Q    What did you do then?

A    I left Trooper Eales and I went to this position just by the right front tire of the blue pickup sitting here and took a cover position.  As I came around the pickup there and looked, there's a window on the east side of that house.  As I looked at that window, it's covered by a blind.  The blind moved for whatever reason, whether it was brushed up against or whether someone looked out of it, I'm not for sure, but it did move and I fired two bursts from my weapon through that window.

Q       With what kind of a weapon?

A       I had an MP-5 SD HMK model, 9mm.

Q       And at the time that you were on the east side of the building, what type of firearm had you selected on the way?

A       Automatic.

Q       Can you tell us when you selected the automatic fire?

A       When I left Trooper Eales position and went to the pickup, I pushed my selecter switch on fully automatic.

Q       Trooper Manion, I have marked two exhibits, Government Exhibit 193 or -- pardon me -- 96 and 4 for the purpose of this hearing and I want to show you Government's Exhibit 96.

        MR. LITTLEFIELD:  And I would move at this time, Your Honor, for its admission as well.

        MR. HILFIGER:  No objection.

        THE COURT:  That's 96?

        MR. LITTLEFIELD:  Yes, Your Honor.

        THE COURT:  It will be admitted without objection.

BY MR. LITTLEFIELD:

Q       I will show you Government's Exhibit 96 and I would ask if you recognize what is depicted.

A       Yes.

(PAUSE)

MR. LITTLEFIELD:  I think that should be 4, Your Honor.

THE COURT:  4?

MR. LITTLEFIELD:  Yes.

THE COURT:  Okay.

BY MR. LITTLEFIELD:

Q     I would show you Government's Exhibit 4 and ask you if you recognize what is depicted.

A     Yes, it's the blue pickup sitting beside the Barrett residence.

Q     When you first observed that pickup truck and -- well, when did you first observe that pickup truck when it was executed -- or that evening?

A     When we went to execute the warrant.

MR. LITTLEFIELD:  Judge, I recognize what happened.  I miswrote it.  It should have been 193.  And I'm going to ask for admission of 193 and display that again.

MR. HILFIGER:  May I have just a moment?

THE COURT:  You may.

(PAUSE)

MR. HILFIGER:  No objection to 193?

THE COURT:  193 will be admitted without objection.  Is 96 -- 96 and 4 are what you were confused

about?

MR. LITTLEFIELD:  And I'm looking real quick. I think it is 96.  I'm going to have to check to verify again, Your Honor.  If I might have a second?

THE COURT:  You may.

(PAUSE)

BY MR. LITTLEFIELD:

Q    I'll show you 193 and I will ask if you recognize what is depicted.

THE COURT:  Before we go on, just so we clarify, Government's Exhibit 96 -- is it still in play?

MR. LITTLEFIELD:  I don't anticipate we will reference it.  I don't have a problem with it being admitrd, if the defense counsel doesn't.  If he does, I will withdraw 96?

MR. HILFIGER:  I don't have any problem with it being admitted.  It's just that it is not a part of this testimony here though?

MR. LITTLEFIELD:  I think so, I believe so, Your Honor.

THE COURT:  Just a minute.

(PAUSE)

THE COURT:  So is 96 in?

MR. LITTLEFIELD:  It was offered and admitted and I'm not going to withdraw it and I don't think the

defense has any problem with it.

THE COURT:   96 will be admitted without objection.   4, which we talked about, has already been admitted.   Okay.   You may proceed.   And now we are talking about 193, which has been admitted without objection?

MR. HILFIGER:   No objection.

THE COURT:   193 is admitted without objection.

BY MR. LITTLEFIELD:

Q     I would first show you Government's Exhibit 193 and ask you if you recognize what is depicted.

A     Yes, it is the blue pickup sitting beside the Barrett residence.

Q     And when did you first observe that pickup that evening?

A     When we went to execute the warrant.

Q     Is it in the same position and condition as it was when you observed it there on that evening?

A     Yes, it is.

Q     Anything changed about its location or position to your knowledge?

A     No, there is not.

Q     Does it fair -- does the photograph fairly and accurately represent the pickup truck and the residence as you observed it on that evening of September of 1999?

A     Yes, it does.

Q      I would show you Government's Exhibit 4.  Do you recognize that?

A      Yes, this is the same pickup in the same position.

Q      And does that photograph fairly and accurately depict the condition of the pickup and its position and the position of the residence as you observed it?

A      Yes, it does.

Q      On the 24th of September, 1999?

A      Yes, it does.

Q      Am I correct that it was after midnight -- the midnight hour that you were there on that evening?

A      Yes.

Q      Do you know what time you arrived?

A      Approximately 12:30.

Q      Trooper Manion, I would ask, do you recognize what is depicted by the photograph?

A      Yes, I do.

Q      Does the photograph show the position you took prior to firing the shots into the window?

A      Yes, I stood --

Q      Show us where you were.

A      I stood right here by the right front tire using the pickup as cover.

Q      And how did you position yourself on or about this vehicle?

A      I stood against it and I laid my -- rested my elbows on the hood of the pickup.

Q      And then can you tell us, in terms of the course of fire, the pattern, how you fired and how many times?

A      I fired one burst, which was approximately two rounds, and I immediately fired a second burst, which was approximately four rounds.

Q      What happened when you fired the burst?

A      I heard a subject inside the house yell.  I couldn't tell what he was yelling.  I just heard him yell.  I was getting ready to fire again when Trooper Greninger yelled at me not to shoot, that Trooper Hamilton, Buddy was going in the house.  When he yelled that, I went back to the front of the house by the porch.  Trooper Hamilton was removing a subject from the house at that time.

Q      By the porch, the front porch?

A      Yes, directly in front of the porch.

Q      Let me put up number --

THE COURT:  Mr. Littlefield, let's take a recess. Members of the jury, if you will remember my admonition not to discuss this among yourselves while we are in the recess.

(JURY OUT)

THE COURT:  We will be in recess for about 15 minutes.

(SHORT RECESS)

(JURY IN)

THE COURT:  Let the record reflect that the jury is in the box, counsel for government is present, the defendant is present with counsel.  You may continue.

BY MR. LITTLEFIELD:

Q      Now, you say by the porch, the front porch?

A      Yes, directly in front of the porch.

Q      Let me put up Government's Exhibit 94, again, if I may.  And what was your position with regard to the porch on Government's Exhibit 94?

A      I left this position and come around to the southeast corner of the porch.

Q      What happened at that point?

A      Trooper Hamilton was bringing the subject out. They come off the porch onto the ground.

Q      How did Trooper Hamilton remove the subject from the residence?

A      He was dragging him out, either by his shirt or by the hair.

Q      Was the subject -- can you tell us the position in terms of the back or the front?

A      He was face down.

Q      What happened at that point then?

A      Let me back up just a second.  Just before I left

my position, I heard Trooper Hamilton yelling for the -- for someone to come out of the house, come out of the house, Highway Patrol, come out of the house.  That's when he -- he went in.  I come around to the southeast corner when and when they come out onto the ground, I fell across the individual, secured him to the ground.  As I did, he kept moving his right arm and hand toward the front of his body as he was laying face down.

Q      What did you do at that point?

A      I grabbed his arm and secured it behind him. Trooper Hash was there.  At that time I asked him for some handcuffs, which he gave me his handcuffs.  I handcuffed the subject, I rolled him over on his side and began to pat him, pat him down for weapons.

Q      Did you find any weapons?

A      Yes.  I found a semi-automatic pistol stuck in the front of his waist band under his shirt.

Q      What did you do with that?

A      I removed it from the waist band and laid on the ground, three to four feet from the subject.  I finished searching him to make sure that he didn't have any more weapons.  I asked him his name.

Q      Now, you say you searched him.  Did you go inside the clothing?  How did you make this search?

A      No.  I simply patted him down and touched him and

felt in his pockets.  I didn't go inside his clothing, except to remove the pistol from the front of his waist band.  I asked him who he was.  He said my name is Kenny Barrett.

Q     Let me ask you this:  Do you see the person that you had the conversation with in this courtroom now?

A     Yes, I do.

Q     Could you point him out for the Court?  And I would ask you to explain what he is wearing today.

A     On that occasion he was wearing a gray (inaudible) shirt, longish hair and a beard.

Q     Point to the subject, please.

A     That's him right there.

          (Whereupon the Court accepted the identification)

BY MR. LITTLEFIELD:

Q     After the patdown that you did, what happened, what did you do next?

A     I said -- I asked him who he was.  He told me he was Kenny Barrett.  I asked him if there was anyone else in the house and he said no.  At that point Trooper Hash secured the subject there on the ground by guarding him and I went immediately to Trooper Eales.

Q     What occurred then?

A     I rolled Trooper Eales over on his back face up.

Q      Had his positions changed from when you first contacted Trooper Eales?

A      No.

Q      All right.  What did you do?

A      I tore his shirt open to check for wounds.  I was trying to talk to him.  I felt for a pulse and he did have a heart beat at that time.  I cut his vest off of him, his bullet proof vest, protective vest.

Q      What did you use to do that?

A      A pocket knife I carry with me in my pocket.

Q      What happened after that?

A      Trooper Eales made a -- a coughing noise and when I felt for a pulse he -- he didn't have one then.  I started C.P.R.

Q      Where did you make your feeling for examination of his pulse?

A      On his neck.

Q      The carotid?

A      On his carotid?

A      Yes.

Q      What happened next?

A      Myself and Trooper Hise started doing C.P.R. on him.

Q      All right.

A      I had yelled for a vehicle earlier, that we had a man down.  As we did C.P.R., his heart started beating

again.  When I checked him, he was breathing.  He made another coughing noise, when he did that his heart stopped beating again.  We were still doing C.P.R. Lieutenant Pettingill said let's load him up and get him out of here.  Someone pulled up the other Bronco that belongs to Trooper Greninger.  We loaed him.  I picked him up along with Trooper Hamilton.  I picked him up, loaded him in the back and the sheriff of Cherokee County jumped in and started doing C.P.R., also one of the Task Force members and Trooper Hise drove them away.

Q     And you remained then at the scene?

A     I remained at the scene.

Q     What did you do next?

A     At that time point several of us went into the house to secure it, to make sure there wasn't anybody else in there.

Q     What troopers and officers helped you examine the house?

A     I remember Trooper Greninger being there, I believe Trooper Hash.  Trooper Hamilton went in, started in and Trooper Greninger saw that he was wounded and sent him back out of the house to receive medical attention.  Also, Danny Oliver went in with us.

Q     Were you successful in clearing the residence?

A     Yes.

Q    Did you find any persons?

A    No, we did not.  My -- I stayed close to the stairs that goes into the upstairs sleeping area.  When the bottom was cleared by the other guys, I yelled for a mirror on a metal rod we use to look up in attics and up above our heads.  I used it to look up into the sleeping area. I couldn't hardly see anything, so I went up the stairs and -- and secured that area to make sure there was no one up there.

Q    Now, did you or any other troopers remove anything or move anything in the residence during your exercise of clearing the residence?

A    No.  After I came down out of the sleeping area, I went immediately outside and did not enter the residence again.

Q    Trooper, did you at any time have any conversation with Trooper Eales during either the first time you went to him or the second time you went to him?

A    When I went to him the first time, I met him at the back of the Bronco when he first exited the vehicle and went down.  I said to him, Rocky, are you okay, are you hurt, and I knew that he was hurt.  I could tell by his movement that he was injured and he goes I'm hit bad.

Q    Did you have any more conversation with him?

A    No, I did not.

Q     Thank you.

CROSS EXAMINATION

BY MR. HILFIGER:

Q     Trooper, in preparing for your testimony here today, have you read or reviewed any documents or other materials to refresh your recollection?

A     Yes, I did.

Q     Could you tell me, please, what you reviewed?

A     A report prepared by the OSBI.

Q     And that's a report of an interview conducted by Agent Rosser with you; is that correct?

A     Yes.

Q     Mr. Manion, I have four photocopies here of pieces of paper and I would just like you to look at them -- look at that and tell me if that is the report that you reviewed.

A     Yes, it appears to be.

Q     All right.  Thank you.  Have you been interviewed by anyone else in connection with this matter?

A     Yes, the department of Internal Affairs Department.

Q     All right.  And would that be a Highway Patrol group?

A     That's correct.

Q     And if you say Internal Affairs, what's the difference in being interviewed by Mr. Rosser about these events and being interviewed by Internal Affairs or

whatever about the same event?

A      Just two different agencies.

Q      When you were interviewed by the Internal Affairs person, when were you interviewed by the Internal Affairs person?

A      Approximately two and one-half hours after the incident.

Q      Meaning you were still on site there?

A      No, we had -- the people involved in the raid came into Sallisaw and left the scene.

Q      So you were at a particular location here at the sheriff's department or --

A      I believe it's the child support office.

Q      And who all was present in the child support office with you?

A      During the interview?

Q      Yes.

A      Myself, Lieutenant George Randolph and Lieutenant Danny Robbins.

Q      All.  RightThere is a gentleman named Gordon who work for the Highway Patrol also.  Do you know who I'm speaking of?

A      Yes, Lieutenant Paul Gordon interviewed me about a month later.

Q      So you would have had two separate interviews with

what you are calling Internal Affairs?

A     That's correct.

Q     Was Mr. Rosser present during the Internal Affairs interview?

A     No, he was not.

Q     Did you interview with Mr. Rosser before or after the first interview at the child support office?

A     After.

Q     And was the interview with Mr. Rosser before or after the second Internal Affairs interview with Mr. Gordon?

A     Before.

Q     Have you had an opportunity to read any summary or transcript of either what you call your Internal Affairs interviews, the first one at the child support office and the second one with Mr. Gordon in order to refresh your recollection?

A     No, I have not.

Q     When you reviewed Mr. Rosser's summary, did you note any omission, did you feel that Mr. Rosser got the interview wrong in any respect?

A     There was a couple of things that was incorrect.

Q     All right.  Tell me, please, what was incorrect on the interview.

A     I believe on that one, the thing I remember the most

was that when I looked through the window on the east side of the house, I only saw the curtain move and that was it. I didn't see anyone inside the house at that time.

Q All right. And so -- just so I'm clear in understanding this, the Rosser interview reports that you saw a shape or something because of the back lighting, the shape of a person?

A Yes. I think that is being misunderstood from when I first saw him through the door.

Q All right. And it's also true that the Rosser interview does have a reference though to you see Mr. Barrett through the front door of his -- of his home?

A Yes, but I did not see him through the window.

Q Anything else that struck you as incorrect about the Rosser interview?

A Not anything that comes to mind.

Q All right, sir. Now, when you undertook this project or this assignment, was there anything tactical reason for conducting the operation at night?

A Element of surprise.

Q And was there a desire or an expectation or hope that the element of surprise would be better served if you raided the home, let's say, at five a.m. as opposed to 12:30?

A Time really didn't matter to us.

Q      Was there a desire or hope or expectation that whoever was there would be asleep?

A      Yes.

Q      Were the interior lights on at -- and I'm going to -- I'm going to go back the old way of doing this. I'm going to stand here at the screen.  Okay, sir?

A      Witness nods head affirmatively.

Q      When you drove by the property at the bottom of this picture -- and we have other pictures that might display it better, but there is a road that goes along here indicating that you all came down before you could turn up in this direction, indicating on the east side of the house, correct?

A      Yes.

Q      When you drove by this road did you notice whether or not the lights were on in the property or any part of the property?

A      Yes, we could see the lights were on.

Q      So the lights were on in the house?

A      Yes.

Q      And how about this garage building back over here where there is a car sort of out in the front door area of the garage?

A      I don't remember any lights being on in there.  It could have been and I don't remember it.

Q    All right, sir.  Did you see anyone in the front area of the house as you drove by on the county road?

A    No, I did not.

Q    As you -- and perhaps I should change this exhibit. I'm going to place Exhibit 192 on the projector, please. Now, sir, this is -- I'm pointing now where you say you activated your emergency lights; is that correct?

A    Yes.

Q    At that point were the emergency flashers on the vehicle in front of you on or off?

A    I don't know about the one in front of me.

Q    At any time did you believe that the emergency flashers on the lead Bronco were activated?

A    I have no idea whether they were on or not, whether they had time to turn them on or not before they taking gunfire, I have no idea.

Q    All right, sir.  And then your recollection is that you have no recollection at any time of the lead Bronco, that being Mr. Eales' Bronco, he and Mr. Hamilton, of that Bronco having its emergency flashers on?

A    That's correct.

Q    Was there -- was it the plan for that vehicle to turn on its lights at the same place where you turned your on?

A    At some point as we approached the house, they will

be turned on.

Q     As you exited this area here, did you take a route -- and now I'm pointing sort of at the top area where those yellow flowers are and that's a little bit past the deeper part of that ditch you described, correct?

A     Yes.

Q     As you cleared this top area here where these yellow flowers are, what route did your vehicle take, please?

A     We stayed on the driven path there.

Q     Okay.  So it sort of looks like there is a defacto driveway, not a covered surface of any kind, but just merely where the grass is worn down and et cetera?

A     Yes.

Q     And you followed that path on up to what position, please?

A     We parked right here in this area.  (Indicating)

Q     And was that the same path that had been followed by Trooper Eales and Trooper Hamilton?

A     He he was behind them by -- about the time -- about three or four car lengths and to their right side.

Q     All right, sir.  Did they though follow this same -- what looks like sort of a path through the grass?

A     Yes, and we was offset to their right.

Q     So you were to their right and you could see past

their vehicle and see the home?

A     Yes.

Q     At any time when you were at this location -- and I'm -- and I'm sort of -- I'm saying generally sort of toward the top of where the yellow flowers are in the photograph, at any time did you observe any one on the front porch of this home?

A     No, I did not.

Q     Was there a tactical reason for approaching the house in this fashion as opposed to, let's say, forming a parameter and getting out a bullhorn and saying, we are from the Highway Patrol and you need to come out now?

A     Yes.  We considered that method.  We discussed it and abandoned that idea because we didn't feel like, due to the information and intelligence that we had received from the Drug Task Force, that it was a workable idea.

Q     And did anyone on the Drug Task Force -- well, let me ask you this:  Who gave you information from the Drug Task Force, please, sir?

A     The information was given to Trooper Hamilton mainly through -- I know it was Clint.

Q     Were you present when Trooper Hamilton received this information?

A     No.

Q       In speaking now -- I'm not -- and I realize that I'm asking what Trooper Hamilton said, but I just want to know what words he used in describing this -- this person to you.  Did he tell you that law enforcement was unable to go up and talk to Mr. Barrett?

A       Yes, basically that was the information we received.

Q       Did you receive any information to the effect that law enforcement officers within the past few months had actually been to Mr. Barrett's home and examined his weapons and otherwise interacted with him at his home?

A       No.

Q       What information, if any, did you receive concerning what other persons might be present at that location?

A       The information we received was that he was a reclues, that he was a loaner, there would be no one else there.

Q       Okay.  Did that contribute to the type of tactical plan that you adopted?

A       Of course, yes.

Q       Now, sir, with respect to the blue pickup -- and that's Exhibit 193, which I will now place on the projector, and Exhibit 96 --

            MR. HILFIGER;  That should be 193 again

Q       -- shows the pickup that you described that you used as an aid in your firing position?

A     Yes.

Q     And if I just briefly put Exhibit 192 back on and show it, you can see the same blue pickup in this area, correct?

A     Yes.

Q     And after the time that you were involved in this incident, did, to your knowledge, did the blue pickup -- was it moved by anybody?

A     Not to my knowledge.

Q     All right.  Does it appear to be in the same location that it was in when you used it as a block aid and a firing aid?

A     Yes.

Q     And again, sir, putting Exhibit 193 back on, does that picture appear to you to give a fair and reasonable prospective of the height of the hood of the pickup, vis-a-vis windows through which you fired?

A     Yes.

Q     And would -- do you know which panes of the window glass you fired through?

A     It was in the center of the window glass.

Q     All right.  Could you indicate, please, with your pointer?

A     I believe it was in this area right here.
(INDICATING)

Q      All right, sir.  And if I -- and MP, a heckler and cockx MP-5 -- you had what, the SD-3?

A      Yes.

Q      Flash suppressers?

A      S.D. model.

Q      All right.  Did you have a flash suppressor on yours?

A      No.

Q      When you fired you say that you used your elbows as a -- to stabilize your weapon?

A      Yes, I leaned across the hood.

Q      Would it be fair to say that your angle of fire would have been approximately horizontal then, or do you believe it would have been up or down?

A      It would be a little lower because I was trying to stay low.

Q      Okay.  So your -- your trying to -- your using the vehicle for cover in addition to a firing aid?

A      That's correct.

Q      And if I understand you correctly then, you would be staying as low as you could with your weapon.  And now what I would like to know is would that have yielded a -- basically a horizontal parallel to the ground type of projectory for your bullets or would that projectory have been slightly upward or slightly downward?

A      Maybe slightly downward.

Q      Now, sir, in your interview with the internal affairs investigators at the child support office, did you provide them with different information than you provided Mr. Rosser in his subsequent interview?

A      Concerning what?

Q      Well, concerning, for instance, whether or not you recalled having been under fire at the time that you were attending to Trooper Eales at the rear of the Bronco?

A      No, I have given them the same information I gave Agent Rosser.

Q      And did you give Mr. Gordon the same or similar information concerning whether or not you recall being under fire at the rear of the Bronco when you were attending to Trooper Eales?

A      Yes, I gave him the same information.

Q      And it's correct, is it not, sir, that as you approached -- well, you never actually saw Mr. Barrett fire his weapon.  That's correct, is it not?

A      That is correct.

Q      And it's also correct that you didn't even see Mr. Barrett until the occasion when you were behind the vehicle where Trooper Eales was lying?

A      That's correct.

Q      You never saw any muzzle flash; is that correct?

A     Not that I remember.

Q     And you -- your initial belief was, when you looked into the direction of Trooper Eales and Trooper Hamilton's vehicle -- your initial belief was that they were firing into the home?

A     It crossed by mind and then as immediately as I thought that I realized that the smoke and the gunfire were coming from the residence, that their doors were not open and there was no way they could be firing.

Q     All right.  So you were able to see Trooper Hamilton was still in his vehicle at that time?

A     I had not seen him exit the vehicle, no.

Q     All right, sir.  And just -- and I won't put the other picture back up, but I recall your testimony that the Bronco in which Troopers Hamilton and Eales were -- were approaching the home in, that it came up very close to the porch before it stopped?

A     Yes.

Q     So that it -- it would have been at that point or at that distance from the front porch that Trooper Eales would have exited his vehicle and Hamilton on the other side?

A     Yes.  If I may, just by answer, the reason I know that they couldn't have been firing is because the Bronco was still moving at that time.

Q      Okay.   When you say at that time, please --

Q      When I realized the gunfire was coming from the front door --

Q      Now, sir, at the time you were discussing these matters with Mr. Rosser, do you recall advising him that you did not recall if there was gunfire at the time that the flashbang exploded?

Q      At the exact moment -- at that time when Mr. Rosser interviewed me, it was Saturday morning after this happened on Thursday night, early Friday morning.  I got home Friday night about midnight, got to sleep about two o'clock in the morning and he interviewed me the next morning, I believe around ten, there in my hometown. There was a lot of things that wasn't fresh in my mind at that time.

Q      All right, sir.  I appreciate that.  What I'm trying to find out is whether Agent Rooser had accurately reported what you said to him as opposed to whether some other matter -- all right.  So I'm not trying to do anything other than ask you whether that is an accurate record of what you told Mr. Rosser.

A      Yes, it is.

Q      Okay.  And in your discussion with Mr. Rosser, you indicated that you did not approach the back of the Bronco where Trooper Eales was wounded until after the

flash bang had exploded; is that correct?

A        No, I was already at the back of the vehicle when it exploded.

Q        My question is:  Did you advise Mr. Rosser that you were at the back of the vehicle at the time that the flash bang exploded?

A        I could have.

Q        All right.  Did you advise Mr. Rosser that at the time the flash bang exploded you didn't know whether anyone was firing or not?

A        I could have.

Q        Now, sir, did you advise Mr. Rosser that you had handcuffed Mr. Barrett and that he made this movement with a hand towards his -- the front of his body?

A        No, I don't believe I did.  I believe at the time I didn't remember who had handcuffed him.  I knew that Trooper Hash and myself and Trooper Hamilton were standing there.

Q        All right, sir.  My question is did you tell Mr. Rosser that you -- that you had handcuffed Mr. Barrett?

A        I believe --

Q        And that he had made a *flirtive movement or some type of movement with a hand toward the front of his body?

A        No, I didn't.  I believe what I told Mr. Rosser was that I couldn't remember who handcuffed him.

Q    All right.  And myou also didn't tell Mr. Rosser anything about Mr. Barrett making some kind of a movement with his hand; is that correct?

A    That's correct.

Q    Trooper, in your conversation with the internal affairs people at the child support office, did you advise them that you had handcuffed Mr. Barrett?

A    I truthfully don't remember what I told them about the handcuffing --

Q    Did you --

A    -- at that time.

Q    I'm sorry.  I didn't mean to interrupt.

A    At that time I don't remember what I told them.

Q    All right, sir.  And with respect to the testimony you have given about Mr. Barrett making some kind of movement with his hand toward the front of his body, did you advise the Internal Affairs people at the child support office of the gist of that testimony?

A    I don't believe I did.

Q    All right, sir.  And did you advise either Mr. Rosser -- well, let me ask you if you advised Mr. Rosser.  Did you advise Mr. Rosser that you physically laid down on top of Mr. Barrett?

A    I don't know if I said that in so many words, but I believe that I said that I secured him by putting weight

on him or something to that effect.

Q      Do you know an attorney named Gary James?

A      Yes, I do.

Q      And I don't want to ask what was said until the relationship was clarified, but did you have any contact with Mr. James prior to the time that you spoke to Rosser?

A      Yes, I did.

Q      And was Mr. James in your opinion acting as your attorney at that time?

A      Yes.  He is counsel for the Oklahoma State Trooper Association.

Q      That's right.  At the child support office you have indicated the people who were present when you gave your statement.  What other officers from the assault team or from the assault team and support teams were present at the child support office?

A      During the interview?

Q      During the interview first, yes.

Q      During the interview there was no one there from the tactical team.  The only other person that was present was Trooper Russell Nockey (sic).

Q      All right, sir.  And what is his relationship to the -- is he a part of Internal Affairs or is he a part of --

A      No, he was acting as support for myself.

Q      And now speaking not of during the actual interview

but what other assault team and support team personnel were present at that location near the time when your interview took place?

A      In another room was the rest of the team, except for Trooper Hamilton, who was in the hospital.  Also, Trooper Hise was at the hospital with Trooper Hamilton for a while.  He showed up later.  Also, Lieutenant Pettingill and Lieutenant McBride were still at the scene.

Q      Was your interview at the child support office tape recorded as far as you are aware?

A      Yes, it was, and later erased.

Q      And were you prsent when it was erased?

A      No.

Q      How did you become aware that it had been erased?

A      Lieutenant Randolph told me.

Q      And in terms of the time frame, when did he tell you that in relation to when the interview had actually been conducted?

A      Directly after the interview was over.

Q      So he said I will now erase it or --

A      He explained the reasoning to me, it's a procedural reason.  He didn't realize at the time he did the interview that I had fired my weapon and it is some sort of administrative thing within the Department that he advised the tape would not be used.

Q      And, sir, again, referring to that issue, did somebody take notes, let's say, while you -- while you were being interviewed at the child support office?

A      Lieutenant Randolph.

Q      Did you say anything or -- pardon me.  Would you agree with me that the Rosser report -- strike that.  In the -- in the Rosser report of your interview with him, did he -- he states that you crossed the ditch.  The report states that as Greninger and Manion crossed a ditch on the east side of Barrett's house in the second unit, Manion observed someone firing on Hamilton and Eales in the lead unit.  Is this a fair statement of what you told Mr. Rosser?

A      Yes.

Q      And that this occurred -- that this -- that just prior to this you had heard Lieutenant Pettingill on the radio saying they are in the yard?

A      Yes.

Q      And that's also -- now, I have accurately stated from Mr. Rosser's report and I ask you now, is that an accurate statement of what you told him?

A      Yes, I believe so.

Q      You also stated that someone fired -- someone fired at Hamilton and Eales while Greninger watched Toby.  The gunfire sounded like automatic weapon gunfire.  Do you

recall that portion?

A     The name is incorrect.

Q     I'm sorry, sir?

A     Greninger's name is incorrect.  It should be either Trooper Hise or Trooper Darst.

Q     All right, sir.  Other than the misname, does that -- is that what you told Mr. Rosser?

A     Would you repeat and read that again?

Q     It said and I'll -- let me read the entire paragraph so that it's fully in context for you.  It says, "Hash and Oliver, in the third unit, parked east of Greninger and Manion.  Greninger yelled he is in the yard.  Greninger saw Kenneth Barrett's son, Toby Barrett, in the yard on the west side of the house.  At the time Greninger saw Toby, Manion did not know if Toby was the shooter or not."

Now, up to that point, that is consistent with your recollection?

A     Yes.

Q     And not only of what you told Mr. Rosser but of what actually happened?

A     Yes.

Q     And it continues.  "Someone fired at Hamilton and Eales while Greninger watched Toby.  The gunfire sounded like automatic weapon fire."  Does that -- other than your statement that Greninger's name is incorrect --

A      Yes.

Q      It is still, sir, your testimony that the name Greninger is incorrect where it says Greninger watched Toby?

A      Yes.

Q      But otherwise, it's consistent with your recollection?

A      Yes.

Q      And then, sir, in the following paragraph you described Mr. Eales exiting the passenger door of the Bronco and that he goes to the rear of the Bronco and falls down and that's when you run to him; is that correct?

A      He had not fallen when I got to him, no.

Q      But he was -- in your view, he was clearly wounded at that time?

A      Yes.

Q      Is that a -- is that paragraph consistent with your current recollection?

A      Yes.

Q      All right, sir.  Then the following paragraph is the one in which you put, as a statement, that you didn't recall whether there was weapon fire at the time the flash bang detonated; is that correct?

A      That's correct.

Q      Sir, you described wearing your badge on a chain

around your neck.

A    Yes.

Q    Were any of the other assault team members also wearing a metal badge on the exterior front of their clothing?

A    I have no idea what they were wearing.

Q    Sir, at any time while you were present at that location did you see anyone -- and I'm speaking of after the shooting had stopped, after Mr. Barrett had been secured.  Did you see anyone undertake any prying open a part of the surface of the door on the front of the house or anything of that kind?

A    No.

Q    Did anyone in your presence strike Mr. Barrett with a first or a foot or a flashlight or a weapon or anything?

A    Not in my presence.

Q    Would it be fair to say, sir, that in the aftermath of Mr. -- it was understood by the troopers there that Mr. Eales was -- was hit very seriously, if not fatally; is that correct?

A    Yes.

Q    In the aftermath of that realization, did any of the troopers, whether on the assault team or the backup team or any other law enforcement officers, exhibit any kind of anger directed toward Mr. Barrett?

A      Not that I'm aware of.

Q      So, you didn't hear anybody call him a -- some derogatory names or otherwise tell him what was coming his way because he had shot a law officer?

A      My concern was with Trooper Eales.

Q      I appreciate that, sir.  And I'm simply asking whether you recalling hearing any statements of hostility or anger made toward Mr. Barrett by any of the people that were there in the aftermath of Mr. Eales?

A      No, I do not recall any.

Q      Whose responsibility was the use of the batteing ram?

A      I believe it was Trooper Hash's.

Q      In your experience as a tactical team officer -- and I assume -- and I would assume that you have been involved in dozens or maybe hundreds of tactical operations?

A      That's correct.

Q      Certainly many, many operations?

A      Yes.

Q      Is it unusual for a lot of elected officials and assistant district attorneys or other officers to come out in support of a tactical operation?

A      It certainly has happened in the past.  It's not unusual for them to be present, no.

Q      Was there a sense in which this tactical operation was thought to be more likely to result in gunfire than

other tactical operations?

A      No, I don't believe that's the case.

Q      If we assume hypothetically that -- well, let me ask this:  In other tactical operations do you consider whether it's best to assault the property or whether it's best to form a perimeter and demand that someone abide by lawful orders?  Is that fair statement?

A      Yes, we have done that in the past.

Q      Did anyone prior to the time that Mr. Eales exited his vehicle -- did anyone use any kind of amplification or bullhorn to announce that it was a police raid or a Highway Patrol raid or law enforcement raid?

A      Not to my knowledge.

Q      Did anyone -- let's say shout that out at any time prior to the time that you heard -- I believe Mr. -- and I may have the name wrong, but you testified that Mr. Hamilton said Highway Patrol come out or something like that?

A      That's correct.  There was not time to announce anything.

Q      What, if any, wounds do you believe -- did you believe Mr. Barrett had sustained?

A      I could see that he was injured in his legs.

Q      And did -- and did you see wounds to both legs?

A      I don't remember if it was both legs or not, but I

can remember seeing wounds to his leg.

Q     And do you -- were you still present at the scene when he left in an ambulance?

A     Yes.

Q     How long was it from the time that he was subdued on the ground and then handcuffed by whomever and then he was picked up in an ambulance --

A     I'm not sure.

Q     Would it be on the order of an hour and a half?

A     It doesn't seem like it was that long, probably about an hour or thirty minutes or so.  That's what it seemed like to me, but it could have been longer or it could have been shorter.

Q     Was your interview with Mr. Gordon recorded?

A     Yes, it was.

      And do you know whether or not that interview was -- that tape was erased?

A     I have no idea.

Q     Did you tell Mr. Gordon that you handcuffed Mr. Barrett?

A     I believe I did.

Q     And did you tell Mr. Gordon anything about Mr. Barrett making any kind of a movement with his hand?

A     I don't remember that, if I did or did not.

Q     So as I understand your response, you're saying you

don't know whether you did or you didn't?

A      That's correct.

Q      When is the first time you remember telling someone about Mr. Barrett making a movement with his hand?

A      I don't remember that.  I don't remember the first person I told that to.

Q      Do you remember when -- your first recollection -- do you have just no recollection of ever telling anyone?

A      Yes, I have talked about in the past, but I don't know when.

Q      Okay.  Do you remember with whom?

A      No, I do not.

Q      Other than the three interviews that you have described, the child support office, the Gordon interview, and the interview with Mr. Rosser, has anyone else interviewed you about this case?

A      No.

Q      Was your vehicle struck by any gunfire?

A      No.

Q      Sir, the window that we have depicted, I think it's Exhibit 96 -- 193 -- and I hope I haven't misspoken, but it is the window you have described through which you fired?

A      Yes.

Q      Was that window open at any time during this

operation?

A       No, not that I'm aware of.

Q       During the afternoon drive-by -- do you know what I'm referring to?

A       Yes.

Q       At that time who all was in the vehicle with you, please?

A       Trooper Hamilton and Trooper Greninger.

Q       Did you see Mr. Barrett at any time during the drive-by?

A       I saw two subjects in the front yard.  I did not know Mr. Barrett at the time.  I could not actually see him.  I could just see two subjects standing behind a vehicle in front of the house.

        MR. HILFIGER:  I have no further questions, Your Honor.  And the Court asked:

                    EXAMINATION

BY THE COURT:

Q       Trooper, on direct, as I understood your testimony, the point at which you came up to the rear of the first Bronco, the one that was ahead of you, to render assistance?

A       Yes, sir.

Q       Your statement, as I have written down, is that you were still -- you were at the rear of it and you were still taking fire is the statement you have given me.  I

need for you to define what that actually means, what was actually happening at that point.  I know that would be more or less be a term of art for someone in your position, but it means -- it doesn't mean a lot to me.  I need to know what was happening.

A    Your Honor, I could hear gunfire directed outside toward our location.

Q    Uh-huh.

A    I did into see the gunfire.  I did not hear where it struck, but there was gunfire, several shots coming from the house which caused me to stay under cover.

Q    Okay, all right.

        THE COURT:  Have I asked anything that you need to follow-up on?

        DEFENDANT'S ATTORNEY:  Yes.  Briefly, Your Honor, if I might.

                    FURTHER CROSS EXAMINATION

BY MR. HILFIGER:

Q    If I understand you correctly, sir, you didn't see anyone firing?

A    That's correct, I was behind cover.

Q    Your behind cover behind the Bronco?

A    Yes.

Q    You didn't see or hear any projectile land at your feet -- I don't mean land, I mean strike at your feet or

near you or that kind of thing; is that correct?

A      That's correct.  And it wouldn't have with us being behind the Bronco.

Q      All right.  You were in a -- at that point you were in a -- basically a secure position because of the cover?

A      Yes.

Q      And you didn't see anyone directing fire at you personally?

A      No.

MR. HILFIGER:  That's all I have, Your Honor.

(END OF TRANSCRIPT TESTIMONY

OF RICKY MANION)

THE COURT:  You may call your next witness.

MR. LITTLEFIELD:  Danny Oliver.

DANNY OLIVER, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q      State your name for the record, please, sir.

A      Danny Oliver.

Q      Mr. Oliver, how are you currently employed?

A      I work for Homeland Security.

Q      And what do you work?

A      What capacity?

A      Instructor.

Q      Federal or state?

A       Federal.

Q       And what area do you instruct for the Department of Homeland Security, sir?

A       Weapons of mass destruction.

Q       Have you previously been employed by the Oklahoma Highway Patrol?

A       Yes, sir, I have.

Q       And how long were you a worker or an employee for the Department -- for the Highway Patrol?

A       28 years, sir.

Q       In what capacity did you work for O.H.P.?

A       I was a trooper.

Q       When did you leave the Highway Patrol?

A       I retired in May of 1999.

Q       Besides being a trooper, did you have any other responsibility or duty that you served or fulfilled with the Highway Patrol?

A       Yes, sir, I was a trainer with them and also on the tactical team, the east tactical team.

Q       And how long, Mr. Oliver, were you with the east tactical team for the O.H.P.?

A       Prior to my retirement, 15 years.

Q       In that period of time did you have any position of responsibility with the east tactical team?

A       Yes, sir, the last ten years of the -- while I was

on the team I was the team leader for the east tactical team.

Q    As a consequence of your experience with the tactical team and your experience as being team leader, were you still familiar with the techniques, the tactics, and the individuals who were on the team in September of 1999?

A    Yes, sir, I was.

Q    When you retired in May of '99, what position of employment did you -- from the O.H.P., what position of employment did you go to, sir?

A    I went to work for Cherokee County, the sheriff's office as an investigator for the D.A. as a Task Force Officer.

Q    Do you recall receiving information about the possibility of the execution of a search warrant on Kenneth Eugene Barrett's residence?

A    Yes, sir, I do.

Q    And from whom did you receive that information, sir, or about the possibility of receiving a warrant?

A    I got a call from two people, Frank Loyd and Clint Johnson.

Q    Okay.  And what were Mr. Loyd and Mr. Johnson's position?

A    They were on the D.A.'s Task Force, Drug Task Force,

as task force agents.

Q     Okay.  And when you got the information about the possibility of needing the tactical team's assistance in executing a warrant, what did you do with that information?

A     I advised them that -- of course, they knew I was no longer employed for the Highway Patrol.  I advised them that they needed to get in touch with Lieutenant Pettingill out of Oklahoma City, which was the team commander at the time, and I also called Lieutenant Pettingill the next day and told him the information I had and they were going to contact Lieutenant Pettingill.

Q     Okay.  Did you ever receive information advising you that, in fact, a search warrant had been obtained?

A     Yes, sir, I did.

Q     And do you recall participating in the incident and in the execution of this warrant, sir?

A     Yes, sir, I do.

Q     How much prior to the actual execution of the warrant was it that you learned that, in fact, the warrant had been obtained?

A     They called me on the Sunday prior to the warrant, late at night, approximately eleven o'clock.  I was in bed.  Somewhere Monday or Tuesday I was informed by either Buddy Hamilton or Raymond Greninger, I don't remember which one, that a warrant had been obtained.

Q      Okay.  And at what point was it learned by yourself that you might well be participating in the execution of this warrant, the best you can remember --

A      Thursday, the 19th, Thursday whatever that date was, I had met them down at Camp Gruber.  I had been talking to them --

Q      When you say Thursday --

A      Yes, yes.

Q      She can't get us both talking.  When you say Thursday, are you talking about -- how close to the actual execution of the warrant are you talking about?

A      About the day before.  I'm sorry.

Q      Okay.  So if the evidence is that this warrant was actually executed in the early morning hours of September 24th, then the day that you would have been contacted would have been what?

A      The day before.

Q      Okay.  On the 23rd?

A      Yes, sir.

Q      And where did you go in regards to preparation for the execution of this warrant?

A      I went to Camp Gruber, which is a military installation southeast of Muskogee.  It's just at Braggs, a small town in Braggs.

Q      What had you been doing during that week?

A       I had been teaching a rifle course for Cherokee and Adair County in Stillwell, Oklahoma.

Q       And was your instruction -- did it go into that Thursday?

A       Yes, yes, sir, it did.

Q       When would it have been that you were able to get to Camp Gruber at Braggs, the best you can recall, about what time?

A       I arrived approximately four p.m. that afternoon.

Q       Okay.  When you got there did you learn of anything that was then at that point in time being done in regards to finalizing the plan of entry to the Barrett residence?

Q       That was -- they had had a briefing at approximately two p.m. that afternoon and they was doing reconnaissance with the vehicle on Mr. Barrett's residence at the time I got there.

Q       Okay.  So the drive-by was being conducted when you got there?

A       Yes, sir, right there at that point, yes, sir.

Q       At any point did the individuals who were conducting the drive-by of Mr. Barrett's residence return to Camp Gruber and, if so, was there any modification of the plan?

A       We had another -- they had another briefing that I attended at approximately eight p.m. that night and at that point in time I was sitting in on the briefing and

briefed what was to happen.

Q     Okay.  What position were you going to occupy during the execution of this warrant?

A     They asked me to go with the entry team and be an outside security element, which would be on the south as you go on the northeast corner, if I have got my directions correct, of the residence.

Q     Okay.  Which vehicle were you to approach in?

A     I was riding with Trooper Hash in the marked patrol unit.

Q     Okay.  And what vehicle was he in, in regards to the number that entered, first, second, third...

A     Third vehicle, sir.

Q     What kind of vehicle did he have?

A     It was a marked patrol unit, a Ford.

Q     Okay.

          MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 129 be displayed to Trooper Oliver.

BY MR. LITTLEFIELD:

Q     Do you see to your left -- it's also displayed there to the jury.  It's on that teleprompter just to your left right beside you there.  Do you see the photograph there and do you recognize what is displayed there on the screen?

A     Yes, sir, I do.

Q     What is that?

A     This is a -- Mr. Barrett's residence, the place that the warrant was executed or attempted to be executed.

Q     Do you see a vehicle to the -- as you look at the screen, to the right of Barrett's residence?

A     Yes, sir, I do.

Q     Whose vehicle is that?

A     That would be the unit that I was riding in or the vehicle I was riding in, Trooper Hash's.

Q     And in relation to where in this photograph -- where did that vehicle end up in the yard as the entry was made, sir?

A     At that location, sir.

Q     Okay.  From which direction was entry made into Barrett's property?

A     There was a lane running east and west.  We come down the lane, entered into the yard through the ditch, approached from the east side, sir.

Q     Okay.  And do you see over there, Government Exhibit Number 1, do you see the lane off of which you turned and the ditch through which you entered in making the entry?

A     Yes, sir, I do.

Q     Okay.  What happened in regards to the emergency lighting on Trooper Hash's vehicle as you all approached the property?

A    As we turned into the lane, which runs east and west, which would be the white lane to the outside of the diagram itself --

Q    Okay.

MR. LITTLEFIELD:  Your Honor, I would ask that the witness be allowed to go down to the model.

THE COURT:  You may, sir.

BY MR. LITTLEFIELD:

Q    Go ahead and face the jury as you discuss it.

A    Okay.  The lane I'm speaking of is this lane right here.  We turned down -- it's not on the model but we turned in here at this location and the overhead on this patrol unit was turned on.

Q    Okay.  And where did Trooper Hash go in regards to -- where did he make entry into the property?

A    All three vehicles made entry right here at this ditch line.

Q    How far was Trooper Hash's vehicle trailing Trooper Greninger's Bronco?

A    Very, very close.

Q    When you say very, very close, a car length or how much?

A    Less than a car length.

Q    Okay.  What happened when Trooper Greninger or -- let me ask first, did you observe Trooper Hamilton's

vehicle, the lead Bronco, hit that ditch?

A     Yes, sir.

Q     What happened when he hit the ditch?

A     As they crossed the ditch here -- if you look at the diagram, the ditch is very deep and the back bumper drug as it crossed the ditch.

Q     That was Hamilton's Bronco?

A     Yes, sir.

Q     What about Greninger's Bronco?

A     Greninger's did it also.

Q     As a consequence of that, what action was taken by Trooper Hash to assure his crossing of that ditch?

A     As we was watching the other two vehicles cross, I told Steve, I said you are really going to have to gun it because we are not going to make it across this ditch because the Bronco -- as you well know, it's higher in height than a patrol car is.  So as we crossed the ditch, he gunned it really hard and, in fact, it did a lot of damage to the vehicle itself.

Q     Okay.  As you were making entry, did you discern or notice anything that was unexpected or unusual in relation to your experience in other entries?

A     Yes, sir.  As we were making the entry, as the first two Broncos were making the entry, the first one had already crossed the ditch and the second one was in the

process or nearly already out of the ditch when I started hearing gunfire.

Q    At what location were you and Trooper Hash and his vehicle when you started hearing gunfire?

A    We were at the -- this edge of the ditch.  We hadn't got into the ditch yet.  The first Bronco was already through the ditch and the seocnd one was nearly through it when I first started hearing the gunfire.

Q    Okay.  Approximately where did Trooper Hamilton and Trooper Eales' Bronco end up in relation to that cabin?

A    Can I step over here?

Q    Yes, sir.

A    Can I move the vehicles?

Q    If you need to.

A    Okay.  Trooper Hamilton's vehicle was -- ended up just about this location.

Q    Okay.  What do you recall about the location where Trooper Greninger's vehicle ended up?

A    To my recollection, this is pretty close to where Trooper Greninger's vehicle ended up.

Q    Do you see a blue pickup east of the residence?

A    Yes, sir, I do.

Q    Is that the location in which -- where it was or do you think it should have been in another position?

A    No, sir, that's fairly close.

Q     As to Hash's vehicle, is that where you believe you all ended up or would you place it in a different location?

A     That's fairly close, sir.

Q     Okay.

A     Maybe a little closer to the residence.

Q     If you need to move it a little closer, if you think it was a little closer, move it to where you think it ended up.

Q     Okay.  Go ahead now, if you would -- all right.  Do you think that's the correct position on all three of the entry vehicles?

A     Fairly close, sir.

Q     Okay.  If you would, go ahead and return the microphone and return to the witness chair, sir.  You indicated that you were somewhere in the vicinity of the ditch just getting ready to enter it when you first heard the gunshots?

A     Yes, sir.

Q     At what point, if any, did you learn or were you able to observe as to what the gunshots were directed toward?

A     Not until I -- we stopped and I exited the vehicle --

Q     Okay.

A     -- which was patrol unit.

Q     When you exited the vehicle, where was Trooper Hamilton's vehicle located?  Had it arrived at that location, was it approaching or what?

A     It had already arrived.

Q     And what did you see that informed you as to what the target of the shots was?

A     When I exited the vehicle -- of course, I exited from the passenger side.  I went down on one knee because I could hear the gunfire and it was very rapid at that point.  I'm looking right down the porch.  That's the reason I moved the vehicle because when I got out and exited and got down on a knee, I could see all of the way across the porch.

Q     Okay.  And when you exited, which -- where were you in relation to that black and white?  Were you able to look down the porch line?

A     I was just on the right-hand side or the passenger side of the black and white car.

Q     And when you viewed down the porch line, what were you able to see?

A     I'm seeing gunfire come out of the front door of this residence.

Q     Okay.  When you say you were seeing gunfire, what are you able to observe?

A     The overheads on the marked unit was on, which lit

up the whole area, the lights of the Broncos were on, which lit up the house, and I could see glass coming off -- and it was -- after it was over with, it was off the off Trooper Hamilton's vehicle and I seen -- as a gun fires, smoke and fire comes out of the end of the barrell. We call it a flume. I could see that coming out of the front door of this residence.

Q      Are you familiar with how far a flume is visible in the nighttime when it's in an area that is somewhat illuminated?

A      Yes, sir.

Q      How far out is it visible from the end of the barrel of the gun?

A      From the amount of light that was there, maybe 18 inches, approximately.

Q      And was the flume that you are referring to, did it go out beyond the threshold of the door?

A      Yes, sir, it did.

Q      Okay. What were you able to observe in relation to the vehicle which was being or whatever was being struck by the shots being fired?

A      There was glass and the light was reflecting off this glass coming -- I found out it was coming off the windshield of this vehicle. As it was shot into, there was glass just floating in the air and as the glass and smoke

was there, you could see the light reflecting off the glass itself.

Q      Which light?

A      All of the lights, sir.

Q      How about the over headlights?

A      The overhead and the lights on the vehicle themselves, the two Broncos.  It was very dark that night.

Q      What did you do then?

A      By my observation, I determine someone was shooting out that front door.  So, then I was going to make a route as safe as I could to see -- see when I could see was shoting out the front door corner of that vehicle and I come to the back driver's side of the -- Trooper Greninger's Bronco.

Q      Okay.  What did you observe when you got to the rear driver's side of Trooper Greninger's Bronco?

A      I observed the -- when I got there I observed a body laying on the passenger side or the rear of the lead Bronco, which was Trooper Hamilton's Bronco, face down.

Q      What did you do then, sir?

A      I seen it was Rocky Eales.

Q      What was your relationship with Mr. Eales?

A      Excuse me.

                              (PAUSE)

A        Trooper Eales is my best friend.

Q        Okay.  How long had you known him?

A        Since junior high.

Q        Okay.  So you observed that it was Rocky at the back of Trooper Hamilton's Bronco?

A        Yes, sir.

Q        What did you do then?

A        I went directly to Rocky.

Q        And what did you observe when you went to Rocky?

A        He was laying on his stomach motionless.  I reached down and -- and grabbed his right shoulder and was going to turn him over on his back and he screamed out in pain and I laid him back down.

Q        Okay.  Mr. Oliver, what did you do at that point, sir?

A        At that point in time the firing had seized.

Q        Okay.  Did you know at that time why the firing had ceased?

A        No, sir.

Q        Okay.  What did you do at that point?

A        I turned and looked into the cabin, of course, which is the direction the fire was coming from and I seen Trooper Buddy Hamilton bringing Mr. Barrett out of the residence.

Q        Okay.  And where did Trooper Hamilton take

Mr. Barrett to when he moved -- removed him from the residence?

A      Right out in front of the steps.

Q      Okay.  Would you look --

        MR. LITTLEFIELD:  And I would ask that Government's Exhibit Number 21 be displayed.

BY MR. LITTLEFIELD:

Q      Okay.  Would you look to --

        THE COURT:  I don't show it in evidence yet.

        MR. LITTLEFIELD: No, it's not that one.  There is another one.  Government's Exhibit 12.  I'm sorry.

BY MR. LITTLEFIELD:

Q      And do you recognize the -- what's displayed in Government's Exhibit Number 12?

A      Yes, sir, I do.

Q      And does it show the area to which Mr. Barrett was taken by or the individual removed from the cabin was taken by Mr. Hamilton?

A      Yes, sir, it does.

Q      And you can tap that screen and at the area where you tap it it will leave mark.  So could you tap the screen at the area to which the person was taken?  Tap it again, it didn't come through.

A      (COMPLIED)

Q      Okay.  We have got a couple of them.  Try it one

more time.  Okay.  And is that approximately the area to which he was taken?

A      Yes, sir.

Q      What did you observe happen at that location?

A      As Trooper Hamilton was bringing him out the front door, Trooper Manion had come around from the east side of the house and also Trooper Hash was up there at that point in time.  If I recall this correctly, Trooper Manion was on one side and Trooper Hash -- Trooper Manion and Trooper Hamilton was on both sides of him and I observed a pistol in Mr. Barrett's waist line.  When I observed this, I hollered at both of them, he has got a gun in his waist. If I'm not mistaken, Trooper Manion jerked the gun out and threw it on the ground.

Q      Do you see the gun in the photograph?

A      I can't in this photograph -- oh, yes, sir, right here it is.

Q      Tap it at that location.

A      (COMPLIED)

Q      Okay.  And would that have been where Trooper Manion had tossed the firearm?

A      Yes, sir.

Q      Okay.  What happened with the person that was pulled from the residence?

A      He was secured and handcuffed at that location.

Q     Okay.  Let me take you back for a moment when you were at the east side of the house.  Did you see Trooper Eales exit the Bronco?

A     No, sir, I did not.

Q     Okay.  Did the firing from inside the house remain the same or did it appear to change in regards to its position, vis-a-vis the front door?

A     When I exited the vehicle and moved to the Bronco, the second Bronco, to the driver's side area, the firing was heavy.  When I seen Rocky he was laying on the ground. I went to Rocky and somewhere in there the firing ceased or slowed down and then I heard some more shots and then it stopped.

Q     Okay.  So when you were at the back of Trooper Greninger's Bronco, the firing was still going.  You said it stopped and then it picked up again?

A     Yes, sir.  It may not have completely stopped, but it slowed down.

Q     Did you ever hear a flash bang or a distraction device go off?

A     Yes, sir, I did.

Q     Do you recall when that went off in relation to the dimunition of the firing from the house, the reduction of the speed of that firing?

A     The flash bang went off somewhere about the time I

got to othe rear of the second Bronco.

Q     And when was it in relation to your getting to the rear of the second Bronco that the firing slowed down and then picked up again?

A     The firing slowed down just about the time I got to the rear of the Bronco, right there in that period of time.  I went to Rocky and then it -- and then some firing started again.  It wasn't as intense the second round, if you want to call it that.  It wasn't as intense and then it stopped.

Q     When you were standing to the side of Trooper Hash's vehicle as you could see the flume coming out the front door, did it remain the same or did it appear as if it diminished with a change of location from the person that was shooting?

A     When I was at the side of Trooper Hash's vehicle, the flume was the same, very rapid firing.

Q     Did it ever change?

A     Not until I got to the back of Bronco itself.

Q     What about its location of the person firing?

A     After it had changed, after it slowed down that first time, if you want to go to first and second, it had -- when the firing stopped the first time or slowed down, it changed.  Apparently it sounded like it was farther inside the house.

Q     Okay.  Originally, did you have a recollection of the flash bang?

A     No, sir, I did not.

Q     When did that come back?

A     About three months after the incident.  Originally I did not remember the flash bang going off.  I knew it did because they -- afterwards I -- they showed me the body (sic) and most everyone heard it, but I didn't remember it, no.

Q     Okay.  After Mr. Barrett was taken into custody, secured out at this location out in the front yard, was that residence -- were you all certain that that residence was secure and any jeopardy to the officers at that scene totally eliminated and removed at that point?

A     No, sir, because we hadn't cleared the residence itself.

Q     Okay.  What was done in that regard, sir?

A     Myself, Trooper Manion, Trooper Greninger, and Trooper Hamilton -- actually Trooper Hamilton didn't come in originally.  Myself, Greninger, and Manion cleared the bottom floor.  About the time we got it cleared --

Q     When you say cleared the bottom floor, what are you referencing?

A     Well, if you look at the diagram itself, it has an upstairs.

Q      Yes, sir.

A      Okay.  So we went in -- when I say cleared, we made sure no one else was in the house.

Q      Was anyone else in the downstairs of the house?

A      No, sir, there was not.

Q      So then what happened in regards to the upstairs area in relation to the staircase?

A      We had a stairwell.  Somewhere in this point in time Trooper Hamilton come in.  I called for a mirror.

Q      Okay.

A      And when I say a mirror, it's actually a mirror -- a round mirror, probably six inches in diameter on a little pole or extendable stick and we use it to clear areas that we cannot see in.  We stick it up in there and you can turn it around and see if anyone is in there before you stick your head up and possibly get hurt.  So at this point in time, Buddy came back with a mirror.  At that point in time I saw Buddy was wounded.

Q      Do you recall what you saw that -- on Buddy that exhibited the wounds?

A      He had blood all over his face, half way down his chest, and I seen he was wounded.  I then told Trooper Greninger get Buddy to a doctor, get him to the hospital. At that point in time him and Buddy left and I don't know what mode of transportation they left in, but they --

Q    Continue in regards to making sure the house was clear and secure.

A    Myself and trooper Manion cleared the upstairs.  No one was found upstairs.

Q    So how many people were removed from that house where the shots were being fired, sir?

A    Just one, sir, Mr. Barrett.

Q    Okay.  And did you see Mr. Barrett that night?

A    Yes, sir.

Q    Can you identify him in court today?

A    Yes, sir, it's this gentlemen sitting right here.

Q    What is he wearing today?

A    He has got a blue checkered shirt on.

        MR. LITTLEFIELD:  I would ask that the record reflect that the witness has identified the defendant, Kenneth Eugene Barrett.

        THE COURT:  The record will so reflect.

        MR. LITTLEFIELD:  May I have just a second, Your Honor?

        THE COURT:  You may.

                    (PAUSE)

        MR. LITTLEFIELD:  Pass the witness, Your Honor.

        THE COURT:  You may cross examine.

                CROSS EXAMINATION

BY MR. HILFIGER:

Q      On this -- Mr. Oliver, you said you received call on a Sunday night.  Was that the Sunday night before this -- before this warrant was executed?

A      Yes, sir, it was.

Q      And was that the first time you had any contact at all with Clint Johnson and Loyd as to getting the tact team in?

A      Yes, sir, it was.

Q      And did you -- did you tell them at that time to call Pettingill?

A      Yes, sir, I did.

Q      And so any contact -- did they give any indication to you that they had made any prior contact with Pettingill prior to that Sunday?

A      No, sir, they did not.

Q      Did they give any indication to you that they had a search warrant?

A      They said that they -- if I remember correctly, that they needed the tactical team to do a high risk search warrant.

Q      To do a what?

A      A high risk search warrant, sir, and by me being on the team and being familiar with the officers and just retired, they contacted me to contact the team itself or the highway patrol.

Q      Did they indicate to you that they already had the search warrant?

A      No, they did not.

Q      Do you know whether they already had the search warrant?

A      I don't know at that point whether they had it or did not have it.

Q      But they told you that what they wanted to use the tact team for was to execute a search warrant?

A      Yes, sir.

Q      And then do you recall the day of the week that this execution took place?  And I'm talking about the day being -- it would be 12:30 in the morning, so whatever that morning is.

A      It would be about 12:30 a.m. in the morning, that following Friday.

Q      So you think it was a Friday?

A      Yes, sir, I believe so.  It's been a long time.

Q      Okay.  And you were first called in to it the Thursday before that Friday, as far as being called in to -- that you were going to be a part of that team?

A      Yes, sir.  I had been in contact or I should say we had been in contact with Trooper Greninger and Trooper Hamilton a couple of times throughout the week in the evemomgs?

Q      Okay.  You had been teaching a rifle course?

A      Yes, sir.

Q      Are you familiar with the different arms and rifles that are used in the -- with the tact team?

A      Yes, sir, I am.

Q      When you were on the tact team was an MP-5 used?

A      Yes, sir, it was.  We had two of them.

Q      You had two of them?

A      Yes, sir.

Q      Did you use one?

A      No, sir, I did not.

Q      Are you familiar with an MP-5?

A      Fairly so, yes, sir.

Q      Does an MP-5 eject cartridges?

A      Yes, sir, it does.

Q      How does it eject the cartridges, which direction?

A      To the right, sir.

Q      To the right?  Just straight out to the right?

A      With my experience with H&K, which is the brand of an MP-5 -- of course, the MP-5 or HK-53 or other models -- they may eject them out, up, to the side, they are not consistent.

Q      Okay.  Do they ever eject them forward?

A      It's possible.

Q      Okay.  Did you ever -- did you ever use an MP-5 to

make that determination?

A     No, sir, I have not.

Q     What about your HK -- the 223?

A     Yes, sir, I've shot one of those quite a bit.

Q     Those, do they eject just all over the place?

A     Yes, sir, they do.

Q     They do eject all over the place?

A     Yes.

Q     Right, left, up, down?

A     Very seldom to the left.  I have never saw one eject to the left, but they -- other than mini-rifles, which you will pop within a three or four foot circle when you are shooting it if you stay in one location, an HK will not do that.  They throw them different directions.

Q     Do you know anything about an AR-15?

A     Yes, sir, I do.

Q     What about their ejection?

A     Pretty consistent.

Q     Pretty consistent, which way?

A     In one location, in one direction.

Q     Well, which direction?

A     To the right.

Q     To the right?

A     Yes, sir.

Q     Just to the right and up or back or front or --

A       Up to the right and down, of course.

Q       No forward, no reverse, no behind, no forward?

A       Very -- no.

Q       And is a Colt Sporter the same thing as an AR-15?

A       Yes, sir, basically the same.

Q       Have the same basic ejection pattern?

A       Yes, sir.

Q       It would be to the right?

A       It would be to the right.

Q       You were part of the second briefing at eight o'clock that evening and at that briefing was there any kind of a determination -- well, at that briefing was the whole group there?

A       Yes, sir, it was, the team.  Excuse me, the tactical team was there, everybody.

Q       Was Clint Johnson and Alan Loyd there at that time?

A       No, sir.

Q       Just the tact team?

A       Yes, sir.

Q       At that briefing was there any discussion as to emergency lights?

A       Yes, sir.

Q       What is your recollection of the discussion on emergency lights?

A       As we turned in the lane, I specified when I got

up -- if you remember that, sir, the lights would be turned on when we turned down the lane itself.

Q     Okay.  And that was as far as Hash's vehicle, right?

A     Yes, sir.

Q     What about the two Broncos?

A     I don't recall -- I don't remember that, sir.

Q     You don't recall what?

A     If they discussed it, if they did what was said.

Q     What about Hise's vehicle?

A     I don't recall that either.

Q     Do you know whether they discussed it?

A     I don't recall them discussing it, no, sir.

Q     What about Pettingill?

A     That either, sir.

Q     Were you able to see the two Broncos in front of you when you first heard the gunfire?

A     The first Bronco I couldn't see.  It had disappeared or moved out of my sight.  I could see the second one, yes, sir.

Q     Okay.  About where would you say the second Bronco was?

A     It was just as you exit the ditch, sir, somewhere in that area.

Q     Okay.  And the first Bronco was out of sight?  Why was it out of sight?

A      It had just moved out of my sight.

Q      Well --

A      Because as you -- can I explain this, what I meant by that?

Q      Sure.

A      The ditch was very deep.

Q      Okay.

A      And as the Bronco ran across, the back bumper drug extremely on the ditch.  So as one Bronco comes across and then it sped up and then the second one came across and, of course, it sped up and then we came across.

Q      Okay.  But I'm not following you why you say the first Bronco was out of sight.

A      Well, when I say out of sight, we are talking about, sir, it's dark and once the gunfire -- I started hearing gunfire, my focus went to where is the gunfire coming from. Is it coming from this residence, is it coming from -- at that point in time my focus went to where is the gunfire coming from.

Q      Okay.  So the first Bronco was out of sight because your focus was on something else?  Is that what you are saying?

A      Yes, sir.

Q      Okay.  And where were you looking --

A      I was scanning the whole area.  Of course, at that

point time I don't know where the gunfire is coming from. At that point in time I couldn't see anyone moving outside of the residence itself.  When we stopped, the vehicle stopped itself, was as soon as I can see the gunfire coming from the residence itself, as I stated earlier.

Q     So -- now, as I understand it then you are saying when you first heard the gunfire the Hamilton Bronco was not in your focus, it was out of sight, and you did a scan of the area and you couldn't see anybody outside in the yard or anything?

A     Not at that point, no, sir.

Q     Okay.  Could you see -- were you able to see the porch area when you first heard the gunfire?

A     Yes, sir.  If you look at the angle here where the -- and I assume this is to scale here.  If you look at the angle where the ditch is here, as we came in I could see the east side of the house and part of the porch.

Q     Could you see anybody on the porch?

A     No, sir, I did not.

Q     Could you see any flumes coming out of the porch when you first heard the gunfire?

A     No, sir.

Q     And these flumes, as I understand what you are talking about, it's an 18 inch spread coming out of the barrel of the gun; is that right?

Page 1177

A       Yes, sir.  It's the burnt powder.  If you are familiar with weapons, it's the burnt powder and the fire that is coming out of the end of the barrel itself.

Q       At what point was it that you were first able to see where the gunfire was coming from.  Where were you located?

A       I was to the right-hand side, as I stated before, of the marked unit, sir.

Q       You were getting out of the unit?

A       Yes.  I exited the unit, I went down on one knee for cover and I saw the fire coming out of the door.

Q       Coming out of the front door?

A       Yes, sir.

Q       And when you saw it coming out of the front door, you only saw flumes; is that right?

A       Yes, sir.

Q       Did you see any person?

A       No, sir, I did not.

Q       Did you see any body part of any person?

A       No, I did not.

Q       Did you see any silhouette of any person?

A       No, sir, I did not.

Q       Did you see any part of a rifle?

A       No, sir, I did not.

Q       So everything according to what you could see was back inside that house, except for the flume?

A     Yes, sir.

Q     Okay.  At that time your car was stuck -- your -- Hash's car was stopped, as I understand it, and then these other two Broncos were in the location they are in now?

A     Fairly close, sir.

Q     They had stopped moving at the time you got out of your car?

A     Yes, sir.

Q     Had you heard anything on the radio or phone or any kind of communication that someone was seen in the yard prior to you or your car going on the property?

A     I saw someone in the yard.

Q     At what point did you see them in the yard?

A     Prior to -- coming down the lane just prior to entering the ditch.

Q     Now, when you saw that person, did you -- you were driving the car, but was there anything done to change your plan or was any decision made that you felt like needed to change your plan because somebody was seen outside?

A     No, sir, we had already went in, it was just prior to entering the ditch.  If you are familiar with the patrol unit, the distance here with the overhead lights on and our vehicle lights, it lit up enough so I could

see someone moving from the -- it would be the west side of the house moving west.

THE COURT: Mr. Hilfiger, let's stop there for the evening. It's five o'clock. We will be in recess this evening. If you will -- members of the jury, if you will remember my previous admonition not to discuss this case with anyone or allow anyone else to discuss it with you. Avoid any news coverage that there might be about the case.

I'll ask everyone to please remain seated as the jury -- we will start again in the morning at nine. I'll ask everyone to please remain seated as the jury exits.

(JURY OUT)

THE COURT: Mr. Oliver, you may step down. You will be recognized back in in the morning at nine.

(MR. OLIVER EXITED THE COURTROOM)

THE COURT: The record should reflect that the jury has departed the courtroom. Anything to take up outside the hearing of the jury on behalf of the government?

MR. LITTLEFIELD: No, Your Honor.

THE COURT: The defendant?

MR. HILFIGER: No, Your Honor.

(RECESSED UNTIL OCTOBER 5, 2006)

1180

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,           )
          Plaintiff,                )
                                    )
                                    )  Case No. CR-04-115-B
vs.                                 )
                                    )
KENNETH EUGENE BARRETT,             )
          Defendant.                )


* * * * * * * *
JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE JAMES H. PAYNE,
UNITED STATES DISTRICT JUDGE and a jury

OCTOBER 5, 2005

VOLUME VI of ~~XX~~ XXVII
* * * * * * * *
K.M

A P P_E A R A N C E S:

FOR THE PLAINTIFF:   MR. SHELDON SPERLING
                     United States Attorney
                     MR. MICHAEL LITTLEFIELD
                     Assistant United States Attorney
                     1200 West Okmulgee Street
                     Muskogee, Oklahoma, 74401

FOR THE DEFENDANT:   MR. ROGER HILFIGER
                     Attorney at Law
                     620 West Broadway
                     Muskogee, Oklahoma, 74401

                     MR. BRET A. SMITH
                     Attorney at Law
                     417 West Broadway
                     Muskogee, Oklahoma, 74401

COURT REPORTER:      KARLA S. McWHORTER
                     United States Court Reporter
                     P.O. Box 2251
                     Muskogee, Oklahoma  74402

United States District Court

1181

C O N T E N T S

WITNESS                                                        PAGE

**(Robert Darst)**
        (Examination by The Court)                            1188
        (Cross-Examination by Mr. Hilfiger)                   1190
        (Cross-Examination by Mr. Littlefield)                1192
        (Recross-Examination by Mr. Hilfiger)                 1195

**Danny Oliver**
        (Continued Cross-Examination by Mr. Hilfiger)         1200
        (Redirect Examination by Mr. Littlefield)             1217
        (Recross-Examination by Mr. Hilfiger)                 1230

**Gene Hise**
        (Direct Examination by Mr. Littlefield)               1236
        (Cross Examination by Mr. Hilfiger)                   1274
        (Redirect Examination by Mr. Littlefield)             1309
        (Recross-Examination by Mr. Hilfiger)                 1327

**(Juror 85)**
        (Examination by The Court)                            1267
        (Examination by Mr. Hilfiger)                         1270

**Robert Darst**
        (Direct Examination by Mr. Littlefield)               1333
        (Cross Examination by Mr. Hilfiger)                   1364
        (Redirect Examination by Mr. Littlefield)             1381
        (Recross-Examination by Mr. Hilfiger)                 1382

United States District Court

<u>COURT IN SESSION</u>

(JURY OUT)

(HEARING IN-CHAMBERS)

THE COURT:  Let the record reflect counsel for the government, counsel for the defendant are present. First thing I wanted to take up -- well, let me ask what -- tell me what you would like to talk about.  I have got two or three things.

MR. HILFIGER:  The first one is number 46.  I guess the -- number 46 juror.  Of course without knowing what Trooper Darst has to say, my concern is -- as to that juror, I did go back and I look at my notes and my notes did not reveal anything.  I had a little color system and stuff like that and it didn't reveal anything about his knowledge of any highway patrolman or Trooper Darst in particular and my concern is that if he -- if he is the one that initiated this -- and I almost believe he had to be because I don't see how Darst would even know who a juror was because he has never even been in here. My concern is if he has initiated this, then he may be a little bit too aggressive as a juror and be -- and just shouldn't be on this panel because he is -- he has been told don't talk to anybody about this.  He apparently sought out Darst and made some contact.  Trooper Darst is here.  The government in this case we think you should make

nquiry, Judge.

And the other issue has to do with the older juror in the front who is having problems with continence.

THE COURT:  We have recognized that.

MR. HILFIGER:  I have talked with Paula about this and I just wanted to bring this up in chambers.  He was trying to hide himself --

THE COURT:  Well, first, on juror number 46 -- no, 24, does anybody have any objection to him being excused?

MR. HILFIGER:  No.

THE COURT:  You don't have any objection, do you?

MR. SMITH:  No.

MR. SPERLING:  24 is the older man in front?

THE COURT:  What has been reported to me, for the record, and what I have observed during these first few days of trial, if you have noticed the abrupt -- the abrupt breaks have been caused by his requests.  He is the first juror I have ever had take me up on any time you need to go to the rest room waive your hands and we will break.  Sometimes he goes an hour.  The afternoons he seems to be worse.  And then yesterday he didn't make it. We had -- our custodial staff, Bruce Guthrie, was cleaning up yesterday and what remained in the seat was pretty wet.

So I'm going to excuse him.

And this morning, for the record he said, "I thought if I was 70 I didn't have to serve."  That's the closest he has come to being excused.  So, unless you -- he had made that statement before, hadn't he?

COURTROOM DEPUTY:  Yes.

THE COURT:  I understand if I'm 70, I don't have to serve, and he never requested not to serve.  I'll take any further responsibility.  I should have pushed it a little bit, but anyway, I didn't.  So... now, I think the best thing to do is excuse him because it's being a little disruptive and I'm sure it's disconcerning for his fellow jurors.

MR. SPERLING:  You know, he was clearly wet yesterday, Judge, trying to hide himself while walking out of court with his noted pad and it was clearly embarrassing to him as well.

THE COURT:  Yes, yes.  I think on juror 46, my experience in the past with a couple of trials where we have had questions about juror communication with people associated with the case is -- it probably -- it requires that we bring probably Officer Darst in and get his view, get his view of what happened.  That might be sufficient to satisfy that, rather than the juror should be excused or we should go further.  The next step is a little more

difficult, is when you bring that juror in and talk with him.  That's probably -- the only thing -- and then I have gone as far as interviewing all of the jurors to see if there has been any -- I would rather not do that, but I think that's the next -- that's the three steps, Darst, and then the juror, and then depending on what we find there, talking to each of the jurors individually to see if there has been any indication.

MR. SPERLING:  It may innocuous, but we agree with your protocol.

MR. LITTLEFIELD:  I am concerned about talking to the juror because obviously -- because if the juror is inquired of, it's going to be obvious to the juror why he is inquired of and it may result in some kind of animocity towards Darst and I'm -- and I'm concerned about that.

THE COURT:  Well, that's the difficulty, if you take it to the next step.  First is Darst and then you have to make a decision about what you find out --

MR. LITTLEFIELD:  I understand.

THE COURT:  It may be enough that -- we may -- I'll give you all an opportunity to speak to it.  We may all agree that juror needs to go.  If there is a disagreement about it, then the role of the judge -- then I'm inclined to let us talk to the juror and see how he feels and what the record reflects.  I don't disagree

with you.  When you get to that stage, it does -- it is tedious.  So...

MR. HILFIGER:  Are we going to have the Darst hearing first?

THE COURT:  Yes.  First I'm going to release juror number 24.  And then we will -- I think -- why don't we just bring him -- move the chairs around him and let him sit down there and we will put a chair -- a couple of more chairs in here.

(END OF IN-CHAMBERS HEARING)

COURT IN SESSION

THE COURT:  Let the record reflect that counsel for the government is present, the defendant is present with counsel, the Court has sealed --

(PAUSE)

THE COURT:  Let the record reflect that counsel for the government is present, the defendant is present with counsel.  Previously in a short meeting with counsel for the government and counsel for the defendant, the Court, by agreement of all parties, excused juror number 24.  He was the gentleman sitting, I think, in the third or fourth over on the front row.  The Court observed during the trial to date that he had requested breaks on several occasions, after what the Court felt was just a short periods of testimony.  He apparently has a health problem

which prevents him from being able to serve. And I think counsel for both parties agreed, and the Court was inclined to excuse him, frankly, whether counsel agreed or not. So just for the record, juror 24 has been excused.

I've closed this hearing in regard to a report that counsel for the government made yesterday in regard to a report from Robert Darst, who is listed as a witness for the government. My list indicates he is with the Oklahoma Highway Patrol. It's my understanding he reported that he had contact at a public event with juror number 46. And the purpose of this closed hearing is to first inquire of Mr. Darst as to the circumstances of that contact to determine whether or not to allow juror 46 to continue as a juror in this matter. So unless I have comment from counsel for the government or the defendant, it's my intention to bring Mr. Darst in now to appear before the Court. Anything -- any suggestion from the government?

MR. SPERLING:  No, Your Honor.

MR. LITTLEFIELD:  Your Honor, do you want me to go get him at this point or just have him -- I know him. He's out there.

THE COURT:  Is he standing in the hallway?

MR. LITTLEFIELD:  In the hall.

THE COURT:  I'll just have court security officer bring him in.

Sir, if you would stand before the clerk and be sworn.

(The witness was duly sworn by the Clerk.)

THE WITNESS:  Yes, I do.

THE COURT:  Sir, if you would have a seat in the witness stand.

ROBERT DARST,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY THE COURT:

Q    I'm -- first, Officer Darst, I'm going to ask you a few questions and then give counsel for the government and counsel for the defendant an opportunity to ask you additional questions if they choose to.  The subject of the questioning has to do with what was reported in court by the witness coordinator for the U.S. Attorney's Office that apparently you advised her or she gained knowledge through you, either directly or indirectly, that you were under the impression that you'd had contact with one of the people that's serving as a juror in this matter.  Is that true?

A    Yes, sir.

Q    Would you explain just generally how that occurred?

A    It was past Saturday.  I believe it was the 1st of

October.  I had taken my children to a -- what's the annual deer festival in Antlers, Oklahoma.  It's like a community event put on by some community organizations.  And it's for just increased tourism and stuff into that area.  While at the event, I'd a chance meeting two gentlemen that I know from the Hugo area.  One of them -- would you like for me to call their names?

Q    Yes.

A    One of them is a gentleman I know as Quarter Cooper.  Another one is a gentleman I know as Horace Slaten.  Both of them are what I would characterize as friendly acquaintances.  I've known them for -- both of them approximately ten years since I've been living in the Hugo and Antlers area.  And as I was leaving, I happened on to these two gentlemen and spoke with them in a friendly greeting.  And Mr. Cooper, after we greeted each other, asked me when I was going to Muskogee.  And I didn't -- I mean, I knew I was scheduled to come up here this week, but I wasn't aware that anyone else knew it, and so I wasn't really sure why he was asking that.  And he said, "Aren't you going to that trial?"  And I said, "Yeah, I think I'm scheduled on Tuesday."  And he said something that let me know that he was a juror, and I don't know if he said, well, I'm a juror on that, or I'm on the jury, or exactly what his phrasing was.  And so, at that point, I

was -- I had four children with me and I didn't have another adult with me, and I was trying to get them -- I was trying to break the contact without being completely rude. And then he said something to the effect that the driver of the vehicle had been on the stand and he would see me here. That was -- that was the extent of it -- of the conversation.

Q    Okay.

THE COURT: Counsel, government, any questions?

MR. LITTLEFIELD: I don't have any additional.

THE COURT: Defense?

MR. HILFIGER: Just a few questions.

CROSS-EXAMINATION

BY MR. HILFIGER:

Q    Were you in uniform?

A    No, sir, I was not.

Q    And you said you've known him as an acquaintance for about ten years?

A    That's an estimation. Probably somewhere between nine to ten years.

Q    And during that period of time, have you always been a trooper?

A    Yes, sir.

Q    And have you -- in your acquaintanceship with him, would you assume that he knew you were a trooper during

that period of time?

A    Yes.

Q    How often do you see him?

A    I've been trying to think.  It's probably been over a year since I've had any conversation with him.

Q    And would this acquaintanceship that you had with him, is this like where you see him at deer hunting deals or -- or what kind of times would you see him?

A    Most of the acquaintance was developed over a common place to drink coffee, a common restaurant there in town that we both went to, and so we developed -- I mean, we had conversations and things like that.

Q    There in Antlers you're talking about?

A    Well, it was actually in Hugo.

Q    In Hugo?

A    Yes, sir.

Q    And in that coffee shop in Hugo, would that be one where you would maybe before, during duty, or something like that, you would be at and be in uniform?

A    Yes, sir.

Q    And he actually told you something about somebody being on the stand?

A    If I remember -- his exact wording, I can't -- I can't just tell you, but it was something to the effect of the driver of the vehicle had been on the stand.  That's

-- that's all I recall exactly from it.

Q    And did he say anything to you about what his duty was or what he was doing?  Did he tell you he was a juror in the case?

A    In some way he informed me of that, yes, sir.

Q    Okay.

A    That's when I began to try to move away.

Q    How long did this conversation go on?  A matter of minutes or just a minute or so, or what?

A    Between one to two minutes.  Not -- not exceeding two minutes.

Q    Okay.

MR. HILFIGER:  I have no further questions.

MR. LITTLEFIELD:  Your Honor, may I?  Something has come to my mind if I might follow up and have the opportunity?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. LITTLEFIELD:

Q    I understand coffee shop type situation.  By the way, did he mention in the conversation with you at the deer festival that whether he had said anything about knowing you in the court?

A    Yes, sir.  I -- I do recall that he said when he was -- I suppose when he was interviewed to be a juror, he

was asked if he knew me or if he knew any of the jurors. I'm not sure which the question was, if it was directed about me or if it was about any of the witnesses.  But that he had told them yes, he did know me from the coffee shop.

Q    Okay.  And did -- did he mention -- do you recall how that came up in the conversation?

A    No, I really don't recall.

Q    Okay.  Contact was initiated by yourself or by him?

A    It was actually initiated by me.

Q    Okay.  At the time, did you know -- have any idea his connection with the -- with the trial?

A    I had no clue that he was a juror in this trial.

Q    And as soon as you learned that, you attempted to break off communication?

A    I -- I didn't want to be rude because, like I say, he is a friendly acquaintance, but I was attempting to -- to move on away.  And yes, I was trying to break it off.

Q    Okay.  In the last six years during the coffee shop conversations, have you discussed this case and the circumstances and the situation?  And I don't mean specifically and I mean just --

A    With Mr. Cooper?

Q    It just appears to me that this is something that was an important event in your life?

A    Yes, sir.

Q    Okay.  And as a consequence, it seems to me likely that, at some times during the past, you would have made mention of this circumstance at like a coffee situation when you were preparing to appear in other proceedings, circumstances or situations like that?

A    I would have probably not ever talked with any civilian about any circumstances involved in this proceeding.  But there may have been cause where I was speaking with another trooper about it in the past six years.

Q    Okay.  And how certain are you that you would not have been in a situation in which this case would have been discussed in front of the juror on previous occasions innocently?

A    I don't believe there's a chance that it was discussed in front of him --

Q    Okay.

A    -- by -- by me.

Q    Okay.  That's just something that I could see as a possibility that might have happened two, three, four years ago and something that wouldn't even have crossed your mind, and I was just wanting to ascertain whether that was likely or not?

A    If I might, to be quite honest, the -- the common

restaurant that we had that we -- I really don't go there anymore and haven't for probably about six or seven years -- five, six, seven years or something like that.  I don't know if Mr. Cooper does now or not.

Q    Okay.

A    To be quite honest, I can't remember the last time that he and I sat down in that situation together.  It was actually probably the first three or four years that I was in that area that we developed this acquaintance, and it's -- and like I say, it's just a friendly acquaintance now stemming from that.

Q    Okay.  So in all likelihood, any coffee shop talk that you would have had with Mr. -- with the juror would have been prior to this incident's happening?

A    As near as I can recall, yes, sir.

            MR. LITTLEFIELD:  That's all I have.

            MR. HILFIGER:  Judge, if I may.

                    RECROSS-EXAMINATION

BY MR. HILFIGER:

Q    I'm assuming that when you -- under this acquaintanceship, you know both his first and last name?  I'm not asking to you say it, I'm just asking you if you know it.

A    I -- I know what he's called by first and last name.  I think his first name is probably shortened.

Q    How -- you refer to him as Quarter?

A    Yes.

Q    To your knowledge, does he know your first and last name?

A    He probably doesn't know my -- my actual first name.

Q    But he just refers to you as Trooper Darst, or something like that?

A    No, he refers to me as a nickname that I've carried for my entire life.

Q    Okay.

MR. HILFIGER:  I have no further questions.

THE COURT:  Trooper, you may step down.  Thank you.  I might add for the record, and she's sitting here, so she can -- I'll give the court reporter leeway to correct my report if it's not true.  I asked the court reporter, when this report was made, to review our voir dire.  And her report to me was that Darst's name of course was read as one of the potential witnesses.  We have in the record, from her report to me, no indication that juror 46 indicated that he knew Mr. Darst.  Now, if anyone has notes contrary to that, I would be prepared to have the court reporter re-verify her report to me, but I think that's -- I think that's of some import in this -- some import in trying to discern what to do about this matter.

MR. HILFIGER:  Your Honor, I reviewed my notes and I'm not going to say anywhere that a I'm fastidious and copious note taker, but those were one of the things that I was trying to keep track of.  I mean, that -- the names, if they knew any witnesses, number one; if they had any contacts with troopers, especially troopers that were testifying.  And my notes do not show anything of any -- with any troopers.  Now, when Mr. Darst talked today and he said something about coffee shop talk, I do remember somebody saying that, you know, that they have drank coffee with troopers, but I don't think they ever mentioned any names.  And I'm not even sure if it was this particular person or not.

I have a real concern with this individual continuing to serve on the jury because he's -- he has already violated one of your admonitions, and he did it on his own.  It wasn't somebody coming to him asking him about it.  It's where this -- you know, it's not just when are you going to Muskogee, but when he advises the trooper that he's -- the driver of the vehicle has already been on the stand.  And that one of your admonitions is don't talk to anybody about this case.  And I think he's already violated that particular one.  And my concern is, if he's done that, what else has he done?  And I don't think, in this type of case, he shouldn't be on as a juror.

THE COURT:   Comment from the government?

MR. SPERLING:   Case law indicates that the government has the burden to show the defendant was not prejudiced.   The Court has inquired into the circumstances.   Although you haven't inquired as to the impact on the juror, I noted that the contact was initiated by Mr. Darst who did not know that Mr. Cooper, the juror, was a juror.   And it was a mere exchange of greetings.   But the conversation apparently progressed to discuss this case.   As I understood Mr. Darst's testimony, the juror in question asked me when I was going in Muskogee; asked aren't you going to that trial.   And when Mr. Darst's singular comment that is in the record that I got was to the effect that he believed that he was scheduled to come up here on Tuesday, then the juror indicated that he was a juror, and Mr. Darst tried to extricate himself from the conversation.

That considered, Your Honor, there is a case that has been brought to my attention.   It's an Eighth Circuit case and it's from 1978.   U.S. v. Bohr, B-o-h-r, 581 F.2d 1294.   It's to the effect that if a juror engages in conversation with a witness during a recess, the preferable procedure is to substitute an alternate for that juror.   You could make inquiry of this juror, Your Honor.   But at this point, if you don't, the preferable

procedure is to replace the juror.  You selected alternates.  I hate to lose two in one day.  But at the same time, giving that four remain, the exercise of caution would be to excuse the juror.

THE COURT:  Well, you've both spoken, if not eloquently, accurately.  And I agree with your assessment.  And I'm going to excuse juror 46 from any further service in this matter.  I'll have the clerk notify the juror, and I will also retrieve his notes and have them locked in the vault.

And we'll be in recess for about ten minutes, and then we'll start -- continue with the trial.

(Off the record at 10:01 a.m.)

(Back on the record at 10:18 a.m.)

THE COURT:  Let the record reflect that the jury is in the box.  Counsel for the government is present; defendant and counsel are present.  Government may call your next witness.

MR. HILFIGER:  Your Honor, I think I'm on --

THE COURT:  Were you?  Okay.  Still cross-examining?  Ask Witness Oliver to come back in.  Just have a seat and continue cross-examination.

MR. HILFIGER:  May I proceed, Your Honor?

THE COURT:  You may.

DANNY OLIVER,

being previously sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

CONTINUED CROSS-EXAMINATION

BY MR. HILFIGER:

Q    Mr. Oliver, we were talking yesterday, and I understand -- I want to go a little bit in general on your TAC team.  How many years did you say you were with the TAC team?

A    Fifteen years sir.

Q    And during that 15 years, there was a period of time when Kerry Pettingill was the commander of that TAC team; is that right?

A    Yes, sir.

Q    How many years was that?

A    Roughly the last four or five years I was on.

Q    Okay.  He had been the commander the last four or five years?

A    Yes, sir.  Roughly.  I can't remember exactly, but that's fairly close.

Q    Now, during that period of time that you were on the TAC team, the 15 years that you were on it, how many no-knock warrants did you serve that were anytime warrants, day or night warrants that you didn't have to -- that were no-knocks?

A    Probably three or four, sir.

Q    So it wasn't a very usual thing to do; is that right?

A    No, sir.

Q    Do you know how many no-knock anytime warrants were served by you -- by your team when Pettingill was a commander of the team?

A    Two to three possibly, sir.  It's just hard for me to remember exactly.

Q    Now, when you served the no-knock anytime warrants, how many of those three to four, or whatever you served, did you serve between midnight and 3:00 a.m.?

A    I can't remember any, sir.

Q    You can't remember serving any at that time?

A    No, sir.

Q    But you had the no-knock and that allowed you to go anytime, didn't it?

A    Yes, sir.

Q    On those, can you recall why you didn't serve midnight to 3:00?

A    No, sir I can't -- I can't recall.  It's just been too long ago.

Q    Any of those no-knocks did you serve in the country as opposed to in the city?

A    Yes, sir.  Most all of our warrants are served in the country, sir.

Q    Now, I'm assuming that some of those no-knocks, even

though they weren't served between midnight and 3:00, did you serve any of them during the hours of darkness?

A    Yes, sir.

Q    When you were assembling to get this -- to do this warrant, did you have any responsibility of assembling information or intelligence on this?

A    No, sir, I did not.

Q    It was all done by somebody else?

A    Yes, sir.

Q    You, at the time, were connected with the Cherokee County; right?

A    Yes, sir.  I was an investigator for the Cherokee County Sheriff's Office.

Q    Okay.  And -- but you really took up the position of a TAC team member for this particular operation; is that right?

A    I wouldn't use those words.  I -- I assisted with the operation yes, sir.

Q    Okay.  Were you -- did you consider yourself more as a TAC team member or more as a deputy investigator?

A    More as a deputy investigator.

Q    And in that -- in that capacity, you didn't -- did you talk to any of the other investigators with Cherokee County or Sequoyah County to get information for this -- not for the warrant, but for the execution of this

warrant?

A    No, sir.  I was busy all week doing the rifle school.

Q    You were in the Sallisaw area, or Sallisaw-Cherokee County area.  Were you aware of Kenneth Barrett?  Did you ever see him before?

A    No, sir.

Q    Had you ever seen a picture of him before?

A    No, sir.

Q    Had you -- were you aware of who the confidential informant was?

A    No, sir.

Q    Did you make inquiry -- well, let me -- on Alan Loyd and Clint Johnson, you had worked with them to some extent, hadn't you?

A    Yes, sir, I had.

Q    And did you make any personal contact with them seeking information concerning the confidential informant?

A    No, sir, I did not.

Q    You just accepted what was given to you --

A    Yes, sir.

Q    -- is that right?  Or it wasn't even given directly to you.  It was given to the TAC team; is that right?

A    Yes, sir.  Yes, sir.

Q    So you didn't get any -- you didn't have any personal knowledge of anything concerning this search of this --

execution of this search warrant?

A    No, sir, I did not.

Q    Did you ever tell somebody under oath that you felt like there was an intelligence problem in this case?

A    I don't recall that, no, sir.

Q    Did you give any -- did you give any affidavits or anything to a Mr. Randolph or a Mr. Gordon?

A    Yes, sir, I did.

Q    And do you know -- you don't recall whether or not you told them that there was some lack of intelligence in this case?

A    No, sir, I don't recall.

Q    The -- when were you -- when did you become aware of the second group that you met out there at Dwight Mission Road?

A    At the briefing at 8:00 p.m. that night, sir.

Q    Okay.  And what were you informed -- you mean at the briefing at Camp Gruber?

A    Yes, sir.

Q    With just the TAC team?

A    Yes, sir.

Q    And you were informed that there was going to be another group coming along?

A    I was informed that the District Attorney and some of Sequoyah County Sheriff's Office was going to be at a

location that we were going to meet.

Q    Okay.  So when you -- you were aware that people were coming other than the TAC team?

A    Yes, sir.

Q    Was that a normal thing when you were on the TAC team, to have other groups coming?

A    Well, to answer that question, sometimes, yes, sir.

Q    Did you do anything to organize that second group as far as, you're an investigator with the sheriff's office, wasn't there some deputies from the sheriff's office in Cherokee County that came?

A    Yes, sir.

Q    Did you have any conversations with them prior to this, you know, to inform -- inform them of this TAC team operation?

A    No, sir, I did not.

Q    You didn't have anything to do with organizing anybody from Cherokee County to come there?

A    No, sir, I did not.

Q    And you knew that Delena Goss was coming?

A    I did not know she was coming.  The information that I received at the briefing was that the District Attorney's Office and some of Sequoyah County was going to be there.

Q    Was there a reason given why the District Attorney

was coming?

A    No, sir, not -- not at the briefing, it was not.

Q    Were you aware that there was some kind of a movement in Cherokee County, that they were going to try to organize some task force in Cherokee County?

A    No, sir.

Q    You weren't part of -- part of any of that organization?

MR. LITTLEFIELD:  Assuming facts not in evidence.  He's asking him questions he said he didn't know anything about.

THE COURT:  Sustained.

Q    (By Mr. Hilfiger)  When you got -- met at Dwight Mission Road, about how many people do you think were there, not TAC team members?

A    I couldn't tell.  There was several vehicles there. I couldn't tell how many people, sir, was there.

Q    Were you aware that, in addition to the District Attorney, that there were assistant district attorneys out there?

A    No, sir, I wasn't aware of that.

Q    Did you do anything when you got there as far as going out to see who was there?

A    No, sir.  I stayed in the vehicle I was riding in.

Q    Yesterday -- I'm shifting gears here, okay?

A    Uh-huh.

Q    Yesterday you -- you were talking about a plume that you saw coming out the door of this -- of the residence. And I guess I was assuming one thing and I was talking to my co-counsel and he was assuming another thing. What do you describe as plume?

A    The -- the powder -- unburnt powder and burnt powder coming out of the end of a barrel when a rifle or pistol discharges, and of course the flame associated with that from the discharge of the cartridge.

Q    Okay. So when you were talking about plume, you're not just talking about smoke then? You're talking about fire also?

A    Yes, sir.

Q    Okay. Did you give a statement to Mr. Rosser over here? Do you know Mr. Rosser?

A    Yes, sir, I do.

Q    Did you give a statement to him sometime in November I believe of 1999?

A    I did give a statement. I don't remember the date, sir.

Q    Do you recall how you described plume in that statement?

A    No, sir, I don't.

Q    Do you recall in that whether or not, when you were

talking to Mr. Rosser, that you denied seeing any kind of fire?  You just saw smoke.

A    No, sir, I do not.  I don't recall that.

Q    You don't recall?

A    No, sir.

Q    And your definition of plume in 1999, would that still be the same definition as you used now, that it's smoke and fire?

A    Yes, sir.

Q    So any statement that says you didn't -- you saw smoke plumes but you didn't see fire would be incorrect; is that right?

A    In that essence, yes.  The way you put it, yes.

Q    What now?

A    Yes.

Q    Would you -- what weaponry did you bring that night?

A    I carried a SIG-Sauer .45 caliber pistol, and a Colt M-16 .223 rifle.

Q    An M-16 .223?

A    Caliber, yes, sir.

Q    Okay.  Is that similar to an AR-15?

A    Yes, sir, it is.

Q    Is it also similar to a Colt Sporter?

A    Yes, sir, it is.

Q    And how did you have that loaded?

A     Could you explain that, sir?

Q     Well, number one, how many bullets did that -- as you had the gun, how many bullets were capable of being put in that gun with the magazines and everything that you had?

A     I had a 30-round magazine in the weapon if that's what you're meaning, sir.

Q     Okay.  And, now, how did you -- you had a 30-round magazine in it.  Did you have 30 rounds in it in the magazine?

A     I could couldn't tell you that.  I probably had 30 or 29 or 28.

Q     Were you -- before you left Camp Gruber, were you told to charge -- fully charge your weapons?

A     No, sir.

Q     Did anybody talk to you at all about having your weapons charged?

A     No, sir.

Q     Do you understand or do you have an idea of what fully charged means?

A     Yes, sir, I do.

Q     And what does it mean to you?

A     That means to have the magazine in the weapon and the charge, or put a shell in the chamber.

Q     So you have your magazine full and one in the chamber --

A    Yes, sir.

Q    -- is that right?  And you don't know whether you were fully charged or not?

A    Do you mean fully charged, 30 rounds in the magazine or -- explain that, please.

Q    Well, what do you understand fully charged means?

A    Fully charged, my understanding is you have the magazine in the weapon, you have shells in the magazine and a shell in the chamber.

Q    But it doesn't necessarily mean that your magazine is full?

A    No, sir.

Q    Okay.

A    That's my definition.

Q    Did you make any count of the number of bullets that were in your magazine?

A    No, sir, I did not.

Q    What kind of bullets did you have in the magazine other than the designation of .223s?  Did you have any unusual type of shells in the magazine?

A    Normally I carry what we call full metal jacket. Other than that, I don't recall.  I don't know.

Q    Did you have what's called -- have you heard bullets referred to as tracer rounds?

A    Yes, sir.

Q    Did you have any tracer rounds in your magazine?

A    I do not know.  Don't -- do not know.

Q    Do you have the capability of having tracer rounds?

A    Yes, sir, I do.

Q    And is there some authority that you have that authorizes you to have tracer rounds?

A    No, sir.

Q    Aren't tracer rounds limited to military individuals?

A    No, sir.  Not to my knowledge.

Q    To your knowledge, you can -- you, as a law enforcement officer, is authorized to have tracer rounds?

A    Yes, sir.

Q    Civilians can have tracer rounds?

A    Yes, sir.

Q    There's nothing illegal about having tracer rounds?

A    Not to my knowledge, sir.

Q    Okay.  Anything else that you had besides the AR-15 and the SIG-Sauer?

A    No, sir.  That was all.

Q    Did you have access to any other weapons --

A    No, sir.

Q    -- for your use?  I'm displaying to you -- it will show on your screen.  It hasn't been admitted -- as Defendant's Exhibit Number 148.  Do you recognize, first, what that picture is of?  And don't tell.  That's a yes or

no.

A     Yes.

Q     Do you recognize the weapon in that picture?

A     Yes, sir, I do.

Q     Was that in the car you were in on -- on the night of September 24th, 1999?

A     I didn't see it, no.

Q     Okay.  Was that the car you were in?

A     That's a police unit, sir.

Q     You can't recognize the car?

A     No, sir.

Q     Can you recognize the weapon?

A     Yes, sir.

Q     But you didn't see it that night?

A     No, sir.

Q     Do you know what a grenade launcher is?

A     Yes, sir.

Q     Was there a grenade launcher there that night?

A     Once again, I couldn't -- I don't -- don't recall seeing one.

Q     You didn't have access to one?

A     No, sir.

Q     You didn't carry one?

A     No, sir.

Q     When you -- when you were -- got out of this -- of

the Hash's car, you were looking toward the house or the residence, and that's -- you said -- that's when you say you saw the plumes coming out the door; is that right?

A     Yes, sir.

Q     Now, in addition to them coming out the door, did you make any determination about the height of what plumes you saw?  Can you recall that?

A     No, sir, I don't recall it.

Q     Well, let me ask you this:  Do you recall the speed or how fast the cycles were on the bullets, or the sounds that you were hearing?

A     Yes, sir.

Q     Was there -- describe how fast it was.

A     It was a very fast rate of fire.

Q     Did -- was it a continuous cycle or did it stop at some point?

A     Once I got out of the car, the cycle of the firing was very fast and very continuous.

Q     Okay.  And it was continuous, and then was there any interruption in that -- in that fast cycle of fire?

A     Once I had moved to the rear of the Bronco --

Q     Yes.

A     -- at some point in that time, the firing either stopped or come close to stopping.

Q     Okay.  And did it -- did that particular type of

firing restart again?

A    There was more gunfire after I had -- from the point I -- it had slowed down or stopped, there was more gunfire that started up again, but the rate or cycle of gunfire wasn't near as fast.

Q    Could you tell -- could you tell the difference between the sound of the gunfire?  I mean, did it -- when it started back up and you said it was not as fast, did it sound like a different type of gun, or was it the same sound that you had before, or could you tell the difference?

A    I couldn't tell the difference, sir.  Once I seen Rocky laying on the ground, my focus went to him, so I --

Q    Okay.  So -- and understandably.  So when you got -- when you're by Greninger's Bronco, the second Bronco there, the back of the Bronco, and you see Rocky Eales on the ground, from that point your vision is really -- your focus is on him; isn't that right?

A    Yes, sir.

Q    And did you ever see Buddy Hamilton fire a weapon?

A    No, sir, I did not.

Q    Did you -- while you were back there with Rocky Eales, did you see Buddy Hamilton come back to you?

A    No, sir.

Q    When is your next recollection of what -- well, when

did you next see Buddy Hamilton?

A    When we did the clearing the house, the residence.

Q    Okay.  So from the point that you're back there -- you've already been around by the pickup or have you gone around by the pickup yet when you're -- when you're over here behind Buddy Hamilton?

A    That -- that statement was wrong.  The first time I saw Buddy Hamilton and I can recall was when he was taking Mr. Barrett out of the house.

Q    Okay.  That's first time you can recall seeing him out of the Bronco?

A    Yes, sir.

Q    At the scene?

A    Yes, sir.

Q    Okay.  And did you see -- you didn't see him go in the house?

A    No, sir, I did not.

Q    Because at that time you were out by the pickup, or at the southeast corner or something?

A    Either there or at Trooper Eales.

Q    Okay.  I'm referring you back to this -- to these -- this plume again.  And you say you can't recall the level that the gasses that you saw coming out of the door?

A    No, sir, I can't.

Q    Is that right?

A     Yes, sir.

Q     Referring to -- do you recall testifying that -- you were under oath September, October of 2002?

A     Yes, sir, I do.

Q     And at that particular time, referring to Page 1608, beginning on Line 16, the question was:  "You were able to do that because of the gasses that were being discharged when the weapon fired?"  And your answer was:  "Yes, sir."  And the question is:  "Do you recall the level in terms of the gasses, whether the gasses were coming out at the top of the door or the middle of the door or the bottom of the door?"  And your answer was:  "About the middle of the door, sir."  And a question:  "I believe that's about waist high?"  And your answer was:  "Yes, sir."

Do you remember those questions and were those your answers in September, October of 2002?

A     If that's what it said, yes, sir, I'm sure that's correct.

Q     Can you recall now whether or not you saw those gasses at a level about waist high?

A     No, sir, I can't.  I'm sorry.

Q     At this -- this execution of this warrant, you didn't have -- you know, you said you didn't have a picture of Kenny Barrett.  Do you think that's something you should

have had before you done -- did the execution of the warrant, or some kind of description -- particular description of who Kenneth Barrett was?

A     Of course, it would have been better, yes.

MR. HILFIGER:  May I have just a moment, Your Honor?  I don't have any further questions.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     Mr. Oliver, how would you define your role in regards to this particular mission?

A     I assisted the east tactical team in execution of the warrant --

Q     Okay.

A     -- by -- my job was to pull security on the corner I designated earlier in the trial.

Q     Okay.  You assisted and provided security?

A     Yes, sir.

Q     What responsibility did you have for the particular planning of this incident?

A     None.

Q     Okay.  In regards to intelligence gathering, what responsibility or obligation did you have in regards to intelligence gathering, sir?

A     None, sir.

Q   Okay.  In regards to intelligence gathering, you were asked if it would have been helpful to have had a photograph or a description.  Do you know if the TAC team received a description of Mr. Barrett?

A   No, sir, I don't.

Q   Okay.  Does that mean they didn't, or you just don't know?

A   I don't know.

Q   As a person who is doing security, how important -- or do you need the information in regards to a description as a security person more or less than the entry team?

A   Less, sir.

Q   You were asked a number of questions in regards to the M-16 that you had on the scene?

A   Yes, sir.

Q   Typically do you fully top off the magazine, or do you keep it a little bit looser and not fully loaded?

A   I never top off the magazine.

Q   Why is that?

A   Because at times you have a problem of the magazine feeding.

Q   When you arrived at the scene, was your weapon chamber loaded?

A   Yes, sir, it was.

Q   And when did you chamber a round?

A     I just don't recall.  It was prior to the -- somewhere between Camp Gruber and there.  I just don't recall.

Q     Okay.  How wise would it be to go into that situation without your weapon being chambered?

A     Very unwise.

Q     Did you fire any shots at all that night?

A     No, sir, I did not.

Q     Were you familiar with the objective that was assumed by the tactical team in this operation, what they were supposed to do?

A     Yes, sir.

Q     And what part was the tactical team to have in the actual search of this premises, if any?

A     None.

Q     And in your 15 years experience as a member of the tactical team, what was the policy as far as the tactical team to be involved in the actual search of the premises that you had entered and secured?

A     I cannot recall a time in the 15 year period we did a search.

Q     After the tactical team secured the premises, made sure that everybody in there was secured and there was no threat to the local law enforcement officers, who would conduct the searches?

A      The designated agency.  If it's in city limit, it would be a city agency, police agency.  If it's in a county, of course it would be a county agency.  If it was a state agency that asked us to execute a warrant, it would be the -- a state agency.

Q      Okay.  Well, and in those situations, you all go in, you enter a place, you secure it.  Do you then go make a telephone call?  Or how does the local law enforcement know that they can then come and search the premises, that they have been secured and rendered safe?

A      They are usually close to the location when we do the warrant.

Q      Is it unusual to have officers meet from the local agencies who are going to actually serve the warrant to meet you at some location and be prepared to enter after you secured the premises?

A      No, sir.  That happens normally.

Q      So when you met with these individuals who were at Dwight Mission Road, the local law enforcement agencies, was it any kind of surprise that there would be local law enforcement there to follow up with the TAC team?

A      No, sir, it was not.

Q      The task force.  Clint Johnson works for what agency, sir?

A      The District Attorney's agency -- the District

Attorney.

Q   Okay.  And are you familiar with how -- who was the D.A. in Cherokee County in September of 1999?

A   My mind is blank.

Q   Male or female?

A   Female.

Q   Does the name Dianne Barker Harrold ring a bell?

A   That is her, yes.

Q   And what agency -- if Clint Johnson is the person who would have secured this search warrant, what agency would have been responsible for executing the warrant?

A   The task force itself.  The District Attorney's task force.

Q   In regards to the task force, was that made up only of members of the D.A.'s Office?  Who all would have comprised the task force?

A   The D.A.'s Office had some members of the task force.  As I recall, one or two from each county was also involved with the task force.

Q   When you say each county, what agency from the counties -- the various counties would have participated in the D.A.'s task force?

A   It would the -- normally the sheriff's department, sir.

Q   So would the sheriff of Cherokee County have

participated in the District Attorney's drug task force?

A    Yes.

Q    And as a consequence of that, if a warrant was being served by the D.A.'s drug task force, would it be appropriate or inappropriate for a deputy from Cherokee County to participate in that search, even though it was in Sequoyah County?

A    It would be appropriate.

Q    What was Delena -- who was the sheriff of Cherokee County?

A    Delena Goss.

Q    And she was, in fact, your employer at that time, your boss?

A    Yes, sir.

Q    Do you know what her policy was in regards to a circumstance in which one of her deputies was participating in a warrant, what was her policy as far as being at those warrant sites if her deputies were involved?

A    She would do her very best to be at every warrant we served.

Q    Would it be unusual for her to be at a warrant which was being served in Sequoyah County if one of her deputies was participating in the execution or service of that warrant as a member of the task force?

A     No, sir.

Q     And as who is ultimately responsible for the District Attorney's drug task force?

A     The District Attorney.

Q     Do you know if Ms. Barker Harrold participated or went to warrants and their service during the time she was the D.A. in Cherokee County?

A     I've seen her at several, sir, yes.

Q     You were asked questions in regards to the ejection of empty casings from a .223 semiautomatic rifle?

A     Yes, sir, I was.

Q     Okay.  And you indicated that generally the ejection went in which direction?

A     Usually up and right, sir.

Q     What difference does it make in regards to how the weapon is being held at the time it's being fired in regards to or in relation to how the casings eject?

A     May I elaborate?

Q     Sure.

A     A weapon, in this case being a rifle, AR-15, the ejection port is normally -- is all the time on the right-hand side is all I can remember.  If the weapon is held up where you get a site picture, it ejects to the right and up.  Of course, any way that you move the weapon itself is going to affect how the empty cartridges eject

from the weapon itself.  If you slant it to the left, they are going to go more up.  If you slant it to the right, they are going to go to the ground.

Q    In regards to where those casings go, what difference, if any, does it make as to the surface upon which that weapon is being fired and the casings land on?

MR. HILFIGER:  Your Honor, I think that's going to supposition and may -- unless he's designated as some kind of expert, that may go beyond his ability to testify.

THE COURT:  Argument, counsel?

MR. LITTLEFIELD:  It certainly was opened up by defense counsel.  He asked him about the ejection of these -- of these -- of that particular weapon.

THE COURT:  Objection overruled.

MR. HILFIGER:  If I may, Judge.  It wasn't the ejection.  It was the question about if it hit -- what kind of surface it hits and what's going to happen after it hits the surface, and that's what I'm saying the supposition is.

THE COURT:  I think it's reasonable redirect. Go ahead.

A    If you're outside and you're shooting a rifle and it's falling on a grass or dirt surface, okay, as the round or the empty cartridge comes out, it comes out at a speed.  And as it slows down, of course it drops to the

ground because of gravity. Well, it will stay in fairly -- a certain location because there's no bounce or ricochet. Then if you take that weapon and where the round will come out and hit wood or glass or concrete, it bounces. It can -- for instance, if you're shooting beside a car, it will bounce -- it could bounce off the car and ricochet across in front of your face. Many times we've seen them bounce in cars. Or if you're shooting in a house, it can hit anything and it will ricochet until the velocity stops and that's where the round will stay.

Q     (By Mr. Littlefield) In regards to the round staying, you went into that house?

A     Yes, sir, I did.

Q     Did you see any -- any casings within that house?

A     As I recall, there was several in the living room area. The first area that you come into.

Q     Okay.

        MR. LITTLEFIELD:   I'd ask Government Exhibit 14 to be displayed.

        THE COURT:   You may.

Q     (By Mr. Littlefield)  Do you see Government Exhibit 14?

A     Yes. Yes, sir, I do.

Q     And do you see the numbers that have been placed there?

A    Yes, sir.

Q    Do you know, when you mentioned casings, in what area were casings that you saw in the living room of the house?

A    The ones that I -- I saw was in around in the floor area, sir.

Q    Well, in relation to these numbers, where were they?

A    I'm trying to orient myself to where you enter.  If this is the entry --

Q    If what is the entry?

A    This direction.

Q    Okay.

A    They was on the floor in this area here, sir.

Q    Where in relation to the numbers?

A    Just on the floor as best I can recall, sir.

Q    How many officers entered in trying to secure that location?

A    Myself, Trooper Greninger, Trooper Hamilton, Trooper Manion.

Q    Okay.  And from what area did Trooper Hamilton drag Mr. Barrett when he pulled him out?

A    If I'm correct on remembering this picture -- let me draw it here.

Q    Okay.  When casings -- empty casings are in an area such as that and there's activity moving through, what can happen to those indications?

A     They're either moved, kicked around.  Sometimes kicked under stuff.

Q     If something is dragged across an area in which there are casings, what can happen to the casings in the area of the dragging?

A     Of course it's going to do the same thing, it's going to move them.

Q     You had .223 rounds with you on that night?

A     Yes, sir.

Q     What kind of care is necessary for you to exercise when you have .223 rounds in a location such as that?

A     Could you explain that?  I don't understand.

Q     Well, how far can a .223 round be shot and be lethal in your experience, sir?

A     500 meters, which is -- a meter is close to three inches longer than a yard, so 500 -- a little over 500 yards.

Q     Did you note the proximity of neighbors to Mr. Barrett's residence when you were out there?

A     Yes, sir.

Q     Describe the proximity of Mr. Barrett's neighbors when you were out there.

A     Well, from Mr. Barrett's residence, there's some neighbors nearly encircling his residence.

Q     Were those neighbor's residences --

A     Or residences.

Q     Were they within that 500 meter range?

A     Yes, sir.

MR. LITTLEFIELD:  I would ask that Government Exhibit 184 be exhibited to the witness.

THE COURT:  You may.

Q     (By Mr. Littlefield)  Do you see that, sir, the area photographed?

A     Yes, sir, I do.

Q     Do you recognize where Mr. Barrett's residence is in that photograph, sir?

A     This right here, sir.  Am I correct?

Q     In that regard, do you see the trailer to the east of Mr. Barrett's residence, which will be directly below it?

A     Yes, sir.  Right here.

Q     Is that within 500 meters?

A     Yes, sir.

Q     And a round fired -- a .223 round fired from Mr. Barrett's residence in that direction, could it penetrate that trailer?

A     Yes, sir, it could, if it's -- according to the -- what type of round is fired.  If it's full metal jacket, yes, sir.

Q     The residence across the road south and east of that trailer?

A    Yes, sir.

Q    That -- one of them, could a .223 round fired from Mr. Barrett's residence endanger individuals in that location?

A    Yes, sir.

Q    If an individual stepped outside while activity was happening and a shot -- stray shot went over there, would those individuals be in danger?

A    Yes, sir, they would.

Q    What about the house immediately east of that that has the next dot on it, the one that is immediately below that?

A    This one, sir?

Q    Yes, sir.

A    Yes, sir.  That also.

Q    How about across the road south and west of Mr. Barrett's residence?  Do you see any residences across the road and south and west?

A    Yes, sir.  Yes.

Q    Would that be within 500 meters?

A    Yes, sir.

Q    Would individuals who would be out in the yard, for example, if shots are being fired from Mr. Barrett's residence be endangered by a .223 round?

A    Yes, sir.  If shot at that location.

Q     In regards to his mother's trailer?

A     Yes, sir.

Q     Would that -- would an individual in or around that trailer have been endangered?

A     Yes, sir.

Q     What care did you exercise with your .223 round, sir?

A     Well, my location I was assigned to go to, which was the north -- if my direction is right, the northeast corner, and it was on this corner.  We covered two sides of the house, which would be the north and the east.

Q     Yes, sir.

A     Of course, by seeing the photographs of this prior to the warrant, you knew that houses are close and residences are close, and you knew people lived in there, and of course you're concerned about where you're going to -- if you have to fire and where you're going to shoot.

Q     Okay.  But you didn't shoot, did you?

A     No, sir, I did not.

          MR. LITTLEFIELD:  May I have a second, Your Honor?  I pass the witness.

          THE COURT:  Further cross?

                    RECROSS-EXAMINATION

BY MR. HILFIGER:

Q     There was an MP5 out there being used by law enforcement, wasn't there?

A     Yes, sir.

Q     How far a range does an MP5 have?

A     I could only guess, sir.  I'm not that familiar with the MP5.

Q     What do you assume it has?

A     Hundred meters.

Q     Hundred meters?  Do you recognize this is a house right here?  This is a residence?

A     Yes, sir.

Q     If someone is standing on the east side of the residence with an MP5, would they -- in shooting in the westerly direction, are they endangering people in this area?

A     Are you -- could you explain this to me, sir?  Are you just saying they are shooting out in the open, or are they shooting --

Q     Same kind of instance that Mr. Littlefield was talking about a .223.

A     It could --

Q     You have an MP5 and you're facing the east and you're shooting in an -- I mean, facing the west and you're shooting in a westerly direction, do you affect somebody sitting in that trailer?

A     Yes, sir.

Q     Do you affect a person standing out here?

A     Yes, sir.

Q     Do you affect a -- does it affect another person standing out here?

A     Yes, sir.

Q     Does it affect anybody in a garage if they are there?

A     If there's a wall between them, no.

Q     If it's an open area?

A     If it's nothing in between the muzzle and the shell, yes, sir.

Q     So a person shooting an MP5 in a westerly direction could endanger people down here, even if they are law enforcement; isn't that true?

A     If there's nothing between a muzzle and them, yes.

Q     Do you know whether there are any MP5 shells that were found down in -- other than in the house, that were found outside the house?

A     No, sir, I'm not aware of it.

Q     Did you see Manion fire anyplace other than in the window?

A     No, sir.

Q     Do you know whether he did fire anyplace other than in the window?

A     No, sir.

Q     On this .223 ejection pattern, you're telling this jury that, to your knowledge and to your experience .223s

on the .223 rifle, they eject to the right and up?

A    Yes, sir.

Q    No ejection in the back?  They don't go back at all, is that what you're telling this Court and jury?

A    I'm telling you normally they go up and right.

Q    Okay.  My question is:  Do you have any experience with a .223 that ejects up, right and to the back?

A    No, sir, I do not.

Q    So let's go to Exhibit 14 then.

MR. HILFIGER:  Is that 14?  I'm sorry. Government's Exhibit 14.  Yes, okay.

Q    (By Mr. Hilfiger)  This Government's Exhibit 14, if your statement is that you are -- that .223 ejection pattern is to the right and not back any, it's just to the right and up, then as to 8, 9, 4, 5, 6, 7, 16, 15 and 3, are you telling us that whoever had the rifle had to be in a position somewhere up and down here in the house facing out this way?

A    If this is the front of the house?

Q    Yes.

A    Yes.

Q    They had to be in the house, didn't they?

A    Yes.

Q    Now, and you also gave this deal about somebody's dragging somebody out, they could move casings around.

And on this, you showed that somewhere around here that you saw Buddy Hamilton dragging a person out of the house this way; is that right?

A    That's correct.

Q    So this Number 2 here may have been moved from back here someplace in your supposition; isn't that right?

A    That is possible.

Q    And if 2 is a casing and he's drug out this way, then 2 may have been back here also, isn't that true, in your supposition?

A    That is possible.

Q    Did you, in the same kind of observation that you were able to see casings in this house, .223 casings, did you see any .223 casings outside?

A    No, sir, I do not recall.

Q    You told Mr. Littlefield that you don't load your magazines full and you put your chamber -- you loaded one in the chamber someplace between Gruber and coming on this property; isn't that right?

A    Yes, sir.

Q    When did you load your magazine?

A    Magazine stayed loaded, sir.  It could have been a week, could have been a month prior to that.

Q    And so when you load your magazine, you put some in and then just -- you don't check it at a later time to see

that you've got enough in there?

A    Of course.  You check the magazine and make sure it's full before you go.

Q    Okay.  And how do you make that determination?

A    Well, I take my thumb and I push to the top of the shells and see how far they go down in the magazine --

Q    Okay.

A    -- to tell how full it is.

Q    And you did that on this night?

A    Yes, sir.

Q    And when you were doing that, did you notice whether or not you had any tracer rounds in there?

A    No, sir, I did not.

        MR. HILFIGER:  May I have just a moment, Your Honor?  Nothing further.

        THE COURT:  Any further direct?

        MR. LITTLEFIELD:  No, Your Honor.

        THE COURT:  May this witness be excused?

        MR. LITTLEFIELD:  He may.

        THE COURT:  Defense have any objection to this witness being excused?

        MR. HILFIGER:  We have no objection to him being excused.  I believe he's under our subpoena also.

        THE COURT:  Sir, you may step down for now. You're subject to recall.  You may call your next

witness.

MR. LITTLEFIELD:  Gene Hise.

(The witness was duly sworn by the Clerk.)

THE WITNESS:  I do.

GENE HISE,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Good morning.

A    Good morning, sir.

Q    State your name for the record please, sir.

A    My name is Gene Hise.

Q    You're going to need to speak --

A    My name is Gene Hise.

Q    Much better.  Mr. Hise, how are you employed?

A    State trooper, the Oklahoma Highway Patrol.

Q    And how long have you been a trooper?

A    January will be 16 years.

Q    Do you have any -- what's your responsibility or duties with the Oklahoma Highway Patrol, sir?

A    Right now I'm a canine handler, and I work in the criminal interdiction division for the Oklahoma Highway Patrol.

Q    Prior to being a canine handler and working

interdiction, what was you were general day-to-day responsibility?

A    Protect the lives and the property of the people of the state of Oklahoma, and patrol the interstates.

Q    Okay.  In what capacity?

A    As a state trooper.

Q    Just one of the road troopers?

A    Yes, sir.

Q    Okay.  And as a canine handler in interdiction, where are your efforts -- and I'm not asking specific locations, but do you work roadways or what?

A    The major interstates throughout Oklahoma thoroughways.

Q    Been testimony about the tactical team of the Oklahoma Highway Patrol for the eastern half of the state of Oklahoma.  Were you a member of that team in September of 1999, sir?

A    Yes, sir, I was.

Q    And when did you become a member of the tactical team for the eastern half of Oklahoma?

A    I'd say it was in latter -- latter part of the year of 1997, spring of 1998, somewhere in there.

Q    Okay.  I'm losing you a little bit, so make sure you stay with the microphone.

A    Yes, sir.

Q    And partially because the acoustics in this courtroom are bad, it's hard to hear, so it's really important that you project into the microphone.

So you would have been on the team how long in September of '99, sir?

A    Approximately two years.

Q    Do you recall receiving information about an operation that was going to take place on September the 23rd and 24th of 1999, sir?

A    Yes, sir.

Q    And how much prior to that do you recall was it that you received the information that there was going to be a mission or an operation?

A    I believe, sir, it was the day before.  I think around September 23rd.

Q    Okay.  And where were you told to go?

A    To Camp Gruber.

Q    And did you get to Camp Gruber and, if so, about when was it?

A    Been September 23rd around 11:00 a.m.

Q    Okay.  When the team assembled, what information was presented to the team?

A    We were to serve a -- serve a no-knock warrant and a search warrant and --

Q    You're going to have to speak up.

A     We were to serve a no-knock search warrant, and we had an -- an arrest warrant.

Q     Okay.  What information did you have -- and if you would, lean forward a little bit.

A     Yes, sir.

Q     What information did you have in relation to the location, the nature of the individual, the surrounding area, that kind of information?

A     The information came from -- from task force, and the residence was in a rural area in Sequoyah County.

Q     Okay.  Know anything about the neighbors?

A     I don't -- I don't recall the neighbors, other than, at the residence that we were to serve a warrant, I believe the mother resided directly west.

Q     Okay.  When was the ultimate plan of entry finalized, sir?  And I'm not asking the specific time, but approximately when was it -- the ultimate plan that was going to be utilized?

A     It was on the day of the 23rd of September.

Q     Okay.  And what was your position in regards to the overall plan of entry into the location?

A     I was the driver of the fourth vehicle.

Q     Who was going to occupy the fourth vehicle with you, sir?

A     It would have been me as the driver, Trooper Doc

Darst as a front seat passenger, and Trooper Billy Poe, the rear seat passenger.

Q   Okay.  What was your assignment -- or how close -- once the plans finalized and it's like determined that you're going to be in the fourth vehicle and that Darst and Poe are going to be in the vehicle with you, as to the overall plan, are you absolutely concerned with who is going to do what, for example, on the entry team if you're not a part of the entry team?

A   Would I be concerned with it or --

Q   Well, do you know the exact and precise details of the entry plan if you're not on the entry team?

A   No.  I have an idea, but that's not my assignment within that mission.

Q   Okay.  What are you concerned with within the mission?

A   As my assignment within that mission was to provide security and cut off any access, from the residence that we were to serve as a warrant to, to the mother's residence directly west.

Q   Okay.  And are you familiar with the assignments of the individuals that are in your particular vehicle?

A   Yes, sir.

Q   What was Trooper Darst's assignment in this mission?

A   His assignment was the same as mine.

Q   Okay.   What was Trooper Poe's assignment in this particular mission?

A   Trooper Poe was the assigned sniper that night to provide cover fire.

Q   And obviously you're not the first trooper that's testified here, but there has been discussion about creek teams.   Are you familiar with a creek team in this type of operation?

A   Yes, sir.

Q   And in regards to a sniper providing cover, which was Mr. Poe's mission you stated, had there been a creek team, how would Mr. Poe have been incorporated in regards to creek team, if any way at all?

A   If we would have utilized the creek team?

Q   Yes, sir.

A   The creek team would have went out and scored and recorded and related back to the entry and the security team what was going on at the residence prior to the entry team, security team's arrival.

Q   Where would -- if there was a creek team, what part would -- would the sniper have been involved in it?

A   Yes.

        MR. LITTLEFIELD:   I would ask that Government Exhibit Number 69 been displayed to the witness.

        THE COURT:   You may.

Q    (By Mr. Littlefield)  Mr. Hise, where were you supposed to go in the fourth vehicle?

A    In looking at this photograph, there's a vehicle parked at the bottom of the driveway.  It would be --

Q    Okay.  You can tap it on that screen and it will show up where you tap.  Just tap it one time at that location.

A    (Witness complies.)

Q    Okay.  Do you see up there, and does the tap mark display on your screen as well?

A    Yes, sir, it does.

Q    And is that the area to which you were to go?  Is that where you were supposed to go?

A    The vehicle, yes, sir.

Q    And, in fact, where did you go on that night?

A    I -- I --

Q    Where did your vehicle go on that night?

A    I stopped my vehicle there facing east in front of the gate.

Q    Same location that you tapped?

A    Yes, sir.

Q    In regards to timing, when were you supposed to arrive at this location in relation to the entry vehicle, sir?

A    Just -- just after -- actually, simultaneously.

Q    Okay.  With their arrival at what location?  Where

was -- where was -- okay.  Let me rephrase it and put it a different way.

Where were the entry team -- where was the lead entry team vehicle to have been when you arrived at that gate location and stopped?

A   They were -- they were to be turning off and entering the residence from the -- from the east, from the private drive.

Q   Okay.  And do you see the location on Government Exhibit Number 69 as to where the lead entry vehicle should have been at the time you pulled up and stopped at the gate?

A   Yes.

Q   And can you tap that location, sir.

A   (Witness complies.)

Q   Okay.  And you're talking just immediately behind that black and white patrol car?

A   Yes, sir.

Q   In regards to lights and the emergency lights on those vehicles, do you know what responsibility those three entry vehicles were supposed to have as far as their lights being on?

A   Do I know exactly which their lights were, or --

Q   Do you know what their -- the first two vehicles in that entry team were what, sir?

A    They are Ford Broncos.

Q    Okay.  Third vehicle was?

A    Patrol car.  Marked patrol car.

Q    Are all of them equipped in some way, shape, or form with some kind of emergency lighting?

A    Yes, sir.

Q    As you were on the security on the west side, do you know what they were supposed to do as far as turning on their emergency lights?

A    Yes.

Q    Okay.  What were they supposed to have done?

A    When they -- when they turned off of the county road onto the private drive, as they were turning, they activated their emergency lights.

Q    As to your arrival at the front gate simultaneous with them coming in, okay, what were you supposed to do as far as your emergency lights, sir?

A    None.

Q    Why?

A    I wouldn't give up my position.

Q    And why would it be important that your position would not have been given up or identified, sir?

A    I don't want to silhouette my sniper.  I want to keep him in good cover, concealment.

Q    Okay.  In regards to -- I mean, you got Darst in the

front seat, Poe in the back seat.  Which way were -- for you and Darst to have fulfilled your portion of the mission, which direction were you to have entered the yard.

A    From the from the gate traveling north through the driveway.

Q    Okay.  And in so doing, would you have gone forward -- or let me back up.

What was the condition of the gate when you arrived?

A    It was closed and locked.

Q    How were you and Darst going to pass the gate area and enter the yard, sir?

A    Climb over the gate.

Q    Okay.  And where was Poe going to go to assume his position as sniper slash cover for this operation?

A    Remain at the gate area.

Q    Okay.  Was it worked out, and if so, how was it worked out between yourself, Darst, and Poe regarding you all's exiting the vehicle to make sure that you all didn't bump into each other and get in each other's way and interfere with each other's progress?

A    Well, I being the driver, stopped.  I was the first one over the fence.  As -- as Billy Poe got out of the passenger side, there's two doors on that side of the car.

Q    Right.

A    So they both clearly exited that side of the vehicle.

Q    Okay.

A    Took their position.

Q    When you arrived, exited, and started into the yard, what did you focus upon?

A    As I was going through the yard?

Q    Yes, sir.  What caught your attention?  What did you focus on?  Where did you go?

A    I -- as I was traveling through the -- through the -- through the driveway to the front, as I -- as I got to about the rear of the pickup trucks, I heard gunfire.

Q    Did you see anybody in the yard?

A    Yes.

Q    When did you see someone in the yard?

A    As I went -- as I drew my weapon, I ducked.

Q    I didn't ask what you did.  My question was:  When did you see someone in the yard?

A    When they appeared in front of me.

Q    Okay.  Where did you see someone in the yard, and where were you when you first observed this person approximately at the pickups?  Do you remember if you went between them or around them?

A    Between them, I believe.

Q    And do you know where Trooper Darst was when you were at that location going between the pickups?  Do you know

where Darst's location was?

A    He was directly behind me.  I lost him during the commotion just momentarily out of my peripheral vision.

Q    Okay.  Now, you mentioned hearing shots fired?

A    Yes, sir.

Q    Where -- was it before or after you observed this person at the location you've indicated that you heard the shots being fired?

A    I heard the shots before I saw the person.

Q    Okay.  And about where were you when you heard the shots fired or you made a -- on that line, you see it?  Where along that line was it?

A    (Witness indicated.)

Q    Okay.  In that area there?

A    Yes, sir.

Q    At that point, were you able to determine where the shots were coming from?

A    No.

Q    Were you able, at that point, to determine where the shots were -- what the shots were directed to?

A    No.

Q    As your function was to provide security for the west side, what did you do as -- after you've heard the shots fired, what did you do to get yourself from the position where you were when you first heard them until you saw the

individual in the yard?

A    I went between -- between the vehicles, took cover, drew my weapon.  I was looking around.  And then the person appeared in front of me and was backing away from the residence.

Q    Okay.  Backing into this position?

A    Yes.

Q    And would have been facing towards what?

A    The residence.

Q    Okay.  What was the person who appeared in front of you who's backing up doing?

A    He turned to me, appeared, and I was yelling at him, "Highway Patrol, Highway Patrol, get on the ground, get on the ground."  At first he did not comply.

Q    Okay.  Was the person armed?

A    No, sir.

Q    Okay.  There has been indication previously in the trial that Toby Barrett, son of the defendant, Kenneth Barrett, was out in the yard.  Did you subsequently learn who it was that had appeared in front of you?

A    Yes, sir I did.

Q    And who was it?

A    It was Toby Barrett.

Q    Okay.  You indicated initially that Toby Barrett didn't comply with your command to get on the ground?

A     Yes, sir.

Q     Did he at some point comply?

A     Yes, sir.

Q     What happened -- after Toby Barrett got on the ground, what was done in relation to Toby Barrett?

A     He was handcuffed.

Q     Okay.  And at that same location or was he handcuffed at a different location?

A     No, it was -- it was right there.

Q     What happened after Toby Barrett was handcuffed? What happened with him?  Was he left at that location or moved?

A     No, I -- I laid on top of him there for briefly, just a short second until I could get the cuffs secured.

Q     Okay.

A     I was looking back towards the residence to try to see where this gunfire was coming from.  And he was drug back.

Q     Who was drug back?

A     Toby.

Q     And where was he drug back to?

A     I don't -- I don't know what Trooper Darst did with him at that point.

Q     Darst was with you at that point?

A     Yes.

Q     And who took custody or control over Toby Barrett?

A     Yes.

Q     Who did?  Who took custody over Toby Barrett at that point?

A     Trooper Darst.

Q     Okay.  During this period -- you indicated a location at which you heard gunfire.  During the period where you approached, observed Toby Barrett, took Toby Barrett into custody, and turned him over to Trooper Darst, what was the circumstance in regard to the gunfire?  Was it continuing or what?

A     Simultaneously during -- during the cuffing and the gunfire --

Q     My question is:  From the time you first heard the gunfire until you took Toby into custody, did the gunfire continue?

A     Yes.

Q     Okay.  At the point that you turned Toby over to Trooper Darst, had you determined where the gunfire was coming from?

A     Somewhere in the front of the residence.

Q     And what had you seen or heard that allowed you to ascertain that the gunfire was coming from somewhere in the front of the residence, sir?

A     Trooper Hamilton's vehicle.

Q    What did you observe about Trooper Hamilton's vehicle?

A    As the vehicle was approaching the front of the residence during the gunfire, you could -- you could see the flume of smoke from the weapon and glass flying off the vehicle.

Q    The flume of smoke, where was that coming from?

A    The area of the front of the house.

Q    And where was Trooper Hamilton's vehicle located when you could -- when you picked up the glass coming off of it?

A    (Witness indicated.)

Q    Do you see the white Bronco that's immediately -- as I'm looking at the photograph, probably you too -- immediately to the right of that?

A    Yes, sir.

Q    Do you know whose Bronco that is that's there now in that photograph?

A    It's Buddy's.

Q    And where in relation -- how far from that location that we see it in now was it you first saw the glass flying off of it?

A    It was right in that -- pretty much in that area where I just showed you.

Q    Where did Buddy's Bronco go to from that point?

A     To its final point of rest?

Q     Where did it go to?  Yes.

A     To the front porch.

Q     If you look in front of you to the model, Government Exhibit 1, there's a Bronco immediately in front of the house.  Where -- in relation to where that Bronco is immediately to the front of the house, where is it that Trooper Hamilton's Bronco went to?

A     It rolled back.

Q     No.  When it approached the house, came to the house, where did it go to in relation to that Bronco right there now?

A     Pretty much right where it is.

Q     Okay.  Did you -- the other two vehicles on the entry team, were you able to observe where they went to?

A     Steve's vehicle was in the -- was in the back.  And I don't remember where Trooper Pettingill's vehicle ended up.  I wasn't --

Q     Was Pettingill's vehicle one of the entry vehicles?

A     No, sir.

Q     Okay.  My question is:  Where -- did you see where the two entry -- the other two entry vehicles went to in the entry and where they ended up?

A     Yes.

Q     Okay.

MR. LITTLEFIELD:  I would ask that the witness be allowed to go around to the model, Judge, to Government Exhibit 1.

THE COURT:  He may.

Q   (By Mr. Littlefield)  Would you go around and place, the best you can, the location of where Trooper Greninger's Bronco ended up and Trooper Hash's Crown Victoria ended up?

THE COURT:  If you'll take this mike, Trooper, and talk into it any questions that are asked of you.

A   At the conclusion of the --

Q   (By Mr. Littlefield)  When they came up on the entry and stopped, where did they come to and stop?

A   Okay.  Well, I remember -- I remember who this vehicle was.

Q   Do you remember where Trooper Greninger's Bronco came to and stopped on the entry?

A   It was somewhere in this area here.

Q   Would you place that in the area where you believe Trooper Greninger's vehicle stopped?

A   (Witness complies.)

Q   And Trooper Hash's vehicle, approximately where did Trooper Hash's vehicle stop?

A   It was back over here somewhere.

Q   Okay.  You think he was down by the ditch?

A    Yes, sir.

Q    Okay.  Do you see in -- you can return up there.

You see where the black and white is in Government Exhibit 69?

A    Yes, sir.

Q    Do you know whose vehicle that is?

A    Trooper Hash's vehicle.

Q    And where is that in relation to where it stopped during the mission?

A    Right now?

Q    Where it is in that picture, where is that in relation to where Trooper Hash stopped the vehicle when they entered?

A    I guess that would be the final point of rest where they stopped.

Q    Okay.  Is that the same location that you have the vehicle there?

A    It's pretty close.

Q    Okay.  Go ahead and return to your seat.  Now, you're at the -- after you turn Toby over to Trooper Darst, what did you do next, sir?

A    The mission changed.  I went from providing security to lifesaving.

Q    Okay.  What did you do next?

A    I told Trooper Darst to cover me during the gunfire.

When the flash-bang went off, there was momentary pause in the gunfire. I ran directly back down the driveway. I jumped over the gate. I -- I got into my unit. I rammed through the gate. I drove back to the front of the residence.

Q   Okay. At that point, were you aware of whether or not anyone had been injured?

A   Yes.

Q   When did you become aware that someone had been injured?

A   Immediately after I -- I cuffed Toby, I got up and I looked over and Trooper Manion was yelling we had a man down, we have a man down.

Q   And where was Trooper Manion when you heard him yelling we had a man down?

A   At the rear of Buddy's vehicle.

Q   Did you see Buddy at that point?

A   No.

Q   Did you see Buddy exit the Bronco at any point?

A   No.

Q   Okay. And you said Manion was at the rear of Buddy's vehicle?

A   Uh-huh.

Q   Where did you go when you heard Trooper Manion hollering we've got a man down, we've got a man down?

A    Ran down the driveway to my unit.

Q    Okay.  Is that when you moved through the gate?

A    Yes.

Q    And what did you do in relation to the gate, sir?

A    I drove through it.

Q    Okay.

MR. LITTLEFIELD:  I'd ask that Government Exhibit 55 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield)  Do you recognize Government Exhibit 55?

A    Yes.

Q    And what is that sir?

A    It's the gate.

Q    Is that the condition it was in after you crashed it?

A    Yes, sir.

Q    And where did you take your vehicle, sir?

A    To the front of the residence.

MR. LITTLEFIELD:  And I would ask that Government Exhibit 192 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield)  Do you see your vehicle in that -- in that photograph, sir?

A    Yes, sir.

Q    Okay.  And where is your vehicle in that photograph?

Can you tap your vehicle?

A      (Witness complies.)

Q      When you crashed the gate and drove into the yard, where did you take it to?

A      To where I just -- where it's sitting.

Q      Okay.  That location?

A      Yes.

Q      Okay.  And to your knowledge, was it moved at any time after that, sir?

A      No.

Q      Okay.  If you look to your right, that will help.

Trooper Hise, what was your relation to Rocky?

A      Me and Rocky were both -- were both Marines and we were brothers, and we took care of one another.

Q      And in relation to your friend, how did you classify?

A      Sir?

Q      In relation to being your friend, how did you classify Trooper Eales?

A      He was my trainer.  He is somebody I looked up to. He helped get me on the TAC team.

Q      Okay.  I understand it's not easy, just do the best you can, okay?

Let me direct your attention back to Trooper Hash's vehicle, Steve Hash's vehicle.  Do you see where it's located there?

A     Yes, sir.

Q     And where in relation to where Hash stopped is that as it's shown now?

A     (Witness indicated.)

Q     Is that where it stopped, or did it move on up?

A     I don't remember.

Q     Okay.  How closely were you focused on Trooper Hash's vehicle, if at all?

A     Wasn't.

Q     What were you focused on?

A     Saving my partner's life.

Q     Okay.  When you pulled your vehicle up to this location, what happened next, sir?

A     I got out of my car and Trooper Rick -- Ricky Manion was yelling at me.  And so I got into my trunk, I got my load bearing vest out where I carry my trauma dressings for sucking chest wounds and major wounds.  And I got over there and Rick was cutting off Rocky's vest and clothes, and he said, "We're losing him."  Rocky was gasping and Rick said, "We've got to -- we're going to have to start CPR", and he said, "I'll do the chest compressions and you do the breathing."  And we started doing what we're trained to do.

Q     Yes, sir.  You all attempted to minister to Rocky. At some point, was there an effort made to get Rocky to

more comprehensive medical care?

A     Yes.

Q     Okay.  And do you know, Trooper Hise, if there was any effort -- and how were you going to get Rocky out to try and get him to medical attention?

A     Well, first we lifted him up and we originally was going to put him in Buddy's vehicle, but it was disabled so Raymond pulled his vehicle around and we dropped the tailgate on it.  And we lifted Buddy -- or we lifted Rocky up, put him on the back.

Q     Was -- were there individuals that were attending to Rocky and trying to give him -- at that point, when he was placed into Trooper Greninger's Bronco, trying to give him medical care, CPR?

A     Yes.

Q     And who -- who were those persons?

A     Involved was myself, Trooper Manion, Delena Goss, and Clint Johnson.

Q     And who -- who left in Trooper Greninger's Bronco to transport Rocky to meet the ambulance?

A     I did.

Q     And you were in what position, sir?

A     I was driving.

Q     Okay.  And what individuals were with Rocky attempting to minister to him?

A    Clint Johnson and Delena Goss.

Q    And did you all meet with the ambulance?

A    Yes, sir.

Q    Where?

A    At the off-ramp, I believe it's Dwight Mission Road and Interstate 40.

Q    And was Rocky, at that point, delivered to the ambulance?

A    Yes, sir.

Q    Who went with him?

A    I believe Delena.

Q    Okay.  And did you know where the hospital was in Sequoyah County or in Sallisaw?

A    No, sir.

Q    Who rode with you to the hospital?

A    Clint Johnson.

Q    Were you with Rocky or at the hospital when they pronounced him dead, sir?

A    (Witness nodded head.)

Q    Did you stay -- or did anyone else from the team come to the hospital at Sallisaw?

A    Yes.

Q    Who?

A    When I went through the front door emergency room with Rocky, I looked over to the room to the left and

Trooper Hamilton was sitting there bleeding.

Q   Okay.  And where was -- where was Buddy bleeding from?

A   The head and shoulder.

Q   And did Buddy stay at the Sallisaw Hospital, receive treatment, or did he go elsewhere?

A   Went elsewhere.

Q   Where did he go?

A   Saint Francis in Tulsa.

Q   And how was Buddy transported to Saint Francis?

A   By helicopter.

Q   Do you know if anyone went with Buddy when he was transported to Saint Francis?

A   I did.

Q   Trooper Hise, let me take you back for a moment to when you approached Toby from the gate, approached and came through the pickups and observed Toby in the yard. Prior to -- as you were approaching, before the shots that you first heard, was there any -- any loud noises or anything that you heard?

A   No, sir.

Q   Okay.  And knowing the location, can you tap on Government Exhibit 192, the approximate location where Toby was when you observed him on this photograph, sir?

A   (Witness complies.)

Q    Okay.  In relation to the arrow, would it be at the point or where on that arrow?  And I'm not going to ask you to tap it again.  Just describe it.

A    It would be just to the -- to the right of the top of the point.

Q    Okay.  And you were where when the shots started?

A    At the rear of the truck.

Q    So Toby would have been -- how far from you would Toby have been, his location there to where you were when you first heard the shots being fired?  About how far apart?

A    Twenty feet probably.

Q    How far?

A    Twenty, twenty-five feet.

Q    After you and Trooper Darst secured Toby, placed him on the ground and handcuffed him, at any point from the time you first approached and saw him until you cuffed Toby and put him down for security purposes, had he said anything?

A    Before that, no.

Q    At the point when you had placed him down for security purposes, were the shots already being fired?

A    Yes.

Q    What -- at what point was it that you first heard Toby utter a word?

A    When I was -- when I was on top of him and I was handcuffing him, he turned his head back towards the residence and he was screaming, "Dad."

Q    This was after you cuffed him?

A    Yes, sir.

Q    And when was it in relation to the shots being fired that Toby hollered out "Dad"?  Before they started being shot or after the shots started?

A    Well, it was after.

Q    When you were ministering CPR, did Rocky respond?

A    No.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield)  On your approaching, as you were coming down that road, Hash and Buddy and Raymond Greninger make the turn up the driveway, you said something previous about trying to arrive simultaneous with their entry.  How much lead time -- how far was Hash in front of you?

A    Forty, fifty yards.

Q    When -- where was -- when Hash made his turn onto that driveway to the left, were you able to observe him turning?

A    Yes, I could see his lights.

Q    And where was your vehicle in relation to his vehicle?

A    I hadn't quite made it to the gate yet.

Q    Okay.  How far were you from the gate?

A    Twenty, thirty yards probably.  Twenty yards.

Q    Okay.  Do you believe that you were able to time it so that the arrival was simultaneous or near simultaneous, your stopping at the gate as they are making the entry?

A    Yes.

Q    When you were doing the CPR, who was doing the compressions?

A    Rick.

Q    Who was doing the breathing?

A    I was.

Q    What happened?

A    Every time Rick would do the compressions, Rocky's mouth would fill up with blood.

Q    Did you have to clear it?

A    Yes.

Q    Okay.  Was there any response?

A    No.

        MR. LITTLEFIELD:  I pass the witness, Judge.

        THE COURT:  It's noon.  We'll take the noon recess.  I ask the jury to be back at 1:15.  Remember my admonition not to discuss this among yourselves or allow

anyone else to discuss it with you.  Avoid any news coverage if there is any.  I ask everyone in the courtroom to please remain seated as the jury leaves for the noon recess.

(Jury excused.)

THE COURT:  Officer Hise, you may be excused until 1:15.  Let the record reflect the jury has departed the courtroom.  Anything to bring up outside the hearing of the jury, first from the government?

MR. SPERLING:  No, Your Honor.

THE COURT:  Defendant?

MR. HILFIGER:  No, sir.

(Off the record at 12:00 p.m.)

(On the record at 1:42 p.m.)

THE COURT:  I'm waiting for verification that the sound system has been turned off for this sealed hearing.

Let the record reflect counsel for the government is present; defendant and counsel are present.  It has been reported to the Court by counsel for the government and the Clerk of the Court that juror 85, during the lunch break, somewhere in the smoking area outside of the handicapped entrance area made contact with Billy Poe of the Oklahoma Highway Patrol.  By contact, it was reported to me that he shook his hand and indicated as if he had

known Mr. Poe in the past.  The questionnaire that juror 85 filled out shows no indication.  I'm not -- have not reviewed the record of the jury selection process including voir dire which is where I believe Officer Poe's name would have been read to determine whether or not juror 85 made any mention of his relationship to Officer Poe.  It's my plan to bring juror 85 into the courtroom and ask him if he recalls -- first, if he recalls the Court reading the name of Officer Billy Poe during voir dire and, if he did, did he relate that information to the Court.  Ask him -- depending on what his answer to that question is, ask him about the activities today; how long he's known Mr. Poe; whether Mr. -- whether the juror, in light of his knowledge of who Officer Poe is, whether he can be fair and impartial to both parties; and then, lastly, whether or not the juror has had any communication with any other juror about his relationship with Billy Poe.

Government have any other -- I'll also give counsel for the government and defendant an opportunity to inquire.

MR. SPERLING:  We'd also ask Your Honor -- I think it's a good question, not only does he know him and, if so, what's the nature of the relationship.

THE COURT:  Yes.

MR. SPERLING:   May I return this?

MR. HILFIGER:   About the other juror this morning, has there been any checks about any other jurors realizing they know some of these witnesses?

THE COURT:   I'll let you re-urge that issue after we question him.  At this point I don't -- and depending on how he answers the questions, I don't see -- he may answer the questions in such a way that further questioning in that regard might be appropriate.  But until -- until I hear something from him, I would take that request under advisement.  And if you, in your questioning, choose to go into that area, I would request you approach the bench and talk about it outside the -- either that or I'll have the witness step out of the courtroom.

<p align="center">JUROR 85,</p>

being previously sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

<p align="center">EXAMINATION</p>

BY THE COURT:

Q    Thank you.  If you -- if you'll recall, sir, you were previously sworn and you're still under oath --

A    Yes, sir.

Q    -- you understand that?  It's been -- and the reason for this hearing and my request for you to come in and

take the witness stand has to do with information that was provided to me by counsel that indicated during the lunch break that you, in the area of the handicapped entrance and what we sometimes call the smoking area, had occasion to communicate with Billy Poe of the Oklahoma Highway Patrol indicating that you had -- that you knew him in some respect?

A    Yes, sir.

Q    And if you -- you might tell me what occurred.

A    I worked with his mother years and years ago, and I've known Billy Poe for a long time.  And I just recognized him when he come by, and I said, "Billy Poe" because I recognized him.

Q    Do you recall during the voir dire process, I think it was the last day, not the first session or the second session, but the third session, I had the clerk read the names of the potential witnesses for the government?  Do you recall hearing his name read?

A    No, sir.  I'm sure it was, but I don't --

Q    Are you -- not for me to put words in your mouth, were you telling me it just didn't register with you?

A    It just didn't register with me because it's been years since I've seen Billy Poe.

Q    And when you say years, how many years would you estimate?

A      Long time.

Q      Are we talking 20 years, or 10 years, 15?

A      Fifteen to twenty, yes, sir.

Q      And you say you worked with his mother?

A      Yes, sir.

Q      And I don't have any idea how old Billy Poe is, but you mean when he was a youngster?

A      Yes, sir.

Q      Have you seen him since he was an adult or since he was a --

A      One time since he was a trooper, but that was probably 10, 20 years ago.

Q      Did you know before today that he was involved in this case?

A      No, sir.

Q      The answer appears to be obvious, but it's still appropriate for me to ask it.  Have you talked with him or discussed this case with him at all?

A      Oh, no, sir.

Q      And then finally, have you discussed your relationship with Billy Poe with any of the other jurors?

A      No, sir.  This happened just a few minutes ago.

Q      You're saying it happened spontaneously?

A      Yes, sir.  I just saw Billy Poe and I said -- I looked at him and I recognized him.  I said, "Billy Poe",

and he shook hands and that was it.

Q   The fact that you had this relationship, you worked with his mother -- what did his mother do?  What was she?

A   She was a secretary for Kelwood Company, a place that makes pants for Sears.  And I was a supervisor over there.

Q   She didn't work directly for you?

A   Oh, no, sir.

Q   She was just another --

A   She worked in the office and I was a peon back in the back.

Q   Okay.  Anything about that relationship with Mr. Poe that would keep you from being anything other than fair and impartial to both parties in this case?

A   No, sir.  I wouldn't -- I don't know Billy that well, you know.  I knew his mother, but I didn't know Billy that well.

Q   Okay.  Counsel for the --

A   I'll be fair, whatever I do.

THE COURT:  Okay.  Counsel for the government, any questions?

MR. SPERLING:  No, Your Honor.

THE COURT:  Defense, any questions?

MR. HILFIGER:  Just one.

EXAMINATION

BY MR. HILFIGER:

Q    Sir, were any other jurors around when this occurred that you are aware of?

A    No, sir.  I believe this lady was -- was with me.

Q    But no -- you weren't with any other jurors?

A    No, sir, huh-uh.

Q    Thank you.

A    I didn't think anything about it when I recognized him.

THE COURT:  Thank you, sir.  You may step down.

JUROR 85:  Okay.

(Juror excused.)

THE COURT:  Any comment on behalf of the government?

MR. SPERLING:  No, Your Honor.  We don't believe that there's been any prejudice shown.

MR. HILFIGER:  May we have just a moment?

THE COURT:  You may.

Would you -- would you retrieve the juror?  Yeah, have him come back.  Just one minute, Mr. Hilfiger.  Something else occurred to me.

I apologize -- you don't have to take the stand.  You can just stand out.  I apologize for bringing you back in, but it just occurred to me that it's important to the process that you not discuss with your fellow jurors what just went on in this hearing.  You understand that?

JUROR 85:  Okay.

THE COURT:  And I take it you have not?

JUROR 85:  No, huh-uh.

THE COURT:  Okay.  If you will not.  It's a necessary and technical part of the process when that's been reported to me, but it's incumbent upon you not to discuss what went on here with those in the jury.

JUROR 85:  I'm sorry if I --

THE COURT:  No, no.  You don't have to -- no, don't say anything.  You just go back now.

(Juror excused.)

THE COURT:  Mr. Hilfiger.

MR. HILFIGER:  Judge, I had discussion just with counsel and the client.  We're sort of the opinion that even though this appears to be an innocuous matter, we still get back to this concern, and I know the Court has tried and everybody has really tried to get a proper set of jurors on this panel.  And my concern is, again this name, Billy Poe, has come up, you know, in the general voir dire, it's come up for five days of testimony now. And it just seemed like maybe we didn't do what was necessary as far as informing the jurors as to -- to get the information from them as to their knowledge of these people.  And my concern is that this juror probably should not be -- even though he's in the position he's in on the

chair he's on, but that he should not be a member of this panel at this time because of the concern I have that he never informed us about his knowledge of Billy Poe. We would ask he be removed.

THE COURT: The Court is satisfied after hearing Juror 85's explanation of the situation. He appeared -- his demeanor appeared to be one of truthfulness and it was -- was a spontaneous reaction to someone he'd known -- known his mother. Remembered him as a child. He has not discussed his relationship, as distant as it is with Mr. Poe, with the fellow -- with his fellow jurors. And I'm not going to remove him from the jury. Now --

MR. HILFIGER: May it please -- we take exception to that.

THE COURT: Yes, I understand. I note your objection. Are the parties ready to proceed in five minutes? Are you ready? The government ready?

MR. SPERLING: Your Honor, can we note that I think a word from you one -- and one thought that crosses my mind is this contact, innocuous as it was, would have been seen by someone. It's one of those things that I would not want, even though it's innocent, even though the Court has made an appropriate record, if you could appropriately warn the jurors that we will duck our heads when we are in the hall and the like, I think it would be

helpful.

THE COURT:  I think that what my plan -- I don't think that's an inappropriate suggestion.  I think at the end of the session today would be the appropriate time to re-urge that issue.  Any comment, Mr. Hilfiger?

MR. HILFIGER:  Not on our behalf, Your Honor.  But we would, because of not striking Mr. Gaylor, and also because of the information received -- I'm sorry, Juror Number 85 -- and also the information received on the juror this morning, we feel that maybe the selection process was not carried out properly.  And we're asking for a mistrial because of the failure to be able to get the information necessary from the jurors to make a proper selection of the jurors for this panel.

THE COURT:  Motion overruled.  Five minutes and we'll start.

(Off the record at 2:01 p.m.)

(On the record at 2:19 p.m.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the government is present, defendant is present with counsel.  I'll ask the witness to step back in, please.  If you will just take the witness stand please, sir.  You may cross-examine.

MR. HILFIGER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HILFIGER:

Q    Mr. Hise, when were you first made aware that the TAC team was beginning to be brought into this search warrant execution?

A    Sir, I want to say it was in the evening of September 22nd, prior to the arrival of September 23rd.

Q    And you arrived at Camp Gruber on the 23rd?

A    Yes, sir.

Q    Do you recall what day of the week that was?

A    No, sir, I don't.

Q    What meetings did you attend with your TAC team to discuss plans?

A    We had a briefing at Camp Gruber on the warrants and the type of operation that would be conducted.

Q    When was your first meeting?

A    It was sometime on the 23rd there in the afternoon at Camp Gruber.

Q    Then did you -- at that meeting, what did you discuss as far as the operation?  Did you discuss different plans?

A    Yes, sir.

Q    What different plans did you discuss?

A    How the warrants would be served.

Q    Okay.  And did you have different tactics that were discussed on how you were going to execute this search warrant?

A    Yes, sir.  There was a -- a plan had formed at first, and then after a drive-by of the residence was conducted, that had changed.

Q    Okay.  And the first one -- the first plan was what that you discussed?  The creek team?

A    Yes, sir.

Q    Did you discuss anything other than the creek team at first?

A    No, sir.

Q    Are you familiar at all with surrounding a place and announcing police and -- you know, over a P.A. system or bull horn or anything like that?

A    Yes, sir.

Q    Did you discuss that at all?

A    No, sir.

Q    Did you discuss any other than tactic other than just the creek team in the afternoon?

A    No, just when the plan had changed, that was the only other --

Q    After the drive-by?

A    Yes, sir.

Q    And then after the drive-by, I guess there was a discussion that the creek team wouldn't work; isn't that right?

A    Yes, sir.

Q    And what other tactics -- did you discuss any other tactics other than this full scale assault?

A    That's an inappropriate word, sir.  It was not assault.

Q    Okay.  What's your word?

A    I was commanded by a judge to serve a warrant.

Q    Okay.  And did you discuss anything other than how -- other than what you ended up doing?

A    No, sir.

Q    Now, did you make your change -- did you determine the time first, or determine how you were going to do it first?

A    Well, after the drive-by and the different plan to complete the mission at hand, the time was formulated within the team.

Q    Okay.  Did you set the time and then say, okay, this is how we are going to do it, or did you say this is how we are going to do it, now what time are we going to do it?

A    I believe, on this particular mission, it was the -- how we were going to do it.  We mocked it.  We went through it, and the time was formulated sometime thereafter, if I remember correctly.

Q    Do you recall how the time was set?

A    Yeah.

Q    How was it set?

A    It was set amongst the team members and time toward -- for whatever reason, one individual locked on a time.

Q    Okay.  Was there a tactical reason set on the time being set that you know of?

A    No.  During that plan of the mission, we all know, in dealing with this type of an individual, that hours of the day or night really don't matter.

Q    Okay.  The person that -- did a person suggest the time?

A    Yes, sir.

Q    Who was the person that suggested the time?

A    Rocky.

Q    What was the reason that the time that was suggested was suggested?

A    Rocky wanted to go home to his wife and his kids.

Q    Okay.  So the time -- the set of the timing didn't have anything to do with tactics, it was for a convenience type setup, wasn't it?

A    So we could -- we could go home in the early hours of the 24th.  We're usually pulled away for a day or two from our families, and everybody likes to complete their mission and go home.

Q    Now, in this planning stage, because it was set for nighttime, did you discuss lighting on the cars?

A    Yes.

Q    And what's your recollection of the lighting on the cars?

A    You mean emergency lights or --

Q    Well, were headlights to be on?

A    Yeah, on the entry vehicles, yes.

Q    On entry vehicles only?

A    Yes.

Q    What about emergency lights?

A    Yes.

Q    On everybody or on what?

A    On the entry team.

Q    Only on the entry team?

A    Yes.

Q    And you're not part of the entry team; right?

A    No, sir.

Q    And Mr. Pettingill wasn't part of the entry team; right?

A    No, sir.

Q    When the -- when it was determined the emergency lights were to be used on the entry team, was there a determination of when those lights were to come on?

A    Yes.

Q    And what's your record of when the planning was that the lights were to come on?

A    As they were turning into the private drive.

Q    And the private drive being -- looking up here, you're talking about this white road right here, or are you talking about this road?

A    Yes, sir.  The one that your light was first on.

Q    This white road right here?

A    Yes, sir.

Q    So according to your understanding, is the emergency lights were to come on on all three entry vehicles as each one turned in the private drive; is that right?

A    Yes, sir.

Q    What was the reason -- reasoning for turning on the emergency lights at that particular time?

A    Because you're within close proximity of the residence and that all involved would know that law enforcement was at that residence.

Q    Okay.  And the first two vehicles, was there some concern about the first two vehicles being unmarked?

A    No, sir.

Q    Nobody talked about that?

A    No, sir.

Q    You turn on your emergency lights to warn people that this is a police action, don't you?

A    Yes, sir.

Q    Was there a concern that, because the first two

vehicles are unmarked, that people might not recognize those as being police vehicles?

A    No, sir.

Q    And why not?

A    Why would there be?  I don't -- why would there be with all of the lights on?

Q    Okay.  That's what I'm saying.  Because the idea was they were supposed to turn on their emergency lights, aren't they?

A    And they did.

Q    Okay.  Did you ever see Hamilton's emergency lights on?

A    No, sir.

Q    And his is the first vehicle on the property, wasn't it?

A    Yes, sir.

Q    And according to what you're telling us, he was supposed to turn his emergency lights on going down that private drive?

A    Yes, sir.

Q    Isn't that true?

A    Yes, sir.

Q    And when you are out here in this yard with Toby Barrett, as far as you know, he still didn't have his emergency lights on, did he?

A    I don't think he had the opportunity to turn them on.

Q    From the private drive all the way down to the ditch, he didn't have an opportunity to turn them on?

A    Well, you asked me the front yard.  I just answered your question, sir.

Q    The plan was, as you turn on to this white private drive, the emergency lights are supposed to come on.  Is that what your plan was?

A    Yes.

Q    And all of the -- you never saw the Hamilton Bronco emergency lights on even when it was up at the house, did you?

A    No, sir.

Q    Did you see the Bronco lights on -- the Hamilton Bronco emergency lights on when it's coming down the private drive?

A    No, sir.

Q    Did you see the Hamilton Bronco emergency lights on when it was coming through the ditch?

A    No, sir.

Q    At any time, did you see the Hamilton emergency lights on that night?

A    No, sir.

Q    So Hamilton's vehicle was not giving any warning that it was a police vehicle, was it?

A    No, sir.

Q    And that wasn't what the plan was, was it?

A    The plan was to have the lights on.

Q    Okay.  Now, what about Mr. Pettingill's car?  Was he supposed to have lights on?

A    I don't recall.  I don't remember, sir.

Q    You do not remember on that one?

A    No, sir.

Q    Now, as to your car, your understanding was you were specifically not to turn on your emergency lights; is that right?

A    Yes.

Q    And what about your headlights?

A    No, they were off.

Q    They were off?

A    Yes, sir.

Q    And when did your headlights go off?

A    Just prior to seeing Steve -- Trooper Hash's vehicle turning onto the private drive, something like that.

Q    Had you testified different before under oath about -- concerning your headlights?

A    No, sir.

Q    What?

A    No, sir.

Q    Did you make a statement under oath in September,

October of 2002?

A     I don't recall.

Q     You don't recall?

A     No.

Q     Do you recall being under oath at a -- in a matter concerning this where there was testimony given by you?

A     Yes, as I am today.

Q     In 2002 I'm talking about.

A     Yes, as I am today.

Q     The question was asked of you on Page 1769, Lines 1 through 3:  "The only lights on your vehicle would have been your headlights?"  And your answer was:  "They were on."  And than the question:  "They were on also?"  And the answer is an affirmative nod.  And the question: "Were you using your parking lights?"  And your answer was:  "No."

     Were those the questions and answers at that time where you stated that your lights were on?

A     Yes.  And as I told you, I turned them off.

Q     Okay.  And so your answer is now that they were off at what point?

A     As I explained just a moment ago, I turned them off just prior to getting to the gate.

Q     Okay.  Government's Number 69.  You recognize this picture?

A    Yes, sir.

Q    And, as I understand it, you're saying that your car was somewhere parked right around where that dark colored car is; is that right?

A    Yes, sir.

Q    How far down this road was it that you turned your lights off?

A    Thirty, forty yards prior to getting to it.

Q    Okay.  And at the time you turned your lights off, you're saying that Hash's car was turning right here?

A    Yes, sir.  He was just getting ready to turn in left.

Q    And did you see his emergency lights on before he made the turn?

A    Yes.

Q    And you turned your lights off?

A    Yes.

Q    And what was the purpose in turning your lights off?

A    So that my sniper and myself weren't silhouetted.

Q    Also, it prevents anybody from seeing your car; isn't that right?

A    Yes, sir.

Q    And you were trying to hide the fact that you were out there; is that right?

A    Well, I didn't want the attention to be drawn to my team right there.

Q     Okay.  Then when you saw Hash's car turning, you hadn't got to the gate yet; is that right?

A     No, sir.

Q     Is that right?

A     Yes, sir.

Q     Now, when you moved up to this gate right here, are you on -- which side of the road are you when you're at that gate?

A     That would be the north side.

Q     Okay.  So, you are actually on this side of the road right up next to the gate; is that right?  Is that what you're saying?

A     Yes, sir.

Q     And when you're at that gate, you can see over here, can't you?

A     Yes, sir.

Q     Did you look over in this area?

A     No, sir.

Q     You were trying to be simultaneous with stopping here with the entry here; right?

A     Yes, sir.

Q     Were you -- were you concerned about looking over here to see if you were simultaneous?

A     Well, as short as that is and as fast as we had accelerated coming down that road, I had a pretty good

indication they were where they needed to be as I stopped.

Q   So you didn't even look over here at all?

A   Not until later, no.

Q   Okay.  Now, if Hamilton -- I mean, not Hamilton -- Hash is turning here, then you're assuming that Greninger's Bronco is in here someplace and also Hamilton's Bronco is in here someplace?

A   Yes.

Q   Is that right?

A   Yes.

Q   And you're right here stopped.  By the time you stop here, has Hash's car already made this corner?

A   Yes.

Q   And he is already down here someplace?

A   Yes.

Q   And they are moving in a car.  Do you know how fast they are moving?

A   No, sir, I don't recall.

Q   Are they moving faster in the car than you're moving on foot?

A   Would have to be, yes.

Q   So they are covering this distance down here and coming in here, and you have to get out of your car, climb the fence, and you come up to here; right?

A   Yes, sir.

Q    And by the time you get up to here, where do you see Hamilton's car?

A    I wasn't looking at Hamilton's vehicle right there.

Q    Okay.  What was your focus on?  When you're coming up this -- when you're coming up this drive, you get over the gate, you're coming up this drive, what's your focus on?

A    Right there is where I heard gunfire and I started looking and ducking and drawing my gun and trying to figure out what was going on, and that's when Toby appeared in front of me.

Q    Okay.  Did you -- you heard gunfire here, you're saying, right behind the pickup?

A    Yes, sir.

Q    At the time you heard gunfire, you're saying you hadn't even got to Toby yet; is that right?

A    That's right.

Q    Toby -- Toby was over here, as I understand?  That's what you're saying?

A    Yes, sir.  He appeared in front of the trucks there, yes, sir.

Q    And when you heard the gunfire, you went from here -- between these two trucks?

A    Yes, sir.

Q    And got to Toby?

A    Yes, sir.

Q    Is that right?

A    Yes, sir.

Q    When you heard the gunfire, which direction did you look in?

A    I looked to the front of the house.

Q    Okay.  And what were you able to see at the front of the house?

A    Smoke and -- and then I took my eyes off of that because Toby came in front of me, so I couldn't shift back over there.  I was trying to make sure he didn't have anything in his hands.  My attention got taken from that to Toby.

Q    Now, at any time, had you told somebody something different about the relationship of seeing Toby and the gunfire?

A    No, sir.

Q    You've always told them that you heard the gunfire first, and then saw Toby?

A    Yes, sir.  As I recall it, that's the way it went down.

Q    Do you recall giving a statement under oath in February of 2004?

A    Yes, sir.

Q    And in that statement, on Page 674, Lines 10 through 12, the question was asked:  "Toby Barrett yelled dad,

dad, dad before any gunfire broke out?" And your answer was: "In there somewhere, yes, he did."

A    No, that's incorrect.

Q    That's wrong?

A    Yes, sir.

Q    Do you remember those -- that statement being -- that question being asked and your answer?

A    No, sir, I don't.

Q    You don't?

A    That doesn't sound right.

MR. HILFIGER:  May I approach the witness and show him?

THE COURT:  You may.

A    I guess it was -- it was worded inappropriate and I answered it incorrectly.

Q    (By Mr. Hilfiger)  So your answer was incorrect or their taking down your answer was incorrect?

A    No, the way they worded it.

Q    So what you're saying today is that the gunfire started before you even got to Toby?

A    Yes, sir.

Q    And are you also saying -- what about the words dad, dad, dad, when was that said?

A    When I was on top of Toby handcuffing him on the ground.

Q    Okay.

A    He looked to the front of the residence and was screaming out his dad, dad, dad.

Q    And so this statement here that says, "Toby Barrett yelled dad, dad, dad before any gunfire broke out," and you said, "in there somewhere, yes, he did," that's incorrect?

A    Yes.

Q    Did you tell -- did you make a statement to Lieutenant Gordon with the highway patrol?

A    Yes, I did.

Q    And in that statement to Lieutenant Gordon, do you know whether or not you made the same incorrect statement, that Toby Barrett yelled, dad, dad, dad before the gunfire broke out?

A    No, sir, I don't.

Q    You don't?  I would draw your attention to Page 673 in the statement that you made under oath in February of 2004, Lines 18 to 21, where it says -- the question is: "You told Lieutenant Gordon on that day that Toby Barrett yelled dad, dad, dad before the gunfire broke out; isn't that correct?"  And your answer was:  "That's what it says."

    Is that a question that was asked and is that your answer?

A    I guess it is, yes, sir.

Q    And you're just saying that that was wrong?

A    Yes, sir, that's wrong.

Q    Were you -- was your memory faulty on that day or were you just weren't being able to hear what the questions were?

A    That's just the way I remember it happening is the way I testified today.

Q    Okay.  In February of 2004 when you testified, was that the way you remembered it happening on that day?

A    Yes, sir.

Q    But it's different today, isn't it?

A    Yes, sir.

Q    And when you made that statement to Lieutenant Gordon -- when did you make that statement to Lieutenant Gordon, do you know?

A    It was 1999 or 2000.

Q    It was sometime within a month or two months after the incident; isn't that true?

A    That would be fair, yes, sir.

Q    And at that time, when you made the statement to Lieutenant Gordon, things were a little fresher in your mind, weren't they?

A    I don't know.

Q    You don't know if they were?  They were more recent,

weren't they?

A    I don't really know.

Q    Do you know whether the statement you made to Lieutenant Gordon was made before or after you had any -- well, let me ask you this.  I'll back up just a second.

You met with -- in Oklahoma City, I think it was, with a group -- the TAC team when you met with Ricks, the Commissioner Ricks?

A    Yes, sir.

Q    And that was in November sometime, or do you remember?  November -- or November of '99?

A    I remember a meeting.  I don't remember what month, sir.

Q    Was it a month or so after this incident?

A    Yes, sir, I guess so.

Q    And in that meeting, did you all sort of discuss and talk about what happened out here on September 24th, 1999?

A    Yes, sir.

Q    And then you also had some meeting or debriefing or something with a Jim Horn; is that right?

A    Yes, sir.

Q    And I'm talking about where the group -- the whole TAC team was there, or most of them?

A    Yes, sir.  Yes, sir.

Q    And in that meeting, did you have some kind of

discussion on what happened?

A     We all individually shared our experiences and what had happened that night.  They were attempting to get us some counseling for --

Q     And I'm not asking about your individual counseling. I'm talking about the group; okay?

A     I am, too, sir.

Q     Now, before those two group meetings, isn't it true that that is when you had your interview with Lieutenant Gordon, before you had those group meetings?

A     I'm not sure.  They were pretty close, weren't they? I don't recall.

Q     Okay.  But it was at the interview with Lieutenant Gordon that you said that Toby Barrett said dad, dad, dad, before any gunfire; isn't that true?

A     I guess that's what you've got, yes, sir.

Q     And now you're saying -- after those group meetings, you're saying, no, that's not the way it was; isn't that right?

A     It doesn't -- I don't recall it happening that way.

Q     Okay.  By the way, let me show you defendant's -- what's your trooper number, by the way?

A     Sir?

Q     Your trooper number?

A     My badge number?

Q     Yes.

A     344.

Q     Let me show you Defendant's Exhibit Number 15.   It has not been admitted.   Do you recognize that, sir?

A     Yes, sir.

Q     Did you sign that?

A     Yes, sir.

Q     Would you have signed that on or about the day that it is shown on the a agreement, on the statement?

A     Yes, sir.

        MR. HILFIGER:   And Your Honor, I move to introduce Defendant's Exhibit Number 15.

        MR. LITTLEFIELD:   No objection.

        THE COURT:   Mr. Hilfiger, would you approach the clerk and bring your exhibit list?   The U.S. Attorney may approach.

        MR. HILFIGER:   A clerical matter.   That should be Hise instead of Randolph.

        THE COURT:   Still no objection?

        MR. LITTLEFIELD:   No.

        THE COURT:   Defendant's Exhibit 15 admitted without objection.

Q     (By Mr. Hilfiger)   And what is this?

A     I'm not sure what we call that.

Q     Garrity.   Have you heard the word Garrity?

A    Yes, sir, that's exactly what it is.

Q    And basically it says that you're allowed to talk to these -- that you can talk to these people without being prosecuted, isn't that -- for any kind of criminal action; isn't that right?

A    Yes, I think it's what the department -- if you don't talk to them, you can be disciplined.

Q    Right.  Because this is an internal affairs deal?

A    Yes, sir.

Q    And because -- it's because of internal affairs you sign this agreement, and that they can't prosecute you criminally when you sign this agreement for what your discussion is about; isn't that true?

A    Yes, sir.

Q    And after you signed this agreement, did you talk to Mr. Randolph?

A    Yes, sir.

Q    And do you know whether that was tape-recorded or not tape-recorded?

A    I don't -- I was pretty stressed.  I don't remember if they tape-recorded it or they did handwritten notes.

Q    This was on the night or the early morning hours; is that right?

A    Yes, sir.

Q    After this incident occurred, were you told by

anybody out there at the scene -- well, no, I'm going to withdraw that.

Were you told on the night that this occurred to make any written statements of your own recollections?

A    No, sir.

Q    Okay.  You actually left the scene with Greninger's Bronco; is that right?

A    Yes, sir.

Q    When did you next come back to the Barrett residence?

A    Myself and -- I flew with Trooper Hamilton on the Life Flight helicopter to Saint Francis in Tulsa.  We were there for I want to say two to three hours.  And the commissioner, he came to Saint Francis Hospital in Tulsa, and I left Buddy there and rode with Commissioner Ricks back to Sallisaw.

Q    Okay.  Is that when you signed this agreement, when you got back to Sallisaw?

A    Yeah, at some point that morning, yes, sir.

Q    And did you give any statements after you signed this agreement?  I mean, immediately right around that time?

A    No, sir.

Q    After that time, did you give my statements to the OSBI?

A    Yes, sir, I did.

Q    And after the OSBI, did you give any statements --

when did you give the statement to Paul Gordon?

A     It was sometime after the OSBI statement, sir.

Q     I didn't --

A     It was sometime after the OSBI statement, sir.

Q     And do you recall whether it was before these debriefings or these group meetings?

A     No, sir, I don't remember.

Q     Now, where -- on Government's Exhibit Number 192 -- no, I'm sorry.  69.  I apologize.  On Government's Exhibit Number 69, you are somewhere in this position, Toby Barrett is somewhere over here -- well, you are either behind the pickup or right around here when you first hear gunfire.  Where can you recall seeing the Bronco, the Hamilton Bronco?  And there is a laser there or you can punch the screen.  Or did you even look at the Bronco at that time?

A     I don't recall looking -- looking at the Bronco until I was cuffing Toby and he turned, I was turning and looking.  It was right after that, right in there somewhere.

Q     Okay.  I didn't --

A     It was right after that.

Q     Right after --

A     Is what I'm recalling, it was right after cuffing Toby, I remember to the right and seeing the glass and the

smoke and it was really fast.

Q   Now, that's when you remember seeing the glass and the smoke.  Where can you recall seeing Hamilton's vehicle?  You can use that laser or you can punch --

A   Right in here before it got to --

Q   And where you are pointing is just -- as you are looking at the picture, you are pointing just to the left of the Bronco that is sitting there; is that right?

A   Yes, sir.

Q   And was that Bronco moving, the one that -- Hamilton's Bronco, was it moving toward the house?

A   Yes, sir.

Q   And at that particular time, you had a view of the door of the house, didn't you?

A   Just at an angle.  Not really.  I mean, I knew that the door was open, but at the angle I was at, I couldn't see.

Q   You couldn't see in the house?

A   No, sir.

Q   Could you see anything in the doorway?

A   No, sir.

Q   Did you look at the doorway?

A   I looked through the front of the house.

Q   You looked at the front of the house?

A   Yes, sir.

Q    Did you see muzzle flash or smoke or anything like that from the doorway?

A    I saw the smoke and the continuation of smoke, but as heavy as it was, I couldn't tell where it was directly coming from.

Q    And you definitely didn't see a person in the doorway; is that right?

A    No, sir.

Q    Did you say a person on the porch?

A    No, sir.

Q    Did you see any physical piece of a weapon in the doorway?

A    No, sir.

Q    When you first heard those shots until -- there was a point -- there was a flash-bang.  Do you recall that?

A    Yes, sir.

Q    From the point you first heard those shots until the flash-bang, would you say the shots were continuous?

A    No, there is a shift in fire.

Q    Okay.  When?

A    After the flash-bang.

Q    Okay.  But I'm saying from the point you first heard the shots until the time you heard the flash-bang, the shots were continuous, weren't they?

A    Yes, sir.

Q    Were they rapid?

A    Yes, sir.

Q    Do you know how many shots you could have heard?

A    I'm guessing, 20, 30.  I don't know.

Q    Pretty fast then?

A    Yes, sir.

Q    Do you know how long a period of time it was?

A    Fifteen, twenty seconds.  Thirty seconds maybe.

Q    Now, did you hear or see the flash-bang, or both?

A    I saw the brilliant light and I heard it.

Q    Okay.  Where did you see the light?

A    In front of the residence.

Q    Okay.  And when you say the front, sort of point to what general area.

A    (Witness indicated.)

Q    You are pointing right to sort of like the southwest corner of the porch somewhere?

A    Yes.

Q    Would that be about right?

A    Yes, sir.

Q    When a flash-bang goes off -- have you ever used one before yourself?

A    Yes, sir, we have.

Q    When the flash-bang goes off, is there some -- is there any kind of recoil or anything like that where the

flash-bang itself moves?

A    Yes.

Q    How much of a recoil does it have?

A    That all depends on the surface it is or what it lands against.  I can't really give you a correct answer on that.

Q    Okay.  After you heard the flash-bang -- well, let me ask you this:  So you're -- when the flash-bang goes off, can you recall where the Bronco -- Hamilton Bronco was?

A    Sir, it was up at the house.

Q    It was right up at this area right here?

A    Yes, sir.

Q    Sort of like it is on the model here, right here?

A    Yes, sir.

Q    Could you tell whether it was up to the porch, touching the porch, or close to the porch?

A    I don't know if it was touching.  It was right up to it.  It could have been resting on it.

Q    Did you see Hamilton outside that Bronco?

A    No, sir.

Q    Did you see -- after the flash-bang, did you see Hamilton get out of the Bronco?

A    No, sir.

Q    Did you see Hamilton at all -- well, when was your first vision or recollection that you saw Hamilton after

you got up in this area?

A    In the hospital emergency room.

Q    Okay.  So from the time you left Dwight Mission Road until the hospital, you didn't see Hamilton -- I mean, I know you saw his car maybe, but you didn't really see Hamilton at all; is that right?

A    I did not see him.

Q    Okay.  After the flash-bang went off, did you hear further shots?

A    Yes.

Q    Was there anything different about those shots than the previous shots you heard?

A    They were slower and not as many.

Q    Okay.  And not as many, do you know the numbers?

A    One, two, maybe three.

Q    Could you tell the difference between the shots as far as sounds?  Could you tell whether it was a rifle shot or a pistol shot, for example?

A    At that time, no, sir.

Q    When you were approaching on the county road, did you hear something over the radio, over your radio, or some voice as to somebody being in the yard or a runner or something like that?

A    Yes, sir, I did.

Q    And where were you when you heard that?

A     It was before I got stopped at the gate, I heard that over the radio.

Q     And do you know -- before you got to the gate, do you know where Pettingill was?

A     Somewhere behind me, sir.

Q     Do you know whether he had turned into his designated spot?

A     Before I had stopped, no, I don't think he could have.  He was somewhere behind me prior to me stopping. And then, when I stopped, I wasn't looking or knowing where he was at at the time.  I was focused on the front of the house and the residence.

Q     When you heard over the -- is that what it was said, it was a runner?

A     It was runner or runners, something.

Q     Something like that?

A     Yes, sir.

Q     Were you able to see anything in the yard?

A     No, sir.

Q     It wasn't until you got up in front of those pickups that you saw anybody; is that right?

A     Yes, sir.

Q     And what kind of -- what kind of lighting was out there?

A     In remembering, it was dark that night.  And I know

it was somewhat lit.  You know, a full moon gives you a little light at night.  I remember a light being on in the residence, and I think there was a light on out by the shop or the garage, whatever that is out back.  I don't --

Q    You are talking about the -- this area somewhere in here?

A    Yes, sir.  There was a light there, yes, sir.

Q    Do you have experience firing -- well, what weapons did you have that night?

A    That night on my person was a SIG-Sauer .45 semiautomatic pistol.  I had an H&K 53, .223 machine gun in the floorboard.

Q    Did you -- did you -- what did you take up here to the pickup?

A    Just my sidearm.

Q    Just your pistol?

A    Yes, sir.

Q    And how was that pistol loaded?

A    That pistol, one round chambered, eight rounds and three magazines.  I had eight round magazines, yes, sir.

Q    And you had three magazines, one in the gun and two on you someplace?

A    Yes, sir.

Q    Or were they all taped together somehow?

A    No, they are in magazine pouches.

Page 1306

Q    Okay.  And is that what you refer to as being fully charged?

A    I don't understand.  What do you mean fully charged?

Q    Well, have you heard the term fully charged?

A    No, sir.

Q    With regard to a pistol?

A    No.

Q    When you go on one of these missions, is that the way you load your weapons, one in the chamber and fill the magazines?

A    Well, all troopers and law enforcement, peace officers in the state of Oklahoma have one round chambered and the rest are magazine loaded.

Q    So you always have one in the magazine when you are going on a mission like this; is that right?

A    Do you mean one in the chamber, sir?

Q    I mean -- I'm sorry.  One in the chamber, yes.

A    Yes, sir.

Q    And then in your particular case, you had eight in the magazine?

A    Yes, sir.

Q    Now, what about the HK 53?

A    Magazine inserted.  Weapon was in car ready position.

Q    Okay.  I didn't understand.

A    Weapon was loaded with the magazine, car ready

position.

Q    And how many -- how many magazines?

A    In the weapon was one.

Q    Okay.  And what does that magazine hold?

A    I think my 53, at the time that I had that weapon issued to me was 30 rounds.  Approximately 30 rounds.

Q    And with one in the chamber; is that right?

A    Yes, sir.

Q    And that's the common way to load the HK 53?

A    Yes, sir.

Q    Were you cross-trained or anything on the MP5?

A    Yes, sir.

Q    And what about the MP5, do you know how many is in a magazine on the MP5?

A    I don't recall how many is in the magazine.  Trooper Manion, at the range is a firearms instructor.  He instructed me on how the weapon shot and I got to shoot the weapon, but I didn't carry the weapon.

Q    Okay.  You shot that MP5, though, the one that Manion used?

A    Yes, sir.

Q    When it ejects, how does it eject?  Where do the -- which direction do they go?

A    I don't remember.  I didn't get to shoot it enough to remember which way it ejects.

Q     Did you have a chance to look around that gate area when you pulled up next to the gate?

A     No, sir.

Q     When you -- let me show you Exhibit Number 55, I believe it is.  Yes.  Do you recall that?

A     Yes, sir.

Q     Okay.  That's the gate area, isn't it?  That's the gate you knocked down?

A     Yes, sir.

Q     And there is a sign on it.  Prior to knocking down the gate, did you even look at the sign or pay attention to what that sign said?

A     No, sir.

Q     What is behind that sign?  What is all of this area here?

A     It looks like overgrown weeds and barbed wire fence.

Q     Is all that -- is all of that brush right along the fence, isn't it?

A     Brush, yes.

Q     Were you able to see through that brush?

A     I didn't have time to stop and look.

Q     Okay.

          MR. HILFIGER:  May I have just a moment, Your Honor?

          THE COURT:  You may.

Q    (By Mr. Hilfiger)   Mr. Hise, you have been on the highway patrol a number of years; right?

A    Yes, sir.

Q    And you have stopped a number of people; is that right?

A    Yes, sir.

Q    And do you ever search people?

A    Yes, sir, I do.

Q    And when you search people and you find some kind of contraband on a person, do you just leave it there or do you take it off of them?

A    We seize it.

Q    You seize it.   You take it off the their person, don't you?

A    Yes, sir.

Q    It's not usual to search it and just leave the contraband right with the person, is it?

A    No, sir.

        MR. HILFIGER:   I have no further questions.

        THE COURT:   Redirect?

                    REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Mr. Hise, in this type of operation, do you have occasion to take people into custody?

A    Yes, sir.

Q     And when you take people into custody in this type of operation, is there any type of action taken by the officers to ascertain if they have any weapons on their person?

A     Yes, sir.

Q     What do you do?

A     You take it from them.  You seize it.

Q     I'm sorry?

A     You take it from them and seize it.

Q     I still didn't hear you.

A     You take it from them and seize it.

Q     You are talking weapons; right?

A     Yes, sir.

Q     And my question is:  What do you do to ascertain whether they have weapons on their person or not?

A     Well, you would pat them down.

Q     And if you pat somebody down and feel something in their pocket, are you going to take these -- are you going to keep these people in custody, or do you turn them over to the other officers who come upon the scene?

      When you are doing the tactical operation --

A     Yes, sir.

Q     -- and you secure somebody at the scene, are you the ones who maintain custody of them, or do you turn them over to the officers who are eventually going to handle

search operations?

A     When we're assisting other departments or whatever it is, we render them safe, and then we pass them over to whoever it is for processing.

Q     Okay.  So if, in a pat-down, you feel an item, but it's not a weapon, what do you do when you turn that person over to the local law enforcement officials who are there to serve the warrant?

A     What do I do with it?

Q     What is done with that individual and the information that this person has something in his pocket?

A     I guess they would --

          MR. HILFIGER:  Your Honor, I'm going to object if he is guessing.  The question is what he would do.

Q     (By Mr. Littlefield)  What is the procedure --

          THE COURT:  Objection sustained.  You can rephrase the question.

Q     (By Mr. Littlefield)  What is the procedure if, as you are there, take somebody, just secure somebody, and in the pat-down notice there is something in their pocket that is not a weapon, when you turn that person over to local law enforcement, what do you do in regards to the information that there is something in his pocket?

A     You would advise them.

Q     Who do you advise of that?

A    Well, whichever officer has custody of someone and they pass them to the next officer.  That's good officer safety.

Q    Okay.  Okay.  Explain Defendant's Exhibit 15.  And you identified this item previously on cross-examination. Do you recall that?

A    Yes, sir.

Q    Okay.  I note at the top, it says, "Disciplinary interview, advice of rights."  Were you being the subject of discipline as a result of this circumstance?

A    No, sir.

Q    Why does it say disciplinary interview at the top?

A    I don't know.

Q    Okay.  Was there any -- anyone disciplined in regards to their performance on this interview?

A    No, sir.

Q    When the department asked you about what occurred during this procedure, what was the reason why they were asking?  What was the purpose?

A    To --

        MR. HILFIGER:  Your Honor, I object.  That calls for speculation on his part unless he was informed of the purpose.

        MR. LITTLEFIELD:  I'll withdraw it and --

        THE COURT:  Question withdrawn.

MR. LITTLEFIELD:  -- and ask a question.

Q    (By Mr. Littlefield)  Do you know why you were being interviewed, for what purpose the department was conducting interviews of the officers who were involved in this operation?

A    To make sure that we didn't violate any department policy procedures -- any department policy procedures and/or state or federal laws.

Q    Okay.  Was there any interest in attempting to determine what had happened and what might be done in the future in regards to these type of operations?

A    Yes, sir.

Q    By the way, did you receive any kind of commendations for your conduct on this operation?

A    Not from the Oklahoma Highway Patrol.

Q    Okay.  Let's talk about the lights on the car.  You say -- as you approached -- put up Government's Exhibit 69, please.

As you approached on the road, which was to the south of the residence, what kind of road is that out in front of Barrett's place?

A    It looks like a chat, gravel road of some sort.

Q    And the cars in front of you, what was happening in relation to the visibility because of the cars -- the travel of the cars in front of you?

A     Well, they were stirring up dust and chat.

Q     And you were how far behind Hash's car?

A     Forty, fifty yards.

Q     When he turned on his emergency lights, did you have any difficulty in observing that his emergency light bar was turned on?

A     No, sir.

Q     How brightly did it shine?

A     Very bright.

Q     Okay.  And you transported Rocky in Trooper Greninger's car?

A     Yes, sir.

Q     When you got in Greninger's car, did you notice anything about his emergency lighting?

A     Yes, sir.

Q     What did you notice?

A     They were on.

Q     What type of emergency lighting did he have?

A     The light -- he has a visor light on the passenger's visor, and I remember it reflecting off the inside of the vehicle out the front windshield.

Q     Okay.  In regards to turning on the emergency lights for the entry vehicles, is there any kind of requirement that they be turned on?

A     No.

Q    You were asked about selection of the hour, that Trooper Eales selected the hour to do it because he wanted to get home to his wife and kids.  And you made the statement that hours of a day or night don't matter in this kind of situation.  What did you mean by that?

A    In dealing with people that use, abuse, and/or sell illegal methamphetamines, the drug makes you stay awake and alert, causes paranoia, anxiety.  The people are up all hours of the night, all hours of the day.  They may go days on end without sleep.

Q    If you're running an entry or conducting an entry into a meth user's house, is there any advantage to be gained going at 5:00 o'clock in the morning or 4:00 o'clock in the morning or anytime, as opposed to 12:30 in the morning?

A    No, sir.

Q    You used the term in discussing the plan that you mocked it.  Is that the correct term that you used?

A    Yes.

Q    What do you mean by mocking it?

A    We simulated the scene, the scenario, the mission, and we went through it.

Q    And how did you set up the residence to run through it or practice the operation?

A    I think we used a classroom at Camp Gruber.

Q    Which part of the team did the simulation at Camp Gruber?

A    The entry team.

Q    Okay.  You were asked questions about your SIG .45?

A    Yes, sir.

Q    And you also mentioned you had an H&K 53; is that correct?

A    Yes, sir.

Q    Were both firearms used in this operation by yourself?

A    My weapons?

Q    Yes, sir.

A    No, sir.

Q    Which firearm was used by yourself in this operation?

A    I didn't fire any weapons.

Q    Okay.  Did you -- you drew one and you had one with you?

A    Yeah, it was my sidearm.

Q    Okay.  The SIG-Sauer?

A    Yes, sir.

Q    Okay.  During this operation, where was the H&K 53?

A    In the floorboard of my unit.

Q    Okay.  Never removed it from your vehicle?

A    No, sir.

Q    And you didn't fire any shots?

A    No, sir.

Q    What was done with your sidearm, your SIG-Sauer .45 in regards to -- was it turned over to anybody for any kind of person --

A    Yes, sir, it was seized.

Q    By whom?

A    I believe was internal affairs.

Q    Do you know if it was ever made available to the OSBI?

A    I don't recall.

Q    Okay.  What about your H&K 53?  Did that ever -- was that ever taken by any agency for the purpose of determining if it was fired or testing or anything else?

A    I think it was.  I don't recall.

Q    Okay.  Now, the MP5, you didn't carry one on this operation, did you?

A    No, sir.

Q    The communication in regards to there being a runner, you said it was shortly -- you received or heard that radio communication shortly before you stopped at the gate?

A    Yes, sir.

Q    Did you recognize whose voice it was that advised that there was a runner?

A    No, sir.

Q     Do you recall that -- you were asked questions in regards to your testimony in a proceeding in February of 2004?

A     Yes.

Q     Do you recall that?

A     Yes, sir.

Q     And let me ask you if you were also, at that same proceeding in February of 2004, asked the following questions and if you gave the following answers.  And I'm referring to Page 649 at Lines 23 through 25, and 650 through 1 -- Lines 1 through 5.  "Question:  What did he say?  Answer:  He was yelling dad, dad, dad.  Question: Three times?  Answer:  Yes, three to five times. Question:  Was the gunfire happening at that time? Answer:  Yes.  Question:  Had it already begun?  Answer" --

        MR. HILFIGER:  Your Honor, I object.  I object, this is not for impeachment purposes.

        MR. LITTLEFIELD:  It is a completion of the record from which that was read, the same record which the previous questions were read.

        MR. HILFIGER:  His testimony is not inconsistent with what he is saying today.

        THE COURT:  Let me see counsel.

        (The following proceedings were had at the

bench, out of the hearing of the jury.)

MR. LITTLEFIELD:  I advised the Court which lines I read from and I said Mr. Hilfiger, Lines 5 through --

THE COURT:  So are you doing what we sometimes call the rule of completeness?

MR. LITTLEFIELD:  I am, Your Honor.

THE COURT:  Generally that objection should be made when he is -- when he is questioning.  Now, what's your objection?

MR. HILFIGER:  My objection is is that he's using it for impeachment.

THE COURT:  It's not impeachment because it's -- the only way it stays in if it fits in under the rule of completion, and we haven't even talked about that.

MR. HILFIGER:  Well, it's a statement he has already made, and so I don't see where it's a completion because it's not adding to anything, it's just saying something different than what he -- you know, what his impeachment was.

MR. LITTLEFIELD:  It is not a statement he has already made.  It does complete because it shows the entirety of his testimony.  If one looks at only the segment that Mr. Hilfiger cited, one gets the appearance that his testimony in 2004 was that the yelling happened

before the shots.  And that is certainly not what his testimony was.

MR. HILFIGER:  That wasn't what the impeachment was.  The impeachment was that he had told Gordon previous to 2004 that this occurred --

MR. LITTLEFIELD:  You also -- you also asked, Mr. Hilfiger, did you not testify that he yelled before the shots were fired and read that portion --

MR. HILFIGER:  Believe I said, did you not say under oath, and that was a part of the Gordon affidavit, is under oath.

MR. LITTLEFIELD:  But you read two locations from his testimony.

MR. HILFIGER:  Yes.

MR. LITTLEFIELD:  One of them is the Paul Gordon location.  The other is the location where you read that portion of this passage in regards to --

MR. HILFIGER:  In regards to Paul Gordon's testimony -- I mean, Paul Gordon's affidavit.

MR. LITTLEFIELD:  I think you read -- if I recall --

MR. HILFIGER:  673 and 674.

MR. LITTLEFIELD:  And on 674, there is no reference to Paul Gordon's testimony or his statement to Paul Gordon.

MR. HILFIGER:  But it's a continuation of --

MR. LITTLEFIELD:  Well, you didn't read that consecutively.  You broke off and read one portion of 674 and one portion from 673.  And the portion you read from 674 referenced his yelling prior to the gunshots and made no reference to that being a part of Paul Gordon's statement.  That created a clear implication that his testimony in February of 2004 was that Toby yelled before the gunshots.

MR. HILFIGER:  I believe that he said, though, that his testimony in 2004 was exactly what it is today.  And I --

MR. LITTLEFIELD:  You read that portion of it which it only creates the impression that he testified in 2004 that Toby yelled before the gunshots were fired, and that was his testimony in 2003.

MR. HILFIGER:  I don't believe he said that, though.

MR. LITTLEFIELD:  I think that's the testimony you read to him, though.  And he testified in February 2004 that the gunshots started before the -- before Toby yelled, clearly and distinctly under oath.

MR. HILFIGER:  And that's what he said today.

THE COURT:  That's what he said today, too.

MR. LITTLEFIELD:  But the testimony read creates

the impression that he testified differently from that in 2004.

MR. HILFIGER:  Well, he said he didn't -- you know, that's not what he was saying.

MR. LITTLEFIELD:  Well, I -- then I still want to read the passage for the rule of completion where -- and complete that segment which is on 673, because the next question and the next answer state that that was incorrect, what Paul Gordon said.  And that was not the question read.  On 673 from Line 18:  "Question:  You told Lieutenant Gordon that day that Toby Barrett yelled dad, dad, dad, before the gunfire broke out, isn't that correct?  Answer:  That's what it says."  The next line, which was not read, is, "Question:  So you might be incorrect today when you say the gunfire broke out before he yelled?"  And the answer is no.  And that was not read.

MR. HILFIGER:  No, I agree, that was not read, but that's what his statement was today, too.

MR. LITTLEFIELD:  Well, I certainly should be able to read that for the rule of completeness.

THE COURT:  I don't know.  You have lost me. What are you accomplishing?

MR. LITTLEFIELD:  That even when -- when he was questioned by Mr. Hilfiger on cross, all that was read

was:  "You told Gordon that on that day that Toby Barrett yelled dad, dad, dad before the gunfire broke out, isn't that correct?  Answer:  That's what it says."  That's all that was read.  The next question is:  "So you might be incorrect today when you said gunfire broke out before he yelled?  Answer:  No."

MR. HILFIGER:  But I did not read that I'll admit, but I did ask him were you in correct on that day, and he said no.

MR. LITTLEFIELD:  And he said on that day that that was not incorrect.  I think the jury needs to at least know that much, Judge.

THE COURT:  When you say it's not incorrect, are you saying that he -- that it's your position that he did or he didn't yell before?

MR. LITTLEFIELD:  That he did not yell before the gunfire started.

THE COURT:  And you think what you're reading accomplishes that, that last part you are adding?

MR. LITTLEFIELD:  When he asks so you might be incorrect today that the gunfire broke out before he yelled, and his answer is no.  I'm not -- it doesn't say that I'm not incorrect, but no.  The question is are you incorrect, and he says -- today, and he says no.

MR. HILFIGER:  And that's the question I asked.

THE COURT: And I think ultimately what he said today is, if I said that then, that's not right. My testimony today is right.

MR. LITTLEFIELD: I understand that, but he also said that on that day.

THE COURT: Let me see it.

MR. HILFIGER: I think he also said that today, too, though. He said today that on that day he said that. As a follow-up on that, I know asked him was his memory better then, in February, than it was when he talked to Gordon and -- because he had said that in February of 2004, he said that the dad, dad, dad occurred afterwards.

THE COURT: I'll allow you to make that record.

(The following proceedings were had in open court in the presence and hearing of the jury.)

Q    (By Mr. Littlefield)  Trooper Hise, do you recall that Mr. Hilfiger asked about some testimony from a previous proceedings in regards to what you had spoken to Lieutenant Gordon back in -- the proceeding in February of 2004 and read some questions and answers?  Do you recall him reading those questions and answers on cross-examination?

A    Yes.

Q    Okay.  Let me ask if this was the complete testimony

in that regards.  "Question: You told Lieutenant Gordon on that day that Toby Barrett yelled dad, dad, dad before the gunfire broke out, isn't that correct?  Answer:  That's what it says.  Question:  So might you be incorrect today when you say the gunfire broke out before he yelled?  Answer:  No."

Was that your -- were those questions asked of you and were those your answers in the proceeding in 2004, sir?

A    Yes.

Q    Did Toby yell before or after the gunfire started?

A    After.

Q    How long did it take you to exit your vehicle upon arrival at that gate?

A    Immediately.

Q    And after your immediate exit, how long did it take you to -- or how quickly was it that you moved from there to make entry into the yard?  Did you delay or did you move directly to making entry?

A    As soon as I opened the door, I was at the back of the pickups within 12, 13 seconds.

Q    Did you time any of these activities?  I mean, did you set a stopwatch to see how long it took you to go from one place to the other?

A    No, sir.

Q    Or were you counting shots?

A    No, sir.

Q    When you first entered that yard, where was your focus?

A    Between the residences.

Q    I'm sorry?

A    Between the residences.

Q    And even when you heard shots fired, where was your focus?

A    It shifted to -- immediately to the front to where Toby appeared.

Q    And until Toby was taken into custody and secured, what remained your focus?

A    Eliminate the escape from this residence to the mother's residence.

Q    Okay.  And, again, until -- when was it you were able to shift your focus from Toby and anyone in the side of the yard to other locations?

A    When I looked up and Rick was yelling, "Man down, man down."

Q    Okay.  For the team to perform effectively, how clearly focused does each member have to be on their task and their responsibility?

A    It's of utmost importance that you continue with what your assignment is.  If your assignment fails, the whole

operation may fail.

Q     Okay.  And is that what you were doing out there on that night?

A     Yes, sir.

MR. LITTLEFIELD:  May I have just a second, Judge?

THE COURT:  You may.  Further cross-examination?

MR. LITTLEFIELD:  No, your Honor.

MR. HILFIGER:  Yes.

RECROSS-EXAMINATION

BY MR. HILFIGER:

Q     As I understand your answer to the question -- and maybe I didn't get the question right, but I thought he said was anybody disciplined on the TAC team as a result of this incident, and your answer is no; is that right?

A     That's correct.

Q     And then he further asked was there an interest in reviewing this incident to see if there were any changes that needed to be made to the TAC team or their operation; is that true?

A     Yes.

Q     And were any changes made?

A     No, sir.

Q     No changes at all in the operation of how you carry

it out; is that right?

A    That's correct.

Q    As I understand it, Greninger's -- you first noticed that Greninger's emergency lights were on when you got in that car to take Eales to the hospital; is that right?

A    Yes.

Q    You didn't notice those emergency lights before that; is that right?

A    No, sir.

Q    And -- 69, please.  And Greninger's car was somewhere in this area; is that right?

A    Yes, sir.

Q    And you were in this area right here, somewhere in this area; right?

A    Yes, sir.

Q    And until you got in that car, you never saw Greninger's emergency lights?

A    No, sir.

Q    Was there anything blocking your view from seeing Greninger's emergency lights?

A    I wasn't looking for them.

Q    You weren't focused on them, were you?  Isn't that true?

A    That's correct.

Q    You were focused on something else; isn't that right?

A     You've got that right.

Q     And when you're focused on something else, all of these lights, red and blue flashing may not make -- give you any recognition; isn't that true?

A     When you're trying to keep your partner alive, emergency lights don't make any difference.

Q     Okay.  So when your focus is on something else, you may not be seeing those emergency lights; isn't that true?

A     Yes.

Q     And you're not the only one that had a focus out there, are you?

          MR. LITTLEFIELD:  Objection.  Calls for speculation.

          THE COURT:  Sustained.

Q     (By Mr. Hilfiger)  When you gave the statement to Gordon that said Toby Barrett yelled dad, dad, dad before the gunfire was shooting?

          MR. LITTLEFIELD:  Objection.  Assumes facts not in evidence, and it's also beyond the scope.  I never referenced Gordon.  I only referenced his testimony from 2004.

          THE COURT:  Argument?

          MR. HILFIGER:  He admitted to giving the statement.  He just said he didn't -- he didn't agree with it.

THE COURT:   Rephrase the question.

Q    (By Mr. Hilfiger)   Did you give a statement to Lieutenant Gordon?

A    Yes, sir.

Q    And in that statement, you -- part of that statement was read to you from your previous testimony under oath; isn't that right?

A    Yes, sir.

Q    And do you recall that that statement was made by Lieutenant Gordon in Lieutenant Gordon's -- in the statement made to Lieutenant Gordon?

A    Not until today.

Q    Okay.  You didn't hear that in February of 2004?

A    I guess I did.  I don't recall it.

Q    You can't recall it, though?

A    That's right.

MR. HILFIGER:  I'm going to withdraw that.

Q    (By Mr. Hilfiger)  You told Mr. Littlefield that, as far as you were concerned, there was no advantage to going at 4:00 a.m. or 5:00 a.m. when you're dealing with trying to execute a warrant on somebody that you think is doing drugs; is that right?

A    I don't think he asked the question that way.

Q    Okay.

A    You used the word think.  I don't think -- I don't

think that's the way he asked me the question.

Q    The question was something along the line of was there an advantage -- was there any advantage to going at a particular time at night when you are dealing with a warrant on somebody that is -- that is involved in drugs?

MR. LITTLEFIELD:  Objection.  I didn't say drugs.  I specified the drug.

THE COURT:  You did what?

MR. LITTLEFIELD:  I specified the particular drug.

MR. HILFIGER:  I can't hear what --

MR. LITTLEFIELD:  I specified a particular drug.

MR. HILFIGER:  Okay.

THE COURT:  Question withdrawn.  You may rephrase the question.  Disregard the first question.

Q    (By Mr. Hilfiger)  Was there any advantage at going at any particular time on a person that you are dealing with that you understand is involved in methamphetamine?

A    No, sir.

Q    And specifically I think the times were given like 4:00 a.m., 5:00 a.m., or 12:30 a.m.?

A    Yes, sir.

Q    What about 5:00 p.m., 6:00 p.m., 7:00 p.m., is there any advantage or disadvantage?

A    No, sir.

Q    This warrant could have been executed at any time, couldn't it?

A    Yes, sir.

Q    And you chose it -- for no tactical purpose, you chose it at 12:30 a.m.; isn't that true?

A    Yes, sir.

MR. HILFIGER:  I have no further questions.

THE COURT:  Any further direct?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Fine with the government.

THE COURT:  Defendant, any objection?

MR. HILFIGER:  I believe he is under subpoena, but he may be excused.

THE COURT:  He says he's not.

THE WITNESS:  Only from the prosecution.  I have never received a subpoena from the defense counsel, Your Honor.

THE COURT:  Okay.  Well, let me say this: Officer, you may step down.  You may be excused today, but you should stay within -- you are subject to recall at the Court's direction.

THE WITNESS:  Thank you, Your Honor.  Thank you.

THE COURT:  You may step down.  You may call

your next witness.

MR. LITTLEFIELD:  Robert Darst.

THE COURT:  If you will stand before the clerk and be sworn, please, sir.

(The witness was duly sworn by the clerk.)

THE WITNESS:  I do.

ROBERT DARST,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record, please, sir.

A    Robert Darst.

Q    Mr. Darst, how are you employed?

A    With Oklahoma Highway Patrol.

Q    Okay.  And what is your responsibility with the Oklahoma Highway Patrol, sir?

A    I'm assigned to Choctaw County, Hugo detachment.

Q    What area -- what do you do?  What's your job?

A    I'm regular patrol unit.

Q    Okay.  And how long have you been employed by the highway patrol, sir?

A    For approximately ten and a half years.

Q    Okay.  Did you, during any point in time, also accept the responsibility of being a member of the Eastern

Oklahoma tactical team for the Oklahoma Highway Patrol?

A    Yes, I did.

Q    And when was that period, sir?

A    I believe it be began -- I became a member of the team in September of 1998.

Q    Okay.  And are you still a member of the TAC team?

A    No, sir.

Q    And how long a period did you remain a member of the Eastern Oklahoma tactical team?

A    Approximately four and a half years.

Q    Okay.  Do you recall -- you know what we're here about?

A    Yes.

Q    Do you recall when you first learned that there was going to be an operation in Sequoyah County, or about this operation?

A    My first notification was, I believe, on September 22nd of 1999.

Q    Okay.  And what was the nature of that communication?

A    I received a page on my pager.

Q    And as a consequence of that, did you call somebody or receive a call or what?

A    I was just advised by message flash on the pager that I was to arrive at Camp Gruber the next day, on the 23rd.

Q    Okay.  And you were familiar with Camp Gruber?

A    Yes.

Q    Had you all used that as a staging area before?

A    I'm not sure if I had been involved in anything where they used it for a staging, but I had been there on training operations.

Q    Okay.  When did you arrive at Camp Gruber on the 23rd of September, sir?

A    Approximately 10:00 or 10:30 in the morning.

Q    About what time was it that the entirety of the team assembled?

A    I'm not sure when all members were assembled, but most of the members were there by about noon.

Q    Okay.  And after the members got there, what was presented to you all in the nature of this operation?

A    That there was a search warrant for a residence in Sequoyah County.

Q    Okay.

A    And also that there were arrest warrants for a subject that -- whose residence it was.

Q    Okay.

A    And we were requested to serve those warrants.

Q    Okay.  And what information did you all receive that would assist you in formulating a plan for the service of the search warrant and the arrest warrant?

A    There were -- of course, there were warrants that

we --

Q     Okay.

A     -- that described the property and direction to the property.  Also, there were aerial photographs, aerial videotapes.  And there was a mock-up -- I don't believe it was to scale -- of the building at the residence.

Q     Okay.  Now, which portion of the team would be particularly interested in the mock-up of the residence itself?

A     We would all have a certain amount of interest in it, but particularly interested would be the entry units.

Q     Okay.  And what was your assignment to be in regards to this operation, sir?

A     Ultimately, I was a member of what was called a chase team or an outside security team.

Q     Okay.  Was a plan formulated based upon the information that had been received there at Camp Gruber?

A     Yes.

Q     And how was the plan formulated?

A     By input from the officers that had done the investigation and had sought the warrants and received the warrants.  Also, we took all of that information, and our team members and staff formulated a plan.

Q     Okay.  Anybody -- when you all formulated the plan, is it basically a free exchange of ideas, or is it one

person directing how the plan is going to be?

A    No, it was a free exchange of ideas.  Everyone had input.

Q    Do you recall originally where the entry team was going to go into this location, how they were going to make entry?

A    Originally, it was through the front gate of the residence, the driveway of the residence, as I recall.

Q    Do you recall anything about a creek team in the original plan?

A    Yes, there was a plan for a -- for an observation team.

Q    Okay.  Did something result in or cause the original plan to be changed, and, if so, what?

A    Late in the afternoon of the 23rd, some members of our team drove by the residence in a white Bronco or in a vehicle and observed that the chain -- the gate was locked with a heavy chain.

Q    Uh-huh.

A    And that, also, the proximity of some of the residences that were believed to be family members of the person that we had warrants for, the person that owned the residence or lived in the residence, the proximity of those residences of family members was extremely close. And it wasn't really known and you couldn't -- it didn't

appear that close on the aerial photographs that we had. And also the topography of the area didn't lend itself to a safe approach because of the possibility of being spotted by people or a lot of dogs in the area, things like that.

Q    How did that change the plan, sir?  The information that was reported back by the team that did the drive-by observation, how did that change the plan?

A    That made it -- it made it where it was almost impossible to feel comfortable deploying a creek team or an observation team --

Q    Okay.

A    -- because of their security.

Q    What about the entry?

A    Also, it changed the way that we had to make entry into the property because stopping to -- the team members, all of them to go over the gate, or to get out and cut the chain or something like that would take too long and put the team in a perilous situation.

Q    Okay.  And so entry was going to be made from where as opposed to the front gate or the front driveway?

A    There was a driveway into a residence.  I don't know exact distance, but it was a short distance east of the original intended entry driveway, and it looked as though, from the aerial photographs and the intel that we had,

that people had been coming off of that driveway entering into this residence through a low area.

Q    I would ask that Government's Exhibit 69 be shown. Do you recognize what is Government's Exhibit Number 69?

A    Yes, I believe that's an aerial photograph of the residence in question.

Q    Okay.  And do you see the driveway area to the east?

A    Yes, I do.

Q    And where is it on the photo?

A    I can't really see where -- clearly where it comes off and connects to the county road there, but it's right at the very top edge of the photo.

Q    Okay.  And the county road is where in that photo?

A    It's diagonally across the right -- top right-hand corner.

Q    Originally, who was going to be on the creek team?

A    As I recall, it would have been Trooper Poe and Trooper Manion.

Q    When it was determined that a creek team would not be inserted, what did Trooper Manion's responsibility become?

A    He became one of the members of the entry team.

Q    Was entry practiced by the team members?

A    Yes, sir.

Q    And how did they do that?

A    One of the classrooms there at Gruber that we were

using for a briefing area was transformed into essentially trying to show the size of -- and the shape of the rooms of the residence, at least on the bottom floor of that residence.   And the doorway into that classroom was used to represent the front door of the residence.

Q    Okay.  So they went in and practiced the entry and where they would go?

A    Yes.

Q    What vehicle were you to be in, sir?

A    At the time of the warrant service, I was assigned in the fourth vehicle in the approach, which would have been Trooper Hise's vehicle.

Q    And where was -- and how many vehicles were making the entry?

A    As I recall, there were five making --

Q    Actual entry onto Barrett's property itself?

A    There would have been three actually going onto the property.  I'm sorry.

Q    And do you recall what type of vehicle the first two were, of the entry team?

A    As I recall, the first two were white Ford Broncos.

Q    The third vehicle was what?

A    It was a black and white Ford Crown Victoria.

Q    And why was a black and white Ford Crown Victoria selected to be one of the vehicles going into the

property?

A    That particular Crown Victoria had a light bar on top of it, and it was marked police unit.

Q    Okay.  And the fact that it had a light bar, what significance was that?  What was going to happen with that light bar?

A    They would be activated, the lights would be activated.

Q    Where?

A    My understanding was that as it turned off of the county road.

Q    Okay.  So that would have been the vehicle immediately preceding yours?

A    Yes, sir.

Q    How far in front of -- as you all approached down that county road, where did Hise's vehicle go to?

A    It stopped in front of the gate that would be the entrance onto the property in question here.

Q    Okay.  Do you see the location in that photograph?

A    Yes.

Q    Can you -- if you look to your left, that screen, if you just tap it at that spot.

A    (Witness complied.)

Q    Okay.  As you pulled up there, how far was Trooper Hash's vehicle in front of yours?  As you are approaching

this point here in Hash's vehicle and coming to a stop, where is Trooper Hash's vehicle?

A    I'm not exactly positively sure because it was dark.

Q    I understand.

A    It was on down the road.  But I do remember Trooper Hise had slowed down a bit to make a little bit of distance between our vehicle and Trooper Hash's vehicle.

Q    Did you see Trooper Hash make the corner turn -- and I think at the very top, you can just see the edge of the -- the underbrush where the road curves back.  Did you see him make the turn into the driveway?

A    Yes, I believe I did.

Q    Okay.  Do you recall at what point his overhead light bar was activated, if, in fact, it was?

A    I don't recall seeing it activated.  The last I remember seeing the vehicle, it was still on the county road, but it was right at the point of making that turn.

Q    Okay.  At any point in the entry, did you observe that the lights on Trooper Hash's had been activated?

A    I believe I saw them late during the entry.

Q    Okay.

A    But I did see some lights that were activated, yes, sir.

Q    When you say some lights that were activated, what vehicles were supposed to activate their lights, as you

understood the plan?

A    My understanding was that the three entry vehicles would activate their lights.

Q    Did you know if Buddy Hamilton -- do you recall if Buddy Hamilton's lights were activated?

A    I remember seeing some headlight wig-wags, what we call wig-wags.  I suppose it's some type of breaker or some type of lighting system that's put on to the headlight system of the unit, and it causes them to flash on and on.

Q    Do you recall if that would have been Hamilton's or Greninger's, or which one?

A    I can't say specifically, sir.

Q    But you recall that one of those two had their wig-wag headlights working?

A    Yes, sir.  Yes.

Q    Do you recall whether Hash's light bar was on during the operation?

A    Late during the operation, I can recall that it was on, yes, sir.

Q    How bright is his overhead light, that overhead -- that light bar across the top?  How visible are the lights coming off of it?

A    It's very visible.

Q    When you all approached that gate on 69, do you

recall if Trooper Hise's headlights were on or not?

A    He had turned his off.

Q    Okay.   And how far back from where you all stopped at the gate was it that he turned his headlights off?

A    I can't be positive about that.   I know it was sometime prior to arriving at the point there at the gate.

Q    For what reason were your lights going to be off at that location?

A    Because we were assigned as a chase team, which put us out on the ground on foot onto the property, and we didn't really want attention drawn to us as that vehicle wasn't making entry, but we wanted to be on the property.

Q    And that -- and the chase team, or the security for the west side was going to be which troopers?

A    Trooper Hise and myself.

Q    Okay.   A third person was in your vehicle, wasn't he?

A    Yes, sir.

Q    Who was that?

A    It was Trooper Bill Poe.

Q    Now, he had been a part of the team that the -- the creek team?

A    He was originally assigned as an -- as an observation unit, yes, sir.

Q    What responsibility would he have had if he had been a part of the creek team?

A      One of them would have been -- one of his responsibilities would have been a sniper.

Q      And what was his responsibility that night as he rode up there with you and Trooper Hise?

A      He was -- as I recall, he was assigned the security on the front of the residence.

Q      And when you arrived, what was Trooper Poe supposed to have done when you came to that -- that point to stop?

A      After -- he and I had somewhat tried to choreograph the way we would exit the vehicle.  And after I exited the vehicle and went past the back door, because he was on the passenger side of Trooper Hise's vehicle.

Q      You were in the front and he was in the back?

A      Yes, sir.  I was going to go over the gate, as was Trooper Hise, and then Trooper Poe, he would take up a position at the gate post on the east side of that gate of that driveway.

Q      Okay.  And when you got there -- how was your arrival to have been timed with the entry from the entry team off that driveway?

A      As I recall, we wanted to be exiting the vehicle as the team was turning into that driveway.

Q      Okay.  So as they are coming on, you are going to be climbing on to the property, or climbing out of your vehicle?  Which one?  I'm sorry.

A    As they were turning off of the county road, we wanted to be exiting our vehicle.

Q    Okay.  Which would have put you on -- where at the time they're actually entering the property from that driveway?

A    Well, place me somewhere between the gate and the residence more or less.

Q    Do you recall as you approached, or at any time during this operation, the early -- very early portions of this operation as you arrived at the scene, receiving any communication about people being outside of the residence?

A    No, sir, I don't recall that.

Q    When you got there and climbed over the gate, where did you go?

A    I ran straight -- the direction would be north, but I ran straight away from the county road up that driveway.

Q    Okay.  Now, the driveway, there is some -- three vehicles there on the east side of that driveway.  Do you see them kind of in a triangular area there in the center of the photograph?  And then there is a number of vehicles parked on the western edge of that driveway.  Which portion of the driveway did you head north on?

A    I was near the east edge of that driveway.

Q    Over closer to the three vehicles?

A    Yes, sir.

Q   Okay.   And where was it that Trooper Hise went?

A   I'm not sure.

Q   Okay.   Who was in the lead; yourself or Trooper Hise?

A   At the time I thought I was, but I later learned that I don't believe I was.

Q   Okay.   But you didn't see Trooper Hise?

A   No, sir, I did not.

Q   What were you looking for?

A   I was looking for any type of threat or any -- any type of instance that I needed to be addressing.

Q   Okay.   Why were runners placed -- or security placed -- I'm sorry -- you all moving on foot on the west side of the house?

A   Part of our intel was that the subject that we had arrest warrants for, his mother lived in that residence, that trailer house that you can see in the bottom corner of the photograph there, and that there was concern that he would try to run from his residence to her residence.

Q   Okay.   So you were going to cut it off?

A   Yes.

Q   As you moved north along the driveway, what did you see or hear?   What is the first thing you recall happening?

A   I was running north -- I had gotten approximately 25, 30 feet inside the gate, and I saw a white male subject

standing almost directly north of me straight away from me, the direction I was running.

Q     Where were you -- and would you tap again -- approximately your location when you saw the white male subject standing?

A     (Witness complied.)

Q     And where was the white male subject standing when you observed him?

A     (Witness indicated.)

Q     What direction was the white male subject going?

A     He was -- he was facing east looking back to the east at the direction the units were coming in from there.

Q     Okay.  Was he standing still or moving or what?

A     He was moving to the west while facing east.  It was like he was walking backwards --

Q     Okay.

A     -- looking back to the east.

Q     And did he continue to move in that direction, backing up toward the west?

A     Yes, sir.

Q     And what were you doing?

A     At the time that I saw him, I drew my sidearm and pointed it at him and commanded him to get on the ground. And I believe it was actually, "Police, get on the ground" was what I said to him.

Q    Okay.  Did you continue your approach and get closer, cut the distance?

A    No, sir.  I stopped and dropped to what's called a high kneeling position.

Q    Did you see Trooper Hise at any point in time in this particular -- in relation to your observation of the person backing up from the east to west?

A    No, sir.

Q    Who happened then?

A    I believe I called out to him two times, "Police, get on the ground.  Police, get on the ground," but he didn't act like he heard me.

Q    Okay.  What happened then?  Did you find out who that person was?

A    Eventually, yes, sir.

Q    Who was it?

A    It was Toby Barrett.

Q    Okay.  And was Toby Barrett armed?  Could you see that?

A    At that time, no, he was not armed, not that I could see.

Q    Okay.  And, in fact, did you ascertain whether he was armed or not?

A    When he was taken into custody, no, he was not armed.

Q    Could you see the residence?

A    I suppose I could.  I wasn't looking at it, so I couldn't say that, yes, I could see it.

Q    What was the subject of your focus?

A    I was looking down the sights of my pistol at the subject that was standing in the yard.

Q    What happened then?

A    As I was giving the commands to get on the ground, gunfire erupted to my right.

Q    When the gunfire erupted to your right, what did you do?

A    I turned -- I was still in the high kneeling position.  I turned to my right toward the residence.

Q    What did you see?

A    I could see the residence and, as I was looking at it, I saw a white Bronco coming into my vision from the right.

Q    Okay.  Did you notice anything about the white Bronco as it came into your vision?

A    There was glass coming off the front of it.

Q    Could you tell if it was being hit by anything? Could you tell if it was taking fire?

A    I believed it was, yes, sir.

Q    What -- approximately where was the white Bronco when -- did you look directly at it or was it just something you caught out of your peripheral vision?

A    It came into my vision from the right.

Q    Okay.  So it was just kind of -- where were you looking?  Where were you focused when it came into your vision?

A    I was focusing on the residence, the front of that residence.

Q    What were you seeing at the residence, if anything?

A    I couldn't see anyone outside, other than -- well, I wasn't even looking at what I later knew was Toby Barrett.  But I didn't see anyone else outside.

Q    Okay.  And where was the Bronco that was receiving fire?

A    When I initially saw it?

Q    Yes, sir.

A    Would you like for me to show that on --

Q    Can you point to the approximate area?  Yeah.

A    It may have been fairly near to where it's sitting -- where that white Bronco is sitting there.

Q    Okay.

A    But it may have actually been a little bit behind that.

Q    Okay.  So it would have been about that location, might have been a little farther back?

A    Yes, sir.

Q    And could you discern -- you said it was moving into

your eyesight.  Could you determine the path it was moving or where it was moving to?

A     It was not coming toward me, but it appeared to be kind of curving toward the residence.

Q     Okay.  Would it be in about the position that is there and moving in towards the residence?

A     I don't know that it was exactly that position, but it would have been close, yes, sir.

Q     Okay.  Okay.  And did you see where it ended up in relation to the residence?

A     I don't know how close it got, but it got very close.  It may have possibly have bumped the front porch.

Q     Okay.  Do you see Government's Exhibit 1, which is the model out in front of the clerk's table there, or the clerk's area?

A     Yes, sir.

Q     And do you see the Bronco that is in front of the residence immediately to the left or west of the steps?

A     Yes, I do.

Q     Where in relation to where that Bronco is there on the model was it that the Bronco that was receiving fire ended up?

A     That could be close to it.  I thought it actually got closer than that.

Q     Closer to the house?

A    Closer to that front porch, yes, sir.

          MR. LITTLEFIELD:  Judge, I would ask that he be allowed to go around and place it where he believes it ended up.

          THE COURT:  You may.  If you will take this mike, officer.  The clerk will hand it to you when you get down there.

A    (Witness indicated.)

Q    (By Mr. Littlefield)  Okay.  And at that point, was there still gunfire?

A    Yes, sir.

Q    Did you notice any of the other vehicles?

A    At that point in time?

Q    Yes, sir.

A    No, I was busy relocating -- approximately that time when is I relocated myself.

Q    Okay.  Go ahead and -- at this point go ahead and return back up.  When you say you relocated yourself, what do you mean, sir?

A    My actual assignment was with Trooper Hise, and we had a predetermined location that we wanted to meet at.

Q    Where was the -- and do you see to your right there on the bar in front of you, do you see the pointer?

A    Yes.

Q    I think that there is going to be some movement, so

rather than put a whole bunch of lines up there, can you take that and direct it toward the screen and show the jury where you went to?

A    Right in here is an older model -- and I believe it was a Chevrolet or a GMC pickup, and we predetermined that we were to meet on the driver's side of that vehicle.

Q    Okay.  Now, where was Toby at this point?  He had been the subject of your focus and you had said get down, get down, and then you saw -- you heard the shooting and the vehicle moved in.  Was Toby still in that area, was Toby moving, where was he?

A    I didn't see him at the time that I was relocating from my position out in the driveway until I started down the driver's side of that blue Chevrolet pickup.

Q    And where did you see Toby when you were moving down the driver's side of that blue Chevrolet pickup?

A    As I came down the driver's side of the pickup and came past the front fender, I saw Trooper Hise on -- had a subject face down in this area right about there.

Q    Okay.  So back a little further west from the point where you had originally seen him?

A    Yes, sir.

Q    And when you saw Trooper Hise on the ground with Toby -- and who was face down?

A    It was Toby Barrett.

Q     Okay.   What was Trooper Hise doing with Toby Barrett?

A     He was securing him with handcuffs.

Q     What did you do when you observed Trooper Hise and Toby Barrett out there in front of those two pickups?

A     I moved -- I moved on past them toward the residence, and then again took a kneeling position and pointed my pistol at the residence to cover them while Trooper Hise took him into custody.

Q     And where did Trooper Hise take Toby?  Did he leave him right there in front of the pickups or what?

A     No, sir.

Q     Where did he take him?

A     Somehow or another he communicated to me that he had him secured.  I'm not exactly sure what words he used.

Q     Okay.

A     As he did that, then I stood up and moved back toward them, and I can't recall if I -- if I grab him by the foot and Trooper Hise grabbed him by the foot and we drug him back, or if it was just Trooper Hise, but we moved back to the cover of the old Chevrolet pickup.

Q     Okay.  So did you take cover behind the Chevy pickup?

A     Yes.

Q     Was Toby placed in a covered position behind the Chevy pickup?

A     He was pulled back to that location, yes, sir, right

in front of it.

Q    Was the gunfire still going on?

A    Yes, sir.

Q    At any point -- well, when you -- where were you standing when you first heard the shots being fired?  Is it that location at the arrow, or were you closer?

A    It was that location of the arrow there.

Q    Toby is over here at that dot, or about that area?

A    Yes, sir.

Q    And he is looking east backing west.  And you see him before or after the shooting -- when you see him, have the shots been fired yet?

A    No, sir.

Q    At any point did Toby say anything?

A    After we had gotten him back to the covered position, and I don't recall whether it was myself or Trooper Hise asked him who all was in the residence, how many people were in the residence.

Q    Okay.

A    And he said, "Just my dad."

Q    Okay.  At any point, did Toby holler or yell anything?

A    As I recall, when I was in the kneeling position between Trooper Hise and the residence, I recall him yelling daddy or dad, something like that.

Q    Was that before or after Trooper Hise had taken Toby Barrett into custody that you recall him yelling daddy or dad?

A    It was when Trooper Hise was actually placing the handcuffs on him or had him down in that position.

Q    Okay.  And at the time that you heard Toby holler dad or daddy, had the gunfire started yet?

A    Yes.

Q    After you got Toby back in the covered position, was the gunfire still going?

A    Yes, for a time, it was.

Q    Was there something that caused it to cease for a period?

A    There was -- at one point there was a flash-bang that was -- that was used by one of our team members.

Q    Okay.  Did you know where that flash-bang went off, about where in the yard it was -- where it went off?

A    It went off somewhere in the yard, that's all I can tell you.  It was --

Q    Okay.  At the point it in time it went off, where were you?

A    I was in -- on the driver's side of that Chevrolet pickup, looking over the hood of it.

Q    Okay.  When the flash-bang went off, did you see any activity around Buddy's and Rocky's Bronco?

A    Yes, sir.

Q    And could you tell the jury what you saw in and around that Bronco?

A    I saw one of the team members kind of going down to his knees near the passenger rear bumper.

Q    Did you later learn who that was?

A    Yes.

Q    Who?

A    It was Rocky.

Q    Okay.  After you observed Rocky go down to his knees near the rear passenger, what did you see as far as activity at the Bronco?

A    I just saw guys moving back and forth.

Q    Okay.  What were you doing during this operation at this point in time?

A    Like I say, we were -- I was watching the west side of the residence and trying to watch what would be the northwest corner of it for anyone trying to flee the residence, and also looking for any -- any of the gunfire or anybody who was in the front of the residence.

Q    Okay.  Did you ever, at any point in time, ascertain where the gunfire was coming from?

A    I never saw exactly where it was coming from, no, sir.

Q    Okay.  Could you tell where it was coming from?

A    I believed it was coming from inside the residence.

Q    And where -- and at the point in time where you believe that the fire was coming from inside the residence, where was Buddy's and Rocky's Bronco located?

A    Approximately where I've got it located at this point.

Q    Did the firing continue into that Bronco after it came to the stop there at the point where you have placed it?

A    I saw some glass coming off the front of the unit, yes, sir.

Q    Even when it was stopped in front?

A    Yes.  I believe so, yes, sir.

Q    Did you stay with Toby the entire time?

A    After he was taken into custody, yes, sir.

Q    Okay.  After you and Trooper Hise moved him around to the driver's side of that blue pickup, did Trooper Hise remain there?

A    No, not the entire time.

Q    Where did he go?

A    He had a hand-held radio on his person, and we heard a -- one of our members call over the radio that we had a man down and they need to get a vehicle in there to get him out.  So Trooper Hise went to get his vehicle and to drive it through the gate to get in there to get --

Q   Did he crash the gate?

A   Yes.

Q   Okay.  And do you know where Trooper Hise went after he crashed the gate?  I mean, after he crashed the gate and parked his vehicle, do you know what his activities were out in the yard?

A   At some point he assisted in loading Rocky and driving him to the hospital.

Q   Okay.  Do you know where Trooper Hise drove his vehicle to after he crashed the gate, sir?

A   Yes.

Q   Can you see it in that photo?

A   Yes, sir.

Q   Can you tap where it is?

A   (Witness indicated.)

Q   Okay.  As you're over here on the west side of the house, you said something a while ago about later seeing the illumination off of Trooper Hash's headlights -- or the overhead light bar.  What were you seeing in regards to the illumination from Hash's overhead light bar?

A   At what time?

Q   When did you first notice it?

A   I first noticed them while I was pointing my weapon at Toby Barrett.

Q   While you were back here at this arrow?

A    Yes.

Q    And how visible were they as you're pointing your weapon at Toby Barrett?

A    I could see the -- he was facing to the east and I was facing north, and I could see the whole right side of his body, and it was flashing red and blue and white lights on it.

Q    And at that point in time, had the gunshots started?

A    No, sir.

Q    Okay.  What happened in regards to his overhead light bar when the gunshots are going off?  What is Trooper Hash's light bar doing at that point as far as shining in that front yard?

A    I could see it across the front of the house.  I was looking almost right across the front of the house at it.

Q    When Trooper Hamilton's vehicle is coming in and you see it and it pulls up in front of the house, the glass is flying off, what impact or effect does the lighting have on the glass that you see flying off?

A    It sparkles in the light and it's -- and you can see it flash.  And I don't know if that were Trooper Hamilton's lights or if it was Trooper Greninger's wig-wag lights that was causing it to do that.

Q    But it was visible when it was in front of the house?

A    It was coming off the front of Trooper Hamilton's

unit, yes, sir.

Q    Okay.  Did you learn -- did you see where Trooper Hash's vehicle ended up that night?

A    Yes.

Q    Can you see it in the photograph?

A    Yes, sir.

Q    And tap it where it was.

A    (Witness indicated.)

Q    And at any point in time, did that overhead light bar turn off?

A    Not until after -- I had already walked Toby out to the gate.

Q    You took Toby to the gate.  What did you do with him there?

A    I turned him over to some of the officers that were coming to do the search.

Q    Okay.  You all weren't going to do the search?

A    No, sir.

Q    Had Trooper Eales gone off at that point?  Had he been transported?

A    Yes, sir, he had been removed from the scene.

Q    And he was transported in what?

A    As I understand, it was Trooper Greninger's Bronco.

Q    Okay.  After you turned Toby over to the local officials, what more did you have involved in this

operation, sir?

A     Just to secure the scene.

Q     Well, how -- what were you doing in that regard?

A     We put up some crime scene tape and -- and just stayed there until we were relieved by other units.

Q     Okay.  And you see some of the crime scene tape up there.  Is that some of the tape that you all put up that night?

A     Yes, sir.

Q     Essentially, did you have anything to do with clearing the house?

A     No, I didn't.

Q     Making sure it was secure?

A     No, sir.

Q     You didn't do anything with the search?

A     No.

Q     So you turn Toby over and the place had been secured, what more did you have to do at this point with this scene, other than hurry up and wait?

A     That's about it.

          MR. LITTLEFIELD:  May I have just a second, Your Honor?

          THE COURT:  You may.

          MR. LITTLEFIELD:  Pass the witness.

          THE COURT:  You may cross-examine.

CROSS-EXAMINATION

BY MR. HILFIGER:

Q     Mr. Darst, you're no longer on the TAC team?

A     No, sir, I'm not.

Q     You left in what, 2003 or so?

A     It would be January of 2003, yes.

Q     Who on this team that came in there that night is still on the TAC team, do you know?

A     I'm not aware of any of them being on the tactical team.

Q     All of them are off the TAC team now?

A     Yes, sir.

Q     When you did this mock-up out at camp Gruber and you -- were you part of the entry practicing, or did --

A     Originally, yes, sir.

Q     And you practiced entry.  Did you do any kind of vehicle entry practice or not worry about that?  You know, driving your cars up to some spot and get out?  Did you do any kind of entry practice there?

A     I didn't do any of the vehicle exit practicing at that date, no, sir.

Q     Did you see anybody else do any?

A     No, I'm not aware of any that was done.

Q     When you were coming in in -- riding in Hise's car, you saw Mr. Hash turn from the county road onto the -- you

saw that turn being made from Mr. Hash from the county road onto the private drive?

A    As I recall, he was still on the county road but beginning to negotiate that turn, yes, sir.

Q    And at that time, did you see the lights -- Hash's lights being activated, or can you recall that?

A    I don't recall seeing them being activated at that time, no, sir, but --

Q    Now, according to the plan, my understanding was that all three were activate -- all three entry cars were to activate their lights on entering the property.  What was your understanding of what that means?

A    That as you entered the property, you were to activate your lights.

Q    Okay.  Could we look at Number 69, please?  Okay. There is a laser there where you can point.  Under your -- you saw the aerial photos -- and this isn't one of the aerial photos that you looked at before you went.  But you saw the aerial photos and were part of the discussion as to how this entry is going to be made; right?

A    Yes.

Q    During this discussion and according to what you said is all three were to activate on entering property.  Where was your understanding that the activation of lights would be then?

A    I'm not sure if it was entering the property or if it was turning off the county road at this location.

Q    But your testimony was that your understanding is all three were to activate upon entering the property; isn't that right?  Isn't that what you told Mr. Littlefield?

A    I'm not sure if it was when they entered this property off of that driveway, or if it was off of the county road onto that driveway.

Q    Okay.  So what you are basically saying, you don't know whether that meant turning on here or what, or turning on here?

A    My understanding was that it was as they turned off the county road.

Q    Okay.  That's what your understanding?

A    That was my understanding.

Q    So according to your understanding then, when Mr. Hamilton, who has the lead vehicle, when Mr. Hamilton, when he comes off here and turns right here, he is supposed to turn his lights on?  Is that what your understanding was?

A    That was -- I think that is what the agreement was, but I don't know.  I wasn't driving --

Q    Well, I understand.  I'm just trying to find out what you understood was supposed to be done with the lights.

A    My understanding was that, at some point, as they

approached the property, there were to turn on their emergency lights.

Q    Okay.  And that's what I'm trying to find out, what that means.

A    Okay.

Q    Okay.  So are you -- that's what I'm trying to see. Was it here that Hamilton is supposed to turn on his lights, or is it here that Hamilton is supposed to turn on his lights?  Where is it that you understood?

A    I'm not sure what they had determined.  My understanding was at some point, as they approached the property, they were to turn on their overhead lights, their emergency lights.

Q    And that's what I'm referring to, their emergency lights.

A    Okay.

Q    Which includes wig-wags; right?

A    Yes.

Q    Was that something that -- when that discussion came about, were you part of that discussion?  That is, okay, here is where we're going to turn on the lights?  Or did they just say, as we're approaching the property someplace, we're going to turn on the lights?

A    I don't recall if I was a part of that particular discussion as to whether it would be as they turned off

the county road or as they went through that low spot or as they exited that driveway.  I don't know that I was a part of that discussion.

Q    Okay.  Do you know, did they have a separate -- I mean, did part of the team go over to a separate spot and start talking about how they were going to do their lights, or are you even aware of any of that?

A    I'm not aware if they did that or not.

Q    So at what point did you see Hamilton's emergency lights on?

A    At some point as he came into my view from the right, while I was looking at the residence.  And I don't know that it was Hamilton's emergency lights.  It might have been Trooper Greninger's emergency lights.

Q    Can you tell us for sure whether you saw Hamilton's emergency lights at any time that night?

A    I believe I saw them flashing on the front of the house.

Q    Hamilton's?

A    I believe his were the ones that were pointed at the front of the house at that time.

Q    Are you telling us the car that is right here, that car right there that you've got right up to the porch, you are saying that that one you saw emergency lights?  The wig-wag lights or the red and blue lights, which ones, or

both?

A    I don't know that he had any red and blues other than on a visor that flipped down.  And I don't know if those were ever put on or not.

Q    What about wig-wags?

A    I believe his wig-wag lights were on as he was coming across the yard.

Q    Okay.  So your recollection out of the corner of your eye, as I understood you said, was that your vision -- his car was coming into your vision from the right, and you're saying that, as that came into your vision from the right, you saw the wig-wags going?

A    I saw -- I saw some wig-wags going, some headlight wig-wags, yes, sir.

Q    And were those wig-wags associated with Hamilton's Bronco?

A    I believe they were.

Q    And are you telling us that as you saw that Bronco -- your recollection now, okay?  As you saw that Bronco sitting there up to that porch, you saw wig-wags on that car flashing on the porch?

A    I saw the front of the house being flashed with wig-wag headlights.  Now, I assumed it was Trooper Hamilton's vehicle.

Q    Okay.  Can you recall -- well, can you recall on that

-- if you look on that model, do you think you could place on that model where you recall Hamilton's Bronco when you first saw it receiving gunfire?

A     I could approximate it.

Q     Okay.

        MR. HILFIGER:   May he do that?

        THE COURT:   You may.

Q     (By Mr. Hilfiger)   And let me ask you to do this just for this purpose, leave the one Bronco there where it is, the -- this one right here if you would.   Leave that Bronco there and use this Bronco here, and show the approximation where you think Hamilton's Bronco was when he first received fire.

        MR. LITTLEFIELD:   I'm going to object because it was a compound question.   At first it's asked --

        THE COURT:   Well, we'll rephrase the question. Officer, don't answer the question until -- until counsel has a chance to object.   I'm standing up so I can see.

Q     (By Mr. Hilfiger)   Will you please --

        THE COURT:   Wait a second.   Officer, if you will take that mike.

Q     (By Mr. Hilfiger)   Will you place that Bronco in the position -- the approximate position that you recall that Bronco being when it first received -- when you first saw it receiving fire?

MR. LITTLEFIELD:  And that's compound.  It's where it first received fire, and then that where you first saw it receiving fire.  Which one?

MR. HILFIGER:  No, I -- I said -- I meant when you first saw it receiving fire.

THE COURT:  Okay.  Let's back up.  The question is withdrawn.  Rephrase the question.

Q    (By Mr. Hilfiger)  Place that Bronco in the approximate position that you saw it when you first saw it receiving fire?

THE COURT:  You may answer.

A    That's when I first saw Trooper Hamilton's Bronco receiving fire?

Q    (By Mr. Hilfiger)  Receiving fire.

A    I believe that to be the approximate location.

Q    Okay.  One question.  When you -- when you first saw that Bronco receiving fire, had you already heard previous fire?

A    Yes.

Q    Okay.  Now, will you take this ruler, please --

MR. HILFIGER:  If I may approach the witness?

THE COURT:  You may.

Q    (By Mr. Hilfiger)  Will you do -- would you, with that ruler, measure ten inches from the southeast corner of the steps to the right front tire of that Bronco that

you have placed there showing where it first received fire -- where you first saw it first receiving fire?  From the right -- yeah, from the southeast corner of the -- can you see the inches on that okay?

A    Yes, sir.

Q    Okay.

A    I'm not sure how I'm going to do this without moving something or just guesstimating it.  Okay.

Q    How many inches is that?

A    Approximately seven an half.

Q    Okay.  Now, will you do a measurement from the southeast corner of the porch to the right rear tire of that Bronco?

A    Okay.

Q    How much is that?

A    Approximately nine inches.

Q    Nine inches.  One more.  From the southeast corner of the steps to the left rear -- I mean, left front tire of that Bronco.

A    Okay.

Q    How many inches?

A    Approximately nine and one quarter.

Q    Nine and a quarter?

A    Yes, sir.

Q    Thank you.  You may sit down.  And as you have placed

the other Bronco up next to the porch there, is the whole

Bronco -- is the front tires -- right tire of that Bronco

to the left of the porch?  Is that where you --

A     Yes, sir.

Q     And it's touching the porch?

A     No, sir.  It's not touching the porch.

Q     Okay.  Did you say that you thought it did touch the porch?

A     I said it might possibly have touched the porch.

Q     Okay.  Okay.  Now, at the point -- I guess we're going to have to jump back to Number 69, because, as I understand it, when you first saw fire hitting that Bronco right there where you have got it placed, my understanding is you were right where these -- somewhere in this neighborhood here where these two people are; is that right?

A     Yes, sir.

Q     Now, and at that point right there, were you -- did you have -- because those cars weren't there, were they?

A     No, sir, they were not.

Q     Did you have a direct line of sight into the front door of that house?

A     It wasn't a direct line of sight.  It was a bit of an angle.

Q     Okay.  Could you -- could you see the door opening?

A     Yes.

Q     Could you see anything in there?

A     No, I couldn't see any -- I couldn't see anybody in the door or anything in the door.

Q     Did you look in that direction or anything?

A     Yes.

Q     And you actually look that way and you couldn't see anybody in the door?

A     No, sir, I did not.

Q     Did you see any muzzle flash, smoke, or anything like that in the door area?

A     I did not see a muzzle flash.

Q     What about smoke?

A     I believe I did, but I can't be positive.

Q     You may have seen smoke?  Is that called flume or -- or do you know?

A     Smoke.

Q     Smoke is what you would call it?  Okay.  Now, were you able to tell, when you first saw Hamilton's vehicle receiving fire, were you able to see Greninger's vehicle or --

A     I don't recall seeing it.

Q     Okay.  Were you able to see Hash's vehicle?

A     At the time that I was --

Q     When you first saw Hamilton's vehicle receiving

fire.

A    I don't recall seeing them, no, sir.

Q    Now, when you left this area, went up to these -- between these pickups and got involved with Toby Barrett right around in here; is that right?

A    Yes, sir.

Q    Did Hamilton's vehicle beat you to the porch before you got up here, or were you keeping track of that?

A    No, it was already stopped before I got up there.

Q    Okay.  Hamilton had already driven his right up to the porch here before you got from this point to this point; is that right?

A    Yes, sir.

Q    And when you got up to this point, did you -- did you see anybody exit that vehicle, the Hamilton vehicle that was right up here?

A    I don't recall seeing anyone exit.

Q    The firing that was going on, was it a continuous firing from the time you saw -- from whatever point it was right here until it ended up here?

A    No, sir.  I -- I -- until it stopped?

Q    Yeah, I mean, was it just ba, ba, ba, ba, ba?

A    Yes, sir, it appeared to be.

Q    And then it stopped, and then you heard a flash-bang or saw a flash-bang; is that right?

A       I saw one, yes, sir.

Q       And when you saw it, did it stop?

A       The gunfire?

Q       Yes.

A       Yes, sir, it appeared to stop for a time.

Q       And after the flash-bang, was there any more firing?

A       I can't say for sure.

Q       Okay.  When these -- when you were in position back here in the driveway and you're in a high kneeling position with a gun on Barrett, were you able to see or hear any of the three entry cars coming through the ditch and coming up around the house?

A       While I was aiming my weapon at Toby Barrett?

Q       Right.

A       No, sir.

Q       You didn't hear or see either one of them; is that right?

A       I don't recall hearing them, no, sir.

Q       When you first -- you said that when you first saw the Hamilton Bronco receiving fire, that was not the first fire that you heard.  Do you know how much before that -- how many shots you heard before that?

A       I can't tell you the number, no, sir.

Q       Do you know, was it a matter of like a split second, or was it a matter of a lot of seconds?

A    I can't be sure about time.  I mean, in that time span.

Q    Was everything going pretty fast?

A    No, sir.

Q    It wasn't going fast?

A    No, sir.

Q    Do you know how long it took you to get over to the gate and get up here where Toby Barrett was?  Do you know how many seconds past then or minutes or --

A    No, sir, I don't.

MR. HILFIGER:  May I have just a moment, Your Honor?

THE COURT:  You may.

Q    (By Mr. Hilfiger)  Did you -- before you saw Toby Barrett in the yard there, were you informed that there was some runner in the yard, or were you aware that there was a runner in the yard before you saw him?

A    No, I was not aware of it.

Q    Was there anything -- when you arrived at the property, was it set up -- was it as you expected the property to be?  I mean, did you expect to see people up, or did you see lights on in the house when you approached?

A    I'm sorry.  Now --

Q    When you approached, were you expecting to see a house that was -- that was shut up and dark and people

asleep or at least not outside or doors open?

A    No, I expected that people would at least be in the house, not out in the yard.

Q    Okay.  Did you expect to see a door open?

A    No, not really.

Q    Okay.  And when you saw that, did you feel like there should be any change in the plan?

A    When I saw what?

Q    When you saw that there was a door open or that the situation on the property was different than what you expected, did you feel that there should be some change in the plan or even not even going through with the plan?

A    At the point that I was already on the property?

Q    No.  Before you got to the property.

A    I didn't see any of that until I was already on the property.

Q    It wasn't until after you got over the gate before you saw that?

A    That's correct.

Q    Is that right?

A    Yes, sir.

Q    Prior to -- when you saw Toby Barrett in the yard, were you in such a position that you could see -- that you could hear anything he was saying at that time?

A    I was yelling very loud.

Q    You were yelling loud at him; right?

A    Yes, sir.

Q    And did he respond to your yelling?

A    No, sir, he did not.

Q    So if he had been saying something at that time, you may not have heard what he was saying; isn't that true?

A    I'm sure I probably wouldn't have heard what he was saying if he was saying something at that time.

Q    Since this incident, you have been part of some interviews, group interviews; is that right?  Did you meet with a Ricks, Commissioner Ricks, the TAC team?

A    Yes, sir.

Q    And were you part of that group?

A    Yes.

Q    And you discussed this -- this incident; is that right?

A    Yes.

Q    And did you -- did you listen to other people's descriptions of what happened and what they did?

A    To some degree, yes, sir.

Q    And did you also give your viewpoints on what you did and what you saw?

A    Yes.

Q    And also did you meet with a Jim Horn?

A    Yes.

Q    As part of a group?

A    Yes, sir.

Q    And at that time, did you also do the same, discuss what each one of you did and --

A    To some extent, yes, sir.

Q    And was Buddy Hamilton part of that group?

A    Yes, I believe he was.

Q    For both -- for both?

A    I believe so, yes, sir.

Q    And you guys discussed this pretty openly about what each one of you did and --

A    I don't know that it was directly a discussion, what you would call discussing, but --

Q    At either one of these interviews, did Buddy Hamilton say that he had shot his .45 or his SIG-Sauer?

A    I don't recall if he did or not.

Q    Did you ever see him shooting his SIG-Sauer?

A    At the time of this warrant service?

Q    Yes.

A    That night?

Q    That night.

A    I don't recall seeing him shoot it, no, sir.

Q    Did you see anybody on your TAC team firing?

A    No, sir, I did not.

Q    Okay.

MR. HILFIGER:  I have no further questions.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     When you saw Toby backing up, what was he doing?

A     He was walking backwards looking to the east.

Q     Was he hollering?

A     I don't recall him hollering, no, sir.

Q     Would you -- where was your attention focused?

A     Directly at him.

Q     If he would have been hollering, would you have seen or heard it?

A     I would think.  Before I started yelling at him, yes, sir, I would have heard him say something if he was yelling.

Q     Okay.  And what was he doing with his hands and arms as he was moving back?

A     As I recall, they were kind of down like this.  Maybe his hands were together.

Q     Okay.  You were asked about the wig-wag lights that you could see on the front porch.  Do you know if those were Buddy's or Raymond's?

A     I can't say for sure which one they were.

Q     Okay.  You just know you saw someone's wig-wag lights?

A    Yes, sir.

Q    You were asked if -- you made the statement that everyone has left the TAC team since this incident.  Do you recall saying that?

A    In court here?

Q    Yes.

A    There is -- I answered that there were no -- none of these members left on the TAC team.

Q    Do you know why all of the former members are no longer associated with the tactical team today?

A    I'm sure there were various reasons.

            MR. LITTLEFIELD:  Pass the witness.

            THE COURT:  Any further cross-examination?

            MR. HILFIGER:  Yes, just two questions.

                    RECROSS-EXAMINATION

BY MR. HILFIGER:

Q    Number one.  Are you positive that Raymond Greninger had wig-wag lights on his car and that they were on?

A    I'm not positive.  They may have been Trooper Hamilton's lights that were wig-wagging.

Q    And the next question:  At the position where you saw Toby Barrett, was he facing you or facing away from you?

A    He was facing at a right angle to me.  I was looking north, he was looking east.

Q    Okay.  And he didn't hear your voice when you

yelled?

MR. LITTLEFIELD:  Objection.  That's speculative.

THE COURT:  Sustained.

Q   (By Mr. Hilfiger)  He didn't react when you yelled?

A    No, sir, he did not respond.

MR. HILFIGER:  I have no further questions.

THE COURT:  Further direct?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

MR. HILFIGER:  Same as far as this time.  I think he should be under subpoena.

THE COURT:  Officer, I'll excuse you for now. You will be subject to recall and you will be notified if there is a need for you to come back.  But you may be excused for now.

THE WITNESS:  Yes, Your Honor.

THE COURT:  It's a little after 5:00.  We'll take our evening recess.  Members of the jury, let me again remind you, after a few days of trial, it gets to be sometimes second hat as we say, but remember it's very important for you to remember not to discuss this with anyone; it's very important not to discuss it among yourselves.  The reason for that is this case has not been

submitted.  You have not heard the evidence.  There are several days of testimony.  You should -- I know that sometimes we think this is a reasonably large building, large courthouse, but when you -- we have maybe two or three trials going on here.  It's important for you to remember what I said in regard to the attorneys, that they will not be speaking to you.  And there are people who are witnesses that come and go.  In the southwest where we live, we tend to be pretty friendly folks, how are you doing today, good to see you.  We wave a lot.  I'm as -- and I think that's a good thing.  But during this trial, you are not to make eye contact.  You are in a special position.  You cannot do that.  So if you will remember that admonition, again, not to discuss this with your family.  If there is any news reports of this, you should avoid them.  And I'll ask that you keep your mind as free and clear of this matter as you possibly can until you report back here in the morning and we'll continue this trial.

I'll ask everyone in the courtroom to please remain seated as the jury leaves the courtroom.

(Jury excused.)

THE COURT:  Let the record reflect that the jury has departed the courtroom for the evening recess. Anything from the government to be taken up out the

hearing of jury?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  For the defense?

MR. HILFIGER:  No, Your Honor.

THE COURT:  We will start again in the morning at 9:00.

(Proceedings adjourned.)

COPY

329  39

FILED

MAY 0 1 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By:_____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,        )
            Plaintiff,           )
                                 )
vs.                              )  Case No. CR-04-115-P
                                 )
KENNETH EUGENE BARRETT,          )
            Defendant.           )


* * * * * * * *
JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE JAMES H. PAYNE,
UNITED STATES DISTRICT JUDGE and a jury

OCTOBER 6, 2005

VOLUME VII of XXVII
* * * * * * * *   K.M.

A P P E A R A N C E S:

FOR THE PLAINTIFF:    MR. SHELDON SPERLING
                      United States Attorney
                      MR. MICHAEL LITTLEFIELD
                      Assistant United States Attorney
                      1200 West Okmulgee Street
                      Muskogee, Oklahoma, 74401

FOR THE DEFENDANT:    MR. ROGER HILFIGER
                      Attorney at Law
                      620 West Broadway
                      Muskogee, Oklahoma, 74401

                      MR. BRET A. SMITH
                      Attorney at Law
                      417 West Broadway
                      Muskogee, Oklahoma, 74401

COURT REPORTER:       KARLA S. McWHORTER
                      United States Court Reporter
                      P.O. Box 2251
                      Muskogee, Oklahoma  74402

C O N T E N T S

WITNESS                                                        PAGE

**Billy Poe**
        (Direct Examination by Mr. Littlefield)             1398
        (Cross-Examination by Mr. Hilfiger)                 1435
        (Redirect Examination by Mr. Littlefield)           1455

**Kerry Pettingill**
        (Direct Examination by Mr. Littlefield)             1458
        (Cross Examination by Mr. Hilfiger)                 1522
        (Redirect Examination by Mr. Littlefield)           1568
        (Recross-Examination by Mr. Hilfiger)               1577

**Ronald Distefano**
        (Direct Examination by Mr. Sperling)                1579
        (Voir Dire Examination by Mr. Smith)                1609
        (Continued Direct Examination by Mr. Sperling)      1609

OCTOBER 6, 2005 PROCEEDINGS.

THE COURT:  Let the record reflect that counsel for the government is present, defendant and counsel are present.  I have been advised that counsel would like to inquire of the Court.

MR. SPERLING:  We would.  Your Honor, the parties disagree as to whether the government may call Kevin Ottwell, a special agent with the Bureau of Narcotics in support of the -- in Count 3 of the Superseding Indictment, the 21 U.S.C. 848(e)(1)(B) element, the wording while attempting to avoid apprehension or prosecution for a felony violation of this subchapter -- what did I say?  I mean, 848(e)(1)(B) for a felony violation of a subchapter.  Here is the dispute in a nutshell, I think, Your Honor.  The defense thinks the government should be restricted to the wording on Government's Exhibits Numbers 87 and 89.  87 is the arrest warrant that included the wording information charging Kenneth Eugene Barrett with the crime of unlawful delivery of CD.  That document, Your Honor, does not define CD. Document Number 89, although a little more clear, is a handwritten docket sheet really does not indicate the nature of the charge.  We believe, Your Honor, we should be allowed to try our case.  We believe we should be permitted to establish -- absent a stipulation to the

element, the underlying felony violation of this subchapter.  As I examine the Superseding Indictment and Count Number 3, the salient language is a felony violation of Title 21 U.S. Code, Section 841(a), 841(c), 843(a), 846 and 956.  Our theory, Your Honor, that is the underlying felony, concerning which the defendant sought to avoid apprehension and prosecution, were several fold.  First, the pending charge then in Sequoyah State District Court, which constitutes a felony violation of this subchapter, delivery of methamphetamine.  Second, the specific violation of Title 21 that we outlined in the Indictment to include manufacturing methamphetamine, possession with intent to -- possession of precursor chemicals with intent to manufacture methamphetamine, maintaining a house where drugs are manufactured, used or sold, among others.  And I guess maybe to further suggest where we are on this, there is no case law, Your Honor, that makes this analogous to 922(g).  The Court is well aware that, under 922(g), prosecution of possession of a firearm by felon after former conviction of the defendant may prevent the government from presenting evidence concerning the underlying felony by stipulation.  There is no case law that I can find under this statute, 21 U.S.C. 841(e)(1)(B), that says that the defendant can stipulate and therefore forestall the government's presentation with

regard to the underlying or predicate felony violation of this subchapter.  I am willing, though, by analogy -- we're willing by analogy to employ that procedure as a cautionary route, should the defendant be willing to concede by stipulation that portion, that element of that offense, although not the offense entirely, obviously, but that element of that offense.  What we're asking, Your Honor, is that absent that stipulation, we be permitted to call Kevin Ottwell, who was the Oklahoma State Bureau of Narcotics agent who made a hand to hand purchase of a quarter paper, $25 worth of methamphetamine, from the defendant at his house, meaning the assistance of a confidential informant and under the observation of Detective Blunt from Sallisaw P.D. and Robert Jerome, another agent from OBN.  We would only, though, in our presentation, even if they don't stipulate, call one witness with regard to that transaction.

MR. HILFIGER:  Judge, we would object as to going into the detail of the charges.  And, to me, one of the big differences between the 922 analogy and this is that, in the 922 analogy, it deals with a conviction that has been done in a state court or another jurisdiction. Here, what they are wanting to do is take this charge -- and that's all it is, it's a -- the actual alleged date of the offense was December of 1996.  The charge was filed

sometime, I think, in March of 1997. And they had a preliminary hearing, and at the preliminary hearing, my understanding was, even at that time, they did not have a drug report. And there was some testimony at the preliminary hearing that I don't have. But the point is the difference between the 922 analogy and this one is this is not a conviction. There are allegations out there, and Kevin Ottwell I don't think would be able to do anything except make some allegations that -- they don't have any proof that it was drugs. I mean, basically that's it. Kevin Ottwell -- because Kevin Ottwell didn't do anything to test it. What they are going to have to end up doing is going into more detail and trying that case in this case. I think that any proof or evidence of that is totally prejudicial under 403. I don't think it's proper. I think -- you know, they have got in -- got in there -- we don't necessarily agree that that bench warrant was a correct warrant, but there is a warrant in there for the arrest. And they also -- and there is also in there evidence -- a docket sheet that shows unlawful delivery of controlled drug. So, I mean, I think that allegation is there. But to go into the detail of what that case -- as if that case -- as if that detail is a conviction, I think would be highly prejudicial to this defendant.

MR. SPERLING:  Counsel's argument as to the sufficiency --

THE COURT:  Let me -- let me -- before we -- as I recall, this is the first time I have heard about this issue.  No trial brief, no pretrial.  Is he the next witness?

MR. SPERLING:  No.  We would anticipate he would be called later today, Your Honor.

THE COURT:  Well, my thought is that whatever report -- whatever authority you have, one way or the other, that you -- that we -- give me an opportunity to see what -- maybe you don't have any authority.  I'm not sure.  But if it's -- it's a significant matter, that I think we should pause before we go forward and I'll hear you.  But my thought is I would like your best effort -- although I realize your time is limited, as soon as you could reasonably give me your position with whatever case authority you are relying on, whatever statutory authority you are relying on, to give me an opportunity to digest the issue.  You both may have -- apparently have been thinking about it.  I don't know if for strategy or whatever reason I haven't been apprised of the problem.  But for the sake of this jury, I would like to bring as many witnesses as we could bring and maybe deal with this issue after 5:00 o'clock today or at noon today or

sometime when we can -- I can have an opportunity to analyze both of your positions before I make any rulings.

MR. SPERLING:  If there were case law on this, Your Honor, we would have it.  There are ten cases that I found that include the phraseology which is found in 21 United States Code, Section 848(e)(1)(B).  And there are a number of them that are prosecution under that statute that do not involve federal prosecution for the underlying felony violation of this subchapter, but there is nothing that analogizes under that section to 922(g).  With what I really -- I think this is a simple -- it's a relatively simple regular issue because I think it comes down to whether or not the government is permitted to in support of an offense.  There is no case law under that statute that says that, but I think that's foundational law. We're obligated, since we have the burden of proving the defendant guilty beyond a reasonable doubt, to establish each an every element beyond a reasonable doubt, and we're allowed to put on relevant evidence of each element. That's what we're asking to do.  The defense doesn't want us to do that.  I think that's what this really all boils down to, is that more prejudicial than probative.  It's an element of offense.  I think that's what it boils down to.  If evidence of an element of the offense itself is prejudicial, then the next question is whether or not it's

unfairly prejudicial.  And our answer to that question is it clearly is not in this case.  We have to establish a felony violation of this subchapter.  How do we do that?  Call the agent who has information and evidence concerning the underlying felony violation.  In fact, most of the commentary by the defense was to challenge the sufficiency of the evidence.  That's an even more compelling reason to allow us to call Kevin Ottwell.  He, for example, says no proof of drugs.  I beg to differ.  A field test long since discovered to the Dennis Reimer criminalist report that conclusively establishes the controlled substance to be methamphetamine, long since discovered to the defense.  What we're intending, though, to do is simply call one witness to the effect that the defendant was subject to apprehension or prosecution for that felony.  That's a very limited request, Your Honor.  And defense counsel's effort --

THE COURT:  Well, is -- well, is the issue whether or not there is a valid arrest warrant?

MR. SPERLING:  No.  The issue is whether or not the arrest warrant was for a felony violation of this subchapter.  That's why we think we have to establish what the underlying felony was.  You know, a jury might have a question as to efficacy of the charge.

THE COURT:  I guess my question is, why isn't --

why wouldn't this be a record -- a certified copy of whatever he is charged with in state court introduced as a document to support the basis for the warrant?  The warrant is based on an information charge in Sequoyah County, I assume.

MR. SPERLING:  I think that is a permissible way to do this, too.  Our position is, Your Honor, there is --

THE COURT:  That way, that way there is no -- I mean, that is a fact.  He was charged by information, certified copy of the information with an instruction -- a limiting instruction that this is what it is.  It's a charge.  I don't know what the defense thinks about that, but, I mean, that is what on occurs to me, rather than have a witness here who is going to testify about facts that could be in dispute between --

MR. LITTLEFIELD:  May I approach?

THE COURT:  You may.

MR. SPERLING:  I think what we wanted to do this morning is to bring this in.  We're not trying to spring this.  We can call this witness, if need be, tomorrow as well, Your Honor.

THE COURT:  Okay.

MR. SPERLING:  We're not trying to spring this on you.  The one thing I would say if we were to adopt the suggestion you just made, we will also ask for a court

instruction to the effect that that offense constitutes a felony violation of this subchapter, that is that --

THE COURT:   I think that's a question of law.

MR. SPERLING:   We do, too.   I think in conjunction with the instruction, that may be another way to skin the cat.

THE COURT:   Mr. Hilfiger, I'll give you a chance to speak now.   I'll give you the benefit of an opportunity to think about it also.   You may have -- you may have another answer.

MR. HILFIGER:   Can I do both?

THE COURT:   Yes.

MR. HILFIGER:   You know, I tend to think -- they've got into evidence the arrest warrant, and, while we don't agree with that arrest warrant, that is into evidence.   And, number two, they also have the -- you know, as part of their evidence, the docket and the information is sure easy to put into evidence.   That's -- you know, that's all they need, is, you know, was that subject.

THE COURT:   Before we go too much further, I think we're close to an agreement.

MR. HILFIGER:   And I'm just -- I'm saying I don't think they need to have somebody come in.   I think that's more prejudicial, having a person come in and say,

I went through this buy and I did this.

THE COURT: Well, we're -- what I'm suggesting, and what I suggested to the government is, we don't need the witness. We might need a witness if there is a question about the authenticity of the information. I assume there wouldn't be, but I don't know. But if there is an a authentic information, a certified copy of that introduced by the appropriate person, or a stipulation would appear to solve that problem.

MR. HILFIGER: Immediately, I think so, too.

THE COURT: Well, let's let you both think about it and we will raise it again. Give me a chance at noon to look at the law, and then we will talk about it, but that's my suggestion on how to resolve that.

Ready for the jury? Government ready for the jury?

MR. LITTLEFIELD: Yes, Your Honor.

THE COURT: Defendant ready for the jury?

MR. SMITH: Yes, sir.

(Jury present.)

THE COURT: Good morning. Let the record reflect the jury is in the box, counsel for the government is present, the defendant and counsel are present.

The government may call your next witness.

MR. LITTLEFIELD: Billy Poe.

THE COURT: Sir, if you would stand before the

clerk and raise your right hand and be sworn.

(The witness was duly sworn by the Clerk.)

THE WITNESS:   I do.

THE COURT:   You may proceed when you're ready.

MR. LITTLEFIELD:   Thank you, Your Honor.

BILLY POE,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name, please.

A    Billy Poe.

Q    Mr. Poe, how are you employed?

A    I'm a trooper with Oklahoma Highway Patrol.

Q    And how long have you been a trooper, sir?

A    I have worked for the Department of Public Safety for about 21 years.

Q    What is your current assignment with the highway patrol, sir?

A    I work out of Troop S, which is commercial motor vehicle enforcement, and I live in Antlers, Pushmataha County.

Q    When you say commercial motor vehicle enforcement, what do you do?

A    I work trucks, weigh trucks, inspect trucks.

Q    Do you have any particular area of assignment, statewide or what?

A    It's southeastern part of the state primarily.

Q    Okay.  Were you ever a member of the tactical team for the eastern part of the state?

A    Yes, sir, I was.

Q    And when did you join that TAC team?

A    It was about December of 1995.

Q    And how long did you stay with the TAC team?

A    Until approximately December of 2001.  About six years.

Q    Do you recall the operation in regards to the entry of the Kenneth Barrett residence which took place during the early morning hours of September the 24th, 1999?

A    Yes, sir.

Q    When was it that you first received information about this operation?

A    I was notified from Troop E Headquarters out of Durant that we had a TAC team call-out on September the 22nd, that we need to report to Camp Gruber on September the 23rd, about noon --

Q    Okay.

A    -- prepare for an operation.

Q    By the way, did you have any specialized area within the operations of the tactical team at this time, sir?

A    I was a sniper.

Q    And what kind of training did you receive in regards to that specific area of performance or duty?

A    I went to a sniper school at Camp Gruber in January of 1998.

Q    And how long had you assumed the role of a, quote, sniper for the TAC team?

A    Approximately two years at that time.

Q    Okay.  In that regard, had you ever fired a weapon as a sniper in an operation up to this point in time?

A    No, sir.

Q    When you say sniper, what are your responsibilities, sir?  What are you supposed to be doing?

A    Ordinarily what we would do is be surveillance, reconnaissance, observation of a target we were going into, like a residence or serve a warrant on.

Q    Okay.  Now, there has been reference to -- or I think the term creek team has been used?

A    Yes, that's a common term used.

Q    In addition to the observation and surveillance real-time in advance of the mission and as the mission is going into operation, what else do you do as a sniper?  What else are you trained to do?

A    Shoot.

Q    And for what purpose are you doing that?  If you had

to, and you didn't have to up to this point, what are you looking for and what are you trying to do?

A    Are you -- in reference to --

Q    As a sniper.

A    In shooting or --

Q    Yes, sir.

A    It would be defend myself and defend somebody else.

Q    Okay.  When did you get to Camp Gruber?

A    I got there just before noon on the 23rd.

Q    Okay.  And how long did it take the team to assemble, the best of your recollection?

A    I would say everybody was there around noon.  Not long after noon.

Q    What information did you all have in the development of the plan of this operation?  What information did you have that -- input to make the plan that you all underwent?

A    What did I input?

Q    No.  The team, as you assembled, I'm assuming you all developed a plan of entry?

A    Yes.

Q    What information did you have to rely upon?

A    Well, Buddy Hamilton and Ray Greninger had been down, I guess a day earlier, or sometime earlier and did a fly over the residence.

Q    Okay.

A    And made some aerial photographs.

Q    Yes, sir.

A    And I believe they had a scale model -- or a model. It wasn't a scale model.  A model depicting the residence --

Q    Okay.

A    -- that we were supposed to do the warrant on.

Q    Okay.

A    The location.  And we had a search warrant and an arrest warrant.

Q    Okay.  Did you have any information in regards to the individual who occupied the residence?  And I'm not asking you to go into it.  But did you have any information in that regard as well?

A    About him?

Q    About him.

A    Yes, sir, we did.

Q    What kind of warrants do the OHP tactical team assume?

A    We had an arrest warrant.

Q    Okay.  Maybe my question is not clear.  What was the nature of the operations that the team would take on?

A    To serve a no-knock search warrant.

Q    Okay.  In regard -- would you accept every warrant

that came down the pike?

A   Well, that usually wasn't up to me.

Q   Okay.  It was over your head?

A   Yes.

Q   Okay.  As the plan was developed, who had input into what was going to be done?

A   The whole team always had input.  Everybody would make a plan or participate in making the plan.

Q   Okay.  In that regard -- if somebody said, hey, wait a minute, I've got a real problem with this whole operation, what would have been done?

A   We could have done anything from postponing it to canceling it altogether.

Q   Had that happened in the past?  Had there been occasions in the past when you were on the TAC team where somebody said there is a problem here, I don't think we should do it?

A   I don't recall in the past, no.  It happened after.

Q   One happened afterwards?

A   Yes.

Q   What was your responsibility in the original first plan that was formulated?

A   In the original plan, Trooper Manion and I were going to be inserted in to watch the residence for a period of time.

Q    Okay.  Creek team?

A    Yes.

Q    And did that remain in effect?

A    No.

Q    What caused that to change or be removed from the plan?

A    After we had made the initial plan, Buddy Hamilton, Raymond Greninger and Rick Manion made a drive-by of the residence to get a ground view of it.

Q    Okay.  Do you recall about when in the day that would have been that they did the drive-by?

A    The best I can remember is in the afternoon of the 23rd.

Q    Okay.  And when they came back, did they report to you anything that caused the change in the plan?

A    Rick was concerned about the -- he said there were some dogs running loose in the area, and also there's several residences within close proximity.  And he was concerned that if we went in, the dogs would come to us and alert on us, bark, give away our position, and with the closeness of the residences, we would be compromised.

Q    Okay.  And as a consequence of that information and Trooper Manion's concern about the insertion of a reconnaissance or creek team, how did the plan change?

A    We -- it was decided that we wouldn't send Rick and I

in.  Rick was made part of the entry team and I was going to act more or less as a cover man on the perimeter.

Q    Do you recall where the entry team was supposed to have entered in the original plan, where they were supposed to have entered onto the Barrett property?

A    As I recall, there is a driveway on the east side of the residence they were going to enter on.

Q    Okay.  Do you recall anything being reported in regards to a gate?

A    Yes.

Q    What was that?  What was reported?

A    That was also reported by the troopers that made the drive-by.  There was a metal gate that was locked in front of the residence.

        MR. LITTLEFIELD:  And I would ask that the witness be shown Government's Exhibit Number 69.

        THE COURT:  You may.

Q    (By Mr. Littlefield)  It will be on your screen to the left, and the jury can also see it up here.  How many vehicles were going to enter the property, sir?

A    Three.

Q    Okay.  And you said something about coming from the east.  Do you see in the photograph that is depicted here the area from which -- or through which they were going to enter?

A     Yes.

Q     And where is that in the photograph?

A     It's --

Q     You can go ahead and tap it at that location.

A     They were going to enter, the best I can remember, in this area right there.

Q     Okay.   And you were in which vehicle in the group that was approaching the residence?

A     I was in the fourth vehicle.

Q     And who was accompanying you in that fourth vehicle?

A     Trooper Hise was driving, Trooper Darst was in the front right-hand seat, the passenger side.

Q     Uh-huh.

A     And I was sitting behind Trooper Darst in the back seat.

Q     Okay.   Now, do you recall discussion about the lights -- emergency lighting on the entry vehicle, the team -- the vehicles that were going to enter from that location that you have tapped?

A     No, sir, I don't.

Q     What was the typical -- in previous operations, in a rural area where vehicles are driving onto property, what do they do with their emergency lights?

A     As soon as, or if not before, you would activate all of your emergency equipment.

Q    Okay.   And you were in the fourth vehicle?

A    Yes.

Q    Where were you all going to go?

A    To the gate in front of the residence.

Q    Okay.   And do you see the location where you all were to proceed on that photograph?

A    Yes.

Q    Can you tap it?

A    (Witness complied.)

Q    Okay.   What were you all going to do in regards to lighting, both emergency and headlights, as you all approached that gate?

A    We were going to go in dark.

Q    When you say go in dark, what do you mean?

A    We weren't going to have any lights on.

Q    Why?

A    Because we were going to be out on the ground and we don't want to give away our position before the entry team got into position.

Q    In regards to the arrival and the timing of the arrival, when were you all supposed to pull up to the gate in relation to the entry team entering onto the property?

A    We were just fourth in line.   As soon as we got to the gate, we were just going to pull off parallel to the gate.

Q     And how -- and what would that put, as far as your time of arrival in comparison with the entry team's arrival onto the property?

A     We would be on the ground first.

Q     Okay.  What is the reason for that, if there was one?

A     The reason -- Trooper Darst and Trooper Hise were going to act as more or less chase men on the west side of the residence.  So they needed to be in a position when the entry team -- before the entry team got assembled.  And I was supposed to act as a cover man at the gate.

Q     Okay.  And are you able to afford protection to the entry team if you aren't in place when they are already going in?

A     No, sir.

Q     Did you have an idea as to what position you would take to provide cover as you were coming in?

A     Yes, sir, I did.

Q     What was your anticipation?

A     There was a gate post, it would be on the right-hand side of that gate.

Q     Okay.  Is that as you are looking at the property or looking away?

A     Yes, it would be on the east side of the gate.  And I thought I would get there.

Q     In regards to your approach, you have three people in

the vehicle?

A    Yes, sir, we did.

Q    And Trooper Darst was going to go in which direction when you stopped?

A    He was going to go across the fence to the west side of the residence.

Q    Okay.  Was he going to cross in front of the vehicle or behind it?

A    We made a plan where he was going to come out and cross behind it.

Q    Okay.  So that means he is going this way and you are going that way?

A    Yes.

Q    How did you work that out?

A    What we done, I told Doc I would let him dismount first, get out of the vehicle first, and when he was clear, I would then get out so we wouldn't run into each other.

Q    And when you arrived at that location, is that, in fact, what happened?

A    Yes, sir.

Q    Advise the jury -- where was your focus?  When you all stopped, Darst and Hise go that way, and then as Darst passes, you go that way.  Where was your focus?  What was your attention directed to?

A    As soon as I got out of the car and started towards the post, I started hearing gunfire.

Q    Okay.  What did you do at that point?

A    At that time I thought they were shooting at Gene, Doc and I because we were on the ground.

Q    Okay.

A    So I took cover behind the post.

Q    Okay.  What, at that point, did you see, if anything?

A    Not really anything at that point.  I just took cover.

Q    Were you looking to determine whether or not the entry vehicles had turned on their emergency lights?

A    No, not that I remember.

Q    Okay.  Do you recall whether they had or not at that point, I mean, in your recollection?

A    Not at that point.  Not at that point.

Q    Okay.  You took cover?

A    Yes, sir.

Q    Okay.  And when you say you heard shots, how rapid were they?

A    Just real rapid.  It sounded to me like rapid rifle fire.

Q    Okay.  How long did you stay in your cover?  And what was happening at time at this point in your mind?

A    I thought they were shooting at us, or Doc, Gene and

I.

Q    Okay.   When was happening in regards to time in your mind at this point?

A    Time?   I started losing concept of time.

Q    Okay.   And you indicated that initially you took cover.   Were you able to ascertain whether you were, in fact, the target of fire or not?

A    After I was there for what I'm going to say was a few seconds, I determined that I couldn't hear no rifle fire or gunfire hitting around me or anything being hit, so I didn't think I was being shot at.

Q    So what did you do at that point?

A    I came up from behind my cover.

Q    Where was your attention directed at that point?

A    I was looking toward the house.

Q    Okay.

        MR. LITTLEFIELD:   I would ask that Government's Exhibit 174 be displayed.

        THE COURT:   You may.

Q    (By Mr. Littlefield)   And Trooper Poe, do you see -- and remove the arrows, please.   Do you see -- are you familiar with what is shown in Government's Exhibit 174, sir?

A    Yes.

Q    And does that show a better perspective of what you

were looking at in the view you had?

A     Yes, except I was at ground level.

Q     Okay.  And can you tap on this photograph your location?

A     In that area right there.  It's hard to tell because of the shadow.

Q     An when you came out of cover, you said you were looking towards the house?

A     Yes.

Q     Was the gunfire still sounding?

A     Yes.

Q     And at that point, what, if anything, did you observe, sir?

A     I seen Trooper Hamilton's Bronco come into my view from the east side.

Q     Okay.  And anything else that you observed at that time?

A     It appeared that the Bronco was taking gunfire.

Q     What created that appearance?  What did you see that causes you to say that?

A     In the flashing emergency lights -- this is when I was conscious of the emergency lights.

Q     Okay.

A     I could see glass sparkling within the air.  The emergency light was reflecting off the glass.  And also

there was a lot of smoke and steam apparently coming from the Bronco.

Q    Okay.  At what location -- you said it came into view from your right?

A    Yes.

Q    What were you looking at when it came into view?

A    I was looking at the house trying to determine where the gunfire was coming from.

Q    Where was it?  Can you place with exactness where that Bronco was?

A    Not exactly.

Q    Okay.  How close can you get?  And if it's too far off and you can't do it, then tell me that.

A    Are you talking about when I --

Q    When you -- do you have approximately where its location was when it came into your peripheral vision, sir?

A    I can put it approximately, I think, where it was.

Q    Can you tap that screen there, sir?

A    (Witness complied.)

Q    Okay.  Do you see the -- the white vehicle in the photo there?

A    Yes.

Q    And where was it in relation to that white vehicle?

A    The white vehicle that I put the arrow at?

Q     Yes, sir.

A     It was just -- I didn't put the arrow exactly where I wanted it there.  It was just a little bit back to the right.

Q     A little further east than that?

A     Yeah.  Not much.  That's the best I can remember.

Q     Certainly.  And as you saw the glass sparkling, where did that vehicle go?

A     It went to the front of the residence.

Q     Okay.

A     And I don't know if it hit the porch, but if it didn't, it come very close to the porch on the west side of the doorway.

Q     Okay.

          MR. LITTLEFIELD:  Judge, I would ask that he be allowed to go down to Government's Exhibit 1 and place it in the location he recollects it being.

          THE COURT:  Officer, you may.

          MR. LITTLEFIELD:  And I'm not going to ask him any questions there.  Just place it and return back if you would.

          THE COURT:  Yes, you can go down to the exhibit.

Q     (By Mr. Littlefield)  And if you would place that lead Bronco at the location where you -- best as you can where you believe it stopped.

A    Can I move anything else?

MR. LITTLEFIELD:  If I may approach?

THE COURT:  You may.

Q    (By Mr. Littlefield)  Okay.  Go ahead and return to your seat.  As the Bronco approached from the area you described to that location, what did you observe in regards to the gunfire and that Bronco?

A    From this point, I don't remember hearing any more gunfire when I initially seen the Bronco come in.

Q    What did you see?

A    I seen a lot of movement around the Bronco -- I seen people moving around the Bronco at the front of the residence.

Q    Okay.  And from where you were, what did that Bronco do in regards to your ability to observe that area and to provide cover?

A    It blocked my view.

Q    Okay.  In regards to the movement in the area of the Bronco, did you have any idea or belief as to who those people were or what it was that was moving?

A    I know it was our people that was moving.  I didn't know exactly --

Q    Didn't know which ones?

A    Not exactly at this point, no.

Q    As a consequence of the view being blocked and your

people in that area, what was your ability to provide cover from your location?

A    I couldn't do it without hitting them.

Q    What kind of weapon did you have, sir?

A    I had an HK 53 rifle.

Q    And what caliber is that?

A    It's .223 or 5.56 millimeter.

Q    At any point in time during this operation, did you fire your weapon?

A    No, sir, I did not.

Q    And what happened to your weapon ultimately?  I mean, after the whole operation was done and finished, do you know what happened to your gun?

A    It was sent to OSBI for analysis.

Q    Okay.  When you made the determination that you could not provide cover from that location, what did you do?

A    I moved back to my left or back to the west, and there was a -- I went through the fence.  There was a fence on the gate.  I went through the fence and advanced towards the Bronco.

Q    Okay.  And as you were approaching the Bronco, what did you see?

A    I seen we had somebody down.

Q    At what location, sir?

A    He was behind the Bronco.

Q     Where in relation to the back of it was the person who was down?  Right side or passenger side, or the left side driver's side, or do you recall?

A     I don't really recall.  I just remember he was down and behind the Bronco.

Q     Okay.  Was anyone with the team member that was down at that time as you approached him?

A     No.  No.

Q     Where did you go to?

A     I went to the Bronco and laid down -- or used the hood for a rest and cover to look inside the door of the residence.

Q     Okay.  Why were you -- why were you focusing on the door of the residence, sir?

A     I thought that is where the threat was at the time. And, also, Trooper Hamilton was on the porch of the residence calling out to somebody -- he was apparently calling to somebody in the residence to come out.

Q     And as you got to that location -- on the Bronco, where were you in relation to the -- where were you when you laid across it?

A     About the front left tire over the hood.

Q     Okay.  And where were you looking?

A     I was looking inside the house.

Q     Did you see anything inside the house?

A    Yes.

MR. LITTLEFIELD:  I would ask that Government's Exhibit 175 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield)  Before we get into 175, let me -- focus back with me, Trooper Poe.  At any time as you are looking into this area -- and when was the first time you picked up Trooper Hamilton, that you first consciously observed him?

A    As I was running up to the Bronco.

Q    Did you see him exit the vehicle?

A    No.

Q    Did you see --

A    Well, I seen movement around the vehicle.  I don't remember actually saying yeah, I can see Buddy exit the vehicle.  I can't say that.

Q    But you saw movement around it, but you didn't see him get out?

A    Yes.

Q    Did you see Trooper Eales, Rocky Eales exit the vehicle?

A    No.

Q    Did you hear or see the flash-bang?

A    No, sir, I did not.  I don't remember seeing it.

Q    Okay.  At any point did you hear a lull or a

cessation, a stoppage of firing, and then it pick up again?

A    No, sir, I don't remember that either.

Q    Okay.  When you got to the front, you're leaning across, what kind of view did you have inside?

A    Really, I -- I could just see a little bit of the -- see from the doorway inside just a little ways.  I couldn't see much -- I can't remember seeing much into the house.

Q    Okay.  From that viewpoint?

A    Yes.  But I could see another doorway.

Q    Have you viewed this model that's there and do you recognize that this is a photograph looking down into this model?

A    Yes.

Q    Okay.  And where is the front door?  Go ahead and tap it?

A    (Witness complied.)

Q    The doorway that you were able to see on the interior, do you know where its location is and can you view the area where it's located?

A    (Witness indicated.)

Q    And would it help you to go look at the model to draw your perspective on the -- on the overhead photo?

A    Yes.

MR. LITTLEFIELD:   Judge, I would ask that he be allowed to approach, and then return.

THE COURT:   You may.

Q   (By Mr. Littlefield)  Did that assist, Trooper Poe?

A   Yes, sir.

Q   Can you demonstrate or tap for the jury's perspective where the doorway that you were able to observe is located?

A   (Witness indicated.)

Q   What, if anything, did you see -- well, let me back up.  Okay.  Trooper Hamilton is standing on the porch?

A   Yes, sir.

Q   What, if anything, is he saying?

A   He is saying about something to the effect, come out, come out.

Q   And did you hear a response to Trooper Hamilton's commands?

A   Yes.

Q   And what was it if you did?

A   Yes.  I heard the man that was in the house say he can't come out because he has been shot in the legs and he can't move.

Q   Okay.  When the response came to Trooper Hamilton, what did Trooper Hamilton do?

A   Trooper Hamilton entered the residence and pulled the

guy out.

Q    Did you see the guy that Trooper Hamilton pulled out, where he was located?

A    Yes, I could see him.

Q    Where was he located?

A    He was laying prone with his head sticking out of that doorway toward where I was at.

Q    Okay.  So the head was -- was the head in the living room?

A    The head was in the living room.

Q    Okay.  And was the remainder of his body any other location or in another room?

A    It was back into this room here.

Q    Tap which room his body was in.

A    (Witness complied.)

Q    Okay.  And in regards to the arrow, the arrow you put up that, as I'm looking at it, is on the right of those two at the doorway, the right arrow, where was his body in relation to that?  That first arrow along the wall is where you indicated the doorway?

A    Yes.  That's about where his head was at.

Q    The second arrow, the one to the immediate right, where was his body in relation to that second arrow?

A    He was laying prone, face down or stomach down there.

Q    Okay.  When Trooper Hamilton -- did you observe what

Trooper Hamilton did when he got to the individual who was laying face down?

A    All I remember is him dragging him out.

Q    And what direction did he pull him out?

A    He pulled him out the front door off the porch.

Q    As Trooper Hamilton came out with the individual dragging him out from inside, where was your attention focused?

A    The house.

Q    Why?

A    I didn't know how many shooters were inside or how many other people might be inside that may want to hurt us.

Q    Did you observe whether anyone came to the assistance of Trooper Hamilton with the individual who had been dragged outside?

A    The best I can remember is Steve Hash had went up on the porch and maybe even helped Buddy drag him off the porch is what it seems like, to the best I can remember.

Q    Were you watching Hash and Hamilton?

A    No.

Q    What were you watching?

A    I was watching the house.

Q    Were you aware of whether or not that person who had been dragged out was placed into custody and secured?

Page 1423

A    No, not consciously, I wasn't.

Q    Okay.  At some point, did it become apparent because the other troopers left that location?

A    Yes.

Q    After that happened, what was -- what was your responsibility and what did you do?

A    I felt my responsibility was to maintain where I was at to cover the residence because it hadn't been cleared.

Q    Did it get cleared?

A    Yes.

Q    And can you advise the jury how that happened?

A    After --

Q    Did something happen intervening?

A    Yes.

Q    What happened to intervene?

A    While I was watching the house, some of the guys was helping Rocky.

Q    Okay.  Did you know at that point in time it was Rocky?

A    I don't think I did.

Q    Okay.  How did you know that assistance was being provided?

A    I could hear them.  They were right behind where I was at, right behind the vehicle.

Q    As they were helping Rocky, what were you doing?

A    I was covering the house because we still hadn't cleared it.  I didn't want anybody else to come out.

Q    Okay.  Do you know what -- as you heard the help being rendered to Rocky, did you hear anything happening at the Bronco that you were leaning across to provide cover?

A    Yes.

Q    What?

A    I heard somebody beating on the back glass of the Bronco.

Q    And was that Bronco -- what happened in regards to that Bronco that you were leaning on as far as rendering assistance to Rocky?

A    It was disabled.  It couldn't be any assistance to anybody, except maybe me for cover.

Q    Okay.  Was Rocky taken out before the house was cleared?

A    I'm not really sure when Rocky was taken.  I think he was at least loaded before the house was cleared.

Q    Okay.  And into what vehicle was he loaded?

A    Into Raymond's Bronco.  Trooper Greninger's Bronco.

Q    As he was being loaded, what were you watching?

A    The house.  I was still focused on the house.

Q    At that point, as he was being loaded or in the process of being transported, did the attention turn back

to the house as far as clearing it?

A    Yes, we still had the mission to complete, an operation to complete.

Q    And what was done to complete that mission and that operation, sir?

A    Raymond -- I don't know who said it, too, but we knew we needed to clear the house.  So Raymond Greninger and I entered the house and cleared the bottom portion of the house.

Q    Okay.  And you had seen the model at the -- at Camp Gruber?

A    Yes.

Q    And you have seen the floor plan that we have here?

A    Yes.

Q    Is this an accurate depiction of the condition of the house?

A    The best I can remember on the layout.

Q    And was the model that you all had at Camp Gruber, was it accurate and give you a good depiction of the layout of the house?

A    The best I can remember, it did also.

Q    Okay.  When you cleared the bottom, was anyone else in there?

A    No, sir.

Q    Did you notice any firearms in that residence?

A      Yes.

Q      What did you notice?

A      In the doorway of where the subject had been laying, there was an AR-15 type rifle laying there in the doorway or close to the doorway.

MR. LITTLEFIELD:   I would ask that Government's Exhibit 15 be displayed to the witness.

THE COURT:   You may.

Q      (By Mr. Littlefield)   Do you recognize what is depicted in Government's Exhibit 15, sir?

A      Yes.

Q      What is it?

A      That's the rifle I saw in the doorway.

Q      And is that the location?

A      Yes.

Q      Okay.   And where in relation to that doorway was the person that you saw laying on his stomach as Trooper Hamilton went in and pulled him out?

A      Laying on the rifle.

Q      Did you see any other firearms at that time when you entered?

A      Yes.   There was a double-barrel shotgun back in the room.

Q      Do you see it in that photograph?

A      Apparently --

Q    Where was the shotgun laying?

A    It was laying back further in the room.

Q    And what do you see that apparently is the shotgun?

A    It looks like Number 12 there in that area.

Q    Okay.  Was there anything unusual about the magazines on that AR-15 type weapon that is marked 11?

A    I didn't examine the rifle, I just glanced at it, but I knew it had at least two magazines taped together.

MR. LITTLEFIELD:  I would ask Government's Exhibit Number 17 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield)  Sir, do you see Government's Exhibit Number 17?

A    Yes, sir.

Q    And you talked about the magazines being taped together?

A    Yes.

Q    What do you see there?

A    I see magazines taped together and the magazine well of an AR-15.

Q    And if the two magazines are taped in that fashion, what would they be taped to?

A    Another magazine.

Q    And where would that other magazine be located in relation to the weapon?

A    It's in the magazine well of the firearm.

MR. LITTLEFIELD:  I would ask that Government's Exhibit 47 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield)  Do you recognize Government's Exhibit 47?

A    Yes.

Q    And what is that?

A    That's the double-barrel shotgun I remember seeing.

Q    Now, in regards to this residence, you talked about clearing the ground floor.  Was that the only location in the residence that needed to be cleared?

A    No, sir.

Q    What other area, sir?

A    There is an area of the house, I'll refer to it as a loft or upstairs portion of the house that had to be cleared.

Q    Were you all aware of the existence of that?

A    Yes.

Q    And how -- do you recall how one got to that upstairs portion?

A    There was a real steep ladder, if not stairs, more like a ladder than stairs going up to it.  It was real steep.

MR. LITTLEFIELD:  I would ask that Government's

Exhibit 175 be displayed again.

THE COURT:   You may.

Q    (By Mr. Littlefield)   And where was the ladder and stairs -- or ladder, steep ladder or stairs leading to the loft area, sir?

A    (Witness indicated.)

Q    And what was done in regards to clearing that, sir?

A    It didn't take Raymond and I long to clear the house, it was so little.  We were just looking for people.  So by the time we got to the back and turned around, Danny Oliver and Rick Manion and Buddy had entered the residence.  Rick was standing on this -- these steep stairs.

Q    Okay.

A    He said he needed a mirror because he was wanting to do a visual sweep of the loft or the room upstairs before he made entry, so he said, "I need a mirror."  Buddy went back out, came back in with a mirror --

Q    What happened when Buddy came back in?

A    Danny Oliver and I had our rifles pointed at the ceiling to the loft area while Rick is on the ladder.

Q    Okay.

A    I hear Rick say -- or correction -- Raymond say to Buddy, "Buddy you've been hit."

Q    Then what happened?

A    I kind of glanced over at Buddy and he had blood --

Q    Where was the blood on Buddy?

A    On his face.  Raymond or one of us, I don't remember who, took the mirror from Buddy, handed it to Rick and then Raymond takes Buddy out of the house.

Q    Okay.  Did Trooper Manion clear the upstairs?

A    Yes, he cleared -- looked with the mirror and then him, and I believe Danny Oliver both went upstairs and cleared that upper room, or Danny covered him while Rick was doing it.

Q    And was anyone in that upper room?

A    No, sir.

Q    After the house was cleared, what did you do then, sir?

A    We just backed out and it was -- they began to tape it off as a crime scene.

Q    When you all do these searches -- these entries, do you all do the searches?

A    No, sir.  Not ordinarily, we don't.

Q    When you finish obtaining entry, securing the premises, what do you do with that location so that the search warrant can be executed?

A    We always turn it over to the requesting agency is what we have done in the past.  It's request the warrant so they can search.

Q     Did the other individuals that was compromised or comprised the -- not compromise -- comprised the requesting agency, did they arrive?

A     The people from the District Attorney's Office were there.

Q     And the individual who was pulled out of house, do you know if you all maintained custody or if custody of him was turned over to anyone?

A     I'm not sure when it was done because I didn't ever see him again, but it was ultimately turned over to the sheriff's office, I believe.

Q     And was that ever your focus?

A     No.

Q     How close attention did you pay to the person that came out of the house?

A     None really at all after he was taken out of the house.

Q     Okay.  And how good a view did you have of him?

A     Not very good.  I could just see his head really in the house, so -- and that was -- it wasn't for a long period of time.

Q     Do you recall the light conditions that night?

A     We had a very full moon.

Q     The front door of that house, as you approached it on the Bronco, opened or closed?

A    The door was open.  It was an open doorway.

Q    Any lights on inside the house?

A    Yes.

Q    Where?

A    It seems, the best I can remember, one coming from like the living room area of the house.

Q    There were five vehicles in this entry team and you have described where four of them went?

A    Yes.

Q    Where did the fifth one go?

A    It went next door.

Q    When you say next door?

A    To the residence to the west.

Q    And who was occupying that fifth vehicle?

A    At the time, it was Lieutenant Pettingill and Lieutenant McBride.

Q    And what was McBride's position in regards to the team?  Was he normally a team member?

A    No.

Q    Why was McBride there?

A    We were a couple of people short and he come over, I guess, just to kind of help Kerry with the running of the team.

Q    When you say Kerry, Kerry who?

A    Kerry Pettingill.  Lieutenant Pettingill.

Q    And what was Lieutenant Pettingill's circumstance in regards to the team?

A    He was team -- he was the commander.

Q    You joined the team in when?

A    It was about December of 1995.

Q    Okay.  Was Pettingill -- do you recall, was Pettingill the commander the whole time that you were there?

A    No.

Q    No, you don't recall or no, he wasn't?

A    He wasn't.  He wasn't the commander at the time I got on the team.

Q    When you joined, was there a different commander?

A    Yes, sir.

Q    Okay.  Do you remember exactly when he came on?

A    No, I sure don't.

Q    Why were Pettingill and McBride over next door?

A    The intelligence that we did have said at times the subject we were going after, that was his mother's residence and he would run that way or possibly be there.

Q    Okay.

          MR. LITTLEFIELD:  May I have just a second, Your Honor?

          THE COURT:  You may.

Q    (By Mr. Littlefield)  Do you recall what clothing the

person that was dragged out was wearing, what kind of clothing it was?

A     No, sir, I don't.

MR. LITTLEFIELD:  Okay.  Can I have just a second, Judge?

THE COURT:  Yes.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross-examine.

CROSS-EXAMINATION

BY MR. HILFIGER:

Q     Mr. Poe, approximately how many missions had you been on at the time of this one?

A     I really don't know, sir.

Q     Well, let's maybe look at it another way.  How many times a month or a year or something like that would you go?

A     I would have to say eight to ten times, twelve times a year probably on average we were called out.

Q     Okay.

A     It varied.  Some months we would go two or three months without a call-out, and then we might have three in a month, so that's just a guess.  I never kept count.

Q     How many times had you served, that you recall that your TAC team was on, that it had done no-knock missions?

A     This is the only one I had ever participated in that

I recall.

Q    Was there anything discussed during your -- you were there at some kind of a briefing on the 23rd out at Gruber?

A    Yes, sir.

Q    And then there was another briefing that night, I guess?

A    Yes.

Q    At either one of those briefings, was there anything discussed about something needed to be done different because this was a no-knock?

A    I don't understand your question.

Q    Well, the fact that this was a no-knock --

A    Yes.

Q    -- mission, was there anything expressed by any of the other members about being on no-knocks before?

A    Not that I recall.  I don't --

Q    Did you express anything about, hey, this is the first time -- first one I've been on?  What do we need to do that's different?

A    No, I didn't.

Q    Can you recall anybody else asking about it?

A    No, I don't.

Q    And as I understand, you said that the practice, whether it was a policy or whatever, but the practice was

that, on any of these missions, as soon, if not before entry, you activate all emergencies; is that right?

A     Yes, that was what we always done.

Q     And that was the practice.  Do you know if that was written anyplace?  If that was a policy?

A     To my knowledge, it's not written anyplace, but that's the way we just always done it if you was driving.

Q     Did you guys have any kind of written policies on how to take care of different missions?

A     No.

Q     To your knowledge, there wasn't --

A     No.

Q     -- any policy?  It was just all sort of understood; is that right?

A     There was a general TAC team policy, but it pertained more or less to call-outs and whatnot.

Q     Not how to --

A     Not how to execute anything.

Q     When you say activate all emergency, does that include sirens?

A     No, not usually.  We just do our lights.

Q     Okay.  And what about Pettingill and McBride, was there any understanding of what they were to do as far as their emergency lights?

A     Not that I recall.  I just know where they were going

to be at.   I don't know what was -- I don't remember any discussion about the emergency lights.

Q     On Pettingill or any of them?

A     Well, I wasn't driving.   And with everything that has happened in the past -- anything that -- everything that has happened since, it's something I don't think I could remember if it was ever discussed or not.

Q     Okay.   I didn't understand.   Happened since.   What do you mean?

A     Well, the circumstances, everything that has happened, it's something that I didn't -- I haven't thought about again if --

Q     Since that time, you haven't thought about it?

A     Yeah.   Yeah.   And since I wasn't driving a car that night, it's something I might not have remembered anyway.

Q     Okay.   That wasn't your concern?

A     No.

Q     Well, then, in any of this, as I understand what you're saying, when you're getting into these objectives or these planning sessions, like what happened sometimes in the afternoon and sometimes at night, you all give your own input --

A     Yes.

Q     -- from maybe your perspective what needs to be done or what you can do?

A    Yes.  If anybody has any ideas, it was just practice to say them.

Q    Okay.  And you say that, prior to this time, one of the things you could do is say let's cancel this or let's postpone it?

A    Yes.

Q    But it had never been done prior to this incident?

A    Not to me -- not that I know of.

Q    As far as any you were on?

A    No.

Q    But since this incident, it has been done?

A    Yes.

Q    How many times since this incident have you -- are you aware of that one has been cancelled or postponed?

A    That's the only one I'm aware of.

Q    Just one of them?

A    Yes.  But I haven't been on the team for a while.

Q    Did you -- do you remember the discussion of when this particular -- when you were going to execute this plan, the timing of it?

A    Yes.

Q    Do you remember any discussion on that?

A    Yes.

Q    Okay.  And do you remember the time that was picked was 12:30; right?

A      Yes.

Q      Okay.   Do you remember if there was any tactical discussion as to why 12:30?

A      No.

Q      Do you remember the reason 12:30 was picked?

A      No.

Q      When your -- as a sniper either on the creek team or a cover man, you have a responsibility on some kind of weapon; is that right?

A      Yes.

Q      And in order to prepare that weapon or prepare to be there, do you do something as far as loading the weapon?

A      Yes.

Q      Do you make sure it's loaded?

A      Yes.

Q      Because it's your weapon that's issued to you that you keep with you all of the time, don't you?

A      Yes.

Q      Do you do something to check to make sure that you've got certain ammunition in there, certain numbers of ammunition or anything?

A      Well, on -- are you talking about just in general?

Q      In general.

A      Or a particular firearm?

Q      Well, in general.

A     Well, in general, like check loaded magazines, things like that, yes.

Q     Okay.  You were using the HK 53?

A     Yes, sir.

Q     And the HK 53, do you have more than one magazine for that HK 53?

A     If I recall correctly at the time, we had three.

Q     You had three mags?

A     Yes.

Q     And were -- did you have any of your magazines hooked together, or were they just all individual?

A     They were individual.

Q     Do you know whether some people on the team had their magazines hooked together?

A     I know they had the capability to do it.  We had a device to hook them together, but I don't know if anybody did or not.

Q     And this HK 53 fires what, .223s?

A     Yes, sir.

Q     Now, what would -- what did you do on this particular mission to make sure that that weapon was loaded?

A     I just put -- check the magazine and put the magazine in it.

Q     Okay.  Do you know how many bullets were in the magazine?

A     If I recall correctly, it's been several years since I've had a 53, I believe it had a 25-round magazine.  And usually I would carry a couple of rounds -- put 23 in it most of the time and then top it off before a mission. But I can't -- that's what I would usually do.

Q     So whether it's in your car or when you are carrying it around without a particular mission to go on, you won't have the magazine fully loaded?

A     I usually didn't, no, sir.

Q     But when you got ready to go on a mission, you would fully load the magazine then?

A     Usually I would, yes.

Q     And what about the chamber of the rifle?

A     Then I would chamber a round.

Q     So in your HK 53, the normal procedure, you would have the magazine fully loaded, plus one in the chamber?

A     Well, I would have -- usually I would just take one -- it would be 24 in a magazine and one in a chamber if it's a 25 round magazine, because I would chamber the magazine -- or chamber the rifle out of the first round of the magazine.

Q     Okay.  So you had 25 rounds and, of those 25, one of those would be in the chamber?

A     Yes.

Q     Okay.  Now, do you -- was that the only rifle that

you used or you had anything to do with, that HK 53?

A     That night or --

Q     In general.

A     In general?  No, sir, I had another rifle.

Q     What was the other rifle?

A     It was a .308.  It was a sniper rifle.

Q     Okay.  That's what you -- you didn't use that that night?

A     No, sir.

Q     Did you have any familiarity with the MP5?

A     Yes, I was familiar with the MP5 also.  Basic same operation as the 53.

Q     Same basic operation?

A     Yes.

Q     On that HK 53, do you know -- are you familiar with the ejection pattern of the HK 53?

A     Oh, yes.

Q     What kind of ejection pattern did that have?

A     The HK 53 has a very strong ejection pattern and it spreads the rounds over a big area when they eject.

Q     Okay.  In which directions?

A     All directions.

Q     Okay.

A     The HKs were designed to shoot out concealed positions.

Q    Now, I didn't understand.

A    When they designed the HK --

Q    All right.

A    -- the Germans designed it for positive extraction to shoot from concealed positions to disburse your brass.

Q    Okay.  You are using far more weaponry terms than I'm aware of.  When you say positive -- positive --

A    Ejection.

Q    -- ejection, what does that mean?

A    It really kicks it out.  They kick the hulls a long way.

Q    Okay.  Do they go right, left, up, down, or what?

A    Well, they will -- they'll go to the right, but they will go -- not all of them will go in the same place.

Q    Okay.  Are you familiar with the MP5?

A    Yes.

Q    Are you familiar with the MP5 ejection pattern?

A    Really not as much because I didn't shoot it as much.

Q    Okay.  Do you know whether it's ejection to the right or --

A    It's ejection to the right, but I'm not --

Q    When you got to that position by the gate, Hise got out of the car first; is that right?

A    Yes.

Q    Then Darst got out and ran around to the back?

A    Yes.

Q    You got out and went to the front to the post?

A    Yes.

Q    Now, were you at the post when you first heard the gunfire, or were you still around by the car?

A    I was approaching the post.

Q    Okay.  And when you -- did you look around the post at all while the gunfire -- while you were hearing the gunfire, or did you just stay right behind the post?

A    The best I remember, I stayed pretty much behind the post.  I don't remember looking around.

Q    From your position behind the post, could you tell -- well, from the time you got out of your car until the time you got to that post, could you tell whether there were any emergency lights on any of the vehicles there?

A    I don't remember at that point.

Q    You don't remember if there were any lights on, or did you --

A    I don't remember if there was any lights on.

Q    Now, then you went from the post to the other side of the gate; is that right?

A    Yes.

Q    Where the lock was, or the chain?

A    To that side, yes, and went through the fence.

Q    Could you put Number 69 on?  I'm putting up here

Number 69.   You're familiar with that?

A       Yes.   Yes, sir.

Q       When you were at the other side of the gate, what were you able to see at that point?   After you left the post -- when you left -- the post was over here; right?

A       Yes, sir.

Q       Okay.   And you went from that there over to this point?

A       Yes.

Q       And then, when you got to that point, did you look in this direction at all?

A       No, I just advanced.   Got through the fence and advanced to the Bronco.

Q       Okay.   And you went from here to where?   To all of the way up to here?

A       Yes.   Yes.

Q       So when you got to this -- to this gate right -- when you got to this point here, the Bronco was already approaching into the porch, or he had already --

A       No, it was there.   It was stopped before I started up.

Q       Okay.   Then I'm sort of mixed up here then.   You said -- okay.   Where were you when you first saw the Hamilton car coming into the view?

A       I was at the post.

Q    Okay.  You were still here when you first saw Hamilton's car?

A    Yes, sir.

Q    That's when you say you saw the smoke and the glass?

A    Yes, sir, and I saw the lights.

Q    And you saw the lights?

A    I remember seeing the lights at that time.

Q    And at that point, you're saying Hamilton's car was somewhere --

A    Yes.  Yes, sir.

Q    -- back in this area?

A    Yes, the best I can remember.

Q    Now, can you recall where any of the other cars were, other than the one you came in?

A    At that time, no.

Q    You didn't see Greninger's car?

A    No.  I don't -- I don't remember seeing it.

Q    What about Hash's car?

A    No, sir.

Q    And then you come across to the gate and you come directly into where --

A    Yeah, I went through the fence and then come up to the Bronco.

Q    And as you were coming down through here, do you remember seeing the Greninger Bronco or the Hash car?

A    No, I don't.

Q    Your focus was getting into that Bronco; is that right?

A    Yes.

Q    When is your first recollection -- well, okay.  As you were coming down here, your focus is in this area, is that what I'm understanding?

A    Yes.

Q    You are running from here -- and I'm assuming you're running; right?

A    Yes.

Q    You're running from here down to the Bronco and your focus is directly in front of you, somewhere along in here?

A    Yes, around the Bronco there at the house.

Q    Did you see anybody exit the Bronco?

A    Not at that time.

Q    You just saw movement?

A    Movement is all I can really say I saw.  I can't consciously say, yeah, I see somebody get out of the door.  I just remember movement.  I can recall movement around the Bronco when I was at the post.

Q    And all -- and you heard rapid gunfire?

A    Yes.

Q    And then it stopped?

A    I -- I can't remember.

Q    Okay.

A    I'm not saying it stopped.  I don't remember any more fire.

Q    Did you hear any different type of gunfire?

A    No, sir.

Q    Okay.  Just the rapid gunfire?

A    Yes.

Q    Can you recall either seeing or hearing the flash-bang?

A    No, sir, I can't remember it.

Q    You can't remember that one, either?

A    No, sir.

Q    So you get down here at the Bronco and you're laying across --

A    Yes.

Q    -- somehow across that hood of that Bronco.  And at the time you're doing that, Buddy Hamilton is on the other side of the Bronco; is that right?

A    He is -- he is up on the porch.

Q    Oh, he's on the porch?

A    Yes, when I get to the Bronco, Buddy is on the porch of the house.

Q    But on the porch in this area right here?  I mean, is he to the -- is he to the right of the Bronco, or is he on

the porch to the left of the Bronco?

A    He's -- he's a little bit to my left there in front of the Bronco.

Q    Okay.  You're saying Buddy Hamilton is somewhere down here?

A    No, he's on the porch.

Q    Okay.  Up here on the porch?

A    Yes.

Q    Okay.

A    Yes.

Q    And you have a clear view into the door?

A    Yes.

Q    Okay.  But you don't see anybody immediately?

A    I immediately see -- at this time, I see a man laying down, or a man's head come out of that doorway --

Q    Okay.

A    -- from laying prone.

Q    Did you see Manion -- did you see or hear any sound from Manion?  Do you know where Manion was at that particular time?

A    No, I don't.

Q    How long did you remain at the scene?

A    I don't remember.

Q    How did you get from -- where did you go when you left the scene?

A    After we left, they had arranged for some cars to come and pick us up and we went to a -- I'm going to call it a D.A.'s annex of some sort in Sallisaw.

Q    Okay.  So you went as a group?

A    We were there as a group, except for the ones that had went with --

Q    Eales?

A    -- Eales.  And, of course Buddy wasn't there.  But the rest -- I believe the rest of us went.

Q    While you were -- after you cleared the house, did you stay around there for any length of time, or do you recall?

A    We stayed there for a while, but I couldn't tell you how long.  I just -- my concept of time was just gone.  I don't -- I don't know.

Q    When you left -- or can you recall the yellow --

A    Yeah, I remember.

Q    -- tape being up?

A    Yeah, I remember them putting up the tape.

Q    You put up some tape?

A    No, I didn't.  I remember them putting it up.  I remember it being put up.

Q    Okay.  When the tape is being put up, where were you located?

A    It seems like -- I believe -- as I recall, Lieutenant

Pettingill had pulled his vehicle over here and to the driveway.

Q    Okay.

A    And we -- we was down there around that vehicle in that vicinity toward -- toward the road.

Q    You're talking about someplace in here?

A    Somewhere back in there is where I was, is in that area somewhere.

Q    And were other people inside the taped area doing things?

A    I don't recall.

Q    Did you see anybody after -- you know, when you cleared the house and came back out?

A    Yes.

Q    Where was that Bronco?  In the same location --

A    The best I remember, it was still in the same location.

Q    While you were there with Pettingill, did you see anybody move that Bronco?

A    No, sir, I didn't.

Q    Did you see anybody get in the Bronco and take the keys out?

A    No, sir, I didn't.

Q    When you left -- when you left the area, can you recall the location of the Bronco?

A    I don't know for sure, but I think it was in this position here.  And I can -- I don't know when it was moved.

Q    So it had not been moved as far as --

A    Not -- not -- you know, I don't remember looking over there and looking it over before I left.  But the last time I remember seeing it, it was there.

Q    Okay.  When you left, do you know whether or not Kenny Barrett was still there, or had he left --

A    I'm not sure.

Q    Did you ever see how long -- did you ever see Kenny Barrett leaving?

A    No.

MR. HILFIGER:  May I have a moment, Your Honor?

THE COURT:  You may.

Q    (By Mr. Hilfiger)  You had talked about hearing the glass being knocked out of the -- out of the Hamilton vehicle?

A    Yes, sir.

Q    And when that was being done, did I understand that you were right on the steps or the porch?

A    No.  No, sir.  I was still across the hood of the Bronco.

Q    You were still across the hood when the glass was being knocked out?

A    Yes, sir.

Q    While you were across the hood of that Bronco, did you -- did you hear or see anybody get in the front of that Bronco --

A    No.

Q    -- in the driver's --

A    I don't remember that.

Q    You don't remember anybody getting in it?

A    No, sir, I don't.  I just remember them beating on the back glass, or I assume it was the back glass.

Q    While you were out there waiting with Mr. Pettingill, did anybody talk to you about writing down a statement as to what happened?

A    I don't remember that.  I didn't remember it until I read the statement I give to OSBI.  I don't remember.

Q    You gave a statement to OSBI?

A    Yes.

Q    Did you ever handwrite a statement out about --

A    Not that I remember.

Q    Do you remember anybody telling you to do that?

A    I didn't remember it until I read my statement.  I don't remember -- I didn't remember it until I read my statement I gave OSBI where I told them that.

Q    Okay.

A    Okay.  I don't remember.

Q    Okay.  I understand what you're saying.  You told OSBI that somebody told you to write down your statement?

A    Yes.

Q    But you never wrote one in the first place?

A    Not that I remember.

MR. HILFIGER:  I have no further questions.

THE COURT:  Redirect?

MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.

MR. HILFIGER:  May I -- I'm sorry, may I have just --

Q    (By Mr. Hilfiger)  You mentioned that in the policies or tactical team stuff, that there is a -- the only thing you could recall in any kind of manual on TAC team is something about call-outs.  What are call-outs?

A    Well, what I was referring to, I think there is a procedure that's -- and this is off memory.  I haven't looked at it in a long time.  On a procedure that needs to be gone through to call out the TAC team.

Q    Okay.  It's not -- it's not how you take an operation or how you --

A    No.  No, sir.  It's just on -- it's just more administrative type.

Q    How you're informed to go on --

A    Yes.  Or how -- the process that's gone to request

the TAC team to be activated.

MR. HILFIGER:  Okay.  Okay.  Thank you.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    You indicated about Lieutenant Pettingill's vehicle being moved into the yard?

A    That's what it seems like.

Q    Do you remember Trooper Hise's vehicle coming into the yard?

A    Yes.

Q    And what was the circumstance of that?

A    While I was maintaining my cover position over the hood of the Bronco, I heard Gene's car start up.  I didn't know at the time it was Gene, but I heard his car start.

Q    Uh-huh.

A    He crashed through the gate and come into the yard.

Q    Okay.  In regards to the selection of time, 12:30 p.m., the hour being selected for the execution?

A    Yes.

Q    Do you recall what kind of warrant this was?  What kind of -- and I'm not talking about search warrant, but search warrant for what?

A    Drugs.

Q    And in the intelligence, did you have information in regards to what type of drug?

A     I believe it was methamphetamine.

Q     Had you previously had experience in executing methamphetamine search warrants?

A     Yes.

Q     What is the predictability of the hours of sleep or awake of meth users?

A     You can not predict it.

Q     You mentioned the HK 53s?

A     Yes.

Q     You had one on this mission?

A     Yes, sir.

Q     How many HK 53s were on the team?

A     On the mission or total?  I mean, in general?

Q     Well, first, on this mission, how many were being used?

A     I believe, as I recall, I had the only one.

Q     The team itself, how many were available?

A     Everybody had one.

Q     You made the statement about -- when you looked inside and saw Buddy on the porch, you made a statement -- and I tried to get it -- I think this is what you said, that you saw a man's head coming out of the doorway?

A     Yes.

Q     Okay.  And I'm trying to understand that.  When you say coming out of the doorway, did you mean he was falling

out or that's just the location?

A    His head was in the doorway.  He was laying there --

Q    Okay.

A    -- when I got there.

Q    So it wasn't that you saw it coming out as it fell.  That's where it was located?

A    No, he was laying prone when I got to the Bronco.

Q    Okay.  That's all I have.  Pass the witness.

THE COURT:  Further cross-examination?

MR. HILFIGER:  No.

THE COURT:  May this witness be excused.

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  Subject to recall, Judge.  I think he also has a -- he should have a subpoena on him also.

THE COURT:  Officer, you may be excused from testimony.  You're subject to recall.

THE WITNESS:  Thank you.

THE COURT:  Let's take a 15 minute recess.  I'll ask everyone in the courtroom to please remain seated as the jury leaves for the morning recess.  I'll remind the jury not to discuss this among yourselves or allow anyone else to discuss it with you.  Report it to me if anyone attempts to.  Now, if you would just leave through this

door.

(Jury excused.)

THE COURT: Let the record reflect that the jury has departed the courtroom. Anything to take up out the hearing of jury on behalf of government?

MR. LITTLEFIELD: No, Your Honor.

THE COURT: Defendant?

MR. HILFIGER: No, Your Honor.

THE COURT: We will be in recess for 15 minutes.

(Off the record at 10:49 a.m.)

(Back on the record at 11:12 a.m.)

THE COURT: Let the record reflect the jury is in the box, counsel for the government is present, defendant and counsel are present.

You may call your next witness.

MR. LITTLEFIELD: Kerry Pettingill.

THE COURT: Sir, if you would raise your right hand and stand before the Clerk and be sworn.

(The witness was duly sworn by the Clerk.)

THE WITNESS: I do.

THE COURT: You may proceed.

MR. LITTLEFIELD: Thank you, Your Honor.

KERRY PETTINGILL,

being first duly sworn to testify the truth, the whole

truth, and nothing but the truth, testified as follows:

<div align="center">DIRECT EXAMINATION</div>

BY MR. LITTLEFIELD:

Q    State your name for the record, please, sir.

A    Kerry Pettingill.

Q    Mr. Pettingill, how are you employed?

A    I'm employed by the State of Oklahoma.

Q    What capacity?

A    I'm the State Homeland Security Director.

Q    And how long have you been the director of Homeland Security in the state of Oklahoma, sir?

A    Since January of 2004.

Q    And how is that position obtained?

A    I'm appointed by the governor.

Q    Previous to that -- or let me withdraw it.  With what agency is the director of Homeland Security affiliated, sir?

A    We're housed at the Department of Public Safety by executive other.  We're a stand-alone agency, but we're housed at another agency.

Q    In regard to the Department of Public Safety, have you previously been connected or affiliated with that agency, sir?

A    Yes.

Q    And in what capacity?

A     As a state trooper.

Q     And how long have you been with -- associated with the Oklahoma Highway Patrol, sir?

A     Over 23 years.

Q     What were you when you started out as a trooper?

A     A trooper.

Q     Just running the roads and enforcing the rules and regulations of the roads?

A     Yes.

Q     Okay.  Did you ever have any kind of connection with the tactical teams?

A     Yes.

Q     And when did you begin your association or connection with the tactical team, sir?

A     In 1985.

Q     Okay.  And in what capacity were you serving when you began in 1985?

A     Just as a team member.

Q     Now, in 1985, how many teams were there?

A     There were two.

Q     Okay.  East and west?

A     Yes, sir.

Q     And which tactical team were you associated with in 1985?

A     The west.

Q    Did you receive a promotion so that you became connected with the eastern tactical team as well?

A    In 1991, I was promoted to supervisor and was assigned as an assistant commander.  But I was assigned to the west team, but I still had some responsibility over the east team if the commander was away and I was assigned as the acting commander.

Q    Okay.  Did you ever become commander?

A    Yes.

Q    And when did that happen, sir?

A    In 1997.

Q    Prior to 1997, did you have any official control over the eastern tactical team?

A    Only -- only as -- whenever I was an acting commander.  There was another supervisor over the east team.

Q    And when the commander -- the commander is responsible for which -- which team, or both?

A    The commander is responsible for both.

Q    Okay.  And when the commander was present prior to your becoming the commander in '97, when you were acting commander, who -- when he was present, who was responsible for the east team?

A    The commander.

Q    Okay.  And so your actual responsibility full-time

would have began when?

A    In 1997.

Q    Okay.  As the commander of the team, what was your responsibility in regards to both teams?

A    Overseeing their training, procuring equipment. Anytime that requests for assignments came in, they came in through me.

Q    Okay.  When you're talking about assignments, are you talking individual assignments to the team, or what?

A    Yes.  Anytime there was a request for a team to be utilized, that request would come to me.

Q    Okay.  In regards to the training, were you -- did you participate in and were you present at the various trainings the officers had?

A    Yes.

Q    Okay.  And how often did they train?

A    They trained two times per month -- or two days per month.  And then in the spring and in the fall, there were one-week training sessions.  But they -- the west team would train somewhere in the state, the east team would train somewhere in the state, so I wasn't at everybody's training each time.

Q    Were you responsible for coordinating and ascertaining the schedule of making sure appropriate items were being a part of their training?

A    Yes.

Q    As a part of their training, what is an officer -- what does an officer learn as a part of their training in regards to their responsibility on a mission?

A    They are given a particular assignment for that mission, and they need to concentrate on their assignment, to not worry about what anyone else is going to do.  It's this is what we want you to do.

Q    Why is that?

A    It's a team.  It requires each member doing a specific job in order to complete the mission.

Q    Okay.  In that regard, is their focus a part of, and what they are focusing on in operations a part of their training?

A    Yes.

Q    Okay.  As a consequence of that, when a team goes into operation, are the members aware of what other individuals are supposed to be doing and what the other members of the team's connection is with the overall mission?

A    Yes.

Q    Okay.  Where is their attention to be directed during the performance of the mission?  Where is the individual team member's attention to be directed?

A    At their task.

Q    Assignments -- or the determination as to whether or not a particular request will be accepted by the OHP is whose decision?  In other words, if I'm a member of some local drug task force, I have a search warrant, and I request that the Oklahoma Highway Patrol's tactical team to assist my operation in obtaining entry into a location, who makes that decision as to whether or not my particular search warrant is going to be assisted by the OHP TAC team?

A    Well, I would make recommendation that we either do or do not through their -- I had a captain, and that captain would generally go to the chief's office and let them know.  It was a process in that point that it was more of I would say, we have a request, I think it's something we ought to do, and then we would go do it.  I don't recall any time that we were told not to upon my request.  But there were times that I would say I don't think this is something for us to do, and we wouldn't.

Q    What kind of principles did you look at when a request came to you all in order for you all -- for you to determine, yes, this is something I would recommend we do, or, no, I don't think this is appropriate to our responsibilities and what our TAC teams ought to be involved in?

A    As much information as we could about the particular

process that they wanted us to do.  If it was a warrant, then what are the particulars about the warrant?  Why is it that a local police department, sheriff's office, or task force cannot do this particular job?  And they would generally tell me, you know, various types of situations. The person has a known history of being violent.  We believe, you know, that there is going to be something else there.  You know, it's going to be too many people for us to handle.  Just a lot of different scenarios that would come up that we would have to look at.

Q     Generally, what kind of operations was it that were accepted by the -- by the tactical team?

A     Generally, it was when it was a known individual, and there was -- they believed that there would be a propensity for some type of violence.

Q     Do you recall this particular operation that we're here about today that occurred on September the 24th of 1999?

A     Yes, sir.

Q     Okay.  And who was the requesting agency, or who were the individuals that were requesting your assistance?

A     Right.  Well, the first call I got was from Danny Oliver.

Q     Okay.  And what did you learn from Mr. Oliver?

A     Danny told me that there was a possibility that they

would have a search warrant that they would need for to us execute.  They had not obtained a warrant yet, but they were looking at getting one.

Q    Did you know the individuals that were seeking the warrant that were requesting assistance?

A    Yes.

Q    Who were they?

A    District 27 task force.

Q    Do you remember the particular names of the persons?

A    In particular, Clint Johnson.

Q    Was this the first occasion that Mr. Johnson had asked for assistance from the TAC team in regards to entry on an area for a search warrant?

A    No.

Q    Okay.  You were familiar with Mr. Johnson previously?

A    Yes, sir.

Q    When -- when the information comes to you in regards to the warrant and -- and the decision-making process is being entered into as to whether you're going to take it or not, do you talk directly to the local officers, or is someone else doing that and filtering the information through to you?

A    It varies.

Q    And --

A    Sometimes I did.  Sometimes I'd have somebody else do

it.

Q    In this particular case, who initially made -- from the team, once you ascertained that, well, there's possibility, who was it that ended up talking directly to Mr. Johnson or any other members of the District Attorney's drug task force?

A    Trooper Hamilton and Trooper Greninger.

Q    And how did they know to get in touch with Mr. Johnson?

A    I told them to.

Q    Okay.  And after they met, did Troopers Hamilton and Greninger report back to you?

A    Yes.

Q    What was the nature of the information they provided you?

A    Well, when I contacted them, I told them that we needed to do an aerial surveillance.

Q    Okay.

A    At the time I contacted them, I knew at that time that there was -- there was going to be a warrant or they had a warrant.

Q    Okay.

A    And to make contact with Clint Johnson, that I wanted them to do an aerial surveillance.

Q    Okay.

A      And then report back.  Trooper Hamilton is the one that contacted me back.

Q      Uh-huh.

A      And said that they had completed that.  And from the information that Clint Johnson had given him -- and I believe Frank Loyd was with them at the same time.

Q      Okay.

A      But anyway, that he believed that it was a mission that we should take.

Q      Okay.  And did you receive the nature -- the information from Mr. Hamilton -- from Trooper Hamilton in regards to why it was an appropriate mission for the tactical team?  Did he give you some of the background that would have justified his recommendation?

A      Right.  There was past history on the occupant of the -- of the house that was going to be searched.  Mr. Oliver had also made some statements about that as well.

Q      Okay.  Based upon that information and what you got, what was your recommendation as to whether or not the mission should have been undertaken?

A      That we should take the mission.

Q      Okay.  And, in fact, was there an approval from your higher up?

A      There wasn't -- it was more of -- I had told Captain Harris, who was my captain at the time, that this was a

possibility. And then I called him back and said it's -- it's a deal, we need to take the mission. And he said okay. There wasn't a report back to me saying --

Q    Okay.

A    -- we've been approved for it. It's keep us informed.

Q    Okay. When were the members to assemble after the decision was made yes, this is a go? Do you recall the date and indication where the assembly was undertaken?

A    On the 23rd.

Q    At what location?

A    At Camp Gruber.

Q    And were you there? Did you go to the team meeting on the -- on the 23rd?

A    Yes.

Q    Okay. How many members are on a team -- on each of the teams in regards to these kind of operations?

A    Back then, there were 11.

Q    Okay. And are you a part of the 11?

A    No.

Q    Okay. How many -- who all was present and was going to participate in the execution of this particular warrant?

A    Of the 11?

Q    Just my -- who all was there?

A    Okay.   Trooper Hamilton, Trooper Greninger, Trooper Darst, Poe, Hash, Hise.   And then Lieutenant McBride was an assistant commander.   And myself.

Q    What about Manion?

A    Oh.   Trooper Manion.

Q    Okay.   There has been mention of Danny Oliver.

A    Uh-huh.

Q    Was he going to participate?

A    Yes.

Q    Okay.   And was Mr. Oliver affiliated with the tactical team at that time?

A    No.

Q    What, if any, affiliation had Mr. Oliver had with the team?

A    Danny was retired from the highway patrol.   He had retired just a short time prior to September.   And upon his retirement, he was a team -- a team leader for the east tactical team.

Q    At the time of his retirement?

A    Yes, sir.

Q    And was he still affiliated with law enforcement?

A    Yes.

Q    As a consequence, would he have had authority in regards to the operation of this warrant?

A    Yes.

Q    When you got to Camp Gruber, how was the plan developed?

A    Trooper Hamilton briefed everyone on the information that they had obtained, and --

Q    What kind of information was provided?

A    Some aerial photographs.  And there was, I believe, a diagram or even perhaps the -- there was a model.  I'm not for sure whether the model was there or later on, but we also had a model at some point in time.

Q    What other information was provided to the team?

A    That was -- I mean, he just gave us the information about -- that the warrant itself -- he had a copy of warrant.

Q    Was there one or two warrants?

A    There was a search warrant, and then there was arrest warrants.

Q    Would you look at Government's Exhibit Number 87?  It will be displayed to your left and it will also be displayed on the screen up here for the jury.

A    Okay.

Q    Did you view the arrest warrant?

A    Yes.

Q    Do you recognize Government's Exhibit Number 87?

A    Yes.

Q    What is that?

A      It is a bench warrant for Kenneth Eugene Barrett.

Q      Is it the bench warrant you all had on September the 23rd?

A      Is it -- I don't know if this is the actual one.   I mean, it resembles what I remember.

Q      Okay.   Do you remember the search warrant?

A      Yes.

Q      Would you look at Government's Exhibit 88?   And it will be displayed again.   Okay.   Do you see Government's Exhibit 89, both pages?

A      Yes.

Q      And do you recognize that, sir?

A      Yes.

Q      What is that?

A      It is a search warrant for the residence of Kenneth Barrett.

Q      Is that the search warrant that you all had?   Or is it a copy of it?

A      Yes, sir.

Q      In addition to that, did you have any information in regards to the terrain and the neighborhood surrounding the residence?

A      Yes.

Q      What was the nature of that information, sir?

A      That it was in a rural area, that there were several

houses around.  There were some open areas and then some areas where some trees and bushes and things like.

Q    Okay.  In regards to the neighbors, did you have any information about them and their affiliation to Mr. Barrett, if any?

A    That there were a number of the neighbors that were relatives.

Q    Okay.  Did you know who his closest neighbor was and that relationship?

A    That would be his mother.

Q    Okay.  And did you know where -- did you have information in regards to where his mother's residence was located?

A    Yes.

Q    Did that have any bearing in the formulation of your plan?

A    Yes.

Q    Okay.  How did that have bearing in relation to the formulation of the plan, sir?

A    Just its close proximity to the residence that we were supposed to search.  It was very close.  And it was indicated to us that, if we were seen approaching, that he may run to that residence.

Q    Okay.  And in regards to any risk to law enforcement, was any information provided in that regard?

A      Yes, sir.

Q      And what was the nature of that?

A      We were told that -- that if he had an opportunity, that there would be gunfire involved.

Q      Did that have any impact in the plan -- in the formulation of the plan?

A      Yes.

Q      What was the original plan, if you recall?

A      The original plan called for a deployment of a, what we refer to as a creek team, a small team of people that would go out and conduct surveillance on the residence prior to the main body of the team coming in.

Q      Okay.  And in order to deploy a creek team -- by the way, as the commander, the head of both east and west tactical units, what authority did you have over this operation, either to approve its going or to stop it at any point?

A      Total.

Q      In regards to the formulation of the plan, as it's being formulated at its initial stages and as it develops, what authority do the members of the operation have in regards to that plan?

A      Well, they have input into the formulation of plan.  It's their plan.  I didn't put the plan together, they put it together.  We review it, and then I approve it.

Q    Okay.   What happens if one of the members says this is absolutely wrong, it shouldn't happen, and has some strong objection about it?

A    Well, it would be discussed and it would be taken into consideration --

Q    Do you recall --

A    -- as to whether or not to make -- let it go forward or not.

Q    Okay.   Do you recall if there ever were situations in which -- a situation in which somebody said, hey, I've got a problem with this particular element right here, and even to the point of saying I don't think we should do that?   Do you recall that ever happening?

A    On this --

Q    Any plan.

A    Yeah.

Q    Previous -- prior to this or just after?

A    Prior.

Q    What happened?

A    We were going to execute a search warrant on a residence, and the suspect involved -- there was a small child that generally slept in the same room or in the same bed with the parents, and they were concerned about that child being in the room.

Q    How were those concerns addressed in that previous

case?

A    They just wanted to stop and call them out, as opposed to going inside the house.

Q    What was the decision in that case?

A    To go into the house.

Q    Why.

A    It had been faster.  There would have been no hostages.  There would have been -- it would just have been an easier thing for us to do.  And that's not part of our processes.  You know, the person -- they said that person posed a danger, and so, you know, we didn't want to give them the opportunity.  So it was to go inside and secure that person as rapidly as possible.

Q    Who was the team leader for this particular operation, sir?

A    The team leader was Trooper Hamilton.

Q    Okay.  And in regards to his position in formulating the plan as opposed to the other members, does he have greater authority, or is his, as a team leader, the same?

A    Well, he had a great amount of input and influence over it because he had the background on everything.

Q    Okay.

A    But he had a vote.

Q    Like every other member?

A    Yes, sir.

Q    Okay.   Now, you mentioned a creek team being inserted?

A    Yes.

Q    In order to insert the creek team, what other necessary things have to be done for the creek team's insertion to be successful and secure for their safety?

A    Well, number one, they have to be inserted.   You have to have a drop-off point.   You have to get them into the area, and then you have to maintain contact with them.

Q    Okay.   Where originally -- how was the entry onto the Barrett property to be -- how were they supposed to enter in the initial plan?

A    The creek team?

Q    No, the entry team itself in the initial plan.

A    I believe, in the initial plan, it was the same, the same way that the --

Q    Okay.   Do you recall if there was anything done before the operation itself that resulted in some changes in the plan?

A    Yes.

Q    What was that?

A    Some of the members conducted a drive-by of the residence to gather more information on it.

Q    Who?

A    Trooper Hamilton for sure, and I believe Trooper

Manion and Greninger.

Q    Okay.  And how did they go to the location to do the drive-by?

A    In Trooper Hamilton's vehicle.

Q    What kind of vehicle did he have?

A    A Ford Bronco.

Q    Okay.  Was it marked or unmarked?

A    Unmarked.

Q    Was there anything that had to be done to accommodate it to minimize its appearance as a law enforcement vehicle, do you recall?

A    They removed the antennas, the radio antennas.

Q    And do you recall approximately when it was that they did their drive-by?

A    It was late afternoon.

Q    Okay.  When they got back, do you recall what they reported in regards to the location that might have modified the plan?

A    Yes.  They came and said that -- that we should not deploy the creek team.  They just said we can't do it.

Q    Why?

A    Because of the terrain, it looked much different from ground level from the aerial photographs.  They were concerned about the neighbors and how well that they would be able to be concealed and protected.  That they would

not be able to leave a vehicle in the area to do a pick-up of them or stay within -- the radios were only going to work for a one mile radius.  They were concerned about not being able to be picked up if they were compromised.  And then leaving a vehicle in that area, who would see it and would that draw attention to it as well.

Q     Do you remember any discussion about animals?

A     Yeah, they said there were dogs in the area.

Q     How would that compromise?

A     Dogs barking, drawing attention to them being there.

Q     Okay.  Do you recall any discussion in regards to a gate when they came back?

A     Yes.

Q     What was that?

A     That at the driveway into the Barrett residence, there was a gate.  I believe they said it had a chain on it and they weren't for sure whether it was locked or not.  And it looked like it was a fairly solid gate, so they didn't know whether they would be able to crash the gate or not.

Q     Okay.  Now, when you said earlier you think that the entry was the same as ultimately, does the recollection in regards to the gate have anything do with that issue?

A     Right.  Well, yeah.  Now that -- you know, talking about crashing the gate and them pointing that out, it may

have been the first plan that they would go through the gate.

Q    Okay.  Was a time selected for the execution of this warrant?

A    There was.

Q    What time was selected?

A    12:30 a.m.

Q    And that would been on the 24th, the next day?

A    Yes, sir.

Q    Did you know what kind of drugs were affiliated with this warrant?

A    The warrant said methamphetamine.

Q    And in your experience regarding methamphetamine abuse and abusers, what -- what's time -- what time is best to enter someplace where somebody is using meth?

A    There is no particular good time.

Q    Why?

A    Because it depends on where they're at and the use of the drug.  They could be up for several days at one time without going to bed, or they could be coming down and crashing off of it and sleeping for a while.  So you just don't know.

Q    Is there any disadvantage or advantage of 12:30 as opposed to any other time in a meth user's case?

A    Not -- you know, not 12:30 in particular, no.

Q    What discussion was there on lights on the vehicles that were entering the property?

A    Those that were going onto the property were supposed to activate their emergency lights.

Q    When?

A    I believe as they were rounding the corner to go into the property.

Q    Okay.  What was the policy, general policy, in regards to turning over -- turning on emergency lights in the execution of search warrants from the OHP TAC team?  Not just this warrant, but any warrant.

A    I don't know of any policy that directed that.

Q    Okay.  I'm not talking written policy.  What did you all do on your missions in regards to lights?

A    In the past, we had always activated lights.

Q    Why?

A    Just to give -- if we didn't have that element of surprise, that they were asleep, that they would know that it is the police.

Q    Okay.  And what vehicles were going to enter at this particular location?

A    Onto --

Q    Onto the property.

A    Onto Kenneth Barrett's property, the two Broncos and a Crown Victoria.

Q     And whose Crown Victoria was going to make entry?

A     Trooper Hash.

Q     And what kind of emergency lighting did Trooper Hash's Crown Victoria have?

A     It had a light bar across the top of it.

Q     Okay.  What was the -- and I'm not going to -- practice, not policy.  What was the practice of the tactical team in regards to making entry onto property, vehicles selected, and the use of a black and white marked unit?

A     It was just that if -- you know, we would usually take a black and white car onto the -- onto our property whenever we would go.

Q     Why?

A     It's a very recognizable vehicle.  Most people see a black and white car and think police.

Q     Okay.  Same reason that the lights are turned on if you don't have surprise?

A     Yes, sir.

Q     What kind of warrant was this?

A     It was a day or night, no-knock search warrant.

Q     In your recollection as the team commander for the eastern half, how many previous no-knock nighttime search warrants had been executed by the eastern half -- eastern TAC team?

A    As I was the commander, I don't recall any.

Q    Okay.  And you have been commander since?

A    '97.

Q    When in '97?

A    December.

Q    So how long had you been commander of the eastern half?

A    Probably just over a year and a half.  Year and seven, eight months, something like that.

Q    Okay.  What is the difference between a no-knock and a knock-and-announce warrant?  What is the difference?

A    Knock-and-announce, you have to knock, announce who it is, and give the people inside an opportunity to open the door.

Q    Okay.  This wasn't -- I'm sorry.  This wasn't a regular warrant where you had to knock and announce.  What was to be done here?

A    It was a no-knock warrant.  There was no requirement to knock and announce.

Q    What do you do when you execute a no-knock warrant?

A    You go through the door.

Q    What do you do when you enter after going through the door?

A    Well, you secure the facility.

Q    But when --

A      But as we're doing it -- as we go through the door, we have -- we call out that we are the police --

Q      Okay.

A      -- to let people know because they're, you know, obviously going to be awakened, as you crash through a door, that it is the police.  And we try to move very quickly.  People have assignments of where they are going to go and they go to those places and secure any people that might be in those areas.

Q      As the approach is made to the residence, once the property has been entered, in either a knock-and-announce or a no-knock warrant, what are the officers do -- that are on the entry team, what are they doing with their firearms?

A      They have them at the ready.

Q      When you say at the ready, what do you mean?

A      They have a weapon in hand.  They are ready to fire a weapon, if need be.

Q      And does the type of warrant make any difference as to whether -- when I'm saying no-knock as opposed to the type where you knock and announce -- in respect to having your weapons drawn and ready?

A      No.

Q      Okay.  In addition to being a no-knock warrant, when normally does one -- or what kind of requirements normally

does one have as far as the timing of the execution of a warrant?

A    On a day warrant?

Q    Yes.

A    You have to serve it within the hours of 6:00 a.m. and 10:00 p.m.

Q    Okay.  When you have a -- this was a 24-hour warrant?

A    Yes, sir.

Q    Previous warrants that are, quote, daytime warrants, are they always executed during daylight hours?

A    No.

Q    Other than -- could this warrant have been executed at 9:30 p.m.?

A    Yes.

Q    As opposed to 12:30?

A    Yes.

Q    Other than the three hours time difference, is there any difference in the approach that would be taken onto the property different from 12:30 to 9:30?

A    No.

Q    You identified the three entry vehicles.  What was the fourth vehicle?

A    Another black and white.

Q    And whose was it?

A    Trooper Hise.

Q    Do you recall who was the -- who were the occupants of the fourth vehicle?

A    Trooper Hise, Trooper Poe, and Trooper Darst.

Q    Okay.  And what was their function on this particular operation?

A    To provide security at the front and to the west side of the residence.

Q    Okay.  So how were they to provide security?  What were they supposed to do when they arrived at the premises, at the location?

A    Trooper -- Troopers Darst and Poe were supposed to exit their vehicle and move forward to the -- back to the north on the west side.

Q    Okay.  And what was -- what was Trooper Poe to do?

A    Trooper Poe was to stay at the gate and provide front cover.

Q    Okay.  What was -- due to their role in the mission, the operation, what was supposed to happen in regards to their lighting?

A    I'm not for sure whether they were supposed to turn theirs on because of being at the gate.

Q    Okay.  Fifth vehicle, who was that?

A    Mine.

Q    What was your vehicle?

A    An unmarked Suburban.

Q    Did you have any kind of emergency lighting?

A    Yes.

Q    Where were you to go?

A    Into the driveway at the mother's residence.

Q    And why were you going to the driveway of the mother's residence?

A    Because of the information that we had gathered that there was a possibility that, you know, if he were to try to run, he might run to that residence.

Q    And what would your location there allow you to do?

A    To be able to see if they were running towards that residence, and perhaps even to interdict them before they got there.

Q    In regards to the location of Troopers Darst and Hise, where were they in respect to his mother's residence and Mr. Barrett's residence, if Mr. Barrett had, in fact, chosen to run to his mother's?

A    They were -- they were in between them.

Q    Was there a means by which communication was between you and your vehicle as a spotter from or an observer from the mother's residence and Troopers Darst and Hise?

A    Yes.

Q    And how was that to be done?

A    By radio.

Q    Okay.  You all left Camp Gruber.  Let me bounce one

more deal back.

When you got -- when you were at Camp Gruber, what was done by the team to make sure they understood their assignments and could effectively perform them?

A    We did walk-through, a dry run of the execution of the warrant.

Q    And how was that done?

A    We were in a classroom at the main base area, and we took chairs and tables and laid the tables on the sides to try to give an example of the layout -- the floor plan of the residence.  And then it was just practice making the entry.

Q    Okay.  You all left to go perform this operation. Who was going to search the place once you secured it?

A    Members of the District 27 task force.

Q    And how were you going to hook up with them?

A    They were going to be a follow-on after we secured the residence.

Q    Were they going to leave from Gruber with you or what?

A    No.  We were to meet them at Dwight Mission Road.

Q    And what happened when you got to Dwight Mission Road?

A    I stopped and made contact with some of the people that were there.  I believe -- I believe I talked to Clint

Johnson and Dianne Barker Harrold.

Q    Okay.   What was Dianne Barker Harrold's position?

A    She was the District Attorney.

Q    Okay.   And what authority would she have had over the task force?

A    It was her task force.

Q    What about other officers that were there?

A    There were several other officers there.

Q    More than you thought there were going to be?

A    Yes.

Q    Okay.   What, if any, concern did that cause you?

A    It gave me concern.

Q    Why?

A    It was just in the sheer numbers.   If they were to follow us in, I just -- I just thought the number of vehicles themselves would be way too much, that it would bring way too much attention.   So I asked them to give us a -- somewhat of a delay.

Q    Do you recall how long?

A    It wasn't very much.   There was a road -- the road that we went --

Q    My question was:   Do you recall how long?

A    It was about two minutes.

Q    Okay.   And did you feel that that was sufficient if they gave you a two minute lead time?   Why did you pick

that number?

A    I believed that we would be able to get onto the property, enter the house and secure it, before they would get there.

Q    Okay.  Based upon your experience of having been with the western TAC team since '85 and the commander since '97, how long did it take to secure a residence of this size?

A    Seconds.

Q    How big was this place?

A    Not very big.

Q    After you told them to give you a two minute lead time, what happened then?

A    We drove to the site.

Q    What was the plan as far as the arrival of the vehicles at the various locations in relation to one -- you know, the entry team in relation to Hise's arrival, the surveillance and security on the front gate, and your arrival in the mother's driveway on the west side, how was that supposed to happen?

A    The three vehicles that were part of the entry team were ahead of the other -- Trooper Hise and myself.  And we gave a little bit of a distance between them, the front three.

Q    Okay.

A    They were to go -- what the hope was was that, as they rounded the corner to enter onto the property, that we would be pulling into our positions at that same time. So we wanted to give them a little bit of a lead.

Q    And do you know if the timing was accomplished?  That you pulled into the mother's driveway about the time Hise got to the gate, about the time that Buddy Hamilton's vehicle entered the property?

A    Yes, very close.

Q    Okay.  You mentioned the policy in regards to the entry vehicles turning on their lights, or the practice. Is that a requirement in any way, shape, or form, that lights got to go on when you enter somebody's property if you're lawfully executing a search warrant?

A    No, sir.

Q    What did you do in regards to the lighting, or what was your plan with Lieutenant McBride?

A    In my vehicle, the plan was that I would activate certain lights by some switches that I had control of. There was a visor light that had to be manually turned on on the passenger side, and Lieutenant McBride was to turn it on.

Q    Okay.  When you entered the mother's driveway -- go ahead and put on Government's Exhibit Number 69.

Do you recognize what is shown there, sir?

A    Yes, sir.

Q    And what is that?

A    That is Barrett's residence and the scene after the fact.

Q    Okay.  And do you see the area where the entry team was to come in?

A    Yes, sir.

Q    And where is that located?  You can tap it, just where they were supposed to enter the property.

A    (Witness complied.)

Q    And Hise was supposed to go where?  You can tap that as well.

A    (Witness indicated.)

Q    And are you able to see the entry into the mother's driveway?

A    No.

Q    Are you able to see where you were to have gone and where you went to in this photograph?

A    Yes.

Q    Can you tap where you went to?

A    Well, that's a little high.  Tap it again?

Q    Yeah.

A    (Witness indicated.)

Q    Is that approximately the area where you ended up in the mother's driveway?

A    I believe so.

Q    As you made the turn in, what happened to your emergency lights?

A    I didn't turn them on.

Q    Why?

A    As I was turning into the residence, I saw a silhouette of a person moving from the Barrett residence back to the west.  And I was turning in and I had to use my other hand to talk on the radio to call out to the other troopers that there was somebody on the ground moving to the west.

Q    Okay.  How were you able to observe someone on the ground moving west as you were making the turn into that driveway?

A    I -- I don't know.  I just saw them.

Q    Where was that person that was on the ground heading west as you turned into the driveway?

A    Well, of course, I was back -- further back from where that mark is that I said I was --

Q    I understand.

A    -- still coming in.  And it appeared to be somewhere in that area.

Q    Okay.  So you got on the mike and said what?

A    We have someone on the ground running to the west.

Q    Okay.  Could you tell how that person was moving?

A     At a pace?

Q     Direction, pace.  Describe what you saw.

A     They appeared to be moving to the west fairly rapidly.

Q     Do you recall if he was running facing you, looking back, or backing up, or what?

A     No, sir.

Q     Do you know if your lights got turned on or any of your emergency lights got turned on when you turned into that driveway?

A     The visor light did.

Q     Okay.  Did you turn them on?

A     No.

Q     Okay.  And do you know if Lieutenant McBride has indicated whether he turned them on or not?

A     He wasn't for sure that he turned them on.

Q     Did they get turned on?

A     Yes.

Q     After you came to a stop at that location, what happened then?  You see the person in the yard moving rapidly toward the west, what happened then?

A     I called out that there was somebody running across, and that's whenever I heard gunfire.  And I started trying to associate where the gunfire was coming from.

Q     Okay.  And at that point, had you seen the entry

vehicles coming in yet?

A    I don't recall them at that point.

Q    Okay.  You heard gunfire.  Where were you looking?

A    I just scanned the area, and then I saw a muzzle flash coming from the porch area.

Q    Which porch area?

A    Of the Barrett residence.

Q    Okay.  And describe the muzzle flash that you observed.  What were you seeing?  What did you see at that point?

A    Fire coming out of the barrel of the weapon.  I could see the brass being ejected.  A lot of smoke.  I saw a silhouette of a person.  I could see what I believed to be shards of glass in the air.

Q    Okay.  At that point -- now, just a second ago you said I heard gunfire, I tried to find it, and I asked if you know where any of your entry vehicles were.

When you're talking shards of glass, are we talking at the same time, or how were you seeing shards of glass?

A    Right.  I believe it was the glass from the windshield of Trooper Hamilton's vehicle.

Q    When did you see -- when did you pick up Trooper Hamilton's vehicle in your vision?

A    About that time.

Q    And where was Trooper Hamilton's vehicle coming from?

A    It was coming from the east traveling to the west.

Q    Okay.  As you saw the shards of glass in the air, was there anything that you picked up in regards to those -- that glass that was in the air?

A    Yeah, there seemed to be -- I mean, it was light reflecting off of them.  The blue and red light.

Q    Where was blue and red light coming from?

A    I would --

Q    Well, I mean, where -- do you know where there were blue and red lights that would have shown upon that glass?

A    Trooper Hash, his vehicle.

Q    Okay.  When you saw the shards of glass coming off of what you believe to be Trooper Hamilton's Bronco, where was it located in relationship to the front of Mr. Barrett's residence, sir?

A    It was very close.  Maybe very much in the proximity that it is in this picture.

Q    Okay.  Did you notice the direction it was traveling?  I mean, you say it was about the location.

A    Yeah.

Q    How was it in relation to where it was and how it was moving and where the front and everything was positioned, how did that compare or contrast to what is shown in Government's Exhibit 69?

A    Well, it was -- he was traveling to the west and it

just was very close.  And that's just where I'm guessing that it was at.

Q     Okay.

A     Very close to where it is right there.  But that's -- that's not where it ended up.

Q     I understand that.  Where did it end up?

A     At the porch.

Q     Okay.

MR. LITTLEFIELD:  Your Honor, I would ask that the witness be allowed to step out of the witness box and approach Government's Exhibit 1 and place the vehicle.

THE COURT:  Let's take the noon break.  It's a little bit after noon.  We will be in recess until 1:15. I'll ask that the jury remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you.  I'll ask everyone in the courtroom to please remain seated as the jury leaves for the noon recess.

(Jury excused.)

THE COURT:  The witness may also step down. I'll recognize you back at 1:15, sir.  Thank you.  The record should reflect that the jury has departed the courtroom, the witness has stepped down.  Anything to bring up outside the hearing of the jury on behalf of the government?

MR. LITTLEFIELD:   No, Your Honor.

THE COURT:   The defense?

MR. HILFIGER:   No, Your Honor.

(Off the record at 12:06 p.m.)

(Back on the record at 1:38 p.m.)

THE COURT:   Let the record reflect the jury is in the box, counsel for the government is present, defendant and counsel are present.   If you would ask the witness to step back in.

MR. LITTLEFIELD:   Thank you, Judge.   I think at the time of the break for lunch, I was asking the witness -- the Court's permission for the witness to be allowed to go to Government Exhibit Number 1 and place the Bronco in that location and then return to his seat.

THE COURT:   You may.   Sir, if you will step down.

Q   (By Mr. Littlefield)   Where it ended up.

A   (Witness indicated.)

Q   And that's the location, as best as you can recollect where it ended up in front of the house?

A   Yes, sir.

Q   Okay.   At that point -- and you had identified -- would you place Government's 69 back up.

I think you indicated that you saw shards -- where it was when it was at that location.   And I'm talking about

Government's 69.

A    Yes, sir.

Q    Okay.  Were you seeing anything when it was in the location it is now where you have placed it against the porch?

A    I don't recall anything.  Once it was there -- the time I recognized it was there is whenever I was going behind it.

Q    Okay.  You discussed seeing fire and that information coming out of the front door about when it was at that location?

A    In the photograph, yes, sir.

Q    Okay.  What did you do at that point, sir?

A    I -- excuse me.  I exited my vehicle.

Q    And where did you go?

A    Well, I had received radio traffic that we had a trooper down.

Q    Okay.

A    And so, as I exited, I was looking for someone on the ground.  And I noticed one person standing and one person laying on the ground and I went to that location.

Q    Where was that location?

A    I -- I'm not real sure.  I think it's somewhere up in here.

Q    And as you got to that location in that area, what

did you find at that location?

A    Trooper Darst and -- and a person who was unknown to me.

Q    Have you later learned who that person was?

A    Yes, sir.

Q    And who was that person?

A    Toby Barrett.

Q    Okay.  After you got to Darst and -- to Doc Darst and Toby Barrett, what did you do then?

A    I -- I started looking again for whoever it was that was down.

Q    Okay.  From the time that you exited the vehicle, any -- was there -- and moving forward in time, did you hear gunshots at any further point?

A    There -- there might have been from the time that I left my vehicle until I got to Darst, but I'm not positive.

Q    Okay.  Do you know what a flash-bang is?

A    Yes.

Q    What is a flash-bang?

A    A diversionary device.

Q    And how does it work?

A    It is a -- it's a fuse and explosive that -- that you deploy, and it has a timing system, a time delay on it. And whenever it goes off, it make a very loud noise, an

explosion and a bright flash.

Q    Okay.   During this incident, did you hear a flash-bang?

A    Yes.

Q    And did you see where the flash-bang went off?

A    No.

Q    Okay.   Do you recall where you were when you heard the flash-bang?

A    I believe I was still in my vehicle.

Q    So that would have been prior to exiting?

A    Yes.

Q    What, if any, effect did the flash-bang have on the firing of the gunshots?

A    It made it stop.

Q    Okay.   After you got to Darst and Toby Barrett, you were still looking.   Where did you go next?

A    Approximately where the Bronco is right now in this particular photograph.

Q    In the photograph?

A    Right.   It wasn't there at that time.

Q    Where was the Bronco?

A    The Bronco was at the porch.

Q    As -- as you displayed it on Government's Exhibit 1?

A    Yes, sir.

Q    Okay.   Where, in relation to the Bronco on

Government's Exhibit 1, did you go?

A    Right behind it.

Q    And why did you go there?

A    That's where the person was down.

Q    Okay.  What happened when you got there?

A    I tried to identify who it was, called out their name, rolled them over.

Q    And who was it?

A    It was Trooper Eales.

Q    Who else was there?

A    No one.

Q    Okay.  When you rolled Rocky over, what was the status?  What was his status?

A    He was struggling to breathe.  He had a bright frothy blood coming from his mouth.  He was having a very difficult time breathing.  I tried to clear his mouth to try to get it open enough where he could breathe.  About that time, Trooper Greninger showed up.

Q    Okay.  What happened then?

A    I told Trooper Greninger to stay with him, and I went back to my vehicle.

Q    For what reason -- why did you go back to your vehicle?

A    Lieutenant McBride was still in my vehicle.  There was radio traffic about getting help in.  And I wanted to

ensure that he was calling for a helicopter, a medical helicopter as opposed to just an ambulance, a ground ambulance.

Q    And was, in fact, an medical helicopter called for?

A    Yes.

Q    After you got back to your Suburban and made that call or saw that the radio transmission for the helicopter was made, what happened then, sir?

A    Actually, at some point in time, I realized that Trooper Hise had crashed the gate.  So I just -- when I got back in my vehicle and I told Lieutenant McBride -- I asked him if he had called a helicopter and to give them our location, our physical location, I just drove the vehicle out and circled back around into the Barrett drive.

Q    At that point in time, were you aware of what had been done to secure the residence?

A    No.

Q    Where did you go when you pulled back into the drive?

A    Back to Rocky.

Q    And what happened when you got back there?

A    About the time I got to him, I noticed that the task force folks were coming down the road.

Q    Okay.

A    And I was concerned -- that's a dead end road.  I was

concerned that they were going to just start double stacking their cars and we would not have an exit, so I ran back out to the road to -- to advise them not to block the road, that we had a trooper shot.

Q    Okay.  And what did -- what did the people who were coming in, the local officers who were coming in do at that point in response to your advice?

A    Well, they obviously were keeping the road clear, but as I was turning around to run back up to where Rocky was, some of them came with me.

Q    Who?

A    Clint Johnson and Delena Goss.

Q    Okay.  And where did Clint Johnson and Delena Goss go?

A    To Rocky.

Q    Okay.  What happened then, sir?

A    We loaded him in the back of one of the Broncos and they left with him.

Q    Whose Bronco was Rocky loaded back in?

A    Trooper Greninger's.

Q    And do you recall approximately where Trooper Greninger's Bronco was?

A    At the time that he was loaded into the Bronco or --

Q    When you saw it, do you recall where it was?

A    Not exactly.  I mean, I don't recall the Bronco at

all until we were putting him in the back of it.

Q     Until you were putting Rocky in the back?

A     Yes.

Q     What were -- what were you focused on when you were in that front yard?

A     Getting Rocky and getting him out of there.

Q     Was there anything done in regards to the evacuation of Rocky as it related to the Bronco that Buddy and Rocky -- Trooper Hamilton and Rocky Eales were in when they entered the location?

A     At some point in time, they were going to try to load Rocky into the back of Buddy's Bronco.

Q     Okay.

A     But they were unsuccessful in getting that done.

Q     Do you recall anything that was done in trying to -- in regards to trying to get the tailgate down?

A     They broke the back window out.

Q     Do you even know who it was that did that?

A     No.

Q     After -- or who was it that accompanied Rocky in Trooper Greninger's Bronco?

A     As they departed?

Q     Yes, sir.

A     Trooper Hise was driving and Clint Johnson and Delena Goss were in the back with Rocky.

Q    Okay.  After Rocky was evacuated in the back of Trooper Greninger's Bronco, where did your attention turn, sir?

A    Well, it was somewhat still focused on Rocky.  I was walking back out towards the driveway, I think, just to watch -- to make sure he got off down the road.  And as I got there, I got another radio call.

Q    From whom?

A    Trooper Greninger.

Q    And what did Trooper Greninger report, sir?

A    That Buddy had been shot.

Q    What did you do at that point?

A    I turned around to look for them, and saw both of them standing on the porch.

Q    So where did you go?

A    To the porch.

Q    What did you observe when you got to the porch?

A    Trooper Greninger and Trooper Hamilton standing there.  There was blood on Trooper Hamilton's face and shoulder.

Q    What did you do in regards to Trooper Hamilton's injury, sir?

A    I inquired to him as to how bad his injuries were, and he responded that he didn't know, but he would be okay.

Q    Okay.   Any other conversations with Buddy at that point?

A    No.

Q    Okay.   Do you recall any conversations about Trooper Hamilton's gun, his firearm?

A    Yes.

Q    What was the nature of that?

A    Trooper Greninger asked, "What do you want me to do with this?"

Q    What did he have?

A    He had a handgun.

Q    Okay.   And when he said, "What do you want me to do with this," what did you say to him?

A    I asked whose was it.

Q    Okay.   What did he -- what were you told and by whom?

A    Trooper Greninger said that it was Trooper Hamilton's weapon.

Q    Okay.   After you heard that, did you make a comment or ask a question of either of the two?

A    I asked if the weapon had been fired.

Q    To whom?

A    To both of them actually.   Trooper Greninger said he didn't know.   I asked Trooper Hamilton, and he said, "I don't know."

Q    Okay.   What direction, if any, did you give to

Greninger in regards to Trooper Hamilton's firearm?

A    I told him to place it on the edge of the porch.

Q    Did he?

A    Yes.

MR. LITTLEFIELD:  I would ask that Government's Exhibit 22 be displayed.

Q    (By Mr. Littlefield)  Do you recognize what is in Government's Exhibit 22, sir?

A    Yes, sir.

Q    What that is?

A    That's Trooper Hamilton's weapon.

Q    And where was it that Greninger placed Trooper Hamilton's weapon?

A    On the edge of the porch.

Q    Is that the location?

A    Yes, sir.

Q    What did do you at that point in relation to Trooper Hamilton's injuries, sir?

A    I told Trooper Greninger to get him out of there.  I said, "Get him to a hospital."

Q    Okay.  Do you know if that was accomplished?

A    Yes.

Q    Do you know how it was accomplished?

A    Either a deputy or a police officer transported him to the hospital.

Q    One of your -- one of your individuals or one of the locals who had arrived?

A    One of the task force members.

Q    All right.  Did you observe whether anyone had been secured from that residence?

A    Not at that point.

Q    At any point?

A    Yes.

Q    And when was it that you observed that, sir?

A    As we were roping off the crime scene with tape.

Q    Where was that individual being maintained?

A    On the east side of the house.

Q    Approximately -- if we could go back to -- let's not go to 69.  Hold on.

          MR. LITTLEFIELD:  I would ask that Government's Exhibit 192 be displayed.

          THE COURT:  You may.

Q    (By Mr. Littlefield)  Can you identify the area approximately where the individual was being maintained in custody?

A    Well, it was on the east side.  I'm not for sure whether it was on the -- between the -- excuse me -- between the porch and that blue vehicle, or whether it was on the east side of that blue vehicle.

Q    Okay.

A      It was somewhere in that -- in the vicinity of that vehicle.

Q      Moved off to the area near the blue pickup truck?

A      Yes, sir.

Q      Okay.  And is that located appropriately in Government's Exhibit 1?

A      It appears to be.

Q      Okay.  What additional happened in regards to this mission after Troopers Eales and Trooper Hamilton were evacuated, sir?

A      Well, after they were evacuated, it was a matter of securing the scene.

Q      Okay.  And for what purpose?

A      For investigative purposes.

Q      How was that done, sir?

A      Well, there was no one else there other than task force folks and us, so I secured some crime scene tape from the back of my vehicle and began putting it out. Well, actually, I got it out and trooper -- or Lieutenant McBride tied it off, and he and I walked together as we put it out.

Q      Okay.  I note that, if you look at Government's Exhibit 192, there is quite a bit of crime scene tape in that area.  Was all of that placed by yourself or Lieutenant McBride at your direction?

A    No, not all of it.

Q    Without -- and I'm not going to ask you to tap it at this point.  But can you describe -- do you see the crime scene tape that you all put out on that night?

A    Yes, sir.

Q    And where does it go from, if you can describe it?

A    From the left-hand side of this -- or the west end of the porch --

Q    Okay.

A    -- to the front of the black and white car, which was Trooper Hise's.

Q    Okay.

A    And then back around behind the Bronco, and then to the blue vehicle.

Q    Okay.  Now, was the Bronco, at that point, moved back?

A    I'm assuming that's where it was at whenever I put the tape out.

Q    Okay.  Is that where it ended up against the porch, where we see it now in Government's Exhibit 192?

A    No, sir.

Q    Did it stay there against the porch, as it's shown now?

A    No.

Q    Do you know how it got back to the location?

A   No.

Q   Okay.  Are you aware of anyone who moved it?

A   No.

Q   And have you spoken to ascertain if anyone moved it?

A   No.

Q   Okay.  Trooper Hash's vehicle, where -- do you see where Trooper Hash's vehicle is located now?

A   Yes, sir.

Q   And can you just tap that one time?

A   (Witness indicated.)

Q   Where did -- did you see where Trooper Hash's vehicle stopped for the entry?

A   I believe in that location in the picture.

Q   Okay.  Same place --

A   Yes.

Q   -- as it's shown right there?

A   Yes.

Q   And what were the conditions of Trooper Hash's overhead light bar?

A   It was on.

Q   Did anyone interfere with or cut it off or stop it?

A   I don't believe so.

Q   You mentioned Trooper Hise's vehicle crashing the gate.  Do you see Trooper Hise's black and white?

A   Yes.

Q     And can you tap where that is located?

A     (Witness indicated.)

Q     And when Trooper Hash -- or Trooper Hise came through and crashed the gate, is that where he stopped?

A     Yes.

Q     Okay.  After the crime scene tape was put up, what was done to secure that area inside of it?

A     Within that crime scene tape?

Q     Yes.

A     Well, we -- or I had Lieutenant McBride establish a log, a log of entry to keep everybody out.

Q     Okay.

A     Or record anybody that entered into that area.

Q     And how long were you there?

A     I don't know, you know, the amount of time.  I was there beyond daylight.

Q     Okay.  Before you left?

A     Yes.

Q     Did -- was anyone -- withdraw that.

      What was done -- and I understand Gene Hise and Buddy and Rocky left.  Did the rest of the troopers hang around there for a while?

A     Yes.

Q     What provision was done for them?  What was done for them in regards to -- did they stay there until daylight

with you or what?

A     No.   No.   I -- as more people arrived, they were there for some time, and then I asked, I believe, Lieutenant Louder and Dianne Barker Harrold if there was any place that we could move those troopers to away from the scene.

Q     Okay.   And was a place provided?

A     Yes.

Q     In regards to the investigation of what happened there on the entry, who was contacted in that regard?

A     Could you --

Q     First off with your agency, if it was reported?

A     Right.   Well, the headquarters in Muskogee, Troop C Headquarters was contacted by radio and advised that, you know, the situation and that medical assistance was required.   They would automatically start making some notifications.   But I personally called Captain Harris and advised him.

Q     Who was Captain Harris?

A     John Harris who was my captain at the time.

Q     Okay.   Where was he stationed, with what area? Headquarters or what?

A     Yeah, captain is out of headquarters.

Q     Okay.   In regards to the investigation of what occurred there, what agency, if any, was contacted?

A      Outside of the Department of Public Safety, the Oklahoma State Bureau of Investigation.

Q      Were you there until the Oklahoma State Bureau of Investigation or some of their representatives arrived?

A      Yes.

Q      And during the time that you were there, did you all make sure that nobody was in there messing around and fiddling with stuff?

A      Yes, sir.

Q      During the time that this incident was happening, what happened to time as far as your perspective of it?

A      During the incident itself?

Q      Yes, sir.

A      Time for me slowed down.

Q      Okay.

A      I mean, as all of this took place, there were parts of it that seemed to be in slow motion.  It seemed like it took a long time for this to stop, but, you know, I know that it didn't take very long at all.

Q      Okay.  And in regards to the amount of time it takes to do entries in your experience, was it -- did this time period, would it have taken particularly or appreciably longer in this circumstance than in your other operations?

A      If it -- if it did, it wasn't that much longer.  I mean, we're just talking seconds.

Q     And you had asked the locals to give you how much lead time?

A     A couple of minutes.

Q     Okay.  And when they arrived, what was the condition there?

A     Rocky had been shot, we were trying to get him loaded.  Gene had already crashed the gate.  I had already moved my vehicle around.  The other troopers had -- well, I don't know, but -- well, I think -- the other troopers were going through their actions that they were tasked to do.

Q     Do you know if Mr. Barrett had been secured at that point?

A     I believe that he had been.

Q     Okay.  Do you have any blanks, memory blanks, any periods of time?

A     Well, I don't know.

Q     Have you -- are there any -- have there been any items of recall after the fact where something triggered a recurrence or a recollection?

A     Yes.

Q     What?  In regards to seeing what you saw at the front porch?

A     Yes.

Q     What was your initial recollection as far as what you

observed at the front porch when the shots were being fired?

A    The initial recognition was muzzle flash and smoke.

Q    You testified here today that you saw muzzle flash, smoke.  I think you mentioned brass?

A    Yes.

Q    Did you initially remember seeing brass?

A    No.

Q    Okay.  You also mentioned seeing a silhouette?

A    Yes.

Q    Did you initially recall seeing a silhouette?

A    No.

Q    How much after the incident was it that you recalled seeing the silhouette?

A    I think it was probably close to three years.

Q    In regards to the silhouette that you testified today that you observed, can you identify who that silhouette was?

A    No.

Q    What sex is the silhouette?

A    No.

Q    Don't know if it's male or female?

A    No.

Q    How much of the silhouette do you see in your mind's eye as you visualize this situation?

A     About mid chest up.

Q     What is the silhouette that you recall doing?

A     Firing the weapon.

Q     If we can go back to 69.  Where were you located when you saw the silhouette?

A     (Witness indicated.)

Q     And the silhouette was located where?  And I know you can't tap it there but --

A     In the doorway.

Q     All of the way inside, or partially inside, partially outside, or outside or what?

A     Partially in and out.  In the door frame.

Q     In which direction was the silhouette shooting, could you tell that?

A     Not from the angle that I'm at.

Q     Could you tell which direction the silhouette was facing?

A     Out front.  I don't know -- I can't give you a direction, whether --

Q     My question is:  Was it turned one way or the other, or can you even tell?

A     It seems more like more towards -- can I --

Q     Yes.

A     More towards the south and east.

Q     Okay.  And where -- you have already mentioned the

position of Trooper Hamilton's Bronco.  Is that when you saw Hamilton's Bronco there, or was it a time other than when you located Hamilton's Bronco that you observed the silhouette?

A    At the time that I see the muzzle flash and all this going on, it's more of a peripheral type view of the vehicle or the glass and things like that.  And so just because of the position that Trooper Hamilton's vehicle ended up in, I believed that was his vehicle.

Q    Okay.

MR. LITTLEFIELD:  May I have just a second, Judge?

THE COURT:  You may.

Q    (By Mr. Littlefield)  After local law enforcement got there, into whose custody -- who took custody of the defendant?

A    Whenever they were there, it was -- I believe it was a couple of sheriff's deputies, but it could have been --

Q    Okay.  I'm not asking the specific person, but was custody maintained by you all or was he turned over to local law enforcement?

A    No, they were turned over to other people.

Q    Medical attention was sought for the two -- two troopers?

A    Yes.

Q    Do you know what, if any, medical attention was sought for Mr. Barrett?

A    Whenever I saw him laying on the ground, I asked those two officers that were with him if an ambulance had been called.  And they advised me that it had been.

Q    Okay.  Do you know how long it took to get there?

A    No, sir.

Q    Did you observe injuries about Mr. Barrett?

A    Yes.

Q    And where was he injured?

A    In the lower torso.  His legs.

Q    How close an observation of Mr. Barrett did you have?

A    I was standing over him.  I mean, he was right there in front of me.

Q    Is he present into courtroom today?

A    Well, I believe so.

Q    When you say you believe so, why are you saying that?

A    At the scene, you know, it was -- he had grass in his hair laying there.  He had been shot up.  I didn't, you know, stand there at look at him for a long time.

Q    Okay.  Do you believe you can recognize him in the courtroom today or not?

A    I don't believe that I could say, as a matter of fact, that is Kenneth Barrett.

Q    Okay.  That's fine.  How loud is a flash-bang?

A     Very.   I mean, it -- actually, it varies.   Outside it's going to be very loud, it's going to echo.   It depends on any structures that might be around it, you know, to cause it -- excuse me -- reflection of the blast.   Inside it would appear to be much louder.

Q     Okay.

A     So --

Q     I'm -- not having experience in flash-bang going off, the closest thing I can think of as far as a boom would be like if I'm at a public fireworks display on the 4th of July and I hear one of them explode, a good noise maker. How does it compare to that?

A     That would be fairly close.   It's very loud.   You know, if you're too close to it, it could cause injury to your ears.

Q     And the whole purpose of it is what?

A     Distraction.

Q     Does it stun?   Is it supposed to stun?

A     Yes, to stun in a way to make you pause because you're surprised that this large explosion has just occurred.

Q     Okay.

          MR. LITTLEFIELD:   May I have just a second, Your Honor?

          THE COURT:   You may.

MR. LITTLEFIELD: Pass the witness.

THE COURT: You may cross-examine.

MR. HILFIGER: Thank you.

CROSS-EXAMINATION

BY MR. HILFIGER:

Q    Do I understand you're with Homeland Security now; is that right?

A    Yes, sir.

Q    And you have been there for a year and a half or so?

A    A little over that, yes, sir.

Q    And did you -- were you also responsible for hiring Danny Oliver?

A    Danny Oliver doesn't work in Homeland Security.

Q    He doesn't work in Homeland Security?

A    Not for the State of Oklahoma.

Q    Okay. You talked about making this -- when a request was made -- or you were contacted on a request made for getting the TAC team to do an execution; is that right?

A    Yes.

Q    Do you recall what day of the week it was that you first heard about it?

A    I believe it was a Sunday.

Q    A Sunday afternoon, night?

A    I think it was in the afternoon.

Q    And did you -- when the request was made, were you

aware that there was already a search warrant, or did you require that a search warrant be included?

A    I believe that the conversation was that they believed that they were going to get a search warrant. And that, if they did, that we would be needed.

Q    Okay.  So you were making a tentative -- there was a tentative request because they hadn't had a search warrant at that time; is that right?

A    Oliver had called me to give me a heads-up that it might be needed.

Q    Okay.  And your understanding that a search warrant was not in place at the time you first got contacted?

A    That was my understanding.

Q    Did you give any direction to Oliver on what you needed on the search warrant?

A    No.

Q    And then who was the next contact that was made?  Did you get any more contacts?

A    I did.  I don't remember if it was Danny or if it was Clint Johnson that called that said that they had secured a warrant.

Q    Okay.  And do you know when that would have been?

A    I think it was Tuesday.  It would been like the 21st.

Q    Okay.  And you -- when did you arrive in the area to assist on this tactical team?

A     On the 23rd.

Q     Okay.   And that would been what day of the week?

A     I think it was Thursday.

Q     Thursday.   When you -- when you I guess met out at Gruber, is that where you were when the TAC team first got together?

A     Yes.

Q     And when you were out there at Gruber, did you -- is part of your intelligence or anything, did you ever get any kind of physical description or picture or anything of the person that you were going to go out and arrest?

A     A physical description was given to us later on that evening, but we never saw a photograph.

Q     Did the physical description include some sort of drawing or facial features, or just height, weight, body build?

A     Height, weight, body build.

Q     So you didn't really know what -- the facial features of the person?

A     No.

Q     And you had no pictures?

A     No.

Q     Do you normally have pictures or some kind of more accurate description of individuals when you're going to go out and arrest them?

A      Well, I was executing a search warrant.  We had an arrest warrant that would be secondary to the search warrant.

Q      Okay.  So as far as you're concerned, all you needed to do was get to the right place; is that right?

A      Yes, sir.

Q      Now, I got a little mixed up on your position with the TAC team.  When you became the commander in 1997, were you the commander of both the east and west teams, or just the east team?

A      Both teams in '97.

Q      Okay.  And prior to 97, you were an acting commander on the west team?

A      I was the assistant commander assigned to the west tactical team.  And at times, when the commander was gone, I would be tasked as the acting commander.  It wasn't a full-time deal.  Only during his absence.

Q      Okay.  Now, how many no-knock anytime warrants, as a TAC team member, including commander, prior to this had you served?

A      I don't recall any day or night prior to that.

Q      This is the first day or night no-knock that you had served; isn't that right?

A      To my recollection, yes, sir.

Q      And a day-night no-knock doesn't require that you

serve it at night, does it?

A    No.

Q    It's when it's tactically best to serve.  It's sort of left up to you; isn't that right?

A    Yes.

Q    Did you personally receive any intelligence concerning this information as to the individual or the location or anything like that, other than what you got from Hamilton and Greninger and Manion?

A    We received information from Clint Johnson and Frank Loyd.

Q    Okay.  Did Frank Loyd actually -- were you there when Frank Loyd talked to you -- talked to the TAC team?

A    Yeah, it was at the lodge.

Q    Okay.  And Clint Johnson was there also?

A    Yes.

Q    And that was at the first meeting in the afternoon or the second meeting at 8:00 o'clock?

A    Second meeting.

Q    At 8:00 o'clock?

A    I don't know if --

Q    I mean --

A    It was later in -- yes.

Q    Can you -- do you recall the time you selected was 12:30 a.m.; is that right?

A    Yes, sir.

Q    Can you recall how that time was arrived at?

A    We were just talking about various times and various advantages or any advantages that a particular time would have.  And I believe that 12:30 was agreed upon by everyone.

Q    Was there any particular reason given for the 12:30 time?

A    No, not a tactical reason or anything like that.

Q    I didn't ask for just a tactical reason.  Was there any reason given for the 12:30?

A    At the time, I did not know of any particular reason why 12:30 was chosen.

Q    Okay.  I guess subsequently you heard something?

A    Yes.

Q    Okay.  Was any -- was there any tactical reason for the 12:30 time?

A    No.

Q    Was there any thought given to the time being -- I mean, your idea was to try to sneak up on somebody, wasn't it?

A    Potentially catch them while they are sleeping, yes.

Q    Okay.  Was that consideration thought about or discussed?

A    Yes.

Q    Okay.  Was it -- and I understand this deal where you say meth users, you know, they can be up two or three days at a time and then they are down two or three days at a time.  But you were giving consideration and thought, weren't you, that this person is going to be asleep and at this time we can go in there and -- and come in there secretive and get to the door without him knowing we're there.  Isn't that sort of the idea?

A    That was the idea, yes.

Q    Okay.  Now, you weren't the first one up there, but you saw that that wasn't -- that idea wasn't going to work out that night when you got there, didn't you?

A    Yes.

Q    I mean, the lights were on --

A    Well, no.  When I pulled up, I saw someone running across the yard.  That was the first clue that someone was up.

Q    Right.

A    And that was just as I arrived.

Q    Did you see any lights on in the house?

A    I think there were lights on in the house.

Q    So did that give rise to think that maybe something different ought to be done on this plan, or do you just, by gosh, we're going to go ahead with it?

A    It was too late.

Q     When you say your policy is to -- is to activate the lights -- activate emergency lights when you're coming on the property, that's not a written policy or anything like that, is it?

A     No, just a procedure that we would do.

Q     That you follow.  And there is a reason for doing that, isn't there?

A     Yes.

Q     You want to let them know -- I mean, you've got the authority from a search warrant or an arrest warrant or something, but they don't know you have that authority? The people you're going up to search or to arrest, they don't know that you have that authority, do they?

A     Until you tell them.

Q     Until you tell them.  They don't even know who you are unless you do something to identify yourself; isn't that right?

A     Correct.

Q     I mean, if you have a black and white like that Crown Victoria, that's doing something to identify yourself, isn't it?

A     Yes.

Q     If you have emergency lights and turn them on, that's doing something to identify yourself, isn't it?

A     Yes.

Q     If you put a siren on, that's doing something to identify yourself, isn't it?

A     Yes.

Q     What, on that white Bronco that Hamilton was driving, was there to identify that vehicle as a law enforcement vehicle?

A     Just by looking at it?

Q     Yes.

A     It had emergency lights on it, but that would have been it.

Q     But if the emergency lights are not on, can you see them?

A     No.  Well, you would have -- you could if you were you were looking for them very closely, yes.

Q     Where would the emergency lights be that you could see?

A     On the headliner.

Q     The visor --

A     The visor.

Q     But doesn't the visor have to be turned down?

A     Yes.

Q     If the visor is up, you're not seeing them?

A     Well, when the visor is up, the light is interior. So if you were to walk by the vehicle and look inside, you would see the visor light.

Q     Okay.

A     So you flip it, because, as you flip it down, the light is now facing outward.

Q     Okay.  So you would have to be that close to the Bronco to be able to look in to see it?

A     Yes.

Q     Otherwise, there is nothing identifying that Bronco as a police vehicle?

A     That's correct.

Q     And that was -- was there some discussion when you -- when they did the drive-by, that, hey, we can take the Bronco because it's not marked?

A     On the drive-by, yes.

Q     Right.  I mean, they took the antennas off.  The whole idea is that's not marked, nobody is going to tell that's a police vehicle?

A     That's correct.

Q     174, please.  I have asked that 174 be displayed. No, that's not the right one.  Okay.  69.  I'm sorry.

        Now, as I understand it, you say it's the policy to activate lights to let them know that you're the police, and you activate the emergency lights when you're -- when you're going on the property.  Okay.  Where was it, your understanding, that the first emergency lights would be activated?

A    At the very -- I thought it would be at the very -- very top.  I don't know whether that will -- somewhere up in that area maybe.

Q    Okay.  So you're talking about coming down this private road?

A    Yes.

Q    Before they even get into this ditch?  That was your understanding?

A    That's what I was thinking, yes.

Q    Okay.  Do you know whether it was actually discussed where physically they are going to come on?

A    I think -- my recollection is that, as they entered the property, they would activate the lights.  So --

Q    And that's my --

A    That's where I was thinking the property would be begin.  My -- my assumption.

Q    Okay.  Your assumption is right up there?

A    Yes, sir.

Q    Do you know whether Hamilton activated -- Hamilton was the lead vehicle; right?

A    Yes.

Q    And he was the vehicle that was unmarked, no identification?

A    Right.

Q    Do you know whether he activated emergency lights

there?

A    I don't know that Trooper Hamilton ever activated any emergency lights.

Q    Okay.  You never saw any emergency lights on that vehicle when it was right there, did you?

A    I don't recall that, no.

Q    Would that be sort of a fallacy on your plan if you don't activate those emergency lights?

A    Well, it depends on what the factors involved in them not activating them.

Q    But it definitely would not have been according to what you thought the plan was going to be, not to activate those lights; right?

A    Could you state that again?

Q    It definitely wasn't -- wasn't what you thought the plan was going to be, not to activate those lights at that point?

A    Correct.  I thought they would be activated.

Q    On the second vehicle, Greninger's vehicle, what was your understanding that when he was supposed to activate his lights?

A    In the same time frame, as he entered into the property area.  All three of those vehicles.

Q    Okay.  So they are all three supposed to be activating somewhere up and down through there; is that

right?

A     Yes.

Q     Have you learned at a later time where Greninger's vehicle activated his --

A     No.

Q     You don't know?

A     No, sir.

Q     If the testimony is that activated right there, would that be according to what your understanding of the plan was, if he activated them or Manion activated them before Greninger right around there?  Would that be your understanding of the plan?

A     My -- my thought was that they would as they came onto this property.

Q     So you're saying that Greninger wouldn't have followed what you understood to be the policy?

A     Well, not the policy, but --

Q     The plan.

A     -- the plan.

Q     Okay.  Now, have you understood where Hash activated the lights -- his lights?

A     No, I don't know where he activated his lights at.

Q     Okay.  Now, if it comes along right in there, that would be according to the plan, if he activated his lights somewhere in this area?

A     I think that's about where the gate was, or the road that turns into that area.  I don't know whether there is a gate there or not, but there is a fence there.

Q     So, Hash, if his lights came on in that area right there at that turn someplace, that would be according to the plan as you understand it?

A     Sure.

Q     Again, this activation of the lights is just so you will let the landowner know that you're the police?

A     That's the intent, yes.

Q     When you -- when you were discussing plans, was there any discussion or consideration given to just coming up there with a -- with your P.A. system?  Everybody has a P.A. system in their car, don't they?

A     Yes.

Q     Or sirens or something, and just saying police, you know, we're here?

A     Was there thought about doing that?

Q     Right.

A     No, sir.

Q     That wasn't one of the considerations, was it?

A     No.

Q     I understand that when you say your -- one of your practices is that you always take a black and white, and the reason you took it was because it's recognizable as a

police vehicle --

A      Yes.

Q      -- is that right?  Was there any reason that you didn't put the black and white as the first one in then?

A      Because he wasn't part of the lead team that was going to make entry into the residence.

Q      Hash wasn't?

A      No.  He was taking the ram.

Q      Okay.  The ram is what you use to open the door, though, right?

A      Right.

Q      So he's got to be right there at the doorway?

A      Uh-huh.

Q      So he's got to be there just right along with the other two cars.  But no consideration was given to putting a marked black and white as the first vehicle in to identify as police coming in, was there?

A      No.

Q      When you came in, as I understand it, what was your idea -- what was your understanding of what you were supposed to do with your lights?

A      That they would be activated.

Q      Okay.  Now, and I got a little lost on -- there are two sets of lights that you had on your car?

A      Right, I -- yes.

Q    And what are those?

A    Various types of lights that were on that vehicle, but there is a control box that I had access to to turn those on.  The visor light, however, had to be manually switched.  It wasn't controlled by that box.

Q    And you're using your right hand as a control box -- it's between the two seats or --

A    Yes.

Q    Okay.  And that was the control box.  What did that control box switch control, as far as the lights?

A    Various strobe lights, corner lights, wig-wag headlights, grill red and blue lights.

Q    Okay.  Which of those lights did you turn on?

A    I didn't turn on any of them.

Q    But your plan was you were supposed to turn them on?

A    That's correct.

Q    And so as far as the plan and the operation, there was -- there was a little difference in that?  You didn't do anything as far as what you should have done to notify that you were police; is that right?

A    Yes.

Q    And the lights that you were going to turn on were what, the strobes?

A    Yes.

Q    Is that all?

A     No.

Q     I mean, that you personally were going to turn on?

A     Right.  Wig-wag headlights, there were halogen lights, there were grill lights, corner strobes.  There is another strobe light over the visor, but it's not the same type of a visor light.  There are strobes in the back end of the vehicle, interior, and, again, exterior.

Q     Okay.  And were all of those supposed to be turned on by you or just some of them, or which ones?

A     I would turn all of those on.

Q     Okay.

A     That's on that master control.

Q     Oh, it's just one control that turns a whole bunch of them --

A     No, there are toggle switches but --

Q     But none of those came on?

A     No.

Q     Now, as I understand it, you said that the visor lights were supposed to be turned on by McBride; is that right?

A     That's correct.

Q     Now, I didn't understand what you said that McBride said about -- you made some comment about what McBride said about turning on the lights, didn't you?

A     That McBride did not remember turning the lights on.

Q    And is that what you're saying, McBride says he cannot remember turning them on, or does McBride flatly say, "I didn't turn them on"?

A    I wasn't there when he made that statement.  I've heard that he said he didn't turn them on.

Q    Okay.  That he didn't turn them on?

A    Right.

Q    Right.  He didn't say, "I cannot remember turning them on."  He just flat said, "I didn't turn them on."

MR. LITTLEFIELD:  Objection.  That is hearsay.  It's also not a question, it's just a statement.

THE COURT:  Sustained.

Q    (By Mr. Hilfiger)  So is your testimony then, though, that the visor lights were on?

A    That's correct.

Q    Can you recall seeing those visor lights on?

A    Yes.

Q    At what point did you see the visor lights on?

A    While I was in the vehicle.

Q    At some time did you leave the vehicle and come back to the vehicle?

A    Yes.

Q    And at that time, did you recall seeing those lights on, those visor lights?

A    I don't recall them being on.

Q     Okay.   Isn't that what you told under oath, that you didn't recall seeing those visor lights on?

A     Just now?

Q     No.   Well, you just now said it.   But had you said it previously?

A     I don't -- I don't know.

Q     Let me direct you to a statement you made under oath.   You made a statement under oath in about February -- February, March of 2004; is that right?   You cannot recall?

A     In February or March of 2004?

Q     2004.

A     January?

Q     January.   January, February of 2004.   Beginning on Page 292, the question was asked:   "When you went back to your vehicle" -- at Line 20.   "When you went back to your vehicle after you had been at the back of the Bronco and assisted Trooper Eales, your vehicle would have been facing you at that time?   Answer:   It was facing towards the north.   Question:   Do you recall seeing your emergency light on at that time?   Answer:   No.   Question:   Were they off at that time?   Answer: I don't recall.   I don't recall whether it was off or on."

      Were those the questions asked and the answers you gave while you were under oath?

A     Yeah, the same thing I just answered.

Q     Okay.  Did you -- you don't recall whether your emergency lights -- whether those visor lights were on at that time?

A     When I went back to the vehicle --

Q     Right.

A     -- I don't recall them being on.

Q     When you moved your car into this position, do you -- what direction were you facing?

A     When I pulled in, I was facing towards the north.

Q     Okay.  So your -- it would be up in this direction?  You're facing like towards this home right here?

A     No.  Between -- between that house and then that -- the shed or --

Q     There is a laser right there if you want to --

A     It's more over in here.  So it's actually facing -- the view would be more through here.

Q     Okay.  Well, I -- I understand.  Okay.  Your direction of facing was -- was along this line; right?

A     Yes.

Q     And you're telling us you were looking from there through these cars here, though that pickup there, and to that house there; is that right?

A     Well, I started looking back on the road and as I was pulling into the driveway.

Q    Okay.   When did you -- when did you first hear shots?

A    As I was pulling into the drive.

Q    And when you -- when you first hear those shots, were you able to see -- were you able to look and see where they were coming from?

A    Yes.   As I started hearing the shots, I started looking to try to determine where they were coming from.

Q    Okay.   And when did you make that determination in relation to where your car was?

A    Some point between where I pulled in and where I stopped.   I don't -- I mean, I was still traveling.

Q    Okay.   So -- and as you were traveling, you've got all of these cars lined up right here, don't you?   Do they block your -- and these pickups right there?

A    Not all of those vehicles were there.

Q    Oh, these vehicles -- these vehicles weren't there that night?

A    Some were, some weren't -- were not.   Some of those belonged to some of the investigators.   All of those vehicles weren't there.

Q    Okay.   What about these pickups?

A    I believe that they were there.

Q    Did those pickups block your view at all?

A    No.   I was quite a bit further behind them.

Q    Down here a little ways you're talking about?

A   Right.  I'm back over in here.  These -- you can see kind of a mark right there.  I believe that's where I made my U-turn to exit, so I was in this area looking this way.

Q   Now, when -- at what point is it that you're saying that you saw the silhouette?

A   While I was in my vehicle and I heard the shots and was trying to determine where the shots were coming from, I looked toward the porch and that's whenever I saw that.

Q   Okay.  And how far away were you from that?

A   I'm guessing 50, 60 yards.

Q   50, 60 yards away.  And you're saying -- you're saying you saw a silhouette, chest up; right?

A   About mid chest, yeah.

Q   You're saying you saw brass being ejected?

A   Yes.

Q   How much of the brass being ejected did you see?

A   I don't know.  A couple.  Just, you know, coming in the air, the brass.

Q   Well, and you recognize that you were under oath at one other time, weren't you, that you denied seeing any of this stuff?  Do you recognize that?

A   Yes.

Q   And you were under oath?

A   Yes.

Q   Do you remember what you said at that time as far as

what you were actually able to see?

A    Right.  I made a statement that I didn't even see a silhouette.

Q    Did you mention anything about a silhouette?  Did you say you didn't even see a silhouette?  Did you even mention seeing a silhouette?

MR. LITTLEFIELD:  He is repeating his answer back to him, Judge.  That's exactly what he said, and he just testified to it.

THE COURT:  Argument, counsel?

MR. HILFIGER:  Your Honor, I think -- that's what I'm trying to find out.  He said he didn't -- he said he didn't even see a silhouette.  Okay.  Now, let me --

THE COURT:  You're going to withdraw the question and you may rephrase it.

MR. HILFIGER:  Okay.

Q    (By Mr. Hilfiger)  You were under oath in February of 2000; is that right?

A    Correct.

Q    And at that time was a question --

MR. LITTLEFIELD:  Judge, I need to know page and line.

MR. HILFIGER:  Page 151, on line -- I'm going to have to come back to that because the two don't line up.

May I have just a moment?

THE COURT:   You may.

Q    (By Mr. Hilfiger)   Would you look at number -- I believe it's 175.   Do you recognize that?   Do you recognize that?

A    Somewhat.

Q    It's an overview of this model here.

A    Okay.

Q    If this is the front door right here --

A    Yes.

Q    -- inside, where do you say that you saw this silhouette?

A    It would been more on that side of the doorway.

Q    Okay.   Was any part of the silhouette outside the house that you saw?

A    I think a little bit of it.   Not a great degree of it.

Q    Okay.   And was -- did you see a weapon?

A    I'm not sure.

Q    You're not sure if you saw a weapon?

A    The muzzle flash, the brass being ejected, the weapon is there.   But as far as me seeing an outline of the weapon, I do not recall seeing the outline of the weapon. I just -- the muzzle flash, the brass, the --

Q    Where did you see the brass?

A    In the air.

Q    In the air where?

A    Well, I couldn't depict it in that.

Q    Was it -- did you see it coming out the doorway?

A    In the area of the porch.

Q    You saw it in the area of the porch?

A    Yes.

Q    You saw the brass on the porch?

A    In the air.

Q    In the air.  Okay.  Well, let's look at this model here.  Can you --

          MR. HILFIGER:  Can he come around to show us on this model?

          THE COURT:  You may.

Q    (By Mr. Hilfiger)  Move that Bronco just a second so we can -- so everybody can see.  Where were you saying that you saw the brass?

A    Well, I believe that the brass would have been around in this area.

Q    And that's on the outside of the door; is that right?

A    Correct.

Q    And you saw -- how much brass did you see on the outside of the door?

A    Not a lot.

Q    So -- and you're positive it was brass that you saw?

A    That's what I believed I saw.

Q    Okay.  And where did you see it going?  See, there is a little white thing down there.  You may not know what that is, that the white box there.  Was it going around that white box?

A    No.  It was in the air.

Q    It was in the air.  Well, it had to come down, didn't it?

A    I didn't watch it go to the ground.

Q    Okay.  Well, would it have been -- when it was in the air when you saw it, it was outside on the porch, though, in the porch area?

A    Right.  I could not see inside the house.

Q    Okay.  Okay.  That's fine.  So you're saying all of this stuff took place outside on the porch?

A    That's where I saw the brass and the muzzle flash.

Q    Okay.  You can go ahead and sit down.  Now, as to your testimony under oath in February of 2000 on Page 154, the question, starting on Line 10 -- on Line 11:  "What do you recall about gunfire after you exited your vehicle?  Answer:  I didn't make the call about the gunfire.  I made a call about a person being in the yard or alongside the west side of the house.  Question:  Well, I incorrectly recalled your testimony.  Excuse me.  Answer:  Yes, sir.  There, I heard gunfire.  Question:  All right.  Answer:  I looked towards the residence to determine if I could make

a determination as to where the gunfire was coming from and I saw a large amount of smoke coming from the doorway area of the residence and, at that time, I saw a muzzle flash coming from the same area."

MR. LITTLEFIELD:  Judge, I'm going to object. That is not inconsistent with his testimony.  He has acknowledged that previously he did not recollect having seen a silhouette in another proceeding.  And so he reads to him exactly what he acknowledged previously he testified.  That's not inconsistent with his testimony, and it's improper impeachment.

THE COURT:  Counsel?

MR. HILFIGER:  Your Honor, it's -- Mr. Littlefield brought up the -- his own impeachment by saying that he had testified different.  He said that his testimony -- he didn't identify any silhouette.  He never said anything about a silhouette in his previous testimony.

THE COURT:  Well, it seems like you're both straining at a -- I don't know what the -- I'm sure you both have some significance in what you're saying.  I think Mr. Littlefield elicited from the witness that he didn't see a silhouette or he didn't testify that he saw a silhouette and, since then, it's come back to his memory.

MR. HILFIGER:  Right.

THE COURT:   I mean, I think that's the significance of -- if there is an inconsistency, that's it.   But I don't think he's testified contrary to that.   I agree with you that that was solicited on direct, and now I don't know what -- I'm not sure what you're trying to do with that questioning at that point -- at this point.

MR. HILFIGER:   I'm going to go a couple of steps further.

THE COURT:   Okay.   Well, you can proceed then.

MR. LITTLEFIELD:   Then, Judge, I would suggest that he ask him the question to establish if there is an inconsistency because, at this point, the defense on cross-examination has not elicited testimony with which --

THE COURT:   Well, apparently he is -- counsel is suggesting that this is a foundation for something significant.   And if it isn't, then the Court will hold him accountable.   So let's proceed.

Q    (By Mr. Hilfiger)   After, you have given statements to OSBI; is that right?   Have you given statement to OSBI?

A    Yes.

Q    And you gave them right after this incident?

A    Before daylight, yes.

Q    Right.   Did you give any statements to Paul Gordon?

A    Yes.

Q    Did you give any statements to George Randolph?

A    I don't believe so.

Q    At any of those times, did you identify anything as far as a silhouette or brass or anything like that?

A    I don't -- I don't believe I did.

Q    Okay.  And then subsequent to that, those statements and things like that, you had meetings with Ricks, is that right, where the whole TAC team met with Ricks?

A    A meeting.

Q    What?

A    A meeting.

Q    A meeting?

A    Yes.

Q    Were you a part of any -- and in that meeting, did you have any -- that was sort of an open discussion type thing?

A    Yes.

Q    And where each of you gave what you saw and what you heard and things like that; isn't that right?

A    It was more about the plan, what we were doing, how we carried it out.  There was some discussion about particulars, but it wasn't real detailed.

Q    Okay.  And then you met with Horn, James Horn?

A    I have met with --

Q    Not individually.  As a group?

A    Yes.

Q    Okay.

A    I'm trying to -- there was two different meetings with Kathy Thomas and Jim Horn.

Q    Okay.

A    So that --

Q    I'm talking about a group meeting, though.

A    I believe there was a group. I don't know if it was everyone, but there was.

Q    At any of those meetings, did somebody else bring out that they saw a silhouette?

A    I don't recall that at all.

Q    When did you first make this recollection in your mind that you saw a silhouette?

A    Testifying in another proceeding.

Q    And was that one about two years later, or longer than that?

A    I think it was longer than that. I think in 2002 or somewhere in that area.

Q    Okay. And you're saying that's -- did it just all the sudden come to you?

A    I was under oath testifying, and I was asked to recall the events, and that was what I recalled at the time. As I was -- I testified then, as I was asked to recall it, that's what I saw.

Q    And prior to that time that you testified in 2002,

you're telling us that you never recalled seeing brass or the silhouette before that?

A    No.

Q    It just came to your mind at that time in 2002?

A    Yes.

Q    Was there anything suggested to you by anybody that was questioning you?

A    No, not that I'm aware of.

Q    Are you familiar with the weapons used in this mission?

A    The ones that we had?

Q    Yes.

A    Yes, sir.

Q    And you used -- there was an HK 53, an MP5?

A    Yes.

Q    Is that right?

A    Yes.

Q    Was there any policy -- and when I'm saying policy, I'm talking about policy like your turning your lights on before you come in.  Was there any policy concerning those weapons and how they were loaded?

A    The policy was the magazine was to be loaded.

Q    What about anything in the chamber?

A    On the approach, you would have a round in the chamber.

Q    Okay.  And when you say magazine loaded, does that mean one bullet in, two bullets in, ten bullets in?  What does it mean?

A    The size of the magazine.  If you have a 20-round magazine to 30-round magazine, you would have it loaded.

Q    Okay.  And that's --

A    Some had different magazines.

Q    You would fully load a magazine?

A    Yes.

Q    Did -- at that time, was there any policy or practice, you as a commander, to make sure that each weapon was properly loaded and fully loaded?

A    No.

Q    Was there anything done by you as a commander to remind the team members, make sure your weapons are fully loaded and we've got one in the chamber?

A    No.

Q    When -- who all picked up these weapons from the scene?

A    The OSBI picked up some, and then internal affairs ended up picking up the sidearms.

Q    Okay.  When were the -- when did OSBI pick up and what did they pick up?

A    We left -- we left the weapons at the scene.

Q    All weapons?

A       No, some of them did not.  The sidearms.  And I think -- I know the sidearms weren't.  But they were -- later that morning, internal affairs took the sidearms and reissued different weapons.

Q       But they weren't taken right there at the -- each one of the highway patrolmen --

A       Right.

Q       -- other than Buddy Hamilton --

A       Right.

Q       -- took their arms with them, and then later turn them in?

A       Gene Hise still had his weapon when he left.  Rocky's sidearm was not removed from his holster, that I'm aware of.

Q       What about Ricky Manion?

A       Rick was at the scene, so his sidearm would have stayed with him as well.

Q       Okay.  What about the MP5 that he had?

A       The MP5 was secured.

Q       At the scene?

A       Yeah.  And we had secured Buddy's weapon.  Buddy's sidearm did not go with him.

Q       Right.  Right.  Now, on that Bronco, the Hamilton Bronco, you never saw anybody move that Bronco; is that right?

A    No.

Q    Did you see anybody in the Bronco?

A    No.

Q    Was the Bronco an automatic or standard?

A    It's an automatic.

Q    And do you know whether the keys were in the Bronco?

A    No.  I assumed that they were, but I -- I do not know.

Q    If the Bronco is -- it's an automatic and you put it in park, is that Bronco going to be able to roll on its own?

A    I don't know what circumstances would be required to make it do that.

Q    In order to get the keys out of it, you've got to put it in park, don't you?

A    I'm not for sure, on that model, whether you would or not.

Q    And as I understand it, as shown on 69, we can see that's the position of the Bronco in the morning.  And you were out there all night; right?

A    Yes.

Q    Until the morning?

A    Yes.

Q    You can't recall it ever being moved?

A    No.  And whenever I set the tape out, it was there.

Q    When you set the tape out, it was -- it was already there?

A    Yes, sir.

Q    Will you look at what I've marked as Defendant's Exhibit 107 -- or 106?  I'm sorry.  And it has not been admitted.

As I understand it, you said that you put the tape out, or you and McBride put the tape out together; is that right?

A    Yes.

Q    Do you recognize what 106 is?

A    Yes.

Q    And what is that?

A    That is the crime scene tape and where Lieutenant McBride established the scene and he noted the time.

Q    Okay.

MR. HILFIGER:  Your Honor, we move the introduction of Defendant's Exhibit 106.

MR. LITTLEFIELD:  No objection.

THE COURT:  It will be admitted without objection.  Is that Defendant's Exhibit?

MR. HILFIGER:  Number 106.  Defendant's Exhibit Number 106.

THE COURT:  Admitted without objection.

MR. HILFIGER:  Move the Court it be displayed.

Q    (By Mr. Hilfiger)   Can you tell us what time that shows that the crime scene was established?

A    12:55.

Q    12:55.   You left Dwight Mission Road at what time?

A    I'm not for sure.   We were supposed to be there -- we wanted to be at the scene at 12:30.   I don't think we made it at 12:30.

Q    So it was a little bit after 12:30, or a little before?

A    Well, I think we were at Dwight Mission maybe a little bit before 12:30, but we didn't make it to the residence at 12:30.

Q    Okay.   So somewhere -- and then you execute your search warrant.   At what time -- and I'm not talking about time like this, but I'm talking about what particular time was it that you actually put up that tape?   Had Rocky Eales left?

A    Yes.

Q    Had Buddy Hamilton left?

A    Yes.

Q    And at that -- it was after that that you put up the tape?

A    Yes.

Q    And so here it is somewhere 20 to 35 minutes after this and you've got the tape up.   And you're sort of in

charge here, aren't you?

A     Yes.

Q     And you're saying the Bronco moved back a good -- how many feet did that Bronco move?

A     I don't know.

Q     And in that time, that Bronco moved, and you don't even recall it being moved?

A     I don't know when the Bronco was moved.

Q     Well --

A     I think the Bronco was moved from the time that I left Rocky, went back to my vehicle, moved it around, and got back.  At some point in time during that that it had to have happened.

Q     But you didn't see anybody move it?

A     No.

Q     Have you talked to members of the TAC team?

A     I have not asked anybody if they moved that vehicle.

Q     Okay.  But in that -- but based on what you're saying, though, it was moved between the time the TAC team went in there and 0055; isn't that right?

A     Yes.

Q     Because it was moved at the time the tape was put up?

A     Yes.

Q     And my understanding is you said you secured -- that you're responsible and you secured that scene.

Now, at any time after that crime scene tape was put up and before you turned this over to anybody -- and who did you turn it over to?

A    I believe the first person that got there was Paul Gordon, I think.  I'm not for sure.

Q    Did you turn it over to Paul Gordon?

A    Once the investigators got there, it belonged to them.

Q    And the investigators were people with the highway patrol or people with OSBI?

A    Both.  And my -- Ben Rosser and Paul were there fairly close in time.  But I think Paul got there before Ben.

Q    Do you know whether or not there were -- that you allowed any people inside that tape?

A    We didn't allow anyone inside.

Q    Do you know whether any of the TAC team troopers came back after they left and got inside that tape?

A    After they left --

Q    After they left to go to Sallisaw and came back?

A    None of them had come back before I left to go to Sallisaw.  And then whenever we left Sallisaw, we went back to Gruber.

Q    We being?

A    The team.

Q    The whole team went back to Gruber?

A    Yes.

Q    Well, other than --

A    Yes.

Q    -- Buddy Hamilton, Rocky Eales, and Gene Hise, I guess?

A    Right.  I don't think Gene had come back.  I think Gene went to Tulsa.

Q    Are you familiar with a -- the AR-15 weapon?

A    Somewhat.

Q    Are you familiar with a Colt Sporter, which is a military -- I mean, a civilian version of it?

A    Yes.

Q    Do you know what ejection pattern that an AR-15 or Colt Sporter has?

A    No.

Q    Have you ever fired one?

A    A Sporter?

Q    Or an AR-15.

A    I've fired an AR-15.

Q    What does an AR-15 -- how does it eject?

A    It ejects to the -- to the right, up and left.  I mean, it will go out and up.  It's going to come -- eject it out and it's going to flip out.

Q    Okay.  And it will flip to the right?

A    Not always.

Q    What other direction does it go?

A    It goes in all kinds of directions.

Q    Okay.  It's not consistent is what you're saying?

A    That's correct.  I mean, you're not going to have a clean pile of casings sitting on the ground beside you whenever you stop.  They are going to be scattered everywhere.

Q    Okay.  And that's as far as an AR-15 is concerned?

A    Most weapons are like that.

Q    Okay.  Are you familiar with the MP5 ejection pattern?

A    A little bit.  The same.

Q    What kind of pattern --

A    Basically the same, yes.

Q    Will they basically, though, all --

A    It's different weights.

Q    I mean, they are not going to go right one time and left one time, are they?

A    They do funny things.  It's -- you never know.

Q    Okay.

A    Most of times they are going to go, you know, on the right, but that doesn't necessarily mean that they are all going to.

Q    Who -- as far as Danny Oliver, now, he wasn't with

the TAC team at this particular time.  The weapon that he had, was that a TAC team weapon, or was it his personal weapon?

A     I don't know.  It wasn't a TAC team weapon, but I don't know that it was a personal weapon either.

Q     Okay.  It wasn't a weapon that came from the TAC team?

A     That's correct.

Q     He brought that himself?

A     Yes.

Q     Did you do anything to check that weapon since, you know, you're in command here?  Did you do anything to check to see what kind of weapon it was, to see if it was an authorized weapon?

A     Prior to coming on?  Prior to the mission beginning?

Q     Right.

A     No.

Q     Did you check anything about his -- the type of load -- I mean, gunfire -- bullets in the weapon?

A     No.

Q     Would that have been a concern for you since you've got somebody that's not part of the TAC team, to know what kind of a weapon -- what kind of weapon and what kind of load they're putting in there?

A     I knew that he had a rifle that was a .223 rifle.  I

mean, I knew that he was bringing that.  But I didn't check it to see what ammunition he had or anything like that.

Q     Does the TAC team ever use tracer rounds?

A     They've been known to put tracers in the bottom of their magazine so they will know if they are running dry.

Q     Okay.  Do you use that as a regular procedure?

A     No.  No.

Q     Do you know whether tracer rounds are authorized outside the military service?

A     No.

Q     Do you know whether or not, when you put that tape up, whether Kenny Barrett had been removed?

A     He had not been removed from whenever I put the tape out.  He was still there.

Q     Well, then -- okay.  Let me go back to 174 then.

So did they have to go inside that tape to get Kenny Barrett out, or was Kenny Barrett not inside the taped area?

A     I just went to the corner of the truck.  Like I said, I can't remember whether he was between the house and the vehicle, or on the other side of the vehicle.  If he were on the inside of it, then he and the two deputies would have been in it, but I don't think we would have taped it off with them inside.  We would have gone to the opposite

side of them.

Q    I guess that's my question.

A    I just don't --

Q    You can't recall.  You're saying that two deputies were with Kenny Barrett?

A    Yes.  Or police officers.  I'm not sure whether they were deputies or police officers.  They weren't our people.

Q    Somebody not including the TAC team members?

A    Right.

Q    And you can't recall whether they were here or over here?

A    Well, they were right beside that vehicle.  I think that they were on the -- the right side of the vehicle outside of the taped area.

Q    Somewhere out here?

A    Yeah.  Because I can't imagine taping them inside the -- the crime scene.

Q    Okay.  So in your previous testimony -- previously where you were sort of pondering where they were, based on this tape recollection, you're saying that they would have been on the outside of the tape; is that right?

A    I'm assuming that they were.  They were there.  I put the tape out.  I can't imagine putting the tape with people inside of it.

Q   As part of your policy or procedure -- and not necessarily written policy -- do you ever do pat-down searches as far as the TAC team or as far as trooper is concerned?

A   Conducted of a person or suspect?

Q   Of a person.

A   Sure.

Q   If you find contraband on that person, do you just leave it on that person, or do you take it off?

A   You take it off.

Q   And that would be what the policy would be; is that right?

A   Yes.

MR. HILFIGER:  May I have just a moment, Your Honor.

THE COURT:  You may.  Mr. Hilfiger, let's take a recess.  Members of the jury, if you will remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you during this recess.  If you will exit through this door with the court security officer.

(Jury excused.)

THE COURT:  Mr. Pettingill, you may also step down.  Let the record reflect the jury has departed the courtroom and the witness has.

Anything to take up outside the hearing of the jury for the government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  No, Your Honor.

(Off the record at 3:17 p.m.)

(Back on the record at 3:45 p.m.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the government is present, defendant and counsel are present.  If you will ask the witness to come back in.  Mr. Hilfiger, you may continue.

MR. HILFIGER:  Thank you.

Q    (By Mr. Hilfiger)  Mr. Pettingill, on taping this area off here, how did you determine where your tape went?

A    I just went to an object that I could tie the tape off on.

Q    Okay.  Was there any particular reason, for example, that you didn't go around the Hise -- I mean, the Hash car and come all of the way out to the gate, because that's where all of the action was taking place in there?

A    No, there was no real thought process in how to do it.  I just walked along and tied off in that particular area because that seemed to be where everything occurred.

Q    Okay.  And so even where the -- the actual Bronco is that's there now, you saw that would have still been about

the same area you're saying that where you saw the glass shards come off the top and everything, didn't you feel it was necessary to sort of get that area in there?

A    Yes.   That's where I just felt like everything took place, and those vehicles were there.   It was easy just to put the tape off on those vehicles.

Q    Okay.   You didn't see any need to enlarge it any larger than what you have there?

A    No.

Q    Now, you -- did you go from the highway patrol to Homeland Security?

A    I'm on a leave of absence from the patrol.

Q    And when did you leave the TAC team?

A    When I was promoted to major in, I believe it was September of 2003.

Q    Okay.   So you left the TAC team then, and then a year -- was it a year later or just a few months later that you went to Homeland?

A    I was already assigned to Homeland Security.   I worked in Homeland Security as the deputy director from the time of its inception.

Q    Okay.   Mr. Pettingill, would agree with me that this mission didn't go like you planned it to go or the team planned it to go in the sense that you didn't sneak up on the person or the house, the people were awake, emergency

lights weren't turned on when they were supposed to be, or not turned on at all, you lost an individual, you got another person wounded?  Did you consider this mission a success or not?

MR. LITTLEFIELD:  That's compound.  And it's also argumentative.

THE COURT:  Sustained.

MR. HILFIGER:  I have no further questions.

THE COURT:  Redirect?

MR. LITTLEFIELD:  Yes, sir.  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    In regards to the lights on the vehicles, the emergency lights, what obligation do you have to turn the emergency lights on prior to entering property?

A    None.

Q    What basis do you all have for entering the property?

A    An order of the court.

Q    Does the lights have any implication on your lawful authority to be there doing what you're doing?

A    No.

Q    Whether or not you have lights on as you're entering under the order of the court lawfully upon to that property, is a homeowner entitled to shoot at you all

while you're there lawfully?

A    No.

Q    You understand that Mr. Hamilton's emergency lights were not turned on?

A    Yes.

Q    Was he the only vehicle in that entry team entering?

A    No.

Q    The other vehicles, were their emergency lights on?

A    Trooper Hash's were.  I'm not for sure about Greninger's.

Q    Okay.  In regards to having seen someone in the front yard, at the point in time that you observed someone in the front yard, could you have stopped it and announced, hey, we're the police, on the P.A.?

A    No.

Q    Why?

A    It was -- everything was unfolding right then.  I couldn't stop -- stop it.

Q    Would it --

A    I mean, I could have gotten on it, but --

Q    I'm sorry.  What?

A    I guess I could have -- I could have -- I would have to be too technical to try to explain it.  I mean, I'm talking on the radio saying there is somebody running across the yard.  I would have to throw that microphone

down, reach over, grab another microphone, turn the P.A. set on, turn it on to P.A., and make an announcement.  By that time, everything has already unfolded.

Q    And if you throw down that mike -- there is someone in the front yard, throw that mike down, announce we're the police, where are Trooper Hamilton and Trooper Eales going to be?

A    They are going to be at the front porch.

Q    What kind of security or protection would you have had had you stopped that operation at that time and announced you were the police?

A    We wouldn't have had anymore than what we -- that we had.

Q    At that point in time, did you know whether Kenny Barrett was at that residence?

A    When we made our approach -- no, I didn't know Kenny Barrett was at the residence until he was identified as Kenny Barrett.

Q    Did you have any knowledge as to whether or not he would have been at one of his relatives in the neighborhood?

A    No.

Q    Had you stopped the operation because someone was in the front yard, what position were the other -- would the other officers had been in in regards to the surrounding

neighbors?

A    They would have been open to them.

Q    Would that have been a safer policy than proceeding onward?

A    No.

Q    You have testified that you did not recall whether your visor lights were on when you returned to your vehicle.  Do you recall that?

A    Correct.

Q    Now, when was it you knew your visor lights were on?

A    Before I exited my vehicle.

Q    Would there have been any reason for them to have been turned off as you went back to your vehicle?

A    Yeah.  I mean, I would have to make an assumption.

Q    Well, what reason would there have been for them to have -- you've gone over the scene?

A    Yes.

Q    What reason would there have been to have turned them off at that point, after you left the vehicle and went to the scene?

A    That they would be an annoyance to Lieutenant McBride who is sitting in the passenger seat with those things -- they are strobe lights bouncing right in front of him.

Q    Okay.  At that point, what purpose would they have had to have been on or off?

A    Probably about the only one would be if Mrs. Barrett looked outside, she would have seen those.

Q    Do you know if Mr. Barrett's mother's last name is even Barrett?

A    No.

Q    Is that the individual to whom you're referring when you said Mrs. Barrett?

A    Yes.

Q    By that time, had everything happened as far as the -- as far as the entry and the injuries to the officers when you return back to your vehicle?

A    I don't know that, in fact, that they had secured Barrett and made entry into the residence to secure the residence at that time -- that they had actually made entry.  I don't know that that had occurred at that time.

Q    Where was Hash's car at that time?

A    It was still where it was at, and that was reflected in those photographs.

Q    Was there any question that it was police in the yard at that time?

A    I don't believe so.

Q    Your vehicle was off how far to the west?

A    From the property line or --

Q    From the residence where the activity was taking place.

weapons every single day of their life.  That's what they do for a living.  They should have their magazines loaded.  I expected that of them.

Q    Okay.  What kind of training do they -- did they have in relation to firearms?

A    They trained with those weapons.  Those weapons are assigned to them.  They keep them with them every day. There is nothing that prohibits them from firing that weapon any day that they want to.  We did various types of trainings with the weapons.  Day fires, night fires.  We went through various schools.  We went through some -- a military version of an automatic weapons course that we did at Camp Gruber.  I mean, there -- there's a wide variety of training that was conducted with the weapons, and it was always ongoing.  May have not been in every training, but it was often.

Q    Were those individuals who were assigned to the tactical team proficient in the use of their firearms and in the understanding and knowledge of the firearms?

A    Yes.

Q    And were they fully understanding of the risks inherent on this mission?

A    Yes.

Q    You were asked questions about the ejection pattern. What impact does it have if a shell lands on a hard

surface, a casing lands on a hard surface?

A    It's going to bounce or roll.

Q    And what happens if there are walls or posts in the area of where shells are being ejected?

A    They could be bounced off those, deflected in different directions.

Q    And what happens if a number of officers are conducting activities in the areas where casings have been ejected?

A    I don't understand that.

Q    Okay.  I'll withdraw it.  As to the Bronco, the one that was at the front porch initially, later was backed up to a different location -- let's go ahead and put 69 up -- what damage did that receive?

A    The Bronco?

Q    Yes, sir.

A    It had multiple gunshots to the vehicle.

Q    Okay.  And in regard to the engine, did you ascertain whether -- or did you learn that there was damage to the engine or the mechanisms of that vehicle?

A    Well, at the front end, it had a transmission cooler on it, and I know the transmission -- the cooler was either hit or something happened to it because all of the fluid drained out of it.

Q    Do you know how that Bronco moved from the front

porch to that location?

A    No, sir.

Q    What did the movement of that Bronco back have to do with Rocky Eales being shot?

A    Nothing.

Q    When that vehicle -- when Rocky Eales was shot, where was that vehicle located?

A    I'm not for sure because I -- with the rounds going into the vehicle, I don't know when Rocky was first shot.

Q    Okay.  Would it have been -- did Rocky receive the wounds --

    MR. HILFIGER:  Your Honor, I'll object.  He is now trying to ask questions that this man has already said I don't know when he was shot.  He is trying to make a supposition on when he was shot.

    MR. LITTLEFIELD:  When you saw Rocky --

    THE COURT:  Wait.

    MR. LITTLEFIELD:  I'll withdraw the question.

    THE COURT:  Okay.

Q    (By Mr. Littlefield)  When you saw Rocky on the ground, had he been shot?

A    Yes.

Q    Where was the Bronco then?

A    At the porch.

Q    What movement from the porch back to there did it

have to do with Rocky being shot?

A    Nothing.

          MR. LITTLEFIELD:  Pass the witness.

                    RECROSS-EXAMINATION

BY MR. HILFIGER:

Q    You're in charge of this scene?  You're the
commander?

A    Yes.

Q    And if it didn't have anything to do with it, why was
it moved?

A    I don't know how it moved.  It could have rolled back
on its own.

Q    And you don't know anything about why?

A    Well, I know it lost its transmission fluid, but I'm
no Ford mechanic.  I don't know whether it could roll back
or not.

Q    You were asked, you know, about a homeowner, if he's
 -- if he's entitled to shoot if you're there lawfully.
Does a homeowner have any rights to protect himself
against intrusions?

A    Intrusion into the --

          MR. LITTLEFIELD:  I'm going to object as beyond
the scope of this witness's knowledge.  He's asking for a
legal --

          MR. HILFIGER:  Your Honor, he asked the question

and I'm raising the same question.

THE COURT:  Of course, as I recall, there wasn't an objection.

MR. HILFIGER:  No, there wasn't.

THE COURT:  And I think it is objectionable. Sustained.

MR. HILFIGER:  Then, Your Honor, we would ask to have that statement taken out of the record and struck from the record then in his question.

THE COURT:  Which was?

MR. HILFIGER:  Which was is a homeowner entitled to shoot if you're there lawfully, and his response to that question.

THE COURT:  Argument?

MR. LITTLEFIELD:  There is a difference between an intruder and someone who is there lawfully.

THE COURT:  Well, let me say this to the jury, both questions should be stricken, and they both -- both questions and answers are inappropriate because it's not appropriate for these witnesses to predict what the law is.  That's a question for the Court.  The question -- it's not a question for a layman to answer, and you should disregard both answers.

MR. HILFIGER:  We have no further questions.

MR. LITTLEFIELD:  I have nothing further.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  Same statement.  Well, I -- I'm not sure whether he is under our subpoena, but we would ask that not to excuse him from the trial.

THE WITNESS:  I have a defense subpoena, yes, sir.

MR. HILFIGER:  We do have a subpoena.  Okay.  Then he can be excused for now and subject to recall.

THE COURT:  You're not excused from the defense's subpoena, but you may step down for this evening.  You will be subject to call.  You may call your next witness.

MR. SPERLING:  Dr. Ronald Distefano.

THE COURT:  What was the witness's name again?

MR. SPERLING:  Dr. Ronald Distefano.

THE COURT:  Sir, if you would raise your right hand and be sworn.

(The witness was duly sworn by the Clerk.)

THE WITNESS:  I do.

THE COURT:  You may proceed.

RONALD DISTEFANO,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Good afternoon, sir.  Please state your name, sir, and spell your last name.

A    I'm Dr. Ronald F. Distefano.  D-I-S-T-E-F-A-N-O.

Q    What's your business or occupation, sir?

A    I'm a forensic pathologist and a medical examiner.  I work for the State of Oklahoma at the Office of the Chief Medical Examiner in Tulsa.

Q    What's the physical address of that office?

A    1115 West 17th Street, Tulsa.

Q    Okay.  Do you currently serve as the deputy chief medical examiner for the State of Oklahoma?

A    I do.

Q    And have you so served since September 1st of the year 2000?

A    Yes.

Q    What essentially do you do as the deputy chief medical examiner?

A    Well, in addition to the case work that I perform, I'm also the administrator of the Tulsa office.

Q    In short summary, what is a medical examiner?

A    Well, he is an appointed official of the State of Oklahoma, a physician who investigates certain types of death that the Oklahoma law requires to be investigated.

He does that to try and determine what caused the person to die, and also what the manner of the death was.

Q    Thank you, sir.  Did you have occasion from January 1st, 1990 through August 31st, 2000 to serve as a forensic pathologist and deputy medical examiner?

A    Yes, sir.

Q    When we use the term forensic, what does that mean?

A    Well, it's a term that has a number of meanings.  If you talked about a forensic team in high school, it would pretty much mean a debate team.  But in the sense of forensic pathology, it really means people who are experts in a particular area, such as forensic pathology or forensic anthropology or whatever.  But they also apply themselves to the communication of their expertise to situations like courts of law.  In other words, it is a -- it is a -- it is an expert in a particular area who focuses his work on its applications with respect to civil and criminal justice.

Q    Have you had occasion, sir, to serve as an educator?

A    Yes, sir.

Q    And did you do so from about November 1st, 1988 through about December 31st, 1989?

A    Yes.

Q    Where?

A    I was assistant professor of pathology at the

Oklahoma State University College of Osteopathic Medicine.

Q     There is a term called board certification.   What is that, sir?

A     Well, in board certification, the board refers to a group of experts in a particular area, and by their setting up of criteria, which usually means both experience and examinations, they will certify that a particular candidate is competent in that particular area.   So by completing training, completing examinations, the board of experts says that a person is competent in that area.

Q     Are you so certified by the American Osteopathic Board of Pathology?

A     Yes, sir.

Q     Have you been so certified by the Anatomic Pathology and Laboratory Medicine Division since July 19, 1991?

A     I believe the completion of the certification was 1992.

Q     Thank you, sir.   Have you been so certified in forensic pathology since about the mid '90s?

A     Yes, sir.

Q     All right, sir.   Let's talk for a moment if we may, sir, about your education.   First, as an undergraduate, where did you go to college?

A     First went to Northwestern State University in

Natchitoches, Louisiana.

Q    What year did you graduate?

A    1971.

Q    What was your undergrad degree?

A    Bachelor of science, chemistry.

Q    Did you obtain a further bachelor of science degree in pharmacy in about 1974?

A    Yes, I did.

Q    From what university?

A    Northeast Louisiana University in Monroe.

Q    All right.  Did you subsequently attend medical school?

A    I did.

Q    Where, sir?

A    At the Oklahoma College of Osteopathic Medicine in Tulsa.

Q    As a footnote, in between those periods of time, sir, did you also serve professionally in some other capacity?

A    Well, I was a registered pharmacist in the state of Louisiana, where I grew up, for about three years.  I then moved to Oklahoma and shortly thereafter attended the Osteopathic College.

Q    Where was the Osteopathic College located at that time, sir?

A    In Tulsa.

Q    You received your doctorate of osteopathy in what year, please?

A    1983.

Q    After you graduated, sir, did you do an internship?

A    I did.

Q    Where?

A    Hillcrest Hospital in Oklahoma City.

Q    For how long?

A    One year.

Q    After your internship, sir, did you do a residency?

A    Yes, I did.

Q    What was your specialty or field of concentration as a resident?

A    Anatomic pathology and laboratory medicine.

Q    Where did you so serve?

A    That was at the Oklahoma Osteopathic Hospital in Tulsa.

Q    Who was your primary trainer during that period of time?

A    A Dr. Melvin Van Boven.

Q    And would that have been from about August 1st, 1984 through about July 31st, 1988?

A    Yes, sir.

Q    Do you have postgraduate training as well, sir?

A    Yes.

Q   And did you complete a forensic pathology fellowship?

A   I did.

Q   Under whose tutorship?

A   The tutorship was Robert L. Hemphill, and under the overall auspices of Fred Jordan, the chief medical examiner for the state of Oklahoma.

Q   All right.  And was that also located in Tulsa?

A   Yes.

Q   For one year in 1990?

A   Yes.

Q   And have you had occasion, sir, to join any professional organizations with regard to your occupation and your profession?

A   Yes, sir.

Q   Are you familiar with the National Association of Medical Examiners?

A   Yes.

Q   Did you have occasion to join that group in 1994?

A   Yes, sir.

Q   And the American Academy of Forensic Sciences, did you join that group in 1991?

A   Yes.

Q   Can you briefly tell us what the National Association of Medical Examiners is?

A   It's a professional association of people all over

the United States who practice forensic pathology and are either medical examiners or coroners, depending on the type of death investigation system in that location.

Q    The American Academy of Forensic Sciences, what is that?

A    The American Academy of Forensic Science is the primary professional organization for all of the various forensic sciences.

Q    All right, sir.  I note here in your curriculum vitae there is an annotation about the College of American Pathologists, that you're a fellow?

A    Yes, sir.

Q    What's that, sir?

A    The College of American Pathologists is just a group of pathologists.  The group is primarily a professional organization that deals with really all of the subspecialty areas of pathology.

Q    Are you also a member of the American Osteopathic College of Pathologists, the American Osteopathic Association, an the Oklahoma Osteopathic Association?

A    Yes, sir.

Q    Briefly, let me ask you about appointments.  Have you had occasion to serve in an education forum as a clinical assistant professor of pathology?

A    Yes.

Q    Where?

A    That was at the Oklahoma State University College of Osteopathic Medicine in 1988 through the end of '89.

Q    All right, sir.  And have you also served as an adjunct assistant professor at the University of Oklahoma College of Medicine in Tulsa in 1999?

A    Yes.

Q    And do you continue to so serve?

A    For both schools, I still am an adjunct faculty member.

Q    All right, sir.  Have you been a recognized expert in this court, the Eastern District of Oklahoma, in an unrelated case in July of this year?

A    Yes, sir.

Q    And were you recognized as an expert and allowed to testify as an expert in forensic pathology on that occasion?

A    Yes, sir.

Q    I'm convinced that you may not have kept a precise numerical listing as to the number of times, sir, that you have been qualified as an expert in various jurisdictions and courts of United States and of the states.  Are you able to give us an approximate number, sir?

A    Yes.  I mean, I know that it's over 300 in the sense of district courts in Oklahoma.  Testified in federal

court about six or seven times.  Once in Kansas, once in Texas.

Q    I'd offer the same preamble with regard to the number of autopsies that you have performed.  But are you able to give us a rough estimate as to the number of autopsies that you have performed in your experience as a pathologist, sir?

A    Yes.  I think it's between 3,000 and 4,000.

Q    All right.  And a general estimate, how many of those would involved gunshot wounds?

A    I would say between 20 percent and 25 percent.  Twenty-five percent of our cases are cases that we classify as homicides, and the overwhelming majority of those are gunshot cases.

Q    Thank you, Doctor.

    MR. SPERLING:  Your Honor, we move this Court to recognize Dr. Distefano as an expert in forensic pathology, and tender him to the defense for any voir dire questions concerning his qualifications.

    MR. SMITH:  Your Honor, the doctor is qualified.

    THE COURT:  The Court recognizes Dr. Distefano as an expert.  You may proceed.

    MR. SPERLING:  Thank you, Your Honor.

Q    (By Mr. Sperling)  Do you have a -- some people call

it procedure, some call it protocol. Do you have a process that you follow, sir, with regard to autopsies?

A   Yes, sir, we do.

Q   Would you explain that to the jury in summary form, please?

A   Yes. Well, each case is, of course, different and each case may involve differing procedures and techniques. But, in a sense, every autopsy exam goes through a series of about four steps -- four major steps.

Q   What are those steps?

A   The first step is actually the collection of information about what is known at that time about the death. That information is very important because it not only directs what is done in that particular case, but it also helps to interpret what we find when we examine the body.

The second two steps are the examination of the body itself. The first -- the second step being looking at the body on the outside, and the third step, examining the body internally. Now, by looking on the outside, I mean looking on the surface of the body, at the clothing, at radiographs, looking for signs of injury or illness that will explain why the person died.

Similarly, in terms of the internal examination, it means that the vital organs are removed. And they are

removed also to be looked at individually to see signs of injury or illness, again to try and explain why the person died and the manner.

And then the last step really is the recording of the information. That's formalized in a written document and a report is generated in each death that we investigate.

Q   Did you have occasion, sir, in this case to generate a report of investigation by the medical examiner concerning David Eales?

A   Yes, sir.

Q   All right, sir. Did you conduct this autopsy at the Office of the Chief Medical Examiner where you were employed in Tulsa, Oklahoma?

A   Yes, I did.

MR. SPERLING:   We would ask, Your Honor, first, that the Doctor be shown Government's Exhibit Number 82.

THE COURT:   You may.

Q   (By Mr. Sperling)   Do you recognize the cover sheet that is shown there, sir?

A   I do.

Q   Is this an accurate copy of the original of that document that is a business record generated by you, who was -- when you were responsible for this autopsy?

A   Yes, sir.

Q   And if we can go through the other pages here, if

they can also be shown to you, sir.  Do those pages appear to be accurate reproductions of the original of that document that you generated, sir?

A     Yes, they are.

Q     All right.  First, how were you examined -- or how were you notified, that is, of this death?

A     Well, a Dr. Michael Callery worked both as a physician in the emergency room at Sequoyah Memorial Hospital, and he also functioned as a county medical examiner.  And so Dr. Callery was on duty at the hospital on the night in question, and he did treat the decedent up until the time that the death was declared.  Dr. Callery then notified the office in Tulsa about 2:00 o'clock in the morning on that -- September 24th of '99.

Q     Did you obtain the date of birth with regard to the decedent?

A     Yes, sir, it was given to us.

Q     An by decedent, we are referring to the person who has died?

A     Yes, sir.

Q     What is the date of birth that was given to you, sir?

A     July the 4th of 1950.

Q     All right.  And did you determine the race and sex of the decedent?

A     I did.

Q     And what was that?

A     It was a white male.

Q     All right.  An did you also have occasion to determine the type of death as evidenced by your cover sheet?

A     Yes, we did.

Q     And what did you determine that the cause of death was -- or the type of death was, I should say?

A     The type of death, which is the categorization whereby the medical examiner takes jurisdiction of the death, was, under the Oklahoma law, the part that indicates all violent, unusual or unnatural deaths.

Q     Okay.  By the way, do you know a woman by the name of D.J. Mann?

A     I do.

Q     And what position does she have with the Office of Chief Medical Examiner?

A     At that time, she was a -- she was an investigator. By that, I mean an in-house investigator.  She worked in the Tulsa office.

Q     Were you also familiar with Steve Scott and James Hilliard?

A     Yes, sir.

Q     Did they serve you as pathology assistants during the course of this autopsy?

A      Yes, they did.

Q      I notice from your report that you indicate, as I think you briefly noted, that Michael Callery, a doctor from the Sallisaw area, is the one who notified your office.  Would that be fair?

A      Yes, it is.

Q      And there is an indication, 9-24-99 at 0207 time, that is hours?

A      Yes, sir.

Q      What does that evidence?  What does that indicate?

A      That is just the time that the Tulsa office was notified about the death.  The date and time.

Q      All right.  And you indicate in your report that the decedent was injured on or about the 24th -- well, it says on September 24th, 1999, at 0020 hours; is that correct?

A      Yes, sir.

Q      And is that an approximation?

A      Yes, sir, it certainly is.

Q      All right, sir.  And the location of death is indicated as Sequoyah Memorial Hospital and at 0140 hours.  Is the declaration of the time of death necessarily the precise time of death?

A      No, it's not.  The time of death that is given in any death is the time that it is recognized.  And so when we indicate 0140 hours, what we mean is that, prior to that,

attempts were being made to try and save his life.  But at that particular point in time, they decided to stop resuscitative efforts.  So in the sense of when a person dies, in a biological sense, that is not necessarily the time.  But for legal purposes and for recording purposes in Oklahoma, and elsewhere, it is when the death is recognized.

Q    Thank you, sir.  Did you have occasion to make a record and a report of your autopsy to include pathological diagnoses?

A    I did.

Q    When you conduct an autopsy, do you do an x-ray?

A    We sometimes do.

Q    Did you in this case?

A    Yes, sir.

Q    For what purpose?

A    Well, we didn't have the information that was known at the time, and believing that the death was likely related to firearm injuries, we x-rayed the body in order to look for fragments or projectiles, in other words, to guide the procedure that we then undertook.

Q    I don't ask you at this time, Doctor, to specify the precise number of fragments that were located on the x-ray, but did you locate metallic foreign objects as the result of the x-ray?

A    Yes.   There were many.

Q    All right.   And can you tell the jury, generally speaking, where they were in the body of the decedent, David Eales?

A    Yes.   Yes.   We x-rayed virtually the entire body, and the x-rays that showed the -- the upper left chest area, in this area and inside the chest, and also along the flank area of the body, as I'm now indicating on my own body, in those two areas there were clusters of metallic fragments.

Q    All right.   And you were indicating the flank area. So that the record may precisely reflect where you were indicating, were you indicating in a location slightly above your left hip?

A    I am.

Q    On the side -- on the left side?

A    On the left side of the body, the torso, the lower part of that, and somewhat above the left hip.

Q    Okay.   And then what was the other area where you saw metallic -- metallic objects?

A    It was essentially within the left chest and shoulder.

Q    Okay.   On a pathological diagnosis, I notice that there are five findings on your report.   I would like to, if we could, with the Court's permission, discuss each of

them in some detail.  But can you briefly tell the jury, in numerical order that they are listed here, what those five were?  Before I ask you that, though, sir --

MR. SPERLING:  Your Honor, we would ask for purposes of demonstration that Government's Exhibit Number 82 for demonstrative evidence purposes be introduced just so we can show it.  It's the report.

THE COURT:  Any objection?

MR. SMITH:  Judge, can we approach quickly?

THE COURT:  You may.

(The following proceedings were had at the bench, out of the hearing of the jury.)

MR. SMITH:  Your Honor, the problem I have with introduction of the report is the next to the last page, this final summary talks about gunfire from the residence struck the officer.

MR. SPERLING:  We are not going to introduce that part.  All I want to do -- maybe I can shorten this. I just want this to be displayed, you know, the pathological diagnosis and then the gunshot wounds as he discusses them.

MR. SMITH:  I don't mind the rest of it coming in, if you will just take out that page.

MR. SPERLING:  Okay.

MR. SMITH:  It's the next to the last one in

mine.

THE COURT:   Are the pages numbered?

MR. SMITH:   No.   It's just the last one in that packet, Judge.   I don't think they were numbered.

MR. SPERLING:   I'll withdraw it, Your Honor.   It has 186 at the bottom of mine.

MR. SMITH:   The Bates stamp?

MR. SPERLING:   Yeah, the Bates stamp.   I'll withdraw the final page.

THE COURT:   It's entitled final summary.   And withdraw the final summary?

MR. SPERLING:   Yes.

MR. SMITH:   Yes.

(The following proceedings were had in open court in the presence and hearing of the jury.)

THE COURT:   Counsel, for clarification, is this to be introduced as an exhibit?

MR. SPERLING:   I'll offer it as such, Your Honor.

THE COURT:   So it's Government's Exhibit Number 82?

MR. SPERLING:   Yes, Your Honor.

THE COURT:   As amended at the bench.

Q    (By Mr. Sperling)   All right, sir.   On the report of autopsy --

THE COURT:  Any objection?

MR. SMITH:  As amended, no, sir.

THE COURT:  Admitted as amended.

MR. SPERLING:  Thank you, Your Honor.

Q    (By Mr. Sperling)  I'm on Page 2, I believe, of the report of autopsy and it has listed pathological diagnosis.  May that be displayed, please?

Doctor, if you would please, would you briefly summarize those five diagnoses?

A    Yes.  Well, I indicated five diagnoses, numbered them one through five, and they are as follows:  Number one, gunshot wound of the right arm.  Number two, gunshot wound of soft tissues in left flank.  Number three, gunshot wound of chest, and then a brief list of the effects of that particular wound below that, listed A, B, C and D.  And then the fourth diagnosis showing some rib fractures that were part of resuscitation effort.  And, finally, number five, which involved atherosclerotic blockage in the coronary arteries.

Q    Okay.  What does that basically mean, number five?

A    Well, it's a disease process that is extremely common and is often referred to as blockage in the arteries, bad circulation.  But the coronary arteries supply your heart, so it is a serious finding, and to the extent that you have atherosclerosis in those arteries, you're subject to

heart attacks and other bad things.

Q    I am properly warned, sir.  Did that contribute in this case, however, to the death?

A    No, it did not.

Q    You also have listing in parenthesis, intervening target.  What does that mean?

A    Well, that was an opinion based on observations of the wounds.  On two of the wounds, the ones that were arbitrarily numbered as numbers two and number three, the features of those wounds were atypical.  And they were atypical in such a sense that I believed I could tell that the bullet hit something else before it hit his body.

Q    Have you conducted further inquiry, also, sir with regard to gunshot wound number one to the right arm?

A    Yes, I did.

Q    And upon further inquiry, if you were to have made further commentary on the report, would you also have made the same finding with regard to gunshot wound number one?

A    With respect to gunshot wound number one, it would correctly be characterized as atypical, and also that atypical quality could or could not involve the bullet striking an object right before or preceding striking the arm.

Q    All right, sir.  If we could, let's move toward two pages to the page that begins at the top, description of

gunshot wounds.  I do so not to rush through this, Doctor, but to at least provide this transition.  Do you conduct an external examination of the body as well?  You indicate that was one of the four steps?

A    I do.

Q    All right.  And apart from noting the apparent gunshot wounds, was there anything of marked significance concerning the external part of Mr. Eales' body?

A    I would say no.

Q    All right.  In paragraph one, though, of the external exam, you noted that -- was there -- did he have any jewelry on?

A    He did have a ring on the fourth finger of the left hand, a gold band.  A wedding style ring.

Q    All right, sir.  Was clothing submitted along with Mr. Eales' body for purposes of your examination?

A    Yes.  The body was clothed in a pair of briefs and a pair of socks.  But separately in a bag accompanying the body were several other items of clothing.

Q    What did that include?

A    It included a pair of boots, a pair of pants that had been cut, a belt, a T-shirt that had been cut, a vest of the type -- a protective vest, a firearm protective vest, and also a button style shirt.

Q    All right.  And was the button style shirt in a

singular piece or was it rendered -- or rented -- torn?

A    I didn't -- I didn't write that on the diagram, but I feel certain it was probably torn.

Q    All right.

A    Because all of the clothing were removed in that fashion at the hospital in order to provide the medical care, help.

Q    Other than the gunshot wounds, were there any other acute injuries that you identified?

A    No.  There was the minor abrasion on the underside of the chin, about here where I'm showing on my own chin. Those are the only -- that was the only other injury.

Q    Thank you, sir.  The gunshot wounds that you list in your autopsy report, are these numbered for any reason other than for purposes of description?

A    No, sir.

Q    And in fairness, are you able to tell, based on your examination, which of the gunshot wounds was effected first, second, or third?

A    No.

Q    All right.  So for purposes of numbering, this is arbitrary as you say?

A    It's arbitrary and in order to facilitate talking about them.

Q    All right, sir.  For purposes of our discussion,

we're going to stay with the numbering system that you allotted to these wounds, sir.  With regard to gunshot wound number one, what were your findings?

A    Well, gunshot wound number one was a wound of the right arm, about here where I'm showing on my own body.  And what was present there was a large defect, a large jagged defect of tissue involving both the skin and the muscle.

MR. SPERLING:  May the record reflect that the Doctor is referring to and indicating, Your Honor, the outside upper part of his right arm at the shoulder and moving a little bit to the back?

THE COURT:  The record so reflects.

Q    (By Mr. Sperling)  Continue, if you would, sir.

A    So that was a wound that was made by a projectile that I would characterize as having struck the arm in a somewhat tangential fashion.  In other words, in a typical gunshot wound, there's a small round hole where the bullet goes in, and there is usually a kind of a slit-like hole where the bullet comes out.  But this was not like that.  This was literally a three and a half by two and a half inch gaping, jagged, tearing type wound of the skin and the underlying muscles.

Q    What do you make of that with regard to whether or not this bullet struck Mr. Eales' body first, or hit

something else that intervened?

A    Well, when a bullet hits and passes -- and what is called tangential fashion means sort of like a grazing wound, only this would have to be called deeply grazing. That that type of wound often causes a kind of a jagged defect, except that, in this case, it was very deep.  And because of the nature of the projectile that struck him, it is conceivable that either -- the sheer force of the projectile because of its speed or because it struck another object, that it resulted in this gaping kind of tearing open effect of the soft tissues.

Q    Is that wound consistent with a bullet having struck something before it hit Mr. Eales?

A    Yes, it -- yes, it certainly is consistent with the bullet having struck something else.  It did not have the features of the other two wounds, which I have characterized as intervening target.  But still the atypical quality of it is consistent with hitting another object, as you said.

Q    You indicate that it involves the musculature but not the bone?

A    That's correct.

Q    That means?

A    That means that the bone itself was not broken.  That an x-ray of the arm showed that the bone was still intact,

but the skin and the muscle underneath were torn open.

Q    As a result of the surgical procedure that you performed with regard to gunshot wound number one, Doctor, were you able to recover the projectile?

A    No, there was no projectile there.  That is, of course, not seen on an x-ray.  And in probing into the wound, there was nothing to be found.

Q    All right.  With regard to gunshot wound number two, did you determine the point of entry?

A    I did.

Q    How can you tell?

A    Well, I'm simply looking at the skin, and I'm looking at a hole that a projectile would have made.  And in this particular case, it's not a simple wound.  It's not typical, as I mentioned earlier.  And there were several things that could be seen on the skin and in that area. But -- excuse me.

Q    I'm sorry.

A    But primarily there was one larger hole.  And I was able, during the internal part of the examination to dissect the tissues in that area and follow the track of that -- of the wound and ultimately to recover a fragment that had caused that.

Q    How do you follow the track of a wound?

A    Well, it's just simply a physical dissection where --

in other words, an incision is made and one can see the damage and the associated hemorrhage in the tissue, and one can simply follow by use of a scalpel or a scissor and follow the wound path.

Q    Okay.   Where did you determine the entrance to be, sir, with regard to gunshot wound number two?

A    Well, the main part of the entrance was on the side, as we earlier mentioned, about here where I'm showing on my own body.

Q    You're indicating about how far above your waist on your left side?

A    Well, we use the top of the head as a standard measuring reference point, and it was 25 inches from the top of the head.   And the hole was just in front of an anatomic line that we call the posterior axillary line. Now, these are terms that doctors use based on landmarks of the body.   So if you just think -- if you just consider a body with the arm hanging down, the axilla is the armpit, and the place in front where the skin is folded, there is a line that goes straight down the side of the body there.   That is the anterior, or front, axillary fold.   And then there is a line that goes from the back where the skin is folded down the side.   That's the posterior axillary fold.   So this bullet -- these fragments and the main part of the bullet entered the body

just in front of the line in the back.

Q    Okay.  Anterior, front; posterior, back?

A    Yes, sir.

Q    And this was just in front of that line?

A    Just in front of the posterior line.

MR. SPERLING:  And may the record also reflect, Your Honor, that he was indicating just above where I think the belt line would be above the waist area on his on his left side?

A    Yes, sir.  I think it would be just about -- just a little above the level where most people would wear a belt.  The belt line, so to speak.

THE COURT:  The record so reflects.

MR. SPERLING:  Thank you, Your Honor.

Q    (By Mr. Sperling)  Were you able then, you indicated, to obtain or surgically remove certain fragments?

A    I did.

Q    What were those surgical fragments?

A    Well, from that -- from that point -- that is, I should say, from the end of the track of that wound, which was located over the -- over the lower back and actually about the -- about the midline of the body.  So within the soft tissues just over that, I recovered a single, relatively speaking, large fragment of lead.

MR. SPERLING:  May Government's Exhibit Number

129 be handed to the witness, please?

THE COURT:   You may.

Q     (By Mr. Sperling)   Do you recognize the contents of that envelope, sir?

A     Yes, I do.

Q     How do you recognize the contents, sir?

A     Well, the contents of this larger envelope -- there are two.   And these are standard evidence envelopes that my office uses and used at the time to contain projectiles that are removed from the body.   And I recognize that both the name of the deceased person, as well as the autopsy number is displayed on there, as well as my name, and also the description of the site from which that was recovered.   In this case, it says lower back.

Q     And is that as you have indicated under gunshot wound number two, subparagraph C in your report, sir?

A     I did.   Subparagraph C of wound number two, I indicate that the fragment is recovered and, in quotation marks, labeled on the envelope, lower back.

MR. SPERLING:   Your Honor, we move the introduction of Government's Exhibit Number 129.

THE COURT:   Any objection?

MR. SMITH:   Brief voir dire, Your Honor?

THE COURT:   You may.

VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Doctor, I understand the fragments that you have recovered that you put into an envelope, but you didn't maintain those in your possession, did you?

A    Well, I did maintain them in the possession of the Office of the Chief Medical Examiner.

Q    For a while you did, and then you eventually turned them over to somebody else?

A    That's correct.

Q    And so they have been out of your hands for six years now?

A    That's correct.

Q    And you don't know where they have been, who has had them, or what has gone on with them; is that correct?

A    That's correct.

         MR. SMITH:  We would object to the introduction at this point, Your Honor.  Chain of custody reasons.

         MR. SPERLING:  He has given a sufficient basis, Your Honor.  That may go the weight of the evidence, but that doesn't go to the authenticity of the item.  He testified that he recognized the markings on the envelope.

         THE COURT:  Let's go through -- there is an objection in regard to chain of custody.  I'll give counsel an opportunity to trace that chain of custody, and

then I'll give counsel an opportunity to object again.

MR. SPERLING:   Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION

BY MR. SPERLING:

Q     So we can maybe summarize that, is this an envelope that, when you originally extracted the metallic object, that you put it into?

A     Yes, sir.

Q     All right.   And for what purpose do you do that?

A     Well, that is my understanding of the proper handling of a piece of evidence such as that.   One thing we have in mind at the time we do a case like this, again, based on that initial information, is that that may be appropriate at a later time.

Q     Okay.

A     So we do go through that.   We seal that envelope.   It is maintained in our office and subsequently delivered to whatever law enforcement agency has the authority to investigate that death.

Q     And does your office maintain custody of that item until such time as such items are requested to be examined by other agencies?

A     Yes, sir.

Q     And you maintain those items in a secure fashion in the Office of the Chief Medical Examiner?

A     Yes, we do.

Q     Do other people who operate under your supervision also have access to the place where they are securely kept?

A     Well, yes, they do.

Q     And among other people, did D.J. Mann have authority and custody and control over this item, as well as yourself?

A     Yes, she did.

Q     Okay.  This may not be within your personal knowledge, sir.  But did you become aware that ultimately that item, as well as other items of evidence were turned over, that is, were conveyed to other investigators or officers for purpose of further examination?

A     Yes, I knew that.  And we have records of that transfer.

Q     All right, sir.  Did you have occasion to trace the path of the fragment of lead that you have identified as associated with gunshot wound number two?

A     I did.

Q     What did you determine the path of that projectile to be?

A     Well, in paragraph -- subparagraph B, it indicates that the fragment penetrated into the musculature and soft tissue of the lower back ending up in the soft tissues at

the approximate level of the second lumbar vertebra and about 22 inches from the top of the head.  So that we could see it went primarily in a left to right direction, as is indicated on subparagraph D, that it was also somewhat upward, and very slightly from front to back.

Q    Were you also able, sir, to determine -- and we can get to this in a moment.  But were you able to determine specifically the damage that that bullet or that fragment did?

A    Yes.

Q    All right.  We'll get there in just a moment.  With regard to gunshot wound number three, were you able, sir, to determine the point of entry?

A    Yes, sir.

Q    What did you determine the point of entry to be?

A    Well, the point of entry of gunshot wound number three was on the left side of the upper back about right here, as I am now showing on my own back.  This is on the left side, just behind the fold between the arm and the chest.  So it entered here twelve and a half inches from the top of head, and eight and a half inches to the left of the midline of the body as viewing the body from behind.

Q    Did you measure the approximate diameter of the entrance wound?

A    I did.  I measured it at approximately three-sixteenths of an inch.

Q    Your report indicates that it shows marginal abrasion?

A    Yes.

Q    What significance is that, sir?

A    Well, marginal abrasion is a feature of a gunshot wound that often is the indicator that that is where the projectile entered the body.  Now, there are exceptions to every rule.  But gunshot wound entrances primarily are characterized by what we call marginal abrasion.

Q    You noted multiple satellite impacts.  What does that mean?

A    Well, if you look at the body in the area that I'm indicating where that hole was, around it both on the back of the left arm and also on the skin below it, there were multiple additional small places of damage of the skin. And from the radiographs, which we mentioned earlier, one could see that metallic material had penetrated into the skin through those small holes.

Q    Why is it significant that there are multiple satellite impacts?

A    That is what indicates that the bullet struck something else before it struck his body because, in striking something else, the bullet breaks up into

fragments.  And depending on what it hit, can also propel fragments from what it hit into the body itself.  So those are the things that allow me to say that there was an intervening target in that particular wound.

Q    Your report indicates that there is an associated three inch linear defect.  What's that?

A    Well, I noticed that right where the arm meets the shoulder in back, the skin was torn, cleanly torn right in the line of fold of the skin.  And it was quite a large tear.  It was three inches in length.

Q    What do you associate that with?

A    To me, that represented an effect of that gunshot wound.  In other words, a spliting of the skin at that location as a result of the cavity formed as the projectile and those other fragments struck the body.

Q    Are you familiar with an AR-15 type semiautomatic rifle?

A    I am.

Q    Do you know about what velocity a bullet fired from an AR-15 is?

A    Yes, sir, I do.

Q    About what is it?

A    Well, it's -- it's extremely fast and it's somewhere twice to three times the speed of sound.

Q    Okay.  When a bullet like that strikes the body, what

impact does it have?

A    Well, the energy of a projectile striking the body is a product of both the weight of the bullet and how fast it strikes.  And in fact, the speed is one of the greatest determining factors from the standpoint of it causing a wound.  Because in a mathematical way of considering that energy, it is related to the square of the speed.  So that means that, for any given bullet, to increase its speed, causes a tremendous increase in the amount of energy that it can deliver to a target.  And a projectile like this is a very high velocity projectile.

Q    When a high velocity projectile like that hits the body, does it just affect the area as wide as the bullet itself or bullet path itself, or does it have more impact than that?

A    More.

Q    How so?

A    When the bullet hits the body, it not only damages the tissue in front of it as it pushes a hole through it, but the energy of the bullet is distributed to the body actually in a radial fashion, meaning radiating out from the flight path.  So as a bullet goes through the body, if one could see that or film it with fast motion photography, one would see that, as the bullet goes through, after the bullet has passed, the energy is

causing a large temporary cavity to open up.  In other words, the bullet is knocking a huge size hole stretching, damaging, distorting all of the tissues that are adjacent to the path of that bullet.  So there is damage away from the actual place where the bullet goes.

Q    Okay.  Back to what you have numbered gunshot wound number three and the path, what did you determine the path of this third gunshot wound to be?

A    Well, in subparagraph B here, I indicated that it penetrated the soft tissues and entered the chest cavity striking and breaking the fourth rib on the left side laterally, meaning the fourth rib right underneath where the bullet went in.  But because of the effects that we just talked about, it also broke the second, third, and fifth ribs at the same time.  So in other words, that bullet, even though the bullet itself just struck the fourth rib, actually the second, third, fourth, and fifth ribs were all broken by that expanding cavity as that bullet went in.

Q    What impact would that have on a victim?

A    Well, it would be tremendous impact, and, of course, fatal to the extent that it involves vital organs like the lung, the heart, or major blood vessels.  So it's a devastating wound.

Q    Okay.  You also indicate that the path resulted in

the perforation of the left upper lung lobe?

A   Yes, sir.

Q   When you call perforate, you mean it pierced it?

A   To perforate means to not only enter, but to go all of the way through.

Q   Okay.  And when it entered and went all the way through, what, in your opinion, is the impact of a bullet wound that pierces and goes through -- travels all the way through a lung?

A   Yeah, a bullet perforating the lung like that has a number of very serious consequences -- adverse consequences.

Q   What are they?

A   Probably the worst aspect is that the lung is a very vascular organ because our body pumps a lot of blood to our lungs in order to pick up oxygen and carry it to the rest of our body.  So many blood vessels, small and large, are all destroyed in that process.  So there will be a very severe and rapid loss of blood from such a wound.  A wound that perforates the chest cavity also destroys the relative vacuum that is present around the lung.

Q   When you call a vacuum, what do you mean a vacuum around the lung?

A   Well, by vacuum around the lung, I mean that the body creates a -- I mean, vacuum, in other words.

Q    Space?

A    No.   No, sir, it's not a space because the body has removed anything from that space and the vacuum is what allows the lung to remain expanded in the chest.   So that when that vacuum is lost in a penetrating energy, then the lung, which is composed of tissue that is in part elastic, it collapses.

Q    So like popping a balloon?

A    Not quite like popping a balloon, but more like letting a whole lot of the air out of a balloon.

Q    All right.

A    So that as the lung then collapses, you have a loss of the ability of the lung --- that part of the lung to function, meaning breathe.   The bleeding collects in the cavity around where there was a vacuum before.   Now, there is -- can be air inside and also blood.   So as bleeding continues, then there is further constriction of the lung itself and further worsening of the person's condition as they need to breathe and to maintain the blood within the blood vessel's system in order to stay alive.

Q    What did you determine the path of this bullet to be after it perforated the lung?

A    Well, as it went through the lung, it actually went into the middle part of the chest that is referred to as the mediastinum.   And in there, it struck -- this

particular projectile struck the aorta.  And the aorta is the main artery.  It comes out of the heart to deliver blood to the body.  And so any defect or damage or tear of the aorta is almost certainly a fatal injury.

Q    And you indicated that that wound measured approximately one quarter inch to the descending aorta?

A    Yes, sir.  In looking at the body and in looking at the aorta, there was the defect there caused by the part of the bullet, a fragment of the bullet.  And in that state, it measured about a quarter of an inch, which is very large in significance.

Q    About how large would the aorta be in a typical male of that age?

A    I would say it would be about as big around as a half dollar.  Probably bigger than a quarter, but not much.

Q    Okay.  What kind of wound is a one quarter inch perforation of an aorta?

A    Well, the aorta is so vital and there is such pressure -- the aorta really maintains the body's blood pressure.  So a loss of integrity of the aorta results in a tremendous loss of blood, which ultimately becomes loss of blood pressure and subsequent death.

Q    In your opinion, Doctor, given the reported location of this injury, is there any way that Rocky Eales' life could have been saved by getting him to a doctor?

A    No.

Q    You indicated bullet recovery with regard to this bullet wound?

A    Yes, sir.

Q    What were your findings, sir?

A    Well, with respect to this particular path of this projectile, I was able to recover a few tiny fragments of lead and one larger fragment which was part of the metal jacket of a projectile.  And that was recovered from the mid part of the chest where I earlier indicated.  And those I labeled as in quotation marks, upper chest.

Q    All right, sir.  And is the fragment that you recovered there the fragment that appears to be in Government's Exhibit Number 129?

A    The second evidence envelope -- bullet envelope that was present in Government's Exhibit 129 contains the fragments from upper chest, as indicated on there.  Also as I mentioned the other information, including my initials and the name, David Eales, and the date of the autopsy and, of course, the number of autopsy.

Q    What did you determine the direction of this bullet wound to be, sir?

A    Well, it was primarily left to right.  I also characterized it as slightly back to front and slightly downward.

Q     You then use a term radiographic appearance of the wounds.  What does that mean?

A     That means looking at an x-ray.

Q     Okay.  And what did the x-rays reveal with regard to wounds two and three?

A     Well, I think I might have mentioned earlier, there were many fragments of metal associated with each wound track, more for the upper chest track, but -- and fewer for the flank, but still quite a few.  And these -- this pattern I characterized using a term that is frequently used in forensic pathology, which is referred to as a snowstorm effect.

Q     What's that?

A     Well, it simply means that, when you look at the x-ray, there are many, many little tiny fragments.  Of course, they are whiteish since the x-ray doesn't go through metal.  And kind of looks like a little miniature snowstorm like as might happen in one of those little decorative things where you tilt it upside-down and make the flocculent material float around.

Q     You have significant experience --

            THE COURT:  Counsel -- counsel, let's recess for the day.  It's a little bit after 5:00 o'clock.  We will take our recess for the evening and start back at 9:00 o'clock in the morning.  If you will remember my

admonition not to discuss this among yourselves or allow anyone else to discuss it with you.  Refrain from involving yourself with any news coverage of this matter as I've suggested in past days.  Now, if everyone would remain seated as the jury leaves the courtroom.

(Jury excused.)

THE COURT:  Dr. Distefano, you may step down also.  You will be recognized back at 9:00 o'clock in the morning.

Let the record reflect that the jury has departed the courtroom and the witness has also departed the courtroom.  Anything to take up outside the hearing of the jury on behalf of the government?

MR. LITTLEFIELD:  No, Your Honor.

MR. SPERLING:  Hold on just a second.  I think we have an understanding and agreement, Your Honor, with regard to the matter we brought up with the Court.  I'll be ready with an announcement early tomorrow.  But I think it is that the defense is -- well, maybe we can do it now.  The defense is willing to stipulate to the admission of Government's Exhibit 202, 203 and 204.

THE COURT:  Which are?

MR. SPERLING:  They are, first, the information -- the information in CF-97-86, filed March 24, 1997 in the District Court of Sequoyah County, State of Oklahoma.

That's 202.  203 is the accompanying affidavit.  And 204 is the warrant dated March 27, 1977.

MR. HILFIGER:  1997.

THE COURT:  Arrest warrant?

MR. SPERLING:  Sorry, 1997.  They are certified records, Your Honor, of the -- and we have the certification by Vernell Edwards, court clerk of Sequoyah County.

THE COURT:  Is that correct, Mr. Hilfiger?

MR. HILFIGER:  Yes, Your Honor.

THE COURT:  And Exhibit Number 82 that was offered -- has not been offered or it's withdrawn?  We had -- that was -- the question had to do with --

MR. SPERLING:  The report?

THE COURT:  No, not the report.  I take that back.  Not the report.  The effort to introduce the -- 29, I'm sorry.  129.

MR. SPERLING:  I would like to recess the offer.  I believe that we will have further testimony from the Doctor about it tomorrow based on his record, but I accept the Court's ruling at this point.

MR. SMITH:  Judge, can I comment on that a minute.  I don't mean to aggravate the Court, but --

THE COURT:  Oh, I'm not.  I'm a long way from being aggravated.  I'm just trying to keep the record

straight.

MR. SMITH:  Well, I understand it.  That piece of evidence is one of the more important pieces that's going to be involved in this case.  We have discussed chain of custody, but it's never been demonstrated to us -- this is the first time that it has come up so far.  So I don't have any choice but to --

THE COURT:  No, I understand.  I understand it's important and I understand your objection.  I'm not --

MR. SMITH:  But I don't mind trying to work it out with them, Judge, if they can show that to us.  We have indicated they don't need to call everybody about it, but we do need to see what has gone on with it.  I know this envelope has been opened, because we have looked at it in Mr. Littlefield's office.

THE COURT:  Well, as always, the Court is interested in counsel working through what could be a technical problem by agreement.  But if you can't, well, the Court is here to rule on the objection if the objection continues.

I might just -- we also have the question of Mr. Horn's testimony.  I'm not going to ask either one of you to comment now.  I still have that under advisement.  And, as I recall, the defense had asked that it be stricken. And whether that is still the position of the defense --

I'll take that up in the morning before we start.  I'll try to start a little early, 15 or 20 minutes before 9:00 so we can take care of that issue.  I don't want the jury to recess Friday evening without having dealt with that issue.

MR. HILFIGER:  Judge, I did have one other matter.  It may be resolved now, it may not be.  But it was drawn to my attention this afternoon before we started that there had been a highway patrol trooper in here taking pretty extensive notes.  And then, in the breaks, that he would be out there talking to the troopers, you know, the next witness or the previous witness.  And our concern was whether or not he is doing something, you know, in violation of the sequestration of the witnesses in the sense that he is letting the other witnesses know what the previous witnesses have said.  I don't know.  He is not here now.  He was a highway patrolman that was back here.  And that was just -- I just wanted to --

THE COURT:  I didn't hear.

MR. HILFIGER:  She said it was peer support. And the only thing I was concerned about and I just think the witnesses need to be made -- I mean, not the witnesses, but the people out here need to be made aware that they are not supposed to talk to any witnesses about what is being said in here, either.

MR. SPERLING:  We're cautioned, Your Honor. Mary Jo Speaker knows how to do this, and I'm confident she will continue to relay that message.

THE COURT:  Well, just to reinforce, the rule of sequestration has been requested and that's the order of the Court, which means that the witnesses are not to discuss their testimony.

MR. HILFIGER:  Okay.  Thank you.

THE COURT:  They are supposed to stay outside the hearing of this matter.  As to 202, 203 and 204, the Government's Exhibit 202, 203 --

MR. HILFIGER:  We didn't have any objection.

THE COURT:  Well, they can be admitted?

MR. HILFIGER:  Yes.

THE COURT:  Be admitted without objection. Anything further?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  We have nothing further.  Let the -- I speak too soon again.  We're finished.

(Proceedings adjourned at 5:12 p.m.)

COPY

Page 1626

FILED

MAY 1 8 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By:_____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,         )
          Plaintiff,              )
                                  )
                                  )        NO. CR-04-115-P
VS.                               )
                                  )
KENNETH EUGENE BARRETT,           )
          Defendant.              )

*       *       *

JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE, and a jury

OCTOBER 7, 2005

VOLUME VIII OF XX VII
K.M.

*       *       *

A P P E A R A N C E S:

FOR THE PLAINTIFF:          MR. SHELDON J. SPERLING
                            United States Attorney
                            MR. D. MICHAEL LITTLEFIELD
                            Assistant United States Attorney
                            1200 West Okmulgee Street
                            Muskogee, Oklahoma 74401

FOR THE DEFENDANT:          MR. ROGER HILFIGER
                            620 West Broadway
                            Muskogee, Oklahoma 74401

                            MR. BRET A. SMITH
                            Attorney at Law
                            315 North 5th Street
                            Muskogee, Oklahoma 74401

COURT REPORTER:             KARLA S. McWHORTER
                            UNITED STATES COURT REPORTER
                            P. O. Box 2251
                            Muskogee, Oklahoma 74402

1553

I N D E X

                                                        PAGE
PROCEEDINGS COMMENCING 10/07/05.......................... 1626
ARGUMENTS REGARDING TESTIMONY OF JAMES HORN............ 1628
COURT'S RULING REGARDING TESTIMONY OF JAMES HORN....... 1632
MR. SMITH OBJECTS TO GOVERNMENT'S EXHIBIT NO. 83-86.... 1641
RESPONSE BY MR. SPERLING............................... 1641
COURT'S RULING........................................ 1642

WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:
      DR. R.F. DISTEFANO
            Direct continued by Mr. Sperling............ 1643
            Cross-examination by Mr. Smith.............. 1688


      DONITA JO MANN
            Direct examination by Mr. Littlefield....... 1703
            Cross-examination by Mr. Smith.............. 1713


      JOHN HUNTINGTON
            Direct examination by Mr. Littlefield....... 1717
            Voir dire examination by Mr. Smith.......... 1722
            Direct continued by Mr. Littlefield......... 1724

LUNCH RECESS.......................................... 1731
INSTRUCTION TO THE JURY BY THE COURT ON THE TESTIMONY
                        OF JAMES HORN................ 1739

      JOANN KIHEGA
            Direct examination by Mr. Littlefield....... 1740
            Cross-examination by Mr. Smith.............. 1756
            Redirect examination by Mr. Littlefield..... 1759

      STANLEY PHILPOT
            Direct examination by Mr. Littlefield....... 1761
            Cross-examination by Mr. Hilfiger........... 1774
            Redirect examination by Mr. Littlefield..... 1787

      JOHNNY PHILPOT
            Direct examination by Mr. Littlefield....... 1788
            Cross-examination by Mr. Hilfiger........... 1808
            Redirect examination by Mr. Littlefield..... 1828
            Recross-examination by Mr. Hilfiger......... 1831

      RANDALL WEAVER
            Direct examination by Mr. Littlefield....... 1834
            Cross-examination by Mr. Smith.............. 1840
            Redirect examination by Mr. Littlefield..... 1847
            Recross-examination by Mr. Smith............ 1848

PROCEEDINGS CONCLUDING 9/28/05.......................... 1851

<u>COURT IN SESSION</u>

THE COURT:  Let the record reflect counsel for the government is present, the defendant is present with counsel.  I mentioned at the conclusion of the trial yesterday, after the jury had been excused, that I wanted to take up the issue of the testimony of James Horn.  The first inquiry I want to make is to counsel for the defendant, as to whether you -- I have taken the matter under advisement and the defense had asked that that testimony be stricken.  I'm curious about what your position is now.

MR. SMITH:  Judge, our position hasn't changed in that matter.

THE COURT:  Just for absolute clarification for the record, your position hasn't changed in that you desire it to be stricken?

MR. SMITH:  That's correct, Your Honor.

THE COURT:  And I assume, but I'll learn not to assume anything -- I assume the government still takes a position that it's admissible?

MR. SPERLING:  We do, and for additional reasons, Your Honor.

THE COURT:  I'll hear those.

MR. SPERLING:  I'm cautious first, Your Honor, that I may be swimming upstream.  This is a unique issue,

Your Honor, in that this evidence floats in without objection from the defense to the qualification of the expert and without objection to the testimony.  After aggressive cross examination and only after the Court sua sponte raises the issue -- and I'm not criticizing that because I know the Court is the gatekeeper.  I think I understand the Court's role, but only after the Court raises this sua sponte does the defense then make a claim that this evidence should be stricken.

We looked for case law, Your Honor, and invariably the case law goes to eyewitness testimony in bank robbery type cases.  Invariably, the case law talks about repressed memory and memory loss and memory gaps and memory diminishing over time and memory distortions and eyewitness memory short-comings related to concentration and weapons focus, opportunity to view, degree of intention, accuracy of description, level of certainty and time between the crime and the confrontation.  There are cases concerning memory manipulation, favorable memory forming conditions and unfavorable memory forming conditions.

There is a particular case in the Seventh Circuit which says that the issue can be adequately addressed on cross examination and the jury may assess using common sense evaluations.

I understand that the Court's primary concern about this testimony is how helpful is it.  As I understood the Court's inquiry, the Court was asking essentially whether or not the Rule 702 requirement that the testimony assist the tryer of fact has been fulfilled.  I would say in response to that, Your Honor, the fact that the expert's testimony is a matter which we think now makes sense is a strong indication, having heard additional testimony of the troopers before the Court raised the issue, that the testimony will assist the jury.  It doesn't have to be case derminative.  I think ultimately -- and after looking at the case law reviewed, there are lots and lots of cases, but most of them are in the bank robbery context where a teller has viewed a suspect, and I'm talking about either a show-up identification or a line-up identification.  Ultimately, I think here we have to come back to the Rule.  I think it's fair to say that all principles of consequence that were stated by Mr. Horn will be advanced in one form or another by both of the parties.  The defense -- if you will recall Buddy Hamilton's testimony concerning whether he fired his gun, Kerry Pettingill's testimony about the silhouette, Danny Oliver's testimony that three months later he recalled the flashbang, Steve Hash's testimony that he saw bullets hit but cannot say that he heard the gunfire, Greninger's testimony about a

blank period of time, and -- and I should probably have secured it through my notes, but one of the officers, Your Honor, said that he doesn't remember hearing the flashbang. All of those testimonial events, Your Honor, relate to the ground work that was laid by Mr. Horn.

He is an expert by training and education. He stated principles, he stated a volume of training and experience that he has had with regard to this area. So, I think ultimately when we are talking about this traumatic stress expert, we should consider that he talked about the impact on memory and recollection of violent trauma, he talked about short-term and long-term effects on recollection, he talked about fear and danger that affect recollection, audio, visual and time distortions that may be substantial, memory lapses that may not be unusual, flashbang or shotgun blasts, for example, he referred to. He said that a memory may later be triggered or recalled. He talked about the relationship between swat team members, a bond, a brotherhood, so to speak, that increases the impact of trauma on recollection. He was aggressively and comprehensibly cross examined, Your Honor. Our position or our bottom line is that his testimony will assist. I can't say that there is no -- that there are no common sense principles that he stated that we don't share, that many on the jury may not share, but bottom line, Your

Honor, his testimony is of assistance and satisfies Rule 702 and should be admitted for that reason.

THE COURT:  You may.

MR. SMITH:  Your Honor, I don't want to rehash what we have already discussed, but if his testimony isn't self-serving, then I don't know what is, particularly in light of what we heard from Trooper Pettingill yesterday about...well, it's been three years and all of a sudden I remember a silhouette in this doorway.  Horn's testimony is flawed for the specific reason that he is a fact witness because he visited with these guys in a debriefing session and then he comes to court and says, well, I didn't keep any of those notes, I haven't reviewed anything.  In fact, I don't remember anything about that, but here is why you ought to believe what they are saying with all of their varying stories because that is common with trauma victims.  That is where, Judge, we think he is invading the province of the jury.  It is not helpful to the jury and that is why we would request his testimony be stricken.

THE COURT:  As I had mentioned, I had taken this under advisement on the 4th October.  After hearing the testimony of James Horn and hearing the cross examination and the redirect, the Court would note for the record that defense counsel allowed this Court, at the government's request, to qualify Mr. Horn as an expert with substantial

knowledge regarding Mr. Horn's prior testimony concerning the underlying events of this case and therefore, clearly knew the substance of what his testimony would be in this case.  Further, the testimony was admitted without an objection by defense counsel.  The Court also notes that defendant did not file a Motion in limine, that is, there was no pretrial objection, no pretrial Daubert objection raised.  After this, the Court made inquiry regarding the direct testimony of Mr. Horn as to whether the testimony would assist the tryer of fact in deciding the facts in issue of this case.  The defendant objected to the testimony, but indicated he wished to complete his cross examination.  After cross examination, defense counsel again asked this Court to strike the testimony.  The government was allowed to complete its redirect examination and the defendant did not at that time reurge their objection to the testimony or their request to strike the testimony.

Based upon the requirements of Rule 702 of the Federal Rules of Evidence, this Court finds to be admissible testimony by an expert it must assist the tryer of fact to understand the evidence or to determine a fact in issue.  As the Supreme Court in Daubert, 509 U.S. 579 and 591, recognized this requirement goes primarily to the issue of relevance.  An additional consideration under

Rule 702 or perhaps another aspect of relevance is whether expert testimony proffered in the case is sufficiently tied to the facts of the case so that it will aid the jury in resolving a factual dispute.  That's Daubert quoting from <u>United States versus Downing</u>, 753 F.2d 1224.

To determine reliability, Courts use the flexible Daubert test of reliability, which includes the following factors: (1)  Whether the expert's technique or theory has been tested, that is, whether the expert's theories could be challenged in some objective sense or whether it is instead simply a subjective conclusionary approach that can not be reasonably assessed for reliability.  (2) Whether the technique or theory has been the subject of peer review in publication.  (3) The known or potential rate of error of the technique or theory when applied, the existence and maintenance of standards and controls, or, (5) whether the technique or theory has been generally accepted in the scientific community.  Based upon the testimony before the Court, there is no way to challenge Mr. Horn's theories in an objective sense.  While Mr. Horn clearly has had real life experiences far in excess of an average person dealing with the issues he discussed, this Court is not convinced that his testimony has been subjected to or been scientifically tested in such a manner to make the evidence reliable under Daubert.  The

Court would note, however, based upon defense counsel's questioning, that the subject of Mr. Horn's testimony aimes to have been the subject of peer review and publication.  Furthermore, it would appear that defense counsel made a strategic decision to allow the testimony and then challenge it before the jury in an effort to discredit the value of the testimony.  Defense counsel did an admirable job in his cross examination of Mr. Horn. Generally, a trial court's focus should not be on the precise conclusions reached by an expert, but on the methodology employed in reaching those conclusions. That's by Butler (sic) versus A.O. Smith, 391 F.3d 1114 at 1121, 10th Circuit, 2005.

This Court doesn't know what methodology was used, nor what conclusions Mr. Horn reached, if any, based upon the actual facts involved in this case.  Furthermore, as indicated earlier, this Court does not believe Mr. Horn's testimony will assist the tryer of fact in determining the issues herein.  At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue.  Additionally, my review of Mr. Horn's testimony leaves me with a definite conviction that Rule 702 only authorizes testimony by an expert in the form of an opinion, if, (1), the testimony is based on sufficient

facts or data; (2), the testimony is the product of reliable principles and methods; and (3), the witness has applied the principles and methods reliably to the facts of this case, and I emphasize the facts of this case. Mr. Horn did not testify regarding any opinions based on the underlying facts or data of this case or the individual responses of the officers involved.  He did not offer an opinion regarding the specific facts of this case or identify any reliable principles or methods which he actually applied to the facts of this case.  Rather, his testimony indicated that his focus was on helping the officers cope with the traumatic experience, not critiquing the differences in their memories or whether the differences were explained by the traumatic event they experienced.

        Therefore, this Court finds Mr. Horn's testimony is neither reliable, nor will it assist the tryer of fact in determining an issue of fact in this case pursuant to Rules 702 and 1046 of the Federal Rules of Evidence.  It should not have been admitted herein.  Accordingly, I'm going to strike the testimony and admonish the jury to disregard it.

        I have prepared an instruction that I will pass to the clerk and pass a copy to each party and give counsel an opportunity to look at those instructions.  My thought

is, at this point to proceed with the trial.  I will take that issue up at the break, at the noon break.  Again, if you have any -- in light of the Court's ruling, if you have any proposed instruction other than the one I have provided, then you may submit that to my clerk after the noon recess.  I plan to give that to the -- that instruction to the jury before we recess today.

Anything -- one other matter, a peripheral matter, in regard to the -- well, let me see Mr. Hilfiger and Mr. Sperling at the bench for just a moment.

(BENCH CONFERENCE)

THE COURT:  This is a real peripheral matter. I had the Clerk of this court check with the Clerk of the Court in Sallisaw thinking the transcripts had been prepared and filed there.  That's what I was told was supposed to be done.  They haven't been.  In defense of the court reporter, he may very well be waiting until he finishes it all before he files it.

MR. HILFIGER:  I will contact him.

THE COURT:  I don't -- if that's what he is doing, I don't really care.  We just thought we would get it --

MR. HILFIGER:  Well, I -- you see, he informed -- I think we informed the Court that he informed us, when he talked to the state association for court reporters or

for the court clerk or somebody, that they told him that the original had to be filed in the state.

THE COURT: Yeah, that's what you were telling me.

MR. HILFIGER: So, I was assuming -- I didn't do any follow-up to check, but I will check.

THE COURT: It's just a matter of course. I thought we would get it during this break.

MR. HILFIGER: He may be here in Muskogee this morning.

THE COURT: So we are not getting into --

MR. HILFIGER: Truthfully, I have never really -- I have never really paid attention to the last page, because that last page is not one I even --

THE COURT: During this recess, if you would look into that...

MR. HILFIGER: I will.

THE COURT: Tell him it will be helpful, whatever he has, to file it and sign it.

MR. HILFIGER: Okay.

THE COURT: Thank you.

(END OF BENCH CONFERENCE)

THE COURT: Mr. Littlefield?

MR. LITTLEFIELD: Yes, Your Honor. There is one other matter. I am advised that the court's clerk does

not show Government's Exhibit Number 102 as having been admitted. I believe that's the video clip of the lights going through the yard. It's been displayed a couple of times, but I sure have a recollection that I -- I moved its admission through Trooper Greninger and it was offered and admitted at that time. For a housekeeping matter, I wanted to --

THE CLERK: He asked that it be played.

MR. HILFIGER: I thought it was admitted myself.

THE CLERK: It's a video though. Is it going to go to the jury? Is it going to be an actual exhibit?

THE COURT: First of all, I think you both agree it can be admitted without objection; is that correct?

MR. LITTLEFIELD: That's my recollection.

MR. HILFIGER: What now?

THE COURT: That 102 has been admitted without objection?

MR. HILFIGER: I think that's right, that's my understanding.

THE COURT: Okay. The question the clerk is inquiring about -- as usual she catches me off guard. I don't know the answer to this. She was asking whether or not it would go to the jury. It's my thought that it would not go to the jury. Maybe I need to give a special instruction to the jury, that it would require special

equipment for them to make use of it.  That's the practical problem.  If it goes to the jury, we will need an instruction that if they desire to observe it, that we will have to make arrangements in the jury room to do that.

MR. LITTLEFIELD:  We, at this point, only have it digitally.  I think it was on disk when we played it. We can provide a videotape of that specific segment of the tape which was offered so that only that portion which was admitted would be available on a video to go back with the jury.

THE COURT:  And, of course, depending on -- depending on the skills of our jurors in this technical age -- we will have to make arrangements either to determine whether they can make use of the equipment that you would provide and, if not, who would do that.  So, I think -- I think for the record it has been admitted and we will take up that issue when it goes to the jury.

MR. SPERLING:  We have no objection in view of the Court's ruling to the suggested instruction.

MR. SMITH:  It is fine with me too, Judge.

THE COURT:  Do you have any thoughts about when to give that instruction?  I'm thinking -- we are in the middle of some fairly dramatic testimony.  I was thinking of waiting until the noon break and doing it before this afternoon.

MR. SPERLING: That will be fine, Your Honor.

MR. SMITH: That will be fine, Judge. I do have a comment about what I think is going to be coming up this morning. It has to do with photos that -- autopsy photos. I assume the government is probably going to introduce that. They are listed as exhibits. I think we are going to go ahead and interpose an objection to those being admitted, provided they do proceed forward. We think they are overly prejudicial and not really probative. They have got the report in evidence. So, I'm just bringing that to the Court's attention. I think there are four of them. I do know that there were several. They appear to have limited their pictures to four, but --

THE COURT: Do you have those so I can look at them?

MR. SPERLING: They are listed. They are 83 through 86, Your Honor. I would note for the record, they aren't gruesome. They are extremely limited. They are, one -- first, they are for the purpose of identification, 83, and then the others are clearly probative with regard to the testimony of the doctor concerning the wounds.

THE COURT: Well, I think we have the technology to show them to the Court and the witness without showing them to the jury, so I think --

MR. SPERLING:  While we are waiting, also, Your Honor, when you give this instruction, could we also publish the government's exhibits that were agreed to yesterday?  I believe that's 202 through 204.

THE COURT:  Remind me of what they are again.

MR. SPERLING:  They were the information, the attached affidavit and the warrant.

THE COURT:  Yes, you may.

MR. SPERLING:  83 appears now.

THE COURT:  Okay.  I have seen it.

(PAUSE)

MR. SPERLING:  Those are 83 through 86, Your Honor.

THE COURT:  The record should reflect that the Court has reviewed the photos and I will wait for the testimony of the -- of the identifying physician, but my impression, before I hear his testimony, is that they would be admissible.  I find nothing about them so exaggerated or gross that it would inflame the jury.

We will take about a five minute recess.  Bring the jury in and the witness and we will get started.

(SHORT RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect that the jury

is in the box, counsel for the government is present, the defendant is present with counsel.  If you will ask the witness to step back in.

(COMPLIED)

THE COURT:  Sir, if you will just take the stand again.

DIRECT EXAMINATION CONT'D

BY MR. SPERLING:

Q     Dr. Distefano, you testified here under oath yesterday, did you not?

A     I did.

Q     You understand, sir, you are still under that same oath as you testify here today?

A     Yes, I do.

Q     I believe yesterday when we concluded we were talking about the path of gunshot wound number 3.  We have used a number of terms, path, direction, and perhaps even projectory in discussions during this trial.  Would you share with the jury what the word projectory means?

A     Well, the word projectory really is a word that refers to the path of a projectile through air.  For example, like an artillery shell or a bomb.  In other words, projectory is really used to describe a sort of a -- an object in free fall, that is, accelerating due to gravity.  So sometimes people use that and say,

well, what was the projectory through the body. So that's not quite the correct usage for that. We simply say the path of the bullet to mean what structures did it hit and then we talk about direction, which is a description in terms of front to back, up and down, left to right. And that always -- and any time I say left to right, front to back, I always mean in reference to the deceased person's body because that could be very confusing, unless you assume to use it in that way. So if I say left to right, I mean the dead person's left to the dead person's right.

Q      Okay. So that would be from the perspective of the person, not from the perspective of the examiner?

A      That's correct.

Q      All right. Yesterday also there were some questions concerning various items of evidence that were retrieved by you and then were stored in the -- what you called an evidence vault or an evidence locker room. What would you call it there?

A      It's a small room. I call it the evidence locker.

Q      Okay.

A      In that room, which is locked, all of the evidentiary material that we collect and then later turn over is kept there.

Q      The term implies -- is that room actually under lock

and key?

A      It is under lock and key.  It's not always locked in the sense of when we are down in the morgue working.

Q      Okay.

A      I wouldn't say they always remember every time, but the whole area is an entirely secured area.  There is no visitation in the office without someone accompanying.

Q      In fact, the office of the chief medical examiner is a secure office, is it not?

A      Yes, sir, it is a restricted access building.

Q      And when you say restricted access, how may one gain access other than a person employed there as a professional on a recurring basis?

A      Well, individuals who come to the office to the front door can ascend the elevator and come into the front lobby.  From there we usually ask them to sign-in with respect to the date and time and the business they have and then if they are moving thought the building, they have to be accompanied.  Now, logistically that can be difficult because people are working on the air conditioning, we have servicemen, but we always have people, particularly in the downstairs morgue area -- we always have people present any time anyone is in the building.

Q      Okay.  So far as items of evidence that are

retrieved and stored, are they maintained in a secure condition and situation?

A    They are in the locked room, which is within the restricted access area of the morgue.

Q    You were kind enough this morning to share with me a portion of the report and it is several pages that have not yet been admitted, but we have marked them as Government's Exhibit.  205 that is just to your left, sir. Do you recognize those two pages?

A    I do.

Q    And do those two pages accurately reflect the original of that document, which is in the medical report that you have in front of you?

A    Yes.

Q    What is this document?

A    This document is referred to commonly as the CME-7. It just means Chief Medical Examiner document or form, rather, 7.

Q    What is that?

A    This is the standard form that we use any time we receive or give up materials.  In other words, for evidence when we are giving it to the law enforcement personnel, this is a list, an inventory list of what is being given and also places for the individuals making this transaction to sign.

Q     Does this document accurately reflect certain items of evidence that were retrieved -- that were either received by you or obtained by you pursuant to this autopsy?

A     Yes, sir.

Q     Does it also contain information concerning not only the type of item, but the container, cover, how it was sealed?

A     It does.

MR. SPERLING:  We would move, Your Honor --

BY MR. SPERLING:

Q     Well, is it an accurate reflection of the chain of custody so far as your office is concerned?

A     Yes, it is.

Q     In fairness, once you convey -- once you give up something to someone else, you are no longer responsible for the custody of that item; would that be fair?

A     That's correct.

Q     So once it is conveyed from you, say, to the Oklahoma State Bureau of Investigation or FBI or someone else, they then maintain custody of that and you no longer, once you give it to them, maintain custodial responsibility?  Would that be fair?

A     That's correct.

MR. SPERLING:  Your Honor, we move the admission of Plaintiff's Exhibit Number 205.

MR. SMITH:   No objection, Your Honor.

THE COURT:   Exhibit 205 will be admitted without objection.

BY MR. SPERLING:

Q      Government's Exhibit Numbers 111 and 129.   I will ask in just a moment that they be handed to you.   Doctor, so we may proceed at this point in time though, let's return to what you arbitrarily listed as gunshot wound number 3 and path.   I'm not sure exactly where we were through that yesterday.   I think we may well have been through that, but would you share with the jury, please, from your report and based on your expertise, the pathway of this projectile?

A      Yes.   Well, the projectile -- after entering the body about here, where I'm showing on my left shoulder, it did enter the chest cavity fracturing the second, third, fourth, and fifth ribs.   The projectile actually struck the fourth rib and it then -- and then the larger part perforated the left upper lung.   It then continued into the area of the middle of the chest where it struck the aorta.   And as we mentioned yesterday, that resulted in a fatal loss of blood.

Q      All right.   You indicated yesterday with regard to the loss of blood and breathing that there would be a very significant and rapid loss of blood.   How would that

blood appear if -- in the mouth of a victim who was breathing his last breaths?

A     Well, a projectile that would go through the lung would, of course, damage the lung and transect or break the blood vessels within the lung.  And, of course, the air passages from the smallest ones within the lung up through the bronchi into the trachea and up though the mouth and nose -- all of that, of course, is connected in order for air to get down into your lungs.  So when that -- when there is bleeding in the lung itself, it may be manifest as blood coming up out of the mouth and/or nose.

Q     All right.  Are you familiar with anecdotal circumstances concerning perforation of an aorta?

A     Yes, I am.

Q     And yesterday, as the best I recall, you may have talked about the fact that an aorta is under some pressure.  That may not be the precise terminology that you used.  Can you explain that concept to the jury?

A     I'll try.  The aorta is, of course, as I mentioned, the largest artery bringing blood from the heart to the rest of the body.  It's not like most of the other arteries in the body though because it's not a muscular artery.  Muscular arteries have muscle in the walls so that they can either make themselves smaller or make themselves larger.  The aorta is basically elastic, so

it's responsible for maintaining your blood pressure. Now, if you go to the doctor and he takes your blood pressure, he generally would tell you two numbers, a number that is on the top of the fraction and a number that is on the bottom.  Well, the top number reflects the pressure in your system when the heart beats and the bottom number reflects the pressure in your body when the heart is not beating, that is when it's relaxed.  Well, that lower number, that pressure, comes in large part from the aorta, because it is elastic, it stretches.  So as the heart beats and blood courses through the aorta, the pressure is higher and then while the heart relaxes, the elasticity of the aorta continues to squeeze on the blood and maintains that -- what we call the diastolic pressure.  So that is why a wound of the aorta is so devastating because not only is it large and there by subject to resulting in a great blood loss, but it's intimately connected with the maintenance of blood pressure and it's really blood pressure that keeps our brain supplied, keeps the heart itself supplied and our other vital organs and we rely on blood pressure second to second in order to continue to live.

Q      Have you become familiar with circumstances, say, in the context of back surgery where an aorta was nicked or cut and the impact of penetration by a scapula or by

a surgeon's tool of an aorta by accident went unnoticed --

A      Yes.

Q      What impact -- well, can you explain that to the jury and tell the jury what impact that has?

A      Well, in order to understand what an injury to the aorta does I often refer to experiences that I or other people have had wherein surgery a doctor inadvertently makes a wound of the aorta.  This can happen, for example, in back surgery because even though they are working on your back and trying to work on your vertebral disks or the vertebrae themselves, the aorta is sitting right in front of that.  So if the instrument is allowed to -- the sharp instrument is allowed to go too far forward, it can actually cut or perforate the aorta.

Q      What happens when the aorta is cut or perforated in such a circumstance?

A      In such a circumstance there is a tremendous, of course, loss of blood and very quickly shock, loss of blood, what we call hypovelemia shock can ensue so that when this happens, even in the surgical suit when all of the doctors are right there and particularly if they don't recognize it because in terms of the anatomy they don't always realize that has happened -- then the patient is really in dire jeopardy of loss of life and I know of cases where the patient was saved, but only after a very

sort of tenuous and critical course and in some ways very much a credit to the physicians treating, not a credit that they made a mistake and cut that blood vessel, but they were able to deal with it once it had happened.

Q      And that is in the case of a nick, if you will.

A      Yes, sir.

Q      In this case where the damage was a one quarter inch hole, could anything have been done?

A      No.

Q      With regard to bullet recovery concerning gunshot wound number 3, what was or were your findings?

A      Well, with respect to that particular wound, I was able to recover, as I have shown here in subparagraph C, a few tiny fragments of lead and one larger fragment that was a piece of metal jacket.  The metal jacket of a bullet is a little different than the lead itself.  It's sort of a shinny flat metal covering that surrounds sometimes all of the bullet, sometimes only parts of it, but I was able to recover a piece of jacket and then a few tiny fragments.

Q      All right.  Would you look at Government's Exhibit Number 129, please?  Do either of the small envelopes that are inside what has been marked as Government's Exhibit 129 contain that fragment?

A      Yes, sir.

Q      All right.  And which of those documents or which of

those smaller envelopes is it?

A     It's the one I'm holding in my hand that is designated fragment upper chest in writing on the --

Q     I know this may be too small for the jury to see from where you are, but is that in a concealed condition now?

A     No, it's not.

Q     Can you open it and retrieve that item?

          MR. SMITH:  Your Honor, there has been an objection raised.  It has not been admitted.  We would obviously object to it being shown to the jury at this point.

          THE COURT:  Sustained.

          MR. SPERLING:  We will do that in due course, Your Honor.

BY MR. SPERLING:

Q     Can you look at that item without displaying it to the jury?

A     I have.

Q     All right.  Does that appear to be the same item that you surgically removed from the body of David Eales?

A     Yes.

Q     How large is it?

A     The part that is the jacket is about -- I would say about -- it's less than a half inch by -- in greatest

dimension.  So I would say it's approximately 7/16th's inch in greatest dimension.

Q     Okay.

A     That's just eyeballing it with my eye.

Q     Are there other particles in there?

A     There are two very small fragments of lead also.

Q     All right.  And if you were to compare them to something -- I mean, are they smaller or larger than say the end of a pen?

A     I would say one of the fragments is about like -- about like the lead of a pencil.  If you broke the tip off of a pencil, it's about that size.  The other is just slightly larger.

Q     All right.  And do those items appear to be the same as you have described in bullet recovery subparagraph C, with regard to gunshot wound number 3?

A     Yes.

Q     All right.

        MR. SPERLING:  May I have just a moment, Your Honor?

        THE COURT:  You may.

BY MR. SPERLING:

Q     Were you able to determine which of those items, which of those fragments or the jacket perforated aorta?

A     I would say I really wasn't certain about that.

I thought that it was more likely one of the small lead fragments.

Q     All right, sir.  With regard to direction, what was your determination?

A     I characterized the direction as -- and, again, this is in his body -- as left to right, slightly back to front, and slightly downward.

Q     Thank you, sir.  Then you reflected in your report a radiographic appearance, that is the x-ray appearance, which I believe you indicated yesterday, showing prominent fragmentation and described a snow storm effect.  As I heard your testimony yesterday, you were talking about -- maybe these decorative items you turn upside down and they -- is that what referring to there?

A     Yes, sir.

Q     And what impact or why did you find that of significance, the snow storm effect?  What is that indicative of?

A     The snow storm effect is associated with high velocity projectiles because a bullet, of course, is very hard.  And even when it hits the body, say in an area of bone, the bullet may or may not be damaged itself and that is mainly dependent -- not on what the bullet is made of, but on its velocity.  So when bullets are traveling extremely fast, then they tend to greatly fragment.  So

when you see a snow storm, what you mean is that there has been substantial fragmentation of the projectile.  So that is one feature that is consistent with high velocity type weapons.

Q      Could such fragmentation in your experience and in your opinion, Doctor, occur after a high velocity bullet such as that struck an intervening target such as a window or a car door?

A      Yes, sir.  The striking of an intervening target, again, greatly depends on the target itself, but also the velocity of the bullet.  That can make a projectile break up.  So that can result in this appearance of many fragments and have an impact to the body.

Q      The second sentence of that paragraph that begins radio graphic appearance talks in terms of indications that these two wounds, gunshot wounds numbers 2 and 3, involved an intervening target.  Would you explain, please, to the jury why you believe and found that so?

A      Yes.  And one has to recall that at the time the autopsy was done, there was still a lot of work to be done at the scene.  So the information that I had was not entirely clear in terms of all of the details of what happened.  So when I looked at the body, I had three wounds that were all atypical.  One of them of the arm, atypical in the way we have already talked about, but

then these two showing this appearance of multiple things striking and damaging the skin.

Q     Atypical meaning unusual?

A     Atypical meaning not typical, which in terms of gunshots usually means a small round hole and marginal abrasion at the entrance.

Q     And so the changes on the skin, such as you found them, are what caused you in significant part to render the opinion that there was an intervening target?

A     Yes.  I knew immediately when I saw these wounds that these bullets struck something else prior to striking the body.

Q     All right.

A     I don't think I knew what precisely, other than I knew there was a vehicle.

Q     All right.  Was the examination of the clothing in summary consistent with your findings concerning the body?

A     Yes, it was.

Q     All right.  Did you have occasion, also, with regard to your examination and report to make certain notations on body forms, both front and back, as reflected on your report?

A     I did.  I always use diagrams to document at the time I'm looking at the body the things that I see and those diagrams become a part of the written report that we

publish.

Q       All right.  May we turn to that page, please?
Okay.  It's depicted on the screen as well.  In summary
form, why do you do this?

A       Well, one important part of what I do, in addition
to trying to determine what caused the death and the
manner, is I try to undercover anything that I can
anticipate may be of use at a future time.  So given the
circumstances of the death as I knew them, I realized that
all of these details would be very important at a later
date and it's done also in some sense just for
completeness, but as I said, this diagram is -- is
actually used at the time that I'm examining the body to
record the things that I have seen.

Q       And do you during the course of your examination
leave open the prospect that when additional details are
provided to you from the investigators that are actually
out on the scene that you will then plug that into and
incorporate that into your examination and analysis?

A       Yes.

Q       For the jury will you explain briefly the items of
consequence with regard to these diagrams?

A       Well, of course, most important is the name and the
unique identifying case number in order to be sure you are
referring to the correct person.  The date is shown and my

signature is also shown on the diagram.  On this side my practice is to list the clothing that is actually on the body itself and in this case was the brief underpants and socks and on this other side of the document I listed the things that came in a bag with the body.  Those were the other items of clothing.  If you look, you can see that the various items of what I call therapeutic paraphernalia, meaning tubes or bandages, whatever, that has been applied at the hospital, that is left on the body until it arrives at our office.  So there are notations about that.

Then on this particular side of the diagram showing the back of the body, one can see marking that I made that relate to gunshot wound number 3, which is indicated in that writing.

Q     And with regard to gunshot wound number 3, are you able to read the notations that you made underneath "G.S.W." and circle number 3?

A     Yes.  G.S.W. stands for gunshot wound number 3. Beneath that it says entrance, round, 3/16ths inch diameter marginal abrasion, and multiple satellite impacts.  Then right over here it says at posterior axillary fold and that means here at the armpit, where the arm joins the chest.  The fold of skin is referred to as the posterior axilliary fold.

Q     Thank you, sir.  The next page, please.  Do these

diagrams further reflect gunshot wounds that you have numbered 1 and 2?

A      Yes, they do.

Q      And would you explain to the jury the matters of consequence that you on these diagrams?

A      Yes.  Well, right here on the lower right-hand part of the diagram, within sort of a box, I indicated that in looking at the radiographs, I put in quotation marks the words "snow storm effect left upper chest."  Also, "lesser snow storm effect, lower left chest and abdomen, and no bony defects of right arm."  So these were just notes I made after looking at the x-rays that were taken.  Now, the -- this diagram can be a little confusing because what it is trying to show, of course, is the side of the body, the full side of the body, and in order to do that it sort of cuts away the arm.  So, then, here in the middle it displays the arm and, of course, in this sense we are looking at the back of the hand and the forearm. So in looking at this, you can see that this would be the right forearm -- this would be the right upper arm, the right forearm and right hand and then the left upper arm, left forearm and left hand.  So just for orientation purposes, this arm would have been up here on the left side of the body, but they have -- they cut it away so that you could make notations on it that way.  And this

would be the right arm sort of cut way from the body here. That's so that you can show stuff that the arm would otherwise be in the way of, which in this particular case this material right here...these areas where the gunshot wound number 2 entrance is located along with the many satellite impacts.

Q     Okay.  Since you performed the autopsy, were you then given additional information with regard to any intervening target that the wound to the right arm just above the elbow experienced?

A     Yes.

Q     And what information was that?

A     Well, only fairly recently did I learn that the handgun that was carried by the trooper and carried on the right hip -- I learned that that was damaged by a bullet strike.

Q     All right.  Is the damage that you noticed with regard to the area above the right elbow of the victim, David Eales, consistent with a high velocity bullet that would have struck an intervening target, that is a firearm first before hitting his elbow?

A     Yes.  It is shown here on the part that shows the right arm.  One sees the large defect that I have been talking about.  I drew a line here to indicate where the elbow was to use as a reference point, three and a half

inches above, and I indicated here the right marginal abrasion, which is located toward the rear of the arm. At the time I did not necessarily believe that the bullet hit something before it hit this arm, but in retrospect looking at the irregularities and extent of the damage, it's entirely consistent with that bullet striking that weapon and this part of the arm would be carried very close to that weapon.  In other words, if you just think about where a handgun would be carried on the right hip, it's not really that far from where -- assuming the arm is down by the side, they are really in the same location. So considering that and assuming that a bullet struck that handgun, then that could very well fit with just this overall irregularity of the shape of that wound.  I would say it didn't have to and I did believe that this wound could result only from a high velocity projectile, no intervening target, but certainly from the way it looks that is a potential explanation that is consistent.

Q      Is there such a thing as a tumbling effect of a bullet that hits an intervening target?

A      Yes, sir, there is.

Q      What is that?

A      Well, bullets are shaped the way they are in order to allow them to be aerodynamic and thereby, stay on the path that they are intended to be on.  That's why bullets

have sort of a tip or a nose.  In addition to that, in modern weaponery, the barrel of a gun is constructed in a such a way as to cause the bullet to spin on its front to back axis as it is flying through the air.  Similar to a quarterback throwing a football, that spin tends to stabilize the path of the bullet in terms of resistance from air.  Thereby, it maintains in the best way possible the direction the bullet is trying to go.  Now, the speed of that bullet, however, means that once a -- particularly a very fast bullet, that once it hits something, then there is a tremendous effect on its path and one of those effects can be that the bullet no longer is traveling nose first, but may, in fact, tumble, meaning fly end over end. So that's what I'm really talking about with respect to that wound.  A bullet tumbling end over end could conceivably and consistently result in a jagged torn open wound like that.

Q     After, for example, striking a hard object like a pistol butt?

A     Right, especially when they are both anatomically located close together.

Q     All right.  In this case did you take photographs?

A     Yes, sir, I did.

Q     And did you take photographs, at least in part, to document the course of your examination?

A     I did.

Q     How many photographs did you take in this case?

A     I counted 39.

Q     All right.  You understand, Doctor, we are not going to ask to introduce all of those photographs in evidence here today?

A     Yes, sir.

Q     But did you take photographs of each of the gunshot wounds that reflect accurately the wounds as you have observed -- as you observed them originally and as you have described them to the jury?

A     Yes, sir.

Q     And did you also take a photograph with regard to the victim Rocky Eales?

A     His face, yes, I did.

        MR. SPERLING:  Government's Exhibit 82, may it first be shown to the witness, Your Honor?

        THE COURT:  You may.

BY MR. SPERLING:

Q     I'm sorry, 83.  Do you recognize what is marked as Government's Exhibit Number 83 and shown on your screen?

A     Yes, sir, I do.

Q     And how is it that you recognize that photograph, sir?

A     Well, I recognize that as a photograph --

specifically what we call the I.D. photograph of David Eales.

Q      All right.  And with regard to Government's Exhibit Numbers 84 through 86, would you also examine them, sir?

A      Yes, sir, yes, sir.

Q      Do Government's Exhibit Numbers 84 through and including 86 accurately depict in substantially more detail than you are able to actually draw in the diagrams the wounds of the victim, David Rocky Eales?

A      I would say, yes, they do.

MR. SPERLING:  Your Honor, we move their admission, Government's Exhibits 83 through 86.

MR. SMITH:  Your Honor, we would object to their admission.  They are overly prejudicial and not probative.

THE COURT:  Objection overruled.  They will be admitted over objection.

MR. SPERLING:  May I have just a moment, Your Honor?

THE COURT:  You may.

BY MR. SPERLING:

Q      First, Government's Exhibit Number 83, does this photograph show the face for identification purposes of the victim, David Rocky Eales?

A      Yes, sir.

Q       Government's Exhibit Number 84, please.  I know this is not very clear here on the screen, as it shows -- do you want the lights --

        MR. SPERLING:  Can we drop the lights for a moment, please, Your Honor?

        THE COURT:  Yes.

BY MR. SPERLING:

Q       Using the laser, identify, first, the areas of gunshot wounds and explain them to the jury?

A       Yes.  The photograph displayed on the screen shows the body of David Eales in a face down position.  His head is to your left as you look at the screen and his feet would be to your right as you face the screen.  So what we are looking at is the left side of the body, specifically the left side of the hip area and the left side of the lower back and torso area.

Q       Is this the area that you have referred to, Doctor, as the flank?

A       I think it is often referred to as the flank.  In some of our discussions yesterday, we talked about the area where the beltline would be, which, of course, would be approximately here, assuming you are wearing the pants in the traditional site and what is shown here is a cluster of skin injuries that makeup what I called the atypical wound number 2.

Q      Okay.  And if you were to just summarize this wound for the jury, how would -- how would you assess the probable entry of the larger of those wounds?

A      Well, first of all, by looking at the largest defect, which is here, as I'm now showing with the pointer, there is a large defect in the skin there and it is surrounded actually by a relatively large area of abrasion and then there are additional smaller damaging injuries, that is damaging to the surface of the skin that one can see.  Of course, the proof of which particular hole is -- does what then involves making dissections into these areas in order to look for the damage.  So this particular larger defect that I'm now putting the pointer on, this was the wound I earlier described as tracking from left to right over toward the midline of the body and, in fact, the fragment being recovered essentially behind the lower part of the lumbar spine.

Q      What was the extent of damage with regard to this gunshot wound?

A      Well, the wound was very damaging, but only to skin, subcutaneous fat and muscle.  In other words, this wound did not involve any vital structure, meaning body organs or large size blood vessels.

Q      Would this wound have been life threatening?

A      It would not have been life threatening in what I

would call an immediate sense.  By that I mean if you were wounded only with this wound, would you die right away?  The answer is no.  Now, any wound can become infected or there can be complications, so it's not possible to predict the future of what would happen for a given wound, but a wound like this isn't striking any vital structures and is not going to result in death in a short period of time and certainly not in the period of time that occurred in this particular case.

Q    In your opinion, Doctor, had this been the only wound that Rocky Eales suffered, had he been rushed to the hospital, say, five, six miles away or so within a reasonable period of time, could this have been treated successfully?

A    Yes.  The probability is that this would have been survivable.

Q    All right, sir.  What damage -- but this struck no vital organ?

A    That's correct.

Q    All right.  Government's Exhibit Number 85, please.  There are a number of items that this photograph depicts, Doctor.  Would you describe them to the jury, please?

A    Yes.  This photograph shown on the screen shows the back and upper left arm of David Eales.  One can see his head is at the upper left corner of the screen and,

of course, the feet would be directed back to your right as you view it.  It shows, first of all, a piece of plastic tubing that is stuck through the chest wall.  This is what is referred to as a chest tube.  This was a tube that the doctor at the hospital placed in order to try and help restore the functioning of the lung that I talked about earlier in terms of the lung collapsing.  This is an attempt to restore the vacuum around the lung in order that it would re-expand.  Right here is just a metallic clamp that we have put, in other words, at my office. We have put on this tube and that's just simply to prevent blood from coming out as the body is moved.

Then one can he see several skin injuries here, here, here, here, here and here on the back of the upper left arm.  There is a large injury of skin here that I'm outlining with the laser pointer and then there is a small hole here, which is actually the fatal wound. Earlier I mentioned satellite impacts, so this material here -- excuse me, not material, but this wound here, here, here, here, on the back of the arm, as well as here and here and also I think one that can be seen right in here, those were all the additional sites of skin injury that resulted from the impact of material related to the intervening target.  So this is the fatal wound here where a portion of projectile entered.  This is what went through

breaking the ribs, going through the upper part of the left lung, and at least putting a hole in the aorta.

Q    You know, just as you look at that photograph, you wonder how can the smaller of those wounds be more damaging than the larger.  How do you -- what is your understanding with regard to the larger of the wounds, the one just under what you have indicated to be the fatal wound?

A    Well, this large gaping defect here was actually quite puzzling to me at the time I did this autopsy because in looking at that, I had questioned in my mind whether that was even related the the gunshot wound or whether there might have been an attempt of some sort of surgical exploration.  So later I actually spoke to the physician and this was not a therapeutic intervention and what this represents is one effect of the high velocity projectile.  It is a somewhat unusual effect in my experience where -- when the tremendous expansion of the temporary cavity occurred, as I talked about I believe yesterday, I believe this skin just simply split open right along that fold.  The edges of this were very clean.  So, in other words, there was no indication that anything went through the skin here, in other words, going into the body.  On the other hand, that clean edge, which, of course, as I said I wondered about a surgical wound,

could also have resulted from just a violent expansion of those tissues. There was some special circumstances with respect to this death, particularly in view of the clothing that was present.

Q    What clothing created in your opinion -- produces that special effect?

A    Well, he was wearing the protective gear that included a vest. In other words, of course, he had a couple of shirts on and he had the -- for want of a better term, a bullet proof vest or bullet resistant vest. So all of those things were part of the phenomenon that occurred at the time that that projectile entered his body.

Q    With the court's permission, I would like for you to examine a number of other government's exhibits, keeping in mind the testimony that you have given, sir, with respect to the various gunshot wounds. They are Government Exhibit Numbers 115 through and including 119.

MR. SMITH:    While the doctor is examining that, we would request that this be taken down off of the display.

MR. SPERLING:    We will be back to it in a moment. We can remove it for now.

BY MR. SPERLING:

Q    Government's Exhibit Numbers 115 through and including 119, are they various items of clothing and

protection that were examined by you with regard to this autopsy and examination and investigation?

A     I would say yes, they are, these are items I recall seeing.

Q     Did you also make notations about each of those items, sir, in your report?

A     Yes, sir, I did.

Q     All right.  And I know that our numbering system is not the same numbering system or identification system that you may have used, sir, but can you tell us -- and I would be happy to do this in the order of the item that is nearest to you, but can you tell us what the first item that you have there beside you is?

A     Did you say the numbering did not matter?

A     Well, we need it for purposes of identification here.

A     Right.  Item Number 115, I recognize this is the shirt.

Q     Okay.  And with regard to Government's Exhibit Number -- you say that's 115?

A     Yes, sir.

Q     115, did you have occasion to observe any holes in that shirt that were consistent with gunshot wounds you identified as having been suffered to the body of Rocky Eales?

A      I did.

Q      Government's Exhibit Number 116, please.  As that is being handed to you -- I'm sorry, I didn't mean to jump ahead of you, Doctor, but where were the holes in Government's Exhibit Number 115?

A      Well, I indicated in my report, referring to it as a button shirt, I said cut -- that it had been cut meaning at the hospital and I said it shows both a small defect in the left arm area posteriorly as well as a large defect in the right elbow area and two large defects in the left flank area.

Q      Okay.  And are those defects in the shirt consistent with the gunshot wounds that you observed and have testified concerning to this jury?

A      Yes.

Q      Thank you, sir.  Government's Exhibit Number 116, please.

A      116 is what I refer to as a T-shirt.

Q      Okay.  Did you observe any defects with regard to the T-shirt?

A      I indicated the T-shirt, which has been cut, shows multiple holes on both the trunk area left side and also on the region of the left sleeve.

Q      All right.  Are the defects to the T-shirt and the notations that you have made with respect thereto

consistent with regard to the injuries, the gunshot

wounds that you observed suffered by the victim, David

Rocky Eales?

A    Yes, sir.

Q    All right.  Government's Exhibit Number 117, please.

A    117 are the pants.

Q    All right.  Did you notice any defect with regard

to the pants?

A    I did.  I noted that the bag contained pants which

had been cut and they demonstrated a small impact site

with a shinny metallic appearance on the left side in the

waist area and near a small metal buckle part, which is a

part of the makeup of the pants.

Q    Is that consistent with the injuries that were

suffered by David Rocky Eales?

A    Yes, sir.

Q    Government's Exhibit Number 118, please.  What is

Government's Exhibit Number 118?

A    118 is a vest, a protective vest, a firearm

protective vest.

Q    Did you notice any defects with regard to the left

lower side?

A    Yes, I did.

Q    What did you notice, sir?

A    With respect to the vest, I noticed that there was --

and I call it a body armor type of vest and there was --

along the edge of the back of the vest on the left side

there was a ragged defect.

Q      All right.  Was that ragged defect consistent with

a gunshot wound that you have already detailed to this

jury concerning David Rocky Eales?

A      Yes, sir.

MR. SPERLING:  Your Honor, we move the admission

of Government's Exhibit numbers 115 through and including

119.

MR. SMITH:  Your Honor, I show 118 has already

been admitted, but the others we don't have any objection.

THE COURT:  So 115, 116, 117, 118 --

MR. SMITH:  I show 118 is already in.

MR. SPERLING:  He shows -- I'm offering it just

protectively, but 119 is also offered, Your Honor.

MR. SMITH:  And we have no objection to 119,

Your Honor.

THE COURT:  119 has been offered?

MR. SPERLING:  I need to ask him a couple of

questions about it, Your Honor.

THE COURT:  Okay.

BY MR. SPERLING:

Q      What is Government's Exhibit -- well, before I get

to that, the protective armor, as you have referred to it,

is the discrepancy -- the damage to that item, Government's Exhibit Number 118, consistent with the injury that you have explained and detailed concerning gunshot wounds -- both numbers 2 and 3?

A      The damage on the body armor was in correlation to wound number 2.  In other words, the hole that was present on that left side in the flank area was actually a perforation by the largest part of the projectile and the part that I recovered.  In other words, the bullet went through that.  That is why it had the appearance that we looked at on the photograph where from the jury's point of view they are -- they probably just look like a large sort of dark purple area.  Well, part of that was a hole, but the rest of it was damage of the skin surface because as the bullet went through the vest, it slapped the vest against the skin right next to it and then pushing through the vest, the vest itself caused damage on the surface of the skin.

Q      Are you talking about -- I'm sorry, but are you talking about the gunshot wound to the flank area?

A      To the flank area.

Q      Would you go back to that photograph again, please? When you talk about the slapping effect, where is that indicated here?

A      Well, we talked about this entire cluster and what

these are are several individual impact sites, one here and one here in the middle of this sort of larger dark purplish area.  Well, the hole is present here, but the larger area of discoloration that we are looking at is an abrasion of the skin surface.  You can see that no shrapnel, for want of a better term, struck the back nor the front, but rather all occurred within the unprotected area.  This vest is of a type that has a protective area in front and a protective area in back, but there is nothing to protect the side.  In fact, here where the hole is that the projectile went in, this went through the vest, not the hard part of the vest that is meant to stop just about any kind of projectile, but through the fabric part of the vest which would likely stop many handgun rounds, but could not stop a rifle projectile.  So this damage of the skin shows how the vest itself is driven against the body.  This is the effect of that vest.  This is a very typical thing to see depending on clothing. For example, if my glasses were present in this pocket and I were shot with a bullet going through those glasses, the glasses would be driven against my skin and sometimes in kind of a pattern that would like look glasses which would be seen on my skin around the hole where the bullet went in.  What we are seeing here is the effect of that vest.

Q        Thank you, sir.  In fairness, Doctor, are you able,

based on your autopsy, based on your examination, to determine the specific position of a victim at the time that he was shot?

A     No.

Q     Are you able to determine the particular movement of a victim at the time that he was shot?

A     No, not by looking at the body.

Q     In fairness, can you tell us who fired the gun?

A     No, sir.

Q     Can you tell us what particular gun -- I mean, you have talked about high velocity weaponery here.  But just so we understand the nature of your examination, sir, Doctor, can you tell us what particular gun was fired?

A     No, sir.

Q     Can you tell us where that particular gun was fired?

A     No.

Q     Now, although -- you can talk in terms of distances, can you not?

A     Sometimes we have observations that allow that.

Q     There are some terms called sooting and stippling. Would you explain the term sooting to the jury?

A     Yes.  Those two things are findings that I might see on the person's body that would be an indication of closeness of the muzzle at the time the gun is fired. In fact, we often try to characterize roughly the range

of fire, if we see effects like sooting or stippling. Soot is just the gunpowder that has burned. It basically burns and it becomes a kind of -- like an arc. It's kind of black or gray black in color and it would only be on a wound if the muzzle was very close, meaning a couple of inches or in contact. Soot is light weight so it doesn't travel far though air. When a gun is fired, the soot comes out the end, but the air resistance really just causes it to basically cease to forward motion within a very short distance. Stippling refers to marks on the skin that are caused by unburned particles of gunpowder. So when a gun is discharged, the bullet comes out the end but not all of the powder burns, so some of it is blasted out of the end. The gun is quite close to the body. You can see marks from the gunpowder on the skin around the hole and that's called stippling. Those things only occur within a general frame of reference of a couple of feet. Beyond that, the only thing that hits the body that can be seen is the bullet itself. Of course, there are excep-tions, like here, where when the bullet hits something else, you can see the effects of that on the body.

Q      Was soot or stippling present with regard to any of the gunshot wounds, 1, 2 or 3, that you observed here?

A      No, sir.

Q      From that would you conclude the shooter to have been

at least several feet away from the victim?

A       It would suggest that the muzzle of the gun was not very close at the time it was being fired.  By very close, I mean just a few -- just a couple of feet.

Q       Okay.  Could the muzzle of the gun have been as little as 10 or 15 feet from the victim?

A       Yes, sir.

Q       Or 20 or 30?

A       Right, it could.

Q       Okay.  In fairness, Doctor, are you able to tell us the specific timing of these bullet wounds, these gunshot wounds, that is, which one was first, which one was second, and which one was third?

A       No, sir.

Q       Now, other than what you have told us with regard to the lethality of the gunshot wound that perforated the upper chest area -- by the way, both in photographs as well as in your diagram, did you indicate that gunshot wound to be in front of or behind the arm?

A       Behind.

Q       And behind the left arm?

A       That's correct.

Q       Other than to have occurred, given the lethality of that wound, within a relatively short period of time, can you tell us how much time elapsed, based upon your

examination, between the firing of gunshot wound number -- gunshot number 1, 2 or 3?

A    No, sir.

Q    By the way, ballistics -- other than your observation, but ballistics in terms of lands, grooves, what makes bullets turn, tumble, you have -- you have general knowledge of that subject, do you not?

A    Yes.  I have what I would call limited knowledge. It is -- it is a fairly large part of my work.  So I often then say I have a working knowledge, but I'm not an expert specifically in firearms or ammunition.

Q    And that work and knowledge has included contacts with -- well, perhaps hundreds of officers and investigators concerning gunshot wounds?

A    Yes, sir.

Q    But in fairness, you are not holding yourself out, as you indicated, to be an expert with regard to firearms themselves?

A    That's correct.

Q    Thank you, sir.  Did you do a toxicology screen with regard to the victim, David Rocky Eales?

A    I did ask for a blood alcohol determination to be done.

Q    And what was the determination?

A    It showed no alcohol present.

Q      All right.  With regard to the gunshot wound behind the left arm that penetrated Rocky's chest, can you tell this jury based on your training, experience and education how long he would have lived?

A      Well, I think I can estimate really.  In other words, I cannot be precise.  Each person is different.  The effects of a wound would vary from person to person.

Q      Might it also depend on efforts to resuscitate?

A      And it will obviously depend on intervention that might then done in a particular case.

Q      Okay.  Considering variables, however, Doctor, are you able to give this jury an opinion with regard to the probable amount of time that Rocky would have lived after experiencing that which you have determined to be the fatal gunshot wound?

A      Yes.  I think he died very soon after being shot. In other words, he may have still shown some since of life by the time he reached the hospital, but I -- and I really don't recall from six years ago when I actually reviewed the medical records, but I would say that likely there probably were not signs of life even by the time that he reached the hospital.

Q      All right.  Is it reasonable to believe that if efforts were made to immediately resuscitate Rocky that he may have responded, all be it momentarily, in the form

of a breath or a gasp?

A    Well, he could have displayed some of those signs without any intervention.  In other words, even sustaining the wounds, it wouldn't preclude, for example, being able to say move several feet or stagger several feet in an effort to take cover, but I think within really just a few minutes he would probably not be able to us sustain blood pressure which would sustain consciousness.

Q    And the -- what is your best estimate -- I know that there are variables and I know that people may be different and conditions may be different, but what is your best medical judgment, your best opinion, sir, with regard to the length of time that Rocky would have remained conscious after suffering the fatal gunshot wound?

MR. SMITH:  Your Honor, I'm going to object.  That's been asked and answered.  And also, with all of these other variables, I don't think anybody can put a time on that.

THE COURT:  Objection overruled.  You may answer.

BY THE WITNESS:

A    I think that having sustained a wound almost immediately, meaning within just a few seconds, he likely would suffer loss in blood pressure so that he couldn't remain upright.  Once he would lay down, the body's mechanisms to try and cope with that would come into

effect and it's possible he could have remained conscious then for a few minutes, but I think in five or ten minutes, I think, he would no longer have been conscious and I think death probably would have occurred very shortly thereafter.

Q     All right.  Is it possible for someone to have sustained a fatal injury and yet to remain on their feet, even to walk for a period of time?

A     Yes, sir.

Q     All right.  Do you have an opinion, Doctor, all things considered, your education, your training, your experience and your examination in this case, as to the cause of death?

A     I do.

Q     What was it?

A     My opinion is that David Eales died as a result of a gunshot wound to the chest.

Q     All right.  Government's Exhibit Number 119, I believe we may have discussed that very briefly, sir. What is that?

A     119 is the belt.

Q     And is there any impact area on the belt?

A     Yes, sir, there was.

Q     And is the belt that you see there, Government's Exhibit Number 119, consistent with the belt you examined

with regard to the autopsy of the body of Rocky Eales?

A    Yes, it is.

Q    Where is the area of defect concerning the belt?

A    I indicated that a black woven belt showed a strike on what I thought was the left side and the material of the belt was indented, but I didn't think that it was completely perforated.

Q    Given the way a vest is typically worn, are you able to tell us, Doctor, based on the blow back, to explain the large hole under the armpit?

A    Well, the -- I think I alluded to that earlier, that the armpit is, of course, not protected by the vest, but the vest would in front and behind support the chest.  So as the temporary cavity formed, this could direct the expansion either toward the body and/or away from the body and so that is -- that reinforcing nature of the vest could explain the splitting of the skin back out in this direction.

Q    Thank you, sir.  I would like also to discuss briefly with you Government's Exhibit Number 86.  Does Government's Exhibit Number 86 reflect the gunshot wound above the right elbow of Rocky Eales?

A    Yes, sir, it does.

Q    I notice there are jagged edges or it appears that there are jagged edges with respect to this wound.  What

do you make of that?

A      Well, I think that's fairly typical for a wound that is caused by a projectile striking the body in what I would call a tangential fashion.  What I mean is kind of a glancing blow across the surface.  As the projectile would tear through the skin, this -- the skin would be greatly stretched and then it would give and tear in a certain way to result in the pattern that can be seen there.

Q      Okay.  So that the record is clear, does this photograph and did your examination reveal that this wound was to the back of the right elbow?

A      Well, I wouldn't describe it exactly that way.  You see the elbow is approximately here and the elbow -- if you bent the arm and measured it from the distal part of the humerus, it was three and a half inches from the elbow itself to this wound and I believe that it was likely the bullet went in this direction, which I would characterize as primarily back to front, but also there is a left to right character to it.

Q      So on me, back to front here and from left to right?  (INDICATING ON HIS ARM)

A      Right.  You know, the arm is a little difficult to describe because it has the ability to rotate like this. When I give the descriptive words, what we really mean is with the body laying in what is called the anatomic

position. The anatomic position means the body laying on

its back, the arms extended down by the sides, and the

palms toward the ceiling. So when -- so when we attempt

to describe the wound in terms of a person's body, you

see, that's the position of the body, but it's a little

complicated by the fact that the arms -- mostly our arms

are not like this, they are more like this. (INDICATING)

So to the extent that the upper arm can rotate, it becomes

a little confusing just to say exactly which way you are

talking about, but I thought it came mainly from back to

front, but also from left to right.

Q     All right. Do you have an opinion, Doctor, as to

whether or not the victim would have been -- what would

have been his relative body position with respect to the

shooter?

A     Likely facing away.

        MR. SPERLING: I have nothing further, Your

Honor.

        THE COURT: Counsel, did you intend to offer

Exhibits 115 through 119?

        MR. SPERLING: Yes, Your Honor.

        THE COURT: My record reflect -- any objection?

        MR. SMITH: No, Your Honor.

        THE COURT: Exhibits 115, 116, 117, 118, and 119

will be admitted without objection. You may cross examine.

CROSS EXAMINATION

BY MR. SMITH:

Q       Good morning, Doctor.

A       Good morning, sir.

Q       Good to see you again.

A       Thank you.

Q       The organization that you work for is the Office of the Chief Medical Examiner?

A       It is.

Q       That's a state governmental entity?

A       Yes.

Q       You are not a private physician doing these just -- you know, that's your particular job and you subcontract out, you are employed by the state agency; is that correct?

A       I am.

Q       Okay.  This autopsy that you performed, sir, you had some numbers on your report and I would like to ask you about those.  One of them was your 'T' number?

A       Yes, sir.

Q       456-99?

A       Yes.

Q       Can you explain to us what that means, please?

A       The 'T' refers to Tulsa in the sense of the record keeping.  There are two offices, one in Oklahoma City,

one in Tulsa.  So Tulsa designates their autopsy numbers with a '7'.  456 indicates the 456th that was performed in the Tulsa office in 1999.  The '99 is referring, of course, to the year.

Q     Okay.  And in 1999, how many of those autopsies would you have done?

A     I would have done -- there were three doctors and I probably did a little more than a third.  The administrator at that time probably didn't do a full third, so I would just say 40 percent.

Q     Okay.  So, well over 200; would that be fair?

A     Yes.

Q     Okay.  And you also had a case number associated with this, 99-11476?

A     Yes, sir.

Q     What does that refer to, Doctor?

A     Well, '99 does refer to the year.

Q     Yes, sir.

A     And then the numbers after that are given to -- the Tulsa office every year would begin with the number 10,000.

Q     Okay.

A     Whereas, the Oklahoma City office would begin with the number 0.  So the first case in Oklahoma City would be 99-00001.  Whereas, in Tulsa the first case would be

99--10000.

Q     Okay.  So what you are telling us is there are several cases that may be investigated by your office, but not all of them result in an autopsy?

A     That's correct, sir.

Q     So in '99 how many cases were presented through the office at the time that you performed this autopsy?

A     Well, this would be -- this would have been our 11,476th case.

Q     And of those, how many would you participate in an investigation of or have something to do with the particular case?

A     I think that 40 percent would probably be right.

Q     So it would be fair to say you see an awful lot of these cases?

A     I do.

Q     It's been six years?

A     Yes, sir.

Q     And so when you come to court and testify, your reports are important to you?

A     It is.

Q     I guess it's also important to you what others may tell you whenever you go back and you look at your report and you start trying to put everything together, correct?

A     That is correct.

Q      Okay.  And part of what has changed over the period of six years is the discussion about an impact on a pistol?

A      Yes, sir.

Q      That wasn't ever indicated previously in your testimony, was it?

A      That's correct, I don't think it was.

Q      Okay.  And that information came to to you through who?

A      The United States Attorney's office.

Q      Okay.  So that's a theory that they had as to what may have happened to a magazine on a pistol and they said, Doctor, I would like for you to take this into consideration as it relates to this case involving Trooper Eales, correct?

A      Yes, sir.

Q      Okay.  And, in fact, you have and you have rendered a different opinion as opposed to what you had on some other occasions?

A      I believe that's correct.

Q      Okay.  Now, let's talk about -- about some of these particular injuries, Doctor.  Number 1 -- and you could tell us briefly -- or agree with me, I guess.  That's the upper right arm that we are talking about, correct?

A      It is.

Q      And previously you agreed that there could be room

to differ as to whether or not that injury was caused by a high velocity round?

A        I probably did.

Q        Okay.  And also, Doctor, I think you agreed that you could not tell previously whether or not that wound was caused by a projectile striking an intervening object?

A        That's correct.  I would say that only recently did I consider that the bullet may have struck something else.

Q        And part of what we talk about whenever we try to decide whether or not it was a high velocity round has to do with that defect that you talked about, a grazing wound, but it caused a tremendous defect, correct?

A        That's correct.

Q        And when you mentioned tumbling a little bit ago, that can be the same thing.  In other words, a bullet that's not spinning and traveling in a straight path, if it's tumbling as it's coming out and it hits a portion of the body, a meaty part of the body, that can cause a tremendous void also, can it not?

A        Yes, I believe it can.

Q        And that can happen whether or not it's a high velocity round from a rifle or it could be a lower velocity round from a pistol?

A        That's correct.

Q        Okay.  So what you are telling us is that you have

considered some things that the government has told you about -- well, what if it hit the magazine of the pistol? Now take that into consideration. And from what I'm gathering, you are saying, well, that is a plausible explanation for this striking an intervening object being a high velocity round and that's what caused the injury, correct?

A     Yes.

Q     But I also gather from the way that you told us that, that it's a plausible explanation, that you probably can't state that opinion within a reasonable degree of medical certainty?

A     That's correct. I would say I'm not certain about that.

Q     As to wound number 2, you are convinced that there was an intervening target that was involved in that wound itself?

A     Yes, sir.

Q     And there is a couple of things that tell us that, one is satellite impacts?

A     Right.

Q     And the other one is typically you would not expect that wound would be the size that it was unless there was some sort of intervening impact and in this case what made the wound bigger was the vest?

A      I believe that is correct.

Q      Okay.  And whenever we are talking about intervening targets -- and I'm not talking about clothing such as that vest particularly in that case, but I'm going to talk a little bit here about the satellite impact some of these fragments have caused.  Typically you would expect that to result from a projectile hitting something substantial, correct?

A      Yes, sir.

Q      I mean, it's not like just going through a T-shirt and then just having this satellite impact.  It's hitting something and then the projectile is going into several different pieces?

A      Right.  The nature of what was struck would certainly be important.

Q      And whenever a projectile hits an intervening target, that also has the ability or the effect of making that projectile take a different path, correct?

A      It can, that's correct.

Q      So whenever we look at a -- what we may think is an entrance hole -- an intervening target and entrance hole, it doesn't necessarily mean that that is where the projectile or the fragments wound up?  In other words, on a linear line that could be off one direction or the other, up or down, wherever; would that be correct?

A      Yes, I think what you are saying is that there could be deviation from a relatively perfect line and I would say that is correct.

Q      So it's not always just as easy as taking a stick or taking a laser an punching it through a hole and saying, well, yeah, everything lines up.  I mean -- because we can't say what happens when a projectile hits an intervening object.

A      That's correct.  In other words, it may be that the projectile continues on in essentially the same direction or it could deviate to some extent.  Obviously it could hit something and entirely stop.  In other words, what we are talking about there is the object just completely stops the bullet.

Q      Okay.  Let me take you back to wound number 1. I came across the last thing that you had answered for the government, which was based on this information they gave you and that opinion was that you thought it was a reasonable explanation.  They asked how did -- what was the direction of that bullet, front to back, what have you.  They told us that your opinion -- that you can't say within a reasonable degree of medical certainty.  So I guess that also means you cannot tell us the direction that that bullet was traveling when it impacted the upper right arm to a reasonable degree of medical certainty

either, can you?

A      That's correct.  I think my feeling about that wound always was that likely it was from back to front, but that the nature of that wound could sufficiently -- I mean, it's a typical nature.  One could tend to dispute whether it was going that way or not.  I mean, there would be some room for debate about that.

Q      Okay.  Now, back to wound number 2, again, if we can -- again, that's one that is on the left flank; is that correct?

A      Yes, sir.

Q      Okay.  Now, as it relates to that wound and an intervening target, you have told us that you can't tell how far the muzzle was away from the victim other than you know that it wasn't within say two feet?

A      Right.

Q      But you can't disagree that it might not have been ten feet away?

A      That's correct.

Q      Or it might not have been 15 feet away?

A      Yes, sir.

Q      There is no way for us to tell that?

A      No, that's right.  You would not want to try and draw a conclusion on where the gun was based on this wound and the satellite impacts.

Q      Okay.  Again, Doctor, you may have answered this for us, but I gather that you randomly numbered these wounds just as you were examining the body, one, two, and three?

A      I did.

Q      But you are not expressing an opinion to the jury as to an order or as to the order that they were suffered by the victim?

A      That's right.

Q      And the same way with the trajectory, what we just talked about with the upper right arm.  You can't really express much about where the gun may have been, the flight that the bullet was taking because what you are looking at is the body and you are doing a dissection and that tells you how it traveled through the body, correct?

A      That's correct.  I think that's an important thing that I find myself trying to explain quite often, is that when you consider looking at a person's body in an examining room what you see is only what is present on the body.  So, you really do not want to make a whole lot of inferences about that.  Now, later if you get other information, you may decide whether that is consistent or not, but in looking at the body you only characterize it in terms of the body itself.

Q      You are kind of one piece of that puzzle?

A      That's right.

Q      Okay.  So, what you are looking at is what you are dealing with in your examination.  Now, if you were to get with another expert later, y'all might say, yeah, that makes sense with what I found, but as it relates with what you do, you can't tell which way a gun was or what have you?

A      That is really correct.

Q      And that's really not your job either, right?  That's not what you are called on to do?

A      That's correct.

Q      Now, as it relates to the wound number 3, it had an intervening target also?

A      Yes, sir.

Q      Okay.  And from from the way I understand what you've described, you had this tear that was in the armpit area?

A      Yes, sir.

Q      And at first you didn't know what caused that.  In fact, you thought maybe the physician had done this?

A      Right.  There was the surgical intervention where an incision was made and the chest tube was placed just a few inches from that and I thought about the possibility that -- with the brisk bleeding that was occurring, whether the doctor at the hospital might have tried to open that area to get in there and try to correct some bleeding.  So, that

was a possibility and that finding is a very unusual finding with any kind of wound.

Q    That one caused you some problems.  When I say problems, it caused you to think a little bit more about it because there wasn't just an easy explanation for it; would that be fair?

A    Yes, it is.

Q    And from the way I look at that wound, it looks to be almost surgically?  In other words, there are no jagged edges.  You talk about a split of the skin, but it is real clean, isn't it?

A    It's very clean.

Q    So, would it be fair doctor that somebody else could disagree with you as to whether or not that was caused by avoid from a projectile hitting just above it and the skin -- you know, you talked about how it will give and with the vest holding everything together that there is going to be something that has to give.  Another physician could differ with you as to what they think may have used what looks like a surgical cut, correct?

A    Yes, sir.

Q    Okay.

A    And had the surgeon said I made the cut there, I was trying to do that, I would not have disputed that or tried to assert this was part of the wound.

Q       You wouldn't have questioned it, would you?

A       No, I wouldn't.

Q       I mean, you may have thought it was kind of weird or a different type of resuscitation or to find a projectile, but other than that you probably wouldn't have questioned it; is that right?

A       That's correct.

Q       Okay.  Now, Doctor, yesterday we talked a little bit about -- or I asked you a couple of questions about evidence.  And I understand whenever you receive a body, you receive personal effects and in this case you may also retrieve items that are -- such as projectiles.  You protect those, don't you?

A       Yes, sir.

Q       You put those in an envelope like you had in front of you yesterday and you sign your name to them and you seal them and you put them in your vault?

A       Actually, a lot of times the investigator -- in other words, since I'm doing the case and maybe have blood on myself, I often hand that to the investigator and have them put it in and have them actually seal and initial those -- or each container that either the clothing or the projectile or whatever is in.  So, I do not necessarily do that specifically myself, but I supervise them doing it.

Q      It is done under your supervision and that's the way y'all do it and that's fine, right?

A      Yes, sir.

Q      I mean -- but what you don't know is -- and I guess that was my point to you yesterday.  This has been six years ago.  Once that stuff leaves your custody, which it did -- it left shortly after you did this autopsy, correct?

A      Yes, sir.

Q      You can't really say what happens to it?

A      That's correct.

Q      Would that be fair?

A      That's correct.

Q      Now, from looking at the material from the previous testimony, I gathered that at some point in time you had a practice of scribing on some of these projectiles that you may recover; is that correct?

A      On occasion in my earlier years, I would often use a diamond tip stylist to inscribe on the base of an intact projectile the initials of the deceased person, but then I ceased doing that.

Q      And I understand why you ceased doing it because you probably got criticized about changing the character or something about that projectile.  The better practice is not to change it any, right?

A       Actually, what happened was that caused confusion about who it was that actually wrote that.  So, I realized that my identification of the evidence later rested primarily on being able to identify the container in which we put it.

Q       Okay.  So in a case like this, whenever you are telling us...well, this fragment looks like what I have described in my report and based on what I remember about this case, yeah, it looks similar and that's probably it, but really with all of these that you do, with all of the various projectiles that you recover and fragments, you can't say, yeah, that is it?

A       That's correct.  I would also say that if there were a line of different fragments there, I don't think I would necessarily pick out the correct one.

Q       So what we are saying is based on what I have written, based on my notes, based on what I have reviewed, this is consistent with what I recall?

A       Yes, sir.

MR. SMITH:  Thank you, Doctor.

THE COURT:  Further direct?

MR. SPERLING:  I have no more questions, Your Honor

THE COURT:  May this witness be excused

MR. SPERLING:  He may.

MR. SMITH: Yes, Your Honor.

THE COURT: Doctor, thank you for your testimony. You may step down. You may be excused.

You may call your next witness.

MR. LITTLEFIELD: Donita Mann.

DONITA JO MANN, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     State your name for the record, please, ma'am.

A     Donita Jo Mann.

Q     And Ms. Mann, how are you currently employed?

A     I'm a paramedic with EMSA.

Q     And EMSA is...

A     Emergency Medical Services Authority in Tulsa.

Q     Okay. And prior to becoming an employee of EMSA, did you have an occasion to work for the Office of the Chief Medical Examiner of the State of Oklahoma in the Tulsa office?

A     Yes.

Q     And were you working in that capacity in September of 1999, ma'am?

A     Yes.

Q     Okay. In what capacity were you working for the M.E.'s office up in Tulsa, what were you doing there?

A     I was an investigator.

Q     And what are the responsibilities of an investigator?

A     At that time we would be present during autopsies, we would collect evidence, we would transfer the evidence to whatever law enforcement was involved at that time for whatever particular case.  We handled cremations and out of states (sic).  We investigated and went to crime scenes for unnatural deaths.

Q     Are you familiar with the circumstance about which you are present here today?

A     Yes.

Q     And did you take any investigator's role going to the crime scene or any of that kind of stuff?

A     No, because at that time we were only doing --

Q     Okay.  You don't need to go beyond that.  No simply answers the question.

A     No.

        MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 205 be presented to the witness.  It's the transmittal sheet that was just introduced.

BY MR. LITTLEFIELD:

Q     When you are responsible for receiving evidence and then passing it on to an agency, is there some kind of form that is filed out and completed?

A     Yes.

Q     And what -- and is that, in fact, the form?

A     This is the form.

          MR. LITTLEFIELD:   May I approach the table?

          THE COURT:   You may.

                    (PAUSE)

BY MR. LITTLEFIELD:

Q     In addition -- would you -- I would ask that the witness look at Government's Exhibit Numbers 115 through 119, which are the items back on the tray.

     Ms. Mann, do you recognize those items?

A     Yes.

Q     And what are those?

A     Those -- that's the evidence that I turned over or collected on that date.

Q     Okay.   Are those the clothing items that were with the body of David Eales?

A     Yes.

Q     And how did you collect those at the M.E.'s office?

A     Some of the clothing items came in a plastic bag with the body, had already been removed, I guess, by the hospital.

Q     Okay.

A     So, those items we transferred into paper bags, sealed it, signed it, and eventually I turned it over to the --

Q     And were there other items that were collected as a

part of the process of the medical examination or the autopsy items?

A    Yes.

Q    And who is responsible for checking those items and making those available to the particular law enforcement agency?

A    The investigator and the doctor would as well.

Q    Were you present during the performance of the autopsy --

A    Yes.

Q    -- of David Eales?

A    Yes.

Q    Okay.  And were items retrieved by yourself either from Dr. Distefano or he took them and handed them to you and you made sure that those were placed in envelopes or whatever to maintain the security of those particular items?

A    Yes.

Q    Okay.  I would ask that Government's Exhibit Number 129 be displayed to the witness.  It's the envelope that --

BY MR. LITTLEFIELD:

Q    It has been unsealed.  You can look inside of it. I think the top part has been opened so that you can examine the contents as well.  Do you recognize those two

particular envelopes?

A       Yes.

Q       And how do you recognize those envelopes?

A       I filled these envelopes out and submitted these fragments.  They were given to me by Dr. Distefano.

Q       Okay.  Now, I think one indicates upper back and one indicates -- how do you differentiate one from the other as to where the fragments came from?

A       The doctor retrieves them, hands them to me, I put them in this envelope, and he tells me where they were retrieved from.

Q       And does that show where they were retrieved from?

A       Yes.

Q       And the one you have in your right hand, where was that retrieved from?

A       It was recovered from the upper chest.

Q       And the one that you have in your left hand, does that identify where it was retrieved from?

A       Lower back.

Q       Okay.  And who wrote upper chest and lower back on those envelopes?

A       On the upper chest, the right one, I did.

Q       Okay.

A       On this left one, I believe it is -- that Dr. Distefano wrote this.

Q      And you recognize the writing?

A      Yes.

Q      And who took custody of those fragments after they were retrieved?

A      I did.

Q      Okay.  And would you again reinsert those in the -- in fact, are those -- do those contain the fragments or did they when they were passed on by yourself to the law enforcement agency?

A      Yes.

Q      Okay.  I would ask that you pass that back to the clerk.

In addition to those items, are certain anatomical items retrieved during the medical examination for assistance in the investigation as well, --

A      Uh-huh.

Q      -- blood, tissue, any of those kind of items?

A      Yes.

Q      And when those items are retrieved or taken from the body of the deceased, in this case David Eales, what is done with those items by the investigator for the purpose of maintaining custody in a chain of custody?

A      Depending on what the item is, they are placed in a container or an envelope, depending on what it is.  It is sealed and signed and put up in our lock-up.

Q      What items -- does your transmittal sheet identify the items taken from the body of David Eales -- from the body itself?

A      It would be the scalp hair, pubic hair, and then the fingernails from the right and the left hands, and we also took blood and DNA muscles.

Q      Okay.  And who would have gotten or received custody of those items within the Medical Examiner's structure or the office structure?

A      I did.

Q      Okay.  Would you look at Government's Exhibit -- what has been marked as Government's Exhibit Number 111, please?

A      Yes.

Q      Do you recognize what those are?

A      Yes.

Q      What are those?

A      This is the envelope containing the scalp hair, pubic hair, and the right and left hand fingernails.

Q      Okay.  As to the blood, what was done with the blood that was retrieved from --

A      Okay the.  The blood is put into a vial, a glass vial --

Q      Okay.

A      -- with a rubber stop and it is labeled and put in a

secure area in the -- down in the autopsy room.

Q      And was blood retrieved from body of David Eales?

A      Yes.

Q      And who maintained that blood?  And was there another item besides blood that was actually retrieved from -- not from the exterior but the interior of the body

A      Yes, the muscle.

Q      And what was done with the muscle?

A      The muscle was put in a plastic container, sealed, and labeled and put in a secure area in the autopsy room.

Q      Okay.  And as to all of the clothing, the fingernails, head hair or scalp hair, pubic hair, and the muscle and blood, were those items given to a law enforcement agency and, if so, which one?

A      Yes.

Q      Who?

A      OSBI.

Q      Do you recall who it was -- who gave it to an agent from the OSBI?

A      I gave it to John Huntington.

Q      Okay.  Go ahead and return those and turn to Government's Exhibit 111.  On the transmittal sheet --

        MR. LITTLEFIELD:  If we could display it now...

Q      -- on the front page, the initial items that are listed, what are those?

A      Uh...

Q      The breast plate, utility belt, boots, et cetera, whose writing is that?

A      That is mine.

Q      Okay.  The items below the clothing, you mentioned the pubic and scalp hair and the fingernails, whose writing is that?

A      That is mine.

Q      Okay.  Now, if we could go to the second page, you mentioned the tube of blood and the muscle.  Are those --

A      Yes.

Q      And the fragment that you identified in Government's Exhibit 129, are those revealed on there?

A      Yes.

Q      Now, if we look down at the bottom, do you recognize where it says witness?

A      Yes.

Q      And whose signature is that?

A      That is mine.

Q      Okay.  And additionally on the right, there is a signature -- and I'm -- it looks like to me John J. Huntington, OSBI.  Did you see that written on there?

A      I did see him write that.

Q      Okay.  Who writes that on there?

A      Mr. Huntington.

Q      And when does he write that on there?

A      It was on the 27th, is when he picked it up.  And when he comes to pick it up, he signs it.

Q      Okay.  And I note up there on the top where it says date, it says what date?

A      The 27th, 9-27.

Q      When is that date attached, when do you put that date up there?

A      That part is filled out with the time -- with the date and the time when he comes to retrieve the evidence and I turn it over to him.  After he signs it, I put the date and the time.

Q      Okay.

            MR. LITTLEFIELD:  May I have a second, Your Honor?

            THE COURT:  You may.

BY MR. LITTLEFIELD:

Q      When these items are given to you, the scalp hair, pubic hair, and fingernails that were placed in the envelope, and the tubes of blood, are those left open?

A      No.

Q      What happens to them?

A      At that time I seal them and identify them, label them, and I sign that after it's sealed.

Q      Okay.  And in regards to the tubes of blood and the

tube that contained the muscles --

A      Uh-huh.

Q      Who seals those?

A      I seal those as well.

Q      Okay.  Where are they kept between the time of the autopsy until they are turned over to the OSBI?

A      There is a room in the autopsy area where evidence is kept and there is a refrigerator because those two items would have to be refrigerated.

Q      It wouldn't be necessary to refrigerate the clothing or the nails or the hair samples?

A      No.

Q      But the blood sample and the muscle sample were refrigerated?

A      Yes.

Q      And that is a secure item?

A      Yes.

Q      Were those the items still sealed and secured and untampered with when they were delivered to the OSBI?

A      Yes.

          MR. LITTLEFIELD:  Pass the witness.

          THE COURT:  You may cross examine.

          MR. SMITH:  Thank you.

                    CROSS EXAMINATION

BY MR. SMITH:

Q    Ms. Mann, good morning.

A    Good morning.

Q    Who do you work for currently?

A    I work for EMSA, which is Emergency Medical Services Authority in Tulsa.

Q    Okay.  And how long had you for the M.E.'s office prior to September of '99?

A    I started there in October of '97.

Q    Okay.  And when did you leave there, ma'am?

A    March of 2000.

Q    And during that period of time, how many autopsies do you think you participated in?

A    I would roughly say well over 200.

Q    Okay.  You -- how many others were similarly situated like you within the M.E.'s office in Tulsa?

A    When I was there, there were three investigators and one chief investigator.

Q    Okay.  And you are considered an investigator?

A    Yes, at that time in '99, I was an investigator.

Q    So you would divide your duties up, just kind of split the cases up and that's how you would do your workload?

A    We had a schedule, a rotating schedule, and if you were on call when a case came in, that's...

Q    Okay.  You have testified previously in this matter.

A      Yes.

Q      Is that correct?

A      Yes.

Q      And do you have independent recollection of this particular case?

A      Yes.

Q      And is that because of your previous testimony?

A      No.

Q      Okay.  Can you tell us what it is?

A      Actually because it happened on my birthday and I just happened to remember it because of -- I guess because it was law enforcement involved and those kind of things stick in your head.

Q      Okay.  So this case kind of stands out?  I mean, y'all are a state agency?

A      Yes.

Q      And you are a state employee?

A      Yes.

Q      And this involved another state employee?

A      Yes.

Q      So, there are some factors about that that make this a little different than just your normal routine autopsy?

A      Yes.

Q      Okay.  And then also looking at the records helps familiarize yourself with the particular case; is that

correct?

A     Yes.

Q     Okay.  Whenever we talk about projectiles and evidence and things like that, with this independent recollection do you think you can say, yeah, that is absolutely it or that seems to make sense with what I have written down here and based on what I can recall?

A     It makes sense with what I have written down here.

Q     Okay.  How long have you been doing your EMSA duties, ma'am?

A     About 18 months now.

Q     Okay.  And is that like a paramedic or --

A     Yes.

Q     Did you have to have some additional training than what you had in the M.E.'s office?

A     No, I was a paramedic when I went to the M.E.'s office already.

Q     So you have had experience with that beforehand and afterwards; is that right?

A     Yes.

Q     Okay.  Can you tell me, were you there when the body was received at the Office of the Medical Examiner?

A     I was not there.  I was not in the office personally.

Q     Okay.  In your role as working with an ambulance service, have you ever been run out of an ambulance by law

enforcement, said leave, we want to do something to this patient in the back of this ambulance like take their clothes off or something like that?

A     No.

Q     Would you do that, would you leave or would you feel like that was your role?

A     No.

Q     Your place to be?

A     No, I would stay because otherwise I would be -- I have to turn them over to somebody who has the same medical experience.  That would be negligent for me to leave.

Q     Yes, ma'am.  Thank you, ma'am, for being here.

MR. SMITH:  Pass the witness, Judge.

MR. LITTLEFIELD:  I have no redirect.  I would ask that she be allowed to be excused.

THE COURT:  May this witness be excused?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.  You may be excused.

THE COURT:  Call your next witness.

MR. LITTLEFIELD:  John Huntington.

JOHN HUNTINGTON, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q      State your name for the record, please, sir.

A      My name is John J. Huntington.

Q      Mr. Huntington, how are you employed?

A      I'm currently employed with the Oklahoma State Bureau of Investigation.

Q      In what capacity, sir?

A      I'm currently a deputy inspector out of Oklahoma City, Oklahoma.

Q      Mr. Hamilton, did you have occasion to -- I'm sorry. I have said Hamilton too many times in this trial.

Did you have occasion to assist in the investigation of the homicide involving Trooper Rocky Eales?

A      Yes, sir.

Q      Okay.  Let me ask as a part of that, was one of things you did was retrieve items from the Office of the Medical Examiner from the -- from David Eales for the purpose of whatever analysis was going to be performed?

A      Yes, sir.

Q      When you did so --

MR. LITTLEFIELD:  And I would ask that he be provided with Government's Exhibit 205, please.

BY MR. LITTLEFIELD:

Q      When you did so did you have to sign a transmittal sheet identifying items that you received from the Office of the Medical Examiner, sir?

A     Yes, sir.

Q     Okay.

MR. LITTLEFIELD:  And if we could display this and show the signature on -- I think it's the second page -- whichever page, down at the bottom.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q     Do you recognize your signature as it is displayed on the screen, sir, and in the document you have in front of you?

A     Yes, sir.

Q     Is that, in fact, your signature?

A     Yes, sir, it's printed out by name, but it's my signature.

Q     Okay.  And when was it that you signed or put your name there on that document?

A     September 27th, 1999.

Q     And what would have been the process -- what were you doing at the Office of the Chief Medical Examiner on the 27th of September, '99?  Why were you there?

A     I was collecting evidence following an autopsy that was going to be -- basically I was going to transfer it to the lab.

Q     Do you see the items that are listed on the page -- and let's talk about what is displayed on the screen that

the jury is looking at. If you would look to your left or up here either one, whichever you choose...did you receive all of those items?

A    Yes, sir.

Q    Okay. If we look at the next page, do you see those items listed on that page as well?

A    Yes, sir.

Q    And did you receive all of those items?

A    Yes, sir.

Q    Okay.

MR. LITTLEFIELD: I would ask that Government's Exhibit Number 129 be provided to the witness.

THE COURT: You may.

BY MR. LITTLEFIELD:

Q    Sir, you have an envelope. Do you recognize that envelope?

A    Yes, sir.

Q    And how do you recognize it?

A    This is an evidence envelope with the OSBI, in particular, where I filled out the writings. It's my writing where I'm basically submitting this to the laboratory.

Q    Okay. Would you look at the contents of it? It's open at the top where the blue tape is. Do you recall those or do you recognize those items, sir?

A     Yes, sir.

Q     And how do you recognize those items?

A     These items are what I received from the Medical Examiner's office in Tulsa, Oklahoma, on September 27th, 1999.  The way I recognize this is, for one thing, I have my date, OSBI, and my initials located on both particular pieces of evidence.

Q     When you got these two envelopes, what did you put them in for submission to the OSBI lab?

A     I placed them, sir, into another envelope.

Q     And that's the envelope that you've identified your writing on?

A     Yes, sir.

Q     Okay.

          MR. LITTLEFIELD:  Judge, I would move admission now of Government's Exhibit Number 129 and it's contents.

          THE COURT:  Any objection?

          MR. SMITH:  Your Honor, same objection.  The person receiving it, what they have done with it I think is certainly relevant to the chain of custody.  He has taken it from the M.E.'s Office and now he has got it and he says he transmitted it to somebody on the other end of that.

          MR. LITTLEFIELD:  Judge, that goes to the weight, not the admissibility.  There is a presumption that once

it gets to the OSBI lab, it's going to be handled appropriately within the lab.  And that's to the weight of the evidence, it is not a matter for the admissibility of the evidence.

THE COURT:  Do you have any cross examination or any inquiry before I rule?

MR. SMITH:  Just briefly, Your Honor.

VOIR DIRE EXAMINATION

BY MR. SMITH:

Q     Mr. Huntington, all of the records that you have as it relates to the transmitting of those items, are they included on the envelope?

A     There would have been a submittal letter or a submittal to the laboratory, so the answer to your question would be no, sir.

Q     Okay.  Sir, there are other things that may tell us what happened or what did not happen with those particular items; is that correct?

A     That would be beyond the scope of me answering that, sir.

Q     You don't have those items with you, is what I'm getting at.

A     No, sir.

Q     And so -- can I look at that envelope?

MR. SMITH:  Can I approach, Your Honor?

THE COURT:   You may.

BY MR. SMITH:

Q      Sir, by examining the larger envelope, the only other thing I see there, other than you receiving it, is that writing at the very bottom, the small writing.  Can you read that for us?  What does that say?

A      Yes, sir, I can read it and --

Q      What does that say, sir?

A      Received at T.R.L.C.D. Curtis, 9-30-99.

Q      What does that mean?

A      That would be internally a laboratory function. I'm not sure what that means.  You would have to ask the person that did that.

Q      Okay.  So nothing on that envelope indicates that anybody particularly received it from you.  There is that notation at the bottom, but you don't know what that means; is that correct?

A      Not in accordance with that particular thing. However, I did provide that to the laboratory on that date, the 28th of September.

Q      But there is nothing on that -- me looking at that envelope wanting to know what Agent Huntington did and who received it and where it went, is there anything on there that tells me that?

A      There is a back stamp located -- that says received,

but that's another laboratory service.  So the answer to your question is not at this time on this.

Q     Thank you, sir.

MR. SMITH:  It doesn't change my objection, Your Honor.

THE COURT:  Any further argument?

MR. LITTLEFIELD:  The issue, Judge, in regards to that is whether or not other individuals within the laboratory handled it.  There may be ten, eleven or twelve individuals within the lab handling.  There is a presumption as to the appropriateness once it is within the custody of the agents within the lab itself.  There is an -- there is an evidence recipient and several people that may be involved, but again, that goes to the weight, not the --

THE COURT:  Is there one official person in the lab who received it?

MR. LITTLEFIELD:  I'm --

THE COURT:  I mean, did somebody log it in the lab?

MR. LITTLEFIELD:  I haven't asked that question yet.

DIRECT EXAMINATION CONT'D

BY MR. LITTLEFIELD:

Q     When you take that into the lab, what is done with

it once it gets to the lab?

A       When I submit evidence to the laboratory, there is another representative on the other side representing the lab receiving that evidence on the 28th of September.

Q       Okay.  And you were going to say something and I interrupted.

A       And in most cases that would be a Krista Rhodes or a representative that would be receiving that evidence and then her job would be to make sure it gets to the appropriate laboratory studies or analysis.

Q       Okay.  And is that done with every piece of evidence that comes into the laboratory?

A       Yes, sir.

Q       Okay.  And is that part of the administerial function within the lab?

A       Yes, sir.  There would be supplement documents of any kind of analysis or things done to the evidence, whether anything is done to it or something has been done, but there would be supplemental reporting as to the analysis of that evidence.

Q       Okay.  Essentially what you are talking about is a records clerk that receives it from you?

A       Yes, sir.

Q       Okay.  And you took that and turn it over to the records clerk at the lab?

A      Yes, sir.

Q      Which lab?

A      The one located in Tahlequah, Oklahoma, the OSBI laboratory there.

Q      Okay.  Look at -- and I would ask -- go ahead and reinsert that.  I would ask that -- go ahead and put those two envelopes back and give them back to the clerk.

        MR. LITTLEFIELD:  If we could again display Government's Exhibit Number 205?

BY MR. LITTLEFIELD:

Q      We have got it up there.  I see that you have got a tube of blood and D.N.A. muscle.  Do you recall receiving those on the 27th?

A      Yes, sir.

Q      If we go to the previous page, we have scalp hair, pubic hair, fingernails, right and left fingernails. Did you receive those as well?

A      Yes, sir.

        MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 111 be provided to the witness.

BY MR. LITTLEFIELD:

Q      Do you recognize that, sir?

A      Yes, sir.

Q      And what is that?

A      This is an envelope which I put the vial of blood,

scalp hair samples, pubic hair samples, and right and left fingernail clippings into an envelope that I received from the Medical Examiner's office.

Q    Okay.  And is that, in fact, the envelope that you received from the Medical Examiner's office, sir?

A    I did not receive this envelope.

Q    Okay.  But that you inserted those items in.  I'm sorry.

A    I would have to look inside to verify that?

Q    Okay.  Go ahead.  Is that the envelope that you inserted the -- the yellowish envelope, is that the envelope in which -- in which you inserted scalp hair, pubic hair, fingernails and the blood sample?

A    Yes, sir.

Q    And who filled out that envelope, sir?

A    I did, sir.

Q    Do you recognize your writing?

A    Yes, sir.

Q    Okay.  And all of those items went in to that envelope?

A    Yes, sir.

Q    Okay.  And what did you do with that envelope?

A    After filling out that envelope, I provided it to the Tahlequah laboratory on September 28th.

Q    Okay.  Reinsert, if you would, those items and

return that to the clerk.  You also received, I think, some items of clothing that are listed.

A     Yes, sir.

Q     Okay.  Would you look at Government's Exhibit Numbers 115, 116, 117, 118, and 119?  Do you recognize those items, sir?

A     Yes, sir.

Q     What are those items?

A     Those are items or they are display items -- basically evidence I collected from the Medical Examiner's Office and in all but one case were the items -- the sacks themselves were received from the Medical Examiner's office, with the last thing being a large sack where all of those items were placed into and taken to the laboratory.

Q     Okay.  Are those the items that you received on the list that were from the person of David Eales?

A     Yes, sir.

Q     Okay.  And you took those to what lab?

A     I took them to the Tahlequah laboratory.

Q     Okay.  Government's Exhibit 129, which had the two small envelopes, and Government's Exhibit Number 111, which had the four envelopes, the nails, the hair, a blood sample, were those sealed when you transported those?

A      Yes, sir.

MR. LITTLEFIELD:  Again, I renew my -- or my request for admission of Exhibits 111 and 129.

MR. SMITH:  Your Honor, yes, sir, I still object. I don't think anything has changed in regards to those.

THE COURT:  I'll take 129 and 111 under advisement.

We will take the noon recess now.  Remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you.

If everyone will please remain seated for a noon recess, I'll ask you to be back at 1:15.

(JURY OUT)

THE COURT:  Does counsel for the government have any objection to Mr. Huntington being excused?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defense?

MR. SMITH:  No, Your Honor.  Well, are you talking about --

MR. LITTLEFIELD:  I don't know that there has been any cross.

THE COURT:  Well, I didn't know whether you were going to cross or not.  I thought you were not.  I just --

MR. SMITH:  Well, no, for purposes of what we just went through, I don't have.  There are some other

areas that Mr. Huntington was involved with and I assume the government is going to bring him back for those items. If not, we should have him under subpoena and we would ask him not be released from that.

MR. LITTLEFIELD: Are you talking about interviewing Toby Barrett?

MR. HILFIGER: No. I'm talking about the projectiles.

MR. LITTLEFIELD: No, I'm not going to bring him back for those. Other people were there when it was seized and would talk about it being seized.

MR. SMITH: So Your Honor, we would just subject him to recall. We have got him under subpoena. If he will make arrangements with my office, we will notify him.

THE COURT: Is it my understanding you do not wish to cross examine him?

MR. SMITH: In reference to what Mr. Littlefield asked, I have nothing else to ask about that, Judge.

THE COURT: Mr. Huntington, you are excused from this session. However, you should remain available because you are under subpoena.

THE WITNESS: Thank you, sir.

THE COURT: You may step down.

Anything to take up outside the hearing of the jury

on behalf of the government at this time?

MR. LITTLEFIELD:  Not at this time, Judge.

THE COURT:  Defense?

MR. SMITH:  No, sir.

THE COURT:  We will be in recess.

(LUNCH RECESS)

COURT IN SESSION

THE COURT:  Let the record reflect counsel for the government is present, the defendant is present with counsel.  It's my understanding counsel for the government wishes to address the Court.

MR. LITTLEFIELD:  Yes, Your Honor.  Your Honor, may it please the Court, I am somewhat concerned in regards to the issue -- on the custody of governmental exhibits, and specifically what arose with Mr. Huntington. His testimony was that these items have been -- were submitted by him at the OSBI lab.

THE COURT:  They were submitted to him and he released them to the lab?

MR. LITTLEFIELD:  Yeah, he turned them into the lab.  And, judge, my -- and here is my concern.  It is the law in the Tenth Circuit that in that regard, it is unnecessary for us to prove the entire chain, that once it is in the custody of public officials, that it is, in fact, presumed to be untampered with.  And I cite for

the Court, United States versus Gay, it's a Tenth Circuit case, 774 F.2d 368, in which it was stated, "Absent some showing by the defendant that the exhibits have been tampered with, it will not be presumed that the investigators who had custody of them would do so.  We have upwards -- well, in excess of 100 exhibits here. Some of the items will be just for the purpose of the items themselves that were found by investigators, although they were later submitted to the lab.  Other items that were submitted to the lab and may have undergone several tests, which will constitute, to do a perfect chain, the calling of multiple individuals within the OSBI.  There is nothing that has been shown that would indicate that once these exhibits have been turned over to the lab that there has been any tampering with, any modification of those items, or any change of those item.  There has been nothing presented by the defense that would create the impression that the governmental officials who are responsible for maintaining and analyzing these exhibits would have done anything to have tampered with them or changed the integrity of them if they are coming in as just an exhibit.  I'm concerned as to how far we need to go in attempting to establish chains with these particular items.  I mean, certainly as to the exhibits that were offered, those items were taken

to the lab and submitted.  They are in the hands of the public officials.  There has been no reason to believe that the integrity of those exhibits --

THE COURT:  You are you are talking about 129 and 111.

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Okay.  Well, the only -- let me just inquire.  Of course, in the role of the Court, I'm not privy to what you are going to do with Exhibits 111 and 129.  I'll look at the case and I don't know what step -- what next step -- normally, if these would be -- the person from the lab would come and say I received this envelope and I removed the contents and I did some test and came to this conclusion and I put it back in and it has been left in the vault until whenever.

MR. LITTLEFIELD:  And that will happen in that regard.  My concern is that -- for example, on 129, which is the fragments that were removed from Mr. Eales' body, I don't want to be caught in a position of bringing the individual who will be responsible for doing the ballistics analysis on those items here and then at that point have him ready to testify and find out because I didn't bring in Krista Rhodes, who received those items, and then the person who maintained them in Tahlequah and then the person who transported it from Tahlequah to

Oklahoma City and turned it into the Oklahoma City lab and then I don't have the individual in the Oklahoma City lab who received those items and transported them back to the vault and then I don't have the individual who brought it from the vault to Terrance Higgs and Terrance Higgs then says I tested... because I won't have that chain.  It's not my anticipation that having entered it into the confines of the Oklahoma State Bureau of Investigation laboratory system that when Terrance Higgs his prepared to testify that he should be able to testify as to that item.  And it may well be that those two items are premature right now, but I'm kind of looking in the future because of the context of the objection in saying, hey, do I need to try to bring in the other five people who, within their official capacity, were responsible for this exhibit, even though they did no analysis on it?

THE COURT:  Let me hear what counsel has to say.

MR. SMITH:  Your Honor, I think your right on point when you say there has been no submittal sheet from the lab that received these items.  As I stressed the importance of this particular bit of evidence, specifically Exhibit Number 129, we have got to see that. Within the laboratory system from one guy that is testing and writes the report and then it goes to another, it's easy to follow that, but at this point we have got

somebody with an envelope that says, yeah, I turned that into the lab. It's not marked on the envelope, there is no submittal sheet and I do think it's a little premature for Mr. Littlefield to introduce that. We are not trying to belabor the point, we just have to see that.

THE COURT: Well, I will look at the case and I assume counsel for the defense will do the same. We have this recess of a few days, so if -- if the government would submit maybe it's only case -- I'm not asking you to file a brief. If you want to just cite that case and say that's it, that's fine, but anything else you want to file, file by the close of business on the Tuesday. I'll ask the defense to respond by the close of business on Wednesday.

MR. LITTLEFIELD: Yeah, there are multiple -- that's not the only case. I just pulled down one.

THE COURT: Well, if you want to outline what your -- what you anticipate your procedure with those exhibits are as to how they are to be used, and I'll give the defendant an opportunity to respond, then that will give me -- if you will do that by close of business on Wednesday, then I will have a chance to look at it before we start back.

MR. SMITH: And, Your Honor, we are willing to go meet with them next week and to go through that, if

we need to also.

THE COURT:  I think that was -- I was hoping that was obvious, but if --

MR. LITTLEFIELD:  And, Your Honor, that was done.  I showed them all of the exhibits.

THE COURT:  Well, apparently -- let me just say, apparently he is not satisfied.  So, I would think that it would serve you both well to spend some of these hours that we are going to be in recess trying to work through that.  And then, of course, the Court would like for you to leave me with whatever it is you haven't agreed to and brief it and have it to me by the close of business on Wednesday.

MR. LITTLEFIELD:  Can we have one extra day? We are not --

THE COURT:  Wednesday.

MR. LITTLEFIELD:  Okay.

THE COURT:  And Thursday.

MR. LITTLEFIELD:  In that regard, I am going to take one witness out of order.  I spoke with Mr. Smith in that regard.  I don't think there is an objection to the nature or the weight of the testimony, and it does relate to one of those items, but we are not going to use that as identification.  We are going to have her describe it.

THE COURT:  Okay.  Are those two exhibits 129

and 111?

MR. LITTLEFIELD:  Yes, and it's one of items that came from Government's Exhibit 111.

THE COURT:  She is going to describe it, but you are not attempting to --

MR. LITTLEFIELD:  I'm not going to introduce the exhibit.  It's the blood.  There was a blood stain made.  She did DNA analysis on the blood stain and will talk about it, but we will not actually offer it.

THE COURT:  Anything else before I bring the jury in?

(NO RESPONSE)

THE COURT:  It's my intention, so both of you know for planning purposes, to stop at 4:30 today.

MR. LITTLEFIELD:  If one of the latter witnesses should be extremely lengthy and if we are pushing -- if we get close to four and haven't called her, I would hate to break her up for a week and a half.  If that might be possible, if we get to --

THE COURT:  If I let you off at 4:30, then you start wanting off at four.

MR. LITTLEFIELD:  No, no, I possibly see Vicki Lyons testifying toward the later end and she is going to take several hours.

THE COURT:  No, I don't -- unless you have got

a 30 minute witness you want to put in there, but I think that's an appropriate request.

Okay.  Let's bring the jury in.

THE COURT:  Exhibits 203, 204, and 202 will be admitted without objection.

MR. SMITH:  What were the numbers, Judge?

THE COURT:  202, 203 and 204.

MR. SMITH:  Yeah, we don't have any objection.

(JURY IN)

THE COURT:  Let me see counsel at the bench for just a moment.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

THE COURT:  Exhibits 202, 203 and 204 we have talked about displaying to the jury.  I'm going to read this instruction on Mr. Horn.  I don't know if you want to do that at this time before you start.

MR. SPERLING:  We would be happy to.

THE COURT:  Or do you want to wait until some other time?

MR. SPERLING:  I suppose there is not going to be another opportunity.  Will you give them the instruction?

THE COURT:  Yes, I will read it.  You both have a copy of the instruction?

MR. SMITH:  Yes, sir.

MR. SPERLING:  Are you going to at least acknowledge 202, 203 and 204 are in front of the jury?

THE COURT:  Oh, am I going to?  I will.

MR. SPERLING:  Okay.

THE COURT:  Whenever you bring them up, I'll just say they have been admitted without objection.

(END OF BENCH CONFERENCE)

THE COURT:  Let the record reflect the jury is in box, the government is present with counsel, the defendant and his counsel are present.

Members of the jury, if you will listen, I'm going to give an instruction.  I started to say a special instruction.  It's not special, it's just -- it's just a --

(PAUSE)

THE COURT:  Not a special instruction, but just an instruction in regard to some testimony you have heard from Mr. Horn.  So if you would listen to this interim instruction:  Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial.  As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law.  As a matter of law, I have

determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial.  You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case.  Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

And I'll ask that the clerk mark this instruction as Court Exhibit 1.

The government may call your next witness.

MR. LITTLEFIELD:  Joann Kihega.

JOANN KIHEGA, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     State your name for the record, please, ma'am.

A     Joann Kihega, K-I-H-E-G-A.

Q     And Kihega, how are you employed?

A     I'm employed with the Oklahoma State Bureau of Investigation or the OSBI.

Q     Okay.  And in what capacity do you work for the OSBI?

A     I am the DNA technical manager in the discipline of forensic biology serology, and DNA analysis.

Q      How long have you -- and you are located at which laboratory?

A      The Central Regional Laboratory in Oklahoma City.

Q      How long have you been employed by the OSBI?

A      Ten and a half years.

Q      Okay.  And how long have you been the manager of the serology and DNA portion of the laboratory or the OSBI itself?

A      I have been the technical manager since 2001.

Q      Prior to becoming employed by the OSBI, what area of education did you have to prepare you for your responsibilities with that agency?

A      I have a Bachelor of Science in chemistry from Cameron University in Lawton and I have a Master of Science from the University of Oklahoma in chemistry as well.

Q      And when did you receive your Master of Science from the University of Oklahoma?

A      December, 1994.

Q      As you were going to the University of Oklahoma and received your Masters, did you have any kind of fellowship or assistantship or anything such as that in in that regard?

A      Yes, I did.

Q      Could you explain to the jury what -- what

assistance you got or what you had in that regard as far as during the time you were getting your Masters?

A    Well, the first year of my Masters I was with a teaching assistant, graduate teaching assistant.  I taught general chemistry, laboratory recitation class.  After that first year, I received a fellowship that is called the Patricia Roberts Harris research fellowship and it's given to graduate students to do their research and they pay their tuition, books and give you a stipend.

Q    Are there any kind of qualifications required to receive the Patricia Roberts Harris fellowship?

A    You know, I can't recall right now, it's been awhile.

Q    Okay.  Have you had any other teaching experiences in the area of chemistry?

A    Yes, I have.

Q    What are those?

A    I have been an organic chemistry adjunct instructor at the -- at Oklahoma City Community College.

Q    Okay.  For what period of time?

A    That was in the spring of 1995.

Q    Until...

A    Just one semester.

Q    Okay.  Is that the only teaching or instruction you have done after -- before going to the OSBI?

A    Or outside the OSBI?

Q       Yes.

A       Yes.

Q       Okay.  And when was it you became employed by OSBI?

A       March 1st, 1995.

Q       Immediately out of your -- after receiving the Masters?

A       Yes, during some additional Ph.D work I was doing.

Q       What training have you had -- and you're here in regards to your expertise to the extent you have any in DNA?

A       Yes, sir.

Q       What training have you had in performing DNA analysis?

A       Well, according to federal standards called the Quality Assurance Standards for Forensic DNA Testing Laboratories, a DNA analyst has to have a minimum of a Bachelor of Science degree in chemistry, physics, biology or a forensic science related field.  You also must have four classes, which include (inaudible) biology, biochemistry, genetics, and statistics.  So I have had those classes, plus my Master's degree, and I have ha extensive in-house training with the OSBI in serology, which includes blood and semen identification, as well DNA analysis, and I began DNA analysis in 1997, I believe.

Q       Okay.  So you have been doing that for upwards of

eight years?

A     That's correct.

Q     Okay.  Have you previously been qualified as an expert witness in the area of doing forensic DNA analysis?

A     Yes, I have.

Q     And where and in what different jurisdictions?

A     Several different district courts in the state of Oklahoma, but I can't really recall right off what they were.

Q     Have you been qualified in any federal courts?

A     I testified once in federal court, but I can't remember if I was qualified as an expert witness.

          MR. LITTLEFIELD:  Your Honor, I would ask that based upon her experience, her background, and her training that Ms. Kihega be qualified as an expert witness in the area of DNA forensic analysis.

          THE COURT:  Counsel.

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  That will be the order of the Court. No objection from the defense.

BY MR. LITTLEFIELD:

Q     Explain to the jury what DNA analysis is.  What is DNA?

A     DNA stands for deoxribonucleic acide and it's located in the nucleus of a cell and it contains genetic

information that makes us humans and individuals as well. You get half of your DNA from your mother and half of your DNA from your father.

Q      How unique is an individual's personal DNA?

A      With the exception of identical twins, everyone's DNA is different.

Q      And how are you able to test and determine from various items what -- what is the DNA inside those items?

A      Everybody's body fluids, the blood, semen, saliva, plucked hairs, anything -- any cells that contain a nucleus all contain DNA, everybody's DNA, and any of those samples is the same throughout the body.  We are able to take samples from criminal investigations and take any blood stains or hairs that we find and isolate the DNA present in those stains or hairs or whatever and determine a DNA profile from those stains.

Q      And how do you go about obtaining the DNA profile? What's the means of testing, what's the procedure that you utilize with the equipment?

A      What we utilize is a reaction.  It's called prelim (inaudible) chain reaction or PCR.  What it does is it takes the DNA present in a sample and makes numerous copies of it, almost like a photocopier.  It copies the DNA over and over again.  It doesn't change the sequence or anything, it just makes enough DNA so that we are able

to type it.  Once we have that reaction complete, we put that sample into an instrument called a genetic analyzer and that genetic analyzer runs through some programs developed specifically for the forensic science community and develops a DNA profile which is a set of numbers that we can compare from sample to sample to sample to the known reference samples.

Q    Are there different types of analysis that can be done or different types of DNA tests that can be done? An I -- and I have seen that some are more specific, some give a greater indication of identity than others.

A    Uh-huh.

Q    What are some of those?

A    Well, the state of the -- of DNA testing today utilizes what is called short tandem repeats.

Q    Okay.

A    That's STR testing, and that gives numbers in the quadrillions and quintillions, very, very high numbers. There is an older technique that also uses the chain reaction, which is called the reverse dot blot (sic) and those numbers aren't -- because we don't look at enough locations, the numbers are in the thousands. So that's not very discriminating or doesn't make it as -- you know, give us numbers that can tell us how common or rare a profile is.  There is another type of analysis

called R.F.L.P. or restriction fragment polymoriphism, and those numbers are easily in the millions.  So right now the state of DNA analysis is STRs, which we use at the OSBI.

Q       How long has the OSBI used the STR?

A       I believe we started in 1999.

Q       Okay.  Let me ask if you know why you are here today and the proceeding you are in here today?

A       Yes.

Q       Okay.  And did you have occasion to receive some known samples or some samples that were known to have come from the body of David Eales?

A       Yes, I did.

Q       Okay.  And what was the nature of the samples that you received for the purpose of performing DNA analysis on the known samples or the body fluids or whatever of David Eales?

A       I received a stain card that contained a stain of the known blood from David Eales.

Q       Okay.  And who was it that prepared the stain card from the known blood of David Eales and made that available to you for DNA analysis?

A       A criminalist that currently works in the Central Laboratory, but at that time worked in the Tahlequah lab, April Marcangeli.

Q      Okay.   And when you ran the analysis on the -- was there a laboratory number assigned -- let me back up. When an item comes into the laboratory, into the laboratory system of the OSBI, how is it that one item is distinguished from another and you are able to keep those items sorted out?

A      Every case that comes into the OSBI is given a unique case number.   Once we receive -- well, in this case, the -- can I refer to my case file?

THE COURT:   Yes, you may.

BY THE WITNESS:

A      This case was given the case number 99-11543.

Q      Does that number -- is that number within all labs? I mean, if part of the case goes to Tahlequah, part of it goes to McAlester, part of it goes to Durant, but it's about the -- it's all about this particular case, all of them will have that same case number?

A      That's correct.

Q      Okay.

A      And each item is given it's -- a unique item number starting with depending on where the location is.   In this case Tahlequah, so numbers are given -- it is T-1 for the first item, T-2 for the second item and so on.   If we have to collect a stain from T-1, let's say it's a pair of pants or something like that and we see a blood stain on it,

we will collect that blood stain only and we give that what we call a derivative number.  So that stain from those pants would be T-1-1 and T-1-2, et cetera.

Q    In this case was there a lab number assigned to the known sample of Mr. Eales' blood that was submitted to the Tahlequah laboratory?

A    Yes.

Q    And what was that lab number?

A    T-140-2.

Q    Okay.  And when you did the analysis on the stain card that was taken from that lab number, what number did that -- did that stain card have?

A    Okay.  I misspoke just a second ago.  The known blood sample --

Q    Yes, ma'am.

A    -- in the tube was T-140.

Q    Okay.

A    The stain prepared by April Marcangeli and transferred to me for DNA analysis was T-140-2.

Q    Okay.  And when you did your analysis did you prepare some document that shows the results of that analysis?

A    Yes, every analysis -- there is a report prepared for that.

Q    Okay.  And I would ask that what has been marked as Government's Exhibit Number 190 be displayed to the

witness.  And it's not in evidence.  You should be able to see it on the screen just to your left.  Do you have Government's Exhibit 190 in front of you, ma'am?

A    I don't have a screen yet.

Q    Is it displayed now?

A    Yes, it is.

Q    And do you recognize that, ma'am?

A    This is page 1 of the report that I prepared for my analysis results.

Q    And does that report contain the examination and the information stating that you did the examination on T-140 -- and I think it was 2?

A    Yes.

Q    And does that --

A    The current page just shows page 1.

Q    If we go to the next page --

A    That's the beginning of my results.

Q    Okay.  And on what page would your results be contained, ma'am?

A    On pages 2 through 4.

Q    Okay.  And if we look to page 4, do you see the -- what do we have on page 4?

A    Page 4 is a table that I prepared that contains the results from the DNA analysis.  In this case it's the profiles generated from the samples that I analyzed.

Q      And you did more than one DNA analysis in this case, did you not?

A      Yes.  I attempted DNA analysis on 15 items.

Q      Specifically though, we are asking about the analysis on the card that Ms. Marcangeli prepared that was taken from the known sample of Rocky Eales' blood. Is that contained on this page?

A      Yes, it is.

Q      Okay.  How would -- if we focus on that -- is it marked?

A      Yes.  There are 14 columns on this --

Q      But, I mean, is it designated by some means where if we look at it we can find which one is the analysis you did on the known sample?

A      Yes.

Q      And how is that identified?

A      By it's item number T-140-2 and then in parentheses it says Eales.

Q      And then how -- if one is trying to compare an unknown item of fluid -- for example, if a DNA analysis is performed and one tries to make a comparison to ascertain whether the unknown is Mr. Eales' DNA, how would they utilize this chart to compare the unknown sample to?  Is my question making sense to you?

A      I believe it does.

Q      Okay.

A      On my report you go horizontally across the table.

Q      Okay.

A      So T-140-2, which is the third sample from the bottom, is the DNA profile from Trooper Eales.

Q      Okay.  The known sample?

A      The known sample.  As you go across we look at 13 locations, plus a sex determining location, which is XX or XY, whether you are female or male.  So we look at that 13 and that entire horizontal row for DNA profile is the known blood stain of Trooper Eales.

Q      Okay.

A      When we are comparing it against a questioned sample, I go and look at each location and say does this 14/15 match the known sample of 14/15.  If it does, then I continue on to the next column and I say does this 13/14 match this 13/14.  So you go all of the way across the columns and if the numbers are identical, then it's a match.  If any one number is different, then it's an exclusion and it's not from the same source, much like your social security number.  If any one number is different in your social security number, then it's not yours any more.  So that's kind of how you can relate it to a DNA profile.

Q      And these items that you reference as locations,

what are those?

A      They are just 13 different locations on the chromosomes.  They are called a locus or a location.

Q      Okay.  And do we need to take a class in organic chemistry to understand all of that?

A      No, no, you don't.

Q      Okay.  In other words, if we put up an unknown and a known and there is like 13 different columns that have numbers in them and if they match all of the way across, then we know that that unknown sample is of -- matches and is of the same person or matches the same person?

A      The two DNA profiles match and they are identical.

Q      Okay.  And then the odds -- depending upon which test is done --

A      The probabilities are calculated according to a data base containing how frequent a specific number occurs in the population.

Q      And you mentioned the STRs method, I think you said, gave the greatest odds of match or the greatest --

A      Probabilities.

Q      And does this test that you performed on the known sample that you received from the card by Ms. Marcangeli, did that utilize the STR method?

A      Yes, it did.

Q      Okay.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

(PAUSE)

BY MR. LITTLEFIELD:

Q     Would it be possible -- once you get this profile of the known sample of -- that was taken from T-140-2, is that then kept in your records, that profile that you lay across with the 13 or 14 columns?

A     Our case files are considered a record and it's kept in the case file.

Q     Okay.  And if -- do you recall when it was that you did that analysis to lay out the profile of Trooper Eales' known sample of blood?

A     I can give you my report date.

Q     Okay.

A     May 9th, 2000.

Q     And if four or five years later it is determined to test an unknown sample against -- and compare the results against that known sample, is there any problem with testing an unknown four or five years later?

A     No, there is not.

Q     So if in 2005 an unknown sample was given for a DNA analysis and compared to that, if it matched, then you have got the probabilities of which you were speaking, that is

a match?

A      That is correct.

Q      Okay.  Is it necessary that the same person who did the known sample also do the unknown sample?

A      No, it is not.

Q      Okay.  Are the test procedures the same to set out those columns for both the unknown and known samples?

A      The test procedures are developed -- we develop those procedures based upon the FBI's procedures.  The procedures are the same in blood cases.

Q      Okay.  So, when you -- you don't -- when you are setting up the DNA profile, you don't do anything differently in determining that profile between an unknown and a known?

A      Well, it's different if it's of a sexual assault type case, the extraction method is different, but that's the only thing that is different, everything else is the same.

Q      As far as running the analysis itself, the analysis is performed in the same fashion?

A      That's correct.

Q      Okay.

          MR. LITTLEFIELD:  May I have just a second?

          THE COURT:  You may.

                              (PAUSE)

MR. LITTLEFIELD:  Pass the witness.

CROSS EXAMINATION

BY MR. SMITH:

Q      Good afternoon, ma'am.

A      Good afternoon.

Q      As it relates to the analysis that you used, can you tell us how these machines work?  You just plug a card in there and then it reads it and spits out these numbers or --

A      What we do is ones we have done the chain reaction, we take a small part of that and put it in another tube. This tube is then placed on the instrument and is injected into a very small device called a capillary and once it's injected, it goes through the instrument and admits a wave length and that wave length is changed into data by a specific program that was developed by the forensic science community and then once that is analyzed by that program, then we put it into a second program, which develops the gene type or the DNA profile.

Q      Is there an error rate associated with these tests?

A      As long as we run positive controls, negative controls, and everything works out properly, there is no error rate that I'm aware of.

Q      And you have a lab protocol that indicates when you need to run your controls?

A      Yes.  We are an accredited laboratory and we are required to have protocols.

Q      How long have you been accredited?

A      Since 2001, I believe, because we are just coming up for accreditation in 2006.  You have to be reaccredited every five years.

Q      For doing the S.T.R. testing?

A      The entire laboratory system.  DNA analysis is different.  We have to be audited every year and every other year by an external agency.

Q      Have there ever been any deficiencies in the office while you have been there as it relates to DNA testing?

A      There have been some minor findings.

Q      And what were those, ma'am?

A      More administrative type findings, nothing technical in nature, maybe a conflict in the protocols where, you know, you might be labeling one way at one time and another time something different.  So, it's nothing that effects the quality of our results or else our laboratory would have to cease operation.

Q      No criticism of the testing that was actually done?

A      No.

Q      Okay.  And when I look at what is marked Page 4 of 4, that table that we were talking about -- and it may still be displayed.

A     Yes.

Q     As we read across those 14 columns that you've identified, do those numbers have to match exactly for you to say that you have a match?  In other words, let's take the first column.  You have identified T-140-2, third one from the bottom, correct?

A     Yes, that's correct.

Q     If we take the first column, you have got two numbers in there, 15/17.

A     That's correct.

Q     Now, whenever we are going to look at a match for that, that first column, is there any variance?  Can it be a 14/16 or 15/18, or does it have to be a 15/17?

A     To be a match, yes.

Q     Does it have to match identically with each one of those 14 columns all of the way across your chart?

A     All of the way across has to be identical.

Q     And if one of them is off by a digit, then we have got a problem?

A     If one is off, that would be very rare because you would have a 12 locus match, so we would do some investigation into that.  If any one number is different, it's an exclusion.

          MR. SMITH:  I don't believe I have any more questions, Your Honor.

THE COURT:  Any further direct?

MR. LITTLEFIELD:  Just briefly.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    You were a accredited in 2001.  This was performed -- your analysis was performed in 2000?

A    That's correct.

Q    Were you following the same protocols in 2000 that were applicable in 2001, when you were accredited?

A    Yes.

Q    So, was there any difference in the method or procedures followed when you did the test as opposed to afterwards when you became accredited?

A    The methods are the same.  The protocols may have changed with minor changes, as far as grammatical or maybe labeling or any of the discrepancies they may find. Every year our protocol changes just a little bit more just to clarify something a little bit more.

Q    Is that normally administrative type stuff or does that change the nature of the test and how it's done?

A    Normally it's administrative.

Q    You talked about being audited yearly in regards to DNA, the DNA section of the lab.  Were you being audited prior to the the accreditation in 2001?

A    Yes.

Q      So, the DNA lab was being audited even prior to your accreditation?

A      Yes, that's correct.

Q      And when they audit, do they point to deficiencies -- if you all were running the test improperly, would the audit advise you of that?

A      Yes.

Q      Did you receive any information from your audits for the year 2000 that indicated that you were doing anything improper in regards to the performance of the DNA analysis?

A      Again, I would say every lab -- every DNA laboratory across the country has some minor findings, unless they have something really major, majorly wrong with their analysis.  Again, we have probably had finding on every single audit, but they have been minor, administrative or something like that.

Q      Do they undermine the test results that were done?

A      No, they do not.

Q      Okay.  Were any findings issued in the 2000 audit that undermine the test results on the known sample of Trooper Eales' blood?

A      No, no.

Q      Okay.

            MR. LITTLEFIELD:  Pass the witness.

            MR. SMITH:  I don't have any more questions,

Your Honor.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Ma'am, thank you for your testimony. You may step down.  You may be excused.

THE COURT:  You may call your next witness.

MR. LITTLEFIELD:  I'm going to call Stanley Philpot.

STANLEY PHILPOT, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     State your name for the record, please, sir.

A     Stan Philpot.

Q     And Mr. Philpot, how are you employed?

A     I'm a park ranger for the Oklahoma Department of Tourism and Recreation.

Q     And is there any particular park --

A     Brushy Lake State Bark.

Q     Where is Brushy Lake State Park located, sir?

A     Eight miles south of Sallisaw.

Q     Were you working on September the 23rd, 1999, sir?

A     Yes.

Q     And do you recall the hours you would have worked on

that date, sir?

A      Four to midnight.

Q      Did you work straight -- and you need to lean forward just a little bit.  The acoustics in this courtroom are not real good.  Unless you speak clearly into the microphone, you won't be amplified.

A      Okay.

Q      You are coming through well now.

Did you work straight up to the midnight hour on the 23rd?

A      I got off just a little bit early that night.

Q      Okay.  Do you know Johnny Philpot?

A      Yes, that's my brother.  He's the sheriff.

Q      Okay.  Was he the sheriff of Sequoyah County in September of 1999?

A      Yes.

Q      Is he still the sheriff of Sequoyah County?

A      Yes.

Q      After you got off as a park ranger -- well, is that the only job you do as far as a park ranger or do you have any other law enforcement connected functions?

A      I'm a reserve deputy for for Sequoyah County.

Q      And what does a reserve deputy do, sir?

A      Law enforcement duties, just like a normal deputy.

Q      I'm sorry?

A    Just like a normal deputy would do.

Q    If you are a reserve deputy, do you work full-time or what?

A    Just part-time.

Q    Is it always scheduled or is it kind of like being on call and subject to your availability or what?

A    Just when necessary, when they need me, yes.

Q    After you got off work at Brushy State Park on September the 23rd of that year, where did you go?

A    I stopped by the Sallisaw Police Department.

Q    For what purpose?

A    To drink coffee, shoot the bull.

Q    Did you know anything was going on that night before you got over there?

A    Not before I got there, no.

Q    When you got to the police department, I think you said, in the city of Sallisaw, did you learn that there was an operation that was about to take place?

A    Yes, sir.

Q    What did you learn was about to take place?

A    A search warrant was going to be severed at Kenny Barrett's residence.

Q    And what, if anything, were you asked to do in regards to the service of that search warrant?

A    I was recruited by an assistant district attorney,

Robbie Cowen, to go assist with that execution.

Q      And did you, in fact, go to assist with the execution?

A      Yes, sir, I did.

Q      Who did you ride with?

A      I rode with my brother, Gary Philpot.

Q      And Gary Philpot at the time was what?

A      He was the chief of police of Sallisaw.

Q      And where did you and your brother go?

A      We first went to the intersection of I-40 and Dwight Mission Road.

Q      And were you the only local law enforcement officers that went to that location?

A      No, there were several of them.

Q      I'm sorry.  We couldn't hear you.  Try again.

A      No, there were several of them.

Q      Okay.  What happened when you got there?

A      At Interstate 40 and Dwight Mission?

Q      Yes.

A      We waited for the O.H.P. Tactical Team.

Q      And how long?  Can you approximate how long it was before they --

A      About ten minutes.

Q      When they -- when the tactical item arrived, what happened at that point?

A      The director of the tactical team came and told us what they were going to do.  They wanted us to give them two minutes and they would go in and serve the paper that they had to serve and then we would go in as the back-up team and set up the perimeter.

Q      And did the group of local law enforcement officers, in fact, give the tactical team a two minute head start?

A      Yes, sir.

Q      Who was leading the local law enforcement officers? Do you recall who was in the first vehicle?

A      I believe it was Alan Loyd and Clint Johnson.  They were investigators for the district attorneys's office.

Q      And did you know whose warrant it was that was actually being served, who served the warrant?

A      It was a District Attorney's Task Force.

Q      Okay.  Between the time you left Dwight Mission Road and until you arrived -- it was Dwight Mission and I-40?

A      Yes.

Q      -- and you arrived at Kenny Barrett's residence, did something happen to slow you down?

A      We got caught by a train there at Key.

Q      At where?

A      Key.

Q      Okay.  And what community did Mr. Barrett live in?

A      It's just a rural area, it's not really -- I don't

think it's a community.

Q      Speak up.

Q      It's between Key and, you know -- kind of the Key area.

Q      Okay.

Q      After the train passed on -- do you know how long you were held up by it?

A      It was a short train, we wasn't held up too long.

Q      Okay.  After the train got on down the tracks and y'all were able to cross and go on, where did the local law enforcement officers go?

A      We tried to catch back up with the O.H.P. Tactical Team.

Q      Okay.  Did y'all get to Kenny Barrett's place?

A      Yes.

Q      When you got there, what was happening?

A      Everything was over when we got there.  It was a little pandemonium.  We had pulled up and stopped and an officer came out told us not to block the road that they had two shot and they were coming out.

Q      And did the individuals from the local law enforcement, in fact, maintain a lane down that county road to allow the officers to evacuate those who had been injured?

A      Yes, we did.

Q       Did vehicles leave?

A       Two vehicles left.

Q       Were you able to see into the yard?

A       Yes.

Q       Were there any emergency lights on any vehicles in the yard when you arrived?

A       There was an O.H.P. marked unit with a light bar illuminated on the east side of the Barrett residence.

        MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 69 be displayed.

BY MR. LITTLEFIELD:

Q       Do you see Government's Exhibit 69?

A       Yes, sir.

Q       And you may be able to see it up here as well, but whichever one you can see best, you use.

A       All right.  I think this one here is best.

Q       Okay.  And the vehicle that you mentioned -- which way is east in that photo?  Do you know?  Do you know your directions out there?

A       The back side of the Barrett residence is north.

Q       Okay.  So east would be --

A       East would be to the left out there.

Q       Can you tap on -- would you take your finger and tap it on the screen -- can you tap the vehicle that had its overhead light bar on?

A    That one.  (COMPLIED)

Q    Okay.  And where was you all's vehicle located when you all came up?  Can you see it on the county road here or was it off to the west?

A    This photo here won't show it.  We are more back to the west where our vehicles were parked.

Q    Okay.  Where did -- did you all go into the yard area?

A    Yes.

Q    Who did you go into the yard area with?

A    I went by myself.

Q    Okay.  At the time you all arrived -- do you see this crime scene tape around here?

A    Yes, sir.

Q    Was that up?

A    No was not up yet.

Q    Did you see Kenny Barrett when you arrived out there?

A    Yes.

Q    And do you know Kenny Barrett?  Can you identify him?

A    Yeah, that's him right there.

Q    What color shirt is he wearing today?

A    Blue checkered shirt.

       MR. LITTLEFIELD:  I would ask the record to reflect that the witness has identified the defendant.

       THE COURT:  The record will so reflect.

BY MR. LITTLEFIELD:

Q      Did you see Kenny Barrett out there when you arrived?

A      Shortly after I arrived, yes.

Q      And where at the residence was he located when you saw Mr. Kenny Barrett?

A      He was lying on the east side of his residence approximately right in there, lying on the ground.

          MR. SPERLING:  And I would ask that Government's Exhibit Number 192 be displayed.

          THE COURT:  You may.

BY MR. LITTLEFIELD:

Q      Can you see in this photograph the area where Kenny Barrett was lying on the ground?

A      Just by the corner of the porch right behind this blue pickup.

Q      Can you tap that area where it was?

A      Just inside that -- well, it's a little bit further over, just inside the yellow tape.

Q      Okay.  When you say inside -- would it be -- I have got the pointer, look where I have got the pointer.  Would it be in that area there?

A      Just inside that tape line behind that blue pickup, yes.

Q      Okay.  Who had custody of him at that time?

A     Sheriff Philpot was standing there with him.

Q     And did you see anything happen in regards to Mr. Barrett while Sheriff Philpot was watching him?

A     Oh, off the top of my head, Johnny pulled a vial or a prescription bottle out of his pocket, opened it and it had a plastic bag in it.  He put the lid back on it and put it back in his pocket.

Q     And you observed when the sheriff reached and pulled it out of the pocket?

A     Yes.

Q     And then it was returned into that same pocket?

A     Same pocket, yes.

Q     What was Mr. Barrett wearing, do you recall?

A     He was wearing several things.  He was wearing, I believe, three shirts, a pair of jeans, sweatpants, and briefs, if I'm not mistaken.

Q     Did he have anything on his feet, if you recall?

A     He had boots.

Q     Did you know on that night whether or not Mr. Barrett had been injured?

A     After I walked up, yes.

Q     And what was the nature of his injuries, sir?

A     He was shot.

Q     Where?

A     Once around the waist band and once in the lower

leg, I think.  I'm not sure.

Q     Was any medical attention called for Mr. Barrett?

A     Yes.

Q     What medical attention came for Mr. Barrett?

A     Muldrow E.M.S.

Q     I'm sorry?

A     Muldrow E.M.S. came to pick him up.

Q     How was Mr. Barrett transported to receive medical attention?

A     By ambulance.

Q     All right.  Who rode in the ambulance with Mr. Barrett when he was transported to wherever he was transported?

A     Myself, Sheriff Philpot, and an ambulance attendant.

Q     Who called for the ambulance from Muldrow?

A     Sheriff Philpot did.

Q     As you were riding in the ambulance, what, if anything, happened in regards to the clothing that Mr. Barrett was wearing?

A     I took his clothing in the ambulance.  When we arrived at the hospital, I obtained a red biohazard bag in the hospital and bagged them and held them for the OSBI --

Q     I'm sorry, I couldn't understand the last part of that.  You bagged it and what?

A       And held it for the OSBI investigation team.

Q       Okay.  When you say you got the clothing, are you talking all of the shirts and the --

A       Everything but his briefs.

Q       Including the boots?

A       Including the boots.

Q       Describe what you bagged it in.

A       A red biohazard bag.

Q       And where did you receive the red biohazard bag?

A       From the emergency room at the hospital.

Q       Do you know who you gave it to with the OSBI?

A       I can't recall her name.

Q       You said her.  Was it a female?

A       Yes.

Q       In regards to the plastic pill bottle that you saw Sheriff Philpot remove and then return to the pocket of Mr. Barrett's pants, was that ever removed from his pants, sir, after it was reinserted by Sheriff Philpot?

A       Not after that, no.

Q       Were you present with Mr. Barrett from the time that Mr. Philpot reinserted that plastic pill bottle and the bag inside of the pill bottle back into the pocket?  Were you with Mr. Barrett from that point in time until you retrieved his clothing in the ambulance?

A       Yes.

Q       Where was the OSBI -- do you remember where the OSBI -- the female from the OSBI to whom you gave that red biohazard bag, do you recall where the transfer was, whether it was at the hospital or back at Mr. Barrett's residence or where?

A       It was at the scene right before you get -- there's Barrett's driveway, the county road turns back north. We were keeping everybody out right there at that intersection.  When she drove up and identified herself, I gave it to her at that time.

Q       Okay.  So, it would have been on west of here?

A       West of Mr. Barrett's residence, yes.

        MR. LITTLEFIELD:  I would ask that Government's 185 be displayed.

BY MR. LITTLEFIELD:

Q       Where was it -- do you recognize what you are looking at in the aerial view you are looking at, sir?

A       Yeah, parts of it, yes.

Q       Do you see Barrett's residence on there?

A       I'm not for sure.

Q       If you aren't sure, that's fine.

A       I think it's right here, but we were here at this intersection.

Q       Which intersection?  Tap it.

A       This one.  (INDICATED)

Q      Okay.   Let me show you Defendant's Exhibit 103.   It may better show it.   Do you recognize it from that perspective, sir?

A      Yes, this is the intersection right here.

Q      Okay.   And that's the location, approximately there, when you were guarding it that you gave the red biohazard bag --

A      Yes.   She drove in from the west to the road where we were stationed right here.

Q      Okay.

MR. LITTLEFIELD:   May I have just a second, Your Honor?

THE COURT:   You may.

BY MR. LITTLEFIELD:

Q      By the way, as a reserve deputy, is that a paid employee or is that a voluntary deal or what?

A      Voluntary.

Q      How much do you get paid?

A      None.

MR. LITTLEFIELD:   Pass the witness.

CROSS EXAMINATION

BY MR. HILFIGER:

Q      Mr. Philpot, do you recall about the time that you took off work -- about what time that was on 9-23?

A      It was just before midnight.

Q       And you left from the area of, what eight miles north of Sallisaw?

A       Yes, sir.

Q       And then you went into Sallisaw?

A       Yeah.

Q       And where did you go in Sallisaw?

A       To the police department.

Q       And when you got to the Police Department at Sallisaw, who all was there?

A       Oh, there were several people there.  Chief Philpot was there, Robbie Cowen was there, the sheriff showed up later, one of the deputies, Kelly Karnes was there, and I beleive Officer Jeff Murrey.

Q       Was there some discussion going on about something was going to be happening that night?

A       The discussion had already happened.  Robbie Cowen came up and asked me if I wanted to go -- that they were going to serve the paper and asked me if I wanted to go.

Q       Other then a reserve deputy with the sheriff's department -- you are not on the task force or anything like that; is that right?

A       No.

Q       And were you dressed as you are now in your uniform for the state parks?

A       Yes, sir.

Q      And were you -- what was Robbie Cowen wanting you to do?  What was the purpose in you going?

A      I guess the more the better.

Q      Okay.  He never told you a specific duty for yourself?

A      No.

Q      Who is Robbie Cowen?

A      He was an assistant district attorney for Sequoyah County.

Q      Did he tell you why he was going in or did you question that?

A      I didn't question it.

Q      Were there others -- at the police department, were there other -- was Lynn Anderson there?

A      I believe so, yes.

Q      Did he go also?

A      I think so.

Q      And what's his position?

A      He was an assistant district attorney.

Q      Were there other attorneys there that went at the police department?

A      Not at the police department.

Q      How many cars went from the police department, that group from the police department?

A      I believe there were five of us, five vehicles.

Q      Five vehicles?

A      Uh-huh.

Q      And how many people?

A      Roughly, I don't know, about six, I think.

Q      And --

A      Six or eight.

Q      When you left the police department, were you aware of what particular mission you were going to be going on?

A      I don't understand your question.

Q      Well, did somebody say come with us and you went or did they say come with us and we are going to serve a search warrant or did they say come with us we are going to serve a search warrant at Kenny Barrett's?  How much detail did you get?

A      The detail I got, Mr. Cowen told me that they were going to serve a paper at the Barrett residence and asked me if I wanted to go.

Q      Didn't tell you what it was?

A      Didn't say what it was.

Q      Did they say it was a tact team search or that group -- or was that group going to search?

A      The tactical team was going to serve it.

Q      You were informed that the tact team was going to be doing it?

A      Yes.

Q       So when you left the Police Department, you were aware that it was going to be at Kenny Barrett's house?

A       Yes.

Q       When you got to Dwight Mission Road, in addition to your five or six people or -- you said five cars, six people, right?

A       Somewhere around there.

Q       In addition to the five cars and six people, were there others from the Sequoyah County Cherokee County area?

A       The district attorney, Delena Goss, and the Cherokee County Sheriff -- Diane Barker-Harrold was the district attorney and Delena Goss was the Cherokee County Sheriff at that time.  They met us at I-40 and Dwight Mission Road.

Q       Were Clint Johnson and Alan Loyd in the group from police department or were they in the group that you met out there?

A       I believe they were from the police department.  We were all together there.

Q       As I understand it, do you know about what your -- what car you were in the second group that went out there, do you know what line?  You weren't the first car, were you?

A       No, I wasn't the first car.  I was either the third

or the fifth car.  I can't remember.

Q      And by the time you got there, did you hear any --
had you heard any gunshots?

A      No.

Q      Now, who called the ambulance, do you know?

A      Sheriff Philpot did.

Q      And Muldrow is on the south side or east side of
Sallisaw; is that right?

A      It's 11 miles east of Sallisaw.

Q      And you -- was there a reason that they called for
the Muldrow ambulance rather than the one out of
Sallisaw?

A      Both Sallisaw ambulances were busy.  They were
in Fort Smith delivering patients.

Q      Okay.  And as I understand it, you say when you got
there, you had -- you made room for two cars to leave, one
of them --

A      Well, the whole unit moved over to one side so we
could keep one lane open to get the injured out.

Q      And did I understand you to say those two cars left?

A      Yes.

Q      Were they -- did they leave one right after another
or -- was it pretty close together or did one leave and
then a little bit of time and then another one left?

A      One left and then just a few minute later the other

one left.

Q    Look at Number 69 -- number 92.  How long -- 192, you can see it on your screen.  How long were you there -- were you there when the tape was put up?

A    The tape wasn't there until I got back.  We left with Kenny -- when the ambulance arrived, we left with him and I guess the team set that up.  The tape was up when we got back.

Q    How long were you there then before you left?  You got there -- you met around twelve -- a little before 12:30 at Dwight Mission, right?

A    Give or take.

Q    And then about how long did it take you to get from Dwight Mission to the property?

A    I don't know.  You are asking me to guess.  I can't.

Q    Five or ten minutes or 30 minutes or an hour?

A    It didn't take 30 minutes.  You are asking me to guess.

Q    I'm just trying to get some kind of range of time.

A    Five to eight minutes.

Q    Okay.  Do you have any idea how long you were there before you left?

A    It took quite a while to get the ambulance there, so I don't know how long we were there.

Q    And when you left they -- did they have any yellow

type up anyplace that you did recall?

A      Not that I recall.

Q      And the whole time -- Sheriff Philpot was already down there with Kenny Barrett by the time you got in?

A      Yes.

Q      Now, did he go -- did you see him go directly in --

A      No.

Q      Was he ahead of you in the car?

A      Yes.

Q      I mean, in the car line.

A      Yes.

Q      As I understand it, did you stay out here on this road a little bit to sort of direct traffic or get people --

A      Later on.

Q      Okay.  You went in first and then came back out and sort of directed -- got people to keep the lane open?

A      No, sir.

Q      Okay.

A      We opened the lane before we ever went in the yard.

Q      Okay.

A      So the injured could be took out.

Q      Okay.  So the lane was open before you even got into the yard?

A      Right.

Q      Now, was anybody else up here in this area with Kenny Barrett, other than Sheriff Philpot?

A      Sir, there were people all over the yard.  I don't know -- I don't know what you want me to say.

Q      Well, was anybody else standing around Kenny Barrett besides Sheriff Philpot?

A      Sheriff Philpot was there and Kelly Karnes walked up and he left, he walked off.

Q      Okay.  And you say people were all around.  Were they all around in this area or just --

A      Well, you have got several O.H.P. troopers.  They are all in the yard.  Then you have the secondary units just trying to secure the scene, so you have several people.

Q      Okay.  Was -- did anybody appear to be in charge of securing the scene?

A      I didn't pay any attention.

Q      When you got -- when you came up, did you -- how did you get to the back of this pickup?

A      I walked through the gate.

Q      The gate is down here, right?

A      Yes, sir.

Q      When you came across here, did you walk -- did you walk behind this car to come over here, did you walk through the yard, how did you --

A      I walked up through the middle of the yard.

Q      Walked through the middle of the yard?

A      Right.

Q      When you got here, can you recall whether that white Bronco was in that position or in any other position?

A      Sir, I don't recall.

Q      By the time you came in this yard in this area here and came inside the gate, can you recall whether both of the cars had already gone at that time?  You said two cars left.

A      When I went back into the yard, one car had left.

Q      Okay.

A      And they were preparing to leave with the other one.

Q      Okay.  And where did the second car leave from?  Was it in the yard or --

A      Just inside the gate and in the --

Q      Right in here some place?

A      Right at the edge of the yard.

Q      Okay.  When you were over here at this pickup where Sheriff Philpot was, you know behind the pickup, Kenny Barrett was on the ground?

A      Yes.

Q      And his hands were cuffed behind him?

A      Yes.

Q      And what was Sheriff Philpot doing?

A       Standing there.

Q       Just standing next to him?

A       Yeah.

Q       At any time did you see Kenny Barrett get up and move around?

A       No, he just laid there.

Q       He just laid there?

A       Yeah.

Q       When the ambulance came -- were you there when the ambulance came?

A       Yeah.

Q       When the ambulance came, did it -- did it come down to this position?

A       No, it stayed on the road.

Q       It stayed on the road.

Q       How did Kenny Barrett get from this position out to the yard?

A       We put him on a gurney.

Q       Okay.  And you -- at that time -- from the time you came up to that pickup, did you pretty much stay at that pickup with Kenny Barrett and Sheriff Philpot?

A       I left one time and then went back.

Q       And you rode in -- you and Sheriff Philpot both rode in the ambulance with Kenny Barrett?

A       Yeah.

Q    And you went directly to the hospital?

A    Yes, Sallisaw Hospital, yes.

Q    Do you have any recollection of when you arrived at the hospital?

A    I didn't keep the time, no.

Q    How long -- approximately how long a distance is it from here -- you know, from Kenny Barrett's residence to the Sequoyah Hospital?

A    It's probably six, six and a half miles.

Q    Okay.  And that would be going on Interstate 40 or going down --

A    No, it would be 64.

Q    Highway 64?

A    Yes.

Q    Six and a half miles to get there?

A    Approximately, approximately it is.

Q    But you say it did take a little bit of time for the ambulance to get there?

A    Yes, it did.

Q    But you don't know how much time that was?

A    I don't know.  I would have to guess.  It was awhile.

Q    You didn't keep -- you didn't keep track of the time itself?

A    No.

Q      Now, do you in your job as a park ranger or in your job as a reserve officer -- do you ever take part in making stops of people and searching people?

A      Sure.

Q      And is it procedure when you search somebody and find something that you consider contraband, do you -- what do you do with it?

A      Just depends on the circumstances.  A lot of times we put it back in their pocket until we get to where we are taking them, the county jail or wherever, and then we do the inventory there at the jail.

Q      So, you are saying you don't normally just take it and keep the contraband and hold it?

A      After we get them in jail, yes, a lot of times.

Q      Were you able -- on this pill bottle were you able to -- did you look at the pill bottle, examine it or see what was in it or --

A      I just looked at it when Johnny took it out of his pocket.  I never touched it.

Q      Did Johnny hold it up for you?

A      He picked it up, held it up, saw a plastic bag, put the lid back on it and then put it back in his pocket.

MR. HILFIGER:  May I have just a second?

THE COURT:  You may.

(PAUSE)

BY MR. HILFIGER:

Q      During that time that you were out waiting for the ambulance with the sheriff, how many people would you estimate were inside what is now -- what is shown on here with the yellow tape?  I know the tape wasn't up there then, but I'm saying about how many people were in there, would you estimate?

A      I don't know.

Q      Did you see more than a couple?

A      There were more than a couple, sure.

Q      Did you see people going in and out of the house?

A      I didn't pay any attention to the house.  That wasn't my duty.

Q      You saw some in the yard though?

A      Yes.

Q      You don't have any way of telling how many you saw?

A      No, I would just have to guess.

       MR. HILFIGER:  I have no further questions.

       THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q      You were in either the third or the fifth vehicle?

A      One or the other.  I don't recall.

Q      Okay.  As you approached, how far were you from the house when you noticed the lights on the overhead bar?

A     When I first noticed them -- there is a hill about three quarters of a mile down the road and -- in front of Mr. Edgeman's house.  We topped that hill and you could see the light bar on the O.H.P. car illuminated, however far that is.

Q     From about three quarters of a mile --

A     Somewhere in there.

          MR. LITTLEFIELD:  Pass the witness.  No further questions.

          THE COURT:  May this witness be excused?

          MR. LITTLEFIELD:  Yes, Your Honor.

          THE COURT:  Does the defendant have any objection to this witness being excused?

          MR. HILFIGER:  No objection.

          THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.

     You may call your next witness.

          MR. LITTLEFIELD:  Johnny Philpot.

          <u>JOHNNY PHILPOT, PLAINTIFF'S WITNESS, SWORN</u>

                    <u>DIRECT EXAMINATION</u>

BY MR. LITTLEFIELD:

Q     State your name for the record.

A     Johnny Philpot.

Q     Mr. Philpot, how are you employed?

A     The sheriff of Sequoyah County.

Q      How long have you been the sheriff of Sequoyah County, sir?

A      I'm in my ninth year.

Q      Do you know Kenneth Eugene Barrett?

A      Yes.

Q      And is he present in the courtroom today?

A      Yes, he is.

Q      And can you identify him and point to him and tell us what he is wearing today, sir?

A      A blue checkered shirt.   (INDICATED)

MR. LITTLEFIELD:   I would ask the record reflect that the witness has identified the defendant, Your Honor.

THE COURT:   The record will so reflect.

BY MR. LITTLEFIELD:

Q      Sheriff Philpot, there has been reference to an incident in which Kenneth Barrett allowed officers to look at his firearms.   Are you familiar with that incident?

A      Yes, I am.

Q      And when did that happen?

A      It was in July, I think the 29th of 1998.

Q      '98?

A      Yes.

Q      Are you familiar with when the felony bench warrant was issued for Mr. Barrett's failure to appear, sir?

A      In January of 1999, I believe.

Q      Okay.

MR. LITTLEFIELD:  And I would ask that Government's Exhibit Number 87 be displayed, Your Honor.

THE COURT:  You may.

BY MR. LITTLEFIELD:

Q      And I think you can see it on the screen to your left.  You may need your glasses.  Do you see Government's Exhibit 87?

A      Yes, I do.

Q      Is that the felony bench warrant for failure to appear, sir?

A      Yes, sir, it is.

Q      Was that bench warrant in existence in July of '98, when officers went to Mr. Barrett's residence?

A      No, sir, it was not.

Q      Was there a search warrant for officers to search Mr. Barrett's property in July of 1998?

A      No, sir, there was not.

Q      Was the purpose of being out there with the officers in July of '98 to arrest Mr. Barrett?

A      No, it was not.

Q      Did you learn -- direct your attention to the service of the warrant during the early morning hours of January the 24th -- September, pardon me, the 24th, 1999.  When did you learn that that warrant was going to be served on

that night, sir?

A    It would have been on the 23rd.

Q    And how much prior to the actual service of the warrant -- when on the 23rd, approximately, did you learn it?

A    I don't specifically remember exactly the time of day.  It was some time during that day that I learned it was going to be executed later on that night.

Q    Do you recall who -- from whom you learned that the warrant was going to be issued late that night or early the next morning?

A    I think it was probably both the Task Force officers, Loyd and Johnson.

Q    Okay.  And you, as sheriff of Sequoyah County, did you have -- did you participate with the District Attorney's Drug Tack Force in activities that were taking place in Sequoyah County?

A    Yes, sir, we did when warrants were being executed by the D.A.'s office -- by Investigators Loyd and Johnson in Sequoyah County.

Q    How did the sheriff's office participate in the execution of those warrants?

A    We participated in all of them as they did with ours. We rode together on probably every one that was executed in Sequoyah County.  We worked together.

Q      And when your deputies participated, what did you do in that regard?

A      I always went along.

Q      Was there a meeting of the local law enforcement in preparation to going out for the service of this warrant?

A      Yes.

Q      And about what time did the local law enforcement officers get together, sir?

A      Around ten o'clock at night.  The ones I met with, around ten o'clock at night in my office.

Q      Okay.  And was the D.A.'s Task Force limited only to Sequoyah County, sir?

A      No.

Q      In that regard, what are the counties that were in that district attorney's district?

A      Sequoyah County, Cherokee County, Adair County, and Wagoner County.

Q      And was it uncommon for Cherokee County deputies to participate with Drug Task Force agents from the D.A.'s office and participate in search warrants in the Sequoyah County area?

A      It was not, no, it was not.

Q      Had Brian Swim assisted in the execution of search warrants in Sequoyah County prior to this date?

A      I believe he did.

Q     Okay.  And when a deputy from Cherokee County participated in warrants with the D.A.'s Drug Task Force, what was the practice of Delena Goss?

A     She would come also to those.

Q     And vice versa in Sequoyah County?

A     Yes, some of mine would go to Cherokee County at times.

Q     If your deputies were helping in Cherokee County, what would you do?

A     Sometimes I would go, sometimes I would not.

Q     Were you aware of whether or not the entry was going to be made by local law enforcement officers on to Kenny Barrett's property on this warrant?  Were you all going to make the initial entry into Barrett's property?

A     No, we were not.

Q     Who was?

A     The Highway Patrol Tactical Team.

Q     And why was that?

A     The task force officers believed it to be a high risk execution and they felt it would be better if the tactical team executed the warrant.

Q     Did you disagree with that?

A     Initially I did, yes.

Q     Did you change your mind?

A     Yes.

Q      Prior to the execution?

A      Yes.

Q      Where did the local officers meet the tactical team?

A      Junction of Interstate 40 and Dwight Mission Road.

Q      And was there a request made upon the local officers by the tactical team when you all met there at the road as far as when you should proceed?

A      Yes.

Q      What was the nature of that request?

A      They asked us to delay two minutes.

Q      And did that happen?

A      Yes.

Q      After y'all gave them the two minutes, who led the local law enforcement officers?

A      It would have been Task Force Officers Loyd and Johnson, they were the lead vehicles, followed by myself and the other officers behind me.

Q      Okay.  Do you have any idea how many local law enforcement officers were at the location?

A      I didn't have a whole lot back then.  Probably no more than five or six of mine.

Q      Okay. In total?

A      In total?  Probably ten, ten to twelve.

Q      Okay.  You say you were in the second car?

A      Yes.

Case 6:04-cr-00115-RAW   Document 336   Filed 05/18/06   Page 170 of 226

MR. LITTLEFIELD:  Would you show Government's Exhibit Number 184, please?

BY MR. LITTLEFIELD:

Q      And are you familiar with what is displayed in the aerial photograph of Government's Exhibit 184?

A      Yes.

Q      Can you tap Mr. Barrett's residence, put your finger on that screen and tap it where Kenneth Barrett's residence is?

A      It would be right there. (INDICATED)

Q      Okay.  The road in front of Mr. Barrett's residence, what kind of road is that, sir, gravel, paved or what?

A      It was a gravel road at the time.

Q      Okay.  And do you know if that continues as a thru-road or does it dead-end?

A      It's a dead-end road.

Q      Are you familiar with the individuals -- your an elected official of Sequoyah County, aren't you?

A      Yes.

Q      Do you try and know the voters?  You have got to run for election every four years.  Do you know who were the neighbors around there, sir?

A      I don't know them personally, but I know who most of them are.

Q      And what, if any, relationship do most of the

immediate neighbors of Kenny Barrett's have to Mr. Barrett?

A       Pretty much all are related in one way or another.

Q       Prior to -- do you see the intersection back to the west where the T.V. -- where apparently the T.V. vans are located, sir?

A       Yes.

Q       Prior to that, if you head on west, is that gravel or dirt?  I mean, gravel or paved.

A       Paved.

Q       Okay.  And where does it become a dirt road, sir?

A       Right there.

Q       At the brief section?

A       At the brief section.

Q       Okay.  Describe, as you got on to the dirt road, the visibility as you are approaching, as you are coming in two minutes later, two minutes later after the tactical team.  How visible was it?

A       After you --

Q       After you got on the gravel road, how clearly could you see?

A       There was a lot of vegetation along the fence row on the gravel road leading up to Barrett's residence.

Q       What about the air?

A       The air on that particular night it was -- there was

a lot of dust and what appeared to be smoke.

Q       When you topped the hill, what did you see as you were coming in and topping the hill approaching that residence from the west?

A       I noticed the dust and the smoke and immediately I noticed two taillights that appeared to be going in -- driving into the Barrett driveway.

Q       Okay.  And did you learn later that a vehicle had drove through the gate?

A       Yes.

Q       When you got into the area of the yard, did you notice whether or not any of the law enforcement vehicles had emergency lights on that were in the yard?

A       I noticed one black and white O.H.P. unit that had the light bar -- lights on flashing, yes.

        MR. LITTLEFIELD:  I would ask that Government's Exhibit 69 be displayed.

        THE COURT:  You may.

BY MR. LITTLEFIELD:

Q       And do you see the vehicle that had its light bar flashing, sir?

A       Yes.

Q       And could you tap it?

A       (COMPLIED)

Q       And describe how clear those lights were throughout

the yard when you got there?

A       This type of light bar is -- brightly illuminates the area around for a good ways.  It's red and blue.

Q       I'm sorry?

A       It illuminates for a good distance around the vehicle.

Q       Was there any problem with visibly seeing those lights from that vehicle in the yard?

A       No.

Q       There was a bench warrant for failure to appear for Kenny Barrett?

A       Yes.

Q       Who obtained -- who got custody of Mr. Barrett after your arrival?

A       I did shortly after my arrival.

Q       Okay.

A       The initial custody of him, but shortly after...

Q       When you got there, was he already in custody?

A       Yes.

Q       And where was he located?

        MR. LITTLEFIELD:  I'm going to ask that Government's Exhibit 192 be displayed.

        THE COURT:  You may.

BY MR. LITTLEFIELD:

Q       Can you see where Mr. Barrett was located and was

in custody when you arrived?

A     Yes.

Q     And can you tap that area, sir?

A     To the rear of the blue pickup, right in there.
(INDICATED)

Q     I'm sorry, you are not speaking into the microphone.
Okay.  Good ahead and tap again where it was.

A     Right in that area, maybe a little closer to the --
(INDICATED)

Q     To the blue pickup?

A     To the pickup, yes.

Q     And who had custody when you first arrived?

A     Deputy Kelly Karnes was standing there when I first
enter into the yard.

Q     Kelly Karnes?

A     Yes.

Q     And who -- you said deputy.  Whose law enforcement
agency was he?

A     Sequoyah County.

Q     And when you saw Mr. Barrett in the custody of
Mr. Karnes, what did you do?

A     I approached and Deputy Karnes cautioned me to watch
the windows, that the house had not been cleared yet and
that he didn't think that Barrett had been searched yet
and he said that another fellow deputy was around back by

himself and he asked if I would watch Mr. Barrett while he went back there with him.

Q      So you watched Mr. Barrett?

A      Yes.

Q      Did you ever pat Mr. Barrett down?

A      Yes.

Q      And what, if anything, did you find on Mr. Barrett's person when you patted him down?

A      In his rear pocket there was a prescription bottle.

Q      And how did you know that?

A      I took it out.

Q      Did you open it at that time?

A      I took the cap off and looked inside.

Q      What did it have in it, if anything?

A      A rolled up plastic baggie.

Q      After you observed the rolled up plastic baggie inside of the prescription bottle, what did you do with that prescription bottle?

A      I called it to the attention of another officer, an officer that was standing there, so they would see where it came from and I placed it back in his pocket.

Q      Did you seal it before you put it back in his pocket?

A      I put the cap back on, yes, sir.

Q      Do you recall what other officers were there?

A    There were, but who exactly it was, I don't.

Q    What was Mr. Barrett's condition in regards to injuries at this time?

A    During the pat down, I reached the lower -- the extremely lower portion of his body and I noticed blood on his trousers, pants leg, and I think in the hip area.

Q    Okay.  And what did you do to inquire as to whether any medical attention had been sought for Mr. Barrett?

A    I had already heard previous that ambulances had been called and I believe two, one for Rocky Eales and one for Buddy Hamilton, had been called.  They were both subsequently transported by by other vehicles.

Q    Did you find out why neither Rocky Eales nor Buddy Hamilton were transported by ambulance?

A    Because of the serious nature of Rocky Eales' wounds, they wanted to get him to a hospital quickly, so they loaded him in the back of a Bronco, O.H.P. Bronco, and left the scene and told the ambulance to meet them at the intersection of I-40 and Dwight Mission.

Q    How many ambulances were available in Sallisaw on a normal basis?

A    At that time I think there were two, but for some reason the second one never did make it to the residence and Buddy Hamilton was eventually, I think, transported by another officer.

Q     Did the ambulance -- did you ever experience concern that an ambulance had not arrived to transport Kenny Barrett?

A     Yes.

Q     And what did you find out in relation to the reason why an ambulance had not yet arrived to transport Kenny Barrett?

A     For some reason, the second ambulance was unavailable and they had -- and someone had called for Cherokee County to --

Q     Did that make sense to you?

A     No, it's too far away.

Q     What did you do then?

A     I had them to -- I had the dispatch -- instructed the dispatcher to send an ambulance from the Muldrow area.

Q     Is Muldrow closer than Cherokee County?

A     Oh, yes.

Q     And, in fact, did an ambulance arrive from Muldrow to transport Mr. Barrett?

A     Yes.

Q     In that regard, did you make an assessment, based upon the location and the amount of blood, as to how serious or life-threatening Mr. Barrett's wounds were?

A     There was very little blood at the time.  There was blood on his pants, but the wounds did not appear to be

bleeding at that time.

Q    Okay.  When the ambulance from Muldrow arrived, what was done with Mr. Barrett?

A    He was placed in the ambulance.

Q    And did the ambulance drive up in the yard or how did --

A    No, no, it stayed on the road.

Q    How did y'all get him to the ambulance?

A    I believe on -- I don't remember for sure.  I think a gurney from the rear of the ambulance, but I'm not real positive.

Q    Okay.  Did he go to the -- which medical facility was he transported to?

A    Sequoyah Memorial in Sallisaw.

Q    And who, if anyone, accompanied him as representatives of law enforcement?  At this time whose prisoner was he?

A    He was in the sheriff's department custody.

Q    Being in the sheriff's department custody, what law enforcement officers accompanied him to the hospital?

A    Myself and Stan Philpot.

Q    And Mr. Philpot was -- as a family, how are you related?

A    Brother.

Q    On a professional relationship, what was the

relationship?

A     Stan at the time was a state park ranger, still is, and at that time he was a reserve deputy sheriff.

Q     As a reserve deputy sheriff -- younger brother or --

A     Yes, sir.

Q     As a reserve deputy sheriff, from whom did your younger brother take orders?

A     Me, the older one.

Q     Was any direction given in regards to Mr. Barrett's clothing?

A     Yes.

Q     What was that?

A     To remove clothing and retain possession of them until they were delivered to the OSBI.

Q     And who removed the clothing?

A     Stan and I probably helped Stan.

Q     And where was -- where were you all -- where was Mr. Barrett when y'all took his clothing?

A     In the ambulance.

Q     And who kept custody of his clothing?

A     Stan did.

Q     Do you know if there was anything he maintained possession of those in, anything he kept them in before turning them over to the OSBI?

A    When we arrived at the hospital he obtained a biohazard bag because of the blood that was on the clothing.

Q    Was Mr. Barrett subsequently in custody in Sequoyah County?

A    Yes.

Q    At any time during this period of which he was in custody was a complaint lodged by Mr. Barrett in regards to the wounds he had received on September the 24th, '99?

A    Yes.

Q    With was the nature of the complaint?

A    Pain or a rash -- everything from a rash to constipation.

Q    Well, in regards to the wounds received and any of the bullet entries, was there a specific complaint?

A    One bullet was still -- had not been removed, it was still in Mr. Barrett's body.

Q    Okay.  What was done in regards to the removal of that bullet when Mr. Barrett complained?

A    We took him to the hospital and the bullet was removed.

Q    Who transported Mr. Barrett to the hospital for the purpose of removing the bullet?

A    I believe Kelly Karnes.

Q    Was Mr. Karnes still a deputy at the time?

A       At the time, yes.

Q       And when Mr. Karnes returned with Mr. Barrett from the hospital, did Mr. Karnes provide you any item in relation to the bullet that had been in Mr. Barrett's body?

A       Yes.

Q       What was it?

A       The bullet.

Q       And how was it contained or packaged?

A       In a clear plastic bottle that is commonly used at hospitals for that type of thing.

        MR. LITTLEFIELD:  I would ask that what has been marked as Government's Exhibit 120 be provided to the witness.  And Government's Exhibit 120 is a sack which contains an item.

BY MR. LITTLEFIELD:

Q       Would you examine the item?  And go ahead and hold it down where it's not displayed, sir.

A       Yeah.

Q       Do you recognize what that appears to be, sir?

A       It appears to be a bullet.

Q       Okay.  And is there a container in which that bullet is there?

A       Yes.

Q       And you indicated that there was a plastic bottle

or jar or whatever that the bullet was in when Deputy Karnes brought that back. What does that look like?

A    A clear plastic bottle.

Q    Okay. What did you do with that clear plastic bottle after you received it from Deputy Karnes, sir?

A    When Deputy Karnes arrived at my office with this bottle, I opened my desk drawer and had him deposit it and I closed it and locked it.

Q    Would you go ahead and reinsert that in the sack and return it to the clerk?

A    (COMPLIED)

Q    And who maintained control over that bottle in the locked drawer of the desk, sir?

A    I did.

Q    Whose desk was that?

A    My desk.

Q    Okay. Did anyone retrieve that bottle from you with another law enforcement agency?

A    Yes.

Q    And who?

A    It would have been Agent Ben Rosser with the Oklahoma State Bureau of Investigation.

Q    Okay.

         MR. LITTLEFIELD: May I have just a second, Your Honor?

THE COURT:  You may.

(PAUSE)

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examine.

CROSS EXAMINATION

BY MR. HILFIGER:

Q     Sheriff, as I understand it -- when did you first become aware that there was going to be a search warrant issued on Kenny Barrett?

A     Probably several days before execution.  I can't give you an exact date.

Q     Were you aware at all of discussions of getting the tactical team involved?

A     Yes.

Q     And as I understand it, you said you initially disagreed with the use of the tactical team?

A     Yes.

Q     Was that discussed before search warrant was issued or after the search warrant was issued?

A     I believe it was before.

Q     If the search warrant shows that it was issued on Monday, early in the morning on Monday, say like ten, nine o'clock, something like, would you have discussed it that morning?

A     I don't know.

Q      Who did you discuss it with, as far as talking about the use of the tact team?

A      The task force officers.

Q      And that would would be Clint Johnson and Alan Loyd?

A      Yes.

Q      And they -- you knew Kenny Barrett, didn't you?

A      Yes.

Q      You had had contact with Kenneth Barrett before, right?

A      Yes.

Q      In fact, some good and some bad?

A      Correct.

Q      You had been out to the house -- as you told Mr. Littlefield, you had been out to the house about a year before, a little over a year before, to look at -- to look at a rifle; isn't that right?

A      I responded to a call with other deputies, yes.

Q      When you went out there at that time, how did -- did you go right up to the house or how did you get -- how did you go about approaching Mr. Barrett's residence?

A      Yes.

Q      And is -- Number 69.  All of these cars weren't there, I know, but did you -- how did you get into his house or did you go up to his house?

A      Yes, I did.

Q      Okay.  Did you let him know you were coming ahead of time?

A      No.

Q      When you got there was the gate locked or unlocked?

A      It was open.

Q      It was open.  How did you come in?  Did you come in the regular gate area right here?

A      Yes.

Q      You didn't come around here, did you?

A      No.

Q      Do you recognize that as an extranceway to the house?

A      Not at that time, no.

Q      And when you came in the gate area, you came up -- where did you come up in there, into the parking lot some place?

A      I just about in the area of that white vehicle right there.

Q      Okay.  And were there other police cars there or were there other cars there besides yours that came out with you or just --

A      Yes, there was probably two other deputies that arrived prior to me.

Q      Okay.  And where was Kenny Barrett?

A      In the house.

Q      Did he come out?

A      No.

Q      Did you go in the house?

A      I went on the porch.

Q      You went on the porch of the house.  Did you look at the -- did you get an opportunity to look at a rifle?

A      I saw more than one rifle, I believe, in the yard. The deputies were looking at those.

Q      Okay.  And was the purpose to see if that rifle was an automatic rifle or not?

A      I believe that was the initial report, that there was automatic gunfire, what people believed was automatic gunfire from Barrett's residence.

Q      And do you recall the particular rifles that you looked at -- was one of them a Colt Sporter?

A      No, not that I --

Q      You can recall what it was?

A      I didn't personally inspect the rifle, the deputies were doing that.  I asked where Kenny was and went directly to the front porch.

Q      Did you talk to Kenny?

A      Yes.

Q      Did did he give you any problems at that time?

A      He was a little bit agitated or upset about even being there, I suppose.

Q    About people being out there?

A    But we had conversation, yes.

Q    As a result of that, what did you do?

A    I more or less talked to him about shooting firearms in the area in the neighborhood.  We were getting complaints about it and I asked him more or less to exercise a little common sense and be a neighbor and I also advised him of a misdemeanor warrant that was outstanding.

Q    For another matter?

A    Yes.

Q    But you didn't -- did you a arrest him on the misdemeanor warrant?

A    No.

Q    Did he -- was it something he later turned himself in on?

A    He asked if he could -- if he would be allowed, that he would turn himself in and I agreed.

Q    So you left without effecting an arrest or anything like that?

A    Yes.

Q    Now, you were shown this bench warrant, number 87. Are you familiar with the operation of how they put out bench warrants in Sequoyah County?

A    Other than being issued by the court clerk's

office, no.

Q       Okay.  When the court clerk issues them out, do you get a copy of them or something?

A       Yes.

Q       This shows January 28th, 1999, right up here?

A       Yes.

Q       Once it is issued, what does that mean, that the court clerk has done something with it?

A       It is issued, I would say, and...

Q       But then does some copy of it or the original of it go to your office?

A       I goes to the dispatch office, yes.

Q       The dispatch office is a part of the sheriff's office?

A       Yes.

Q       Okay.  And would it go to your -- to the dispatch office sometime around January 28th, 1999?

A       Sometime thereafter, not particularly that day, huh-uh.

Q       Within a few days or a week or --

A       Yeah.

Q       So this bench warrant, which this is an open and active bench warrant, was in your office since some time in the latter part of January of 1999?

A       Yes.

Q     You may not have been personally aware of it?

A     Correct.

Q     Is that right?

A     Correct.

Q     When were you personally aware that there was a bench warrant out?

A     I couldn't really say.  I don't remember.

Q     But that was -- I mean, there was nothing hidden about that bench warrant by the court clerk's office, it was just something that was open right there in your office and it was there?

A     Not to my knowledge, it wasn't hidden, no.

Q     And it was available to anybody in your office to have -- could have effected that bench warrant from the time it was issued go out and pick up Kenny Barrett?

A     Yes.

Q     It just wasn't done?

A     No.

Q     Until September 24th?

A     Right.

Q     When you got to the -- got to the area shown in Government's 192, did you drive your car into this area or did you leave your car out on the road?

A     It was left on the road.

Q     Now, were you in a sheriff's vehicle?

A      I was in my personal vehicle.

Q      You were in a personal car?

A      I drove my personal vehicle.

Q      Did you have anybody else with you?

A      No.

Q      When you came in -- where did you go when you came in the gate?

A      I stopped just east of the Barrett driveway on the left side of the road.

Q      Okay.  Somewhere just off this picture here?

A      Yes.

Q      And did you go into the yard area, walk into the yard area?

A      Not immediately.

Q      What did you do first?

A      I walked to the fence.

Q      As I understood it, you said something about going over by the fence.  You said something about that there was a lot of vegetation in that area?

A      Yes, weeds had grown up in the fence, weeds and that type of thing.

Q      All right.  Up and down through here?

A      Yeah.

Q      How high was that vegetation, do you recall?

A      It depends, some of it was high, some of it wasn't.

Q     Was it the type of vegetation you could see through and see what was going on up in the -- you know, in this area up here or did it pretty much block your view?

A     You could see.

Q     Where did you go when you first got in the yard area here, inside the gate, inside the fence area, where did you go?

A     Inside the --

Q     Right --

A     To the rear of the blue pickup sitting on the east side of the residence.

Q     And what direction was that blue pickup?  I mean, did somebody tell you that, you know, we have got a person over here or how did you just happen to go to that blue pickup?

A     I didn't want to go into the house.  It was definitely a crime scene and the situation changed when the shooting happened, so the search was not going to happen immediately, the drug search was not going to happen immediately.

Q     Okay.  But did anybody direct you over to the pickup or did you just happen -- that's just where you happened to go?

A     That's where I saw one of my officers, so that's where I went.

Q      Is that Kelly Karnes?

A      Yeah.

Q      Okay.  Now, when you got there did you see whether or not this yellow crime scene tape was up?

A      It was not up at that time, no.

Q      When you got there do you know whether this -- whether this car was in this position?

A      No, it was not.

Q      And you went over behind that pickup.  At that time what was the status of Kenny Barrett, as far as what his location was?  Was he standing, down, was he cuffed, how was he cuffed, if he was?

A      He was lying on his stomach with cuffs behind him.

Q      And Kelly Karnes more or less had custody of him at that time?

A      Yes.

Q      And then you took control?

A      Yes.

Q      After you took control, were you -- were you by yourself when you did the search of him?

A      No, there were other officers around.  I think Stan was there during part of the time and there were other officers coming and going.  There were a lot of people doing a lot of different things at that particular time.

Q      Did you see -- how many people did you see people

around in this area, you know, officers or tact team members or officers with your team?

A       By that time I think everyone had pretty much gotten away from the area because it was going to be a crime scene.  It was a crime scene and they didn't want to disturb any areas.

Q       Did anybody appear to be in charge?

A       Well, like I said, there were a lot of people doing a lot of different things at that point.

Q       You, as a sheriff of Sequoyah County, didn't feel that you were going to be in charge or you didn't -- or did you try to take control of anything?

A       I directed my officers and O.H.P. directed their officers.

Q       What did you direct your officers to do?

A       We sent some down to the intersection to patrol the traffic that may be coming down that way.  I sent some further down to intercept to show other people how to get to the scene, ambulances, OSBI agents later on, things of that nature.

Q       Did you direct any of your officers to do anything in this area or did you feel like somebody was in control of that area?

A       I don't recall directing them to do anything specifically in that area, no.  As I recall, we pretty

much were staying clear of that area.

Q      How long were you there with Kenny Barrett before the ambulance came?

A      It's hard to say.  I was back and forth.  I was back and forth to my vehicle or other vehicles for radio communications or -- at that time I kept my cell phone in my vehicles so I would go to it to make a call or try the radio.

Q      Okay.  So you would leave that area, go out to the road, come back to that area.  When you would go back and forth like that, did you leave somebody in charge?

A      Yes, there was always someone with him.

Q      Do you know who was in charge?

A      It was different ones at different times.

Q      More than just you and Kelly Karnes then?

A      Yes.

Q      During the time when you had Kenny Barrett out there, he was in your custody as part of the sheriff's custody; is that right?

A      I would say so, yes.

Q      Did you see anybody doing anything to Kenny Barrett, anybody kick him, hit him, beat him or anything like that?

A      No, sir.

Q      You never saw anything like that?

A      No.

Q     You were asked about some complaints that he lodged about injuries.  You named a number of things. Were there any complaints that he lodged to you about being kicked or hit or black eyes or anything like that?

A     You mean to me?

Q     Yes.

A     No.

Q     You never got any complaints that he had been -- that he had been physically harmed out there at that site, other than the gunshot wounds?

A     From him?

Q     From him.

A     No.

Q     Had you gotten it from somebody else?

        MR. LITTLEFIELD:  Well, I'm going to object. That would be hearsay, Judge.

        MR. HILFIGER:  I'm not asking what the statements were, I'm just asking if he got information from somebody else.

        THE COURT:  Objection withdrawn.

BY MR. LITTLEFIELD:

Q     Did you get a statement from somebody else as to injuries occurring to him out there?

A     Yes.

Q     And who was that from?  I'm not asking what they

were, I'm just asking if you got them.

A      From his defense attorney.

Q      Okay.  That was -- so that would have been sometime later; is that right?

A      Yes.

Q      And until you got them from the defense attorney, you never heard anything about any kind of injuries to him, is that right, other than the gunshot wounds?

A      It's hard to say.  I don't remember exactly when I first heard it.  There were allegations made, yes.  Who they first came from, I don't remember.

Q      Did you see any physical -- any evidence of any kind of physical damages, injuries to him other than the gunshot wounds?

A      On that night, no.

Q      No, within the next few days.

A      Yes.

Q      Okay.  And what kind of injuries did you see?

A      A black eye.

Q      Any injuries to his teeth or anything like that, mouth area?

A      No, not that I remember, no.

Q      You said that after that time Kenny Barrett was in your custody.  How long a period of time was he in your custody?

A       On the 24th?

Q       Yeah.  Well, there was sometime that a bullet was removed from his leg.  At that time he wasn't in your custody; is that right?

A       Yes.

Q       How long a period of time was that?

A       Your question is confusing.  I'll try to answer it. He was in the sheriff's department custody --

MR. HILFIGER:  May I approach, Judge, may we approach?

THE COURT:  You may.

(BENCH CONFERENCE OUTSIDE

THE HEARING OF THE JURY)

MR. LITTLEFIELD:  I am really concerned that this opens up the area of him being in custody for a matter of several years.

MR. HILFIGER:  Okay.  What I was talking about --

MR. LITTLEFIELD:  Well, I think the way the question is asked sure is opening it up for a response. I think if you ask him a matter of two or three weeks, within a very short period of time -- I think that was like in November, say just a matter of couple of months. But when you ask him how long was he in your custody, we are talking years and I think we are getting into the issue we are not supposed to be getting into.

MR. HILFIGER:   All right, that's fine.

(END OF BENCH CONFERENCE)

BY MR. HILFIGER:

Q      Let me try to clear that up a little bit.  What I was asking about, how long a period of time time was it that he was in your custody when the bullet was removed?

A      We received possession of the bullet in -- on November the 2nd, I believe of '99.

Q      Okay.  Now, at that time were you aware of any other bullets in his leg that were still in his leg?

A      I don't honestly remember.

Q      You don't?

A      No.

Q      You took a pill bottle out of his pocket.  You searched him and you took a pill bottle out of his pocket. is it your normal procedure when you do a search, if you find something you think may be contraband, to place it back into -- to give it back to the individual or do you normally seize that?

A      We normally seize it.  It was placed back in his pocket because we knew his clothing would subsequently be seized.

Q      Okay.  You didn't -- you didn't -- but you didn't feel like it was a necessity to take it and keep it at that time?

A      No.

Q      Could you -- do you recall enough about the location of where the cars were when you got out there, the police -- the Bronco and the black and white that you could locate them on a model?

A      Probably.

Q      Okay.  If you would, --

MR. HILFIGER:  May I approach the model just a second, Judge?

THE COURT:  You may.

BY MR. HILFIGER:

Q      As I understand it from the -- from what you told us on the picture, the Bronco -- there was a white Bronco there in the picture and you said that wasn't the location of the Bronco when you got there.  Can you recall enough of the location of the Bronco that you can place that Bronco where you thought it was?

A      I can get close.

MR. HILFIGER:  May he approach the model?

THE COURT:  He may.  Sir, you may step down.

BY THE WITNESS:

A      It would probably be about like that. (INDICATED)

Q      And, sir, about how long --

THE COURT:  Let me give him that mike so we can hear him talk.  Speak into that, if you would, sir.

BY MR. HILFIGER:

Q    About how long were you out at this location on that night?

A    I was there two different times, so the first --

Q    Okay.

A    The first arrival I was there until we transported Mr. Barrett to the hospital, which was probably just over an hour.

Q    Okay.  And during that time, two questions -- I'm going to ask you about that particular time.  You remember being there a little over an hour until you took him to the hospital, right?

A    Yes.

Q    When you took Kenny Barrett to the hospital, was the crime scene tape up yet at that time?

A    It was probably being done around that time.

Q    Okay.  Can you recall it -- let me ask you this: When you took Kenny Barrett away from that pickup, did you have to cross the crime scene tape?

A    Not that I recall.

Q    So at least, to your knowledge, the crime scene tape wasn't up in that area?

A    Not that I recall at that time.

Q    Now, when you left -- this is the second question for that hour or so that you were there.  When you left

was the Bronco in the same position that you see it in now or the same approximate position?

A     I can't truthfully state, Mr. Hilfiger.

Q     You can't remember where that Bronco was at that time?

A     Not at that time, no.

Q     Now, how long was it before you -- you can go ahead and sit back down.  I'm sorry.  How long was it before you came back?

A     It was some time because I stayed at the hospital until arrangements were made for an ambulance to transport Mr. Barrett to Tulsa, to the hospital in Tulsa.

Q     Okay.  And when you say you made arrangements, does that mean that you stayed there until the ambulance actually took him or did you just make the arrangements and then left?

A     No, I didn't specifically make the arrangements. The arrangements were being made for him to be transported to Tulsa.  I think the doctor made the arrangements or may have arranged that.  The arrangements were made for an officer to ride with him in the ambulance to Tulsa.

Q     Okay.  Are you talking about a matter of minutes or hours before you went back out there?  I'm not trying to get you down on the exact amount of time, but I'm just trying to get some --

A     It wasn't hours, no.

Q     It wasn't hours?  When you came back out there, did you come back out on your own or was somebody else with you, back out to the residence?

A     I'm trying to remember how I got back out there. I think I commandeered a vehicle and drove back out there myself.

Q     When you came back out there, was the tape up?  Can you recall?

A     I believe it was.

Q     When you came back out there, can you recall the location of that Bronco?

A     At one point it was -- it had either rolled back or had been moved back to where -- to about where it was in the photograph that was previously --

Q     Government's 192 was where it had rolled back. When you came back there -- when you got back there after you had gone to the hospital the Bronco was already moved back; is that right?

                    (PAUSE)

A     Boy, it's hard -- I can't -- I can't really say if it was.  I want to think it was, but I wouldn't swear to it.

Q     Did you have anything to do with moving that Bronco?

A     No.

MR. HILFIGER:  May I have a moment, Your Honor?

THE COURT:  You may.

(PAUSE)

BY MR. HILFIGER:

Q     This is Government's Exhibit 184.  As I understand, there was a question about going -- as you came across the top of the hill you saw a lot of dust and there appeared to be smoke.  Do you recall that -- saying something like that or the question was asked about topping the hill?

A     Yes, I do.

Q     Where is the top of the hill?

A     To the west back down the weaved portion of the road.

Q     Okay.  You talking about even off the picture back here?

A     Yes.

Q     So the top of the hill you are referring to is not somewhere along this area?

A     No.

Q     Okay.

MR. HILFIGER:  I have no further questions.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     When Rocky was transported out of that location and to seek medical care for him, was the Bronco still in that

position?

A   Yes, to the best of my memory it was, yes.

Q   So when the Bronco was there or had moved back to the latter position as you saw it in the photograph, what did that have to do with Rocky being shot?

A   Absolutely nothing that I can think of.

Q   In regards to the crime scene tape -- I'm going to ask that Defendant's Exhibit 106 be displayed.  Can you see what time the log indicates that tape was placed there?

A   0055, if that's the time.

Q   Would your quarrel with that time if that's when the officers indicated that that is when it was placed there?

A   Would I quarrel?  No.

Q   In regard to the questions as to when the tape was placed, are you absolutely certain as to when it was placed?

A   No.

Q   Was that something that you were particularly concerned with as to, oh, the crime scene tape has been placed, I better figure out what time it is?

A   No.

Q   You were asked about the occasion -- on cross examination about the occasion when you and several deputies were at Mr. Barrett's residence and you

mentioned problems or complaints about Mr. Barrett shooting guns. Did that happen often?

A    We had several complaints of that nature over a period of time, yes.

Q    And you were also asked did Kenny Barrett give you any problems at that time?

A    Yes.

Q    Okay. Mr. Hilfiger asked you about knowledge of the existence of an open warrant since January of 1999. The sheriff's department knew there was a warrant outstanding for Mr. Barrett?

A    Yes.

Q    Were there any instructions you gave to your deputies in regards to going out to Mr. Barrett's for the purpose of serving that warrant?

MR. HILFIGER:  Your Honor, I'm going to object because he said he didn't even know the warrant was in existence until September.

THE COURT:  Argument?

MR. LITTLEFIELD:  I don't think his testimony was that he knew of that that warrant was in existence. He indicated he knew that it was in existence prior to September.

THE COURT:  Well, why don't you ask him.

BY THE WITNESS:

A       Are you referring to the arrest warrant or the search warrant?

Q       The arrest warrant.

A       The arrest warrant?

Q       Yes, sir.  When did you know of its existence?

A       I honestly don't remember.

Q       Would it have been just right before this operation?

A       Right before it?  Probably not, but not too long before the operation probably.  I don't see every warrant that is issued out of the court clerk's offers.

Q       Were deputies given instructions as to what to do in regards to Mr. Barrett?

A       Yes.

Q       What was that instruction?

A       Any call they receive to the Barrett residence, do not go alone, take a backup officer with you or -- and in reference -- once we became aware of the arrest warrant, it was try to arrest him away from the residence to avoid any type of gun fight.

             MR. LITTLEFIELD:  Pass the witness.

             THE COURT:  Cross.

                    RECROSS EXAMINATION

BY MR. HILFIGER:

Q       As a sheriff do you take charge of crime scenes on occasion?

A      On occasion.

Q      Is it important to maintain the integrity of the crime scene?

A      Yes.

Q      The movement of the Bronco, does that indicate that there was some -- some possibility that that -- the integrity of that crime scene was not kept?

MR. LITTLEFIELD:  Objection, calls for speculation.

THE COURT:  Sustained.

BY MR. HILFIGER:

Q      You don't have any disagreement with that tape, the time on there of OO55 on the tape being put up; isn't that right?

A      That's right.

Q      Okay.  But you say -- and you don't know what time it was put up?

A      That's correct.

Q      But you do know that it wasn't put up when you took Kenny Barrett to the hospital?

A      I don't recall crossing the tape when we left the yard to take Kenny Barrett to the hospital.

Q      Do you know whether that tape was up when you took Kenny Barrett to the hospital?

A      No.

Q    You don't know one way or the other or --

A    I don't remember crossing the tape when we took him from the yard.

MR. HILFIGER:  I have no further questions?

A    I'm not saying it wasn't up.

MR. HILFIGER:  I have no further questions.

MR. LITTLEFIELD:  I have no additional questions.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

MR. HILFIGER:  I believe he is subject to recall on our subpoena, I believe.

THE WITNESS:  Yes.

THE COURT:  Sir, you may step down and be excused for now.  You are subject to recall. Government's witness's next witness.

MR. LITTLEFIELD:  Randall Weaver.

THE COURT:  Mr. Littlefield, how long is this witness?

MR. LITTLEFIELD:  He should be pretty short. I don't anticipate much testimony from him.  I don't think there is going to be a whole lot of cross.

THE COURT:  I have got a juror asking for a break.  We will take about a 15 minute recess.

MR. LITTLEFIELD:  Okay.  May I release the next witness who would be for a period?

THE COURT:  Yes.  We will take a recess for about 15 minutes.  I would ask everyone to remain seated as the jury leaves for the recess.

(JURY OUT)

THE COURT:  Let the record reflect that the jury has departed the courtroom.  I'm going to -- I was hoping to make it to 4:30 without a recess, but the jury has saw fit for a break now.  So I'm going to instruct the clerk right at 15 minutes to round them up and bring them back, so be prepared.  We are going to go hopefully in about 20 minutes.

(SHORT RECESS)

COURT IN SESSION

(JURY IN)

THE COURT:  Let the record reflect the jury is in the box, the defendant is present with counsel.  I would ask the witness to come in.

RANDALL WEAVER, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     State your name, please, sir?

A     Randall Weaver.

Q     You need to lane forward and speak into the microphone.

A     RandAll Weaver.

Q      Mr. Weaver, how are you employed?

A      Tattoo shop in Fort Smith.

Q      Okay.  And sir, have you ever been convicted of a felony?

A      Yes, I have.

Q      And what was the nature of it?

A      It was cocaine delivery charge, Fort Smith.

Q      Okay.  And when was that, sir?

A      Back in '89.

Q      Any pending charges against you now?

A      Nothing.

Q      And in regards to your appearance and your testimony today, have I made you any promises or anything in regards to any law enforcement obligation?  Does it have anything to do with you being here?

A      No.

Q      Okay.  Do you know Kenneth Eugene Barrett?

A      Yes, I know him.

Q      And how do you know, Mr. Barrett?

A      I have just known him for a long time, friends. I have been friends with him.  I was friends with him for a while.

Q      Okay.  Would you advise the jury -- and advise the Court and the jury what he is wearing today, sir?

A      Checkered shirt right here.

Q      Okay.

MR. LITTLEFIELD:  I would ask the record reflect that the witness has identified the defendant, Your Honor.

THE COURT:  The record will so reflect.

BY MR. LITTLEFIELD:

Q      Were you aware of where Kenneth Barrett was living in 1999, sir?

A      Yes.

Q      In regards to the -- you indicated a delivery of cocaine charge, which I think you said was in '89?

A      Yeah.

Q      Since that time -- directing your attention back to 1999, did you have occasion to be involved in drug use, sir?

A      Yes, I did.

Q      What kind of drugs were you using in 1999, sir?

A      Methamphetamine.

Q      How long has it been since you have been involved in drug use?

A      Gosh, five years, six years, I'm not sure, something like that that I have been clean.

Q      In fact, do you have a family now, sir?

A      Yes, I do.

Q      Let me show you what has been marked as Government's Exhibit Number 192.  It's an aerial photograph

and I'll ask if you recognize the place.  It will be displayed there to your left and also up here projected for the jury.  Do you recognize what that is, sir?

A      Yes.

Q      What was that?

A      It's Kenny's house.

Q      Have you been there before?

A      Yeah, I have been there just a few times.

Q      Do you recall what year it was, when it was that you had been out there last?

A      Not exactly.

Q      Okay.  Do you recall -- do you recall learning about an incident at which an officer or officers were shot at Mr. Barrett's place?

A      Yeah, I saw it on T.V.

Q      Okay.  When was it in relation to that, the same year or --

A      It would have been later that year.

Q      So the incident was later?

A      Yeah, the incident was later that year.

Q      For what reason did you go to Mr. Barrett's place?

A      I went out there looking at cars.

Q      When you say we, who is we?

A      I went out there R.C. Adams.

Q      And when you were there, was there ever any

discussion in regards to methamphetamine?

A      He had a little bit.

Q      Who had a little bit?

A      Kenny and I had a little bit.

Q      Okay.  And was that little bit of methamphetamine made available to you, sir?

A      Yeah, I bought some there.

Q      Okay.  Do you recall the quantity or how much you would have paid?

A      About twenty bucks probably.

Q      Okay.  If you wanted to see Mr. Barrett at that time, earlier in the year, 1999, where did you have to go to see Mr. Barrett?

A      Just go out to his house.

Q      Did he often leave his house or did you need to go there if you wanted to see him?

A      I usually went by there.  He didn't call nobody or do anything of that.

Q      Was there any discussion with Mr. Barrett about whether there was a warrant outstanding for him at that time?

A      Well, I knew he had missed a court date.  He said something about that, but that's about all I know about that deal.

Q      Did he indicate whether he knew there was a

warrant outstanding for him?

A      He thought he had a warrant for missing a court date.

Q      Okay.  How many times do you think you went out there in the spring and summer of '99?

A      Three or four times.

Q      Okay.  And did you normally go in the house or when you were out there where did you normally go?

A      I went in the house and I -- he had built a motor out there and I looked at some of the cars he had and that's about it.

Q      Where was it that you bought cocaine from him, sir?

A      I didn't buy cocaine from him.

Q      I'm sorry, I said cocaine.  I apologize.  Methamphetamine.

A      Oh, just there in his house.

Q      In the residence itself?

A      Yeah.

Q      Okay.  Which room?

A      Oh, I can't recall that, I can't recall.  This has been a long time ago.  I don't even remember which room we were in.

Q      Okay.

        MR. LITTLEFIELD:  Can I have just a second, Your Honor?

        THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examine.

CROSS EXAMINATION

BY MR. SMITH:

Q     Mr. Weaver, good afternoon.

A     Good afternoon.

Q     You and I have met on one prior occasion; is that correct?

A     Correct.

Q     And that was in the office of the U.S. Attorney; is that correct?

A     Yeah.

Q     Who was present at that meeting?

A     You, him, and Mr. Littlefield.

Q     Do you remember anybody else?

A     Oh, there was -- I can't recall who all was in there.

Q     Do you remember an investigator --

A     Yeah, yeah, an investigator, yes, sir.

Q     By the name of Loyd Cobb?

A     Yeah.

Q     I want to ask you about some of the things that we talked about then and some of the things you have testified to here today.  Okay?

A     Okay.

Q     All right, sir.  First off, you work at Nighttime

Tattoo in Fort Smith; is that correct?

A      Yeah.

Q      From what I understand from what you told me before, you met Kenny Barrett in high school?

A      I met him when I was in high school years ago.

Q      You graduated in 1982?

A      No, I graduated in '83 from Muldrow.

Q      So you are talking several years ago; is that right?

A      Yeah.

Q      Now, today you said that you had been out there three to four times at Kenny Barrett's house.  Do you recall telling me anything differently whenever we visited?

A      No, I can't even recall exactly how many times I have been out there.  I wasn't out there very many times.

Q      Okay.  So you don't know if you told me two or three times?

A      Two, three, four, something like that.

Q      Okay.  I guess the point is, you hadn't been out to Kenny Barrett's house very often all, had you?

A      No, sir.

Q      Do you know how long prior to 1999 he had lived at the residence that you were shown the picture of?

A      No, sir.

Q      Now, I understand that you were arrested for a

cocaine charge and convicted of that in May of 1989; is that correct, sir?

A     Yes, sir.

Q     And you did some time over that, didn't you?

A     Yes, sir.

Q     And this is the first time that you have ever testified in a proceeding involving Kenny Barrett; isn't that true?

A     Yes, sir.

Q     From what I understand at some point government agents and Mr. Littlefield came and visited you at your tattoo shop?

A     Yes, sir.

Q     Right?

A     Yes, sir.

Q     And I understand one of the topics of conversation with you was whether or not you had ever sold any ammunition to Kenny Barrett.

A     Yes, sir.

Q     And you knew that being a convicted felon that if you possessed any ammunition that there could be federal charges filed against you, couldn't there?

A     Yes, sir.

Q     Excuse me?

A     Yes, sir.

Q    You got you pretty scared, didn't you?

A    Not really because I didn't sell any ammunition to Kenny Barrett.

Q    You were wondering where they were coming from because you had never sold any ammunition, right?

A    I had never sold any ammunition.

Q    But yet here's the government in there with some agents accusing you of doing that and yet we want to talk to you about Kenny Barrett, right?

A    Yeah, he just asked me if I had done that and I said no.

Q    You didn't ever feel like maybe they were kind of holding something over your head and kind of like that's an idle threat or something like you if you don't cooperate with us, we may do something to you?

A    No.  The fact is I wasn't even around Kenny's house before this happened.  It had been a long time.

Q    Tell me when the first time is that you can recall for certain that you were at Kenny Barrett's.

A    I can't, I can't give you that date because -- I can't recall that.  That's been a long time ago.

Q    Tell me whenever you can recall that you were at Kenny Barrett's whenever you bought methamphetamine.

A    I was out there with R.C. Adams and we got a little bit one time and I don't know when.  I can't tell you what

day it was.  That's been a long time ago.

Q     Now, there have been some dates suggested to you, spring, summer of '99.

A     It would have had to have been in the spring.

Q     Why would you say -- you are telling me you can't remember, but now you are saying it would have had to have been the spring.

A     Well, I know I have been clean sine I -- I got clean before this even happened with Kenny.  I know I got clean in -- probably around May of that year is when I started getting clean.

Q     So it couldn't have been after May of '99?

A     Right.

Q     It would have had to be some time before then?

A     Right.

Q     And whenever people do methamphetamine, sometimes they lose tract of time, don't they?

A     Yeah, they do.

Q     Yeah.  What you are telling me is or what you are telling the jury is there is one time that you are out there, and now you are thinking it had to be before May of '99, and that you got twenty dollars worth of methamphetamine.  That's what you are telling us, right?

A     Yeah.

Q     Okay.  Now, the reason you went to Kenny Barrett's

was because he's a mechanic?

A      Exactly.

Q      He's a good mechanic?

A      Yeah.

Q      Been known to build motors?

A      Yeah.

Q      And that's why you were interested in going out there?

A      Yeah.

Q      Whenever you went out there, you drove through an open gate?

A      Yeah.

Q      Kenny Barrett didn't come meet you at the gate with a rifle?

A      No.

Q      Didn't come out there and threaten you or anything crazy like that?

A      No.

Q      In fact, he come out there and y'all started talking about vehicles and what have you?

A      Yeah.

Q      Now, there was an incident when you were out there with this R.C. Adams fellow -- is it Adams?  Do I have it right?

A      R.C. Adams.

Q       -- whenever a Tommy Gorty came out there.  Do you remember that?

A       Yeah.

Q       Tommy Gorty was going to jump on you.  You remember that deal, don't you?

A       Yeah.

Q       Kenny Barrett told him to get out of there, not do any of -- that that he didn't want any of that out there at his place.

A       Right, he didn't want any trouble out there.

Q       Yeah.  And he kept Pits out there, didn't he?

A       Yeah, he did.

Q       Now, you live out in the country?

A       Yeah, I did live out in Muldrow, yeah.

Q       You don't pull up to people's houses in the middle of the night, do you?

A       No.

Q       Unannounced?

A       No.

Q       If they have got a gate closed, you don't come on their property?

A       No.

Q       Why do you not do that, sir?

A       I just don't go in.  If anybody has got a locked gate, they don't want you in there, so you don't bother

them.

Q      Do you have a fear of being out in the country in eastern Oklahoma and pulling up to people's houses at night if you are unannounced?

A      I don't have a fear of that because I don't do it.

Q      it doesn't make sense to do that, does it?

A      No.

MR. SMITH:  Pass the witness, Your Honor.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q      Mr. Weaver, when was the first time that you received any clue that you might become involved in this matter?

A      When you came to the tattoo shop.

Q      I came?

A      Yes.

Q      Okay.  When I came in, did I accuse you of doing anything?

A      No.  You just asked me -- you told me this is what you had heard.  You asked me about it and I told you straight up that never happened.

Q      And did I tell you I believed that it had happened or did I tell you whether I needed to just check it out?

A      Yeah, you told me you just needed to check it out,

you didn't believe it.

Q     Okay.  Did I threaten you in any way with anything?

A     No, sir.

Q     Okay.  Was I trying to put any fear into you at all?

A     No.

          MR. LITTLEFIELD: Pass the witness.

                    RECROSS EXAMINATION

BY MR. SMITH:

Q     I guess there are a couple of different ways to approach that topic, isn't there?  In other words, I'm with the federal government and you are you and you have a conviction and I have got some information that you have been selling ammunition, which would be a federal offense.  Now, you can say that kind of subtle or you can say it loud and boisterous, but the bottom line it's all pointing in the same direction, isn't it?

A     Yeah, but I didn't have anything to worry about.  I didn't do that.

Q     You knew you didn't do that?

A     Yeah.

Q     But that was the topic, that was the introduction, that was the greeting, right?

A     No.  He just asked me about that, that he heard that and I told him no.  That's all it was.

Q     And then it's, oh, by the way, do you know Kenny

Barrett?

A    (NODDED HEAD)

Q    Kind of along those lines?

A    Yeah.

Q    Now, one of your friends, somebody that you know, is Cody Hyde.  Do you know Cody Hyde?

A    The police officer?

Q    Oklahoma Highway Patrol Trooper?

A    Yeah.

Q    He does a lot of work with U.S. Attorney's office?

A    Yeah.

Q    It's not coincidental that you are here telling us a story about Kenny Barrett when, in fact, you can't remember when this ever happened, is it?

A    Right.  I don't --

Q    I didn't think so.  Thank you.

        THE COURT:  Further direct?

        MR. LITTLEFIELD:  I don't have any more, Judge.

        THE COURT:  May this witness be excused?

        MR. SMITH:  Yes, sir.

        THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.

        THE COURT:  Members of the jury, we are going to recess.  If you will recall when you were seated, I tried to give you a schedule.  We have now finished

testimony through the 7th and we will be in recess until the morning of the 18th of October.  There's the admonition that I have given you in the past about not discussing it overnight, well, now the recess will be longer.  So keep in mind you are not to discuss this case with anyone.  I think I have made myself clear, you are not to discuss it with fellow jurors or anyone else you come in contact with.  You are not to do any type of investigation or anything during this recess.  You are not -- you are not to reach any conclusion.  If it were humanly possible, I would tell you not to think about it, If I thought it was possible for you not to think about it.  Just do not think about it until you come back, but that's the goal.  And then also because the case, as you perhaps are aware, has not yet been submitted to you. There are many more witnesses, much more evidence, so it's not time to start considering the case or what you think about the case.  So as I have stated before, keep your minds free and clear.  Avoid any news coverage that there may be, either print coverage or radio or television. Just do not read it, watch it or listen to it.

We will be in recess until October the 18th at nine o'clock and we will start hearing testimony again at that time.

Everybody in the courtroom will please remain seated

as the jury exits the courtroom.

(JURY OUT)

THE COURT:  Let the record reflect the jury has departed the courtroom.

Anything to take up outside the hearing of the jury on behalf of the government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  No, Your Honor.

THE COURT:  You remember the briefing schedule? Unless you make some arrangements otherwise, I'll be expecting those from you.  I'm going to stand up and gather up some things, so you can depart at your leisure.

(RECESSED UNTIL OCTOBER 18, 2005)

"I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter."

_____

KARLA S. McWHORTER

KARLA S. McWHORTER
OKLAHOMA CERTIFIED SHORTHAND REPORTER
CERTIFICATE NO. 00981
EXPIRES DECEMBER 31, 20___06

5|12|06
_____
DATE

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,   )
                            )
            Plaintiff,      )
                            )
-vs-                        )   No. CR-04-115-P
                            )
KENNETH EUGENE BARRETT,     )
                            )
            Defendant.      )

VOLUME 9 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on October 18, 2005.

A P P E A R A N C E S

For the Plaintiff:          Mr. Sheldon J. Sperling
                            United States Attorney
                            and
                            Mr. D. Michael Littlefield
                            Assistant U.S. Attorney

For the Defendant:          Mr. Roger Hilfiger and
                            Mr. Bret A. Smith
                            Attorneys at Law

## EUSTICE REPORTING SERVICE
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 1849 - 2068

1849

W I T N E S S E S

PAGE

VICKI LYONS
Direct Examination by Mr. Littlefield . . . . . . . 1851
Voir Dire Examination by Mr. Smith  . . . . . . . . 1856
Further Voir Dire Examination by Mr. Smith  . . . 1886
Further Voir Dire Examination by Mr. Smith  . . . 1890
Further Voir Dire Examination by Mr. Smith  . . . 1892
Further Voir Dire Examination by Mr. Smith  . . . 1921
Further Voir Dire Examination by Mr. Smith  . . . 1923
Cross Examination by Mr. Smith  . . . . . . . . . 1942
Redirect Examination by Mr. Littlefield . . . . . 2041
Recross Examination by Mr. Smith  . . . . . . . . 2057
Further Redirect Examination by Mr. Littlefield . 2062
Further Recross Examination by Mr. Smith  . . . . 2063


E X H I B I T S

                                           OFFERED   REC'D

Government's Exhibit Number 8 . . . . . . 1898      1898
Government's Exhibit Number 9 . . . . . . 1898      1898
Government's Exhibit Number 13  . . . . . 1863      1863
Government's Exhibit Number 16  . . . . . 1865      1865
Government's Exhibit Number 18  . . . . . 1932      1932
Government's Exhibit Number 19  . . . . . 1903      1903
Government's Exhibit Number 23  . . . . . 1926      1926
Government's Exhibit Number 24  . . . . . 1912      1913
Government's Exhibit Number 25  . . . . . 1908      1908
Government's Exhibit Number 26  . . . . . 1928      1928
Government's Exhibit Number 27  . . . . . 1927      1927
Government's Exhibit Number 28  . . . . . 1910      1911
Government's Exhibit Number 29  . . . . . 1930      1930
Government's Exhibit Number 30  . . . . . 1930      1931
Government's Exhibit Number 37  . . . . . 1855      1856
Government's Exhibit Number 38  . . . . . 1858      1859
Government's Exhibit Number 39  . . . . . 1860      1860
Government's Exhibit Number 40  . . . . . 1862      1862
Government's Exhibit Number 43  . . . . . 1917      1917
Government's Exhibit Number 46  . . . . . 1918      1918
Government's Exhibit Number 48  . . . . . 1895      1895
Government's Exhibit Number 49  . . . . . 1904      1904
Government's Exhibit Number 50  . . . . . 1905      1905
Government's Exhibit Number 51  . . . . . 1906      1906
Government's Exhibit Number 52  . . . . . 1907      1907
Government's Exhibit Number 101 . . . . . 1853      1853

(Exhibits continued . . .)

1850

(Exhibits continued . . .)                          OFFERED    REC'D

Government's Exhibit Number 108 . . . . . 1890      1891
Government's Exhibit Number 109 . . . . . 1889      1889
Government's Exhibit Number 110 . . . . . 1888      1888
Government's Exhibit Number 112 . . . . . 1894      1894
Government's Exhibit Number 123 . . . . . 1886      1887
Government's Exhibit Number 135 . . . . . 1933      1933
Government's Exhibit Number 138 . . . . . 1881      1881
Government's Exhibit Number 139 . . . . . 1935      1936
Government's Exhibit Number 140 . . . . . 1873      1873
Government's Exhibit Number 141 . . . . . 1873      1873
Government's Exhibit Number 142 . . . . . 1871      1871
Government's Exhibit Number 143 . . . . . 1871      1872
Government's Exhibit Number 144 . . . . . 1867      1867
Government's Exhibit Number 145 . . . . . 1868      1868
Government's Exhibit Number 146 . . . . . 1869      1869
Government's Exhibit Number 147 . . . . . 1870      1870
Government's Exhibit Number 149 . . . . . 1878      1878
Government's Exhibit Number 150 . . . . . 1876      1876
Government's Exhibit Number 151 . . . . . 1876      1876
Government's Exhibit Number 152 . . . . . 1874      1874
Government's Exhibit Number 162 . . . . . 1920      1921
Government's Exhibit Number 163 . . . . . 1923      1924
Government's Exhibit Number 164 . . . . . 1925      1925
Government's Exhibit Number 171 . . . . . 1892      1893
Government's Exhibit Number 183 . . . . . 1934      1934
Government's Exhibit Number 185 . . . . . 1874      1875
Government's Exhibit Number 194 . . . . . 1877      1878
Government's Exhibit Number 195 . . . . . 1879      1879
Government's Exhibit Number 196 . . . . . 1880      1880

Defendant's Exhibit Number 26 . . . . . . 1969      1969
Defendant's Exhibit Number 119  . . . . . 1982      1982
Defendant's Exhibit Number 208  . . . . . 2034      2034
Defendant's Exhibit Number 209  . . . . . 1950      1950
Defendant's Exhibit Number 210  . . . . . 1948      1948
Defendant's Exhibit Number 211  . . . . . 2036      2036

                    P R O C E E D I N G S

        THE COURT:  Good morning.  Let the record

reflect the jury's in the box, Government counsel is

1851

present, Defendant's present with counsel.   And Government may call their next witness.

MR. LITTLEFIELD:   Vicki Lyons.

VICKI LYONS,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     State your name for the record, please.

A     Vicki Lyons.

Q     And how are you employed?

A     I'm a Special Agent for the Oklahoma State Bureau of Investigation.

Q     And how long have you been employed by the OSBI as a special agent?

A     For about nine and a half years.

Q     As a special agent, what are your duties or responsibilities in regards to being a special agent for the OSBI?

A     My duties, I'm assigned to general assignment.   I conduct general investigations.   The majority of what I do are homicide investigations.

Q     And in what particular area do you work?

A     I work in the Northeast Region of Oklahoma.

Q     Where are you stationed out of?

1852

A     Tahlequah.

Q     Direct your attention to the early morning hours of September the 24th, 1999 and ask if you got any information or received any information that caused you to receive an assignment?

A     Yes.

Q     And what was the nature of the call?

A     I received a call from my inspector at the time, Dave Page, to respond to Sequoyah County.

Q     About what time was it you got the call, do you remember?

A     It was very late evening hours.  I don't recall the time.

Q     And where did you go?

A     I went to a residence located in Sequoyah County.

Q     If you look at Government Exhibit Number 1 which is the model out in front of you.  Are you familiar with that location which is depicted by that model?

A     Yes.

Q     And what is that?

A     That's the residence, at the time, known -- of Kenny Barrett.

Q     Okay.  Is that the residence that you went to?

A     Yes.

Q     Okay.  Was it daylight or dark when you got there?

1853

A    I don't recall.  I believe it was dark.

Q    Okay.  Let me ask, did you have occasion as a part of your investigation to record the overall scene?

A    Yes, I did.

Q    And did you do that in such a fashion that it could be observed by others at a later time?

A    Yes.

Q    How did you do that?

A    I did a video recording.

Q    Okay.  And have you viewed that video recording and is it accurate and does it accurately depict the scene that you observed out there?

A    Yes.

Q    And have you viewed the video tape that has been made of that, which is Government Exhibit 101?

A    Yes.

         MR. LITTLEFIELD:  I'd move admission of Government's Exhibit 101, Your Honor.

         THE COURT:  Any objection?

         MR. SMITH:  No objection, Your Honor.

         THE COURT:  It'll be admitted without objection.

         MR. LITTLEFIELD:  And, Your Honor, I would ask that lights be dimmed so that it can be played for the jury.

1854

THE COURT:  Dim the lights, please.

(Whereupon, the video was played for the jury, the video having no audible sound.)

Q    (By Mr. Littlefield) After the video tape of the crime scene, what were you doing in regards to the investigation of this incident?

A    We began processing the exterior of the residence by documenting it and photographing the exterior.

Q    And who was involved in that process?

A    The exterior of the residence, it was myself, Lynette Lee, April Marcangeli, a criminalist from our lab, Ryan Porter; and I believe that was it on the outside.

Q    And in doing so, in regards to documenting, what is involved in that, besides finding items and photographing them in place?

A    We assign each agent or criminalist individual responsibilities as far as the logging the evidence in, documenting, searching for the evidence, documenting it by numbering it and photographing it.

Q    And were you involved in the processing of the exterior crime scene?

A    In so much as I was assigned to sketch the exterior and do measurements on the outside.

Q    And would you look at what has been marked as

1855

Government Exhibit Number 37, please?  And it will be shown on the -- do you recognize what's displayed in Government Exhibit Number 37?

A    Yes.

Q    And what is that?

A    This is my sketch of the exterior of the crime scene.

Q    And I note that there are a number of numbers that are depicted on that exterior sketch.  Who was responsible for placement on there?

A    I did.

Q    And how -- and what do those numbers represent?

A    They represent individual items of evidence.

Q    That were seized at the scene?

A    Yes.

Q    And you indicated that there was a team involved. It was Lynette Lee, April Marcangeli and Ryan Porter and you.  Were each one of you just doing your own thing or were you working together as a team to process the crime scene?

A    We were working together as a team.

MR. LITTLEFIELD:  Your Honor, I would move admission of what has been marked as Government Exhibit Number 37.

THE COURT:  Any objection?

MR. SMITH:  Brief voir dire, Your Honor?

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Ma'am, what is depicted in Government Exhibit Number 37, that is not drawn to scale, is it?

A    That's correct.  It is not to scale.

Q    And then later you had that reproduced by somebody in your lab; is that correct?

A    By someone at our headquarters, yes.

Q    And the reproduction is an accurate copy of what you have done there in 37?

A    Yes.

MR. SMITH:  Thank you.  I have no objection to this exhibit, Your Honor.

THE COURT:  It will be admitted without objection.

MR. LITTLEFIELD:  And I would ask that it be displayed.

Q    (By Mr. Littlefield) And if we look at the items there as Mr. Smith asked, that's not to scale but does it essentially display the areas at which those items were located?

A    Yes.

Q    And how were numbers assigned to the items that were

discovered and retrieved in evidence?

A    They were essentially assigned as we discovered the items of evidence.

Q    And was a list made which corresponds to the numbers that are identified on Government Exhibit 37?

A    Yes.

Q    And so if I had the list and I went to item 9-A, which is shown on there, then I could find out what item 9-A was; is that correct?

A    Yes.

Q    Before we look at the list, if you look to the black and white which is off to the right, OHP -- it shows as OHP 720, what were the conditions of the lights, emergency lights, when you observed that vehicle?

A    The emergency lights were operating at that time.

Q    Did they stay operating the whole time?

A    After I finished the videotape, I turned them off myself.

Q    I note that if you look at the vehicle, the Bronco, which shows FAL 803, to the driver's rear there was some items there.  I noted a red colored bag.  What were those items there?

A    Some of the items were equipment belonging to OHP troopers and the red bag was a medical bag belonging to some emergency personnel.

Q    And is that depicted and marked on your Government's Exhibit Number 37, your diagram there?

A    Yes.

Q    By the way, the OHP 720, OHP 344 and the FAL 803, what -- where do those numbers come from?

A    They're the license plates for those vehicles.

Q    Speaking of the list --

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 38, which is not yet in evidence, be provided to the witness.

Q    (By Mr. Littlefield) Do you recognize what you see as Government's Exhibit Number 38?

A    Yes.

Q    What are we showing right now?  What are you looking at right now?

A    I looked at page one and page two of the evidence list.

Q    And is that the evidence list identifying the items of evidence that were discovered and seized at the scene and correspond to the numbers that were displayed on Government's Exhibit 37?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government's Exhibit -- what's been marked as Government Exhibit Number 38.

1859

THE COURT:  Any objection?

MR. SMITH:  No, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  Okay.  And if we could view the Government's Exhibit Number 38.

Q   (By Mr. Littlefield) And is those items -- if you see the numbers, we're looking at the first page now.  If you see those items you can go to 37 and, for instance take item number one, would you be able to find where it was located at the scene based upon this?

A   Yes.

Q   Did you do the same with the interior of the residence?

A   Yes, I did.

MR. LITTLEFIELD:  And I would ask that Government Exhibit -- what's been marked as Government Exhibit Number 39 be displayed to the witness and it's not in evidence.

Q   (By Mr. Littlefield) Do you recognize what is displayed before you as Government Exhibit Number 39?

A   Yes.

Q   And what is that, ma'am?

A   This is my sketch of the residence.

Q   And does that also -- as in Government's Exhibit Number 37, did you identify locations of items that were

seized as a part of the investigation?

A   Yes.

Q   Now is this to scale?

A   No.

Q   Does it break down and show the location and depiction of the four rooms on the bottom floor in relation one to the other?

A   Yes, it does.

Q   I would -- and who was responsible for preparing this item, ma'am, this particular exhibit?

A   I did.

MR. LITTLEFIELD:   Move admission of what's been marked as Government Exhibit Number 39, Your Honor.

THE COURT:   Any objection?

MR. SMITH:   No, Your Honor.

THE COURT:   Admitted without objection.

Q   (By Mr. Littlefield) I noted when you were doing the crime scene video and you came to the metal threshold of the front door, you paused on that location.  I couldn't see in the video what it was you were pausing on.  What was it at that location?

A   That would be item number one in this sketch.  It's a -- what turned out to be a blood drop.

Q   And I noted also that there were some casings that were located in and around the couch.  Are those depicted

and shown here and indicated here by numbers?

A    Yes, they are.

Q    And where were most of the casings located?  You can tap the screen and identify that area.

A    Most of the casings were item two through 18, located around this couch and in this area.

Q    I see on the range a 20.  What is -- what was -- do you recall what was depicted by item 20?

A    Item 20 is actually -- has an arrow next to it which points to an area behind the couch.  There were three shell casings recovered on the floor underneath the couch and behind it.

Q    And as with the exterior crime scene, did you also make a log of the items which correspond to these numbers which are displayed on Government Exhibit Number 39?

A    Yes.

MR. LITTLEFIELD:  I would ask that what's been marked as Government Exhibit Number 40 be displayed to the witness, Your Honor.  And it's not in evidence.

Q    (By Mr. Littlefield) Do you see what's marked as Government Exhibit Number 40?

A    Yes.

Q    And what is that, Ms. Jones -- or Ms. Lyons?  I called you Ms. Jones, why?

A    At the time of this incident my last name was Jones.

1862

Q     Okay.  I felt like I was silly there for a second.
What's displayed on what's marked as Government Exhibit
40?

A     This is the evidence list and measurement list for
those items on the previous exhibit.

Q     Those items that were numbered on Government Exhibit
Number 39?

A     Yes.

Q     Okay.  And do the numbers, the listing here,
correspond to the numbers that are displayed on
Government Exhibit Number 39?

A     Yes.

          MR. LITTLEFIELD:  Move admission of what's been
marked as Government Exhibit 40.

          THE COURT:  Any objection?

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Admitted without objection.

Q     (By Mr. Littlefield) What area were you primarily --
you mentioned the stuff that was in or around the couch.
What numbers are those items that are shown, that were
the casings that were found in and around the couch?

A     That would be primarily two through 18 with the
exception of number 17.  It was in the kitchen.

Q     What's 11?

A     Eleven is also the Colt Sporter .223 rifle which was

1864

that was on the seal of the door and what number did it have?

A It's number one.

Q Now, two, three, four, five, six, seven, 16 and 15 which are visible shown here, what was at those locations?

A Each one of those is a .223 caliber shell casing.

Q And if we look to Government Exhibit Number 14, which is in evidence --

MR. LITTLEFIELD: I'd ask that that be displayed.

THE COURT: You may.

Q (By Mr. Littlefield) Are you able to see the casings and how they're located in relation to the placards there or the numbers there?

A Yes.

Q Okay. Is there a way we can kind of focus in on number three? Where is the casing in relation to the number?

A It's actually placed in the square of the measurement square on the number.

Q And what are eight and nine?

A Eight and nine are also .223 caliber shell casings.

Q Were there other casings on the couch?

A Yes, I believe there was.

1865

Q     Would you look at what's been marked but not yet admitted as Government Exhibit Number 16?  What do you see on what's marked Government Exhibit 16?

A     You'll see Item Number 10 and Number 18 in addition to number eight and nine.

Q     And what were 10 and 18 depicting?

A     They were also .223 caliber shell casings.

MR. LITTLEFIELD:  Move admission of what has been marked as Government Exhibit Number 16.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  It'll be admitted without objection.

Q     (By Mr. Littlefield) I see this number 20 that's on the coffee table.  What is that?

A     That's just a place where I'd sat the number down. It does not depict an item of evidence at that location.

Q     But there was an item of evidence that was marked number 20; is that correct?

A     Yes.

Q     And what was that?

A     Those were the three .223 caliber shell casings that were located underneath the couch.

Q     You mentioned 18 and 10, what was at those items?

A     They were .223 caliber shell casings.

Q   Who seized, if anyone, all of those shell casings that were found in the living room area?

A   I did.

MR. LITTLEFIELD:   I would ask that Government Exhibit Number 144 be provided to the witness.

THE COURT:   You may.

MR. LITTLEFIELD:   If we could go back to Government Exhibit Number 14 and display it as we talk about Government Exhibit Number 144.

THE COURT:   You may.

Q   (By Mr. Littlefield) Do you have Government Exhibit Number 144?  Do you have it now?

A   Yes, I do.

Q   Do you recognize what that is?

A   Yes.

Q   What is what's been marked as Government Exhibit Number 144?

A   This is an envelope which contains item number two, a .223 caliber shell casing.

Q   And who retrieved that item?

A   I did.

Q   Does the envelope show your mark where you retrieved and obtained custody of that item?

A   Yes.

Q   What did you do with that item after -- what did you

1867

put it in when you -- after you took that casing that's shown there at number two, what did you put it in?

A    I placed it in this envelope and sealed it.

Q    Okay.  And where was it taken then, ultimately?

A    To the OSBI Laboratory.

Q    In which community?

A    In Tahlequah, Oklahoma.

Q    Can you look inside?  Is it open?  Can you examine the contents of it?

A    Yes.

Q    And does it in fact contain a .223 shell casing?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 144.

THE COURT:  Objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. LITTLEFIELD:  I would ask that what's been marked as Government Exhibit Number 145 be provided to the witness.

Q    (By Mr. Littlefield) Do you recognize what's been marked as Government Exhibit Number 145?

A    Yes.

Q    What is that?

A    This is an envelope which contains item number

1868

three, a .223 caliber shell casing.

Q    And is it the item -- the shell casing we can see in the photograph right under the placard number three in the Government Exhibit Number 14?

A    Yes.

Q    And how did you go about processing that, ma'am; what did you do with it?

A    I placed it in the envelope, sealed it and took it to the OSBI Laboratory in Tahlequah.

Q    And is your mark on -- in fact on the envelope that's in front of you?

A    Yes.

        MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 145.

        THE COURT:  Any objection?

        MR. SMITH:  No objection.

        THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) Would you go ahead and remove that casing and display it to the jury, please?  Okay. Reinsert it and if you'd return it to the clerk.

        Item number six, which is displayed in Government Exhibit Number 14, did you seize that as well, ma'am.

A    Yes.

        MR. LITTLEFIELD:  I would ask that what's been

marked as Government Exhibit 146 be provided to the witness.

THE COURT:  You may.

Q   (By Mr. Littlefield) And do you recognize the envelope that is marked as Government Exhibit Number 146?

A   Yes.

Q   And what is that?

A   This is item number four in the exhibit.  It's a .223 caliber shell casing.

Q   Your marking on the envelope?

A   Yes.

Q   Handled in the same manner as the previous casings?

A   Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit 146.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

Q   (By Mr. Littlefield) I would ask that's what's been marked as Government Exhibit --

THE COURT:  It'll be admitted.

MR. LITTLEFIELD:  I'm sorry.

THE COURT:  146 admitted without objection. Now we're on Government's Exhibit?

MR. LITTLEFIELD:  147.

Q   (By Mr. Littlefield) And you recognize what's marked

1870

as Government's Exhibit 147?

A    Yes.

Q    What is that?

A    This is item number five, a .223 caliber shell casing.

Q    Handled in the same manner as the previous shell casings, numbers two, three and four?

A    Yes.

Q    Are your initials on the envelope?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 147.

THE COURT:  Any objections?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that what's been marked as Government Exhibit Number 142 be provided to the witness.  And while you're there, Paula, you can pull 143 as well.

Q    (By Mr. Littlefield) Do you recognize what has been marked as Government Exhibit Number 142?

A    Yes.

Q    What is that?

A    This is item number six in the exhibit.  It's a .223 caliber shell casing.

1871

Q    Handled in the same manner as the previous casings?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit 142.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) And I would ask that you examine the envelope that's marked as Government Exhibit Number 143; and do you recognize that, ma'am?

A    Yes.

Q    And what it?

A    This is item number seven, a .223 caliber shell casing.

Q    Handled in the same manner as the previous casings?

A    Yes.

Q    Your initials on the envelope?

A    Yes.

Q    Sealed and submitted to the OSBI Lab in Tahlequah?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government Exhibit -- what has been marked as Government Exhibit Number 143.

THE COURT:  What item did that refer to?

THE WITNESS:  Number seven.

1872

THE COURT: Thank you. Any objection?

MR. SMITH: No objection, Your Honor.

THE COURT: Be admitted without objection.

Q   (By Mr. Littlefield) In Government Exhibit Number 14 you can see displayed further up item numbers, or what you called, I guess, item numbers or scene numbers 15 and 16. What were those?

A   Those were also .223 caliber shell casings.

Q   And where -- I note the two horizontal brown colored items. What -- that you can see in Government Exhibit 14, what is that?

A   I believe that's the door facing to the kitchen, if that's where you are pointing out.

Q   Yes.

A   Yes.

MR. LITTLEFIELD: I would ask that the witness be provided Government Exhibit Numbers 140 and 141.

Q   (By Mr. Littlefield) Do you have those?

A   Yes.

Q   What is what has been marked as Government's Exhibit Number 140?

A   This is item number 15 in the exhibit. It's a .223 caliber shell casing.

Q   Handled in the same manner as the previous one?

A   Yes.

1873

MR. LITTLEFIELD: Move admission of what's been marked Government Exhibit Number 140.

THE COURT: Any objection?

MR. SMITH: No objection, Your Honor.

MR. LITTLEFIELD: Your Honor, is it admitted?

THE COURT: Yes. Without objection.

Q (By Mr. Littlefield) Would you look at Government Exhibit Number 141?

A Yes.

Q What is this?

A This corresponds to item number 16 from the exhibit. It's a .223 caliber shell casing.

Q Move admission of -- handled in the same manner with your initials on the envelope and sealed to the OSBI Lab?

A Yes.

MR. LITTLEFIELD: Move admission of what has been marked as Government Exhibit Number 141.

THE COURT: Any objection?

MR. SMITH: No objection, Your Honor.

THE COURT: It's admitted without objection.

Q (By Mr. Littlefield) Do you see item number eight?

MR. LITTLEFIELD: I would ask that Government's Exhibit 152 be provided to the witness.

Q (By Mr. Littlefield) Do you recognize that?

A Yes.

1874

Q    What is that?

A    This is item number eight, a .223 caliber shell casing.

Q    Handled in the same manner?

A    Yes.

        MR. LITTLEFIELD:  Move admission of what has been marked as Government Exhibit Number 152.

        THE COURT:  Any objection?

        MR. SMITH:  No objection, Your Honor.

        THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) Do you see item nine?

A    Yes.

        MR. LITTLEFIELD:  I would ask that Government Exhibit 185 be provided to the witness.

Q    (By Mr. Littlefield) Do you recognize what Government Exhibit 185 is, ma'am?

A    Yes.

Q    What is it?

A    This is item number nine.  A .223 caliber shell casing.

Q    And was that seized by you and handled in the same manner as the previous ones?

A    Yes.

        MR. LITTLEFIELD:  Move admission of Government Exhibit 185.

1875

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that Government Exhibit 16 be displayed to the witness.

Q   (By Mr. Littlefield) Eight and nine have already been talked about.  Let's talk about item 10 and that was what, ma'am?

A   A .223 caliber shell casing.

MR. LITTLEFIELD:  I would ask that Government Exhibit Numbers 151 and 150 be provided to the witness.

THE COURT:  Government's Exhibit 150.

MR. LITTLEFIELD:  150 and 151.  And I'm going to talk about 151 first.

THE COURT:  Neither one have been admitted, right?

MR. LITTLEFIELD:  That's correct.

Q   (By Mr. Littlefield) Let's talk about 151.  Do you recognize what Government Exhibit Number 151 is, Ms. Lyons?

A   Yes.

Q   What is it?

A   It's item number 10, a .223 caliber shell casing.

Q   Handled in the same manner as the previous shell casings by yourself?

1876

A     Yes.

          MR. LITTLEFIELD:  Move admission of what has been marked as Government Exhibit Number 151.

          THE COURT:  Any objection?

          MR. SMITH:  No objection.

          THE COURT:  Be admitted without objection.

Q     (By Mr. Littlefield) And if you would look at what's been marked as Government Exhibit Number 150.  Do you recognize that?

A     Yes.

Q     And what is that?

A     This is item number 18, a .223 caliber shell casing.

Q     And is that -- that's 18, and did you handle that in the same manner?

A     Yes.

          MR. LITTLEFIELD:  Move admission of what has been marked as Government Exhibit Number 150.

          THE COURT:  Any objection?

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Admitted without objection.

Q     (By Mr. Littlefield) Were there -- and we have -- and you mentioned the items or the casings behind the couch.  Were there any other casings found in the residence that you recall?

A     I believe there was one in the kitchen.

MR. LITTLEFIELD:  I would ask that what's been marked as Government Exhibit 194 which is not yet in evidence be displayed to this witness.

Q   (By Mr. Littlefield) Do you recognize what is shown in Government Exhibit Number 194?

A   Yes.

Q   What is that?

A   This depicts item number 17, a .223 caliber shell casing in the floor of what I refer to as the kitchen.

Q   Now when we saw 15 and 16 just a minute ago, those two items that were -- and I was asking you about that horizontal, those two horizontal -- and you said you thought that was the threshold or the facing of the door?

A   Yes.

Q   Where was 17, item 17, in relation to that door facing?

A   It would be further into the kitchen from the door facing.

Q   Is that the location at which you found that .223 shelf casing that was item 17?

A   Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 194, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection.

1878

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And I would ask it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And was that casing seized?

A    Yes.

MR. LITTLEFIELD:  I would ask that what has been marked for identification purposes as Government Exhibit Number 149 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what Government Exhibit Number 149 is?

A    Yes.

Q    What is that?

A    It's item number 17, a .223 caliber shell casing.

Q    And was it handled by yourself in the same fashion, initials placed on the envelope, sealed and then submitted to the OSBI Lab in Tahlequah?

A    Yes, it was.

MR. LITTLEFIELD:  Move admission of what has marked as Government Exhibit Number 149.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  It's admitted without objection.

Q    (By Mr. Littlefield) You mentioned item number 20

1879

which had the arrow pointing down on your diagram. What was item 20?

A    Three .223 caliber shell casings.

Q    Were those three .223 caliber shell casings which were located where?

A    On the floor behind the couch.

Q    Were those photographed?

A    I don't recall if they were photographed.

Q    Would you look to what's been marked as Government Exhibit 195? Do you recognize what that is?

A    Yes, that would be the photograph of item number 20.

Q    Were they photographed, those three casings?

A    Yes.

Q    And how many of those casings are depicted in what has been marked as Government Exhibit Number 195?

A    I believe there are just two in that photograph.

MR. LITTLEFIELD: I move admission of what's been marked as Government Exhibit 195, Your Honor.

THE COURT: Any objection?

MR. SMITH: No objection, Your Honor.

THE COURT: Admitted.

Q    (By Mr. Littlefield) And you see the two casings. I would ask now that you view what has been marked as Government Exhibit 196.

MR. LITTLEFIELD: It's not in evidence yet.

1880

Q    (By Mr. Littlefield) And do you recognize what is displayed on what's been marked as Government Exhibit 196?

A    Yes.

Q    What is that?

A    This would be the third of the three shell casings that are item number 20.

Q    And were those three shell casings that were item number 20 seized and entered into evidence?

A    Yes.

MR. LITTLEFIELD:  Just a second, Judge.  And it's taking me just a second to find it, Judge.

THE COURT:  Are you going to move for admission of 196?

MR. LITTLEFIELD:  Yes, I am.

THE COURT:  If you're not ready to, I just --

MR. LITTLEFIELD:  No. I am.  I am.  I'm trying to find, I'm looking for something else.  I'm trying to keep it moving as well as I can.  I do move for admission of Government Exhibit -- (Interrupted)

THE COURT:  You're doing fine.  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 138, what's been marked as 138, be

1881

provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what has been marked as Government Exhibit Number 138?

A    Yes.

Q    And what is that?

A    This is item number 20, the three .223 caliber shell casings.

Q    Were those three casings handled in the same manner as the previous casings?

A    Yes, they were.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 138.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) Do you recall if any other items were discovered in what I'll call the front room or the living room of the residence, which was seized by yourself?

A    There was a small metal projectile seized from the front of the television.

Q    Any other item?

A    I don't remember anything else.

Q    What room did you move to next in your processing

1882

the scene?

A   It would have been what I call the front east room.

Q   And would you look at Government's Exhibit Number 15.  And it is in evidence.  I see three items that have numbers provided 11, 12 and 13.  What were those items?

A   Item number 11 is a Colt .223 caliber rifle.  Item number 12 is a 12 gauge shotgun and item number 13 is a Realistic room monitor.

Q   What was done with those two firearms, ma'am?

A   They were seized as evidence.

THE COURT:  What was item 12?

THE WITNESS:  It's a shotgun, a 12 gauge shotgun.

MR. LITTLEFIELD:  I would ask that Government Exhibit Numbers 127 and 128 be provided to the witness, please.  And they are the firearms.

Q   (By Mr. Littlefield) Which one do you have on top?

A   Number 128.

Q   Go ahead and pull that out and identify that if you would, ma'am.  What is that?

A   This is the Colt .223 caliber rifle which I seized from that residence.

Q   And was there anything unusual about that when you saw it on the ground there?

A   At the time I recovered it, it was fully loaded and

1883

off safety.

Q    How -- when you say fully loaded, how do you load one of those items, one those firearms?

A    A magazine containing rounds would be inserted into the magazine well and you let the bolt go home.

Q    Was there a single magazine in that weapon or multiple magazines?

A    There were multiple magazines.

MR. LITTLEFIELD:  I would ask that Government Exhibit 17 be displayed.  It's one of the photographs.

Q    (By Mr. Littlefield) Do you see the multiple magazines depicted?

A    Yes.

Q    Would you look at --

MR. LITTLEFIELD:  I would ask that Government's Exhibit 125 be provided to the witness.

Q    (By Mr. Littlefield) And what are those?

A    These are the three magazines which were removed from that rifle.

Q    Now you say -- you said it was fully loaded.  How many -- do you know how many bullets, .223 cartridges, could you place in each one of those magazines?

A    Each one of these magazines would hold 30 bullets.

Q    Thirty cartridges?

A    Yes.

1884

Q    And if one then topped off -- that term make sense to you -- the weapon, how many total bullets or cartridges could be in that firearm if the magazines were fully loaded and one was in the chamber?

A    A total of 91.

Q    When you say it was fully loaded, what was done with the rounds in those magazines?

A    I seized those rounds.

Q    In the process of seizing the rounds that were in those magazines, did you count them?

A    Yes, I did.

Q    How many .223 rounds were in Government Exhibit Number 128 and the magazines which is 125?

A    I believe there were a total of 72 rounds.

Q    You say you believe.  How many were there?  Did you count them?

A    Yes, I counted them.

Q    How many were there?

A    Seventy-two.

Q    And what was the configuration or breakdown of those 72 rounds?

A    There was a round chambered in the weapon and there were -- the side magazines were fully loaded with 30 each and the remaining rounds, eleven I believe, were in the middle magazine, which was inserted into the weapon.

1885

Q      What did you do with those rounds?

A      Those rounds were placed along with this -- the magazines in a paper bag sealed and submitted to the laboratory.

MR. LITTLEFIELD:  I would ask that what's been marked as Government's Exhibit 123 be provided to the witness.

THE COURT:  You may.

Q      (By Mr. Littlefield) Do you recognize what that item is, ma'am?

A      Yes.

Q      What is that?

A      These are the rounds which were taken from the magazines.

Q      How do you know that?

A      I recognize markings that were placed on here.

Q      Is that all 72 rounds?

A      No.

Q      How do you know -- what would have happened to some of the rounds, some of the 72 rounds that you submitted?

A      Some of these rounds have been test fired.

Q      Are those the rounds, the remaining rounds, that with the exception of what was done during the firearms testing process in the OSBI lab that were removed from Government Exhibit Number 128?

1886

A    Yes.

MR. LITTLEFIELD:  I move admission of what's been marked as Government Exhibit 123.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, can we get a count, sir?

THE COURT:  You may.  You may voir dire.

FURTHER VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Go ahead, ma'am, I'll let you finish and then I'll ask you a question.

A    Okay.

Q    Ma'am, you've had an opportunity to examine that exhibit.  Tell me how many live rounds are contained within.

A    At this time there are 61 live rounds.

Q    Okay.  And then are there also cartridges in there?

A    Yes, there are.

Q    And I say cartridges, actually that's not correct. I should say casings, correct?

A    That is correct.  Casings.

Q    How many casings do we have?

A    It's labeled as containing 10.

Q    That's in a sealed envelope that you're unable to count but you're able to see on the outside of the

1887

envelope that it says 10?

A     Yes.

          MR. SMITH:   Thank you.   No objection, Your Honor.

          THE COURT:   This is as to 123?

          MR. LITTLEFIELD:   That's correct, Your Honor.

          THE COURT:   123 are the three --

          MR. LITTLEFIELD:   It's the rounds that were removed from the magazines, from the .223 and the magazines.

          THE COURT:   Okay.   Admitted without objection.

Q     (By Mr. Littlefield) Were there any other firearms that you recall -- well, let's go back to the 127.   Do you recognize Government's Exhibit 127?

A     Yes.

Q     What is that?

A     This is a Coach double barrel 12 gauge shotgun.

Q     And have you seen that Coach double barrel 12 gauge shotgun before, ma'am?

A     Yes.

Q     And where?

A     I seized it from the residence of Kenneth Barrett.

Q     And if we go back to Government Exhibit 15, which item is that?

A     This would be item number 12.

1888

Q    Were there any other firearms in that room?

A    Yes, there was.

Q    And would you look to what's been marked as Government Exhibit 110?  Do you recognize what's been marked as Government Exhibit 110, ma'am?

A    Yes.

Q    What is that?

A    This is a Browning .22 caliber pistol.

Q    Have you seen that particular Browning .22 caliber pistol previously, ma'am?

A    Yes.

Q    Where have you seen it?

A    I recovered it from a desk drawer in that room.

Q    In the east room?

A    In the east room, yes.

Q    And did you seize and mark that, put it in a bag and mark the bag and introduce it in evidence?

A    Yes I did.

        MR. LITTLEFIELD:  Move admission of what's been marked Government Exhibit 110.

        THE COURT:  Any objection?

        MR. SMITH:  No objection, Your Honor.

        THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And what was its condition in regards -- do you recall what its condition was in

1889

regards to whether it was loaded or ready to fire or what?

A    It was loaded and one bullet was in the chamber.

MR. LITTLEFIELD:  I would ask that Government Exhibit Numbers 109 and 108 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Let's look at what's been marked as Government Exhibit Number 109.  You mentioned a round was in the chamber.  Do you see Government Exhibit 109?

A    Yes.

Q    What is that?

A    This is the .22 caliber bullet which I removed from the chamber of that pistol.

MR. LITTLEFIELD:  Move admission of what has been marked as Government Exhibit 109.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

Q    (By Mr. Littlefield) Do you see what's 108?

A    Yes.

Q    And what is that?

A    This is the magazine which was removed from the .22 caliber pistol.

Q    Which was Government Exhibit 110 that you just looked at?

1890

A     Yes, yes.

Q     Move admission -- and is the magazine still in there intact?

A     Yes, it is.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 108.

THE COURT:  Any objection?

MR. SMITH:  Brief voir dire, Your Honor.

THE COURT:  You may.

FURTHER VOIR DIRE EXAMINATION

BY MR. SMITH:

Q     Ma'am, can you tell us how many unfired rounds are contained within that package?

A     In item number 108 there are no unfired rounds.

Q     Okay.  It's just the magazine?

A     It's just the magazine.

Q     Did we place those unfired rounds into another container?

A     At the time I sealed it, they were in this container.

Q     So you don't know what's happened to the unfired rounds?

A     No, I don't.

Q     Do you have a listing on the outside of Number 108 as to how many unfired rounds were placed in there with

1891

the magazine?

A   At the time I sealed it there were nine unfired rounds in here.

Q   And the capacity of that weapon, do you know, ma'am?

A   No, I don't.

Q   Do you know what the capacity of the magazine was?

A   No, I don't.

Q   Do you know whether or not the magazine was fully loaded whenever you took it from the weapon?

A   No, I don't.

THE COURT:   Any objection?

MR. SMITH:   Your Honor, as relates to 108, the description is magazine and bullets.  We have no objection to the introduction of the magazine as there are no bullets so --

THE COURT:   Counsel.

MR. LITTLEFIELD:   Well, the description is not what's going to the jury, Judge.  It's the item itself. And there's no objection to the magazine.

THE COURT:   Be admitted.

Q   (By Mr. Littlefield) You indicated that there were in the living room and you have identified a number of casings.  Did you find any evidence of loading of that .223?  That it had been loaded at any location with the cartridges placed into the magazines?

1892

A    In the east bedroom -- or excuse me, the east room in the front next to the living room there were some boxes, empty boxes, of shell casings.

MR. LITTLEFIELD:  I would ask that what has been marked as Government Exhibit 171 be displayed, and it's not in evidence, to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what is displayed in that photograph which is marked as Government Exhibit 171?

A    Yes.

Q    What is that?

A    This is item number 19.  It's an empty box of .223 caliber rounds.

Q    Was that where it was located when you made your -- when you went into that room and started retrieving items of potential evidence, evidentiary value?

A    Yes.

MR. LITTLEFIELD:  Move admission of what has been marked as Government Exhibit Number 171.

MR. SMITH:  Brief voir dire, Your Honor?

THE COURT:  You may.

FURTHER VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Ma'am, as we look at that cartridge box is sitting

1893

on top of another box, looks like a desk drawer or something?

A    Yes.

Q    Is that the condition that existed in when you took that picture or had that cartridge box been moved from some location and displayed on top of there?

A    No, it was in the condition where we found it.

Q    Just like it is in the picture?

A    As far as I recall, yes.

Q    Do you have any reason to think differently?

A    No.

          MR. SMITH:   Thank you, ma'am.

          THE COURT:   Any objection?

          MR. SMITH:   No objection, Your Honor.

          THE COURT:   171 admitted without objection.

          MR. LITTLEFIELD:   Would ask that what's been marked as Government Exhibit 112 be provided to this witness.

Q    (By Mr. Littlefield) Do you recognize what has been marked as Government Exhibit 112?

A    Yes.

Q    How do you recognize that, ma'am?

A    This is the bag in which I placed the empty box of .223 caliber bullets.

          MR. LITTLEFIELD:   I would ask that what's been

1894

marked as Government Exhibit 112 be admitted, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

Q    (By Mr. Littlefield) Could you display it?  Is the bag sealed or can you get in it?

A    I can get in it.

Q    Would you do that, please?

THE COURT:  Exhibit 112 is admitted without objection.

Q    (By Mr. Littlefield) Is that in fact the box that was found on the little table there in the east room?

A    Yes, it is.

Q    Go ahead and reinsert that and return it to the clerk, if you would.

In your video as you're looking at that table, to the right --

MR. LITTLEFIELD:  And I don't know if I asked for 171 to be admitted.  If it is, I do ask that it be admitted.  I think it was.

THE COURT:  It has been admitted.

MR. LITTLEFIELD:  Can it be displayed?

THE COURT:  It may.

Q    (By Mr. Littlefield) What is the item to the right-hand side where this arrow is located?

A    That's a gun cabinet.

1895

Q    And were there any firearms located in that gun cabinet?

A    Yes.

Q    What?

A    There was a .22 caliber rifle.

Q    I would ask you to view what has been marked as Government Exhibit 128.  It is not yet in evidence.  I'm sorry.  I said 128.  I don't know where that came from.  My dyslexia is kicking in.  Government's Exhibit Number 48 and it's not in evidence.  Do you recognize what's displayed in Government's Exhibit Number 48?

A    Yes.

Q    What is that?

A    This is a photograph of the .22 caliber rifle which was in the gun cabinet.

Q    Is that the condition it was in when you observed it, when you went into the east room conducting your investigation?

A    Yes.

            MR. LITTLEFIELD:  Move admission of what has been mark as Government Exhibit Number 48.

            THE COURT:  Any objection?

            MR. SMITH:  No objection, Your Honor.

            THE COURT:  Admitted without objection.

            MR. LITTLEFIELD:  I would ask that it be

1896

displayed.

THE COURT:  You may.

MR. LITTLEFIELD:  I would ask that Government Exhibit 175 be shown to the witness.  It's a photograph and it is in evidence.

THE COURT:  You may.

Q    (By Mr. Littlefield) Ms. Lyons, are you familiar with and have you seen the model Government Exhibit Number 1 down here?

A    Yes.

Q    And have you viewed the interior of the first floor of Mr. Barrett's residence as it's displayed there?

A    Yes.

Q    Where is the gun cabinet located?

A    It's located in the front east room.

Q    And the table upon which the cartridges are located, where is that?

A    Just under the window in the front east room.

Q    Did you have occasion to make a trip up into the loft area?

A    Yes.

Q    And how is access gained into the loft area?

A    Through the stairwell.

Q    Was there anything unusual or -- well, let me ask you first.  If Government Exhibit Number 7 would be

1897

displayed and it is in evidence.  And what is that, ma'am?

A    I believe this is a photograph of the stairwell portion of it.

Q    Was there anything unusual about that stairwell?

A    Yes.

Q    What was unusual about the stairwell?

A    The stairs were configured in such a manner as the stairs could be raised and there was storage underneath the stairs.

Q    Were you able to discover the area of storage underneath the stairs?

A    Yes.

Q    And were any photographs taken of that area of storage underneath the stairs?

A    Yes.

Q    Would you examine what has been marked and not yet introduced, it's a photograph, Government Exhibit Number 8.  Also going to ask that Government Exhibit Number 9 be displayed for your observation beside Government Exhibit Number 8.

We can talk about 8 while it's up there, while we're trying to get 9 up there.  Do you recognize what's shown in Government Exhibit Number 8?

A    Yes.

1898

Q    What is that -- now 9's displayed for you as well. What is shown in Government Exhibit 8?

A    Number 8 is a photograph of what we found when we raised the stairs.

Q    Does it show the entire portion of it or just a partial portion of those items that you discovered?

A    Just what I was able to get into that frame on the photograph.

Q    And what does Government Exhibit Number 9 display?

A    Also the lower portion of the same firearms.

Q    And is that accurate and does that depict those items which were discovered underneath the stairs by yourself?

A    Yes.

          MR. LITTLEFIELD:  I would move admission of both Government Exhibit Numbers 8 and 9, Your Honor.

          THE COURT:  Any objection?

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Be admitted without objection.

          MR. LITTLEFIELD:  I would ask that those items be displayed.

          THE COURT:  You may.

Q    (By Mr. Littlefield) Did you examine the firearms that were located in the residence, ma'am?

A    Yes.

1899

Q    And in doing so, did you record serial numbers and makes, what the model numbers were, what the makes were and what the serial numbers on those firearms were, ma'am?

A    Yes.

Q    Let me ask you:  Did you see Ruger M-77 Mark Two with scope firearm with serial number 78233413?

A    Could I refer to my report to confirm that?

            THE COURT:  You may.

A    Yes.

Q    (By Mr. Littlefield) You did?

A    Yes.

Q    And what kind of firearm was that?

A    It was a .223 caliber rifle.

Q    Where was that located?

A    In the storage area under the stairs.

Q    Let me ask if you observed an Ithaca Deerslayer 12 gauge shotgun, serial number 371425235?

A    Yes.

Q    Where was that located?

A    Also in the storage area under the stairs.

Q    Did you find Fabrique Nationale 16 gauge shotgun, serial number 65701?

A    Yes.

Q    Where was that located?

1900

A    In the stairway, or the storage area under the stairs.

Q    Did you find a Savage 24 HDL over/under .22 caliber .20 gauge shotgun?

A    Yes.

Q    Where was that located?

A    In the storage area under the stairs.

Q    Did you find a Ruger 7722 and scope, serial number 72010989?

A    Yes.

Q    Where was that?

A    In the storage area under the stairs.

Q    Did you find a Remington Model 700 .30-06 rifle with scope, serial number C6717537?

A    Yes.

Q    And where was that located?

A    In the storage area under the stairs.

Q    Did you find a Remington Model 7400 .30-06 rifle, scope, magazine and case, serial number 8582164?

A    Yes.

Q    Where was that located?

A    Also in the storage area under the stairs.

Q    Did you find a Browning Arms Company .22 caliber rifle with scope, serial number 05577NP242?

A    Yes.

1901

Q    And where was that found?

A    Also in the storage area under the stairs.

Q    And the Colt Sporter .223 model or Colt model Sporter H, Match H Bar rifle, serial number MH043631, was that found by yourself in the course of the investigation?

A    Yes.

Q    And where was that?

A    That was in the east room of the residence.

Q    Is that what was Government Exhibit 128, the rifle that you examined awhile ago?

A    Yes.

Q    I noted in the crime scene that there was a firearm in the front yard of the residence.  Do you recall filming that?

A    Yes, I do.

Q    And do you know what kind that was, the semi-automatic pistol that was out in the yard?

A    I believe that was a 9 millimeter pistol.  I don't recall the brand.

Q    Were you responsible for seizing that?

A    I did not seize it, no.

Q    Did you, after examining these firearms underneath the stairwell, proceed upward into the loft area?

A    Yes, I did.

1902

Q    And what was -- means of observation was available from that loft area?

A    There was a small window in the loft area and there was a set of binoculars and a spotting scope focused out the window.

Q    Was there a sleeping area up there at all?

A    Yes.

Q    What was the nature of the sleeping area?

A    The loft had been converted into a small sleeping area.  There was some type of a mattress or blankets and such in that area.

Q    And how far was the spotting scope which you mentioned located from the sleeping area, that mattress itself?

A    It was located right next to the sleeping area.

MR. LITTLEFIELD:  I would ask that what's been marked as Government Exhibit Number 19 be provided or displayed for the witness and it's a photograph.

THE COURT:  You may.

MR. LITTLEFIELD:  And it's not in evidence yet.

Q    (By Mr. Littlefield) Was that spotting scope visible in your crime scene video?

A    Yes, it was.

Q    Do you recognize what is shown in Government Exhibit Number 19?

1903

A     Yes.

Q     What is that?

A     This is the spotting scope focused out the window next to the bedding area.

Q     Is that the condition in which it was when you observed it on September the 24th, 1999?

A     Yes.

        MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 19, Your Honor.

        THE COURT:  Any objection?

        MR. SMITH:  No objection, Your Honor.

        THE COURT:  Admitted without objection.

        MR. LITTLEFIELD:  And I would ask that it be displayed.

        THE COURT:  You may.

Q     (By Mr. Littlefield) And when one looked out that window through that spotting scope what -- if you're looking at Government Exhibit Number 1, what would you be looking upon?

A     The what I refer to as the drive area where the vehicles are located on Government Exhibit Number 1.

        MR. LITTLEFIELD:  I would ask that what's been marked as Government Exhibit 49 be displayed.  It's not in evidence yet.

        THE COURT:  You may.

1904

Q     (By Mr. Littlefield) Do you recognize Government Exhibit Number 49?

A     Yes.

Q     What are those shown in that photograph?

A     This is the stairwell leading to the loft.

MR. LITTLEFIELD:  Move admission of Government Exhibit 49.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q     (By Mr. Littlefield) After you went into the -- looked underneath, found the stairwell, found the storage area beneath the stairs and then went upstairs, did you look at the back rooms, the what I call the kitchen area, which is in the northwest corner?

A     Yes.

Q     And did you also look into what I call the northeast room?

A     Yes.

Q     And what were the condition of those rooms?

A     The kitchen area had several items sitting around in it and the northeast room had several items of what I refer to as drug paraphernalia.

Q     Okay.  I would ask you to look at what's marked Government Exhibit Number 50.  It's not in evidence yet.

1905

It's a photograph.

THE COURT:   You may display it.

Q   (By Mr. Littlefield) Do you recognize that item which is shown in the photograph Government Exhibit 50?

A   Yes.

Q   Where was that located?

A   In the kitchen.

MR. LITTLEFIELD:   Move admission of what has been marked Government Exhibit Number 50.

THE COURT:   Any objection?

MR. SMITH:   No objection, Your Honor.

THE COURT:   Admitted without objection.

MR. LITTLEFIELD:   And I would ask that it be displayed.

THE COURT:   You may.

Q   (By Mr. Littlefield) Is there writing on it?

A   Yes, there is.

Q   Do you recall what it said; can you read it?

A   It says in case of emergency break glass.

Q   What is that?

A   It's a box with it looks -- it had a glass face in it and it looks like it has a plastic syringe inside.

MR. LITTLEFIELD:   I ask that what's been marked as Government Exhibit Number 51 be displayed to the witness.   It's not in evidence yet.

1906

Q     (By Mr. Littlefield) Do you recognize what room that was in in that photograph?

A     This is in the kitchen.

Q     Does it accurately depict the condition in that area?

A     Yes.

MR. LITTLEFIELD:  Move admission of what's been marked Government Exhibit Number 51.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  Ask it be displayed, Your Honor.

THE COURT:  You may.

Q     (By Mr. Littlefield) Do you see any foil anywhere in there?

A     Yes.

Q     Where is that located?

A     It's in a Crock Pot.

Q     Would you look at what's been marked as Government Exhibit Number 52.  Do you recognize what's been displayed in Government's Exhibit Number 52?

A     Yes.

Q     What room was that in?

A     The kitchen.

1907

Q    Does it accurately depict -- is that the way it looked?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 52.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  It's admitted without objection.

MR. LITTLEFIELD:  And I'm going to move -- and I'm going to ask that you display -- I'm moving the arrow.

Q    (By Mr. Littlefield) Can you identify what that item is upon which the arrow is located?

A    Yes.

Q    What is that?

A    They're coffee filters.

Q    And what is that there?

A    Paper towels.

Q    Was there any coffee pot to your recollection in that house?

A    No.

Q    Did you observe the area outside and around the front of the house?

A    Yes.

Q    And in regard --  I understand you didn't seize all

1908

the items, but were you in any way involved in locating and identifying items that were found in the yard area of the residence?

A    Yes.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 120 -- well, let me go about it this way. I would ask that Government Exhibit Number 25 be displayed to the witness.  It's not in evidence yet.

Q    (By Mr. Littlefield) Do you see what's displayed on Government Exhibit Number 25?

A    Yes.

Q    And I note that there's a number on it.  Does that accurately depict the condition of that after the item was identified and marked?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked Government Exhibit Number 25.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

MR. LITTLEFIELD:  And I would ask it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) What is this item there that the arrow is on?

A    That is the handle to a flash bang.

1909

Q   Are you familiar with flash bangs?

A   Yes.

Q   And is that where it was located at the scene, that handle for the flash bang?

A   Yes.

Q   Which vehicle is that on?

A   This is the --

Q   And I'm not asking the number, but there was a Bronco that was shot up.  Where was it in relation to the shot up Bronco?

A   That is on the hood of the shot up Bronco.

Q   Was there any other evidence -- well, let me ask you to look --

MR. LITTLEFIELD:  I'd ask that what's been marked Government Exhibit 121 be displayed for the witness.  It's in the boxes.

Q   (By Mr. Littlefield) Do you recognize what that is?

A   Yes.

Q   What is that?

A   This is item number 19, the handle to the flash bang.

Q   Did you actually seize it or was it seized by someone else?

A   It was seized by April Marcangeli.

Q   Was there any other -- go ahead and hand that back.

1910

Was there any other evidence of an expended flash bang in the area?

A    Yes.

Q    And what other evidence was there of an expended flash bang?

A    On the west side of the residence on the ground was the body of the flash bang.

Q    Was there --

MR. LITTLEFIELD:  I would ask that what's been marked Government's Exhibit 28 be displayed to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  It's not in evidence.

Q    (By Mr. Littlefield) Do you recognize what is shown in Government Exhibit Number 28?

A    Yes.

Q    What is that?

A    This is item number 14A. It's the body of the flash bang.

Q    Is that where it -- is that how it was located on the day that you all were doing the search on September 24th, 1999?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit 28.

1911

THE COURT: Any objection?

MR. SMITH: No objection, Your Honor.

THE COURT: Admitted without objection.

MR. LITTLEFIELD: And if we could go to -- I'd ask that Government Exhibit 37 be displayed.

Q (By Mr. Littlefield) Now, that's item number what?

A Fourteen A.

Q If we go to Government Exhibit 37?

THE COURT: The photograph?

MR. LITTLEFIELD: Yes, it is.

THE COURT: Is it admitted or not?

MR. LITTLEFIELD: It is admitted.

Q (By Mr. Littlefield) Where is 14A? Can you see that on -- do you see 14A and where it's located?

A Yes.

Q And can you tap it? Was that where the flash bang was located?

A Yes.

Q Do you recall other evidence of the flash bang having been expended?

A Yes.

Q What's that?

A There was a pull pin located in the front yard.

Q Do you recall where that was located?

A I would have to refer to the legend. I don't

1912

remember which number it is.

Q    If we show Government's Exhibit 38 which is in evidence.  And I think that had two pages.  Do you see -- can you find the pull pin on the flash bang?

A    Yes, that would be item number nine.

Q    Okay.  Now, if we could go back to Government's Exhibit Number 37.  And where is -- do you see where item number nine is located on that?

A    Yes, that's this item.

Q    And it's which item?  Just tap right beside it.  Okay.  Would you look at --

        MR. LITTLEFIELD:  And I'm going to ask that what's been marked as Government's Exhibit Number 24 be displayed to the witness.

        THE COURT:  You may.

        MR. LITTLEFIELD:  And it's not in evidence yet.

Q    (By Mr. Littlefield) Do you recognize that, what's displayed there?

A    Yes.

Q    What is that?

A    That's item number nine, the pull pin.

        MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit Number 24.

        THE COURT:  Any objection?

        MR. SMITH:  No objection, Your Honor.

1913

MR. LITTLEFIELD:  And I would ask it be displayed.

THE COURT:  You may.

Q     (By Mr. Littlefield) Is that it itself?

A     Yes.

Q     Was there evidence in the yard that indicated damage to a firearm of any nature?

A     Yes.

Q     What did you observe in the front yard that would have been indicative of damage to a firearm?

A     There were pieces of a magazine laying on the ground in the front yard.

Q     And where were those pieces of a -- of the magazine located?

A     They were located near the Bronco, the white Bronco that had been shot up.

Q     And were those items listed on the exterior crime scene list?

A     Yes, they were.

MR. LITTLEFIELD:  Let's go back to what's marked as Government Exhibit -- or what's in evidence, Government Exhibit Number 38, which is the exterior crime scene list, or the exterior evidence list.

THE COURT:  You may.

MR. LITTLEFIELD:  And if we could show both

1914

pages.

Q      (By Mr. Littlefield) Do you see either or any item that would be indicative of damage to a firearm?

A      Yes.

Q      What numbers?  Could you point to them or give us the numbers?

A      It's item number five.

Q      What's that?

A      It is a magazine butt plate.

Q      Any other items?

A      Items number 4-A and 5-A, the magazine screen and follower.

Q      And when you say a butt plate from the magazine, what portion of the magazine are you describing?

A      It's actually the end portion of a magazine that's visible from the outside of the weapon.

Q      And if I jammed or put in the magazine into the handle of a semi-automatic pistol, where would it be in relation to the handle of the pistol?

A      It's on the bottom portion of the magazine that's going in.

Q      And if the butt plate of the magazine is damaged and falls of, what would happen to the contents of the magazine?

A      It would cause the contents of the magazine to be

1915

ejected.

Q    Okay.  When you talk about the follower, is that a part of the contents?

A    Yes.

Q    What is that?

A    It's a small piece that sits in the spring that holds the bullets in place.

Q    And the spring sits where?

A    Inside the magazine underneath the bullets.

Q    And was there any evidence of -- and what would happen to the bullets if the butt plate were damaged and fell off?

A    They would also fall out.

Q    Was there indication of unused bullets, live rounds, in the yard at any location?

A    Yes.

Q    And which numbers were those?

A    It would be item number four, item number six, item number seven, item number eight.

Q    Any others?  And if not, I'm not sure.  I'm asking you any others?

A    Item number 20 and item number 1-A, although this list shows it is casing, it is actually a bullet, an unfired bullet.

Q    Okay.  So 1-A is also an unfired bullet?

1916

A    Yes, it is.

Q    And where were those -- now if we could go back -- were they all over the place or were they grouped -- those items that are now marked or were they grouped in one general area?

A    They were also in one general area near the white Bronco.

Q    And if we go back to Government's Exhibit Number 37, can we identify where four through eight, 20, 1A, 4A and 5A are located?  Where are those items generally located? Can you kind of draw a circle around the general area where those were found?

A    They're located in this area.

Q    Okay.  And what's the rectangular item in the upper portion of that circle that you marked?

A    That's item number 22.  I'm sorry.  I can't read it very well on this sketch.  It's blurry on it.

        MR. LITTLEFIELD:  Judge, could the exhibit notebook be provided to the witness so she can look at 37?

        THE COURT:  She may.

        MR. LITTLEFIELD:  And 38.

A    I have it now.  That's item 18-A.

Q    (By Mr. Littlefield)  And what is item 18-A?

A    It's a ballistic shield.

1917

Q    So how close were those items to the ballistic shield?

A    They were all in the same general vicinity of the ballistic shield.

MR. LITTLEFIELD:  Now, I would ask that Government Exhibit Number 43, which is not yet in evidence, be displayed to the witness.

Q    (By Mr. Littlefield) Do you recognize what is shown in this photograph, ma'am?

A    Yes.

Q    What is that?  What does that photograph display?

A    This is the ballistic shield and the items which were surrounding it.

MR. LITTLEFIELD:  Move admission what has been marked as Government Exhibit Number 43.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. LITTLEFIELD:  And I would ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And where are the live rounds about which you're speaking?

A    Item number four is a live round.

Q    Okay.

1918

A    Item number six and seven.

Q    Okay.

A    And item number eight.

Q    Okay.

A    And item number 20.  I don't see it on here.

Q    Where was item 20 located?

A    They were actually two bullets together that were located immediately underneath the truck.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 46 be displayed to the witness.  And it again is not in evidence.

Q    (By Mr. Littlefield) Do you see what's displayed in Government Exhibit Number 46?

A    Yes.

Q    What's that?

A    This is a photograph of the white Ford Bronco which shows item number 19 and number 20.

Q    And is that -- does that accurately depict the location of those items?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked Government Exhibit 46.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Government Exhibit 46 will be

1919

admitted without objection.

MR. LITTLEFIELD:  Your Honor, I would ask that it be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) And item 20 is located where?

A   Just under the truck.

Q   And how many live .45 rounds were there?

A   On item 20 there were two.

Q   Was there any firearm out there -- when the OSBI was involved in this investigation, what was done on the part of your agency to obtain custody of the weapons that the Oklahoma Highway Patrol had at the scene, in order to evaluate them for ballistics firearm purposes, et cetera?

A   We located and evaluated the weapons which were still within the crime scene at that time.

Q   Okay.

A   And the weapons that were with the officers who had been taken for emergency treatment.

Q   Was any officer's firearm -- did any officer's firearm have damage to the magazine?

A   Yes.

Q   Whose?

A   David Eales.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 162, 163 and 164 be provided to this

1920

witness.

THE COURT:  Would you repeat those numbers again?

MR. LITTLEFIELD:  162, 163 and 164.

THE COURT:  You may.

Q    (By Mr. Littlefield) And go first to Government Exhibit 162.  Do you recognize what that is, ma'am?

A    Yes.

Q    What is that?

A    This is marker number -- or item number five.  It's the magazine butt plate.

Q    And if we go back to Government Exhibit 43, and it is in evidence, so I'm going to ask it be displayed. Where was that item, item number five, found?

A    On that location.

Q    The one to the left, that also has a five on it, what number is that?

A    That's 5-A.

Q    And would you look at the contents of Government Exhibits Number 162 and is that in fact the item that was there?

A    Yes, it is.

MR. LITTLEFIELD:  Move admission of Government Exhibit 162.

THE COURT:  Any objection?

1921

MR. SMITH:  Brief voir dire, Your Honor?

THE COURT:  You may.

FURTHER VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Ma'am, did you seize item number 162?

A    No, I did not.

Q    Can you tell us who did?

A    Criminalist April Marcangeli.

Q    And it's been how long since you looked at that item?

A    It's been probably a year and a half.

MR. SMITH:  We object to its introduction at this time, Your Honor.

MR. LITTLEFIELD:  May I ask another question?

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize it?

A    Yes, I do.

Q    And how are you able to recognize it?

A    I viewed this on several occasions over several years and I recognize it from being placed in this evidence package which I've seen on numerous occasions.

MR. LITTLEFIELD:  I'd renew my --

THE COURT:  It'll be admitted.

Q    (By Mr. Littlefield) Go ahead and remove that item and display it.  Is there anything unique about that butt

1922

plate, that magazine butt plate, which is Government Exhibit 162?

A    It's damaged.

Q    And are they -- are they normally curved like that or are they normally flat?

A    They're normally flat.  This is -- the curve is from the damage.

Q    Would you look at Government Exhibit Number 163.  Do you recognize what that is?

A    Yes.

Q    What is that?

A    This is the -- what I refer to as a follower, which is part of the magazine.

Q    What item number was that?

A    Item 5-A.

Q    And where is that displayed?  And do you recognize item -- Government Exhibit 163?

A    Yes, I do.

Q    And how are you able to recognize it?

A    From the markings on the bag that I've seen.

Q    And did you see that particular -- what piece of magazine is that?

A    It's a follower.

Q    Did you see that follower out there that day?

A    Yes.

1923

Q    Is that in fact the follower that -- where 5A is there?

A    Yes.

MR. LITTLEFIELD:  Move admission of 163.

THE COURT:  Any objection?

MR. SMITH:  Brief voir dire, Your Honor?

THE COURT:  You may.

FURTHER VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Ma'am, on Exhibit Number 163 what is unique about that magazine follower?

A    The follower itself, there's nothing unique about it.

Q    That's what I mean, ma'am.  There are no identifying marks on that follower?

A    No.

Q    That's a common part in any Sig Sauer .45 caliber pistol, is it not?

A    Yes, it is.

Q    You did not seize that item, did you, ma'am?

A    No, I did not.

Q    While it looks similar to one that you've seen out at the Barrett Residence, you can't tell us for sure if that's the one that's laying in the grass?

A    Yes, I can.

1924

Q     You can tell us that because of some unique mark or how, ma'am?

A     Because of the packaging that it's in.

Q     You didn't seize it?

A     No, I did not.

Q     You didn't package it?

A     No.

MR. LITTLEFIELD:  May I?

THE COURT:  You may.

Q     (By Mr. Littlefield) Were you present when that was packaged?

A     Yes.

Q     And who was packaging it?

A     April Marcangeli.

Q     And was that a part of the process where you all were working together to retrieve items of evidence at the scene?

A     Yes.

MR. LITTLEFIELD:  I renew the offer.

THE COURT:  It'll be admitted over objection.

Q     (By Mr. Littlefield) And I'd ask you to look at Government Exhibit 164.  Do you recognize what that is?

A     Yes.

Q     What is that?

A     This is a spring from a magazine.

1925

Q    And what item number was that?

A    This would be item number 4-A.

Q    And is that shown on Government Exhibit 43?

A    Yes.

Q    Tap it, please.  When that was seized, did you seize it?

A    No, I did not.

Q    Who seized it?

A    April Marcangeli.

Q    Were you present when it was seized?

A    Yes.

Q    And when it was packaged were you present?

A    Yes.

Q    Is that in fact the magazine spring that was item 4-A next to the follower, next to the butt plate, in the front yard of Kenneth Barrett's?

A    Yes.

        MR. LITTLEFIELD:  Move admission of 164.

        THE COURT:  Any objection?

        MR. SMITH:  Object based on the same grounds, Your Honor.

        THE COURT:  Admitted over objection.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 23 be displayed.

        THE COURT:  You may.

1926

MR. LITTLEFIELD:  It's not yet in evidence.

Q    (By Mr. Littlefield) Do you recognize what is shown in Government Exhibit Number 23?

A    Yes.

Q    What is that?

A    This is the magazine butt plate, item number five.

Q    And does it show the close up of five as we show -- as we saw its location in Government Exhibit 43?

A    Yes.

Q    Does that accurately depict its condition as it lay on the ground being photographed by that marker, number five?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government's Exhibit 23.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) The follower, which was item number -- I think you said 5-A.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 27, which is again not in evidence, be

1927

displayed to the witness.

THE COURT: You may.

Q   (By Mr. Littlefield) Do you recognize what's displayed in the photograph which is marked Government Exhibit Number 27?

A   Yes.

Q   And what is that?

A   This is number 5-A, the follower.

Q   Does it accurately depict its condition?

A   Yes.

MR. LITTLEFIELD: Move admission of Government Exhibit 27.

THE COURT: Any objection?

MR. SMITH: No objection, Your Honor.

THE COURT: It's admitted without objection.

MR. LITTLEFIELD: I would ask that Government Exhibit Number 26 be displayed to the witness. Again, it is not admitted into evidence.

THE COURT: You may.

Q   (By Mr. Littlefield) Do you recognize what is shown in that photograph?

A   Yes.

Q   What is that?

A   This is item number 4-A, the magazine spring.

Q   Accurately depict its condition?

1928

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked Government Exhibit Number 26.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted out objection.

Q    (By Mr. Littlefield) Where is it?  I have trouble seeing it because it's blending in.

A    It blends in with the grass but it's in this area. I think I messed it up.

Q    Can you run around, do it again?

A    It's in that area.

Q    To the left, right of the of line or on the line?

A    To the left of the line.

Q    If we would go back to the interior crime scene sketch which is Government Exhibit Number 39, was there any item on the front porch which was seized by yourself, ma'am?

A    Yes.

Q    And what was that?

A    It was a projectile seized from on top of the refrigerator in this area.

Q    What item number did it have?

A    That's item number 21.

Q    Was there anything that caused -- drew your

1929

attention to that particular projectile that was found sitting on top of the refrigerator that's on the front porch?

A    Yes.

Q    What's that?

A    We found on the door facing near -- which is marked on here as B, we found a strike mark which appeared to be where a bullet grazed the door facing.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 29 be displayed to the witness, Your Honor.  And it is not in evidence.

THE COURT:  You may.

Q    (By Mr. Littlefield) You might look in the book while we're doing -- is that 29 in front of you there? Does that include it?  I think we've got it now displayed.  If you can look on the monitor.  Do you recognize the photograph that's shown in Government Exhibit Number 29?

A    Yes.

Q    What does that display?

A    This is the door facing to the residence.

Q    Does it show the area where the -- appears that a projectile struck the facing?

A    Yes, I believe it does.

MR. LITTLEFIELD:  Move admission of what's been

1930

marked as Government Exhibit Number 29, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that it be displayed.

Q    (By Mr. Littlefield) Where is the area where the damage is located?  If you could point to or tap in that area.

A    In that area of the bullet -- it appeared that the bullet had grazed that area of the door facing.

MR. LITTLEFIELD:  I would now ask that what's been marked as Government's Exhibit Number 30 be displayed to the witness.

Q    (By Mr. Littlefield) Do you recognize what is shown on Government Exhibit Number 30?

A    Yes.  This is a photograph of the projectile on the refrigerator.

Q    And does it accurately display the location of the projectile on the refrigerator?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit Number 30.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

1931

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And I would ask that it be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) Tap where the projectile was located, ma'am.  What was done in regards to that projectile?

A   I seized it, packaged it and submitted it to the laboratory at Tahlequah.

MR. LITTLEFIELD:  I would ask that what has marked as Government Exhibit Number 135 be provided to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  Before we get to that, I'm going to ask that Government Exhibit 18 be displayed to the witness as well.

THE COURT:  You may.

MR. LITTLEFIELD:  It's not in evidence yet.

Q   (By Mr. Littlefield) Do you recognize what's shown in Government Exhibit 18?

A   Yes.

Q   What is that?

A   This is a close up of item number 21, the projectile.

MR. LITTLEFIELD:  Move admission of Government

1932

Exhibit 18.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And I would ask that it be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you have Government Exhibit Number 135 there with you?

A   Yes.

Q   Do you recognize what Government Exhibit Number 135 is, ma'am?

A   Yes.

Q   What is that?

A   This is the package containing item number 21, the projectile.

Q   Was that handled in the same manner as the casings about which you spoke previously, your initials placed on it, sealed by yourself and submitted to the laboratory?

A   Yes.

Q   Which lab was that introduced to, ma'am, or submitted to initially?

A   The OSBI lab in Tahlequah.

MR. LITTLEFIELD:  Your Honor, I would move admission of what's been marked as Government Exhibit

1933

Number 135.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) When you were examining the east room, was there any indication of a -- of shots having been fired at that location or into that location?

A    Yes.

Q    And I'm not referring to the window but any other area?

A    Yes.

Q    Where?

A    We recovered a projectile from a shelf in the east room.

Q    If we put up 175 --

THE COURT:  Been admitted; is that correct?

MR. LITTLEFIELD:  Yes, Your Honor.

Q    (By Mr. Littlefield) About where -- at what location would it have been that the shelf was located in that room?

A    The shelves were built in this location.

Q    And who discovered the projectile?

A    Criminalist Iris Dalley discovered it.

Q    Were you there at the time?

A    Yes.

1934

Q    And who was responsible for seizing that item?

A    I collected that item.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 182 be displayed to the witness and it's not in evidence.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what's displayed in Government Exhibit Number 182?

A    Yes.

Q    What is that?

A    This is a photograph of the trajectory of a bullet, but I can't tell for sure which one.

Q    Can you tell -- if you look at Government Exhibit, then, 183.  It also is not in evidence, yet.  Do you recognize that what is?

A    Yes.  That's the bullet or projectile that I recovered from the shelf.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 183.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that it be displayed.

THE COURT:  You may.

1935

Q     (By Mr. Littlefield) And where -- can you tap where the bullet is?  Okay.  Is it the left or right arrow?  Now tap it.  Okay.  What was done with that bullet?

A     It was seized, packaged as evidence and submitted to the OSBI laboratory.

MR. LITTLEFIELD:  I don't know if I've asked but 139, Government Exhibit Number 139, needs to the provided to the witness, please.

THE COURT:  You may.

Q     (By Mr. Littlefield) Do you recognize what has been marked as Government Exhibit Number 139?

A     Yes.

Q     What is that?

A     This is the package containing the projectile which was found on the shelf.

Q     Logged in by yourself with your initials, sealed and submitted to which lab?

A     To the OSBI Laboratory in Tahlequah.

Q     Your initials on it?

A     Yes.

Q     Logged in and submitted by yourself?

A     Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 139.

THE COURT:  Any objection?

1936

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. LITTLEFIELD:  Judge, may I approach?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  Your Honor, I think I have completed all items for direct.  I've looked back a couple times thinking I've pick all of them.  I'd like to take a look if I could and then that way I think I'll announce that I'm through when we come back.

THE COURT:  It's nearly 12, we'll take a recess to 1:15.

MR. LITTLEFIELD:  I appreciate that.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, it's near the noon hour.  We'll take the noon recess now.  If you'll remember my admonition not to discuss this matter among yourselves or allow anyone else to discuss it with you. Keep your minds free and open until you return to start hearing evidence again.  I'll ask that everyone in the courtroom please remain seated as this jury leaves for the noon recess.  I think I said 1:15.  If I didn't, 1:15.

1937

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT: Let the record reflect the jury has departed the courtroom for the noon recess. Anything to take up outside the hearing of the jury on behalf of the Government?

MR. LITTLEFIELD: No, Your Honor.

THE COURT: Defense?

MR. SMITH: No, Your Honor.

THE COURT: We'll be in recess.

(Whereupon, the noon recess was held after which the following record was made in the presence of the jury.)

THE COURT: Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel. You may continue your examination.

Q   (By Mr. Littlefield) Ms. Lyons, prior to becoming an agent with the OSBI, did you have any other law enforcement experience?

A   Yes.

Q   With what agency or institution?

A   United States Marine Corps.

Q   In what capacity were you in the Marines?

A   I was in the Marine Corps for 20 years. I retired

1938

as a chief warrant officer in the criminal investigations field.

Q   And how long were you involved with the criminal investigations section of the Marines?

A   Twelve years.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 3 be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize that view, ma'am?

A   Yes.

Q   And what is that of?

A   This is the view of the front porch of the Kenneth Barrett residence.

Q   Looking in which direction?

A   Looking from west to the east.

Q   If one were to straddle that front door with the right foot in, left foot out looking down the porch line, would you be able to observe the area where the entry team came in?

A   Yes.

Q   In relation to the casings, can you tell exactly where that firearm was located when it fired, when those casings were ejected?

A   No.

1939

Q    Can you tell when those guns -- that firearm was shot?

A    No.

Q    Can you tell who it was that shot it from the location of the casings or anything that you saw at the crime scene?

A    No.

Q    Can you tell whether or not any of the casings might have been moved by activity that was located or occurred in the area at which those casings were deposited?

A    Prior to our arrival, no.

Q    Okay.  The empty box of .223 shells, do you know where it might have been prior to your arrival?

A    No.

Q    Those -- what you talked about and testified to relates to items and their location when you all arrived?

A    That's correct.

          MR. LITTLEFIELD:  Could Government Exhibit 128, the Colt Sporter, be provided to the witness?

          THE COURT:  128?

          MR. LITTLEFIELD:  I think so, Judge, let me verify.  Yes, Your Honor.

          THE COURT:  You may.

Q    (By Mr. Littlefield) Ma'am, go ahead and remove it. Where -- from what portion of that firearm do the casings

1940

eject when they're fired?

A    They eject from the ejection port in this area.

Q    What's the general direction of ejection from that type weapon?

A    From this weapon they eject to the right and slightly in a backwards direction.

Q    Have you fired a weapon similar to that previously?

A    Yes, the M-16.

Q    In regards to the ejection pattern, what difference does it make what kind of surface or surfaces are in the area where those shells eject to or those casings eject to?

A    When a casing is ejected, depending on what it hits, it could hit and land and stay where it hits or it could hit and bounce off and go in many different directions.

Q    And in relation to the final location of the casings, does it make any difference as to whether or not there's activity that takes place in the area where those casings have been deposited?

A    Any type of activity in those areas could move the casings around.

Q    What about dragging a body through the area?

A    Yes.

Q    What about officers reentering the area after those shells had been fired to clear the area of any other

1941

suspects?

A     That could cause them to be moved.

Q     How many casings, .223 casings, were inside the residence, ma'am?

A     If I recall correctly there were 16.

Q     Do you know if there were other casings, .223 casings, in and around the exterior of that residence?

A     Yes.

Q     What general area or location were those?

A     There was some on the front porch and some to the east side of the porch.

Q     When you say to the east side of the porch, do you mean on the porch or to the east off of the porch?

A     Off of the porch on the ground.

Q     And the ones -- the .223 casings that were found on the front porch, what area of the front porch were those located in?

A     On the east end of the front porch.

Q     Is there any restriction on a civilian owning that firearm, assuming that that person has no prior problems, prior convictions or anything of substance.  I mean, just -- could I go in and buy a gun like that?

A     As far as I know you could.

Q     Depends on my background?

A     Yes.

1942

MR. LITTLEFIELD:  May I have just a second, Judge?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Do you want the witness to replace the exhibit?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Okay.  You may cross examination..

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q    Ms. Lyons, good afternoon.

A    Good afternoon.

Q    And if I call you Ms. Jones, I apologize.  I've just seen that name typed up in these reports, okay?

A    Okay.

Q    And whenever I'm asking you questions today about bullets or cartridges or casings, if I misspeak whenever I'm asking you a question about something you think that maybe it's a casing and I've labelled it as something else, will you correct me?

A    Yes.

Q    What I'd like for us to have at the end of our dialogue is a clear understanding by way of question and answer; is that fair?

1943

A    Yes.

Q    Okay.  Ma'am, I have looked at the report that you generated and can you tell the jury when you generated that report as it relates to this matter?

A    Could I look at the report?

Q    Yes, ma'am, if you would.

A    I wrote this report on October the 12th of 1999.

Q    And you've had a chance to review that report probably more than once since you generated it; is that correct, ma'am?

A    Yes.

Q    Would you say that report is accurate?

A    There are a couple of corrections that have to be paid in the report.

Q    And as we go through I want to talk about your report and we'll see if we can discuss those as we go through; fair enough?  Is that fair, ma'am?

A    Yes.

Q    Now, whenever you arrived at the scene at the Barrett residence, do you know what time in the morning it was?

A    No, I don't.

Q    Was it still dark?

A    Yes, I believe it was.

Q    And did you ever leave the scene prior to

1944

processing?

A    Yes.

Q    Where did you -- was that in the beginning or when?

A    Before we began processing the scene I obtained a search warrant for the scene.

Q    Okay.  And so did you have to leave and go do that?

A    Yes.

Q    How long were you gone, ma'am?

A    Probably an hour or so.

Q    Do you know what time it was whenever you came back and started processing the scene?

A    No, I don't.

Q    Was it daylight yet?

A    Yes, we waited till daylight to begin processing the scene.

Q    Had there been other people inside of the scene area?

A    From the time it was secured when I arrived until we began processing it, I'm not aware of anyone that went in it.

Q    Would you be aware of people that may have been in while you weren't at the residence?

A    No, I would not be.

Q    Such as when you were obtaining the warrant?

A    That's correct.

1945

Q    So there could have been people inside the scene that you wouldn't know about?

A    We had scene security posted so it's not likely anyone went in there, but I don't know about that.

Q    You would hope that there would be nobody inside of that scene that shouldn't be there.  Would that be a fair statement?

A    As far as I know there was no one in there.

Q    Ma'am, whenever you're conducting an investigation is consistency with the investigators and your procedure important?

A    Yes.

Q    Why would that be important?

A    To ensure that you do things the same way each time, accurately time.

Q    And oftentimes, you fill out a report and you're called to testify about it several months, maybe even years later; is that true?

A    Yes.

Q    And it'd be fair to say, ma'am, that you conduct quite a few investigations in a year's time?

A    Yes.

Q    And so you have to rely on your report and the paperwork that you generated to help refresh your memory as to what happened out at that scene; is that correct?

1946

A    Yes.

Q    So that would be another reason why consistency would be important to you as an investigator and as a criminalist; is that true?

A    Yes.

Q    As a criminalist you have certain protocol or guidelines that you must follow; is that true, ma'am?

A    I'm not a criminalist, sir, I'm a special agent.

Q    Okay.  As a special agent conducting an investigation you have certain guidelines that you must follow; is that true, ma'am?

A    Yes.

Q    Now, one of those guidelines would be evidence should not be moved or tampered with prior to it being documented, located, photographed, indexed, et cetera; is that true?

A    That's true.

Q    And in response to Mr. Littlefield's question this afternoon, you said from what you had seen, none of the evidence been moved prior to it being photographed or to the condition that you saw it in; is that true?

A    That's true.

Q    But I gather that you're not telling us that some evidence could have been moved prior to you getting inside of the house and seeing it, photographing it,

1947

logging it, et cetera?

A    I don't know what happened to it before we went in.

Q    And again, that's one of those concerns that you would have.  You would hope that nobody would be in there monkeying around, correct?

A    Yes.

Q    Ma'am, I'd like to show you Government's Exhibit Number 16 and I believe that has been put into evidence. Ma'am, there's some glare on this screen.  Is your screen a little darker than what it is on the main screen up here?

A    Yes.

        MR. SMITH:  Could we dim the lights, Judge?

        THE COURT:  Yes.

Q    (By Mr. Smith) Ma'am, while they're dimming the lights, could you tell me if you see an object on top of that table by where you have that placard number 20, and an object that I would be asking you about would be a CB radio?

A    No, there's not.

Q    We're going to take that down, ma'am.  I'm going to show you what has not been introduced into evidence, but Defendant's Exhibit Number 210.  I would ask if you would look at it for me.  Can you see that, ma'am?

A    Yes.

1948

Q    Does that appear to be the same table that was in that previous photograph?

A    Yes.

Q    Have you seen this photograph before?

A    Yes.

Q    Does that appear to accurately reflect the scene as it existed on September the 24th, 1999?

A    Yes.

        MR. SMITH:  Your Honor I'd move for the introduction of Defendant's Exhibit Number 210.

        THE COURT:  Any objection?

        MR. LITTLEFIELD:  No objection.

        THE COURT:  Be admitted without objection.

        MR. SMITH:  Ask that it be displayed to the jury, Judge.

        THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, tell the jury what we see in photo number 210?

A    This is a CB radio, I guess, on the table or the coffee table in the living room.

Q    Is that the same table that was previously depicted in Government's Exhibit Number 16?

A    That's correct.

Q    And Government's Exhibit Number 16 did not show the CB radio; is that correct?

1949

A    That's correct.

Q    Ma'am, I would like to display for you Government's Exhibit Number 171 and I believe that is in evidence.

THE COURT:  What exhibit, counsel?

MR. SMITH:  171, Your Honor.

THE COURT:  Government's exhibit or Defendant's exhibit.

MR. SMITH:  Government's exhibit.

THE COURT:  You may proceed.

Q    (By Mr. Smith) Ma'am, do you recall speaking about that exhibit this morning?

A    Yes.

Q    Tell us again what that is.

A    That's an empty box of .223 caliber bullets.

Q    I believe you testified earlier that that's how it existed whenever you went into that east bedroom?

A    Yes.

Q    We're going to take that down, ma'am.  And I'm going to show you what has not been introduced into evidence, Defendant's Exhibit Number 209.  Ask if you would look at this for me, please.  Can you tell me what 209 is, ma'am?

A    It's a photograph of the bottom part of the gun cabinet.

Q    Does that appear to be the gun cabinet in the east bedroom that you had previously seen at the Kenny Barrett

residence?

A    Yes.

Q    In that photograph, ma'am, do you see a yellow box?

A    Yes.

Q    And does that picture appear to be the way things were when you were out there at the Barrett residence?

A    I don't recall that lower portion being opened when I was there.

Q    Did you ever look inside of that gun cabinet?

A    Yes, we did.

Q    You don't recall seeing anything inside of the bottom portion of the gun cabinet when you looked in it, is that what you're telling us?

A    No.  We did see things inside.  I just don't recall it being open like it is in this photograph.

Q    But you can identify that photograph?  Have you seen that photograph before?

A    Yes, I've seen it before.

        MR. SMITH:  Your Honor, I'd move for the introduction of Defendant's Exhibit Number 209.

        THE COURT:  Any objection?

        MR. LITTLEFIELD:  Object to the relevance.

        THE COURT:  Overruled.  Be admitted.

        MR. SMITH:  Your Honor, I'd ask that it be displayed.

1951

THE COURT:   You may.

Q    (By Mr. Smith) Ma'am, would you tell the ladies and gentlemen of the jury what that yellow box appears to be at the -- right in the middle of that photograph?

A    It appears to be a box of a similar make and brand as the box that was on the other -- in the last photograph.

Q    Okay.  So it appears to be an empty cartridge box of .223s; is that correct, ma'am?

A    I don't know if it's empty or not, but it does appear to be a box of .223s.

Q    It appears to be the same type of box; would that be a fair statement?

A    Yes.

Q    Let me ask you this, ma'am; you have but one box into evidence of empty .223 cartridges, correct?

A    Correct.

Q    If there were more than one in that east bedroom in the area around that gun cabinet, do you think more than one would be into evidence if it existed?

A    If it were outside the gun cabinet, like the other one was, it would be in evidence.  This was not outside the gun cabinet.

Q    What if it was inside the gun cabinet?  You don't think that's something that would have been introduced

1952

into evidence?

MR. LITTLEFIELD:  That's speculation, Judge. That's my decision, not hers.

MR. SMITH:  And I'll strike that question, Judge.

THE COURT:  Question stricken.  You may rephrase.

Q   (By Mr. Smith) Ma'am, let me ask you this:  Do you recall while you were out there at the scene at the Barrett residence seeing more than one box of .223 cartridges?

A   I can't say for certain that I recall seeing more than one box.  I know that we looked in the bottom but I can't say for certain what I recall was in there.

Q   Is there anything that leads you to believe that you might have seen more than one?

A   I could have.  Based on what I see in this photograph it could have been there, yes.

Q   Anything you documented in your report or elsewhere that indicates there would be more than one .223 box?

A   No.

Q   Ma'am, what is depicted in this picture, the .223 box, is not in the same location as what we previously displayed on Government's Exhibit 171; would you agree with that?

1953

MR. LITTLEFIELD:  Assumes facts not evidence which is that is the same .223.

THE COURT:  Argument, counsel?

MR. SMITH:  I think, Judge, my question was this box is not in same location as what is depicted in Government's Exhibit 171.

MR. LITTLEFIELD:  That wasn't his question.

THE COURT:  No objection to that question?

MR. LITTLEFIELD:  I don't remember but that second question I was comparing.

THE COURT:  The first one's withdrawn.  Do you have any objection to that one?

MR. LITTLEFIELD:  I don't remember it.

THE COURT:  Okay.  Rephrase your question.

MR. SMITH:  If I can remember it, Judge.

THE COURT:  Well, disregard, jury, all the questions -- not all the questions but those last two questions and we'll start fresh and, ma'am, if you'll not answer the question until counsel has had an opportunity to object.

Q    (By Mr. Smith) Ma'am, does the box that looks like a .223 cartridge box as depicted on the exhibit that is displayed to the jury, Defendant's 209, that box is not in the same location that a .223 cartridge box is in Government Exhibit 171, is it?

1954

A     That's correct.  The two boxes are in different locations.

Q     Thank you.  Ma'am, whenever you were involved in the military, in the Marine Corps, you had some education in investigations; is that true?

A     Yes.

Q     And that carried over into your work with the OSBI?

A     Yes.

Q     And that's the experience that you relied upon whenever you're conducting this investigation; is that true?

A     Yes.

Q     And part of the investigation that you have done, you created some measurements and listed those on some of your documents as to the location of vehicles and other items of evidence out at the scene; is that correct?

A     That's correct.

Q     And that methodology that you used was faulty, wasn't it, ma'am?

A     As far as the vehicles, yes, it was faulty.

Q     Tell the ladies and gentlemen of the jury why it was faulty.

A     When you triangulate a piece of evidence, normally you will take measurements from two fixed locations to the piece of evidence, basically creating a triangle.

1955

It's called triangulatization (sic).  It fixes that piece of evidence in one location.  When I did the measurements for the vehicles being that I was not aware at the time you have to take actually three measurements to fix a vehicle in a location.

Q    Ma'am, I have a piece of coat hangar and if the Court would allow me to approach you, I would ask you if you could demonstrate for us the faulty methodology that you used in trying to measure the location of these vehicles.

THE COURT:  You may approach the witness.

Q    (By Mr. Smith) And, ma'am, with the Court's permission, what I would ask that you do is to approach Government's Exhibit Number 1 and just show us by way of demonstration how you went about measuring the location of the vehicle.

A    What I did in placing the measurements on the vehicle is say I used a fixed point which would be in my case was the point, the corner of the residence and in order to do that, obtain measurements to the tires on the vehicles.  As I was later instructed, this is incorrect.  You need a third measurement because this particular location, you can actually rotate the vehicle if you needed to.  That's why you need a third measurement to actually fix the vehicle's location.

1956

Q    So in all fairness, ma'am, would what we had to have done would be take the tire as a single point and get two reference points back to say towards the cabin?

A    Well, just from one tire would not -- still would not fix the vehicle because the vehicle could still be moved.

Q    That's right.

A    You'd have to take a third measurement.

Q    That's right, from that one tire, you would want two points and you'd want to go to another location on the vehicle and do the same thing, correct?

A    That's correct.

Q    Okay.  Ma'am, you can be seated.  Now, is this the way things have been done for 20 years in terms of your investigations?

A    I can't say that prior to this investigation I had ever had the occasion to fix a vehicle like that.

Q    And in all fairness, what you're saying is when you're looking at a single item that just has a point, what you did would work, but it's whenever you have something that has multiple points it does not; is that true?

A    That's true.

Q    So in essence the measurements that you have taken as it relates to the vehicles aren't helpful to us?

1957

A    Not -- no, not that much.

Q    Ma'am, whenever you were inside of the house at the Barrett residence, did you see evidence of hunting activity?

A    I saw a -- some type of a bow which you would use in hunting.  I believe there were also -- the firearms could be used in hunting, some of them.  I don't recall anything else.

Q    Do you recall seeing any clay pigeons?

A    No.

Q    Do you recall seeing any mounts of wildlife?

A    No.

Q    Do you recall seeing any deer skulls on the shelf?

A    No.

Q    And stuffed fish, things of that nature, do you recall seeing any of that?

A    No.

Q    You said some of these weapons could be used for hunting weapons.  Wasn't that really the majority of what was at the Barrett residence?

A    I'm not a hunter so I couldn't get into that very well.

Q    Okay.  That's fair enough, ma'am.  Now, in your crime scene video, you showed us a picture of the sign that was on the gate at the Barrett residence; do you

1958

recall that?

A    Yes.

Q    And it's in evidence back behind us, ma'am. But looking at your video, it appeared that that sign was faded?

A    It may have appeared faded in the video. It's painted.

Q    It is a painted sign, but it's not the easiest sign to read, is it?

A    I could read it fairly well, yes.

Q    As you hold it up close. Would you agree with me that it does appear to look faded and worn?

A    I don't think I would classify it as faded, no.

Q    It's a matter of perception, would we agree on that?

A    That's true.

Q    Okay. Now, when you started your crime scene investigation at the Barrett residence, were you responsible for expanding the area of the crime scene?

A    We did expand it. I can't tell you specifically who gave that direction to do that.

Q    And let me back up a second, because I said something I said I wasn't going to. For purposes of identification, whenever you go out to a place where you're called to go work, that area is called a crime scene, isn't it?

1959

A    Yes.

Q    But you're not making the determination that that's what actually has happened out there, that's just a descriptive term; would that be fair?

A    That's true.

Q    Now, while you were out there, somebody decided to enlarge the area within which you're going to consider the scene; is that true?

A    Yes.

Q    And that was done while you were there or before you had gotten there or do you know?

A    It was done while I was there.

Q    Do you know what area had been expanded?

A    I don't recall.

Q    I would like to display Government's Exhibit 94, ma'am. Again, it's kind of dark from this perspective but does looking at Government's Exhibit 94 refresh your recollection as to what portion if any of the crime scene may have been extended, ma'am?

A    I believe we extended from the lower -- the southwest corner and the southeast corner over to the shrubs on the east side and the vehicles on the west side.

Q    Ma'am, you have a laser right there beside you. You can do it one of two ways. You can use this screen or

you can tap on yours, whichever you feel more comfortable with.

A   I can see this one better.

Q   Okay.  That's fine.  If you want to use that and just tap and maybe show us where you're talking about that had been expanded.

A   I believe we expanded from this corner out to this corner and then from this corner out to this corner.

Q   Do you recall when that was done, ma'am?

A   No, I don't.

Q   Now, as it relates to from the house going to the east and I want to reference from the blue pickup back towards the Highway Patrol vehicle, was any of that ever taped off?

A   I don't believe so.  I don't recall that.

Q   I see what looks like tape from the blue pickup to the white Bronco.  Do you see that, ma'am?

A   Yes.

Q   And do you see anything that goes from the northeast corner of the cab and say back to the OHP vehicle?

A   No.

Q   You might look up here just so we know we're talking about the same thing.  In this area right in here?

A   I don't see anything that goes that direction.

Q   So nothing would have prohibited a person from

coming into that area; is that true?  I mean, that's not part of the scene?

A    From the backside of the residence, no.

Q    Or coming up through what has been described as this trail to the east, is that right?

A    I don't recall if that may have been blocked off over on that side.

Q    Nothing reminds you that it was, though, does it?

A    I just don't remember that.

Q    And we're going to talk about what we found on the exterior of the residence.  But would it be fair to say, ma'am, in the area to the northeast of that blue pickup that there were numerous items of evidence found there?

A    That's true.

Q    And that area, again, was not protected, was it?

A    I believe it was protected.

Q    Can you tell me how?

A    There were crime scene or deputies protecting the crime scene from the front of the location, from in this area and there was no access from the field above that house.

Q    Okay.  Show me what area you were talking about.

A    The deputies who were posted to protect the crime scene were in this area in here.

Q    Okay.

1962

A    And they were posting and logging people as they entered the scene.

Q    Okay.  Now, again, I understand there was tape that went from the Bronco to the pickup.  Prior to this barrier being put up that extends to the east, would anything have prohibited an individual from walking behind that Bronco and back around by that blue pickup in that area?

A    I don't know of anything.

Q    Again, is that a matter of perception as whether we would say that was protected or not?

A    I would say it was protected but it's perception.

Q    Now, did you also conduct a video out on the roadway area, ma'am?

A    Yes, I did.

Q    Okay.  And you went down to the corner of the property near where the cattle guard was?

A    Yes.

Q    And in your report you described that corner, I believe, and the entrance that comes in from the east side as the brushy area; is that true?

A    Yes.

Q    And as you're sitting on that county road say just as you're making the turn on to that private drive, just in front of the cattle guard, do you know where I'm

referring to?

A    Yes.

Q    Would you say that that brush was so high that it would obscure your vision of the cabin, of the Barrett residence?

A    I don't believe so, no.

Q    You think you could see through it clearly?

A    Maybe not clearly but you could see the residence.

Q    Could you see detail?  Do you think you could see the identity of a person in the yard?

A    I couldn't say that.  I don't know.

Q    Do you know how high that brushy area was, say in the corner of the area there by the cattle guard?

A    No, I don't.

Q    You didn't measure that?

A    No.

Q    Okay.  Ma'am, I'd like to display Defendant's Exhibit Number 105.

        MR. SMITH:  I misspoke, Your Honor.  I meant Government Exhibit 105.  Well, I may have misspoke twice, there.  Excuse me, Your Honor, it is Defendant's Exhibit 105 and that has been introduced into evidence.

        THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, have you had time to orientate yourself with the items in that photo?

1964

A   Yes.

Q   Now, whenever you conducted your examination of the exterior of the residence, you traveled to what I want to call the shop area, which is that area that is to the northwest of the house; is that true?

A   Yes.

Q   And in that area, describe what all you found in terms of structure.

A   I recall there being a garage, a place where he worked on vehicles.  There was some type of a travel trailer behind it and there were several vehicles all around it.

Q   Can you identify the travel trailer for us, please? You can tap on that screen.

A   That would be the travel trailer.

Q   That looks like a rather small travel trailer?

A   Right.

Q   Did you determine who, if anybody, lived in that travel trailer, ma'am?

A   I don't know if anyone was living in it.

Q   Did you look inside of it?

A   I did not.

Q   So you don't if somebody was living in it; would that fair?

A   That's true.

1965

Q    Now, ma'am, in that area around the shop, and I'm going to for purpose of our conversations for the next few moments, I would like to concentrate our discussion in this area. Would that be fair?

A    Okay.

Q    And in that area you found some casings; is that true?

A    Yes.

Q    If you would refer to your report, tell us what all casings you found in that area.

A    There was a .22 caliber shell casing that was located just south of the garage on the ground.

Q    Okay. I'm looking at page two of your report, ma'am, in the third paragraph. I'll try to help us speed along here a little bit and if I misspeak, correct me. But would it be true that you found seven .22 cartridges in that area, .22 -- seven .22 casings in that area?

A    I'm not sure what you're referring to.

Q    Again, on page two of your report, paragraph three.

A    Yes, there were seven .22 caliber casings located in the back side of the garage.

Q    Okay. And you've indicated by way of arrow where that would have been?

A    Yes.

Q    Tell us what else you found there by way of casings.

1966

A     A 9 millimeter shell casing and a -- well, one .223 caliber shell casing.

Q     Did you have any information, ma'am, that Kenny Barrett was known to shoot around his property?

A     Yes.

Q     So it really didn't surprise you that you might find casings laying out there in the grass there?

A     That's true.

Q     You policed up a range before in your experience on the firing line?

A     Yes.

Q     And on a range you can even lose casings, can you not?

A     Yes.

Q     And that's usually in an area that is barren of any vegetation?

A     A range.

Q     Most ranges are, are they not?

A     Some are, some aren't.

Q     But whenever you're talking about finding something in the grass, something that is -- such as a casing, it can be hard to find those sometimes, can it not?

A     Yes.

Q     Now, I'd like to direct your attention to the west end of the porch area, ma'am.  On the south end of the

1967

house, west end of the porch?

A    Yes.

Q    Do you know the direction of the projectile that was found on top of that refrigerator on the front porch?

A    It would have gone from the east end of the front porch, traveling toward the west.

Q    Can you show us by way on this photo the direction that it would have extended -- the direction it would have been traveling if it doesn't lodge on top of that refrigerator?

A    I don't believe that I could say that with any -- being very specific about that.  I just know it was traveling from east to west.

Q    You're going to say east to west.  Let me ask you this, ma'am:  Would you expect it to be going kind of in the area of this trailer?

A    I couldn't say that.  I didn't do the trajectory analysis on it.

Q    Let me ask you this.  Would you expect it to be going somewhere in the area in front of these two pickups right here?

A    Again, I could not say.  I didn't do the trajectory on it.

Q    Anywhere in that vicinity?

A    I don't know.

1968

Q    Now, whenever you looked at the -- whenever you're conducting your exterior examination, you found a necklace?

A    Yes.

Q    And you logged that into evidence?

A    Yes.

Q    Can you show me on this photograph where you may have found that necklace?

A    It was somewhere on the ground in this vicinity.

Q    Okay.  To the west end of that porch?

A    Yes.

Q    Do you know whose necklace that was?

A    It was reported to us to belong to Toby Barrett.

Q    Ma'am, I would like to display to you an item that has not been put into evidence which is Defendant's Exhibit Number 26.  Ma'am, if you need to, you can look at the evidence book while we're pulling this up.  Is it displaying, ma'am?

A    Yes.

Q    Okay.  Great.  And can you tell us what you see in that picture, ma'am?

A    This is a copy of my sketch of the exterior evidence and it has been colorized.

Q    I have put some colored pencil on that report.  But other than the colored pencil, is that an accurate

1969

rendition of your sketch of the exterior of the residence?

A    Yes.

MR. SMITH:  I move for the introduction of Defendant's Number 26, Your Honor.

THE COURT:  Any objection?

MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.

MR. LITTLEFIELD:  No objection.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No, no objection.

THE COURT:  Admitted without object.

MR. SMITH:  Ask that it be displayed, Your Honor.

Q    (By Mr. Smith) Ma'am, the color coding that I put on there is by way of description and I hope that it helps clarify things and not confuse us.  But if I can direct your attention around the area of the blue Chevy pickup.

A    Okay.

Q    You'll see what I have indicated on there, items depicted in blue?

A    Yes.

Q    Can you tell us what those, what I'm going to identify as one, two, three, four, five of those rectangle boxes are.

1970

A    The blue boxes you have marked is 9 millimeter H&K. It doesn't say -- well, I guess they're casings.

Q    And you can refer back to your original listing of items, ma'am.  I guess what I want to clarify is those five items are all 9 millimeter shell casings; is that true?

MR. LITTLEFIELD:  Judge, it is beyond the scope.  She didn't testify as to the retrieval of those casings, those casings marked in green which were on the exterior of the residence.

THE COURT:  Okay.  Let's don't get carried away here.  Let's withdraw the question and rephrase the question.  You can have an opportunity to object.  I was getting a speaking objection there.  Let's see what the question is.  Disregard that speaking objection.

Q    (By Mr. Smith) Now, ma'am, I've got one in front of me so I'll refer to them by way of item numbers and it will help us be a little more accurate.  What I have depicted in blue is 2-A, 6-A, 7-A, 11-A and 10-A.  Do you see those?

A    Yes.

Q    And they are all depicted around that blue Chevy pickup, are they not, ma'am?

A    Yes.

Q    And they also are depicted in blue; is that true?

1971

A      Yes.

Q      And --

MR. LITTLEFIELD: Object as beyond the scope.

THE COURT: I'm still listening.

MR. LITTLEFIELD: I didn't want to speak. She testified as to the casings inside the residence and the .45 live rounds which are shown. But as far as the .223 or the 9 millimeter H&K casings, she didn't testify as to the retrieval or anything. I anticipate they will be testified about, but this witness is not the one responsible and spoke not about them at all.

THE COURT: I think it's within the zone of cross examination. Overruled.

MR. SMITH: Thank you, Your Honor.

Q      (By Mr. Smith) Again, ma'am, are all of those 9 millimeter casings as depicted on your sketch?

A      Yes.

Q      Again, all's I did was help color code them; is that true?

A      That's true.

Q      Okay. Now what is listed as number one is an unfired 9 millimeter shell; is that true?

A      It's a bullet, yes.

Q      Again, if you'll correct me like that, I'll try to call it a bullet, okay?

1972

A     Uh huh.

Q     All right.  Now what we've listed in green, ma'am, 10, 11, three, 13A, two and 8-A, all those are what type of casings?

A     They're .223 caliber casing.

Q     Would it be fair to say, ma'am, other than the one .223 casing that was found out by the trailer, out by the -- behind the shop in the small trailer that we talked about earlier, okay?  Outside of that, would it be fair to say, ma'am, that these are all of the .223 casings that were found outside of the Barrett residence?

A     As far as I know, yes.  They're the only ones that were found outside.

Q     And you can't tell how long those cases may have been -- whether they're on the ground or the two that are on the porch; is that true?

A     That's true.

Q     Now, from an area that I'm going to -- what you have depicted on the house as number A, letter A, excuse me. Around the Bronco that has been previously identified as the Hamilton Bronco, back around to say, area D, were there any .223 cartridges in that area?

A     No.

Q     Ma'am, whenever you're in the Marine Corps, you qualified with an M16, did you not?

1973

A    Yes.

Q    That M16 looks very similar to that Colt Sporter, does it not?

A    Yes.

Q    A variation of the two being that the Colt Sporter is not a fully automatic weapon?

A    That's true.

Q    But in all other regards, the action looks very similar?

A    That's true.

Q    The ejection port looks very similar?

A    Yes.

Q    And your experience with that .223, ma'am, is the M16, that it doesn't really -- it doesn't direct the shells out to the right.  It directs them to the right and back; is that true?

A    Yes.

Q    And it doesn't just throw them straight out to the right, correct?

A    That's correct.

Q    Back to our diagram, ma'am, what I have depicted in orange, which you previously had told us was the .45 cartridges, number 20, four, eight, seven and six.  Are all of those .45 bullets?

A    Yes.

1974

Q Unfired bullets, correct?

A Yes.

Q And 20 depicts two; is that correct?

A Yes.

Q Now, over here at 1-A, that is also a .45 bullet, is it not?

A Yes.

Q Now, this is one of the errors that exist in your report, is it not?

A Yes.

Q And explain to the jury what the error is.

A In my evidence list, I called it a casing when it is in fact a bullet.

Q That's not the only place that you called it a .45 casing, is it?

A There may be another place. I don't recall.

Q Do you recall when you did a return on a search warrant?

A It may be on there also as a casing.

Q Would you like to see a copy of it, ma'am? Do you have a copy of the return of the search warrant?

A No, I don't have one with me.

Q Do you have any reason to question if I tell you that it's on the return on the search warrant?

A No, I don't have any reason to question it.

1975

Q    Now, do you know the distance between the closest .45 unfired shell, which is number six appears to be on your diagram and 1-A?

A    No, I don't.

Q    Did you take that measurement?

A    No.

Q    Do you have any idea, ma'am -- well, let me ask you this:  Do you associate 1-A, the unfired .45 cartridge, with these others that are near the Hamilton Bronco?

A    Not necessarily.

Q    So you don't know if it's part of those or not?

A    I don't know.

Q    If it was part of those, then I guess you wouldn't how 1-A got over there by itself, would you?

A    I don't know.

Q    Okay.  Now, 3-A that I have a circle around is what, ma'am?

A    It's a .380 caliber shell casing.

Q    And a .380 shell is also known as a 9 millimeter Kurtz; is that true?

A    I have heard that.

Q    What does that mean to you, ma'am, if anything?

A    All I know is that they're supposed to be the same size, but I don't know that as a fact.  I'm not an expert in that kind of weapon.

1976

Q    All right.  Is it your understanding that the diameter on a 9 millimeter and a diameter on a .380 are the same?

A    I don't know that for certain.

Q    Fair enough.  That was a casing; is that true?

A    Yes.

Q    Okay.  Ma'am, I would like to look at 14 and 13 which are at the bottom edge of the Bronco.  Can you tell us what those are?

A    Those or .45 caliber shell casings.

Q    Have been fired; is that true?

A    Yes.

Q    And then the only other casing that I show outside of the residence and we haven't talked about is this one right here, 12-A; is that true?

A    Yes.

Q    And tell us what kind of casing that is.  Or if it's a bullet or what is it?

A    12-A is a 9 millimeter shell casing.

Q    Okay.  And any particular weapon that you can attribute that to?

A    I could not at the scene.

Q    It's out there by its lonesome, though; is that true?

A    That's true.

1977

Q    Ma'am, do you have in your report there what is listed -- what you have listed as evidence list and measurements exterior crime scene?

A    Yes.

Q    Would you look at item 1-A.  And I'm interested in your description of that item.

A    Okay.

Q    Can you tell us what that says, ma'am, beside 1-A.

A    It says one .45 caliber RP casing.

Q    And I asked you earlier if you could attribute that to those other cluster of bullets that are around by the Hamilton Bronco; is that true?

A    That's true.

Q    And some of those were six, seven and eight; is that true?

A    Yes.

Q    And six and seven, is that the same description that you give for 1-A?  I mean, they're both RPs?

A    They're both RPs, yes.

Q    And then number eight, in all fairness, says .45 caliber WW bullet; is that true?

A    Yes.

Q    WW is a different brand?

A    Yes.

Q    Thank you.  Ma'am, you retrieved a Sig Sauer .45; is

that true?

A    Yes.

Q    Do you know whose weapon that was that you retrieved?

A    I don't recall.

Q    Can you tell us where you retrieved it?

A    Yes, that was the pistol that was on the front porch of the residence.

Q    What you have listed as item number 15; is that true?

A    Yes.

Q    In your description, in your report, ma'am, when you're talking about that .45 caliber Sig Sauer, you identify it as having one round in the chamber; is that correct?

A    Yes.

Q    Okay.  And then you say a magazine with rounds.  But you don't count them, do you?

A    No, I did not.

Q    And nowhere in your report do you make an accounting of the rounds for that .45 caliber pistol?

A    Not in my report, no.

Q    And you have later come to find out that that was the Hamilton pistol, have you not, ma'am?

A    Yes.

1979

Q    And you've come to find out that that pistol was fired?

A    Yes.

Q    But you didn't count the rounds that were left inside of the magazine?

A    I did not, no.

Q    Now, you recovered a Smith and Wesson 9 millimeter semi-automatic pistol, did you not, ma'am?

A    Yes.

Q    And that pistol was what is identified on your exhibit as Number 12; is that true?

A    Yes.

Q    Okay.  And you had a description of that item in your report, did you not, ma'am?

A    Yes.

Q    Again you described that as containing one round in the chamber?

A    Yes.

Q    Is that correct?

A    Yes.

Q    You described the magazine with containing how many rounds, ma'am?

A    Nine.

Q    Now, earlier whenever we started this discussion I asked you about consistency.  We're not being consistent

1980

with the reporting on those two descriptions of weapons, are we?

A    As far as the report goes, yes, that's correct.

Q    Ma'am, I'm now working on page three of your report because I know that sometimes it may be helpful for you to refer to there.  And we talked about the door facing and I'm going to put up here Defendant's Exhibit 104.

MR. SMITH:  Your Honor, strike that.  I'm just going to move on.

THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, you conducted an examination on the interior of the residence, did you not?

A    Yes.

Q    And remember previously when I showed you that CB radio?

A    Yes.

Q    And do you have a description of that CB radio in your report?

A    Yes.

Q    It indicates that it was sitting on a table, does it not?

A    Yes.

Q    But again, the photo that we looked at when the Government was going through their pictures didn't indicate that, did it?

1981

A    No.

Q    Can you explain to us how in your report you would have identified it as being on the table, but yet when you're looking at the photos with the Government, you don't remember it being there?

A    By the time the photo was taken that the Government used as an exhibit, that CB radio had been moved.

Q    Why would it have been moved?

A    I don't recall.

Q    Do you know who would have move it?

A    No, I don't remember.

Q    Can we -- I guess my next question would be are there other items within the interior of that residence that were moved during this photographing and logging of evidence or do you know?

A    I don't recall.

Q    Okay.  Ma'am, you saw on that couch in the front room some damage to the -- what I want to describe as a left front corner; is that true?

A    Yes.

Q    I want to ask you to look at Defendant's Exhibit Number 119.  I don't think this is in so I'm just going to ask you to look at it for me.  Do you recognize that picture, ma'am?

A    Yes.

1982

Q    Tell us what you see.

A    This is the front lower edge on the east end of the couch.

Q    In the Barrett residence?

A    Yes.

Q    Does that appear to accurately depict the scene as you remember it?

A    Yes.

MR. SMITH:  Ask that Number 119 be admitted, Your Honor.

MR. LITTLEFIELD:  No objection.

THE COURT:  It will be admitted without objection.

MR. SMITH:  Ask that it be displayed, Judge.

THE COURT:  You may.

Q    (By Mr. Smith) Show us, ma'am, where you see a bullet hole in the end of that couch if you would.

A    There is a hole in the -- (Interrupted)

MR. LITTLEFIELD:  I would object, assumes facts not in evidence.

THE COURT:  Sustained.

MR. SMITH:  I'll strike.

Q    (By Mr. Smith) Ma'am, do you see any damage to the area on that couch?

A    Yes.

1983

Q    How would you describe that damage?

A    There is a hole in the couch.

Q    And what does it appear to be from?

A    I couldn't say for certain.

Q    You're an investigator and you're curious and you had a theory about what caused that hole, didn't you?

A    Yes.

Q    What did you think caused that?

        MR. LITTLEFIELD:  Objection.  That would be speculation as to what her theory was, Judge.

        THE COURT:  Sustained.

Q    (By Mr. Smith) Did you conduct an investigation based on seeing the hole in that couch, ma'am?

A    Yes.

Q    What were you looking for?

A    When I cut open the couch I was looking for a bullet.

Q    And tell me what portion of the couch you cut open.

A    The lower portion.

Q    Which lower portion, ma'am?

A    The portion near the hole.

Q    Just on the front side of the couch?

A    Yes.

Q    Did you take that end of the couch apart?

A    The entire end, no.

1984

Q    You just -- would it be fair to say you explored from the front or how did you explore?  I'll let you describe it for us.

A    We went in as far as I could to try to locate the end of where that hole ended and never recovered any type of projectile.

Q    But you were looking for a projectile?

A    Yes.

MR. SMITH:  Your Honor, I would ask Government 194 be displayed.

THE COURT:  You may.

MR. SMITH:  I think that is in evidence, Judge.

THE COURT:  194 is in evidence.

Q    (By Mr. Smith) And again, ma'am, while we're waiting on any of these, you can look at the exhibit book also.  Now we've got it up, ma'am.  Are you able to orientate yourself as to what is depicted in that photograph?

A    Yes.

Q    Would it be fair to say, ma'am, that this is looking towards the kitchen area?

A    Yes.

Q    And this area that is depicted in the center of the photo at the top, what portion of the cabinet is that, if you know?

A    I'm not sure what you mean.

Q    Do you know what these are in here?

A    That's a set of shelves that he had next to the back door.

Q    And they go from the floor to the ceiling?

A    They go from the floor very far up, but I don't know how far.

Q    Are they directly in front of that back door?

A    Yes.

Q    And were those permanent shelves?

A    As far as I know.

Q    And so whenever you described in your report, ma'am, that the back door was inaccessible, is that why?

A    Yes.

Q    By that you mean that you couldn't travel in and out of that area because those shelves were across that door?

A    As far as I know, yes.

Q    So there was no way out of the back end of that house, was there not, ma'am?

A    Not that I'm aware of.

Q    And in fact, you made a description of the kitchen window near that door, did you not?

A    Yes.

Q    And what was your description of that kitchen window?

A    It was covered with something, but I don't recall

1986

what it was.

Q  And what else -- how else did you describe that kitchen window, other than being covered?

A  I don't recall.

Q  Then I'd refer you to the bottom of your report on page three, ma'am.  The second to the last sentence.

A  The kitchen window was also covered and inaccessible.

Q  Indicating that you couldn't travel in and out of that window to get to the back end of the residence either; is that true?

A  That's true.

Q  Who was in charge of the crime scene out there, ma'am?

A  I was.

Q  Now, the interior of the residence, did you notice any plumbing?

A  I don't recall any.

Q  Any running water?

A  I don't recall any.

Q  Ma'am, in the east room of the house, we talked about a .45 projectile that was found on some magazines earlier; is that true?

A  Yes.

Q  Do you recall that during the Government's

1987

examination?

A    Yes.

Q    That's not all that was found in the same area or near that area, was it?

A    That's true.

Q    We didn't talk about what else was found, did we?

A    No.

Q    Tell the jury what else was found.

A    There was a bag of hypodermic syringes found in that area also.

Q    What else was found there?

A    In the shelves?

Q    Yes, ma'am.  In that area.

A    I believe there was also a .223 caliber bullet.

Q    Unfired, is that true?

A    That's true.

Q    Ma'am, I would ask that you take possession of that Colt Sporter again.  If you need to move that exhibit book, ma'am, let me know and we'll get that out of your way.  What I'd like for you to do is to set the butt of that rifle up on top of the podium in front of you and turn it around a little bit more toward -- a little bit more the other way, ma'am, come on around, on around.

A    This way.

Q    On around.  Show the ladies and gentlemen of the

1988

jury what is referred to as the charging handle on that weapon.  You just activated it for us, have you not, ma'am?

A     Yes.

Q     The charging handle does what whenever you pull that to the rear on that weapon?

A     If the weapon is loaded it will -- I believe -- it's been awhile but I believe it will eject the round.

Q     Let's put it back up there so they can see it, ma'am.  Again, you qualified with the M16?

A     Yes.

Q     Very similar weapon.  So when I talk about a charging handle, you know what I'm referring to, don't you?

A     I think so.  It's been awhile.

Q     Okay.  I can appreciate that.  And whenever you pull that charging handle to the rear, the extractor does what to a bullet if it's inside the chamber?

A     Would eject it.

Q     And which way does it eject it, ma'am?

A     To the right.

Q     Show the jury the ejection port on that weapon.  Can you show us by way of pointing to it?

A     It's the open chamber there.

Q     So it's going to go to the right and where, ma'am?

1989

A    Well, if it were being fired, it would go to the right and back slightly.  Just to eject it, it would go to the right.

Q    Would it go back some to the right also if you manually ejected it?

A    Not as much as if you were firing the weapon.

Q    That is a gas operated weapon; is that true?

A    Yes.

Q    And whenever that expends the shells on its own, it does with more force than what you would expect if you just charged that handle manually; is that true?

A    That's true.

Q    Ma'am, you can put that weapon back, if you would, please.  How many crime scenes, ma'am, have you investigated where there has been weapons involved?

A    There's been a lot.  I couldn't begin to tell you how many.

Q    And it's very common, is it not, ma'am, for an individual before they get ready to shoot a weapon, question themselves as to whether or not it's loaded and what they do is they charge a round into the chamber and if there's already one chambered, you'll find an unfired round on the ground, will you not?

A    That happens, yes.

Q    That's been your experience on several of these

crime scenes, has it not?

A    That happens, yes.

Q    Police officers do it.  Civilians do it.

A    I've known civilians to do it.  I don't think I've ever known a police officer to do it.

Q    So you don't know whether or not, ma'am, this unfired cartridge that was found on that shelf in that east bedroom resulted from Mr. Barrett manually charging that weapon and it expending that shell onto the shelf, do you?

A    I don't know where that shell -- that bullet came from.

Q    But you don't know that's what didn't happen, do you?

A    I don't know.

Q    Okay.  Fair enough, ma'am.  Now, you took that Colt Sporter weapon and you logged it into evidence, did you not?

A    Yes.

Q    And you had a description that you provided in your report?

A    Yes.

Q    And again, that's listed on page four, is it not?

A    Yes.

Q    And, ma'am, I notice that that is the first time

1991

that we addressed the safety on a weapon in your report; is that true?

A     Yes.

Q     And what do you indicate the position of the safety is on that Colt Sporter?

A     It was positioned to fire.

Q     Tell us what you found as to a round being chambered or not?

A     There was a round chambered.

Q     And then you describe how the rifle was loaded, do you not, ma'am?

A     Yes.

Q     Describe that for us.

A     Two of the magazines were loaded with 30 rounds each and the third magazine contained 12 for a total of 72 rounds.

Q     So what your report says that we have three magazines with a total of 72 rounds?

A     Right.

Q     Correct?

A     Right.

Q     And we've got a weapon with a round that's chambered?

A     Right.

Q     Reading your report, you see why I count 73, do you

1992

not, ma'am?

A    I can see that.

Q    Now, whenever you were asked questions by Mr. Littlefield, and I had you count those cartridges, you said there were 71 in that package?

A    That's correct.

Q    And if you're not sure, tell me.  I mean, that's what my notes say and if we can get that package back out if you want to count them again?

A    I believe that's correct, yes.

Q    Okay.  Then let's talk about that just a minute so we know what we're discussing.  There were 61 unfired rounds; is that true?

A    Yes.

Q    And then because of some testing that was done, there were 10 cases inside of that package that indicate a total of 71?

A    Yes.

Q    And in your report you say that you had 72 rounds that came out of the magazines?

A    Right.

Q    Nothing in your report indicates that you're accounting for the one that's in the chamber?

A    Right.

Q    And then, ma'am, later on you submitted that weapon

and those cartridges to Terrance Higgs, did you not?

A    Yes.

Q    And then the description where it says that you submitted those cartridge, it says that there were 72 .223 cartridges.  Do you recall that?

A    I haven't seen the report but I'm sure that's true.

Q    Would you like to see it?

A    Please.

MR. SMITH:  It's not in evidence, Your Honor.

THE COURT:  What's the number?

MR. SMITH:  Your Honor, I don't think it's --

THE COURT:  Maybe you're not -- maybe you're not going to --

MR. SMITH:  I wasn't, Judge.  We anticipate it's going to come in later.

THE COURT:  Okay.

Q    (By Mr. Smith) Ma'am, have you had a chance to look at that?

A    Yes.

Q    And I have highlighted there the area that I'm discussing.

A    Right.

Q    And I'm going to take that back down now.  Again, I want to ask you, the report that's submitted that says that -- well, first off, this is an OSBI report that

1994

you're looking at; is that true?

A    That's true.

Q    And it says that that evidence was submitted by yourself?

A    Yes.

Q    And it indicates that there were 72 cartridges that were submitted; is that true, ma'am?

A    That's true.

Q    So today we count 71, right?

A    That's true.

Q    Whenever we submitted that we counted 72?

A    Yes.

Q    And you agree with me that you understand how I get 73 when I read your report?

A    I can see how you would see that, yes.

Q    What happened to the other two cartridges?

        MR. LITTLEFIELD:  Objection.  Assumes facts not in evidence that there were two other cartridges.

        THE COURT:  Objection overruled.  You may answer.

A    I don't believe that there were two other cartridges.  There was one other, as far as I know.

Q    (By Mr. Smith) What happened to the one other cartridge?

A    It was submitted to the laboratory.  Beyond that, I

can't explain what happened to it.

Q    Are there control problems in that laboratory?

A    Not that I'm aware of.

Q    On those -- on that packaging that we have it indicates whose hand it comes into and whose hand it goes out of?

A    Yes.

Q    How did we lose a cartridge?

A    I don't know that it was lost so much as it was probably or could have been fired in the testing of that weapon.

Q    And when you fire a bullet, what's left over?

A    The shell casing.

Q    Because we have 10 others in that package.

A    Fired by a different agency.

Q    I don't care if an astronaut fires it, you still have a casing that's left over, do you not?

THE COURT:   Mr. Smith, that's not appropriate.

MR. SMITH:   I apologize, Your Honor.  I'll rephrase my question.

Q    (By Mr. Smith) It doesn't matter who fired that weapon, ma'am.  There would still be a casing that would be left over; is that true?

A    That's true.

Q    And individuals within the OSBI understand the

significance of bullet count; would that be true?

A    Yes.

Q    I mean, people that are dealing with ballistics, firearms, evidence, that's something that you'd want to pay attention to; would that be true?

A    Yes.

Q    Now, ma'am, just a little bit under that you talk about that Coach double barrel 12 gauge shotgun, do you not?

A    Yes.

Q    And that's the shotgun that was found in the east bedroom as well?

A    Yes.

Q    And in that shotgun there was one side had an expended round and one side had an unfired round; is that true?

A    Right.

Q    The left side was fired, the right side was unfired?

A    Right.

Q    Have you come to learn that the left side of that barrel did not function?

A    There was one side that did not function.  I don't recall which it was.

Q    You don't recall if it was the left or the right?

A    I don't remember.

1997

Q    Let me ask you this:  Why would an individual leave a fired round in a double barrel shotgun on a side that did not function, if you know?

MR. LITTLEFIELD:  Your Honor, it's not -- it calls for speculation.

THE COURT:  Overruled.  If you know.

A    It is possible if the person knew that that side did not fire that they left an expended shell casing in there to keep them from loading and trying to use that side.

Q    (By Mr. Smith) Thank you, ma'am.  Then I would ask you about a .22 caliber rifle that was found within that gun cabinet.  Do you recall which one I'm referring to, ma'am?

A    Yes.

Q    And you'd given a description of it in your report on page four at the end of that first full paragraph, have you not?

A    Yes.

Q    And in that description, ma'am, again you describe that on that .22 caliber rifle there's no mention of a safety; is that true?

A    That's true.

Q    There is mention of one round being in the chamber?

A    Yes.

Q    And five rounds in the magazine?

1998

A    Yes.

Q    We've accounted for them separately?

A    Yes.

Q    Now let's talk about what has been referred to as the hidey hole.  The hidden compartment in the stairwell. Anything sinister about that?

A    It's unusual.

Q    It was not an easy thing to discover, is it?

A    No.

Q    It's not something that was easy to access?

A    Once you knew it was there it was easy to access, yes.

Q    But you had to go through some trouble.

A    Yes.

Q    I mean, that whole area isn't any wider than this podium, is it?

A    That's true.

Q    I mean, it's a small area and I'm talking about the stairwell going up and everything?

A    Yes.

Q    And it's a very steep stairwell, isn't it?

A    Yes.

Q    Would you agree with that?

A    Yes.

Q    Did it appear to you, ma'am, that that area could be

1999

used for storage of guns for the prevention of theft?

A    I don't know why it would be used for storage of guns.  It could be any number of reasons, including the prevention of theft.

Q    It's not easy for somebody if they're coming in and out of that cabin.  It's going to be hard to find, isn't it?

A    Yes.

Q    And you saw several different weapons inside of what I'm going to call the hidey hole?

A    Yes.

Q    And one of them you described earlier as a Ruger .223 rifle?

A    Yes.

Q    Again, shoots the same bullet as an M16?

A    Yes.

Q    Same as the Colt Sporter?

A    Yes.

Q    Did that gun have a bolt?

A    No.

Q    Would a gun fire without a bolt?

A    No.

Q    Was that a hunting rifle?

A    I don't know.

Q    Did it have a scope on it?

2000

A    Yes.

Q    Did it look like an assault weapon?

A    Again, I couldn't say for sure.

Q    Because you're not a hunter?

A    I'm not a hunter.

Q    Okay.  Underneath that, you listed an Ithaca Deer Slayer shotgun.  Just a .12 gauge shotgun, right?

A    Yes.

Q    Okay.  .16 gauge shotgun?

A    Yes.

Q    That one didn't have a stock on it, did it?

A    That's correct.

Q    There's an over/under .22 on top .20 gauge shotgun on the bottom; is that true?

A    Yes.

Q    Savage?

A    Yes.

Q    And you might not know this, appear to be a common firearm or do you not have experience with those type of weapons?

A    My only experience with that type of weapon is that it is an uncommon type of firearm.

Q    Because it's an over/under .22 and a .20 gauge?

A    Yes.

Q    But you have no reason to think if we go to a Tulsa

2001

Gun Show we're not going to see some of those there, do you?

A    I don't know.

Q    Again, there's a .22 rifle in there, a Ruger, another one?

A    Yes.

Q    Didn't appear to be anything other than what you might use for target shooting or hunting?

A    I don't know.

Q    Then we found a black case that contains a .30-06, is that true, ma'am?

A    Yes.

Q    And there was another .30-06; is that true?

A    Yes.

Q    Are you aware of the characteristics of a .30-06?

A    No, I'm not.

Q    Do you know in terms of caliber what size a .30-06 is?

A    No, I don't.

Q    Do you know if a .30-06 is more powerful than a .223?

A    No, I could not tell you that.

Q    I guess, ma'am, other than there being eight guns in that hidey hole, anything unusual about any of them?  I mean, strike you as, boy, this is weird or this is

unusual or this just doesn't look right?

A    No.   Just other than it being hidden in that manner.

MR. SMITH:   I would like to put up Government's Exhibit Number 19.  And that has been introduced into evidence.

Q    (By Mr. Smith) Ma'am, you've described this as a spotting scope; is that true?

A    Yes.

Q    And do you know how high that spotting scope would be above the ground from just right outside that window?

A    I couldn't say for certain.

Q    Would it be higher than three feet?

A    Yes.

Q    In other words this is in the loft area?

A    Yes.

Q    So, would you expect it to be over 10 feet?

A    Possibly.

Q    Are you aware of the elevation change between the house and the ditch area that was depicted as some sort of a drive area to the east of the residence?

A    I don't know what the elevation change is there.

Q    It's not flat though, is it?

A    No, it's not.

Q    And you can tell that by looking at the model?

A    Yes.

2003

Q   Okay.  But in this picture it appears that that scope is horizontal, does it not?

A   That's what it looks like.

Q   So if we're at least -- what would you say, at least 10 feet off of the ground, right outside the window?

A   At least 10, maybe more.

Q   And whatever elevation change we have down there at the ditch.

A   Yes.

Q   That scope isn't focussed on that drive is it?

A   It absolutely is.  I looked at it myself.  It is focussed on that drive.

Q   Horizontally, sticking out the window?

A   It appears to be horizontal in this photograph, but when I looked through the spotting scope itself it is focused on that drive.

Q   Let me ask you this one.  In all fairness, are you aware of any other photo that's going to show us a different angle with that spotting scope?

A   I'm not aware of any.

Q   That's the best photo that depicts it as far as you know; is that true?

A   I don't know if there are other photos that may depict that, but I can tell you where that was focussed.

Q   So you and I have room to argue if I would think

2004

that to focus it on the driveway, it might have to be pointing down more?

A    That might be your opinion.  I know what I saw when I looked in it.

Q    Tell me, ma'am, did you look in that at night?

A    No, it was daytime.

Q    Did you -- were you ever out at the residence at night?

A    It got dark while I was inside there toward the end, yes.

Q    Did you look through that scope at night?

A    No.

Q    Have you ever looked through a night vision scope?

A    Yes, I have.

Q    Okay.  And you can see quite a bit with a night vision scope, can you not?  You can see movement?

A    You can see, yes, movement.

Q    This wasn't a night vision scope?

A    No.

Q    If it's dark outside, what are you going to see through that scope?

A    I don't know in that area.  I didn't look through it at night.

Q    Okay.  Would you expect to be able to see very well through that scope?

A    As long as there's no lighting out there, I wouldn't expect to see very well at all.

Q    Then, ma'am, right below that we talk about the .22 caliber pistol and I think you testified inaccurately earlier and I'm going to give you a chance to correct it, okay?  Under questioning by Mr. Littlefield, you described as retrieving that weapon from the hidey hole, do you remember that?

A    If I said I took it from the hidey hole, that was incorrect.  It was actually taken from a desk drawer.

Q    Right.  Didn't have anything to do with the hidey hole, did it?

A    That's correct.

Q    Okay.  But now we did provide a description on this Browning .22 caliber pistol, didn't we?

A    Yes.

Q    Was there any mention of the safety?

A    No.

Q    Was there any mention of whether or not there was a round in the chamber?

A    Yes, there was a round in the chamber.

Q    And a magazine with a count?

A    Yes.

Q    How many?

A    Nine rounds.

2006

Q   And then, ma'am, at the bottom of that report the last two entries that you have.  You show that there's a paper envelope containing one .22 caliber bullet.  You see what I'm referring to?

A   Yes.

Q   That's the chambered round, is it not, ma'am?

A   Yes, it is.

Q   You're going to package that differently than you are the rounds from the magazine?

A   Yes.

Q   You don't take a round from the chamber and stuff it back in the magazine, do you?

A   No.

Q   Why do you want to preserve the character of a chambered round as opposed to one in the magazine?

A   In the event that there are markings on the round that was chambered, you would want it preserved separately from the others.

Q   And oftentimes a person involved in examining these cartridges, these bullets, they can see scratch marks that are caused by the action of a rifle, can they not?

A   Caused by the action or by the firing pin.

Q   Okay.  So that's why you packaged that one separately?

A   Yes.

Q     That's your practice, that's what you've been learned to do and in fact that's what you did here?

A     Yes.

Q     And then you packaged separately the magazine and you have on there nine .22 caliber bullets?

A     Yes.

Q     Now, earlier whenever I was voir diring you, whenever the Government was introducing the evidence that contained that magazine, the bullets were gone?

A     That's correct.

Q     Don't know what happened to them, do we?

A     No.

Q     Anything on that paperwork going to give us a clue as to what happened to those bullets?  And I'm talking about the envelope that they were packaged in.

A     Not that I'm aware of.

Q     Some reason those bullets should not be contained within a packaging that you sealed and submitted to the lab?

A     I don't know what happened to them after I submitted them to the lab.

Q     You were in charge of this crime scene.  Have you inquired later as to what may have happened to items of evidence?

A     No, I have not.

2008

Q     Again, ma'am, on your search warrant return you've identified the same listing for those .22 bullets, with the magazine and also the one with the chamber, in terms of being packaged separately, did you not?

A     Yes.

Q     Now, is there some reason for us to believe that the cartridge that was chambered in that Colt Sporter rifle was not packaged separately like you did with this .22?

A     It was packaged separately.

Q     It wasn't stuffed back into the magazine making the 12th round?

A     No, it was not put back in the magazine.  It was packaged separately.

Q     We talked about magazines with a total of 72 rounds.

A     Yes.

Q     And then one in the chamber?

A     No, 72 rounds total.

Q     I don't want to confuse anybody.  Can we just back up to that portion of your report?  We're on page four, ma'am.

A     Right.

Q     Is that true?

A     Yes.

Q     I'm going to ask you to read this for me again.  Starting with the weapon's safety switch, read that

2009

sentence for me, please.

A    The weapon safety switch was on fire and a round was chambered.  The rifle was loaded.  We have three 30 round magazines taped to each other.  Two of the magazines were fully loaded with 30 rounds each and the third magazine contained 12 rounds for a total of 72 rounds.

Q    Now, and I know we went over this earlier, but now in the context of the way that you told us that you packaged those .22 bullets, okay, and the fact that we discussed that you want to do things the same, we want consistency, right?

A    Yes.

Q    Would you agree with me, ma'am, that this indicates that there should be 73 rounds?

A    I agree that I can see how you could be confused by that, but there were 72 rounds.

Q    How I can be confused?

A    How anyone could be confused by that.  But there were 72 rounds.

Q    Let me do a count on the bullets with you if I can. Well, let me ask you this:  The .223 round you said that was -- excuse me, strike that.

     You said the .223 round that was chambered was packaged separately; is that true?

A    Yes.

2010

Q    Do you know what identification was attributed to that item?

A    I don't know.

Q    Do you have that listed in your report?

A    No.

Q    Is that important?

A    As far as what weapon?

Q    We're talking about the Colt Sporter.  Let me back up a second.  When you're conducting this investigation, you're aware that there was a shooting.  In fact, you're probably aware that there'd been a death?

A    Yes.

Q    And you're aware that the Colt Sporter was the weapon that was suspected of being used in that shooting?

A    Yes.

Q    And now I'm asking you, ma'am, what importance do you place upon having that chambered .223 round packaged separately and so identified in your report?

A    It was packaged separately for the purpose of preserving it for identification by the laboratory.

Q    And show me where that is identified in your report as being done?

A    It's on the packaging that was submitted with the items to the laboratory.

Q    And does it have a separate F number, T number?

A    I would have to pull the packaging itself.

Q    Okay.  Which one would we pull?

A    The packaging for all the rounds that were submitted to the laboratory.

Q    The package of 71 or 72 or --

A    The package that describes 72 rounds.

Q    Let's find that.

MR. SMITH:  Okay, ma'am, let me see which one we're dealing with.  I think I got it on my cheat sheet here.  I'm sorry, did you find it, Paula?  It's the package with what she identified earlier as having 71. What's that exhibit number, ma'am?

THE CLERK:  123.

Q    (By Mr. Smith) You've been handed two exhibits, ma'am.  What is that one in your hand right now that you're looking at?

A    They're both marked Government's Exhibit Number 123.

Q    Okay.  Tell us what you see listed on that package that you're holding in your hand.

A    This is the original packaging for those rounds and it describes 72 rounds.

Q    Does it say that they all came out of a magazine or that there was one packaged separately out of the chamber?

A    It says from Colt Sporter, I can hardly read it.

2012

Three magazines 20 -- I can't read that.  Taped together and 72 rounds bagged with bullet from chamber and then I have each magazine listed with a total of 72 rounds.

Q    Okay.  Now hold on one second.  You said a bag separate with chamber?

A    Bag with a bullet from the chamber.

Q    Okay.  Then whenever you said there's 72 rounds when you're describing the magazines, do you have a count out there beside them?

A    Yes.

Q    Tell us what that count is.

A    Thirty, 30 and 12.

Q    Okay.  Did you stuff that chambered round back in the magazine?

A    No, I did not.

Q    So that indicates that there's 72 rounds from the magazine?

A    Yes.

Q    Plus a separate packaged chambered round?

A    Not plus a separate packaged chambered round. There's a total of 72.  I removed all of the rounds from the magazines.

Q    Why would you count 12 in a center magazine if it contained 11?

A    Because it included the one that was in the chamber.

2013

Q    But it's not in the magazine?

A    Well, it was not in the magazine at the time we removed it from the weapon.

Q    But you don't describe that as being a total of rounds.  You describe that as magazines with how many are in the magazines.

A    I do have a total of 72 rounds listed on this item.

Q    And you got 30 and you got 30 and you got 12.

A    Yes.

Q    It doesn't say anything about 11 plus one?

A    No, it does not.

Q    And it says a separate packaged chambered round?

A    Yes.

Q    Seventy three?

A    Seventy two.

Q    And one on the shelf is 74.  Just follow my math if you would for a second.  Will you do that with me, ma'am?  I think there's 73.  One on the shelf is 74.  Would you agree with that?  The unfired round?

A    If we follow your math, you're counting 74.

Q    Yes, ma'am.  And 16 cases inside of the house?

A    Yes.

Q    For a total of 90?

A    Yes.

Q    The most that this weapon could have if it's fully

2014

charged with 90 rounds in those magazines and one in the chamber is 91?

A    Yes.

Q    So by way of my math, I've got 90 accounted for, would you agree with that?

MR. LITTLEFIELD:  I'm going to object to that. She doesn't need to agree with him.

MR. SMITH:  She can agree or not agree, Judge.

THE COURT:  Okay, okay.  The extraneous argument that's no help to the jury.  Objection overruled.

Q    (By Mr. Smith) Would you agree, ma'am?

A    I guess I'm confused, now.  Can you ask that again?

Q    Okay.  Let's go back through it.  Because of the description on that package, it appears to me that there's 72 in the magazines, 30 plus 30 plus 12, 72, correct?

A    By your way of looking at it, yes.

Q    By the way of the description as you read it to me. I'm mean, that's what it says by magazine.

A    It also says 72 rounds.

Q    Okay.  But I'm talking about how you described the magazines.  30 plus 30 plus 12, right?

MR. LITTLEFIELD:  Your Honor, it's accumulative and it's also argumentative.

2015

THE COURT:  Overruled.

Q    (By Mr. Smith) Would you agree with that, ma'am?

A    Yes.

Q    Okay.  Then we've got a separate packaged chambered round, correct?

A    No.

Q    You describe a separate round as being packaged from the chamber?

A    It is packaged separately but it was in the count for the middle magazine.

Q    Okay.  Follow through with me with what I'm doing. 72 rounds in the magazine by way -- by how they're described, okay?  A separately chambered packaged round, 73, okay?  You with me?

A    By your count, yes.

Q    One on the shelf that's unfired inside the east bedroom, 74, correct?

A    Yes.

Q    16 cases on the floor inside of the house for a total of 90?

A    Yes.

Q    Total capacity, fully loaded, you can't stuff anything else in it, 91?

A    Yes.

Q    Doesn't have anything to do with those six casings

2016

outside of the house, does it?

A    I don't know if it does or not.

Q    Is it going to hold a hundred and five?

A    I don't know which casings were fired from this weapon that night.

Q    Is it going to hold 97?

A    No, it's not going to hold 97.

Q    The most it can hold absent somebody reloading is 91, period.

A    Yes.

Q    Would you agree with that?

A    Yes.

THE COURT:   Let's take the afternoon recess. Members of the jury, if you will remember my admonition not to discuss this among yourselves, allow anyone else to discuss it with you.  We'll be in recess for 15 minutes.  I'd ask everyone to please remain seated as the jury leaves the courtroom.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:   Witness may step down, also.  We'll call you.  Record should reflect the jury has left the courtroom.  Anything to take up outside the hearing of the jury for the Government?

MR. LITTLEFIELD:   No, Your Honor.

THE COURT:  Defendant?

MR. SMITH:  No, Your Honor.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  You may continue your cross examination.

MR. SMITH:  Thank you, Your Honor.  May we hand her number 123 one more time?

THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, if you would take that paper sack out of that plastic wrap so you can see it a little clearer, I had a chance to look at that on break and I want to ask you a question about it.  Over near your right thumb you have a notation on there -- let me ask you this.  The writing that's on that envelope, is that your handwriting?

A    Yes, it is.

Q    Okay.  And right there by your right thumb, could you read the language that you have on there about the magazines?

A    It says from Colt Sporter magazine .223 tape -- taped together and 72 rounds, bag containing bullet from chamber.

2018

Q    Okay.  Hold on one second.  You have about the taped magazines and it looks like plus 72, right?

A    It says and 72 rounds.

Q    And then right underneath that you've got written separately bag with bullet from chamber; is that true, ma'am?

A    Yes.

Q    Where is that bag that has the chambered bullet packaged?

A    It was placed inside this bag and submitted to the laboratory.  I don't know where it is now.

Q    Have you had an opportunity to look at Mr. Higgs' report?

A    Yes, I have.

Q    And are you aware that it does not list a separately packaged chambered round?

A    I believe it does not, that's correct.

Q    And the reason that we're going to package a chambered round separately is so somebody else is conducting an examination will realize the significance of that single round, correct?

A    Yes.

Q    How do we lose the bag that has that chambered round if you seal that envelope and then turn it into the OSBI lab?

2019

A    I don't know what happened to it once it went to the laboratory.

Q    But it's never been reported after you listed it on there as containing a separate bag with a chambered round; would you agree with that?

A    That's -- I'm not sure.  I'd have to check one other report.

Q    Do you have that in the paperwork in front of you?

A    No, I don't.

Q    Okay.  If I knew what you were looking for I'd give it to you, but I don't know what you're --

A    It's a latent print report by Rich Spence on this particular item.

Q    While I'm conducting my examination, I'm going to ask Mr. Hilfiger to look for that for us so we can make sure that it's not there, okay?

A    Okay.

Q    In all fairness to you, ma'am.  I talked a little bit earlier about a return that you made on your search warrant.

A    Yes.

Q    Some of that language was similar as to what you had within your report?

A    Yes.

Q    Some of the language was different than what you had

2020

in your report, contained different items?

A    I'm not sure what you're referring to.

Q    In your return you made notation of there being seven tracers that were retrieved from the scene?

A    Again, I'm not sure what you're referring to.

Q    Do you know what a tracer round is?

A    Yes.

Q    What I'm referring to is your return on the search warrant.

A    Okay.

Q    On page two -- do you have the return with you?

A    No, I do not.

Q    I just have the copy I'm working from, ma'am, but I'll put it up, ma'am, and we'll work off of it together, okay?  And this has not been admitted.  I'm just going to ask you to look at it and see if this will refresh your recollection.

A    Okay.

Q    That is page two of what I show to be a three page document, ma'am.

A    Okay.

Q    Does that refresh your recollection as to what I'm referring to?

A    Yes.

Q    And does that appear to be the listing of items that

2021

you caused to be written down?

A    Yes.

Q    And what I have highlighted about halfway down through that report is a listing of seven tracers and 22 5.56 caliber bullets.  Do you see that, ma'am?

A    Yes.

Q    Where did the seven tracer rounds come from?

A    They came from that particular weapon which is identified by serial number in that -- on that same line.

Q    There's also a description of an M4A-1; is that true?

A    Yes.

Q    Now you probably don't know whose weapon that was?

A    No, I don't.

Q    But that was in one of the vehicles out there at the scene?

A    It belonged to one of the OHP troopers or one of the law enforcement officers at the scene.

Q    Okay.  That was involved in the raid; is that true?

A    Yes.

Q    And then right below that, ma'am, again you have one bullet from M4A-1, the same serial number?

A    Right.

Q    That one bullet that you have on there would indicate the chambered round; is that true?

2022

A    That's possible that's what it indicates.

Q    You don't have further description of chambered round but why else would you list seven tracers and 22 right above it and then right below it have one bullet from the same weapon?

A    I don't know why it's listed separately that way. That's a list that was given to me by the people that seized those items outside the residence.

Q    Below that, ma'am, a little bit, about three lines you have 20 9-millimeter bullets from an HK MP5 and there's a serial number.  Do you see that?

A    Yes.

Q    Do you know whose weapon that was?

A    No.

Q    Right below that you have 31 9-millimeter bullets from the same weapon; is that true?

A    Yes.

Q    And those 31 came from a magazine or can you tell?

A    I can't tell if they came from the magazine. They're listed as being with a magazine.

Q    That description is not near as descriptive, for lack of a better term, than what you have in your report with the other weapons that we talked about earlier, is it?

A    No.

2023

Q    Okay.  Then right below that, ma'am, you have two rounds from chamber of the same weapon; is that true?

A    Yes.

Q    Okay.  So, when I look at -- there's a magazine -- we're talking about one weapon and three counts on rounds; is that true?

A    That's what it looks like, yes.

Q    And we have two rounds in the chamber?

A    Yes.

Q    And one magazine with 20?

A    Yes.

Q    The other magazine had 31.  Do you know what the capacity of an MP5 magazine is?

A    No, I don't.

Q    Ma'am, when you went out to the scene and looked, could you tell if that Bronco had been moved?  I'm talking about the FAL803 vehicle?

A    Had been moved from what?

Q    Been moved from a previous location where it had been?

A    It did appear that at one time it was up against the porch or near the porch of the residence and had been moved backwards.

Q    I'm talking about the Hamilton Bronco.  Is that the one you're talking about also?

2024

A    Yes.

Q    The vehicle that had the bullet holes in it?

A    Yes.

Q    And you could tell that it'd been up against the porch because there had been transmission fluid right there in front of the porch?

A    That and there were tire tracks.

Q    And you listed both of those on your exterior crime scene, did you not?

A    Yes.

Q    And then you also, when you got to looking at that exterior crime scene, you realized it doesn't make sense that all these items are directly underneath this Bronco now?  It would've had to run over something or somebody to have gotten in that location with all that stuff being under there, wouldn't it have?

A    I don't know that it would've had to run over anything.  It rolled or moved back to the location it was in.

Q    Let me put up your exterior crime scene sketch and ask you just a few questions.  I think it's 26.

        MR. SMITH:  It's been admitted, Your Honor. Can we display it?

        THE COURT:  You may.

        MR. SMITH:  Thank you.

Q    (By Mr. Smith) Okay.  Ma'am, just so we all know we're talking about the same thing, this is what I'm referring to as the Hamilton Bronco; is that your understanding?

A    Yes.

Q    Okay.  And these items that we identified previously as being orange and number 20 specifically is what I'm going to talk about, those are two unfired .45 caliber rounds?

A    Yes.

Q    And your discussion with Mr. Littlefield revealed that you believe that they came out of that magazine that Trooper Eales had?

A    Yes.

Q    That the butt plate was broken, malfunctioned, something happened to it and the bullets fell out, correct?

A    It did not malfunction.  It was struck by something.

Q    Something damaged it?

A    Yes.

Q    Is that fair enough?

A    Yes.

Q    Did you conduct an examination such that you know that something struck it or not or can you just tell that it was damaged?

2026

A    You can tell that it was struck by something.

Q    Now, for number 20, those two unfired bullets to get underneath of that Bronco, which is how you have them described, right?

A    Yes.

Q    They're either going to have to dump out of that magazine and bounce on the grass or they're going to have to get kicked underneath there or that Bronco wasn't there when they fell out?

A    Correct.

Q    One of those three scenarios?

A    Correct.

Q    And when we look at these other items that are underneath the Bronco, there's a ballistic helmet underneath the Bronco; is that true?

A    Yes.

Q    What else, ma'am, if you know?

A    A ballistics plate and a disposable CPR mask.

Q    So, that indicates to you that there was activity in that area and probably without that Bronco being there?

A    Most likely, yes.

Q    So, whenever you see the tire tracks and that transmission fluid up there by the house, as an investigator that tells you that Bronco probably wasn't there when that activity was going on, was it?

2027

A    Most likely not.

Q    So at some point in time you knew that Bronco had moved?

A    Yes.

Q    It had moved before you had gotten out there?

A    Yes.

Q    What did you do to ascertain who moved that Bronco?

A    I had spoken with people as during the course of my interviews with people.

Q    Yes, ma'am.

A    Beyond that I don't know who the case agent may have interviewed regarding that.

Q    So you've interviewed folks about who moved the Bronco?

A    Yes, during the course of my interviews with them.

Q    Did you specifically ask that question?

A    Yes.

Q    Who did you ask that of if you can tell me?

A    An investigator Clint Johnson, Investigator Frank Loyd, specifically that I recall.  But beyond them I don't remember anyone else.

Q    Clint Johnson left the scene with Trooper Eales?

A    Yes.

Q    Do you know where Frank Loyd was?

A    I don't know.  At one time he was at the scene.  I

2028

interviewed him at the scene.

Q    The troopers that remained at the scene, did you ask them who moved that Bronco?

A    No.

Q    Did you do anything to determine whether or not that Bronco could have moved on its own?

A    No, I have not.

Q    When you got to the scene was that Bronco running?

A    No.

Q    Did you examine the interior of that Bronco?

A    I'm not sure what you mean.  I've looked inside of it, yes.

Q    As an investigator when you look at something are you looking for clues?

A    Yes.

Q    I mean, I'm going to guess, ma'am, that if you and I go to a scene like that, you're going to see a ton of things that I'm going to miss because you're trained to see things.  You're trained to see detail at a scene like that, aren't you?

A    Yes.

Q    So when you got inside of that Bronco you're looking for clues, you're looking for things?

A    I never got inside the Bronco.

Q    Did you look inside the Bronco?

2029

A    I looked inside, yes.

Q    Okay.  Did you open the door to the Bronco?

A    No.

Q    You just looked through the window?

A    Yes.

Q    Passenger window or the driver's window?

A    Probably both.

Q    Were they both up or were they both down?

A    I don't recall.

Q    You indicated on your exterior crime scene sketch a dotted line here that represents the path that the Bronco took as it was going towards the house, is that right?

A    Actually those are tire tracks, I believe as it was leaving the house.  That was my opinion at the time.

Q    On this diagram you have two lines listed under FAL803 towards what I'm going to represent as the front of the vehicle off to the left edge of that rectangle.  Those two lines represent the tires, do they not, ma'am?

A    Yes.

Q    And the way that you have those -- you have those tires drawn there for a reason, do you not?

A    Yes.

Q    Not only that's where they are on the vehicle but that also indicates the direction that they were turned; is that true?

2030

A    Yes.

Q    And you would agree with me that if I get behind that vehicle and push it, it's not going to follow that arc, is it?

A    Not on the diagram, no.

Q    You drew that diagram based on what you saw out there?

A    Yes.

Q    You got these tires as turned a different direction, right?

A    Yes.

Q    I mean, you did this for a reason in terms of indicating a direction?

A    Yes.

Q    And so now you still think that that is the path that this Bronco took as it was coming away from the cabin and not going to the cabin?

A    I can't say for certain but I believe it was probably coming away from the cabin.  But I can't say for certain.

Q    And the way those tires are indicated on your diagram, that make sense to you?

A    I'm sorry.  I don't know what you mean.

Q    I'll move on, ma'am.  Ma'am, who put you in charge of the crime scene?

2031

A     Inspector Dave Page.

Q     Did he stay out there?

A     Yes, he did.

Q     And he's your supervisor?

A     Yes, he is.

Q     As -- since you're in charge of the crime scene, are you in control of who comes in, who goes out?

A     Not necessarily.

Q     There's people from various disciplines there or people doing different things while they're there; is that true?

A     No.  I mean, as far as people coming in and out of the crime scene, no, that is controlled.

Q     I understand you want to try to limit who comes in and who leaves, but you have different people doing different things out there?

A     Yes.

Q     And you would agree with me that the way that we keep -- kept track of the inventory on the bullets and the condition of the weapons was not consistent, was it?

A     I wouldn't say that, no.

Q     It's your opinion that you kept consistent inventory of the weapons and bullets?

A     There were different people keeping different inventories.  Each one of us may have done it

2032

differently.

Q    What I'm referring to is within your report, okay? As it talks about the -- let's start with the Hamilton pistol and we describe that there was no indication as to how many round were in the magazine?

A    I did not count the rounds in that magazine.  It was counted by the agent or the criminalist that received the weapon.

Q    And are they working for you under your direction since you're the supervisor out there, since you're in charge of that crime scene?

A    That person, yes, seized that item based at my direction.

Q    And you generated a report from that activity?

A    Yes.

Q    And in that report it is not consistent with one weapon to the next as to whether a round was in the chamber or not or how many rounds may have been in a magazine; would you agree with that?

A    That's true.

Q    Whether we're talking about the Hamilton pistol or the Colt Sporter?

A    Yes.

Q    Or whether we're talking about the .22 pistol in the cabinet or whether we're talking about the 9 millimeter

Smith and Wesson outside the cabin?

A    I belive the rounds were counted on those weapons.

Q    But whether a safety was on or off?

A    No, that was not noted.

Q    Whether a round was chambered and packaged separately or accounted for separately.  I mean, it differed throughout that; would you agree with that?

A    As far as the chambering of the rounds, those were accounted and packaged separately.  The rounds in each weapon were counted.

Q    And then, ma'am, you will agree with me based on the photos that we looked at, items of evidence had been moved out there so that pictures could be taken?

A    There were items of evidence moved out there, yes.

Q    I'm going to display for you, ma'am -- and this has not been introduced into evidence.  We talked about it earlier.  I want to show you what has been marked as Defendant's Exhibit Number 208.  Have you seen that before, ma'am?

A    Yes.

Q    Can you describe what that is?

A    This is the .223 caliber bullet from the shelf.

Q    From the shelf where, ma'am?

A    In the east room.

Q    That is the unfired bullet?

2034

A    Yes, it is.

Q    Appears to be in the same condition as it was when you first saw that bullet in the Barrett residence?

A    Yes.

MR. SMITH:  Move for the introduction of 208, Your Honor.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No objection.

THE COURT:  Be admitted without objection.

MR. SMITH:  Your Honor, I'd ask that be displayed.

THE COURT:  You may.

MR. SMITH:  I'm going to show two more pictures, Your Honor, so if we could turn the lights down.

THE COURT:  Okay.

MR. SMITH:  And I think I'll be done.

Q    (By Mr. Smith) Ma'am, can you show me the picture of that unfired .223 round in Defendant's Exhibit 208?

A    It's in this location.

Q    I'm going to -- am I circling it with my pointer?

A    Yes.

Q    It's kind of hard to see because of the wood underneath it; would you agree with that?

A    Yes.

2035

MR. SMITH:  Take that down, please.

Q    (By Mr. Smith) Ma'am, I'm going to show you what was previously admitted as Government's Number 55.

MR. SMITH:  Ask that it be displayed, Your Honor.  It has been admitted.

THE COURT:  You may.

MR. SMITH:  52, Your Honor.  I'm sorry.

THE COURT:  You may.

MR. SMITH:  It's Government's Exhibit Number 50.

THE COURT:  52?

MR. SMITH:  51, Your Honor.  51 or 52.  And I want 51 and I apologize.

THE COURT:  It's been admitted?

MR. SMITH:  Yes, sir, it has.

THE COURT:  You may display it.

Q    (By Mr. Smith) Ma'am, do you recall seeing that previously?

A    Yes.

Q    And what area of the Barrett residence does that depict, if any?

A    I believe that's the kitchen.

Q    Can you tell me what that is at the top left of the photograph?  This thing?

A    It looks like the vent hood in the kitchen.

2036

Q    And was that the condition of things whenever you were out there at the Barrett residence?

A    Not when I first arrived, I don't believe it is.

Q    Okay.  I'm going to take that down, ma'am, and I'm going to show you what's been marked as Defendant's Number 211 which has not been admitted.  Have you seen that photo before, ma'am?

A    Yes.

Q    And do you recognize what that is a picture of?

A    That is a picture of the kitchen before the items were moved.

Q    Does that show the vent hood?

A    Yes.

Q    And describe what else you see in there.  Cluttered countertop or clean?

A    It's cleaned off.  It's got a couple of things on it but it's pretty much cleaned off.

Q    Is that how you remember things being at the Barrett residence?

A    Yes.

        MR. SMITH:   Move for the introduction of Number 211, Your Honor.

        THE COURT:   Any objection?

        MR. LITTLEFIELD:   No, Your Honor.

        THE COURT:   Be admitted without objection.

2037

MR. SMITH: Your Honor, I would ask that --

THE COURT: That's exhibit number what?

MR. SMITH: 211.

THE COURT: 211. It'll be admitted without objection.

MR. SMITH: I would ask that a split screen be shown between Government's Number 51 and Defendant's 211?

THE COURT: You may.

Q   (By Mr. Smith) One picture is taken vertically and the other one's horizontally, ma'am. But you would agree with me that they both depict the same countertop area?

A   Right.

Q   One of them has all this clutter stuff including that Crock Pot with foil that you described earlier for Mr. Littlefield; is that true?

A   Yes.

Q   And the other one has a clean countertop?

A   Right.

Q   Now, would I be right if I assumed that the clean countertop is how it looked like whenever you first got out there?

A   Yes.

Q   And when you said it looked like it'd been cleaned off, you don't mean that the agents cleaned it off. The agents brought that stuff out of the cabinet and put it

2038

on the counter, didn't they?

A    Well, one is not cluttered, the other one is cluttered by things that were brought out and put up on the counter, yes.

Q    Items of evidence were moved, were they not, ma'am?

A    Yes.

Q    And the picture on the right is how they were depicted whenever you first got out there?

A    Yes.

Q    Outside of the counting of the weapons and the rounds and the inventory on those that we discussed earlier, does it concern you, ma'am, whenever you look at pictures such as this where you see that evidence has obviously been moved in this scene?

A    No.

Q    As the supervisor out there conducting this investigation?

A    In the normal processing of a crime scene you have to move items of evidence.  The items that you're referring to in the last photograph were not moved by people from my agency.

Q    And I believe, ma'am, under examination by Mr. Littlefield after lunch you indicated that you did not know of any items that were moved while you were out there.  Is that true?  Was that your answer?

2039

A   Yes.

Q   And you can see now obviously that there were items that had been moved in that scene, is that right?

A   When I say that, I'm referring to not moving items before we began the photographing process, the documenting process.  But in the processing of a crime scene, you have to move items of evidence.

Q   But, ma'am, in all fairness to Mr. Barrett, when you described that Crock Pot with that foil inside of it, you did not tell the ladies and gentlemen of the jury that this stuff has been moved from some place and put on the counter, did you?

A   No.

Q   That's not what you said?

A   No.

Q   You led them to believe that's how it looked right when you walked inside this residence; is that true?

A   No.

Q   You didn't say anything different to them though, did you?

A   No.

Q   That's the impression that was left with them; would you agree with that?

A   That is not the case and that is not where it was originally when we went into the scene.

2040

Q   No, it was not.  We've shown that it wasn't that way.  But that's not what you told the jury, was it?  You didn't tell them this stuff had been moved by agents of the Government?

A   No.

Q   You said this is what it looked like inside Mr. Barrett's kitchen, this foil and this Crock Pot?

A   Yes.

Q   You talked about the coffee filters and no coffee pot?

A   Yes.

Q   Those coffee filters weren't on the counter, were they?

A   Not originally, no.

Q   No.  And as a supervisor concerned with the integrity of a crime scene, none of this bothers you?

A   Those items where placed on that countertop after the OSBI was finished processing our part of the scene.

Q   My question is, ma'am, the items of evidence that have been moved, you as the supervisor, none of that bothers you?

A   That particular item that you're referring to, no, that does not bother me.

Q   The count on the weapons and the magazines and the bullets, none of that bothers you?

2041

A   No.

MR. SMITH:   Thank you, ma'am.

THE COURT:   Redirect.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   Ms. Lyons, prior to conducting any search, going in and photographing items, what was done to show the condition of that residence and the rooms in that residence?

A   We did a videotape.

Q   And that video tape is what was played for this jury, isn't it?

A   Yes.

Q   And when that videotape was done, does it show the condition of each of those rooms?

A   Yes.

Q   And does it show the locations of those various items that are throughout the house?

A   Yes.

Q   The CB monitor that's on the table where the shell casings were found in the living room, is that monitor sitting on the table in the videotape for the jury to see?

A   Yes.

Q   Was there an attempt to alter the scene to disguise

2042

things from this jury as it appeared in the last questions?

A    Absolutely not.

Q    That CB monitor is there, right?

A    Yes.

Q    What about the box, this .223 shell casings?  You remember that box that you described in the east room we saw the photograph of?

A    Yes.

Q    Where was it in the crime scene video?

A    It's on the box underneath the window where it was when we first arrived.

Q    In the same location as the photograph the Government demonstrated?

A    Yes.

Q    Now, you were shown a later photo of what was characterized as a .223 box.  Do you remember that photo?

        MR. SMITH:  Your Honor, I'm going to object to the extent that I don't know that we can tell which photo was taken when.  He's talking about later that I showed her one after his.  I agree with that.  But not in terms of which photo was taken first.  We don't know that.

        THE COURT:  Counsel.

        MR. LITTLEFIELD:  I don't think I have to show which photo was taken first, but I can approach that.  I

2043

can approach.

THE COURT: Question withdrawn. You may proceed.

Q (By Mr. Littlefield) The photograph that Mr. Smith showed you that had the box underneath the bottom of the gun cabinet, with the gun cabinet open, do you recall that photograph Mr. Smith showed you?

A Yes.

Q And do you even know if that box was or was not a .223 cartridge box?

A I don't know.

Q Do you even know if it had any .223 cartridges, live rounds, in it or if it was empty even if it was a .223 box?

A I don't recall.

Q In that regard, do you know if that photograph was taken before or after the discovery of the .223 box that was empty on the table?

A It was definitely taken after.

Q And how do you know it was taken after, ma'am?

A Because when we first arrived and is shown in the video, the lower portion of that gun cabinet is actually closed.

Q So the gun cabinet was closed?

A Yes.

2044

Q    And was that .223 box on top of the table?

A    Yes.

MR. LITTLEFIELD:  May I return to the desk just a minute, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Ask that 112 be displayed, Government Exhibit 112.  It's in evidence.

THE COURT:  Which one?

MR. LITTLEFIELD:  112.

THE COURT:  You may.

MR. LITTLEFIELD:  Now that's the actual item. I'm sorry.  I was looking for the photograph, Your Honor. I apologize.  171.

Q    (By Mr. Littlefield) Where is the gun cabinet?  Can you tap it?

A    Yes.  You can see it on the right-hand side of the photograph.  That's the top door that's open.

Q    And the bottom door, with all that stuff spilled out, is that visible on there at all?

A    No, it's not.

Q    And when you did the crime scene video and taped it and videoed this box in this position, was that bottom door open or closed?

A    It was closed.

Q    Speaking of that gun cabinet, was there anything on

2045

that gun cabinet, any signs?  Any decals?

A    There was a decal on the front door of the cabinet.

MR. LITTLEFIELD:  I would ask that Government Exhibit 56 be displayed to the witness and it's not in evidence.

MR. SMITH:  Your Honor, I'd object.  This is outside the scope.

THE COURT:  Well, I haven't seen it so let me see the exhibit.  Okay.  There's an objection that it's outside the --

MR. LITTLEFIELD:  Judge, it probably is.  I missed one item amongst the 50 plus that we admitted and I'm trying to offer this one.  I would ask permission to go beyond the scope of cross, that we produce this one exhibit.

THE COURT:  Counsel, anything further?

MR. SMITH:  Your Honor, I mean, I can understand how it's easy to miss one.  I think the Court recognizes the significance, too.  We continue to object.

THE COURT:  Let me see counsel at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  I'm looking at the exhibit 56 for identification as submitted by the Government.  And your request is to --

2046

MR. LITTLEFIELD:  I'm hoping to just allow to go ahead and put this in.  It is -- I acknowledge it's beyond the scope although the gun cabinet was talked about on cross examination.

THE COURT:  What's relevant about it?  Why is it relevant to either one of you?

MR. LITTLEFIELD:  What he aimed at, Judge.

THE COURT:  Well, I don't see that.  Why is it -- I don't know.

MR. SMITH:  It's not probative of anything, Judge, and it is prejudicial.

MR. LITTLEFIELD:  Everything I introduce is certainly an attempt to be prejudicial, Judge.  The question is, is it unreasonably prejudicial.  It's sure indicative of his attitude.

THE COURT:  I'll sustain the objection.

(Whereupon, the following record was made in open court within the hearing of the jury.)

MR. LITTLEFIELD:  Your Honor, may I ask on what basis?  Was it beyond the scope or the other basis?

THE COURT:  Both.

MR. LITTLEFIELD:  And it would make a difference in regards to other witnesses and that's why I'm asking.

THE COURT:  Well, the Court's ruling's based on

2047

first it is outside of the cross examination then the request to put it on out of time, I find it's not relevant to anything before the Court.

MR. LITTLEFIELD:  Okay.

Q   (By Mr. Littlefield) In regards to staging of exhibits, moving, do you know what happened to that CB monitor that was sitting on that table in the living room?

A   It was seized as evidence.

Q   And when in relation to the photograph that shows the weapons on the couch or the casings on the couch was it seized into evidence?

A   It had already been seized and moved by the time that photograph was taken.

Q   Okay.  And that's Government Exhibit 16, would we display that?  Could we display that?  Where was that CB monitor in that photograph?

A   Before we moved it, it had been sitting on that end of the table.

Q   Now, the 20, that's -- those ended up being placed where?  That number 20?

A   They were the items that were behind the couch on the floor.

Q   So 20 has nothing to do with anything on the table?

A   Right.

Q    And does the location -- whether the CB monitor is at that location or had been seized into evidence and moved outside to the porch, how does that impact the location of those numbers where the casings were found?

A    It doesn't change the location of the casings at all.

Q    In regards to the kitchen shelf, who was -- was the OSBI the only agency that conducted a search of this premises?

A    No.

Q    What other agency was conducting a search, do you know?

A    When we were finished the DEA came in and conducted a search of the residence also.

Q    And when the troopers entered, what kind of search warrant did they have?

A    They had a search warrant for drugs.

Q    When you all conducted your search, was your search for drugs and drug evidence?

A    No.

Q    Who conducted the search for drugs and drug evidence?

A    The DEA.

Q    Did you note as you looked in the kitchen the existence of the coffee filters?

A    I recall that there were coffee filters but I don't recall noting exactly where they were.

Q    Did you note whether there was or there was not a coffee pot?

A    I do recall there was not a pot.

Q    The .223 weapon that is Defendant Exhibit Number -- the .223 round that is Defendant's Exhibit Number 208. I'm going to display that.  Where was that located?

A    On a shelf in the east room.

Q    Now, Mr. Smith had you take Government Exhibit 123 and show how to what's the term?  Is it charge it?  Is that the appropriate term for pulling back that lever?

A    Yes.

Q    And is that a means by -- what do you do when you charge it, pulling back that lever?  What's that do?

A    If there was a round in the chamber, it would eject the round.

Q    Why would one do that?

A    To check to see if there's a round in the chamber.

Q    When one charges it and it ejects the round from the chamber, what's that do in regards to the chamber itself? Does another one enter into it or does it stay empty?

A    You can load another one into it at that time.

Q    How?

A    By letting the charging handle go home.

2050

Q    Okay.  And that would assure that there's a round in the chamber?

A    Yes.

Q    Is there another means by which one can ascertain and make certain that the chamber is charged, other than just pulling it back and doing it like Mr. Smith talked about?

A    I'm not sure.

Q    Let me ask it a different way.  Okay.  How many magazines were in the gun?

A    Three.

Q    And they had a capacity of how many rounds?

A    Each one had a capacity of 30.

Q    And to fully -- to have that weapon loaded to the max, how many .223 live rounds could be in that?

A    A total of 91.

Q    Now, if I wanted to get 91 rounds in that weapon, how would I go about doing it?  What would I do?  If I took that weapon empty and I wanted to make sure it had one in the chamber and all the magazines were fully loaded, I had it fully set to go, how would I go about doing that?

A    The easiest way would be to take the three magazines that are still taped together, fully loaded, insert them into the weapon.

Q    Okay.

A    Chamber a round, then take the magazines back out and put the last round into the magazine that had just had a round chambered out of it.

Q    Okay.  And that would assure that I had 91 rounds?

A    Yes.

Q    If I did it the way Mr. Smith was discussing with you, would I have 91 rounds at that point by pulling it back and checking?

A    No.

Q    If I wanted to maximize my fire power, which way would I go about making sure that it had a round in the chamber?

A    By taking the magazine out and putting the last round in the magazine.

Q    Mr. Smith asked you about your search warrant return, do you recall that?

A    Yes.

Q    Did you note how many .223 rounds were discovered at the scene in your search warrant return?

A    I believe I did.

Q    If I display it to you, would that refresh your recollection?  And this is not into evidence.

A    Yes.

        MR. LITTLEFIELD:  And I would ask for the

2052

Court's permission to do that.

THE COURT:   You may.

Q    (By Mr. Littlefield) What is that you're looking at?

A    This is the search warrant return.

Q    Which page?

A    Page one.

Q    And does that indicate how many -- how many .223 rounds did you report and it's not in evidence.  How many .223 rounds did you report in your return that were found at the scene, with the magazines -- along with the magazines and the firearms?

A    Seventy-two.

Q    Is that consistent with the -- what you reflected in your report that you prepared on the examination at the scene?

A    Yes.

Q    And how many rounds were there in that .223?

A    Seventy two.

Q    How did you come up with the 12?  And Mr. Smith's talking about the 12 in the magazine.  How did that happen?

A    The 12 would be because that was the center magazine and I was counting the one that was pulled out of the chamber as part of that 12.

Q    Were 73 in that weapon?

A    No.

Q    Is there any indication -- is there anything that would indicate to you that the photograph that we looked at, Defendant's Exhibit 208, that that .223 round was in that weapon?

A    I don't know if it was ever in the weapon.

Q    Mr. Smith asked you about your report and not counting consistently rounds in firearms.  And he mentioned specifically the Sig Sauer that was on the southwest corner of the front porch.  Do you recall that Sig Sauer firearm, that .45 that was out there?

A    Yes, I do.

Q    And who was responsible for seizing that?

A    Criminalist April Marcangeli.

Q    Why is it that you didn't record the round count in that weapon?

A    Because she seized the weapon itself and the rounds and she documented the exterior crime scene.

Q    Who -- do you know if she did the round count for that .45?

A    Yes, she did.

Q    So if Mr. Smith looked at other reports, would he have the round count for that .45?

A    Yes.

Q    Whose report would that be in?

A    Criminalist April Marcangeli.

Q    Was it your responsibility to document every item that was done by every other criminalist that was on the scene?

A    No.

Q    You were asked questions about the location of the tires as it moved back.  Let me ask you if -- would you look to Government Exhibit Number 5 and I'm going to display it.  Do you recognize what's displayed there in Government Exhibit Number 5?

A    Yes.

Q    There was some discussion of the fluid spot.  Where is it?

A    It's in this area of the photograph.

Q    And there was also discussion of the positioning of the front tires.  I think your diagram, the crime scene diagram, pointed or showed them essentially straight; is that correct?

A    Yes.

Q    Were they actually exactly straight?

A    No.  Looking at this photograph you can tell that they're slightly canted.

Q    And canted in what direction, ma'am?

A    Toward the porch.

Q    Would the angle of -- is that flat land there or

2055

does it slope?

A     It slopes down away from the house.

Q     And in what direction does it slope; in relation from the porch toward the Bronco, in what direction does it slope?

A     It slopes down from the porch to the Bronco.

Q     Are those tires consistent with a vehicle backing from the location where that fluid spot is or that transmission fluid spot is back towards where the vehicle is?

A     Yes.

Q     You were asked some questions about the rounds from the .22.  Are you familiar with what weapons were fired during this incident?

A     Yes.

Q     Was there ever a .22 fired?

A     Not that I'm aware of.

Q     Anyone get shot with a .22?

A     No.

Q     Where was that .22 located?

A     In a desk drawer in the east room.

Q     And was there any indication that that .22 was fired at any time?

A     No.

            MR. LITTLEFIELD:  May I have just a second,

2056

Judge?

THE COURT: You may.

Q (By Mr. Smith) Do you know who was out there photographing during the search?

A There were several people taking photographs during the search.

Q What agencies?

A Both OSBI and the DEA, the OHP. That's the ones I recall.

Q Are you familiar with those photographs that Mr. Smith showed? Those exhibits that were shown to you by Mr. Smith?

A I don't recall which ones you're referring to.

Q Well, let's take, for example, Defendant's Exhibit 209. Do you know who would have taken that photograph?

A I believe that was taken by someone from the DEA.

Q Okay. And do you know -- let me show you Defendant's Exhibit Number 208. Do you know who took that photograph?

A I don't recall. I believe the OSBI took that photograph.

Q Was that one of your number placards that you all used?

A Yes.

Q And Defendant's Exhibit Number 211?

2057

A     The OSBI took that photograph.

Q     And those photographs are not just made available to the Government, are they?

A     That's correct.

Q     Who else are they made available to.

A     To the defense counsel.

Q     And in regards to moving evidence and that kind of stuff, the photographs that described those, that Mr. Smith used to described those, do you know how those would -- he would have had access to those photographs?

A     The photographs were provided by the prosecution.

Q     Wouldn't be real smart if you all were trying to hide stuff to make those photographs available to show him, would it?

          MR. SMITH:  Your Honor, I'm going to object to that.

          THE COURT:  What's the basis of the objection?

          MR. SMITH:  Relevance, Judge, and also it asks for a conclusion.

          THE COURT:  Sustained.

          MR. LITTLEFIELD:  Pass the witness.

                    RECROSS EXAMINATION

BY MR. SMITH:

Q     Ma'am, what I gather on that last line of questioning is that there is some things done by the DEA

2058

that me as an OSBI agent, I can't be responsible for.  Is that kind of the tone of what's going on here?

A    There are things that are done by the DEA that I am not responsible for.

Q    Right.  But the picture that you identified with the foil in the Crock Pot, I'm going to display it for you. This is what you're saying was a DEA photograph or an OSBI photograph?

A    I believe that's a DEA photograph but I can't tell you that for certain.

Q    Okay.  But now that's the photograph on direct with Mr. Littlefield that you talked about the coffee filters and the foil in the Crock Pot, right?

A    I don't believe the coffee filters are in that photograph.

Q    They're in Number 52, the one that was introduced right behind this, right?

A    Yes.

Q    But that's what you talked about on direct?

A    Yes.

Q    You didn't say then, well, the DEA came in and did a search afterwards and that's what this depicts after the DEA got through?

A    I didn't offer that, no.

Q    What you indicated to us was this was how it looked

2059

like when I walked in to Mr. Barrett's kitchen?

MR. LITTLEFIELD:  Objection, Judge, that's argumentative.

THE COURT:  Sustained.

Q   (By Mr. Smith) Now, as it relates to the .223 box, ma'am, I'm going to display for you Number 209 again. This is a photo that you said was taken by the DEA?

A   I believe it was.  I can't say for certain.

Q   Okay.  Ma'am, I'm going to have to ask you to be exact in what you know and don't know.  We can't guess in here, okay?  Do you know who took this photograph?

A   No, I do not.

Q   Now, can you tell me any differences between that box that's in the center of that photograph that is yellow compared to the one that was put into evidence earlier that you said was the .223 box?  Is there any differences in them?

A   I don't know because I can't see that box well enough to identify it.  It's different as in it's in a different location from the other box.

Q   It's in a different location, it's the same shape?

A   Yes.

Q   It's the same color?

A   Yes.

Q   Appears to have the same markings on the side of the

2060

box?

A    Similar, yes.

Q    From what we can tell?

A    Yes.  It is not the same box.

Q    It's not the same box because it's in a different location?

A    Because it's a different box.

Q    How can you say it's a different box and not just in a different location?

A    Because the box that was underneath the window I seized as evidence.

Q    But you don't know when this photo was taken?

A    No, I can't tell you when that was taken.

Q    It could have been taken before?

A    No, I don't believe it was taken before.

Q    You said you don't think, but you don't know, do you?  You don't know -- excuse me.  You don't know that somebody didn't take this photograph of that .223 box and then put it on the box underneath the window where you seized it from.  You don't know that, do you?

A    At the time I went into that room, that door was closed to the lower portion of that gun cabinet.

Q    What time did you go into the house and video tape everything?

A    When we began processing at first light that

2061

morning.

Q    What time was that?

A    Sometime after seven but I can't tell you exactly what time.

Q    And what time did this incident happen?

A    Sometime around midnight the night before.

Q    And who else had been in there?

A    Before we arrived.  I don't know.

Q    You don't know.  So you don't know that somebody didn't move that box, do you?

A    I don't know when that photograph was taken.

Q    So you don't know that somebody didn't move that box, do you, ma'am?

A    I don't know.

Q    It looks very similar to the box that's in evidence, does it not?

A    It is similar.

Q    What can you tell me that's different about it other than the location?

A    I can't other than location.

Q    Any evidence, ma'am, that that Colt Sporter was fully charged and loaded with 91 rounds?

A    I don't know.

        MR. SMITH:   Pass the witness.

        MR. LITTLEFIELD:   I do have a couple.

2062

THE COURT:  Okay.

FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    What was done to protect the security of the scene from the time of your arrival and when you went and got the search -- went to get the search warrant?

A    When I arrived, the scene was secured by other officers and the crime scene tape had already been put in place and it was left in place with an officer posted for crime scene security until after I got the search warrant.

Q    When you returned with the search warrant, what was done to protect the security, integrity, of the scene at that point?

A    Even while we were conducting the search of the scene, there was an officer posted on the outside of the crime scene tape recording people as they came and went.

MR. LITTLEFIELD:  Could Government Exhibit Number 69 be displayed, Your Honor?

Q    (By Mr. Smith) Do you see -- and I'm going to use the laser and point up here.  Do you see where the crime -- is that crime scene tape that's extended across there?

A    Yes.

Q    And is it across here?

A    Yes.

2063

Q    And these officers who are located at the scene, are they inside or outside of the crime scene tape?

A    They're outside.

Q    And where were you all doing your investigation in relation to the crime scene tape?

A    Inside the crime scene tape.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Further questions?

MR. SMITH:  Thank you, Your Honor.

FURTHER RECROSS EXAMINATION

BY MR. SMITH:

Q    Ma'am, this incident involved what agency?

A    I'm sorry.  What do you mean?

Q    This incident -- Officer Eales, who did he work for?

A    The Oklahoma Highway Patrol.

Q    Who are the ones that first secured this scene?

A    The Oklahoma Highway Patrol.

Q    Who were the other individuals behind the Oklahoma Highway Patrol that secured this scene?

A    Sequoyah County Sheriff's Office.

Q    That were a member of what group, ma'am?

A    I don't know you mean.

Q    Are you aware that there were two groups that were coming in to the Barrett residence on September the 24th of 1999?

2064

A    I don't know what you mean by two groups.

Q    Do you know whether or not the Sequoyah County Sheriff's Office and other members of law enforcement were following this tactical team in their operation?

A    Yes, I know that.

Q    They were involved in the operation, right, ma'am?

A    Yes.

Q    They were also the ones who secured this scene, were they not?

A    Yes.

Q    The OSBI is an independent investigative agency, are they not?

A    Yes.

Q    You were on the scene protecting the integrity of things in the daylight, correct?

A    Yes.

Q    This incident happened at 12:38 a.m., did it not, ma'am?

A    Yes.

          MR. SMITH:  Thank you.

          THE COURT:  Any further questions of this witness from the Government?

          MR. LITTLEFIELD:  No, Your Honor.

          THE COURT:  May this witness be excused?

          MR. LITTLEFIELD:  I would ask that she be

2065

excused, Your Honor.

THE COURT:  Any objection from the defense of this witness being excused?

MR. SMITH:  Your Honor, subject to recall, we've discussed with her and we have a contact number.

THE COURT:  Has she been subpoenaed by the defense?

MR. SMITH:  Yes, she has, Your Honor.

THE COURT:  Ma'am, you may step down and be excused for the day and you're subject to recall as we've discussed.

THE WITNESS:  Thank you.

THE COURT:  We'll take the evening recess. I'll ask the jury to be back at nine o'clock and remember my admonition not to read anything about it or involve yourself in any news coverage if there is any.  And don't allow anyone to talk with you about it.  And you should not initiate any discussions about this matter.  I'll ask everyone in the courtroom to please remain seated as the jury leaves for the evening recess.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Any matter to be taken up outside the hearing of the jury on behalf of the

2066

Government?

MR. LITTLEFIELD:  Yes, I have a question in regards to 56.  Another witness can identify -- that's the one that Your Honor said you didn't think was relevant on the gun control sign.

THE COURT:  Well, not with that witness.  I mean, you can reoffer it with another witness if you choose to.

MR. LITTLEFIELD:  Okay.  I was just making sure that -- trying to ascertain the essence of the Court's ruling on whether it be just a total waste of the Government's time or if it was flat out you were going to say it's not admissible or that there was a determination --

THE COURT:  Not based on the foundation that that witness gave.  I mean, there was no sequence for the jury to relate to at the time you were offering it and without going back through the whole testimony of the previous witnesses I thought that it was inappropriate and a poor use of the Court's time and the time of the jury.

MR. LITTLEFIELD:  Okay.

THE COURT:  Anything from the defense?

MR. SMITH:  Your Honor, we had a tardy offering of some exhibits today, those pictures, the last three or

2067

four.  We need to retract those to be able to make our copies and bring back tomorrow for the exhibit books, if we can.

THE COURT:  You may.  Just keep the clerk of the court satisfied, you'll keep me satisfied.  If she reports any inappropriate activity on the part of defense counsel, not getting them back or they're lost, you'll have the wrath of the Court.

MR. SMITH:  We understand that.

THE COURT:  Tomorrow, from a scheduling point it's my plan to start at -- I have a bad reputation for not starting on time, I realize that.  But it's not always my fault.  Nine o'clock tomorrow is the goal, go until 11, recess and then go until 12:30, recess until 1:45.

(Whereupon, the Proceedings were continued to October 19, 2005.)

2068

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on October 18, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 1848 through 2067.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

_____
GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,  )
                           )
          Plaintiff,       )
                           )
-vs-                       )   No. CR-04-115-P
                           )
KENNETH EUGENE BARRETT,    )
                           )
          Defendant.       )


VOLUME 10 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on October 19, 2005.


A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965   Pages 2070 - 2328

2070

W I T N E S S E S

                                                          PAGE

APRIL MARCANGELI
Direct Examination by Mr. Littlefield . . . . . . 2072
Cross Examination by Mr. Smith  . . . . . . . . . 2145
Voir Dire Examination by Mr. Littlefield  . . . . 2184
Further Voir Dire Examination by Mr. Littlefield  2209
Redirect Examination by Mr. Littlefield . . . . . 2211
Recross Examination by Mr. Smith  . . . . . . . . 2219
Further Redirect Examination by Mr. Littlefield . 2222
Further Recross Examination by Mr. Smith  . . . . 2223

RYAN PORTER
Direct Examination by Mr. Littlefield . . . . . . 2224
Cross Examination by Mr. Smith  . . . . . . . . . 2264
Redirect Examination by Mr. Littlefield . . . . . 2314
(Examination continued to October 20, 2006)


                        E X H I B I T S
                                          OFFERED    REC'D

Government's Exhibit Number 20 . . . . . .  2088     2088
Government's Exhibit Number 21 . . . . .    2124     2124
Government's Exhibit Number 31 . . . . . .  2100     2100
Government's Exhibit Number 32 . . . . .    2140     2141
Government's Exhibit Number 33 . . . . .    2243     2243
Government's Exhibit Number 34 . . . . .    2106     2106
Government's Exhibit Number 35 . . . . .    2088     2088
Government's Exhibit Number 36 . . . . . .  2089     2089
Government's Exhibit Number 41 . . . . .    2107     2107
Government's Exhibit Number 42 . . . . .    2109     2109
Government's Exhibit Number 44 . . . . .    2103     2103
Government's Exhibit Number 45 . . . . .    2111     2111
Government's Exhibit Number 99 . . . . .    2246     2246
Government's Exhibit Number 111  . . . .    2136     2136
Government's Exhibit Number 114  . . . .    2138     2138
Government's Exhibit Number 121  . . . .    2097     2097
Government's Exhibit Number 124  . . . .    2098     2099
Government's Exhibit Number 126  . . . .    2096     2096
Government's Exhibit Number 132  . . . .    2121     2121
Government's Exhibit Number 133  . . . .    2108     2108
Government's Exhibit Number 134  . . . .    2242     2242
Government's Exhibit Number 136  . . . .    2116     2116
Government's Exhibit Number 137  . . . .    2117     2117
Government's Exhibit Number 148  . . . .    2115     2115
Government's Exhibit Number 153  . . . .    2103     2103

(Exhibits continued . . .)

2071

|  | OFFERED | REC'D |
|---|---|---|
| (Exhibits continued . . .) | | |
| Government's Exhibit Number 154   . . . . | 2105, 2245 | 2245 |
| Government's Exhibit Number 155   . . . . | 2107 | 2107 |
| Government's Exhibit Number 156   . . . . | 2093 | 2093 |
| Government's Exhibit Number 157   . . . . | 2118 | 2118 |
| Government's Exhibit Number 158   . . . . | 2118 | 2118 |
| Government's Exhibit Number 159   . . . . | 2119 | 2119 |
| Government's Exhibit Number 160   . . . . | 2112 | 2113 |
| Government's Exhibit Number 161   . . . . | 2113 | 2113 |
| Government's Exhibit Number 165   . . . . | 2091 | 2091 |
| Government's Exhibit Number 166   . . . . | 2240 | 2240 |
| Government's Exhibit Number 167   . . . . | 2122 | 2123 |
| Government's Exhibit Number 168   . . . . | 2110 | 2110 |
| Government's Exhibit Number 176   . . . . | 2122 | 2122 |
| Government's Exhibit Number 177   . . . . | 2102 | 2102 |
| Government's Exhibit Number 178   . . . . | 2248 | 2249 |
| Government's Exhibit Number 179   . . . . | 2120 | 2120 |
| Government's Exhibit Number 186   . . . . | 2129 | 2129 |
| Government's Exhibit Number 190   . . . . | 2253 | -- |
| Government's Exhibit Number 191   . . . . | 2253 | 2253 |
| | | |
| Defendant's Exhibit Number 148 . . . . . . | 2307 | 2307 |
| Defendant's Exhibit Number 152 . . . . . | 2310 | 2310 |
| Defendant's Exhibit Number 154 . . . . . | 2312 | 2312 |
| Defendant's Exhibit Number 159 . . . . . | 2207 | 2207 |
| Defendant's Exhibit Number 160 . . . . . | 2208 | 2209 |
| Defendant's Exhibit Number 212 . . . . . | 2201 | 2201 |
| Defendant's Exhibit Number 213 . . . . . | 2203 | 2203 |
| Defendant's Exhibit Number 214 . . . . . | 2199 | 2199 |

P R O C E E D I N G S

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  Government may call your next witness.

MR. LITTLEFIELD:  April Marcangeli.

2072

THE COURT: Ma'am, if you could stand before the clerk, raise your right hand and be sworn.

(Whereupon, the witness was administered the oath.)

THE COURT: Mr. Littlefield, before we get started, I wanted to advise the jury that I instructed counsel to be prepared to go until 11:00 today then we're going to take a recess for 20 minutes and then we'll continue till 12:30 and we'll take the noon break from like 12:30 to 1:30 plus, then come back and finish the afternoon.  Just so you understand where the schedule is and where we're going.  Try to go for two hours and then a 15 minute recess and then we'll go for about another hour and take a lunch recess.  You may proceed.

MR. LITTLEFIELD: Thank you, Your Honor.

APRIL MARCANGELI,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record, please, ma'am.

A    April Marcangeli.

Q    And, Ms. Marcangeli, how are you employed?

A    I'm a criminalist with the Oklahoma State Bureau of Investigation.

Q    What's a criminalist?

A    A criminalist is someone who performs scientific analysis on evidence in criminal cases.  We will also occasionally assist in processing crime scenes and we'll testify in court when needed.

Q    In regards to your analysis as a criminalist, what areas have you received training and do you deal with specifically?

A    I work in the area of forensic biology and that consists of -- we call it serology which is the study of body fluids and we also perform DNA analysis.

Q    What training have you received in that regard, ma'am, that would qualify you to do serology and DNA analysis and those kind of matters?

A    I have a bachelor of science in biology from Oklahoma Christian University and then upon employment with the OSBI I have completed training in the areas of serology and DNA where I've tested numerous samples in-house.

Q    And you mentioned that one of your other responsibilities is to assist in the processing of crime scenes?

A    Yes, that's correct.

Q    Where are you employed -- where's your area out of which you work now?

2074

A    I work in the Oklahoma City Laboratory at this time.

Q    Okay.  And let me direct your attention back to 1999.  Where were you stationed with the OSBI at that time, ma'am?

A    At that time I was in the Tahlequah Regional Laboratory.

Q    And how long have you been employed by the OSBI?

A    About six and a half years.

Q    Direct your attention to the early morning hours of September the 24th of 1999.  Were you still working out of the Tahlequah laboratory during the month of September '99?

A    Yes.

Q    Did you receive any kind of call in relation to your responsibilities as a criminalist for the OSBI on September the 24th, '99 and if so what was the nature of that call?

A    Yes, I received a call from my supervisor at that time, who was Lynette Lee and we were advised that there was a possible residence and vehicles that needed to be processed.

Q    And where -- did you ascertain the location which you needed to go to in order to process those items?

A    Yes, I was given directions -- (Interrupted)

Q    Where was it?

2075

A    -- that location.  I don't have an address but I can give you the directions.

Q    Generally where was it?

A    Well, it was located in Sallisaw.

Q    How did you go from Tahlequah to the Sallisaw area, ma'am?

A    I rode in a vehicle with another criminalist who was Ryan Porter.

Q    And where was Mr. Porter from at the time?

A    He was also stationed at the Tahlequah laboratory.

Q    And where was the first place that you and Mr. Porter went to when you arrived in the Sallisaw area?

A    We first arrived at the residence there located on Dwight Mission Road.

Q    If you would look at Government Exhibit 1 which is the model that's out in front of the bench there, do you recognize what that is, ma'am?

A    Yes.

Q    What is that?

A    That appears to be the location that we arrived at initially.

Q    And how long were you there?

A    We were there -- (Interrupted)

Q    Let me back up and ask you first, do you recall what time it was you arrived at the location that's shown

2076

there in Government Exhibit 1?

A    We arrived there at 4:15 at that location.

Q    4:15 a.m.?

A    Yes.

Q    And who else was there at the time you arrived?

A    There were numerous individuals they're at that time.  Ryan and myself met up with my supervisor, Lynette Lee.  At that time there were other individuals at that scene.

Q    And who was in charge of the scene when you arrived? What agency?

A    At that time I'm not for sure who was in charge. OSBI is who I would say.

Q    Was there any indication of attempts to preserve the sanctity of the scene at the time of your arrival, if you recall?

A    Yes, there was crime scene tape around at that time.

Q    Do you recall how far it had been spread around at that time?

A    No, I actually do not recall that.

Q    What was your first assignment when you got there?

A    Well, when we first arrived there we were informed that the search warrant had not been obtained yet so we were waiting on that.

Q    Did you go any place?

2077

A    While we were waiting on that we actually left there to go to the hospital to process a vehicle at the hospital.

Q    And describe the vehicle that you observed at the hospital. What kind of vehicle was it?

A    It was a Ford Bronco, a white Ford Bronco.

Q    What was the condition of that Bronco at the hospital?

A    I guess I don't understand the question.

Q    Was there anything that was out of the -- what you would expect to see in a Ford Bronco?

A    There were -- inside the Bronco, there was some red stains in the Bronco and we collected a couple of things out of the Bronco there.

Q    Was it just a little bitty stain or how would you -- (Interrupted)

A    I don't remember exactly how big the stains were but there was staining that was consistent with blood inside that Bronco. I remember it being inside the driver's door and on the back inside the tailgate.

Q    And did you learn what had been done with that Bronco? Why it was at the hospital?

A    Yes. We were informed that that was the Bronco that was used to transport Eales to the hospital.

Q    After you were there and spent some time with the

Bronco, where did you and Mr. Porter go next?

A   Immediately following the hospital we arrived to the police department for just a brief while.  One of our agents was there and we were asked to see if he needed any help there at the police department.  So we were there briefly, about 10 minutes, and then we left there to go back to the residence.

Q   And eventually was the scene processed?

A   Yes.  At that time, after we left the hospital and went back to the scene.  That's when we began to process that residence.

Q   What individuals were involved in processing the crime scene from the OSBI?

A   Myself, Ryan Porter, Vicki Lyons, Lynette Lee and then there were several of our agents that processed the inside of the home.  I actually did not process inside the home.  We mostly did the outside area.

Q   With whom did you work in processing the outside?

A   I worked with my supervisor, Lynette Lee, and then I also worked and did a lot of collecting and laying down marker numbers on things with Vicki Lyons.

Q   Was Mr. Porter involved in the process of collecting items with yourself?

A   Yes, I'm sorry.  Ryan Porter was also involved in that.

2079

MR. LITTLEFIELD:  I'd ask that Government Exhibit Number 69 be displayed and it is in evidence. And it will be on that little screen to your left and it will also be up here on this projector.

Q    (By Mr. Littlefield) Do you recognize what that is, ma'am?

A    Yes.  This looks like it's a photograph of the actual scene of the residence.

Q    And I want to use this laser and point up in here. What is this that goes through there?  Can you see what I'm talking about?

A    I can't really tell what that is to be honest.

Q    Okay.  What's this right here?

A    That's the crime scene tape that was taping off the area.

Q    And what's this right here?

A    Same thing, the crime scene tape.

MR. LITTLEFIELD:  I'd ask Government Exhibit 192 be displayed.

Q    (By Mr. Littlefield) Do you recognize -- do you see that line there?  Do you recognize what that is now, that goes across there?

A    I can't really tell.  It appears to be the tape but I could be wrong.

Q    Okay.  Let's go back to Government's Exhibit 69.

2080

And if in that regard another witness has testified that that was crime scene tape across there on the east side of the house, would you have any reason to dispute that?

A    No.

Q    Where did you go first in regards to processing the scene?

A    The first thing that I processed myself and Lynette Lee, processed -- it would be the -- (Interrupted)

Q    You can tap that screen and where you tap will show up on here and then you can describe the area just generally by tapping it and indicating around that area.

A    Okay.  We processed this area right in here.  Can you see that?

Q    Tap it a little harder.

A    Right in there.

Q    And what did you find in that area, you and Ms. Lee?

A    In that area we collected several .22 caliber shell casings.

Q    Okay.  Any other items that you recall?

A    Yes.  There's also one 9 millimeter shell casing, one .223 shell casing and it's possible lead and shot from the ground in that same area.

Q    Okay.  And then from that area once you went there, to what area did you, Ms. Lee, Ms. Lyons and Mr. Porter go in regards to processing the scene?

2081

A    Well, I can't remember exactly where we went from there but at that time we kind of searched the whole area in the front of the residence around to this area in here.

Q    I can't tell yet.

A    Right in there.

Q    Okay.

A    That whole area right in there.

Q    Okay.

A    And myself and Vicki Lyons went and laid down marker numbers for different things that we found in the front of the yard.

Q    Did you go into this area here as a part of the processing?

A    Yes, we did.  We searched that area, too.

Q    And you can't see the east side.

MR. LITTLEFIELD:  Well, I'd ask Government Exhibit Number 4 be displayed.

Q    (By Mr. Littlefield) See the blue pickup that's located there?  Are you familiar with that as well?

A    Yes.

Q    How are you familiar with that?

A    That is the pickup that I noticed on the east side of the residence.

Q    Was there anything done in regards to processing the

2082

exterior crime scene in and around that pickup?

A    Yes, we also looked over there.

MR. LITTLEFIELD:  I'm going to ask that Government Exhibit Number 37 be displayed to the witness.

Q    (By Mr. Littlefield) And as it's being displayed, let me ask you was there a diagram of the exterior of the crime scene prepared?

A    Yes.

Q    And are you familiar with that diagram?

A    Yes, I've seen this diagram.

Q    Did you prepare it?

A    No, I did not.

Q    Okay.  Who did?

A    I believe that was Vicki Lyons.

Q    And I note that on that and if we could draw -- there are a number of -- there are a whole bunch of numbers up there.  Are you familiar with what those numbers at the exterior location reflecting?

A    Yeah, those are the marker numbers that were laid down with the pieces of evidence that we found.

Q    I would ask -- was anything done on the porch?

A    Yes.

Q    And what was that?

A    Well, there were a couple items that were collected from the porch.  There was also red staining on the steps

2083

of the porch and those, that staining was collected.

MR. LITTLEFIELD:   I would ask that Government Exhibit Number 12 be displayed.

Q     (By Mr. Littlefield) And let me direct your attention to this area right in here.

A     Okay.

Q     Are you familiar with that item, ma'am?

A     Yes.

Q     And what is that item?

A     That is the Sig Sauer .45 caliber weapon, gun.

Q     Let's look at Government Exhibit Number 22.   And I noted in Government Exhibit Number 37 there was a number 15 that was on the porch in the southwest area.   Do you see the number 15 here?

A     Yes.

Q     And what does the number 15 signify?

A     The number 15 is just the marker number that we laid down with that piece of evidence.

Q     And in relation to those numbers, was a corresponding listing of all those numbers of items found on the exterior of the residence, did you write down for instance on that number 15 is the Sig Sauer pistol?

A     Yes.

Q     Who seized that firearm?

A     I did.

2084

Q     What condition was that firearm in when you seized it, ma'am?

A     I don't understand.

Q     Did you do anything in regards -- was it loaded?

A     Well, before we collected each of the firearms, they were cleared by an individual at the scene before we collected those to preserve it and take it back as evidence.

Q     When you say cleared, what do you mean by that?

A     All the ammunition was cleared out of the magazine and the weapon.

Q     Was there any ammunition in that weapon?

A     Yes, there were six rounds in that weapon.

Q     And where were the rounds located?

A     There was one in the chamber and then five were in the magazine.

Q     And in regards to the weapon and the ammunition that was in the weapon, the six rounds, the five and the one, what happened to those items, ma'am?

A     Those items were transferred to the firearms unit.

Q     Okay.  Initially what happened to them after you seized them, what did you all do with -- and we're going to talk about a number of items today that were taken at the scene.  How did you all preserve the integrity of those items within the system of the OSBI?

2085

A    Every item was placed into it's own container and then sealed and then our initials were put on that seal, whoever sealed that piece of evidence.

Q    And as to particular items, is there a means by which those items are designated as they come into the OSBI system so that you know which one's which?

A    Yes.  We will give something what is called an item number to designate that piece of evidence.  The item number would have a T number in front of it and T would basically stand for Tahlequah, the Tahlequah laboratory. So this would be marker number 15 but then it would also have a corresponding T number once it gets into the laboratory.

Q    Do you know what T number was ultimately assigned to this weapon?

A    Yes, that was T-28.

Q    Now, are T numbers the only numbers that will appear on items of evidence seized in relation to this case, ma'am?

A    No.  If a piece of evidence goes to the print laboratory, like in the print laboratory in Tahlequah, I believe they gave it a TP and if it goes to a different unit first, they would give their unique number like Firearms had F numbers.

Q    If for example -- well, are you familiar with the --

2086

did you see the .223 Colt Sporter that was seized at the scene?  Do you recall it?

A    I don't recall the .223.

Q    You didn't have -- (Interrupted)

A    No.  I did not collect that, no.

Q    Well, I know you didn't collect it.  My question was did you see it, do you recall it?

A    Vaguely.

Q    Do you know what number it got?

A    No.  I could check my notes.

Q    Okay.  It's not that important.  You seized that particular item which is 15 and it got designated as what?

A    T-28.

Q    In regards to the items you seized, at the end of the day when all the processing was said and done, where did you go after concluding at the scenes that were involved in this particular case?

A    Myself and Ryan Porter rode back to the laboratory with the evidence and then Ryan Porter submitted that evidence into the evidence vault there at Tahlequah.

Q    So all of the items that you and Mr. Porter seized at the scene were ultimately submitted under Mr. Porter's name?

A    That's correct.

Q    Were you with him when he processed and submitted these items?

A    When he submitted them, yes, I was.

Q    Okay.  I would ask were there other items on the porch that you recall that were processed?  And let's go back and display 37 again.

A    Yes, there was.

Q    And do you recall their location?  We're going to have the exterior diagram shown again in just a moment. And I direct your attention down to the east end of the porch.

A    Yes.

Q    Do you recognize the item numbers, the scene item numbers, 11 and 10?

A    Yes.

Q    What were those?

A    Those were two .223 casings.

        MR. LITTLEFIELD:  And I would now ask that Government Exhibit Number 20 be displayed to the witness and it is not in evidence.  And it's a photograph.

Q    (By Mr. Littlefield) Do you recognize what is displayed in the photograph that is marked Government Exhibit Number 20, Ms. Marcangeli?

A    Yes.  Those are the marker numbers 10 and 11.  11's kind of in the shadow, there.  But they're both there.

2088

Q    And is that the condition in which they were when you all marked those items for processing?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 20, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I'll ask that Government Exhibit Number 20 be displayed.

THE COURT:  You may.

MR. LITTLEFIELD:  And we've got the location. Now, I would ask that Government Exhibit Number 35 be displayed to the witness.  It is not in evidence.

Q    (By Mr. Littlefield) Do you recognize what is displayed as Government Exhibit Number 35?

A    Yes.  That's a close-up shot of marker number 10.

MR. LITTLEFIELD:  Move admission of Government Exhibit 35.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And ask it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) Where is the casing?

2089

A    It's right in front of the marker number.  It's kind of in the shadow, it's a little bit hard to see.

Q    Can you tap right below it?

A    Yeah, it's right in here.

MR. LITTLEFIELD:  Now, I would ask that what's been marked as Government Exhibit Number 36 be displayed.  And it's not in evidence either.

Q    (By Mr. Littlefield) You recognize what that is, ma'am, a photograph of?

A    Yes, that's also a close-up of marker number 11.

Q    Does it accurately depict the condition at the scene?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 36.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  Ask it be displayed.

Q    (By Mr. Littlefield) And where is the casing there?

A    Right behind the arrow.

Q    What was done with these two -- the casing that was marker item number 10 and the casing that was item number 11?

A    I collected both of those items and then sealed them

2090

in a brown paper sack.

Q    And you mentioned what happened in regards to you and Mr. Porter transporting them back?

A    Yes.

Q    Were they transported back by yourself and Ryan Porter?

A    Yes.

Q    And who submitted them to the lab actually?

A    Ryan Porter did.

Q    And were you present when Ryan Porter actually did the submission?

A    Yes.

Q    What was submitted under Mr. Porter's name?  Was that envelope already sealed?

A    The brown paper sacks, yes.

Q    What the items in which you placed them?

A    Yes.

Q    Do you know if item 10 received one of those T numbers that you mentioned?

A    Yes, it did.

Q    What T number did it received?

A    It was T-23.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 165 be shown to this witness and it's going to be the item itself.

2091

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize that item, Ms. Marcangeli?

A    Yes.  This is the brown paper sack in which I collected that casing.

Q    How do you recognize that sack?

A    My initials and date are on this brown paper sack.

Q    Is that in fact the brown paper sack into which you inserted the casing which was item number 10?

A    Marker number 10, yes.

Q    Yeah.  Okay.  I called them item marker whatever. If I screw up and call it item, go with me, okay?  Is that the one?

A    Yes.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 165, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, I show it's already in.

MR. LITTLEFIELD:  I don't.

MR. SMITH:  I mean, I have no objection if it's not.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And can you hold up that envelope?  Is there any place where -- you mentioned it was assigned what T number?

2092

A    T-23.

Q    And is that noted on the envelope, ma'am?

A    Yes.

Q    Can you how hold it and display the location where it is?

A    T-23 would be right up here.

Q    When and how is that T number assigned?

A    We were actually assigning T numbers as we went at the scene so this was assigned at the scene.  It was T-23.

Q    Because you knew it was going to the Tahlequah laboratory?

A    Yes.

Q    And where are your initials on the item, ma'am?

A    My initials are right here on the front and they're also here on the back with the seal.

Q    Can you -- is the item still in the envelope, ma'am?

A    Yes, it feels like it is.

Q    Can you get to it?

A    There's a little hole.

Q    I think we opened them in anticipation of the trial.

A    Yes.

Q    Hold it up and what is it?

A    It would be the shell casing.

Q    Do you know what kind of casing that is, .45, .22 or

2093

what?

A    A .223.

Q    And would you go ahead and reinsert it?

A    Yes.

Q    And you can pass that back to the clerk and I'm going to ask you to retrieve from her what's been marked as Government Exhibit Number 156.  Do you recognize Government's Exhibit 156?

A    Yes.  This is marker number 11 which is my T-24. It's also a -- the packaging of the .223 casing.

Q    Is that that second casing on the porch?

A    Yes.

Q    And did you place it in that envelope and do you recognize it?

A    Yes.  My initials and date are on the front and back of this brown paper sack.

          MR. LITTLEFIELD:  I move admission of what's been marked as Government Exhibit Number 156, Your Honor.

          THE COURT:  Any objection?

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And item 11 was what?

A    It's the .223 casing.

Q    Is it in that package still, ma'am?

A    Yes, it is.

2094

Q    Go ahead and reinsert it and you can hand it back to the clerk.  Hamilton's .45, the one on the southwest corner of the porch received what T number?

A    T-28.

Q    Was that assigned at the scene as well?

A    Yes.

MR. LITTLEFIELD:  I will ask that Government Exhibit Number 37 be displayed to the witness again.

THE COURT:  You may.

Q    (By Mr. Littlefield) Are you familiar with the term of flash bang or distraction or diversionary device?

A    Yes.

Q    Was there indication of a flash bang having been used at the scene?

A    Yes, there was.

Q    What item numbers were associated with the flash bang, and this should be displayed?

A    I gave it item number T-47.

Q    What scene number, marker number?

A    Marker number 14-A.

Q    And where was that?

A    Right on the east side of the residence.

Q    What was that?

A    That was the flash bang.

Q    What other items were there associated with the

2095

flash bang, if any?

A    There was a handle, marker number 19, T-32.

Q    Can you look on top of the Bronco FAL 803?

A    Yes, it's right there.

Q    And was there any other item associated with it?

A    There was a pull pin for the flash bang that was number nine, marker number nine, and my T-22 and that would be located right here.

MR. LITTLEFIELD:  I would ask that Government Exhibit 24 be displayed to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  And it's in evidence.

Q    (By Mr. Littlefield) Do you recognize what that is, ma'am?

A    That's a close-up of the marker number nine which is the pull pin.

MR. LITTLEFIELD:  I would ask that what's been marked as Government Exhibit Number 126 be provided to the witness and it should be in the file.  It's not in evidence.  126.

Q    (By Mr. Littlefield) Do you recognize what you have there, ma'am?

A    Yes.  This is a brown paper sack that contains that pull pin.

Q    And how do you recognize the brown paper sack,

ma'am?

A    It has my date and initials on it.

Q    What date does it show?

A    September the 24th of 1999.

MR. LITTLEFIELD:  Move admission of Government Exhibit 126.

THE COURT:  Any objections?

MR. SMITH:  No objection.

THE COURT:  It's admitted without objection.

Q    (By Mr. Littlefield) What T number if any was that assigned?

A    T-22.

Q    And was that assigned at the scene as well?

A    Yes.

Q    Is the pull pin in there?

A    Yes, it is.

Q    And can you display that to the jury?  Go ahead and reinsert it.

MR. LITTLEFIELD:  I would ask that Government Exhibit 25 be displayed to the witness and it is in evidence.

Q    (By Mr. Littlefield) Do you recognize what Government Exhibit 25 shows?

A    Yes, that's the handle, the close-up of marker number 19.

MR. LITTLEFIELD:  And I would ask that Government Exhibit Number 121 be provided to the witness, Your Honor.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize that, ma'am?

A   Yes.  This is the packaging that contained marker number 19 and then marker -- or the actual handle is outside of the packaging.

Q   Okay.  And was that retrieved also by yourself and Mr. Porter or the others at the scene on September the 24th, '99?

A   Yes.

MR. LITTLEFIELD:  Move admission of Government Exhibit 121, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

Q   (By Mr. Littlefield) You said the pull pin itself is outside the packaging.  Point to it, please.

THE COURT:  It's admitted without objection.

MR. LITTLEFIELD:  I'm sorry, Your Honor.  I apologize.

Q   (By Mr. Littlefield) Go ahead and point to it.  I would ask that you return it to the clerk.

MR. LITTLEFIELD:  And I would ask that Government Exhibit Number 28 be displayed to the witness,

2098

Your Honor.

THE COURT:   You may.

MR. LITTLEFIELD:   And 28 is likewise in evidence.

Q    (By Mr. Littlefield) And what marker number is that, ma'am?

A    That's actually marker number 14-A.

Q    And what is shown marker number 14-A?

A    That's the actual flash bang.

Q    And again, that was where in relation to the residence, do you recall?

A    14-A was located -- yes, just directly west of the house.

MR. LITTLEFIELD:   I would ask that Government Exhibit Number 124 be provided to the witness.

THE COURT:   124?

MR. LITTLEFIELD:   Yes, Your Honor.

Q    (By Mr. Littlefield) And do you recognize what has been marked as Government Exhibit 124, ma'am?

A    Yes.   This is the brown paper sack that contains the flash bang or did contain the flash bang, has my initials and the date on it.

MR. LITTLEFIELD:   Move admission of Government Exhibit 124, Your Honor.

THE COURT:   Any objection?

2099

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And go ahead and display. Where is the flash bang?

A    The flash bang is right outside.  It's sealed in a plastic.

Q    But it's in your right hand?

A    Yeah, this.

Q    And if you would pass that back to the clerk.

MR. LITTLEFIELD:  I would ask that Government Exhibit 37 be displayed again.

THE COURT:  You may.

Q    (By Mr. Littlefield) And I would direct your attention to the blue Chevy truck.  Do you see 10-A and 11-A identified as scene markers on 37?

A    Yes.

Q    What were marker numbers 10-A and 11-A, ma'am?

A    Those were two 9 millimeter casings.

MR. LITTLEFIELD:  I would ask that -- and these are not in evidence.  I would ask that first Government Exhibit 31 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what's shown in Government Exhibit Number 31, ma'am?  What is that?

A    That's a close-up of the marker number 10-A, a

2100

close-up of the casing.

Q    Does that depict the casing as it was discovered at the scene?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 31, Your Honor.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. LITTLEFIELD:  Ask it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) Where is the casing?

A    It's to the right of that red mark.

Q    Was that casing retrieved?

A    Yes.

MR. LITTLEFIELD:  I would ask that what has been marked as Government Exhibit Number 166 be provided to the witness, Your Honor.

THE COURT:  Exhibit 166?

MR. LITTLEFIELD:  Yes, Your Honor.

Q    (By Mr. Littlefield) Do you recognize what has been marked as Government Exhibit Number 166?

A    This is the coin envelope that had this shell casing in it.  However, Mr. Porter's the one who collected that.

Q    Mr. Porter's the one who got that?

2101

A    Yes.

Q    Did he also get 11-A?

A    Yes.

Q    Then we'll pass over 11-A. If we go back to the chart, you note 12-A which is out southwest of the porch, that more south or just off of this corner.

A    12-A?

Q    Yes, ma'am.

A    Yes.

Q    And what is 12-A?

A    12-A is another 9 millimeter casing.

Q    Do you know who collected that if it was collected?

A    Mr. Porter.

Q    What other items that are shown there did you collect, ma'am?

A    There was marker number one which is a live 9 millimeter round between the Chevy truck and the house.

Q    All right.  What about number two?

A    Number two which is a .223 casing.

Q    And who was it that collected those?

A    I did.

Q    Let's go to Government Exhibit 177.

        MR. LITTLEFIELD:  It's not in evidence and I would ask that it be displayed.

        THE COURT:  You may.

2102

Q    (By Mr. Littlefield) Do you recognize that, ma'am?

A    Yes.  It's a close-up of marker number two, which is the .223 casing.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 177.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

MR. LITTLEFIELD:  If we go back to Government Exhibit Number 44 -- or has that been displayed yet?  I want it displayed.

THE COURT:  Yes.

Q    (By Mr. Littlefield) What is that?  That's the close-up of the casing?

A    Yes.

Q    What kind of casing was at marker number two?

A    A .223.

Q    And if we would go back to Government's Exhibit Number 44, which is not yet in evidence.  Do you recognize what that depicts?

A    Yes.  This is area on the ground between the blue Chevy truck and the residence and it has the marker number two in it.

Q    What other markers does it have in it?

A    There's also marker number one and number eight.

MR. LITTLEFIELD:  Move admission of Government

2103

Exhibit Number 44.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And I will ask that Government Exhibit Number 153 be provided to the witness.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize Government Exhibit 153?

A   Yes, this the brown paper sack that contains the .223 shell casing which is marker number two.  It has my name and initials on it.

MR. LITTLEFIELD:  Move admission of Government Exhibit 153.

THE COURT:  Any objection?

MR. SMITH:  No, Your Honor.

THE COURT:  Admitted without objection.

Q   (By Mr. Littlefield) Now, you also mentioned marker number eight.  By the way, let me go back to marker two. What T number was assigned that?

A   Actually, that's marker number 8-A, I apologize.  It was hard to see the A in the picture.

Q   Let's go back to the second, marker number two, the item that is Government Exhibit Number 153.  Did that receive a T number?

A       It's T-15.

MR. LITTLEFIELD:  I would ask that Government's Exhibit Number 154 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what is marked as Government Exhibit Number 154?

A       It appears to be the packaging, however it was collected by Mr. Porter.

Q    That was Mr. Porter as well but the -- you said that you did?

A    No, I just mentioned that's what was in the photo.

Q    Okay.  I apologize.  That was Mr. Porter that did that.  Were you there when he took it, when he retrieved it?

A    We were processing the area together, yes.

Q    And you observed 8-A out there?

A    Yes.

Q    Did you observe Mr. Porter collecting it?

A    Yes.

MR. LITTLEFIELD:  I'm going to move its admission, Your Honor.

Q    (By Mr. Littlefield) You turned them in together? Took them back to the lab and turned them in?

A    We collected them all.  I mean, we were all there together collecting.

2105

MR. LITTLEFIELD:  I'm going to move admission of 154.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, we object to the admission.

MR. LITTLEFIELD:  I'll wait and ask Mr. Porter.

THE COURT:  Sustained.

Q   (By Mr. Littlefield) Ms. Marcangeli, what was item number one?

A   Marker number one?

Q   Yes.

A   That was the live 9 millimeter round.

Q   Just the live round?

A   Yes.

Q   Let's go back and I'm going to display on the ELMO Government Exhibit 37 so we don't have to tie this.  Can we get it back closer?  I liked it like we had it.  Do you see 13-A just to the west of the blue truck?

A   Yes.

Q   Was that processed at the scene?

A   Yes.

Q   And what was that, ma'am?

A   That was another .223 casing.

Q   Who retrieved that?

A   I did.

2106

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 34 be displayed to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  And it's not in evidence yet.

THE COURT:  Did you say 34 or 44?

MR. LITTLEFIELD:  34.

Q    (By Mr. Littlefield) Do you recognize what 34 is, ma'am?

A    Yes, it's a close-up of 13-A, the .223 casing.

Q    And you collected that?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 34.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

Q    (By Mr. Littlefield) And where is the casing?

A    It's right above that red mark.

MR. LITTLEFIELD:  I would ask that Government Exhibit 155 be provided to the witness.

Q    (By Mr. Littlefield) Do you have Government Exhibit 155?

A    Yes.

Q    What is that?

A    This is the coin envelope that contains the .223 casing which would be marker number 13-A and it has my

2107

initials and date on it.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 155, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q   (By Mr. Littlefield) If we go back to the exterior crime scene again.  Do you see items 6-A and 7-A in front of the blue pickup?

A   Yes.

Q   Who was it that -- what were those?

A   Those were two 9 millimeter casings that -- I collected those.

Q   You collected those?

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 41 then be displayed to the witness.  It is not in evidence.

THE COURT:  You may.

Q   (By Mr. Littlefield) What is that?

A   It's a close-up of one of the casings, marker number 6-A.

MR. LITTLEFIELD:  Move its admission.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  It's admitted without objection.

2108

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 133 be provided to the witness.

Q   (By Mr. Littlefield) Where is the casing?

A   It's really dark and hard to see but it's right above -- right above that red area.

Q   Okay.  Do you recognize -- do you have Government Exhibit 133?

A   Yes.

Q   What is that?

A   It's the brown paper sack that contains the 9 millimeter casing, marker number 6-A, and has my initials and date on it.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 133.

THE COURT:  Any objection?

MR. SMITH:  No, Your Honor.

THE COURT:  It'll be admitted without objection.

Q   (By Mr. Littlefield) Was it assigned a T number?

A   Yes, it was T-39.

Q   And where is that displayed?

A   Up in the upper left hand corner of the brown paper sack.

Q   Is the item still in the paper bag?

A   Yes, it is.

2109

Q    Would you display it?  And you can hand that back to the clerk.

MR. LITTLEFIELD:  And while that's happening I would ask that Government Exhibit 42 be displayed.  It is not in evidence yet.

Q    (By Mr. Littlefield) Do you recognize what's displayed in Government Exhibit 42?

A    Yes.  This is the close-up of marker number 7-A which is the other 9 millimeter casing.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit 42, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) Where is it displayed or where is it located in the photograph?

A    Right above that red area.

MR. LITTLEFIELD:  I would ask that Government Exhibit 168 be provided to the witness.

Q    (By Mr. Littlefield) Do you have Government Exhibit 168, ma'am?

A    Yes.

Q    And what is that?

A    It's the brown paper sack that contains marker number 7-A which is the 9 millimeter casing and it has my

2110

initials and the date on it.

MR. LITTLEFIELD:  Move admission of Government Exhibit 168.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Admitted without objection.

Q   (By Mr. Littlefield) Was it assigned a T number?

A   It has T-40 on the upper left hand corner of the brown paper sack.

Q   And can you display it?  And is the 9 millimeter casing in there?

A   Yes.

Q   Okay.  You can go ahead and reinsert it.  Let's go back to the Government Exhibit 37.  Do you see marker number one again?

A   Yes.

Q   Who seized that?

A   I did.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 137 be provided to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  137.

Q   (By Mr. Littlefield) Do you recognize that, ma'am?

A   Yes, this is the brown paper sack that contains -- well, this is the one that contains marker number four.

2111

Q    Is that marker number four?

A    Yes.

Q    Go ahead and pass that back for the time being. Let's look at item numbers 13 and 14 which are here.  And do you see where I'm talking about?

A    Yes.

Q    What were those?

A    Those were two .45 casings.

Q    And who seized those?

A    I collected those.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 45 be displayed to the witness.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit 45?

A    Yes.  This is the area where marker number 13 and number 14 are.

Q    Are they displayed in the photograph in their location?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government Exhibit 45, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that it be

2112

displayed.

THE COURT: You may.

Q    (By Mr. Littlefield) And in relation to this photograph, what's this here in the aerial photo?

A    That's the Ford Bronco, one of the Ford Broncos.

Q    And what are these items on the ground, do you recall?

A    I didn't collect those items.

Q    I didn't ask you if you collected them, I just was wondering if you recollected what those items were at the scene?

A    It appears to be a bag.

Q    You don't know what the nature of it is?

A    I don't remember, no.

MR. LITTLEFIELD: I would ask that Government Exhibit Number 160 be provided to the witness and, Paula, while you're looking at it, look for 161 as well.

Q    (By Mr. Littlefield) Do you recognize 160?

A    Yes, this is the brown paper sack that has marker number 13, which is the .45 shell casing and it has my initials and date on it.

MR. LITTLEFIELD: Move admission of what has been marked as Government Exhibit Number 160.

THE COURT: Any objection?

MR. SMITH: No objection, Your Honor.

2113

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And is it also in the sack?

A    Yes.

Q    What T number was it assigned?

A    T-26.

Q    Can you display it?  Okay.  If you would reinsert it.  Do you have what's been marked as Government Exhibit 161 in front of you, ma'am?

A    Yes, that's another brown paper sack that contains marker number 14 which is a .45 shell casing and it has my initials, date on it and T number T-27.

MR. LITTLEFIELD:  Move admission of Government Exhibit 161.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And display it as well.  What caliber casing was that?

A    Forty five.

Q    If we go back to Government Exhibit Number 37, were there some live .45 bullets on the ground near a butt plate and portions of a magazine?

A    Yes.

Q    And where were the butt plate and portions of the magazine, ma'am?  What item numbers or markers numbers,

2114

scene marker numbers were those?

A   The butt plate is marker number five and the spring was marker number 4-A.

Q   And was there a follower from the magazine; do you recall that being out there, too?

A   Yeah, the piece of the magazine, number 5-A, yes.

Q   If you could take the laser, can you point and circle to the area they're located up there, the butt plate and the spring?

A   Right.  Right in here.

Q   Where were the live rounds located?

A   Live rounds, just in here.

Q   Were those collected and if so by whom?

A   Those were collected by myself, yes.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 46 be displayed to the witness.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you see the marker number located -- you circled an area.  Do you see a marker number located and displayed there by the Bronco?

A   Yes, marker number 20.

Q   What was marker number 20?

A   That was a live .45 round.

Q   Was it one or two?

A   Actually, it was two.  I'm sorry.  Two rounds.

2115

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 148 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) And do you recognize Government Exhibit Number 148, ma'am?

A    Yes.  This is the coin envelope that I packaged those two .45 rounds in.  It has my initials and date on it and T-33.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 148.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Government 148 will be admitted without objection.

MR. LITTLEFIELD:  I would ask that Government Exhibit 43 be displayed to the witness.

Q    (By Mr. Littlefield) And do you see the scene numbers that are displayed there, ma'am?

A    Yes.

Q    Are they the same scene numbers that we were talking about -- I'll go back to the ELMO just a second -- in this area where you circled and said the live rounds were located?

A    Yes.

Q    And who collected those live rounds?

A    I did.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 136 be provided to the witness as well as 137.

Q    (By Mr. Littlefield) Do you recognize what those are, ma'am?  Which one do you have in front of you now?

A    The right now I have marker number six which is the .45.

Q    Which exhibit number is that?

A    I'm sorry.  It's Exhibit Number 136.

Q    And that is marker number which?

A    Marker number six.

Q    And did you collect that, ma'am?

A    Yes, I did.

Q    And what is it?

A    It's a live .45 round that was given T number T-19.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 136.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit Number 137?

A    Yes.  This is a brown paper sack that contains marker number four which is another .45 live round.  I

2117

gave it T number T-17.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 137.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q   (By Mr. Littlefield) 136, what T number did that have?

A   T-17.

Q   136 is marker number which one up there?

A   Marker number six.

Q   137 is marker number?

A   Four.

Q   And did you also collect seven and eight?

A   Yes, I did.

MR. LITTLEFIELD:  I would ask that Government Exhibit Numbers 157 and 158 be provided to the witness.

THE COURT:  157 and 158?

MR. LITTLEFIELD:  Yes, Your Honor.

Q   (By Mr. Littlefield) Which one is marker number eight?

A   Marker number eight is Exhibit 158.

Q   And who collected 158?

A   I did.

MR. LITTLEFIELD:  Move admission of

2118

Government's Exhibit 158.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) And it is what and what T number was it assigned?

A    It is a live .45 round and it was assigned T-21.

Q    And what is Government Exhibit 157?

A    157 is another live .45 round, marker number seven and T number T-20.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 157.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) I would direct your attention to marker number 1-A. Do you see it?

A    Yes.

Q    Out here?

A    Yes.

Q    What was that?

A    Marker 1-A was another live .45 round that I collected.

Q    You collected that?

A    Yes.

Q    I would ask was there a T number assigned to it?

A    T-34.

MR. LITTLEFIELD:  I would ask that Government Exhibit 159 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit 159?

A    Yes, this is a coin envelope that contains that marker number 1-A which is the live .45 round, has my initials and date on it and it was given T-34.

MR. LITTLEFIELD:  Move admission of Government Exhibit 159.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) In regards to your investigation, did you learn whether or not there had been an attempt to initially load Mr. Eales in the Bronco that was at the scene for transport?

A    I was aware that he was loaded in that Bronco, yes.

Q    That there was -- one was an attempted and then he was loaded in a second Bronco?

A    Oh.  I did not know that.

Q    Did you know how far his person had to be moved from one Bronco to the other to attempt to load him?

2120

A    No.

Q    Do you know in what area that second Bronco was parked when he was moved over to load him?

A    No.

Q    Okay.  Do you note east of the porch, do you see item number three?

A    Yes.

Q    And what was item number three?

A    It was a .223 casing that I collected.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 179 be displayed to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  It's not in evidence yet.

Q    (By Mr. Littlefield) Do you recognize what's displayed in Government Exhibit Number 179, ma'am?

A    Yes, this is a close-up of the marker number three which is the .223 casing.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 179.

THE COURT:  Any objection?

MR. SMITH:  No objection.

MR. LITTLEFIELD:  Now, I would ask that Government Exhibit 132 be provided to the witness.  And I would ask that this be displayed as soon as -- I know she can't be two places at one time.  Can we have 179

2121

displayed, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) What is Government Exhibit 132?

A    This is the brown paper sack that contains marker number three, the .223 casing.  It's given number T, T-16 and it has my initials and date on it.

MR. LITTLEFIELD:  Move admission of Government Exhibit 132.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) And you can pass it back.  If we can go back to the ELMO again.  Do you see item 2-A in front of the blue pickup?

A    Yes.

Q    Do you know what that was?

A    That was a 9 millimeter casing that I collected.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 176 be displayed to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  It's not in evidence.

Q    (By Mr. Littlefield) Do you recognize what's photographed there, displayed in Government Exhibit 176?

A    Yes.  This is a close-up of Marker Number 2-A which is the 9 millimeter casing.

2122

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 176.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that it be displayed, Your Honor.

THE COURT:  You may.

Q   (By Mr. Littlefield) Where is the casing?

A   It's hard to see but it's right above that red line.

Q   Was that -- you said you seized that?

A   Yes, I did.

MR. LITTLEFIELD:  I would ask that Government Exhibit 167 be provided to the witness.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize what's been marked as Government Exhibit 167?

A   Yes, this is the brown paper sack that contains marker 2-A, which is the 9 millimeter casing, has my initials and date on it and it has marker or the T number T-35.

MR. LITTLEFIELD:  Move admission of Government Exhibit 167, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection.

2123

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And display it, please.

Q    (By Mr. Littlefield) What is it again?

A    It was a 9 millimeter casing.

Q    Do you recall how many 9 millimeter -- by the way what T number did it have?

A    T-35.

Q    How many 9 millimeter casings -- if we could go back to the ELMO.  Tell me how many 9 millimeter casings were in and around that blue Chevy truck?

A    I had five actual casings, 9 millimeter casings, and one live round.

Q    And of the casings, which marker numbers were they?

A    That would be 2-A, 6-A, 7-A, 10-A and 11-A.

Q    And how many of them did you seize?

A    Let me just double check.  I think I -- I seized three of those.

Q    Who seized the other two?

A    Mr. Porter seized 10-A and 11-A.

Q    So you got the three out above, to the north of the truck or in front of the truck and Ryan Porter got 10-A and 11-A?

A    Yes.

Q    In looking at the scene, do you recognize item number 12?

2124

A    I have that item number 12 was a Smith and Wesson 9 millimeter with 10 rounds of ammunition that I collected.

Q    And if we would look to Government Exhibit Number 21, which is not yet in evidence, do you recognize what's marked as Government Exhibit 21?

A    Yes, this is the area in front of the porch and it has marker numbers 12, 17 and 16 in it.

MR. LITTLEFIELD:  Judge, I have that I have not received or admitted or offered this in evidence yet and I'm moving it now.

THE COURT:  21?

MR. LITTLEFIELD:  Yes.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And I would ask it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And what's marker 12?

A    Marker 12 is a Smith and Wesson 9 millimeter with 10 rounds of ammunition.

Q    I note that there's marker number 16 and 17 there. Do you see those?

A    Yes.

Q    And do you know what those are?

2125

A     Yes.   Number 16 is actual scrapings from that porch area and --

Q     Scrapings of what?

A     Scrapings of red stained material on that step and same thing with marker number 17.   It was stained grass, reddish color.

Q     So who collected 16 and 17?

A     I did.

Q     And for what purpose?   Why did you scrape off the porch at 16 and off the grass at 17?

A     It was consistent with what blood looks like so that's why we collected it.

Q     And was serology examination done on those items to ascertain whether or not those were in fact blood?

A     Let me double check that both of those were tested.

Q     Either or both.

A     Yes.   Serology testing was done on both of those items.

Q     By whom?

A     Myself.

Q     And what were 16 and 17?

A     It was blood.

        MR. LITTLEFIELD:   I would ask that Government Exhibit Number 122 be provided and it is in evidence.

Q     (By Mr. Littlefield) In regards to 16 and 17, you

2126

didn't try and determine whose blood it was, did you?

A    No, I didn't do any DNA testing.  I wasn't trained at the time.

Q    You said you seized item 12?

A    Yes.

Q    And what is item 12?  What is Government Exhibit 122?

A    It is the actual Smith and Wesson 9 millimeter and it has my packaging.  Packaging of the magazines and the rounds that were in the magazine.

Q    And how many rounds were in that?

A    There were 10 all together.  One was collected from the chamber and then there was nine in the magazine.

Q    What kind of number was placed on that?  You said there were firearms which got F numbers and prints which got P numbers and items which got T numbers?

A    Well, we went ahead and gave it a T number at the scene and it was given T-25.

Q    Okay.  Do you know if all firearms at the scene were received T numbers or did some of them receive other numbers?

A    I know the two that I collected both received T numbers.

Q    Okay.  And that was the .45 that was on the porch and that 9 millimeter?

2127

A      Yes.

Q      Okay.  If we go back to the ELMO again, the crime scene, you got 7-A, which is in front of the truck?

A      Yes.

MR. LITTLEFIELD:  I would ask that Government Exhibit 42 be displayed.

THE COURT:  You may.

MR. LITTLEFIELD:  Apparently this isn't in evidence.  I thought I had gotten it in, Judge.

THE COURT:  Which exhibit?

MR. LITTLEFIELD:  42.

THE CLERK:  I show it is.

MR. LITTLEFIELD:  You show it is?  Then I ask that it be displayed.

Q      (By Mr. Littlefield) Is that 7-A?

A      Yes, that is a close-up of 7-A.

MR. LITTLEFIELD:  I would ask that Government Exhibit 168 be provided to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  Paula, is that in evidence before I go back to it?

THE CLERK:  168?

MR. LITTLEFIELD:  Yes, we've got a disagreement up here.  Don't want to miss anything, but I don't want to do it twice.

2128

THE CLERK:  I show it is.

MR. LITTLEFIELD:  Okay.  I don't need her to see it and we can go ahead and knock this off.

Q   (By Mr. Littlefield)  Prior to you leaving the scene, did you collect any items from any individuals affiliated with the Sequoyah County Sheriff's Department?

A   Yes.

Q   What did you collect from an individual affiliated with the Sequoyah County Sheriff's Department?

A   I retrieved a red biohazard sack with some clothing in it and I was told that that clothing was wet.

Q   And what did you do with that -- who was it that you received that bio -- red biohazard bag from?

A   His name is Stan Philpot.

Q   And when you received the red biohazard bag from Deputy Stanley Philpot, what did you do with that?

A   Those items were taken back to the laboratory, Ryan submitted those items and then because they were wet we hung those items to dry in a drying stall that we have at the laboratory.

Q   After those items were hung up to dry, what if anything did you do with those items at the laboratory there in Tahlequah?

A   I analyzed those items.

Q   Did you check the items to ascertain if they -- what

2129

were the items?  What kind of items were --

A    They were clothing -- clothing and various.

Q    When you hung them up to dry, did you ascertain why they were wet?

A    They appeared to have staining consistent with blood on them.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 186 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) By the way, did Mr. Philpot advise you of where those items came from?

A    Yes.  I was informed that those were clothing from Barrett.

Q    Do you recognize what is in Government Exhibit Number 186?

A    Yes.  These are items that I obtained from the jeans which was one of the items that I hung up to dry and this is the packaging that I placed several different items from the jeans in.

MR. LITTLEFIELD:  Move admission of Government Exhibit 186.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) What was -- and you said those

2130

were from the jeans?

A    Yes.   These items were actually from the pockets of the jeans.

Q    And can you open that?  Is it so that you can open it and display what the items are?  Before you do that, what was in his pockets?

A    Inside the front right pocket I have noted that there is one plastic bag of red -- drug red powdery substance and one turquoise lighter.  Inside the left back pocket I have that there was one brown pill bottle that contained a plastic baggy with unknown contents. Inside the right back pocket I have that there were two pieces of white notebook paper and one dime, one black wallet with a hole through it and then the wallet contained, inside of it, piece of white notebook paper and 21 one hundred dollar bills and one twenty dollar bill.

Q    Let's go back first to the -- you said there was something that had a pill bottle?

A    Yes.   Inside the left back pocket there was a pill bottle that had a plastic baggy with unknown contents in that.

MR. LITTLEFIELD:   I would ask that Government Exhibit 113 be provided to the witness.

Q    (By Mr. Littlefield) Do you recognize Government

2131

Exhibit 113?

A    Yes.  This is the actual packaging that I packaged that pill bottle and then the plastic baggy and the powdery substance.

Q    And who offered that into -- did you put it in that envelope?

A    I packaged it separately, yes, because it was sent to another unit within OSBI.

Q    And you retrieved the bottle from the pocket and put it in what?

A    I put it into this evidence envelope here.

Q    And do you see your initials and all on it?

A    Yeah, I see my name down at the bottom that I sealed it and the date that I sealed it.

Q    What did you do -- you said you transferred it to another unit within the lab?

A    Yes.  Those items were transferred to the drug unit in the Tahlequah laboratory.

Q    Why was it transported to the drug unit?

A    To see -- so they could do testing on the substances inside the plastic baggies.

Q    And that -- is Government Exhibit Number 113 in fact the envelope which you transferred -- got from the pocket or put the contents of the pocket, the pill bottle, and then transferred it to the drug lab?

2132

A      Yes.

Q      And you can hand that back to the clerk.  I won't offer it yet.  Was it sealed when it left your custody?

A      Yes, I sealed it.

Q      Now, you mentioned the other items that were in the wallet and those items.  Would you look at the contents of Government Exhibit 186?  And what's inside that envelope?

A      It appears to be another evidence envelope but it's labeled as containing 21 one hundred dollar bills and one 20 dollar bill, but my initials are not on that.

Q      I understand that.  Was it contained in the envelope that you initially had logged that evidence in?

A      Yes.

Q      Was there something unique -- what was unique about the wallet?

A      There was a hole in the wallet.

Q      And did it go all the way through the wallet?

A      I don't have that noted.  I just have the black wallet with hole through it, so, yes.

Q      Would you look at the money that's contained therein?

A      Okay.

Q      And what do you got?

A      A hole through the money.

Q    What is it?  What kind of -- what denominations?

A    The hundred -- several hundred dollar bills and one 20 dollar bill.

Q    How many were there?

A    Twenty one $100 bills and one $20 bill.

Q    And can you hold one of them up and show where the hole through it is?  You can place those back in.  Have you put them back in?

A    Yes.

Q    You can provide those back to the clerk.  You say you do serology?

A    Serology is just what we consider body fluids, the testing of body fluids, things such as bloods, seminal fluids, saliva.  We have tests that we run for those in the lab.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 111 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Let me run a T number at you. Do you know what T number -- are you familiar with T number 140?

A    Yes.

Q    In relation to the case?

A    Yes.

Q    And have you had anything to do with T-140?

A    Yes.

Q    What was T-140?

A    Originally, T-140 was a sealed plastic bag that contained a vile of blood from David Eales.

Q    And who was it that introduced T-140 into the Tahlequah laboratory system?

A    It was submitted to the Tahlequah system by Jon Huntington on September 28th, 1999.

Q    September 28th of '99?

A    Yes.

Q    And when you retrieved it, what condition was it in?

A    It was sealed in the evidence envelope.

Q    And what was T -- who opened the envelope?  What was T-140?

A    It was the vial of blood.

Q    To get to the vial of blood what did you have to do to the envelope?

A    I had to cut the envelope open.

Q    Was it tampered with in any way?

A    No.

Q    When you removed the vial of blood, what did you do with it?

A    I made stains of the blood.  That's typical of what we do when we get blood into the laboratory.  We'll make stains and then send those on to the DNA unit.  It's just

2135

easier for them to work with stains than it is the actual blood.

Q    And did you give a designation, a T designation, to the stains that you prepared from the blood which was in the vial that was identified as T-140?

A    Yes.  Those stains I labeled as T-140 dash one and T-140 dash two.

Q    What happened to T-140 dash one?

A    T-140 dash one was -- let me make sure.

Q    You made two stains?

A    I made two stains.  One of those stains was sent to DNA and one was retained at the Tahlequah laboratory.

Q    And where is -- when you say it was sent to DNA, where is that located?

A    At the time, when I was in Tahlequah, I wasn't trained as a DNA analyst and the trained analysts were in Oklahoma City so it was sent to the DNA unit in Oklahoma City.

Q    Do you know if somebody examined -- when you made the stain, what did you do to preserve the integrity of that?

A    I would have sealed it in another envelope to transport it to Oklahoma City.

Q    Do you know who it was -- if that was analyzed by one of the DNA analysts in Oklahoma City?

2136

A    Yes, it was.

Q    Who?

A    Joann Kihega.

MR. LITTLEFIELD:   Judge, I would now move admission of what's been marked as Government Exhibit Number 111.

THE COURT:   Any objection?

MR. SMITH:   No objection, Your Honor.

THE COURT:   Admitted out objection.

Q    (By Mr. Littlefield) You can pass that Government Exhibit Number 111 back to the clerk.   Did you perform -- you mentioned scraping the blood that was on the steps and on the grass?

A    Yes.

Q    Do you recall any stains in the passenger compartment, specifically the passenger seat of the Bronco which was out in front of the residence?

A    Yes.

Q    And where were the stains?   What were those stains consistent with?

A    They were also consistent with blood.

Q    Where were those stains located on the passenger seat?

A    I don't have their exact location.   I just have that they were located on the passenger seat, I believe the

2137

top of the seat.

Q    I'm sorry?

A    I believe the top of the seat.

Q    And was there a designation provided -- you mentioned that you and Mr. Porter and others were given T numbers and assigning them out at the scene.  When you did the scraping, how did you collect the blood off the passenger seat, what you believe was the top of the seat?

A    We used -- at the time we were using razor blades and would just scrape it off and then put the razor blade and the scrapings into what we call a paper bindle.  It's just a piece of paper folded up so that the contents cannot easily escape.

Q    And then what do you do with it?

A    Then we seal it up and then transport it to laboratory.

Q    Did it receive a lab number?

A    Yes, it was T number T-88.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Numbers 114 and 178 be provide to the witness.

        THE COURT:  114 and 178?

        MR. LITTLEFIELD:  Yes, Your Honor.

Q    (By Mr. Littlefield) Do you recognize those two items, ma'am?

A    Yes.

2138

Q    What is Government Exhibit Number 178?

A    178 is a coin envelope that I generated.  I took scrapings from the original and just took a portion of that to send on to DNA and this is the actual coin envelope that I sent to DNA.

Q    Okay.  And what's 114?

A    114 is the original container of the original scrapings that contains all of -- or had all of T-88 in it at one time.

Q    So you took and put it in 114 and then submitted that to the lab?

A    Yes.  I had it originally in this, took a portion of it out and put it in this.

Q    Let's stop with that.  Was 114 submitted to the lab in that envelope in a sealed condition?

A    Yes, it was.

         MR. LITTLEFIELD:  Move admission of 114.

         THE COURT:  Any objection?

         MR. SMITH:  No objection.

         THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And then when was it that you submitted 114?  Does it not have it on the envelope?

A    I believe it was the same date that Ryan submitted all the other items.  Let me just double check.  On September 25th.

2139

Q    You all were out there all day?

A    Yes.

Q    Then you had occasion to go back and break the contents of 114 or break the seal?

A    Yes.  I had to break the seal to do my testing when I got back into the laboratory.

Q    What was your analysis and testing?  What did you do when you got back to the lab with 114?

A    Tested to see if it was blood and it was in fact blood.

Q    And then what was done?

A    And then a portion of that original scrapings were removed and put into another container to send on to DNA.

Q    The portion that you sent on for DNA analysis to Oklahoma City was in what envelope, please?

A    This envelope that's State's Exhibit -- or Exhibit 178.

Q    Okay.  You normally testify in state proceedings. We aren't the state.

A    Yes.

Q    Government Exhibit 178?

A    Yes.

Q    And where did that go?

A    That was the one that was transferred to DNA.

Q    Do you know if a DNA analysis was performed on that?

2140

A    Yes.

Q    By whom?

A    It originally has Joann's initials, but it also has Ryan Porter's and I believe that Ryan performed that DNA.

MR. LITTLEFIELD:  Judge, may I have just a second?

THE COURT:  You may.

Q    (By Mr. Littlefield) You all seized a number of shells and a number of casings from a number of locations?

A    Yes.

Q    Most you can tell is what caliber those casings are?

A    Yes.

Q    Can you tell who fired them?

A    No.

Q    Can you tell when they were fired?

A    No.

Q    Can you tell what -- who the target was, if any person or item was the target of the firing?

A    No.

Q    And other than knowing that the crime scene was secured, you arrived there when?

A    4:15 in the morning.

Q    Prior to 4:15, other than knowing that there was law enforcement there that was maintaining security, you

can't vouch for the security that was provided by those law enforcement officers previous to your arrival?

A    No.

Q    What kind of security did you all provide after you took over the scene?

MR. SMITH:  Your Honor, I'm going to object to you all.  If she wants to talk about --

MR. LITTLEFIELD:  OSBI that you observed.  I'll withdraw the question and change it.

Q    (By Mr. Littlefield) What kind of security did you observe being provided by OSBI at the scene?

A    The scene was secured when we were there.  I don't know exactly what you're meaning to that.  I mean, it was taped off.  We had people watching over the scene.  There were various agents there.

Q    Was anyone allowed into the scene other those who were actually processing it?

A    No.  I don't recall that, no.

Q    You mentioned -- I think you said there were five 9 millimeter shell casings that you retrieved from the exterior of the residence, was that correct?  Or that were around that blue pickup?

A    Did you say 9 millimeter?

Q    Yes, ma'am.

A    I actually retrieved three.  Mr. Porter retrieved

2142

two.

Q    And I realize that.  You were there while five 9 millimeter shell casings were retrieved?

A    Correct.  Yes.

Q    How many .223 casings -- and if we can go back to Government's Exhibit 37.  How many .223 casings were retrieved in and around the exterior of the residence that's displayed by Government Exhibit 37?

A    I have a total of six.

MR. LITTLEFIELD:  Judge, may I approach just a second?  Go back to the table just a second.

THE COURT:  You may.

MR. LITTLEFIELD:  Judge, I'm going to put Defendant's Exhibit 26 up.  I kind of like what Mr. Smith did yesterday.

Q    (By Mr. Littlefield) Do you see the items that are marked in blue, highlighted in blue?

A    Yes.

Q    And which caliber were those?

A    Those were the 9 millimeters.

Q    Do you see the ones that are marked in green?

A    Yes.

Q    And which ones were those?

A    Those appear to be the .223s.

Q    Are they the .223 casings?

2143

A     Yes.   They are actually.

Q     And those are the casings?

A     Yes.

Q     All right.   Now, you discussed a number of live 45s that were spilled on the ground around the magazine parts.   What are the kind of dirty yellow, orange-ish yellow that are marked?

A     Those are the live 45s.

Q     And the purplish color on the south side of the Bronco, what ones were those?

A     Those were the .45 casings.

Q     And is -- we got 12-A over there on the left hand side.   What was that?

A     12-A is a 9 millimeter casing.

Q     We've got one circled by the window.   What was that?

A     That was a live 9 millimeter.

Q     And that one's been introduced into evidence today, wasn't it?

A     Yes.

Q     And then we've got out by 1-A the circled 3-A.   What was that?

A     That was a .380 casing.

Q     Was that the only .380 casing that was found anywhere out there at all?

A     That's the only one I found, yes.

2144

Q    And in fairness, back behind that trailer area that we started talking about, there were some more casings out there?

A    Yes.

Q    And they were what?

A    There was one .223 and the others were .22.   Then I believe there was one -- let me check.   There was also one 9 millimeter casing in that area.

Q    Okay.

A    And one .223 casing.

Q    Fifteen was what caliber?

A    Fifteen?

Q    On the southwest corner of the porch?

A    Marker number 15?

Q    Yes.   What caliber?

A    Oh, .45.   I'm sorry.

Q    And twelve was what caliber?

A    Nine millimeter.

MR. LITTLEFIELD:   Pass the witness, Judge. I'll ask that Government Exhibit 129 be provided to the witness.

THE COURT:   You may.

Q    (By Mr. Littlefield) Do you recognize that?

A    No.

Q    Did you have anything to do with that item at all?

2145

A    No.

MR. LITTLEFIELD:  I'll pass the witness.

THE COURT:  Ladies and gentlemen of the jury, we'll take our morning recess now.  Ask everyone to remain seated as the jury leaves.  Remind the jury not to discuss this among yourselves or allow anyone else to discuss it with you.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Witness may step down for now. Jury has departed the courtroom.  Anything outside the hearing of the jury for the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defense?

MR. SMITH:  No, Your Honor.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury's in the box, counsel for Government is present, Defendant is present with counsel.  You may cross examination.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q    Good morning, ma'am.

A    Hi.

2146

Q    You're a criminalist that specializes in serology and now you do DNA work; is that correct?

A    Yes.  Now I'm trained in DNA as well.

Q    Okay.  September of '99, what sort of training did you have as it relates to cartridges and casings and weapons?

A    I really didn't have training as far as firearms analysis goes.  You mean like in a laboratory analysis?

Q    No, ma'am.  I'm talking about like out here at the Barrett residence you were doing a crime scene investigation, correct?

A    Correct.

Q    And that resulted in you retrieving various items of evidence that you testified to here this morning?

A    Correct.

Q    So when we're talking about 9 millimeters and 45s and .223s, do you have experience with those sort of things or is that something that somebody's telling you when you're out there, well, this is a 9 millimeter and this is what it looks like?

A    Yes.  Most of the time someone would tell me what it was also but it was also labeled on the casing.  It's normally labeled 9 millimeter, .45, depending on what caliber it is.

Q    Lots of time they're stamped on the bottom side; is

2147

that correct?

A    Yes, that's correct.

Q    I didn't hear you describe any military training or anything like that?

A    No, I don't have any military training.

Q    Are you CLEET certified?

A    Yes, I am CLEET certified.

Q    So you've had some firearms training with the OSBI such as enough to qualify with carrying a handgun, I suppose?

A    Yes.

Q    Ma'am, if I was to go over to the OSBI laboratory in Tahlequah in September of '99 and ask them to print me out a list that would correlate to containers that may come in to their laboratory, could they print out such a list in '99?

A    Could they in '99?  I don't remember if they could do that in '99 or not.  They have it in the computer, though, logged in each piece of evidence.  Each piece of evidence gets a control number is what we call it and we're able to track each piece of evidence through that control number in the computer system.

Q    Okay.  But as far as a master list to make sure nothing got lost, misplaced or reassigned, did they have that capability back then?

2148

A   I really don't recall.  It's something I would have to check with one of the evidence techs.  I really didn't do that.

Q   Let me ask you this, ma'am:  If you gave that laboratory in September of '99 an envelope, let's say that it contained 10 bullets.  Whenever you turn that into the OSBI lab, would somebody open it up and say there's 10 here?

A   Did the evidence techs do that?  No, they did not.

Q   So as an OSBI analyst, whenever you receive an envelope, you trust what's in that envelope is based on what's on the outside of that envelope, what's written on the outside of the envelope; is that true?

A   Well, I'll write down what's written on it, but then if it contains something different, I'll note that it contains something different.

Q   But you're going to generally trust when somebody hands you something and says this is what it is, that you trust that's what it is?

A   Unless I open it and it's different, yes.

Q   Okay.  Now, if you're going to give -- turn in some evidence such as in this case and we can talk about that Smith and Wesson 9 millimeter.  Whenever you turn that weapon in, you got an envelope that contains the weapon, correct?

2149

A      Correct.

Q      You got an envelope that contains the magazine and the rounds that are still contained within that magazine?

A      Okay, yes.

Q      Is that right?

A      Yes.

Q      I mean, that's how you're trained to do it?

A      That's, yes, how I would do that.

Q      And then you separately package the round that comes from the chamber?

A      Yes.

Q      Now, sometimes you may put all that into the one envelope; is that true?

A      Yeah, correct.

Q      And whenever you separately package that one round from the chamber, is it put in one of those sealed coin envelopes like you were talking about earlier with the other items of evidence?

A      Yes.

Q      Such as with a .223 casings and what have you that you were displaying for the jury?

A      Yes.

Q      Okay.  Well, ma'am, back to the OSBI lab.  In 1999 was the Tahlequah laboratory certified then?

A      It had not been accredited at that time, no.

2150

Q    And did they have written protocols for handling evidence back in 1999 in September?

A    Yes.  We did have those protocols, yes.

Q    And can you tell me what sort of protocols that they may have had when you're dealing with clothing that would have blood stains?

A    Well, all evidence will be sealed if it has blood stained items inside that evidence in containers.

Q    How about sealing blood stained items into a plastic bag when those items are wet?

A    Well, any time that we have wet evidence we need to put it in plastic so that it doesn't seep through, like if it was in a brown paper sack it would seep through the brown paper sack.  So we always transport it in a plastic baggy before we have to hang it up.

Q    And you're going to hang it to dry?

A    Correct.

Q    So that you can go back later and determine your analysis, what was there and what wasn't there, correct?

A    Yes.

Q    Now, whenever you first got to the scene it was what, 4:15 in the morning?

A    Yes.

Q    And then you were directed to go to the hospital and process the Bronco that was there; is that correct?

2151

A    Yes, that's correct.

Q    And also you had been given some instruction to find items of clothing from any of the suspects or victims involved in this case; is that true?

A    I don't recall that conversation, no.

Q    Nobody ever directed you to be on the look-out for some clothing that might be at the hospital?

A    I don't remember that conversation.  I was with Lynette who was my supervisor at the time, so a lot of information sharing was with Lynette and not myself and Ryan Porter.

Q    So you're with Mr. Porter and Ms. Lee so it could have been one of them was given that task, but all three of you were traveling together and essentially doing the same thing in the early morning hours of September 24th; is that correct?

A    That's correct, yes.

Q    And in fact, you didn't retrieve any clothing when you went to the hospital, did you?

A    No.

Q    And do you recall whenever you left the hospital and went to the D.A.'s office that the reason you were there was to check again to see if there was any clothing? Does that strike a --

A    Well, we did retrieve some gloves from that Bronco

2152

at the hospital.

Q   Okay.

A   As far as clothing goes.

Q   I'm talking about from any individuals that may have seized, because I assume those gloves were inside the Bronco just laying there, is that right?

A   Yes.

Q   Do you recall you or anybody in your party going to the D.A.'s office for the specific reason of trying to ascertain whether or not there was clothing that had been seized from a suspect or victims involved in this case?

A   No, we never went to the D.A.'s office then.

Q   You said you left somewhere other than the hospital on your way back to the residence, you made a stop?

A   Yeah.  We stopped at the police department there and met one of our agents there briefly.

Q   Okay.  And do you understand why you stopped there?

A   Actually, yes.  We spoke to OSBI Inspector Dave Page to see if he had any clothing from the people involved and to see if he needed anything.  And he did not at that time.

Q   So we were looking for clothing in the early morning hours of September 24th prior to you going back to the Barrett residence; is that correct?

A   Well, that is what it has in the notes here of a

2153

crime scene memo that is Lynette's, Lynette Lee's crime scene memo.

Q    Yes, ma'am.

A    So she probably received those instructions, yes.

Q    So that would be yes; is that correct?

A    That's what it has in her notes, yes.

Q    Thank you, ma'am.  Now, you ultimately received some items of clothing from Deputy Philpot; is that correct?

A    Yes, that's correct.

Q    Did you know Deputy Philpot prior to September 24th of '99?

A    No, I did not.

Q    And you hadn't worked at OSBI very long?

A    No.

Q    Prior to that.  When did you start, ma'am?

A    I actually started in May that same year.

Q    And Deputy Philpot gave you those items of clothing as you were leaving the Barrett residence to go back to the lab and you had already finished your duties, hadn't you?

A    Correct, yes.

Q    And what time in the day was that?

A    That I spoke with Mr. Philpot?

Q    Yes, ma'am.  Whenever he gave you the biohazard bag that had items of clothing in it.

2154

A     I don't remember the exact time that I spoke with him.  I don't believe I have that recorded.

Q     I'm sorry.

A     Let me -- we left the scene at approximately 1:30.

Q     In the afternoon?

A     No, the next morning.

Q     So it's been -- you'd been on that scene for 20 hours, correct?

A     Yes, correct.

Q     And you hadn't received any items of clothing from Deputy Philpot prior to you finishing up at 1:00 o'clock in the morning, true?

A     No, we actually received those when we were leaving.

Q     Some --

A     So around 1:30 in the morning.

Q     Some 25 hours after this incident happened?

A     Somewhere in there, yes.

Q     Now, whenever he gave these items of clothing, did he ever indicate to you you might want to look in those pockets because there's something in there?

A     No, I don't recall that conversation.  I just remember the conversation that this item of clothing were wet.

Q     And they came from whom?

A     And that they were -- belonged to Barrett.

2155

Q    And you ultimately removed the clothing from the biohazard bag, did you not, ma'am?

A    Yes, I did.

Q    And you held that up -- excuse me, strike that.

     You put that in some stalls for drying that are designed for that purpose?

A    That's correct, yes.

Q    How long was it before you got to the laboratory whenever you received those items?  I mean, did you -- were you on your way back there whenever you saw Deputy Philpot and you just went on to the laboratory or did you all do something else?

A    We left the scene and then, yes, we went straight to the laboratory.  We didn't process anything else.

Q    Been a long day, hadn't it?

A    Yes.

Q    Now, you can't vouch from where Mr. Philpot may have got those items of clothing, can you?

A    No.

Q    And you don't really know how he came into possession of them?

A    No.

Q    Or what he may have done with them in between the time that he got them and before he gave them to you?

A    No.

2156

Q    When did you locate the pill bottle that was in the -- did you say the left rear pocket?  And when I say that, ma'am, I'm talking about more in terms of during your process of drying and what have you, not necessarily a clock time.

A    The pill bottle was located inside the left back pocket and that was actually after all the items were dried.  I would take them out of the drying stall one at a time and would analyze each item.  And I located the things in the pocket when I was analyzing the jeans.

Q    And I'm going to guess that you really don't want to mess with them a whole lot when they're wet.  You want to get them in there and get them dried and then you're going to look at things later, right?

A    Correct, yes.

Q    Now, what, if anything did you do to preserve the integrity of that pill bottle so that it could be submitted for fingerprint analysis?

A    We do the same thing with all of our evidence. We'll always use gloves and protective gear with any piece of evidence as to preserve the integrity of each piece of evidence.

Q    You didn't want to contaminate anything, did you?

A    No.

Q    And that's how you've been trained?

2157

A    Correct.

Q    So when you're dealing with these items, you're wearing gloves, I suppose?

A    Correct.  Yes.

Q    Now, you said that ultimately you sent that item over for a drug analysis; is that correct?

A    That's correct, yes.

Q    Did you also have a choice to send that for fingerprint analysis?

A    That was not requested, no.

Q    So that would be done by a supervisor?

A    Well, I think ultimately I called the agent and had a conversation with the agent.  I'm sure that I spoke with Lynette, too, because I was more of in the training capacity and she instructed me to send those to the drug unit.

Q    Lynette Lee did?

A    I believe it would have been Lynette, yes.

Q    Ma'am, any time during our questioning, because I know you've got documents in front of you, if you find something that changes an opinion or a statement that you made, just let us know and we'll re-address it, okay?

A    Okay.

Q    All right.  But you think based on what you're looking at and what you recall is Lynette Lee that told

2158

you to send it for analysis?

A    Let me double check the conversation logs.

Q    Okay.

A    In speaking with my supervisor, I don't typically make a conversation log, but if we notify someone on the phone we will log that in to the conversation log.  But I would have routinely talked to Lynette about things of that nature.

MR. LITTLEFIELD:  Your Honor, may we approach a second?

THE COURT:  You may.

MR. SMITH:  Excuse me.  I'm sorry.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  Judge, I'm being hyper-cautious but I'm a little afraid of asking about who was talked to and responsible for requesting certain items because it may end up resulting in a request from the D.A.'s office and if nothing else I'd ask that on the way back that Mr. Smith, again -- and she has been advised not to mention state charges or state proceedings, but I'd hate to have something slip up because of the line of questioning.

MR. SMITH:  I'll caution her if you want me to.

THE COURT:  Here's what I'd like to do.  Have

2159

you two and the court reporter go over and have a session with her off the record.

MR. LITTLEFIELD:  Okay.

THE COURT:  And you both.

MR. LITTLEFIELD:  I just was concerned about the line of questioning.

THE COURT:  No, I appreciate your caution.  I don't disagree.  Does the court reporter understand? What I want you to do is go with the two attorneys over to the witness and you are going to caution her about what not to say and we'll let you make a record of that.

MR. LITTLEFIELD:  And I had already advised her.

THE COURT:  I know you have, no.  But I think caution is needed.

(Whereupon, the following record was made at the witness chair outside the hearing of the jury.)

MR. LITTLEFIELD:  You aren't doing anything wrong, I just wanted to make sure that continues in the line of questioning.  If there's any time that there's any consultation with somebody from the D.A.'s office in regards to the case, that you just indicate law enforcement or something like that to make sure we're conforming to --

THE WITNESS:  Okay.

MR. LITTLEFIELD:  I just wanted to make sure.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  You may proceed.

MR. SMITH:  Thank you, Your Honor.

Q   (By Mr. Smith) Ma'am, we were talking about direction that you may have received as relates to the pill bottle and where it was sent for analysis.  Have you had a chance to review your records?

A   Yes.

Q   Can you tell us what you found, ma'am?

A   Yes.  I have -- in my conversation log I have a conversation with Ben Rosser in which I told him of the money and the contents of the wallet.  I don't have whether he instructed me to send those on to the drug unit, but standard procedure would be that if we had something that was suspected to be drugs we would send it on to the drug unit.  But that was probably consulted with Lynette Lee.

Q   I mean -- and I know it was a long day out there and you were probably worn out and had retrieved all sorts of items.  So I don't guess you were very suspicious whenever Sheriff Philpot -- or Deputy Philpot came up with this bag of clothing, right?

A   No.

2161

Q    Let me ask you:  Did you have an option to send items contained within that clothing for fingerprint analysis?  Is that something you could have done?

A    It could have been done, yes.

Q    And I assume that nobody told you don't do it, they just didn't suggest to do it, is that right?

A    Correct.

Q    That's a fair statement?

A    Correct, yes.

Q    Now, ma'am, a plastic baggy can also retain fingerprints, can it not?

A    I believe it can, yes.

Q    Paper can retain a fingerprint?

A    Yes.

Q    And we would think that a plastic baggy could as well, true?

A    True.

Q    And again, I assume that you're going to tell me that in terms of dealing with the plastic baggy that was found in one of the front pockets, is that right?  Was that a right front pocket?

A    Yes.

Q    That you used gloves and you didn't do anything to contaminate that yourself, right?

A    Correct.

2162

Q    But you didn't send that item off for fingerprint analysis either?

A    No.

Q    Now, was there -- I guess within the pill bottle there was a baggy stuffed down inside of it; is that true?

A    Yes.

Q    And then was there just one baggy stuffed in that pill bottle?

A    I just have that there's one baggy, yes.

Q    And then there was a separate baggy that was in the left front pocket?

A    Correct, front right pocket.

Q    Okay.  And I'm sorry, ma'am.  Front right pocket?

A    Yes.

Q    There wasn't anything else contained within that baggy in terms of packaging or anything?

A    Not that I noted, no.

Q    Ma'am, what do you show item T-128 is?  Make sure I've got it right.  Is that the Sig Sauer that was on the porch?

A    T-128 or T-28?

Q    Well, it might be 28.  That may be why I've got it wrong.

A    Yeah.  T-28 is the Sig Sauer.

2163

Q   And that was the one that was with marker number 15; is that true?

A   Yes, that's correct.

Q   And did I understand you earlier to say that it contained six rounds?

A   Yes.

Q   And how were those packaged, if you know?  Let me strike that.  Let me back up a second.

It contained six rounds.  Was there a round in the chamber?

A   Yes.  There was one round in the chamber and five in the magazine.

Q   Okay.  And who collected and packaged that weapon?

A   I did.

Q   And how did you package those rounds?

A   Well, I don't have noted how I packaged those rounds.  But if memory serves me right, I believe that I took the one from the chamber, packaged it separately and then the magazine, packaged it in a separate container and then put everything into one larger container.

Q   Okay.  Now, let me back up a second.  Your paperwork doesn't indicate that you did that; is that true?

A   That's correct.  I can't find that anywhere.

Q   And what you're telling me is you have a practice on how you go about doing these things?

2164

A     Well, that's how we did it at that scene.

Q     And so you would think based on that's how we do things that this would have been done that way even though your paperwork doesn't reflect it?

A     Yes.

Q     And what I'm talking about is packaging separately the chambered round and the rounds from the magazine, correct?

A     Correct.

Q     Now, do you know about these Sig Sauers, these .45s, that the Highway Patrol were carrying out there, about the magazine capacity?

A     Do you mean this one in particular?

Q     Yes, ma'am.  I want to talk about it.

A     Do I know -- I don't know remember what the magazine capacity was, no.

Q     You don't know if some would hold eight and some would have seven?

A     I wouldn't know.

Q     Did you do anything to determine what the magazine capacity was of that weapon?

A     No.

Q     Where is that weapon and the magazine and the rounds?

A     Where is it right now?

2165

Q    Yes, ma'am.

A    I'm not sure.

Q    It wasn't retained by the OSBI, was it?

A    No, that item was sent on to firearms.

Q    Then it was returned to the Highway Patrol; is that true?

A    I'd have to double -- well --

Q    Anything in your records tell you differently?

A    If it went to firearms, it actually went to Oklahoma City and they might have been returned it from Oklahoma City, so I don't think I would have that information in my case file.

Q    And that's what I'm getting.  There's nothing in your case file that would indicate that that weapon was still in the custody of the OSBI or the Government?

A    No, I don't have that in my records.

Q    Kind of hard for us to examine that thing in court now, isn't it, ma'am?

A    Yes.

Q    And again, what you're relying on is your practice even though the paperwork doesn't say how you packaged those items?

A    Correct.

Q    Was there any inconsistency from what you saw out there of the way weapons and rounds and chambered rounds

2166

were counted or were account for?

A    I didn't really notice.  I was just really doing --
I just really did those two weapons and I wasn't really
collecting any other weapons, so I didn't observe any.

Q    Fair enough, ma'am.  Now, Exhibit Number 122 that
you looked at previously.  That was the Smith and Wesson
9 millimeter pistol.  Do you recall that, ma'am?

A    Yes.

MR. SMITH:  I'm going to ask that that be
handed to you, please.

Q    (By Mr. Smith) And, ma'am, what I want to direct
your attention to is not the pistol itself, but I want to
look at the packaging that's contained within that box
and I believe it's underneath the pistol.

A    Okay.

Q    You got two separate packages there; is that
correct, ma'am?

A    Yes, that's correct.

Q    Okay.  Let's talk about that one you have in your
hand right now.

A    Okay.

Q    Now is that -- that doesn't have a separate T number
or anything, does it?

A    No, it was just inside this original T-25.

Q    Okay.  It's all packaged together, true?

2167

A    Correct.

Q    Now, in your description of T-25, can you tell us what it says?

A    On the big brown paper sack?

Q    Well, I'm sorry, ma'am.  I'm going to refer you to your report for one second while you have those sacks in front of you.

A    Okay.

Q    I believe it's on page two of your report.

A    I have sealed brown paper sack containing Smith and Wesson 9 millimeter handgun, magazine and 10 rounds of ammunition.

Q    It doesn't say anything about a round as packaged separately that came from the chamber, does it?

A    No, it does not.

Q    Now, I would like for you to look at that smaller package that you had in your hand a moment ago.

A    Okay.

Q    And that contains a magazine and rounds, correct?

A    It says nine live rounds.

Q    And that's how many you believed to have been in that magazine when that weapon was at the scene, true?

A    Yes, correct.

Q    And if you'll look at the bigger envelope.

A    Okay.

Q    That says -- it references a Smith and Wesson and gives the serial number, true?

A    Uh huh.

Q    And it says one round from gun.

A    Uh huh.  And bullet from gun, yes.

Q    And that indicates to you, ma'am, that the round from the chamber was packaged separately and was contained within that envelope, true?

A    Yes.

Q    Okay.  Now, can you show me or can you find inside of that package where that separate packaging would be for that chambered round?

A    Well, this doesn't indicate necessarily that the bullet was packaged in its separate container.

Q    But isn't that our practice whenever we take a round from the chamber to ensure the integrity of that round so we can look at the scratch marks that may be on that round?

A    I believe that's, yes, what I should have done.

Q    I mean, that's what we're trained to do, correct?

A    Correct.

Q    And you're relying on what you do and what you did at the scene?

A    Yes.

Q    Not necessarily on your paperwork, right?

2169

A     Correct.

Q     And there is no separate package in there that contains the chambered round, is there?

A     I don't see any other packaging, no.

Q     In fact, we don't even have a round, do we?

A     I don't see the round, no.

Q     Okay.  But you do have a package that contains a magazine that's labelled as nine rounds?

A     Correct.

Q     Do you know what happened to that round?

A     No.

Q     OSBI, do they ever lose things?

A     Not that I'm aware of.

Q     Well, we're aware of this one, right?

A     Well, this one's a firearm so I don't know, unless firearms has done something with that live round, I can't really say.

Q     If they fired that live round, we'd expect there to be a casing?

A     Yes.

Q     And if they examined that round without firing it, we would expect it to be maintained with those other items of evidence that are listed as T-25, would we not?

A     Not necessarily.  Sometimes I analyze things and will remove them and package them separately so I can't

2170

really say what firearms would do with that evidence.

Q   Okay.  Now, we're talking about firearms within the OSBI.

A   Correct.

Q   We're all on the same page here within the OSBI, right?

A   Yes.

Q   Okay.  Now, there's nothing on that big envelope that says that the round that came from the gun, that something different was done with it, right?

A   No.

Q   That's the paper trail that we use.  We write on those evidence envelopes, right?

A   Correct.  Yes.

Q   And there's not a hint or clue as to what has happened to that 9 millimeter round that came out of the chamber?

A   I couldn't tell you, no.

Q   We don't know if the OSBI lost it or not, do we?

A   I couldn't tell you, no.

Q   We just know we don't have it?

A   Correct.

Q   Ma'am, let me -- and I hate to skip around, but I saw a note that I had written here.  I want to refer back to Government's 186.  And you can put that up, ma'am, I

think we're done with it.

MR. SMITH:  I'm going to ask that those be given to you, ma'am.  186.

Q    (By Mr. Smith) That's the contents from the pocket of Mr. Barrett; is that true, ma'am?

A    Yes.

Q    Do you have that pill bottle in there?

A    No.

Q    That's just an envelope that represents where you put the items; is that true?

A    Well, the pill bottle was packaged separately and sent to the drug unit with the other container.  This is just everything else that had the money and the lighter and a couple pieces of paper.

Q    Do we know what item that would have been that had the pill bottle?

A    I actually handled it earlier.  I don't know what exhibit number it was.

Q    If I find it, I'll come back to it.  Well, it looks like T-138 dot one.

A    Yeah, it should be T-138 dash 4.

Q    Uh huh.  That's the plastic bag.

A    Oh, yeah.  That's the plastic bag.  But it was contained with the others.

Q    T-138 dot one?

2172

A     Yes, you're right.  It will have all that in it.

Q     It may be Government 113, ma'am.  Let me look and see.  It is, and I don't show that it's in evidence.  But I would ask that you look at it and don't display it to the jury but see if you recognize it.

A     Yes.  Yes, this is the container that has the pill bottle and the plastic bag.

Q     Is the pill bottle in there?

A     It feels like it is.

Q     Can you open it and see, again without displaying it to the jury?

A     Well, it's sealed in the plastic that surrounds it.

Q     We're in court, ma'am.

MR. LITTLEFIELD:  Judge, I'm going to object. It's contaminated.  That why it's in plastic.

THE COURT:  Let's see you at the bench.  Get the exhibit.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  That's red phosphorous and it has also tested positive for methamphetamine.

THE COURT:  That's not heat sealed, is it?

MR. LITTLEFIELD:  I'm not sure if it is or not, but she sure shouldn't be handling it.

THE COURT:  What, you're concerned because of

the --

MR. LITTLEFIELD:  It's the red phosphorous. I'm not sure of the safety of that.

THE COURT:  The bag says biohazard.

MR. LITTLEFIELD:  And it also tested positive for methamphetamine.

MR. SMITH:  I'm not asking for the contents of the bottle, but I would like to see the bottle.  And I don't know, Judge, if we can get her gloves at lunch or something and let her come back and do it that way.

THE COURT:  Let's do that, see if we can.

THE CLERK:  I have gloves in the drawer down here.

THE COURT:  Well, why don't we talk about it. I want to be sure we're as safe as possible.  Safe to her, safe to all of us.

MR. SMITH:  Sure.

THE COURT:  If there's any -- if she has any concerns about that.

MR. LITTLEFIELD:  It sure is nasty and it'll mess her clothes up.

MR. SMITH:  We don't want to do that.

THE COURT:  We can take those precautions.  But you might talk with her, rather than making -- trying to establish that issue before the jury, I think it would be

2174

best dealt with outside the hearing of the jury with her, with both of you there, talking to her and see.  Then I will -- if you all are not satisfied with her response about the dangers, et cetera, I'll have to talk to her, hear your arguments.  I mean, what I'm hoping is that either the defense is going to be convinced it is too dangerous to open or you all -- or the Government will agree it's not.  Somewhere in between, I'll have to decide.

MR. LITTLEFIELD:  I'm not sure if it's like an explosive hazard or something like that but I know that methamphetamine --

THE COURT:  No, no, no, I agree.  I don't disagree with you.  I just don't know that -- she's the closest thing to an expert we have.  She ought to know.

MR. LITTLEFIELD:  Except she's not a drug expert.

MR. SMITH:  No, but she dealt with it in the lab.  She's the one who retrieved it.  So I mean --

THE COURT:  If she feels uncomfortable doing it then, you know, I don't want her to do it.  She probably knows.  If she doesn't know, you all could probably call somebody, find out over the lunch hour.  So let's do that.

(Whereupon, the following record was made in

2175

open court within the hearing of the jury.)

THE COURT:   Just one minute.   You may proceed.

MR. SMITH:   Thank you, Your Honor.

Q    (By Mr. Smith) Ma'am, we're going to come back to the item with pill bottle, okay?   And it may be after lunch; fair enough?

A    Okay.

Q    Ma'am, I want to put up on the display Defendant's Exhibit Number 26 and it isn't in evidence.   And, ma'am, again, this is color coded and so if you can't follow my chart just let me know.   But I think you'll recognize these items, okay?

A    Okay.

Q    Let's look at marker number one.   That's the live 9 millimeter round; is that true?

A    Yes, that's correct.

Q    And did you retrieve that item?

A    Yes, I did.

Q    And did you ascribe a T number to that?

A    T-14.

Q    And do you know what brand that unfired round was?

A    No, I do not.

Q    Was there some reason -- well, let me ask this: Stamped on the base of those casings is where you would find identifying information; is that true?

2176

A    Yes, that's correct.

Q    And you've identified several of these cases by way of brand; is that true?

A    That's correct.

Q    Any reason why we don't have a brand name on this one?

A    The only reason I can think of is there wasn't one on that actual round or the one that I could see to write down.

Q    Okay.  You haven't seen that 9 millimeter round today, have you?

A    I don't believe that I have.

Q    We're going to try to retrieve that at lunch and see if you can identify it further; fair enough?

A    Okay.

Q    Okay.  What we've referred to as the blue or the purple, which were the fired 9 millimeter rounds around the blue pickup?

A    Yes.

Q    Were they all the same brand or do you know?

A    I can double check.

Q    Okay.

A    Yes, I believe they were all Speer, S-p-e-e-r.

Q    And what about 3-A?

A    I just have it 3-A is a .380 casing and I don't have

a brand on that.

Q    You don't have an identification of that?

A    No.

Q    And again, 3-A is what I'm depicting with my laser and you won't see it on your screen, but right there; is that true?

A    Yes.

Q    Do you know whether or not a .380 will fire through a 9 millimeter?

A    I don't know.

Q    Ma'am, you were responsible for retrieving these three holes, these three cases, and that live 9 millimeter round; is that true?

A    Yes, that's correct.

Q    And Mr. Porter got these?

A    Correct.

Q    Now, whenever you got out there and you conducted your search, you looked in this area, right?

A    Ryan and I searched that area, yes.

Q    There was no crime scene tape that came out like this, was there?

A    I don't remember the tape being out that far.

Q    There was no tape in this area, was there?

A    No, I don't believe there was.

Q    What we have is some tape that went from the rear of

2178

the blue pickup to the Bronco that was still there?

A     Okay.

Q     Correct?

A     Correct.

Q     Do you remember Mr. Littlefield asking you what that line was that went east to west across the property?

A     Yes.

Q     And after looking at it you thought, well, maybe that's crime scene tape?

A     Yes.

Q     But you'd agree with me there was nothing out in this area that cordoned this area off, true?

A     Correct.

Q     Now, where all did you search for 9 millimeter rounds?  And you have that laser in front of you or you can tap on your screen, whichever.

A     Where did I search?

Q     Yes, ma'am.

A     We just searched this area in here.

Q     Okay.  Now, the grass was how high out there?

A     I don't remember.

Q     Some of those pictures that we looked at, I couldn't see a casing in there.  You knew because you took the picture what you were looking at?

A     Yeah.  Some of them were high enough that you

couldn't really see the casing very well.

Q   It was very hard to find?

A   Some of them were, yes.

Q   Did you conduct an examination of that area with a metal detector?

A   I did not, no.

Q   Do you know if anybody else did?

A   I believe -- I recall that there was one out there but I did not use it.

Q   How far -- can you show us by way this diagram and using the laser how far you think you searched for 9 millimeter casings?

A   I remember going all the way to the back of the porch area right around this area.  I don't recall exactly, but I remember being back there a little bit.

Q   Now, you were asked a question about you don't know who shot and you don't know what they were shooting at and things of that nature, right?

A   Correct.

Q   But I assume as an investigator, I mean, there's probably two schools of thought.  One, don't tell me anything, let me just see what I can figure out, right? I mean, we'll look at the physical evidence?

A   Correct.

Q   That's going to tell the story.  But the other one

is if I have a little knowledge going into this thing, then I have an idea of what I'm looking for, right?

A    Okay.

Q    And it kind of helps focus you or channel you into an area and it gets your curiosity up and you realize maybe I need to be on the look out for something, true?

A    True.

Q    Had anybody told you that Officer Manion was traveling from this area with an MP5 that shoots 9 millimeter rounds?

A    I believe that information was shared with us, yes.

Q    When you were looking for those holes?

A    Yes.

Q    Now, as an investigator, do you wonder how do I have two 9 millimeter holes in this area and I've got a live round here and I've got three more out in this area?

A    I was mainly there to collect and preserve evidence. I'm not really an agent. I'm more a criminalist that goes out and collects the evidence. So we were just looking for evidence.

Q    Was somebody directing you as to where to go look for evidence?

A    We were searching the area together, yes. To look for casings and things of that nature.

Q    You and who, ma'am?

2181

A   Ryan Porter.

Q   Okay.  So again, my question would be if you had information that an individual was traveling from this area and you have these rounds, these are scattered over a pretty good area, are they not?

A   Yes.

Q   I mean, I assume first off you're not going to expect somebody that shoots a 9 millimeter in this area to have a live round just drop out right there?

A   That would be the assumption.

Q   And you're not going to expect that if somebody was shooting from this end of the pickup that a live round is going to drop out right there underneath the window?

A   I wouldn't think so.  If they were only in that location, no.

Q   Your experience tells you that for there to be a live round underneath this window, that gun was probably right there, wasn't it?

A   Unless for some reason that round was moved afterwards.

Q   Unless somebody was in the scene tampering with something?

A   I can't say.

Q   Okay.  Now, have you ever shot an MP5?

A   No.

2182

Q    Have you ever handled an MP5?

A    No.

Q    You ever fired an automatic weapon before?

A    No.

Q    Do you have an idea as to whether or not these casings and these casings would all result from a single firing position?  Do you understand my question?

A    Would the casing get all the way over there?  Is that your question?

Q    Yeah.  I mean, would it sound reasonable to you to say if a fellow was shooting in the area, that you might have two casings here, but then you'd have three way out here?

A    The two, maybe.  It seems a far distance for the other three.

Q    So you'd probably think we've got one firing position that was resulted in these?

A    Possibly.  Possibly.

Q    Probably another firing possession that resulted in these?

A    Possibly.

Q    And may or may not have another firing position that dropped this live round unless this is where they shot from, dropped the live round and that's where the case is?

2183

A    I can't really say.  There's really several possibilities.

Q    Okay.  Now, you said you searched to the corner of the house?  Did you go -- how far out in the easterly direction did you go?

A    I really don't remember how far out we went.

Q    What is marked as OHP 720, I believe, it wasn't taped off around behind it or anything was it?

A    I don't recall it being taped behind it.

Q    Did you search in, I guess -- I know you searched in this area.  Did you search in this area?

A    I think we searched that area a little bit, yes.

Q    I'm going to come back to some of those other cases in a minute.  But did you retrieve any rounds from an MP5?

A    I didn't handle any of the MP5s, no.

Q    Okay.  In your report did you have anything that indicated how many rounds may have been in an MP5?

A    Whatever the packaging was labeled is probably what I had in my report.

Q    Ma'am, could I refer you to page four of your report?  And I'm going to talk about item T-68.

A    Okay.

Q    Are you there?

A    Yes.

Q     Okay.  Tell us what T-68 says that it is.  What's the identity?

A     It says it's a sealed brown paper sack containing 20 9-millimeter rounds of ammunition from left magazine, HK MP5, serial number 63-99771 from the trunk of the OHP unit 344.

Q     So let's abbreviate this a little bit so we'll know what we're talking about, okay?

A     Okay.

Q     First off we're talking about an MP5?

          MR. LITTLEFIELD:  Judge, may I object?  May I ask a question of voir dire in relation to the testimony as to that particular item?

          THE COURT:  You may.

                    VOIR DIRE EXAMINATION

BY MR. LITTLEFIELD:

Q     Did you seize the item?

A     No, I did not.

Q     Did you have anything to do with the item?

A     No.

          MR. LITTLEFIELD:  I object to the line of questioning beyond her ability to testify.  Anything she'd have would be hearsay that she obtained from someone else.

          MR. SMITH:  Your Honor, I'm questioning her

from her report.

MR. LITTLEFIELD:  She can write a report based upon hearsay information, Judge.  She has no independent knowledge of her own about anything in regards to that item.

MR. SMITH:  She certainly would have the ability to testify about what is contained within her report, Your Honor.

MR. LITTLEFIELD:  It's hearsay based.

THE COURT:  Well, let me hear the question and Government counsel is right.  If it's hearsay, if her answers -- although it's her report, if it's based on hearsay perhaps there's a problem.  But let me hear what the question is.

Q   (By Mr. Smith) Ma'am, by way of identification, I want to abbreviate this a little bit so we don't get lost and we're talking about an MP5?

A   Okay.

Q   And the last three numbers that I'm going to refer to on the serial number is 771.

A   Okay.

Q   And on your identification that indicates that that came from the trunk of OHP unit 344?

A   That's what the brown paper sack says and I've seen the brown paper sack.

Q   Do you know whose unit 344 was?

A   No, I do not.

Q   You don't know if that was Mr. Hise's or not?

A   No.

Q   Do you know whose weapon 771 was?

A   No.

Q   Nothing on the paper sack identifies it as such, does it?

A   No.

Q   Okay.  Let me go to the second line right below it, T-69.  Okay?

A   Okay.

Q   Again, that's referring to the same weapon, is it not?

A   Yes.

Q   An MP5, 771?

A   Yes.

Q   Okay.  And that indicates what, ma'am?  What's the description?

MR. LITTLEFIELD:  I object to the description unless she is the one who wrote the description and is aware of it.  She received it from the basis of what someone else provided.  It's hearsay.  I don't think she seized this firearm, just familiar with it.

THE COURT:  Counsel?

2187

MR. SMITH:  I can ask her if she's seen the sack, Judge.  She can testify from the sack like I have everything else that these other agents have done.

MR. LITTLEFIELD:  The only thing she's testified from any sacks what she wrote on it herself.

MR. SMITH:  Your Honor, and I guess my idea is that OSBI relies upon what is written on these sacks to tell them what it is and know what they're dealing with. That's their practice, that's what they do.

MR. LITTLEFIELD:  And when I asked about items that were seized and submitted by Mr. Porter in her presence Mr. Smith objected to those.  This item was seized by Mr. Porter and Mr. Porter will testify.  He is the witness who ought to be testifying about that particular item.  She's not familiar with it.  She didn't seize it.

THE COURT:  Counsel, argument?

MR. SMITH:  Judge, I can cover it either place. I wasn't going to move for the introduction of it.  But if the Court would rather me deal with Mr. Porter, I certainly can.

THE COURT:  Objection sustained.

MR. SMITH:  Okay.

Q    (By Mr. Smith) Ma'am, do you know how many rounds a magazine that fits into an MP5 will hold?

2188

A    I have no idea.

Q    You're just not very familiar with the MP5, are you?

A    No.

Q    Now, let's talk about back to the diagram again. What we've got marked in green, okay?  We've got four items that are marked right there between the house and the pickup.

A    Okay.

Q    Those are .223 casings, right?

A    Yes.

Q    And 10 and 11 are also .223 casings?

A    Yes, correct.

Q    Now, what all weapons do you fire for the OSBI?  A handgun?

A    I just have a handgun, a 9 millimeter handgun.

Q    Have you ever fired an M-16?

A    No.

Q    Ever fire a Colt Sporter?

A    No.

Q    Are you familiar, based upon your training, how weapons discharge there hulls?

A    Generally, just on a general basis.

Q    What's your general understanding as it relates to an automatic rifle, excuse me, a semi-automatic rifle?

A    My handgun?  You mean -- generally on my handgun

2189

it's back and more to the right.

Q    That's been your experience?

A    That's my experience, yes.

Q    So whenever we talk about where somebody -- you can't tell where somebody fired from.  By looking at these casings and as an investigator you can get a pretty good idea where they didn't fire from, though, can't you?

A    I suppose so.

Q    I mean, just follow me here a second.  We've got these five casings that are on the ground that have all been fired.

A    Okay.

Q    We wouldn't expect somebody to be shooting in this area and those cartridges to result from right there, would we?

A    I wouldn't expect that, no.

Q    And the same way with these .223 casings.  We wouldn't expect somebody to be over here and them go all the way over there, would we?

A    No, I wouldn't expect that.

Q    So we can talk about places where they probably weren't?

A    Okay.

Q    Let's talk about the 9 millimeter for a minute. Okay.  Based upon your understanding of ejection patterns

2190

would you think that somebody would probably have to be in this general area for those two holes to result in being right there?

A    Based on my knowledge that's what I would think.

Q    Again, for these three to be right there and that live round to be dropped right there, it wouldn't seem unusual that a person was right there shooting and it resulted in that, would it?

A    It wouldn't really seem that unusual to me, no.

Q    For these .223 casings that are right here, somebody could be standing in this area shooting that way and they'd eject that way, right?

A    Possibly.

Q    What if they're standing right here shooting this way?  Are you going to expect those casings to go that way?

A    Not necessarily.  Not based on what I know.

Q    That would have to be pretty strange, wouldn't it?

A    I would think so.

Q    But as an investigator, you just kind of scratch your head and think, well, that doesn't make sense, right?

A    Yeah, I might question it.  Yes.

Q    The 380 casing, item 3-A, did you retrieve that?

A    Yes, I did.

2191

Q    And do you know what sort of analysis was performed on that?

A    No.  That was transferred over to firearms.  I'm not sure what they did.

Q    And that was a live round?

A    The .380 was a casing.

Q    Okay.  So it had been fired?

A    Correct.

Q    So it would have been processed through a weapon?

A    Correct.

Q    You just don't know what the results -- if there were any testing done to see if it fit a weapon that was out there, right?

A    No, I don't know.

Q    Ma'am, when you were out there on the scene, can you describe the location of the Ford Bronco that had the bullet holes in it?

A    It was directly south of the residence, it went directly south.  I don't know, it was kind of turned a little ways, it was angled more probably southeast.

Q    And there were items of evidence that were contained underneath of it?

A    Yes.

Q    Did you have a question as to whether or not that Bronco had been moved?

2192

A    Did I question that?

Q    Yes, ma'am.

A    Not necessarily.  That's where it was when we arrived there.

Q    Did you see any evidence that that Bronco was some place else other than where it was when you got out there?

A    No.

MR. SMITH:  I'm going to put 26 back up, if I may, Your Honor.

THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, are you aware of what this diagram is of just to the left of the steps?

A    I don't remember what that was.

Q    Okay.  Are you aware of what this dotted line represents that's on the diagram?

A    They're -- I believe those were tire tracks, yes, that extended from the house.

Q    And do you know what caused those tire tracks, what vehicle?

A    No.

Q    Did you try to determine what caused those tire tracks?

A    No.

Q    Did you talk to anybody out there about what may

2193

have caused those tire tracks?

A    I don't recall.

Q    Did you examine that Bronco?  I'm talking about the Bronco that had bullet holes in it.

A    I don't believe I retrieved -- I did retrieve a couple items that were underneath the Bronco.

Q    Did you examine the interior of the Bronco?

A    Yes.

Q    I'm going to show you, ma'am, what has not been placed into evidence.  I'm going to ask to see if you can identify this picture and then go from there.  Do you see it on your display screen?

A    Yes.

Q    That is Defendant's Exhibit Number 136, ma'am.

A    Okay.

Q    Can you tell me if you recognize that photograph?

A    It appears to be the floor board.

Q    Of what, ma'am?

A    I can't really say from this photo, but it appears to be a floor board with keys.

Q    Of a vehicle?

A    It appears to be, yes.

Q    And there appears to be keys in the center of that area?

A    Yes.

2194

Q   Can you tell what that black boot-looking thing is in front of those keys?

A   A possible gear shift.  I can't really tell.

Q   Okay.  Is there just not enough from that picture for you to tell me what that is, other than how you've otherwise described it?

A   I mean, there appears to be a radio.

MR. LITTLEFIELD:  Object.  The question asked, does there appear to be enough.  The answer is not responsive.

THE COURT:  Sustained.

Q   (By Mr. Smith) Can you answer my question, ma'am?

A   It still appears to be the floor board because of the radio.

MR. LITTLEFIELD:  Again, it's not responsive. The question is:  Is there enough that you can identify what it is.

THE COURT:  Sustained.

Q   (By Mr. Smith) Again, ma'am, it's either you can or you can't and if you can't, then just tell us that.

A   I can't really tell.

Q   I'm going to take that down.  I'm going to show you another one that's marked as Defendant's 139.  It'll come in to focus here in just a second.  Have you seen the items that are depicted in that photograph before, ma'am?

2195

A    I believe that I have, yes.

Q    Okay.  And what do you see in there that looks familiar to you?

A    It looks like car seats, two radios, miscellaneous items on the floor board.

Q    Such as?

A    Appears to be some handcuffs, a possible knife, a possible magazine.

Q    And can you tell by looking at that photograph whether or not that could be attributed -- whether or not it is attributed to the vehicle that is there at the Barrett residence?

A    Honestly, I don't remember those items in that vehicle.

Q    Ma'am, that's perfectly fine.  If you don't remember then that's what I expect you to testify and I'll move on.  Did you have anything to do with the interior of the Hamilton Bronco?  I mean, I believe you said that you took a scraping from some seats or something, right?

A    Yes.

Q    And to do that you have to get inside the vehicle; is that true?

A    Yes.  There were several of us that were searching the inside of that vehicle.

Q    You say several, who are we talking about?

2196

A    Lynette Lee, Ryan Porter and then Iris Dalley.

Q    Now, to get inside of that Bronco you had to open the door?

A    Yes.

Q    Do you recall whether or not the windows were up or down?

A    I don't remember.

Q    Okay.  And what door did you get in?  The passenger door or the driver's door?

A    I think I looked on both sides of the vehicle.

Q    Did you actually climb inside the vehicle?

A    I believe that we were inside the vehicle, yes.

Q    Did you make any determination as to whether or not that vehicle was running whenever you were conducting your examination?

A    I do not remember the vehicle running.

Q    Did you make any determination whether or not the keys were in the ignition?

A    I don't remember the keys in the ignition.

Q    I guess the obverse of that would be if the keys were in the ignition, do you think that's something you would recall?

A    Probably.

Q    If that vehicle was running, do you think you would recall that?

A    Yes, I would remember that.

Q    If that vehicle was in neutral, do you think you would recall that?

A    Possibly.

Q    If that vehicle was in drive, do you think you would recall that?

A    Yes.

Q    And nothing at all about your recollection indicates that it was in drive or neutral, does it?

A    I don't remember.

Q    Okay.  How long did you spend inside of that vehicle?

A    I don't know.

Q    Was it a lengthy time or just a short period of time?

A    Well, I was kind of helping Lynette, so I was kind of helping her collect stains, various stains, in the inside of that and that's when I took the scrapings on the seat.

         THE COURT:  Mr. Smith, it's 12:30 and we'll take the noon recess.  Members of the jury, remember my admonition not to discuss this matter among yourselves or allow anyone to discuss it with you.  We'll be in recess until 1:45.  I'll ask everyone in the courtroom to please remain seated as the jury leaves for the noon recess.

2198

(Whereupon, the noon recess was taken after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  You may continue your cross examination.

MR. SMITH:  Thank you, Your Honor.

Q    (By Mr. Smith) Ma'am, I think we've decided not to open the contents of that envelope that contains that pill bottle.  But I want to ask you if you can recall that particular pill bottle whenever it was packaged.  And I'm referring to Exhibit Number 186.  Did you take any notes on that, ma'am?

A    On the pill bottle?

Q    Yes, ma'am.

A    Yes, I did.

Q    And what I'm going to want to know from you, were there any labels on that pill bottle?

A    I did not note any labellings on the pill bottle, no.

Q    If it had a name on it such as Roger Hilfiger, that's something that you'd probably have logged in your notes, wouldn't you?

A    Yes.

Q    The fact that you didn't log anything like that in

your notes and based on your recollection, can we assume there's nothing on that pill bottle in terms of a name or identifying information?

A    Yes.

Q    Okay.  Then, ma'am, we talked about the clothes a little bit and I think they are here.  I don't know if -- I'm going to ask that you look at them.  We've marked them as Defendant's 214, I believe.  Are you able to identify Defendant's 214, ma'am?

A    I think my labeling is actually on the inside of the pants.

Q    I know we discussed you didn't want to get -- you know, for health reasons, you wanted to be careful and I don't want you to expose yourself, but --

MR. SMITH:  Your Honor, I think we're going to have a stipulation from the Government.

MR. LITTLEFIELD:  Yes, we'll stipulate that those are Kenny Barrett's pants.

MR. SMITH:  So I'd move for the introduction of Defendant's 214, Your Honor.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No objection.  Judge, and they have been plastic sealed but that has become open and I would ask that they shouldn't go back to the jury because of the condition, because there could be a

2200

biohazard.

THE COURT:  We'll address that and you should take pains to remind the Court of that as we progress toward the time when the jury would deliberate.

Q    (By Mr. Smith) And, ma'am, whenever you examined those articles of clothing after they were in that drying stall that we talked about, you generated some paperwork did you not?

A    Yes, I always take notes.

Q    And you provided us those over the break, did you not?

A    Yes, that is correct.

Q    And I want to show you what has been marked as Defendant's 212.  This has not been put into evidence. If you look at your screen there, ma'am, and are you able to recognize that piece of paper?

A    Yes, I do.

Q    Can you tell me what it is?

A    That is my actual notes that I took on item number T-137, which is the thermal underwear.

Q    And does that have some drawings and some depictions of holes and things?

A    Yes, I just did a rough sketch of the underwear and I just note that they were covered with red stains.  I didn't actually test those stains.  I just kind of noted

what they looked like.

MR. SMITH: Move for the introduction of Defendant's 212, Your Honor.

MR. LITTLEFIELD: No objection.

THE COURT: Admitted without objection.

MR. SMITH: Ask that it be published, Your Honor.

THE COURT: You may.

Q    (By Mr. Smith) Again, ma'am, this is thermal underwear that you understand that Mr. Barrett was wearing; is that true?

A    Yes, that's correct.

Q    And you have a laser pen in front of you. Were you able to determine whether or not there were entry or exit wounds or holes on these articles of clothing?

A    I can't really tell whether they're entry or exit. I noted that there were some holes, yes.

Q    Did they appear to be consistent with a gunshot or do you know?

A    I can't really say that either.

Q    Will you show me where you saw holes on these thermal underpants?

A    Yes. On the back there were several holes on the right side. There was also on the front side, which would be the left on the front, there were some holes and

2202

there were a couple of holes on the other leg as well.

Q   So, when I look at the bottom drawing, the one that I'm shining on now, this would be as an individual such as I'm facing, facing the wall; is that true?

A   Yes.

Q   And could you tell if the holes were in the back here or they're in the side like that or could you tell?

A   I just laid them down and oriented them as the back and the front and wrote the holes like that.

Q   Again, this is the right leg; is that true?

A   Yes.

Q   And this would be the back of the leg?

A   Correct.

Q   What you have drawn on here, what is that, the dark spots?

A   The dark red is just consistent with the staining that was on the underwear.

Q   And then if we look what's up above, again this would be the front of the right leg?

A   Yes, that would be the front of the right, correct.

Q   And did you see bullet holes or holes in those articles of clothing?

A   There were some holes in that section as well, yes.

Q   And are these holes or what are those?  Or are those stains?

A     It looks like there's a couple of holes more towards the inside there.  And then I believe those two little specs on the outside, I think that's just staining.

Q     Do you think these two are stains on the outside of the left leg?

A     Yes.  On the inside of the area, it looks like there's a couple holes.

Q     We're going to take that down, ma'am.  Thank you.  I want to show you what is not into evidence that is marked as Defendant's 213 and ask if you would review this briefly.

A     Yes.  That's also my original notes on item number T-138 which is a pair of blue jeans.

Q     Jeans that you believe are in front of you that were worn by Mr. Barrett?

A     Yes.

Q     And is that -- the drawing that you're looking at came from your notes just a little bit ago?

A     Yes.

      MR. SMITH:  Your Honor, I move for the introduction of Defendant's 213.

      MR. LITTLEFIELD:  No objection.

      THE COURT:  Be admitted without objection.

      MR. SMITH:  Ask that it be published.

      THE COURT:  You may.

2204

Q    (By Mr. Smith) Again, ma'am, if you would briefly describe for me and let's start with the drawing at the bottom.

A    That's just the back portion of the pants.  There's some red staining on this leg, the right leg and then a little bit on the left leg.  There's also a hole in the back pocket and I've noted that there's a couple of holes down here and it looks like a tear right in there.

Q    Again, this would be the right leg?

A    Correct.

Q    And does this -- this would be the right rear pocket?

A    Yes.

Q    What I'm shining on.  And does that appear to be consistent with the hole that you saw in the billfold?

A    Yes.

Q    And that it's consistent with the hole that was in the money that you showed us earlier?

A    Yes.

Q    Okay.  Then would you describe the drawing to the left?

A    The drawing to the left is just the front of the pants so this would be the right leg, the front of the right leg.  On the jeans there was actually some cuts right in here, this jagged line down in here is actual

2205

cuts into the jeans.  And then there's a couple holes on this side and then red staining on the right side or actually the left side, the left leg and a couple tears and holes on that side as well.

Q    Predominantly would you say the holes were in the right leg or the left leg?

A    It seems like there's more holes in the right leg.

Q    Then the holes that are in the left leg, do they appear to be on the inside of the pants such as on the inside of the knee area or somewhere else?

A    Yes, they looked more interior.

Q    Thank you, ma'am.  Ma'am, I want to direct your attention again to what I have listed as marker number one and it's the item T-14.  Do you recall what I'm referring to?

A    Yes.

Q    And it is the unfired 9 millimeter round that is outside of the window by the blue pickup; is that true?

A    Yes, that's correct.

Q    Did you take that into evidence?

A    Yes, I collected that.

Q    Okay.  Do you know what has happened to that item?

A    No.  Not since it's been transferred to the firearms unit, no.

Q    You haven't seen it today?

2206

A      No.

Q      Do you keep paperwork that tells you that you submitted that?  I mean, I know you have a report.

A      Yes, we'll have submittal sheets that contains all the items that were submitted to the laboratory.

Q      Can you tell me what all you have in your records that reflects what was done with marker one, item T-14?

A      I do have the submittal form where it came to Tahlequah.  I have in my report that it was also transferred to the firearms unit on September 27th by Ryan Porter and from there it could have been returned, but I do not have that information in my case file which would have been out in Tahlequah at the time.

Q      So beyond that you don't know.  Would that be a fair statement?

A      Correct.

Q      Now, ma'am, we talked a little bit earlier about processing that Bronco that was identified as FAL 803, the Bronco in front of the residence; do you recall that?

A      Yes.

Q      Okay.  I'm going to show you two pictures which have not been put into evidence and see if you can identify these.  First one is Defendant's 159.  Can you tell what that is a picture of, ma'am?

A      It appears to be the floorboard area of that Bronco

2207

that was processed.  I say that because that the broken mirror is one that we collected.

Q   Does that appear -- excuse me.

A   And submit to the laboratory.

Q   Does that appear to be consistent with your recollection of how things looked on September 24th of '99?

A   Yes.

MR. SMITH:  Your Honor, I would move for the introduction of Defendant's 159.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  It's admitted without objection.

MR. SMITH:  Ask that it be displayed, Your Honor.

THE COURT:  You may.

Q   (By Mr. Smith) Ma'am, can you tell me outside of the broken mirror that you talked about, what else is depicted in that photograph?  Or let me do it another way.  Do you see a weapon in that photograph?

A   It appears to be, yes.

Q   Maybe if we turn it a little bit, might make it easier.  Does that help you or not?

A   Yes.  It appears to a weapon, yes.

Q   And what appears to be underneath that mirror and on

2208

top of that weapon?

A    It looks like a magazine.

Q    Do you know what type of weapon that is, ma'am?

A    No.

Q    Did you seize that weapon?

A    No, I did not.

Q    Did you inventory any bullets out of it?

A    No, I did not.

Q    Do you know if it was even loaded?

A    No.

Q    Did you obtain any scrapings from that weapon that you know of?  If you don't know, that's all fine.

A    There were -- Mr. Porter collected some stains from one of the weapons but I'm not sure if that's the same weapon or not.

Q    We'll ask him that, ma'am.  Let me show you -- I'm going to take that down and show you Defendant's 160. Can you recognize that photograph, ma'am?

A    Because of the broken mirror it appears to be the same area, just a different angle, a different angle.

          MR. SMITH:  Move for the introduction of 160.

          THE COURT:  Any objection?

          MR. LITTLEFIELD:  May I ask a voir dire question?

          THE COURT:  You may.

2209

VOIR DIRE EXAMINATION

BY MR. LITTLEFIELD:

Q    Where is the broken mirror and can you describe it?

A    Right under -- (Interrupted)

Q    -- you can't poke it because it's not up there?

A    Sorry.

Q    I'm trying to figure out where it is.

A    It looks like it's right to the bottom right hand of the picture, just kind of up on an angle, under that cord.

MR. LITTLEFIELD:  Okay.  No objection.

THE COURT:  It's admitted without objection.

MR. SMITH:  Ask that it be displayed, Your Honor.

THE COURT:  You may.

Q    (By Mr. Smith) And I don't know, ma'am.  Do you see anything else in there of evidentiary value, compared to the other photograph?

A    Not that I can tell.

MR. SMITH:  Your Honor, if I may approach my desk for a minute?

THE COURT:  You may.

Q    (By Mr. Smith) I'm going to try this one more time, ma'am, and if you can't recognize it just tell us.  I previously showed you Defendant's 136.  It has not been

2210

into evidence and I'm going to see now if having looked at those others if that helps your recollection.

A    I still can't really tell.  If I had something in it that could distinguish it like the broken mirror, but I still can't really tell.

Q    Okay.  That's fair enough, ma'am.  Thank you.

MR. SMITH:  Your Honor, I think I pass the witness.  One second, Judge.  One additional brief area, Judge.

THE COURT:  You may.

Q    (By Mr. Smith) You examined the Bronco at the hospital; is that correct?

A    Yes.

Q    And you talked about some staining that was in there.  Did you look at that Bronco to see if there was any bullet holes in it.

A    Yes, we did examine that Bronco for bullet holes.

Q    And you did not find any; is that true?

A    No, we did not.

MR. SMITH:  Thank you, ma'am.

THE COURT:  Redirect?

MR. LITTLEFIELD:  Yes, Your Honor.  Judge, ask to display Defendant's Exhibit 213.

THE COURT:  You may.

2211

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   Ms. Marcangeli, you can't tell whether they're entry wounds or exit wounds, but can you tell if there are corresponding wounds on both sides of the leg, front and back?

A   You mean --

Q   Would appear that a bullet passed all the way through the leg maybe, whether it's going backwards -- from back to forward or forward to back, it passed all the way through the leg?

A   You might be able to tell if you laid it on top of one another that it went all the way through, yes.

Q   Well, if we look at Government's Exhibit Number 213 and you look at the right leg, there are -- for example, there is a hole in the pocket.  Was there a corresponding hole on the right front of the pants?

A   In that same location?

Q   Or a similar location which might have been an exit hole if it came from rear to front or vice versa.

A   Possibly in this area down there.  There could have been a hole that passed all the way through.  I just didn't note if it matched up or not.

Q   Okay.  And were there holes in the back of the right leg that would have had holes corresponding in the front?

2212

A    Possibly, yes.

Q    Where are those?

A    There's some holes over here that -- there's two holes on this side as well.

Q    How many holes are there here?  One or two?

A    There appears to be two.

Q    Okay.  Now, on the left leg, are there and that's -- are there holes on the back but not -- on the front but not on the back?

A    Well, they were so far interior that if they were just --

Q    Right there?

A    Yes.

Q    Okay.

A    Pretty close to the inside.

Q    Okay.  And that would be in the left front area?

A    Correct.

Q    Right in here?

A    Okay, yes.

Q    Are there holes on the other side that would indicate that if bullets entered from there that they would have passed out the back in any location?

A    I didn't note any on the backside, no.

Q    And likewise there were none from the back that would have caused those to have been exit holes?

2213

A    Correct.

Q    You can't tell which direction those holes came from or the fire came from that caused those holes?

A    No, I can't.

Q    And you couldn't tell if for instance those were in the left leg which is a glancing blow off the right that just creased the edge of the pants and didn't even enter the leg?

A    Yeah, I can't tell.

Q    You don't know whether or not Mr. Barrett had wounds that required him to visit a physician in Sallisaw later to have projectiles removed, do you?  Or do you?

A    I've heard that, yes.

Q    Okay.  Did you come into contact with any evidence in regards to a removed projectile that was subsequently turned into the laboratory?

A    No, I don't believe that I did.

Q    Okay.  There was a great deal of discussion.  And let's look at Defendant's Exhibit Number, and I'm going to display it to you, 26.  There's a lot of discussion about one.  What was that?

A    It was a live 9 millimeter round.

Q    A live what?

A    9 millimeter.

Q    And these were that I'm circling here?

A     Those were the casings, the 9 millimeter casings.

Q     In these two areas?

A     Correct.

Q     What evidence do you have that connects this live round with these expended casings?

A     I don't have any.

Q     Were there any live 9 millimeter rounds located anywhere else on the property that you remember?

A     No, I do not believe so, not that I saw.

Q     I'm sorry.

A     Not that I saw.

Q     Were there any expended 9 millimeter casings on the property in areas far removed from this location?

A     Yes, there were some casings.

Q     Where were they located.

A     They were located more to the west of the residence.

Q     And if we go back and display real quickly Government Exhibit Number 69, can you tap where those 9 Millimeter casings, the other 9 millimeter casing was?

A     There was one in this general area and then one, I believe, in this area.

Q     Okay.  Is there any reason to think that the live round under the window on the east side of the house is any more likely to be connected with those 9 millimeter casings than these 9 millimeter casings on the west side

2215

of the house?

A    Could you repeat your question?

Q    Is there any reason why you would associate the live round which is on the east side or far side of the house with the 9 millimeter casings on the east side of the house any more closely than the 9 millimeter casings on the west side of the house?

A    Not necessarily, no.

Q    Do you have any idea when that live round was put there?

A    No.

Q    Was there indication as to whether or not Mr. Barrett had a 9 millimeter weapon?

A    I believe that that was -- that, yes, I believe that's true.

Q    In your experience, how familiar are you with trajectories or ejection patterns?

A    Just basically from my weapon.

Q    And that's what?

A    That's a 9 millimeter handgun.

Q    And typically when you fire your 9 millimeter does it eject out the side, the used casings eject out the side port?

A    Typically, yes.

Q    Does it typically also eject live rounds when it

2216

ejects those used casings?

A    No.

Q    In regard -- you were asked a number of -- let's go back to Defendant's Exhibit 26.  You were asked about these groupings and the likely location of the position of fire for those casings to be there and those casings to be there.  Do you remember being asked those questions on cross examination?

A    Yes.

Q    What if anything does the positioning of the firearm have to do with the ejection pattern, how those casings eject?  In other words, if the gun is turned this way or this way or this way are they going to go in the same direction?

A    I would think so.  No.  I mean, no, I don't think so.

Q    Okay.  And you were asked about these .223 casings?

A    Yes.

Q    When a weapon ejects a casing, is there anything that would modify or change the likely area or pattern as to where those casings are going to end up?

A    Well, if there was an object that it hit or it bounced off of, that's going to have a difference as well.

Q    Do casings respond in the same fashion if they land

2217

on ground or if they land on a hard surface?

A    I wouldn't think so, no.

Q    Do you have any clue as to whether or not if there is activity in the area of where casings have fallen, if that's likely to cause a dispersion of the casings that have fallen in that area?  For instance, if a number of officers are going through clearing a house, would that possibly disturb the location of the casings?

A    It's possible, yes.

Q    If somebody is dragged out of the house, would that likely disturb the location of casings, if they're in the area where that person's dragged?

A    It's possible.

Q    How much do you really know about .223 casings?

A    Not very much.

Q    How much do you know about 9 millimeter casings that are fired from a machine gun?

A    Not very much.

Q    You were asked about not knowing what Lake Ranger Stanley Philpot would have done with the contents of Mr. Barrett's pocket when it was in his custody.  Do you recall that?

A    Yes.

Q    How many times have you had it when local officers have placed thousands of dollars in a wallet of an

2218

individual and turned them into the OSBI lab?

A   Never to my knowledge.

Q   You were asked about the Sig Sauer that was found on the porch, item 15.   What was the serial number on that?

A   G222155.

Q   You all had a record of what specific weapon that was, didn't you?

A   Yes.

Q   And you were asked if it was kind of hard to examine it in court because it hadn't been produced.   Do you recall that?

A   Yes.

Q   How many defense requests were there to examine that firearm while it was within the custody of the OSBI?

A   I'm unaware of that.   I don't know.

Q   How difficult would it have been for the OSBI to have retrieved that weapon or gone back to the OHP if they'd released it if there was a defense request to examine it?

A   It could have been done.   We could have found where it was returned to and located it that way.

Q   The fact that that weapon was returned to the OHP, if it was, does that make it inaccessible?

A   Not to my knowledge, no.

Q   As long as you got the serial number, can't you find

2219

that weapon?

A     I would think so, yes.

          MR. LITTLEFIELD:  That's all I have, Judge. Pass the witness.

          THE COURT:  Recross?

          MR. SMITH:  Thank you, Your Honor.

                    RECROSS EXAMINATION

BY MR. SMITH:

Q     Ma'am, as it relates to item number one, T-14 again, we don't have it, correct?  You don't have it?

A     Correct.

Q     We can't look at it here today.  We don't have any idea where it's at?

A     I don't know where it is.

Q     And did you collect the blood samples on the stairs leading out of the house?

A     On the front steps?

Q     Yes, ma'am.

A     Yes, I did.

          MR. SMITH:  Can we display Number 26?  Do you have that, Defendant's 26?  Your Honor, if I could retrieve my book?

          THE COURT:  You may.

Q     (By Mr. Smith) Okay.  Ma'am, and in Number 16, is that the area of the steps that you retrieved the blood

sample from?

A    Yes.

Q    And then Number 17, I believe you told us that that is an area?

MR. LITTLEFIELD:  Objection.  Beyond the scope. I didn't ask about that on redirect.

THE COURT:  Argument counsel?

MR. SMITH:  Your Honor, it has to go with dragging somebody out of the house.

THE COURT:  You may answer the question. Overruled.

Q    (By Mr. Smith) Ma'am, Number 17 is an area that you depicted as being grass that had red stains on it; is that true?

A    Yes, that's true.

Q    So you were asked about cartridges and things that could be moved by people coming in and out of the house or being drug; do you recall that?

A    Yes.

Q    Is there any evidence that you've seen that indicates that there were blood stains in this area of the porch leading up to Number 11 and 10?

A    I don't remember any blood stains.  That was not noted on the porch.

Q    Did you conduct an analysis of the stains, Number 16

2221

and Number 17, to see who they came from?

A    I didn't do that, no.  I just said whether it was blood or not.

Q    Do you know if somebody did that?

A    I don't know if those stains were tested for DNA or not.

Q    If there was blood on this porch, do you think you would have seen it?

A    Well, there was some stains on the inside door frame or right on the door frame.

Q    In here?

A    Not inside but on the outside on the frame.

Q    Okay.  Beyond that, and I'm talking about in the area of these .223 cartridges, Number 11 and 10?

A    I don't recall any red stains on the porch in that area.

Q    I'm sorry.  Go ahead.

A    In that area.

Q    If there would have been, is that something you would have noted?

A    Yes.

Q    Okay.  Now, the pill bottle that we talked about earlier, that was not found in the wallet, was it?

A    No, that was -- no.

Q    That was not found wrapped up in 22 one hundred

2222

dollar bills?

A    No.

MR. SMITH:   I believe that's all I have, Judge.

THE COURT:   Any further direct examination?

FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Do you recall what Defendant's Exhibit Number 214 was?  Do you recall the jeans?

A    Yes.

Q    And that was an item that was in the custody of whom?  What agency?

A    When I was received it?

Q    Yes.

A    It was in our custody at that time.

Q    The OSBI?

A    When I received it, yes.

Q    And that was offered as a defense exhibit; is that correct?

A    Yes.

Q    Any reason why, that you know of, the defense couldn't have offered number one, T-14, item T-14?

MR. SMITH:   Your Honor, I'm going to object. What we're going to offer or not offer is really not on her to comment on.

THE COURT:   Argument?

MR. LITTLEFIELD:  Same position from us, Judge. The question is she is having to answer the question why it isn't produced by the Government.  There's no reason why it can't be produced by either side, Your Honor.

MR. SMITH:  Yes, Your Honor, it goes to who keeps control of the evidence in these cases.

THE COURT:  Okay.  Let's rephrase the question. You both have lost me now.

MR. LITTLEFIELD:  Is there any reason why that item would not have been made available to the defense had the defense wished to offer it as an exhibit.

THE COURT:  Is there an objection to that question?

MR. SMITH:  No, Your Honor.

THE COURT:  You may answer.

A    No, there's no reason that I know of.

MR. LITTLEFIELD:  Pass the witness.

MR. SMITH:  Very briefly, Your Honor.

FURTHER RECROSS EXAMINATION

BY MR. SMITH:

Q    Can you tell us, ma'am, whether that item -- and I'm referring to T-14 -- even exists in evidence?

A    At this time?

Q    Yes, ma'am.

A    I don't know where that item is.

2224

MR. SMITH:  Thank you, ma'am.

THE COURT:  Anything further?  May this witness be excused?

MR. LITTLEFIELD:  No objection.

MR. SMITH:  Your Honor, she may be.  But these are her originals and I would like to return those to her and we have copies to supplement the record with.

THE COURT:  You may.  Ma'am, you may step down and you may be excused.  Thank you for your testimony.

Government may call your next witness.

MR. LITTLEFIELD:  Ryan Porter.

RYAN PORTER,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record please, sir.

A    Ryan Porter.

Q    Mr. Porter, how are you employed?

A    I'm a Criminalist with the Oklahoma State Bureau of Investigation.

Q    And how long have you been a criminalist?

A    Approximately six and a half years.

Q    And what is a criminalist as opposed to a special agent?

2225

A    A criminalist is somebody who works in the laboratory and provides analysis on potential evidence in criminal cases and also occasionally assists in criminal investigations in regards to crime scenes.

Q    What area is it that you work in in the laboratory, sir?

A    I'm a forensic biologist.

Q    What's a forensic biologist do?

A    We're the ones who specialize in serology and DNA which means we basically deal with any of the body fluids and anything that might come off the body such as hair, blood, seminal fluid, anything dealing with the human body.

Q    You might lean a little more into the microphone, have it just a little bit better picking you up.  I can basically hear most of it.  What is your experience that would make you a forensic biologist, sir?

A    I have a Bachelor of Science in Forensic Science from the University of Central Oklahoma.

Q    What is forensic science?

A    Forensic science is a degree that ties both the science of law and science itself together to provide scientific background for criminal law.  We do the actual science part of law.

Q    What areas would -- of study would be incorporated

2226

in the receipt of a bachelor of forensic science?

A    It involves a lot of chemistry, a lot of biology, but it also involves classes in criminal justice, criminal law.  It basically incorporates a little bit of everything.

Q    After receiving that degree, what's your employment history, sir?

A    Upon receiving my bachelor of science degree, I was employed with the Oklahoma State Bureau of Investigation.

Q    During the period of time that you were working on receipt of your degree, did you have any outside employment relevant to forensic sciences?

A    Not forensic science, per se, but I worked for the OSBI during that time also.

Q    Did you work in any private setting at any period?

A    No.

Q    What training have you received since becoming employed by the OSBI, sir?

A    I've been through the entire forensic biology training program which includes training in blood, sexual assaults and DNA analysis.

Q    And how long have you been applying these skills in doing forensic analysis, sir?

A    I've been doing blood and sexual assaults for approximately five and a half to six years and the actual

DNA analysis for about five years now.

MR. LITTLEFIELD: Your Honor, I ask that --

Q    (By Mr. Littlefield) Have you been qualified as an expert in any prior court proceedings, sir?

A    Yes, I have.

Q    Any in state courts?

A    Yes.

Q    And what counties?

A    Let's see.  There's Washington County, Tulsa County, Mayes County, Adair, McIntosh, Oklahoma County.  I think that's it.

Q    And have you been qualified as an expert previously in any federal court proceedings?

A    Yes, I have.

Q    And which courts?

A    In Tulsa.

Q    Would that be in the Northern District of Oklahoma, sir?

A    Correct.

Q    And what were you qualified as in the Northern District?

A    As a DNA analyst.

MR. LITTLEFIELD: Your Honor, I would ask that Mr. Porter be qualified as an expert in the area of analysis of DNA.

2228

THE COURT:   Any objection?

MR. SMITH:   No objection, Your Honor.

THE COURT:   That will be the order of the Court.

Q    (By Mr. Littlefield) Mr. Porter, did you have -- you mentioned that you also have -- as a criminalist, you occasionally assist in the processing of crime scenes?

A    Correct.

Q    Where do you work out of now, sir?

A    I'm currently in the Oklahoma City laboratory.

Q    How long have you been in the Oklahoma City laboratory?

A    Since June 1st of this year.

Q    Prior to June 1st of 2005 where were you located?

A    In the Tahlequah, Northeast Regional Laboratory.

Q    And were you employed in the Tahlequah or the Northeast Regional Laboratory in September of 1999?

A    Yes, I was.

Q    Did you have occasion to assist in a crime scene in Sequoyah County during the early morning hours -- starting in the early morning hours of September the 24th, '99?

A    Yes, I did.

Q    When did you receive the contact advising you that you needed to proceed to Sequoyah County to assist in a

2229

crime scene investigation?

A    It was approximately 11:00 o'clock that night from my supervisor, Lynette Lee.

Q    If the evidence is that the actual entry wasn't made until after midnight, could you have possibly been contacted at 11:00 o'clock?

A    I don't know, that's right.  We actually showed up at the area at two o'clock, I believe.  I just know it was late that night that Ms. Lee contacted me.

Q    And who was it that contacted you?

A    My supervisor, Ms. Lynette Lee, at the time.

Q    How did you get to the location?

A    I traveled along with Ms. Marcangeli in my van to the location.

Q    Do you recognize Government's Exhibit 1, which is the model that's out there in front of the bench?

A    Yes, I do.

Q    And what is that, sir?

A    It looks like it's a representation of the scene that we arrived at.

Q    Where did you and Ms. Marcangeli go to first?

A    We actually proceeded to the scene.

Q    And did you stay at that location, sir?

A    No, we did not.

Q    How long were you there?

A       Approximately two hours.

Q       Two hours first at this location?

A       Yes.

Q       And what agency was going to be responsible for the homicide investigation, crime scene homicide investigation, at this location, sir?

A       The OSBI.

Q       Were you able -- when you arrived, were you all able to initially start right up and get in and start working on the investigation?

A       No, we weren't.

Q       What prevented that?

A       My understanding was that the search warrant had not been received at that time to allow us to go in and start processing the scene.

Q       So there wasn't any processing until the search warrant was obtained?

A       Correct.

Q       What was done or being done to maintain the security of that location prior to the arrival of the search warrant?

A       There were officers on the scene and there was actually crime scene tape put around most of the area to prevent anybody from coming in or out.

Q       And was the crime scene tape and the presence of

2231

officers effective in regards to keeping unauthorized personnel from the area that ultimately became the crime scene?

A     Yes.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 69 be displayed.

THE COURT:  You may.

Q     (By Mr. Littlefield) When you arrived, were other OSBI personnel at the location?

A     Yes.

Q     When you all got there, you and Ms. Marcangeli got there, what area were you all -- do you recognize what's shown in Government Exhibit 69?

A     Yes, I do.

Q     Where did you all go in this area?

A     When we first arrived?

Q     Yes.  Where did you all locate?

A     We showed up at this area right here.

Q     At the gate?

A     Correct.

Q     Did you stay in that area or did you go to some other area and report to somebody?

A     Initially that's where we reported to the OSBI agents that were on the scene.

Q     Where were the officers -- what area was available

for officers to go into and what area was off premises where they weren't supposed to be going to protect the sanctity of the crime scene?

A    At the time, that same area was pretty well blocked off.  We didn't go anywhere else around the area so I couldn't tell you anything about the east side of the residence.  But from what I saw up to the gate area was basically the area that was blocked off.

Q    So the area of the yard all through here was pretty well kept vacant of officers; is that correct?

A    Correct.

Q    Did you recall seeing any crime scene tape when you arrived?

A    Yes, I do.

Q    Where was that?

A    It was --

Q    And you've got right in front of you a laser pointer and it might be better if you could do it up here on the --

A    The crime scene tape, if I remember correctly, was somewhere around in this area.  It was more towards the gate than towards the house.

Q    Do you see the crime scene tape located in the photo now?

A    Yes, I do.

Q     Okay.  And was what you're talking about in the same area or a different area, that you were talking about when you first arrived there?

A     When I first arrived, I believe it was more towards this area down towards the gate.

Q     Okay.  And is the crime scene tape visible that's at the location -- can you see the crime scene tape now in Government's Exhibit 69?

A     Yes.

Q     And can you point to the areas that are blocked off by crime scene tape?

A     It's more this area right here.

Q     What is this right here?

A     That's also more crime scene tape.

Q     What is this right here?

A     That also appears to be crime scene tape.

Q     What area was involved in -- when you are all processed the scene, what area were you all processing?

A     We actually started out processing this area right here behind this car, all the way down behind our vans and then we also included all the vehicles at the time, we actually looked at the vehicles.

Q     We don't need to go into the vehicles.  Let's go into the other areas besides the vehicles.  Were all these vehicles here Mr. Barrett's or were some of those

law enforcement vehicles?

A    I believe the majority of them were Mr. Barrett's.

Q    Okay.  Did you go into any area back in this area or any OSBI agents back in this area?

A    Yes, we did.

Q    Was that part of the area that was processed?

A    Yes, it was.

Q    Now, you all didn't initially do anything out here until the arrival of the search warrant?

A    Correct.

Q    In the interim, where did you and anyone else go?

A    We, meaning Ms. Lee, Ms. Marcangeli and myself, proceeded to the Sallisaw Hospital.  We were asked to go and process a Bronco that was at that location.

MR. LITTLEFIELD:  May I return to my desk just a second, Judge?

THE COURT:  You may.

Q    (By Mr. Littlefield) And there was a Bronco at the hospital?

A    Correct.

Q    Describe its condition.

A    It was one of the white OHP Broncos and it was -- we were asked actually to look at the Bronco to see if we could see any type of blood that might need to be collected or any type of holes in the exterior.

Q    Were there any holes in the exterior?

A    No, not that I recall.

Q    Was there any blood on that Bronco?

A    Yes, there was.

Q    Where was the blood located?

A    There was some blood on the driver's side door and also on the tailgate area.

Q    Did you later have occasion to look at that Bronco to determine if there were any firearms in it?

A    Yes, I did.

Q    And did you see a firearm in that vehicle?

A    Yes, I did.

Q    What kind?

A    It was a Sig Sauer pistol.

Q    What caliber?

A    Let me check.

Q    You can go ahead and look at your notes.

A    It was a .45.  Sorry it took me so along.  But it was a .45 caliber.

Q    That's all right, sir.  Do you have the serial number handy, with it at that location?

A    Yes.  It was G, as in golf, 222485.

Q    Was that firearm seized?

A    Yes, it was.

Q    By whom?

2236

A     Myself.

Q     And was it taken and submitted to any lab?

A     Yes, it was initially taken to the Tahlequah Northeast Regional Laboratory.

Q     Was it assigned a T number?

A     Yes, it was.

Q     What T number was it assigned?

A     T-63.

Q     And it would have been turned in to the lab by yourself?

A     Yes, it was.

Q     Was there anything unusual about that Sig Sauer .45 firearm, the serial number you just provided, that was retrieved by yourself in the Bronco that did not get shot up?

A     Yes.  That particular firearm had one round in the chamber but the magazine, the butt plate was gone.  There were no rounds in the magazine.

Q     Did you find any evidence at the scene consistent with -- that would provide you with an explanation of why that Sig Sauer .45 had no butt plate or guts inside the magazine and no bullets inside the magazine?

A     Yes, there was actually a butt plate and a spring and some live .45 rounds found at the scene.

Q     Do you recall where those were and the item numbers?

2237

A     The magazine butt plate was item T-18 which was located --

Q     Did it get a scene marker number?

A     Yes, it was number five.

Q     And if we display Defendant's Exhibit 26.  Do you see where item five is located?

A     Yes, it's located right there.

Q     Were there any other magazine parts near item five, the butt plate?  Do you have a listing of the items that were found on the exterior handy?

A     Yes, I do.

Q     Would you look for 4-A and 5-A and tell me what those were?

A     4-A is our item number T-37, which was the spring.

Q     What was 5-A?

A     5-A was a piece of a magazine.

Q     Where were they in relation to item five, marker number five?

A     They're actually located just to the left.

Q     And would you disagree that that exhibit has been marked -- and do you see there's kind of an orange-ish mark on item numbers 20, four, eight, seven and six?

A     Yes.

Q     In your recollection were those item numbers live .45 rounds?

2238

A    Yes.

Q    And if you looked to item 1-A, was that -- what was item 1-A?

A    Item 1-A was also a live .45 caliber round.

Q    Now, when you were involved in processing the scene, with whom were you primarily working?

A    I was primarily working with Ms. Lynette Lee, my supervisor.

Q    Was there another individual that was assisting you in working with Ms. Lee?

A    Ms. Marcangeli at times was also with us directly.

Q    And who submitted all these items that were found? Who actually made the submittal to the lab?

A    The majority of the items I submitted myself.

Q    Did you submit items that Ms. Marcangeli found?

A    Yes, I did.

Q    And were you with her when she found them?

A    Not necessarily.

Q    Let me direct your attention to a couple of items. Do you see here items 10-A and 11-A?

A    Yes.

Q    And do you recognize what those items were, sir?

A    Yes.  Both of those were 9 millimeter shell casings.

Q    And who was it that seized 10-A and 11-A?

A    I actually seized both of those items, 10-A and

2239

11-A.

Q    Would you look at Government Exhibit 31?  And I think this one got admitted but just let's not display it yet anyway, make sure.  Do you recognize -- it's not quite displayed yet.  Do you recognize what's displayed in that photograph that's Government's Exhibit 31?

A    Yes, I do.

Q    What is it?

A    That's the marker 10-A marking the shell casing.

       MR. LITTLEFIELD:  Judge, I think it was admitted.

       THE COURT:  It has been.

       MR. LITTLEFIELD:  I'd ask it be displayed.

Q    (By Mr. Littlefield) And where is it?  You can tap the screen right at the location.

A    Okay.

       MR. LITTLEFIELD:  I would ask that the witness be provided with Government Exhibit 166.

Q    (By Mr. Littlefield)  Mr. Porter, do you recognize what Government Exhibit 166 is?

A    Yes.  Government Exhibit 166 is the coin envelope that I sealed that shell casing in.

Q    And how do you recognize that that's the envelope that the shell casing that received the marker 10-A is that's that envelope?

2240

A    I can tell by the labelling on the outside and my initials.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit 166.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) Was that assigned a T number?

A    Yes, it was.

Q    What T number does it have?

A    T-43.

Q    And you also indicated you discovered or found marker number 11-A?

A    Correct.

MR. LITTLEFIELD:  I would ask that what has been marked as -- and it's not in evidence yet -- Government Exhibit Number 32 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) And do you recognize that, sir?

A    Yes, I do.  That's the marker 11-A.

Q    And is that in the condition it was when you discovered it?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 32, please.

2241

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that it be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) And where is that casing, sir?

A   This one's a little harder to see but it's actually in the grass.

MR. LITTLEFIELD:  And I would ask that Government's Exhibit Number 134 be provided to the witness.

Q   (By Mr. Littlefield) Do you have that exhibit, sir?

A   Yes, I do.

Q   What is that?

A   This is the coin envelope that I sealed the 9 millimeter shell casing, 11-A, in.

Q   Okay.  And how do you recognize that coin envelope, sir?

A   From the description I put on the outside and my initials.

Q   What date does it show on it?

A   It actually shows 9-24-99.

Q   That's the day you were out processing the scene?

A   Yes.

2242

Q     What T number does it have?

A     T-44.

          MR. LITTLEFIELD:  I move admission of Government Exhibit 134.

          THE COURT:  Any objection?

          MR. SMITH:  No objection.

          THE COURT:  Be admitted without objection.

Q     (By Mr. Littlefield) And if we go back to Defendant Exhibit 26 which is on -- is there -- was there another 9 millimeter round found, sir?

A     There were some other 9 millimeter rounds found, yes.

Q     I'm sorry.  Casing.  I apologize, casings?

A     Yes, there were some other 9 millimeter casings found also.

Q     Did you recognize -- on the chart there's 12-A which is marked in yellow over just south of the west edge of the porch?

A     Yes.

Q     And what was that, sir?

A     That was also a 9 millimeter casing.

          MR. LITTLEFIELD:  I would ask that Government Exhibit Number 33 be shown.

          THE COURT:  You may.

Q     (By Mr. Littlefield) Do you recognize it, sir?

A    Yes, I do.  This is the marker and the shell casing, 12-A.

Q    Was that seized?

A    Yes, it was.

Q    And was it turned into the lab by yourself?

A    Yes, it was.

Q    And was it given a lab number?

A    Yes, it was.

Q    What was that lab number?

A    T-45.

MR. LITTLEFIELD:  I move admission of Government Exhibit Number 33.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) Were you responsible for retrieving or seizing into evidence any .223 casings?

A    Yes, one.

Q    And let me direct your attention to items numbers -- let's look back to Government Exhibit 26 -- I mean, Defendant's 26.  I apologize.  Do you see the marker number two and the marker number 8-A just east of the blue pickup?

A    Yes, I do.

Q    Are you familiar with those markers and those items?

2244

A    Marker number two is a .223 casing.

Q    And would you look at Government's Exhibit 44?  Do you see marker number two?

A    Yes, I do.

Q    And do you also see marker number 8-A?

A    Yes.

Q    Were those items -- what was at marker number two?

A    Marker number two was a .223 casing.

Q    What was at marker number 8-A?

A    Number 8-A was also a .223 casing.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 153 be provided to the witness.

Q    (By Mr. Littlefield) Do you recognize that, sir?

A    Yes, I do.

Q    And what is that?

A    Government Exhibit 153 is our item number T-15 which was a spent .223 casing, marker number two.

Q    And was that given a T number?

A    Yes, T-15.

MR. LITTLEFIELD:  Move admission of Government's Exhibit 153.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  It's already been admitted.

MR. LITTLEFIELD:  Would you look now -- I see

2245

that now.  I'm getting mixed up.  Look at 8-A and get -- pass 154 to him.

Q    (By Mr. Littlefield) Do you recognize 154?

A    Yes.  Government Exhibit 154 is the brown paper sack that the .223 shell casing was packaged in, marker number 8-A.

Q    And what T number did that get?

A    T-41.

MR. LITTLEFIELD:  Move admission of 154.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) Mr. Porter, do you see over on the model?

A    Yes.

Q    Do you see the middle Bronco?

A    Yes.

Q    And what is it -- what are its rear tires in?

A    There was actually a ditch that ran along that area.

Q    Did you go out and observe that ditch?

A    Yes, I did.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 99 be displayed to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  It's not in evidence yet.

2246

Q     (By Mr. Littlefield) Do you recognize that, sir?

A     Yes, I do.

Q     What is that?

A     It's a picture of that ditch area.

Q     And does it accurately depict the condition of that chair?  Or that chair -- I'm sorry.  I was looking at something here.  Of that ditch as it existed on that morning?

A     Yes.

Q     Trying to do two things at once.

MR. LITTLEFIELD:  Judge, I'd move admission of what's been marked as Government Exhibit Number 99.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And I'd ask it be displayed.

THE COURT:  You may.

Q     (By Mr. Littlefield) Where is the ditch?  Can you go ahead and tap the area?  What kind of drop off was that?

A     It was significant.  I couldn't -- we didn't take any measurements other than it was a significant drop.

THE COURT:  Do you want to turn the lights off?

MR. LITTLEFIELD:  If I could.  I appreciate that, Judge, I think that --

Q     (By Mr. Littlefield) What was the condition on the

grass when you all got out there that morning?

A    It was --

Q    I see white stuff.  Was it snowing?  Was that frost?  What was that?

A    Well, it was dew basically was out there, it appeared.  It was an early morning so there was some dew that was present.

Q    Do you recall the night?  You got out there early in the morning, still dark?

A    Correct.

Q    Was it cold that night, cool that night?

A    It was cool.

Q    Do you recall whether it was overcast or not?

A    No, I don't remember that.

MR. LITTLEFIELD:  Judge, I would ask that Government Exhibit 107 be provided to Mr. Porter.

THE COURT:  You may.

MR. LITTLEFIELD:  My records reflect it's not in evidence.  I'm not certain.  Okay.  I did too.  Never mind.

Q    (By Mr. Littlefield) Did you perform -- you indicated that you didn't -- that you got serology and DNA training?

A    Correct.

Q    Did you examine any items in relation to performing

2248

a DNA analysis of any materials in this particular case?

A    Yes, I did.

MR. LITTLEFIELD:  I would ask that what has been marked as Government Exhibit Number 178 be provided to this witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what Government Exhibit 178 is, sir?

A    Yes.  Government's Exhibit 178 is the coin envelope that contained item T-88 that I performed DNA analysis on.

Q    What condition was that in when you received it, sir?  The envelope?

A    It was sealed.

Q    And do you know who was responsible for placing the item from T-88 into that envelope?

A    Ms. Marcangeli actually did the original analysis and placed it in this envelope.

Q    And when you got it, it was still sealed after Ms. Marcangeli had placed T-88 into that item?

A    Correct.

MR. LITTLEFIELD:  I move admission of Government Exhibit Number 178, Your Honor.

THE COURT:  Any objections?

MR. SMITH:  No objection, Your Honor.

2249

THE COURT:   178 is admitted without objection.

Q    (By Mr. Littlefield) Now, when you do DNA analysis, how do you go about -- was that a known or an unknown sample?

A    It was a question sample, an unknown.

Q    What are you attempting to do when you perform DNA analysis on T-88, sir?

A    I was actually trying to compare the DNA profile that was obtained from that item to known samples that had been previously analyzed.

Q    And who previously analyzed known samples?

A    Joann Kihega.

Q    And do you know if she had performed a known -- an analysis on a known sample which was T-140 dash two?

A    Yes, she did.

Q    And did you have the results of her analysis from T-140 dash two?

A    Yes, I did.

Q    Now, when you did your analysis on T-88, how did you -- how do you do a DNA analysis?

A    Basically what we'll do is we'll take the item out and we have to first extract the DNA out of the sample. So we do that through an extraction process just using some chemicals.  Once we have the DNA out of the actual sample, then we have to quantitate it, see how much DNA

2250

we actually have.  Once we know that, then we can go ahead and amplify the DNA which is basically just making billions of copies of that DNA.  Once we have those billions of copies --

Q    Billions of copies?

A    Yes, billions of copies of it.

Q    Okay.

A    Once we have the billions of copies of it, then we put it on to an instrument and that instrument actually provides us with the DNA profile.

Q    And did you perform the analysis necessary in this particular case on T-88, which was in Government Exhibit Number 178?

A    Yes, I did.

Q    And did you make a comparison, did you get your -- what kind of breakdown do you get when you do it?

A    We're actually looking at 13 different loci and androgen which is the sex determining gene.  So what we do is, if we get a full profile, we'll actually have what are called the DNA profile or the numbers at every single one of those locations and then we can compare every one of those locations against the known samples to see if the numbers that we got for the DNA profile match.

Q    And did you get numbers at every one of the -- is it loci?

2251

A       Correct.

Q       Did you get numbers at every one of the loci on T-88?

A       Yes, I did.

Q       And did you make a comparison of your DNA analysis of T-88 to any of the known samples?

A       Yes, I actually compared it to three known samples.

Q       Did you find a match with a known sample?

A       Yes, I did.

Q       What known sample was it?

A       It matched T-140 dash two which was a known allele?

Q       Did you prepare a report which reflected that?

A       Yes, I did.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 191 be provided to the witness.  And it's not in evidence yet.

Q       (By Mr. Littlefield) And do you recognize what's displayed on the screen, sir?

A       Yes.  This is the first page.  It's a copy of the first page of my report.

Q       And I'm trying to display the second page.  Do you see both pages now, sir?

A       Yes, I do.

Q       And is that in fact the report of your DNA analysis?

A       Yes, it is.

2252

Q   Does it likewise show what the three items to which you compared it?

A   Yes, it does.

Q   And from what did you retrieve that, that information?

A   I retrieved it from a report that was previously generated by Joann Kihega.

MR. LITTLEFIELD:   Judge, I would ask that the hard copy of Government Exhibit Number 190 be displayed to the witness so that he can compare that to what he utilized for preparation of Government Exhibit 191.

THE COURT:   You may.

Q   (By Mr. Littlefield) Behind those tabs you'll find -- they're numerical, but behind the taps you'll find what's been marked as Government Exhibit Number 190.  Do you find in Government Exhibit 190 the three known samples that you prepared and placed on the second page of your report which is Government Exhibit Number 191?

A   Yes, I did.

Q   And in fact, are those the correct analysis that were determined by Ms. Kihega?

A   Yes.

Q   Specifically as to item number T-140 dash two?

A   Correct.

MR. LITTLEFIELD:   Judge, I would move at this

2253

time for the admission of Government Exhibit Number 191.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would likewise move admission of 190, which is Ms. Kihega's report about which she testified previously.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, I think she has to sponsor that report.  I don't think --

MR. LITTLEFIELD:  She already identified it, Judge.  We just never offered it at that time.  And, Your Honor, I have no objection to the Court reserving its ruling so that we can move on.  But I would still like to have the offer open.  I'm not going to need it for this witness.  I'm just doing it for a matter of the record.

THE COURT:  Is this the last witness who testified identified it?

MR. LITTLEFIELD:  About it?

THE COURT:  Yes.

MR. LITTLEFIELD:  Yes.  If it doesn't get admitted, I'm not going to offer it again, but I'm making the offer and it doesn't have to be admitted right now for him to testify.  I'm just wanting to have it available.

2254

THE COURT:  Are you telling me it was an oversight or --

MR. LITTLEFIELD:  No, I didn't --

THE COURT: -- or you planned to do it this way?

MR. LITTLEFIELD:  At the point in time that Ms. Kihega identified and did the exhibit, there was some question as to its relevance because it hadn't been linked up yet and I think at this point the link with 140.2 has been made and its relevance has been demonstrated as to this exhibit as well.

THE COURT:  Counsel?

MR. SMITH:  Nothing further, Judge.  I stand on my objection.

THE COURT:  Let me -- it's 190, right?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Is 190 -- where is 190?

MR. LITTLEFIELD:  190 is in front of Mr. Porter.

THE COURT:  Let me see it just for a moment. Okay.

MR. LITTLEFIELD:  Judge, I'm going to withdraw -- I'll withdraw my offer.

THE COURT:  Give me just a moment to look at it.

MR. LITTLEFIELD:  Judge, I really do, I'll

2255

withdraw the offer.

THE COURT:  Okay.

MR. LITTLEFIELD:  That'll be the easiest way because we've got what we need off of it.  I would ask that 191 be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) Now, where is -- and if we could go to the second page only.  Do you have an opinion as to what T-88, the scrapings from the Bronco, is, sir? Or whose blood -- does it match anybody's blood?

A   Well, the DNA profile obtained from item T-88 matched the DNA profile obtained from T-40 dash two which was a known allele.

Q   You said T-40?

A   T-140 dash two.

Q   How do you make that determination?  If I'm looking at this exhibit, how am I going to figure that out and how do I do that?  How do I make that comparison and see that for myself?

A   The way the chart is read, along the far left hand side is actually the description.  That'll be the item number and the description of the item.

Q   Okay.

A   As you can see on this area right here, it's T-88. As you go across the top these are actually the loci that

we look at and those are just the specific names for the loci.

Q   Okay.  And you said how many of those loci are there?

A   We look at 13 and androgen which is right there. This is the sex determining gene.

Q   Okay.

A   So as I go down through the table, what I'll do is compare each loci to the known samples to see if it's a match or if it can be excluded.

Q   And the match was on the first item which is T -- or the top of those three items, which is what was recorded by Ms. Kihega, correct?

A   Correct.

Q   And that's T-140 dash two?

A   Correct.

Q   Okay.  Go ahead and explain.

A   So as you can see it's kind of hard for me to see those numbers so I'll look over here.  On the second column which is the loci D three as you can see on T-88, the numbers are actually reported as fifteen seventeen. That's the DNA profile that was obtained for that question sample.

Q   Okay.

A   If you look down at item T-140 dash two, which is a

known allele under that same loci, you'll also see that it is 15 and 17.

Q    Okay.

A    As you follow along through the chart and look at each one, you'll notice that it matches at each loci. Now for the other two samples, what you will see for T-145, it actually has a fifteen fifteen, a D three. And T-146 has a fifteen sixteen.

Q    So since they're fifteen fifteen and fifteen sixteen, they don't match in that loci?

A    They're both excluded.

Q    Okay.

A    And it only takes one loci to exclude somebody, so therefore both of those samples were excluded from being contributors of that DNA profile on item T-88.

Q    And if we went to the second loci, they would also be excluded on that basis as well, would they not?

A    Yes, actually in this case they would be.

Q    They were the same sex, though, weren't they?

A    Yes.  All three known samples were the same sex.

Q    In that regard, do you have -- if we look at every one of those loci all the way across, is there a match in each and every one in all 13 of the loci as well as the sex?

A    Between item T-88 and T-140 dash two, yes.

2258

Q    Did you do an analysis of the odds of that match, numerical odds, of the likelihood of that matching?

A    Yes.

Q    One person against that, the unknown and the known?

A    Actually the statistical calculation that we do is called a match probability.  So what we do is initially we say the samples match.

Q    Okay.

A    Then we have to do the statistical calculation, the probability of finding somebody unrelated to that individual being able to contribute that same DNA profile.

Q    Okay.  So what you're basically saying is what's the odds of somebody else matching all the way across?

A    Right.  If we can find somebody else with that same profile.

Q    And did you do that kind of statistical analysis in this case?

A    Yes, I did.

Q    How many people are on the face of the earth?

A    Approximately six billion.

Q    Six billion?

A    Yes.

Q    Where is it reported the matched calculations or the likelihood of match in your particular report, sir?

2259

A     It's on the first page of the report.

Q     If we could view the first page.  And where is that -- which portion of that is the statistical match reported?

A     The bottom section is the analysis of evidence and then within that, if you'll look on the first paragraph it will tell you the match and the exclusions.

Q     Okay.

A     And the very last --

Q     Is that the section?

A     Yes.

Q     Okay.  Tell me what your match indications are.  Or is it in the next paragraph.

A     No, it's in that paragraph.  It's actually the very last sentence.

Q     What does it tell us?

A     Assuming a single donor, the probability of selecting an unrelated individual by random from the population having that same DNA profile was approximately one in 89.4 quadrillion in Caucasians, one in 8.26 quintillion in African Americans and one in 5.72 quintillion in Hispanics.

Q     I know what a billion is.  What's a quadrillion?

A     A quadrillion is three more zeroes above a billion, so it would -- whereas a billion has nine zeroes, a

2260

quadrillion's going to have 12 zeroes.

Q   So the odds would be one in 89.4 quadrillion Caucasians?

A   Correct.

Q   What is a quintillion?

A   It's three more zeroes beyond a quadrillion so it would actually be 15 zeroes, a one followed by 15 zeroes.

Q   So like one in 8.2 zero, zero African American?

A   Yes.   18, it would be 15 zeroes.

Q   And 5.7 quintillion in Hispanics?

A   Correct.

Q   You can't absolutely say that that scraping in the passenger seat of that Bronco was Rocky Eales' blood?

A   We do not do identity.  We only do a match probability for the OSBI.  That's what our policy requires.

Q   But it matches Rocky Eales' blood?

A   Correct.  That profile matched the profile from the known of Rocky Eales.

Q   And that's the odds of it being somebody other than Mr. Eales?

A   Unrelated to him, yes.

Q   If he had a twin brother or something, that might happen?

A   Twin brother would be the same DNA profile, yes.

2261

MR. LITTLEFIELD:   191 can be removed.

Q    (By Mr. Littlefield)   You already mentioned that you seized the .45 Sig Sauer, the serial number which you identified that did not have the butt plate or the inner guts of the magazine?

A    Correct.

Q    Did you seize any other weapons?

A    Yes.   Ms. Lee and myself went through the other vehicles that were at the location and seized some of the firearms that were in those vehicles.

Q    And was there an attempt or what did the OSBI do about obtaining the firearms from troopers that were at the scene?

A    I don't have any direct knowledge of it.   My understanding was that OHP was contacted and if requested or asked where the firearms were, if they were there at the scene we went ahead and collected them.   If they were not at the scene, they were delivered to the Tahlequah laboratory.

Q    Did other firearms come into the Tahlequah laboratory beyond those that you just collected, to your knowledge?

A    Yes, they did.

Q    And you mentioned collecting firearms along with Ms. Lee at the scene?

2262

A    Yes.

Q    Let me direct your attention -- are you familiar with a firearm which received a laboratory number of T-93?

A    Yes.

Q    And was that -- what kind of firearm was that, sir?

A    It was an HK MP5 SDM.

Q    MP5 SDM?

A    Correct.

Q    And did you identify that firearm by serial number, sir?

A    Yes, we did.

Q    What serial number was that?

A    The serial number was 6399771.

Q    And what was done with that firearm, sir, that was marked as T-93?

A    That one was collected and I submitted it to the Tahlequah laboratory and took it on to our firearms unit.

Q    And it went on to the firearms unit?

A    Correct.

Q    But you're the one who turned it in to the lab?

A    Yes.

Q    Do you know what kind of firearm that was?  I mean, what kind of cartridge or caliber of cartridge it was?

A    I believe the MP5 is a 9 millimeter.

Q    And do you know whether that was an automatic or semi-automatic or select fire type weapon?

A    I don't recall on that particular weapon, no.

Q    But you pulled it -- where did you retrieve that particular weapon from, sir?

A    That trunk was actually found.in one of the cars which was --

Q    I think you said that trunk was found?

A    Sorry.  That firearm was found in the trunk of one the cars at the scene, which was labeled as OHP 344.

Q    Okay.  And if we could turn back on Defendant Exhibit 26, do you see OHP 344, sir?

A    Yes.  It's the diagramed vehicle at the bottom.

Q    That was found in the trunk?

A    Correct.

Q    And do you know where that OHP 344 came from?

A    No, I don't.

                MR. LITTLEFIELD:  Could I have just a second?

                THE COURT:  You may.

                MR. LITTLEFIELD:  Pass the witness.

                THE COURT:  You may cross examination.

                MR. SMITH:  Thank you, Your Honor.  May I have just a second?

                THE COURT:  You may cross examine.

                MR. SMITH:  Thank you, Your Honor.

2264

CROSS EXAMINATION

BY MR. SMITH:

Q    Good afternoon, Mr. Porter.

A    Good afternoon.

Q    While it's on my mind, I want to address with you about the DNA report that you did, and that's 192; is that correct?  Government's Exhibit 192?

A    I think it's 190.

Q    Excuse me, 191?

A    191.

Q    I notice that that was reported on August the 15th of 2005; is that correct?

A    That's correct.

Q    And the profiling that Ms. Kihega had done was reported back in 2000?

A    Correct.  May 9th of 2000.

Q    Some reason that wasn't done for five years?

A    That was not an item that was requested at that time.

Q    Now, let's talk a little bit about that MP5 that Mr. Littlefield was discussing with you just one second ago that came from the trunk of OHP 344.  Are you familiar with an MP5?

A    I have a little bit of knowledge, yes, just based upon handling them at this scene.

2265

Q    Can you tell me what you did at the scene as it relates to that MP5?  Did you take it out of the trunk?

A    Yes, we did.

Q    Did you unload it?

A    No.

Q    Who unloaded it?

A    I don't remember that particular firearm.  I know that there was an individual there from OHP who was unloading and clearing the weapons for us.

Q    Did you put any rounds from that weapon into any sacks and seal them and submit them?

A    I believe we did, yes.

Q    And I want to refer to page four of your report, item T-68.  Would you look at that for me?

A    Of my report?

Q    You know, you're exactly right.  I think that's Ms. Marcangeli's report.  But it has information that you've done on it.

A    Okay.

Q    Do you have that with you, sir?  It's the report of November of '99?

A    Yes, I do.

Q    Would you turn to page four of that, please?

A    All right.

Q    And item T-68, does that reflect rounds that were

2266

removed from a magazine of that MP5?

A     Yes, it does.

Q     Okay.  And by way of further definition, the serial number, the last three are 771, correct?

A     Correct.

Q     All right.  And item T-68 contained how many rounds?

A     Twenty 9-millimeter rounds.

Q     And it says from which magazine?

A     The left magazine.

Q     Do you know which magazine was inserted into that weapon?

A     I don't recall, no.

Q     Look right below it.  Is that referencing the same weapon?

A     Yes, it is same serial number.

Q     Okay.  And it's referencing -- how many rounds were in that magazine?

A     Thirty one 9 millimeter rounds.

Q     All right.  And it also says something about a dual magazine.  Do you know what that means?

A     Yes, there were two magazines that were actually connected together.

Q     How are they connected together?

A     There's a small piece that goes in between the two magazines that holds them together, I believe.

Q    So that you can just -- you don't have to completely remove -- strike that.

You do have to completely remove one magazine, but just move it over a little and you can insert the other magazine, right?

A    Correct.  They're attached together side by side.

Q    They're just separated by a little bit?

A    Correct.

Q    And in one magazine it held 31.  Do you know what the capacity of those magazines are?

A    No, I do not.

Q    And then right below that, item T-70 talks about that same weapon, does it not?

A    Yes, it does.

Q    And how many -- what does that say on T-70?  Tell us what that description references.

A    Sorry.  It was a sealed coin envelope containing two jammed rounds of ammunition, one Speer 9 millimeter Luger and one Win 9 millimeter Luger from the chamber of that firearm.

Q    All right.  So would it be fair to say that we had 20 rounds in one magazine with two rounds in the chamber?

A    Yes.  20 in one magazine, 31 in the other and two in the chamber.

Q    If we have two that are jammed in the chamber -- let

2268

me ask you, will that magazine hold more than 31 or do you know?

A    I don't know on this particular weapon.

Q    Did you check to see if it was fully loaded?

A    No, we did not.

Q    I want you to assume for me that the 20 round magazine was in that weapon.

A    All right, sir.

Q    You don't have any reason to think that it wasn't, do you?

A    No.

Q    If that was in the weapon and we had two in the chamber, that's a total of 22 rounds; is that correct?

A    Correct.

Q    I'm going to put up Defendant's Exhibit Number 26 and keep this same train of thought going.  The MP5 shoots what sort of rounds?

A    It's a 9 millimeter.

Q    And how many 9 millimeter hulls do we have empty casings that are grouped together at the Barrett residence?

A    Well, there were actually three in this area.

Q    All right.

A    Two more in this area.

Q    Okay.  Then we've got marker number one is a live 9

2269

millimeter round, correct?

A    Let me double check but I believe so.  Yes, that's correct.  It was a live 9 millimeter round.

Q    Okay.  3-A is a .380?

A    Yes, 3-A was a .380 casing.

Q    Do you know if a 9 millimeter will fire a .380 round?

A    No, I don't know that.

Q    Have you ever heard of .380 rounds being referred to as a 9 millimeter Kurtz?

A    No.

Q    That doesn't mean anything to you?

A    No, it doesn't.

Q    Do you know what the diameter of a .380 is compared to a 9 millimeter round?

A    No, I do not.

Q    So, if we've got a magazine that contains 20 rounds and you've got two in the chamber, that's 22.  And we've got five empty casings on the ground that are grouped together, near the pickup, let's put it that way.

A    All right.

Q    That's 27, correct?

A    Correct.

Q    We've got one that's ejected on the ground.  Even if we count that, that's 28.

2270

A    Correct.

Q    If a magazine holds 31, we're unaccounted for three, aren't we?

A    Yes, that would be right.

Q    Now, when you got out to the crime scene area, you indicated and I'm going to put Government's Number 69 up there briefly and we'll come back to this in a second, okay?

A    All right.

Q    You indicated whenever you got out to the scene that the area that you thought was secured was down here by the gate?

A    That's right.  That's as far as we entered and I believed at that time that that's where it was secured at.

Q    Incidentally, you thought that you arrived on the scene at what time?

A    I believe we arrived there around 2:00 o'clock in the morning.

Q    You rode with Ms. Marcangeli?

A    Correct.

Q    And if she says it was 4:15 in the morning when you arrived, do you have anything to contradict that?

A    I can double check in my notes to find out an exact time.

Q   If you would.

A   Actually, she's correct.  I got that mistaken.  We received the request for assistance at two in the morning, arrived at the scene at 4:15.  That's right.

Q   And when you got there you talked about that you needed a search warrant to be able to process the scene, correct?

A   That's correct.

Q   And that wasn't done, so you were given another task, you and Ms. Lee and Ms. Marcangeli, and that's when you went to the hospital to look at the other Bronco?

A   Correct.

Q   When you went and looked at that other Bronco, you didn't see any bullet holes in it?

A   No.

Q   And did you recover any keys out of that Bronco?

A   I remember that there was some keys in the tailgate area.

Q   And to which vehicle did those keys fit?

A   I'm not sure about that.

Q   Never did check it out?

A   No, I didn't.

Q   Who seized those keys?

A   I'd have to double check, but I believe that was Ms. Marcangeli.

2272

Q    Okay.  Would that be something to be reflected in your paperwork that you have there?

A    Should be, yes.

Q    Let me know if you find it, sir, or when you find it.

A    Marcangeli, yes.  Ms. Marcangeli did collect that item.

Q    Are you referring to her report?

A    It's actually the crime scene narrative that was generated by Ms. Lee, myself, and Ms. Marcangeli.

Q    Does it indicate what those keys fit?

A    No, it does not.

Q    Now, back to that Bronco for one second.  Out there at the hospital, you didn't see any bullet holes in it, correct?

A    Not that I recall, no.

Q    Did you recall anybody telling you or anybody that was with you -- and I'm saying Ms. Lee or Ms. Marcangeli -- we need to get some clothes from the hospital from any victims or suspects?

A    I remember that Ms. Lee went into the hospital to see if she could collect any clothing that might be at that location, yes.

Q    And this is at four or five o'clock in the morning?

A    This was -- we actually arrived there about 5:40 and

2273

left about 7:00 o'clock.

Q    Didn't leave with any clothes, did you?

A    No.

Q    And specifically you did not leave with any clothes that belonged to Mr. Barrett?

A    No, we did not.

Q    And you left and you stopped at another location before you went back to the Barrett residence?

A    Yes, we did.

Q    Looking for clothes again.  Seeing if somebody might have some.

A    Clothing or anything else that they may need us to collect, yes.

Q    Where did you stop?

A    It was the Sallisaw Police Department.

Q    Didn't get any clothes there, did you?

A    No.

Q    Now, you went back to the scene.  Was it daylight still?  Or excuse me.  Was it becoming daylight or was it still dark?

A    Yes, at that time it was actually more in the morning time.

Q    Now, when you got out there, did you recall seeing that crime scene tape still in this area?

A    At that time, when we got back to the scene, we

2274

moved up to this area.

Q   But you do recall seeing crime scene tape in this area when you first got on the scene at 4:15 in the morning?

A   I remember this area being secure, yes.

Q   With crime scene tape?

A   Yes, I believe there was crime scene tape there.

Q   Do you know who removed that crime scene tape?

A   No, I do not.

Q   Now, when you went up into this area when you came back the second time, Mr. Littlefield suggested to you that this is crime scene tape and I don't have a problem with that.  I think that's been identified earlier.  Do you recall that being there?

A   Yes, I do.

Q   Now, how much tape was from the corner of the residence back out here to this Highway Patrol vehicle?

A   Actually, there was not on that corner of the house.

Q   Okay.  And actually while you were on the scene, you saw them expand some of the area of crime scene tape, didn't you?

A   Yes.

Q   And show us what areas you saw expanded.

A   We actually moved the area more out towards the barn area and around the back and then it was also extended

further out this direction.

Q    This line was extended?

A    Yes.

Q    But it never did connect and come back around like this?  It did not surround that OHP vehicle?

A    No, we just -- this -- it was just a straight line that went straight out.

Q    What's that connected to?  And I don't mean out here but I mean does it come back around one way or the other or is that just a line going out there?

A    It was just a line going out towards the road area.

Q    That's kind of an unusual way to secure an area, isn't it?  I mean, don't you normally want to perimeter?

A    Yes, but in this case there was actually nothing behind the house.  It was an open field and the road ran down beside the house, so I didn't actually put the crime scene tape there, but --

Q    I understand.  But you've worked crime scenes before?

A    Yes.

Q    And that's really not a perimeter, that's just a line, right?

A    Correct.

Q    And that's what keeps somebody from coming this way or somebody from going that way?

2276

A   Correct.

Q   But it doesn't really keep somebody from coming in this way, right?

A   No.

Q   Okay.  Now, whenever you searched for items of evidence out there, were you given any information as to what had happened?

A   We were given a general scenario, yes.

Q   Okay.  And were you told that there were three different weapons that were believed to have been fired?

A   At the time that we started processing, I'm not sure that they told us specifically three.

Q   During your processing, did you ever learn that?

A   I think through the interviews and such it came back to us that there were three that were fired.

Q   So you learned that there was a weapon that was coming from this vehicle that had shot in this direction; is that true?  Across the front of the house?

A   Yes.  Next to the blue pickup that was actually next to the house.  You can't see it in this photo.

Q   And you had learned that there were some shots that were coming out of the residence?

A   Yes.

Q   And you learned that there were some shots that were coming from somewhere around this white Bronco into that

2277

residence?

A    Correct.

Q    Any others?

A    That's all that I'm aware of.

Q    You said the crime scene was extended into this area.  What information did you have that there was any shooting down in this area?

A    Well, as I said before, that came through the day of processing.  We were out there for 21 hours, I believe.  So when they initially started surveying, we found shell casings in this area, kind of through this area, the yard also.  So we just extended the scene there to collect those items, not knowing at that time what we were specifically dealing with.

Q    So what you're telling me is because you found some rounds in this area, you wanted to secure it because you didn't know if there'd been shooting from there or not?

A    Right.  We wanted to go ahead and process that area in case they were shooting from that area.

Q    Now, you knew there had been shooting into that east window?

A    Yes.  From the testimony or from what we had heard from one of the agents.

Q    See bullets holes in the glass, couldn't you?

A    Well, yes.

Q    I mean, it was very obvious there was shots that went into that east window.

A    Yes, correct.

Q    We lost our photo there for a second.  But that area, nothing additional was done to secure the area around that east side of that house and that blue pickup, was there, in terms of crime scene integrity?

A    Not in regards to crime scene tape, no.

Q    She may get it back up here in just a second.  Now, let's talk about the area of the gate a minute.  Did you ever look around the area of the gate to see if there were any cartridges or any evidence of firing or anything from out there?

A    I didn't specifically, no.

Q    You thought that that had been taped off earlier. Do you know if anybody ever looked around the area of the gate to see if there were any cartridges or any firearms?

A    Not that I recall.

Q    And specifically, I want to ask you right in that corner right near the front of that vehicle, that post. Anything ever been looked at there?

A    Like I said, not that I recall.

Q    And we may have to shut this off for a second.  And tell me what you did whenever you searched around the east side of the residence here looking for cartridges.

2279

Did you use a metal detector?

A    Later on we did, yes.

Q    When did you do that?

A    It was probably mid-day to maybe afternoon.

Q    And I think I'm going to go back to Number 26, Defendant's 26, and we'll work off of that now, okay. How far did you search and what area did you search with a metal detector looking for evidence?

A    I didn't specifically use the metal detector but I was there while it was being used, if that makes sense.

Q    What areas did you see being searched with a metal detector?

A    It was actually starting probably in this area and working out past the diagram.

Q    Did you feel like this whole area was covered?

A    Yes, I did.

Q    Now, you had information sometime in the day that an individual was moving from this vehicle with an MP5?

A    Correct.

Q    And you understand an MP5 do be a 9 millimeter?

A    Yes.

Q    And you understood that the 9 millimeter, at least one shot had gone across the porch?

A    Correct.

Q    Because you helped recover a round that was on top

2280

of a refrigerator that was right in this area, is that right?  Remember that projectile?

A    No, I don't recall that projectile.

Q    Never did see a projectile on top -- on the porch?

A    I don't recall that, no.

Q    Did you have some information that there'd been a shot fired across that porch?

A    Yes.

Q    And you also understand that there were two different groupings of 9 millimeter casings?

A    Correct.

Q    Correct.  So now back to my count a while ago. Twenty in the magazine, two in the weapon.  That's 22?

A    Correct.

Q    And even if we count this one at number one as belonging to that weapon -- and we don't know, do we? You don't know, do you?

A    No, I don't know.

Q    But it is a 9 millimeter, unfired round?

A    Correct.

Q    So that would be 23, 24, 25, 26, 27, 28, right?

A    Correct.

Q    We're missing three rounds if that magazine holds 31?

A    If it had 31, correct.

2281

Q     And if there was one that was chambered in the weapon, it could actually be 32, right?  You're aware of was fully charged means?

A     Yes.

Q     You could have a fully loaded magazine and one in the chamber, right?

A     Correct.

Q     So if the capacity of the magazine is 31, it could be 32 total?

A     Correct.

Q     All right.  Okay.  So there's three, maybe four, cartridges there unaccounted for if we were fully loaded in the magazine?

A     If it was fully loaded, yes.

Q     Now, did you have any information that there was a shot that went into the front door area and impacted a couch that was right in there?

A     I don't remember the couch specifically, but I do remember that there was a shot that was fired towards the front of the house, yes.

Q     Now, you know there were two shots that were reflected by Exhibits Number 14 and 13 which are .45 caliber casings, right?

A     Correct.

Q     And they're in the same area, consistent with what

2282

you would believe somebody to be in this area shooting into that front door?

A    Correct.

Q    The casings come out to the right, slightly behind and they're grouped together?

A    Correct.

Q    That would make sense to you as investigator?

A    Yes.

Q    You know because you found out that there was some grazing in the door area and in fact there was a projectile found in the house, right?  A .45 projectile?

A    Yes, I believe so.

Q    Okay.  But you also understood that there was a third shot, kind of went this way into the house, is that right?

A    No, I don't recall that.

Q    You never had any information about that?

A    No.

Q    Did you have anything to do with the processing of the interior of the residence?

A    No, I did not.

Q    All of yours was strictly outside?

A    Correct.

Q    Now, when did you get information that this Bronco had been moved?

2283

A    Initially whenever we started doing our walk-through of the scene, which is when we came back to the scene the second time and we started walking through, we were informed that it had come back off of the -- back down towards the east from where it initially had entered or it stopped.

Q    Who informed you of that, if you know?

A    I don't recall a name.

Q    And did you see anything at the scene that indicated that, sure enough, that Bronco had been moved?

A    There was some indications that it was possible that it had been moved.

Q    Do you know what this depicts on the diagram?

A    That was some sort of a spill of some sort of fluid that we suspected was from the vehicle.

Q    Reddish looking fluid?

A    Yes, if I recall correctly.

Q    You could see it on the ground?

A    Yes.

Q    In fact, it kind of made an indention in the ground where it had run out in one area?

A    I don't remember that specifically.

Q    And did you associate that with transmission fluid?

A    The color would be consistent with that, yes.

Q    Do you know what this dotted line depicts?

2284

A    I'm assuming based upon my experience with diagrams that that's a movement that shows a movement of something, a path.

Q    Did you see any tire tracks out there that morning that went from an area near this Bronco up towards that front porch, that you can recall?

A    I recall some partial tire tracks, yes, in the ground.

Q    And did they follow this -- kind of that dotted line, based on what a you can recall?

A    Yes, from what I can recall.

Q    Do you know what these lines depict?

A    Once again, just based upon experience with diagrams I would say those were probably the tires for that vehicle.

Q    Just like on 344, those are tires?  So what you'd think those would be tires?

A    I would assume, correct.

Q    Now, if I roll -- get behind that vehicle and push it, is it going to make that arc and go to that cabin?

A    Not based upon where the tires are pointing, no.

Q    The way the tires are pointing, it's going to go off this way, right?

A    Correct.

Q    But that only makes sense, doesn't it?

2285

A    Correct.

Q    Now, you processed some of these rounds.  These are .45 rounds?

A    Correct.

Q    And you talked about that spring and the butt plate and what have you?

A    Yes.

Q    And you found -- item number 20 was actually rounds that were underneath that Bronco?

A    Correct.

Q    And then that ballistic helmet and a breastplate and some other things were underneath that Bronco?

A    Yes, we did recovery some things from underneath the Bronco.

Q    Further evidence that that Bronco had been moved after this incident had occurred?

A    It's possible.  Other things could have -- I mean, I can't determine how those things got underneath the Bronco, but it's possible.

Q    Or you'd be looking for somebody under there, wouldn't you?  I mean, it would have run over them?

A    Well, I'm not sure what you're asking me.

Q    Well, you have a breastplate, you got a helmet, you've got ammunition that came out of a magazine.  I mean, if that Bronco hadn't been moved, then you would

2286

wonder how all that stuff got underneath there, right?

A    Yes, we were actually curious at the time how it got underneath the Bronco.

Q    I mean, that's an awful lot of stuff to be kicked underneath a car.  You can understand maybe one item getting kicked or something, but not all these little bullets and not the helmet and the breastplate, right?  You'd agree with me.

A    It's possible, yeah.  Either scenario is possible.

Q    And in fact, that's why you were curious out there, gosh, what happened here?

A    Correct.

Q    Number 1-A, .45 caliber bullet.  Right?

A    Let me double check.

Q    Yes, sir.  And if you need to refer to something, do so.

A    Yes, it was a live .45 round of ammunition.

Q    You know if that .45 caliber round right there belonged with any of these?

A    I have no specific knowledge of that, no.

Q    If it did, any idea how that gets carried that distance?

A    No.  I have no idea how any of those specific rounds were deposited where they are at the scene.

Q    Do you know how far that distance is between number

2287

six and 1-A?

A   No, I don't.

Q   You didn't make a measurement or something like that, did you?

A   No, I didn't.

Q   Now, you're CLEET certified?

A   Correct.

Q   You're trained with weapons?

A   Correct.

Q   What all automatic type weapons have you shot or semi-automatic weapons?

A   Through the OSBI, none.  I am only qualified on my Glock.

Q   A Glock is a semi-automatic pistol?

A   Semi-automatic, yes .45.

Q   It ejects rounds to the right and rear?

A   Yes.

Q   Whether it's through the OSBI or wherever, are you familiar with any semi-automatic weapons?

A   Yes, I am.

Q   Through where?

A   Through my military experience.

Q   What branch of the military were you in?

A   The Air Force.

Q   For how long, sir?

2288

A    Actually, I'm still in.  I'm in the Air National Guard at this point.

Q    And do you qualify every year with a weapon?

A    Not every year, no.

Q    You do qualify with a weapon, though?

A    Yes.

Q    Is the M-16 a weapon that you qualify with?

A    Yes, it is.

Q    Is the M-16 very similar to a Colt Sporter, or do you know?

A    It is.

Q    And are you familiar with the ejection pattern on the M-16?

A    Yes, I am.

Q    And it has an ejection port to the right, does it not?

A    Yes, it does.

Q    And the Colt Sporter looks like its got the same mechanism, does it not?

A    Yes, it does.

Q    In fact, Colt made an M-16, didn't it?

A    Colt makes the M-16, yes.

Q    Right.  There are some other manufacturers, make a similar weapon, right?

A    Correct.

2289

Q    But Colt was the original manufacturer of the M-16?

A    Yes.

Q    You can't tell any difference between the action on that Colt Sporter than the M-16, other than one can -- the M-16 can be made to fire fully auto, right?

A    The older versions can, yes.

Q    You don't have any reason to believe that the ejection pattern would be different from a Colt Sporter as opposed to an M-16, do you?

A    Not on a factory model, per se.

Q    And you fired a lot of those rounds, whether it's on the range or not, right?

A    Yes, I have.

Q    And you can predict where a round is going to go when it ejects from a .223, can you not?

A    Well, it's a rather large area, but you can get a general idea of where it's going to be.

Q    If I'm firing that weapon at you, from me to you, I'm not going to expect there to be empty casings out this way, am I?

A    Not necessarily.

Q    What do you mean not necessarily?

A    I've seen it happen before and I can't really explain why.  It may have bounced off of somebody's shoulder or something like that.  But typically, no.

Q    It would have to hit something, right?

A    Correct.

Q    You're not going to expect them to go forward?

A    No.

Q    You're not going to expect them to go straight back?

A    No, not necessarily.

Q    You're going to expect them to go out here to the right and rearward?

A    Correct.

Q    You're not even going to expect them to go straight to the right?

A    Not necessarily, no.

Q    So whenever we look at a diagram such as this that shows empty casings, we can look and we can say, well, as an investigator, I can probably rule out a lot of areas where somebody was not; would you agree with that?

A    Yes, at the time of firing the weapon.

Q    In other words the MP5, you have no reason to believe that it doesn't eject to the right and rearward, do you?

A    No.

Q    So when you look at these two groupings of casings, these 9 millimeter casings, if they came from an MP5, wouldn't you expect that weapon to have been shot somewhere in this area for those two to wind up in there?

2291

A    It's possible.

Q    I mean, in this general area where you'd expect it to be?

A    Yes.  Depending on which direction the person was firing, they could have also been this -- in this area firing this direction.

Q    That right.  They could have been out here?

A    Correct.

Q    Firing out towards what would be where the vehicles are on the model?

A    Actually, they could be anywhere within that circle.

Q    And let's look at these over here.  Same way, they could be standing over there?

A    Correct.

Q    Or they can be over here by this window, right?

A    Correct.

Q    Now, how many crime scenes have you investigated where there's been weapons involved and shootings?

A    Off the top of my head, probably three or four.

Q    Have you ever found an unfired round where somebody charged their weapon just prior to shooting?

A    Not that I specifically, recall, no.

Q    In your -- what all training did you go through in investigations?  I guess what I'm getting at is do you understand that to be a phenomenon with people?  Right

before they shoot, they have a second question or guess in their mind as to whether or not they're loaded and they'll charge their weapon?

A    I know that people have done that, yes.

Q    Police officers, civilians?

A    Yes.

Q    I mean, they're always questioning their selves right there, just in the moment, well, do I have a loaded weapon or not, right?

A    Correct.

Q    And they dump one out, then they'll know.

A    Correct.

Q    They got one in the chamber, they dump out that round in the chamber, right?

A    Correct.

Q    Does it seem to make sense to you, sir, that somebody could be right there in front of this window, dump out a live round, shoot and there's their cartridges?

A    That's possible.

Q    It fits the scenario that I just described, doesn't it?

A    Yeah, that's possible.

Q    Now, we've got right here one, two, three, four, five, six that are marked in green, these are .223

casings.

A    Yes.

Q    Correct?

A    Correct.

Q    Okay.  Now, we can talk about some areas where a person would not be for those casings to wind up there, correct?

A    Right.

Q    In other words, if they're standing out here, out beside the porch, and there's nothing in this area in terms of trees or posts or anything like that, they're shooting this way, you're not going to expect a .223 round to be over there, are you?

A    No, you would typically expect it to be the other direction.

Q    It's going to be out here, right?

A    Correct.

Q    Now for them to be there, it wouldn't be unusual for them standing here shooting that way and they'd go that way, right?

A    That's a possibility, yes.

Q    And if they're back here in this house shooting out this way, you're not going to expect them to somehow come around, bounce off of stuff and wind up over there, are you?

2294

A    If they're inside the house, not necessarily, no.

Q    Let's say if they're standing right in the doorway. Then I guess you could say, well, one might bounce off that doorway, but to do that and then come out here and turn the corner around the house, I mean, that's kind of really improbable, isn't it?

A    It would depend on what was there. I mean, if it bounced off the truck or something like that.

Q    Matter of fact, let's look at those .223 rounds, if you don't mind. Okay. I think they're in evidence and you identified some of them previously.

A    All right.

Q    Do you recall looking at them when you seized them out there at the scene?

A    Yes.

Q    I'd like to -- for you to look at what I show as Government's Exhibit Number 154. That's what you testified to previously as being a .223 case. I believe it was that marker 11-A, is that right?

A    Government Exhibit 154 is marker 8-A.

Q    I may be wrong. 8-A. You're exactly right. T-41, right?

A    Correct.

Q    Okay. Would you pull that out of that package. How clean is that?

A    It looks like it's a little oxidized.

Q    So what you can't -- well, let me ask you this: Does it appear to be -- to have changed in appearance since when you seized it on September 24th of '99?

A    Other than the writing on it, not that I can specifically say, no.

Q    There's nothing on your envelope that indicates this was a bright shiny new round?

A    No.

Q    And that the reason it's tarnished is six years have gone by.  I mean you don't have any evidence there, right?

A    No, I have no evidence of how it was when we collected it as far as how clean it was.

Q    So when you picked it up out of the ground, you don't know how long that round had been there?

A    No.  As I stated before, really we didn't -- we had no knowledge of how any of those rounds were left.  We were just collecting them.

Q    And you can go ahead and put that back, sir, and hand that back to the clerk if you want to.  And if I were to take you through number 10, number 11, those other five, same answer?  You can't tell how long those rounds were in the position they were in prior to you seizing them?

2296

A     No, I cannot.

Q     But what I'm going to guess, I'm going to take a leap of faith here.  You cannot tell me that you seized any brand new, shiny brass rounds, shiny as those door hinges right there besides you?

A     I don't recall if I did or not actually.

Q     But you have seen rounds like that that you've taken out of a box of ammo that you just bought at the store, haven't you?

A     Yes.

Q     That's what it looks like, doesn't it?

A     A brand new box, yes.

Q     Okay.  Now, back to this trajectory -- or not trajectory but the ejection pattern again, okay?  If somebody was standing on the porch shooting that way, how we going to get a round out here, eject out of a .223?

A     I don't know.

Q     There's Government Exhibit Number 1 right in front of you.  You see a post right there on the edge of that porch, don't you?

A     Yes.

Q     To the left of those steps?

A     Correct.

Q     If somebody's standing in the doorway facing the jury, shooting a .223, I guess we can say, well, that

round might impact that post, right?

A    The casing?

Q    Casing, right.  I said round, I meant casing.

A    Correct.  The casing could have hit off the post.

Q    And then it's going to be a pretty good stretch though to say it comes off of that and comes all the way down the front of the porch, isn't it?

A    I don't know if I'd call it a stretch, no.

Q    And you said you'd seen different things happen with them, right?

A    Yeah, they have a tendency to do some strange things sometimes.

Q    It would be pretty strange for two of them to wind up right there together, though, if that was the case with one of them?

A    I can't really testify to that one way or the other.

Q    No, but what you do know whenever you shoot a .223 if you stand in one location and hold that weapon the same way, generally you're hulls go in the same place, within reason, don't they?

A    The hulls?

Q    Yes.

A    The casings?  The casings have a tendency to be in a little wider area.

Q    Yeah, okay.  Hulls is what I said.  Not holes.

2298

A    Yeah, the hulls, okay.

Q    I refer to hulls the same as casings, okay?

A    All right.

Q    All right.  Just so we will understand in our discussion.  I think I'm through with 26.  Sir, I'm going to ask that you be handed an exhibit, if I can find it real quick here.

MR. SMITH:  It's Government's Number 32, please.  Actually, that might be a picture of it.  It was a photo, sir.  We're going to display it if I may, Judge.  It's in evidence.

THE COURT:  You may.

Q    (By Mr. Smith) There we go.  We're going to get that bottom -- all right.  And we can dim the lights if we need to, but the point I'm making, sir, is you know what you're looking at because you're out there when you processed that scene?

A    Correct.

Q    Me looking at this photograph, I can't see a hull in there, or a case.  Now you told me there's one right in here, right?

A    Correct.

Q    Or told me, Mr. Littlefield was asking you the questions.

A    Yes.

Q    This grass is what, couple inches high?

A    Probably.

Q    There's pretty good growth around the east edge of the house?

A    Yes.

Q    And that's where marker number 11-A came from?

A    Correct.

Q    Pretty hard to see that in the grass?

A    Correct.

Q    Be pretty easy to step over, pass up two or three, four cases laying out there in the grass, wouldn't it?

A    Well, I mean we did the search -- we looked for specifically that type of a casing within the grass because we knew the grass was tall, so that's how we found the specific casing like this in the tall grass.

Q    I understand that.

A    But, yes, it was -- it's in the grass and it is hard to see in the photo.

Q    You can see how somebody could miss one, couldn't you?

A    Yes.

Q    What if somebody is walking through that area and they step on it, push it down underneath something and then it gets even more difficult, doesn't it?

A    It's possible, yes.

Q    Now, whenever you were out there and the weapons were being gathered up, did you have anything to do with packaging those bullets like we talked about with that MP5?

A    Those were specifically packaged by Ms. Lee.

Q    Were you helping her with that?

A    I was helping her in the collection and the documentation, yes.

Q    So whenever you collect rounds out of a magazine, do you take them out of the magazine or leave them in the magazine and just package that whole thing together?

A    At this scene we were taking the rounds out of the magazine and counting each round.

Q    And then doing what with them?

A    Packaging them together with the magazine in the package.

Q    But not putting them back in the magazine?

A    No.

Q    Were there any rounds that you're aware of that were left intact in the magazine and packaged that way?

A    Not that I recall.

Q    Did you have anything to do with the Smith and Wesson that was out there to the right of the steps on the porch?  And I believe that was number 12, marker number 12.

2301

A    Marker number 12.  I actually submitted that item but that was collected by and sealed by Ms. Marcangeli.

Q    Did you assist her in doing so?

A    I don't believe so, not on that particular firearm.

Q    So when you say you submitted it, help me out here.

A    I actually took it to the laboratory and submitted it to the laboratory.

Q    So she may have packaged it up and had it sitting over there, but you're the one that carried it to the lab?

A    I'm the one that submitted it into the laboratory, yes.

Q    Okay.  Now, did she have a different way of packaging those sort of things than you did?

A    I'm not sure about that.

Q    Was there -- did you have any training within the OSBI as to how to package a firearm that is loaded, with one in the chamber and also the magazine that's loaded?

A    Not specifically.  Like I stated, this was actually the first scene that I worked with firearms.  I was following the direction of Ms. Lee, my supervisor, and that's what she was instructing and showing at the time.

Q    So she was telling you how to do it?

A    She was, yes.

Q    Were you instructed to take a round out of the

2302

chamber and to package it separately, out of a weapon?

A    Not to take it out, but once it was cleared then, yes, that would packaged separately.

Q    And then take the rounds out of the magazine?

A    Correct.  And count them.

Q    And then package the rounds with the magazine?

A    Correct.

Q    And then package -- put that, I guess, with the package with the chambered round?

A    Well, they might be labeled separately, but they'd be submitted together, yes.

Q    Was there consistency with the collection of the weapons and the rounds out there, as far as what you saw?

A    It was -- Ms. Lee and I did, yes, there was consistency.  I was not with Ms. Marcangeli or Ms. Lyons when they were actually collecting the other weapons, so, no, I don't know how they collected them.

Q    Did you collect the Sig Sauer off of the left front corner of the porch?

A    No, I didn't.

Q    Do you know how that weapon was accounted for in terms of the rounds, whether chambered or in the magazine?

A    No, I'm not sure about that.

Q    Now, back to that metal detector again.  Was

anything found with that metal detector, any brass?

A    Excuse me.  I didn't understand the question.

Q    The metal detector, you said you saw somebody out there using it?

A    Correct.

Q    How big of a head did it have on it, one of those small ones, great big thing?

A    No.  It wasn't huge.  I mean, I would say probably maybe 12 inches across, 10 to 12 inches across.

Q    Something like that?  About like a pie plate?

A    Probably about that size.

Q    Did they use it like you see people out there swinging it back and forth and walking and what have you?

A    Yes.

Q    Have you ever used one?

A    Yes, I have.

Q    But you didn't use one out there that day, right?

A    No, I did not.

Q    Did you take any pictures inside that Bronco that was -- had the bullet holes in it?  Did you have anything to do with that?

A    I don't know if I specifically took any pictures.  I don't recall that.

Q    Did you process anything out of that vehicle?

A    I assisted Ms. Marcangeli and Ms. Lee in that

2304

vehicle, yes.

Q   Okay.  And what did you do as it relates to that vehicle?

A   Basically whatever they needed at the time. Documentation, if they needed me to take a photo I would, as I did throughout the rest of the scene.

Q   Was the key -- were the keys in that vehicle?

A   I believe there were some keys in there.  I don't know that they were in the ignition.  I don't recall that.

Q   Do you recall seeing keys in the interior of that vehicle?

A   If I remember correctly, yes.

Q   I want to show you an exhibit that has not in evidence and see if you can identify this for me.  And while I'm looking for it, sir, did you remove anything from that Bronco?

A   I don't believe I specifically removed anything from the Bronco.

Q   Do you recall whether or not the windows were up on that Bronco whenever you were looking at it?  And I'm talking about the driver's side or the passenger side.

A   Not that I recall right offhand.

Q   That's not something that you would have noted in your report, is it?

2305

A    No, not necessarily.

Q    Did you retrieve any weapons out of that Bronco? Let me ask you this:  What did you retrieve out of that Bronco, if anything?

A    I specifically -- I don't recall retrieving anything out of that Bronco.

Q    Did you take the keys out of it?

A    No, I did not.

Q    Did you check and see what the keys fit?

A    No, I did not.

Q    Was the Bronco in neutral?

A    I don't recall.

Q    Was it in park?

A    I don't recall.

Q    Do you know if you could remove keys from a vehicle that's not in park?

A    I don't know on that specific vehicle, no.

Q    Do you know if there were keys in the ignition and keys in the floor board area?

A    No, I don't recall if they were in the ignition or not.

Q    If keys are in the ignition and you open the door what do you hear?

A    Typically you'll hear the dinging sound of the keys being left in there.

Q    Didn't hear any dinging sound out there that day, did we?

A    No, not that I recall.

Q    Did you remove any weapons from any other vehicles?

A    Yes, I did.

Q    What other vehicles?

A    Ms. Lee and myself processed the other vehicles that were there and removed.  As I stated before, the MP5 out of OHP 344 and I can't recall specifically if there were other weapons removed.

Q    Do you know what an M-203 is?

A    Yes.

Q    What is an M-203?

A    It was marked as a grenade launcher, categorized as a grenade launcher.

Q    That is what an M-203 is, right?

A    Correct.

Q    That's the military designation, correct?

A    Correct.

Q    And you found one of those out there or did you find two of them?

A    I remember one specifically that was in one of the trunks.

Q    Okay.  Do you recall one being in the front seat of a vehicle?

A    Yes, actually I think I do.

Q    And what vehicle was that?

A    I don't recall specifically.

Q    Have you ever fired an M-203?

A    No, I haven't.

Q    Do you know what purpose an M-203 would have in a search?

A    No, I don't.

Q    I'll show you what's marked as Defendant's 148 and it is not in evidence.  Do you see that, sir?

A    Yes, I do.

Q    Does that appear to be the same weapon in the same vehicle as you recall it at the Barrett residence?

A    Yes, it is.

        MR. SMITH:  Move for the introduction, Judge, of 146 -- 148.

        THE COURT:  Any objection?

        MR. LITTLEFIELD:  No objection.

        THE COURT:  Be admitted without objection.

        MR. SMITH:  Ask that it be displayed, Your Honor.

        THE COURT:  You may.

Q    (By Mr. Smith) Now, whenever we talk about an M-203 grenade launcher, what is this right here, it's got ribs on it?

2308

A    That's actually the M-203.

THE COURT:   What was the number on that?

MR. SMITH:   148, Your Honor, Defendant's.

THE COURT:   Okay, thank you.

Q    (By Mr. Smith) That is a tube that extends underneath that weapon; is that true?

A    Yes, it's attached on the bottom side of the weapon.

Q    And that tube is what, two and a half, three feet, or do you know?

A    I don't think it's that long.  I don't know specific measurements but I don't think it's that long.

Q    On top of that tube is what?

A    The weapon itself.

Q    A .223, right?

A    I believe in this case it was, yes.

Q    And what sort of rounds can you fire out of a grenade launcher?

A    I don't know the designations of the rounds.

Q    Percussion rounds?

A    Possibly, yes.

Q    Do you know if they'll fire smoke?

A    Like I said, I don't have any specific experience with them.  I don't know.

MR. SMITH:   Okay.  Take that down, Your Honor.

Q    (By Mr. Smith) I'd like to show you Number 149,

2309

please, sir, and this is not in evidence.  Ask you if you can recall what you see there?  Can you tell what that is, sir?

A    It's some sort of weapon, but I can't tell you specifically.

Q    And I want to show you some photos and if you don't recognize what's in them, then just tell us that and we'll move on.  If you do recognize it as being something out there, then tell me that, okay?

A    All right.

Q    So having looked at this photograph, is there anything in there that you can recognize having seen at the Barrett residence?

A    Not that I recall, no.

Q    Okay.  We'll take that down.  Let me show you what's been marked as Number 150.  Anything in there, sir, that you can recall?

A    Not specifically.  I'm not exactly sure where that is.

Q    We'll move on.  I want to have you look at Number 152.  Tell me if you see anything there that looks familiar.  Kind of fuzzy right now.  She's going to clear that right up.  How about that?  Still too fuzzy?

A    That's better.

Q    What's in that photograph, if you know?  Or do you

2310

recall seeing that before?

A    I do recall seeing this one.

Q    Okay.  And can you tell what type of weapon that is in what's depicted in Defendant's Number 152?

A    It's a .223.  I'm not exactly sure if it was an AR-15 or what the actual designation was on that one.

MR. SMITH:  Move for the introduction of 152, Your Honor.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No.

Q    (By Mr. Smith) I'm going to show you what's been marked as 154.

THE COURT:  Be admitted without objection.

MR. SMITH:  Oh, I'm sorry, Judge.  And can I display this to the jury briefly?

THE COURT:  152?

MR. SMITH:  152, Your Honor.

THE COURT:  You may.  And we'll turn the lights off.

Q    (By Mr. Smith) Now, the weapon that -- is there more than one weapon depicted in this vehicle?

A    Yes.  It appears there's one on the other side also, of the console.

Q    What I've got my pointer on up here, now, that's an extended stock?

2311

A    Yes.

Q    Is that true?

A    Yes.

Q    This is a weapon that's laying down this way, is that right?

A    Correct.

Q    Did you examine this article right here?

A    I don't specifically remember looking at that, no.

Q    You know what that is though, don't you?

A    It looks like a smoke canister to me.

Q    That's the spoon, right?

A    Correct.

Q    I'm going to take that down and I'm going to ask that you look at Number 154.  This is not in evidence. Do you see that, sir?

A    Yes, I do.

Q    Do you recognize what that is?

A    Yes, I do.

Q    Tell us what that is.

A    It was a dual magazine that was in the side compartment of one of the doors of the vehicle.

Q    And it's in the door panel but it's upside down because it won't fit on our projector back here.

A    Correct.

Q    But you can recognize what it is?

2312

A     Correct.

MR. SMITH:  Move for the introduction of 154, Your Honor.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Be admitted without objection.

MR. SMITH:  Ask that it be displayed, Your Honor.

THE COURT:  You may.

Q     (By Mr. Smith) Now, is this what you described earlier in terms of two magazines being clipped together mechanically?

A     Correct.

Q     And that's kind of what we can see.  That's a magazine that's the other one, right?

A     Correct.

Q     Kind of a quick way to reload?

A     Correct.

Q     How many automatic weapons did you recover out there at the scene?

A     I don't specifically remember the number.  I could count them up for you possibly, through our evidence list.

Q     Can you do that quickly?

A     Uh-huh.  Did you ask specifically automatic weapons?

Q    Yes, sir.

A    There were seven.

Q    Do you know how many troopers were out there?

A    No, I don't recall how many were there at the time.

Q    Now, have you ever fired a tracer round?

A    No, I haven't.

Q    Have you ever seen one fired?

A    Yes, I have.

Q    And did you recover any tracer rounds from out there at the Barrett residence?

A    There were some recovered, yes.

Q    Inside of a weapon, magazine loaded?

A    I believe so, yes.

Q    And that weapon was inside of one of the vehicles?

A    Correct.

Q    Do you know whether or not your agency issues tracer rounds?

A    I don't know.

        MR. SMITH:  One second, Your Honor.

Q    (By Mr. Smith) I'm going to ask you just kind of the same area that we're at just a second ago.  You said there's seven automatic weapons.  There were several shotguns out there too, weren't there?

A    If I remember correctly, we did see a few shotguns. I don't remember a number or where they were at.

2314

Q    And there were probably also some semi-automatic weapons, also; is that true?  In addition to the seven automatics that you told us about?

A    I believe so, yes.

Q    Quite a bit of firepower?

A    I can't make a judgment on that.

Q    It's all relative, isn't it?

A    Correct.

            MR. SMITH:  Pass the witness, Judge.

                    REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Do you have any reason to believe that this was not a high risk operation for law enforcement?

A    No, I don't.

Q    And as such, would law enforcement be expected to have weapons and ammunition capable of dealing with the risks which they possibly might face?

A    Yes.

Q    Are you familiar with whether or not law enforcement officers often carry multiple weapons in their vehicles with them, so that they are available to them if they are needed in different kinds of situations?

A    Yes, I do.

Q    In the regard to -- you all got some information at the scene, Mr. Smith asked you about that on cross; do

2315

you recall that?

A    Yes.

Q    How many shotguns were fired by the OHP troopers?

A    None.

Q    And how many grenades were launched by the troopers?

A    None.

Q    The grenade launchers that they carry, is there -- are you familiar at all with these type of weapons?  And you -- they were called grenade launchers, finally got that word out.  I think you said they were M-203s?

A    Correct.

Q    Are they able to fire other items besides grenades?

A    I believe so, but I specifically don't know which items.

Q    Are you aware that they can be used -- that they can launch CS gas?

         MR. SMITH:  Your Honor, I'm going to object because he said he doesn't know.

         MR. LITTLEFIELD:  I'm not asking him to list everything he knows.  I'm asking what he's aware of.

         THE COURT:  You may answer.

Q    (By Mr. Littlefield) Are you aware of whether they can launch CS gas?

A    I've heard that.  I don't know specifically, no.

Q    Are you aware that they can specifically launch

2316

grenades?

A    That I am aware of.

Q    Are you aware that they can also launch less lethal type of ammunition such as rubber batons, which are less deadly than regular bullets?

A    I'm not specifically knowledgeable of that, either.

Q    Are you aware that they can launch smoke projectiles?

A    Not specifically.

Q    There were seven automatic weapons and where were they located?

A    In various vehicles.

Q    And are you aware of what arms the troopers were carrying when they went into this operation and were intending to use on this operation?

A    We were told based upon what was submitted and what we collected what individual weapons they were carrying at the time.

Q    And in fact, one of the weapons that was fired that was retrieved was a .45 caliber handgun, wasn't it?

A    Correct.

Q    One of the firearms that was retrieved was the MP5 that you've talked about previously?

A    Correct.

Q    Beyond those two firearms, was there evidence of any

2317

other law enforcement weapon being fired at the scene?

A    Not that I'm aware of at the scene, no.

Q    In regard to the shells, you were talking about the oxidation on the casings, and Mr. Smith asked you about pristine, shiny ammo coming out of boxes.  Have you seen ammo coming out of boxes that's less than pristine and shiny?

A    Yes, I have.

Q    Is it a function of how long that ammo's been sitting in the box?

A    Typically, yes, I would suspect.

Q    And do you have a recollection of the oxidation on any of the casings that were retrieved at the scene?

A    Not specifically, no.

Q    Let's look to Defendant's Exhibit Number 26, again.  Do you have it still?

MR. LITTLEFIELD:  May I return to the --

THE COURT:  You may.

Q    (By Mr. Littlefield) In regards to the .223 casings, do you have an -- you don't know where somebody was standing when those were fired?

A    No, I don't.

Q    As to the ejection pattern, how -- is there anything that varies how those shells will end up when they're being ejected from an M-16 or .223?

2318

A    Yes, there is.

Q    What kind of things can vary how those things end up?

A    The actual angle that it's being held.  Typically, like if a left handed person is shooting it, they'll tend to deflect those shells a different direction because a lot of them will bounce off of themselves.

Q    What if the item itself is close to hard surface structures?  What will that do to the casings?

A    They would also tend to bounce.  They would bounce off that hard structure into another area.

Q    On Government Exhibit Number 1, if an individual is straddling the door, one foot in, one foot out?

A    Yes.

Q    And shooting toward -- from the west toward the east, are there any items in the area of where .223 casings might eject that would cause a ricochet or deflection back to the east?

A    Yes.  There would actually be the posts that hold up the porch of the roof and then the porch itself of the roof, depending on the angle that the -- (Interrupted)

Q    I am sorry.  I had trouble, you were -- (Interrupted)

A    Sorry.

Q    State that again, please.

2319

A    The posts from the porch and the actual porch itself depending on what angle that was being held.

Q    Okay.  What about the air conditioner and refrigerator that's out there on the front porch?  Could possibly that cause a ricochet?

A    Depending on the angle, yes, it could have.

Q    Do you recall if there was a -- and I know the porch is there.  Do you recall if there's an under-threshold or a ceiling on that porch?

A    I believe there was, but I can't remember specifically if there was.

Q    If there was, would that possibly cause some deflection off of -- I mean, if it goes up, hits the side, kicks up, could that cause it to ricochet?

A    Yes, it could.

Q    Could the post itself cause it to ricochet?

A    Yes.

Q    What was the nature of the porch itself?  What kind of material?

A    Wood.

Q    And large pieces or what?  Do you recall how it was configured?

A    I don't remember specifically.

Q    Let's look at Government Exhibit 22.  Does that help you recall how the porch was set up?

2320

A    Yes, it does.

Q    And what can boards in that kind of configuration, running away from the house, do as far as casings landing in that area?

A    Well, you have the actual slits in between the boards, too, which could cause a deflection in any direction from those shell casings.

Q    In regards to the casings themselves, if officers -- if casings are inside the house and a number of officers go in to clear the house, can anything happen to the casings?

A    Yes.

Q    What?

A    They could be moved.

Q    And what way?

A    By somebody kicking them, by if they're clearing the house, they could move them by opening the door, any number of scenarios.

Q    If somebody's dragged through, can a shell be dragged underneath a person's body?

A    Yes, I would suspect.

Q    If it's dragged underneath a person's body, and then supposited (sic) on the porch, could it be kicked after that?

A    It's possible, yes.

2321

Q     Can you have any assurance as to where those casings are going to go in this kind of area, with this kind of activity?

A     No.

Q     You were asked about doing the DNA five years later. Does the fact you performed the analysis five years after the initial analysis was done on T-140 dash two have any impact on your finding?

A     No, it doesn't.

Q     Does it change -- does the passage of the five years change the science at all?

A     No, the DNA profile will remain the same throughout the five years.

Q     In regards to -- let's go back to Government Exhibit 69.   In regards to the preservation of the scene and the preservation of the integrity of the scene, anybody coming -- was anybody coming in from the east to fiddle with this crime scene and screw up its integrity?

A     Not that I was aware of, no.

Q     And in fact, this road here, do you know whether it's a through road or if it dead ends?

A     I believe that road actually dead ends.

Q     And this is a driveway that goes to a single residence, isn't it?

A     Yes, on the far backside.

2322

MR. LITTLEFIELD:  Could we have Government Exhibit Number 184 displayed?

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what's shown in this photograph?

A    Yes, that appears to be an aerial view of the area.

Q    If there has been testimony that this where I'm showing the laser is Mr. Barrett's property, would you disagree with that?

A    No, I wouldn't.

Q    What is to -- what's to the north that Mr. Smith was asking you about not blocking it or having a perimeter or so that no one came in from the north.  What's out there to the north?

A    As I've stated before, it was basically just an open field.  There was nothing to the north, per se.

Q    Was there any threat to the integrity of the scene that occurred from the north?

A    No.

Q    If we could go back to 69 a second.  Government's Exhibit 69.  Mr. Smith asked you about an individual coming from this vehicle firing shots.  Do you know specifically what vehicle the individual who fired the MP5 came from?

A    Not that I recall, no.

2323

Q    So you don't know if it was from this vehicle or from that second Bronco that's on the model?

A    No, all I do know is it was a later vehicle.  It was not the first vehicle that entered the property.

Q    So whether it was the second or the third or the fourth, you're not sure of?

A    No, I don't recall.

Q    If we could go back to Government Exhibit -- Defendant's Exhibit Number 26.  Do you know which vehicle was the lead vehicle in?

A    Yes, that was -- from what we were told, it was FAL 803.

Q    And was that the vehicle that received all the shots?

A    Correct.

Q    Was that the vehicle that Mr. Eales was transported to the hospital in?

A    No.

Q    So he would not have been transported in the lead vehicle?

A    No, he wasn't.

Q    Do you know where the lead vehicle was parked and where Mr. Eales was carried to when he was placed on the tailgate of that later vehicle, so that he could -- later arriving vehicle, so that he could be transported to the

2324

hospital?

MR. SMITH:  Your Honor, outside the scope.

MR. LITTLEFIELD:  I was asking about 1-A and how it got deposited over there.

THE COURT:  Overruled.  You may answer.

Q    (By Mr. Littlefield) Do you know where that vehicle was parked?

A    No, I don't know specifically.

Q    Do you know how far Mr. Eales' person was carried when he was moved over to the second vehicle which -- or third, whichever one it was, that transported him to the hospital?

A    No, I don't.

Q    So from that perspective, could you exclude 1-A as having come from Mr. Eales' magazine?

A    I'm not sure that I understand your question.

Q    Could you exclude that 1-A as a .45, when you were asked to explain how it got over there, not a part of this grouping, can you exclude it from coming from Mr. Eales' magazine?

A    No.  As I stated before, I can't specifically state as how any of those were placed where they were at.  So, no, we can't exclude that one as being from there.

Q    All you can tell us is where they're located?

A    Correct.

Q   And it could have been there and kicked over there at some point in time, and you don't know that either?

A   It's possible it could have been kicked prior to us processing the scene.

Q   Or it could have been there for months?

A   Correct.

Q   That's where they were?

A   Correct.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Let me see counsel for just a minute.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  Can you give me an estimate how much you're going to have?

MR. SMITH:  Yes.  We'll be very brief, Judge. If we limit Mr. Littlefield to four or five redirects, probably get out of here.

MR. LITTLEFIELD:  Mr. Porter, at least at noon, was supposed to be appearing in a child sex case trial in McCurtain County.  He may -- there may have been a stipulation.  He was going to let me know.  I can ask him real quick if they got the stipulation or not.  Judge in McCurtain County said he was going to throw him in jail. Not too worried about that.

2326

THE COURT: This is an important witness, so I don't want to hurry. If there are recross or -- well, there might be redirects, so we're going to take a recess. If he does have a major problem, I need to call the judge or something.

MR. LITTLEFIELD: We will ask if that becomes a problem.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT: Members of the jury, we'll take the evening recess now. I ask you to remember my admonition not to discuss this among yourselves, do not involve yourselves with any news coverages, I'll remind you. I'll ask everyone to remain seated as the jury leaves for the evening. We'll start at 9:00 o'clock in the morning.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT: Let the record reflect the jury has departed the courtroom. Anything from the Government outside the hearing of the jury?

MR. LITTLEFIELD: No, Your Honor.

THE COURT: Defense?

MR. SMITH: No, Your Honor.

(Whereupon, the proceedings were continued to October 20, 2005.)

2327

                        C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

          I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on October 19, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 2070 through 2326.

          I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

          WITNESS my hand this 20th day of May, 2006.

                              _____
                              GREG EUSTICE
                              Certified Shorthand Reporter

                              Greg Eustice
                        Oklahoma Certified Shorthand Reporter
                            Certificate No. 0176
                        Exp. Date: December 31, 2006

339   43

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
                         )
          Plaintiff,     )
                         )
-vs-                     )   No. CR-04-115-P
                         )
KENNETH EUGENE BARRETT,  )
                         )
          Defendant.     )

VOLUME 11 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on October 20, 2005.

A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 2329 - 2565

2329

WITNESSES

PAGE

RYAN PORTER
(Continued from October 19, 2006.)
Recross Examination by Mr. Smith . . . . . . . . . 2230
Further Redirect Examination by Mr. Littlefield . 2335
Further Recross Examination by Mr. Smith . . . . . 2336

JUAN BEAL
Direct Examination by Mr. Littlefield . . . . . . 2337
Voir Dire Examination by Mr. Smith . . . . . . . . 2366
Further Voir Dire Examination by Mr. Smith . . . . 2389
Cross Examination by Mr. Smith . . . . . . . . . . 2406
Redirect Examination by Mr. Littlefield . . . . . 2458
Recross Examination by Mr. Smith . . . . . . . . . 2481
Further Redirect Examination by Mr. Littlefield . 2486

CHARLES SANDERS
Direct Examination by Mr. Littlefield . . . . . . 2488
Cross Examination by Mr. Hilfiger . . . . . . . . 2524
(Examination continued to October 21, 2005)


EXHIBITS

| | OFFERED | REC'D |
|---|---|---|
| Government's Exhibit Number 60 . . . . . | 2376 | 2376 |
| Government's Exhibit Number 61 . . . . . | 2381 | 2381 |
| Government's Exhibit Number 62 . . . . . | 2384 | 2384 |
| Government's Exhibit Number 63 . . . . . | 2389 | 2390 |
| Government's Exhibit Number 172 . . . . | 2360 | 2360 |
| Government's Exhibit Number 181 . . . . | 2353 | 2354 |
| Government's Exhibit Number 197 . . . . | 2465 | 2465 |
| Government's Exhibit Number 206 . . . . | 2362 | 2363 |
| Government's Exhibit Number 207 . . . . | 2365 | 2366 |
| Government's Exhibit Number 208 . . . . | 2368 | 2368 |
| Government's Exhibit Number 209 . . . . | 2378 | 2378 |
| Government's Exhibit Number 210 . . . . | 2382 | 2382 |
| Government's Exhibit Number 211 . . . . | 2385 | 2385 |
| Government's Exhibit Number 218 . . . . | 2374 | 2374 |

PROCEEDINGS

THE COURT:  Good morning.  Jury's in the box, counsel for the Government is present, Defendant is present with counsel.  You may continue this examination.

MR. SMITH:  Thank you, Your Honor.

RECROSS EXAMINATION

BY MR. SMITH:

Q    Mr. Porter, good morning.

A    Good morning.

Q    Yesterday we were talking about rounds that were collected out east of the house and what have you, casings and rounds.  Do you remember that discussion?

A    Yes.

Q    Would you agree with me, sir, one way to determine how many shots were fired out of a particular weapon would be to have an inventory of bullets before an individual ever went out on a scene?

A    To actually have a -- yes, an inventory prior to, correct.

Q    I mean, you can count beforehand there's 50 bullets, count afterwards there's 45 bullets and you know I need to be looking for five casings, right?

A    Correct.

Q    You were never given any sort of information like that when you were out there looking for casings at the

2331

Barrett residence, were you?

A    No, I wasn't.

Q    So you had no idea ahead of time how many times somebody may have shot?

A    No, I didn't know that.

Q    And you don't know today how many times somebody may have shot?

A    No, not aware of that.

Q    And another way to manipulate, if there was a count as to how many rounds might have been shot would be if somebody reloaded before a count.  Would you agree with that?

A    Yes, that would be something else that would change the total number.

Q    And I guess another point would be you can't collect evidence if it's not there?

A    Correct.  We only collect what we see, what we can find, what we can document.

Q    So if somebody picked up some casings out there on the ground, you don't have any way to account for them?

A    We wouldn't have any knowledge of it so we wouldn't know if they were there prior to or after or whatever.

MR. SMITH:  Right.  I would like to put up briefly Government's Exhibit Number 22 which is a photo that is in evidence, Your Honor.

2332

THE COURT: You may.

Q    (By Mr. Smith) Sir, does this picture accurately depict the condition of the porch at the Barrett residence?

A    Yes, it does.

Q    Okay.  And are those spaces in between those boards on the porch?

A    Yes, they are.

Q    And what effect if any do you think that would have on a casing that would be rolling down that porch?

A    It could move the casings, make it go into a direct direction than what it was initially moving in.

Q    But also tend to have the effect of slowing it down, would it not?

A    It's possible.

Q    It's not the same as rolling a case on a smooth surface like that desk right in front of you?

A    No.

Q    If you have gaps in between those planks, as it hit it's going to tend to slow it down; would you agree with that?

A    You would suspect it would, yes.

Q    Now, you conducted an examination of the exterior of the scene?

A    Yes.

Q    Including the porch?

A    Correct.

Q    And you didn't find any blood stains east of the steps on the porch, did you?

MR. LITTLEFIELD:  Objection.  Cumulative and it's also beyond the scope of redirect.

MR. SMITH:  And, Your Honor, if I may.

THE COURT:  You may.

MR. SMITH:  This is in response to whether or not casings could have been moved by dragging a person out through the house.

MR. LITTLEFIELD:  He asked about that on cross, Judge.  He put up the exhibit, identified the two blood stains.  Certainly cumulative.  If not through him, certainly through Ms. Marcangeli.

THE COURT:  Overruled.  You may answer.

Q    (By Mr. Smith) Sir, you conducted an examination of that porch, did you not?

A    Yes, we did.

Q    And you did not find any blood staining east of the steps on the porch?

A    Actually on the porch itself, no, I don't believe so.

Q    And again, if you look at Government's Model Number 1, I'm talking about from the right edge of the steps

2334

towards that blue pickup, correct?

A    Correct.

Q    Now, you also were not provide any information nor do you know how far Mr. Eales may have been transported from where he was on the ground until he was put in the back of the second Bronco, do you?

A    No, I don't.

Q    So you don't know the location of that second Bronco or if he was moved, how far he may have been moved?

A    No to both.  Correct.

Q    Is that true, sir?

A    That's true.  I don't know either of those facts.

Q    Thank you, sir.  And then one final question.  You examined the area to the east of the residence.  Did you find any glass out there in the grass?

A    Not that I recall.  Not that I did, anyway.

Q    No fragments off the vehicle, no pieces of glass from the windshield?

A    Not that I recall.

Q    No bullet fragments laying out there in the grass east of the residence?

A    Not that I recall past the initial first white Bronco, no.

Q    Do you see where the Bronco is depicted on Government's Exhibit Number 1?

2335

A    Yes.

Q    You didn't find any evidence of any sort of damage to that Bronco in that area, did you?

A    Not that I recall that far out, no.

MR. SMITH:  All right, sir.  Thank you.

THE COURT:  Any further direct?

MR. LITTLEFIELD:  Yes.  I ask that Government Exhibit Number -- may I return a second, Judge?  67 be displayed.

THE COURT:  You may.

FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Do you recognize that, sir?

A    Yes, I do.

Q    What is that?

A    That appears to be the first initial white Bronco.

Q    The one that's out, the first in the line on Government Exhibit 1?

A    Correct.

Q    And what -- in relation to the damage to the glass, what would you expect would happen when those bullets would hit the glass?

A    In this particular case as it's hitting the front windshield, the glass would go towards the inside of the vehicle.

2336

Q    Okay.  And pieces that -- were there large -- are there going to be large pieces of glass from that kind of damage?

A    I'm not sure what you mean by large.  There were -- there were a lot of glass fragments inside of the vehicle.  Nothing substantial as far as greater than an inch in diameter.

Q    So we're talking shards that are about the size of my finger?

A    Correct.  Smaller fragments.

Q    From between the gap between my fingers?

A    Correct.

        MR. LITTLEFIELD:  Pass the witness.

        MR. SMITH:  Real brief, Your Honor.

                FURTHER RECROSS EXAMINATION

BY MR. SMITH:

Q    Sir, in your discussion with people out there at the scene on the 24th?

A    Yes.

Q    Did anybody describe to you as seeing bullets hit the windshield of that Bronco and seeing glass and items in the air, flickering in the air and the like?

A    Not that I recall, no.

Q    Nobody told you that?

A    No.

2337

MR. SMITH:  Thank you, sir.

THE COURT:  Any further?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  We'd ask that he be excused.

THE COURT:  May this witness be excused?

MR. SMITH:  Yes, he may, Your Honor.

THE COURT:  Sir, thank you for your testimony.

You may step down.  You may be excused.

THE WITNESS:  Thank you.

THE COURT:  You may call your next witness.

MR. LITTLEFIELD:  Juan Beal.

JUAN BEAL,

being first duly sworn to testify the truth, the whole

truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record please, sir.

A    Juan Beal, B-e-a-l.

Q    Mr. Beal, how are you employed?

A    I'm a deputy with the Pittsburg County Sheriff's

Office, McAlester, Oklahoma.

Q    And how long have you been in law enforcement, sir?

A    This November 1st will be 33 years.

Q    Previous to working for the Pittsburg County

2338

Sheriff's Office were you working with any other law enforcement agency?

A    Yes, sir.  The District Attorney's Office out of Payne and Logan County and I successfully retired from the Del City Police Department, Del City, Oklahoma.

Q    What were you doing with the -- what was your job with the Del City Police Department?

A    I was a patrolman for awhile, then I worked investigations, then I was promoted to a sergeant in charge of investigations.

Q    When you were a patrolman what was involved in your duties, sir?

A    Average every day routine traffic stops, making calls, no matter what they are.

Q    Did you respond to emergency type calls?

A    Yes, sir.

Q    And were you armed?

A    Yes, sir.

Q    What kind of armament did you carry in your patrol vehicle?

A    Of course a sidearm, we had shotguns, we had mini-carbines that we carried with us.

Q    What are mini-carbines?

A    Oh, it's like a mini-14.

Q    What's a mini-14?

2339

A   It's a .223 caliber.  It's one of the first rifles that they used over in Vietnam.

Q   And why did you have so much armament just on a normal every day patrol, sir?

A   You never knew what you was going to run into.  If we needed the firepower, we had it with us.

Q   As a deputy in Pittsburg County, have you at any time had an assignment -- associated yourself with another law enforcement agency, sir?

A   Yes, sir.

Q   And what was that?

A   The Drug Enforcement Administration, DEA, McAlester.

Q   And how were you -- as a deputy, sheriff's deputy, in Pittsburg County -- associated with the DEA in McAlester?

A   I was a task force officer.

Q   And as a task force officer, what kind of function did you perform, sir?

A   We investigated narcotics violations.

Q   In regards to your investigations and how you handle them as a task force officer, what appreciable difference was there between you and the other DEA agents assigned to that office?

A   Other than the special agents, there were none.  We both had Title 21 authority.

2340

Q     And Title 21 authority is?

A     The Federal Uniform Controlled Dangerous Substance Act.

Q     Direct your attention to Government Exhibit Number 1 which is there in front of the bench there.  Do you recognize what that is a model of, sir?

A     Looks like a reproduction of where Trooper Eales was shot and killed at Kenny Barrett's residence.

Q     Did you have occasion to go there, sir?

A     Yes, sir.

Q     And when did you go there?

A     September 24th, 1999.

Q     What time did you arrive at that scene?

A     I would say between 1:30 and 2:00 o'clock in the morning.

Q     And how did you receive information that you needed to go to that location between 1:30 and two?

A     I received a phone call from Frank Loyd.

Q     Did Mr. Loyd advise you of what had happened?

A     Yes, sir.

Q     After you received the call from Mr. Frank Loyd did you contact anybody advising them what had happened at that location?

A     I contacted Special Agent Jimmy Waddell, I contacted our boss, Kevin Wilson, and he authorized us to leave

immediately and head to the location.

Q    And when you got to the location, what was --
between 1:30 and 2:00, who was in control of that scene?

A    The Oklahoma Highway Patrol.

Q    Were there any other agencies there at the time?

A    District 27 Drug Task Force, the Sequoyah County
Sheriff's Office.  I don't know whether OSBI had arrived
or not.

Q    Did they arrive shortly thereafter if they weren't
already there?

A    Yes, sir.

Q    Who was responsible for the investigation of what
had transpired at that residence, sir?  What agency?

A    OSBI.

Q    What was DEA going to do at that scene after you all
arrived?

A    We were going to execute the drug search warrant
that originally was one of the reasons why they were
there.

Q    And why was it that the Drug Enforcement
Administration agreed to execute the state-issued drug
search warrant rather than having the state officers
execute it?

A    The state officers that were there were directly
involved.  We were not directly involved.  We weren't

2342

there when it happened and it was also a request from Dianne Barker-Harrold, who was the district attorney at the time, requested from our boss if we would do the search.

Q    And ultimately did the representatives of the Drug Enforcement Administration conduct the drug search warrant?

A    Yes, sir.

Q    Now, was there any kind of restraint on when you all executed the drug search warrant?

A    Yes, sir.

Q    What was that?

A    We were -- we could not come on to the premises or the crime scene until OSBI released it to us to conduct our search.

Q    And you got there you say about between 1:30 and 2:00?

A    Yes, sir.

Q    What time did the other agents from the DEA arrive, as best you can recall?  And I'm not going to hold it to you exactly.

A    Approximately 4:00, 4:30.

Q    Okay.  And when did you all begin -- you got there at 4:00, 4:30 in the morning or the afternoon, the other agents?

2343

A     In the morning.  It was still in the morning.

Q     Did you all immediately begin a search?

A     No.

Q     What time did you all initiate any portion of the search?

A     I believe, sir, it was pretty close to being dark that same day.  Probably 12-13 hours later.

Q     Okay.  In regards to the search that was conducted by -- you all were out there for an extended period of time before you began your search?

A     Yes, sir.

Q     Were you able to observe items at the scene?

A     From a distance, yes, sir.

Q     And were there portions of the property to which you were not restricted; areas where you all could be that were not a part of the OSBI search where you were able to wait, mill around, do whatever?

A     There was a public road there in front of Mr. Barrett's residence and we were allowed to wait there and there was an open field, I believe to the east, that there was some vehicles that we -- that's where we stood by and waited.

Q     Okay.

A     It was out by the front gate.

          MR. LITTLEFIELD:  I would ask Government

2344

Exhibit 69 be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) And do you see Government's Exhibit Number 69, Mr. Beal?

A   Yes, sir, I do.

Q   What is that?

A   It's an aerial photograph of Mr. Barrett's residence in Rock Creek.

Q   And you have to your right, if you kind of turn back just right on the -- that's a laser pointer, you got a button.  What area were you all allowed to access to?  If you just punch the red arrow, it'll -- and can you --

A   This is the public road right here and there's another field over in this area right here and this is the area where we was congregated at, this general area right in here.

Q   Okay.

A   Right here by the front gate.

Q   Let me direct your attention to this item here.  Did you ever have occasion to see what that was, sir?

A   Yes, sir.  That's like a cattle guard gate that had been taken down so that car could -- (Interrupted)

Q   Was there anything on that gate?

A   Yes, sir, there was a sign.

Q   Did you see the sign?

A    Yes, sir.

MR. LITTLEFIELD:  I will ask that Government's Exhibit 104 be displayed for the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) And can you hold it kind of to your side so it will also be visible to the jury, sir? Do you recognize that sign?

A    Yes, sir.

Q    What's it say?  Where did you see that sign?

A    That sign is on that gate laying right there.  It was up across the driveway.

Q    What does it say?

A    Keep out.  I don't give a shit who you are.  If you cross my gate or come on my property I'll shoot.

Q    Hand it back to the clerk.  And did you perform -- when you all performed the search, did you search all at once or did you search in stages?

A    We searched in stages.

Q    And what determined the stages that in which you conducted -- you and other agents from the DEA conducted the search?

A    OSBI would release a portion of the crime scene to us.

Q    What was the first portion of the crime scene that was released to you, sir?

2346

A    The trailer, the garage area, work shed area.

Q    Can you -- what was the first area that was searched?

A    Would be a little trailer, camping trailer, I believe that's -- let me look.  Yes, sir.  There's a little camping trailer right here and a trash bin and then this kind of an open workshop area right in this location, that general area right there.

Q    And to get access to that from the area which you were initially located, out here, did you all proceed through here or did you come through Mr. Barrett's mother's property?

A    No, we came through the road.  We never did -- I never did cross this fence right here, that was right there.  We came right down this road.

Q    By the way, do you know what this yellow through here is?

A    I believe that's crime scene tape.

Q    Was that up when you were all were out there?

A    Yes.

Q    And this over here?  Do you know what that is?

A    Appears to be also crime scene tape.

Q    I'm sorry.  You were --

A    It appears to be crime scene tape.

Q    Was the area taped off?

A    Yes.

Q    And when you all were out there, were people violating the integrity of the scene by crossing the crime scene tape, if they were not involved in the homicide investigation?

A    Not to my knowledge, no.

Q    After you got there at 1:30, were there a number of officers milling around in the area of the homicide crime scene or did they stay back and appreciate the integrity of that area?

A    Everybody that I observed was back behind the barriers.

Q    Now, what areas were you personally responsible -- let me back up.  As you walked down through here, did you notice this vehicle here?

A    Yes, sir.

Q    Do you recognize what vehicle that was, sir?

A    I believe it's the vehicle that Trooper Hamilton and Trooper Eales were in.

Q    Did you observe that vehicle, sir, and get a good view of it?

A    Yes, sir.

        MR. LITTLEFIELD:  I'd ask that Government Exhibit Number 67 be displayed for the witness.

        THE COURT:  You may.

2348

Q     (By Mr. Littlefield) Do you recognize that, sir?

A     Yes, sir.

Q     Is that the condition that that vehicle was in when you were out there on that day and observed it?

A     Yes, sir.

MR. LITTLEFIELD:  If we could go back to Government Exhibit Number 69.

Q     (By Mr. Littlefield) Who was responsible for searching the small travel trailer that was back behind that garage area, that building right there, sir?

A     I was.

Q     And did you find anything inside of that travel trailer, sir?

MR. SMITH:  Your Honor, may we approach?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. SMITH:  Your Honor, there was previously filed a Motion to Suppress any evidence related to that travel trailer.  It is a significant distance away from the residence.  We don't believe there's any evidence of Kenny Barrett occupying that travel trailer and we would renew that objection at this time as it relates to any evidence that may have been contained within that trailer.

MR. LITTLEFIELD:  Number one, it wasn't suppressed.  Number two it's within the curtilage, and certainly there's no evidence of Mr. Barrett?  Had control or access over it.

THE COURT:  Objection overruled.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q    (By Mr. Littlefield) Again, did you search that travel trailer?

A    Yes, sir, I did.

Q    And did you find any items in there -- and the nature of the search, you and other representatives of the DEA were purporting was what kind of search?

A    A drug search.

Q    Was this the first drug search you had done?

A    No, sir.

Q    And what was the area of emphasis?  What kind of -- and I understand you were looking for drugs, which covers a broad category.  Did you have any idea of what type of drug or drug activity you were looking for in relation to the type of drug?

A    Methamphetamine.

Q    Previous to this, do you have any idea how many searches you had done in regards to methamphetamine and the manufacture of methamphetamine in Eastern Oklahoma?

2350

A   Yes.  I've been at the scene or help conduct or conducted probably in excess of a hundred.

Q   So this wasn't new stuff to you?

A   No, sir.

Q   Did you find any evidence that was relevant to the drug search in that trailer?

A   Yes, sir.

Q   What?

A   Several exhibits.  Found some Ziploc bags, plastic bottles that had residue in them.

MR. LITTLEFIELD:  Judge, may I return to the desk?

THE COURT:  You may.

Q   (By Mr. Littlefield) When items are found in the course of the investigation, is there a policy or a procedure that's followed by you all in regards to recording and identifying items that are seized?

A   Yes, sir.

Q   And you mentioned exhibits.  What are you talking about?

A   An exhibit would be a piece of evidence that we would attach a number to and we call it by policy an exhibit.

Q   Okay.  Now if it -- and are there different types of exhibits?

2351

A    Yes, sir.

Q    And what types of exhibits would there be as related to this particular search, sir?

A    There is a drug exhibit and then there is a non-drug exhibit.

Q    And what's the difference -- all this is a drug search warrant, right?

A    Yes, sir.

Q    What's the difference between a drug exhibit and a non-drug exhibit?

A    A drug exhibit would be the actual powder chemical, something that we would need to package up and forward to the DEA South Central Laboratory in Dallas, Texas.

Q    Okay.

A    It would actually be whatever substance you want to have, have an analysis performed on.

Q    Okay.

A    A non-drug exhibit would be something that we do not send to the South Central Laboratory, that by policy would be permitted to keep in a non-drug vault located there at the office.

Q    Okay.  Let's talk about the non-drug exhibits first. Did you discover any items that were initially seized and identified as non-drug exhibits?

A    Yes, sir.

2352

Q    Okay.  And how do you identify these or numerically sort these out for purposes of logging in and keeping controls and maintaining records?

A    On the non-drug exhibits, the exhibit starts with the letter N and then it could have a dash or just a one beside of it.

Q    For non-drug?

A    Right.  So you would start your non-drug exhibits in a particular case as N-1 and then go down N-2, N-3, N-4, however many you would have.

Q    Was there an N-1 in this case?

A    Yes.

Q    What was N-1?

A    N-1 was a wallet with an Oklahoma driver's license of Toby Barrett.

Q    And that was found in that little travel trailer?

A    Yes, sir.

Q    Was there an N-2?

A    Yes, sir, there was.

Q    And what was N-2, sir?

A    It was an address book with miscellaneous papers in it.

Q    And did you seize both N-1 and N-2?

A    Yes, sir.

          MR. LITTLEFIELD:  I would ask that Government

2353

Exhibit Number 181 be provided to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  181.

Q   (By Mr. Littlefield) Do you recognize what Government Exhibit 181 is, sir?

A   Yes, sir.

Q   What is that?

A   It's a non-drug Exhibit N-2.  It's a notebook, address-type item.

Q   And who discovered that?

A   I did.

Q   Is that in fact the notebook that was found in the small travel trailer?

A   Could you repeat the question?

Q   Is that in fact the notebook that was found in that small travel trailer?

A   Yes, sir, it was.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 181.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, based on the previous grounds that was not the Kenneth Barrett -- (Interrupted)

MR. LITTLEFIELD:  Objection, Judge.  I got chewed out for a speaking objection.  I'm going to object to the speaking objection.

2354

THE COURT:  I don't recall anybody -- if you think you've been chewed out by this Court, you haven't -- (Interrupted)

MR. LITTLEFIELD:  Well, okay.

THE COURT:  So don't mistake anything I've said to being chewed out.

MR. LITTLEFIELD:  I didn't, maybe -- (Interrupted)

THE COURT:  Objection sustained.

MR. LITTLEFIELD:  Mine or his?

THE COURT:  Your objection is sustained.

MR. LITTLEFIELD:  And I'd move -- (Interrupted)

THE COURT:  I guess I should say overruled, you may proceed.

Q    (By Mr. Littlefield) Mr. Beal, where is that -- would you hold up Government's Exhibit 181?

THE COURT:  Let's go back and straighten out the record.

MR. LITTLEFIELD:  Okay.

THE COURT:  The objection's overruled.  The exhibit is admitted over the objection of the defense.

MR. LITTLEFIELD:  Thank you, Your Honor.

Q    (By Mr. Littlefield) Is that sealed?

A    Yes, sir, it is.

Q    Do you have a means by which you can open it?

2355

A    Just with a pair of scissors, sharp knife.

MR. LITTLEFIELD:  Your Honor, I do have a knife.  May I approach?

THE COURT:  You may.

Q    (By Mr. Littlefield) And can you go ahead and remove that item?  And what kind of items are in there, sir?

A    Its got telephone numbers, telephone addresses.  Its got yellow sticky pads.  Its got another little phone book.  I think an ink pen in here.  And there is a -- I believe this is a Rolodex, Rolodex in here.

Q    Did you ever look at the names that were contained in the book?

A    Yes, sir.

Q    And were any of those names familiar to you, sir?

A    Yes, sir.

Q    And how were those names that were in that book familiar to you?

A    Prior drug investigations.

Q    I would ask that -- go ahead and close it back up. We'll come back to it in a little bit, so I'd ask that you go ahead and set it aside if you would.  I see it closes up and is zippered up.  Was it closed up and zippered up?

A    Yes, sir.

Q    If you hold up the -- go ahead and insert it.  On

2356

the front of that -- and if you'd hold it up so that it's facing the jury.  How do you all go about recording those exhibits as you seized them, sir?

A    There's a label right here labelled Evidence.  The first line says Case Number.  This would be the case number that DEA would assign to a particular case.  The next line is the exhibit number, which I had N-2.

Q    Okay.

A    And that would in the sequence that it was found.

Q    Right.

A    Acquired By would be actually who found it, who acquired the item.

Q    And what does it show on the acquired by line?

A    My name.

Q    Who filled that out?

A    I did.

Q    Below that what appears?

A    Below that is the location, which says trailer. Below that would be the date which was 9-24-1999.  Sealed By would be the next line, which would be myself, my name.  Then Witnessed By and it says C. Nixon.

Q    Who is C. Nixon?

A    Craig Nixon.  He's a special agent.

Q    And as you found those items and other agents from the DEA found those items, was there one individual who

2357

was responsible for collecting and maintaining those exhibits after they were seized, drug and non-drug exhibits alike?

A    Yes, sir.

Q    And who was that individual?

A    Special Agent Craig Nixon.

Q    And who filled out -- you mentioned on the label it says C. Nixon.  Who wrote that in?  Whose writing is that one?

A    Mr. Nixon's.

Q    Okay.  And do you recognize his writing from having worked with him over a period of time, sir?

A    Yes.

Q    Now, you mentioned sealing that exhibit.  What are you talking about when you say -- you were responsible for sealing that exhibit?

A    Yes, sir.

Q    What do you mean by that?

A    This bag is normally sealed on the bottom where I just cut it open.  That's a seal.  Up here on top, which would be the top where you would insert whatever item that you're going to preserve.  And we have a heat sealer.  There's also a red and white sticker right here that we fill out and we place that on there and then we heat seal it.

2358

Q    Was that done to maintain the integrity of that item, sir?

A    Yes, sir.

Q    In regards to the non-drug exhibits, the ones that aren't sent off to the lab, how are they preserved and protected and their integrity maintained, sir?

A    After we seal them and then we fill out another form which is the 7-A, which is the Non-drug Evidence Regulatory Form.

Q    Okay.

A    Called the DEA 7-A, we fill that out and then we give the evidence and the 7-A together to the non-drug evidence custodian.

Q    That would be Mr. Nixon in this case?

A    No.  In this case -- hold on.  I need to read this. He was the one that we turned it over to.

Q    Okay.

A    I don't recall who would have been the non-drug evidence custodian at the time.

Q    Where are those items kept?

A    They're kept right there at the McAlester resident office.

Q    And in what circumstance or condition are they kept? How are they maintained?

A    They're maintained in a room that's got an alarm,

2359

that's got a code to get in and the non-drug evidence custodian and the supervisor of the office are the only two that can get in there other than an alternate, if one is selected.

Q   What was non-drug Exhibit Number 3, sir?

A   It was a set of scales and it was contained in an audio cassette case.

Q   And where was that found?

A   In the trailer.

MR. LITTLEFIELD:  Would ask that Government Exhibit Number 172 be provided to the witness.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize that, sir?

A   Yes, sir.

Q   And what is that?

A   It's Non-drug Exhibit N-3.

Q   And what's the item?

A   It's a Fuji cassette holder with a set of scales in it.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number --

Q   (By Mr. Littlefield) Is that the scales you found in that cassette case in that trailer?

A   Yes, sir.

MR. LITTLEFIELD:  Move admission of what's been

marked as Government Exhibit 172.

MR. SMITH:  Same objection, Your Honor.

THE COURT:  Overruled.

MR. LITTLEFIELD:  Judge, may I -- I want to ask to approach again.  I'm going to leave it up so that he can open some of the other bags with the knife.

THE COURT:  The clerk may have scissors.

MR. LITTLEFIELD:  If she has scissors, that's fine.

Q   (By Mr. Littlefield) Go ahead and open Government Exhibit Number 172.  And what's -- can you open the second one?  Is it inside that second heat sealed bag or is that just a separate bag?

A   No, sir.  This is the original bag that I sealed it in and it's been opened for trial preparation and it's been resealed back in this bag.

Q   Okay.  And would you display the items, sir?  How do those scales work?

A   It's a set of digital scales, it's a real small set of scales.

Q   Where does it register?

A   It registers right here on the very bottom of it.

Q   Go ahead and put what you got in your left hand down so you can hold it and point to it.

A   Okay.  It registers the read out right here.  It

2361

would be a digital read out.

Q    You have no idea whether -- what the condition of the batteries were in on this day or not, do you?

A    No, sir, I do not.

Q    Was it in working order on the day that you discovered it on September the 24th, 1999, do you recall?

A    No, sir, I do not.

Q    Okay.  The labeling on that item as far as the person who discovered it and who it was turned over to and the location, is that the same as what was in Government Exhibit Number 181?

A    Yes, sir.

Q    And who was it that you turned that item over to for the purpose of maintaining?

A    Special Agent Nixon.

Q    And is it your writing that's on the label, sir?

A    On the original label, yes, sir, it is.

Q    Did you discover any other non-drug exhibits, you personally, in that trailer?

A    No, sir.

Q    Did you discover any what you designated as drug exhibits in that trailer?

A    Yes, sir.

Q    And what number was it given in relation to your all's numerical sequence?

2362

A    I discovered Drug Exhibits 1 through 3.

Q    What was -- let's go to one.  What was Drug Exhibit Number 1?

A    Number 1 was a clear Ziploc baggy containing a residue.

MR. LITTLEFIELD:  And I would ask that what's been marked as Government Exhibit Number 206 be displayed to the witness.  And it's not in evidence.

Q    (By Mr. Littlefield) Mr. Beal, can you see the photograph that's marked Government Exhibit Number 206?

A    Yes, I can, sir.

Q    And do you recognize what that photograph displays, sir?

A    It displays the content and the evidence bag that I submitted.

Q    Which exhibit item, as you all labelled them at the scene, was that?

A    Exhibit Number 1.

Q    Drug Exhibit 1?

A    Yes, sir.

Q    And where was Drug Exhibit 1 found by yourself, sir?

A    In the trailer.

MR. LITTLEFIELD:  I would move admission of what's been marked Government Exhibit Number 206.

THE COURT:  Any objection?

2363

MR. SMITH:  Same objection, Judge.

THE COURT:  Overruled.  It will be admitted.

MR. LITTLEFIELD:  And I would ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) How do you know that's the same exhibit or the same item that was the Drug Exhibit Number 1, sir?

A    On the bottom left hand corner of the bag it's written in black, bold letters.  I think the first letter says trailer.  I can't be sure but that's my handwriting.

Q    Okay.

A    And directly under the word Evidence, it appears that that's my handwriting that wrote the case number on it.

Q    Is that the same writing that you had placed on the non-drug exhibits as well?

A    Yes.

Q    And do you see the actual item, the baggy with residue, that you seized out of the trailer, sir?

A    Yes.  It's below the bag at the bottom of the ruler.

Q    Can you tap it?  If you tap that screen just right where it is, it will -- okay.  How is drug evidence handled in contrast to non-drug evidence?

A    The non -- the drug evidence is packaged in the same

2364

evidence packages that we have.

Q   The heat seal bag?

A   The heat seal bags.

Q   Who heat sealed this?  Do you recall if you did or would it have been Mr. Nixon?

A   I don't recall, sir.  I'd have to read the bag to be a hundred percent sure of who sealed it.

Q   To whom would you have given the baggy with residue that you found?

A   To Mr. Nixon.

Q   And then who is responsible -- you said the drug evidence goes to the South Central Lab in Dallas?

A   Yes, sir.

Q   For what purpose?

A   Analysis.

Q   And who is it that's responsible for submitting the drug exhibits to the lab?

A   It could be the special agent, it could be the task force officer, it could really be anybody that's involved in that case.

Q   In this case do you know who made this -- do you recall who made the submissions of the drug evidence to the lab?

A   Special Agent Nixon.

Q   Okay.  You also mentioned seeing a -- what you

identified as Drug Exhibit Number 2.  What was Drug Exhibit Number 2, sir?

A    A small Ziploc baggy containing residue.

MR. LITTLEFIELD:  And I would ask that what has been marked as Government Exhibit Number 207 be provided to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  And it's not in evidence.

Q    (By Mr. Littlefield)  Do you recognize it, sir?

A    Yes, sir.

Q    What is that?

A    It appears to be the original evidence container with the small baggy.

Q    Well, you say appears to be?

A    Well, it's turned sideways.

Q    We aren't going to be able to turn that screen sideways, but --

A    I recognize my handwriting at the very top where the case number is.  And on the bottom left hand corner I believe it says trailer and then it continues on.  That's my handwriting in black, bold.

Q    And is that in fact Drug Exhibit Number 2?

A    Yes, sir, it.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 207.

2366

THE COURT:  Any objection?

MR. SMITH:  Your Honor, can I have a brief voir dire?

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Sir, this item that you refer to as number two, was that found inside the trailer also?

A    Yes, sir.

MR. SMITH:  Thank you, sir.

MR. LITTLEFIELD:  Same objection, Your Honor.

THE COURT:  Objection overruled.  It will be admitted.

MR. LITTLEFIELD:  I would ask it be displayed. And, Your Honor, I think we have a copy here that if we could use the ELMO for 207, that will display it.

THE COURT:  You may.

MR. LITTLEFIELD:  Not sideways.

Q    (By Mr. Littlefield) And can you take the laser and point to where the item is, sir?

A    Right there.

Q    And where's your name on the evidence label?

A    Best I can see, it should be right in this location.

Q    And who filled out this portion of the writing here?

A    It appears that this is my handwriting, right here,

these top two lines.  And then on the bottom of the bag, right in here in bold black letters is my handwriting.

Q    Do you recognize this right here?

A    That would -- it's really hard for me to see.  I can't really -- even on this -- appears it's Mr. Nixon's signature.

Q    Okay.

A    On the very bottom.  But below that, I don't know whose writing that is on the very bottom.

Q    Okay.  Do you all fill out the lab information on those labels when they're submitted to the lab or is that done at the lab?

A    No.  Are you talking about this section right here?

Q    Yes.

A    No, sir, we do not fill that out.

Q    Do you all fill out the top part?

A    Yes, sir.

          MR. LITTLEFIELD:  We could have the lights back on, Your Honor.

Q    (By Mr. Littlefield) Was ultimately -- are those the only drug exhibits that you found in the trailer on that day, sir?

A    Yes, sir.

Q    By the way, there was a -- what's Drug Exhibit 3?

A    Drug Exhibit 3 is a plastic bottle labeled Pseudo

2368

60s, Max Brand.

Q    Where was that found?

A    In the trailer.

Q    By whom?

A    By me.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 208 be shown to this witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what's been marked as Government Exhibit 208, sir?

A    Yes, sir.  That's Drug Exhibit Number 3, the bottles, just above the ruler and then the lab submittal evidence container with the red seal on it.  My handwriting is on bottom left hand corner.

Q    Is that in fact the Drug Exhibit 3 that you seized inside that trailer that we saw on Government Exhibit 69?

A    Yes, sir, it is.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 208, Your Honor.

THE COURT:  Objection?

MR. SMITH:  Same objection, Your Honor.

THE COURT:  Admitted over the objection.

MR. LITTLEFIELD:  Could we display it?

THE COURT:  You may.

Q    (By Mr. Littlefield) Now, you said Drug Exhibit 3

2369

was a bottle labelled Pseudo 60s, Max Brand?

A    Yes, sir.

Q    Can you tap the screen to identify where that item is?  And why would Pseudo 60s Max Brand be a, quote, drug exhibit?

A    To find out if it's pseudoephedrine.

Q    Okay.  Well, what's pseudoephedrine got to do with anything in your experience, sir?

A    It's a precursor chemical in the manufacture of methamphetamine.

Q    What's precursor chemical mean, sir?

A    It's one of many chemicals and items that is used in the manufacture of methamphetamine.

Q    And do you observe your name on the label?  And can you -- go ahead and if you'd -- rather than tap it and clutter it up, can you use the laser pointer and display for the jury where your name is, sir?

A    My name would be in this block right here.

Q    You mentioned also filling out stuff on the -- writing stuff on the heat sealed envelope.  Where is that, sir?

A    The original bag, I believe that's going to be the top of the seal there when they cut it open.  But that's it right there.

Q    What is this right in here, sir, as much as you can

2370

read of it?  And I realize that it doesn't all display with the writing, but --

A    The first word says trailer and it's in -- we used a black Sharpie, and that's what I used to write on the bag where I found it.

Q    Did you have occasion to go back to -- and I asked you to keep Non-Drug Exhibit N-2, which is Government Exhibit 181 out in front of you.  Did you have occasion to go back and examine that on a later date, sir?

A    Yes, sir.

Q    And when was that?

A    My memory serves me correct, it was October 6th, 2003.

Q    And where was it located when you did the reexamination?

A    At the McAlester resident office in McAlester, Oklahoma.

Q    Okay.  You mentioned a drug room where all of the security and alarms and the code was located.  Where was it located in relation to that room?

A    It was inside the room.

Q    And how was it retrieved?

A    Special Agent Joe Bays at that time was the non-drug evidence custodian.

Q    Uh huh.

A     And I asked him to retrieve it, which he did.

Q     And when he retrieved it, was the heat seal still intact?

A     Yes, sir.

Q     When you examined it, did you notice anything about it?

A     Yes, sir, I did.

Q     What did you notice?

A     During examination or the copying of the contents of the book, a small, about three and a half -- three inches, three and a quarter inch long red and white straw had fallen out of the -- one of the pockets that were in here.

Q     And where was it in relation to the envelope, the notebook and all when you observed it?

A     The straw?

Q     Yes.

A     It was inside this notebook.

Q     When you observed the straw did you discern anything about it that caused you to take further action?

A     Well, when it fell out I obviously picked it up and it was a small, you know, flaky substance that was coming from inside the straw that had fallen on my desk.

Q     When you observed that, sir, what did you do?

A     I retrieved a field test kit for methamphetamine and

2372

I scraped the residue that'd fallen out of the straw into the field test and performed the field test on it.

Q    What result did the field test give you?

A    It gave a positive reaction for methamphetamine, the presence of methamphetamine.

Q    As a consequence of seeing the flaky powder in the straw and receiving a positive field test for methamphetamine, what if anything did you do with the straw, sir?

A    I processed that exhibit as Drug Exhibit 13 and forwarded it to the South Central Laboratory for the analysis.

MR. LITTLEFIELD:  I would ask that what has been marked as Government Exhibit Number 80 be displayed to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  And it's not in evidence.

Q    (By Mr. Littlefield) Mr. Beal, when you submit -- make one of these submittals, what do you as the submitting agent fill out on these submittal sheets?

A    We fill out everything except for the -- when it was received and the analysis and who -- (Interrupted)

Q    Which portion of the paper?  Top, bottom, sideways, what?

A    I would say the top half of the form.

2373

Q   And this top half of Government Exhibit Number 80, who filled that out, sir?

A   I did.

Q   Do you recognize it, sir?

A   Yes, sir.

MR. LITTLEFIELD:  Move admission of what's been marked Government Exhibit 80.

Right now I'll just withdraw it, Judge.  I'll hold off on doing that.  I'll hold off on doing that.

THE COURT:  You're withdrawing?

MR. LITTLEFIELD:  Yes, Your Honor, I am withdrawing.

I would ask that what's been marked as Government Exhibit Number 218 be displayed to the witness.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize that, sir?

A   Yes, sir.

Q   What is that?

A   It's the original evidence -- sealed evidence bag that I put the straw in and sent it to the laboratory down in Dallas.

Q   Is that in fact the straw and the item that you submitted it in?

A   Yes.

2374

Q    Do you recognize your writing?

A    Yes, sir, I do.

Q    Who filled that envelope out or the label that's out -- or the label that's on the envelope out?  Who filled that out?

A    I did.

Q    And do you see the straw in there that was submitted?

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 218.

THE COURT:  Any objection?

MR. SMITH:  Same objection, Your Honor.

THE COURT:  Admitted over objection.

MR. LITTLEFIELD:  I would ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And where -- which portion of the evidence label did you fill out, sir?

A    Just below where it says evidence in this general area right here.

Q    And where is the straw?

A    Right there.

MR. LITTLEFIELD:  Okay.  I'm through displaying that.  Back to Government Exhibit Number 69, please.

2375

Q    (By Mr. Littlefield)  In regards to the trailer, was there anyone else who assisted or who also was involved in searching in that travel trailer?

A    Yes, sir.

Q    Who?

A    Special Agent Kevin Wilson who was the supervisor on site.

Q    And the supervisor from DEA assisted in conducting the search at this location?

A    Yes, sir.

Q    After the trailer here, you mentioned a dumpster?

A    Yes, sir.

Q    And where was that located?

A    Just in front of the trailer, right in this general area right here.

Q    Was that dumpster photographed?

A    Yes, sir, it was.

        MR. LITTLEFIELD:  I'd ask that what's been marked as Government Exhibit 60 be displayed.

        THE COURT:  You may.

        MR. LITTLEFIELD:  It's not in evidence.

Q    (By Mr. Littlefield) Do you recognize what's displayed in that photograph, sir?

A    Some paper towels.

Q    I mean, what is the whole item?

A    It's a portable trash dumpster, green in color, with an aluminum handle.

Q    Is that the dumpster that you all searched out at the scene?

A    Yes, sir.

MR. LITTLEFIELD:  Move Government Exhibit Number 60.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) You said you see some paper towels.  Where are you talking about, sir?

A    Right here.

Q    What, if anything, struck you about those paper towels?

A    The reddish color.

Q    And why did that have any significance to you, sir?

A    During the manufacture process of methamphetamine there are paper towels, coffee filters are used and when they filter some of the product out, there is red phosphorous and red phosphorous is reddish in nature and it tends to stain the filters.

Q    You mentioned pseudoephedrine a while ago as being

2377

part of the -- one of the precursor items that's used to manufacture meth?

A    Yes, sir.

Q    What if any involvement does red phosphorous have in manufacturing methamphetamine?

A    It's part of the process.

Q    Is there any other item that's used that causes staining that is part of the manufacturing process that you've become familiar with, sir?

A    Iodine crystals, iodine.

Q    What was done with the paper towels, sir?

A    They were seized by me and packaged and labeled and they were turned over to Mr. Nixon for analysis to be forwarded.

Q    You talked about drug exhibit numbers.  Were the paper towels given a drug exhibit Number, sir?

A    Yeah, DEA Drug Exhibit Number 4.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 209 be displayed to the witness.

        THE COURT:  You may.

Q    (By Mr. Littlefield) And do you recognize what's displayed to you there as Government Exhibit Number 209?

A    Yes, sir.

Q    What is that?

A    It's the paper towels that have a reddish color to

them, the original bag that was --

Q    I didn't do that.

A    I didn't either.  Anyway, it was the original container that it was shipped to the lab in --

Q    And what drug exhibit number -- you said you assigned Drug Exhibit Number 4 to that item?

A    Yes, sir.

Q    What drug exhibit number is that?  Is that you're looking at now?

A    The one I'm looking at right now is Drug Exhibit 4.

Q    And those are the paper towels?

A    Yes, sir, they are.

Q    Do you recognize your writing on the heat sealed envelope or the label?

A    Yes, sir, I recognize my -- on the bottom on the black and on the label itself.

        MR. LITTLEFIELD:  Move admission of Government Exhibit Number 209.

        THE COURT:  Any objection?

        MR. SMITH:  Your Honor, I object.  Nothing has been established that Mr. Barrett had dominion and control over that dumpster.  It's clearly a common area.

        THE COURT:  Objection overruled.  Be admitted.

        MR. LITTLEFIELD:  I would ask that it be displayed.

2379

THE COURT:  You may.

Q    (By Mr. Littlefield) On the heat sealed envelope, does it identify where those items were found, sir?

A    Yes, sir.

Q    And what's does it say?

A    Two different locations.  One location would be right about here and the other location that is in my handwriting right there.

Q    And on the label where it identifies location, do you recognize whose writing that is on the label?

A    That would be mine.

Q    And what individual did you turn these items over to, sir?

A    Special Agent Craig Nixon.

Q    Did Mr. Nixon collect all the evidence out here at the scene?

A    Yes.

Q    Where are the paper towels?  In that -- can you show where the paper towels are, sir?

A    Right here.

MR. LITTLEFIELD:  Finished with that and I would ask that Government Exhibit Number 61 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) When you were searching the

2380

dumpster were any items moved as you performed the search, sir?

A    Yes, sir.

Q    And how were you moving those items?  And first off, what were you doing to move them?

A    We had on a pair of gloves, plastic gloves, surgical gloves, and we were just moving them with our hand.

Q    When you do a drug search, do you leave everything in place or do you move items?

A    We move items.

Q    Why?

A    Because, you know, a small amount of drugs can be hid just about anywhere.

Q    Do you recognize what's shown in Government Exhibit 61?

A    Yes, sir.

Q    And what is that?

A    It's a photograph of the trash bin with some items moved.

Q    With some what?

A    With some of the items that had been moved.

Q    And is that in fact the dumpster that was being searched by the DEA agents on September the 24th of '99?

A    Yes, sir.

          MR. LITTLEFIELD:  Move admission of Government

Exhibit 61.

THE COURT:  Any objection?

MR. SMITH:  Same objection, Judge.  No dominion and control.

THE COURT:  Admitted over the objection of the Defendant.

MR. LITTLEFIELD:  Your Honor, I ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) Mr. Beal, what is this right here?

A    Looks like a hand with a finger pointing to an item that's gloved.

Q    And other than the paper towels, were any items seized out of this dumpster?  And I direct your attention to Drug Exhibit Number 5.

A    Yes.  A clear Ziploc baggy containing a residue.

Q    And would you now look to Government Exhibit Number 210, sir?  And it's not in evidence.  Do you recognize Government Exhibit Number 210?

A    Yes, sir.

Q    What is that?

A    It's a picture of a plastic baggy with a reddish residue.  Its got my handwriting on it under the word evidence where it was found.

2382

Q    Drug exhibit what or exhibit number what?

A    It would be Drug Exhibit Number 5.

Q    Is that in fact the baggy with residue that was pulled out of the dumpster that was identified as Drug Exhibit Number 5 at the Barrett residence?

A    Yes, sir, it is.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 210.

THE COURT:  Any objection?

MR. SMITH:  Same objection, Your Honor.

THE COURT:  Admitted over objection.

MR. LITTLEFIELD:  I would ask it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) Can you see where you identified the location where this was seized on the exhibit, sir, and can you use the laser and point to it?

A    Location -- the location would be right in here and also written in black bold letters right there.

Q    And does it show the -- who found the item and submitted it and sealed the item?

A    Yes, sir, it does.

Q    And where does it -- who does it say found it?

A    I found it, but I can't read what it says, sir.  I can see Mr. Nixon's name.  Yeah, I can make it out now. Says Mr. Nixon -- was witnessed by Mr. Nixon, sealed by

2383

myself and found by me.

Q    Can you use the laser again and identify where Mr. Nixon's name shown?

A    Mr. Nixon's name would be right here.  Mine would be above it.  Then my name again right up above here.

Q    And the numbers that were assigned to the exhibit, the case number, where is that?

A    Case number is right there and the exhibit number is right below it.

Q    That's where the number five appears?

A    Yes, sir.

Q    Where is the trash or the baggy that had the residue in it, sir?

A    This baggy right here.

Q    Were there any other drug exhibits found in that dumpster that you recall?

A    Yes.  Drug Exhibit Number 6.

Q    I would ask that you look to Government Exhibit Number 62 and it's not in evidence yet.  Do you recognize Government Exhibit Number 62, sir?

A    Yes, sir.

Q    And what is that?

A    It's another photograph of the same trash bin.

Q    You mentioned Drug Exhibit Number 6.  Do you observe it in that photograph?

2384

A    Yes, sir.  It's a white plastic bottle with a red label on it.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 62, Your Honor.

THE COURT:  Objection?

MR. SMITH:  Same objection, Your Honor.

THE COURT:  Admitted over objection.

MR. LITTLEFIELD:  Ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And the bottle to which you were referring, sir?

A    This bottle right here.

Q    Do you remember that bottle?

A    Yes, sir.

Q    What kind of bottle was it?  What was it?

A    It's a plastic bottle labeled Durex Iodine Crystals and Multiple Vitamins.

Q    And the bottle said crystals and multiple vitamins?

A    Yes, sir.

Q    What was done with that after it was seized?

A    It was packaged and labeled and forwarded to the South Central Laboratory in Dallas, Texas for analysis.

MR. LITTLEFIELD:  I would ask that Government Exhibit 211 be displayed to the witness.

THE COURT:  You may.

2385

Q    (By Mr. Littlefield) By the way, are you familiar with what happens to packages that contain iodine crystals over an extended period of time, sir?

A    The iodine crystals will seep through the original container sometimes and contaminate the inside of the bag and it's pretty tough if you open it up and smell of it.

Q    Pretty nasty?

A    Yes, sir.

Q    Do you see Government Exhibit Number 211?

A    Yes, sir.

Q    Do you recognize what that is, sir?

A    Yes, sir, I do.

Q    What is it?

A    It's the evidence bag that is now turned a brownish, reddish color.  It's got a label filled out and then the plastic bottle that is sitting here beside of it is the original bottle that was pulled from the trash can.

Q    Okay.  Is that in fact Drug Exhibit Number 6?

A    Yes, sir, it is.

        MR. LITTLEFIELD:  Move admission of Government Exhibit Number 211.

        THE COURT:  Any objection?

        MR. SMITH:  Same objection, Your Honor.

        THE COURT:  Admitted over objection.

Q    (By Mr. Littlefield) Which one's the iodine crystal

2386

bottle, can you tell?

A    The bottle right here.

Q    Do you know what that bottle next to it is?

A    I believe that the iodine crystal bottle was probably placed inside here for shipping.

Q    What do you do go multiple vitamins, Mr. Beal?

A    Normally, you would take them.

Q    Internally?

A    Yeah, you would ingest them.

Q    Would you take iodine crystals internally?

A    No.

Q    Do you think they would be packaged together in one container or do you think there might have been two bottles in there?

A    There very well could have been two bottles inside that.

Q    Do you recognize the writing on the evidence seal, sir?

A    Yes, sir.

Q    And whose writing is it?

A    The top portion is mine.

Q    And was the package that kind of brownish, yellowish color when you placed the iodine crystals stuff in there when you initially submitted it to the lab, sir?

A    No, sir.

Q    We've seen the other plastic bags and they appear to be clear, kind of like that one when it's heat sealed. What did that look like when you first put the bottles in there for submission?

A    They were clear also.

Q    Was that all that was found in the dumpster, sir?

A    Yes, sir.

Q    Now, you mentioned awhile ago that when you search for drugs because they can be in small containers that stuff has to be moved around?

A    Yes, sir.

Q    Was anything else searched at the scene?  Any other areas searched?

A    Yes.  The shed or garage, out building, workshop was searched.  The residence was searched.

Q    Okay.

A    After it was released to us from OSBI.

MR. LITTLEFIELD:  Can we go back to 69, Government Exhibit 69?

Q    (By Mr. Littlefield)  And I'm going to use the laser, Mr. Beal, up here to point it.

A    Okay.

Q    This area here was the first area that was released by the OSBI?

A    Yes, sir.

2388

Q     And that's the first area you searched?

A     Yes, sir.

Q     And then what was the next area that you all went to?

A     Inside of the workshop area in this location on this side.

Q     Did you personally discover any items inside of that which you were responsible for seizing?

A     Some non-drug evidence, yes, sir.

Q     What non-drug evidence did you seize, Mr. Beal?

A     I seized Non-drug Exhibits N-5, N-6 and N-7.

Q     Were those relevant to the manufacture of methamphetamine?

A     Not in my opinion, no.

Q     Did you observe anyone else seize any exhibits or any items that appeared to be related to the manufacture of methamphetamine inside that storage building?  Either seized by others or observed by yourself?

A     Seized by others, yes.

Q     What did you observe that was seized by others, sir?

A     Special Agent Nixon, I believe, seized some plastic tubing.

Q     Did you observe that plastic tubing?

A     Yes, sir, I did.

          MR. LITTLEFIELD:  I would ask that Government

2389

Exhibit Number 63 be displayed and it's not in evidence yet.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what's displayed in Government Exhibit Number 63, sir?

A    Yes, sir.

Q    And is that in the condition it was when it was discovered in that garage?

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of Government Exhibit 63.

THE COURT:  Objection?

MR. SMITH:  Brief voir dire, Your Honor?

THE COURT:  You may.

FURTHER VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Sir, you can look at that exhibit as it's displayed to you.

A    Yes, sir.

Q    Those items, whenever you saw them, were not laying on top of that box were they?

A    No, sir.  The box was opened and there was tubing inside that box.

Q    So whenever you say that that's the condition that they were in, they weren't in that location, were they?

A    No.   These were laid up on top of the box.

Q    And then the photo was taken?

A    Yes, sir.

Q    This was in the garage area; is that true?

A    Yes, sir, in that workshop area.

         MR. SMITH:   Thank you, sir.   No objection, Your Honor.

         THE COURT:   Admitted without objection.

Q    (By Mr. Littlefield) What do you have there?   What are we seeing on top of that box, sir?

A    Two pieces of tubing and then I can't tell if the black item is a piece of tubing or not by the lighting.

Q    Mr. Smith asked you about finding that tubing. Where was that originally located, sir?

A    Inside this box.

Q    Let's go to what's been marked as Government Exhibit 63 and it's not in evidence yet.   I'm sorry, 64.   I apologize.   Do you recognize what's shown in Government Exhibit 64?

A    Yes, sir.

Q    What is it?

A    It's the same case in the prior photograph that's now open.

Q    And is that the condition it was in when you first opened it?

A    I didn't open it, sir.  Special Agent Nixon found it.

Q    Were you present when it was opened?

A    I don't recall whether I was standing right there when he found out and when he opened it.

MR. LITTLEFIELD:  Let's go back then to 63. I'm not going to move admission of this at this point.  I would ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) What's the significance of these two tubes and why are they shown out in this fashion on this box, sir?

A    During one of the processes of the manufacture of methamphetamine, a tube is used and placed in a -- it could be a one liter plastic bottle or a glass jar or a container and used as an HCL generator, a gas generator.

Q    When you say HCL generator, what are you talking about?

A    Hydrochloric gas.

Q    And when is the gas generator, HCL gas generator, process applied?  What do you do -- when you're doing that, if you're a meth cook and you're using tubes like this to generate gas in your meth, when -- where are you in cooking this stuff, do you recall?

A    I would say on the far end of the manufacturing.

2392

Towards the completion of it.

Q    Have you ever heard of the term gassing?

A    Yes, sir.

Q    What is it?

A    It's when they've applied the gas to the meth to -- it's been a long time and I've forgotten a lot of it.

Q    Okay.  What's this tape for?

A    That plastic hose would be stuck down into the neck of the bottle and then the tape would around -- placed around the tube and the neck of the container to keep the gas from escaping only through the tube.

Q    And if somebody previously talked about this as a gassing tube, does that -- in your experience, what that gassing tube looked like?

A    Yes, sir.

Q    Were there any chemicals that you were familiar with that are utilized in the manufacturing process located in that garage?

A    Yes, sir.

        MR. LITTLEFIELD:  I'd ask Government Exhibit 65 be displayed and it is in evidence.

        THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize that photograph, sir?

A    Yes, sir.

2393

Q    Where was that photograph -- where were those items located when that photo was taken?

A    Located in the workshop area.

Q    And what we've identified in Government Exhibit 69?

A    Yes, sir.

Q    And this toluene, is it something that can be used in the manufacture of meth?

A    Yes, sir.

Q    Paint thinner, can it be used in the manufacture of meth?

A    Yes, sir.

Q    Mineral spirits?

A    Yes, sir.

Q    What about Coleman fuel?

A    Yes, sir.

Q    Was there anything else interesting in that storage building?

A    Yes, sir.

Q    What?

A    A rattlesnake in a glass fish tank.

Q    When you cook meth, you mentioned containers in relation to the gassing process.  A liter, two liter bottles and other items?

A    Yes, sir.

Q    Did you observe any containers that could have been

2394

used for cooking meth on the premises?

A    I don't remember, sir.

MR. LITTLEFIELD:  I would ask that Government Exhibit 66 be displayed to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  It's not in evidence yet or at least I don't have it marked as such.

Q    (By Mr. Littlefield) Do you recognize that item that's shown in Government Exhibit 66?

A    It appears to be a galvanized trough of some kind with plastic and glass containers in it, jars.

Q    Do you recollect that, sir?

A    No, sir, I don't.

Q    After you all searched around the storage area, where did you next search?

A    The next part of the search was conducted in the residence itself after OSBI had released the crime scene to us.

Q    Was that done immediately after the completion of the search of the storage building?

A    No, sir.

Q    How long did you all wait after concluding the search of the storage building prior to going into the residence?

A    This was probably four, five, six o'clock, somewhere

2395

in that timeframe.  I know it was getting dark on us.

Q    Before you got into the residence?

A    Yes.

Q    And how much, previous to that, was it that you finished the store room?  How long a gap of time did you have?

A    It was daylight.  I mean, it was, you know, that afternoon, but it was daylight.

Q    So would it have been hours or more?

A    Yes.  It was hours, yes.

Q    And in the interim while you all waited for the OSBI to complete their investigation of the residence, what did you all do?

A    Just sat around and watched and offered our assistance in any way that we could.

Q    Were you all inside the crime scene area that had not yet been completed by the OSBI?

A    No, sir, we were not.

Q    In regards to moving items around -- by the way, let me back up on that.  When cooks -- when the first part of the meth manufacturing process is being done, what kind of items are necessary?  Not the ingredient, but what kind of utensils or containers or glassware or whatever is necessary to do the manufacturing process?

A    Plastic containers, I've seen Mason jars, pots and

2396

pans, beakers, flasks.

Q    Does it have to be expensive chemical equipment one would purchase in a chemical lab?

A    No, sir.

Q    Big old pickle jar work?

A    Pickle jar, Mason jar, any thing that would hold the liquid that wouldn't eat through it or, you know, break or rust or melt.

Q    And is it necessary to have a heat source?

A    In some processes of the manufacture, yes.

Q    What kind of heat sources have you seen?

A    I've seen open campfires, I've seen small single burners, Coleman camp stoves.  Like if you go out camping, camp stoves, electric heaters, burners, electric frying pan.

Q    Use a hot plate?

A    I mean, a hot plate, a small electric hot plate.

Q    Okay.  Did you actually discover any items within the residence when you finally got to it?

A    No, sir, I don't believe I did.

Q    Were you there and participating in the search of the residence?

A    Yes.

Q    When you searched, you mentioned moving items to look for stuff.  Were items moved in that residence?

2397

A    Yes, sir.

Q    And were items moved in the kitchen area of the residence?

A    Yes.

MR. LITTLEFIELD:  Ask that Government Exhibit Number 51 be displayed to the witness.

THE COURT:  You may.  It has not been admitted, is that correct?

MR. LITTLEFIELD:  It is in evidence.

THE COURT:  It is admitted?

MR. LITTLEFIELD:  Yes, sir.

Q    (By Mr. Littlefield) See all that stuff on the counter?

A    Yes, sir.

Q    Do you now how it got there?

A    It was probably removed from where it was at and placed on top of the counter.

Q    See aluminum foil in there?  Could aluminum foil be used in the manufacturing process?

A    Yes, sir.

Q    How?

A    It's part of the reaction in part of the manufacture.

Q    Okay.  See down here, salt, table salt.  Can you use table salt in part of the stages?

2398

A   Yes.   It's used in probably the HCL generator gassing process.

Q   I'm not sure if this is a paper towel or not.   Can paper towels be used?

A   Yes, sir.

MR. LITTLEFIELD:  And I would ask that 52 be displayed.  It's in evidence.

THE COURT:  You may.

Q   (By Mr. Littlefield)  During the manufacturing, do you have to use -- you mentioned paper towels, and in fact, I think you submitted paper towels.  Were paper towels found at that scene?

A   Yes, sir.

Q   Tap them.  You mentioned coffee filters, coffee filters at the scene.  You need to answer on the record, too.

A   Yes, sir, I'm sorry.  There is coffee filters and paper towels in this photograph.

Q   Were you present when drug items were found inside the residence, sir?

A   Yes, sir.

Q   Were they open and just sitting out or were they secreted in locations which required you all to move items in the search?

A   I believe they were secreted and hidden and items

2399

had to be moved to find them.

Q   About what time was it, Mr. Beal, you all finished up the search?

A   It was later that evening.  It was dark when we left and headed back towards the office.

Q   Which would have put it seven, eight o'clock or later on the night of the 24th?

A   Yes, sir.

MR. LITTLEFIELD:  May I have just a second Judge?

THE COURT:  You may.

Q   (By Mr. Littlefield) The scales, the little scales in the cassette case?

A   Yes, sir.

Q   How are scales -- why was scales seized as a non-drug exhibit, sir?

A   Based upon my experience in narcotics investigations, scales are used to weigh out the finished product and sold by, you know, different weights.  So they want to weigh them out, package them and get them ready for distribution.

Q   When somebody is distributing methamphetamine, is it always the same quantity that's distributed?

A   No, sir.

Q   And what quantities are typically -- in your

2400

experience, what quantities are typically distributed? Distribution of quantities?

A   Street level can be grams, it can be eighth ounces, quarter ounces and then moving on up.

Q   And in order to determine the various sizes, can you eyeball a gram versus an eighth of an ounce?

A   I can't.

Q   Do you know what the price of an eight ball was back in '99?

A   Anywhere between 250 to $325.

Q   What is an eight ball?

A   It's an eighth of an ounce.

Q   Grams?  What do grams go for?

A   Typically anywhere from 90 to $125.

Q   And you said quarter, what's a quarter paper?

A   Quarter paper is a quarter of a gram.

Q   How much would a quarter paper sell for?

A   Oh, anywhere from 20 to $30.

Q   In your experience in regards to the distribution of methamphetamine, when you weigh that stuff out, what is it packaged in?

A   Small plastic baggies.  I've seen it also in small vials.  But generally small plastic baggies.

Q   Were there plastic baggies available at the Barrett residence?

2401

A    Right now, sir, I don't remember.

Q    You didn't seize any plastic baggies?

A    No, sir, I did not.

Q    The rattlesnake is kind of interesting.  It's not against the law to possess a rattlesnake, is it?

A    No, sir.

Q    Just wasn't your favorite thing to find?

A    Well, it found me.  I didn't find it.

Q    You mentioned what you carried when you were a police officer?

A    Yes, sir.

Q    As a deputy on patrol, what kind of firearms did you carry?

A    High powered rifles, carried M-16s, AR-15s, mini-14s, sidearms.

Q    In regards to execution of search warrants, are you still a task officer, sir?

A    No, sir, I haven't worked since December the 29th.

Q    Of what year?

A    2004.

Q    And why is that?  I mean, did you get in trouble or what was the deal?

A    I had two neck surgeries, one in December and then one in July.  I've been off on work leave, I mean, injury leave.  I'm sorry.

2402

Q    When you were working as a task force officer, were you involved in the execution of search warrants on residences where clan labs were purportedly located?

A    Yes, sir.

Q    And did you ever perform any of these searches done under the cover of darkness?

A    Yes, sir.

Q    What kind of armaments would you all take in relation to the performance of these kind of search warrants?

A    We would have our sidearms.  We would have M-16s, which is .223 calibers.  We would have 9 millimeter sub-guns.  We would have 12 gauge pump action shotguns.

Q    Did you ever have flash bangs available?

A    Yes, sir, we did.

Q    Is it unusual to take this kind of firepower into a location that is a suspected meth lab?

A    No, sir.

Q    Why not?

A    You never know what you're going to resist, what you're going to find.

Q    Did you always carry each and every firearm that you had available to you in the vehicle on your person when you performed the searches?

A    Can you state that question again?

2403

Q    For example, if you had a rifle, a mini-submachine gun, a shotgun and a pistol, when you executed a search and all of those were available to you, did you carry all of those weapons on your person as you made the entry?

A    No, sir.

Q    What would determine what type of firearm you were carrying on the entry?

A    Location, how many people were involved in the actual entry team, who was qualified with what weapon, our intelligence of what may be inside the house, if there may be adults or small children.  Just the general intelligence would dictate to us what we needed to probably take with us.

Q    What impact would your assignment in the planned entry have in the type of weapon that you might carry? For example, if you were part of the entry team that was going in, would that change the type of weapon you might be carrying as opposed to if you had security assignment on a location outside of the residence?

A    Sometimes it would, yes, sir.

Q    And how would it do that?

A    If you were going to be a security individual a hundred, two hundred, three hundred yards out, you may possess an M-16 or a long range rifle.  If you were going to be on the entry team, you might possess a sub-gun or

2404

even the shotgun or a rifle, which we would call the M-16.

Q    And if the -- you saw this residence?

A    Yes, sir.

Q    And would you call it palatial or quite closed-in quarters?

A    It's very small.

Q    Would that impact the type of weapon you were an officer involved in the entry would have carried inside?

A    I would carry one of three, yes.

Q    What would you have carried?

A    I would either carry a sawed-off shotgun, 12 gauge pump. I would have carried either a 9 millimeter sub-gun which is a small or a smaller carbine, M-16 .223 caliber.

Q    Would you consider making entry with a pistol?

A    Yes, sir.

Q    Aren't going to need a long range shot from there, are you, inside of that -- making that entry?

A    No, sir.

MR. LITTLEFIELD:  May I have just a second, Judge?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness, Your Honor.

THE COURT:  Members of the jury, we'll take the morning recess. Remember my admonition not to discuss

2405

this among yourselves or allow anyone to discuss it with you. We'll be in recess about 20 minutes. Ask everyone to please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT: Mr. Beal, you may step down also. Record should reflect the jury has departed the courtroom. Witnesses also departed the courtroom. Anything to take up outside the hearing of the jury for the Government?

MR. LITTLEFIELD: No, Your Honor.

THE COURT: Defense?

MR. SMITH: No, Your Honor.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT: Let the record reflect the jury's in the box, counsel for the Government is present, Defendant is present with counsel. You may --
(Interrupted)

MR. LITTLEFIELD: May I reopen just a couple questions, Your Honor?

THE COURT: Just a couple?

MR. LITTLEFIELD: Well, maybe three.

THE COURT: Okay. I'm suspicious of you lawyers who say -- I know the jury is by now -- when you

2406

say just a couple. You may proceed.

MR. LITTLEFIELD: Thank you, Judge.

Q (By Mr. Littlefield) Have you ever been shot when performing an entry in a search warrant?

A Yes.

Q Where? Where were you when you got shot?

A You mean the location?

Q Yes, sir.

A In Oklahoma City.

Q And describe what happened when you go shot.

MR. SMITH: Your Honor, I don't really understand the relevance.

THE COURT: Counsel?

MR. LITTLEFIELD: Establishes the dangerousness of these kind of situations in relation to the armament.

MR. SMITH: Judge, I think we can understand the dangerousness just by the nature of the activity.

THE COURT: Sustained.

MR. LITTLEFIELD: That's a couple.

THE COURT: You may cross-examination.

MR. SMITH: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q Mr. Beal, good morning and it's good to see you again.

2407

A     How are you doing, sir?

Q     Doing fine, thank you.  I want to kind of go through the same order I think that the Government did and maybe this will kind of make sense in our examination, okay?

A     Okay.

Q     And one of them was talking about the scene control. And I want to put up, if I can, Government's Exhibit Number 69 -- (Interrupted)

THE COURT:  You may.

Q     (By Mr. Smith) -- and ask you about some of the crime scene tape that was displayed out there.  And while that's coming up, did you ever see that crime scene expanded?

A     No, sir.  I don't recall.

Q     And by way of definition, if we say crime scene just as a way to refer to an area such as this, correct?

A     Yes, sir.

Q     I mean, you're not substituting nor am I our judgment as to whether or not there's even a crime committed?

A     That's correct.

Q     Now, you said initially when you were there that you had stayed out on the county road because they didn't want people inside the scene, is that right?

A     That's correct, sir.

2408

Q    Do you ever remember there being any crime scene tape in the area around this gate?

A    No, sir, I don't.

Q    Do you ever remember this crime scene tape being added later?

A    No, sir, I don't.

Q    Or this tape that comes alongside the residence?

A    No, sir.  I don't know when it was put there.

Q    Do you know how far this extends?  I can't tell where it ends because of that tree.  Do you know?  Do you recall?

A    Best I can tell you from the photograph, it goes right there to that tree.  Now, if it goes any further, I can't tell you.  I don't know.

Q    And is this the trash container that you were speaking of earlier or is this another trash container?

A    The trash container I believe I'm speaking about, sir, is located right in this area.

Q    Okay.  Do we know what's just to the north of that? What I'm showing that, can you tell?

A    No, sir, I can't tell.

Q    But you believe there was more than one container out there?

A    I just remember the one, the one that I took the evidence from.  I don't recall any other.  There could

have been, but I don't recall.

Q   Would you agree that that's what that appears to be also?

A   It looks like it, yes.

Q   And do you know who used those?

A   No, sir.

Q   Do you notice this was a separate residence?

A   Yes, sir.

Q   And did it appear that somebody was living in this trailer?  Let me ask it this way.  Did you find items consistent with a person staying in that trailer?

A   Yes, sir, I did.

Q   And this was a very small residence?

A   Yes, sir, very small.

Q   So we can't say really who used any of the trash containers out there, but you didn't find any other containers around this residence, did you?

A   I didn't even go over there, sir.

Q   So we don't know if they had a separate container or if this is where all the containers were, right?

A   That's true.

Q   I want to talk about that sign just a second.  When you were reading the wording on the sign that was on the gate, I noticed you had a hard time reading some of that?

A   Yes, sir.

2410

Q    It was kind of faded, wasn't it?

A    It is now, yes.

Q    Does it appear to be the same way now that it was back in 1999?

A    It appears to be the same consistency.  Now whether the lettering has faded, I couldn't tell you.  But I do remember it.

Q    And you wouldn't expect it to be preserved since it's been in plastic, wouldn't you?

A    Would expect it to, yes.

Q    I mean, you'd expect fading to happen because of the sunshine and the weather and the elements, that sort of thing.  But probably not if it's protected inside plastic, right?

A    That's correct.

Q    Okay, sir.  Were you ever responsible or any individuals with your agency for creating any additional crime scene area?

A    Repeat that again.

Q    Did you stay within the areas that were defined by previous law enforcement personnel or did your agency or anybody working with you extend the crime scene area?

A    No, sir, I don't remember that at all.

Q    So you accepted things the way that somebody else had defined them?

2411

A    Yes, sir.

Q    Now, we talked about sometimes you have to move items, correct?

A    That's correct.

Q    And the reason is because they may be small?

A    Correct.

Q    May be obscured, they may be hidden?

A    Correct.

Q    So in order to display them for purposes of photography and to depict later such as at a trial, we might want to put them out and display them, right?

A    That's correct.

Q    I want to show you what was previously marked --

MR. SMITH:  And I believe it is introduced, Your Honor, Defendant's 211.  If I can retrieve my evidence sheet, Judge?

THE COURT:  You may.

MR. SMITH:  Thank you.  I do show it's in evidence, Your Honor.

Q    (By Mr. Smith) Can you make out what that is, sir? And I'll help you a little bit.  I'm sorry.  See this? Doesn't that appear to be a range hood?

A    Yes, sir.

Q    And this appears to be some sort of a canister?

A    Yes.

2412

Q    I know it's kind of light in here, but any reason to believe this isn't the kitchen counter inside the Barrett residence?

A    No, sir.

Q    Now, the Government showed you a picture that was -- let me find the exhibit here real quick.  51 and 52, I believe.

MR. SMITH:  I'm going to show those. Government's 51 and 52 and they're in evidence.

THE COURT:  You may.

Q    (By Mr. Smith) And while she's bringing that up, let me ask you this question.  Something that I meant to ask you just a moment ago.  You got there a little after 2:00 o'clock in the morning?

A    I would say between 1:30 and two.

Q    Was Kenny Barrett still at the residence?

A    No, sir.

Q    He'd already been gone?

A    Yes, sir.

Q    You said that individuals were kept outside the crime scene when you were there?

A    Yes, sir.

Q    Did you see anybody around the house at all while you were there?

A    Not that I recall, no, sir.

2413

Q    Do you know where Kenny Barrett was before they transported him?

A    He would have been at the residence.

Q    Right.  But do you know where he was being detained? Where he physically was after he was brought outside the residence?

A    No, sir, I do not.

Q    And do you know who it was that may have been around him at that time?

A    No, sir, I do not.

Q    We have displayed 51 and 52, both of them.  Now, you could tell by the range hood that this is the same area in the Barrett residence, isn't it, sir?

A    Yes, sir.

Q    And that's not how it looked whenever you initially went in there, did it?

A    No, sir.

Q    And this is some of that display type thing that we're going to do for photography reasons?

A    Yes, sir.

Q    Now, I'm going to assume that Doritos really don't have anything to do with manufacturing of methamphetamine?

A    Not to my knowledge.

Q    And I'm going to assume that soup doesn't have

2414

anything to do with it?

A    No, sir.

Q    And this foil in this pot, did you put that there?

A    No, sir, I don't believe I did.

Q    So we don't know if somebody stuffed foil in that pot for purposes of display or not?

A    No, sir, I don't know.

Q    And paper towels really is pretty common item in a household?

A    Yes, sir.

Q    Coffee filters, same thing?

A    Yes, sir.

Q    I'm going to show you 209, Defendant's 209.

MR. SMITH:  And I show that it has been introduced into evidence, Your Honor.

Q    (By Mr. Smith) Sir, do you recognize what this is?

A    Appears to be a bottom of a gun cabinet.

Q    Okay.

A    With ammunition.

Q    In the east bedroom?

A    Yes, sir.

Q    Do you know if any of your agents had anything to do with opening the drawer on that cabinet and taking out any of the contents?

A    That, I don't know who did that.

2415

Q    That room was searched?

A    Yes, sir.

Q    The whole house was searched?

A    Yes, sir.

Q    You just don't recall what -- anybody doing this or you didn't search the bottom of that gun cabinet?

A    I did not do that, no, sir.

Q    And I'm going to assume that you probably don't know what this is, other than it's a box, but can you tell what that's a box of?

A    All I can do is assume what it is, but I don't know for sure.  I can't read the writing on the box.

Q    Okay, sir.  Thank you.  Now, you talked about going to the trailer.  And I'm going to put 69 back up there just so we know exactly what we're talking about.  When you went in there you didn't find any evidence at all that Kenny Barrett stayed in that trailer, did you?

A    Other than the trailer being on the property, no, sir.

Q    And I'm talking about something that had his name on it, something that you could say without a doubt to this jury this is evidence that Kenny Barrett was inside there?

A    No, sir.

Q    And this is the trailer that we're talking about?

2416

A    Yes.

Q    And that looks to me like one of those little Scotty trailers or something?

A    It's not very big.

Q    Somebody like me and you would have a hard time in there, wouldn't we?

A    We'd have to be good friends.

Q    Maybe too good of friends.  All right.  Now, you testified about that non-drug evidence book that you found, didn't you, sir?

A    Yes, sir.

Q    And ask do you still have that in front of you?

A    Right here.

Q    Yes, sir.  I'm going to ask that you search it a little bit for me, okay?  And I want to start with that pocket right there where your thumb is.  Tell me what you got in your hand there?

A    It's a Certification of Enrollment dated 8-13 of 1997.  Birth certificate of Toby Wayne Barrett.  Name of school is Central.  Principal of school is Curtis Knorr.  And it's signed by Ronald Windes, driver's education permit number 2024.

Q    Okay.  And you can put that back where you got it, sir.  And while we're going through this, you tried to preserve the integrity of that -- what do we call that?

2417

Notebook, I guess?

A     Address book, notebook.

Q     In other words, you put things as you looked at them back where you would find them, tried to; is that true?

A     Well, I took it apart and then just put it in there. I didn't put them exactly back in order. But I put them back in the same container.

Q     Right on top of there, looks like a contact report from the Oklahoma Highway Patrol. Can you tell me who that's from, or who that's addressed to, who got that citation?

A     It appears Toby W. Barrett.

Q     Does it have Kenny Barrett's name on there anywhere?

A     No, sir.

Q     Now, do you know who Toby Barrett is or have you learned who Toby Barrett is?

A     Toby Barrett is the son of Kenneth Barrett.

Q     You can put that on the other side there and if you'd continue to look through there and I'm going to ask you, while you look there, find something in there with Kenneth Barrett's name on it. A document, official document, enrollment card -- what's that? You've got two names on that one?

A     Superior Federal Bank. It appears to be an account card for Toby and Abby Barrett.

2418

Q    Okay.  Keep looking.

A    This has got Abby Barrett's name on it and it appears to be a prescription.

Q    Does it have a physician that that's from?

A    Dr. Brent Kissee, M.D., Oklahoma City.

Q    All right, sir.  Thank you.  And those are just various pieces of paper?

A    Yes, sir.

Q    And I guess what I'm getting at is if there was something with Kenneth Barrett's name on there, that attributed that wallet or that envelope to him, we'd know about it, wouldn't we?  I mean it's just simply not there?

A    No, sir, it's not.

Q    You can put that stuff back together if you would, sir.  Now, where did you find that item?

A    In the trailer.

Q    Where at in the trailer, if you can recall?

A    No, sir, I don't.  It was such a small area I just labeled it trailer.

Q    But it's inside of it, it's in the trailer, isn't it?

A    Yes, sir.

Q    And that is an item that you identified as N-2; is that correct?

2419

A       That's correct, sir.

Q       Now, N-1 was a wallet?

A       Yes, sir.

Q       That you identified as containing a driver's license with a name of Toby Barrett; is that true, sir?

A       That's correct.

Q       And do you recall where you retrieved that item from?

A       From inside the trailer.

Q       Then N-3 were scales that you found in that cassette tape box; is that true?

A       That's correct.

Q       Okay.  And are they still up there on the counter with you or are they put up?

        MR. SMITH:  If I could ask that be handed to him, please?

        THE COURT:  You may.

        MR. SMITH:  And I think that's Government's Exhibit 172.

Q       (By Mr. Smith) If you would go ahead and take those out again for me.  Now, I want to talk about dope a little bit.  Whenever we talk about a gram of dope, specifically methamphetamine, just to give the jury some sort of an idea of comparison, would you agree with me that a gram of powdered methamphetamine is approximately

2420

the same as what you would find in a sugar packet at your local restaurant?

A    Exactly.

Q    Or an equal packet or whatever.  So you open up one of those, you're making your ice tea, dump that out on your plate, that's about a gram, right?

A    That's what it says on the package, yes.

Q    And that is going to be very similar to the same size pile that you're going to expect to find on a gram of methamphetamine based on your experience?

A    Yes, sir, that' correct.

Q    Now, those scales that you have there aren't very big, right?

A    That's correct.

Q    And if you would hold those up for us, what you're talking about the area that you would weigh something on those scales, that's depicted by that circular area; is that true?

A    Right here, yes.

Q    And whenever we're talking about packaging methamphetamine, you know we say we use little baggies for small quantities.  And a small quantity would be a quarter gram?

A    Yes.

Q    Which is a pretty small amount?

2421

A    Yes, sir, it is.

Q    A half a gram up to a gram and you probably have seen what were referred to as those eight balls or eighth of an ounce packaged in about a three inch plastic baggy, right?

A    Yes, sir.  Correct.

Q    That's going to be pretty hard even to put a three inch plastic baggy that contains an eighth of a gram of methamphetamine on those scales, isn't it?

A    That's correct.

Q    I mean, there's simply not enough room there.  If a guy's interested in selling dope, he wants to be accurate as to what he's selling, right?

A    Yes, sir.

Q    So he doesn't want to lay something across those scales that isn't being weighed or that the scales were supporting the weight of the substance, does he?

A    That's correct.

Q    I mean, if you're putting dope on there, you want all the dope to fit on the area that you're weighing.  So that you know that's what you've got, right?

A    Correct.

Q    So when we talk about transaction of drug business using a scale such as this, we're talking about something that's going to be a very small amount of dope?

2422

A    I would assume that, yes.

Q    Hundred dollar amounts of dope, but not thousands of dollars worth of dope?

A    Correct.

Q    And probably not even a couple hundred dollars worth of dope, because it just wouldn't physically fit on there.  I mean, you would agree with me, when we get to a couple hundred dollars worth of dope, we're going to have a hard time putting it on that scale?

A    No, not really.

Q    Well, let's go back through it.  Because you're talking about an eighth of a gram or what?

A    I can take an eighth of an ounce.

Q    Yes, I'm sorry.  An eighth of an ounce.  That's what I'm talking about.

A    I can take an eighth of an ounce in a smaller plastic bag and put it on there and it'd probably weigh it without any problem.

Q    But it's not going to fit in a one inch by one inch baggy?

A    An eighth of an ounce is not as much as what a person would really think it was as far as the bulkiness of it.

Q    That's kind of pushing the upper limit, though, isn't it?

2423

A     Yeah, that's kind of pushing it.

Q     And you said an eighth of an ounce is a $200 bag of dope?

A     Anywhere from two and a quarter to $300, in that general range, yes.

Q     Now, whenever you go to crime scenes, whenever you're doing your drug investigation and you look at something like scales, one of the things you always want to look at is there any dope on these scales?

A     That's correct.

Q     And I'm going to guess nothing's been mentioned about dope being on those scales.  There wasn't any or we would have already heard about it, wouldn't we?

A     That's correct.

Q     Okay, sir.  You can go ahead and package those up if you would.  Now, the N items are what you referred to as non-drug items?

A     That's correct.

Q     And then you refer to the -- and it's just an item number that is a drug item?

A     That's correct.

Q     Now, because you have characterized it as a drug item whenever you're labelling it, when you're storing it, when you process it, doesn't mean that it had dope in it, does it?

2424

A     That's correct.

Q     Okay.  So I want to go through and talk about some of these items that have previously been discussed and we'll see if in fact they're drug items, okay?  First one that I want to talk about is number one, which is a clear Ziploc baggy.

MR. SMITH:  And I believe that was shown by Government's 206, if we can display that, please.

Q     (By Mr. Smith)  Now I have in my notes, sir, that this was a clear Ziploc baggy that you found inside the trailer?

A     Correct.

Q     And I also have in my notes that you put that it contained some sort of residue?

A     Yes, sir.

Q     But you're not telling the jury that that contained any detectable amount of drugs, are you?

A     Well, they can detect trace amounts of drugs if it was just residue in the baggy.

Q     I understand that.  I understand we have the capability to take a fleck of something and test it and if that's dope it comes back as dope.

A     That's correct, yes.

Q     And this bag was tested?

A     Yes, sir.

2425

Q   Because you thought it had residue in it?

A   Yes.

Q   And there wasn't any dope found in it, was there?

MR. LITTLEFIELD:  I'm going to object.  That's hearsay.

MR. SMITH:  Your Honor -- (Interrupted)

MR. LITTLEFIELD:  A chemist to come and testifies to what the results of those exhibits were, Your Honor.  This isn't the person to ask.

MR. SMITH:  Your Honor, I think it's only fair, we're talking about baggies and we're talking about residue, that if this witness knows that he can tell the jury whether that was dope or it was not dope.

THE COURT:  If he knows.

MR. SMITH:  If he knows.

THE COURT:  You may.

Q   (By Mr. Smith) Do you know, sir?

A   I do not know if the residue in the bag was dope or not.

Q   You're not telling us that it was dope?

A   No, sir, I'm not.

Q   You were suspicious?

A   That's correct.

Q   Is that fair?

A   Yes.

2426

Q    That's why you packaged it.  That's why you called it item one, drug evidence, and packaged it to be tested later on?

A    That's correct.

Q    But you can't tell us, again, that had dope in it?

A    No, I can't.

Q    All right.  Item number two, and I think that's probably on that same sheet that you have.

A    Yes, sir.

Q    Same thing.  Clear Ziploc baggy found where, sir?

A    In the trailer.

Q    Okay.  And again, you identified that as having some amount of residue in it?

A    Yes, sir.

Q    You're not telling us that that baggy had dope in it, are you?

A    Not on the form.  No, sir.

Q    And you don't know that it contained dope?

        MR. LITTLEFIELD:  Again, it's hearsay, Judge, because the report will be from another individual.  He can only testify what -- (Interrupted)

        THE COURT:  He can testify to what he knows.

Q    (By Mr. Smith) Based on what you know?

A    Based on what I know now?

Q    You're looking at a report?

2427

A    Yes, sir.

Q    Let's talk about that.  Because it does say there's methamphetamine in that package, too, doesn't it?

A    That's correct.

Q    Okay.  But let's talk about how much it says. That's that speck we're talking about now, isn't it?

A    Yes, sir.

Q    Tell us how much dope was in that package.

A    The net weight was 0.018 grams.

Q    And 0.018 grams?

A    Yes, sir.

Q    How much are we talking about?

A    Very little.  Trace amounts.

Q    Could we see it if it was on the counter in front of you?  Is that a speck of dope?

A    It's just trace amounts of residue that's in there. It's not a great amount.  No, it's not.

Q    And then there's a reserve amount.  And what's a reserve amount?  Do you know about testing?

A    Very little.

Q    Is the reserve amount what's left over after it's been tested?

A    The only thing -- I don't know what they do with the reserve amount or what it is.  You'd have to ask the chemist.

2428

Q    And I don't want to take you out of your area of expertise so if we start going there, just tell me and we'll go on, okay?

A    You'd probably need to ask the chemist what that reserve amount is.

Q    All right.  I'd like to talk about Exhibit Number 3, item number three?

A    Yes.

Q    That was in -- the Government showed it to you by way of photo 208?

A    Yes, sir.

Q    And I think at the time we didn't know if that was one bottle or two bottles, but I assume now you are going to believe there's two different bottles; is that true?

A    Yes, sir.

Q    And when we're talking about bottles, what are we talking about?

A    Well, probably two, three inches high and maybe, oh, big around as a silver dollar.

Q    And actually, I may have gotten ahead of myself. That's the pseudoephedrine bottle, right?

A    Yes.

Q    Exhibit Number 3?

A    Yes, sir.

Q    Now pseudoephedrine in 1999 was something that was

2429

available over the counter?

A     Yes, sir.

Q     You could go down to any Quik Trip, any -- store and get you a bottle of pseudoephedrine, couldn't you?

A     That's correct.

Q     Nothing illegal about possessing it?

A     No, sir.

Q     And where did you find that item?

A     In the trailer.

Q     I would like to go to Number 4, sir.  Incidentally, there was no CDS.  And when I say CDS, I'm talking about a Controlled Dangerous Substance.  I'm talking about dope.  There was no dope inside there, was there?

A     No, sir.

Q     Okay.  I would like to look at Number 4, if I may. And those were the paper towels.  Do you remember those?

A     Yes, sir.

Q     Now the paper towels, they caused you some concern because they were red and you said that was consistent with staining of red phosphorous; is that true?

A     That's correct, sir.

Q     But we don't understand that that's what they were contaminated with?

A     No, sir.

Q     You understand they're contaminated with what?  Do

2430

you know?

A    At the time I did not know what they were contaminated with.

Q    Do you know now?

A    Yes, sir.

Q    What?

A    Number 4 was contaminated with methamphetamine.

Q    Okay.  And how much?

A    Just residue according to my reports and the chemist report.

Q    When we say residue, that means what?  Just a positive test but there's nothing there we can weigh?

A    No.  I don't believe they can weigh.  It's just trace amounts of residue.

Q    That was found in that garbage can?

A    That's correct.

Q    And we don't know who's used that garbage can?

A    No, sir, I don't.

Q    You didn't have any information about that?

A    No, sir.

Q    That's just something that you're looking through and you see these red towels and you think I might ought to seize them, so you do?

A    Yes, sir.

Q    I want to go back to the trailer before we get out

of there just yet.  Inside of that notebook, you opened it in October of '03; is that what you said?

A    Yes, sir.

Q    You unsealed it?

A    Yes, sir.

Q    And whenever you're conducting an examination you found a straw inside of there?

A    Yes, sir.

Q    And you testified that it was flaky something came out on your desk and that appeared to be consistent with dope?

A    Yes, sir.

Q    And so you do the field test, shows that it's presumptive for methamphetamine?

A    Correct.

Q    And then you send it off, right?

A    Yes, sir.

Q    Now, whenever you seized that book in 1999, you never found that straw or you would have packaged it separately and sent it off?

A    That's correct.

Q    It was never sent to the laboratory until when, sir?

A    I believe the report says on the 7th, the next day.

Q    Again, the weight of dope that was contained within that straw was how much?

2432

A     Residue.

Q     Now, what caused you to go looking through that in October of '03?

MR. LITTLEFIELD:   Judge, may we approach?

THE COURT:   You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:   He's getting ready to -- he was asked to pull it out in preparation for one of the state trials.

THE COURT:   What was the question?

MR. LITTLEFIELD:   What caused you to open -- to look for that straw or to look through that book.

MR. SMITH:   He knows not to mention anything.

MR. LITTLEFIELD:   Well, again, there's a problem.   I've talked to them, but there's a problem.

MR. SMITH:   Caution him again?

MR. LITTLEFIELD:   He needs to be cautioned if you're going to get into that.

THE COURT:   Okay.   Well, both of you go over there with the court reporter and do the same drill we did yesterday.

(Whereupon, the following record was made at the witness stand outside the hearing of the jury.)

MR. SMITH:   Just want to be very careful that

2433

you know not to make mention of any state trials or other trials.  So in response to my question that caused you to open it, Mr. Littlefield was concerned there was -- causing state trial, and we wouldn't want you to say that.

MR. LITTLEFIELD:  Do you really need to ask him that question, Brett?

MR. SMITH:  Well, I probably -- he can just admit as to -- what you said earlier, you look for some information.

THE WITNESS:  The report, I opened it so I could copy it.

MR. SMITH:  Same -- (Interrupted)

THE WITNESS:  Right.  So I could copy it because the -- on the prior proceedings I figured they might need to have that.  But none of it was ever used so --

MR. SMITH:  You can just tell them you just opened it to copy some information in there and found it.  Yeah.

MR. LITTLEFIELD:  That's fine.  I just wanted to make sure -- (Interrupted)

MR. SMITH:  We don't want to get jammed up.

(Whereupon, the following record was made in open court within the hearing of the jury.)

2434

THE COURT:  Counsel, if you'd give my court reporter just a minute to get reset.

MR. SMITH:  Yes, sir.

THE COURT:  You may proceed.

MR. SMITH:  Thank you, Your Honor.

Q    (By Mr. Smith) Now, I think my question was what caused you to look in that notebook in October of '03?

A    Yes, sir.

Q    Tell us, sir.

A    I needed to copy the information that was in the book.

Q    So it was during that examination that this straw rolls out of a pocket or something, somewhere in that book?

A    Yes, sir.

Q    Can you tell us which pocket or where it came from? Can you show us?

A    I believe it was one of these inside pockets right here.  I really -- it's been so long ago I really don't remember which one.

Q    Okay.  And then that caused you to package that item and send it off to the lab?

A    Yes, sir, it did.

Q    And again, that's the notebook that we find attributed to Toby Barrett and not Kenneth Barrett; is

2435

that correct?

A    That's correct.

Q    All right, sir.  Now, back to the trash container out there, okay?

A    Yes.

Q    Number 5, do you recall what that was?

A    Yes, sir.

Q    Tell us again, sir.

        MR. LITTLEFIELD:  When he says five are we talking the drug exhibit or non-drug exhibit?

        MR. SMITH:  I'm talking about what he has -- well, it's Drug Exhibit Number 5.  Yes, sir.  I'm sorry.

Q    (By Mr. Smith) What you have characterized as Drug Exhibit Number 5 and it was depicted by photo 210 by the Government.  And we might just go ahead and show it at this time.  Tell us what that was, again, sir?

A    It's a clear Ziploc baggy containing a residue.

Q    Okay.  And again, that didn't contain what we call controlled dangerous substance, did it, if you know?

A    At the time that I seized it, I did not know what it contained.

Q    All right, sir.  Thank you.  And that's it as far as what we're looking at on the screen, is that right?

A    Yes, sir.

Q    Now, Drug Item Number 6, those are the dual bottles

2436

that I kind of jumped to a minute ago.  That was -- we had iodine and then we had a multi-vitamin bottle, is that right?

A    Yes, sir.

Q    Now, there's nothing sinister about the multi vitamin bottle?

A    No, sir.

Q    And there's nothing in there that indicated something else was there, such as dope or anything like that?

A    That's correct.

Q    All right.  Now, the iodine, this was something you can go to any feed store and buy?

A    That's correct.

Q    Small bottle?

A    Yes, sir.

Q    Used for various reasons?

A    Yes.

Q    I understand you're going to tell me that it's used in the manufacture of methamphetamine.  But it has other uses as well?

A    That's correct.

Q    Okay.  That's like a lot of these items.  You come to my house, you're going to find some things that you'd say that could be used to make -- manufacture

2437

methamphetamine probably, right?

A    Yes, sir.

Q    Because I've got coffee filters.  That's something that, yeah, that could be used, right?

A    Correct.

Q    And if I've got any tubing out in my garage, that's something that can be used?

A    Yes, sir.

Q    If I've got a gallon jar sitting over there somewhere underneath my cabinet, again that's going to be something that, boy, that could be used?

A    Correct.

Q    Foil?

A    Yes, sir.

Q    Camping stoves?

A    Yes, sir.

Q    And that camping fuel that I use on my boat, same thing?

A    Correct.

Q    So whenever you go to a place and you see these items that make you suspect, it doesn't necessarily mean that's what was going on here.  But those would be items that you typically find when you go to what we call a clandestine lab, right?

A    That's correct.

2438

Q    Now, just so everybody is clear, we didn't find a lab out there, did we?

A    No, sir.

Q    Didn't find anything gassing off?

A    No, sir.

Q    You didn't find any two layer liquids?

A    No, sir.

Q    And we're talking about things you and I know that the jury may not, that these are items that typically you would find when you go into a lab that's in operation?

A    That's correct.

Q    And two layer liquids is a process in the manufacture of methamphetamine, right?

A    Yes, sir, it is.

Q    Something that you typically find, depending on what stage of the cook they might be engaged in?

A    That's right.

Q    And what your always fearful of is going into this gassing off situation, because there's vapors and those are the things that can be dangerous for law enforcement?

A    That's correct.

Q    You didn't find anything like that, did you?

A    No, sir.

Q    All right.  Now, we did talk about some tubing and some of that tubing that was shown to you was kind of

2439

dark?

A     Yes, sir.

Q     And one of them had some tape around it?

A     Yes, sir.

Q     And that's what you said this looks consistent to me was somebody that has at some point manufactured, right?

A     That's correct.

Q     Now, there's nothing about that that you can tell us when -- first off, you don't know for certain that it was used in manufacturing.  It's just consistent with that, right?

A     That's correct.

          THE COURT:  Mr. Smith, let's stop there.  It's the noon hour.  I'll ask that the jury remember my previous admonitions about discussing this with anyone. Do not discuss it among yourselves.  I ask you to be back at 1:15.  I will ask everyone in the courtroom to please remain seated as the jury leaves for the noon recess.

          (Whereupon, the jury left the room after which the following record was made.)

          THE COURT:  Record should reflect the jury has left the courtroom.  Anything to take up outside the hearing of the jury?

          MR. LITTLEFIELD:  No, Your Honor.

          THE COURT:  For the defense?

2440

MR. SMITH:  No, sir.

(Whereupon, the noon recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box.  Counsel for the Government is present. Defendant is present with counsel.  You may continue your cross examination.

MR. SMITH:  Thank you, Your Honor.

Q   (By Mr. Smith) Mr. Beal, good afternoon.

A   Yes, sir.  How are you doing?

Q   Good.  Did you have a conversation with the prosecutors over lunch?

A   We sat down and talked a little bit.

Q   Okay.  I thought so.  I'm going to ask you a few things about -- we were talking about that lab, earlier. The lab that wasn't there.  Do you remember that?

A   Yes, sir, I remember that, but -- (Interrupted)

Q   I mean, what we established on cross examination before lunch there wasn't a lab out at the Barrett residence.  That's what you had testified to, correct?

A   There wasn't a working lab out there, that's correct.

Q   You also testified on direct about an HCL generator. Do you remember that?

A   Yes, sir.

2441

Q    And again, I don't want to -- I know some of these terms, the jurors may not be familiar with, but that's part of a gassing off process?

A    Yes, sir.

Q    And you're looking for hydrochloric acid?

A    Correct.

Q    That's something that's used during that process. And that's a chemical process that you go through to extract dope is what it amounts to?

A    Yes.

Q    There wasn't an HCL generator out there, was there?

A    I couldn't tell you if there was or not.  I don't know.

Q    If you would've seen one, you probably would have recognized it?

A    It's not that I didn't see one there, I just -- I didn't see one.

Q    Right.  And so, I'm going to ask you, you didn't see one, there wasn't one out there?

A    That's not true.  That doesn't mean that there wasn't one out there.  I just didn't see one.

Q    All right.  I'm with you.

A    Okay.

Q    In any event, we didn't find a thing gassing off out there, did we?

2442

A    That's correct.

MR. SMITH:   I'm going to put up Number 65, if I may, Your Honor.

THE COURT:   You may.

Q    (By Mr. Smith) Do you know what MSE is?

A    Not just by that.

Q    Well, we got MSE right here on a container?

A    I don't know what that is.  It just says MSE enamel on it.  That's all I can read.

Q    Okay.  What do you associate enamel with?

A    Paint.

Q    Right.  Any reason to believe -- and it has N-a-p-a right there on that label, does it not?

A    Yes, sir.

Q    Isn't that symbol, that logo, those words, aren't they all affiliated with the N-a-p-a, auto parts store?

A    Yes, NAPA.

Q    Okay.  NAPA, MSE enamel, would it be reasonable to believe that that's probably paint, automotive paint, which you can obtain down there at NAPA and use that to paint cars with?

A    All I know is it says MSE enamel and it's made by NAPA.  The first word I can't even beginning to describe what it might say.

Q    Do you have any reason to believe -- let me ask you

2443

this:  Do you know of any process that you can use enamel in to manufacture dope?

A    No, sir.

Q    Okay.  So, we talk about things that are in here. Again, it's one of those deals that, yeah, some of this stuff might be a common ingredient that we find in a meth lab.  It doesn't mean there aren't uses for it in other applications?

A    That's correct.

Q    You were aware that there were several vehicles out there at the Barrett residence that were unrelated to law enforcement?

A    Yes.

Q    That shop that you went into, looked like an automotive repair shop, did it not?

A    Somebody could work on a car in there, yes.

Q    I mean, it didn't look like one you're going to see out here on Okmulgee Street?

A    No, sir.

Q    But it looked very similar to one you're going to find on a private residence?

A    Could be.

Q    Right.  And there were several vehicles around there that looked like they were probably being worked on?

A    Yes, sir.

2444

Q    And that blue pickup that was just to the east of the house that's depicted on Government's Exhibit Number 1?

A    Yes.

Q    Pretty sexy, wasn't it?

A    I wouldn't go sexy, but it's a nice pickup truck.

Q    Pretty clean pickup, wasn't it?

A    Yes, sir.

Q    And that's a '70s model Chevrolet pickup, is that right?

A    Yes, sir.

Q    And so, it indicated whoever's that was probably took care of it and at some point probably had to preserve it, didn't they?

A    That's correct.

Q    Okay.  So whenever we look in here and we see MSE that we think is probably auto paint, we see paint thinner, it doesn't really surprise you that that stuff's used in automotive painting application, does it?

A    No, sir.

Q    Same way with mineral spirts?

A    No, sir.

Q    Now, these items were taken out of that cabinet to be displayed, were they not?

A    I don't know.

2445

Q     Do you recall that this was a cabinet that I'm framing out here with my laser?

A     No, sir.  I do recollect the items.  But who took them out, I couldn't tell you.  I don't know.  I didn't take them out.

Q     Do you recollect that this is a cabinet that I'm depicting here with my laser?

A     It appears to be a cabinet.  Yes, sir.

Q     So again, a lot like the kitchen, when you walk into this shop, there's -- things are put up, right?

A     Yes, sir.

            MR. SMITH:  You can take that down.

Q     (By Mr. Smith) Now, we found us a rattlesnake.  You said it found you.  Now, I want to clarify something here.  That rattlesnake wasn't underneath a pie plate or behind a can of MSE or anything like that?

A     No, sir.

Q     Wasn't just out there running loose?

A     No, sir.

Q     This was in a cage?

A     It was in a -- to the best of my recollection, it was in an old glass fish aquarium.

Q     Yes.  Being kept in there.  Being cared for.  Some people have hamsters, some people have snakes, right?

A     That's true.

2446

Q    Some people have dogs, some people have cats?

A    Yes, sir.

Q    You probably don't like rattlesnakes?

A    Not one bit.

Q    I don't like them either.  But nothing really --
there's nothing illegal about that?

A    I don't know about the fish and game laws.  I don't
know if it's illegal to possess one or not.

Q    Nothing drug related with it?

A    No.

Q    It was just out there in the shop, right?

A    Yes.

Q    Okay.  Would you agree with me, sir, as somebody
that is looking at this stuff six years after the fact
that it would be helpful to have pictures of items in
their original condition, in their original location?

A    It could.

Q    In other words, we saw the items that were displayed
on the kitchen table, right?

A    Yes, sir.

Q    And the foil was stuffed into a Crock Pot?

A    Yes, sir.

Q    Now, if that Crock Pot just happens to be in the
cabinet, there happens to be foil beside of it, it
doesn't mean the same thing as it might if there's foil

2447

stuffed down inside of it, does it?

A    I wouldn't know.

Q    But you do understand what I'm getting at.   If we have a picture of things in their original condition, in their original location, that could be very helpful some six years after the fact?

A    It could.

Q    Okay.   Now, you were talking about search warrants and you've done in excess of a hundred.   Done a lot of them?

A    I said I've been in locations where methamphetamine laboratories -- had been at them, helped investigate and initiated investigations in excess of a hundred.

Q    You're experienced then?

A    Yes.

Q    And intelligence is something that is important to you before you go in and conduct a search warrant, particularly at a residence where you don't know who may be there?

A    That's correct.

Q    It's one thing to go into a residence that's already secured and execute a search warrant.   Anybody can do that, right?

A    You'd hope so, yes.

Q    They might not be as successful at finding things,

2448

or they might screw something up when they're finding it. But as far as walking into a house that's secure, anybody can go about that process?

A     Yes.

Q     But it takes a little bit -- it's a different creature to go into a residence where there may be somebody, right?

A     That's correct.

Q     And so the intelligence is something that becomes important to us?

A     Yes, sir.

Q     Now, when we're dealing with drugs, particularly with powder, I mean, I assume if we have a bale of marijuana it's kind of harder to dispose of that in an emergency?

A     That's correct.

Q     Can't eat very much of it?

A     No.

Q     Kind of hard to flush a bale of marijuana down the toilet stool?

A     That's true.

Q     You can throw it in the trash compactor, but it's still going to be there?

A     Yes, sir.

Q     Can't put it in the garbage disposer because it's

2449

not going anywhere?

A    That's true.

Q    But now when we're talking about powder, or we're talking about two layer liquids, it's a little different creature, isn't it?

A    Yes, sir.

Q    Now, because of that, if you have information that you're dealing with powder, if you're dealing with methamphetamine, and you think that there's plumbing in that house, then you're going to want to get in there pretty quickly.  Make sure that the occupant doesn't know that you're coming and go flush the drugs down the stool and you miss out on being able to find the evidence, right?

A    Yes.

Q    I assume that it would be just as important to know there wasn't any running water in a place?

A    That would be important.

Q    If there is no plumbing, if there is no sink, if there is no toilet stool, if there is no water supply, then it's kind of harder to dispose of a bunch of powder, isn't it?

A    Yes.

Q    We can eat it, but we can only eat so much or it's going to kill us, right?

2450

A     Yes.

Q     You can throw it out the window, but it's still going to be there?

A     Yes.

Q     You can dump it underneath the counter, but it's still going to be there?

A     Correct.

Q     So that's one of the things that would be important to you if you're trying to decide whether or not I really need to bust into this door with a no knock type situation, whether or not they have plumbing or not and can get rid of the dope, right?

A     I would like to know if they had plumbing.

Q     I mean, that's one of those reasons why you might want to get in there without somebody knowing who you are or what you're doing.  Their ability to get rid of the evidence?

A     There's always that factor that they can get rid of the evidence.

Q     That's part the equation, isn't it?

A     Right.

Q     Now, you talk about when you go on these -- whenever you're conducting law enforcement operations, okay?  Fair enough?  I mean, that's pretty broad.  That you carry -- and I understand your on -- your off duty right now.

2451

You're on some sort of an injury leave, right?

A    Yes, sir.

Q    So I'm talking about whenever you were working, say prior to December of last year, okay?  Because I know now you're not conducting these operations.

A    Right.

Q    You carried various weapons, a shotgun, sidearms, talk about the mini-14 and a sub-gun?

A    Yes, sir.

Q    Now, just so everybody understands, when we talk about a sub-gun, we're talking about a submachine gun, aren't we?

A    That's correct.

Q    A fully automatic weapon?

A    Yes, sir.

Q    And we talk about sub, what we mean by that is that it's small?

A    That's correct.

Q    It's kind of a compact unit?

A    Yes, sir.

Q    It's easy to wheel around, easy to carry, easy to get to.  But none the less, fully automatic machine gun?

A    Yes, sir.

Q    Now, tell me how many operations you went on where you carried tracers?

2452

A    I never carried a tracer.

Q    That would seem kind of goofy to have tracers on a search warrant, wouldn't it?

A    Well, I wouldn't say it was goofy.  I just never carried them.

Q    You ever heard of anybody carrying tracers on an operation -- on any search warrant operation?

A    Not to my knowledge.  I don't know their policies and procedures, either.

Q    But you have never heard of law enforcement carrying tracer rounds on a police operation?

A    That's not a true statement.

Q    Okay.  Tell me one that you can think of when law enforcement has used tracer rounds in a search warrant entry?

A    I have never carried a tracer round.  I don't know of any agencies that have that I have ever dealt with.  And that's not saying that another agency that I've never worked with has carried one.

Q    I'm talking about what you have knowledge of.

A    What I have knowledge of, I've never seen an agency carry any tracers.

Q    Yeah.  And you've been in the military?

A    No, sir.

Q    What about a grenade launcher?  Did you ever use a

2453

grenade launcher on a search warrant?

A    No, sir, but on some rifles they are a standard piece of equipment.

Q    On an M-203 they're a standard piece of equipment?

A    You can find them on M-16s or an M-4, which is also a modified version of an M-16.

Q    Which is also designated as M-203, correct?

A    I'm not sure about that.  I just know it's a little bit more updated version of an M-16.

Q    Now, I'm not talking about do they exist.  We know they exist.  I'm talking about going -- kicking a door in, storming a house with a grenade launcher.  Have you ever done that?

A    I've been present when it was done.

MR. LITTLEFIELD:  I object to relevance. There's no evidence that any grenade launcher was utilized in the execution of this warrant.  The fact it's in the trunk of a car has no bearing and that's not relevant.

MR. SMITH:  Your Honor, I think the evidence was the grenade launcher was in the front seat of one of these trooper vehicles and if the vehicle was on the premises and this grenade launcher's in the front seat, I can consider that being part of the operation.

MR. LITTLEFIELD:  The question was about

2454

kicking the door in and carrying it in was how the question was phrased, Your Honor.

THE COURT: Counsel, I think you've established whatever it is you're trying to establish with that inquiry. And I think any further discussion of it is not relevant.

MR. SMITH: I can move on, Your Honor.

Q (By Mr. Smith) Tell me, sir, you've had -- you've been trained quite a bit in how to execute a search warrant?

A Yes, sir.

Q You've been trained in shoot, don't shoot scenarios?

A Yes, sir.

Q And part of this intelligence thing that we're going to want to know before we go into a residence and conduct a search is who all may be in that house, true?

A Yes, sir.

Q One of the things we don't want to have happen is to injure, kill or maim some sort of bystander, true?

A That's true.

Q Some innocent party, whether it's a child, particularly if it's a child, or somebody that's unrelated to the activity that you're looking for, right?

A Yes, sir, that's correct.

Q So in your shoot, don't shoot scenarios or training

2455

that you've had, part of that is always focused on you acquire a target before you shoot, don't you?

A    Yes, sir.

Q    I assume that there has never been a situation that you've been in where you have shot through a window that was covered with a blanket, covered with a blind, that you couldn't see behind?

A    I've never done that, no.

Q    And if you couldn't acquire your target and you just shoot with a machine gun into a house, not knowing who else may be in there, pretty reckless conduct, isn't it?

A    I'd have to say, sir, depending on what the situation was at the time.

Q    Never been trained to conduct yourself such as that, have you?

A    I've never been trained to shoot through a window that's covered, no.

Q    No, sir.  But you've been trained that if you're going to pull the trigger, you got a target, you know what you're shooting at?

A    Yes, sir.

Q    And not only do you know what you're shooting at, but you also know what's behind where you're shooting?

A    In some instances, yes.

Q    Don't you always want to know where your bullet's

2456

going to go if you miss what it is that you're shooting at?

A   It would be nice to know where it's going to go, yes.

Q   If there's a residence right there next to where you're shooting at, you don't want to shoot into another residence where there could be people?

A   No, sir, I wouldn't.

Q   You always want to be sure of your background?

A   Yes.

Q   Not only your target, but also your background?

A   Yes.

MR. SMITH:  All right, sir.  One minute, Your Honor?

THE COURT:  You may.

MR. SMITH:  Just one more area, then I'll be done, Your Honor.

Q   (By Mr. Smith)  Sir, I want to go back to that straw that we found.

A   Okay.

Q   And you said that you discovered that in October of 2003?

A   Yes, sir.  I believe that's the correct date, October the -- I believe 6th is the exact date.

Q   Just a little more than four years after that wallet

2457

was seized, after that notebook was seized, correct?

A     Yes, sir.

Q     Now, in four years, the character of that residue did not change?

A     I don't believe so.

Q     You're able to test it?

A     Yes, sir.

Q     And you don't know when it was placed into that straw?

A     No, sir, I don't.

Q     It could have been four years before you ever found it?  Let me strike that.  It was four years before you found it because it was in that notebook?

A     Right.

Q     It could have been four years before that before it was ever even placed in that book?

A     That's true.

Q     We have no idea.  So when you send this stuff off for testing, you don't know when it was generated.  You don't know how old that dope is?

A     That's true.

Q     All right.  And the same way with something that may be in a hose.  You don't know when it got there?

A     That's correct.

Q     You don't know how it got there?  I'll bet the

2458

closest that we can get to is we talked about the paper towels in the trash can, the fact that trash cans get dumped periodically.  That's the closest that we have to dating anything that you found out there on the property, right?

A    Yes.

MR. SMITH:  Thank you, sir.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Let's talk about acquiring a target and shooting through a window.

A    Okay.

Q    Let's assume we're talking about that east room there in that house, okay?

A    Okay.

Q    And the window one shoots through is next to the pickup truck.

MR. LITTLEFIELD:  And I'd ask you that Government Exhibit 175 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And we're talking about this window here, which was covered.  Let's assume that it had a towel over it and blinds, okay?

A    Okay.

Q    Shots fired from the other side of that pickup

2459

truck?

A    Okay.

Q    And prior to making your decision to shoot or not shoot, you know that one of your associates has been shot while in front of that front door, less than 10 feet in front of you, okay?

A    Yes, sir.

Q    And you know he's fallen to the back of a Bronco and bleeding and is probably mortally wounded?

A    Yes, sir.

Q    You know a second associate, who was in that Bronco, has also been shot from gunfire coming from the location of that front door, okay?

A    Yes, sir.

Q    And let's assume before you make your shoot, don't shoot decision that prior to making that decision, you saw an individual standing in that doorway between those two rooms holding a rifle and that he stepped from this room into this room, okay?

A    Yes, sir.

Q    And upon seeing that individual holding the rifle, having known that two of your associates have been shot through that door, you go around to the side and you see movement in that curtain.  In that situation, would it be appropriate or inappropriate to shoot?

A    Appropriate.

Q    It would be what?

A    Appropriate.

Q    Thank you.  Why?

A    Because you have an individual in there that has a firearm in his possession and knowing the facts that you just stated, I would have shot.

Q    Let's talk about the disposal of meth, meth powder and other items associated with the manufacture or distribution or use of methamphetamine.  And plumbing -- flushing stuff down a toilet is one way to destroy items, powderous items, associated with methamphetamine?

A    True.

Q    Is that the only way to destroy items associated with the manufacture of methamphetamine?

A    No, sir.

Q    What other ways can meth evidence be destroyed?

A    It can be ingested, it can be thrown on the floor, it can be thrown out a window, it can be thrown out the front door, it could be just thrown in the air.

Q    What will acid do to it?

A    Acid will destroy it, it will eat it up.

Q    Would it -- and would you necessarily know whether somebody would have acid at a location where meth has been manufactured?  Would you expect that that would be a

2461

possibility?

A    Yes.

Q    What would happen if one took some lighter fluid or Coleman fuel and spread it around and threw a match, what would that do to meth evidence?

A    It'd burn it up.

Q    Have labs burned up before?

A    Yes, sir.

Q    And have people burned labs and meth evidence before?

A    Yes, they've blown up trailers, houses, themselves, caused fires.

Q    Can you destroy evidence by intentionally setting a fire?

A    Yes, sir, you sure can.

Q    And talking about the intelligence, when you were a task force officer with the Drug Enforcement Agency down in McAlester, was one of the counties that you worked in regularly Sequoyah County?

A    Yes, sir, it was.

Q    Did you work in Adair County?

A    Yes, sir.

Q    Did you work in Cherokee and Wagoner Counties?

A    Yes, sir, I did.

Q    And what individuals -- what drug task force agents

2462

did you work with that were with the local district attorney's office?

A    District 27 Drug Task Force.

Q    Who were those officers?

A    Two that come to mind is Clint Johnson and Frank Loyd.

Q    Did you receive intelligence from them?

A    Yes.

Q    And did you rely on intelligence from them?

A    Yes, sir, I did.

Q    What would you give -- relate as far as the quality of intelligence that you received from those two agents?

A    Over the nine and a half, 10 years that I worked with them, their intelligence was always on target.

Q    You were asked if it would have been helpful to have pictures of items in their original positions and original locations.  Do you recall that question being asked?

A    Yes, sir.

Q    As to the items that you discovered, those were not photographed in place, were they?

A    That's correct.

Q    Okay.  With the exception of the towels and the iodine in the dumpster?

A    True.

2463

Q    Where there items that you saw that were photographed in place before were moved, at that search?

A    You mean in the entire complex?

Q    During the entire search of the entire location.

A    The tubing inside the metal case that was taken in place when opened up got photographed.  I believe there was a camera that was found inside this room right here, I believe.

Q    You weren't the only one searching, were you?

A    No, sir, I was not.

Q    Other individuals were searching and other items were found?

A    That's correct.

Q    And the camera that was in that room that you pointed to, did you find that or was that discovered, actually found, by someone else?

A    It was actually discovered and found by someone else.

Q    Were you present when it was discovered?

A    I was not in that room, no.

Q    Were there any other items, and we're talking about your knowledge, now, that were found and photographed in place, that you recall?

A    I believe there was some pills in a sandwich bag that was found in the ceiling in that room.

2464

Q    Did you see that photograph being taken?

A    I saw the photograph.  I wasn't there when it was taken.

Q    Was that in place?

A    Yes, sir.

Q    Do you recall in the -- let me ask you to look at Government Exhibit 219.

          MR. LITTLEFIELD:  And it's not in evidence.

Q    (By Mr. Littlefield)  Do you recall that item?

A    Are you talking about the red pill?

Q    The red pill and the foil.  Do you recall that being taken in place?

A    Vaguely.

Q    Okay.

A    I believe it was inside the kitchen area of the house.

Q    You were involved also in the search inside the storage building, right?

A    Yes, sir.

Q    With whom?

A    Craig Nixon.

          MR. LITTLEFIELD:  I would ask that Government Exhibit 197 be displayed to the witness.

          THE COURT:  You may.

          MR. LITTLEFIELD:  And it's not in evidence,

2465

Your Honor.

Q    (By Mr. Littlefield) Do you recall that item?

A    I believe it's a used syringe.

Q    Well, no, my question is do you recall that item?

A    Yes.

Q    And do you recall -- did you see it at that location?

A    Yes.

Q    Was that taken in place?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 197.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) Where was this -- what is this?

A    That is a syringe, needle and syringe.

Q    Where was that found?

A    In the workshop area.

Q    Storage building?

A    Yes.

Q    Where all that paint thinner and toluene and the rest of those items?

A    Yes, sir.

Q    Is that an item you'd expect to find in a mechanic

2466

shop?

A    No.

Q    Do you recall the condition of that item?

A    No, sir, I don't recall.

Q    You didn't seize it?

A    No, I did not.

Q    Who was it that seized it?

A    I believe it was Special Agent Nixon.

Q    Was that taken in place?

A    Yes.

Q    You were asked about an HCL generator.  Do you recall that question being asked?

A    Yes, sir.

Q    And you didn't see one?

A    No, sir, I did not.

Q    Did you see evidence of the existence of one?

A    Yes, sir.

Q    What was that evidence?

A    The two pieces of tubing that were in the photograph with the black electrical tape around the bottoms of them.

Q    By the way, do you know if there was any test done on the tubing?

A    No, sir, I do not know if there was.

Q    You said that there was no danger.  I remember you

2467

saying there was no danger to law enforcement in this search. Do you recall saying that? That you didn't feel like you were in danger performing the search.

A   Yes, sir. I think I understand what you're asking, yes.

Q   When you performed the search, did you have protection to prevent yourself from being exposed to danger?

A   Yes, sir, we did.

Q   What protection did you wear in performing this search to prevent your exposure to danger?

A   We wear plastic gloves. We have face respirators. We have Tyvec suits that we can wear.

Q   Did you wear all of those in this particular search?

A   No, sir, I did not.

Q   What protection did you wear that prevented exposure to danger in this search?

A   I had glasses on and I had gloves.

Q   Would you have handled those towels that you pulled out of the dumpster without gloves?

A   Absolutely not.

Q   Would it have been dangerous to have done so?

A   Yes.

Q   Why?

A   Depending on what I know now that was in it and what

2468

we suspected was in them, if you get that in the pores of your hand, then you can get some kind of a chemical poisoning and you can suffer greatly from it.

Q    And you know what was in those towels.  What was in those towels?

MR. SMITH:  Your Honor, I guess this goes to if he knows he can answer it.  But if he's going to read from a report, probably ought to have that offered, would be my objection.  Appears he doesn't know for certain.

Q    (By Mr. Littlefield) Do you remember what was in the towels, when it was tested?  You answered that for Mr. Smith.

THE COURT:  Okay.  Counsel, the question is withdrawn.  New question.

Q    (By Mr. Littlefield) And I ask a new one.  Do you know what was in the towels when you answered it with Mr. Smith?

A    Yes, I did.

Q    What was in the towels?

A    I don't remember what my answer was.  That's why I'm having to refer.

Q    Okay.

A    May I go ahead?

Q    Yes.

A    Methamphetamine.

2469

Q    And you were asked about it being -- and the amount was residue, wasn't it?

A    Yes, sir.

Q    Were you particularly surprised that in a paper towel that was stained in a dumpster that the quantity of methamphetamine was residue?

A    No, sir, it does not surprise me.

Q    Why does that not surprise you, sir?

A    Because it's a filter.

Q    When you filter meth through a paper towel, what are you going to have in regards to quantity of meth?

A    You're going to have residue.

Q    In regards to the baggies, you were asked about there being a residue of meth in a baggy.  Does that surprise you?

A    No.

Q    What does that tell you when you see residue of meth in a baggy?

A    Means that the bulk of it has been used or taken out.

MR. LITTLEFIELD:  Ask that N-3 be provided to the witness, which is Government Exhibit Number 172.

Q    (By Mr. Littlefield)  Go ahead and take that out. The tiny scale, I think it was referred to.  Can that measure quarter papers?

2470

A    Yes.

Q    Can it measure eight balls?

A    Yes.

Q    Can it measure grams?

A    Yes.

Q    Were those the only scales -- based on what you know, were those the only scales that were discovered at the trailer?

A    No, sir.

Q    What was the size of the other scales that were found at the trailer?  Smaller than that or larger?

A    They were larger.

Q    You were asked about possession of various items. Not illegal to possess iodine crystals, is it?

A    No, sir.

Q    Can it be illegal to possess iodine crystals?

A    Yes, sir.

Q    Under what circumstance?

A    The circumstance right here.  Because it's conducive to the manufacture of methamphetamine with everything else that has been found, you know, that's where I would draw my conclusion.  That it was used to manufacture methamphetamine.

Q    You were asked about the Drug Exhibit Number 3, the bottle of the Max Brand Pseudo 60s?

2471

A     Yes, sir.

Q     And your testimony was it is not illegal to possess Max Brand Pseudo 60s?

A     That's correct.

Q     And it wasn't then, in '99?

A     No, sir.

Q     And it's not illegal to possess pseudoephedrine now, is it?

A     That's correct.

Q     Is it lawful to possess it with the intention of manufacturing methamphetamine?

A     No, sir, it's not.

Q     What is the average -- what's the recommended dosage of 60 gram pseudoephedrine or 60 milligram, pardon me, pseudoephedrine?

A     Recommended dosage is no more than four dosage units per day, in a 24 hour period.

Q     Would it be lawful to possess 1,426 pseudoephedrine tablets?

A     No.

     MR. SMITH:  Your Honor, assuming facts not in evidence.

     THE COURT:  Argument?

     MR. LITTLEFIELD:  I didn't ask him were there. I'm asking him a hypothetical.  Would it be lawful to

2472

possess that quantity.  Mr. Smith was asking about possessing them.  I'm just saying in a particular quantity, would that quantity be lawful.

THE COURT:  What's the objection?

MR. SMITH:  He's also, Judge, asking for a conclusion based on the law.  We think it invades the Court's province.

THE COURT:  Sustained.

Q    (By Mr. Littlefield) Based upon the items that you observed at the residence, if someone had 1,426 pseudoephedrine tablets combined with the other ingredients and items you saw at the residence, would you leave them there if you were conducting a search or would they be arrested and taken to jail?

A    Be arrested and taken to jail.

Q    For what reason?

A    Attempted manufacture of methamphetamine.

Q    You indicated that it is not illegal to have coffee filters?

A    That's correct.

Q    You got coffee filters at your house?

A    Yes, sir.

Q    You got a coffee pot?

A    Yes, sir.

Q    Would you look at Non-Drug Exhibit N-2.  It is

2473

Government Exhibit Number 181.  And have you examined that item, sir?

A   Several times.

Q   Are there any names in there that you would associate with your knowledge of individuals involved in narcotic activities in Sequoyah County?

A   Yes, sir.

Q   Who?

MR. SMITH:  Your Honor, I'm going to object as that not being relevant.  Also, it is outside the scope.  My question related to this was any information of Kenny Barrett's name was in that notebook.

THE COURT:  Sustained.

MR. LITTLEFIELD:  Your Honor, may I be heard?

THE COURT:  You may.

MR. LITTLEFIELD:  In relation to what the question was -- okay.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  The question was in relation to whose notebook is that and there were questions about Toby Barrett's name being in there.  Is Kenny Barrett's name in there?  The answer was no.  There are a number of names of individuals who are individuals related to drug activities who are associates of Kenny Barrett's, who are

2474

Kenny Barrett's age or older, who are known associates of Kenny Barrett's and Toby is an 18 year old person. There are individuals who are in their 30s and 40s and 60s and 80s whose names and numbers are listed in that notebook, who are known to be related to the drug culture in Sequoyah County. One of them -- one of the names in there is a former girlfriend of Kenny Barrett's.

MR. SMITH: She's a former girlfriend of several in Sequoyah County, Your Honor.

MR. LITTLEFIELD: That's true, including Kenny Barrett.

MR. SMITH: That doesn't do anything to show that that notebook was Kenny Barrett's. The questions were directed as to any reference to him in any way. Whether it was traffic tickets or anything else. And it is outside the scope as it relates to these other individuals and really it's not relevant.

MR. LITTLEFIELD: He asked him about the contents of the notebook, Judge, on cross examination. I am just asking as to additional contents in there. Does he know who they are? What kind of activities are they involved in? How old are they? How old was Toby Barrett? How old was Kenny -- (Interrupted)

THE COURT: When you say they were involved in drug activities -- (Interrupted)

2475

MR. LITTLEFIELD:  One of them, for example, Judge, is Tracy Swearingen.

THE COURT:  And has been convicted?

MR. LITTLEFIELD:  Tracy Swearingen has been convicted.  Chip Teague has been convicted.

THE COURT:  And these are cases he investigated?

MR. LITTLEFIELD:  They are cases he is aware of.  He is aware of those individuals, aware of their background.  And, Your Honor, another individual is going to testify that there was a relationship between Tracy Swearingen and Kenny Barrett related to drug activities.

MR. SMITH:  Your Honor, with the fact that this -- I think is clearly Toby Barrett's notebook, that is overly prejudicial to Kenny -- (Interrupted)

MR. LITTLEFIELD:  And I think it's Kenny Barrett's notebook so there we are.  There's no evidence and the question is what's in there and how does it relate to those two individuals.  And that's what I'm trying to go into.

MR. SMITH:  There's a contact report from the Highway Patrol in the name of Toby Barrett.  It has his mother's prescription in there.  There's a card in there that has a joint account at a bank with Toby Barrett and his mother.  There's no reference at all to any cards,

any business documents, anything that has Kenny Barrett's name on it.

MR. LITTLEFIELD:  No, but there's names and telephone numbers of individuals that are Kenny Barrett's age that are drug related that other individuals are going to say are associates of Kenny Barrett's.

THE COURT:  How many names are in there?

MR. LITTLEFIELD:  There's a whole bunch.  I'm just going to reference three.

THE COURT:  How are you going to tie it to Kenny Barrett?

MR. LITTLEFIELD:  Well, one of them, Tammy Bedwell admitted that she was his former girlfriend.  Her name's in there.  Another individual -- (Interrupted)

THE COURT:  She's admitted it -- (Interrupted)

MR. LITTLEFIELD:  She admitted to OSBI.  I think I got enough -- a couple of witnesses that are going to say there was a relationship between Kenny Barrett and Tammy Bedwell.

THE COURT:  Tammy Bedwell is a younger lady, Your Honor.

MR. LITTLEFIELD:  She's 28 at the time.  She's 10 years older than Toby and 10 years younger than Kenny.

MR. SMITH:  And that is my point.

MR. LITTLEFIELD:  Tracy Swearingen was related

2477

in appeal activities with Kenny Barrett.

THE COURT: So what's the question you want to ask him?

MR. LITTLEFIELD: I was going to ask him is Chip Teague's name, telephone number in there and how does he know Chip Teague. Is Tracy Swearingen's name and telephone number in there and what age level is Tracy Swearingen. Is Tammy Bedwell's name and number in there or is Tammy Bedwell's name in there. I didn't go into the names in the notebook, Judge. I'm not the one who started trying to connect the notebook with one particular individual. But if there's evidence that can be used or reasonably cause an individual to believe it is associated with Kenny Barrett, then I should be allowed to introduce that evidence.

THE COURT: I think that's a stretch. I'll sustain the objection.

(Whereupon, the following record was made in open court within the hearing of the jury.)

MR. LITTLEFIELD: Judge, there's something I just thought of. May we approach again?

THE COURT: You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD: Judge, part of my concern,

2478

also, is that is in evidence.  Those are names that are already in there.  I mean, the item's in evidence.  It was not objected to.  So what I'm asking him to do is identify things that are already in evidence in that book.

MR. SMITH:  But to go and say do you know this person.  Do you know that -- I mean, that really doesn't have any relevance to Kenny Barrett.  This is --
(Interrupted)

MR. LITTLEFIELD:  I don't even have to ask him that, but I can sure enough ask him if he knows these three names.  I won't go into criminal records.

MR. SMITH:  The names are in there.  It seems like that's enough.  I mean, whatever is in there is in there.  It's Toby Barrett's stuff, it's not Kenny's stuff.

MR. LITTLEFIELD:  How do we know that?  There's no evidence of that.  Certainly may I ask him is the name Chip in there.  Is the name Tammy Bedwell in there.  And is the name and telephone number for Tracy Swearingen.  And they're already in evidence.

THE COURT:  But those names are in evidence, but the evidence that they've been -- they're somehow drug connected -- (Interrupted)

MR. LITTLEFIELD:  I'm not going to go beyond

2479

that with this witness.

THE COURT: I mean, you're just going to ask him if -- (Interrupted)

MR. LITTLEFIELD: I'm going to ask him he can -- (Interrupted)

THE COURT: -- is Joe Smith's name in there?

MR. LITTLEFIELD: Well, not Joe.

THE COURT: No. I mean, just the names -- (Interrupted)

MR. LITTLEFIELD: -- yes, yes, yes -- (Interrupted)

THE COURT: -- just the names -- (Interrupted)

MR. LITTLEFIELD: -- with this witness. With a later witness I will ask them was there a connection between.

THE COURT: You know what I'm getting at. You can ask the generic question is so and so's name in there.

MR. LITTLEFIELD: Yes.

THE COURT: Yeah, I'll let you do that.

MR. LITTLEFIELD: With a later witness who -- (Interrupted)

THE COURT: -- what happens to the later witness we'll see.

MR. LITTLEFIELD: Yeah, who knows them.

2480

THE COURT:  Okay.  I'm not -- you understand that perhaps is subject to an objection when that happens, but I think you can ask him it's come into evidence that there are some names in there.  If you want to ask him about a specific name is in there.  But no -- (Interrupted)

MR. LITTLEFIELD:  I won't go beyond that.

THE COURT:  -- whether they're drug or not drug related.

MR. SMITH:  And whether he's had any contact with them or anything like that.

THE COURT:  Yes.

MR. LITTLEFIELD:  I won't go beyond that at this point.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Just one minute, Mr. Littlefield, please.

Q    (By Mr. Littlefield) Are you familiar with some of the names in there?  Have you reviewed those -- the address book?

A    Yes, sir.

Q    And I'm not going to ask you who these people are or how you know them.  But is Chip Teague's name, telephone number in that book?

2481

A    Yes.

Q    Is Tammy Bedwell's name and telephone number in that book?

A    Yes.

Q    Is Tracy Swearingen's name and telephone number in that book?

A    Yes, sir.

Q    You said that this wasn't a lab.  Do you recall saying that on cross?

A    Yes, sir, I did.

Q    What did you mean by that?

A    It wasn't a functional working lab at the time.

Q    What was lacking to manufacture meth?

A    I believe everything was there.

         MR. LITTLEFIELD:  Pass the witness.

         THE COURT:  Further cross?

         MR. SMITH:  Thank you, Your Honor.

                 RECROSS EXAMINATION

BY MR. SMITH:

Q    Let's talk about this lab business.

A    Okay.

Q    A little bit.  There was not a lab set up, displayed, in operation at that residence?

A    That's correct.

Q    And to have a functioning meth lab, you also need

2482

acid, don't you?

A   I'm sitting here thinking over what was there and that was the only thing that I did not see was an acid base part.  And I stand corrected on that.

Q   So everything wasn't there for a functioning, operating lab, right?

A   I'm just trying to think what was there that I saw and I didn't see any acid.

Q   And I can appreciate that you're a police officer, that's the government, and we want to make a lab there if we can make a lab.  I understand that.  But there wasn't a lab there was there?

MR. LITTLEFIELD:  Judge, I object to that.

THE COURT:  Sustained.

Q   (By Mr. Smith) Now, you talked a little bit earlier about if you go up there and you see some pills here and you see some red phosphorous there and you see some towels here that you're going to arrest somebody for attempted manufacture of methamphetamine, aren't you?

A   Yes, sir.

Q   Didn't arrest Kenny Barrett for that, did you?

A   No, he wasn't there when I got there.

Q   He wasn't arrested for any drug crimes, was he?

A   Not that I know of, no.

Q   Sir, you've been visiting this thing off and on for

2483

six years.  Wasn't the case, was it?

A    It wasn't my case.

Q    But it also was not the case either, was it?

A    What was not the case?

Q    He was not arrested for drug crimes.

A    Not that I know of.

MR. SMITH:  Your Honor, I want to ask 69 be displayed.

THE COURT:  You may.

Q    (By Mr. Smith) Sir, I want to talk about this shoot, don't shoot scenario just one more time, okay?

A    Okay.

Q    You talked about that under the scenario that Mr. Littlefield gave you that you might go ahead and take that shot through that window even though you couldn't see your target?

A    There's -- (Interrupted)

Q    -- your comrade's injured.  But that's kind of a hypothetical.  Or did you take it that you would have a target acquired before you would shoot?

A    The way the scenario that Mr. Littlefield gave me, I would have shot.

Q    Okay.  Even though you couldn't see somebody behind the curtain or blanket or whatever?

A    That wasn't the scenario.

2484

Q    Okay.

A    The scenario he gave said there was an individual seen with a rifle in his hand.  I would have shot.

Q    You couldn't have seen him, you wouldn't have shot, would you?

A    I wasn't there.  I don't know exactly what the situation was at that particular incident.

Q    I can appreciate that because we have to be there, right?

A    Yes, sir.

Q    All right.  Now, you remember me talking to you about the background?

A    Yes, sir.

Q    Where you're going to shoot.  If somebody's over here to the east of you in reference to this photograph, right?

A    Yes, sir.

Q    Okay.  If somebody's over here shooting from the east across that front porch, they're going to be shooting in the vicinity of this trailer in the background, isn't it?  That's the background.

A    Yes, sir.

Q    A sub-machine gun, whether it's a 9 millimeter or a .223, it's going to travel that distance over to that trailer, isn't it?

2485

A     I don't think so.

Q     You don't think a 9 millimeter can shoot from the corner of that house to that trailer?

A     Not going through the walls and everything in that house, no.

Q     No, sir.  I'm not talking about hitting an intervening target.  That wasn't part of my question.

A     Okay.

Q     I'm talking about standing over here shooting across that porch, 9 millimeter sub-machine gun, it's going to reach that trailer, isn't it?

A     That's correct.

Q     Trailer is pretty thin skinned, isn't it?

A     You betcha.

Q     So if you're shooting across that porch, knowing that there's a residence here with people inside of it, you'd be kind of concerned, wouldn't you?

A     Given the scenario I would've still taken the shot.

Q     Let me ask you this, what if you're shooting and there's nobody on the porch?  No shooting on the porch?  And there's a trailer over here in the background.  Are you going to shoot?

A     Are you asking me if I'm just going to shoot in thin air across there?

Q     Across the porch, just lob a shot across the porch

2486

with a 9 millimeter machine gun with this trailer being your background, residence?

A   And there's nobody on the porch?

Q   Right.

A   No.

Q   What about somebody in the yard right here?  How about three somebody's?  How about an 18 year old kid and two troopers right here in the yard?  Just to the west of that porch?  You going to shoot that 9 millimeter sub-machine gun across there?

A   With nobody on the front porch -- (Interrupted)

Q   Yeah.

A   -- yeah.

Q   No.  That'd be kind of silly, wouldn't it?  Or very reckless?

A   Could be either one.

MR. SMITH:  You can take that down, Debbie. Your Honor, I don't think I have anything further.  Thank you.

THE COURT:  Further direct?

FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   In the scheme of things, how does an arrest for a drug crime compare to an arrest for murder?

A   Quite a bit of difference, sir.

2487

Q    You were asked a bunch of question about firing across the porch?

A    Yes, sir.

Q    From that camera angle, can you tell whether that trailer is in direct line of fire or not?

A    No, sir, you can't.

Q    You don't really know, do you?

A    No, sir.

            MR. LITTLEFIELD:  Pass the witness.

            THE COURT:  Anything further?

            MR. SMITH:  No, Your Honor.

            THE COURT:  May this witness be excused from the Government?

            MR. LITTLEFIELD:  No objection.

            MR. SMITH:  He can be excused as far as we're concerned, Your Honor.

            THE COURT:  Mr. Beal, just one second.  May this witness be excused?

            MR. SMITH:  Yes.

            THE COURT:  Thank you for your testimony.  You may step down.  You may be excused.

            MR. LITTLEFIELD:  Judge, it'll take us a minute to get our next witness in.  I think he's in the custody of the Marshal's service.

            THE COURT:  Let me see counsel.

2488

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT: Just a cautionary matter. This reference to the marshal.

MR. LITTLEFIELD: Yes, sir.

THE COURT: Just I don't think there's any appropriate place in front of the jury to even mention the marshals here.

MR. LITTLEFIELD: Oh, I apologize. He's in the -- (Interrupted)

THE COURT: I understand.

MR. LITTLEFIELD: The witness is in custody.

THE COURT: You come to the bench.

MR. LITTLEFIELD: Okay. I apologize.

THE COURT: Okay.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT: Sir, if you would raise your right hand and be sworn.

CHARLES SANDERS,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record please, sir.

2489

A    Charles Sanders.

Q    You're going to need to lean forward and speak into the microphone.

A    Charles Sanders.

Q    Mr. Sanders, what's your middle name?

A    Edmond.

Q    And let me ask you -- (Interrupted)

MR. HILFIGER:  Your Honor, may we approach a second?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. HILFIGER:  Your Honor, part of the ability of a juror to determine credibility and truthfulness is by the eyes and facial movements and everything and this individual is coming in with sunglasses and unless there's a prescription and necessary need for sunglasses in the courtroom -- (Interrupted)

MR. LITTLEFIELD:  And that was going to be my next question and I didn't get the chance to ask it.

MR. HILFIGER:  I'm sorry.

MR. LITTLEFIELD:  His left eye has been injured.  He is real light sensitive.  I don't know if he can go without them.  His left eye is sewn about half way shut.  The tear ducts don't work.  But he's got --

2490

(Interrupted)

MR. HILFIGER:  His DOC picture does not show sunglasses.

MR. LITTLEFIELD:  Okay.

MR. HILFIGER:  Okay.

THE COURT:  You can ask him to remove them on cross examination.  Just so the jury can look at him.

MR. LITTLEFIELD:  I'll ask him to take them off now.  I'm not sure if he can.  I'll ask him.

THE COURT:  Okay.  Okay.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q    (By Mr. Littlefield) And your middle name is what, sir?

A    Edmond.

Q    Mr. Sanders, I've got glasses but I don't have sunglasses on.  Why do you have -- why are you wearing sunglasses today?

A    I've got -- (Interrupted)

Q    You need to lean forward.

A    I've got a scar on the cornea of my eye.  My left eye.  The eye is sewn together because there's no tear ducts in the left eye.  And to keep the light out of the eye, to keep it from getting bothered because it could twitch with the light hitting the eye.

2491

Q    You're going to need to remain leaning -- you're going to need to remain leaning forward.

A    Okay.

Q    Can you remove them just a second so we can see what you're talking about?

A    Yes, sir.

Q    Okay.  How long can you keep the sunglasses on before it starts bothering you?

A    How long can I keep them off you mean?

Q    Yes.  I'm sorry.  That was a bad question.

A    Probably like five or 10 minutes is how long.

Q    If you don't mind, keep them off, but if they bother you and you need to put them on, put them on.

A    Not a problem.

Q    Where are you located now, sir?  I mean, where have you been housed the last several years?

A    Stringtown, Oklahoma.

Q    And -- (Interrupted)

A    With the Department of Corrections, I should say.

Q    And why are you in the custody of the Department of Corrections, sir?

A    For running a roadblock, arson and knowingly concealing stolen property.

Q    What sentence did you get?

A    Got 25 years with 20 suspended and five to do in the

2492

Department of Corrections.

Q   Have you previously received any felony convictions, sir?

A   Prior to them?

Q   Yes, sir.

A   Yes, sir.

Q   Were you ever convicted -- let me direct your attention to 1987.  And make sure you speak directly into that microphone, sir.

A   Okay.

Q   You might even bring it closer to you.  Were you previously convicted in 1987 for delivery of amphetamines for which you received six years confinement?

A   Yes, sir.  I was deliver -- (Interrupted)

Q   I'm not asking you what the circumstances where. But did you receive that conviction?

A   Yes, sir.  Yes, it was for possession of marijuana and possession of controlled dangerous substance in the Arkansas Department of Corrections.

Q   Did you receive a conviction in 1992 for possession of dangerous drugs in which you received a 10 year prison sentence?

A   Yes, sir.

Q   Were you convicted in 2001 for possession of a controlled substance and uttering forged instruments for

2493

which you received a concurrent 20 year prison sentence?

A    Yes, sir.

Q    Any more that we haven't covered?

A    I think there was a burglary that I left out on that last charge, when I -- the 25.  I don't think I told you about the burglary.  There was a burglary with the arson and the knowingly concealing stolen property.

Q    Okay.

A    I just want to make sure, you know, we keep it on.

Q    Make sure you can keep -- you go along and then you kind of drop off and at the end it kind of gets hard to pick up on so speak clearly.  In regards to the -- is it 25 year sentence with five to do and 20 suspended?

A    Yes, sir.

Q    And that's what you're currently serving now?

A    Yes, sir.

Q    Do you have an anticipated release date, sir?

A    Yes, sir.

Q    And when is your anticipated release date?

A    March 25th, something like that.

Q    Of what year?

A    2006.

Q    So you're anticipating you'll be released on the doing the five year portion of your sentence next March?

A    Yes, sir.  That's without -- I'm taking a drug

2494

program.  Upon completion of the drug program, I'll be -- the remainder of this time is suspended.  But -- and they also give me 70 days credit time for that.  So that will make it -- going to bring it up another month or so. Because they give you 70 credits, which is not really 70 days.  So they got a chance to get there.  So that may bring it up, it's roughly figured, probably March 1st, March 25th.

Q    You're still being hard to understand.

A    Okay.

Q    But you anticipate sometime in March, you would -- (Interrupted)

A    Yes, sir.

Q    We've talk previously.

A    Yes, sir.

Q    And I advised you of any assistance that I would provide to yourself in relation -- for your cooperation, testimony in this case, haven't I?

A    Yes, sir.

Q    What did I tell you I would do in your behalf?

A    You tell -- you didn't make me no promises.  You told me that you would talk to the prosecution upon completion.  That -- no, you haven't guaranteed me nothing.

Q    In relation to talking to the prosecutors, the

2495

conviction you're serving now is in Sequoyah County; is that correct?

A     Yes, sir.

Q     Did I advise you that I talked to the prosecutors in Sequoyah County and tell them of your cooperation?

A     Yes, sir.

Q     And since then you also had an application to revoke a misdemeanor sentence in Tulsa County, didn't you?

A     Yes, sir.

Q     And in fact, I called the District Attorney's Office in Tulsa County and advised them that you were cooperating in this case as well, didn't I?

A     Yes, sir.

Q     Beyond doing that, contacting the D.A.'s Office in Sequoyah County and the D.A.'s Office in Tulsa County and advising them that I anticipate you're going to cooperate, have I told you any promises in regards to what would happen to any sentence that you may be facing or any time you may be serving?

A     Have you advised me of what now?

Q     Have I told you anything about what would happen to any sentence you have?

A     No.

Q     Has any promise been made in regards to your early release or anything that might happen in Tulsa County at

2496

all?

A    No, sir.

Q    In fact, if you had your preference, would you rather do the six months in the Department of Corrections or would you rather be here?

A    I'd rather do my time.

Q    Do you know Kenny Barrett?

A    Yes, sir, I do.

Q    How do you know Mr. Barrett?

A    I've known Mr. Barrett, I guess, since 1983, '84.

Q    And you're from where, sir?

A    Sallisaw, Oklahoma.

Q    That's in -- (Interrupted)

A    Sequoyah County.

Q    And where is Mr. Barrett from?

A    Sallisaw, Oklahoma.

Q    How do you know Mr. Barrett?

A    He's been a friend, I guess, all my life.  I've known him pretty much all my life.

Q    Do you know any individuals with whom Mr. Barrett associates?

A    Yes.

Q    Do you know an individual by the name of Chip Teague?

A    Yes, sir, I do.

2497

Q    Who is Chip Teague?

A    Chip Teague is -- (Interrupted)

Q    Well, let me ask you --

MR. LITTLEFIELD:  Let me withdraw that question.

THE COURT:  You may.

Q    (By Mr. Littlefield) Is there an association or has there be an association between Chip Teague and Mr. Barrett?

A    Yeah, I'm sure -- (Interrupted)

MR. HILFIGER:  Objection as far as relevancy and -- as far as relevance.

THE COURT:  Argument counsel?

MR. LITTLEFIELD:  Teague's one of the names that was in the book, in that address book.  And his name was identified as having been in that address book and it tends to show a relationship between Mr. Barrett and the Government Exhibit N-2.

MR. HILFIGER:  Your Honor, may we approach on that?  Because that's one of the problems we're talking about.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. HILFIGER:  Your Honor, my objection on this stuff that's out of the address book is number one,

2498

there's nothing that links this address book to Kenny Barrett. The address book has Toby Barrett's name in it. Has Toby Barrett's identification. Everything that -- anything that indicates any kind of link to this book is Toby Barrett. The book was found in the travel trailer that Toby Barrett was living in.

MR. LITTLEFIELD: There's no testimony to that.

MR. HILFIGER: The only evidence of anybody -- of any idea anybody in that travel trailer was the wallet and that notebook and the wallet had the driver's license of Toby Barrett in it. There's no evidence that Kenny Barrett was in that travel trailer. And that's where all this -- you know, the notebook and everything is Toby Barrett's.

MR. LITTLEFIELD: There's no evidence that that notebook was Toby Barrett's. Wallet, yeah, is Toby Barrett's, because it has his driver's license. There is a bank statement that has Toby Barrett's name in it. There was a ticket that had Toby Barrett's name in it and there was some other document in the front of it. Those could have been placed there by anyone else and there's no -- necessarily, there's no -- not necessarily any indication that Toby hadn't borrowed it, that Toby hadn't used part of it. To the extent that associates of the Defendant, Kenny Barrett's, are listed in the address

2499

book part with their phone number -- (Interrupted)

THE COURT:  Let me ask this question.  I don't know what the evidence that's coming out down the road.  I assume you both do.  Is this all the testimony we're going to hear about the travel trailer?  I mean, is it going to be identified with either Toby or -- (Interrupted)

MR. LITTLEFIELD:  The only additional items, there's another drug exhibit that was found in there -- (Interrupted)

THE COURT:  -- Toby lives in that?

MR. HILFIGER:  Toby does live.

MR. LITTLEFIELD:  Well, we'll have to wait and see about that.

MR. HILFIGER:  You know Toby Barrett's going to say that.

MR. LITTLEFIELD:  I imagine Toby Barrett's going to say all -- (Interrupted)

THE COURT:  I don't know -- (Interrupted)

MR. LITTLEFIELD:  -- kinds of stuff.  But that don't make it true -- (Interrupted)

MR. HILFIGER:  Judge, that's why he said there's no evidence that this belongs to Toby Barrett.  There's absolutely no evidence that this notebook belongs to Kenny Barrett.  There's nothing identifying Kenny

2500

Barrett with this notebook, number one.  And Mr. Littlefield is being a little disingenuous if he says he doesn't know what Toby Barrett's going to testify to because there are transcripts where Toby Barrett admits that he lived in that trailer.

MR. LITTLEFIELD:  There are transcripts in which Toby Barrett's told three different stories that were all entirely inconsistent and I wouldn't believe a word he says.

MR. HILFIGER:  But he never said anything different than he lived in that trailer.

MR. LITTLEFIELD:  Judge, that's on Kenny Barrett's property.  He lives -- I anticipate he lives with his mother and stayed there on occasion.  There's nothing that says he owns it.  That it's his trailer. That it's his property.  Or that he was staying there full time.  Wasn't paying any rent.  There's no receipts. He stayed there potentially on occasion.  But there's nothing that says that's exclusively Toby Barrett's.  To the extend -- (Interrupted)

THE COURT:  What does this guy -- does this guy know about these three names?

MR. LITTLEFIELD:  He knows who they are and I anticipate he'll be able to say they are associates of Kenny Barrett.  For example, Tracy Swearingen --

2501

(Interrupted)

THE COURT: -- when you say associate, do you mean driving fast cars or associates in the drug business?

MR. LITTLEFIELD: Associates in the drug business. I know he will able to say that Chip Teague is in prison for drugs and he was an associate of Kenny Barrett's. He will also be able to say that in regards to Tracy Swearingen, he obtained pseudoephedrine tablets in a transaction that involved Tracy Swearingen. This is based upon my previous interviews with him. That he was -- that he obtained pseudoephedrine in a transaction which involved Tracy Swearingen, another female and Kenny Barrett.

MR. HILFIGER: Was he there at the time or is that what Tracy Swearingen said?

MR. LITTLEFIELD: Tracy told him to get the pseudo and deliver it and he gave it to another girl who then delivered it to Kenny Barrett and Kenny Barrett confirmed later that he got it. And I think he can say that Tammy Bedwell was a girlfriend of Kenny Barrett's.

THE COURT: So where does that get us? I mean -- (Interrupted)

MR. LITTLEFIELD: All those names and telephone numbers are in the book.

2502

THE COURT: I know. But what does he know about any -- I mean, as far as being relevant to -- I assume you're trying to prove that through those associates that he's involved in the drug business.

MR. LITTLEFIELD: No, I'm trying to prove in relationship to -- that the association that the names in that address book are associates of Kenny Barrett's, not Toby Barrett's, which establishes a relationship between Kenny Barrett and that trailer.

THE COURT: Well, you know, I know this -- I mean, I'm not being naive, but I mean this guy could say, yeah, I know that these three people are associates of Kenny Barrett. Okay.

MR. LITTLEFIELD: And then that -- the fact that those names are in that address book that was found in that trailer creates a reasonable inference that that address book is Kenny's, not necessarily Toby's.

MR. HILFIGER: I object to that, Judge. That doesn't create any inference other than Toby Barrett may know those same people.

MR. LITTLEFIELD: Let Toby testify to that.

MR. HILFIGER: But there's nothing in that book that links that Kenny Barrett. All the identification shows it's Toby Barrett's and it was found in the trailer that through testimony, that Mr. Littlefield has read and

2503

is well aware of, that Toby Barrett says he lived out there and he started living out there in May of 1999 and that's all in the testimony, that he'd been living in the trailer and his billfold was found in that trailer.

MR. LITTLEFIELD:  And it's on Kenny Barrett's property.

MR. HILFIGER:  Well, I agree with that.  I'm talking about the notebook.

MR. LITTLEFIELD:  And it is Kenny Barrett's trailer.

MR. HILFIGER:  And I don't necessarily disagree with that.

THE COURT:  What makes it a -- I mean, it may be a problem of foundation.  But, I mean, if -- I don't know who's going to testify about what, but if somebody, I don't care who it is, if somebody comes in and says, well, Toby Barrett lived in that thing almost exclusively, I mean, that's where he spent the night. That's where he lived.  I don't know whether that trailer is capable of supporting life.  But, I mean, if that was where he lived, that is one thing.  On the other hand, if it was just a trailer out there where they threw stuff in it every once in a while, nobody really lived in it, that makes a difference to me, as to whether or not it has any relevance.  If it's primarily Toby's residence, I think

2504

Mr. Hilfiger's got a point. If it is just a trailer out there where they threw stuff in every once in a while, then -- (Interrupted)

MR. LITTLEFIELD: I think that the testimony will be that Toby was staying in there. But by the same token, that does not mean that that was exclusively his, nor does it mean that being on his property, owned by Kenny Barrett -- (Interrupted)

THE COURT: Is there anything in there that belonged to Kenny Barrett?

MR. LITTLEFIELD: Two sets of scales.

THE COURT: Can you establish that?

MR. LITTLEFIELD: Well, by the fact that all the baggies that were being distributed are in the house and as Mr. Smith argued, you don't just throw them in, you weigh them.

MR. HILFIGER: That's a leap of faith though. Where do you get that the scales even belonged to Kenny Barrett? That's just your leap of faith.

THE COURT: They weren't in the trailer.

MR. LITTLEFIELD: They were in the trailer. There weren't any scales in the house. The scales were in the trailer. But all the distribution stuff, the items for distributing and dispensing them are in the house.

2505

MR. HILFIGER:  Judge, I don't think they're there.  I don't think that -- and the testimony, I think, will be that from about May, sometime before school was out, in 1999, Toby Barrett lived and stayed in that trailer.

MR. LITTLEFIELD:  But that doesn't exclude Kenny Barrett from that trailer, access to the trailer.  I mean, it's on his property, it's his trailer.  And if there's items that are in that trailer that are indicative of his use of that trailer as well, and that would include an address book, then I ought to be able to get it in.  It may not have much weight and that's for the jury to decide.

THE COURT:  So he's going to testify that there's three people that he knows that associated with Barrett's, whose names are in there.

MR. LITTLEFIELD:  With their phone numbers.  One of them being his ex-girlfriend.

THE COURT:  I know.  But is -- (Interrupted)

MR. LITTLEFIELD:  One of them being somebody with whom he was involved in drug activities.

THE COURT:  Is this guy personally involved in it with him or is this hearsay?

MR. LITTLEFIELD:  This guy advised me that Tracy Swearingen arranged for him to get some

pseudoephedrine pills for Kenneth Barrett.  And that he delivered them to a third party who was a female and for the purpose of those pills being delivered to Kenny Barrett and that he later asked Kenny did you get the pills from -- I don't remember the gal's name, but I'll say it was Sally.  Did you get the pills from Sally and Kenny said yeah.

MR. HILFIGER:  Judge, all that is is way outside any relevance, number one.  And my concern is there's hearsay involved on that.  Because he's having a conversation with Tracy, who's not here and Tracy's saying -- (Interrupted)

MR. LITTLEFIELD:  Except that -- and I'm not asking what did the other person say.  Except that he acted upon what Tracy got -- advised him, he got the pills, delivered it to a third party and then when he asked Barrett did he get those pills from that third party, Barrett acknowledged that he had.

THE COURT:  Are you going to introduce anything else that ties these people, these other people to drugs or anything -- (Interrupted)

MR. LITTLEFIELD:  I'm sorry.  What?

THE COURT:  Those three.  Anybody other than those three?

MR. LITTLEFIELD:  No.  Because I don't know

2507

every name in there.  Yeah, and I'm not sure how the evidence is going to develop.  I mean, I don't know if Kenny Barrett's going to take the stand.  If he does, he might tell the truth and acknowledge knowing some of those people.  He might even tell the truth and tell that's my book.

MR. HILFIGER:  Except that it's Toby Barrett's book.

MR. LITTLEFIELD:  Well, who knows that, Roger?  Toby might say that, too.

MR. HILFIGER:  I just don't think there's a foundation at this point for them to get into that.  I mean, I think they can get Toby Barrett up here and find out.  But there's no foundation.  All the evidence at this point is that notebook belongs to Toby Barrett, it's where Toby Barrett was staying.  I know there's no testimony now, but you know darn well that there's two trials and a preliminary hearing of testimony that Toby Barrett says he resided in that trial.

MR. LITTLEFIELD:  And he didn't testify at the preliminary hearing, so that's not true.

MR. HILFIGER:  Okay.  Two trials.

MR. LITTLEFIELD:  And I don't remember what he said.

MR. HILFIGER:  No.  You do.  If you want to,

2508

you can.

THE COURT: If he -- (Interrupted)

MR. LITTLEFIELD: No, that's not true, Roger.

THE COURT: Okay. Listen up here. I think it's premature. And I don't think there's any foundation for those questions to be asked now. It could be sometime later, but not now.

MR. LITTLEFIELD: Okay. One of the things that -- one of my problems is one of the things that I was going to ask him about, anyway, in relation to the drug business is Mr. Barrett's connection with the drug business, was that he did get pseudoephedrine for him. So I'm going to ask him about that particular transaction anyway.

THE COURT: You can ask him about that. I hadn't heard that yet.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q    (By Mr. Littlefield) Mr. Sanders, are you familiar with what's out there that's identified as Government Exhibit Number 1?

A    Yes, sir, I am.

Q    What is that?

A    Look's like Kenny's house.

Q    Are you familiar with Kenny's house?

2509

A   Yes, sir.

Q   By the way, do you recognize Kenneth Barrett?

A   Yes, sir, I do.

Q   Is he present in the courtroom today?

A   Yes, sir, he is.

Q   Can you point to him and tell what he's wearing?

A   He's wearing a black shirt.

MR. LITTLEFIELD:   I'd ask the record to reflect that the witness has identified the Defendant.

THE COURT:   Record so reflect.

Q   (By Mr. Littlefield) Do you recall the time when the state trooper was killed at Mr. Barrett's -- and I'm not asking you the specific date, but do recall when that happened, sir?

A   Yes, the month of September.

Q   Of 1999?

A   That's correct.

Q   How often prior to that did you frequent Mr. Barrett's residence, go over there?

A   Often.   Whenever I was close to his house.   My uncle lives across the street from Mr. Barrett.

MR. LITTLEFIELD:   And I would ask that Government Exhibit Number 182 be displayed.

THE COURT:   You may.

MR. LITTLEFIELD:   184.   I apologize.

2510

Q     (By Mr. Littlefield) It will be on that little monitor to your left and it's also displayed up here.  Do you recognize what that aerial view is of, sir?

A     Yes, sir, I do.

Q     And do you see Mr. Barrett's residence there?

A     Yes, sir, I do.

Q     Can you tap -- if you just tap that screen at that location.  Can you just reach up and put your finger on it and tap it.  Okay.  Now, where is your uncle's place?  Okay.  For what reason did you go to Kenny Barrett's in the period of time leading up to the incident where the trooper was shot at Mr. Barrett's house?

        MR. HILFIGER:  Your Honor, if we could have a time in this.

        MR. LITTLEFIELD:  I think I said in the months leading up.

        MR. HILFIGER:  Months.

A     I was there in September, August.

Q     (By Mr. Littlefield) For what reason would you go there?

A     Visiting.  He's a friend.  He was working on my cousin's vehicles, he was working on my girlfriend's vehicles.

Q     Did you ever -- I noted you have drug related prior felony convictions, sir?

2511

A    Yes, sir, I do.

Q    Back in '99 did you have -- did you use controlled substances; were you using drugs back in '99?

A    Yes, sir, I was.

Q    What kind of drugs were you using in 1999?

A    Methamphetamines.

Q    And was Mr. Barrett ever a source of the methamphetamine that you used?  Did you ever get meth from him?

A    Yes, sir, I have.  I've done meth with him.

Q    I'm sorry?

A    Yes, sir, I have done meth with him.

Q    Where did you do meth with him?

A    I done the meth with him at his house, at my brother-in-law's house, at the lake, just whenever we felt like doing some of it.

Q    Did Mr. Barrett have any firearms?

A    Yes, sir, he did.

Q    What kind of firearms did he have?

A    I know he had a .223 which is a AR-15.

Q    Okay.  And hold on a second.

        MR. LITTLEFIELD:  I'd ask that Government Exhibit Number 128 be displayed to the witness.

        THE COURT:  You may.

Q    (By Mr. Littlefield) Mr. Sanders, would you examine

2512

the contents of that box?

A    Yes.

Q    Do you recognize what that is, sir?

A    Yes, it's an AR-15 Colt, AR-15 .223.

Q    And whose AR-15 .223 is that, sir?

A    It looks like Mr. Barrett's.

Q    And you were going to mention another firearm that he possessed?

A    Yes, he had an automatic pistol.

Q    What kind, do you know?

A    9 millimeter, maybe a .45.

Q    And in regards to that AR-15, did he keep that in any particular location, sir?

A    I've seen it out in his garage, I've seen it in his house.

Q    Where did he keep it in his house?

A    In that room as you -- (Interrupted)

        MR. LITTLEFIELD:  Well, Judge, could we display Government Exhibit 175?

        THE COURT:  You may.

Q    (By Mr. Littlefield) And do you recognize the photograph of the model, sir?

A    Yes, sir, I do.

Q    And where is the front door to the residence, sir? Okay.  Where was it that you observed that Government

2513

Exhibit 128, the AR-15 in the residence?

A   I've seen it in here, I've seen it in the corner there and there and there.

Q   Now, you mentioned an automatic pistol, .9 Millimeter?

A   Yes, sir.

Q   Do you think you could identify it if you saw it, sir?

A   Possibly.

MR. LITTLEFIELD:   I would ask that Government Exhibit Number 122 be provided to the witness.

Q   (By Mr. Littlefield) Mr. Sanders, have you had a chance to look at Government's Exhibit Number 122?

A   Yes, I have.

Q   Do you recognize that?  If you don't, that's fine.

A   No, I haven't -- I don't recognize that pistol there.  I recognized he used to have a black pistol he carried in his waistband once in a while.  I haven't seen that one.

Q   Okay.  Okay.  During 1999, the months leading up to the incident at his residence, how often did Mr. Barrett leave that place?  Did he leave very often, stay there or what?

A   Well, I wasn't at his house all the time, so I wouldn't know how long he was there.  How long he stayed

there.  But from what I gather, he wasn't leaving much.

MR. HILFIGER:  I'm going to object as to what I gathered is really a -- (Interrupted)

THE COURT:  Sustained.

Q    (By Mr. Littlefield) Did you ever talk to Mr. Barrett about him leaving his place?  Any conversations about whether he'd leave or not?

A    Yeah, I think we've had a discussion about him leaving.  I think I tried to get him to come to the -- to my brother-in-law's once or something and he said he had a warrant, he couldn't leave or something.  And that's all I remember about that, I think.

Q    Did he ever have any conversations about what he anticipated law enforcement would do in relation -- (Interrupted)

MR. HILFIGER:  I object.  This is very leading and suggestive, just the way he's asking this question.

THE COURT:  Sustained.

Q    (By Mr. Littlefield) What if anything did Mr. Barrett say about what he expected law enforcement to do in relationship to the outstanding warrant?

A    We had a -- we had a discussion about that.  We had a discussion that -- well, me and Kinney was standing outside.  They came and stayed out of a store one day and the police drove by and this is a store that's closest to

2515

his house, I think.  And it's Chuck Fields's store and the police drove by and he said that -- we went back inside and he said he had a warrant for his arrest, he didn't need to be seen.  And I said okay.  And I think to the question that you asked me was -- (Interrupted)

Q   What did he say in relation to what he expected law enforcement to do because of the warrant that was outstanding for him?  What did he say about it?

A   He told me that if the police ever came to his house that he would shoot the first police that came through his door.

Q   Did he identify anyone that he anticipated that first person might be and if so who?

A   Yes, he did.  Johnny Philpot.

Q   Who's Johnny Philpot?

A   That would be the Sheriff of Sequoyah County.

Q   When methamphetamine was used at Kenny Barrett's house, who supplied it?

A   The only time I done meth at Kenny Barrett's house he had it.

Q   What was the quality of it?

A   I guess it was good.

Q   What do you mean you guess it was good?

A   I mean, that's kind of a -- no question.  Yeah, it was good dope.

2516

Q    How much meth dope -- well, let's talk about -- are you familiar with how much meth cost back in '99 in Sequoyah County?

A    Well, sure.

Q    How much was an eight ball?

A    Two hundred, two fifty.

Q    And that's how much?  An eight ball is how much of an ounce?

A    Three and a half grams.

Q    Or how much in relation -- how much of an ounce is it?  Why is it called eight ball?

A    It's because it's a quarter -- I mean an eighth of an ounce.

Q    How much is -- how much was an ounce?

A    Twenty eight grams.

Q    How much did an ounce cost you?

A    Thousand, $1200.

Q    What's a quarter paper?

A    It's point two five, point -- 25 tenths of a gram.

Q    So it's a fourth of a gram?

A    That's correct.

Q    How much would a quarter paper cost?

A    Twenty five dollars.

Q    Was there ever an occasion in which you were involved in supplying pseudo to Mr. Barrett's?

2517

A     Yes, I gave a female some pseudo to give to Mr. Barrett.

Q     Who arranged that transaction?

A     A female named Tammy Bedwell.

Q     And what did Ms. Bedwell -- how did Ms. Bedwell go about arranging that transaction?

A     She came and asked me if I had some pseudoephedrine.

Q     Were you able to get pseudoephedrine?

A     Yes, I was.

Q     Where did you get it from?

A     From my source up near Tahlequah.

Q     And when you received the pseudoephedrine, what did you do with it?  When you got the pseudo, what did you do with it?

A     I changed it into -- they got blockers in the pseudoephedrine so you got to pull the ephedrine out of the pseudo.  So I would pull the ephedrine out of the pseudo so it would be -- (Interrupted)

Q     To do that -- lean forward again.  To get your -- when it comes, when you buy it, it comes in what type of -- (Interrupted)

A     Comes in a pill form.

Q     And how do you convert it to usable pseudo that could be used in manufacturing methamphetamine?

A     You put it in rubbing alcohol or isopropyl alcohol

or what we call HEET, the stuff you put in your car.

Q   Then what do you do then?

A   You just drain it off into filters and you put it in the microwave to dry if you want a quick dry or you can just leave it in the Pyrex plate to let it dry.

Q   I'm sorry.  You leave it what?

A   You can leave it in a Pyrex plate to let it dry or if you want it to dry quicker, you can use a microwave to let it dry.

Q   And after you powder it out so that it's separated from the binders in the pills, what did you do with that pseudo in relation to Mr. Barrett?

A   I put it in a bag and sealed it up and give it to Tammy Bedwell who takes it Kenny.

Q   After you gave the pseudo to Tammy Bedwell, was there any conversation with Mr. Barrett about his having received it and if so, what was that conversation?

A   I think I seen him a day or so after and asked him if he got the ephedrine from Tammy.

Q   What did he say?

A   He said, yes, he did.

Q   Have you ever picked up methamphetamine for use with anyone at Mr. Barrett's?

A   Yes, sir, I did.

Q   Who?

2519

A    Who was I with?

Q    Yes, sir.

A    Geniece.

Q    Geniece?

A    Thomas.

Q    And how long would it have been prior to this shooting incident, approximately?

A    Probably -- probably a week, three, four days maybe.

Q    Okay.

A    Maybe a week with her.

Q    What happened?

A    I just went to her house and went to his house and he was working in the garage and we pulled up and got some methamphetamines.  It was in the evening hours.

Q    And who was it -- who was it that acquired the methamphetamine at Mr. Barrett's residence?

A    Ms. Thomas.

Q    And where were you when Ms. Thomas acquired the meth?  Did you go with her, accompany her, or did you stay back at the vehicle or what?

A    No.  I was outside the vehicle.  It was in his garage.  I was outside the garage and she went inside the garage and got the meth.

Q    And who was inside the garage that she met with?

A    Kenny.

Q    After Ms. Thomas acquired the methamphetamine from Kenny, where did you and Ms. Thomas go?  Do you recall?

A    Yes.

Q    Where did you go?

A    Went to back to my house.

Q    When you got to your house, what did you with the meth that had been acquired?

A    Consumed it.

Q    How was it?

A    Intravenously.

Q    Okay.  Was it good, indifferent or what quality?

A    Yeah, it was good.

Q    You said you used it intravenously, what are you talking about?

A    With the syringe.

Q    Have you ever used methamphetamine with Kenny Barrett?

A    Yes, I have.

Q    When you used it with Mr. Barrett, how did you use it?

A    Intravenously.

Q    How did Mr. Barrett use methamphetamine if he in fact consumed it?

A    Intravenously.

Q    Do you recall advising Clint Johnson that Mr.

2521

Barrett had methamphetamine in his residence?

A    Yes, sir, I do.

Q    And how much was that prior -- how long was that prior to this incident on September the 24th?

A    Couple days.

Q    Where did you see the meth?

A    In his hand.

Q    What was the circumstances of seeing the meth?

A    We was doing some of it.

Q    I'm sorry?

A    We was using it.

Q    Both of you?

A    Yes, sir.

Q    You told Mr. Johnson about that?

A    Yes, sir.

Q    Do you know who the informant was on the search warrant that resulted in the officers going to Mr. Barrett's place?

A    Me.

Q    Had you provided information to Mr. Johnson in the past, sir?

A    Yes, sir, I have.

Q    What, if anything, did you receive in payment?

A    I didn't receive no payment.

Q    For this particular transaction?

2522

A    No, sir, I didn't.

Q    What did Mr. Johnson do, if anything, in your behalf as a result of receiving the information from you about Mr. Barrett having methamphetamine at his residence?

A    Mr. Johnson's helped me in the past.

Q    In relation to what, sir?

A    I had a check charge in a Tahlequah that he took care of.

Q    Have you received money from Mr. Johnson previously for providing information?

A    For gas and expenses.

Q    Did he ever pay you in a way like if you give me information on Mr. Sperling, I'll give you X number of dollars?

A    No, sir.

Q    Ms. Bedwell is the individual who asked you to acquire some pseudoephedrine for Mr. Barrett?

A    Yes, sir.

Q    What relationship did she have with Mr. Barrett?

A    I think she was his friend, maybe girlfriend.

Q    Did you ever cook meth?

A    Yes, sir, I have.

Q    Did you ever see Mr. Barrett cook meth?

A    No, sir, I haven't.

Q    Do you have any idea how many times in the summer of

'99, prior to this incident, three or four months leading up to this incident that you used methamphetamine that was provided to you by Kenny Barrett?  And if you don't know, that's fine.

A    No, I don't know how many times.  Exactly how many times.  It's more than five.

MR. LITTLEFIELD:  May I have a second, Judge, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) Mr. Sanders, you mentioned, I think, a quarter paper was $25?

A    Yes, sir.

Q    And you said you used it intravenously.  That means you used what to ingest methamphetamine?

A    A syringe.

Q    And where would you get your syringe that you used to inject methamphetamine?

A    At the pharmacy.

Q    You had your own?

A    That's correct.

Q    Where would Mr. Barrett -- how did he use it?  When he took meth, how did he use it?  How did he take it?

A    When I done meth with him, he done it the same way I done it.

Q    Syringe?

2524

A    That's correct.

Q    And did you ever -- where did he get his syringes from?  And I don't mean the original source, but where at his residence did he have his syringes?

A    I don't know.  I don't know where he kept his syringes.

Q    When you would ingest methamphetamine, when you would use it, you mentioned that a quarter paper was $25 worth?

A    That's correct.

Q    The typical dosage that you would use, how much would you use?

A    Twenty to $25 worth.

Q    So your typical injection would have been a quarter paper of meth.

A    That's correct.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Cross-examine.

CROSS EXAMINATION

BY MR. HILFIGER:

Q    Mr. Sanders, I heard you go over with Mr. Littlefield some convictions that you had.  I sort of pulled up your sheet from the Department of Corrections.  It seems that you have more than what you said.  You named off about three, four convictions.  Three before

and then one you're serving now.  As I see here you got a conviction out of Arkansas for illegal distribution of controlled substances; is that true?

A    That's correct.

Q    And that was a '86 case, is that right?

A    Yes.

Q    And you got six years?

A    I got ten years with four suspended and six.

Q    Six in, four suspended?

A    That's correct.

Q    Ten year sentence.  Then I show the next one appears to be in 1989 in Sequoyah County, uttering a forged instrument, is that right?

A    Yes, sir.

Q    And you got one year incarceration and some time on paper, is that right?

A    Yes, sir.  I think it was a -- '89, yeah, that's correct.

Q    I'm not saying when the conviction occurred, I'm saying when the charge was.  1989.

A    Yes, sir, that's correct.

Q    So that's two.  Then I show in 1990 you had a sexual battery, is that right?

A    That's correct.  That's correct.

Q    Possession of CDS, cocaine.  So you do other things

2526

than meth, right?

A    Yes, sir.

Q    And two counts of possession of CDS cocaine -- well, one count, I'm sorry.  And it appears you've got three years -- a 10 year sentence, three years in and the balance suspended?

A    Ten years, three years in and seven suspended.

Q    So that's the third conviction you got?

A    That's correct.

Q    And then in '92 you got another -- you had another charge in '92 of possession of CDS cocaine out of Sequoyah County again.  You got a 10 year sentence on that.  Part of it was seven years probation, is that right?

A    That was the same one.

Q    But it was two different instances, wasn't it?  One was a charge in 1990 and one was a charge in 1992, is that right?

A    No, that's not right.  It was all the same charge.

Q    Okay.  So you got -- so they're wrong.  And you have a case number, CF 90-144 -- (Interrupted)

A    That's sexual battery.

Q    -- charging you with sexual battery -- (Interrupted)

A    That's correct.

Q    Possession of CDS cocaine and possession of CDS

2527

cocaine and did you also have another CF 92-91 that had two counts of possession of cocaine?

A    Not to my knowledge, no.

Q    Okay.

A    That was the same charge.

Q    That was the same charge?

A    Yes.

Q    It shows -- were you convicted in CF 1990 to CF 90-144 in August 8th, 1990?

A    Yes, sir.

Q    And CF 92-91 in Sequoyah County, were you convicted in July 20th, 1992?

A    No.  I was in the penitentiary during that time.

Q    You were in the penitentiary at that time, so you didn't get that conviction?

A    No, sir, I didn't.

Q    So this is wrong CF 92-91 you didn't get a conviction, is that right?

A    That's got to be the same case.  I don't remember that case number.  But that's got to be the same case because I was in the penitentiary during that time.

Q    So you're confessing that conviction.  In Muskogee County, I don't think you mentioned one in Muskogee County.  You got -- you were charged in CF 93-131 and convicted in December of 1994 of carrying a weapon, drugs

2528

and alcohol in the jail and escape from a penitentiary. Do you recall that?

A     The escape's correct.  The carrying a weapon in the jail is incorrect.

Q     You didn't get a conviction for that?

A     No, sir, I did not.

Q     Okay.  But you did escape from jail?

A     Yes, sir, I did.

Q     From the penitentiary?

A     Yes, sir, I did.

Q     And you got time in for that, didn't you?

A     Yes, sir, I did.

Q     And then back in Arkansas in 1995 you were charged with possession, concealing stolen property and forgery, second degree, is that right?

A     Yes, sir, that's correct.

Q     And in July you got a conviction for that, of 1995?

A     Yes, sir, that's correct.

Q     So that's one, two, three, four, five convictions, is that right?

A     That's correct.

Q     Not including the one that you're contesting?

A     That's right.

Q     Then back in 1998 you got another possession of CDS, controlled dangerous substance, in CF 98-346 and you were

2529

convicted in August 23 of 2001, is that right?

A   That's correct.

Q   So, it was during this -- well, let me go through this.  So that gives you three -- that's six convictions, right?

A   Yes.

Q   And you got -- the one on that one you got after -- for the sixth conviction you only got one year in, is that right?

A   No.  I got 20 years for it.

Q   Well, that was probation, though, wasn't it?

A   Yes, that was a suspended sentence.

Q   But you got a sentence to go to balance suspended upon successful completion of Last Stop Program?

A   That's correct.

Q   Last Stop Program is a drug program in prison, isn't it?

A   That's correct.

Q   Takes about a year to do it, doesn't it?

A   Yes, but I wasn't sent there.

Q   What?

A   It takes less than that, but I wasn't sent there.

Q   Okay.  So that's your sixth conviction.  You got in 1998 in three 60 -- in 1998-363 you also had uttering forged instruments and got a sentence going right along

2530

with that one, didn't you?

A    That was one -- all the same charge, yeah.

Q    That was all -- but separate convictions?

A    All the same incident, separate conviction.

Q    And then I guess you -- but you didn't stay in a year on that one though, did you?

A    That was run concurrent.  That was the same one.

Q    In 1999, in CF 99-562, you also had knowingly concealing stolen property.  And it's all the same conviction.  The four -- looks like you had three cases?

A    That's correct.

Q    It's all wrapped up in August of 2001?

A    Yes.  They're all run concurrent, yes, sir.

Q    You got a 20 year sentence?

A    That's correct.

Q    Only one year in the penitentiary?

A    Upon completion of the Last Stop or something similar program, balance suspended, yes.

Q    Got pretty favorable treatment, do you think?  After six convictions?

A    Yes.

Q    Only had to do one year in?

A    Yeah.

Q    And then after you completed that, it looks like in 2003, CF 2003-124, you got convicted in November of 2004

of running a road block.  Looks like three separate --

four separate counts of running a road block.  Did they

charge you with four separate times of going through the

road block?

A     No.

Q     You just got one of those?

A     No.  It was running a road block times two.

Q     What now?

A     Running a road block times two.

Q     So two running road blocks?

A     Yes.

Q     Is that all you got?  And on the two running a road

blocks, this was in 2003, now you have one, two, three,

four, five, six, seven, eight previous convictions and

you come back in 2003 and you get another conviction and

what do you get in 2003?  What's the deal in 2004,

November 19th, 2004?

A     I got 20 years -- 25 years, with running concurrent

with the previous 20 years that I had, with five years to

do in the Department of Corrections and Key to Life

Program or something similar program, balance suspended.

Q     So you had a chance to do the Last Stop Program, you

didn't get that one done.  And now they set it up so you

do a Keys to Life Program.  How long does that take you?

That takes about a year to do Keys to Life?

2532

A    That's the year program.  The Last Stop is a four month program and you've got any convictions of escape or anything that's got to do with escape they will not take you then.  Excuse me.  They will not take you there.

Q    Take you into what?

A    The Last Stop Program.

Q    That's why you had to go to Keys to Life and almost a year in jail?

A    No.  I didn't get to go to Key to Life Program.  That's all -- them's a minimum security penitentiaries.  They do not take anybody that's had prior escape history.  The courts didn't know this.  They don't know this when they sentence you.  They sentence you based on what they've got in front of them.  They don't know what the Department of Corrections going to do once you get there.  So, whatever that -- and you're going along with it thinking, yeah, maybe they'll just -- might get to go to the Last Stop Program or the Key to Life Program which them are kind of luxurious places to be, which I wasn't so fortunate to get there.  But I was sentenced to the -- I ended up at the Therapeutic Community at Davis Correction Facility in Holdenville the first time we was talking about -- in the 20 year sentence and then this time I haven't got to get to a drug program because of the eye.  They have shipped me around, dodging the

2533

expense of the eye this time.  So I haven't got to go to the drug program yet.

Q    And I haven't finished talking because you still got another conviction.  And all those running were -- the one we just finished, you still got another conviction out of Sequoyah County in CF 2004-19, that's running the same time as the running the road block that's for knowingly concealing stolen property, burglary second degree, arson second degree and knowingly concealing stolen property, is that right?

A    Yes, sir.  I think I named them earlier.

Q    So without counting the one you're disputing, you've got one, two, three, four, five, six, seven, eight, nine, 10 previous convictions and the only time you're serving is a Keys to Life Program with balance suspended upon completion and the maximum amount of time you're going to be able to serve on that is like a 35 percent of five years, isn't that right?

A    The maximum amount is what now?

Q    Well, you don't have -- you have a split sentence. You don't have a 25 year sentence on those two cases, do you?  You have a sentence that's already split five years in, 20 years probation?

A    The twenty's already suspended.

Q    Yeah.

2534

A    The five is to do in the Department of Corrections upon completion of a drug program.

Q    Right.

A    Yes.

Q    And you're saying you may not be able to get into the drug program or you don't know?

A    Well, at the present time, I'm not in one.

Q    But what I'm saying is after one, two, three, four, five, six, seven, eight, nine, 10 convictions running from 1986 through 2004, the maximum amount of time that you're going to be serving is some percentage with good time credits of only five years, isn't that right?

A    That's correct.

Q    And usually the time's going to be about 35 percent of that five years because this is a non-violent offense, isn't it?

A    Yes.

Q    So you're looking at somewhere around two, two and a half years after 10 convictions?

A    Well, that -- yes, sir.

Q    Yes.   Did Clint Johnson help you on those?

A    No, I didn't even -- no, sir.   He helped me on some, but, no.

Q    Well, now, how long have you been working with Clint Johnson?

2535

A   Since '96, '97.

Q   Since '96 and '97.  And, well, my gosh, but '96 and '97 you were still committing crimes, weren't you?

A   Yes.

Q   So you're working with Clint Johnson during the daytime and at nighttime committing crimes, is that right?

A   No.

Q   Well, you started working with him in '96.  How long -- from '96 up to when did you stop working with Clint Johnson?

A   It wasn't -- it was never just a full-time job working for Mr. Johnson.  Mr. Johnson is a friend.  It's not a full-time job.  That was like when I wanted to go out and do recreational drugs, you know.  That was when I worked for Clint Johnson.  That could be any of the time. I wasn't working a full-time job.  I guess if I wanted to be working for Clint Johnson, I could be working for Clint Johnson.

Q   But Clint Johnson was aware that you had -- in 1998 that you had possession of CDS, that you were charged in 1998 with possession of CDS.  You didn't get convicted on that charge until August of 2001?

A   That's right.

Q   And so, during this period of time, Clint Johnson

was aware that you had this charge hanging over your head, wasn't he?

A    Clint Johnson couldn't do nothing about that.

Q    Except make recommendations to the DA?

A    I don't know if he could do that either.

Q    But you weren't sentenced until after --

(Interrupted)

A    I hired an attorney to fight them cases for me.  It wasn't like Clint Johnson sat there and represented me during them cases.

Q    Well, I mean, you had 98 -- CF 98-346, CF 98-363, and CF 99-562.  Those three cases, which are possession of CDS, uttering forged instruments and knowingly concealing stolen property, so on one hand you're out here doing your deal, doing whatever criminal acts you're doing, but on the other hand, you're helping Clint Johnson, aren't you?

A    Well, no.

Q    You aren't?

A    That's wrong again.  No.  Them charges happened just because they happened.  It was -- the forgery charges is on my girlfriend.  The fraud charge was on my girlfriend.  It wasn't like I was just committing crimes so I can see how much trouble Clint Johnson could get me out of.

Q    He sure got you out a lot of it, didn't he?

2537

A     No, sir, he didn't.

Q     How many people did you inform on for Clint Johnson? You're an informant for him, right?

A     Some, yes.

Q     Some.  How many people did you inform on?  You informed on Kenny Barrett.

A     Four or five.

Q     Four or five people.  And who were the people you informed on?

           MR. LITTLEFIELD:  Object to the relevance, Your Honor.

           THE COURT:  Overruled.  You may answer.

Q     (By Mr. Smith) Who were the people you informed own?

A     A guy named Phillip.

Q     Who?

A     A guy named Phillip.

Q     Diane Phillips?

A     No.  A guy named Phillip.

Q     A guy named Phillip?  Is that how you described him? As a guy named Phillip?

A     No.  Phillip Morris.

Q     Phillip Morris.  Okay.  How much did you get paid for doing Phillip Morris?

A     I don't think -- gas and expenses.

Q     Just gas and expenses.  What kind of expenses did

2538

you get paid?

A   Well, depends on, I guess, if I wanted a pack of cigarettes that day or not, you know.  I don't know.  It's probably 40, $50.

Q   Forty, $50.  What kind of expenses did you have to get to get 40 or $50 to inform on -- (Interrupted)

A   Just gas and expenses.  I guess if I wanted -- if he was wanting a bust, I guess he wanted to give me money to go into the place and buy drugs.

Q   Yes.

A   He would give me money to go in to buy drugs.

Q   Okay.  Was Phillip Morris a drug deal?

A   No.  Phillip Morris wasn't a drug head.  He was a chop shop guy.

Q   Chop shop.  Did Phillip Morris get convicted based on your information?

A   No, sir, he didn't.

Q   He didn't.  When was it that you did inform on Phillip Morris?  About what time?  '96 to what, 2001 or when?  When in the '96 to 2001 time period did you inform on -- (Interrupted)

A   Probably '98.

Q   About '98.  Was that about the same time you were uttering forged instruments?

A   I don't know if it was the same.

2539

Q    Because you don't know that?

A    I can't answer that question correctly.  I don't know what month it was even I was charged with the forged instruments.

Q    Okay.  Do you know what month it was that you did -- was it just a one time informant deal on Phillip Morris or did you -- was it over a long period of time that you were working with Clint Johnson on Phillip Morris?

A    No, he sent me in there to check on Phillip twice.  But it wasn't any long drug out deal.  It was something he was wanting to know about.

Q    Now, how did you and Clint Johnson get together?  Did you say, hey, Clint, help me out and I'll tell whatever you want?

A    I've known Clint, I guess, most of his life.  I know his whole family.  I think I met him at the Cherokee County Courthouse.

Q    Okay.  Phillip Morris.  Who's another guy that you informed on?

A    Greg Cloud from Tahlequah.

Q    Who?

A    Greg Cloud.

Q    Greg Cloud.  And about when was that?

A    That was in '98.

Q    '98.  And what kind of information was on Greg

2540

Cloud?  What did they ask you to do?  Drugs?  Chop shop?
Or you just give him information on what?

A    He was basically wanting to know where Greg lived.
Greg was on the run.

Q    Okay.  Was he an escapist?

A    No, he was just wanted.

Q    Want for what?

A    I think drugs.

Q    And you were more than willing to tell Clint Johnson
where to find Greg Cloud, is that right?

A    Yes, sir.

Q    What did you get paid for that?

A    I don't think I got paid anything.

Q    No pay for that one, is that right?

A    That's right.

Q    That was in 1998?  Do you know whether that was
before or after you got charged with possession of CDS in
1998?

A    I don't know.  That's --

Q    Do you know whether it was before or after you got
charged with uttering a forged instrument in 1998?

A    Can you reflect on --

Q    What now?

A    Can you tell me which month that was that I was
charged with the forgery and the --

2541

Q    The forgery, I can't tell you exactly what month.  I can tell you it was over half the year.

A    Okay.

Q    Sometime summer or later.

A    Okay.  That's --

Q    Does that sound about right?

THE COURT:  Mr. Hilfiger, let's --

THE WITNESS:  I don't remember.

MR. HILFIGER:  Okay.

THE COURT:  We'll take a recess.  Remember my admonition not to discuss this or allow anyone else to discuss it with you.  Everyone please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  We'll be in recess for 20 minutes.

(Whereupon, a short recess was held after which the following record was made outside the hearing of the jury and in a sealed courtroom.)

THE COURT:  Let the record reflect that the jury is not present.  Counsel for the Government is present.  Defendant is present with counsel.  U.S. Attorney requested the courtroom be sealed.

MR. LITTLEFIELD:  Yes, I did, Your Honor.

THE COURT:  And the courtroom has been sealed.

2542

MR. LITTLEFIELD:  May I proceed?

THE COURT:  You may.

MR. LITTLEFIELD:  Your Honor, I am seriously concerned about the area of inquiry that is currently going on in cross examination.  And I objected when it started, in regards to requiring this witness to name individuals about whom he has informed in the past.  And there's several reasons for that concern.

The first is that this is the individual whose name was revealed and whose mother, within a matter of I think two days, received a telephone call advising her that she would be murdered in her house.  There's certainly serious concerns about the safety of this individual's family.  His mother is a 71 year old woman who lives by herself in the country in Sequoyah County.  And she is not the only witness who has been threatened in this case.  We had an additional witness who received a phone call saying you will not live to testify.

In that regard, the line of inquiry, Judge, as to what individuals he has informed on in the past might be appropriate if we were in a suppression issue as to who he'd informed on in the past, was it truthful, did they -- you know, was appropriate information found, what did he advise Mr. Johnson.  What information did Mr. Johnson find when he executed the search warrant.

2543

But we're not in that circumstance now.  This witness's testimony related to Mr. Barrett's conduct and in essence just boiling it down to its essence, he knew Mr. Barrett.  Barrett was involved in narcotics activities.  Mr. Barrett knew there was a warrant outstanding for him and said if police come I'm going to shoot the first one through the door and I hope it's Johnny Philpot and that he had a gun.

I further think that the area of inquiry is not appropriate for cross examination.  Rule 608(B) talks about specific instances of conduct and whether or not it is appropriate to attack the witness's credibility based on specific instances of conduct.  And it says that it may not be -- other than convictions of crime which we've certainly got into, it's not appropriate for proving the witness's character for truthfulness or untruthfulness.  But it can be gone into, in the Court's discretion, if it is a matter that relates to truthfulness.  This witness is identifying names of other individuals whose names he has provided to law enforcement is not in any way going to define whether he is or he is not a truthful person.  If he says I identified such and such and gave that name to Mr. Johnson and he ran a chop shop, you can't go beyond that.  The jury's not going to have any idea as to whether there were or were not truthful or untruthful

2544

allegations passed to Mr. Johnson. And it does nothing to advance or enlighten this jury on whether or not this witness is or is not a truthful witness.

THE COURT: Was that information disclosed to the defense?

MR. LITTLEFIELD: As to other individuals against whom he informed?

THE COURT: Yes.

MR. LITTLEFIELD: No, Your Honor. It wasn't -- number one, it wasn't requested and number two it was not -- it wouldn't be appropriate area of inquiry anyway.

THE COURT: Well, it may -- it could be. I mean, if he informed on somebody that's involved in this matter or a related matter or something of that nature.

MR. LITTLEFIELD: Well, and that's not -- but he's not asked have you ever informed on anyone other than Mr. Barrett in regards to this particular matter. And even if -- I mean, if you went to pick one of those individuals and said did you inform on that individual. Yes, I did. And was your evidence truthful and he says, yes, it was and it wasn't, they couldn't go into it anyway because it's extrinsic. They'd be stuck with whatever answer. But the answer does nothing to establish whether he is or is not a credible witness.

All this line of inquiry does, Judge, is

2545

instead of having him being threatened or his family being threatened because he's testifying against Kenny Barrett, it will raise four, five or six other people who may end up threatening his family or him. And it does nothing to establish whether he is or is not a credible individual.

His naming Greg Cloud does nothing to establish whether he is or isn't credible and requiring him to name those people doesn't either.

THE COURT: I'm not going to argue with you. It's just -- I assume you know those things and I do not. I don't know whether the defense does or not.

MR. LITTLEFIELD: No. We didn't inquire in them because Mr. Johnson's statement in the affidavit, when he testified at the suppression hearing, is my informant had advised me on -- and I think it was at least five previous occasions, and that information was truthful and credible resulting in -- and I don't remember the specific language. But Mr. Johnson testified to that. Even if this individual had lied to Mr. Johnson, it wouldn't go behind the motion, but behind Mr. Johnson's affidavit.

THE COURT: Well, I think what -- let me see -- what you're concerned about is Mr. Hilfiger going behind each of the situations where this witness's allegedly how

2546

many times has he helped out Clint Johnson. Then he's gone more specific than that but who are they.

MR. LITTLEFIELD: That even more so, yes, and Judge -- (Interrupted)

THE COURT: Here's my -- and I haven't heard what the defense has to say. Maybe I misunderstood your objection. I hadn't really noted you objecting to that line of questioning.

MR. LITTLEFIELD: I did when the first -- when he asked the first name -- to name the first witness, I asked -- or name the first individual.

THE COURT: Well, so you'll understand what was on the Court's mind, I don't know that he's not seeking to find out whether that he is -- has been a paid informant on the behalf of somebody involved in this transaction. As it appears now, from your perspective, they all look isolated. But I don't know that.

MR. LITTLEFIELD: And that was -- (Interrupted)

THE COURT: -- defense counsel knows that.

MR. LITTLEFIELD: That was asked of him. Did you receive any payment for identifying Mr. Barrett and he said no.

THE COURT: I know. But you're taking issue with whether or not he should be inquiring about what other people did he act as an informant on.

2547

MR. LITTLEFIELD:  Yes, sir.

THE COURT:  And I assume you know.

MR. LITTLEFIELD:  I do not -- (Interrupted)

THE COURT:  No, no, no.  I mean, I assume you know that he hasn't acted as an informant in any matter related to what's going on in this courtroom before now. I don't know that.  So when defense asks that question, I'm anticipating that's where it's going or that's what they're trying to find out.  Now from your perspective, you're saying these are all isolated instances and they shouldn't be -- they shouldn't go into them.  And my suggestion is in discovery that you should have or they should have asked what, if any, assistance has he been in the past and with whom was it.  And if it's not relevant, it shouldn't come in.  I don't disagree with that.

MR. LITTLEFIELD:  And -- but that's what the question is.  It is an open ended question.  Who all have you informed on.  You have informed on -- you have been an informant for Mr. Johnson since 1996.  Who all have you informed on.

THE COURT:  Well, and if this is -- I'm saying to both of you we shouldn't be where we are.  But it's not an unreasonable question from the defense if they don't know whether or not the witness is going to say, oh, yes, I have been involved with Mr. Johnson with four

2548

or five other people involved in this case.  Apparently that's not the case.  Let me see what Mr. Hilfiger has to say.

MR. LITTLEFIELD:  And I don't have a problem asking is this the only person you've informed on in relation to this prosecution and Mr. Barrett.  I don't have that problem.  What I got a problem on is who all have you informed on over the course of the three years previous.

THE COURT:  Okay.  I see your point.

MR. HILFIGER:  Your Honor, one of the points on an informant is that you want to see if they're biased.  You know, what they received from their information.  And those are the general things you can go into.  And you know one -- to get from what Mr. Littlefield talked about, we didn't ask for who all he's informed on, we probably need to go back and really set it all up straight.  There was like about a week before the death qualification on the jury that we were even informed as to this particular person's name and that this particular person was the confidential informant.

Back in February, March and April, we asked who the confidential informant was and Mr. Littlefield said, no, I'm not telling.  Okay.  So did we ask for who the informant was used on?  No.  He wouldn't even tell us who

2549

the informant was.  So it's a little bit, you know, not fully disclosing everything on the part of Mr. Littlefield's part when he says we did ask who all those people were.  That's true.  We didn't.  We didn't even know who the informant was until about -- it was a Thursday or Friday, either the week before death qualification or the Thursday or Friday before death qualification.  But that's -- (Interrupted)

THE COURT:  Let me stop right now.  Does the Government know who else he's informed on?

MR. LITTLEFIELD:  No, I don't know all the individuals he's informed on because it's not relevant to this case.  Judge -- (Interrupted)

THE COURT:  Well, that's -- I don't know that. I mean, you may know that.  I don't know whether it's relevant to this case till I know who he's informed on. And in my concern for both of you is if -- I mean, this is a -- I don't take it as an -- I don't take it lightly. And I'm convinced that this witness should be taken off the witness stand and the Government should make whatever disclosures they have as to who he's informed on, so the defense will be aware of who they are, and to the extent that they had anything to do with this case.

MR. SPERLING:  May I have a thought here, Your Honor?

2550

THE COURT:  You may.

MR. SPERLING:  That's exactly what we're -- what we think we should not be ordered to do.  Because that information goes directly from counsel to Defendant and that's why we're -- (Interrupted)

THE COURT:  No.  I'm not -- (Interrupted)

MR. SPERLING:  Here's my point.  Here's my point.

THE COURT:  No, here's my -- let me make my point.  I'm not asking you -- I'm not asking you to -- I'm asking you to disclose in a formal way, to the best information the Government, this witness has never informed on anyone that has anything to do with this case.

MR. SPERLING:  We didn't object, Your Honor, if rather than engaging in this fishing expedition an appropriate question would have been asked, to wit:  Have you informed on anyone else that has any bearing on this matter.  Now, if they want to ask that question, you know, that I understand the Court would permit.  What we object to is a fishing expedition to get there by asking about all of these people, putting all of their names in the public record and in the newspaper and access in any manner to fishing and then at the end of that come in, yeah, that's right.  None of this has anything to do with

2551

this case.  Well, it doesn't have -- none of this has anything to do with this case.  A chop shop, the first person that was mentioned was Phillip Morris and that was a chop shop.  And the other guy, Greg Cloud, the guy was wanted.  Has nothing to do with this case.  They're fishing.

THE COURT:  Well, I understand you know that.  But when he says chop shop, I've been much like the jury here.  What I understood that this Defendant has a -- he works on vehicles, he repaints vehicles.  It's not necessarily a foreign subject matter.  I mean, he was a mechanic.  There was a chop shop.  He did have several cars out by his place.  In fact, that was what was on my mind and I think that's what's on the jury's mind.  So I think that's a fair -- that links together.  That's a fair inquiry.

MR. SPERLING:  That's the last thing that they would want in, though, Your Honor, that he's engaged in other criminality.  I just can't see their motivation to do that.  I think one way to short circuit this, though is for us to specifically ask him that question.  Let us just take a moment to meet with him and ask about these five other people and to ask if they have anything to do with Kenny Barrett.

THE COURT:  I think that's the solution to the

2552

question, reveal that to the defense.

MR. HILFIGER: May I have just -- and I may be way off on this, myself. But, you know, part of this deal is how reliable is he. And we're not going in to this, you know, did he tell the truth to Clint Johnson. That's not what I'm trying to get at, Judge. What I'm trying to get at is just what I said. He's out helping Clint during the day and committing crimes at night. He's informing to Clint Johnson knowing that Clint Johnson is going to help him when he commits a crime. And is he going to admit that? No, he's not going to admit it. But I think we have the ability to set it up and say in 1998 he informed on this guy. In 1998 he was charged with a felony crime. Later in 1998 he was informing on another guy and in 1998 he was charged with another crime and eventually in 2001, in Sequoyah County, where Clint Johnson is working in drug task force and where he's working with the sheriff, he comes down and gets a conviction that's a sweetheart deal. Now, I think that goes to show, you know, what he's got involved in this case.

THE COURT: Well, I'm not insensitive to the Government's concern about the -- what's been brought to the attention of the Court about threats against people who are going to testify. I think that the defense can

2553

make that case without emphasizing -- I mean, if there is an appropriate disclosure that this cooperating witness has helped Clint Johnson or whoever on ten different cases, I think you can make those inquiries without raising the names of those parties and you have the same effect.

MR. HILFIGER:  If I could have something to show he's just not making stuff up out of the blue, Your Honor.

THE COURT:  No.  That's why -- what I'm about to say, I think it's going to take more than five minutes.  And I'm suggesting that this witness be delayed until whenever that can be -- a disclosure can be resolved, until Government has time, apparently to talk to their witness and make a disclosure as to how many times he's cooperated for the State of Oklahoma or anybody else he's cooperated for.  And disclose that to the defense.

MR. HILFIGER:  And I think that's exactly what they don't want to do.

MR. SPERLING:  We've already done that.  It's in the affidavit for search warrant.

MR. HILFIGER:  I mean, as far as names -- (Interrupted)

MR. LITTLEFIELD:  And I don't have a problem if

2554

he is asked how many times have you -- and he's already been advised of a couple, but -- and name the approximate time, instead of saying who else did you inform on. What was the next time. What was the nature of the case and when was it. Was it a drug case. Was it a chop shop case? And if he says I gave Mr. Johnson information in '98 in relation to a meth lab. And that's -- and going no further than that, it's not going to identify who the individuals upon whom he was informing.

THE COURT: Well, and you're appropriately, I assume, trying to do all that you possibly can to protect innocent people. From -- the only thing I can say is from the Defendant's point of view, as long as those -- and the only way you can do that is make a disclosure to the defense that none of these people had anything to do with this case. But short of that, they have a right to inquire.

MR. LITTLEFIELD: And that would -- and I understand that and I don't have a problem with the inquiry. But the inquiry itself doesn't -- would not require naming a name.

THE COURT: No.

MR. LITTLEFIELD: And that's the type of inquiry I don't have an objection to.

THE COURT: Well, I don't want to argue with

2555

you, but naming a name could have something to do with this case. I mean, it's a balance between protecting that person and being sure this Defendant's right to challenge the credibility of that witness is properly protected.

MR. LITTLEFIELD: What Mr. Hilfiger was asking, and the nature of what he was seeking, did not require naming a name. And even if -- as to the names he named, the chop shop, Phillip Morris, he's named the name. It's extrinsic anyway. And so, if they go to Phillip Morris and Phillip Morris says I've never owned a chop shop. I am a school teacher. I don't even know how to change a spark plug and I can't even change the oil in my car. They couldn't bring -- even if he lied about that, they couldn't bring Phillip Morris in and ask that any way because it is extrinsic and naming -- (Interrupted)

THE COURT: I think you've hit on the key word and that's the question. Is it extrinsic? If it is extrinsic, you're correct. It has no reason to come before the jury because it's not relevant. If it is intrinsic, then it is part of the evidence, it should become before the jury. And that's the fine line.

MR. LITTLEFIELD: I understand that.

THE COURT: And without disclosure on the part of the Government, the defense is left with having to ask

the question.

MR. LITTLEFIELD: And I understand what you're intending, but there's nothing to reflect that there is anything in regards to information he has provided previously, that's related to the information he gave about Kenny Barrett. And -- (Interrupted)

THE COURT: It may be that my suggestion is so impractical that I can't -- that I'm the only one that can see it. But it would appear that this would have been something that would have been foreseeable in that an appropriate disclosure would be our witness in this case, you named him, obviously the issue of his credibility is going to come before this Court. Has he acted as an informant in the past. Yes. How many times. And if you don't want do that then the defense is left with having to ask those questions.

MR. LITTLEFIELD: And I'm sorry. My foresight wasn't as good as yours and part -- (Interrupted)

THE COURT: Well, mine's all after the fact. It's easy.

MR. LITTLEFIELD: And in part because my belief was that relates to a question of law as far as the suppression. Because as to this witness and what he has testified to in this trial, he has testified as a fact witness in regards to Mr. Barrett's conduct, not in

2557

regard to the information provided as far as the search warrant is concerned.

THE COURT:   But you understand the question of his credibility.   That's key.   That's key.

MR. LITTLEFIELD:   Yes.   I do understand the question of his credibility.   But I don't see the issue of previous individuals against whom he has informed years previous in other communities as having any bearing to his credibility.

THE COURT:   I don't argue with that.   I don't think it does either.   But you don't know that until you ask the question.

MR. LITTLEFIELD:   I understand what Your Honor -- can we go ask him?   Can we take five minutes?

THE COURT:   Well, I think it will take more than five minutes.   I would like you to talk with him and report to the defense counsel.   And, you know, we'll start 30 minutes early in the morning and see if we can't get this resolved.

MR. LITTLEFIELD:   My concern is I don't want to reveal the names of all those individuals.

THE COURT:   I'm not suggesting you -- I haven't suggested that you should.   I just -- what I'm trying to say for the record, I think that the names came out not for any malicious reason on the part of the defense.   I

2558

think their inquiry was justified because they didn't have any information about what activity, if any, this cooperating witness had been involved in before. So I think the questions were reasonable. I understand your -- I didn't know either. I mean, I didn't have any way of knowing what the defense was asking for or what information was out there. But based on what was before the Court at the time of the questions were asked, they were reasonable questions. So what I suggest you do is you talk to your witness and make a disclosure to the defense as to what his previous history as an informant has been. Clint Johnson is the -- if Clint Johnson's the only one, I mean, he'd seem to be the most pertinent one to this case. If he's the only one, you know, and it appears it would be within the Government's knowledge to know, through Clint Johnson, if there's other -- if he's done other -- I mean, to verify what he says. So the defense has some security in knowing that's all there are. I'm not suggesting that you reveal names. Just that if the facts are there's been no involvement, that all these other cases did not involve this case, that that's -- if that's the disclosure. And again, I'm not suggesting how you do this, but Clint Johnson is the key. He would appear to be another part of the verification process.

2559

MR. HILFIGER:  Your Honor, this case includes anything directed at Kenny Barrett.

THE COURT:  Yes.

MR. HILFIGER:  Not just -- (Interrupted)

MR. LITTLEFIELD:  -- I don't have any problem saying he did inform on other occasions, in regards to Kenny Barrett.  Because, I mean, the cat's out of the bag as far as that's concerned.  But it's a question of how many cats are out.  And if he's given other information in regards to Mr. Barrett, that's fine.  I don't have a problem with that -- (Interrupted)

THE COURT:  Well, I think -- (Interrupted)

MR. LITTLEFIELD:  I mean, Joe Schmoe in Arkansas wouldn't have him.

THE COURT:  No.  But I think the fact that he has acted as an informant a number of times is reasonable.  The name of the person he's acted as an informant is not important unless it's connected to this case or Mr. Barrett.  And that's all that I think you're obligated to disclose.  And to the extent that it came out earlier, you know, I'm just -- we were -- I'll just say that the wavelength I was on was something different than where you were.  I was thinking they're asking the question, trying to find out whether this is connected with Kenny Barrett.  Maybe I missed something.  But the

2560

defense has a right to challenge his credibility.  And I think if we can follow that kind of disclosure, then I'll have a basis, if there is an objection, to ring people that are not involved in this case at all, then there's a basis to keep their names from being a part of the public domain.

MR. HILFIGER:  One other matter on that, I mean if it's like Mr. Littlefield has hoping and supposing it is, I would still be able to bring in maybe dates that were done, what was done.

THE COURT:  Yes.

MR. HILFIGER:  Without the names.

THE COURT:  Yes.  I mean, as long as they're people that are not involved with this case, there's no need for their name to enter the public domain.  And that's what the Court was hoping to glean from the testimony.  Anything else?

MR. SPERLING:  This has come up in the past, Your Honor.  I'm just thinking back over things that have happened here and looking forward at the prospect of being in Denver.  And one occurrence that comes to mind was the Batson challenge.  And the judge -- the Court overruled the Batson challenge.  I don't think that because one judge does something in a certain way that necessarily is incumbent on another.  But in the Fourth

Circuit, in a case of U.S. v. Joe, 928 Fed. 2nd, 99, it's a 1991 case, in a Batson challenge the question was raised as to whether or not the court should do more than deny the motion.  I think the court was well justified to do what the court did.  My concern is I would not want an appellate court looking back some day saying the Court did not provide findings of fact nor its rationale for the ruling.  And so, the inquiry that I'm making is rather than facing the prospect of a remand even later, better for me at least to raise that prospect now and the prospect that the Court may want to issue findings of fact and it's rational for the ruling.

THE COURT:  Comment?

MR. HILFIGER:  Well, Mr. Sperling has a lot better memory than I.  I mean, other than Batson challenge, I can't really remember too much about it.  I think that was -- was involved on minorities.  Is that right, Mr. Smith?  Do you recall whether it was minorities in general or African Americans?  I think, no, that was -- he was the last African American.  Fourth minority, but he was the second black.  And I think they offered some race neutral -- they considered race neutral reasons.  But that's -- I don't have any further comment.

THE COURT:  Okay.  Thank you.  I'm going to release the jury till 9:00 o'clock in the morning.  I ask

2562

counsel to be back here at 8:30 in the morning to address the issue of this witness. If the Government desires to submit any proposed findings on the Batson issue, if you would submit them to the defense. If the defense has any proposed findings, the comment on the proposed findings, if you'll do that by close of business on Monday. Anything else from the Government?

MR. LITTLEFIELD: No. Your Honor, I'm just trying to get stuff together so we can do what we got to do.

THE COURT: Defense?

MR. HILFIGER: Sir, just one other matter involved with the Government that I did talk to Mr. Littlefield about. And at this particular time, I can't say that I'm going to go -- it just depends on how the questions with this witness go. But my understanding -- and this again goes to bias on this witness against Mr. Barrett. I have been informed that in 2004, in Sequoyah County Jail, that this witness was in the process of getting beat up and he requested Mr. Barrett to assist him and Mr. Barrett said, no, I'm not doing it. And we're saying that's a reason that now he's coming to show the jury that that's the reason for the biasness. Now whether that incident occurred, I'd probably do some preliminary foundation questions to see whether that

2563

incident even occurred or not or if he had any recollection of that incident.  But my concern is with the Court's, you know, restricting too much about the prior Sequoyah trials, this is going to go into Mr. Barrett was in jail in Sequoyah County in 2004.  Is there going to be any problem on that?  I'm not saying what he's in jail for.  I just think -- (Interrupted)

THE COURT:  I think that's the key is you can -- he could have been in custody for any number of reasons.

MR. HILFIGER:  I'm just saying this occurred in Sequoyah County Jail.  He was in -- Mr. Barrett was in -- and we may not even get there.  But I was just informing the Court of that.  I talked to Mr. Littlefield about it.  He didn't have any objection to it.

MR. LITTLEFIELD:  I don't -- no, I think that he could ask that line of inquiry.  I am concerned -- I understand, yeah, he could have been in jail for anything.  However, having committed this act in 1999 in Sequoyah County, I don't think there's going to be much doubt what he was in jail for.  I don't think they're going to think he was in jail in Sequoyah County on a hot check charge.  Now, I understand it might have been a situation where they decided not to file charges and we picked it up six years later.  But -- (Interrupted)

2564

THE COURT:  Well, I appreciate both of your concern -- I mean, I think you're both being sensitive to the issue.  I'm not overly concerned about you mentioning he's in custody there because this jury knows that there was state officers there.  The sheriff was there.  He could have been and was arrested.  The truth was he was there.  I just don't -- what I'm trying to avoid is I think as you're all aware, is going into that trial, those trials.  And I think you should be as delicate with the facts as possible.  But I'm not concerned about saying he was in Sequoyah County Jail when that incident took place.  Anything else, Mr. Hilfiger?

MR. HILFIGER:  Just one matter, that under seal matter that does not involve the Government.

THE COURT:  Budget matter?

MR. HILFIGER:  Budget matter.

THE COURT:  I'll excuse the counsel for the Government and ask that the CSOs keep the -- after the Government leaves, keep the courtroom sealed.  The Defendant may also be excused at the Marshal's pleasure.

(Whereupon, a record was made in the case that the reporter was instructed was not a part of this transcript, after which the Proceedings were continued to October 21, 2005.)

2565

C E R T I F I C A T E

STATE OF OKLAHOMA   )
                    ) SS.
COUNTY OF TULSA     )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on October 20, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 2329 through 2564.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

_____
GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

Mar 22 2006

Clerk U.S. District Court
By
Deputy Clerk

UNITED STATES OF AMERICA,  )
                           )
          Plaintiff,       )
                           )
-vs-                       )   No. CR-04-115-P
                           )
KENNETH EUGENE BARRETT,    )
                           )
          Defendant.       )


VOLUME 12 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on October 21, 2005.


A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                        United States Attorney
                        and
                        Mr. D. Michael Littlefield
                        Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                        Mr. Bret A. Smith
                        Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 2567-2822        2498

2567

W I T N E S S E S

PAGE

CHARLES SANDERS
(Continued from October 20, 2005)
Further Cross Examination by Mr. Hilfiger . . . 2579
Redirect Examination by Mr. Littlefield . . . . 2630
Recross Examination by Mr. Hilfiger . . . . . . 2639

KEVIN WOODRICH WILSON
Direct Examination by Mr. Littlefield . . . . . 2653
Voir Dire Examination by Mr. Smith . . . . . . 2660
Cross Examination by Mr. Smith . . . . . . . . 2695
Redirect Examination by Mr. Littlefield . . . . 2737
Recross Examination by Mr. Smith . . . . . . . 2744

WILLIAM EDMONDSON WOOD
Direct Examination by Mr. Sperling . . . . . . 2752
Cross Examination by Mr. Smith . . . . . . . . 2761
Redirect Examination by Mr. Sperling . . . . . 2767

CRAIG NIXON
Direct Examination by Mr. Littlefield . . . . . 2770
(Continued to October 24, 2005)

E X H I B I T S

|  | OFFERED | REC'D |
|---|---|---|
| Government's Exhibit Number 53 . . . . | 2660 | 2661 |
| Government's Exhibit Number 54 . . . . | 2807 | 2807 |
| Government's Exhibit Number 57 . . . . | 2806 | 2806 |
| Government's Exhibit Number 58 . . . . | 2685 | 2685 |
| Government's Exhibit Number 59 . . . . | 2691 | 2691 |
| Government's Exhibit Number 64 . . . . | 2795 | 2795 |
| Government's Exhibit Number 66 . . . . | 2740 | 2740 |
| Government's Exhibit Number 68 . . . . | 2804 | 2805 |
| Government's Exhibit Number 95 . . . . | 2660 | 2661 |
| Government's Exhibit Number 105 . . . . | 2671 | 2671 |
| Government's Exhibit Number 120 . . . . | 2760 | 2760 |
| Government's Exhibit Number 170 . . . . | 2809 | 2809 |
| Government's Exhibit Number 173 . . . . | 2662 | 2662 |
| Government's Exhibit Number 212 . . . . | 2794 | 2794 |
| Government's Exhibit Number 213 . . . . | 2798 | 2798 |
| Government's Exhibit Number 214 . . . . | 2694 | 2694 |
| Government's Exhibit Number 215 . . . . | 2802 | 2802 |
| Government's Exhibit Number 216 . . . . | 2689 | 2689 |
| Government's Exhibit Number 217 . . . . | 2670 | 2670 |
| Government's Exhibit Number 219 . . . . | 2801 | 2801 |
| Defendant's Exhibit Number 162 . . . . | 2717 | 2718 |
| Defendant's Exhibit Number 219 . . . . | 2765 | 2765 |

2568

P R O C E E D I N G S

THE COURT:  Let the record reflect counsel for the Government is present, Defendant is present with counsel.  Any announcements on behalf of our discussions we had yesterday?

MR. LITTLEFIELD:  I'm not sure announcement is the correct word but I will advise the Court that we spoke both with Mr. Sanders and Clint Johnson, who was the individual for whom Mr. Sanders informed.

A number of names were given and they both, Mr. Sanders and Mr. Johnson advised that this incident is an isolated incident unconnected with any of the other individuals, in regards to any kind of investigation. There wasn't an ongoing investigation showing connections between groups or anything such as that.

Essentially, Mr. Sanders was from Sequoyah County.  There were a number of individual doing these kind of activities, as I'm sure the Court is familiar in Sequoyah County.  Some would have known others.  And Mr. Sanders knew a number of them as he indicated he used methamphetamine and was familiar with individuals who did.  And that he would provide information to Mr. Johnson in regards to activities of individuals.

But they're unrelated and isolated.  And I've communicated that to Mr. Hilfiger and I think -- and I

don't want to speak for Mr. Hilfiger, but I think Mr. Hilfiger has indicated he is not particularly interested in asking about the identities of these other individuals.

THE COURT: Okay.

MR. HILFIGER: Judge, the only question that I do have, and without bringing the name up, I think Mr. Littlefield can make a comment on it, is there is a person that is anticipated to be testifying from Sequoyah County, Cherokee County area that was involved in a major drug deal in Cherokee -- in Sequoyah County that Mr. Littlefield prosecuted. And my question to Mr. Littlefield is did any of Mr. Sanders' information deal with that particular operation? Do you know who I'm talking about?

MR. LITTLEFIELD: Yes, I do. I think so. I think he was an informant in regards to that individual as well.

MR. HILFIGER: Well, and see, that's going to be sort of the tie because you're having this lady, who's going to be testifying -- and I don't know what she's testifying about.

MR. LITTLEFIELD: And those, again, are not related to this search warrant, as I indicated. They're -- (Interrupted)

2570

THE COURT:  Now, I'm not sure what we're talking about.

MR. LITTLEFIELD:  One of our witnesses was prosecuted by me.

THE COURT:  Federal or state?

MR. LITTLEFIELD:  Federal.

THE COURT:  Guess it's been too long, hasn't it?  Nobody would still be alive that you prosecuted in state court.

MR. LITTLEFIELD:  A couple of them.  It's been awhile, 10-15 years.

THE COURT:  Okay.

MR. LITTLEFIELD:  However, the information provided and who the informant is or was in relation to that case is -- and I'll advise the Court that there was no connection between that investigation and that prosecution and this investigation and this case.  It is -- (Interrupted)

THE COURT:  I still don't have the context of what the Government witness is going to -- you have a Government witness who's previously acted as an informant in a case?  Okay.

MR. HILFIGER:  He has a Government witness that was the girlfriend in another action that he prosecuted that he is now going to have her testify in this action

2571

and to what, we don't know.  But we know that she was the girlfriend in this other -- (Interrupted)

THE COURT:  She was a girlfriend to somebody who was prosecuted?

MR. HILFIGER:  By Mr. Littlefield.

THE COURT:  Yeah.  Okay.

MR. LITTLEFIELD:  The problem is -- and I'll proffer what she's going to testify.

THE COURT:  You may.

MR. LITTLEFIELD:  She knew Mr. Barrett.  That during a period of a couple of years prior to and up to probably the early part of '99, she would occasionally go to Mr. Barrett's for short periods.  That during the period of time that she was there, Mr. Barrett had drugs and made them available to her.  And that Mr. Barrett had had a number of firearms at his place.  That Mr. Barrett rarely left his place during that period of time leading up to -- that she had an association with Mr. Barrett. The association with Mr. Barrett was unconnected and this is not a part of the proffer.  At least I haven't talked to her about that.  That there's no connection between what she's in prison for and this particular action, other than both of them involved methamphetamine.

THE COURT:  I think Mr. Hilfiger has made the suggestion that she is the girlfriend of somebody else

2572

that was prosecuted. And I don't know, but I assume that one of the inquiries might be is the fact she's testifying here going to benefit her?

MR. LITTLEFIELD: It is potentially and they have been advised of that.

MR. HILFIGER: We have been advised of that.

MR. LITTLEFIELD: And she has been advised that there is potentially a Rule 35 sentencing reduction request and that's totally at my discretion. No promise has been made. And that it's got to be based on substantial assistance. And I'm the only one that can make that judgment call.

THE COURT: Okay.

MR. LITTLEFIELD: And that any ultimate relief would be from the Court and not from me.

THE COURT: Okay. I have a little context now. Mr. Hilfiger, what's your concern?

MR. HILFIGER: Okay. Well, now my concern is based on what he's just proffered is the relevance in time to any of this. Because if he's saying that maybe, you know, that some -- a couple of years before and maybe even into '99, and that's -- we don't necessarily agree with his '99, but we do agree with a couple years before that this woman had been over to Kenneth Barrett's place or his mother's place. And the question is what's the

relevance.

THE COURT:  Because of the time factor?

MR. HILFIGER:  Because of the time factor.

MR. LITTLEFIELD:  Yeah.  That has no bearing on the issue of Sanders.

MR. HILFIGER:  Well, I agree with you.

THE COURT:  Okay.

MR. HILFIGER:  But now -- because he just raised the proffer.

MR. LITTLEFIELD:  Well, then that may be -- that may be a matter that he will want to question and I'm -- (Interrupted)

THE COURT:  Okay.  So we take them one at that time.  So you have the Sanders issue resolved?

MR. HILFIGER:  I think we pretty much get around the Sanders issue.  Now, as far as names are concerned.

THE COURT:  Okay.

MR. HILFIGER:  I still think it is proper to go into how -- the methodology he did -- how he did his informing.  You know, who proffered the informing?  Did he do it on his own?  What period of time he was doing the informing.  And was he committing crimes at the same time he was doing informing?  That kind of question, I think we can go and do.

2574

THE COURT:  I think that's appropriate question.

MR. LITTLEFIELD:  I don't have a problem with that.

THE COURT:  Okay.

MR. LITTLEFIELD:  And that wasn't what our concern we raised yesterday was.

THE COURT:  No.  I understand.  Okay.  So we all know the concern the Government was raising and I think was your concern about the potential safety of people being identified and the informant's activities.

MR. LITTLEFIELD:  That and the relevance of naming particular names.  I don't even think that was relevant.  But then I think your greater -- (Interrupted)

THE COURT:  And the point the Court was making is we don't know whether it's relevant because we don't know what the testimony is.

MR. LITTLEFIELD:  I understand.

THE COURT:  Okay.  Are we ready?  Are we ready for the jury?  I mean, I'm going to take a break for 10 minutes or so, so we can get them here.  But are we ready for the jury?  Anything else to take up outside the -- (Interrupted)

MR. HILFIGER:  Not that I know of.  The only thing I would -- as long as we're here if you got some

time.  It appears, I hope, that we're moving toward the end of the prosecution's case.  And just as a matter of trying to figure out where we are and getting our witnesses here and everything, I would like to know, number one, if we could have about two or three days notice before the prosecution's case ends and is it the Court's intention that the minute they say prosecution rests that we're going to say, okay, bring on the defense witnesses or are we going to have a half a day or a day or something like that to organize things?

And to let the Court know, we do not have victim/witness coordinators.

THE COURT:  I understand.

MR. HILFIGER:  To do that.  That's why we sort of need to line them up.

THE COURT:  I don't have any intention of being anything other than this is in my mind a very, very serious matter to being as deliberate, within reason, as we possibly can to be sure you're ready.  I don't know what the Government's plans are.  You told me more than I know.  I didn't know whether they were two weeks away or two days away.

MR. HILFIGER:  And I'm not sure -- I may have been just sort of guessing a little bit.  And one of the other reasons is one witness that we are anticipating

2576

that was going to be a problem witness to get here may be available at the end of next week or he may be -- or the next time is the following week.  And I'm just trying to -- (Interrupted)

THE COURT:  Well, all I have to go by is the witness list of the Government and they got a hundred witnesses and I count 25 have been called.  So based on that, I thought we were about a fourth of the way through.

MR. HILFIGER:  I hope not, Judge.

MR. SPERLING:  I have one allied request, Your Honor.  We have a doctor, Dr. Wood, who is scheduled to be here this afternoon at 1:45.  He has rearranged his schedule in order to accommodate us and be here this afternoon.  And if the Court permits and I've spoken with Mr. Hilfiger and Mr. Smith and they do not object, when he arrives or a reasonable time thereafter, if we are in the middle of something that appears to be lengthy such that he would have to be put on another day and wouldn't be beyond today, we'd like to be able to interrupt whatever we're doing at that time reasonably.

THE COURT:  What is his -- (Interrupted)

MR. SPERLING:  His testimony is that on November 2nd, 1999 the Defendant was brought to him for treatment and he removed a large caliber bullet from the

2577

Defendant's leg.  It's very short.

THE COURT:  Okay.

MR. SPERLING:  The other thing is -- and in discussing with Mr. Littlefield, our best estimate is that we believe we will rest next week.  Part of -- we were even thinking mid-week.  But it depends on progress, in part, today.  We expect that next will be the DEA special agents that were involved in the search, Kevin Wilson and Craig Nixon.  Then there will be three DEA chemists to testify depending on the length of direct and cross.  We may be through much of that today.

THE COURT:  So Wednesday or so at the earliest and at the latest, next Friday?

MR. LITTLEFIELD:  Judge, it is entirely dependent upon the length of cross examination.  I was hoping that we would pick up at some point yesterday.  My best guess would be somewhere -- (Interrupted)

THE COURT:  Based on how -- here's what I want to know.  Based on how the cross examination has gone to date, what's your estimate?

MR. LITTLEFIELD:  Tuesday or probably Wednesday of next week, best guess.

THE COURT:  Okay.  Does that help?

MR. HILFIGER:  That helps a lot, yes.  Thank you.

2578

THE COURT:  Okay.  What are you thinking about as far as assuming -- let's talk about assuming the Government rests Wednesday afternoon?

MR. HILFIGER:  Assuming they rest Wednesday afternoon, what's the question?

THE COURT:  You asked about whether we -- you could have a delay.

MR. HILFIGER:  Well, assuming they rest Wednesday afternoon, I would like a Thursday delay and start Friday because -- (Interrupted)

THE COURT:  Let me give that some thought.  But I'm not opposed to do doing that.

MR. HILFIGER:  Because I think our witness -- Mr. Smith, did you say Friday, that he would be available?

MR. SMITH:  That's what we suggested to him.

MR. HILFIGER:  I thought on the 29th you said.

MR. SMITH:  That's what we estimated --

MR. HILFIGER:  There is one witness who's giving us a lot of problems -- (Interrupted)

THE COURT:  Well, let's kind of play it by ear with the idea that I will give you some time depending on when the Government rests.

MR. HILFIGER:  Thank you.

THE COURT:  You both ready for the jury now?

2579

MR. LITTLEFIELD: Can we take a brief --
(Interrupted)

THE COURT: Yes. We're going to take a break.

MR. LITTLEFIELD: Okay. Yes.

THE COURT: Ten minutes.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT: Let the record reflect the jury is in the box. Counsel for the Government is present. Defendant is present with counsel. You may continue your cross examination.

MR. HILFIGER: Thank you, Your Honor.

FURTHER CROSS EXAMINATION

Q    Good morning, Mr. Sanders.

A    Good morning.

Q    Before I start in to the regular examination, other than yesterday we've never talked before, have we?

A    No, sir, we haven't.

Q    In fact, you haven't really talked with anybody representing Mr. Barrett from -- you had an investigator -- we had an investigator come talk to you and you refused to talk to him, is that right?

A    Yes, we didn't discuss nothing.

Q    You're -- just like Mr. Littlefield said, you need to lean -- (Interrupted)

2580

A    I seen -- and we didn't discuss nothing.

Q    You didn't discuss anything about this case?

A    That's right.

Q    You refused to talk to us about it, is that right?

A    That's correct.

Q    What?

A    That's correct.

Q    Now, where we were yesterday, you were -- from about like '96 to sometime in 2000, you were working with Clint Johnson informing on people for him, is that right?  Did I have the right years?

A    Did you say '96?

Q    '96.

A    Yes.  That's when it started, yes.

Q    Now, and you said you did it about four or five people or was it just a continuous deal on a whole bunch of people?

A    It was four or five that, yeah, he asked me questions about other people, other situations or something he wanted to know like just street talk.

Q    Now, how would -- we talked about a couple yesterday and I'm not going to ask you about name, I'm going to ask you about instances, though, okay?

A    Okay.

Q    So you talked about a couple in '98 and were those

2581

like one time deals where you just told Mr. Johnson about, you know, one time or were they continuous on those two?

A    On the two that I spoke of yesterday?

Q    Yes, sir.

A    They was just a one time deal.

Q    Okay.  And how did those one time deals come about on those two?  Did you go to Mr. Johnson and say, hey, I know something about so and so.  Or did Mr. Johnson come to you?

A    Mr. Johnson came to me.

Q    Okay.  And during this period of time, I see -- you know you had a number of CDS charges starting back from '86 on.  Were you still addicted or were you ever addicted to CDSs?

A    That and a variety of other drugs, yes.

Q    Well, what kind of drugs -- during that timeframe, '96 to 2000, what kind of drugs were you using?

A    Probably marijuana and methamphetamine.

Q    And now, the cocaine, had you got off the cocaine or did you ever use cocaine?

A    No, I really never did use cocaine.  I had a charge of cocaine, but it was just something they pick up and it wasn't -- there wasn't no cocaine found.  It was the residue of a paper that my girlfriend had in her truck

2582

but I never been addicted to cocaine, no.

Q    So it was meth and marijuana, your basic drugs, is that right?

A    That's correct.

Q    And during this period of time that you were helping, you know, Clint Johnson was coming to you or you were going to Clint Johnson helping him, were you using meth at that time?

A    Off and on, yes.

Q    Off and on.  And would you tell Clint Johnson that you were using meth?

A    If he asked, yes.

Q    And so you'd tell him that you're shooting up on meth, taking a hit on meth and he'd say fine.  Go ahead and tell me about this other person?

A    If he asked, yes.

Q    And he never would do anything about your particular violation, is that right?

A    I don't ever recall him asking me about my violation.

Q    Well, I mean, you told him that you were taking meth, is that right?

A    I don't know if I told him.  You just asked me if he knew if I was.  He never did ask me if I was using.  He just knows I've been in trouble for it.

2583

Q    Well, let's talk about some other occasions here that you helped on.  You talked about two in '98.  Did you do any in '99?

A    Maybe.  Other than Mr. Barrett, yes.

Q    Other than Mr. Barrett?

A    Yes.

Q    Okay.  And in those particular cases -- we'll get to Mr. Barrett in just a little bit.  In those particular cases, while you were -- was it a one time information that you gave Clint Johnson or was it continuous information?

A    It was two or three times and then one time.

Q    Okay.  And I can't understand you.

A    In '99 it was one particular time other than Mr. Barrett.

Q    Other than Mr. Barrett, it was one particular time?

A    One particular time, yes, sir.

Q    And the information you got that you gave Mr. Johnson, did any of that information contain -- did you tell Mr. Johnson how you got that information?

A    Did I tell him how I got the information?

Q    Right.

A    Yeah.

Q    Was it drug type information?

A    Yes, it was.

2584

Q    And did it have anything to do with you being in some place where drugs were bought or sold or manufactured?

A    Yes, it was.

Q    And during that time that you're telling Mr. Johnson that you were at a place where drugs were bought or sold or manufactured, did you go into anything the reason why you were there?

A    Usually I was sent there.  I mean, if he asked me about that particular person, that's the reason I was there.

Q    Okay.  So you're saying on the -- other than Ken Barrett deal, you're saying that Clint Johnson came to you and said I want you to go out to this place and buy some or pick up some or see what's going on, is that right?

A    Well, see what's going on.  That would be a better way of saying it, yes.

Q    What now?

A    To see what was going on, to see if there was anything going on.  That would be a better way of saying it, yes.

Q    And when you went out to those places did you buy any drugs?

A    To that particular one, no.

2585

Q    Did you use any drugs?

A    No.

Q    You had another -- was that the only one you did in '99, other than Ken Barrett?

A    Yes, sir.

Q    Any other people that you informed on concerning drugs that we haven't talked about?  You talked about two in '98.

A    Yes, sir.

Q    You talked about one in '99.  Now, and I think Clint Johnson said that you did five.

A    Okay.

Q    So we've got four.

A    Okay.

Q    One more.

A    I did another one in late part of '98.

Q    And was that a drug?

A    Yes, sir, it was.

Q    And on that particular one, how did you determine -- how did you get together with Clint Johnson on talking about that particular one?

A    He come and asked me about if I knew anything about some marijuana sales.

Q    Okay.

A    On this particular guy.  I said yes.

2586

Q   And so, he sent you out to get some marijuana?

A   No, he didn't send me to get no marijuana.  He just sent me to see if the guy had marijuana.

Q   What did you do in relation to that?

A   I went and talked to the guy.

Q   Did you buy any marijuana?

A   No, sir, I didn't.

Q   Did you use any marijuana?

A   Yes, sir, I did.

Q   Did you tell Clint Johnson that you used marijuana?

A   If he asked.

Q   Well, did he ask?

A   No, he didn't.

Q   He didn't want to know?

A   I don't guess he did.  He didn't ask.

Q   So he sent you out to get marijuana or sent you out to find out about marijuana.  You used marijuana while you were out that, is that right?

A   That's correct.

Q   Were you aware that the use of marijuana was a violation of law?

A   Yes.

Q   Were you -- you were on probation at the time, weren't you?  Or were you off probation by that time?  No, you had to be on probation.

A    I was on a suspended sentence, I think.

Q    That's probation, isn't it?

A    Well, I wasn't reporting to a probation officer if that's --

Q    But you were still on probation?

A    I'm on a suspended sentence.

Q    Yeah.  And probation has rules and conditions, doesn't it?

A    If you -- yes, they did.

Q    One of those rules is I'm not going to use or consume any illegal drugs, isn't that right?

A    That's correct.

Q    Did you report that to a probation officer?

A    I just told you I didn't report to a probation officer.

Q    Did you report that to any law enforcement person that you were in violation of your probation?

A    No, sir.

Q    But you did talk to Clint Johnson about it, about being out to the marijuana place?

A    He sent me there.

Q    Now, let's talk about Ken Barrett, okay?  How many times -- when did you first start going out to Ken Barrett's place according to your recollection?

A    I've known Kenny Barrett a long time, so I've been

2588

in his place more times than I can probably count, I guess.

Q    Okay.  Now, let's start talking about when did you first go out there?

A    Well, I've been to his mother's.

Q    That's Gelene Dotson's?

A    Yes.

Q    Was that before Ken Barrett built that cabin out there?

A    Yes.

Q    Okay.

A    And you know I was there after he built the cabin.

Q    Do you know when he built the cabin?

A    No, I don't.  I think I may have been locked up during that time when he was -- built the cabin.

Q    Would that have been -- would that have been in the early part of the '90s or the late part of the '90s, what?

A    Early part of the '90s.

Q    Early part of the '90s. You'd been locked up and it'd only been for a short time though, right?

A    Well, between '90 to -- other than the escape, I was locked up from '90 -- or '92 to '96.

Q    How long were you out on the escape?

A    Ten months.

2589

Q    So, when you first went to Kenny Barrett's house -- now, my understanding when you -- Mr. Littlefield asked you the question about going to Kenny Barrett's house during the months immediately before September 24th.  The responses I got were you went out there visiting, you worked on your cousin's vehicles and your girlfriend's vehicle, is that right?

A    Yes, sir.

Q    And I notice something there, you never said anything about going out there to get drugs, is that right?

A    No.  That's right.

Q    Yeah.  I mean, the primary reason to go to Kenny Barrett's house in that couple months before had to do with his -- either visiting him or having work done on a car, isn't that right?

A    Well, I think it was he asked me had I ever been to Kenny Barrett's and what was I doing out there.  And I told him to visit -- (Interrupted)

Q    That was the reason.

A    Yeah.

Q    Now, at what time -- when you -- you're informing on Kenny Barrett.  Was it a one time deal or a continuous deal?

        MR. LITTLEFIELD:  Judge, I object.  Because

there's more than one time or continuous, there's a continuum in between that as well.  And it's not necessarily a question.

THE COURT:  So far I'm not understanding your concern.

MR. LITTLEFIELD:  Well, the way the question posits there's only two alternatives and that's not necessarily how it would have been.

THE COURT:  Well, I'll overrule your objection. He can answer and I'll keep listening.  I'm still not sure what your objection is.  I want you to understand that I'm not -- I'm overruling because I don't understand it.

Q    (By Mr. Hilfiger) Did you inform on Kenny Barrett on more than one occasion or one occasion?

A    Just more than one.

Q    Okay.

A    But for the same purpose.

Q    Okay.  Now, my understanding was, again -- what did you say your association was with Kenny Barrett?  Did you call yourself friends?

A    Yes, we was friends.

Q    You were friends.  And did you consider yourself friends with Kenny Barrett while you were informing on him?

2591

A     That came right at the last.

Q     That came right at the last?

A     Yes.

Q     You sort of dropped the friendship and starting informing?

A     Well, no.

Q     Well, okay.  How many occasions did you talk to Clint Johnson concerning what you thought were criminal activities with Kenny Barrett?

A     Two or three.

Q     Okay.  Now, let me talk to you about -- and what I'm trying to get down to is not necessarily a date, but sort of a time frame, okay?

A     Okay.

Q     It shows that you got a charge of possession of CDS in about the same timeframe another charge of uttering a forged instrument, sometime in mid to late 1998; would that be about right?

A     That's probably correct, yeah.

Q     Now, after -- did you spend any time in jail waiting to get bonded out or did you bond out immediately on those two charges?

A     I spent time in jail.

Q     How long did you spend in jail?

A     Not positive.  Probably 40 to 60 days, waiting on a

2592

bond reduction.

Q    Did you use Clint Johnson in any way to assist you in getting that bond reduction?

A    No, sir.

Q    Did you talk to Clint Johnson about helping Clint Johnson on any kind of charges while you were in jail waiting for your bond reduction?

A    No, sir.

Q    Did you have any conversations with Clint Johnson at all while you were in jail?

A    No, sir.

Q    After you got out of jail, how soon was it that you went and talked to Clint Johnson?

A    I don't know.  It could have been from a week to three months.

Q    From a week to three months?

A    It could have been.

Q    Okay.  And when you went and talked to Clint Johnson, what was your purpose in going to talk to Clint Johnson?

A    Well, it may not have been went.  I could have probably spoke to him over the phone.  I've known Clint just a long time also.  So me and him talked on the phone frequently.

Q    Did you talk to Clint Johnson about helping on

2593

getting people in Sequoyah County?

A    Sometimes.

Q    I'm talking about that period of time after you got out of jail.

A    No.  Other than Kenny, no.

Q    Other than Ken?

A    No.

Q    But you said in late 1998, that would have been after you got out of jail, wouldn't it have been?

A    Well, it's possible but that wasn't Sallisaw.  You asked me -- (Interrupted)

Q    Oh, the marijuana deal wasn't Sallisaw?

A    That's correct.

Q    That was in another county?

A    That's correct.

Q    So, but Clint Johnson -- you talked to Clint Johnson about it though, didn't you?

A    That's who we was talking about was Clint Johnson, wasn't it?

Q    Right.  Right?

A    Okay.  Yeah.

Q    So in late '98 what you are distinguishing with me was that you didn't talk to Clint Johnson about somebody in Sequoyah County.  You talked to Clint Johnson about some other people?

2594

A    That's correct.

Q    In other counties.  So you handled more than one county, is that right?

A    That's correct.

Q    Okay.  When did you first become aware that Clint Johnson was interested Kenny Barrett?

A    I think after Kenny Barrett had got the -- got a warrant for Kenny Barrett or something.  I think they was trying to serve a warrant on Mr. Barrett.  And I'm not positive about that either.

Q    How did it come about?  Did Clint Johnson come to you asking for assistance or did you go to Clint Johnson saying, hey, I've got some information?

A    Mr. Johnson came to me.

Q    Okay.  When was that?

A    It was in '99.  '99.

Q    '99.  Okay.  '99 is a big year.

A    Okay.

Q    Let's put it sometime in '99.  When in '99?

A    Well, the first time I think was July.

Q    July?

A    Yes.

Q    Okay.  So July of '99 was when you went to or when Clint Johnson contacted you, is that right?

A    That's correct.

2595

Q   And at the time Clint Johnson contacted you, when was the last time -- you know, taken at that point, how much prior to that time had it been since you'd been out to Kenny Barrett's place?

A   I don't recall.  I can't remember exactly how many times I've been to Kenny Barrett's prior to that.

Q   No.  Was it like a week before?

A   Prior to July?

Q   Prior to that contact with Clint Johnson, when was the last time you had been out to Kenny Barrett's place?

A   In July?

Q   In July?  How often did you go out?  On a weekly basis?

A   No.

Q   Monthly?

A   There wasn't no scheduled time.

Q   There wasn't.  So you're saying when Clint Johnson had contacted you about Kenny Barrett, you had already been out there within that month, is that right?

A   Yes.

Q   And what was your purpose in going out there that time?

A   Well, I think I just went out there with a friend. But there wasn't no -- there wasn't no purpose at that time.  There was no purpose with Clint sending me at that

2596

time, he was just asking questions.  There wasn't no purpose in July.

Q    Well, now, as I understand it, you said yesterday you were the confidential informant on the search warrant, is that right?

A    Yes.

Q    How did you know that?  Did Clint Johnson say you're the confidential informant?

A    No.  That wasn't -- I didn't know that until after the incident happened.

Q    After the incident happened, Clint Johnson told you that, is that right?

A    Yes.

Q    Okay.  So, you went out to -- you had been out to Kenny Barrett's for no purpose and you talked to Clint Johnson and when you talked to Clint Johnson, did you tell him about any kind of manufacturing process going on out there?

A    I think he asked me.

Q    Yes.

A    And I don't think I recall telling him anything about manufacturing processes going on out at Kenny Barrett's.

Q    Because as I understood yesterday, you said you never saw Kenny Barrett manufacturing drugs out there, is

2597

that right?

A    That's correct.

Q    So you would never have told Clint Johnson that you saw manufacturing going on out there?

A    That's right.

Q    In that July '99 time when you went to see Kenny Barrett for no particular purpose, were there any -- did you get any drugs or do any drugs while you were out there or can you recall that?

A    Excuse me.  I don't think I'd done any drugs in August of '99 when I went to Kenny's, no.

Q    Now you said August.  I was asking about July.

A    Oh, July.

Q    Yes.

A    Okay.  Excuse me.  July, no.

Q    You did not do any drugs in July of '99?

A    No.

Q    Out at Kenny Barrett's?

A    No.

Q    Now, so that was your first contact with Clint Johnson.  What did you tell Clint Johnson in that first contact?  You didn't see any manufacturing.  You didn't do any drugs.  What information did you give Clint Johnson?

A    Just because me and Clint Johnson talked, it don't

mean that I had to tell him every detail what I seen and what happened out at Mr. Barrett's.  I would go out there, if I went out there, and when I did go out there, if he asked me particularly about Mr. Barrett, I would tell him.  But I don't think that he -- at that time, if he even recalled -- he just wanted me to go see Kenny, see what was going on, see the talk that was going on.  Just supposed to be worried that after Kenny Barrett had received the warrant -- (Interrupted)

MR. HILFIGER:  He's not being responsive.

Q    (By Mr. Hilfiger) Please answer the question and don't go rattling on on something else, okay?

A    Okay.

THE COURT:  Mr. Sanders, if you could make an effort to speak right into the mike, I think we're all having a little hard time hearing.

THE WITNESS:  Okay.

Q    (By Mr. Hilfiger) So, but did you give -- in the July meeting -- now, I'm trying to keep these meetings straight.  July meeting or phone conversation, or conversation you had with Clint Johnson concerning Kenny Barrett, that's the first time you say you talked about him.  Did you give him any information concerning drugs at Kenny Barrett's house?

A    No.

2599

Q    Okay.  Then how much -- then what did Clint Johnson want you to do then?  Did he want you to back out there again?

A    He was asking me just to observe what was going on out at Mr. Barrett's, like anybody else's.

Q    Okay.  So, when did you next have a conversation with Clint Johnson, after the July?  And I know you're not going to be able to tell a day.  But I mean like a couple days, a week, two weeks, a month?

A    I guess could have been a week, could have been two weeks.

Q    Well, after that conversation with Clint Johnson when was the next time you recall going out to Kenny Barrett's house?

A    In August.

Q    In August.  So in July and then you went out in August.  So let's talk about the August.  Did you go out there by yourself or with somebody?

A    I went out there with somebody.

Q    Who did you go with?

A    I think I went with my sister.

Q    And what was the purpose in going out there in August?

A    We took a guy named Ronny to Kenny's.

Q    So there was three of you in the car?

2600

A      Yes.

Q      What was Ronny going out there for, do you know?

A      Drugs.

Q      And when that occurred, was that day or nighttime?

A      That was nighttime.

Q      And what occurred at that time in August of '99 when you went out there with your sister and Ronny?

A      Ronny went inside and got Kenny, Kenny came out. They talked.  I got out of the car, said hi.  We left.

Q      Okay.  You didn't go in the house?

A      Not at that time, no.

Q      I'm talking about this -- that whole -- that trip?

A      No.

Q      You didn't go to house.  Your sister didn't go in the house?

A      No, sir, we didn't.

Q      Ronny went in the house and got Kenny Barrett and he came outside, is that right?

A      That's correct.

Q      And when you're outside -- look at this model here. I know those cars weren't there that -- I don't think those cars were there that day.  But was it just right outside the porch?  Or where was it that you guys -- there's a little laser right up there if you can use it. Was it out here in this area?

A   He's got a garage on the right hand side of his house, here.  And it's a pretty big garage.  And the driveway is over here.  And it would be on this side of the house, in the driveway.

Q   Okay.  It's the driveway that leads up to the garage?

A   Yeah.

Q   Okay.  It's not on the model, is it?

A   No.

Q   And so you got out and talked.  Did you do any drugs?

A   Not there.

Q   And you didn't go in the garage, did you?

A   No.

Q   Didn't go in the house?

A   No.

Q   Didn't do any drugs?

A   Not there.

Q   Did you see any drugs?

A   I seen Kenny hand something to Ronny, yes.

Q   And then when was your next -- how long were you out there?

A   Just a few minutes.  No longer than 15 minutes, probably.

Q   I'm sorry.

2602

A    No longer than 15 minutes probably.

Q    Okay.  And then how soon did you go report to Clint Johnson?

A    If -- the next time I seen him.  It wasn't like I called him and told him I just come from Kenny Barrett's. During that time he wasn't asking me questions other than when he would see me I would give him an update on what I'd seen out at Mr. Barrett's.

Q    But you'd only been out there twice at that point, hadn't you?

A    Yes.  July and August, yes.

Q    July and August.  Okay.  Then when was the next time that you went out to Kenny Barrett's?

A    Again in August.

Q    Again in August.  Do you remember about when?  Let's put this first one, do you know whether the first time in August was the first part of August, middle August or late August?

A    It was probably between the 5th and the 15th, probably.

Q    Okay.  And then the second time in August, when was it?

A    Probably the 15th through the 25th.

Q    And who all went out there then?  Did you just go out by yourself?

2603

A     No.   There was my girlfriend.

Q     And what was the purpose of going out that time?

A     To pick up some drugs.

Q     Had you talked with Clint Johnson about that before?

A     Before I went?

Q     Yeah.

A     No.

Q     That was sort of a deal you were doing on your own? You weren't directed to go out there by Clint Johnson, is that right?

A     That's correct.

Q     So what happened on that occasion?

A     I went to Mr. Barrett's and this is in the evening hours.  And went in, sat down and he had company and waited until he could talk to me.

Q     Okay.  You went in where and sat down?

A     In his house.

Q     Did your girlfriend go in, too?

A     Yes, sir, she did.

Q     And where was Kenny Barrett?

A     He was in the house, probably I think in the living room.

Q     And you waited for company or, I didn't -- (Interrupted)

A     Yes, he had company.

Q    You waited for the company to leave?

A    Yes, some of it.

Q    Okay.  And how long were you there?

A    Probably 30 to 45 minutes.

Q    And then what occurred?  What occurred while you were there?

A    We just -- well, we talked and I was just waiting for his company, some of his company, to leave and we done some dope.

Q    Okay.  Done some dope.  What do you mean by done some dope?

A    Had some methamphetamines.

Q    What?

A    Done some methamphetamines.

Q    Well, did you just do some right there?

A    Yeah.

Q    Okay.  How much did you do?

A    I don't know.  It was just put in a spoon and we ingested it.

Q    And when you say you put it in a spoon, you put it in a spoon, heated it up, melted it or made it a liquid and then put it in the syringe?

A    That's correct.

Q    And then stuck it in your arm?

A    That's correct.

Q    Or some part of your body?

A    That's correct.

Q    Did your girlfriend also do that?

A    Yes, sir.

Q    So, when you're saying you did some dope at that time, how much are you talking about you did?

A    I don't know.  It wasn't weighed.

Q    And you were only there 30 to 45 minutes.  You just did the dope and leave?

A    Basically, yes.

Q    Did you leave with any dope, other than the dope in your system?

A    No.

Q    Now, did you make contact with Clint Johnson concerning that particular deal?

A    Not right away.

Q    How long was it before you made contact with Clint Johnson concerning the second visit in August of '99?

A    It was probably around September 1st or between the first and the fifth.

Q    At that time did Clint Johnson make contact with you or did you seek him out?

A    He called me and we met.

Q    And what information did you give Clint Johnson at that time concerning Kenny Barrett?

2606

A    He just asked me what I did.  Did I see any drugs.
Did I see him sell any drugs.  Was he cooking dope.  Did
I see any gun.

Q    I didn't understand.  What was the last one?

A    If I'd seen any guns?

Q    See any guns.

A    Yes.

Q    What did you tell him about selling dope?

A    Told him I didn't buy no dope, so, no, I didn't see
him sell no dope.

Q    So you told Clint Johnson at that time you didn't
see him selling it.  What about manufacturing it?

A    Didn't see him.

Q    What?

A    I didn't see him manufacturing.

Q    Didn't see him manufacturing.  I think -- what was
the third thing you said?

A    Did I see any guns.

Q    Did you see any guns.  Did you see any guns?

A    Yes, sir, I did.

Q    He had them right there in the east room, doesn't
he?

A    Yes.

Q    Southeast room?

A    Yes.

2607

Q     Did you tell him anything more about any drugs out there at that time?  September 1st or 1st through the 5th?

A     No.

Q     Did you tell him that you had done dope out there?

A     If he asked.

Q     Well, do you know whether he asked you or not?

A     I don't recall if he asked me.

Q     Okay.  So you don't recall whether you told him you had done some out there?

A     That's right.

Q     Now, did you go out there any other time after September 1st, out to Kenny Barrett's house?

A     After September 1st?

Q     Right.  I don't mean that September -- you said 1st through the 5th, somewhere along there?

A     No.  I told you I seen Clint Johnson between September 1st and 5th.

Q     Oh, I'm sorry.  I'm sorry.

A     After I went there in August, from the 15th to the 25th.

Q     Okay.  I apologize.  That's right.  I just wrote it down wrong.  I was reading it wrong.  I'm sorry.  After you talked to Clint Johnson did you go back out there again?

2608

A       Yes, sir, I did.

Q       And when was that?

A       Probably from the 5th to the 15th.

Q       Of September?

A       That's correct.

Q       When you went out there that time were you directed to go out there by Clint Johnson or did you just happen to go out there?

A       I went out there with a friend.

Q       Okay.  But let me ask you this question again though.  Did Clint Johnson tell you to go back out there?

A       I don't know if he told me during that time or not.

Q       Okay.  So you went out there with a friend.  And what was the purpose of going out there?

A       Just I think to -- she was picking up some keys for a car or something.  It was a female I went out there with and she was picking up some keys to a vehicle.

Q       And what happened on that occasion?

A       She got the keys.

Q       Got the keys and left?

A       That's correct.

Q       You see any dope?

A       No.

Q       See any manufacturing of dope?

A       No.

2609

Q    So, did you report that to Clint Johnson?

A    Yes.

Q    And when you reported that to Clint Johnson did you tell Clint Johnson that, hey, we were out there, didn't see any dope, didn't see any manufacturing or anything like that?

A    Yes, if he asked.  Yes, he did.

Q    And when did you do that reporting to Clint Johnson?

A    Probably around the 20th, the 19th, I'm trying to recall the date that the incident happened because I was there like three days prior to like the incident happening with the shooting.

Q    Okay.  You know I told you the incident was on the early morning hours of September 24th?

A    That's correct.

Q    Now, does that help you sort of focus in on when you contacted Clint Johnson?

A    I don't think I -- he contacted me and asked me to go back out there and I told him about me going out there with a female to get the keys to the vehicle.

Q    So, Clint contacted you to go back out there and you said, hey, I'd just been out there?  Is that -- and I know that's a rough deal, but --

A    Yes, that's correct.

Q    And you told Clint -- did you tell him anything

2610

about any dope being out there?

A    I don't think he asked and I don't think I told him.

Q    So, then when was your next -- well, what did Clint Johnson have to say about anything about Kenny Barrett?

A    He just asked me if there was a lot of people out there and asked me if he was doing drugs.  If he asked me if he was doing drugs and I told him no, probably.  Because it wasn't at that particular time.  I didn't see him doing nothing.  So -- does that answer your question?

Q    Okay.  So, did he want you to go back out again?

A    At that particular time, yes, he did ask me to go back out there.

Q    At that time or another time?

A    After we came back from getting the keys to the vehicle, the next time I talked to Clint he asked me if I could go back out to Kenny's.

Q    Okay.  And do you know about when that was?  Was it in this same contact that you had when you were talking to Kenny -- I mean, talking to Clint Johnson and saying, you know, we're just out there with a female and the keys and I told him there weren't any drugs out there?  Was it that same contact that he said go back out there or was it a later time?

A    Well, he asked me to go back out there.

Q    Was it that same time or was there another contact

after that with Clint Johnson?

A   You mean other than me going after the keys?

Q   Well, okay.  Let me make my question clear.  The way I understand what you said is that you went out there with this female to get keys?

A   That's correct.

Q   And then after that occurred, sometime after that occurred, Clint Johnson contacted you and you and you told Clint that you been out there with a female to get keys and that you told him that you didn't see any drugs out there, or something along that line, is that right?

A   That's correct.

Q   Okay.  Now, while that contact was going on with Clint Johnson, did Clint Johnson ask or request you at that time to go back out there or did you -- was that sort of the end of that contact?

A   That was the end of that contact.

Q   Okay.  Then there was another contact you had with Clint Johnson?

A   Yes.

Q   About how much later was that?

A   A day or two later.

Q   And then what happened there?

A   He called me and asked me if I could go back out to Kenny Barrett's.

2612

Q    And what was he wanting you to do?

A    He was wanting me to find out if Kenny Barrett was -- he asked me the question that did I hear Kenny Barrett saying anything about Kenny Barrett supposedly going to kill a police if they come to his house.

Q    So Clint was asking you if you had heard Kenny Barrett saying anything about killing police if they come to house, is that right?

A    Yes.

Q    And what was your response to that?

A    I think the response was that me and Kenny Barrett had a discussion about him killing Johnny Philpot if he come through his door.

Q    Okay.  Now, did you -- when you gave this to Clint Johnson, did you put it in any kind of time frame when you're saying that Kenny Barrett told you that?

A    No.

Q    You just said that, yeah, that occurred sometime?

A    Yes, that's -- that would be fair, yeah.

Q    Now, when are you saying that particular -- that that particular conversation I'm talking about is the conversation where you're saying that Kenny Barrett told you that he would kill Philpot if he came through the door.  When did that occur?

A    I don't know.  I think it was just in conversation.

2613

Q    Just regular conversation?  Was it -- now, you said something the other day about being out at Fields' store. I think it was Fields' store.

A    That's correct.

Q    Chuck Fields' store.  And was that the time you're saying that occurred?  That conversation occurred?

A    No.  No, I don't think it -- no, I don't think that was brought up during that time.

Q    At the Chuck Fields store that wasn't brought up?

A    No, it was brought up that he had a warrant for him, just for his arrest.

Q    So at the Chuck Fields' store the only thing that was discussed was that Kenny Barrett said he had a warrant for him.  Is that what you're saying?

A    Yes.

Q    But at Chuck Fields store he never said anything about if the police came out that he would shoot the police and he wanted -- and he felt that Philpot would be that person.  That didn't occur at Chuck Fields' store, is that what you're saying?

A    I don't think it did, no.

Q    Okay.  Well, are you saying that there was some conversation about if police come out that Philpot, that if Philpot comes through the door he's going to shoot Philpot?  Are you saying that that conversation took

2614

place sometime?

A    Yes.

Q    When?

A    I don't recall when that conversation took place. It could have been at any of the three visits.  It could have been any of them visits.  I don't recall exactly the date.

Q    Well, I mean, could it have been a visit the year before?

A    No.

Q    Would it have been before July?

A    Yes.

Q    Okay.  Could it have been -- what time of year was this -- was it you're saying that you saw Kenny Barrett at Chuck Fields' store?

A    What year?

Q    What time of year.

A    You're asking me a month?

Q    Oh, season.

A    Time of day or what?

Q    Season or month or day.  You know, whatever you can remember about it.  Was it like the fall, winter, spring, summer?

A    Summer.

Q    Summertime.  And you were there at the store?

2615

A    That's correct.

Q    Was your mother there with you at that time?

A    Yes, I think she was.  I think she worked there.

Q    She worked at the store?

A    Yeah.

Q    Was there a time that you were looking for a job and Kenny Barrett gave your mother some work-related equipment?  Can you recall that?  Like a tool belt or something like that?

A    Yes, I think he did give my mother a tool belt, yes.

Q    To give to you?

A    Yes.

Q    Was that -- were you there at the time that happened?

A    No.

Q    Do you know whether that -- did your mother give you a tool belt?

A    The one that Kenny gave me?

Q    Yes.

A    Yes.

Q    Okay.  Now -- and the only reasoning I'm bring that up is to try to put it in focus here.  Okay?  You're saying this conversation with Kenny at the Chuck Fields' store, did that occur before or after you got the tool belt?

2616

A    After.

Q    Okay.  So now, let's sort of fast forward here, back up to this contact that you had with Clint Johnson when Clint Johnson -- this had been in September sometime, when Clint Johnson calls and wants you to go out to Kenny Barrett's, okay?

A    Okay.

Q    We got you focused on that now?

A    Yes.

Q    What was the purpose -- what was he wanting you to do out there at Kenny Barrett's?

A    He wanted me to go out there and see if there was any guns.  See if Mr. Barrett had any guns.

Q    Well, now you had already told him a month before that he had guns out there, didn't you?

A    That's correct.

Q    But he wanted you to go back out there and see if there were any other guns out there or any new guns or what?  Just --

A    See if I could see how many guns he had.

Q    Okay.  So, how much after that -- was there anything about seeing about drugs out there?

A    He asked me if there was -- if I'd seen any drugs out there, yes.

Q    Well, what I'm saying is when he directed you to go

back out there to look for guns or find out how many guns were out there, did he also ask you about seeing anything about drugs?

A    Yes.

MR. LITTLEFIELD:  Objection.  Assumes facts not in evidence.

THE COURT:  Argument?

MR. HILFIGER:  I don't know what --

MR. LITTLEFIELD:  In relation to the question of being addressed, I think that's not what this witness said, that he was directed by Mr. Johnson.

MR. HILFIGER:  Okay.  Wanted.

Q    (By Mr. Hilfiger) When he said he wanted you to go out there -- (Interrupted)

THE COURT:  Okay.  We'll sustain it for the record.  We'll withdraw the question.

Q    (By Mr. Hilfiger) When Clint Johnson said he wanted you to go out there to look to see how many guns were out there, did he also say he wanted you to look for any drugs?

A    Well, he asked me about it.  I don't think he wanted me to.  He asked me about it after I went out, yes.

Q    Okay.  But not before you went out there?

A    No.

Q    Okay.  So, after this conversation with Clint

Johnson when Clint Johnson said he wanted you to go out to Kenny Barrett's house -- by the way, when he said he wanted you to go out to Kenneth Barrett's house, I mean Kenny Barrett's house, did you feel that was sort of something he was making a request for you to do?

A    He asked me if I could.

Q    Okay.  Did you feel like you had any kind of obligation to go out there?

A    No.

Q    So how long was it after that that you went out to Kenny Barrett's house?  After this conversation that you had with Clint Johnson, how long was it after that that you went out there?

A    I think it was the next day or the day after.

Q    That within the next day or so?

A    Couple days, yes.

Q    And did you go out there by yourself?

A    No, I didn't.  I went with someone.

Q    You went with someone?

A    Yes.

Q    And who was that?

A    It was my nephew.

Q    What was the purpose of bringing your nephew out there?

A    There wasn't no purpose in taking him out there.  He

2619

was just with me.

Q    And what time of day or night was that that you went out there?

A    It was in the evening hours.

Q    And what occurred at that time?

A    I think we was there to talk to Kenny about a pickup at first.  That was the conversation that was brought up was about a vehicle.

Q    You were talking to Kenny about the vehicle?

A    Yes.

Q    And was that just a ruse?

A    Yes, it was just conversation.

Q    Okay.  And where did this take place?

A    In front of the garage.

Q    Did you stay in front of the garage or did you go some place?

A    I think we went inside the garage.

Q    Okay.  And then what went on in there?

A    We were talking about the vehicle.

Q    Right.

A    And a title to a vehicle.

Q    Title to that same pickup or another pickup?

A    It was the same vehicle.

Q    And then what happened?

A    And we was just having conversation.

2620

Q      How long were you out there?

A      Probably 20 to 30 minutes.

Q      And then what happened after that?

A      We ended the conversation.  I think we went in and got something to drink.  He had an ice chest inside the house.

Q      Did you know -- you said he had an ice chest in the house.  How much have you been around in that house?  Had you been to every room downstairs?

A      Yes.

Q      Did you know whether that house -- number one, when you were in the house did it have a back door that you could go in and out of?

A      I never went out the back door, no.

Q      Did you ever see the back door?

A      No.

Q      Do you know whether there was a toilet in the house?

A      I don't think so.

Q      Did you ever see one?

A      No.

Q      Did you ever see a sink in the house?

A      No.

Q      Did you ever see anything that would indicate running water was in the house?

A      No.

Q    Did you ever see -- well, it's sort of unusual having an ice chest, having drinks in the ice chest.  Was there a refrigerator in the house?

A    I don't know.  I've had an ice chest in my house before.

Q    Well, did you see a refrigerator in the house?

A    I don't remember.

Q    So you were in the house to get something to drink. How long were you in there?

A    Just a few minutes.

Q    And what went on in there?

A    We went in, got a soda pop and come right back out.

Q    And you and your nephew and Kenny were in the house?

A    That's correct.

Q    And then what happened after you left the house?

A    We went back out to the car.  I think we was talking about -- I was there talking to him about a vehicle and I said that we -- and a title to a vehicle.

Q    Right.

A    I think that particular vehicle had been stolen from an individual that I knew and Kenny knew who it was and where it was at and I think he told me and that conversation just ended and we got in the car and left and I went and checked on the vehicle.

Q    Okay.  And you checked on the vehicle?

2622

A    Yes.

Q    It was some place else?

A    Yes.

Q    Now, was there any discussion about drugs at this time while you were out there on this occasion?

A    I think we asked him if he had any drugs.  Yes, I think we did.  I think I did.

Q    You asked him?

A    Yes.  And I think my nephew asked him also.

Q    Okay.  Did you see any drugs out there?

A    Not at that particular time, no.

Q    Did you do any drugs out there at that time?

A    I think we may have smoked a joint.

Q    Okay.  Was that one joint shared by everybody?

A    Yeah, it was one joint shared by three of us and I think Kenny just took a couple of hits and we left.

Q    And what?

A    I think it was just shared by us three, me, Kenny and Trevis Don and -- which is my nephew -- and we left.

Q    Okay.

A    He took a couple of hits and we left.

Q    Okay.  And then from that did you have a contact with Clint Johnson concerning that time going out there?

A    Yes.

Q    And how much longer --- you know, what space of time

2623

from the time you left there until you had a conversation with Clint Johnson?

A    I think he called me and he set up a day or time to see me.

Q    I didn't -- (Interrupted)

A    I think he called me and we set up a time to come and see me and we met.

Q    And where did you meet?  Clint Johnson's office or just some place outside?

A    No.  Some place between my house and his house.

Q    And when was this -- when was the telephone call first, in regards to after you left Kenny Barrett's?  Was it a day -- hour, day, couple days, what?

A    It was -- it was the very next day.

Q    When was the meeting?

A    The same day.

Q    And what was discussed at that meeting?

A    He asked me if I'd been to Kenny's.  I said yes.  He asked me if I seen any guns.  I said yes.  He asked if we'd done any drugs and I told him no, not other than smoking the joint.  He asked me if I seen any drugs and I told him no.

Q    Did you see any manufacturing?

A    No.

Q    Okay.  How long was that meeting that you had with

2624

Clint Johnson?

A    From fifteen to forty five minutes.

Q    When you ended that meeting with Clint Johnson was there any request or directions or things that Clint Johnson wanted you to do in regard to Kenny Barrett? Anything further?

A    No.

Q    Didn't ask you to do anything further?

A    No.

Q    Okay.  Did you do anything further as far as going out to Kenny Barrett's after that?

A    No.

Q    That was the last time, the day or so before this meeting with Clint Johnson, you're telling us is the last time that you had any conversation with Clint Johnson about Kenny Barrett prior to September 24th, is that right?

A    That's correct.

Q    Is that also the last time that you say you even went out to Kenny Barrett's house prior to September 24th?

A    That's correct.

Q    Okay.  So, as I understand this, the information that you were giving to Clint Johnson -- and correct me if I'm wrong, okay?  But as I understand the information

2625

that you're giving to Clint Johnson is that you had been out there in July and you didn't see any drugs, any manufacturing, didn't do any drugs.  And you gave Clint Johnson -- and you didn't see any manufacturing going on out there of any drugs.  And you gave Clint Johnson no information on drugs.  And in August you went out there with your sister -- (Interrupted)

MR. LITTLEFIELD:  Objection, Judge. Summarizing the entirety of his testimony is inappropriate.

THE COURT:  Argument, counsel?

MR. HILFIGER:  I'm just trying to make sure that I've got -- that it's correct.

THE COURT:  Objection overruled.

Q    (By Mr. Hilfiger) And in August you went out there with your sister and Ronny and there were no drugs and you told Clint Johnson there were no drugs.  And the only thing that -- let's see.  In September you went out there.  You had never saw any manufacturing out there, is that right?

A    That's correct.

Q    And the only time that you were contacting and telling Clint Johnson from the July, August and September dates in 1999, the only time that -- there were like two times that you did drugs.  One time you were in the house

2626

and you shot up and one time you smoked a joint, is that right?

A   That's right.

Q   Never saw any manufacturing.  The only thing Clint Johnson -- that you told Clint Johnson was about guns, is that right?

A   Other than the drugs I just told you about, yeah.

Q   Right.  Okay.  Now, did Clint Johnson approach you at any time and tell you I'm going to use you as an informant for a search warrant?

A   No.

Q   Maybe I missed that.  When did you first become aware that you were an informant for a search warrant, if you've ever become aware of it?

A   He told me that the last visit, prior to going to -- yeah, the last visit prior to the incident happening that he was seeking to get a search warrant.

Q   And did he tell you then that you were going to be a -- that he was going to use your information?

A   Not solely, no.

Q   Not solely.  Did he tell you anybody else's information he was using?

A   I don't think so.

Q   Were you ever out there with a person named Bobby Morgan?

2627

A     I don't remember, no.

Q     Don't remember that.  These times that you were going out there in the summer of 1999, do you remember any other Barretts being out there?  Do you know who Toby Barrett is?

A     That's his son.

Q     Do you know that?

A     Yes.

Q     Do you know Toby Barrett?

A     I know of him.

Q     Did you ever see him -- did you ever see Toby Barrett out there?

A     Yes.

Q     Do you know -- and I'm talking about during the summer of 1999.  Was he out there on those occasions that you went out there?

A     Yes, once.

Q     One time.  Was that one of these July, August -- July, August, September times or one before that?

A     It was the time that I had my nephew with me.

Q     Okay.  When did you first talk with Mr. Littlefield concerning any information you had as a witness in this case?

A     December of 2004.

Q     Not quite -- about ten months ago, is that right?

2628

A    Yes.

Q    And how long a conversation did you have with him at that time?

A    Fifteen to thirty minutes maybe.

Q    And that conversation, were there other people present besides you and Mr. Littlefield?

A    Yes.

Q    Who else was present?

A    Mr. Johnson.  Mr. Johnson.

Q    Jones?

A    Johnson.  Mr. Johnson.  Clint Johnson.

Q    Clint Johnson.  Okay.  You and Clint Johnson and Mr. Littlefield, is that right?

A    Yes.

Q    And during that conversation did you tell them pretty much this same information you've just told the jury today?

A    No, I don't think so.

Q    You didn't tell them that.  What information did you tell them then that's different?

A    I don't think I was asked this information.

Q    Oh, you weren't asked the detail that we've gone through today?

A    No.

Q    So it wasn't that you didn't tell them something

different, they just didn't ask the right questions, is that right?

A    They didn't ask me what you was asking me, yes.

MR. HILFIGER:  May I have just a moment?

THE COURT:  You may.

Q    (By Mr. Hilfiger) And as I understood what you said yesterday, did you say that you're getting -- that you anticipate being out in March of 2006?

A    That's correct.

Q    So, after ten convictions you're going to serve about 18 months in prison, is that right?

A    The time I'm done I'll be -- I'll have with the good time and the program that I'd taken in the penitentiary which gives you good days, approximately 25 months.

Q    Twenty five months.  But that includes jail time, I guess, too?

A    Yes.

Q    Because your convictions were in November 18th, 2004.

A    That was when I was convicted, yes.

Q    That was when you were convicted.  And you're going to get out in March of 2006, you anticipate?

A    I was in jail from March 31st and convicted in November of 2004.

Q    For your ninth and tenth convictions?

2630

A     That's correct.

MR. HILFIGER:  I have no further questions.

THE COURT:  You may.  Mr. Hilfiger.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  I have been controlling my liquid consumption and I have not had a problem.  But I've got to at this time.

THE COURT:  Okay.

MR. LITTLEFIELD:  And I controlled it today.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, we'll take our morning recess now.  Remember my admonition not to discuss it among yourselves or allow anyone else to discuss this matter.  Everyone please remain seated as the jury leaves the courtroom.

(Whereupon, a brief recess was held after which the following record was made in the presence of the jury.)

THE COURT:  You may cross examine.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Mr. Sanders, I was a little confused by your testimony.

2631

THE COURT:  Well, I should say redirect.  I said you may cross examine, but you may -- it's redirect.

Q    (By Mr. Littlefield)  When you testified yesterday you mentioned an incident with Geniece -- is it Geniece Thomas or Janice?

A    Geniece.

Q    Geniece Thomas.  And you advised me that about three or four days prior to the shooting you all had gone over to Mr. Barrett's house?

A    That's correct.

Q    And what happened when you went over there with Geniece Thomas?

A    I picked up some keys at one time and then we got some dope.

Q    When the dope was received at Mr. Barrett's, was it given to you or to Ms. Thomas or was it purchased?

A    It was purchased.

Q    By whom?

A    Ms. Thomas.

Q    And then you all went and used it where?

A    At my house.

Q    And how many times did you go over to Mr. Barrett's with Geniece Thomas?  One time, two times, multiple times?  Do you know?

A    More than two.

2632

Q    Looking back six years ago, do you today remember which time was which?

A    Not exactly.

Q    Did Ms. Thomas buy drugs from Mr. Barrett?

A    Yes.

Q    When you had your conversations with Mr. Johnson, if there had been a purchase of meth at Mr. Barrett's, would -- did you advise Mr. Johnson of that?

A    Yes.

Q    The incident when you went over with -- was it Ronny?

A    That's correct.

Q    On cross examination, correct me if I'm wrong, but I believe your testimony was that you -- Ronny went there for drugs and it was in the nighttime?

A    Yes.  We took Ronny there, yes.

Q    And that Ronny met with Kenny Barrett?

A    Yes.  Ronny went and got Kenny Barrett out of his house.

Q    And you spoke to Kenny Barrett?

A    Yes.

Q    And then you said you left?

A    Well, we all left.

Q    When Ronny spoke to Mr. Barrett, did you see what they talked about?

2633

A   About dope.

Q   Was there an exchange of dope?

A   Yes.

Q   Who received dope from whom?

A   Ronny received dope from Kenny.

Q   Was it given away or was it sold?

A   It was purchased.

Q   And you said on cross that I believe you thought this took place in August?

A   That's correct.

Q   When you were given the estimates or the time frames, this was between July the 10th and July the 15th and July the 25th, how certain are you on those day?

A   I'm not positive.  I'm not certain.

Q   When you met with Mr. Johnson and you advised him of the activities that you had seen at Mr. Barrett's, did you tell him about the transaction that involved Ronny?

A   Yes.

Q   When you talked to him, what information was Mr. Johnson interested in learning about?  What did he want to learn about what was happening at Mr. Barrett's?

A   If there was any drugs there.

Q   And would it have provided Mr. Johnson with the information he was interested in for you to have not told him about drug sales if he -- you haven't observed them?

MR. HILFIGER:  Your Honor, that's such a compound sentence.

THE COURT:  Sustained.

MR. LITTLEFIELD:  I'll rephrase it.

Q   (By Mr. Littlefield) Mr. Johnson wanted to know about drug activities?

A   That's correct.

Q   When you were reporting to him in relation to what you observed at Mr. Barrett's, what were you trying to tell Mr. Johnson in relation to what you had observed?

A   About if Kenny had any drugs or not.

Q   If you had seen a drug transaction take place, did you report it to Mr. Johnson?

A   Yes, sir, I did.

Q   Were you trying to sugar coat the stuff to him or were you trying to tell him what you'd seen happen?

A   I would try -- I would just tell him what was happening.

Q   If we look back now, if we look at what is said now, and there is uncertainty about when an event happened, would you anticipate your recollection now as better or what Mr. Johnson wrote down in 1999?

MR. HILFIGER:  Your Honor, I object to that. That calls for speculation.

THE COURT:  Sustained.

Q    (By Mr. Littlefield) In regards to the specific time something happened, how certain are you as to the specific time of an incident happening?

A    It would probably been more correct when the incident happened.

Q    Do you know how many -- exactly how many times you went over to Mr. Barrett's house in the summer of 1999 through September?

A    No.

Q    And did you observe drugs and drug activities on every occasion?

A    Yes, pretty much.

Q    Were there times you went over there and didn't see any drugs, they weren't there?

A    When we say drugs, are we -- I mean, when I say drugs that's anything that's illegal, right?

Q    Well, let's limit it to meth.  Did you see meth every time you were over there or were there times that it wasn't there?

A    There was times that I didn't see it when I went over there.

Q    And were you reporting to Mr. Johnson on every occasion you went over there?

A    No.

Q    When you saw narcotics there, meth there, did you

2636

advise Mr. Johnson of that?

A    Yes.

Q    And when you reported it to Mr. Johnson, you went over and saw meth there or saw meth transaction there, how much later would it have been that you let Mr. Johnson know of what you'd observed?

A    I don't know.  It could be from that day till -- (Interrupted)

Q    I'm sorry.

A    It could be from that day till ten days or even two weeks.

Q    And when you reported to him, did you let him know when the incident had occurred?

A    Yes.

Q    Now, in regards to your contact with Mr. Johnson, was it always face to face?

A    Not always.

Q    What other method did you have for contacting him?

A    Phone.

Q    Did he ever call you?

A    Yes.

Q    Did you ever call him?

A    Yes.

Q    The occasion when you went over and only smoked a joint, do you recall that?

2637

A     Yes.

Q     And you said Mr. Barrett took a couple of hits and then you all left.  Do you recall that?

A     Yes.

Q     How certain are you that that was the last time that you went over there before the incident in which the trooper was killed?

A     I'm not certain.

Q     And between the number of times you went over there, are you absolutely certain as to which -- what happened which or in what order those visits were?

A     No, I'm not positive about that.

Q     When you said on direct that you and Geniece Thomas went over there and it was three or four days before the trooper incident, scored meth, went home and used it intravenously, could that have been six or seven days before?

A     Yes, it could have.

Q     Could it have been two or three days before?

A     Possibly.  It's been a long time ago.

Q     I understand.  Did you keep a journal?

A     No.

Q     What's meth do to you when you take it?

A     Gives you a euphoric high.

Q     I'm sorry.  It what?

2638

A    Gives you a euphoric high, speeds you up.

Q    What kind of high?

A    Euphoric.

Q    Euphoric.  Real happy?

A    Yes.  I guess you could say that, yes.  It's a stimulant.

Q    In regards to these number of times that you've been in prison, is Kenny Barrett aware that you'd been in prison?

A    I don't know if he was aware.  I'm sure he knew that I was -- you know, he should have knew.

Q    It wasn't any secret in the community?

A    No.

Q    Would he have been aware what you were in prison for?

A    Well, it's public record.  I'm sure that he reads the newspaper.  I was probably in there.

Q    Did you ever talk about it?

A    No.

          MR. LITTLEFIELD:  May I have just a second, Judge?

          THE COURT:  You may.

          MR. LITTLEFIELD:  Pass the witness.

          THE COURT:  Further cross?

          MR. HILFIGER:  Yes, sir.

2639

RECROSS EXAMINATION

BY MR. HILFIGER:

Q   Mr. Sanders, where did you go during the break?

A   I went to my holding cell.

Q   Where?

A   Went to a holding cell to use the restroom.

Q   Did you talk to anybody down in the holding cell?

A   No.

Q   Huh?

A   No.

Q   Didn't talk to Mr. Littlefield?

A   Not in the holding cell.

Q   Where did you talk to Mr. Littlefield?

A   I guess a conference room.

Q   Downstairs?

A   Yes.

Q   So during the break you had a little conversation with Mr. Littlefield about what your testimony was?

A   No.  Not what the testimony was, no.

Q   What's it going to be?

A   He just told me how much longer we got to go.

Q   Okay.

A   Approximately how much longer.

Q   So he asked you questions concerning the incident while you were having this conversation during the break?

2640

A    Yes.

Q    Did he ask you questions about what your testimony was on cross examination?

A    I don't think so, no.

Q    Did he ask you questions about the times that you went out to the house, Kenny Barrett's house?

A    He asked me if I was maybe confused about the dates, yes.

Q    Oh, he asked you if you were confused?

A    Yes.  If I could be confused, yes.

Q    Are you confused or you are confused?

A    No, he asked me if I could have been confused.

Q    Okay.  And you agreed you could have been confused?

A    Well, I told him it was a long time ago.  He asked me if I was certain about the dates and I told him, no, I wasn't.

Q    Well, you gave a range of dates.  I never locked you in on a particular day, did I?

A    Not no particular day, but, yes, dates.

Q    I sort of locked you in on the occurrences, though. Which one occurred first and which one occurred next. Would you know that?

A    Not to be certain, no, I don't.

Q    After talking with Mr. Littlefield you're certainty's a little change, isn't it?

2641

A   No, I was -- I wasn't for certain then.  I was just trying to give you a ballpark figure.

Q   Okay.  It sure sounded like you were certain when I asked you about the last time you went to see out at Kenny Barrett's house and you said that was the time that you went out there with your nephew.  But you're saying that's not -- you don't know whether that's right or not, is that right?

A   If I went out there, what day I went out there?

Q   No, not the date.  The last -- whether that was the last time you went out there before the police came out there on September 24th.  You were pretty sure that the time you went out there with your nephew was your last time.

A   I'm not positive, but, yeah, I was pretty sure.

Q   Huh?

A   I wasn't positive, but, yes, I was pretty sure.  Not positive, but pretty sure.

Q   You're pretty sure?

A   Yeah.

Q   So now you're back to you're pretty sure that the time you went out there with your nephew is the last time you went out there, is that right?  I'm just -- I'm trying to get my -- (Interrupted)

A   I'm trying to think, too.  It's been six years ago.

2642

Q    Well, I just -- did Mr. Littlefield help you recall anything while he was down there talking to you?

A    No.

Q    During this period of time how much were you on meth?  How often were you taking meth?

A    Would it be fair to say when I felt like it?

Q    What?

A    Would it be fair to say when I felt like it?

Q    Whenever you felt like it?

A    Yeah.

Q    And you were getting meth from all sorts of sources, weren't you?

A    Yes.

Q    So whenever you felt like it, would that be like on a daily basis or weekly basis?  Did you have a regular -- a daily basis or a weekly basis?

A    Yes, I kept it most of the time.

Q    Most of the time?

A    Yes.

Q    Would that be basically a daily basis?

A    Yes, I guess you could say.

Q    And when you shot up, is that what you call it? Shooting or hitting?

A    Yes, shooting up.

Q    Shooting up on meth on a daily basis.  How long

2643

would you feel this euphoric high?

A     Probably two, three hours.

Q     And then what would happen?

A     Well, unless you done some more, you'd probably come down.

Q     And then would you keep doing more or would you come down?

A     Well, I felt like I didn't abuse it, so I probably used it, so I'd probably come down.

Q     But you'd use it on a -- is it fair to characterize it, and if you need to talk to Mr. Littlefield you can about this, but is it fair to characterize you use it on a daily basis?

        MR. LITTLEFIELD:  Object to that, Judge.

        THE COURT:  Objection sustained.  Disregard -- (Interrupted)

        MR. HILFIGER:  I'll withdraw it.

Q     (By Mr. Hilfiger)  Do you feel like you did it on a daily basis during the summer of 1999?

A     Off and on.  I don't know if I did it on a daily basis every day.  No, I couldn't -- I'd say no.

Q     Okay.  Now, when I was talking to you and we'll talk about the Geniece Thomas matter.  Let's see.  I think you told Mr. Littlefield initially that you went out there with Geniece Thomas about a week or three or four days

before this, before the police came out there.  That's what you initially told Mr. Littlefield.  Would that be -- do you recall that?

A    Yes.

Q    And at that time you said that you were in the garage and Kenny Barrett gave her the meth and you went back and used it intravenously, you and her both.  Would that be about right?

A    Yes.  She purchase the meth, yeah.

Q    And Geniece Thomas, how do you describe who she is?  She's a girlfriend or is she the person that went out there with the keys?

A    She was a girlfriend.

Q    She was the girlfriend.  And when do you think you went out there with that girlfriend?

A    I don't know a date.  But it was in September.

Q    It was in September you're saying you went out there with Geniece Thomas.  And was it before or after the time you went out there with that female to get the keys to the car?

A    It was the same female.

Q    That was the same female?

A    Yes.

Q    So the female that you went out there to pick up the keys for the car, I got that you said you didn't see any

2645

dope or manufacturing going on out there.  Is that what you told me?

A    That was the first time.

Q    Okay.  So you went out with a female twice to get keys?

A    No, not to get keys.  We went out there to get keys one particular time and then we went out there to get dope at another particular time.

Q    Okay.  You didn't tell me about that second time, is that right?

A    I don't guess.

Q    Okay.  Well, how was the time that you went with the girlfriend, when was that, to get -- the second time you're talking about?  You went out with a girlfriend twice, in July, August, September time frame, is that right?

A    Yes.

Q    The girlfriend we're talking about is Geniece Thomas?

A    Geniece Thomas, yes.

Q    And the time with the keys, that you went out to find the keys, was before the time you went out that you the dope, is that right?  Or that she got the dope?

A    Yes.

Q    Is that what you're saying?

2646

A     Yes.

Q     Now, the time that you're saying that the girlfriend, Geniece Thomas, went out -- you and she went out there and she got the dope, and you went back to your place and did it, is that right?

A     Yes.

Q     Now, was that before or after the time you went out there with your nephew?

A     The particular keys, I think was before.

Q     Now, I'm not talking about the keys.

A     Oh.  To get -- to do -- to get some dope?

Q     No.  You're telling us you went out there a second time with a girlfriend.

A     Okay.  It was before.

Q     It was before you went out there with the nephew?

A     Yes.

Q     Is that right?

A     No.  Yes, yes, it was before.

Q     Okay.  Listen.  I want to get it straight because it seems like whoever you talk to you just want to change your story a little bit.

A     Okay.

Q     You went out there with your girlfriend, Geniece Thomas?

A     Okay.

2647

Q    Got the keys?

A    Okay.

Q    And then another time you went out there -- and this is a later time.  I mean, you're telling us you went out there with Geniece Thomas and she got dope?

A    Yes.

Q    You didn't get the dope.  She did.

A    Yes.

Q    That's what you're saying.

A    Yes.  Yes, that's right.

Q    And then are you saying that it was after that that you went out there with a nephew?

A    Yes, that's right.  That was after.

Q    Okay.  And the time you went out there with a nephew you smoked a joint, is that right?

A    Yes.  We smoked a joint.

Q    Kenny Barrett took a couple hits and then you guys left?

A    Well, we went in the house and got a pop, I think.  That's what I told you.  We was talking to him about a car title, a truck title.

Q    And you left?

A    Yes.

Q    And that time you didn't do any drugs, you didn't see any drugs and you didn't see any manufacturing, is

2648

that right?  Other than the marijuana, other than a joint?

A    I may have seen some drugs, but I did get no drugs.

Q    You didn't get any drugs.  You didn't see any manufacturing.  Now, my questions to you were after that, you said you met with Clint Johnson after that, the next day after that.

A    Yeah.

Q    He called and he set up a time to meet with you, too, and you went out and met some place that same day, is that right?

A    Yes.

Q    Do you recall answering that?

A    Yeah.

Q    And I asked you what you told Clint Johnson and you said that Clint Johnson asked you if you'd seen any guns and you'd said yes.  And you said Clint Johnson asked you if you'd done any drugs and you said none other than the joint.  And Clint Johnson asked you if you'd seen any drugs and you said no.  Now, is that the answers that you gave me?

A    I don't -- excuse me.  Yes.  But I think I seen some drugs.  But as far as getting any drugs, I don't think Clint asked me -- I think he asked me if I got any drugs. He didn't ask me if I'd seen any drugs.

2649

Q   Okay.  So you misunderstood when I was asking you about seeing any drugs?

A   Yes.

Q   Okay.  That's the time that you're saying is the last time that you went there before the police came, is that right?

A   Yes.

Q   At that time -- excuse me.  Where are you saying that you saw -- well, let me ask you this:  When you and the nephew were out there, was that the time you were in the garage?

A   Yes.

Q   And you went in the house?

A   Yes.

Q   For 20 to 30 minutes?

A   Yes.

Q   And that's the time -- then you left.  Where are you saying that you saw meth?

A   I seen meth on a counter of the kitchen when we went in the house.

Q   Okay.  And how much are you saying you saw in there?

A   I don't know.  I don't know how much is there.  It was --

Q   How do you know it was even meth?

A   It looked like methamphetamine.

2650

Q    Was there anything done to represent that it was meth?

A    No.

Q    So you don't know it was meth at all, do you?

A    No, not other than me being a drug user myself and Kenny being a drug user.  What other substance would be there other than methamphetamine?

Q    What did that quantity look like?

A    It looked like meth.

Q    No, I mean size, size-wise?

A    It was probably from -- I don't know.  It was in two separate baggies.

Q    Okay.  Two separate bags.  How big were the bags?

A    Probably, I'm going to estimate, from three to five grams.

Q    Okay.  Were they -- what size bags were they?  Can you remember this stuff or are you just sort of thinking about it as you go along?

A    No.  I'm trying to remember it.  It was in a --
(Interrupted)

Q    A bag as big a square as this?

A    It wasn't in squares like that.  It was in a cut corner of a baggy.

Q    Okay.  What kind of a baggy are you describing?

A    It was, I don't know.  I don't know if it was Glad

2651

or what kind of baggy it was.  It was just a bag that was cut from a corner of a Ziploc baggy it looked like and I don't know how much was there.  It looked like from three to five grams, if I'm guessing.

Q    You're guessing?

A    You asked me how much was there.  I didn't weigh it so I couldn't tell how much was exactly.

Q    How close did you even get to it?

A    From here to that board right there.

Q    This board that's got the model on it?

A    That's correct.

Q    Did you pick it up?

A    No.

Q    Didn't touch it?

A    No.

Q    Didn't sample anything in it?

A    No.

Q    And from that you're saying it was in a bag and so you're saying it was meth, is that right?

A    That's correct.

Q    Did you see any of that stuff being divided up?

A    No.  It was -- (Interrupted)

Q    Did you see any money being exchanged?

A    No.

Q    Was anything said or done to represent those bags as

2652

being meth?

A    No.

Q    You just made that assumption, is that right?

A    There may have been conversation about it, but I don't think there was anything going on particular about them bags, no.

Q    You mean there was a conversation about methamphetamine?

A    Yes.

Q    But there's not necessarily a conversation about those bags being methamphetamine?

A    That's right.

Q    And you are positive now or pretty sure that the incident with the nephew was the last time you were out there?

A    I'm not positive.

Q    Pretty sure?  Pretty sure?

A    Yeah.

MR. HILFIGER:  I have no further questions. Just one second.  I have nothing further.

MR. LITTLEFIELD:  I don't have any additional questions.

THE COURT:  The witness may step down.  Call your next witness.

MR. LITTLEFIELD:  Kevin Wilson.

2653

KEVIN WOODRICH WILSON,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record please, sir.

A    It's Kevin Woodrich Wilson.

Q    Mr. Wilson, how are you employed?

A    I'm a Special Agent with the Drug Enforcement Administration.

Q    And in that regard, what is your current assignment, sir?

A    I'm currently assigned to -- in Washington, DC at DEA headquarters.

Q    And what are you doing in Washington?

A    I'm working on the international enforcement operations desk.  I'm a staff coordinator of enforcement operations at headquarters.

Q    You're going to need to lean forward.  I'm having a little trouble hearing you.  Are you anticipating any future assignment in the near future?

A    Yes, I am.

Q    And what would that be?

A    I'm going to be assigned to be the resident agent in charge of the Sao Paulo, Brazil office of the DEA.

2654

Q    And when are you expecting that to happen, sir?

A    When I finish language school in about four months I expect to go down there come March or April.

Q    Have you ever had occasion to live in McAlester?

A    Yes, I have.

Q    And when were you in McAlester?

A    I was in McAlester from roughly January 1999 to March of 2003.

Q    What were you doing in McAlester?

A    I was the resident agent in charge for the supervisor of the McAlester resident office of the DEA.

MR. LITTLEFIELD:  Judge, can I -- pardon me just a second.

THE COURT:  You may.

Q    (By Mr. Littlefield) What's a resident agent in charge do, sir?

A    Supervises the agents that are there.  Authorizes enforcement operations, oversees reports and so forth. Basically a general supervisor.

Q    Direct your attention to September the 24th, 1999. Did you have occasion to, during the early morning hours, involve that office in an operation?

A    Yes, sir.

Q    And what was the nature of the activity on September 24th, 1999?

2655

A    I received a telephone call asking us to serve a warrant, or to assist in serving a warrant, a search warrant at a residence out in Sallisaw, Oklahoma.

Q    Was it your all's search warrant?

A    No, it was not.

Q    Whose search warrant was it?

A    It was, I believe, the district attorney's task force search warrant.

Q    You typically serve search warrants for state agencies?

A    Quite frequently, yes, sir.

Q    Was it typical to be called out in the middle of the night and say, hey, we got a search warrant, we want you all to serve it as opposed to us?

A    This was an emergency situation that we were called out.  That's not typical, no.

Q    Do you see the model there that's Government Exhibit Number 1?

A    Yes, sir.

Q    Do you recognize that, sir?

A    Yes, sir.

Q    What is that?

A    That would be the area that we were called out to search.  The residence of Mr. Kenny Barrett.

Q    About what time did you get to Mr. Barrett's

2656

residence that early morning, sir?

A    I would say it was about between 2:00 and 2:30 in the morning.

Q    You knew when you went to Mr. Barrett's that the residence had already been secured and that you all weren't going to have to make entry?

A    Yes, sir.

Q    When you all made entry on search warrants, how are you typically armed?

A    We usually are armed with a primary weapon as well as a -- which may be -- depending on what your assignment is in the search, may be a handgun or a long rifle, submachine gun or a shotgun and then of course you'd have a backup weapon as well.

Q    When you all -- when you would go to perform search warrants where you were making the entry, did you carry more than one weapon with you in the vehicle?

A    Almost always.  Everybody usually carried at least two weapons.

Q    Typically when you would go to an area to make entry, what two weapons would you carry?

A    I usually carried a primary handgun as well as a back up handgun as being the supervisor.

Q    You aren't the one going in and beating down the door?

2657

A    Sometimes, but usually not.

Q    When you got to this residence, who was responsible for the residence and making -- the security of the residence?

A    Well, when we had gotten there, it had already been secured by the Oklahoma Highway Patrol.  And it was now a crime scene.

Q    Do you know if there were any Oklahoma State Bureau of Investigation agents there by that time?

A    They were in route or there shortly thereafter.

Q    You all had a search warrant to do drugs.  Did you all initiate the search at that point in time?

A    We initiated the search after the -- after the scene had been secured and the crime scene had done their job, the OSBI.

Q    So the crime scene search took place before any of the drug search took place?

A    Yes, sir.

MR. LITTLEFIELD:  I'd ask that Government Exhibit 69 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize that -- what's depicted in Government Exhibit 69, Mr. Wilson?

A    Yes, sir.

Q    And what is that?

A     That would be an aerial view of the crime scene location, Mr. Barrett's house, as well as the out buildings.

Q     Now, when you all received authorization that an area is cleared, did you wait until the whole thing was clear or did it come piecemeal?  That part of it was cleared, therefore you ran your search there?

A     It came piecemeal.  We searched the outer buildings during the day before we searched the primary residence. We searched the trailer and some of the vehicles that were on the outside.

Q     Do you see security in the premises that's visible in Government Exhibit Number 69?

A     Yes.  The yellow tape would have been the initial crime scene area.

Q     And did you all stay outside of that crime scene area until it was cleared and you were allowed to go in and do the drug search?

A     Yes, we did not do the search until after that was cleared and we were allowed to go in.

Q     Where was the first place searched, sir?

A     The first place searched would have been the trailer, the outbuilding, the garage and the vehicles.

Q     As to those items, what was the first place searched?  Do you recall?

2659

A    As I recall it was the trailer.

Q    You've got -- see the laser pointer in front of you to your right.  Can you go ahead and just if you press that red button, it'll -- yeah, we got them both.

A    Then the trailer, yeah, the trailer right there. The little trailer, outbuilding.

Q    Who was responsible initially for the search of that trailer?

A    Task force officer Juan Beal.

Q    Did you go into that trailer after Mr. Beal was complete?

A    Yes, I did.

Q    Did you find any items that you associated with -- what kind of warrant was it?  Drug warrant or what?

A    It was a drug warrant, search warrant.

Q    And did you find any items that you associated with drugs or the use or distribution of drugs in that trailer?

A    Yes, I did.

Q    What?

A    I found a digital scale, small scale, as well as some pseudoephedrine, a couple packets of pseudoephedrine.

MR. LITTLEFIELD:  I would ask that what has been marked as Government Exhibit 53 be displayed to the

2660

witness.

THE COURT:  Has it been admitted?

MR. LITTLEFIELD:  No, Your Honor, it has not.

Q    (By Mr. Littlefield) Do you recognize that, sir?

A    Yes, sir.

Q    What is that?

A    That would be the scales as well as the pseudoephedrine tablet packages.

MR. LITTLEFIELD:  I would ask that Government Exhibit 95 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) And is that basically a photograph of the flip side of the same scales and pseudoephedrine?

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of both Government 53 and 95, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  Brief voir dire, Your Honor.

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Mr. Wilson, is it your testimony that those items were found in the small trailer by yourself?

A    Yes, sir.

2661

Q   And can you tell us where in that small trailer they were found?

A   As I recall it was in like just a storage area like -- I guess it would either be a covered or a -- maybe for clothes, by the -- just a storage, small storage area by the bed.

Q   Okay.  And this is a small trailer?

A   It's a very small trailer, yes, sir.

Q   Out there by the shed, right?

A   Yes, sir.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection. That was 95 and 53?

MR. LITTLEFIELD:  Yes, Your Honor.  That's displayed while we got -- well, if you're going to do them both let's do them both.

Q   (By Mr. Littlefield)  And is that those two exhibits?

A   Yes, sir.

Q   Are the photographs of them.  And I note they both say N-4.  There's been discussion of giving N numbers to -- is that non-drug evidence or drug evidence?

A   N is designated as non-drug evidence.

MR. LITTLEFIELD:  I would ask that Government

2662

Exhibit Number 173 be present to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize that, sir?

A    Yes, sir.

Q    What is that?

A    These are the scales that were found in the trailer.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 173.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, just based on what we've talked about yesterday, this is not the residence of Kenny Barrett and on those grounds we object to the admission.

THE COURT:  Be admitted over objection.

MR. LITTLEFIELD:  I would ask the clerk provide scissors so that the agent can have access to that exhibit.

THE COURT:  You may.

Q    (By Mr. Littlefield) That's heat sealed, right?

A    Yes, sir.

Q    What's your practice in regards to sealing baggies which contain exhibits, both drug and non-drug?

A    They were -- they would be taken back to our location, our office for processing.  Once it would be logged, it would be put into a heat sealed envelope and

2663

that would be what this -- done by an agent and then witnessed by another agent.

Q    Can you go ahead and set the scissors down for just a moment.  Can you hold that up showing the label so that the jury can see the evidence label?

A    It's too late.

Q    Where you fill out the information?

A    The information is filled out on the evidence label right there.

Q    If you could hold it in such a fashion that the jury can see it as well.  Where does the case number go?

A    Case number is right at the very top.  It's the first line.

Q    Is the person would seizes that listed?

A    Yes, sir.  It's the third line down.  The second line would be the exhibit number and then the third line down is who acquired the evidence.

Q    And is your name showing as who acquired it?

A    Yes, sir.

Q    Now, is there someone assigned to take custody of that, sir?

A    Yes, sir.

Q    Who was that?

A    It was Craig Nixon at that time.

Q    And where is that -- can you point to where that is

2664

on the -- (Interrupted)

A    His name is right after mine.

Q    And if you would go ahead now and use the scissors to break the seal and remove those items.  How much pseudoephedrine was there, sir?

A    Two bags of -- or two packets of six tablets each of Pseudo 60s.

Q    When you say Pseudo 60s, does it identify what the milligram dosage of those pseudoephedrine tablets are?

A    Yes, sir.

Q    What is it?

A    That would be 60 milligrams each.

Q    If you check the backside, does it give instructions regarding the usage and appropriate dosage for an adult?

A    Yes, sir.

Q    What is the appropriate dosage of pseudoephedrine in 60 milligram doses for adults?

A    Getting older here.  I can't read as well as I used to.  One tablet every four to six hours, adults and children 12 years of age and over.  One tablet every four to six hours.

Q    How many a day?

A    Not to exceed four tablets in 24 hours.

Q    Now, hold up the scale if you would.  How large an area -- where do you weigh the items on that type of

scale?

A    It would be set on the plate here.

Q    Do you know what brand is that?

A    It's an Ohaus.

Q    Ohaus scale?

A    Yes, sir.

Q    Do you know if that's digital or not?

A    It's digital.

Q    And where does the reading come out?

A    The reading would be this face right there.

Q    Would it be metric or good old American measurements or both?

A    Sometimes they have them where they got both.  This one looks like it would probably be -- looks like grams, it says grams so it would be metric.

Q    Okay.

A    Well, it has both actually.  It has grams and it also has ounces listed there.

Q    So you can convert it one to the other?

A    Yes, sir.

Q    Is that the only area in which you were directly involved in searches, sir?

A    No, sir.

Q    What other area were you directly involved in searching?

2666

A    Searching of the house, the actual residence.

Q    And you indicated -- and if we could take that off and go back to Government Exhibit 69.  You indicated the first area was that trailer?

A    Yes, sir.

Q    And then you said other items, the storage stuff. Where are you talking about, that you all did that portion of the search?

A    Well, there was the search was -- I believe the vehicles were searched as well as the outbuilding, I guess they call it a garage there, a workshop.

Q    Were you present when the search was done in the storage building, this building right in here?

A    As a supervisor I was present.  I don't -- I was not actually involved in the search of that building itself.

Q    Did you even go in and participate in the search of that building?

A    I don't recall participating in it.  I walked through the building but as a supervisor often times would do that.

Q    Was there a dumpster which was also searched, do you recall?

A    I do recall a dumpster being there and that being searched, yes, sir.

Q    Were you involved in the search of the dumpster?

2667

A    No, sir.

Q    After this area and any vehicles were searched, were you immediately able to go into the residence and search it as well?

A    No, sir.

Q    Do you recall about what time of the day this area would have been searched by the DEA?

A    As I recall it was about two to 2:30 in the afternoon.

Q    And how long was it before you, the DEA agents, were allowed to go into this area to search?

A    It was fairly late at night.  It was probably -- it was late, nine, 10 o'clock at night.

Q    What was it that prevented you all from -- after you completed your search here, just immediately going over here and searching the house?

A    The crime scene investigation had not been completed yet.

Q    While they were doing the crime scene investigation here in this area, after you all completed your search here, where did you all go so that you stayed out of the way and didn't contaminate it?

A    We just waited around outside.  One of the things that I did actually was go up and take aerial photographers with the DEA helicopter, of the crime

scene.

Q   Do you know if this one's one you -- (Interrupted)

A   I believe that would be one of them.

Q   When you first got there, 2:30 in the morning, where did you all go?

A   We stayed around.  We were there around the scene. We just waited all day.

Q   Did you go up into this area here?

A   We're not allowed to go in the house.

Q   Did you go right here in this area at the side?

A   We were in that area a little bit.

Q   I note that there's tape around this area here. Were people going in and out and back and forth in this area here or was it controlled?

A   It was controlled.

Q   When you got into the house, what area did you search first?

A   As I recall we searched the -- I guess we would call it the living room area, the front door area where the front door came in.

Q   Do you see the model?

A   Yes, sir.

MR. LITTLEFIELD:  I'd ask that Government Exhibit 175 be displayed.

THE COURT:  You may.

2669

MR. LITTLEFIELD:  It will be on the screen in both places.

Q    (By Mr. Littlefield) Do you recognize that as being a shot looking down upon the model?

A    Yes, sir.

Q    And do you recognize the rooms in the house?

A    Yes, sir.

Q    Where is the front door?

A    Front door would be right here.

Q    Okay.  And so which room was it that was searched first?

A    As I recall was that front room right there.

Q    The one that the door goes into?

A    Yes, sir.

Q    And did you discover anything in the front room area, sir?

A    I believe there was a flask.

MR. LITTLEFIELD:  I would ask that what has been marked as Government Exhibit Number 217 be displayed to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  It is not in evidence yet.

Q    (By Mr. Littlefield) Do you recognize that which is displayed, sir?

A    Yes, sir.

2670

Q   What is that?

A   It's a 200 milliliter flask.

Q   Two hundred what?

A   Two hundred milliliter flask.

Q   How many zeros are there?

A   Or 2,000 milliliter, I'm sorry.  2,000 milliliter flask.

Q   Is that a photograph of the flask that you found?

A   Yes, sir.

          MR. LITTLEFIELD:  I would ask that that -- move admission of Government Exhibit 217.

          THE COURT:  Any objection?

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Admitted without objection.

          MR. LITTLEFIELD:  I would ask that Government Exhibit 105 be provided to the witness.

Q   (By Mr. Littlefield) Do you recognize that, sir?

A   Yes, sir.

Q   And I note that -- how do you know -- what is that?

A   That's a 2,000 milliliter flask.

Q   Is the 2,000 milliliter flask?

A   Yes, sir, I believe so.

Q   Why do you believe so?

A   It look likes the one that was seized at the time.

Q   Why don't you look on the top?

2671

A    There's the evidence -- yeah, there's the evidence sticker on it.

Q    And is that the evidence sticker that was placed on that box in regards to the flask that was found there at Sallisaw at Kenny Barrett's residence?

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 105, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

Q    (By Mr. Littlefield) And, Mr. Wilson, would you take that out and display it?

THE COURT:  Wait.  Admitted without objection.

MR. LITTLEFIELD:  I'm sorry, Judge.  I was not trying to step on you.

Q    (By Mr. Littlefield) Would you display it?  Was there -- do you know if there was efforts to fingerprint that flask?

A    Yes, I believe so.  It was sent to the lab for fingerprints.

Q    And do you know what the report was?

A    I do not.  I don't recall the reports.

Q    Do you think if they'd have found anything that would have been of assistance fingerprint-wise you'd have known about it?

2672

A     I believe so.  They would have reported to the case agent.

Q     Well, I understand.  But you weren't the case agent. But you think you would have learned of it one way or another?

A     Probably, yes, sir.

Q     Do you know anything about any?

A     I don't recall.

Q     That was in what room, sir?

A     It was in the front room.

Q     What kind of flask is that?  Is it a brand?

A     It's a Pyrex flask.

Q     Can that type of item be utilized in the manufacture of methamphetamine, sir?

A     Yes, sir.

Q     And in what capacity?

A     Used during the cooking of the methamphetamine.  It can handle high amounts of heat.

Q     In regards to cooking meth, when you were in McAlester did you have occasion to participate in search warrants related to clandestine labs?

A     Yes, sir.

Q     And got any idea how many you all -- your agency, your office, would have been involved in the -- how long were you in McAlester?

2673

A     I was there four years, sir.

Q     In the four years, you got any idea how many meth search warrants you all would have been -- participated and involved in?

A     Probably be well over a hundred, sir.

Q     Do you have any idea what the primary precursor ingredients are in the typical meth lab in eastern Oklahoma in 1999 were?

A     Yes, sir.

Q     What were they?

A     The three primary ones would be ephedrine, iodine and red phosphorous.

Q     You say ephedrine, the pills you had in --

(Interrupted)

A     Pseudoephedrine.  I'm sorry.  Pseudoephedrine or ephedrine.

Q     Can pseudoephedrine and ephedrine be used interchangeably from your understanding?

A     Yes, sir.

Q     And iodine and red phosphorous?

A     Yes, sir.

Q     Did you find any evidence of the existence of iodine in that residence?  And you can return Government Exhibit 105 to the clerk.  Let me ask you this:  Was there any indication and did you learn of an indication of iodine

2674

being discovered or the remnants of iodine being discovered before you got to the search of the house itself?

MR. SMITH: Object, Your Honor. That is a compound question.

THE COURT: Sustained.

Q   (By Mr. Littlefield) Before you got into searching the house, was there any evidence of iodine that was found anywhere else, prior to going into the house?

A   Prior to going in the house, not that I'm aware of.

Q   Do you recall what was found in the dumpster?

A   I did not do the search of the dumpster.

Q   You didn't have -- don't recall specifically what items were found in it?

A   I recall there was some -- as I recall, there was some like tissues or filters and some other stuff. But I don't recall the exact stuff.

Q   You don't recall if there was or there was not an iodine bottle in that dumpster?

A   I do not recall, sir.

Q   Okay. That's fine. Let's go as to what was found then in the house. Do you recall if there was anything that you associated with iodine or iodine crystals found in the residence?

A   Yes, sir.

2675

Q    And where -- who discovered something you associated with iodine or iodine crystals?

A    I did.

Q    What did you find?

A    There was like an antique camera up on one of the shelves in what I guess we'd call the bedroom, on a shelf there.

Q    When you're saying the bedroom -- let's put 175 back up.  When you say bedroom, which room are you referring to?

A    This room right here.

Q    Was that actually a sleeping area?

A    There was a couch in there and there was access to an upstairs loft.

Q    What was in the loft and we'll come back to the east room or bedroom.  What was in the loft?

A    A small crawl space with a bed, blankets and such.

Q    And did you go up there?

A    I stuck my head up there.  It was very small.

Q    Did you notice anything -- was there a place to sleep up there?

A    Yes, sir.

Q    Anything else that you observed up there in relation to -- were there any windows in that upstairs room, that loft area?

2676

A     There was.

Q     Where was that located?  On which side of the house?

A     That window would have been on this side of the house.

Q     But it's not shown on the bottom floor area?

A     No, sir.

Q     Is there anything in regards to that bed, that window that you recall?

A     The window looked out to the -- into the gate where the entry was made by the OHP.

Q     Any optical items there that you recall that would assist one of you?

MR. SMITH:  Your Honor, I'm going to object. He's leading this witness.

THE COURT:  Just a minute.  Sustained.

MR. LITTLEFIELD:  I'll withdraw it.

THE COURT:  Okay.  Let's sustain it and we'll let you think about it over the lunch break.

MR. LITTLEFIELD:  Okay.

THE COURT:  We'll take the noon recess.  Ask you to be back at 1:15 and remember my admonition not to discuss it among yourselves or allow anyone else to approach you about this case.  Ask everyone to please remain seated as the jury leaves for the noon hour.

(Whereupon, the jury left the courtroom after

2677

which the following record was made.)

THE COURT:  Mr. Wilson, you also may step down and I'll recognize you back at 1:15.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Anything to take up outside the hearing of the jury?

MR. LITTLEFIELD:  Not for the Government.

MR. HILFIGER:  We do have one matter, Judge. It's really of large import, but I don't think it's really full to argue it at this time.  But we would ask the Court, based on the testimony of Mr. Sanders to reconsider and we would re-urge our motion to suppress the drug evidence based on the search warrant because it was based on a faulty affidavit.  And as you heard from Mr. Sanders, the affidavit -- and I know this isn't in evidence in the jury trial, but it was -- the affidavit was presented at a motion to suppress and relayed certain items that this witness specifically denied saying. Specifically, it says that confidential informant -- on page 163 in the affidavit, it says -- 163 of the OSBI report, which is the second page of the affidavit.  It says that the confidential informant advised within the past 72 hours they were in the above described residence and observed a male that is known to be to the confidential informant as Kenny Barrett present a

2678

quantity of white powder substance and represent it as being methamphetamine.  Specifically, I asked those questions to this person who says he is a confidential informant and my understanding that who is the confidential informant.  And he said that there was no specific discussion about what he thought was methamphetamine in the kitchen.  There was no specific representation that that was methamphetamine and there was no presentation by Kenny Barrett of a quantity of white powder substance representing the methamphetamine.  That's in the first paragraph.

In the second paragraph, I asked him specific questions about while he was in the residence did he observe Kenny Barrett divide and exchange a portion of white powder substance for a quantity of money and he said that didn't happen.

And so, for that reason, I'm asking the Court -- and I know this is on a sudden notice but you need to understand we had never talked to this person until -- we didn't even know who he was until a month ago and we didn't have a chance to talk to him until today and yesterday.  And we'd ask the Court -- we re-urge our motion to suppress and ask the Court to reconsider suppressing the drug evidence based on the faulty affidavit as told to us by the confidential informant.

2679

THE COURT:  Counsel?

MR. LITTLEFIELD:  Mr. Johnson testified at the hearing on the motion to suppress.  Mr. Johnson, under oath, advised the Court that the specific items that were supportive of probable cause were in fact what was reported to him.  And I don't have the transcript of Mr. Johnson's testimony in front of -- (Interrupted)

THE COURT:  Well, let me.  I think, Mr. Hilfiger, I wanted to give you just a quick chance, but I think to have it properly before the Court and give the Government an opportunity to respond, that the defense should file a motion to re-urge and give -- and I don't know that -- time is important.  I don't want to rush you.  But if it could be done by Monday and the Government could respond by Wednesday, then I can take it up either in a hearing or rule on the papers.

MR. LITTLEFIELD:  I would advise the Court -- and I'm not going to give you exact testimony because I don't remember it.  But I do recall Mr. Johnson was asked -- advised that this individual had given him information on more than five previous occasions.  And that it had been accurate and then advised as to the items of probable cause that that was in fact what he was informed.  When this individual spoke on direct yesterday, he said three or four days prior to the

2680

incident he and Geniece Thomas went over there and they got methamphetamine from Kenny Barrett.  He also said that he and Geniece Thomas went over.  Geniece Thomas purchased methamphetamine from Kenny Barrett and that an individual by the name of Ronny was taken over there and Ronny purchased methamphetamine from Kenny Barrett.  There's no question that this -- that the informant today is not absolutely certain of his dates.  There's no question about that.  And there's no question that there's some conflict.  But it does not call into suspicion the information that Mr. Johnson provided and the information that Mr. Johnson testified to under oath when he testified at the suppression hearing.

THE COURT:  Well, I understand there's a difference of opinion about that and I'll await your pleadings.

(Whereupon, the noon recess was held after which the folding record was made.)

THE COURT:  Let the record reflect the jury is in the box.  Counsel for the Government is present.

2681

Defendant is present with counsel.  You may continue examination.

MR. LITTLEFIELD:  Could we have Government Exhibit 175 back again?

THE COURT:  You may.

Q   (By Mr. Littlefield) And I think that as we recessed for lunch you were talking about going up into the area above this?

A   Yes, sir.

Q   And you had commented about the window on the east side of the house.

A   Yes, sir.

Q   What did that window overlook?

A   It overlooked the driveway coming into the residence.

Q   And when you say driveway, you see on Government Exhibit Number 1, is that the area to which you are referring?

A   Yes, sir.

Q   Was there anything up there in that window that would be of assistance to observation in that direction?

A   Yes, sir.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 19 be displayed to the witness, Your Honor.

2682

THE COURT:  You may.

Q   (By Mr. Littlefield) Can you recognize what you see in Government Exhibit 19?

A   Yes, sir.

Q   What is that?

A   It's a spotting scope.

Q   Have you seen that spotting scope before?

A   Yes, sir.

Q   Where?

A   There at the residence of Mr. Barrett.

Q   What is this?  You might be able to see it better in the photo in front of you.

A   That would be the bed that was up there.

Q   Now, you mentioned that -- if we go back to 175, Government Exhibit 175.  You mentioned that you were involved in searching in this area here?

A   Yes, sir.

Q   Was there -- were there any signs or decals that were the topic of discussion in this room?

A   Yes, sir.

Q   And what was that, sir?

A   On the wall -- gun safe on the wall, there was like a bumper sticker.

Q   And do you recall if that was affiliated with any organization, that bumper sticker that was on the gun

2683

safe, the gun cabinet?

MR. SMITH:  Your Honor, I'm going to object. This doesn't have any relevance to what we're on trial for here today.

THE COURT:  Argument counsel?

MR. LITTLEFIELD:  Part of the elements relate to intent.  It's my belief that what was on that sticker relates to the element of the Defendant's intent.

MR. SMITH:  Your Honor, that's not a statement of intent.  It doesn't have anything to do with that.

THE COURT:  Let me see counsel at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  The exhibit itself as I recall -- (Interrupted)

MR. LITTLEFIELD:  I have a copy.  That's it.

THE COURT:  I'm looking at for the record Government Exhibit 56 for identification.  And you use the term sticker.

MR. LITTLEFIELD:  The witness did.

THE COURT:  And there was -- I'm not sure by that what he's talking about.

MR. LITTLEFIELD:  Your Honor, I believe what he's referencing is this item right here where it says gun control.

2684

MR. SMITH:  We're talking about two things. He's talking about an organization and that's the National Rifle Association.  Then you talk about decal and the other one said sticker.  But, Your Honor, if this isn't an evidentiary harpoon, I don't know what is. That's not a statement of intent.

MR. LITTLEFIELD:  Well, it certainly -- Your Honor, we're obligated to prove the Defendant's intent. We didn't put that sign up there.  He did.  The sign itself says gun control, hitting where you aim.  This is a case about this Defendant shooting and intentionally killing somebody.  And if that's hitting what you aim at --

THE COURT:  Do you think it's relevant because of what?

MR. LITTLEFIELD:  Part of what we got to do, Judge, is show that this Defendant's intent and the idea of him sitting there having and displaying in his own residence a sign says gun control is hitting where you aim certainly has indication of his consideration of being able to fire a gun, being able to fire a weapon, and what he wants to do when he fires it.

MR. HILFIGER:  Your Honor, it's inflammatory, it's prejudicial and it's not probative of a thing.

THE COURT:  I find that it's prejudicial, not

2685

probative.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q    (By Mr. Littlefield) Sir, you mentioned a camera?

A    Yes, sir.

MR. LITTLEFIELD:  I would ask that what's been marked Government Exhibit 58 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what you see in the photograph, sir?

A    Yes, sir.

Q    And is that picture representative of the circumstances in that room at the time that you observed it and were conducting the search?

A    Yes, sir.

Q    Do you see the camera which you referenced previously in that photograph?

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 58, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. LITTLEFIELD:  I would ask that it be displayed.

2686

Q      (By Mr. Littlefield) By the way, did you all stage these items or is this the way it was when you walked in there?

A      That's the way it was.

Q      And the camera, if you'd take the laser pointer and point to it, please.  And when you looked at that camera, what did you discover in the course of the search?

A      I took the camera down and looked inside of it and inside there were two plastic bottles.

Q      And do you recall the bottles?

A      Yes, sir.

Q      What kind of bottles were they?

A      I recall they were small plastic bottles.

Q      Do you remember the labeling on them?

A      Not specifically what the labels were.

Q      Was that item or the bottles inside of that camera seized, sir?

A      Yes, sir.

Q      And was it given an exhibit number?

A      Yes, sir, I believe so.

Q      Do you recall what the exhibit number was?

A      I don't recall the exact exhibit number.  I'd have to look at my notes or look at the notes.

Q      Do you have your case notes with you?

A      I do not.

MR. LITTLEFIELD:  Judge, may I approach?  I have a copy, I think, of the report of the investigation and I'd ask that for the purpose of allowing the witness to refresh his recollection.

THE COURT:  You may.

Q    (By Mr. Littlefield) Did you get an opportunity to look at the report of the investigation for the purpose of refreshing your recollection?

A    Yes, sir.

Q    And do you recall the exhibit number?

A    It was Exhibit 11.

MR. LITTLEFIELD:  I would ask that what's been marked as Government Exhibit Number 216 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) And when that exhibit -- when the two bottles were retrieved, what did you all do to them in regards to logging them in and preserving them in the office?

A    They were logged -- they were turned over to the special agent who was collecting the evidence.  That would have been Special Agent Nixon.  They were taken back to the -- to our evidence vault, our drug evidence vault, and locked away until they could be processed.

Q    And you mentioned that this is Drug Exhibit Number

2688

11?

A    Yes, sir.

Q    Was there a label as we saw the earlier exhibit prepared?

A    Yes, sir.

Q    Would you look now to Government Exhibit Number 216, sir?  And do you recognize -- can you see the evidence label in that, sir?  We may be able to focus in a little closer on it.  Do you see the label or do we need to bring it in more?

A    Bring it in more.  I can't -- that would be from the lab, that top part.

Q    I understand.  Let me ask the questions.  Hold on. See if we can get a little closer.  Do you see the label now, sir?

A    Yes, sir.

Q    And is that Drug Exhibit Number 11?

A    Drug 11, yes, sir.

Q    And do you see the items that were placed in the envelope, sir?

A    Are you talking about the -- (Interrupted)

Q    The items that were seized.

A    Yes, sir.

Q    Do those appear to be the items?

A    Yes, sir.

2689

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 216.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that Government Exhibit 216 be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) And what is that in the photograph, sir?

A   That would be a photograph of the evidence envelopes with the items of evidence.

Q   And the items of evidence, can you take the laser pointer and show where the bottles that you were talking about are located?

A   The bottles I'm talking about were right here.

Q   Okay.  Did you look anywhere else in that room, sir, in conducting your search?

A   Yes.

Q   What else did you discover in that room, in that east bedroom?

A   We found a gun locker.

Q   Other than the gun locker, in relation to drug related materials?

A   Oh, up in the attic or the crawl space or the space

2690

between there and the upper floor I found some ephedrine tablets or pills at that time.

Q     Would you look --

MR. LITTLEFIELD:   I would ask that Government Exhibit Number 59 be displayed to the witness.

THE COURT:   You may.

MR. LITTLEFIELD:   It's not in evidence.

Q     (By Mr. Littlefield) And describe the pills, how the pills were packaged when you found them?

A     As I recall they were in like a white grocery bag, trash bag type thing, and then they were inside of a plastic bag.

Q     And what did you have to do in order to discover the location of those pills, sir?

A     Had to move the ceiling -- the boards in the ceiling to look inside the space up there between the ceiling and the floor above.

Q     So you had to actually lift part of the ceiling?

A     Yes, and remove panels there.

Q     What are we looking at in what's marked as Government Exhibit Number 59, sir?

A     This would be a picture of where the pills were located.

Q     And does it show the pills and what the pills were packaged in as they were discovered at the site on

2691

September the 24th -- (Interrupted)

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 59.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) What do we got here?

A    That would be the -- well, that's a ceiling fan.

Q    What is this that the laser light is on now?

A    That is the bag that contained the pills.

Q    You mentioned moving a board.  Can you see the board?

A    Yes, sir.

Q    You point to it this time.  Where is the board?

A    This would be the board right here that was moved.

Q    Was that as it existed when you walked in or did you all have to move the board, if we're going to talk about -- (Interrupted)

A    We moved the board.

Q    When you say those were ephedrine pills, why are you saying that, sir?

A     They appear to be or they were suspected to be and from my understanding from the lab result that came back, that they were pseudoephedrine.

Q     Do you know how many pseudoephedrine pills there were?

A     I don't recall the exact number.  I'd have to look at the count.  We usually do it by weight.

Q     And after you retrieved the pseudoephedrine pills or what you suspected to be pseudoephedrine pills from behind that board in the ceiling in that east room, to whom did you deliver those pills, sir?

A     They would have been given to Special Agent Craig Nixon.

                MR. LITTLEFIELD:  I would ask that Government Exhibit Number 214 be displayed to the witness.

                THE COURT:  You may.

                MR. LITTLEFIELD:  And it's not in evidence.

Q     (By Mr. Littlefield) And it's not in evidence so you're going to have to look on it there.  Do you recognize what that is, sir?

A     Yes, sir.

Q     What is that?

A     That would be Exhibit 9.

Q     And I didn't ask you that.  Was the -- were the pills assigned a drug exhibit number?

2693

A    Oh, yes, sir.

Q    What was that number?

A    Exhibit 9.

Q    Is there an evidence label on that?

A    Yes, sir.

Q    Do you recognize any of the individual's writings on that evidence label?

A    A little small for me to say exactly whose name's on there.

Q    Hold on a second.  Can you see the writing now, sir?

A    Yes, sir.

Q    Do you recognize whose writing is on there?  Any of the writing?

A    That looks like Juan Beal's writing.

Q    Below Mr. Beal's, do you recognize who the witness -- (Interrupted)

A    The witness is Craig Nixon.

Q    Do you recognize Mr. Nixon's writing?

A    His signature.  I can't say exactly whose print that is.

Q    Does it identify who seized the evidence or acquired the evidence?

A    Yes, sir.

Q    And that's who?

A    That would be myself.

MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 214.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) And the label about which you were just speaking, where is that if could show the -- (Interrupted)

A    This would be the label right here, the evidence label.

Q    And you mentioned the plastic or grocery bag.  Is that shown in the photograph, sir?

A    Yes, sir.

Q    Where is that?

A    Right here.

Q    And the pills that you referenced that you believe were pseudoephedrine, are they visible?

A    Yes, sir.  Right here.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Your Honor, I pass the witness.

THE COURT:  You may cross exam.

MR. SMITH:  Thank you, Your Honor.

2695

CROSS EXAMINATION

BY MR. SMITH:

Q    Mr. Wilson, good afternoon, sir.

A    Good afternoon.

Q    Get organized here and we'll fire this thing off. All right.  I want to go back to your supervisory duties back in September of '99?

A    Yes, sir.

Q    And during that period of time you were responsible for overseeing your agents and also the paperwork that was generated from their activity; is that true?

A    Yes, sir.

Q    When did you leave the house or office?

A    March of 2003.

Q    Okay.  So you pretty much saw this case to conclusion as far as investigation goes or not?

A    Not.  I mean, we're here now and I've been gone for the last two years.

Q    Has there still been investigation going on as late as -- (Interrupted)

A    No, I just -- I saw as far as DEA's part to conclusion.

Q    That's what I'm talking about.  That's who you work for, right?

A    Yes.

Q    That's what I'm talking about.

A    Yes, sir.

Q    What you did as a supervisor or case agent, did you pretty much see the investigation of this case to conclusion?

A    Yes, sir.

Q    As far as you're concerned, everything was done in March of 2003?

A    As far as -- yes, other than we have regular updates on the case in case anything comes up, case status reports and so forth.

Q    But then you're aware in October of '03 they started testing things again or are you not aware of that?

A    Testing what things?

Q    Items that were found at the Barrett residence.

A    They would have been sent to the lab for testing, yes, sir.

Q    In October of '03, after you left in March of '03, four years after -- (Interrupted)

A    Well, in March of '03, I'm not aware of that.

Q    Okay.  So you don't know what's happened since March?

A    No, sir.

Q    But as far as you were concerned -- (Interrupted)

        MR. LITTLEFIELD:  Your Honor, may we approach

2697

the bench, please?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  Judge, he knows exactly why the additional connections were done into October of '03. He knows it was because they were requested to look back at that notebook by the state's attorneys.  And he knows that this witness can't say a word about why.  And it's disingenuous to bring that line of testimony up.

MR. SMITH:  Just seems to me, Judge, that if they're conducting an investigation, particular drug investigation, they're going to wrap up things then, not four years after the fact.

MR. LITTLEFIELD:  And he knows why they were asked to go back and look at that notebook.  That relates to Mr. Beal going back, getting names from the notebook as a request from the state prosecutor and it sounds like an indictment on DEA.  And it can't be explained and he knows it can't can be explained.  And that's disingenuous.

MR. SMITH:  It's not an area I intend to spend a lot of time with but I do think it's important that some four years after the fact.  I'll ask --

(Interrupted)

2698

THE COURT:  You made your point.  Let's move on.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q    (By Mr. Smith) Sir, as a supervising case agent, would part of your duties be to look at analysis that had been done on things for fingerprints?

A    I was not the case agent.  I was just the supervisor of the group.

Q    So the supervisor might not see that but the case agent would?

A    The case agent would.

Q    Now, you indicated earlier that this was an emergency, that everybody got a phone call at two o'clock in the morning and we had to get out there, to this Barrett residence?

A    Actually, I got the phone call at about -- I would probably say about 1:00 a.m. and was asked to come out an assist the serving the warrant.

Q    I think your words were it was an emergency?

A    Yes.

Q    What was the emergency?  We didn't search until two in the afternoon.

A    We were told that State Trooper Rocky Eales had been killed and that they asked for our assistance.  So we

2699

went out there as quickly as possible to render our assistance.

Q   But you weren't kicking the door in?  I mean, I just fail to see the emergency connection whenever you termed it that way.

A   We felt it was urgent to be out there and assist the fellow law enforcement officers.

Q   And then you'll agree with me it's some 12 hours later before we actually start conducting our search because the OSBI had control of the scene?

A   Absolutely, yes, sir.

Q   Now, what time were you on the premises?

A   I would probably say I arrived there -- I think I said earlier between two and 2:30.  Something like that.

Q   Was Mr. Barrett still there?

A   No, sir.

Q   Was all the crime scene tape up?

A   The tape was up.

Q   Was it ever expanded while you were there?

A   I can't recall specifically.  It may have been.

Q   Between 2:00 a.m. and 2:00 p.m. did you ever leave the residence?

A   Between 2:00 a.m. and 2:00 p.m., no, we stood by.

Q   You stood by where?

A   Outside the perimeter there.

2700

Q     Out on the road?  Outside in the yard?

A     Okay.  A lot of time we're sitting in our cars, waiting.  And then, like I said, then we realized we can start searching some of the outer buildings and that's when we started searching the outer buildings.

Q     Do you know how many personnel were there at two in the morning, in the area of the crime scene?

A     I cannot recall how many people were there.  But there was a number of people, but more came throughout the day.

Q     As many as 34?

A     At one time could there have been that many.  Could have been, yes, passing through at one time or another.

Q     Now, for a supervisor that is concerned with integrity of a crime scene, that can be a nightmare, can't it?  The more people, the worse.  Do you agree with that?

A     It can be difficult.

Q     I mean, this is a 20 by 20 residence, you'd agree with that?

A     Yes, sir.

Q     Doesn't take 34 people, does it?

A     No, sir, not for the search.  We didn't use 34 for the search.

Q     I understand that.  But it didn't take 34 people out

2701

at the scene, I would guess.  Probably wasn't a need for all those people?

A    It's a major incident.  I'm not one to say.

Q    Okay.

A    I had my people out there.

Q    Yes, sir.  And I think you had Mr. Waddell?

A    Yes, sir.

Q    Mr. Wilson, yourself?

A    That's me.

Q    Mr. Nixon?

A    Yes, sir.

Q    And Mr. Beal?

A    Yes, sir.  And Mr. Sexton.

Q    And who?

A    Mr. Sexton.

Q    Okay.  That's one I missed.  So now there's 35 people.  Sexton?

A    Yes, sir, I believe his name is on the report.

Q    It very well may be.  Now, let's go to the exhibit that you talked about a little bit earlier about N-4.  Do you remember which one I'm referring to?

A    N-4 would be the scales.

Q    Yes, sir.  And if any time I've got a summary here, if you need that let me know.  Because I want you to be accurate in your testimony.

2702

A    No problem.

Q    Fair enough?

A    No problem.

Q    The scales were found inside of that trailer?

A    Yes, sir.

Q    What evidence did you find that Kenny Barrett had anything to do with that trailer?

A    I personally did not find any evidence.

Q    What evidence did any of your employees under your supervisory control find that Kenny Barrett had anything to do with that trailer?

A    I believe there was an address book found and so forth, but I don't -- (Interrupted)

Q    Yes, sir, there was.  And there were four forms of ID inside of that address book.  And do you know whose they were?

A    I don't recall.

Q    You don't recall if they were all Toby Barrett's and not Kenneth Barrett?

A    That is possible, yes, sir.

Q    Would you like to look at it?  We've got it here.

A    Sure.

        MR. SMITH:  Let me try to find the exhibit number for the Court, please.

        THE COURT:  Clerk knows.

2703

Q     (By Mr. Smith) Its 181, sir.  And if you would take a moment and slip that out of that plastic, it was opened yesterday.  Take all the time that you need to look through there and find some evidence that that belongs to Kenny Barrett.

And while you got it open, I'll go ahead and ask you some questions while we're looking at that stuff. Do you see that yellow piece of paper in there on the front -- I think you just flipped some things over on top of it.  It's an Oklahoma Highway Patrol contact report. No, bigger piece of paper, sir.  It's a warning ticket.

A     You said yellow?

Q     Yes, sir.  There it is.  I'm sorry.  I thought we had it in the front.  Name, please?

A     Toby Barrett.

Q     And then there's some other forms of ID in there in terms of an account card, a prescription.

A     Uh huh.

Q     But nothing in there that has Kenneth Barrett's name on it, correct?

A     Not that I see.

Q     Right.  Okay.  Now, what other items that tend to show dominion and control did you find in that trailer or anybody under your supervision that you're aware of?

A     I don't recall anything that had his name on it that

2704

I recall.

Q    Excuse me?

A    I don't recall anything.

Q    No.  Nothing that has Kenny Barrett's name on it?

A    That had Kenny Barrett's.

Q    But you recall finding a wallet in there?

A    I believe there may have been a wallet found in there.

Q    And that wallet belonged to?

A    I didn't find it.

Q    One of your employees did and you were out there. You looked in the trailer right after Mr. Beal, right? So you knew what he was finding in there.  You were right there with him.

A    I mean, I don't want to say what it was without recalling, but it may have been Toby's.  I have no idea.

Q    Okay.  Any question you want to look at it and make sure it's not Kenny Barrett's?

A    No, it's no problem.

Q    Okay, sir.  Thank you.  Now, you said along with those scales you found two packets of Pseudo Max 60 or something along those lines?

A    Yeah.

Q    Is that right?

A    Right.

2705

Q     Packet that can be obtained over the counter?

A     Yes.

Q     1999, there wasn't anything illegal about that?

A     Correct.

Q     Those are just two separate -- (Interrupted)

A     Two separate tablets of pseudoephedrine, correct.

Q     No CDS, no controlled dangerous substance, as it relates to meth?

A     No, you can buy them at any 7-11 or whatever. They're commonly found there.

Q     Okay, sir.  Thank you.  Now, I'd like to talk about that flask that was shown to you earlier.  And I might ask that it be displayed again.  And I think it's Exhibit Number 105.  If you want, sir, you can go ahead and put that back in the plastic and we'll get that out of your way.  We're getting that flask out for you.  Have you ever had any experience with -- I don't know -- mixing two cycle motor oil and gas?

A     No, sir.

Q     You don't have any four wheelers or kids have any or anything like that?

A     No, sir.

Q     What about chain saws?  You ever run a chainsaw where you got to -- (Interrupted)

A     I have ran a chainsaw.

2706

Q     Okay.  So whenever you mix oil and gas for the chainsaw, you got to have a correct mixture, right?

A     Yes, sir.

Q     That flask has graduations on it, right?  Pull that out and show it to us so everybody knows what we're talking about.  And I'm talking about those markings over there on the side of that bottle.

A     Yes, sir.

Q     Now, you can mix oil and gas in that thing, couldn't you?

A     I guess you could.

Q     I mean, it's going to give you an accurate idea of liquid in terms of if you're wanting to know how much you have in there, isn't it?

A     Sure.  You need to convert it to gallons.  Most of the time I've used a chainsaw it's usually per gallon, parts per gallon.

Q     But if it says 40 to one, 32 to one, it doesn't matter if we're talking about gallons or if we're talking about quarts or if we're talking about milliliters, does it?

A     I guess you can do the math in your head, sure.

Q     I mean, if you're talking about ratios?

A     Yeah, it's a ratio.

Q     Yeah.  So it doesn't really matter what unit we're

2707

talking about, it's a ratio?

A    Sure.

Q    And when we're mixing oil and gas for a chainsaw, that's what we're doing is a ratio, right?

A    Correct.

Q    And that's something that you can use, right?

A    Sure.

Q    I mean, they sell those same things down at AutoZone or in a plastic version that are a little smaller, specifically for that purpose, don't they?  Have you ever seen them?

A    I hadn't seen them.

Q    Now, you found that on the wall as you walk into the residence that was on that south wall by the door; is that correct or do you recall?

A    I recall it was there.  I believe it would have been -- I'm not sure of the direction, but on the wall sounds right.

Q    And it was up there with various other items a lot like that photo you were shown where the camera was.  It was displayed up there, out in the open, along with various other items?

A    I believe so, yes, sir.

Q    Some of those items were antique milk jugs.  You remember those?

A    Yeah.   There were various items in there.   Different things.

Q    Wasn't anything sinister.   It was just a display, correct?

A    No.   You're right.

Q    Do you recall that thing being full of quarters?

A    Would have had change in it.   I don't recall what kind or how much, but it had money in it.

Q    Now, in the report it didn't say anything about being full of quarters, but it said something full of residue.   Remember that?

A    Because there was residue on the thing, yes, sir.

Q    But let's be fair to Mr. Barrett.   What did that test back as?   Because it was tested.

A    I'd have to look at the report.   I don't recall.

Q    Do you want to look at it?

A    Sure.

MR. SMITH:   May I approach, Your Honor?

THE COURT:   You may.

A    It says -- (Interrupted)

Q    (By Mr. Smith)   Hold on a second.   Let me go back.

A    Oh, all right.   No problem.

Q    Sir, I apologize.   The other agent brought his file or I would have had copies of these so we wouldn't have to go through that.   I didn't know you wouldn't have

yours.

A     No problem.

Q     But you have looked at the examination of this flask where it was sent off for testing?

A     Yes, sir.

Q     And it was tested for controlled dangerous substances?

A     Correct.

Q     And what was the test result?

A     No controlled substances found.

Q     So it's just a piece of glass?

A     Yes, sir.

Q     Or flask.  Now, you also saw the fingerprint analysis.  Do you want to comment on that?

A     I was looking for the drug analysis.

Q     And you saw it right there.

A     I wasn't paying attention to the fingerprint analysis.

Q     I'm not going to ask you about that.  We're going to have the agent here to talk about that.  Now let me ask, because this brings up something that I'm kind of interested in.  Clandestine lab.  I heard you say that, right?

A     Yes, sir.

Q     You're familiar with them.  How many of these search

2710

warrants have you been involved in directly?

A      Probably over a hundred.

Q      And you've been to actual labs?

A      Been to all sorts of labs, yes, sir.

Q      I mean, DEA, when you get involved, it's a big deal?

A      Yes, sir.

Q      And we see an awful lot of evidence when you go out to these clandestine labs such as gallon milk jugs scattered all over the premises.  That's one of the things you'd see out there, isn't it?

A      You can see that.

Q      Yeah, various -- a lot of these places are very unkempt, right?

A      Yes, sir.

Q      People just take stuff, cook it, use it, throw it away.  I mean, there's evidence everywhere, scattered out all over the premises?

A      Yes, sir.

Q      And that's not what you found when you went out there to the Barrett residence, was it?

A      There was evidence scattered everywhere.

Q      There were things that you're going to associate with a lab because that's what can be used in there.  But tell me how many jugs you found laying around the residence?

2711

A    There were -- there was glassware laying around. There was used filters and so forth that goes along with the manufacture of methamphetamine.

Q    Where was the glassware laying around?

A    There was -- I mean, various Kerr jars or whatever could be used in the manufacture.

Q    Where were they?

A    In the garage or out in the yard.  They were around. I mean, this itself could be used for the manufacture.

Q    They're not on here as N items, they're not on here as D items.

A    I don't believe they were seized.

Q    So then there'd be a question as to whether or not that's what they were being used for, would it not?

A    You can use any glassware just about for methamphetamine manufacture.

Q    That is my point.  You find a pickle jar laying over there for your idea of what could fit for a clandestine lab, well, that's something that could be used?

A    It could be used, yes, sir.

Q    Okay.  Now, we find a roll of paper towels, that's something that could be used in a lab?

A    Yes, sir.

Q    We find some coffee filters, that's something that can be used in a lab?

2712

A    Yes, sir.

Q    We find some foil.  That's something that can be used in a lab?

A    Yes, sir.

Q    These items are in everybody's house?

A    Mostly, yes, sir.

Q    So it's looking at everything in total that you say whether or not this is a clandestine lab?

A    Well, when it has residue with chemicals on it, that wouldn't be in a standard household or being used by the standard person, yes, sir.

Q    We just talked about that item.  There was no CDS in it.

A    That's correct.

Q    I mean, you thought there was residue, sure didn't test back as anything?

A    Sure.

Q    Okay.  So whenever we're trying to be fair to Kenny Barrett, when you look around, there's a lot of household items there that you say, well, yeah, maybe this could be used for that.  But you didn't find a lab in operation, did you?

A    We found a non-operational lab.

Q    You didn't find a lab in operation, did you?

A    No, sir, not in operation.

Q    And what you did find outside, we talked about some glassware, there was a washtub out there by a hose, by a hydrant, a freeze-proof hydrant.  You know what those are, don't you?  You remember that being out on the premise?

A    I remember there was the tub and the hose.

Q    Yeah.  It was about a three foot freeze-proof hydrant and below that was a washtub that had some items in there?

A    Yeah, I vaguely remember that.  Yes, sir.

Q    None of those were seized because there wasn't any evidence they were used in drug production, right?

A    I don't recall what was seized on that, in that regard.  I didn't seize it.

Q    It's not in our report.

A    And I don't believe they were.

Q    Okay.

A    But there were other things seized.

Q    You're aware whenever you went into that house there was no plumbing?

A    Yes.

Q    There's no running water?

A    Correct.

Q    On the property is this freeze-proof hydrant. Underneath of which was a washtub that had common things

2714

you'd use inside your house.  That was it, right?

A    It could be used in the house or the manufacture of methamphetamine, whatever, yes.

Q    Sir, you're DEA.  If there's evidence that are used in the manufacturing, do you think that they would be on this report and in here in evidence?  Or would they be out there in a washtub on the Barrett property?

A    We seized the evidence that we believed was used in the manufacturing of methamphetamine.

Q    Okay.  Well, you didn't seized that, did you?

A    I don't recall, no, sir.

Q    Do you want to look at this to see if you did?

A    No, sir.

Q    Now, we talked about paint thinner?

A    Yes, sir.

Q    That's associated and -- that's right.  We can take that flask down and get that out of the way so we don't drop it.  Paint thinner is a pretty common item, isn't it?

A    Sure, yes, sir.

Q    And it wouldn't surprise for individuals involved in auto repair, particularly if he's involved in painting vehicles, for there to be enamel paint out there, would there?

A    Sure, yes, sir.

2715

Q    So if you have enamel, you're going to have mineral spirits?  Right?

A    Yes, sir.

Q    You're going to have paint thinner?

A    Yes, sir.

Q    There's nothing unusual or clandestine about that?

A    No, sir.

Q    How about these Coleman fuel bottles?  Do you deer hunt?

A    They're common.

Q    Do you deer hunt?

A    No, sir.

Q    Got any family that deer hunts?

A    No, but I have Coleman bottles.

Q    Okay.

A    For camping and so forth.

Q    So you use a Coleman bottle?

A    Sure.

Q    They also fit on little heaters.  They fit on little grills.  There's various uses for them, isn't there?

A    Sure.

Q    I want to ask you about that upstairs because you made reference to it.  And I do not believe there's pictures are -- first off, before I go there, you searched the room where the gun cabinet was?

2716

A    Yes, sir.

Q    And did any individuals open up that gun cabinet?

A    Yes, sir, I believe it was -- it was opened up.

Q    Opened up the bottom of the gun cabinet?

A    I believe so, yes, sir.

Q    Did you do that?

A    No, sir.

Q    Were you there when it was done?

A    I was search -- I don't recall when it was done.  I don't recall exactly when it was done.

Q    Do you recall any of the items in the bottom of the gun cabinets, shell boxes -- (Interrupted)

A    I believe there were shell boxes and so forth.

Q    I want to show you 209 and I believe it is in evidence if I can find my sheet.

        MR. HILFIGER:  209 is in evidence, Your Honor.

        THE COURT:  Yes.

        MR. HILFIGER:  If I can display that.

        THE COURT:  You may.

Q    (By Mr. Smith) Sir, if you'd look at that yellow box right there in the middle of that photograph, do you recall seeing that?

A    I don't recall specifically seeing that box.

Q    So you probably don't know what it is other than it's a box.  If I'm telling you it's a box?

A     Yeah.   I would assume it's an ammunition box.

Q     But you don't know what it is or anything like that other than what you said?

A     Right.

Q     Okay.   We'll take that down and we'll move on.   I want to hand you what's been depicted as Number 162.   And that is not into evidence.   Ask you to look at your monitor and tell me if you recognize what that is a photo of, sir?

A     It's a photo of the window.

Q     Of which window?

A     I believe that's the window upstairs.

Q     You testified about that spotting scope earlier.   Is that the same window on the east side of the house?

A     I believe that was the scope that was up there.

              MR. SMITH:   Move for the introduction of 162, Your Honor.

              THE COURT:   Any objection?

              MR. LITTLEFIELD:   May I have just a second, Judge?

              THE COURT:   You may.

              MR. LITTLEFIELD:   May I have just a second to ask Mr. Smith something, Your Honor?

              THE COURT:   You may.

              MR. LITTLEFIELD:   No objection.

2718

THE COURT:  Defendant's 162?

MR. SMITH:  Yes, sir.

THE COURT:  Admitted without objection.

MR. SMITH:  Thank you, Your Honor.  And I ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Smith) When you were looking outside that window from the inside of the loft area, the window didn't look like that, did it?

A    Actually, it was at night time when we got in there.

Q    It was night time when this photo was taken.

A    Right.  So you really couldn't see much when you looked out but as I recall, I think you had to look through a slit.

Q    If you look at that spotting scope, we had a nice pretty picture of that -- (Interrupted)

A    We saw the spotting scope.  It was there.

Q    Yeah.  It was there and that window wasn't like that either -- that window is broken, can you see that?

A    I assume so.

Q    Do you recall that being done when you were there?

A    I don't recall.

Q    I want to show you what has been marked as Defendant's Exhibits 163 and 164 that are not in evidence.  If you would look at your monitor, sir.  Do

you recall the location where this photograph -- where these photographs were taken?  And one is just a little different version of the other.

A    No, sir.  Those are photos I'm not familiar with.

Q    Excuse me?

A    I'm not familiar with those photos.

Q    Let me ask you this.  Your agents conducted a search of the upstairs portion of that residence; is that correct?

A    Correct.

Q    Do you recall -- and you said you stuck your head up there?

A    Correct.

Q    And I know it's a small area, it's tough to get up that stairwell, wasn't it?

A    Correct.

Q    It's narrow and steep?

A    Correct.

Q    It's not a very big loft area so you probably didn't spend a whole lot of time up there?

A    No, sir.

Q    Do you recall any items that were removed from that area?

A    I do not.

Q    You don't know if there's a safe removed?

2720

A     I don't recall.

Q     Is that something you all would be interested in looking inside of if there was a safe in the residence?

A     Yeah, we would be.

Q     Would Agent Nixon perhaps know more about that?

A     Yes, sir.

Q     Okay.  We'll take those down and we'll address those with him then, sir.  Thank you.  I want to go back to that spotting scope and I think that was Government's Number 19.  I think it's a photo.

           MR. SMITH:  I would ask that it be displayed, Your Honor.

           THE COURT:  You may.

Q     (By Mr. Smith) While she's pulling that up, sir, were you ever in the military?

A     No, sir.

Q     In you're dealings with the DEA, you ever use night vision?

A     I have.

Q     This isn't a night vision scope, is it?

A     Doesn't look like one.

Q     You saw it up there, you talked about this photo earlier?

A     No, I don't recall it being a night vision scope.

Q     Spotting scope?

2721

A    Correct.

Q    You can get one at K-Mart, nothing unusual about it?

A    Correct.

Q    Not very helpful at night, is it?

A    No, sir.

Q    Can't see a thing through it unless you got a light source?

A    Correct.

Q    That doesn't have a light source on it.

A    No, sir, I don't believe so.

Q    The fact that it's pointing out that window doesn't really have any significance in this matter, does it?

A    I can't say other than the fact that it's there to look out and see what's coming up that way.

Q    That is my point.  Because I kind of got from your testimony earlier it was trained on this area, the entrance to the east?

A    Yes, sir.

Q    You can't say really what it was helpful for, can you?

A    That's not my decision to make.

Q    Did you look through that scope?

A    I don't recall looking through it.

Q    We'll move on.  Now, you will agree with me, sir, that when the DEA goes in and photographs items of

2722

evidence sometimes they move them?

A   Sometimes they're found and they're put where they were found, yes, sir.

Q   Sometimes we take a photo where they were, like that one with the camera, right?

A   But that's where the camera was.  I mean, that's where it was.  Yes.

Q   And I don't want to talk over you so we got to be careful.  But there was a photo taken of that camera on the shelf where it was?

A   Yes, sir.

Q   A lot of the photos that we have in here, though, don't depict that, do they?  In other words, a lot of the pictures depict items once they've been moved and displayed?

A   Sometimes they're done for display of what was found.

Q   And that's really not a fair depiction as to the way things were, correct?

A   We -- like I said, we came in after OSBI.  So I have no idea what the state was prior to that.

Q   I understand that you're going behind somebody else and if somebody else has moved something?

A   Correct, we have no idea.

Q   But you would agree with me, sir, you know the

2723

things that looks suspicious whenever you're going in and looking at these crime scenes, right?

A     Correct.

Q     We can put two or three items together that may be in different portions of the cabinet, put them together on a table and say this is drug stuff, right?

A     If that was the purpose to show what was found you might take a picture to show what was found.

Q     Otherwise, you open up the cabinet and take a picture and see a bag of Doritos over there and can of soup and a thing of coffee filters, doesn't look suspicious does it?

A     We would -- coffee filters and other things would be suspicious.

Q     It is to you because you're looking for a clandestine lab?

A     That's what I was there for was to look for a clandestine lab, yes, sir.

Q     My point is you open up the cabinet and you look at how somebody has their groceries stuck in a cabinet along with a can of soup and a bag of Doritos and a thing of coffee filters, there's nothing unusual about that.

A     No, sir.

Q     But you take that coffee filter and put it with some foil and put it in a Crock Pot and you put it in a roll

2724

of paper towels and you say those are all items that can be used in lab, now it looks suspicious, doesn't it?

A    In my experience, that's usually how they do it is they keep it separate until they're ready to use it.

Q    Because what you're interested in -- I mean, you're a government agent.  You're interested in showing what you think is out there that is beneficial to prosecution?

A    We're looking for evidence of a clandestine lab, yes, sir.

Q    Right.  You weren't out there for the benefit of Kenny Barrett, right?

A    We're out there to serve a warrant, searching for drugs or drug paraphernalia.

Q    You weren't out there to help Kenny Barrett, correct?

A    No, sir.  Just to do -- go straightforward and search for a lab.

Q    I mean, I don't want to speak the obvious, but I think it is, isn't it?

A    Sure.

Q    Now, we talk about what we did find.  Okay.  I want to talk about what we didn't find.  Fair enough?  And if you need to refer to the reports, let me know.

MR. SMITH:  As a matter of fact, Judge, if I can just go ahead and approach him with them, if he has

any questions I've got my notes and I can do the rest of this with them.

THE COURT:   You may.

Q   (By Mr. Smith) Sir, just so you'll know how I have them organized, that piece of paper you have in your hand is a copy of the report.

A   Sure.

Q   All of the other items are as they are listed, items one, two, three, then the tests results behind them. Four, five, six and the test results behind them.

A   Sure, uh huh.

Q   Okay.  So as we go through these, if you just flip them over, you'll be able to keep up with me, okay? Now, item number one found in the trailer, a Ziploc baggy.

MR. LITTLEFIELD:   Judge, I would object.  He is asking him to testify from items which are not evidence.

THE COURT:   Counsel?

MR. SMITH:   Your Honor, the items I'm speaking of they covered yesterday with Mr. Beal.

MR. LITTLEFIELD:   And they were not offered because they were not complete, yet, because the chemist who did the report, part of those, has not yet testified.

MR. SMITH:   I guess, Your Honor, yesterday we talked about what was there and that's where I want to

2726

talk about what was not there, with those same items.  I don't see the problem.

THE COURT:  You may proceed.  And counsel feel -- I'm not -- so you'll know what's on my mind, I'm not sure that I have understood the Government's objection.  Are you saying that what he's talking about is not admitted into evidence?

MR. LITTLEFIELD:  He's asking him essentially to read from what is in the report and the report's not even in evidence yet.

MR. SMITH:  I have provided the report, Your Honor, in case he had a question about it, to refresh his memory so I didn't have to keep going back and forth from the podium.  I do not mind trying to do this to see what he recollects without him looking at it.

MR. LITTLEFIELD:  And I don't have a problem with him asking about, for example, Government Exhibit 1.  But I don't think it's appropriate to have him reading from the exhibit which is marked as Drug Exhibit 1, for instance, and start reading what's on the report when the report's not yet in evidence.  If he wants to move the admission, I don't have a problem.

MR. SMITH:  I'm not asking him to read it and I'm not going to ask for the introduction of that report.

THE COURT:  You may proceed.

2727

MR. SMITH:  Thank you, Your Honor.

Q     (By Mr. Smith) D-1, sir, was a Ziploc baggy that was found inside of that trailer by Juan Beal, the trailer that you were there assisting him with, correct?

A     Yes, sir.

Q     Ziploc baggy, number one.  No controlled dangerous substance?

A     Correct.

MR. LITTLEFIELD:  Now, he's asking him to read from the chemist report when the chemist hasn't even testified.

MR. SMITH:  Your Honor, I'm not asking him to read from a thing.  He was the case supervisor.  These reports -- (Interrupted)

MR. LITTLEFIELD:  Then objection, hearsay. Because he doesn't know except for what the chemist reported who hasn't even testified.

MR. SMITH:  And I would think if he knows, Your Honor, he can testify and if he doesn't then it may be hearsay.  I mean, I would agree with that if he doesn't know.

MR. LITTLEFIELD:  And the basis of the knowledge still would be hearsay from some witness who has not yet testified.

THE COURT:  Let me see you at the bench.

2728

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. SMITH:  I can do it another way, Your Honor, and get the same thing that I'm wanting without going item per item.  I can do kind of a summary of it. I understand what Mr. Littlefield's objection is.  The chemist has not testified, but --

MR. LITTLEFIELD:  And, Judge, the chemist will testify.  And he's going to testify, for example, about Drug Exhibit 1 and certainly it would be appropriate to ask him was there a controlled substance, did you do analysis, was there a controlled substance.  And he's going to say no.  But this isn't the witness to ask that of.  Because he didn't do the analysis.  Any information he has is based solely on what the chemist told him.  And it's strictly hearsay and it's going to be cumulative.

MR. SMITH:  But as an investigator and these are reports that come in their possession, that's what they rely on.  I mean, it's not a -- it may be hearsay, but I think it's an exception, too.

MR. LITTLEFIELD:  What exception?

MR. SMITH:  It's a record he relies on in his investigating and if he knows, he can testify to it.

MR. LITTLEFIELD:  His knowledge is hearsay, though.

2729

THE COURT: Unless it goes to hearsay and any time -- (Interrupted)

MR. LITTLEFIELD: I understand.

THE COURT: I mean, whether -- you know, I'm thinking about the analogy is that medical evidence when you've got -- although he's not a physician, it's in that same realm, do you rely on this?

MR. LITTLEFIELD: And that's one expert. He's not testified as an expert. The problem is, Judge, that certainly not as to the chemist, the problem is that -- (Interrupted)

THE COURT: I guess what defense wants to do is go through and say these were things that were seized, but were tested and didn't have -- (Interrupted)

MR. SMITH: No dope.

MR. LITTLEFIELD: I understand that and he's not the person to do it because the chemist will say that. It's just cumulative and why ask this guy.

THE COURT: Wait till the chemist gets here.

MR. SMITH: I'll attempt to do a summary fashion. If it's objectionable then I'll move on. But I'm going to try to make it where it's not objectionable.

MR. LITTLEFIELD: And I mean even when Mr. Beal testified, I wasn't asking about the lab results. I just said is this what you all submitted.

2730

MR. SMITH:  The unfairness part of it is, though, Your Honor, just like with that flask, they want to talk about the residue and that implants -- (Interrupted)

MR. LITTLEFIELD:  I never said anything about residue.

MR. SMITH:  He did.  And that implants in those jurors' mind that there's something there.  And then whenever we know that there's not.

MR. LITTLEFIELD:  And I didn't object to that either.

MR. SMITH:  I know you didn't.  But to do it two days later, I mean, it gives them -- it's unfair.

MR. LITTLEFIELD:  And the person who found that flask, I let you ask if there was any CDS in it.  But to go through all of this stuff -- he didn't find the stuff you're asking about.  Juan Beal did.

MR. SMITH:  He was in that trailer.  He did find -- (Interrupted)

MR. LITTLEFIELD:  He went through later and he found the scales and that's all he's testified about until you start going into other items.

THE COURT:  So the chemist is going to be testifying?

MR. LITTLEFIELD:  The chemists are going to

2731

testify if we ever get to them.  They're here.

THE COURT:  You are both guilty of that.  So let's move on.

MR. LITTLEFIELD:  They're here.

MR. SMITH:  I'll try in a summary fashion, Your Honor.

MR. LITTLEFIELD:  They're here.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q   (By Mr. Smith) Mr. Wilson, again, I'm going to discuss with you what wasn't found out there.  Okay?

A   Okay.

Q   I mean, it's an emergency situation.  We go out there.  We wait around all day.  We conduct a search of the premises.  We don't wind up with any methamphetamine, do we?

A   Let me see what the -- read what the report says?

Q   I don't want you to read it.  I want you to tell me. Sir, disregard the reports, okay.  You got how much experience in this business?

A   Got over 17 years.

Q   Okay.  You've conducted how many of these search warrants?  Over a hundred you said, right?

A   Yes, sir.

Q   And you've been in all these clandestine labs.  You

2732

know what methamphetamine looks like.

A    Absolutely.

Q    You know when you score -- when you go to a search and, by golly, we got us a pile of stuff here, right?

A    We don't make that determination till the lab comes back.

Q    I understand that the lab confirms it, but you do field tests on things?

A    Sure.  We found items that we believed had residue of methamphetamine or were -- (Interrupted)

Q    I understand that.

A    Indicative of the manufacture of methamphetamine.

Q    I understand that.  But that's why I want to talk about what you didn't find.  You didn't find a pile of dope, did you?

A    Oh, no, sir.

Q    No.  You didn't.  You found some pills, 1400 pills, stuck up in the -- above the ceiling fan?

A    Yes, sir.

Q    That's what you found?

A    Yes, sir.

Q    There wasn't anything illegal about possessing those.  You could go, like we said, to 7-11 and buy them?

A    In that quantity there is.

Q    At that time, you could go buy those pills at 7-11

2733

without a prescription?

A     Yes, sir.

Q     You go down to the store, any convenience store, and get that stuff.  But that's what you found were pills, right?

A     There were pills, yes, sir.

Q     You found a small quantity of iodine?

A     Yes, sir.

Q     The red phosphorous somehow wound up in the Defendant's pocket, not out there at the house.  Are you aware of that?

          MR. LITTLEFIELD:  I'm going to object to that. That's argumentative, Judge.

          MR. SMITH:  I'll try to rephrase that question.

          THE COURT:  Question withdrawn.  Rephrase.

Q     (By Mr. Smith) Are you aware of there being any red phosphorous found?

A     I've heard that there was.

Q     Okay.

A     We also found filters that indicated red phosphorous.

Q     Indicates staining.  You found some hoses that had some sort of residue in it.  Three hoses, right?

A     Yes, sir.

Q     You found some scales, didn't have any residue on

2734

it?

A    No, sir, not that I know -- am aware of.

Q    I mean, stuff's tested and you'd probably be aware of it if it had it on there. It'd be in the reports and it's not in the reports. What I'm getting at is this, sir. Of all the things that we want to talk about that was there, there's an awful lot of things that were not there?

A    There were -- I mean, as far as I'm concerned, it was a non-operational meth lab. I mean, the items were there that could -- (Interrupted)

Q    You went in there with four of your personnel and wound up with small potatoes, didn't you?

A    We found out -- we found stuff that was indicative of a manufacturing.

Q    Things that we can put together and say these are items that you used, but you could not recreate a lab out of what you found out there and make a cook, could you?

A    With less the -- with everything except acid, yes, I could -- (Interrupted)

Q    Not with what you had out there. I didn't ask you what was missing. I said with what you had out there you could not -- (Interrupted)

A    Oh, I thought you did ask me. I wasn't listening.

Q    Hold on, I want to talk or that reporter is going to

2735

get real mad at us.

A    Oh, sorry.

Q    You could not make a cook with what you found out there, could you?

A    Like I said, less one item.

Q    That wasn't my question.  You couldn't make a cook with what you found out there, could you?

A    No.

Q    Whenever we talk about what was found and what wasn't found, the DEA normally isn't interested in going and conducting searches where's all you find is trace evidence that something may have been there at one time, are you?

A    We've conducted lots of searches where there's been trace and there's been evidence of a clandestine lab or non-operational lab.  That's quite frequent.

Q    That's not what you're interested in finding, is it?

A    We're interested in finding any indication of illegal drug activity.

Q    That's right.  You're looking for dope.  That's why you're going to Brazil.  You're looking for dope.

A    Or indications that there's a conspiracy or something else happening.

Q    All right, sir.  Now, just like that straw that was found -- are you aware of the straw that was found?

2736

A    Heard about the straw later.  I was not aware of it.

Q    Just like that straw, the same way where there might be some residue in something.  You can't date it.  You can't tell when it was there.  How long it had been there, can you?

A    I'm not the expert in that field, no.  The chemist -- (Interrupted)

Q    Do you know of any expert that could come in and tell us that?

A    They could say what it is.  The chemist could tell you what it is.

Q    That's not what I'm talking about.  I'm talking about dating it, sir.

A    No, not that I'm aware of.

Q    So if you find something in a hose that comes back as residue, you can't tell us if it was there four years ago or if it was there eight years ago?

A    I don't -- not that I'm aware of.

Q    Same way with something that might be stained on a piece of paper?

A    Yeah, again, I'm not aware of how you could date it.

        MR. SMITH:  Thank you for your testimony.

        THE COURT:  Redirect?

2737

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   What was missing?  What was lacking to be --

(Interrupted)

A   For a full lab?

Q   Yes.

A   It would have been muriatic acid, sulfuric acid, some time of acid.

Q   And is that difficult to acquire?

A   No, sir.

Q   Where do you get -- if I wanted to finish up that lab, where would I need to go to buy muriatic acid?

A   Any hardware store.  In fact, actually most grocery stores.

Q   I'm sorry.

A   Any hardware store or grocery store you could probably pick up some form of acid.

Q   I go to Lowe's down the street, would I be able to finish up that lab?

A   Absolutely.

Q   Was referred to -- I think the term used was small potatoes.  Is 1400 pseudo pills small potatoes?

A   No, sir.

Q   You were asked was it illegal to purchase pseudoephedrine in 1999.  And I think you started to say

something about quantity.  What were you going to say about quantity in relation to pseudoephedrine?

A    Well, I believe at that time there was a limit on how much quantity you could purchase at one time.

Q    Could you go buy 1400 pseudoephedrine pills?

A    No, sir, absolutely not.

Q    Do you remember looking at those little packets?

A    Yes.

Q    What was the average dosage per day?

A    There was four per day and there were six tablets in that packet.

Q    And how many days would it take you to use up 1400 and 26 of those pseudo pills?

A    Well, take 1400 and 26 and divide it by four.

Q    You don't want to do the math right off?

A    I don't.

Q    Would it be close to a year's supply?

A    It would be a lot, absolutely.  In fact, it would be over a year's supply.

Q    I don't think so.

A    Or right there.  You said 1400, four a day.  Yeah, that would be right close to it.

Q    And let's talk about the paper towels and coffee filters.

MR. LITTLEFIELD:  Ask that he see Government

2739

Exhibit 52.

THE COURT:  You may.

MR. LITTLEFIELD:  I ask the lights be turned off.

THE COURT:  You may.

Q    (By Mr. Littlefield) See those paper towels that were on the cabinet?

A    Yes, sir.

Q    Anything illegal about having a roll of paper towels?

A    No, sir.

Q    What was in those paper towels in the center?

A    As I recall there were syringes inside.  Secreted in the cardboard roll.

Q    That typical in most houses you go into that they keep their syringes inside of the cardboard in paper towels?

A    No, sir.  Only if they're trying to conceal it.

Q    You were asked about glassware --

MR. LITTLEFIELD:  I'd ask that what's been marked as Government Exhibit Number 66 be displayed.  And it's not in evidence yet.

Q    (By Mr. Littlefield) Do you recognize what's shown in Government Exhibit 66?

A    Yes, sir.

Q    Where did you see that previously?

A    At the residence of Mr. Barrett.

MR. LITTLEFIELD:  Move admission of Government 66.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) We've got some jars out there?

A    Yes, sir.

Q    Can those jars be used in the manufacture of methamphetamine?

A    The glass ones, yes, sir.

Q    Now, just to have a jar isn't a violation of the Controlled Dangerous Substance Act?

A    No, sir.

Q    Just to have a Max brand Pseudo 60 packet is not a violation of the Controlled Dangerous Substance Act?

A    No, sir.

Q    And just to have one deal of iodine crystals is not a violation of the Controlled Substance Act?

A    No, sir.

Q    And if I have some toluene, that's not a violation of the Controlled Substance Act, is it?

A    No, sir.

Q    And if I have some tubing, not a violation of the

2741

Controlled Substance Act?

A    No, sir.

Q    And if I got a little bit of red phosphorous in my pocket, that by itself doesn't mean I'm violating the Controlled Substance Act?

A    No, sir.

Q    What is it that is indicative -- was there enough there that had Kenny Barrett not already been in custody, based on what you saw, would you have taken him in?

A    Yes, sir.

Q    For what reason?

A    For manufacturing methamphetamine.

Q    In regards to your knowledge, you indicated that you think there may have been residue of items on what?

A    On the paper towels, filters, on some of the stuff that was seized, the items that were seized.

Q    Now, if you go to my house and I got some paper towels in my trash and they don't have any meth on them, is it illegal; does that indicate I've been cooking meth or intend to cook meth?

A    No, sir.

Q    But if I got paper towels that have meth residue on them in my trash dumpster behind my yard, what's that tell you?

A    Tells me that you're manufacturing methamphetamine.

2742

MR. LITTLEFIELD:  I ask that Government Exhibit Number 197 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) If I've got 1400 pseudoephedrine pills hidden behind tiles in my ceiling, and I've got iodine crystals hidden in a camera in my residence and I've got syringes in paper towels and I've got coffee filters or paper towels stained with residue and I have syringes in my garage like this, do you have any kind of impression as to what I'm doing at my residence?

A    Yes, sir.

Q    What impression?

A    My impression would be that you're manufacturing and using methamphetamine.

Q    Is it one item or a combination of the whole?

A    It's a combination of the whole, sir.

Q    Did you go out there with the intention of trying to help Kenny Barrett?

A    Our intention was to go there and see what we could find and let the chips fall where they may.  It was not to help him.  It was obviously a drug warrant.  We were going out there to search for drugs.

Q    Was it intending to hurt Kenny Barrett?

A    No, sir.  Just to do our job.

2743

Q    By the way, that Pyrex flask, when you mix your chainsaw oil, do you normally use a Pyrex flask to mix it in?

A    No, sir, I do mine, I put it in -- it says one can to a gallon.  I take a gallon canister, pour it in and mix it up in the gas can and leave it in the gas can.

Q    Do you -- when was the last time you were at AutoZone and picked up an assortment of Pyrex beakers?

A    I've never seen them there, sir.

Q    I'm sorry.

A    I've never seen them at AutoZone, a Pyrex beaker.

Q    What's a Pyrex beaker?  Is it just a piece of glass?

A    No.  Pyrex is a special.  It's usually used in laboratories, either school, colleges, high schools, so forth.

Q    Why are they used -- what's special about them to allow them to be used in labs?

A    Pyrex is a -- can sustain high heat, like a Bunsen burner or heat from an external source without breaking.

Q    So that makes it particularly good in mixing chainsaw oil, doesn't it?

A    Not that I am aware of.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may.

RECROSS EXAMINATION

Q    You got a Bunsen burner to show us today?

A    I do not.

Q    Wasn't one out there, was there?

A    Not that I recall.

Q    And you don't have a racing four wheeler?

A    No.

Q    So you don't know about dumping a can of oil into a gas tank for a racing four wheeler to come up with a mixture on some fuel, do you?

A    No.  Like I said, a chainsaw, I just mix it in the one gallon container.

Q    I talked about a chainsaw because that's what you had experience in?

A    Correct.

Q    We established you don't have a familiarity with a racing four wheeler?

A    No, I don't.

Q    Or other applications for mixing fuel and oil?

A    No, sir.

Q    Okay.  Now, there's a recipe for making dope, isn't there?

A    Yes, sir.

Q    And just because you got an awful lot of one thing doesn't mean that you can all of a sudden just make a big

old pile of dope?

A     No, it's a combination of things.

Q     Do you know what the recipe is?

A     Yeah, pretty good idea.

Q     One to one to one and a half?

A     I don't know the exact -- I mean, I can't recall the exact ratio even though I've known it.  But, yeah, there's different recipes you can use a different amount.

Q     Well, we're talking about 1400 pills.  You think we ought to talk about how much iodine in relation to those pills and how much red phosphorous, if we're talking about you can cook dope if you had acid out there?

A     If you have 1400 pills, it doesn't take much iodine or red phosphorous.

Q     You just told me you don't know the recipe.

A     I know what the chemicals that are used for it.  Off the top of my head I'm not going to tell you the proportions that are used.

Q     You're not going to tell this jury out here how much dope you could make with that lab if you had had acid out there, either, are you?

A     I can tell you how much -- what the usual ratio for ephedrine to methamphetamine is.

Q     That's not what we're talking about.  We're talking about ephedrine to iodine to red phosphorous.

2746

A    It doesn't take much red phosphorous or iodine. Those are just catalysts that are used in the process. They don't -- doesn't take very much at all.  I do know that.

Q    How much red phosphorous did you find out there in that house?

A    I didn't find it.

Q    No, you didn't, did you?

A    No.

Q    Didn't find any acid.  Did not find an HCL -- (Interrupted)

A    You asked me earlier.  I was aware that red phosphorous was found.  I did not find it.

Q    Wasn't in the residence, was it?

A    I don't know where it was.  I was told it was in his pocket.

Q    I can appreciate you don't know about it.

MR. SMITH:  Number 66, I'd like to show that one more time.  That's Government 66.

THE COURT:  You may.

Q    (By Mr. Smith) Sir, what's this?

A    Appears to be a plate.

Q    What's that?

A    I think it's a plate also.

Q    Maybe a plastic glass?

2747

A     Yes, sir.

Q     Mason jar, mayonnaise jar, something like that?

A     Yes, sir.

Q     Is that that water hydrant?

A     I believe so.

Q     Now, you're trained to look for things that are associated with manufacturing.  If there's residue in these things, they'd have been seized.  Do you agree with me there?

A     I believe so.

Q     Okay.  So just because we got jars and things and dishes in a wash tub, that in and of itself doesn't mean a thing, does it?

A     Not in itself.

Q     I mean, you're not going to expect a dish to be used in the manufacture of methamphetamine?

A     I've actually seen dishes used in the manufacture of methamphetamine.

Q     Okay.  Well, what evidence would you see on there?

A     I don't see any residue and that's probably why it was not seized.  But I have seen dishes used to dry out the end product.

Q     Awful lot of plastic in there, isn't there?

A     Yes, sir.

Q     Now, let's talk about a syringe.

2748

A    Yes, sir.

Q    You don't make dope with syringes, do you?

A    No, sir.  You use syringes to take them.

Q    It's what users -- consumers of methamphetamine will sometimes use syringes?

A    Yes, sir.

Q    That doesn't have anything to do with manufacturing?

A    No, sir.

Q    All right.  When I was talking about an AutoZone, I don't think I said a thing about a Pyrex beaker being at AutoZone.  But I was talking about a graduated cylinder that is used for the mixing of fuels and oils.

A    Sure.  Okay.  Yeah.

Q    Didn't say anything about Pyrex.  Have you ever seen those at AutoZones?  I think you told me earlier you hadn't?

A    No, I hadn't.  I haven't seen a Pyrex there at AutoZone either.

Q    I wasn't asking about Pyrex at an AutoZone.  I was asking about a graduated cylinder?

A    Right.

Q    Now, a trash dumpster and this trash dumpster --

        MR. SMITH:  I want to ask 69 be shown, Judge. I think that's the one I want.

Q    (By Mr. Smith) You're aware of where the trash

2749

dumpster was?

A    I didn't search the trash dumpster, but I --

Q    I'm sorry.  Go ahead.

A    I don't believe I've ever testified that I searched the trash dumpster.  I was not the one who searched that.

Q    No.  I don't think you testified that you searched it.  But you testified about the contents in the trash dumpster.

A    I remember I recall the trash dumpster being out there.

Q    That one?

A    I'd have to see a close-up.

Q    We're going to try.  It may lose focus.

A    I recall it being there.  I recall there was several areas of trash.

Q    While she's trying to zoom it up, what several areas of trash?

A    I mean, it could --

Q    We'll go back to it.  Well, she's got it pulled up. Does that look like a trash dumpster?

A    That looks like a trash dumpster.  That very well could be it.

Q    Okay.  We're going to take it back out of zoom.  Try to keep an idea of what's around it.  Does it appear to be that one?

2750

A   It could be.

Q   Okay.  Now, you said there were other areas of trash.  Show me.  You've got a laser pointer up there.

A   What I say, I mean, there's just junk laying around. I mean, you know, there was stuff -- like I said, that you showed me earlier, the dishes laying out there under the thing and stuff like that.

Q   Well, the dishes were in a tub by the water hydrant.

A   Right.

Q   They weren't just -- (Interrupted)

A   I don't recall a specific trash, other than the one.

Q   Now, did you recognize what this -- or do you recognize what this is?

A   I believe so.  I believe that's the trailer of Mr. Barrett's mother.

Q   And you knew that this was a separate residence that you couldn't attribute any evidence to Kenny Barrett living in there?

A   Right.

Q   That's a trailer, right?  So we got a house, got a trailer, a trailer house here, a driveway over here and a driveway there and that trash can's sitting out there by its lonesome?

A   Like I said, I don't know if that's the trash bin. There was a trash bin around the trailer, I do know that.

Somewhere in this area here.  I don't know if that's it or not.  There was a trash bin that was in the proximity.

Q    Hard to tell what these may be.  Let's --

(Interrupted)

A    Like I said I didn't -- I did not search the trash bin.

Q    Even if one of these is a trash container, kind of hard to say that somebody over here is the one that's responsible for generating the trash, isn't it?

A    I don't know -- I don't recall exactly where the trash bin was.  I didn't search it.

Q    But my point is there's nothing that you found or that your agents found that would indicate that anything that may have been found in that trash container was linked to Kenny Barrett?

A    I don't know if there was anything with his ID on it or anything like that.  I don't believe there was.

Q    I mean, it's just in a common container between one, two, three places that we see in this photo, right?  Would you agree with that, sir?  A common container between this residence, this residence and that residence?

A    It could be used by either.

MR. SMITH:  Thank you, sir.  That's all I have, Your Honor.

2752

THE COURT:  Further direct?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  I would ask that he be allowed to be excused.

THE COURT:  Defense have any objection?

MR. SMITH:  No, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  May call your next witness.

MR. SPERLING:  Dr. William Wood.

WILLIAM EDMONDSON WOOD, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q   Good afternoon, Dr. Wood.  Thank you for joining us, sir.

A   Good afternoon.

Q   Please state your name and spell your last name if you would, please.

A   My name is William Edmondson Wood, W-o-o-d.

Q   What is your business or profession, sir?

A   I am a family physician and ER doctor.

Q     Where are you presently employed?

A     Sallisaw, Oklahoma.

Q     In what capacity or with what facility?

A     I have my own private clinic, Wood Family Medicine, plus I work regularly at the Sequoyah Memorial Hospital in the emergency room.

Q     For how long have you been affiliated with that emergency room?

A     Six years.

Q     And were you so affiliated on or about November 2nd, 1999?

A     Yes, I was.

Q     If I can briefly by way of background ask you first, doctor, where did you obtain your medical degree?

A     I graduated from McGill University in Montreal, Canada in 1970.

Q     Prior to that time did you have an undergraduate degree?

A     At McGill University I graduated in biochemistry in 1966.

Q     And in what, sir, year did you say you obtained your medical degree?

A     1970.

Q     Did you do an internship?

A     I did an internship at the Royal Victoria Hospital

2754

in Victoria, British Columbia.

Q    And for how long did you do an internship?

A    One year.

Q    Did you do a residency following that, sir?

A    I did not.

Q    Where did you begin your practice after your internship?

A    I was practicing in Ontario in a rural setting.  I practiced rural medicine for approximately five years.  I was also working for the McMaster University as a professor of family medicine at that time.  I then moved to Ottawa, Canada, where I was a professor of family medicine for 23 years before I came down to Sallisaw.

Q    For those of us who are far south of the United States/Canadian border, basically what area of Canada was that directly north of in this country?

A    That would be directly north of Rochester, New York.

Q    Thank you, sir.  Did you have occasion on or about November 2nd, 1999 to treat a patient by the name of Kenneth Eugene Barrett?

A    Yes, I did.

Q    Do you see him here in the courtroom today?

A    Yes, I do.

Q    Where is he seated and what is he wearing, please?

A    He appears to be wearing a grey/green shirt, a

2755

mustachioed gentleman.

MR. SPERLING:  Thank you.  May the record reflect the witness has identified the Defendant, Your Honor?

THE COURT:  You may.

Q    (By Mr. Sperling) Do you know what the nature of his concern or complaint was that prompted your service on or about November 2nd, 1999?

A    On November 2nd -- may I refer to my notes?

Q    You may, please.

A    Because November 2nd, I believe it was the second or third time I had seen him in the emergency room.  On November 2nd, he was concerned about a bullet coming to the surface of his left leg.

Q    You indicated that you had previously treated him. Was your prior treatment of him on or after September 24th, 1999?

A    It was after September 24th.

Q    Can you by referring to your notes, sir, tell the Court and jury on what dates you treated the Defendant?

A    I saw Mr. Barrett on the 27th of September, 1999.

Q    What was the nature of that consultation?

A    He was coming in for a dressing change for gunshot wounds to the legs.

Q    Did you treat that -- the patient in that manner at

2756

that time?

A    Yes, I did.

Q    After the dressing change, other than that, was there anything else of significant consequence for which you treated him?

A    Dressing change, antibiotics applied to the wound plus PO or by mouth antibiotics was prescribed at that time.

Q    Thank you, sir.  When was the next time you treated him, please?

A    I believe the next time was November the 2nd.

Q    Do you know a radiologist by the name of David Albers?

A    I do, sir.

Q    Where is he employed?

A    He is employed at the Sparks Hospital, but comes to the Sequoyah Memorial Hospital to do reading of x-rays.

Q    Did you have an occasion, sir, to have the benefit of certain radiology work that he had performed with regard to the Defendant Barrett?

A    Yes.

Q    What had he done?

A    On 10-20-99 an x-ray -- I'm sorry.  An x-ray was read.  Views of the right femur, metallic density, foreign body consistent with a large caliber bullet which

2757

appears to be within the soft tissues lateral to the neck to the right femur. No other findings are present as far as the right femur goes. The left femur indicated a single AP view with a large caliber bullet overlying the distal femoral shaft.

Q    If you were to tell the Court and jury and if you would be so kind with the Court's permission as to stand around and in front of the witness stand so that you can tell the jury where those bullets were located in his legs, please.

        MR. SPERLING:  May he do so, Your Honor?

        THE COURT:  You may.

A    The right femur, there's the soft tissue -- I'm sorry.  Large caliber bullet appears to be within the soft tissues lateral to the neck of the right femur.  On the left femur there's a large caliber bullet overlying the distal femoral shaft.

Q    (By Mr. Sperling) All right.  And you indicated first with regard to the right femur, that was right near your right buttock.  Would that be correct, or above?

A    That would be correct.

Q    And you were indicating in the back, did you not?

A    I was indicating the lateral, to the side.

Q    All right, sir.  And that would be about where a right rear pocket is on a typical pair of jeans, say, or

2758

very near there?

A    It would be -- this would be the lateral right here.

Q    All right.  Thank you, sir.  And then the one on the left, just for the record, because the record can't show where the hand is, you won't have a picture.  For the record was your left hand above the left knee?

A    Yes.

Q    About roughly how far?

A    Roughly two inches above the knee.

Q    And which of those bullets was the Defendant contending to have been giving him pain?

A    Mr. Barrett was complaining about the bullet in the left femur.

Q    Did you take action with regard to that complaint?

A    Yes, I did.  I removed the bullet.

Q    All right.  What was the nature of the procedure? General or local?

A    It was a local anesthetic applied to what's called a field anesthesia applied to the area around the bullet which allowed me to incise the skin and therefore take out the large caliber bullet.

Q    As between major or minor surgery, how would you characterize this, sir?

A    Minor.

Q    Did you also do this for him as an outpatient?

A    I did this in the emergency room, essentially outpatient, yes.

Q    Did you stitch up the incision?

A    Yes, I did.

Q    Do you recall how many stitches it took, roughly?

A    Three roughly.

Q    Did you remove the bullet?

A    I removed the bullet.

MR. SPERLING:  May the witness be shown Government's Exhibit Number 120, Your Honor?

THE COURT:  You may.

Q    (By Mr. Sperling) Ms. Butcher has just handed you a package, doctor.  Would you take a moment to remove the contents of that envelope, please.  When you removed the bullet from the Defendant, what did you do with it?

A    I placed it in a metal kidney pan.

Q    And was the bullet at that point put in any other container?

A    I placed it in a kidney pan and handed it to Constable Carnes who then placed it in an appropriate container.

Q    Will you examine that item that is in front of you that is marked Government's Exhibit Number 120?  Does that appear to be the bullet that you removed from the Defendant's leg?

A     Yes, it does.

Q     And does that appear to be the kind of container that Deputy Carnes utilized to put the bullet?

A     It would seem so.

MR. SPERLING:  Your Honor, we move the introduction of Government's Exhibit Number 120.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, I show 120 was entered. I may be wrong.  But I don't have any objection.

THE COURT:  No.  Be admitted without objection.

Q     (By Mr. Littlefield) When you did this procedure, doctor, you didn't do anything to mark the bullet itself, that is to make any cut or mark?  You left it in the condition that it was, did you not?

A     I left it in the condition that it was when I extracted it.

Q     All right, sir.  Did you consider that the wounds to the Defendant were life threatening?

A     No, I did not.

Q     And if the Defendant had been shot on or about the 24th of September, and you first saw him on the 27th, for a wound change and then he came to your office or he was brought to your office on the 2nd of November, would you have considered the collation -- the collection of those items to be anything approximating life threatening?

2761

A      No.

Q      Not really very serious?

A      Not serious.

           MR. SPERLING:  Thank you, sir.  Nothing further.

           THE COURT:  You may cross examine.

           MR. SMITH:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. SMITH:

Q      Dr. Wood, in your notes on the 27th you made indication as to the various entrance wounds and some exit wounds on Mr. Barrett; is that true?

A      On the 27th I made a diagram of wounds.

Q      Okay.  Do you know entrance or exit or --

A      No.

Q      Okay.  Let's talk about that diagram that you have there.  How many wounds do you show on the right leg?

A      I show seven wounds.

Q      Okay.  And you've got three of them in that right hip area; is that true?

A      This diagram indicates three.

Q      Did those bullets remain in the right hip or do you know?

A      I don't know.

Q      Did you see any evidence that they may have passed

2762

in and passed out?

A    No.

Q    Okay.  And on the right leg, right above the knee, you show four wounds; is that correct?

A    It -- I'm sorry.  I see four.  I put down four wounds there, yes.

Q    Okay.  And then right across from those four above the right knee, on the right leg, you show some entrance above the left knee.  Or you show two other wounds on the left knee, is that right?

A    I show two wounds on the left knee.

Q    Okay.  And the one on the left is where you ultimately removed the bullet?

A    That's correct.

Q    Okay.  Does it appear from your recollection of Mr. Barrett whenever you examined him and having now look at your report again, that those wounds on the right leg may have been a through and through and lodged into the leg on the left?

A    I have no idea.

Q    You can't tell?

A    I cannot tell.

Q    You don't have any experience in gunshot wounds in terms of trying to ascertain what's an entrance or an exit wound?

2763

A    I do not.

Q    Do you know how many times Mr. Barrett was shot?

A    I have no idea.

Q    And did you know how many slugs he had retained in him?

A    I do know that.

Q    Okay.  Tell us how many, if you know.

A    The x-ray indicates two.

Q    So he still has one in him, is that right?

A    I don't know that.  All I know is that on 10-20 when the x-rays were done there were two slugs.

Q    That was a poor question.  Because I understand you're relying upon what you know at the time the examination was done.  But tell us where that second fragment or that second bullet was, if you know, whenever you conducted your examination.  The last that you know. Where was the other one?  The one that wasn't taken out.

A    The one that wasn't taken out is in the lateral aspect of the right femur.

Q    Okay.  And again, that's going to be lateral is --

A    To the side.

Q    Right.  And how far down the leg, near the knee?

A    No.  This would be the neck of the femur, which is higher up.  Almost -- the touchable part of your hip would be the neck of the femur.

2764

Q     The area that you described for Mr. Sperling; is that true?

A     That's correct.

Q     All right, sir.  I'd like to display for you Defendant's Exhibit Number -- we'll try 213.  We had a colorized version.  This is black and white, so it might not do what we're looking for, but we'll try it.

MR. SMITH:  And I don't think we can see enough on here, Your Honor, to be helpful.  So I'm just going to take that down.  I don't think there's anything there that can be useful.

Q     (By Mr. Smith) Doctor, I'd like to display for you your report, have you look at this.  It's got your diagram on it and that might be useful for us.

MR. SMITH:  It's not in, if you'll just display it to him.  Your Honor, this was not previously marked and I would ask to mark it as Defendant's 219.

Q     (By Mr. Smith) Doctor, does that look to be an accurate reproduction of your records?

A     Yes, it does.

Q     And that is going to be marked as Defendant's 219. Does that indicate the drawing that you -- does it have a drawing on there that indicates the area of wounds to Mr. Barrett?

A     That's my drawing of that date.

2765

MR. SMITH:  I'd move for the introduction of Defendant's 219, Your Honor.

THE COURT:  Any objection?

MR. SPERLING:  No objection, Your Honor.

THE COURT:  It's admitted without objection.

MR. SMITH:  Ask that it be displayed, Your Honor.

THE COURT:  You may.

Q    (By Mr. Smith) As I look at your diagram, the area that I am depicting with my laser would be the right leg?

A    That's correct.

Q    This is the right hip area?

A    Yes.

Q    Would it appear consistent with looking at this diagram what you recall of Mr. Barrett that these wounds on the left leg would have come from the right side of the body, from the direction from the right?  In other words, if you have entrance over here on the right hip, or you have wounds on the right hip, he didn't have any on the left hip, right?

A    He has wounds on his left leg.

Q    Right.  But on the left hip, you don't have any wounds?

A    I did not see any.

Q    We got them on the right hip.  And we've got them

2766

down here just above the right knee.  Would it seem consistent with you, sir, by looking at this diagram and what you recall seeing with Mr. Barrett, that this could be an entrance, an exit and an entrance wound into that left leg?

A     It is possible.

Q     In other words an individual was shot from the right side, he gets shot into the right buttocks, but in the lower leg, a bullet passes through and lodges into the left leg where you in fact removed the projectile?

A     It is possible but I'm not an expert in that area.

Q     I understand that.  But by looking at this, nothing appears to be inconsistent with that, does it?

A     Correct.

Q     All right.  Thank you.  Hold on one second.  And I guess the corollary to that would be you don't see any wounds or you did not see any wounds on the anterior portion of the left leg?  I asked you about the left hip.

A     I can't see you, sir.  Because he does have wounds on the anterior left leg.

Q     On the anterior or interior?

A     Anterior.

Q     That's -- you're talking about the front?

A     Front.

Q     Okay.  What about the side of the left leg?

2767

A    I did not see any.

Q    Okay.  So they appear to be to the front of the left and to the side on the right and the front of the right near the knee, right?

A    Correct.

MR. SMITH:  Pass the witness, Your Honor.

REDIRECT EXAMINATION

BY MR. SPERLING:

Q    Doctor, with regard to these three wounds here in the right hip area, there was one bullet still inside his body?

A    That's correct.

Q    Is it possible, based on your examination for these three wounds to have been caused by two shots, one which went in and out and one which remained?

A    Yes.

Q    And with regard to the bullet that was remaining here, is it possible that it entered and remained in that leg without being struck here?

A    It's possible.

Q    Is it also possible, based on your examination, that that bullet, the one that ended up in his left leg, the one that you removed, could have passed through the right leg and then exited and lodged in his left leg?

A    Yes.

2768

Q    So, assuming that scenario, the Defendant could have been shot one, two, three, four times?

A    That's possible.

MR. SPERLING:  Thank you, sir.  Nothing further.

THE COURT:  Anything further?

MR. SMITH:  Nothing further, Judge.

THE COURT:  May -- Mr. Sperling, may this witness be excused?

MR. SPERLING:  Yes, please, Your Honor.

THE COURT:  Defense?

MR. SMITH:  Yes, sir.

THE COURT:  Doctor, thank you for your testimony.  You may step down.  You may be excused. Who's your next witness?

MR. LITTLEFIELD:  Craig Nixon.  And I anticipate he'll be lengthy.

THE COURT:  Let's take the afternoon recess. Members of the jury, remember my admonition about not discussing the matter.  I ask everyone to please remain seated as the jury leaves the courtroom.

(Whereupon, the jury left the courtroom after which the follow record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Anything outside of the hearing

2769

of the jury from the Government?

MR. HILFIGER:  Judge, considering the time, we have three chemists that are here from out of state. They may be able to make flights if we cut them loose.  I don't think we can get to them.  If per chance we went through Nixon real quickly, I'd be caught in a bind.  Can I have permission to go ahead and tell them to make their flights and go?

THE COURT:  Well --

MR. LITTLEFIELD:  Considering how long it's taken everybody else, I can't imagine us getting to them.

THE COURT:  Mr. Nixon is -- I mean, how long is your direct with him?

MR. LITTLEFIELD:  Time -- I would say it's going to be at least an hour.  I can't imagine it possibly getting done this afternoon.

THE COURT:  I don't want you to finish in 15 minutes and we lose an hour.

MR. LITTLEFIELD:  Don't worry about it.

THE COURT:  Okay.  You may do that.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box.  Counsel for the Government is present. Defendant is present with counsel.  You may call your

2770

next witness.

MR. LITTLEFIELD: Craig Nixon.

CRAIG NIXON,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record please, sir.

A    My name is Craig Nixon.

Q    Mr. Nixon, how are you employed?

A    I'm a Special Agent with the Drug Enforcement Administration.

Q    And where are you stationed now, sir?

A    Currently I'm at Albuquerque, New Mexico.

Q    And what is your -- what do you as a special agent in Albuquerque now?

A    I'm assigned to the technical operations group, and I'm responsible for support, utilizing technical abilities.

Q    What's that mean in English?

A    We employee wiretaps, we use covert cameras, covert audio, microphones, that sort of thing, trackers on vehicles.

Q    Are you responsible for any maintenance of the equipment or what?

2771

A    We look after the equipment, perform preventive maintenance and maintenance needs to be referred to a manufacturer or to a maintenance facility.

Q    Okay.  How long have you been associated with the DEA, sir?  How long have you been employed by that agency?

A    Approximately 15 years.

Q    Prior to being stationed out in Albuquerque, where were you stationed?

A    I was in McAlester, Oklahoma.

Q    And what was your position in McAlester?

A    I was a special agent in McAlester.

Q    Did you work with the technical assistants or what did you do as a special agent in McAlester?

A    In McAlester I was general enforcement, I just did enforcement duties with limited collateral duties but not in the technical field in McAlester.

Q    When you say general enforcement, what areas does that encompass, sir?

A    That would encompass pretty much all aspects of the job from enforcing drug laws to financial investigations. But in McAlester, it's primarily working on drugs such as methamphetamine, marijuana, other controlled substances that we'd come across.

Q    Back in the time frame of '97, '98, '99, what was

2772

the primary problem that you observed, and that you all were involved with from the McAlester lab?

A    Methamphetamine.

Q    I said lab -- (Interrupted)

A    McAlester office.  Yes, sir.  Methamphetamine production and marijuana cultivation.

Q    During that period of time you worked in McAlester, did you have as a part of your responsibilities to respond to requests or assist in the execution of search warrants as it related to the distribution and manufacturing of methamphetamine in eastern Oklahoma?

A    Yes, I did.

Q    And do you have any idea how many warrants you went on in relation to meth manufacture and distribution during the time you were in the McAlester office?

A    Well, innumerous.  I would say in the four and a half years I was in McAlester, easily over a hundred over that time span.

Q    Okay.  Were all of the warrants in which you were involved in the execution federal warrants or did you on occasion work jointly with local law enforcement officers in assisting in the execution of their warrants?

A    Very often we were asked to assist with state and local officers and task forces in the execution of their warrants.

Q    In regards to the execution of search warrants on suspected meth distributors and manufacturers, typically how are you armed in regards to the entry into those sites?

A    Typically I would be armed with a issued sidearm, a pistol.  Then I would be also armed with a back up pistol that I carry in another location.  And almost always, I would be armed with a long gun, usually a sub -- a Colt sub-machine gun.

Q    And was the Colt sub-machine gun automatic or semiautomatic?

A    It had fully automatic capabilities which I employed it in that manner in that function.

Q    And are you aware of how the local law enforcement officers would be armed in the execution of the warrants?

A    To my recollection, most of the local law enforcement officers would also have a long gun.  I'm not familiar with their department's policies or type, you know, issue requirements.  But I know just seeing them, they were usually carrying a long weapon or rifle or a shotgun type of weapon.

Q    Now, when you said a long gun for yourself, did you classify the sub-machine gun as a long gun?

A    Yes, sir, I do.

Q    And when you say long gun possessed by local law

2774

enforcement officers, would that on occasion include the sub-machine guns or weapons such as that?

A    Yeah.  It would include sub-machine guns or rifles, automatic rifles.  Like I said, there were a variety of weapons I had seen carried by these officers.

Q    And did you ever -- were you ever involved in the execution of warrants with officers associated with the Oklahoma Highway Patrol?

A    Yes, I was.

Q    And how were they armed in the execution of the warrants?

A    They were pretty uniformly armed, to my recollection.  I'm not sure of the type and caliber weapon.  But I know that their weapons were uniformly issued by their department, I believe.  And they almost always to my recollection carried a rifle or a long arm type gun in addition to a sidearm pistol.

Q    Why that quantity of armament for the execution of a search warrant, sir?

A    A lot of these locations were fairly remote and you wouldn't have access to immediate backup of other personnel or the ability to retrieve other weapons if they were stowed in the vehicle or another location.  So we would carry these weapons with us and the weapons themselves to combat the potential weapons we may face if

there were a counter assault against us during one of our warrants.

Q    Direct your attention to September the 24th, 1999. Let me ask you, are you familiar with the location that is shown in the model, which is Government Exhibit Number 1?

A    That looks like the location that I was at on September 24th.  I've been there once and only once.  But that doesn't look like the representation of the place I was on that day.

Q    The one time you were there was September 24th?

A    Yes, that's correct.

Q    And when was it you were contacted in relation to going to that location, best of your recollection?

A    My office was contacted days prior to September 24th, I don't recall what day, in anticipation of our office assisting in the execution of a search warrant.

Q    You all didn't assist in the execution?

A    No, sir, we did not.

Q    When was it that you were contacted that said you all need to go there?

A    That was early in the morning of September 24th. I'd say 12:30 to 1:00 a.m. if I recall correctly.

Q    Okay.  And did you learn what had happened?

A    We were told -- (Interrupted)

2776

Q    I didn't ask you what you were told.  My question was did you learn?

A    Oh, yes, we did.

Q    What time was it that you arrived at that location, sir?

A    I believe I arrived to the location about 4:30 in the morning on the 24th.

Q    Now, I understand and there's been testimony that there were several officers from the Drug Enforcement Administration that ultimately arrived at the scene.  Did you all go in a group or arrive individually?

A    We arrived individually.  Staggered, if for no other reason by where we lived and the time of travel to that location.

Q    When you got there, you said you got there about 4:30 in the morning?

A    I believe so.

        MR. LITTLEFIELD:  I'd ask Government Exhibit Number 69 displayed.

        THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what's depicted in this aerial photo?

A    Looks like an aerial view of the residence that I visited on the 24th.

Q    Did you all immediately proceed to do a search?

A    No, sir.

Q    Where did you all stay when you first got there?

A    We were instructed to stay outside the taped perimeter and basically off the grounds, out of the way of other law enforcement officers that were on the scene.

Q    And there was a death there?

A    Yes.

Q    When did your all's performance of the drug search warrant occur in relation to any investigation in regards to the death that occurred there?

A    It was several hours after our arrival.  Later on during the day we were allowed entry, limited entry, to certain parts of the location there.

Q    Even when you began your drug search, were there areas that were still off access to your all's team?

A    Yes.

Q    And why was that?

A    Because they were still conducting searches for evidence related to the death.

Q    Was this -- whose -- and I'm not meaning the individual, but what entity's drug search warrant was this?

A    I believe this drug search warrant was the drug task force from the Sallisaw area.

Q    The D.A.'s office?

2778

A     Yes, sir.

Q     Why did you all execute their search warrant rather than them executing their search warrant?

A     The members of the D.A.'s task force had been up for several hours prior to the warrant and then through the trauma of the incident and the hours afterwards, we just did it, to my knowledge as a courtesy, so they could get rest.  I mean, it was a very traumatic and trying experience and we were there relatively fresh and willing and able to execute the drug search warrant.

Q     In fact, did the DEA assist in providing transportation home to the members of the drug task force?

A     Yes.

Q     Which members of the district attorney's drug task force did you all arrange for transportation home?

A     I don't recall specifically.  I wasn't part of those arrangements.  But I do know that transportation was offered and received by several members of the task force.

Q     Okay.  In regards to the search, what role did you play in the DEA conducting the warrant, conducting the search?

A     I assisted with the search.  But my primary role was to -- as an assistant, to log locations and type of items

2779

that were taken as evidence.

MR. LITTLEFIELD:  May I return just a second, Judge?

THE COURT:  You may.

Q    (By Mr. Littlefield) When an item is seized --

MR. LITTLEFIELD:  I'd ask that Government Exhibit 172 be provide to Mr. Nixon.

THE COURT:  You may.

Q    (By Mr. Littlefield) Are you familiar with that item, sir?

A    Yes.

Q    And I note if -- we got it upside down in regards to the label.  You note the label that's there on the front of it?  Yes?

A    Yes, sir.

Q    And who is involved in the process of logging in and making sure that the numbers are given and locations as to the area where an item is found?  Who had that responsibility?

A    On the exterior envelope?

Q    On all of the exhibits.

A    On the exterior it lists Beal, which is task force officer -- (Interrupted)

Q    Okay.  Maybe my question didn't make sense.  When a drug exhibit is found, what information -- I mean, here's

an item, we found it, we think it may be a drug exhibit. What information is logged?

A   We log the case number, the exhibit number, the person that found the item, the location it was found, the date it was found and then it's witnessed by another agent and then it's sealed by an agent who witness that it's being sealed.

Q   Whose responsibility was it to maintain that record of exhibit number, where it was found, who found it, its location, all of that?

A   That was our responsibility.

Q   And when the labels are filled out on the -- that's an non-drug exhibit, correct?

A   That's correct.

Q   So it's not submitted to the lab?

A   No, sir, it's not.

Q   Is your name on that label in any location?

A   Yes.  On the interior envelope, inside the exterior it is.

Q   Go ahead and look at the interior envelope.  Go ahead and pull it out.  I think you can get to it.

A   Okay.

Q   Okay.  And where is your name located on that interior envelope, sir?

A   I put -- (Interrupted)

Q    Go ahead and hold it up and point it so the jury can see it as well, as you do that.

A    I signed my name here on the witness line.

Q    And would you do that on all of the labels that come in?

A    Yeah.  If I was the witness on this exhibit, I would.

Q    Okay.  And as the individual who was logging those items, were you the witness on the various items that were discovered during this search?

A    Yes.

Q    Do you know why there are two envelopes in that particular exhibit?  Or why would there be two envelopes in that particular exhibit?

A    Typically, if an evidence envelope is opened, you know, multiple times, the original seal becomes destroyed and it's difficult to reseal the exhibit so we'll put it in a new envelope to include the original evidence bag to maintain the integrity of the exhibit and its prior method of sealing.

Q    Okay.  The one you have in your left hand there which came out of that heat sealed envelope, would that have been the original heat sealed envelope in which Non-Drug Exhibit 3 -- into which it was placed?

A    Yes.

2782

Q    Go ahead and put that back in and give it to the clerk.  And, Mr. Nixon, what was the first area searched?

A    I believe the first area we searched was the shop building adjacent to the residence.

Q    Did you work -- when you did the non-drug exhibits and the drug exhibits, are they numbered sequentially?

A    Yes.

Q    And do you have in your paperwork there -- the sequence of the exhibits as they were logged in?

A    Yes, I do.

Q    And would that tell you what was searched first by -- based upon the sequence of retrieval of those items?

A    Yes.

Q    Would you look at your notes and see what was searched first?

A    According to the report that I wrote, the first place that was searched was a trailer behind the workshop.

Q    Okay.  Do you see the trailer behind the workshop?

A    Yes, I do.

Q    And you can use the laser pointer, if you would, and point so the jury can see what we're talking about. Okay.  Who was it that seized items from that?

A    That was task force officer Juan Beal.

Q    And when he retrieved items from there, who was it responsible for logging those in and collecting the non-drug exhibits?

A    He would bring those out and then I would collect those, log those in and then list them as non-drug exhibits.

Q    Were drug exhibits found inside of -- and you can check your notes.  Were drug exhibits found inside of that trailer?

A    Yes, there were.

        MR. LITTLEFIELD:  I would ask Government Exhibit Number 206 be displayed to the witness.

        THE COURT:  You may.

Q    (By Mr. Littlefield) Can you see Government Exhibit Number 206, sir?

A    Yes.

Q    And do you recognize what that item is?

A    I recognize the evidence envelope but the contents and the writing is unclear.

Q    Okay.  What is the case number?  Can you see the case number?

A    I can't read the case number, but I know what the case number is.  I'm not sure what you're asking.

Q    Okay.  Now can you see it?

A    Yeah.  The case number is KA-99-0038.

2784

Q    Do you know what case number that is?

A    That's the case number for the case entitled Barrett -- (Interrupted)

Q    Okay.  Do you see where it says witnessed by on the label?

A    Yes.

Q    Whose signature is that?

A    That's my signature.

Q    What exhibit is this?

A    Looks like Exhibit 1.

Q    Exhibit 1.  Would it be a drug or non-drug exhibit?

A    That would be a drug exhibit.

Q    And looking at your notes, who found Drug Exhibit 1?

A    That was task force officer Beal.

Q    Does this indicate who it was that acquired Drug Exhibit 1?

A    Yes, it does.  It says Beal.

Q    Okay.  As to all the drug exhibits, the ones found by Mr. Beal, yourself, RAC Wilson, who was responsible for submitting those items to the lab, sir?

A    I was.

Q    Was this, Government Exhibit 1 -- or Government Exhibit 206, which is your Drug Exhibit 1, was that submitted to the lab, sir?

A    Yes, it was.

2785

Q    Would you look to Government Exhibit 207.  Can you see the label on it?

A    Yes, I can.

Q    What Drug Exhibit is it?

A    Exhibit 2.

Q    Who found it?

A    Beal.

Q    Where?

A    Trailer.

Q    Who is the one -- do you see your signature?

A    Yes, I do.

Q    And would that have been submitted to the lab?

A    Yes.

Q    Would you look at Government Exhibit Number 208?  Do you recognize that, sir?

A    Yes.

Q    And what is that?

A    Exhibit 3.

Q    Drug Exhibit?

A    Yes.

Q    And where was it found?

A    Trailer.

Q    By whom?

A    Beal.

Q    And who was it that received it and was responsible

2786

for submitting that drug exhibit to the lab, sir?

A    That was me.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 60 be shown.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what that is, sir?

A    Yes.

Q    What is that?

A    That's a trash bin.

Q    Do you recognize that specific trash dumpster?

A    Yes.

Q    And where have you seen that previously, sir?

A    That was behind the workshop area of the residence location that we were searching.

Q    Okay.  Were drug and non-drug exhibits or were drug exhibits seized from this as well, sir?

A    Yes.

MR. LITTLEFIELD:  I would ask that Government Exhibit 209 be shown to this witness.

Q    (By Mr. Littlefield) Do you see the label?

A    Yes.

Q    And what is -- what drug -- is this a drug or non-drug exhibit?

A    This is a drug exhibit.

Q    What number?

A    Four.

Q    Who seized it?

A    Beal.

Q    Where from?

A    Looks like it says trash or trash bin.  I can't read it very clearly.

Q    Do you recognize your signature on it?

A    Yes, I do.

Q    And was Drug Exhibit 4 submitted to the lab by yourself?

A    Yes.

Q    Was this the envelope in which -- if we could go back and look at the envelope, is that the envelope in which it was submitted?

A    Yes.

Q    What -- if you go back to your notes, you documented everything that was seized and what Drug Exhibit 4 was, did you not?

A    Yes, I did.

Q    What was Drug Exhibit 4?

A    Paper towels with chemical stains.

Q    Did you see the item that's in the photograph?

A    Yes.

Q    Is that what Drug Exhibit 4 was?

A    Yes.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 210 be shown to the witness.

Q    (By Mr. Littlefield) And was there a Drug Exhibit Number 5, sir?

A    Yes, there was.

Q    What was Drug Exhibit 5?

A    It was a clear Ziploc baggy which contained residue.

Q    And what Drug Exhibit is this, sir?

A    Exhibit 5.

Q    Do you recognize -- can you tell where this was from?

A    This was from the trash.

Q    And who seized it?

A    Beal.

Q    And who witnessed it and submitted it to the lab?

A    I did.

Q    And if we go back to the photo, do you see the Ziploc bag that was seized in the trash?

A    Yes, I do.

Q    Is that what you submitted to the lab?

A    Yes.

MR. LITTLEFIELD:  I would ask 211 be shown to the witness.

Q    (By Mr. Littlefield) And was there a Drug Exhibit 6?

A    Yes, there was.

Q    What was it?

A    It was a plastic bottle labeled Durex Iodine Crystals and a plastic bottle labeled multiple vitamins.

Q    Can you see what exhibit this was?  Is this the envelope that you would have placed on it or the seal you would have placed on it?

A    No.  My name does not appear on that seal.

Q    If we could go back, do you see a second label, sir?

A    Looks like there's one on the evidence tag to the right.

Q    Okay.  And when you put iodine crystals in an envelope, plastic or otherwise, and they stay for a period of time, what happens to the envelope?

A    The envelope tends to take on the color or characteristics of the iodine.

Q    Can you make out what's on this particular envelope?

A    As far as the label?

Q    Yes.  Or is it just too corroded up?

A    Yeah.  The quality of either the picture or the envelope itself is -- I can't make out the label on this.

Q    If we could go back to the photo, do you see the two bottles?

A    Yes, I do.

Q    Does that appear to be what you submitted?

2790

A     Yes.

Q     After the trash bin and the items that were -- you got those items that were the non-drug or the drug evidence, did you also receive the non-drug evidence?

A     Yes.

Q     And what do you recall being the non-drug evidence from the trailer?

A     From the trailer, looking at my notes, it would be Exhibit N-1 was the first thing we took.

Q     What was that?

A     A wallet containing an Oklahoma driver's license.

Q     Do you recall the name of the driver's license?

A     I noted it in the report as the name of Toby Barrett.

Q     Okay.  And was there an N-2?

A     Yes, there was.

Q     What was that?

A     It was an address book containing miscellaneous papers.

          MR. LITTLEFIELD:  I would ask that 181 be shown to the witness.

Q     (By Mr. Littlefield) Is that N-2?

A     Yes, it is.

Q     And N-3 you already looked at, the scales that was in that second bag?

A     Yes.

Q     Was there an N-4?

A     Yes, there was.

Q     And rather than show you the envelope, I'm going to -- well --

MR. LITTLEFIELD:  I'd ask that 95 be displayed. Got the wrong side.  Ask that 173 be displayed.  May be the real thing.  That's it.

Q     (By Mr. Littlefield) Is that the N-4?

A     Yes, it is.

Q     And did you log that as well?  Your name appear on the label?

A     Yes, it does.

Q     Okay.  After you finished in the -- and you can go ahead and return those items.  If you'd look at your log, do you know which area -- after you searched the trailer and then the dumpster, where did you go?

A     Then we proceeded to the workshop, which was adjacent to the residence.

Q     And did you assist in the search of the workshop, storage, out -- the garage, whatever you want to call it?

A     Yes, I did.

Q     Did you find any items in there?

A     Yes, we did.

Q     Did you personally?

2792

A    Yes.

Q    Would you look at Government Exhibit 197.  Do you recognize that photograph, sir?

A    Yes, I do.

Q    What's that?

A    That looks like a syringe.

Q    Do you recognize that syringe?

A    Yes.

Q    Where did you see it?

A    In the workshop, and I believe on the top of the old air conditioner unit.

Q    Was that seized by yourself?

A    Yes.

Q    As an exhibit?

A    Yes, it was.

Q    Describe for the jury what the condition of that syringe was when you observed it on that old air conditioner unit on that outbuilding out there?

A    To me, it appeared to be used.

Q    Why?

A    There was residue in it along with a red liquid color in the syringe.

Q    What did that red liquid color indicate to you?

A    To me it indicated that it had been intravenously used and blood had been withdrawn into the syringe during

2793

the use.

Q    Had you seen used syringes before?

A    Yes, I have.

Q    Did it match the character that you'd seen previously?

A    Yes.

Q    That was seized by yourself?

A    Yes.

Q    Would you look to what's been marked as Government Exhibit 212.

        MR. LITTLEFIELD:  And this is not yet in evidence.

Q    (By Mr. Littlefield) Can you see the label, sir?

A    Yes, I can.

Q    Can you read the writing on the label?  Okay.  Let me ask you this.  What drug exhibit is it?

A    It's Exhibit 7.

Q    And who acquired it?

A    I believe it says Nixon, but I can't read it very clearly.

Q    Let's get a little closer.  Who acquired it?

A    Nixon.

Q    Does it identify the location?

A    Workshop.

Q    And do you recognize your signature as being the one

who is the custodian of that evidence?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government Exhibit 212.

THE COURT:  Any objection?

MR. SMITH:  No objection.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) Now, you can see the label there.  Now we're going back to the picture.  Where's the syringe?

A    The syringe is inside the sealed tube.

Q    Was that submitted to the lab?

A    Yes.

Q    Did you observe any other items inside that workshop, garage, whatever you want to call it?

A    Yes.

MR. LITTLEFIELD:  And I would ask that Government Exhibit Number 64 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize --

MR. LITTLEFIELD:  It's not in evidence.  I thought that was in evidence.  I thought Mr. Beal had identified it.  It's not in evidence.  Okay.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit 64?

2795

A    Yes, I do.

Q    How do you recognize it?

A    It appears to be a photograph that was taken about the time we were locating this evidence.

Q    Okay.  Did you observe these items at any location?

A    Yes.

Q    Where?

A    In the workshop.

Q    Are these the items that you observed in the workshop?

A    Yes, they are.

        MR. LITTLEFIELD:  Move admission of Government Exhibit 64.

        THE COURT:  Any objection?

        MR. SMITH:  No objection, Your Honor.

        THE COURT:  Admitted without objection.

        MR. LITTLEFIELD:  And I'd ask it be displayed.

        THE COURT:  You may.

Q    (By Mr. Littlefield) What is that, sir?

A    It's various lengths of various types of tubing.

Q    Why was there any interest in tubing, sir?

A    Tubing has been found to be associated with the manufacture of methamphetamines at labs we've seen in the past.

Q    Were there any tubes that were in this group that

2796

appeared to have been -- more than just tubes, but caused you to have a specific reason to believe that they were associated with the manufacture of meth?

A    Yes.

Q    And what was that?

A    There were some sections of tubing that appeared to have been used as there was residue on the inside of the tubing.

Q    Would you look --

MR. LITTLEFIELD:  I'm going to ask that Government Exhibit 63 be displayed.

Q    (By Mr. Littlefield) Do you recognize those tubes which are shown in Government Exhibit 63?

A    Yes.

Q    And how do you remember those, sir?

A    Those -- I remember those as having been -- appeared to have been used and used in conjunction with another device in the manufacture of methamphetamine.

Q    What do you mean by used in conjunction with another device?  What are you talking about?

A    Typically when we see tubing with duct tape or electrical tape, it would be to create a seal to prevent loss of air or pressure and to manufacture HCL gas.

Q    The term gas generator mean anything to you?

A    Yes.

Q    And what's it mean?

A    Gas generator's what typically used to finish the methamphetamine manufacturing process to gas or what's known as gassing out the product.

Q    When a tubing is inserted into meth oil to gas it out, what happens to the end of the tube that's inserted in your experience?

A    The end of the tube becomes contaminated with residue.

Q    As a consequence with your experience, was anything done with this tubing in regards to seizing it for the purpose of submission to the lab?

A    I believe this is part of an exhibit that we seized.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 213 be displayed to the witness, please.

THE COURT:  You may.

MR. LITTLEFIELD:  It's not in evidence.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit Number 213, sir?

A    Yes.

Q    What is that?

A    That is some sections of tubing.

Q    Is that the tubing you seized out of the workshop?

A    Yes, it is.

Q    And does the label reflect same?

2798

A     It appears to be the exhibit that I seized from that location.

Q     What drug exhibit was assigned to that item, sir?

A     Exhibit 8.

Q     By the way, what drug exhibit was assigned to the syringe?

A     That was Exhibit 7.

Q     Okay.  Was Exhibit 8 submitted to the lab?

A     Yes, it was.

          MR. LITTLEFIELD:  Move admission of Government Exhibit Number 213.

          THE COURT:  Any objection?

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Admitted without objection.

          MR. LITTLEFIELD:  And I would ask it be displayed.

          THE COURT:  You may.

          MR. LITTLEFIELD:  If we could focus on the label.

          THE COURT:  You may.

Q     (By Mr. Littlefield) And it shows -- where's the drug exhibit if you can go ahead and use the --

A     The exhibit number or the --

Q     Exhibit number.  And acquired by whom?

A     Nixon.

2799

Q   Where -- does it show the location?

A   Yes, it does.

Q   As what?

A   Barrett's workshop.

Q   And witnessed by and the signature that's yours?

A   My signature appears there.

Q   Now, if we could back off and look at the entire exhibit.  What is this here?

A   That would be the contents of the exhibit, or the exhibit itself.

Q   What is that?

A   The tubing.

Q   What's this right in here?

A   That was the tape end of the tube.

Q   Is that the only place you searched?

A   No, it was not.

Q   Where else did you search?

A   When we were cleared to search, continue our search, we were allowed to search in the residence.

MR. LITTLEFIELD:  Put Government Exhibit 69 back up.

Q   (By Mr. Littlefield) As soon as the search in this area back in here and the outbuilding was done, the workshop as you referred to it was done, did you immediately go into the residence?

2800

A    I don't recall the time frame, but we went into the residence once we were allowed.  I don't say it was immediately, but it was after completion of the search of the workshop.

Q    You don't remember if you had to wait or if so, how long?

A    I don't recall.

Q    Did you discover any items within the residence, sir?

A    Yes, I did.

Q    What did you find?

A    I found an exhibit I labelled as Exhibit 10 which was a Styrofoam cup covered with tin foil.  It contained numerous pills, red pills.

Q    That's a drug exhibit, correct?

A    Yes.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 219 be shown to the witness.

        THE COURT:  You may.

        MR. LITTLEFIELD:  And it's not in evidence.  I don't think.

        THE COURT:  No.

Q    (By Mr. Littlefield) Do you recognize that photograph, sir?

A    Yes.

2801

Q     And what is that?

A     That's a photograph of a small room near the kitchen and the object in the photograph is tin foil covering a cup and also a red pill on that countertop.

Q     Is that the item that you seized as Drug Exhibit Number 10?

A     Yes, it is.

MR. LITTLEFIELD:   Move admission of Government Exhibit 219.

THE COURT:   Any objection?

MR. SMITH:   No objection, Your Honor.

THE COURT:   Admitted without objection.

MR. LITTLEFIELD:   And I would ask that it be displayed.

THE COURT:   You may.

Q     (By Mr. Littlefield) Was this how it was or did you pose this, placing one pill out and then the tin foil?

A     If I remember correctly, that was the way it was located.   I don't believe I rearranged it or placed anything outside of the cup.

Q     You say that was Drug Exhibit 10?

A     Yes.

MR. LITTLEFIELD:   I would ask that the witness be shown Government Exhibit Number 215 and it's not in evidence.

2802

THE COURT: You may.

Q (By Mr. Littlefield) What was in that tin foil?

A A Styrofoam cup.

Q Anything else?

A Yes. And numerous red pills.

Q Do you recognize Government Exhibit Number 215?

A Yes, I do.

Q What is that, sir?

A That is the Exhibit 10, the red pills.

Q Is that the envelope in which it was inserted for submission to the South Central Lab in Dallas?

A Yes, it is.

Q And who put those items in there?

A I did.

Q Do you see your signature on the label?

A If we can zoom in on the label, I could make it out. But it's too small.

Q I think we just did.

A Oh, okay. Yes, I do.

MR. LITTLEFIELD: Move admission of Government Exhibit Number 215.

THE COURT: Any objection?

MR. SMITH: No objection, Your Honor.

THE COURT: Admitted without objection.

Q (By Mr. Littlefield) Now, you mentioned there was

2803

tin foil around a Styrofoam cup.  Do you see the tin foil?

A     Yes, I do.

Q     Can you point to it?  You mentioned numerous red pills, do you see where the red pills are located?

A     Yes.

Q     And could you also -- and where's your signature on the label, sir?

A     Be right about in this area here, on that label.

Q     Okay.  Is that the only item -- well, let's go about it this way.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 68 be shown to the witness and it's not in evidence.

        THE COURT:  You may.

Q     (By Mr. Littlefield) Mr. Nixon, before I ask you specifically about the photograph, when you searched in the residence, did you all have to move items to discover items?

A     Yes.

Q     What kind of items was it required that you all move in order to discover items?

A     If we were searching a shelf, for example, we may need to remove items from the shelf to search behind the items or to get to additional items on the shelf.

2804

Q    Do you recall having to remove or move any planks or boards in any locations?

A    Yes.

Q    And what kind of planks and boards were had to be moved?

A    There were wall boards that were moved.  There were ceiling boards that were moved.

Q    What's Government Exhibit Number 68, sir?

A    Looks like the inside, the interior, of a small closet or cubby in the residence.

Q    Were you -- do you see the items that are depicted there?

A    Yes.

Q    Who discovered those items that were depicted there?

A    I believe those are items that I discovered.

Q    Okay.  That photo as it exists -- did something have to be moved for that discovery to take place, sir?

A    If I recall we had to remove some wall boards to see into that area.

Q    Okay.  Is that as it was existed after the wall boards were moved?

A    Yes.

MR. LITTLEFIELD:  Move admission of Government Exhibit 68.

THE COURT:  Any objection?

2805

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) What is this, sir, that I'm -- do you see what I'm pointing at?

A    Looks like a wire, but I'm not sure.

Q    I mean, this whole deal here, kind of brownish yellow thing.

A    Looks like a board.

Q    How did it get in that position?

A    I believe it was pulled from the wall, pried away from the wall.

Q    What's that behind here?

A    Syringes.

Q    Who moved the boards to find the syringes?

A    I don't recall who actually moved the board.

Q    Were you there when it happened?

A    Yes, I was.

Q    Is that how it was when you all found those -- when you found those syringes there?

A    Well, after we moved the wall board the syringes were discovered.

Q    Okay.  That's what I mean.  Is that how it was -- (Interrupted)

A    Yes.

Q    -- when the syringes were discovered?

2806

A    Yes, it was.

Q    Ask you to look at what's been marked as Government Exhibit 57.  Do you recognize what's depicted in Government Exhibit 57?

A    Yes.

Q    And what is that?

A    More syringes.

Q    Were those found in Barrett's house in that condition?

A    Yes, they were.

Q    What did you have to do with the discovery of these syringes?

A    I believe I was the one that discovered those syringes.

MR. LITTLEFIELD:  Move admission of Government Exhibit 57.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  Ask that that be displayed.

THE COURT:  You may.

MR. LITTLEFIELD:  I would ask that Government Exhibit 54 be displayed to Mr. Nixon.

THE COURT:  You may.

Q    (By Mr. Littlefield)  Was there a Non-Drug Exhibit

2807

Number 8?

A     Yes, there was.

Q     What was Non-Drug Exhibit Number 8, sir?

A     It was 46 syringes and a baggy containing more Ziploc baggies.

Q     And who found those items, sir?

A     I did.

Q     Do you see what's marked as Government Exhibit Number 54, sir?

A     Yes, I do.

Q     And what is that?

A     That's an evidence envelope containing syringes and the bag of baggies.

Q     And those are the syringes and the baggies that you found at the scene?

A     Yes, they are.

          MR. LITTLEFIELD:   Move admission of Government Exhibit Number 54.

          THE COURT:   Any objection?

          MR. SMITH:   No objection, Your Honor.

          THE COURT:   Be admitted without objection.

Q     (By Mr. Littlefield) How many syringes?

A     There were 46.

Q     Were those found in one location or was that throughout the house?

A    If I recall, those were primarily located, if not totally located, in the bedroom, what I call the bedroom area, to include that small closet.

Q    To include the small closet?  I didn't understand that.

A    Yes.  The bedroom area and the small closet which is part of the bedroom area.

MR. LITTLEFIELD:  I would ask that Government Exhibit 54 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And are those the items you seized?

A    Yes.

MR. LITTLEFIELD:  I would ask Government Exhibit 175 be displayed to this witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) When you say -- do you recognize that photograph, what that is, sir?

A    It looks like a model of the residence.

Q    Does that appear to be accurate?

A    Yes.

Q    When you say the bedroom, would you use the laser to point to the room to which you were referring?

A    Sure.

Q    Okay.  And you said small closet.  Some of the

2809

syringes were found in the small closet?

A    Yes.

Q    Point to that area please, sir.  Okay.  I would ask what's been marked as Government Exhibit Number 170 be provided to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  It's not in evidence yet. And it's one of the items on the cart there, I think.

Q    (By Mr. Littlefield) Do you recognize that, sir?

A    Yes, I do.

Q    Is that exhibit in your Non-Drug Exhibit N-8?

A    Yes, it is.

MR. LITTLEFIELD:  Move admission of Government Exhibit 170.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And would you hold it up? Where are the syringes?

A    They're in the bottom of the bag.

Q    And where are the baggies?

A    The baggies are top and behind the syringes.

Q    And the label with your name and all is --

A    My signature is here.

Q    You mentioned -- go ahead and pass that back.  You

2810

mentioned that in addition to planks of the wall, that other planks had to be moved?

A    Yes.

Q    What other planks do you recall having -- or other item that had to be moved to discover something?

A    I remember some ceiling boards that were pulled down.

MR. LITTLEFIELD:  Ask that Government Exhibit 59 be displayed.

THE COURT:  You may.  Is it in evidence?

MR. LITTLEFIELD:  It is.

Q    (By Mr. Littlefield) Do you recognize that photograph, sir?

A    Yes, I do.

Q    What's that?

A    It's a wall boards above the ceiling fan with a package of the substance in the ceiling boards.

Q    Do you know what that substance was?  Do you remember?

A    I don't recall specifically without looking at somebody else's notes or their reports.

Q    Okay.  Well, did you collect all the evidence?

A    Yes, I did.

Q    What's Drug Exhibit Number 9?

A    Exhibit 9 is a white plastic trash bag containing

2811

numerous white tablets and that was located in what I call the bedroom ceiling of the residence.

Q    Was that Drug Exhibit 9?

A    Yes.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 214 be shown to the witness.  And it is in evidence.

THE COURT:  So it can be shown to everyone?

MR. LITTLEFIELD:  Yes.  Can we focus more on the -- just the photograph itself?

Q    (By Mr. Littlefield)  Can you see your signature there?

A    Yes, I can.

Q    What drug exhibit is this or what exhibit is it?

A    Exhibit 9.

Q    Was this submitted to the lab?

A    Yes, it was.

Q    By whom?

A    By me.

Q    Do you recall --

MR. LITTLEFIELD:  Let me ask that Government Exhibit 58 be shown to the witness and it's in evidence.

Q    (By Mr. Littlefield) Do you recall Government Exhibit -- not Government Exhibit but Drug Exhibit Number 11?

2812

A   Yes.

Q   What was it?

A   It was old -- old style camera.

Q   What was found in the old style camera?

A   According to the report it was two plastic bottles containing residue.

Q   Do you see the old style camera?

A   Yes, I do.

Q   Use the laser to point to it.  Who found the plastic bottles in that camera?

A   That was my supervisor Kevin Wilson.

Q   That was drug exhibit which?

A   Nine.

Q   I would ask that -- check again.

A   I'm sorry.  I'm sorry.  It's Exhibit 11.

MR. LITTLEFIELD:  I would ask that Government Exhibit 216 be shown to the witness and it is in evidence.

Q   (By Mr. Littlefield) And there are two bags on here. Do you see the two bottles?

A   Yes.

Q   Where are they?

A   One, two.

Q   If you'd look to the envelope on the right, do your DEA evidence labels -- what color ink's used on them?

A     Typically it's black ink.

Q     Have you ever seen red ink like that on your DEA envelopes?

A     I don't recall seeing red ink on envelopes before.

Q     When you have bottles such as that, what happens to the bags in which they're contained?

A     Bags will often turn the color of the substance in there, if it's a corrosive type substance.

Q     And do you see corrosive on the second bag that was used?

A     It appears -- there's some at the bottom of that bag.

Q     If we could focus on the label on the bag on the right and I know it's upside down.  Can you even make out at this point any of the writing on that, sir?

A     Only the large writing that says evidence.  The rest is unintelligible.

Q     Did you submit Drug Exhibit Number 11 to the South Central Lab along with the rest of the items, sir?

A     Yes, I did.

Q     Are you familiar with a substance known as Nicotinamide?

A     Vaguely.

Q     Do you know what it's used for in relation to meth?

A     No.  No, sir, I don't.

2814

Q    Okay.  When you submit these items that we've gone through, these drug exhibits, do you fill out if any paperwork and if so what do you fill out when you submit the items?

A    With the submission of drug evidence, we fill out a DEA Form 7.

Q    And when you do a DEA Form 7, do you fill out the entirety of it or just a portion of it?

A    There's a portion just for the submission of evidence.  There's other portions for, you know, other facets of the investigation.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 72 be displayed to the witness.  And it's not in evidence yet.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit Number 72, sir?

A    Yes, I do.

Q    And what is Government Exhibit Number 72?

A    This is a DEA Form 7.

Q    The Form 7 is what you use when you do what?

A    It's for submittal of drug evidence.

Q    To?

A    To the laboratory.

Q    Is this the form that you used or one of the forms that you used when you submitted the drug exhibits that

2815

we've talked about in here, to the South Central Lab?

A     Yes, it is.

Q     Okay.  And which portion of this is it that you fill out?

A     I fill out to the portion numbered box 17, which is my signature.  And then my supervisor would complete the box 18, approval box.

Q     And I see in box 18 Kevin Wilson, Rack.  Do you recognize that signature?

A     Yes, I do.

Q     What drug exhibits did Government Exhibit 72 include that you submitted to the lab?

A     One, two and three.

Q     Would you look to Government Exhibit Number 74, please.  And do you recognize that, sir?  Have you got it?

A     Yes.

Q     And what is Government Exhibit Number 74 in relation to, sir?

A     It is a DEA 7 for Submittal of Drug Evidence to the lab.

Q     Okay.  Is it -- does it have this case number?

A     Yes.

Q     And is there a file type?

A     Yes.

2816

Q    Whose name is in the file title?

A    Barrett comma Kenneth.

Q    Is this the submittal form for exhibit numbers four, five and six, Drug Exhibit Numbers 4, 5 and 6 that you submitted to the South Central Lab in this case?

A    Yes, it is.

Q    Your signature on it and the supervisor's signature?

A    Yes.

Q    I would ask that you look to Government Exhibit Number -- what's been marked as Government Exhibit Number 76.  And do you recognize Government Exhibit Number 76, sir?

A    Yes.

Q    What form number is it?

A    DEA Form 7.

Q    And same case number and same individual written in the file title, Mr. Barrett?

A    Yes.

Q    What drug exhibits were identified and submitted with Government Exhibit Number 76, sir?

A    Exhibits 7, 8 and 9.

Q    Would you look to Government Exhibit Number 78, sir?  Do you recognize Government Exhibit 78?

A    Yes, I do.

Q    Is this the DEA 7, the lab submittal in this case?

2817

A    Yes, it is.

Q    For Drug Exhibits 10, 11 and 12?

A    Yes.

Q    And how many drug exhibits did you identify in the report, sir?

A    Twelve exhibits.

Q    All were submitted?

A    Yes.

Q    By yourself?

A    Yes.

Q    What was your Drug Exhibit 12?

A    Exhibit 12 was one 2,000 milliliter Pyrex flask.

         MR. LITTLEFIELD:   Look at Government Exhibit Number 217.  I think it is in evidence.  It's a photograph.  It's in evidence.

Q    (By Mr. Littlefield)  Is that Exhibit 12 that was submitted, sir?

A    Yes, it is.

         MR. LITTLEFIELD:  May I have just a second, Judge?

         THE COURT:  You may.

         MR. LITTLEFIELD:  I ask that Government Exhibit 170 be provided back to the witness.

Q    (By Mr. Littlefield) In regards to the baggies, what sizes are those baggies?  The baggies inside the baggy?

2818

A    They appear to be small, one and a half by one and a half square baggies.

MR. LITTLEFIELD:  Judge, I'd ask that he be given the scissors to open that.

THE COURT:  You may.

Q    (By Mr. Littlefield) Can you reach in and pull out?

A    Yes.

Q    Is that in another baggy?

A    Yes, it is.

Q    Okay.  Can you show what baggies are inside the second baggy there?

A    These are two bags connected.

Q    And what size quantity -- in your experience those baggies, what size quantity of drugs would hold baggies of that size?

A    Very small amount, gram amounts I would estimate.

Q    Are all of those what you're looking at in that bag or together, are all of those baggies of that same size?

A    They appear to be the same size.  There's a bunch of them.

Q    Yeah.  Okay.  Could you go ahead, now that you've got them all out, reinsert them?

A    Sure.  Can I just put them back in the main bag or do you need me to stuff them in here?

Q    Go ahead and put them back in the main bag.  Kind of

2819

like digging a hole and filling it up, isn't it?

A    Just don't call me Gomer.

THE COURT:  I think we're deteriorating here pretty fast.  Are we -- (Interrupted)

MR. LITTLEFIELD:  Judge, I got about two more questions and I will be ready to pass the witness.

THE COURT:  We're not going to pass the witness.  We're going to stop for the day.  So when you get through -- (Interrupted)

MR. LITTLEFIELD:  Okay.  If I could ask him just a couple more.

THE COURT:  You may.

Q    (By Mr. Littlefield) In regards to those syringes, do they appear to be new or used?

A    For the most part, if not in whole, they appear to be new.

Q    If not in whole?

A    I mean, I can't see every single syringe, but the ones I do see appear to be new.

Q    They do not appear to be used syringes as was the one displayed in Government Exhibit 197 that you submitted to the lab?

A    Yes.

Q    Had you seen what appeared to be used syringes, what if anything would you have done with used syringes?

2820

A     Those would have been submitted as drug evidence rather than non-drug evidence.

Q     And they would have been shipped off to the lab?

A     Yes.

MR. LITTLEFIELD:  May I have just a second, Judge?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Members of the jury, we'll take our recess until Monday.  I'll ask you to be back at 9:00 o'clock.  We'll continue to hear testimony.  Remember during this weekend recess not to discuss this with anyone, allow anyone to discuss it with you.  You should keep your minds free and open.  That's not think about this case at all as I've tried to remind you in the past.  Avoid any news coverage whether it be television, newspapers or any other written material.

Do no investigation on your own.  Just, if at all possible, I'd tell you to forget about it until Monday.  But I know that's not possible.  But keep your minds on something else if you can.  We'll see you back Monday morning.  I'll ask everyone to please remain seated as the jury leaves the courtroom for the weekend recess.

(Whereupon, the jury exited the courtroom after

2821

which the following record was made.)

THE COURT:  Mr. Nixon, you may step down and be excused until Monday morning.

THE WITNESS:  Thank you, sir.

THE COURT:  Let the record reflect the jury has departed the courtroom.  The witness has departed the courtroom.  Anything to take up outside the hearing of the jury on behalf of the Government?

MR. LITTLEFIELD:  Nothing, Your Honor.

THE COURT:  For the defense?

MR. SMITH:  No, sir.

THE COURT:  We'll be in recess.

(Whereupon, the Proceedings were continued to October 24th, 2005.)

2822

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

        I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on October 21, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 2567 through 2821.

        I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

        WITNESS my hand this 20th day of May, 2006.

                          _____
                          GREG EUSTICE
                          Certified Shorthand Reporter

                          Greg Eustice
                          Oklahoma Certified Shorthand Reporter
                          Certificate No. 0176
                          Exp. Date: December 31, 2006

EUSTICE REPORTING SERVICE
BOX 700488  TULSA, OK 74170  (918)445-2965

2757

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,  )
                               )
        Plaintiff,     )
                               )
-vs-                    )  No. CR-04-115-P
                               )
KENNETH EUGENE BARRETT,   )
                               )
        Defendant.    )

VOLUME 13 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on October 24, 2005.

A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                       United States Attorney
                       and
                       Mr. D. Michael Littlefield
                       Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                       Mr. Bret A. Smith
                       Attorneys at Law

**EUSTICE REPORTING SERVICE**

CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 2824 - 3095

2824

W I T N E S S E S

PAGE

CRAIG NIXON
(Continued from October 21, 2005
Cross Examination by Mr. Smith . . . . . . . . . . 2827
Redirect Examination by Mr. Littlefield . . . . . 2858
Recross Examination by Mr. Smith . . . . . . . . . 2863
Further Redirect Examination by Mr. Littlefield . 2875
Further Recross Examination by Mr. Smith . . . . . 2880
Further Redirect Examination by Mr. Littlefield . 2885

DAVID LOVE
Direct Examination by Mr. Littlefield . . . . . . 2889
Voir Dire Examination by Mr. Smith . . . . . . . . 2905
Cross Examination by Mr. Smith . . . . . . . . . . 2911
Voir Dire Examination by Mr. Littlefield . . . . . 2912
Redirect Examination by Mr. Littlefield . . . . . 2919
Recross Examination by Mr. Smith . . . . . . . . . 2920

GERALD SKOWRONSKI
Direct Examination by Mr. Littlefield . . . . . . 2929
Cross Examination by Mr. Smith . . . . . . . . . . 2983
Redirect Examination by Mr. Littlefield . . . . . 3007
Recross Examination by Mr. Smith . . . . . . . . . 3011

LYNDELL GRIFFIN
Direct Examination by Mr. Littlefield . . . . . . 3015
Cross Examination by Mr. Smith . . . . . . . . . . 3045
Redirect Examination by Mr. Littlefield . . . . . 3055

CINDY CRAWFORD
Direct Examination by Mr. Littlefield . . . . . . 3058
Cross Examination by Mr. Smith . . . . . . . . . . 3069
Redirect Examination by Mr. Littlefield . . . . . 3075

KAREN REAL
Direct Examination by Mr. Littlefield . . . . . . 3079
(Continued to October 25, 2005

2825

| E X H I B I T S | OFFERED | REC'D |
|---|---|---|
| Government's Exhibit Number 72 . . . . . | 2934 | 2934 |
| Government's Exhibit Number 73 . . . . . | 2945 | 2945 |
| Government's Exhibit Number 74 . . . . . | 3021 | 3021 |
| Government's Exhibit Number 75 . . . . . | 3043 | 3043 |
| Government's Exhibit Number 76 . . . . . | 2947 | 2947 |
| Government's Exhibit Number 77 . . . . . | 2960 | 2960 |
| Government's Exhibit Number 78 . . . . . | 2963 | 2963 |
| Government's Exhibit Number 79 . . . . . | 2975 | 2975 |
| Government's Exhibit Number 80 . . . . . | 2905 | 2907 |
| Defendant's Exhibit Number 220 . . . . . | 2912 | 2914 |

P R O C E E D I N G S

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  You may continue your examination.

MR. LITTLEFIELD:  We pass the witness, Your Honor.

THE COURT:  Mr. Hilfiger, Mr. Littlefield, let me see you just a minute.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  You are both aware Juror 75 got excused?

MR. LITTLEFIELD:  I understand.

THE COURT:  She's at the hospital with back pains.

MR. LITTLEFIELD:  Okay.

THE COURT:  And lower pains.  They're doing an MRI.  That's the report I have.  So I didn't think I had any choice but to excuse her.  I didn't think it was appropriate to delay.  That leaves us with three is all we have.

MR. HILFIGER:  And that just moves -- are we going to move the seats around?

THE COURT:  We did at the request of these jurors who -- some of them said they couldn't see.  So we moved them down.  Paula will do us a new chart.

MR. HILFIGER:  Okay.

THE COURT:  And I'll give you a copy.

MR. HILFIGER:  Are they still going to remain in the same order or are we changing the order of their seating as well?

THE COURT:  We just took her out and moved everybody down one from over here.

MR. LITTLEFIELD:  Okay.

MR. HILFIGER:  Okay.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  You may cross examine.

MR. SMITH:  Thank you, Your Honor.

2827

CROSS EXAMINATION

BY MR. SMITH:

Q    Mr. Nixon, good morning, sir.

A    Good morning.  Thank you.

Q    You've had a chance to review the report that you generated in this matter; is that correct?

A    Yes, I have.

Q    And did you notice any inaccuracies in your report?

A    I believe on one of the pages there's a typographical error in one of the exhibits.

Q    Okay.  How about on the first page of it as it references a fully automatic AR-15?  That's not correct is it?

A    I'm not sure where you're referring to, sir.  If you could point that out to me.

Q    What I have is Bates stamp number 37 at the bottom of my page.  I don't know if yours is Bates stamped.  See those numbers at the very bottom?

A    Okay.  I see -- yeah, I'm on page 37.

Q    Halfway through that paragraph?

A    I see that, sir.

Q    That's incorrect, isn't it?

A    Yeah.  I believe that was corrected on the -- another report that's subsequent to that.

Q    Just so we'll establish, there was no fully

2828

automatic AR-15 that Mr. Barrett had, was there?

A     I'm not a ballistics expert or a weapons expert so I don't know what weapon was there.

Q     I understand, sir.  But you wrote that in your report, but you don't know that to be the case now, do you?

A     No, I do not.

Q     Okay.  Thank you, sir.  Now, you indicated that whenever you are conducting activities for the DEA, that part of your job now is controlling equipment or taking care of equipment that's used for surveillance; is that true?

A     That's true.

Q     Okay.  And I think you said something about you have devices that you attach to vehicles to tell where they go?

A     Yes.

Q     A GPS tracking device?

A     Yeah, we have access to that type of equipment.

Q     And you use microphones to detect audio?

A     Yes.

Q     Use visual aids to conduct surveillance?

A     Yes.

Q     In those type of investigations you're not looking for trace amounts of dope, are you?

A     I'm just supporting the agents in their requests. I'm not sure what their goal is in their investigation necessarily.

Q     Well, that's an awful lot of resources to be expending if all you wound up with was a small amount of dope, isn't it?  In other words, to put a tracker on a vehicle to conduct that type of surveillance that you're providing support for now, that's a large scale operation, would you agree with that?

A     Oftentimes those investigations are to lead to the source of the investigation, not necessarily to the person that's, you know, we're actually tracking.

Q     Yeah, but you hope that the end justifies the means, don't you?

A     We hope to be successful in our investigation, whatever the means is.

Q     All right, sir.  Now, you indicated that the various weapons that would be common with individuals that participate in search warrants, correct?  Do you remember that?

A     Were for law enforcement officials?

Q     Yes.

A     Yes, sir.

Q     And specifically you talked about what you would carry?

A    Yes.

Q    And we're going to talk about those items in just a minute.  But I never heard you mention the fact that you carried a grenade launcher into a search warrant?

A    Personally I don't.

Q    I never heard you say that any of these other agencies ever carried a grenade launcher, right?

A    I'm not familiar with an agency using grenades, but I did not mention that, you're correct.

Q    Okay.  I also never heard you mention that in terms of ammunition that tracer rounds would be used?

A    Yeah, I didn't -- no, sir, I did not.

Q    No, sir.  You didn't.  Now, let's talk about the weapons that you said you carried.  You said typically, whenever you go into a residence that you're going to conduct a search on -- and you've done well in excess of a hundred, right?

A    Yes.

Q    That you typically would carry a sidearm.  And then you'd carry a backup firearm?

A    Yes.

Q    And that's in case something happens, maybe you get in a struggle, you lose control of your main weapon, you want another weapon for backup, right?

A    Well, there's many reasons I would need another

2831

backup weapon.

Q   You might have a weapon fail on you and you want another one?

A   It's possible, yes.

Q   And typically I'm going to guess that second weapon you carry is an ankle gun, is that right?

A   I wouldn't carry it on my ankle, but it would be that type of a weapon.  But I wouldn't carry it in that location.

Q   And it's concealed?

A   Possibly.

Q   It's something you can get to?

A   Yes.

Q   But if you got into a struggle with somebody, you wouldn't want them to know, hey, I've got another weapon here in the event they got your primary, right?

A   I would have it so I could access it easily.

Q   Now, let me ask you, you've been responsible for taking suspects into custody?

A   Yes.

Q   Now, when you're dealing with a suspect, somebody that you're going to apprehend, would you rather see a weapon that was in plain view on that person or one that was concealed that maybe it's kind of hard to find?  What is safer for you as an agent?

A   We're going to conduct a search of that person to determine if there are weapons regardless if we see one or not.

Q   I understand that.  But as far as you dealing with somebody, would you rather -- would you want to know, hey, there's a gun sticking in the waistband, I can see it sticking halfway out of their britches, so I know he's armed as opposed to, boy, I don't know, but I better be very careful because this guy could have something hidden?

A   Any weapon that's visible is a clue to us.

Q   At least you know what you're dealing with in that situation, correct?

A   At the minimum, yes.

Q   Let me ask you this:  Whenever you take somebody into custody, conduct a search like that, you got them apprehended and you find something on them.  Not a weapon but something that you might think was contraband, say if you find it in the right front pocket, pull it out and look at it, are you going to stuff that back in their pocket?

A   A lot of times we will until we can get them to a safe area.  If they're -- if the suspect is handcuffed and somewhat immobilized, then we'll leave things where we found them for documentation at a later date, point.

2833

Q    I don't know if it's just television that does it or not, but whenever you watch COPS and they pull somebody over, outside of a vehicle, you always see them put the dope on top of the police car?

MR. LITTLEFIELD:  Objection to what they see on COPS.

THE COURT:  Sustained.

Q    (By Mr. Smith) Is that not the more standard practice that if you find contraband on a suspect, that once you've identified it and you retrieve it, you don't put it back on that person.  Isn't that the more accepted practice?

A    I don't believe it, sir, at least in my experience.

Q    Okay.  Now, whenever you testified previously, you said -- and this kind of struck me as something new -- that you were contacted days before September 24th in regards to this search.  Do you recall saying that?

A    I don't recall specifically saying it to this search.  We were contacted by an agency requesting assistance.  And I don't know if I was told specifically where we were going or who the target of the investigation was.

Q    What I wrote down in my notes that you testified to was contacted days before regarding assisting in the search warrant.  Do you recall testifying that?

2834

A    Yeah, I recall testifying that I -- about being notified about assisting in a search.

Q    Who contacted you?

A    My supervisor, Kenneth Wilson.

Q    And he contacted you prior to September the 24th, days before?

A    He put us on heads up, on standby, that we may be assisting a task force with the execution of a search warrant.

Q    Do you know where that information came from other than your supervisor?

A    No, I do not.

Q    Now, you said that you got there at about 4:30 in the morning on the scene; is that correct?

A    Yes.

Q    How many individuals were there?

A    There were quite a few.  I didn't take a head count, but there were numerous state troopers and other law enforcement officials there.

Q    As many as 35?

A    It's possible.

Q    Now, do you know who Stanley Philpot is?

A    No, sir, I do not.  I don't know him personally.

Q    He was out there in the morning when you got there?

A    I don't know.

Q     Okay.   I noticed in your report, I'll see if I can direct you to the page.   It looks like page two of four where you have other officers.   And that's in paragraph number seven?

A     Okay.

Q     Do you see that, sir?

A     Yes, I do.

Q     The very last entry under paragraph number seven, read who that says.

A     Oklahoma State Park Ranger S. Philpot.

Q     Okay.   Now, you don't indicate when he was on the scene.   You just have him indicated as having been there enough such that you would document it in your report?

A     Yes.

Q     Because you don't have 35 names on there.   How many do you have written down?   I count eleven; is that correct?

A     I count 12 counting S. Philpot.   But 11 or 12.

Q     Okay.   That's fair enough.   So out of, say, 35 you thought it was important to document the fact that Stanley Philpot, Oklahoma State Park Ranger, was there on the scene?

A     Yes.

Q     Thank you, sir.   Now, I want to talk a little bit about these different items.   And I understand that you

2836

found just a few.  But mainly your job was to inventory them.  Somebody else would find them, they would give them to you, you would put them in a package, you'd put a label on them and you'd seal them, right?

A    Yes.

Q    So that's why you testified to the 12 items, because you actually received them, not that you found them all, but they all came into your custody, right?

A    That's correct.

Q    Now, let's talk about that trailer, because we said that there was some items that were found in that trailer?

A    Okay.

Q    You found nothing in the trailer that indicates to you that that was Kenny Barrett's trailer; is that true?  No items of what I'm going to call dominion and control?

A    There was an address book, Exhibit N-2, but I don't know the contents that could have indicated some dominion and control.  But I'm not aware of the contents of the address book.

Q    And for the purposes of my questioning, I don't want us to assume anything or guess, okay?

A    Okay.

Q    I'd like for us to be accurate.  It's a pretty serious deal we're doing.

2837

A    Certainly.

Q    You don't know a thing that you found in that trailer that ties that trailer to Kenny Barrett, do you?

A    I don't know of anything that would tie the trailer to him.

Q    Okay.

A    Other than it was on his property, but --

Q    There was some property found -- we're going to talk about what was found.

A    Okay.

Q    But let's talk about these D labels that were put on things, your drug exhibits.  Now, that's a handy label that you put on them because this is something that you suspect may contain controlled dangerous substance, right?

A    Do you mean the exhibit number or the label itself?

Q    Yeah, and I said D something and actually that's not right.  You have exhibits that are numbered, that you refer to as your drug exhibits, correct?

A    Yes.

Q    Then you have exhibits that start with the letter N that are non-drug?

A    That's correct.

Q    Just because they're numbered and you refer to them as a drug exhibit, doesn't mean ultimately that that

2838

tested for drugs?

A    That's correct.

Q    Tested positive for drugs?

A    That's correct.

Q    That's just a label you put on it whenever you're separating your items of evidence?

A    Yes.

Q    Would you agree with me there?

A    Yes.

Q    And we got to be careful.  This gentleman over here taking all this down is going to get mad at us so I'll try to not step on you, but you have to let me finish my question, okay, sir?  All right.

Now, as it relates to your numbered exhibits that were found in that trailer, item number one didn't have any controlled dangerous substance, did it?

A    I'd have to refer to the chemist report because I'm not sure of the outcome of the exhibit that I found.

Q    Okay.  So a chemist later performed an analysis?

A    Yes.

Q    But you're not telling the jury based on your knowledge that it contained drugs?

A    No.

Q    Then number three, I notice that it was a pill bottle?

2839

A    Plastic bottle with a label on it.

Q    That's that Pseudo 60 bottle?

A    That's correct.

Q    But it was empty?

A    I don't recall, but possibly.

Q    You don't have anything on your report that indicates there was any contents in there, right? Actually you have residue but that means there's dust or something in there, right?

A    Yeah.  That something would have been there previously.

Q    Right.  But there wasn't -- if there were pills in there, you would have on there pills and you would have a count?

A    I would have to look at my drug submission report. It may indicate that.

Q    Do you want to -- do you have it with you?

A    Sure.  If you don't mind, yeah.

Q    No.  Sure.  Go right ahead, sir.

A    And according to my report, the bottle contained a -- (Interrupted)

        MR. LITTLEFIELD:  Judge, the items to which he's referencing is in evidence and I think it would be preferable if he identifies the exhibit number which -- it's not been offered yet, but if he's going to look at

2840

something that's an exhibit for the purpose of refreshing, I would ask that he use that since it, at some point will be offered.  And he's identified the exhibit number as well.

THE COURT:  But it's not in evidence?

MR. LITTLEFIELD:  Not yet.

THE COURT:  So what's the objection?

MR. LITTLEFIELD:  If he's going to refresh, I'd ask that he refresh from the exhibit which he's viewed and identified previously.

MR. SMITH:  Your Honor, it seems like his report would be just as well for him.

THE COURT:  Well, the problem is, I assume he's going to testify his report reflects the ultimate determination of the lab and the exhibit is not in evidence so it's premature unless it's offered and accepted into evidence, unless you want to offer the exhibit.

MR. SMITH:  No, sir.  Other than -- I mean, I guess my point would be if there was something in there, it would be indicated in his report.  And that's -- really my question goes to not what it ultimately tested as or anything like that, just was it empty or was it not.

THE COURT:  You don't care about the ultimate

2841

conclusion of the analysis, you just want to know whether the bottle contained something other than -- well, whether the bottle was empty or had something it?

MR. SMITH:  That's correct, Judge, because I do think the chemist would have to testify as to the ultimate test.

THE COURT:  You may inquire then.

Q   (By Mr. Smith) All right, sir.  You've looked at your report?

A   Yes.

Q   And nothing in there indicates therein a quantity of pills, one pill, two -- any pills?

A   Our report indicates trace.

Q   Which would indicate to you it's an empty bottle?

A   Of pills, yes.

Q   Now, D-2 was an envelope that was tested and we're going to have to talk to the chemist about what was found there, okay?

A   Okay.

Q   All right.  So I'm going to move on to the dumpster. You said -- well, let's back up a second.  While we're on the trailer, are you aware of the billfold that was found that you took into custody?

A   Yes.

Q   Okay.  And that billfold belonged to who?  And I

2842

believe that's N-1, sir?

A    Yes, sir.  The -- it had an Oklahoma Driver's License with the name Toby Barrett.

Q    Okay.  And then number two was the address book?

A    N-2, yes.

Q    And did you look through there and look at the various forms of ID that were in that -- (Interrupted)

A    I did not.

Q    -- particular notebook?  Okay.  You just took it, packaged it and put it in the sealed container, right?

A    Yes.

Q    All right, sir.  But you're not telling us that -- anything in there we could -- we addressed that earlier about there was some notations in an address book.  But you're not saying anything in there linked that to Kenny Barrett?

A    I'm not aware of the contents of the address book.

Q    Let's talk a little bit about the dumpster that was there at the residence.  Are you familiar as to whether or not there were -- was another residence near the Barrett residence?  His mother's house?

A    Oh, yes, I'm aware of that.

Q    Do you know whether or not she had a separate trash can?

A    I never entered that property so I have no idea.

2843

Q    Looked like it -- what I'm going to term a common area?

A    It was divided by a tree line if I recall correctly.

Q    What I'm getting at, it wasn't back there behind that house, was it?

A    If I recall the dumpster was near the workshop area.

Q    Okay.  In between that house and that trailer house?

A    If I recall it was right behind the workshop.

Q    Now, nothing was found in that dumpster that linked any of those items that you have listed on here as evidence to Kenny Barrett?  No pieces of mail in the trash that had his name on it, right?

A    I don't recall anything like that, no.

Q    No bills, no nothing with his name on it.  No subscriptions, nothing?

A    Nothing that was logged into evidence that I recall.

Q    And I'm going to guess if there was something in there that had his name on it, you would have thought that had evidentiary value because that would link that to a particular person you would have seized it?

A    Yes.

Q    All right, sir.  Now, you talk about a syringe that was found.  Did you actually find that?

A    Yes.

Q    Okay.  And that was one that was on top of the air

2844

conditioner in the shop, is that right?

A    Yes.

Q    Okay.  And oftentimes -- I mean, you retrieve syringes more than once in your -- when you conducted search warrants?

A    Oh, in the past, yes.

Q    And a used syringe, like you said, often will have a red liquid in there, is that right?

A    Yes.

Q    And are you familiar as to how that gets inside of the syringe?  What the drug user's doing?

A    Yes.

Q    They're registering that syringe, aren't they?

A    I'm not sure of the terminology, but --

Q    They draw a little bit of blood back in the syringe, mix it with that dope and then they take their injection. Isn't that your understanding of what they do?

A    That is my understanding.

Q    And that's why, whenever that syringe is left, there's a little bit of red liquid in there that contains blood, typically?

A    Yes.

Q    Is that your understanding?

A    Yes.

Q    And if there's any dope then it's going to be

2845

diluted in that as well, right?

A     With the blood, yes.

Q     In other words whenever you go home with that syringe you don't get it all out?

A     That I don't know.

Q     You don't use syringes and I can appreciate that. But what I'm getting at is oftentimes whenever you see something in the bottom of a syringe like that, a red layered liquid, that tells you that it's a used syringe?

A     That's what it would indicate to me.

Q     Now, there's a little bit of conflict between what the DEA likes to see and what the public health department likes to see as it relates to syringe, isn't there?

A     Well, syringes are potentially a hazardous, you know, item.

Q     I understand they're hazardous.  The point that I'm making is the health department, when they're dealing with drug users, would rather a drug user have a new syringe every time they're going to use dope, wouldn't they?

A     I'm not familiar with the health department policies so I couldn't answer that.

Q     Are you familiar with the transmission of blood amongst drug users and the danger that's associated with

2846

that, if they use the same needle?

A    Yes.

Q    Okay.  And so, it's a lot safer for a doper to use a new needle and not share needles, right?

A    Yes.

Q    So if you see a bunch of syringes, particularly a bunch a new ones, then that tends to indicate that they're not using the same one over and over again. Maybe at least they're being careful about this dangerous activity they're engaged in; would that be true?

A    I have no idea how many times that needle I found was used.

Q    You don't know if it was used once or a hundred?

A    That's correct.

Q    Or maybe shared amongst 20 people?

A    Yeah, I don't -- no, no idea.

Q    But you did testify about that bag of 46 that you found inside the house.  Do you remember that?

A    I remember the 46 and I believe the bag was just the submittal bag.

Q    All right.  But they were all new?

A    Yes.

Q    Now, item 10 was a Styrofoam cup that was covered with foil that contained red pills?

A    Yes.

2847

Q    You're not aware of that containing dope?  I mean, we talked about pills but you don't know what kind of pills, right?  Is that a fair statement?

A    That is fair.

Q    But you're not wanting the jury to think that there's anything illegal about those pills?

A    When I took those pills I had no idea what the content of the pills was.

Q    So you seized them, sent them off for testing?

A    Yes.

Q    They could be a harmless substance or they could be dope, is that right?

A    Yes.

Q    But you don't know what it is?

A    No.

Q    You didn't conduct the analysis?  Did you send any of these items away for fingerprint analysis?  And when I say these items, I'm talking about anything that was seized at the Barrett residence.

A    I would have to refer to the submittal report to ask if I requested a fingerprint analysis.

Q    And that would be something that you would request?

A    Yes.

Q    Can you tell me if you did so, sir, and if you did what items you submitted?  You found it, sir?

2848

A    Yes, I have.

Q    Were there any items submitted for fingerprint analysis?

A    Yes.

Q    Can you tell us what items were sent?

A    Exhibit Number 12.

Q    Which was?

A    Two thousand milliliter Pyrex flask with residue.

Q    All right, sir.  Any other items?

A    That's all that I see noted in my reports.

Q    Could be some other items and you're just not aware of it having thumbed through your reports right now?

A    It's possible.

Q    Let me ask you just by way of if you would have any disagreement with it.  Are you aware that that foil that covered that Styrofoam cup was sent off or not?

A    Was it sent for analysis?

Q    Yes, sir.

A    The whole exhibit was submitted together, the cup, the foil and the pills were submitted to the lab together.

Q    And the plastic bag that contained pills, do you know whether or not that was submitted?

A    When we submitted an exhibit we sent it with the original container.

2849

Q    Whatever is in it is in it?

A    Yes.

Q    If I have some different submittals.  I don't guess you've got them.  That's why I was asking.  Looks like some other items were sent.  All you show is the flask.  Is there some reason you don't have those?

A    I have the original submittals that I submitted it.  If something was done afterwards, you know, I'm not aware of that.

Q    Let me ask it this way.  I'm going to bring a fingerprint examiner in here who testifies these items were sent to him by you and if something else that you haven't testified to here today, you wouldn't have any reason to question that?  A DEA fingerprint examiner?

A    I'm not sure of your question.  I'm sorry.

Q    If a DEA fingerprint examiner comes in and says Special Agent Nixon submitted these items to me for analysis, you wouldn't have any reason to question that, would you?

A    No.

        MR. SMITH:  I would like to put up Government's Number 64, Your Honor, if I may.

        THE COURT:  You may.

Q    (By Mr. Smith) Sir, this is the tubing that we talked a little bit about on Friday, you did with Mr.

2850

Littlefield, correct?

A    Yes.

Q    Do you associate this with automotive repair or with air conditioning type work or radiator hoses, heater hoses?

A    I can't tell in the photograph that that's an automotive hose or like a PVC type.  I don't recall what the makeup of that hose was, that tubing.

Q    And this was an automotive workshop where these items were found, or do you know?

A    I don't know what the function of the workshop was. There was numerous things in there.  So I don't know if it was automotive or otherwise.

Q    Numerous vehicles at the residence, correct?

A    Yes.

Q    Numerous tools inside of this workshop consistent with the repair of automobiles, true?

A    Yeah, you can use tools for the repair of automobiles.

Q    I mean, the tools that you found in there with consistent with the repair of automobiles?

A    I didn't take an inventory of the tools in it. Whether there were carpentry tools, automotive, I can't say one way or the other.

Q    Okay.  And you can't say whether or not an awful lot

2851

of this hose is associated with automotive repairs, such as these black ones, correct?

A    Those black ones could be used, I suppose.  I'm not sure what the tube -- what they are, but --

Q    You don't know if these clear hoses could be used for syphoning or not?  What I'm going to get at it as -- what I'm going to get at is inside of this box you found a couple of hoses that you suspected were used in the meth production, right?

A    Yes.

Q    And those were seized?

A    Yes.

Q    You don't know when they were used in meth production, if in fact that's what they were used for?

A    No.

Q    Could have been four years ago, could have been eight years ago?

A    Could have been the day before, I don't know.

Q    No way to tell, is there?

A    No, sir.

        MR. SMITH:  I want to ask that Government's 170 be displayed.

        THE COURT:  You may.

        MR. SMITH:  That's the actual exhibit, Your Honor.

2852

Q    (By Mr. Smith) That's those 48 syringes that I was talking about earlier, correct?

A    I believe the report reflected 46.

Q    Forty six syringes.  I'm sorry, sir.  And they're all new?

A    As far as I can tell the ones I see appear to be new.

Q    And in there also were some jewelry bags or some plastic bags; is that true?

A    There are numerous plastic bags, little Ziploc baggies.

Q    And I call them jewelry bags because I'm going to imagine that most of the members of the jury, if they've ever got something from a jewelry store that's probably what they'd reference it to.  Have you ever gotten anything from a jewelry store in a little bag like that?

A    No, sir, I have not.

Q    A chain that you've had repaired or anything like that?

A    No, sir.

Q    Okay.  Do you know where those bags were found?

A    I would have to refer to my report to refresh my memory.

Q    If you would, sir.

A    The baggies were located in the residence in what I

2853

call the bedroom of the residence.

Q   Do you have any other identifying information other than that?

A   No, sir, I do not.

MR. SMITH:   I'd like to put up Defendant's 209, if I may, Your Honor.   And it is in evidence.

THE COURT:   You may.

Q   (By Mr. Smith) All right, sir.   Do you recognize what this is a photograph of?

A   Looks like it might be the bottom of the gun cabinet, but I'm not for sure on that.

Q   Do you see this plastic box right here?

A   Yes.

Q   White plastic box.   Do you remember what was in that plastic box?

A   No, sir, I do not.

Q   Did you open that plastic box?

A   I did not.

Q   Okay.   So if those baggies were in that plastic box with scope screws and scope parts you wouldn't know any different?

A   Yeah.   I didn't open that box so I don't know what the contents of that box would be.

Q   So you can't tell if the baggies were not in that box, can you?

2854

A    No, I don't know where these -- these baggies where according to the report found in the bedroom.

Q    And this is in that bedroom, right?

A    I don't -- I don't recall, sir.

Q    When you're talking about the bedroom, you're talking about on the lower level in the east room?

A    Yes.

Q    And that's where the gun cabinet was?

A    I don't recall for sure.  I'm not arguing that it's not, but I don't recall.

Q    I understand and I do appreciate that, sir.  And that's what I'm getting at.  You can't tell us whether or not those baggies were in there along with various small screws that are associated with scopes and what have you?

A    No, I can't say that.

Q    Did you retrieve that box right there?

A    No, sir, I did not.

Q    Now, did you stay until this search was completed?

A    Yes.

Q    And you logged all the items, right?

A    Yes.

Q    And the upstairs in the residence was searched, the loft bedroom?

A    I believe it was.

Q    Okay.  And are you aware of any items removed from

that loft area?

A    No, I'm not.

Q    Do you know if there was a safe up there or not?

A    I don't recall.

Q    Did you go into that loft area?

A    Yes, I did.

Q    Did you spend any time in there or just stick your head up the stairwell?

A    Yeah.  I don't really recall the duration that I spent in there, if I was in there for an extended period or just looking out.  I don't recall.

Q    If there was a safe on the premises in that residence, is that something that conducting a drug search warrant that you'd be interested in getting inside of?

A    Yes, it would be.

Q    And do you recall whether or not there was a safe in the Barrett residence?

A    I don't recall, honestly.

Q    Do you recall any items at all being removed from that loft area out that window on the east side of the residence and deposited down on the ground on the east side of the house, including a safe?

A    Yeah.  Now that you refresh my memory, I recall something going out the window, but I don't really recall

2856

what it was.

Q    I'm going to show you Defendant's 162.

MR. SMITH:  And let me see if that's in evidence, Your Honor, before we -- I show that it is in evidence.  Ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Smith) Do you recall this being the east window of the loft area?

A    It looks familiar.  I'm not sure what those -- the bar looking things are, but the window looks familiar.  I know there was a window on the east end.

Q    Okay.  Now the bar thing, you're talking about that that's on the right side of the photograph?

A    No, actually the things that are over -- that thing there, yes, sir.

Q    Doesn't that appear to be the window that's pushed out?

A    Okay.

Q    The bottom frame of the window?

A    Okay.  Yeah, okay.  That makes sense, sure.

Q    Now, I'd like to show you 163.

MR. SMITH:  And it's in evidence as well and ask that it be displayed, Your Honor.  Actually, I'd like to show 164.

THE COURT:  163 is not in evidence.

2857

MR. SMITH:  164 is the one I'd like to show, Your Honor.

THE COURT:  It's not in evidence either.

MR. SMITH:  Okay.  Just display it to the witness and don't -- and I apologize, Your Honor, I had them checked off as having been admitted.

Q    (By Mr. Smith) Sir, have you looked at 164?

A    Yes.

Q    Can you see -- does that refresh your recollection as to any items being outside the east side of the Barrett residence while you were there?

A    This particular -- this picture doesn't really refresh my memory of anything I recall seeing.

Q    Nothing in there looks familiar to you?

A    No, not really.

Q    Do you know whether or not a safe was entered into?

A    I don't know.

Q    Is it pretty common, sir, whenever there's a safe found at a place where you suspect there's drug activity that that's where you'll find items of evidentiary value?

A    That's certainly possible.

Q    Pretty common, isn't it?

MR. SMITH:  Thank you, sir.  I don't think I have anything further.  Pass the witness, Your Honor.

THE COURT:  Redirect?

2858

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    You were contacted by your supervisor about possibly assisting in the execution of a warrant?

A    Yes.

Q    That was earlier in the week?

A    Yes.

Q    Earlier in the week of September the 24th of 1999?

A    Yes.

Q    Do you know who the -- where that warrant was to be executed?

A    Did I know at that notification?

Q    Yes.  Did you know if that was the Barrett warrant or not?

A    I don't recall being told specifically a location other than we're going to assist with a warrant.

Q    Do you even know if -- was it this warrant?  Did you learn later whether it was this warrant?

A    Yes, I did.

Q    Was it?

A    Yes.

Q    Were you all tactically equipped to execute a warrant such as this?

A    Not with the intelligence that we had received, you know, towards the end of that week.

2859

Q     Were you all as -- and this would be the local DEA squad in McAlester -- you all as trained as the Oklahoma Highway Patrol tactical unit?

A     No, sir, we were not.

Q     Were you equipped as well as the Oklahoma Highway Tactical Patrol unit?

A     No, sir.

Q     You were asked questions about grenade launchers and tracer rounds.  Do you know if any of those items were ever used by law enforcement in this warrant or if they were just left in their cars?

A     I don't have any knowledge of their use in this warrant.

Q     That trailer --

MR. LITTLEFIELD:  And I'd asked Government Exhibit 69 be displayed.

THE COURT:  You may.

Q     (By Mr. Littlefield) With whose property do you associate that travel trailer?

A     I would associate it with the property belonged to Mr. Barrett, Kenny.  Kenneth Barrett.

MR. LITTLEFIELD:  And if I could display Government Exhibit 60.

THE COURT:  You may.

Q     (By Mr. Littlefield) Did you find any mail, bills,

2860

items of identification in Gelene Dotson's name in that dumpster?

A    I don't recall anything with that name.

Q    If you had names would you have seized them?

A    Yes.

Q    Did you seize any evidence of anybody's name in that trailer, or in that dumpster, rather?

A    I would have to look at my report.  I don't recall specifically.

Q    Go ahead and look in your report.

A    I don't see anything in my report of having received -- seized any -- excuse me, exhibits with names on them.

Q    Had items been found with individual's name on them, anyone's name on them, would that have appeared in your report?

A    Yes, it would.

Q    Based upon that was anyone's name, Gelene Dotson, Kenny Barrett, Toby Barrett, anyone's name in there that you would be able to identify who possessed that dumpster?

A    No.

MR. LITTLEFIELD:  Ask Government Exhibit 215 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) She's trying to bring it in.

While she does so do you know what those are there? Those items there.

A    Those are the red pills from that exhibit.

Q    And the red pills were found in what, sir?

A    In the Styrofoam cup.

Q    Where did that aluminum foil come from?

A    The aluminum foil was surrounding, covering the cup.

Q    What is a cut?

MR. LITTLEFIELD:  And I'd ask Government 219 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) What was in that?

A    The white Styrofoam cup with the red pills.

Q    What's a cut in relation to meth manufacturer?

A    It's a substance used to reduce the strength of the finished product.

Q    To do what?

A    To reduce the strength of a finished product.

Q    How does that happen?

A    By adding to the total quantity it relatively reduces the weight -- I mean, the strength, under a ratio depending on how much cut you put into the substance.

Q    At the same time it reduces the strength, if you add a cut to a quantity of meth, reduces the strength because it dilutes it?

2862

A    Right.

Q    What does it do to the quantity of saleable product that one could sell as methamphetamine?

A    It increases the quantity.

MR. LITTLEFIELD:  I would ask that Government Exhibit 197 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) What was the condition -- the condition of this syringe, you said it had red in it?

A    Yes.

Q    What was the -- describe the red.  Was it solidified or liquid?

A    I believe it was a liquid.

Q    Does that give you -- would you say that that syringe had been placed there eight years previous?

MR. SMITH:  Your Honor, that's leading.

THE COURT:  Sustained.

Q    (By Mr. Littlefield) How long prior to your seizing that would you have estimated that syringe had been used?

A    To me it seemed very recent.  The contents were still liquid.

Q    That workshop, you indicated it might have been used for auto repair?

A    Well, the defense indicated that and I didn't disagree with that.

Q    You got any idea what else that place could have been used for?

A    There's lots of stuff in there.  I mean, it -- with the equipment we seized it could have also been used for a makeshift meth lab.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may.

MR. SMITH:  Thank you, Your Honor.

RECROSS EXAMINATION

BY MR. SMITH:

Q    Sir, I guess I want to start up there with your last comment.  I want you to identify for me and the members of this jury what was found in that workshop that tells you that was a lab?

A    The tubing with residue.

Q    Okay.  So we got three pieces of tubing that had residue in it, right?

A    Yes.

Q    Okay.

A    And the various chemicals in the lab, solvents.

Q    The various chemicals in the workshop.

A    I'm sorry.  In the workshop.  I apologize.

Q    I'm going to try to find those for us.  I'm going to show you Number 65 so we understand -- we're talking about the same thing.

2864

MR. SMITH:  This is Government's, Your Honor, if I may display it.

THE COURT:  You may.

Q   (By Mr. Smith) Let's talk about that.  You're talking about this mineral spirits and I've got my laser. It won't show on your screen.  We're talking about the mineral spirits?

A   Yes.

Q   Paint thinner?

A   Yes.

Q   And this toluol?

A   Yes.

Q   That says Coleman fuel.  I guess you're talking about that.  So you're saying because these were there you could use that in your lab with those three hoses, is that right?  But I'm just trying -- I'm looking for this lab that you just told us was in that workshop.  So I've got chemicals that are right here.  Any other chemicals?

A   Not in that photograph.

Q   Any other chemicals that are indicated in your report?

A   There were chemicals, yes, the red phosphorous.

Q   In that workshop.  You said in the workshop there was a lab in there?

MR. LITTLEFIELD:  Objection.  That's not what

he said, Your Honor.

MR. SMITH:  Your Honor, he was talk -- asked about the use of that workshop and he said with the items that were contained within that workshop, that it was a lab.

THE WITNESS:  No, sir.

THE COURT:  Well, you can ask him that question.

Q    (By Mr. Smith) Is that what you're telling us, sir? That there are items in there that you could use to make a lab?

A    I was asked on the hypothesis that it could have been a workshop, that it could also have been a lab.

Q    Right.  Because of the items that you found in there, right?

A    And throughout the residence and the area.

Q    You were asked about the workshop.  But we'll talk -- we'll add the whole area in there.  But let's start with the workshop while we're there.  Now you're saying there were other chemicals in the workshop other than what's depicted on here?  Or is this -- does this comprise those chemicals?

A    I don't recall all the chemicals in the workshop and I'd have to refer to my report for the actual location of other chemicals.

2866

Q    I don't mind you looking at your report.  And I'm interested in chemicals that were in that workshop that you say would be used to make a lab.  If you need to look at it, look at.  While you're doing that I'm going to ask you if you're familiar with MSE?

A    No, I'm not.

Q    When it says enamel underneath that label, what does that tell you?  What do you associate enamel with?

A    I've heard enamel with bad dentistry and with paint.

Q    With paint, right?

A    Yes.

Q    What's that symbol right there, if you can tell?  Do you need me to blow that up?

A    If you don't mind.

Q    That's not going to help us any, is it?  Maybe go just a little smaller.

A    Smaller.

Q    Still doesn't help us.  Let me ask you this, sir. Any reason to believe that's not an NAPA auto symbol? You're familiar with NAPA auto stores?

A    NAPA?

Q    Yes.

A    Yes, I am.

Q    You've seen their logos, haven't you?

A    Yes.

2867

Q    Blue and yellow, N-A-P-A, isn't that what that appears to be?

A    It could be.  I can't read the lettering but the colors look like it could be a NAPA symbol.

Q    You looked inside of that shop?

A    Yes.

Q    Do you recall this being a paint gun?  Right here, this can.

A    I don't recall specifically.

Q    Any reason to think that's not what it is?

A    I have no idea what that is.  I'm sorry.

Q    Now, you're familiar with auto painting?

A    Yes.

Q    Enamel, mineral spirits, paint thinner, toluol, all used in the preparation of vehicles and in the painting of them, isn't it?

A    I know those chemicals are solvents.

Q    Clean piece of metal, get it ready to paint.  Get your surface down there like you want it to be.  Would you agree with that?

A    I'm not sure, in that use, what they're for.

Q    So we've got these chemicals that you're saying are lab materials and we've got three hoses, okay?  Now, what else?  You got that Pyrex beaker?  Exhibit 12?

A    That was found in the residence.

2868

Q    Now we're kind of talking about everything we got here.

A    Okay.  And we had the iodine from the trash bin.

Q    Yeah.  And let's look at that.

A    Okay.

Q    Residue, wasn't it?

A    Yes.

Q    You're not going to be able to use that, nothing there?

A    Already been used.

Q    You said they're items in there that you can make a lab out of.  If it's not there you can't use it, correct?  Would that be true, sir?

A    For future labs.

Q    If it's gone how are you going to use it in the future?

A    If that's an expendable item, you still have the hardware.

Q    It's not there, right?  If it's not there how you going to use some -- how can you use something that's not there?  Okay.  What else?  And I'm going to help us out a little bit because this is what I'm getting at, sir.  This is my point.  I know as a trained investigator and as a trained drug agent when you go to a residence you're looking for things that are associated with

2869

methamphetamine production.  And chemicals such as these, you could associate with that, even though they may have some other legitimate purpose, but you're going to associate this with meth production because that's what you're looking for, correct?

A    That's one of the items we're looking for, sure.

Q    Various items, chemicals, glassware, hosing, you're looking for acid, right?

A    We're looking for anything that could be used in the production or could have been in the past used for the production of methamphetamine.

Q    Acid is a necessary ingredient to produce methamphetamine, isn't it?

A    Yes.

Q    Didn't find any acid out there?

A    Not on this search.

Q    Did you conduct another search?

A    No.

Q    So, because that's how I take your response, when you say not on this search maybe there's another one we haven't talked about.  Let's be clear.  One search, right?

A    Yes.

Q    No acid found, was there?

A    Correct.

Q    Okay.  How much alcohol did you find out there?

A    I don't recall.

Q    Did you find any?  Sir, I'm going to indicate to you you can look at that front to back.  There's no alcohol in your report.

A    Okay.

Q    You need to take the time to look, then take the time to look.

A    I'm not going to testify to something I'm not clear on.

Q    I understand.  And I don't want you to do that.  Didn't find any lye out there either, did you?

A    I don't recall.

Q    Lye -- excuse me?

A    I said I don't recall finding lye.

Q    Lye is a necessary ingredient for the production of methamphetamine, isn't it?

A    Yes.

Q    So when we talk about whether there was lab or that workshop can be used for a lab, I guess what you're saying to us is because it's a sheltered area that you can close up and you could be in there doing something behind closed doors, that's what you're saying you could use that for a lab, is that right?

A    If there are components for a lab there.

Q    Hoses, three hoses, right?  Wasn't any glassware in there?  How many labs have you been to when you walked inside of, that you saw a container there that was percolating and a hose coming out of it, that it was an actual lab functioning, that they were sure enough making methamphetamine?  How many of those have you found?

A    Not very many.

Q    You haven't found very many?

A    No, not that were operational, but there have been a few.

Q    Okay.  And that's what you found, isn't it?  Let me ask you about some other labs you've been on.  How many two layer liquids have you found?

A    There have been two layer liquids at several labs.

Q    And what's the purpose of a two layer liquid?

A    That's the process before the finishing out -- the gassing of that.

Q    Okay.  That indicates to you that there's a cook in progress, right?

A    Yes.

Q    Didn't find any two layer liquids out there, did you?

A    No, sir.

Q    So that's what I'm getting at.  When we talk about a lab or a workshop being able to use for a lab.  You

didn't find a lab, did you?

A   We found the components of a lab.

Q   You found some things that you can associate with the manufacture of methamphetamine, period, right?

A   I call it components, sir.

Q   But you didn't find a functioning lab.  You couldn't make a lab because you don't have all the ingredients.  You don't have alcohol, you don't have lye, you don't have acid, true?

A   We have precursors.

Q   Did you have alcohol, lye or acid?

A   No, sir, we had other components.

Q   Did you have alcohol, lye or acid?

A   I just said, no, sir, we had other components.

Q   You cannot make a lab without those three ingredients?

A   Not on that day.

Q   All right.  Now, I want to go back just a moment to this property issue and I want to put Number 69 up there, okay?

MR. SMITH:  If I may, Your Honor?

THE COURT:  You may.

MR. SMITH:  Government's.

Q   (By Mr. Smith) I'm going to encompass this whole frame in my question, okay?  You know who owns all that

2873

property?

A     No, sir.

Q     Don't know that Ms. Gelene Dotson owns the property?

MR. LITTLEFIELD:  Objection.  Assumes facts not evidence, Your Honor.

THE COURT:  Sustained.

Q     (By Mr. Smith) Whenever you -- who -- you attribute that dumpster to who?  This is where the dumpster was, isn't it?

A     Yes.

Q     You attribute that to who?

A     To the residence where Mr. Barrett, Eugene Barrett -- I mean, sorry, Kenneth Barrett occupied.

Q     Why do you not attribute it to this residence?  What is so unique about that dumpster that says it belongs to Kenny Barrett and not over here to this trailer?

A     Because it's right outside of that workshop.

Q     To the back of the property, closer to the trailer than it is to that camper, wouldn't you agree?  What it looks like on this picture, would you agree with that?

A     Maybe not toward the door located on the trailer, the door of the trailer, the exit door.

Q     You mean you'd have to walk out of the front and do that?

A     Or the back door at the bottom of your frame.

2874

Q Back here? Equally apply to either one of those, couldn't it? I mean, you want to say Kenny Barrett. There's nothing in there that indicates to you that he owned that dumpster?

A I just say it's much closer to the workshop than the trailer.

Q It's closest to that trailer.

A It's closer to the trailer also, yes.

Q It's closer to that trailer, to that small trailer, that little Scotty trailer than it is anything, isn't it? It's right next to it, sir. Isn't that closer to it than it is anything?

A Yes. Sure, it's next to the trailer and the workshop.

Q Now, when you talk about cut. First time we've heard cut mentioned in here. But I'm glad that it was asked of you. Nicotinamide, do you know what that is?

A I've heard of it. I'm not real familiar with it.

Q Are you aware of whether or not it's a nicotine replacement?

A No, sir, I'm not.

Q Kind of like a patch, you take this nicotine pill?

A I'm not aware of that.

Q You were asked about cut. Was there cut found out there or was there nicotinamide?

A    There was nicotinamide as determined by the chemist.

Q    And then one last area, sir.  You were asked about the various weapons and what have you, what was used. And I'm not asking you what was fired.  Okay.  Do you have any information that Mr. Danny Oliver, who was participating with this tactical team, a former member of that tactical team, whether or not he was carrying a .223 fully automatic weapon that had a grenade launcher attached to the bottom of it and also had his weapon loaded with tracer rounds?

A    What's your question again?

Q    Are you aware whether or not that's what he was carrying?

A    No, I have no idea, sir.

Q    Not that it was just in a trunk of a car somewhere, but that was the weapon that he was carrying?

            MR. LITTLEFIELD:  Objection.  Assumes facts not in evidence, Your Honor.

            THE COURT:  Sustained.

            MR. SMITH:  Pass the witness.

            FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    How difficult is it to obtain rubbing alcohol?

A    You could go to Wal-Mart or any drugstore.

Q    How difficult is it to obtain muriatic acid?

2876

A    Hardware store or pool supply would carry that.

Q    How difficult is it to obtain Red Devil lye?

A    Not difficult at all.

Q    Can you get it at Wal-Mart?

A    Wal-Mart, grocery store, sure.

Q    If we get those three items do you have a full lab?

A    Yeah.  Yes.

Q    You indicate -- Mr. Smith was asking you about the iodine in the trash and it having been used; do you recall that?

A    Yes, I do.

Q    Was there available iodine -- (Interrupted)

        MR. SMITH:  Objection.  I didn't say iodine has been used.  What I established was there was no iodine in the trash.  Didn't say anything about it being used.

        MR. LITTLEFIELD:  I'll rephrase it.

Q    (By Mr. Littlefield) Mr. Smith was asking about an empty iodine crystal container in the trash; do you recall that?

A    Yes, I do.

Q    Was there a full iodine crystal container found anywhere?

A    I would have to look at my notes on the submittals.

        MR. LITTLEFIELD:  May I return to the desk just a second, Your Honor?

2877

THE COURT:  You may.

A    Yes.

Q    (By Mr. Littlefield) Where?

A    Exhibit 11.

Q    Your Drug Exhibit 11 or Non-Drug Exhibit 11?

A    Let me make sure.  Drug Exhibit 11.

Q    Which was what item, sir?

A    The old camera which contained two plastic bottles.

Q    You were asked about glassware.  Was there glassware
available there beyond the Pyrex glass?

A    Yes.

Q    You had the solvent?

A    Yes.

Q    Are you aware of whether or not there was red
phosphorous found there?  Not by you all, but are you
aware of whether or not there was red phosphorous found?

A    I believe there was.

Q    And are you aware whether or not there was
pseudoephedrine pills?

A    Yes.

Q    Was there packaging for distribution?

A    Yes.

Q    Were there needles for use?

A    Yes.

Q    Were there scales for weighing?

2878

A     Yes.

Q     Were all these items in the workshop or where were we talking about finding these items?

A     Items were located in the workshop, in the trash bin, in the residence.

Q     And when you're saying residence, we're talking about that residence that's visible in Government Exhibit 1?

A     Yes.

Q     Now, in relation to associating this dumpster with either the trailer or this residence, were there any paper towels in that dumpster that would cause you to associate it with one residence or another?

A     Yes.

Q     What was on the paper towels?

A     We found paper towels with chemical stains.

Q     Which residence would you associate those paper towels in that dumpster with?

          MR. SMITH:  Your Honor, I'm going to object. How do you attribute one paper towel to a residence compared to another?  It's not like they have identifying marks on them.

          THE COURT:  I guess that's the question. Overruled.

Q     (By Mr. Littlefield) How did -- which residence

2879

would you associate the paper towels with?

A    With the residence pictured in Exhibit 1.

Q    Why would this -- (Interrupted)

A    Because of the chemicals found in Exhibit 1.  I mean, in the residence in Government Exhibit 1 would match the chemical analysis of the paper towels.

Q    Being what?

A    Red phosphorous.

Q    Are you aware of what the lab report reflected the chemical stains was to those paper towels?

        MR. SMITH:  Objection, Your Honor.  I think it's premature.

        MR. LITTLEFIELD:  Just asked him if he was aware of it.  Didn't ask him what it was.

        THE COURT:  You may answer whether you were aware of it or not.

A    I'm aware of the report.

Q    (By Mr. Littlefield) Which residence would the analysis -- (Interrupted)

        MR. SMITH:  Your Honor, I object to that. That's calling for a hearsay answer, answer based on hearsay, he's asking about the -- (Interrupted)

        MR. LITTLEFIELD:  I'll withdraw -- I'll withdraw the question.

        THE COURT:  Question withdrawn.

2880

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may.  Further cross examination?

FURTHER CROSS EXAMINATION

BY MR. SMITH:

Q    Sir, all of those items that were seized from the Barrett residence, from the workshop, from the dumpster, from the trailer, every one of them could be obtained from the store?

A    Yes.

Q    Wasn't anything prohibiting the purchase of any of those items?

A    No, sir.

Q    So when we talk about it's easy to go get alcohol, easy to go get acid, it's easy to go get red lye, it's just as easy to go get all this other stuff, too, isn't it?

A    I'm not familiar with how the -- you obtain red phosphorus, but all the other items would, yeah, easily accessible.

Q    Let's talk about the red phosphorus for a minute. It's not something that you all seized, correct?

A    I would have to look at my report.  I don't recall.

Q    Well, you said earlier with Mr. Littlefield's question that it wasn't something that you all seized but

2881

you're aware that there was some out there at the residence. See if this refreshes your recollection. That red phosphorus was found in the pockets of Kenny Barrett?

A    I don't recall that. If I said that, I don't recall. I'm sorry.

Q    Let me ask you this, sir. As you all are finding items out there at the residence, is it being announced what was found?

A    Being announced?

Q    Yes, sir.

A    I don't recall an announcement being made.

Q    Somebody comes out of the trailer and says, okay, I found this, log this, Mr. Nixon. I found this, log this, Mr. Nixon?

A    Yes.

Q    People that are out there know what you're finding, right? Other law enforcement? They're watching, they're curious. What do we have here, right?

A    Yeah. I'm not sure -- the way you described it, they would bring the evidence to me and I would log it in. That's correct.

Q    I'm asking you to confirm with me that other law enforcement personnel at that scene would be understanding and realizing what it is that you're

2882

finding in your search?

A    I'm not -- I mean, most of the other law enforcement personnel had their own responsibilities and who was overhearing what we were searching for, you know, I'm not aware of that.

Q    I noticed that of those 12 names that you have in your report out of the 35 people that were out there at the scene, you saw fit to put Stanley Philpot's name on your report?

MR. LITTLEFIELD:  Objection.  That's cumulative, Judge, and it's beyond the scope of any redirect.

MR. SMITH:  Your Honor, it's not as it relates to the red phosphorus and that is my area of inquiry.

THE COURT:  Well, tie it up because it's not -- unless you do it's not related.

MR. SMITH:  I will, Your Honor.

Q    (By Mr. Smith) You noted his name amongst -- it's the last name that you had on your report, number seven, paragraph seven?

A    It's actually mentioned twice in the report.

Q    And are you aware that Stanley Philpot delivered clothing to the OSBI as it was getting dark, the Barrett clothing that he says -- or excuse me -- that ultimately was found to contain red phosphorous?

2883

A    I'm not aware of that.

Q    But you note Stanley Philpot was out there during the day while you all are conducting your search?

A    I believe the reason I noted him in our report was because he was one of the transport officers.

Q    Doesn't say transport in your report.  It says other individuals on the scene, right?

A    Well, if you read it in the disposition of the Defendants, in paragraph one, it does mention in my report.  So, I mean, that's where the second time he's mentioned in my report.

Q    So what you're confirming for me is that you knew there that Mr. Philpot had possession of Kenny Barrett and his clothing?

A    That's what I was told as far as the Defendant disposition.

Q    All right, sir.  And red phosphorus is a necessary ingredient for the production of methamphetamine?

A    Yes.

Q    And there wasn't red phosphorous found at the residence?

A    I would have to look at my report to --

(Interrupted)

Q    Then look.  It was found in the clothing of Kenny Barrett that was delivered by Stanley Philpot some more

2884

than 12 hours -- 18 hours later?

MR. LITTLEFIELD: Objection. Assumes facts not in evidence.

THE COURT: Sustained.

Q     (By Mr. Smith) Go ahead and look, sir.

A     The only thing that I see that contained red phosphorous was Exhibit 5.

Q     And there was no quantity of red phosphorous in Exhibit 5, was there?

A     I believe that would be more properly answered by the chemist on his report for the amount of grams that were found.

Q     Then we'll let them talk about that but there is no appreciable quantity. I mean, you know that. You know what was found out there. You logged it into evidence?

A     I'm looking at what the report says, which I won't testify to.

Q     All right, sir. And let me ask you about this: Do you recall whether or not that camera, where you said that iodine was found, up on the shelf, whether or not fingerprint analysis was conducted of that camera?

A     My report did not request a fingerprint analysis of that camera.

Q     You don't know whether it was submitted or not based on your report; is that true?

2885

A    Yeah.  I didn't ask for it.  If it was submitted for another reason, I'm not aware of that.

Q    Could have been.  You just wouldn't know about it?

A    That's correct.

        MR. SMITH:  All right.  Pass the witness, Your Honor.

                FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Did other law enforcement agencies besides DEA agents conduct -- or were they involved in conducting the drug search?

A    Not that I'm aware of.  That was just the DEA personnel.

Q    Was it lawful to possess 1426 pseudoephedrine tablets?

        MR. SMITH:  Your Honor, that's out the scope.

        THE COURT:  Sustained.

        MR. LITTLEFIELD:  May I be heard?

        THE COURT:  No.

        MR. LITTLEFIELD:  Okay.  No further questions.

        MR. SMITH:  Nothing further, Your Honor.  As far as I'm concerned he may be excused.

        THE COURT:  May this witness be excused?

        MR. LITTLEFIELD:  Yes, Your Honor.

        THE COURT:  Sir, thank you for your testimony.

2886

You may step down. You may be excused.

We'll take a recess at this time. We should be experienced. I'm trying to hold it to 20 minutes. I know with all the people we move around it takes awhile. So keep that in mind. I'll ask you to remember my admonition not to discuss this among yourselves or let anyone else discuss it with you. And everyone be seated as the jury leaves the courtroom.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT: Let the record reflect the jury has departed the courtroom. My clerk has furnished me with a stipulation regarding the testimony of Kelly Karnes. Do you desire that I read that before the next witness?

MR. LITTLEFIELD: Yes, Your Honor.

THE COURT: Anything further?

MR. SMITH: No, Your Honor.

THE COURT: Is that correct?

MR. SMITH: I don't have -- (Interrupted)

THE COURT: The Kelly Karnes stipulation you agree to?

MR. HILFIGER: Yes, that's correct.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT: Call your next witness.

2887

MR. LITTLEFIELD:  I'd ask that the stipulation be read, Your Honor.

THE COURT:  You may.  Members of the jury, both the Government and the Defendant counsel have advised the Court that I should read the following stipulation.

The parties to this action, the United States of America represented by the United States Attorney, Sheldon J. Sperling and Assistant United States Attorney, D. Michael Littlefield and Defendant Kenneth Eugene Barrett appearing in person by counsel, Roger A. Hilfiger and Brett A. Smith stipulate as follows:  One, if Kelly Karnes, and it's K-a-r-n-e-s, were to testify, his testimony would be that on November the 2nd, 1999 he transported the Defendant Kenneth Eugene Barrett, who he can identify in court to the Sequoyah County Memorial Hospital for a medical procedure related to Barrett's gunshot injuries.

And second paragraph, Karnes will further testify that he received the projectile marked Government Exhibit Number 120 from Dr. Wood, placed it in a plastic pill container and delivered it to Sheriff Johnny Philpot on the same day.  Respectfully submitted, Sheldon J. Sperling, United States Attorney and signed by D. Michael Littlefield, Assistant United States Attorney.

I would ask that the -- this copy that I have

2888

is signed only by Mr. Littlefield.  Is there a signature -- everyone signed that?  Okay.  If you would mark that as Court Exhibit 2 for the record.  You may now call your next witness.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  I would ask that the Court explain the implication of a stipulation to the jury.

THE COURT:  There will be an instruction when the case closes as to the use of a stipulation and how you should deal with it from an evidentiary point of view.  But for now, be aware that you may accept this stipulation as if Kelly Karnes had appeared here and testified under oath to the facts set forth in the stipulation.

And perhaps it would be appropriate to send the stipulation to the jury during deliberations so you can review it.  Without rereading the stipulation, it's fairly simple.  I think the point of the stipulation is that Mr. Karnes would testify concerning receiving the projectile marked as Government Exhibit 120 from Dr. Woods and that he placed it in a container and delivered it to Johnny Philpot.  You can accept this stipulation as if Mr. Karnes testified here in open court.

2889

MR. LITTLEFIELD:  Thank you, Your Honor.  The Government would call David Love.

THE COURT:  You may.

DAVID LOVE,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record, please, sir.

A    My name is David Love.

Q    Mr. Love, how are you employed?

A    I'm a supervisory forensic chemist for the Drug Enforcement Administration.

Q    Okay.  You may need to lean a little bit -- I'm just picking you up.  And where are you -- a what now?

A    Supervisory forensic chemist.

Q    What's the difference between a supervisory forensic chemist and a forensic chemist?

A    A forensic chemist does most of the routine analysis and bench work associated with evidence analysis.  A supervisory forensic chemist would be the one that assigns the work and reviews the work.

Q    Have you -- how long have you been a supervisory forensic chemist, sir?

A    Almost one year now.

Q    Where are you -- where are you located now?

A    Currently I'm located at the DEA Southwest Laboratory which just north of San Diego in a town called Vista.

Q    Vista?

A    Vista.

Q    And prior to being at the Southwest Regional Laboratory in Vista, California, where were you located, sir?

A    Then I was in the South Central Laboratory located in Dallas, Texas.

Q    And how long were you at the South Central Lab approximately?

A    Approximately six years.

Q    What duty did you fulfill at the South Central lab in Dallas, sir?

A    At the South Central Laboratory I was a forensic chemist.

Q    And what does a forensic chemist do?

A    Well, the primary responsibilities of a forensic chemist are for the analysis of physical evidence submitted to the laboratory.  That's typically the drug evidence in a case of the Drug Enforcement Administration.

Q    And what training and background did you have to

2891

qualify you as a forensic chemist, sir?

A    Well, I received a bachelor of science degree in Chemistry from Wichita State University and then when I was hired by the DEA.  I completed an on-the-job training program -- (Interrupted)

Q    When did you complete the bachelor, sir?

A    That was 1996.

Q    Okay.

A    It was Wichita State University in Kansas.

Q    Then you were hired by the DEA when?

A    That was 1998.

Q    And what happened when you got to the DEA?

A    Then the DEA South Central Laboratory starts an on the job training program which is roughly six months of training focussed on the applications of chemistry towards drug analysis and the techniques used to identify drugs and substances used to manufacture drugs.

Q    And how long did you spend as a forensic chemist?

A    About six years.

Q    Have you previously been qualified to testify as an expert in the area of drug analysis, sir?

A    Yes, I have.

Q    Where?

A    I testified in McAlester, in Dallas.

Q    McAlester, Oklahoma?

2892

A    McAlester, Oklahoma, yes.

Q    That have been -- have you been qualified as an expert in the area of drug analysis previously in the Eastern District of Oklahoma?

A    Yes.

Q    Where else, sir?

A    Besides McAlester, it would have been New Orleans, Louisiana, Dallas, Texas, Corpus Christi.  This year I also testified in Lovington, New Mexico, Amarillo, Texas. That's all I can remember at the moment.

Q    What area of the country did the South Central Laboratory -- or areas of the country did the South Central Laboratory serve, sir?  What states?

A    Those would be New Mexico, Texas, Oklahoma, Arkansas, Louisiana, Mississippi and Alabama.

            MR. LITTLEFIELD:  Your Honor, I would ask that Mr. Love be qualified as an expert in the area of drug analysis.

            THE COURT:  Any objection?

            MR. SMITH:  No objection, Your Honor.

            THE COURT:  That will be the order of the Court.

Q    (By Mr. Littlefield) Mr. Love, you're aware of what we're here about today?

A    Yes.

2893

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 218 be displayed to the witness.  And it is in evidence.  It will show up on the scene to your left and also be depicted on the -- kind of jumping around but it's up there, too -- well, it was until I said that.

Q    (By Mr. Littlefield) Do you recognize what you view there, sir?

A    This is a DEA evidence envelope, heat sealed evidence envelope.

Q    Do you recognize specifically that evidence envelope, sir?  And we're going to try and bring it a little -- enlarge it so it just basically incorporates the envelope.

A    Yes.  I recognize this as a piece of evidence that I would have analyzed.

Q    Okay.

A    I can see my initials are here.  Basically what this is you see inside the evidence envelope is the lower strip of the heat sealed evidence envelope.  When we receive it, we cut open the bottom to preserve the original top seal.  And in this case I would have written the laboratory number, the date and my initials and that's what that strip of plastic there is.

Q    Was it sealed when you received it?

2894

A     Yes.

Q     And how was it received?

A     How was it received?  Do you mean how did it arrive?

Q     How did it arrive at the lab and when?

A     This particular piece of evidence came in registered mail.

Q     And when did it arrive at the South Central lab, sir?

A     It would have arrived on October 27th.

        MR. SMITH:  May we have the year of that, please?

        MR. LITTLEFIELD:  I'm sorry, yeah.

        THE COURT:  You may.

Q     (By Mr. Littlefield) Go ahead and provide the year.

A     October 27th, 2003.

Q     When did you perform your analysis?

A     Could I refer to my notes and I can tell you?

Q     Sure.

A     My analysis was performed November 26th, 2003.

Q     November 26th?

A     Yes.

Q     What specifically did you analyze, sir, and can you see what specifically you analyzed, and if so identify it?

A     Yes.  There's a red and white straw, you can see it

2895

right here, that I observed when I opened the heat seal. Contained an off-white color residue in the interior surface. And that is what I analyzed.

Q    And how did you go about performing your analysis, sir?

A    Well, the first test I did was an infrared analysis. And to perform that, I basically scraped some of the residue from the interior surface of the straw to perform the infrared analysis.

Q    What is the infrared analysis and how is that done? How is that performed?

A    Well, the infrared analysis is basically -- the way it works is it uses an infrared spectrometer or spectrophotometer. And it basically measures the ability of a substance to absorb infrared radiation. The way a substance absorbs infrared radiation depends upon the way it is assembled at the molecular level. So in effect it gives you a fingerprint with which to identify something.

Q    And you're result from the infrared analysis was what?

A    It was inconclusive.

Q    Why was it inconclusive?

A    Well, the -- one of the weaknesses of infrared analysis is if you have a mixture of substances the results are essentially a mixture. Everything lays on

2896

top of each other. So you can't clearly see each particular individual components in the mixture. It's sort of like if you had three or four squares of colored glass. You put them all together, you can't clearly see the color of each individual piece of glass.

Q   If you would have had a pure item, an uncut powder, would you have been able to have a different result with the infrared analysis?

MR. SMITH: Your Honor, I'm going to object. There hasn't been any testimony about a cut or anything like that.

MR. LITTLEFIELD: There had been.

THE COURT: No.

Q   (By Mr. Littlefield) Had you had a pure item would you have had a -- expected a different result in an infrared analysis?

A   Yes.

Q   After the infrared analysis was inconclusive, what then did you do, sir?

A   Well, then I performed a methanol rinse of the interior surface of the straw.

Q   What's a methanol rinse do?

A   Methanol is just an alcohol. So basically, drop wise, I passed a little bit of alcohol through the inside of the straw and collect what comes out the other end.

Q   Then what do you do with what comes out the other end of the straw and the methanol rinse?

A   Yeah.   Then I prepare that for an analysis by gas chromatography and mass spectrometry.

Q   And -- (Interrupted)

A   Abbreviated GCMS.

Q   Okay.   And what's the -- and I can say it, but I'm going to go the GCMS anyway.   What's the GCMS do?

A   Well, the GCMS is essentially a coupling of two instruments, the gas chromatograph is an instrument of -- (Interrupted)

Q   I sorry.   Slow down just a little bit.   You're talking faster than I can hear.

A   The GCMS is actually a coupling of two instruments. GC is the gas chromatograph.

Q   Okay.

A   And the MS is the mass spectrometer.

Q   Okay.

A   So the GC, the gas chromatograph, essentially is able to separate mixtures of volatile compounds.

Q   What's a volatile compound?

A   That's something that evaporates.

Q   So, and when it separates the compounds which are capable of evaporation, what then are you able to discern?   What do you do?

2898

A    When they pass through the gas chromatograph, there's a component in the gas chromatograph called a column which is basically a very, very small tube and in layman's terms you can say the interior surface of that tube are sticky.  And different components stick to the sides at varying degrees.  So the end result of this process is what was introduced to the gas chromatograph as a mixture exits the instrument one component at a time.

Q    So it basically -- essentially it purifies it?

A    Well, that would be one interpretation, yes.

Q    Okay.  But it separates out what was in there?

A    Yes.

Q    And once that separation is done, what are you able to do with that, sir?

A    Well, with the GCMS, the components then pass through the mass spectrometer portion of the instrument.

Q    Okay.

A    And the mass spectrometer breaks molecules apart. And scientifically we've observed that molecules break apart reproducibly.

Q    I'm sorry.  I didn't understand the last part. Break apart what?

A    Reproducibly.  That means -- (Interrupted)

Q    Reproducibly?

2899

A     The same way every time.

Q     Okay.  And then what happens -- what happened when you passed this through the mass spectrometer, sir?

A     Then I received the results of the analysis.

Q     And how are you able to view -- when it breaks apart, how are you able to view the results?

A     As a graph.

Q     Okay.  And so, when you get the graph of the unknown item, how is that displayed?  I mean, is it a bar graph, peaks and valleys, pie chart, what kind of deal is it?

A     Well, with the GCMS, again, since there's two instruments, there's two sets of results.

Q     Okay.

A     One is going to be the gas chromatograph results which is simply a graph of time versus intensity.  So whenever something exits the gas chromatograph, you'll get a peak.

Q     You get what?

A     A peak.

Q     Okay.  And then on the graph that's produced by the mass spectrometer, what kind of graph is produced by that, sir?

A     That's a graph which shows the weight of each individual fragment as the molecule is broken apart versus abundance.

Q     And what does the weight versus abundance show you?

A     Basically that shows me, in effect, another fingerprint of the molecule.

Q     Do similar molecules come out the same way all the time or are they -- do they come out differently?

A     Well, it depends on how similar you're referring to.

Q     Well, I mean molecules of the same substance.

A     Molecules of the same substance appear the same every time.

Q     And so, when you take the graph that's produced by the gas chromatograph and the graph that is produced by the mass spectrometer, what do you do then after you have those that have been prepared from the unknown substance? What do you do with those, sir?

A     I then compare those to known authentic standards to see if whether or not they're consistent with one another.

Q     And how -- and when you say -- how do you make a comparison with a known authentic standard, sir?  What's that mean?

A     That means, for example, if the results of my analysis show what appears to be methamphetamine, I compare that with a known authentic sample of methamphetamine.

Q     When you've done the known -- what are you comparing

2901

the graphs to for the unknown with the known standards?

A    With the GCMS I can compare either the retention time or the fragmentation of the mass spectrometer or both.

Q    You put the known graph up side by side with the unknown or what?

A    Yes.

Q    And did you perform that analysis on the residue which was in this straw?

A    Yes, I did.

Q    And do you have a conclusion based on running the gas chromatograph exam and the mass spectrometer exam as to what the unknown substance in that straw was, sir?

A    Yes.  My opinion based upon that test was that the substance and results were consistent with methamphetamine.

Q    When you say consistent, what's that mean?

A    That means the results that I observed were exactly like those that come out with a known entity.

Q    Do you have an opinion as to whether that was methamphetamine or not in that straw?

A    Yes.

Q    What is that opinion?

A    The straw contained methamphetamine.

Q    And did you make a report of that determination,

2902

sir, after running the examination on that particular item?

A    Well, I did two more tests in my reports.

Q    What else did you do?

A    Okay.  I also did what's known as a TF/APC, which stands for trifluoroacetyl prolyl chloride.

Q    Run that one by again?

A    Trifluoroacetyl prolyl chloride.  And that's a derivatization -- (Interrupted)

MR. LITTLEFIELD:  Does he need to spell that one?

Q    (By Mr. Littlefield)  It might help.

A    Okay.  Tri, of course, is t-r-i, fluoro, f-l-u-o-r-o, acetyl, a-c-e-t-y-l, prolyl, p-r-o-l-y-l, chloride, c-h-l-o-r-i-d-e.

Q    And what does that show, sir?

A    What that is is a derivatization and it basically allows me, by also running the same GCMS with the derivatized sample from the straw, allows me to determine whether the methamphetamine present is in the D-isomer or the L-isomer form.

Q    What was this, D or L?

A    This was D.

Q    In reality, both isomers -- what's -- do you know what the legal status of both isomers is?

2903

A      All salts and isomers are controlled.

Q      So, either one's illegal?

A      Yes.

Q      But in this case it was D-Methamphetamine?

A      Yes, it was.

Q      And you said you did one more, didn't you?

A      One more test is again a gas chromatograph test. But this one, rather than having a mass spectrometer attached to it had an infrared detector.  And basically this is very similar to the first test I performed, but now by passing it through the gas chromatograph, rather than seeing a mixture, I can see each individual component one at a time.

Q      So instead of having four or five panes of glass you pull them apart?

A      One at a time.

Q      And when you pulled them apart and looked at them one at a time, what did you see in your infrared analysis?

A      Again, I saw the presence of methamphetamine.

Q      After running all these examinations and reaching your conclusion as to what was in that straw, did you perform an analysis or did you prepare -- did you prepare your report or a report of your findings?

A      We have -- each analytical group has a program

2904

assistant and they type up the DEA Form 7.

Q    And you review it and signed it?

A    Yes.

MR. LITTLEFIELD:  I would ask Government Exhibit Number 80 to be provided to this witness.  And it's not yet in evidence.  I said provided, displayed might be better term.

THE COURT:  You may.

Q    (By Mr. Littlefield) You observe on the monitor to your left what's been marked as Government Exhibit Number 80, sir?

A    Yes.

Q    And are you familiar with what Government Exhibit 80 is, sir?

A    Yes.  This is the report of drug property collected, purchased or seized, also known as a DEA Form 7.

Q    And you mentioned that an individual who is there to assist you types up the report of your examination.

A    Yes.  It's just the lower half of this form is reserved for laboratory analysis.

Q    And I think that Government Exhibit Number 218 identified a drug exhibit number that had been assigned by the McAlester DEA office.  What was that exhibit, 13?

A    It was 13.

Q    Thirteen?

2905

A    Yes.

Q    And is this -- does this contain your report on their Drug Exhibit 13 as well as what they submitted to you in requesting the analysis?

A    Yes, it does.

MR. LITTLEFIELD:  Your Honor, I would move admission of what's been marked as Government Exhibit Number 80.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, brief voir dire, if I may?

THE COURT:  You may.

MR. SMITH:  May I leave something with the witness, Your Honor?

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Sir, you call this a DEA 8?

A    It's a DEA Form 7.

Q    Seven.  I'm sorry.  And I've shown you another DEA Form 7; is that true?

A    Yes.

Q    That relates to this same submittal?

A    It appears to.  It has the same DEA file number and exhibit number.

2906

Q    It relates to Exhibit Number 13; is that correct?

A    I would assume.

Q    I mean, we're -- (Interrupted)

A    I've never seen this document before, so I don't really know how it came into existence.

Q    Well, that's kind of what was confusing me.  This is the similar submittal form as to what is shown in Government's Exhibit Number 80, is it not?

A    Yes, it's similar.

Q    Other than that, it doesn't -- that has a little more information in the remarks section, the one that I showed you, compared to Government's Exhibit Number 80; is that true?

A    Yes.

Q    But you don't know who generated that or where it came about other than it's a form that's consistent with submittals that are used in the DEA?

A    That's true, yes.

Q    And you've never seen what I just showed you?

A    No.

        MR. SMITH:  No objection to Number 80, Your Honor.

        THE COURT:  The document that you showed the witness, for the record should be identified as what?

        MR. SMITH:  I'm going to mark it, Your Honor,

2907

as Defendant's Exhibit Number 219, I believe is where I'm at.  220, Your Honor.

THE COURT:  220 for identification?

MR. SMITH:  Yes, sir.

THE COURT:  Government Exhibit 80 then will be admitted without objection.  You may proceed.

MR. LITTLEFIELD:  I'd ask it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And rather than tapping, you've got a laser pointer right in front of you and if you press that button it'll --

Now, when the exhibit comes into the lab, which portion, if any, of Government Exhibit 80 is filled in prior to the laboratory receipt?

A    Blocks one through 18.  Eighteen stops right here.

Q    And I see in the middle of it right below the signature of where Juan Beal signed, there's a laboratory evidence receipt report.

A    Uh huh.

Q    From that point, who is responsible or which portion of the DEA responsible for filling out this portion?

A    The laboratory evidence custodians are responsible for this middle section here.

Q    Okay.

A    That tracks how it came in.  If there's a registered

2908

mail number that's indicated here.

Q   Okay.

A   And the evidence technician that signed for it and the date.

Q   Okay.

A   And then the lower form here is prepared after the analysis.

Q   Where it says laboratory report?

A   Yes.

Q   And where is -- where is it shown where your opinion is that this contained D-methamphetamine?

A   Here and here.

Q   And I note you show the -- what's the difference between the gross weight which is here and the net weight which is here?  And what are you trying to show the distinction between in those two items, sir?

A   Gross weight is the weight of the entire heat sealed evidence envelope.  So that's all the packaging.  If the evidence came in in a box with packing material, the gross weight reflects the weight of everything.

Q   So it's the item itself and everything that comes with it?

A   Yes.

Q   And what does the net weight show, sir?

A   Net weight is simply the substance of interest, what

2909

was analyzed.

Q    So in this case the net weight was?

A    It was just a residue.

Q    Now, when you're talking about net weight, do you include even the straw?

A    No.

Q    So it's just the powder?

A    Yes.

Q    And you mentioned that you had to run rinses and stuff.  What portion of the contents of the straw is it that you're weighing when you get the net weight and determine it's residue?

A    Well, there is no number associated with residue. The residue -- (Interrupted)

Q    Well, I understand -- okay.  My -- maybe my question wasn't properly phrased.  How are you able to get the item which you weighed and report as residue?  How do you get it on a scale or whatever?  In this case what did you weigh to get -- (Interrupted)

A    There's no way -- (Interrupted)

Q    Did even try a way?

A    By definition, a residue cannot easily be weighed.

Q    Not even enough to weigh?

A    Right.

Q    Okay.  Where is your signature on this item, sir?

2910

A    Right there.  It's box -- box 34.

Q    And I see here it says date completed 12/2/03?

A    Yes.

Q    What day was it that you did your analysis?

A    November 26th.

Q    Why is there a distinction or difference between the November 26th date when you did your analysis and this date on which is purported to have been completed, sir?

A    December 2nd is the date that the completed report was finally submitted to the supervisor.

Q    So that's the date that the laboratory director signed off on it?

A    That's the day that I submitted it to the supervisor.

Q    Submitted to him?

A    Yes.

Q    And in fact, is there a date indicated as to when he approved of it on Government's Exhibit 80?

A    The laboratory director?

Q    Yes.

A    Looks like it's December 12th.  His handwriting is not very legible, but it looks like December 12th, 2003.

Q    Okay.  So he waited about 10 days before he said, yes, it looks okay for me and signed off on it?

A    Yes.

2911

Q    And is that what you're doing now, signing off on them?

A    Not as the laboratory director, no.

Q    Are you signing off as the supervising forensic chemist?

A    Yes.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examination.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q    Sir, do you know where this straw was found?

A    I have no personal knowledge.  All I know is what I read in the box 16 remarks on the DEA Form 7.

Q    Okay.  And I'd like to show you what has been identified as Defendant's Exhibit Number 220, not in evidence.  That's the one I showed you previously during your voir dire.

MR. SMITH:  Mr. Littlefield, it's Bates Number 200.

Q    (By Mr. Smith) That has the remarks section and again this refers to what's previously been introduced as

2912

Government's Number 80, correct?

A    Yes.

Q    That has a little bit more identifying information as to where this straw was found on Defendant's Exhibit 220; is that correct?

A    Yes.

Q    Okay.  And that information for some reason was left off of the submittal that you saw which was Government's Exhibit Number 80?

A    Yes.

Q    There's some other dates and what have you, but they don't really appear to be that relevant, do they?  I mean, that's nothing major to us, right?

A    I wouldn't know if they were relevant.

MR. SMITH:  I would move for the introduction of 220, Your Honor.

MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.

MR. LITTLEFIELD:  May I ask a question, a voir dire, Judge?

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. LITTLEFIELD:

Q    In viewing what has been marked as Defendant's Exhibit Number 220, have you seen this before, sir?

2913

A     No.

Q     If you look back to Government Exhibit Number 80, do you note and do you have in front of you a hard copy of what you previously viewed as Government Exhibit 80?

A     Yes.

Q     And rather than put it up, if you'd look at Government -- your hard copy of Government Exhibit Number 80, does it reflect that Government 80 was submitted on one occasion to the lab and that there was some kind of problem with it and that as a consequence it was submitted a second time, that what you have was a re-submittal by the agency in McAlester?

A     No, I don't see any indication of that.  Oh, wait, here we go.  The last sentence in Box 16 says on October 23rd, 2003, task force officer Beal resubmitted Exhibit 13 to the South Central Regional Lab via U.S. Postal Service.

Q     Does it show also the previous sentence that Exhibit 13 was processed as evidence and sent to the SCRL, which I assume is the South Central Lab?

A     South Central Regional Lab, yes, sir.

Q     On October 6th and on October the 23rd, Exhibit 13 was returned to Resident Agent in Charge or RAC Lee?

A     Yes, I see that.

Q     Does that then reflect that initially it was

2914

submitted, there must have been some problem with the method of submission, it was returned and then resubmitted?

A     Yes.

Q     And would that re-submittal show up in Defendant Exhibit Number 220?

A     That's possible.

Q     Would that be an explanation for the additional information and why there is a difference between the -- in the remarks on the two exhibits, sir?

A     Yes.

Q     Does your analysis show on Defendant Exhibit Number 220?

A     No.

Q     So the guts of what you did was on Government Exhibit 80?

A     Yes.

          MR. LITTLEFIELD:   I don't have any objection to the Defendant's Exhibit 220, Judge.

          THE COURT:   Be admitted without objection.

          MR. SMITH:   Thank you, Your Honor.   I'd ask that 220 be displayed.

          THE COURT:   You may.

Q     (By Mr. Smith) And, sir, what I've highlighted up there is what is not on Government's Exhibit Number 80

2915

which is the one that you worked off of.  But I'm talking about -- and if you can see what I've got with my laser up here.  N-2 was found in a trailer behind the shop, adjacent to the residence.  That was left out of Government's Exhibit 80, right?

A     Yes, it was left out.

Q     And then also down here midway through that paragraph, during the copying, Task Force Officer Beal found Drug Exhibit 13 in the side pocket of the address book.

A     That does not appear on my copy of Exhibit 80 as well.

Q     Right.  You don't know why the remarks in 16 on Government's 220 would be different from Government Number 80 as you described, right?

A     I can speculate but I have no personal knowledge.

Q     Right.  And we don't want you guessing, we want you to tell us if you know, but you don't know.  All right, sir.  I'm going to guess in school you did real well, didn't you?

A     I did pretty well.

Q     I'll bet.  Just to be clear, you're not telling the jury that there was a bunch of dope in that straw and through the process that you used to test it a bunch of it got lost or wasted or anything like that.  I mean,

2916

there was residue when you started and there was residue when you finished, right?

A   Well, residue is kind of like dust.  And there was residue when I started, but keep in mind the process of analysis and especially when you're rinsing the interior surface, some of it will be consumed.

Q   Okay.

A   The only way to know whether it's all gone is if you continue analyzing it until it's all gone.

Q   May have been something left there to analyze later, may not have been.  But it wasn't very much whenever we started, was there?

A   True.

Q   And you don't know how long that residue had been in that straw?

A   No.

Q   Don't know how it got there or how long it had been there?

A   No.

Q   Do you understand that this straw was seized in September of '99?

A   That's what I infer -- (Interrupted)

Q   From the report?

A   From the report, yes.

Q   And that you tested it in '03?

2917

A    Yes.

Q    And so, it's at least been four years since you tested it, correct?

A    Between the time of -- (Interrupted)

Q    Seizure and when you tested it?

A    Yes.

Q    Could have been there four years, you just don't know?

A    No.

Q    There's no way to tell, right?

A    No way.

Q    All right, sir.  Are you familiar with whether or not there is residue on paper money that's in circulation in this country?

A    Yes, I've -- it's been awhile.  It seems like there are some information I've seen that currency contains residue.

Q    Is it along the lines of 60 percent of the 20 dollars in circulation currently have residue that would test positive for the presence of controlled dangerous substance?  Is that what you've seen?

A    I don't recall a number.

Q    But it's very large, it's kind of shockingly large, isn't it?

A    Not really.  It wasn't very shocking to me.

2918

Q    Because it's common with what you analyze or what?

A    Just because the instrumentation today is sensitive enough to detect trace amounts and knowing that money rolled into tubes is occasionally substituted as a straw, I mean it only makes sense.  Especially when a lot of the banks use these automated counters, that money comes into contact with, you know, close proximity any way, with other bills, that there's going to be crossover.

Q    So there's a lot of residue on a lot of bills, isn't there?

A    I have not performed any analysis myself but --

Q    Okay.  When we say residue, and I think you described it as dust?

A    Residue is like dust.

Q    Can't weigh it really, can you?

A    No.

Q    I mean, I guess there's some instrument might be able to weigh it, but really there's no practical reason to weigh it because there's such a small, small quantity?

A    That's true.

Q    All right, sir.  Thank you for your time.

A    You're welcome.

MR. SMITH:  Excuse me.  Did I move for the introduction of 220, Your Honor?  I did, didn't I?

MR. LITTLEFIELD:  Yes, and I didn't object.

2919

THE COURT:  It's admitted without objection.

REDIRECT EXAMINATION

BY MR. SMITH:

Q    You indicated how residue can get on currency and what use would have it to cause it to have residue on it?

A    I'm aware that bills are occasionally rolled into tubes as a substitute for a straw.

Q    Okay.  And how are they used then in the ingestion of controlled substances when they're rolled up?

A    They'd be inhaled through the nose.

Q    Is that the same thing that would cause residue to appear in a straw?

A    Yes.

Q    If I go down to Sonic, I'm not likely to get any drug residue in my straw in my Coke, am I?

A    No.

Q    I used the wrong term, didn't I?  I should have said Pepsi, I guess.  What kind of residue typically shows up in bills, currency?

A    The information that I've seen is cocaine.

Q    So we're not talking about the same drug that we're talking about in this case?

A    That's true.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may.

2920

RECROSS EXAMINATION

BY MR. SMITH:

Q    Meth can be consumed like cocaine in terms of it can be snorted through a straw, correct?

A    Yes.

Q    It can be smoked?

A    Yes.

Q    It can be injected?

A    Yes.

Q    And residue, as far as it relates to its presence on dollar bills doesn't just come from being rolled into a cylinder and snorted through, does it?  If anybody has it on their hands and they're dealing with money, then the residue can transfer that way, can't it?

A    In theory, yes.

            MR. SMITH:  Okay.  Thank you, sir.

            THE COURT:  Further direct?

            MR. LITTLEFIELD:  None, Your Honor.

            THE COURT:  May this witness be excused?

            MR. LITTLEFIELD:  I would ask that he be allowed to be excused, Your Honor.

            MR. SMITH:  Yes, Your Honor, he may be.

            THE COURT:  Sir, thank you for testimony.  You may step down.  You may be excused.

            MR. LITTLEFIELD:  Your Honor, may we approach?

2921

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  I was -- the logical next witness is Gerald Skowronski, who is the chemist in Chicago who tested most of these items.  He has not made it in yet.  They wanted him to fly home for the weekend rather than stay here.  If we could, the witness -- the next witness I have who is available is a chemist who is Lynn Griffin and he isn't -- in addition to performing analysis, he is the DEA's clan lab expert.

THE COURT:  What?

MR. LITTLEFIELD:  The DEA's clandestine lab expert.  And a lot of what he would base his testimony on is the analysis which was performed by Skowronski.  I understand he could do it based upon opinion type questions, but it'd sure flow a lot better if we could take an early lunch so I could have Skowronski testify before Griffin.

THE COURT:  Where is Skowronski?

MR. LITTLEFIELD:  He's -- should be between here and Tulsa.  His flight was supposed to get in about 10:30 and I was hoping he would be here.  I wasn't sure how long we'd take with the rest of our witnesses.  And the problem is that if I put on somebody else, then the

2922

most likely person to testify would be Mr. Rosser and I'm not sure how long we're going on cross-X. And I've had these chemists here since like last Tuesday and I hate to hold -- I'm hoping to get them on and off today and get them concluded so they can be out of here since they spent most of last week here.

THE COURT: Who's the other non-chemist witness here?

MR. LITTLEFIELD: Mr. Rosser. And I'm not sure how long the cross examination is going to take on him.

THE COURT: Who is he?

MR. LITTLEFIELD: Case agent.

MR. SMITH: Case agent sitting at table. And Mr. Hilfiger's going to be responsible for him and so I don't know how long, but I think it's going to be not rather lengthy, but it will be -- take a little bit of time.

MR. LITTLEFIELD: I hate to get these chemists in and have them make them stay overnight.

MR. SMITH: We don't want to inconvenience anybody.

MR. LITTLEFIELD: Well, it's not me. I'm going to be here regardless.

MR. SMITH: I'm teasing.

(Whereupon, the following record was made in

2923

open court within the hearing of the jury.)

THE COURT:  Okay.  Members of the jury, we're going to recess early for lunch today and I'll ask you to be back at 12:45.  Remember my admonition not to discuss it or allow anyone else to discuss it with you during the noon break.  I'll ask all those present in Court to remain seated as the jury leaves.  Quarter till one.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Let the record reflect that the jury's departed the courtroom.  Anything else to take up outside the hearing of the jury for the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  For the defense?

MR. SMITH:  Your Honor, something concerns me, if I may?

THE COURT:  You may.

MR. SMITH:  I don't know how far the Government intends to go with Mr. Griffin, but it was just revealed in our side bar that he intends -- that he's an expert in clandestine laboratories.  And that subject of his testimony has never been provided to us.  I mean, he was a chemist that performed analysis just like the other two chemists, Mr. Love and Mr. Skowronski.  So I guess my concern would be the Government's going to expand this

2924

into an area that really is kind of catching us a little flat-footed.

THE COURT:  Counsel?

MR. LITTLEFIELD:  Basically, Judge, he'll be shown the exhibits that have been introduced and asked if in his opinion it's a clandestine lab or not.  And I anticipate he will say yes, in his opinion it's a clandestine lab.

THE COURT:  And -- (Interrupted)

MR. LITTLEFIELD:  It's not a product of a report, Judge.

THE COURT:  It is not?

MR. LITTLEFIELD:  It is not.  It is based upon my conversations with him.

THE COURT:  The defense's position is that you're surprised?

MR. SMITH:  That's correct, Your Honor.  I mean, it's -- to me, if that was an appropriate area of inquiry with him that should have been identified.  We have no way to discover any of that information, because as Mr. Littlefield said there are no reports when this individual addresses that particular issue.  The only report that we have again, was his analysis, chemical analysis, just like Mr. Love prepared.

THE COURT:  Is that correct?

MR. LITTLEFIELD:  That's correct.

THE COURT:  I'm not sure -- now which witness are we talking about?

MR. LITTLEFIELD:  That would be Lynn Griffin. Judge, I intend to ask him do you know how to make methamphetamine.

THE COURT:  Tell me who he is again.

MR. LITTLEFIELD:  He is a DEA chemist.

THE COURT:  What's going to be different about his testimony than the next witness you're calling?

MR. LITTLEFIELD:  The next witness will talk about just his analysis of the exhibits which were submitted.  Mr. Griffin, I think, identified -- Mr. Griffin did analysis -- (Interrupted)

THE COURT:  I guess my point is I've learned over the years that there are those who consider themselves to be experts in identifying clandestine labs. And perhaps this last witness may have been an example of someone who is a pure chemist and may or may not have had any experience with a lab in the field, so to speak.

MR. LITTLEFIELD:  Mr. Griffin was a -- he is a DEA chemist.  His CV, which we did provide, stated that he was a criminalist and a forensic chemist.  That he responded to clandestine laboratories, performed qualitative, quantitative analysis on submitted evidence

2926

and assisted in training of local law enforcement.  And we did provide that he had responded to clandestine labs. He -- I anticipate he will testify as to how methamphetamine is made, which would fall within his area of expertise.  And then I anticipate that I will identify for him items which have been found, which were found to be at Mr. Barrett's residence, and ask him if he has an opinion based upon his experience and his training as to whether or not this was a clandestine methamphetamine lab.  And that he will testify that, yes, he believes it is a methamphetamine lab.

MR. SMITH:  Your Honor, may I?

THE COURT:  You may.

MR. SMITH:  Mr. Littlefield says that CV was provided to us.  We were given five CDs that contained various images.  And, Your Honor, I thought I searched front to back on those CDs and I pulled off an awful lot of information.  I personally have never seen a CV of this individual.  I'm not saying that I haven't missed it.  And I believe Mr. Littlefield if he says that's included in that material.  But to say that they provided it to us, he has never -- like with witness Foreman, for instance, that he anticipated calling as an expert.  We got a hard copy of the CV as it related to Mr. Foreman. I have not ever received such from Mr. Griffin nor have

we ever been put on notice that he would testify other than as a forensic chemist, which he's listed on his DEA seven or eight, whichever these are.

MR. LITTLEFIELD: They only had to look. I'm sorry. I thought you were done.

MR. SMITH: The first that it's ever been revealed that he would testify other than performing his analysis was at the sidebar, Judge. And we've had various discussion about these witnesses and what have you. So, I mean, that's my area of concern.

MR. LITTLEFIELD: Number one is it's Number 128. They didn't have to look very far -- Bates Number 128. Number two is the opening statement provided that information. Number three is they have opened the door by asking witness after witness after witness was this a clandestine lab.

THE COURT: Well, are you telling me that the CV was provided?

MR. LITTLEFIELD: Yes, sir, it was the 128th --
(Interrupted)

THE COURT: Okay. Well, show it to counsel and you all talk about it. If the CV was provided you can tell me about it when we come back.

MR. HILFIGER: Your Honor, I have one other matter.

2928

THE COURT:  Okay.

MR. HILFIGER:  And this is mainly clarification.  As to two of the witnesses, one is Karen Real who was -- we're supposed to be given an opportunity to talk to and we have not.  And I don't know whether Mr. Littlefield said she didn't want to talk to us or not.  And the other was Brandie Price.  And I think it was -- we discussed it about a month ago, that Karen Real was in the federal pen some place and her availability would have to wait until she got up here.  I understand -- I don't know if whether she's here or not.  I just want to request that we be given that opportunity to see if she'll -- wants to.

MR. LITTLEFIELD:  She's been in Tulsa County Jail.  I thought I told you.  You all sent somebody up to check for Mr. Sanders.  He was in marshal's custody and if anyone would have requested, I could have told you and the Marshals could have told you.  I thought you had requested or --

MR. HILFIGER:  We were not aware of her -- (Interrupted)

THE COURT:  You all talk about those issues and report to me after lunch.

(Whereupon, the noon recess was held after which the following record was made.)

2929

THE COURT:  Let the record reflect the jury is in the box.  Counsel for Government is present.  Defendant is present with counsel.  Government may call your next witness.

MR. LITTLEFIELD:  Gerald Skowronski.

GERALD SKOWRONSKI,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record please, sir.

A    Gerald Skowronski.

Q    And where are you from?

A    I'm from Chicago, Illinois.

Q    Did you go to the World Series the last time the White Socks were in it?

A    Well preserved.  No, not quite.  I was happy enough I could watch it on TV on Saturday.

Q    How are you employed, sir?

A    I'm a forensic chemist for the Drug Enforcement Laboratory in Chicago.

Q    And how long have you been a forensic chemist, sir?

A    For almost 32 years.  Thirty years with the Chicago lab and then two years I worked for a local police laboratory in southern Indiana.

2930

Q   What is your educational background?

A   Received a Bachelor of Science degree from Xavier University, Cincinnati, Ohio, where I majored in chemistry, minored in math.  And I received a Master of Science degree from Indiana University where I majored in Organic Chemistry, minored in pharmacology.

Q   Have you received any training since being associated with the -- let me -- what area of forensic chemistry do you primarily deal, sir?

A   It's a drug analysis.

Q   Have you received any training from the Drug Enforcement Administration in regards to -- which assist you in your duties as a drug analyst?  And if so, what's the nature of the training?

A   Yes, I did.  When I first joined the DEA lab I had, I think it was, a one to two month training period and then while I've been employed with my present lab, I've had a number of seminars where you learn on how to operate new instrumentation.  I've gone to clandestine laboratory investigation training, a variety of schools. Like usually the longest the school would is about a week long.

Q   It is Skowronski, right?

A   Yes.

Q   As a part of your function as a drug analyst,

forensic drug analyst, would that be correct?

A    Yes.

Q    Do you have occasion and have you had occasion to be involved in responding to searches of clandestine methamphetamine labs?

A    Yes, I have.

Q    Do have any idea how many you've been to, sir, just ball park?

A    Maybe 10 to 20.

Q    Have you been qualified previously as an expert in relation to drug analysis in any United States district court, sir?

A    Yes, I have.

Q    Where?

A    In the states of Kansas, South Dakota, Illinois, Wisconsin, Michigan, Ohio, Kentucky, Nevada, Alabama, New Jersey.

Q    Oklahoma is not on the list?

A    No.  First time in Oklahoma.

Q    Let's see if we can get it there.

MR. LITTLEFIELD:  Judge, I'd ask that Mr. Skowronski be declared an expert witness in the area of drug analysis.

THE COURT:  Any objection from the defense?

MR. SMITH:  No objection, Your Honor.

2932

THE COURT: That will be the order of the Court.

Q   (By Mr. Littlefield)  You got to update your CV now.

A   Okay.

Q   You're in the -- what lab is it?

A   Chicago, North Central Lab.

Q   North Central.  Typically what states do you receive items for analysis in the North Central Lab in Chicago, sir?

A   We handle middle -- let's say north central 13 states of the country.  On the west we'll handle the Dakotas, Kansas, Nebraska.  Going east then we've got Missouri, Kentucky.  And then up north we go as far east as Ohio.  We handle Michigan also.

Q   Pick Iowa and -- (Interrupted)

A   Iowa, Minnesota, Wisconsin.

Q   And then there's Illinois?

A   Yes.

Q   Was there a period of time and if so, when, when the North Central Lab received evidence from the South Central Lab in Dallas to assist that lab?

A   Yes.  It was in late 1999 and there was a huge backlog of exhibits in the Dallas laboratory.  A large number of those exhibits or a certain number of those exhibits were shipped to the Chicago lab just so we could

help with their backlog and there'd be a quicker turnaround time on the analysis.  It's happened a couple times where we've sent exhibits to another lab and then we once did it to the northeast version.  There's another time period where we had exhibits from them, which we analyzed.

MR. LITTLEFIELD:  Let me ask that Government Exhibit Number 72 be displayed to the witness, Your Honor.

THE COURT:  You may.

MR. LITTLEFIELD:  And it's not in evidence.

Q   (By Mr. Littlefield) Let me ask you do you recognize what's been marked for identification purposes as Government Exhibit 72?  And it will be on the monitor right there by you.

A   Okay.  Yes, I do.  This is the DEA Form 7 which lists exhibits one through three.

Q   And were you involved in the analysis of the items that were drug exhibits numbers one, two and three, sir?

A   Yes, I did.  I analyzed those three.

Q   And did you complete any portion of Government Exhibit Number 72, sir?

A   Yes, I did.  The bottom portion.  This is -- let's see here.  On the -- (Interrupted)

Q   Doesn't do any good to touch it at this point

2934

because it's not displayed to the jury.  But -- (Interrupted)

A     Okay.  It's the bottom portion of it, which is the analysis portion.  It just lists the -- (Interrupted)

Q     Did you fill that portion out?

A     I didn't do the typing of it.  But I did arrange to have it -- (Interrupted)

Q     Sign it?

A     Yes.  I signed it.

Q     And did you perform analysis on those three exhibits, sir?

A     Yes, I did.

            MR. LITTLEFIELD:  Move admission of what's been marked as Government Exhibit Number 72.

            THE COURT:  Any objection?

            MR. SMITH:  No objection, Your Honor.

            THE COURT:  Admitted without objection.

            MR. LITTLEFIELD:  And I ask it be displayed.

            THE COURT:  You may.

Q     (By Mr. Littlefield) And do you see -- which portion was filled out when it comes into the lab, sir?

A     All the portions up till -- (Interrupted)

Q     You've got the -- Mr. Skowronski, you've got a -- that's a laser pen.  If you see -- it's also being displayed for the jury.  If you push that red button on

the top of the pen you could do this thing.

A    Oh, okay.  I see here.

Q    And you can point to the sections up here so the jury can see what you're pointing to.

A    Oh.  There we go.  Just let's see -- we had it filled out see attached.

Q    Where's your signature show?

A    Right there.

Q    And what portion is filled out when it comes into the lab, sir?

A    Everything above where the red dot is showing right now.

Q    Okay.

A    I take that back.  I take that back.  Right up here, because just where the agent Craig Nixon signed it and his supervisor.  Because this portion right here in the middle, this is the evidence custodian that received the exhibit.  That person filled out this section.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 206 be displayed for the witness and it is in evidence.

        THE COURT:  You may.

Q    (By Mr. Littlefield) And as we're getting there that had one, two and three on it; is that correct?

A    Yes, it did.

2936

Q     Okay.  Do you recognize what is being displayed for you now?  And you can also see it on the screen as well. We're going to try and bring it in a little closer.  Do you recognize that item, sir, Government Exhibit 206?

A     Yes, I do.

Q     And how do you recognize that?

A     I recognize it by my initials.

Q     Where are they?  Can you use the --

A     Initials are right there.  This is the date that I -- well, I initialed it the date that I opened the exhibit.  And on the bottom, this is a cut tab.  After I sealed it, I placed an Avery label on the bottom section of it and sealed it there.

Q     What was the condition of this bag when it came in, sir?

A     When it came into the laboratory it was in a sealed condition.

Q     And do you see the Government -- do you see Exhibit 1?

A     Exhibit 1 would be I would say -- (Interrupted)

Q     You got it right there -- Mr. Skowronski, kind of if you just press it as you're pointing and watch it because that's probably not real good if it hit somebody in the eye.

A     Okay.  Right there.

2937

Q    Yeah.   Do you see the exhibit itself that you tested?

A    Oh.   The powder, the reserve is down here.

Q    And what was it in?

A    It was originally in the larger plastic bag. There's a small amount of white powder residue.

Q    Did you test the white powder?

A    Yes, I did.

Q    What was your analysis?

A    I found that it contained no controlled substance.

Q    So it wasn't anything?

A    Nothing controlled.

Q    Okay.   Well, obviously it was something.   It could have been sugar or baking soda.   You don't know what it was, but it wasn't a controlled substance?

A    Well, I did determine it on one test that I performed.   But it was stearic acid, palmitic acid.

Q    Did you also -- and we saw on Government Exhibit 72 that there was a Drug Exhibit Number 2?

A    Yes.

Q    Did you perform an analysis on it, sir?

A    Yes, I did.

Q    Okay.   And would you look to Government Exhibit Number 207.   We'll display it just look we did 206.   Do you recognize it, sir?

2938

A    Yes, I do.

Q    And what is that?

A    This is -- the outer bag is -- the outer bag is the plastic bag that came to me that I checked out of the main vault and then the small -- small bag here is a little bit of a reserve powder left that was present, powder reserve or powder -- I should say residue which I analyzed.

Q    Okay.  Government Exhibit 70 referenced that as a small Ziploc baggy containing residue.  Do you see the small Ziploc baggy in which Government Exhibit 2 or Drug Exhibit 2 was contained?

A    Yes.  This small bag.

Q    Do you recognize your writing on that, sir?

A    Yes, I can recognize it clearly there on the outer bag.  There's my signature on the smaller Ziploc bag.

Q    How did you go about performing your analysis on Drug Exhibit 2?

A    I ran a battery of three tests on this powder.  I performed an infrared spectrophotometry test.

Q    Did you have any kind of result from the -- and we've already had an explanation of what the infrared spectometry -- I almost said it right -- test was.  Did you receive a result on the infrared test, sir?

A    Yes, I did.

2939

Q    What was the result?

A    I found that the material contained methamphetamine hydrochloride.

Q    Now, when you say methamphetamine hydrochloride, what's that commonly referred to?  When I'm talking about that substance, what do you commonly call that?

A    Known as speed on the street.

Q    Is there a difference between methamphetamine and methamphetamine hydrochloride, sir?

A    Yes, there is.

Q    What is the difference?

A    Well, it's the salt form -- methamphetamine by itself is a base form with kind of be like a slurry or it might be as a liquid form.  When it's methamphetamine hydrochloride, it's the crystal or powdered form.

Q    In what form is methamphetamine usable by users?

A    It's methamphetamine hydrochloride because that form of it will dissolve in water.  Methamphetamine by itself, as a base, is not soluble in water.

Q    Okay.  And the other you said you did, that was the infrared spectrometry?

A    Yes.

Q    Spectrometry test.

A    Yes.

Q    Did I say it right?

2940

A    Yes.

Q    What was the second test?

A    Second test was a combination gas chromatography/ mass spectrometry.

Q    And is the GCMS test done the same by all DEA practitioners?

A    They may use different solvents but basically it's the same test.

Q    I mean as far as using the machine and getting the charts and the graphs and then comparing the unknown to a known and making the reading?

A    Yes.

Q    When you utilized the gas chromatograph and the mass spectrometer, did you have an opinion based upon that as to what the substance was in Drug Exhibit Number 2?

A    Yes, I did.

Q    What is that opinion, sir?

A    It contained methamphetamine.

Q    And you said there was a third test?

A    Yes, I did.  It's a -- it's another GC analysis. It's a GC analysis that was using the TPC Derivatization technique.

Q    And that's to determine whether it was the D or the L isomer?

A    Correct.

2941

Q    And what results did you receive from that test, sir?

A    I found that this was the D isomer of methamphetamine.

Q    In your opinion, what was contained in Drug Exhibit Number 2?

A    This exhibit contained D-Methamphetamine hydrochloride.

Q    Did you weigh it?

A    Yes, I did.

Q    What determination did you have as far as the weight of the residue or if it was weighable?

A    It was weighed.  If I could refer to my notes I'd get the exact number on it.

Q    Okay.

A    Contained a net weight of 0.018 grams.  That's 18 thousandths of a gram.

Q    Pretty puny amount?

A    Yes, residue.

Q    I'm sorry?

A    Residue which is, you know, a very small amount.

Q    Did you also examine exhibit number three?

A    Yes, I did.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 208 be displayed to the witness.

2942

THE COURT: You may.

Q (By Mr. Littlefield) And do you recognize that portion? We've kind of -- (Interrupted)

A Yes. Yes, I do. As with the other two exhibits, I recognize it with my initials on the outer bag as -- you know, I initialed it, the date that I opened the bag and here's the plastic strip that was cut off. Here's the plastic bottle where there was a small amount of residue which I analyzed.

Q What was Drug Exhibit Number 3? What was submitted to you for analysis?

A It was this particular plastic bottle.

Q And what was labeled on that plastic bottle?

A It was labeled Pseudoephedrine -- let's see. It said Pseudos -- Pseudo 60s.

Q And was the milligram dosage displayed on that bottle, sir?

A Yes, it was.

Q What was the milligram dosage on that bottle?

A It was listed as 60 milligrams per tablet.

Q What's truth in lending?

A Truth in -- (Interrupted)

Q I said truth in lending. I'm sorry. Truth in labelling. Well, I've got the wrong area entirely.

A Truth in labelling means that whatever is listed on

2943

the label -- first of all qualitatively, that particular drug or substance is present inside. And the second thing, if they list a particular strength, say in this case it's 60 milligrams per tablet, that the tablets have to be in what I've seen last is about five percent either way, so it's 60, but it could be from as low as 57 milligrams per tablet to, let's see, to 63 milligrams per tablet.

Q   So, there's a little leeway and a little flexibility?

A   Yeah.

Q   But if they say it's a 60 milligram tablet it's got to be more or less 60 milligrams?

A   Correct.

Q   Would each tablet weigh 60 milligrams?

A   No. Each tablet would weigh more. There are binders and other things to hold the tablet together present inside there too. But the active component is pseudoephedrine, there'd be 60 milligrams of that per tablet.

Q   Okay. Did you test the contents of Drug Exhibit Number 3?

A   Yes, I did.

Q   And what was your determination -- what test did you use, sir?

2944

A    I did two separate tests.  I did the combination gas chromatography/mass spectrometry and I also did the specialized TPC derivatized gas chromatography.

Q    Based upon your analysis, do you have an opinion as to the contents of Drug Exhibit Number 3?

A    Yes, I do.

Q    What is that?

A    That the residue contained in that bottle was -- it contained pseudoephedrine.

Q    What's pseudoephedrine?

A    It's a drug that's used for people with allergies and it's also the starting material for making methamphetamine.

Q    What is needed in addition to pseudoephedrine to make methamphetamine, sir?

A    Well, in one method you would need either hydriodic acid or you could use iodine and red phosphorous.

Q    And what's iodine and red phosphorous in combination create?

A    Combined with a little bit of water, it forms hydriodic acid.

Q    And what's -- and then when hydriodic acid combines with pseudoephedrine, what is created?

A    It makes methamphetamine.

Q    Would you look at Government Exhibit Number 73 and

it is not in evidence.  Do you recognize -- do you recognize Government Exhibit Number 73, sir?

A    Yes, I do.  That's the completed chemical analysis report for exhibits one, two and three in this case.

Q    And is that your -- does it bear your signature and show approval by your laboratory director?

A    Yes, it does.  I signed it on the 26th of January, the year 2000, and the laboratory director signed it two days after I did.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 73, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. LITTLEFIELD:  And I'd ask it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) It shows on -- this is Exhibit 1.  Where does it show there is no controlled substance?

A    Right there.

Q    Exhibit 2 is right here.  Where does it show it's D-Methamphetamine hydrochloride?

A    Right there.

Q    And you said the net weight was where?

A    Right where you have the X, right there, net weight. Oh, wait.  Just above that yellow line right there.

Q    What's the -- okay.  And the net weight is what?

A    It's 0.018 grams, but that's 18 thousandths of a gram.

Q    And right above that, the gross weight, what's included in the gross weight?

A    Gross weight includes the entire plastic bag and anything inside it.  So you weigh everything.  As I get it, I check if it's in a sealed condition and then I weigh the entire bag and that's what that weight is right there.

Q    And when we get to Drug Exhibit 3, that was the bottle of Pseudo 60s?

A    Yes.

Q    The gross weight is shown as where?

A    Gross weight is the third line.  They're 40 point -- 40.9 grams, right there.

Q    And what would be included in that weight, sir?

A    That would be the outer packaging, the large plastic bag.  It would also contain the plastic bottle itself.

Q    And what about -- where you show us it's no controlled substance.  Was pseudoephedrine a controlled substance?

A    No, it's not a controlled substance.

Q    Okay.

A    But there is the analysis of it.

2947

Q    Where it says that it is pseudoephedrine, is that what is based upon your determination and your results?

A    Yes.

Q    Would you look to what's been marked as Government Exhibit Number 74, sir.  I'm going to scratch that one. Let's move on.  Look to Government Exhibit Number 76.  Do you see Government Exhibit 76?

A    Yes, I do.

Q    Go ahead.

A    This is the DEA 7.  The top portion that was filled out describing the submission of exhibits seven, eight and nine.  Middle section, as it came into the laboratory.  The bottom section that I had my analysis on the exhibits that I analyzed on those two -- two of the three.

Q    Does that exam -- or does that identify the -- in fact the exhibits you examined?

A    Yes.  I analyzed two of the three exhibits listed on this particular item.

          MR. LITTLEFIELD:  Move admission of Government Exhibit 76.

          THE COURT:  Any objection?

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Government Exhibit 76 will be admitted without objection.

2948

Q    (By Mr. Littlefield) And is this the same, Mr. Skowronski, as the previous exhibit we looked at in relation to how the form is filled out?

A    Yes.

Q    Which exhibit -- where do we see the exhibit numbers that are displayed, sir?

A    Well, there's two spots.  Here's -- up on the top portions, exhibit seven, eight and nine and then on the bottom of the report, here's seven, eight and nine.  And these three numbers here, laboratory numbers that are assigned to these particular case exhibit numbers.

Q    Did initially, exhibit numbers -- you did one, two and three?

A    Yes.

Q    Did four, five and six initially come to your attention?

A    Yes.

Q    Did you do an analysis on four, five and six?

A    No, I did not.

Q    Do you know who did that?

A    Yes, I found out that Lynn Griffin did those.

Q    Okay.  What about seven?  Did you do the analysis on exhibit seven?

A    No, I did not.

Q    Who did that?

2949

A    That's Lynn Griffin.

Q    Okay.  And he's also associated with the DEA?

A    Yes.  He worked -- I think at that time he worked out of the Dallas laboratory.

Q    Which of these items did you analyze, sir?

A    I analyzed exhibits eight and nine on this seven. The last two of the three exhibits on this form.  So these two -- (Interrupted)

        MR. LITTLEFIELD:  I would ask that Government Exhibit 213 be displayed to the witness.

        THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit Number 213, sir?

A    Yes, I do.  I recognize it by my initials here and the date that I opened it.  I also remember the rubber tubing with, you know, black tape at one end of it. There're actually three, three small pieces of rubber tube -- this is the longest of the one.  There were two other small pieces of rubber tubing in there.  And it's an exhibit which I analyzed in this case.

Q    Is that Exhibit Number 8, Drug Exhibit Number 8?

A    Yes.

Q    And what analysis did you perform on those tubes, sir?  Did you visualize, look at those tubes?

A    I looked at the rubber tubes, yes.

2950

Q   And was there anything particular that stood out besides the black tape on the rubber tubes that appeared to be drug related which would cause an examination by yourself, sir?

A   Well, it was sent in to us, the laboratories.  Just the fact that it came into our laboratory to analyze, I had to analyze it.

Q   Okay.  Did you notice anything, detect any powder or anything else on the tubes?

A   No, I did not.

Q   What did you do to go about analyzing it, sir?

A   I rinsed the inside of these rubber tubing with methanol.  Methanol being a solvent that would dissolve any drug residue inside the tubes.

Q   Why did you do that?

A   You had to -- the drug residue would probably, if it was anywhere, it would be on the inside of this tube.  So you can't not easily cut open the entire tube and, you know, scrape.  So the easiest and most thorough way of checking for residue within the tube is to rinse the entire inside of the tube with a solvent that would dissolve drugs that could have been present inside there.

Q   You said you had been to 10 to -- I think you said 10 to 20 labs?

A   Yes.

2951

Q    Have you seen tubing like this, the methamphetamine labs that you had been to, sir?

A    Yes I have.

Q    And how had you seen tubing like that used at the meth labs with which you were familiar?

A    It's used in the last step of converting the liquid methamphetamine to solid methamphetamine.  It's used in an H -- they call it an HCL or hydrochloric acid generator.

Q    Have you ever heard the term gas generator?

A    Yes.

Q    What does that do?

A    Well, you'll have -- you're going to make hydrogen chloride gas somehow.  It would go, eventually, through this rubber tube and the rubber tube you would stick into a solvent which would have the liquid form of methamphetamine present.  You'd bubble the hydrochloric gas through the solvent and it would form HCL -- well, the methamphetamine hydrochloride and that would precipitate out as a whitish or sometimes an off-white solid.

Q    When you say precipitate out, what are you saying it'd do?

A    Well, when you started it will be a -- maybe a yellowish liquid.  You know, it's just the

methamphetamine dissolved in an organic solvent.  You'd bubble it through there, you'd have bubbles coming, but then you could see a whitish or maybe it's yellow or light tan solid forming.  And so you would have solid precipitating out of liquid.

Q   Well, I think of precipitation like rain.  How's the H -- how's the methamphetamine hydrochloride precipitate out?  If you're bubbling through, what am I seeing when I see the meth precipitating out?

A   You have a solid forming.  It's a chemical expression.  You're having a solid precipitate out of a liquid.

Q   Does it look like a big drop -- or a big old rock dropping out or what?

A   It'd be like a cloud.  You have like a cloud, you know, while you're bubbling you see this like white -- like a cloudy cloud and as it's bubbling a little bit further you can see this cloud is starting to turn into a solid.

Q   Big old solid lump or -- (Interrupted)

A   No, it'd be -- it'd usually be -- what I'd say -- a small little section.  Not one big clump over here.  It'd be just -- when I'd seen it over here -- (Interrupted)

Q   When it precipitates, what does it do?

A   It falls to the bottom.  It will be cloudy and then

2953

gradually as it turns solid and a little heavier than the liquid it would fall to the bottom of whatever container you're doing it in.

Q    Does it fall all at once or kind of through this -- spread over -- (Interrupted)

A    It would do it for awhile.  You'd bubble it for maybe five minutes.  I've worked -- one of the things that I -- as part my job, we assist in training agents, both state agents and federal agents, in how to investigate clandestine methamphetamine labs.

And one of the things that we do is we perform this particular synthesis with them.  And have them do it and let them see what's going on, so if they're more familiar with the operation when they come upon a clandestine lab and they come across different items, they have a better idea what step in the synthesis it is. And so when we performed or helped the agents actually do the synthesis, we do this last step.  We're -- you're bubbling HCL gas through a solvent containing methamphetamine liquid at the end.  And I'm giving you my impression of as it is bubbling through, what I see.  And it's not just one clump.  And you bubble it for maybe about, like I say, a couple of minutes.  Maybe not five minutes.  Maybe a couple of minutes through there.  And then you'll take it away and you can see gradually a

2954

little solid forming.  Usually it's not perfectly clear white.  It's a tan.  I've seen it like a light green color to it.

Q    Does it come down in flakes or something?

A    Granules.  Not big flakes, but granules.  It's cloudy and then you see small sections, not real being flakes.

Q    You mentioned that the meth is in an organic solvent?

A    Yes.

Q    And that stage before you bubble it out?

A    Yes.

Q    Is that solvent introduced in the manufacturing process, sir?

A    No, it's usually -- (Interrupted)

Q    I mean, is it introduced by the manufacturer?  Is it a solvent supplied by the manufacturer in the manufacturing process?

A    It's something that whoever is doing the synthesis or the cook would add in.  This is the way they're cleaning up their final product.

Q    What kind of products are the organic solvents that can be used?  What kind of items could be solvents?

A    Oh, naphtha, Coleman fuel, any -- some type of petroleum, you could use gasoline.  Actually you could

use cleaning solvents, also with a chloroform base, Freon type solvents. Most often -- (Interrupted)

MR. LITTLEFIELD: Let me ask that Government Exhibit 65 be displayed.

Q   (By Mr. Littlefield)  Do you see any solvents that would be organic solvents that could be used or would be used in the manufacturing of methamphetamine displayed in this photograph, sir?

A   Yes, I can see three.

Q   What?

A   Toluol, that's, I'm sure, a trade name for just Toluene. The gold can odorless mineral spirits is an organic solvent base, or paint thinner. So all three of those could be used.

Q   What's this?

A   Let's see.

Q   That's Coleman fuel. Could it be used?

A   Oh, yes, it could.

Q   Let's go back to Government Exhibit 213. You said you performed a rinse on this?

A   Yes.

Q   When an item such as this, if in fact this was used in the manufacturing process, is placed down in the organic solvent which contains the methamphetamine, would you anticipate that you would find methamphetamine on an

item such as this, if it had been used in a meth cook?

A    Yes.  You would find it at one end of the rubber tubing, whichever end was stuck into the liquid.

Q    And you said you put a rinse into it?

A    Yes.

Q    And what did you do with the rinse, sir?

A    The rinse I ran through the gas chromatograph/mass spectrometer instrument.

Q    And did you receive any results from your analysis of the gas chromatograph/mass spectrometer analysis, sir?

A    Yes, I did.  And I found that my methanol rinse contained methamphetamine.

Q    Did it have methamphetamine before you ran the rinse through this tube, sir?  Or these tubes?

A    No.  I checked the methanol that I used initially and there was no methamphetamine present in that methanol.

Q    Do you have a conclusion as to whether the tubes that were presented to you as Government Exhibit Number 8 had any controlled in them and if so what?

A    I found that they contained the controlled substance methamphetamine.

Q    Is the gas chromatograph/mass spectrometer the only analysis you performed on Drug Exhibit 8?

A    No, I did not.

2957

Q    What else did you do?

A    I also did the combination gas chromatography or -- yeah, gas chromatography with the TPC derivatization.

Q    Okay.  And what isomer of methamphetamine did you find, sir?

A    I found that it was the D isomer of methamphetamine.

Q    Again, any legal difference between D and L, the D and L isomers; are they both legal, illegal or what?

A    They're both controlled substances.

Q    That was Drug Exhibit Number 8.  Did you look at Drug Exhibit Number 9, sir?  And if you would look back to Government Exhibit Number 76.

A    It's not up here yet, but I know the report that had the results of exhibits eight and nine.

Q    Okay.  Does it show eight and nine both?

A    Eight and nine.  Right.  Eight and nine are the bottom -- yeah, the bottom two, last two.  Eight was the -- were the three sections of rubber tubing, then nine were tablets.

Q    And would you look to Government Exhibit 213.  It will be displayed to you in just a second, sir.

A    Okay.  Yeah, Government's Exhibit Number 76 is -- (Interrupted)

Q    Now I'm going to go to 213.  And it should be up there in just a second.  I'm sorry, 214.  Do you

2958

recognize Government Exhibit Number 214?

A    Yes, I do by my initials on the outer bag which I opened.  Here's my signature across the reserve tablets and the ground up tablets powder reserve.  And here's the plastic bag that those tablets were originally contained in.

Q    Was that a controlled substance, sir?

A    No, it was not.

Q    What kind of analysis did you perform on it?

A    I performed two tests.  I actually performed three tests.  I performed a Chen's color test on a certain number of the tablets.

Q    And what's a Chen's color test do?

A    Chen's color test -- (Interrupted)

Q    And how do you spell Chen's?

A    It's C-h-e-n apostrophe s.

Q    Okay.

A    And it's a three part test where you take a tablet, a section of a tablet, and you test it with three different solutions.  The first solution is one percent acetic acid, second solution is one percent copper sulfate and third solution is two normal sodium hydroxide.

Q    And what are you looking for in that analysis?

A    Whether they gave a positive color test for

pseudoephedrine or ephedrine.

Q    And did you receive such a positive color test?

A    Yes.  They all turned purple and it's a positive test for pseudoephedrine.

Q    Now, is that a presumptive test or is that a test that absolutely says that is pseudoephedrine?

A    No, it's a presumptive test and it also indicates to me -- I looked at the tablets but in addition I did this color test on it, that they all tested the same, so they appear that all the tablets are the same.

Q    So as a consequence of that color test, what analysis did you do?

A    Then the tablets which I tested for the color test -- I only took a portion of tablets.  The rest of those tablets I ground into a fine powder composite and to the composite I performed two separate tests.  The combination gas chromatography/mass spectrometry and I also did the infrared spectrophotometry test.

Q    And are those tests presumptive or conclusive?

A    Those are conclusive tests.

Q    What did those test results tell you about these tablets?

A    I found that those tablets contained pseudoephedrine hydrochloride.

Q    And you've already testified as to what -- how that

2960

relates to the manufacture of methamphetamine.  Did you report those analyses on laboratories -- or items eight and nine, sir?

A    Yes, I did.

Q    And does your report also -- would you look to Government Exhibit 77?  Do you recognize Government Exhibit 77?

A    Yes, that's the copy of my report for exhibits eight and nine.

Q    Does it also show that you did not perform an analysis on exhibit seven?

A    Yes, it does.

        MR. LITTLEFIELD:  Move admission of Government Exhibit 77.

        THE COURT:  Any objection?

        MR. SMITH:  No objection, Your Honor.

        THE COURT:  77 admitted without objection.

        MR. LITTLEFIELD:  I would ask it be displayed.

Q    (By Mr. Littlefield) What is that the result on -- or the lack of result on exhibit seven?

A    Yes.

Q    Okay.  And it was what?

A    It was a used syringe and if -- it's laboratory policy if you don't have to do an exhibit -- you don't have to analyze a syringe if at all possible.  There's

2961

always a danger you're going to get pricked, you're going to get some type of disease off of it if there's blood on it.

Q    Okay.  Let's go to eight.  This was D-Methamphetamine.  What was that D-Methamphetamine contained -- or found to be -- what was that out of?

A    That was out of the rubber tubing.

Q    The gross weight of 75.1 grams related to what?

A    That's the weight of the rubber tubing present inside the outer heat sealed evidence envelope.

Q    The actual methamphetamine in that tubing shows what weight, sir?

A    It's just residue.

Q    And where is that?

A    It would be -- let's see, net weight.  Right there.

Q    Right below your dot?

A    Yes.  Right next to it, yes.

Q    Exhibit 9, where is your results shown on that, sir?

A    Right here.  The second line, Exhibit 9 contains pseudoephedrine hydrochloride.

Q    The gross weight shows what, sir?

A    It's 219.7 grams.

Q    And that includes what?

A    That includes the tablets, the plastic bag that they are contained in, as well as the outer heat sealed

2962

evidence envelope that they were heat sealed inside of.

Q   The net weight is what, sir?

A   The net weight is the weight of the tablets themselves and I also have a listing of the number of tablets.  Now, I didn't have -- (Interrupted)

Q   How many tablets were there?

A   I calculated out to be -- let's see here -- 14 hundred and 26 tablets.

Q   One thousand four hundred twenty six?

A   Yes.

Q   And what was the net weight of those 1,426 tablets, sir?

A   181 -- 181.6 grams.  Right there.

Q   In relation to -- how many grams in a pound?

A   There are 454, approximately, grams in a pound.

Q   So that would be how much of a pound?

A   Oh, about one-third.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 78 be displayed to the witness.

        THE COURT:  Which exhibit?  78?

        MR. LITTLEFIELD:  Yes, Your Honor, 78.  And it's not in evidence yet.

        THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize Government Exhibit Number 78, sir?

A    Yes.   That's the exhibit -- that's the sheet that lists exhibits 10, 11 and 12 on the case, on the top portion filled out by the agents submitting it.   The bottom portion of the form is what I arranged to have typed and filled out at our laboratory.

Q    And did you do an analysis on these items, sir?   Or at least some of them?

A    Yes, I did.

Q    And were you responsible for the completion of the bottom portion of Government Exhibit 78?

A    Yes, I was.

MR. LITTLEFIELD:   Move admission of Government Exhibit Number 78.

THE COURT:   Any objection?

MR. SMITH:   No objection, Your Honor.

THE COURT:   Admitted without objection.

Q    (By Mr. Littlefield) And this is a drug exhibit numbers what, sir?

A    Well, exhibits 10, 11 and 12 on the case.

Q    Let's go to Drug Exhibit Number 10, first.

MR. LITTLEFIELD:   And I would ask that Government Exhibit 215 be displayed to the witness.

Q    (By Mr. Littlefield) Do you recognize what's shown in Government Exhibit 215?

A    Yes, I do.   Again, my initial's on the outer heat

sealed evidence envelope, but as well as I've got my markings on the smaller items also, as items that were originally present in this heat sealed evidence envelope.

Q    What did you perform an analysis on in Drug Exhibit Number 10, sir?

A    I -- there were two types of tablets here.  Actually there were a bundle of these reddish tablets and then there was one white tablet.

Q    And I noted back on Government Exhibit Number 78 that there was a 10 point something.  What was -- do you recall those numbers?

A    It was 10.01 and 10.02 and if -- whenever we receive an exhibit in the laboratory and there are two grossly different items inside for an analysis and here it was obvious, you got some red tablets and you got one white tablet, you subdivide it and you just call the thing that you got more of the first number, so this is 10.01 and then we have a single white tablet and that was 10.02.

Q    Let's go to the single white tablet first, which was 10.02.  Did you do an analysis on it?

A    Yes, I did.

Q    What was it?

A    I did two different tests -- (Interrupted)

Q    What was it?

A    Oh.  It was aspirin.

2965

Q    Okay.  No big deal?

A    Correct.

Q    What were these -- what was 10.01, sir?

A    There were 72 red tablets.

Q    That them there?

A    Correct.

Q    What analysis did you perform on the 70 -- how many?

A    Seventy two.

Q    On the 72 red tablets, sir?

A    I performed two tests, a combination gas chromatography/mass spectrometry.  And I also performed an infrared spectrophotometry.

Q    Did you reach an opinion based upon these analyses as to what those red pills contained, sir?

A    Yes.

Q    And in your expert opinion, what are those red pills?

A    They contain nicotinamide.

Q    Not -- (Interrupted)

A    Nicotinamide.

Q    And does that have any relation to nicotine?

A    It's a different compound.  It's -- there is a structural comparison, but it's a different compound. Nicotine is different.

Q    What is nicotinamide?

2966

A    Nicotinamide is a vitamin that has been found a number of times as a cut with methamphetamine.

Q    Wait a minute.  It's a vitamin?

A    Yes.

Q    It's not a stop smoking deal?

A    No.

Q    Okay.  And you said it has a use in relation to methamphetamine?

A    Yes.

Q    What's that?

A    Well, I've found it in a number of samples of methamphetamine.  It's used as a cut.

Q    What's used as a cut?

A    Nicotinamide.

Q    Okay.

A    It's used to first of all cut the potency of the methamphetamine.  But it's also added to give bulk to a sample.  So you've got -- you know, let's say you've got a ounce of pure methamphetamine, if you're going to add an ounce of nicotinamide to it, now you have two ounces of a material that contains methamphetamine.  So potentially, you'd maybe make more money if you were selling the material.

Q    And that's Exhibit 10.  Did you also analyze exhibit 11, sir?

2967

A     Yes, I did.

Q     Would you look to Government Exhibit 216.  Do you recognize Government Exhibit 216, sir?

A     Yes, I do.

Q     And what is that?

A     Well, the outer plastic bag, this is the plastic bag that it came in.  It was in a heat sealed condition when I received it.  Inside of it there was an old partially rusted camera and there were two bottles, each of which contained a dark gray solid.

Q     Was there a label on those bottles?

A     There was a label on both of them.  One of the labels was too dark.  I couldn't read it.  The other label I was able to read and it said iodine.

Q     And have you -- in your experience working with a lab some 30 years, was that right?

A     Yes.

Q     What happens when you have iodine or iodine crystals for an extended period of time contained in a sealed item such as the plastic bag?

A     That's how your item becomes very dark, a brownish color.  The iodine fumes -- unless you have a real tight seal on the container, it'll permeate through and then the entire plastic bag, the evidence bag, turns a dark color.

2968

Q    Did you perform an analysis on the contents of Drug Exhibit Number 11, sir?

A    Yes, I did.

Q    And how did you go about performing your analysis?

A    Well, the -- there were two separate jars so I wanted to check each of them separately.  I did a -- one's a chloroform test so you just take a little bit -- they look like iodine, first of all.  The fact that it said iodine on the one -- (Interrupted)

Q    Speaking of -- looking like -- speaking of -- saying iodine on the label, how would truth in labeling apply to a bottle of iodine crystals?

A    Should have iodine.

Q    Okay.  And who enforces truth in labeling, by the way?

A    I believe the Federal Food and Drug Administration.

Q    And you said it looked like iodine and the labeling said iodine.  Go ahead, sir.

A    So I -- the testing that I did, the first series of tests -- one was a chloroform solubility.  You take a little bit of the solid, dissolve it in chloroform and from a dark gray solid you throw in the chloroform, you get a real bright, kind of a pretty fuchsia colored liquid.  The second test you would do is just take a little bit of the solid and put it on a piece of Xerox

2969

paper, just a white paper, and it will stain it kind of a yellow orange brown color.  And then the stain, if you've got it on paper, you add -- if you wet it, it would turn navy blue.  So that testing was the same on each of the two bottles that I checked the material.

Q    And what did that testing tell you in regards to the contents of Drug Exhibit Number 11, sir?

A    It was consistent for the presence of iodine in those two bottles.

Q    Now, is that a conclusive or a presumptive test?

A    Those are pretty strong presumptive tests and then I with -- based on my initial test results, I combined a certain material from each of the jars and then performed one additional test and that was a gas chromatography/ mass spectrometry.

Q    Okay.  And is the GCMS test a conclusive or presumptive test?

A    That's a conclusive test.

Q    And the results of the GCMS test upon the contents of Drug Exhibit 11 was what, sir?

A    Presence of iodine in those two bottles.

Q    In your opinion was iodine in Drug Exhibit 11?

A    Yes.

Q    Did you report your analysis on drug exhibit numbers -- did you also do one on 12, Drug Exhibit 12?

2970

MR. LITTLEFIELD:  And I'll ask that 218 be shown.

A    Yes, I did.

MR. LITTLEFIELD:  217.  I apologize.  217.

Q    (By Mr. Littlefield)  What analysis did you do on the beaker, sir?

A    There was just a -- I rinsed the inside of that beaker with methanol.  There was just a little bit of residue that I could see on the inside of the beaker. And then ran that methanol extract through the combination gas chromatography/mass spectrometry instrument.

Q    And your result on the residue?

A    No controlled substance.  It's -- actually I saw stearic and palmitic acid like I saw on that first exhibit.

Q    What is stearic and palmitic acid?

A    Those are binders that are seen in -- like in tablets as, you know, tablet binding material.  You'll find that in tablets a fair amount of time.

Q    And when you speak of binders, when you talk about binders and binding material, have we talked about anything today which contains that kind of binding material, sir?

A    We -- we talked about it when we talked about the

pseudoephedrine tablets.

Q    And what does the binding material do -- or the binders or binding material do in a pseudoephedrine tablet, sir?

A    Keeps -- gives the tablet shape and it also just keeps the other materials like the pseudoephedrine, I guess, held together inside the tableting material.

Q    Okay.  So if I've got a 60 milligram tablet of pseudoephedrine, does that tablet weigh 60 milligrams?

A    No, it doesn't.  It weighs more than that.

Q    How much of that tablet would be the pseudoephedrine?

A    I'd say usually around half, about half of it.

Q    And what would the other half of that tablet be besides the active ingredients, 60 milligrams, give or take pseudoephedrine?

A    It would be the binding.  It could be stearic acid, palmitic acid.  Could have starch in there.  There could be other inorganic -- (Interrupted)

Q    When one is -- when one is -- if I'm manufacturing meth and I've got me a bunch of pseudoephedrine tablets, do I just throw them in in the tablet form with iodine crystals and red phosphorous and start my cook?

A    No, you don't.

Q    What do I do first off?

2972

A      First of all you have to extract the pseudoephedrine away from the binders in the tablet so the first -- (Interrupted)

Q      When you say extract it, what am I going to be doing with the binder?

A      Binder you'd be just throwing away.

Q      How do I go about extracting the pseudoephedrine and separating it from the binder, sir?

A      First of all you'd have to grind the tablet into a powder.  Sometimes they'll use like things that you would grind up coffee beans in or something that would break up, you know, a solid material into a fine powder, just because it's easier to extract material, if you're just -- (Interrupted)

Q      Can I extract if I don't do that?

A      You can extract, but you probably wouldn't get all the pseudoephedrine out of the tablets.

Q      I'd do a better job if I ground it first?

A      Correct.

Q      Then after I break it up, then what do I do?

A      Then you would add it with a solvent that would extract the pseudoephedrine in it.  You could use water, you could use HEET.  It's methanol, but it's like HEET that you would add to your gas tank -- that's mostly methanol.  Or you could take like ethanol or you could

even do it with isopropyl alcohol.

Q   And I put -- and after I powder it up, kind of break it apart and I put it in let's say HEET, then what do I do?  What happens?

A   It -- the pseudoephedrine would dissolve in the HEET.  Now, you might stir it to make sure as much of it will dissolve in possible -- as much will dissolve in it as possible.  You could add a little bit of heat to it, but carefully, because methanol is flammable.  You could add a little heat to it to help, you know, force the material to make the easier to dissolve.  Something will dissolve easier in like, you know, a hot solvent than it would in a cold solvent.  So you might want to add a little bit of heat gently to it.

Q   And so as I put that powder into HEET or isopropyl alcohol and gently heated it up, what is happening?

A   The pseudoephedrine is dissolving inside the liquid, whatever solvent you're using, while the binder does not dissolve in it.  So it just stays outside as a solid.  So if you filter the material afterwards, you would be filtering the binder out and the liquid would now contain the pseudoephedrine hydrochloride.

Q   And if I had used something like that beaker to do that separation process, where would the binder be?

A   It would be in the solid and -- well, actually

potentially it would be the binder, a little bit of residue that I found inside that particular beaker.

Q   And then I pour off -- and then what do I do with the liquid?

A   Liquid you would filter.  You could use anything like coffee filters, for instance, through maybe a plastic funnel you got from an automobile store or an oil filter -- you know an oil -- something you would add oil to the car in.  Just put some coffee filters in there, pour the solvent through, the paper would trap, would trap the binder, the solid, liquid would come through. So now you would have a liquid of containing pseudoephedrine hydrochloride.  And the next step would then be evaporating the liquid.  When the solvent would evaporate, if you're using isopropyl alcohol or the HEET, what would be left then would be a residue after you evaporated that off, with just pseudoephedrine hydrochloride.

Q   And then would that be capable then of initiating the cook with iodine and red phosphorous?

A   Yes.

Q   And what you found in here as far as residue was consistent with what?

A   With binder.

MR. LITTLEFIELD:  Let's go back now to

2975

Government Exhibit Number -- let's go to Government Exhibit 79.  I don't think it's in evidence yet.

Q    (By Mr. Littlefield) And I think this is a two page report?

A    Yes.

Q    And let's just do them one at a time.  Let's do the first page.  Do you recognize the first page of Government Exhibit 79?

A    Yes.  That's the analysis report for Exhibits 10.01, 10.02 and 11.

Q    And go quick to the second page.  Is that the second page of that report, sir?

A    Yes, it is.

Q    And is that the complete report on items 10, 11 and 12?

A    Yes.  That's the complete report, yes.

        MR. LITTLEFIELD:  Move admission of Government Exhibit 79.

        THE COURT:  Any objection?

        MR. SMITH:  No objection, Your Honor.

        THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) Let's talk first about 12 since that's what displayed.  And what -- was Government Exhibit 12 no controlled substance.  What was that item contained in?  What was Government Exhibit 12?

2976

A      This is -- Exhibit 12 was the residue inside the beaker.

Q      The flask?

A      Inside the flask.  I did testify that, you know, palmitic and stearic acid.  And before -- those aren't controlled substances.  And before we write anything on the chemical analysis report, we do at least two separate tests on it to identify it as a particular substance. This one I just performed the GC mass spec test on it, which showed me, you know, palmitic acid and stearic acid, but that's just one test.  So I reported that particular result on the back on my work sheet, but I did not report it on the typed report.

Q      Okay.  And it showed no controlled substance?

A      Correct.

Q      Now if we'd go back to the first page.  Let's go to 10.  You said you did 10.01 and 10.02?

A      Yes.

Q      10.02 was the what?

A      Was the aspirin tablet.

Q      The single pill?

A      Yes.

Q      10.01 was the what?

A      Nicotinamide.

Q      You said how many tablets?

A     Seventy two tablets.

Q     Is that displayed there, sir?

A     Yes.  It's displayed right there, 72 tablets.

Q     And the net weight of that nicotinamide?

A     108.1 grams is the weight.

Q     And what -- in relation to a pound, approximately what's 108.1 grams, sir?

A     It's approximately one fourth of a pound.

Q     And nicotinamide can be used as you said what, sir?

A     Can be used as a cut for methamphetamine.  It could be used as a cut for other drugs, also.  But I've seen it in methamphetamine.

Q     So if I combined it with a quarter pound of meth, how much meth would I be able to sell?

        MR. SMITH:  Your Honor, I'm going to object. This is a repetitive argument and we've been in this area once.

        THE COURT:  Counsel?

        MR. LITTLEFIELD:  It might have been.  It'd been quicker if he'd answered the question, but I'll withdraw it.

        THE COURT:  Question withdrawn.

Q     (By Mr. Littlefield) Exhibit 11.

A     Yes.

Q     What was that, sir?

A    Iodine.

Q    And where does it show the -- what it contained?

A    Well, here is Exhibit 11 right here.  Exhibit 11 contains iodine.

Q    And the net weight or how much iodine?

A    It was listed right here.  I can't read it up there. It's 144.3 grams.

Q    And how much is that in relation to a pound, sir?

A    It's over a quarter pound, less than a third.

Q    Okay.  When you combine red phosphorous with iodine crystals, what is created?

A    With a little bit of water also, you create hydriodic acid.

Q    And what is it that reacts with the pseudoephedrine?

A    Hydriodic acid.

        MR. LITTLEFIELD:  Could I have just a second, Your Honor?

        THE COURT:  You may.

Q    (By Mr. Littlefield) When you combine red phosphorous with iodine and it makes hydriodic acid -- am I saying it right?

A    Yes.

Q    What happens to the iodine?

A    Well, it reacts with the material.  Some of -- usually you have extra iodine, some of the extra iodine

is released.

Q    Does it go away or do I get to keep it and use it again?

A    It's there in the reaction, it's a byproducts over here because the initial step, when you cook it, I mean you're first of all you're adding the iodine, red phosphorous, water and the pseudoephedrine.

Q    Right.

A    And you mix it up.  A lot of times you're going to add a little heat to it, cook it for a little while.

Q    Right.

A    The next step is you filter the material.

Q    Well, I'm not asking about the next step.  My question is what happens to those chemicals when you do that step?  What happens to the iodine when you do that first step?

A    You convert it.  Let's say -- chemically, I'm trying to think if I know the exact -- let's see.  You're converting -- I'm not sure if you actually form the iodine form, but you're breaking down the OH bond on the pseudoephedrine.  You're going to be adding a hydrogen in it's spot.  So you're going from a pseudoephedrine, changing OH to an H and with the H there, it's methamphetamine.  I'm not sure if there's an intermediate form with the iodine for a little while.  But there is no

2980

iodine present in the methamphetamine structure as the end.

Q   Is the iodine -- if I use 144 grams of iodine in a meth cook, when I finish that first step and have converted the pseudoephedrine into methamphetamine, do I have 144 grams of iodine left?

A   No.

Q   Is it gone?

A   Well, it just doesn't disappear.  Some of it's still there.  What form it's in, whether it's -- you've got some iodine sulfur, I'm not exactly sure.  It's probably in a number of different forms after a cook.

Q   Can I reuse that iodine in another meth --

(Interrupted)

A   No.  You cannot reuse it.  If it's used in the cook, you're not going to be able to reuse it.

Q   What about the red P.  If I combine a hundred -- and I'm not sure that that would be my -- I'm not sure that would be my combination.

A   Right.

Q   But let's -- just for the sake of my question, let's say I take 144 grams of red phosphorous and combine it with 144 grams of iodine to do a meth cook and then put in an appropriate amount of pseudoephedrine, okay?

A   Yes.

Q    You say the iodine would not be reusable?

A    Correct.

Q    What about the red phosphorous?

A    Red phosphorous, you can reuse it.  It's been said -- (Interrupted)

Q    Can or cannot?

A    You can use it.  However, if you're going to use it a second time or then a third time, it would not be as reactive as you would the first time.

Q    Kind of loses it's potency?

A    It loses a certain amount of it.  So like the word on the street that I've heard through, you know, clandestine lab operators or through other chemists that have investigated it -- (Interrupted)

MR. SMITH:  Your Honor, I'm going to object as hearsay.

THE COURT:  Argument counsel?

MR. LITTLEFIELD:  He can certainly rely upon the opinions of other individuals in relation to his own opinion and other experts.

THE COURT:  That wasn't the question.  That question's not before this witness.  Sustained.

Q    (By Mr. Littlefield) In your experience can red phosphorous be reused?

A    Yes.

2982

Q    And if I used a hundred -- if you used 144 grams -- not asking about it's potency.  But if you used 144 grams of red phosphorous in combination with 144 grams of iodine, how much of that red phosphorous would be left over?

A    Quite a bit of it.

Q    Would some potentially be lost in the process; I might not filter it all out or what?

A    Well, there's a lot of different, let's say, recipes for using a certain amount of iodine, certain amount of red phosphorous, certain amount of pseudoephedrine -- (Interrupted)

Q    Well, I understand that.  There's different breakdowns.  My question relates to the red phosphorous. Is it consumed in the meth cooking process?

A    No, it's not.

Q    If I have used it before, if I cook, I use red phosphorous in a cook and preserve it to use for future cooks, if an analysis is performed on that red phosphorous that has been previously used in meth cooks, what is going to show up in that red phosphorous and that analysis of it?

A    You would find methamphetamine.  I've analyzed red phosphorous residue a number of times.

                    MR. LITTLEFIELD:  May I have a second, Judge?

2983

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examination.

MR. SMITH:  Thank you, Your Honor.  Your Honor, may I pass the note back here to the clerk?

THE COURT:  You may.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q    Good afternoon, sir.

A    Good afternoon.

Q    Let me get organized here, a second.  All right. Sir, I'd like to visit with you about -- and we'll try to take them in order with these various exhibits.  So let's just go back to the first three.

A    Okay.

Q    And you have the lab submittal sheets with you?

A    Yes, I do.

Q    Now, I want to look at item number two, Exhibit Number 2.  And you had net weight on there of 18 thousandths of a gram?

A    Yes.

Q    Can you quantify that for me by way of reference to say a grain of salt, grain of sand or something like that?

2984

A     It would be a very small amount a material.   Maybe a few -- a few grains of sand, a few granules of salt.

Q     All right.   Very little then?

A     Small amount.

Q     On Exhibit Number 3, and I'm calling them exhibits because that's how you have them listed on your submittal sheets.   And it's that bottle that was labelled Pseudo 60s Max brand?

A     Correct.

Q     Am I correct, sir, that there were no pills inside of that bottle?

A     Correct.

Q     So what we had inside was some dust or something off of what had been in the bottle before?

A     Exactly.

Q     All right.   Now, I'd like to look at the submittal sheet for four, five and six.   Those were submitted to you in February of 2000?

A     No.   They came into the Chicago laboratory in December of 1999 and they were originally submitted to the Dallas laboratory in October of '99 and they came in October 12th by registered mail.

Q     Okay.

A     And they were mailed by registered mail to the Chicago lab in December of '99 and they were assigned to

2985

me in January.  I analyzed in January of 2000.

Q    And then you submitted the report in February of 2000?

A    Yes, that's when it was -- (Interrupted)

Q    And actually -- excuse me, sir?

A    That was when it was typed up, the report.

Q    And actually as it relates to four, five and six, there was no analysis performed, was there?

A    No, there wasn't.  Right.  This is just tech comments in Section 25.  No analysis of exhibits four, five and six.  But I signed it on the 4th of February.

Q    Of 2000?

A    Yes.

Q    Okay, sir.  Then I'd like to look at the submittal for seven, eight and nine.

A    Okay.

Q    And seven, as you said, wasn't analyzed at that time because of the danger associated with syringes, particularly used syringes, correct?

A    Yes.

Q    But number eight was the hose that you talked about?

A    Yes.

Q    And inside of that hose you ran your methanol wash and you came up with a positive test for methamphetamine?

A    Correct.

2986

Q    But there's no way to tell when that hose may have been used, if it was used, in methamphetamine production?

A    Correct.

Q    Don't have any idea how long that hose had been around or the substance that got in there, when that occurred?

A    Correct.

Q    Now, you said that you've gassed off methamphetamine before?

A    Yes, I have.

Q    You've made methamphetamine?

A    Yes.

Q    For purposes of demonstration?

A    Yes.

Q    And whenever you would see a hose like that in the production of methamphetamine, engaged in this gassing off process, you would see it stuck down into a liquid?

A    Yes.

Q    And then where would the other end be stuck?

A    The other end is in the gas generator.  And there's a couple of ways you can do it.  The one common way is you've got just rock salt and you're adding battery acid to it.  So you might have in a red plastic maybe garbage can or not -- red plastic container that you would carry like, say, one or two gallons of gas and they've got it

closed off from one end of it with this tube running.   So you'd have the rock salt in it, you'd add the battery acid.   Immediately you'd have to cap it so it doesn't come off -- right off the stop.   The battery acid reacts with the salt forming a hydrogen chloride gas and it would come out the tube.   And you would have that put into a solvent which contained a methamphetamine base. And then that would force the methamphetamine base turning into methamphetamine hydrochloride and you would have that precipitate.

Q    Is this the closed system -- (Interrupted)

A    No.   Well, it's not a totally closed system or it would blow up because you've got -- you have it closed at one end.   As soon as you added the sulfuric acid, you want to have it closed.   You don't want it coming out the top.   You want the gas that's generated to come out through the tube into the solvent, which has got the meth in it.

Q    And then does it bubble out of that solvent?

A    Yes.

Q    So that's the end that's open?

A    It bubbles through there, right.   And, you know, you'll have extras -- not hydrochloric gas.

Q    Okay.

A    It doesn't feel real good.   So you'd -- hopefully

you got a vent going or something.

Q   And you've done that?

A   Yes.

Q   And what's left over after I'm done with that?

A   Well, you're going to still have -- inside the battery compartment you'll probably have some hydrochloride gas inside there.  You'll have some sulfuric acid inside there and excess rock salt that's in one side of it.

Q   Kind of a nasty container of stuff, isn't it?

A   Yeah.  It's a sample that we would not want to analyze in the Chicago lab.

Q   So it's laying around, very easily identifiable?

A   Well, if you tested it with PH paper, it would be a strong acid.  You wouldn't want to -- I mean, we recommend to agents out in the field this is like a dangerous stuff.  You don't really need it.  So we prefer that those particular -- the gas generator's not even sampled.

Q   You don't want them confiscated?

A   Well, no, it's like the safety hazard.  It's just a safety hazard for whoever is sampling it.  It's a very strong acid.

Q   Nonetheless, that's not an easy thing to get rid of, is it?

2989

A    Well, I guess you could pour it out somewhere.

Q    Now, the container that the solvent would be in, the other end of it?

A    Yes.

Q    What's going to be left over after that process?

A    You would have -- you would have a methamphetamine hydrochloride which precipitated out and you'd still have the solvent inside there.

Q    Okay.  And that's a liquid?

A    Yes.

Q    And I guess eventually that may evaporate out?

A    Yes.

Q    That's going to leave residue of some sorts -- (Interrupted)

A    Well, if it -- (Interrupted)

Q    Go ahead.

A    If it evaporates, it's just going to evaporate. There wouldn't be a residue of that.  It just turns into a gas.

Q    What's going to be in that container?

A    Just the methamphetamine hydrochloride.

Q    So would there be a residue from that possibly?

A    If it wasn't washed out.

Q    Yeah.

A    There would be residue of methamphetamine

2990

hydrochloride.

Q   Further proof of an ongoing cook?

A   Yes.

Q   Now, whenever you made methamphetamine, did you ever have a two layer liquid?

A   Yes.

Q   And what's the significance of having a two layer liquid?

A   Well, the step -- there's one step that I haven't talked about yet today is after you do the cook and I mentioned the second step is we filter out the red phosphorous sludge.

Q   Right.

A   So now you've got a liquid.  It's a liquid with methamphetamine.  It's an acidic liquid, because we had formed HI, hydriodic acid, to react with it.  And now you've got an acid solution containing methamphetamine. The next step is you want to change that particular liquid into like a solvent, like the toluene or Coleman fuel.  And to get it to go into that, it'll go into that solvent only if the solution that you're extracting it from is basified.

Q   So what do we have to use to make it basified?

A   There's a number of things.  One of the items that they use a lot of the times is just lye, sodium

hydroxide.

Q   So if we're in an ongoing cook, we'd expect there to be lye laying around?

A   Right.  It's easy to obtain.  But lye is the -- you could use other things, also.  But lye is the most often used.

Q   What's that two layer liquid look like?

A   Well, it's exactly it's two layer liquids, because what will -- (Interrupted)

Q   Color-wise?

A   What does it look like?

Q   Is there different colored -- (Interrupted)

A   Oh.  There'll be -- let's say if you had it in -- let's just say it could have been a plastic gallon -- just a plastic milk gallon over here.  You'd have a liquid with -- and you can see a difference in the layers.  And usually there'd be a slight difference in color.  So maybe the bottom layer will be like a yellowish color.  Top layer will be a lighter yellow or maybe a clear color.  One them might be like a dark or like an orange color.  But what you do is after you basify the material, you would then add the solvent like Toluene or Coleman fuel.  Coleman fuel does not mix with water.  So, after you basify it, it's going to be a water solution that's basic.  And you'll have this Toluene or

naphtha or -- and those particular solvents sit on top of the basic layer.  So you could see there's a -- you know, two layers that aren't mixing.  You can see -- you know, you'd swirl it, you could see this middle thing.  The middle layer of the two liquids would be swirling back and forth.  So you could separate it.

Q    Very identifiable?

A    Yes, you can.  Yes.

MR. SMITH:  I'm going to show Government's Exhibit Number 65, if I may, Your Honor?

THE COURT:  You may.

Q    (By Mr. Smith) And, sir, you can look at your screen or up here, whichever's more comfortable with you.  And on there you see some items that you described previously, the toluol, paint thinner and the mineral spirits?

A    Yes.

Q    Okay.  And you also see that MSE container and it has enamel underneath of it.  What would you tend to associate that with?

A    I'm not sure what MSE is.  I don't know.  The fact that it's a metal can, I'm thinking it's a solvent, something like the toluol.  But I don't know what it is.

Q    Okay.  What does enamel mean to you?

A    What does -- excuse me.

Q    Enamel?

A    Oh, I guess putting an enamel finish on --
(Interrupted)

Q    Paint, right; is that correct?

A    Yes.

Q    So -- and we can't see that first word before that
enamel on there?

A    Yes.

Q    But you do -- do you recognize that symbol up in the
upper left hand corner of that container, that blue and
yellow symbol right here?

A    I think it says naptha, but I'm not positive.

Q    N-A-P-A?

A    Oh, I thought it would maybe be Naphtha.  I can't
read it on my screen.

Q    It's hard to read, isn't it?  It's hard to see?

A    Yes.

Q    Let me ask you this:  You don't have any reason to
believe that that's not paint, do you?  I mean, it does
say enamel on that container.

A    I don't believe paint would come in a metal can like
that.  It's not paint.  Might be paint remover.

Q    Okay.  It's hard to see this container.  If that was
previously -- and it's not going to show up on your
little screen, this little container -- you have to look

2994

at the big screen, sir.

A    Oh --

Q    This little container here has been described earlier as a paint gun.  It's hard to see right there.

A    Oh.

Q    Let me ask you:  If in fact that's a paint gun and this is paint -- and I know we can't read the first word there -- would you associate these items with an automobile paint operation?

A    Well, the one is definitely not paint.  That MSE is definitely not paint, because you've got a little container -- you're not going to -- any paint I've seen, it's in a regular can, wide -- you know, it's a wide thing.  This is just -- it's a solvent of some type.

Q    Okay.

A    You've got just the metal can with a little spigot for just pouring it out.  It's not going to be paint.

Q    What's that look like for coming out of that container?

A    Well, that looks like more a paint can, it's a wider mouthed container, that one.

Q    That does look like paint, doesn't it?

A    That one is paint, yes.

Q    So if that's paint, paint thinner, mineral spirits, toluol, paint gun, you'd expect all those to be together,

wouldn't you?

A   You could have it for cleaning paints.  I mean, the paint thinner, mineral spirits and the toluol, I would think that's -- after you've painted you're using like an enamel base paint, maybe you're cleaning brushes or something like that.  You could use it for that.

Q   Or if you're preparing your surface for painting, such as metal on a vehicle?

A   For cleaning metal or for cleaning a number of items, you could use it, yes.

Q   Sure.  Okay.  Thank you, sir.  Now, still referring to the lab submittal, which was Exhibit 76.

MR. SMITH:  And we can go ahead and put that up, if you would, with Your Honor's permission.

THE COURT:  You may.

Q   (By Mr. Smith) I want to refer -- and you've got a hard copy there, sir, while she's pulling it up.  I'd like to refer down to the item number nine, the pseudoephedrine.

A   Okay.

Q   I see on there the weight, we have 221 grams?

A   The pseudoephedrine -- no.

Q   On number nine, on the submittal sheet, isn't that what that says right here, 221 grams?

A   Oh, oh, there.  Yes.

2996

Q    Okay.  Now, that doesn't completely line up with our chemical analysis report, does it?  I mean, there we have gross weight 219 grams?

A    219.7, yes.

Q    Yes, sir.  And the net weight being 181.6 grams?

A    Yes.

Q    And you describe sometimes the difference between the gross weight and the net weight is the difference between a packaging and the container that it's in?

A    Yes.

Q    But there's really not an adequate explanation for the difference between 221 and the other of 219.7, right?

A    Well, there is a difference in actually moist -- or one -- the balances they use there may not have been calibrated just right where the agent is.  This is actually very close.  219.7, that's -- (Interrupted)

Q    That's not exact though, is it?

A    No, it's not.  But there's -- (Interrupted)

Q    This is a laboratory?  I mean, we want to be exact, don't we?  I mean, if we're testing something for methamphetamine, we want to be exact, don't we?

A    You'd want to be exact, yes.

Q    Okay.  We don't have to have any variance here because somebody's, well, liberty's at jeopardy, right?

A    That's true.  But moisture goes in and out of

plastic bags. And so, just humidity differences can cause differences in weight from when the agent weighed it and when we weighed in the laboratory.

Q    And they're sealed bags, heat sealed bags, I think we testified to, didn't we?

A    Yes.

Q    Let's talk about the gross weight of pseudoephedrine. And we can use whatever weight we want to on here but why don't we go with the 181.6, because that's the net weight that you have on here on your analysis report?

A    Correct.

Q    Correct. Now, you indicated to us earlier that those pills are made with a binder substance?

A    Yes.

Q    We don't have a net weight of ephedrine, do we? No pseudoephedrine. We don't have a net weight for that. We've got a net weight of binder.

A    Together with pseudoephedrine.

Q    Right. So we can't really tell the jury how much pseudoephedrine was there because we never broke it down, never took the binder out of it and said this is pseudoephedrine and here's what it weighs.

A    But we could calculate it and I could give you that number.

Q    It's not -- sir, the only thing I have to work with whenever we're getting ready for these trials is the evidence.  And it's not on this evidence, is it?  You would agree with me about that?

A    Yes.

Q    Okay.  So really this isn't an accurate depiction of how much pseudoephedrine was analyzed because it was never determined without the binder included in it, correct?

A    I did not do a chemical purity check on the powder.

Q    Now, Mr. Littlefield didn't let you complete your answer whenever you said you didn't count each one of those pills, but you didn't, did you?

A    What I did was I took -- (Interrupted)

Q    Hold on -- hold on a second, sir.  The question was you did not count those individual pills, did you?

A    I didn't count 1426 tablets, no.

Q    But that's what it says on here, right?  It says 1426 tablets.

A    Yes.

Q    But you didn't count those?

A    I did a calculation to figure out how many.

Q    That's not what I asked, sir.  You did not count those pills?

A    No.

2999

Q    It doesn't say on here that you made some sort of calculation.  It says on here 1,426 tablets.

A    Yes.

Q    This submittal sheet, let me make sure I've got the right one.  Number 78.  And I might not want that one. Let me see here.  I'm looking at the chemical analysis report, sir, of Exhibits 10.01, .02 and Exhibit Number 11 and I'm trying to find that exhibit number.  One second, please.  I've been told it's 79.  Let's see if it is, sir.

          MR. SMITH:  If I may display it, Your Honor?

          THE COURT:  You may.

Q    (By Mr. Smith) Now, again accuracy is something that we want to be concerned with.  You would agree with me there?

A    Yes.

Q    Okay.  And I made a statement earlier about this nicotinamide being related to nicotine?

A    Yes.

Q    And, sir, I guess I'm not even an armchair chemist. I got on the internet and did a search.  But I looked up here for nicotinamide.

A    Okay.

Q    Do you see that?

A    Yes.

3000

Q   Because that's what's provided on your analysis report?

A   Yes.

Q   Right?  Nitco -- and that's not right, is it?

A   No, that's correct.  Oh.  Oh, I just -- it was a typo.  It's a typo.  It's -- I didn't even notice that until just now you bring it up.  That T should not be there.

Q   All right, sir.  Now, somebody like me, not even an armchair chemist, having to go to the old internet trying to figure out what Mr. Skowronski's talking about here, kind of hard if we've got the old chemical word misspelled, isn't it?

A   Correct.

Q   Now, do you know what nicotinamide is?

A   When you say Nitco -- (Interrupted)

Q   Well, that's what that says.

A   Right.  That's a typo.  I don't -- you're not going to find anything in an internet looking at nicotinamide.  The T should not be there.  But it passed myself and evidently the laboratory director also missed that.

Q   And again, we want to be accurate.  They had 72 tablets on here.  Did we count those?

A   Seventy two tablets, I -- if I could refer to my notes I could tell you.

3001

Q    And I want you to refer to your notes for anything that you need.

A    Okay.

Q    If you don't remember then I want you to refer to them, okay?

A    Those I counted individually, 72 tablets.

Q    Okay.  Let's talk about nicotinamide.

A    Yes.

Q    And that is also something that we know as anisatil, niacin?

A    Well, not anisatil.  Anisatil is a different substance.

Q    Okay.  That's in a vitamin B3, right?

A    I don't know if it is vitamin three.  You'd have to show me that it's vitamin three.  I don't -- (Interrupted)

Q    Again, I just have the old armchair internet stuff here, but when I look at this nicotinamide, it is a vitamin?

A    Yes.

Q    And that's what you talked about earlier?

A    Yes.

Q    Now, you associated that with a cut?

A    I've seen it in a number of methamphetamine samples. I've seen it in some cocaine samples also.

3002

Q    But it does have a legitimate purpose, you would agree with me there?

A    Yes.

Q    And that's why you identified it as containing no controlled substance?

A    Correct.

Q    And then I've got to bring up 10.02, the aspirin?

A    Okay.  Yes.

Q    That's it, right, aspirin?

A    Yeah.

Q    Let me go to the flask, if we may.  Again, we've identified that as not having any sort of CDS, no controlled dangerous substance?

A    Correct.

Q    Correct?  Now, today's another one of those instances -- there's nothing on our analysis that indicates that was stearic or palmitic acid?

A    Correct.

Q    That wasn't indicated on your analysis, was it?

A    No, it was not.

Q    Okay.  Now, and I haven't cooked meth before, so I got to kind of struggle through with what you told us earlier, so you kind of gave us a way to go about breaking down these pills.  You want to grind them up if you can?

A     Right.

Q     That something that's going to be left in a -- whatever you're using to grind with?

A     As long as it wasn't cleaned out, you're right.

Q     A portar and pestle is one way to do it -- or mortar and pestle, is that right?

A     Mortar and pestle, yeah.

Q     Yeah.  That's one way to do it.  You know what I'm talking about there?

A     Right.

Q     Another way is to have some sort of a mechanical grinder where you have a screen and probably contained within that screen is going to be sort of evidence that that's what you were doing?

A     Right.

Q     Kind of hard to clean them.  I mean, you can rinse it but it's still kind of hard to get it all out of there?  Is that right?

A     I don't -- depending on how well you wash it out, right.  If you do it just one time, yeah, there'd be something in there.  If you wash it out a few times, maybe you'd clean it up good.

Q     But if you're talking about grinding it so we break it down so we make this process easier to break it down, to get the binders out of it, right?

A     You break it down so that when you're extracting it with the liquid, better chance you're going to get all of the pseudoephedrine up into the whatever solvent you're using.

Q     Okay.  And the solvents that you described are methanol, which is also known as HEET, which is H-E-E-T, right?

A     Correct.

Q     That's that kind of a -- (Interrupted)

A     Pint container -- sometimes it's -- it's just a tall container, it's got a little spout.  Some of them are -- oh, I don't know, probably about that big, that tall.

Q     And you're very familiar with them in Chicago because it's probably a little more common colder state that you live in to use that in the wintertime in your gas tank?

A     Yes.

Q     All right.  Okay.  So HEET or methanol is one thing. Isopropyl alcohol is another?

A     Right or water.

Q     Or water.  Water's not as good because it takes longer to evaporate?

A     Absolutely.

Q     And isopropyl alcohol, is that -- did I mention that?

3005

A    Yes.

Q    Ethanol, isopropyl and methanol, right?

A    Yes.

Q    Something that would be laying around if that's what we were doing was breaking down pills?

A    If you got some stuff left over, yes.

Q    Now, left in that container -- let's say if I was using that flask to break down pills, okay?  You said that you found stearic and palmitic acid.  Would there also be some sort of traces of ephedrine or pseudoephedrine?

A    Could, unless you washed it out a couple times.

Q    Okay.  If I washed it out a couple times I might get that stearic and palmitic acid out of there, too, wouldn't I?

A    Well, no, that's the whole purpose of the extract. The purpose is to get the stuff that will dissolve in the solvent away.

Q    To get the binder out and the solvent?

A    Right.  The stuff that's dissolved in it depends. It's only -- you'd get rid of like that palmitic or stearic is if you scraped any residue off the side, any solid trapped there and then gotten rid of that.

Q    Let me go about it this way.  Wasn't any pseudoephedrine found in that flask?

3006

A    No.

Q    Exhibit Number 12?

A    Correct.

Q    All right, sir.  That flask was sent for fingerprint analysis, or do you know?

A    It was.

Q    Now, I guess just a few different areas because you appear to be very knowledgeable about these subjects. Are there legitimate uses for iodine?  And let me ask it this way:  It's sold in the store.  You can go buy it?

A    Yes, there is -- (Interrupted)

Q    Tell us what legitimate uses are for iodine.

A    I think it's something to do with disinfectant.  I'm not sure about it, like for out in rural areas.  I guess it's -- I know I've looked at it in a sheet -- disinfectant for maybe hooves of large cattle or so.  I'm not absolutely positive, but I -- that's what I vaguely remember that iodine has been used for, the solid iodine for.

Q    And I don't mean to get just elementary, but there are various obvious uses for mineral spirits, paint thinner, toluol or Toluene?

A    Yes.

        MR. SMITH:  Sir, thank you for your time.  Pass the witness, Your Honor.

3007

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    You didn't do an analysis of exhibits four, five, six or seven, did you?

A    No, I did not.

Q    Do you know what exhibits Lynn Griffin analyzed?

A    Were exhibits four, five, six and seven.

Q    In regards to basifying, adding lye, et cetera, is there -- and you talked about the two layer liquids.  Is the meth always on the bottom, always on the top, or does it vary depending upon the cooking method?

A    Depends on which solvent that you're using.  Most of the solvents, the ones that were listed on the photograph, naphtha, the paint thinner, the Coleman fuel, they are lighter than water, they would be on the top. So, when you're doing a two layer liquid, you would be saving that top layer liquid.

Q    And that would be where the meth's contained?

A    Yes.

Q    The meth's in the solvent?

A    The meth would be in the solvent, yes.

Q    And what's -- what would be a solvent that would cause the meth to be in the bottom?

A    The bottom would be Freon, something that's got the

3008

halogens in it, which would make the solvent heavier than water.  And I believe there's certain cleaning solvents used in the dry cleaning industry which has got halogens in it that cause it to be heavier than water, so then again -- then it would be in the bottom layer and the basic layer would be on top.

Q    In regards to the pseudoephedrine, the DEA submitted that and gave a gross weight of 221 grams.  Do you recall that, Government Exhibit 76?

A    Yes.

Q    And your analysis was the gross weight was 219.7 grams; is that correct?

A    Yes.

Q    Is that a significant difference?

A    No.

Q    In fact, what percentage would that be?

A    Be less than one percent.

Q    In regards to the 181 grams of gross weight or net weight on the pseudoephedrine, you can calculate the quantity of pseudoephedrine in those, can't you?

A    Yes.

Q    How did -- first off, how did you calculate that there were 426 pills?

A    What I take are 10 tablets.  I look at all the tablets, appear to be the same, I take 10 tablets, weigh

3009

that and I'll get the average weight of one tablet.  I would then weigh all the tablets and divide it by the weight for one tablet and it's a calculation, and that would give you the calculated number of tablets. Sometimes we get a lot of tablets into the laboratory, you're getting over a hundred tablets arbitrarily, you're weighing 10, getting an average weight, dividing it and then getting a calculated number of tablets in the particular exhibit.

Q    How close do you think that 1426 figure is, sir?

A    I'd say plus or minus five.

Q    Then let's go from that, 1426 tablets.  You calculate how much pure pseudoephedrine would be in those tablets?

A    Yes.

Q    Do you have the means of being able to do so now?

A    Yes, I do.

Q    Would you do it?

A    Yes.  Well, first of all there were markings on the tablet.  Markings on the tablet was K27 on one side and there was a cross on the opposite side of the tablets. We can refer -- we've got a large book, it's like a telephone sized book, it's called the Global Index, comes out every two or three years and it has the markings of the tablets and what was found to be in those tablets

with a particular manufacturer.  Well, those markings, K27 with a cross on the opposite side had the markings from the Global Index of 60 milligram pseudoephedrine tablets as distributed by PDK Labs.

Q    Okay.  So those are a 60 milligram pseudoephedrine tablets?

A    Yes.

Q    And that would be according to what you said about truth in labeling, each one of those tablets would have contained how much pure pseudoephedrine?

A    Correct.

Q    How much?

A    Sixty milligrams or .06 grams.

Q    Tell me how much 1,426 tablets would contain of pure pseudoephedrine, please, sir.

A    Multiply -- (Interrupted)

Q    Do it for me.

A    Okay.  It's 85.5 grams.

          MR. LITTLEFIELD:  Pass the witness.

          THE COURT:  Further cross?

          MR. SMITH:  Thank you, Your Honor.  I'd ask Number 77 be displayed, Your Honor.

          THE COURT:  You may.

3011

RECROSS EXAMINATION

BY MR. SMITH:

Q    Sir, first off when I refer to Exhibit Number 9 and it has the net weight and you see the 1,426 tablets?

A    Yes.

Q    That doesn't say that's an approximation, correct?

A    No.  Right.

Q    It doesn't say plus or minus five?

A    No.

Q    By looking at that, it's hard to tell otherwise that these tablets were, sure enough, one by one counted because we have -- even a -- it's not 1430 or 1450, that's 1426.

A    I was probably even more generous in saying plus or minus.  I mean, it may be plus or minus one or two.  But that's the calculation, that's the routine laboratory procedure for a large number of tablets.

Q    But nothing on here says that's an approximation.  I mean, it indicates 1426 tablets.

A    It's not an approximation, it's a calculation.

Q    Okay.  Nothing on there says calculating weight. That was another term that you used.

A    Calculation, but it's not laboratory policy to write down calculating.

Q    Okay.  Now, this says pseudoephedrine hydrochloride.

3012

Now, does that hydrochloride refer to those binders?

A    No, it's the salt form of pseudoephedrine.

Q    Okay.  So, it's a little misleading whenever we have 174 grams as it relates to pseudoephedrine hydrochloride, because you just told us actually there's 85.5 grams?

A    Well, it says this is a material, so it's 181.6 grams of a material that contains pseudoephedrine hydrochloride.

Q    All right, sir.  But this exhibit that I'm looking at right here, it says Exhibit 9 contains pseudoephedrine hydrochloride.

A    Correct.

Q    It doesn't say a material, it doesn't say a combination, it doesn't say anything else.

A    Right.

Q    It says pseudoephedrine hydrochloride.

A    Correct.

Q    And that weight down there is not correct for containing that much pseudoephedrine, is it?

A    That's the reserve weight.  Reserve weight refers to the amount of material left after I completed my analysis.

Q    Excuse me.  I meant this net weight.  I'm sorry.

A    Oh, okay, yeah.  Net weight is the weight of the tablets, the total weight of the tablets as it came into

3013

the laboratory.

Q    Right.  And I understand what that means.  But I guess my point is, in all fairness to Mr. Barrett, that we could have put on there 85.5 grams of pseudoephedrine, correct?

A    It's 85.5 grams of pure pseudoephedrine.  This is material or tablets that contained the pseudoephedrine.

Q    Okay, sir.  And I understand what you're telling me.  But that does not say non-pure pseudoephedrine hydrochloride.

A    Correct.

Q    So, just a lay person looking at that has no reason to think that's anything other than what it says.  It doesn't say pseudoephedrine tablets, doesn't say Max 60s brand.

A    Right.

Q    Okay, sir.  You can understand why it can appear to be a little misleading?

A    Okay.  Yes.

Q    You understand that?

A    Yes.

        MR. SMITH:  All right, sir.  Thank you.  Pass the witness, Your Honor.

        THE COURT:  Further direct examination?

        MR. LITTLEFIELD:  No, Your Honor.

3014

THE COURT:  We'll take the afternoon recess at this time.  I'll ask everyone to remain seated in the courtroom and remind the jury not to discuss this among yourselves or let anyone else discuss it with you during this recess.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  We'd ask so, Your Honor.

MR. SMITH:  He may, Your Honor.

THE COURT:  Sir, thank you for your testimony, you may step down, you may be excused.  It's my understanding that this witness is excused permanently?

MR. SMITH:  Yes, sir.  I wasn't quite sure, we didn't have it, but we're done.

THE COURT:  The record should reflect the jury and the witness are out of the courtroom.  Anything to be brought up outside the hearing of the jury from the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defendant?

MR. SMITH:  I do think we resolved our previous problem, Your Honor.  I don't think there's going to be -- (Interrupted)

THE COURT:  Which problem was that?

MR. LITTLEFIELD: The question of Mr. Griffin testifying as an expert and his opinion whether it was a lab or not. I'm not going to ask him.

THE COURT: Okay.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT: Let the record reflect the jury is in the box. Counsel for the Government is present. Defendant is present with counsel. You may call your next witness.

MR. LITTLEFIELD: Lyndell Griffin.

LYNDELL GRIFFIN,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record please, sir.

A    My name is Lyndell Griffin.

Q    Where you from, Mr. Griffin?

A    Currently I work at the DEA Office of training, the clandestine laboratory training unit in Quantico, Virginia.

Q    Would you lean closer to the microphone? And where was -- and what was that again?

A    It's the DEA's office of training, the clandestine

3016

laboratory training unit in Quantico, Virginia.

Q    What do you do in regards to the clandestine lab training unit for the DEA in Quantico?

A    My actual title is a state, local and international training coordinator.  Essentially what that is, is I'm a teacher.  I teach law enforcement officers how to process clandestine laboratories in a safe manner, as well as how to synthesis controlled substances.

Q    And prior to being an instructor at the clan lab investigation area at Quantico, what connection or what job did you have with the DEA, sir?

A    As a forensic chemist with the DEA South Central Laboratory in Dallas, Texas.

Q    And what were you doing as a forensic chemist, what were you analyzing, sir?

A    As a forensic chemist with DEA, we analyze items that are submitted that are suspected to be controlled substances.  We analyze those to determine exactly what the substance is and then we prepare reports of our findings and then occasionally testify in court.

Q    In that regard, what is your educational background that would qualify you to analyze drugs for the Drug Enforcement Administration, sir?

A    Well, I received a Bachelor of Science in forensic science from the University of Central Oklahoma.  After

graduating, I worked as an analytical chemist in the food industry. I also worked as a criminalist with the Oklahoma State Bureau of Investigation.

Q   Okay. Let me back up. Before you went to Central -- I still call it Central State there in Edmond. Where did you -- were you in any other area or any other school of higher education?

A   I did attend the Southwestern Oklahoma State University before University of Central Oklahoma.

Q   And that's at Weatherford, right?

A   Correct.

Q   And what were you studying at Southwestern?

A   Chemistry.

Q   And then why did you transfer to Central State? Or University of Central Oklahoma?

A   At that time I knew I was going to go into a forensic science type of a field. And when I learned that they had a forensic science program, I transferred schools so I could achieve that degree.

Q   And was there an area of specialization that you studied in in regards to the bachelor of science in forensic science?

A   The program is for the most part analytical chemistry. It also does have some biological classes, microbiology, zoology, those types of classes in case the

3018

area of forensics you go into is one of a biological nature. Since I knew I was going to go into drug chemistry, the analytical chemistry portion of it was most beneficial for me.

Q   And you were with the Oklahoma State Bureau of Investigation for how long, sir?

A   Approximately a year and a half.

Q   And what were you doing with the OSBI?

A   With them, my title was a criminalist. And it's essentially the same job that I performed as a forensic chemist with DEA, just a different title. But that's to analyze items submitted as drug evidence and also to respond to crime scenes and in particular, in my field, it was clandestine laboratories.

Q   And during the time you were with the OSBI as a criminalist, do you have any idea how many clandestine methamphetamine labs you might have responded to, sir?

A   While with OSBI, probably 80 to 85 laboratories.

Q   While you were with the South Central Lab in Dallas, did you ever respond to any clandestine labs as a part of your job?

A   Yes.

Q   And do you have any idea how many clan meth labs you would have responded to in connection with your being associated with the DEA in the South Central Lab?

3019

A    Probably -- probably around 50 clandestine laboratories during my time with South Central Laboratory.

Q    So combining the two, you would have exceeded over -- well over a hundred labs that you'd gone to, sir?

A    Yes.

Q    Have you previously been qualified as an expert witness?

A    I have.

Q    And where, sir?

A    Various state and federal courts in New Mexico, Texas, Oklahoma, Alabama, I believe Louisiana also.

Q    You've previously been qualified in any of the federal district courts in Oklahoma, sir?

A    I have.

Q    Which ones?

A    The Western District I know for certain.  That's the only one I can remember for sure.

MR. LITTLEFIELD:  Your Honor, I would ask that Mr. Griffin be qualified as an expert in the area of drug analysis for the purpose of this trial.

THE COURT:  What says the defense?

MR. SMITH:  No objection, Your Honor.

THE COURT:  That will be the order of the Court.  You'll be recognized as an expert in the area of

3020

chemical analysis.

Q    (By Mr. Littlefield) Mr. Griffin, did you have occasion to analyze any exhibits that were related to this particular case, sir?

A    I did.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 74 be displayed to this witness.

THE COURT:  You may.

MR. LITTLEFIELD:  It has not been in evidence yet.

Q    (By Mr. Littlefield) Let me ask you, have you seen this item, sir, as soon as it's displayed.  It will be displayed immediately to your left.

THE COURT:  What's the number?

MR. LITTLEFIELD:  74.

Q    (By Mr. Littlefield) Do you recognize what's shown on Government Exhibit Number 74, sir?

A    I do, although it's not one that I had in my possession.  But it's a DEA Form 7.  It's the submittal as well as the report form for exhibits four, five and six.

Q    Did you perform an analysis on four, five and six on this same case?

A    I did.

MR. LITTLEFIELD:  Judge, I'd move admission of

3021

Government Exhibit Number 74 as identified through Mr. Skowronski.

THE COURT: Any objection?

MR. SMITH: I don't have any objection, Your Honor.

THE COURT: It's admitted without objection.

Q   (By Mr. Littlefield) And do you recognize those items, exhibit numbers four, five and six, sir?

A   I do, but again, that's not the seven that I had.

Q   I understand. Did you analyze those exhibits?

A   I did.

Q   Okay. Would you look to Government Exhibit Number 209, please. And we're talking here first -- we're going to follow them down, four, five and six, okay?

A   Okay.

Q   Now, we're displaying Government Exhibit Number 209 and we'll try to bring it in on just that portion. Do you recognize Government Exhibit Number 209, sir?

A   May I refer to my notes to compare the numbers?

Q   Sure.

A   I do.

Q   And how are you able to identify it, sir?

A   I can see what appears to be my initials as well as the corresponding laboratory number that matches this evidence with the report that I filed.

3022

Q    Do you see the laser pen in front of you?

A    Yes.

Q    And if you take the arrow and push on it and point towards the exhibit, can you point -- can you direct the jury's attention as to where your initials are?

A    On this one up here?

Q    Yes, sir.

A    My initials are right here.

Q    You mentioned the lab number that corresponds. Where is that located, sir?

A    It's right above it.

Q    Do you see -- does it also display the drug exhibit number, sir?

A    On the image here it's too small to read.

MR. LITTLEFIELD:  Can we focus in a little closer?

Q    (By Mr. Littlefield) Are you able to see it now, sir?

A    Yes, I can.

Q    And where is the exhibit number?

A    It's this number right here.

Q    And what exhibit is this?

A    It's Exhibit 4.

Q    And where were your initials?

A    Right here.  That's the date and my initials when I

3023

opened it as well as the date when I resealed it.

Q    What condition was this in when you received it?

A    It was in a sealed condition.

Q    And what was Government Exhibit -- or pardon me, Drug Exhibit Number 4, sir?  What was in there that you were going to test?

A    Again, if I could read from my notes?

Q    Yes.

A    What I received was one heat sealed evidence envelope that contained numerous red stained paper towels.

Q    Okay.  If we could go back to the exhibit, the larger focus.  Do you see the paper towels which you were to analyze?

A    I do.

Q    And can you again identify them using?

A    Yes.  The paper towels in the lower portion.

Q    How did you go about analyzing those paper towels, sir?

A    What I did, I did not determine a net weight because I considered this a residue.

Q    Okay.

A    For the analysis, I actually rinsed the paper towels with methanol to rinse off any substances that may be there.  And then I performed three tests, a gas

3024

chromatography/mass spectrometry analysis.

Q    Okay.

A    A gas chromatography infrared detection analysis.

Q    Okay.

A    As well as a potassium/iodide starch test paper.

Q    What's the -- we've already heard about the gas chromatograph/mass spectrometer and the gas chromatograph infrared spectrometer analysis.

A    Correct.

Q    I'm assuming you would have done those the same as the other DEA chemists who also perform those kind of analyses?

A    I would say so.

Q    What's the -- the last test was a what?

A    Potassium iodide starch.  It's simply a piece of paper that has starch impregnated in it and it reacts with iodine, if any is present.  It's a what we call a color test, an indicator test for the presence of iodine.

Q    And what was the result of the -- that last one?

A    That it did contain iodine.

Q    Okay.  So it was shown to have iodine in it?

A    Indications of it.  Again, it's not a confirmatory test, but, yes.

Q    And on the GCMS and GC infrared spectrometer test, what if any analysis did you -- or conclusion did you

reach in regards to what was contained in those red stained paper towels, sir?

A     That the results of both of those tests were positive for methamphetamine.

Q     Is that a presumptive -- are those presumptive or conclusive tests, sir?

A     Both of those tests are considered confirmatory tests.

Q     Which means what?

A     That without a doubt the results are methamphetamine.

Q     In your opinion was there methamphetamine in that -- in those paper towels?

A     Yes.

Q     Based upon the -- your knowledge that those towels contained methamphetamine, does that have any bearing on your opinion as to whether iodine was also in those paper towels?

A     What that leads me to think is that those towels were used as a filter in the manufacturing process, to have iodine and methamphetamine in the same place.

Q     And is there a stage -- are you familiar with how to make meth?

A     I am.

Q     And have you made methamphetamine before in -- as a

part of your responsibilities for becoming a drug analyst?

A    I have.

Q    And what in regards to your instruction, your teaching, in the clan lab area at the schools, does that involve any knowledge of manufacture of methamphetamine?

A    It does.  That is a major portion of my current job is to manufacture methamphetamine.

Q    In that regard, how would paper towels -- you talked about staining and having both of those and filtering. How would that happen?

A    The paper towels would probably be folded into possibly a cone shape and then placed into a funnel. Whatever you're trying to filter would be poured through the coffee -- or the coffee filters or paper towels and any solid material would be held in the paper towel and the liquid portion would be allowed to run through it.

Q    In regards to the processes of manufacturing meth, where would it likely be that you would get both methamphetamine and iodine in filtering items?

A    That would happen right after the initial mixture is cooked, where we use the term cook, for reflux.  All the starting materials are added together, allowed to cook for a certain -- (Interrupted)

Q    And those starting materials are?

A    Red phosphorous, iodine crystals and pseudoephedrine or ephedrine and water.  They're allowed to cook and then the solid portions of that need to be removed so they're poured through a filter to remove the red phosphorous, any iodine that's left over.

Q    And how would the methamphetamine get on the towel?  I understand you'd remove iodine left over and the red phosphorous would be filtered out, but -- (Interrupted)

A    Just by running through it, it's going to be trapped in the paper.

Q    When you do that first step of the cook, actually is that the first step of the cook or the manufacturing?

A    If the precursor material, the pseudoephedrine or ephedrine has already been obtained, then, yes, that's the starting point.

Q    Do you have to do anything to prepare the pseudoephedrine for the first step, the starting point?

A    If you're starting with cold tablets -- (Interrupted)

Q    If you got a bunch of pills?

A    Yes.

Q    What do you got to do?

A    You need to extract the pseudoephedrine out of the pills.  The pseudoephedrine or ephedrine is water soluble, it's also soluble in alcohol.  And by soluble I

3028

just mean that it will dissolve in water or alcohol. Whereas the tablet binders, the starches, the sugars, the what makes up the bulk of the tablet will not dissolve in water or alcohol. So you grind the tablets up or crush them up, add in a solvent such as water or alcohol and the pseudoephedrine will move into that water or alcohol phase. And then it's filtered. That way you remove all of the tablet binders, again the starches and sugars.

The liquid that runs through will contain the pseudoephedrine and then it's evaporated off. The powder that you recover is relatively pure pseudoephedrine.

Q   And then what do you do with that relatively pure pseudoephedrine?

A   That then is combined with red phosphorous, iodine crystals and water and that's what you cook.

Q   When that -- those three are combined and cooked, do you add heat?

A   You do.

Q   And what else do you add to the red phosphorous, the pseudoephedrine and the iodine?

A   Water.

Q   And how do you go about converting -- what's converted into meth?

A   The pseudoephedrine itself is converted into methamphetamine. The reaction actually has two phases or

two reactions that happen simultaneously.  The first part by combining red phosphorous, iodine crystals and water, you create an acid known as hydriodic acid.  It's very -- (Interrupted)

MR. SMITH:  Your Honor, we qualified this individual as an expert in chemical analysis.  I don't know, but we're kind of getting outside the area that he's been qualified for.  I'm going to object to the relevance.

MR. LITTLEFIELD:  Are you waiting for a -- I'm not sure if you're thinking or waiting for a response or what, Judge.

THE COURT:  No, I'm not thinking.  I'm waiting for you -- you may make any arguments you want to.

MR. LITTLEFIELD:  Certainly the information he's providing is relevant because it is a part of the charges against Mr. Barrett in regards to maintaining -- (Interrupted)

THE COURT:  Objection overruled.  You may proceed.

A    The red phosphorous, iodine crystals and water form hydriodic acid.  It's a very strong acid.  Once the levels of hydriodic acid are high enough or strong enough in the solution, then they start to convert pseudoephedrine into methamphetamine.

3030

Q     (By Mr. Littlefield) At this stage do you actually have methamphetamine?

A     Yes.

Q     Is it the kind that can used by street users?

A     No.

Q     What happens to the iodine in this portion of the cook?

A     Most of it is converted to hydriodic acid.  Small portion of it that's not used will just stay in solution. Actually some of it evaporates as well.

Q     What happens to the red phosphorous?

A     Generally, we consider it nothing.  It's what we for the most part call a catalyst.  It's in there to cause the reaction to happen more efficiently and faster, but it doesn't actually become part of the finished product or any other chemical for the most part.  So we consider it a catalyst and it just stays there.  We filter it out at the end of the process.

Q     When they filter -- when it is filtered out at the end of the process what is done with that by methamphetamine manufacturers?

A     Most often it's saved.

Q     Why?

A     Because it can be reused in subsequent cooks.

Q     If it has -- if one has used red phosphorous

3031

previously in methamphetamine production, will there be a telltale sign to indicate that it has in fact been previously used in methamphetamine production?

A    In every case that I can think of that I've analyzed, it's always contained methamphetamine.

Q    The red phosphorous tested for it?

A    Yes.

Q    Is there a formula as far as how much pseudo, how much iodine and how much red phosphorous?

A    There are many.  There's some that are more common than others.  One of the most common is what we generally call the one, two, three method where it's one part red phosphorous, two parts pseudoephedrine and three parts iodine and then enough water is added to make it soupy, you know, make it wet.

Q    So if you had 50 grams of red phosphorous, how many grams of iodine approximately would you need?

A    Approximately 150.

Q    And if you had 50 grams of red phosphorous and 144 grams of iodine, how much pseudoephedrine could you add to that?

A    Right at a hundred grams.

Q    If you used a little less, would that hurt the cooking process?

A    No.

3032

Q    How much methamphetamine, pure methamphetamine, would 85.5 grams of pure pseudoephedrine produce, sir?

A    Could I use my calculator and --

Q    Sure.

A    The number was 85.5?

Q    I believe so, yes.

MR. LITTLEFIELD:  Can I go back just a second, Judge?

THE COURT:  You can.

Q    (By Mr. Littlefield) Yes, 85.5.

A    At a 100 percent theoretical yield, you would get 78.6 grams of pure methamphetamine.

Q    Why do you say if it's a 100 percent yield, why do you say 76 point?

A    There's actually a weight difference between pseudoephedrine and methamphetamine.  Just the molecules actually have some different atoms so they weigh differently.  It's 92 percent is the weight difference.

Q    So essentially methamphetamine is nine tenths the weight of pseudoephedrine?

A    Yes.

Q    A little more than that.

A    Yes.

Q    How much -- what's a typical -- what's a reasonable yield for a semi-competent meth cook?  You gave a hundred

3033

percent conversion.

A    That was at a hundred percent.

Q    What's a typical reasonable yield for a semi-competent meth cook?

A    I would say 70 percent is pretty reasonable.

Q    At the 70 percent conversion rate, when you say 70 percent conversion and we're talking about it like a code.  What do you mean when you say a 70 percent conversion?

A    Just that the reaction was not 100 percent efficient, not every bit of the pseudoephedrine gets converted to methamphetamine.  And then additionally you're not going to recover 100 percent of what you started with.  You're going to lose portions in filtering or when you do extractions.  You'll leave a little bit behind.

Q    Is 70 percent a reasonable yield?

A    Yes.

Q    Taking the 85.5 gram figure, what -- at 70 percent conversion rate, how much pure methamphetamine could one produce?

A    55.0 grams.

Q    Trying to figure out what 55 grams is, how much is that of a pound?

A    It's almost two ounces.  There are 28 grams per

ounce.  Sixteen ounces per pound.  It's difficult for me to think in pounds.

Q   Well, two ounces would be what, eighth of a pound?

A   An eighth of a pound.

Q   Have you ever seen methamphetamine cut?

A   Certainly.

Q   What's nicotinamide?

A   Generally, when you see it, it's used as a cut for methamphetamine.

Q   If one were able to produce 55 grams of pure meth, would 108 grams of nicotinamide be an appropriate or an inappropriate cut?

A   I would say that would be very appropriate.

Q   And then how much product would one have to sell if you cut that -- if you added the 108 grams of nicotinamide to 55 grams of pure methamphetamine?

A   Be 163 grams.

Q   How much would that relate to a pound?

A   It's about a third.

Q   We've talked about Exhibit 5 or Exhibit 4.  Did you analyze Exhibit 5 that was shown on the lab submittal, Government Exhibit Number 74?

A   I did.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 210 be shown to the witness.

3035

Q      (By Mr. Littlefield) From looking at the label do you recognize that, sir?

A      I do.

Q      I'm sorry?

A      I do.

Q      How are you able to recognize it?

A      Again, it bears the dates and my initials when I opened and resealed the evidence.

Q      Can you again use the laser pen to identify?

A      This is the dates and my initials and then it also bears the lab number that corresponds to my worksheet for this exhibit.

Q      And do we also see -- we're talking about Exhibit 5, is that displayed, sir?

A      It is.  Exhibit 5 is here and this is the lab number that I referred to.

Q      And if we could go back to the larger photograph of the item itself.  What -- can we see what was Exhibit 5, what it was that you analyzed, sir?

A      We can.

Q      And can you use again your laser pointer to point that out for the jury?

A      What I wrote in my notes was one heat sealed evidence envelope containing one Ziploc bag, containing one Ziploc bag with a red powder residue.  And the two

3036

Ziploc bags are shown here in the lower portion, with the one on the right with the red powder residue.

Q    Did you analyze that red powder residue, sir?

A    Yes.

Q    And what test did you perform to do that analysis?

A    Again, I initially rinsed this with methanol, performed a GCMS and then I also took a dry portion of the powder itself and performed a GCMS analysis on that, as well as I lit the powder.

Q    When you light the powder, what -- why did you light the powder?

A    It's a presumptive test for red phosphorous.  That's one of the chemical properties of phosphorous is that it's a flammable solvent.  Once lit, it will continue to burn on it's on, it burns very hot.

Q    What happened when you lit the sample of that powder?

A    That it did burn.

Q    And the GCMS, was that a confirmatory or conclusive -- was that a conclusive test, sir?

A    It is.  In this case, it was conclusive to identify phosphorous.

Q    Do you have an opinion as to what was in that plastic bag, sir?

A    That it contained red phosphorous.

3037

Q     And did you do an analysis on Exhibit Number 6, sir?

A     I did.

MR. LITTLEFIELD:  I would ask that 211 be displayed.

THE COURT:  You may.

Q     (By Mr. Littlefield) Do you see the label for Government Exhibit 211?

A     Yes.

Q     And can you recognize that one, sir?

A     Yes.  By the same means as the previous, it bears the date and the initials, or my initials when I opened and resealed it.  The laboratory number's actually handwritten on the line below where it should be.  And then the exhibit number's up here.

Q     If we go back to the item itself, can we focus on this label here?  Do you see the lab number on there as well, sir?

A     I do.

Q     Where is that?

A     It is right here.

Q     And let's back off now and do the whole exhibit. What is this item here?

A     That is going to be the heat sealed evidence envelope that the vials were actually in.  However, the reason it appears that way and the reason the label is so

3038

difficult to read is that the iodine has started to corrode the plastic and the labelling.  So that would have been placed inside of the other bag to preserve the label.

Q    And what did the iodine -- I guess is it fumes or what?

A    It is.  Iodine is a substance that has the capability of sublimation.  Basically, that means that even at room temperature the solid can evaporate, it can become vapor, rather than having to be become a liquid then a vapor, it can go straight from the solid phase to the vapor phase.

Q    And when iodine becomes a vapor, what does it do?

A    It's extremely corrosive and anything it touches it's going to stain.

Q    What happened to this bag, inside of which this bag was placed?

A    As you can see, the bag itself is starting to yellow from the iodine that's escaping this bag.  It's starting to stain the inside of the outer bag.

Q    Could you discern what labels were on the items that were there in Government Exhibit Number 6?

A    No.

Q    Why not?

A    The paper, the labels themselves, had been

3039

completely stained from the iodine vapors.

Q    When did you have access to these exhibits, sir?

A    I received them on November 10th of 2003.

Q    So several years later that you got to look at them?

A    Actually, I'm not sure when the original submittal date was.

Q    If the testimony has been the original submittal was in 1999, had the vapors had plenty of time to work their magic on these bags?

A    They would have, yes.

Q    Did you do anything to try and analyze the contents of these items of Drug Exhibit 6?

A    I did.  The vials were first tested with potassium iodide starch paper that I described earlier.  And then I also rinsed the vials with chloroform and performed a GCMS analysis of that.

Q    And what -- the potassium test, what did that --

A    It showed positive for the presence of iodine.

Q    And then the GCMS test?

A    Was not able to confirm anything.

Q    How come?

A    My opinion would be that the iodine was just too weak, too low for the instrument to detect.

Q    Based on what you saw, everything you saw and the -- was it a potassium test?

3040

A    Potassium iodide starch.

Q    Was there anything that you observed that would make you think that that was not iodine?

A    No.

Q    If Mr. Skowronski testified that he saw one of those bottles in 1999 or early 2000 and they were labeled iodine, would that -- do you have any reason to doubt his testimony in that regard?

A    No.

MR. LITTLEFIELD:  I would ask that the witness be shown Government Exhibit Number 76.

THE COURT:  You may.

MR. LITTLEFIELD:  And it's in evidence.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit 76, sir?

A    I do, but as before it's not one that I had.  But it is a DEA Form 7.

Q    Is it a DEA Form 7; can you recognize it is involved in this particular case?

A    Yes, it bears the same case number and file title, which is generally the Defendant's name.

Q    And are you aware that Mr. Skowronski performed an analysis on a number of items, sir?

A    Yes.

Q    He's already testified about eight and nine.  Do you

3041

have any familiarity with Exhibit Number 7, sir?

A     I do.

Q     And what is your familiarity with Exhibit Number 7 which is described as one used syringe containing residue, sir?

A     I performed an analysis on the contents of the syringe.

MR. LITTLEFIELD:  I would ask that Government Exhibit 212 be displayed to this witness.

THE COURT:  You may.

MR. LITTLEFIELD:  And if you just do the whole thing, I think we may even be able to see the label on this one.

Q     (By Mr. Littlefield) Do you recognize where your signature is and can you tell on the label on this item, is that clear enough?

A     It is up here.

Q     Can you point to where your initials appear if they do?

A     It's right in this region, again the dates that I opened and sealed it and my initials.

Q     Where's the lab number?

A     Lab number is here.

Q     Where is the exhibit number?

A     Second line there.

3042

Q    What are we looking at?  What did you analyze in relation to this exhibit, sir?

A    My original description was one heat sealed evidence envelope containing one syringe holder containing one one CC syringe.

Q    Can you see the one CC -- the syringe holder and the syringe, point to them, sir.

A    The syringe holder is the clear plastic tube with the orange end caps and the syringe is inside of that tube.

Q    How did you go about doing an analysis on this syringe, other than very carefully?

A    I rinsed the syringe with methanol and then I performed a GCMS as well as a GCIRD, gas chromatography infrared detection.

Q    And again you got different graphs and readings and what did you compare the readings on the analysis you did with, sir?

A    They were compared with known authenticated standards.

Q    Of?

A    Of methamphetamine.

Q    And then how did they compare to the known standards of methamphetamine?

A    That for both tests, the GCMS and GCIRD, they were

3043

determined to be methamphetamine.

Q   In your expert opinion what was the contents of that syringe, sir?

A   Methamphetamine.

Q   Did you prepare a report of your analysis on Government Exhibit or Drug Exhibit Numbers 4, 5, 6 and 7, sir?

A   I did.

MR. LITTLEFIELD:  I would ask that Government Exhibit 75 be displayed to the witness and I don't believe it is in evidence yet.

THE COURT:  Government Exhibit 75?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize Government Exhibit Number 75, sir?

A   I do.  It is the laboratory report or the results of the analysis that I performed for exhibits four, five, six and seven.

MR. LITTLEFIELD:  Ask that Government Exhibit 75 be admitted into evidence, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q   (By Mr. Littlefield) And if we could focus on the

3044

lower half, lower third.  There we go.  Exhibit 4, what did it contain?

A     Exhibit 4 contains methamphetamine.

Q     And that was the --?

A     That was the paper towels.

Q     How much methamphetamine was there in those?

A     As a weight, I gave it residue which means to me it was not something that could be readily weighed.

Q     The red phosphorous, is that exhibit five?

A     Yes.

Q     And how much weight was that?

A     Again, residue.

Q     The item six, you said no controlled substance. What did you believe that was, sir?

A     That was the one that I got the positive test for iodine, but was unable to confirm.

Q     And again, how much weight was that as far as the -- what you believed to be iodine?

A     Residue.

Q     And on the seven, that was which item?  Exhibit 7 was which item?

A     It was the syringe.

Q     Again, how much weight was that, sir?

A     Residue.

Q     Did you notice anything else in that syringe, if you

recall?

A     Not that I recall.

Q     The fact that the syringe had methamphetamine in it but was only residue, what does that tell you about that syringe?

A     That it had been used previously, or at least loaded and unloaded.

Q     When you say loaded and unload, what do you mean, sir?

A     A solution of methamphetamine had been drawn up into it, whether it had been injected into an individual or just back out, I can't tell.

Q     If there's testimony that that syringe had blood in it, would that give you any clue as to whether it'd been used or not?

A     That would indicate that it had indeed been used.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examination.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q     Mr. Griffin, good afternoon and welcome back to

3046

Oklahoma.

A    Good afternoon.

Q    We talked a little bit, or you did, about manufacture of methamphetamine and you talked about the one, two, three formula.

A    Yes.

Q    There's various formulas for cooking dope, isn't there?

A    Certainly.

Q    And it all, I guess, goes to the quality of dope that an individual may be trying to produce or what they have on hand to cook dope with, right?

A    That and the recipe they got.

Q    Okay.  Now, in addition to that one, two, three, there's also a pretty common formula that's called one, one, one and a half, isn't it?

A    I've heard of that one.  Typically when I hear of that one, it's usually referring to hypophosphorous acid or phosphorus acid flakes in place of red phosphorous.

Q    But the one, one, one and a half would refer to equal parts of red phosphorous and ephedrine and then a little more iodine, correct, based on what you've heard about it?

A    Yes.

Q    So that would change -- I'll tell you what, let's

3047

just go through that just out of curiosity's sake, okay?

A    Yes.

Q    One, one, one and a half.  Let's start with 50 grams of red phosphorous, 50 grams of ephedrine and then 75 of iodine.  That would fit the formula, right?

A    Correct.

Q    And what's the yield?

A    It's going to be about the same, actually, because in most all of these formulas, the one, one, one and a half as well as the one, two, three, in reality the amount of red phosphorous and the amount of iodine present is in great excess of what's actually required for the reaction to happen.  So either one would probably produce pretty much the same amount of methamphetamine.

Q    But if you're -- if that was your formula and you're starting with 50 grams because that's what you know is one, one, one and a half, and you got 50 grams of red phosphorous and 50 grams of ephedrine, you're not going to get the 80 or so that you testified earlier.  You're going to get a little less than 50, right?

A    Yes.  If you start with 50 grams of pseudoephedrine you would get the 92 percent conversion, 100 percent theoretical yield.  And then if we took the same 70 percent actual yield, I could calculate that.

Q    Well, it's 45 grams, isn't it?  Ninety percent of 50

3048

is 45?

A    I don't like to do math out of the top of my head and get it wrong.

Q    I don't either.  Lawyers just know how to divide by three, so --

A    With the 70 percent yield it would be 32.2 grams.

Q    Okay.  A hundred percent would be the 45 and you went ahead and took it to the 33.  A little more than an ounce?

A    Yes.

Q    Because an ounce is 28 grams?

A    Yes.

Q    Now, the people that are using meth, they don't want to see it diluted as much as three times that amount, do they?

A    That's actually a fairly common street level. Especially in the late '90s, it would be about 30 percent.

Q    Is what you would see?

A    Yes.

Q    So if you had 70 percent is what you recovered, 70 percent is what you recovered out of your pseudo, that's still a hundred percent meth, right?

A    Seventy percent is 100 percent meth, yes.

Q    So according to what you've seen on the streets,

3049

you'd step on that three times?

A    Or step on it -- well, I guess that would be -- make it a third, rather.  Make it about 30 percent.

Q    It could also be a lot less.  We just don't know.  It all depends on the individual, right?

A    Certainly.

Q    So really when we're talking about how much we're doing with this and how much we're doing with that, we're just kind of throwing numbers out there, aren't we?

A    Well, the amount that you cut it with, yeah, I have no way of knowing what it would have been.

Q    So, I mean, we're just throwing numbers up in the air, right?

A    As far as the cut.  Not as far as the production.

Q    If we have a 70 percent yield, you understand that, that comes out of the lab.  I mean, that's what you expect to yield?

A    Correct.

Q    But as far as how much we're going to make it stretch by use of a cut, use of an agent, we're just throwing that number up in the air?

A    Yes.

Q    Did you discuss any of that with Mr. Littlefield before you testified about the nicotinamide or any of that business?

3050

A    What nicotinamide could be used for?

Q    Yes.  Did you all have any discussion about nicotinamide today?

A    No.

Q    Prior to you testifying?  Okay.  Now, let's talk a little bit about your -- well, let me ask you this.  If we're going to manufacture methamphetamine, we're going to break the binder out of our pills, we need some sort of a solvent, right?

A    Correct.  Generally either an alcohol or water.

Q    We don't like water because it sticks around too long.  You like something that's going to evaporate a little quicker, most generally, right?

A    Sure, yes.

Q    So what type of solvents?  Alcohols, methanols, what else?

A    Methanol, isopropanol or ethanol.

Q    All right.  So we'd expect some of that to be laying around.  Now, you said earlier about HEET.  Were you talking about heat as in some sort of a heat source or HEET as in an additive like you put in your gas tank?

A    For the actual cooking process?

Q    Yes, sir.

A    Heat source like a stove or a burner or some type of a heat source.

Q     Bunsen burner, hot plate, something like that?

A     Crock Pot, stove, anything, yeah.

Q     Now, what about HEET, H-E-E-T?

A     The gas line antifreeze, that's methanol.

Q     Okay.  You've seen that used for various portions of meth production, correct?

A     Yes.

Q     Now, lye is something that would be popular for somebody's manufacturing to have laying around the house?

A     You mean Red Devil lye or just lye in general?

Q     Red Devil lye, how about that.

A     Yeah.  Red Devil lye is sodium hydroxide.  It's a very common, strong base that's used for converting the methamphetamine hydroiodide into its base form for the extraction.

Q     Okay.  So we kind of expect that to be around too, wouldn't we?

A     Or some type of a base.  You could also use potassium hydroxide, you could use Liquid Plumber, almost any base would work.

Q     Okay.  Acid?  Some other types of acid?

A     For?

Q     Methamphetamine production.  Would we expect there to be acid?

A     If they're making hydrogen chloride gas which is

3052

used to powder out the methamphetamine, then generally it's made by one of two ways, combining sulfuric acid with salt or muriatic acid, which is hydrochloric acid, combine that with aluminum foil to generate hydrogen.

Q    That's another item that we probably need.

A    For salting out, yes.

Q    I think that's about all the questions I have about the meth production, so I just want to hit your DEA 7 just briefly.  Exhibit Number 4, the paper towels, you said -- excuse me, it was positive for methamphetamine, net weight residue?

A    Correct.

Q    Red phosphorous in an envelope, correct?  And you don't know where these items were found.  They just come to you to be tested, right?

A    That's correct.

Q    Okay.  Again, residue?

A    Correct.

Q    Then the iodine, you have no -- you have a presumptive test.  You have no test that says positively I can go into court and say that's what that substance was?

A    That's correct.

Q    But you're saying based on the way things look, that's what I think it is, but you can't tell us, yeah,

that's what it was?

A   Right.   Based on the starch test and the staining, my thought is that it is iodine but I cannot confirm that.

Q   Can't say for certain.   And then Exhibit Number 7 which was the syringe, positive for methamphetamine, again residue?

A   Correct.

Q   Okay.   Now, you rinsed that with a methanol solution?

A   That's correct.

Q   And then what happened?   Do we have any that's left over?

A   You mean inside the syringe?

Q   Now.

A   Certainly.

Q   Okay.   Any of it tested for DNA?

A   Not that I'm aware of.

Q   You weren't asked to do that?

A   No.

Q   Now, let me see if I have the exhibit I want to ask you about.   I think it's Exhibit Number 74.

        MR. SMITH:   I ask that Exhibit Number 74 be put up and displayed, Your Honor.

        THE COURT:   You may.

3054

Q    (By Mr. Smith) This was one of the first DEA 7s that were shown you and you said this wasn't in your packet or you weren't responsible for this.  Do you remember that?  And you probably -- you'll know why I'm talking about it.

A    That's correct.

Q    Okay.  This is signed by Mr. Skowronski and that's in February of 2000?

A    Correct.

Q    Right?  Now, you generated a DEA 7 that included four, five and six and number seven, the syringe, correct?

A    That's correct.

Q    And your report was generated when, sir?

A    I signed my report on November 10th, 2003.

MR. SMITH:  Yes, sir.  Thank you for your time.  Pass the witness, Your Honor.

MR. LITTLEFIELD:  May I approach, Your Honor?

THE COURT:  Yes, you may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  Your Honor, I had agreed not to ask this individual if in his opinion this was a meth lab.  But when Mr. Smith starts asking about not having this, not having that, not having this, not having that, I think he opens the door for me to ask him if you have

3055

this item, this item, this item, this item, this item, and go through do you have an opinion as to what was at that location. I think Mr. Smith opened the door on his cross examination.

MR. SMITH: Your Honor, I didn't ask if he knew this stuff was there or not. Just said these are items you'd typically -- (Interrupted)

THE COURT: Yeah, I don't think so.

MR. LITTLEFIELD: Okay.

(Whereupon, the following record was made in open court within the hearing of the jury.)

REDIRECT EXAMINATION

Q   How difficult is it to obtain alcohol, isopropyl alcohol, which will allow you to break the binder up more quickly than water on the pseudoephedrine tablets?

A   It's not difficult at all. Any pharmacy would have isopropyl alcohol, Wal-Mart, K-Mart, any store of that type would have alcohol, both in the paint section, you know, in the gallon type cans, as well as the HEET, the gas line antifreeze solution that we talked about. All of those are readily available.

Q   Okay. And in fact, is there any particular problem with breaking the binder away from the pseudoephedrine tablets just using water and heating it up a little bit?

A   No.

3056

Q    Just if there's a concern about it evaporating quickly, will that do it?

A    It will.  And with the red phosphorous method, you don't even have to evaporate all of the water because you're going to be adding water to the solution anyway.

Q    Mr. Smith asked you about throwing numbers up in the air in regards to quantities that could be produced.  If Mr. Skowronski testified that there was 85.5 grams of pure pseudoephedrine in one of the exhibits submitted to him, was your determination as to how much meth could be -- or how much meth could be produced, is that throwing numbers up in the air?

A    No.  That's based on, again the 92 percent conversion, which is 100 percent theoretical yield.  And then taking that times 70 percent, which is a reasonable clandestine laboratory production.

Q    And that would be based upon the quantity of pure pseudoephedrine that was actually at that location according to Mr. Skowronski?

A    Correct.

Q    Now, is the cut -- Mr. Smith made reference to using the cut, throwing numbers up in the air.  If Mr. Skowronski stated that there was 108 grams of nicotinamide, is that throwing numbers up in the air or is that talking about the quantity of cut that was

available at that location?

A    To me that would -- (Interrupted)

MR. SMITH:  Your Honor, I'm going to object.  I don't know that they're talking about it being at a location or they're just talking about his analysis, Mr. Skowronski's.

MR. LITTLEFIELD:  Let me -- may I withdraw it and rephrase it?

THE COURT:  Question withdrawn.

Q    (By Mr. Littlefield) If Mr. Nixon testified that he found those nicotinamide pills at Mr. Barrett's cabin and that Mr. Skowronski testified that the nicotinamide pills at Mr. Barrett's cabin totaled 108 grams of nicotinamide, is that throwing numbers up?  Or when you're talking about the cut, is that a reasonable amount that could have been done with those quantities?

A    That's a reasonable amount for those quantities.

MR. LITTLEFIELD:  Pass the witness.

MR. SMITH:  Your Honor, I have nothing further.

THE COURT:  May this witness by excused?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down and may be excused.

Call in your next witness.

MR. LITTLEFIELD:  Cindy Crawford.

3058

CINDY CRAWFORD,

being first duly sworn to testify the truth, the whole

truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     Good afternoon.

A     Good afternoon.

Q     How are you doing today?

A     I'm fine.

Q     What's your name?

A     Cindy Crawford.

Q     And do you know Travis Crawford?

A     Yes.  He's my husband.

Q     And is Travis -- what, if any relationship does
Travis have with the Defendant Kenny Barrett?

A     They're cousins.

Q     Where's Travis's mama live?

A     McKey.

Q     Where is McKey?

A     It's between Sallisaw and Vian.

Q     And are you familiar with where Kenny Barrett lived
in 1999?

A     Yes, sir.

Q     And where was Travis's mama -- what is Travis's
mama's name?

3059

A      Phyllis.

Q      Where does Travis's mama, Phyllis Crawford, live in relation to where Mr. Kenny Barrett lived in 1999?

A      Two houses down.

MR. LITTLEFIELD:  May I return to the table a second, Judge?

THE COURT:  You may.

MR. LITTLEFIELD:  I would ask Government Exhibit 184 be displayed to the witness.

THE COURT:  You may.

Q      (By Mr. Littlefield) Ms. Crawford, it'll appear just to your left there on that little screen.  It's also going to be displayed on this projector up here for the jury to see.  Do you recognize those -- that location there and what's shown there from that aerial photograph, ma'am?

A      Yes.

Q      If you can take -- do you see that laser pen in front of you?  If you point it up towards the -- this screen here and punch that red button?

A      Okay.  Point it up towards this way?

Q      Yes, please.  And punch the red button.

A      Red button.  Gotcha

Q      There you got it.  Do you see how it's displaying?

A      Uh huh.

3060

Q    Where was Kenny's place?

A    Well, my eyesight is not too good.

Q    Can you pick it up from looking in the picture and then find it up there on the screen?

A    Kenny's place would probably have been right there.

Q    And where is Travis's mother's place?

A    Hers is on the corner right there.

Q    Okay.  Do you recognize what's shown in Government Exhibit 1, which is the model in front of the bench there?

A    Yes, I do.

Q    And what is that shown in that location, ma'am?

A    That's Kenny's house and the landscaping.

Q    Okay.  Is Kenny present in the courtroom today, ma'am?

A    Yes, sir.

Q    And where is he seated and what's he wearing?

A    He's seated beside this gentleman right here and he's wearing a button up green and brown striped shirt.

          MR. LITTLEFIELD:  Ask the record reflect that the witness has identified the Defendant, Kenneth Eugene Barrett, Your Honor.

          THE COURT:  Record so reflects.

Q    (By Mr. Littlefield) Ma'am, have you ever been convicted of a felony?

A    No, sir.

Q    Have you ever been convicted of a crime?

A    Yes.

Q    What?

A    Well, it was deferred sentence, but it was under marijuana charges.

Q    Okay.  And when was that, the best you can recollect?

A    Last year in November and then there's one more time back in '99.

Q    What was that for?

A    Marijuana.

Q    Okay.  Ma'am, have you used drugs previously?

A    No, not in the past year.

Q    Prior to the past year, before that, were you a user of illegal drugs?

A    Yes, I was.

Q    What was the nature -- what were your drugs of preference, ma'am?

A    Marijuana.

Q    Any other drug?

A    Alcohol, methamphetamine.

Q    Have you ever -- let me direct your attention.  Do you recall the incident that occurred at Mr. Barrett's residence -- and I know you weren't there.  But do recall

when it happened in September of 1999?

A    I recall it on the news, yes.

Q    So you know when it happened?

A    Yes.

Q    Prior to that, had you had occasion to be over to Mr. Barrett's residence?

A    Yes, sir.

Q    And at the time were you married to your husband Travis?

A    No.

Q    What were you -- did you have any kind of relationship with Travis?

A    Yes.

Q    Fiancee, girlfriend, boyfriend?

A    Yes.

Q    What was the nature of it?

A    At the time it was more of a boyfriend/girlfriend relationship.

Q    Have you ever seen anything connected with drugs at Mr. Barrett's residence?

        MR. SMITH:  Your Honor, I'm going to object and ask to approach.

        THE COURT:  You may.

        (Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. SMITH:  Your Honor, this is another one of those individuals that we've asked to talk to who wouldn't talk with us.  But I'm concerned about the cumulative nature of her testimony.  It appears that she's going to testify about the use of drugs at the Barrett residence.  This has been established, I think, adequately by several previous witnesses.  I don't know anything else that she intends to add to this.  But it appears to me to be cumulative and at some point, Judge, it becomes overly prejudicial.

MR. LITTLEFIELD:  He provided methamphetamine to her.

THE COURT:  Objection overruled.  She can testify.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q    (By Mr. Littlefield) Did you ever receive drugs from Kenny Barrett's residence from any individual?

A    I have received drugs there.  But I can't recall from whom.

Q    Did anyone ever provide a bump to you at Kenny Barrett's residence?

A    There was drugs there, but nobody ever provided me with them.

MR. SMITH:  Your Honor, can we get a time frame

to reference?

THE COURT:   You may.

Q    (By Mr. Littlefield) In the months leading up to the incident?

A    Can you repeat the question?

Q    In the months leading up to the incident did anyone provide you a bump at Kenny Barrett's residence?

A    I don't recall who, but, yes, I had used there.

THE COURT:   We're still not sure it's clear when.  I know what -- (Interrupted)

THE WITNESS:   I'm still not clear -- (Interrupted)

THE COURT:   Wait, wait.  I don't think she's clear.  What year?  Let's get to the year.

MR. LITTLEFIELD:   I'm sorry, Your Honor?

THE COURT:   I think a year would help.

MR. LITTLEFIELD:   My question was in the months leading up to it.

THE COURT:   I know that.  But I don't think that means anything to this witness.

Q    (By Mr. Littlefield) In the summer of 1999, was there an incident -- do you recall telling me about an incident in which you had a difficulty, without going into it?  Do you recall an incident which you had a difficulty with Mr. Barrett at his residence?

A     Yes, sir.

Q     And how much prior to the incident on September 24th of 1999 was this incident in which there was a difficulty, approximately?

A     Approximately two weeks to a month.

Q     Okay.  Did you receive any drugs on the night or day that there was the incident involving yourself and Mr. Barrett?

A     No, sir.  No, sir.

          MR. LITTLEFIELD:  Judge, I would ask that Government Exhibit 128 be provided to the witness.

          THE COURT:  You may.  Is it in evidence?

          MR. LITTLEFIELD:  It is.

          THE COURT:  Is not?

          MR. LITTLEFIELD:  It is in evidence.

          THE COURT:  You may.

Q     (By Mr. Littlefield) You can open this box if you would.  Do you recognize that, ma'am?

A     I believe so.

Q     What is that?

A     It's a gun.

Q     Have you seen that gun or a gun that looked just like it before?

A     I believe so, yes.

Q     Where?

A    At Mr. Barrett's house.

Q    And where did Mr. Barrett keep his gun that looked like that?

A    Usually they're in a gun case or beside his desk.

Q    And where was his desk located?

A    In his living room area.

MR. LITTLEFIELD:  I would ask that Government Exhibit -- well, I would ask the witness be allowed to come down and look at the model, Your Honor.

THE COURT:  She may.

Q    (By Mr. Littlefield) And, Ms. Crawford, would you look at the model and look inside of the residence?

A    Uh huh.

Q    Do you -- does that appear to be accurate as to how the residence was laid out, ma'am?

A    Yes, sir.

Q    And do you see the area where you mentioned the desk where the gun was often kept?

A    Yes, sir.

Q    And which room is that in, ma'am.

A    This side room in front.  Go through the front door, first one on your right.

Q    Okay.  You can return.

MR. LITTLEFIELD:  I would ask that Government Exhibit 175 be displayed to the witness.

3067

THE COURT:  You may.

MR. LITTLEFIELD:  And it's going to appear on the screen.

Q     (By Mr. Littlefield) Do you recognize what you're looking down in?  That that's a photo looking down into something, ma'am.  Do you recognize that?

A     Yes.

Q     And what is that looking down into, ma'am?

A     There's Kenny's kitchen, his side room.

Q     Is that -- does that photograph look down into the model that you just looked into?

A     Yes, sir, I believe so.

Q     Can -- if you reach up and just tap on the screen where it was that Mr. Barrett kept that gun.  Okay.  In those two areas?

A     Around about, I believe so.

Q     Okay.

A     There was a gun cabinet that fit, where he kept it.

Q     Okay.  And both of those, the gun cabinet and the area that -- the other area where he'd leave it were both in that east room?

A     Yes, sir.

Q     Was there ever a discussion involving Mr. Barrett in regards to an arrest warrant?

A     There was a -- there was a -- (Interrupted)

Q    Let me rephrase it.  Mr. Barrett ever say anything about an arrest warrant for himself?

A    It was a misdemeanor warrant.

Q    Is that what he said?

A    As far as I know -- yes.

Q    What did he say in regards to that warrant?

A    All he said is that he'd stayed at home because he didn't want to, you know, get into any trouble.

        MR. SMITH:  Your Honor, can we get a time frame as to when we're talking about this?

        THE COURT:  Yes.

Q    (By Mr. Littlefield) When were the conversations with the warrant in relation to the incident in his residence?

A    I do not recall.  I mean, I do not recall.

Q    Okay.  Did Mr. Barrett ever make, close in time, the months -- month or two, the summer months of 1999, leading up to this incident, did Mr. Barrett ever make any statement regarding his anticipation that the police were going to come to his house because of a warrant?

A    He really didn't specify who or what, but he knew that there was a chance that the police could come out there or, you know, any other of the people that he was associated with.  Therefore, that's why, you know, he had protection.

3069

Q     What did he say about if the police came out there, what was going to happen?

A     Police or anyone, that he would go out in a blaze of glory.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examination.

MR. SMITH:  One second, Your Honor.

THE COURT:  You may.

MR. SMITH:  May I, Your Honor?

THE COURT:  You may.

CROSS EXAMINATION

BY MR. SMITH:

Q     Ma'am, you got a request to visit with myself and Mr. Hilfiger and you declined; isn't that true?

A     No, sir.  No, sir.

Q     Let me asked you this.  You never visited with us prior to today?

A     No, sir.

Q     And you're still with Travis?

A     Yes, sir.

Q     And you knew there was a request that we wanted to talk to Travis, too?

A     No, sir.

Q     You don't know about that?

A     No, sir.  I don't remember if there was.  I don't.

Q    Okay, ma'am.  You admitted that prior to a year ago you were involved in drugs?

A    Yes, sir.

Q    And that you liked to do marijuana and methamphetamines and what else?

A    I drink.

Q    Okay.  And during the period of time that you were using -- let me back it up a second.  When did you start using methamphetamine?

A    When I was 18 years of age.

Q    Okay.  And I'm not going to ask you how old you are, but how long approximately you've been using methamphetamine, other than I understand this past year -- (Interrupted)

A    Nine years.

Q    Okay.  And what was your preferred method of ingestion, ma'am?  How did you like to do it?

A    All different ways.  I would eat it, snort it, shoot it.

Q    So you're pretty heavily involved?

A    At that time, yes, I was.

Q    And so, would it be fair to say about the time this incident at Kenny Barrett's house you were heavily involve?

A    Yes, sir.

3071

Q   Okay.  And how long was the longest that you've ever stayed up continuously while you were using methamphetamine?

A   About five days.

Q   Okay.  Then when you come down off of methamphetamine after staying up for five days, you sleep for a period of time?

A   Yes, sir.

Q   How long do you sleep?

A   Probably a good 16 hours, maybe more.

Q   Then you would go at it again?

A   Maybe not, probably give it a week in between.

Q   Then how hard do you hit it?

A   Back just the same.

Q   Right back at it, right?  So this stretch of five days in a row of being up, you've done that more than once?

A   No.  One time, five days in a row.

Q   How many times were you up four days?

A   Probably about four or five.  Usually I just went about three days is about all I could handle.

Q   That's where you like to stop it.  You'd stay up for three days?

A   Right.

Q   And then let's not do any more dope and you'd sleep

3072

for what -- for 16 hours even then?

A    Yeah.  And get up and eat and still tired, go back to bed.

Q    And then when you were doing methamphetamine like that, staying up and crashing like that and getting back up and charging again at it and going back, you lose a whole sense of time, don't you?

A    Yes, sir.

Q    I mean, time just kind of -- (Interrupted)

A    Yes, sir.

Q    -- goes right on by, right?  Friends, family, kind of the whole bit.  I mean, that's -- really become secondary.  What's important is getting high?

A    Exactly.

Q    Okay.  Now, this misdemeanor warrant business with Kenny that you talked about?

A    Yes, sir.

Q    Could have been way before '99, couldn't it?

A    Yes, sir.

Q    We really have no idea?

A    Right.

Q    Okay.  And we talked about the use of drugs at Kenny Barrett's.  You're not telling us that he gave you drugs?

A    No, sir.

Q    As you talked about some time frames with Mr.

3073

Littlefield, do you have a recollection of time frame or is really all that kind of a blur?

A    It's all pretty much a blur.  I mean, because it -- you know, some things I can remember clearly, other things I can't.  And, you know, I'm not so sure that I remember them clearly sometimes, because -- (Interrupted)

Q    I didn't hear that, ma'am.  You what?

A    Sometimes I'm not for sure if I remember them clearly because, you know, of the usage.  It takes a toll on your mind.  It plays tricks on your mind.

Q    Is there some reason why we should question your testimony here today?  I mean, is there -- are you under -- (Interrupted)

A    No, sir.  I'm speaking of what I know today.

Q    Okay.  I don't guess I understood what you previously said, though.  Do you think some of the things that you're trying to remember back when you were under the influence of methamphetamine, that you're memory could be clouded because of that meth use?

A    No, sir.

Q    Is that what you're telling us?

A    No, sir.  No, not at this instance.

Q    Can you explain to me what you're talking about a moment ago then?

A    A moment ago?

3074

Q    When you were saying about you don't really know when you're using the dope things that are happening?

A    Well, it just depends on the dope and it depends on how long you stay up and it just depends on, you know, basically the situation and your surroundings.

Q    Okay.

A    And the circumstances.

Q    Now, people that do methamphetamine, there's kind of a -- kind of a subculture of those folks, isn't there?  I mean, you know who uses and who doesn't.  More importantly, you know who uses?

A    Uh huh.

Q    Because those are your friends, right?

A    Yeah, they're associates.

Q    Yeah.  I mean, when you're using dope, that's the people you're going to seek out.  And a lot of people, whenever they're using methamphetamine, they get to running their yap a little bit, don't they?

A    Oh, yes.

Q    Kind of talking things up.  They just -- (Interrupted)

A    Exactly.  Exactly.

Q    And so, talking about somebody's going to come over and I'm going to do this to them or I'm going to do that to them -- (Interrupted)

A   Right.

Q   That's just part of the game, isn't it?

A   Right.  That's just -- that's part of the game.

Q   In one ear and out the other, right?

A   Exactly.

Q   Whether we're talking about it's a police officer, talking about somebody going to rob me or whatever, that's stuff that you hear all the time amongst these people that are out there doing that dope, isn't it?

A   Exactly.

Q   Doesn't mean a thing to you, does it?

A   No.

MR. SMITH:  Thank you, ma'am.  Pass the witness, Your Honor.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   Let's talk about meth people -- meth users talk a lot and brag a lot and boast a lot; is that correct?

A   Yes, sir.

Q   And have you heard a meth user say, well, I'm going to shoot the cops if they ever come over here?

A   Yes, I have.

Q   How many of them do you know that did it?

A   Oh, more than I can -- more than I can count.

3076

Q    How many of them do you know that actually shot the cops that came over there?

A    Well, as far as I know, the people that have said this, the cops have never showed up there.

Q    What did Kenny Barrett do when the cops showed up?

MR. SMITH:  Objection, Your Honor.

THE WITNESS:  I don't know, I wasn't there.

THE COURT:  Sustained.

MR. LITTLEFIELD:  Pass the witness.

MR. SMITH:  Nothing further, Your Honor.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  No objection.

MR. SMITH:  No objection.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.  You may be excused.  Call your next witness.

MR. LITTLEFIELD:  Karen Real.

MR. SMITH:  Judge, may we approach regarding this witness?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. HILFIGER:  Judge, I have not been able to talk to this witness, Karen Real, not because of Mr. Littlefield.  She did not want to talk to me at noon.

But based on what Mr. Littlefield has said, I would object to this witness as her evidence is going to be cumulative to what we've already heard from about four other witnesses, number one. And to that extent that it's not cumulative, it's not going to be relative in time in the sense it's going to be prior to 1999.

MR. LITTLEFIELD: She will testify, Judge, that she was there from -- she was married to a relative of Kenny Barrett. That she would go out there on a regular, but not frequent, basis through the years of '97, '98, into she believes either late '98 or early '99. She will testify that Mr. Barrett had guns there. That when someone arrived, Mr. Barrett would retrieve a gun and have it available until he could identify who it was. Mr. Barrett continually had drugs there and provided it to her.

THE COURT: Does she get into the year '99?

MR. LITTLEFIELD: She will say it was late '98, early '99. She can't give the exact month. It was in that time period. She would say it was less than a year from the shooting.

THE COURT: Is she better than that last witness?

MR. LITTLEFIELD: The last witness was saying right within that time period, Judge. And she does not

know the exact date.  I asked her if it was within less than a year prior to the incident, how long she continued there, going there.  And she would say, yes, it was less than a year.  She can't give the exact month.  She says there's nothing to make any one particular time stand out as being different from any other time.

THE COURT:  She's going to testify about drugs, about drugs in there or just the gun?

MR. LITTLEFIELD:  He provided her drugs when she was there.

THE COURT:  In the '99?

MR. LITTLEFIELD:  It is less than a year from the time -- the last time she was there was within the year preceding the shooting incident, so it would have been after September of '98.

MR. HILFIGER:  I object as to relevance, as time and also cumulative.

THE COURT:  And since you don't know what she's going to testify to, you can object as we go along, but I'll let her start.

MR. LITTLEFIELD:  Okay.

(Whereupon, the following record was made in open court within the hearing of the jury.)

(Whereupon, the witness was administered the oath.)

3079

THE COURT:  You may proceed.

MR. LITTLEFIELD:  Thank you, Your Honor.

KAREN REAL,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Good afternoon.

A    Hi.

Q    How are you doing?

A    All right.

Q    You're going to have to lean up, speak into the microphone, okay?

A    Okay.

Q    What's your name?

A    Karen Real.

Q    And, Ms. Real, where are you located now?  And I don't mean at this instant, but where have you been the last several years, ma'am?

A    In Fort Worth, in Carswell.

Q    What is Carswell?

A    It's a federal prison.

Q    And can you pull that a little -- the mike a little closer to you.  And why are you in federal prison, ma'am?

A    For drugs.

3080

Q    More specifically, what were the charges that you were convicted of, ma'am?

A    Conspiracy to manufacture, maintaining a house and a gun charge.

Q    When was it that you were convicted, ma'am?

A    In March 2nd of 2000 is when they came into my house.

Q    Was it your house or was it a house that someone else owned and you were staying there?

A    It was someone else's house.

Q    Do you know an individual -- by the way, what was your sentence, do you recall?

A    Fourteen years.

Q    And we visited previously to your being here, have we not?

A    Yes, sir.

Q    And did I indicate anything that I would do for you or attempt to do for you in relation to your cooperating with the Government in this case?

A    No, sir.

Q    Did I talk about anything I'd say to the Court?

A    Well, you just mentioned that, you know, you could tell the Judge, you know, what I did.  And then it would be up to the Judge.

Q    Okay.  Any relief from your sentence -- you're aware

3081

it's not going to come from me, its got to come for the court?

A    Yes.   The court.

Q    Did you have a drug problem, ma'am?

A    Yes, sir.

Q    What kind of drugs were you involved with?

A    Meth.

Q    And how long had you been involved with methamphetamine, ma'am?

A    I guess I started doing drugs probably pretty regular about '94, '95.

Q    Up until they came in in March of 2000?

A    Yes.

Q    Do you know Kenny Barrett?

A    Yes, sir.

Q    And how long have you known Mr. Barrett, ma'am?

A    Well, I've actually was probably going out to his house in 1997, I guess.   But I've known him before that.

Q    Okay.   And are you a married or single lady now?

A    Single.

Q    Have you ever been married -- is Real your married name?

A    Yes, sir.

Q    And did you know if you ever had any kind of kinship with Mr. Barrett as far as family relations?

3082

A    Well, I believe Roger Real is his cousin.  I think that's what's -- what he told me.

Q    So your ex-husband would be Mr. Barrett's cousin?

A    I think that's what he told me, yes.

Q    You said something about starting going out there in 1997.  Where are you talk about, ma'am?

A    Out to Kenny's house.

Q    And would you look to Government Exhibit Number 1?  It's that model that's out there in front of the bench.  Do you recognize what that is, ma'am?

A    Yes, sir.

Q    What is that?

A    That's his house.

Q    And how long a period, you said you started in '97.  How long a period of time was it that you went to Mr. Barrett's residence?

A    Well, '97 to maybe early '99.

Q    Do you know exactly the dates?

A    No.

Q    Did you become aware or learn of the incident at Mr. Barrett's in which an Oklahoma Highway Patrol trooper was shot and killed and another was injured?

A    Yes, sir.

Q    Can you tell the jury how long prior to that happening it had been that you had been at Mr. Barrett's,

3083

the best you can give?

A    Probably nine to ten months.

Q    Would it have been less than a year when the shooting happened that you had over -- within the year prior to that, that you had been to Mr. Barrett's?

A    I think so.

Q    Okay.  When you go -- (Interrupted)

MR. HILFIGER:  Your Honor, at this time I would renew my objection based on -- (Interrupted)

THE COURT:  Okay.  Overruled.

Q    (By Mr. Littlefield) When you would go to Mr. Barrett's, how long -- for what kind of periods would you stay there, ma'am?

A    There's -- sometimes I would just go out there a day, I might stay two or three days, maybe even longer.

Q    Okay.  And during the approximate two year period up into early '99 that you went to Mr. Barrett's, how often would you go over there?  Was it a monthly basis, more than once a month, once every couple months, how frequently was it that you would go there?

A    There's no pattern.  I mean, I might go out there and then it might be a month, it might be two months, it might just -- sometimes it would just be a week.  I mean, there wasn't no -- any certain time, any certain pattern.

Q    How conscious was Mr. Barrett of security during the

3084

time period you were going out there, ma'am?

A    What do you mean?

Q    Well, did people have free access to his place?

A    I mean, he also knew who was there.  He, you know.

MR. LITTLEFIELD:  I'd ask that Government Exhibit Number 69 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And you can see it to your left and you can also see it on the screen.  Do you recognize Government Exhibit Number 69, ma'am?

A    Yes, sir.  Yes, sir.

Q    And what is that, ma'am?

A    That's his house and his mother's trailer and his -- the shed he has.

Q    Okay.  Do you see this right here?

A    Yes, sir.

Q    Can you tell what that is?

A    His gate?  Is that what you're -- (Interrupted)

Q    Okay.  Where was that gate normally, ma'am?

A    Where that car's sitting.

Q    Right here?

A    Yes.

Q    And during the times that you were there, what was the condition or status of that gate as far as being open or closed?

A   Usually be open and then sometimes in the evening time, a lot of times he'd close it.

Q   And when he closed it, how was it secured?

A   I think it was with a chain.

Q   Was there a sign on the gate?

A   I do believe so.

Q   Do you recall that sign?

A   I recall the sign.  I don't know exactly what it said, but I remember there being a sign there.

MR. LITTLEFIELD:  Ask that Government Exhibit Number 104 be provided to the witness.

Q   (By Mr. Littlefield) And, Ms. Real, you can take that sign and hold it.  Do you recognize that sign, ma'am?

A   No, it don't look like the sign that I've seen.

Q   What does the sign that you saw say?

A   Well, I don't remember exactly what it said, but it was more or less that he would shoot you if you come on his property.

Q   Well, what's that -- did you read that sign?

A   Yes.

Q   Did it say essentially the same thing as that sign?

A   Yeah, basically.

Q   Okay.  When he had his gate locked, what would he do if people would drive up to the area of the gate, ma'am,

3086

if he was in the house?

A    Until he'd see who it was, a lot of times he would get his gun.

Q    I'm sorry, what?

A    Until he would see who it was, a lot of times he would come out with his gun.

Q    Describe the gun.

A    It was just a rifle.  I don't know nothing about guns.

Q    Was there anything about the gun that was distinctive?  Anything about it that you recall?

A    The only thing I can think, I think it had a strap on it.  But I don't know anything about guns.  I just know it was a rifle.

Q    A rifle with a strap?

A    I believe so.

MR. LITTLEFIELD:  I would ask that she be shown Government Exhibit 128.

THE COURT:  You may.

A    Yeah, it may -- I don't know if that's the exact same gun, but it does favor it, yes.

Q    (By Mr. Littlefield) I'm sorry?

A    It does favor the gun, yes.

Q    Okay.  Can't say absolutely sure it's it, but that looks similar to the gun?

3087

A    Yes, sir.

Q    During the period, two year period, that you went over there, were there ever any drugs consumed there by yourself?

A    Yes, sir.

Q    And what kind of drugs did you use when you were there?

A    Meth.

Q    How did you get the meth?

A    What do you mean how did I get it?

Q    Was it your meth or was it someone else's meth provided to you?

A    It was someone else's.

Q    Who provided you methamphetamine at Mr. Barrett's residence?

A    Kenny did.

Q    What kind of quantities was it that you were receiving on the occasions you were over there?

A    You mean how much did I do?

Q    Yeah.

A    Well, I don't know.  We'd just -- whenever we wanted to do some, we'd just do some.  I don't --

Q    Were they -- we've heard of quarter papers and there's been various references to various sizes.  Were you familiar with the size of -- or how were you taking

3088

it?

A    I was using needles.

Q    Were you familiar with the size of the dosage that you would receive?

A    If you're asking did I weigh it, no.

Q    By looking at it, could you tell?

A    It was probably less than a quarter paper, but, yeah.

Q    You said you were using needles?

A    Yes, sir.

Q    Where were the needles provide from?  Who provide the needles?

A    Kenny usually had needles.

Q    Were they clean or previously used needles?

A    No, he had new needles.

Q    Do you see Mr. Barrett in court today?

A    Yes, sir.

Q    Where is he?

A    Sitting right there in the green shirt.

        MR. LITTLEFIELD:  I'd ask the record reflect that Ms. Real has identified the Defendant, Kenneth Barrett.

        THE COURT:  The record so reflects.

Q    (By Mr. Littlefield) Do you know where he kept his methamphetamine, ma'am?

3089

A     Usually he just had it in his pocket.

Q     Mr. Barrett ever make statements about his attitude towards law enforcement?

A     Yes, sir.

Q     What did he say?

MR. HILFIGER:  I'd object unless there's some time frame put on it.

THE COURT:  Objection sustained.

Q     (By Mr. Littlefield) When was the last time you heard him make a comment about law enforcement?

A     He just usually -- any time you was out there, sometimes it would come up, you know, he'd just --

Q     Was it -- you said you were there from '97 until the latter part of '98 or early part of '99?

A     Yes.

Q     Was there -- during that time period, was there any particular difference that would say, well, this was how it was in one portion of the time period?  It was different in another portion of the time period, and different in another portion of the time period.  Or was it all pretty much the same as far as attitudes and what happened?

A     To me it was just the same.

Q     During the time period from '97 to '99, what was Mr. Barrett's attitude toward law enforcement?

3090

A    He didn't like them.

Q    What did he say about them?

MR. HILFIGER:  Again, Your Honor, I'd like some -- (Interrupted)

THE COURT:  Sustained.

Q    (By Mr. Littlefield) Mr. Barrett -- during the time that you were out there, what employment did Mr. Barrett have?

A    Well, there's times he went to work for about, you know, a week or so.  But other than that, I don't know of him working.

Q    And during what portion of the time period was it that you saw him work for periods of maybe up to a week?

A    When I first started going out there.

Q    Would it have been -- in which year then?

A    '97 I guess.

Q    Do you recall him being employed during 1998?

A    He borrowed my truck one time to go to a job and I can't remember if it was in '97 or '98.

Q    During the latter period at which you were going out there, do you recall Mr. Barrett having any kind of employment?

A    No, sir.

Q    Do you know what income or what source of income Mr. Barrett had?

A     I assumed the only income he had was what drugs he sold.

Q     Did you ever see him sell drugs?

A     Yes, sir.

Q     And do you recall anyone to whom he sold drugs?

A     I can't recall anybody's names because he hung out with different people than I hung out with.

Q     I'm sorry?

A     He hung out with different people than I hung out with.  I didn't really know a lot of the people that come out there.

Q     Where were the drug -- where did the drug transactions take place, ma'am?

A     Either in his house or right outside his house.

Q     Did he attempt to hide the fact from you that he was distributing drugs, ma'am?

A     No, sir.

Q     The individuals to whom Mr. Barrett sold drugs, were they -- how would you define them as far as his knowing who those people were when they came to purchase them?

            MR. HILFIGER:  Your Honor, again, we don't have any time frame here.

            THE COURT:  Sustained.

Q     (By Mr. Littlefield) During the latter part of 1998, 1999, did you ever see Mr. Barrett sell drugs to any

3092

individuals that you knew were strangers to him?

A    No, I assume he knew them.

Q    Why did you assume that?

A    Because he acted like he knew them.

Q    And what would Mr. Barrett do if individuals approached that were unknown to him and he did not appear to know who they were?

A    I don't recall anybody coming out there when I was there that he didn't know.

Q    Okay.  How often was Mr. Barrett lacking methamphetamine?

A    Not very often.

            MR. LITTLEFIELD:  May I have just a minute, Judge?

            THE COURT:  You may.  We're going to take the recess for the evening now, so we'll start here again in the morning.

            Members of the jury, if you'll remember my admonition not to discuss this matter among yourselves or allow anyone else to approach you about this.  And if they do, you should contact the Court.  I'll ask that you be back in the morning at 9:00.  Ask everyone to please remain seated as the jury leaves for the evening recess.

            (Whereupon, the jury exited the courtroom after which the following record was made.)

3093

THE COURT: The witness may be excused.

(Whereupon, the witness left the stand and exited the courtroom after which the following record was made.)

THE COURT: Let the record reflect the jury has left the courtroom. The witness has left the courtroom. Anything to take up outside the hearing of the jury?

MR. SPERLING: Judge, we have one matter that was raised the other day and upon additional review I believe the Court made an appropriate inquiry, explicit and implicit findings we believe were sufficient. We believe the record is sufficient. Prophylactically, though, I ordered the transcript and upon receipt and review, we believe that supplemental findings are appropriate and we will be submitting it.

THE COURT: Say that one more time. I was following you till the end.

MR. SPERLING: All of it?

THE COURT: No. I was following you. I guess what I want to know is are you -- (Interrupted)

MR. SPERLING: I won't be filing it today, Judge.

THE COURT: Okay. Are you going to file something sometime in the future? I didn't understand that part of it.

3094

MR. SPERLING:  That was the part that I may have hurried through.  But we have ordered the transcript and upon review and receipt of that transcript, Judge, we believe that supplemental -- (Interrupted)

THE COURT:  I understand.  I understand now. Anything on behalf of the defense?

MR. HILFIGER:  No, Your Honor.

(Whereupon the Proceedings were continued to October 25th, 2005.)

3095

C E R T I F I C A T E

STATE OF OKLAHOMA   )
                    ) SS.
COUNTY OF TULSA     )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on October 24, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 2824 through 3094.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

_____
GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date:  December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )
                           )
-vs-                       )   No. CR-04-115-P
                           )
KENNETH EUGENE BARRETT,    )
                           )
            Defendant.     )

VOLUME 14 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on October 25, 2005.

A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                        United States Attorney
                        and
                        Mr. D. Michael Littlefield
                        Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                        Mr. Bret A. Smith
                        Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965    Pages 3097-3324

3097

W I T N E S S E S

PAGE

KAREN REAL
(Continued from October 24, 2005)
Further Direct Examination by Mr. Littlefield . 3098
Cross Examination by Mr. Hilfiger . . . . . . . 3110
Redirect Examination by Mr. Littlefield . . . . 3129
Recross Examination by Mr. Hilfiger . . . . . . 3134

BEN W. ROSSER
Direct Examination by Mr. Littlefield . . . . . 3137
Cross Examination by Mr. Hilfiger . . . . . . . 3140

IRIS DALLEY
Direct Examination by Mr. Littlefield . . . . . 3154
Cross Examination by Mr. Hilfiger . . . . . . . 3262
(Continued to October 26, 2005)


E X H I B I T S

OFFERED    REC'D

Government's Exhibit Number 182 . . . .    3160       3160


P R O C E E D I N G S

THE COURT: Let the record reflect the jury's in the box, counsel for the Government is present, Defendant is present with counsel. You may cross examine.

MR. LITTLEFIELD: I haven't finished direct.

THE COURT: You hadn't. I am sorry. I thought you had. You may proceed with your direct. I do recall now.

3098

FURTHER DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   Ms. Real, during the period of time from sometime in '97 until late '98, early '99 when you would go over there to Mr. Barrett's residence, when you and he would use drugs, where were the syringes kept?

A   I'm not sure of any certain place they was kept.  He just -- I just remember them being there by the -- by his stereo.

Q   Where was his stereo located, ma'am?

MR. LITTLEFIELD:  And I'd ask Government Exhibit Number 175 be displayed.

Q   (By Mr. Littlefield)  And you'll see it on the screen next to you.  Do you recognize what is shown there in Government Exhibit 175?

A   Yes, sir.

Q   And where was it that his stereo was located, ma'am?

A   It was in the same room as the gun cabinet is and it's -- you walk into the house.

Q   Well, can you see the location in 175?  Do you see the front door?

A   Yes.

Q   Where's the front door?  Tap it.

A   Right here.

Q   You need only tap it once.  Every time you tap it --

but that's all right.  And where was the stereo located where the syringes -- that area where the syringes were kept?

A    Okay.  It'd be right here.

Q    Okay.  Where's the door between those two rooms?

A    Be right here.

Q    And when one -- when he'd walk through the door, how far from that door between the two rooms was it that the fresh syringes were kept?

A    Just right there.  I mean, just right there on the same wall as the door.

Q    I'm sorry.  You need to lean -- (Interrupted)

A    It's on the same wall.  As soon as you walk in the door, it's right there to your left.

Q    Okay.  When you first started going over there -- how did you first -- what caused you to first start going to Mr. Barrett's?

A    I was over at Tina -- I think it was Tina Eckler is her name, I think that's his cousin, I'm not sure.

Q    Okay.

A    And he stopped by there one day and that's how I got to talking to him and he invited us over.

Q    And did you and Tina both go over there?

A    Yes, the first time I went over there I went over there with her.  Or she went over there with me, yes.

3100

Q     What happened when you got over there?

A     We got high.

Q     I'm sorry.

A     We got high.  We did drugs.

Q     Who provided them the first time?

A     Kenny.

Q     Why did you continue to go there, ma'am?

A     It was just a place to go and we did drugs so we had that in common, I guess, is why I went, yes.

Q     During the early time, the early portion of this -- the '97 portion, were there many other people that came by when you were over there?

A     No, there wasn't a whole lot when I first started going over there.

Q     Did that change at any time?

A     Yes.  The more I went over there it seemed like the more people came around.

Q     During the latter period that you were going over there, in the latter part of '98 to the early part of '99 -- and are you exactly sure of the dates?

A     No, sir.

Q     During that latter time when other people were coming over there, do you know what they were coming over there for?

          MR. HILFIGER:  Your Honor, I'd object.  That

3101

calls for speculation on her part -- (Interrupted)

MR. LITTLEFIELD:  I'll ask it in a different way.

THE COURT:  Question withdrawn.

Q   (By Mr. Littlefield) Did you ever hear the individuals who came over make requests?

MR. HILFIGER:  Your Honor, I object.  That's hearsay.

THE COURT:  Argument?

MR. LITTLEFIELD:  It's not offered as the truth, it's what she observed as what was said.  It establishes a reason for what Mr. Barrett did in response to those comments and requests, Judge.

MR. HILFIGER:  Your Honor, again that's going to the truth.

MR. LITTLEFIELD:  The truth is not what was said but what -- what is said which caused Mr. Barrett to do what he did and what he did in response to those statements, Your Honor.

MR. HILFIGER:  Your Honor, my response to that is she can testify as to what she saw Mr. Barrett do.  She doesn't need to testify what somebody else said.

THE COURT:  Sustained.

Q   (By Mr. Littlefield) Were statements made to Mr. Barrett when these individuals came over?  And not what

3102

statements were made, but were statements made?

A    You mean did they talk to him?

Q    Were requests ever made to Mr. Barrett by these individuals who came by to visit him?

A    Yes, sir.

Q    When the individuals came by and made whatever the statements were, what did Mr. Barrett do in response to those requests?

A    The request that I'm thinking of -- (Interrupted)

Q    Not -- okay.  Go ahead.  Don't say the request, but what -- (Interrupted)

A    What did he do?

Q    What did he do when somebody came by and made a request of him?

A    He would -- he would give them -- I don't understand what you're wanting me to say.

Q    Did you ever see drug transactions?

A    Yes, sir.

Q    What initiated the drug transactions?

A    Somebody would come up and ask if he had any drugs.

Q    And when that happened, what would Mr. Barrett do?

A    He would go into his house and he would usually, you know, they would make a transaction.

Q    And where were the transaction -- where did the transactions take place?

A    Sometimes in the house and sometimes outside.

Q    Did you ever see drugs -- Mr. Barrett exchange drugs or provide people drugs after the requests were made?

A    Yes, sir.

Q    How were the drugs packaged that Mr. Barrett delivered?

A    In little Ziploc baggies.

Q    Can you display the size of the baggies that you observed Mr. Barrett provide other individuals, use your hands and show -- (Interrupted)

A    They just -- they'd be about this tall and they'd be about that wide.  It wouldn't be very big.

        MR. LITTLEFIELD:  I would ask Government Exhibit Number 170 be provided to the witness.

        THE COURT:  You may.

Q    (By Mr. Littlefield) Do you have Government Exhibit 170, ma'am?

A    Yes, sir.

Q    It is open and inside are some bags.  Could you open and pull out one of those bags?  Are those the size of the bags that you saw?

A    Yes.  They would be similar, yes.

Q    What size quantities to those bags hold, ma'am?

A    I guess up to probably a gram, at least.

Q    Do you know what size quantities Mr. Barrett was

distributing when you observed the distribution?

A    Sometimes I would hear them ask for the amount, but sometimes I didn't.

Q    Did you observe amounts that were being distributed?

A    I seen the drugs.  I wouldn't -- didn't see him weigh them or nothing, no.

Q    Okay.  What money -- how much where those transactions?  What kind of dollar value were those transactions?

A    I'd just see money.  I don't know how much he actually charged them.

Q    Who received the money when those transactions took place, ma'am?

A    Kenny did.

Q    During the latter period of time when you were going out there, how often a day would individuals come by to do these drug transactions?

A    Sometimes it might be two or three times and sometimes it might not be, you know, but maybe one.

Q    Okay.  During the period you were going over there, how often was it that Mr. Barrett did not have drugs available for you and he to use?

A    Not very often.  I just recall one time maybe him going and getting some.

Q    Where did he keep it?

3105

A    The only place I ever actually seen it is in his pocket.  I don't know where he kept it.  If he kept it some place else I have no idea.

Q    When you all would use, where would he retrieve it from?

A    His pocket.

Q    And what quantities did he keep on his person in his pocket, when you all would use it?

A    Probably sometimes maybe an eight ball or less.

Q    And an eight ball is how much?

A    Three and a half grams.

Q    Would an eight ball fit in one of those little baggies that you just displayed from Government Exhibit 170?

A    I'm not sure.  It'd be pretty full if it did.  I don't know.

Q    How much is an eight ball, just street value or how much was it back in '99 in Sequoyah County?

A    Anywhere from 200 to 250.

Q    Do you recall the largest transaction you ever saw Mr. Barrett involved in?

A    No because it was always seemed like smaller amounts.

Q    When you were in the residence, when people would come over for drug transactions, what did you do?

3106

A     If I seen what was happening I'd -- and usually, if they was in the house, I'd usually just go outside.

Q     Why?

A     To make room because the house was so small anyway. Just because it wasn't none of my business.

Q     You ever see a location when somebody would make a request for it where would Mr. Barrett go, in relation to the drug transactions?

A     I guess around the stereo is where I think he would usually go, in that room.

Q     I'm sorry?

A     Where the stereo is in that room there.

Q     You mentioned the rifle yesterday.  Did Mr. Barrett possess any other firearms?

A     Seems like he had at least two or three rifles and I think he had a handgun.

Q     Where did he keep the handgun?

A     What I remember him having it is when I'd see the handgun, usually he had it in his pants.

Q     Ma'am, during the latter part of 1998 into the early part of 1999, what did Mr. Barrett say in regards to cops?

A     He didn't like them so -- but he mentioned that, you know, if they ever come out he would shoot them.

Q     Did you believe him at the time?

A    No, sir.

Q    How often --

MR. LITTLEFIELD:  And I would ask that Government Exhibit 69 be displayed again.

THE COURT:  You may.

Q    (By Mr. Littlefield) The shop building here, how often was Mr. Barrett out at that location?

A    Quite a bit.

Q    And what was he doing out there?

A    Sometimes he would be just -- I don't know, just messing with maybe a car or something.

Q    You need to lean forward.

A    I'm sorry.

Q    That's all right.  And I'm sorry.  What was your answer again?

A    Sometimes he'd be messing with some kind of motor or something like that, a car or something.  I don't know. Nothing really.

Q    Did he appear -- did you observe him make substantial money in working on cars during the periods of time you were out there?

A    Not that I know of.

Q    When he was out at that location, where were his weapons?

A    Well, if he had a rifle, a lot of times it would be

3108

leaning up against the wall or something.

Q    In what building?

A    If he was -- wherever he was at.  If he was out in the garage it would be out there just leaning up against -- in the corner.

Q    The individuals that came out there to purchase methamphetamine from Mr. Barrett -- (Interrupted)

MR. HILFIGER:  Your Honor, I object.  That's assuming facts not in evidence.

MR. LITTLEFIELD:  I thought that was her testimony.

MR. HILFIGER:  The purpose -- she never testified as to what purpose.

THE COURT:  I didn't hear all the question. Would you restate the question.  Ma'am, wait until I rule on the objection before -- (Interrupted)

Q    (By Mr. Littlefield) The people who came out to purchase drugs from Mr. Barrett, did you know who they were?

MR. HILFIGER:  Again, Judge, I object. Assuming facts not in evidence, as far as the reason the people came out.

THE COURT:  Objection overruled.

Q    (By Mr. Littlefield) Did you know who they were?

A    Some of them I did, but not very many of them.

3109

Q    Did you know the names of the individuals or how did you know them?

A    Mostly just by their face.  I didn't know their name.

Q    Did you know them prior to their coming to Mr. Barrett's, these individuals that you knew by face?

A    I just seen them, you know, because of living in the same town.  I've seen them in the town.  But, no, I'd never seen them at any other house.

Q    Would you classify Mr. Barrett as a big time drug dealer?

A    No.

            MR. LITTLEFIELD:  May I have just a second, Judge?  Your Honor, may I have just a second?

            THE COURT:  You may.

Q    (By Mr. Littlefield) During the time you were out there, how often did you see -- do you know who Toby Barrett is?

A    His son.

Q    During the time you were out there, how often did you see Toby Barrett out there?

A    I never did.

            MR. LITTLEFIELD:  Pass the witness.

3110

CROSS EXAMINATION

BY MR. HILFIGER:

Q    Ms. Real, you're not unfamiliar with this courtroom, are you?

A    No, sir.

Q    You spent some time in it a couple of years ago, about four years, five years ago?

A    Almost six years ago.

Q    Six years ago.  And that was resulting from some transactions you had with Gann boys, wasn't it?

A    Yes, sir.

Q    And there's a Gann boy that was your boyfriend or husband or what was his --

A    Boyfriend.

Q    Boyfriend.  Now, when did you have this relationship with the Gann boy?  And which one was it?

A    It was Doss Gann.

Q    And when was that?  When did you start that relationship with him?

A    July or August of '98.

Q    Okay.  Now, I'm going to back up a little bit to try to figure out a little time frame, okay?  As I understood you said something about Tina Eckler and that's when you first went to Kenny's, is that right?

A    Yes, sir.

Q    And she was a cousin of Kenny's, is that right?

A    I think she was his cousin, yes.

Q    Do you know about when that is that you're saying that you went there?

A    Well, I'm thinking it was in '97.

Q    It was in '97?  So you're saying that prior to 1997 you had never been to Kenny's, is that right?

A    I don't think I had, no.

Q    Did you know Kenny?

A    Yes, sir.

Q    How long had you known Kenny?

A    I've known of him for a long time.

Q    How long did you know him, though?

A    I didn't actually ever know him until I actually started going to his house.  I just knew who he was.

Q    Now, you were married to a Bob Real, is that right?

A    Roger Real.

Q    Roger Real.  Okay.  And when was your marriage to Roger Real?

A    In '84 to '94, I believe.

Q    You say Roger Real was this cousin of Kenny's, is that right?

A    I believe that's what he said, yes.

Q    When you were married to Roger Real, where did you live?

3112

A    We lived -- well, we lived in town some but then we also lived right down past Kenny's house.

MR. HILFIGER:  Would you display -- hold on a second -- 184, please.

Q    (By Mr. Hilfiger) Do you recognize that?

A    I can't tell.  I'm sure it's out there but I don't know -- it's all turned around.

Q    Is this a road that goes by Kenny Barrett's house and Gelene Dotson's house and the Crawford's house?  Can you recognize it now?  You'll have to look up here.  I can't mark it on there.  This road right here.

A    I can't -- it looks like -- I guess it is.  I can't really tell.

Q    Do you recognize this building right here?

A    I'm sorry.  I can't see that very good.

Q    Okay.  Let's start with Government 69.  Let's start with Government 69.  I want you to understand where you are.  Let me ask you, when you say Robert -- Roger Real lived down the road, what down the road is it?

A    Okay.  Like when you go to -- come to Kenny's house you just keep going.

Q    Do you recognize this?

A    That's Kenny's house.

Q    Is that the road?

A    Yes, that's the road.

3113

Q    And when -- and which direction are you going to get to Kenny's house from the outside?  Are you going this way?

A    If you was to come out of Kenny's driveway you would turn left.

Q    You'd turn left and go down this road here, is that right?

A    Yes.

Q    And then you go on down that road to Roger Real's house, is that right?

A    I think he had an aunt that lived in between us, yes.

Q    And how long did you live down there?

        MR. HILFIGER:  Now would you show 180 for her, please?

A    I don't know.  I really -- two or three years, maybe.  I'm not sure.  I can't remember.

Q    (By Mr. Hilfiger)  Would that be up till the end of your marriage?

A    No.

Q    So it would have been early '90s or something like that?  Or late '80s?  When did you live there?

A    I think it would be the early '90s, maybe the end of '80 to early '90s.

Q    And now going back to this 184, this is the road

3114

that goes in front of Kenny Barrett's house and this is the road that you're talking about going on down to the aunts and uncles, right? Now, where is Roger Real's house down through there?

A    It was a trailer house in between -- (Interrupted)

Q    That trailer house or is it another trailer house that's there?

A    It -- we didn't have our trailer sitting that way, so, no, that has to be another trailer.

Q    But Roger Real and you lived down in this area some place?

A    Yes.

Q    By the way, where does this road go? What's on down through here?

A    It just goes to a dead end down to some land.

Q    You can't get into that road except up through here, isn't that right?

A    Yes.

Q    So, when you lived out there with Roger Real, was Kenny Barrett living out there with Gelene Dotson?

A    Yes.

Q    But you didn't know Kenny at that time, I guess?

A    No, I just knew who he was.

Q    You just knew who he was. You didn't go -- did you ever go to Gelene Dotson's house?

3115

A    Not until I went out to Kenny's.

Q    Not until this cabin here, house or whatever it was, was built, is that right?  The one that Kenny Barrett lives in?

A    Yes.

Q    Do you know who built that?

A    Yes.  Kenny did.

Q    Built it with his own hands, didn't he?

A    That's what he said.

Q    Now, so when you and Tina Eckler got together, where was this?

A    Where did we get together at?

Q    Yeah.

A    We was working at the same place, at Mike -- working for Mike Martin and that's how I got to know Tina.  And then we was at her trailer one day and he stopped by.

Q    And where was her trailer?  Any relation to any place out here?

A    No.

Q    And was her trailer in Sallisaw or just around the area someplace?

A    Sallisaw.  Well, it wasn't directly in Sallisaw, but it was -- I can't remember the street it was on.  It's kind of out in the country a little bit.

Q    Was that before or after your divorce to Roger Real?

3116

A    After.

Q    And was that before or after you met up with Doss Gann?

A    Before.

Q    Now, you met up with Doss Gann in July of '98 and at that time where was Doss Gann living?

A    He stayed at Lake Tenkiller.

Q    And he was making meth out there, wasn't he?

A    At different times, yes.

Q    I mean, in fact, there were like three raids out there?

A    Something like that.

Q    In '98, two in '98, maybe one in '99?

A    I think so.

Q    And were you there when they raided in '98?

A    I believe so.

Q    So he's making meth out there at Tenkiller in '98 and you're going with Doss Gann out there at -- you know, are you staying out there at Tenkiller?

A    At one time, yes.

Q    And when you came to Kenny Barrett did you bring any drugs from Doss Gann's over there?

A    No.

Q    What was the need to go to Kenny Barrett's house for drugs if Doss Gann's making them out there?

A    I started going to Kenny's before I ever started dating Doss.

Q    Okay.  But -- (Interrupted)

A    And I was getting drugs off Kenny and I hadn't even started dating Doss yet.

Q    Well, after you started dating Doss in July of '88 or -- I mean, July of '98 or August of '98, were you getting your drugs off Doss Gann?

A    Sometimes there at the first.  Not all the time, no.

Q    And how long a period of time were you getting your drugs off Doss Gann?

A    What do you mean?

Q    After you started -- you said sometime at the first and then did you increasingly get your drugs off Doss Gann?

A    Yeah.

Q    Okay.  So, you didn't need to go to Kenny Barrett's, did you?  Doss Gann was furnishing you the drugs.

A    We didn't always have drugs.

Q    Doss Gann didn't have them going all the time?

A    No.  Not all the time, no.

Q    And that was in '98.  Now, as I understand your testimony, you recall when the incident occurred that we're here for, when the Highway Patrol come out there.  And you said that you were out there in early -- '97 to

3118

maybe early '99 and how long prior to that Highway Patrol incident, you said nine to ten months. Is that pretty truthful?

A   That's as close as I could think, yeah. It's what -- (Interrupted)

Q   If you back up nine to ten months from September 24th, 1999, what month does that give you?

A   It would be January or December.

Q   Yeah. So, when you're saying early '99, you mean right in January?

A   Uh huh.

Q   Because February is about when you got arrested on the Doss Gann bust, didn't you?

A   Somewhere in there.

Q   February '99?

A   Yeah, I think so.

Q   And so, you're talking about very early in January or December. Now, is there any -- can you recall, were you out there before or after Christmas? Or did Christmas make any impact on you because of the drug uses?

A   No. Every day was just the same as the next day.

Q   At that particular time?

A   Uh huh.

Q   When you went out there, weren't there other people

3119

that you went out there to see?  Didn't you go see Gelene, just about every time you went out there?

A    Sometimes we'd see her, yeah.

Q    I mean, you would go by and see Gelene before you would come and see Kenny, wouldn't you?

A    No, sir.

Q    Not all the time?

A    No, sir.

Q    None of the time?

A    I'd seen Gelene sometimes when I was out there, because I'd take showers sometimes over at her house. But I never went out there just to see Gelene, no.

Q    Okay.  So, is it correct to say the last time you were out there would have been January, at the latest, in 1999?

A    Yes.

Q    Okay.  And it could have been even the latest -- it could have even been just December of '98, is that right?

A    Yes.

Q    What about any earlier than that?

A    That's -- I'm just assuming that -- that's my best -- it was about nine or ten months before the shooting.

Q    Okay.  And what in your mind is prompting the nine or ten months?

A    I'm just -- that's just the best I could come up

3120

with.  I just knew I was out there in the latter part of '98 for sure and I just -- I didn't know if I was out there -- how soon I was out there after '99 or even if I was.

Q    Okay.  So now you're saying you may not even be sure that you were out there in '99, is that right?

A    I had already said that.  I said '98 or the early part of 1999.

Q    You mentioned when you were out there -- did you -- Kenny sometimes would be out in the garage, is that right?

A    Sometimes.

Q    Working on cars?

A    I don't know what he was actually working on.  Just different things.

Q    When he was out in the garage did you come out in the garage and talk to him?

A    Yeah.  I mean, I don't know what he was actually doing.  I don't recall any mechanic work or anything like that.  But he was doing something, yes.

           MR. LITTLEFIELD:  Would you turn to 69, please?

Q    (By Mr. Hilfiger) When you were out there and he was working in the garage area, did you see a number of cars out there?

A    No.

3121

Q   You didn't?

A   No.

Q   Do you see like some of these cars here, this pickup's here and stuff like that?  Were any -- did he have any type -- not necessarily those particular cars because you were out there, you know, ten months, nine, ten months before that.  But did he have any number of cars siting out there that had been worked on or anything?

A   Seems like there might have been one or two sitting there, something.

Q   Do you know whether -- on any of the cars that were out there that he was doing work on, do you know whether he was doing it for free or getting paid?

A   I didn't know that he was doing any work for anybody in particular.

Q   Okay.  When you talked about something about him -- well, let me back up.  Can you recall -- can you recall the specific last time you were out there what happened, what occurred or anything like that?

A   The very last time I went out there, I went out there just to get some drugs.

Q   Can you recall anything specific about that time?  Was it hot?  Was it cold?  Was there green grass on the ground?  Was it raining, snowing?  Can you recall

3122

anything?

A   No, I can't.

Q   And this time would have been a time that you were with Doss Gann?

A   The last time I went out there, yes, I was still dating Doss, but Doss was mad at me.  That's the only reason I would have probably went out there, because he was the only place else to go to get drugs.  That I would go, anyway.

Q   And when you went -- and you say this last time you went out there to get drugs, did you pay for them?

A   I think I gave him some money.

Q   What's the I think mean?

A   Well, I can't remember if it was actually that time or another time.  Most of the time he just gave them to me.

Q   And can you say most of the time he just gave you the drugs, was it drugs to do right there?  I mean, did you do your shot or did you take them with you and leave?

A   To do right there.

Q   To do right there.  It was just part of the hospitality deal, wasn't it?

A   I guess, yeah.

Q   After you started -- well, at any time where you -- would you say that you were in a type of dating

relationship with Kenny Barrett?

A   No, sir.

Q   Never?  Even after you started dating Doss Gann?

A   No.

Q   You mentioned something about a time when Kenny Barrett used your pickup, is that right?  Or your truck or your car?

A   My pickup, yes.

Q   Do you recall about when that was?

A   I believe that was -- it was in '97 or maybe early '98 because it was when I first started going out there.

Q   And wasn't the truth on that is it you traded trucks, really.  You used his and he used yours?

A   Well, yeah.  He wanted me to -- his truck, he couldn't take it or something, to wherever he had to go, Fayetteville or someplace.  So he left me his truck and he used mine.

Q   You mentioned that you saw while you were out there that people came out there, and the only time you saw him keep drugs was in his pocket, is that right?

A   Yes, sir.

Q   And were there, you know, one baggy, more than one baggy?  What did you see when he'd pull it out of his pocket?

A   I just remember one.

3124

Q    One baggy.  And when somebody would come out there and you say that you saw drugs given to that person, back on the time frame again, it would have to be in '98 or before, right?

A    It would start in '97 to '98, yes.

Q    Because in -- the time, the last time you were there did you see anything like that?

A    I don't know because I wasn't out there very long.

Q    Okay.  So the last time you were there, if it was in the first part of '99 or the last part of '98, whichever, you didn't see any kind of drug transaction with anybody else out there, did you?

A    No.

Q    So if you saw any drug transactions at all out there, it had to be in '98 or before, isn't that right?

A    Yes.

Q    When you're saying you saw somebody give money to Kenny Barrett for whatever the deal was, was it cash, checks, credit cards, vouchers?

A    Cash.

Q    It was always cash, wasn't it?

A    That's all I ever seen, yes.

Q    You never saw anything but cash trade, is that right?

A    Yes.

Q    And as I understand -- that -- are you saying that when -- were you there to watch the drug transaction?  I mean, were you able to say that you saw Mr. Barrett pull out something out of his pocket and give it to whoever this other individual was and then he received cash from him or was this done out of your presence?

A    There was times I seen -- seen him hand the dope to them and they'd hand him back -- they'd hand him back the money.  But not always.  But most of the time -- sometimes I'd just hear them ask for it and then they'd go in the house.

Q    Okay.  So you're just talking about a few times that you saw any kind of exchange, is that right?  Is that right?

A    I don't know how many times, no.

Q    Most -- but you said most of the time it was done in the house.  They went in the house, you didn't see what would happen?

A    No.

Q    That's not right or that is?

A    No.  I mean -- sometimes, yes, they sometimes went in the house and I didn't see what happened.

Q    And when that happened you don't know whether there was any exchange or not; isn't that true?

A    I guess I couldn't say for sure, no.

3126

Q    And whatever exchanges you saw or whenever you saw people come out to the house -- well, let me withdraw that question.

When you were there, was it mostly daytime or nighttime?

A    Both.

Q    Was there anything that Mr. Barrett did with that gate during the daytime or nighttime on a regular basis?

A    Sometimes he would close it in the evening, not always.

Q    Would people come out there at nighttime?

A    Sometimes.

Q    What is the latest that you can recall -- the latest time of night that you can recall somebody coming out there while you were there?

A    I don't know.  It would be dark.

Q    What?

A    It would be dark so it could be any time depending on the time of year.

Q    Did you ever see anything after midnight?

A    No, I don't think so.

Q    So, while you were out there you never saw anybody come after midnight, is that right?

A    No, it might have been somebody already there but I don't think I recall anybody coming up after midnight,

3127

no.

Q   Now, how many times during this time frame in '97 to the end of '98 would you say you would have been out there?

A   I don't really know because I would go sometimes a month or so in between and not even go maybe two months.

Q   And then when you would go out there, would you go on a weekly basis or be more than that?

A   No.  When I'd go out there, sometimes I'd stay for two or three days or longer.

Q   And even when you stayed out there for two or three days or longer, did you ever see anybody come there at midnight or after?

A   I'm not really sure.  I don't -- I really don't -- it wasn't like a revolving gate, no.

Q   Would you say in that year and a half period -- is that a fair statement?  From July of '97, July, August of '97, is that when you started coming out there?  I'm sorry -- (Interrupted)

A   I don't know what time in '97.  It was just in '97 when I started going out there, through '98.

Q   Okay.  So, not two years maybe?  Not -- close to a two year period but not quite two year period.  Would you say you were out there 24 times?

A   I don't know.  I'd just be guessing.  I have no

idea.

MR. HILFIGER:  May I have just a moment, Your Honor?

THE COURT:  You may.

Q   (By Mr. Hilfiger) Ms. Real, how did you find out about this particular trial coming up?

A   Mr. Littlefield contacted me.

Q   And Mr. Littlefield -- you and Mr. Littlefield have had a relationship in the sense that he's the one who prosecuted you, isn't that right?

A   Yes, sir.

Q   And when were you contacted?

A   I think it was last November.

Q   And is that when you first started talking about your relationship with Kenny Barrett or knowing Kenny Barrett?

A   He asked me about Kenny, yes.

Q   Had you talked to anybody else prior to that?

A   No.

Q   So, in November of -- this occurred, this incident occurred, in September of 1999 and in November of 2004 you first mentioned it to any prosecutor?

A   Yes.

Q   About your knowledge of Kenny Barrett?  Five years later?

3129

A     As far as I know, yes.

          MR. HILFIGER:  I have no further questions.

          THE COURT:  Redirect.

                    REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     Who initiated the contact in November of 2004?  Was it you contacted me or how did that happen?

A     You contacted me.

Q     And the means by which you were contacted, how did that occur?  I just give you a telephone call or write a letter or what happened?

A     No, I just -- one day they told me to pack out and they sent me here.

Q     And once you got here with whom did you visit?

A     You.

Q     And when we visited, what did I do?

A     You asked me if I knew Kenny Barrett.

Q     What did you tell me?

A     I told you yes.

Q     Other than what you told in court today, what was talked about?

A     That was about it.

Q     When you stayed out there for the two or three day periods, where was it that you slept?

A     Well, we usually didn't sleep.

3130

Q    Where did Kenny sleep?

A    He usually didn't sleep either.

Q    How did you manage to stay up for two or three days?

A    Drugs.

Q    Now, sometime in '98, late summer, you began a girlfriend/boyfriend relationship with Doss Gann.  Is that what you said?

A    Yes.

Q    And did Mr. Gann always have drugs?

A    No, there was times he didn't.

Q    Where did you get drugs when he didn't?

A    I would -- I had went out to Kenny's after that.

Q    Okay.  Was there any other source besides Kenny and Doss Gann?  And you need to continue to lean forward. When you lean back I lose you.

A    Sometimes he would go -- if we was out, sometimes Doss would go get some.  But I -- you know, I didn't go to too many places, no.

Q    Did Doss know Kenny Barrett?

A    Yes.

Q    How do you know that?

A    I don't know.  I just know he knew him.

Q    You mentioned -- and Mr. Hilfiger asked you about being arrested several times in '98 and then arrested with Mr. Gann in, I think he said, February of '99.  Do

3131

you recall talking about that on cross examination?

A    Yes, sir.

Q    Did you stay in jail continuously after February '99 or were you able to make bond?

A    No, we bonded out.

Q    And when was it that you went to jail and from that point no longer were able to bond out?  Do you remember the month and year?

A    March 2nd of 2000.

Q    Gelene is whom?

A    Kenny's mother.

Q    And where did she live?

A    In the trailer next to him.

Q    When you went out there, who was it you went out to see?

A    Kenny.

Q    What occasioned you to see Gelene when you were out there to see Kenny?

A    Every once in a while we'd go over there and get something to eat or I'd take a shower.

Q    You mentioned that -- and Mr. Hilfiger asked you about sometime in '97 or early '98 trading trucks with Mr. Barrett; do you recall that?

A    Yes.

Q    On that occasion how long -- do you know how long

3132

you'd stayed over at Mr. Barrett's place on that time?

A    I didn't stay there whenever I had his truck.   Is that what you're asking?

Q    Okay.  Well, I understand you took his truck and left.

A    Right.

Q    But was it a deal where it was just went there, traded trucks and left and never went back?  Did you spend the night there?  How long during that time -- do you recall how long you were at Mr. Barrett's on that occasion?

A    I can't remember.  I just know he borrowed my truck to go to work and I took his truck and I think he was gone maybe a week.

Q    He was gone a week?

A    I think he was.

Q    Did you have his truck the entire week?

A    Yes.

Q    And where did you stay that entire week?

A    I was -- I was staying -- that's when I was dating somebody else so I was with my boyfriend then.

Q    That was before you took up with Mr. Gann?

A    Yes.

Q    How did Mr. Barrett get his truck back?  How did you swap back?

3133

A    We met -- we met some place and I can't remember exactly where it was and he got his stuff out of my truck and we just exchanged trucks.

Q    And during the period of time that you had his truck, did you go places?

A    Not very many places.

Q    Did he ever say why he wanted to swap trucks?

A    I don't think his truck was -- maybe his truck wasn't legal.  I don't know.  I really don't remember why.

Q    You mentioned on cross that on the last transaction, the last time you were there, in '97 -- I mean, pardon me, in late '98 or early '99, January, December whichever month it was, that you didn't see a drug transaction on that occasion?

A    No, I don't recall.

Q    Okay.  How long were you there?

A    Not very long.

Q    Why did you go there?

A    Just to get some drugs.

Q    Did you get drugs?

A    Yes.

Q    Was there then a drug transaction on that occasion?

A    I guess so, yes.

        MR. LITTLEFIELD:  Pass the witness.

3134

RECROSS EXAMINATION

BY MR. HILFIGER:

Q    Ms. Real, all this information you say you have today, you apparently had back in March of 2000, is that right?

A    March of -- what do you mean?  Oh, yes, yes.

Q    You had it in March of 2000.  The information was available.  You could have given it to Mr. Littlefield back in March of 2000, April of 2000.  When did you go to trial, May and June of 2000, wasn't it?

A    Something like that.

Q    And that information was available.  You could have given it to Mr. Littlefield then, but you didn't give it to him until November of 2004, is that right?

A    That's right.

Q    Were you given some -- do you have some expectation of something that's going to be given to you as a result of that?

A    I guess I could -- yes, I could hope that it would help me some, yes.

Q    What are you expecting?

A    I don't expect anything.

Q    Would Kenny Barrett put you up when Doss Gann kicked you out?

A    I don't know that -- he never did turn me away from

his home if that's what you're talking about.

Q    But Doss Gann -- you'd get in a fight and he'd kick you out from time to time, right?

A    I think he did once, yes.

Q    Would you go to Kenny Barrett's?

A    I think I did that time, yes.

Q    And he put you up, took you, is that right?

A    Well, I was there for a few days, yes.

MR. HILFIGER:  I have no further questions.

THE COURT:  Any further direct?

MR. LITTLEFIELD:  No.  Pass the witness, Judge.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes.

MR. SMITH:  Yes, Your Honor.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.  You may be excused.

MR. LITTLEFIELD:  May I have just a second -- Judge, may I step to the back of the courtroom?

THE COURT:  Yes.

MR. HILFIGER:  Your Honor, may we approach?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. HILFIGER:  Comes now the Defendant and moves to strike the testimony of Karen Real as being

3136

outside the time of relevance for the reason that her statement is she's locked in that it was January had to be the latest, but it could have been December, which is a full nine or ten months before this incident and the time sequence is not relevant.

MR. LITTLEFIELD:  The whole deal, Judge, is the maintaining a place and it shows a continuing pattern of his use for the purpose of dispensing drugs, using drugs and then there's the manufacture.  It becomes later, but shows it from the time of the incident in September of 1999 back to and through '97 and it shows a continuing pattern of that and I think it's all relevant to the maintain clause.

MR. HILFIGER:  Nothing to show from January through July.

THE COURT:  Motion overruled.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  You may call your next witness.

MR. LITTLEFIELD:  Ben Rosser.


BEN W. ROSSER,
being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

3137

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record, please, sir.

A    Ben W. Rosser.

Q    Mr. Rosser, how are you employed?

A    I'm a Special Agent with the Oklahoma State Bureau of Investigations.

Q    And how long have you worked for the Oklahoma State Bureau of Investigation, sir?

A    Nine and a half years.

Q    In what capacity do you work for the OSBI?

A    I work in general assignments.

Q    Well, what's general assignment?

A    We have specialized units.  My particular area that I work in, we investigate a variety of things, robbery, rape, homicides, criminal -- official misconduct, just whatever.

Q    In what areas -- do you have a specific area of the state to which you're assigned, sir?

A    The northeast region.

Q    That include Sequoyah County?

A    Yes, sir.

Q    Did you have an involvement in this particular case, sir?

A    Yes, sir.

3138

Q   As a part of your involvement in this case, are you familiar with Mr. Barrett's date of birth?

A   Yes, sir.

Q   And when was Mr. Barrett born?

A   June 29th, 1961.

Q   And would he have been have been in excess of 18 years on September the 24th, 1999?

A   Yes, sir.

Q   Direct your attention to November the 4th, 1999. Did you have an occasion to go by the Sequoyah County Sheriff's Office?

A   I did.

Q   For what purpose?

A   To pick up an item of evidence.

MR. LITTLEFIELD:   I would ask that Government Exhibit Number 120 be provided to the witness.

THE COURT:   You may.

Q   (By Mr. Littlefield) And are you familiar with Government Exhibit 120, sir?

A   Yes, sir.

Q   What is that?

A   It's an OSBI laboratory submittal envelope.

Q   Are you familiar -- do you recognize it?

A   Yes, I do.

Q   How?

3139

A     It is -- has the evidence seal on it and it still has my initials and dates on the seal.

Q     And what's in that envelope, sir?

A     It contains a plastic bag containing a plastic bottle.

Q     Do you recognize anything on the bottle?

A     Yes, I do.

Q     What do you recognize?

A     It has an evidence seal and my initials.

Q     When was that stuff placed on that bottle, sir?

A     November 4th, 1999.

Q     What is contained inside that bottle?

A     A projectile.

Q     And where did you -- was the projectile in the bottle when you received it, sir?

A     Yes, sir.

Q     From whom did you get it and at what location?

A     I obtained it from Johnny Philpot at the Sequoyah County Sheriff's Office.

Q     Did you see where he got it from?

A     Yes.

Q     Where did he get it from?

A     He retrieved it from his desk drawer.

Q     What did you do with that bottle after you received it from Sheriff Philpot?

3140

A    I then transported it to the OSBI laboratory in Tahlequah, Oklahoma.

Q    Who submitted it to the lab?

A    I did.

MR. LITTLEFIELD:  May I have a second?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

CROSS EXAMINATION

BY MR. HILFIGER:

Q    Mr. Rosser, the question was asked what -- about your involvement in this case.  What is your official involvement in this case?

A    I was the case agent.

Q    And the case agent means what?

A    Basically that you coordinate the investigation and try to put it in some sort of finished product for the prosecutors.

Q    And are you sort of in charge of assembling the evidence?

A    Yes, sir.

Q    And when you say you put the case together for the prosecutor, that means that you're sort of -- you're not a neutral person to this case, you're attempting to assemble a prosecution report for the prosecutor to use, is that right?

3141

A    I just gather what is obtained in the investigation.

Q    Okay.  And what -- when did you arrive out at the scene that night?

A    Approximately two o'clock in the morning.

Q    Where did you come from?

A    Checotah, Oklahoma.

Q    Now, when you arrived out there, I'm assuming that Mr. Eales had left, had already -- had left the scene, is that right?

A    Yes, sir.

Q    I'm assuming that Mr. Hamilton had already left the scene, is that right?

A    Yes, sir.

Q    And I'm assuming that Kenny Barrett had already left the scene, is that true or not?

A    Yes, sir.

Q    How many people were at the scene when you arrived, do you know?

A    I didn't take a head count but there was several.

Q    Would several be more than ten?  And by at the scene I'm talking about right around the physical area.

          MR. HILFIGER:  Let's put up Number 69, please.

Q    (By Mr. Hilfiger) And when I'm saying at the scene, I'm talking about this -- in this area right here.  Would you say more than ten people were there?

A    Fewer than ten in that area.

Q    And when you arrived was this vehicle in this proximate location or was it in any other proximate location?

A    I believe it was in about that location.

Q    Okay.  And did you -- part of your deal is to gather the evidence and make sure it's not tampered with, is that right?

A    No, sir.  I would see that that is done, but I don't necessarily gather the evidence and collect -- (Interrupted)

Q    You're in charge of the other people gathering it, is that right?

A    On that date, myself and Inspector Dave Page was.

Q    And was there -- when you got there was there any kind of information that you received?  And I'm not asking for the actual information.

A    Yes, sir.

Q    That gave you some kind of hint that that white Bronco had been moved?

A    Yes, sir.

Q    And did that concern you at all?

A    Well, yes, sir.  Everything out there concerned us, is what happened.  So that's why we were trying to piece together all the information possible.

3143

Q    Well, but -- I mean, did it -- the fact that you understood that that Bronco had been moved -- had moved -- had you understood any kind of distance that it had been moved?

MR. LITTLEFIELD:  Assumes facts not in evidence and I object on that basis.  And may we approach?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  Couple items.  One is the question he keeps saying it had been moved.  There is no testimony that it was moved.  There was certainly testimony that it moved.  And -- but there's no testimony that it was moved by an individual as opposed to being -- it moving on its own.  And there's a distinction that's fine but important.  And there's no testimony that it had been moved.

Second, is all of this line of questioning is beyond the scope.  And I'm not going to object to it being beyond the scope, but the questioning is inappropriate to the extent it's leading.  If he wants to adopt him as a witness -- and he's not being unresponsive so at this point I don't think it's been established that he is hostile.

THE COURT:  I mean, I have recognized it seemed

3144

to be going beyond the scope. I didn't know whether you all had talked to each other about something I didn't know about or -- but I mean, all it looks like he did to me is establish the age of the Defendant and picked up the -- (Interrupted)

MR. LITTLEFIELD: That's correct.

THE COURT: -- picked up the projectile and took it to the OSBI lab.

MR. LITTLEFIELD: And I recognize that he could call Mr. Rosser as a part of his case. And, I mean, you know, it could work in either way. But the questioning as it's being -- (Interrupted)

THE COURT: That's always -- I mean, I understand that and sometimes that works well. But I don't know that in this case, unless Mr. Hilfiger's -- unless that's what you've done.

MR. HILFIGER: What's that?

THE COURT: Is putting him on as your witness.

MR. HILFIGER: No. Well -- a little bit. I mean, he said he was -- his involvement in the case and that's what I'm asking about.

THE COURT: He didn't really -- all he's done is -- I mean, what it looks like to me is all he's done is shown the beginning of the transportation of the projectile to the lab. And I think that's all he's here

3145

for.

MR. LITTLEFIELD:  That and establish Mr. Barrett's age, which is one of the elements.  And those are the only two reasons I put him on.  I needed to establish that he had some involvement and some basis for doing what he did.  But that's all I did with him.

THE COURT:  If your intention is to go into the depth of the investigation with him, I don't think you can go there.

MR. HILFIGER:  Not to the depth of the investigation.  Just about the car moving --

(Interrupted)

THE COURT:  Then I sustain the objection.

MR. HILFIGER:  Just the car movement.

THE COURT:  The car movement wasn't covered in direct.

MR. HILFIGER:  I understand that.  I understand.

THE COURT:  I thought maybe it had something to do with this projectile.

MR. HILFIGER:  If the Court's going to say -- you know, limit us based on that, then can something --

(Interrupted)

THE COURT:  I thought maybe you were going to recall him or something.  I don't know if this is it for

3146

you with him.

MR. LITTLEFIELD:  That's all I'm going to use him -- (Interrupted)

MR. HILFIGER:  If the Court's going to limit us on that -- and I understand that.  I just wish the Court -- in future witnesses that we call, if we do call witnesses, will do the same limitation as it applies to us to the Government.  In other words, if we call a witness and only ask him very limited questions, that the Government cannot expand.

THE COURT:  I may have failed in the past, but that's my goal every time a witness comes up.  And this one's pretty clear that that's all.  I was assuming that you were going somewhere with this projectile with his background.  But I don't see that coming.

MR. HILFIGER:  No.  That's not coming.

THE COURT:  Okay.  Well, I think it should be restricted to just the age and the projectile.  And I'd be willing to give you some leeway as to that projectile, to get into that.  But if you're going into other areas, I'd think you'd better call him as your witness.

MR. HILFIGER:  Okay.  That's fine.  It's just -- I'm making the Court aware that if I'm being limited -- (Interrupted)

THE COURT:  You feel mistreated in the past --

3147

(Interrupted)

MR. HILFIGER:  No, no.  It's something that I'm anticipating calling a witness in the future and I'm only going to ask certain questions of that witness and I think just leave it at that.

THE COURT:  I'm trying to -- on cross examination, but I think to this point it's been broad enough that just -- there's been justification for you going where you've gone.  This witness just appeared to be very limited.

MR. HILFIGER:  Okay.  Fine.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q    (By Mr. Hilfiger) Mr. Rosser, how did you make the determination of the age of Kenneth Barrett?

A    I received from the cover sheet for my report to the district attorney.

Q    So it was provided to you by somebody else?

A    Yes, sir.

MR. HILFIGER:  I have no further questions.

THE COURT:  Any redirect?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  May this -- you may step down, sir.  You may call your next witness.

MR. LITTLEFIELD:  Iris Dalley.  And, Judge, may

3148

-- prior to the Ms. Dalley testifying, may Mr. Hilfiger and I approach in regards to the previous discussion as to the approach on Ms. Dalley?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  I'm going to tell him about a phone call last night.

THE COURT:  That's fine.

MR. LITTLEFIELD:  She has prepared a PowerPoint which is one exhibit and we'll be testifying from that. I've spoken with Mr. Hilfiger in regards to that and identified the areas -- and there are multiple areas within that exhibit that she has prepared.  And we have discussed and I've identified the specific areas into which she's going to testify about.  Mr. Hilfiger advises me that he did not have an objection to allowing her to testify from that exhibit as a demonstrative exhibit.

MR. HILFIGER:  That's right.

THE COURT:  Okay.  Well, demonstrative exhibit or demonstrative aid come into evidence or not come into evidence?

MR. LITTLEFIELD:  It will be displayed to the jury.  The issue is that there are some photographs that she took that are a part of that exhibit and --

3149

(Interrupted)

THE COURT: You use the term exhibit. Has this been identified as an exhibit?

MR. LITTLEFIELD: It will be identified as an exhibit.

THE COURT: Has it been before today?

MR. LITTLEFIELD: Not before today. It's on the list but no one has spoken of it previous to today.

THE COURT: So, do you plan on introducing it as an -- this is in simple form, I'm not trying to make it -- is it a demonstrative aid the jury's going to see to enhance her testimony or is it an exhibit you anticipate that will go to the jury?

MR. LITTLEFIELD: Yes and no.

MR. HILFIGER: I understand it will be an aid.

MR. LITTLEFIELD: At this point it is an aid although a part of that are photographs that were taken during her analysis. It relates to the trajectory of the bullets into the Bronco.

THE COURT: When you say PowerPoint there's a practical problem that you understand if it goes to the jury.

MR. LITTLEFIELD: I don't intend to -- for it to go to the jury.

MR. HILFIGER: I think what he's talking about

is the pictures themselves.

MR. LITTLEFIELD: The pictures themselves -- (Interrupted)

THE COURT: Are individual exhibits?

MR. LITTLEFIELD: We will -- I.

THE COURT: Provide them.

MR. LITTLEFIELD: Yeah, we're going to add them at some point. We're going to pull them out and offer them subsequent as an exhibit. She will have identified them. We won't offer them now.

THE COURT: Are they a part of the PowerPoint?

MR. LITTLEFIELD: They are a part of the PowerPoint.

THE COURT: As a demonstrative aid?

MR. LITTLEFIELD: As a part of the demonstrative aid. And today I'll identify it as an exhibit for demonstrative purposes.

THE COURT: And they are -- this would be additional exhibits to what she -- (Interrupted)

MR. LITTLEFIELD: Then we will add additional exhibits based upon the photographs that she has identified from that PowerPoint. And I don't think Mr. Hilfiger will have an objection.

MR. HILFIGER: I don't have any objections. And as part of that, now, further part there was, you're

3151

not going to put any demonstrative aid in as to Rocky Eales, the figure -- (Interrupted)

MR. LITTLEFIELD:  Not -- not that there's -- there's multiple items.  She did several items and I selected -- (Interrupted)

THE COURT:  Tell me in general what she's going to testify about.

MR. LITTLEFIELD:  She will -- she did a trajectory analysis of the shots.  She has photographs and displays the trajectories of each of the shots.

THE COURT:  Shots fired?

MR. LITTLEFIELD:  Fired.  That went into -- (Interrupted)

THE COURT:  That went in -- from the house?

MR. LITTLEFIELD:  Yes, that went into the Bronco.  And will identify 18 separate shots into the Bronco itself.  And then will discuss that she believes that the elbow wound was a 19th shot that did not pass through the Bronco.  She will -- and then she has prepared displays as to each one of the trajectories.

THE COURT:  What are the photographs going to be marked as exhibits, photographs of what?

MR. LITTLEFIELD:  The trajectories that she prepared at the scene.  She ran dowel rods through the various shots.

THE COURT:  And the defense has seen this?

MR. HILFIGER:  I've seen these, yes.

MR. LITTLEFIELD:  She also prepared a -- it is a computer generated model of the Bronco that kind of rotates, like -- (Interrupted)

THE COURT:  This is in her PowerPoint?

MR. LITTLEFIELD:  Like it's levitating.  Yes. And it displays those trajectories in groupings.  And that will be part of the PowerPoint.  She also had an individual of the same size, physical characteristics, white, as Mr. Eales, dressed him as Mr. Eales and had him get out of -- with the ballistic shield and the uniform that Mr. Eales -- the equipment Mr. Eales was dressed in on that night, had him exit a Ford Bronco and photographed him as he was exiting.  She then superimposed that onto the Bronco with the trajectories, with an analysis of the trajectories -- there's four shots that go through the door.  And her demonstration will show how those trajectories are consistent with the locations of the wounds to Mr. Eales' body as this individual was exiting from the door.  She'll do that. Those will not go to the jury.  That will be demonstrative.  The levitating Bronco will not go to the jury.  It will be demonstrative.  We will then download the photographs of the Bronco itself where she did the

3153

trajectories and will offer those as exhibits.

THE COURT:  How long is her testimony?

MR. LITTLEFIELD:  Pretty long.

MR. HILFIGER:  It'll be long.

MR. LITTLEFIELD:  Pretty long.

THE COURT:  I think we'll take a recess now and then start with her.  It'll go the rest of the morning?

MR. LITTLEFIELD:  Yeah.  I'm not sure if we'll even finish her -- I don't think we'll finish her by noon.

MR. HILFIGER:  I don't see how.

THE COURT:  So we're going to take a recess. Now's as good -- (Interrupted)

MR. LITTLEFIELD:  Now's as good as any.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, we'll take our morning recess now and we'll try to hold it to 20 minutes.  If you'll remember my admonition not to discuss this matter among yourselves or allow anyone else to discuss it with you.

(Whereupon, a short recess was held after which the following record was made in the presence of the jury.)

THE COURT:  Let the record reflect the jury's

3154

in the box.  Counsel for the Government is present.
Defendant and counsel are present.  And you have called
your next witness.  If you'll raise your right hand and
be sworn.

                    IRIS DALLLEY,

being first duly sworn to testify the truth, the whole
truth and nothing but the truth, testified as follows:

                 DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name, please, for the record, ma'am.

A    Iris Dalley.

Q    And, Ms. Dalley, how are you employed?

A    I'm an agent with the Oklahoma State Bureau of
Investigation.

Q    And when you say you're an agent for the OSBI, what
is your area of -- what areas --  how are you classified?

A    My title is special agent, my job assignment is
crime scene agent for the eastern regional office.

Q    Where you stationed out of?

A    McAlester.

Q    When you -- when you're saying you're a crime scene
agent, what areas of expertise do you have in regards to
crime scene analysis?

A    I do crime scene investigation to include blood
stain pattern analysis, shooting scene -- shooting

incident reconstruction, crime scene reconstruction.  I do evidence identification and collection, I prepare demonstrative exhibits of my analysis and I also was employed as a criminalist in the laboratory where I did analysis specifically on body fluids.

Q    What kind of training have you received that is relative to your job as a criminalist or as an agent for the OSBI, ma'am?

A    Well, as far as training -- (Interrupted)

Q    What educational background?

A    I have a bachelor's of science in biology and a master's in secondary science.  I have attended numerous law enforcement training schools and seminars to include basic police academy.  I've been to two OSBI academies. The Southern Institute in Homicide Investigations I've attended twice.  I've attended several schools in blood stain pattern analysis, both basic and advanced.  Schools with the FBI in forensic serology.  I have taught other law enforcement officers.  I'm a charter member of the International Association for Crime Scene Reconstruction and am an officer of that association.  I'm also a member of the International Association of Blood Stain Pattern Analysts, and I'm an officer of that association.  I am certified as a senior crime scene analyst by the International Association of Identification.  And I'm an

3156

active member of that association.  I also am an officer of the Oklahoma Division of the International Association of Identification.  And I do training and presentations for each of those associations and particularly the Association of Crime Scene Reconstruction and the International Association of Blood Stain Pattern Analysts.

Q    What's involved in crime scene reconstruction?

A    In crime scene reconstruction, we look at the evidence, any analysis such as laboratory analysis, look at blood stain patterns, trajectories that may be identified, forensic serology, ballistics reports, and take all of that into consideration to determine what could and more particularly, what could not have occurred.

Q    In that regard, is analysis of trajectories a part of crime scene reconstruction?

A    In those instances where we find shootings are involved, then, yes, trajectory analysis is part of that.

Q    How long have you been with the OSBI?

A    Since 1989.

Q    Have you previously been qualified in crime scene reconstruction and trajectory analysis in any courts as an expert witness?

A    Yes, sir.

3157

Q    And what courts have you been -- specifically in those two areas, what courts have you been qualified as an expert?

A    In this court, the -- (Interrupted)

Q    In the Eastern District, federal court in the Eastern District of Oklahoma?

A    Yes, sir.

Q    Any state courts?

A    Yes, in numerous state courts.  And particularly eastern Oklahoma and also in Grady County, which is in western Oklahoma.

          MR. LITTLEFIELD:  Your Honor, I would ask that Ms. Dalley be qualified as an expert in the area of crime scene reconstruction, particularly in trajectory analysis.

          MR. HILFIGER:  No objection.

          THE COURT:  That will be the order of the Court, hearing no objection.

Q    (By Mr. Littlefield) Ms. Dalley, did you have occasion to go to -- do you recognize what's shown in the model there, Government Exhibit Number 1, ma'am?

A    Yes, sir.

Q    And did you have occasion to go to that location on September the 24th, 1999 for the purpose of preparing a reconstruction of the crime scene?

3158

A    I went to a scene that this appears to depict for the purpose of assisting in the analysis of that crime scene and specifically requested to do trajectory analysis.

Q    Did you look within the residence?

A    Yes, sir.

Q    Let me direct your attention to --

MR. LITTLEFIELD:   I would ask that Government Exhibit 183 be displayed to the witness.

Q    (By Mr. Littlefield) And while we're calling that up, did you find a projectile in a bookshelf in the east room of that residence, ma'am?

A    I found a projectile in what I characterize as a cabinet in the east room.

Q    And as soon as we get that up.  Do you see Government Exhibit 183, ma'am?

A    Yes, sir.

Q    And where was that located?

A    This is in the northwest corner of that southeast room of the house.

Q    And were you able -- and what do we see right here? What is that?

A    It's a fired projectile.

Q    Did you perform any kind of trajectory analysis on that item, ma'am?

3159

A    Well, not on that item -- (Interrupted)

Q    I mean, but on the trajectory that would have been consistent with that item?

A    I did identify a trajectory that was consistent with being caused by that item.

MR. LITTLEFIELD:  I would ask that what has been marked as Government Exhibit 182 be displayed to the witness.  And it's not in evidence.

Q    (By Mr. Littlefield) And in relation to that projectile that you observed, did you happen -- do you know what caliber that projectile was; do you recall?

A    I don't recall precisely.

Q    Okay.  What's Government Exhibit 182; do you recognize that?

A    Yes, sir.

Q    And what is that?

A    This is a photograph which I took inside that house when I was there that day.

Q    And is it related to the projectile we just observed in Government Exhibit 183?

A    Yes, sir.

Q    And does that -- is that your -- show what you were doing in regards to establishing the projectile of that -- or the trajectory of that projectile that's shown in 183?

3160

A      Okay.  What's being shown here is an analysis I was doing of a defect through the wood that did in fact lead to the projectile that we saw in the previous photograph.

MR. LITTLEFIELD:  Move admission of Government Exhibit 182, Your Honor.

THE COURT:  Any objection?

MR. HILFIGER:  No objection.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And I'd ask that it be displayed.

THE COURT:  You may.

Q      (By Mr. Littlefield) What is this item, ma'am?

A      It's a wooden Dowel rod.

Q      And what are you doing with that wooden Dowel rod?

A      I'm putting it through the hole to see if I can establish a line of trajectory.

Q      And where was the projectile that we saw in Government Exhibit 183?  Where was that in relation to what we're seeing in Government Exhibit 182?

A      If you look at Government Exhibit 182 you're looking at the front wood facing that would be at the top of the cabinet.  Okay.  That is -- this is the cabinet coming up from the floor so this would be the top of that cabinet. And as you look along the bottom of the photograph you can see some stacks of magazines.

3161

Q    Uh huh.

A    And in the previous Exhibit Number 183 we saw the projectile laying on top of some stacks of magazines that would be inside this cabinet.

Q    And what does this Dowel rod do in regards to establishing the trajectory of the -- the line of fire of that projectile?  How do you do that to determine the trajectory of the projectile?

A    Well, the projectile travels in virtually a straight line over short distances, so I use a straight Dowel rod, in this case inserted through the defect, to try to visualize that line of travel, that path of travel.  And then I look at that line -- to continue that line in both directions.  In this case it continues into the cabinet and then below the line, the projectile was laying on top of the magazines.

        MR. LITTLEFIELD:  I would ask that Government Exhibit 175 be displayed to the witness.

        THE COURT:  You may.

        MR. LITTLEFIELD:  And it's a photograph as well.

Q    (By Mr. Littlefield) Do you recognize what's displayed in Government Exhibit 175, ma'am?

A    Yes, sir.

Q    Where was that?  Can you tap on the screen as to the

3162

area where that projectile was located?  You said, I think, the northwest corner of the southeast room.  If you tap on it, it should --

A    Over just a bit.

Q    I'm sorry.  Where in relation to the door is it?

A    To which door?  There's a doorway and a front door.

Q    The door entering that room.

A    There's a doorway between the two rooms, open space doorway.

Q    Where is the -- where was the projectile in relation to that doorway?

A    It would be just to the east side of that doorway and slightly north.

Q    Maybe rather than tap it, let's -- see the laser pointer.  Can you identify with it the area where that projectile was found?  Where are the shelves and the cabinets located?  Is it out in the open or is it in the wall or what?

A    In the corner, built into the corner.

Q    Okay.  From where -- when you trace the trajectory back, from where would the shot have been fired?  Or what trajectory does it follow?

A    The trajectory that it follows, the path that it took, was from the southwest towards the northeast.  And when I examined the line, that is when I extend the line

from the Dowel rod back to the south, it could have come through the open door and from some distance out to the southwest of that front door.

Q    So, when you say the open door, which -- is there a door actually in here or is it just an opening?

A    It was opened when I was there.  I don't recall there being a door mounted in that area.

Q    And does the trajectory move through this opening between the two rooms?

A    Yes.

Q    The front door, does the trajectory move through the front door and that door as well?

A    Yes.  If the front door was opened, then the projectile could originate outside the house, entering the space of the house.  Another defect in the door facing was a part of that line.  So that it could have come through the open front door and ended in the cabinet where I found it.

Q    Which door facing was there another defect?

A    In the door facing between the two rooms.

Q    This one here?

A    Yes, sir.

Q    Was it in the -- which room?  Was it in the facing of the southwest room or in the facing of the southeast room?

3164

A     Southwest.

Q     So it would have been on this side?

A     Yes, sir.

Q     Which of the two facings, the northern facing or the southern facing?

A     Southern.

        MR. LITTLEFIELD:  I would ask that Government Exhibit 69 be displayed.

        THE COURT:  You may.

Q     (By Mr. Littlefield) Direct your attention to this vehicle here.  Are you familiar with that vehicle, ma'am?

A     It appears to be the Bronco that I spent a lot of time with.  However from this angle it's kind of difficult to see in this photograph.

Q     Okay.  Bear with me just a second.  Describe the Bronco you dealt with.

A     It was a white Ford Bronco.  It was a two door with a tailgate that dropped down and had a broken glass in the back.

Q     A broken glass in the back?  And what was the condition of it?

A     I'm sorry.  It had a glass in the back and that glass was broken.

Q     I mean the Bronco itself, what was the condition of it?

3165

A    The condition of the Bronco, there were several holes in the Bronco and there was broken glass.  The rear glass was basically shattered but held together in the film of the glass.  There were perforations of the windshield and of the passenger wing glass.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 67 be displayed.

Q    (By Mr. Littlefield) Do you recognize that, ma'am?

A    Yes, sir.

Q    And what is that?

A    That's a photograph of the front of the Bronco.

Q    And what kind of analysis did you perform on that Bronco, ma'am?

A    Primarily trajectory analysis.

Q    And how did you go about performing a trajectory analysis on the various defects in that Bronco?

A    First I examined each defect to see if I could determine direction of travel of the projectile, that is, whether it was going into or coming out of the Bronco. And then I analyzed each one individually to see if I could determine a trajectory line through the opening to see if it matched any particular defects inside the Bronco or to the exterior of the Bronco.  And then I used a laser pen, I used wooden Dowel rods and tape to try to visualize each of those lines.

3166

Q     How would you use a laser pen in doing -- in performing your analysis?

A     I used a laser pen by laying it in the actual perforation through the windshield, for example, to see if that gave me a line.  And if it went to any identifiable point and if there was sufficient characteristics about that individual perforation that would indicate a line of trajectory.

Q     Okay.  In your experience, what does a .223 caliber projectile do when it hits something like the windshield of a vehicle, a high velocity round, what will it do when it hits a piece like the windshield glass?

A     Well, they tend to perforate the glass to start with.  And then as they exit on the other side of the glass there will be some fragmentation.  One thing that happens is -- (Interrupted)

Q     Fragmentation of what?  The glass or the projectile itself?

A     I'm referring to the projectile.  And the jacket will come off, in fragments it comes off.  The core, the main part of the metal, of the projectile, would continue to move on a straight line.  Pieces of that can shatter off, so you can get satellite fragments that will leave that straight line and travel off in other directions.  But if the core remains intact, then it continues to move

3167

in a straight line.

Q    In performing the analysis, you mentioned doing Dowel rods and the lasers.  Was your analysis of the shots fired into this Bronco recorded with photographs?

A    I did record my work with photographs.

Q    And did you -- have you done anything with those photographs and your analysis in preparation for your testimony here today?  Did you prepare anything to assist in the preparation or assist in your testimony?

A    Yes, sir.

Q    What did you prepare?

A    I prepared a PowerPoint presentation to describe and to follow each of the trajectories that identified and then I used all of the information I collected from the Bronco and especially the photographs to produce a three dimensional computer-assisted drawing that is a 3-D model of the Bronco and inserted rods to duplicate in that model what I saw in all my photographs.

Q    Okay.

A    To see if I could visualize all of the trajectories, not just with the Dowel rods but in three dimension.

        MR. LITTLEFIELD:  Your Honor, with the Court's permission, I would ask that Ms. Dalley's PowerPoint be presented to the jury or blow it up to present as we go through her testimony.

THE COURT:  You may.

MR. LITTLEFIELD:  It's marked for identification purposes for the record as Government Exhibit Number 189, however we are not offering it as an exhibit.

THE COURT:  It's marked as a demonstrative aid?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  189?

MR. LITTLEFIELD:  Yes, Your Honor.

Q   (By Mr. Littlefield) And if we go first -- the trajectories that you developed through the Bronco, is that what is marked as Bronco trajectories, ma'am?

A   Yes.

Q   And how many shots did you observe or count that were fired into that Bronco?

A   Eighteen.

Q   And as we look, are each the trajectories that you identified -- and I think you can see it on the screen there.  Are each of those -- what is each one of those? We see Trajectory 1 through Trajectory 18.  What is each of those?

A   Each of those, as various defects were located, were arbitrarily assigned a number, just as a means of identification.  Not to indicate chronological order or anything like that.  Just as a means of identification.

3169

And by naming them with numbers, then we also end up with a count.

Q    And so Trajectory 1, is that necessarily the first shot fired into that Bronco?

A    No.

Q    Last shot?

A    I have no idea.

Q    Do you have any means of sequencing the shots at all?

A    No.

Q    If we would look at Trajectory 1, if we click on it, does it show the photographs and establish the trajectory or show the trajectory you established through the shot?

A    If you click on it, yes, it will show the Dowel rod in the hole to visualize that line.

Q    Where was Trajectory 1 in the vehicle?  Where was the entry defect?

A    Entered in the right front quarter panel.

        MR. LITTLEFIELD:  If we could go ahead and go to Trajectory 1.

Q    (By Mr. Littlefield) What is that?  What are we seeing in this photograph?

A    Next to the number one on the right front quarter panel there is a defect, a hole, through the metal.  And I've inserted a Dowel rod through that hole.  There's

3170

also a hole on the interior side that you can't see.  So that's what -- establishes the whole line.

Q    And this yellow line that's displayed, what is that?

A    That's a line that I put on top of the picture to extend the line of the Dowel rod, just to visualize more of that line.

Q    Is there another photo, do you recall, on Trajectory 1?

A    I don't believe there's another photograph on Trajectory 1.

Q    So we go to Trajectory 2.  Where was that located?  Where was that defect located?

A    That was a defect in the passenger door of the Bronco, just below the wing glass.

Q    Okay.  Go ahead.  Do we see the entry defect, initially?

A    Yes, sir.

Q    And did you -- when you performed the trajectory on that, where did you -- were you able to determine where it passed to from this point?

A    Yes, sir.

Q    And where did it go to, this trajectory from the defect that you've marked as two, which is Trajectory 2?

A    It perforated the outer metal as you see and then also the interior side of the door.

Q    Were you able to trace on through, into the vehicle?

A    Yes, sir.

Q    And is that shown if we go to the next slide that's presented?

A    Yes, sir.

Q    That's -- is -- what are we showing here?

A    Close-up of that same defect, labeled as number two.

Q    What's the yellow line show?

A    The yellow line is a line I put on top of the Dowel rod to emphasis the Dowel rod to make it more visible.

Q    Could we go to the next photograph of Trajectory 2? And what do we see here, ma'am?

A    This is a photograph which I took after inserting Dowel rods into -- and to visualize various trajectories. And then in this photograph, I've highlighted the one that is associated with Trajectory 2.

Q    Now these other Dowel rods that we see displayed in there, what are they?

A    They're for other lines of trajectory that I identified inside the Bronco.

Q    Go to the next slide on Trajectory 2.  And what do we -- what's the yellow line on that next line?

A    Again, this is a continuation of that same line of trajectory associated with Trajectory 2.

Q    Where did that pass to?

3172

A    It went through the passenger door and into the back of the passenger seat.

Q    And can we go to the next shot of Trajectory 2? What do we see at the left of that line?

A    To the left of that line, we're looking at the back of the passenger seat.  You can see where the line goes into a defect in the back of the seat and there is a little piece of paper that's stuck on the back of the seat with the number two on it.

Q    Ma'am, did you notice anything in regards to the condition around that hole where the second trajectory, what's identified as Trajectory 2, passed into the passenger seat?

A    Yes, sir.

Q    What was there around it?

A    There was blood spattered on the back of the seat.

Q    Where in relation to that hole?

A    In the area around that hole.

Q    Is that the last shot on Trajectory 2?

A    I believe there's another close-up of the seat back.

Q    Okay.

A    I'm sorry.  The photograph taken from the opposite side of the Bronco, but again highlighting that same line of trajectory.

Q    Go to the next photo.  Is that where that trajectory

3173

ended up?

A    Yes, sir.

Q    Go to the next one.  What are we displaying here, ma'am?

A    This is a drawing, a line drawing, of the vehicle that I used in the 3-D model.  And in this view what I've done is to convert it so we can see the outline as opposed to the shell.  So that we can look down through the vehicle and look at the area where the trajectory is.

Q    Okay.  Now, let me ask you, do you have -- as you went through and prepared your trajectory analysis of these various shots, did you formulate an opinion as to whether or not the passenger door was open or closed when Trajectory 2 passed through it?

A    Yes, sir.

Q    What is your opinion as to whether or not the passenger door was open or closed on Trajectory 2, ma'am?

A    Passenger door was not closed.  It was open to some degree.

Q    On this particular diagram that is prepared, the door is not open, is it?

A    No, I don't depict the doors open.

Q    Why not?

A    I'm not that good an animator.

Q    Does that change -- the fact that the -- your

3174

animation has the door closed rather than opening up,

does that change the trajectory as it passes through, and

the line?

A    No.  The line is given relative to the body of the

Bronco and not the door.

Q    Okay.  Is that the area -- is that the area in which

it passed into the door?  Do we see the entry point?  Is

that still the area in which it passed into the door?

A    Yes, sir.

Q    Why does the line not bend, then?  If the door is

opened up, why does the line not bend?  Why is it still a

straight line?

A    The line is there to depict the pathway of travel of

a projectile.  That line would still be there even if you

opened the door.  I mean, because the line is to show it

relative to the body, not to the door.

Q    Okay.  We go to the next slide.  And what's that

displaying?

A    This is the same trajectory rod through the model.

I've just taken and looked at the side-view instead of

the top view.

Q    And in relation to the Bronco, is that going down,

up or what?

A    It's going slightly downward.

Q    What's that tell you about the elevation of the

3175

shooter related to the Bronco, when Trajectory 2 -- the shot that fired Trajectory 2 was demonstrated or fired?

A     The muzzle of the gun is somewhat higher than the defect in the door.

Q     Can you place exactly where the shooter was or where the Bronco was in relation to this location, for any of these trajectories, ma'am?

A     No.  My analysis does not tell me the exact position of either or both.

Q     By the way, as we're looking at all these trajectories, can you tell if one or the other of these, either the shooter or the Bronco, were stationery, moving or what?

A     My analysis indicated to me there were three possible scenarios.

Q     Okay.

A     One that the shooter is stationery and the Bronco is moving.  Two, that the shooter is moving and the Bronco is stationery, or three, both are moving.

Q     Can you discern how much movement there would be?  Let's assume for just a second that just to pick one of them, that the -- both of them are moving.  That both of them moved during the incident.  Can you tell how much they moved in relation one to the other?

A     No.

Q    Can you tell which one moved more than the other?

A    No.

MR. LITTLEFIELD:  May I approach the model, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Thank you, Judge.

Q    (By Mr. Littlefield) In relation to Trajectory 2, if that shot was fired with the Bronco in that position and the shooter inside the residence at approximately that inside door, would that -- and from a normal height for that type of weapon, would that trajectory be consistent from that location with what you saw in Trajectory 2?

A    The only way I could determine that would be to actually put a rod there and see if there's a straight line between those two locations.

Q    Can you do that?

A    Yes, sir.

MR. LITTLEFIELD:  I would ask that she be allowed to approach the model.

THE COURT:  You may.

Q    (By Mr. Littlefield) Go ahead.

A    I'm sorry.  Could you identify for me the position of the gun?

Q    Held in a normal position, standing in the area of the door separating the rooms.

3177

A    If we take a normal position to mean point shoulder position, that is raise the rifle to shoulder height, then it would be feasible that someone standing in that interior doorway could possibly make that shot.

MR. LITTLEFIELD:  May I ask her to return at this point?

THE COURT:  You may.

Q    (By Mr. Littlefield) Next slide, ma'am.  Go to Trajectory 3 and where was -- and I think it will show it.  Where was the entry defect on Trajectory 3?

A    It was in the passenger wing glass.

Q    And what's circled?

A    The -- I put a circle around the defect that is identified three.

Q    And how far is that defect from the -- what you identified as Trajectory 2?

A    Three to four inches.

Q    And did you again show the entry path on Trajectory 3?

A    Yes, sir.

Q    If we could look at the next slide, where does that go?

A    That goes across the passenger seat, behind the driver seat and exits through the left side glass.

Q    Yellow line, the trajectory as that goes through the

3178

car?

A    Yes, sir.

Q    And if we go to the next line, what's that show?

A    This is showing the same trajectory line, this time looking across from the inside, look at the interior side of that wing glass and highlighted again that same trajectory rod number three.

Q    If we could go to the next slide.  And which one of those is Trajectory 3, ma'am?

A    The one that's highlighted.

Q    Been waiting for that.  If we go to the next slide, does that show it from the back?

A    Yes.  This a photograph that I took from the back of the Bronco looking towards the front.  And it shows line three as it goes behind the driver's seat and exits through the left side glass.

Q    Next slide, please.  What does that display?

A    This is a photograph which I took inside the Bronco looking at the left side glass and highlighting that same rod.

Q    And again, these -- the number three, which is over on the right hand side, almost off the screen, who added that?

A    I did.

Q    To identify the shot?

3179

A    Yes.

Q    The next slide on Trajectory 3.  What is that?

A    This is a photograph which I took from outside the Bronco looking at the left side, exterior side, and extending that line from the hole associated with three.

Q    And I note that in this photograph we see multiple yellow Post-It stickies stuck up there.  Who wrote those -- who put those numbers up there, ma'am?

A    Lynette Lee.

Q    Was she assisting you in this?

A    Yes.  She was on the scene before I was and met me there.

Q    My question is did she assist you in this?  In your trajectory analysis?

A    She did not assist in this part of the analysis other than identifying those markers as being hers.

Q    Okay.  If we'd go to the next slide then.  And what does that display?

A    Again, this is a sketch or a line, outline of the model, looking at the line as it goes across the Bronco and again it's relative to the body of the Bronco.

Q    Okay.  Again, this one has Trajectory 2 passed into the passenger door of that Bronco.  Did you have -- do you have an opinion as to whether that door was open or closed when that shot was fired through the Bronco?

3180

A   This is through the wing glass of that door and the door was not closed.  It was partially opened to some degree.

Q   And again, does that affect the trajectory as it passes through the Bronco, ma'am?

A   No.  The line is to indicate the path relative to the body of the Bronco.

Q   Okay.  Next slide.  Again, what's this show in relation to the level of the shot?

A   That the shot is slightly downward.

Q   Does it show the same degree of angle downward as was in Trajectory 2, do you recall?

A   I believe it was a little more shallow, that is a little flatter, than Trajectory 2 or Trajectory 2 would be a little more downward.

Q   Was that trajectory consistent?  When we did the display where you went up and looked at the trajectory into the vehicle of the shot coming into the side, the passenger door, having been fired from the open door of the Barrett cabin, do you know if this trajectory would have been consistent with having been fired from within the cabin out the front door?

A   Based on examination of the model with the rod, it's possible that it could be a shot from that position.

Q   Now, there could have been other places where the

3181

shooter was and the Bronco was, that that shot could have been fired?

A    Yes.

Q    But for example, if it were out -- further out, could the shooter have fired that shot and still been at the location around the front porch of the Bronco?

A    I'm not certain of the exact question.  There would be -- (Interrupted)

MR. LITTLEFIELD:  Could I approach a second, Judge?

THE COURT:  You may.

Q    (By Mr. Littlefield) If the Bronco is at this location and the shooter is firing from an area, say straddling the front door, where they're partially in, partially out and shooting into the Bronco on this line, could that trajectory have been made?

A    I'm not certain.

Q    Would there be some point in this area where the shooter could have been standing and fired a shot consistent with that trajectory which is Trajectory 3?  I mean, if we moved the shooter, have the Bronco stationery there, and moved the shooter, is there a location from which the shooter could have fired that shot?

A    Yes.  It appears that if the Bronco is in that position at that location, that a shooter could have been

3182

somewhere on the porch and still be able to make that shot. It appears that that's a possibility.

Q But that would have required what in relation to the passenger door, for that trajectory to have been fired from this area? Passenger doors would have had to have been open or closed?

A It has to be partially opened.

Q Okay. Next slide. What's that display?

A This is again looking at the trajectory as it goes through the Bronco, this time looking at the opposite side, looking at a left side-view. So you have a right side view and then a left side-view.

Q Go to the next slide, please. Go to Trajectory 4. Where is Trajectory 4?

A Trajectory 4 is also through the passenger wing glass.

Q And if we can go to the next slide. What do we show there?

A Again, looking across the Bronco you can see a portion of that line Trajectory 4.

Q Go to the next slide, please. Where did that trajectory pass into the Bronco?

A Came into the Bronco through the passenger wing glass.

Q And where did it pass through the Bronco?

3183

A    Went out the left side window.

Q    In relation to -- when you say left side, is that -- where in relation to the driver?

A    Behind the driver.

Q    And is that displayed in your slides?

A    Yes.

MR. LITTLEFIELD:  I'd ask that the next slide be displayed.

Q    (By Mr. Littlefield) And where is this from?  What perspective do we show in this?

A    This is a photograph which I took from back to front and again I've highlighted through trajectory line four.

Q    I'd ask the next slide be shown.  And what do we see there, ma'am?

A    This is a photograph which I took of the outside of the Bronco, the left side, showing that line extending through that left side glass.

Q    How far are three and four separated, the trajectories of those two shots?

A    They are very similar trajectories.  They're just a few inches apart.  Where they exit through the glass is just a few inches from front to back from each other.

Q    And what about where they entered the Bronco?

A    They entered the Bronco very close together.

Q    And if we looked at the trajectories of those two

shots as they go through the Bronco, how far apart are they as they go through the Bronco?

A     Well, the farther they travel, the more distance between them, but they still have very similar trajectories.

Q     Go to the next slide, please.  And what's that display?

A     Again, this is looking at an outline of the Bronco, outline view, top down, looking at the line of trajectory for number four.

Q     In regards to this trajectory, you said two and three, which entered the passenger door -- that the passenger door in your opinion would be -- have been open when that shot was fired.  What about on four?

A     Yes, also on four the door is not closed. .

Q     Why do you say that?  Why do you say these, on two, three and four, that the door was open as opposed to being closed?  What did you see that caused you to reach that opinion, ma'am?

A     Well, there were two trajectories through the passenger door with where I had something to work with inside the Bronco that gave me a line of trajectory inside the Bronco.  And then of course, number two had a definite line through two layers of metal which gave me a good line.  And I would expect that something coming

3185

through the door should have left a defect or some -- you know, some indication inside the Bronco. And when I opened that door the two lines met. The one that -- coming through defect number two in the door and the line that's in the passenger seat. So those two lined up. There was no other place in the Bronco that could be associated with that trajectory through number two.

Similarly, with number three and four, I noted that when I looked at each of those separately with a laser, that they each went -- with the door open somewhat, each led directly to the exit hole in the left side glass.

Q   Okay. So when you put the -- when you put the laser in the entry hole, the defect, and you turn it on, what's the -- is this a straight, curved line or what?

A   The laser is a coherent line. It's a straight line.

Q   And when you did it with the door closed and turned the laser light on, would it match up with a similar defect inside the vehicle, with the door closed?

A   No.

Q   How would you -- what did you have to do with the door to have the match on the laser line as it's placed in the defect, to find a hole inside the vehicle?

A   Open the door.

Q   Next slide, please. What's that display?

3186

A    It's the side-view outline of the model with the rod through the model.

Q    Again, level, downward or upward?

A    Slightly downward.

Q    In regards to the Trajectory 3, the one we just looked at previous, how does this level as far as slightly downward compare to the trajectory on shot three or Trajectory 3?

A    Trajectories 3 and 4 were very similar.

Q    Next slide.  What's that display?

A    This is an outline view of the model with the rod through the model, this time from the left side view.

Q    Go to the next slide, please.  Trajectory 5.  Where is this defect?

A    This is a defect in the top of that passenger door wing glass.

Q    Did you -- when you put the laser light in with the door closed, were you able to match up an interior defect which gave you this straight line that a projectile would travel?

A    Actually, I did this from the reverse.  There was a defect through a light that was mounted in the left rear -- above the left rear of the tailgate, and I inserted the rod through that defect and turned on the laser.  It led to this hole with the door partially opened.

3187

Q    Okay.  Go to the next slide.  And what's that show, ma'am?

A    This is a photograph with a Dowel rod through number five and it's highlighted.

Q    Next slide.  What's that display?

A    This is a photograph showing that Trajectory 5 looking across the cab from left to right.

Q    We look at -- and I'm going to try and put the laser on it, this item right here, just above -- that has a slight bow -- the yellow line.  What is that item, ma'am?

A    That's where two Dowel rods, I've tried -- they're bowed because I'm just working with Dowel rods and they're not nearly long enough to go across the entire length and width of the Bronco, and so I would tape Dowel rods together, try to reinforce them, and then suspend them from the ceiling with tape.  And so some of them bow a little bit.

Q    Okay.  We go to the next photograph, ma'am.  You mentioned the rear left light.  What are we seeing here?

A    This photograph, we're looking through the Bronco from the back and you can see the lights that were mounted in the top corners above the tailgate.  To the right of the photograph, as you're looking at it, the right side light into the left is the left side light.  I have circled defect that's on the back of the left side

3188

light and highlighted the trajectory as it comes across near the headliner and then comes into that left rear light mounted above the tailgate.

Q   And you said that you were able to match up the laser light by placing your laser where as you can see in this photograph?  Where did you place your laser?

A   First I put a rod through the defect in the mount bracket of that light, at the enclosure of that light and put my laser on that rod and looked to see where the laser was -- what target it struck or where it went to from there and it went to the top of the wing glass.

Q   Okay.  So what you did was take one of the shorter rods and then place the laser on top like that?

A   As nearly as I could, yeah, to try to continue the same line.

Q   And if we go again to the next photograph, what is that?

A   This is where I have pulled up that glass that was broken, to see if I can find a hole in the glass that would match the position through -- of the defect in that left light that mounted above the left side of the tailgate.  And I did find -- in fact find a hole there that would be consistent.

Q   Did the projectile pass all the way through that rear emergency light?

3189

A     Yes.

Q     And this would have been the exit through the rear glass?

A     Yes.

Q     Okay.  Next photograph, please.  What do we see here?

A     This is a top view outline of the model with the rod in place for number five.

Q     Door closed or open?

A     It's partially opened.

Q     Next photograph.  What does that display?

A     This is a view from the right side looking at the outline of the Bronco.

Q     In regards to this, vertical, horizontal or what?

A     It's near horizontal.

Q     And the next shot, ma'am.  The next slide.  What's that show?

A     Again, this time looking through the left side and if I could make a correction, it's near horizontal relative to the Bronco, looking at -- it's travelling close to the headliner.

Q     Okay.

A     Not relative to the ground but to the Bronco.

Q     By the way, what was the condition of the terrain out there in regards to slope and elevation changes?

3190

A    I would call that terrain hilly -- (Interrupted)

Q    Why did you say that?

A    The ground's not level.

Q    And how does it slope -- where was the highest point out there?

A    The cabin was the highest point, appeared to me to be the highest point.

Q    If one was entering from the eastern side as those vehicles are displayed there, what kind of slope would one be coming on in approaching that cabin from the east?

A    It would be an upward grade going uphill.

MR. LITTLEFIELD:  I would ask that the witness approach the model again, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  And may I approach as well?

THE COURT:  You may.

Q    (By Mr. Littlefield) As I placed that Bronco in front of the house, would the trajectory that we've looked at, Trajectory 5, be consistent with that shot having been delivered from inside of that cabin into the Bronco at that position?

A    It appears it would be possible.  It appears that it would be possible for a shot to originate from somewhere inside the house and still produce that trajectory.

Q    So would it be consistent with a shot having been

3191

fired from there if the Bronco was located at that position?

A     Yes.  I could not exclude that scenario.

Q     Okay.  It could have happened out there with the shooter standing five feet to the right of the Bronco and a slightly elevated position, couldn't it?

A     Yes, sir.  It could have occurred anywhere where the muzzle or the barrel of the gun could be on the same level as the -- slightly below the headliner inside the cab.

Q     But it also could happen at that location as it exists there?

A     Yes, I cannot exclude that scenario.

Q     And how high is a Bronco, the top -- the headliner of a Bronco?

A     I didn't measure the vertical distance.  My recollection is it's somewhere above five feet.

Q     Was that porch elevated?

A     Yes.

Q     In relation to the ground?

A     Yes.

Q     Go ahead and put it down and return.  Next slide please.  That's Trajectory 6.  Where is that located?

A     This is in the -- through the windshield.

Q     And did you -- and if we go to the next slide will

3192

it show the trajectory of that shot?

A     Yes, sir.

Q     Okay.  And were you able to determine -- how did you determine it passed on that line, that trajectory, ma'am?

A     This was another example where I had a clear line that I could identify from inside the vehicle.  It went through the driver's seat.

Q     Okay.  Next slide, please.  Does that show it from the inside?

A     Yes, sir.

Q     Go to the next slide.  Where is it going?

A     It's going into the right side of the driver's seat.

Q     Okay.  And the next slide.  What do we see here?

A     We're seeing that same line as it comes from the windshield into the right side of the driver's seat, exits the back of the seat and continues to the left side glass.

Q     And if we go to the next slide what are we going to see?

A     Left side glass.

Q     And what are we pointing at -- I see two arrows where it says six and exit.  Do you see that?

A     Yes.

Q     Why?  Why are there two arrows showing there?

A     I don't know.  I didn't put those arrows on there.

3193

Q    Okay.  Which direction was this shot fired in relation to that Bronco?

A    Right to left, front to back.

Q    In relation to the shots we've seen thus far, where was the shooter in relation to the Bronco?

A    To the right front of the Bronco.

Q    Go to the next slide, please.  What do we see here?

A    Looking at a top view of an outline of the Bronco model with the rod for number six.

Q    And if we look at the next slide, what's that show?

A    The outline, right side view.

Q    In relation to elevation, what does it show?

A    Slightly downward.

Q    And if we look to the next slide, again, what's it show?

A    From the left side view.

Q    Okay.  Go to the next slide, please.  And it would be Trajectory 7.  Were you able to trace the trajectory of the entry there that -- which you identified as seven and into the Bronco?

A    Yes, sir.

Q    And where did this one go?  Do you recall off the top of your head?

A    I believe this one went into the left side of the driver's seat.

3194

Q    And if we go to the next shot and what line are we showing here?

A    Seven.

Q    Okay.  Go to the next shot, please.  Is that taken from the interior?

A    This is looking from the driver's side across.

Q    Okay.  And what's -- do you see what I've got, what I'm circling right there?

A    Yes, sir.

Q    And what is that?

A    That's where two Dowel rods were connected by tape and the tape doesn't hold steady.

Q    Is that the tape itself; can you see it in the photograph?

A    I can't see the tape.  I can see the smaller rod that I tried to tape to it to support it.

Q    Okay.  Go to the next photo, please.  What are we showing here, ma'am?

A    Again, we're looking at number seven.  And there are two places going into the driver's seat, it appears to be fragments from number seven.

Q    I see two yellow lines here.  What does -- why are we showing the two yellow lines?

A    Because there are entries into the back of the driver's seat there and both of them would associate with

perforation number seven in the windshield. So it appears that number seven, as it comes through, there's a fragment that actually has two separate lines of trajectory. That is they land -- they enter the back of the driver's seat very close together.

Q   If -- how far apart were the two entries into the back? I'm not asking a precise measurement of, you know, 1.234 inches, but approximately how far were those two fragments, how far apart were they when they entered the seat?

A   They were very close together. I'd say less than two inches is my recollection.

Q   And as -- if we went from the seat back towards the entry point, where seven hit the windshield, how did those lines deal with each other from each of those two fragments that are two inches apart, as they approach the windshield, ma'am? In relation -- one in relation to the other. If I trace one line into the other line, what are they going to do as they approach the windshield?

A   Well, if we just look at the lines, both of them can be associated with that same perforation number seven.

Q   What do they do in relation to each other as they approach the windshield? They diverge, converge, come together or what?

A   The projectile perforates the windshield and begin

3196

to fragment and so one small piece goes one direction, the other piece goes a little bit different direction.

Q     Okay.

A     But the core continues in a straight line but you have these little fragments that come off at the sides.

Q     Go to the next slide.  What's that show?

A     An entry into the driver's seat.

Q     Okay.  If a person were sitting in that seat when that fragment hit, do you have an opinion as to whether that's a core or a fragment that's shown here?

A     There's a core that passed through the seat and into the wall behind the seat.

Q     Where would that be in relation to a normal sized male sitting in that seat?

A     I could only approximate it as possibly around the left shoulder.

Q     Okay.  Next slide, please.  What's that?

A     That's an entry into the left side wall that's right behind the driver's seat where the projectile continued through the driver's seat and into that wall.

Q     Next slide.  What do we see there?

A     There is a photograph of the defect on the exterior of that same wall where the projectile struck on the interior side and it did not perforate that exterior metal.  It simply knocked off some of the paint.  You can

3197

see that as where some of the paint has been knocked off and then the projectile stayed inside that wall.

Q    Okay.  So that's not a bullet hole?

A    No, it's not a hole.  It's a dent from inside to outside.

Q    Next slide, please.  What do we see here?

A    It's a top view, outline view, number seven.

Q    Okay.  Next photograph or slide.  What's that show?

A    Outline, right side view.

Q    And the next one?

A    Outline left side view.

Q    And as to the level, what are we looking at from the shooter to the Bronco?  Downward, upward, level, what?

A    Slightly downward.

Q    And that was Trajectory 7?

A    Yes.

Q    We'll go to the next one.

          THE COURT:  Let's stop here for the noon recess.  And I'll ask the jury to remember my admonition not to discuss this matter, allow anyone to discuss it with you.  And everyone please remain seated as the jury leaves the courtroom for the noon recess.  And I'll ask you to be back at 1:30.

          (Whereupon, the jury exited the courtroom after which the following record was made.)

3198

THE COURT:  Witness may step down and be excused until 1:30.

(Whereupon, the witness exited the courtroom.)

THE COURT:  The jury and the witness have departed the courtroom.  Anything to take up outside the hearing of the jury now, for the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  For the defense?

MR. SMITH:  No, Your Honor.

THE COURT:  We'll be in recess.

(Whereupon, the noon recess was held after which the following record was made in the presence of the jury.)

THE COURT:  Let the record reflect the jury's in the box.  Counsel for the Government is present.  Defendant is present with counsel.  You may proceed.

Q    (By Mr. Littlefield) I believe we're ready to discuss the Trajectory 8 and if we can go to the first photograph, what is that?

A    This is a photograph of the hood of the Bronco taken from the right side looking across and I've circled the defect that's numbered eight.

Q    And if we would go to the next photograph.  From what angle is this photograph taken?

A    Downward.

3199

Q    And does that show the trajectory as it enters into the hood?

A    Yes, sir.

Q    From what direction did that shot travel?

A    From the right front.  Went front to back, left to right.  I'm sorry.  Right to left.

Q    When you say right to left, are you talking as you're looking at the Bronco or as you would have been sitting in it?

A    It's relative to the Bronco.  The passenger side is on the right.  The driver's on the left.

Q    So it goes for the right to the left --

(Interrupted)

A    Coming from the right or passenger side toward the left, to the driver's side.

Q    Is that directed more toward the driver or the passenger?

A    Well, it's right to left, so it'd be more from the passenger side toward the driver side.

Q    Next photo, please.  What does that display, ma'am, in relation to the eighth trajectory?

A    Yes.  This is a photograph which I took after I raised the hood and a fragment went down into the engine area where it scraped across some insulation, left a track there and then at the end of that track there was

3200

fragments.

Q   And it ended up what?

A   It?

Q   Ended up what?

A   It ended up down inside the engine area.  That is when I followed that line where it scrapes the insulation, you follow the line down and there's fragments.

Q   Okay.  I didn't understand the last part.  Next photograph, please.  And how does that -- the trajectory into it, how is that -- is it consistent, inconsistent or what with the rest of the shots into the vehicle?

A   It's consistent with the rest of the shots in that the core entering the top of the hood was traveling right to left, front to back.  The fragment, which is a part of the jacket, is copper, went down past the insulation and was down inside the engine area.

Q   What was that in regards to the plane of the shot? Horizontal, downward, upward, could you tell?

A   It was near horizontal, very slightly downward.

Q   If we could go to Trajectory 9, please.  Where is that located?

A   This is located on the front bumper.  That would be the right front of the vehicle.

Q   And what were you able to discern about this

3201

trajectory?

A    That this was a near horizontal trajectory, that it -- it's going from right to left.  That as you look inside this hole there was two layers to the metal or to -- there's an exterior layer and then interior layer a few inches behind that.  If we're looking at this bumper and you go over about six inches, you see the fragments laying there inside that frame.

Q    Okay.  Next photograph, please.  Trajectory 10.  And what are we displaying here?

A    This is looking at the front grill of that Bronco and it's not visible in the photograph but at this point if we could look into the grill, you would see that there's a hole through the radiator.

Q    And I note that there is written in writing pen and pointing downward.  Where is the entry in relation to that arrow on that Post-It note?

A    It's actually inside the grill, but as it missed the chrome part of the grill, went in the spacing between, perforated the radiator that's immediately behind that grill.

Q    Where's the entry in relation to that arrow?  Do you see the arrow I'm talking about?

A    Yes, sir.

Q    If I'm looking straight at the front of that Bronco

3202

and I see that arrow, where is that hole in relation to the arrow?

A     It's below that arrow.

Q     Next photograph, please.  What are you displaying here?

A     This is a photograph of that same area.  This time I've moved around and I'm facing more directly into the grill and I've inserted a rod into the perforated radiator and I've highlighted that rod.

Q     Is that rod the trajectory of the entrance of that shot?

A     Yes, sir.

Q     Next photograph, please.  What do we have displayed with these two items, ma'am, in this diagram here?

A     Looking outline view of the model of the Bronco with the line 12 showing that trajectory.

Q     And is it regarding to horizontal, vertical, upward, downward, how was that shot?

A     It's near horizontal.

Q     For that shot to have been fired from inside the house, where would the rifle have had to have been in relation to the floor of the residence?  For that to be a horizontal shot entering that Bronco there, where would the rifle have had to have been positioned in relation to the floor of that residence?

3203

A   It looks like the rifle would have had to have been near the floor of the residence, that is, it has to be on the same level as the entry into the radiator.

Q   Okay.  And the entry of the radiator, assuming that that -- the Bronco is to scale with the residence, would that have been capable of being fired from inside of the house?

A   Yes, it looks like that's a possibility.

Q   But the other shots that you talked about which went into the passenger door, do you recall?

A   Yes, sir.

Q   And what level would the rifle to have been to have fired those shots into the passenger door from inside the residence?

A   Well, they would have to be on a level slightly -- somewhat above the perforations in the passenger side of the vehicle.  So, you know, exactly how high that the rifle would be would depend on the distance from the vehicle.

Q   Certainly.  That house was 16 feet deep.  So, how would -- is that going to change the plane of that shot or the angle of the shot within the 16 foot distance?  Is that appreciably much to that angle or were those shots into the door fairly level?

A   Well, the number five was near horizontal relative

3204

to the Bronco, that is, it traveled near the headliner of the Bronco.

Q    Okay.  What about three and four?

A    Three and four were slightly downward inside the Bronco.

Q    Would the firearm that fired three and four -- assuming the shots would have come from inside the house for three, four and this shot, would the firearms have been at essentially the same height or would there have been a drastic difference in the height, had all those shots been fired from inside the house?

A    Well, the entries into the vehicle are not at the same level.  So if we assume that neither one is moving -- I'm sorry.  If we assume that the Bronco is stationary for those shots, then the rifle would have to be raised and lowered for the different shots.  They're not all on the same level.

Q    Okay.  Go to the next trajectory, please.  What are we displaying in this photograph, ma'am?

A    Looking at the front of the windshield, and I've circled the perforation identified as 11.

Q    And would you -- if we looked at the next.  What are we displaying here?

A    This is a distant -- more distant shot looking across the hood of the Bronco and I've highlighted the

3205

line that indicates Trajectory 11.

Q    And going -- as between the passenger and the driver, which shot does this appear to be going toward?

A    This doesn't go actually in front of the passenger inside the cab.  It goes through the -- approximately the center of the windshield in front of the driver and over to the driver's seatbelt.

Q    Do you trace the trajectory on through inside the cab of the vehicle itself?

A    Yes, sir.

Q    Go to the next photo, please.  What is that?

A    That's a trajectory line indicating projectile that came from perforation 11 and continued across in front of the driver seat over to the driver's seatbelt.

Q    Was there a defect in the driver's seatbelt?

A    Yes, sir.

Q    Go to the next photo, please.  What is that?

A    Defect in the driver's seatbelt.  And I've tried to circle it.  My circle is a little bit offside, but it indicates the area where that defect is.

Q    Where in relation to the yellow circle is the defect?

A    It's actually just to the side.

Q    Just the left side as we're viewing it?

A    Yes.

Q    Go to the next -- go ahead.

A    The arc of the circle actually cuts through the defect there.

Q    Okay.  Go to the next photo, please.  Can we go to Trajectory 12?

THE COURT:  Let me ask a -- do you mean that the bullet caused the defect?

THE WITNESS:  The bullet or a fragment from the bullet.

THE COURT:  Okay.  It wasn't a pre-existing defect?

THE WITNESS:  It appeared to be very recent and was on the line of that trajectory.

THE COURT:  Okay.  Thank you.

Q    (By Mr. Littlefield) Where's Trajectory 12?

A    Trajectory 12 is in the arm bar of the passenger side windshield wiper.

Q    And what happened on this shot as far as after it hit that arm bar?

A    It continued in a straight line and I believe did not enter the cab of the vehicle.

Q    Do you show the trajectory if we go to the next photograph?

A    Yes, sir.

Q    And is that the trajectory -- how do you determine

3207

that that's the trajectory that that shot entered into the bar -- the arm of the wire?

A    Well, there's a tunneling type of defect in the -- that wiper.  So I simply laid a Dowel rod in that groove, in that tunneled defect, and I found that when I did that one end of it went to another defect towards the windshield and then I simply extended the line backward.

Q    And in regards to this shot, is this horizontal, vertical, upward, downward or what in relation to the Bronco?

A    Downward.

Q    And front to back?

A    Front to back and somewhat right to left.

Q    Next shot, please.  Next photograph.  What is that?

A    That's a continuation of Trajectory 12 showing where it went under the molding at the bottom of the windshield.

Q    And what happened to it after it passed under the molding?

A    I don't know.  Presumably it's still under the molding.

Q    Were you able to trace it on into the cab?

A    No.  There was not an exit on the interior of the cab -- of the dash where it would have gone into the cab.

Q    And you couldn't see anything at the dash that

showed it went on through?

A    No.

Q    Okay.  Next photo, please.  Trajectory 13.  And what's circled?

A    This is a defect through the windshield and it's identified as number 13.

Q    Were you able to discern the trajectory which this shot travelled as it was entering into that particular hole?

A    Yes, as it was entering.

Q    Next shot, please.  And what is that?

A    That is a line indicating the trajectory that's identified as number 13.

Q    Did this travel on into the cab?

A    It did enter the cab.

Q    Do you recall where this struck in the cab?

A    I didn't find a location where the -- a core struck from this particular perforation.

Q    And why would that be?  How is that possible that you didn't find a core for this particular shot?

A    It could be that it fragmented to the point that it's -- that fragments traveled on from there.  There were numerous fragments that struck in the headliner as well as the driver's door -- the window -- I'm sorry. The window of the driver's door.  So I don't know other

3209

than it entered at this point.

Q   When bullet fragments, after it hits an intervening target -- or intermediate, whichever term you want to use, items such as this -- what -- do the fragments all continue in a straight line or do they spread in a pattern?

A   The individual fragments don't necessarily continue in a straight line.  If there's a core, a mass that continues, it will go in a straight line.  But it can fragment to the point you can't identify that.

Q   Do you know if the driver received injuries from this?

A   I don't have personal knowledge.  I've read reports and discussed with other officers.

Q   Did you learn whether the driver, Mr. Hamilton, did receive injuries from this?

          MR. HILFIGER:  Your Honor, I object.  I don't know from this meaning from this -- (Interrupted)

          MR. LITTLEFIELD:  From this particular -- from this incident.

          MR. HILFIGER:  I don't know how she would make that determination.

          MR. LITTLEFIELD:  I'll withdraw it.

          THE COURT:  Question withdrawn.

Q   (By Mr. Littlefield) As you look at the trajectory

3210

of this shot, where is it headed?  In what direction is it headed?

A    Toward the driver's seat.

Q    And do you know who the driver was?  Have you learned who the driver was?

A    Yes.  I have read reports and been told who the driver was and I've discussed with that person who identified himself as the driver.

Q    Did you learn that the driver received any injuries to his face or shoulder area?

A    He told me he did.

Q    Ask to see the next photograph, please.  What's that one?

A    This is a continuation of one of the lines that could be identified with the perforation 13.

Q    Can you tell if that's the core, the fragment or what?

A    That would be the core if the core continued.

Q    And where is this line going?

A    It's going upward across in front of the driver seat.

Q    Was there an inside injury or inside damage to the vehicle that corresponded to this particular line?

A    I couldn't determine an end point for a core of this particular trajectory.

3211

Q    Okay.  Where is that -- where does that trajectory go in relation to the driver's window?

A    Basically toward the driver's window.

Q    Do you know whether the window was partially upward or downward?

A    The window was partially upward during the shooting incident.

Q    That was a bad question and the answer was just fitting the question that was asked.  Did you see -- when you got out there was, the driver's window totally up, totally down or partially up?

A    It was partially up.

Q    Okay.  Go to the next photo, please.  And what do we have there?

A    This is again outlined of the Bronco model showing the rod for number 13.

Q    And I note that the yellow doesn't go on through in this particular circumstance.  Why is that?

A    Again, because I could not identify an end point for this particular trajectory.  Either because it struck a target that moved or fragmented to the point that a single core could not be identified.

Q    Now, on the trajectory of this one, in regards to upwards, downwards, et cetera, is this consistent or inconsistent with the other shots you've seen?

3212

A    It's consistent in that it originates from the right front of the Bronco -- (Interrupted)

Q    Now, I'm talking about up or downward, the upward and downward, the plane with horizontal, is this consistent or inconsistent?

A    Well, this is upward where some of the others were downward.

Q    Okay.  How many other shots are upward?

A    I don't recall.  There may be a couple more.  I don't recall right off.  I'd have to look at the individual trajectories.

Q    Okay.  If we go to the next trajectory, please. What's this?

A    This is a perforation of the windshield identified as number 14.

Q    And were you able to discern from what direction this shot happened?

        THE COURT:  Counsel, just a second.

        MR. LITTLEFIELD:  I'm sorry.

        THE COURT:  You may.

Q    (By Mr. Littlefield)  We're looking at Trajectory number 14.  Were you able to discern from which direction this shot came?

A    Yes, sir.

Q    Which direction?

3213

A     From the right front of the Bronco.

Q     And if we could look at the next photograph.  What do we see there?

A     The exit through the left side window.

Q     Okay.  And then go to the next.  What's that?  What do we see here?

A     Looking at the exit through the left side window.

Q     The other side -- the other shot, the previous shot, was that from the interior or the exterior?

A     Interior.

Q     And where's this from?

A     Exterior.

Q     Next photo.  What's there?

A     It's a line drawing of the model of the Bronco with the line indicating Trajectory 14.

Q     Okay.  And go ahead to the next slide.  What's that show?

A     This is the line drawing of the model of the Bronco with the line indicating Trajectory 14.  This is from the right side.

Q     And again, is this downward, level, upward?

A     This is downward.

Q     Next photograph or next slide.  What's that show?

A     This again a line drawing of outline of the Bronco model with the rod for this trajectory, this time from

the left side.

Q    Okay.  From the area that ditch to the house, was that level?

A    No, sir.

Q    You indicated previously it's sloped toward the house.  Was it the same general slope or did it vary as far as how much it was up and how much of it was down?

A    Well, generally the house was on what appeared to be the highest part and the ground sloped from the house.

Q    Okay.  Was the slope this gradual -- I mean, the same all the way out there or did it vary at different positions?  Do you understand what I'm asking?

A    I think you're asking if the ground was flat along that slope and I don't know.

Q    Okay.  Go to the next trajectory, 15, I believe. What's that?

A    This is a photograph of the windshield of the Bronco and I've identified perforation 15.

Q    And go to the next slide, please.  What is this?

A    This is a rod through perforation 15 and highlighted a line indicating that trajectory.

Q    Okay.  Go to the next slide.  What happened to 15?

A    I don't know.

Q    No -- you didn't -- were not able to discern an interior strike?

3215

A    That's correct.

Q    Did you put a laser in the hole to try to find one that corresponded?

A    Yes, sir.

Q    And were there strikes inside that you could not necessarily tie to a particular entry hole?

A    Well, there was numerous fragments struck the headliner and the passenger window and I couldn't say the point of origin for all of those.

Q    The passenger window?

A    I'm sorry.  The driver's window.

Q    Okay.  From which side to which side, front -- right to left, left to right, front to back, what?

A    This trajectory is from the right to left, front to back.

Q    And the angle at which this entered, what's the trajectory on that?

A    Somewhat downward.

Q    Go to the next one, please.  What do we show here?

A    This is perforation 16 in the windshield.

Q    What did you discern about this perforation, this entry or this defect?

A    That it was an entry into the cab.  It's very high inside the cab and travels toward the driver's door.

Q    Next slide, please.  And what are we showing here?

3216

A    Where I placed a trajectory rod through that perforation and I've highlighted that.

Q    Same as the others from front to back and from right to left?

A    Yes, sir.

Q    Next slide.  What do we see here?

A    This is a defect in the molding above the driver's door and there was a fragment inside that.

Q    Next slide.  And what are we showing at this point?

A    Showing that outline of the Bronco model with the trajectory rod 16 in place.  This is top view.

Q    In regards to that shot on Trajectory 16, can you tell whether that was fired with the driver's door was shut or was opened?

A    Can I back up and make one correction?  I don't recall if I actually retrieved a fragment from that molding.  The trajectory rod did lead to defect in the molding.  And the door would have to be open to expose that molding.

Q    What do you mean?  I don't understand by -- how do you know that the door had to be opened to expose the molding?  Expose the molding to what?

A    To any object going through to cause that defect in the molding.

Q    Where's the molding located?

3217

A    Well, when the door is shut it's between the interior metal and the exterior of the door.

Q    What's between the interior metal of what?  When the door is closed, where is that molding that had the defect?

A    It's closed between the door and the frame of the Bronco.

Q    If the door is closed, would that molding have been exposed so as to have received that defect?

A    No.

Q    Go to the next photo, please.  And what are we showing here?

A    An outline of the Bronco model with the rod, with this trajectory looking at the right side.

Q    Is this horizontal, slightly downward or what?

A    Slightly downward.

Q    And we're looking from which side of the vehicle?

A    Looking from the right side to the left.

Q    Passenger to driver?

A    Yes, sir.

Q    Next slide, please.  And what's that show?

A    It's showing the same model of the Bronco outline drawing, this time from the left side to the right side.

Q    Okay.  And I note in -- as we're looking at this trajectory, and this was 16; is that correct?

3218

A     Yes, sir.

Q     That when you got this line here, the door is closed.  But you indicated that it would have been opened.  Is this attempting to show where this line or this trajectory struck the door?

A     The line is attempting to show where the trajectory actually was from the windshield to the driver's door including that molding that went through.

Q     Does the position of the door have any bearing on what this line is?

A     No.

Q     Is this line placed in relation to the circumstance of the door whether it be open or closed, or is it just showing where that is in regards to the body of that Bronco?

A     It's showing the trajectory relative to the body of the Bronco.

Q     If we think back to the Trajectories 2, 3, 4 and 5, which passed through the passenger door, was that an attempt on your part to show where that shot hit the Bronco in relation to the passenger door?

A     Each of these is an attempt to show the trajectory through the Bronco relative to the body of the Bronco.

Q     So we're talking about where it passed through the body?

3219

A    Yes, sir.

Q    Does it show where it entered the door?  Is that -- would that necessarily -- that line that goes through there, is that necessarily at the position where it entered the door?

A    It's not necessarily going to be the exact position where it entered the door when it was in the open -- slightly open position.  It's relative to the body of the Bronco.

Q    So that's just the line through the Bronco, not trying to show where the door was or where it entered the door.  That's just how it passed through the body itself?

A    Yes, sir.

Q    The next trajectory, 17.  Where is that?

A    We're looking down at the windshield of the Bronco looking at the bottom of the windshield and I've circled defect 17.

Q    And did you -- were you able to discern the trajectory along which this shot was fired when it entered?

A    Yes, sir.

Q    And did you put a rod and are we going to see the rod in the next slide?

A    Yes, sir.

Q    Okay.  Next slide.  And where is this shot taken

3220

from?

A     On top of the hood looking down.

Q     In relation to the hood of the Bronco, how close to parallel is that shot?  Is it down into it or pretty close along the top line of the hood?

A     Well, it's very shallow as you can see, where it just presses down into the metal and goes under that molding.

Q     Did it go on through?

A     No.

Q     Next slide, please.  And what do we see here?

A     This is the trajectory for number 17 as it came into the molding just under the windshield.

Q     Horizontal or slightly downward, slightly upward?

A     Slightly downward.

Q     And from which side of the Bronco?

A     From the right front.  It's going from right to left and front to back.

Q     Trajectory 18.  Where is that?

A     This is on the hood of the Bronco on the right side, be in front of the passenger area.

Q     And what is this right in here?

A     That's a defect in the hood where something has penetrated to the point that it's pressed the metal down but it didn't perforate.

3221

Q    And where was it that 18 entered -- what happened to 18 after it hit the hood and kind of -- I guess ricocheted is the appropriate term -- off that surface, bounced off, kind of skipped like a rock off of water?

A    It's somewhat of a ricochet.  It continues pretty much along the same line, but it's -- it did fragment and we can see those two.

Q    Next slide, please.  And what are you showing here?

A    I'm showing that it fragmented, now producing two divergent trajectories.

Q    Okay.

A    And I analyzed those trajectories and they both led back to this point.

Q    And where is that point?  On the vehicle -- this point where these two lines diverge, where is that point on the vehicle?

A    That's on the hood, top of the hood of the vehicle, in front of the passenger area.

Q    Is that what we just looked at in the previous slide?

A    Yes.

Q    If we go on to the next slide then.  What are we showing in this line and then this line?

A    This is looking down from the top, looking at those same two trajectories that each came back to that same

3222

point, the original defect 18.

Q   As I look at the line -- as we look at the photograph, the line on the left, what does that go into?

A   Goes into the -- I believe it's the molding at the bottom of the windshield.

Q   This second line, the one on the right.

A   Yes.

Q   What does that go into?

A   It struck the windshield and did not perforate the windshield.

Q   Was there a defect in the windshield, visible defect?

A   Yes, sir.

Q   Okay.  Next photograph.  And what do we see here?

A   Here we see a top view line drawing of the Bronco looking down at number 18.

Q   Does that show the trajectory that that shot traveled from?

A   Yes, sir.

Q   Right to left, left to right, front to back, back to front, what?

A   Right to left, front to back.

Q   And as far as the level of the shot, upwards, downwards, horizontal?

A   Be closer to horizontal.

3223

MR. LITTLEFIELD:  May I approach the model, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield)  We already talked about the possibility of some of those trajectories having been consistent with being -- the Bronco being at this location.  Assume for the purpose of the question that the individual who was firing the shots would have been located in an area around the front door of the residence.  Could be on the porch, could be straddling the door, but in the vicinity of the front door.  And assume that the vehicle follows this path.  Are there trajectories consistent with that vehicle receiving shots delivered from that location with the vehicle at that place?

A    I would have to put a rod on it and see.

Q    Be my guest.

A    It appears that if a shooter is in the doorway or very near the doorway that it might be possible to get some of -- a couple of the shots, especially to the top of the windshield.

Q    Okay.  Let me move the vehicle along a pattern, okay, along a path, and ask you if considering the trajectories fired into the vehicle, if the position of the vehicle and those shots is consistent with an

3224

individual firing the shots from a location in and around the front door of that vehicle as it follows the path.

THE COURT:  You can stand up if you would like, if you can't see.

Q    (By Mr. Littlefield) Okay.

A    I'm sorry.  What's the question?

Q    Following that path, the trajectories you viewed in the vehicle, are they consistent with a shooter being in and around the front door and hitting the vehicle as it followed the path as I just took it through?

A    Okay.  As near as I can determine if the shooter is in the doorway at a given height, the closest I could determine is that there is a range or a scope of area that shots could be fired from.  Then to determine it any further than that, I would have to compare any specific location to any specific trajectory through the Bronco since they don't all occur from the same position.

Q    Okay.  I note you're putting it in the door.  What if the shooter is out partially on the porch, does that change this angle?  How much?

A    Well, the further outside that it is, the greater the scope of the possible range of shots that he could fire.

Q    Okay.  If one shoots straight down the porch, straight down the porch line, can he hit the vehicle at

3225

that location?

A    Yes.

Q    Here?  Can he hit the vehicle at that location?

A    Yes.

Q    And the rest of the way through that path could he hit the vehicle at that location?

A    Yes.

Q    You are familiar with that path -- and we visited before in relation to this path and those shots and those trajectories?

A    Yes, sir.

Q    We've sat and talked before?

A    Yes.

Q    And you're familiar with the slope of the ground out there?

A    Yes.

Q    And does this accurately display the slope of the ground in relation to that residence?

A    It appears to be the same.

Q    Okay.  Are there any shots that would cause you problems in regards to the trajectories considering the path that we discussed and a shooter being located in or around the front door which would put him in potentially just outside the door on the porch to moving inside of the house?

3226

A    It would be possible for a shooter to be either on the porch or in the doorway if the Bronco is moving in the described path, could put the Bronco in the various positions that could account for the trajectories.

Q    Okay.  You can't say where the shooter was for any one of those given shots?

A    No, I cannot.

Q    You can't say exactly where the Bronco was for any one of those given shots?

A    No, I cannot.

Q    Let me ask you --

        MR. LITTLEFIELD:  Let me approach again, if I might, Your Honor?

        THE COURT:  You may.

Q    (By Mr. Littlefield) And assume for purposes of this question that the shooter is right there at the front door.  If the shots were initiated with the Bronco in this position and passed to here, could every one of those shots have been fired on those trajectories?  From this position here to this position here, on that path?

A    If you include in that path a place where the Bronco is approximately 90 degrees to the shooter since the trajectory number nine is nearly horizontal and almost directly right to left.

Q    Which one is nine, which one is Trajectory 9?  So

3227

that the vehicle would have had to have been at this level or this degree or angle for the -- which one is nine?  Which one went into nine?  And describe it.

A    Trajectory 9 came in to the right front of the vehicle.  It's near horizontal and it's right to left, very much right to left.

Q    Okay.

A    So at some point the front end of the Bronco has to be at approximately 90 degrees to the barrel of the rifle.

Q    So if the -- so if the vehicle was sitting in approximately this position at this location and then proceeded into here, is there any point along that pathway where the vehicle is -- the front is approximately 90 degrees so that a shot could have come from the door?

A    Not in the way that you're moving the path now.

Q    For the vehicle to have been in approximately this position we're talking about now and then proceed on into the path to beside the steps, where would the shooter have to have been to fired shot number nine?  Let's start from here.  Where would the shooter had to have been to have delivered -- way out there?

A    Yes.  If this is the position of the Bronco, then the shooter has to be such that the barrel of the rifle

3228

is about 90 degrees to the -- close to 90 degrees to the front of the Bronco.

Q   Okay.  Go ahead and return to the seat.  Ms. Dalley, if you can wait a second, I'm going to ask from back here.  And let's go ahead and put the -- let's go ahead and put the Bronco in the position just to the left of the steps that I had placed it in a couple -- just a moment or so ago.  To the left and slightly angled in.  Just to the left of the steps, all the way up against the porch, or right there against the porch.  Okay.  Angled the other way.  Right in there.  Okay.  Assume that the Bronco's stationary at that location, okay?  Assume that the shooter is firing from a prone position on the floor and a location between the doorway between the southeast and southwest rooms.  Do you understand where I'm talking about?

A   Yes, sir.

Q   From that position if he's laying across on the ground with his feet inside that eastern room and his head just outside the doorway on the southwest room, could those -- could the shots that you observed in the Bronco have been delivered from a shooter located in that position?

A   No.  You cannot shoot all of these shots from that location.  All the 18 could not be from that position.

3229

Q   Why not?

A   Well, because you can't shoot up into the windshield and have it go in a shallow or downward to any degree and be below the level of the entry shot.

Q   How about number nine, the one across the front bumper?  Could that have been delivered from that position, ma'am?

A   Not with the Bronco stationary against the porch. If it's up -- if the front of the Bronco is touching or near touching the porch.  If we move it back so that it's 90 degrees to the barrel then it's possible.

Q   You would have to turn that Bronco almost all the way around, wouldn't you, so it's basically parallel to the house to receive a 90 degree shot from that front door -- or from the -- a shooter being prone between the doors?

A   Well, it wouldn't have to be parallel with the front of the house, it depends on which direction of aim, which line that the barrel is on -- (Interrupted)

Q   Okay.  But I'm putting the barrel -- I'm placing the barrel in between those two -- the doorway area between those two rooms.  What position would the Bronco have to be in to be able to receive shot number nine which is the one across the front bumper?  Do you want me to hold the -- (Interrupted)

3230

MR. LITTLEFIELD:  May I approach and hold the microphone?

THE COURT:  You may.

A    There would be a range of area that would be possible.

Q    (By Mr. Littlefield)  Okay.

A    So you would have to take the widest -- the farthest to the shooter's left, if the shooter's facing outward and the farthest to the right, and it would give you a range of area that the front of the Bronco -- that that part would have to be somewhere between the farthest to the left and the farthest to the right, somewhere between there.

Q    Okay.  In regards to the elevation changes of the shots, as they entered the vehicle, the path I showed you, are there positions along that pathway that would have allowed for those various elevations into the Bronco if the shooter was shooting from the area of the front door?

A    Well, what you're question -- if these are the number of variables, but, yes, it would be possible because you've got variations for where the Bronco could be as well as variations of the position of the shooter, assuming he's in the front door.

Q    Front door or just outside the front door on the

3231

front porch?

MR. LITTLEFIELD:  Judge, I'm assuming a little liberty in approaching.  I hope it's okay at this point for this particular purpose.

THE COURT:  Well, you may approach.

MR. LITTLEFIELD:  I appreciate that.

THE COURT:  I don't know what you're talking about other than that.

MR. LITTLEFIELD:  I'm not going to go beyond that liberty.

Q    (By Mr. Littlefield) In regards to the angle of the shots, if the vehicle was positioned from here where the headlights are shining in the direction of the front door and went along that angle, are there any other shots besides this one across the front bumper that are inconsistent with this pathway relative to a shooter at that location?  And you did identify number nine, which was across the front bumper.  Are there any other shots which could not have followed the trajectory of a vehicle with the headlights pointing in the direction of that front door, shots being initiated about this position and coming in like that?  Grab the microphone before you speak.

A    It looks like it could be possible for the other shots to be along there assuming that the shots to the

3232

passenger side are when the Bronco is very close because the farther it is the harder it is to get that direction. That is because you're moving the Bronco in an arc, it brings it more into that possible alignment if it's close to the house.

Q    In regards to -- and let's go back to this path here where the shooting starts at approximately this location, headlights pointed in the direction of the door, and it moves to here.  And assume for the purpose of the question that the shots through the passenger door are delivered after it comes to a stop and the door's opened, okay.  How much -- and let's put the shooter at a relatively stationary position of just inside the door. How much elevation change is there in the land from here to there?  I'm not asking about a six feet three inches or anything like a precise measurement, but -- and you said it tends to slope in this direction.  Is there a great deal of difference in elevation between the land at this point and the land at that point?

A    Well, it's not real steep.  It's a shallow grade.  I don't know the exact -- you know, how much rise there is from any given point up to the level of the house other than to say it was obvious to me there at the scene that there was a grade.

Q    Okay.  Where is most of the elevation change between

3233

that -- from the ditch to the house where is most of the elevation change?

A    My recollection is that there's -- the grade is steeper farther away from the house.

Q    Closer to the ditch?

A    Yes.

Q    For there to have been the difference in the entry -- you know, the angles of entry of the shots and the elevation of the shots into the vehicle, for the shots to have been initiated in approximately this position, as the vehicle approaches and assuming there were shots through the passenger door were delivered after it came to rest, what would the shooter have had to have been doing with the gun to have caused the kind of elevation changes that we saw in that vehicle?

A    The simplest explanation for those changes in elevation is that the barrel of the gun is at different levels.  It's raised at some point and lowered at other points.

Q    How much elevation change are we talking about shots?

A    That really depends on the distance of the muzzle of the gun to the Bronco.  The closer it is, the greater the distance in elevation of the barrel.  The farther away the less difference in elevation.

Q   Assuming from this position here to there, how much change would there have to be in the position the shooter is holding to have delivered all of the angles into that vehicle at the different heights in which the entries were made?

A   I really can't give a number on it.  The Bronco is not stationary.  If we assume the shooter is stationary then it depends on the motion of the Bronco, how far away.  There are a lot of variables.  All I can tell you is there is a difference in elevation.

Q   And I'm telling you how far away.  This far away, this point right out here in front.  From there to there and we're assuming that the shooter's stationary right there in the door or right inside of the door.  How much movement is he going to have to be doing with that gun to shoot one at the top up there, another level across here?

A   If we put the Bronco at a given position, assuming stationary, then the level can be very slight if the Bronco is a distance from the house or from the doorway -- from the porch.

Q   Okay.

A   Assuming the shooter is standing at this location because the simple slight raising and lowering of the rifle can give you difference in elevations of entries to a stationary object.

3235

Q    What about the elevation that went upwards -- upwards across the top of the hood?  Where would that have to come from if this range was happening from this location to here?

A    Then either the shooter or the Bronco or both have changed positions.

Q    I'm asking you from here to here to deliver the one shot that came upward from over the hood, where would the shooter had to have been holding the gun at that point?

A    The shooter could simply lower himself and/or the gun slightly cocking the gun, raising the barrel slightly, at the time he pulls the trigger, would give you the upwards trajectory.

Q    He would have to squat in essence?

A    Not necessarily.  He could simply hold the rifle slightly -- at a slightly higher.  If you just -- (Interrupted)

Q    Start that again because they can't hear you.

A    Okay.  He doesn't have to squat.  I can't say that. All I can say is that the elevation of the gun, whether he changes it from shoulder to say hip and now it's slightly upward or maintains the same position and lowers himself.  I don't know.

Q    This would -- from there to there, could that shot have been delivered that moves upward?

3236

A    With the shooter in the doorway and the Bronco in approximately that position, yes, you could get an upward shot.

Q    How close is the gun to the floor at that point?

A    Well, the more -- the closer to the floor that the barrel is, the easier it is to get an upper shot in the Bronco.

Q    Okay.  Go ahead and return.  In regards to these 18 shots, toward what portion of that Bronco are the majority delivered?

A    The majority of the trajectories are from right to left and appear to be more towards the area of the driver's seat.

Q    And did you prepare a model, computer model, of a Ford Bronco such as this one showing all of the trajectories together as they entered the car?  Not one at a time but where all the trajectories are through the vehicle and their angles through that vehicle?

A    Yes, sir.

Q    And was there any grouping pattern that you displayed in relation to those various trajectories?

A    Yes.  I colored the rods for various areas.  For example, there's certain trajectories that go through high on the windshield versus those that go through lower.  And then those that went into the front end and

3237

did not enter the cab and those that went in the passenger door.

Q   Okay.  So we got high trajectories, we've got lower trajectories, we got those that entered into the front but didn't go to the cab and the fourth grouping is those in the passenger door?

A   Yes.

Q   Would there be a problem with somebody being in a prone position on the floor of delivering the lower trajectories?

A   The lower trajectories would be easier to do from a prone position than the higher ones.

Q   Would they be all be easy -- would they all be able to hit the vehicle in the positions they entered?  Would there be anything blocking it?

A   I don't know.  Only that given the heights that we have it would be possible from a prone position to do some of those shots.

Q   Okay.  Did you also prepare -- did you talk to anybody in relation to the trajectories and the wounds that Mr. Eales received?

A   Yes, sir.

Q   And did you prepare a model in relation to using it -- a human being in relation to Mr. Eales exiting the vehicle as it would have been sitting at the location on

3238

the front porch?

A    I did do an investigation where I used an actor in place of Mr. Eales and a Bronco.  It was not done at this scene -- (Interrupted)

Q    Well, I understand that.  But, I mean, in relation to how Mr. Eales would have exited that vehicle at that location?

A    I did an investigation to try to determine if I could, what Mr. Eales' position might have been at the time that he was shot and that did lead me to looking at him exiting the vehicle.

Q    Okay.  In that regard, as that vehicle approaches from the initial position I put it over there and had you look at the trajectories to see if they were consistent with shots coming from the area of the porch, was there at any point in time from that initial position following the path that I initially showed you up to the porch, throughout that entire pathway was there any time that Mr. Eales sitting normally in the passenger seat, that his left side would have been exposed to the fire?

A    Well, looking at the inside of the Bronco, the configuration and Mr. Eales sitting there with the ballistic shield that he was purported to be carrying, there was at no time, while he's inside the Bronco, that his left side is exposed.

3239

Q    Did you talk to Dr. Distefano, the individual who performed the autopsy on Mr. Eales body?

A    Yes, I did.

Q    And did you discuss with him the wounds and the paths of the wounds?

A    Yes, sir.

Q    And in that regard, did you attempt to discern how Mr. Eales could have been positioned to have received those wounds?

MR. HILFIGER:  Your Honor, I understand what she's doing and I object to the extent that she's not only making a theory of how the wounds came about, but she's also making a theory about how Mr. Eales exited the vehicle, without any proof of how he exited the vehicle. It's just her own theory of how he exited the vehicle. And as long as the jury is understanding that, that's fine.  There's no proof of how he exited the vehicle.

THE COURT:  You accept that qualification?

MR. LITTLEFIELD:  I understand -- I accept Mr. Hilfiger's argument, Your Honor.  I do.  I'd accept the qualification.

THE COURT:  You may -- (Interrupted)

Q    (By Mr. Littlefield) You don't know exactly how it was Mr. Eales exited that Bronco?  I mean, you weren't there, didn't see him and no one described it to you?

3240

A    No.  No one described it to me.  All I know is what I found in my investigation.

Q    And what did you do in attempting to replicate Mr. Eales exiting from that vehicle?

A    Well, first of all, I wasn't looking to specifically find out how Mr. Eales exited the vehicle.

Q    What were you trying to find out then?

A    First thing I was trying to find out was how the physical configuration could have been.  That is, to actually visualize Mr. Eales sitting in that position with that ballistic shield.

MR. LITTLEFIELD:  Your Honor, I'd ask the ballistic shield, which is right behind her, be passed to her.

THE COURT:  You may.

Q    (By Mr. Littlefield) And in doing your investigation, what -- did you have a ballistic shield such as that?

A    Yes, I examined the one that was at the scene that night and then obtained another one, same make and model.

Q    And what else did you do, ma'am?

A    I also got another individual that was the same height, weight and body build as Mr. Eales.

Q    And how was that person equipped or dressed?

A    I had him dressed the same way I was told Mr. Eales

3241

was dressed there that night.

Q   Same kind of protective equipment and everything else?

A   Yes, sir.

Q   What did you do with that person?

A   I got another Bronco, same make and model.

Q   Then did what?

A   I asked him to sit in the passenger seat with the ballistic shield.

Q   And where was the ballistic shield positioned?

A   In front of him.

Q   And why was it placed there?

A   Because that was the only position in which it could be carried.

Q   At that point what did you ask the individual -- the same size, shape of Mr. Eales, carrying the ballistic shield, what did you ask him to do?

A   Then I asked him to show me how he could move, what he could do, how he could get -- exit, anything that might start to show me what could have happen to Mr. Eales.

Q   And by the way, where did you find this individual that was -- what'd this person do for a living?

A   He was an Oklahoma state trooper.

Q   Did he have any special duties?

A     Some type of tactical force, SWAT team, something like that.

Q     So he was a member of a tactical team as well?

A     Yes, sir.

Q     Was he familiar with this ballistic shield?

A     Yes, sir.

Q     Was he familiar with how it's carried in a vehicle?

A     Yes, sir.

Q     When you told him to exit the vehicle, what did you do to record his exiting the vehicle?

A     I was photographing him.

Q     What then did you do with the photograph -- or the photographs that you took of him exiting the vehicle?

A     I compared those to the crime scene photographs.

Q     When you say crime scene photographs, what specific photographs?

A     Photographs that I took during my analysis of the Bronco at the scene.

Q     Did you do anything to crop or superimpose or anything the photos you took of him in relation to your crime scene or trajectory photos?

A     Yes, sir.

Q     How did you go about doing that?

A     I took photograph of the actor in the same make and model of Bronco, same make and model shield and so forth

3243

and took the photograph and basically erased everything except the actor and the passenger seat, which I used to size to superimpose over the crime scene photograph -- I'm sorry. A photograph that I did during my analysis of the Bronco there.

Q   Uh huh.

A   And superimpose that one on top of the photograph that I took during my analysis of the Bronco.

Q   After you superimposed the individual with the shield getting out of the Bronco onto the photographs that you took of the trajectories entering the Bronco, what did you find in relation to the trajectories and the position of the -- in relation to the position on the actor?

A   I found that the Trajectory 2 was consistent with the area of the flank wound on Mr. Eales and that Trajectories 3 and 4 were each consistent with the trajectory into Mr. Eales that entered in his left shoulder area and traveled across.

Q   And how are you familiar with the flank wound and the wound in the left shoulder area, left flank wound and the left shoulder area? How did you become familiar with those locations and the path of those wounds?

A   I studied the autopsy record and discussed it with Dr. Distefano, who did the autopsy.

3244

Q    Did you prepare for demonstration purposes in this courtroom proceeding the model that shows how you superimposed it and then where those wounds or those trajectories were in relation to the wounds on Mr. Eales' body and the trajectories through it?

A    Yes, sir.

        MR. LITTLEFIELD:  Can we displays it, Your Honor?

        THE COURT:  You may.

        MR. HILFIGER:  And again, Your Honor, this is demonstrative evidence only and not for any other purpose?

        THE COURT:  That's correct.  It's not an exhibit.

Q    (By Mr. Littlefield) What's that that's showing up?

A    This is just a way of describing my methodology. That I've trained an actor of the same height, weight and build as Mr. Eales.

Q    Okay.  Next step.

A    That I asked him to dress in the same type of clothing that was identified to me as Mr. Eales wearing that night.

Q    Okay.

A    That I asked him to hold the same make and model ballistic shield.  Sitting in the passenger seat of the

3245

same make and model of Bronco.

Q    Okay.

A    In a riding position.

Q    Go ahead.  And what's that?

A    This is a photograph which I took of that actor sitting in the passenger seat with the ballistic shield and dressed as it was identified to me that Mr. Eales was dressed that night.

Q    Is that the position that he -- the actor indicated, who was a tac team member, that that ballistic shield would be carried?

A    Yes.

Q    Then what's the next photo show?

A    This is a photograph that I took of him exiting the vehicle and when I saw how this was happening I asked him to stop and I took photographs in different viewpoints, one of them being from the front of the Bronco looking back at him.

Q    And it's tough to see but where is he located in this photograph, ma'am?

A    He's in the -- exiting from the passenger seat -- that is, he's getting out, dropping one foot out first and then turning with the ballistic shield, turning to the side and back of the Bronco, to step out of the Bronco.

3246

Q    At this point is this where he is located?

A    Yes.  The upper part of his body would be exposed there.

Q    Has he already made the turn, is his back towards the camera or his left side towards the camera at this point?

A    Well, exposed to the camera at this point would be his left side.

Q    Okay.  Go ahead with the next photo.  What are you showing here?

A    This is a photograph which I took from the driver side looking across.

Q    And is this the same position that we see here?

A    It's as close as he could hold it while I moved around to take the different photographs.

Q    Which side is exposed to the door?

A    The left side.

Q    Next photograph.  Where is the ballistic shield at this point?

A    At this point the ballistic shield is out in front of him, which would be now outside the Bronco.

Q    Go ahead to the next.  By the way, were there any hits or any strikes on the ballistic shield?

A    No, there were not.

Q    When you got the comparison, you got the photo of

3247

the reenactment, what did you do with it?

A     Then I began to crop the photograph, eliminating areas that I -- areas that -- so that I could superimpose it onto the other photograph, so you could see from one -- pass one to the other.

Q     Okay.  Let's go to the next slide.  And what have you done here?

A     I've eliminated here the garage that we were in and the steering wheel and just showing the process.

Q     Go to the next slide.  Then what did you do with that?

A     I kept the passenger seat to use for sizing purposes, size it on top of the photograph that I took while I was analyzing the Bronco there that night and then simply, basically pasted the actor and the seat on top of them so that they're the same size.

Q     And is that where you're pasting the actor?

A     Yes, sir.

Q     Next one.  Now, what are we looking at?

A     This is the same photograph where I've pasted two together, but now I have eliminated the other -- all of those rods that were not consistent with the area of the flank wound.

Q     Okay.

A     And that left number two.

3248

Q    And that's -- you identified this trajectory as which trajectory?

A    Two.

Q    Okay.  And where did two end up?

A    A portion of it goes into the back of that seat if you follow that yellow line into the back of the driver -- passenger seat.

Q    And what was on the seat at that point?

A    Blood spatter.

Q    And in relation to where this trajectory passes the actor, where was this Mr. Eales' wound to the left flank?

A    It was in his left flank.  Part of it went through the waist area.  Some of it -- there was some fragments that strafed or cut into the bottom of his body armor.

Q    Is the actor's position here consistent and -- in relation to the trajectory, consistent with the wounds that Mr. Eales received and the location of those wounds to his left flank?

A    Mr. Eales did have wounds in that area on his body and that position would be consistent that a person in that position -- if a person were in that position when the projectile travelled through along Trajectory 2 could have received injuries.

Q    Okay.  Let's go to the next line.  What are we showing here?

3249

A    This is a line drawing trying to depict the same basic information from the previous and comparing that information to the autopsy report.

Q    Let's go to the next slide.  Okay.  What are you talking -- okay.  Let's pull out what you're talking about in this slide.  What's that indicate?

A    In the autopsy report the main wound here is described as having an upward trajectory relative to the body.

Q    And -- if we go to the next bullet.

A    But if you position that body in the Bronco, then we see that that trajectory is downward, relative to the Bronco, because the movement of the body, how the body can, for example, flex at the hips, so that the buttocks are lower, those kind of things, as opposed to laid out flat on an autopsy table.

Q    Okay.  Go to the next bullet.  What are you showing here?

A    Again, describing how that upward trajectory described in autopsy is actually downward inside the Bronco.

Q    Okay.  And how is that?  How is that?

A    Again, based on -- (Interrupted)

Q    When you step out -- (Interrupted)

A    -- where the body is sitting -- (Interrupted)

3250

Q    When you step out of the vehicle, what did the actor do with his right leg to get out of the vehicle?  How did he do that?

A    He stepped out with his right foot lowered and that caused his hips then to rotate towards the right and lower.  So one side is lower than the other.

Q    And as the bullet passes through, how does that put the body in relation to the trajectory, so that it would cause an upward or downward wound into the body?  When he starts stepping out, how would that allow for an upward trajectory?

A    Well, it's described as upward in the autopsy, when you take the body and lay it out on its back.

Q    Uh huh.

A    Then upward -- an upward trajectory is from any point lower in the body than -- say, like towards the legs, up towards the head would be described as lower. But if you take that body and put that body in a sitting position, then what would be upward relative to the body as it's described in the autopsy actually begins to be horizontal or downward, depending on the position of the hips and the waist and how the body is bent.

Q    Let's go to the next photo.  And in regards to the wound to the left shoulder area, what trajectory or trajectories could have caused that wound that you saw go

3251

through the door?

A    Trajectories three and/or four.

Q    And why can you not discern which one?

A    Well, as I said, they were very close together where those two projectiles perforated the windshield, they're very -- very close together.  And just a slight movement in the body up or down would put that area of the body in line with either or both of those trajectories and also the fact that as the projectile perforates the wing glass that there will be some fragmentation and so some of those wounds could be caused by those fragments as they come through.

Q    Now, as -- which of the trajectories are you marking in this photograph?  Is this three or four?

A    Well, I'm -- it's intending to show both.  I think I've actually highlighted a portion of four.  But it's intended to show that either of those would be consistent with causing the wounds.

Q    Now, when you reference gunshot wound three, where did you receive that -- where did you pull that phrase from?

A    Gunshot wound three is the way that Dr. Distefano identified a wound to Mr. Eales' upper left arm, upper shoulder area and traveling across.

Q    Was that the fatal wound?

3252

A    Yes, sir.

Q    Would you go to the next slide, please.  What are you demonstrating here?

A    Again, I'm demonstrating that the description from the autopsy can be somewhat different than the description once you see the body actually in position, so the body -- if it's slightly turned and slightly lower than we saw in the previous -- that is the one consistent with Trajectory 2, then now it's in position consistent with Trajectories 3 or 4.  We know that fragments -- based on autopsy, fragments entered Mr. Eales.  This position certainly puts him in line with fragments from either perforation three or four.  And again, there was blood spatter on the left side of the passenger seat and that blood spatter could be from either or both of the injuries to Mr. Eales that are on his left side.

Q    And at any point during this entry, as I went through the path, is there any other time in which you're aware of Mr. Eales' left side being exposed to a shooter from that cabin other than when the vehicle's right in front of the house and Mr. Eales is turning to the left to exit?

A    Well, I would have to qualify my response to that in that the wounds to Mr. Eales left side, both the flank and the shoulder area indicate an intervening target.  So

3253

the only places that I identified where there was an intervening target and consistent with possible positions was with him exiting that vehicle.

Q    In that regard --

MR. LITTLEFIELD:  May I approach again, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) Mr. Eales had a third gunshot wound as described by Dr. Distefano.  Are you aware of that?

A    Yes, sir.

Q    And where was that wound delivered to?

A    It's across the back of his left arm at about the elbow level.

Q    Do you recall if it was his left or right arm?

A    I'm sorry.  It was right arm.

Q    And did you view any autopsy photos or discuss with Dr. Distefano the location of that wound on his arm?

A    Yes, sir.

Q    Where -- can you hold up your right arm and show the jury where the wound was, approximately in the right arm?

A    Approximately at the elbow level.

Q    Okay.  And I note that you're taking it -- and I'm going to describe it from back to front.  Was there a discussion with Dr. Distefano as to the more likely path

3254

of a bullet causing that wound?

A     Yes, sir.

Q     And what was that?

A     Back to front.

Q     As you examined the Bronco, was there any trajectory that appeared to be consistent with Mr. Eales receiving a wound going through or just above the right elbow from back to front that passed through the Bronco?

A     No.

Q     Do you have an opinion as to whether or not he would have been in the Bronco when that shot was delivered, which caused the wound to his right elbow which travelled from back to front?

A     Yes, I do.

Q     What is that opinion?

A     He was not in the Bronco.

Q     And why do you -- how do you reach that opinion?

A     Because I tried and was not able to position that part of his body consistent with any of those trajectories.  And more specifically, there was tissue missing from that part of his arm and no tissue spatter inside the Bronco.

Q     I'm sorry.  What was the last part?

A     Tissue.

Q     What about the tissue?

3255

A     Was missing.

Q     From where?

A     From his arm.

Q     Okay.   Where the wound was delivered?

A     Yes.

Q     And did you examine the inside of the Bronco to see if you could find tissue?

A     Yes, I examined the inside of the Bronco.

Q     Anything that was consistent with what you would have seen in the Bronco had he been -- received that injury inside of it?

A     Had that injury occurred inside the Bronco, I would expect to have found some tissue spatter.

Q     Didn't locate any?

A     No.

Q     How would Mr. Eales have had to have been positioned inside the Bronco to have received a wound going from this direction from the back to the front?   Was there any time that you're aware of when he was in the Bronco that he could have received that wound and been in that position?

        MR. HILFIGER:   Your Honor, I object.   She doesn't know how he was in the Bronco, when he was in the Bronco, how he exited the Bronco.   She can give an opinion as to what this actor did, maybe.   But she

3256

doesn't know any -- (Interrupted)

MR. LITTLEFIELD:  Okay.  I'll withdraw the question.

THE COURT:  Question withdrawn.

Q   (By Mr. Littlefield) How would Mr. Eales had to have been seated in the Bronco to have received a wound consistent with that which you saw?

A   I was not able to come up with a scenario that would put him in any seated position and getting that wound inside the Bronco.

Q   You couldn't find one that fit at all?

A   No.

Q   Do you have an opinion as to how many shots at a minimum would have had to have been fired to encompass the damage you saw to the Bronco and the additional wound that was delivered to Mr. Eales' arm?

A   Assuming a single incident, it's appears to be a minimum of 19.

Q   What do you mean by assuming single incident?

A   That all of these shots into the Bronco and to Mr. Eales occurred at this location.  A minimum of 19 shots.

Q   How rough was the terrain out there?  And you said it was a gradual slope.  Was it kind of -- did you get a good enough view to be able to determine whether that would have caused bouncing in the Bronco as it would have

3257

moved through that area?

A    I don't know that.

MR. LITTLEFIELD: May I have just a second, Your Honor?

THE COURT: You may.

MR. LITTLEFIELD: May I approach, Your Honor?

THE COURT: You may.

Q    (By Mr. Littlefield) Based on what you saw, is there any reason to believe -- based on what you saw, is there any reason to believe that stationary shooter located here, Bronco travelling this path, that shots could not have been initiated at about this point and continued as the Bronco followed this path?

A    If you're starting the path as I examined before, looking down the sight line that it was possible for windshield shots to occur there, then, yes, I would say that there is the possibility that all the shots could be with the shooter in one position and the Bronco moving.

Q    Okay. And would the one position from which the shooter is shooting -- and I'm not trying to say that the person's stationary, but in a location at the front door, just outside the front door on the porch and backing into the house, so that as the Bronco approaches, the shooter moves into the house and continues to face the Bronco during its approach. Okay. Shots being initiated here,

3258

shooter at that location, and the Bronco following this path, is that consistent with the shots that all the trajectories that you saw in the Bronco?

A    I can't exclude that scenario, but that's a possibility.

Q    Okay.  And my question is:  Is that which I just displayed consistent with all of the trajectories that you saw into the Bronco?

A    It appears that it is possible for all the trajectories to be accounted for in that manner.

Q    Okay.  Shooting starts -- now let's do the other scenario.  Shooting starts here where the headlights are pointed toward that house, and the vehicle moves in this pattern, is that consistent -- and the shooter is at the front door area.  Is that consistent with all the trajectories into the Bronco?

A    If the Bronco turns in that -- (Interrupted)

Q    I'm taking -- this path.  This path from right here to right here, is that consistent with all of the trajectories into the Bronco?

A    If the shooter is -- (Interrupted)

Q    At the front door.  Shooter's at the front door, Bronco follows this path, is that consistent with all the trajectories you saw in the Bronco?

A    It may be possible to make all those if the

3259

shooter's changing positions.

Q    My question is:  Shooter is at the front door, okay.
And the vehicle goes from here to here, is that
consistent with all the trajectories into the Bronco?

A    Only if the shooter moves.

Q    Okay.  Would the shooter ever on this path be able
to put Trajectory 9 in the vehicle from that front door?

A    Given the limited path you just described, no.

Q    Okay.  Same question, vehicle coming from here and
shots starting anywhere along this line from here to
here.  Shooter prone between these two doors firing out
the front door and you can have him any -- firing at any
point along this line, is that consistent with all the
trajectories into the Bronco?

A    The shooter prone inside that interior doorway is
not consistent with all the shots being fired from that
position prone in that doorway.

Q    Okay.  Of the three scenarios, which one is -- which
one allows for every shot that you saw in that Bronco?
And I'll say number one, number two with the shooter
standing there or number three with the shooter in the
door, in the interior door.

A    Of the three scenarios you just gave, the first
scenario could account -- has the possibility of
accounting for all those trajectories.

3260

Q    Do either of the other two have -- (Interrupted)

A    There are problems with the other two as you describe them.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Members of the jury, let's take a recess.  Remember my admonition and everyone please remain seated as the jury leaves.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Ma'am, you may step down.  If you'll -- when the bailiff calls you, if you'll return.

(Whereupon, the witness left the courtroom after which the following record was made.)

THE COURT:  Record should reflect that the jury and the witness have left the courtroom.  Anything to take up outside the hearing of the jury from the Government?

MR. LITTLEFIELD:  Judge, yes, there is.  There is a witness who we have under subpoena who we directed to be here at 10:00 o'clock this morning.  Our victim witness coordinator had been in contact with her for the last couple of days.  She's been out of touch the last

day.   Last report I received is we haven't had any contact with her yesterday or today and she has not appeared and I'd ask for a bench warrant for her.

THE COURT:   Are you going to give me a name or -- (Interrupted)

MR. LITTLEFIELD:   Brandie Zane Price.

THE COURT:   That will be the order of the Court.   From the defense?

(Whereupon, a short recess was held after which the following record was made in the presence of the jury.)

THE COURT:   Let the record reflect the jury is in the box, counsel for Government is present, Defendant is present with counsel.

MR. LITTLEFIELD:   Your Honor, I have been advised I swung a little too far out.   Can I reopen just a second?

THE COURT:   I think that's consistent with your past.   You may.

Q   (By Mr. Littlefield) Everyone's a critic.   I was told I swung it a little too far out.   Let me try it again and see if I can position it satisfactory.   If the Bronco followed this path, would the shots that you saw, the trajectories you saw, be consistent with the shooter being stationed around the front door which would put him

3262

on the porch to stepping inside at some point, the Bronco following that path that I just provided then would the shots be consistent or the trajectories be consistent with that path?

A   It appears that it would be possible for all the trajectories to occur somewhere along that path, given a shooter in the doorway and the Bronco moving as you just showed.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examination.

CROSS EXAMINATION

BY MR. HILFIGER:

Q   Ms. Dalley, based on this -- just this last one that he just talked about, are you going to call that scenario four or is that a scenario 3-A or 2-A or is that a whole different scenario?  You said you had three scenarios, right?

MR. LITTLEFIELD:  Objection.  She didn't say anything.  I presented three scenarios and she responded. She didn't say three scenarios.

MR. HILFIGER:  Okay.  I'll withdraw the question.

THE COURT:  Question withdrawn.

Q   (By Mr. Hilfiger) Two of the three scenarios that Mr. Littlefield talked to you about right at the last, is

3263

that an additional scenario or do you understand that as a part of one, two or three?

A    I wasn't identifying any scenario by any number. I'm just trying to answer the questions as they are asked. And each scenario as its presented separately from any others.

Q    Okay. But did you understand that he gave you three separate scenarios?

A    Yes. Shortly before the break he did describe three separate scenarios.

Q    Now, do you take this particular one as a fourth scenario or is it an alternative to one of the three?

          MR. LITTLEFIELD: Objection to the relevance as to how she takes it. She didn't dream up the scenario, Judge, they're what I did.

          THE COURT: Overruled. You may answer.

A    The scenario that he just asked in his last question was somewhat different than the previous three.

Q    (By Mr. Hilfiger) Okay. But does it change your opinion -- okay. Without going one, two and three, okay. I'll label them now for you, okay. Let's call scenario number one, okay. Number one was the scenario that Mr. Littlefield said that I am calling number one, could shots have started at the top where the Bronco --

          MR. SMITH: If I may approach?

3264

THE COURT:  You may.

Q    (By Mr. Hilfiger) Could shots have started up here at the top and continue on the path to the porch with the -- again continue on the path to the porch with the shooter being in the doorway and backing up and your response to that was all shots are consistent.  I cannot exclude this scenario.  It is possible.  That's one.  Do you understand that one?

A    Okay.

Q    Now, let's talk about what he said was scenario -- what I am calling number two, okay?  The shooting starts where the Bronco with the lights on the house and go toward the house and he started here and he brought it in to here.  I am calling this scenario two that Mr. Littlefield said.  To your response to that, you said that is consistent with all shooting at the Bronco except for number nine.  Do you recall that?

A    Yes.  I recall an answer somewhat like that, yes.

Q    That's scenario two, okay.  That I'm calling two.

A    Okay.

Q    Scenario that I am calling three that he said is if the shooter is in a prone position and the same shooting starts with a Bronco with the lights on or the house and go into the house, is that consistent to allow for all the shots?  And what was your response to that?

A    That with the shooter prone on the floor of the house -- (Interrupted)

Q    Yes.

A    That no.

Q    That's not.  Okay.  Now, we will call the next one four, my number four, what Mr. Littlefield just described to you, okay?  And that is coming out -- though he didn't describe it that way.  He could come straight across here, didn't he?  Isn't that how -- he didn't come out like this, did he?  He didn't come out around and come in, and make a big U.  He came in like this and made a turn, didn't he?

A    Yes, I believe he made a turn.  There was a difference in the depth of that turn.

Q    How much depth did he come out here?

A    I'm sorry, I don't recall.  I was just answering based on what I could see from here.

Q    Okay.  Did he come out this far?

A    I don't recall the exact position that he had.

Q    Would this scenario be closer to one, two or three of the scenarios that I gave you?  The one -- the one last one he just described?

A    The last one he described would be closest to the one you identified as one.

Q    Okay.  Now, do you have any evidence as to the

3266

pathway of that Bronco?

A   The only evidence I have of the path of the Bronco is that it did in fact come up to the porch based on tire impressions that I saw and staining on the ground that appeared to be transmission fluid.

Q   Okay.

A   Other than that, I don't know the path of the Bronco.

MR. HILFIGER:  May I approach again?

THE COURT:  You may.

Q   (By Mr. Hilfiger) So basically what you're saying, when you got there -- when you got there the Bronco was back here somewhere in this neighborhood, right?

A   Yes.

Q   You could tell that it had been up here, right?

A   Yes.

Q   But you don't know anything about how it got from where ever to there and there; isn't that true?

A   I don't have any evidence about the path other than as I just described from the ground stain and the tire impressions.

Q   But the ground stain shows you where it is right now -- show it in that location, right?

A   Yes, at approximately that location.  I don't know if it was that close or not quite touching, but somewhere

3267

in that area.

Q    So, for any of what you're talking about is just possibilities in a realm of many, many thousands of possibilities because you don't know the pathway, do you?

A    That's correct.

Q    Now, when you did this, were you able to differentiate the holes based on what kind of -- well, let me back up just a second.

So we are again talking the same, okay?  What do you call the thing that goes in a gun that shoots out?

A    Bullet, cartridge.

Q    Well -- (Interrupted)

A    Or shell.  Any of those -- (Interrupted)

Q    What do you call it so I can talk your same language?

A    Cartridge.

Q    Okay.  What do you call the piece that comes out of the gun that goes into something?

A    I generally just refer to it as a projectile.

Q    Okay.

A    Because I don't know which part of it is striking -- (Interrupted)

Q    Is that what you're going to call it -- (Interrupted)

A    Projectile.

3268

Q    Now, do you know based on your examination the holes in this Bronco, can you tell what size projectile caused those holes?

A    I don't have any ballistics that tells me the exact projectile caliber that caused the holes.

Q    Do you have anything that can tell you whether all of the holes were caused by the same caliber projectile even?

A    They're all consistent with being caused by the same caliber, but I can't say that to a scientific certainty.

Q    Well, in fact you've said before, haven't you, that you can't tell what caliber it was or if there were more than one different size caliber; isn't that true?

A    That's true.  The holes are consistent with being of the same or similar caliber, but I don't have any independent forensic evidence that says absolutely it was this size versus that.

Q    And when you say same or similar caliber, what range of caliber -- does it say if they're a .223?  What can a .223 go up to?  What range are you talking about when you say similar caliber?

A    Well, I'm saying there may be some other projectile that would be close to the same measurements as a .223.

Q    I'm asking you what?  Name one.

A    I don't know all of them.

3269

Q    Name one.

A    I don't do the ballistics.  I don't do that part of it.  I do the trajectory analysis.  I don't do the ballistics.

Q    Well, so can you name any caliber other than a .223?

A    Actually, when I need that information I either go to a ballistics chart or call -- more frequently call the firearms examiner and ask them.

Q    Okay.  So what you're basically saying is you don't have any idea what the caliber was of the projectiles that went in this car and you don't know even if it's more than one type caliber, is that right?

A    Right.  I couldn't recover anything that could be analyzed by the firearm's examiner to tell me what caliber it was.

Q    Okay.  And that's -- that's the next question.  You understood where the car was at the porch level.  You know when it's on the porch, like where it is right now, the Bronco.  Do you see the model?

A    I see the model.

Q    Do you see where the car is?  Now, when you got there the car wasn't there, right?

A    That's correct.

Q    What did you do to examine the position that the car is in located -- is located in now, to look for

3270

projectiles?

A    I looked in the Bronco, primarily.  And for example, I dug into the left sidewall, went into the passenger seat, places where there might be projectiles inside the Bronco to see if I could recover anything that could be analyzed.

Q    But did you look on the ground where the Bronco was located near the house?

A    No, I did not examine the ground.

Q    So you don't know if there's any projectiles down there on the ground, do you?

A    No.

Q    Did you -- you could see from the car -- well, let me ask you this:  Would you be able to do a more definitive trajectory analysis if the car had remained in the position where it was stopped?

A    Possibly.  And I was certainly looking to do that. But when I arrived at the scene, there's evidence that it is not in the same position.  It has changed positions.

Q    And because the car had changed positions you couldn't do what you would want to do as a normal definitive trajectory analysis; isn't that true?

A    Well, one of the things I would like to have done, if the circumstances had been appropriate, would be to travel -- turn my laser back the other way to point to a

3271

possible point of origin as opposed to just the trajectory through. But since I see evidence there when I get there that the Bronco has moved, then that's not a thing I'm going to do to try to establish the point of origin, because I can't show that that's where it actually came from.

Q   How did you determine it had been moved -- that the car had moved?

A   Well, as I said, when I got there, it look like -- I could see the tire impressions.

Q   Did you receive any information as to how it got moved?

A   There was discussions afterward, but my determination it was moved was the tire impressions, the location of the stain on the ground and then when I looked under the vehicle I also saw that there were -- was what appeared to be blood stains and medical debris under the Bronco, which again indicated the Bronco had been moved before I got there.

Q   Okay. But you never received any information as to how or why it was moved, is that right?

A   Well, I had discussions but that wasn't part of my analysis.

Q   Who did you have discussions with? I'm not asking you what the discussions were. Who did you have

3272

discussions with concerning how the car got moved?

A     There were various officers on the scene and I'm sorry, I didn't get all of their names.

Q     Did you get any of their names?

A     No.  I simply commented that this is moved and some people were saying some things -- I heard them say some things about how it had moved and then later, in the course of the investigation, I read reports and talked to people that said it had moved and how they thought it got to this position or that position.  But again, that wasn't part of my analysis.

Q     What time did you get there on the scene?

A     I don't remember the exact time.  I'd say it was approximately 5:00 p.m. in the afternoon.

Q     Did you do anything to try to determine what position the Bronco was in when it was at the house, at the porch?

A     Nothing other than looking at the tire impressions and the stain on the ground, just to see that it had been in approximately a certain position up at the porch.

Q     Was there glass broken on the Bronco?

A     There was some breakage in the glass.  Certainly perforation of the glass.

Q     Okay.  And I understand that possibly the front windshield perforation, the glass may have gone inside

3273

the car.   But as to the driver's side window perforation, wouldn't the glass have gone outside the car?

A     No, I didn't say that the driver's window was perforated.

Q     No.   Driver's side window?

A     Oh.   The left side window behind the driver's seat?

Q     Yes.

A     There were some perforations, yes.

Q     And that glass would have gone outside the car, wouldn't it?

A     Yes.

Q     Did you make any attempt to try to locate a place where that glass was on the ground?

A     No, sir.   That glass would -- would -- I would expect would primarily be glass dust.

Q     You didn't make -- you didn't look for it though, did you?

A     There wasn't anything to look for.   These were fairly small holes and my understanding of firearms and what -- and what happens when projectiles go through glass, the glass is basically dust.   You don't find that.

Q     Now, when you used your Dowel rod idea to locate, you know, your trajectories, do you use a Dowel rod of the same caliber of the projectile or do you think that makes any difference?

3274

A     The size of the Dowel rod depends on the size of the perforation.  And I used a Dowel rod slightly smaller than the perforation.  And that's not necessarily relative to the caliber.

Q     Okay.  I noticed in some of those window shots you use the same Dowel rods for all this, though, didn't you?  Or did you use different sizes?  I couldn't -- it appeared that they all looked the same size.

A     I think they were all the same size except for the small pieces that I used to try to brace -- to join two Dowel rods end to end.

Q     Well, on some of these where you had a window where you had a hole like this, and I'm putting my middle finger to my thumb, you used the same size Dowel rod.  Doesn't that allow for a lot of wiggle room?

A     It does and I tried to suspend the Dowel rods to match where the laser hit.

Q     Okay.  Now, let's go through some of these what I call schematics, okay.  Just to compare them on this Bronco, okay?  Now, trajectory number one, there's not a schematic for that.  And you know what I'm talking about by schematic, don't you?  I told you up there.

A     I think you're referring to those line drawing sketches looking down through the model and looking through the side of the model.

Q    Right, right.  Now, trajectory number one, that's one that came into the right front panel?

A    Right front quarter panel.

Q    Quarter panel.  Now, what angle did that have to the Bronco?

A    I don't know the exact degrees.  It was right to left and front to back.

Q    Well, you can't give a rough approximation?

A    I didn't measure the angle, I didn't have any of the equipment for doing that.

Q    You looked at it, didn't you?

A    Yes, certainly I looked at it.

Q    Okay.  At what position -- let me ask you this:  On your -- where you got the car suspended in air, you know the Bronco suspended in air?

A    Right.  Where I did the animation to turn the model -- (Interrupted)

Q    The animation.  Would you say -- did you try to get the right angle on that animation?

A    I certainly did.

Q    So the animation, you think, would effectively reflect approximately what that angle is?

A    Approximately, yes.

Q    On number one.  We're just talking about number one, right?

3276

A     Yes, sir.

Q     Can we show that on the suspended in 3-D. Okay. Now, let's -- I have -- well, maybe we can get by.  Well, now I have your animation up here.  Maybe.  Okay.  Is that number one right there?

A     Yes, sir.

Q     Number one, how does that appear to be coming out of that left front wheel well?  Almost at 90 degrees, isn't it?  Not quite but almost, relative to the Bronco.

A     Well, this is not the appropriate medium to use to try to determine that.

Q     Well, you drew it on here, didn't you?  Didn't you do this schematic?

A     Yes.  But this is not a schematic, this is a three dimensional model.

Q     Okay.  What is the right medium to determine that with?

A     If we, for example, take the top view, the line drawing top view where you're looking down, straight down, then you have something to compare it to.

Q     You don't show one on here for number one.

A     Yes, sir, I believe I did.

Q     Well, we don't show it here.  Can we go to number one, please?

A     I don't know why it's not there.  I had one.  I

3277

don't know why it's not there.  I'm sorry.

Q    Okay.  Well, can you tell us how that trajectory is to the Bronco?

A    Yes, I can demonstrate it.

Q    Okay.  Does it go anywhere like that -- your 3-D picture does?

A    Yes.

Q    Are you saying that 3-D picture's not really accurate?

A    No.  I believe the 3-D model is accurate.  But the angle that it appears to be depends on the angle that you're looking at it.  That's why I also did the line drawings so that you could see them from 90 degrees top and from the side.

MR. HILFIGER:  May I approach?

THE COURT:  You may.

Q    (By Mr. Hilfiger) Okay.  Take this Bronco and take these little skewers here and tape.  Across the top of the hood show an angle, but I want you to tape it on there.  I'm not talking about the horizontal.  I'm not -- I'm not getting -- want to talk to you about the horizontal.  I'm just talking about you saying that's the angle that's it's represented going in, is that right?

A    As near as I can make it in this rough estimation.

MR. HILFIGER:  Okay.  May she go around and

place that on the model?

THE COURT:  You may.

Q     (By Mr. Hilfiger) Place that on the model where you're saying the shooting -- according to your scenario -- or my scenario number one, that I'm labelling number one, which Mr. Littlefield told you, place that Bronco there, would you please, where you say the shooting could have started?

A     I never said where the shooting could have started.

MR. HILFIGER:  Well, let me place it there okay?

THE COURT:  You may.

Q     (By Mr. Hilfiger) You agree that you were saying that Mr. Littlefield pointed to this spot right here and saying is there anything -- everything's consistent with all shots with a car starting there, is that right?

A     I believe the scenario was taking in if the Bronco is moving on approximately this path, is -- these trajectories could occur somewhere -- (Interrupted)

Q     Yeah.  But starting at that position, isn't that right?  Starting at that position and continuing on to the porch, isn't that right, what the question was?

A     Well, my understanding of the question was it possible for any of these shots to have been with the Bronco somewhere near that position and I could not

exclude that as a possibility.  I never said it was where the shooting started.

Q   Ma'am, I think the question was could the shots have started at that position and continue on the path to the porch, are all the shots -- all the shots consistent with that scenario?  And my question to you is -- I'm going to go through each and every shot for you, okay?  Could number one have occurred at that position?

A   If the Bronco is in exactly that position and if the shooter is -- (Interrupted)

Q   Just like Mr. Littlefield said.  He's on the porch or in the doorway.  Could that shot, number one, have been in that -- could have --

A   No.

Q   Absolutely not; isn't that true?  Because where's the shot -- where's the shooter have to be?

A   Shooter has to be to the right front of the Bronco.

Q   Right.  And so, number one is eliminated as being consistent with that scenario, isn't it?

A   No, sir.  Number one is eliminated -- (Interrupted)

Q   As that position?

A   -- Bronco in that position and the shooter in that doorway.

Q   Okay.  Now, let's go to number -- go ahead and sit back down.  Now, I'm going to try to group these together

for you a little bit.  Numbers two, three, four and five. Do you remember the angles that you had on two, three, four and five, trajectories two, three, four and five?

A    Approximately.

Q    And can you put that -- and you'll have to do it on the top of the car -- where you think those angles are -- because weren't they all pretty much the same?

A    Number five was much more front to back than -- (Interrupted)

Q    Okay.  Let's do two, three and four then.

A    Okay.  Number two was also more front to back than numbers three and four.

Q    Okay.  Do two and five then.  You do it however you want to do it.  I want to go through each one of these things.  What I'm asking you, just put it on the -- you can't tape it like that.  Put it on the top of the car just like you did the line in your drawing.  Isn't that how you did the line in your drawing?

A    No, sir.

Q    Let's look at Trajectory 2.

A    Could I explain?

Q    Yes.

A    I did the model taking into account all the information and comparing each rod with each of the photographs that I had, going back and forth to get them

3281

the same.  Then I took a top view of that model and made all but one rod visible -- invisible, so you only look at one rod at a time.  And I took a view -- I changed from the solid view to the line drawing looking through and recorded that as top model right -- right side and left side.

Q    Okay.

A    So I didn't individually do each one of these sketches.  I did the entire model after I placed all the trajectories.

Q    Okay.  See how you got that?

A    Yes.

Q    Put that stick on there like you've got it.  Same angle across the top of the car.  Is that going across that seat?  I'm asking you -- ma'am, can I show you what I'm asking you to do?

         MR. HILFIGER:  May I approach?

         THE COURT:  You may.

Q    (By Mr. Hilfiger) You're making it a lot harder than -- would you look at your schematic, you got this thing here going through here.  And I'm saying isn't that about what you've got -- about like that?

         Okay.  Now, there's one little catch on this one, though, two, three, four and five, isn't there?  And that is the door is open.  Isn't that right?

3282

A    Yes.  The door was open to varying degrees for each of those shots.

Q    Okay.  So, do you have any testimony or are you aware of any evidence when and where the right passenger door was opened?

A    No, I don't know where the Bronco was when that door was opened.

Q    Okay.  Do you know where the Bronco was when Rocky Eales exited the Bronco through the right passenger door?

A    No, I don't have any evidence to tell me where the Bronco was at any specific time.

Q    Okay.  Put the Bronco out there where the Bronco was -- you know where we just had it.  Leave it.

THE COURT:  You may.

Q    (By Mr. Hilfiger) No.  Up -- where we're starting.  The position that we're starting.  Well, now is that position -- and sort of keep an eye on the position because I want you to put it in the same positions for each one of these 18 shots, okay?  Is that the position Mr. Littlefield said it started in?

A    That's approximately the position that he asked me to give a scenario that -- and could it have -- could -- are there any shots that could have occurred in this position.

Q    Could that shot have occurred at that position on

3283

that scenario?

A    If the shooter is in the doorway, if the Bronco is in that exact position, no.

Q    Okay.  So, number two could not have work at that position, right?

A    That's correct.

Q    Okay.  Now, do you want to look at number three? Number three -- is that more right to left than number two is even?

A    Yes.

Q    So, do you need to adjust that?

A    If you want me to try to simulate number three, it would have to be adjusted to show more right to left.

Q    Okay.  Okay.  Do that, please.  Now, could number three have been the shot that started out in that position?

A    I don't know the position of the Bronco when the shooting started and given this configuration, this is not consistent with the shooter in the doorway and that particular shot occurring.

Q    Okay.  So that's number three.  Number four.  Number four, how is number four different from number three?

A    They're very similar.  Number four is only slightly more back to front -- (Interrupted)

Q    So would your answer be -- okay.  Do you want to use

3284

the -- would your answer be the same for number four? That number four could not have been shot under that scenario?

A    The answer would be -- (Interrupted)

Q    In that position, is that right?

A    The answer would be the same.

Q    Okay.  Let's go to number five.  Do you know how the projectile was on number five?

A    Yes, sir.

Q    Your answer as to trajectory number five, could that have been fired under scenario number one, with that Bronco in that position?

A    Okay.  Relative to the Bronco at that position.

Q    That's what I'm talking about.  I'm just talking about the Bronco at that position.  Could trajectory number five have been fired under scenario one with the Bronco at that position?

A    Shot number five could not have occurred from the doorway with the Bronco in that position.

Q    Let's go to trajectory number six.  The question for number six is:  Could that trajectory have been shot under scenario number one, my scenario number one, of Mike Littlefield's scenario to you, with the Bronco in that position?

A    Okay.  I'm sorry, sir.  It appears you are asking

two separate questions.  I can either exclude the scenario or the position.  If we're talking about the position, this position is excluded with a shooter in the doorway and the Bronco in that position.

Q    Okay.  So the answer to the question is that couldn't have happened at that position with the shooter on the front porch or in the doorway.  Isn't that right?

A    That's correct.

Q    Number seven.  Number seven.  Could that trajectory have occurred with the Bronco in that position, with the scenario that the shooter is on the front porch or out the front door?

A    Again, relative to the exact position of the Bronco with the shooter in the doorway, shooter standing in the doorway, and the Bronco in that position could not have fired that shot.

Q    Okay.  Trajectory number eight.  And we don't appear to have, I don't think, a drawing of number eight.  But the question is -- and you feel confident that that would be the representative -- how number eight would be, is that right?

A    Yes, sir.  Number eight, the core struck the hood and it travels under the hood, struck the interior -- part of the interior molding in the hood and then fragmented into the firewall -- in the position with the

3286

firewall's in front of the driver.

Q   As to trajectory number eight, would that trajectory be able to be caused by a shooter on the front porch or in the doorway with the Bronco in that position?

A   If the Bronco is in that position with the shooter in the doorway, the shooter in the doorway cannot make that trajectory with the Bronco in that position.

Q   Now, do you want to go through all 18 of these or can you tell me which one -- which shot are you saying could have occurred with the Bronco in that position? Can you tell us of your 18 trajectories, which trajectory are you saying could have occurred with the Bronco in that position and the shooter on the front porch?

A   If the Bronco is turned just slightly, it may be able to get, for example, number 16 or I believe number 15.  Those -- (Interrupted)

Q   You're saying 15 or 16, is that right?

A   I think.  If -- because if the Bronco simply turns slightly.

Q   Well, let's talk about -- let's go to 15.  Now, there's something real unusual about 15, though, wasn't there?  Do you know what it was?  You couldn't find an exit hole, could you?

A   That's correct.

Q   Did that indicate maybe the driver's window was

3287

open?

A   Well, that could and the driver was like about halfway or slightly less.

Q   Do you know when that driver's window was open halfway?

A   It was open during the incident and we know that from the impact to the interior side of that glass and then when I examined -- rolled the glass up, there's no damage at all below that.  It's a line of demarcation.

Q   Do you know when during the incident that window was opened halfway?

A   I know it was opened when those fragments struck the glass.

Q   Do you know if there's testimony that Trooper Hamilton opened that window when he was at the porch?

A   I don't know what Trooper Hamilton testified to.

MR. LITTLEFIELD:  Judge, that wasn't the testimony of Mr. Hamilton.

MR. HILFIGER:  I disagree, Judge.

MR. LITTLEFIELD:  Well, and I disagree with what you disagree with -- (Interrupted)

MR. HILFIGER:  And I will go on.  I will go on. I'll withdraw that question.

THE COURT:  Jury disregard comments from both counsel and let's proceed to the next question.

3288

Q   (By Mr. Hilfiger) Let's look at 15.  Okay.  Can you place a stick so it matches up with 15?  Going from the right front fender to -- toward the back of the front door.  Now you moved the car.  You moved the position of the car, didn't you?  You changed it.  You changed the front end of the car around.  That wasn't where you had it?

MR. LITTLEFIELD:  That's not a question, Judge, that's an argument.

THE COURT:  Well, it's a -- since we're using a demonstrative exhibit, it's an appropriate question if it's been moved.

Q   (By Mr. Hilfiger) Did you change the position of the front of the car?

A   I didn't intentionally alter it.  I'm trying to put it back in the same place.  If you want it to turn another way, I'll turn it another way.

Q   The front end of the car was turned more to the right, wasn't it?  Would you agree with that?

A   If you want it turned more to the right, I'll turn it more to the right.

Q   Well, turn it more to the right it seems to be.  And I don't think that's -- I'm going to be fair, but I don't think it that's far to the right.  I think it was somewhere between the two.  But the point is, can -- what

3289

is your answer to that trajectory, with the Bronco in that position and the shooter on the front porch or in the door, can that trajectory -- would that trajectory be caused by a shooter on the front porch or in the door with the Bronco in that position?

A    With the Bronco in that exact position, it can't be shot from the doorway.  If we turn it a little bit the other direction, maybe.  I don't know.

Q    Okay.  And number 16 you said is also a possibility.

A    I'm not sure.

Q    Well, you said it, didn't you?

A    I think I said it was a possibility.  I don't know unless we actually try it.

Q    Let's look at 16.  Now, as to 16 is there a little something different on 16?

A    The passenger door -- I mean, I'm sorry, the driver's door was opened.

Q    Is there any indication that you know of that the driver's door would have opened out in that position? When the Bronco's in that -- you don't know?

A    I don't know.

Q    Okay.  So, could 16 have occurred out there?

A    Again, if the Bronco was turned slightly one direction, yes.  If it's turned slightly the other direction, no.

Q    And if the door was opened -- I mean, but the door would have to be opened, isn't that right?

A    Yes.

Q    On 16 you'd have -- not only have to have the position right, but you'd have to have the driver's door opened; is that true?

A    That's true.

Q    Okay.  Any other shots -- you're saying a possibility of 15 and a possibility of 16.  But 16 the driver's door has to be opened, isn't that right?

A    Yes, sir.

Q    Any other 18 shots -- we've only come to two shots that you have a possibility that it could have occurred under the scenario of the Bronco in that position -- starting in that position, and the driver -- and the shooter on the front porch, is that right?  Can you think of any other shots that could have occurred out at that position?

A    If we keep the Bronco in that position so that the front of the Bronco is roughly parallel to the side of the house.

Q    Yes.

A    Then it's not possible for the shooter to be on the front porch, because all of the trajectories are right to left and front to back.  The shooter's always to the

right front of the Bronco.

Q   Okay.  You may sit down, please.  So, in the big realm of possibilities, you're saying that what I call scenario number one cannot be excluded because there is a possibility, is that right?  Of the Bronco starting in that position, receiving fire in that position and then coming up to the porch of the house?

A   If we define the scenario as all of the possibilities that could occur as the Bronco moves along that path, then I cannot exclude the possibility that those shots occurred as the Bronco moved along that path. At any given point along that path we may able to include or exclude certain trajectories.  But if we take into account the entire path and the relative positions that occurred between the Bronco and a shooter in the doorway, then it may be possible for all the trajectories to occur given that scenario.

Q   And do you have any understanding as to the height of the shooter -- I mean, the height of the rifle that was being held by the shooter above the floor?

A   I don't know what the position of the shooter was for any given trajectory.

Q   Well, Mr. Littlefield -- (Interrupted)

A   Other than -- other than the muzzle of the rifle or of the weapon has to be, at a minimum, the height of the

3292

trajectory.

Q   Okay.  And Mr. Littlefield gave you a -- and I don't want to get this confused with those four scenarios, but he gave you the deal that the shooter is holding it in a normal position.  Do you know -- what was your understanding of a normal position when you were responding to that question?

A   I believe that in my response I qualified normal as point shoulder.  I don't know if that's what he calls normal or not.  But that to me, to shooting a rifle, normal position for me is point shoulder.

Q   If there was testimony that the muzzle was seen approximately halfway up the door level, would you take that as being normal position at shoulder or at say, hip?

A   I couldn't qualify what someone else might have said that they saw -- as I understand you're saying the barrel of the gun.  I would have to know the position of the shooter.  I can shoot point shoulder standing, kneeling, squatting, sitting, and it's all point shoulder.  I mean, you can go prone and still be point shoulder.

Q   Okay.  But the height, you could be kneeling and have that height, couldn't you?

A   Approximately half the height of the doorway?

Q   Yes.

A   Depending on the size of the shooter, certainly.

Q    Now, let's -- there's three I want to talk about here.  Trajectory number one, did you find in trajectory number one is the one that went in the right wheel well?  I mean, right front quarter panel, I'm sorry.

A    It went in through the quarter panel.

Q    Right front quarter panel, right?

A    Yes, sir.

Q    Did you determine how big the hole was?

A    No more than what I show in the photographs.

Q    Did you measure it?

A    I don't remember.

Q    Did you look for any projectile from that?

A    Yes, sir, I did.

Q    Did you find any projectile from that hole?

A    Not anything to collect.  I did go back and look at the Bronco, open the hood and found where the projectile perforated a little plastic reservoir inside, but I didn't find anything I could collect that could tell me anything about the ballistics of the projectile.

Q    And you didn't look right there at that spot in front of the porch to the house for any projectiles, isn't that right?

A    I didn't do an examination of the ground.

Q    As to trajectory number nine, that was the one that went in the right front bumper, is that right?

3294

A    Yes, sir.

MR. HILFIGER:  May I approach the witness, Your Honor?

THE COURT:  You may.

Q    (By Mr. Hilfiger) You may need to tape that.  Can you show us the approximate angle that number nine went in on?  Okay.  I can see your hand, but I can't see -- can you tape it there at all?  Is that -- relative to the Bronco, approximately what angle is that?

A    It's approaching 90 degrees to the right side of the Bronco.

Q    Now, if that Bronco was at the porch, would you place it on the porch with that same stick there?  Did you do any investigation out there about any other bullets that were found -- or projectiles that were found on the porch area?

A    I did collect one that was found on the porch, just laying on -- I believe it was a little refrigerator that was back here against the wall.

Q    Okay.  Right there in front of where that Bronco is, is that right?

A    Well, on the model you can see there's two little blocks here that are representative of the refrigerator and there was an air conditioner, I believe, sitting out there.

THE COURT:  Ma'am, if you could use that -- sorry to interrupt.

Q    (By Mr. Hilfiger) Okay.  And part of that -- could you make a determination of where the person would be that fired that projectile that went -- that landed on the refrigerator?

A    Yes.

Q    Okay.  Where would that person be?

A    That person would have to be somewhere to the east of the house, relatively -- approximately on the same line as the exterior wall, in that the projectile grazed the front wall.

Q    Now, would you put the Bronco up next to the porch.  Go ahead and leave that -- can you leave that stick just like it is?  I'm not trying -- I know you've got two hands.  Now, are those two rods in relatively close proximity to each other?

A    Well, if we put the Bronco there and say it was there, then they appear to be -- that they could be parallel lines.  However, I have no evidence as to where the Bronco was at the time of trajectory number nine.

Q    Right.  You don't know -- but you don't where the Bronco was when any of the shots were fired, do you?

A    I believe that's what I've testified several times.

Q    And I'm just -- just like Mr. Littlefield, I'm

3296

saying if the Bronco is there and that rod shows -- goes into number nine, if you drew your Dowel rod out or your laser out, it goes to approximately the same area where the person that made that shot that went down on the refrigerator; isn't that true?

A    Well, it is possible to orient the Bronco to make those two lines approximately parallel.

Q    You may sit down, please.  Do you know what kind of projectile or what the caliber of the projectile was that was recovered from the refrigerator?

A    I'd have to refer to reports.  I read reports.  I don't recall the exact caliber that it was.  I do recall the reports saying what weapon it matched.

Q    You don't have anything in any of your determination that says the person that fired that projectile onto the refrigerator could not have also fired the projectile resulting in trajectory number nine, do you?

A    Well, I didn't recover anything from trajectory nine to compare with any particular weapon, so I can't say what caliber it was or what weapon fired it.

Q    You can't say what caliber anything was on that Bronco, can you?

A    That's true.  I didn't recover anything that could be analyzed to determine that.

Q    Now, there's another shot -- this projectile that

3297

entered through the right front grill, trajectory number 10.

MR. HILFIGER:  May I approach the witness?

THE COURT:  You may.

Q    (By Mr. Hilfiger) Can you place that rod approximately at the angle that trajectory number 10 was? I think you may have an -- no, we may not.  We don't have a drawing for that so just whatever you can -- okay.  We do have a drawing for that.  And did you recover any kind of projectile from that to show the caliber or show anything?

A    No, I was not able to recover a projectile from this line of trajectory.

Q    And that trajectory is going from a hard right to the left?  I mean, if you continue that on through it would go about and it would come out -- if it would have come on out, it would have come on out where the left front tire is, is that right?

A    I believe it would be above the tire level.  But it -- I would expect it -- had it not been destroyed prior, that it could possibly exit through the left quarter panel.

Q    The left quarter panel?  Okay.  Now, you made a determination that there were 18 trajectories, is that right?

3298

A    Yes, sir.  I found 18 defects and -- consistent with the 18 trajectories identified.

Q    And the 18 trajectories, are you saying that they are resulting from 18 individual projectiles or could some of them be from fragments?

A    No.  The 18 that I identified were from 18 separate perforations.

Q    Okay.  But were they from 18 separate projectiles or could some of the defects be caused by a fragmented projectile?

A    No, I didn't find any consistent with being parts of a single projectile.

Q    Well, on the number eight, trajectory number eight?

A    Yes, sir.

Q    Did you look at that?

A    Yes, sir.

Q    Now, as I understand on trajectory number eight, that's it right there.  The only thing you saw from trajectory number eight the way I understood it was that there was a fragment down in the motor area, is that right?

A    That what I recovered from my examination here was fragments that had grazed the side of some insulation and then came to rest on a piece of metal below there.

Q    What happened to the core or the rest of the

projectile?

A     The core as I said continued coming into the hood and then struck a -- some kind of the molding on the underside of the hood and then fragmented and struck the firewall in front the driver's area.

Q     Okay.  So on that one, when it fragmented, it hit underneath this hood, is that right?

A     Well, the core continues in a straight line until it hit the underside of the hood and fragmented and the fragments struck the firewall.

Q     When we -- at trajectory number -- let me find the one.  Which one was it that hit the arm of the passenger side windshield wiper, do you remember?

A     I think it was number 12, but I'm not certain.

Q     Number 12.  Did that fragment at all?

A     It may have.  I don't know.

Q     What was the angle of number 12?  I mean, what was the relationship on the line on number 12?

A     Well, it struck the top of that wiper arm and then continued to the molding under the windshield.

Q     And did you find the whole bullet or the whole projectile?

A     No, I didn't open that part of the vehicle to see if there was anything in there.

Q     So do you know whether that's the whole projectile

that went in there or could that have fragmented?

A   It's possible that some of it fragmented when it struck the wiper arm.  I don't know.

Q   What would have happened to the fragment?

A   They could have -- small fragments could have come off and gone off in any direction.

Q   What about the core?

A   The core continued under the molding.

Q   You looked and found the core?

A   I found where it entered under the molding.

Q   How do you know it was the core that entered under the molding, as opposed to a fragment itself?

A   Because it just produced a hole that looks like the bullet striking as opposed to tiny fragments that don't generally perforate a lot.

Q   Would you agree that the line of 12 I think is either lined up with 11 or 13?

A   No.

Q   They aren't?

A   No.

Q   You're saying trajectory number 11 and number 12 and number 13 have different lines to them?

A   Yes.

Q   Okay.  Is your drawing accurate as to those lines then?

3301

A    Near as I can make it.

Q    Well, let's look at 11.  So 11 doesn't have a drawing.  It did at the break.  Let's go to 12.  Thirteen.  As far as the right to back angle, that particular angle there, how does 11 and 12 differ from that angle?

A    They're not the same angle.

Q    Well, would you show me on your laser on here how their -- what their angle is different from that angle?

A    Well, it's difficult to show it on here since I don't have the other two marked on this particular sketch, but I believe we can go back and look at the photographs and we see that number 12 is lower, clips across the top of that wiper arm and goes under the molding.  Number 11 is slightly to the left and higher than number 12.  And number 13 is even higher.

Q    But a fragment, if it hit that arm, a -- if the bullet that arm, it could fragment and go up, couldn't it?

A    No, sir, not to produce what I see in numbers 11 and 13.

Q    Okay.  You're saying that can't happen?

A    I'm saying that when I examined those, no, it's not consistent with number 12 being a fragment off of either 11 or 13.

3302

Q    Okay.  Well, let's talk about number 13 then.  How did you determine the trajectory of number 13?  Let's go to 13, the picture.  That hole is considerably bigger than your Dowel rods, isn't it?

A    The overall hole is, yes.

Q    How did you determine the trajectory of number 13?

A    I put my laser pen in the groove of the hole, the rounded -- the most rounded part.

Q    Uh huh.

A    And that indicated a line that was where the direction that it would have traveled and then placed the Dowel rod in that hole.

Q    Did you match it up to anything else?

A    It didn't match up.  I mean, there wasn't an end point that I could identify.  So either it went through and fragmented to the point that I could not determine an end point or it struck some intermediate target or a final target that was no longer there.

Q    So what you basically did is you had a hole and you stuck something in there and just sort of set -- it had a lot of wiggle room, because you didn't have a beginning or you didn't have an end, did you?

A    Did not have a lot of wiggle room in that there is a rounded portion that's a tunnel, that gives me the line.  And that's the points that I used to establish the line.

Q    But a line is established when you have two points, isn't it?

A    Right.  No matter how far distant or how close those two points are.

Q    And you didn't have a beginning line, you didn't have an ending line.  You had one hole right there and you made your trajectory based on that hole alone; isn't that true?

A    And the line of that hole, which includes the rounded portion from the entry through the exit.

Q    The -- you're talking about the thickness of the glass?

A    Through the thickness of the glass.

Q    How thick was the glass?

A    I don't recall.  Possibly a quarter inch.  I don't recall exactly.

Q    So you're basing your two lines and your trajectory on that quarter inch -- two points on that quarter inch, is that right?

A    I'm basing it all on the characteristics that I saw in that hole.

Q    You made a determination that the driver's door was -- the driver's window was open.  Do you know about how far open it was?

A    The glass was up several inches.

3304

Q    Can you -- (Interrupted)

A    Say less than half.

Q    Less than half, you say?

A    My recollection is.

Q    Somewhere right around there?

A    My recollection was slightly less than half open.

Q    And you made a determination that that window was open to that extent -- or partially opened or partially closed, whatever one you want to say -- to that extent when certain shots were fired, is that right?

A    Yes.  That there were defects on the interior side consistent with small projectiles, fragments, striking the interior side of that glass.  And that when you roll the glass up you can see the line of demarcation, that there's no damage at all below that point, would be consistent with it being in that position, the same position which I found it that day, was in that position at the time that damage occurred.

Q    And do you know when -- but you can't say that that window was in that position through the whole scenario?

A    All I can say is it was in that position at the time that the damage I saw occurred.

Q    Okay.  To the driver's side window?

A    To the interior side of the driver's window.

Q    Now, you noticed like on trajectory number 11.  Go

3305

to the next picture, please.  Next.  Okay.  Well, can you follow -- there's 11 right there.  That goes to the seatbelt.  If a person was sitting in the driver's seat, could you make a -- I mean, you know, sitting upright, driving the car in the driver's seat, could you make a determination whether Trajectory 11 would injure that driver?

A    Well, the projectile that Trajectory 11 did fragment as it came through the windshield, and strafed the driver's notepad up beside the windshield, some of those fragments possibly could strike someone if they were in some position in the driver's seat.

Q    What I'm talking about -- see this little yellow line you've drawn down through here?

A    Yes, sir.

Q    If the driver was in an upright position driving that car, would that yellow line have done anything to his body?  Do you have an opinion as to that?

A    It might or might not have.  I can't tell for certain.

Q    Would there be a better angle that you could look at that to see?

A    I don't have a way to determine that.  It would depend on the exact position of the driver.  It's possible that someone sitting there could have been

3306

injured from that.  But I can't say for certain.  Too many variables.

Q    Okay.  So what you're saying is if -- the other angle from the windshield looking in, you couldn't tell, is that right?

A    It comes across the general area of the driver, but whether or not a driver would actually be injured by that particular projectile I can't say.

Q    If the driver was leaning over to the console, leaning to the right of the console, would that prevent that projectile, that particular path from hitting the driver?

A    Yes.

Q    Okay.  Now, let's look -- look at number seven --

THE COURT:  Just a second, counsel.  You may proceed.

Q    (By Mr. Hilfiger) Number seven.  Can you tell from that particular trajectory where it went in relation to the driver's seat, from that picture, or do we need to have the next picture?

A    Well, I remember.

Q    Okay.

A    That it goes through the windshield and through the left side of the driver's seat approximately shoulder high.

Q    If a person was upright and driving that car, would the trajectory of number seven -- do you have an opinion as to whether or not that trajectory would hit the driver of the car?

A    I would say there's a distinct possibility that the driver could be exposed to a wound to the left arm, left shoulder area.

Q    If he was leaning over to the console area, would that trajectory hit him?

A    Well, it's certainly possible he could lean over enough that his -- a body is not in line with that trajectory and not be injured.

Q    Okay.  Number six.  Number six, do you know where that trajectory went in relation to the driver's seat?

A    Yes, sir.

Q    Where did it go?

A    It passed through the right side of the driver's seat and out the window behind the driver.

Q    Do you -- would you have an opinion if that particular trajectory -- if the driver was sitting upright driving the car, would that trajectory have hit a driver?

A    It would be within the realm of possibility that a driver could be in a position to be injured by that projectile.

Q    If he is leaning over to the console area, would that trajectory hit him or pass him?

A    If he's leaning far enough to be below that trajectory, then he could escape injury from that projectile.

MR. HILFIGER:  Can we go to the next picture on that?  Is there another picture?  Another picture.

Q    (By Mr. Hilfiger) Okay.  So that's how high it goes is up to the -- almost to the headrest, is that right?  Is that an accurate drawing there?

A    It's a photograph and it is an accurate drawing of the -- (Interrupted)

Q    Of the trajectory?

A    Of the trajectory.  Yes, sir.

Q    And the trajectory's up here and this is -- is this the headrest?

A    Well, it's a formed seat so you could consider that part of the headrest.

Q    Okay.  So if a person's leaning over down here, he would escape number six, is that right?

A    Yes.  It's possible to move, to bend, far enough to the right or to the left to take oneself out of that line.

Q    Trajectory Number 13.  On number 13, this is one that traveled toward the driver's door and there was no

exit hole found; is that correct?

A   That's correct.

Q   Is that sort of indicating it may have gone out the window?

A   That's a possibility.  I don't know.

Q   Was 13 slightly -- going slightly up or slightly down or can you recall?

A   I believe it was somewhat upwards.

Q   So it would be rising, going through the window -- through the windshield?  Can you recall?  And I'm not trying to test your memory on that.  I just wanted to -- let's go to the next picture on 13.  You've got it part way there, is that heading right on toward the open driver's window?

A   It appears it could be going toward the driver's window.

Q   Now, do you have an opinion as to whether or not that shot would hit a person that was in an upright position and driving the car?

A   It would be possible.

Q   If that person was leaning over -- over the console to the right, would that shot hit that person?

A   Again, it's possible for a person moving himself out of that line and not be injured.

Q   Okay.  But you don't have any problem saying that

that -- the reason you couldn't find that projectile or the exit is because it went out the window -- or could have gone out the window?

A    I can't completely exclude that possibility, but I also can't exclude the possibility that it simply fragmented to the point that I couldn't identify which points that it hit.

Q    Well, would you agree with me that if you extend that yellow line that you have right there, that you've put on there with the projector, if you extend that yellow line, it goes right out that window, is that right?

A    It could.  It looks to me like it could.

Q    Okay.  And the window is -- the closed part of the window or the glass part of the window is right along in here, would you agree with that?

A    Approximately.  I really would need to look at it from the top view to see just how close it is to going out the window.  I don't know.

Q    Top view?

A    Yes.  And look at the sketch looking down on it -- (Interrupted)

Q    Drawn to sketch.

A    To get a better idea of the angle.

Q    How is that?

3311

A    Again, I can't determine.  It's possible it could --
could have gone out near the back of the door or it's
possible that it's too far inside.  I can't tell for
certain.

Q    Trajectory Number 14.  Do you know where that
trajectory went in relation to the driver?

A    I think it would have passed the right side of the
driver's seat and exited the left side window.

Q    Okay.  Let's go to the next position.  Okay.
Apparently we don't have a picture depicting.  Can you
tell whether or not on T-14 -- number one, it was pretty
high up, wasn't it?

A    Yes.

Q    If the driver was upright driving the car, would he
probably be hit or not hit with that one?

A    It may be possible for the driver to be in a
position that could have been injured along that line.
However, that shot is somewhat high and it goes past the
driver's seat.

Q    Okay.  If he was leaning over, would -- would he be
able to escape any kind of injury from that shot?

A    Just that shot would be certainly high enough it
would be easier to duck out of that.

Q    T-15.  What can you say about the trajectory of T-15
in relation to the driver?

3312

A    It appears to be high enough that the driver, unless he's very tall, would not be in the line of fire.

Q    T-16.  And that's the one that the driver's door is open, is that right?

A    Yes, sir.

Q    And you don't know how much open, you just know it's open?

A    That's correct.  Open enough that it goes through the molding and there's no sign of it on the driver's door.

Q    If the driver was in a full upright, you know, driving position, would he be hit in that particular case?

A    It doesn't appear that he would necessarily be hit if he's sitting back in his seat.

Q    T-17.  And this is -- okay.  Would this come anywhere near the driver?

A    It did not enter the cab.

Q    T-18.  This is the one that split, is that right?

A    Yes.  This did split.

Q    And do you know whether this would have come near the driver?

A    It did not enter the cab.

Q    Didn't break the glass or anything, is that right?

A    It partially penetrated the glass and it left a

3313

defect in the glass, but didn't perforate the glass.  It didn't go through.

Q    Okay.  Now, as to your reenactment that's set up with the highway patrolman, do you know what I'm talking about?

A    Yes, sir.

Q    While we're getting to that let me ask you a question.  Do you know on trajectories two, three, four, and five, your assumption is that the door is slightly -- is being slightly open; is that correct?

A    The evidence indicates that the door was opened.

Q    The evidence indicates.  What evidence is that you're talking about?

A    Yes, sir.  I described, for example, trajectory two, I put the rod through where a projectile went through the door.  I looked at it with the door closed and followed that line and there was no damage.  As I open the door, I also had a rod in the driver's seat and it came to a point that those two lines were one in the same.

Q    Okay.  So what you did is you put your laser in and opened the door back and forth until you found something that it went -- hit into, isn't that right?

A    No.  I had a trajectory that I could identify from the driver's seat and I had a trajectory that I could identify as perforation two through the door and I opened

3314

the door and found that those two lines at one point met, was one in the same line.

Q    Until you moved the door back and forth, you couldn't match it up, is that right?

A    Well, until I opened the door there was no place for number two to go inside the vehicle.  When I opened it back, then that's where it matched.

Q    Was the -- and now you said that the door was slightly open.  What you're definition of slightly open mean?

A    It wasn't completely open, it wasn't completely shut, it was somewhere in between.

Q    And for two, three, four and five, did you make the determination that the door was open at the same amount or was it different for each one of them?

A    They were different, slightly different for each.

Q    Okay.  And can you tell us which one was the smallest and which one was the largest?  And I'm talking about smallest in reference to the door being shut?

A    I believe number two was the smallest, from my recollection.  That is in photographing, that had the most difficulty with opening the door and getting a good view of number two.

Q    So the -- so we're straight, I want to make it straight here.  You're saying that the angle of the door

3315

was the smallest in reference to being shut?

A    That's my recollection.

Q    Well, is there something that you have that can --
you can utilize to refresh your recollection?

A    No, sir.  I just remember the difficulty I had
trying to photograph all these and keep all the rods in
at the same time and some of them were stressed, because
they weren't -- the door wasn't at the right angle.  So,
move the door somewhat and this one is stressed and that
one is not, so slightly different angles.

Q    Can you tell us either in angle on the door or in
inches from the -- inches from the door, how much that
door was open?

A    No, I don't have a measurement.

Q    Did you take a measurement?

A    I don't recall.  I remember considering it at the
time, but I don't recall that I came up with a good way
of doing that.

Q    Did you make an angle measurement?

A    I didn't have anything to use to measure exact
angles.

Q    What was the next largest?

A    My recollection is that the next largest would be
three and four, which were very similar.

Q    So three and four were pretty close?

3316

A     Yes, sir.

Q     And then five?

A     My recollection is that five would have been slightly more open.

Q     Okay.  And now, when you're saying slightly, slightly more, I don't understand what that term is and I'm trying to gather what that means.

A     That there's not a great deal of difference between them, but there is a difference that I could recognize that there was a difference.

Q     Would you be able to get out of the car with two?

A     Possibly.

Q     Would you be able -- so, when you say possibly, I mean, there's a whole lot of possibilities here.  Would a normal person be able to get out of the passenger door with the opening the size that it was in two?

A     I certainly could.  You know, I don't know about everybody else.

Q     You certainly could, you say.  Is that because of your size, your agility?

A     I would say both.

Q     Size and agility?  Okay.  So are you saying that somebody less agile or bigger would not be able to get out possibly?

A     Someone else may require more space.  Who would

3317

require how much space I couldn't say.

Q    And you don't have any -- do we have a picture of how wide that door was open at the widest spot?

A    We have pictures where I forced the door to a certain point to try to get the photographs of the trajectories.  But I don't have a picture that says, okay, it was this angle at this point and this angle -- I didn't have a way of doing separate photographs that way.

THE COURT:  Mr. Hilfiger, it's a little after five.  Let's recess for the evening and we'll start again at 9:00 o'clock in the morning.  Again, jury, remember my admonition not to allow any discussion of this matter and avoid news coverage.  I'll ask you to be back in the morning at 9:00 o'clock.  If everyone in the courtroom will please remain seated as the jury leaves for the evening recess.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  And the witness, ma'am, you may step down and be excused till 9:00 o'clock in the morning.

(Whereupon, the witness exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom, the witness has been excused for

3318

the evening.  Anything from the counsel for the Government outside the hearing of the jury?

MR. LITTLEFIELD:  Judge, can I check outside real quick to see if I have a report on the witness about which we asked for the bench warrant?

THE COURT:  Who was that again?

MR. LITTLEFIELD:  Brandie Zane Price.

THE COURT:  You may.

(Whereupon, Mr. Littlefield left the courtroom and upon returning the following record was made.)

MR. LITTLEFIELD:  It is possible that the witness is on her way to Muskogee.  I do not -- I've had a report of that but it's not been confirmed.  If she arrives voluntarily, would there be a means by which we can contact the Court and ask that the warrant be withdrawn?

THE COURT:  Yes.

MR. LITTLEFIELD:  Other than that, then I have nothing additional to report.

MR. HILFIGER:  I didn't have -- I had two, I guess, planning matters.  Number one dealing with this witness here.  There is some other testimony that we want to go into that the State -- Government didn't want to go into.  And we can either expand cross examination to include that, but based on what Mr. Littlefield's

3319

previous argument was, I want to make -- give the opportunity to allow it from the stand.  If he doesn't, then we'll just call her as a defense witness at a later time and she'd have to come back.

MR. LITTLEFIELD:  In that regard, Judge, since I think that's in relation again to trajectories and as a consequence, I think that it would go in regards to her credibility in order to perform the task which she performed and would be appropriate for cross examination. And I'm not going to complain about the scope in that regard.

THE COURT:  I'm not sure that I understand the -- tell me again what the scope.

MR. HILFIGER:  Well, what it is, she has talked, Judge, about trajectories in relation to the Bronco coming up to the house.  But she's also done examination of trajectories, and if I may approach this model, of Manion -- Manion who stood out here, said he stood out here and shot into this window.  Of Manion's shots into the window and where they went in here and also she has testified to -- that Manion shot here.  And that's -- I want to go into that and he hasn't done anything except outside.  And I would intend to go on with Manion shots -- (Interrupted)

THE COURT:  Are you saying she's made formal

3320

projections of Manion's firing that -- sometime in the past or in preparation for this trial or some other -- (Interrupted)

MR. HILFIGER:  No.  She's done it at every hearing.  I mean, you know, she's had pictures and she's run her Dowel rods and her thread and everything through the house.  That's number one.

THE COURT:  And as I understand it, then, the Government has no objection to expanding the cross examination to include those -- (Interrupted)

MR. LITTLEFIELD:  No, she talked about the shot fired across the -- or the projectile that was found on the back of the refrigerator already.  I didn't object to that and I told Mr. Hilfiger I didn't have any -- would not object as to beyond the scope in regards to the question of trajectories through the curtain.

THE COURT:  Manion's -- I don't know whether there's one or two -- (Interrupted)

MR. LITTLEFIELD:  Well, it wasn't identified as Manion's shot by her.  Although the -- ultimately the testimony will reveal that that's Manion's shot, but it isn't in evidence yet.

THE COURT:  Okay.

MR. HILFIGER:  The other matter, Judge, is just again scheduling.  I'm assuming it looks like we'll try

3321

to finish up tomorrow.

MR. LITTLEFIELD:  At this point it may go into -- it may be done tomorrow, it may go into Thursday based on the extension of -- this witness is taking longer than I anticipated.  It's probably going to be the better part of the day tomorrow.  It's possible it could go into Thursday.

MR. HILFIGER:  If it does go into Thursday, we would ask that -- we would ask -- maybe two days at the most for our defense testimony.

THE COURT:  Well, and you'd asked for some time to prepare and I'm -- appreciate the inquiry because I was trying to make a plan, too.  If it gets into Thursday, I think for the sake of this jury to give them a break if we could -- Friday would be a good day to recess.  I mean, recessing Thursday and then going Friday is a little disjointed.  But if it sounds like there's a possibility the Government may use part of Thursday, if they do then it would be my plan to whenever they recess to not start again until Monday.

MR. HILFIGER:  And I don't have any objection to that.  I just as soon take Thursday and Friday off too.

THE COURT:  You'd take both if you could get it, is that what you're -- (Interrupted)

3322

MR. HILFIGER:  I'd take both.

THE COURT:  I want the Government to finish first and then we'll talk about -- but my plan would be at the very least Friday and whatever part of Thursday that they don't use is yours too.

MR. HILFIGER:  Thank you, Your Honor.

THE COURT:  Anything else?

MR. LITTLEFIELD:  Does that mean that if we are done tomorrow they get both Thursday and Friday?

THE COURT:  Well -- (Interrupted)

MR. LITTLEFIELD:  I may hurry, Judge.

THE COURT:  That's the -- I'm reluctant to -- I'd rather not let the jury off Thursday and bring them back Friday.  And since you told me two days, you think you can finish your case in two days -- (Interrupted)

MR. HILFIGER:  Well, we probably could finish up and I hate to interrupt but probably we can finish our case in two days, but two of our witnesses are not available until Monday.

THE COURT:  I understand.  And that's why -- but if you can start Monday and finish by the end of Tuesday is -- you think that's a possibility?

MR. HILFIGER:  I think that's a very strong possibility.

THE COURT:  Okay.  That's what I'm working with

3323

now.  And at this point, again, I'm not faulting anyone but as deliberate as we have been, I think this is no -- this is no reason not to continue to be deliberate so that time is important to this jury particularly, I know. We're taking them out of their homes.  But the issue before the jury and the issue before the Court is of such import that I don't want to add stress by putting a time factor involved at this point.

MR. LITTLEFIELD:  That's fine.

(Whereupon, the Proceedings were continued to October 26, 2005.)

3324

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on October 25, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 3096 through 3323.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

47

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED
MAY 22 2006
Wm. __ Clerk
By ___ U.S. District Court
Deputy Clerk

UNITED STATES OF AMERICA,   )
                            )
          Plaintiff,        )
                            )
-vs-                        )   No. CR-04-115-P
                            )
KENNETH EUGENE BARRETT,     )
                            )
          Defendant.        )

VOLUME 15 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on October 26, 2005.

A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law

## EUSTICE REPORTING SERVICE

CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 3326 - 3553

3263

3326

W I T N E S S E S

PAGE

IRIS DALLEY
(Continued from October 25, 2005)
Continued Cross Examination by Mr. Hilfiger . 3327
Redirect Examination by Mr. Littlefield . . . 3435
Recross Examination by Mr. Hilfiger . . . . . 3473

BRANDIE PRICE
Direct Examination by Mr. Littlefield . . . . 3485
Cross Examination by Mr. Hilfiger . . . . . . 3498

TERRANCE HIGGS
Direct Examination by Mr. Littlefield . . . . 3512
(Continued to October 27, 2005)


E X H I B I T S

                                        OFFERED   REC'D

Defendant's Exhibit Number 112 . . . . .  3387     3387
Defendant's Exhibit Number 113 . . . . .  3384     3385
Defendant's Exhibit Number 120 . . . . .  3375     3376
Defendant's Exhibit Number 124 . . . . .  3373     3373
Defendant's Exhibit Number 125 . . . . .  3374     3374
Defendant's Exhibit Number 126 . . . . .  3380     3380
Defendant's Exhibit Number 165 . . . . .  3337     3337
Defendant's Exhibit Number 221 . . . . .  3364     3364


P R O C E E D I N G S

THE COURT:   Good morning.   Record should reflect the jury's in the box, counsel for the Government is present, Defendant is present with counsel.   Mr. Hilfiger, you may continue your cross examination.

MR. HILFIGER:   Thank you, Your Honor.

CONTINUED CROSS EXAMINATION

BY MR. HILFIGER:

Q    Ms. Dalley, when we have left off last night my recollection was we were talking about the passenger door, the opening on the passenger door, in discussion of Trajectories 2, 3, 4 and 5.  Can you recall that?

A    I recall we had some discussion about the passenger door.

Q    And I asked you about measuring the door, the size of the opening of the door, is that right?

A    Yes.

Q    And you didn't take any measurement of the size of the opening of the door, is that right?

A    I don't remember if I recorded measurements.  I looked at ways of possibly doing that and I don't -- I don't remember that I came up with anything that I thought would be a reliable method for measuring those.

Q    You didn't think about just measuring from the door to the door jamb to measure the -- how open that door was?

A    I remember looking at it to see if there was some way I could accurately record measurements that I thought would be valid and reliable and I didn't come up with any better method than just photographing as best I could.

Q    Okay.  And on the topography of the opening of that

3328

door, would you say that the opening that you photographed for two, three, four and five, that the door was in the same position?

A    I can't say that the door was in exactly the same position for all the photographs that I took.

Q    So you moved the door -- I'm talking about when you were trying to figure the trajectory of number two, you took photographs, is that right?

A    Yes, I took photographs.

Q    When you figured the trajectory of number three you took photographs, is that right?

A    I took photographs.

Q    When you figured the trajectory of number four you took photographs, is that right?

A    I did take photographs.

Q    When you figured the trajectory of number five you took photographs, is that right?

A    I did take photographs.

Q    Did you take separate photographs to determine the trajectory of -- to show and represent on your disk, your trajectory analysis, did you take separate photographs showing two, three, four and five or were they all represented on one photograph?

A    They're all shown in various photographs.  I worked on all the trajectories and after the dowel rods were in

place, then took photographs of all of them.

Q    Okay.  Now, this is a exhibit -- okay.  Now, will you look at your screen, please.  Is this photograph -- even though this one has -- shows two, is three, four and five shown on the same photograph?

A    Yes.  All of those rods are in the same photograph.

Q    This is the same photograph with the exception of the yellow line?  This is the same photograph that you represent in three, four and five, is that right?

A    Yes.

Q    That is the representation of which you say the door opening is for two, three, four and five, is that right?

A    That's just the position that the door was for the photographs.  And I'm not saying that it was exactly that position for each and every one of those trajectories.

Q    Well, that's what your representation is, isn't it?  Isn't that what you're representing to this jury, that for these trajectories that door is open that amount?

A    The door is open that amount in these photographs.  Some of these -- some of trajectories are more taut than others so that there's -- they may be slightly skewed.  But to get the best position so I can get the photograph, that's where the door is.

Q    Okay.  So you -- what I'm asking though is you didn't open and close the door more or less for each

individual trajectory, did you?  When you made this representation that you're showing to the jury you didn't make a separate representation saying, well, between -- for example, between Trajectory 2 and Trajectory 3 the door went from this position to this position.  You didn't do that, did you?

A    I didn't photograph those separately, no.

Q    Okay.  So that -- you're using that to represent the amount of door opening that was there for your determination or your opinion as to trajectories two, three, four and five; is that correct?

A    The purpose of this photograph was simply to show all of the dowel rods as they go across and not specifically to determine the angle of the door.

Q    Well, but you had to have the door open to do that, right?

A    Yes.

Q    And you didn't determine, I guess, that the -- how wide that door was open made any difference; is that correct?

A    How wide the door opened makes a difference as to which trajectories are in proper alignment and which are slightly skewed because they're not all exactly the same.

Q    Which ones -- in this picture which ones are you saying are in alignment and which ones are you saying are

3331

slightly skewed?

A    I couldn't determine that from this photograph.

Q    What do you need to have to determine that?

A    I don't have a photograph that shows the different positions of the door.  I just -- for each photograph would position the door to get the photograph of the rods.

Q    Somebody said you could only take one photograph to show all the rods?

A    No, I took numerous photographs to show all the rods.

Q    Okay.  But you couldn't take a photograph to represent the line of each shot?

A    I didn't do that.

Q    You did not do that.  That wasn't part of your -- (Interrupted)

A    I did not.

Q    -- your methodology, is that right?

A    In this -- in this particular case and what I had to work with, no.

Q    Now, look at the door opening that you got there. Sort of look at that.  And --

            MR. HILFIGER:  May approach the witness -- (Interrupted)

            THE COURT:  You may.

3332

Q    (By Mr. Hilfiger) This is just a standard ruler.  Do you recognize that in inches?  Do you see inches on that?

A    Yes.

Q    Do you have any doubt that that's -- doesn't represent regular inches, American method inches?

A    Appears to be a standard ruler.

Q    Okay.  Measure on your picture from the top -- we'll do it two places.  Measure from this top -- top of the white edge there to the edge of the door over here on that picture on the screen.

A    Okay.  You want -- just measure from the top of the porch and the door that's showing in the photograph.

Q    Do you see right where I'm pointing to?

A    Sure.

Q    Over to here.

A    Just measure that on the screen?

Q    Yes.  How much?

A    It appears to be about one and three eight inches.

Q    Okay.  Now, measure -- see where the white bottom of the window is right here?  Do you see where I'm pointing to?  Actually, it's just about right along where this rod's going right here?

A    Yes, sir, I see that point.

Q    Okay.  Measure from that point where the white ends to where the door -- I mean, where the jamb is -- I don't

3333

know what you'd call that but that part of the rise on the car.  Measure that for me.

A    You want from inside the window?

Q    Yeah.  No, not inside the window but the edge of the door right there.  How much is that?

A    From the edge of the door frame that's in the photograph over to the edge of the interior line it's about one and three quarter inches, as it's displayed in that photograph on this monitor.

Q    Now, isn't that a way to measure how opening that -- how open that door is?

A    No, sir.

Q    It isn't?

A    No, sir.

Q    From taking it from the edge of the door, the open door, to the side of the car, that doesn't measure how wide open that door is?

A    No, sir.

Q    I'm not talking about on the picture.  I'm talking about on the actual car?

A    On the actual car I would need to find a specific point on the door to a specific point on the body frame and try to measure the distances between those.  But they are not perpendicular to each other and, I mean, measuring curved surfaces and --

3334

Q    But that would measure the opening, wouldn't it?

A    It might.

Q    But you didn't do that?

A    No, I didn't do that.

Q    Let's look at your reenactment scene.  Now, when you did the reenactment scene, did you try to have the door at the same opening level that you did when you took the pictures?  Or did you just have the person get out and whatever he needed to open the door to get out, that's what he needed?

A    I didn't have the door at any particular angle.  I just had him sit in the seat and then begin to move and show me what he would do to get out of the vehicle.

Q    Okay.  Now, look at this -- at this upper here, this picture here.  Does that door appear to be open wider than in number two?

A    It could be.

Q    And that's -- and this is where he's actually getting out of the car, isn't it?

A    In that photograph that actor is trying to get out of the car.

Q    Now, did you try this different ways to get out of the car or was it just one way that he got out of the car?

A    I didn't try it particular ways.  I just told him to

3335

show me what he would do.

Q    And what he would do to get out of the car was -- was that -- was there any information given to you by anybody as to how to get out of the car?  What method used to exit the car?

A    The only methods that he and I discussed were the training in that they had -- he had similar training to Trooper Eales.

Q    And his training and drills would show to get out of the car this way?  Is that what you're saying?

A    I'm saying that I asked him to do what he was trained to do and this is what he showed me.

Q    And when you do this what happens to that ballistic shield though?

A    The ballistic shield begins to move in front of the body and he's -- to go out of the door before the actor himself.

Q    Don't you lose the use and effectiveness of the ballistic shield that's sitting in front of you when you use that method of getting out?

A    Well, the ballistic shield is still in front of his body.  Obviously it begins to expose the left flank when he turns.  If a shooter is to the right front, then, yes, the left flank begins to be exposed.

Q    Okay.  Measure from the white up here over to the

3336

door.  And I realize these pictures are -- (Interrupted)

A    At which point?  At which point?

Q    Right up here where the -- the furthest part of the white curve at the outside edge over to the nearest part of this door frame.  And I realize these pictures are different sizes and stuff like that.  But you do recognize that this -- that this door appears to be open far more than in number two, don't you?

A    It appears so from this photograph.  I don't know if that's in fact the case or not -- (Interrupted)

Q    Because you didn't measure it?

A    There's a difference in the distance of the focal length of the camera.  In the previous picture we had more of the cab exposed than we do in this picture so I can't really make a determination from that.

Q    What measurement did you come up?

A    It was about two and an eighth inches.

Q    Two and an eight inches.  But you didn't do any measurement on this as to the door opening amount, did you?

A    No.

Q    I'm displaying to you that this has not been admitted into evidence, Defendant's Exhibit Number 165.  Do you recognize that picture?

A    I think so.

3337

Q    You think so?

A    Well, it appears to be a picture that I took that day with that same actor.

Q    Oh, okay.  So, is there anything in that picture that doesn't -- that you're not familiar with?

A    As I say, it appears to be a picture that I took there that day.

MR. HILFIGER:  Your Honor, I move to introduce Defendant's Exhibit Number 165.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No objection.

THE COURT:  Be admitted without objection.

Q    (By Mr. Hilfiger) Now, this is a picture you took -- now -- and it wasn't out at this scene, was it?

A    No, it was not.

Q    And -- but it -- my understanding is that it is in a Bronco of the -- is it the same make and model Bronco?

A    Same make and model, yes, sir.

Q    Same year?

A    Yes, sir.

Q    And the person in that car is a Highway Patrol trooper, right?

A    Yes, he is.

Q    And did you -- is he the same approximate height, weight and everything as Rocky Eales?

3338

A     Yes, sir.

Q     And the shield -- and that is a shield, isn't it, right there?  Do you recognize that?

A     Yes, sir.

Q     Is that a shield of the same make, model, size and everything as the shield that Rocky Eales had that night?

A     Yes, sir.

Q     And is that what you're representing to be how the shield would have been carried by Rocky Eales that night in the Bronco?

A     This is to represent how this trooper showed me that it would be carried and it was consistent with what I saw with the Bronco.

Q     Okay.  What on that picture -- now, does that shield -- can you recall does that shield have the word state police on it or some law enforcement identification on it?

A     I believe it said state trooper on the front of it.

Q     State trooper.  So it had the state trooper on it -- have you seen the shield that's entered in evidence here?

A     Yes, sir.

Q     Does it have the same state trooper identification marking in approximately the same location, this shield as to that shield?

A     They appear to be the same to me.

3339

Q    What on this picture identifies this person as a law enforcement officer?

A    Nothing that I can see in this photograph.

Q    Okay.  State trooper can't be seen, is that right?

A    No, sir.

Q    There's -- in this -- this uniform this person is wearing, you understand that's the same uniform that Rocky Eales -- I mean, same type of uniform Rocky Eales was supposed to be wearing, is that right?

A    Yes, sir.

Q    And did this have designations on the uniform of Oklahoma Highway Patrol or state trooper or something like that on the uniform?

A    Yes, sir.

Q    Can you see it in this picture?

A    No, sir.

Q    What about on the hat?  Was there any designation on the hat of law enforcement?

A    I don't recall.

Q    Now, I understand that this uniform has state trooper or something like that written on the back of the uniform, is that right?

A    I don't specifically recall the back.  I know that there was some markings on it.

Q    And -- but you can't see any of that, is that right?

3340

A    Not in this view, no, sir.

Q    I have no further questions on that.  We talked -- or you talked yesterday a little bit about assumptions on, you know, possibilities of different shots and everything.  Didn't you?  Can you recall that?

A    I recall answering questions about that.

Q    Well, you also recall answering questions from Mr. Littlefield about the possibilities of different shots, didn't you?

A    Yes.

Q    Now, I have placed -- I've taken the liberty of placing that first white Bronco at an area that I refer to as the top of the yellow flowers.

          MR. HILFIGER:  If you'll show number 69, Government 69.

Q    (By Mr. Hilfiger) And what I'm referring to are these -- see these yellow flowers here?

A    I see what you're pointing to.

Q    I've taken the liberty of putting that Bronco in this area which is sort of the top of the yellow flowers, okay?  First Bronco right here.

A    Okay.

Q    Now, from that position, any of your 18 shots -- trajectories, would you be able -- would a shooter be able to accomplish any of those trajectories, assuming

3341

that he -- that any part of the rifle was in the house, shooting out the front door with any part of the rifle in the house?  Would he be -- and you can --

MR. HILFIGER:  May she come around and pick up one of these -- (Interrupted)

THE COURT:  You may, ma'am.

MR. HILFIGER:  -- and use her pink sticks or she can use the kabob sticks.

THE COURT:  If you'll take the mike with you.

Q   (By Mr. Hilfiger) Okay.  Either one of those -- any -- whichever sticks is easiest to use.  Now, with any part of the rifle in the house can -- is there a possibility that any of the 18 trajectories that you have identified as hitting the car, would any of those be able to be done with the Bronco in that position?

A   It appears that given those specifics with any part of the rifle barrel being inside the house -- (Interrupted)

Q   I'm not saying rifle barrel, I'm saying any part of the rifle including the back part of the rifle.

A   It appears that if the rifle -- any part of it is actually inside the house that those 18 shots, none of them would be consistent with that exact position of the Bronco.

Q   Let's call that assumption number 1-A, okay?  Just

3342

so we keep all track of them.  For assumption 1-A, that none of the 18 trajectories can hit that car; is that correct?  Or none of the 18 trajectories can be accomplished with any part of the rifle inside the house; is that correct?

A    Given that exact assumption of the shooter and position of the Bronco, then, no, they would not occur in that exact position.

Q    Now, did you see the path -- were you able to follow the path of that Bronco down that model?  Were you -- without -- I mean, I know Mr. Littlefield moved the path, but did you follow the path or do you want me to move the path of the car?

A    If I understand the question you're asking, did I see Mr. Littlefield move the Bronco along the path?

Q    Right.

A    And I did see that.

Q    Okay.  And do you recall what that path is?

A    Approximately, yes.

Q    Now, would you move that car down what you recall that path being until you get to a point when you say one of the 18 trajectories can be done on that Bronco with any part of the rifle in the house.  Do you follow what I'm saying?

A    Well, I'm trying to.  But I'm not sure this is

3343

exactly the same scenario that Mr. Littlefield gave as far as the exact position of the shooter but assuming -- (Interrupted)

Q   I think it's not to the exact -- not the same position, no.

A   Okay.  Okay.  I'm just trying to make sure I'm understand the question properly.

Q   Okay.

A   If the -- if we start with the assumption that a part of the rifle has to be inside the house, then you want me to move the Bronco into a position -- (Interrupted)

Q   Where you say one of the -- any of the 18 -- any of the 18 can be accomplished.  And then I want you to specify which of the 18.  We have some longer dowel rods over here, ma'am, if you want to use those.  Would that be easier?

A   It might.

Q   I've got one that's about half that length.  Would that be better or would that -- (Interrupted)

A   Except the car start -- the portion much larger than the trajectory itself would have been.

Q   Sure.  Even that pink stick that diameter's larger than the trajectory, isn't it?

A   Yes, it's there.

3344

Q    I mean, it was okay to use yesterday, wasn't it?

A    Yes.  And it's still.  But the proportion is still a problem.  So, the nearest I can do in all of these scenarios is approximate.

Q    Okay.  And that's basically what you did on all your opinions, isn't it, is approximate?

A    No, sir.

Q    Okay.  And which trajectory is that what you're saying?

A    Well, any of those trajectories that basically come across the right front corner of the Bronco depending on the exact position of the Bronco, that I can exclude the possibility of those trajectories occurring with the Bronco somewhere in that general area.

Q    Okay.  Now, let's see.  Take the ruler.  You may have to use two of them, I don't know.  Take the ruler and measure from the southeast corner of the porch, southeast corner of the porch, to the left front tire.  What's that measurement?

A    Approximately 15 and a quarter inches.

Q    Okay.  Measure from the same southeast corner to the right front tire.  What measure?

A    It's approximately 13 and a half.

Q    Okay.  And now just to lock it in position, measure from the southeast corner of the steps to the left front

3345

tire.  I should have had you do that the first time, I'm sorry.  You can do it from the right tire, whichever one. Just do it from another position off the cabin.  You're going to do it from the left -- from the southeast corner of the steps I'm talking about, yeah, to the left front tire, is that right?  That's left, isn't it?

A    Approximately 18 inches.

Q    Okay.  Now, let's take another position.  Can you recall what I referred to as scenario number two yesterday and scenario number two was the second -- I call it scenario or whatever you want to call it when Mr. Littlefield talked about where the shooting starts where the Bronco has it's lights on the house and toward the house and goes up to the house.  Do you know approximately where the Bronco was at that point, for what I refer to as scenario two which was Mike Littlefield's second group of assumptions to you?  Can you remember where the Bronco was at that point?

A    It was somewhere in front of the house with -- angled toward the house.

Q    Okay.  Just place it there.  Wherever you remember that.

A    It would just be pure speculation on my part, it was somewhere in front of the house.

Q    I'm just -- I'm just going with your best

3346

recollection, okay.  You were here.  You saw it, didn't you?

A    Yes.  The model was put in the front of the house several times and I can't say exactly where other than it was in front of the house and angled somewhat towards the house.

Q    Do you want me to place it and then we can just go from there?

A    Okay.

Q    This is my placement, not yours.  Now, this is the question to you though:  Does that appear to be in the area that it was when Mr. Littlefield asked you those questions about the house with his headlights on -- I mean, about the Bronco -- the placement of the Bronco where the Bronco had its lights on the house and then moved toward the left of the porch?  Is that -- if it's not, I want you to put it where you thought it was.

A    As I said, I saw the Bronco placed several times in front of the house.  I can't exactly locate which one you're talking about or where you want it to be.  So it may have been in this position.  I don't know.

Q    Okay.  Let's assume it was in that position, okay. Headlights are shined toward the porch, is that right? If the headlights were on.

A    They certainly could be shining towards the porch.

3347

Q     And then that Bronco would then take a path into the left of the porch, left of the steps of the porch.  Do you want to sort of swing that in just like that?  On whatever path you want to take it, from that point on in and then place it back.  Okay.  Now -- and I think Mr. Littlefield would also tell you that the -- you're pointing that car in a northeasterly direction.  Did you ever see the car in a northeasterly direction?

A     No, sir, I didn't.  When I was there the Bronco was out in front of the house.

Q     Okay.

A     There were tire tracks, but --

MR. LITTLEFIELD:  That's not responsive, Judge. That's well beyond what the question asked for.

THE COURT:  Wait just a minute.  Question withdrawn.  Strike the answer.

Q     (By Mr. Hilfiger) Is that your understanding how the car ended up?  For the purposes of all your analyses and everything, is that your understanding how the car ended up?

A     I'm sorry.  I put the car here trying to follow your directions.

Q     Well, you did a trajectory analysis -- you did some determination that the car was by the porch in some location in some fashion, is that right?

3348

A     The only determination that I made, as I said yesterday, was I saw that there were tire impressions that indicated it had been in some position up close to the porch.

Q     And what assumption did you use in placing that car on the porch?  Not this particular car.  I want you place it like you think the car was based on the tire tracks, based on the fluids on the ground.  You place it like you think it was.

A     I didn't do any analysis to give me the exact position of the car other than the tire impressions that I saw indicated that it came into some position up close to -- (Interrupted)

Q     Okay.

A     -- the front of the porch.

Q     And I'm just asking you -- I was just asking you -- you had it at -- angled that way and that's fine if you want to angle it that way.

A     Again, I was just trying to move it at your direction.

Q     Okay.  Move it back to where you started from.  I mean -- and I'm not talking about out there to the yellow flowers, I'm talking back here.  Well, just place it there.  Okay.  Were the headlights facing towards the porch?

A   No.

Q   Okay.  Now, at that position, my understanding of the -- at that position and driving that car into the porch in your response yesterday to the assumption, my understanding that that -- where the fire starting there, the gunfire starting at that point all the way into the porch, that was consistent -- the trajectories were consistent with a shooter being seen at the front door and all way into the porch, is that right?

A   I don't believe I said anything about seeing the shooter.

Q   No, no, that was the assumption given to you.  Is the shooter's in the doorway then all those shots would be consistent with the exception of number nine, is that right?

A   Okay.  If the shooter is shooting from the doorway, then it's possible in this area to position the Bronco in such a way that those 18 trajectories could have occurred -- (Interrupted)

Q   I think -- but you said with the exception of number nine or -- (Interrupted)

A   As long as you include that at some point it has to be in such a position that the front of the Bronco would be -- that the right side would be approximately 90 degrees to the shooter for number nine.

3350

Q    Okay.  And is that when he came back after -- and made a wider swing?  You did three assumptions yesterday with Mr. Littlefield.  We took a break and you came back and you did a fourth assumption; isn't that true?  Can you recall that?

A    Okay.  I recall that given -- he stated certain assumptions then asked questions based on those assumptions.

Q    Right.

A    And I tried to answer those questions.

Q    And the fourth assumption gave a little bit wider turn for the Bronco, didn't it?  Do you recall that?

A    He may have said that and that certainly would be a possibility.

Q    And on that assumption you included number nine, didn't you?

A    Again, if the Bronco was turned in such a way that in that turn that there's some point that the right side is about 90 degrees to the shooter, then that's a possibility.

Q    Okay.  So, the angle of number nine to the car is approximately -- going into the car is approximately 90 degrees, is that what you're saying?

A    Yes.  The trajectory, because it is so much right to left.

3351

Q    Okay.  So, with the car at that location and the shooter inside the house, you know, moving in the house as long as the doorway's open, shooting out the doorway, would that be consistent with the -- and how you drove the car up to the porch, would that be consistent with all 18 trajectories into the car?

A    It is possible to have a path starting at this point and coming up to the porch in which you could have relative positions that could create all of those trajectories.

Q    That's good.  Go ahead and take a seat.  And I'm going to call that assumption number 2-A, just so we keep the numbers, okay?  And under that assumption we're only assuming the shooter's in the doorway and the shooter's doing all 18 shots, correct?

Now, you earlier had identified a shot from the -- going northerly in the house to a shelf in the house, is that right?

A    Yes, sir.

Q    And we're changing directions here.  We're out of this stuff.  Now, when you made that determination, you found it on the shelf in that southeast bedroom, a projectile; isn't that true?

A    Yes.  Inside a cabinet.

Q    Okay.  Just so we get everybody back on track on

3352

this one.  Let me go ahead and talk about it.

MR. HILFIGER:  Just a second.

THE COURT:  You may.

Q   (By Mr. Hilfiger) Did you make a determination -- and I'm talking about any kind of shots going in northerly directions, okay?  Did you make a determination as to the origination of those shots -- where they came from?

A   I did identify a trajectory line that was associated with the projectile inside that cabinet.

Q   It was not?

A   It was.

Q   Okay.  And where did that trajectory line -- can you show us with one of these dowel rods from the shelf out where that trajectory line was, approximately -- and I know it's approximate.

MR. HILFIGER:  May she approach?

THE COURT:  She may.

Q   (By Mr. Hilfiger) And that is the trajectory from the projectile that you found on the shelf, is that right?

A   Yes.  The projectile that was laying inside the cabinet on top of the stack of magazines.

Q   Okay.  Now that's -- so we just keep those straight, let's assign that a number, okay?  We'll assign that H-1,

3353

will that be okay?  Just arbitrarily H-1.  Now, could you tell whether H-1 in your trajectory analysis originated from inside or outside the model -- or the house?

A    No.

Q    Okay.  Was there anything that was consistent with H-1 originating in the house?

A    There was -- there was no evidence that told me whether the shot originated inside or outside the house.

Q    Okay.  From the inside of the house, what distance would you be going to from the door to that shelf, roughly?  Eight or ten feet?

A    That sounds within reason.  It wasn't a great distance.

Q    It wasn't a great distance.  Would you expect that projectile -- let's look at Number 180 -- you can go ahead and sit down.  Well -- yeah, go ahead and sit down. 183.  You've examined projectiles and -- I mean, in doing trajectory analysis do you see bullets, projectiles?

A    Of course.

Q    And this one was just -- was laying on the magazine, is that right?

A    Yes.

Q    That's Number 183.  That's the projectile on some papers, magazines, newspapers, whatever, is that right?

A    Yes, sir.

Q    Was it in fairly good shape?

A    Yes, sir.  Very good shape.

Q    And look at Number 182.  Is that 182?  And that's the defect in the wood.  How far in the wood did that -- would you estimate that projectile went?

A    It went all the way through.

Q    Went all the way through the wood and came out the backside?

A    Yes, sir.

Q    Now, would you expect the condition of that projectile to be any different if it was fired at that close a range, like eight to ten feet and go through more than just that wood, if it was fired at eight to ten foot?

A    Well, the distance doesn't tell me anything about the condition of the projectile.

Q    Okay.

A    The intervening targets could have an affect on the projectile.

Q    What intervening targets did you see?

A    Well, in this case the facing of the cabinet, that's shown in the photograph and it also grazed the door frame.

Q    Okay.  Would it be also consistent that that -- would it be just as consistent that it was fired outside

3355

the house in that trajectory as being inside the house?

A    Again, there was no evidence to tell me what the -- what distance it was fired from other than it was not -- the muzzle was not close to that door frame when it was fired.

Q    Okay.  And that's H-1, right?  Now, did you see any other evidence of projectiles coming in a northerly direction to that house or into that house?

A    There was some damage to a door that may have been some projectiles at some time.

Q    Okay.  Did you -- was there -- did you make a determination whether or not there was one that went through the door?

A    It did appear that there had been at some time one that went through the door.

Q    Did you make any kind of determination whether the door was open or closed when that occurred?

A    Apparently, assuming the door was hanging in that position when and if those are in fact bullet trajectories, the door was not completely open.

Q    And I get a little thrown off.  When you say -- to me when you say not completely open, it means it's almost shut or -- I mean, is it closer to being all the way open or is it closer to being shut?

A    Well, if I could explain.

3356

Q   Okay.

A   If the door is opened back against the wall, then -- and a projectile goes through the door, then it should strike the wall.  So there should have some defect in the wall.  So there was none.  So what I do then is move the door looking for some defect.  There was no defect in the wall that was behind the door.  So, it had to be closed to some degree.  However, there's nothing in there -- in that room that matched that trajectory.  There was no target, no defect, that matched that particular trajectory through the door.  So if that was a projectile coming through that door hanging in that position, then whatever it struck apparently is no longer present when I'm there.

Q   Okay.  Had you previously -- well, let me go to number -- well, we'll just call that one H-2 then.  And so that -- there's a hole in the door that you can't tell whether it was caused by a projectile or not, is that right?

A   It certainly appears to be a projectile.  But again, I followed that out and don't find an end point or any defect to match that trajectory, so I don't know.

Q   Well, you found something in the door, didn't you; isn't that a defect?

A   Yes.  I found a defect in the door, yes.

Q    Okay.

A    Actually, two.  One of those was a through and through and when I followed that through I tried to identify any end point.

Q    Uh huh.

A    Any other target anywhere in that -- in swinging the door, looking for anything and didn't find anything.

Q    And so, what was your determination as to whether or not that was a projectile trajectory?

A    Well, it was a trajectory.  That is, something did go through the door.

Q    Okay.

A    But where that -- you know, I don't know what it struck, if it struck -- if something went through the door and struck something, it's not still there when I'm there.  So I don't know.  I can't confirm that it is in fact a bullet trajectory.  I don't find a bullet.

Q    Okay.  So, what you're saying is if you see a defect -- now, I want to get this right, now.  If you see a defect and it appears to be a hole and it may be a bullet -- caused by a bullet, you don't know.  If you don't see the end point of that, then you can't say that that was a trajectory for a bullet.  Is that what you're saying?

A    No.  To say definitive, to scientific certainty that

3358

it was a bullet hole, then I would need to either find some fragment of the bullet or do a chemical test to show that there is lead wipe going through that hole.  And I didn't find either one of those.

Q   Okay.  So let me get it straight.  You have to find some -- what was it?  Some ID that it was a fragment -- that there was a fragment.  I don't want to put words in your mouth.  I want -- you said it faster than I could write it.  In order to make sure with a scientific -- (Interrupted)

A   To be -- to a scientific certainty that it was -- that the projectile was a bullet.

Q   Okay.

A   Then I would want to find some bullet fragment or other evidence of it being a bullet or do a chemical test on the hole to determine that it is bullet wipe through that hole.

Q   And what kind of evidence that you'd need for a bullet fragment?  Would you actually have to have part of the bullet to determine that or would the size of the hole or shape of the hole -- would that determine that?

A   It would really depend on what the next target is and what I found on the next target.

Q   So you'd have to find the next target to make that determination?  If you don't have an end point?

3359

A     To be -- to say to a scientific certainty that the -- that that trajectory is in fact from the path of a bullet as opposed to some other object, then we'd need to either find some evidence of the bullet or do a chemical test to show that it was in fact a bullet.

Q     Okay.  And so, all you can see with H-2 is that it's a hole in the door?  Is that about what it is?

A     Yes, sir.

Q     Have you ever made any different statement as to what H-2 would be?  Have you ever claimed that H-2's a bullet -- I mean a projectile?

A     There was a projectile that went through the door.

Q     Okay.

A     And I still say it's a projectile defect caused by a projectile.

Q     Okay.  That's what I want to get to.  You still say that's a projectile defect that went through that door, isn't it?

A     Yes.

Q     Okay.  Now, let's go to -- are there any other indications of a projectile going in a northerly direction into that house or into something in that house?  Was there anything else in the door?

A     As I say, there were two holes in the door.

Q     Oh.  You hadn't said two holes.

3360

A    Yes, sir, I did.  I said there were two.  I said one of those was a through and through.

Q    Okay.  So the through and through we'll call H-2, okay?  And as far as you're concerned, for the purposes here today, you're confident that that was a projectile that went through that door?

A    Yes, sir, it was a projectile.  I can't say if it was a bullet, what type of bullet, but it certainly appeared to be.

Q    Okay.  And now H-3 -- what I'll call H-3, is the third -- and that was something that stays in the door, is that right?

A    Yes.  There was a hole in the exterior side of the door.  And on the interior -- on the interior side of the door -- it did not perforate the interior skin of the door.

Q    Was anything -- was anything done -- dig in that hole to see if anything was in that hole?

A    It wasn't done by me, but something was done.

Q    Do you know whether or not something was recovered from that hole?

A    I don't know that anything was recovered.

Q    Okay.  And for your analysis, did you determine that to be a projectile?

A    It was -- (Interrupted)

3361

Q   Projectile defect, I'm sorry.

A   It certainly appeared to be a projectile defect on the exterior side and it appeared that whatever that projectile was fragmented as it went through the exterior side and those fragments struck the interior side but did not perforate.

Q   It didn't go all the way through the door -- even the fragments didn't go through the door?  Is that what you're saying?

A   I'm saying the fragments went all the way through the exterior skin of the door.

Q   Okay.

A   Steel clad door.  It goes through the exterior layer then fragmented and fragment had struck the interior but did not perforate the interior side.

Q   Now -- so, that's a determination that you have that there are three trajectories going in -- going in a northerly direction, either beginning from the exterior of the house into the doorway -- door or doorway, or going in a northerly direction while in the house, is that right?  Because number H-1, you're saying you can't tell whether it was fired from the inside or the outside?

A   Okay.

Q   Is that right?

A   If H-1 is the projectile that was recovered laying

3362

on top of the magazines inside the cabinet.

Q    Yes.

A    I can't identify the trajectory of that particular projectile and I don't have definitive evidence that says where the shooter was other than it was fired along that line somewhere.

Q    Okay.  Now, at any other time, did you make any determinations of other trajectories coming in that doorway or door?

A    Other than the two that we've just been talking about?

Q    Three we've been talking about.  We've talked about three, haven't we?  H-1?

A    Coming through the door?

Q    No, no.  Through the door or doorway.

A    Okay.

        MR. LITTLEFIELD:  Well, I'm going to object because she didn't say that one of those three was necessarily through the door.  She doesn't know if it was fired from outside the house which would have it coming through the door or inside.

        MR. HILFIGER:  Judge, I will try to limit it --
I understand that.

Q    (By Mr. Hilfiger) The one -- H-1 is one of the three, right?  H-1 is the projectile that we've just

3363

identified right -- that made that hole right there, okay? And with the exception that you can't say whether it was shot from inside the house or outside the house, your trajectory analysis would show that if it came from the outside of the house it would have gone through the doorway; is that true?

A    The analysis says if it came from outside the house, it was somewhere along the line of that -- that I showed there.

Q    Which is through the doorway -- not door, doorway; is that true?

A    If it's fired from outside the house, the door was open.

Q    Now, that's one, H-1. H-2 is the projectile that went -- what you say appeared to be a projectile defect that went through and through the door. H-3 is what you say is a projectile defect -- that appeared to be a projectile defect that stayed in the door. Okay. Have you ever given any kind of indication that there were other projectile trajectories that came through that doorway?

A    No, sir.

Q    You haven't?

A    No.

Q    I'm displaying -- this has not been admitted into

3364

evidence -- Defendant's Exhibit Number 221.  Do you recognize that?

A   Yes.

Q   Is that something that you've drawn?

A   Yes.

MR. HILFIGER:  Your Honor, I move to introduce Defendant's Exhibit Number 221.

MR. LITTLEFIELD:  No objection.

THE COURT:  Admitted without objection.

Q   (By Mr. Hilfiger) Now, as to Number 221, you show a dotted line going right along through here, is that right?

A   Yes, sir.

Q   Did you just draw that on there or was there a purpose in drawing that dotted line on there?

A   This I had a purpose.

Q   What was the purpose?

A   That if the hole in the door was a projectile fired through that door with the door closed, then that would be the approximate trajectory.

Q   Okay.  So, this is not anything more than you're still saying three trajectories, but was there something down here that you sort of associated with this?

A   Not with the holes in the door, no, sir.

Q   Was there a purpose that you went to this house?

3365

A     Just that that's where the first solid object I come to in the sketch as I'm drawing in -- to show the arrow to show the possible path.

Q     Did you look at anything in that room that -- around that couch that had any defects in it?

A     Yes, sir.

Q     Let me show you what's --

MR. HILFIGER:  I don't know whether this has been admitted or not.  I think it has.  Defendant's Exhibit Number 119.

Q     (By Mr. Hilfiger) What's that?

A     It's some type of defect in the front corner of that couch.

Q     And is that -- well, now, let's go back to 221.  Is that the approximate location up where that defect is, right where that arrow's going to without giving regard to height, I'm not talking about height.  I'm talking about just the lineal trajectory there.

A     If you take a top view then -- and if that's the proper position of the couch, then the arrow there points to about the same corner of the couch.

Q     Okay.  And -- but you're never saying that that was a -- you're saying that that may be a trajectory if the door is closed, is that right?

A     Yes.  If the door was closed, that that could be a

3366

trajectory through that door.

Q   Okay.  And -- but you're saying it didn't cause the defect in the couch?

A   No, sir.  I examined those and could not associate the two.

Q   And on what basis would you say you couldn't associate the two?

A   Because at no point when I make the line through that hole in the door does it ever come close to the hole that's down in the couch.

Q   Would you agree that your -- the drawing makes it that way though?  Does it appear that way on the drawing?

A   I agree that it could be misrepresented that way on the drawing.  That's not the intent.

Q   Oh.  Okay.  So would the door -- and you took an analysis -- you did an analysis through this door and so you're saying that wherever this door is open, that's the angle that it went through, that apparent -- or appeared to be projectile defect would be at that angle.  And if the door is open, it would be at an angle going that way. If it was, you know, halfway open it would be going some different way, is that right?

A   No, sir.

Q   Well, what are you saying then?  I don't understand how you got this line.  What did you use to determine

3367

this line?

A    If a -- if a projectile went through that door when it was closed, that that would be the approximate trajectory.  Taking a top view looking down, that would have been the approximate trajectory of that projectile across that room.

Q    Okay.  And in order to determine that trajectory in the door -- I mean, the door is a moving object.  I can see it open and close, right?

A    Yes.

Q    Okay.  And if it's -- so what you're doing is you're saying you took -- you used your laser or whatever, dowel or whatever, and you took, what, a point on the inside of the door and then a point on the outside of the door and then made a determination that going through that door, that's the angle going through the door?

A    That's the approximate angle, if the door was in a closed position.

Q    Well, it's the same angle, whether it's in a closed position or open position, isn't it?

A    The angle at which it strikes the exterior side of the door and enter -- and exits through the interior side of the door is the same.

Q    It's going to stay whether that door's closed, open partway or open all the way; isn't that true?  That angle

3368

in relation -- the trajectory in relation to the door is -- that angle is always going to be the same, isn't it?

A    Yes, relative to the door.

Q    Relative to the door.  And that was my question. That this angle right here, if the door was closed, then it would indicate a shot coming from out this direction, is that right?

A    Yes.

Q    And out in this direction, was there any car out in that direction?

A    Well, when I was there -- (Interrupted)

Q    -- car out in that direction?

A    When I was there, there was.

Q    Okay.  The path that you have shown on any cars, are they paths coming across that direction?

A    Yes, sir.

Q    Now, shifting gears.  You did an analysis of trajectories through a window, didn't you?

A    Yes, sir.

Q    And those trajectories through the window, which --

        MR. HILFIGER:  Let's look at 175, I believe. It's an overview of this model.

Q    On those trajectories going through a window -- and they did go through a window, didn't they?

A    Yes, there were projectiles that struck the outside

3369

of the window traveling towards the inside.

Q   And you didn't have any problem determining that they were projectile defects caused by a projectile?  I mean, there wasn't any problem in your mind -- I mean, did you have to determine the end point or did you do any chemical testing or anything like that to determine -- to make sure that they were -- with a scientific certainty, that they were a bullet or projectile?

A   There were projectiles.  I didn't do anything to determine that that projectile was in fact a bullet or any particular bullet.

Q   How did you determine they were projectiles?

A   Because they make a hole through the glass and that -- the objects that are inside -- hanging inside the room against the glass.

Q   The projectiles were?  What objects?

A   The projectiles traveled through glass, mini-blinds, a towel and one of them continued through the west wall.

Q   Okay.  What about -- how many of them did you determine came in -- and as I understand it, it's this window right here, right?

A   Yes, sir.

Q   And now, that window on the model doesn't have anything on it.  When you examined it did it have some type of covering or coverings on it?

3370

A    Yes.  As I just said, there was mini-blinds and a towel.

Q    How many projectiles did you determine came through that window?

A    I would say a minimum of five.

Q    Do you have a maximum?

A    No, sir.

Q    Have you said any -- well, let's go with the minimum of five.  Did you make a determination of where those -- the origination of those projectiles and the termination of those projectiles?

A    They originated somewhere east of the window.

Q    Okay.  And did you find the termination of all five?

A    No, I found a termination or a point for one of those five.

Q    And where was that point that you found for one of the five?

A    In the round on the west side of the house.

Q    We can't see it here but it would be over here some place?

A    Yes, sir.

Q    And that particular one, what line of travel did you make a determination on that particular one -- went through this window?

A    Yes, sir.

3371

Q    Did it go through the doorway?

A    Through the open space of the doorway.

Q    What?

A    Through the open space in the doorway.

Q    Okay.  So, I mean, that doorway didn't hit any object there, right?

A    I didn't see any evidence of it striking an object.

Q    And did it strike any objects in this room?

A    No, sir.

Q    And then it just went out what -- do you know whether it went out the wall?  And I'm assuming it went out the wall; is that correct?

A    Yes, sir.  It went through the wall.

Q    Did it go out the wall between the couch and this table or above the table?  Can you tell any area that it went out the wall?

A    It was low on the floor, I mean, close to the floor. I don't remember the exact height.

Q    What about in relationship to the couch and this table?

A    Didn't strike either one.

Q    Well, did it go just a straight line so it'd gone between them?

A    Well, I don't know the position of the table at the time.  I didn't see evidence that it struck the table.

3372

Q    Okay.  And as to those trajectories coming in that window, you only found one projectile, is that right?

A    I didn't fine the projectile.  I found where a projectile continued through the west wall, struck the ground and was deflected and I could not find the actual projectile.

Q    As to any of the other four or more, what evidence did you show or did you find in this house that the projectile went through this house?

A    As I said, there was damage to the mini-blinds and to the towel.

Q    Okay.  Other than that?

A    I did not find an end point or a projectile to know where it went past that.

Q    Didn't find any defects or anything like that?

A    No.

Q    And so that would be four projectiles?

A    It appeared to be.

Q    Now, let's talk about -- well, just so we can follow it, let me show you -- and it has not been admitted, Defendant's Exhibit Number 124.  Do you recognize that?

A    Yes.

Q    And is that a picture you took or somebody took on your behest?

A    I did.

MR. HILFIGER:  Your Honor, we move for introduction of 124.

MR. LITTLEFIELD:  No objection.

THE COURT:  124?

MR. HILFIGER:  Yes.

THE COURT:  Be admitted without objection.

Q   (By Mr. Hilfiger) And as to 124, that's the projectile that you're saying -- not projectile.  That's the end result of the trajectory analysis for that projectile, is that right?

A   Well, that's the dowel rod through the hole -- holes in the west wall pointing down towards the ground.  The rod's not long enough to make it -- to stay through the wall and touch the ground where the defect was in the ground.

Q   So it's somewhere -- you're theorizing it came out somewhere out here; is that right?

A   It did strike the ground somewhere beyond -- (Interrupted)

Q   Somewhere -- (Interrupted)

A   Where we see the end of that.

Q   And this is the one you're talking about you could find?

A   Yes.

Q   As to the others, did you do any analysis to

3374

determine lines with the others?

A   I did attempt to identify what might be the trajectory for the others and document those attempts.

Q   This has not been admitted either.  Defendant's Number 125.  Do you recognize that?

A   Yes, sir.

Q   And is that a picture you took or caused to be taken through your investigation?

A   I took it.

MR. HILFIGER:  Your Honor, we move to introduce Defendant's Number 125.

MR. LITTLEFIELD:  No objection.

THE COURT:  Be admitted without objection.  225?

MR. HILFIGER:  125.

THE COURT:  125.  Be admitted without objection.

Q   (By Mr. Hilfiger) And what does that represent?

A   This is a photograph I took after putting dowel rods through the holes through the glass and through the mini-blinds and the towel and then after placing five dowel rods then I got up above it and turned my camera down towards the floor.

Q   And this represents five shots going through the window, is that right?

3375

A     Yes, sir.

Q     And it represents that -- and I realize it doesn't represent the level of the shots from this position.

A     That's correct.

Q     But it represents how they were coming through the window right to -- from front to back in relation to the house, with the front of the house being here and the back of the house being there, is that right?  Do you follow what I'm saying?

A     Yeah.  It does show that they are somewhat east to west.  I mean, primarily east to west.

Q     This is west, this is east?

A     Yes, sir.

Q     Then did you string some lines and dowel rods and stuff like that?

A     I did.

Q     And I'm going to hand you what we marked as Defendant's Exhibit Number 120.  That has not been admitted.  Do you recognize that?

A     Yes, sir.

Q     Did you cause that picture to be made or take it yourself?

A     This is one of the pictures I took.

        MR. HILFIGER:  Your Honor, I move to admit Defendant's Exhibit Number 120.

3376

MR. LITTLEFIELD:  No objection.

THE COURT:  Admitted without objection.

Q    (By Mr. Hilfiger) What -- I see, you know, there's a bunch of -- are these dowel rods or these strings?

A    Black yarn.

Q    Black yarn.  And how many of them are there?  Is that one, two, three, four?  Or do you have a fifth one there some place?

A    No, sir, I see three in this photograph.

Q    Okay.  That's just a -- that must be just a shadow, is that right?

A    Yes, sir, it's a shadow.

Q    So there's just three.  Does one of these three represent the one that went through the wall?

A    I can't tell from this photograph.

Q    Okay.  I see this one goes across.  Does it go up that -- to that point up there?

A    It appears to in this photograph.  This is one in a series of photographs I took while I was trying to identify these lines.

Q    How did you determine where to put that up there?  What was up here to tell you that's where it goes as opposed to down here or over here?  What did you use?

A    I had a dowel rod through the -- through a hole in the window, hole in the glass and the hole in the towel

3377

and then I used the laser and wherever the laser light hit, I tried to make that an end to try to continue the line of the dowel rod.

Q   Okay.  And so, I assume you did -- we can't see it out on this other wall, but I assume you did the same thing with this line here?

A   Yes, sir.

Q   And that line there?

A   Yes, sir.

Q   Now, I see this line is going right there at the edge of the couch.  Is it just happen to be -- is there any relation to this line and the hole that's in that couch?

A   No.

Q   So there's -- it's not intended that this line goes through that hole or anything like that, is it?

A   No.

Q   That's three lines.  Where do the other two go?  Talking about five?

A   Yes, sir.  They're not in this photograph.

Q   Did they go to another area in the house?

A   I believe two of them, based on this type of examination, appear to stop somewhere inside that room and not continue to the living room.

Q   Okay.  So you say two -- you didn't even try two

3378

lines, is that right?

A    No, that's not right.

Q    Okay.

A    No.  I said that the other two don't show in this photograph.  I went through this same procedure with all five.

Q    Okay.  Well, I guess other than putting your laser on the end of the dowel rod, is that right?  That's what you did, right?

A    Yes, sir.

Q    And shine it over to here, what indication did you have that this line, that this bullet or projectile went even into this room?

A    I don't know that it traveled into that room.  I didn't find any target, nothing that held the projectile, a strike point.  All I had was wherever the laser dot shined to from the end of the dowel rod.

Q    Now, as to the two that we don't see in this picture?

A    Yes, sir.

Q    You did the same thing, right?

A    Yes, sir.

Q    You put the dowel rod in and you stuck the laser on the end of it?

A    Yes, sir.

Q   Where did that laser point to?  I know we don't have the picture of it.  Where did it point to?

A   As I said, I believe that those two were in the room that's not shown in this view -- in this photograph.

Q   You mean they went down in the floor or something like that?  Is that what you're saying?

A   That the laser light along the dowel rod as it was positioned in the window struck somewhere inside the room that's not shown in this photograph.

Q   And the room that's not shown in this photograph, are you referring to the -- this room here, the southeast room?

A   Be from the southeast room.

Q   Okay.  So from your trajectory analysis, you're saying based on what you have done you feel that two of them went -- stayed inside the southeast room, is that right?

A   I'm saying based on the work that I did there at the scene that I can't exclude the possibility that two of the trajectories may have been -- had end points in the southeast room.  I didn't find where those trajectories -- or where projectiles struck for those four -- for four of the lines so I can't say to a certainty.

Q   And two of the trajectories could have gone in through the living room although you didn't see any

evidence of it, is that right?  And I'll get to the third one that went out the door -- that went out the west side.

A   As I did this I found end points that could have been in the living room and end points that could have been in the southeast room.  But I didn't find any final target, didn't find any projectile, anything that confirmed -- could confirm that.

Q   Except for the one that went out the west wall?

A   That's correct.

Q   I'm going to hand you what's marked as Defendant's Exhibit Number 126.  Do you recognize that?

A   Yes, sir.

Q   Is that a picture you took or caused to be taken?

A   I took the picture.

MR. HILFIGER:  Your Honor, I move to introduce Defendant's Number 126.

MR. LITTLEFIELD:  No objection.

THE COURT:  Be admitted without objection.

Q   (By Mr. Hilfiger) And this is that -- this is the window that the -- that you determined five shots came through -- at least five shots came through, is that right?

A   Yes, sir.

Q   And this -- is this what you're calling a towel?

3381

A     Yes, sir.

Q     And then behind that towel is a Venetian blinds or mini-blinds?

A     Mini-blinds.

Q     Mini-blinds, okay.  And it's hard to see in this picture but is this sort of the area right here that the five to six are?

A     Well, there are two groupings but the groupings are close together.

Q     Okay.  But they're not -- see these sort of these right angle triangles up here, this line of right angle triangles that are blue?  Do you see what I'm talking about?

A     Yes, sir.

Q     The two groupings are below that, isn't that right?

A     They appear to be in the diamond shape directly below those little blue triangles.

Q     This black diamond shaped thing right there?

A     Yes, sir.

Q     And are these the trajectories that you're saying went into the room?

A     Well, it looks like you're pointing to one yarn and one shadow.

Q     Okay.  But what you determined going into the room is real close into the room, is that right?  I mean,

close to the west wall -- or east wall.  I'm all confused on it.  Close to the east wall, is that what you're saying?  Those two that you're saying had a termination point or possible termination point in the southeast room were close to the east wall?

A    No, sir.

Q    No?  Okay.

A    No.  It would be close to the west side of the room.

Q    West side?

A    They would have ended no shorter than the west side of the room.

Q    Okay.  And that's the view inside the house.  And did you take pictures outside the house?

A    Yes, sir.

THE COURT:  Mr. Hilfiger, let's take our morning recess now.  Members of the jury, remember my admonition about discussing this matter.  Everyone in the courtroom please remain seated as the jury leaves.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Ma'am, you may step down.  I'll recognize you back after the break.

(Whereupon, the witness left the courtroom after which the following record was made.)

THE COURT:  Record should reflect the witness

3383

and the jury has departed the courtroom.  Anything to take up outside the hearing of the jury?

MR. LITTLEFIELD:  Only that I think that we've got the record clear on the withdrawal of the bench warrant for -- the witness ultimately showed.  There was car trouble and she also had phone troubles which prevented the contact.  But I think we -- (Interrupted)

THE COURT:  So the warrant never had to be executed, is that correct?

MR. LITTLEFIELD:  That's correct, Your Honor.

THE COURT:  I'll enter a minute order withdrawing the bench warrant.  Anything for the defense?

MR. HILFIGER:  Judge, I don't have anything.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  You may continue your cross examination.

MR. HILFIGER:  Thank you, Your Honor.

Q   (By Mr. Hilfiger) Did you have an opportunity to talk with Mr. Littlefield during the break?

A   I don't remember if I spoke to him or not.

Q   Okay.  Let's talk about -- we were talking about the window trajectory and we've gone to on the inside and now

3384

let's go to the outside, okay?  And I'm going to hand you what first is Defendant's Exhibit Number 111.  It has not been admitted.  Is there a way we can turn that up the other way?  Do you recognize that?  Is that a picture that -- do you recognize that, first?

A    I'm not absolutely certain.  It's not my picture.

Q    It's not your picture.  Did you do anything to examine the outside window?

A    Yes, sir.

Q    Well, let me hand you what's been marked Defendant's Number 113.  And it has not been admitted.  Do you recognize that?

A    Yes, sir.

Q    Is that the outside window?

A    Yes, that's the east window of that southeast room.

Q    Okay.  Now, let me move you back to Number 111. Having seen number 113, now do you recognize Number 111?

A    That might be that same window, but I'm not certain.

Q    You're not certain of that.  You didn't take that picture?

A    I did not take this picture and I don't believe I've ever examined this picture.

Q    Okay.  Well, I'll withdraw Number 111.

        MR. HILFIGER:  Number 113.  Your Honor, I move to admit number 113.

3385

THE COURT:  Any objection?

MR. LITTLEFIELD:  No objection.

THE COURT:  Admitted without objection.

Q    (By Mr. Hilfiger) Did you cause to put the stickers on there?

A    I put those on there.

Q    And you're the one that labeled A, B, C, D and E?

A    Yes, I did.

Q    And A, B, C, D and E are just arbitrary?

A    Yes, they are.

Q    And that's to represent what you believe to be five projectiles through that window, is that right?

A    They represent five holes in that window.

Q    And as to 113 -- and we're looking sort of straight on this window, aren't we?

A    Yes, sir.

Q    And these items here, are they dowel rods?

A    Yes, they are.

Q    And these items here, is that a dowel rod?

A    Yes, it is.

Q    Now, out of -- and you said that there were two groupings?

A    Yes, sir.

Q    This grouping here is one?

A    Yes, sir.

3386

Q    And how many defects -- or how many projectiles or whatever you want to call it caused those -- that hole there or went through that hole?

A    Appears to be two.

Q    Okay.  Now, I can see one dowel rod.  Where is the other dowel rod, out of that hole right there?  And I just -- is just the angle not right to see it?

A    I believe it's the angle.

Q    So you're saying two come out of this first hole, right?

A    Yes, sir.  I put two dowel rods in that area.

Q    Now, on this second hole, how many, three?

A    Three.

Q    This over here, is this a shadow on this dowel, right there, does that appear to be two dowel rods or is that a dowel rod and a shadow?

A    That's one dowel rod.

Q    Okay.  A dowel rod and a shadow?

A    Yes, sir.

Q    Now, let me hand you -- let me show you what's been marked as Defendant's Exhibit Number 112.  Now, on this, do you recognize this picture?

A    Yes, sir.

Q    Is it one you made or caused to be made?

A    I took the picture.

MR. HILFIGER:  Your Honor, I move to admit Number 112.

MR. LITTLEFIELD:  No objection.

THE COURT:  Admitted without objection.

Q     (By Mr. Hilfiger) Now, as to this picture, you have somebody standing here holding these rods?

A     Yes, sir.

Q     Is there a reason to have them hold it?

A     Yes, sir.

Q     What was that reason?

A     Because I was trying to stabilize the rods in the holes and I -- as you can see there's also tape around the dowel rods where I tried to keep them from moving because they could move very easily.

Q     Okay.

A     And so I was trying to get the photograph of those two groupings and so I asked this officer to hold them for the purpose of taking the picture.

Q     And when this picture was taken, do you know whether you were facing south or north?

A     I believe that one's facing south.

Q     Okay.  And would you say that you held the camera in such a fashion that the camera is pretty much on the same level as either one of those groups of dowel rods or is it below?

3388

A    I believe the focus is approximately between the two groups.

Q    So your camera level -- then what you're saying is you're holding the camera so it's somewhere right in there?

A    Somewhere in there.  I'm trying to get both groups in one shot.

Q    And was there some purpose in taking this picture? Did you want to show the angles or anything?  Is that what you're trying to do?

A    Well, this does not accurately record the angles.  I was trying to do that.  But in the officer holding them, as he's trying to hold all three together with one hand they shift.

Q    So, are these any kind of approximation of the angles?  I mean, are you saying that these generally are going -- this would be the horizontal, right?

A    The bottom of the photograph is approximately horizontal.  It may be off a few degrees one way or the other.

Q    This is approximately horizontal.  Is this generally the idea of the angle to the horizontal that these -- that you're saying these in the bottom are sort of going in an upward fashion?

A    They're going downward because they're going from --

3389

(Interrupted)

Q    Okay.  They're going downward this way, right?

A    Yes, sir.

Q    And from origination they would be going upward, wouldn't they?

A    Well, they originated somewhere east of that window.

Q    Right.  And they continue on at about that same angle, wouldn't they?

A    I cannot say that what the photograph displays is an accurate representation of the actual angle of the entry into the glass.  As I said, as he's holding them they shift in his hand.

Q    Well -- but if the general idea is that they're not representing and you don't intend them to be level shots straight in like that, do you?

A    I can't say whether they were or were not level going into the glass.

Q    Well, why did you depict them as going in an angle like that?

A    That's the way that the dowel rod moved.  Because the only things I had to put the dowel rods through, the glass did not move, but the blinds and the towels both moved.

Q    Well, now when you represented these shots coming in on the inside of the house, didn't you represent them

3390

going in a downward fashion toward the floor?

A    In those photographs it does appear that that is a possibility.  However, I'd have to stipulate that both the blinds and the towel can move.  So those are only accurate if towel and the blinds were in those exact positions.  And they're movable objects so I can't say that they were in fact in those exact positions.

Q    So what does that say about your trajectories then?  You don't know whether those trajectories are anywhere even close?  Is that what you're basically telling this jury?

A    I'm telling the jury that the one trajectory I can identify because it also went through the west wall, so I have a solid surface and more points to work with.

Q    Okay.

A    The other four I can't exclude the possibility of the trajectories as they showed if the blinds and the towel were in those positions as they were showed with the dowel rods and the yarns extending up those lines.

Q    Okay.  Well, let's talk about the one, okay?  That trajectory on the one where you say that you could tell because it went out the wall, right?

A    Yes, sir.

Q    And it came in which grouping?  The A, C grouping or the D, E, F grouping?  I mean, B, C -- A, C, B, E -- I

3391

think B, D, E?  Which grouping?  Can you tell?

A    I'm trying to remember exactly from my analysis.  I believe it was the one that I identified as B that was the one that went through the west wall.

Q    And B would be one of these right here or one of these up here, can you remember?

A    I don't recall.

Q    I don't want you to guess, if you can remember it. Let's go back to 114 real quick, is that right -- 113 real quick.  Okay.  Can you remember which one?  A, C appears to be the top group, is that right?  And this is B, D, F or B, D, E?  I'm sorry.

A    Okay.

Q    You're the one that marked them.  Which ones were they?

A    I'm not sure exactly what the question is.  As you look at it, you can see that at the top it appears to be A and C are at the top and B, D and E are at the bottom.

Q    Okay.  My question is which one of those five do you attribute to the trajectory that went through the west wall?

A    Okay.  And my recollection is without referring to a report or anything is that it was B. And if it was B, then it's marked as B on the glass.

Q    Have you made more than one report?  Do you have

3392

your report with you?

A    No, I do not.

MR. HILFIGER:  May I approach with the report so she can refresh her memory?

THE COURT:  You may.

Q    (By Mr. Hilfiger) Have you refreshed your memory?

A    Yes.  It was B.

Q    So, B would be in this second grouping down here?

A    Yes, sir.

Q    And for B you can sort of determine an angle, right?

A    Yes, sir.

Q    And that angle is if you're going for the outside inside, up to down, right?

A    It is east to west and downward.

Q    And if you're going back to the origination, you're going up, aren't you?  If you're trying to find where the origination of B is, where it came from, you're going at an upward climb, aren't you?

A    Yes, it would be on -- at some point higher than B as it goes through the glass.

Q    Okay.  Now let's go back to whatever that -- Number 112.  And one of those three is B?  Now, I understand that you're angles are approximate.  I understand that. That they're going up, aren't they?  They're going up, aren't they?  Or down.  They're going up if you're going

back toward the highway patrolman, isn't that right?

A    Yes.

Q    And assume -- well, we got to do some more measurements.  Can you come over here and take this ruler that's right here and measure from the window to the east side of the hood of the pickup?

THE COURT:  You may.

Q    (By Mr. Hilfiger) Have you got a measurement in inches?

A    Yes, sir.

Q    What's the inches?

A    It appears to be approximately three and a quarter inches.  I'm sorry.  That's perpendicular to the east wall.

Q    What now?

A    Perpendicular to the east wall.

Q    Of the pickup, is that right?

A    A measurement from -- taken from the east wall to the farthest east side of the hood of the pickup, perpendicular to the east wall.

Q    Okay.

A    Appears to be about three and three quarter inches.

Q    Okay.  You may take your seat, please.  Now, assuming that a conversion rate on that model is one to 32, if you multiplied -- and assuming the way to make

that conversion is multiply 32 times three and three quarters, can you do that?  Can you do it in your head?  And I don't mean -- about a hundred and five inches, would that be about right?  And if it's not, that's fine.  Do you need a piece of paper?

A     It would be somewhere over a hundred.  I don't -- (Interrupted)

Q     Somewhere over a hundred inches, okay?  And that's fine.  A hundred inches and then how many feet would that be, approximately?

A     You take how many inches it actually is and divide by 12.

Q     And 96 inches would be eight feet; would you agree with that?

A     Yes.

Q     So assume the conversion of that model to feet would be eight plus feet from the window to the east side of that pickup, is that right?  That's the assumption I'm asking you to do, okay?  Now, if you extended that along from this window -- if you extended along that line -- eight feet from window on that line on up, would that line at the eight foot point -- would you anticipate that that line would be above the shoulder of that highway patrolman?

A     If that were in fact a line of trajectory, that that

3395

would, at that distance be higher than the shoulder.

Q    Would you anticipate going eight feet from that line on up, it would be higher than the head of the patrolman?

A    Certainly could be.

Q    What about these two?  If you extended that at that angle eight feet along that line, would you anticipate that those -- at those angles, that that would be higher than the shoulder of that highway patrolman?

A    That I can't say.  I don't know the vertical distance is and -- (Interrupted)

Q    Well, you could convert it -- oh, you mean you don't know the distance here?  You know you're going eight feet from this point to that point?

A    Right.  But to state where it would be on someone's body and not knowing the elevation of their body compared to this, I don't know.

Q    Okay.  Well, let me ask you this:  Did you have this person standing on any kind of object to increase his height?  Ladder, bucket or anything when he was standing here holding this?

A    I just asked him to stand there and hold it.  And I don't remember how he was standing or if he was standing on anything.

Q    Well, did he -- did you ask him to stand on anything?

A   No, I didn't ask him to.  I just asked him to hold the rods.

Q   Did you see whether he was standing on anything other than the ground?

A   I don't recall he was standing on anything or if he was kneeling.  All I recall is that I asked him to hold the rods.  I was trying to make the rods stationary and that was my focus, not his position.

Q   Do you have -- if you use this angle here, these angles -- and I know they're approximate.  I understand that.  But if you use these angles here and extend this out eight feet, do you have an opinion on whether or not a person on the east side of that vehicle would be able -- that shot -- a shot could come from that person who is across the hood of the vehicle resting his elbows on that vehicle?

A   I'm sorry.  I believe you've introduced too many variables for me to have an opinion.

Q   Okay.  Well, that's fine.  You can't make that kind of determination?

A   As I said, I believe you've introduced too many variables to state an opinion.

Q   Well, let's -- do you know how high this vehicle is, what do you need to solve it?  What would you need to solve -- how high this vehicle is off the ground?  Does

3397

that help you any?

A    I don't know how high the vehicle is.  I don't know the configuration of the shooter.  I don't know the angle from the window.  There are too many variables for me to state an opinion.

Q    That's the angle from the window.  Any of those three.  Okay.  You got that.

A    So if -- (Interrupted)

Q    I'm trying to solve your variables.  The configuration of the shooter, what do you mean by configuration of the shooter?

A    I don't know what his exact body size and shape is or how he's holding the weapon or how he's in whatever position you're trying to make him on the truck, I don't know.

Q    Assuming -- this is an assumption, okay.  Assume that he is resting his elbows on the hood of that blue pickup.  Now, does that resolve the configuration?

A    I still cannot say whether he could or could not have made that shot from that position.

Q    Okay.  What variables do you lack?

A    As I said, these are not necessarily the angles of the shots.  And there's just too many variables.  I don't know the exact position of the pickup, exact position of the shooter.  I don't have the opinion whether it could

or could not have occurred that way.

Q   Okay.  So, what you're basically saying you don't know where the person was.  Can you give us an opinion on where the person was when the shots were fired that went in that window?

A   Yes, sir.

Q   Okay.  And what's your opinion?

A   He was east of the window and the muzzle of the gun was greater than three feet from the window.

Q   Okay.  And that's as far as your opinion can go as to the location of the shooter, is that right?

A   Yes, sir.

Q   Did you take any swabs or anything like that to determine if there was any kind of -- I can't think of the name of it.  Gunpowder or residue or anything on the window, is that how you're -- is that why you're saying greater than three feet?

A   I didn't see any indication that a muzzle was close to the glass at the time.

Q   What indications would you look for to see if there was any -- to show on the glass?  What indications would you look for on the glass to show the muzzle is closer than three feet?

A   I would look for any indication of gunshot residue, gunshot particles, on the exterior of the glass.  I

3399

didn't see any there.  Therefore my opinion would be, based on what I saw, that the muzzle is not closer than three feet.  And that's based on published material about gunshot distances.

Q    Based on what you saw now -- let's go based on what you saw.  Could you tell whether or not -- this is not included -- this is also include what you saw out here and what you saw in the house, okay?  Based on what you saw, can you tell whether or not the shooter that caused these shots was firing at that window at a horizontal level or any -- horizontal shot or at any other type of shot?  And then describe that type of shot.

A    What I can tell you about the trajectories is that looking at the holes on the outside of the window, that they appear to be nearly round and some of them overlap.  The shape of those holes would indicate a more level trajectory.  When I look at it inside, assuming that the towel and blinds were in the exact position as they were when I was examining them, then the trajectory would be more downward.  So my opinion would be that the trajectory could be anywhere in between and I cannot determine the exact trajectory, other than the one shot that went through the west wall.

Q    And would that particular trajectory be more level or more downward?

3400

A    That trajectory was downward.  I can't give you the angle, but it was downward.

Q    Okay.  Are you familiar -- and this is back to your determination on the three feet question.  Are you familiar with silencers, suppressors on weapons?

A    I know some things about them.  I've never used them or done any particular analysis on them myself.

Q    Do you know whether having a suppressor -- it suppresses the fire, doesn't it?

A    Yes, it does.

Q    Suppresses the sound?

A    Yes.

Q    Do you know whether a suppressor on a gun would have any effect on residue coming out of that gun?

A    It may or may not have an effect.  I don't know.

Q    You don't know that?

A    I don't know that.

Q    Would it make any difference in your determination of whether or not the shooter had to be at least three feet from the window if in the overall scheme of things the assumption was that there was a suppressor on that gun?  Would that make any difference?

A    Well, as I said, my opinion was based on what I saw and what I know of that.  Based on my research of literature, just a general figure for a lack of any

3401

gunshot residue.  It may be that there are other factors that could change that.  And as I said yesterday, I don't do the ballistics analysis.  That would be for someone else to determine.

Q   Okay.  Has any of your literature -- in fact, has any of the literature that you've talked about gone in -- talked about suppressors and how much residue come from suppressors?

A   I don't recall doing any research specific to that area.

Q   Now, let me give you another assumption.  We'll identify this assumption as assumption M as Manion B, okay.  MB assumption.  Let's assume that shooter M has an MP5 automatic rifle and he's on a location east of the -- that blue pickup and he is positioned himself over the hood of that blue pickup to steady himself and fires five to six shots into the window.  Much like those five or six shots there, okay?  That's the assumption.  Now, my question to you is:  Would any of those five to six shots, would you have an opinion, on whether the projectile found on the refrigerator on the front porch would come from any of those five to six shots?

A   Be sure I understand you.  You're saying that the shooter is over the hood of the pickup and the pickup is in that configuration as shown in the model?

3402

Q    Absolutely.

A    From that position the shooter could not fire the shot that grazed the front wall of the house.

Q    Okay.  That's MB, assumption MB.  That projectile on the refrigerator could not have come from the shots fired over the hood of the pickup into the window, true?

A    Given all the particulars you just stated with the position in the -- with the pickup in the position as shown on the model, a shooter could not be on the hood of that pickup and fire the shot that grazed the front wall of the house.

Q    And resulted in the projectile on the refrigerator?

A    Yes.  That projectile grazed the front wall of the house and landed on top of that little refrigerator.

Q    Now, let me talk to you about another assumption that we will label MA, M as in Manion, A.

MR. HILFIGER:  May I approach the model, Your Honor?

THE COURT:  You may.

Q    (By Mr. Hilfiger) For this, assume that the Bronco is at the porch and that there is an M shooter that is crossing the front yard south of the house going to a position to the east of the blue pickup and exactly his pattern of going I can't tell you.  But from the area behind the Bronco to the east of the pickup.  Assuming

3403

that.  And assuming that the M shooter has an MP5 automatic on automatic.  And would it be possible for that shooter to have fired a shot that results, you know, somewhere in that course of travel, that results in the projectile on the refrigerator?

A    The shooter has to be to the east of the house along the line consistent with the front wall of that house.

Q    Right.  Would a person, a shooter, coming from this position here in the yard going over to the east of the pickup, by the hood of the pickup, would a shooter ever be in that position?

A    A person traveling that direction could cross the line that would be consistent with turning and making that shot.

Q    Okay.  And so your answer is, yes, that would be consistent, or it could happen?

A    It's possible a shooter traveling the path that you described could -- would cross a point where they could stop and make that shot, possibly.

Q    Let me ask you this.  Would they have to stop to make the shot or could the shot be made on the run?

A    Well, using stopping in the sense of being at the instant that the trigger is pulled.  The only thing I can give you is that at that instant that the muzzle of the gun is along a certain line.  What the shooter is doing

3404

other than pulling the trigger I can't say or how long he held that position. The only time I can give you is the time it took for the mechanism to release the bullet.

Q Okay. Now, I'm going to do some sub-assumptions here. We'll call -- and so we keep them all tracked we'll call that one assumption MA-R for refrigerator, okay? Now let's go to assumption -- what I'll refer to as MA number one. As you recognize in your report, there is a trajectory number one in the Bronco; is that correct?

A Yes, there was a trajectory that was identified as one for purposes of identification.

Q That's what I -- trajectory number one that you labeled as number one. And that was in the right front wheel -- right front quarter panel, I'm sorry. Right front quarter panel of the Bronco. Now, for assumption number MA number one, if a shooter -- call them an M shooter with an MP5, an automatic, and located somewhere behind this Bronco here and advancing or moving toward a position to the east of the blue pickup, would there be a time or an instant in that movement that M shooter could cause the -- cause the defect in the left front quarter panel of that Bronco that you've labeled as trajectory number one?

A I don't know.

3405

Q    And what -- you don't know.  Is there some variable that's missing that you don't know?

MR. LITTLEFIELD:  I'm going to object.  It assumes facts not in evidence.  Because there's nothing that says there was a defect in the left front quarter panel.

MR. HILFIGER:  Did I say left?  I apologize.  I meant the right front quarter panel.  I apologize.

Q    (By Mr. Hilfiger) I'm not trying to mislead you.  I just -- my assumption MA number one is he's coming from -- the M shooter is coming from somewhere behind this Bronco and is moving to a position over to the blue pickup, is there an instant in that movement that the defect number -- that you called trajectory number one and labelled number one could be caused by that M shooter?

A    I don't know.

Q    Okay.  And would you -- do you recall the angle that number one had on the car -- on the Bronco?

A    Yes, sir.

Q    Do you want to tape that angle back on there again?

A    I can try.

Q    Okay.  Do you want it up here?  Do you want it down there?

A    As I understand the question, the question had to do

3406

if that shot could be made with the Bronco in a particular position?

Q     In that position, yes.  Yes, ma'am.

A     No.

Q     Why not?

A     Because in order for a person traveling from the south toward the east side of the house to make a shot -- a trajectory identified as number one he'd have to be on the porch, with the Bronco in the position as you stated.

Q     Well, now, I noticed you moved it a little bit.  So if you move it back like this?

A     Still would have to be on the porch.

Q     Oh.  Is that the angle that that -- let's look at trajectory number one.  You're showing that as -- can you guess that angle that you're putting that on?  Can you guess what angle that is?  Is it a 90 degree angle?

A     No, sir.  It's not a 90 degree angle relative to the side of the Bronco.

Q     What now?

A     It is not 90 degrees relative to the side of the Bronco.

Q     About approximately what -- that you're showing, what angle are you showing?

A     I don't have a measure of what the angle was.  I know where it entered the side of the quarter panel and I

3407

know which direction it went from there.

Q    Okay.  Did you prepare a -- I'm going to go to -- we'll come back to this one, okay?  Now, as far as trajectory number nine, do you remember what trajectory number nine was?

A    Yes, sir.

Q    And what angle was that to the car?

A    It's in the right front of the bumper, right to left slightly backwards.

Q    Okay.  Was it almost at a right angle?

A    It was near a right angle to the right side of the Bronco.

Q    Would, for assumption MA number nine, assuming everything we just talked about, you know, got an M shooter with an MP5 on automatic and going from the location south of the house to the location east of the pickup, would there be some instant between that location, that M -- that trajectory number nine to the car in that position?

A    If the shooter as you described traveling from the south came to the west side of the pickup, with the Bronco in the position at the porch, then it's possible that that person could fire the shot into the --
(Interrupted)

Q    Would he have to be on the west side of the pickup?

3408

A    Yes, sir.

Q    Now, there's another one, trajectory number 10.  And this assumption -- I'm going the call MA number 10, just see we keep track of all of them.  On MA number 10 that's referring to your trajectory number 10 which was in the grill of the car?

A    Yes, sir.

Q    And would that be a trajectory that could be done -- could that be a defect that could be done by a person going from the back of the Bronco to the -- over to the east of the house, by the east of the pickup?

A    With the Bronco in the position as you place it at the house -- (Interrupted)

Q    In that position right now, yeah.

A    No.

Q    Okay.  I'm trying to put the -- your audio visual, where it's sloping -- where the car's sloping in the area.  I'm trying to get that on right now and then I'll ask you again about number one, okay?  This is something you made to depict the angles, is that right?

A    To depict all the trajectories going through the vehicle.

Q    Going in and out of the vehicle not just through it, right?

A    Yes.

3409

Q    I didn't -- I was trying to stop it just a second ago and didn't get it to stop.  Okay.  Now, can you see number one?

A    Yes, sir.

Q    Isn't this number one, right here?

A    Yes, sir.

Q    Pick up the car -- pick up the car and instead of trying to tape it to the side put it across the hood with the same angle you've got right there.  Do you want to tape it?  Do you want to tape it, please?  And you're saying that's the same angle that you've got on this drawing?

A    As near as I can tape it to this to get it -- to do to the model this is taped to the top.

MR. HILFIGER:  May I approach the witness and do this?

THE COURT:  You may.

Q    (By Mr. Hilfiger) If I lay this on top of that, then this angle should be about the same, shouldn't it?

A    Only if you can get it at exactly the same angle.

Q    Well, so -- but you're saying if I put that up there, is that the same angle?

A    No, sir, it's not.

Q    Would it be more -- let me get another piece of tape and we'll try it a second -- so it matches your picture,

3410

okay?  Do you agree that's about the same angle?

A    It's too deep -- on the same angle.

Q    If I put the wheels right on the edge of that, isn't that where it is?  Do you want to try to do it on the string so we get the same angle?

A    No, sir.

Q    Would you agree that this is closer than what you had?

A    I didn't understand your question.

Q    Would you agree that this angle is closer than the angle that you previously taped up?  Does this angle better represent what you've got drawn here?

A    The angle that you have it on now does not appear accurate to me.

Q    Okay.  Make it accurate then.  Hold it up for the jury.  Okay.  And you're saying that's accurate with what is on there, is that right?

A    As near as I can make it under these circumstances.

Q    Okay.  Put the Bronco up to the porch.  Is that the angle that you had the Bronco at the porch?

A    That's the angle you had the Bronco at the porch, as near as I can duplicate it.

Q    Okay.  And so, you're saying that this one -- with this angle here cannot have been caused by somebody running across here?

3411

A    I'm saying that at the position that you had the Bronco at the porch and the scenario that you gave, that that shooter could not make that shot.

Q    If that angle is like that, the shot can be made from there?

A    Well, you can change the angle to fit any particular scenario you want to change it to.  But that doesn't -- that's not what the evidence was.

Q    The assumption was?

A    No, sir.  The evidence is what the trajectory was.

Q    You're saying that this angle is not representative of what you show on your drawing, is that right?  You're saying the angle that I've got represented here in the pink stick on this car is not representative of the angle that you show on your AVI sketch.  Is that what you're saying?

A    I'm saying that I tried to the best of my ability to duplicate it.  It's difficult to do under these circumstances.  And I'm not sure of exactly what you're question is.

Q    Does that angle that I have, that stick, represent this angle for number one?

A    It appears that you've altered it and it does not match.

Q    Okay.  And you're saying the way you had it, you're

3412

saying this angle more closely represents number one?

A    More closely than what you had it, yes, sir.

Q    On your angle, do you see -- does any of your angle cross in front of that tire?  On this drawing does any of -- the trajectory comes out, does that angle cross the tire until it gets way out here?

A    Not in that view.

Q    Not in that view.  Does that, in that view, cross the tire when it comes right off the hood?

A    Which view?

Q    In the view you got right here.

A    Again, I don't know which view you're referring to. If I look down at it then I could -- from a 90 degrees, approximately down, then I can see that it actually does cross the tire.

Q    Okay.

A    If I turn it to a different angle, looking at it from a different angle, it may not appear to cross the tire.

Q    Okay.  Go ahead and sit down.  Now, and so your opinion is that number one could not -- and I'm not putting words in your mouth.  I want you to tell me because you've been pretty good about it.

MR. LITTLEFIELD:  Objection, Judge.  That's inappropriate.

3413

THE COURT:  Sustained.

Q    (By Mr. Hilfiger) Your opinion is that trajectory number one could not have been caused by a person going from the back of the Bronco to the east side of the pickup; is that true, under the scenario I gave you?

A    If the Bronco were in the position as you placed it, given the scenario you described, then that shooter would not be in a position to fire that shot across that trajectory.

Q    Okay.  Now, I am going to shift gears back to the house.  And you understand with the five shots coming in the house, right?

A    Minimum of five shots through the east window.

Q    I'm sorry.  I'm just talking about the shots through the east window.  That's all these scenarios are about, okay?  In the shots through the east window -- before I get to that, I want to put on Defendant's Exhibit Number 219.  It's been admitted.

Okay.  In this assumption I want you to assume that this drawing right here represents the lower half of an individual, with this being the right leg, this being the left leg and each one of these one, two, three, four, five, six, seven, eight, nine marks representing -- we'll call them defects, okay, defects that went through the skin.  Do you follow that assumption so far?

3414

A    Well, I'm trying to.  I've never seen this document before so -- (Interrupted)

Q    I understand that.  You follow the assumption.  Lower half of the body, right leg, left leg, defects that went into the skin, broke the surface of the skin.

A    Okay.

Q    Okay.  Now, first assumption -- and I'm going to call this group of assumptions KB, okay?  KB assumption, the first is just going to be general assumption on KB.  Assume that M shooter is on the east side of the hood -- the east side of the blue pickup, leaning across the pickup with his arms holding a rifle and shooting through the window on the east side.  Firing a minimum of five shots in the window.  Assuming the trajectories that you have shown and you know the trajectories you've shown, do you remember those or do you need to be shown those again?

A    I remember.

Q    And if a person in that house was wounded by projectiles as shown in that picture, you know, causing defects as shown in that picture, would it be consistent for that wounded person to have been some place in the line of those projectiles?

A    If I understand your question, the shooter shooting across the pickup, shoots through the east window and

3415

struck -- with projectiles that struck a person inside the house?

Q   Well, no, no, you're jumping one.  But -- (Interrupted)

A   I'm trying to understand what you just said.

Q   Okay.  A shooter has shot through the window from the east side of the pickup, five shots, minimum of five shots, that went on the trajectories that you show and there is a person that was in that house that was wounded in this manner, would you assume or would your opinion be that the person that was wounded by the projectiles had to be somewhere in the line of those trajectories?

A   If a person is wounded from a shot that's fired, then his wound would have to be somewhere along the line of the trajectory of the shot that wounded him.

Q   It's a dumb question, isn't it?  I mean, let me take you back.  I'm not -- I just want to get it clear to -- let's go to 175.  Now, the trajectories aren't going to be shown on here, but you're just going to have to imagine them, okay?  Okay.  The assumption is shots came in this window here, five shots, okay?

A   Yes, sir.

Q   And your trajectory lines come across here.  And I know there's a couple of them coming here.  Come across here, come down through here.  Your trajectory lines are

3416

basically this way; isn't that true?

A    Yes, sir.   East to west.

Q    A person who is wounded by a projectile in that house would have to be somewhere along that line, wouldn't they?   They couldn't be in the kitchen and be wounded by it, could they?

A    No.   If they're struck by one of those projectiles, they would have to be in the line of the trajectory that the projectile caused.

Q    That's KB.   That's what I want to understand. You're saying they have to be in that line somewhere up and down through there, right?

A    Yes, sir.

Q    Okay.   Now, going with that assumption, do you know if there is blood found and assume there's blood found on -- below the window on this wall.   Would you have any opinion, along this trajectory line, and assuming the blood came from the person that was wounded by the projectile, would you have any opinion as to the location of that person along this trajectory line?

A    I couldn't give an opinion without doing analysis of the particular blood in question.

Q    Okay.   Analysis to do what?

A    Of the blood stain patterns.

Q    Okay.   You'd need to have some blood stain patterns

to make that.  Did you ever do any in this case by the way?

A     Yes, sir, I did.

Q     And did you do a blood stain analysis on a section from the house that is represented by the model that came from right around that area?

A     Yes, sir.

Q     And what did your blood stain -- what opinion did you come from that blood stain analysis that you did?

A     That the blood stains that I saw could have been caused by a gunshot wound and that that could have occurred near the window.

Q     Okay.

A     However, it wasn't definitive enough to identify an area -- an exact area where the wound was so there -- (Interrupted)

Q     Where the wound was or where the person was?

A     The wound on the person.

Q     Did you make some -- I thought there was some determination that you made as to how far away from the blood splatter the person was.  Did you make some kind of determination as to that?

A     Yes.  If this is a spatter from a gunshot wound, that that gunshot wound occurred close though that wall.

Q     Okay.  Was close -- define close to.

3418

A    I think I put it at less than two feet.

Q    That would be 24 inches, right?

A    Yes.

Q    So, to get down to the nitty gritty, what your analysis was, was if that blood spatter over here was caused by a projectile wound coming through that window, then the person had to be somewhere within two feet.  The wound had to be within two feet of that area, isn't that right?

A    That -- I cannot exclude that as a possibly.  That -- there could have been a gunshot wound within two feet of that wall.

Q    Okay.  Are you saying it could be further away?

A    No.  I'm saying if that -- the patterns that I looked at were in fact from a gunshot wound and -- but if it was, then that wound occurred within two feet of that wall.

Q    If that was done by gunshot wound splatter caused in this incident then the person had to be -- the wound itself had to be two feet away from that wall, is that right?

A    Within two feet of that wall.

        THE COURT:  Mr. Hilfiger, let's take the noon recess.  Members of the jury, I'll ask you to remember my admonition about discussing this matter, ask you to be

3419

back at 1:30.  Everyone in the courtroom please remain seated as the jury leaves for the noon recess.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Witness may step down.

(Whereupon, the witness exited the courtroom after which the following record was made.)

THE COURT:  Now that the jury's departed the courtroom and the witness has, anything on behalf of the Government.

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  No, Your Honor.

(Whereupon, the noon recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury's in the box, counsel for the Government is present, Defendant is present with counsel.  You may continue Mr. Hilfiger.

Q    (By Mr. Hilfiger) As I recall when we broke for lunch we were talking about assumption KD one and the wound -- wounds occurring within about two feet of the west wall, interior west wall of the house.  Is that -- do you recall that?

MR. LITTLEFIELD:  Objection.  I don't think it

3420

was the west wall, I think it's the east wall.

MR. HILFIGER:  I mean, the west interior wall on the east side of the house.

THE COURT:  Okay.  I think we're clear.  You may proceed.

Q    (By Mr. Hilfiger)  Is that right?

A    That there was some blood stain under the window indicative of a gunshot wound could have occurred within two feet of that area.

Q    Now, I'm going to go to assumption that I will call KB two with the same assumptions as above, that we have M shooter, who's at the window firing five -- minimum of five shots in the window on trajectories that you had set out in your analysis into the house -- to the wound that we showed in Exhibit 219.  And the wounds as shown on 219 indicate skin defects like they're shown up here, to the right area of the hip, to the right area above the knee and to the inside left area of the left leg.  Would you -- based on that -- those wounds, would you have an opinion as to the general direction that the individual who received those wounds would be facing when those wounds were received, based on your trajectories and all that?

A    My analysis of the trajectories -- and I didn't identify exact trajectories on any except the one

3421

identified as B.  But the analysis of the trajectories doesn't tell me anything specifically about wounds.  This drawing doesn't tell me anything specific about wounds.  You're telling me that this drawing depicts wounds in certain areas.  I don't know if those are gunshot wounds, if those are entry, exits, which are entry, which are exits, what type of entry, what type of exits.

So, the only thing I can say is what I've already said, that there is a blood stain pattern that is indicative of a gunshot wound occurring possibly within the two feet of that wall.  But I can't relate that to this drawing or your scenario that you just gave.

Q    Okay.  Now, let me ask you, did you see the body of Rocky Eales?  Did you see the body of Rocky Eales?

A    No, sir, I did not.

Q    What did you use to determine your information that you got to determine your reenactment on Rocky Eales?

A    The information I used about the wounds of Rocky Eales came from the autopsy, from the information I got from Dr. Distefano who did the autopsy.

Q    Okay.  Were they pictures?

A    There were photographs, diagrams, a written report and discussions with Dr. Distefano.

Q    Okay.  The assumption I'm giving you is that these wounds are -- these are the defects to the skin.  Can you

3422

make any determination as to -- in relation to those defects where the bullets would have to come from?  Would they come from his back area?  Let's try to -- okay.  You can't answer those questions.  Let me try to eliminate where they -- to see if you can determine where these defects that may be associated with projectiles, in which direction the person would have to be facing in order to receive those types, okay?  Would those types of defects be received by a person in that house if his back was to the window that the bullets came in?

A    Again, I don't have enough information to give you a position.  Assuming that this drawing is to represent some wounds occurring from those trajectories we discussed through the window, making that assumption, I still don't have enough information to lead to any particular position for a person receiving these wounds.

Q    Would you agree that the bullets -- in order to receive the wound, the bullets would be on a direct line from the origination to the wound pretty much?

A    That would be the most likely scenario.

Q    A bullet's not going to go around a corner, is it, like that?

A    No.

Q    Okay.  So, if you have a bullet going in that window that is on the east side of the house and going in this

3423

direction and you have a person who is wounded in that house, if the person's back was to the window, would you expect to see those kind of wounds?

A   I don't know.  I don't have enough information about the wounds themselves.  I don't have wound patterns, I don't have any trajectories, anything identifying entrance, exit, what tissue that a projectile may have gone through.  I don't have enough information to tell you what position a person was in.

Q   If -- assuming there is a bullet lodged up here, would that give you any kind of indication as to where that bullet had to have gone in?

A   Only if I knew the wound track.

Q   Well, can you eliminate positions?  If you have three wounds -- three wounds here and I'm going to face this house, okay.  You had three wounds here and say where the house is is the window, assume that, okay?  And the bullets are coming from that window, you have three wounds here, you have no wounds around here.  From the right flank about where my pocket is, all the way around my back, all the way around to my belly button there are no wounds around there.  There are three defects here -- wounds here, okay?  And there is a bullet lodged in here.  Assume that.  Can you do that?

A   I'm trying.

3424

Q    Okay.  Now, would I be able to receive those wounds if my back was to the window?

A    Depends on how your body is turned.

Q    Just like this.

A    The only thing I can tell you, sir, is that if it's a gunshot wound of entrance that it's along the line of a trajectory and that the wound track would be generally along the line of that trajectory.

Q    Okay.  But you're saying you can't make a determination -- if the bullets are fired from that area to here in all of your studies of trajectory analysis you can't make a determination of whether or not I can receive those three wounds on my right hip if I was standing in this relationship to that wound -- window?

A    What I can tell you is that the wound track caused by a given bullet would be along the trajectory of that bullet.  So whatever position you put the body in then it would have to be aligning the wound track with that trajectory.

Q    Okay.  Let me ask you this, too.  And this is really a yes or no question.  Okay to answer a yes or no question.  If my -- if the trajectory -- the bullet trajectory is coming from that house and this direction -- trajectory and I am standing in this relationship with my left side of my body to where that bullet -- the

3425

trajectory is coming from according to your analysis, would I be able to receive -- would I be able to receive three wounds here on my right side, yes or no?

A    I'm sorry.  It's not a yes or no question.  You have to identify an exact position of the body.  And again, if the -- you have to align the wound tract with the trajectory.

Q    This is the exact position of the body.

A    I'm sorry.  I still don't have a wound track.

Q    Wound right hip, right back pocket and right front part of the hip.  You can't make an identification on that?

A    I'm sorry.  You still haven't given me a wound truck through the body.  You're talking about pockets and such.  I'm talking about track through the body.

Q    The track doesn't go through the body.  The bullet's lodged in the hip.  You can't make a determination.  How many years have you been doing trajectory analysis now?

A    Since 1989.

Q    1989.  Twenty six years.  Or sixteen years -- bad math, okay.  Sixteen years you've been doing trajectory analysis.  Okay.  Would you agree with me that the bullet would roughly go in a direct line?

A    Yes.

Q    Unless there's an intervening target?

3426

A     Yes.  Generally the bullet will continue in a straight line.

Q     Okay.

A     Near straight.

Q     And you did not find any evidence of any bullets in your trajectory analysis other than the one that went out the opposite wall, is that right?

A     In reference to the east window?

Q     Yeah.

A     Yes, it was just the one that I found where it struck the ground outside.

Q     And in addition, those ones that you said went in this southeast room some place, did you find anything -- fragments or anything like that, reflecting a bullet?

A     No.

Q     Well, okay.  Let me go to something else just a second.  As I understood -- as I understood when we were talking about the projectile in the door -- going through the door, that you sort of telling me that you couldn't tell me with a scientific certainty whether that projectile going in the door -- what I'd classified as H-2 was a bullet.  And the reason was you said that you couldn't find any bullet fragments to associate with it and you didn't do any chemical testing; is that correct?

A     That I could not say to a scientific certainty, and

3427

I believe we're talking about the through and through hole through the door?

Q    Right.

A    Yes, it certainly appeared to be a bullet hole but I can't say to a scientific certainty that it was a bullet hole to the exclusion of all other.

Q    Well, then let's look at trajectory 13.  Using that same scientific certainty, what did you use on 13 or if you could -- can you even tell with scientific certainty, the same type of certainty that you're using on the door, that that was a bullet hole?

A    I said that's a projectile that traveled across that trajectory.

Q    Okay.

A    If it was a bullet then we could talk about if it was a bullet.

Q    Okay.  And that's what I'm getting to.  So what you're basically saying now is that you can't tell whether that's a bullet hole because of those same scientific certainty principles that you attached to the Hamilton door; is that correct?

        MR. LITTLEFIELD:  I object to Hamilton door.  I don't know what the Hamilton door is.

        MR. HILFIGER:  I'm sorry.  The H2 projectile trajectory.

3428

Q    (By Mr. Hilfiger)  You know what the H-2 projectile trajectory is?

A    No, sir.

Q    The H2 projectile trajectory is the one that goes through the front door of the residence, okay?

A    Okay.

Q    Do you recall that?

A    Of course.

Q    Do you recall that I -- and these are the questions I just asked you about -- that you couldn't tell with scientific certainty that that was a bullet that went through that door; isn't that true?

A    That's correct.

Q    And the reason was because you didn't see the end result, one, and the other one is you didn't do -- you didn't see any fragments or any end result and the other one was you didn't do any chemical testing to make that determination; is that true?

A    To prove that the projectile was a bullet, that's true.

Q    Now, as to number 13, did you see the end result of number 13?

A    No.

Q    You didn't see any fragments, you didn't see any end results, is that right?

3429

A    There was a large amount of fragmentation -- indication of fragmentation inside the truck.  However, I couldn't associate fragments to say that it was all -- that these fragments were part of association with this particular trajectory or this particular hole.

Q    Okay.  And also did you do any chemical testing around that hole?

A    No, I did not.

Q    So, to this same scientific certainty you cannot say that hole -- trajectory number 13 is the result of a bullet then, can you?

A    That's correct.  I didn't do any test to determine that the projectile was in fact a bullet.

Q    Okay.  Now, on doing your reenactment and your determinations you made in the reenactment, specifically as to the wound to the upper arm on Mr. Eales, do you recall which wound I'm talking about?

A    Yes, sir.

Q    Now, in that determination, you made -- did you make an assumption in that determination that the direction was back to front of travel -- direction of travel was back to front?

A    I'm sorry.  Are you talking about to his left or to his right?

Q    Back to front, what you mean?

3430

A    I'm confused about which wound you're talking about.

Q    I'm talking about the one in the -- the outside wound on his arm?

A    Okay.  On his right arm?

Q    Yes.

A    I didn't make a determination or an assumption.  I was told by Dr. Distefano based on his findings at autopsy.

Q    Okay.  And that's what you're relying on, is that right?  You're relying on the assumption that Dr. Distefano said that it was solely a back to front wound; is that correct?

A    I'm relying on information from the autopsy.

Q    Well, is part of that information it was back to front?

A    Yes, sir.

Q    Okay.  Now, if -- and this is an assumption.  If the testimony would be that couldn't say with certainty that it was back to front or front to back, would that affect your assumption?

A    It would -- okay.  I don't believe I'm making assumptions.  I'm stating the evidence as I see it and my interpretation, conclusions I reached based on that evidence.

Q    Okay.

3431

A    I'm not stating an assumption.  Now -- (Interrupted)

Q    Well, let me change.  Would that change your opinion if the assumption -- the testimony was that -- and this is the assumption.  The testimony was that Dr. Distefano could not say with certainty whether that was a back to front or a front to back wound.  Would that change your opinion?

A    Which part of my opinion?

Q    As to how it occurred.

A    Well, it wouldn't change my opinion in that there's tissue missing from that right arm and there's no tissue spatter inside the truck.

Q    Okay.  So the part of the opinion that says it occurred outside the truck would not change?

A    No, I still don't see anything that indicates to me that that wound happened inside the truck.

Q    Okay.  But whether it occurred as a back to front wound or a front to back wound, would that change your opinion at all?

A    Well, the direction was given by autopsy.  So I'd have to rely on Dr. Distefano's opinion.  He did the autopsy.

Q    Okay.  But I'm just saying if the testimony was a little different than what the autopsy said, that wouldn't change your opinion or would it change your

3432

opinion?

A    It does not change my opinion in that I would expect to see tissue spatter in the truck had that wound occurred in the truck and that tissue spatter was not in the truck.

Q    Okay.  You also relied I think -- or did you -- on whether or not there was an intervening target for that particular wound?  You know which wound I'm talking about?

A    We're still talking about the wound to the right arm?

Q    Right.

A    I recall the discussions with Dr. Distefano.  I don't recall if it's specifically stated in the autopsy report.  But the fact that is an irregular wound could be because there was some intervening target.

Q    My question to you is this:  If -- assumption -- the testimony was that the doctor couldn't say with certainty whether or not there was an intervening target, would that change your opinion as to how the wound occurred?

A    It doesn't change my opinion in that there's tissue missing from the arm and there's no tissue spatter inside the truck where I would expect it to be had that wound occurred inside the truck.

Q    So the only part of your opinion that wouldn't

3433

change is what I'm understanding is whether or not the person was in the truck, is that right?

A    Well, that part doesn't change.  The fact that the tissue spatter's not inside the truck does not change.

Q    That's exactly what I said.  And I'm just asking if you agree with that?

A    If I agree with what I just said?

Q    Yeah.

A    Yes, I agree with what I just said.

Q    Okay.  Even if I said it you agree with it, huh?

A    If you repeat what I just said, yes, I agree with that.

Q    Okay.  But as to how the wound -- not where, not where -- how the wound occurred, would your opinion change if it was a front to back wound or -- well, let's take it -- if it was a front to back wound, would it change your opinion on how the wound occurred -- not where, how?

A    Well, my understanding of how the wound occurred is it was identified as a gunshot wound therefore it occurred by being struck by a bullet.

Q    Right.  But you did a reenactment, didn't you?

A    I didn't do a reenactment of that particular wound.

Q    Oh, you didn't?  So you don't have any theory on how that wound occurred other than by a bullet?

3434

A    My opinion is that it did not occur inside the truck and given that the autopsy reported it as a back to front wound that it was back to front.  Therefore the back was exposed to the muzzle of the gun.

Q    You could make that determination from that little evidence?  That just saying a back to front wound that the back had to be to the gun?  And yet you can't make a determination that when you have three wounds in the hip with a gun to your left, you can't make a determination of whether or not that gun could have caused those three wounds?

A    Given that I have the doctor performing the autopsy telling me the wound tract and identifying it as a gunshot wound from back to front then across that arm then the back of that arm, where he said the entry was, would be exposed to the muzzle of the gun.

Q    Okay.  And I don't want to belabor it, but just one deal on it.  So, if his medical certainty as to whether it was a front to back or a back to front wound, are you saying that wouldn't change your opinion of the position of Rocky Eales when that wound was received by him?

A    If the doctor at autopsy determined that it was a front to back injury with the wound tract such that the entry was to the front, then I would say that the front was exposed to the muzzle of the gun at the time that the

bullet was fired.

Q    Okay.

A    But that's not my determination.  That's the doctor at autopsy.

MR. HILFIGER:  I have no further questions.

THE COURT:  Redirect.

MR. LITTLEFIELD:  Government Exhibit 175, please.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    The blood spatters on the easternmost wall in the residence.  Can you take the laser pointer and up here identify the location of where those were?  Right below the window?

A    Yes.  Directly below the window.

Q    And do you know when those -- is it splatter or spatter?

A    Spatter.

Q    No L in it?

A    No L.

Q    Merry Christmas.  You can't tell when those spatters were placed there?

A    No, sir.

Q    You don't know if they had been there for two or three years or if they occurred in this incident?

3436

A    No, sir.

Q    In regards to all these trajectories that are going into the east wall, into that east window, was there a problem in attempting to determine those trajectories?

A    Yes, sir.

Q    What was the problem?

A    Well, as I said, what I got to work with here is a thin pane of glass, then mini-blinds and a towel.  And the blinds and towel are both movable objects and I can't ascertain or guarantee that they were in the position -- in a given position at a given time.

Q    What happens when a bullet goes through -- when the first bullet went through that towel, what would have happened to that towel?

A    It may have moved the towel or it may not have.

Q    Did you have any evidence to indicate whether or not the towel would have been moving when those bullets passed through it?

A    Well, I note that when I put the rods through that there appeared to be a wrinkle in the towel between some of the rods and that might be an indication that the towel moved.

Q    This is Defendant's Exhibit 125.  Do you recall looking at that on cross examination?

A    Yes, sir.

3437

Q    And this photograph was taken from what angle?

A    Looking down to the floor.

Q    So the camera would have been above the rods and looking directly down towards the floor?

A    Yes, sir.

Q    And did you -- you mentioned wrinkles in the towel. Can you see the wrinkles in the towel in this photograph, ma'am?

A    Well, there are some horizontal wrinkles and there's also what appears to be a vertical wrinkle.

Q    And when you were talking about a wrinkle indicating the towel would have moved while the shots were passing through it, what wrinkle are you talking about?  Can you use the -- yes.

A    It's possible that the towel moved and this could be an indication that it moved because when I put -- just put the dowel rods through and have them resting in the hole in the glass and through the hole in the towel that -- there's this vertical wrinkle between the two of them. That might be an indication that the towel moved.

Q    When the rods aren't ended, did the towel have a wrinkle in it or did it hang straight down, pulled down by gravity?

A    It hung straight down, sagged somewhat in the middle, just gravity.

3438

Q    And what caused that wrinkle that you just pointed at?

A    It appears to be caused by the dowel rods being placed through.

Q    So that the location of the rods in relation to the holes is what had -- is pulled up and grabbed together that towel, that curtain?

A    That's what it looks like.

Q    And if the towel -- once the first shot passes through, if that causes the movement of the towel, just like throwing a rock in water, waves in the towel, what's that going to do with the remaining holes through the towel as far as trying to perform a trajectory analysis?

A    Well, again, we're talking about a movable object, so unless that movable object is in the same exact position it was when the projectile goes through, you know, without that circumstance, I can't be certain of a trajectory.  That's why I don't rely on movable objects for trajectories.

Q    Other than the one shot that passed all the way through the house, how confident are you that these trajectories are the actual trajectories of the bullets that passed through that window?

A    I can't say what the actual trajectories were.  As I said, there's some -- the appearance of the entry holes

3439

on the glass gives the appearance that the trajectory should have been more level. These would -- the way they showed through the towels would probably be the most angle downward that they could be. It could be anywhere in between.

Q   Let's talk about the shot over -- the shots into that window. You were asked how far that east side of the truck was from the window and I think you did a figure that it was between eight and nine feet. Do you recall that?

A   I recall the mention of somewhere around eight feet.

Q   Do you know that the barrel of the gun was positioned even with the edge of that truck, the easternmost edge?

A   I couldn't estimate the position of the barrel of the gun other than to say it's along the trajectory. And the only one that I could have any confidence in really would be B, the one that goes through the west wall. And I don't have any way of looking at what the position of the barrel of the gun was other than to say it was along that trajectory.

Q   Okay. You don't know how far from the house it was?

A   No, I do not.

Q   You don't know if it was closer than eight feet, if it was halfway over the hood of that truck or if it was

3440

back farther behind it?

A    All I can say is it was far enough that I didn't see any gunshot residue on the glass.

Q    By the way, on that window, how high is that window?

A    The bottom seal of the window or the --

Q    Well, okay, the bottom seal.  Do you know how high it was?

A    I know that from the inside of that east room that it was just a few inches from the floor up to the bottom of the window frame.

Q    Wasn't far at all?

A    No.

Q    In relation to yourself, how high off of the ground were those two bursts that went into the east window?

A    Well, the holes in the east window -- I don't recall a vertical measurement.  They weren't difficult for me to see.  I didn't have any difficulty standing on the ground and photographing them.

Q    Let me pull that one off and show Defendant's Exhibit 112.  Do you see Defendant's Exhibit 112?

A    Yes, sir.

Q    Do you know what position the trooper who is bracing those rods is standing?  I mean, do you know if he's standing, if he's kneeling down a little bit to try and steady?  Do you recall what position he was in?

3441

A   No, sir.

Q   Where the rods are and where those holes are in relation to his body, can we rely upon the location of his body to give us an estimate of the height of those shots?

A   I think the only reliable method is to measure it vertically from the ground.

Q   Okay.  And no one did that?

A   I don't recall if that was done the day that I was there.

Q   You don't have a measurement of that, do you?

A   I don't recall making that measurement.

Q   Are --

        MR. LITTLEFIELD:  Your Honor, I would ask the witness come around and look at the east side of the model.

        THE COURT:  You may.

Q   (By Mr. Littlefield) And does that window appear to be in a proper perspective in relation to the cabin and the truck as it was at the scene?

A   Yes, it appears to be.

Q   In relation to the entire window, where was it that the two bursts of shots entered?

A   Well, the holes that were through the window you start at the bottom.  There's a row of window panes and

3442

then a second row and they're in that second row.

Q   Is this one where there's the bottom half and the top half?  I mean, I've got the whole window seal but are there two panes of glass, one on top and one on bottom, with the center dividing it?

A   I think there was three panes -- I believe there were three panes across in a row.

Q   Okay.  I'm talking about -- well, go ahead and go back up.  Do you know what -- do you know what this line is here?

A   I'm not certain.  I think it's the dividing between the upper and lower of the window, but I'm not certain.

Q   Okay.  Well, let's look at -- let's go to the Defendant's Exhibit Number 113.  Maybe that will help. Do you see that?

A   Yes, sir.

Q   And these are taken from inside or is this from the outside or the inside?

A   Photograph is on the outside looking at the east window from the outside.

Q   And is there a divider between the two panes of glass there?

A   Between the upper and lower of the window, yes, sir.

Q   And the shots were in which?  The upper or the lower pane of glass?

3443

A     They were in the upper row of the lower portion of the glass of the window.

Q     But as between the two panes, the upper pane, the lower pane, which pane was it in?

A     In the lower half of the window, the upper pane.

Q     You indicated which one is the only trajectory that you have confidence in?

A     The one trajectory that I did have a solid trajectory line for was B and that's the entry hole for B.

Q     Now, of those three rods in the lower -- and I'm going to call it upper burst and lower burst, would that be fair as far as two bursts of shot going through that window?

A     There are two areas of holes.

Q     And both holes had more than one projectile passing through?

A     Yes.

Q     As to the lower of the two holes, you've got three dowel rods.  Which one is B?

A     I'm not absolutely certain.  I think it's the one on the left as you look at the picture, but I'm not absolutely certain.

Q     You aren't certain if E designates this dowel rod, B designates this dowel rod and I guess D -- I can't read

3444

it, but that's the one that's left out from what I can read. D would designate that dowel rod?

A If the rods have not shifted at all, then the one on the left is B.

Q Was there a problem with the rods shifting?

A Yes, I've said that there was a problem with that.

Q And why was there a problem with the rods shifting?

A Again, just the dowel rods through the window, they're resting on -- in the holes in the window which is single pane glass.

Q Right.

A Then there's the -- the mini-blinds and the towel. The minute -- mini-blinds, individual slats are very movable and broken -- broken up and then there's holes through the towel and the towel could easily be moved.

Q Okay. So what you had to rest these dowel rods on when you tried to place them to photograph would have been the hole in the window and what?

A The towel.

Q And how stationery was that towel?

A Well, the towel could be moved.

MR. LITTLEFIELD: Your Honor, may I approach defense counsel for just a second?

THE COURT: Yes, you may.

MR. LITTLEFIELD: I would like to display

3445

Defense Exhibit 221.

THE COURT:  You may.

Q    (By Mr. Littlefield) Can you see it?  Is it focussed well enough for you to pick up?

A    Yes, sir.

Q    The angle here through the front door, on this line, what is the position of the front door for that trajectory?

A    Door's closed.

Q    Entirely?  I mean flush close to the wall?

A    Yes.

Q    There was a -- you mentioned there was a defect in that couch.  Describe that defect.

A    A little hole in the upholstery.

Q    I'm going to have it displayed and then I'll come back to 221.  Use your laser pointer and direct our attention to the little hole in the upholstery.  Was that a bullet hole?

A    I didn't find any indication that it was a bullet hole.

Q    Did you try to find out if it was a bullet hole?

A    Yes, sir.

Q    And what did you do in an attempt to ascertain if that was a bullet hole?

A    I probed that hole, turned the sofa over.  I looked

3446

at it to see if there's any fragmentation anywhere, any damage to the frame, which I would expect if that upholstery's covered the frame that -- if it goes through -- if a bullet went through fabric that it should cause other damage inside.

Q   Any indication of any damage inside that hole?

A   No.

Q   Could that have been a cigarette burn?

A   It didn't appear to be a cigarette burn.  I didn't -- I don't recall there being any burned edges.

Q   Do you have any idea what caused that other than you could not find any indication that there was a projectile there?

A   I don't know what caused that.

Q   Do you have any idea when that hole was placed in that couch?

A   No, sir.

Q   Any reason to believe that that hole was from a projectile?

A   No.  I looked at it and couldn't find any indication that told me that it was from a bullet.

Q   If we go back to Defense Exhibit 221, it appears that the line with the door entirely closed goes right to the area of that couch?

A   Yes, sir.

3447

Q   And that shows the angle or the direction.  Does it show the level of the trajectory that -- is that a through on through shot?  Is that the through on through shot through the door -- or the through on through projectile indication through that door?

A   The dotted line that ends in the arrow that appears to be pointing towards the couch is my attempt to approximate the trajectory of the through and through projectile through the front door.

Q   This model here, this exhibit here, 221, shows us nothing in regards to the height of that dotted line, does it?

A   That's correct.

Q   Where in relation to that hole in the couch that we just looked at on 119 does that dotted line go?

A   It would be above.

Q   Even if this was a bullet, the projectile was a bullet, and even if it had passed through the door whenever it had been and even if it went on that line, could it have caused that hole in the couch?

A   I could not associate the damage that we saw on the couch to that line.

Q   Why?

A   They weren't at the same elevation for one thing.

Q   Okay.  And I'm not even going to try and put a label

on it, scenario whichever one, M or KB or whichever, but do you remember on cross examination discussion about the possibility of Mr. Manion going from the back of the -- south of the portion of the yard, behind the Bronco and around the east side of the truck? Do you remember that line of questioning in that discussion?

A   Yes, there was a discussion of a possible shooter moving in that general area.

Q   And one of the questions was in regards to -- I think you were asked about trajectory one and the dowel rod which is currently taped onto the Bronco, which is in front of the house. What trajectory is that closest to?

A   It might be closest to one.

Q   Okay. Is that the one where you moved it or where Mr. Hilfiger moved it? Is it -- what position are we in now?

A   I'm not certain.

Q   Could trajectory one possibly have been Mr. Manion running around the side of the house if he'd have fired a shot off into the Bronco on the line that was described to you on cross examination?

A   If the Bronco were in the position that it was placed during the previous line of questioning then a shooter on the east side of the pickup or any further away from the porch could not have fired that shot.

3449

Q    Why not?

A    Because as it was positioned in the previous line of questioning, that line of trajectory ends on the porch.

Q    Okay.  So it couldn't be from someone from the east side of the truck.  It could not have been fired from the -- from someone from the east side of the truck; is that correct?

A    That's correct.

Q    As to nine --

MR. LITTLEFIELD:  And, Your Honor, may I approach?

THE COURT:  You may.

Q    (By Mr. Littlefield) I think you were also asked about trajectory number nine and an individual going to the east side of that truck, do you recall being asked about that?

A    Yes, sir.

Q    Can you reposition this dowel rod in -- where it would have been for trajectory number nine.  You need new Scotch tape or you still got a -- there it is.  Is that about right?

A    It's approximately.

Q    Okay.  I understand it's not exact, but is that fairly close?

A    It's as close as I can get it under these

3450

conditions.

Q   And your model which was displayed that rotated showed it more correctly than this, but this is as close as you can get it?

A   Yes, sir.

Q   Okay.  Now, if we position this, we can't get it to the front porch with that dowel rod there, can we?

A   That's correct.

Q   Why?

A   The rod's too long.

Q   Okay.  And, well, what gets in the way of placing it on up here with the rod of this length?

A   The pickup.

Q   If a person had -- do you know where that had been play previously?

A   Yes, sir.

Q   And at this angle, assuming it goes on in at this angle where my hand is now, is my hand approximately the same angle, same direction, everything else, if the tips of my fingers are the front bumper?

A   It appears to approximate that position.

Q   Would a person be able to go to the east side of the pickup and fire that shot in the trajectory?

A   Doesn't appear so.

Q   Why?

3451

A   Because of the level of that particular trajectory would be below the side of the truck.  It appears to go through the bed of the truck.

Q   You'd have to shoot through the truck -- both the bed before you could ever get there?

A   It appears that the height of the bed of the pickup would be an intervening object.

Q   I guess what would have to happen then is the individual would run around here, squat and shoot and then go around there; is that correct?

A   Well, but if it's being shot by a person near the pickup, then they would have to be on the west side of the pickup.

Q   And would they be able to stand at shoulder height to get that kind of elevation or what level would that firearm had to have been at?

A   The barrel would have to be along the line of the trajectory.

THE COURT:  Let me see counsel at the bench for just a minute.  Mr. Hilfiger, let me see.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  It's occurred to me that we've all been given this.  I think about a record in this case. And we're talking about the mock -- I think at the very

3452

least we need to make a photograph of it and make it a Court exhibit so --

MR. LITTLEFIELD:  On which one?

THE COURT:  No, I'm just talking about the whole exhibit.

MR. LITTLEFIELD:  Oh, you mean -- you mean the model that we've used as demonstrative?

MR. HILFIGER:  We've got a picture of it.

THE COURT:  I want a picture of it to go on the record.  It's already been introduced.  And I'm guessing that's what we're going to do with it.

MR. LITTLEFIELD:  Yeah.  We don't have -- you're talking about the model vehicles or -- (Interrupted)

THE COURT:  Well, yeah, model vehicles are what occurred to me.  You all keep moving them around and I keep worrying about what this record's going to look like.  So I caution you to be a little more careful and help me remember to -- (Interrupted)

MR. LITTLEFIELD:  There is a photograph -- Government's Exhibit Number 2 is a photograph.

MR. HILFIGER:  Is it one or two?

MR. LITTLEFIELD:  Two, I believe, is a photograph of the model.

THE COURT:  I want the model.

3453

MR. LITTLEFIELD:  Yes.  And it's in evidence.
It was introduced by -- (Interrupted)

MR. HILFIGER:  I thought it was.

THE COURT: -- and the vehicle -- (Interrupted)

MR. LITTLEFIELD:  No, no, the vehicles are not
positioned on it.

THE COURT:  Well, we probably.

MR. LITTLEFIELD:  And, Judge, what my thought
was is that Government Exhibit 1 from my perspective
which is the model itself, my impression of it was that
the vehicles themselves are a part of that exhibit.

MR. HILFIGER:  Well, if they aren't, I think
they ought to be.  I mean, I don't have any objection --
(Interrupted)

THE COURT: -- then we need another photograph
with them.  I mean, we can't do every position --
(Interrupted)

MR. LITTLEFIELD:  There's no -- you're right.

THE COURT:  But you may -- may want to agree on
-- think about this -- on three or four different
versions of how it -- (Interrupted)

MR. HILFIGER:  Well, the only ones that we
could have -- that I think we could agree on are the ones
where I took measurements on it, because I did take
measurements -- (Interrupted)

3454

MR. LITTLEFIELD:  Well, I disagree with that because I, you know, from that perspective, you know, I wasn't trying to position and take measurements.  You don't think we can agree, for example, of certainly a close approximation of placement of where Hash, Greninger and the Hamilton vehicles were positioned?

MR. HILFIGER:  Hamilton, yes, and Hash, yes -- (Interrupted)

MR. LITTLEFIELD:  And Greninger's right over to the left and front of Hash just a little bit -- (Interrupted)

MR. HILFIGER:  Well, Greninger's going to be a problem because we don't have any picture or anything for Greninger.

MR. LITTLEFIELD:  No, we don't.  But what I'm saying is we've got the witnesses having placed it -- and I think they were all in approximately the same position and that could be photographed.

MR. HILFIGER:  And I -- I'd have to look and see.  I'm not sure I can agree on Greninger.  I can agree on Hamilton and Hash because I think we've got enough there.  But my concern on Greninger, there's no photos, there's nothing to back up -- (Interrupted)

MR. LITTLEFIELD:  Well, there's no photo on Hamilton's either.  It's just the testimony of the

3455

witnesses that placed it in -- (Interrupted)

MR. HILFIGER: You've got glue spots and you got other stuff -- (Interrupted)

MR. LITTLEFIELD: Yeah.

THE COURT: Here's what I want you to both think about for the record. I want you to agree on, we want to make a photograph of those.

MR. HILFIGER: Okay.

MR. LITTLEFIELD: We can certainly -- I think we can -- I think we can clearly get those two -- (Interrupted)

THE COURT: Those that you don't agree on you might want to think about making photographs and ask the Court to rule on them. If I rule against you, you want to make them -- present them -- preserve them for purposes of the record. I just -- it just occurred to me -- I get up and look every once in a while, try to get oriented, but anybody reviewing this record without seeing that mock up and the size of the vehicles and at least some of the depictions that you all have illustrated, I think it would be helpful.

MR. LITTLEFIELD: May I make an oral motion to be allowed -- and probably the best time to do that as far as photographing it for presentation to the Court at a later date would be on Thursday or Friday, because

3456

there is no court.

THE COURT:  That's fine.

MR. LITTLEFIELD:  And I would ask orally for permission of the Court to bring a digital camera into the building for the purpose of making those photographs.

MR. HILFIGER:  And I can -- I'll let you use mine.  I brought -- (Interrupted)

MR. LITTLEFIELD:  I don't want it -- (Interrupted)

MR. HILFIGER:  There's nothing wrong with the defense's digital.  I mean, it's not going to show anything -- (Interrupted)

MR. LITTLEFIELD:  I'm not sure I know how -- I can operate -- I'm not a digital camera guy.  I want to get somebody to come over and take.

THE COURT:  The best thing for you all to do is meet over here and the ones you can agree to, agree to, and the ones you don't agree to you can say I know you don't agree with this, but this is the one I'm going to present to the Court to be introduced as depicting something I think is important.  And then if I turn it down you can present it as an offer of proof so we'll have the record clear.

MR. LITTLEFIELD:  And I don't think there are more than maybe -- (Interrupted)

3457

MR. HILFIGER: Greninger is the only one that I can see is -- (Interrupted)

MR. LITTLEFIELD: Yeah, and -- (Interrupted)

MR. HILFIGER: -- because there is some float on whether -- (Interrupted)

MR. LITTLEFIELD: Well, and there's going to be -- I don't know if you're going to agree, for example, to where I would position the vehicles as the officers identified them during the entry.

MR. HILFIGER: During what?

MR. LITTLEFIELD: The entry. You know -- (Interrupted)

MR. HILFIGER: I think that's a floating deal, too. I mean, there's going to be some -- there's going to be some float on that.

THE COURT: You can -- in the future you can count your arguments knowing what the pictures are in in the record so that somebody looking at this on appeal has some better idea of what you're talking about.

MR. LITTLEFIELD: Still not sure I can do that one, but -- (Interrupted)

THE COURT: Well, at least we'll have -- it will be a -- there'll be a photograph there for them to see.

MR. LITTLEFIELD: I understand.

3458

THE COURT:  Okay.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q   (By Mr. Littlefield) Let's go back to Defendant's Exhibit Number 221.  What was the condition of the door when you observed it, ma'am, when you went out there and observed it at the scene?  And the door -- by door I mean the front door to the residence?

A   The front door to the residence when I arrived, the exterior skin of the door had been torn open and there was still one -- (Interrupted)

Q   Now, where was it?  Open, closed, how far open, what?  My question may not have been clear.

A   Okay.  I believe it was open when I arrived.  I opened and closed it while I was there.  But I believe it was open when I arrived.

Q   You talked to people at the scene, correct?

A   Yes.

Q   And got some information and background information as to what individuals were saying occurred?

A   At the scene -- (Interrupted)

Q   Well, at the scene and since?

A   I have had discussions -- excuse me -- with various people in this investigation and what they say occurred.

Q   Is there any indication of a shot coming from

southeast, going towards the northwest, other than that trajectory through the closed door, in the entirety of your investigation?

A    Just that there's a hole through the door that indicates at some time some projectile went through that door.

Q    Okay.  But other than that trajectory going through the closed door, which is shown in your dotted line going across the word porch, is there any indication of a shot going through that front door from the southeast in front of the house toward the northwest?

A    No.

MR. LITTLEFIELD:  May I approach again, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) I'm sitting here going, dang, I should have thought of that a moment ago.  I'm going to ask you to put it back on -- in the position of trajectory one.  And go ahead and lay it across the hood to secure it.  I understand it didn't enter the hood, it entered on the right front quarter panel.  And is that the -- is it well enough secured or do you need to put another deal of tape on there?  Do you trust me with it?

MR. LITTLEFIELD:  May I approach, Your Honor?

THE COURT:  You may.

3460

Q    (By Mr. Littlefield) Do you recall on cross examination where Mr. Hilfiger was up here trying to position the model which is part of Government Exhibit Number 1 with your demonstrative display of the trajectories into the Bronco?

A    Yes, sir.

Q    And I think you responded that Mr. Hilfiger was not placing it in a proper position.  Was that what you were saying?

A    I did observe that the position he was holding the model was not identical to the one projected on the screen.

Q    What was wrong with the way that he was displaying it in relation to the item projected on the screen?

A    The two were not in the same -- did not appear to be in the same plane or at the same angles.

Q    What do you mean the same plane?

A    Well, it appeared that one -- that one of the Broncos was angled one direction and one was angled the other direction.  It was -- (Interrupted)

Q    Would that have -- how would that impact the trajectory?  In the matching of the trajectories between the AVI, which was the demonstrative exhibit, and the model, which is part of Government Exhibit 1?

A    Well, unless you can get them into the same

3461

orientation, then you can't make a direct comparison.

MR. LITTLEFIELD:   And if I may approach, Your Honor?

THE COURT:   You may.

Q     (By Mr. Littlefield) Do you remember the scenario -- and I'm not going to try to give it a label, where the headlights are approaching towards the residence, from somewhere in there, is that approximately where it was? And I know we can't position it exactly the spot, but is that approximately the location?

A     Somewhere in that area, yes.

Q     Do I need to move it one way or the other?  You don't remember?

A     I don't know exactly.  Never marked the exact position so I don't know.

Q     If we moved it this way, this way, up, back, any amount of ways -- yesterday when you were asked about this, you indicated trajectory number nine could not have been shot from the front door.  Do you recall that?  In this approach, that trajectory number nine was not consistent with the shooter being in the front door following this angle with the vehicle positioned like that.  Do you recall that?

A     I believe I said that in response to a specific path that you identified -- (Interrupted)

3462

Q    And was this along the lines of the specific path?

A    Yes, sir.  Somewhere in that area.

Q    If we took the vehicle from this position where the headlights are near the edge of the grass back almost in front of the left -- or the right edge of the porch as you're facing it, and approach the vehicle so it ended up as it's been displayed, is there anywhere along that path where number nine can enter the vehicle, if the shooter is in the area of the front door?

A    If the shooter is in the area of the front door then the -- and remains in that position and shoots number nine, then the Bronco has to be turned such that the right side of the Bronco is approximately 90 degrees to the shooter.

MR. HILFIGER:  Your Honor, I'm sorry.  I thought the question was to number one and she was answering as to number nine.

MR. LITTLEFIELD:  I asked that it was number nine.

Q    (By Mr. Littlefield)  The vehicle would have to be turned in a position so that the front bumper is approximately 90 degrees or -- to the house, isn't it, along that line there?

A    Yes.  Approximately -- so it would have to be turned such that that trajectory is -- and the barrel of the

3463

weapon are along the same line.

Q   Do the headlights any longer point at the house if it's on this line?

A   If the shooter is in the doorway -- well, in that position -- I'm sorry.  In that position, the Bronco headlights would not be pointing directly at the house.

Q   And that position would allow the shooter to put number nine in; is that correct?

A   It would be possible for a shooter in the doorway to do number nine -- (Interrupted)

Q   Okay.

A   -- in that general orientation.

Q   If we go back to where the headlights again are shining into the house or into the area of the house, can Trajectory 1 be shot into the vehicle by a shooter from the doorway, with the vehicle in this position and following a path that approaches, in part, where Mr. Hamilton ended up being parked?

A   It may -- as it approaches, it may come into a position consistent.  I'm not certain.

Q   On this line, is there any position where the shooter can fire from that door and put in Trajectory 1?

A   It doesn't appear so from here.

Q   For trajectory one to be fired from the front door, the vehicle has to be at least at that angle to the front

3464

door, doesn't it?

A    Vehicle has to be oriented such that the barrel of the rifle is along the same line as the trajectory.

Q    Okay.  If you would come down here, would this be where the barrel of the rifle -- if the shooter's in the front door, is that where the barrel of the rifle is oriented to the trajectory?

A    It looks like it could be.

Q    Do you recall when you were asked to utilize this dowel and position it inside the door -- and as I was looking, you were going to the western edge of that post, the eastern-most post on the porch.  Do you recall that?

A    Yes, sir.

Q    Why didn't you go inside that post?

A    There were two issues raised.  One being a condition given that the gun was inside or at least partially inside the room, which would make a defining point being the door frame.  So I have to insert inside the door frame.  The other issue is the relative size of the dowel rod compared to an actual trajectory.  The dowel rod is relatively much larger than the actual trajectory.

Q    So if you'd of used a different dowel rod, can you get inside the front door then?

A    If the dowel rod is a smaller diameter it is possible.

3465

Q     These dowel rods -- does that allow it?

A     It looks like it does.

Q     Okay.  Is that trajectory using that dowel rod still too large?

A     Yes.  The relative size of the diameter of the dowel rod is still considerably larger than what the trajectory would have been.

Q     If we took a string rather than one of these dowel rods, like a string of thread, would you then be able to go on inside the door down?

A     It looks like you could.

Q     Do you remember the questions you were asked about each one of the trajectories and asked in regards to the driver being injured if he was ducking between the seats?  Do you recall that?  You were asked about a number of trajectories.  You were asked about Trajectory 7, Trajectory 6, Trajectory 13, Trajectory 14, do you recall all those questions and asked would the driver have necessarily been injured?  Do you recall those questions and that line of questioning?

A     Yes, I do.

Q     Where were projectiles going, the fragments from those projectiles, going throughout the cab of that vehicle?

A     There were fragments in the headliner.  Fragments

3466

struck the interior side of the driver's window. Fragments strafed across a note pad on the dash.  They were going lots of places in the front end of that vehicle.

Q    When you were describing that had the driver been positioned in a certain position or going, was that taken into account injury from fragments?

A    Those questions were relative to specific trajectories and if he could avoid specific trajectories. I can't say what might have happened as far as fragments.

Q    Even if one were able to avoid the projectiles along those trajectories, would that have assured that the driver would have avoided injury from fragments caused by those shots along those trajectories?

A    Since I don't have any way of determining the exact pass of each fragment, I have evidence looking inside the Bronco that there are fragments going a lot of places, I can't say to a certainty what position a driver would be in to be struck by a fragment.

Q    Do you know specifically what position the driver was in on each one of those shots or trajectories?

A    No.

Q    Do you have any reason to disbelieve that Mr. Hamilton in fact received injuries to his face, eye and left shoulder?

3467

A    I have no reason to think -- to have any particular opinion.

Q    Have you seen pictures of him?

A    Yes.

Q    Did he appear to have injuries?

A    Yes.

Q    Did you talk to him?

A    Yes.

Q    Did he appear to be injuries?

A    Not at the time I talked to him.

Q    Did he acknowledge that he had received injuries?

A    Yes, he said he was injured.

Q    Is there any reason -- can you tell which shot, which trajectory, caused the injuries to Mr. Hamilton?

A    No.

Q    These scenarios that were discussed, did you come up with them?

A    No, sir.

Q    And there are a whole bunch of scenarios.  We got some H's and some M's and some KB's and Mike Littlefield's and all kind of deals.  Were those your thoughts as to what happened?

A    No, sir.

Q    When you were answering questions in regards to the various possibilities, were you trying to endorse any

3468

particular idea or position or anything such as that?

A    No, sir.

Q    Do you know where the shooter was?

A    No, I do not.

Q    Do you know which order the shots were fired in?

A    No, I do not.

Q    Do you know where the Bronco was when it received a shot -- any of those shots?

A    No, I do not.

MR. LITTLEFIELD:  May I approach, Judge?

THE COURT:  You may.

Q    (By Mr. Littlefield) And would you remove Trajectory 1 and place Trajectory 10?  And then when it entered in where?

A    Went in through the grill and struck the -- perforated the radiator.

Q    Okay.  Now under -- and can you put it not exactly in the position where it entered the grill, but put it on the hood along that angle so it will be more secure.  And we'll all bear in mind that it was actually a couple of feet lower than that.

MR. LITTLEFIELD:  And may I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) You don't know where the first

3469

shot was fired?

A    No, sir, I do not.

Q    You don't know where the shooter was located?

A    No, I do not.

Q    Do you know the position the Bronco was in in relation to this when the first shot was fired?

A    No, sir.

Q    Or the second?

A    No, sir.

Q    Or the 18th?

A    No, sir.

Q    Okay.  If the Bronco is placed in that position, can a shooter have fired that shot from the front door?

A    I need to come down and check.

THE COURT:  Can the jury see?  Okay.

JUROR:  I can't see from here.

THE COURT:  Well, you can move if you like, and get where you -- you can move in the front or stand up or walk over here if you like.  Or you can move to this seat here in the middle if you want.  Yeah, you can go ahead.

JUROR:  This is fine.

THE COURT:  You can even come all the way up here and stand right behind these guys.  Anywhere you want to go to see.

JUROR:  Thank you, sir.

3470

A     If the question is could number 10 have occurred with the shooter in the area of the front door and the Bronco in that approximate location, it appears that that's a possibility.

Q     (By Mr. Littlefield)  What if the shooter stepped out a step, comes out a step further?  How does that small difference in the shooter's position change in regards to the possibility of firing that shot?

A     Well, the farther out the door that the gun is, the greater that the scope of the possibilities for the trajectory could be fired.

Q     Okay.  Does that make it more -- or if the shooter was out a full step on the front porch, does that make it more likely that that shot could be delivered at that position or the Bronco in that location?

A     I couldn't say whether it's more likely that that particular shot occurred in the particular position.  But if the shooter's outside the door, then there's a wider range of area where you could be shooting.

Q     If the shooter's out the door then, would he be able to shoot it, hit the vehicle here?

A     Again, with the shooter outside the door then it's a wider range of possibilities and the possibility he could be shot in that particular position.

Q     Okay.  Now, put Trajectory 12 on.  Is it on 12?

3471

A    As near as I can remember it.  It struck the arm bar of the wiper blade and then struck the windshield.

Q    Okay.  Can't do it from standing right at or just outside the front door there?

A    Not with the Bronco in that position.

Q    How about there?

A    No.

Q    How about there?

A    From the front porch, yes.  From this position the Bronco appears to be getting outside the range of possibilities.

Q    Okay.  So it needs to be there.  Does that little amount of movement bring it back within the range?

A    It appears the Bronco would need to be turned slightly.

Q    Or moved up?

A    Or moved forward.  That's approaching the range of possible.

Q    Okay.  With those angles, a small movement of a degree of the position of the shooter makes a big difference in what could have been hit at what time, doesn't it?

A    Yes.  The changing position of the shooter changes the range of possibilities for shots that that shooter could make.

3472

Q    A change in the angle of the Bronco changes the likelihood of a trajectory being fired at that location or being able to hit the Bronco, doesn't it?

A    Change the position of the Bronco changes the range of possibilities for the shooter relative to the Bronco.

Q    You don't know whether anyone has been able to place an exact location of Kenny Barrett when the shots were started to be fired, do you?

A    No.

Q    You don't know whether anyone has exactly placed the Bronco or exactly placed its position when the shooting began, do you?

A    No.

MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.  Let's take our afternoon recess.  If you'll remember my admonition not to discuss this matter during your recess, I'll ask everyone in the courtroom to please remain seated as the jury leaves.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Witness may step down.

(Whereupon, the witness left the courtroom after which the following record was made.)

THE COURT:  Anything to take up outside?

MR. LITTLEFIELD:  No, Your Honor.

3473

THE COURT:  For the defense?

MR. HILFIGER:  No, Your Honor.

THE COURT:  Are we making any headway toward -- I'm concerned about your forecast about additional witnesses in this case.

MR. LITTLEFIELD:  Got four.  I'm not sure how long we're going to take -- have left with her.  I anticipate putting at least one more on, if not a couple of more this afternoon.

THE COURT:  So we will go into tomorrow.

MR. LITTLEFIELD:  That's my guess -- yes, we will go into tomorrow.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  You may continue.

MR. LITTLEFIELD:  Pass the witness, Your Honor.

THE COURT:  Further cross examination?

MR. HILFIGER:  Just a couple of questions, I hope.

RECROSS EXAMINATION

BY MR. HILFIGER:

Q    I'm sort of interested in the last couple possibilities that you talked about today.  You talked

3474

about number 10 as being a possibility out there in that location, is that right?  Trajectory Number 10, didn't you talk to Mr. Littlefield about it being -- and the car was a little bit different lineup, but it was back out in that area, with the shooter on the porch as being a possible?

A    I believe that there was a configuration we discussed where that would be possible, with the shooter on the porch.

Q    Okay.  And were you --

MR. HILFIGER:  Judge, may I approach the model?

THE COURT:  You may.

Q    (By Mr. Hilfiger) Were you talking about with this -- out in this area?

A    That at a particular location where Mr. Littlefield placed the Bronco?

Q    Yes.

A    That he did place it in a location that it would be possible for a shooter on the porch -- (Interrupted)

Q    Can you sort of guide me to that location here?  I mean, you made the determination, didn't you?  Was it -- was it -- I don't want to put it some place that you didn't -- don't say that it was.

A    As I previously testified, I can't determine where the Bronco was at any given trajectory.

3475

Q    I'm not talking about at any given trajectory.  I'm talking about where the Bronco was when you said to Mr. Littlefield that, yes, where the Bronco is in that location is a possible trajectory from the front porch for number 10.

A    Yes, I said that at the position that he had it, it was within the range of possibilities.

Q    I want to know what was that position.

A    I don't know if I can place it in the exact position because that position wasn't marked.

Q    Okay.  Was it up here?

A    It was further back than that, I think.  I don't recall.

Q    Was it back out in here?

A    I don't recall the exact position.

Q    Was it here?

A    I don't recall.  It was in that general area.  I don't recall exactly.

Q    Was it in this general area?  Okay.  Let me ask you this.  Is it in that general area?  As I recall, you testified that there is a gentle slope from that ditch up to that house, didn't you, yesterday?

A    I said that there was a slope.

Q    Did you use the word gentle -- (Interrupted)

A    I don't -- (Interrupted)

3476

Q    -- shallow grade I think is what the words you used; isn't that true?

A    I believe I said it was not a steep grade.  I don't recall the exact words that I used.  I don't believe I used the word gentle.

Q    When you made the decision -- or saying that it was possible for number 10 -- did you take into any kind of consideration the level of the trajectory?

A    What I did was look at the model and the position that he described for the shooter and I put the rod there to see if it was possible for a trajectory given those exact positions and I could see that that was within the range of possibilities.

Q    But you were specifying as to Trajectory 10, is that right?

A    Yes, he asked about Trajectory 10.

Q    Okay.  And on Trajectory 10 can you tell this jury anything about how you made the determination of what kind of a level that trajectory was going into the car for Trajectory 10?

A    The level it was going in it went in through the grill and perforated the radiator.

Q    Yeah.  In relation to the horizon, what kind of level would you make?  Would you say it went from front to back, from high to low, from low to high or almost

3477

horizontal or can you recall?

A    I never said high to low or low to high.

Q    Okay.  Would you say horizontal then?  Or near horizontal?  Can you remember?

A    I remember that it's -- it would be -- that it was somewhat close to horizontal.  It was not notably downward and definitely not upward.

Q    Well, let's look at Trajectory 10 on your drawing, okay?  Do you see that drawing?

A    Yes, sir.

Q    Does that look like it's upward or downward or near horizontal?

A    It appears to be near horizontal.

Q    Okay.  Knowing that, if you throw that variable in, can number 10 be done?

A    I would have to put a rod on it and see.

Q    Well, would you have to make the determination of whether it's level or not?

A    I would just have to put the rod on there and see if it would match the trajectory.

Q    And are you talking about levels?

A    I'm talking about trying the establish the same trajectory in all planes and then put a rod on it and see if it would match.

Q    -- put the rod on there.

3478

A   On where?

Q   On the car.

A   I can't put the rod through the car.  It went in through the grill.

Q   Okay.

A   And you can't tell it from -- it's difficult to work with it when you take a rod on top of the hood because that's not where it went into the Bronco.  It went in in the grill.  And I don't have a way of taping it so that it can go in into the grill in the same way.

Q   And do you have any way of telling whether or not -- where that car is, the ground that the car is on in that model, is that ground lower or higher or the same as the ground that the house is on?

A   It appears that it's lower where the Bronco is positioned now relative to the house.

Q   Okay.  So let's just use -- let's just try to use our head a little bit, okay?  So, this went into the grill of this car, right?  And I know you're not going to tell me how high that is.  But --

        MR. HILFIGER:  Let me approach just a moment.

        THE COURT:  You may.

Q   (By Mr. Hilfiger) Let's use this other Bronco, okay?  If we put this other Bronco, this one here, up here on the porch, where is that grill in relation to the porch

3479

as far as height off the porch?

A     The grill is slightly higher than the porch.

Q     Just slightly higher?

A     Well, it's higher than the porch.  I don't know how to describe exactly high.  It's higher than the porch.

Q     Okay.  Now, would that be level from this grill, where this is here, to down to here, or would it be slightly downward?  If you put this rod from where you say it went in there to where that is right there.  Would you say that is level, horizontal -- level to the horizon or would you say it is upward or downward?

A     From the angle I'm looking at it, looks like it's nearly level.

Q     Okay.  Even though according to what you say this here, this area here, the ground here is lower than the ground here; is that correct?

A     Yes.  The ground where the -- in the middle of the model appears to be lower than the ground on this side of the model.

Q     Right here?

A     Yes, sir.

Q     And so, if this ground is lower than this ground here, and you have two identical Broncos, this Bronco and this Bronco, and I put a straight rod on a location here on this Bronco and run it down to the same location on

3480

this Bronco, would you anticipate that that would be level or would you anticipate that it would be going downward?

A    If everything else is equal and you put them in the same height from the ground at two separate points and the ground is lower at one point, then I would expect the line would not be level.

Q    Okay.  So if you are saying this picture that it's near horizontal and you have a shooter at this door, the shooter's not -- has there been anything saying that the shooter's laying on the porch?

A    I don't recall anyone asking about a shooter laying on the porch.

Q    The assumption that you used is he's standing or kneeling or something so he's up, is that right?

A    I'm not making any assumption.  I'm trying to answer the question as asked, given a specific scenario.

Q    Okay.  The specific scenario I'm asking is if the shooter's on the porch and if that Bronco is at a lower level than that Bronco is there, and the shooter shoots to that Bronco, can it come in at a horizontal level?

A    It could make that particular trajectory.  It appears to me that that is a possibility that a shooter could be on the porch and could make that particular trajectory from the porch with the Bronco in that

3481

approximate position. Because another aspect here is that the two Broncos aren't -- there's nothing saying that they are both level. That if one is coming up hill then obviously it's not as level as one that is at the -- say the top of the hill and all four wheels level.

Q   But if it's coming up hill then it's not horizontal to the ground, right?

A   It may be parallel to the ground but it may not be horizontal.

Q   I didn't say parallel, I said horizontal. And so you're saying that this would be coming up a hill and the shot would be coming down at the same level that that is parallel to the ground?

A   I said if the Bronco is coming up the hill it's possible for someone higher to shoot and that the resultant trajectory could appear level when the Bronco is sitting on level ground.

Q   And is there anything here to show that those levels -- that this hill is at that -- or is that -- do you even call that a hill?

A   It appears to be hilly to me. I mean, it's not flat.

Q   Okay. So that's -- you refer to that as hilly out there? Is that -- (Interrupted)

A   It's not flat.

Q   Well, would you say hilly?

A   Yes, I said hilly.  I said that terrain out there was hilly.

Q   Okay.  Well, if it's hilly then that's -- you're okay.  That's fine.

MR. HILFIGER:  I have no further questions.

MR. LITTLEFIELD:  I don't have any redirect, or re-redirect.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Do you have any objection to this witness being excused?

MR. HILFIGER:  No, that's fine.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.  You may be excused.

Members of the jury, you are instructed that Ms. Dalley's PowerPoint presentation was only offered as a demonstrative aid to illustrate Ms. Dalley's testimony. The PowerPoint presentation is not evidence and should in no way be viewed as an actual recreation of any incident. Like any testimony, Ms. Dalley's PowerPoint presentation may be accepted or rejected in whole or in part.  I would also ask that counsel provide the clerk at the appropriate time with a copy of the PowerPoint presentation so it can be made Court Exhibit 3 for the

purposes of the record.  It will be preserved as a Court Exhibit what, Paula?  Three.  Okay.  You may call your next witness.

MR. LITTLEFIELD:  Brandie Price.

MR. HILFIGER:  Your Honor, may we approach just a few matters?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. HILFIGER:  The only thing I do request on the PowerPoint presentation is only the stuff that we -- because some -- only the stuff that was presented or shown.  Because there was more to it -- the actual PowerPoint -- the full PowerPoint included all -- (Interrupted)

MR. LITTLEFIELD:  There were items that were not presented.

THE COURT:  All I want is what was presented in court.

MR. HILFIGER:  That's it.

MR. LITTLEFIELD:  We'll offer the photographs and I think Roger admitted they could be admitted as exhibits.  But we haven't done that yet.

THE COURT:  Yeah.  I think -- that's okay.

MR. HILFIGER:  And the other thing is on

3484

Brandie Price, we object.  This is -- appears to be more cumulative evidence as to the same, you know, she was out there and used drugs from time to time and it's cumulative.  This is like about the sixth witness saying the same thing.

MR. LITTLEFIELD:  She's going to talk about her drug use out there unless she's asked on cross examination.  She did not use drugs out there.

MR. HILFIGER:  Okay.

THE COURT:  Okay.

MR. LITTLEFIELD:  And our victim witness coordinator isn't here so I'm not sure if she's -- if Ms. Price has the word.  Do you want me to send somebody out? She's down in 218.

THE COURT:  She's right there.

MR. LITTLEFIELD:  Is she out there?

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Ma'am, if you would stand before the clerk and be sworn.

(Whereupon, the witness was administered the oath.)

THE COURT:  Ma'am, if -- when you're asked a question, if you'll lean up and talk right into the microphone it'll help.  Thank you.

3485

BRANDIE PRICE,

being first duly sworn to testify the truth, the whole

truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record, ma'am.

A    Brandie Price.

Q    And you know an individual by the name of Kenny

Barrett?

A    Yes, sir.

Q    Do you recognize him in the courtroom today?

A    Yes, sir.

Q    Where is he?  Go ahead and point and describe what

he's wearing.

A    I can't tell.  Gray shirt, maybe.

MR. LITTLEFIELD:  Judge, I'd ask the record to

reflect that she has pointed to and identified the

Defendant.

THE COURT:  Record so reflects.

Q    (By Mr. Littlefield)  And, ma'am, when was it that

you were an acquaintance of Mr. Barrett?

A    August and September.

Q    Of?

A    '99.

Q    Are you familiar with -- do you see what's shown

3486

there in that model that's -- it's identified as Government Exhibit Number 1?

A     Yes, sir.

Q     Are you familiar with where that is, ma'am, what that depicts?

A     Yes, sir.

Q     What is it?

A     The cabin at Kenny Barrett's place in Sallisaw, Oklahoma.

Q     And you indicated that you were out there essentially August and September of 1999?

A     Yes, sir.

Q     How often did you go out there, ma'am?  And I'm not asking for a specific number, but approximately how many times do you think you may have gone out there?

A     Not a whole lot, probably four, five, six times at the very most.

Q     And, ma'am, have you ever used drugs?

A     Yes, sir.

Q     What kind?

A     Methamphetamine.

Q     And have you ever been convicted of a crime, ma'am?

A     Yes, sir.

Q     What crime or crimes?

A     Possession with intent to distribute

3487

methamphetamine, CDS.  Possession of a firearm in commission of a felony, feloniously carrying a firearm.

Q    Ma'am, you're going to have to get closer to the microphone?

A    Feloniously carrying a firearm.

Q    Okay.

A    Possessing a firearm in commission of a felony.

Q    Okay.

A    Possession of drug paraphernalia, possession of marijuana, possession of CDS with intent, uttering a forged instrument and knowingly concealing stolen property.

Q    And were -- were you convicted of all of those, ma'am?

A    Yes.

Q    What sentence did you receive?

A    Ten, seven, five and one, the years.  They all ran together, concurrent.

Q    Okay.

A    And I received a one year program, upon completion the balance of my sentences was to be suspended.

Q    What was the ten year sentence for?  That was the more serious of the sentences.

A    Possession with intent.

Q    Of methamphetamine?

3488

A    CDS, yes, sir.

Q    And did you complete the program?  Did you actually go to a penal institution?

A    Yes, sir.

Q    And did you complete the program, ma'am?

A    Yes, I did.

Q    What kind of program was it?

A    It was a boot camp and a therapeutic community combined inside a minimum security women's prison.

Q    When was it that you entered your plea of guilty? And I'm not asking a specific date.  What year?

A    '99.

Q    When was it that you went to prison?

A    '99.

Q    And how long -- what did you have to stay in to complete the program?

A    Eighteen months.

Q    Since 1999 have you been using illegal narcotics?

A    No, sir.

Q    Program work?

A    Yes, sir, it did.

Q    During the two month period when you went to Mr. Barrett's -- let me show you Government's Exhibit Number 69 and it will be displayed on that little bitty screen to your left and it will also be displayed up here on the

3489

screen for the jury to view.

A    Okay.

Q    Do you see that, ma'am?

A    Yes, sir.

Q    And to your right, just in front of you -- you've got -- just to your right, right in front of you, you got this little deal and it's got a little arrow on it.  If you punch this button and point it, it's a laser pointer -- see the dot?

A    Uh huh.

Q    Can you take that pointer and punch the button and show where Mr. Barrett's cabin was located on this?  Okay.  And when you went there, where did you normally enter?  I mean, how did you approach and enter?

A    If the gate was open then we would go through right here.

Q    Did you ever have occasion to go out there -- when you went, who did you go with?  Same person, different people, what?

A    Only two -- two different people.  One male and one -- the other was a female.  They were both acquaintances of Kenny's.

Q    Did you ever go out there when that gate was locked?

A    Only once.  Well, and actually go onto the property only one time.

3490

Q    How did you go on to the property?

A    We went down that road and there was a trailer on further than the picture.  Right before that trailer there was like -- it looks like a turn around.

Q    Okay.

A    And we went in that way and went through like almost like a dip or a ditch and then come in right through there.

Q    Okay.  Can you see where you entered and where the dip and ditch is?

A    Yes.

Q    And can you point to that area where the dip and the ditch is, ma'am?

A    The dip, I believe it would have been like right in there.  And I actually came from right there, right through there and around.

Q    Okay.  Did you ever see any other individuals drive through that area, ma'am?

A    No.

Q    When you were out there did you have occasion to visit and talk with Mr. Barrett?

A    Yes, sir.

Q    And was there ever any discussion of an -- of a warrant?

A    Yes, sir.

3491

Q    Can you tell the jury what the discussion of the warrant was?

A    Shortly after we arrived and we actually went into the cabin, he had made the statement that if -- (Interrupted)

Q    When was this?

A    This was the same week of -- (Interrupted)

Q    Well, let me back up.  Are you -- and let me -- I'm going to withdraw that and let's go at it a different way.

A    Okay.

Q    Are you aware of the occurrence in which law enforcement officers were shot at Mr. Barrett's residence on September the 24th, 1999?

A    Yes, sir.

Q    And you weren't out there, didn't see it happen, but did you -- how did you become aware of it?

A    I was -- (Interrupted)

Q    Not where you were but I mean by what medium? Reading the newspaper, television or what?

A    Become aware that it had actually happened?

Q    Uh huh.

A    On TV.  I saw it on the news.

Q    Okay.  How long prior to the occurrence had it been that you were last at Mr. Barrett's residence?

3492

A    A week to ten days.

Q    At that last time you were at Mr. Barrett's residence, was there any discussion of a warrant?

A    Yes.

Q    And what was the nature of that discussion?

A    That he, Kenny, had actually said when we came -- shortly after we got there.

Q    Lean forward.

A    Shortly after we got to his house, he had made -- he had said that if we were there when they showed up, they being the law, that we would grab a gun and hit the floor.  That he had -- someone, somewhere, had told him that he had a warrant and it was, you know, drug related that they would be coming to his home to get him.

Q    And he told you to do what?

A    To either grab a gun or hit the floor.

Q    Did he make any other comments as to what his intentions were when the law showed up?

A    He was going to open fire on them and take as many -- because he intended at least from the conversation we had, he intended to -- (Interrupted)

MR. HILFIGER:  Your Honor, I'm going to object. Now she's doing speculations.  She's not saying what he said, she's saying this is what I intended.

THE COURT:  Sustained.

3493

Q     (By Mr. Littlefield) What did he say he was going to do?

A     To take as many of them bastards with him as he could.

THE COURT:  I didn't -- I think she was too close to the mike.  I at least couldn't understand.

Q     (By Mr. Littlefield) What -- say it again.  Slow down a little bit.  I think you rushed it.  What did he say he was going to do?

A     Take as many of them bastards with him as he could.

Q     Did he have any firearms?

A     Yes, sir.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 128 be displayed to the witness.

THE COURT:  You may.

Q     (By Mr. Littlefield) And, ma'am, would you look at Government Exhibit 128.  If you need to you can pull it out of the box.  Do you recognize that, what is marked -- what is Government Exhibit 128, ma'am?

A     An AR-15.  The same one that was in the -- where we visited at, at Kenny's residence.

Q     I'm sorry.  I'm not understanding you.

A     It's an AR -- it appears to be the same gun that I saw at his residence in the little visiting room.

Q     When you say the little -- you said the little what

3494

room?

A    Well, it's where we visited, where we sat down and talked and BS'ed.

MR. LITTLEFIELD:  I would ask that Government Exhibit 175 be displayed to the witness.

THE COURT:  You may.  Exhibit number on the weapon was what?

MR. LITTLEFIELD:  128.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit Number 175, ma'am?

A    Yes, sir.

Q    And what does that show in regards to the layout, what's that a layout of?

A    Kenny's cabin.

Q    I think you used the term visiting room.  Which room were you referring to as the visiting room?

A    The bottom right corner.

Q    And where was it that you would see that firearm, Government Exhibit 128, located in that bottom right hand corner room?

A    The northern wall.

Q    Go ahead and if you reach up and just tap that screen at that location, it will record that location.  Okay.  And how was it positioned?  Do you see how it showed up there?  How was it positioned at that location?

3495

I mean, was it hanging from the ceiling or laying on the floor or what?

A    It was leaning like against -- I can't remember if it was a shelf or cabinet.  I don't really recall exactly what it was, but it was just leaned up against it.

Q    Did you notice how that AR15 was loaded?

A    Two clips, black taped together.  I remember that. I don't remember much more than that.  But I do remember having -- not black -- electrical tape wrapped around two clips that went to that gun.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 17 be displayed to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you recognize what you see there, ma'am?

A    Yes, sir.

Q    What is that?

A    The gun and a -- the two clips that were electrical taped together.

Q    Is that how Mr. Barrett kept it loaded?

MR. HILFIGER:  Your Honor, I object.  That calls for a speculation.

Q    (By Mr. Littlefield) Okay.  Is that how you saw the clips inserted in that rifle?

A    One time, yes.

3496

Q   Was that the only firearm with which you were familiar Mr. Barrett having possession of?

A   No.

Q   What other type of firearm did Mr. Barrett have in his possession, ma'am?

A   A 9 millimeter handgun.

Q   And where would you see the 9 millimeter handgun?

A   Usually in his waistband or on his left hip or maybe in a holster on his hip.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 122 be provided to the witness.

THE COURT:  You may.

Q   (By Mr. Littlefield) And go ahead and take -- you can go ahead and remove it from the box.  Do you recognize that, ma'am?

A   I don't recall ever actually -- it was always on his hip.  I don't recall him ever pulling it out in front of me, like waving it around.  From about here up it looks familiar, but I really couldn't tell you what from there down it looked like, honestly.

Q   Okay.

A   But it appears to be, but I couldn't say for absolute certainty, because I never saw the barrel.

Q   Okay.  Go ahead and reinsert it in the box.  And you can -- I guess the clerk is going to pick it up.  Are

3497

there any kind of actions against you, any criminal cases pending, or any charges pending against you or anything like that?

A    No, sir.

Q    And we've had communication before, haven't we?

A    Yes, sir.

Q    Do -- who initiated the contact between yourself and me?

A    You did.

Q    Were you expecting to see me when you first saw me?

A    No, sir.

Q    Why are you here?

A    Because I have to be.

Q    Why?

A    I received a subpoena very unexpectedly.  I received a subpoena that I had to appear here.  I had no other option but to appear here -- appear here and give as truthful a testimony as I'm capable of.

Q    You were using drugs at that time?

A    Then, yes, I was.

Q    Clean and straight now?

A    Absolutely.

        MR. LITTLEFIELD:  May I have a second, Judge?

        THE COURT:  You may.

        MR. LITTLEFIELD:  Judge, I'll pass the witness.

3498

THE COURT: You may cross examination.

CROSS EXAMINATION

BY MR. HILFIGER:

Q   Ms. Price, I understand -- I didn't catch how many times you said you were out there when you were talking about in August and September of 1999?

A   Yes, sir.

Q   How many times did you say?

A   No more than six, but no less than four. Some visits I may not necessarily have gotten out of the vehicle.

Q   I didn't -- (Interrupted)

A   I may not have gotten out of the vehicle. You know, there may have been times that I was there but I didn't actually like get out of the vehicle and then go around.

Q   Okay. Who -- and I didn't understand. I'm going to back up just a second. I didn't understand. You had a conviction for possession with intent, you had a conviction for possession of firearms during commission of a felony?

A   Yes, sir.

Q   And how much time did you get on that?

A   On the possession of a firearm? If I'm not mistaken they reduced the sentence. I think that one went away.

Q   What else was it? You had 10, seven, five and

3499

something.  What was the seven?

A    One.

Q    What was the seven years?

A    Honestly, I don't remember.

Q    What was the five years?

A    I don't remember.  It was either knowingly concealing or uttering.  I can't remember.  Haven't really needed to know any of this in a very long time.

Q    Now, were these all in one action?

A    No, sir.

Q    Were they different incidents?

A    The possession with intent occurred almost a year earlier and I received a five year deferred sentence on that.  And the second -- the latter part which was the knowingly concealing and the uttering, it occurred like eight months later and they accelerated the previous sentence to ten years in -- from five deferred to ten years.

Q    Okay.

A    Balance suspended upon completion of RTP.

Q    So when was that done?  You said you pled guilty in 1999, sometime in '99, is that right?

A    To the second case.

Q    To the knowingly concealing case?

A    Yes, sir.

3500

Q     And it was only when you pled guilty to the 1999, to the knowingly concealing case that they accelerated the possession with intent?

A     No.  No.  They were going to accelerate that case regardless.  I had -- (Interrupted)

Q     Further matters?

A     From the second case.  I got in trouble the first time.  They gave me a deferred.  When I got in trouble the second time they automatically like withdrew my deferred sentence and -- there's a word for it, PTR.  I received a PTR.  They were accelerating my sentence on the first one, regardless of the second -- I mean, regardless of whether or not I pled guilty.  But if I pled guilty, my sentence would not be as large as it would have been.  I would have gotten more like 25 as opposed to ten.

Q     Go ahead.

A     Had I chosen to make a -- you know, to fight them on the second case.

Q     And was this all in Sequoyah County?

A     Yes, sir, it was.

Q     And did you go to jail prior to the time that you pled guilty in 1999?

A     When I went to RTP?  I went to jail and then I went to -- I pulled chains like a month later, something like

3501

that.

Q   So prior to going to jail when you pled guilty, you weren't in jail for what, five or six months before that?

A   No.

Q   When you were accelerated -- (Interrupted)

A   No, I was not in jail.

Q   You didn't go to jail on that, did you?

A   I was accelerated at the same time.

Q   Well, but you said on the second case you were -- you got PTR, right?

A   Because of the second case.  So you know, where I'm from, when you get in trouble you can't turn around and get in trouble again if they give you paper -- if they give you a suspended or a deferred.  You have to stay out of trouble completely.  If you get in trouble again, then that first case, you're going to get in even more trouble over it.

Q   Okay.  I'm trying to find out the time that you got in trouble on the second case.  When was it?

A   From the time I was sentenced January -- like January 31st of 1999, for the first case.  That's when I got five years deferred.

Q   Okay.

A   And in October -- (Interrupted)

Q   That's what I'm trying to find.  October of '99 is

3502

what you're saying?

A    Yes.

Q    And then it was sometime after that that you pled guilty?

A    Yes.

Q    Now, these four to six times you went out there -- out to Kenny Barrett's house, you went out there -- well, let me ask you this:  Prior to going out to his house, did you have -- had you met him before?

A    No, sir.

Q    So the first time you went out to his house in August, was that the first time you'd been out to his house, in August of '99?

A    I've explained this to him.  And it's a little -- I'm pretty -- it may have been late July.  I'm not -- I mean, I didn't -- didn't -- you know, I didn't really have a real good sense of time.  But I believe it was around, you know, first, second week of August.  And, yes, I met him for the first time at his home.

Q    Who did you go out there with at that time?

A    Ronnie Baldwin.

Q    So the first time out there was with Ronnie Bowman?

A    Baldwin.

Q    Baldwin.  And that time, did you -- and that was either end of July or first of August, right?  And that

3503

time, did you go out daytime or nighttime?

A    The first time, daytime.

Q    And was the gate locked or unlocked?

A    Unlocked.

Q    Open?

A    Yes, sir.

Q    And then how long were you there that time?

A    I don't.

Q    A few minutes, hours?

A    Minutes.

Q    Okay.  Did you go in the house?

A    No, sir.

Q    Stayed in the car or --?

A    Yes, sir.

Q    And then how much longer was it before you got there the second time?

A    Can't say for certain but probably a week maybe. Within the week.

Q    And who did you go there with that time?

A    The same person.

Q    Ronnie Baldwin?

A    Yes, sir.

Q    Daytime or nighttime?

A    Nighttime.

Q    Did you go -- was the gate locked or unlocked?  And

3504

when I'm saying nighttime, I'm referring to was the sun down and it was dark.

A    Yes.

Q    Gate locked or unlocked?

A    You're asking me to go on like chronological order?

Q    Right.

A    I can't say for certain if I went out that time with him and the gate was locked or if it was the time after that.

Q    Okay.

A    But there were two -- on two occasions at nighttime with Ronnie Baldwin, once the gate was locked, once it was not.

Q    Okay.  And they were consecutive times, is that right?

A    One right behind the other.

Q    Right.  Or was there --

A    I went out there with another person at nighttime and the gate was open.

Q    Okay.

A    I mean, I don't have the clearest memory from that time, honestly.  Most of it's pretty clear but a lot of it is not.

Q    Okay.  The next time out who did you go out with?

A    Jamie Crow.

3505

Q    Jamie Crow?

A    Yes, sir.

Q    And that's a female?

A    Yes, sir.

Q    And was that at nighttime or daytime or --?

A    Nighttime.

Q    And was that the gate open, closed?

A    It was open.

Q    And then that's four times.  Now, you think you may have been out two more times?

A    One or two, yes.

Q    And the other one or two, would that -- who would that have been with?

A    With Jamie Crow, I believe.

Q    So the last times you were out would be with Jamie Crow, is that right?

A    I told you I wasn't really, really certain about the times being -- if I went out with Jamie in between going out with Ronnie or if it actually fell behind it.  I'm not really certain.

Q    Okay.

A    But I don't recall having gone out there with anybody other than those two people.

Q    And who was it that you went out with this time you're talking about that the gate was locked?  Who was

3506

it that you went out with that time that you went in through the drive, through that ditch?

A    When we didn't come through the -- Ronnie Baldwin.

Q    Ronnie Baldwin?

A    He was driving, actually driving my vehicle.

Q    What kind of car's your vehicle?

A    It was a Mazda.

Q    Regular little Mazda?

A    Uh huh.  You had to drive it very, very slow.  I remember that.

Q    Do you know whether or not there had been any contact prior to going out there as far as whether or not Ronnie Baldwin had made Kenny Barrett aware that he was coming out there or anything?

A    I don't -- I didn't know then and I don't know now. I have no way -- I don't know if they had contact or not.

Q    And when you came out and went through that, was that daytime or nighttime?

A    That was nighttime.

Q    Now, you mentioned something about some guns out there.  You saw some guns out there, is that right?  You identified the AR-15.  Was there something particular or peculiar about that gun that you can say, yeah, I know that gun?

A    Honestly, no.  It just looks like the one that I

3507

seen.

Q    Okay.

A    Of course, I thought I saw more than just that gun and the two that I've seen here.  But that one looks just like the one that I recall.

Q    What other guns did you -- you told somebody different number guns that you saw out there, didn't you?  Have you talked to -- other than Mr. Littlefield, you've talked back four, five years ago, you talked to some OSBI agents, didn't you?

A    I'm really -- he said something about that.  I've apparently met the same person twice and don't really remember, you know, a whole lot of the conversation.  But if I'm not mistaken, I did, but I -- (Interrupted)

Q    You talked to somebody about -- can you recall guns that you told them about?

A    Not without having -- not without reading it.  I don't really -- and I've told them this before.  I don't really remember a whole, whole lot.

Q    Okay.

A    The things I do remember, I remember well.  But I just don't -- a lot of my memory is very foggy.  And I'm not -- I'm not in that same frame of mind anymore.  I don't think like that and I don't remember a lot of the things that I seen.

3508

Q    Well, would you have told somebody if you saw a Mach-10?  Do you know what a Mach-10 is?

A    Not now.

Q    What?

A    No.  Honestly, I'm not real sure what a Mach-10 is. There's a rapper named Mach-10, but as far as a gun goes I'm not really certain.

Q    Well, would you have known what a Mach-10 was back at that time?

A    It's a possibility.

Q    Would you have known enough about a Mach-10 that you'd said Mach-10?

A    By looking or by hearing the word?

Q    Right.

A    Maybe.  But looking at it, I don't know.

Q    Do you know -- have you heard a Mini-14?

A    Yes.  And I used to mistake Mini-14 for being a AR-15.  To me they were pretty much one in the same.  But they're definitely not now.

Q    So back then when you thought somebody -- you say you'd mistake a Mini-14 for an AR-15?

A    In looking at them, yeah.  Not real -- I'm not then and not now very gun literate.  I only can describe what I see now or what I've seen.  I can't say with absolute certainty what anything is because I'm no gun expert.

Q   Well, would you mistake -- that particular Exhibit 128, would you mistake that as a Mini-14?

A   No.  I may be mistaken, but I think a Mini-14 is a lot smaller than that.

Q   Would you have told somebody that you saw a Mach-10 and a Mini-14 out at Kenny Barrett's house?

A   Would I have?

Q   Yeah.

A   When?

Q   Oh -- (Interrupted)

A   A long time ago it's a possibility.

Q   In about February of 2000?

A   It's a possibility.  It takes 365 days to clear your head and that would have been four months, so it's a possibility, honestly.

Q   So your head wasn't clear?

A   No.  Lord, no.

Q   What?

A   Then?  No.

Q   I'm talking about then, not now.  I'm talking about now.

A   Then, absolutely -- no.

        MR. HILFIGER:  May I have just a moment, Your Honor?

        THE COURT:  You may.

3510

Q    (By Mr. Hilfiger) In this -- when you talked to somebody back in February of 2000, would you have told them something about you and Jamie Smith being out to Kenneth Barrett's house?

A    If Jamie Crow went by the name Jamie Smith it's a possibility, but right now I'm not even familiar with the name Jamie Smith.

Q    You're not familiar with Jamie Smith so if that name came up, that would be a mistake on someone's part, right?  You don't know a Jamie Smith?

A    To my knowledge, no.  Unless Jamie Crow went by Jamie Smith.  And I call her Jamie Crow because she was a friend of mine, Sissie Crow, her little sister.  Her last name could have been Smith.  I would have no way of knowing her legal name.  But -- (Interrupted)

Q    But if you were talking to somebody and telling somebody about who went out there, it would -- you would be the one furnishing the name, wouldn't that be right?

A    And I would have said Jamie Crow.

Q    But not Jamie Smith?

A    No.

Q    So if there's something that says Jamie Smith?

A    It would be mistake.

Q    It would be a mistake on someone's part?

A    Yes.

3511

Q    You didn't go out there with anybody that you knew as Jamie Smith, is that right?

A    No.

Q    Do you even -- at this time that this conversation would have been while you were at the Eddie Warrior Correctional Center in Taft, do you recall that?

MR. LITTLEFIELD:  Which conversation, Your Honor?  I don't know what the question -- (Interrupted)

MR. HILFIGER:  I'm sorry.

Q    (By Mr. Hilfiger) The conversation that you -- do you recall talking to somebody once or twice in law enforcement?

A    I remember somebody coming to talking to me, yes.

Q    And that would -- would that have been at Eddie Warrior Correctional Center in Taft?

A    Yes.

MR. HILFIGER:  I have nothing further, Your Honor.

THE COURT:  Any further direct?

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Judge, certainly for today. I would ask that she remain in contact with our office. But, yes, certainly for today.

MR. HILFIGER:  No objection.

3512

THE COURT:  Ma'am, you may step down and be excused.  You're subject to recall.  The subpoena is still active until you're excused, until you're called.  You may call your next witness.

MR. LITTLEFIELD:  Terrance Higgs.

TERRANCE HIGGS,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name, please, sir.

A    My name is Terrance Higgs.

Q    And Higgs?

A    Higgs.  H-i-g-g-s.

Q    How are you employed?

A    I'm employed with the Oklahoma State Bureau of Investigations in the capacity as a firearms and toolmarks examiner.

Q    How does one become a firearm and toolmarks examiner, sir?

A    One is trained in the field, in forensic field.

Q    How were you -- how did you receive -- or how are you that, sir?

A    Yes.  As I was saying, one is trained in the field of firearm and forensic identification.  And forensic

3513

identification is a branch of forensic science that has as its main emphasis being able to say whether any projectile or shot shell casing or cartridge casing was fired from a particular weapon. And the training you get in that field are such. I have a Bachelor of Arts degree in biology from Harding University in Searcy, Arkansas.

Q     What -- and I'm sorry. The microphone -- if you're turned that way, the microphone's not picking you up. So if you'd go ahead and continue to speak towards the microphone.

A     Yes. I have a Bachelor of Arts degree from Harding University in Searcy, Arkansas.

Q     How do you spell -- is it Harning or Harding?

A     Harding, H-a-r-d-i-n-g.

Q     Okay.

A     In Searcy, Arkansas, right next door in Arkansas. I've also spent two years at the Metro-Dade Crime Lab in Miami, Florida, where I studied under the senior firearms examiner, Mr. Robert Hart, who now has some 30 plus years in the field. During my two year tenure at the crime lab in Miami, I have analyzed well over a thousand weapons. I've viewed over 2500 projectiles and casings under the comparison microscope. I have visited other laboratories to view their instrumentation and methodology in the field of firearms identification, toolmark

3514

identification, and also shoe print and tire print identification. I've also published an article in the Association of Firearms and Toolmark -- AFTE, Association of Firearms and Toolmark Examiner's Journal in January of 1993. After my training -- (Interrupted)

Q When was your training in Miami with the Metro-Dade law enforcement or their lab? When was that, sir?

A That was between June of 1992 to July of 1994.

Q And did you work in fact within the laboratory then in addition to receiving training?

A That's correct.

Q After you completed your term in June of '94, then where did you go, sir?

A Yes. I was actually on loan from the Royal Bahamas Police Force in the Bahamas at the time, and I returned back to my native country and I set up the Firearms and Toolmark examiners lab with the Royal Bahamas Police Force Forensic Lab. We had the areas of basic chemistry where we did drug analysis. We had basic serology and also toxicology. But we did not have a firearms and toolmarks identification section.

Q You're speaking of in the Bahamas prior to your returning?

A That's correct. During the -- between 1994 to '99 not only was I the senior examiner there, I testified in

3515

well over 600 cases in both our supreme and magistrate's court in the country.  And I have looked at another 800 to a thousand weapons.  I've also written, I would say, about 800 reports, maybe more.  And in June of 1999, I resigned my tenure or commission with the Royal Bahamas Police Force and I came to United States about a month later and I took over the position here at the OSBI.

Q   How long have you been employed as a firearms and toolmark examiner with the OSBI, sir?

A   Since July of 1999.

Q   And did you receive any additional training in connection with your expertise or your appointment with the OSBI after you joined their firearms and toolmarks section?

A   Yes.  As a part of our -- the -- my employment with the Royal Bahamas -- oh, sorry -- with the OSBI, we have continual training which is attending the AFTE training seminar.

Q   What kind of training?

A   The AFTE training seminar.

Q   What's AFTE?

A   AFTE is the Association of Firearms and Toolmark Examiners.  They have an annual training seminar, usually June, July.  Different states each year and --

(Interrupted)

3516

Q    Have you attended their seminars, sir?

A    Say again, sir.

Q    Have you attended the AFTE seminars?

A    Yes, I have.  I've also attended the armor schools put on by Glock and Ruger.  And I've also attended other management courses which are not related to my field as a firearms examiner but since that I am now the supervisor in charge of the section, that is something that's been required for me to attend also.

Q    Okay.  Have you previously testified as an expert -- been qualified as an expert in the area of firearms -- and I'm not asking you which cases, but in the area of firearms and toolmark examination?

A    That's correct.

Q    And have you previously been qualified in a federal court as an expert in those fields?

A    That is correct also.

Q    Where?

A    That would be right here in this court.  I don't think this is the exact courtroom, but it was in the building.

Q    Within the Eastern District of Oklahoma?

A    That's correct.

Q    Any other federal district courts in which you've been qualified in those areas?

3517

A    No, sir.

Q    How about state courts?  And again, I'm not asking you any particular proceeding, but have you been qualified previously in district courts within the state systems?

A    Yes.  Various counties around the state.  I have testified as an expert in the field my last six years.

Q    Did you testify as an expert ever when you were in Miami?

A    No, sir, I was only in training at that time.

Q    Okay.

          MR. LITTLEFIELD:  Your Honor, I would ask that Mr. Higgs be qualified as an expert in the area of firearms examination and toolmark examination.

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Be recognized -- hearing no objection, he'll be recognized as an expert.

Q    (By Mr. Littlefield) Mr. Higgs, did you have occasion to become involved in the examination of various firearms, shell casings and projectiles as it relates to the proceeding about which we are here today?

A    That's correct.

Q    And as you examined the firearms, and the various items that were submitted to the lab, and as we've looked at them there are some items that are identified T -- as

3518

T and then a number.  Some that are identified as P and then a number.  And some that are identified as F and then a number.  Can you explain why those would have those different designations, sir?

A    The items that were submitted directly to the Central Regional Lab where I work, where the firearms lab is housed, those items that came directly to me were given F numbers for firearms.

Q    What would the P numbers be?

A    The P numbers are numbers that were given to the items that went to latent print section to be fingerprinted, hence they get P numbers.

Q    And the T numbers, sir?  What would they -- where did the T come in in that designation?

A    The T numbers are the numbers of the items that were collected at the crime scene but they originally submitted to the Tahlequah lab.  They were subsequent, after being logged in at Tahlequah, sent to the Central Regional Lab.  So they would have the T numbers because they went to Tahlequah first.

Q    Okay.  Did you have occasion to examine various firearms in relation to this particular case, sir?

A    Yes, I did, sir.

Q    And do you have any idea -- or how many firearms did you examine in relation to this case?

3519

A    If my memory serves me correctly, there should be about 26 of them.

Q    When firearms come into the lab, if they aren't submitted directly to the Central Lab where they get the F numbers, if they come with a T number or a P number, when they are received by the lab, is there a record kept by the OSBI so you can ascertain where those were submitted and how they were submitted?

A    Yes, there is.

Q    How did the firearms come to the lab in this particular case?  And I'm not asking about any one, but were there several methods and if so could you describe those methods?

A    Yes.  Some of the items -- I'll start with the F numbers.  F-1 through F-8, those were submitted directly to the central lab by a Lieutenant B.D. Robins from the OHP.

Q    Okay.  Go with some others.  How were some others received by the labs, sir?

A    Yes.  We have some that have T numbers and these were submitted to the Tahlequah lab by one Ryan Porter and then they were transported to the Central Lab -- (Interrupted)

Q    I didn't ask transported -- but by whom?

A    Ryan Porter.

3520

Q    Okay.  Were any T numbers submitted to the Tahlequah lab by an individual by -- who is named Vicki Jones, now Vicki Lyons?

A    Let's see.  Yes.  We do have a -- it's actually an F number.

Q    An F number?

A    Yes, it's an F number.

Q    Okay.

A    And it's the -- a .22 caliber pistol that was submitted to the lab on September 27th by one Vicki Jones, now Lyons.

Q    Okay.  At the time, do you know that at the time she was Vicki Jones and now she's Vicki Lyons, are you familiar with that fact, sir?

A    Yes.

Q    Okay.  Let's take that .22.

MR. LITTLEFIELD:  I'd ask that Government Exhibit Number 110 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) And do you recognize Government Exhibit Number 110, sir?

A    Yes, I do.

Q    And how do you recognize that?

A    Well, I placed the lab number and my initials and item number on the firearm in question, using a little

3521

strip of tape.

Q   Now, you mentioned that a .22 caliber pistol that was submitted to the lab in Tahlequah by Vicki Jones, now Vicki Lyons; do you recall that?

A   That's correct.

Q   What pistol is that?

A   This is a .22 caliber Browning.

Q   Well, is that the one that she submitted?

A   That's correct.

Q   Okay.  Now, of the 20 -- I'm thinking you can go ahead and hand that back to the clerk.  Of the 20 -- was it six?  Twenty six firearms, was that the number?

A   I think it was.  But I said if my memory serves me correctly, I think it was 26.

Q   Of the 26 firearms that you examined, were you able to ascertain, based upon looking at projectiles and casings that were submitted, how many of these firearms had been fired?

A   Okay.

          MR. LITTLEFIELD:  Let me withdraw that question.  Let me withdraw that -- let me go at it a different way.  Go at it a different way.  I'd ask that Government Exhibit Number 22 be provided to the witness.

          THE COURT:  You may.

Q   (By Mr. Littlefield) Do you see the item number

3522

that's marked item number 15?

A    Yes, I do.

Q    Can you tell from that photograph what kind of weapon that is, sir?

A    I'd have to see more of that. Once -- it looks more of like a -- it really would help if I could see the slide. What I'm looking at is the magazine, the magazine well and the back portion of it or the underside of it. That could be a 9 millimeter or a .45. Could be a Sig or a Smith.

Q    Did you find a Sig .45 that was submitted that you determined had in fact been fired, sir?

A    Yes, I did.

Q    Okay. And what was the serial number on the -- well, wait, let me ask it a different way. Was there a submittal number on the Sig .45 that had been fired?

A    A submitted number -- (Interrupted)

Q    A T number?

A    On the Sig, that would be T-28.

Q    And who was it that submitted -- that seized and submitted T-28 to the Tahlequah lab?

A    T-28 was one of the firearms that Ryan Porter submitted to the Tahlequah lab.

Q    Okay. And what was the serial number on T-28?

A    T-28 is G222155.

3523

Q    Did that -- was that firearm that -- what kind of firearm was that?

A    That was a .45 caliber Sig Sauer pistol.

Q    Okay.  Did you receive any shell casings that were .45 shell casings that were compared to that Sig Sauer .45 pistol, sir?

A    Yes, I did.

Q    And what T numbers were those shell casings that you compared to that .45 and determined that they were fired or ejected from that .45?

A    Yes.  This was T-27 and also T-28.

Q    Would you check again as to the casing numbers?  The numbers on the casings that were fired -- what was T-28?  You said the shell casings were 27 and 28.  What was T-28?

A    I'm sorry.  I'm sorry.  T-26 and T-27.

Q    What was T-28?

A    T-28 is the gun.

Q    Okay.

A    T-28 is the firearm.

Q    And the shell casings that were checked against that firearm which were found to have been matched were what?

A    Was T-26 and T-27.

MR. LITTLEFIELD:  I would ask that Government Exhibit Numbers 160 and 161 be provided to the witness.

3524

THE COURT:  You may.

Q    (By Mr. Littlefield) Looking at the envelopes on those two items can you identify Government Exhibit Numbers 160 and 161?

A    Yes, I can identify them by my initials and date that I placed on the seal that I placed on each of these packages.

Q    Okay.  Would you open -- let's pick 160.  You got -- we're on the same path now, or same track.  What's in 160, sir?

A    It's a spent .45 caliber casing.

Q    Go ahead and hold it up for the jury.  And who was it that submitted Government Exhibit 160 to the lab and also Government Exhibit 161?

A    As I said before, it was Ryan Porter and he submitted to the Tahlequah lab at first and then he was also the person who transported it to the Central Regional Lab.

Q    And what condition were those envelopes when you received them at the Central Regional Lab, sir?

A    They were sealed.

Q    Can you tell what firearm had fired and ejected those two shell casings, Government Exhibit 160 and 161, which were lab numbers T-26 and 27?

A    Yes.  These two casings, T-26 and T-27, were fired

3525

by the gun that I indicated that had the item number as T-28.

Q    And that was what kind?

A    That was the .45 caliber Sig Sauer pistol, serial number G222155.

Q    How can you determine that that .45 Sig Sauer pistol fired those two .45 shell casings, sir?

A    What we do when we come into the laboratory and we get a gun, we test fire it.  We test fire the gun to make sure it's working and two, to get tests.  We take the tests that we knew were fired from the gun, because we did it, and we compare it against evidence casings from the crime scene.

Q    Wait a minute.  Wait a minute.  You're losing me. You take -- you got those two and they're unknown?

A    Yes.

Q    And what do you compare them to?

A    As I said, we fired a gun, or the suspect weapon and we obtain tests from that suspect -- (Interrupted)

Q    When you say tests, what is a test?  What is it that's the test?

A    We go ahead and we take live ammunition, place it in the gun and we go into a shoot or bullet recovery room and we have a water tank.  We fire the gun into the water, the bullet loses energy and drops to the bottom of

3526

the tank.  We can retrieve that.  The casings are ejected and we have a box around the shooting aperture so the casing ricochets off the walls and drops in the bottom and we can pick that up also.

Q    Okay.  Now, when you're comparing the casings, is that -- the casing that's a known casing that you knew you fired from that .45, is that what you're saying is the test?

A    That's correct.

Q    Then what do you do with the test in relation to the unknown casings?

A    What we do is a -- the items are marked, the evidence items are marked, with the item number for identification purposes and we take the test that we fired in the gun and we use a comparison microscope. Now, a comparison microscope is simply a compound microscope that has an optical bridge that allows you, while viewing them, you can see both items at the same time.  Okay?  And because of the way a gun is manufactured, okay, it leaves telltale -- when a casing or a live round -- sorry, a live cartridge is placed into a gun and discharged, the force that pushes the bullet downrange also pushes the casing back against the breech brace that holds it in place.  Casings are made of -- out of -- excuse me -- casings are made out of brass so they

3527

take on the negative impression of the harder steel breech brace. And because of the manufacturing process, all breech braces are unique. Meaning there are no two breech braces that are made on the face of this planet that are identical.

So now that we have individuality from the breech brace, that is transferred now to the casing, we can take knowns, the tests that we fired, and then we can take unknowns, the casings from the crime scene, and theoretically you can give me one casing and a hundred guns and I should be able to tell you which specific gun that one casing came from. In this case you had several .45 caliber pistols. And so what we did is we test fired all of them, we saved our tests and envelopes, fired them one at a time, saved our tests in envelopes so we'd know which tests we're working with and we take each one to the scope, looking for microscopic matching stria.

Q    What's stria?

A    Stria is lines, basically. That's all -- that's what it amounts to is just lines. And there are -- they come in all different shapes and sizes. There's different spatial relationships. There are gouges. There are -- but it forms of pattern is what I want you to get out of that. It forms a pattern that the firearms examiner can see and remember and when he sees that prime

3528

again, he's able to attribute it to a certain gun.  And this -- (Interrupted)

Q    Now where -- and this stria, is that what appears on the back of the cartridge when it goes into the breech face?

A    That's what appears when the casing hits the breech face.  It also appears when the casing is placed into the chamber, because of the way the exact tolerances of the casing and the chamber of the weapon -- when this goes in there it's a tight fit.  So if it's extracted, metal on metal scrapings leave lines or stria.  When the extractor -- is another portion of the gun -- reaches into the extraction groove here and pulls the casing out of the chamber, metal on metal again -- leaves stria.

When the ejector, which is another portion of the gun, hits the back of the casing to pop it out either to the right or to the left, depending on the type of weapon you're dealing with, stria again.  So, we have a possibility on each casing of breech face marks, ejector marks, extractor marks and also chambering marks and then the firing pin sometimes -- most times does not leave stria but leaves an -- I should say a very good mark as firing pin impression and that sometimes you can actually -- you're able to make an identification based on the firing pin impression also.  So there are five different

3529

areas on this spent casing that you can actually make an identification.

Q   On this -- on these particular casings, Government Exhibits Number 160 and 161, which were item numbers -- or lab numbers T-26 and T-27, when you compared them to the test which was fired from T-28, which was the Sig Sauer .45, which areas were you able to find the matches?

A   I found the matching, the most prominent portion of the casing, which is the breech face, where you will find -- about nine out of 10 times when you make an identification on a casing it's going to be on a breech face. And that's the place we look first and foremost and you'll find that some weapons don't mark well on a breech face but then you go to the other areas. But initially you look on the breech face and in this case this is where we found the matching microscopic stria that we were able to identify and say conclusively that these two casings, T-26 and 27 were fired from the T-28 to the exclusion of all guns that are made or that will be made.

Q   Okay. In your opinion that weapon fired and ejected those two casings?

A   That's correct.

Q   Would you go ahead and reinsert the casing in, I think it was 160, and return it to the clerk. And the

3530

match was both on 160 and 161, was it not?

A    That's correct.

Q    Did you also find a projectile which was fired from that particular weapon, that Sig Sauer .45?

A    That's correct.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 139 be provided to the witness.

THE COURT:  You may.

Q    (By Mr. Littlefield) And do you recognize Government Exhibit Number 139, sir?

A    Yes, I do.

Q    And how are you able to recognize Government Exhibit 139?

A    The F-39 that's on the outside of the envelope.

Q    And the F-39, what is that?

A    That is an item number that I gave to this item when it came into the section.

Q    Okay.

A    And that's in my handwriting that's on the outside of the envelope.

Q    Who was it that initially submitted that exhibit, Government Exhibit 139, sir?

A    F-39 originally was submitted by Vicki Jones, now Lyons, and it went to Tahlequah lab first and then it came to Oklahoma City by Ryan Porter again.

3531

Q    When you received -- is that the envelope you received at the Oklahoma City lab, sir?

A    Yes, it is.

Q    When you received it at the lab what was the condition of that envelope?

A    It was sealed.

Q    Who broke the seal?

A    That's correct.

Q    Who -- who broke the seal?

A    I broke the seal.

Q    What type of analysis did you perform on Government Exhibit 139, which was your lab number F-39?

A    Yes.  Basically when we have bullets, we're looking at a different portion of the firearm now.  Rather than the breech face that lends individuality to the casing we're looking at the barrel or the bore, which lends individuality to the projectile or the bullet.  When a barrel is made, based on the manufacturing process, there's some four different operations that goes on into barrel.  But each of these leaves microscopic imperfections that are unique internally to that barrel and that barrel alone.  Even weapons that are made right after the first one, in consecutive order, are microscopically different from the first one to the last.

        So, therefore, we as firearms examiners can

3532

conclude after firing tests through the suspected barrel or gun, that -- and using the tests to compare to a known, we can make a determination that a bullet or bullets was fired from a particular firearm to the exclusion of all guns that are made or that will be made.

Q   Can you look at F-39 and tell what caliber --
(Interrupted)

A   This is a .45 caliber projectile.

Q   A .45.  I'm sorry?

A   .45 caliber projectile.

Q   So, you're comparison would have been to what, sir?

A   All of the .45 caliber pistols submitted.

Q   And you compared that unknown to the known which are your tests?

A   Yes.

Q   And is that -- how are the tests obtained?

A   The tests are obtained like -- I'm sorry -- like I explained earlier, where we take the gun, we take it to our water tank, we fire through a firing aperture.  The bullet hits the water, slows down, drops to the bottom of the tank, and we use a net to scoop it up and then we take the test that we knew were fired in the gun, because we did it.  We place those in envelopes marked with the information about the gun that they came from, and then we take them to the scope where we take our unknown and

we place it on the comparison microscope again.  And this one, I have my information about the bullet described on the base of the bullet.  Okay.  I wrote the information on the casings on the side of it so I'd know which was evidence, which was test.  In this case, I used the electric engraver and I scribed the information on the bottom of the projectile.

Q    And when a projectile leaves the barrel of a gun, does it just go out straight or what happens as that projectile leaves the barrel?

A    Well, when a projectile leaves the barrel it speeds towards it target and the -- barring any intervening objects or anything like that -- (Interrupted)

Q    No, no.  Does it just go out flat, does it spin, does it tumble, what does it do?

A    The bullet is rotating as it leaves the barrel.  And that's what the rifling in the barrel cause it to do, gives you a straighter trajectory, a -- stabilizes the flight for a short period of time, allows you better accuracy.

Q    Okay.  Is there any -- when the barrel and the rifling on the barrel causes the projectile to spin -- and I may -- I'm not sure if it's clockwise or counterclockwise, but whichever way, as it goes down through the barrel, what does that do to the projectile?

3534

A     That's the portion of the -- the rifling that causes it to spin actually marks it.  Because the land impressions that sticks out -- that juts out into the barrel actually grabs or holds on to the bullet.  What all of us might not know is a lot of bullets are slightly -- because of the portion of the lands that are sticking out into the barrel, these bullets are slightly larger than the barrel they come out of, so it's a very, very tight fit and they tend to squeeze out of the bore.  And that's because -- I mean, you want that happen because you want the bullet spinning as it comes out and when it squeezing out of the bore, it's picking up all of the microscopic imperfections left over from the manufacturing process.  Okay.  And that is the reason why we can go ahead and fire the gun, collect tests, take our unknown evidence and mark those, place them on a comparison microscope and look for these microscopic matching imperfections.

Q     I've heard the term before -- the terms land and grooves.

A     Yes.

Q     What's the difference between those items?  What are they and what's the difference?

A     The land -- grooves are recess and lands are distended.

3535

Q   Lands are the what?  Wait a minute.  Lands are the what?

A   Lands are distended.  I mean, they are jutting out into the barrel itself.

Q   The extensions?  Where it goes out into the barrel and the grooves are where it kind of -- (Interrupted)

A   If you're looking down the barrel of a weapon, you will see portions that are recess and portions that are sticking out into the barrel itself.  Okay?  Thus making the barrel just a little bit smaller than their recess portion.  The portions that are sticking or jutting out into the bore, those are called land impressions.  The land impressions on the bullet, where they act on the bullet, cause a recess portion in the bullet called a groove.  A negative impression.  They jut out in the barrel, they make a recess -- they make a furrow or a tract on the bullet.  The recessed portion causes a raised portion on the bullet.  So it's just opposite. What's sticking out in the barrel will recess on the bullet.  What's recessed in the barrel will be sticking out on the bullet.

Q   Okay.  When you make your comparison, I'm assuming you use the comparison microscope?

A   That's correct.

Q   And how are you able to line it up and match on like

3536

this particular F, F-39, which was Government Exhibit Number 139?

A   Yes.

Q   How are you able to make that comparison and determine what gun it's fired from?

A   It's a number of steps that we go through.  First thing we have to look for is identical class characteristics.  Class characteristics are a set of measurable differences that manufacturer places into the bore of the weapon or to the -- in the barrel of a weapon and there are caliber, which is basically the diameter of the bullet and the diameter of the bore.

Q   We were looking at all .45 calibers here, right?

A   Yes.  There's the number of lands and grooves and they can vary anywhere from three up to 22 that I've seen.  Okay.  There's the direction of twists, as you mentioned earlier.  It's either clockwise or counterclockwise.  I tend to call them left and right, myself.  Bullet has spins to the right, clockwise, bullet spins to the left, counterclockwise.  Then there is the groove width.  Okay.  And this is when we have our -- we have an instrument that we measure this width.  The other two that we don't use much at the laboratory, the groove depth and also the angle of twist, which varies from gun to gun, depending on the manufacturer.  Okay.  The first

3537

four are the ones that we look for before we even take a projectile to look at it under the comparison microscope. In this case, the T-28 is a Sig Sauer. It has six land and grooves, so it's a Sig Sauer .45 caliber pistol. Has six lands and grooves with a right hand twist. Well, bullets coming out of that must be .45, six lands and grooves and a right hand twist. If they are .45, have six lands and grooves -- I'm sorry, a left hand twist, sorry. If they are .45s, six lands and grooves with a right hand twist, that's not your gun. Okay. If it's a .40 caliber with six lands and grooves and a left hand twist, it's not your gun. So we're looking for identical class characteristics.

Q   Okay. All -- or most of the .45s you examined in this particular instance all Sig Sauer .45s?

A   That's correct.

Q   So they would have matched up on those first four characteristics? All of them would?

A   Yes. That's what we expected and that's the reason why when we made our tests and we had our evidence, we checked it -- sorry -- against all of the guns that met the class characteristics.

Q   Did you reach a conclusion as to what firearm fired the -- after doing all these analyses, looking at the tests from all of the Sig Sauer .45s, and matching your

3538

tests or the sample that you fired into your water tank against Government Exhibit 139, do you have a conclusion as to which firearm fired Government Exhibit Number 139 which is your lab number F-39?

A   Yes.   My conclusion was that F-39 was indeed matched to T-28, the Sig Sauer pistol .45 caliber pistol, to the exclusion of all guns that are made or that will be made.

Q   Okay.   So that the same gun that fired that projectile is also the same gun that deposited the two casings that you identified?

A   That is correct.

Q   Did you find any other projectiles that were fired out in that yard or that were submitted to you, that were fired by any of the other .45s that were submitted?

A   No, I did not.

Q   You received two other firearms, T-25 and F-20.   Do you recall those two firearms, sir?

A   Yes, I do.

Q   What was T-25?

A   T-25 was a 9 millimeter caliber Smith and Wesson model 915 pistol, with a serial number of VAV3270.

MR. LITTLEFIELD:   I would ask that Government Exhibit Number 122 be provided to the witness.

THE COURT:   You may.   If you have just a moment.   Court reporter needs to change paper.   Ready.

3539

Q     (By Mr. Littlefield) Do you recognize Government Exhibit Number 122, sir?

A     I recognize the brown paper sack.  It has my initials on it.  But I don't recognize the box that's -- (Interrupted)

Q     Don't worry about the box.  I asked you about the weapon itself.  Do you recognize that weapon?

A     The weapon itself, yes, I do recognize, because again, I use a piece of tape and I wrote the lab number, the item number and my initials and I placed it on the weapon.

Q     And does it -- are you also able to match it by serial number, sir?

A     That is correct.  Serial number is found on the left side of the receiver, underneath the slide stop.

Q     Okay.  And what item number, lab number, was that firearm that -- what kind of firearm is that?

A     This is a 9 millimeter Smith and Wesson pistol.

Q     What lab number was that 9 millimeter Smith and Wesson, sir?

A     The lab number or the item number, sir?

Q     Well, whichever you want to call it.  The T number.

A     Okay.  The T number is T-25.  That's actually our item number, sir.

Q     Okay.  And other people have called it lab number

3540

but we'll call it T number for this point, okay?  When that came in, when that was submitted to the lab, how many rounds were submitted with it?

A    There were ten rounds of ammunition submitted with this.

Q    And what was the capacity -- what's the capacity of that particular weapon?

A    Let me check my notes.  Fifteen plus one.

Q    Okay.  And that's the 15 in the magazine?

A    Fifteen in the magazine and you can also load one into the chamber in addition to it, so -- for a total of 16.

Q    Okay.  And would you look at -- and go ahead and return that to the clerk.

          MR. LITTLEFIELD:  I would ask that Government Exhibit Numbers 108, 109 and 110 be provided.  And it's the magazine and the round and the -- with bullets -- round from the chamber and the .22 Browning pistol.

Q    (By Mr. Littlefield) By the way, before we get into these exhibits on the Smith and Wesson 9 millimeter, who submitted that, sir?

A    The Smith was submitted to Tahlequah lab by Ryan Porter and also transported to the Central Lab by Ryan Porter.

Q    Okay.  On that Browning .22, do you recognize

3541

Government Exhibit Number 110, sir?  The pistol itself?

A     Yes, I do.  Yes, I do.

Q     And how do you recognize it?

A     As I pointed out earlier, again I placed my lab number, 99-11543, my initials, TAH, and also the item number, F-20 on it.

Q     And what is Government Exhibit Number 108?

A     108 is a magazine.

Q     Any other thing inside of there?

A     Say again, sir?

Q     Anything else inside of there?

A     Oh, yes.  There's a -- nothing else in that -- in F-19.  There's also 108 -- 109, sorry.  That feels like it has ammunition in it.

Q     Okay.  Did you examine the Smith and Wesson, the 9 millimeter and that .22 Browning?

A     Yes, I did.

Q     And were there any projectiles that were submitted that were fired from either of those two weapons?

A     No.  No projectiles were fired or identified -- sorry -- as having been fired by the .22 or the nine millimeter.

Q     Go ahead and return that to the clerk, please.  What was T-93, sir?

A     T-93.  T-93 was an H&K MP5 submachine gun, serial

3542

number 6399771.

Q   And who submitted T-93, the H&K MP5 sub machine gun?

A   That was also submitted on same date and time by Ryan Porter, Tahlequah lab and then to the Central Regional Lab at a later date.

Q   Okay.  Now, what caliber is that H&K MP5?

A   That's 9 millimeter, sir.

Q   Did you examine -- did you receive shell casings that you examined against that H&K MP5 and determined that they were in fact fired from that weapon, sir?

A   Yes, I did.

MR. LITTLEFIELD:  I would ask that Government Exhibit Numbers 133, 134, and 166, 67 and 68 be provided to the witness.  133, 134 and then 166, 167 and 168.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize those items, sir?  Have you looked at all of them?

A   Yes, I have, sir.

Q   As to those five exhibits, Government Exhibit Numbers 133, 134, 136 -- pardon me.  133, 134, 166, 167 and 168, did you examine those items, sir?

A   Yes, I did.

Q   And how were they -- were they submitted in sealed envelopes, each separate in a separate sealed envelope?

A   That is correct.

3543

Q    Okay.  Who broke the seal on each of those envelopes, sir?

A    I did.

Q    Do you see who submitted those five items into the OSBI laboratory system?

A    T-39, your state's Exhibit 133.

Q    Not the state, we're the Federal Government. Government Exhibit.

A    Sorry.  Federal.  Federal exhibit.  My apologies, sir.

Q    We'll live this one time.

A    Government Exhibit T-39 was exhibit -- was submitted to the laboratory on September 25th by Ryan Porter.

Q    Okay.  Who did -- and that was 133.  Would you look at 134?

A    Okay.  T-44, which is Government Exhibit 134, was also submitted by Ryan Porter on the same date and time.

Q    Would you look to Government Exhibit Number 166?

A    166, T-43 was also submitted on the same date and time by Ryan Porter.

Q    Would you look to Government Exhibit 167?

A    167 is T-35 and that too was also submitted on the same date and time by Ryan Porter.

Q    And would you look to Government Exhibit Number T -- got my T number in there again.  168?

3544

A       T -- (Interrupted)

Q       You did it too, didn't you?

A       T-40, Government Exhibit 168, was also submitted on the same date and time as the other items by Ryan Porter.

Q       Okay.  What caliber -- what's in those items -- go ahead and just pick one of them.  And hold it up so the jury can see it.  What have we got?  What is that?

A       This is a spent 9 millimeter casing.

Q       And are all of those exhibits that we have been talking about right now, are all of those spent 9 millimeter casings, sir?

A       Yes, they are.

Q       Okay.  And you've examined them previously?

A       That's correct.

Q       Did you perform -- and you've talked about how you identified the .45 caliber shell casings?

A       Yes, I did.

Q       Did you use the same method for analysis on these five exhibits that you used for the .45 caliber shell casings, sir?

A       Yes.  The only thing I did differently was I didn't compare these casings against the .45.  I compared them only against the 9 millimeter weapons.

Q       Okay.  Well, yeah, that makes sense.  And did you -- and did you eject fire your -- the different 9

millimeters that you had -- that were submitted -- fire them all and then compare these casings to a known casing from each of the 9 millimeters that were submitted?

A     That's correct.

Q     Did you find a weapon which ejected a shell casing which the ejection patterns on that casing were identical to these five casings that you have just spoken of?

A     Yes, I did.

Q     And what firearm was it that ejected Government Exhibit Numbers 133, 134, 136 -- pardon me -- 166, 167 and 168?

A     All those casings was fired by the H&K MP5 9 millimeter pistol -- 9 millimeter submachine gun and that was submitted as T-93.

Q     Okay.  And that was -- and that firearm was submitted, I think you said by Ryan Porter?

A     Ryan Porter, that's correct.

Q     Describe what that H&K MP5 submachine gun is.  What is it?  Describe what that gun is.

A     Rephrase the question.

Q     I mean, is it a rifle?

A     No.  It looks -- it's almost as long as a rifle. Okay.  It's a carbine, which means it's less than 16 inches.  Okay.  16 inches for a rifle, 18 for a shotgun. A carbine is going to be less than 16 inches and then --

3546

(Interrupted)

Q    I think you said it's a submachine gun.  Did you use that term?

A    Yes, I did.

Q    What's that mean?

A    Well, a machine gun fires rifle ammunition.  Okay.  It's a weapon that can fire in the fully automatic mode, has select fire and fires rifle ammunition.

Q    This is a submachine gun.  How is it different?

A    Now, a submachine gun is basically the same type of weapon except that it fires pistol or revolver ammunition.

Q    And 9 millimeter is what kind of ammunition?

A    Pistol ammunition.

Q    And how does it -- what means -- by what means does it fire?  I mean, does it have different modes?

A    Yes, it does different modes.  In firearms identification and by the AFTE's definition it must -- a weapon like that can be select fire, which means it can be single shot.  It can have a three shot burst or it can be full auto.  Basically single shot is one squeeze of a trigger, one round, the disconnector resets and you get one shot per squeeze.  Three shot bursts allows the disconnector to be -- to stay recessed for a while, three shots get off, the disconnector goes back into place.

Full auto, you hold the weapon and you squeeze the trigger to the rear and as long as the firing mechanism works and it's cycling properly, it will fire everything in the magazine with one squeeze of the trigger. Now, it will take a little time but that's full automatic.

Q   Let me ask you this: If you have it in fully automatic mode and a person is practiced and proficient with that firearm, can you fire short bursts even if it's in an automatic mode?

A   Yes, you can.

Q   So if I was an expert at shooting that gun and was proficient and practiced with it, could I fire a two shot burst and a three shot burst?

A   You possibly could.

Q   What about -- and you examined this particular firearm?

A   Yes, I did.

Q   What is a suppressor?

A   A suppressor is a name that we use in firearms identification what you guys would probably call a silencer. And what it does is -- the silencer -- sorry, is more of a misnomer. All it does -- all a suppressor does is suppresses the sound, lowers the decibel range. And there are federal laws basically tells you how much of the decibel has to be lower before it's considered a

3548

suppressor.  And if I'm not mistaken, as long as an examiner or somebody can come in and say I fired this weapon without the suppressor on and identified it with the suppressor attached and it was lower than what it was without, then it would be called a suppressor.  But it just suppresses the sound.

Q    Did this firearm have a noise suppressor on it?

A    If my memory serves me correctly, there were two of these weapons and if I'm not mistaken I think both of them had suppressors on them.

Q    Does a suppressor -- what impact does a suppressor have on residue that's ejected out of the barrel of the firearm when a weapon is fired?

A    Well, as a part of the suppressor, not only does it lower the sound range, I should say, it also traps a lot of residue that comes out after the bullet and it's trapped in that suppressor.  So, if I was doing distance determination which uses powder patterns that come out of the barrel after the bullet has left the barrel, and I got a gun that has a suppressor on it, I'd actually have to do test patterns with the suppressor on and with the suppressor off before I could make a determination as to the distance on it.

Q    You didn't do that in this particular case, though?

A    No, sir.

THE COURT: Mr. Littlefield, let's stop for the evening. Members the jury, remember the admonition not to discuss this matter or involve yourself in any news coverage. I'll ask that everyone remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT: Mr. Higgs, you may step down and be excused until nine o'clock in the morning.

(Whereupon, the witness exited the courtroom after which the following record was made.)

THE COURT: Let the record reflect the jury has departed the courtroom and the witness on the stand has left the courtroom. Anything on behalf of the Government outside the hearing of the jury?

MR. LITTLEFIELD: No, Your Honor.

THE COURT: Defense?

MR. HILFIGER: Not at this time.

THE COURT: Any estimate on how you're doing as far as the discussion we had about concluding tomorrow?

MR. LITTLEFIELD: We have two additional witnesses after this one. And I would anticipate this will be the most lengthy of the three.

THE COURT: And how much lengthier do you anticipate he'll be on direct?

3550

MR. LITTLEFIELD:  I don't think I'll be longer -- I don't think I'll take an hour additional. Essentially he is going to identify a couple of projectiles from the 9 millimeter and then the casings, the .223 casings and a projectile from the .223.  And I don't think there's anything additional.  There may be something else, but those are the primary areas, Your Honor.

THE COURT:  And then you have what -- how many more witnesses?

MR. LITTLEFIELD:  Two after that.

THE COURT:  Do you anticipate being able to conclude tomorrow, depending on cross examination?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Do you know anything different from that, Mr. Hilfiger?

MR. HILFIGER:  No, Your Honor.  I anticipate that's -- I don't think the last two are going to take very long.

THE COURT:  I want -- I'd like to be able to tell this jury in the morning that we're not going to go on Friday.  I hesitated to do that this afternoon because I couldn't tell where we were going.

MR. LITTLEFIELD:  The last two, Your Honor, are both experts.  Both of whom tested the red phosphorous

3551

that was in the pocket which was submitted by Ms. Marcangeli and Ryan Porter -- came out of the pocket. One's going to say it had methamphetamine on it and then he sent it on to the lab in Oklahoma City and it was determined to be red phosphorous. And they're not going into any other particular area.

THE COURT: All right. What I understand the defense does not anticipate any overly extended cross examination that you know about now at least?

MR. SMITH: I'll say Mr. Higgs is going to take the longest, Judge. I would guess an hour, maybe just a little longer.

THE COURT: Okay. The back up position in the event that you're misleading me is -- we'll start at 8:30 on Friday morning and I anticipate quitting about one, one o'clock in the afternoon. No lunch break and go to one. I'm not offering that as an alternative but that is what we'll do if we don't finish tomorrow. I'm also going to instruct the clerk to file the instruction I read in regard to Ms. Dalley's PowerPoint presentation as Court Exhibit 4. Well, and also I want the PowerPoint presentation itself should be an exhibit. That may be three and that's four.

MR. LITTLEFIELD: Judge, in regards to that, can we have a couple of days as far as making sure that

3552

we've got the specific portions of the PowerPoint that were used to provide to the Court?

THE COURT:  Yes.

MR. LITTLEFIELD:  As a court exhibit?

THE COURT:  Yes.  Just be sure that the two parties agree on it.

MR. LITTLEFIELD:  And I anticipate I'll offer tomorrow morning at some point the photographs which were a part of the PowerPoint exhibit.

THE COURT:  Well, it would be helpful if you could do that when you rest, just as far as keeping -- (Interrupted)

MR. LITTLEFIELD:  And that's what I'm saying.

THE COURT:  The Court exhibit, I think I can add any time.

MR. LITTLEFIELD:  I understand.  And that's what I'm saying.  I'm anticipating, for the Court's -- for Your Honor's information -- (Interrupted)

THE COURT:  Okay.

MR. LITTLEFIELD:  We anticipate adding -- moving the admission of those as individual exhibits, but just the photographs that were displayed as a part of the PowerPoint presentation.

(Whereupon, the Proceedings were continued to October 27th, 2005.)

3553

C E R T I F I C A T E

STATE OF OKLAHOMA   )
                    ) SS.
COUNTY OF TULSA     )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on October 26, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 3325 through 3552.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date:  December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 2 2 2006

Clerk, U.S. District Court
By _____
Deputy Clerk

UNITED STATES OF AMERICA,   )
                            )
            Plaintiff,      )
                            )
-vs-                        )   No. CR-04-115-P
                            )
KENNETH EUGENE BARRETT,     )
                            )
            Defendant.      )

VOLUME 16 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on October 27, 2005.

A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                        United States Attorney
                        and
                        Mr. D. Michael Littlefield
                        Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                        Mr. Bret A. Smith
                        Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 3555 – 3834

3555

W I T N E S S E S

PAGE

TERRANCE HIGGS
(Continued from October 26, 2005)
Continued Direct Examination by Mr. Littlefield .   3556
Voir Dire Examination by Mr. Smith  . . . . . . .   3593
Further Voir Dire Examination by Mr. Smith  . . .   3598
Continued Direct Examination by Mr. Littlefield .   3697
Cross Examination by Mr. Smith  . . . . . . . . .   3712
Voir Dire Examination by Mr. Littlefield  . . . .   3783
Further Voir Dire Examination by Mr. Littlefield    3784
Further Voir Dire Examination by Mr. Littlefield    3790
Further Voir Dire Examination by Mr. Littlefield    3805
Redirect Examination by Mr. Littlefield . . . . .   3816
Recross Examination by Mr. Smith  . . . . . . . .   3821
Further Redirect Examination by Mr. Littlefield .   3828

DANNY FARRIS
Direct Examination by Mr. Littlefield . . . . . .   3611
Cross Examination by Mr. Smith  . . . . . . . . .   3628
Redirect Examination by Mr. Littlefield . . . . .   3637
Recross Examination by Mr. Smith  . . . . . . . .   3641
Further Redirect Examination by Mr. Littlefield .   3645

J. DOUGLAS PERKINS
Direct Examination by Mr. Littlefield . . . . . .   3647
Cross Examination by Mr. Smith  . . . . . . . . .   3658
Redirect Examination by Mr. Littlefield . . . . .   3661
Recross Examination by Mr. Smith  . . . . . . . .   3663

CHRISTA RHODES
Direct Examination by Mr. Littlefield . . . . . .   3666
Cross Examination by Mr. Smith  . . . . . . . . .   3675
Redirect Examination by Mr. Littlefield . . . . .   3679
Recross Examination by Mr. Smith  . . . . . . . .   3683
Further Redirect Examination by Mr. Littlefield .   3686

E X H I B I T S

OFFERED   REC'D

Government's Exhibit Number 113 . . . . .   3620      3620
Government's Exhibit Number 129 . . . . .   3593,3598
                                . . . . .   3696      3696
Government's Exhibit Number 220 . . . . .
Government's Exhibit Numbers 221 thru 288  3693      3693

(Exhibits continued . . .)

3556

(Exhibits continued . . .)                          OFFERED   REC'D

Government's Exhibit Number 229-A . . . .    3693      3693
Government's Exhibit Number 236-A . . . .    3693      3693
Government's Exhibit Number 241-A . . . .    3693      3693
Government's Exhibit Number 246-A . . . .    3693      3693
Government's Exhibit Number 252-A . . . .    3693      3693
Government's Exhibit Number 259-A . . . .    3693      3693
Government's Exhibit Number 265-A . . . .    3693      3693
Government's Exhibit Number 275-A . . . .    3693      3693
Government's Exhibit Number 278-A . . . .    3693      3693
Government's Exhibit Number 280-A . . . .    3693      3693
Government's Exhibit Number 283-A . . . .    3693      3693
Government's Exhibit Number 285-A . . . .    3693      3693
Government's Exhibit Number 288-A . . . .    3693      3693
Government's Exhibit Number 289 . . . . .    3670      3670
Government's Exhibit Number 290 . . . . .    3699      3699

Defendant's Exhibit Number 7   . . . . . .   3717      3717
Defendant's Exhibit Number 67 . . . . . .    3790      --
Defendant's Exhibit Number 222  . . . . .    3784      3785


                    P R O C E E D I N G S

        THE COURT:  Good morning.  Let the record

reflect the jury is in the box, counsel for the

Government is present, Defendant is present with counsel.

If you'll bring the -- you may have a seat, Mr. Higgs.

You may continue your examination.

              CONTINUED DIRECT EXAMINATION

BY MR. LITTLEFIELD

Q    Mr. Higgs, I think yesterday we were talking about

Government Exhibit Numbers 133, 134, 167 -- 166, 167 and

168.  Do you still have those there?

A    Yes, I do.

Q    And all those were fired by which firearms, sir?

A    All those were fired by the H&K submachine gun, 9 millimeter.

Q    And did you find -- in the course of your analysis, did you also examine projectiles which you determined to have been fired by that same H&K 9 millimeter firearm, sir?

A    Yes, I did.

Q    By the way, what kind of cartridges -- those casings, what brand are those?  The one -- Government Exhibit 133, 34, 66, 167 and 168 -- and that's 162.

A    Okay.  Let me check my notes and make sure.  T-39 which is Government Exhibit 133.  That's a Speer.  T-44 which is Government Exhibit 134 is a Speer.

Q    T-43 which is Government Exhibit 166?

A    166.  It's also a Speer.  167, T-35, that is also a Speer.

Q    And T-40 which is Government Exhibit 168?

A    T-40, that is also a Speer.

Q    Did you examine the other rounds that were submitted with that H&K MP5 9 millimeter submachine gun?

A    The other round.

Q    Live rounds that were submitted with it?

A    Yes, there were live ammunition that came with the gun.

Q    What kind of -- what were they, what brand?

3558

A    The live ammunition that came with the firearm was -- it's T-69 and they were all -- there's 31 rounds of Speer ammunition.

Q    All were Speer ammunition?

A    That's correct.

Q    And did you examine -- and did you examine other MP5s that were submitted from law enforcement, sir?

A    Yes, there was another MP5 that was submitted.

Q    What kind of ammunition did it have, sir?

A    Let's see.  That would be T-89, T-89.

Q    What kind of ammunition was submitted with it, sir?

A    Let's see.

Q    What was the brand of ammunition?

A    Make sure.  Okay.  We have -- those were Winchester, sir.

Q    Okay.  What -- on the ammunition with the H&K 9 millimeter MP5 that fired Government Exhibit Numbers 133, 134, 166, 167 and 168, what is the nature of that projectile, the bullet that's in the casing?

A    Oh, the -- if you're talking about the type of ammo it is, it's a jacketed hollow point.

Q    It's a jacket hollow point?

A    Jacketed hollow point.  It's called a Gold Dot.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 220 -- and you have it to your left, right

3559

there.

Q     (By Mr. Littlefield) Do you recognize that item, sir?

A     Yes -- (Interrupted)

Q     And did you examine that?

A     Yes, I did.

Q     And was that -- do you recognize April Marcangeli's initials on that envelope?

A     Yes, I do.

Q     Was there an item number which would have been found at the scene on there as well as a T number?

A     There is an item number on here, T-14.

Q     Was there a number that -- another number that would have been supplied at the scene -- not your T number or lab -- what I call a lab number, but an item number as it was discovered at the scene, sir?

A     Well, it just says here marker number one.

Q     Marker number one?

A     Yes.

        MR. LITTLEFIELD:  I would ask that Government Exhibit Number 37 be displayed.

        THE COURT:  You may.

Q     (By Mr. Littlefield) And do you see marker number one?  Do you see where the number one is, sir?

A     Yes.  It's -- if I'm looking correctly, it seems to

3560

be right here next to -- (Interrupted)

Q    Is that right there below -- (Interrupted)

A    Right there.  Yes.

Q    Okay.  And what kind -- what is Government Exhibit Number 220, sir?

A    This is a 9 millimeter cartridge, full metal jacketed, round nose.

Q    Round nose?

A    Yes.  Not a jacketed hollow point.  Okay.  It's a round nose projectile and this is from TCW.

Q    When you say it's from TCW -- (Interrupted)

A    Manufacturer, sir.

Q    What's TCW stand for?

A    That's a Russian manufacturer, Tula Cartridge Works, Tula Cartridge Works.

Q    And is that similar to a Speer?

A    No, it's much different.

Q    Why?

A    Well, the projectile is different in that Speer Gold Dots are hollow points, it has a hollow point in the middle of the bullet.  This is a round nose, you can see.  Speers are nickel casing.  This is actually a steel casing.  And it's made by different companies actually across the seas.  One is Russian, one is U.S., United States.

3561

Q    Speer's the U.S. company?

A    That's correct.

Q    And did you examine that -- the casing on that to see if there were any markings on the casing, sir?

A    Yes.  There is -- there are markings on this casing.

Q    Are the markings on the casing consistent with the 9 millimeter H&K MP5 submachine gun that was involved in the ejection of Government Exhibit Numbers 133, 134, et cetera?

A    I was not able to make a determine as to whether this particular projectile was chambered in an H&K MP5. The other five that I made just determinations on were actually fired cartridges that I saw on the breech face, microscopic matching stria that led me to the conclusion. This has some markings on it that leads me to believe that it was chambered in a gun.  I can't say which gun it was chambered in.

Q    If that would have been sitting on top of the magazine in the chamber and somebody would have pulled it back to eject it, would you have had markings that would have identified it with a particular firearm?

A    I would have markings that would have identified it to a particular ejector.  I mean, not ejector, extractor. Because I would be saying a certain extractor acted on it.

3562

Q    Can you -- did you look to determine whether or not this was -- would have been extracted?

A    I did not.

Q    Okay.  Everything else in that gun was what brand?

A    Speer.

Q    And in fact, are you aware of whether the MP5 -- if there was some kind of malfunction during its operation, sir?

A    Say again?

Q    The MP5 about which we're speaking, which was T-28 -- or not T-28.  Pardon me.  T-93 I think it --

(Interrupted)

A    That's correct.

Q    Was your T number.  Did you ascertain whether -- how many rounds were in the chamber when that was taken by the OSBI?

A    When weapons are submitted to the laboratory they have to be unloaded so I wouldn't know.

Q    I understand that.  Did the record reflect whether or not there were two rounds in that chamber when it was seized?

A    I would have to check and look.

Q    Okay.  Still on the T-93, the H&K MP5, did you ascertain whether or not that fired any projectiles, sir?

A    Yes, I did.

3563

MR. LITTLEFIELD: I would ask that Government Exhibit Number 135 be provided to the witness.

THE COURT: You may.

Q (By Mr. Littlefield) Do you recognize Government Exhibit Number 135, sir?

A Yes, I do.

Q And what is that?

A This is an envelope that contained the projectile that I labeled as F-37.

Q That's your lab number, F-37?

A Yes, that's correct.

Q Okay. And who was it that submitted that, sir?

A F-37. F-37 was submitted by Vicki Jones, Lyons.

Q Vicki Lyons?

A Yes.

Q And are you able to ascertain where that item was discovered at the scene? Is it on the envelope?

A Well, it says here projectile from outside porch on top of refrigerator.

Q Okay. And did you -- are you able to -- you were talking about the lands and grooves yesterday in regards to the .45 projectile; do you recall that testimony?

A Yes.

Q Did you apply the same type of examination and analysis on this projectile that you applied on the .45

3564

projectile that was in the shelf in the residence?

A    Yes, I did.

Q    And in so doing, did you fire a test from any firearm that you compared it to this Government Exhibit Number 135?

A    That's correct.

Q    Which firearm was it that was relevant to the comparison on Government Exhibit 135, sir?

A    This projectile was conclusively identified as having been fired by T-93.

Q    And T-93 -- (Interrupted)

A    That is the MP5 with the serial number 6399771.

Q    Is that the same firearm that ejected those five casing that are in front of you, sir?

A    That's correct.

Q    Go ahead and hand that become the clerk.  By the way, was that in a sealed condition when you received it?

A    Yes, it was.

Q    Would you look to Government Exhibit Number 120?

        MR. LITTLEFIELD:  And I would ask that it be provided to the witness.

Q    (By Mr. Littlefield)  Do you recognize that, sir?

A    Yes, I do.

Q    And how do you recognize that?

A    This is the container that has the other projectile

3565

that I identified to T-93 and again it has my item number F-51.

Q    F what?

A    F five one, 51.

Q    And who submitted that item, sir?

A    F-51 was submitted by Ryan Porter.  Oh, sorry.  I'm looking at T -- no -- (Interrupted)

Q    You're looking at T-51.

A    Yes.  I'm looking at T-51.  It's -- F-51 was submitted by Ben Rosser.  I'm sorry.

Q    And does it show Mr. Rosser's name on the envelope, sir, in which that was submitted?

A    That is correct.

Q    And what condition was that envelope at the time you received it, sir?

A    It was sealed.

Q    Would you open it up and examine the contents and hold it up for the jury to see it.  What do we got?

A    Okay.  This is the container that houses a bullet. Oh, I should say the second bullet, that I identified as coming from T-93 and again I placed my item number on the outside of the container.

Q    Okay.  And how did you perform an analysis on this projectile and determine that that projectile matched T-93, the H&K 9 millimeter MP5 submachine gun?

3566

A     Yes.  Like I said yesterday I fired tests in the suspect weapon -- actually, all three of them, the two MP5s and then the Smith and Wesson.  And then once I've obtained tests from them, I compared known tests to unknown evidence which is this and I look for microscopic matching stria and once I've seen a preponderance of evidence or enough to convince me that this was indeed fired by the T-93, the submachine -- the 9 millimeter H&K submachine gun to the exclusion of all guns that were made or that will be made.

Q     Go ahead and reinsert it for me.  And if you would hand that back to the clerk.  In regards to the 9 millimeter, were the five 9 millimeter casings that you have in front of you the only 9 millimeter casings that you received at the scene?

A     No, sir.

Q     There were others?

A     There were two others.

Q     Did you make an analysis on those, sir, and ascertain what firearm -- were you able to determine what firearm fired those other two that were submitted to you?  The other 9 millimeter casings?

A     Yes.  The other two -- and in my notes I have them as T-9 and T-45.

Q     My question is did you find out what firearm fired

3567

those other two 9 millimeter casings?

A    Yes, I had.

Q    What firearm?

A    That was the 9 millimeter Smith and Wesson.

Q    The one you looked at yesterday?

A    Yes, that is correct.

Q    In regards to these projectiles, do you know who it was that shot them?  Not asking you of the firearm, the person.  Do you know who it was -- what person it was that shot them?

A    No, sir.

Q    You aren't claiming to identify a person?

A    No, sir.

Q    You can identify a firearm but not a person?

A    That's correct.

Q    Okay.  Do you know when the casings that you examined -- any of these casings you examined in this case, do you know exactly when those casings were fired?

A    No, sir, I do not.

Q    Could have been on September the 24th, '99, could have been weeks, months prior?

A    That's correct.

Q    Did you find any .22 casings that matched any of the firearms we've talked about?

A    Yes, I did.

Q    And how many .22 casings were submitted that matched the firearm that we've spoken about?

A    There were seven of those.

Q    Okay.  And what .22 would have been responsible for ejecting those casings?

A    That was the .22 caliber Browning that we showed -- you showed me yesterday that I marked as F-20.

Q    Okay.  Would you return to the clerk Government Exhibit Numbers 133, 134 and 166 through 167 as well as 220?

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 127 be provided the witness.

THE COURT:  220 -- do you intend to -- (Interrupted)

MR. LITTLEFIELD:  I'm sorry.

THE COURT:  Do you intend for 220 to be admitted?

MR. LITTLEFIELD:  I move its admission, Your Honor.  I'm sorry.

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. LITTLEFIELD:  Thank you.

Q    (By Mr. Littlefield) What's Government Exhibit Number 127, sir?

A    Yes.  This is a double barrel shotgun.

3569

Q    And have you looked at that shotgun previously?

A    Yes, I have.

Q    And who submitted that shotgun, sir?

A    The shotgun was submitted by Vicki Jones, Lyons.

Q    And were some -- and that's got two barrels?

A    Yes.

Q    Were there two shells in relation to those two barrels, sir?

A    Two shells or -- (Interrupted)

Q    Whatever?

A    There's one cartridge, one spent cartridge and one live one.

Q    Okay.  I'm not a gun guy as you can tell by the question.  I'm doing the best I can to do the vernacular. One live, one spent?

A    That's correct.

Q    Did you ascertain in regards to that shotgun whether or not both barrels were capable of being fired, sir?

A    I did.

Q    And what did you find in regards to whether or not both of those barrels were capable of firing?

A    I found out that only the right barrel functioned properly.

Q    Okay.  Now, when you prepared your report, the one that functioned properly, did it have the spent round in

3570

it or the live round?

A    It had the live round in it.

Q    So the one that worked had a round in it that would have fired had the trigger been pulled?

A    Right.

Q    That was which side?

A    The one that functions properly is the right barrel.

Q    Okay.  And it had the live -- (Interrupted)

A    That barrel that did -- (Interrupted)

Q    He can't take us if we're both talking at the same time, okay?

A    Okay.

Q    The one in the right had the live round?

A    That's correct.

Q    And it did or did not function?

A    It did function.

Q    What was in the left round?

A    An empty casing.

Q    And would that left barrel have been capable of firing that empty casing?

A    Not in the condition that I received the gun in at the time I looked at it.

Q    I guess it could have broke on the last shot is a possibility?

A    That's possible.

Q    But you have no knowledge of that?

A    That's correct.

Q    Okay.  Did you at one point in your report get those two mixed up as far as which one was in which?

A    That's correct.  In my -- in the first report I generated for this trial -- sorry.  In the report I generated for this one I had that -- I had the left barrel was functioning properly and that was incorrect.  And checked my notes.  It's actually left barrel did not function properly.

Q    Okay.  So your notes reflect that you just got them mixed up in the report you generated?

A    That's correct.

Q    But the one that had the round was the one that could shoot, but the empty one that had been shot was in the one that couldn't have fired?

A    That's correct.

Q    Okay.  If you'd hand that back to the clerk?

THE COURT:  That exhibit number is what?

MR. LITTLEFIELD:  127.  And I would ask that while you're there if you would retrieve Government Exhibit 128.

Q    (By Mr. Littlefield) And are you familiar with Government Exhibit Number 128, sir?

A    Yes, I am.

3572

Q     And how are you familiar with that?

A     This is the firearm I labeled at P-1 and --
(Interrupted)

Q     P-1 -- who gave it P-1 as a number?

A     P-1, that is the number that was given by the crime
scene person who picked it up.

Q     Did you say T or P?

A     P as in Paul.

Q     Or as in print?

A     Prints, yes.  And that -- Vicki Jones picked that
particular -- submitted that particular item.

Q     And what kind of firearm is that, sir?

A     This is a .223 caliber rifle.

Q     Brand?

A     It is a Colt and the model is H bar, which is heavy
barrel, Sporter.

Q     Are you familiar with the -- that type of rifle,
sir?

A     Yes, I am.

Q     What is the lethal range of that rifle?

A     Well, according to the manufacturer, it's between
500 and 550 meters.

Q     And that's -- a meter in relation to a yard?

A     A meter is -- there're 39 -- there's 36 inches in a
yard, there are 39 inches in a meter.  So if you were to

3573

convert this to yards, it would be like about 541 if -- at 500 and I think -- (Interrupted)

Q    541 yards to 500 meters?

A    Yeah.  And at 550 meters, it's about 595, close to 600 yards, so -- if you convert it to yards.

Q    And when we're talking about the lethal range, what does that phrase mean?

A    Lethal range basically means that at a range where the projectile will have enough energy to penetrate and possibly incapacitate a person.

Q    Does lethal mean incapacitate or what's lethal mean?

A    Okay.  Lethal means -- when I say incapacitate, I mean it can kill somebody.

Q    Is that a fully automatic or a semiautomatic weapon?

A    This is a semiautomatic rifle.

Q    In and of itself, is it lawful for an individual to possess that firearm?

A    Yes, sir.

Q    Did you perform any kind of analyses on this firearm?  Was it capable of functioning?

A    That's correct.

Q    And the 9 millimeter Smith & Wesson, when you compared the -- when you did the ejection on it, how did you get the casing that you compared the two that you said matched?

3574

A    Oh.  On the Smith & Wesson, we tested the weapon like I stated earlier and we collected the tests.

Q    When you did the test, did you fire the gun?

A    Yes.

Q    Did the Smith and Wesson fire?  Was it capable of firing?

A    Yes, it is.

Q    The Browning, the .22, was it capable of firing?

A    Yes, it is.

Q    The P-1, the shotgun, was it capable of firing?

A    Yes, it was.

Q    And did this -- was this capable of firing?

A    That's correct.

Q    Did you perform any analysis -- did you perceive any casings that you compared to this firearm in order to ascertain if they had been ejected from this firearm?

A    Yes, I did.  Yes -- yeah, I received 23 total casings .223 caliber casings that were discharged.

Q    And in regards to the 23, did you determine or did it -- was it reported to you as to whether any of them had been fired and found by a trailer?

A    Yes, there were -- yes, that was reported to me at a later time.

Q    How many were by the trailer?  Do you recall how many were found by a trailer?

3575

A    I think it was just one of them.

MR. LITTLEFIELD:  I would ask that Government Exhibit Numbers 132, 140 and -- let's just do them one at a time.  132 be provided to the witness.  I'll just take them in the order I got them here.  153, 165, 156, 154 and 155, 144, 145, 146 and 147, 142 and 143, 152, 185.  Okay.  If I get ahead of you, you let me know.  151, 140 and 141, 149 and 150 and 138.

Q    (By Mr. Littlefield) Have you received each of those Government exhibits from the clerk, sir?

A    Yes, I have.

Q    And as you received those exhibits, did you look at the envelopes in which were those exhibits?

A    Yes, I did.

Q    Were you familiar with every one of those exhibits, sir?

A    Yes, I was.

Q    And how do you recognize every one of those exhibits?

A    The item number and my initials that I placed on each of the envelopes.

Q    How -- were all of those exhibits in the same condition when received by you, sir?

A    Yes, they were all in the sealed condition when I received them.

3576

Q    And what -- well, let's just run through them real quick, okay.  Government Exhibit Number 153, what T number is that?

A    153.

Q    The first one you received?

A    Actually I received 132 as the first one.

Q    Okay.  I'm going to do -- that's the second one you received.  What T number is it?

A    T-15 is 153.

Q    And Government Exhibit 132 was T number what?

A    T-16.

Q    Government Number 165 was T number what?

A    T-23.

Q    Government Exhibit 156 was what T number?

A    Twenty four.

Q    You need to let me finish.  He can't get us both if we're saying the same thing.

A    My apologies.

Q    Government Exhibit 145 was what T number?

A    T-41.

Q    Government Exhibit Number 155 was what T number?

A    That was T-46.

Q    Now, Government Exhibit 144, did that have a T or an F number?  144?

A    144 has an F number.

3577

Q    What was that F number?

A    F-21.

Q    Government Exhibit 145, what number was that?

A    That's an F number.  F-22.

Q    Government Exhibit Number 146, what number was that?

A    That's F-23.

Q    Government Exhibit Number F -- pardon me.  Got the F number ahead.  Government Exhibit 147, what number was that?

A    F-24.

Q    Government Exhibit Number 142, what number?

A    F-25.

Q    Government Exhibit 143?

A    143 is F-26.

Q    Government Exhibit Number 152?

A    F-27.

Q    Government Exhibit Number 185?

A    F-28.

Q    Government Exhibit Number 151?

A    Is F-29.

Q    Now, we go to Government Exhibit Number 140, what number was that?

A    140 -- 140 is F-31.

Q    Government Exhibit 142?

A    142?

3578

Q   Yes, sir.

A   We've already done that one.

Q   Did I say 142?

A   Yes, sir.

Q   I'm sorry.  149, pardon me.

A   141 is F-32.

Q   Okay.  And then 149?

A   149 is F-33.

Q   Government Exhibit 150?

A   F-34.

Q   And Government Exhibit Number 138?

A   F-35.

Q   Okay.  What is in each of those envelopes, sir?

A   In all of the envelopes we talked about except the last one -- (Interrupted)

Q   Okay.  Let's go -- all but Government Exhibit Number 138, all of those I mentioned, what's in those?

A   Each of them contains a spent .223 casing.

Q   In 138, which is your F number what?

A   Thirty five.

Q   What is in Government Exhibit Number 138?

A   Three .223 spent casings.

Q   How many total spent casings are there?

A   What's here now is just 22.

Q   Twenty two casings?

3579

A    That's correct.

Q    Did you perform an analysis on those 22 spent .223 casings?

A    Yes, I did.

Q    And how did you go about performing that analysis, sir?

A    Well, when I fired the firearm, suspect firearm, and gathered tests from it and then I took the tests from the gun and I compared them to the evidence casings from the scene.

Q    And when you made that comparison, was the result the same on each one of those .223 casings, all 22 of them you have in front of you, or was there any difference as far as ascertaining what firearm had fired and ejected those 22 casings in front of you?

A    No.  I determined that all of the casings in front of me were fired by this weapon.

Q    By Government Exhibit Number 128?

A    That is correct.

Q    On that Government Exhibit Number 138, does it have a marker number on the envelope, sir?  No.  On 138.

A    138?  A marker?

Q    Yes, sir.

A    Okay.  Yeah, it does have a location as to where they were found.

3580

Q     And what does that display as far as location?

A     Says three .223 shell casings from behind couch.

Q     And do the other envelopes identify marker numbers or locations?

A     That's correct.

Q     And which one did you just pick up?

A     That was F-34.

Q     And what's F-34 state?

A     F-34 says .223 casing, couch arm, western.

Q     Does it have a scene marker number on it?

A     Item 18, one eight.

Q     One eight?

A     Yes.

            MR. LITTLEFIELD:  And I would ask that Government Exhibit 39 be displayed.

            THE COURT:  You may.

Q     (By Mr. Littlefield) 39.  And the one -- go back to 138, the three casings found behind the couch, does it have a marker, scene marker number as well?

A     Yes.  Item two zero.

Q     If we look at 39, what's that number?

A     That's two zero.

Q     And the one you looked at that is number 18, arm of the couch, what exhibit number is that?

A     Item 18.

3581

Q    And what exhibit number, Government Exhibit Number?

A    Exhibit number -- I'm sorry.  Government Exhibit 150.

Q    And do you see up there 18?  Where -- and that's signifies where was 18?  On the envelope?

A    Yes, I see it.

Q    On the envelope where does it say it was found?

A    Item 18 and found on the couch arm, west end.

Q    And what's that?

A    That's item 18.

Q    And if we look at -- can you find Government Exhibit 132, which was the first one?  Have you found it?

A    I have it, sir.

Q    Does it have a location and marker number?

A    It says .223, west at truck and it does not have -- (Interrupted)

        MR. LITTLEFIELD:  May I approach, Your Honor?

        THE COURT:  You may.

A    Oh.  I see it here.  Marker number three.

        MR. LITTLEFIELD:  And if we could -- Judge, I would ask that Government Exhibit 37 be displayed.

        THE COURT:  You may.

Q    (By Mr. Littlefield) And we're going to get a little closer so -- a better view of it.  Do you see a truck at marker three in there?

3582

A    Yes, I do.

Q    And can you use your laser and point to where marker three is displayed as it's projected up there?

A    It's right here.  Can you can see it right there?

Q    Okay.  And as you look through the envelopes, do the envelopes identify the locations where those casings were found and a scene marker number?

A    That's correct.

Q    When a -- and is there a description as far as velocity in regards to firearms, sir?

A    Say your question again.

Q    When one is talking about firearms, what's high velocity mean?

A    Well, I guess again, it would depend on the person. When I think of a high velocity firearm, I mean even a .22 goes over a thousand feet per second.  That's pretty fast.  That's very fast.

Q    How fast does the .223 -- Government Exhibit Number 128, how fast does that round travel?

A    Muzzle end -- muzzle velocity is a total of 3200 feet per second.

Q    I'm sorry?

A    Thirty two hundred feet per second.

Q    Over three times as fast as a .22?

A    Yeah.  That's about half a mile per second.

3583

Q     And when -- describe the projectile from a .223 in comparison to the projectile from a 9 millimeter.

A     Okay.  The .223 projectile is -- we got two different versions now.  Fifty five grains is what I received on these cartridges.  And then there's a 62 grain that the military uses.

Q     Okay.  Let's talk about -- now these were 55 grains?

A     Fifty five grains.

Q     Then let's confine ourselves to the 55 grains.

A     Okay.

Q     Okay.  Compare that to a 9 -- or contrast maybe would be the better term -- that with a 9 millimeter projectile.

A     A 9 millimeter projectile is heavier.  Okay.  It weighs between -- actually comes in three different weights, 115, 124 and 147, depending on the manufacturer of the cartridge.  Okay.  Two -- (Interrupted)

Q     And so, that's twice as heavy as the .223 -- the 55 grain?

A     Yes, in most cases.

Q     Okay.

A     And the 9 millimeter -- the 147 is subsonic, means it goes less than a thousand feet per -- (Interrupted)

Q     I'm sorry.  I didn't understand you.  State that again a little slower.

3584

A     The 9 millimeter, the 147 grain cartridge, is subsonic, meaning it goes slower than the speed of sound. Okay.  Less than a thousand feet per second.  Both the 115 and the 124 are supersonic.  They go about 1100 feet per second.  And depending on the type of cartridge, because you have a plus P, a plus P cartridge has more powder in it, so the cartridge is actually a little bit faster than the regular cartridge and then there's also a plus P plus is actually a much faster than the regular one.  So -- (Interrupted)

Q     Did you see any plus Ps or plus P pluses out there at this scene?

A     Not in this case.

Q     Okay.

A     So it's a lot slower than the .233.  What the -- where this comes into play is -- (Interrupted)

         MR. SMITH:  Your Honor, I'm going to object. That not responsive.

Q     (By Mr. Littlefield) I'm not asking us what it comes into play, I'm just asking you for a comparison or contrast between those two.

         THE COURT:  Question withdrawn.

         MR. LITTLEFIELD:  Well, no, because I -- he went beyond it, the response.

         THE COURT:  The answer is stricken.  Question

3585

withdrawn.  Rephrase the question.  I'm not criticizing you.  I'm just trying to clarify for the jury.

MR. LITTLEFIELD:  I understand.

Q   (By Mr. Littlefield) Compare the -- or contrast, whichever is appropriate, the .223 round, the 55 grain .223 round with the 9 millimeter rounds that you were provided in this case in regards to these 9 millimeter firearms, which would have included the Smith & Wesson and the H&K MP5.  What's the speed of the 9 millimeter?

A   Speed of the 9 millimeter is 115 grain, as I said before, is supersonic, a little over a thousand feet per second.

Q   And the H&Ks?

A   H&Ks actually going to go -- because whenever you fire a pistol cartridge in a longer barrel you actually will get a little bit greater velocity because of the better closed in system.

Q   What's the velocity of the H&K in this particular case?

A   What's the speed of it?

Q   Yes.

A   It's got to be about 1200 feet per second.  Maybe more.

Q   Twelve hundred feet per second?

A   Uh huh.

3586

Q    You said something about 3200 feet per second awhile ago.

A    You said H&K.

Q    I don't mean -- I'm sorry.  H&K.  I mean, the Colt Sporter in this case.

A    Okay.  The Colt Sporter and the .223 cartridge is 3200 feet per second.

Q    So we're talking 1200 versus 3200?

A    Yes.

Q    What does a .223 cartridge do when it passes through an intermediate or intervening target, sir?  Such as sheet metal on an automobile or glass -- window glass on an automobile?

A    That's going to depend on the angle it hits at.  A .223 can very well penetrate a door on a car, you mentioned the sheet metal on something else.

Q    On an automobile, door of a car.

A    Yeah, it will go through it with no problem.

Q    What can happen to the projectile itself when it will pass through something like that?

A    The projectile is going to be deformed and fragmented.

Q    When you saw fragmented what do you mean?

A    It means it's going to break apart.  It's a very small -- it's a very light projectile and in terms of

weight and, yes, it's got a lot of velocity but when they hit they fragment.  As a matter of fact if you were to fire a .223 in water it deforms.

Q    What happens when you would fire a .223 and the projectile would pass through auto glass such as a windshield or a passenger -- side passenger window?

A    Again, it's going to depend on your angle but depending on if it's, I should say straight on in, maybe at 90 degrees, I'm expecting it to penetrate.  When you start getting the angle off maybe to an acute one, you can basically ricochet it off.  But the penetration power is there.

Q    Okay.  When it hits and penetrates, what would one expect that projectile to do upon -- when it penetrates the glass.  Is it going to be in one piece or is it going to fragment?

A    It's going to fragment and the fact that it's hitting something that's pretty resistant, it's going to loose a lot of its energy.  So there's no telling what it's going to.

Q    Did you have the opportunity to analyze a projectile or a portion of a projectile in relation to this .223 firearm, sir?

A    Yes, I did.

MR. LITTLEFIELD:  Judge, I would ask that what

3588

has been marked as Government Exhibit Number 129 be provided to the witness.

THE COURT:  You may.

MR. LITTLEFIELD:  And I think now would be an appropriate time to return all of the casings to the clerk.

Q    (By Mr. Littlefield) By the way, before we look at Government Exhibit 129?

COURT CLERK:  This fell out of one of these.  I don't know which one it was.

THE WITNESS:  This is T-15.

Q    (By Mr. Littlefield)  T which one?  I'm sorry.  T what?

A    T-15.

Q    That should be Government Exhibit 153?

A    Yeah.  That's correct.

Q    And that's what you reinserted it in?

A    That's correct.

Q    We're talking about what a .223 projectile does when it strikes something.  If it strikes something -- and you mentioned an acute angle?

A    Yes.

Q    What do you mean by an acute angle?

A    Well, I mean a sharp angle or something -- an acute angle is 60 degrees.  If it hits at that angle it can

3589

ricochet.

Q    Okay.  60 degrees.  What if it's greater than 60 degrees -- more than 60 degrees?

A    I'd say then again, like I'm saying, it's going to depend on -- (Interrupted)

Q    Oh, I mean less than.  I guess 90 degrees would be like that and 60 would be?

A    Like that.

Q    And if it struck at less -- 60 degrees or less, what can that -- (Interrupted)

A    Well, I would expect it.  I would expect it to ricochet.  But -- (Interrupted)

Q    When -- go ahead.

A    I would expect it to ricochet.  But there is really no telling what it was going to do when it strikes an object.  What I expect it to do and what it actually does, I would only be able to say that if I actually go and I take a gun with the ammo and do some testing and actually observe it.  But I've seen -- done crime scenes before and I know what was pointed out and when you've done the reconstruction scene, oh, okay, this is what happened.  But that's working from -- (Interrupted)

Q    I understand.  And let me ask you this:  If it ricochets, doesn't fragment but ricochets instead, what will the -- you mentioned that a -- you mentioned that a

bullet when it goes through the air spins as it's proceeding through.  And the spin -- what does that do as far as maintaining its line on the firing?

A     What does the spin do?

Q     What does the spin do in regards to maintaining its direction of travel?

A     When a bullet comes out of a barrel, the spinning actually equalizes the gravitational forces and some of the outside forces that would cause it to not have a very true or straight flight.  Okay.  That's why they got away from the ball ammo because it would come out and only -- (Interrupted)

Q     What's the spin do?  What -- does it keep it on the line or does it -- in regards to the line of flight?

A     Actually that -- all it does it equalize the gravitational forces just for a very short period of time so that the bullet -- when the bullet leaves the barrel it's actually slowing down and falling.  So the spin actually allows it to travel just a little bit straighter and truer for a very short period of time.  Okay.  That's all the spin does.

Q     When a bullet ricochets, what's that do to the spin?

A     The spin virtually disappears and your bullet has a tendency to tumble.  But that's going to depend on how it's struck, again, the object that it ricocheted off of.

Q    Okay.  If a bullet hits a butt plate of a magazine of a firearm, what would you expect -- if the angle was acute, what would you expect a .223 to do when it would strike a butt plate of a firearm at an acute angle?

A    Well, again, if it does it at an acute angle it probably would ricochet because we have a copper jacketed projectile, we got steel construction magazine or butt plate or whatever.  I expect it to leave some sort of a mark showing that it had struck the butt plate.  But I also expect it to fragment, okay.  Because .223 is notorious for doing that.  And I'd expect the fragments to go some place.

Q    Okay.  If the angle is acute enough, is it going to necessarily fragment?

A    Say again?

Q    If the angle it acute enough, is it necessarily going to fragment?

A    It has been my experience with working with the .223s over the last 13 years that that light projectile going that speed will fragment -- I mean, I've seen it fragment in people, I've seen it fragment hitting walls, I've seen it fragment hitting cars.  That's just something I anticipate happening -- (Interrupted)

Q    Does the angle have a bearing on whether a .223 fragments or it begins to tumble instead?

3592

A    I can't say that, sir.  I would not say that the angle would cause it not to fragment.  But like I said before, I've seen hollow points, .223, that fired in water, fragment.  So that's just something I expect to happen with the .223 caliber cartridge.  It's something I expect.

Q    Okay.  Look at 129.

A    Okay.

Q    Do you recognize that, sir?

A    Yes, I do.

Q    And what is that?  Let me ask you this:  How do you recognize that?

A    I see my item numbers F-40 and 41 that I placed on the outside of the envelope when I received it.

Q    And what condition was that envelope in when you received it, sir?

A    It was a sealed condition.

Q    Who submitted that, sir?  Does it show on the envelope?

A    Well, it is from the OCME's office, Tulsa, Oklahoma, and it was obtained by Jon Huntington.

Q    Okay.  What was -- you said there was F-40 -- two items in it?

A    That's correct.

Q    And what were those two items?

3593

A     Those were two -- (Interrupted)

Q     What T numbers -- what F numbers were they?

A     F-40 and 41.

MR. LITTLEFIELD:  I move admission --

Q     (By Mr. Littlefield)  And it -- was the seal tampered with in any way when that envelope was presented to the central office, which had been obtained by Jon Huntington?  Was it tampered with -- the seal tampered with in any way?

A     No, sir.

Q     And who broke the seal?

A     I did.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 129, Your Honor.

THE COURT:  Any objection?

MR. SMITH:  Brief voir dire, Your Honor.

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. SMITH:

Q     Mr. Higgs, would you look at that envelope for me, please, and tell me who at the OSBI received that from Agent Huntington?

A     Well, it just says here at the bottom, date obtained and says where obtained.  And that's OCME, Tulsa, Oklahoma.

Q   Yes, sir.

A   And obtained by whom, Huntington.

Q   That's correct.

A   Yes.

Q   And so, what other records do you show that it was received into the OSBI -- now I'm talking about looking at the envelope, not your notes.

A   Oh.  I was going -- well, every time -- everything that comes into the laboratory is accompanied with a request for analysis form saying who bringing it in and who their bringing it for and I was going to show you that -- from that.

Q   With the submittal form, correct?

A   Yes.

Q   All right.  Before we go to the submittal form, I want you to look at that envelope and tell me who received that at the OSBI from Agent Huntington?

A   Okay.  Again, we got by Huntington and received at the Tahlequah Regional Lab by C.D. Curtis on 9-30-99.

Q   It shows he received that from Agent Huntington? Are the dates the same?

A   No.  Dates are different.

Q   What dates are different on there?

A   Well, Huntington sealed it 9-28 of '99 and Charlie Curtis obtained it at 9-30-99.

3595

Q    So what happens between 28 and 30?

A    Well, this evidence, according to my notes --
(Interrupted)

Q    I'm talking about looking at that envelope.  Tell me
what happened to it between 28 and 30.

A    I can't say, sir.

Q    All right, sir.  Now, you want to look at the
submittal form because you think that might tell us
something a little different?

A    Yes.

Q    But you agree with me nothing is indicated on that
evidence envelope?

A    Well, no.  I'd agree with you.

Q    Other than what you've just testified to?

A    Yes, I testified to.  That's correct.

          MR. SMITH:  Your Honor, we'd object to the
introduction because I don't think the chain of custody
has been maintained.

          THE COURT:  Counsel?

          MR. LITTLEFIELD:  Don't need to, Judge.  It was
submitted by Huntington.  He testified he sealed it and
submitted it to the lab.  This witness received it in the
normal course of business of the OSBI in a sealed
untampered with condition and he opened it.

          THE COURT:  You've said that.  I don't think

3596

he's testified to that.

Q    (By Mr. Littlefield) What -- when you received this, was it sealed?

A    Yes, it was.

Q    What appearance did it have that that envelope had in any way been tampered with?

A    There was no indication that it had been tampered with when I received it.

Q    How were you able to break the seal?

A    I used a scalpel and I cut it open.

Q    You examined the envelope?

A    Yes.

Q    Before you opened it?

A    That's correct.

Q    Was there any sign that there had in any way been opened, changed, in any thing in regards to the contents of the envelope?

A    No.  I examined the envelope and then I broke the seal on it and then I also broke the seal on the two envelopes that were inside the -- this envelope.

Q    And were those two envelopes -- I think you said something about F-41?

A    And F-40.

Q    And were those -- what was the condition of those envelopes?

3597

A    They were sealed also.

Q    Any sign of tampering with either F-40 or F-41?

A    No sign.

Q    And in that regard, how did you have to get it --
what did you have to do to get into F-40 and F-41, those
envelopes?

A    You got to break -- you have to open them up.  I
mean, they're closed up.  You got to open them up and
take out the contents.

Q    By the way, Charlie Curtis, who is Charlie Curtis?

A    Charlie Curtis is criminalistics administrator and
he is actually over the serology -- I mean, DNA section
of the laboratory.

Q    And who -- that was taken by Mr. Huntington to which
laboratory, sir?

A    Huntington took it to the Tahlequah lab.

Q    And you're located where?

A    In Central Lab in Oklahoma City.

Q    And how did that package, Government Exhibit Number
129, make it from Tahlequah to Oklahoma City?

A    Charlie Curtis brought it in on the 30th of
September, 1999.

Q    So when he received it on the 30th as shown on that
envelope, what did he do with it?

A    He checked it into the property unit.

3598

Q    I mean, when he got it in Tahlequah on September the 30th, what did he -- Charlie Curtis do with that?

A    Just transport it to the central lab.

Q    And where did you retrieve it?

A    At the central lab.  Oh, where did he receive it or where did I receive it?

Q    Where did you receive it?

A    Central lab.

MR. LITTLEFIELD:  I again move admission of Government Exhibit Number 129.

MR. SMITH:  Maintain my objection.  I do have another question or two to ask him.

THE COURT:  You may.

FURTHER VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    Sir, you're testifying that you opened that envelope in a sealed condition.  How many times that envelope been opened since 1999?

A    I cannot tell you.

Q    That's right.  And so, you're testifying from memory as to when you opened it up in a sealed condition?

A    Actually, I'm not.

MR. LITTLEFIELD:  Judge, may we approach, just real briefly?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD: I'm again concerned because when we start talking about how many times has that been opened up and all, that starts getting us into the question of opening it up for other trials and I'm concerned that that may come up.

MR. SMITH: I don't intend to go any farther with him. And that was my point. But -- and, Your Honor, I think you understand the nature of my objection and that -- (Interrupted)

THE COURT: I understand that you're concerned about other trials but if it has been opened, even for every purpose, are you telling me there's no record of when it was opened and placed and tested?

MR. LITTLEFIELD: It's on the envelope but I'd have to call a number of different witnesses. I think he can -- he can identify even by looking at the envelope.

THE COURT: You see what the record looks like now.

MR. LITTLEFIELD: I understand that.

THE COURT: It's been opened up several times and there's no record before the Court, at least, of how the custody was maintained.

MR. LITTLEFIELD: Your Honor, if I have to

3600

bring the custody, I'm going to end up having to bring the court reporter from the state trial who maintained custody.

THE COURT: I understand that.

MR. LITTLEFIELD: And I can't -- and at that point we can't keep out the state trials because it was in the hands of the court reporter. And if I ask a court reporter what did you have -- why did you have this, I sure got to ask him why, because everybody's going to be sitting there going what the heck's a court reporter got to do with it.

THE COURT: Well, I mean, those -- I understand your concern about that.

MR. LITTLEFIELD: That was the Court's concerned, too, as well.

THE COURT: Well, no, I'm concerned. I'm not just concerned about that. That should not be a block to the verifying.

MR. LITTLEFIELD: Additionally, Judge, right now all I've asked him about is do you recognize that envelope, was it in a sealed condition. The next thing I'm going to ask him is did you look at F-41 and what condition was that in. Would you examine that and does that appear to be the same item. What test did you perform on this item and what conclusion did you reach.

3601

THE COURT:  But you asked for its admission. That's why we're up here.

MR. LITTLEFIELD:  I understand.  I understand. And if he goes on in -- (Interrupted)

THE COURT:  If you're not going to ask for it's admission now, then we don't have any problem.

MR. LITTLEFIELD:  Well, let me go on with him on that.  I think that when he looks at the item itself, he can say that appears to be the same item that I did the analysis of and I haven't got into it.

MR. SMITH:  That doesn't change the problem that you have from September 28th and September 30th of '99.

MR. LITTLEFIELD:  Sitting in the lab, wrapped in a sealed condition.  When he got it, it was in a sealed condition.

MR. SMITH:  There's nobody that has received that item.

MR. LITTLEFIELD:  Doesn't matter.  Mr. Huntington checked it into the lab and that's sufficient to establish the chain.

MR. SMITH:  There's nothing on that envelope that indicates that.  It indicates that Huntington picked it up from the inmate and Charlie Curtis delivered it two days later.

3602

MR. LITTLEFIELD:  But you got the testimony of Mr. Huntington that says I took it to the lab and submitted it.  That establishes it was taken in the lab.

THE COURT:  It was taken to the lab in Tahlequah?

MR. LITTLEFIELD:  Yes, sir, and that's what Huntington testified on the 28th.  And that's what he testified to.

THE COURT:  And then the next thing that happens is it's taken to Oklahoma City.

MR. LITTLEFIELD:  It was picked up and transported.

THE COURT:  Who did that?

MR. LITTLEFIELD:  Charlie Curtis.

THE COURT:  Is that what he testified to?

MR. LITTLEFIELD:  That's what Mr. Higgs testified to, yes.

MR. SMITH:  But I still think they've got a problem, Judge, of who does he give it to, who gets it.  I mean, that hasn't changed.  And it's just cause we're here at the last minute that he's thinking, well, something's different.  Nothing's different than it was two weeks ago.  Same problem exists.

MR. LITTLEFIELD:  Well, I'll tell you what's different than it was two weeks ago.  You told me that

3603

there wouldn't be any chain if he said he picked up in a sealed condition. And now, I'm in here and he says it's in a sealed condition. And now you're saying, contrary to what you told me, that there wouldn't be a problem. That's what changed.

MR. SMITH: There is no indication that anybody has received that into the lab. And your representation was that Higgs would be able to say that that's what was done and that was not what was -- (Interrupted)

MR. LITTLEFIELD: That's not what I said. And in addition there is, because Mr. Huntington said I submitted it at the lab.

THE COURT: Either one of you submitted any case law -- (Interrupted)

MR. LITTLEFIELD: No. And after I got this statement from Mr. Smith that soon as he -- as soon as Mr. Higgs identifies that as being in a sealed condition you've made your chain, and I ain't got a problem -- and that's not his exact quote, but it's the essence of what was said, and that's what we have done now. Huntington took it, Huntington checked it into the lab in a sealed condition. It went through normal procedures within the lab and when it was received by Mr. Higgs it was sealed.

MR. SMITH: That's the problem I've got, though. We don't know that it went through the normal

3604

procedures.  We don't know what happened to it.  We just know that Curtis got it two days -- we don't know if he got it outside the front door.  I don't know where he got it from.  That is the problem.  And that is one -- we thought Higgs was going to be able to straighten up and he can't.  He doesn't know.  He just knows Curtis brought it to him.  That's why I thought we -- (Interrupted)

MR. LITTLEFIELD:  If we've got to have a total chain on it, I can get Christa Rhodes here and I can get Charlie Curtis here -- (Interrupted)

MR. SMITH:  He just -- (Interrupted)

MR. LITTLEFIELD:  I'm not sure if I can them here within the next hour, but I'll get them here.

MR. SMITH:  My opinion is, Judge, he has to have somebody that received it.

THE COURT:  Okay.

MR. LITTLEFIELD:  I don't know if I have -- I don't believe I have Christa Rhodes on the list, but I want to add at this point Christa Rhodes.

THE COURT:  Who is she?

MR. LITTLEFIELD:  And she is -- she works at the OSBI lab in Tahlequah and I want to have -- (Interrupted)

MR. SMITH:  Is she the one who received it from -- (Interrupted)

3605

MR. LITTLEFIELD:  Yeah.

MR. SMITH:  From who -- from -- (Interrupted)

MR. LITTLEFIELD:  And I want to add Charlie Curtis.

MR. SMITH:  I don't need you to bring Curtis. If you're going to say he hauled it to Oklahoma City I'm fine.  I just want somebody to come in saying I got this from this guy.  And if she's the one, I don't object to him adding her.  But I think that's what's missing here.

THE COURT:  We'll add her.

(Whereupon, the following record was made in open court within the hearing of the jury.)

MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.

MR. SPERLING:  Your Honor, may Mr. Lane be excused for just a moment?

THE COURT:  He may.  Members of the jury, let's take our morning recess and I'll ask you to remember my admonition.  Everyone just remain seated as the jury leaves for the morning recess.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Mr. Higgs, you may step down and step outside.

(Whereupon, the witness left the courtroom

3606

after which the following record mass made.)

MR. LITTLEFIELD:  If we may be excused, I'm going to make a call to the Tahlequah lab and as to Christa Rhodes, she should be here within an hour.

THE COURT:  You may.

MR. LITTLEFIELD:  And, Judge, I'll go ahead and have Mr. Higgs -- what I'm thinking is ask him -- go ahead and have him open it, have him say I examined the fragment, talk about the analysis he performed, offer his conclusion and then when Ms. Rhodes comes, offer her to say that I received this item from Mr. Huntington.  It was in a sealed condition.  I logged it in.  And here's the submittal seat of Mr. Huntington when it was submitted.

THE COURT:  And move for it's admission with her?

MR. LITTLEFIELD:  And at that point move for admission of the item itself.  I think Mr. Higgs can testify as to what he did and what his conclusion was without actually offering the item itself.  But then when Ms. -- when Ms. Rhodes, Christa Rhodes, arrives then we have I think to Mr. Smith's satisfaction the chain on that item as well.

MR. SMITH:  I will be at that point, Judge.  If she can't provide the chain, of course I'm going to ask

3607

that her testimony be stricken.

THE COURT:  Yes.

MR. SMITH:  Provided -- (Interrupted)

THE COURT:  His testimony will be -- (Interrupted)

MR. LITTLEFIELD:  Judge, additionally, the item itself is a fragment and I'll offer -- make an offer of proof that Mr. Higgs will testify that when he analyzed the items it was a fragment of a jacket of a .223 projectile.  And that he examined that jacket and compared it to the jacket which he test fired and in his determination those two jackets were fired by the same weapon, which is Government Exhibit Number 128, the Colt Sporter.  That -- the analysis in and of itself proves the link, because that fragment about which he's testified, which he received, which is F-40 or 41 was fired by that same weapon.  I mean, that also connects the chain because it was fired by that same gun and the testimony is that item was removed from Mr. Eales' chest during the autopsy.  And Dr. Distefano testified as to that.  He then testified he gave it to Donita Mann. Donita Mann came in and said that's the item -- that's the fragment that was removed from the chest.  And I gave that to Jon Huntington.  And then Jon Huntington said I took that, I sealed it, I pulled it in that envelope, I

3608

took it to the Tahlequah lab.  And when Mr. Higgs analyzed that item, it was fired from that Colt Sporter. And the analysis itself proves the connection.

THE COURT:  What day did he analyze it, Higgs analyze it?

MR. LITTLEFIELD:  Doesn't have the date of the analysis.

THE COURT:  Or the year.

MR. LITTLEFIELD:  The report was made on January the 20th, of 2000.

MR. SMITH:  But, Your Honor, the fact that it may have come from that weapon validates the question if you fire a projectile through that weapon today and he's going to say, well, that makes the chain.  That doesn't make the chain.  The problem is as we've talked about it, reception into the lab, period.  That's where it exists. And that's why I have a problem.  Beyond that -- but what's happened with it, we can trust that.  But the problem that I had two weeks ago is the same problem we have today.

MR. LITTLEFIELD:  And that's what Mr. Huntington provided.  I checked it into the lab.

THE COURT:  He checked it in -- as I understand it, he checked it into the lab in Tahlequah.

MR. LITTLEFIELD:  That's correct.

3609

THE COURT:  And then it was transported to the lab in Oklahoma City.

MR. LITTLEFIELD:  And the only witness that Mr. Smith is asking that -- he's not complaining about it. And it was transported by Charlie Curtis.  And his statement at the bench was I'm not concerned about Mr. Curtis transporting it from Tahlequah to Oklahoma City. I'm only concerned about who received it at the lab and that's going to be Christa Rhodes.  And, I mean, all she's going to say is, yeah, I got it.  It was brought in by Mr. Huntington and he turned it in to me at the lab. And Mr. Huntington's already said I turned it in at the Tahlequah lab.

MR. SMITH:  If she could do that, Judge, I don't have a problem.  But that was a problem. Huntington couldn't say who that person was.  This is the first we've heard of this lady's name.

MR. LITTLEFIELD:  That's not true.  Mr. Huntington mentioned her name when he was asked who did you give it to, and he said Christa Rhodes -- (Interrupted)

THE COURT:  Well, from the Court's perspective what's happened is apparently you think you had an agreement and you don't have an agreement.  And so, we'll wait for Christa Rhodes' testimony.  But he may testify

3610

about his -- what he did, what his conclusions were.  If she can establish the chain, it comes in.  If she can't then it's stricken.

(Whereupon, a short recess was held after which the following record was made outside the hearing of the jury.)

THE COURT:  Let the record reflect counsel for the Government is present, counsel for the Defendant is present, Defendant is not present.  As I was thinking about the next few steps, does the Government have other witnesses?  I mean, is this witness going to be here in 20 minutes, 30 minutes, an hour?

MR. LITTLEFIELD:  She's coming from Tahlequah, 45 minute drive at the most.  We could put on another witness in the interim.

THE COURT:  I think that would be the prudent thing.

MR. LITTLEFIELD:  Mary Jo, is Dan here?  Okay. Yeah, we're ready to put on another witness.  And if we could go back and put Christa back in here.

THE COURT:  Let the record reflect Defendant's now present.  And the next witness will be?

MR. LITTLEFIELD:  Danny Farris and if we -- he may well be short.  He's the chemist tested the red phosphorous and says that he didn't test it for red

3611

phosphorous but will say it had -- contained methamphetamine and weighed it.  And if that doesn't take long, I think Doug Perkins is also here.

THE COURT:  Okay.

MR. LITTLEFIELD:  And he can say he tested and there was red phosphorous.

THE COURT:  Okay.  Everyone please remain seated as the jury comes in.

(Whereupon, the jury entered the courtroom and was seated in the box after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box.  You may call your next witness.

MR. LITTLEFIELD:  Danny Farris.

MR. SMITH:  May I speak briefly with our coordinator, Your Honor?

THE COURT:  You may.

DANNY FARRIS,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record, please, sir.

A    Danny Farris.

Q    Mr. Farris, how are you employed?

3612

A    I'm a criminalist with the Oklahoma State Bureau of Investigation.

Q    And how long have you been employed by the OSBI, sir?

A    A little over seven years.

Q    Mr. Farris, in what capacity do you work now?

A    Currently I'm assigned to the latent evidence unit as a fingerprint expert.

Q    And where's that located?

A    In Oklahoma City.

Q    Prior to being assigned to the lab in Oklahoma City, where were you assigned?

A    I was assigned to the Tahlequah laboratory as a drug chemist.

Q    And how long did you work -- what period of time did you work at Tahlequah lab as a drug chemist, sir?

A    From May of '99 till December of 2003.

Q    What experience, educational background, do you have that would have qualified you as a drug chemist, sir?

A    I have a degree from the University of Central Oklahoma in forensic science -- (Interrupted)

Q    What area did you tend to focus on in that area?

A    Well, my degree included as a family of chemistry degree, as far as I also had some criminal justice classes as well.

Q    And after your graduation from the University of Central Oklahoma in Edmond, with that forensic science -- is it bachelor of science in forensic science?

A    Yes, sir.

Q    After that what was your first employment?

A    I was assigned to the Oklahoma City laboratory as a drug -- in the drug identification unit.

Q    And what -- did you receive any special training once you went on to the OSBI in drug analysis, sir?

A    Yes.  I completed the OSBI -- basically the drug unit training program.  I've attended a seminar, well, actually two seminars by the Drug Enforcement Administration and one seminar provided by the Federal Bureau of Investigation.

Q    Have you previously testified as an expert witness in the area of drug analysis, sir?

A    Yes, I have.

Q    And can you tell me the courts in which you've been qualified?  Or any of the federal courts -- any of the federal district courts have you been qualified, sir?

A    Yes, I have.

Q    And where -- what federal district courts have you been qualified as an expert in drug analysis?

A    In this district as well as Tulsa and Oklahoma City.

Q    So all three districts within the state of Oklahoma?

3614

A      Yes, sir.

Q      Have you testify in any of the district courts within the state judicial system as an expert in the area of drug analysis?

A      Yes, I have.

Q      Do you have any idea how many?

A      Not off the top of my head, no.

Q      More than two or three?

A      Yes, sir.

Q      As a part of your responsibilities with the OSBI as a drug analyst when you were at the Tahlequah lab, did you have any connection with responding to clandestine methamphetamine laboratories, sir?

A      Yes, I did.

Q      And what was the nature of your requirements or responsibilities as a forensic chemist with the OSBI in regards to response to clandestine meth labs?

A      Whenever a call would come in for a meth lab, we were asked to respond to the scene, I would arrive at the scene, assess the scene for safety and then I would process the scene to collect evidence.  And I'd photograph, inventory, collect all the evidence needed, take it back to the laboratory, then perform the necessary analysis on that evidence.

Q      Okay.  And approximately how long a period were you

at the Tahlequah lab working as a drug analyst?

A    From 1999 to 2003.

Q    About four years?

A    Yes, sir.

Q    During that four year period do you have any idea how many clan labs, meth -- clandestine meth labs you responded to, sir?

MR. SMITH:  Your Honor, I'm going to object as to relevance.  It's my understanding he's here to talk about his analysis.  Doesn't have anything to do with clandestine labs.

MR. LITTLEFIELD:  As relation to his expertise, Your Honor.

THE COURT:  Overruled.

A    I've probably responded to well over 200 clandestine laboratories.

Q    (By Mr. Littlefield) What are the primary necessary components for manufacturing methamphetamine that you saw in the different clan labs in the Eastern District of Oklahoma?

A    The typical clan lab, you'd have to have ephedrine or pseudoephedrine, red phosphorous and iodine.

Q    Now, ephedrine and pseudoephedrine, is it one or the other?

A    Yes, sir.

3616

Q    Okay.  Typically, which was it?  Ephedrine or pseudoephedrine?

A    Typically pseudoephedrine.

Q    Red phosphorus and iodine?

A    Yes, sir.

Q    Of those three items, can any item of those three be used in multiple cooks?  Used again and again and again?

A    Yes, sir.

Q    Which one, if -- all?  Which one?

A    The red phosphorous.

Q    And have you analyzed what appeared to be or what was red phosphorous from the clandestine labs in the Eastern District of Oklahoma, sir, during the four years that you were in the Tahlequah laboratory?

A    Yes, I have.

Q    When red phosphorous has been used previously in manufacturing of methamphetamine, are you able to discern that or detect it in your analysis in the Tahlequah lab?

A    Yes.

Q    How?

A    We use instrumental analysis.

Q    Well, I mean and how can you tell -- maybe the question was too broad or improperly directed.  How can you tell that red phosphorous has previously been used in manufacturing methamphetamine as opposed to being virgin

3617

red phosphorous which had never been used in the manufacture?

A     It would contain methamphetamine mixed in with the red phosphorous.

Q     And why is that, sir?

A     During the manufacturing process once the red phosphorous is -- it's filtered away from the reaction vessel, you're not going to be able to get all of the methamphetamine out of the red phosphorous.  Some will be left behind.

Q     What's red phosphorous look like?

A     It's a red powder, dark red powder.

Q     And when -- you said filtering it off from the reaction vessel?

A     Yes, sir.

Q     Have you ever seen filters or filter paper, paper towels, coffee filters, whatever, through which the red phosphorous had been filtered off from the reaction vessel in the manufacturing process?

A     Yes, I have.

Q     And describe the filters after that red phosphorus has been filtered off.

A     They're usually moist, stained, kind of like a reddish stain, purplish stain.  That's basically about it.

3618

Q    By the way, if one tested the filters through which the red phosphorus had been filtered off from the manufactured methamphetamine -- at that point if you filter it off has methamphetamine been made?

A    Yes.

Q    If you examine the filters in which the red phosphorous has been collected by filtering it off for methamphetamine, what will you find in regards to those papers as to methamphetamine?

A    You will find methamphetamine.

Q    In the filter papers as well?

A    Yes.

MR. LITTLEFIELD:  I would ask that Government Exhibit Number 113 be provided to the witness, Your Honor.

THE COURT:  You may.

MR. LITTLEFIELD:  Oh, Judge, I would ask that Mr. Farris be recognized as an expert in the area of drug analysis.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Hearing no objection the Court finds the witness as an expert.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit Number 113, sir?

3619

A    Yes, I do.

Q    What is that?

A    It's an OSBI evidence envelope.

Q    Do you recognize that specific OSBI evidence envelope, sir?

A    I'm actually looking for my initials which would be on it. But it appears that it might have been deteriorated from the chemical.

Q    Kind of hard to find?

A    Yes, sir.

Q    When that item came in, did you analyze an item that was submitted -- seized by April Marcangeli and submitted by Ryan Porter in relation to this case?

A    Yes, I did.

Q    And what evidence number -- or was it given a T number, a P number, an F number?

A    A T number.

Q    What T number did it have?

A    It contained items -- (Interrupted)

Q    No. What T number?

A    T-138.

Q    Can you see the T number on that particular envelope, sir?

A    Yes, I can.

Q    What is that?

3620

A    T-138.

Q    Does that evidence envelope, the submittal envelope there, identify what case this is in?

A    Yes.

Q    Do you recognize that envelope, sir?

A    Yes, I do.

Q    And what is that?  I mean, what's T-138?  What is it?

A    It's actually T-138-1 which is one pill bottle.

Q    And did you analyze a pill bottle in relation to this specific case, sir?

A    I analyzed the contents of the pill bottle.

MR. LITTLEFIELD:  Judge, I'd move admission of Government Exhibit 113.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

Q    (By Mr. Littlefield) Now, that's all sealed up, isn't it?

A    Yes, sir.

Q    What happens when red phosphorous is contained in a package such as that, to a paper envelope over a period of time?

A    Well, I think if red phosphorous is sealed up by itself I don't think it would cause any problems.  I

think the fact that it was possibly used to manufacture methamphetamine, it would contain an acidic residue and the iodine possibly left behind would cause deterioration as you can see.

Q    Did you -- now, you said there was a pill bottle?

A    Yes.

Q    What was contained in the pill bottle itself, sir?

A    Items T-138-1.1, which is one plastic bag containing a dark red powder with a net weight of 15 grams.

Q    Fifteen grams?

A    Yes, sir.  Items T-138-1.2 which is one paper filter containing a dark red powder with a net weight of 2.8 grams.

Q    So we got 15 grams and 2.8 grams?

A    Yes, sir.  And T-138-1.3 which is two moist paper filters containing a red powder residue which was not weighed.  And item T-138-4 which is one sealed clear Ziploc bag containing one clear Ziploc bag containing a dark red powder with a net weight of 33.2 grams.

Q    So you've got 15 grams, 2.8 grams and 33.2 grams?

A    Yes, sir.

Q    Who weighed those three packages, sir?

A    I did.

Q    And what did you weigh?  Did you weigh the packages plus the powder or just the powder or what?

3622

A    Just the powder.

Q    What was the total weight of those three packages of red powder, sir?

A    Around 51 grams.

Q    I'm sorry?

A    Fifty one grams.

Q    As an individual who had responded to more than 200 labs, did that red powder contain an appearance that -- as to what you believe that was, sir, based on what you had seen in your experience?

A    Yes.

Q    What did you believe that was?

A    I believe it was red phosphorous.

Q    And did you perform any kind of analysis on those three packages, and it was 138.1.1, 1.2 and 1.4?

A    Yes, and 1.3.

Q    You also tested 1.3?

A    Yes, I did.

Q    But it was the 1.1, 1.2 and 1.4 that contained the weighable quantities?

A    It was actually T-138-4.

Q    Okay.

A    Okay.  Yes.

Q    38-4, 1.1, 1.2 and 1.4?

A    1.3.

3623

Q    Okay.   And which one had the 33?

A    Dash four.

Q    Dash four, okay.   What type of analysis did you perform on these four items?

A    I performed a gas chromatograph and a gas chromatograph/mass spectrometer examination.

Q    And what's the difference between the two, sir?

A    Basically the gas chromatograph is an instrument that gives me an indication of what is present in the sample.

Q    Is the indication conclusive?

A    No, it's not.

Q    Just presumptive?

A    Yes.

Q    When you ran the gas chromatograph analysis on these four items, what indication did you receive as was the contents or which was contained in these items?

A    May I refer to my case notes?

Q    Sure.

A    Items 1.1 gave me an indication of methamphetamine. 1.2 gave me an indication of phenyl acetone or methamphetamine.

Q    I'm sorry.   What?

A    Phenyl acetone.   And 1.3 gave me an indication of phenyl acetone and dash four give me an indication of

3624

methamphetamine.

Q    What's phenyl acetone?

A    It's a schedule three substance which is commonly found in red phosphorous that has been used to manufacture methamphetamine.  It's like a by-product.

Q    And I think you said -- on 1.2 I think you said two items were found in that -- indications?

A    The gas chromatograph, when it gives an indication it -- between phenyl acetone and methamphetamine you can't tell the difference until run it on the mass spectrometer.

Q    Okay.  So you said phenyl acetone or methamphetamine as to 1.2?

A    Yeah.  For 1.2 and 1.3.

Q    After receiving that -- I guess would you call that presumptive or just indicative or what?

A    Presumptive is good.

Q    Okay.  After you received those presumptive results on those four items what then did you do?

A    I take the same samples and I place them onto the gas chromatograph/mass spectrometer.

Q    And will the gas chromatograph/mass spectrometer, the GCMS, will that give a conclusive or presumptive analysis?

A    A conclusive.

3625

Q    And did you perform -- did you perform the GCMS on all four of the items, the T items that you've identified which were contained in Government Exhibit Number 113?

A    Yes, I did.

Q    What were your results in regards to the four items?

A    T-138-1.1 was consistent with red phosphorous containing methamphetamine, a schedule two substance. Items 138-1.2 and 138-1.3 were consistent with red phosphorous containing phenyl acetone, a schedule three substance. And item T-138-4 was consistent with red phosphorous containing methamphetamine, a schedule two substance.

Q    Okay. So the one that was 15 grams tested positive for meth; is that correct?

A    Yes.

Q    And what was the weight of the other that tested positive for meth?

A    33.2 grams.

Q    And so, that's a total of 15 plus 33 is?

A    Around 48.

Q    48.2 grams?

A    Yes.

Q    And you said that what -- and phenyl acetone is -- how is it a by-product of the manufacturing process?

A    During the manufacturing process there's other

3626

compounds that will be produced and this is one of the by-products that is found, is commonly found, in red phosphorous.

Q   Did you analyze other -- during your period of time at the Tahlequah laboratory, did you analyze other red phosphorous from what was believed to be clandestine meth labs to determine whether or not there were other substances on those others?

A   Yes, I have.

Q   Is it uncommon to find phenyl acetone in what's believed to be red phosphorous from clandestine labs?

A   No, it is not.

Q   Okay.  Now, you said consistent with red phosphorous.  Was that the conclusion that you reached?

A   Yes, sir.

Q   Why do you say consistent with red phosphorous?

A   I did not perform any test to conclusively identify red phosphorous.

Q   Is that something that was regularly done at the Tahlequah lab to test for red phosphorous during the time you were there?

A   Yes, back in -- from around 1999 it was common.

Q   To test for red phosphorous at the Tahlequah lab or -- (Interrupted)

A   No, it was not.  It wasn't common then.  They

3627

actually perform the test now.

Q   At the time you were there, could you perform the test on red phosphorous at the lab?

A   No, I could not.

Q   If one -- if you wanted to determine whether or not that actually conclusively was red phosphorous, what did you have to do during that time period?

A   I would have to transfer the samples to the trace evidence unit.

Q   Where was the trace -- where is the trace evidence unit located?

A   It's in Oklahoma City.

Q   After you performed your analysis on those four items and reached the determination you reached as far as meth in two of them and phenyl acetone in two of them, what did you do with Government Exhibit Number 138?

A   It was transferred back -- it was transferred to the trace evidence unit in Oklahoma City.

Q   And when was it you performed your analysis on these items, sir?

A   According to my records, around October 7th.

Q   Of?

A   Of 1999.

Q   And when was the -- when did you forward it on to the trace evidence unit, sir?

A    I don't actually -- I don't actually have that paperwork in my file.  I would -- basically what would happen is I would return it back to the evidence vault and the evidence tech would fulfill the transfer.

Q    Okay.

A    I'm not actually sure of the date it was transferred to Oklahoma City.

Q    And would the individual who received that item in the Central Lab have the evidence of when it was transported and transferred to them?

A    Yes.

MR. LITTLEFIELD:  May I have a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examination.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q    Mr. Farris, good morning.

A    Morning.

Q    I want to talk a little bit about what you found there.  But first off let's identify what you weighed.

A    Okay.

Q    The net weight that you have is the powder that you

3629

took off of the samples that you had, is that right?  Off the evidence that you had?

A    The net weight is the actual -- just the powder.  I would dump it into a weigh boat.

Q    So in items 138-1.2 and 1.3, that doesn't have anything to do with what you're calling filters, that's just a powder that may have been on the paper that was contained on them, is that right?

A    Yes.  It's the powder by itself.

Q    Okay.  And that's what you have as 2.8 grams, correct?

A    Yes.  As well as 1.1, the 15 grams and the dash four, the 33.2 grams.  Those are all net weights.

Q    All right.  I'm talking about on the filters -- (Interrupted)

A    Oh, on the filters.

Q    You labelled as filters and you took off some powder that was on there, your net weight off of those were 2.8 grams -- (Interrupted)

A    That's correct, yes.

Q    -- is my understanding.  Okay.  Now, describe the package that you received that Ms. Marcangeli turned into the lab if you would, please.

A    Well, according to my report it was one sealed evidence envelope containing -- it was one sealed

3630

evidence envelope containing items T-138-1 and T-138-4.

Q    Let's talk about 138-1 if you may.  Do you recall what that vessel was?

A    Just according to my report.

Q    You don't have any independent recollection?

A    I really don't remember, no.

Q    And sometime -- a couple weeks ago, a week ago, we weren't able to retrieve it out of that envelope and I assume you wouldn't want to today?

A    I would not feel safe opening that in here, no, sir.

Q    So you can't tell me -- and what we're talking about is a pill bottle as you have it labeled on your report?

A    Yes, sir.

Q    Is that correct?  And you can't tell me from looking at your notes whether or not there's anybody's name on that pill bottle?

A    That's correct.

Q    And the pill bottle was never submitted for fingerprint analysis; is that true?

A    Not according -- not to my recollection.

Q    Were you aware, whenever Ms. Marcangeli received that pill bottle, that it had been in the custody of Stanley Philpot, an Oklahoma State game ranger -- or state park ranger, excuse me?

A    No.

3631

Q    For well in excess of 12 hours and actually it was about 18 hours before it was ever turned over to Ms. Marcangeli?

A    No, I was not.

Q    Would that have anything -- as far as in your mind, would that raise any concerns as to, well, maybe we ought to look at this fingerprint -- or excuse me -- this pill bottle for fingerprints because sometime down the road somebody might question what happened here?  Did that ever come across your mind?

A    No, sir.  I was just asked to analyze the items.

Q    Okay.  So that's not a call that you would make as to whether or not it should be sent off for fingerprint analysis; is that true?

A    That's correct.

Q    Okay.  And again, you have nothing in your notes that you have in front of you there that identifies that pill bottle or that vessel as belonging to any particular individual?

A    No, sir.

Q    Okay.  Now, contained within that pill bottle was a Ziploc bag, is that correct?

A    Yes.

Q    Or am I reading it wrong?  Was there a bag inside of it?  There was, wasn't there?

3632

A    Yes, inside the pill bottle there was one sealed clear Ziploc bag containing -- well, one prescription bottle containing the items.  And the items were one plastic bag, one paper filter and some moist paper filters.

Q    Are you aware of the capability of retrieving fingerprints from plastic bags?

A    Yes, I am.

Q    And again, as it relates to the plastic bag that was stuck inside of the pill bottle, that wasn't ever analyzed, was it?

A    For fingerprints?

Q    Yes, sir.

A    No, sir.

Q    Okay.  Now, let's talk about the paper filters.  Are you aware of whether or not fingerprints can be detected on paper?

A    Yes, I am.

Q    And I assume the answer's going to be the same, that what you have on here is paper filters, they were never submitted for fingerprint analysis either; is that correct?

A    I don't believe so.

Q    Okay.  And then finally the item that you have 138-4 is a sealed clear Ziploc bag containing another Ziploc

bag; is that true?

A   Yes, sir.

Q   Okay.  Capabilities exist to detect fingerprints on plastic bags just like this one, right?

A   Yes, sir.

Q   And again, that wasn't done?

A   Not to my knowledge.

Q   Now, let's talk about your lab results.  You have consistent with red phosphorous on 138-1.1, contains methamphetamine, correct?

A   Yes, sir.

Q   Okay.  Is there any appreciable weight of methamphetamine that you can tell us that was in that sample?

A   I couldn't understand what you said.

Q   Well, I want to be -- I want us to be very clear as to what your lab results mean, okay?

A   Okay.

Q   Because when I read the results for 138-1.1, again it says consistent with red phosphorous?

A   Yes, sir.

Q   Meaning you don't have a conclusive test that you did, but you just think that's what it is.  That's what it seems like, that's what it looks like, that's what I believe it to be, right?

3634

A    Correct.

Q    But you have on there contains methamphetamine, right?

A    Correct.

Q    How much methamphetamine was in that sample?

A    I did not make that determination.

Q    Okay.  Does that capability exist?

A    Yes, it does.

Q    Now, based on your experience when dealing with these clan laboratories whenever you -- this red phosphorous you said is a -- is something that's left over once you make dope?

A    Yes, sir.

Q    So I guess what you're going to tell us is that you would find trace amounts of methamphetamine in red phosphorous that's previously used in a cook?

A    It would be a small amount, yes.

Q    How small?

A    I didn't make that determination.  I've actually never made that determination.

Q    You have on your report that it contains methamphetamine.  And that's what the jury's over here listening to.  I want to know how much methamphetamine was in there.  You have meth on here.  I need to know how much.

3635

A    I did not make that determination.

Q    Okay.  Are we talking about half of this 15 gram sample?  Are we talking about ten percent?  Are we talking about one percent of it?

A    I did not make that determination, so I do not know.

Q    Okay.  You have experience with clan laboratories and the production of methamphetamine and the red phosphorous that's left over as a result of that, right?

A    Yes.

Q    Have you ever conducted an analysis on items such as that to be able to determine how much residue of methamphetamine would be left in red phosphorous that was used in a cook?

A    No, I have not.

Q    Let's talk about phenyl acetone.  You said that is -- and that's in the samples 1.2 and 1.3, which came from what you determined to be filters, right?  Are you with me?

A    One point --?

Q    138-1.2 and -- (Interrupted)

A    1.2 and 1.3.  Yes.

Q    All right.  Your results on there say consistent with red phosphorous, contains phenyl acetone.

A    Yes, sir.

Q    And you told us just a little bit ago that phenyl

3636

acetone is a by-product in the manufacturing of methamphetamine?

A    Yes, sir.

Q    And that based on your experience with clan laboratories, that's a common ingredient that you would expect to find with red phosphorous that's been used in a cook?

A    Yes, sir.

Q    Again, same answer.  You can't tell me how much phenyl acetone was in that red phosphorous that you tested on those -- that came off those filters?

A    No, sir.

Q    Okay.  Now, this phenyl acetone -- tell us what acetone is.  Do you know what that is?

A    It's just like an organic solvent.

Q    Okay.  And that's commonly used in the manufacture of methamphetamine; is that true?

A    Yes, it can be.

Q    Do you know whether or not any acetone was found at the Barrett residence?

A    I do not.

Q    Okay.  That wasn't part of your function, was it?

A    No.  I just analyzed these items.

Q    Okay.  Then let's talk about the last item, 138-4, consistent with red phosphorous, contains

methamphetamine.  And you have the total weight on there 33.2 grams, correct?

A    Correct.

Q    Again, you're telling the jury there's methamphetamine in that sample.  I need to know how much.

A    I do not know.

Q    Never performed that sort of analysis?

A    No, sir.

MR. SMITH:  Pass the witness, Your Honor.

THE COURT:  Further direct?

MR. LITTLEFIELD:  Actually, Judge, may I approach for a second up here?

THE COURT:  You may.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    What is phenyl acetone -- you said it was a by-product?  Is that two different -- what is that?

A    It's really just -- it's the by-product that's produced.  It was actually used, I guess, years ago in the P2P method of manufacturing methamphetamine.  It was actually a precursor in that type of manufacturing process.

Q    Is phenyl -- is it one item or is there a phenyl item and an acetone item?

A    I don't believe that the phenyl acetone has anything

to do with actually, you know, acetone itself as far as how it was used in the manufacturing process.

Q    So it's just a -- is it a combination of two ingredients?

A    It's just a compound that's produced during the manufacturing process.

Q    Can you use phenyl by itself to make meth?

A    I have never heard of that, no.

Q    You were asked some questions about fingerprints. If I just touch that am I going to leave a fingerprint, a readable print?

A    Well, it's possible that you could.

Q    Well, if I touch it like that could it be a readable print?

A    You'd have to perform the analysis, you know, the development procedures to see if it was going to be a print of value or not.

Q    How often have you been looking at prints now?

A    Be two years in January.

Q    Most of the items that you see, are there legible prints on them?

A    I want to say most of them, no.

Q    Why?

A    It's just a chance occurrence to have a latent print left behind that can be used for identification purposes.

Q    Well, if I put my thumb on here and my thumb moves, is that going to likely leave a legible print?

A    It's possible it could.  I mean, there's going to be -- (Interrupted)

Q    Likely going to?

A    Well, if your thumb moves it can cause distortion or twisting, so I mean it's possible.

Q    And if there's oil or substance residue on an item, is that -- does that enhance the likelihood of a print?

A    It's possible.

Q    Does it enhance or decrease from the likelihood?

A    It's really -- it's kind of hard to say.  I mean, I'd actually have to look at it.  I can't really sit up here and say that if you touch an item and there's oil on there, it's going to make it better or worse.  I mean, there's really no way of saying.

Q    Okay.  If you look at an item upon which a print is found and you can even ascertain it's a clear latent print, and you're able to compare it to a known print of an individual and say, yep, that fingerprint's that guy's print and it's on that item, what's that tell you?

A    It just tells you that the person touched that item at one time.

Q    Can't tell you when?

A    No, sir.

3640

Q    And is that the only means by which an individual touches an item?  I mean, is a fingerprint the only means whereby someone can establish that an individual touched an item?

A    Yes.

Q    Well, can you tell me I touched that pen?

A    Well, I see you touched it, so, yes, I can say you touched it.

Q    So if witnesses -- if I have this in my pocket, do I need a fingerprint to say that's in my pocket?

A    No, sir.

Q    If in regards to that pill bottle, Steve Hash saw it in a pocket, Johnny Philpot saw it in a pocket and Stanley Philpot saw it in the pocket, do I have to have a fingerprint to say it was in the pocket?

A    I don't believe so, no.

Q    Do fingerprints tell ownership?

A    No, they do not.

Q    Every time someone touches an item, is that going to leave a legible, readable fingerprint?

A    No, sir.

Q    Why not?

A    There's just so much that could happen.  I mean, it could depend on, you know, the surface that's being touched, whether it's receptive to fingerprints.  It

could depend on if a person's hands are dry, if it's wet. There's so many factors that could go into whether a fingerprint is left behind.  Or a legible, identifiable fingerprint.

Q    Okay.  Most of the cases of items you view in the latent print section, are they readable prints that you can pull off?

A    I'd say most of the items that we process for latent prints come up with either negative results or latent prints that are not of comparison quality.

Q    That are not of what?

A    Comparison quality, where they're not legible enough to make a comparison to a known set of fingerprints.

          MR. LITTLEFIELD:  May I go back for just a second, Judge?

          THE COURT:  You may.

          MR. LITTLEFIELD:  Pass the witness.

          THE COURT:  You may.

                    RECROSS EXAMINATION

BY MR. SMITH:

Q    Sir, that envelope that's in front of you, would you pick that up for me.  Okay.  Set her down.  Now, I've got two places on that that I could conduct a fingerprint analysis and look and see where you touched that, couldn't I?  Front side where you had it with your thumb,

3642

the backside where you had it with the other four fingers, correct?

A    You can process the plastic bag -- or this plastic container.

Q    Just like -- hold it up again.  Show -- turn it around back this so we can see the back of your hand, the jurors.  And if you clamp it with all your fingers, you've got a place I can look on that bag and conduct a fingerprint analysis, don't you?

A    You look and see if a latent print was left behind, yes, sir.

Q    That's right.  Now, if I never look at it, I never know, do I?

A    That's correct.

Q    So when we talk about, you know, how often do I get a print off of something, you got to look at it before you even know?

A    Yes.  You have to process the evidence to see.

Q    And these items were never processed, were they?

A    Not to my knowledge.

Q    Okay.  And you weren't aware of there being a question as to this evidence being in the custody of somebody else for 18 hours, right?

A    No, sir.

Q    Okay.  Now, let's talk about this phenyl acetone.

3643

If I cook dope using acetone, it's not going to surprise you that red phosphorous comes back with trace of acetone in it, is it?

A    It's possible, yes.

Q    You also talk about P2P method.  You said it's more common to have phenyl acetone in dope that is manufactured using the P2P method?

A    Yes.

Q    Okay.  Let's talk a little bit about the two ways that methamphetamine is manufactured.  Are you aware of them?

A    I'm mainly aware of the red phosphorous method and the anhydrous ammonia method.  I'm not too familiar with the P2P method.

Q    So there's more than two ways?

A    Yes, there's another method.

Q    There's three ways?

A    That I'm aware of, yes.

Q    Let's find out what you do know about the P2P method?

A    Okay.

Q    How is that different than the red phosphorous method?  Different chemicals involved?

A    Yes, there's different precursors, as far as phenyl acetone.

3644

Q    What chemicals are involved in P2P method?

A    I'm not really that familiar with it.  It's a method that -- I've actually never been to a P2P like clandestine laboratory.  Most labs I went to were red phosphorous or anhydrous ammonia.

Q    In a P2P method is red phosphorous used at all?

A    I don't believe so.

Q    Is the process for P2P vastly different than a red phosphorous method?

A    I believe so.

Q    Okay.  Now, you're an investigator.  That's what you do.  OSBI.  You're an investigator.

A    Yes.  I work in the laboratory, yes.

Q    All right, sir.  Does it raise any concern with you that you got items of evidence and you're dealing with red phosphorous that now you think, boy, one of these could have been used in a red phosphorous method of manufacturing and the other one could be used in a P2P method of manufacturing?  Did that ever come across your mind as being, boy, I wonder what went on here?

A    No, it did not.  Because like I said, phenyl acetone is actually a by-product in the red phosphorous method, so it's very common to find phenyl acetone during the red -- in the red P method.

Q    I thought you said, though, that it's more common in

3645

the P2P method?

A   I said phenyl acetone is more common as a precursor in the P2P method.  If you're using the P2P method, you would have phenyl acetone as a precursor substance, whereas in the red P method, it's just a by-product that is produced.

MR. SMITH:  I don't think I have anything further.  Thank you, sir.

MR. LITTLEFIELD:  Judge, I do have a couple redirect.

THE COURT:  You may.

FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   If one has red phosphorous iodine crystals and pseudoephedrine, what kind of cook is it?

A   Red phosphorous.

Q   Is it a P2P cook?

A   No, sir.

Q   If one has red phosphorous, iodine crystals and pseudoephedrine and does that cook, what will you see on the red phosphorous?

A   It's possible -- well, you'll find methamphetamine and it's possible you'll find phenyl acetone.

Q   Now, you mentioned the term by-product.  What do you mean by by-product?

3646

A   It's just another product that's produced during the manufacturing process.

Q   Kind of extraneous to the whole deal?

A   It's not the desired effect.  I mean, the desired effect is to produce methamphetamine.  However, you will have other compounds that are produced and phenyl acetone is one of them.

Q   And if there is some phenyl acetone left over in the red phosphorous, does that go, whoops, that's a P2P cook?

A   No, sir.

Q   And would you even use red phosphorous in an P2P cook?

A   I don't believe so.

Q   Would you pick up that envelope?  Yeah, that one again and hold it.  Now, you're holding it now and you might leave fingerprints?

A   It's possible, yes.

Q   Would the jury, having viewed what they just viewed, need to see fingerprints to determine whether you were holding that or not?

A   I believe they saw me pick it up so I don't think they would.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Any further cross?

MR. SMITH:  I don't think so, Your Honor.

3647

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes.

MR. SMITH:  Yes, sir.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.  You may call your next witness.

MR. LITTLEFIELD:  Doug Perkins.

J. DOUGLAS PERKINS, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record, please, sir.

A    First initial J. Douglas Perkins.

Q    Douglas?

A    Yes.

Q    Mr. Perkins, how are you employed?

A    I am employed as a Criminalist Supervisor with the Oklahoma State Bureau of Investigation.

Q    And what area of the OSBI are you a supervisor of?

A    The trace evidence unit.

Q    Where is the trace evidence unit located, sir?

A    In our Oklahoma City laboratory.

Q    Is that the central lab?

A    Yes, sir.

3648

Q    And what is the difference between the trace evidence unit in what a criminalist does for the trace evidence unit and the lab such as the Tahlequah lab?

A    The trace evidence unit has instrumentation that is unique to that one lab in that we can identify materials, we can also analyze cases dealing with gunshot residue.

Q    Okay.  Lean forward if you would.

A    Oh.  Sorry.

Q    That's all right.  Gunshot residue?

A    Gunshot residue.  We test for ignitable liquids on arson cases.  We also analyze paint and we're working on towards analyzing glass evidence.  So we deal with what's called trace evidence or small amounts of evidence, small items.

Q    And are there certain products that the trace evidence lab is equipped to test for which the other labs, at least in 1999, were not equipped to test for?

A    Yes.  In the area of elemental determinations.

Q    And elemental, is that kind of like the chemical charts I used to see -- the way back when I was in high school?

A    Yes, sir.  The period chart that contains the elements, that's the one we're talking about.  Those elements.

Q    Okay.  What kind of training and educational

3649

background -- let's start with education.  What kind of educational background do you have to allow you to be the supervisor of the trace evidence unit, sir?

A     I have a bachelor's degree in science, a major in biology with a minor in chemistry.

Q     From where?

A     From Cameron University.

Q     Cameron?

A     Yes, in Lawton, Oklahoma.

Q     Okay.

A     And that was back to 1978.

Q     Okay.

A     Since then I would join the Bureau in 19 -- in early 1980.

Q     The OSBI?

A     Yes, sir.

Q     Okay.

A     And since then I've gone through numerous schools through the FBI, the Bureau of Alcohol, Tobacco and Firearms, through the U.S. State Department dealing in trace analysis, dealing with ignitable liquids, gunshot residue, through the different vendors of our instruments on how to properly run your instruments, how to do quality assurance, quality control measures, in almost 24 years.

3650

Q    Okay.  And back in '99 were you the supervisor of the trace evidence unit or were you just one of the lackey criminalist?

A    May I look at my -- oh, '97.  Okay.  Yes.

Q    '99?

A    Yes.  In '99 I was the supervisor.

Q    You were?

A    Yes.

Q    Did you at that time still perform analysis?

A    Yes, sir, as I do today.

Q    Still do today.  Have you previously been qualified as an expert witness in the area of drug analysis in any of the federal district courts within the state?

A    In the federal court system I have testified to elemental determinations.

Q    Okay.  And where have you been qualified in that regard, sir?

A    In this court.

Q    Have you also testified in regards to elemental determinations and drug analysis within the state courts around us?

A    As the elemental determinations relate to drugs, yes, sir, I have.

          MR. LITTLEFIELD:  I would ask that he be again qualified as an expert in the area of elemental

3651

determinations, Your Honor.

THE COURT: Any objection?

MR. SMITH: No objection, Your Honor.

THE COURT: Hearing no objection, the Court recognizes the witness as an expert.

Q (By Mr. Littlefield) Mr. Perkins, in regards to elemental determinations and what the trace section did, and we're looking in the time frame of late 1999 and early 2000. When red phosphorous or an item or materials that were suspected to be red phosphorous was submitted to the OSBI, was there a location at which that determination could be confirmed conclusively?

A Yes, sir.

Q And where was that location, sir?

A In my lab, the trace evidence unit.

Q If a criminalist working, for example, in the Tahlequah lab had a material that was suspected to be red phosphorous, what would they do with it at that time, back in '99, early 2000?

A When they had finished their other analyses, to do the final confirmation of what the material -- the elemental determination of that material, they would transfer that to my laboratory for analysis.

Q To your left is Government Exhibit 113. And do you recognize that, sir?

A     Yes, sir.  It has aged a bit since I last saw it.

Q     I understand that.

A     This item -- (Interrupted)

MR. LITTLEFIELD:  Judge, may I approach the witness real quick?

THE COURT:  You may.

Q     (By Mr. Littlefield) And you said it had been a while since you'd last seen it.  Have you seen that specific item, sir?

A     Yes.

Q     When did you last see it?  I mean, when did you first see it?  Let me put it that way.

A     When I first saw this item, I'm trying to see where -- in my -- may I refer to my case notes?

Q     Sure, sure.  Is it difficult -- are you clearly able to see dates on that envelope in which it was submitted?

A     I can see at the bottom when I sealed the evidence back up, it contains my seal, my initials and the date of 10/22 of '99.

Q     10/22 of '99?  And that's when you would have started or finished your analysis?

A     Finished.

Q     So you would have done it prior to the 22nd of October of '99?

A     Yes, sir.

3653

Q    Okay.   What was contained -- and there was a T item number assigned to that; is that correct?

A    Yes, sir.   That would have been assigned through our Tahlequah lab.

Q    And what item number or numbers were assigned to Government Exhibit 113, sir?

A    On Exhibit 113 it's my case number 99-11543.

Q    Okay.

A    Within the original evidence envelope was items T-138-1, T-138-1.1.

Q    Okay.

A    These are derivative numbers meaning -- (Interrupted)

Q    I understand.

A    Samples from a parent sample.

Q    Okay.

A    A T-138-1.2 and T-38-1.3.   T-138-4.

Q    And so we got .1, .2, .3 and dash four?

A    In essence, yes, sir.

Q    Almost sounds like Morse code, doesn't it?

A    Yes, sir.

Q    Did you perform an analysis on those four items .1, .2, .3 and dash four?

A    On 1.1 -- (Interrupted)

Q    Let me ask you, did you analyze all those?

A   No, sir.  There was one item I did not analyze.

Q   Which one did you not analyze and let's exclude it?

A   T-138-1 was a pill bottle that had a white safety cap.  I did not analyze that item.

Q   What ones did you analyze?

A   T-138-1.1, 1.2, 1.3 and dash four.

Q   I think that's what I asked you about.  Did you do analysis on .1, .2, .3 and dash four?

A   Yes, sir.

Q   Was the analysis the same on each -- not what the conclusion was, but was the analysis the same on each of those four items?

A   Yes, sir.

Q   What means of analysis did you perform on those four items, sir?

A   Of each of those four items I took a small sample from each, put that sample on what's call a sample platform, which is a -- literally just a little -- looks like a giant thumb tack.

Q   Okay.

A   That sample was put into the -- my instrument which was a scanning electron microscope.

Q   And that's what you call it is a scanning electron microscope?

A   Yes, sir, which we use the initials SEM.

Q    Okay.

A    And then attached that instrument is another instrument that is called an energy disbursive spectrometer or EDS for short.  So it's an SEMEDS.  This instrument not only looks at the sample, allows me to look at it at great magnification, but the spectrum can also be acquired as to what elements are contained within those samples.

Q    All right.  And then as you do that, as you perform that and with your spectrum are able to ascertain what elements are contained in the samples, what do you do then and what does that tell you?

A    As the data is being acquired, I can print out a spectrum of what is seen in each sample and then from that make a determination as to the spectrum where it comes out in the timeline as to what elements contained within that sample.

Q    And do you have known standards against which you compared this -- I'm assuming it's a chart or a graph that's printed out?

A    It's similar to a graph.

Q    And what is it that you compare the graph of the unknown item, what you're testing against?

A    Well, we have to show that the instrument works properly each and every day.  So the first thing that I

3656

run it against is a known nickel standard.  This is a government tested material that we know is pure nickel. If I get a pure nickel standard that day spectrum produced, then I know the instrument's operating correctly.

Q    When you ran this analysis, did you perform the nickel standard?

A    Yes, sir.

Q    And did you ascertain whether the machine was operating properly and was it?

A    Yes, I verified that it was operating correctly.

Q    And then you put this sample from each of these items on your little thumb tack deal and ran your analysis, the SEM and the EDS, is that correct?  SEM and the EDS?

A    Yes, sir.

Q    And when that was done, when the analysis was performed, what did you receive out the other end?

A    A printout.

Q    And when you get that printout, what did you compare that printout to as far as a known item?

A    The instrument -- the printout contains an ability, with the computer attached to it, to label those peaks that come out.

Q    Okay.

3657

A    And each of the peaks of interest were labeled by the instrument with me confirming what they are.

Q    All right.  And then what do you do with that result then?

A    Then I make my determination as what the sample is and put my file together and produce a report.

Q    Are you familiar with what produced the peaks that you read?  What -- when you ran 1.1, .2, .3 and .4 -- or dash four, I'm sorry -- in this particular case, were the test results and the results that you were able to read the same as to each of those items or were there any differences?

A    They were the same.

Q    So all four tests showed you they were the same thing?

A    Yes, sir.

Q    What were they in your opinion, sir?

A    Well, the sample contained the element phosphorous and -- conclusively contains phosphorous.

Q    And do you have -- was there any color to it?

A    Yes, sir.  It is a red amorphous, meaning without a definite shape, powder.  And being red, a powdery material, noncrystalline in structure, containing phosphorous is red phosphorous.

Q    And is that conclusive?

3658

A      For identification of it.

Q      Is that conclusive?  Is that what that was?

A      Yes, sir.

MR. LITTLEFIELD:  May I have just a second, Judge?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examine.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q      Mr. Perkins, good morning.

A      Good morning.

Q      I noticed on your report it says that you performed a qualitative analysis; is that true?

A      Yes, sir.

Q      Tell the jury what the difference is between qualitative analysis and quantitative analysis.

A      Qualitative analysis is determining what is within something in its overall general scheme but not determining its concentration or purity.  Quantitative analysis would be able to ascertain its total purity, whether something was 100 percent this or 95 percent this or whatever within that sample.  My instrument tells me qualitatively, without numbers, what is contained within

3659

that sample.

Q    So if I understand what you're telling us, the qualitative says what that sample is?

A    Yes, sir.

Q    And the quantitative says how much of it we have?

A    Yes, sir.

Q    Okay.  Now, as it relates to what it is, okay, did you test any of these samples to see if they contained methamphetamine?

A    No, sir, I don't have that capability.

Q    And then, since you didn't test them to see if meth may have been involved in them, you didn't test them to see if it was, how much would have been there, right?

A    Are we talking about meth?

Q    Yes, sir.

A    No, I didn't test for meth.

Q    Now, in '99 are you aware of whether or not the Tahlequah lab was certified?

A    An accredited lab?

Q    In September of '99.

A    We were an accredited lab in 2000 -- early 2001.

Q    Would that be a no, sir?

A    That would be -- well, we were not an accredited lab system at that time.

Q    Okay.  Thank you.  How many times have you opened

3660

that envelope?

A    I would have opened it once and then sealed it back up.

Q    Has it ever been opened after that?  What I'm getting at is this, sir.  We've asked that envelope be opened.  I want to look at a bottle that's inside there.  Did a pill bottle come to you?

A    Yes, sir.

Q    And that's what you said you didn't analyze?

A    I did not analyze that pill bottle.

Q    What I want to know is are you aware of whether or not that envelope had previously been opened outside of your analysis back in 2000, had been opened after then and that pill bottle examined?  In other words, if we get into it two years ago, three years ago, now we can't get into it because it's deteriorated?

A    I do not know if it's been opened since I last saw it.

Q    But you took notes whenever you performed your analysis; is that correct?

A    That is correct.

Q    Did you indicate that that pill bottle had any sort of labelling on it?  Anybody's name on it?

A    No, sir.  I just labelled it -- my descriptor just says one pill bottle with a white safety cap.

3661

Q    And we can't look at it so we don't whether there's a prescription label on it or what's on it. But you don't show anything in your notes that has anything on it, is that right?

A    No, sir, I do not.

Q    Do you know if any of those items contained within -- is that 132 that's in front of you?

A    Government's Exhibit 113?

Q    113. I'm sorry. Do you know if any of those items that are contained within that exhibit have ever been submitted for fingerprint analysis?

A    I have no knowledge of that.

Q    Nothing in your notes indicates that to be the case; is that true, sir?

A    Nothing in my notes indicate that it had been fingerprinted.

MR. SMITH: Okay. Thank you, sir. Pass the witness.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    When you do analysis on an item such as that in the lab, what precautions do you take for safety and your own protection, sir?

A    Well, in this instance, these type of materials we have to wear gloves, laboratory -- usually I wear nitrile

3662

gloves or -- (Interrupted)

Q    What kind of gloves?

A    Nitrile or latex.  Both protect me from other chemicals.

Q    Okay.  What about breathing?  Do you do anything to assure that you don't breathe fumes?

A    Well, we have several areas in our laboratory that are ventilated.  The air passes from behind us and then goes up and out.  I open these type of items in that area, collect my samples and they're capped right away and then they go to the instrument and then returned.

Q    And you had results -- this item came from whom, sir?

A    This item was transferred by Danny Farris to my lab.

Q    And did you have the results of Mr. Farris' analysis at the time you performed your analysis?

A    I don't believe so.

Q    What would you -- based on your experience, is this the first time you've tested red phosphorous from the various labs around the state?

A    No, sir.

Q    In your experience, what are you likely to see contained on red phosphorous when it comes into you from the various labs outside the state?

A    If the red phosphorous arrives to me on filter paper

3663

material, media, normally that means it's been through some type of chemical process and there's odors associated with it that I know that I -- don't come from red phosphorous but from -- normally from some drug.

Q     What drug?

A     Clandestine lab materials such as methamphetamines.

Q     And that -- does that have any bearing upon the precautions necessary for one to take in trying to analyze -- open, examine and analyze that item?

A     All the evidence such as this that's in a fine powdery form is treated equally as hazardous to health.

Q     Would it be appropriate for somebody in here to be opening up that and checking it out and messing with it during this courtroom proceeding without the protections that you've been talking about?

A     It would not be advisable.

Q     Do you want to open it?

A     No, sir.

          MR. LITTLEFIELD:  Pass the witness.

          THE COURT:  Any further cross?

          MR. SMITH:  Yes, sir.  Briefly.

                    RECROSS EXAMINATION

BY MR. SMITH:

Q     Sir, I'm not asking you to open that, but the fact is you can't tell us whether or not there's any labeling

3664

contained within there or not?

MR. LITTLEFIELD:   That's cumulative and it's beyond the scope.

THE COURT:   Sustained.

Q    (By Mr. Smith)   You can't manipulate that package where we can see that bottle, can you?   I mean, it's contained within an envelope within an envelope, is that right?

A    These items are individually packaged within this outer packaging.

Q    Right.   So we can't tell by looking through that paper envelope what's on that bottle if anything, can we?

A    I don't believe so.

Q    Now, there was nothing that prevented you from performing a qualitative analysis on those samples to see if they contained methamphetamine, was there?

MR. LITTLEFIELD:   Objection.   Beyond the scope.

THE COURT:   Sustained.

Q    (By Mr. Smith) And again, sir, nothing prohibited you from submitting those samples to fingerprint analysis either, is there?

A    I was asked to determine elemental composition and I leave that up to the submitting officers and those that wish to have the analysis, what they wish to have done.

Q    Nothing prevented you from submitting those samples

3665

to fingerprint analysis, is there?

A     No.

MR. SMITH:  Thank you, sir.

MR. LITTLEFIELD:  No additional questions.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes.

MR. SMITH:  Yes, sir.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.

THE WITNESS:  Thank you, Your Honor.

MR. LITTLEFIELD:  May I go back here just a second, Judge?  May I approach, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Your Honor, I would now offer Government Exhibit Numbers 221 through 288 and these are the photographs that were utilized -- and I'll show them to counsel.

THE COURT:  You may.

MR. LITTLEFIELD:  That were utilized by Ms. Dalley in her PowerPoint presentation, I think we talked about those yesterday.  Those are just the photographs.

MR. HILFIGER:  May I look at them?

THE COURT:  Why don't you allow counsel to look at them.  I'm not necessarily breaking for lunch, but over the lunch hour.

3666

MR. LITTLEFIELD: Okay. And I can go ahead and -- we have a copy available for them. If I may go ahead and provide these to the Court and then Mr. Hilfiger can look at them. And then, Your Honor, I would also ask to give to the clerk two additional exhibits and I'll provide copies.

THE COURT: What are the numbers?

MR. LITTLEFIELD: Those are 289 and 290. And here's an extra copy for the Court. And I would call Christa Rhodes.

THE COURT: You may.

(Whereupon, the witness was administered the oath.)

MR. LITTLEFIELD: And, Your Honor, I would ask that the clerk retrieve Government Exhibit 113.

THE COURT: You may.

MR. LITTLEFIELD: And provide the witness with what has been marked as Government Exhibit Number 129.

CHRISTA RHODES,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your full name for the record, please, ma'am.

A    Christa Rhodes.

Q    Ms. Rhodes, how are you employed?

A    I'm a Senior Physical Evidence Technician with the Oklahoma State Bureau of Investigation lab in Tahlequah.

Q    And a senior what?

A    Physical evidence technician.

Q    What does a physical evidence technician do, ma'am?

A    I receive and route evidence and maintain chain of custody on evidence that's submitted -- (Interrupted)

Q    I'm sorry.  You're going to have to slow down, because you're going faster than my ears can hear.

A    I receive and route evidence through our laboratory system and maintain chain of custody on it.

Q    Maintain a chain of custody?

A    Yes.

Q    When an item of evidence is submitted, what comes with the item itself in the packaging of the item?  For example, would you look to Government Exhibit 129 and it's not in evidence yet, but it's been discussed.  Have you seen this item before, ma'am?

A    Yes, I have.

Q    And when -- who submitted that?

A    May I refer to my file?

Q    I'm sorry.

A    May I refer to my file?

Q    Sure.  Does it show on the envelope itself who

submitted it?

A    It shows that it was sealed by Huntington.

Q    And when it is submitted -- and for purpose, let's assume Mr. Huntington has previously testified that he submitted that item.  When he submits that item, does he give you some paperwork in relation to the submission?

A    Yes, he does.

MR. LITTLEFIELD:  Judge, I would ask that Government Exhibit Number 289 be provided to the witness.

Q    (By Mr. Littlefield) And do you recognize what Government Exhibit Number 289 is, please?

A    Yes, I do.

Q    What is that?

A    It's a request for laboratory examination form.

Q    I've always -- I've used the term submittal form.  Would that be an appropriate terminology?

A    Yes, that's the same thing.

Q    So if I submitted -- if I was an agent and submitted 129, what paper would I turn in with it?

A    You would turn a submittal form similar to this.

Q    Do you recognize Government Exhibit Number 289?

A    Yes, I do.

Q    What is it?

A    It's a request for laboratory examination form for lab number 99-11543.

Q    And who filled out that submittal form?

A    Jon Huntington.

Q    Does your name appear -- does your name appear on the submittal form anywhere?

A    Yes, it does.

Q    And where does your name appear, ma'am?

A    On the line that says for lab use only, received by C. Rhodes.

Q    Does the item -- does the submittal form identify what case the item is submitted in?

A    Yes, it does.

Q    And does it submit -- does it show the date of the offense?

A    Yes, it does.

Q    What date was this item submitted, ma'am?

A    It shows it was submitted to the Tahlequah laboratory on September 28th, 1999.

Q    And does -- and who was the individual who submitted it?

A    Huntington.

Q    Does it show that Huntington submitted it on behalf of anyone?

A    Yes, it does.

Q    Who?

A    Ben Rosser.

3670

MR. LITTLEFIELD:  Judge, I'd move admission of Government Exhibit Number 289.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. LITTLEFIELD:  May I display it?

THE COURT:  You may.

Q   (By Mr. Littlefield) And just to your left, just beside that screen, right to the right of it as you're looking at it is a little -- this deal and there's a little button.

A   Okay.

Q   And if you could hold it like that and point and press that button you can -- see how you aim it?

A   Uh huh.

Q   Where does your name appear, ma'am?

A   Right there.

Q   And where does it show the date that this was submitted?

A   In the upper right hand corner.

Q   Okay.  Now, you indicated that it was submitted by whom?

A   Huntington.

Q   And where does it show Jon Huntington as the individual who submitted this item?

A    On the submitting officer line right here.

Q    What is this item up here?

A    That is the requesting officer.

Q    And whose name does it -- whose name or names are shown there?

A    Jon J. Huntington for Ben Rosser.

Q    Does it -- where does it identify the case in which -- for which this item was submitted, ma'am?

A    It's identified in two places.  Here's the officer's -- or, I am sorry, the Defendant's name, the victim's name.

Q    And does it -- in regards to -- if we look on this, does it show where Mr. Huntington received the items that were attached to and submitted with this sheet, ma'am?

A    Yes, it does.

Q    Where is that?

A    In this block right here it identifies what I received.

Q    What does this show down here?

A    That shows to me the statement of facts and a type of examination requested.

Q    What does it show in regards to the statement of facts as to where these items were obtained from, ma'am?

A    It says these items were obtained on 9/27/99 by Huntington at the OCME in Tulsa, Oklahoma.

Q    Do you know if the OCME is the Office of the Chief Medical Examiner?  Are you familiar with those initials?

A    Yes.

Q    There has been testimony regarding two items -- you see Government Exhibit 1 -- I believe it's 129 immediately below this.  Is that the correct number?

A    Yes, it is.

Q    Would you open -- and I'm going to come back to it in just a second.  Would you open that envelope and remove the contents, please, ma'am?  And I'm not sure -- I think the other side may be open.  One or the other end is easily opened.  It's already open.  If you're having to tear it go to the other end.  Do you see those two items?

A    Yes.

Q    Do they have a number on them identifying them like a T number or a P number or an F number?

A    Yes, they do.

Q    And what two numbers appear on that, ma'am?

A    F-40 and F-41.

Q    What are these numbers right here?

A    F-40 and F-41.

Q    There has also been testimony that these items, that envelope, was transported to the central lab where Terrance Higgs subsequently performed analysis.  Do your

3673

records reflect who it was that transported these items and when they would have been picked up from the Tahlequah laboratory for transportation?

A    Yes, it does.

Q    And where -- and go ahead and use the pen and show us where that is, ma'am.

A    In this block right beneath the lab number.

Q    Okay.  Now -- you're covering a pretty big block. When were they picked up for transportation?

A    They were picked up on 9/30 of '99.

Q    And who would have transported them from the Tahlequah lab to the Oklahoma City lab?

A    C.D. Curtis.

Q    And who is C.D. Curtis?

A    Charlie Curtis.

Q    What's Charlie Curtis?

A    He is a criminalistics administrator.

Q    The what administrator?

A    Criminalistics administrator.

Q    Where does he office out of normally?

A    Oklahoma City.

Q    Does Mr. Curtis commonly or occasionally pick up envelopes and take them off?

A    Yes, he does.

Q    What was the condition of that envelope when Mr.

3674

Huntington submitted it to the lab, the big envelope that's marked 129?

A    It was in a sealed condition.

Q    And when it was handed to Mr. Curtis, who would be -- who would have given it to Mr. Curtis to take to Oklahoma City?

A    I did.

Q    What would its condition have been when you gave it to Mr. Curtis?

A    It would be in a sealed condition.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) By the way, this was picked up, according to what Mr. Huntington wrote on the submittal, what day?

A    9/27/99.

Q    And it was checked into the lab on what day?

A    9/28/99.

Q    And that was up here?

A    Yes.

Q    And then -- so it was picked up on the 27th, reported in on the 28th.  And when was it Mr. Curtis removed it or you gave it to Mr. Curtis to transport in a sealed condition to Oklahoma City?

3675

A       9/30 of '99.

Q       Is that one there?

A       Yes.

            MR. LITTLEFIELD:  Pass the witness.

            THE COURT:  You may cross examination.

                  CROSS EXAMINATION

BY MR. SMITH:

Q       Ma'am, would you look at Government's Evidence
Number 129, pick that envelope up.  Does it show that you
received that item into the Tahlequah lab on September
28th of '99?

A       Yes, it does.

Q       Okay.  It's got your name and your initials on it?

A       It does not have my name or initials on this
envelope.  It has the lab number on this envelope.

Q       And what does the lab number -- tell us what number
that is.

A       The lab number is 99-11543.

Q       Now, was that number generated when it came into the
lab or is that something that would have been on it when
Mr. Huntington picked that up from the medical examiner?

A       No, I would place that number on the envelope when I
received it.

Q       But you don't have your signature or a date or
anything else like that on that envelope, is that right?

3676

A     That's correct.

Q     Now, you talked about Government's Exhibit Number 289, this lab submittal form.  That's not stapled to or made part of that envelope, is it?

A     No, it's not.

Q     This is an interagency document?

A     Yes, it is.

Q     It kind of helps you keep track paperwork-wise as to what happens with something?

A     Yes.

Q     But it's not something that's affixed to that envelope that we write on it and that this is just a photocopy of it?

A     Yes.

Q     This is something that's maintained in the Tahlequah lab where the evidence comes into?

A     We would keep a copy of it in the Tahlequah lab, but it will also go with the evidence when it is transferred.

Q     Okay.  It's not affixed thereto, just accompanies with it?

A     It accompanies with it.

Q     Okay.  So is this the copy that came from your records or is this a copy that came from Oklahoma City?

A     This copy came from Oklahoma City's records.

Q     Well, this isn't your document, something you had in

3677

Tahlequah that you might wind up with a copy of it, is that right?

A    Correct.

Q    Okay.  Now, you're testifying as to things that have happened back in '99.  Do you have an independent recollection of Government's Exhibit Number 129?

A    Not specifically, no.

Q    Because you log in and out hundreds, maybe even thousands of items of evidence, is that right?

A    That's right.

Q    Okay.  So in the six years, you don't remember a thing about that particular exhibit?

A    Not this particular exhibit itself, no.

Q    So what you're relying on is the paperwork that's generated, go back, maybe your notes that you have with you, then looking at that tells you what you think happened?

A    Yes.

Q    Not independent recollection.  Just some sort of a paper trail that you say, well, this makes sense because it's written down here?

A    I can identify it by the numbers that match on the evidence and also on the request for laboratory examination.

Q    I understand.  As long as the numbers line up then

3678

you've got something that makes sense to you?

A    Yes.

Q    If the numbers didn't line up, then we might have a problem?

A    Yes.

Q    But again, nothing on the envelope indicates that it's received in that Tahlequah lab by you or anybody else, other than you said there's a laboratory number on that envelope, correct?

A    There is a control number on there identifies it did come from the Tahlequah laboratory.

Q    Let me kind of take this another way.  Mr. Huntington signed that envelope, didn't he?

A    Yes, he did.

Q    Okay.  And that's when he received it from the medical examiner?

A    Yes.

Q    Did anybody in Oklahoma City sign that envelope?

A    The gentleman that transferred the evidence to Oklahoma City signed the envelope.

Q    Okay.  So what we don't have is your signature because you're the one that received that envelope from Mr. Huntington?

A    Correct.

Q    But you didn't affix your name or your date or

3679

anything to that envelope when it was received into the Tahlequah lab on September the 28th of 1999?

A   I did affix the lab number and I did affix the control number which identifies it was received in Tahlequah laboratory.

Q   I don't believe that was my question, ma'am.  I believe my question was in September the 28th of '99 when you received that item of evidence into the Tahlequah laboratory, you did not affix your name nor the date when you received that item, did you?

A   That's correct.

MR. SMITH:  Thank you, ma'am.  Pass the witness, Your Honor.

MR. LITTLEFIELD:  May I approach?

THE COURT:  You may.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   You were asked about affixing your name or the date. Did you affix anything on 129?

A   Yes, I did.

Q   What did you affix?

A   I affixed the OSBI evidence control number.

Q   Anything else?

A   And the lab number.

Q   Now, the lab number -- where is that on the

3680

envelope?

A    It's in the upper right hand corner on the front and it's also on the back across the top.

Q    And when we say affix, you don't just -- you're not just taking something and licking it and putting it on there, are you?

A    No.

Q    When the lab number is placed on that envelope, how is it placed on the envelope?

A    I write the lab number on it when I log the evidence in.

Q    Do you recognize your handwriting?

A    Yes, I do.

Q    Is that handwriting which assigns the lab number your handwriting?

A    Yes, it is.

Q    So independently whether you have a recollection or not, do you know you wrote that lab number on that envelope?

A    Yes, I do.

Q    Okay.  And if we put 289 back up, do you write anything on this besides your name?

A    Yes, I do write the lab number and what evidence I receive, the containers.

Q    Okay.  Where is the lab number?  Take your --

3681

A    This is the lab number here.

Q    And in fact, do you recognize that handwriting?

A    Yes, I do.

Q    Whose handwriting is it?

A    That is mine.

Q    Does it look the same as the lab number on that envelope?

A    Yes, it does.

Q    When are those lab numbers placed on the envelope?

A    They're all placed on it at the same time when I receive the evidence and log it into our system.

Q    And you mentioned control numbers.  Do we see the control number on this particular?

A    Yes.  Right here.

Q    And who puts that number on there?

A    I affix it at the time that it is submitted.  I affix that number onto the evidence.

Q    Okay.  And does that number show on the envelope which is marked as Government Exhibit Number 129?

A    Yes, it does.

Q    Where is it?

A    It's in the upper left hand corner.

Q    Which side?

A    On the front.

Q    Okay.  And it matches that number there?

3682

A     Yes, it does.

Q     And who puts that on there?

A     I put that on there.

Q     Now, Mr. Smith asked about you having thousands of items and don't have a specific recollection.  Is there any doubt in your mind that this is an envelope that -- you received this envelope on the day that you show over on Government Exhibit Number 289?

A     There's no doubt.

Q     When you receive an item does your routine vary?

A     No, it does not.

Q     Does your procedure vary?

A     No, it does not.

Q     When you do it -- when that envelope comes in with that submittal, what do you do about the lab number?

A     When this envelope comes in with this submittal, I go to my computer and log the case into our evidence tracking system and enter these numbers into our system.

Q     Which numbers?  The property control number or the lab number?

A     It would be both.

Q     And how is the control number selected?  How is that number determined?

A     Each item that comes into our lab receives the next number that we have available to it.

3683

Q    So that's the chronological sequence?

A    Chronological sequence, yes.

Q    And of course, who generates that number?  I mean, is it -- do you type that in or does it just come up automatically on the computer?

A    No.  We have a roll of these numbers and they -- we just take them as they come in.  And then I place them into the computer myself.

Q    And then this number -- how is that number determined?

A    That number is computer generated.

Q    So that -- the computer kicks out the number and when you see that number on the computer, how is that number transferred from the computer generated reading you got on the monitor or wherever you're looking on the computer, to that submittal and to the evidence envelope itself?  How is that generated?

A    I write them on there.

            MR. LITTLEFIELD:  Pass the witness.

            MR. SMITH:  Briefly, Your Honor?

            THE COURT:  You may.

                    RECROSS EXAMINATION

BY MR. SMITH:

Q    Ma'am, looking at 289, I understand these numbers are generated whenever you process this and get this

control number and get this lab number.

A    Yes.

Q    That doesn't mean that that is automatically at that time written on an envelope, does it?  I mean, you're going to tell me that's your practice.  But nothing in here says written on envelope or anything like that, right?

A    It's just general procedure.

Q    I understand.  Of course, nobody ever varies any procedure, do they?

A    No.

Q    We hope not, right?

A    Right.

Q    Now, looking at these numbers that we have generated on this form, Exhibit Number 289, you said they were transposed on to that envelope.  No date, no signature as to when those were done?

        MR. LITTLEFIELD:  Object.  I believe she said those -- I'm not sure what numbers we're talking about. Are we talking control numbers or are we talking about the lab numbers?

        MR. SMITH:  I'll be more specific.  Of the lab number and the control number.

        MR. LITTLEFIELD:  Well, I object to the term transposed because I don't think she said transposed.

3685

MR. SMITH:  Written onto that to exhibit.

THE COURT:  I don't know -- she didn't say transposed.  And counsel you may rephrase your question.

Q   (By Mr. Smith) Those numbers were written at some point onto that envelope, is that right?

A   The lab number was written and the control number was placed on it at the time I received them.

Q   And again, there's no date or any indication when you did that?

A   Correct.

Q   Okay.  So you can't tell us that those numbers weren't written on there on the 30th or something like that, when Mr. Curtis took it to Oklahoma City.  I mean, you know they were on when Mr. Curtis left because it goes to Oklahoma City outside of your control, right?

A   Correct.

Q   But there's nothing -- I mean, there is on the 289?

A   Yes.

Q   But there's nothing on that envelope?

A   Mr. Curtis signed the envelope the date that he transported it.

Q   I understand that, on the 30th?

A   Yes.

Q   What we have missing is between Huntington on the 27th when he received it from the office of the medical

3686

examiner and the 30th whenever Mr. Curtis takes it to the Oklahoma City lab?

A     The date that he received it -- or I received it into the laboratory is written in the upper right corner by Mr. Huntington.

Q     Of the 28th?

A     Of the 28th.

Q     The date written by Mr. Huntington?

A     Yes.

Q     That's it.  Not signed by you, being received by you or anything like that?

A     Correct.

                MR. SMITH:  Thank you.

                FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q     That lab number, does it match the lab number on Government Exhibit 129?

A     Yes, it does.

Q     When did you put that lab number on Government Exhibit Number 129?

A     When I receive the evidence.

Q     That would have been on what date?

A     September 28th, 1999.

                MR. LITTLEFIELD:  Pass the witness.

                MR. SMITH:  Nothing further, Judge.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, sir.

MR. SMITH:  Yes, sir.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.  You may be excused.

Members of the jury, it's 12:15.  I'll ask you to be back at 1:30 from the lunch break.  Remember my admonition.  Ask everyone to be -- remain seated as the jury leaves for the noon recess.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Any further arguments you have in regard to the exhibit -- what exhibit number?

MR. LITTLEFIELD:  129.

THE COURT:  Chain of custody issues I'll hear at 1:30.

(Whereupon, the noon recess was held after which the following record was made outside the hearing of the jury.)

THE COURT:  Let the record reflect counsel for the Government is present.  Defendant is present with counsel.

MR. LITTLEFIELD:  Your Honor, on an unrelated subject, the exhibits which we said we were going to

3688

tender which were the photographs from Ms. Dalley's presentation. Mr. Hilfiger also wanted the diagrams and the projections that were a part of that PowerPoint presentation. And so what we've done is add -- I don't have to make a record on them to make sure they're correct on the order of those. But we've added, for instance -- and I'm going to pull one out as a hypothetical. But I think, for example, Trajectory 2, the second shot, Ms. Dalley prepared a diagram of the trajectory showing it entering the Bronco. And because we'd already numbered all of the exhibits we're going to have the trajectories as if -- shot two is, for example, Exhibit 224, the trajectory will be 224-A and then 223 -- or 224-A, 225, 226.

THE COURT: What does that do to you, Paula, if we do a 224-A?

THE CLERK: It's up to you. I can handle it.

THE COURT: You'd rather not handle it?

THE CLERK: As long as I've got a good list.

THE COURT: Generally speaking we wouldn't do a 224A. It would be -- (Interrupted)

MR. LITTLEFIELD: I understand that. It was a miscommunication because I said photographs and Mr. Hilfiger had said yes and he thought I meant photographs and trajectories and -- (Interrupted)

3689

THE COURT:  I'm not -- it's not -- it's the number, it's not the exhibit.

MR. HILFIGER:  I mean, the only reason we put the As in is so we wouldn't have to renumber all -- the whole -- so they could go in a sequential order, with the pictures of two and then following the picture of two is going to be the schematic of the trajectory of two.

MR. LITTLEFIELD:  For example, two, the second shot, will be Exhibits 223 through 229 and then 229A will be the -- (Interrupted)

THE COURT:  We only have one A.  We don't have any other As.

MR. LITTLEFIELD:  Well, for example on two, the shot two, those will be Exhibits 223 through 229 and the trajectory will be 229A.

THE COURT:  Okay.  But there's no more -- there's no A, B, C, D?

MR. SMITH:  No, no.

MR. LITTLEFIELD:  No.  Then on shot three it will be 230 through 236 and then the trajectory will be 236A.  So that there's only an A.  No B, C or Ds and it will follow the last exhibit.

THE COURT:  Let me see it to -- let me see what it is.

MR. LITTLEFIELD:  That's the whole batch.

3690

THE COURT: I guess my only comment is what you have essentially done is you've taken what amounts to the -- what we have in the form of a disk that I've marked as Court Exhibit -- as a Court exhibit, you have -- and I have instructed the jury that it was not evidence and the only thing that concerns me is that you've essentially taken those photographs and now you're introducing them as exhibits which are evidence.

MR. LITTLEFIELD: In part. The disk which was the demonstrative exhibit and which the Court instructed on also had those photographs that related to her theory of Mr. Eales' position as he was exiting the vehicle lined up with those trajectories and additionally had the AVI which was the model of the Bronco which moved in different directions and different elevations, showing all of the trajectories simultaneously. And those two portions of the demonstration are not included in the exhibits.

MR. HILFIGER: Right.

THE COURT: But you see my concern is, of course, the jury has seen the demonstrative aid. We'll have to give this some thought as to whether or not to give the jury any special instructions, because I just want you -- I'm going to admit these as agreed. I assume there're no objections to the exhibit -- it's Exhibit 221

3691

-- are they in sequence?

MR. LITTLEFIELD:  They are sequential.  The only thing that would disrupt the sequence is the addition of the A items within that sequence.

THE COURT:  And how many A items are there?

MR. HILFIGER:  There are not one for each trajectory.

THE COURT:  I noticed that.  That's why I asked.

MR. LITTLEFIELD:  I don't know because I didn't put them down.  I did that for Mr. Hilfiger in an attempt to be cooperative with Mr. Hilfiger's request.  So he's the one that -- (Interrupted)

THE COURT:  Are you going to use these today?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Why don't you make the clerk a list so that we can introduce them with the As included in the introduction of the evidence for the record.

MR. LITTLEFIELD:  I'm going to brazen and I've done that once or twice, but I think that -- our last witness is Mr. Higgs and I think that Mr. Smith is doing that, handling that portion.  Roger, if you would be willing to go ahead and identified which one of the As so that it's 236A -- (Interrupted)

MR. HILFIGER:  I'll do that.

3692

MR. LITTLEFIELD:  -- and 240-A, then I can offer 220 through 236 and 236-A, 237 through 240 and 240-A and do that while the jury is still here.

THE COURT:  Well, okay.  Let me -- I see 221 through 236 and 236-A and then it picks up with 237.

MR. HILFIGER:  Your Honor, I think there may be 13.  I counted 12, you counted 13 but I may have miscounted.  But I think there's 13 of those drawings.

THE COURT:  Thirteen As?

MR. HILFIGER:  Thirteen As.

THE COURT:  I'm at 236 and then the next one I see is 246-A.  252-A.

MR. HILFIGER:  241-A.  There's a 241-A.

THE COURT:  Okay.  I'm going to let you do it.

MR. HILFIGER:  I'll make a list of them.

THE COURT:  Okay.  There's too many.

MR. LITTLEFIELD:  Here's the A.  Debby, handed me a list of the --

MR. HILFIGER:  Okay.

THE COURT:  Okay.  What are they?

MR. LITTLEFIELD:  229-A, 236-A, 241-A, 246-A, 252-A, 259-A, 265-A, 275-A, 278-A, 280-A, 283-A, 285-A, and 288-A.

THE COURT:  Are you there, Paula?

THE CLERK:  Yes, sir.

3693

MR. HILFIGER:  Thirteen of them.

THE COURT:  There should be 13 As.

MR. LITTLEFIELD:  And then it would be exhibit numbers 221 through -- numerical, 288 inclusive.

THE COURT:  And you're offering that as Government's exhibit with no objection from the Defendant?

MR. HILFIGER:  That's right, Your Honor.

THE COURT:  Okay.  Be admitted without objection.  Any further argument on the issue of chain of custody?

MR. SMITH:  Your Honor, I'm going to make a comment.  I don't know if Mr. Littlefield wants to go first or not.  He might want to respond to what I've got to say.

THE COURT:  You may.

MR. SMITH:  Your Honor, I don't think my position changes.  I think the problem was and is the reception of F-41 into the OSBI laboratory in Tahlequah. And I don't think Government's Exhibit 289 solves that problem.  The lady that received it, Ms. Rhodes, her signature doesn't appear on there and so I'm going to maintain my objection to it.

But also, Judge, at the same time what I told the Court earlier about it then being transported to

3694

Oklahoma City and what have you, I don't have a problem with that. I mean, my problem still remains with the reception into the Tahlequah laboratory and it not being properly documented other than on a submittal sheet that is not part of Government's Exhibit 113, the actual envelope that those projectiles were contained in.

THE COURT: Any comment from the Government?

MR. LITTLEFIELD: The comment was on -- I think Mr. Smith said 113 and I think it's 129.

MR. HILFIGER: 129 is an envelope.

MR. SMITH: Yeah, if that's the envelope, it's 129. I didn't have my notes to reflect that.

MR. LITTLEFIELD: I just want the record to be clear. Ms. Rhodes -- Mr. Huntington said he submitted it in a sealed condition. Ms. Rhodes says this is the -- has the submittal sheet. She said I filled it out. I completed it. I put the lab number on it. The lab number on the submittal sheet matches the lab number on the envelope. Ms. Rhodes says I take it, I log it in, I sealed it -- or it retains sealed. I do not tamper with it. Mr. Higgs, when he received it, says it was sealed, untampered with. This is that envelope. We've got the chain right into the lab. We've got the person who took it to the lab. We have the person who received it at the lab. And then we have now linked it to the individual

3695

who tested it, who received that envelope untampered with and then also identified the two items which were contained in it, also untampered with in a sealed condition, unsealed by Mr. Higgs.

Mr. Huntington said I received that from the office of the chief medical examiner, shows on the submittal it is from -- it was received from the office of the chief medical examiner.  Mr. Huntington testified that he picked that up, I believe -- and I don't have the exhibit in front of me, but I believe on the 28th of September and logged it in on that date.  Ms. Rhodes' record reflects and the submittal shows.  And it's stamped in with a date stamp on Government Exhibit 289 showing that it was received at the Tahlequah laboratory and turned into the lab as evidence on September the 28th, 1999.        Judge, we've completely connected the chain.  It came from Mr. Eales' body to Dr. Distefano. From Dr. Distefano to Donita Mann.  Donita Mann then said I gave it to Jon Huntington.  Jon Huntington said I placed it in those envelopes, sealed them.  I took that to the lab and we've got the connection with the lab.

THE COURT:  Has 289 been introduced into evidence?

MR. LITTLEFIELD:  We offered it.  And I think it was admitted.

3696

THE COURT:  289 and 290 both?

MR. LITTLEFIELD:  Didn't -- have not yet offered 290, but I don't think it's necessary to complete the chain, Your Honor.

THE COURT:  What I was discussing with my clerk is I'd been furnished one that had a -- it looked identical to what's been offered as an exhibit, so we're marking it as Court copy.  After hearing the testimony of the witnesses and argument of counsel, I'll overrule the objection.  Ready for the jury?

MR. LITTLEFIELD:  Is 129 admitted into evidence, Your Honor?

THE COURT:  Has it been offered?

MR. LITTLEFIELD:  I have offered it on several occasions and renew my offer.

THE COURT:  Any objections, other than the ones you've made previously?

MR. SMITH:  No, Your Honor.  My objection still remains and I understand you're going to admit it and show my objection.

THE COURT:  I'll show the objection's been renewed and overruled.

MR. LITTLEFIELD:  Nothing additional.

THE COURT:  Ready for the jury?

MR. SMITH:  Yes, sir.

(Whereupon, the jury entered the courtroom and was seated in the box after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  Your next witness.

MR. LITTLEFIELD:  I would ask to recall Terrance Higgs.

THE COURT:  You may.

(Whereupon, Mr. Higgs retook the stand after which the following record was made in the presence of the jury.)

MR. LITTLEFIELD:  Your Honor, I would ask that Government Exhibit 129 be provided to Mr. Higgs.

THE COURT:  You may.

CONTINUED DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   Mr. Higgs, this is now in evidence.  You have viewed 129, have you not?

A   Yes, I have.

MR. LITTLEFIELD:  And I would ask that --
before we start looking at the contents of 129, I would ask the Government Exhibit Number 290 be shown to the witness.  It's not in evidence yet.  And we need the --
yeah, the projector needs to be off.

3698

Q     (By Mr. Littlefield)  Do you recognize what that is, sir?

A     Yes.  It's a copy of one of my worksheets.

Q     Okay.  And in regards to that, you commented about that envelope in which Government Exhibit marked 129 and the two inner envelopes -- about them being sealed?

A     Yes.

Q     Does Government Exhibit Number 290 show in any place the fact that -- or correspond to the testimony that they were sealed, that you opened it and then resealed those items, sir?

A     Yes, it does.

Q     And where is that?

A     If you look at the top portion of the note, you see the item numbers that I've assigned, F-40 and 41.  And as you read across you see package -- just before Remarks/Results.

Q     Yes, sir.

A     And if you come down you see tape, manilla envelope for F-40.

Q     See what, sir?  You see what, sir?  I didn't -- (Interrupted)

A     You see taped ME and that stands for manilla envelope.  And then you have F-41 which was a taped envelope.

3699

Q   Taped what?

A   F-41, also a taped envelope.

Q   Okay.  And whose handwriting is that on Government Exhibit 290?

A   Say again?

Q   Whose handwriting is that?

A   That's mine.

Q   And does that show the condition of those two inner envelopes when you received them, sir?

A   That's correct.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 290.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection, 290.

MR. LITTLEFIELD:  I would ask that it be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) And where does it say -- find T-40 and T-41 and show where you're talking about the package?

A   Okay.  There's 41 and there's 40 right above it.

Q   Where's the column that shows from the packaging?

A   The packaging is right here.

Q   Okay.  The PKG stands for --?

3700

A     ME?

Q     No.  No.  My question is the PKG, what does that --
this right here, this PKG, what's that stand --
(Interrupted)

A     Yeah.  That's packaging.  That's the package it came
in.

Q     And where did you write that they were taped?

A     Yeah.  It's right above it.  It says taped right
there.  I'm sorry for the handwriting, people.  I'm --
(Interrupted)

Q     Okay.  It says what?

A     Okay.  Taped right there and then taped right there
right above it.

Q     And that's in reference to F-40 -- (Interrupted)

A     F-40 and 41.

Q     Would you open -- go into the contents and display
F-40 and F-41?  Which one is F-40?

A     That's this one here.

Q     And hold it up.  And does that describe the
location -- does that describe the location from Mr.
Eales where F-40 was removed, sir?

A     Yes, it does.

Q     Where?

A     It says fragment removed from lower back.

Q     Did you perform an analysis on F-40?

3701

A     Yes, I did.

Q     And what's in F-40?

A     F-40 is a piece of lead.

Q     Okay.  Were you able to perform an analysis and make any kind of conclusion as to the piece of lead which was contained in F-40 which was removed from Mr. Eales' lower back?

A     No, sir.  I said that it was a portion of a lead core that had no identification value.

Q     Okay.  Go ahead and reinsert that in your tissue and put that back into F-40.  And if you would reinsert that into Government Exhibit Number 129.  Let's concentrate on F-41.  And where is that identified as having come from Mr. Eales' body?

A     Says fragments, upper chest.

Q     Would you remove the contents of F-41 which came from Government Exhibit 129?  And what was contained in F-41, sir?

A     I have a portion of a copper jacket and a few pieces of lead.

Q     Were you able to perform any kind of analysis on the items which were in envelope F-41, sir?

A     Yes, I was.

Q     On -- you said a few pieces of lead and a copper jacket?

3702

A    And a portion of a copper jacket, yes.

Q    A portion of copper jacket.  Upon which of those items were you able to perform any kind of analysis, sir?

A    The portion of the copper jacket.

Q    Do you know if that is in fact the copper jacket that you analyzed at the lab?

A    Yes, it is.

Q    And how do you know that it is the copper jacket that you analyzed?

A    Because I placed the item number, F-41 -- I wrote it on the back portion of the jacket.

Q    And if you hold up that -- can you hold up the jacket?  And where is it that -- and it's teeny tiny, isn't it?

A    It's on the inner -- yeah, it's pretty tiny.  But it's on the inside.  All the information from the barrel goes on the outer portion of the jacket.  So I wrote it on the inside of it.  It's still there.

Q    Still there and you can see it and that's -- and it says what?

A    F-41.

Q    Okay.  What type of analysis did you perform on that copper jacket which was removed from Mr. Eales' upper chest?

A    The analysis I performed was to see if I could

3703

identify it to a specific weapon.

Q    And how did you go about doing that, sir?

A    Using the test that I fired in the .223 rifles that were submitted to me from OHP and from the suspect, I was able to compare those bullets to this projectile and I was -- (Interrupted)

Q    Okay.  Wait a second.  When a projectile is fired, what is it that you're looking at to match?

A    We're looking at the class characteristics, first and foremost.

Q    I'm sorry, what?

A    Class characteristics.

Q    First and foremost?

A    First and foremost, to see if they are identical, because they have to be.

Q    Okay.

A    Once we've done that, then we started looking for microscopic matching stria that carry over from the microscopic imperfections that are in the barrel.

Q    That are -- I'm sorry.  What was the last word you used?

A    In the barrel.  Barrel.

Q    Oh, in the barrel?  Okay.

A    Or bore.  And once we do that, we can then determine by the matching microscopic stria that a projectile or a

3704

fragment in this case, was fired from a particular weapon to the exclusion of all guns that are made or that will be made.  In this case I was able to do that and I matched it to -- I want to say P -- okay.  Yes.  F-41 was fired by the .223 Colt H Bar Sporter and item number P-1, P as in Paul.

Q    P-1's your all's number?

A    Say -- (Interrupted)

Q    P-1 is your all's number.  The OSBI's?

A    Right.

MR. LITTLEFIELD:  Would Government Exhibit 128 be handed to the witness.

Q    (By Mr. Littlefield)  And go ahead -- I'm going to ask that you go ahead and reinsert that fragment back in the envelope that's labeled as -- is it F-41?

A    F-41, yes.

Q    What firearm fired that jacketing -- that fragment of jacketing that was removed from the upper chest of Rocky Eales?

A    The firearm that you have indicated as F -- I mean, sorry, F -- not F -- (Interrupted)

Q    Government's exhibit number what?

A    Government's Exhibit 128 and in my notes I have it listed as P-1.

Q    And to the exclusion of all firearms in the world,

that is the gun that fired that fragment from Mr. Eales' chest?

A   That's correct.

Q   Is it typical that you can find markings on jackets or fragments of jackets that match that let you identify?

A   Yes.

Q   How do those -- that Colt Sporter, Government Exhibit Number 128, how do the casings eject from that kind of firearm?

A   With this firearm it has the ejector on the left side, right ejection port.  The casings are extracted -- they hit the ejector and they pop to the right and behind the shooter.

Q   What is the position of the OSBI in regards -- now, in regards to doing analysis of ejection patterns, sir?

A   At this point in time we've discontinued doing that particular examination.

Q   You don't do ejection patterns now?

A   Not anymore, sir.

Q   When you say anymore, did you at one point in time?

A   Yes, we did.

Q   Why has the OSBI discontinued doing ejection pattern testing?

A   The results that we would give were based on the way that the examination was conducted.  Okay.  We would say

3706

-- we would have two persons go.  One would actually have the weapon loaded with X amount of ammunition.  Another person would be watching.  And we'd normally go out to a range, okay.  One person would fire, the other person would note where the casings would fall and then we'd issue a report saying the ejection pattern on this weapon would be from so many feet to the right of the shooter and so much behind and give them an overall view.

Q    Give an overall range?

A    Yes.  Give an overall range.

Q    Has there been --  have there been studies in the literature and reports in the literature in regards to the accuracy of that kind of analysis?

A    Yes.

Q    And what is -- is that a good analysis or is it a flawed analysis?

A    It was a flawed analysis on this point that one, you have to take into account the surface that the bullets were landing on.  Okay.  We were firing it primarily in grass so they would hit at one position and stay there.  If you're in a room like this or out on a road where you found the casings would not necessarily where they may have initially landed.  Two, they study also proved that you have -- if you stand and you hold the weapon and you fire, if you turn the -- if you tilt the weapon, if you

3707

angle it, if you do other things to it, even do a slight movement to the firearm and firing patterns can alter the pattern distribution.

Q    Pattern of what?  Distribution?

A    The pattern of distribution, yes.  So using the pattern to say the approximate location of where somebody was standing is the reason why we've discontinued it. And even in our reports we would say to the agents, okay, you got to realize we are standing in one spot, pointing a weapon downrange, holding like we normally would and firing and then making note of where they land.  This may have nothing to do with what the person was doing at the crime scene.  So you need to bear in mind that this is what we're going to tell you, but it may have nothing in relation to what's happening at the crime scene and may be a totally different thing.

Q    After -- when you did them, did you have people tromp through the area in which the casings landed who might have disrupted or moved inadvertently or even intentionally the location of the casings?

A    No, sir.

Q    Did you drag people through the location where those shells landed?

A    No, sir.

Q    When you were doing them, did the test conditions in

any way attempt to replicate or duplicate the circumstances and the conditions in which the shells were fired?

A   No, sir.

Q   Could you assure when you did any kind of testing that the firearm was being maintained in a position that the shooter would have maintained that firearm in?

A   No, sir.

Q   Did you receive the magazines and cartridges that matched or -- when I say cartridges, I mean the full unfired bullets that were submitted with this weapon, sir?

A   Yes, I did.

Q   And when -- describe those magazines for me.

A   They were three magazines designed to fit the Colt. They had the magazine capacity, each of them, of 30 rounds per and they were taped together.  Two looking up and one coming down but they were taped -- all three were taped together.

MR. LITTLEFIELD:  I would ask the magazines be provided.  I'm trying to find the exhibit number, Your Honor.  And Paula may well find it before I find the number.

THE COURT:  What is the number?

THE CLERK:  125.

3709

THE COURT:  Clerk tells me it's 125.

MR. LITTLEFIELD:  Yes.  That's it.

Q    (By Mr. Littlefield) Do you recognize that item, sir?

A    Yes, I do.

Q    And each one of those holds how many rounds?

A    They can hold 30 rounds apiece.

Q    And that's topped off?

A    That's topped off, yes, sir.

Q    And if one inserted those into that .223, Government Exhibit Number 128, what is the maximum capacity of cartridges, bullets, that if it's filled to the brim that that firearm could have with those topped off?

A    '91, if you put one in the chamber.

Q    And is that a problem to put one in the chamber and then still have 30 in the magazine that you insert into it?

A    No, sir.

Q    And in an attempt -- I'm not trying to belabor the obvious, but how do you do that?

A    Well, what you would do is you take the magazine, put it into the receiver -- sorry, into the magazine well, pull on the bolt, let it go forward.  It will actually load one into the chamber for you.  Drop the magazine, put it on the top, put it back in.

3710

Q    When this was submitted, how were the rounds packaged?

A    They were in a brown paper sack.

Q    And did the brown paper -- who submitted those?

A    Let's see.  Those were submitted -- those were submitted by Vicki Jones Lyons.

MR. LITTLEFIELD:  I'd ask Government Exhibit Number 123 be provided.

THE COURT:  You may.

Q    (By Mr. Littlefield) If you would open the contents of Government Exhibit 123, sir.  Go ahead and pull it out of the plastic envelope.  What do you have?  What do you have in your -- what is it -- (Interrupted)

A    I have a heat sealed K-Packs plastic that's round and I have the brown paper sack.

Q    And do you recognize the brown paper sack, sir?

A    I don't see my initials on this sack.  I know I wrote my lab number, initials, on the items themselves I took out of the sack.  And in my notes I wrote down that was P-5, 72 Remington .223 cartridges in a taped brown paper sack with three magazines.

Q    You said how many cartridges, sir?

A    Seventy two.

Q    And how do you know there were 72 in there?

A    Well, initially they weren't in this.  I counted

3711

them.

Q    You counted them as well?

A    Yes, I counted them when I looked at them on the date and time in question.

Q    Do you recall, sir, if as those were submitted, there were 71 rounds separate and one in a sack identifying it as being from the chamber or were all 72 in there together?

A    I do not recall that they were all together.  I know the total of them was 72.  I don't recall whether one came separate and then another 71.

Q    Okay.  But you counted the 72 rounds?

A    That's correct.

Q    If Government Exhibit 128 had been fully loaded, each of the magazines full with 30 rounds and had one in the chamber, and 19 shots were fired, how many rounds would you have left?

A    Ninety one.

Q    Well, if you had 91 and fired 19 how many rounds would you -- (Interrupted)

A    Seventy two -- sorry.  72.

           MR. LITTLEFIELD:  May I have a second, Judge?

           THE COURT:  You may.

           MR. LITTLEFIELD:  Pass the witness.

           THE COURT:  You may cross examination.

3712

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q    Mr. Higgs, let's not let that get too far away from you.  I bet we're going to have a few questions about it, okay?

A    Okay.

Q    Before we get started here, I want to know how important is accuracy in what you do in the laboratory?

A    Accuracy as in --?

Q    When you're doing your job, performing your duties, going about analyzing and keeping records and coming in and testifying before a jury, how important is accuracy?

A    It's very important.

Q    It's something that we want to make sure that to the best of our ability, we have everything covered, is that right?

A    That's correct.

Q    And are there any errors in your analysis as you know them?

A    In this case?

Q    Yes, sir.  In the Barrett case.

A    No, sir, not in my analysis.

Q    And in your report, we talked about one area you did with Mr. Littlefield earlier and I'm going to cover that

3713

in just a second.  But other than that, with the Colt shotgun, are you aware of any other errors or problems with the methodology that you used in this case?

A    There was -- I don't know if you got the amended report.  There was a .223 casing that I'd labeled as a -- not a casing, sorry.  It was a -- it was a .45 caliber projectile -- not projectile, cartridge that was -- (Interrupted)

Q    Are we referring to T-34?

A    Let me see if I can find the correct number.  Okay.  T-34, yes, was a Remington round .45 auto cartridge and I think I had it as a .223 cartridge.

Q    So that's two that we've identified.  Any other errors or problems with the methods that you used in this case, that you're aware of?

A    Not to my knowledge.

Q    All right, sir.  So you think everything else you did is accurate and that's important?

A    Well, everything I've testified to is correct.

Q    All right, sir.  I want to take you through a few areas.  I think we'll come back to that 123 in just a little bit, Government's Exhibit 123, okay?

A    Okay.

Q    I want to direct your attention to the -- what I'm going to call the Manion weapon and it's identified as

3714

T-93 by way of your report, okay?

A    That's correct.

Q    That's the MP5.  Do you recall that?

A    Uh huh.

Q    All right, sir.  And you identified for us that there were five casings that you analyzed that you said were all attributed to the Manion weapon.  Do you recall that, sir?

A    Yes, I do.

Q    Now, just so the jury can follow along with us -- and I understand you didn't go to the scene in this matter, did you?

A    No, sir.

Q    And it probably doesn't really matter to you where casings were or were not at the scene, as it relates to you doing your job, correct?

A    That's correct.

        MR. SMITH:  Your Honor, I'd like to display Defendant's Number 26, if I may.

        THE COURT:  You may.

Q    (By Mr. Smith) And, sir, what we're going to do as we talk about these various projectiles and casings, I'm going to have these diagrams up here that we can kind of use to help orientate us and everything, okay?

A    Okay.

Q    All right, sir.  Now, this is a color coded chart and you probably haven't worked with this before.  But I'll help you with it.  It's pretty simple, okay?

A    Okay.

Q    I want you to look at -- up here at the big screen and on my laser see those two that I'm pointing right there?

A    Is this 11-A?

Q    Yes, sir.  11-A and 10-A.

A    Could you enlarge this for me a bit?

Q    We'll try.  It may come out of focus, but we'll see.

A    Okay.  Thank you.  That's good.

Q    There we go.  Is that better?

A    Very good.

Q    Okay.  And then we've got 2-A, 6-A and 7-A?

A    Yes, sir.

Q    Those three along with 10-A and 11-A are the Manion casings that you analyzed.

A    Okay.

Q    And you've told us they all came from the Manion weapon.

A    Yes.

Q    Now, you can't analyze something that's not given to you, can you?

A    True.

3716

Q   All right.  And you're familiar -- have you ever performed an ejection pattern analysis on an MP5?

A   I have not in this case.

Q   Not in this case.  Have you ever performed any ejection analysis of an MP5?

A   Not to my recollection.

Q   Are you aware of where the rounds eject from an MP5?

A   Well, knowing -- I've shot the firearm and -- but I did do it in an enclosed room.  I expect the -- has a right ejection port.  If I'm not mistaken, with the ejection port being to the right, the casing should exit to the right.  I would expect it to go slightly behind the shooter, but I have not really tested this weapon so I wouldn't know.

Q   Just so we're talking about the same thing, I'm going to take 26 down for a minute.  Ask that an exhibit be displayed to you that is not in evidence yet and see if you can identify it and this is Defendant's Exhibit Number 6, I believe.  Or excuse me, Number 7.

A   Okay.

Q   All right, sir.  Do you recognize what it depicted in that literature?

A   Yes.

Q   Tell me what it is.

A   Well, it's an MP5 with the stock inserted --

3717

actually retracted. And looks pretty much like the weapon that was submitted on the date.

Q   It is that weapon that's -- Oklahoma Highway Patrol uses, isn't it?

A   Yes. They do use the MP5.

Q   Yes, sir. You see the nomenclature associated with that weapon? The nomenclature associated with that weapon in Defendant's Exhibit Number 7, do you see that?

A   Okay. I see it.

Q   And you also see the specifications down there at the bottom, is that right?

A   Yes, I do.

Q   And this is the pertinent information that pertains to Heckler and Koch MP5; is that correct?

A   Yes.

MR. SMITH:  Your Honor, I move for the introduction of Defendant's 7.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No objection.

THE COURT:  Be admitted without objection.

MR. SMITH:  Ask that it be displayed, Your Honor.

THE COURT:  You may.

Q   (By Mr. Smith) All right. Now, this is the information that comes from the manufacturer; is that

correct?

A    Uh huh.

Q    All right. And this is a picture of the MP5 that we're dealing with?

A    Okay.

Q    And this is the suppressor at the end?

A    Yes.

Q    And again, a suppressor silences that weapon, makes it quieter?

A    Reduces the sound.

Q    Right. And that also increases the length a little bit, right?

A    It's -- (Interrupted)

Q    Increases the length of that barrel a little bit.

A    Well, it was not -- if we were measuring it, that would not be counted as a portion of the barrel. But -- so you would note that it has a suppressor on the end.

Q    But when we look down here at the barrel length, the difference when you see on the longer barrels and the shorter barrels generally have to do with whether or not it's suppressed or not, correct?

A    Yes.

Q    Okay. Now, the weapon that was used by Mr. Manion in this case that you examined is the weapon that's depicted in here in terms of the same model, correct?

3719

A    Okay.

Q    Is that correct?

A    Yeah.

Q    And it's got a right ejection port?

A    It has a right ejection port?

Q    Yes, sir.

A    I can't see ejection port on that, sir, can you?

Q    No, I'm talking about the Manion weapon has a right ejection port?

A    I said that earlier.  I'm thinking it does, but I'm not sure that it does have a right ejection port.  The MP5.  Okay.  I think I said that earlier, but I -- I don't.

Q    Let's go about it this way.

A    Okay.

Q    You're familiar with semiautomatic weapons?

A    Semiautomatic and machine weapons, also.

Q    And automatic weapon, that's right.

A    Yeah.

Q    And the majority of all those weapons have right ejection ports.  That's the -- (Interrupted)

A    I'd say 99 percent of them.

Q    That's the standard in the industry; is that not true, sir?

A    Yeah.

3720

Q    Now you can get a left-handed gun if you want one for left-handed shooters?

A    Yes, you can.

Q    It ejects out the other side because when a left-handed shooter's holding it, if it ejects to the right it's going to hit their forearm, right?  It's real uncomfortable -- it can hit their forearm?

A    Not really, sir.

Q    All right.  The purpose that they eject to the left, though, helps with the left-handed shooters, right?

A    Yes, it would.

Q    All right.  And that is not the norm.  The norm is a right ejection port, correct?

A    That's normal, yes.

Q    All right.  And you had no reason to think the Manion weapon was anything different than that, that on 99 percent of all automatic weapons that you're familiar with, with right ejection ports?

A    Well, I tell you, if you had the weapon here today we could be able to see what side it'd actually eject from.  I'm thinking it is a right ejection port because -- (Interrupted)

Q    Hold on a second.  Would be very helpful if we had that weapon here today, wouldn't it?

A    Yes, it would.

3721

Q   Wasn't maintained into evidence.  It's turned back to the Highway Patrol, wasn't it?

A   Yes, it was.

Q   Okay.  And it's not here so we can't examine it. But tell me that it's anything other than a right ejection port?

A   It's possible.  What I'm saying to you is I -- that Sig Sauer that I worked on, I've worked on those lots of times.  I've worked on the Colt Sporter and other Colt weapons lots of times.  I've seen a few MP5s in my lifetime.

Q   Yes, sir.

A   And I've been in the field for 13 years.

Q   Shot a few of them, too, haven't you?

A   Say again?

Q   Shot a few of them, too, haven't you?

A   Yes, I have.

Q   So you're familiar with where they eject the rounds?

A   I'm thinking it's a right ejection port, but I could be wrong.

Q   All right.  I'm going to put 26 back up there and we're going to talk a little bit about some other evidence in this case.

A   Uh huh.

Q   And we'll see if it makes sense with what you're

3722

thinking -- with your recollection of the Manion weapon, okay?

A    Okay.

Q    All right, sir.  And also what this drawing depicts -- Government's Exhibit number 1 is in front of you. It's that model, that big model right there?

A    Oh.  Okay.

Q    That's what this drawing depicts is that cabin as depicted on Government's 1.  So at any time if you want to refer to that, then we can do that also, okay?  But I want to take you back up here to Defendant's 26.

A    Okay.

Q    See right underneath Number 1?

A    Yes, sir.

Q    That's the east window on this cabin that's been testified to.

A    Okay.

Q    And there's been testimony that up to five shots from Mr. Manion's weapon, the MP5, came through that east window.

A    Okay.

Q    That's the testimony that's been introduced here.

A    Okay.

Q    Now, the testimony also was that Mr. Manion was leaning across this rectangle, which depicts the blue

Chevy pickup, which is also there in Government's Exhibit Number 1, the table in front of you, okay?

A    Okay.

Q    Now, everybody understands that that blue pickup was in the same or similar position that it was that evening out at Mr. Barrett's, okay.  Anytime you want to look at that you just let me know.  We'll let you get up, go around there, take a look at it.

A    Okay.

Q    Testimony was Mr. Manion, leaning across this pickup, in a supported fire position -- and you understand what that means?

A    In a --?

Q    Supported fire position.

A    No, I'm not really familiar with that one.

Q    Well, does it have something to do about steadying your arms on a surface, would that be supported fire?

A    Like I said, I have no idea, sir.

Q    Okay.

A    I'm a firearms examiner.  I don't do tactical stuff.

Q    All right, sir.  Testimony was he was leaning across that truck, shoots at least five times into that east window, okay?

A    Okay.

Q    With the MP5.  We got three casings right here on

3724

the ground.  2-A, 6-A and 7-A.

A    Okay.

Q    Now, with your knowledge of the MP5 -- and there is no testimony that Mr. Manion moved while he's shooting five times.  Okay.  There is no testimony that there's any intervening object, because he's leaning across the hood of that truck.  So there's nothing to the right of him that a casing was going to hit, okay?  You follow me?  How are you going to get number 11-A and 10-A to the left of a shooter that's shooting through that east window?

A    I don't know.

Q    All right.  Now, you would expect three casings to be where 7-A, 6-A and 2-A are, correct?

A    It would depend.  It's going to -- (Interrupted)

Q    Hold on a second.  The scenario I'm giving you is a shooter leaning across the hood of that pickup in a supported fire position, you would expect casings to be in that vicinity if using an MP5, wouldn't you?  Where 2-A, 6-A and 7-A are?

A    When a right ejection port and without the use of -- I mean, actually take the gun out and test it to see what it actually does, yes, I would expect something to that effect.

Q    And what I don't want you to do, sir, is to check your common sense in at the door, okay?

A    Say again?

Q    I want you to rely on your training and your experience and good old-fashioned common sense during the questions that I'm asking you here today, okay?  That's what you've done for your life, you're interested in firearms.

A    You ask me about ejection pattern of a gun I did not test, sir.

Q    I understand.  I'm asking you based on common sense, your education of firearms, your training and your actual use of an MP5, okay, to look at these and to tell me whether or not it makes sense to you that an individual shooting across this pickup into that east window up to five times, at least five times, that it would be consistent to have rounds in this position, where 2-A, 6-A and 7-A are.

A    As I said earlier, if the gun has a right ejection port, yes, I would expect it to be to the right of the -- if he's laying facing -- I mean, pointing towards the window, with the gun pointed towards the window and the casings ejecting to the right.  That's what I would expect.

Q    Perpendicular to the window?

A    More like parallel.  Are you talking the casings or you talking the person?

3726

Q    Shooting directly into the window.

A    Okay.  You're talking the person?

Q    Right.

A    Perpendicular, yes.

Q    Now, it would not be consistent with that scenario to find two other -- casings, excuse me -- to the left of that shooter, without those casings hitting some sort of an intervening object?

A    Or been moved.

Q    I understand.  And we're going to talk about evidence moving here in a minute.  I'm talking about the shooter not moving, staying in one position, shooting five times, it's not consistent to have two to the left and three to the right, would you agree with that?

A    I would agree with you.

Q    Even if it's a left-hand, left side ejection, you wouldn't expect them to be over on the right.  You're going to expect all five to be in a similar area, right?

A    Sir, it has been my experience at crime scenes that when -- I mean, when I get there and I look at things and they are what I would say where I don't expect them, I don't know exactly what happened at the crime scene between when what happened and when I got there.

Q    That's why I said don't check your common sense in at the door, okay.  You're expecting all five to be in a

similar area, right?

A   Yes.

Q   All right.  Now, let's look at these rounds right down here.  Four, six, seven, eight and 20, okay.  Do you recall what those were?

A   Say again?

Q   Do you recall what those were?

A   No, sir.  But if I can see your legend at the bottom I can tell what they are.

Q   I'm going to tell you what they are.  Those are .45 live rounds that have been identified and I'm going to give you the numbers here, I think.

A   Okay.

Q   M-7 is T-20, M-8 is T-21, number 20 are two rounds that are T-33.

A   Okay.

Q   What did I miss?  Number four?  Six and seven, T-19 and T-17, okay?

A   Okay.

Q   All right.  Now, you understand those to be live .45 caliber rounds?

A   Yes.

Q   Okay.  You didn't test those?

A   No, sir.

Q   You didn't attribute those to any weapon?

3728

A     No, sir.

Q     Okay.  See over here what I'm pointing to is 1-A?

A     Okay.

Q     You understand that to be a live .45 caliber round? Isn't that also what we referred to earlier as T-34 -- (Interrupted)

A     Well, yes.  If it is T-34, it is a live .45 caliber cartridge.

Q     That's one of the subjects of the error in your report because originally that was listed as a casing. It's not a casing.  It's a live .45 cartridge.

A     And as I explained earlier and that's before the amended report, sir.

Q     Sir, it's six years later.  I understand you got your report corrected now.  But it was a mistake earlier on, wasn't it?

A     As -- like I -- yes, I said it was.

Q     It's an inaccuracy.  You didn't test that round, that 1-A, to see which weapon that it may have been ejected from, did you?

A     No, sir.

Q     Okay.  Now, do you know what marker number one is?

A     No, sir, I do not know.

Q     Okay.  I'm going to help you with that.

A     Okay.

3729

Q     Marker number one is T-14.

A     T-14?

Q     T-14.   It's our live 9 millimeter round.

A     Okay.

Q     Okay.   And I think that was brought to the courthouse today.   I think it's back there with the other evidence.   You didn't examine that round, did you?

A     No, sir.

Q     Now, is it consistent with your knowledge of the ejection pattern of the MP5 for an individual to be shooting not on the east side of that pickup which is over here where my laser is, okay, but on the west side of that pickup where that live round is?   Okay.   Let's assume something for me.   Assume that an individual was standing at that window and ejected a live round onto the ground and then shoots into that window.   Would these ejection patterns with 2-A, 6-A and 7-A be consistent with that?

A     Say your question one more time, sir.

Q     Assume that a person was standing at this window with an MP5.

A     Uh huh.

Q     And ejects a live round onto the ground, marker number one, T-14, okay?

A     Okay.

3730

Q    And then shoots a burst through that window.

A    Okay.

Q    6-A, 7-A and 2-A are all consistent with an ejection that you would expect from a right-hand ejection port on an MP5.  That's in an area where you would expect them to be, aren't they?

A    Yes.

Q    Okay.  Now, while we're talking about Mr. Manion's weapon for a minute -- (Interrupted)

A    Did you -- you're not finished your question?

Q    My question was and you answered it, would it be consistent with an individual standing at that window with these casings right here would be consistent -- (Interrupted)

A    Wait.  Hold on.  You said -- you asking me about these 6-A, 7-A and -- (Interrupted)

Q    2-A?

A    2-A.  From a right ejection port.  But you also had a question about one.

Q    What I said was that's a live round.  You didn't analyze that.

A    No.

Q    You didn't see what weapon that fit.

A    No, I did not.

Q    You didn't look to see -- whenever a live round is

3731

ejected from the chamber there's markings that you can examine and look at and identify that with -- (Interrupted)

A    And sometimes you can say a certain ejector worked on it.

Q    Right.  You didn't do that in this case.

A    As I said in the evidence in chief, I did not look at that.

Q    All right.  Now, 3-A, do you know what that is?

A    You're going to tell me, I'm assuming.

Q    No.  Because I know you don't get marker numbers. You get T numbers, P numbers, F numbers.  We've already talked about that.

A    That is correct.

Q    T-36.  Okay.

A    Okay.

Q    .380 casing.

A    Uh huh.

Q    That's a fired shell.

A    Okay.

Q    Right?  When we talked about casings, we're talking about something that's been fired?

A    Yes.

Q    Okay.  You didn't analyze 3-A to see what, if any, weapon may have fired that?

3732

A     Yes, I did compare that against the 9 millimeter weapons.

Q     You did?

A     Yes.

Q     That's in your report?

A     It's not in my report.

Q     Now, wait a second.  We've here in a jury trial for murder and you're telling us something that's not in your report -- (Interrupted)

MR. LITTLEFIELD:  Objection, Judge.  That's not a question.  That's an argument.

THE COURT:  Sustained.

Q     (By Mr. Smith) When did you analyze 3-A?

A     The analysis that I did with this particular casing was I checked it against the other 9 millimeters to see, because you can discharge a .380 in a 9 millimeter weapon.

Q     It's called a 9 millimeter short or a 9 millimeter Kurz?

A     That's the same thing.

Q     Right.  That means short in German?

A     Yes.  And also korto in Italian.  But what you do with a .380 is you check it to see if it was indeed discharged by the 9 millimeter weapons because it will leave telltale markings and you're able to identify it

3733

even though it was fired -- fired in a 9 millimeter -- (Interrupted)

Q    So what I want you to do for me, sir -- sorry to interrupt you.  What I want you to do for me, because I've got your report, is to show me where you analyzed it.

A    It's to -- (Interrupted)

Q    Show me where it's in your report that you've analyzed it?

A    As I said earlier, it's not in my report, sir.  Did you not hear that?

Q    Yes, I did hear that.  I also realize this is the third time you've testified and it's the first time it's been mentioned.

A    It's the first time I've been asked about it.

Q    I'll ask Mr. Hilfiger to look for that, while we carry on here.  Okay.  Now, I want you to assume something else for me here.

A    Assume something for you, sir?

Q    I'm going to give you a set of things that I want you to consider in our discussion here.

A    Okay.

Q    Let's talk about what your knowledge is of the rounds that came along with that Manion weapon when it came into the lab, okay.  When you examined it.  You had

3734

two magazines.  One contained 20 rounds, correct?  The other one contained 31.  Which by the way, these magazines are the H&K MP5.  How many rounds do they hold?

A    Let me check.

Q    And, sir, I can help you.  If you've got Ms. Marcangeli and Vicki Lyons' report, it's page four of 11 -- or page four of six.  They had -- (Interrupted)

A    Sir, I don't -- I don't have that.

Q    Well, some of that comes with the submittals, doesn't it?

A    Say what?

Q    Doesn't it come with the submittals of the weapons?  Don't you ever get those?

A    No, we don't.  We get the evidence they submit to us for us to analyze.  But if you hold for a second, I can tell you I got the gun -- what the -- gun that came at -- I identified as T-93 and I have -- (Interrupted)

Q    T-68's the magazine.

A    Well, that's not what I have in my notes.  It's not what I have.

Q    I'll read you the description of T-68 that's been previously testified to by Ms. Lyons.  It says -- (Interrupted)

A    Well, I have -- I have T-69, 31 Speer 9 millimeter full metal jacketed -- (Interrupted)

Q   Okay.  Let's talk about -- (Interrupted)

A   -- in paper sack -- (Interrupted)

Q   Let's talk about T-68.

A   Anyway, I'm telling you what I have.  Magazine and ammo for H&K MP5, 6399771.

Q   Sir, let's go about this another way.  It's going to work a lot better if you'll respond to my questions, okay?

MR. LITTLEFIELD:  Objection, Judge.  That's not for him to do that to the witness.

MR. SMITH:  Wasn't being responsive, Judge.  And I'm trying to keep us from just going into an area.

THE COURT:  Okay.  Well, let's settle down.  Mr. Higgs, you listen to the questions asked by counsel and try to answer just the question.  Counsel for the Government will have an opportunity to come back and clarify anything that's not clear from your perspective.  So let's try again.

Q   (By Mr. Smith) And I do want to be fair with you, sir.  And I want to talk about T-69 and it was a magazine that holds 31 rounds and it was loaded that way, correct?

A   As far as I can say, yes.

Q   All right.  Now, T-68 was the other magazine that came along with that MP5.  Will you find that in your notes and tell us how many rounds were contained within?

3736

A    T-68 had -- let me make sure.  T-68 had 20 Winchester 9 millimeter full metal jacketed projectiles -- I mean, cartridges in it.

Q    Twenty rounds, correct, sir?

A    Yes.

Q    Okay.  And then are you aware that there were two rounds that were lodged inside of that weapon -- and I understand they both couldn't be chamber loaded, but that they were somehow -- that weapon was hung up with two live rounds.  You're aware of that, aren't you?

A    I'm now aware of it.  It was explained to me after I got the stuff.  But when the gun came to me there was -- it was unloaded.

Q    You received T-70, didn't you?  T-70?

A    C-70?

Q    T as in Tahlequah 70?

A    Yes.

Q    An T-70 is two rounds of ammunition, 9 millimeter.

A    Yeah.

Q    Okay.  And you understand those to be contained within Manion's MP5?

A    I don't know that, sir.  I don't get the crime scene briefs.  I only get the information -- I only get the evidence to look at, sir.

Q    Well, Ms. Lyons testified that that's what was on

her submittal and Ms. Marcangeli's.  You have no reason to dispute that, do you?

A    That's fine.  If she's saying that, that's probably the way she submitted it.  But I'm telling you when it comes into the laboratory, okay, I get a request for analysis form -- (Interrupted)

Q    I understand.

A    -- that tells me what they're submitting and what they want me to do.

Q    I understand that.  So let's do a little bit of math here and let's give you a couple scenarios.

A    Okay.

Q    The magazine that contained 20 -- do you understand that to be the magazine that was in the weapon?

A    I don't know that for sure, sir.  You know that.

Q    Well, then let's do this.  Let's use our common sense.  If you know that the Manion weapon had been fired -- you said that you've analyzed it and it'd been fired five times?

A    Yes.

Q    Now, let's get on to that one.  You can't tell me how many times that weapon was fired.

A    I can say it was fired at least five times.

Q    Because you analyzed five casings?

A    Yes.  I'm basing on the five casings.

3738

Q    You can't tell the jury how many times it was fired other than you analyzed five casings that were attributed to that weapon, is that right?

A    I can say to the jury that I -- the weapon was fired at least five times to my knowledge, because I identified five casings to it.

Q    So when you talk about any of these weapons out at that Barrett residence that were fired or not fired, you don't know, other than you conduct an examination of what you're given in terms of casings and cartridges, correct?

MR. LITTLEFIELD:  Judge, I'm going to object. He didn't testify as to which weapons were fired.  All he testified to was the casings which matched and the projectiles which matched.  And he has never made a claim as to which weapons were fired or how many times.  And those questions mischaracterize his testimony.

THE COURT:  Argument, counsel?

MR. SMITH:  He can answer whether or not he has knowledge of how many times a weapon was fired other than what he examines in terms of cartridges or casings.

THE COURT:  I thought he did testify that he couldn't answer that question.  I mean, he didn't investigate that area.  But I'll let him respond to your question.

Q    (By Mr. Smith) My point is, sir, there aren't

3739

counters on weapons.

A    No, I mean, that's -- (Interrupted)

Q    Nothing tells us about a weapon -- how many times it's been fired in its life.

A    That's true.

Q    You can tell by looking at weapon that may be more worn than another weapon, indicating it's been shot a lot.

A    Actually, you can't look at a weapon and say that. What I'm saying to you is based on the evidence that was submitted to me and making my determinations.  And that's why I'm saying it was fired at least five times.  Now, if it was fired more times than that I can't say.  But I can say at least five.

Q    If something's not submitted to you, you can't analyze it.  If something is not submitted to you, you cannot analyze it?

A    That's true.

Q    Now, is where I want you to assume a scenario for me as it relates to the Manion weapon, okay?

A    Okay.

Q    We know if we've got two magazines -- first off, those magazines were mechanically clipped together, were they not?

A    I don't remember.  And it is possible they could

3740

have been put together.  I don't remember.

Q    Heckler and Koch makes a device, a metal device, that will hold two magazines together where you can speed load them.  You can drop one and just move it over and insert the other one, correct?

A    Yeah.  They do make it.  And other manufacturers make it, too.

Q    Okay.  So we got two magazines and I want you to assume that they're clipped together.

A    Okay.

Q    One of them is loaded to the gills, 31 rounds.  The other one's got 20.  And you've got evidence that that weapon's been fired five times.

A    Yes.

Q    So that tells you that the magazine that's got 20 in it was probably the one that was in the magazine with it, correct?  Unless -- (Interrupted)

A    That's logical to assume.  I'd say that.

Q    Okay.  Well, let's assume that since that appears logical.  We've got 20 in the magazine that's inserted in the Manion weapon.  We got two in the action that are jammed.  That's 22 rounds.  Follow me?  We've got five that you've attributed to the Manion weapon.  That's 27.

A    Uh huh.

Q    Okay.  There's four that we can't account for?

3741

A     There's three you can't account for.  Four?

Q     Or maybe even five.

A     Okay, sir.  You're going on the assumption that the magazines were fully loaded.

Q     Well, the one magazine was fully loaded.

A     Yes.

Q     And we're going to assume that an individual, particularly a trained officer, that they got a habit of loading something one way that you're going to generally expect it to load the other the same, correct?

A     I think that's a question you have to pose to the officer who loaded the magazine, sir.

Q     And also if we had an inventory of rounds before a group went out on a mission that told us how many they started with and how many they wound up with, would be an inventory that we could use to compare also, would it not?

A     Again, that's a question you need to pose to the officer who owns the weapon.

Q     I'm posing it to you.

A     Well, I can't answer you, sir.

Q     You cannot tell me whether or not if we had an inventory of rounds before an operation and you do an inventory afterward, whether or not that would be an indication as to how many rounds were fired?

3742

A    I can tell you that.  But I don't know -- I can tell you that.

Q    And what's -- (Interrupted)

A    That would be common sense that you would do an inventory.  But I'm not the person to ask that to because there's a definitive answer for it.  I can't give it to you.

Q    I didn't ask you why they didn't do that.

A    I know that.

Q    I'm saying that's the way to account for rounds, okay?  All right, sir.  And I want you to assume for me that we have both magazines that were loaded the same way with 31 rounds, okay.  Can you do that?  The Manion weapon.

A    You want me to make an assumption.  Okay.  If you're assuming that, we will assume that.

Q    That's 62 rounds, correct?  And if we're chamber loaded, now that's 63 with the capacity.

A    Very true.  Yes.

Q    And we've got 51.  We've got 31 in one magazine, 20 in the other.

A    Yes.

Q    All right.  51 from 63 is how many?

A    11.  No, 12.  Sorry.

Q    And we're going to deduct two that are in the

3743

action.  That's 10.

A    Okay.

Q    Five on the ground.

A    Okay.

Q    Now, we've got a possibility of five that are unaccounted for, okay?

A    Yes.

Q    All right.  Now, we've already talked about that you're not going to think 10-A and 11-A were consistent with the person shooting through this window if we've got three out here, okay?

A    Okay.

Q    I want you to assume for me we got two missing out here somewhere that weren't picked up.  That you were never able to analyze.  Because that's where we would expect to find them, right?  Let me do it this way.  You wouldn't expect to find them over here.  You wouldn't expect to find them over here, out here.  If the guy is shooting through that window, you'd expect them in here, okay.  Assume that you didn't -- that those two weren't presented to you for analysis.

        MR. LITTLEFIELD:  Objection.  Compound question.  He's throwing about 10 questions at once at him.

        MR. SMITH:  The question -- I just want him to

3744

make the assumption, Judge, that two rounds weren't presented to him for analysis.

Q    (By Mr. Smith) Now, I want you to follow me through my scenario here, okay.

A    Okay.

Q    The projectile that you recovered that was related to the Manion weapon -- do you know which one that was?

A    That -- (Interrupted)

Q    Actually your -- (Interrupted)

A    It was actually two -- (Interrupted)

Q    Two -- F-37 was a round that's been testified to that was found on the front porch in this area.

A    Okay.

Q    Actually, if you look at Government's Model Number 1.

A    Uh huh.

Q    See the white box -- there's a gray box on top of it.  The testimony was that that round that you looked at, F-37, that projectile grazed the front door facing and dropped right on top of that gray box, okay?

A    Okay.

Q    And there's also been testimony from Ms. Dalley that there's no way somebody shooting through this window could get that projectile right there.  Okay.

A    I -- what -- (Interrupted)

3745

Q    Ms. Dalley testified to that, okay.  So this is part of that assumption that I want you to do because you weren't here throughout the trial and I realize that. Okay.  I want you to assume that.  Okay.  These rounds right here, 10-A and 11-A, you with me?

A    Okay.

Q    The ejection from the MP5 would be consistent with the shooter in this area, shooting across that front porch that resulted in a projectile landing where F-37 was ultimately found.  Would you agree with that?

A    With a right ejection port, you would be correct.

Q    I would be correct?

A    Yes.  That's what we expected.

MR. SMITH:  Your Honor, may I approach the model?

THE COURT:  You may.

Q    (By Mr. Smith) This depicts the Hamilton Bronco that's -- whether you want to say it's at the porch, touching the porch, near the porch, it doesn't matter to me, okay.  But what I want you to assume for me -- and you might have to get over there and look at that model because it is not drawn on this diagram.  These casings right here, whether it's 10-A or 11-A -- and by the way, you can't tell me 10-A or 11-A, which if either of those casings were associated with projectile 37 that was found

3746

on the refrigerator?

A    No, I can't.

Q    You can't do that, okay.  Not only would it be consistent with a shooter in this area, which is somewhere around that -- the rear end of that blue pickup, shooting -- causing a projectile to be on top of that refrigerator, it would also be consistent if a shooter was shooting across that front porch and hit the corner of that Bronco.  The ejection of one of these casings would be consistent with that, would it not?

A    Okay.  Let me see if I can get this correctly, here -- (Interrupted)

Q    What I'm getting at -- (Interrupted)

A    You're saying that somebody standing by the blue truck and shoots in this direction towards me and hits the windshield or the hood or whatever -- it hits this car.

Q    Down by the bumper.

A    Is that what you're saying?  And then it ricochets on top of the refrigerator?  No?

MR. SMITH:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Smith) I want you to assume a couple things for me.  One, the projectile F-37 was found on top of this refrigerator.

3747

A    Yes.

Q    And we know -- we have two casings that are in this area, 10-A and 11-A.

A    Yes.

Q    Okay.  And you've already said it'd be consistent with somebody shooting across that porch with those -- 10-A and 11-A to be in that area?

A    Yes.

Q    It would also be consistent for somebody shooting in that same direction where that projectile hits the front of this Bronco down there around that bumper, wouldn't it?  I mean, you're just talking about a small distance between the refrigerator and the front of the Bronco. Would it be consistent?

A    No, sir.  The shot -- the casings where you found them is consistent.  Where the person is apparently standing is consistent.  Where the bullet is found is not.  Because when you look at -- if it hits that -- this car where you're indicating it's going to hit, it's too low.  It would have to actually ricochet up and on top.

Q    Maybe I wasn't clear then.  I want you to assume we have two projectiles.  Because we have two casings over here.  One projectile's on top of the refrigerator, right here.  The other projectile hits somewhere along that bumper on that Bronco.  And what I'm getting at is for

3748

purposes of locating a shooter, it'd be consistent that both of those shots could be made and the casings would be in the same area that is depicted on 10-A and 11-A; is that not true?

A    As I just finished explaining to the prosecutor about the ejection patterns, I would actually have to know how the person was holding the weapon and where they were standing before I could make any determinations.  As I said earlier, if I conducted a test doing what I normally do, I would expect to find casings in that area, if they, you know, haven't been moved, tampered with, hit anything else, whatever.  I would expect to find things there because of the ejection on the weapon.  Let me finish, please.  Okay.  And if they're pointing their weapon towards this refrigerator it is possible to get a projectile on top of your refrigerator.  It is possible. What you're saying here now, a second projectile may have hit the post?  No?

Q    Hit the corner of that Bronco in the front near the bumper.

A    I'm going to say -- (Interrupted)

Q    I'm not asking you for trajectory.  That's not what I'm asking you -- (Interrupted)

A    No.  You're asking me is this -- you're asking me is this possible?

3749

Q    Yeah.  That the cases would be in a position where a shooter could make that shot.  It's consistent with that, isn't it?  And let me give you -- let me add something else to it for you to consider.

A    Uh huh.

Q    That that individual is moving, okay.  Carrying that weapon and he's moving.  And as he's moving from somewhere in this area, he's coming over in this direction.  Okay.  Moving across the front of the area. And let's assume there's fire coming out the front door -- shots coming out the front door.  It'd be consistent with an individual moving -- laying down what we call cover fire, wouldn't it?  I mean, you're a police officer.  You know what cover fire -- (Interrupted)

A    Yes.  But as I've said before, I did not attend this crime scene.  And I'm -- seem like I'm getting a lot of questions about what went on at the crime scene that I've never been to.

Q    But this is what we're trying to put some common sense into and trying to understand.  Okay.  And my point is if somebody's moving we got just a couple of feet there difference between the scenario I gave you, on top of the refrigerator and the front bumper of that Bronco. And if they're moving, while they're moving across there shooting that MP5, it wouldn't be inconsistent to find

3750

two rounds in that area and near one another, correct?

A    It is possible.

Q    Okay.  That's all I need, sir.

A    Possible.

Q    I'll live with that.  Okay.  Now, let's assume that number one was part of that weapon.  Okay.  It's part of that magazine well.  Now, we still have unaccounted rounds, don't we?

A    Say again, sir.  Unaccounted rounds -- oh, you mean 31, 31, the 63?

Q    Right.

A    Okay.

Q    You would think so, right?  I mean, if we got five -- (Interrupted)

A    Well, my thinking on this is this -- that one round, that TCW, Tula -- Tula Cartridge Works, was not a part of the OHP's magazine.

Q    This one out front?

A    That number one -- (Interrupted)

Q    Number one, marker number one, T-14.

A    T-14.

Q    So if we -- (Interrupted)

A    I do not think of that -- you said what I think. What I think that was not a part of their magazine.  It was never in their gun.

3751

Q    So if we take that out of the equation, now we're missing up to six.  Is that -- (Interrupted)

MR. LITTLEFIELD:  Objection.  That is not an additional -- and that wasn't in his equation where he came to five.  So to subtract it out doesn't give him to six.  Because that wasn't in his count.

MR. SMITH:  Your Honor, I can move on.  I think I've -- (Interrupted)

THE COURT:  I think you should.

MR. SMITH:  -- address this area.

Q    (By Mr. Smith) Now, I want to address the Hamilton weapon a second, okay?

A    Okay.

Q    And this is -- (Interrupted)

A    Sir, you keep referring to these names.  Who are we talking about?

Q    I'm giving you T numbers.  The jury understands.

A    Could you maybe give me a serial number so I know? You keep saying the -- this weapon and -- (Interrupted)

Q    The last three of the Hamilton weapons, without going through all of them, the last three numbers, the number 155.

A    Okay.  You saying the Hamilton weapon and the other -- okay.

Q    T-28.  The .45 Sig.  Last three on the serial

3752

number, 155.  Fair enough?

A    Okay.

Q    Do you have it, sir?

A    155.

Q    Yes, sir.

A    Okay.

Q    Okay.  Now, if I understand, this was an area in our report that -- well, let me back up a second.

You have listed on that weapon that you received a magazine plus six rounds, correct?

A    Yes.

Q    Didn't indicate whether or not there was one in the chamber?

A    No, sir.

Q    Doesn't say five in the magazine and one in the -- just says weapon -- or excuse me.  Magazine plus six rounds?

A    Yes.

Q    How many does that weapon hold?

A    This weapon can hold -- T-28 -- seven plus one.

Q    All right.  So that's the same.  Now, we know some Sigs can hold nine, because of the magazine spring.  But you think this one will just hold eight?

A    Yes.

Q    Okay.  And you got the two projectiles -- or you

3753

analyzed one projectile, F-39, that came from this weapon?

A     Yes.

Q     You also analyzed two casings, T-26 and T-27, that you correlate to this weapon.

A     That's correct.

Q     Is that correct?  All right.  Now, I want to look at what is referred to as F-12, F-13 and F-14.

A     Okay.

Q     Do you have those, sir?

A     F-12, F-13, F-14?

Q     Serial number 366, the last three.

A     Okay.

Q     There's not consistency in the reporting from the criminalists in this matter, is there?  Compared to the one -- number 155 we just looked at a minute ago?

A     Uh huh.

Q     There's not consistency, is there?

A     No.  One held eight and this one had nine.

Q     Well, the consistency that I'm talking about on F-12, 13 and 14 says not only do we have a Sig Sauer, but we got one cartridge from the chamber and we got seven from the magazine.

A     Okay.

Q     Right?  That's not consistent with the description

3754

that was associated with the Hamilton weapon, which just had magazine plus six rounds.  Didn't indicate whether or not one was in the chamber?

A    That's correct.

Q    Just helpful if we're consistent throughout the recording of ammunition, chambered rounds and those that are in the magazine; would you agree with me there, sir?

A    I would say that -- and bear in mind, whenever I work these cases, I tend to write down what I see at the time.  And sometimes the submittal would make that designation and sometimes they won't.

Q    And I'm not -- (Interrupted)

A    And I go and I write down what I see.

Q    And I'm not just criticizing you, I'm criticizing the OSBI because there is no consistency in how they record these counts.  Would you agree with that -- (Interrupted)

        MR. LITTLEFIELD:  Objection.  That's argumentative.

A    No, I would not agree with that.

        THE COURT:  Objection sustained.

Q    (By Mr. Smith) All right.  Now, I want to look at -- you do agree with me, though, that that was counted differently than the Hamilton weapon in that it counted the one that was in the chamber and the Hamilton weapon

3755

did not?

A    I would agree with you that it's different.

Q    All right, sir.  Now, I would like to look at page one of your report.

A    Okay.

Q    Okay.  I believe this is something I've identified as another error.  Okay.  Now, what I want to refer you to is F-5.  Do you remember addressing that concern, sir?

A    I'm looking.

Q    And wasn't there a difference between what was reported and what your work sheet shows in terms of the cartridges?

A    F-5.

Q    F-5 on your report, sir, you show to be a Sig Sauer, last three -- number 308, with nine .45 cartridges?

A    Yeah.

Q    Look at your work sheet as associated with that weapon.

A    Mine says nine -- nine rounds of .45 caliber jacketed hollow point.

Q    Your work sheet does not show seven rounds plus one?

A    On F-5?

Q    Yes, sir.

A    No, sir.

Q    You didn't previously testify to that?

3756

A   F-5?

Q   Yes, sir.

A   No.  I was looking at the -- when I told you seven plus one, we were talking about T-28.

Q   You don't recall that as being a discrepancy previously when you testified?

A   Just now you asked me about the Sig Sauer T-28 and I told you that's seven plus one.  We were not talking about F-5.

Q   F-5?

A   No, we weren't talking about F-5.

Q   I'm talking about F-5 right now.

A   Okay.  Well, my notes and my report says nine rounds.

THE COURT:  Counsel, let me see you both at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  I assume but don't know and fear you're talking about at a previous trial he testified?

MR. SMITH:  That's correct, Judge.

THE COURT:  Okay.  Well, I think you need to have one of those conferences at the bench -- I mean, with him so he understands -- (Interrupted)

MR. LITTLEFIELD:  I have -- I wasn't sure on

3757

the other witness, but I have had it with him but I'll do it again.

THE COURT:  Let's do it again because --

(Interrupted)

MR. SMITH:  I didn't -- I'm sorry, Judge.  Go ahead.  I'm sorry.

THE COURT:  No.  I'm through.

MR. SMITH:  I didn't think that -- I mean, previously that's what he'd testified and I didn't know that was going to be an issue.  And I didn't put the transcript number so they're having to find it.  So I'll address that when I come to it --

THE COURT:  -- recognize that.

MR. SMITH:  Yeah.

THE COURT:  I'd like you to both go over with the court reporter and give him a heads up.

MR. LITTLEFIELD:  We did do that, also.  And I don't think there was any dispute in the advice we gave to Mr. Perkins.

MR. SMITH:  This is about whether or not the reporter has to go with us.  I don't have a problem with that, Judge.

THE COURT:  Well, I just for the record would like the reporter to go.

MR. LITTLEFIELD:  Well, I apologize for not

3758

doing him the last time.

THE COURT:  No.  That's okay.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, let's take a recess.  Remember my admonition not to discuss this among yourselves.  We'll be in recess for about 20 minutes.

(Whereupon, the jury left the courtroom after which the following record was made.)

MR. LITTLEFIELD:  Just listen.

MR. SMITH:  You haven't done anything wrong.  What we're doing is -- because I want to get into previous testimony.

MR. LITTLEFIELD:  Potentially.

MR. SMITH:  The Judge has told us not to mention anything about previous trials, okay?  I just want to make sure you understand that and don't refer to it because what I want to ask you about is previous testimony.

MR. LITTLEFIELD:  You may ask -- (Interrupted)

MR. SMITH -- testimony in another proceeding.

MR. LITTLEFIELD:  He may ask you if you've testified in a previous proceeding related to this matter in 2002 -- (Interrupted)

MR. HIGGS:  -- (Inaudible)

3759

MR. LITTLEFIELD:  Listen.  Or 2004, okay.  And if he does, if you did in fact testify -- first state in trial and we're not to mention it in front of the jury. But if you did, that will be the proceeding that was in 2002 or the second state trial that will be identified as the proceeding in 2004, then you will know what he's talking about.  But you are not to make reference, as I told you previously, to the state charges at prior state trials or any state charge against Mr. Barrett or any of that.  Do you see what we're saying?  And was just an opportunity to warn you.  We don't want to make that mistake.

MR. SMITH:  It's not any criticism of you.  You haven't done anything wrong.

(Whereupon, a short recess was held after which the following record was made in the presence of the jury.)

THE COURT:  The record should reflect the jury's in the box, counsel for the Government is present, Defendant is present with counsel.  You may continue your cross examination.

MR. SMITH:  Thank you, Your Honor.

Q    (By Mr. Smith) Sir, whenever we left off, we were talking about F-5.  Okay.  And I brought up to you about something that you had previously testified to?

3760

A    Yes.

Q    Right.  Now, you and I have had a discussion since then and we had a little bit of miscommunication, didn't we?

A    That's correct.

Q    Because you thought what I was referring to that you previously testified today about F-5; is that true?

A    That's correct.

Q    And as I informed you, no, that's not what I was referring to.  I was referring to previous testimony in another matter.

A    That's correct.

Q    And I have showed you that testimony in the previous matter; is that true?

A    That's correct, sir.

Q    All right.  I would like to read for you, sir, the areas that I think -- what I pointed out that I thought you had an error in your report.  That was about my question about F-5.  Was there an error in your report, okay.  So I'm going to read to you then I'm going to give you an opportunity to explain it.  Is that fair?

A    Okay.

Q    All right, sir.  Listen to me carefully.

MR. SMITH:  And, Judge, I can display it for him if we wanted that.  Whatever would be easier.

3761

However you want it.

MR. LITTLEFIELD: Your Honor, I object to the display of -- (Interrupted)

THE COURT: Just read it.

Q (By Mr. Smith) Sir, the question was: What about F-5. And this is your response. Yeah, the number of cartridges came with the gun. Nine of them came with the gun. Question: Were the cartridges in the magazine when they were submitted? Answer: I don't recall if they were. Question: Did you examine the individual magazines and load them to see the number -- what number of cartridges they would hold? Answer: Yes, I did. Can I ask your findings as to F-5? Answer: According to my sheet, holds seven plus one. Question: You received nine cartridges with that weapon; is that correct? Yes, I did.

Now, is there a discrepancy between that testimony then and your testimony today? And if so, clarify that for us.

A Yes. In my report, the ones I generated, F-5 came with nine cartridges. And in my notes I have came with nine cartridges. The seven plus one, I was referring to the standard Sig Sauer magazine does hold seven and plus one actually goes in the gun itself. And in this case here, I've had some guns that had seven plus one. I've

3762

had some that hold eight plus one.

Q    So what I'm understanding you to say that your testimony in this previous proceeding about seven plus one was inaccurate?

A    That's correct.

Q    And that your notes are consistent with your report which shows nine?

A    That is correct.

Q    Okay.  Now, I want to direct your attention back to the question I had previously about the .380 casing.

A    Yes, sir.

Q    And with that casing, my questions were about whether it was analyzed or not?

A    That's correct.

Q    Do you recall that?  Okay.  Now, and I'll try to do this briefly.  I want to read the question and then just part of the answer because I think it will address -- and if it's not fair to you, let me know and we'll read the whole thing.  Question:  Did anyone request that you compare the casing of T-36 to any of the MP5s or 9 millimeter weapons that were submitted to you?

MR. LITTLEFIELD:  Counsel, what page number?

MR. SMITH:  3380.

MR. LITTLEFIELD:  33 what?

MR. SMITH:  80.

3763

Q    (By Mr. Smith) And then towards the bottom of your answer, starting at that line 20, let me check to see if I have any notes down as opposed to -- okay. I have this down as negative. And I also noted dried grass was found inside the casing. To me that meant that it's probably sitting out in the yard for awhile. Correct?

A    That's correct, sir.

Q    Now, we discussed this off the record, correct?

A    Yes, we did.

Q    And what I think you indicated to me was where you have I have this down as negative, in your testimony and in your notes means that you examined that casing and it didn't fit any of the 9 millimeters?

A    Yeah, I was not able to identify it to any of the 9 millimeters.

Q    But you agree with me, sir, that that is nowhere reflected in your report?

A    That's correct.

Q    Okay, sir. Anything about either of those two areas that you don't feel like we've addressed as it relates to being fair with you?

A    You have been more than fair, sir.

Q    All right, sir. Now, I would like to talk about the M4-A1 carbine which was identified as T-84, last three on the serial number 009.

3764

A    Yes, sir.

Q    All right, sir.  Now, you know what an M4-A1 carbine is, and give us a brief description.

A    Yes, sir.

Q    Would you, sir?

A    Yeah.  An M4-A1 carbine is a carbine or rifle -- actually it is a carbine, meaning has less than a 16 inch barrel, because it's not a rifle.  It's a carbine made by Colt and it fires the .223 cartridge.  It's just a slightly shorter and has a collapsible stock and rather than the full size .223 that you saw with, I think, state's exhibit -- Government Exhibit 128, it's shorter, but it looks about the same and it fires the same cartridge.

Q    Fully automatic .223?

A    That's correct.

Q    All right, sir.  Now, I would like for you to look in your report at T-64?

A    T-64?

Q    Yes, sir.

A    Yes, sir.

Q    In T-64 the description that you have is magazine -- or excuse me, 29 .223 cartridges.

A    Yes, sir.

Q    Correct?  Nothing is mentioned on T-64 as to whether

3765

or not any of those were tracer rounds.

A    Sir, I did not check to see if any of them were.  I did not.

Q    So you did not examine them; is that true?

A    Well, I looked at the rounds and I counted them.  I did not -- I did not check to see if any of them were tracer rounds.

Q    Okay.  Then T-65.

A    Yes.

Q    In other reports was identified as being a round in that chamber.  But your notes don't indicate that, do they?  It just says one .223 cartridge?

A    Yes.

Q    Do you agree with that -- (Interrupted)

A    If my report says that -- let me see what my notes say.  No, I just have it as -- what it is and what it came in.  I did not indicate if it was taken from the chamber of that weapon.

Q    And it is helpful if we're thorough and complete to have whether or not a round is from the chamber or they're off of the magazine or what have you?  For analytical purposes; would that be true?

A    For analytical purposes?

Q    Analytical -- for purposes of analysis?

A    I would have to say no to that.  Whether a round's

in the chamber or not does not help me analyze the weapon or the -- it doesn't. It just tells me that there was one in the chamber.

Q    What about consistency in reporting?

A    Well, for consistent reporting, yes, I think I should note that one was in the chamber if there was one.

Q    All right, sir. I'm going to ask that Defendant's 148 be displayed to you. And it has been introduced into evidence, sir. Can you identify that weapon, what type of a weapon that is?

A    That appears to be an MP5.

Q    Does it have a grenade tube on the bottom of it?

A    Does it have a --

Q    Grenade tube.

A    Yes. It has a launcher in the bottom of it. At least -- right, right there. Yes, I can see that.

Q    That's a grenade launcher; is that true?

A    That's correct.

Q    All right, sir. Thank you. You want to take that down. Now, sir, looking through your report I have counted nine machine guns and two submachine guns that you examined; is that true?

A    That's correct.

Q    That are purported to be at the Barrett residence on the evening of this event.

3767

A    That's correct.

MR. SMITH:   I would like to look at the Coach shotgun which was Exhibit Number 127.   And he doesn't need it, Paula, I don't think.   I just want to talk about it.

Q    (By Mr. Smith) You previously had the weapon?

A    Yes, sir.

Q    Okay.   Now, earlier we identified that your report was incorrect and that you had discrepancy between which barrel did not function?

A    Yes.

Q    It's -- right now it's indicated on your report now. Do you agree with that?

A    That's correct.

Q    And what you have in your report now is that the right barrel functions?

A    Yes.

Q    And in the -- you received a casing and you also received a cartridge for that shotgun; is that correct?

A    That's correct.

Q    And the unfired cartridge was in the side of the barrel -- the right side of the barrel that functions?

A    That's correct.

Q    Can you tell me why, if you know, a person would keep a fired round -- a fired cartridge in a double

barrel shotgun in a barrel that doesn't work?

A    Like you say, I do not know, sir.

Q    Let me ask you, see if this makes sense to you. That if a person has a shotgun on one side of a double barrel shotgun and one side doesn't work, if you have an expended cartridge in that side then you wouldn't be able to load it with a round and then it subsequently wouldn't work?

A    That would make sense.

Q    All right.  Now, I'd like to display for you Government's Exhibit Number 21 that is in evidence.

MR. SMITH:  And at the same time we may -- if I may, have him handed Government's Exhibit Number 122.

THE COURT:  You may.

Q    ·(By Mr. Smith) And we're going to see if we can zero in -- yes, sir, if you'll just put that up there, we'll talk about 122 in a second, okay.  I want to try to blow up marker number 12?

A    Okay.

Q    Which is also T-25, okay?

A    Yes, sir.

Q    Now, that photo is a little blurry, but can you tell about the position of the safety on that weapon from looking at the photograph?

A    Could you clear it up a little bit for me, it looks

3769

really pixilated here on my side.

Q   That might be the best one -- maybe we'll back out of it a little bit and see if it clears up.  We're going to do the best we can with it.  There you go.  Now you can see the safety position selector, can you not?

A   I might can see it a little better.  The safety on this, and it does not -- it's not very clear at all. Looks like it's in the safe position.

Q   What I want you to do is go ahead and take out Government's 122 and look at that safety selector on that weapon and compare that to the photograph.

A   Okay.

Q   And see if you can agree with me that it appears to be on safe in that picture?

A   It looks the same.  It's in the same position.

Q   All right, sir.  Now, incidentally, I want to look at that sack right there.  And that sack right there is what's being referred to as Exhibit Number 122.

A   Okay.

Q   Okay.  Take that out and let's talk about what's written on there.

A   Okay.

Q   First off, before we get there, what is the magazine capacity of that weapon if you know?

A   T-25 had a magazine capacity of 15 plus one.

3770

Q    All right, sir.  And how many -- does the paperwork of 122 reflect that the gun was packaged inside of there?

A    This says that also contains a magazine and bullet. But it does not give you an amount.

Q    All right.  Let's talk about that a minute.  When it says magazine and bullet?

A    That's correct.

Q    You would take that to mean that the bullet was the chamber loaded round, based on how the OSBI keeps track of their evidence; is that true?  And let me go about it this way.

A    Okay.

Q    Because I realize sometimes there's different people that unload the weapon at the scene, right?

A    Yes.

Q    But it is not standard to take -- if there's a chambered round to take a magazine out of a magazine well, to take the chambered round out of that weapon and then reinsert it in the magazine and then submit it?

A    No, that's not standard.  You are right.

Q    What is standard is to keep separate that chambered round that is subsequently removed, along with the magazine?

A    That's correct.

Q    All right.  And that's what is indicated was done on

3771

that sack, is that right?

A     Yes.  It says also contain the magazine and bullet. And I -- yes, I would say yes.

Q     Okay.  Now, on T-25, on your report you have that that came with 10 rounds of ammunition?

A     That's correct.

Q     And so, that would lead you to believe that if one was packaged separately, that there was nine inside of that magazine?

A     Yes.

Q     Was not loaded to the gills, was it?

A     That's correct.

Q     All right, sir.  Now, I would like for you to look and the clerk to hand you Number 110, Number 108 and Number 109.  And while she's doing that, let me ask you, sir:  Where are the rounds that go along with T-25, that are identified on that sack?  You said you looked in that box and there aren't any rounds associated with T-25.

A     Okay.

Q     We're going to come back to that what you got in your hand in a minute.

A     Okay.

Q     I'm talking about right over here with T-25, Government's Exhibit 122, okay.  There are not ten rounds in there, are there?

3772

A     Let me see.  There are three cartridges in here and indication on the outside says the magazine had nine live rounds.

Q     So what's happened to the others?

A     I don't know, sir.

Q     Fair to say there's no accounting for the missing rounds?

A     I do not know, sir.  I don't know what happened to them.  I know when I analyzed the weapon I had 10 rounds that's what I indicated in my notes and that's what I indicated in my report.

Q     Is it fair to say that there's no accounting for the missing rounds?

A     Yes, that's fair to say.

Q     All right, sir.  Now, I would like to look at the sack that's behind you on the counter.  The clerk brought it to you.  110, 108 and 109.  Let's talk about 110 for a second.  That is the Browning .22 pistol; is that correct?

A     That is correct.

Q     And there's an envelope in there, a brown paper sack that that weapon was packaged in; is that true?

A     Okay.

Q     All right.  Tell me what it indicates on that package as to how that weapon was presented into that bag

3773

as it relates to the weapon, a chambered round, if any, and a magazine, and rounds in the magazine?

A    Okay.  Says loaded at the time.  Unloaded by Vicki Lyons.  It does not indicate -- just indicates where it was found.  Does not indicate how many rounds of ammunition were inside it at the time it was found.

Q    Now, let's look at 108, which is the magazine.

A    Yes, sir.

Q    What does that say on that magazine envelope?

A    Magazine plus nine bullets.

Q    Okay.  Count how many are in that magazine?

A    None.

Q    Okay.  And then Number 109, sir.

A    Says .22 caliber bullet from chamber.

Q    Is there one in there?

A    And there is a round in here, yes, there is one round in here.

Q    All right, sir.  If you'd put that back.  Now, is it fair to say that there is no accounting for the rounds that were previously in that magazine as are indicated on Exhibit Number 108?

A    Yes, that would be fair to say.

Q    All right, sir.  Now, I'd like the clerk to hand you Exhibit Number 112.  And if you would put all that back in the envelope for me, please.

3774

MR. SMITH:  Your Honor, I'm also going to ask that Numbers 171 be displayed -- Government's.  And Defendant's 209.

THE COURT:  You may.

Q   (By Mr. Smith) Sir, if you would take that out and identify Number 112 for me.  All right, sir.  Tell me about what you have there.  Let me get back to my notes, here -- that's reflected as 112.

A   The package outside says empty box .22 -- Union Metallic .22 shells -- .223 shells -- sorry.  Union Metallic brand and -- (Interrupted)

Q   And I'm sorry.  I'm not so worried about the package.  What I want to talk about is the box.

A   Okay.

Q   Okay.  Now, that box did at one time contain .223 rounds; is that true?  I mean, that's what it says.  It's a box that packaged for .223 rounds?

A   Sir, I don't -- I'm looking for the T number.  I don't remember.

Q   I'm just asking you to examine that box.  Look at the end of it, on the other side.  The unopened end.

A   Yes.

Q   I'm not saying that it came to you with .223 rounds in it.  I'm saying at one time, when that box was -- came from the manufacturer, it was designed to hold 20 .223

3775

rounds; is that true?

A    Yes, this was designed to do that, sir.

Q    That's what it says, right?

A    That's correct.

Q    Okay.  Now, it has previously been identified as Government's 171 being that box that you're holding in your hand.  That's a photo of it.  Okay?

A    Yes.

Q    Everything looks consistent to you there, is that right?

A    Yes, sir.

Q    All right.  I would like to show you now what has been marked and has been introduced as Defendant's 209.  Now, I think it's been focussed.  Same box?

A    Looks like the same box.

Q    All right.  Anything to tell you that it's not, sir?

A    I was trying to look -- you know there's a little -- there's a barcode with a number on it.  I was trying to see if that number was consistent with what I'm holding here.

Q    And if you'd like, we can blow something up for you.

A    Could you maybe on the box itself?

Q    We'll try.  Sometimes when we do that it just -- it goes out of focus.

A    Okay.  That's good.  Can you clear it up a bit if

3776

you can.

Q   Look at the end of that label on that box, sir. Over here -- (Interrupted)

A   It is the UMC.

Q   See that right there?

A   Yeah.  I'm holding the box like it is in the picture.

Q   Okay.

A   And I can see the UMC and .223 Remington, yes.  And this could very well be that box.

Q   All right, sir.  There's nothing that tells you otherwise, does it?

A   That's correct.

Q   All right, sir.  Thank you.  We're going to take that down.  Now, I want to talk about your examination of F-41, the projectile?

A   Yes, sir.

Q   And I would like for you to look at your notes.

A   Yes, sir.

Q   Because in your report you would agree with me, sir, that the only thing that you have indicated about what was done to compare that to P-1 was that it came from P-1, right?

A   Okay.

Q   Would you agree with that?

3777

A     I would agree with that.

Q     Nothing in your report indicates the stria -- is that what you call it?  Stria?

A     The -- (Interrupted)

Q     The markings on the -- (Interrupted)

A     Stria, yes.  Go on.

Q     Okay.

A     Yeah.

Q     Nothing in your report indicates that?

A     Okay.

Q     Let me ask you this and I don't know, so I'm asking you just -- you tell us.  You said that you have a microscope that you look through.  And it has two oculars where you can put two different items underneath there and you compare the left to the right?

A     That's correct.

Q     And you -- one is stationary, I assume, and the other you're going to manipulate until they look identical?

A     That's correct.

Q     They start out, they're two separate images, and ultimately you bring them together and if the lines line up identically then that tells you I've got a match.

A     That's correct.

Q     All right.  Now, you looked -- you said you're in

3778

that Miami-Dade County laboratory. You trained under a fellow that you're going to say was one of the best firearms examiners in the country, is that right? I mean, you're proud of the fellow that you've trained under.

A    He's very good.

Q    Yeah. And it looks like he's trained you well. Okay?

A    Okay.

Q    Some of that equipment that you've seen has the ability to photograph, does it not?

A    Yes, it does.

Q    All right. Do we have a photograph of those stria?

A    Not -- no, we do not have a photograph of that stria, sir.

Q    So I don't have anything from you that I could show to the jury that says these -- this projectile -- this fragment matches this test round that was fired into that water?

A    No, you do not have any photographic images of the match.

Q    And there is capability to do that?

A    Yes, there is.

Q    And you also are going to agree with me that whenever you fire that projectile into that water bath

3779

from a .223 that oftentimes it fragments to the point that you can't recover what I'm going to call a control or something to compare with another projectile?

A    That's correct.

Q    And that was a problem you had in this case at some point?

A    Yes, it was.

Q    All right, sir.  Now, understanding that we've identified some errors in this report, you're asking the jury to take you at face value as it relates to F-41 matching P-1?

MR. LITTLEFIELD:  I'm going to object.  That's argumentative.  He's not asking them anything.  He's just giving his testimony.

THE COURT:  Sustained.

Q    (By Mr. Smith) You have nothing what I'm going to call objective to show us, to demonstrate for us, the testing that you did and the examination that you conducted on F-41?

A    No, I do not have any photographic or visual imagery to show that particular match, sir.

Q    All right, sir.  Thank you.  Now, I want to talk a little bit about your ejection analysis of the Colt Sporter P-1 .223 in this case which was something that was done in your laboratory just a few years ago; is that

correct?

A    That's correct.

Q    You told us, incidentally, that at some point you stopped that practice?

A    Yes.

Q    But you generated a report from your examination of the ejection pattern of P-1 prior to you stopping that practice in your lab?

A    Yes, I did.

Q    You had no reason to think at the time that what you were doing was not legitimate or was not accurate; would that be true, sir?

A    We have a practice in the laboratory where whenever we did an ejection pattern we would say to the agent or case person would bring them in, you need to bear in mind the results we're going to get are going to be, shall we say, skewed or invalidated by the fact that we're not using the same media as you're using, okay?  We're outside on grass where the casings will tend to land and stop as opposed to a hard surface, where it would hit and roll.  We don't know how the shooter was standing at the time.

Q    All right, sir.

A    Okay?

Q    I'm not asking you why we don't do it today.

A   I understand that, sir -- (Interrupted)

Q   What I'm getting at is whenever you conducted your ejection pattern analysis of P-1, these things that you just now are describing for us weren't considerations that you were worried about then, is that right?

A   Yes.  As I was stating, we did these analyses before, but we would explain those reservations to the agent and say if you still want it done, we can do it but bear in mind the tests may be invalid based on what we are doing.  So that's what I'm saying we used to tell them that before we did it.

Q   And I understand -- (Interrupted)

A   Now, if they still wanted it, we'd go ahead and do it.

Q   And I understand what you're telling me.  I can manipulate that test by how I hold that weapon?

A   Basically, yes.

Q   To manipulate the test by the surface within which the casings are hitting?

A   That's correct.

Q   All right.  I want to show you what is not in evidence, see if you can identify it for me, Defendant's Number 67.  Are you able to identify that, sir?

A   Yeah.  I've seen this before.

Q   Tell me what it is.

3782

A    In previous testimony, this represented by the defense as to their interpretation of what I said about the pattern.

Q    And that sketch takes into consideration your report as it relates to the ejection analysis; is that true?

A    That's their take on it.

Q    Is it accurate?  Is the information that's depicted on there accurate as it relates to the report that you did?

A    They -- it's not accurate, sir.  But they based it on the fact that I said -- (Interrupted)

MR. LITTLEFIELD:  Objection.  That's beyond -- that's not responsive.  The question was is it accurate and he said, no, it's not.  Anything else is beyond and unresponsive.

THE COURT:  Sustained.

Q    (By Mr. Smith) Tell me what portion of that you believe is not accurate, sir.

A    Well, previously I testified that approximately 45 degree angle and hence you note on the bottom of the -- right bottom of your photograph -- I mean, of your exhibit, they have the 45 thing.  And they were holding me to a hard and fast 45 degree and hence that's how they came to that and that does not look any way like what we had -- (Interrupted)

3783

MR. LITTLEFIELD:  May I voir dire on this, Judge?

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. LITTLEFIELD:

Q    Did you prepare Defendant's Exhibit 67?

A    No, sir.

Q    Do you vouch for the accuracy of it?

A    No, sir.

MR. LITTLEFIELD:  I object to any more questions in regards to it, Your Honor.

MR. SMITH:  Your Honor, I may lay additional foundation.  If I may, I'd like to lay additional foundation.

THE COURT:  You may try.

MR. SMITH:  Your Honor, I have not marked but I will now, Defendant's 222 I believe is my next one.  Ask that it be displayed to the witness.

Q    (By Mr. Smith) Can you identify Defendant's 222, sir?

A    Yes, I can.

Q    Tell me what it is.

A    This is a report that I generated after I conducted the test -- an ejection pattern test using the P-1, which is the Colt, and ten rounds from the 72 that were

3784

submitted.

Q    Okay.  That's a report that you did from your analysis; is that correct?

A    That is correct.

MR. SMITH:  Move for the introduction of 222 Your Honor.

THE COURT:  Any objection?

MR. LITTLEFIELD:  May I voir dire?

THE COURT:  You may.

FURTHER VOIR DIRE EXAMINATION

BY MR. LITTLEFIELD:

Q    In regards to the inaccuracies of -- is this an ejection analysis that you did in regards to this case?

A    Yes.

Q    And are the inaccuracies of that analysis -- does that -- are the results necessarily accurate?

A    The results are accurate only to the point where if a person was doing exactly what we were doing when we conducted the test.

Q    You don't replicate the conditions under which the firearm was at the scene?

A    No, sir.

Q    Okay.  And you don't even go to the scene to do it?

A    That's correct.

MR. LITTLEFIELD:  I don't have any objection,

3785

Judge.

THE COURT:  Do not have any objection?

MR. LITTLEFIELD:  I'm not going to object.

THE COURT:  That number is?

MR. SMITH:  222, Your Honor.

THE COURT:  Defendant's 222 will be admitted without objection.

MR. SMITH:  I would ask that it be displayed.

THE COURT:  You may.

Q   (By Mr. Smith) Sir, I'd like for you to explain to the members the jury, please, the results of your examination as -- excuse me, sir?

A   Could you clear it up just a little bit for me, on my side?  It's kind of blurry.  Okay.  Great.

Q   Can you read that okay?

A   Yeah.  I've got it.

Q   All right, sir.  And we may try to -- let me identify a few things on here then we'll enlarge it, okay.  First off, P-1 is the .223 semiautomatic, right?

A   That's correct.

Q   And then you have indicated on here P-5 being a bag that contained 72 .223 cartridges?

A   That's correct.

Q   And three magazines?

A   That's correct.

3786

Q   Now incidentally, because I want to bring this up in just a little bit, there's nothing on here that indicates that paper bag contains an additional separately packaged chambered round?

A   That is true.

Q   Okay.  And we'll get to that later.  For right now I want you to focus on the results of your examination.

A   Okay.

Q   And I want to ask that that be enlarged for you.  So maybe it'll be a little easier to read.  Right there.

A   That's fine.  That's fine.  Very good.

Q   All right, sir.  Now, what I understand your results to be that the casings where you conducted this examination, this test, resulted in an elliptical pattern?

A   Okay.

Q   That was 89 to 143 inches to the right of the firearm?

A   Yes.

Q   All right.  Now, elliptical -- you're talking about -- and just make a -- (Interrupted)

A   It's not a perfect circle.  It's just kind of -- I call it egg shaped.

Q   Use your laser up there and demonstrate it for me.

A   Okay.  Elliptical meaning like that.

3787

Q    All right, sir.

A    Okay.

Q    Now, what you've indicated to the right of that firearm as it's being held in the same position, right? I assume that's how you conducted your test.  You wanted it to be held in the same position for each firing.

A    That's correct.

Q    You wanted consistent results?

A    Yes.

Q    And you found that those casings landed 89 to 143 inches to the right?

A    That's correct.

Q    And that they landed 37 to 69 inches to the rear of the firearm?

A    That's correct.

Q    Now, I'd like to put back up for you Defendant's Number 67.  This is not into evidence.  Do you have a copy of that report that I just introduced, by the way?

A    The second report?

Q    Yes, sir.

A    Yes, I do.

Q    Okay.  Because I want you to refer to it as I'm asking you to look at 67.

A    Okay.

Q    Now, 67, if you'll follow with me, I want you to

assume that the upper left hand corner is where the position of the firearm would be.  That's where a shooter would be standing.

A     Yes, sir.

Q     Does this circle that's to the right and to the rear of that position indicate an elliptical pattern?

A     Yes.

Q     And does that indicate an elliptical pattern that is to the right of that starting position or that shooting position that is from 89 to 143 inches as is depicted on that graph?  Do you see that vertical line that's just a little bit before 90?

A     Yes.

Q     Okay.  Ninety being inches and we'll refer to that as inches.

A     Uh huh.

Q     And then you see that horizontal line that starts down at the bottom at 70?

A     Yes.

Q     Okay.  And does that elliptical line fit within the area that says 54 inches to the left or right and 32 inches front to rear?

A     Say that again, sir.

Q     The pattern dimension that you have -- well, first off, you have from 37 inches to 69 inches to the rear of

3789

the firearm?

A    That's correct.

Q    Does that elliptical circle fit within that description?

A    Yes.

Q    Okay.  And then the final thing that you have is the description of the elliptical pattern that says it's 54 inches left to right and 32 inches from front to rear?

A    That's correct.

Q    Now, tell me how this diagram, number 69, does not describe what was introduced on 222.

A    My memory serves me correctly, and I believe it does on this, you see the 45 degree angle?

Q    Yes, sir.

A    Well, in my previous testimony, I'd indicated that was approximately a 45 degree angle.  The point this was trying to show was it could not have been a 45 degree angle.  It'd had to have been what you're seeing right now.  This over here is what they're saying that should happen, not a 45 degree angle.

Q    Let me ask you this.  If we just disregard that --

(Interrupted)

A    Forty five degree angle.

Q    -- diagonal line, that 45 -- what's depicted as a 45 degree angle, let's just disregard that.  Otherwise, does

this -- is this a demonstration of your report?

A    Yes, that would be accurate.

MR. SMITH:  Your Honor, I'd like to move for the introduction of 67, please.

MR. LITTLEFIELD:  May I voir dire?

THE COURT:  You may.

FURTHER VOIR DIRE EXAMINATION

BY MR. LITTLEFIELD:

Q    On Defendant's Exhibit 67, at what point would the firearm be held?

A    Say again, sir?

Q    On Defendant's Exhibit 67, at what point would the firearm be held?

A    At what point?

Q    Where is the firearm?

A    The point -- if you see here -- well, I guess it's a dot.  You look at 10 and you got a dot.  The magazine -- the action ejection port was held at that position.

Q    Okay.  And what is the elliptical circle supposed to -- do you see the elliptical circle there?

A    Yes.

Q    And is that supposed to be the pattern that's established?

A    Yes.  Basically it's -- (Interrupted)

Q    Okay.  Okay.  I understand that.  That starts to the

right of 90, doesn't it?

A    Well, according to this -- this photograph, yes, it does start to the right of 90.

Q    Okay.  And in fact, the pattern you had started from 89 inches; is that correct?

A    That is correct.

Q    That's not a valid drawing, is it?

A    Based on those numbers, no, it is not.

Q    And it was supposed to be 37 inch to the rear, wasn't it?

A    Yes.  And this starts at 40 -- yes.

Q    And it's over 40 inches; is that correct?

A    That's correct.

Q    Does that reflect the elliptical pattern that your test resulted in?

A    No, it does not.

Q    Is that inaccurate?

A    That is inaccurate.

MR. LITTLEFIELD:  Then I object to it.

MR. SMITH:  Your Honor, I may do this.  If Mr. Hilfiger's going to attempt to construct another one that will take into consideration Mr. Littlefield's concerns. If we get that done before my examination, I'll come back to it.  So we'll take this down, if I may.

THE COURT:  You may proceed.

3792

Q     (By Mr. Smith) Nonetheless, sir, just so we're understanding each other, you have the rounds that come out of the .223 held in a level position?

A     Well, shoulder.

Q     Shoulder mounted?

A     The gun, shoulder and one squeeze, find the round and so forth.

Q     It's going to go to the right and to the rear?

A     That's correct.

Q     Do they go up any?

A     Yeah.  Well, it's an arc or an arch you want to call it.

Q     How far up do they?

A     I can't say, sir.

Q     Okay.  And we're going to try to demonstrate on paper, okay?

A     Okay.

Q     Now, I want to put up Defendant's Exhibit Number 26. We've talked about casings that came from P-1, correct?

A     Yes, we did.

Q     And you have identified 23 casings that you examined?

A     That's correct.

Q     Now, T-8 is one that I have that came north of the small trailer that was on the premises; would you agree

3793

with that?

A     2-A?

Q     T-8.

A     T-8, yes.

Q     In other words, it's not where near -- I mean there is no trailer that's depicted on here.  I'm going to tell you that.  There's not one.

A     Okay.

Q     And I think everybody understand this trailer was -- is off of this exhibit -- off of Government's Exhibit Number 1?

A     Okay, sir.

Q     In other words, I think we can disregard that.  It wasn't in the area of the house.

A     Okay sir.

Q     All right.  I want to look at these casings that we have identified in green, 10, 11, 3, 13-A, 2 and 8-A. And I'm going to give you T numbers for those.

A     Yes, sir.

Q     Just so you'll know.  T-15 is number two.

A     Okay.

Q     T-16 is number three.  All right, sir.  Are you with me?

A     Yes, I am.

Q     All right.  T-23 is number 10.

3794

A    Okay.

Q    T-24 is number 11, right next to it.

A    Okay.

Q    T-41 is 8-A.

A    Okay.

Q    And then T-46 is 13-A?

A    Okay.

Q    All right.  Now, I want to talk to you about an individual shooting that T-1, that .223 Sporter, out the front door of this residence to the south.  Top would be north, bottom would be south, okay?

A    Okay.

Q    All right, sir.  We do have a right hand ejection on that .223?

A    Yes.

Q    All right.  And you told us about how those rounds are going to go to the right and to the rear?

A    Yes, I did.

Q    If somebody's shooting out this front door, you're not going to expect there to be casings over here to the left.  And when I say to the left, and that's really -- that's confusing, okay.  I want you to get with me -- to agree with me that the position of the shooter would be coming out of the -- shooting out that front door.

A    Okay.

3795

Q   A lot like through the wall like I'm pointing to here.

A   Right.

Q   I've got the gun held like this.

A   Okay.

Q   You wouldn't expect to find casings to the left of me, would you?

A   No, sir.

Q   All right.  Now, let's assume that that residence is related just like it's depicted on this photograph.  And a shooter's right there in the doorway but facing this way -- facing down the porch, okay?

A   Okay.

Q   Shooting off to the east.  Which would be off this way.

A   Okay.

Q   You still would not expect there to be casings in front of him, would you?

A   No, sir.

Q   You would expect the casings to be out here somewhere?

A   That is correct.

Q   Okay.  Now, you certainly wouldn't expect there to be casings, even if somebody's on the porch shooting to the east.  Be on around the house, out here by this

3796

window?

A      No, I would not expect casings to be there unless --
(Interrupted)

Q      Well, let's give us another unless.  Look at Government's Exhibit Number 1?

A      Okay.

Q      It's right here in front of you.  It's the model.

A      Okay.

Q      Because it's pretty accurate to the Barrett residence.  And you see what's depicted on there as a support, right there by the steps?

A      Yes, sir.

Q      Let's assume that we have a round that deflects off of one of those porch supports.  Do you see what I'm calling a porch support?

A      Are you talking the posts?

Q      One of those posts.

A      Okay.

Q      Let's say if we have one deflect off of that post with an individual shooting off to the east, okay. Standing right there in the doorway, shooting off to the east.  And a round ejects out of that P-1 and deflects off that post.

A      Okay.  Standing in the doorway and shooting --
(Interrupted)

3797

Q    Directly off to the end of the porch.

A    -- say towards you.

Q    Directly off the end of the porch.  No.  Off the end of the porch -- (Interrupted)

A    Oh.  Towards the blue truck?

Q    Right.

A    It is possible that the rounds could hit the post and deflect somewhere.

Q    Well, that's what I'm saying.  Listen to what I'm saying.  Let's assume something deflects -- that a round -- that a case deflects off of that porch support.  Off of that post.

A    Yes.

Q    Okay.  You're not going to expect it to deflect and travel on around here, on around the cabin and turn, are you?

A    No.

Q    Okay.  So 8-A, you're going to say huh uh.

A    Yes.

Q    Two?

A    No.

Q    13-A?

A    That's a very, very low probability.

Q    Becoming a little more possible.  Number three?

A    Number three, possibly.

Q   Now, what we're talking about is a distance.  If that door -- that cabin is 20 feet across.  That door is approximately in the center, right?  That model's to scale.

A   Okay.  Maybe I heard you wrong.  If the person is standing and shooting towards the truck, right?

Q   Shooting anyway that a round could -- that a case could defect off that post.

A   Okay.

Q   However.

A   Right.

MR. SMITH:  If I may demonstrate, just a second, Judge?  May I approach the model?

THE COURT:  You may.

Q   (By Mr. Smith) First off, sir, there's been no testimony -- (Interrupted)

THE WITNESS:  Is it okay if I go down there?

THE COURT:  You may.

Q   (By Mr. Smith) Now, this is going to be kind of like dancing.  I'm going to have to hand you this when you want to talk, and you're going to have to give it back when I want to talk, okay?

A   That's fine.

Q   All right.  Now, first off there's been no testimony that somebody was out on the porch shooting that way.

3799

Okay. There hasn't been any testimony to that. But I'm asking you because I -- (Interrupted)

MR. LITTLEFIELD: I'm going to object to his characterizing the testimony, Judge. I think there has been. But that's -- if he wants to ask it as an assumption, that's fine. But -- (Interrupted)

THE COURT: You're not going to argue with him?

MR. LITTLEFIELD: We'll be arguing about something.

THE COURT: No. I mean, you're not going to argue that there has been no testimony? He said there's been no testimony. You think there has been testimony.

MR. LITTLEFIELD: I think there has been -- (Interrupted)

THE COURT: Before he can tell really testify, there should have been testimony. So you may proceed.

Q   (By Mr. Smith) All right, sir. Now, but for purposes of demonstration here, okay, I want you to assume that a person would be standing, pointing in a direction of this stick, in the area of this doorway and I don't care if they're directly to the east -- and this is to the east, okay. I don't care if they're pointing this way, that way, however you want to. Just from that doorway somehow. Okay. And I want you to consider whether they're directly to the east or however, I want

3800

you to consider based on your ejection pattern analysis and your common sense and your experience, whether or not you would have an opinion about a casing impacting either one of these supports and winding up out here off of the edge of the porch or two of them right there together at the very end of the porch.

A     Well, based on what I know about the particular gun, the casings eject pretty -- with a lot of force, I would say.  Now, it is possible that somebody standing here, pointing in this direction can cause that ricochet -- they'd probably have to be a little bit forward of the door to get the -- (Interrupted)

Q     How far forward of the door do you think they would have to be, sir?

A     I'm thinking right here, between the window.

Q     And what I'm going to ask that you do, take another stick that's right there beside you and hold it -- there you go.  Yes, sir.

A     I'm thinking right about here.

Q     And what post is -- (Interrupted)

A     It's almost like a 90 degree angle, but it's again going to depend on how they're holding the gun.

Q     So in that position would they have to be out on the porch fully visible?

A     I would think so.  That's my opinion.

3801

Q   And which post would the casings deflect off of?

A   I would expect the casing to deflect off of this way.  Because this is right in behind.  But that's what I would expect.

Q   Okay.  I understand it.  Because we don't -- these things kind of have a mind of their own.  For a mindless thing, they kind of have a mind of their own, right?

A   Yes, they can.

Q   Now, what I'm going to ask you is assuming that, well, maybe it's possible that one of them winds up there.  How possible is it that we've got two of them together at the end of the porch and a third one right there?

A   You say how possible?

Q   Yeah, I mean how likely?

A   Well, all I can say it's possible.

Q   How likely is it?

A   Now you're wanting a probability and I can't give you that, sir.

Q   All right, sir.  If you'd turn around and go back and have a seat, please.  All right, sir.

A   Okay.

Q   Now, you're aware that there's 16 casings found inside of the house?

A   Yes, I was told.

3802

Q   Okay.  And what we talked about, if we're fully loaded, our magazine has 30 rounds in it, the magazine that was in the magazine well.  And one in the chamber, minus the bullets that were accounted for, that we'd have 19 to come up with -- 19 casings, is that right?  That's a maximum we could have?

A   That's correct.

Q   Maximum -- the most that we could have would be 19?

A   Yes, that's correct.

Q   Not 22?

A   That's correct.

Q   That Colt Sporter is not a magic gun?

A   No, it is not.

Q   It will not shoot more than it holds unless you reload it?

A   That is correct.

Q   All right.  So, we can't -- we know that there's too many out here if we try to account for all 22 of them, right?

A   That is correct.

Q   So the most we can do is 19.

A   Yes, sir.

Q   And so, we'd have to find three.  And if we have -- if we're assuming that the shots are coming from the front door area, these three are the closest to the front

3803

door, 10, 11 and 3?

A    That is correct.

Q    All right, sir.  Now, I want to attempt to show you Number 67, again.  Mr. Hilfiger reworked this a little bit.  Take a look at this.  See if it is any more accurate than the other drawing.  Can you examine it, sir?

THE COURT:  Let me -- so we get the record straight, this is -- (Interrupted)

MR. SMITH:  Defendant's 67 that is not in -- (Interrupted)

THE COURT:  Well, we've had a 67 for identification rejected by the Court.  So this is another exhibit.  This should be --

MR. SMITH:  Let me look, Judge.  I may make it 68.  I don't think I've got a 68.

THE COURT:  Clerk says no, that's okay.

MR. SMITH:  Will 68 be fine?

THE COURT:  Yes.

MR. SMITH:  All right.  We're going to identify this as 68.

THE COURT:  For identification.

MR. SMITH:  For identification purposes, yes, sir.

THE COURT:  I'm starting this lesson late, but

I'll announce.  In a case like this, next time you try one, use that term.  Identification, exhibit for identification, until it's admitted.  It helps the clerk a great deal.  Proceed.  This is for identification.  Not admitted yet.

MR. SMITH:  That's correct, sir.

Q   (By Mr. Smith) Does that appear to be an accurate rendition of your report, Number 222.  And you're laughing.  And that's -- it's kind of difficult to put this in an exact depiction, isn't it?  Because what you've described is an area where these casings land, right?

A   Yes.

Q   And does that describe an area that fairly encompasses your report?

A   Okay.  Now, when you use the term accurate is when I have trouble.  That's why I was smiling.  It's -- because you know, you're not using a rule.  What we did is we have actually a tape measure.  We measure out and you measure it accurately.  Now -- but this does depict what we found, okay.  But it is not accurate.

Q   It's not to scale.

A   It's not to scale.  Very good.

Q   But neither in your report did you provide individual points where those casings landed.  You just

said they landed in an elliptical pattern and you described the area within which they were contained.

A    Yeah.  Well, I measured out to the very first one.

Q    That's what I'm saying -- (Interrupted)

A    And then the very last one and then the top one and the bottom one.  That's how I got my pattern.

Q    Right.  You gave us an area within which they were contained?

A    That's correct, sir.

Q    And that is what is supposed to be depicted on this circle.

A    Yes.

Q    This isn't manipulating your exhibit -- or excuse me, my Exhibit 222, your report in any perverse way, is it?

A    No, it is a representation of it.

Q    All right, sir.

A    I just want to say the accurate thing, the accurate word.  That's all.

MR. SMITH:  I'd move for it's introduction.

MR. LITTLEFIELD:  May I voir dire?

THE COURT:  You may.

FURTHER VOIR DIRE EXAMINATION

BY MR. LITTLEFIELD:

Q    This is not truly accurate of the entire pattern, is

3806

it?

A    I explained the entire pattern.

Q    Well, for example, the pattern -- the pattern reflects that it goes from 37 inches to 69 inches of the rear of the firearm.

A    Uh huh.  From top to bottom.

Q    And if you look at the top -- actually the elliptical circle's closer to the 30 than it is to the 40; is that true?

A    Yes, that is true.

Q    So really, this pattern reflects more like a 32 or 33 inch as opposed to a 37 inch.

A    Actually, like a 33 down to a -- almost a 90.

Q    Well, now I think that that's just a badly written seven.  Because if look on down, there's 80 and 90 below it.

A    Oh, okay.  Yes.

Q    Okay.  So it'd be more like 33 to 69 as opposed to 37 to 69, is that correct?

A    That's correct, sir.

Q    Does that however generally reflect -- without being a hundred percent accurate, but generally reflect the position and generally reflect the pattern?

A    That is correct.

Q    Okay.  But you wouldn't say this is absolutely

3807

gospel of the pattern?

A     That is correct.

MR. LITTLEFIELD:  I don't have an objection.

THE COURT:  Admitted without objection.

MR. SMITH:  May we display it, sir?

THE COURT:  You may.

Q     (By Mr. Smith) And again, just briefly, if what is indicated up here with the arrow would be the direction -- (Interrupted)

A     That's correct.

Q     -- of the projectiles would be leaving from.  This is an area within which you would expect to find those casings, provided the gun was held in a shoulder fired level position and that the casings didn't impact an intervening target?

A     That's correct.

Q     And so, the line across the top would be directly to the right of the shooter or of the gun that's being shot and what's right below this would be the line directly behind him, right?

A     That's correct, sir.

Q     All right, sir.  I think we'll move on.  Thank you. Now, do you remember I asked you about 222, about your description for P-5 and you have it there?  That says one paper bag that contains 72 .223 cartridges and three

3808

magazines.

A    Yes, sir.

Q    Do you agree with me that it depicts nothing on there about a separately packaged round from the chamber?

A    I agree with you.

Q    All right.  Now, I'm going to ask that you be handed Government's 123.  And while that's being done, I'm going to ask that Government's Number 6 be displayed to you and it is a two page report.  It is not -- this is for identification purposes.  She's working on that.  Let's go ahead and look at this -- at 123.  All right.  Now, I want to talk about that sack that you have in your hand.

A    Oh.  Okay.

Q    No.  Right there.  The brown paper sack.

A    Okay.

Q    Read the description for the jury on the sack.

A    It says from Colt Sporter magazine .223 taped together, plus 72 rounds bagged with bullet from chamber.

Q    All right, sir.  Now, you receive items like that into your laboratory every day?

A    Yes.

Q    Now, I want you to just give me an interpretation of what that bag says.

A    It says 72 rounds and bagged with bullet from chamber.

3809

Q    So what does that indicate?

A    It indicates there was 72 rounds and says bagged with a bullet from chamber.  I'm assuming there's 73.

Q    All right.  So that would be a separately packaged round or at least it would be contained in there by itself?

A    That's what this bag says, sir.

Q    And the 72 would be packaged together?

A    That's what the bag says.

MR. SMITH:  All right, sir.  Your Honor, if I may have one second.  I think we may have a disagreement about what number 160 is.

THE COURT:  Okay.

Q    (By Mr. Smith) Now, in your report do you describe how many cartridges that you received?

A    Seventy two, sir.

Q    All right.  And do you also describe a separately packaged round from the chamber?

A    I don't think I do, sir.

Q    Okay.  Now, you counted those rounds in a previous proceeding?

A    That's correct.

Q    And you didn't even come up with 72, did you?

A    No, I did not.

Q    All right.  Now -- and I know there's not -- that

3810

you came up with 71.

A    That's correct.

Q    And since then there have been ten rounds that were taken out and fired and we have accounting for those casings?

A    That's correct.

Q    And do you have the bullets -- the cartridges and the casings there in front of you?

A    I have the casings, yes.

Q    Okay.  Now, if you want to take those out and count them, I want you to.  If you don't think you need to, then you don't have to.  Okay.  I'm leaving that up to you.  But here's what I'm getting at.  Just follow me here a second.

A    The way they packaged them it would be kind of difficult to do, I think.

Q    Now, we can open them up and you could count them, but here's my point.  Okay.  Those were always identified -- and you'll have to be careful whenever you rattle that around it's going to be hard for us to hear, okay.  But I want you to examine it if you need to examine it and then I'll ask you a question.

A    I'm checking the numbers that are written on the -- each of the separated squares.  Just making sure whether they are correct.  And they are.  Seventy one.

3811

Q    All right.  Everything that you've seen as it's been depicted says 72 rounds?

A    Yes.

Q    And it doesn't say a thing about the chambered round that's packaged separately?

A    That's correct.

Q    But you agree with me looking at that bag that's what you think we should have 73 in there?

A    According to this -- and I didn't write it, so I'm only reading what it says.  It says 70 rounds in that bag with bullet from the chamber.

Q    Let me back up -- (Interrupted)

A    So to me that says 73.

Q    Okay.  I thought you said 70, but you said 72?

A    Seventy two.

Q    Plus one from the chamber?

A    Right.

Q    But then whenever you finally got to the point of counting them in another proceeding, you had 71?

A    At another proceeding, yes, it was 71.  When I counted them, when I did my notes on 9/28 of '99 there were 72 cartridges.

Q    So we don't know what's happened to one of those cartridges?

A    That is correct.

3812

Q    Actually, we don't know what's happened to two of them?

MR. LITTLEFIELD:  Objection.  Assumes facts not in evidence.

MR. SMITH:  Let me come back to it this way, Judge.

THE COURT:  Sustained.

MR. SMITH:  I'll withdraw the question.

Q    (By Mr. Smith) Do you know where the separately packaged round is that came from the chamber?

A    No, sir.

Q    There is no accounting for that, is there?  Other than it was accounted for on the sack on 123.  But since it came into the lab's custody we don't know what's happened to it, do we?

A    When I counted these projectiles -- I mean, these cartridges when I received them on 9-28, there was 72 total.  I did not make a note as to one coming from the chamber and I didn't do that.  It's been pointed out in a previous -- (Interrupted)

MR. LITTLEFIELD:  Objection.  That's not responsive.

THE COURT:  Sustained.

Q    (By Mr. Smith) Well, sir, you would agree with me that we have 71 accounted for and you understand why I

3813

have concern or question about where are the other two?

MR. LITTLEFIELD:  Objection.  Mr. Smith's concern is irrelevant.

THE COURT:  Sustained.

Q    (By Mr. Smith) You understand there are two that are unaccounted for by your admission, by looking at what you have in front of you and what is reflected on the writing on the envelope for 123?

MR. LITTLEFIELD:  Objection.  That assumes facts not in evidence.

THE COURT:  Argument, counsel?

MR. SMITH:  Does know what happened to the chambered round that was packaged separately that was contained within that envelope, Judge.

MR. LITTLEFIELD:  And that assumes facts not in evidence.  That it was in fact packaged separately.

THE COURT:  Sustained.

Q    (By Mr. Smith) On the envelope, sir, do you agree with me that it indicates there were 73 rounds contained within?

MR. LITTLEFIELD:  Objection.  That's cumulative and been asked and answered three times.

THE COURT:  Sustained.

Q    (By Mr. Smith) And today the most that you can come up with is 71?

3814

A   That's correct.

Q   And you can't tell me where that chambered round is that was packaged separately?

A   No, sir.

Q   Excuse me?

A   No, sir.

Q   And you can't tell me how -- what happened to round number 72?  You have 71.

A   Wait.  Say again.  You just asked me about the chambered round.

Q   That's right.

MR. LITTLEFIELD:  That's not responsive.

Q   (By Mr. Smith) I asked you about the -- a minute ago about the -- (Interrupted)

THE COURT:  Sustained.

MR. LITTLEFIELD:  That's also cumulative. We've gone over that for the last five, ten minutes.

THE COURT:  Sustained.

MR. SMITH:  If I may look very briefly, Your Honor?

THE COURT:  You may.

Q   (By Mr. Smith) Do you know, sir, what has happened to the various rounds that we've identified here today as not being contained within their evidence envelopes?

A   I have no idea, sir..

3815

Q      Now -- and you agreed with me earlier, being accurate and having the same procedures that we follow through are very important in cases like this; is that true?  Is that true?  It's important to be accurate and be consistent and all that.  We already talked about that.

Let me move on to this area right here and this is my last area of inquiry.  That MP5, it has a three selector switch on it.  Single shot, three round burst and fully auto, is that right?

A      I do not recall specifically if it does because I know some of them -- some of the other models did not.

Q      Okay.  If there's been testimony introduced that this model did have a selector switch that would allow for a three round burst?

A      It's -- that's possible.

Q      Okay.  And what -- I believe there was a description of, there's like a device inside that moves forward and it prevents another round from cycling?  Does that -- (Interrupted)

A      Yes, that was me.  I testified to that yesterday if I remember correctly.

Q      If it's on a three round burst and you pull that trigger and you hold it till it stops, is it going to fire three rounds each time?

3816

A    If the weapon is capable of doing that, yes.

Q    So if you did that three times, on a three round burst, you would have nine shots?

A    Yes.

Q    Three times three is nine?

A    Yes.

MR. SMITH:  All right, sir.  Thank you for your time.  Pass the witness.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Generally, if you're shooting in this direction with that -- with Government Exhibit 128, can you hold your arm as to how the casings eject, in what direction?

A    To the right of the firearm.

Q    Well, can you hold it out in what kind of level -- what angle?

A    This way.

THE COURT:  You may step -- (Interrupted)

Q    (By Mr. Littlefield)  Straight out or further back?

A    Actually, it would be more to the right and slightly behind, so that -- this type right here.

Q    Okay.  And if one --

MR. LITTLEFIELD:  May I approach the model, Your Honor?

3817

THE COURT:  You may.

Q    (By Mr. Littlefield) Is this post the only item that a casing could eject off of?

A    The only one?

Q    Yes.  I mean, off -- I'm sorry.  I said eject.  Ricochet off of.

A    No.

Q    Could it -- if depending upon the position of the shooter and the position of the firearm, could it ricochet off the wall?

A    It's possible.

Q    Could it ricochet off the refrigerator?

A    Based on what you said earlier, yes, that's possible.

Q    Could it ricochet off the door facing -- the side of the door?

A    Yes, that's possible.

Q    Could it ricochet off the top of the door?

A    Yes, it's possible.

Q    If there is a roof on the porch, an underside of that porch roof, could it ricochet off of that?

A    Yes.

Q    If an item ricochets and hits one item, does that mean -- if in the ejection it, for instance, hits the post, can it then ricochet off a second item?

3818

A    If it has enough energy, yes.

Q    Could it hit, for instance, this and bounce off of that?

A    It's possible.

Q    Or the door facing and bounce off the porch?

A    Yes.

Q    Do you have any idea which way those shells would bounce once they eject?

A    Well, once they eject or once they ricochet?

Q    Once they eject and ricochet.  Do you have any idea which way they'd go?

A    No, sir.

Q    If the boards are separated on that front porch, could they hit the side of the board and bounce in an opposite direction, depending upon the angle in which they hit the board?

A    It's possible.

Q    If officers are moving around the scene to clear that cabin, is it possible that they kick casings?

A    That's possible.

Q    Would you know in which direction they would be kicked?

A    No, sir.

Q    If a body is dragged -- or a person is dragged face down by the hair through that living room in which most

3819

of the casings were located, could they be dragged out on the porch underneath that person?

A    Yes, that's possible.

Q    After they were dragged on the porch, could they be hit by officers who go into the residence to clear the residence?

A    That's possible.

Q    Do you have any idea how those casings got where they got?

A    No, sir.

Q    All you can tell the jury about the .223 casings is what?

A    That they were fired by Government Exhibit 128.

Q    In regards to the Browning .22.

A    Yes, sir.

Q    And you were asked questions about some rounds not being there now.

A    That's correct.

Q    Were the rounds there when you received it at the lab?

A    Yes, they were.

Q    Did that Browning .22 fire the shot that killed Rocky Eales?

A    No, sir.

Q    In regards to the Smith & Wesson 9 millimeter that

3820

was out in the front yard, you saw the picture of it, do you recall seeing the picture of it?

A    Yes, I did.

Q    And you said it had the safety on when you saw the picture of it out in the front yard?

A    That was correct.

Q    Did that weapon fire the shot that killed Rocky Eales?

A    No, sir.

Q    What weapon fired the shot that killed Trooper Rocky Eales?

A    The Colt H Bar Sporter that you have referred to as Government Exhibit 128.

Q    In regards to the comparison and looking at the stria, is that easily discerned from looking at it or does one need training to be able to read it?

A    You need training to be able to do it and that's why it takes two years to get to that point.

Q    Just looking at a picture, can you -- if I just look at it, am I -- without training, would I necessarily be able to ascertain that?

A    You would have no idea what you're looking at it.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Further cross?

MR. SMITH:  Thank you, Your Honor.  I would

3821

like to display Government Number 39.

THE COURT:  It's been admitted?  Is it admitted?

MR. SMITH:  I believe so, Your Honor.

THE COURT:  Yes, it is.

MR. SMITH:  I made it up here without my cheat sheet so I couldn't tell you.

RECROSS EXAMINATION

BY MR. SMITH:

Q    All right.  So we're going to display that for you. Mr. Littlefield asked you about officers being inside of a home, moving in, moving out, dragging somebody in or out?

A    Okay.  Yes, he did.

Q    I want you look at this and I want to represent to you as it's the interior diagram of the Barrett home.

A    Yes, sir.

Q    And these items that are depicted in green are the casings that you identified as belonging to the -- to P-1?

A    Yes, sir.

Q    Now, looking at these -- (Interrupted)

MR. LITTLEFIELD:  Well, and I object.  That assumes facts not in evidence because 14 was not identified as a casing from the .223.

3822

MR. SMITH:  And I'll correct that.  I'll come back to that, Your Honor.  You're exactly right.

Q   (By Mr. Smith) Fourteen is a projectile on a shelf that you've previously identified as being a .45.  No, that's not right.

MR. LITTLEFIELD:  I object to that, Your Honor.

Q   (By Mr. Smith) Fourteen is a .223 live round, okay?

A   Well, I don't know.  I don't have those numbers in front of me.

MR. LITTLEFIELD:  I accept that representation.

THE COURT:  Okay.

THE WITNESS:  Okay.

MR. SMITH:  If I can get my report, Judge, I can be more accurate.

Q   (By Mr. Smith) What I have done to Defendant's Exhibit is color those in green that depict casings.  And then number 14 is the live cartridge, okay?  Now, incidentally, sir, that cartridge, number 14?

A   Yes, sir.

Q   Which was identified as F-30 in your report.

A   Okay.

Q   Was not analyzed, was it?

A   F-30.

MR. LITTLEFIELD:  Objection.  Beyond the scope of redirect.

3823

THE COURT:  Sustained.

Q    (By Mr. Smith) Now, these other items that are depicted in here in green are the casings.

A    Yes.

Q    Okay.  For those casings to be in this area within the house.

A    Okay.

Q    You would expect -- and they came from that Colt Sporter, you would expect the shooter to be within that house, wouldn't you -- inside of the house?

A    That's the most likely conclusion.

Q    Okay.  And they can bounce around and that's why you might have one on the couch, number 18.  It gets caught over there on the furniture.  Three, four, five, six and seven could directly eject there or they could bounce around and that's where they wind up.  But when you look at the majority of these casings, they give you an idea of where that gun would be shot from, don't they?

A    Yes.  It gives you an idea of where the person could have been standing, yes.

Q    And wouldn't that be right in this area?

A    You're pointing -- (Interrupted)

Q    Or you point for me where you think the most likely area would be.

A    Well, based on what I have seen with the gun, I

3824

would expect the person to be in like this area here. But that would not account for that one or -- (Interrupted)

Q    Yeah.

A    Okay.

Q    Yeah.  Because we're -- (Interrupted)

A    Or these here.  I'd expect these -- these right here is what I would be expecting if a person's in this area here.  But when you get like that one and this one and that one -- (Interrupted)

Q    A little more difficult with those?

A    That's correct.

Q    But the majority of the casings -- and that's what you've identified would be just above number two, right? Correct, sir?

A    And, sir, and these here -- that would indicate if that's where they hit and stayed, but if they -- they could have -- if they ricocheted and then landed there, well, what I just said may be flawed.

Q    I understand that.  And I take that with a full understanding of what you mean, okay?

A    Okay, sir.

Q    Now, I guess this is an awful lot like going to the mechanic when my car is broke.  He's a lot more trained in auto repair than I am and he might explain to me this

3825

is what's broke and this is how you fix it and I might not understand what he's telling me. But I might understand if he gets me underneath the hood and says this right here is what we need to do and here's what's wrong with it and here's how I'm going to fix it. Okay.

A     Okay.

Q     In other words, my point being, sir, you're right. I might look at that casing and not be able to figure out what's a stria or what's not or what's relevant or what's not. But don't you think, just like your mentor did for you, whenever he had you in the lab, that had there been comparison pictures taken, that you could demonstrate for the jury see this mark right here, see this mark right here. That's what I positively identify as belonging to projectile F-41 that correlates to P-1?

A     Your -- your supposition is very, I would say valid, but I'd say one thing to that. We have done that in the past where -- when I was in training, we actually brought in some jurors from court in Miami and had them look at something that the firearms examiner said was a match, but was not. And every last one of them agreed. You know why? Because we said so. Let me finish. We then turned it to the position where it was actually a match and they're like, wow. So basically what I'm saying to you is this: It's not fair to the jury who's not had the

3826

training, education and 13 years in this field to make a determination on something -- and that microscopic markings.  It's not fair to them.

Q    It's not fair to ask them to make that determination.  But wouldn't it be very descriptive and very important and very relevant for them to see a comparison that you could demonstrate that says this is how I match this projectile to this weapon?

A    I have produced photographs in court before.

Q    The corollary, sir, to that is this.  No, sir.  I get to ask the questions.  The corollary to that is this. If you don't bring that material in here to demonstrate for the jury, then we can't see it, can we?

A    We can what?

Q    Can't see it.  If it's not here we can't see it, correct?

A    That's not correct, sir.  It is not our policy -- (Interrupted)

Q    How are we -- (Interrupted)

A    It is not our -- can I finish?

Q    No.  How we going to see it if it's not here?

A    Well, one, we don't produce photographs for court. At this point in time at OSBI we produce photographs, but it's for our case record.  Never for the courts.

Q    That's not my point, sir.  What I'm saying is if

3827

it's not here for us to look at, there's no way we could ever see it, could we?

A    Actually, there is a way you can see it.

Q    If it's not here, how we going to see it?

A    Well, as I've said before, in many trials I've testified in, the judge, jury and yourself, I still have -- the evidence is still here. I still have the tests that I fired in '99 and if you want to, I can -- you can come to the forensic lab where I do my work. I can put that evidence on there and show you. Or you can take the evidence and you can -- and the gun and you can send it to another trained and competent examiner, let him look at it and make a determination.

Q    That's right.

A    I do not work in a vacuum. My work has been under scrutiny and can be scrutinized, it can be looked at by somebody else. So I issue that to you. If you want it done, by all means I have no problem with it. Because I'm pretty certain that if another trained competent examiner looks at the gun and the evidence that I looked at, he's going to give you the same conclusions.

Q    My point very simply, sir, is this: If it is not here, there's no way we can look at it, can we?

A    Okay. I will accede that to you.

Q    Yes.

3828

A    I accede that to you.  Yes.  There is no way you can look at.  But if you want to, you can.

Q    Yes or no, sir.  If it's not here, there's no way we can look at it?

A    Actually, there is a way and I said it already.  There is a way you can look at it if you want to.

Q    I understand.  You're going to argue with me.  But it's not here, is it?

MR. LITTLEFIELD:  I'm going to object.  That's argumentative.

THE COURT:  Sustained.

FURTHER REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Do you know if the defense requested this item?

MR. SMITH:  Your Honor, I'm going to object to that.

THE COURT:  Sustained.

Q    (By Mr. Littlefield) Had there been a defense request, would you have produced it?

MR. SMITH:  Your Honor, same objection.

THE COURT:  Sustained.

MR. LITTLEFIELD:  May I approach, Judge?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

3829

MR. LITTLEFIELD: They asked to see this shield, the fragment, we showed it to them. Had they asked to have it tested, we'd have made it available to have it tested. And -- (Interrupted)

THE COURT: I think you've made that pretty clear.

MR. LITTLEFIELD: We did make it available.

THE COURT: I said I think he made it clear. I think the witness made it pretty clear.

MR. LITTLEFIELD: Okay.

THE COURT: And I think it cumulative and move on.

MR. LITTLEFIELD: I understand.

(Whereupon, the following record was made in open court within the hearing of the jury.)

MR. LITTLEFIELD: Pass the witness.

MR. SMITH: I have nothing further, Judge.

THE COURT: May this witness be excused?

MR. LITTLEFIELD: Yes, Your Honor.

THE COURT: Sir, thank you for your testimony. You may step down. You may be excused.

THE WITNESS: Thank you.

THE COURT: You may call your next witness.

MR. LITTLEFIELD: Government rests, Your Honor.

THE COURT: Let me see counsel up here.

3830

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  I'll give the defense any chance to make any motions you want to make.  Not now.  I mean, I think I'm going to release this jury.  You can either make them Monday morning or if you want to do it tomorrow or if you want to do it this evening.

MR. HILFIGER:  I don't want to do it tomorrow. Judge, nothing against you, but I've been up here a whole lot of times.

THE COURT:  Well, I didn't think you'd take me up on that.  I just didn't want you to think I was putting you off.

MR. LITTLEFIELD:  How long do you anticipate making the Rule 29 motion?

MR. HILFIGER:  I'm not going to do a lengthy motion on it.  I'm just going to make just a general motion.

THE COURT:  I think just do it Monday morning.

MR. HILFIGER:  I think we could do that, yes.

THE COURT:  Everybody agree to that?

MR. LITTLEFIELD:  Yes.

THE COURT:  Monday morning, nine o'clock.  And then we'll recess for tomorrow, give the defense an opportunity to get organized.

3831

MR. HILFIGER:  Yes.

THE COURT:  And you -- I won't hold you to this, you think two days is what you're thinking about?

MR. HILFIGER:  Yes.

THE COURT:  Okay.  Well, I'll release the jury until nine o'clock on Monday.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, you have heard Government announce that they have rested.  We're going to be in recess tomorrow and the defense will start on Monday morning.  I'll ask you to be back at 9:15 on Monday and tomorrow's Friday.  If you're perhaps as fatigued as I am, I'll say it again, tomorrow we are not going to be here.  And you have Friday off is another way of putting it.  And we'll give you three days to heal up and we'll start again on Monday morning at 9:15.

If everybody in the courtroom will please remain seated as the jury leaves the courtroom.  Wait just -- since this is a long -- remember to not discuss it among yourselves, allow anyone else to discuss it. Avoid any news coverage, if there is any on the radio, television or newspaper and I'll see you on Monday morning.

(Whereupon, the jury departed the courtroom

3832

after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  As I understand it, defense has reserved their Rule 29 motion until Monday?

MR. HILFIGER:  If we may, Your Honor.

THE COURT:  And I'll -- we'll do that at 8:45 on Monday.  I asked the jury to be here at 9:15 so that will give us perhaps 30 minutes to take care of it.  Anything else out the hearing of the jury we need to take up?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Anything for the defense?

MR. HILFIGER:  No, Your Honor.

THE COURT:  I'm going to hand -- Paula, anything that we need to clean up from the clerk's point of view?

THE CLERK:  No, sir.

THE COURT:  I'm going to give you this court copy.  I think this is also a copy of Government Exhibit 290.  My clerk's brought to my attention the motion to suppress that was filed did not -- does not have a transcript of the proceeding.  And I don't -- I think for the record there should be one.

MR. HILFIGER:  Excuse me.  Are you talking about the transcript of the -- (Interrupted)

3833

THE COURT:  Of the motion to suppress hearing --  yes, yes.

MR. HILFIGER:  Okay.  No.  There is not a transcript at this moment.

THE COURT:  There needs to be one filed.

MR. LITTLEFIELD:  We'll have to order one.

THE COURT:  Yes.

(Whereupon, the Proceedings were continued to October 31st, 2005.)

3834

C E R T I F I C A T E

STATE OF OKLAHOMA   )
                    ) SS.
COUNTY OF TULSA     )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on October 27, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 3554 through 3833.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20ᵗʰ day of May, 2006.

_____
GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

49

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
-vs-                         )   No. CR-04-115-P
                             )
KENNETH EUGENE BARRETT,      )
                             )
            Defendant.       )

VOLUME 17 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on October 31, 2005.


A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law


**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 3836-4070

3774

3836

W I T N E S S E S

PAGE

DR. MIKE CALLERY
Direct Examination by Mr. Hilfiger . . . . . . . 3846
Cross Examination by Mr. Sperling . . . . . . . 3855

CLOYCE VAN CHONEY
Direct Examination by Mr. Hilfiger . . . . . . . 3879
Cross Examination by Mr. Littlefield . . . . . . 3921
Redirect Examination by Mr. Hilfiger . . . . . . 3972
Recross Examination by Mr. Littlefield . . . . . 3978

KENNETH WILSON
Direct Examination by Mr. Hilfiger . . . . . . . 3980

JIM McBRIDE
Direct Examination by Mr. Hilfiger . . . . . . . 3987
Cross Examination by Mr. Littlefield . . . . . . 4015
Redirect Examination by Mr. Hilfiger . . . . . . 4033

VIN W. ROSSER
Direct Examination by Mr. Hilfiger . . . . . . . 4042
Cross Examination by Mr. Littlefield . . . . . . 4063
Redirect Examination by Mr. Hilfiger . . . . . . 4066
Recross Examination by Mr. Littlefield . . . . . 4066


E X H I B I T S

OFFERED   REC'D

Government's Exhibit Nos. 292 thru 295 .   3860      3860

Defendant's Exhibit No. 19 . . . . . . . .   3847      3848
Defendant's Exhibit No. 107  . . . . . .   4037      4037


P R O C E E D I N G S

THE COURT:  Let the record reflect that counsel for the Government is present, Defendant is present with counsel.  My notes reflect we were going to take up the issue of the Rule 29 motion.  I'll hear the Defendant.

MR. HILFIGER: Your Honor, just a brief motion, Rule 29 motion, at this time at the close of Government's evidence. And we would move for the Court to grant us a judgment of acquittal to Kenny Barrett as to the charges as charged for the reason that as to Counts One and Two, the evidence is clear on Counts One and Two that the homicide that occurred in this case was not a premeditated malice aforethought intentional homicide that would come under the murder statute but was -- the homicide, if any criminal problem with the homicide, it would be a manslaughter first degree. And we would ask that the Court grant Kenny Barrett a judgment of acquittal as to the charge of murder in the first degree as to the Counts One and Two in that they are calling for murder in the first degree.

And as to Count Three, we ask for a judgment of acquittal on Count Three for the reason that one of the points in that Count is that it's the intentional killing of a law enforcement officer and which implies the necessity that somehow that person has to be identified as a law enforcement officer to sufficient basis for the Defendant to recognize that he's a law enforcement officer. And the testimony is clear that that first vehicle in there, Mr. Hamilton's vehicle, did not -- was not identified as a law enforcement officer, that Eales

3838

did not identify himself as a law enforcement officer. In fact, there was no identity prior to the shooting that anybody in that car was law enforcement officer. We'd ask for a judgment of acquittal on Count Three for that basis.

THE COURT: For the Government.

MR. SPERLING: Number one, premeditation, as the Court well knows, can be formed instantaneously but the Government has gone well beyond that in this case. The Government has presented evidence of Mr. Barrett's clear expectation of the arrival of law enforcement and his announcement of intent to not one but several individuals.

Secondly, the circumstances show the continuing fire as that vehicle approached and that Mr. Barrett when, within a distance of -- and this would be based upon the testimony of Mr. Thomas as well as the positioning of the Bronco -- that when Mr. Barrett fired the fatal shots, he used a rifle with a lethal range of some five and a half football fields in length to intentionally inflict that -- those shots upon Mr. Eales' person who was 15 -- maximum 15 feet, 20 feet away.

I don't think there could be any question that it was intentional and premeditated. It was planned and an ongoing -- even if it was formed at the instant the

3839

officers entered the property, there can be no question about that from the evidence.  Certainly there's sufficient evidence to go to the jury on the question and allow them to make that determination.

As to the Count Three, Mr. Hilfiger argues without authority that it is implied that the individual must know that there is a law enforcement officer.  I cannot cite the case off the top of my head, Your Honor, but I know that this statute has been utilized in situations and circumstances where officers were undercover and would not have been known to be law enforcement officers by the individual who conduct -- or who did the homicide, but that's sufficient.  If all that is required in the statute is that the individual was a law enforcement officer and there's no implication in the statute that the Defendant must know.  It's not an element of the crime.

Secondly, however, I don't think from the evidence there can be any question that Mr. Barrett knew when he fired those shots at Mr. Eales that he was a law enforcement officer.  That same vehicle drove by that residence between five and six o'clock p.m. on the evening of September the 23rd. Mr. Barrett announced that he believed that was a law enforcement vehicle, that he expected it to return.  And he announced his intention

3840

that DGF all hell is going to break loose.

When that vehicle entered the property, and Your Honor has seen the configuration, Your Honor's seen the lights washing across the yard, Your Honor has heard the testimony of the officers that as the Bronco approached, the dust from the glass and the smoke glittering in the air was showing the flashing lights. You heard the testimony of Mr. Manion, who Mr. Sperling read because of his untimely death, that as Mr. Eales was exiting the Bronco, the lights were just washing across, reflecting on the dust, the smoke, the Bronco and the person of Mr. Eales as Mr. Barrett was firing the fatal shots. There can be no question that those individuals were law enforcement officers and for one to have one's eyes open and aim and fire the shot, one had to see the lights. And certainly there's sufficient evidence for this jury to make that determination as to whether or not he knew, even though it is not an element of a crime. I think the Rule 29 motion should be denied as to all of its aspects.

THE COURT: Mr. Hilfiger, anything?

MR. HILFIGER: Nothing further, Your Honor.

THE COURT: In regard to the Defendant's motion for judgment of acquittal pursuant to Rule 29, the Court notes in considering the motion for judgment of

3841

acquittal, the Court views the evidence in the light most favorable to the Government. The judgment of acquittal is proper only if the evidence and all the inferences to be drawn from it is insufficient to permit a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. The evidence must be substantial and not raise a mere suspicion of guilt. In this matter, I find the motion should be overruled. Is the defense ready to proceed?

MR. HILFIGER: Yes, Your Honor.

THE COURT: Anything else before we bring the jury in that should be brought to the attention of the Court?

MR. HILFIGER: The only thing, Mr. Littlefield and I did come down and took some pictures of the model as the Court suggested. After I got back, there's one more major picture that I forgot about. I'm going to do that today and I'm get --

THE COURT: Those are the ones that we were going to make Court exhibits for the record?

MR. HILFIGER: Yes. In addition, we have all of them and have Mr. Littlefield approve all of them.

THE COURT: That's fine. I have no problem with that. Let me see Mr. Smith and Mr. Littlefield at the bench for just a moment.

3842

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  Mr. Smith, in regard to your nephew's accident.

MR. SMITH:  No, I haven't told him anything about it, Judge.

THE COURT:  His nephew was killed in a motorcycle accident this weekend.

MR. LITTLEFIELD:  I'm sorry.

THE COURT:  We had some discussions yesterday and it was a possibility that we only go this morning but I'll leave that decision up to Bret.  He called me back yesterday afternoon and told me that he could proceed and he and Roger had talked.  I told him I'd talked to him this morning before we started to see if he was still in that same frame of mind.  And another issue, I know it's a private matter with you and I didn't really want to necessarily broadcast it to the public, and as a technical matter I have a little bit of concern and wanted the record to be clear that Mr. Barrett knows that the Court is willing to continue this if you feel uncomfortable.  And I'm not sure how to approach that without mentioning it here in this public forum.

MR. SMITH:  Judge, I think the record ought to be clear.  I will tell the Court that Mr. Hilfiger

3843

advised Mr. Barrett yesterday of my situation.  I visited with him this morning and told him that I thought the Court was willing to do anything that was necessary in terms of a continuance and that I thought it was best to proceed as long as, you know, I was able to.  At this point, I think I am.  If I felt otherwise, that I'd notify the Court and I felt you might give us some time.

But that just so the record is clear, I think for my family reasons, things going to accelerate the closer we get to the end of the week as opposed to right now.  And it appears from my standpoint, we'll probably have this case submitted by Wednesday and would probably be -- that's what I would rather do.  I told Mr. Barrett that.  He understands, he hasn't indicated any objection to it but I certainly don't have any problem with the Court addressing.  I told him that the Court may very well ask him about our conversation and about if he agrees with us continuing.  So I don't have any problem with the Court asking him.

THE COURT:  I just wanted to be sure.

MR. LITTLEFIELD:  It's more a matter of what's in your head than what's in his head, of course, he obviously has to understand it.  But you're up to it, and that's -- you're the one that's got to make that call.

MR. SMITH:  What I don't want him to do is lay

3844

behind the log.

MR. LITTLEFIELD:  I understand.

THE COURT:  We've all been here before so I just want you to know that I'm not -- it's not Bret, it's not Barrett, it's just a technical issue.  Mr. Barrett has a right to speak and that's why I wanted to address him, unless you have some concern about it, unless you don't feel like you can deal with it.

MR. HILFIGER:  That's -- I don't have no problems, Judge.

MR. LITTLEFIELD:  My sympathies.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  At the bench, I was discussing with -- Mr. Smith had a tragedy take place in his family this weekend.  His nephew who he is very close to was killed in a motorcycle accident.  I wanted the Government to know I had discussions with Mr. Smith over the weekend as to whether or not we should proceed with this trial today and I wanted him to talk with his client, Mr. Barrett, to be sure he understood the Court's position if -- and it's ultimately a decision Mr. Smith has to make -- as to whether he could proceed.

And I wanted Mr. Smith to know and I wanted the Government to know if Mr. Smith wants to continue this

3845

case because of his situation, the Court was more than willing to do that and clearly understands what could be involved in the emotions of this situation.  And Mr. Smith, after contemplating it and as I understand it talking with Mr. Barrett, has chosen to proceed; is that correct?

MR. SMITH:  That is correct, Your Honor.

THE COURT:  I'll ask then that the jury be brought in.

(Whereupon, the jury entered the courtroom and was seated in the box after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box.  Good morning.  Counsel for the Government is present, Defendant is present with counsel.  As you recall, members the jury, the Government announced that they had rested their case last Thursday and now the defense has an opportunity to present their case.  The defense may call your first witness.

MR. HILFIGER:  Call Dr. Callery.

DR. MIKE CALLERY, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

3846

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    Sir, would you state your name for the record.

A    I'm Dr. Mike Callery.

Q    And, Dr. Callery, you are a physician in Sallisaw; is that right?

A    Yes, sir.

Q    And how long have you been there?

A    I've been there now 16 years.

Q    And you practice out of a hospital there in Sallisaw?

A    I have an office there, sir.

Q    An office?

A    And I practice out of the hospital also.

Q    Is that Sequoyah Memorial Hospital?

A    Yes, sir.

Q    And where did you go to school, sir?

A    Oklahoma State University College of Osteopathic Medicine in Tulsa.

Q    And did you do any kind of studies -- are you a general practitioner or did you go into any particular area?

A    I'm in family practice, yes, sir.

Q    Were you practicing in Sallisaw on September 24, 1999?

3847

A    Yes.

Q    And do you recall an emergency -- were you in the emergency room at that time or where were you?

A    Yes.

Q    In the emergency room there in Sallisaw?

A    Yes.

Q    Did you have an occasion to see a patient at that hospital identified to you as Kenneth Barrett?

A    Yes, sir.

Q    Did you bring any records on that?

A    I have a few records here, yes, sir.

Q    Let me have you look at Defendant's Exhibit No. 19. It has not been introduced yet.  Have you seen that before, sir?

A    Yes, sir.

Q    And what is that?

A    That's the emergency room record from the hospital.

Q    Is that involving Kenny Barrett?

A    Yes, sir.

Q    Is that the record that you made?

A    That's correct.

        MR. HILFIGER:  Your Honor, I move to introduce Defendant's No. 19.

        THE COURT:  Any objection?

        MR. SPERLING:  None, Your Honor.

3848

THE COURT:  Admitted without objection.

Q    (By Mr. Hilfiger)  As to that particular exhibit --

MR. HILFIGER:  May we display that to the jury, please?

THE COURT:  You may.

Q    (By Mr. Hilfiger)  Do you know how -- this is your report.  Do you know how Mr. Barrett was received at the hospital there in Sallisaw?  Did he come in on his own or emergency vehicle?

A    He came in emergency vehicle as far as I know, sir.

Q    Is there anything on the record that reflects how he came in on this record?

A    It says Muldrow ambulance.

Q    Okay.  Do you know about what time he came in?

A    Record indicates 1:55 a.m., sir.

Q    And that would be on September 24th?

A    Yes, sir.

Q    And now, you've seen a lot of people down there at Sallisaw, I mean while you've been there at Sallisaw.  Do you have any independent recollection of treating Kenneth Barrett on that night or are most of your recollections based on the record itself?

A    Be based on the records, sir.

Q    Well, then let's go through that record.  What kind of injuries were you treating him for?

3849

A    Gunshot wounds.

Q    Were you able to identify the number of wounds?

A    Well, I can only go by what this form says, sir.

Q    Okay.  What on that record indicates the number of wounds?

A    Well, it looks like from my diagram there that are several wounds.  There is one wound in the upper leg on the right.  There's a wound just above the knee on the right.  There's a wound just above the knee on the left.

Q    Are you saying left leg or left --

A    Left leg, yes, sir.

Q    Now, are you able to make any determination on whether the wounds that you treated are the exit wounds or entry wounds or do you have that kind of expertise?

A    I do not.

Q    Were you able to determine -- you know, from your record, can you tell whether or not any of those -- the wounds were lateral wounds on the sides or on the front or in the back?

A    It looks like they're in the front, sir.

        MR. HILFIGER:  Your Honor, I forgot and left my laser pointer.

        THE COURT:  You may.

Q    (By Mr. Hilfiger)  Dr. Callery, when you're referring, did you make -- this is a standard drawing

3850

that comes on the report, isn't it?

A     That's correct.

Q     And this is showing the frontal position of the person, the one on the right?

A     That's correct.

Q     And these dots right here around in this area, are those the ones that you're describing as wounds?

A     Yes.

Q     I see this is supposed to be the back of the person, is that right?

A     On the left.

Q     On the left, right.  You don't show any kind of wounds in the posterior of the person, in the back of the person?

A     I don't see anything there, sir.

Q     Everything you've drawn shows right here?

A     Yes.

Q     Is that right?

A     Yes.

Q     I want to have you look at Defendant's Exhibit No. 219 and that's already been introduced into evidence and that's a report by Dr. Wood.  Are you familiar with Dr. Wood?

A     Yes, sir.

Q     Does he practice there in Sallisaw also?

3851

A    Yes, sir.

Q    And this report reflects a date of September 27th, '99?

A    Yes.

Q    And that would have been a couple days after you treated Kenneth Barrett, right?

A    That's correct.

Q    Looking at his diagram or his drawing here of the wounds and your drawing of the wounds in Defendant's Exhibit No. 1, are those two fairly consistent with each other, you think?

A    Well, obviously the wounds are in the same place.

Q    I'm -- same area and stuff like that?

A    Yes.

Q    Did you make any determination on these -- and going back to Defendant's Exhibit No. 19, please.  Did you make any determination whether there were any -- whether there was anything left in the leg, like any bullets that were in the leg?

A    There were some plain x-rays done which showed some bullets present.

Q    There was -- do you recall anything on where those bullets were?

A    Is it okay to look?

Q    Yes, please look at your records.

A    There's an x-ray report from the hospital, it's dated 9-24-99, shows views of the right femur.  And there's a bullet present in the soft tissues lateral to the neck of the right femur, that means that's up near the groin area.

Q    Well, I hate to keep jumping back and forth, but let's jump back to Number 219 because it's got a little bit bigger picture.  Would that be where you're talking about a bullet in the upper groin, right femur; would that be someplace up in this area?

A    That's correct.

Q    So there's a bullet lodged -- or was in that area according to the x-ray?

A    That's right.

Q    And now, was there any other bullet left?

A    View of the left femur showed a large caliber bullet overlying the distal femoral shaft, that would be the -- down near the knee.

Q    Would that be the left?

A    That's correct.

Q    So it would be in this -- it would be representative by those, somewhere in that neighborhood?

A    That's correct.

Q    Do the x-rays reflect that there's any other bullets?

3853

A    No, sir.

Q    Would the location of where these wounds are -- if you know, the location of where these wounds are indicate that the projectiles were -- came to him from his anterior right side?

A    I don't know, sir.

Q    You can't tell that?

A    No, sir.

Q    There were no wounds in his back and there were no wounds on his left side, is that right, as far as bullet wounds?

A    There's wounds there in the left knee that we discussed.

Q    But the ones in the left knee were sort of anterior and posterior -- I'm sorry, anterior and lateral on the left knee, right?

A    Yes, front and lateral.

Q    Now, what time do you indicate that you -- there's a time up here of 15:55.  Is that a time that indicates when he came in or when you were treating him, this time right here?

A    That's Dr. Wood's record.

Q    I'm sorry.  That's Dr. Wood's record.  I apologize.  I'm going to go back to yours.  This 1:55?

A    Yes, that's time of arrival.

3854

Q    Is that the time of his arrival there at the hospital?

A    Yes.

Q    Are you aware of other treatment that you did to other people that night, if you can recall, that you understood came out of this same incident?

A    Yes.

Q    Do you have the records on those people with you?

A    I have a record here on John Hamilton.

Q    What time does that record show that he was treated?

A    0:55.

Q    0:55 would be an hour before Kenny Barrett, is that right?

A    That's correct.

Q    Anybody else?

A    Don't have any other records.  Obviously I treated -- the other patient that was treated was Mr. Eales.

Q    Did you treat Mr. Eales?

A    Yes, I did.

Q    But you don't have any record of his -- (Interrupted)

A    No, sir.

Q    When he came in or anything?

A    I don't.

Q    Do you know -- as far as Mr. Barrett, what treatment

3855

did you do to Mr. Barrett there at Sallisaw Sequoyah Memorial?

A    The record indicates he was given tetanus which is, of course, prophylaxis to prevent tetanus.  He was given IV antibiotics which is the Ancef and the wounds were dressed and he was transferred to Saint Francis Hospital in Tulsa.

Q    Do you know how long he was there in your hospital before his transfer took place?

A    Transfer time, according to the records, 3:20 a.m., sir.

THE COURT:  Doctor, if you would lean into that microphone to speak.  The court reporter is having a little trouble hearing you.

THE WITNESS:  Sorry.

MR. SPERLING:  May I have just a moment, Your Honor?

MR. HILFIGER:  I have no further questions.

THE COURT:  Cross examination.

CROSS EXAMINATION

BY MR. SPERLING:

Q    Good morning, Dr. Callery.  Thank you for joining us this morning.

MR. SPERLING:  First, may I ask Your Honor that the witness be handed Government's Exhibits No. 292, 293,

3856

294, and 295, please.

THE COURT:  You may.

Q   (By Mr. Sperling)  As that is being done, doctor, you have, I believe to your right, you've brought a record with you, did you not?

A   Yes.

Q   Is that the collection of your official records, the records that you keep and maintain in the ordinary course of business with regard to this matter?

A   This is a copy of the emergency room record.

Q   How did you obtain that copy?

A   It was sent to me.

Q   Who sent it to you, sir?

A   This district attorney's office here.

Q   And are those copies, sir, accurate with regard to the official record concerning your treatment of the Defendant Barrett and the other person, John Hamilton, and Mr. Eales?

A   As far as I know.

Q   Do you have any reason to believe that they are inaccurate?

A   No, sir.

Q   You've also had an opportunity to examine them and to review them, have you not, sir?

A   I have.

3857

Q    You indicated that you saw other patients to include John Hamilton and Mr. Eales, correct?

A    Yes, sir.

Q    Do you have an independent recollection, sir, that Mr. Eales was deceased when he was brought to the hospital?

A    He was.

Q    Do you have, sir, duties with regard to Sequoyah County vis-a-vis the medical examiner's office?

A    Yes, sir.

Q    What are those duties, sir?

A    I'm just one of the county medical examiners.

Q    There are a number of doctors in Sequoyah County that serve as medical examiners for Sequoyah County, correct?

A    That's correct.

Q    What are your duties as a medical examiner for Sequoyah County?

A    Well, medical examiner system is such that if there's a death such as this, that we contact the chief medical examiner office out of Tulsa.

Q    Do you make preliminary findings or preliminary determinations?

A    Preliminary.

Q    You also sign off on the final report?

3858

A    Sometimes I do, sometimes the medical examiner -- the chief medical examiner in Tulsa does that.

Q    Do you recall whether or not you've had occasion to review the autopsy report in this case?

A    I probably did, but it's been a long time ago.

Q    Would have been a number of years ago?

A    That's correct.

Q    As a doctor in Sequoyah County, sir, do you see many patients on a daily basis?

A    Yes.

Q    Do you have any way of estimating for us -- and I know you may not keep a precise counter with regard to the number of patients that you see on a daily basis. But do you have any sense as to the number of patients that you saw on a daily basis back in 1999?

A    It's going to be the same as it is now.  It's going to be 25 to 30 patients a day.

Q    One of the reasons, doctor, you maintain written records of items of care that you give is because you care for lots of people, correct?

A    That's correct.

Q    It would be unfair for us to suggest that you should have an independent and detailed recollection of a patient that you may have treated years ago?

A    Yes, sir.

Q    Government's Exhibits Nos. 292, 293, 294, and 295, they have been -- actually, you have been given a notebook with each of those items.  Would you first examine Government's Exhibit No. 292?

A    Yes, sir.

Q    Do you recognize what that is, sir?

A    Yes.

Q    What is that?

A    It's a CME1 form for the medical examiner system.

Q    Is this a cover sheet concerning which your name appears with regard to the decedent, David Eales?

A    Yes.

Q    All right.  Government's Exhibit 293, would you examine that, sir?

A    Yes.

Q    Do you recognize that, sir?

A    Yes, sir.

Q    Does that appear to be an accurate photocopy of your encounter record, that is the record of treatment with regard to John Hamilton?

A    Yes.

Q    Government's Exhibit No. 294, examine that, please, sir.  Does that also appear, doctor, to be a correct copy, an accurate copy, of your encounter record with regard to Kenneth Barrett?

3860

A    Yes.

Q    And Government's Exhibit 295, examine that, please, sir.

A    Yes.

Q    Do you recognize what that is, sir?

A    X-ray report.

Q    Is that the imagining report, the x-ray report, with regard to Kenneth Eugene Barrett to which you made certain reference in your testimony in answer to questions by Mr. Hilfiger?

A    Yes, sir.

         MR. SPERLING:  Your Honor, I move the admission of Government's Exhibits 292 through and including 295.

         MR. HILFIGER:  No objection.

         THE COURT:  Admitted without objection.

Q    (By Mr. Sperling)  First, doctor, with regard to Government's Exhibit No. 295, if it may be displayed, please.  292 first.  This item, doctor, is going to be displayed up here to your right, my left, and it's also displayed in the monitor over there.  Just for purposes of explanation to the jury, your name here appears under the box that says examiner notified and that is your name, is it not, sir?

A    Yes, sir.

Q    It indicates that you were notified on 9-24-99 at

3861

02:07. What does that time indicate?

A   That's probably going to indicate the time that I called the medical examiner's office in Tulsa.

Q   That doesn't indicate the time of death, does it, sir?

A   No.

Q   That's a notification time that is -- that's when you notified the office of the chief medical examiner in Tulsa?

A   Yes, sir.

Q   All right, sir. Underneath that, underneath the item where it says injured or became ill at and it says five miles northwest of Sallisaw off Dwight Mission Road, are you familiar with an area known as McKee?

A   A little bit.

Q   Okay. And given your familiarity though with Sequoyah County, is that an accurate description of what you were told as to the place where the decedent Rocky Eales became injured?

A   Yes, it's as accurate as can be expected.

Q   Then it says location of death is Sequoyah Memorial Hospital. And to the right of that it indicates 9-24-99, and then here it says 01:40. You are not representing, doctor, that that is the actual time of death, but instead that reflects the time that you call the death,

3862

doesn't it?

A   I'm assuming that's the time that the resuscitation process was stopped.

Q   Resuscitation may continue long after a person has died, correct?

A   Yes.

Q   And in fact, sometimes, albeit futile, resuscitation efforts continue when there is no heart beat?

A   That's correct.

Q   When there is no brain activity?

A   You wouldn't know if there was brain activity. You're just trying to get the heart started.

Q   Certainly.  Now, let's look if we could, doctor, at Government's Exhibit No. 293.  First, would you assist us, when it pops up, in deciphering the written information that is on this encounter record.  First, it indicates 9-24-99 00:55, that's the time at which you first saw John Hamilton, correct?

A   It's going to be the time of arrival, yes, sir.

Q   Do you remember that John Hamilton was a highway patrolman?

A   Yes.

Q   Do you also recall, sir, that he was dressed in certain official clothing or do you have an independent recollection of that?

3863

A    It seems like he was dressed in some sort of clothing, but I don't remember what he had on.

Q    Whether that may have been some sort of tactical team clothing or a uniform, do you remember at this date?

A    It seems like he was dressed in some particular way, but I don't remember.

Q    Then there is a date of birth and a mailing address. Would those be the dates of the birth, the age, the mailing address for John Hamilton?

A    Yes, sir.

Q    All right.  There is an indication then on the left side, there's a private physician.  Would that be Mr. Hamilton's personal and private physician?

A    Yes, sir.

Q    All right.  And then the ED physician, that was your name, correct, Callery?

A    That's correct.

Q    There is a patient number.  Are those numbers chronologically listed in Sequoyah Memorial Hospital?

A    I don't understand.

Q    There's a patient number that is just to the right of the name Callery, it says 46869.

A    Those are probably insurance numbers.

Q    All right, sir.  And the admit number, is that a patient admittance number?

3864

A    That's probably, yes, sir.

Q    Okay.  Under the comments section, would you translate this section for the jury, please.  What does that say?

A    It says it's a GSW which is gunshot wound to left shoulder, left cheek, left upper eyelid, left upper arm.

Q    Did you make a specific determination as to the number of fragments that struck Mr. Hamilton?

A    No, sir.

Q    And in fairness, you're not able to tell us exactly how many projectiles may have split· or what may have occasioned, other than the gunshot wounds, correct?

A    That's correct.

Q    There is also an indication to the right, it says IV per Life Flight.  What is that?  That's to the right under TX or RX response.

A    That indicates that the IV access was started through the Life Flight people, personnel.

Q    Here where it indicates general condition, doctor, what does that read?

A    Alert -- do you want me to read it all?

Q    If you would, please.

A    It says, alert, HRR means heart rate is regular, lungs are clear, multiple wounds.

Q    Most?

3865

A   Most appear small and are scattered across left upper arm.  Larger wounds, top of left shoulder, left lateral inferior orbit cheek area, bruised evident medial upper lid.  SCH stands for subconjunctival hemorrhage evident medially on the left eye.  No hyphema.

Q   When it says SCH evident, what does that mean?

A   That's where you see blood in the white part of the eye.

Q   When you refer to the shoulder, does that include both the front part of the shoulder as well as the back part of the shoulder?

A   I can't say.

Q   Do you have an independent recollection as to whether Mr. Hamilton received injuries both to the front and rear of his shoulder?

A   I don't know, sir.

Q   When you say plan, what's that?

A   OHP personnel request the patient be transported to Saint Francis.  Life Flight was here for another patient who expired.  They transferred patient via helicopter to Saint Francis.  Diagnosis, multiple gunshot wounds.

Q   Then with regard to Government's Exhibit No. 294, do you see that there, sir?

A   Yes, sir.

Q   This is with regard to the patient Kenneth Barrett,

correct?

A    That's correct.

Q    Do you see him here in the courtroom today?

A    Yes, sir.

Q    Where is he seated and what is he wearing?

A    Like a plaid blue shirt.

MR. SPERLING:  May the record reflect the witness has identified the Defendant Kenneth Eugene Barrett, Your Honor?

THE COURT:  Record will so reflect.

Q    (By Mr. Sperling)  Kenneth Barrett, the person that you have just identified, sir, is the patient that is referred to in this encounter record, correct?

A    As far as I know.

Q    You indicate in written -- by the way, is this form in your handwriting with regard to the comment section?

A    Are you talking about the comment section in the upper left there?

Q    Well, I'm talking about here.

A    No.

Q    Is that your handwriting?

A    That is not.

Q    Or is that typically something that is done by some preparatory agent or nurse or attendant?

A    It looks like most of that generally is done by

triage, a triage nurse.  It really looks like the last two words there on the right, that looks like my writing. So sometimes I'll just come along and add to it.

Q    But the writing that is down here, is this in your handwriting, sir?

A    That's correct.

Q    This says multiple gunshots wounds and then what does this wording in this line just underneath that say?

A    Stands for lower extremity injury on right.

Q    Would you decipher the wording that appears here for the jury, please?

A    Yes.  First word is alert and then it's crossed through.  That's going to be cross-through by me.  The next word is awake, groggy.  Heart rate is regular without murmur, lungs are clear.  He has three entry/exit wounds on the right upper leg.  And then in parenthesis, I have anterior/posterior wounds, one near the inguinal area and two approximately six inches above the knee. Distal pulses are okay.  Small abrasion left distal thigh, and there's a question entry wound.  Do you want me to go on?

Q    When you say -- on line three here, you said something about anterior and what is that phrase right there?

A    It says anterior/posterior.

3868

Q    Okay.  What is anterior?

A    Front.

Q    What is posterior?

A    Back.

Q    Okay.  Would that indicate that there were both anterior and posterior wounds?

A    Well, I think what I really think is, is if you look at my diagram, that's more -- it's not really posterior, it's probably lateral, despite what it says.

Q    All right.  When the patient came into your hospital, doctor, was he clothed or unclothed?

A    I really don't remember.

Q    You don't recall whether or not his britches may already have been removed?

A    It seemed like they were but I don't remember for sure.

Q    You haven't examined those -- well, whatever he wore from the waist down, have you, sir?

A    No, sir.

Q    You haven't examined the billfold that he is alleged to have had in his right rear pocket either, have you?

A    No.

Q    And you would not then have examined any of those contents, to include 21 $100 bills that appeared to be pierced by a bullet, have you?

3869

A     No.

Q     Does this patient record indicate that the person who was encountered was transferred to St. Francis?

A     Yes.

Q     Does it indicate the manner in which he was transferred?

A     Ambulance.

Q     And there's an entry here that says right femur with regard to x-ray.  Do you know what that indicates?

A     That just describes the part of the body that was x-rayed, sir.

Q     When we see say right femur, is that above or below the knee?

A     It's above.

Q     At the bottom you indicate here in written form what phrase?

A     Multiple gunshots wounds right upper leg.

Q     Then Government's Exhibit No. 295, sir.  Does this report appear to be the record of the Medical Imaging, that is, the x-ray that was performed by Dr. David Albers, is it Albers?

A     Albers.

Q     And he's a radiologist there at Sequoyah?

A     Yes, sir.  He actually comes out of Fort Smith but he's the radiologist that serves our hospital.

Q    You relied upon this record, did you not, in part in your treatment of the patient in this case, Kenneth Eugene Barrett?

A    Well, the results of this x-ray really didn't change the treatment.  Treatment was going to be basically the same at that particular point in time.

Q    One of the things that you indicated on your record, do you remember where you were talking about the word alert and then you struck that word in favor of awake and groggy?

A    Uh huh.

Q    Is it conceivable, doctor, that at the time he first arrived he was alert but then as the result of medication that was given him, he became sleepier or groggier?

A    I don't think so, sir.  I don't recollect that.

Q    So is your indication here, doctor, that the awake and groggy was his general condition from the time that he was admitted into the hospital?

A    That's the way I would interpret that.

Q    By the way, have you had occasion to examine the full autopsy report -- the full autopsy report in this case?  I believe you indicated, well, you probably would have in the course of your business?

A    I probably would have looked at it when it arrived in the mail.  That was several months later.  It's been

years.

Q    Do you know Ron Distefano?

A    Yes, sir.

Q    Do you know him to be a qualified and highly competent medical examiner?

A    Yes, sir.

Q    If his report and his examination were to have indicated that as the result of a fragment from a bullet an aorta was perforated, in your experience as a doctor would that cause death in a relatively short period of time?

A    Yes, sir.

MR. SPERLING:  The Defendant's Exhibits No. 212 and 213, please.  May they be handed the witness, Your Honor?

THE COURT:  They may.  212 and 213?

MR. SPERLING:  Yes, sir.

Q    (By Mr. Sperling)  I'm not trying to surprise you, but I'll bet -- have you ever seen these items?

A    No.

Q    And are you aware that there has been investigation by a certain Oklahoma State Bureau of Investigation agents and others with regard to the clothing that was worn by the Defendant Kenneth Eugene Barrett at the time that the shooting and this incident occurred?

A   No.

Q   If such had been done and an agent were to have examined the jeans worn by the Defendant, would you have any reason to question the specific examination that was done by the agent?  I'm not trying to trick you.  You don't have any idea what examination may have been done with regard to the clothing in this case, correct?

A   I do not.

Q   Your best recollection is that when the Defendant came to the hospital, he did not have britches on, trousers or jeans?

A   To the best of my recollection, seems like the wounds were open and obvious and easily seen.

Q   Defendant's Exhibit No. 212 first.  Would you examine that exhibit, sir?

A   Okay.

Q   Do you have any reason, based on the record that you have examined, to dispute that the blood staining to the long johns worn by the Defendant at the time of this incident are correctly identified by virtue of these drawings?

A   As far as I know, they're correct, sir.  I mean, I obviously don't have any idea.

Q   All right, sir.  Then with regard to Defendant's Exhibit No. 213, would you look at that item too, please,

sir?  Do you see in the right -- on Defendant's Exhibit No. 213, do you see this item right here where there is a round item in the right rear pocket, it says back, correct?

A    Correct.

Q    And it says hole.  Do you see that there, sir?

A    I see that.

Q    If the Defendant were to have carried a billfold in the back of his pocket, his right rear pocket, right about the area of his right buttock and were to have been shot in that area, is there anything medically, doctor, that would be inconsistent with the rendition here, the hole in the right rear pocket, and then the indication there where it says, I believe, stains in the area of the pocket?

A    I don't understand what you want me to say.

Q    Is there anything medically inconsistent, doctor, with this description that there was a hole in the area of that pocket?

A    I think it speaks for itself.

Q    Okay.  And if -- well, typically when you handle items of evidence as a treating physician or when you handle clothing that has been brought in, do you change anything from one pocket to another?

A    No.

3874

Q    And if, for example, the Defendant had come into the hospital and he had been wearing jeans at the time and you or someone under your supervision had removed those jeans, as a matter of practice, doctor, do you keep items in the clothing that were in the clothing or do you remove them?

A    I wouldn't typically remove anything.

Q    So typically not only would you not remove them but you wouldn't change an item from one pocket to another pocket, would you?

A    I would not do that.

Q    Do you have any independent recollection, doctor, as to whether or not the Defendant may have suffered a gunshot wound in this area that then penetrated and lodged in his body?

A    I suspect that corresponds to the wound that's in the right inguinal area which is the right upper leg.  I don't know that for sure but I would assume that's --

Q    And the only way to know that for sure would be for you to have performed surgery and tracked the wound, correct?

A    It would be -- take somebody beyond me to figure that out.

Q    In this case, doctor, was there any bullet fragment or -- well, was there any evidence that a bullet was

3875

retained in the area of the Defendant's right buttock or right femur?

A     I don't believe the x-ray report indicated that.

Q     That there was a bullet in that area?

A     Yes.  On the x-ray report where it says views of the right femur, it says there's a bullet in the soft tissue lateral to the neck of the right femur.

Q     Are you aware that the Defendant was also treated on some later date on or about November 2nd of 1999, in a minor surgical procedure for the removal of a bullet from the area near his knee?

A     I've reviewed the record.

Q     Was that right or left knee?  Can you review the record and make that determination?

A     Sorry.  You're going to have to hang on here a second.  All right.  I don't see that right offhand.  Are you talking about Dr. Wood's note?

Q     No, I'm talking about -- well, okay.  Yes, you can review that, if you would, please.

A     Is that what you want me to review?

MR. SPERLING:  Defendant's Exhibit No. 219, may that be displayed?

Q     (By Mr. Sperling)  Let me do it this way, doctor. Government's Exhibit No. 295 was the Albers radiology report with regard to the metallic object, correct?

A    That's correct.

Q    That indicates that there were two bullets in the body of the Defendant, correct?

A    That's correct.

Q    One was in the area of right femur?

A    Yes, near the neck of the femur which would be near the inguinal area.

Q    That would be in about the same area, although not in the rear, but with regard to distance from the ground as this indication right here, correct?

A    Yes.

Q    Consistent also with -- and I know you didn't determine entry or exit, but you didn't see anything medically that was inconsistent with that bullet being the result of an entry right here in the right rear pocket going through a billfold and then being lodged in the right upper leg, correct?

A    I don't know anything about that.  Only thing I saw was the two wounds that are noted on the ER record.

Q    Okay.  I would like to spend just a moment, doctor, with the Court's indulgence, comparing two exhibits, that is Defendant's Exhibit No. 213 which is up here and then Defendant's No. 219.  Although the effort is to be as accurate as possible with regard to drawings, when doctors see patients, would it be accurate to say,

3877

doctor, that those drawings are rough sketches and not precise locations of wounds?

A     They're rough sketches.

Q     And so, if on -- Defendant's Exhibit No. 219, please.   If on Defendant's Exhibit No. 219, a doctor would have written or drawn these three wounds, what would you think that indicates in terms of the number of wounds?

A     Looks like three.

Q     And in terms of location, if this actual entry wound had been a little bit in -- a little bit farther to the rear, that would have corresponded with what you saw on Defendant's Exhibit No. 213, this wound right here, wouldn't it?

A     Once again, I think it's more laterally than posteriorly, according to my drawing.

Q     Okay.

A     But, yes, it's probably the same wound.

Q     You wear jeans on occasion?

A     Yes, sir.

Q     Have you ever seen a right rear pocket appear on the side of anyone wearing a pair of jeans other than perhaps in a college prank?

A     There's all kinds of pockets on all kinds of jeans in this time.   You know, most pockets are in the rear.

3878

Q    Do you have any independent recollection as to the jeans in this case?

A    No, sir.

Q    All right.  In fact, might it be, doctor, conceivable that you never saw the clothing in this case but that the clothing that was worn by the Defendant from the waist down with the exception of underwear may have been removed when he was transported by the Muldrow EMS from the location of this shooting to the hospital?

A    That's very likely.  As I told you before, I don't remember what he had on when he came in.  It just seems like to me to my recollection that things were obvious.

Q    And do EMS officials, medics, typically remove clothing in order to get directly at the wounds so they can see what they are treating?

A    Yes.

MR. SPERLING:  Nothing further, Your Honor.

THE COURT:  Any redirect?

MR. HILFIGER:  We have nothing further.

THE COURT:  The Government have any objection to this witness being excused?

MR. SPERLING:  No, thank you, doctor.

THE COURT:  Doctor, thank you for your testimony.  You may step down and you may be excused.

You may call your next witness.

3879

MR. HILFIGER:  Mr. Chuck Choney.

THE COURT:  What was that last name?

MR. HILFIGER:  Choney, C-h-o-n-e-y.

CLOYCE VAN CHONEY,

being first duly sworn to testify the truth, the whole

truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    Good morning, sir.

A    Good morning.

Q    Mr. Chuck Choney, is that right?

A    Yes.

Q    Mr. Choney, I am Roger Hilfiger.  I don't think
we've met before.  I think you've talked to my colleague,
Mr. Bret Smith, over the phone.  Thank you for coming
here today and I know it's been sort of quite an
inconvenience but we appreciate you being here, okay?

A    Okay.

Q    And you're known as Chuck Choney.  What is your true
and correct name?

A    Cloyce Van Choney.

Q    And how are you presently employed?

A    I'm a commissioner with the National Indian Gaming
Commission.

Q    And where is that located?

3880

A     In Washington, D.C.

Q     And you're here for a gaming commission meeting here in Oklahoma this week?

A     Yes.

Q     How long have you been in the position of the commissioner of the National Indian Gaming Commission?

A     Two years and 11 months.

Q     And prior to that employment, did you have a relationship with the FBI?

A     Yes.

Q     And can you tell us what your position was with the FBI?

A     I was a special agent for 25 years and eight months.

Q     And with the FBI, did you have any special area that you were -- that you worked in?

A     Yes.

Q     And what was that?

A     I was the special weapons and tactics team leader for nineteen years.

Q     Is that referred to with the initials SWAT team kind of thing?

A     Yes.  Yes, it is.

Q     And when did you join the FBI SWAT team, what year approximately?

A     About 1981.

3881

Q    Did you have any military experience prior to joining the FBI?

A    Yes.

Q    And what was that?

A    I spent almost seven years in the United States Army.

Q    And what branch of the army was it?

A    I was in the infantry.

Q    During the course of your military experience, were you involved in actual combat action?

A    Yes.

Q    And where was that?

A    In Viet Nam.

Q    Was that a tour -- one tour of duty?

A    One tour.

Q    What was your position there?

A    I was an infantry platoon leader.

Q    And did you get in actual fire fight situations as a platoon leader?

A    Yes, I did.

Q    What are the requirements for an officer or FBI agent or what were the requirements at that time to join the tactical operations team of the FBI?

A    Well, at the time I joined, the program was relatively new and they relied primarily on agents that

3882

had prior military or law enforcement experience.

Q    Law enforcement experience outside the FBI?

A    Prior to the bureau.

Q    And you were able to use your military time?

A    Yes.

Q    As experience to get into the FBI?

A    Yes.

Q    Did you receive any further specialized training with the FBI?

A    Yes, I did.

Q    What kind of experience was that?

A    Well, prior to being SWAT certified, we had to attend a two-week introductory course at the FBI Academy in Quantico, Virginia.

Q    And then what did you do after that?

A    After that then we're required to do monthly training.

Q    And what kind of training -- what kind of tactical operations training would you do on a monthly basis?

A    Basically would be firearms training, vehicle stops, rural tracking, map reading, assault entries into vehicles as well as building.

Q    And when you completed your Quantico training, were you stationed someplace with the FBI?

A    Yes, in Oklahoma City.

Q     Here in Oklahoma?

A     Yes.

Q     Were you here in Oklahoma -- about what time did you start here in Oklahoma?

A     Well, I transferred to Oklahoma City in 1978.

Q     Okay.  And then with the SWAT team, what, 1981?

A     Actually, I joined the SWAT team right after I transferred but I didn't become the team leader until 1981.

Q     And then did you -- but you were in Oklahoma City the whole time as a SWAT team?

A     Yes.

Q     During the time that you were on the SWAT team, did your operations include both rural settings and urban settings or city settings?

A     Yes, it did.

Q     Did you have one that overrode the other, I mean, did you do more rural or more urban settings?

A     We did more urban settings.

Q     What did you do as a SWAT team for the FBI during that time?  What generally were your type of operations?

A     We did a lot of drug raids.  We also did a lot of arrests on dangerous fugitives.  We also did -- executed search warrants.  We would secure a building before the actual search teams came in.

3884

Q    And when did you leave the FBI tactical operations?

A    I left there -- I retired in 2001 and I stepped down in the latter part of 1999.

Q    And while you were on the -- as the FBI tactical operations team, did you ever come into any fire fight situations in any of your operations?

A    Yes.

Q    In the courses of your duty, about how often did you run into fire fight situations?

A    Well, individually in my almost 26 years in the FBI, I was in four gunfights of which one of them was just with the SWAT team.

Q    So just one -- you just had one gun fight was involving the SWAT team?

A    Yes.

Q    Did you ever -- as part of your SWAT team, did you ever take -- undertake any actions with the Oklahoma Highway Patrol?

A    Yes.

Q    Now, were you aware of the Oklahoma Highway Patrol, what their unit was called that would be like your SWAT team?

A    Yes.

Q    Was it called a tac team?

A    Tactical team.

Q    The SWAT team that you had, did it cover the whole state of Oklahoma?

A    Yes, it did.

Q    The tactical team for the Oklahoma Highway Patrol, were you aware that they had -- were divided into an east and west tac team?

A    Yes.

Q    And did you train with the Oklahoma Highway Patrol --

A    Yes.

Q    -- or did they train with you?

A    Yes.

        MR. HILFIGER:  Your Honor, we request that Mr. Choney be designated as an expert in SWAT team operations.

        THE COURT:  Any objection?

        MR. LITTLEFIELD:  No, Your Honor.

        THE COURT:  Hearing no objection, that will be the order of the Court.

Q    (By Mr. Hilfiger)  Would you say the SWAT team and their operations are substantially the same idea, I mean the same idea, same type of operations, same type of setup as the Oklahoma Highway Patrol tac team operation?

A    Yes.

Q    Now, Mr. Choney, I understand that, you know, you

know the highway patrol and you work with the highway patrol, don't you?

A    Yes.

Q    And you're here testifying in this matter and you've been called by Kenneth Barrett.  I understand that's not really your preference, is it?

A    That's correct.

Q    I mean, you are friends with the highway patrolmen, you knew the people on this operation, is that right?

A    Yes.

Q    And you are not really testifying in the sense of trying to benefit Mr. Barrett, are you?

A    That's correct.  I'm here because I was subpoenaed.

Q    You have previously reviewed certain statements made by the Oklahoma Highway Patrol officers that were at this incident September 24th, 1999?

A    No.

MR. LITTLEFIELD:  May we approach, Your Honor?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. LITTLEFIELD:  I reviewed his prior testimony, Your Honor, and I note that -- I don't know if he's been advised not to mention the prior proceedings or --

MR. HILFIGER: That's what I was talking about. If you want to talk to him this morning, I've given him a letter.

MR. LITTLEFIELD: Well, you told him that because I know that he used freely -- he reviewed the preliminary hearing transcript and he freely talked about his testimony at the prior trial and that kind of stuff.

THE COURT: The first, the state court trial --

MR. LITTLEFIELD: He testified at both state court trials and he reviewed part of -- I think what he reviewed was the preliminary hearing transcript.

THE COURT: Talk to him again.

MR. HILFIGER: I gave him a letter this morning that said, you know, this is how you should refer to the stuff but I don't have a problem with going -- I think we need to do it again.

THE COURT: Let's do it again with the court reporter.

(Whereupon, the following record was made outside the hearing of the jury.)

MR. HILFIGER: Mr. Choney, what this is about, you understand I gave you a little memo today about -- did you get a chance to read that about to not refer to the trial, preliminary hearing, stuff like that? And that's just -- I just want to make sure and Mr.

3888

Littlefield just wants to make sure that you understood that the judge has ruled that -- you know, don't refer to a trial or preliminary hearing and when I refer to --

MR. LITTLEFIELD:  State charges.

MR. HILFIGER:  Don't refer to state charges or anything like that.  But when I refer to previous statements under oath, that's what I'm referring to, okay?  I know you didn't review any statements, but you reviewed the preliminary hearing and that's what we're getting at.

THE WITNESS:  Okay.

MR. HILFIGER:  That's what I will be calling it and that's what I'll ask that you call it also.  Previous statements under oath and that I can sort of try to link them to date if you need something --

MR. LITTLEFIELD:  I think the concern what the Judge has expressed here is this matter should be decided based upon the evidence presented in this proceeding and what happens in this proceeding and as far as what happened in other state courts or anything else are not relevant to what occurs in this particular matter.  And he's just wanting to make sure there's no outside influence of unrelated matters, even though they are related.  We just out of an abundance of caution want to make sure that -- hadn't happened yet, we don't want it

3889

to happened here.

MR. HILFIGER:  So you understand when I talk about that stuff what it's going to be.

THE WITNESS:  I never read any of their statements.

MR. HILFIGER:  That's fine.  I thought that that might be confusing and might open the door.

(Whereupon, the following record was made in open court within the hearing of the jury.)

Q   (By Mr. Hilfiger)  Mr. Choney, as I asked you, you've previously reviewed some highway patrol statements under oath concerning this operation that was undertaken in Sequoyah County in September of 1999?

A   Yes.

Q   And from those statements that you reviewed -- and they were the highway patrol officers that were out there at the scene; is that true?

A   Yes.

Q   And from those statements, did you get some kind of understanding of what occurred in the deployment of that tac team of the highway patrol?

A   Yes.

Q   And let me ask you first if in the course of your review did you learn that the tac team had initially decided to deploy what's called a sniper team or a creep

team?

A    Yes.

Q    Now, when you use -- on the FBI SWAT team, what do you refer to that?

A    We refer to them as sniper observers.

Q    And you understand the tac team refers to them as a creep team?

A    Yes, ma'am.

Q    In your mind, they're both of same thing, is that right?

A    Yes.

Q    And did you understand that the sniper team or creep team idea was rejected?

A    Yes.

Q    From your overall review of the tactical operation, did you form an opinion as to the highway patrol's decision not to employ that tactical -- I mean, that tactic, that creep team or the sniper team?

A    Yes.

Q    What did you find?

A    I found that he didn't use a creep team.  I also saw the reason why.

Q    As a SWAT team member, do you use creep teams or snipers?

A    Yes, I did.

3891

Q   Would you say you used them seldom or most of the time or all the time?

A   I used them every time.

Q   Every time.  That was during -- while you were -- the 19 years or so that you were --

A   Yes.

Q   -- working on it?  Would you have preferred -- if you were in charge of this operation, would you have preferred to have some type of sniper observer or creep team some place at the location of this scene?

A   Well, it is my policy to use sniper observers on every operation, especially in a rural setting.  However, I cannot put myself in that team leader's shoes because I did see, after my review, of why he didn't do it and it was a practical reason.

Q   And how many rural area raids -- during the time that you were involved with the SWAT team for the FBI, about how many rural raids did you get involved in?

A   Well, counting raids as well as manhunts, I would venture to say somewhere around 40.

Q   Okay.

A   Around 40.

Q   Forty?  Now, when you use the creep team or the sniper has a benefit, also isn't it true, that it also puts in there some kind of intelligence gathering people?

3892

A    Yes.

Q    And is that one of the things that you want to do before you do a tactical operation is get as much intelligence as you can from that?

A    Yes, that's basically the sole reason I deploy sniper observers for up-to-date intelligence as well as early warning.

Q    So in your -- as the leader of the SWAT team, you want a sniper in there so it's not just day-to-day intelligence, would you say it's just a minute-by-minute intelligence, is that right?

A    Yes.

Q    What kind of intelligence do you expect a sniper to inform about?

A    Well, up to that point, we would have a basic knowledge of what's in the target location.  However, things always happen as time goes by such as additional people might show up, some people might leave.  There could be a dog running around that we didn't know about.  There could be a barricade or bunker that we didn't know about.  And we plan for up-to-minute contingencies.  That sniper observer can provide that information.

Q    And the sniper observer, he's out there, is he -- he's in contact, isn't he, with somebody on the team at all times?

3893

A     Yes.

Q     And how is that contact made?

A     By radio.

Q     And are these radios that are readily available to law enforcement?

A     No.

Q     They aren't?  Not to other individuals, but I mean to law enforcement personnel?

A     No.

Q     Who is able to get these kind of radios?

A     The radios we use are -- they're basically code-specific, they're scrambler type radios that only the FBI has.

Q     And so somebody else couldn't pick up a scanner or something like that?

A     Right.

Q     Is that right?

A     That's correct.

Q     Would you expect sniper observers to be able to identify, you know, whether other people are out there besides the particular targets you're looking for?

A     Yes.

Q     That's one of the purposes, isn't it?

A     Yes.

Q     What other sources -- other than the

3894

minute-by-minute sniper intelligence, are there other sources of intelligence that you seek before you even plan the operation?

A    Information that's provided to me by the investigating agent that we refer to as the case agent. He will provide me with as much information as he can or I will go to him to get information that I don't have. The information that he has gathered from his investigation and his discussions with family members, neighbors, friends of the person to be arrested as well as confidential informants.

Q    The target of the operation, you also want to have some kind of idea of the identification of that person, what he looks like?

A    Yes.

Q    Pictures of him?

A    Yes.

Q    Do you require that also?

A    I would like to -- short of saying required, I would like to have a photograph, but that's not always the case.

Q    Do you -- what do you do to attempt to get a photograph?

A    Well, we'll ask the case agent if he can provide me with a current photograph.  If the person has ever been

3895

arrested, we'll obtain that, the latest arrest photograph.  Or if there's none, we can possibly get one from a family member or we can obtain one by surreptitious means.

Q    And again, you'd use a sniper observer to get a photograph if you had time?

A    No, we wouldn't use the sniper observers for that, we would use other agents trained in long-range photography.

Q    But you feel it's necessary that you know the identify of the person you're going to go get?

A    Yes.

Q    As to confidential informant information, what do you like to get -- know about the confidential informant?

A    Well, as much information they can provide me of the person to be arrested, such as his propensity toward violence or propensity to resist arrest.  Is he going to run, is he going to stay and fight.  Or the confidential informant can provide us with the interior of the house, the floor plan.

Q    Do you deal directly with the confidential informant or do you deal through the case agent with the confidential informant?

A    Most times we deal with the case agent because the case agent likes to keep the identification of his

confidential informant protected, so he'll get that information.

Q   What kind of reliability do you have -- do you see with confidential informant?

A   I don't trust them, never have.

Q   Because the confidential informants usually are in there for something for their on benefit; isn't that true?

A   Yes.

Q   So, you sort of -- you want to check out what you understand the confidential informant is going to say with other means to verify whatever a confidential informant says?

A   Yes.

Q   You just don't take it on its word; isn't that true?

A   That's true.

Q   And how do you do that kind of verification on a confidential informant?

A   There again, I'll be discussing this with the case agent.  You know, he'll provide me with a floor plan and I'll ask him -- maybe sometimes the case agent has been in the location.  If not -- during the course of his investigation, we'll discuss it with people that have been in there.

Q   Now, let's talk about the planning of the operation

itself.  Is there some requirement that you -- as to how the plan is formulated?  Is it just talk about it or do you write it down?  What kind of process do you do as a SWAT team leader?

A    If we have the benefit of time to plan, we are required by the FBI to come up with a written plan and this plan will have all the aspects, the persons to be arrested, the location, description of the location, the agents that will actually take part in the arrest, the approach plan, the assault plan, the containment plan, the evacuation plan.  In other words, it's pretty extensive.

Q    So you have, you know, the plan -- I guess these are not separate plans but they're all part of the plan, the assault plan?

A    Yes.

Q    What was the other?

A    Well, there's the approach plan, the assault, entry, the actual --

Q    You call it entry plan?

A    Entry plan.  Actions upon entry, clearing plan.

Q    You said something about a containment plan?

A    Containment plan.

Q    And evacuation plan?

A    Evacuation.

3898

Q    And for example, the approach plan is just how you're going to get to the place, I take it?

A    Yes.

Q    And the assault or the entry, what kind of plan is that?

A    Well, who's going to be the lead, who's going to be the person that's going to initiate the actual entry or the assault.

Q    And what's the containment portion?

A    We only use on the average a six-man entry team. The rest of the agents will surround the house, get behind the house, or to the left or the right of the house, basically to keep the people inside, keep them in, keep them for trying to escape or to keep people from trying to get in.

Q    Getting into the --

A    Yes.

Q    -- into the action?  What about the evacuation?

A    Evacuation is after the person is arrested.  Person or persons arrested is going to transfer him to the local sheriff's department or the marshal's office or to the FBI office for further processing.

Q    Does your plan also include anything about injuries?

A    Yes.

Q    What do you include on that, what's that for?

3899

A     That plan will -- generally I turn that over to one of my element leaders who was a paramedic.  He will contact the local EMT or local hospital or ambulance service and he will incorporate that into the plan and that's having them on standby.

Q     Now, when you're talking about a written plan, is that a long-term process or weeks or months to do a written plan or how long --

A     Well, it all depends on how much time we have to put this together.  And, no, it doesn't take that long to put together.  You know, we do these quite often so it's standard operating procedures.

Q     Would you be able to do it in a matter of a few days?

A     At least.

Q     What's the purpose of having the written plan?  What do you do with the written plan after the -- after the operation is over?

A     At the time I left the Bureau, the trend was -- actually before I left the Bureau, the trend was to have these written plans to be -- I would submit that to my immediate supervisor.  He then would discuss it with me in its entirety.  Then he would then take it upstairs and present it to the special agent in charge and he would approve it or come up with his recommendations.  If

3900

there's something in there that he didn't like, well, then he would call me up and we would discuss it.  And then after the operation was over, then we would submit that to the training division at FBI headquarters.

Q    And what would that be?  Would you have a little critique session or something like that to discuss the plan?

A    Well, that would be prior to the critique.  It would go ahead to the training division as an accepted written plan.  Then we would follow it up with the critique as to how well did we live up to the plan and if anything went wrong, we would -- there would be narratives in there as to actually what happened.

Q    And now, in this procedure you're talking about it just is something that just takes a matter of days to do?

A    Yes.

Q    So if you had like one or two days or three days, you could do all this and get it done in that time?

A    Most of the time we could do it in one day, provided the case agent had all this information for us.

Q    Did you see -- from anything that you reviewed, did you see whether or not there was a written plan by the tac team in this operation?

A    I didn't see one.

Q    Do you know whether it was a matter whether the tac

3901

team does written plans?

A    OHP tac team?

Q    OHP tac team.

A    That I don't know.

Q    Assuming that the tac team was contacted like on the 20th of September to do an operation on the evening of the 23rd into the 24th of September, would that have allowed enough time to do this written kind of plan to take assault -- approach, assault, containment, evacuation, and entry?

A    It should have because most of these plans, like I said earlier, are standard operating procedures.  It's something that we should be familiar with and we should already basically know.

Q    As a SWAT team, you don't deal directly necessarily with confidential informants, is that right?

A    That's correct.

Q    But you're relying on a law enforcement agency person who has dealt with that confidential informant?

A    Yes.

Q    Is that right?

A    Yes.

Q    And if you discover that there is something -- after you've completed your operation and you discovered in that operation that there were things that the

3902

confidential informant omitted or didn't say or misled you on --

MR. LITTLEFIELD:  Objection.  Assumes facts not evidence.

MR. HILFIGER:  It's a hypothetical, Judge.

MR. LITTLEFIELD:  Well, then it's irrelevant because it's a hypothetical and that's something for which there is no evidence.

THE COURT:  Argument, counsel.

MR. HILFIGER:  Well, there is some evidence, yes, but this is a hypothetical anyway but there is some evidence.

MR. LITTLEFIELD:  I'm certainly not aware of any such evidence.

MR. HILFIGER:  May we approach?

THE COURT:  Rephrase the question.

Q    (By Mr. Hilfiger)  After the completion -- you know, we're talking about a confidential informant, you're dealing with a confidential informant.  After you have completed an operation and during that operation you determined that the confidential informant had omitted some important facts or given false information about important facts, would that be something that you would look into?

A    No.  I would bring it to the attention of the case

3903

agent, you know, that hears something that was omitted and I would leave it up to him to deal with the informant.

Q    But you'd at least make mention to the case agent about it?

A    Yes.

Q    Would you ever go back to the confidential informant himself if there were some glaring problems in the information that you received?

A    Well, most instances I wouldn't even know who this person is.

Q    Now, in any type of these plans, do you -- you know, any of your approach plans, assault, entry, containment, evacuation, the whole part of the plan, do you ever provide for contingencies?

A    Yes.

Q    And what's a contingency and why do you need to put those in there?

A    Well, contingencies plans is, you know, we commonly refer to as what ifs.  You know, what if you're compromised during the deployment.  You cover all aspects of your plan to -- you know, my plans are -- I always want them to be agent-safe, that no one is going to get hurt.  So we build these contingencies in such as what if our -- someone's radio failed or what if we were spotted

3904

when we're in the process of being deployed.  You know, approaching the house, someone just happens to look out and see us.  Or what if all of a sudden a dog jumps out that we didn't know was there, you know, what are we going to do.  And it's we're prepared for this plan to change at any given moment.

Q    And do you discuss the contingencies before you go out on the operation?

A    Yes.

Q    I notice you made one example was like while you were approaching on your approach plan and someone in the residence or near the residence or something like that just happened to see you, would you consider that to be a contingency that you should have built into your plan somehow?

A    It all -- there again, you have to be on the scene. It all depends on where you are.  You could have reached the -- what we refer to as the point of no return.  In other words, you're already deployed, you're already getting ready to make your assault.  Therefore, it would be more unsafe to stop and backup, so just continue on.

Q    If the contingency -- if the plan was to use stealth to go right up to the door and to bust in the door, and on your approach there were people there that saw you coming, would that be something to at least change that

contingency, change that plan?

A    Well, there again, you know, it depends upon where you are in your deployment.  If you're early on before the whole team starts deploying, then you can stop them and then back up.  Then it can go into a containment, isolate the target area and call the subjects out.

Q    Okay.  And containment, in this sense you're talking about surrounding the area?

A    Yes.

Q    And not going into the approach and busting in the door type thing?

A    Yes.

Q    And in your containment, is part of that -- I assume that's a contingency that you built into the plan, right?

A    Yes.

Q    And as part of that, would you notify that you are law enforcement?

A    Yes.

Q    And how would you do that?

A    Well, either turn your emergency lights on or use your PA system in your car or if you don't have a PA system, you can use a bullhorn to call the attention to everyone inside to come out with your hands up or call the person that you intend to arrest, have him come out with his hands up, or all people in the house come on out

3906

the front door with your hands up.

Q    Do you think -- in your opinion as a SWAT team leader, do you think that the containment -- if your target that you're going after is aware that you're coming in, do you think that the containment and announcement of law enforcement is a proper procedure to use?

A    Yes.

Q    Is that procedure more preferred as opposed to the assault type procedure by the FBI?

A    Yes, it is.  That's the method that the FBI uses predominantly now.  And prior to me retiring, that was the system that they started going to was contain an area, surround it, then call in the personnel.

Q    Did you have any experience with no-knock warrants; are you familiar with no-knock warrants?

A    Yes.

Q    Did you have any experience using no-knock warrants?

A    Yes, I have.

Q    And did you -- as part of the SWAT team or leader of the SWAT team, did you use no-knock warrants on a regular basis?

A    Yes, I did.

Q    And did you continue to use them right up to the end of your leadership?

A    No, the doctrine in the FBI changed.  They did away with no-knock warrants.

Q    And about when was that change made?

A    Probably around -- I'm thinking around 1994 or 1995, it was Bureau-wide.

Q    Again, if you see somebody -- if your target or somebody at the target's residence sees the approach vehicles coming, whose responsibility is it to determine whether the contingency should go into effect of the perimeter and --

A    Well, it's according to your plan.  If you have a plan for containment, well, then the lead vehicles know where to go.  They follow-up vehicles, they also know where to go.  But if it's a no-knock warrant, the lead and the second and third vehicles, they know where to go and they know what to do upon arrival at the target.

Q    Would you consider that a problem in a plan though if they didn't have a contingency for if they were spotted on the approach?

A    Well, that's kind of hard for me to say that because all my plans had contingencies built into it for that sole purpose.

Q    Okay.  So as far as you're concerned, it should have a contingency in there?

A    Yes.

3908

Q   Is that fair?

A   Yes.

Q   And that contingency should take into effect the target's recognition or acknowledgement or discovery that law enforcement is coming in or somebody is coming into their property?

A   Yes.

Q   As far as a contingency for an injury plan, is that part of the -- not contingency -- is that part of your plan, what should happen if somebody gets injured, a law enforcement officer or the target or somebody at the residence?

A   Yes.

Q   And how would you plan for it in your -- as a SWAT team?

A   If we were in the process of deploying and we took gunfire and one of the agents got hit, well, then we would -- of course, our main concern would be recover him, get him medical treatment as quickly as possible. We also have a team that would -- we were all trained but this team would have that assignment at this particular time to retrieve the agent.

Q   Did you see in this plan whether or not they had a medical plan as far as having an EMT or somebody -- on call?

3909

A     I didn't see one.

Q     What type of weapons did you use as a SWAT team?

A     Well, since we carried MP5's which are 9 millimeter semiautomatic and fully automatic, we also had M16 assault rifles.  Of course we had 12 gauge shotguns.

Q     You are familiar then with the MP5, the 9 millimeter?

A     Yes.

Q     And it's a fully automatic?

A     Yes.

Q     And also do you know the 9 millimeter, that MP5, what kind of lethal range does it have?

A     The maximum effective range is about a hundred meters, 150 meters.

Q     Okay.  And that -- a meter is just three inches over a yard, isn't that right?

A     Yes.

Q     So you're talking about a little bit more than a hundred yards to 150 yards, is that right?

A     Yes.

Q     As far as an MP5, they're all automatic -- they have different types of arrangements but they're basically automatic down to single shot, is that right?

A     Yes.

Q     What is the rate of -- are you familiar with the

3910

rate of fire of an MP5?

A    Yes, I am.

Q    What's that?

A    The maximum rate of fire is about probably four -- 300, 400 rounds a minute.

Q    When you do -- on an automatic, are you able to do -- well, let me back up just a second.

On an MP5, do they also have a burst --

A    Yes.

Q    -- type operation where you just pull and it just does short bursts?

A    Yes.

Q    Do you know, are there different -- are there variations on how many bullets are in a burst or are they just generally all the same?

A    Three.

Q    Three bullets is the -- sort of the standard on the MP5?

A    Yes.

Q    Are you aware when an MP5 is in a full automatic position, can you fire it one shot at a time?

A    Well, the MP5 has a selector switch on the side. It's generally always on the single shot.  The next thing you just flip with your thumb is the burst capability, then you flip again to the last setting and that's fully

3911

automatic.

Q    I guess my question is if it's in the fully automatic, can it fire just one shot?

A    No.  Very hard because the rate of fire is so fast.

Q    That's what I'm getting at.  If you're a single shot, it would be easy to do because it stops?

A    Yes.

Q    But on fully automatic, it would be very difficult, would you say, to limit to just one shot?

A    Very, very difficult.

Q    Now, when you are on the SWAT team, did you do anything special as far as inventorying weapons and ammunition before you went on an operation?

A    That was one of my specific duties as the team leader is make sure all agents had the proper weapons to use depending on the setting and make sure they had enough ammunition and make sure they had the right ammunition.

Q    Would you do that -- I mean, would you just assume that these guys were professionals and so they do it --

A    I never assumed anything.

Q    -- they loaded them or would you actually check?

A    No, I never assumed anything.

Q    Okay.  And what would you do to check the ammunition, for example?

3912

A    I would actually make a physical look myself.

Q    Okay.  And would you make a determination as to inventory and the amount of ammunition?

A    Yes.

Q    Do you think that that is a proper procedure to do as a SWAT team leader?

A    Yes.

Q    And was there some standard that you had as to how the magazines and how the rifle -- let's assume it's a rifle -- how the magazines and the rifle were loaded?

A    I would leave that to each individual agent, whether they are right-handed or left-handed, also had some right-handed who shot left-handed.  I would leave it to their -- up to each individual.  I'd just make sure that they would have enough rounds for their magazines, you know, for their weapons.

Q    Would you determine anything about whether fully load or chamber loaded or anything like that, would that be --

A    My SOP was when we start our initial assault that all -- the MP5s would be on the burst, burst capability.

Q    Okay.  Did you actually count ammunition?

A    No.

Q    Is there a -- when you get into these operations, maybe if the operations aren't going smooth or something

like that, do you find that even your -- as a SWAT team leader, did you find that even some law enforcement personnel that were very experienced would tend to get excited or, you know, adrenaline flowing?

A   Yes.

Q   And when that occurred, would you have a -- did you notice anything concerning the memory?

A   Yes.

Q   What was that?

A   Spotty, not sure of the circumstances because their body is just overflowed with adrenaline, enzymes.  Their pulse rate, their heartbeat is up.  They're on the verge of panicking, they're on the verge of stressing out.

Q   And would you find that in those situations where things went awry, not things aren't going like the plan is necessarily, that their focus would be something other than on the overall plan?

A   Yes.

Q   And what did you find there?

A   Well, we would --

        MR. LITTLEFIELD:  Your Honor, I would object to this.  This is beyond his ability to testify as to what other people's focus is on.  I don't think it's within his realm of expertise and would be speculative on his part.  It would also be relying upon hearsay because he's

3914

going to have to be told what the focus was for him to know.

MR. HILFIGER:  Judge, I'll back up and go into another area.

THE COURT:  Question withdrawn.

Q    (By Mr. Hilfiger)  After you completed these -- an operation, did you always go back in with people and critique what happened in that operation?

A    Yes.

Q    And when you would go in on operations and critique operations that had some problems, did you notice any or did you have any concerns about memory problems in certain areas?

A    Yes.

Q    And what kind of problems did you notice as a SWAT team leader during your critiques of those type operations?

A    I would have two critiques, one would be immediately right afterwards.  As soon as I gathered my team up and get away from the scene of action, we would get together and we would have an initial critique, then we go home and the next day we would sit down in a more relaxed setting and then we would have the official critique.

Q    Would there be any differences, as lot of times, in those instances where the operations had problems or went

awry?

A     Yes.

Q     And would problems be concerned with memory and ability to remember certain things that happened?

A     Ability to remember better small minute things that they neglected to mention the night before.

Q     These missions that you undertake -- you undertook as a SWAT team leader, did you have or did you allow other people other than your members of your SWAT team to go along on the missions with you?

A     No.

Q     Did you ever have occasion to have local politicians or sightseers or anybody like that to come out on a --

A     Absolutely not.

Q     And in your opinion if you were having an operation and as part of that operation you saw these sightseers or politicians or local people that are not going to be part of that assault team, what would you do as far as that mission was concerned?

A     First of all, I order them out of there and if they wouldn't leave, we would force them to leave.

Q     And if they were going to be a necessary element for a later -- you know, coming in and taking over the area or doing finishing out the search, would you -- what would you do in that case?

3916

A    What we did in my experience that we would have a followup search team which would be other agents and in some instances local law enforcement.  Rather than have everyone in the search teams there, I would have the element leader participate in part of the planning.  In other words, we're going in at a certain time and we'll be calling you in at a certain time, but they would be away from the action.

Q    And then would you just have a time for them to come later on or would they be there -- would they only come after you've --

A    They would come when I would call them in.

Q    So on the followup, you would require that they wait until you get a call?

A    Yes.

Q    Until they get a call.  You talked a little bit about the adrenaline rush and everything that's going on.  Would that adrenaline rush, in your experience, personal experience as a team leader, would that be something like the fight or flight type thing?

A    Yes.

Q    What occurs at that time?

        MR. LITTLEFIELD:  Object.  Beyond his area of expertise, Judge.

        THE COURT:  Counsel.

3917

MR. HILFIGER: I'll withdraw that question.

THE COURT: Question withdrawn.

Q (By Mr. Hilfiger) Have you ever used or did the FBI have any policy regarding tracer rounds used in any of these operations that you were involved in?

A No.

Q Do you use tracer rounds?

A No, tracer rounds are restricted strictly to the military.

Q So, you were not able -- you listened -- or not listened. You reviewed statements under oath of the highway patrolmen that were at this scene in order to talk about what you saw. You never saw a written plan, is that right?

A That's correct.

Q And you never saw a contingency plan, is that right?

A That's correct.

Q And in a contingency plan, if the operation that was meant to be a stealth plan, all of a sudden the target sees that you're coming, would part of the contingency plan be that just one car lights up and shows emergency lights or would everybody do it?

A My plans are if we're in the process of deploying and we receive fire, the agents that are receiving the actual fire would get out of there, get cover. If you're

3918

in a vehicle, stay in the vehicle.  If you're out of the vehicle, if you can't get back to the vehicle, get behind it.  Place your vehicle between you and the person delivering fire on you until you can move out there -- until you can get a time to get to safety.

MR. HILFIGER:  May I have just a moment, Your Honor?

THE COURT:  You may.

Q   (By Mr. Hilfiger)  Mr. Choney, now, you talked about certain, on your -- the sniper observer, are you aware of whether or not cell phones can be used by a sniper observer?

A   At that time we didn't use cell phones.

Q   Were they -- have the ability to be scrambled at that time?

A   That's why we didn't use cell phone because we couldn't scramble them.

Q   You mentioned that no-knock warrants were done away with by the FBI in '94 and '95.  What was the reason for doing away with them?

A   Generally the courts system had to do with that. Most of the federal judges were not -- didn't have a reason to authorize a no-knock warrant for search warrants.

Q   Was there any danger --

3919

A    Yes.

Q    -- that you ran across with them?

A    Yes.

MR. LITTLEFIELD:  Your Honor, I would object to leading.

THE COURT:  Sustained.

Q    (By Mr. Hilfiger)  Did you run into any kind of dangerous situations when you did no-knock warrants?

A    Yes, there's always an element of danger because you don't know what's going to happen.

Q    Did the determination on no-knock warrants, as far as you're concerned, was that something that you made as a team leader or is that something that came down from Washington?

A    That came down from Washington.

Q    Assuming that as a team leader you went in on a search warrant in which the confidential informant had told about any drugs, quantities of drugs and in the house and there was a concern about an escape ability to get out the back door and as an exit route for the house, and there was a concern about drugs being flushed down the sewer system and as a leader if you went out there and when you got out there found that there weren't drugs or not quantities and that the -- there was no back escape because the door was nailed shut and there was no

3920

plumbing in the house, would that give you some concern about the reliability of the confidential informant?

A    There again as I mentioned earlier, I would mention it to the case agent and then I would let him discuss that with his confidential informant.

Q    Okay.  Even if, as I understand it, you had this critique section concerning what went wrong, I guess, and what went right in every operation that you undertake and even if there had been a shooting at an operation that you went under, would you still do the critique session?

A    Yes.

Q    Would it still be sort of the same time table, like the next day?

A    Yes.

Q    And did you find that there was any critique session in this operation?

A    I didn't see one.

         MR. HILFIGER:  I have no further questions.

         THE COURT:  Let's take a recess for 15 or 20 minutes.  I'll ask everyone to please remain seated as the jury leaves the courtroom.  Remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you.

         (Whereupon, the jury exited the courtroom after which the following record was made.)

3921

THE COURT:  We'll be in recess.

(Whereupon, as short recess was held after which the following record was made in the presence of the jury.)

THE COURT:  You may cross examine.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    Still good morning, isn't it?

A    Yes.

Q    But if you were in Washington, it would be good afternoon?

A    Yes, that's correct.

Q    Before I start, I want to thank you for the service you've given to the country and the military, FBI, now with Indian Gaming Commission.

A    Thank you.

Q    How long have you, in fact, served in service of your country, sir, in the various capacities?

A    Thirty-five years.

Q    And a good segment of that time was with the Federal Bureau of Investigation?

A    Yes.

Q    Now, in regards to the FBI SWAT team, you became the SWAT team leader in what year, sir, for Oklahoma City?

A    1981.

Q    And that service lasted for what period of time?

A    Until latter part of 1999.

Q    Okay.  So 18 years?

A    Yes.

Q    And I believe you stated on direct that during that period of time you participated in some 40 incidents?

A    That's for rural settings.

Q    I'm sorry?

A    Rural settings.

Q    And in regards to the rural settings, you indicated some search warrants, some man hunts?

A    Yes.

Q    Do you have any idea what the percentage is?

A    Most of them were manhunts.

Q    So, that would be less than 20 rural search warrants done over the course of approximately 20 years?

A    Approximately.

Q    Let's talk about training.  Let's go to one of those incidents.  Are you familiar with an individual by the name of Michael St. Claire?

A    Yes.

Q    And his brother was Hansel St. Claire; is that correct?

A    Yes.

Q    One of the operations that was a rural setting was a

3923

warrant that was executed on the residence of Hansel St. Claire in anticipation that Michael St. Claire would have been at that location; is that correct?

A    Yes.

Q    And Michael St. Claire was an escaped -- had escaped from the Bryan County Jail, is that right?

A    That's correct.

Q    And he was being held in jail for having committed at least one homicide; is that correct?

A    Yes.

Q    And while he was out on the run, it was learned that there were several other homicides for which he was responsible?

A    Yes.

Q    So, he was a pretty dangerous killer?

A    Yes, he is.

Q    And you got information that he was in Hansel St. Claire's house; is that correct?

A    Yes.

Q    What was the nature of the warrant that was executed at Hansel St. Claire's house by the FBI SWAT team, sir?

A    It was an arrest warrant.

Q    And there is a difference between executing a straight up arrest warrant and a search warrant, isn't there?

3924

A    Yes.

Q    Because with an arrest warrant, the individual is going to be there and it's kind of hard to flush or burn or destroy an individual contrary to drug evidence; isn't that true, sir?

A    Yes.

Q    So the exigencies, the requirements of getting in there quickly are much less for an arrest warrant situation than they would be for a search warrant situation, especially something that, you know, in the nature of drugs; isn't that true, sir?

A    Yes.

Q    When you did -- and you were responsible for developing the plan which went into effect for entry to Hansel St. Claire's house in hopes to find Michael St. Claire at that location?

A    That is correct.

Q    In fact, Michael St. Claire was found in that location.  He was climbing out a second story window trying to escape when you all entered, wasn't he?

A    Yes.

Q    Was that a nighttime or a daytime entry?

A    It was nighttime.

Q    And what time, best you recall, how late?

A    It was shortly after midnight.

3925

Q    So, that would have been a 24-hour entry?

A    Yes.

Q    Were people up when you went there?

A    Yes.

Q    Did you all do -- establish a perimeter and knock or did your team just make -- announce or did you all make entry into that residence?

A    We -- as we were making our containment of the house, we made or announcement.

Q    And how long was it after you announced we're law enforcement, we're here for Michael St. Claire, how long after that was it that entry was made into the residence?

A    Probably almost immediately because there was people in the process of coming out, family members coming out, out of the downstairs front door.

Q    So in response to being discovered, you all made immediate entry rather than retreat and announce?

A    Yes.

Q    There wasn't any concern about Michael St. Claire being flushed down a toilet or down a drain or having acid thrown on him or being destroyed, was there?

A    No.

Q    In regards to your training, you indicated that the FBI SWAT team, which is equivalent to the Oklahoma Highway Patrol tactical team, trained once a month; is

3926

that correct?

A    Twice a month.

Q    Twice a month?

A    Yes.

Q    And how many times a day?

A    A full eight hours.

Q    So, was that two days a month?

A    Yes.

Q    And did you have also an equivalent period of one week twice a year for specialized training?

A    Yes.

Q    And are you familiar with the training that the Oklahoma Highway Patrol tactical team was utilizing at that period of time?

A    Yes.

Q    And in fact, their training was the same amount of time as the FBI training, wasn't it?

A    Generally.

Q    I mean, if there's been testimony they trained two days a month and then two times a year they spent a week in training, that's essentially what the FBI did, wasn't it?

A    Yes.

Q    And you indicated the training involved firearms, entry techniques, manhunts, tracking.  Are you familiar

3927

with the type of training that was done by the Oklahoma Highway Patrol tac team?

A    They basically did the same type we did.  A standard SWAT operation throughout the United States is basically the same.

Q    So, in your experience, in fact, on occasion the FBI and the OHP tactical team conducted joint training exercises, didn't they?

A    Yes.

Q    And so, what they had as far as background wasn't appreciably different from what your team had as a background, was it?

A    That's correct.

Q    Let's talk about the creep team.  And you said that it was your preference to utilize that in every circumstance, wasn't it?

A    Yes.

Q    And the purpose for that was to obtain real time information; isn't that true?

A    Yes.

Q    In order to do that, there are certain things that are necessary at the location where the creep team is going to conduct their operation; isn't that true, sir?

A    Yes.

Q    One thing that's necessary is cover; isn't that

3928

true?

A    That's probably tantamount.

MR. LITTLEFIELD:  Could we have Government Exhibit No. 184 displayed for the witness?

THE COURT:  You may.

Q    (By Mr. Littlefield)  Mr. Choney, as a part of your preparation, did you go out to this site and analyze the location, sir?

A    This scene here?

Q    Yes.

A    No.

Q    So you're really not particularly familiar with the location?

A    No.

Q    If testimony has been that that is Mr. Barrett's residence, and that that trailer was occupied by a relative, that that house -- a relative by the name of Gwen, that house was occupied by his grandmother, that house was occupied by an aunt and uncle, a relative, that house was occupied by a relative, that house was occupied by a relative, that house was occupied by his mother, and that house was occupied by an aunt, there's not much cover out there is there?

A    No.

Q    Okay.  And in fact, on the north side appears to be

3929

a wide open field, doesn't it?

A    Yes.

Q    And the only cover along here would be the bushes from the -- on the side of the road, any growth along the bar ditch that hadn't been mowed down or right along the fence post; isn't that true, sir?

A    That's true.

Q    And does that location appear to facilitate the placement of a creep team, sir?

A    No.

Q    Now, certainly it would be preferable but if the creep team is discovered, what's that do to your operation?

A    First of all, it endangers the creep team.  Second, it gives early warning that something is getting ready to happen.

Q    And if a drive-by was performed the afternoon this -- you're aware that the entry was made at approximately 12:30 a.m. on September the 24th?

A    Yes.

Q    Of 1999?

A    Yes.

Q    And if during the performance of a drive-by along this road between 5:00 and 6:00 the previous afternoon, p.m., 5:00 or 6:00 p.m. on the 23rd, it was observed that

there were a number of dogs unrestrained in that area, that would further jeopardize the creep team, wouldn't it?

A     Yes, it would.

Q     What would that do as far as the likelihood of that creep team being discovered and blow any chance of a successful operation?

A     Well, it could give early warning and these dogs could attack the creep team.

Q     Were you aware that all of the residences surrounding Mr. Barrett's place were occupied by relatives, sir?

A     Yes.

Q     In regards to the setting of a perimeter, what's necessary to set a perimeter and announce?

A     First of all, you have to be able to get in there, you have to have time to get in there and set up and you have to have -- make sure, you know, that there's no danger to you to receive fire.  But the primary aim is to get in there without endangering yourself.

Q     Now, do you not -- you also have to have cover, don't you?

A     Yes.

Q     Now, is this area -- this area is just not conducive to setting a perimeter, is it?

3931

A   No, it's too wide open.

Q   And if you set a perimeter in this area, do you know what's going to happen on your -- how do you cover your backside, sir?

A   You have to take in more people or you have to make sure that all those residences around there are neutralized.

Q   This was a difficult place to try and perform an entry, wasn't it?

A   Yes.

Q   It's because of the terrain and the unique circumstance of the neighborhood; isn't it true, sir?

A   Yes.

Q   In fact, even though you had used a creep team in every rural setting that you had experienced the 40 manhunts and searches, in this particular case would you have advised using a creep team?

A   No.

Q   You would have liked to have had a photograph of Mr. Barrett, wouldn't you?

A   Yes.

Q   Are you aware that Mr. Barrett had surrendered himself with an attorney and immediately made bond so that a booking photo was not made and available?

MR. HILFIGER:  Your Honor, I object.  That's

3932

assuming facts not in evidence.

THE COURT:  Argument, counsel?

MR. LITTLEFIELD:  No.

THE COURT:  Sustained.

MR. LITTLEFIELD:  I'll withdraw it.

Q   (By Mr. LITTLEFIELD)  Are you aware that in the local system on occasion attorneys bring their clients in, surrender them, and have provisions immediately for bond --

MR. HILFIGER:  Objection.  Assumes facts not in evidence.

THE COURT:  Sustained.

Q   (By Mr. Littlefield)  Are there circumstances where booking photos are not available?

A    Yes.

Q    And in those circumstances, you hope to be able to have somebody stationed with a telephoto lens that can take a long distance photograph of the individual that's the subject of an arrest warrant slash search warrant, isn't that -- that's what you said, isn't it?

A    Yes.

Q    Now, do you know whether or not the state tactical team -- well, you got -- FBI has got more resources than the Oklahoma Highway Patrol, don't they?

A    That's correct.

3933

Q     Do you know whether or not the Oklahoma Highway Patrol had resources to place somebody with a telephoto lens to take a photograph of Mr. Barrett prior to the execution of the warrant?

A     That I don't know.

Q     And are you aware that Mr. Barrett was somewhat of a recluse and wouldn't leave that cabin; would that not make it more difficult to obtain a photograph of Mr. Barrett?

A     Yes.

Q     The problem of trying to establish a creep team and maintain cover, is that the same kind of circumstance that would be necessary to utilize -- insert somebody to take a long range photograph with a telephoto lens?

A     If you have the ability, if you have the time and in this circumstances with the dangers that would face the creep team, the same dangers would face the team trying to get in with a long shot photo.

Q     In this situation would this kind of terrain, knowing that Mr. Barrett rarely if ever left that cabin, not very likely you could get somebody in and out with a telephoto lens unobserved, is there?

A     That's correct.

Q     You indicated that in regards to the confidential informant, most of the time you never met that individual

3934

prior to execution of a search warrant, did you?

A    Very rarely.

Q    You had to rely upon the agent and what the agent advised, didn't you?

A    Yes.

Q    And what was important to you was the agent's credibility as established in the past, wasn't it?

A    Yes.

Q    In this case, if the officers who were a part of the tactical team had testified that they had conducted operations with Clint Johnson who was the affiant in this particular case and had found in the past that he had given them more than enough information and, in fact, oftentimes more than was necessary --

MR. HILFIGER:  Your Honor, I'd object.  I don't believe there's any testimony.  That's more than that was necessary.

MR. LITTLEFIELD:  I think that was the testimony, Your Honor.

THE COURT:  I don't remember it being that dramatic but I think that --

MR. LITTLEFIELD:  I'll rephrase it.  I'll withdraw and rephrase.

THE COURT:  Withdraw the question.

Q    (By Mr. Littlefield)  If these officers testified

that they had met with Mr. Johnson in the past and had executed warrants based on the information in the past and in the past his evidence was always truthful and sufficient, would that meet your criteria as far as the type of information you needed?

A    Yes.

Q    Are you aware that the officers in this case received a floor plan of this residence that was created by the local law enforcement officers?

A    That I don't know.

Q    Would that be the kind of information that local officers should have provided?

A    Yes.

Q    And were you aware that aerial photos of this location were taken by the officers who eventually executed the plan?

A    Yes.

Q    And that's the kind of information that this team should have had, isn't it?

A    Yes.

Q    Are you aware that the local officers advised this tac team that Mr. Barrett was perceived to be a threat to law enforcement?

A    Yes.

Q    That's the kind of information local law enforcement

3936

should have provided, isn't it?

A     Yes, it is.

Q     And in fact, you know the type of circumstances that a tactical team is likely to be called upon to perform an entry; isn't that true?

A     Yes.

Q     And those circumstances are missions that are above and beyond the capability of the searching agency to conduct the execution or entry of; isn't that true, sir?

A     Yes, it is.

Q     In other words, the tac team is not going to be out on every type of search warrant, are they?

A     That's right.

Q     They're going to be out on those that are the more dangerous type of search warrants and the search warrants in which threats are more likely to be encountered?

A     Yes.

Q     You knew some of these guys that were on the tac team, didn't you?

A     Yes.

Q     In fact, you had confidence in them, didn't you?

A     Yes.

Q     You had worked with these officers who were involved in this search for a number of years, hadn't you, sir?

A     Yes.

3937

Q    Are you aware that this is the first search that any of these officers encountered gunfire upon entry?

A    I wouldn't be surprised if I heard that because if they were involved in prior shootings, I would have heard about it.

Q    You didn't hear about any prior shootings, did you?

A    Just one.

Q    That was a manhunt deal, wasn't it?

A    That was a --

Q    Hostage?

A    Yeah, it was a hostage.  Their old team leader, John Haney, got himself shot.

Q    And Mr. Haney was western tac team, wasn't he?

A    Yes.

Q    And this was the eastern tact team?

A    Yes.

Q    Other than the one situation with the other tac team, you're not aware of this tact team being involved in any entries prior to this in which shots were fired at them?

A    I have never heard of any.

Q    You're also are aware, aren't you, that the Oklahoma Highway Patrol tactical team was called on to assist local law enforcement in the execution of a number of search warrants every year, aren't you?

3938

A      Yes.

Q      And so, the number of search warrants in which they would have been involved in these dangerous situations far exceeded the 40 or so that you did over 17 or 18 years?

A      Yes.

Q      And they were uneventful?

A      That's correct.

Q      You were asked about written plans.  Do you recall that?

A      Yes.

Q      And that it was part of FBI policy to formulate written plans for every one of your operations?

A      Yes.

Q      Was that the case from the very outset?

A      No, that actually started around 1995 or 1996, somewhere along in there.

Q      And FBI are pretty paper intensive, aren't they?

A      Yes.

Q      And in fact, a lot of that is really a bureaucracy driven deal to C-Y-A; isn't that true?

A      That's exactly why it's done.

Q      Is the development of a written plan which lays it out necessary to effectively develop an entry plan?

A      We have to do it.  We did it like we always did

before except now we had to put it in a report form and had to go to supervisors and the special agent in charge for his approval, but it would be the same.

Q   In other words -- I'm trying to understand what you're saying.  But really when you had to start putting it down on paper, it didn't change what you did prior to the -- in the time prior to having to put it down on paper?

A   No.

Q   Writing it out didn't really make these plans any better, did it?

A   No.

Q   In fact, to formulate a plan, you all as the FBI when you were looking to go into a location, would get there in a group and do what I call brainstorm, wouldn't you?

A   Yes.

Q   You'd get there and you'd look at the aerial photos.  And if you had a model of the place, you'd look at that model.  And everybody would have input and could make suggestions and if somebody said, well, I don't like that suggestion, let's think about it and you'd come up with a plan, wouldn't you?

A   Actually, what I would do, I would come up with a plan and I would present it to the team.  And I would

present it to the team for their input.  And I would always tell them if there's something about this plan that you don't like, tell me now, don't wait until we get out there on the scene.

Q    That was the Choney method, right?

A    Yes.

Q    And it worked just as well if you got everybody in there and put all the heads together and said here's the place, here's what it looks like, here's the information we have, what ideas -- the floor is open, let's figure out the best way to get in there?

A    Yes.

Q    You've indicated that the Oklahoma Highway Patrol had no written plan?

A    That I know of.

Q    You don't know if they sat there and wrote stuff down on a blackboard and when they were done, they erased it?

A    I don't know that.

Q    And really what's important is that everybody on that team has an assignment and a clear idea of their assignment; isn't that true, sir?

A    That's correct.

Q    And in fact, isn't it also a part of a concept of this kind of team that you know and trust in the

3941

professionalism of the other team members, don't you?

A    Yes.

Q    So that if your assignment is to go to the west side of that premises and make sure that no one runs or leaves and provides cover, you should be focused on what you're doing and assume that the other people are going to do what they're supposed to do, aren't you?

A    Exactly.

Q    The more you have to look out and make sure everybody is doing their job rather than focusing on your specific job, the less likely you're going to have a successful operation; isn't that true?

A    That's correct.

Q    In regards to being discovered, when you all entered the St. Claire residence, you all had been discovered, hadn't you?

A    Yes.

Q    That didn't stop you from going in, did it?

A    No.

Q    And in fact, you all had, I'm sure over the course of the 16, 17, 18, 19 years, whatever it was that you headed up the Oklahoma SWAT team, there had been occasions in which you all had been discovered during the deployment or entry phase?

A    Yes, yes.

3942

Q   And in those cases, you all would continue to make entry, wouldn't you?

A   Yes.

Q   The fact that somebody is in the yard and sees the approach doesn't mandate that you turn around and leave, does it?

A   No.

Q   And in fact, if these officers have testified that on numerous occasions as they're making entry they were seen but continued, that doesn't mean they did wrong, does it?

A   No.

Q   It also makes a difference as to what the circumstances of the warrant are, doesn't it, sir?

A   Yes.

Q   Despite the fact that there was no plumbing inside that residence, drugs are more easily destroyed and drug evidence is more easily destroyed than other types of evidence; isn't that true, sir?

A   Yes, they are.

Q   There are other means by which drugs can be -- drug evidence can be destroyed than flushing it down a toilet or pouring it down a sink; isn't that true, sir?

A   Yes.

Q   You can pour acid on drugs, can't you?

3943

A    Yes.

Q    If there's any wind, you can toss it to the wind and that's going to get rid of at least a good portion of it; isn't that true, sir?

A    That's true.

Q    And in fact, a little bit of Coleman fuel and a match on that shack would have gotten rid of a lot of drug evidence, wouldn't it, sir?

A    Yes, it would.

Q    In regards to setting a perimeter and calling out if somebody is in the yard, the same concerns about cover apply if you call it off in that case, don't they, sir?

A    Yes.

Q    If, as the officers approached, an individual was seen in this location right here, as the officers were approaching to make entry, they've got basically three choices, don't they, at that point?

A    Yes, they do.

Q    They can either continue their entry?

A    Yes.

Q    They can stop and try and set a perimeter around this location; the second choice, isn't it?

A    Yes.

Q    The third choice is just to call the whole thing off?

3944

A   Yes.

Q   Now, let's talk about the alternatives.  If your plan is that as you're coming, there were -- are you aware that were three vehicles that came in through this location?

A   Yes.

Q   And there was a vehicle that was placed here by the front gate with a cover team, sniper team --

A   Yes.

Q   -- and a team that was supposed to apprehend any fleeing individuals along this location.  And a fifth vehicle entered the driveway of the mother's residence right in there.  Are you aware of that?

A   Yes.

Q   And are you also aware that they planned and attempted to have these individuals at the front gate deploy at the same time these officers were entering right in here?  Are you aware of that?

A   Yes.

Q   If the entry team which is going to come through here sees an individual in the yard and stops, it is entirely conceivable that these individuals have made it to that location and are actually deploying into the yard; isn't that true, sir?

A   Yes.

3945

Q    If you stop at that point while they're deploying into the yard, what have you done to these individuals, Mr. Choney?

A    You have them isolated and they have no support. They are in danger.

Q    Further if you decide to attempt to set a perimeter, do you know that -- even if somebody is in the front yard there, do you know that Mr. Barrett is necessarily in the residence?

A    That -- I can't answer that, you know, because I wasn't out there.

Q    I understand that.  But I mean, if you can't see into the house, the fact you see a person in the yard doesn't necessarily mean that that's Mr. Barrett, does it?

A    That's correct.

Q    And it doesn't necessarily mean that Mr. Barrett is located in his residence as opposed to another location, does it?

A    That's right.

Q    Mr. Barrett could have been, and the officers don't know, Mr. Barrett could have been at his mother's house, couldn't he?

A    That's correct.

Q    He could have been at an aunt and uncle's house,

couldn't he?

A   Yes.

Q   Or his grandmother's house, couldn't he?

A   Yes.

Q   And so, if one stops at that point and establishes a perimeter, what's that do to the safety of the officers at that point?

A   Well, your target is now behind you.

Q   So when they had to make a split second decision as to whether to stop and set a perimeter or to proceed onward, they're -- certainly not going to be the information that they need to be able to make that decision safely, is it?

A   Yes.

Q   And if you decide that to stop and abort and turn around, then you aren't going to have a successful search, are you?

A   That's correct.

Q   And Mr. Barrett is going to know that law enforcement is coming after him and coming out there; isn't that true?

A   Yes.

Q   And if he's a danger, it will enhance that danger, won't it?

A   Yes.

3947

Q    And if there's evidence, it will increase the likelihood that that evidence will be destroyed, secreted, or removed, won't it?

A    Yes.

Q    You said that no-knock warrants weren't used on a regular basis after, I think you said, 1995, '96, '97, somewhere in there?

A    Yeah, somewhere in '95-96.

Q    And isn't it true, Mr. Choney, that the FBI still used no-knock warrants after that time?

A    On certain occasions.

Q    And those occasions were occasions in which exigent circumstances or exceptional circumstances were presented to a judge and the judge looked at those statements in the affidavit and determined that based upon those exceptional statements, a no-knock warrant was appropriate; isn't that true, sir?

          MR. HILFIGER:  I'm going to object because he's calling for information on any type of no-knocks and I don't know, I think that's beyond the scope of his ability to answer.

          THE COURT:  Argument.

          MR. LITTLEFIELD:  One, it was raised by direct examination and I ought to have the right to pursue this witness's knowledge and it was presented as if it were a

3948

policy of the FBI. And I ought to be able to ask this individual if, in fact, it was a policy, what knowledge he had of the policy, and if there were exceptions to the policy and what were the basis of those exceptions.

THE COURT: Objection overruled.

Q (By Mr. Littlefield) If certain exceptions were presented or exceptional circumstances were presented and a judge approved of them, then it was still within the -- it was still appropriate for the FBI to use no-knock warrants, wasn't it?

A Yes.

Q And it was certainly within -- it was not inappropriate for the FBI, if a judge approved it, to utilize search warrants which could be executed during the nighttime hour; isn't that true also?

A Yes.

Q I mean 24 hours warrants?

A Yes.

Q And your preference was to do the warrants under the cover of darkness, wasn't it?

A Yes.

Q In fact, the St. Claire warrant, what time was that executed?

A About 12:30 a.m.

Q Any reason why 12:30 is picked over 4:30 or 5:00 or

3949

5:30?

A   Well, most likely either the person to be arrested or the persons inside the residence are down for the night.  Certainly traffic around the house, whether it's vehicles or foot traffic, is minimal.

Q   And that's one of the advantages of using a warrant later at night is because you don't run the risk of innocent people who are traveling the road being exposed to dangers; isn't that true, sir?

A   Yes.

THE COURT:  Mr. Littlefield, let's stop for the noon recess.  I'll ask the jury to be back at 1:30.  Jury will note my clock in the back of the courtroom hasn't been adjusted yet for Daylight Saving time.  I don't mean for you to be back in 15 minutes.  Everyone please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Witness may also step down.  I'll recognize you back at 1:30 also.

(Whereupon, the witness left the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury and the witness have departed the courtroom.  Anything to take up outside the hearing of the jury for the

3950

Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  For the defense?

MR. HILFIGER:  No, Your Honor.

(Whereupon, the noon recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.

You may continue your cross-examination as soon as the witness comes back in.

Q   (By Mr. Littlefield)  Mr. Choney, we were talking about -- I'm not sure what we were talking about when we quit, it's been while.  In regards to the plans, the written plans, you mentioned contingencies?

A   Yes.

Q   Before you all had to develop the written plans, you all discussed contingencies as a part of the operation?

A   Yes, we --

Q   Go ahead, I'm sorry.

A   Yes, we did.

Q   And it was part of the planning session, well, now what happens if this and why and certain scenarios were laid out; isn't that true?

A   Yes.

3951

Q    And essentially the team decided, well, if this happens, then this will be what we do?

A    Yes.

Q    All contingencies cannot be anticipated, can they?

A    That's correct.

Q    And you -- as you plan based upon your experience, your ability to deal with those contingencies that arise are greater based upon long-term experience and the number of operations you've done?

A    Yes.

Q    And you would not dispute that as far as operations done, this Oklahoma Highway Patrol tactical team was much more experienced than the FBI SWAT team?

A    Yes, they were.

Q    In fact, back on the St. Claire incident, when you -- when your team handled that operation, did you all rely upon other law enforcement agencies to assist in conducting that entry into the Hansel St. Claire incident looking for Michael St. Claire?

A    Yes, we did.

Q    What other outside agencies did you utilize in assisting you in that plan?

A    We used the -- a couple deputies from the local -- I think it was Bryan County.  That's mainly for vehicle control, keep cars out there.  Then we also brought up

3952

one time from our Dallas SWAT team.

Q    Did you use any -- where was the Dallas team from, was it FBI or what?

A    Yeah, FBI Dallas.

Q    Did you use any non-FBI assistance besides the two deputies from Bryan County?

A    There was one, possibly two agents from the Oklahoma State Bureau of Investigation on the scene.

Q    Were there any Oklahoma Highway Patrol tactical members, team members, that assisted in that operation?

A    Yes.  Yes.

Q    Which team?

A    We used both the east and the west team.

Q    So they were a part of your tactical entry plan in that particular operation?

A    Yes.

Q    If you didn't have confidence in the Oklahoma Highway Patrol's tactical entry team, would you have asked for their support in that operation, sir?

A    No.

Q    Let's talk about weapons.  You mentioned MP5 9-millimeter, M16, and 12 gauge?

A    Yes.

Q    What did you carry when you went into these kind of operations?

3953

A    Generally I would carry a Remington A70 shotgun.

Q    Is that the only weapon you had with you available to your use?

A    No, I also had an M16 assault rifle as well as I had an MP5 and also carried a sniper rifle.

Q    What about other members of your team, what kind of weaponry would they bring to your operations?

A    They would -- we would bring all our weapons.

Q    Did you have any -- are you familiar with weapons that have the capacity of serving as a grenade launcher?

A    Yes.

Q    What kind of weapons are those?

A    There are two types.  The kind that we had, my team had, was the M79 grenade launcher which is a military weapon.  Then there was an M203 which is an M16 with a tube attached underneath it to handle a -- to lunch a 40-millimeter smoke round or tear gas round, also high explosives.

Q    You said your team carried what kind of -- what I would call a grenade launcher?

A    It was an M79 grenade launcher.  Looked like a big single -- looked like a big, huge shotgun.

Q    Did that go with you on your operations?

A    Yes.

Q    And for what purpose would you take that type of

3954

weapon, sir?

A     That was our main tear gas delivery system.

Q     Would it surprise you that the Oklahoma Highway Patrol tactical entry team had one of those weapons available to them in their vehicles?

A     No, it would not.

Q     Why not?

A     You expect a tactical team fully trained to have all their weapons with them.

Q     Why would you bring them with you if it's not part of your plan?

A     When you're operating in a rural area, you're going to bring all the weapons and ammunition that you have at your disposal.  You're not going to leave it back at your team house because what if you need it?  You don't have it with you, you can't use it.

Q     Let's talk about the MP5. You mentioned a burst mode in which three bullets were fired?

A     Yes.

Q     Are you aware of whether some of the older models did not have that burst mode, it was either -- the selection was either single shot or fully automatic?

A     Yes.

Q     If one had a weapon of that type, can one still fire short bursts if it's in the automatic mode?

3955

A    You can but you're not going to get the three-round bursts.  The rate of firing it is so great, as soon as you squeeze the trigger and let it go, four, five, six rounds could be expended.

Q    Is that a function of the proficiency and practice of the individual with that weapon?

A    Yes.

Q    The more you use it and the more you practice, the greater ability you have to control the number of rounds released in a burst; isn't that true, sir?

A    Yes.

Q    In regards to the debriefing after the completion of the operation, you indicated that your typical practice was to do a short meeting that evening and then a more detailed meeting the next day?

A    Yes.

Q    Is that -- was that your policy in the standard operation?

A    Yes.

Q    If there were a circumstance in which shots were fired, one of your officers had been killed and another injured in an entry, would you still conduct the debriefings on the same timetable, sir?

A    Yes.

Q    If your entry was at 12:30 at night and one of your

3956

officers is off in a hospital and another is accompanying him, you can't even get the whole team together the next day, can you?

A    No.

Q    In regards to a circumstance such as that, you were talking about adrenaline flowing and that kind of stuff in a shooting situation?

A    Yes.

Q    Does that heighten if there are officers who have been injured as a part of the circumstance?

A    If you're a direct participant in the gun battle or if you're on the scene, yes, you would still have the same bodily functions.

Q    And in fact, if you're a direct participant as far as -- if you're one the individuals who was involved in the shooting itself, actively pulled your firearm and shot, in fact, wouldn't you tend to even have heightened adrenaline going?

A    Oh, yes.

Q    What's the FBI policy about -- now, you're talking about the debriefing for essentially trying to look back and say, hey, here's what we did, here's what we could have done different, here's what we could contemplate doing differently in the future.  Is that the kind of circumstance you're talking about?

3957

A    Yes, it is.

Q    Is that the same kind of debriefing that would be involved by an investigative agency that would be looking at criminal action for prosecution?

A    No, it would be a little different.

Q    Is there some kind of federal or FBI guideline in regards to restriction of individuals who were actually involved in a shooting incident for the purpose of criminal investigation?

A    Yes, and it is much different.

Q    What is that?

A    The difference is if I'm -- in the performance of my duty, if I was forced to use my firearm to either hit, wound, or kill an individual, I now incur certain rights. Another agent can or cannot, it's up to me whether he wants to interview me as to what I did because at that point that becomes a shooting investigation which comes under the auspices of our inspection division.  And I do have certain rights such as having a lawyer present.

Q    Is there a difference in the policy in regards to the appropriate time to interview an individual who's involved in a certain situation in which there's an officer shooting?

A    If I agreed to be interviewed or if someone on my team or if I was assigned to interview an agent who was

3958

involved in a shooting, which I have done, we usually wait about 24 hours. We let him get his senses back to him, let things come back to his memory that he really is not aware of what he did. If you asked someone right after shooting how many rounds you fired, he wouldn't know. But given a time to rest, relax, get his wits about him, then he can tell you exactly how many rounds he fired.

Q   In regards to the information that the confidential informant gave, are you aware of what information the confidential informant provided specifically?

A   On this incident?

Q   Yes.

A   Just --

Q   I'm not asking what it was but are you aware of specifically what the confidential informant provided?

A   Not all of it.

Q   Are you aware of whether this tactical team had access to information provided to them beyond the information of the confidential informant? For example, from local law enforcement officers who were familiar with this location and were familiar with Mr. Barrett?

A   Yes, I did know that.

Q   So, in trying to parcel out what information came specifically from the confidential informant, what

3959

information came from the knowledge of these local law enforcement officers who were the affiants and what information came from other law enforcement officers, local law enforcement officers, who were familiar with Mr. Barrett; do you know specifically what the source of that information was?

A    No, I don't.

Q    Have you ever reviewed the affidavit that was provided by the affiant in this particular case?

A    No.

Q    So you don't know if the affidavit specifically said whether or not Mr. Barrett was involved in drug activity or not?

A    No.

Q    And you don't know if the affidavit provided information from the affiant -- or from the confidential informant that Mr. Barrett said that he would shoot law enforcement officers if they came on the scene?

A    No, I don't know that.

Q    There was conversation about -- questions about a bunch of sightseers and local law enforcement officers that were there, I guess, supposedly for the entertainment value of this incident.  Do you remember answering questions in regards to that on direct, sir?

A    Yes.

3960

MR. HILFIGER:  Your Honor, I would object to that.  There was nothing about being there for entertainment value.

MR. LITTLEFIELD:  That was a stretch.  I'll withdraw that portion of the question.

THE COURT:  Let's withdraw the whole question and start over.

Q    (By Mr. Littlefield)  Do you recall that there was conversations about people from local law enforcement and sightseers present, politicians and sightseers I think were the terms used?

A    Yes.

Q    I guess you could classify a sheriff as a politician since he runs for a political office?

A    Yes.

Q    Would it be inappropriate for a sheriff to be at the scene of a search warrant where his deputies are executing the search itself?

A    No, it would not be.

Q    Are you aware -- I guess you'd call a district attorney a politician since they run for elected office?

A    Yes.

Q    Would it be inappropriate for a district attorney to be at a search scene if her drug task force agents were the individuals responsible for securing the warrant and

3961

were going to serve the search itself?

A    Well, in the state system, no, it would not be.  One of my biggest battles is always keeping the Assistant U.S. Attorneys out of my arrest scenes and I was able to do that.

Q    We should be there.

A    But in the state system, I do understand that the assistant district attorneys as well as some district attorneys wish to be on the scene.

Q    In fact, since the district attorney is an elected official, he or she is responsible for the conduct of his or her drug task force agents as they're executing a warrant, aren't they?

        MR. HILFIGER:  I object.  That assumes facts not in evidence.

        THE COURT:  Argument.

        MR. LITTLEFIELD:  I don't know what facts are being assumed that aren't in evidence.  There's certainly testimony that the DEA was there and assistant D.A.'s were there and this is certainly a drug warrant executed by the D.A.'s drug task force.

        MR. HILFIGER:  The assumption that they are all under her auspices and authority.

        THE COURT:  I don't think there's been any testimony to that.

3962

Q     (By Mr. Littlefield)  Do you have any idea in the Oklahoma system who the district attorney drug task force agents are responsible to?

A     Well, first, they're their own parent agency.  And if it's a task force, whoever is the senior agency.  Then as far as my experience goes, generally they don't answer to the district attorney.

Q     If it's the district attorney's drug task force?

A     Well, if it's the district attorney's task force, yes.

Q     Would they be answering to the district attorney?

A     Yes.

Q     And the district attorney, being a politician, would answer to the voters?

A     Yes.

Q     You mentioned occasions in which your SWAT team would secure premises and then turn that premises over to the agency that was actually going to do the search itself?

A     That would be after we would clear the area to be searched where there was a residence or an out building. We would secure it first, make sure there's no one in there.

Q     And then at that point in time, after it's secured and it's safe and any individuals have been removed, then

3963

you turn it over to the -- whatever entity was going to actually perform the search?

A    Yes.

Q    Do you know whether or not that was the circumstance in this particular incident, sir?

A    That I don't know.

Q    And do you know whether or not the individuals that were behind to followup on this premises were the ones who were going to perform the search of the premises?

A    There again, I don't know that.

Q    It's not an unusual circumstance for a tac team to gain entry and secure a premises and then turn that over to politicians or sightseers or the agency that's going to actually execute the search, is it?

A    As long as they do their assigned duty, you know, securing and making it safe.

Q    In fact, when you were doing the Sinclair -- I guess it's St. Claire, isn't it?

A    Yes.

Q    In Bryan County, you had people from the local sheriff's office who were providing perimeter security, didn't you?

A    No, they weren't.  They were there mainly for --

Q    Traffic control?

A    Traffic control.

3964

Q    And is that not a part of perimeter security or are we mincing --

A    An extended part of it.  The perimeter would be the immediate vicinity around the house.  There was a real long road going up there that came off the highway.  We had a car parked there to keep any unwanted persons out of there.

Q    Have you learned as a part of your looking into this particular circumstance that the entry -- the lead entry vehicle came under fire as it entered the property or after it entered the property but before going to the residence itself?

A    Yes.

Q    That being the case, does the question of whether this is a no-knock or a knock and announce warrant make any difference, sir?

A    No.

Q    Why not?

A    You're taking under fire almost immediately.  Your plan goes out the window, contingencies should start kicking in at that point.

Q    If it would have been a knock and announce warrant -- let me withdraw that.

Does the circumstance of the warrant have any bearing on whether or not that vehicle came under fire?

A     No.

Q     Up to that point, does it make any difference -- assume with me that what you have there is a location of the scene, okay?  And that the Bronco, the model of the Bronco -- we're talking about Government's Exhibit 1. And the model of the Bronco which is closest to you was in approximately that location when the first shots were fired, maybe a little closer, maybe a little farther, maybe a little father north or south but approximately in that location.  At that point, had it been a knock and announce warrant, would they have been in position to have knocked and announced?

A     Not when they're in their vehicles.

Q     And certainly with a no-knock they wouldn't have knocked at all had they been able to make it to the residence?

A     Right.

Q     Does the type of warrant then have any bearing on what occurred out there?

A     No.

Q     In fact, had it been a knock and announce warrant and those shots have occurred at approximately that location, would the officers have been expected to knock and announce before making entry?

A     No.

3966

Q    Why not?

A    One of the provisions of the federal no-knock warrant is -- let me back up.  One of the provisions in the federal system that came after 1996, you had to have an announcement or a knock before you entered.  However, if you wanted to survive any of the evidence to use at a later time and under exigent circumstances that no-knock warrant would then come and go into effect.  If you -- mainly if you received fire or somebody came out, saw you, turned around and ran back in, then you did have the authority to run in after him if it was safe for you.

Q    You mentioned normally you have six people on the entry team?

A    Yes.

Q    Is that dependent upon the size of the structure you're entering?

A    Yes.

Q    If that building is approximately -- the residence itself on the ground floor is approximately 16 feet by 20 feet, would you modify that to utilize less people to make entry?

A    Generally a six man entry team, they work together continuous.  It's the same people time and time again that way they know what each one's duties are.  If one falls, another can take up his duty.  The first two

individuals do the door, one is the battering guy. He's got the battering ram or the sledge hammer. They're the ones that get the door open. Then once he gets the door open, he steps aside then now that leaves you five. Then the last guy is the -- we call him the tail gunner. He's the one that covers your backside. So really, in effect, you really have a four man entry team.

Q   And if there's testimony that there were five who were going to effect -- that there were six people that were participating in the entry and that one was going to provide a perimeter security on the northeast corner of the residence, basically to pick up anyone coming in or exiting, either going north or east, leaving five people to make entry. Would that -- for a building with four rooms of that size, a ram man and then four people entering, would that be inappropriate?

A   No.

Q   Mr. Choney, in regards to this location --

MR. LITTLEFIELD:  Do we have Government's Exhibit 69 displayed?

Q   (By Mr. Littlefield)  And if the evidence is that that is Mr. Barrett's cabin, the site of the search, if at this location there was a metal gate that was up, a galvanized metal gate that was up and locked by a chain, that's the only form of entry available to law

3968

enforcement, isn't it?

A    Appears to be.

Q    Okay.  Well, you saw the other aerial photo, you didn't see any area from which they could have entered from the rear?

A    No.

Q    That large open field or from the north.  And would it be advisable to try and enter through a galvanized metal gate that's chain locked?

A    The only way to get -- effectively get through there in a hurry is to crash through there if you have a large enough vehicle.  Even at that, if it's steel with a chained padlock, the only thing that's going to give will be your vehicle.  It's going to probably disable your vehicle.  Then you're going to have other vehicles behind you backed up and you're going to have a big log jam right there.

Q    If one tried to go through the metal gate, what does that do to any hope of having the element of surprise?

A    It's gone.

Q    It may not have existed here but it sure wouldn't have existed if they tried that metal gate?

A    That's correct.

Q    In regards to this type of entry, even if it is a no-knock warrant, it's appropriate to turn your emergency

3969

lights on before you enter the property, isn't it?

A    Yes, it is.

Q    Why is that?

A    Well, first of all to announce, you know, that you're law enforcement and also to let surrounding neighbors know that that's law enforcement out there rather than some type of gang incident.

Q    Okay.  Mr. Choney, after analyzing what happened out there and the occurrences and the plan as it was executed, you wouldn't have done anything different than the Oklahoma Highway Patrol did in the performance of that action, would you?

A    No, I would not.

        MR. LITTLEFIELD:  May I have a second, Your Honor?

        THE COURT:  You may.

Q    (By Mr. Littlefield)  You made mention on direct evidence that tracers, you believe, were illegal?

A    Yes.

Q    Or that they were military --

A    Yes.

Q    -- I think you said?

A    Yes.

Q    Have you had occasion to speak to an officer from the Alcohol, Tobacco and Firearms Agency since

testifying?

A    Yes.

Q    And what agency would be responsible for enforcement of laws in regards to firearms and ammunition, sir, within the federal system?

A    It would be ATF.

Q    Do you still believe that tracer rounds were unlawful for law enforcement to possess in 1999?

MR. HILFIGER:  Your Honor, I object to that question.  Number one, his testimony is going to result from hearsay from ATF that he's heard over lunch.

THE COURT:  Counsel?

MR. LITTLEFIELD:  That's true.

THE COURT:  Sustained.

Q    (By Mr. SPERLING)  Let me ask you this.  When you said on direct that tracer rounds were illegal, had you studied the law?

MR. HILFIGER:  I object to that because there was no testimony they were illegal.  The testimony was they were used by the military.

THE COURT:  Sustained.

Q    (By Mr. Littlefield)  Pardon me.  That tracer rounds were only lawful to be used by the military?

A    Yes.

MR. HILFIGER:  I did not say anything about the

3971

question was not about lawful and only used by military. It was tracer, he said responsible --

THE COURT:  Sustained.

Q    (By Mr. Littlefield)  I'm trying to quote your exact language.  On direct I think you said that tracer rounds were restricted to the military; do you recall saying that?

A    Yes.

Q    Was that based upon a study of the law or based upon something someone told you?

A    That was the practice of the law in the early -- well, '70s, '80s, and '90s.

Q    But my question is in regards to 1999, the information you provided, didn't you tell me that that's what somebody told you?

A    Yes.

Q    And that you had no independent knowledge about the legality of tracer rounds other than based upon what someone had told you?

A    Yes.

Q    So the information you received was -- in that regard, was hearsay as well, wasn't it?

A    Yes.

MR. LITTLEFIELD:  Your Honor, I would ask that that answer that he gave on direct be stricken and the

jury be admonished to disregard it.

THE COURT:  You're both straining at gnats.  I understand what the witness said.  I didn't understand his testimony to be as you illustrated it in your cross-examination.  For that reason, I'll deny your motion to strike.

MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. HILFIGER:

Q    You discussed a lot about this St. Claire incident and as I understand it, that incident was with a dangerous killer and yet you determined that containment and make announcement that you're law enforcement and you're out there to pick him up and that worked, is that right?

A    Yes.

MR. HILFIGER:  Number 69, please.

Q    (By Mr. Hilfiger)  In discussing about contingency plans and while you may not be able to take care of every contingency, if the plan is to stealthily come in and get up to the porch and ram the door open, and on your approach somewhere in this area you see lights on in the

3973

house and somebody in the yard, the front vehicle does that, would then that be a contingency that you should have planned for?

A    Well, it all depends there again on the circumstances.  If I was led to believe that nobody was home and I saw some lights there, then I would notify everyone, you know, that the lights are on, whether I'd seen anyone or not.  You get to a certain point where you get to the point of no return, you have to go through with your assault plan.  To do otherwise could jeopardize your safety.

Q    Right.  My question is:  If the plan was to come up all the way up to here and then bust in the door here -- get out of the car and bust in the door and at this point right here, the lead vehicle sees that the lights are on and that there's someone in the yard, should, at that point, there be some contingency taken into consideration?

A    Well, under these circumstances, no, I wouldn't put that in my contingency because at that point you're already seen, you're already committed.  When you get to that point, the house is right there, you have to go.

Q    But should that have been a contingency that would have been back at the planning stages at Camp Gruber?

A    Yes, I would have put that in as a contingency.

3974

Q   Okay.   That's what I -- and I apologize, that was really what my question was.   That contingency should have been thought about at Gruber or wherever they did the planning session, right?

Now, as I understand, you said that even on the no-knock warrant that it is appropriate to turn on emergency lights before entering on the property.   If the plan was that the cars coming down -- there's a private drive here, and the cars were to turn on their emergency lights going down that drive and coming in here, I'm talking about the emergency lights now, that would be according to what you would say, is that right?

A   Yes.

Q   If the lead car does not turn on its emergency lights all the way up to the porch, would that -- would you say that that would be a problem in not following the plan?

A   When you get to that point, the lead vehicle is intent on looking at that door for his safety.   You know, he's running through a lot of things in his mind.   First of all, are my guys behind me, am I now a target?   You know, if he cannot stop to think to turn the emergency lights on, he probably has a radio microphone in his hand, he's probably got his weapon in the other, plus driving.   And a passenger, if any, he's probably got his

mind occupied.  If they don't turn their emergency lights on, you know, that's -- they should have, but, you know, if they didn't, you can't fault him for not doing that.

Q     That's my question.  If they didn't turn the emergency lights on, that was a problem in their plan, in carrying out their plan, isn't it?

A     It could be.

Q     Now, we talked about these -- you and Mr. Littlefield talked about the second group of people.  And as I understand what you have said on this second group of people is that, regardless of whether they're sightseers or politicians or they're deputies, you know, that's going to come in and take over the place, you know, take over for you after you secure the scene.  As I understood your testimony was that you wouldn't have those people following you out there.  They wouldn't come until you said, okay, the scene is clear, now come on?

A     That's correct.

Q     Is that what you would do?

A     That's my policy.

Q     You understand in this case, there wasn't any of that.  It was wait two-minutes and then come on.  And do you say that that doesn't go by what your policy is, is that right?

A     No, that's correct.

3976

MR. HILFIGER:  Then could we look at Number 184?

Q    (By Mr. Hilfiger)  In part of the planning, there's -- if you happen to do an aerial view, this aerial view when you come in here, part of this is to plan to help you see where escape routes are; isn't that true?

A    Yes.

Q    By the token that right in this area out here you say that there wasn't cover that you could use, by the same token, that's a pretty clear area out through there, isn't it?

A    Yes.

Q    And that would be an area that, I mean, that could be utilized for -- if like back on the model here, even if the person driving this car testified that he started receiving shots back here or even if he started receiving shots up here, would one of the things that person could do would take an escape route right out, which would be going right up through here?  I mean, isn't that part of what you're doing that aerial --

A    I can't answer that.  That's a could-have, would-have situation.  I can't answer that unless it's me behind that wheel, me being engaged by gunfire.  I know what I would do but I can't answer for what he would do.

Q   Okay, I'm sorry.  I didn't mean it that way.  When you receive fire, there are certain alternatives you can do; isn't that true?

A   Yes.

Q   One of them is take an escape route?

A   Yes.

Q   Is that right?

A   Yes.

Q   What are some others?

A   Seek cover.

Q   Seek cover.

A   You can return fire.

Q   Would part of the aerial -- I mean, the idea of going out there and doing your -- the aerial to see the area not only is to see how you approach but see what escape routes are out there, isn't that right?

A   Yes.

Q   And would that be a possibility for a person receiving fire in that area, if they did receive fire in that area, to take an escape route?

A   He could have.

Q   Were you aware in this particular operation that the first two vehicles coming in were unmarked vehicles and the first one that came in, came in without emergency lights?

3978

A    Yes, I knew that.

Q    And did you see that as a problem in the operation of the plan?

A    Yes, I did.

MR. HILFIGER:  I have no further questions.

THE COURT:  Any further cross?

MR. LITTLEFIELD:  Yes.

RECROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    In your experience, what you would have done would have been to secure the premises and then call for the team to come in and execute the search?

A    Yes.

Q    The decision made by these officers to tell the team to wait two minutes and then start, to give us a two-minute lead time was their decision as to how to approach the question?

A    Yes.

Q    Basically that's just a difference of philosophy as to how to deal with that circumstance, isn't it?

A    Yes.

Q    What did whether or not there was a two-minute lead time given instead of calling them have to do with that vehicle receiving fire somewhere in that location when it entered the property?

3979

A    Well, that's one I would never have someone come up there -- another support team come up --

Q    My question is:  What did the decision to have them follow two minutes behind have to do with them receiving shots at approximately that location?

A    Nothing.

Q    In regards to what the driver of that vehicle could have done when he began receiving fire, Mr. Hilfiger asked about taking an escape route out this direction and you then said, yeah, that's a possibility that the lead driver could have done that.  What's going to happen to the second vehicle if the first vehicle cuts out that way?

A    Same thing, he would be taken under fire.

Q    What's that do to the team that has been deployed to cover the west side of the vehicle and they're on the ground at that point in time?

A    Same thing, they will be taken under fire.

Q    You mentioned one avenue is to seek cover?

A    Yes.

Q    One is to return fire?

A    Yes.

Q    Is another possible alternative to attempt to cut the angle of the fire and take the source of fire out?

A    Yes.

MR. LITTLEFIELD:  Pass the witness.

MR. HILFIGER:  No further questions.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  Yes, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down, you may be excused.

You may call your next witness.

MR. HILFIGER:  Kenneth Wilson.

KENNETH WILSON, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    State your name, please.

A    Kenneth Wilson.

Q    How are you employed?

A    I was employed with the Sequoyah County Sheriff's Office.

Q    You were employed with the Sequoyah County Sheriff's Office in 1999, is that right?

A    Yes.

Q    And were you also part of an operation that took you out to a place called Kenneth Barrett's house?

A     Yes.

Q     And that would be sometime September 24th of 1999, do you recall that?

A     Exact date, no.  I know it was around then.

Q     Where did you first assemble before going out there?

A     I was first called to the sheriff's office.

Q     Okay.  What was your duty that -- let me ask you this:  Who called you?

A     Sheriff.

Q     And were you given an assigned duty?

A     Not right then I wasn't, later I was.

Q     At what point did you find out not where you were going to go but what you were going to do?

A     What I considered the staging area which I think was at Dwight Mission.

Q     At Dwight Mission, at that time you were informed of what you were going to do.  And when were you informed where this was going to happen, at the same spot at Dwight Mission?

A     No.  No, I was informed at the sheriff's office of where we were going.

Q     You were already aware at the sheriff's office that it was going to be an execution of a search warrant?

A     Yes.

Q     At Kenneth Barrett's house?

3982

A    Yes.

Q    And do you recall approximately how many -- not on the highway patrol people, but how many other people met there at Dwight Mission?

A    Not the exact number, I don't know.

Q    Do you know whether it was more than ten?

A    Excluding OHP or whoever?

Q    Yeah, excluding OHP?

A    Probably, yeah, more than ten maybe.

Q    And were you in your own car?

A    Yes.

Q    Did you have anybody else in the car with you?

A    No.

Q    And you proceeded on out to Kenneth Barrett's house with a group of cars?

A    Yes.

Q    But not right behind the highway patrol, I understand that.

A    No.

Q    What line were you in the car?

A    I was probably -- probably fifth or sixth.

Q    Now, when you got -- put on Number 69.  Do you recall, does this picture look familiar to you at all; can you recognize any of it?

A    Yes.

3983

Q    Do you recall that as Kenneth Barrett's house?

A    Yes.

Q    Now, this -- do you recognize this is a -- you'd be coming out from this way and coming in the road?

A    Yes.

Q    When you came in, where did you go to, what area did you go to?

A    I didn't get -- you mean where I did I park or where did I walk?

Q    Right.  Where did you park?

A    On the roadway.

Q    There's a laser right there, do you want to point out -- does it show on here approximately where you stopped?

A    Right there.  Actually, I stopped right in front of the drive.

Q    And then what did you do after you stopped there?

A    I got out of my car and before I got going up the driveway, I was told to move my vehicle.

Q    And then where did you move your vehicle to?

A    I just -- there were other cars in front of us and we just pulled further up the road.  Everybody just moved.

Q    Pulled on down the road.  Then what did you do?

A    From there I went to do what I was assigned to.

3984

Q    And what was your assignment?

A    That my assignment was to hook up with another deputy who was further back.  And we were assigned to basically look around the rear of the house.

Q    Now, where did you go?  Did you go right around to look at the rear of the house or did you see Kenneth Barrett there before that?

A    Yeah, I seen him there before I went to do the house.

Q    Now, at the time you arrived, do you know whether or not Rocky Eales had already been taken?

A    Before I arrived?

Q    No, at the time you arrived.

A    At the time we arrived, yeah, they were leaving.

Q    Is that why you had to move your car up?

A    No.  The reason I moved my car was I was told I needed to because they had men down and were needing ambulances.

Q    What now?

A    Men down and we're needing ambulances.

Q    And they needed that open to get in and out?

A    Yes.

Q    So, you went around to the back of the house first?

A    Yeah, about right in here I hooked up with Deputy Karnes.

3985

Q    And did you see Kenneth Barrett?

A    Yes.

Q    About where was he?

A    Would have been -- my pathway brought us up through here.  He was probably somewhere in here.

Q    Out in front of the porch?

A    Yeah.

Q    Okay.  And was he in custody of somebody?

A    Yeah, he was laying on the ground.

Q    Do you know who had him there --

A    No, there was somebody knelt by the Bronco.

Q    And do you see -- do you see this car here?  Do you recognize that as the Bronco?

A    Yeah.

Q    Was that the Bronco that you're saying that he was by?

A    Yeah.  I'm saying it is, yes.

Q    Was the Bronco in any different position in regard to the porch when you came up?

A    It was closer to the porch, definitely closer to the porch.

Q    And while you were there with Kenneth Barrett, did anything occur in regard to that Bronco?

A    Meaning?

Q    Did you -- was the Bronco moved or did you hear

3986

anything about it being moved, did you see it moved?

A    No, I did not see it move.  I heard someone say move it but then I also heard someone say -- it was either Deputy Karnes or the tac member that was kneeling beside Kenny -- not to move it because they would lose their cover.

Q    The cover being what?

A    The vehicle would be the cover and they were --

Q    But I mean cover from what area, over to this area?

A    This area.

Q    And so, at that particular time when that -- when you were there and heard someone say move it, the Bronco was up next to the porch, is that right?

A    Right.  It was, yeah.

Q    Okay.  And then but you didn't see any Bronco being moved?

A    No, I never saw it move.

Q    Then what happened after that as far as what you did?

A    I came across to this area in here where I believe Toby was and another tac member, he was laying on the ground.

Q    And again, did you ever see anybody move that car?

A    No, no, I didn't.

Q    Did you ever see the car -- did you ever recognize

3987

later on when the car was away from the porch?

A   No, no.

Q   You never saw how it got from the porch to where it is in this picture?

A   No.

MR. HILFIGER:  I have no further questions.

THE COURT:  Cross examination?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. HILFIGER:  Yes, he may.

THE COURT:  Mr. Wilson, thank you for your testimony.  You may step down and you may be excused.

You may call your next witness.

MR. HILFIGER:  Jim McBride.

JIM McBRIDE,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q   State your name, please.

A   Jim McBride.

Q   And, Mr. McBride, how are you employed?

A   I'm a lieutenant with the Oklahoma Highway Patrol.

Q   And were you with the highway patrol, Oklahoma Highway Patrol, in 1999?

3988

A    Yes, sir, I was.

Q    And how were you with them at that time, what was your occupation with them?

A    I was a supervisor with our special operations division and I was also assigned as the assistant tac team commander for our tac team.

Q    Now, as this being the assistant tac team leader, was that for the east team or the west team or --

A    I was assistant tac team commander which meant it was over both teams, divided into two teams.  Then over them was the commander and his assistant which was over both of them.

Q    Did you have an opportunity to participate in operations in Sallisaw, around Sallisaw, in September of 1999?

A    Yes, sir, I did.

Q    And how did you -- at that particular time, were you associated with the eastern team or with the western team basically?

A    Well, I was the assistant commander and I'd been in that position for approximately a year.  And as the assistant commander, both teams were under my realm of control.

Q    Had you been on -- well, when you went on special operations or the tac team stuff, did you go mostly with

the west team or the east team?

A     In the year, approximate year leading up to this, I alternated between the two.  Prior to that time, my career was spent with the west tac team.  I was the team leader for the west tac team for about eight years and I had been the assistant tac team commander for approximately one year.

Q     So it wasn't unusual for you to join up with the east team in 1999?

A     No, it wasn't.

Q     And how did you happen to be involved in this particular operation?

A     I received a phone call notification to report to Camp Gruber for a briefing of an operation that was going to follow and we were given a time, I don't remember if it was 11:00 or noon, to be at Camp Gruber and a building number, and that's when my involvement with this started.

Q     Would that have been in -- would that have been on September 23rd or is there another date you remember?

A     I thought it was the 24th, it could be the 23rd.  It's been a long time, but it was, yes, right around that date.

Q     And did you participate in the planning of the operation?

A     No, I didn't participate in it.

Q    Was that because the east team was mainly doing the planning or why didn't you participate in the planning of the operation?

A    It was -- normally the person with the most direct knowledge on our tactical team makes a plan and then briefs the plan.  The plan could have been altered.  I made comments about the plan during the briefing and asked questions about it but at about every question I had, they seemed to have an answer and had already had thought of that and had discussed it and thought it through, so to speak.

Q    Could you tell who was sort of the one leading the plan or you know --

A    The assistant team leader Buddy Hamilton was the one that initiated the briefing.  And the word in charge is kind of a loose term, but he was kind of the orchestrator of the plan.  I wouldn't say that it was all his plan.  Everybody had input on it.

Q    What was your assignment according to the plan?

A    I was assigned to ride with the tac team commander, Kerry Pettingill.  And we were to go between the vehicle -- I'm sorry, between the residence that the search warrant was for, and the trailer house which was beside it.  And we'd received information that a lot of times when they came up there, that the people from the

3991

residence that we were to execute the search warrant on would run to the trailer house. And we were to observe if that happened and if the person went in, and that was pretty much the extent of our assignment at it.

Q   Okay. And were you supposed to do anything as far as getting out of the car and checking the scene or were you supposed to stay in the car and watch for those people?

A   We were doing it from inside the vehicle, the observation. We had another team that was kind of our chase team, foot chase team. If we saw somebody, this team was going to come up there and take the people down before they entered another residence.

Q   And what car back were you in as far as the lead vehicle back to where you were?

A   We were actually in the last vehicle as the convoy went in.

Q   Now, were you part of -- were you there when the discussion went on as to the time that this operation was planned, you know, when you were going to make the approach?

A   Yes.

Q   And did you listen to or did you participate in setting the time?

A   There was -- it was going to be done during the

3992

hours of darkness and before daybreak.  As I remember it, the original time was going to be like 5:00 o'clock and then later -- when we were briefed, it was going to be, I think, 5:00 o'clock in the morning.  Then later it was backed up that we would leave at midnight and it was going to be executed shortly after midnight.  We would leave Camp Gruber at midnight.

Q    When the discussion was to do it at 5:00 in the morning, what was the particular reason for doing it at 5:00 o'clock in the morning?

A    They felt like that it would be higher a possibility that the people inside the residence could be asleep at that time.

Q    And what was -- what was the reason for changing it to 12:00 or 12:30?

A    Been a long time ago.  As I remember it, the time wasn't going to make any difference because if they were -- we had information that the people inside the house were up all night so it didn't matter whether it was at midnight or 5:00 in the morning, as long as it was during the hours of darkness.

Q    Do you know if there was any tactical reason for changing it from 5:00 a.m. to 12:30?

A    I don't know of any.

Q    Do you know who suggested the time of 12:30?

A    No, I don't.

Q    During the discussion of the plan, do you know whether or not there was any discussion of any -- the plan is to come out there -- as I understood it, the plan was to come out there, three entry vehicles come up near the residence and there would be an entry team that would get out and break in the door and enter the residence. Was there any discussion as to any contingency such as if the people were up?

A    Well, one of the contingencies is why the commander and I were where we were in case they ran.  That's why we had the fourth vehicle staged on the road to take down the runners.  Or they were also staged on the road in a marked unit in case the people at the residence left in a vehicle and pursuit was to happen.  So they were staged on the road for that contingency.

Q    That's Hise's car you're talking about?

A    Yes, that was Trooper Hise and Trooper Darst were in vehicle four.

Q    Was there any discussion about how the plan should develop if the people were up as opposed to being asleep?

A    When the plan was developed, as I remember, one of the assumptions was that the people would probably be up.

Q    So, when the operation started, you left Camp Gruber and went to Dwight Mission Road, is that right?

3994

A    Yes, it is.

Q    Was there any concern at Dwight Mission Road by you as to the number -- there was some other people that you met at Dwight Mission Road. Was there any concern by you as to the numbers of people at Dwight Mission Road that you met, not the ones in your troop?

A    Oh, a little bit because I didn't know the people. You're always concerned about the security of your operation when that many people know about it. Had I known all the people there and had I worked with them, I'd probably have less concern about it. But I did have a little bit of concern about it, yes.

Q    And you understood that that group was going to wait a period of time before they came along?

A    Yes.

Q    Did that resolve your concerns?

A    Well, I understood why they had that number. We were actually going to secure the residence and they were going to actually perform the detailed search, yes. And that did ease my concern, yes.

Q    As you left Dwight Mission -- and let's try 184. That's it. Do you recognize what's shown up there as Government's Exhibit No. 184?

A    Yes, I do.

Q    And of course, all those cars weren't out there that

3995

night, but do you recognize the road this is about -- are you sort of oriented as to how this is?

A     Yes.

Q     Do you understand this would be the road you would be coming in on, is that right?

A     Correct.  That is correct.

Q     And it turns up that way but the road down to Barrett's place is down this way?

A     Correct.  The road we came on comes through the bottom of the picture, is that what you're saying?

Q     Right.  Right down through here, right?

A     Yes.  Yes.

Q     That would be Kenny Barrett's house right there?

A     Yes, it would.

Q     Now, when you made this -- you were in Officer Pettingill's car.  When you made this -- crossed this intersection and started coming in here, do you know about how far ahead of you -- could you see Hamilton's car, the lead car?

A     I don't recall looking for that.  I don't know.  We could see the tail -- the vehicle in front of us was the one we were concentrating on.

Q     That's would Hise's vehicle?

A     That would be Hise's vehicle, yes.

Q     Now, at some point coming down here was -- was part

3996

of your plan that you would go turn off your headlights?

A    Yes.

Q    At what point did that occur, do you recall?

A    Been a long time.  No, I don't.  It was before we felt like we were within sight of the residence, but the exact location, I'm not sure.

Q    And was Hise also supposed to turn off his headlights?

A    The entire group did, yes.

Q    All five cars were supposed to turn off their headlights?

A    Yes.

Q    That's your understanding?

A    Yes.

Q    And part of the reason -- what was the reason for turning off your headlights?

A    To be able to get up to the residence before they started running.

Q    Okay.  Was there -- you say all five cars turned off their headlights.  Was there some part of the plan where the emergency lights would be turned back -- turned on?

A    Well, both the headlights and emergency lights were turned on, yes.

Q    Where was that supposed to occur as far as -- let's start with each car down the line.  As far as Hamilton's

3997

car, do you know where -- as far as the plan is concerned?

A    Well, all of them were turned on at the same time and it was after we reached -- the last vehicle in the convoy, we announced that we were at the driveway that we were to be at to observe anybody that may be running out. We announced that and it was a short time after that, that the lead vehicle gave the command and said light them up or turn them on or something indicating at that time is when both the headlights and the emergency lights came on.

Q    And that was an announcement that was made over the microphone?

A    Over our radios.

Q    Or radios?

A    Yes, sir.

Q    So the five vehicles were in radio contact coming in there?

A    Yes.

Q    And the lead vehicle is the one that you understood was said light them up?

A    As I remember it, yes.

Q    When that -- as you recall when that happened, where were you -- where was Pettingill's vehicle?

A    We had turned into the driveway between the two

3998

residence.

Q   Okay.  So, there's a line of cars right here and there's the trailer house right there.  Is the driveway somewhere in this area?

A   Yeah, the driveway is basically behind that line of cars.  I was looking on the picture here.  I don't remember --

Q   There's a laser right there in front of you.  Would you show on here where you think the driveway was when you say behind the line of cars?

A   In looking at the picture, the driveway is right in this area right behind those vehicles.

Q   Okay.  This line of cars right here, you say the driveway is right behind it?

A   It's to the north of those vehicles, yes.

Q   And had you already turned in at that time?

A   No.  Kerry announced on the radio, we're turning in. So we were -- I don't know either -- whether we had completed our turn or in the middle of the turn.  I don't know exactly where we were.

Q   Now, so as he was turning in, did he turn on the lights or were the lights turned on in your car?

A   Yes.

Q   And now, does that include headlights and emergency lights?

A    Yes.

Q    And who turned on the headlights?

A    The driver did, Kerry turned them on.

Q    Kerry Pettingill.  Who turned on the emergency lights?

A    I think he did.

Q    Now, do you recall Mr. Pettingill making any announcement about the time he was going in the driveway?

A    Well, yes, he announced we're at the driveway.  I'm not sure he said driveway or we're at the location.  I'm not sure which he said.

Q    Okay.

A    But that was part of the plan, he just announced that.

Q    Can you recall if Mr. Pettingill made any kind of announcement as far as seeing somebody out in the yard?

A    Yes, he did.

Q    When did that announcement come back?

A    At about the same time.  Right after the announcement to turn the lights on, once the emergency lights and everything started coming on, we saw a person that was beside the residence running first to the -- between the house and the garage was the first time I saw him.  And Kerry actually saw him first and said there's somebody there and I directed my attention there just a

4000

split second later.  He was running between the house and the garage and then started running to the west.

Q   Now, could you tell whether or not when Pettingill made that announcement, was he just telling you or was he doing it over the microphone, announcing it to everybody out there?

A   No, he was doing it on the microphone.

Q   Now, at that time, you say that -- at that time had he already turned on the headlights -- I mean, not the headlights, the emergency lights or was he turning them on?

A   I don't know the exact second that they came on. After it was announced to turn them on or light them up or whatever the phrase was, both the headlights and emergency lights were activated.

Q   How do you activate the emergency lights in that because that was a Suburban, right?

A   Yes, it was.

Q   Is that -- the activation button accessible by both the passenger and the driver?

A   Yes, it's in the center console area.

Q   Okay.  If Officer Pettingill said that you're the one that turned them on and he didn't, would you disagree with that?

A   I don't remember turning them on.

4001

Q    Have you ever said under oath in a previous statement that you just did not turn them on, not don't remember, just didn't turn them on?

A    Yes, I did make that statement.

Q    And at the time you made that statement, had you thought about the emergency lights and whether you had activated them or not?

A    When they asked me that question, it was the first time I had thought about who turned them on.  I remember them being on, but I don't remember how they were turned on.

Q    And after -- how far up into the driveway did you go, do you recall?

A    Estimation, about halfway between the road and the trailer house.

Q    Let's see if we can get another -- Number 69, please.  Can you orient yourself on this?

A    Yes, I can.  But actually where we stopped is probably close to the right of the picture on this.

Q    So, where you think you stopped is sort of outside the picture or right at the right?

A    It's hard to estimate without seeing how far the road is from it on the picture.  As I recall, we were about halfway between the trailer house and the road.  If that comes out to being to the right of the picture,

4002

that's about where we were.

Q    When you say halfway to this road here --

A    Yes.

Q    -- and this trailer house, some place halfway between like that, is that right?

A    Yes, sir.

Q    And when you stop at that point -- well, no, before you stopped, did you see this person running before the car stopped?

A    Yes.

Q    And did you ever hear any gunfire?

A    Yes.

Q    At what point did you hear gunfire in relation to how the car was, how the Suburban -- was it moving or stopped?

A    Approximately the same time.

Q    As the car was -- same time as what, the car was stopping?

A    Yes.

Q    Did you see where the -- could you see or tell where the gunfire was coming from?

A    Yes.

Q    And where was that?

A    From the porch of the residence to my right as I was sitting there.

4003

Q    At the time that you saw where the gunfire was coming from, were you able to determine where the other four cars were?  I'm talking about just starting with the Hamilton's, Greninger's, Hash's and Hise's?

A    I know where Hise's was for sure.  His was still sitting at the gate and he and Darst were out of it on foot taking down the person that was leaving the residence.

Q    Can you recall where Hamilton's car was?

A    Yeah, Hamilton's car was approximately where the van in the picture that is sitting with the back toward the residence with the two doors opened.

Q    Is this the one you're talking about?

A    Yes.

Q    You saw Hamilton's car right there?

A    Approximately there at a different angle than that van but distance from the residence, about that.  The other white Bronco was behind it and then Hash's car was -- actually, I don't know where Hash's car was.  I could see the emergency lights on Hash's car, but when I looked over in that direction, I know that it was behind them and it was coming toward me but it was hard to tell exactly where it was.

Q    And when you say Hamilton's car is somewhere in the area where the van with the double doors, but it was a

4004

different angle --

A   Yes.

Q    -- what kind of angle was it?

A   Well, obviously it was facing the opposite direction and the rear of it would have been further to the north than the front of that van is, if that makes sense to you.  It was still like it was turning coming up there and had not --

Q   And are you talking about at an angle something like this but it's out here or more of a straight-on direction?

A   It was an angle like the vehicle that's sitting there is.

Q   Use the laser.  I don't know which vehicle you're taking about.

A   The one that you were just referring to.

Q   This one here?

A   Right.  There it is.

Q   Say that again, it was --

A   His vehicle was at an angle and it may not have been as far out as this one.  It's hard to really see at night the distance, but it was probably closer in this area out here from the residence as opposed to up there.  The same distance that this vehicle is from the residence but probably maybe about right there.

4005

Q   Now, you're pointing to where it looks like some people are standing, is that right?

A   I'd have to look at this picture to see what that is.  I'm not sure what that is.  Yeah, it looks like some people standing there on the picture.  Probably close to that vicinity when the shots started.

Q   Where was Greninger's car?

A   It was behind his and had not -- Hamilton looked like he was executing a turn, if you will, right in here, starting to turn up this way.  Greninger was still strayed and Hash was still looked like coming toward me.  But the only vehicle that I could get much perspective on was the one that had already turned because the others, when you're looking straight at a vehicle, it's hard to tell.

Q   You couldn't tell, okay.  But the other two you were looking straight at?

A   Yes.

Q   Now, as to Hamilton's car, did you see -- you said Hamilton said light them up or the lead car said light them up, did you see emergency lights on Hamilton's car?

A   I don't recall seeing them on his at that time.

Q   Did you see emergency lights on Greninger's car?

A   I don't recall seeing them either.

Q   And now, I'm sort of lost a little bit on what

4006

you're saying on Hash's car.  Did you see his car at that time when you looked through there?  I thought you said something about you couldn't but what do you remember about that?

A    Okay.  I could see that his car was back there because I could see the emergency lights off of his car lighting up everything out there.  But how far it was when it had the emergency lights on behind the other two, it's hard for me to judge a distance behind them.

Q    When you first heard the gunfire, describe -- well, describe it in the sense that could you recognize what kind of gunfire it was.

A    Not at the time.  You know, I thought about it later and attempted to identify it.  At the time, all I knew was that it was gunfire.

Q    What about the number of shots?

A    I think I previously estimated 15 to 25 but I wasn't counting shots.

Q    What about the rapidity of the shots, was it slow, medium.

A    It was so quick that I thought that it was a fully automatic weapon.  It would fire in bursts, three or four round bursts, and then there would be a pause and then three or four round bursts it sounded like.

Q    Did you see -- well, when you were out here and you

4007

heard those shots, you looked, you saw the -- something from the porch, is that right?

A     Yes.

Q     Describe what you saw from the porch.

A     From my position when the -- when I looked toward the porch, I saw a silhouette of someone on the porch firing from my left to my right.  In other words, away from the porch by the way the flash would come off the weapon.  When there would be muzzle flash, I could see a silhouette of someone standing on the porch.  I saw the silhouette of the person -- almost the full silhouette of a person on the porch.

Then I looked back at Hash and -- I'm sorry.  I looked back at Hise to make sure that there wasn't any fire coming -- they were closer to me than the person on the porch was firing.  I looked back at them to make sure that the person they were attempting to take into custody wasn't firing and he wasn't, then I looked back to the front porch a second time.

Q     What did you see when you looked back the second time?

A     Some more muzzle bursts but I didn't see the full silhouette at that point.  I could see a partial silhouette and it was blocked by something in my view.  I could see a weapon and an arm and part of a head just was

4008

silhouetted there.

Q    Now, and I'm not following when you say from your left to your right.

A    Okay.

Q    When you're out here --

A    Yes.

Q    -- this would be left, this would be right?

A    Yes.

Q    I don't understand.

A    Okay.  When I'm right here, the muzzle flash was coming from here which would have been my left going this way which would be my right.

Q    So it would be going -- are you familiar with the directions out here?

A    Yes.

Q    So are you saying it's going in a southerly direction?

A    Yes.

Q    And then while you were doing these observations, where were you in relation to the car?

A    In relationship to which car?

Q    The car you were in.

A    Okay.  As the firing started, I was grabbing my weapon and opening the door at the same time I was making the observation.  And I got out of the car, the Suburban,

4009

and then the firing was over.  My plan was, it was to get behind the vehicle, which is what we're trained to do, to use it for protection but I never got that far.

Q   So, the firing, from the time the firing started until it stopped was the amount of time that -- or somewhere around the amount of time it just took you to get out of the car, is that right?

A   Well --

Q   Is that -- I'm trying to understand what you're saying.

A   No, it's I -- the sequences as I recall it was I was looking at the guy that was running, Hise and them.  I heard the firing and looked up there and then looked back at them to make sure that they weren't in any threat there and then I looked back at the porch and started getting out at that time.  So it was really the second time I looked at the porch that I started getting out. By the time I got out of the vehicle and walked approximately to the right front tire, the firing was over.

Q   Okay.  Could you tell how far out you're saying that person was out on that porch?

A   They didn't appear to me to be the same distance from the first time I looked until the second time I looked.

4010

Q    Well, how far out the first time you looked?

A    The first time I could see almost a full silhouette. The second time I could only see a partial silhouette. So I think they were further out on the porch the first time as opposed to the second time I looked.

Q    Could you tell how much of the weapon was outside, if any, the first time?

A    The person holding the weapon, I could see the biggest portion of his body or her body, the person's body.  I couldn't even tell whether it was a man or woman at that time but -- so the weapon was completely out of the house at that one.  The second one, I could just see a partial and part of the weapon could have been in the house on the second time I looked up there.

Q    Okay.  Are you familiar with a Colt Sporter rifle?

A    Yes.

Q    Are you familiar with how it ejects ammunition?

A    Yes.

Q    And how does it -- what area does it eject from, which side?

A    The right side.

Q    And are you saying the first time you looked up, the shooting was going from the left to the right and you're saying the weapon was all the way out on the porch, would that be ejecting -- based on what you're seeing, would it

4011

be ejecting brass down this porch line down here from what you saw?

A   Well, of course, that would depend on the angle they were firing.  They could be on the porch and whether they were firing, you know, to their left or right, it would certainly be ejecting.  But if they were, you know, pointed a little bit to the right -- I don't know exactly.  I'm not an expert on that nor could I say exactly where it would land.  Yes, it would be ejected to the right of the shooter.

Q   To the right of the shooter and you're saying that the Colt -- the weapon, it was all the way outside the house, is that right, the door of the house?

A   The first time I saw it --

Q   The first time you saw it.

A   Yes.

Q   You're also saying that the firing was going in a southerly direction?

A   Yes.

Q   Did you hear any different types of shots other than the rapid shots you heard at first?

A   I heard some later bangs at the end of it all, yes.

Q   Okay.  Could you tell a difference in what those shots were?

A   Yeah.  They didn't sound at all like the first shot.

4012

I originally thought that it was a shotgun up there.

Q   Did you -- do you know what a flash bang is?

A   Yes.

Q   Could you tell whether or not there was a flash bang that went off?

A   I now think that what I thought was a shotgun was probably the flash bang going off because I never -- I don't recall hearing the flash bang.  I heard this loud bang and thought it was a shotgun.

Q   And after the flash bang, did you hear any other shots?  Well, let me ask you:  After the flash bang occurred, did you hear any of those rapid shots?

A   I don't recall hearing the shots after that, no.

Q   Did you hear any other shots?

A   I heard a shot -- after I thought the shooting was over, I did hear another shot, I thought, but it was so muffled it may not have been a shot.

Q   Where did you go -- around to the front wheel of the car when the firing, as I understood, when the firing stopped, where did you go from there?

A   I had my back to it when I heard the louder shot. When the rapid firing ceased, I thought the firing was over and I started walking to get back into the vehicle because they were hollering on the radio about somebody had been shot.  At about the time I was getting back into

4013

the vehicle is when I heard the last, what I thought was a shotgun that I think now was probably the flash bang. So I was -- as soon as they started saying on the radio, at about the time that the rapid firing stopped, they were saying on the radio that they had someone down.

Kerry was getting back in -- Kerry was in the vehicle and he was trying to clarify whether it was an officer down or whether they had shot the person that was shooting at us.

Q   To your knowledge, did Pettingill get out of the car?

A   To my knowledge, I don't know, no.

Q   So, you can't say that he did or didn't, you just don't have any idea?

A   I didn't look over there and don't know.

Q   But how long a time was it that you were out of the car?

A   Almost long enough to get out, walk up to the front tire, and get back in.

Q   So you were just out a matter of a few seconds, would that be a safe --

A   A few seconds is probably a good estimation.

Q   When the car stopped and you started hearing fire, Pettingill, was he in the car at that time?

A   I don't know.  When I got back in the car and was

clarifying on the radio, he was in there at that time but I don't know if he had just got back in or whether he had been in the whole time.  I don't know.

MR. HILFIGER:  May I have just a moment, Your Honor?

THE COURT:  You may.

Q    (By Mr. Hilfiger)  How long was the interval of the fire of this rapid fire, do you recall?

A    I'm not sure I understand your question.

Q    You don't understand it?

A    Right.

Q    How long a period of time from the time it started until the time it stopped?

A    Oh, okay.  I don't know.  I would estimate probably -- it's hard to judge time with that but I would say 30 seconds to maybe a minute and a half.  I know it's a wide range, but it's -- there's so much going on, I don't have a good feel of what time period lapsed there.

Q    Well, let me back up.  The interval of fire or the time period of this fire was from the time just before you got out of the car, you went to the front wheel, and then you got back in, is that right?

A    Well, no, it first started when I was watching Gene and them.  There was some firing going on at that time. So I directed my attention to the house and then I heard

some more.  I look back at Gene and them, and then I heard some more after that.  After I looked at them, I looked back at the house a second time.  That's when I got out of the car and walked up around it.

MR. HILFIGER:  Okay.  I have no further questions.

THE COURT:  You may cross examine.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    Mr. McBride, when was it, if any time, that you came over into this area here?  We're looking at Government Exhibit 69.

A    After everything was over, we tried to get a GPS to get a Mediflight out there.  I don't -- probably --

Q    Was it after -- had Rocky been removed?

A    Yes, sir.

Q    So, you and Mr. Pettingill stayed in his vehicle out in this area someplace, Rocky was removed, and after that you all drove the Suburban into that area; is that correct?

A    It was at about the same time Rocky was removed that Kerry drove over to that area, real close.

Q    And your perspective from here was not directly on, as if you were right south or immediately east of that residence; is that correct?

4016

A    That is correct.

Q    You were, in fact, some distance over.  The driveway is -- here's the front porch of the trailer.  I don't know if you recall that or not.

A    Yes.

Q    So you would have been way out in here?

A    About halfway between the trailer and the road and you can see on there it kind of looks like two little tire tracks.

Q    These?

A    Yes.  That was kind of the drive coming in that we were on.

Q    You don't see any of the -- you can see the driveway clearly discerned here?

A    You can.

Q    You can't see it at all here?

A    It's very weak in that picture, yes.

Q    Well, you can see two tire tracks, but do you see any place where it's beaten down as if the driveway is in this area here?

A    No.

Q    In fact, on direct you indicated you were probably off of the picture?

A    It's hard for me to judge without -- on that picture exactly where we were because the picture is not there.

Q    Okay.  It doesn't go far enough over for you to see the whole view?

A    Yeah.

Q    You observed where -- the runner in the front yard, where was that person?

A    When we were first turning in off of the road and --

Q    I didn't ask you that.  I said where was that person when you first observed him?

A    Approximately, oh, I'd say right in this area coming kind of toward us.

Q    That's where your attention was diverted or where your attention was directed at first?

A    Yes.

Q    Now, you said Gene, Gene Hise and Robert Darst were on the ground moving into that area; is that correct?

A    Yes.

Q    And where were they when you first saw them?

A    First saw them?

Q    First saw Gene Hise and Robert Darst.

A    Approximately right in here.  Well, in this area right here taking down the person.

Q    That would have been between the pickups or behind those two pickups there?

A    It was real close to those pickups, maybe a little bit south of them, but not much.

4018

Q    At that point, the location of the individual outside the residence and Mr. Hise's and Mr. Darst's location was what was primarily drawing your attention and your focus; is that correct?

A    That is correct.

Q    You were still in Mr. Pettingill's Suburban?

A    Yes.

Q    The visor lights at that point in time were on?

A    Yes.

Q    In regards to the plan, was there a plan regarding the timing of arrival of individuals?

A    Yes.

Q    And you indicated as you're here, Darst and Hise or Darst and Hise are already on the ground here; is that correct?

A    Once we -- no, that's the first time I saw them was they were at that location.

Q    That's about the time you all arrived here, they're out here on the ground; is that correct?

A    Yes.

Q    So they would have gotten there and gotten out of their vehicle about the time you're turning in?

A    Yes, and that was the plan.

Q    And when they're getting out of their vehicle and you're coming in here, where are the lead vehicles

4019

supposed to be?

A    They were turning in on the road --

Q    This road here or this road here?

A    I'm not sure.  I don't know where they were.

Q    Did you notice anything about the direction of travel of this individual over here?

A    Yes.

Q    Tell the jury about that.

A    As soon as the emergency lights came on, he changed direction.  He looked like he was coming toward us when we first saw him while we were sitting by the road.  As we drove up in there and the emergency lights were activated on the Suburban unit, he changed the direction and started going down the driveway so to speak.

Q    When your Suburban emergency lights came on, he started moving this way?

A    Yes.

Q    When did you first notice the emergency lights on over here?

A    At about that same time.

Q    Your attention is still on him, is it not?

A    Yes.

Q    Him and Darst and Hise?

A    Yes.

Q    So do you know the exact location of these vehicles

4020

over here at that point?

A   No.

Q   And then you hear shots?

A   Correct.

Q   And when you hear shots, what are you looking at when you first hear them?  Are you looking at the individual on the ground or are you looking at Hise and Darst because that's all you told us you were looking at at that time?

A   I'm looking at kind of all three of them.  They were merging.  As he was going toward them, they were running toward him.

Q   So they were getting closer?

A   Yeah.

Q   And in fact, Mr. Pettingill had announced we've got a runner west of the house or words to that effect?

A   That's correct.

Q   So they could hear that and were looking for the runner?

A   Yes.

Q   And then you hear shots?

A   Yes.

Q   When you heard shots, where did you look?

A   To where I perceived them coming from.

Q   You mentioned a silhouette on the porch, is that

4021

where you first looked to?

A    Yes.

Q    And how long was it that your eyes were trained on that front porch right there?

A    I don't know, a matter of seconds.

Q    So I mean, it wasn't just glanced, there it is, and immediately focus somewhere else, you saw the silhouette?

A    It was -- I looked there long enough that I could form an opinion what I saw on the porch.

Q    How were you able to see the silhouette?

A    I could only -- well, there was -- the silhouette I could mainly see when he fired, the muzzle blast illuminating.

Q    Was there any other lighting showing on the porch?

A    Yes.

Q    What other lighting?

A    The red emergency lights from the highway patrol unit.

Q    And do you have an opinion as to which lighting was -- whose lights it was that was putting red lighting from the highway patrol unit on the porch as the shooter was out there shooting?

A    It was Steve Hash's, it was an overhead type light. I don't know the distance he was from me, but I could see the overheads on and they were what was illuminating the

4022

porch with the red.

Q   Describe what those overhead lights were doing as they came across the yard.

A   As they pulled in, it would light up the porch and then it wouldn't, then it would illuminate the porch and then it wouldn't.  It would make everything on the porch look red.  Now, I did not -- when the person on the porch was not shooting, I couldn't distinguish him up there.  There wasn't enough light to really see what was on the porch but --

Q   The overhead light was not like a spotlight which just totally brightens up the porch?

A   That's correct.

Q   Okay.  You then -- and you saw that for a matter of a second or so?

A   Yes.

Q   Then where did you focus your attention?

A   I looked back at Hise and the other trooper and the person that was running to see if they were -- they were closer to me, to see if they were having any trouble and to see if that person was also firing.

Q   How long did you look at them, do you think?

A   They had him on the ground when I -- I looked away and they were in contact with him and I looked at the silhouette on the porch.  When I looked back, he was on

4023

the ground being handcuffed.

Q   Then after you saw that person was on the ground being handcuffed, where did you direct your focus and look then?

A   That's when I started exiting the vehicle and looked back to the front porch.

Q   Looked at the front porch again?

A   Yes.

Q   Is that when you saw the partial silhouette?

A   Yes.

Q   In that sequence, where did you first see Mr. Hamilton, Mr. Eales' Bronco?

A   The very first time I saw it, it was still en route up there --

Q   No, my question is in relation to that sequence, you see -- and we know now that person in the front yard was Toby; is that correct?  You understand that was Toby Barrett?

A   Yes, it was.

Q   And you learned that?

A   Yes.

Q   And so you saw Toby moving back in this direction, you saw Hise and Darst, nothing to draw your attention away from them at that point, was there?

A   Correct.

4024

Q    Then you heard the shooting and you looked up and saw the shooter on the porch, saw essentially the full silhouette?

A    Yes.

Q    And then you said you looked back to Hise and Darst and saw them taking Toby down?

A    Yes.

Q    Then you looked back to the porch and saw a partial silhouette where you couldn't see the entirety of it as you had when it was further out on the porch?

A    Correct.

Q    Where was it -- when in that whole sequence was it that you first observed the Hamilton Bronco?

A    I could see the headlights of the lead Bronco, which was supposed to be Hamilton's, the first time I looked up there.  I mean, I really couldn't tell it was his Bronco. I know now it was but --

Q    I don't think there's been any dispute or any question that the first vehicle in the yard was Mr. Hamilton's Bronco.

A    Right.

Q    Nobody is trying to pin you down on that.

A    Okay.

Q    But my question is when in that sequence was it; you say you picked up the headlights?

4025

A     Yes.

Q     Did you get a firm location when you picked up the headlights?

A     He was --

Q     Question is did you get a firm location?

MR. HILFIGER:  Your Honor, he's trying to answer the question and Mr. Littlefield interrupted him.

MR. LITTLEFIELD:  The question asked for a yes or no answer.  When he started, it was he was.  It was unresponsive.

THE WITNESS:  Would you ask the question again?

THE COURT:  Okay.  Rephrase the question, please, for the witness.  The witness will disregard the first question, previous question.

Q     (By Mr. Littlefield)  Did you -- when was it you first picked up the first of Mr. Hamilton's headlights?

A     When I looked over at the porch the first time.

Q     Were you able to ascertain the exact location from the headlights?

A     Exact, no.

Q     What was Mr. Hamilton's vehicle doing?  Was it stationary or moving?  Let me put it that way.

A     Moving.

Q     What kind of clip, how fast?

A     Not -- not real fast.  I would estimate it ten miles

4026

an hour, maybe as quick as 15 but --

Q    How do you know that if you weren't looking directly at it?

A    By the way it was changing positions.

Q    Well, what were you looking at?

A    At what the person on the front porch was shooting at.

Q    I thought you were looking at the person on the front porch?

A    I did.

Q    Well, I mean, are you looking -- is your focus on the shooter or the vehicle that's coming into your vision?

A    The shooter.

Q    And then you went back to Mr. Hise and Darst as they're taking down Toby?

A    Yes.

Q    And then where did you see Mr. Hamilton's vehicle? This is where the shooter is partially silhouetted?

A    Right.  I don't recall where his vehicle was at that point.

Q    Okay.  Do you know where he ended up?

A    I mean --

Q    When it got to the house, where did it end up?

A    I know where it was at when we drove up to the

4027

house, yes.

Q    Where was it?

A    Approximately where it shows in the picture back away from the porch.

Q    When you drove up, it was back about that location?

A    Yes.

Q    Now, earlier you said at one point you thought his vehicle was here?

A    No, it was that distance from the porch over about where those men are.

Q    In this area here?

A    Yes.

Q    Where was it the last time you saw it before -- I mean, the second time you saw the shooter, the second time you saw the shooter, where was it?

A    The second time I saw the shooter, I didn't see the vehicle.  I mean, it was there but I don't recall where it was.

Q    So you just aren't sure?

A    I don't even remember seeing it.  It obviously had to be there but I don't remember seeing it.

Q    It didn't take off like a helicopter obviously.

A    Right.

Q    You just don't recall?

A    No.

4028

Q    You said you didn't recall Mr. Greninger's emergency lights being on, do you recall saying that?

A    I said I couldn't see if they were on, yes.

Q    I think you said you don't recall emergency lights on Mr. -- on Raymond Greninger's car?

A    Yes.

Q    Could they have been on?

A    Yes.

Q    Any question your all's emergency lights were on?

A    No question ours were on.

Q    When you were in Pettingill's vehicle after everything kind of -- the lull finally hit, what were you doing?

A    You mean after I said that the shooting fired or after Rocky had been removed?

Q    After the shooting stopped.

A    Immediately after?

Q    During that period of time from the time you returned to the vehicle until you all moved over to that property over there.

A    Trying to get a GPS location, a Global Positioning System, location of where we were to get an air ambulance to our location.  So I picked up our Global Positioning System, the GPS, and was trying to pick up the satellites, and I was also calling for assistance on our

radio with the Muskogee Highway Patrol headquarters.

Q   Okay.   You were asked about Mr. Pettingill getting out of the vehicle.   After the vehicle was moved over in this area, did Mr. Pettingill get out?

A   Yes.

Q   Did you get out?

A   Yes.

Q   What did you do in regards to the crime scene area, sir?

A   Put tape around it, a caution tape.   The tape in that picture I think is the tape that I put up.

Q   Okay.   And what did you do, if anything, to maintain security of that scene?

A   I sit at the -- Pettingill's vehicle was located approximately right in this area right in there.   And I sit in his vehicle to make sure that no one entered into the taped off area.

Q   Did anyone enter the taped off area?

A   Yes.

Q   Who?

A   Trooper Phillips and myself.

Q   Is that Vernon Phillips?

A   Vernon Phillips.

Q   And for what reason did you all enter the taped area?

4030

A   We're both members of the bomb squad and they had information that the back door was booby trapped and they wanted to make sure that that -- there was some wires running from it and they wanted to make sure that that wasn't booby trapped before they went in and did their search of collecting evidence in there.

Q   Did you and Trooper Phillips go check that back door?

A   Yes, we did.

Q   Was it safe?

A   Yes, it was safe.

Q   Other than you and Trooper Phillips going in to make sure there wasn't a booby trap, what officers were -- or individuals were walking around in that crime scene from the time you put up the tape until you turned over the responsibility to someone else?

A   No one.

Q   What time was it you turned over responsibility to anyone?

A   About five minutes after 4:00 in the morning.

Q   And where was the OSBI at the time you turned over the responsibilities at the scene?

A   They were at the scene.

Q   What agency did you turn the responsibility over to, sir?

4031

A    To the sheriff's office.

Q    But OSBI was already there?

A    Yes.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Let's take the afternoon recess. Members the jury, if you would remember my admonition.

I ask everyone to please remain seated as the jury leaves the courtroom.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Officer McBride, you may step down to be recognized back.

(Whereupon, the witness left the courtroom after which the following record was made.)

THE COURT:  Anything to take up outside the hearing of the jury?

MR. LITTLEFIELD:  Not from the Government, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  Nothing.  Really, I thought we would do a little bit of planning, we'd talk a little bit about that.  I anticipate about a half a day at the most tomorrow.  I think -- I believe that would be true.  If it's going to run any longer than half a day, it's just going to be early afternoon.  And then would you

4032

anticipate we would have the rest of the afternoon just to take up closing?

THE COURT:  Well, first the Government may have rebuttal.  I'm not -- they prepared to talk about that yet?

MR. LITTLEFIELD:  We haven't talked about that yet in any kind of detail.  At this point, I wouldn't think it would be extensive at all, at this point.

THE COURT:  If you finish at noon we, of course, have instructions to deal with and that would probably occupy the afternoon and perhaps rebuttal.  That sounds like a plan we could work with.  You both be thinking about time for closing and what your thoughts are.  You don't have to tell me yet, but be thinking about that also.  I think it's appropriate to bring that up.  Thank you.

MR. HILFIGER:  Thank you.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, the Defendant is present with counsel.  I believe it's time for redirect.

4033

REDIRECT EXAMINATION

BY MR. HILFIGER:

Q    Mr. McBride, I'm sort of at a loss now on the Hamilton car.  Can we look at Number 69 so we don't get -- this is the picture of the aerial that you were looking at where you were off the picture a little bit or somewhere in that area?

A    Yes.

Q    And the question -- there was a question concerning where the Hamilton car was.  And I got your answer as saying when you drove in or when Pettingill drove in, the Hamilton car is where it is at in Government's 69.  And I don't think you said in that picture.  Were you referring -- after this incident, the Pettingill car went over to the other -- to Kenny's residence, isn't that right?

A    Yes, it did.

Q    Do you remember what I'm talk about here?  You said something about when Pettingill drove in, Hamilton's car is where it is at up here -- it's about where it's at or at right up there.

A    When we drove into the actual scene, if you will, not when we drove into the road.  In other words, when we moved from where we originally were when we drove into their driveway, if you will.

4034

Q    In this driveway?

A    Yes.

Q    Okay.  That's what I was --

A    Yes.

Q    So you're referring to when you guys -- do you recall how you came out of here?  Would you have made a big U turn and go out or did you back up and go out or can you recall?

A    We didn't go back to the road.  By the time we moved over there, there was a lot of vehicles blocking the road.  And at the time, there was some fence posts here but there's not a fence.  He drove right up and like where that car is through there and down to about in here.

Q    And by that time you're saying when you drove through there and came over here, Rocky Eales, had he already left or was he in the process or do you know?

A    He was -- we started moving over there at about the same time that they were taking Rocky out.  It was after they had rammed the gate and opened it and Rocky was leaving.

Q    And you're saying at that time the Hamilton vehicle was right there when you guys --

A    Yeah.

Q    -- had driven over here?

4035

A   Approximately there, yes.

Q   Did you ever see the Hamilton vehicle up here in this area?

A   No, I did not.

Q   Now, let's talk a little bit about the crime scene tape.  You started putting up crime scene tape.  Where did you start stringing it, if you can recall?

A   Over on this side.  I think I tied off right there and went around and there's a --

Q   A blue pickup?

A   Well, I don't know we're tying it to the blue pickup.  I can't see in the picture what that is up there right there that it's tied to.

Q   But this part of the tape right here, you say you put in?

A   I think all of the tape in that picture I put in. There was later some additional tape that was put way outside, in fact this may be it over here, I think, but I didn't put that in.  The one I put just surrounded the immediate residence and Trooper Hamilton's vehicle.

Q   Like from around here?

A   Yes.

Q   Now, this vehicle, would you know if that's Hise's vehicle?

A   Yes, that is.  It looks like it's his vehicle, I

4036

think it is, yes.

Q    You went behind his vehicle and the Bronco was in that position, and you went around the Bronco and then came up over here?

A    Correct.

Q    Let's look at 192 for another view up here.  This is another view, this 192, and you're talking about this tape --

A    Yes.

Q    -- going down to where we saw a post over there and it's going around that vehicle which I'm saying is -- I'm calling Hise's vehicle?

A    I think that is Hise's vehicle.

Q    And then on around the back of the Bronco and up to the blue pickup.  Do you recall whether you tied anything to the Hamilton Bronco?

A    I think I did but I'm not positive.

Q    Now, did you put this tape down, if you can recall, going out here into the yellow flowers?

A    Yes, we did.

Q    So you did that?

A    Yes.

Q    Would that have been all at the same time or did you -- I mean, I know you didn't do it all at once but if you used the same process?

4037

A    We went around the house first and tied off on that vehicle. And then we did -- I was afraid we were going to run out of tape, so then I did have tape left and I went up trying to get it around Hash's vehicle but I wasn't able to. I ran out of tape at the point that you see it ran up there.

Q    I hand you what's been marked as Defendant's Exhibit No. 107. I don't think that's been admitted. Do you see that picture?

A    Yes.

Q    I'm mainly asking about the yellow tape on there, do you recognize that picture, first?

A    That's the pickup, it looks to me to be the pickup that's sitting beside the house, yes.

        MR. HILFIGER: Your Honor, I move to introduce Defendant's 107.

        THE COURT: Any objection?

        MR. LITTLEFIELD: No.

        THE COURT: Be admitted without objection.

        MR. HILFIGER: Ask can we display that, please.

        THE COURT: You may.

Q    (By Mr. Hilfiger) And this is the pickup to the side of the house. Is that part of the crime scene tape that you put up?

A    Yes, it is.

4038

Q    I show you what's been -- I believe 106 has been admitted.  Do you recognize that?

A    Yes.

Q    And it shows on there at 00:55?

A    Yes.

Q    So that would be 12:55, 55 minutes after the -- into the new day, is that right?

THE COURT:  Has it been admitted?

MR. HILFIGER:  I have it admitted, yes.

A    It would be five minutes to 1:00, yes, sir.

Q    (By Mr. Hilfiger)  Would that be the time that you'd done the whole scene, the whole tape deal that you did, or would it be when you started doing the tape or can you recall?

A    It didn't take that long to put the tape up.  I don't know if that was the beginning time or the ending time.

Q    Now, from the time that that tape was up, who was in charge of all of the area inside that yellow crime scene? I mean, into the house area, who was in charge of that?

A    I was except for the approximately 30 to 40 minutes that I gave a statement to an OSBI agent.  During that time, Kerry Pettingill was and he told me nobody went in during that time but the rest of the time I was there.

Q    Now, we've used this a lot of -- it seems like some

4039

terms have been made that no one went in and no unauthorized people went in. I guess my question to you: Are you saying in just a flat no one went in or are you saying no unauthorized person went in?

A   Vern Phillips and I are the only ones that -- until I turned it over to the deputy at 4:05, are the only two that I remember going in there once it was established.

Q   Was there something that you did to make sure that no person went in there?

A   I sat in the vehicle right by that.

Q   Do you know -- while you were out here -- if we could go back to 192. While you were out there sitting in the vehicle for some period of time, did you see Kenny Barrett out there and anybody that had custody of this person right here, Kenny Barrett?

A   During that three hours, I didn't see him.

Q   I'm not talking about the last part of the three hours, I'm talking about from 00:30, 12:30 about the time this incident took place, for 30 minutes did you see Kenny Barrett any place out in this area?

A   No.

Q   Did you -- when you say you sat in the Bronco, I guess -- I mean not the Bronco, the Pettingill's Suburban?

A   Yes.

4040

Q   Was he parked somewhere around in here?

A   Yes, he was.

Q   Did you see if anybody had custody of people over here?

A   There was people over there.  I don't know what they were doing.

Q   What about the troopers that went in to clear the house, are you counting them as far as people that went in the house or not?

A   The troopers that went in the house was before I put the tape up and before I established that 00:55.

Q   So they went in the house and cleared -- you're saying they cleared the house before the 00:55, is that right?

A   Yes.

Q   And then after they came out, you're saying nobody was in this area except you and Officer Phillips until you turned it over to the sheriff, is that who you turned it over to?

A   Deputy sheriff.

Q   And when -- now, were you aware of an individual named, I believe, Paul Gordon?

A   Yes.

Q   Did he come out there?

A   Yes, he did.

4041

Q    And when he came out there, did he take pictures, a video like at 3:00 o'clock in the morning or something like that?

A    I don't know.

Q    Do you know whether Paul Gordon got access into this area?

A    Not at that time.  It would have been after --

Q    After you turned it over?

A    -- 4:05, if he got in.

Q    And during the time from 00:55 until 4:00 o'clock, it's not the question of whether unauthorized people were in there, you're saying nobody was in there except you and Officer Phillips?

A    I'm saying that's my recollection, yes.

MR. HILFIGER:  I have no further questions.

THE COURT:  Recross?

MR. LITTLEFIELD:  May I have just a second, Your Honor?  I have no recross, Your Honor.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

MR. HILFIGER:  Yes, he may.

THE COURT:  Officer, thank you for your testimony.  You may step down, you may be excused.

You may call your next witness.

MR. HILFIGER:  Vin Rosser.

4042

VIN W. ROSSER,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    State your name, please.

A    Vin W. Rosser.

Q    You are employed with the OSBI, is that right?

A    Yes, sir.

Q    And you were the case agent for OSBI in this case or what was your position in this case?

A    Case agent.

Q    As case agent, what's your responsibility?

A    Basically to organize and manage the information and logistics at the crime scene.

Q    What time did you arrive at the crime scene?

A    I believe it was about 2:00 a.m. on the 24th.

Q    When you arrived at the crime scene, as far as OSBI people, what OSBI people were there?

A    I was the first OSBI personnel at the scene.

Q    And did you come by yourself or with somebody else?

A    I came by myself.

Q    So you were first and you arrived at around 2:00 o'clock, would you say?

A    I believe so.

4043

Q     When you arrived, did you check in with somebody?

A     I met Major Pettingill.

Q     And where was he in the -- was he sitting in the car, was he -- where was he?

A     He was south of the Kenneth Barrett's residence near his Suburban.

Q     And at the time you arrived, who appeared to you to be in charge of the crime scene?

A     I guess that would be Lieutenant McBride because Major Pettingill was standing there next to the Suburban and he had pointed out the crime scene tape.  And I think Lieutenant McBride was there in front of the Suburban.

Q     And as case agent on this particular case, had you been given authority to -- what authority had you been given as case agent on this particular case when you arrived at the scene?

A     Well, to take what steps necessary to investigate it.

Q     Okay.  And in order to do that, did you need to do anything as far as the crime scene is considered?

A     Yes.

Q     What was that?

A     Make sure it was secure.

Q     When you got there, were you aware of -- did you see anybody inside the crime scene?

4044

A    No, I did not.

Q    When you got there, do you know whether or not Kenny Barrett was still there or had he gone?

A    He was gone.

Q    What individuals from the highway patrol were there when you got there?  We got Pettingill and McBride.  What other highway patrolman were there, if any?

A    In the immediate area or at the scene or --

Q    In the immediate area.

A    There were several.

Q    Okay.  How many of them are the ones we've talked about that were in the assault or the approach or whatever you want to call it?

A    The only two tactical team members that I recall was McBride and Pettingill.

Q    So, the Manion, Greninger, Hise, Hash, Darst, Poe, those people had already gone?

A    Yes, sir.

Q    Or were they -- I mean, because I talked about the immediate area, or were they in some outlying area around here?

A    They weren't at the area out there.  They were in Sallisaw.

Q    What highway patrol people were there then?

A    I don't know.  There were a number of them.

4045

Q    By number, are we talking ten or more or less?  I'm talking about just highway patrol people.

A    I'd say probably ten or 12.

Q    What were they doing?  What was going on, they just standing around or were they doing something as far as looking around, doing -- you know, actively doing something in the case?

A    It appeared to me they were assisting regulating traffic in and out of the area at the intersection west of the residence.  Then there were some in the roadway and some at the drive of the Barrett residence.  And I recall they were assisting the sheriff's deputies getting traffic in and out of there that needed to be in there.

Q    Now, so would we say any of them were in that you saw -- other than Pettingill and McBride, were any of them within like the model area?

A    No, sir.

Q    Okay.  Now, the sheriff's people, that was another group of people that was out there, wasn't it?

A    Yes.

Q    About how many of the sheriff's people were out there?

A    I don't recall.  There were several from the search party that were still at the road and they were waiting to be interviewed.

4046

Q    And when you say several, ten or less or ten or more or what?

A    I have no idea.

Q    Were any of the sheriff's people located in the -- like the model area?

A    No, sir.  Best I recall myself, Pettingill, and McBride were the only officers between the gate and the residence until sometime about daylight when they prepared to execute the search warrant.

Q    Did you ever see somebody come in -- well, talk about that.  Did you ever see somebody come in and take a video?

A    No, sir.

Q    In the dark?

A    I did not.

Q    Were you there from the time of 2:00 a.m. until what time?

A    I think I left about 9:00 o'clock to take some aerial photos.

Q    In the morning?

A    Yes, sir.

Q    So you were there from 2:00 a.m. until 9:00 in the morning?

A    Yes, sir.

Q    Now, did you see -- because you've been here in

4047

court, you've watched all the exhibits and testimony and everything, isn't that right?

A     Yes, sir.

Q     Did you see -- do you recall seeing a video that was displayed here in court?

A     I did.

Q     And do you recall who took that video?

A     I've learned it was Paul Gordon.

Q     And can you recall the time that that video was taken or at least shown on the video?

A     I believe it was like a little after 1:00 a.m. or it may have been a little longer, I don't recall.

Q     And is it -- you're saying that you weren't there when the video was taken or you just didn't see them -- you didn't see it taken?

A     I didn't see it.

Q     Do you know who Paul Gordon is?

A     I do.

Q     Did you know him on that day?

A     I met him that day.

Q     What time did you meet him?

A     We pulled up at the crime scene at the same time.

Q     So he would have arrived there around two o'clock?

A     Yes, sir.

Q     So, knowing that, did he give you any indication

4048

that he had been out there earlier?

A    No, sir.

Q    So, where was the position of Paul Gordon when he was taking these videos, do you know?

A    I don't understand the question.

Q    Well, do we have that video?  I guess my question is --

A    You mean where was he standing?

Q    Where was he standing when he took those videos?

A    I can only assume he was standing somewhere where he could view the Barrett residence.

Q    And do you know whether he was standing inside that yellow crime scene tape?

A    I don't know.

Q    102.  Let me show you this videotape.  Now, as we're doing it, it shows 3:17:29, did you have any reason to believe that's not the true time?

A    No, sir.

Q    And that was the time after you were there?

A    It was the time during the time I was there.

Q    But you don't recall that -- you don't recall seeing him making that tape?

A    No, sir.

Q    Do you know whether or not any of that tape was taken while he was inside the crime scene area?

4049

A    I do not.

Q    From the time at 2:00 o'clock to 9:00 o'clock in the -- well, from the time of 2:00 o'clock that you came in as case agent, were you to take over that crime scene area or who was still in charge of that crime scene area?

A    Well, I was responsible for it but Lieutenant McBride would have been -- whoever he assigned would be the ones keeping an eye on it.

Q    So Lt. McBride is the person -- well, who's responsible for keeping people out of that taped area?

A    I guess the OSBI.

Q    And the OSBI at 2:00 o'clock in the morning was who?

A    Ben Rosser.

Q    And what did you do to make sure whether or not Paul Gordon got in there to make those tapes?

A    Well, we had crime scene tape up and we were monitoring the area.

Q    Well, but you didn't even know whether he was there or not, is that right?

A    I don't recall seeing him in the area.

Q    So what were you doing to monitor to make sure people didn't get in that area?

A    Well, as I said, we had tape up and we had people posted.

Q    And were you notified by anybody that Paul Gordon

4050

was taking a videotape?

A     I knew Paul Gordon was out there conducting an investigation.

Q     Were there more -- I know, you know, in Government stuff that sometimes you get some hierarchy problems because this was a trooper deal.  The troopers involved, OSBI was involved in the criminal action.  This was in Sequoyah County so the sheriff's office was involved. Was there any discrepancy as to who was in charge at 2:00 o'clock in the morning?

A     I told you, the OSBI.

Q     And Ben Rosser was the OSBI?

A     That's right.

Q     And how long was it before any other OSBI agents came out there?

A     Best of my recollection, it might have been a half hour or so.

Q     Who would that person be?

A     Inspector Dave Paige.

Q     And did he come out by himself or was somebody else come out with him?

A     I believe he came out by himself.

Q     From the time you got there, at what point -- well, let me ask this way.  Can you be as positive as Lt. McBride that no person got in that crime scene area until

4051

a certain particular time?

A    Repeat the question, please.

Q    You heard Lt. McBride say that no person got in that crime scene area except for he and Officer Phillips until he turned that over to Sheriff Philpot at 4:00 a.m.?

A    Correct.

Q    Now, according to what you're telling us is that you were in charge at 2:00 a.m. when you came out there.  Can you be as positive as Lt. McBride was that no person got in that crime scene area until some certain time?  And then I want to know what the time was.

A    Obviously, Paul Gordon was in the area, but there was no unauthorized persons as far as I know allowed in there.

Q    I guess that's what my point is.  I'm trying to figure out who all was in the crime scene area and when they came in the crime scene area.  Rather than no unauthorized person in there, I want to know who was in there and when they went in there.

MR. LITTLEFIELD:  Judge, I object to the form of the question because I'm not sure if we're talking about crime scene area or whether it's the crime scene tape.  It's not clear and it's confusing as it can be.  I object to the form of the question.

MR. HILFIGER:  The question I was asking --

4052

THE COURT:  Let's say the question is withdrawn.  You may rephrase the question.

Q   (By Mr. Hilfiger)  Did you keep a record of people that you allowed into the crime scene taped area?

A   A record was maintained, I did not keep it.

Q   Who maintained that record?

A   I'd have to look back in my reports.  I think there was a crime scene log kept at the gate.

Q   The gate out at the road?

A   Yes, sir.

Q   Was that sort of -- was that a record that was kept by an individual or did people have to sign in on their own?

A   I think -- I'm sorry.  I think a deputy initiated it and I think a trooper maintained it for awhile.

Q   So a deputy, you're referring to a deputy with the sheriff's office?

A   I believe that's how it was.

Q   County deputy.  And then a trooper being the highway patrol trooper is the one who maintained it?

A   I believe so.

Q   And was the ultimate responsibility for keeping people out of that crime scene taped area yours?

A   The OSBI.

Q   Or somebody else's?  OSBI.

4053

A    Yes.

Q    And you were in charge as case agent of the OSBI at that crime scene area?

A    Initially.

Q    And then who came above you?

A    Well --

Q    You said initially you were in charge, right?

A    I'm sorry.  I cut you off.

Q    You said initially you were in charge, right?

A    Yes, sir.

Q    Then who came -- did somebody else come in and take over for you?

A    When they executed the search warrant, the Agent Jones and Lyons and Agent Lee then began with processing the crime scene and they were responsible for it.

Q    Okay.  And at what time did they come in?

A    I don't recall.  It's after they had searched the residence and made it safe and secure.

Q    When they came in and took charge, did they take charge over you or did they take charge of actually doing, just doing the search?

A    They were in charge of doing the search of the premises and this crime scene.

          MR. HILFIGER:  May I have just a moment, Your Honor?

4054

THE COURT:   You may.

Q     (By Mr. Hilfiger)   Were you involved in doing interviews and discussions with the highway patrol officers that were there at the time of the incident?

A     Yes, sir.

Q     And as part of your training as an OSBI agent, do you do -- do you want to do interviews as soon as you can or do you like to wait awhile before you do your interviews?

A     Well, as soon as we can, I imagine.   Depends on the situation.

Q     Well, in this situation.   Do you want to do an interview as soon as you could talk to the highway patrol?

A     Yes, sir.

Q     And were you allowed to talk to the highway patrol?

A     Yes, sir.

Q     Were you -- when were you allowed to talk to the highway patrol people that were out there at the incident?

A     I spoke to Lt. McBride -- or Major Pettingill that morning.   I spoke to Trooper Manion the next morning.

Q     Were you made aware of any handwritten statements that any of the highway patrol officers made?   The highway patrol officers that were out there at the

4055

incident, were you made aware of any handwritten statements?

A    Yes, sir.

Q    Were you allowed -- what happened to those handwritten statements?

A    I don't know.

Q    Did you see the handwritten statements?

A    I don't recall I saw any of them.

Q    What occurred to your knowledge to the handwritten statements that were made?  Of the ones that were made, did somebody pick them up?

A    I heard some of them were picked up.

Q    And who were they picked up by?

A    Gary James.

Q    And was Gary James involved in some part of the OSBI investigation?

A    No, sir.  He's an attorney for the Troopers Association.

Q    The Troopers Association, is that state agency?

A    No, sir.

Q    So a private attorney basically picked up those handwritten statements?

A    That's my understanding.

Q    And did you get those handwritten statements from him?

4056

A     No, sir.

Q     How many handwritten statements were you aware of that existed?

A     I recall there were like four or five maybe.

Q     Do you think those handwritten statements would help in the investigation?

A     No, sir.

Q     You don't know -- how do you know if you don't see them?

A     Well, just from what I've heard from some of the previous testimony from those people that wrote the statements.

Q     When were you first made aware of those statements?

A     Probably around 2001.

Q     So it wasn't until close to two years later then?

A     I believe it was.

Q     Were you made aware of any -- do you know who George Randolph is?

A     I do.

Q     Do you know whether George Randolph did any interviews?

A     I think he began one interview and he ceased it and I don't think he did any others.

Q     Was that the interview with Manion?

A     I believe so.

4057

Q    Were you aware of whether or not that interview was taped at all?

A    That's my understanding.

Q    And was that tape made available to you?

A    No, sir.

Q    What happened to that tape to your knowledge?

A    My understanding was it was destroyed.

Q    By Mr. Randolph or somebody at his behest?

A    I believe it was Trooper Randolph.

Q    Would that -- in doing a proper investigation, do you think that that tape recording may help in your investigation?

A    No, sir.

Q    Were you made aware -- Officer Manion had an untimely death in a motorcycle accident, are you aware of that?

A    That's what I've been told.

Q    Were you aware of whether or not that tape recording was destroyed before or after he died?

A    I don't recall.

Q    When did you first become aware that that tape recording -- that there was a tape recording in relation to the date of this incident?

A    As I said, I believe it was about 2001.

Q    Same thing on the tape recording as it was on the

4058

handwritten statements?

A    Yes, sir.

Q    And when were you made aware that the tape recording had been destroyed, about the same time or later?

A    I don't recall if it was at the same time or a later time.

Q    Did you have any discussions with Trooper Hamilton concerning the firing of his weapon, you know, within a short period of time after this incident?

A    I did not.

Q    Did you do any interviews of Trooper Hamilton at all?

A    Not that I recall.

Q    Do you know whether -- do you when OSBI did any investigation as to ballistics on Trooper Hamilton's cartridges and casings?

A    I believe it was sometime in 1999.  There was testimony to that regard and I don't recall the exact date.

Q    Did you ask at all for any of the highway patrol interviews or were you under the impression that the highway patrol did some of their own interviews with the troopers involved in this incident?

A    Yes, sir, there was an internal affairs investigation.

4059

Q    Did you ask for any of those interviews?

A    No, sir.

Q    Was there a particular reason you didn't do that?

A    Well, it was an administrative investigation.  We were looking at our investigation from a criminal aspect.

Q    And did you have any discussions with the highway patrol about getting those interviews?

A    No, sir.

Q    You just assumed that because it's internal, it wasn't worth anything for you, is that right?

A    No, sir.  It was an internal affairs investigation. They questioned looking for a different -- they look at it from a different angle and, you know, I just didn't think it would be necessary.

Q    In your investigation, did you -- with any of people you talked to, did you make any kind of determination as to where Hamilton's vehicle initially stopped in relation to that residence?

A    Did I make a determination?

Q    Not a determination, did you come to some kind of conclusion as to where the Bronco initially stopped in relation to the residence?

A    I could only speculate.

Q    I'm not asking you to do that.  Was there any concern in your mind that that Bronco had been moved from

4060

one spot after Hamilton got out of the Bronco to another spot?

A     Yes, sir.

Q     Okay.  And was that -- did you do anything to try to determine how the Bronco got from the one spot to the spot that it ended up?

A     Well, several people interviewed about the event were asked about the Bronco and other things and once that information was obtained then we, among the agents, we discussed it, trying to piece together what happened including the moving of the Bronco.

Q     Well, let me ask you this:  Did you find anybody that said they got in the Bronco and attempted to move the Bronco from the front porch area?

A     I believe that was Trooper Greninger.

Q     And that was before Mr. Eales was taken to the hospital, right?

A     Correct.

Q     After Mr. Greninger, did you find anybody else that said they got into the Bronco and attempted to move it?

A     Not to my knowledge.

Q     Did you find anybody -- well, when the Bronco ended up at the location, you've seen that picture a thousand times in this trial.  Do I need to show it to you, Government 69?

4061

A    No, sir.

Q    You recall where that Bronco ended up, don't you?

A    Yes, sir.

Q    When that Bronco ended up in that position, did any of your investigation show whether the keys were in that Bronco?

A    I don't recall.

Q    Did any of your investigation show whether that Bronco was in any driving gear or in park?

A    I don't recall.

Q    Did any of your investigation bring up anybody that saw that Bronco move from the porch out to where it ended up in Government's 69?

A    Not to my knowledge.

Q    And while you were -- while you were doing that part of the investigation, you know, to see how that car had moved, if it had moved, did you determine how many people were at that scene at that time?

A    At the time it moved?

Q    Yes.  Or you know, somewhere in it because nobody saw it move.  But did you ever determine how many people were at that -- in that location?

A    No, sir.

Q    Would you agree with me that with the exception of Eales, Hamilton, and Hise, were the rest of the troopers

4062

would have been still at that area?  This is before you got there, right?

A    Yes, sir.

Q    Hamilton went to the hospital, Eales went to the hospital, Hise drove to the hospital, right?

A    Yes, sir.

Q    So, you have Darst, Poe, Greninger, Hash, Pettingill, McBride, they're still at the scene, aren't they?

A    And Manion.

Q    And Manion.  So that's seven at the scene, right?

A    Yes, sir.

Q    Now, we've had some variations on how many from the second group were there.  Somewhere between 12 to 15 from that second group were there, you've heard that?

A    Yes, sir.

Q    And did your investigation reveal that that 12 to 15 people were in that second group?

A    I don't recall the number.  There were several.

Q    Of that 12 to 15, Clint Johnson and Delena Goss were the only two that left, isn't that right?

A    I believe so.

Q    So you had another somewhere between ten and 13 or somewhere in the teens people out there at that residence in that area.  So you have somewhere in excess of 20

4063

people and your investigation never revealed anybody that saw that car move?

A    Not to my knowledge.

Q    Your investigation never revealed anybody that said, you know, hey, I got in, I saw it rolling, I jumped in and stopped it, is that right?

A    I believe that's right.

Q    So, nobody ever said that they drove it backwards, is that right?

A    Correct.

Q    And to your knowledge other than this Kenneth Wilson who was here, did you recall Kenneth Wilson even saying anything about the car?

A    No, sir.

Q    At this time you still have no idea how that car moved, is that right?

A    I could only speculate.

MR. HILFIGER:  I have no further questions.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    You're a lawyer enforcement officer, right?

A    Yes, sir.

Q    How long have you been one?

A    Almost 33 years.

Q    What's crime scene tape mean to a law enforcement

4064

officer?

A     Keep unauthorized people out.

Q     And if -- does that mean law enforcement gets to walk through and tromp through?

A     No, sir.

Q     In regards to the individuals who were in that yard when you arrived and that crime scene tape was placed, were there any non-law enforcement individuals?

A     No, sir.

Q     As to this Oklahoma Highway Patrol investigation, you said something about an internal affairs investigation?

A     Yes, sir.

Q     What's an internal affairs investigation?

A     That's when an agency take an internal look at an event.  They determine if there's a violation of policies or procedures and they report back to whoever the requesting authority within the agency is.

Q     Is that for the benefit of the -- that's for the benefit of the agency itself, isn't it?

A     Yes, sir.

Q     It's not -- it is not intended to deal with the establishment of criminal liability or responsibility for the conduct of what happened at that scene, is it?

A     That's correct.

Q    What's OSBI's investigation supposed to be and what is OSBI looking at in regards to this incident?

A    Potential criminal charges.

Q    Was the OSBI allowed to conduct their investigation? Were they restricted from conducting their investigation? Let me rephrase that.

A    No, nobody restricted us.

MR. LITTLEFIELD:  I would ask Government Exhibit No. 5 be displayed.

Q    (By Mr. Littlefield) You see Government Exhibit 5?

A    Yes, sir.

Q    What's this on the ground?

A    It's some type of brown fluid.

Q    Did you learn there was damage to the transmission of that vehicle?

A    Yes, sir.

Q    What was the slope of this land here?

A    It was a pretty good grade.  I don't know the exact elevation.

Q    Toward the house or away from the house?

A    Going away from the house.

Q    When that vehicle moved, however it moved, what was Rocky Eales' status?

A    He was dead.

MR. LITTLEFIELD:  Pass the witness.

4066

MR. HILFIGER:  We have one question, Judge.

THE COURT:  Your may.

REDIRECT EXAMINATION

BY MR. HILFIGER:

Q    Are you familiar with this model here?

A    Yes, sir.

Q    And there's going to be more than one, I apologize. You understand this model is drawn to scale?

A    Yes, sir.

Q    Now, there's a slope away from the house, is that right?

A    Yes, sir.

Q    And that slope continues all the way down to here, doesn't it?

A    It appears so.

Q    In fact, the slope gets greater as it goes down, is that right?

A    I believe so.

MR. HILFIGER:  I have no further questions.

MR. LITTLEFIELD:  May I have one more?

THE COURT:  Just one?

RECROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    Those front wheels are turned, aren't they?

A    Yes, sir.

4067

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Any further questions of this witness?

Sir, thank you for your testimony.  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Defendant's next witness.

MR. HILFIGER:  We don't have any further witnesses today, Your Honor.  I think we've got --

THE COURT:  We'll recess for today.  Members of the jury, if you'll remember my admonition to avoid news coverage if there is any, either from the press -- when I said the press, I mean from the newspaper or television or radio.  Keep your minds free and open.  I'll ask you to be back in the morning at 9:00 o'clock.

If everyone would please remain seated as the jury exits the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.

Anything outside the hearing of the jury for the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Defense?

4068

MR. HILFIGER:  No, Your Honor.  And it still looks like we're on the same schedule.

MR. SMITH:  Judge, I might -- it sounds like we might have a stipulation as to one of our witnesses for tomorrow.  Mr. Littlefield was just telling me across the table if we work on that tonight and have that in the morning for the Court.

MR. LITTLEFIELD:  I anticipate I think that essentially I'd report to the Court that we would stipulate that the blood splatter found under the east window that Joann Kihega performed a DNA analysis on it and it was Mr. Barrett's blood.  It was determined to match Mr. Barrett.

THE COURT:  So it's not a blood spattering, it's a DNA issue?

MR. LITTLEFIELD:  It's the -- I think Iris Dalley identified that there was a blood spatter.

THE COURT:  I remember that.

MR. LITTLEFIELD:  That analysis on that blood was performed by Joann Kihega and I think she reached the conclusion that that blood matched Mr. Barrett.

THE COURT:  Based on DNA analysis?

MR. LITTLEFIELD:  Yes, Your Honor.  We'll stipulate to that rather than bring her back from Oklahoma City for the mere purpose of doing that

4069

testimony.

THE COURT:   Is that the sole purpose for having her?

MR. SMITH:   That's correct, Your Honor.

THE COURT:   If you want to reduce that to a written stipulation that will be read to the jury or if you want to make it orally, you can.  One or the other of you can make that stipulation, but I think we should make it more -- I would prefer you reduce it to writing.

MR. SMITH:   I have no objection, Judge.

(Whereupon, the Proceedings were continued to November 1, 2005.)

4070

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on October 31, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 3836 through 4069.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date:  December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 2 2 2006

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By_____
Deputy Clerk

UNITED STATES OF AMERICA,   )
                            )
            Plaintiff,      )
                            )
-vs-                        )   No. CR-04-115-P
                            )
KENNETH EUGENE BARRETT,     )
                            )
            Defendant.      )

VOLUME 18 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 1, 2005.

A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 4072-4202

4072

W I T N E S S E S

                                                        PAGE


JOE MABERRY
Direct Examination by Mr. Smith . . . . . . . . 4074
Cross Examination by Mr. Sperling . . . . . . . 4099
Redirect Examination by Mr. Smith . . . . . . . 4112
Recross Examination by Mr. Sperling . . . . . . 4113


RON BALDWIN
Direct Examination by Mr. Hilfiger  . . . . . . 4116
Cross Examination by Mr. Littlefield . . . . . 4123
Redirect Examination by Mr. Hilfiger  . . . . . 4136


GELENE DOTSON
Direct Examination by Mr. Hilfiger  . . . . . . 4141


LOYD COBB
Direct Examination by Mr. Hilfiger  . . . . . . 4145
Cross Examination by Mr. Littlefield . . . . . 4154


CARLOS SANDOVAL
Direct Examination by Mr. Sperling  . . . . . . 4174


JOHNNY PHILPOT
Direct Examination by Mr. Littlefield . . . . . 4179




                    E X H I B I T S

                                          OFFERED    REC'D

Government's Exhibit No. 297  . . . . . . . 4181      4181
Government's Exhibit No. 298  . . . . . . . 4183      4183

Defendant's Exhibit No. 215   . . . . . . . 4083      4083
Defendant's Exhibit No. 216   . . . . . . . 4086      4086
Defendant's Exhibit No. 217   . . . . . . . 4094      4094
Defendant's Exhibit No. 223   . . . . . . . 4147      4147
Defendant's Exhibit No. 223-A . . . . . . . 4147      4147
Defendant's Exhibit No. 224   . . . . . . . 4147      4147
Defendant's Exhibit No. 225   . . . . . . . 4147      4147
Defendant's Exhibit No. 226   . . . . . . . 4147      4147
Defendant's Exhibit No. 227   . . . . . . . 4147      4147
Defendant's Exhibit No. 228   . . . . . 4089,4091     4092
Defendant's Exhibit No. 229   . . . . . . . 4095      4095

4073

P R O C E E D I N G S

THE COURT: Good morning. Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.

Members the jury, first, the parties have asked that I read the following stipulation:

The parties to this action, the Defendant Kenneth Eugene Barrett appearing in person and by counsel Roger A. Hilfiger and Brett A. Smith, and the United States represented by United States Attorney Sheldon J. Sperling and Assistant United States Attorney D. Michael Littlefield stipulate as follows:

One, that if Joann Kihega testified, her testimony would be that she was employed as an OSBI DNA technology manager in 1999; two, Ms. Kihega would further testify that a DNA analysis of the blood spatter previously identified by Iris Dalley located on the east wall of the east bedroom in the residence of Kenneth Barrett was performed, and to the exclusion of all others' individuals matched known sample of the blood of Kenneth Barrett; three, Ms. Kihega would further testify that the probability of selecting an unrelated individual at random from the population having this DNA profile is approximately one in six billion in Caucasians and one in six billion African Americans and one in six billion in

4074

Hispanic.  And that's signed by Roger Hilfiger, Brett A. Smith, Sheldon J. Sperling and D. Michael Littlefield.

I'll ask that the clerk mark the stipulations as Court Exhibit 6.  Defendant may call your next witness.

MR. SMITH:  Your Honor, Joe Maberry.

(Whereupon, the witness was administered the oath.)

THE COURT:  You may proceed.

MR. SMITH:  Thank you, Your Honor.

JOE MABERRY,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q    Would you state your name, sir.

A    Joe Maberry.

Q    Sir, what is your profession or occupation?

A    I am a Senior Fingerprint Specialist with the Drug Enforcement Administration, South Central Laboratory in Dallas, Texas.

Q    And how long have you been so employed?

A    Approximately 13 years.

Q    Sir, can you tell us -- give us a glance of your educational background, please?

A     I am a Certified Latent Print Examiner with the International Association for Identification, and currently the President of the International Association for Identification.  And I have over 13 years of experience in developing latent prints and preparing latent prints and conducting crime scene searches and photographing latent prints.  I've attended numerous schools.  I've attended the Advanced Latent Fingerprint School conducted by the FBI at the FBI Academy in Quantico, Virginia.  I've attended the Identification Officers School conducted by the Department of Public Safety in Austin, Texas and I've attended numerous other schools in the development and comparison of latent prints.

Q     Sir, have you ever had the opportunity to testify as an expert witness?

A     Yes, sir.

Q     And have you testified in federal court as such?

A     Yes, sir.

Q     And do you know if you've ever testified or been qualified as an expert witness in the Eastern District of Oklahoma?

A     No, sir.

Q     Okay.  Have you been qualified in federal courts in other districts?

A    Yes, sir.

Q    Can you tell us where, please?

A    I testified in New Mexico and Louisiana and Texas and Alabama.

Q    Have you had the opportunity to testify in state district courts?

A    Yes, sir.

Q    Have you been qualified as an expert there as well; is that true, sir?

A    Yes, sir.

Q    Can you give us the benefit of where those courts may be located?

A    I've testified in state courts in New Mexico and also in Texas.  I was a crime scene search and identification officer with the Dallas Police Department for approximately 18 years or 20 years when I was in the police department.

          MR. SMITH:  Your Honor, I'd would move to qualify Mr. Maberry as an expert in the field of latent print examination.

          THE COURT:  Any objection?

          MR. SPERLING:  Your Honor, we're pleased to stipulate that he is.

          THE COURT:  Hearing no objection, that will be the order of the Court.

4077

MR. SMITH: Thank you, Your Honor.

Q (By Mr. Smith) Sir, in October of 2000 were you employed by the Department of Justice?

A Yes, sir.

Q Okay. And where were assigned, sir?

A I was assigned to the South Central Laboratory in Dallas, Texas.

Q And did you have an opportunity to look at some items for fingerprint analysis?

A Yes, sir.

Q And do you know if they relate to the Kenneth Barrett matter?

A Yes, sir.

Q And I see that you have a folder in front of you. Are those your records from the examinations that you have performed?

A Yes, sir.

Q And have you had a chance to review those records, sir?

A Yes, sir.

Q What I would like to do is to ask you about the items that you examined that I'm going to show pictures of on the display and you can tell us whether or not those are the same items and we'll go through your analysis; is that fair, sir?

A     Yes, sir.

MR. SMITH:  What I ask to be displayed, Your Honor, would be Government's Number 215 which is in evidence.

THE COURT:  You may.

Q     (By Mr. Smith) Sir, the corresponding item, I believe, for your examination will be Exhibit No. 10.  Do you have those records with you?

A     Yes, sir.

Q     While that is being displayed, can you give us a description of what Exhibit No. 10 was that you examined?

A     Exhibit No. 10 was a styrofoam cup, piece of aluminium foil, a lock sealed bag containing one die which is half of a pair of dice.  A .12 gauge Remington pewter shot shell with a slug and two screws and a sealed plastic bag containing red colored pills and a yellow-red -- red powder substance and a sealed plastic bag containing a white powder.

Q     Does that appear to be what's depicted in front of you on the monitor, sir, that's previously been marked and identified as Government's 215?

A     Yes, sir.

Q     And I don't see a styrofoam cup in there unless that's that item that's flat by the dice.  Is that what that is or do you know?

4079

A   I don't know, sir.

Q   Hard to tell from that picture, isn't it?

A   Yes, sir.

Q   Can you tell us what process you went through in conducting your examination of these items that are depicted in 215, sir?

A   Yes, sir.  With the styrofoam cup, the aluminum foil, the die and also the shot shell, I processed each one of those items visually with a cyanoacrylate just for fuming which is commonly referred to as super gluing.  We examined them visually and placed the -- die on the items and examined the items underneath a forensic light source for fluorescent latent prints.

Q   This super gluing that you talked about, that's a little different that taking the powder and dusting the items, isn't it?

A   Yes, sir.

Q   And the reason that you do the super gluing as opposed to the dusting with the powder is what?

A   The super gluing can affect bonds and the prints to the surface and allows the print to be dye stained and then examined under a forensic light source.  It's a more sensitive technique than fingerprint powder.

Q   Have you been successful in retrieving prints in that method?

4080

A    Yes, sir.

Q    The items that you examined here, sir, the styrofoam cup -- start with that first off.  Is that an item that you would typically expect to be able to retrieve a print from?

A    I always expect to retrieve a latent print.  But a styrofoam cup and some types of items are a little bit harder.  It depends upon how the item was handled, whether there's moisture on it, whether it was dirty, what happens to the item after it was touched.

Q    Do you have anything in your records that would indicate the condition of the styrofoam cup at the time of your examination?

A    No, sir.

Q    So you don't know if it, in fact, was dirty or wet or any of those type of things that you just described?

A    It would not have been wet.  I would have made notation in the processing that -- worked that it was dry.

Q    Does the surface have something to do with your ability to retrieve the print?

A    Yes, sir.

Q    And is that one of the difficulties that you have whenever you're conducting an examination of, let's say, a styrofoam cup?

4081

A    Yes, sir.

Q    How about aluminium foil?  Is that a surface that you would typically expect to be able to retrieve a print?

A    Again, it depends upon how the aluminium foil was handled.  The surface needs to be relatively smooth and relatively clean and then the pressure that's applied needs to be fairly uniform.  The aluminium foil that I had in this particular case was obviously wrinkled and it had been wadded and I would expect it to be a difficult surface to get a print off of.  It's not impossible.

Q    Let's talk about the die in terms of your ability to retrieve a print off a surface.

A    The die itself is a very small and the area of the die has the indentations for the numbers on the die.  So it would be difficult to get an identifiable latent print off an item that small.

Q    And you have the shot shell that is typically -- this is a shotgun shot shell; is that correct?

A    Yes, sir.

Q    And that has an irregular surface around the -- you have the brass at the bottom and the upper portion is plastic; is that true?

A    Yes, sir.

Q    The plastic portion tends to be irregular, is that

4082

--?

A    Yes, sir.

Q    So that can be a difficult surface as well; is that true?

A    Yes, sir, it can be.

Q    But the brass is another matter; would that be true?

A    The brass is smooth.  But again, it's dependent upon how it's handled and what happens to the item after it's handled.

Q    So if you could, tell us about the results of your examination of those items that were listed in Exhibit 10 for purposes of your examination that are displayed in 215.

A    I did not develop any latent prints on the aluminium foil, the die, the shot shell or the styrofoam cup.

Q    I'd ask that you turn to your report -- well, let back up one second.  Did you generate a report from your analysis of those items, sir?

A    Yes, sir.

Q    And do you have that report with you?

A    Yes, sir.

Q    I'm going to show you what I have previously marked as Defendant's 215 -- and it's not in evidence -- and see if you can identify this for us.  Is that, in fact, a copy of the report you generated in this matter, sir?

4083

A    Yes, sir, it is.

Q    Does that appear to be an accurate rendition of your report?

A    Yes, sir, except for the extra markings that's on it.

Q    Okay.  And I think the -- exactly right.

MR. SMITH:  May I retrieve the unadulterated copy, Your Honor?

THE COURT:  You may.

Q    (By Mr. Smith) Look at this other 215 and see if that's an accurate copy, sir.

A    Yes, sir, it is.

MR. SMITH:  I would move for the introduction of Defendant's 215, Your Honor.

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Be admitted without object.

MR. SMITH:  May I ask that it be displayed?

THE COURT:  You may.

Q    (By Mr. Smith)  This has your results of your examination of those items that we previously discussed; is that true, sir?

A    Yes, sir.

Q    Did you conduct any other analysis of those items after you generated this report?

A    No, sir.

4084

Q    And the date of this report was when, sir?

A    The report is dated October the 3rd, 2000.

Q    All right, sir.  Thank you.  I'll take that down and I'm going to ask that 216 be displayed -- and it is in evidence -- and ask that you refer to any documents that you have as relates to Exhibit No. 11.  Government's 216.

Have you found your notes, sir?

A    Yes, sir.

Q    And the items that you examined that you have listed as Exhibit 11, were they consistent with the items that are depicted on the screen which is Government 216?

A    Yes, sir.

Q    And tell us what those item are, sir.

A    The items include a camera, two plastic bottles and the sealed bag containing iodine crystals.

Q    And what items did you conduct an examination of?

A    I made an examination of the contents of the heat sealed evidence envelope that contained the camera, the two bottles and the plastic -- sealed plastic bag containing iodine crystals.

Q    Let's talk about that camera first.  The surfaces of the camera sufficient that you would expect to be able to retrieve a print from them, from that camera, if there was a print that was located there on it?

A    There might -- there could be a print on that type

4085

of surface.  When I examined the contents of the bag, the iodine crystals had evaporated and re-bonded to all of the surfaces of the camera and the plastic viles.  So I only made a visual examination of these items.  Iodine is one of the historical methods of developing latent prints, so if there was a -- there could have been a latent print on there.  The iodine fume itself could have developed a latent print.

Q    Again, you didn't find anything on the camera; is that true?

A    That's true.

Q    The plastic bottles, can you describe the surface of those, please?

A    The plastic bottles is relatively smooth plastic with a little bit of a textured surface to it.  But again, the bottles themselves were covered in iodine fumes.

Q    And then tell me about the sealed plastic bag that you have containing iodine crystals.

A    The bag itself contained the iodine crystals and the iodine goes through quite a number of different types of surfaces and they evaporated and went through the plastic bag into the large heat sealed bag containing the camera and the two items.

Q    And of these items that are depicted in Exhibit

4086

No. 11, did you find any fingerprints, sir?

A    No, sir.

Q    And you generated a report as well?

A    Yes, sir.

Q    I'd like to show you what has been marked as Defendant's Exhibit 216.  It's not in evidence.  Does that appear to be an accurate copy of your report, sir?

A    Yes, sir, it is.

MR. SMITH:  Move for the introduction of 216, Your Honor.

THE COURT:  Any objection?

MR. SPERLING:  No, Your Honor.

THE COURT:  Admitted without objection.

MR. SMITH:  Ask it that displayed.

THE COURT:  You may.

Q    (By Mr. Smith) Sir, this has your analysis as well; is that true?

A    Yes, sir.

Q    The date of that report again?

A    It's October the 4th, 2000.

Q    Now, sir, I'd like to direct your attention to what you have as Exhibit No. 12, and I'm going to ask that Government's 217 be displayed.  Now, I think there's a little bit of difference between our -- the DEA reports and your exhibit number; is that true, sir?  And the

4087

reason I say that -- let me back up just a second and show what is in evidence as Government's Exhibit Number 78.  You refer to these exhibit numbers as they're generated by the DEA; is that true?

A    Yes, sir.

Q    So they'd know you, they're already identified as such?

A    Yes, sir.

Q    Are you familiar with a report such as what's displayed in front of you, sir?

A    Yes, sir.

Q    Tell us what that is.  What's the nomenclature of that report?

A    The nomenclature is the DEA 7 form.

Q    Is this something that accompanies evidence when it comes to you for analysis?

A    Yes, sir.

Q    And if you'll look at the description for Exhibit 12 for this item.  Can you tell us what is displayed on DEA 7?

A    On DEA 7, Exhibit No. 12, was described as a one 2,000 millimeter Pyrex glass with residue on the inside.

Q    There's an indication that that is being processed for fingerprints, is that right?

A    There's a remark to process for fingerprints.

4088

Q    Now, I would like to go back to 217, if I may.  You have never examined that item; is that true?

A    That's true.  I have not examined this item.

Q    Let's talk about what you did examine that is listed as Exhibit No. 12, sir.  Tell us what those items were.

A    I examined three wads of newspaper, one white envelope and one sealed plastic bag containing the glass viles with a septum.

Q    And again, those are identified by exhibit number?

A    Yes, sir.

Q    Which is --?

A    Exhibit 12.

Q    And previously we discussed some of the items we're going to talk about this morning; is that true, sir?

A    Yes, sir.

Q    And whenever we were talking about the examination that you performed, you indicated to me that you typically take pictures of those items that you examine because they don't always match up to what the paperwork necessarily shows; is that true?

A    Yes, sir.

Q    Now, as relates to Exhibit No. 12, do you have a picture that you have taken of the items that you examined?

A    Yes, sir.

4089

Q    And could you retrieve that for me?

A    Yes, sir.

          MR. SMITH:   Your Honor, may I retrieve that from the witness?

          THE COURT:   You may.

          MR. SMITH:   May I approach the Government, Your Honor?

          THE COURT:   You may.

Q    (By Mr. Smith) Sir, this is not in evidence.   I'm going to see if it will display on the screen through that plastic.

          Does that show up sufficient that you can identify what's located in that picture?

A    Yes, sir.

Q    I'm going to mark it as Defendant's 228, sir, if I may.   Would that be fair?

A    Yes, sir.

Q    Do you know when you took that picture?

A    Yes, sir.   On September the 18th, 2000.

Q    And that accurately depicts the items that you examined that are identified as Exhibit No. 12; is that true?

A    Yes, sir.

          MR. SMITH:   Your, Honor I'd move for the introduction of the Defendant's 228.

4090

THE COURT: Any objection?

MR. SPERLING: Your Honor, at this point there has been insufficient foundation laid for the admission of this document. Although he said he took this picture, there's nothing to correlate this photograph with the Defendant or the Defendant's residence.

MR. SMITH: I can attempt to lay further foundation, Your Honor.

THE COURT: Objection sustained for now.

Q   (By Mr. Smith) Sir, in the file that you have in front of you, does that indicate when and what items you received as relates to Kenny Barrett?

A   Yes, sir.

Q   And would you look at that, please, and tell me what you'd be looking at to tell us the information I just inquired about.

A   I would be looking at my fingerprint examination worksheet referred to as DEA Form 446.

Q   And what items does that indicate that you received for examination? Let me help you with this. It shows you received Exhibit 10.

A   Exhibit 12, sir.

Q   I know we're talking about 12 now, but 10 was the one we previously walked about; is that true?

A   Yes, sir.

4091

Q     Did that identify as you have received as Exhibit No. 10?

A     Yes, sir.

Q     How about Exhibit No. 11?

A     Yes, sir.

Q     And did Exhibit 12 come with 10 and 11?

A     Yes, sir.

Q     Did you retrieve them all on the same day?

A     Yes, sir.

Q     How did you obtain those items, sir; how are you delivered to you?

A     I received them from the evidence technician at the DEA South Central Laboratory.

Q     Do you how they were received into the South Central Laboratory?

A     Yes, sir.

Q     How, sir?

A     They were received through the mail sealed.

Q     And they were all identified as pertaining to this case; is that true?

A     Yes, sir.

          MR. SMITH:  Your Honor, I would again re-urge the introduction of Defendant's 228.

          MR. SPERLING:  We still object, Your Honor. This is not listed in the sixes as Exhibit 12.  In fact,

4092

Exhibit 12 is indicated to be the Pyrex flask.  There has been an insufficient foundation set for its admission.

MR. SMITH:  Your Honor, I think that is an area of inquiry that this witness could try to clear up for us.  But in terms of what he examined, what was sent to him as relates to this case, he has identified these items as items that he examined and all came with the other items, he took a picture of them and that's something we ought to have him put forward now.

THE COURT:  Objection overruled.  They will be admitted.

MR. SMITH:  I would ask that it be displayed, Your Honor.

Q    (By Mr. Smith) Sir, does this depict -- let me ask you this:  Did you generate a report from your examination of these items?

A    Yes, sir.

Q    And your report indicates the items that are depicted in Defendant's 228; is that true, sir?

A    Yes, sir.

Q    Now, tell us about the results of your examination as it relates to what you have listed as Exhibit No. 12.

A    I developed and identified latent prints on the white envelope.

Q    All right, sir.  And then if I understood what you

4093

told me earlier this morning, you didn't have a comparison; is that true?

A    Yes, sir.

Q    You didn't have what we call a known print or a known sample?

A    Yes, sir.

Q    We're talking about a sample that is related to who, sir?

A    To Kenneth Eugene Barrett.

Q    You generated your examination and report in October of 2000; is that true?

A    Yes, sir.

Q    All right.  Since then have you obtained comparison prints, prints that you believe or that you -- let me ask you.  Did you obtain comparison prints?

A    Yes, sir.

Q    Who do they belong to?

A    They're identified as belonging to Kenneth Eugene Barrett.

Q    All right, sir.  And were you able to link the prints that you found on the white envelope to Kenneth Eugene Barrett?

A    No, sir.

Q    And this subsequent examination was conducted when, sir?

4094

A    I conducted the examination on October the 26th, 2005.

Q    All right.  So that's something that you just did; is that true?

A    Yes, sir.

Q    I'm going to show you what has been marked as Defendant's 217 and ask if this is an accurate copy of the report that you generated as it relates to exhibit number -- and is not in evidence.

Have you had an opportunity to compare Defendant's 217 with your records, sir?

A    Yes, sir.

Q    And does that appear to be an accurate rendition?

A    Yes, sir.

MR. SMITH:  I would move for the introduction of Defendant's 217, Your Honor.

THE COURT:  Any objection?

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. SMITH:  Ask that it be displayed, Your Honor.

THE COURT:  You may.

Q    (By Mr. Smith) Now, sir, the subsequent examination that you conducted, I guess that was last week?

A    Yes, sir.

4095

Q   Did you generate a report from that examination?

A   Yes, sir.

Q   And do you have that with you as well?

A   Yes, sir.

MR. SMITH:  May I retrieve a copy of that from the witness, Your Honor?

THE COURT:  You may.

MR. SMITH:  And show it to counsel, Judge?

THE COURT:  You may.

Q   (By Mr. Smith) Sir, I'm going to show you what's been marked for identification purposes Defendant's Exhibit 229.  Is that a copy of what you just handed me?

A   Yes, sir.

Q   And does that depict the subsequent examination that you conducted on the 25th of '05 of October and then you wrote the report the next day; is that true?

A   The report was reported on October 26th of '05.

MR. SMITH:  I move for the introduction of Defendant's Exhibit 229, Your Honor.

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Be admitted into evidence.

MR. SMITH:  I would ask that it be displayed.

THE COURT:  You may.

Q   (By Mr. Smith) Again, this doesn't reflect the last examination that you did as relates to a print that you

4096

observed on an envelope?

A    Yes, sir.

Q    And the results of that can be attributed to who?

A    I don't know, sir.

Q    You don't know who; would that be true?

A    Yes, sir.

Q    All right, sir.  Now, one second.  Let me ask you this:  I guess the corollary would be can you attribute the print that is on that envelope to Kenneth Barrett?

A    No, sir.

Q    All right, sir.  Now, the DEA 7 that I showed you earlier that was depicted on Government's Exhibit No. 7 or described on Government's Exhibit No. 7.  Do you know why your Exhibit 12 would differ from what is listed on DEA 7 as Exhibit 12 and depicted as a flask?

A    No, sir.

Q    Do you know where Exhibit 12, the flask, may have been submitted?

A    Yes, sir.

Q    Where was it submitted?

A    In records it was submitted to the North Central Laboratory in Chicago, Illinois.

Q    You're going to have to scoot up a little closer to that microphone.

A    It was submitted to the North Central Laboratory in

Chicago, Illinois.

Q   All right, sir.  Now, why would you have records that relate to that item if you're in the Dallas office and it's sent to Chicago?

A   All of the records on a particular case are kept in one case file folder and under the case file.

Q   So whoever conducted an examination of that item, the results are contained within the file that you have today; is that true?

A   Yes, sir.

Q   And have you looked at the report as it relates to the flask?

A   Yes, sir.

Q   Was the flask examined for fingerprints?

A   Yes, sir.

Q   Do you know who it was examined by?

A   Yes, sir.

Q   Who, sir?

A   Senior Fingerprint Specialist Tom Morris.

Q   Do you know what his status is with the DEA at this time?

A   He no longer works for the DEA.

Q   He's retired; is that true, sir?

A   Yes, sir.

Q   And you've seen that report?

4098

A    Yes, sir.

Q    Were there any prints detected on the Pyrex flask?

MR. SPERLING:  Objection, Your Honor.  Calls for hearsay.  He's asking about another person's report. That would be based exclusively on hearsay.

THE COURT:  We have a technical problem.  I'm aware.  Technical problem resolved.  Now, Mr. Sperling, what was your objection?

MR. SPERLING:  The question asked this witness to recount the results of a report conducted by someone else that he did not conduct.  It calls for hearsay and we object.

THE COURT:  Argument, Mr. Smith.

MR. SMITH:  Your Honor, this individual's retired and obviously is not available.  I understand the nature of Mr. Sperling's objection.

THE COURT:  Objection sustained.

MR. SMITH:  Your Honor, that's all I have by way of examination.  I would ask that I may be allowed to make copies of 228 and 229 unless the agent would allow us to submit his originals and give him copies.  I don't know if the Court --

THE COURT:  Do you have any objection to making copies?

THE WITNESS:  No, sir.  I would prefer to keep

the originals.

THE COURT: I anticipated that. We'll make copies.

MR. SMITH: All right. Thank you. I pass the witness.

THE COURT: You may cross examine.

CROSS EXAMINATION

BY MR. SPERLING:

Q    First, would you spell your last name for us and clearly pronounce your last name.

A    Maberry, M-a-b-e-r-r-y.

Q    Same pronunciation as M-a-y-b, but without the Y?

A    Yes, sir.

Q    Thank you, sir. You've been looking at fingerprints for a long, long while; have you not, sir?

A    Yes, sir.

Q    You indicated that you always expect to retrieve prints. Were you surprised in this case that you did not?

A    No, sir.

Q    Would it be fair to say, sir, that in a significant number of the cases in which items are submitted to you for examination for purposes of retrieving and identifying prints, that in a significant percentage of them you don't recover identifiable prints?

4100

A     That's true.

Q     Would it also be fair to say, sir, that in a significant number of cases on which you were -- even when you retrieve identifiable prints, you still sometimes are not able to identify whose prints they are?

A     Yes, sir.

Q     I'm sorry.

A     That's true.

Q     Obviously, in order to identify a print, you have to have something to compare it with to which it is a match; is that fair?

A     Yes, sir.

Q     All right.  And just by way of brief explanation, what's the status of fingerprint identification; is it conclusive?

A     Yes, sir.

Q     Does it depend in part on your skill?

A     Yes, sir.

Q     And on the examiner's ability to understand various traits with regard to fingerprints?

A     Yes, sir.

Q     I'm not going to ask you to go into minute detail, but if you could tell us in just summary form, when you identify a fingerprint, what do you look for?

A     I look for the fold of the ridges, the structure of

ridges themselves, areas upon the ridge that may divide or fork or make a bifurcation or end and relative position of that divergence of the ridges, if you will, in the same position on the latent print and in the same position on the known print and then reach a conclusion that the two were made by the same person or not made by the same person.

Q    Thank you, sir.  Are you familiar with the term secreter?

A    Yes, sir.

Q    And just in layman's terms, does that refer in summary form to people who, for example, have sweatier palms than others?

A    Yes, sir.

Q    And if I were to be a person who has a sweatier palm that someone else, would I be more likely to leave a fingerprint than someone who has a less sweaty palm?

A    You may be less likely because you may over-secrete or over-sweat.  So there are a lot of factors that affect whether or not we have an identifiable print.

Q    Okay.  You were asked some questions about a flask and I believe that flask has previously has been introduced as Government Exhibit Number 105.  May we display it, please.  It may be the actual flask.  105, please.

4102

Can you look at that, sir, and say whether you have ever conducted an examination for that item for purposes of determining whether or not they're identifiable fingerprints?

A     No, sir, I have not examined this item.

Q     Defendant's 228.

MR. SPERLING:  May I approach the witness, Your Honor?

THE COURT:  You may.

Q     (By Mr. Sperling) This is a photograph I believe was introduced a moment ago and this comes from your files, does it not, Mr. Maberry?

A     Yes, sir.

Q     That is a photograph that indicates and depicts a number of items that you believed corresponded to an Exhibit 12, does it not?

A     Yes, sir.

MR. SPERLING:  May I retrieve it, Your Honor?

THE COURT:  You may.

Q     (By Mr. Sperling) What are those things?

A     The photograph depicts the wads of newspaper, the envelope and the plastic bag containing another item. These are the items that I received to process as Exhibit 12.

Q     On the screen there are initials here.  Are those

4103

your initials?

A    Yes, sir.

Q    Does that date indicate the date on which you took this photograph?

A    Yes, sir.

Q    And these numbers here, the K8990038, are those your numbers?

A    Yes, sir.

Q    Those are laboratory numbers that enable you to identify what you examined and what is depicted in this photograph?

A    Yes, sir.

Q    Have you ever seen the DEA 6s with regard to the exhibits that were seized by agents in this case?

A    DEA 6, no, sir.

Q    By the way, in this photograph do you see this number here, this number here, 133706?

A    Yes, sir.

Q    Do you know what that is?

A    That's the lab number assigned to that exhibit.

Q    133706, is that a case?

A    No, sir.  The case number is K8990038.

        MR. SPERLING:  Okay.  May I approach the witness, Your Honor?

        THE COURT:  You may.

MR. SPERLING: May I inquire very briefly from here, Your Honor?

THE COURT: You may.

Q    (By Mr. Sperling) I am handing you, sir, an item that has not yet been marked for identification --

MR. SPERLING: And may it for purposes of this inquiry, Your Honor?

THE COURT: You may.

Q    (By Mr. Sperling) I hand you what's been marked Government's Exhibit 296 for identification, sir.  Do you recognize the number that appears under blank three on that document?

A    Yes, sir.

Q    Does that appear to be a photocopy of the DEA 6 with regard to this case as signed by certain agents that were working on this case?

A    Yes, sir.

Q    I am going to turn, if I may, sir, with the Court's permission to page number three.  Would you read what is identified as Exhibit No. 12 in that DEA 6?

A    Exhibit 12, one 2,000 millimeter Pyrex flask containing residue that was located by RAC Wilson in the living room of the residence.

Q    And this -- by the way, this report does refer to the Defendant Kenneth Eugene Barrett, does it not?

4105

A   Yes, sir.

Q   Would you be willing to concede, Mr. Maberry, that the agent accurately reflected item 12 here in his report and as that exhibit may have been introduced here, but there may have been some mess up with regard to numbers somewhere else?

MR. SMITH:   Your Honor, I'm going object.   I think that calls for speculation.   If he knows, that's one thing, but he just asked to figure it out what do you think about it.

THE COURT:   Sustained.

Q   (By Mr. Sperling) The document that I asked you, Government's Exhibit 296, does indicate Exhibit 12 to be a Pyrex glass flask, does it not?

A   Yes, sir.

Q   By the way, with regard to the examination that you conducted in this case, sir, did agents of the United States, that is, DEA special agents, initiate all of the requests for fingerprint identification that you acted upon in this case?

A   Yes, sir.

Q   All right.   Were there any requests for fingerprint identification that you did not process in this case?

A   No, sir.

Q   If any other requests had been made, would you have

made yourself available to conduct the examination?

A    Yes, sir.

MR. SPERLING:  Government's Exhibit No. 78, may it be displayed, please?

THE COURT:  You may.

Q    (By Mr. Sperling) This is an, item, sir, that when we get our glitch stopped has previously been introduced as Government's Exhibit Number 78.  Here we go.  Maybe here we go.

MR. SPERLING:  May I approach the witness with a hard copy so we can do this, Your Honor?

THE COURT:  You may.

Q    (By Mr. Sperling)  All right.  Do you also see this item previously marked as Government's Exhibit No. 78?

A    Yes, sir.

Q    And does this document also include the same case number on which you worked with respect to the Exhibit 12 you identified during direct examination?

A    Yes, sir.

Q    And does this document also, sir, identify Exhibit 12?

A    Yes, sir.

Q    What does it identify Exhibit 12 to be?

A    As one 2,000 millimeter Pyrex flask.

Q    By the way -- I'm sorry.

4107

A    With residue.

Q    I believe that you also indicated that with regard to certain items seized, item number 11, that there was a plastic bag that was part of the submission.  Do you remember that?

A    Yes, sir.

Q    And is that plastic bag part of the original exhibit or is that a container in which the agents submitted the item?

A    I don't know.  The iodine crystal were inside of the plastic bag.

Q    Are you aware of whether or not the iodine crystals and the containers in which the iodine crystals were found were inside the camera?

A    No, sir.

Q    All right.  Are you aware of whether or not inside that camera those bottles were inside any plastic container?

A    No, sir.

Q    So far as you were aware, sir, could that plastic container have been something other than possessed inside the camera containing the iodine crystal bottles?

A    Yes, sir.

Q    With regard to fingerprint examination, when you retrieve an identifiable fingerprint that you

4108

conclusively establish to be a certain person's prints, are you able to tell precisely when that print was affixed to the item?

A    No, sir.

Q    Can you tell generally when that happened?

A    Not normally, no, sir.

Q    Are you able to tell where the physical item was located when the print was applied to the item?

A    No, sir.

Q    You don't know who may have had it or under what circumstances?

A    No, sir.

Q    All right.  By the way, you've never been to the place that is marked by this model that is to your left, sir, that has previously been introduced as Government's Exhibit No. 1, have you?

A    No, sir.

Q    You didn't go to that cabin area to personally retrieve any items?

A    No, sir.

Q    In fairness, you were operating in a lab and examined items that were submitted as they are as a matter of routine by special agents with the DEA?

A    Yes, sir.

Q    Isn't it fact, sir, that prints may degrade even if

4109

they are originally on something?

A    Depending on the surface that it's -- the print that it's on may degrade, yes, sir.

Q    And heat may affect whether or not a print remains on a particular item?

A    Yes, sir.

Q    Elements of weather could affect whether or not a print remains on an item?

A    Yes, sir.

Q    If an item is rubbed, is it possible that a fingerprint even if retrieved could be removed?

A    Yes, sir.

Q    In fact, it's pretty easy to avoid putting a print on something if one elects to do that, isn't it?

A    Yes, sir.

Q    If, for example, I were to pick up this pen and do so in this manner, with a napkin around it, my print would not be on that item, would it?

A    No, sir.

Q    If I were to wear gloves, a print would not be on an item, would it?

A    No, sir.

Q    And in fact, if one were handling toxic chemicals, it would be advisable to utilize gloves in handling things, wouldn't it?

4110

A    Yes, sir.

Q    Fair to say that in any manner of ways, one may touch, handle or move an item without leaving an identifiable print?

A    That is true, sir.

Q    Are you familiar also with the term constructive possession?

A    No, sir.

Q    Are you aware that someone may actually possess something -- I actually possess this pointer now in my waistband.  It is in my actual possession; do you understand that?

A    Yes, sir.

Q    You understand, sir, that even though now I have placed that item over there, that that item may be in my constructive possession, that is, I may be capable of possessing that item even though I don't have now in my hands?

A    Yes, sir.

MR. SMITH:  Objection.  That has nothing to do with fingerprint analysis.  Relevance.

THE COURT:  Counsel?

MR. SPERLING:  The point is, Your Honor, the limitations of fingerprint analysis, that that's not the end-all.  Something may be possessed in any number of

4111

ways without actually having such a fingerprint would be applied to it.

MR. SMITH:  That is a nature of my objection. That doesn't have a thing to do with that fingerprint analysis whether or not a print may be contained thereon.

THE COURT:  Objection overruled.  Let's move on.

Q    (By Mr. Sperling) Have you ever -- well, the question, I guess, remains.  Do you understand something can be possessed without actually having it in physical, immediate control?

A    Yes, sir.

Q    All right.  Have you ever gone out to scenes and worked various crime scenes in order to endeavor to retrieve fingerprints?

A    Yes, sir.

Q    And you've done that as a matter of course during your career, have you not, sir?

A    Yes, sir.

Q    Can the character of the item or the surface affect the prospect that a latent print will be left?

A    Yes, sir.

Q    And in your experience, sir, does the absence of print or prints mean that someone did not possess an item?

4112

A    No, sir.

Q    By the way, Government's Exhibit No. 12 here, there is an item number 12 that indicates as this report indicates, correct?

A    Yes, sir.

Q    And you have indicated -- by the way, with regard to this item, there is not a listing of newspapers, is there?

A    No, sir.

Q    There's not a listing of a plastic bag?

A    No, sir.

Q    There's not a listing of an envelope?

A    No, sir.

Q    And there's not a listing of a septum, is there?

A    No, sir.

        MR. SPERLING:  Thank you very much for your courtesy.  I have nothing further, Your Honor.

        MR. SMITH:  Very briefly, Your Honor.

                REDIRECT EXAMINATION

BY MR. SMITH:

Q    Sir, as relates to this styrofoam cup that you examined in Number 10, Exhibit 10?

A    Yes, sir.

Q    Anything indicate to you that there's a toxic substance contained within that styrofoam cup such that a

4113

person need to handle it with some sort of protective gloves?

A    No, sir.

Q    How about the aluminium foil?

A    No, sir.

Q    How about that shot shell?

A    No, sir.

Q    How about that dice?

A    No, sir.

Q    And you conducted your examination of most of these items in October of 2000?

A    Yes, sir.

Q    If there was a degradation of the print quality, would you expect it to have happened within, say, a year?

A    It may, sir.

Q    It can, that's a possibility?

A    Yes, sir.

Q    But if they're protected, if they're sealed, then really that's not what you would expect to happen?

A    No, sir.

        MR. SMITH:   Thank you.   Pass the witness, Your Honor.

                    RECROSS EXAMINATION

BY MR. SPERLING:

Q    Those items, however, sir, were they to have been

4114

the subject of fingerprints previously not in your control, not in the sealed condition, could be subject to degradation based on any number of factors, couldn't they?

A    Yes, sir.

Q    And with regard to the items that counsel just asked you about as to whether or not they included toxic substances, if those items were possessed in or around a methamphetamine lab or endeavor -- (Interrupted)

MR. SMITH:  Your Honor, I'm going to object to that as not being the testimony that there's a methamphetamine lab.  That is a mischaracterization of the evidence that's been before this Court and jury.

MR. SPERLING:  With all due respect, it's not, Your Honor.  That's an argument -- (Interrupted)

THE COURT:  Objection overruled.

Q    (By Mr. Sperling) If those items were possessed in and around an endeavor to manufacture methamphetamine, would you have any way of knowing that, sir?

A    No, sir.

Q    And if you knew that they had been seized in such an area, would you have taken protective measures with regard to how you handled those items?

A    Yes, sir.

MR. SPERLING:  Thank you, sir.  Nothing

further, Your Honor.

MR. SMITH:  Nothing further, Your Honor.  He may be released as far as we're concerned.

THE COURT:  Any objection -- (Interrupted)

MR. SPERLING:  -- Your Honor.

THE COURT:  Mr. Maberry, thank you for your testimony.  You may step down and you may be excused

THE WITNESS:  May I get the original photographs?

THE COURT:  Yes.  Mr. Maberry, I'll have the clerk make copies and return the originals to you now.

MR. SPERLING:  May I approach your clerk, Your Honor?

THE COURT:  You may.  Do you have the integrity of the exhibits in order?

COURTROOM DEPUTY:  Yes, sir.

THE COURT:  You may call your next witness.

MR. HILFIGER:  Ron Baldwin.

THE COURT:  Mr. Baldwin, stand before the clerk, raise your right hand and be sworn.

RON BALDWIN,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

4116

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    State your name, please.

A    Ron Baldwin.

Q    Mr. Baldwin, where do you live?

A    In Vian, Oklahoma.

Q    Vian?

A    Yes, sir.

Q    Mr. Baldwin, I'm Roger Hilfiger.  We just met this morning, is that right?

A    Yes, sir.

Q    Now, do you know a person by the name of Brandie Price?

A    Yes, I do.

Q    And do you know Kenneth Barrett?

A    Yes, I do.

Q    You'll have to speak up a little bit.

A    Yes, I do.

Q    Did you know each of those people in the summer months of 1999?

A    Yes, I did.

Q    During the summer months of 1999, did you have any occasion to be with Brandie Price that you can recall going out to Kenneth Barrett's house?

A    During that summertime I was with Brandie.  But as

4117

far as going out to Kenny's, we may have.  But I don't really remember whether we did or not.

Q    Can you remember any specific instances of going out to Kenny's house?

A    Not with her, no.

Q    Do you know -- were you in some type of dating relationship with Brandie Price or just running around with her?

A    No, we just hung out together.

Q    Would you have any -- what purposes would you have to go out to Kenny Barrett's house?

A    Usually I just went to Kenny's and Kenny was a friend of mine.  And we -- really no specific reason to be going out there, just, you know.

Q    Would you have any particular reason to take Brandie Price out there?

A    No, just she might have been with me when I went out there.

Q    Do you know -- you're familiar -- I'm showing you an aerial photograph.  Can you sort of recognize that area?

A    Yeah.  Yes.

Q    Did you recognize where Kenny Barrett's house is?

A    Yes.

Q    And do you recognize -- I know all those cars wouldn't be out there when you were there?

4118

A    Yeah.

Q    Do you recognize where the entrance into Kenny Barrett's house?

A    Yes, I see it.

Q    There's a laser right here to your right.  A little pen to your right, right there.  Do you see the picture up here?

A    Yeah.

Q    There's a red triangle up here.  Can you point on that picture where the entranceway to Kenny Barrett's house?

A    Right there.

Q    Was there a gate there?

A    Yeah, there's a gate there.

Q    And when you went out there -- any time you went out there, was the -- was the gate open or shut most of the time?

A    Most of the time I went out there it was open.

Q    And when it was opened, did you just come on in -- (Interrupted)

A    -- through the driveway and come up and knock on the door.

Q    Did you ever come out there when the gate was closed?

A    A few times, yes.

4119

Q    And when the gate was closed, what would you do?

A    Sometimes I'd turn around and leave, sometimes I'd crawl through the fence and go up and knock on the door. Sometimes he might be in there just digging around and I might ask him to go unlock the gate or something because he hadn't been down there yet, I guess.  I don't know.

Q    Were you ever out there during the nighttime and the gate was locked?

A    No, not that I recall.

Q    Okay.  Are you familiar with this road going back behind here to a private drive going back here?

A    Yeah.

Q    Have you ever been down that road?

A    No.

Q    Do you see this area right here, looks like some kind of tracks going through there?

A    Yeah.

Q    Had you ever gone into Kenny Barrett's house from the area?

A    No.  I came -- I came through this area here.

Q    You never went through the ditch?

A    No.

Q    When you went out with Brandie Price, do you know how many times you went out with Brandie Price if you did at all?

4120

A    If I did at all, it wasn't very many times.

Q    Do you know what kind of car Brandie Price had in the summer of '69?

A    When I road around with Brandie she drove a blue Mitsubishi.

Q    Did she ever have a Mazda?

A    Not that I know of.

Q    If she referred to a Mazda, would that be a mistake and it would be a Mitsubishi as far as you were aware?

A    As far as I know, she drove a Mitsubishi.  That's -- (Interrupted)

Q    What type of Mitsubishi was it?  Sedan-type Mitsubishi?

A    Two door sports.

Q    During the summer -- you have some criminal history, haven't you?

A    Oh, yeah.  A lot.

Q    And during the summer of 1969, did you have any criminal problems?

A    Not in '69.

Q    I mean '99.  I'm sorry.

A    '99.  '99, yes, I did.

Q    In the summer of '99 when you had those problems did you go to jail?

A    Yeah.

4121

Q    Have you looked at some information or anything to recall when you went into jail in the summer of '69?

A    Excuse me.

Q    I mean summer of '99.  The summer of '99, do you recall when you went into jail?

A    In '99 I was arrested in June of '99 for drugs.

Q    And how long did you stay in jail then?

A    I stayed in jail probably close to a month and I was released.

Q    And then how long were you out?

A    Not very long.

Q    Well, a week, two weeks?

A    I had jumped bail and I was re-arrested probably three weeks maybe.

Q    Three weeks after you got out?

A    Yeah.

Q    And so, when would you go back in, August sometime?

A    I'm thinking it was late July because I was arrested in Van Buren, Arkansas and extradited back to Oklahoma.

Q    So your -- you had some case that you got involved in and you were arrested in Van Buren?

A    Yes.  It wasn't the case.  They just stopped me and ran a check on me and I was wanted out of Oklahoma and I was detained there and Oklahoma came and got me and brought me back.

4122

Q    When did you come back to Oklahoma?

A    It was the same night.  I don't know what day it was, but it was same night in July.

Q    And from that time on were you in jail?

A    From -- yeah, from the time -- from the time I was brought back from Arkansas I was incarcerated until January of 2000.

Q    Okay.  So, if there are any occasions that Brandie Price said you were out to Kenny Barrett's house in July and August, can you tell the jury where you would have been in July and August?

A    Well, late July I was in Arkansas because I got arrested, in August I was locked up and they brought me to jail.

Q    Were you also in jail in September?

A    Yes.  I was in jail from whenever that was, July, late July till January of 2000.

Q    Okay.  So you wouldn't have been able to go out to Kenny Barrett's house during August or September of 1999, is that right?

A    That's right.

Q    And do you recall any time during the month of July that you would have gone out to Kenny Barrett's house in '99?

A    I may have.  As I said, I don't recall it.  There's

4123

a chance I could have.

Q    Do you ever recall during that month going out there with Brandie Price?

A    No, not to my knowledge, I don't.

Q    Do you ever recall crossing that ditch?

A    No.

Q    To get to his house?

A    No.

MR. HILFIGER:   I have no further questions.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    Mr. Baldwin, you knew Brandie Price?

A    Yes.

Q    You hung out together during the summer of 1999?

A    Some, yes.

Q    And that would have been according to your recollection probably during the month of July of 1999?

A    It could some, yeah.

Q    You said June you were in jail?

A    Yeah.

Q    And then -- (Interrupted)

A    I hung around with Brandie before then.

Q    I'm sorry.

A    Me and Brandie knew each other before August, you know.  On occasion we'd run around a little bit.

Q    In fact, on occasion you provided meth to her, didn't you?

A    Yes, I did.

Q    When you say you have a criminal history or -- I think you described it as a lot of criminal history?

A    Yes, I went to prison for it.

Q    It wasn't in 1969 when you went to prison, though, was it?

A    No.

Q    It was in 2000; is that correct?

A    May of 2000.

Q    Let's talk about what you went to prison for.  You were convicted for an embezzlement by a bailee, weren't you?

A    Yes, I was.

Q    And you in fact were convicted for robbery by fear, weren't you, sir?

A    Yes, I was.

Q    And you in fact -- you indicated you distributed controlled substances.  You distributed, haven't you?

A    Yes, I did.

Q    And in fact, you were convicted of distribution of controlled substances and possession of controlled dangerous substances with intent to distribute within a thousand feet of a school, didn't you?

4125

A     Yes, I did.

Q     And you also were convicted of possessing weapons by a disqualified person, weren't you?

A     Yes, I was.

Q     That means you had prior felony convictions prior to possessing those weapons; is that correct?  Or were you disqualified because of being a drug user?

A     I guess I was disqualified for being on probation.

Q     Okay.  Well, to be on probation you previously had to have been convicted, didn't you?

A     Yeah.

Q     Okay.  And you were convicted of possession of marijuana, weren't you?

A     Yes, I was.

Q     And you were convicted of an additional charge of distribution of controlled substances, weren't you?

A     What do you mean by additional charge?

Q     In addition to the -- in Case Number 2000-268 in Sequoyah County you were convicted on May the 22nd for distribution -- of 2000 -- for distribution of control substances and possession of controlled substances and that's in addition to the one we've already talked about?

A     Yeah.  Yeah.

Q     Okay.  And you were also convicted, were you not, in Case Number 169 in the year 2000 in Sequoyah County for

4126

possession of controlled substance in the presence of children under 12, weren't you?

A    Yes, I was.

Q    And you were again convicted of an additional count of carrying, pointing and transporting firearms during the commission of drug crimes, weren't you?  Case Number 2000-169 in Sequoyah County?

A    Not pointing a firearm.

Q    It wasn't pointing, just carrying and transporting?

A    Possession of a firearm.

Q    Okay.  And you were convicted in 1999, Case Number 324 of being a felon prohibited -- or prohibited from carrying a firearm.  Do you recall that?

A    There was -- just about every one of my charges had a firearm involved.  Possession of a firearm.

Q    And that was after you had previously -- you were on probation for other felonies and continued to possess firearms even though it was against the law?

A    There were firearms whenever I was arrested, yeah. But --

Q    And in fact, you in relation to your drugs and the drug conviction with the exception of the marijuana charge, the other drug was methamphetamine, wasn't it?

A    Yes, it was.

Q    And Kenny Barrett was your friend?

4127

A     Yes, he was.  Still is.

Q     Okay.  And you recognize Government's Exhibit No. 1 which is that model that's laid out there, sir?

A     Of the house?

Q     Yes.

A     Yeah.

Q     You went out there on occasion, didn't you?

A     Yeah.

Q     In fact, during 1999 when you wanted to see Kenny Barrett, you needed to go to his house, didn't you?

A     Ask him --

Q     Because he didn't leave that very often, did he?

A     I've been out there a few times where he wasn't home.

Q     My question is:  During 1999 he didn't leave there very often, did he?

A     He was gone a few times, yes, during 1999.  He wasn't there when I went by.

Q     How many times did you go by in 1999 when Kenny Barrett -- (Interrupted)

A     I couldn't count.

Q     In fact, you were using drugs pretty heavily during that period of time, weren't you?

A     Yeah.

Q     And your recollection is not -- we're talking six

4128

years ago, aren't we?

A    Yes.

Q    Actually, it's more than six now?

A    Yes.

Q    You weren't keeping a diary or a journal that you could go back and consult.  And you've known him for a period that extended well before 1999, didn't you?

A    No.  Actually, I just met Kenny probably two or three years before all this happened.

Q    A few years before?  So you've known him for a period of several years leading up to the incidents that occurred there in September -- (Interrupted)

A    Oh, yeah.

Q    How familiar were you with the inside of his residence?

A    I was familiar with the little den he had and the bedrooms.

        MR. LITTLEFIELD:  I'd ask that Government's Exhibit 175 be displayed.

        THE COURT:  You may.

Q    (By Mr. Littlefield) And do you see the photograph there?  It's also on that little screen to your left, Mr. Baldwin.  Do you see Government's Exhibit 175?

A    Yeah.

Q    And doesn't that -- that pretty well depicts the

4129

layout of his residence, doesn't it, sir?

A    I can tell you what the two downstairs rooms look like.

Q    Let's look up here for a minute.  Basically, you were in these front two rooms, weren't you?

A    Yeah.

Q    And there was a little desk area right there, wasn't there, next to that area what went up to the loft?

A    Yeah.

Q    And there's a gun cabinet here, wasn't there?

A    Yes.

Q    There was a stereo system.  He's got stereo speakers there, doesn't he?

A    Yes.

Q    That was his couch, his coffee table in that area right there, right?  Mr. Baldwin, in regards to the time that you got arrested in the summer of 1999, you bonded out on June the 28th of 1999, didn't you?

A    Yeah, I did.

Q    Okay.  And you weren't returned to the Sequoyah County Jail until October the -- pardon me -- August the 4th of 1999; isn't that correct?

A    No, I was in the jail --

Q    I'm not talking about the Sequoyah County Jail.

A    Yeah.

4130

Q    How long did it take you to get from Arkansas to Sequoyah County?

A    About 30 minutes, 45 minutes.

Q    I mean from the time you were in jail, how many days?

A    Well, from Arkansas, I never went to jail.  I was in the booking process and they called Sequoyah County and Sequoyah County came and got me.

Q    So, if the records at the Sequoyah County Jail reflect that you were not booked in after being released on June the 28th of 1999, if the records of the Sequoyah County Jail facility reflect that it was not until August the 4th, 1999 that you were booked back into the Sequoyah County Jail, would you quarrel with those records or could your memory be just a little off?

A    It could be a little off, you know, but within that time I know I was in the jail when they brought Kenny --

Q    I'm not asking about that.  I'm asking -- you testified on direct of being in jail sometime, you think, in the latter part of July?

A    Yes.

Q    If the records reflect it wasn't the latter part of July but August the 4th of 1999, would you -- you wouldn't dispute that, would you?

A    No.  If the records said that I wouldn't.

4131

Q    Let's go back to this area in here.  There's some shelves up here.  Do you see where I'm pointing at?

A    Yes.

Q    Mr. Barrett kept knickknacks up on there on this shelf, didn't he?

A    I'm sure he did.  I never paid that much attention to it.

Q    Let's display Government's Exhibit No. 58.  Do you recognize Government's Exhibit No. 58, that photograph?

A    Yeah.

Q    Those are the knickknacks Mr. Barrett kept in that east room, aren't they, that set up on the shelves?

A    What?

Q    Stuff -- knickknacks, stuff up on the shelves?

A    Yeah.

Q    Mr. Baldwin, if we're both talking at the same time, he's a talented man, he can't take down both of us speaking simultaneously.  I will try and let you finish your answer, try and let me finish my questions.  We can't talk at the same time and let that gentleman make a record, okay?

A    All right.

Q    Would you say that that accurately depicts the items and the kinds of items that Mr. Barrett kept up on his shelves in that east room?

4132

A    I guess it would be, you know, if that's his room. You know, like I say, it's six years ago, you know.   I didn't really pay that much attention to it.

Q    Did you pay much attention to that camera?

A    Not really, no.

Q    Mr. Barrett never showed you that camera and showed the iodine crystals contained in it?

A    No.

Q    And there was a ceiling fan in that east room; do you recall that?

A    I think there was, yeah.

Q    Would you look at -- let's display Government's Exhibit No. 59.   And that ceiling fan was a recessed area up into the ceiling; do you recall that?

A    Ceiling fan -- is that the room in the den?

Q    Does that look like it?

A    There's the ceiling -- I didn't --

Q    Didn't look outside?

A    Not really.

Q    Mr. Barrett never showed you the pseudoephedrine pills hidden behind the planks up there by that ceiling fan?

            MR. HILFIGER:   Your Honor, I object.   That calls for facts not evidence as far as Mr. Barrett showing him that.

4133

MR. LITTLEFIELD: That was a question. Did Mr. Mr. Barrett ever show you the pseudoephedrine hidden behind the planks above the ceiling fan.

THE COURT: Objection overruled. You may answer.

A No, he didn't.

Q (By Mr. Littlefield) Mr. Barrett had a number of guns also, didn't he?

A Yeah, he did.

MR. LITTLEFIELD: I'd ask that Government's Exhibit No. 128 be displayed to the witness.

Q (By Mr. Littlefield) Mr. Baldwin, do you recognize Government's Exhibit No. 128?

A As far as this -- knowing the guns, I don't know nothing. He had some guns. I never -- (Interrupted)

Q Didn't pay much attention to them?

A No.

Q You didn't specifically see that firearm at Kenny Barrett's residence?

A Not really, no.

Q Didn't pay -- you just don't recall?

A It wasn't really something we talked about.

Q Well, you knew guns, didn't you?

A I know shotguns and hunting rifles.

Q Never recall him having that gun at his residence?

4134

A    No.  He never got his guns out and showed it to me.

Q    Where did he keep the guns?

A    Right there in the room in the gun cabinet.

Q    Did he keep some of them leaning up against the wall?

A    Yeah, there was some -- yeah.

Q    In fact, he also had a semi-automatic pistol, didn't he, sir?

A    He never show me no pistols.

Q    You don't recall him with that Smith & Wesson pistol, nine-millimeter, in his waistband?

A    No, I never seen -- (Interrupted)

Q    Never saw him?

A    Never seen him walk around with guns.

Q    By the way, Brandie -- you're not the only person that Brandie Price hung out with --

A    No.

Q    -- in the summer of '99, are you?

A    No.

Q    Do you know an individual by the name of Jamie Crow, don't you?

A    Yeah, I know Jamie.

Q    Jamie Crow is also know as Jamie Smith, isn't she -- (Interrupted)

A    No, I never heard -- (Interrupted)

4135

Q   Hadn't heard of her called that?

A   No.

Q   Jamie Crow is one the people that Brandie hung out with, isn't she?

A   I don't know if she hung out with Jamie or not.

Q   Do you know Jamie has some connection with drugs, methamphetamine?

A   I know she used drugs.

Q   Okay.  And did you ever provide Jamie Crow with meth?

A   We done drugs together, yeah.

Q   Did you ever do drugs at Kenny's?

A   Yeah.

Q   How did you do drugs, sir?

A   Intravenously.

Q   With a needle?

A   Yeah.

Q   Did you carry your own rig all the time?

A   I tried to keep my rig with me, yeah.

Q   When you used drugs with Kenny, did you use them at his place, sir?

A   Yeah.

Q   And was it your meth, his meth, or both?

A   It was my meth.  We tried -- we just went out there to let him try something that I had.

Q    And did Kenny -- Kenny was using, wasn't he?

A    Yeah, Kenny was using.

Q    Did he use it intravenously as well?

A    Yeah.

Q    And did you provide him a rig or did Kenny have his own rigs?

A    I tried to have some.  Kenny had his own.  He's a drug user.

MR. LITTLEFIELD:  May I have a second, Your Honor?  Pass the witness.

REDIRECT EXAMINATION

BY MR. HILFIGER:

Q    Mr. Baldwin, in regard to Government's Exhibit No. 58, those knickknacks on the shelf, would you have recognized those knickknacks and attribute those knickknacks to Kenny Barrett if Mr. Littlefield hadn't told you that those were knickknacks at Kenny Barrett's?

A    No, I wouldn't.

Q    Was there any particular item up there that you recognize as having seen out at Kenny Barrett's house?

A    No.  Like I said, I never really paid that much attention to what Kenny had on his shelves or what -- anything like that.

Q    So you knew a shelf was there?

A    Yeah.  I knew the shelf was there and I knew he had

things on it, but I never asked him what this was or what that was or anything like that.

Q   As to the Government's Number 59 where they showed you a ceiling fan, did you ever pay any attention to a ceiling fan out there?

A   No.  Like I said, no.

Q   If Mr. Littlefield hadn't told you that that's the ceiling fan out there at Kenny Barrett's, would you have recognized that as being the ceiling fan at Kenny Barrett's?

A   No.

Q   As to the particular rifle that you looked at, the one that he put up here next to the shelf, was there anything on that rifle that you could say, oh, yeah, I recognize that as Kenny Barrett's rifle?

A   No.  Like I said, I didn't really pay that much attention to it, guns Kenny had.

Q   As I understand what you said, you'd -- sometimes you'd go out to Kenny Barrett's and you would do drugs out there, is that right?

A   Yeah.

Q   But you took your own out there?

A   Yeah.

Q   And what was the purpose of taking your own drugs out there?

4138

A    Like I say, I just wanted to see if he liked it, you know.

Q    So what you'd do is take your drugs out there and share them with him?

A    Yeah.

Q    Did you ever use Kenny Barrett's drugs at Kenny Barrett's house?

A    We probably did, yeah.  I mean, we're hooked on drugs, you know.  If he had drugs he'd let me use them.

Q    During the summer -- and you had quite a history, haven't you, of convictions and everything?

A    Oh, yeah.

Q    Does change anything about whether or not you were out there in July of 1999 with Brandie Price?

A    No.

Q    You could have been out there in August, couldn't you?

A    No, I couldn't.

Q    About this Mitsubishi that -- you're familiar with the car that Brandie Price drove?

          MR. LITTLEFIELD:  Objection.  Beyond the scope of cross examination.  I asked nothing about Brandie Price's vehicle, Your Honor.

          THE COURT:  Argument?

          MR. HILFIGER:  I'll withdraw the question.

4139

THE COURT:   Question withdrawn.

Q    (By Mr. Hilfiger) Is there -- during the month of July, were you in the Vian area -- of '99 -- or were you at some other location?

A    I'm -- to my knowledge I think I was in the Arkansas area.  That's where I was arrested at, in Arkansas.

Q    So this being arrested in Arkansas, were you just over in Arkansas -- (Interrupted)

A    I was staying in a motel.

Q    You were staying in a motel?

A    Yeah.

Q    And how long had you been staying in a motel in Arkansas?

A    Oh, probably about a week.  I was -- I had a bondsman looking for me and I wasn't staying in one place too long.

Q    Because you knew there was -- (Interrupted)

A    Yeah.

Q    -- bond forfeiture out?

A    Yeah.

Q    Is that the reason that you understand that you weren't -- you couldn't have been at Kenny's in July?

A    Yeah.  But I ain't saying I wasn't at Kenny's in July, I'm just saying that there's a possibility I could have been.  I don't know -- didn't keep track who I was

4140

with or who I was always taking out there, you know.

MR. HILFIGER:  I have no further questions.

MR. LITTLEFIELD:  I don't have any additional.

THE COURT:  May this witness be excused?

MR. HILFIGER:  Yes, he may.

THE COURT:  Mr. Baldwin, you may step down and you may be excused.  Let's take a recess.  Ask the jury to remember my admonition.  Everyone please remain seated as the jury leaves.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Anything to take up outside the hearing of the jury?

MR. LITTLEFIELD:  Not from the Government, Your Honor.

THE COURT:  For defense?

MR. HILFIGER:  Not at this time, Your Honor.

THE COURT:  How many more witnesses?  Are we talking about possibly finishing at noon, is that --

MR. HILFIGER:  I'm still thinking that except for --

THE COURT:  Probably be in recess 20 minutes, so you probably got --

MR. HILFIGER:  It looks like a possibility we can finish at noon.

4141

THE COURT:  Depends on cross examination?

MR. HILFIGER:  Right.

THE COURT:  Okay.

(Whereupon, a short recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box and counsel for the Government is present and the Defendant is present with his counsel.  You may call your next witness.

MR. HILFIGER:  Gelene Dotson.

THE COURT:  Ma'am, would you raise your right hand right and be sworn.

GELENE DOTSON,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    State your name, please.

A    Gelene Dotson.

Q    And how are you related to Kenneth Barrett?

A    I'm his mother.

Q    And, Ms. Dotson, let me have you look at Government's Exhibit No. 69.  Do you recognize this -- this is an aerial photograph.  Do you recognize this picture?

4142

A    Yes.

Q    And do you live anywhere in this area?

A    Yes.  I live in the trailer that's on the -- in the right hand corner.

Q    This is your trailer here, is that right?

A    Yes.

Q    And do you own the property -- any of the property in there?

A    Yes.  All of that.

Q    Ms. Dotson, I'm going to direct your attention to September 24th, 1999.  Do you recall the early morning hours of September 24th, 1999?  Do you know where you were at that time?

A    I was in bed asleep.

Q    And did anything unusual happen that caused you to wake up that night?

A    Yes.  I heard a loud noise followed by some gunshots.  And I waited a few minutes because I was used to that because Kenny would sometimes shoot at the skunks that came up to eat the cat food.  And I thought, no, that's too many shots.  So I got up.  I didn't turn any lights on.  And I walked to the other end of the trailer. The end -- I was at the west end I walked to the east end.

Q    You have a laser pointer right there.  That little

4143

red triangle on the back of it, push down on it and point to the west end and the east end. Do you see?

A    Okay. I -- my bedroom is right in here and I walked down to this end.

Q    Go ahead.

A    As I was passing my kitchen window, I glanced out and I saw headlights in my driveway.

Q    And where is your driveway located? Is it shown on the picture?

A    No. It's over in -- kind of nervous. It's over in this area.

Q    Okay. And when you saw the headlights, what did you see?

A    I just saw the headlights. I couldn't tell what kind of vehicle it was.

Q    Did you see any kind of flashing lights?

A    No, I did not.

Q    Did you see any kind of colored lights?

A    No.

Q    Do you know when somebody refers to emergency lights on a police vehicle, do you know what I'm referring to?

A    Yes. The red and blue lights.

Q    Did you see any kind of lights on that vehicle that you would consider as emergency lights?

A    No, I did not.

4144

Q     Police identification lights?

A     No.

Q     What happened to that vehicle?

A     I thought I saw the lights turning as I walked past the trailer, but I'm not sure because I just went on to the end of the trailer.

Q     Which end are you talking about?

A     The east end.  The end that's over -- (Interrupted)

Q     This -- (Interrupted)

A     Right.

Q     And what did you do there?

A     I pulled back the curtains and I looked out and I just hear a lot of loud talking and -- like there were people milling around over there.  And then the phone rang.  It was my sister.  Talked to her.  I walked back to the window and that was when I saw a patrol car come through Kenny's gate.

Q     Patrol car being ones that's black and white -- (Interrupted)

A     Right.

Q     And did that patrol car have any lights on?

A     Not when it came through the gate, but as it pulled up closer, it turned it lights on.

Q     Where did it stop?

A     Some place -- I'm not exactly sure.  But I think

4145

some place like around in there somewhere.

MR. HILFIGER:  I have no further questions.

MR. LITTLEFIELD:  We have no cross examination.

THE COURT:  May this witness be excused?

MR. HILFIGER:  Yes, sir.

MR. LITTLEFIELD:  Yes, sir.

THE COURT:  Ma'am, thank you for your testimony.  You may step down and be excused.

MR. HILFIGER:  Call Loyd Cobb.

LOYD COBB,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q   State your name, please.

A   Loyd Cobb.

Q   And, Mr. Cobb, what's your occupation or business?

A   I'm a private investigator.

Q   How long have you been a private investigator?

A   Approximately 15 years.

Q   And are you retired from any kind of -- or have any kind of law enforcement?

A   Yes, sir.

Q   What kind is that?

A   I began law enforcement in 1968.  I was a police

4146

officer.  In 1970 I was appointed as a special agent with the Federal Bureau of Narcotics and Dangerous Drugs.  In April of 1972 I left that agency and was appointed as a Special Agent for the U.S. Treasury's Bureau of Alcohol, Tobacco and Firearms.  I was with them until October of 1983.  And left that agency and became the district attorney's investigator for Okmulgee and McIntosh Counties in Oklahoma, serving there until the end of 1989.  And then I began doing the private work.

Q   Now, I contacted you concerning some investigation in this case; is that true?

A   Yes, sir.

Q   As part of that investigation, I requested that you take some pictures, is that right?

A   Yes, sir.

Q   Let me -- easy to show the ones in the book, sir. Clerk's handing you what I've marked as Defendant's Exhibits 233, 233-A, 224, 225, 226 and 227.

A   I see, yes.

Q   Do you recognize those?

A   Yes.

Q   And are those pictures that you took or taken in your presence?

A   Yes.

Q   And do they reflect what's shown -- properly shown

4147

on the date of the picture?

A     Yes.

MR. HILFIGER:  Your Honor, I'd move to introduce Defendant's Exhibits 223, 233-A, 224, 225, 226 and 227.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Be admitted without objection.

MR. HILFIGER:  Let's start with 233.  Could I ask those be displayed?

THE COURT:  You may.

Q     (By Mr. Smith) Mr. Cobb, would you look at 223-A, the record that you got there.  And those are a set of three pictures, is that right?

A     Yes, sir.

Q     And can you tell the jury what those pictures -- (Interrupted)

MR. LITTLEFIELD:  Excuse me, Your Honor.  I think for the record -- and I may be mistaken, but I think he said 223-A.  I think what we're looking at 233.

MR. HILFIGER:  I'm sorry.  233 first.

THE COURT:  That is 233.

Q     (By Mr. Smith) This series of pictures beginning with 233, what does it depict, can you tell?

A     This is the view from the interior of the cabin

4148

looking out the front door.

Q    The cabin you're referring to is the cabin you understood was Kenneth Barrett's cabin, is that right?

A    Yes, sir.

Q    Would you look at this model over here?

A    Yes, sir.

Q    Is that a model of the cabin that you were in?

A    Yes, sir.

Q    Okay.  Let's start with the top picture in 233. What does that picture show from the -- where are you in that picture?  Where is the camera in that picture?

A    The camera in that picture is centered on the doorway and is six feet to the inside of the cabin.

Q    And that's six feet back into the cabin?

A    Yes, from the doorway.

Q    From the center of the doorway?

A    From the center of the doorway.

Q    The second picture down?

A    Is two feet.  Centered on the doorway two feet from the middle of the door.

Q    It's hard to see on this because -- there's a sign right there that says what the distance is, isn't it?

A    Correct.

Q    And then the bottom picture?

A    Okay.  Now, there's more to that photograph in the

4149

exhibit than what's not exhibited on the board up there.

Q     I understand that.

A     All right.

Q     They're shown in this photo, right?

A     Yes.

Q     This bottom picture, what's the bottom picture?

A     This would have been right at the -- right at the door looking out of the door, centered on the doorway at probably a distance of about four feet, I believe.

Q     Now, this area up here on each one of these pictures, what is that?

A     That would be the header over the door.  Well, part of it is the header, part of it is the porch that's outside.  There was a porch on the outside and the camera looking straight through the door.  You can -- the top of the porch also.

Q     What's this right here?

A     That is the upright that's supports the porch on the right side.  Well -- (Interrupted)

Q     As you're looking out door -- (Interrupted)

A     As you're looking out of the door, be on the right side.

Q     So, would that be the same thing as this one right here?

A     Correct.

4150

Q    Instead of saying right side, are you familiar with the directions here?

A    Yes.  The cabin looks to the south.

Q    Okay.  So this post would be -- (Interrupted)

A    On the west.

Q    On the west -- west post?

A    Correct.

Q    Let's look at 223-A.  Can you tell us what's depicted in 223-A?  Are you still in the center of the door?

A    Let's see.  These we're take -- these were taken from the west side of the room, inside to the out, from the west side.

Q    Okay.  From somebody -- as if somebody's standing in the west which would be the right side as you're looking out?

A    Correct.

Q    What distance -- I know it's hard to see on this, but I think it's easier on the picture, isn't it?

A    That distance on the top photograph is four feet.

Q    What's in the middle photograph?

A    The middle photograph would have been five feet, the bottom photograph is six feet.

Q    And six feet is representing the six feet deep into the room?

4151

A    Six feet deep into the room from the doorway to the camera lens.

Q    And when you are six feet deep into the room, do you know where that camera was in relation to the door, the interior door, that's -- like is shown on this model? Not the outside door, the interior door?  Can you recall the interior door going to another room?

A    Yes.   There were two.   One is a room on the east side of the cabin and then there was one further to the north.

Q    I'm talking about the east side the cabin.

A    Okay.

Q    What's the relationship when you're six feet back from the door to the east side the cabin?

A    You're right in the middle of that doorway.

Q    Not a very deep room?

A    No.

Q    Let's look at 224.   And 224, what does that -- now, this is the sign saying how the -- what the depth is, is that right?

A    Yes.

Q    And 224, where is the camera placed in relation to the door and as far as right center or left and how far back?

A    It's one foot back it is along the west wall.

4152

Q    Which is the interior wall, is that right?

A    That's correct.

Q    And then what's this middle picture?

A    The middle picture would have been, I believe, four feet?

Q    Four feet deep in the room?

A    Yes, sir.

Q    On the west wall again or -- (Interrupted)

A    Yes, along the west wall.

Q    And then the bottom picture?

A    It would have been six-foot back.

Q    Again, back to the door?

A    Yes.

Q    Let's look at 225.  On 225 what do those pictures represent as far as the relationship to the camera to the door and how deep?

A    I think these photographs would have also been taken along the west wall at, again, various angles -- are the various distances.  The bottom would have been six, the next one up would have been five, and the next one up, I believe, would have been four.  The top would have been four feet.

Q    This is six feet deep?

A    Five.

Q    Five, four -- (Interrupted)

A    Yes.

Q    Next picture, please.  That picture, what does that show as far as the depth?

A    These were taken from the east side, the top were being taken from two feet from the doorway, the middle three feet from the doorway and the bottom was four feet from the doorway.

Q    That's on the east side -- east side of the door, is that what you're talking about?

A    That's where that's -- that's where the identifier is.  The camera was positioned on the west side looking --

Q    Looking east?

A    Out the door.

Q    Okay.  And this is how far back in?

A    Which -- the middle, it's three feet.

Q    And this one?

A    Four feet.

Q    Again, it's going back west -- I mean, your angling back into the door into the living room?

A    You're looking from the living room on the west side of the door facing, out the door facing toward the east.

Q    Okay.  The next.  Number 227, again, what angle are you coming in?

A    Would be looking from the west side of the room out

of the doorway, the top photograph being from five feet from the doorway to the camera lens, the bottom would be six feet from the doorway to the camera lens.

Q    And are you familiar with the area out there where like where there's a ditch?  Here's the model here of the actual area where the ditch is.

A    Yes.

Q    Are you familiar with this roadway coming in here or this trail coming in here?

A    I'm familiar with that area.  It's not a roadway there.

Q    It's not -- there's a fence there and everything now, right?

A    Yes.  And there's a trailer in there.

Q    At any of these picture shots with the camera inside the door, would you be able to see like where these -- any of these three cars are?

A    No.

         MR. HILFIGER:  Just a moment, Your Honor.  I have no further questions.

         THE COURT:  You may cross examine.

                    CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    Mr. Cobb, all these photographs you took were positioned inside of that cabin; is that correct?

4155

A    Yes, sir.

Q    No photograph examines the perspective of an individual who was standing outside of the front door, does it?

A    No.

Q    You were asked the question you can't see those three cars if you're inside that residence; do you recall that?

A    Yes, sir.

Q    You can see them if you're standing on the front porch, can't you?

A    Yes.

MR. LITTLEFIELD:  I ask that Government's Exhibit 3 be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) You did stand outside the cabin, didn't you, on the porch area?

A    Yes.  I had been out there.

Q    And you looked down toward the east, did you not?

A    Yes, sir.

Q    And on direct you responded to questions about a ditch and a trail, and in fact, you identified that today there's a fence out there; do you recall that?

A    Yes, sir.

Q    Okay.  And those are, in fact, the posts on that

fence; isn't that true, sir?

A    Yes, sir.

Q    Do you see this little tree here that's inside of the driveway line; do you see what I'm talking about?

A    Yes, I see the little tree there.

Q    And you discern, do you not, that the trunk, in fact, is inside of that driveway that's to the east?  You can look -- maybe see it better on the monitor on your left.

MR. HILFIGER:  Your Honor, I'll object.  I don't understand which driveway he's referring to.  The white private drive?

MR. LITTLEFIELD:  The only driveway you can see which is the white private drive.

Q    (By Mr. Littlefield) You can see that tree, can't you?

A    Yes, I can see the tree -- (Interrupted)

Q    Mr. Cobb, that's -- those amongst those trees right in there, isn't it?

A    Does not appear that way to me.

Q    You didn't take this photo?

A    No.

Q    And if the individual who took this photo surveyed that scene and identified that tree as being one of those trees there, you wouldn't have a means of disputing that,

4157

would you, sir?

A     Just looking at it, it does not appear to be the same tree.

Q     You didn't survey that scene, did you?

A     No, sir.

Q     You didn't get out there with survey machines as we see there and plot distances and elevations, did you?

A     No, sir.

Q     In regard to the accuracy of that scene, you were in that cabin, weren't you?

A     Yes.

Q     And you didn't measure that entirety of that cabin, did you?

A     Yes, sir, I did.

Q     You did?  And what is the dimension of that cabin, sir?

A     I don't recall off the top of my head what it is.

Q     You wouldn't dispute that that front west room is ten feet seven and three sixteenths inches wide, would you, sir?

A     I don't know what it is.

Q     Nor would you dispute that the depth of that front room is eight feet eight and three-eighths inches, would you, sir?

A     Again, I don't know what it is.

4158

Q    Okay.  A person standing outside the door can see the entry area that's defined in that photograph, can't they?  You're standing out there on the porch looking straight down, you can see where those cars are, can't you, sir?

A    At what position on the front porch?

Q    You're standing with your entire body immediately outside that front door and look directly east down that porch line, you can see where those cars are, can't you, sir?

A    Yes.

Q    And the photographs that you took, Defendant's Exhibit Nos. 223, 223-A, 224, 225 and 226, none of those depict that perspective, do they, sir?

A    No.

Q    And likewise, if a person were straddling that front door, one foot in, one foot out, with their head to the south of that wall looking directly down, you didn't take those photographs either, did you, sir?

A    No, sir.

Q    Did you measure the front porch, sir?

A    Yes, I did.

Q    How wide is it from the wall to the edge?

A    I don't have those -- those in the courtroom.

Q    It's less than four feet, isn't it, sir?

4159

A   I believe it's right about four feet or 45 inches.

Q   Okay.  Which is less than four feet, correct?

A   Yes, sir.

Q   And you indicated, I think, on one of the photos that when you were taking that photograph out the direction of the front door, that you were six feet back of the door; do you recall that?

A   Yes.

Q   And in relation to --

MR. LITTLEFIELD:  Could we for a second put up Government's Exhibit 175?

THE COURT:  You may.

Q   (By Mr. Littlefield) Mr. Cobb, as the investigator, you have had privy to the Government's exhibits that have been provided to the defense, haven't you?

A   I have not viewed all of the exhibits.

Q   Have you viewed this one?

A   No.

Q   Okay.  Well, let's ask you then.  Does this appear to accurately depict the layout of that cabin?  Not necessary the location of the furniture, but the location of the walls, the doors, the rooms, et cetera.

A   Yes, sir.

Q   Okay.  And this is the front door -- and I'm pointing up with my laser here.  This is the front door;

4160

is that correct?

A   Yes.

Q   That's the door out of which you took photographs?

A   Yes, sir.

Q   And you said when you were six feet back you were immediately to the west of the door that connected those two rooms; that's correct also, isn't it?

A   Yes, sir.

Q   So from here to there is six feet?

A   Yes, sir.

Q   And from there to there, to the edge of the porch, is less than four feet; is that not true, also, sir?

A   Yes.

MR. LITTLEFIELD:   May I approach the monitor, Your Honor?

THE COURT:   You may.

Q   (By Mr. Littlefield)   And if a person was standing even with that interior door and was firing at an individual exiting a Ford Bronco at that position with a .223-caliber rifle, that person would be within 15 feet of an individual exiting the front passenger seat, wouldn't he, sir?

A   Yes, sir.

MR. LITTLEFIELD:   May I have just a second, Judge?

4161

THE COURT: You may.

MR. LITTLEFIELD: Pass the witness.

THE COURT: Further direct?

MR. HILFIGER: No further questions.

THE COURT: May this witness be excused?

MR. HILFIGER: Yes.

MR. LITTLEFIELD: Yes.

THE COURT: Mr. Cobb, thank you for your testimony. You may step down and be excused.

MR. HILFIGER: May we approach, Your Honor?

THE COURT: You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. HILFIGER: Your Honor, in preparation for the defense resting, we would also like to -- we're at a point where we would normally call the Defendant. The Defendant has indicated to us that he does not want to testify. But we would like to have the Court make inquiry prior to our resting. I mean, this is -- we do not have any further witnesses. If you want me to rest subject to reopening if you decided he needs to testify, I could or if you want me to rest so the jury can go make and inquiry.

MR. LITTLEFIELD: The only thing I would suggest -- I've been brazen enough, I'm going to do it

4162

again -- I don't know that I would let the jury go because what if he does say, well, I change my mind. I want to testify and the jury is gone?

MR. HILFIGER: I mean, let them go from the room.

MR. LITTLEFIELD: Take another 20-minute break or make the record.

MR. HILFIGER: That's what I'm talking about. I didn't mean -- I just meant.

MR. LITTLEFIELD: I'm not disagreeing with you.

MR. HILFIGER: So we can have a record.

THE COURT: Of course, it's noon now.

MR. LITTLEFIELD: I know it's a normal place for our lunch, but --

THE COURT: I don't see anything wrong with having them come back and --

MR. LITTLEFIELD: Announcing in their presence.

THE COURT: Announce rest and then we'll release them for the rest of the day. I think that's the safest -- (Interrupted)

MR. LITTLEFIELD: Makes a lot of sense to me.

THE COURT: We'll take care of that. I'll ask -- I'll make inquiry after -- (Interrupted)

MR. HILFIGER: But that's where we are right now.

4163

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Ladies and gentlemen of the jury, it's 12:00 o'clock.  We'll take our noon recess.  I'll ask you to be back at 1:15.  Remember my admonition not to discuss this among yourselves, allow anyone to discuss it with you.  Keep your minds free and open.  I'll ask everyone please remain seated as the jury leaves the courtroom.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom for the noon recess.

At the bench counsel for the Defendant advised that they were near that time in the case when they would be resting and that one issue that the Court needs to address now that we've arrived at that point is for the Court to address the Defendant.

Mr. Barrett, you have the right to testify in this matter if you choose to.  And it's required under the law that I inquire of you personally whether or not you desire to take advantage of that right.  You also have right to remain silent and not saying anything at all and not have it held that against you.  Would you inform the Court now as to how you desire to proceed.

4164

MR. BARRETT:  I will not take the stand, Your Honor.

THE COURT:  You understand you have the right to, you have an absolute right to.  You can't be forced to and under our Constitution you can't be required to.  I'm just trying to find out what your desires are.  I take it by that response that you do not want to testify; is that correct?

MR. BARRETT:  Yes, Your Honor.

THE COURT:  When the jury returns, I'll ask that the defense announce that you have rested.  Does the Government anticipate any rebuttal?

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Your Honor, we're not contemplating the possibility of rebuttal.  If so, it will be, I think, just one witness and very, very brief.

THE COURT:  If you knew, that's fine.  You can announce after the Defendant has rested.

(Whereupon, the noon recess was held after which the following record was made outside the hearing of the jury.)

THE COURT:  Let the record reflect counsel for the Government is present, Defendant is present with

4165

counsel.  Defendant had announced their intention to rest.  And before we recessed for lunch, I had a short inquiry.  I made a short inquiry to the Defendant, Mr. Barrett, in regard to him testifying in this matter.  And I wanted -- gave it some more thought over the lunch hour.

And, Mr. Barrett, I may not have been as clear with you as I would like to be.  This issue, you testifying, is really, as I view the law, two issues.  One, is that you have that -- that under the law, under the Constitution, you cannot be required to testify and I think from the statement you made, I think you understand that.  The other issue is under case law you also have the absolute right to testify if you chose to.  And I just wanted to -- I know you have two competent counsel to give you advise on this matter.  I just wanted the record to be clear that you understood you have a right to testify if you want to.  That's one thing.  And then the other is you can't be required.  In other words, the Government, the U.S. Government, cannot force you to testify but there are really two issues.  So you can rest assured and secure I'm not going to force you to testify because the law doesn't require it.  That's something you can do if you want to.  But there's also case law that says you have a right.  You could tell your attorneys you

4166

advised me of my rights and I see fit not to follow your advise.  I want to take advantage of Kenneth Eugene Barrett's right to testify.  You can waive that right if you choose to.  But I wanted you to know you have a perfect right to testify if you want to.  Do you understand that?

MR. BARRETT:  Yes, Your Honor, I understand.

THE COURT:  Do you desire to testify?

MR. BARRETT:  No, sir.

THE COURT:  You're telling me you waive that right to the extent you have one?

MR. BARRETT:  Yes, Your Honor.

THE COURT:  Thank you.  Mr. Hilfiger, anything further?  I thought you looked like you wanted to say something.

MR. HILFIGER:  Yes, I did.  It's our intention when the jury comes back that we're going to rest.  My understanding is that the Government is going to call two witnesses on rebuttal.  And I think at this point we were sort of jumping the gun but rather than doing it while the jury is in the box.  We would object to rebuttal.  There's an -- for the reason we don't think it's proper rebuttal.

THE COURT:  What is that proposed rebuttal?

MR. LITTLEFIELD:  There are two witness --

4167

we're going to split them. First, Johnny Philpot -- and not necessarily in that order. I think he may be the second witness we call. Mr. Philpot, as I'm sure the Court recollects, is the Sheriff of Sequoyah County. And he will identify two business records of the Sequoyah County Sheriff's Office. They're booking records on Ronny Baldwin.

THE COURT: You don't have to tell me. I'm just curious about the -- (Interrupted)

MR. LITTLEFIELD: And the tenure of them is on this is that Ronny Baldwin was released from jail on June the 28th of 1999 and the next time he was booked into jail was on August the 4th, 1999. Mr. Baldwin testified that if those were the records he would not disagree with that. However, he testified he believed he was only out in a very short period in July, I think three weeks in July. He said he wouldn't dispute the record, but there's no affirmative testimony as to those dates. And it is our intention to introduce just those dates through the documents, the booking documents, as to Mr. Philpot.

MR. HILFIGER: And I don't object to us stipulating to those release issues. I just don't see -- instead of us having a witness come up and take time to -- I mean -- (Interrupted)

THE COURT: Is he going to do anything other

4168

than -- (Interrupted)

MR. LITTLEFIELD:  I'm going to identify those two documents though him and point to the appropriate location -- and the Court has copies of those two documents.  Government Exhibit 297 down at the bottom where it says released information on the first page.  Shows release date 06-28-1999 at 14:014.  And then on 298 on the second page, it shows the arrest date at the very top of the page of 08-04-1999, and then it shows down -- back on page one it shows the booking date as being 08-04-1999 right by my thumb, Your Honor.

THE COURT:  You want him to testify -- is he going to do anything other than just being a custodian?

MR. LITTLEFIELD:  That's correct.  And identify the appropriate places that show the release information on the June charge when -- the June release date on that document and the booking information and the booking date on -- (Interrupted)

THE COURT:  For your rebuttal, do you think you need him to testify is what you're telling me?

MR. LITTLEFIELD:  It was my preference.  We've got him here.

THE COURT:  I'm not suggesting.  I just wanted to be sure.

MR. LITTLEFIELD:  The question as was asked was

if the sheriff testified, and he agreed that if the sheriff testified, he wouldn't dispute.  But he didn't acknowledge those dates.

MR. SPERLING:  The second rebuttal witness is the one who, I believe, defense counsel lodged an objection.  The background is that Chuck Choney testified -- and I quote -- tracer rounds are restricted to the military and we intend to call Carlos Sandoval, Special Agent with the Bureau of Alcohol, Tobacco and Firearms and Explosives to the contrary.  The tracer rounds are not restricted to the military and may be possessed by members of law enforcement.

THE COURT:  I know that's been at issue through the trial.  But from my view of the testimony of the tracers, is there evidence that the tracers were fired or suggested that they were fired?  They were just found as a part of the -- (Interrupted)

MR. SPERLING:  They were found during the course of the inventory and the information we believe by the defense is that is somehow inappropriate.  They were in Danny Oliver's car, as I recall.

THE COURT:  Agent Sandoval is to testify as an expert that they are not restricted to just pure military use?

MR. SPERLING:  That's correct, Your Honor, and

were commercially available.

THE COURT:  Mr. Hilfiger?

MR. HILFIGER:  I don't think -- I mean, we never said that they are not.  Mr. Choney may have mentioned that.  We said that they're tracers and there's no doubt that there were tracers in Danny Oliver's gun. We didn't say they were fired, we didn't say they're illegal.  We didn't say anything.  We just said there are tracers in that gun.  There was a grenade launcher in that car.  We didn't say anything about whether it's illegal or not.  We were just saying there were tracers.

MR. SPERLING:  They did emphasize as part of the defense theme that the law enforcement officers were -- well, we'll say over-armed, Your Honor.

THE COURT:  I'll permit that rebuttal.  Before the jury comes in and perhaps in that zone of planning, I'm assuming now it should be less than 30 minutes of testimony?

MR. LITTLEFIELD:  I would think so.

THE COURT:  Depending on cross examination?

MR. LITTLEFIELD:  I would think so.

THE COURT:  I would plan on excusing the jury until in the morning.  Any comment, any thoughts about -- I'm trying to make a plan as to when we start and when we could get the case submitted to closing argument.

4171

MR. SPERLING:  Our sense, Your Honor, is -- and we have discussed this with defense counsel as well and mindful of our burden of proof.  I need not remind the Court that's for purposes of my commentary.  And hour and 45 minutes is what we had in mind.

THE COURT:  Defense, is that adequate for the defense?

MR. HILFIGER:  That's fine.  The additional request that we would have is we be allowed to split our own hour and 45 minutes.  I don't want to talk too long.

THE COURT:  You may.

MR. HILFIGER:  And also, I guess, we would like to be able to use the overhead, but do it ourselves from this podium.

THE COURT:  You may.

MR. SPERLING:  And we will split our time as well, Your Honor.  And our anticipation is that Mr. Littlefield's microphone will be turned off after one hour.

MR. LITTLEFIELD:  I talk loud.

THE COURT:  My plan generally is to try to start at 8:30 in the morning.  I think it will take -- we have improved instructions, so I'm thinking 30 to 40 minutes maximum to read the instructions.  If we take a recess, appropriate recess, maybe we can get the case

4172

submitted by 1:00 o'clock and then have the jury sequestered, sequestered for overnight.  It's not my intention at this point.  But I'll listen to what you have to say about that.  When I say sequestered, I mean have lunch brought in, they would be here.  Lunch would be ready for them when we submitted the case so they could start their deliberations without interference with the lunch break.

MR. SPERLING:  That's fine with us, Your Honor.

THE COURT:  Another issue that you can thinking about, as I think my observations detected that we do have some members of the jury who smoke and those of you who have tried cases with me in the past know that I have what I call an informal instruction that allows those who smoke to separate themselves from the non-smoking jury and go to a smoking area for a smoke break.  I realize that when the jury is deliberating they should stay together and I generally instruct those who take the smoke break send a court security officer with them and instruct them not to talk among themselves or to anyone else.  Those who remain in the deliberation room to cease their deliberations and not talk about the case until those who take a smoke break return, then the deliberations are reinitiated.  I have not come up with a better solution than that at this point, but I'm willing

4173

to listen.

MR. SPERLING:  That's fine with us, Your Honor. We have one other suggestion with regard -- (Interrupted)

THE COURT:  Defense have any objection to that smoking record?

MR. HILFIGER:  No, I don't.

MR. SPERLING:  We were also giving some thought to alternate jurors.  And our sense, Your Honor, is that even though the alternates would not participate in the deliberations at first stage, they should be retained against the prospect that something may happen and one of the jurors after -- (Interrupted)

THE COURT:  I don't disagree.

MR. SPERLING:  For second stage.

THE COURT:  I plan to keep them on.

MR. SPERLING:  I was confident you were ahead of us, but we didn't --

THE COURT:  Anything else before we bring in the jury?

MR. HILFIGER:  No, Your Honor.

(Whereupon, the jury entered courtroom, was seated in the box after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present,

Defendant is present with counsel.  Defense may call your next witness.

MR. HILFIGER:  At this time, Your Honor, the defense rests.

THE COURT:  Any rebuttal on the part of the Government?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  You may call your first rebuttal witness.

MR. SPERLING:  Carlos Sandoval.

(Whereupon, the witness was administered the oath.

THE COURT:  You may proceed.

CARLOS SANDOVAL,
being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Please state your name, sir, and spell your last name for the record.

A    My name is Carlos Sandoval.  Spelling of my last name is S-a-n-d-o-v-a-l.

Q    What is your business or profession, sir?

A    I'm an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, sir.

4175

Q    For how long have you so served as a special agent for the ATF?

A    Since September of 1990.

Q    What's your educational background?

A    I have a Bachelor of Science degree from Southwest Texas State University in San Marcos, Texas.

Q    When did you receive that degree?

A    In May of 1996.

Q    When?

A    May 1986.

Q    After graduating from college in May of 1986, did you become a law enforcement officer?

A    Yes.

Q    Where?

A    I was employed by the City of Arlington, Texas as a police officer.

Q    For how long, sir?

A    For just over four years.

Q    What did you do upon completion of that?

A    I applied for and took the examination as an ATF agent and completed my background check.  And I further continued -- after I was hired as an ATF agent, continued my education and completing the new agent training academy for ATF agents in basic criminal investigation school for ATF agents, both held in Glynco, Georgia.

4176

Q    That was -- where was that basic training, sir?

A    In Glynco, Georgia.

Q    When you did you complete that?

A    1991, 1992.

Q    After your completion of basic agent training, where were your assigned?

A    I was assigned to the Tulsa ATF office.

Q    Have you been continuously assigned to the Tulsa ATF office since graduating from the Glynco school?

A    I'm currently assigned to the Muskogee satellite office in Muskogee, Oklahoma.

Q    And during the time that you have been a special agent for -- I'm going to refer to it as BATFE, Bureau of Alcohol, Tobacco, Firearms and Explosives; is that fair, sir?

A    Yes, sir.

Q    During your tenure, have you had assignment with regard to Sequoyah County, among other counties, in the eastern direct of Oklahoma?

A    Yes, sir.

Q    And as an agent, is it your responsibility, sir, to keep up on laws and regulations with regard to firearms, ammunition and explosives?

A    Yes, sir.

Q    Do you engage in continuing education with regard to

4177

those subject matters, sir?

A    Yes, sir, we do.

Q    Have you been qualified also as an expert, for example, in the field of nexus or whether or not firearms have crossed in interstate commerce?

A    Yes, sir.

Q    Have you been qualified as an expert with regard to firearms, explosives and ammunition?

A    Not as an expert, but based on my experience and my training, I've testified on numerous amount of firearms and ammunition and destructive devices.

Q    You and I talked this noon, did we not, sir, about tracer ammunition?

A    Correct.

Q    And are you familiar with whether or not tracer ammunition is available to the general public?

A    Yes, sir.

Q    And what is your familiarity based on your training and experience and education?

A    There is no regulation of ammunition, tracer ammunition, by ATF.

Q    May tracer ammunition be lawfully possessed by a member of the public?

A    Yes.

Q    May tracer ammunition be lawfully sold by members of

4178

the public?

A    It is sold, yes.

Q    And at what kind of circumstances or facilities?

A    Sold by individuals who engage in the business of selling ammunition either as a dealer or to other individuals.  A person for ammunition does not need a license to go buy and -- go ahead and buy it.  There's no background check conducted for the purchase of ammunition as there is a firearm.

Q    During the time that you have served as a special agent for ATF or BATFE, has there ever been a restriction on tracer ammunition?

A    In the 15 years that I've been with AFT, no, sir.

Q    And when we refer to tracer ammunition, most of us having seen movies television or the like have some sense that tracer as a round you can actually see?

A    Correct.

Q    With that be fair?

A    Yes, sir.

Q    What causes what you can see in a tracer bullet?

A    The bullet or the projectile itself that is fired upon a firearm, the base contains a chemical compound either magnesium, potasium chloride, phosphorous.  When the projectile is expelled from the barrel or from the firearm, it is ignited through the gunpowder of the

4179

cartridge case. The projectile leaves the firearm going down range or upon going down to the target area. And it's basically used to walk or trace where the ammunition is hitting at the time.

Q    Is a tracer round any more or less lethal than a non-tracer round?

A    In my opinion, no. It's still the projectile being fired upon a firearm.

MR. SPERLING:  Thank you, sir.  Nothing further, Your Honor.

THE COURT:  Cross examination?

MR. HILFIGER:  No cross.

THE COURT:  May this witness be excused?

MR. SPERLING:  Yes.  Thank you, Your Honor.

THE COURT:  Mr. Sandoval, you may step down and be excused.  You may call your next witness.

MR. LITTLEFIELD:  Johnny Philpot.

JOHNNY PHILPOT, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Mr. Philpot, you were the Sheriff of Sequoyah County in 1999?

A    Yes, sir.

4180

Q    And as a consequence of that, are records kept in regards to when inmates are booked into and released from the Sequoyah County Jail?

A    Yes, there is.

Q    Were those records a part of the normal business records of the Sequoyah County Sheriff in 1999?

A    Yes, sir.

Q    And are you responsible as sheriff for maintaining those records and are they within your custody, sir?

A    Yes, sir.

Q    I would ask that what's been marked as Government Exhibit No. 297 be displayed to the witness.  It's not in evidence.  While it's displayed, are you familiar with an individual by the name of Ronny Eugene Baldwin, sir?

A    Yes, sir, I am.

Q    I have asked you if you would produce records reflecting when Mr. Baldwin was incarcerated and released during the summer of 1999; is that true, sir?

A    Yes, sir, it is.

Q    Do you have displayed in front of you what's been marked as Government Exhibit No. 297, sir?

A    Yes.

Q    Is that in fact a business record of the Sequoyah County Sheriff's Office in regards to Sequoyah County Jail relating to Mr. Baldwin?

4181

A    Yes, sir, it is.

MR. LITTLEFIELD:  Move admission what's been marked as Government's Exhibit 297, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Be admitted without objection.

MR. LITTLEFIELD:  I would ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Littlefield) And what is 297, sir?

A    It is book-in sheet for when Ronny Baldwin was booked into the Sequoyah County Jail on that date.  I can't really read.  It's not focused very good.

Q    I'm going to ask that the lower portion be focused. Does it show a release date down toward the bottom?  Do you see a release date, sir?

A    Yes, I do.

Q    And do you have a laser pointer up there or has it been moved?

A    It's been moved, I guess.

Q    Can you tap the screen as to the area just to the side of where the release information is?  And what date was he released there?

A    6-28-1999.

Q    Okay.  Do you have a record -- would that be when he was released from jail in regards to that time he was

booked in to jail?

A    Yes, sir.

Q    And if we focus up, does it show the booking date on there, on that portion as well, sir?

A    Yes, it does.

Q    And tap that and tell us what date he was booked in?

A    6-23-1999.

Q    Have you obtained a record as to the next time Mr. Baldwin was placed in the Sequoyah County Jail after he was released on June the 28th of 1999, sir?

A    Yes.

        MR. LITTLEFIELD:  I will ask what's been marked as Government's Exhibit No. 298 be displayed, sir.

        THE COURT:  You may.

        MR. LITTLEFIELD:  Not displayed.  Shown to the witness.  It's not in evidence yet.

Q    (By Mr. Littlefield) Sheriff Philpot, do you recognize what has been marked as Government Exhibit No. 298, sir?

A    Yes, I do.

Q    What is that?

A    It is also a book-in sheet on Ron Baldwin.

Q    Is that the booking sheet containing the information regarding the next date for which he was booked into the jail after that June 28th release, sir?

4183

A      Yes, sir.

MR. LITTLEFIELD:  Move admission of what's been marked as Government's Exhibit No. 298.

MR. HILFIGER:  No objection.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And ask that it be displayed.

THE COURT:  You may.

Q      (By Mr. Littlefield) And can you -- if we can bring it in just a little bit.  That should be enough.  Can you tap where it shows that he was next booked into jail, sir?  And what date is that, sir?

A      It was 8-4-1999.

Q      August 4th of 1999?

A      Yes, sir.

Q      And does that document also -- is this one or two pages?  Are you familiar with whether this is a one or two page document, sir?

A      This is a two page document.

Q      If we go to the second page, does it have the date of the arrest for that August the 4th, 1999 booking, sir?

A      It should have, yes, sir.

Q      And do you see the arrest information, sir?

A      Yes, I do.

Q      And can you tap that portion of the document which contains the arrest information?  And what's the date of

4184

the arrest for the August 4, 1999 booking, sir?

A    August 4, 1999.

Q    Same day that he was booked into the jail was the day he was arrested?

A    Yes.

Q    I guess we're going to have to scoot that over a little bit.  But do you see the agency that was responsible for arresting him, sir?

A    Yes, I do.

Q    What is that?

A    Sebastion County Arkansas.

Q    And can you tap where the Sebastion County is?  Okay.  Where it says S-e-b County?

A    Yes.

Q    Was Mr. Baldwin outside of the -- or out of the Sequoyah County Jail from June the 28th, 1999 until August the 4th, 1999?

A    Excuse me.

Q    During the period between June 28th, 1999 when he was released as evidenced in Government Exhibit 297 until he was booked back in on August the 4th, 1999, was Mr. Baldwin outside of the custody, not within the custody, of the Sequoyah County Jail during that time period?

A    He was not in jail during that time period.

        MR. LITTLEFIELD:  Pass the witness.

4185

MR. HILFIGER:  No questions.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down and be excused.

MR. LITTLEFIELD:  Your Honor, may I approach with the original exhibits?

THE COURT:  You may.

MR. LITTLEFIELD:  Your Honor, the Government would rest in regards to rebuttal evidence.

THE COURT:  Anything further?

MR. HILFIGER:  No surrebuttal from the defense. We rest.

THE COURT:  Members of the jury, both the Government and the Defendant have rested.  The next stage of the trial will involve the Court instructing -- giving you instructions.  And my procedure is to instruct first and have the attorneys argue after the instructions. Since there is some preparation time for the Court and counsel after the close of evidence, I will advise you now that we'll be in recess and the jury will be excused until 8:30 in the morning.  And then at 8:30 you can anticipate hearing first instructions from the Court and then closing arguments.  At the close of the closing arguments, the case will be submitted to you.  It's a

4186

term we use, submitted to you, for deliberation. And so, the plan is to start at 8:30. I anticipate when you arrive here in the morning there will be menus for you to order lunch. Lunch will be brought in so as soon as the arguments are finished, you can begin your deliberations. So that's roughly what your schedule will be tomorrow.

So remember, although both the Government has rested and the Defendant has rested, the case is still not submitted to you. So it's not appropriate for you to discuss this matter among yourselves. It's not appropriate for you to discuss, as you know, with anyone else that you may come in contact with. So the instructions at this point are identical to what they've been in the past. We're just a step closer to the case being submitted to you where you can start your deliberations.

And remember my admonition about news coverage. Do not involve yourself in any consumption of any news that this case may have generated. The purpose for that is to keep your minds free and open for you to consider only the evidence you've seen and heard here in this courtroom.

So I'll ask now that everyone in the courtroom please remain seated as the jury leaves for the afternoon recess and I'll ask you to be back just a little before

4187

8:30 in the morning.  We'll start again.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  I'm going to instruct my law clerk to distribute to both parties the Court's proposed instructions, give you an opportunity to -- I'm going to suggest 30 minutes.  It may take you longer than that.  And if it does, you can just relay that information to my clerk.  But 30 minutes -- let me know if you need more time.  I think that's optimistic on my part.  But if you do, just simply tell my law clerk where you are, how much more time do you think you might need.  And then it's 2:00 o'clock now.  I'm thinking if you're ready in 30 minutes, fine.  But if not, roughly 3:00 o'clock or depending on what you find or what your suggestions are, we'll have a conference sometime around 3:00 o'clock.

It's probably not very clear.  I'd like for you to give me an indication that 30 minutes or nearly there or, Judge, your instructions are so far off we're going to have to redo them ourselves or, Judge, we're fairly close.  We just have a few things to talk about.  So, if you'll keep me advised.  And our conference place, as you think both are aware, is a conference room north end of my chambers and that's where we'll meet.

4188

MR. HILFIGER:  Judge, I believe at this time the defense would also renew it's Rule 29 motion with the same argument previously made.

MR. LITTLEFIELD:  Same responses we made.

THE COURT:  Rule 29 motion is overruled.

(Whereupon, a brief record was made that is not a part of this transcript, after which the following record was made outside the hearing of the jury.)

THE COURT:  The record should reflect counsel for the Government is present, counsel for the Defendant is present.  The parties have been furnished with the Court's proposed instructions.  I'm going to go through the instructions and ask -- I'll make a record as to any objections you may have and we'll start with the Government and then the Defendant.  Instruction Number One, opening.  Any objection from the Government?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  None from the Defendant, Your Honor.

THE COURT:  Number Two, offenses charged. That's a copy of the Indictment.

MR. SPERLING:  None, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Defendant has no objection.  Number Three is plea and presumption of innocence.

4189

MR. SPERLING:  No objection.

MR. HILFIGER:  No objection from the Defendant.

THE COURT:  Number Four is reasonable doubt defined.

MR. SPERLING:  No objection.

MR. HILFIGER:  No objection from the Defendant.

THE COURT:  Number Five is stipulations.

MR. SPERLING:  No objection.

MR. HILFIGER:  No objections from the Defendant.

THE COURT:  Number Six, offense of using or carrying a firearm during and in relation to a drug trafficking crime or during a crime of violence for possession of a firearm in furtherance of any such crime, Counts One and Two.  Any objection?

MR. SPERLING:  No objection to that page, Your Honor.

MR. HILFIGER:  No objection from the defense.

THE COURT:  Number Seven, essential elements of offense of using or carrying a firearm during and in relation to a drug trafficking crime or a crime of violence or possession of a firearm in furtherance of any such crime, 18 USC Section 924(C)(1)(a) and (j).

MR. SPERLING:  Our objection, Your Honor, is to paragraph third which we believe should read:  The

4190

firearm played an integral part in one or more of the drug trafficking crimes charged in Count One.

THE COURT:  Are you on the third paragraph?

MR. SPERLING:  Yes, sir.

THE COURT:  As to Count Two or as to Count One?

MR. SPERLING:  Both.

THE COURT:  Okay.

MR. SPERLING:  So, it should read Counts One and Two -- I see.  Yes.  As to -- as charged in Count One.  That is, the Defendant intended that the firearm increased the crimes likelihood of success or the firearm plays a significant role in the crime.  The thrust of our objection, Your Honor, is that as stated, this crime, this element, would require that the firearm increase the likelihood of the success of the underlying crime.  And in this case there is evidence that the Defendant wished to go out in a blaze of glory.  Does that increase the likelihood of success of the crime?  Well, that did not increase the likelihood if you attempt to manufacture methamphetamine successfully, for example.

THE COURT:  You think it should be amended to read as --?

MR. SPERLING:  I believe that the words Defendant intended that should be added after the word -- before firearm.  So it should read the Defendant intended

that the firearm increased the crime's likelihood of success or play a significant role in the crime.

THE COURT: And that same amendment as to Count Two?

MR. SPERLING: Yes, Your Honor.

THE COURT: Comment from the defense?

MR. HILFIGER: Your Honor, we object to that. I think that as far as that particular wording, the wording that's in paragraph third sufficiently reflects the statute and the instruction --

THE COURT: Government's objection overruled. Instruction Number Eight, essential elements of the various drug trafficking crimes.

MR. LITTLEFIELD: Your Honor, if I might interrupt. I don't know whether the defense ever said whether they didn't object to that Instruction Seven. We did object and I'm not sure that the record reflects whether they did not.

THE COURT: If they --

MR. HILFIGER: We do not object to the instruction as --

THE COURT: As the Court proposed? Thank you, Mr. Littlefield. Instruction Number Eight, essential elements of the various drug trafficking crimes. Government have any objection?

4192

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Defendant has objection?

MR. HILFIGER:  Defendant has no objection.

THE COURT:  Instruction Number Nine, essential elements of the offense of possession with intent to manufacture, distribute, dispense a controlled substance, 21 USC 841(a).

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Defendant?

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Number Ten, essential elements of the possession of a listed chemical -- a listed chemical with intent to manufacture a controlled substance, 21 USC Section 841(c).

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Number Eleven, essential elements of possession of precursor chemicals with intent to manufacture a controlled substance.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Number Twelve, essential elements of the offense of attempting to manufacture a controlled substance, 21 USC 846.

MR. SPERLING:  No objection, Your Honor.

4193

MR. HILFIGER:  No objection.

THE COURT:  Thirteen, essential elements of the offense of maintaining a place for manufacturing and distributing or using controlled substance, 21 USC 856.

MR. SPERLING:  No objection.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Fourteen, the offense of intentionally killing a state law enforcement officer engaged in the performance of his official duties, 21 USC Section 840(a)(e)(1)(b).

MR. SPERLING:  No objection.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Instruction Fifteen, essential elements of the offense of intentionally killing a state law enforcement officer engaged in the performance of his official duties.  Any objection from the Government?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  The defense does have an objection and we had -- I really don't have any law on it.  It's just basically in number three, David Eales was a state law enforcement officer.  We would request that there be some acknowledgment that the Defendant has to have some knowledge of that.  And we said that the Defendant knew or he should have known that David Eales was a state law enforcement officer.  And our argument --

4194

our basic argument is it seems to me that as this statute is written, it appears to be a general intent crime, but it doesn't -- because it doesn't put any burden on the Defendant to know that that person -- or he believed or reasonably believed that that person was a state law enforcement officer and it's not -- it's not a legislative intent -- general intent crime.  It should be a specific intent, specifically intended to cause the death of a person he knew to be a state law enforcement officer.  And we request that it would be -- something added in there that would like to -- that he knew or he should have known that David Eales was a state law enforcement officer.

THE COURT:  Argument?

MR. SPERLING:  The specific intent requirement, Your Honor, is that he kill a person.  Knowledge that that person is a state law enforcement officer is not a requirement of the statute.  It certainly is a specific intent requirement.

THE COURT:  In that regard to the Defendant's objection, do you have any case law?

MR. HILFIGER:  No, Your Honor, I do not.  I have no --

THE COURT:  I might just for the record add no Tenth Circuit cases, First Circuit, Fifth Circuit, Fourth

4195

Circuit, I believe, find the cases are factually distinguishable.  In my reading of those cases, the closest discussion is that the guidelines requires that the statute from the First Circuit case -- I admit that it's reflected of the application to this case.  That is, when I say the reflecting, I mean facts are not saying the court said there that the statute that was not required to find anything under the statute or under the guidelines was.  So I can't find any case law to support the Defendant's position, so I'll overrule your objection.  And my clerk brought to my attention this instruction should include in the first sentence in order to establish the defense -- is that where intentional goes?  Intentional killing.  Intentional should be added before killing.

MR. SPERLING:  One of the things we did talk about, Your Honor, in regards to this request for a knowledge instruction, the circumstances were such that the person killed had been an uncover officer, Defendant would not then have known.  But if he were to have killed a state law enforcement officer who was engaged in an undercover purpose from him, he may not have known that he was a state law enforcement officer, but that still would be in violation of this statute.

THE COURT:  Mr. Smith, do you want to --

4196

MR. HILFIGER:  Mr. Smith, I think, is familiar with that case.

MR. SMITH:  My understanding of it, Judge -- it has been a couple weeks since I looked at it.  There was knowledge that it was an undercover agent and that's why they offed him.

THE COURT:  Well, I think that your arguments -- I'm familiar with the case.  And the court in that case suggested that the defendant knows he associated with it knew or it was common knowledge -- or not common knowledge -- but knowledge that the person killed was an undercover agent.  However, I think what Mr. Sperling has to say is true, too.  The statute could be read in such a way that it didn't make any difference whether he knew or not.  If he killed someone that turned out to be unknowingly an undercover agent, it would still cover the statute.  It's an area that's not clearly defined by the case law.  I find that.

MR. HILFIGER:  I understand that the statute reads that the statute doesn't require any knowledge.  It just seems to me that knowledge should be there.

THE COURT:  I think if Congress had intended it, they would have put it there.  Next one is what?  Sixteen, possession defined.

MR. SPERLING:  No objection, Your Honor.

4197

MR. HILFIGER:  No objection.

THE COURT:  Seventeen, counts for separate crimes.

MR. SPERLING:  No objection.

MR. HILFIGER:  No objection.

THE COURT:  Eighteen is knowingly and willfully defined.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Nineteen is proof of knowledge or intent.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Twenty, on or about.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Twenty One is evidence defined.

MR. SPERLING:  No objection.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Number Twenty Two is direct and circumstantial evidence.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Twenty Three is credibility of the

4198

witnesses.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Twenty Four is witness impeachment.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  Just a minor concern.  It's in the third line -- third -- actually, the second sentence says if you find any witness has willfully testified falsely in this trial to any material fact.  And I requested that in this trial be taken out and just says at any time any material fact, because the question may come up whether they were testifying truthfully this time or in the previous -- or testifying truthfully in a previous deal, lying at this time or lying previously. Now, I'm just saying that testifying at any time as opposed to in this trial.  That's the request.

THE COURT:  Comment from the Government?

MR. SPERLING:  Well, I think credibility of witnesses is also covered in the Court's final instruction.  I don't have it numbered.  But with regard to assessing witnesses, I don't think that's necessary.

THE COURT:  You don't think a change is necessary?

MR. SPERLING:  I don't think a change is necessary.

4199

THE COURT: Defendant's objection noted and overruled. Number Twenty Five is impeachment by a prior conviction.

MR. SPERLING: No objection to Twenty Five.

MR. HILFIGER: No objection.

THE COURT: Twenty Six is witness personal advantage.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Twenty Seven, expert witness.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection, Your Honor.

THE COURT: Twenty Eight is PowerPoint presentation not admitted into evidence.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection, Your Honor.

THE COURT: Number Twenty Nine, right of attorney to interview witnesses.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection, Your Honor.

THE COURT: Number Thirty, failure of Defendant to testify.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection, Your Honor.

THE COURT: Thirty One, verdict.

4200

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Thirty Two we'll put an asteric by.

MR. SPERLING:  We have no objection to the form of that one --

THE COURT:  And then Thirty Three will be the closing instruction.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Thirty Four is still under scrutiny; is that correct?

MR. SPERLING:  Yes, Your Honor.

THE COURT:  You've seen the Court's verdict forms and we've discussed.  Is it my understanding that both parties are either going to agree or present alternative verdict forms in the morning?

MR. HILFIGER:  Verdict form or interrogatory?

THE COURT:  Verdict form.  Verdict form.  I'm sorry.  Verdict forms that you've been presented with.  Any objection to the verdict form?

MR. HILFIGER:  I don't see -- the defense does not have objection to the verdict forms.  The interrogatories --

THE COURT:  That's still the issue.  Any objection to the verdict form?

4201

MR. SPERLING:  No, Your Honor.

THE COURT:  Now, as to the interrogatories, I misspoke.  Any general comment the Government would make in regard to interrogatories, if you'll present your version in the morning.  You've seen the Court's suggested and amended in our discussions this afternoon.  If you'll submit in the morning -- when I say in the morning, we'll start at one with the instruction.  And what are your thoughts?  How early do you want to be here?  I mean, I want you to be early enough to -- it's eight o'clock, seven o'clock.  How much time are you going to be able to get it done tonight and get it here by -- you've got to communicate with the -- what's your problems there?

MR. SPERLING:  I'll find out as quickly as I can and I'll do -- what I would suggest is that we report to the Court between nine and 9:30.

MR. HILFIGER:  That will be fine.

THE COURT:  Does that give us plenty of time, their suggestion at 9:30?  What did you say?  Let's say 9:30 for submissions to Denise and we'll meet at 10:30.  The record should reflect that Denise is the Court's clerk.  We'll be in recess.

(Whereupon, the Proceedings were continued to November 2, 2005.)

4202

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 1, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 4072 through 4201.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

_____
GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED
MAY 2 2 2006
W...
Clerk, U.S. District Court ...RIE
By_____
Deputy Clerk

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
-vs-                         )    No. CR-04-115-P
                             )
KENNETH EUGENE BARRETT,      )
                             )
            Defendant.       )

VOLUME 19 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 2, 2005.

A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law

## EUSTICE REPORTING SERVICE
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 4204-4247

4204

PROCEEDINGS

THE COURT:  Let the record reflect counsel for the Government is present, counsel for the Defendant is present.  I have provided both the Government and the Defendant the Court's proposed instructions in this matter.  Has the Government received their copy?

MR. SPERLING:  We just did, yes, Your Honor.

THE COURT:  And has the Defendant received your copy?

MR. HILFIGER:  Of the additional or the new instruction?

THE COURT:  Yes.

MR. HILFIGER:  Yes.

THE COURT:  And the special interrogatory?

MR. HILFIGER:  Yes, Your Honor.

THE COURT:  And the new verdict form has been changed from what we've reviewed last evening.  The record should reflect the Defendant submitted proposed instruction this morning.  I received none from the Government; is that correct?

MR. SPERLING:  We did not give the Court anything in written form, Your Honor.

THE COURT:  First, you should note that Instruction Number Seven has been changed from what you reviewed last night.  Have you had and opportunity to

4205

review changed Instruction Number Seven?

MR. SPERLING:  I have looked at it, Your Honor. I honestly can't tell what was changed from this.

THE COURT:  You have the --

MR. SPERLING:  It appears that element number four was expanded.

THE COURT:  That's true.  If you look at four as it was proposed last evening, the fourth was changed from cause the death of David Eales through the use of a firearm and it's been expanded to say during the commission of one or more of the drug trafficking crimes charged in Count One of the Superseding Indictment.  The Defendant directly caused the death of David Eales with the use of a firearm.

MR. SPERLING:  We don't know have an objection to that element.  We do maintain the objection we had as to the third element which is whether or not we must prove the firearm increased its likelihood of success -- provide elsewhere in the instructions.

THE COURT:  As to Count Two, the same change was made.  You'll remember the discussion we had about the use of intentional.  Is that Count One also or is it Count Two?  As to Count Two, it's the third page over. You are instructed that the -- previously we had the intentional killing.  I omitted intentional, so those are

4206

the only -- perhaps I shouldn't say only.  Those are the changes.

MR. LITTLEFIELD:  Your Honor, is that Count Two or Count Three?

THE COURT:  Count Two.  Definition of a crime of violence.

MR. HILFIGER:  Okay.  As to Count Two first, you took out the intentional killing?

THE COURT:  Yes.  That should be your version I've just given you.

MR. HILFIGER:  That is the version.  I thought we had it in there.

THE COURT:  We did and I took it out.  That's what I'm bringing to your attention.

MR. HILFIGER:  We would object to that.

THE COURT:  I anticipated you would, but I wanted you to be aware of what the change was.

MR. SPERLING:  Which instruction are you referring to, Your Honor, Instruction Number Seven?

THE COURT:  Instruction Seven, Count Two, top of page three.  Third -- after you get to as Count Two, that's one page, then there's a page and then the third page at the top of the page first paragraph.  Your are instructed that the -- previously read the intentional killing and stayed, I removed intentional and instructed

4207

that the killing.

MR. SPERLING:  Are you adding or removing?

THE COURT:  Removing.  It was in.  In the version I gave you last night it was in and I have now on further research determined it's not necessary.

Now, do you have any -- does the Government have any further questions as to Instruction Seven that's been amended?  I'll give you an opportunity to make any further record you desire to make on those changes.

MR. SPERLING:  I'd like to have benefit of the Court's research with regard to the exclusion of that term.  At this point we have no objection, Your Honor.

THE COURT:  Okay.

MR. HILFIGER:  We do object.  I understand you took out two places and we object to the removal of it in both places.

THE COURT:  Objection overruled.  The special interrogatory as to Count One, have you had an opportunity to look at it?

MR. SPERLING:  We have, Your Honor.  We don't object to this one though we still believe that a premeditation special interrogatory should be submitted to the jury.

MR. HILFIGER:  I do strongly object to this one and I've got some reasoning for it if I can put that on

4208

the record.

THE COURT:  You may.

MR. HILFIGER:  As I read this special interrogatory and as I understand the reasoning derived to get to this interrogatory, it appears that this special interrogatory is saying if you find the person guilty of murder and -- which takes into consideration both first degree murder and second degree murder.  And I do understand that the contention that -- a felony murder is a death eligible felony under 924(c)(j).  I disagree -- I agree that a felony murder is eligible.  It doesn't need to be -- just be eligible.  It doesn't need to be identified between a first degree and second degree.  However, I think in the long run it has to be identified because 924(j)(1) states any person in the course of a violation of Subsection C causes the death of a person through the use of a firearm shall, and in one it says if the killing is a murder as defined in Section 1111 -- but that's not -- I understand that's not what I'm talking about -- shall be punished by death or imprisonment for a term of years or for life.  So there's a contemplation, I believe, because they're saying punishment can be death, life imprisonment or a term of years, that they're contemplating murder first or murder second.  Because if it was just murder first, you

4209

couldn't have a term of years because it contemplates murder second in 924(j). Also, when you get over to the death penalty death sentence under Section 3591, that's not -- I'm sorry. It's 3593. Section 3593(e), the return of the finding concerning the sentence of death and it goes through and it says if in the case of and it talks about something if there is jury. And if there is no jury, the court shall consider whether all the aggravating factors or the factors found to exist sufficiently outweigh all the mitigating. But it goes down here, it says based upon this consideration the jury by unanimous vote, or if there is no jury the court, shall recommend whether the defendant should be sentenced to death, which would be murder one or life imprisonment, which would still be murder one, without possibility of release or some other lesser sentence. And if it's a first degree murder, you can't have a lesser sentence. You're only allowed to have death or life imprisonment. But under this statute it says or some other lesser sentence. So I'm saying that the contemplation under 924(j) under 1111 and under 3593(e) is that you should separate murder and murder one and murder two because what would happen -- (Interrupted)

THE COURT: Do you have any authority for that?

MR. HILFIGER: I'm just reading the statute.

4210

THE COURT:  I know.

MR. HILFIGER:  The problem I see is what happens if the jury comes back and says we found murder, we do not recommend the death penalty.  Then can they -- because it's says here based upon this consideration, the jury by unanimous vote shall recommend whether the Defendant shall be sentenced to depth or life imprisonment without the possibility of release or some other lesser sentence.  So, this is directing that the jury has the ability under the death sentence to sentence something other than life or life imprisonment.  And in order to do that, they have to find murder second degree.  And I've just -- I'm saying that I think that this interrogatory needs to be divided up between murder one and murder two, because otherwise I don't think -- you know, the contemplation I always understood was that murder one was only in the statutes -- (Interrupted)

THE COURT:  Give me an overlay to felony murder.

MR. HILFIGER:  Well --

THE COURT:  Felony murder is not -- it's felony murder.  If I rob the grocery store and as I'm leaving I back over the little old lady and killed her, that's felony murder.

MR. HILFIGER:  That's murder one.  Because that

4211

comes under -- (Interrupted)

THE COURT:  Aren't we telling the jury it's either one or it's none?

MR. HILFIGER:  Well, the concern I have here is that it sounds like this second sentence is to act with callous and wanton disregard for human life is murder two.

THE COURT:  Well, if there's -- (Interrupted)

MR. HILFIGER:  I mean, if -- (Interrupted)

THE COURT:  I think the Court has to look at the evidence in the case and there's -- as I recall the evidence, I think that's the predicament.  I'm suggesting that's the predicament we're in.  It's either murder one or it's nothing.

MR. HILFIGER:  I'm not so sure.

THE COURT:  I don't know of any evidence that suggested that's it's anything less than that.  If you can point to something in the evidence that supports that theory of something less than -- it's one of those cases where the judge listens to the evidence and the lawyers listen to the evidence and you decide whether or not there's any other theory to instruct the jury on.  I'm looking for the basis for that.  I mean, the statute provides it if there's evidence to support it.

MR. HILFIGER:  Well, I was going under the

4212

impression that this callous and wanton disregard for human life was murder second degree. And to me this is one of the -- the understanding I always had on murder second degree if you're trying to shoot somebody and you shoot into a crowd and you kill somebody else, that's murder second degree and -- (Interrupted)

THE COURT: Here's what -- so you both understand where I think this is -- it goes to the sentencing stage, if the jury finds that he murdered and jury decides then -- the jury decides the aggravating factors, they'll decide whether there was premeditation. Then you'll know whether it's first degree punishment. If they find it's not premeditated, then it's second degree. But at this point under this statute, I don't understand your position.

MR. HILFIGER: Okay. Well, I just -- I still feel it should be separated, murder first, murder second. Also we're asking that voluntary manslaughter because it doesn't come under heat of passion as defined in the Tenth Circuit.

THE COURT: I guess my response to that would be if -- I think there has to be evidence to support that. I mean, I would suspect that would be the argument of counsel. But looking at it in the cold, hard facts of this case as presented, I don't know what that argument

4213

is based on.

MR. HILFIGER:  If you'll give me just a few minutes, because I did have a basis that defined heat of passion is more than just what you think about getting into an argument.  Sort of like a sudden impulse-type thing.  May I have a couple minutes on that?

THE COURT:  You may.  Let me hear what the Government may have to say.

MR. SPERLING:  As a prelude, Your Honor, one thing I wrestle with is to distinguish what the evidence establishes what I believe we should argue from what the Defendant may construe to be a reasonable inference from the evidence to establish a particular theory.  And when I start from that premise, Your Honor, I collate several issues or several factors.  I collate one factor that there is testimony from Buddy Hamilton to the effect that he drove his vehicle in the direction of the person on the yard.  Factually, what do I believe?  I believe he never got reasonably close to him.  I believe that he then turned in the direction of the house which would have put him a significant distance away from the Defendant's son and I don't think he ever -- I don't think he ever endangered the son.  But if you collect two features from the evidence -- I've already given this -- but if you collect that fact, the fact that Buddy

4214

Hamilton drove his vehicle in the direction of the person that he saw in the yard, and the testimony of McBride and Pettingill to the effect that they saw either silhouettes or a body or a partial silhouette of a person on the porch, I could see that the defense could argue that just as the Defendant when he was shooting at the approaching Bronco could see that Bronco from the east and then from the east southeast.  Similarly, if you were to turn to the right, he could have seen the area where his son was. I think that's the argument that they will make with regard to imperfect self defense or defense of others. Do I think that makes any sense?  No.  Do I think that they can make an argument to that effect such that in the exercise of caution in a capital case we ought to permit the instruction?  I think the answer is yes.  And that's why I advocate in favor of lesser included offenses.

I appreciate the Court's focus on the expressed wording of the statute.  I think there is significant difference as between Counts One and Two and Count Three. Count Three deals with an intentional killing.  And as the Court properly has inferred, and perhaps directly commented, Congress had 1111 and 924(c) in the bank when it wrote 848(e)(1)(b).  If Congress had intended for (e)(1)(b) to be a premeditated killing with that as an element, Congress could have expressly so written and it

4215

didn't.  So, my sense, Your Honor, is that as to the other offenses, the Count One and Two the offenses, first there ought to be a special interrogatory as to premeditation.  I think in the exercise of caution that special interrogatory should include the statutory language from 1111 which is willful, deliberate, malicious and premeditated, as a special interrogatory.  I believe that the argument of imperfect self-defense argues in favor of caution to include lesser included.  What I believe that the evidence actually establishes and will be persuasive is one thing.  I don't think that's persuasive for a moment.  At the same time, whether it's legal required because they can make an argument on the basis of those two correlating factors is I think where we're at now.

I'm also persuaded -- and I know that Title 21 and 848(e)(1)(b) doesn't require expressly that we prove that the Defendant knew that the victim was a law enforcement officer.  I am constrained when I look at that statute, though, to ask myself what does this criminalize?  And I think that there are two divergent arguments.  I've been around and around about this in the past 24 hours, Your Honor, and I can see a reasonable statutory interpretation that says that knowledge that the victim was a local, state or federal law enforcement

4216

officer is not required.  The statute says intentionally kill a state, local, or federal officer.  On the other hand, what does this statute proscribe?  It's proscribes the intentional killing of a state law enforcement officer.  There were some who argue in the exercise and caution there should be a knowledge requirement the victim knew not the precise name, rank, serial number or even law enforcement office that the individual, the victim, worked for but that he was a law enforcement officer.  I think in the exercise of caution --
(Interrupted)

THE COURT:  How do you -- if the facts are not overly-helpful on that court?  How do you deal with undercover prosecution?

MR. SPERLING: It's difficult.  How do you deal with the one case that I think you were referring to the case that actually raises two points?  One is it was a suspected undercover cop.  But he's referred to throughout the discussion of the case as a police officer.  But how do you deal with the circumstance in which someone doesn't know he's dealing with an undercover cop, drug deal goes awry, the bad guy pulls a gun and shoots the undercover cop not knowing that he's undercover cop?  With other statutes, but not with the statute, some would argue, that prescribes the

intentional killing of a law enforcement officer.  There are -- I admit, Your Honor, I'm wrestling with this too because there are any number of federal statutes that either for purposes of jurisdiction or even for elements, I believe, do not require the defendant knew a particular jurisdictional requirement, for example, or knew a -- you know, he has to know the character of the act and what he's doing, but he doesn't have to know the specific identity of certain -- so, you know, I admit that is a tough call.  I'm just saying that there's no case law on this.  The case law that the Court alluded to which is that knowledge is required for a sentencing guideline enhancement is troubling to me because I can see an appellate judge looking at us and saying, you know, if there's a requirement for knowledge with regard to a sentencing enhancement, shouldn't we at least impute that kind of knowledge in a capital setting where death is -- and you're looking at the prospect of the Defendant may be put to death.

These are issues -- and I am sympathetic to the Court's consternation because if there is clearly controlling case law, we would quote it to the Court and we'd say here, knowledge is not required, here knowledge is required in the statute.  I don't know see that there is federal case law that has explicitly addressed whether

4218

or not knowledge is an element of the Title 21 offense.

THE COURT: You agree there's nothing in the statute?

MR. SPERLING: Right. On the other hand, I'm sitting there -- I'm sitting thinking about there are with regard to Rings, some of those cases, sometimes there are due process notions, elements, that are imputed to an offense and -- but the statute doesn't expressly say that.

THE COURT: Okay. As I recall, the Government has no proposed instructions?

MR. SPERLING: Well, with regard to that, I would simply add I think it was the third of four elements.

THE COURT: To that you would add --
(Interrupted)

MR. SPERLING: Yes. I would add the element the Defendant knew that the victim was a law enforcement officer. I would not specify federal, state or local, but that Defendant knew the victim was a law enforcement officer. Knew or had reason to know.

One other item, Your Honor, if I may?

THE COURT: You may.

MR. SPERLING: We believe that consistent with these sentiments that intent should be specifically you

4219

find by the Court's instructs -- there are number of standard standards, but we believe even though there is an instruction as to evidence of intent, we believe that the word intent should explicitly defined and instructed.

THE COURT: While you're still here and while my clerk added to my memory is going back to our previous conversation about the issue of knowing the deceased was a police officer, don't you also bring up the possibility then that the defense is appropriate if you go -- if you stretch the statute to also the ignorance statute, I mean, the ignorance, I'm not aware of?

MR. SPERLING: Willful reliance?

THE COURT: Yes.

MR. SPERLING: I don't believe there's evidence the Defendant remained willfully blind. What do I think? I think the evidence clearly establishes that he knew that the approaching officers were law enforcement officers and that's why he shot them. I think the six civilian witnesses or seven speak very clearly to his knowledge prior -- his expressed knowledge. I think there are a number of factors that clearly establish that. What I'm wrestling with, Your Honor, is how safe should we be. Honestly, this will be the test case as to knowledge under 848(e)(1)(b). I mean, if the Court doesn't give the instruction, the defense will raise it

4220

as a proposition of error and this will be the test case in the United States on that issue. I want to be safe.

MR. HILFIGER: On that issue, Judge, we have already raised that issue. We've already submitted a proposed instruction.

THE COURT: Yes, I'm aware of it.

MR. HILFIGER: And I think this is -- as far as the factual case, it is a factual case where that came into question, whether he had knowledge that that was law enforcement -- (Interrupted)

THE COURT: You agree the statute does not?

MR. HILFIGER: I agree to that. I agree it doesn't say anything about that. But I don't necessarily, you know, think that's right. I just -- I agree that it says those words. However, it doesn't say the words without knowledge in it. But it just appears that in a fundamental fairness, that there should be some issue of knowledge there. And this is -- I mean, the factual basis on this case is one that would be right there, I mean, because that's what we've raised all along is what they did coming on this property and coming in there would not -- did not show that they were -- at least the lead vehicle was not law enforcement. That's part of our argument and continue to be part of our argument. On the -- we still make that argument there

4221

has to be some kind of knowledge there, we feel.

I had written down and I've got on my notes cases that I say definition of heat of passion, I don't have the case here and I don't know where it is.  But I had written down a definition of heat of passion that without -- but I didn't write the definition down.  But I just said that -- you know, what I had was a good definition for heat of passion, but I didn't right it down.  I can't seem to find it now.  So, I don't have -- (Interrupted)

THE COURT:  Let me do this.  You have both received the Court's proposed instructions.  And I want to deliberate some about your comments and then if you would furnish to my clerk handwritten, typed or whatever format, a summary of your -- which specific instructions you object to.  I've got it on the record, I think, but -- and then your alternative to the Court's proposed instruction.  And then we'll make a final record on the instruction.

MR. HILFIGER:  Can I make another comment on this -- that just sort of dawned on me on the special interrogatory?

THE COURT:  You may.

MR. HILFIGER:  I guess one of the concerns I have without -- without anything other than murder

4222

showing on the special interrogatories comes across to me is what would happen? Because on the verdict form it's causing the death. And what would happen if on the verdict form they found guilty because the instruction just says caused the death of, but then on the special interrogatory and find no as to murder, then where are we on the sentencing? Isn't it automatically assumed that it's manslaughter or what? That's the problem I have without having that -- those definitions in there. What happens if you do that? If they find him guilty because under the instructions to the jury as to Counts One and Two, it's -- of course, you have to do the other stuff, crime of violence and everything. But the fourth is that during the commission of crime the Defendant directly caused the death of David Eales through the use of a firearm. Okay. And so then they go over to the -- they find -- very easy. Yes, he caused the death. Find him guilty that caused the death. Then on the interrogatory they come over here and say, no, it's not murder. Then what?

THE COURT: That's what I said earlier. It's either murder or it's nothing.

MR. HILFIGER: Well, if it's nothing, then is the case dismissed if they find no murder?

THE COURT: Yes. I mean, that's my thought.

4223

MR. HILFIGER:  That's what I wanted to understand because it seems like it's -- if that's the thought that it's guilty and murder, then, I don't know. It sort of puts me in a predicament.  But I mean, I would have thought for sure I need to talk to Mr. Barrett about that.

THE COURT:  That's the reason for the special interrogatory.

MR. HILFIGER:  So, the special interrogatory could override the finding of guilt then?

THE COURT:  I think that's the -- that amplified the issue.  I mean, that's why it's there.  I mean, why else would you have the interrogatory?

MR. HILFIGER:  To find the level of homicide to determine punishment.

THE COURT:  Well, I think that that takes place in the sentencing stage.  If there's a killing under these facts, under the facts as I think that they were presented by both parties, that that's the -- it doesn't -- the reason I'm here giving you an opportunity to argue, I could be wrong.  I could be swayed from my position.  But my position as I analyzed it was the good part for both parties is it's real simple.  Either it is a murder or it is not.  The jury finds it's not, it's not.  If it is, then we go to the sentencing stage and

4224

that's where we determine whether -- through the aggravating factors what the sentence is.

MR. HILFIGER:  Well --

THE COURT:  I mean, I may be persuaded by some of the things you both have said, but analysis is not appropriate.  So far, I haven't been convinced that this is a typical murder statute application which is where I think both of you want to go.  But looking at the statute, I don't see that.  That's why I think the Felony Murder Doctrine was a good overview of what this -- really looks more like that than anything I can compare it to.  I think if you envision it through the murder -- Felony Murder Doctrine against -- against to make some sense as to how perhaps Congress intended it.  But you both have brought things to my attention that I'll give some consideration.

MR. HILFIGER:  I do have one further question.

THE COURT:  Okay.

MR. HILFIGER:  And I'm really reluctant to ask this, but I'm real serious about it.  I talked to Mr. Smith about it and he's serious about it too.  We were here until 7:00 o'clock last night and I proceeded and worked on -- spent time working up special interrogatories to go along with what I presented this morning.  I was up late last night and early this

4225

morning.  That's just part of doing the deal.  And then we're over here and it's almost noon and the setup was for 1:00 o'clock to start closing.  I'm nowhere prepared to do closing at this time and I don't think I can in an hour.  We spent 20 days -- I think that's what I figured up, something like 20 days of just testimony in this case.  And it's a very, very significant case for a lot of people involved.  And I just -- I don't think that I can do justice in one hour to be ready for closing.  I realize I won't even start the closing, Mr. Littlefield will start.  But I've got to listen to what he says in order to be able to talk to the jury also.  I don't think it would be fair to my client and be properly prepared for closing at 1:00 o'clock.  I could do it like at 3:00 o'clock, but then I would have to have you split the closing.  We spent 20 days in this case.  I don't see why we can't just wait and start tomorrow because we still -- I'm assuming pretty much though that this is the way it's resolved because I don't know whether we're going to be able to change your mind.  I know you've got an open mind for it.  What I'm saying, I just don't think I've got any lost law authority that's going to -- that I can present to you to change your mind, just the arguments I've made.  And so, I think we're going to be pretty much with this issue and I think I need to talk to Mr. Barrett about it

4226

and that's going to take time because I know as of yesterday's deal he was very upset with the instruction yesterday and I've got to talk to him and explain how the instructions work. And I just don't see how I can be prepared at 1:00 o'clock and really doubtful I'll be prepared this afternoon.

THE COURT: Government?

MR. SPERLING: I know that we were at the office last night, Your Honor, until after 1:00. We arrived early this morning. We were involved with discussions with the department. I'm cognizant of the hardship that this creates for Kelli Eales and others, but at the same time, I'm also confident that we can explain to them that we wish to do this right. And Mr. Littlefield mentions to me, and he was with me till the wee hours of the morning, that he could use more time, too.

THE COURT: Well, the folks that you're not mentioning that are my responsibility are the 15 jurors that are away from their homes and their lives. And I asked them to be back here at 8:30 this morning. I was able to contact them. Frankly, some of them were happy they could sleep in and not be here until 1:00 o'clock. But I understand your position. I want to think about it for at least a few minutes. I'll give you some answer to

4227

that about 12:30 or so.  Remember 12:30 supposed to be any comments about these instructions.  If you have none, you can tell us you have none.  If you have some, well -- the new verdict form, have you had an opportunity to look at it?

MR. SPERLING:  We have and we have no objection to that, Your Honor.

THE COURT:  Okay.  As I recall, Mr. Hilfiger, you did have objection to it, but I want to be sure that you have a chance to speak about it on the record.

MR. HILFIGER:  Well, there's going to be a problem.  I can't remember what my objection was.

THE COURT:  Well, I'll give you --

(Interrupted)

MR. HILFIGER:  To the verdict form?

THE COURT:  Just take a look at the verdict form, and if you want to make a record, just let me know. I'm assuming this is -- I'm assuming I'll have further announcements about the instructions.

(Whereupon, a short recess was held after which the following record was made in chambers.)

THE COURT:  Let the record reflect counsel for both the Government and the Defendant are present for the second conference on instructions.  The Court has considered the arguments made by counsel earlier this

4228

morning and now have provided the parties with what the Court believes is the final instructions in USA versus Kenneth Eugene Barrett, Case Number CR-04-115.  So I'd like to go through again and let you make any further record you would like make to this final version of the Court's instructions.  Any objection to Instruction Number One, opening, first from the Government?

MR. SPERLING:  No, Your Honor.

THE COURT:  Defendant?

MR. HILFIGER:  No, Your Honor.

THE COURT:  Number Two.  Instruction Number Two is the offense that's charged.  Any objection from the Government?

MR. SPERLING:  No.

MR. HILFIGER:  No, Your Honor, on behalf of the Defendant.

THE COURT:  Number Three is plea and presumption of innocence.

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Four is reasonable doubt defined.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Five is stipulations.

4229

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Six, offense of using or carrying a firearm during or relation to a drug trafficking crime and during a crime of violence or possession of a firearm in furtherance of any such crime, Counts One and Two.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Seven, essential elements of offense of using or carrying a firearm during and relation to a drug trafficking crime or a crime of violence or possession of a firearm in furtherance of any such crime.  Number Seven?

MR. SPERLING:  Same objection as before, that element third requires that the firearm increase its likelihood of success and that should be expanded here though I believe is it elsewhere.

MR. HILFIGER:  From the Defendant, the only -- the omission of intentional killing as to Count Two on the first element and intentional killing again on -- I think it's on the third.  Is that where it is?  Yes.  On the first paragraph of the third page, second -- first full sentence, the omission of intentional killing.  I'm sorry.  That's fourth -- I've been corrected.  That's the

4230

fourth page.

THE COURT:  Fourth.  Fourth page or fourth -- okay.  Government's objection noted and overruled. Defendant's objection is noted and overruled.

Instruction Number Eight, essential elements of various drug trafficking crimes.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Nine, essential elements of offense in possession with intent to manufacture, distribute or dispense a controlled substance.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Ten, essential elements of possession of listed chemicals with intent to manufacture a controlled substance.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 11, essential elements of possession of precursor chemicals with intent to manufacture a controlled substance.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 12, I think you're familiar enough with them now, but I'll read the title.  That's

4231

essential elements 21 USC 846.

MR. SPERLING:  No objection.

MR. HILFIGER:  No objection.

THE COURT:  Number 13, 21 USC 856.

MR. SPERLING:  I don't have it.  What number is that, 13?  No objection, Your Honor.

THE COURT:  Defense.

MR. HILFIGER:  No objection.

THE COURT:  Number 14, 21 USC 848(e)(1)(b).

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Fifteen, 848(e)(1)(b).

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Sixteen, is possession defined.

MR. HILFIGER:  No objection.

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Seventeen is counts are separate crimes.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Eighteen is knowingly and willfully defined.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

4232

THE COURT:  Nineteen is proof of knowledge or intent.

MR. SPERLING:  I'm backing up.  We're back on 15 for just a second, Judge, and this is -- the bottom of it defines intentional killing as a killing by means of poison, laying in wait or any other kind of deliberate, malicious or premeditated act.  I think that's 1111 language.  We object to this being in there because this incorporates language beyond the statute Section 848(e)(1)(b).  This is incorporating language from 18 USC Section 1111.  And would blur the distinction between the Title 21 statutory scheme and the Title 18 statutory scheme.

THE COURT:  You still urge it?

MR. LITTLEFIELD:  If I might say something. The Title 18, 1111 defines murder and makes it unlawful to commit murder and defines it as such.  21 Section 848(e)(1)(b) is not a murder statute.  It makes it unlawful to intentionally kill.  And I think that by adding that description of what intentional killing does is makes that a murder statute rather than a violation for intentional killing.

THE COURT:  Argument.

MR. HILFIGER:  We don't have any argument on that.  I tend to agree that that definition is 1111

4233

definition, killing by means of poison, laying in wait or other kind of willful, deliberate malicious or premeditated act.  That first degree murder --

(Interrupted)

THE COURT:  Are you suggesting that should be stricken?

MR. HILFIGER:  In the Title 21, they don't define intentional killing.  I guess that was sort of my problem in reading Title 21.  They don't say intentional kills or intentional killing.  I think -- intentional killing or intentional kills.

THE COURT:  Any thought?  Off the record.

(Whereupon, an off the record discussion was held.)

THE COURT:  Based on the arguments of counsel in regard to Instruction 15, the last two lines on the second page that state an intentional killing is a killing by means of poison, lying in wait or any other kind of willful, deliberate, malicious and premeditated act, counsel has brought to the Court's attention that that comes from 1111 -- 18 USC 1111, replace that with a dictionary definition of intentional and submit that to you for your review before we instruct the jury in the morning.

MR. HILFIGER:  So, you'll put in -- in that

same spot would you just put it intentional means?

THE COURT: Yes. Strike those last two. And I'll have the clerk provide you a copy of that instruction. Making reference to Number 15 will be amended. Sixteen, possession defined.

MR. SPERLING: No objection.

MR. HILFIGER: No objection.

THE COURT: Seventeen.

MR. SPERLING: We have no objection to 17 or 18.

MR. HILFIGER: No objection to 17 or 18 also.

THE COURT: Nineteen, proof of knowledge or intent.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Now, on 20, it's one that's been changed from earlier discussions. Malingering deliberate ignorance.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Number 21 is on or about.

MR. SPERLING: No objection, Your Honor.

THE COURT: Twenty two, evidence defined.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

4235

THE COURT:  Twenty three is direct and circumstantial evidence.

MR. SPERLING:  No objection.

MR. HILFIGER:  No objection.

THE COURT:  Twenty four, credibility of witnesses.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Twenty five is witness impeachment.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Twenty six is impeachment by prior conviction.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 27, witness personal advantage.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Twenty eight is expert witness.

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Twenty nine is PowerPoint presentation not admitted into evidence.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

4236

THE COURT:  Thirty, right of attorney to interview witnesses.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Thirty one is failure of Defendant to testify.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 32 is verdict.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Thirty three is special interrogatories.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  And 34 is closing.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  You recall the unofficial smoking instruction comes after that.

MR. SPERLING:  No objection.

THE COURT:  Any objection to the verdict form?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  No.

THE COURT:  And we have special interrogatory

4237

one and special interrogatory two.

MR. HILFIGER:  We still request the separation of the murder and -- murder one and murder two and also request the manslaughter.

THE COURT:  That would be an objection to these or an additional request?  Objections to what I'm looking at now, do you have any objection to interrogatory one and two?  I'll give you a chance to propose additional instructions if you choose.

MR. HILFIGER:  Well, as to both one and two, my objection is that it's not separated in the murder one and murder two, so that would be an objection to that and the request would be just as I had proposed in the -- (Interrupted)

THE COURT:  Proposed instruction?

MR. HILFIGER:  That I think I gave this morning.  I can't remember how I titled it, but it's a request for interrogatory instruction.

THE COURT:  And do we need to make that a Court exhibit for the record?

MR. HILFIGER:  I did file it.

THE COURT:  Okay.  As I understood, the Government had no objection to the verdict form and interrogatories or are you still contemplating?

MR. SPERLING:  We have no objection to the

4238

verdict form.  In the Indictment in both Counts One and Two, we allege that the killing was murder as defined in Title 18 United States Code Section 1111 in that it was an unlawful, willful, deliberate, malicious and premeditated killing committed with malice aforethought. We believe the special interrogatory should track that language.  And as I look at 11, that is the statutory language.  And we believe that there should be a special interrogatory with regard to premeditation.  The reason that I don't think it should merely be relegated to the second stage, it should be aggravating factor that is alleged is substantial planning and premeditation.  And that is distinguishable from premeditation by the modifier substantial.

THE COURT:  Anything further?

MR. SPERLING:  Well, that is -- it's not a gateway aggravating factor, Your Honor, it is an aggravating factor that's alleged.

THE COURT:  Objection noted.  Overruled.  Any proposed instructions for the record that the Government would offer?

MR. SPERLING:  I don't think so.  No, Your Honor.

THE COURT:  The defense has filed your --

(Interrupted)

MR. HILFIGER:  We filed ours yesterday.

THE COURT:  Now, bring the jury in and we'll call the instruction conference concluded.

(Whereupon, the following record was made in open court in the presence of the jury.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.

Members of the jury, I've brought you here this afternoon to give you what amounts to an interim report. I apologize for telling you we'd start at 8:30 this morning.  I hope you all got the message early enough that you weren't disturbed.  And I can only tell you that this case is -- I know you understand having been here 20 days and I think you've listened to the testimony is one that the attorneys spent a great deal of time working on and the Court has.  And the long and the short of this, we're still not ready to submit the case to you.  I am convinced with a little bit more we'll be ready at 8:30 in the morning.  What I want to assure you so that -- I know this is inconvenient for you and takes you away from your home and your work, so I thought I -- at least this judge, maybe not all of my colleagues feel this way.  I think it's important that you know that we worked until nearly 2:00 o'clock this morning and we came

4240

back this morning and started again at about eight-8:30 and we are very, very close to being able to submit it. But starting here in the middle of the afternoon, we'd be going till seven or eight o'clock to get it. So I think it would be better to start fresh and I do apologize for the attorneys on both sides and for the Court that we have taken another day of your lives, but I think it's important that we make every effort to submit this case to you properly. I want to take just a little bit more time and rather than keep you here this afternoon, I think it would be better to start fresh in the morning. The schedule I had planned to use today we'll use tomorrow at 8:30 and order lunch in and the case should be submitted by tomorrow afternoon.

So, remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you. If you'll here be a little bit before 8:30 in the morning, I am convinced the case will be ready for submission at that time. Remember to avoid any news coverage that there may be about this matter and just follow the previous instruction, keep your minds free and open. You can't discuss it among yourselves because it hasn't been submitted to you, you can't discuss it with anyone else.

Everyone please remain seated as the jury

4241

leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Any record to be made on behalf of the Government in regards to the Court's instruction?

MR. SPERLING:  No, Your Honor.

THE COURT:  For the defense?

MR. HILFIGER:  No, Your Honor.

THE COURT:  The one correction that we talked about in the instruction conference, I'll provide a copy of that corrected instruction to both counsel.  Short of that, we should start in the morning with the Court's instructions which I anticipate to take 30 to 45 minutes maximum and then arguments of counsel, an hour and 45 minutes.  Be sure to tell the clerk how you desire to split the arguments.  I understand the defense is going to split your argument between two attorneys.  If you'll advise the clerk as to the time if you want more than his.  Of course, the Government goes first and finishes, so however you choose to split those arguments.

The clerk has inquired and I don't have any as long as -- with the exhibit where it is, I don't know that you have any choice but to do the argument from this podium in the back of the courtroom.

4242

Paula is pointing out to me we have a wireless microphone, maybe that you want to use the exhibit in your closing. So I think what we'll do is provide the podium in the back and you'll freedom to come to me. You can't go to the jury, but you can come back and we'll have the wireless mike available for your use if you want to use the -- is that Government Exhibit what?

MR. LITTLEFIELD: One.

THE COURT: I should remember that. If you desire to use Government's Exhibit 1 in your closing, feel free and use the handheld mike when you come forward. We will have it available in the morning. Anything else before we --?

MR. HILFIGER: On these -- the Court exhibits. These were the pictures of the model of the cars in certain places and one thing I did not -- excuse me.

MR. LITTLEFIELD: Judge, I have no objection to those as submitted -- (Interrupted)

THE COURT: So we understand about those Court exhibits, the clerk brings something to my attention so we're all on the same page. The reason I had you make photographs, digital photographs, of Government's Exhibit 1 is I was afraid that the appellate court might not be able to understand what we're talking about without seeing the photograph. So, my instruction has

4243

been to make photographs of that exhibit to be included in the record as Court's Exhibits whatever, 1, 2, 3, 4. Now, generally, if you have any desire, you would not be allowed -- I guess the better way to say it. You will not be allowed to refer to the Court exhibits in closing. So, if there are -- if you want identical photographs introduced as your exhibits for the purpose of -- then you need to make the record clear about that.

MR. HILFIGER: I have given Mr. Littlefield separate copies and I've got separate copies. And the only thing I was anticipating doing is put them -- not putting them into evidence, but display them as demonstratives in closing.

THE COURT: Well, I don't want either one of you to have whatever positive or negative benefit it might be to show the jury the Court exhibits is the point.

MR. HILFIGER: Okay. With that instruction I won't do that, because there won't be any number on it or anything like that. All I want to do is be able to say this is a picture of where Hamilton said the vehicles were.

THE COURT: Now, if it's going to go to the jury, it has to be an exhibit -- you just want to use in argument -- (Interrupted)

4244

MR. HILFIGER: Argument, yes. That was my intention. I think Mr. Littlefield had something different, but my intention was just really view it -- (Interrupted)

THE COURT: The Court exhibits are preserved for appeal and they would not go to the jury. And of course, the jury has been looking at that exhibit enough and I think they are familiar with it. But you're free to put a photograph of it up for argument.

MR. HILFIGER: I would like to refer to it as -- Court exhibit -- (Interrupted)

THE COURT: Or Court's Exhibit 1. Or, not Court's Exhibit, Government's Exhibit 1.

MR. LITTLEFIELD: I think what the reference would be, for instance, this is the location that Mr. Hamilton described the vehicles and here's a photograph of it.

MR. HILFIGER: That's my intention.

THE COURT: That's fine. Go ahead and take those Court exhibits.

MR. HILFIGER: I really got -- Mr. Littlefield has the same thing.

THE COURT: My concern is as long as they don't refer to them as Court exhibits, they are Court exhibits. What you're going to do is use them as demonstrative aids

in your closing?

MR. LITTLEFIELD:  That's correct.  And they're not marked as court exhibits.  There's no marking or referring to them as such.  And if what we --

(Interrupted)

THE COURT:  Do we have them?

MR. HILFIGER:  No, those are plastic ones.  The ones that are in the plastic are the ones that I was anticipating to go in as Court -- I mean as the Court --

MR. LITTLEFIELD:  I don't have a Court --

MR. HILFIGER:  I think you do.

THE COURT:  I'm going to mark the photos of Government's Exhibit 1 that you've submitted to the Court as Court Exhibits 7 through 17.  Now, as I mentioned, I don't mind you using duplicates of those in your arguments as demonstrative aides, just don't refer to them as court exhibit.  You have your own copies too.

MR. HILFIGER:  Can I make sure?

THE COURT:  Mr. Littlefield is not completely satisfied with that, I can tell.  But he's trusting you.  And then ultimately, if you don't have them, you can use the Court exhibit but don't tell the jury it's a Court exhibit and give it back to the -- don't refer to it as a Court exhibit, because those are -- you know the reason I'm putting them in the record is just so the appellate

4246

court can see what that exhibit looked like.

I guess I should say this on the record.  Are you both convinced that Court Exhibit 7 through 17 fairly represent Government's Exhibit 1?

MR. LITTLEFIELD:  That and the locations of vehicles identified by certain individuals as described on the court exhibits.

MR. HILFIGER:  That's true.  And we may not agree necessarily with -- (Interrupted)

MR. LITTLEFIELD:  That that word that -- (Interrupted)

MR. HILFIGER:  That that's what was said at that particular time.

THE COURT:  Okay.  Hopefully that helps the appellate court.  Anything else before we recess for the evening?

MR. LITTLEFIELD:  Nothing from the Government, Your Honor.

MR. HILFIGER:  Nothing from the defense.

THE COURT:  Come shortly before 8:30 and we'll give you that instruction or if you want it later afternoon, send somebody.  We'll be in recess until 8:30 in the morning.

(Whereupon, the Proceedings were continued to November 3, 2005.)

4247

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 2, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 4204 through 4246.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

52

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED
MAY 22 2006
Clerk, U.S. District Court
By_____
Deputy Clerk

UNITED STATES OF AMERICA,  )
                           )
          Plaintiff,       )
                           )
-vs-                       )   No. CR-04-115-P
                           )
KENNETH EUGENE BARRETT,    )
                           )
          Defendant.       )

VOLUME 20 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 3, 2005.

A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law

## EUSTICE REPORTING SERVICE

CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 4249- 4415   4189

4249

PROCEEDINGS

THE COURT:  Good morning.  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.

Members of jury, you have heard the announcement of both the Government and the Defendant that they have rested their case and it's now time for you to hear instructions from the Court.  You will first hear my instructions and then argument of counsel for the Government and then the defense and then the Government closes and they have the first and last because they have the burden of proof is the rules by which we administer our trials.  After the attorneys have finished their closing argument I'll give you a closing instruction.  They are what I call the -- these are the instructions and there's one closing instruction after the attorneys have finished their arguments and then the case will be submitted to you for your deliberations.

Let me see counsel at the bench for just a moment.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  You will recall yesterday we were talking about Instruction 15 and the definition of intentional we changed and it was faxed to you?

4250

MR. HILFIGER: Yes.

THE COURT: Do you have any objection as it was -- to the new definition of intentional from the Government?

MR. SPERLING: No, Your Honor.

THE COURT: Defense?

MR. HILFIGER: No, Your Honor.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT: Ladies and gentlemen of the jury, you have heard the evidence and will hear the arguments of counsel, and it is now my duty to instruct you as to the law in this case.

You are the sole and exclusive judges of the facts, but the Court is the judge of the law, and it is your duty to accept the law as given to you by the Court. It is your duty as jurors to follow the law as I shall state it to you and to apply that law to the facts as you find them from the evidence in the case. You are not to single out one Instruction alone as stating the law, but must consider the Instructions as a whole. Neither are you to be concerned with the wisdom of any rule of law stated by me.

Nothing I say in these Instructions is to be taken as an indication that I have any opinion about the

4251

facts of the case, or what that opinion is. It is not my function to determine the facts, but rather it's yours to determine the facts. You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be governed by sympathy, prejudice or public opinion. All parties expect that you will carefully and impartially consider all of the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences. The punishment provided by law for the offenses charged in the superseding indictment is not to be considered by you in arriving at an impartial verdict as to whether the Defendant, Kenneth Eugene Barrett, is guilty or not guilty.

The Court has previously read the superseding indictment charging the Defendant, a copy of which is attached to these instructions. You'll find that behind Instruction Two.

The Defendant has entered his pleas of not guilty to the superseding indictment and charges reflected therein, which places upon the Government the burden of proving the essential elements of each of the charges to your satisfaction beyond a reasonable doubt before you may return a verdict of guilty on the charges. The superseding indictment is simply the means by which

the Defendant is placed on trial and sets forth in a formal way the offenses of which the Defendant is accused.  The return or filing of a superseding indictment is not evidence of the guilt of the Defendant.

The Defendant is presumed to be innocent of the crimes charged and innocent of each and every essential element constituting the offenses.  The presumption of innocence continues, unless after consideration of all the evidence, facts and circumstances in the case, you are convinced of the guilt of the Defendant beyond a reasonable doubt.  If, upon consideration of all the evidence, facts, and circumstances in the case you find a reasonable doubt of the guilt of the Defendant, you must give the Defendant the benefit of that doubt and return a verdict or verdicts of not guilty.

The Government has the burden of proving the Defendant guilty beyond a reasonable doubt.  The Government must prove each essential element of the offenses charged in the superseding indictment beyond a reasonable doubt.  In civil cases, it is only necessary to prove that a fact is more likely true than not true.  However, in a criminal case, the Government's proof must be more substantial or powerful than that; it must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that

4253

leaves you firmly convinced of the Defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is not required that the Government prove guilt beyond all possible doubt.  The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act.  Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

If, based on your consideration of all of the evidence, you are firmly convinced that the Defendant is guilty of any of the crimes charged, you must find the Defendant guilty of that crime or crimes.  If, on the other hand, you are not firmly convinced that the Defendant is guilty, you must give the Defendant the benefit of that doubt and find him not guilty of that crime or crimes.

Statements and arguments of counsel are not evidence in this case.  When, however, the attorneys on both sides stipulate or agree as to the existence of a fact, you must accept the stipulation and regard that

4254

fact as proven.

With respect to the offenses of Using or Carrying a Firearm During and in Relation to a Drug Trafficking Crime or Possession of a Firearm in Furtherance of a Drug Trafficking Crime as charged in Count One of the superseding indictment, and Using or Carrying a Firearm and in Relation to a Crime of Violence or Possession of a Firearm in Furtherance of a Crime of Violence as charged in Count Two of the superseding indictment, the law of the United States provides that whoever, during and in relation to any crime of violence or drug trafficking crime for which he may be prosecuted in a court of the United States, uses or carries a firearm or who, in furtherance of any such crime, possesses a firearm shall be guilty of an offense against the law of the United States.

The Defendant, Kenneth Eugene Barrett, is charged in Counts One and Two with violations of 18 U.S.C. Section 924(c)(1)(A) and (j).

To find the Defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

As to Count One, first, the Defendant committed at least one of the drug trafficking crimes charged in Count One of the superseding indictment;

4255

Second, during and in relation to the commission of one of those drug trafficking crimes, the Defendant knowingly used or carried a firearm or possessed a firearm in furtherance of such drug trafficking crime;

Third, the firearm played an integral part in one or more of the drug trafficking crimes charged in Count One, that is, the firearm increased its likelihood of success;

And fourth, during the commission of one or more of the drug trafficking crimes charged in Count One of the superseding indictment, the Defendant directly caused the death of David Eales through the use of a firearm.

As to Count Two, first, the Defendant committed a crime of violence, the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, as charged in Count Two of the superseding indictment;

Second, during and in relation to the commission of such crime of violence, the Defendant knowingly used or carried or in furtherance of such crime of violence possessed a firearm;

Third, the firearm played an integral part in the crime of violence charged in Count Two, that is, the

4256

firearm increased its likelihood of success;

And fourth, during the commission of such crime of violence as charged in Count Two, the Defendant directly caused the death of David Eales through the use of a firearm.

The term "drug trafficking crime" means any felony violation of federal law punishable under the Controlled Substances Act. Possession of a listed chemical, such as pseudoephedrine or iodine, knowing or having reasonable cause to believe that it would be used to manufacture a controlled substance; possession of a precursor chemical, knowing, intending or having reasonable cause to believe it would be used to manufacture a controlled substance; attempting to manufacture a controlled substance; and maintaining a place for the purpose of manufacturing, distributing, and using a controlled substance are all felonies punishable under the Controlled Substances Act, and thus, are drug trafficking crimes.

The term "crime of violence" means an offense that is a felony and, (A), has as an element the use, attempted use, or threatened use of physical force against the person or property of another; or, (B), that by its nature involves a substantial risk that physical force against the person or property of another may be

4257

used in the course of committing the offense.  You are instructed that the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties is a crime of violence.

The term "firearm" means any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive.

A defendant knowingly "uses" a firearm when it, (1), is readily accessible, and (2), is actively employed during and in relation to the criminal undertaking.  A defendant knowingly "carries" a firearm when he, (1), possesses the firearm through the exercise of ownership or control, and (2), transports or moves the firearm from one place to another.  The Government is not required to prove transportation or movement over any particular distance.

In determining whether a defendant used or carried a firearm, you may consider all of the facts received in evidence including the nature of the underlying alleged crime, the usefulness of a firearm to the crime alleged, the extent to which a firearm actually was observed before, during and after the time of the alleged crime, and any other facts that bear on the issue.

The term "during and in relation to" means that

4258

the firearm had a role in, facilitated, or had the potential of facilitating a drug trafficking crime or a crime of violence.

To "possess" a firearm requires "possession" as defined later in these instructions.

The term "in furtherance of" means the act of furthering, helping forward, promoting, advancing, or progressing.  In this respect, the Government must clearly show that a firearm was possessed to advance or promote the commission of the underlying drug trafficking crime or the underlying crime of violence.  The mere presence of a firearm in the area where the criminal act occurred is not sufficient to establish possession in furtherance of a drug trafficking crime or in furtherance of a crime of violence.

In order to prove the Defendant committed a drug trafficking crime, you are required to find that the Defendant committed all of the drug trafficking crimes alleged in the superseding indictment.  I skipped over a very important word.

It should read:  In order to prove the Defendant committed a drug trafficking crime, you are not required to find that the Defendant committed all of the drug trafficking crimes alleged in the superseding indictment.  Rather, you need only find he committed at

4259

least one drug trafficking crime.

In that regard, you are instructed that every drug trafficking crime requires proof beyond a reasonable doubt of essential elements which are unique to the individual drug trafficking crime. Therefore, you are instructed that the following essential elements apply to the individual drug trafficking crimes alleged in this case.

That is, in order to establish the offense of possession with intent to manufacture, distribute, or dispense a controlled substance, each of the following essential elements must be proven beyond a reasonable doubt by the evidence:

One, that the Defendant, Kenneth Eugene Barrett, possessed the controlled substance as charged in Count One of the superseding indictment;

Two, that the Defendant possessed the controlled substance knowingly and intentionally;

And, three, the Defendant possessed the controlled substance with the intent to manufacture, distribute or dispense it.

In order to establish the offense of possession of listed chemicals with intent to manufacture a controlled substance, each of the following essential elements must be proven beyond a reasonable doubt by the

4260

evidence:

One, that the Defendant possessed the listed chemical as charged in the superseding indictment;

And, two, that the Defendant possessed the listed chemical knowingly and intentionally;

And, three, that the Defendant possessed the listed chemical with the intent to manufacture a controlled substance.

You are instructed that pseudoephedrine and iodine are each listed chemicals.

In order to establish the offense of Possession of Precursor Chemicals with the Intent to Manufacture a Controlled Substance, each of the following essential elements must be proven beyond a reasonable doubt by the evidence:

One, the Defendant, Kenneth Eugene Barrett, possessed a chemical;

Two, knowing, intending, or having reasonable cause to believe;

Three, that the chemical would be used to manufacture a controlled substance.

Methamphetamine is a controlled substance within the meaning of the statute.

In order to establish the offense of Attempting to Manufacture a Controlled Substance, each of the

4261

following essential elements must be proven beyond a reasonable doubt by the evidence:

One, the Defendant, Kenneth Eugene Barrett, intended to commit the crime of manufacturing a controlled substance as alleged in the superseding indictment;

And, two, that the Defendant took a substantial step towards commission of that crime.

A "substantial step" is something beyond mere preparation. A substantial step is an act which, in the ordinary and likely course of events, would lead to the commission of the particular crime. The step must be a strong indication of the Defendant's criminal intent, and must unequivocally mark the Defendant's acts as criminal. It should demonstrate commitment to the crime charged.

In order to establish the offense of Maintaining a Place for Manufacturing, Distributing or Using a Controlled Substance, each of the following essential elements must be proven beyond a reasonable doubt by the evidence:

One, that the Defendant, Kenneth Eugene Barrett, did open or maintain a place;

And, two, that the place was opened or maintained for the purpose of manufacturing, distributing or using a controlled substance, as charged in Count One

4262

of the superseding indictment;

And, three, that the Defendant did so knowingly, that is, knowing the place would be used for such purpose. A house, building, residence, or other similar structure is a "place" for purposes of this statute.

To "maintain" a place means that over a period of time, the Defendant directed the activities of and people in that place. The Government is not required to prove that drug activity was the primary purpose of the Defendant's opening or maintaining a place, but instead must prove that drug activity was a significant reason why the Defendant opened or maintained the place.

With respect to the offense alleged in Count Three of the superseding indictment, the law of the United States provides that any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for a felony drug violation, who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of any federal, state, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties, is guilty of a crime against the United States.

In order to establish the offense of

4263

Intentionally Killing of a State Law Enforcement Officer engaged in the performance of his official duties, each of the following essential elements must be proven beyond a reasonable doubt by the evidence:

One, during the commission of, or in furtherance of, or while attempting to avoid apprehension, prosecution, or service of a prison sentence for, a felony drug violation;

Two, the Defendant, Kenneth Eugene Barrett, intentionally killed or counseled, commanded, induced, procured or caused the intentional killing of David Eales;

Three, that David Eales was a state law enforcement officer;

Four, that the Defendant, Kenneth Eugene Barrett knew or had reason to know David Eales was a law enforcement officer;

And, five, David Eales was killed while engaging in and on account of the performance of his official duties.

You are instructed that a "felony drug violation" means any felony violation of federal law punishable under the Controlled Substances Act and would include:

One, knowingly or intentionally manufacturing,

4264

distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance, under 21 U.S.C. Section 841(a);

Two, possessing a listed chemical with intent to manufacture a controlled substance, 21 U.S.C. Section 841(c);

Three, possessing any chemical, product, or material which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe that it will be used to manufacture a controlled substance, 21 U.S.C. Section 843(a)(6);

Four, attempting or conspiring to commit any of the offenses contained in subparagraphs one through three above, 21 U.S.C. Section 846;

Five, knowingly opening or maintaining any place for the purpose of manufacturing, distributing or using any controlled substance, 21 U.S.C. Section 856.

"Intentionally" means that a person desires to cause the consequences of their act or believes that the consequences are substantially certain to flow from it.

A "state law enforcement officer" includes an Oklahoma Highway Patrol Trooper. An officer is "engaged in his official duties" when he is serving or attempting to serve either an arrest warrant or a search warrant.

4265

The law recognizes two kinds of possession: Actual possession and constructive possession. A person who knowingly has direct physical control over a thing at a given time is in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over an object, either directly or through another person or persons, is in constructive possession of it.

The law recognizes also that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

However, a person's mere presence at the scene where something is found is insufficient to establish possession, unless it can be shown that such person had dominion and control over the thing.

You may find that the element of possession as that term is used in these instructions is present if you find beyond a reasonable doubt that the Defendant had actual or constructive possession.

A separate crime or offense is charged by each of the counts contained in the superseding indictment. Each offense as charged, and the evidence applicable

4266

thereto, should be considered separately.

The facts that you may find the Defendant guilty or not guilty of any of the counts with which the Defendant is charged should not control your verdict with reference to the other counts with which the Defendant is charged.

An act or a failure to act is "knowingly" done, if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

An act is done "willfully" if done voluntarily and intentionally, and with the specific intent to do something the law forbids, or purposely intending either to disobey or to disregard the law.

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done by that person and all other facts and circumstances received in evidence which may aid you in determining -- which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and

4267

probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts from the evidence -- to decide what facts to find from the evidence received during this trial.

When the word "knowingly" is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident. Although knowledge on the part of the Defendant cannot be established merely by demonstrating that the Defendant was negligent, careless, or foolish, knowledge can be inferred if the Defendant deliberately blinded himself to the existence of a fact. Knowledge can be inferred if the Defendant was aware of a high probability that the occupants of the vehicle entering onto the property were law enforcement officers, unless the Defendant did not actually believe the vehicles were occupied by law enforcement officers.

The superseding indictment charges that the offense alleged was committed "on or about" a certain date. Although it is necessary for the Government to prove beyond a reasonable doubt that the offense was committed on dates reasonably near the dates alleged in the superseding indictment, it is not necessary for the Government to prove that the offense was committed precisely on the date alleged.

4268

You must make your decision based only on the evidence you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence and the stipulations that the lawyers agreed on and that I read to you during the trial.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  Their questions and objections are not evidence.  My legal rulings, comments and/or questions are not evidence. During the trial, I did not let you hear the answers to some of the questions that the lawyers asked.  I also ruled that you could not see some of the exhibits that the lawyers wanted you to see and sometimes I ordered you to disregard things that you saw or heard, or I struck things from the record.  You must completely ignore all of those things.  Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence and you are bound by your oath not to let them influence your decision in any way.

4269

There are, generally speaking, two types of evidence from which you may properly find the truth as to the facts of a case. One is direct evidence or evidence such as the testimony of an eyewitness. The other is indirect or circumstantial evidence or the proof of a chain of circumstances pointing to the existence or non-existence of certain facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts in accordance with all the evidence in the case, both direct and circumstantial.

You are the sole judges of the believability of each witness and the value to be given the testimony of each. You should take into consideration the witness's means of knowledge, strength of memory and opportunities for observation. Also, consider the reasonableness and the consistency or inconsistency of the testimony.

You should also consider the bias, the prejudice, or interest, if any, that the witness may have in the outcome of the trial, the conduct of the witness upon the witness stand, and all other facts and circumstances that affect the believability of the witness.

A witness may be impeached by showing that he or she has made different statements on other occasions

4270

contrary to and inconsistent with his or her testimony given at this trial.  If you find that any witness has willfully testified falsely in this trial to any material fact, then you may disbelieve the entire testimony of such witness, but you are not compelled to do so.

The testimony of a witness may be discredited or impeached by showing that the witness has been convicted of a felony, that is, of a crime punishable by imprisonment for a term of years.  A prior conviction does not mean that a witness is incompetent to testify, but is merely one circumstance that you may consider in determining the credibility of the witness.  You may decide how much weight to give any prior conviction that was used to impeach a witness.

The testimony of a witness who provides evidence against the Defendant for some advantage that it may give to them or in contemplation of immunity or reduction from punishment or any other inducement must be examined and weighed with greater care or greater scrutiny than the testimony of an ordinary witness.  You must determine whether the witness's testimony has been affected as to its credibility by any interest they have in any special treatment they receive or any interest they have in the outcome of the trial or any prejudice they have against the Defendant.

4271

There has been introduced the testimony of witnesses who are represented to be skilled in certain areas.  Such witnesses are known in law as expert witnesses.  You may consider the testimony of these witnesses and give it such weight as you think it should have, but the value to be given their testimony is for you to determine.  You are not required to surrender your judgment to that of any person testifying as an expert or otherwise.  The testimony of an expert, like that of any other witness, is to be given such value as you think it is entitled to receive.

A PowerPoint presentation was prepared by Iris Dalley and shown to you during this trial solely for purposes of explaining the facts which are evidence in this case regarding the bullet holes in the white Bronco. The PowerPoint presentation is not evidence in this trial or proof of any fact.  If you find the PowerPoint presentation does not reflect the facts shown by the evidence in this case, you should disregard the PowerPoint presentation.

In other words, the PowerPoint presentation is used only as a way for Ms. Dalley to explain her findings for you, but to the extent that you find the testimony does not accurately reflect the facts as you find them from the evidence in this case, you can disregard it

4272

entirely.  However, the photographs from the PowerPoint presentation which were admitted into evidence may be considered as all other evidence which was admitted in this trial.

An attorney has the right to interview his witnesses for the purpose of learning the testimony the witness will give.  The fact that the witness has talked to an attorney and told the attorney what he or she would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness.

The law does not compel a Defendant to take the witness stand and testify, and no presumption of guilt may be raised, and no inference of any kind may be drawn from the failure of a defendant to testify.

The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

If you find from the evidence in this case and under these instructions, beyond a reasonable doubt, that the Defendant now on trial is guilty of the crime or crimes charged against him in the superseding indictment, then you should find the Defendant guilty of the crime or crimes charged.

If, however, you do not so find, or if you entertain a reasonable doubt as to the guilt of the

4273

Defendant of the crime or crimes charged in the superseding indictment, then you should find the Defendant not guilty of the crime or crimes charged. Upon making your decision, you should complete the verdict form provided to you by marking the appropriate lines on the form which reflects your decision.

If you find Kenneth Eugene Barrett guilty of Count One or Count Two, you must then also answer the questions posed in the Special Interrogatories which relate to the specific counts for which you found Defendant Barrett guilty.  Those interrogatories along with the verdict forms are in the front part of the Instruction Booklet that I will give you.

I might ask that counsel approach the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  Any objections to instructions as read or desire to renew objections you made earlier?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  Which -- we have the same objections we have before and present the same instructions that we had before.

THE COURT:  Okay.  I'm going to now allow you make your closing.  When you finish, I'll give my closing instruction and the case will be submitted.

4274

I neglected to make clear.  My question about the instructions also includes the verdict forms and the interrogatories.

MR. SPERLING:  No objection to them, Your Honor.

MR. HILFIGER:  Same objection we had before as to the -- (Interrupted)

MR. LITTLEFIELD:  I'm assuming we're going to speak from the back podium.  May I turn it around?

THE COURT:  Do whatever you want to that makes you comfortable.

MR. LITTLEFIELD:  I'm not sure I'm strong enough, but --

THE COURT:  If you want to turn it -- (Interrupted)

MR. LITTLEFIELD:  I think -- (Interrupted)

MR. SPERLING:  Do you have an extra clean copy of the instructions?

THE COURT:  Everything except 15.

MR. SPERLING:  Can I look at hers for a little bit?

THE COURT:  Yes.

MR. SPERLING:  Thank you.  You want one also?

MR. LITTLEFIELD:  I've got one here.

(Whereupon, the following record was made in

open court within the hearing of the jury.)

THE COURT: You'll now hear closing argument first from the Government.

MR. LITTLEFIELD: Your Honor, may I make sure position -- (Interrupted)

THE COURT: You may.

MR. LITTLEFIELD -- doesn't block the screen?

THE COURT: You may.

MR. LITTLEFIELD: May it please the Court. Ladies and gentlemen of the jury, you began this process in August. The days were 90 degrees, it got dark about 9:00 o'clock. Now we're here in November and it's the fourth month in which you all have been involved in this process. Now the temperature is down to the 30s, now it gets dark at 6:00 o'clock. It's been a long, extended time we've been in this process.

Throughout the entirety of this trial you all have paid close attention. His Honor said, I think, yesterday that this -- something about the 20th day. Frankly, I lost count how many days we've been in here. But I know that throughout the entirety you all have listened carefully and you paid careful attention and I want to thank you regardless what the final outcome is for your devotion to this case and for you performing your civic duties and your obligations and

4276

responsibilities. And that's to see -- I want to tell you now before we ever have a verdict what your verdict is going to be.

But while this appears to be and has been a lengthy process for all of you, two days before we actually began the final jury selection on September the 26th of this year, September the 24th, it was the sixth year anniversary of this occurrence. It was six years. And if it's been lengthy for us, it certainly has been lengthy for the family of Rocky Eales and it has certainly been a lengthy process for the troopers who were his friends and his comrades and who misses his companionship. And today is the time to resolve it.

When we started the voir dire proceedings, the Court explained the stages through which we would go. This is the guilt stage. As attorneys, we are about to be done with our involvement in the guilt stage. When these closing arguments are -- when we've finished our closing arguments, we will have completed our duties and our responsibilities. Yours will continue, because you will have to deliberate, you will have to examine the facts and the circumstances and reach the conclusions as to whether or not this Defendant is guilty beyond a reasonable doubt of the charges filed and those three counts in the superseding indictment. And the question

4277

may come to you, well, what do we do -- what do we have to do to deliberate?  What do we go about -- how is the process?  And I submit to you that the Court assists you in that process by defining the elements of the crime and telling you exactly what we have to prove for each of these three crimes charged.

In the opening statement I spoke of pieces and I spoke of the evidence and I discussed the puzzle and how the pieces fit together.  And the instructions, the elements, tell you what those pieces must be and how they must fit together before this Defendant is guilty beyond a reasonable doubt.  The elements are exactly what we have to prove and all that we have to prove.  If, for example, a piece of evidence is not -- or a fact is not an element of the crime, we don't have to prove that piece of evidence beyond a reasonable doubt.  For example, if the Defendant's shoe size is not an element of the crime, then you may have a question his shoe size. But we don't have to prove that beyond a reasonable doubt.  That evidence is the pieces that fit together for you to determine what -- whether or not we have established the crimes beyond a reasonable doubt.  And there are three prongs.  As I discuss them today with you or this morning with you, I'm going to lump Counts One and Two together.  Count One and Count Two charge a

4278

violation of the same statute, Title 28 United States Code Section 924(c). And it charges in Count One the use and carrying of a firearm during and in relation to or possession of a firearm in furtherance of a drug trafficking crime. Count Two charges the same violation except that instead of being a drug trafficking crime, it is while committing a crime of violence. And the judge told you that there are four elements to both of those charges. Four things the Government has to prove beyond a reasonable doubt. The second, third and fourth element of both of those counts is exactly the same. The only thing that changes is Count One requires proof of a drug trafficking crime. Count Two requires proof of a crime of violence. And here are the four elements. Here are the four things and the only four things that we are required to prove beyond a reasonable doubt to establish guilt of either Count One or Count Two.

The first element. The Defendant committed at least one of the drug trafficking crime charged in Count One of the Superseding Indictment. Here's the first element of Count Two. The Defendant committed a crime of violence, the killing of a state law enforcement officer engaged in or account of the performance of this officer's official duties as charged in Count Two of the Superseding Indictment. That's the only difference.

4279

Elements on two, three and four are the same.  Element two is during and in relation to the commission of one of the drug trafficking crimes, Count Two, crimes of violence, the Defendant knowingly used or carried a firearm or possessed a firearm in furtherance of such drug trafficking crime and crime of violence.  Element three, the firearm played an integral part in one or more of the drug crimes, a crime of violence.  Element four, during the commission of one or more of the drug trafficking crimes or crimes of violence, the Defendant directly caused the death of David Eales through the use of a firearm.  And if you examine those elements of those two counts, the four things we're required to prove, I submit to you, the evidence establishes those violations, those crimes, beyond a reasonable doubt.

Consider the first element.  Let's talk first about the drug trafficking crime.  And I submit to you that the Defendant without question committed the drug trafficking crimes alleged in the Superseding Indictment. We identified four.  First, the Defendant possessed listed chemicals with the intent to manufacture a controlled substances.  Methamphetamine.  And look, Number 59, that was the pseudoephedrine in the ceiling. You remember the testimony, 1,426 pills, give or take two or three.  1,426 pills hidden in the ceiling.

4280

Pseudoephedrine, iodine and red phosphorous are the three precursor chemicals that are put together and if you put them together with water and they make meth.

You heard the testimony of Kevin Wilson and Craig Nixon that the daily usage for an adult for pseudoephedrine is four tablets. That's enough pseudoephedrine to supply 356 and one half days. He must have planned on having one heck of a case of postnasal drip or he was using methamphetamine. But, you know, when I keep pseudoephedrine -- I don't have it. But when I keep pills at my house, I keep them in a medicine cabinet. I don't put them in the ceiling behind a plank. I submit to you he possessed that to manufacture methamphetamine. And you heard the testimony, you saw the lab report. That was the methamphetamine -- or pardon me. That was pseudoephedrine, 1426 tablets, and it was pure pseudo. And you heard the testimony. When you separate it out, it's 85.5 grams of pseudoephedrine. That would make 55 grams of pure methamphetamine. I submit to you that's why he possessed the listed chemical. As the judge tells you, pseudoephedrine is a listed chemical. That violation -- or that's a portion of the violations.

But it's not just pseudoephedrine. It's iodine crystals. And you remember the camera. Right up there.

4281

A full bottle, 144 grams -- let's go to the lab report -- of iodine crystals was hidden in that camera.  And if you look at the bottle, the net weight of the iodine, 144.3 grams.  Does iodine have a legitimate usage?  Yes.  And if you're using it legitimately, do you hide it in a camera?  No.  I keep film in my cameras, not iodine crystals.  But looking past the iodine, the dumpster. There's the iodine crystals that were used and dumped in the dumpster.  Look at the next photograph.  In the dumpster you had -- if you recall there was a photograph of the stained paper towels.  Let's go off of it.  And the test on those paper towels -- and Lyndell Griffin did that test and he testified.  Those iodine stains, they tested positive for methamphetamine.  When you do the meth transaction, when you do the meth cook, you strain it through paper towels, you strain through coffee filters.  That iodine was possessed to manufacture methamphetamine.  Remember there were questions about when that dumpster in which those items were possessed, well, that's behind.  It could have been used by the person who occupied the trailer.  You know, well, yeah, except that person who occupied the trailer was Gelene Dotson.  She testified.  Did she say that was her dumpster?  No.  Did she say she put iodine filters or iodine -- used iodine and strained filters with

methamphetamine in that dumpster?  No.  You'll remember that that was proximate Kenny Barrett's house and Kenny Barrett's trailer.  That's the first.  Iodine, pseudoephedrine, they are listed chemicals.  Number two, you've got the charge in there of possession of a chemical with intent to manufacture methamphetamine, and that was the red phosphorous.  Government's Exhibit No. 113.  And you heard the testimony.  Steve Hash, that bottle was in his pocket.  Stanley Philpot, that bottle -- that pill bottle was in his pocket.  Johnny Philpot, I saw the bottle.  I put it back in the pocket.  April Marcangeli, when I retrieved his clothes from Stanley Philpot in that biohazard bag and I went through the content, in the pocket I found this pill bottle and I sent it over to drugs because of my suspicions.  And you heard what happened when it was analyzed.  Danny Farris, it was 51 grams of red phosphorous.  I tested it.  It had methamphetamine in two of the bottles or in two of those little packages and it had phenyl propanol P2D residue in the second.  And Mr. Farris testified that when you cook -- use red phosphorous in a meth cook, it picks up taint for meth.  And the P2D is a byproduct of the meth manufacturing process.  But to make certain, he submitted this to Doug Perkins, a trace lab in Oklahoma City and Doug Perkins testified conclusively that this is red

4283

phosphorous and red phosphorous is used to manufacture methamphetamine.

The second drug charge -- drug trafficking crime. Possession of chemical with intent to manufacture meth. Bam. There is it. The third drug trafficking crime, attempt to manufacture in and of itself. And you heard Lyndell Griffin and you heard the testimony that described the process and finding the three precursors HEET and the combination in and of itself makes meth. You heard that there was -- Government's Exhibit 79 which we just put up a minute ago. Nicotinamide, it's the top item, 108 grams. And you heard that that is a common cut for methamphetamine. That if you take 55 grams of meth, which is how much that pseudoephedrine could produce, and combine it with the 108 grams of nicotinamide, you would have 163 grams of methamphetamine. And you heard the testimony from the individuals who were meth users. A gram of meth will go for $100. One hundred sixty three grams was over $16,300 worth, street value, of methamphetamine. $16,000. And I submit to you, clearly Kenny Barrett was attempting to manufacture meth.

You saw the rest of the lab. Government's Exhibit No. 63. The tubing. And that tube was described as a gas generator. You heard the testimony. You bubble the HCL gas into the meth, it causes the meth to

4284

precipitate and you get some residue on the tube.  And you heard the testimony that tube was tested and that tube, according to Gerald Skowronski, the guy from Chicago, had meth residue in that tube.  It had been used to gas generate meth.

The next photograph, the chemicals.  Mineral spirits, paint thinner, toluene, Coleman fuel, all the solvents used in the manufacture of methamphetamine.  Number 66, the glassware.  That's the kind of stuff that you can use to manufacture methamphetamine.  And remember the flask?  It had a residue in it.  What was the residue?  The residue was the binders from when you soak pills.  When you soak pseudoephedrine to separate it so you can get the pure pseudo to cook meth, that binder flakes off.  He had glassware, he had tubing, he had chemicals.  You heard Juan Beal, you heard Craig Nixon, you heard Kevin Wilson.  Had he not been taking in on other charges, he would have been arrested for attempting to manufacture methamphetamine.  He a meth lab, same two item.  He didn't have Muriatic acid, you can get that at a -- supply place.  You can get it at a hardware store.  Easy to pick up.  He didn't have Red Devil lye.  And you can pick it up at Homeland, Safeway, Wal-Mart or a hardware store.  It's a common item and he had it all.  He had the used stain filter, he had coffee filters in

4285

the house. I'm not going to show you the picture of it. You'll remember it. It's on the cabinet where everybody said, well, they moved all that stuff. Yeah, they pulled it out of the drawer when they found it. And you heard Vicki Lyons. I went through that house. There were coffee filters but no coffee pot. He was attempting to manufacture methamphetamine. Randy Turman said he cooked meth in that northeast room of that residence. He had a meth lab.

The fourth drug trafficking crime, possession with intent to manufacture methamphetamine. And I'm going to combine this with maintaining a place for the purpose. He had syringes in the wall, 57 and 68. 197, he had a bloody syringe showing it had -- that place had been used for distribution. Remember that's the garage. Fresh blood in it. That was submitted. It tested for meth. He had these syringes. You've seen them. You heard the testimony. He had his own rigs. He distributed methamphetamine. You had the baggy with the residue. How do you have residue in a baggy? Well, it's been there before. He had the scales, he had the baggies. And you remember all of these spilling out. You remember the testimony of Karen Real. She was over there from 1997 through the early part of '99. When she first went there, she just used meth that Kenny provided

4286

her.  That's distribution.  But as time passed more and more distribution took place.  And when she was there she would see two to three sales of methamphetamine per day.  And when asked what size were the bags in which he distributed, she said that's the size bags for the distribution.  He distributed to Travis Crawford, his cousin, who said I went over there and got my meth.  He distributed to Karen Real.  Charles Sanders said he went over there with Geniece Thomas, his girlfriend and his friend called Ronny.  Ronny Baldwin, the Defendant's own witness said I went over there to use meth, Kenny had his own rigs.  We used my meth and if I didn't have any, we used his.  He distributed to his own witness, Ronny Baldwin.  Randall Weaver went over there and made a $20 purchase.  That place was used to distribute methamphetamine in addition to manufacturing, and it was used to use dope as well.

Finally, Government's Exhibit 186.  When he was shot in the rear end through his wallet, holes in the 21 $100 bills.  He didn't have any other endeavor that was capable of making this kind of money.  Yeah, he worked out on cars on occasion.  But did anyone testify that, yeah, it was a money-making proposition?  The only person who talked about his use of cars or shade tree mechanic business was Karen Real.  She said, well, he just piddled

4287

out there.  I didn't see him doing anything to make money.  $2100 in his pocket and $16,000 worth of meth supplies in his house.  Ask yourself where this money came from.  Kenny Barrett used, Kenny Barrett manufactured, Kenny Barrett attempted to manufacture and Kenny distributed methamphetamine.  That was his means of making a living.  The drug trafficking crimes are proven.

The judge tells you in regards to maintaining a place in Instruction 13 if a place is a residence.  To maintain means over a period of time.  And we show you from '97 when Karen Real started going there up to September the 24th, 1999.  Over a period of time the Defendant directed activities in that place.  The Government is not required to prove that drug activity was the primary purpose of the Defendant's opening and maintaining a place, instead it must proof that drug activity was a significant reason.  And we have shown you the significance of the Defendant's drug activities there.  We've shown you the drug trafficking crimes.

What about crime of violence?  Was there a crime of violence?  Government's Exhibit No. 67.  That's the front of the Bronco, nine clear shots into the drivers -- or into that front windshield.  Look at 223.  Four clear shots into the passenger door.  Look at Government's Exhibit No. 228.  These are the trajectories

4288

through the passenger compartment through that vehicle. Was that a crime of violence? I submit it was. Look at Government's Exhibit 84, the flank wound injury to Rocky Eales. 85, the injuries to his left armpit from those gunshots. 86, the gaping wound to his right elbow that did not pass through the cab of that vehicle, struck the glancing blow off of Buddy Hamilton's injuries -- thrown up there. And you see the photograph, injuries to the side of his face. He also got an injury to his left shoulder. Crime of violence? You've seen the results. Buddy was injured, Rocky was killed.

The Court advises you in Instruction Number Seven that the killing of a state law enforcement officer engaged in or account of the performance of his official duties is a crime of violence. And I submit we have proved the first element of those two charges. Element two, during and relation to crime of violence where a drug trafficking crime the Defendant used or carried a firearm or possessed in furtherance of. And remember the number of firearms possessed. You saw the photograph of the hidey hole. Government Exhibits 8 and 9. There's the guns. And you'll remember what Vicki Lyons testified. I went through. You can look at the Indictment provided -- or the Superseding Indictment that is provided in the instructions, and I listed every one

4289

of those firearms by serial number, and she said, yes, we found those. Those were in the hidey hole. I submit to you -- under the stairs. And I submit to you that those guns were possessed during a drug crime and during a crime of violence. But let's go to the two primary guns, that Smith & Wesson nine-millimeter, Government's Exhibit 122, I believe, and Government's Exhibit 128, the .223 Colt Sporter. And I submit to you if we focus on those, the Court tells you that use means it has to be readily available and actively employed. Those two firearms were readily available, they were actively employed. To carry means exercise ownership and control and over a -- and transport or move. That .223 was in his waistband. He possessed ownership and control. It was there when he walked around. That Colt Sporter was in his hands and it was moved and it was fired and it was moved from that southeast room or southwest room, the living room, into that southeast room. Used, carried, possessed all occurred. That nine-millimeter, he used that, transported it, possessed it in regards to these crimes. Charles Sanders said he always kept it in his waistband. Randy Price said he always kept it in his waistband. Randy Turman, it was always in his waistband. Steve Hash and Rick Manion said it was in his waistband when he came out of the house when he was apprehended by

4290

Buddy and dragged out by his hair and his hands were underneath him and he was reaching for it. And he retrieved it and tossed it in the yard. Government's Exhibit 21, that's the nine-millimeter. He used it, he carried it, he possessed it in relation to these crimes. He was going for it again even after he fatally wounded Rocky and he shot Buddy with that firearm. What about the Colt Sporter? The testimony is that was always available. Charles Sanders, Randy Turman, Randy Price, Karen Real all identified that firearm and said he leaned it against the wall in that east room. Karen Real said when he'd go to the shop building he would take it with him. It was always available to him. He always had it ready. And remember on the 24th it was fully loaded. It was topped off with 91 rounds. Terrance Higgs told you how you do that. And it was. Nineteen were fired and if you subtract 19 from 91, it gives you 72 rounds. And while there was some confusion -- and maybe one lost later. Vicki Lyons counted every one of those rounds and logged in 72. Terrance Higgs received those rounds in the lab in Oklahoma City and counted them and verified there was 72 rounds. He topped off, he was ready. Look to Government's Exhibit 171. That is the .223 box in the east room. And I submit to you it was topped off that night. Now, the defense tries to say, well, that was

4291

staged.  There's another .223 round.  It's on the bottom of the gun cabinet.  Folks, is not it likely that he had two .233 boxes?  Look at the bottom of that gun cabinet and you -- and I don't remember which exhibit.  But with all -- where all of the ammo boxes were down there.  And he had more than one box of multiple caliber bullets.  And I submit to you there's no testimony other than Ms. Lyons who says that's where that box was.  It was empty.  It wasn't staged.  He carried it, fired it from the front porch of the house.  He used it.  He fired 19 shots and hit with every one of them.  He possessed it.  He actually held it in his hand.  It was during and in relation to and in furtherance of.

The Court tells you in regards to that that it has to be an integral part of the crime.  It has -- and that's the third element.  It has to be an integral part of the crime and increase the likelihood of success.  But it doesn't -- the judge didn't tell you it has to ensure success.  And I submit to you when you use these guns to attempt to thwart an arrest warrant, when you attempt to prevent the execution of a search warrant, you are increasing the likelihood of success of your endeavor.  It was an absolute integral part of the crime.  And as to the crime of violence, it is clearly an integral part, because that's what caused it.  Had he been firing spit

4292

wads, Rocky Eales would still be here.  Had he been firing spit wads, they would be splattered all over the front of that Bronco, but the front windshield would not have been disintegrated in front of the Buddy Hamilton's eyes.  And I submit to you it was integral part.  That's the first three elements.

The fourth element, the firearm caused the death of Rocky Eales.  You remember the autopsy, Dr. Distefano.  Wound number two was the shot in the left arm.  It entered his left shoulder, it passed through his left lung and it caused the collapse.  It lacerated his aorta and it caused him to bleed to death within a matter of minutes.  Dr. Distefano said a laceration of an aorta on the operating table can be deadly.  Imagine what it was in the front yard of Kenny Barrett's -- or Kenny Barrett's house.  And Ken Kenny Barrett fired that shot. The trajectories discussed by Iris Dalley.  She identified shot numbers two and three.  Both of those passed right by where Rocky would have been exiting out of the vehicle.  And we followed the trajectory.  It went into the passenger's seat and there was blood.  You remember the testimony from Ryan Porter.  The DNA on that blood matched Rocky.  For trillions and quintillions to out one quintrillion out of six, or one out of six quintrillion, whatever it was.  And the shots were fired

4293

from the house.  You got Gene Hise saying that's where they were coming from, Kerry Pettingill saying that's where they were coming from, Raymond Greninger, Steve Hash, Danny Oliver saw the plumes coming out of the front yard.  The only occupant of that house, the only person in there from which the shots were fired was that man, Kenny Barrett.  Kenny Barrett is the person who shot Rocky.  Ken Barrett held the gun, Buddy Hamilton, Rick Manion saw it in his hands and he fired the fatal shot.  Rocky stumbled back and said his last words to Rick Manion, I'm hit bad.  They tried to give him CPR and Gene Hise drew a mouthful of blood because during the CPR the perforated lung is bleeding.  Clint Johnson, who climbed in the back of Delana Goss, the Sheriff of Cherokee County at the time, said we tried to administer CPR on the back tailgate of Raymond Greninger's Bronco and we had no response.  He was dead before he ever got to the hospital.  And you got the exhibit that proves it all.  Government's Exhibit 129, F-41, the envelope, upper chest.  It went from Dr. Distefano to Donita Mann to Jon Huntington to Christa Rhode to Terrance Higgs.  Terrance Higgs test fired, shot, from that gun and compared the jacket from the jacket removed from Rocky's chest and it's conclusive to the exclusion of every gun which has ever been or ever will be manufactured that shot, that

4294

jacket, that which was in the wound -- of Rocky was fired by that gun in his hands.  It caused the death of David Eales.  Counts One and Two, and all the elements of Counts One and Two are proven beyond a reasonable doubt.

What about Count Three?  The intentional killing of a state law enforcement officer performing the duties or state officer performing his official duties during the commission of a drug trafficking crime.  The Court tells you there are five elements.  During the commission of or in furtherance of or while attempting to avoid apprehension, prosecution or service of a prison sentence for a felony drug violation.  Two, Kenneth Eugene Barrett intentionally killed David Eales.  Three, David Eales was a state law enforcement officer.  Four, the Defendant Kenneth Barrett knew or had reason to know he was a law enforcement officer.  And, five, he was killed while engaging in or account of the performance of his official duties.  And I submit to you those five elements are established by the evidence beyond a reasonable doubt.  Element one, during the commission of or in furtherance of or while attempting to avoid apprehension or prosecution for a felony drug crime. Look to Government's Exhibit No. 87.  Rocky Eales and the others were out there to execute an arrest warrant.  It is a felony arrest warrant.  Case CF -- that's stands for

4295

felony -- 97.  The Defendant is Kenneth Barrett as he's charged unlawful delivery of CD, controlled dangerous substance and failure to appear for jury trial.  Rocky Eales was out there and was killed by Kenny Barrett because Kenny Barrett was attempting to avoid apprehension and prosecution for a felony drug violation. Element one without question is established.  But it also established by all of the other drug trafficking evidence that we presented previously and I will not waste any time discussing it again.  This was a drug house.  It was maintained for the purpose of using, manufacturing, dispensing and distributing controlled substances.  He was avoiding apprehension for a drug trafficking crime. And that's why Rocky Eales was killed.

I'm going to define -- in regards to the discussion of these elements, I'm going to define elements three and five which is that David Eales was a state law enforcement officer, and five which is he was engaged -- or killed while engaged in or on account of the performance of his official duties.  His Honor advises you as a part of the instructions a state law enforcement officer includes an Oklahoma Highway Patrol Trooper.  Beyond a reasonable doubt Rocky Eales was a law enforcement officer under -- and that element is met. Element five was Dave Eales was killed while engaged in

4296

or on account of the performance of his official duties. And the judge tells you an officer is engaged in his official duties when he is serving or attempting to serve either an arrest warrant or a search warrant. It was a drug house, element one is proven. Rocky was a state law enforcement officer, element three is proven beyond a reasonable doubt. And he was engaging in his official duties. He was serving an arrest warrant and a search warrant. And element five is proven beyond a reasonable doubt.

Leaves two elements as to Count Three. Did he intentionally kill Rocky, which is element two? And did Kenny Barrett know or have reason to believe that David Eales was a law enforcement officer? Did he kill him intentionally and did he have reason to believe or know that he was a law enforcement officer? And I submit as you look at those two elements, it is clear that the answer to both is yes beyond a reasonable doubt. The judge tells you about intent. The intent of a person or the knowledge of that person possesses at any given time may not ordinarily be proven by direct -- proven directly, but there is no way of scrutinizing the workings of the human mind. But he also said you may consider the statements made or the acts done and that a person intends the natural and probable consequences of

4297

acts knowingly done.  In this particular case, I submit to you we know.  We do know what was in Kenny Barrett's mind because he told people what was in his mind and he told people what his intention was.  Karen Real, she went out there from 1997 until mid -- or late '98, early '99. And when asked, she said Kenny Barrett always carried his gun with him.  Took that gun out to the shop.  Kenny Barrett always expected the cops to come and Kenny Barrett said throughout that entire time if they come I'm going to take out as many of them as I can.  That's over that period.  The sign -- if I might approach?

THE COURT:  You may.

MR. LITTLEFIELD:  Kenny Barrett announced his intention.  I'm not going to read the whole sign. Keep -- yeah, I will.  Keep out.  I don't give a shit who you are.  If you cross my gate or come on my property I'll shoot.  Kenny Barrett announced his intentions.

Look to the other witnesses.  Look to the other witnesses in regards to his intent and his state of mind. Charles Sanders was there in 1999.  Ken Barrett knew there was a warrant.  He expected the law to show and he said I'll kill the first cop through the door and he hoped it was Johnny Philpot, the Sheriff of Sequoyah County.  Randy Turman was there the summer of 1999. Randy Turman once said he -- parts of it and Kenny cooked

4298

it back in that northeast room. Randy Turman talked about and Randy Turman said Kenny Barrett knew there was an arrest warrant. Kenny Barrett knew they were going to come sometime and he told what they were going to do. He was going to take out as many of them as he could before they took him out, and he felt the first one will be Johnny Philpot or Frank Loyd. Randy Turman also told you he just didn't make that statement, he acted on it. Remember Mr. Turman? He was one of the early witnesses. He was one who had the note, not $100,000 bond, it was $120,000. No, it wasn't, 89,000 it was 98,000. And he knew the facts and he told you why he quit going out there. He was out there one night late. An elderly man came just skidding into the yard with an abrupt stop and that elderly man said the cops are on my tail, they're going to be out here any minute. And I asked him what did Kenny Barrett do and he said Kenny went in his house and got his rifle. He was expecting them to come and he was going to take them out. They didn't show up that night and Randy Turman said I never went out there again because I knew then he was serious.

Brandie Price. Now we're getting close. We aren't a month or two before. Brandie was out there the last time, she said, ten days to a week before this incident. Barrett knew and he told her and Barrett said

4299

he was taking the cops to come and he told her if they come, you better either grab a gun or hit the floor. And he also told her I intend to take out as many of those bastards as I can before they take me out. A week before the incident Kenny Barrett announced his intentions.

But we don't stop there. We go to the night of. And on the 23rd of September of 1999 Charles Sanders saw at five or six o'clock Kenny Barrett out by his locked gate. You remember the testimony of Buddy Hamilton, Raymond Greninger, between five and six they removed the -- from Buddy's Bronco. They drove out there, did a turn around and drove back in that same Bronco that was the first vehicle to enter the yard. And what did Kenny Barrett tell his cousin? He told his cousin I'm believing they're the cop cars. And his cousin Travis Crawford said, yes, it might have been one. And he said, you know, I got that warrant, they may be coming back just like he expected them and Travis said, yeah, they might, Kenny. And he said DGF, all hell will break loose. That was six and a half to seven and a half hours before they did return and Kenny Barrett was right, all hell broke loose.

Those officers had an average of ten years' experience serving seven, eight, nine, ten warrants a year. If dangerous circumstances where they expected

4300

people with guns and expected violence, this was the first time that a shot was ever fired at the members of that team and you heard numerous of them testify.  It is the first time, the only time to that point, that these officers had fired a shot during one of these missions.  The only difference between this mission and those hundred previous dangerous missions was one thing, that man in that house who had the intent, the expectation and the plan to take out as many law enforcement officers as possible and the man who acted upon that plan.

Was it intentional and did he have knowledge?  I submit to you the evidence is yes.  But I submit to you the physical evidence demonstrates it as well.  Recognize that we don't know the exact position of these vehicles.  When Buddy Hamilton is driving up there and begins receiving fire he did not stop and paint an X to mark the stop.  He did the best he could to estimate and he testified when that dowel rod was placed I can't tell you if I was here or here or here.  And he said I can't tell you that my vehicle was pointed this way, this way or this way.  He did not know exactly, but that's as close as he put it and that was the approximate location.  And you'll remember he was going to drive to about that point and would not have proceeded past that point had he not started receiving fire about here.  That's where Buddy

was.  Raymond Greninger said -- or about that location. Raymond Greninger was following.  He was in car two.  And Raymond Greninger said I was a car length behind.  Buddy had trouble hitting the ditch and I was here.  Steve Hash was about a car length behind Raymond Greninger when the shots where initiated.

Bob Thomas of the FBI was two days at this location developing a survey, doing the topography, measuring scale to eight or 16th of an inch and putting everything exactly where it was.  Look down -- and this is the exhibit.  Look down on the porch line.  See what you can see.  And see if when those shots were fired -- and remember they were aimed.  Nineteen shots, every one hit.  Eighteen hit the Bronco and the 19th hit the elbow. Every one of them will kill you, every one of them -- and you can see what Kenny Barrett had to see.  You'll remember Government's Exhibit 102, the lights rolling across the yard.  Couldn't being missed.  Every one of you has driven down a road -- down a road and seen a trooper.  And if there's not a hill in your way, you can see those lights rolling for over a mile.  Kenny Barrett was looking right at this angle, and if he aimed in his line of sight, are the big bright lights and the visor lights on Raymond Greninger's car and the overhead lights on Steve Hash's car.  And I submit to you when those

4302

shots were first fired he knew. Jim McBride was over there in the other yard and he said as these shots were fired, he sees the red reflector off the porch. Rick Manion, Raymond Greninger, Steve Hash said the red and the blue reflected off the dust lights that was flying off the window. Rick Manion said off the smoke, off the dust, off the Bronco and off of Rocky I can see the reflection of Hash's lights.

I submit to you when he fired the first shot he knew. But you know, folks, the first shot didn't kill Rocky Eales. The second and the third did not kill Rocky Eales. Rocky Eales was not killed until they pulled up. When they pulled up to the front and stopped, Kenny Barrett shot him through that passenger door. And if you recall the testimony, as that shooting is going on and Steve Hash and Danny Oliver and Raymond Greninger all three said as well as Kerry Pettingill and as well as Jim McBride, those shots when that vehicle was up front were coming from just inside the front door. They had arrived at their location and you saw where Hash's vehicle was, and those lights are reflected and those lights are clear. And even if the first shot he didn't know or the second shot, by the time that vehicle is up there he had to know. He had to see. It was unavoidable. And he made the choice and continued shooting and when he fired

4303

the fatal shot, if he didn't know at first, he had to know then because as Rocky was coming out of the car, the lights were reflecting off of him.  Buddy tells you he was about 25 to 30 yards.  Bob Thomas told you from that entrance to the porch was 175 feet.  That's 58 yards.  Fifty eight -- foot.  That's elevated.  Bob Thomas told you that was the highest position on that property.  The porch is 21 inches high.  From the porch to the bottom of the ditch is seven feet change in elevation.  He is elevated by his height as well looking down.  He has a perspective down on those officers entering and he knows what is going on.

Look at Government's Exhibit 3, if we can show it.  That's the view he had.  And Bob Thomas told you, you stand on the front porch, you look down, you can see these trees.  Those are the trees that are visible right in the center of the porch.  He had to see the whole way.  He had to know the lights were on.  He knew that same car the night before was a cop car.  Kenny Barrett knew.  And I submit to you evidence clearly shows that those shots were delivered into Rocky's body when the Bronco is right there.  Follow the path.  Rocky's sitting here.  He's looking face on.  Vehicle moves.  Still face on, maybe right side.  Vehicle comes up to here, now his right side is exposed and it continues to be exposed and it

4304

continues and now we're looking at the face. Only this to this is exposed during that entire path. The only place this and this is exposed is when he's getting out. Fifteen feet from the shooter. You'll remember the last witness? Loyd Cobb, the Defendant's own investigator, and I asked the distances from that door inside between the two rooms to the front door, six feet. The porch is 45 inches less than ten feet and the front door of that Bronco would be less than five. At a maximum distance, Kenny Barrett of 15 feet, Kenny Barrett drew down that rifle that has a killing range of 500 meters, five and a half football fields and from a maximum distance of 15 feet he gunned down Rocky Eales. I submit to you he was really closer than that because Danny Oliver and Steve Hash and Raymond Greninger told you when the shots were being fired they could see the muzzle flash, the plumes went out the front door and it only goes about two feet. I submit he was closer than that. Raymond Pettingill said I could see -- or Kerry Pettingill, pardon me -- said I could see his silhouette from the southwest. Jim McBride said I saw all of his silhouette when the car was first coming in and then part of it as he was backing in. Danny Oliver said the plumes backed up as the Bronco got there. And I submit to you he was somewhere in the neighborhood of ten to 12 feet, about

4305

the distance from me to Mr. Sperling. As he drew down and fired with a rifle with a lethal range of five and a half football fields, he was shooting fish in a barrel. He didn't miss a shot. Every one of the 19 hit, and it was intentional.

His actions made it intentional. He kept and locked the front gate. He kept it closed. It forced an east entry. He had the spotting scope up in that room. And Vicki Lyons told you when I looked through it, it focused right on that entry point. He forced that entry to the east. He was always armed. He always kept that .223 leaning against the wall. And on 9-24-99 he topped it off. The pattern of shots show his intent. You'll remember the slowing SUV and where Ms. Lyons -- porcupine shots where all those trajectories go in. And you'll remember where those trajectory patterns were. They were directly -- at the drive. And when someone comes in and you're trying to stop them, when you're trying to stop the law, you take out the lead vehicle. And how do you do it? You take out the driver. And that's where all those shots were until it got parked right in front, 15 feet away. And he changed his focus because Buddy didn't go down between the seats. He changed his focus to the person trying to get out of the vehicle and he shot and killed Rocky at that point. The pattern of

4306

shots tells you his intention.  It will show somebody who was thinking.

But it didn't stop there, the fact that he was -- these were intentional acts to kill is further reflected by what he did even after he had shot Rocky, even after he mortally wounded.  Because you'll remember Buddy's testimony.  He tossed the flash bang out after Rocky had exited, after Rocky had gotten out because Buddy was down.  Buddy took the flash bang and through it out partially opened window and then he began to get out.  And what happened?  Well, Rocky's back in the back and Kenny Barrett again shifts his focus to the driver, Buddy.  Buddy said I got hit in the back of the left shoulder as I was getting out of that vehicle.  He still wanted to kill cops.  He still wanted to take them out.  He shot Buddy in the back as he was getting out.  And you don't have to rely exclusively on Buddy's testimony.  Remember Iris Dalley.  I believe -- I can't remember which shot, but there was one shot that passed through and hit the inside door molding on the driver's door and she testified that door had to be open when that shot was fired because the inside of the door covers the molding, covers that rubber molding when it's closed.  He shot through that door as Buddy was exiting.  Remember shot 13 and Mr. Hilfiger said where did it go?  Could it have

4307

gone out the open window?  And Iris Dalley said it's possible.  Yeah, it's along that trajectory, it could have gone out the open window.  You know something, there's another possibility.  It went out the open door and struck Buddy Hamilton in the left shoulder in the back.  Kenny Barrett is a back shooter in addition.  The shots delivered to Buddy after Rocky was killed reflect his intent.

And finally, even after he was apprehended, even after he was dragged outside, remember the testimony Manion and Hash?  His hands were under him.  He's moving down.  He's reaching for something.  Buddy had him by his hair.  Buddy has a gun in his hand.  Kenny Barrett didn't do anything then.  But when the two officers were on him without guns drawn, what does he do?  Puts his hands right in front going down, they pull his arms back cuffed him and where was his arms headed to?  The Smith and Wesson nine-millimeter.  He wanted to take out as many cops as he could.  He told everybody that and he did everything he could to do so.

You know, we presented a bunch of evidence in this case.  We presented five casings from Rick Manion's gun.  Could there have been more shots fire?  You bet.  Look at Government Exhibits Numbers 31, 32 and 41.  You can't hardly see the casings, the grass is too high.

4308

Those nine-millimeter casings are small. Could they have missed some? Absolutely. But we gave you the five and they were ejected from Manion's gun. And we gave you two projectiles. One was sitting on the refrigerator out front, one was from Kenny Barrett's leg. We gave you the two casings from Buddy Hamilton's .45 Sig Sauer, and it was absolutely ejected from his gun. And the one projectile that went through that front door, through the east door, into the bookshelf. We gave you that projectile. We gave you 16 .233 projectiles -- not projectiles -- casings in the living room and six on the porch. Absolutely fired, absolutely fired, by Kenny Barrett's gun. Do we know order? No. Do we know which one was the fatal shot? No. But we gave you -- we gave you those casings. There were 19 shots, 22 casings. We can't tell you which ones were fired that night, but we have sufficiently covered every shot. What about the ejection patterns? Because those casings are on the left side and it ejects right. Remember the testimony of Terrance Higgs, the OSBI doesn't even do that test anymore. It is too inconclusive and too inaccurate. It can ricochet off of anything. It can ricochet of the front door facing, the porch, that refrigerator. If you look at the Mr. Cobb's photographs of the front porch out the door, you'll see that front porch and a roof. If

4309

he -- a little bit, it can -- every which way.  They can be dragged, they can be kicked.  Kenny Barrett was dragged out of that house.  Officers were trying to secure the scene.  We can't tell you which casings, but we can tell you one thing.

One projectile, and that all this case is about.  One of the -- every now and then I get blamed, and they can tell me and it's been appropriate in my case, KISS, keep it simple stupid.  And I apply the stupid part, that's me.  One shot is all this case is about.  Not two from Buddy's gun, not five or six or seven from Rick Manion's gun, not 18 from Kenny Barrett's gun.  One shot.  This lethal jacket that was pulled from Rocky chest that was fired by that gun by that man to the exclusion of all other guns that ever have been made or will be made.  Kenny Barrett intentionally, knowingly and with premeditation killed Rocky Eales.  Six years and a month and several days, now is the time for justice. Find him guilty beyond a reasonable doubt.  Thank you.

THE COURT:  Members of the jury, we've been going awhile.  We'll take a recess at this time.  I'll ask everyone in the courtroom to please remain seated as the jury exits the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

4310

THE COURT: We'll be in recess for 15 minutes.

(Whereupon, a short recess was held after which the following record was made in the presence of the jury.)

THE COURT: Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel. Members the jury, you'll now hear from the defense.

MR. HILFIGER: Thank you, Your Honor. Ladies and gentlemen of the jury, may it please the Court. Again, just like the Government, we would to acknowledge your presence as part of the system. You've helped us make it work. You've been very patient. Give us your attention. And I know it's been tiring. You've been working hard here. You'll probably go home from here and say that, you know, I didn't feel like the Court system worked that hard because we have been spending a lot of time. Long days, very few breaks. And this has been a lot of days in trial. You see it in California it may be a lot, but this is a lot of days of trial. A lot of testimony, a lot of pictures. There's been a lot of arguments. Kenneth Barrett, Bret Smith, myself, we appreciate your participation. We appreciate your attendance.

Your determinations in this case really depend

4311

solely on the evidence coming from the witness stand along with any introduced physical evidence and any stipulations that have been made.  And as the Court's instructions tell you, whatever the attorneys say or whatever you hear from us is not evidence.  And that may be our arguments, it may be our interpretation of the evidence, but that's not evidence.  And you're to be the sole determiners of what the evidence is and how you interpret it and the importance of that particular evidence.  Now, there's been a lot of testimony, a lot of physical evidence produced, probably more than any one person can really remember factually detail for detail. In some of the evidence that's there may lead to different conclusions or different interpretations to different people.  And some of the evidence, you know, even when you hear things I'm going to say today, just like some of the things, I think, Mr. Littlefield said were interpretations, some of the things he's wrong -- I say he's wrongfully interpreted.  I say some of the things he's spoken wrong.  But you're the one who makes that determination.  It's not what we say, it's not what we say the evidence was, it's not what the judge says the evidence was, it's what you feel the evidence was from your own interpretation.  You may interpret individual's -- the evidence different from what another

4312

person does.  It's what your own individual interpretations are.

Some of the things that we're going to show you or have been shown to you are really for demonstrative purposes, not evidence in the sense that you can take it in and look at it, but just to sort of show a point.  And you know, there may be certain evidence in this case that you as individuals disagree on and it's up to you as the 12 to make the determination of how that evidence fits into this puzzle.  The puzzle is not necessarily like the prosecutor says.  The interpretations are not like the prosecutor says.

And one final thing as part of this entry deal I'd like to sort of bring out to you.  There may be mannerisms or actions that either Bret Smith or I have which you don't like, try to put those out of your mind because that doesn't have anything to do with this case either.  The only thing that has to do with this case is the evidence and how you interpret it.

To help you a little bit, what we're going to here, Mr. Smith and I, I'm going to handle some of the matters that deal directly with the homicide, the killing of David Eales, and Bret Smith is going to discuss the evidence as it deals with drugs and the crime of violence.  Now, there's some overlapping.  But I'll come

4313

back and I'll wrap -- plan for just a little short wrap up.

This will be our only opportunity to talk with you and discuss with your our of the views of the charges, the evidence and these instructions. The Government will have another opportunity. We will not be able to respond to the last statement the Government makes. Let me give you a real brief synopsis and it's even -- does not have as much legalese in it as Mr. Littlefield gave you. But basically, Count One says that -- is the use of a firearm during the drug offense which causes death, and that death is murder. Count Two is the use of a firearm during the violent offense that causes the death, and that death is murder. And Count Three is the intentional killing of a law officer during a drug offense. Now, if they all sound sort of intertwined, you know, One sounds Two and Two sounds like Three and Three sounds like One, it's because they are. But remember, Kenneth Barrett at this point is wrapped in the presumption of innocence. And the burden of proof is upon the Government to prove each and every element in each and every count beyond a reasonable doubt. And if any element -- they fail to prove any element in your minds beyond a reasonable doubt, then you need to vote not guilty as to that particular count.

4314

As I stated in my opening, this was tragic.  It covered ten seconds or less and should never have happened but it did and we have to deal with it.  The prosecutors' theories are not fully consistent with what the physical evidence is and what it shows.  Mr. Barrett may be guilty of some things, but he's not guilty of murder in connection with the charges in this Indictment.  And he had no reason to believe that the person in that white unmarked Bronco was a law officer coming into his house, coming into his yard, toward his house that night, early morning hours, 12:30 a.m. unannounced.  How did this tragedy happen?  Again, within that short ten second span, will probably never be explained fully.  It will be explained differently by different persons who were there depending on their viewpoints.

Let me show you what -- it's a combination of Government's Exhibit 69 I'm showing you as Defendant's Exhibit 105.  They are the same.  And you've seen this time and time again during this trial.  This is the scene the next morning.  We'll start, as it started, with John Hamilton.  He drove that Bronco in.  He says that he first started receiving shots at the top of the yellow flowers right back here.  That's his memory.  His memory -- his memory shows it's a little flawed, though, because when -- if you start receiving shots at the top

4315

of the yellow flowers, the shots to the car can't be like Iris Dalley said.  The trajectories don't agree with where he says it occurred.  He has a flawed memory of what happens when he gets up here.  He says -- he never says that he fired his .45 until after OSBI says, hey, we've got some bullets that match that .45.  Then not only does he remember firing the .45, but then he remembers how he fired it, where he was when he fired it. Does that sound consistent?  These are the locations and these are demonstrative -- these are not in evidence. These are the locations that John Hamilton -- this is the top view where he says where he was when shots were fired.  This is a view from the house.  If you remember, he says the first shots went in the windshield, they came from right -- from his right to his left and he even admitted that they become from the back of the house or back behind the cabinet.  Possible?  Not according to Iris Dalley.  This is where he placed the car.  He placed it.  John Hamilton placed this car with the dowel rod on it.  After he put the dowel rod on, shows that going right back here to the back of the house.  Thirty eight inches, he measured it.  And if you do the calculations, it's roughly about seven feet, eight feet.  I asked him to go along the same trail they went on with the dowel rod in the car.  This is where he came to.  This is where

4316

the dowel rod where the trajectories show that John Hamilton first received the shots. And even though it doesn't agree with what John Hamilton says, if you'll look and you pay attention to the other people, you'll see that just about everybody else places the car, the Bronco, the white unmarked Bronco, in about the same position when the first shots were received.

You have a concern about his memory or his ability to recall what happened? You should. John Hamilton is a good trooper, but John Hamilton was the team commander. This was his plan. He was the first in in the unmarked Bronco. His friend was sitting in the passenger's seat. He was the driver. He was the first to see Toby Barrett. And if we can go back, he was the first to see -- he was the first to see Toby Barrett and he says he saw Toby Barrett when he was right here, somewhere right past the gate he saw Toby Barrett. And yet, he continued on down this road, down here, and came back up when he knew that the plan that had been developed was not going to be able to be carried out like they planned it, and they didn't have a contingency. He drove into the fire with a passenger in the line of fire. If he received the fire out here, he could have turned that way and gone into the field. He would have been away from the fire. Eales would have been away from the

4317

fire.  He came up, he continued on into the line of fire.  But not only did he come into the line of fire, he drove right up -- he doesn't want to say he got to the porch, close to the porch, but he doesn't ever want to say that he touched the porch and that's important.  But he drove right up, according to everybody else, that car right on the porch.  Some of them said he hit the porch, some of them said he touched the porch, some of them said it was so close they couldn't tell.  But he's right there at that porch with Eales in the passenger's seat.  He didn't follow the plan.  According to Pettingill, the entry team -- depends on which part of the plan you want to listen to.  But according the Pettingill, the entry team, those first three vehicles, were supposed to be turning on their emergency lights on right down here.  He didn't have his emergency lights on.  What's the importance of the emergency lights?  They identify law enforcement.  What's the importance of the black and white?  It identifies law enforcement.  John Hamilton didn't do that.  That was part of the plan.  That was part of his plan.  He was the lead vehicle and he didn't do it.  He had his lights on high beam and he drove to Toby Barrett who was some place out in here.  He drove toward Toby Barrett and then turned right in and came into the house.

I'll submit to you that the shots that occurred

were right there when the car was at the house.  Those were where the shots occurred.  There's not one shot, there's not any physical evidence, that occurred at here at the yellow flowers.  Iris Dalley.  As much as Iris Dalley doesn't want to agree with me on anything, says it's consistent that the shots were right there.  Raymond Greninger is -- comes in next.  Everybody was to turn on their emergency lights even though there's no requirement, no obligation.  But Raymond Greninger says that when you come in off that -- in the entry, you're supposed to turn on your emergency lights.  Raymond Greninger says when he came across the ditch, that's when he heard the firing, from the time he hit that ditch until this point Raymond Greninger doesn't remember anything.  He has a memory lapse.  But he places Hamilton's car right here.  He places his car right here. If you'll recall, John Hamilton testifies that he gets out of his car and goes back here and then comes back up and then fires his .45.  He had to remember that he fired his .45.  Fires his .45 from this point into the house. Greninger testifies that he saw Hamilton go up this way and fire the .45.  So the question is whose memory do you go by?  Do you go by Hamilton who didn't recall it until somebody told him about it, or do you go by Greninger who said he has no memory of being there until he got up

4319

here?  That's the problem, ladies and gentlemen, because you're going to have to use their memorize.

Steve Hash says that he first heard the fires -- shots fired as he was coming out of the ditch. He says the first shots were coming out of the front door.  He just saw smoke and flash and he saw a flash from the door.  But he didn't see anybody.  Didn't see anybody on the porch out there.  This is how Steve Hash says the cars were, when they ended up.  You'll see Steve Hash's car west of the top of the yellow flowers, Greninger's car here and Hamilton's car here.  This is another view of same picture.

Then we have Danny Oliver.  Danny Oliver comes along when he first started hearing the fire, he says -- contrary to what Steve Hash says, he says that Hash hadn't got into the ditch yet and he says Hamilton's up here by the house and Greninger is out of the ditch coming around to where the yellow flowers are.  Quite a variance as to where the shots were first fired.

Then you come to Hise.  Gene Hise.  He says these are where the first shots that he recalls seeing being fired.  And where is that?  It's about where Iris Dalley says -- or John Hamilton placed the car once the trajectory patterns were in the car where Iris Dalley -- Iris Dalley's determination.  Robert Darst, same point.

4320

This is a major -- Robert Darst says this is where he first saw Hamilton receive fire.

So, what's the point of all this? There are differing viewpoints as to where it occurred. There are differing viewpoints where all this occurred, and that's understandable. But the basic idea is that the firing occurred when the car was somewhere in this area. That's when the first fires occur. The people that were the closest there, not one of them saw anybody on the porch. Not one person of the people that were closest to there saw anybody on the porch. The best that they can tell you is that they saw a muzzle -- that's Danny Oliver who happened to be further away -- that they muzzle, smoke and fire coming out of the front door, but nobody on the porch.

Now, you have Kerry Pettingill. He comes up here and the problem you have with Kerry Pettingill is this: He's the furthest one away from anything. He's way over here. He's looking across. There's some cars here, although not all those cars are there. There are some cars there. He's looking across through here. He's the furthest person from the incident. And he says, yeah, I saw a silhouette. And something amazing about the silhouette is he didn't see that silhouette until three and a half years later after Jim McBride says,

4321

yeah, I saw a silhouette over here.  Three and a half years later Kerry Pettingill comes up and says, you know, I saw a silhouette.  Before that, it was always I saw smoke, I saw fire, I couldn't distinguish anybody.  But then three and a half years later, lo and behold, Kerry Pettingill can see a silhouette.  And the silhouette, though, is -- like Jim McBride says is firing, Jim McBride says from left to right in a southerly direction.  That's where -- that's the area where that car was.  Jim McBride puts the car here first, then over here first.  But again, it's in this area that the car is being fired upon, not back out here.  And Jim McBride and Kerry Pettingill, I will admit, both say they see a silhouette.  They say that silhouette -- some party may be on the porch.  But the question is, if that silhouette is on the porch and if that silhouette is firing in a southerly, left to right, where are the shells?  Where are the casings?  There's no physical evidence to support that.

There are some common matters that we can find even though there are some differences as to where the firing occurred and how it occurred and all that stuff.  But there are some common things.  The assault plan -- I call it assault plan, they want to call it an execution plan or a serving a warrant.  But the assault plan assumed that Kenny Barrett would be asleep and that he

4322

will be alone. There's no contingency plan. And the practice and the procedure in the previous matters in this was that all the entry cars, all the entry cars, would turn their emergency lights. And then in this plan, all entry cars were to turn on their lights.

Hamilton's lead vehicle, the one that is going in there and making the first attack on this place, is unmarked, does not have his emergency lights on. He's not identified as law enforcement. The first shots occur when the Bronco was moving toward the house or near the house somewhere in the location. That's where that Bronco ended up, somewhere in that same location is where the first shots fired occurred. And the shooter was inside the house when all the shots were fired. This is upheld by the physical evidence. And the other final thing on the common matters regarding this plan and this execution was that each and every one of these highway patrolman discussed this plan, the execution, and what went awry as a group. They discussed it on more than one occasion with the highway patrol deputy chief, Deputy Ricks. They discussed it with Horn and they were on many occasions together themselves to discuss this.

The investigation. You can't really determine the exact truth beyond a reasonable doubt because there's a lot of problems with this investigation. Mr. Smith

4323

will go into some of them.  I heard plenty of times during this trial from some particular agent of a law enforcement agency that there was an agent there to maintain the integrity of the crime scene.  If that has been said one time in this trial it has been said 20 times.  Somebody was there to maintain the integrity of the crime scene and to keep all the unauthorized people out of the scene.  Well, who out there was unauthorized?  I never understood who was unauthorized.  People are allowed to go in that scene.  Immediately after the incident there was all law enforcement people there.  The highway patrol had eight people there.  Eight people left there.  After Hamilton left, after Eales left, after Hise left, there was still eight people of the highway patrol.  The sheriff's -- Sequoyah County Sheriff's Office, they had six people there.  The drug task force had four people there.  The D.A.'s office.  Why was the D.A. out there in the first place?  The D.A.'s office had two people.  At least 20 people were out there at the scene.  All the law enforcement.  And they were all there to maintain the integrity of the crime scene.  And the largest piece of movable evidence moved 20 feet and not one person is here and can say anything about how it moved and who moved it.  Somehow, just poof, it moved.  That's a problem.  Nobody knows how, why or who moved it.

4324

But it did.  Ben Rosser, the case agent, now he was there after it was moved.  But he's the case agent.  He says nobody saw the Bronco move nor nobody saw somebody drive the Bronco.  Something is not right here.  You know, use your common sense because you came here with it and think about it.  At some point they may try to -- you know, some indicate, well, it got shot and lost its transmission fluid.  Because it lost its transmission fluid, it just rolled back.  That transmission fluid is not going to cause it to roll back.  It doesn't -- loss of transmission fluid does not make a car a freewheeler.  If anything it would be harder to move with a loss of transmission fluid.

Common sense tells you that the keys were removed because Greninger had to try to open the back door, the back window.  To do that you have to remove the keys.  The car would have to have been placed in park.  If the car was placed in park, it's not moving.  Transmission fluid, no transmission fluid, it doesn't make any difference, it's not moving.  Then even if you get to their viewpoint that it's a freewheeling thing, it just started moving on its own, well, we've got this model here that is supposedly to scale as to elevation and everything and if a car starts moving and as it moves down, it doesn't come down to a place that's level or

4325

uphill. If you'll look at this, the more you get down here, the slope is greater and greater and greater. That car wouldn't stop if it was moving on its own. Somebody either moved that car, or once it started moving got in and stopped it. Why? Why does anybody want to move that car? That's tampering. You have 20 some law enforcement people out there and not one of them sees it. The movement had to have occurred after Eales had left because -- if I can find it here -- because there are items under that car such as the shield, helmet and stuff like that, that came off of Eales. And that car had to move after Eales was there or the car would have ran over Eales. So we know the car was at the porch, Eales left and at some point in time somebody or something caused that car to move. And you have all the law enforcement out there. And that's their duty. That's their job to look and see and find out what's going on, and they sure haven't told you about it. The movement of the Bronco affected a determination, a proper determination, of the trajectories of the bullets in this case as far as where they came from. Because while we have been putting the Bronco in certain locations at the porch, in truth and reality, we don't know where that Bronco was except it was somewhere close to the porch. If I may come to the model?

4326

THE COURT: You may.

MR. HILFIGER: If you'll notice, when we put the Bronco there, do we know that the Bronco was at that angle? Was it at this angle? Or, as Iris Dalley first placed the Bronco, when she came down and placed it, she placed it like that. How do you know how that Bronco was to that porch? We don't. And why don't we know? We don't know because the Bronco was moved at sometime after people were there, placed there, law enforcement people placed there to maintain the security of the crime scene. The only person that has come forward and has acknowledged any kind of knowledge as to the Bronco in this movement was Kenneth Wilson. And he said that he was out there with Kelly Karnes somewhere in this point over here, with Kelly Karnes, who had Kenneth Barrett. And the Bronco was at this point and someone said move the car or move the Bronco. There was a trooper somewhere around here, there was a trooper on the porch, and he said move the car, move the Bronco. Someone else says -- or Kelly Karnes or someone else says, no, we need the cover. Kenneth Wilson then left to go around to the west side of this house and the Bronco was moved. Why?

The rest is this investigation -- we'll come back to the why later. The highway patrol did its own internal investigation. The troopers association's

4327

attorney, Gary James, a private attorney had written statements from the troopers, not all of them but from some of them, that the troopers had written and he took those statements and he kept those statements and did not share them with the OSBI.  In fact, OSBI wasn't even aware of the existence of those documents until 2001, almost two years, after OSBI had finished the investigation.  Now, why would Gary James be able to hinder the investigation by having the information from the troopers there that they had taken and given on that night?  The highway patrol didn't even inform the OSBI that there was a tape recording that they had taken of Manion.  The investigator had a tape recording in which he talked to Manion about the incident.  And not after Manion died, we found out the tape recording had been destroyed by the highway patrol.  OSBI did its own investigation without the sharing of the information from the highway patrol in the troopers' association.  That's not right.  Somebody appeared to be protecting its own here.

There's the snitches.  And I call them snitches, sort of the common vernacular.  These are the people that testify against -- you know, so called friends of Kenneth Barrett came in and testified.  These are witness that came to say now that from a few days to

4328

a few months to many months to maybe a year before this tragedy they had been to Kenny Barrett's house and they were pretty consistent with three statements. They did drugs there, although the line or so -- you may not agree with it, but it was sort of like the deal, you know, come on over here and let's have a beer. They did a line. That's not right. That may not be legal. But that's not what we're talking about here. He knew he had a warrant for his arrest, that's the second thing. And there would be a shootout and he wouldn't be taken, again, without a fight. It's just too convenient. Each one of them come up with three same kind of statements. Well, one thing that you did find out is -- from the snitches, you did find out that each of them, practically each of them, have records. Each of them had drugs or doing drugs and each of them admit that as to their minds that they don't necessarily function correctly at that time. Their memories were sketchy because of the drug use and the passage of time. And all -- I believe this is right. All only within the last year or so, five years after the incident, make themselves known.

And as to Kenneth Barrett's characteristics, one of the things that they have pretty much agreed with, if not all of them, is that Kenneth Barrett sort of has this paranoia. I'm talking not talking about paranoia in

4329

the sense of an illness, I'm talking about paranoia as we use it in common sense, that he has an unreasonable distrust and suspicion. And that if someone's coming up to his house, that it wasn't unusual for him to grab that rifle and go out and see what's going on. That's something he did, not when the police came up, but when someone unusual came up, it wasn't unusual for him to grab his rifle and go out there.

Then would it be unusual on 12:30 a.m. September 24th, 2005 when Kenneth Barrett is in his house and the noise the car causes him to grab his rifle and check the charge, check the charge, pulling that back, and when he checks the charge, what happens when you pull that back? If you have a projectile in the chamber, it pops out. There's a projectile in that southeast bedroom. And he proceeds to the living room. And as he's going to the front door, his view of the front door is like one of these. It's not this big, wide expansive view of the whole area like you see -- like you can see in the area of the photos, but it's this view right here. As he looks in the door, comes out that bedroom and looking out, this is what he sees at night, 12:30, no lights on. He sees a white, unmarked Bronco somewhere in that area coming through his yard. And is it unusual for him to be -- see that car there? Yes, it is. No

4330

identity on who that car is.  And not only that, that car is heading this -- right across this yard to him.  And then as he shoots, it comes -- doesn't stop, doesn't go away.  It comes directly in toward his house.  What he did next and what occurred next may not have been reasonable, I'm not saying it's reasonable, but it was not done with malice aforethought, and it wasn't done with premeditation and it wasn't done with any knowledge that that was police.  That unmarked vehicle had no emergency warning signals, no recognition that there was a law enforcement officer in there.  He fired.  The car kept coming and coming and coming with his headlights on, probably on high beams, right up to the porch.  And then right there on the porch -- right there on the porch this is what the best with lights -- this is in the light of -- see, this is the best of what Kenny Barrett could see. This is the reenactment of the individual, how he's holding the shield.  And what there identifies that person with law enforcement?  That's what Kenny Barrett sees.  The door opens up and he comes out.  Kenny Barrett's got $2100 on him.  Does he think it's law enforcement?  Does he think it's somebody that's going to rob him?  He's got $2100.  He know he deals in cash and he knows the people that he deals with know he deals in cash and some of them may not all be real honest people

4331

because you heard some of the snitches.  This is his view of what he sees and the guy's coming out of the car and, yes, he opens the door to get out and he fires and he fires.  And then the next thing you know is the driver throws something out of the window and he fires and fires.  But he stops firing.  He's got 12 bullets left in that magazine and he stops firing and goes back to retreat to his bedroom and at that time he is shot.  This doesn't show malice aforethought.  This doesn't show premeditation.  It shows the reactionary shooting to an unknown attack and a car attempting to ram his house.

The plan, you heard that's there's some fallacies in the plan.  And, yes, there were some fallacies in the plan.  There's no written plan.  Containment could have been considered, but it wasn't.  There's no contingency plan.  There's no plan for medical units' availability.  Did it make any difference in this case?  No, it didn't.  But the point is, they didn't make that kind of plan.  They didn't put that into their plan.  There was no written plan.  There was a lot said, well, what good would a written plan do?  You heard some people said, well, these people were supposed to turn on their lights.  All people were supposed to turn on their lights.  They're supposed to turn them on at this point.  What difference does it make on a written plan?

4332

Everybody would know what the plan is. There's no contingency plan, there was no inventory check on the ammo. They didn't -- Pettingill didn't seem to think that was important, and yet Chuck Choney says, yes, he personally checks the ammo.

And, one final thing. There's no tactical reason to make that execution at that time. The reason it was done was a purely personal reason, and it has no play in the law enforcement. The tactics should have been involved, the tactics should have been considered. Like McBride said, we first thought we were going to do it five a.m., but then they wanted to do it at 12:30 so Eales could go home. And both Hamilton and Hise said that the intelligence could be better, and that Hamilton says from now on we do our own intelligence. So were there faults in the plan? Yes, there were. Was the execution proper? No, it wasn't. There was things went wrong. And because things went wrong, that caused the problem because they didn't identify themselves. Once they were known, they should have been identifying themselves rather than coming in and going toward this house in the manner they did. There was no premeditation here, there was no malice aforethought and there was no identity of law enforcement.

Now, one last thing I'm going to show you. And

4333

this -- if I may approach?

THE COURT:  You may.

MR. HILFIGER:  Is my demonstration of what Iris Dalley shows this car to be.  And it's looks bad, doesn't it?  It looks bad.  There's a lot of shots there.  But you look at this.  When this car is out here, there's no shots that could hit that trajectory.  The shots that hit that trajectory are when they're here and when it comes all the way up to here.  Okay.  There's 18 shots.  Two shots come right here.  And those two shots I'm going to talk about.

Just like Mr. Littlefield has his 19 bullet theory -- and it's only a theory because he doesn't know how full that gun was.  He says it was 30, 30, 30 plus one in the chamber which means that when he hears a car coming in off that -- through that ditch, that Kenneth Barrett goes down there and loads his magazine up, puts one in the chamber, takes the magazine out and puts another one back in and then puts it together.  That can't happen that quick.  No.  What happened was there's probably 30, 30 and 30 had been loaded in the magazine, some previous time Kenneth Barrett had charged that gun and put it in the chamber.  So there's 30, 30 and 29. And then when he hears that car coming in, he grabs that rifle from that spot in the bedroom.  He doesn't know

4334

whether he's got one in the chamber or not, so what does he do? He charges the gun. When he charges the gun, one ejects to the shelf and now he's got 30, 30 and 28. And he goes out in that living room and sees that shot that you're seeing of the car coming up and he fires 16 shots. All 16 shots are found in the living room. And then he is shot and they come in. But where did the other two shots to the car come from? Let's talk about Manion. Manion is -- let's go to 69, please. Manion, if you recall, has come up and he's back where the Bronco is and then he goes around. Have to get another one. Government 174. Manion is back here where the Bronco is and then he goes around here to the pickup. There's fire coming out that door. He says he sees fire coming out the door. And so, I would assume that Manion is not walking, that he's running. We know that he shoots one shot that goes down that porch. We know that Manion's gun is either on automatic or three burst shot. We know that Manion, if he follows their setup is loaded with 31, 31 and one in the chamber or 31 -- 30 and one in the chamber which is more than likely. Fills the magazine, charges his gun, so he gets 31, 30 and one in the chamber. And afterwards, that MP5 had 31, 20 plus two jammed in the chamber for a total shots taken by Manion of nine or ten. Let's go with nine, because I don't

4335

agree with a fully charged that they have the magazine plus the chamber. I'd say the magazines were charged, he charged the gun, magazines were full, he charged the gun, takes one out of the magazine, you got one in the chamber. So that would give him nine shots. You see on here, Defendant's Exhibit No. 26, the only difference between it and Government's 39 is the colors, color coded. You see here Manion says he's over here shooting and he shoots five or six rounds. But for some reason, there's only three casings over here. But there's two casings here. Now, if the gun has a consistent ejection pattern, as Manion is going from this place in this area to over here, he shoots down this porch line. If his gun is on automatic or burst, he's going to shoot more than one shot. The casings indicate he shot at least two. I'm telling you that I think that he shot three shots, three groups of three bursts each. One as he was going from this place to this place or when he got out of the car and he got out of the car and over this way, one of the two, in this area he shot a three burst shot. One projectile went here, one projectile went, number one, to the Bronco and one projectile went, number nine, in the Bronco. He was running. He was moving fast. He was trying to provide cover because he saw somebody shooting back in here. He was trying to get around here and he

provided cover.  He wasn't caring about what he hit.  He was providing cover.  He comes over here, does his three shots.  Three shot burst, comes back here, takes two three-shot bursts.  Remember Iris Dalley says it could be five to six shots.  And that's why you have 16 in the car that have the right to left angle and two of them that are just about 90 agree angles right there.

Why do they move the car?  One of two reasons.  Manion was there, Pettingill was there.  And they may -- one reason.  Manion realized that he had made that shot.  But why didn't he tell anybody?  He never told anybody about shooting that.  You know, and Dalley says there's no way that that bullet out there could have come from there.  That had to come down this way.  So Manion never either didn't realize he did that shot, which is unlikely, or realized -- realized it was a mistake.

Pettingill.  Pettingill is the manager of this group.  This is the first time that he has ever done a no-knock any time search warrant at night.  And Pettingill or Manion are concerned about that car being on the porch.  Manion for his reasons, he did those shots.  Pettingill, because it looks like that car is going to ram up into that house to give reason for Kenneth Barrett to shoot into that car.  Ladies and gentlemen -- but you listen to their -- about where those

4337

casings were and how they jumped around.  They can't show 18 or 19 casings within an area that forensics say they were in the vehicle.

Again, we ask that you follow the instructions and the interrogatories.  Kenneth Barrett did not commit murder malice aforethought and premeditation as charged in Counts One and Two.  And as to Count Three, it's readily apparent that he had no knowledge and did not know that the people in that unmarked white Bronco were law enforcement.  The police are allowed -- the Government will have the last word in this argument and we'll not be able to respond.  And now I turn it over to Bret Smith.  Thank you.

THE COURT:  Mr. Smith.

MR. SMITH:  Your Honor, may I retrieve some items?

THE COURT:  You may.

MR. SPERLING:  Your Honor, a juror is needing water.  May we provide it?

THE COURT:  Yes.

MR. SMITH:  Your Honor, counsel, Mr. Barrett. Ladies and gentlemen, I, too, want to thank you all for your service.  It has been a long period of time.  You have been very attentive.  You've listened to an awful lot of detail.  Some of it, I know, is very hard to sit

4338

through.  And you all have been patient and I appreciate your consideration.  It is very hard for me to see folks like you outside of this environment and not say something to you.  I've seen you at Wal-Mart, I've seen at Malon's, I've seen you at other places.  Elevators.  And I don't like that.  Maybe someday we'll be able to visit about things, but unfortunately during this period of time we're prohibited.  I hope you understand that and I brought that up to you during voir dire because that is important.

What we are hearing today an awful lot like what we have been hearing for the past five-six weeks, which there's two sides to every story.  Whenever I heard the Government this morning, I was wondering if I sat through that portion of the trial.  I'm going to try to be accurate in what I tell you today, but now you also need to realize, in all fairness to Mr. Littlefield, when we're inquiring of a witness, we don't always get their answers written down as we're asking them the questions.  So sometimes we think that's what they said and that can be some of the difference that could come up.  But I'm going to try to be accurate because I don't want to misstate anything.  But I do want to give you my version as to what I think has occurred in this flawed investigation.

4339

I want to talk just a little bit about the informants. I'm going to try not to duplicate what Mr. Hilfiger has already told you. But Randy Turman is one of the first individuals to come up here and he's the fellow who would not visit with us. Six years after this crime he didn't have a thing to say to the defense so we could check his story out ahead of time as to whether or not what he was saying was the gospel. Now, Mr. Turman, as he corrected me, was out on $120,000. Then he incurred some new charges, still outstanding, that he filed a $98,000 bond. This is the type of fellow who's probably not going to sit down to the Thanksgiving table with you all. He's been convicted of possession of CDS with intent, possession of a precursor substance, possession of firearm while in the commission of a felony and possession of a firearm with an altered serial number. Ladies and gentlemen, those are all charges that can be brought in federal court. Do you think there was any pressure put on Mr. Turman to tell a story? Do you all? Now, he told you that he was seeing some other people at the Barrett household. He couldn't remember names. He couldn't give us details. And then he also didn't know where they would necessarily obtain their drugs. And then it was about three or four months before this incident whenever he believed that he was there at

4340

the cabin and said he never saw Kenny Barrett mix drugs or cook.  I didn't get the same story that Mr. Littlefield did, that he was cooking drugs back there in that corner of the house.  I had in my notes that he never saw him mix drugs.  But I want to put up Government 65 for you because this was a reason Mr. Turman was out there at the household and it was to paint a Mustang that he had brought out there for Kenny Barrett to take care of.  And I asked Mr. Turman.  Remember when we looked at the items that were in Kenny's work shop.  He identified this as paint.  He identified these items as being associated with an automobile painting operation.  But he also identified that can right there.  That silver can that I'm referring to is automotive spray -- paint spray can.  He also told you that he was out there where, actually I asked him the question reminded him of it, that he was out there whenever he was being -- one of his bonds and I think this is the one that was $98,000 on a charge currently pending.  That he sold some items to Kenny Barrett.  Maybe, well, some car parts and a -- and that Kenny Barrett paid him some $200 for those items. That is a reason why he was there, not for the -- reasons they wanted to come tell.

Travis Crawford, cousin of Kenny's lived down the road.  Remember, this is the guy that had a child

support and in his words out the yazzoo.  Do you think it would kind of hard to put a little pressure on fellow like that when you say, you know what, you've got child support problem.  He's got one.  So he comes into court to talk with us.  What did he tell you about Kenny Barrett?  He said one thing, he was a good mechanic.  And do you remember when they were asking him about how many of your family or your folks?  Do you remember he got kind of agitated on the witness stand?  That he took offense to the fact that the references have been made this is a Barrett relative living in that area are something other than honorable?  Because he knows his answer is -- and that's not how they perceive themselves.  That is not how those folks are.  The problem with Travis is, he said he went outside with his dad.  And I can't remember which one of them smoked.  I think his dad may have, but he didn't.  But anyway, they go out, somebody's smoking and he sees this Bronco goes by, he recognizes it as law enforcement, so he says.  He goes down to the gate where he says Kenny was and he talked about Kenny closing the gate.  Ladies and gentlemen, that's not what Mr. Hamilton told us.  What Mr. Hamilton told us was clearly as they were going by to do the drive by, the gate was closed.  I don't know if we can believe -- well, let me put it this way.  You have to take that into

4342

consideration whenever you determine the amount of weight that you should give to the testimony of Travis Crawford. I do think he gave us a glimpse into the life of Kenny Barrett.  Hunter, he fished, a good mechanic, built that cabin with his own two hands.  And by the way, that cabin, you've seen it.  You've seen pictures, you've seen this model.  Does that look like something where there's a multi-thousand dollar drug operation going on in there? Do you see evidence of that sort of activity?  What do you do with it all?  Not put it back in the cabin, obviously.

Let's talk about Randy Weaver.  Randy Weaver was the fellow that's working in the tattoo shop over in Fort Smith.  Mr. Littlefield comes to see him.  He says I understand that you've been previously convicted of a felony.  I understand that you have sold ammunition to Kenny Barrett, a violation of federal law.  That's not why I'm here to talk to you.  I don't really care about that.  But what I do want to know is about Kenny Barrett. So what did Mr. Weaver tell us?  He said that he had been out there at Kenny Barrett's and his interest out there would be to look at a vehicle and he'd only been out there two or three times, that he had known Kenny from when Mr. Weaver was in high school.  I think he graduated about in '82.  Kenny was a couple years older than him.

4343

So he had known of him.  He wasn't a regular out there.  He also told you something, though.  He said Kenny Barrett did not greet him with a rifle when he came pulling up through the gate, not through the side yard in the wee hours of the morning in a strange vehicle -- through the ditch, but pulling through the gate.  He didn't tell you about every being threatened by Kenny.  He did tell you that Cody Hise was a good friend of his.  Cody Hise was an as Oklahoma Highway Patrolman.  Works drug intervention.  Is that why he's here?  Is that why we found out about him after six years?  I don't know.  Something you might need to ask yourselves.  He did tell us he wasn't around Kenny Barrett hardly any at all.  So what does he know?  He doesn't know that much.

Cindy Crawford, Travis's now wife.  She says she did drugs over at Kenny Barrett's.  She didn't know who supplied them.  It may have been the summer of '99, but as is common with people who do methamphetamine, they tend to lose track of time.  She wasn't sure about the time, but that's when she tends to think it might have been.  She talked about Kenny making a comment about going down in a blaze of glory.  You remember I did the old deal about you -- drug user run their -- you remember her carrying on a little bit?  Yeah, I talked to people running around.  That's what these drug users do.  They

4344

talk a big story.  The bravadoes.  Let's make a big deal out of something.  That's how she dismissed it.  That's what she thought was going on.  She didn't tell you Kenny Barrett was a bad person.  What she told you was that she took that as an offhanded remark.

Karen Real is the lady that got busted in a manufacturing operation while she was living over on the lake.  And she told you she had a boyfriend.  She'd come over to Kenny's.  And usually when she'd come over to Kenny's it was because she had been kicked out of wherever it was that she was living.  She told you that Kenny Barrett never turned her away.  That's the sort of person Kenny Barrett is.  She was struggling to remember was it a year ago when I was out there, was it December of '98, was it January of '99?  Gosh, I don't know.  But she did tell us that Kenny Barrett never cooked dope. She said she thought Kenny Barrett sold drugs but that she never saw the transactions.  She said that Kenny Barrett might have had dope, but it would be a small package that he'd keep in his pocket.  She said that he worked on cars and she didn't know if he made his living that way.  Why does she not know?  She really wasn't around that much.  And when she was there, she was probably in a distressed situation, otherwise she wouldn't be in a place to put her head down.  Who gave

her a safe place to do that?  Kenny Barrett.  Now, she went to prison.  Got convicted in this court.  She didn't expect anything for her testimony.  That's kind of hard to imagine.  Surely she expected to get some of her time cut off.  Does that give her a reason to be in here and testify?

Let's think about Charles Sanders.  He was the confidential informant.  The confidential informant that was never revealed in this case.  Never revealed to Mr. Barrett until shortly before this trial.  Mr. Sanders is constrained now by the Department of Corrections.  He expects to do 18 months on a 20-year sentence.  That he disagreed whether it was 11 convictions that he may have had, but he said ten of them for sure that he knew he had.  He's the fellow that worked for Clint Johnson during the day while he was out committing crimes at night.  Kind of gives you a pretty smooth cover for whatever it is that you want to do, doesn't it?  Let me find some information for you.  Remember, he's the one that Clint Johnson said, you know, I'm kind of interested in Kenny Barrett.  Would you go out there and see what you could find out what the talk is.  See if you see any drugs being cooked out there.  See if you see any guns out there.  Why don't you just go out there and see what you can tell me.  And he told you about the two or three

4346

times that he went out there. He said he never saw Kenny Barrett cook methamphetamine. He did tell you while he was doing all this stuff for Clint Johnson that he was going drugs himself. So does that affect his judgment and his recall? That's something for you all to decide. He said he never did tell Clint Johnson about Kenny Barrett manufacturing drugs. In September of '99 Clint Johnson wanted to know what Kenny Barrett was doing. See any drugs, sell any drugs, cook dope, guns? The only thing Sanders said to him, he saw guns. No manufacturing. He went out there with a female, you may remember some of this testimony, to get keys to a vehicle. Sometimes between this guy -- like to give us the range of what he did. His range on this was from September the 5th to September 15th. No dope manufacturing. Clint Johnson didn't ask about dope, he said he didn't tell. He said he didn't see Kenny Barrett do anything. Then Clint Johnson wanted to know if Kenny Barrett would kill a policeman that came out there. That's when he came back with the story, well, there's some talk. We had a conversation about Johnny Philpot. That could have been in July. He wasn't sure. Went back out there with a nephew of his, talked to Kenny about a truck, had a pop, said he smoked a joint. Kenny took a couple hits off it -- got pot. Didn't see any drugs, and

4347

they left.  Again, Clint Johnson wanted to know, been to Kenny Barrett's, any guns, any meth, any manufacturing. He didn't tell us that there was.  Kind of makes you wonder what he might have told Clint Johnson.

Brandie Price is one that came in here that was asked about methamphetamines, asked about firearms, possession of a firearm, uttering a forged instrument, which is putting somebody else's name on something like a check.  Knowingly concealing stolen property, a thief, possession of stolen property.  And she told us about her sentences.  Ten years, seven years, five years, one year, all running concurrently.  She's going to do 18 months in jail.  She said that she drove through that ditch in what she described as a Mazda.  A Mazda car, not an SUV, and drove it through that ditch.  Through the ditch that Mr. Hash when he went through there disabled his vehicle. Collapsed the springs on it.  She said they drove a Mazada through that ditch off to the east side of the property.  No favors, no deals.  She's just up here because she got a subpoena.

Now, Ronny Baldwin was one that we brought in because she brought -- what did Ronny Baldwin say?  Yeah, I was messing around with Brandie.  He didn't call her a girlfriend, called her an acquaintance.  But said my recollection is she didn't have a Mazda, but she had a

4348

Mitsubishi. Said it's a sports car. He didn't deny whether or not he may have been driving it. Couldn't remember her being out at Kenny Barrett's with him. But he did deny ever coming through that piece of ditch whether it's in a Mazda, a Mitsubishi or whatever. He said when he would go out to Kenny Barrett's, if the gate was closed, he'd climb over it or climb through it or turn around and go back where he came from. Not what Brandie Price said.

Now, I want to shift focus a little bit. I want to talk about what I call the non-drug evidence. In other words, where is the dope? And again, I ask you does this look like an multi-thousand dollar drug operation that's been portrayed to you here today? Juan Beal testified. And I want to put up Government's 69 real quick. He's the only one that told us and, ladies and gentlemen, I realize it's been six years. We all have a lot going on in our lives. If I asked you what you were going on September the 24th of '99, it would surprise me if you could tell me. But if you opened up a packet of paperwork that you had and had a date on there, something may they will you, oh, yeah, now I kind of remember. That's what I did six years ago. It's understandable. A lot of these people testified not from personal memory, but from what their paperwork tells

4349

them.  When they do testify from personal memory, sometimes they're inaccurate because Mr. Beal was telling us that in this area right here by the gate as far as he can go that there's crime scene tape up in that area. Nobody's ever told you all that.  He was the only one. So does that cause you to wonder about maybe they can be inaccurate in some of the other things that they're telling us?

I want to talk about the trailer real quick. The trailer where the wallet was found with the driver's license of Toby Barrett, where the address that was found that had the Oklahoma Highway Patrol warning ticket made out to Toby Barrett.  Inside that address book was account information with Toby and Abby Barrett's name on it.  Nothing in that trailer identified it with Kenny Barrett.  Inside of that trailer were found two sets of scales.  When they talk about two packages of pseudo sixes, small paper packet with six pills each.  One ziploc contained no CDS.  One ziploc that contained .018 grams of methamphetamine.  I'm going to ask that Government's Exhibit 73 be displayed to you.  I think it was Mr. Skowronski that I asked what is .018 grams.  Give us something that we could visualize.  He said two or three grains of salt.  Three bottles of -- or excuse me. Number three was a bottle of pseudo 60s that had residue

4350

in them.  And then not listed on here is a straw which they later found inside the address book some four years later that essentially had residue in it.  Out of all these viles found in the trailer .018 grams of methamphetamine, equivalent to three grains of salt found in the trailer.  I'm going to say nothing ties that to Kenny Barrett.  Disregard it.

I'm going to put up -- talk about the items in the trash dump.  Put up Government's Exhibit 160.  Inside of that they said they found some red stained towels that had meth residue on it.  They found a ziplock bag that tested positive for some sort of red phosphorous residue.  And an iodine bottle that was empty and a pseudoephedrine bottle that was empty.  They couldn't confirm the iodine out of the residue.  Now, I don't know about you all's trash.  I don't know the neighbors that you might have next to you.  I don't know if somebody could walk up and access your trash can.  But I know at any given time if the Government agent came up and looked in my trash can that's outside, that anybody could go look through and put something in.  I might even be responsible for what's in there.  And if they did accuse me of having something in there, said it was mine, said I was engaging in a manufacturing operation, then I would expect them to have a little something to tie me to it.  I would expect them

to find -- on something.  I would expect them to find some trash in there to have my name on it.  I would expect them to find something that says that's mine.  That's not something that somebody just eased up and slipped in there.  I want to show you Number 61.  We talked about different items that you can or cannot get fingerprints off of.  We're going to talk about that in a little bit.  One of the fingerprints -- off a piece of paper.  Some of things you might not think caught when you can.  But items that you do think you can get a fingerprint off of would be a metal box, Coleman fuel.  Now, that in and of itself doesn't mean a thing.  They're going to tell you that's part of the clandestine laboratory.  You know what, there's not a thing that ties anything in that trash can to Kenny Barrett.

Now, there was some plastic tubing that was found in the workshop and they said this plastic tubing had residue in it that was consistent with methamphetamine.  One of the ends of the plastic tube was taped up and it looked like it had been used in a gassing operation.  But it was contained in a work box and several other tubes.  And some of them, black hoses like you might use on a radiator hose.  Others were clear tubing.  Various types of tubing.  They can't tell you when that was used.  They can't say that's what it was

4352

used for.  That it was consistent with what it's used with for some sort gassing operation.  But when these agents talked about gassing operations, they'll tell you they expect to find two layer liquids, they expect to find jars that have liquid in there.  They expect to find rock salt, you expect to find acid, you expect to find lye.  None of those item were found.  None of them were found.  Other than that, you've got the short pieces of tubing.

Now, I want to talk a little bit about the ephedrine tablets that were Exhibit Number Nine as the DEA lists, and these are the ones Mr. Skowronski estimated.  He didn't tell us that he estimated them on us before, but he says that -- your report says I'm going to put it up.  It says 1426 tablets.  It doesn't have EST next to it, estimate, or anything like that.  It's got a specific number.  Does that really matter?  Well, I don't know.  But, you'd think you'd want to be accurate in what we're doing particularly in something that's as serious as this.  Right above that is a syringe that was found in the workshop.  They said it had some residue in it.  And you remember the question being asked.  It was liquid.  Doesn't that look to you like it was new because it wasn't dried up in there?  Ladies and gentlemen, a syringe is a small -- end of the needle is a small area

4353

that passed through them.  The liquid that's in there is going to maintain.  And you know what they said was contained in that -- tested positive for methamphetamine. They said there was blood in there.  I don't know if any of you all have ever shot or not.  But it's not uncommon to get blood in a syringe.  You've heard of DNA evidence throughout this case.  Did they submit that for a DNA sample?  They had DNA from Kenny Barrett.  They had a blood sample.  Did they test that so they could come in here and say, you know what, here's used syringes -- not only does it have methamphetamine, it has Kenny Barrett's blood in it.  No, you don't have anything like that.

Now, I want to talk about something that causes me some concern and I want to suggest it should cause you some concern.  I want to put up Government's 78 and I want to follow up with Government's 79.  Government's 78 is a DEA 7 that lists what is taken into evidence. Right.  If you can blow that up, item number 11 is what I want to emphasize.  Item number 11 identifies one old camera concealing two plastic bottles with residue.  This is what they're telling you the iodine is.  We're going to try to enlarge this.  While she's doing that, when it says approximate gross quantity, approximate gross quantity, trace.  It says residue down here.  Then it says trace on both of those.  Okay.  I want to show you

4354

Government's 79, referring to the same item, item number 11. Somehow we've gone from trace to net weight of 144 grams. Now, you've heard how these agents describe residue. Residue is something that's not easily weighed. There's not much. It's residue, they say. Trace amounts of drugs are residue. Now, is residue 144.3 grams? That's iodine that they're telling you that was in the camera. That's not what the DEA 7 says. But this chemical analysis report, now it says. Remember, that's one of the three ingredients that you need is iodine. Now, before we get off the camera real quick, I want to talk about the prints Mr. Maberry looked at. The fellow that came in with DEA, he's the fingerprint technician down in Dallas. Didn't find a fingerprint at all on that camera, despite anything that Kenny Barrett -- it was in his house. It shows the picture up there on the shelf. Says it's in his house. But they don't have anybody to come in here and tell you we found something on there that says -- back to Kenny Barrett's. What it says on DEA 7 is trace amounts or residue and then that's changed. Those are the things we talk about reasonable doubt concerns me and it ought to concern you.

I want to talk about the flask. The flask as it was described from the DEA agents said, yeah, it contained -- and the flask was -- they made some big deal

4355

about how he graduated to seller.  You know what I'm talking about, mixing fuel and what have you?  But I also notice another difference whenever we're looking at the fingerprint examination.  I want to put up there Defendant's 217.  This is the Defendant's 217 that DEA, as you learned, when these items come in to evidence, whenever they're listed by the agent, and Craig Nixon is one out there on the scene, he's the one taking the evidence in and assigning numbers to them.  They assigned number 12 to this evidence, DEA 12.  What does that say?  Focus.  Three wads of newspaper, one white envelope, one sealed plastic bag with glass vile, that's number 12.  This is one where he said the white envelope had a fingerprint on it that could not be attributed to Kenny Barrett.  It was not Kenny Barrett's fingerprint.  But that's what he examined as number 12.  Item 78.  78 on the DEA 7 is that flask we were talking about.  Now, is this another problem with their investigation?  Is this another error in what they have done out there?  Of course it is.  There's number 12, pyrex glass.  In none of these DEA 7s do you have anything listed as newspaper.  Do you have anything listed as an envelope?  Do you have anything listed as a glass vile?

Now, I want to talk a little bit about some testimony of Juan Beal.  Before he went to lunch there

was no lab at Kenny Barrett's. Whenever he came back from lunch, well, there wasn't a functioning lab at Kenny Barrett's. That's up to you to try to figure out if there's a difference in what he said. But he did tell us there was no acid that was found out there, there was nothing consistent with the gassing operation of two layer liquid that you would expect if you're in a cook of methamphetamine.

I would like to show Government's 51 and 52 because we talked about the way things are and the way things happened in these investigations. And you know, this might not be a big deal, but it seems to me if the Government's going to come in here and portray something, they ought to portray it the way that it is. This -- 52 is going to come up beside it. This is the -- that was described previously as being in Kenny Barrett's house. That's a crock pot with foil supposedly. Doritos we talked about don't have anything to do with cooking methamphetamine as well as soup, but these paper towels somehow do have. I want to take that down and show you Defendant's 211 because Defendant's 211 is what I showed these agents, asked them what did things look like when you got in there. And they all said, well, I don't know who took that stuff. That's what it looked like when I got in there. Well, do you think that whenever you show

4357

up -- when you show up and look at things that are out on the counter that they then package them up and clean up the counter and put things away? Is that what we would expect? That's not what happened in this picture. I want to show you what Kenny Barrett's house did look like. We got a picture of it. It was taken the day of this incident. That's that kitchen counter right down there. It's kind of dark, I realize. It's -- counter up there where that jar is. That's the hood. You don't see any of those items out there. So can I take items, can I take foil, can I prop it up, pull a crock pot out, put foil in there, throw some paper towels beside -- throw some coffee filters out there and say these are items that are consistent with manufacturing methamphetamine? And stage something? Is that what happened in this case? I don't know. That's for you all to decide.

Remember I asked Mr. Beal how the paint container and he said, yeah, the MSE enamel looks like something that was sealing off consistent with the logo of NAPA, N-A-P-A, National Auto Parts Association. He was asked what do you do when you go into these labs, sometimes you gown up, sometimes you wear a respirator. What did he wear at Kenny Barrett's? Gloves and protective glasses. Obviously he wasn't concerned about there being something in the atmosphere that was going to

hurt him.

Now, Kevin Wilson was the agent that was going down to Brazil. The DEA folks doesn't get involved in cases that go on a raid and come up with nothing. They go to places like Brazil where you find planeloads of dope, ship fulls of dope. That's where Kevin Wilson was going. We'll never -- class that he told us about. But he did tell us there were 35 people out there at the scene. This is what Mr. Hilfiger was talking about. Do you think that might compromise the integrity of the investigation? Maybe compromise some of the evidence that was out there? He's the one that told us that flask was full of -- he also said there was no acid, no alcohol, no salt, things that are consistent with the manufacturing of the methamphetamine.

Craig Nixon, the other agent, is down in Albuquerque now. He's in tech support for TPS surveillance. Microphone technology. They do the wire taps. That's the sort of technology that they have and that they use. This is another thing that caught me off guard. He was contacted days before September 24th to help in a search. He's the only one that said that. But you remember Kevin Wilson said he was contacted about this in the early morning hours. It was an emergency. He had to rush down there 2:00 o'clock in the morning and

then wait around for 12 hours as the sun rose.  Now, Craig Nixon was the one that was receiving these items into evidence.  And he's also one that I asked, you know, did you get any items of evidence as Mr. Beal or Mr. Wilson or somebody getting these items, they can take them out and say, well, get here, guys.  So these other people there around know what's being found or in this case, more importantly, what's not being found?  Because some 18 hours later when there is no red phosphorous out there at Kenny Barrett's residence, we have Stan Philpot who was identified as being out there by Craig Nixon put it in his report.  Then Stan Philpot comes out there 18 hours later with a bag of stuff and, oh, here you go.  Just has all his clothes.  Whenever the investigators from the OSBI went to the hospital and the first thing they -- April Marcangeli, Ryan Porter, Lynette Lee, the first job they had was go to the hospital and process the Bronco that was there that took Mr. Eales to the hospital and obtain the clothes.  It was at 4:00 o'clock in the morning.  When did they get the clothes?  They got them from Stanley Philpot at dark, 6:00 o'clock that day.  See how -- oh, yeah, here's some clothes you might be interested in.  You might check the pockets.

Now, Mr. Skowronski, a real nice gentleman, he told us that oftentimes we expect to find grinders,

4360

coffee grinder and -- think of leaf grinders?  They're associated with people who are making, manufacturing, methamphetamine.  Didn't find anything like that out there.  Danny Farris was an OSBI agent that if they wanted to determine if this is red phosphorous that's contained within these pill bottles or not.  Remember we talked about them?  There's a plastic bag with one pocket exposed in a pill bottle stuffed full of plastic bags in another.  Fingerprint -- sent them off for fingerprints.  Did you do anything to determine conclusively that this belonged to Kenny Barrett?  No, they didn't do that.  Should there be a question in your mind as to evidence that turns up some 18 hours later whenever it's been requested for, nobody supplies it?  Somebody whose brother, the sheriff, had a grudge with Kenny Barrett since he was 16 years old.  Does that cause you some concern?  Does to me.

I want to talk about Joann Kihega, be just a stipulation and I bring that up just by way of reference.  The stipulation was there was blood spatter near the east window where Manion fired the shots and that came back as positive it was Kenny Barrett.  Okay.  Iris Dalley, minimum of five shots that went through the window as Mr. Hilfiger talked to you about, found no end point with four shots, then they hit something.  We know some of

4361

them went into Kenny.  The shear from the window, she said, had to be greater than three feet.  Mr. Hilfiger actually got the suppressor on the weapon.  The suppressor, again, is a silencer and muffles the sound of that weapon.  Not only do we have machine guns, we've got silencers firing machine guns.  She didn't -- hadn't done any research as to, well, maybe that will have something to do with the residue that impacts and comes out of the barrel that she determined how close a weapon is to something.  She hadn't done any research -- and she says how close or how far away this was?  No, she can't.  Mr. Higgs said it will measure the residue that comes out. So, was Mr. Manion up there at the window or was he across the hood of that pickup shooting in there from a supportive position?  You remember how the dowel rods she had going through there that the trooper had to hold them up there and they're angled up like this.  He'd had to have been on a ladder to shoot across that pickup if that was the case.  Then she had to back off this and, well, that didn't really mean the trajectory.  Well, what did it mean?  Why didn't we have the dowel rods stuck in there if that's not what she came to display for us? Does that cause some question or concern?  Is that all of our time or just mine?  Does that cause some question or concern as to the investigation to the things that

4362

happened out there?  My perspective, you've got to take it all into consideration.  Is one thing so important that it can exclude it to the others?  I don't know.  I don't think so.  Not in matter like this.

I want to talk about the Manion weapon.  Mr. Higgs got kind of irritated whenever we found out that he had a few errors in his report.  And he's nice guy.  This guy, I think, is truly trying to do the right things.  He's a hard worker.  But you don't like -- people don't like to be criticized.  Whenever they make mistakes and point it out, I realize it's not easier on my side than it is on his.  But he makes mistakes.  He made another one.  It's in evidence.  It's the round that came into -- that was on top of the refrigerator.  Okay?  It was the projectile F-37.  You remember he talked about he checked Manion's ammunition and that all that ammunition was hollow point ammunition?  Ladies and gentlemen, that is not hollow point ammunition, that's ball ammunition.  So, did he make a mistake about what he found that was attributed to Manion?  That's going to be for you to decide.  Is that important that he made another error?  He made more than just that.  Okay.

Nonetheless, I want to put up Defendant's Number 26.  I want to talk about that again.  Whenever we asked if the jurors have ever actually seen this, but you

4363

remember when everybody was in the room together, just everybody's hand went up. Ladies and gentlemen, because we're in trial, you do not have to check your common sense in at the door. Carry that with you and use that in this case. These two rounds right here, number 14 and 13, are the two rounds, the two expended casings from the Hamilton weapon, right, consistent with a semiautomatic pistol. Where would you expect those rounds to be ejected? You'd expect them to be to the rear and to the right. The trajectory that was shown on this dowel shows that Mr. Hamilton's rounds entered that house at an angled direction. I'm going to display this as Defendant's 221 and we'll come back to this. She has the direction of her trajectory, this is a Hamilton's trajectory, because that's where one of the rounds was found, a .45 landed on top of the magazines. It shows it shooting from this direction which is consistent with what he said. Moved around behind the Bronco, beside the rear of the Bronco, that was up here on the porch. Now, if we go back. Then in this area shooting in a way that she has that trajectory is consistent with their casings being right here. That's what we would expect to find even though Mr. Hamilton couldn't tell anybody that shot a gun out there until it was shown to him that we know he shot the gun. We don't need him to tell us that. We

4364

could do the ballistics. We can check the weapons and we can tell who shot these two. And when we find a round in that that's consistent, that's where they are. The same that is consistent for Mr. Manion to be in this direction to fire three shells off this way. The same that it would be consistent for Mr. Manion to be in this area to have two casings in this area. That's why I say don't check your common sense in at the door. At the same time is that the fellow is shooting out this front door, it is not consistent to have any casings out this way. Why do they want to talk about those? Because they got to find 19 somehow. They've got to get to 19. They got 16 casings in the house, so we've got to find something. And how they got there, I don't know. Bounced off the roof, bounced off the post. Those are some of the things that I say don't check your common sense at the door. Look at this evidence that's in there and analyze it like you should.

Now, I want to look at the butt plate that is Government's 162. There was some mention made of this thing. This was on Mr. Eales's weapon. Ladies and gentlemen, something has happened to this, there's no doubt about that. This is what is on that magazine that Mr. Eales was carrying and it is bent. Did it get hung up on a door, did it -- I don't know what happened. But

4365

if you'll examine it and look, you'll find a bullet dent in here.  They want to tell you a projectile hit this and that's what caused it fly apart and that happened as he's getting shot in the side.  You look at this.  It's going to be in evidence.  Take that back.  Take that out and look at it.  It is not consistent with what they want to try and tell us.  Does that matter?  Sure, it matters.  Depends if he's in or out of the vehicle or how he got in there?

Now, I want to throw something else up again.  Government's 171, Defendant's 209 and this box.  What does this box mean?  It's a box of ammo.  And, you know, in and of itself it doesn't mean a thing.  It's .223 Remingtons.  This box contains 20 center-fired cartridges.  They did not find five empty boxes around there, they found one empty box in the house.  She's trying to find the Government's exhibit.  I want to show you Defendant's Exhibit 209 and Government's is 171.  This is the same box that was identified with Mr. Higgs, everything consistent, we blew it up.  It's down there in the bottom of the gun case, not displayed under the window as we're going to show you with Government's 171.  171 has it moved out of the gun cabinet over here on a little table underneath the window.  Now, does that matter?  Is that important?  Does that have something to

4366

do with staged evidence?  Does that have something to do with integrity of the crime scene?  I think it's got everything to do with it.  Let me tell you this.  I asked the question of Mr. Lyons if there was not one box in here, if there was more than one box, do you think we'd have that into evidence?  Got one box and nobody can tell you how it came out of that gun cabinet and got displayed here because what she says, well, that's where it was whenever I saw it.  Couldn't tell us any different.

Now, I want to talk briefly about how they handled these weapons.  The Hamilton .45 has one round in the chamber, a magazine with rounds.  Didn't say how many rounds were in the magazine.  This is Ms. Lyons.  That's how she accounted for those.  Whenever she talked about the Barrett 9 millimeter, said one round in the chamber, a magazine with nine rounds.  She was specific.  What she didn't tell us, Mr. Higgs did later, the capacity of that weapon was 16, 15 in the magazine and one in the chamber.  Capacity of 16.  She did not make any mention of the safety, whether it was on or off.  Mr. Higgs told you looking at that picture the weapon was on safe.  We talked about the Kenny Barrett .223, one round in the chamber, two magazines with 30 rounds, one magazine with 12 rounds for 72 rounds.  I want us to look -- retrieve 123.  We're going to look at 123 in just a moment.  I

want to look at her writing on there because I think it's -- I'm sorry. Exactly right. I apologize. I want to try to blow this up and if it doesn't work on here, then I want you all to look at it in that jury room because the writing is -- show up. It's not going to show very well, but I'm going to tell you where you can look. Three magazines taped together, and is what she said -- said plus there, I thought, was 72 rounds bag with bullet from chamber. Now, you remember we talked about that and she said, well, there's 72 rounds in there. You count them how you want them. I'm not counting them. You're the one counting them. You had 72 on there plus one package from the chamber is 73, one on the shelf inside the house is 74. And she got kind of frustrated with me and said, no, there's 11 in that magazine. So then I asked her, you said 12 and you're counting. All of your records have 12 rounds in that magazine, now you're saying there's 11 hounds in that magazine. Did you take that one out of the chamber and put it in the magazine. Oh, no, we don't do that. I said not only do you not do that, it's shown here as a bag with bullet from chamber. Didn't go in the magazine. Why did they tell us something different? Do we need 18 rounds, do we need 19 rounds? Now, when we get to counting them, there's not 71 -- or not 72 in here,

4368

there's 71.  And I will say there's ten casings in here where some are test fired and some -- inconsistent with that, but they accounted for, but there's not 72 in here, there's 71.  So what have they lost?  They lost the round in the chamber and they've lost another round out here.  That's item 223.  And Mr. Higgs in all of his analysis and being as careful as he could be did not analyze that cartridge, that live cartridge, that's inside that house on the shelf that we maintain was in the chamber when Kenny Barrett charged that weapon and through it out on the shelf leaving him however you want to do it, 90 minus one, 89, 74 and 16 casings.  I mean, it comes up to 90 and that's what the evidence shows.  Doesn't show anything different than that.  Smith and Wesson pistol that he had was not fully loaded.  But we'll concede that there was 90 because we can explain where they went.  Let's do that again.  Thirty in one magazine, 30 in another.  That's 60.  Twelve in the magazine that's inserted in the weapon is 72.  One in the chamber is 73, one on the shelf is 74.  Sixteen casings inside the house is 90.  Every one of those bullets is accounted for.  Look at that sack for Ms. Lyons and analyze why you can understand why I make a point of this.

Now, Mr. Higgs as we know, he's not fail proof and that stuff on there is the right -- anytime you've

4369

got six here, maybe he got it right. But he -- left or right, it's one or the other. So they do make mistakes, ladies and gentlemen, and that's why I asked him the question about F-41, the projectile that was found in Mr. Eales. You have the capability of taking pictures of these items for comparison analysis and displaying them. And he talked about why he did not come up there and do something. Well, ladies and gentlemen, in this country I don't have to do anything to prove a thing about this case. I don't know what they do in the Bahamas, but that's not how we do it here. What he didn't bring for your benefit was a picture, a comparison photo, that would say here's how these things line up, here's how I can say conclusively that that came from the Barrett weapon. Admittedly he's made other mistake but did he make a mistake there?

I want to show you one more thing that is something that some type of people just cannot admit. Ms. Dalley came up with a drawing. She came up with a drawing that I just showed you with the Hamilton -- she's going to display it. Now, what bothers me about this as it relates to Ms. Dalley, well, she's saying, you know, this deal right here that I've got going into this couch, that doesn't mean a thing because I thought about that and disregarded it because the door would have to have

been closed.  If the door is closed it's so much higher than the couch, it doesn't match up.  She went through all that trying to explain why she did this and why she doesn't believe it to be the case.  Okay?  Well, she doesn't have this going up in the wall, she has it going in the corner of the couch.  Now, I'm going to show you what they did on Defendant's 120.  This is kind of in the other way with this yard that she had drawn, she says, well, that doesn't really mean that it's going in the corner of the couch, that's just kind of how I have it displayed there.  Okay?  Then we show 119 that was identified by Vicki Lyons that says that was a bullet hole.  Took the end of the couch apart trying to find the bullet fragment and couldn't find it.  Well, why are they so interested in explaining that away?  She's the one that did the drawing that showed the trajectory and then she wanted to tell you, well, that's really not what it means.  I don't know what it means.  I just know what it looks like.

Now, I'm just about done here.  I want to do one more thing.  The trajectory analysis that OSBI says we don't do anymore and Mr. Higgs says it's not reliable because those things can bounce everywhere, take that into consideration.  Don't abandon your common sense.  If you've shot a gun that's a semiautomatic, use that as to

4371

where you think the rounds may go.

Dr. Distefano, I asked him specifically as relates to the wound as to the upper right arm, was it front to back, did it hit an intervening object or not. I asked him the magic phrase, ladies and gentlemen, can you say within a reasonable degree of medical certainty that that wound was caused from a bullet going front to back or back to front. No, I can't say, positions could differ. Can you say within a reasonable degree of medical certainty that that projectile did not strike an intervening object, an intervening target, meaning the door, the glass. No, I can't say that. The Government wants you to believe that Mr. Eales was outside the vehicle and that's where this other 19th shot comes from. But they don't have any proof of that. That's just conjecture.

Ladies and gentlemen, the thing that bothers me probably the most in this case is we're dealing with a no knock search warrant in the middle of the night with law enforcement had no identification on their vehicles, the lead vehicles are not lit up, they're coming on to somebody's property. As you're analyzing this evidence and decide what you need to do with Mr. Barrett, I want you to consider whether or not you think that's what our country stands for is the ability for somebody to come in

4372

in that manner and you not be able to take care of your property or to protect your son or to defend yourself. Thank you.

MR. HILFIGER:   Thank you, Your Honor.   We in this case ran out of time before -- we still had some things to talk about and I'm just going real quickly -- I want to tell you that the three counts do appear in the -- and they're wrapped together and they all deal with the same incident, but I want you to understand that Count Three has an element that doesn't have to be shown in Counts One and Two.   In Count Three they have to prove to you beyond a reasonable doubt that Counts One and Two that David Eales was known or that Kenneth Barrett knew that David Eales was a law enforcement officer at the time the shooting occurred.   And, you know, I guess the big question I have just like Mr. Smith says, do you -- think about this, that because of the death of Eales on that night that there was a higher level of intensity on the part of those law enforcement officers out there to get Kenneth Barrett and to get him convicted of something.   You bet there was.

Your Honor -- I mean, ladies and gentlemen, this is not a murder, it's not malice aforethought, there's no premeditation.   Kenneth Barrett is not guilty of killing a law officer, knowingly killing a law

4373

officer.  We ask that you follow the instructions and the interrogatories and find that he did not commit a -- commit murder with malice aforethought and he did not knowingly, intentionally kill a law enforcement officer.

This will be our last chance to talk to you. Thank you for your attention.  And Bret Smith and I thank you and Kenneth Barrett thanks you for your attention.

THE COURT:  Members of the jury, we're going to take a recess for now.  I'll ask everyone in the courtroom to please remain seated as the jury leaves for recess.

(Whereupon, the jury exited the courtroom after which a short recess was held, and upon reconvening the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  You'll now hear the final closing argument of the Government.

MR. SPERLING:  Thank you, Your Honor.  May it please the Court.  I have the opportunity just to talk to you for 43 minutes.  And before you sigh, let me tell you I have 43 minutes to respond to one hour and 45 minutes of arguments from the defense.

I feel a little bit about the story about the three umpires and the story of about how they call balls

4374

and strikes. And the first umpire who was kind of an ordinary guy said, balls and strikes, I call them the way I see them. The second umpire said, balls and strikes, I call them they way they are. And the third umpire, he said, balls and strikes, they are nothing until I call them. I expect that that is your function as finders of the fact in this case. You've been very generous with your time. I'm kind of reminded of this inscription on the wall that says -- actually, it's quoting a man named Pascal. He was a 16th Century French mathematician and philosopher and he is credited as saying that it's impossible to be just if one is not generous. And as I watched -- you know, some of us have some common features. Some of us take lots of notes, some of us take very careful notes, others of us listen in different ways. Others of us focus on the witness rather than taking a lot of witness notes. And so, if my recollection should differ during my argument, I would be pleased to go with your recollection of the evidence and testimony and discard anything that I may say that may be contrary to the way you recall things. Silent rather than really isn't much useful anyway for anyone.

This trial, I know, was painstaking, but I think I would really be remiss if I didn't begin by thanking some people for what they did in this case. We

4375

had some brave men who approached Kenneth Barrett's house on September 24th, 1999. In the first vehicle, the driver was Buddy Hamilton. In the second vehicle the driver was Ray Greninger. In the third vehicle was Steve Hash going joined by Danny Oliver. In the fourth vehicle was Gene Hise joined by Doc Darst and Billy Poe. In the fifth vehicle was Kerry Pettingill and Jim McBride. And posthumously we want to thank Rick Manion, and of course, Rocky Eales. These were brave soldiers of the law out there. The notion that they were doing anything other than lawful, anything other than appropriate, is armchair quarterbacking and second guessing of the worst type. I respectfully suggest to you that we've become used to something in this courtroom. We've become used to coming here day after day and seeing a man that I respectfully suggest the evidence proved beyond a reasonable doubt not only committed all three of the crimes with which he is charged, but is a cold-blooded malice aforethought, premeditated murderer. You know, during this trial we've been careful to avoid judgmental terms, so we've talked about the highway patrol incident or the shooting of the trooper and various other characterizations. Ladies and gentlemen, time to call this and characterize it what the evidence established him to be. We've been sitting in this room for weeks now with a cold-blooded murderer.

The Defendant decided to become the law on September 24th, 1999. He was going to do what he was going to do, what he planned, what he thought about doing. What he premeditated. He became prosecutor, jurors, judge and executioner on September 24th, 1999. He calculatingly and methodically murdered a man who had done nothing to you. There is not one piece of evidence in this case that said Rocky Eales did anything to this Defendant. There is not one piece of evidence in this case that said Rocky Eales ever put one foot on the Defendant's porch. There is not one piece of evidence that submits in this case that Rocky Eales ever un-holstered his weapon. The Defendant visited him. A man who was there under lawful authority. He wasn't an intruder. He had a right to be there. Visited him with a hail of murderous gunfire. Rocky got shot in the back while retreating, in the back while retreating. The Defendant was the agent of death. Government's Exhibit No. 128, the Colt Sporter, was the firearm, the instrument of death.

I listened with interest to arguments by defense counsel. I did the best I could to note their arguments. You know what they note? Problems, they say, with the investigation. The first problem is they didn't have their emergency lights on. Was it supposed to?

4377

Were they supposed to say, hey, right here, you with the Colt Sporter, aim at us first?  Would you expect law enforcement officers to do that, even if it was according to plan?  But it makes no legal difference.  If they go in with black shirts and dark colored vehicles, the Defendant was not justified in committing the cold-blooded murder that he committed.  The defense argues that all shots were fired right there at the house.  Well, no way would that account for the testimony of the trajectory analyst.  No way does that account for the repeated testimony of the law enforcement officers who were out there all that day.  And although they can't tell exactly how far it was from the house from where the shots were initially fired, what they all do is give you a range, and it's a consistent range.  It's about 25 yards, maybe a little more than that.  And I've been told that this courtroom is about 21 yards from stem to stern.  That vehicle was at least as far away from the murderer when he began firing as the distance from that door to that door.  No way is that legally justified. The defense gives you then an argument from the perspective of each trooper.  And, you know, may I suggest something to you?  I know that you have individual and collective recollections and I don't want to demean that from a moment.  Rely on them.  I grew up

4378

in the '60s and, you know, when we were growing up there were black lights and strobes.  And you remember being perhaps at a location where there was a strobe.  And if you were to take your arms and you were to start them at your side and then you were to go like this or like this, and then ask various people who just got a glimpse of you at that time, say, well, where were your arms.  And one would say, well, your arms were up.  One would say your arms were at this angle.  One would say your arms were at this angle, another at this angle, another at this angle.  Are they wrong?  They're all different.  Are they wrong?  No.  What I suggest to you in this case is that the troopers told you what they recall.  Did they recall things differently?  You know, I was on the way in today and I honestly do not remember about three miles of road shortly away from my house.  I know I drove it.  I know I wasn't in the ditch.  But I don't remember.  And I remember I was thinking about the advent of today, but I forgot about those three miles.  Isn't that a natural occurrence?  If you've been through a stressful occurrence, isn't it only natural that you would remember things like that?  Have you every been through an experience and, you know, went through it and then later on you go I just remembered?  Isn't that an entirely natural human occurrence?  For the defense to disparage

4379

that testimony as somehow less than credible is not to take account of natural human tendency. That's the way we remember things. That's the way things are.

Well, they talk about Kerry Pettingill and not recalling the silhouette or recalling it later. Natural for him to do that. But his partner remembered it. McBride remembered it. And, you know, if the troopers were really going to lie, they could have -- stories to protect each other. There wouldn't be a silhouette out there. They would be somebody saying, hey, this Defendant, I saw him. I recognized him. And nobody -- came out of the house, we had to go in and get him. He said I'm sorry I only got one or two of you, I was trying to get a half dozen of you. I was trying to go out in a blaze of glory. If they were trying to taylor their testimony, wouldn't you hear that? You didn't hear that. You heard honest, decent men, soldiers of the law telling you what they remembered, honestly recalling the circumstances of September 24th.

Well, they talk about integrity of the crime scene, and, yes, many law enforcement officers responded, a soldier of the law had been murdered. But did the crime scene get changed in the ways the defense suggest? We're going -- there in just a moment. But they talk then about the motor vehicle having moved back some

4380

20 feet.  Look, this complaint has no more validity than the accuracy of the defense counsel's citation of Iris's last name.  It really means nothing in this case.  Did it roll back?  I'm going to forward the cam.  But if a transmission loses fluid, does it lose compression and roll back?  I don't know.  It might.  If the vehicle was in neutral, might it roll back at some point?  Maybe.  We don't know.  But none of that matters because all of that happened after the Defendant murdered Rocky Eales.  It's absolutely irrelevant to this case.  The defense counsel then says, well, somebody must be protecting their own.  The OHP did an investigation.  Wait a minute.  OSBI got those documents later and OSBI as the defense admits, got the reports in 2003 and they now had access and Ben Rosser says those things didn't matter.  You know, it's kind of like the old game show from the '60s about -- you don't say and you'd have this name of a thing or a person or a celebrity and you're trying to get your partner to say the name by saying something that sounds like it, and that's kind of what the defense does here.  It's not so much what they say, it's what they don't say.  I'm not suggesting for a moment that we had anything less than the burden of proving the Defendant guilty beyond a reasonable doubt in this case, but requests can made.  If the investigation is considered inaccurate, requests can

4381

be made of those agents.  You could say, hey, look at that cartridge, hey, conduct an initial examination.  Was there ever any suggestion that that happen?  No, there was not.  Criticism.

Let me talk about snitches.  They say, well, it's just way too convenient.  Look at the snitches' testimony.  Well, go with your recollection, but I remember that Randy Turman talked about the gate sign, talked about guns being acquired in position, talked about three taped together ammo clips, talked about the other items.  He talked about a series of things out at the Defendant's house.  But remember the incident about all the cops coming out with the old man and the Defendant getting his rifle?  What happened then?  Did the Defendant got his gun and went out to see what was going on.  That was the Defendant's response.  Not to go back into his house, but to go out as he did on September 24th and see what was going on.  Randy said he never went back because he knew the Defendant was serious.  Travis Crawford.  The Defendant made his surveillance vehicle.  What's his response?  He's -- don't get up.  That was his response.  All hell is going to break loose.  Charles Sanders knew that the Defendant had a warrant for his arrest and wouldn't leave.  He anticipated, the Defendant said, Johnny Philpot, said if

4382

the police came he'd shoot the first one through the door.  He told Clint the Defendant talked about killing Johnny Philpot.  Told him he was out there once, out there once.  And the Defendant told Geniece Thomas a few days before the shooting, and he also said the Clint had been told that the Defendant had dope at the residence a few days before the shooting.  Pretty much saw drugs or drug activity out there each time that he was out there.  And Randy Weaver.  Randy Weaver, you know, they talk about -- they criticize his testimony.  You didn't hear Mr. Smith talk about the fact that there were a number of drug transactions.  Use your own analysis.  And the Defendant sold drugs to Randy Weaver.  That's what he didn't say.  Cindy Crawford got drugs at the Defendant's residence.  Said if the police come out, the Defendant said that he would go out in a blaze of glory.  Karen Real -- was never out there, she says.  She recalls similar gate signs.  She says when people came up, the Defendant got his gun until he found out who they were.  The Defendant didn't like the law and said so any time you were out there.  He had no employment.  Drug income.  Drug deals in and out of the house.  The Defendant always had drugs.

If you look at the collective testimony of these cooperating witnesses -- let me at least make this

4383

point.  We didn't conduct an audition and, say, oh, by the way, we want witnesses in a federal case, so we'd like those upstanding members of the community, the church leaders, the leaders in the community, to come up here and testify.  How did we select witnesses in this case?  Ladies and gentlemen, the Defendant selected our witnesses in this case.  They were his friends, they were his trusted associates.  It's not like he didn't know that they had criminal histories.  It's not like the fact that they had records as long as your kept them from being out there, was it?  The Defendant through his association selected these witnesses.  I would submit to you that if this crime been committed in Heaven I would call angels as witnesses.  It wasn't.  This crime was committed in Sequoyah County at the Defendant's residence.  We had to call witnesses that knew the Defendant.  The fact that he may have chosen people to associate with you may not want to have for noon dinner tomorrow is really beside the point.  The Defendant selected the witnesses through his association.

Well, Mr. Hilfiger says the law enforcement officers should have further identified themselves.  How smart would that be?  You know already that we have at least the emergency lights on in vehicles two and three. Five, according to those witnesses as well -- testimony

4384

notwithstanding. But if will you look at the line in which they approached -- let's go to Manion's testimony for just a moment, please. If you'll look at the testimony that we read from Rick Manion, here came the questions and answers. As you clear this top area here where these yellow flowers are, what route did your vehicle take, please. We stayed on the driven path there. Okay. So it sort of looks like there's a de facto driveway, not covered surface of any kind, but just merely where the grass was worn down, et cetera. Yes. And you followed that path up on to what position, please. We parked right here in this area, indicating. And is that the same path that had been followed by Trooper Eales and Trooper Hamilton. It was behind them about -- by that time about three or four car lengths and to their right side. All right, sir. Did they though follow the same what looks like sort of path through the grass. Yes. And we was offset to their right. So, you were to their right and you could see past their vehicles and see the home. Yes.

What's the position of these vehicles. This Defendant is looking down this porch line at approaching law enforcement officers with the murder weapon. What does he see? The first vehicle. The second vehicle is offset to the right with wigwags, with emergency red and

4385

blues on the visor. The third vehicle lit up like a Christmas tree. And the argument is that he didn't know these were weren't law enforcement officers? You know, forget for a moment that just hours before he had made the surveillance vehicle, but the notion that he didn't know that these were law enforcement officers just defies belief because he was looking right at them down the porch line. As he fired those initial shots where all -- virtually all the troopers say the shooting began, couple of shots began, the Defendant had clear view of the vehicle number one, vehicle number two and vehicle number three. He knew what he was shooting at. He knew there was a warrant out for his arrest. He expected the law to come in. He hoped the first one through door would be Johnny Philpot and/or Frank Loyd, DEA investigator.

Well, the defense counsel also says there are two sides to every story. Well, there might be, but one of them is wholly inaccurate. Have you seen defense counsels through examinations try to make things fit? You know, it almost reminds me of a jigsaw puzzle in which someone takes varying pieces of the jigsaw puzzle and crams them together without looking at them, without matching color or shape and then says, see, this doesn't fit. Here, ladies and gentlemen, I ask you to put the jigsaw puzzle together. Was it a flawed investigation?

You know, they looked at each of the cooperating witnesses, at Randy Turman, at Travis Crawford, at Randy Weaver, at Cindy Crawford, at Karen Real, at Charles Sanders and Brandie Price.  You know, that from the same team that calls Ron Baldwin which is kind of like the pot calling the kettle black.  But in any event, we called witnesses who knew the Defendant.  You know, defense counsel questions, well, was this a multi-thousand dollar lab operation.  He says look at it.  Folks, that's what it looks like.  That's what they look like.  This was an operation that could have produced given the chemicals that were there some $16,000 worth of methamphetamine.  Yes, that's what they look like.  When he asked Juan Beal, Craig Nixon, Kevin Wilson, they all say that based on the evidence that they seized out there, they would have arrested the Defendant for either attempting to manufacture methamphetamine or manufacturing methamphetamine.

Well, they give you kind of a side glimpse of it.  And they really talk about the evidence in the trailer.  And then they talk about the evidence in the trash.  And then they talk about other items that were found.  You know, the idea is to say if you look at this individual piece of evidence, it doesn't establish the Defendant's guilt beyond a reasonable doubt.  You can't

4387

tell from the napkins or the coffee filters that this is necessarily a manufacturing operation.  But what you can do, if you will please, is to put everything together.  Put it all the pieces of the puzzle together.  Do as Mr. Littlefield did in his opening statement.  Consider all of evidence together.  Consider all of the witnesses together, and I respectfully submit to you that residue evidence is something that was right there before.  You know, if I were to have painted, let's say a house, and after I finished painting that house I had paint on me and somebody looks at me and says, hey, you just got residue of paint on you, and in the next breath in the next statement they add is, obviously, you did not paint that freshly painted house.  I mean, I'd look at them and -- no way.  And isn't that really what they're arguing?  Trace indicates what was there previously.  Look at the pseudo in the ceiling.  Look at the red P.  The red P in his pocket is someone who is endeavoring, who is involved, in a drug operation, in a drug enterprise of his own.  He carries red phosphorus in his own pocket.  A precursor chemical right near and dear to him.  He carries the proceeds from his drug activity in his right rear pocket.  The evidence is clear and unmistakable.

The defense then criticizes the blood in the syringe and said, well, you know, you could have tested

4388

that blood.  Well, they've got the subpoena duces tecum power, too, they could have requested it.  I'm not saying that they have any burden of proof for going forward, but a request could have been made with regard to the investigation like that.  But even if there was certain things that were not done, what does that have to do with whether or not the Defendant shot and killed, murdered, Rocky Eales?  No print on the camera?  Well -- fingerprint, so that wasn't surprising.  These are shoe-sized arguments.  They don't establish reasonable doubt.  The flask.  Remember there was a big deal about whether the fact that he used to measure two cycle oil?  That kind of got abandoned when the information came out that what's in there is binder.  It's evidence that pseudoephedrine had been processed.  And DEA Agent Kevin Wilson is going to Brazil.  Well, when he was asked about 1400 pseudo pills he said no small potatoes -- this is a meth lab.  He would have arrested the Defendant for manufacturing meth.  The towels were positive for meth and that tells me, he says, that the man had been manufacturing meth.  Well, the red phosphorus was in the Defendant's pocket.

You know, if we were really going to set him up, though, why put a piece of red -- why put a little red phosphorus in his pocket?  Why not go to the evidence

4389

fault or the evidence room and take some for real methamphetamine in significant quantity and pop that in his pocket and say there you go? I mean, it's one thing to be impugned for being something less than honest, it's another thing to be impugned for being not very bright. The point is, law enforcement officers didn't plant this on the Defendant. It was there, it was available, it's what he wanted to keep right next to him.

Well, there's some questions about Manion -- we concede, ladies and gentlemen, that Manion apparently fired at least a shot or shots across that door facing that he did not later recall. But you know when he did fire, it was perhaps his shots that ended the gunfire from the Defendant that night. What did the Defendant do after firing 19 shots? He back into that southwest room, didn't he? Or southeast room. He was in that southeast room and, you know, the gunfire only stopped after the flash bang and then after the shots were fired later by Rick Manion. We should be applauding what he did, not criticizing him.

I don't know how many boxes of ammo were out there, but it's entirely conceivable that there was more than one. The fact that two photographs shows something a little bit differently, the fact that things were moved occasionally in order to photograph things together, you

4390

know, it's kind of like criticizing the family reunion, and saying, well, you know, I guess what we could do at a family reunion, we could take one, big overhead of the place where the reunion is taking place.  You can have the kids on the swing sets and, you know, the teenagers by the cars and the married couples taking care of some of their kids in a picnic area and then you have older folks inside in an air conditioned area.  You know, if you took a photograph of that, you know, it would hard to say who all was there, wouldn't it?  But what do we do?  We get people together.  Yes, we put people together so we know who was there.  That's all that law enforcement officers did here.  They put items together so that could -- we never for a moment contended or represented to you that that's the way the items were found.  In fact, we did the contrary.  What we really did do is that we showed you in videotape form what things looked like before the search.  We showed you in photographic form what things looked like before the search.  The integrity of the investigation is sound in that respect.

And then there was some discussion about 72 rounds and a bullet that may have been ejected in the house that wasn't tested.  I wished they had asked us.  But in any event, 91 less 19 one is 72.  The bullets are accounted for.  The Defendant fired 19 rounds, 18 of them

4391

through Bronco, and several of them Rocky and one or two of them -- two or perhaps even more of them Buddy, and then one of them was the last round shot in the back.

In final close what the defense talks about is a lot -- isn't this the place where you can protect your son, protect your property or protect yourself?  Ladies and gentlemen, I submit to you that the evidence clearly establishes that there was no self-defense in this case. There was absolutely no self-defense in this case.  If you look at what the Defendant did affirmatively, if you look at where Toby was, if you look at the testimony of the law enforcement officers as to what happened when Toby was apprehended, Toby was apprehended before -- or after these shots were fired.  These shots had been fired and were raining into the Bronco long before Toby was apprehended, long before the Bronco was anywhere near Toby and the Bronco never was that close to Toby.  The Bronco turned in toward the house.  The Bronco didn't go to the west side of the house where Toby was.  But keep in mind was Toby in harm's way?  The Defendant did, didn't he?  The Defendant knew he had a warrant was out for his arrest.  The Defendant who knew that law enforcement officers might be coming for him.  The Defendant who made the surveillance vehicle.  The Defendant is the one who put his own son in harm's way.

4392

The Defendant shot Rocky three times. He shot him in the side and from behind. Not one of the shots was from the front. Not one. He knew law enforcement officers weren't coming for his son. The Defendant shot him three times, shot Rocky three times, from behind. And, you know, the notion the Defendant was engaged in self-defense is really kind of ludicrous in this case. This defense is belied, is contradicted, by what the Defendant said to many of his friends during the days, weeks and months prior to this incident. The Defendant knew what to expect. He expected law enforcement officers. Rocky never advanced on foot toward the man who murdered him. Never. Rocky never advanced toward Toby. In fact, the evidence would indicate that Rocky never advanced toward the house. Rocky's movement was in retreat, away from the murderer, away from the murderer's house when the murderer shot Rocky from behind. Rocky never pulled his gun much less advanced toward the Defendant with gun drawn. The victim, Rocky Eales, never un-holstered his gun. He was retreating. Unprotected after dropping his shield after being fatally wounded when he was shot again by the Defendant. But think of it this way. Am I authorized to shoot someone who drives onto my property, even if they drive onto my property at 12:30 in the morning? I can't shoot someone for just

driving up to my house or in my yard. And what if five cars drive up on my property? I'm still not authorized to shoot them, to shoot vehicles. Especially if they're lit up like Christmas trees. Self-defense? Well, the real self-defense in this case was that of Troopers Hise and Darst who moved Toby to a place of safety, an action for which no expression of gratefulness has been forthcoming. And the Defendant's pistol in his belt and his last motion self-defense or was he endeavoring to do what he wanted to do, take out as many as he could? The Defendant moved his hands toward his waistband for his loaded nine millimeter pistol. He further demonstrated his murderous intent.

I remember some of the questions being asked of the various witnesses and reminded me of, you know, a kind of snow had fallen. And let's say you get to -- you've got a beautiful, white blanket of snow. And there are footprints to and from the front door and driveway and tire tracks in and out of your driveway. That's circumstantial evidence. And can you imagine the questioning? Well, did you see any boots? Did you see anyone wearing boots? Did anyone take any steps that you saw? Did you see anyone get out of their car? Did anyone get in the car? Anyone drive away, drive out? Oh, you didn't take any photographs of the person in the

4394

boots either, did you?  And look what -- don't you think that's just a little bit silly?  Because we can look at evidence.  We can look at items and tell what happened as a result of putting all the pieces of the puzzle together.

Where was Rocky when the DEA conducted the search?  The Defendant already committed his crimes.  The victim was already dead.  And Terrance Higgs could tell you that the projectile that was fired that killed Rocky Eales was fired from the Defendant's gun to the exclusion of all others.  Did we bring comparison photos?  No.  We could have brought in, I guess, the various microscopes.  We could have brought in the various machinery that was used in various testing.  But the testimony is uncontradicted the fatal slug was fired from the Defendant.  The Defendant was the only person in the house that night, that the Defendant fired the gun that struck the Bronco and that ended up killing Rocky Eales on that night.

The repair shop could have been used for a makeshift lab.  The defense counsel, remember they asked about individual pieces of evidence and really what they established as to various places?  Ladies and gentlemen, we ask you to put everything together.  Put everything together in this case and I submit to you that when you

4395

consider everything that is in evidence in front of you, the evidence conclusively establishes the Defendant's guilt beyond a reasonable doubt.

When did the shooting begin?  It began murderously early.  It began when the troopers -- long before troopers stepped a foot on the porch, but as they drove up in to the property, but still far from the house.  Hamilton.  Buddy Hamilton, Ray Greninger, Rick Manion, Steve Hash, Danny Oliver all say the shooting started before the Bronco arrived at the Defendant's house.  And how many troopers say the Bronco got hit farther from the house than what the defense urges?  All of them.  Keep in mind that the closer to the house the gunfire began, the longer the Defendant had to see the lights, the longer he had to see the emergency lighting on the vehicles.  Couldn't he have seen that?  You remember Clint Johnson's testimony.  He saw the lights from the troopers' car from almost the roadway away, almost a half a mile away.  Stanley Philpot said he saw the lights from some three-quarter mile away.  The other Bronco's visor lights, the red and blue, were on in addition to Steve Hash's, and from much -- from a vantage point where the Defendant could not have missed them. You know, it's almost as if the reasonable inference from the evidence is that the first vehicle was unknown to the

4396

Defendant, he was being chased by two other vehicles that have law enforcement lights on, so as a good citizen he fires at the first vehicle?  It would have been clear to him that these were law enforcement officers.  He was well aware that the emergency lights were ablaze.  He was well aware and had stated his intention of killing law enforcement officers that came upon to his property.

And finally, did the Defendant commit this murder, these events, with malice aforethought?  I submit to you, ladies and gentlemen, that if you look at the gate sign, if you look at how he acquired and positioned the guns, if you look at three taped together ammo clips, the fact that he was always armed, the fact that he virtually compelled officers to come in from the east here by virtue of closing and locking this gate, the gate and the locked chain, the view scope, the view scope that absolutely was trained on the entrance area or the officers.  The hidey hole.  Look at the evidence of drug activity, the 144 grams of iodine, the iodine plus red phosphorus stained filter papers.  The nicotinamide that -- the 10,000 millimeter pyrex glass with binder that was used to prepare pseudoephedrine for methamphetamine cooking.  The flex tubing, the gas generating evidence.  The used syringes, the unused syringes, $2100 in his pocket.  Look at the things the

4398

he was staggering away, and still the Defendant shot at him again.

I wish we had time to visit about each of the witnesses. That's a matter for your deliberations. There's not time in the closing argument to talk to you about each witness, their vantage point. You've been here for a long time. We've sometimes avoided you in the hall and, you know, rather than even exchanging a glance looked down and walked on. If there's anything that we have done in this case or in this trial or I have done that has offended you, I ask you to hold that against me and not against the United States, not against the evidence in this case.

You each took an oath and you promised to try this case according to the instructions the Court gives you. I'm confident that you will each take that obligation very, very seriously, that you will put this jigsaw puzzle together. That you will look at all the evidence and that you will collect all of the evidence in an effort to become the judges of the facts in this case.

It's not open season on law enforcement officers. It is not open season on officers of the law. It is not open season on soldiers of the law. Here we have a Defendant who used and carried firearms during the relationship to his drug activity. The crimes are clear.

4399

Possession of listed chemicals with intent to manufacture methamphetamine, possession of a chemical compound with intent to manufacture methamphetamine or knowing that it would be so used, distributing methamphetamine, attempting to manufacture methamphetamine, maintaining a place where methamphetamine is used or manufactured or distributed.  All of these offenses are clearly established by the evidence and the Defendant carried a gun.  You know, here's a Defendant that carried a gun almost all the time with him.  Virtually every witness that knew him said he carried that nine millimeter pistol in his waistband.  Virtually every witness that knew him talked about Government's Exhibit No. 128, the gun that he kept at the ready, the gun that he tapped up to the brim with lethal ammunition, the firearm, the rifle, that as Mr. Littlefield told you as the evidence indicated has a lethality range of some five or six football fields. Those weapons the Defendant carried during and in relationship to his drug activity, during and relationship to his everyday drug activity, during and in relationship to his methamphetamine-related endeavor. This is a Defendant who used and carried those firearms and possessed them in furtherance of his drug criminality, a means of protecting himself against whatever.  But not in a legitimate self-defense, in an

4400

illegitimate, illegal manner, to protect his criminality. The Defendant used and carried firearms, those guns, during and in relationship to the murder of a highway patrolman. There's no question that Rocky Eales was a law enforcement officer. There's no question that he was engaged in the performance of his duties. There is no question that he had the authorization of law to be where he was when he was on that day. There's no question about that. There's no question the Defendant used that rifle, fired that rifle, during and relationship to the commission of a violent offense. The intentional killing, the malice aforethought killing, and you have the instruction about that. You know, malice aforethought is not something that takes years and years to generate. It can be developed relatively quickly. Just as something that may be premeditated. I premeditate now to put those glasses down. Premeditation can be formed quickly. But that's not what the evidence was in this case. This Defendant premeditated a long, long time. This Defendant engaged in malice aforethought a long, long time. This Defendant intentionally killed Rocky Eales. The evidence is clear. No matter the precise position of the Bronco, though it was well away from the house when the shots began, no matter where the vehicle was, if right against that porch as the evidence

4401

would indicate that it was, the Defendant committed murder in this case when he fired at the approaching vehicle and at the vehicle that was there next to the porch.

Ladies and gentlemen, put all the evidence together. Look at what the troopers collectively told you. Admittedly they each had a different perspective. Look at the collection of the evidence. There's everything there virtually with the exception of muriatic acid and lye in the manufacture of methamphetamine. The Defendant's ongoing intention is clear by what he retained in his own pocket.

There's a man from Greece who was quoted on the law. His name is -- actually, I think it's pronounced Origen. He was from Alexandria. He was in about the Third Century and he was brave man. His dad was a lawyer. He was quoted as saying that conscience is the chamber of justice. I'm honored by your attention in this case, the fact that you have given the evidence serious consideration, the fact that you have listened carefully. And some of it was tedious. I know that there are sometimes that we put in evidence with regard to chain of custody or we're going from one person to handled an exhibit that handled a T marking and then it goes to some other kind of marking at another lab and now

4402

it has a Government's exhibit sticker on it.  I know a lot of that is tedious.  But you've been very, very patient with us.  Now we ask you consistent with the evidence in this case, consistent with the instruction the Court's going to give, let your conscience be the chamber of justice in this case.  Let your conscience serve as the guide, given the evidence, given the instructions of the Court for a fair determination of the issues in this case.

Ladies and gentlemen, I respectfully submit that we are confident that once you do that, that the evidence is clear that the Defendant is guilty of each of the counts, the three counts, of which he is charged. That he used and carried firearms during and in relationship to drug trafficking criminality.  The success was the success that he sought, a blaze of glory. Taking as many with him as he could.  It did, the firearms did, facilitate the success of his venture as he sought.  The Defendant used and carried firearms during and in relationship to the murder of a highway patrolman, a violent crime, and the Defendant intentionally killed Trooper Rocky Eales.

I'm going to end it as I began by thanking the officers and the witnesses.  You know, when you were being voir dired, when you were being examined to serve

4403

as jurors in this case and when you were collectively being questioned, some of you said that was really an unnerving time for you. It was a difficult time. Because you were being put on the spot. You were being asked to sit, as you did, in the witness chair here and asked questions or answer questions about your feelings about deeply-held beliefs. We appreciate your courtesy. You were selected with a special mission in this case, to do the right thing. Not to be the law of yourself, but to do the right thing according to the law and the evidence in this case. On behalf of the United States, on behalf of the agents, on behalf of Buddy Hamilton and Ray Greninger, Steve Hash, Danny Oliver, Gene Hise, Billy Poe, on behalf of Kerry Pettingill, on behalf of Jim McBride, can't forget Doc Darst, but mostly on behalf of Rick Manion, most of all on behalf of Rocky Eales, we thank you for your attention and ask you to find this Defendant guilty of each of the counts of the Indictment for which he is charged. Thank you.

THE COURT: Members of the jury, you have heard the closing arguments of both the Government and the Defendant. In closing, let me instruct you that you are the judges of the facts, the weight of the evidence and the credibility of the witnesses. In determining such weight or credit, you may consider the interest, if any,

4404

which a witness may have had in the result of the trial, the relation of the witness to the parties, the bias or prejudice, if any has been apparent, the candor, fairness, intelligence and demeanor of the witness, the ability of the witness to remember and relate past occurrences and means of observation and his or her opportunity of knowing the matters about which the witness has testified.  From all the facts and circumstances appearing in evidence and coming to your observation during the trial, and aided by the knowledge which you each possess in common with other persons, you will reach your conclusions.

You should not let sympathy, sentiment, or prejudice enter into your deliberations, but you should discharge your duties as jurors in an impartial, conscientious, and faithful manner under your oaths and return such verdict as the evidence warrants when measured by these instructions.

These instructions contain all the law which may be applied by you in this case and the rules by which you should weigh the evidence and determine the facts in issue.  You must consider the instructions as a whole and not a part to the exclusion of the rest.

You will not use any method of chance in arriving at the verdict, but base it on the judgment of

4405

each juror concurring therein.

After you have retired to consider your verdict, select one of your number as foreperson and enter upon your deliberations.  When you have agreed upon your verdict, the foreperson alone will mark guilty or not guilty on the lines provided for each count, sign the verdict form, and you will as a body return it into open court.

The form of the verdict and the written instructions of the Court will be furnished for your consideration and use.  If you find the Defendant guilty of any of the counts, you must also complete the Special Interrogatories relating to that count and the foreperson must sign the Special Interrogatories.

The verdict of the jury in this case must be unanimous, which means that each juror must agree and concur in the verdict.  In this connection, you have a duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment.  You must decide the case individually, but only after an impartial consideration of the evidence with your fellow jurors. In the course of deliberations, you should not hesitate to re-examine your own views and change your opinions, if convinced they are erroneous; but you should not

4406

surrender your honest convictions as to the weight or effect of the evidence solely because of the opinions of fellow jurors or for the mere purpose of returning the verdict.

Should you need to ask the Court a question, please put your question in writing, have the foreperson sign it, knock on the door and give it to the bailiff. The bailiff will see that I get it. I will then have to make a decision about whether or not I can answer the question. There are forms in the jury deliberation room for you to use for notes. You might wonder, after I make this next few remarks, why I took time to make sure of the notepads. Listen closely.

When jurors do have questions, however, it is an unusual situation that I can actually answer their question. If you do ask a question, I will bring you back into the courtroom and advise you whether or not I am able to answer your question. You are advised that you should not, at any time, indicate your numerical division when communicating with the Court.

Now, that concludes what I call the formal closing instruction. The informal matter that I try to address informally about what I sometimes call a cultural issue that we have in this country and that deals with smoking. This is a non-smoking facility. However, I

4407

never know frequently members of the jury who smoke.  If you desire to take a break for the purposes of smoking, you must follow this procedure.  Those jurors who desire to smoke must tell the foreman their names, those names must be put on a piece of paper.  You should knock on the door, give that list to the court security officer who will take those whose names are on that list to a smoking area.  Those of you who take that smoke break are not to talk among yourselves or to talk to anyone during that smoke break.  Those left in the deliberation room are to cease deliberations, that is, cease talking about the case.  You can talk about the weather or something, but you should not have any deliberations while those that are taking a break are away from you.  When they return, then you continue your deliberations.

I'll ask now that the bailiff come forward and be sworn.

(Whereupon, the bailiff was administered the oath.)

THE COURT:  Just one moment.  When I read the instruction earlier, my clerk noted at least something that could cause -- it's essentially I instructed incorrectly.  So let me make reference to the interrogatories.  When I previously read the instruction, I said if you find the Defendant guilty of any of the

4408

counts, you must also complete the Special Interrogatories. I've corrected that with blue pen ink changed and initialed it. That should read -- the instruction should read: If you find the Defendant guilty of Counts One or Two, you must also complete Special Interrogatories relating to that count and the foreperson must sign the Special Interrogatories. You'll find the Special Interrogatories there's one for each Counts One and Two. So, if you find the Defendant guilty of Count One, you should fill out the Interrogatory as to Count One. If you find him guilty as to Count Two, you should fill out the Interrogatory as to Count Two. If you find him guilty as to both, you should fill out both of them.

Let me ask the bailiff to come forward. You're now placed in the care of the bailiff. I'll ask everyone in the courtroom to please remain seated as the jury leaves the courtroom to begin their deliberations. Jurors 31, 197 and 85 should remain seated. Jurors 31, 197 and 85 should remain seated.

(Whereupon, the jury exited the room to deliberate after which the following record was made.)

THE COURT: I'll ask the clerk to take jurors 31, 197 and 85. And as I think back over my instructions that perhaps I've been successful in not telling you

4409

you're alternative jurors.  So you'll move to a special room with the clerk to await further instructions from the Court.

(Whereupon, the alternates exited the courtroom after which the following record was made.)

THE COURT:  Before we recess, there are three things.  I was given notes, so let me start with the one that's the most pressing in my mind.  When we started this trial, there was some concern expressed by Defendant's counsel in regard to the presence of the Oklahoma Highway Patrol or what their presence might be during this trial.  And I want the record to reflect that -- I'm not sure off the top of my head.  We've been in trial for 20 days.  My clerk might be able to tell me. She may be -- seems like we've been here more than 20 days, but we've had at least 20 days of trial.  And I will say for the record, so the record speaks clearly, that I did not recognize the Oklahoma Highway Patrol to be here in uniform in any large numbers.  For the most part, I never saw more than one or two during the trial. I note today, the last day of the trial, that there may have been four or five.  But except for today, there's never been more than three, and that was very infrequent. Most of the time there was either none or one or two present.

4410

Next, I want to ask the attorneys if you leave the courthouse, to leave your cell numbers with the clerk and be within -- I think I have all local attorneys this time, so you can stay within 15 minutes of the courthouse.

Anything further before we recess?  Any inquiry first from the Government?

MR. SPERLING:  No, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  No, Your Honor.

THE COURT:  We'll be in recess.

(Whereupon, the jury deliberated while the Court was in recess after which the following record was made outside the hearing of the jury.)

THE COURT:  Let the record reflect counsel for Government is present, Defendant is present with counsel. I received a note from the jury signed by the foreman.  I ask counsel -- I'm going to mark this Court Exhibit 21. And ask counsel to approach the bench so you can take a look at it.

(Whereupon, counsel and the Court had an off the record discussion after which the jury entered the courtroom and the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present,

4411

Defendant is present with counsel.  I note that juror number ten was apparently elected foreperson of the jury; is that correct?

JUROR:  Yes, sir.

THE COURT:  The Court has received your note and will mark it as Court Exhibit 21.  I have read your question and given it thorough consideration.  And because of the nature of the information you seek, the Court's instruction is to advise you that the answer to your question is in the Instructions and that you should review the Court's Instructions to determine the answer to your question.  It's not unusual for a jury to -- I'm not suggesting you haven't read them more than once or twice, but sometimes it's necessary to read them several times.  And I would advise you so that you understand, I understand your question.  The Court has reviewed all the instructions and I'm confident the answer to your question is in the Instructions that have been given to you.  I'll ask you to go back and review those one more time.  I'll ask now that you retire to return to your deliberations.  Everyone please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom to deliberate after which the following record was made.)

THE COURT:  Let the record reflect the jury has

4412

departed the courtroom.  Any record to be made on behalf of the Government in regard to the Court's discussion with the jury?

MR. SPERLING:  Not at this time, Your Honor.

THE COURT:  Defendant?

MR. HILFIGER:  No, Your Honor.

THE COURT:  We'll be in recess.

(Whereupon, the Court was in recess while the jury deliberated after which the following record was made outside the hearing of the jury.)

THE COURT:  Ask the bailiff to bring the jury in.

(Whereupon, jury entered the courtroom after which the following record was made.)

THE COURT:  We have three alternates available coming in.  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant's present with counsel.

Members of the jury, I have determined that this late hour in the evening, you have deliberated for over eight hours.  I think it would be appropriate to take a recess.  We started at 8:30 this morning and you've heard over 20 days of testimony, and this has been a long day.  I think it's time to take a rest from this.

And I'll ask you to remember my admonitions of

4413

the past.  And it's particularly important that you understand you're not to discuss this matter among yourselves or allow anyone else to discuss it with you. This is as important now as it ever was to avoid any news coverage of this matter if there is any.  Keep your minds free and open.  I have instructed you previously about the only deliberations that take place are when the jury is all together.  That was the discussion I had with you about the smoking break and things like this.  This is the break for the evening where those same admonitions apply.  So I'll ask that you report back in the morning at 9:00 o'clock, reinitiate your deliberations when all the jurors have reached the jury room, and we'll be here waiting for you at that time.

So I'll ask everyone in the courtroom to please remain seated as the jury leaves the courthouse for the evening recess.

(Whereupon, the jury retired for the evening after which the following record was made.)

THE COURT:  Any record to be made on behalf of the Government outside the hearing of the jury?

MR. SPERLING:  No, Your Honor.

THE COURT:  For the defense?

MR. HILFIGER:  No record.  Do we need to be back here at 9:00 o'clock or just be in the office at

4414

9:00 o'clock?

THE COURT:  Just tell the clerk where we can reach you.  Probably a ten minute rule, be here in ten minutes.  Anything further?

MR. SPERLING:  No, Your Honor.

(Whereupon, the Proceedings were continued to November 4, 2005.)

4415

C E R T I F I C A T E

STATE OF OKLAHOMA   )
                    ) SS.
COUNTY OF TULSA     )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 3, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 4249 through 4414.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

_____
GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

53

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,   )
                            )
          Plaintiff,        )
                            )
-vs-                        )   No. CR-04-115-P
                            )
KENNETH EUGENE BARRETT,     )
                            )
          Defendant.        )

VOLUME 21 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 4, 2005.

A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                        United States Attorney
                        and
                        Mr. D. Michael Littlefield
                        Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                        Mr. Bret A. Smith
                        Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 4417-4425

4417

PROCEEDINGS

THE COURT:  Let the record reflect that the jury is in the box, counsel for the Government is present, the Defendant and counsel are present.  I've received a note from the foreperson of the jury indicating that the jury has a verdict; is that correct, Mr. Foreperson?

JUROR:  Yes, Your Honor.

THE COURT:  If you would please pass the verdict forms to the bailiff.  I'll ask that the clerk mark the jury's note as Court Exhibit 23 and ask counsel if you desire to examine, that you may come forward.

Any comment from the Government in regard to the note from the jury?

MR. SPERLING:  No, Your Honor.

THE COURT:  For the defense?

MR. HILFIGER:  No, Your Honor.

THE COURT:  The Court has reviewed the verdict forms and finds them to be in proper order.  I'll now ask that the clerk publish the verdict.

Before we publish the verdict, it's the practice, longstanding practice, in my court whether I have one person in the audience or many as we have this morning to remind those spectators that are here that it is unacceptable to show any emotion in regard to this

verdict. And I say -- I'm not unaware of the emotion involved in this case. But I say that because this jury has poured their lives and hearts and souls into this effort and I don't want to do anything that detracts from their effort. I can only imagine that there are those who are deeply emotionally involved in this matter and I have great respect for those feelings also. But I must tell if you think you cannot control your emotions -- and what I mean by control is to sit there stoic, is the best word that I've come from my vocabulary with to describe what I expect, and that means absolutely no emotion. And if you feel you can't do that, I would ask you please remove yourself from the courtroom. And I don't say what I'm about to say with anything but concern for the process. I'll be required to have you removed from the courtroom if you cannot do that. So I want you to think for a moment. If you feel you can't do that, then it's much less embarrassing if you'll do that on your own.

With that said, I'll ask the clerk to publish the verdict.

COURT CLERK: In the United States District Court for the Eastern District of Oklahoma, United States of America, Plaintiff versus Kenneth Eugene Barrett, Defendant, Number CR-04-115-P. Verdict form number one: We the jury duly empanelled and sworn in the above

4419

entitled case as to Count One of the Superseding Indictment hereby unanimously find the Defendant Kenneth Eugene Barrett guilty.

Number two, we the jury duly empanelled and sworn in the above entitled case as to Count Two of the Superseding Indictment hereby unanimously find the Defendant Kenneth Eugene Barrett guilty.

Number three, we the jury duly empanelled and sworn in the above entitled case as to Count Three of the Superseding Indictment hereby unanimously find the Defendant Kenneth Eugene Barrett guilty.

Dated this 4th day of November, 2005 signed by Juror Number 10, foreperson.

Special Interrogatory, Count One.  We the jury unanimously find beyond a reasonable doubt that the Defendant Kenneth Eugene Barrett in the act of killing David Eales committed murder.  Yes.  Signed Juror Number 10, foreperson 11-4-05.

Special Interrogatory, Count Two.  We the jury unanimously find beyond a reasonable doubt that the Defendant Kenneth Eugene Barrett in the act of killing David Eales committed murder.  Yes.  Signed Juror Number 10, foreperson dated 11-4-05.

THE COURT:  Members of the jury, you have heard the verdict read.  If this is in fact your verdict, would

4420

you please signify by raising your right hand?  The record should reflect that all members of the jury raised their right hand.  Does the Government request any further polling of the jury?

MR. SPERLING:  No, Your Honor.

THE COURT:  Does the Defendant request any further polling of the jury?

MR. HILFIGER:  No, Your Honor.

THE COURT:  Let me see counsel.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  To both parties I apologize for bringing this at this point, but any thoughts about -- before I release this jury?  My thought is to release them until Wednesday before we start the second stage.

MR. SPERLING:  We agree with your thought.

MR. SMITH:  We're going to be off Friday.

THE COURT:  Yes.

MR. SMITH:  Because of the holiday.

THE COURT:  Yes.  And I understand that -- I mean, what I'm presuming is that the Government would, based on what they've told me, to take two days and we'd be off Friday.  I don't know if two days is enough but we'd be off that Friday because of holiday.

MR. SPERLING:  In two days, I think at the

4421

outside, we could well be finished in a day or a day into the second.

THE COURT:  I didn't know if you all talked. Probably haven't had any discussion, but I can't imagine you haven't.  But just thoughts about -- I mean, we have them come back Tuesday, I just want you --

MR. HILFIGER:  Wednesday would be the earliest that I think we would be ready.

MR. SMITH:  Particularly if we weren't responsible for witnesses until that following Monday.

THE COURT:  I mean, I'm not going to put anything on from the defense until Monday after the holiday.

MR. HILFIGER:  We can do it by then.

MR. SMITH:  I think that -- start Wednesday.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, including the three alternatives, I'll excuse you now until Wednesday, Wednesday morning, at 9:00 o'clock on the 9th of November.  I'll remind you that you're under the continuing admonition from the Court not to discuss this matter with anyone, don't allow anyone to discuss it with you, avoid any news coverage that this case may generate. And you should not discuss this matter any further among

4422

yourselves and I'll see you back here Wednesday morning at 9:00 o'clock.

Everyone in the courtroom please remain seated as the jury leaves the courtroom. Exit through this door.

Make it clear, the alternatives are to be back at 9:00 o'clock Wednesday also. The juror tags, if you want to leave those here with the clerk, you may.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT: Let the record reflect that the jury has departed the courtroom. Any record to be made on behalf of the Government outside the hearing of the jury?

MR. SPERLING: No, Your Honor.

THE COURT: For the defense?

MR. HILFIGER: Not at this time, Your Honor.

THE COURT: Two matters. The exhibits that have been introduced will be preserved by the clerk. The next issue I have on my list has to deal with is, I anticipate receiving from the Government a summary of the evidence that you plan to present for the victim impact. We talked about that. When can I anticipate that?

MR. SPERLING: I hope to put that together before the close of business, Your Honor.

4423

THE COURT:  Now, anything further from the Government?

MR. SPERLING:  There will be a point, Your Honor, at which we would respectfully request a discussion concerning the intention of the defense with regard to Rule 12.2.  That will not impact the presentation of witnesses in the punishment phase from our side, but it would impact rebuttal with regard to the expert who is examined.

THE COURT:  Any response to that thought or anything else?

MR. HILFIGER:  At this point we haven't made a decision on that, Your Honor.

THE COURT:  Mr. Hilfiger, would it be possible for you to notify the Court by Wednesday the beginning?

MR. HILFIGER:  Yes.

THE COURT:  You're aware that there's information under seal that's either released or not released depending on whether or not --

MR. HILFIGER:  I would really anticipate we'll know Monday.

THE COURT:  Wednesday morning is sufficient notice, I believe.

MR. HILFIGER:  Okay.  Thank you.

THE COURT:  Anything further from the defense?

4424

MR. HILFIGER:  No, Your Honor.

THE COURT:  We'll be in recess until Wednesday morning at 9:00 o'clock.

(Whereupon, the Proceedings were continued to November 9, 2005.)

4425

C E R T I F I C A T E

STATE OF OKLAHOMA   )
                    ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 4, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 4417 through 4424.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this _20th_ day of May, 2006.

GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 2 2 2006

Wi..
Clerk, U S  District Court
By_____
Deputy Clerk

UNITED STATES OF AMERICA, )
                         )
          Plaintiff,     )
                         )
-vs-                     )   No. CR-04-115-P
                         )
KENNETH EUGENE BARRETT,  )
                         )
          Defendant.     )


VOLUME 22 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 9, 2005.


A P P E A R A N C E S

For the Plaintiff:     Mr. Sheldon J. Sperling
                       United States Attorney
                       and
                       Mr. D. Michael Littlefield
                       Assistant U.S. Attorney

For the Defendant:     Mr. Roger Hilfiger and
                       Mr. Bret A. Smith
                       Attorneys at Law

EUSTICE REPORTING SERVICE
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 4427 — 4627

4427

W I T N E S S E S

PAGE

WILLIAM DeWEESE
Direct Examination by Mr. Sperling . . . . .   4527

STANLEY PHILPOT
Direct Examination by Mr. Littlefield . . . .   4541
Cross Examination by Mr. Hilfiger . . . . . .   4550
Redirect Examination by Mr. Littlefield . . .   4558
Recross Examination by Mr. Hilfiger . . . . .   4560

JOHNNY PHILPOT
Direct Examination by Mr. Littlefield . . . .   4561
Cross Examination by Mr. Hilfiger . . . . . .   4566
Redirect Examination by Mr. Littlefield . . .   4569
Recross Examination by Mr. Hilfiger . . . . .   4574

CINDY CRAWFORD
Direct Examination by Mr. Littlefield . . . .   4575
Cross Examination by Mr. Smith  . . . . . . .   4579

CHARLES SANDERS
Direct Examination by Mr. Littlefield . . . .   4586
Cross Examination by Mr. Hilfiger . . . . . .   4588

LARRY LANE
Direct Examination by Mr. Sperling  . . . . .   4591
Cross Examination by Mr. Hilfiger . . . . . .   4607
Redirect Examination by Mr. Sperling  . . . .   4611

SHANNON SMITH
Direct Examination by Mr. Smith . . . . . . .   4612
(Continued to November 10, 2005)

P R O C E E D I N G S

(Whereupon, the following record was made in chambers outside the hearing of the jury.)

THE COURT:  Let the record reflect that the counsel for the Government is present and counsel for the Defendant is present.  I wanted to have a preliminary meeting just to ask first:  Any objection to the

4428

preliminary instructions that the Court had submitted for your approval?

MR. SPERLING: No, Your Honor.

MR. HILFIGER: No objection. We would ask -- I don't know whether it would be just an additional instruction or something because of the nature of the information as opposed to evidence that's coming in. My concern is that, you know, the people in the audience should be warned about undue emotional outburst.

THE COURT: Somewhat similar to what I said before the verdict?

MR. HILFIGER: Yes. But I mean it's not -- because it won't be a one time deal. It may be over two or three hours. It might be a funeral eulogy and --

THE COURT: Well, hold on that.

MR. HILFIGER: Well, I mean, they've got two of them set up. I mean, one they show a picture of. But my point is, I just think that some warning needs to be given not only to the audience but also to the jury, that, hey, some of this sympathy is allowed but not just outright emotional outburst. And the witness himself -- and you know, you can sort of understand it a little bit with the wife, but my concern is maybe with Gene Hise. I think he tends to be very emotional. I mean, that's what I've heard at the previous trial and he seemed like he

4429

sort of -- he wasn't as bad this time.

THE COURT:  What you're suggesting is to make a suggestion to the witnesses and to the audience and then to the jury to reemphasize not to let emotion, sympathy --

MR. HILFIGER:  Right.

THE COURT:  We tend to do -- that's planned for the final instructions for sure, but I don't see any reason not to make mention of it at the beginning in a general way somewhat similar to close of the case.  At the beginning of this process to remind folks to -- remind the audience and the witnesses to restrain themselves as much as they possibly can.

MR. SPERLING:  That cuts both ways in our estimation, Judge.  And I appreciate --

THE COURT:  Well, my point is there's going to be some natural tears if there are family members in the audience.  The person testifying is in a special situation.  I'm going to give a great deal of leeway to them.  But if there are folks in the audience who can't deal with -- I don't want two emotional settings going on at the same time in the courtroom.  The jury seat, yes. I'm concerned about there being -- because of the nature of this case, the family members and the close friends, I think five or six people crying loudly, I don't think we

4430

can allow that atmosphere in the courtroom.

MR. HILFIGER: I do think -- I don't know whether you're talking about any of our people, but I do know that I've talked to some of Kenny Barrett's family and they are specifically not going to come today because of that concern. You know, they don't want to be upset or --

THE COURT: With that admonition, no objection to the preliminary instructions?

MR. HILFIGER: No.

THE COURT: Then let me get probably to the -- the things I have to talk about are the preliminary instructions, the issues surrounding the nature of the evidence that the Government can put on in the way of victim impact. I want to talk about the video, DVD of the funeral that we've looked at.

MR. SPERLING: May I quickly obtain one document, Your Honor, from my table that's relevant to this discussion?

THE COURT: You may.

(Whereupon, Mr. Sperling exited the chambers and upon his return the following record was made.)

THE COURT: Now, where I left you last evening is the Government gave me a copy of the DVD that depicts the funeral of Rocky Eales. And along with that, my

4431

clerks have done some research.  First, I would say the federal death penalty cases, one that we found, there are some state court cases that after reading them, I would listen to the Government's argument, but I'd like the Government to be aware of these cases.  I don't think there's any possible way that the video comes in.

MR. SPERLING:  We're willing to accede to that expression, Your Honor.  Bill DeWeese will be here.  He can testify.  And I appreciate the Court's concern and I want to step back from any line.

THE COURT:  I think this is -- I would say that after the research I have been provided, I left here with not as much concern as perhaps I have now.  Not having -- using Payne versus Tennessee as a jumping off place and then, of course, our McVeigh case here in Oklahoma gives some insight.  But the strong indicia of all the cases following Payne that takes me away from even considering the funeral atmosphere for this victim impact evidence. There's a Supreme Court of Indiana probably -- in case 675 Northeast Second is a case very similar to ours, involved the death of a -- murder of a police officer.  I won't go into it in detail, but there it appeared that the court did allow what amounted to a reenactment of the funeral.  And there is some caution that I think needs to be brought to bear.  I think if you looked at that

4432

case -- I'll give it to you, I've got it here.  Without reading it into the record here today, it's just a case where a police officer was killed by someone he had arrested and had children similar ages and the court reversed that case based on the victim impact testimony that was allowed.  It sounds very similar to what the Government was planning to do here.  So I would caution you.  And perhaps the byword is -- I'm not saying that there is a bright line.  It's just that the victim impact evidence, Justice O'Connor has said, should relate to the murder victim's personal characteristics and she suggests or the emotional impact of the crime on victim's family and community which I understand it sounds like it's going the other direction.  But what her case emphasizes is victim impact can give a quick glimpse of the life the petitioner chose to extinguish.  I'm a little concerned and I appreciate the -- of the testimony I've heard. I've had the benefit of hearing Officer Hise's testimony, perhaps concerns me as much as any as to whether or not he can keep himself under control to give something of a quit glimpse.  The cases keep saying quick glimpse which takes it away from the funeral.  And here's just some research I've been given.  First, a video presentation may be prejudicial in and of itself.  A glimpse in the life, background, is not an invitation to an instant

4433

replay.  That's a Texas Court of Criminal Appeals case. Of course, when you deal with the death penalty, Texas and Oklahoma is where you look.  And the kind and source of victim impact evidence may also render the information prejudicial holding that the admission of a photo montage of the victim's life set to music was error.  And then the language of the Court's showing the funeral service may go beyond the possible scope of the victim impact evidence.  Victim impact evidence should not be admitted if the focus of the evidence shifts from humanizing the victim, illustrating the harm caused by the Defendant, measuring worth.  I think these are the key things to avoid.  The key thing to avoid is that the victim impact evidence should not measure the worth of a victim compared to other members of society or try to compare the worth of the victim to the worth of the accused.  And I guess the Government -- maybe the Government's conceded on the video but in this video that's been presented to the Court -- just as an example, in the video that the Court's been presented in the video segment at issue here the speaker refers to many times the governor of the American flag symbols the victim's Marine Corps service are prominently displayed and pan shots of a sizable audience, numerous floral arrangements.  And the concern is that it was a very appropriate funeral, not so that

4434

the parties misunderstand, of course.  A very appropriate funeral.  But the purposes of this impact statement, I think, is over the threshold because it does tend to elevate the victim's worth beyond his inherent worth as a unique human being.  And in one federal case, U.S. versus Sampson, District Court case from Massachusetts, 335 F. Supp. 166 memorializing its decision to exclude a video created for a memorial service on grounds that it was unduly prejudicial.

In looking at the part of the funeral, the DeWeese testimony, I think, does perhaps fit the basic authority Payne versus Tennessee attempts to describe because the purpose of the victim impact evidence is to show the victim's uniqueness as an individual human being and to give the jury some basis to weigh the loss to the community resulting from his death.  I think I don't want to necessarily exclude everything in the funeral's ceremony.  I think we talked about that a little bit yesterday, that his testimony and the nature of his testimony described in the eulogy is probably appropriate, not both the -- not both the recording of the eulogy and the testimony is my thought.  And then my concern about Gene Hise when I look at just the notes that the Government has given me as to -- I bring these things to your attention.  I should have said this

4435

earlier.  Based on the law as I understand it, the Court's in a gatekeeper role as to the victim impact.  So I make this comment about Hise that based on having heard him testify during the first stage of the trial.  And I use his testimony as an example of it's already in evidence whether or not allowing him to testify again adds unnecessary emotional impact to the testimony is the question.  I think in general, a spouse, parents, sister, his friend DeWeese are all appropriate people to talk about impact.  And I think how we capture Justice O'Connor's quick glimpse is the goal.  And the Sampson case speaks to the photo montage.  I think I mentioned that.  But the photo montage is -- of course, I don't know it is a photo montage.

MR. HILFIGER:  What we got today there was.

THE COURT:  So, those are the things I've learned since we spoke about this informally.  I was not as concerned as I am now about victim impact.  So I think it has to be a more measured effort on the part of the Government to --

MR. SPERLING:  675 Northeast --

THE COURT:  We'll give it to you.  Victim impact evidence in the form of a 27 minute video of the life of the victim which included 200 still pictures was inadmissible in the penalty phase of a capital murder

4436

trial that under the Federal Death Penalty Act, video which was accompanied by evocative contemporary music was prepared for a memorial service is prejudicial and provided more than allowable glimpse of the victim's life. That's U.S. versus Sampson. That's the 335 F. Supp. 2nd.

This is one of our own 1998 Oklahoma case. The trial court erred in admitting the photograph of a murder victim smiling broadly on a photograph of the victim holding her infant son as victim impact evidence -- those photographs were not limited to the financial, emotional, psychological or physical effects of the murder on the victim's survivors, but the error was harmless because the aggravating circumstances of the defendant's continuing threat to society outweighed the mitigating evidence. Then you find these cases. Seven photographs showing the victim's wedding, victim in a sailor uniform, victim's children, victim swimming with his children were admissible at penalty phase. That's Texas Supreme Court case.

So, my point is so that both the Government and the Defendant are aware of the informal discussion we had about this matter yesterday, my concerns about it have been heightened, to be more cautious than I probably would have been 24 hours ago. First, any comment from

the Government?

MR. SPERLING:  Yes, Your Honor.  Our intention is to present the testimony of Mr. DeWeese, the live testimony.  He will be subject to cross examination and confrontation.  I had intended, honestly, to play it by ear how the testimony goes depending on whether or not we cover certain of topics that he mentioned in the eulogy verbally or to present the tape.  I have not -- actually, I have not yet decided which of those to go.  We have elected to use still photos rather than a montage.  As much as I would like to hear Bette Midler sing, I'm cautioned that we should not do that but that we should do this in the form of still photos.  We're also not going to use children as props.  We just aren't.

MR. HILFIGER:  You mean as far as pictures -- (Interrupted)

MR. SPERLING:  -- like either testify or, you know, to make -- I have not asked Kelli if either of the kids are going to be here, but they are here this morning.  And I presume that they will continue on in school as they have in the past with one brief exception.

The roles of the victim as son, dad, husband, friend and co-worker are not going to be the subject of cumulative testimony.  But what we had intended, Your Honor, is to only -- in fact, we weren't going to provide

4438

anything with regard to his role as dad by direct testimony from either of the children, but to only cover two brief documents that were handwritten, one by Alli and one by Mackey and to introduce those through wife Kelli. So we had intended to call Kelli Eales in her role as wife, Gene Hise in his role as co-worker and Bill DeWeese in his role as friend.

Let me address Hise first. Hise did talk about the immediate impact and I guess it would be fair to say that he also talked about subsequent impact in that this event still affects him. He did not talk about such things as closing the victim's eyes, talked about things that he did subsequently and the impact of this event on him personally and professionally. And we think that fair to present at least in summary form, and that's what we intended to do. So I think we have stepped away from the concerns that the Court has expressed. I mean, obviously, this is a man who was a marine. DeWeese knew him as a marine. He was a highway patrolman. Gene Hise knew him as a highway patrolman. He was a husband. Kelli knew him as a husband and father. And we think it appropriate consistent with Payne to provide a glimpse through those witnesses. And again, we're not calling cumulative witnesses, we're not calling a mother and a father. And we're calling singular witnesses as to those

4439

items and -- (Interrupted)

THE COURT:  I'm not suggesting you couldn't call mother and father.  I think they both could have -- a loss of a mother and a loss of a father could be distinguishable.  I mean, you have chosen to call -- (Interrupted)

MR. SPERLING:  I think it is.  But I think, you know, consistent with the caution of the glimpse rather than calling more than one coworker, calling more than one friend, calling more than one parent, I think it appropriate to do what we have elected to do in terms of limitation.

THE COURT:  Comment from the defense.

MR. HILFIGER:  My only comment is on DeWeese is how much of his -- I know the eulogy is not coming in, but, I mean, how much of his eulogy information are you going to offer in?  Because there are a lot of stories there that appear to be more than a glimpse that I felt like a lot of stories in the marines and those kind of things seemed like it was more than a glimpse.  He's a very powerful speaker.  I mean, that's sort of what I'm trying to get at because he can tell some good stories. I just don't know how much you're thinking about.

MR. SPERLING:  Well, I think experiences are relevant to indicate loss.  I mean, one of the things you

4440

lose when you lose a best friend from the service is the opportunity to ever reminisce again.  And I think we appreciate those things as we get older.  And I think an illustration or several illustrations would certainly be appropriate with regard to their experiences and in a part to establish that in fact he was a friend, that this isn't just an acquaintance.  But I'm confident that when this -- the Court is gatekeeper also when this happens we'll know when enough is enough.

THE COURT:  Just to give you both some insight, I read the eulogy and my concern was not a few obvious things in the eulogy, but my concern was not so much what he said in the eulogy is that if we were going to do the video and then have him testify is piling on.  But if he's just going to testify, I think the general nature of his eulogy was in keeping with giving a glimpse, because he is a unique -- knew him in a unique time in his life. It's worthy of bringing to the attention of the jury. So, I'll leave that issue with those remarks.  Anything else?

MR. SMITH:  There is another eulogy that was in the trooper magazine.

MR. SPERLING:  We have marked a number of items and honestly I'm interested in hearing what the defense reaction is to the various photographs that have been

4441

marked as exhibits.

MR. SMITH: I'm assuming when you say you're not going to use a prop that you'd pull this one.

MR. SPERLING: I was talking about using them as physical in court props. What number was that?

MR. HILFIGER: 321.

MR. SMITH: It's at the tail end of them. I mean, we've got one that looks like at the wall of the fallen officers, his child.

MR. SPERLING: What number is that?

MR. SMITH: 320. 319 is his son at his headstone. I would tend to think 318 would be appropriate, which is the family photo.

MR. HILFIGER: I don't see any problem with that.

MR. SMITH: 317 looks like it's all right. You've got 316 with him in his trooper car and I don't know how many pictures we show. The 316, I think, is relative to the issue of the police officers. 315 seems to be -- and 314 seem just to be more of the same thing, 313.

COURTROOM DEPUTY: Do you want me to go get your book?

THE COURT: Yes. Just for guidance for both of you, my law clerk is mentioning to me that the case law

4442

in general is critical of anything more than one or two photographs. There is one case that approves seven. I think, of course, photos that depict what they depict is important, obviously. The case law that criticized and reversed the montage.

MR. SMITH: Judge, if I was going to go through here and pick pictures that I would think would fairly depict the victim and his life and the impact he may have had on his family, I would 303 would be one that is a fair representation. These are some that I think we need to choose from, 305 I think is a fair one, 306. There's numerous photos behind it that Mr. Eales and his children, I think, some of the same things. But 316 shows him in his car and 318. I would think out of those, the family photo of him in his official uniform is probably -- I think that would cover it. I thought 306 in there looks like his mom and dad.

MR. SPERLING: Yes. 302, fair?

MR. HILFIGER: I think 302 would be okay. That shows part his --

THE COURT: That's the marine?

MR. SPERLING: We'll help you. 319 through 321, 314 and 315.

THE COURT: Those are the ones you're taking out?

4443

MR. SPERLING:  Yes.

THE COURT:   314 through 315.

MR. SPERLING:  I'm still thinking about 312. But 311, 310, 308.  I think in view of the fact that we have the family photo, 305 can come out.  It's the photo of the victim and his wife.  We'll also let go of 322 and 323.  We'll strike 303 as well, even though that reflects him as a young trooper, we have a photo of him in his trooper car.  I'm wrestling a little bit with 304.  It's the lone wedding photo.  His marriage later in life for him, single marriage for both of them, later in life for him.  She's considerably younger.  I think that draws undue -- in fact, the quality of the photo isn't great as blown up.  I don't think it draws undue attention to the wedding reception.

COURTROOM DEPUTY:  What number was that?

MR. SPERLING:  That was 304.  305 we strike.

COURTROOM DEPUTY:  You'll leave 304 in?

MR. SPERLING:  We'd like to.  305 is stricken, 306 remains, 307 remains, 308 is out, still thinking about 309.  310 is out, 311 is out.  Although 313 depicts training, I'm waffling on that.  314 and 315 are out, 316 is in.  Do you have any objection to 317?

MR. SMITH:  I just think you're getting -- I don't know how many you're going to have left, Shelly,

4444

but I think you've got that same thing depicted elsewhere.

MR. LITTLEFIELD: I was mentioning something when you spoke. I don't know if he heard you.

MR. SMITH: I think it's depicted, but we'll see what you wind up with, I guess.

MR. SPERLING: I think 317 is depicted elsewhere.

MR. HILFIGER: 309.

MR. SPERLING: Okay. We will withdraw 317. 319 through 323 are withdrawn. And even though I think the seven is an arbitrary figure as I think the Court has recognized, if we withdrew 317, I think that's what we have.

THE COURT: So tell me the ones you have.

MR. SPERLING: 302, 304, 306, 307, 309 through 12 and 316. We get to do this with your exhibits.

MR. SMITH: 313 you strike?

MR. SPERLING: Yes, we did. And of course, the video montage, 301.

MR. HILFIGER: You're not going with the video excerpt, you're doing testimony?

MR. SPERLING: I think so. We'll see how his testimony goes and if it covers it --

MR. SMITH: You're not going to do the video?

4445

MR. SPERLING:  I don't think so.

THE COURT:  Did you leave the wedding picture in?

MR. LITTLEFIELD:  Shelly, you don't have the family picture.

THE COURT:  Just a caution, you can look at it. My clerk is reminding me that McVeigh kicked wedding pictures out.

MR. SPERLING:  All right.

MR. HILFIGER:  318 is in.

MR. LITTLEFIELD:  He just read the list of those he was intending to --

MR. HILFIGER:  I thought 318 was one of them.

MR. SPERLING:  We'll strike 304.

MR. SMITH:  318 is gone?

MR. SPERLING:  318 is in.

THE COURT:  318 is the family picture.

COURTROOM DEPUTY:  Is 304 the wedding?

THE COURT:  Is out.

MR. SPERLING:  It's out.

MR. SMITH:  With that proposal, Judge, they've got three that basically show the same thing, that is, Mr. Eales with his two children or one child.  And that's 307, 09 and 12.

MR. SPERLING:  Well, 307 is a photograph of him

4446

with parachuting equipment and reaching down to kiss his daughter. But I think we pulled all but one. Anyway, it shows his activities, it shows, you know, what he does extracurricularly and at the same time making time for a daughter.

THE COURT: Let me be sure that what I show that you are proposing to introduce. 302, 306, 307, 309, 312, 316, 318.

MR. SPERLING: Yes.

THE COURT: Now, does the Defendant have any objections?

MR. HILFIGER: I can see what you're talking about.

MR. SMITH: It appears that 307, 309 and 312 depict primarily the same thing, that's Mr. Eales with his children. 307 just has him with his daughter, 309 and 312 has him with his daughter and his son. Seems like one picture could probably take care of all three of those, whether it be 09 or 312.

MR. SPERLING: They depict differing things, Your Honor, and unique, and I would say, certainly a milestone event, 309, the birth of his son with his daughter there in the bed with him.

THE COURT: I'm leaving 309 out. I think it does depict a significant glimpse of his life when it

4447

shows his first day being a father to two children.

MR. SPERLING: 307 we believe unique because it demonstrates not only his avocation, skydiving, but his commitment as a father. We're not going to have Allison testify, but we think this photograph is an appropriate reflection of that fact. And 312 is a reflection of a later time in life when dad was involved with the kids in family activities. That's the singular photograph that we have offered that we're now apparently going to be allowed to offer that depicts a family outing.

THE COURT: The defense's objection is that they're cumulative?

MR. SMITH: Yes, sir. I think the testimony is going to come out that he was a skydiver and that's what's depicted in 07. And I think the love that he had for his children is depicted in 309 which is kind of same thing in 07 with his daughter.

THE COURT: I'll overrule the objection. That's a total of seven. As I understand it, those are the only photos the Government intends to offer.

MR. SPERLING: In regard to the --
(Interrupted)

THE COURT: In the regard to -- (Interrupted)

MR. SPERLING: Yes.

THE COURT: Yes. And the reason I ask that is

4448

I need to make a record. Does the Government desire to offer all of them?

MR. SPERLING: To suggest such would be to say that you weren't very persuasive, Your Honor, and I'm not willing to say that on the record.

THE COURT: Okay. I'm just trying to reveal to you what I found the law to be.

MR. SPERLING: I appreciate the attitude of the Court with regard to these matters. I think the Court is appropriately sensitive to this issue and we are cautioned by that.

THE COURT: We'll consider that issue closed and ones that -- those seven will be admitted. Now, the next issue on my notes is the motion in limine, Defendant's motion in limine, as to Government's witnesses on future dangerousness. Defense desire to be heard on that issue?

MR. HILFIGER: Not any more than really what is written in there, Judge. The Ottwell, basically it's -- I just don't see where any of that evidence has anything to do with future dangerousness. The other two, Lane and Shannon Smith --

MR. LITTLEFIELD: Sheldon.

MR. HILFIGER: Sheldon Fair is a separate deal. Lane and Shannon Smith are dealing with something that

4449

they made a report on but was never filed. Apparently it was given to the district attorney, the district attorney looked at the evidence and decided not to even file anything about the allegations of their saying they saw or -- with a vehicle. And what really ended up happening was he filed misdemeanor charges of marijuana and paraphernalia and attempting to allude. That doesn't seem to be part of a future dangerousness. And they are also cumulative. If both of them testified, they both would be testifying basically the same thing. Sheldon Fair, if this is the only thing I can see on Sheldon Fair, is the incident where he went out to the house and there wasn't anything. He came to the door, I think, with a gun but he wasn't pointing it at anybody. Sheriff Philpot was called out and everything was sort of resolved.

THE COURT: Testimony had been in his case in chief from Philpot.

MR. HILFIGER: Philpot testified to some of the it, but not -- because he wasn't there when Sheldon Fair initially came out there and didn't get all that part.

MR. LITTLEFIELD: He didn't testify as to the incident that precipitated his visit.

THE COURT: He testified about going out after the complaint.

4450

MR. LITTLEFIELD:  He went out -- that's correct.

THE COURT:  Talking to the Defendant about firing his weapon.

MR. SPERLING:  Right.

MR. LITTLEFIELD:  Yes.  But there was not any evidence in regards to the confrontation or a confrontational approach upon the initial arrival of law enforcement.

MR. HILFIGER:  Well, because Sheriff Philpot wasn't there.

MR. LITTLEFIELD:  I understand.

MR. HILFIGER:  I'm not sure that that was even confrontational.  It was just Sheldon Fair is the one that decided to back off.  There wasn't anything --

MR. SPERLING:  I'll take this in reverse order. The fact that the Defendant was willing to confront law enforcement officers with -- while armed with his finger in the trigger guard certainly says something about his dangerousness.  But can we deal with these in the order that Mr. Hilfiger raised them briefly, Your Honor?

THE COURT:  You may.  I wanted to ask Mr. Hilfiger.  Your argument you've made so far, you mention in your papers that the question future dangerousness as applies in this case should be limited acts or actions

4451

that would be indicative of dangerousness in prison settings since the Defendant -- combination of the sentence he's already received would result in remaining prison for the rest of his natural life.

MR. HILFIGER: Yes.

THE COURT: After our discussions yesterday, there's at least the possibility of something less than that; you understand that?

MR. HILFIGER: Yes. But still based on his prison jacket that we have, he's not earning credits and in the state system, because he's not earning credits in the state system, he'll be serving 85 percent of the 20-year sentence followed by 85 percent of a ten year sentence. He's 42 years old, so -- 47, I mean.

THE COURT: He's 47 now? You're saying just based on his state sentence.

MR. HILFIGER: Right. Born in '61. 44.

MR. SPERLING: As to the Ottawa incident, first we have exercised a considerable amount of prosecutorial restraint. There were three witnesses to this episode. Robert Jerome, Larry Bryant -- actually, there's a third that we could call, Dennis Reimer, the criminalist and the witness that we intend to call, Kevin Ottwell. So, we aren't calling undue emphasis to this item. I would point out, Your Honor, that meth is a particularly

4452

dangerous drug.  This incident involved meth and it is probative for that reason.  The distribution of drugs is sufficiently dangerous to be proscribed by federal and state law.  And this involves the distribution of drugs. Distribution of meth in particular is dangerous as to subject to enhanced state and federal penalties. Distribution of meth to an unknown uncover officer as in this case, someone who didn't know him, is an indiscriminate act which indicates Defendant's dangerousness.  I would add that with regard to the Reform Act, Congress has determined a probable cause finding, a mere charge by a grand jury, should -- a charge by a grand jury that carries a maximum punishment of ten years or more under the Controlled Substances Act requires an 18 USC 3142(F) detention hearing and applies a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of a person as required and the safety of the community.  We point out that the mere use of controlled substance is a condition of freedom during pretrial release, and interestingly the Glover case that was referred to yesterday stands for the proposition that un-adjudicated conduct is admissible to prove future danger.  And that essentially is the conclusion 43 Fed Supp. 2nd 1217 at 1227.  That case in part opines that prison staff and

4453

inmates have the same right to be protected from inmate killers as do persons who live and work in free society.

We would point out also, Your Honor, that if the Defendant had been convicted of that offense, it would easily qualify as a statutory aggravating factor. And we are presenting it in support of a non-statutory aggravating factor. It could have been a statutory aggravating factor if it had been a conviction in certain other prosecutions as a serious drug conviction or a drug offense death penalty. We would argue that it's relevant in part because it's part of a drug distribution history or pattern. And again, we are treating this not in a cumulative manner, but this is another deal. You heard the testimony of Karen Real who saw repeated drug deals, perhaps two or three a day. Well, this is a law enforcement officer that's specifically involved that took great care to handle the evidence, that provided a report and will speak as to an incident that is relevant to the Defendant's future dangerousness as well as his plan, his intent, even his motivation with regard to substantial planning and premeditation.

We would finally urge that the Defendant entered negotiations, that is discussions, with Kevin Ottwell indicating his willingness to trade up to an ounce of meth for a stolen motor vehicle during that same

4454

deal.  So, it wasn't just as if it was a quarter paper and that's it.  The Defendant indicated his willingness to trade up substantially and to deal in a much more substantial quantity.  As I say, we are intending only to limit his testimony to a singular witness as opposed to -- well, the three additional that could be called to complete.  Yes.  I'm reminded of something else.  It's not like drugs don't exist in prison.

THE COURT:  That's what I was going to ask.  The Defendant's suggestion that he's going to be incarcerated even under a state sentence to a period of time in the future that he will be -- so that's your response to that is that drugs are a problem in prison also?

MR. SPERLING:  But, it's also the past behavior as the best indicator of future behavior.  I know that there are some things that the defense will argue and perhaps with respect to their mitigation as to his behavior over the last number of years when he became motivated uniquely.  But at the same time, past behavior is the best indicator of future behavior.  And we are willing, Your Honor, to -- in fact, I would be willing to tell the jury that we are willing to assume Defendant's life imprisonment that past behavior is the most reliable indicator of future conduct.

4455

We would also say that as to the Ottwell circumstances, this isn't something that was uncharged, this was something that was charged and was the subject of a preliminary hearing and a probable cause finding as well. I think that as well as these other events are an indication of the Defendant's willingness to commit dangerous and illegal acts wherever he is.

As to Larry Lane and Shannon Smith, counsel, I believe, inaccurately represents that nothing was filed. What was filed was eluding an officer and certain other charges. But this is an incident where the Defendant approached a vehicle checkpoint, he slowed his vehicle. Larry Lane and Shannon Smith have very unique perspectives. Larry Lane saw him coming and Shannon Smith saw him going. Larry Lane saw him idle up to the checkpoint to a virtual stop, look at him and grin and then pedal to the metal and take off. Shannon Smith then saw the Defendant nearly run into two officers who had to jump out of the way to avoid being hit. So their testimony is not cumulative, their testimony is from differing perspective. And then there was a high speed pursuit at speeds upwards to about 100 miles per hour, I am told. The vehicle was abandoned by the Defendant and then recovered. He was not there when the vehicle was recovered. And, yes, the assistant D.A. filed

4456

misdemeanor charges.  That's really inexplicable to me having heard the testimony of the officers.  But of course, her prosecutorial discretion isn't binding on this Court for purposes of relevance.

There's an interesting case that's called Weeks v. Angelone at 4 Fed. Supp. 2nd, 497.  And the court in that case decided in 1998 says:  The trial court's determination that the evidence -- and it's talking about evidence concerning a prior conviction for drug trafficking and even though the Ottwell thing doesn't involve a conviction, it certainly involves a probable cause finding by the state court and he will be subject here to confrontation and cross examination.  But the court's conclusion in that case is that the trial court's determination, the evidence was relevant to future dangerousness was not an unreasonable application of federal law.  Neither is it here we would argue.  I mean, there are a number of cases.  Hatch v. State of Oklahoma that was ultimately decided by the 10th Circuit on -- I believe 58 Fed. 3rd 1447 in 1995 stands for the proposition that un-adjudicated conduct is relevant.  So I think whatever was filed -- and even if nothing had been filed, the fact that conduct is un-adjudicated doesn't make it irrelevant.

THE COURT:  You're saying it's relevant to a

4457

situation where you admit that he very likely -- or you're willing to tell the jury that strong likelihood that he'll be in prison for the rest of his life, and his future dangerousness, although it happened outside of an incarceration situation, shows future dangerousness to those in the institution?

MR. SPERLING: Yes. I don't think the conduct has to be identical, you know, or even involve like circumstances as will be necessarily presented in prison in order to serve as proof of how the Defendant acts given what is available to him.

MR. HILFIGER: Just a couple comments. Number one, I don't know whether discrimination in selling makes -- has any difference. As Mr. Sperling raises it, this is an indiscriminate sale to somebody he doesn't know. Number one, the allegation was that the confidential informant came in, so it wasn't an indiscriminate sale. Whether that makes may difference or not I don't know. But the amount was -- again, was a very small amount. This case has been on file for over eight years without resolution. And without resolution as far as findings of guilt or anything, probably it would be stale at this particular time and probably won't be resolved. We don't feel that shows any kind of future dangerousness at all. Under the prison system setup he's

4458

going to be in, because he is in, basically, administrative segregation and will probably be there. He will not be eligible for credits, and administrative segregation, he's not going to be around anybody else anyway. Because of the particular type of victim in this case, he has been restricted. He's not going to be allowed to receive credits that he should be allowed to receive because of this particular type of crime. So we're thinking this -- you know, the statement that, yes, this could happen in the future, there's drugs in prison, I don't think that's relevant here because of his particular restriction coming from this particular event as a result of this particular victim.

MR. SPERLING: That's speculative, Your Honor -- (Interrupted)

MR. HILFIGER: It's no more speculative, though, to say that it's going to happen.

THE COURT: What are you going to say to the other -- Larry Lane and Shannon Smith?

MR. HILFIGER: Basically that, you know, these -- that this information was presented to the D.A. in Sequoyah County and the D.A. decided not to file the particular charges based on whatever reason they have. So, we don't think that's relevant as far as the -- not the attempt to allude or possession of marijuana, but I'm

4459

talking about as far as assault and battery with a dangerous weapon or assault with a dangerous weapon. And as far as Sheldon Fair, I never -- I haven't talked to Sheldon Fair, so I don't know. He may be saying more than what his OSBI report says, but it just appears that there wasn't any confrontation, it was just a man came to the door, had a pistol, Sheldon Fair, goes back and calls Sheriff Philpot. There wasn't any threats or anything like that.

MR. SPERLING: I believe it was a rifle identified as -- it wasn't called an assault, but it was called either and SKS or an AK which are assault rifles. But, it's easy for someone to say the officer doesn't feel threatened when he backed off and then called for help because he was -- (Interrupted)

THE COURT: Sheldon Fair is a deputy sheriff?

MR. SPERLING: He was a deputy in Sequoyah County and he's now a police officer in Glenpool.

THE COURT: Any further argument on behalf of the Government -- (Interrupted)

MR. SPERLING: Charges were filed, but, I mean, I go back to the same point.

THE COURT: Charges were filed -- (Interrupted)

MR. SPERLING: In the -- they were charged for attempting to allude, but not Sheldon Fair.

4460

THE COURT: In the second situation.

MR. SPERLING: But charges were filed.

THE COURT: When does this evidence come in?

MR. SPERLING: Ottwell was supposed to be our first witness.

THE COURT: Any other case law you want to bring to my attention?

MR. SPERLING: Well, Hatch v. State of Oklahoma is 58 Fed. 3rd, 1447 which says it's Constitutional and permissible. It cites Williams v. New York, a Supreme Court case. It says the court therefore held that it was Constitutionally permissible for the sentencing judge to seek information from out of court sources indicating that the Defendant had participated in un-adjudicated acts. Smith v. Texas is a Supreme Court case in 2004, 125 Supreme Court 400. And here the prosecution -- the court observes without criticism as a future dangerousness the petitioner had previously been convicted of misdemeanor assault and proffered evidence that he had violated drug laws, and proffered evidence that he violated several drug laws. That observed without criticism. And a Fourth Circuit case, Giarratano v. Procunier, 891 Fed. 2nd, 483 decided in 1989 to the effect that voluntary substance abuse may be probative of future dangerousness. And there were other items. I

4461

mean, here in substance abuse and mental illness and drug abuse were cited to establish the probability of violent behavior to come. I'll point out that Cockrell -- Timothy Cockrell was the petitioner and Jamie Cockrell was the respondent. 2003 WestLaw 190, 6163 it's a 2003 case from the district court in west Texas to the effect that drug use abuse can have a mitigating and aggravating quality. We did that because we know the defense is apparently proffering a mitigating factor relating to drug abuse, too. But we think drug abuse, drug sale, in this case has an aggravating quality as well.

We don't have direct evidence that the Defendant walked out and said, by the way, I'm a future dangerous -- danger. I'm going to be a future danger in prison. How do we determine that? We determine it by calling witnesses that are willing to take the witness stand and testify. That has been difficult to procure in this case because of the Defendant's dangerousness. I think that's been relatively apparent from their testimony. But how do we know that? We look at past activity.

THE COURT: Defense's last word.

MR. HILFIGER: Our past activity is the last five years, prison setting, six years. Five-six years in

4462

prison setting to show future dangerousness.

THE COURT: Your argument is he hasn't done anything while he's in prison to justify this concern in the last five years?

MR. HILFIGER: Right.

THE COURT: No report of threats or misconduct?

MR. HILFIGER: No. I think one minor misconduct in the Muskogee County Jail in the last year. And as far as the prison system in Sequoyah County Jail, I don't think they're substantial misconducts.

MR. SPERLING: Talking about other than participation in an elicit sex ring?

THE COURT: What was the response?

MR. LITTLEFIELD: When he was in Sequoyah County Jail he was participating in elicit sex activities with female prisoners allowed by one of the jailers down there. I mean, if they're sitting there saying, well, you can only ascertain by how he behaves in a jail setting, then, yeah, there's even evidence of his illegal, elicit conduct in a jail -- custodial jail setting. We weren't planning to go into that. I think we can go beyond that. But, I mean, when they sit there and say, well, he's in jail and in the past six years he hasn't done anything wrong -- (Interrupted)

MR. HILFIGER: Never said that. Didn't say

4463

that, though.  Never said he didn't do anything wrong.

MR. LITTLEFIELD:  You said there wasn't any serious misconduct and that is serious misconduct.

THE COURT:  Well, first of all, let me say I think my understanding was -- maybe you're both right. My understanding first from the defense was that he had -- the period of time he'd been incarcerated since the event that was tried in this case that his conduct had been good is important to the Court.  And likewise, the Government's response that his conduct hasn't perhaps been good is also of interest to the Court.  So, unless there's anything further, I'll take this under advisement for a few minutes and let now know how I feel on the motion in limine and then we'll get started.

MR. LITTLEFIELD:  I would ask the Court for some direction.  I want to do it here rather than in front of the jury.  I have intended to call Vicki Lyons in regards to -- offering the gun control -- which was excluded because it was prejudice in the first stage.  I think we're at a different stage and we're measuring different -- the issues in a different light now, his having been convicted.  I want to give a heads-up to the defense I've intended to call her and ask her to identify that one exhibit which was offered and the Court excluded because of the belief that it was more prejudicial than

4464

probative to that stage of the trial.  I'm not trying to lay behind the law -- (Interrupted)

THE COURT:  Tell me more.  I don't remember Vicki Lyons.

MR. LITTLEFIELD:  Vicki Lyons is the individual who was responsible for the crime scene.  There was a number of photographs.  She identified on the gun cabinet the sign that said:  Gun control, hitting what you aim at.

MR. HILFIGER:  Which was a manufactured sign. I mean, one that was just on sale in the stores -- (Interrupted)

MR. LITTLEFIELD:  Somebody put up on Kenny Barrett's gun case.

THE COURT:  You've lost me.  What's it coming in for now?

MR. LITTLEFIELD:  In regards to the future dangerousness.  Additionally, Your Honor, I think that there's -- it has some bearing on his substantial planning and his premeditation which is one of the factors.  That this wasn't just something that just perchance happened.  This was a long term objective of this Defendant, that he was constantly and persistently prepared over the course of at least a year and he intended absolutely to do what he did and prepared for

4465

it.

THE COURT:  Her total purpose for testifying to -- (Interrupted)

MR. LITTLEFIELD:  Identify that one exhibit that was not offered -- or was not introduced or admitted.  That's why I'm saying it now in here.

MR. SMITH:  He offered it, Judge, and I objected to it.  The Court -- (Interrupted)

THE COURT:  Sustained.

MR. SMITH:  I don't know if the situation has changed.  Beside that sticker was also a decal from the National Rifle Association which stands for the proposition that we are entitled to defend ourselves, our homes and our loved ones from intruders.  I mean, it's -- I think it's still overly prejudicial.  It's not probative of a thing, the sticker that Mr. Littlefield is wanting to -- we would still urge its exclusion.

MR. HILFIGER:  I'd like to bring up something. It's just the concern I have, Judge, that it appears that in the prosecutor's mind every action that he has taken is an action with a premeditation to cause this death on this particular day.  It's just like when he bought that Colt Sporter he was planning on killing a police officer. When he bought shells he was planning on killing a police officer.  And those -- it's just a farfetched idea, and

4466

you know, by putting a sticker on his cabinet, that shows substantial premeditated planning to kill a police officer. I just -- every move that -- the prosecutor said that just about every move that Kenneth Barrett has done has been for substantial planning to kill a police officer. I think that's just a farfetched idea.

MR. SPERLING: What we're saying is put all the pieces together. We're not saying that that piece in and of itself is the end all with regard to substantial planning and premeditation, but it's a piece of the puzzle. It's a relevant piece of the puzzle.

THE COURT: I'm going to continue to sustain the objection. I just don't think a sticker without the -- the sticker just there, naked sticker there, without any testimony that says he bought this and he said that this is significant because or this is in my plan or this is how I feel. It just doesn't speak and it's too much -- it has to be -- the Court would have to be relying on a great deal of speculation as to how the jury would interpret it without any evidence to go with the sticker. I know the Government in the past would say all the evidence that surrounds it goes with the sticker speak volumes. But also, it's just as easy to say he just likes stickers and bought the sticker. I don't know that it has anything to do with -- there's no testimony

4467

about it other than we found it in his -- if we had one there that -- I can't think of a positive sticker. But a positive sticker reflecting he was an upstanding young man, I wouldn't let that in either.

MR. LITTLEFIELD: There wasn't a support your local police sticker.

MR. SMITH: There was some badges and a little display that the police officers said he had. Nothing derogatory. Doesn't look like -- (Interrupted)

THE COURT: Anyway, that's what you asked for is a ruling, so you have it.

MR. LITTLEFIELD: Initially, Your Honor, there are two witnesses that I anticipate will provide statements by that they overheard by other family members or heard by family members.

THE COURT: This goes to future dangerousness?

MR. LITTLEFIELD: Yes, Your Honor. Johnny Philpot is prepared to testify that he received a telephone call from Gelene Dotson asking what could be done about Kenny Barrett. He was coming over to her house. He was ordering her around. He was making -- demanding that she cook food. He would be filthy dirty, take showers at his place -- (Interrupted)

THE COURT: Her place?

MR. LITTLEFIELD: Yes. Apologize. And

essentially asked him what can I do. Can you keep him out of here? And Mr. Philpot said, well, you need -- have you told him that he is barred from coming to your place. And she said I can't do that. I'm afraid of him. If I did that, I'm afraid he might beat me up. He said, well, you've got to either do that -- (Interrupted)

THE COURT: Is this his mother or his step-mother?

MR. LITTLEFIELD: His mother. You've got to do that. You need to file a protective order. She said I can't do that. If I did that, I'm afraid he might kill me. And he said that he talked to her and -- but, she would not come down and file a written report and expressed the reason because of her fear of him.

Additionally, Travis Crawford mother's Phyllis advised that Abby who is now Abby Stites, Barrett's wife and ex-wife, was beaten by Barrett by a pipe -- with a pipe. And down -- I think Your Honor recalls that there may have been reference to a creek -- a place called the bottoms at the end of that dirt road, at the dead end. And they don't want to tell you Abby was beaten with a pipe, was bleeding and had to walk naked up to the other members of the family to seek relief up that road. And that Phyllis Crawford advised Travis that Kenny had beat her with a pipe. I'll emphasize that this is a

4469

sentencing proceeding. And as Your Honor well knows, sentencing hearsay is admissible. The statutes specifically provides that the jury shall receive information, not evidence. The Evidence Code provides -- (Interrupted)

THE COURT: When is the time frame?

MR. LITTLEFIELD: The fear from Gelene Dotson would have been in about '98.

THE COURT: These are complaints that Philpot received from his mother and from his former wife?

MR. HILFIGER: Philpot didn't get the second one.

MR. LITTLEFIELD: No. The second one was Travis Crawford's mother, Phyllis Crawford, who is the house immediately to the west from the corner -- (Interrupted)

THE COURT: She's going to testify?

MR. LITTLEFIELD: She is not, but Travis will testify.

THE COURT: Travis is who?

MR. LITTLEFIELD: He is the -- he is Barrett's cousin who saw him at the gate after the troopers rolled by.

MR. SPERLING: So the Court is aware, that is not a singular episode even though this one is much

4470

longer ago.  Shannon Smith says that when he was about 18 years old he was driving in daylight hours, midday, in Sallisaw.  He saw the Defendant hold Abby and strike her.  And he stopped, was going to intervene and the Defendant said get out of here or I'll kill you.

THE COURT:  Is Shannon Smith a deputy?

MR. SPERLING:  He was at that -- he is now a police officer in Glenpool.  I'm sorry.  Shannon Smith is an electrician.  He is no longer -- (Interrupted)

THE COURT:  He was a deputy?

MR. SPERLING:  Yes.

THE COURT:  The incident about the wife beating at the creek or bottoms or whatever?

MR. LITTLEFIELD:  I don't recall that I have the specific date.  I don't recall the specific date, how much in time before this it was.

MR. HILFIGER:  It had to be while they were married though, right?

MR. LITTLEFIELD:  It was either when they were married or shortly after that he broke up or after -- (Interrupted)

THE COURT:  When did that marriage end or broke up?

MR. HILFIGER:  It was '95 or '96.

MR. SMITH:  Sounds like, Judge, that's Abby

telling Phyllis who's telling Travis who's going to testify.

MR. LITTLEFIELD:  Abby walking down the road naked and bleeding could advise Phyllis what happened.

MR. SMITH:  Who told Travis, the one sponsoring the testimony.

MR. SPERLING:  Singular hearsay.

MR. SMITH:  Three times removed.

MR. SPERLING:  It's not three times removed, it's one.

THE COURT:  How much time between -- you know, how much time between the time she comes screaming to him telling him he saw this or is this three years later?

MR. LITTLEFIELD:  I think -- I believe it was shortly thereafter.  Abby or Travis Crawford is not the only family member who advised me of that incident.

THE COURT:  He's the only one that's going to testify?

MR. LITTLEFIELD:  Yes.

THE COURT:  Only one that will testify?  That's up to you.  Anything else?

MR. LITTLEFIELD:  Cindy Crawford, I anticipate, will testify that Kenny Barrett put a shotgun to her leg within a month of -- in the summer of '99 and this isn't hearsay.  Future danger.  In essence, Kenny Barrett

4472

wanted her to have sex with him and she refused and left and he took the shotgun which is in evidence and put it against her leg and said don't ever come back, if you do I'll blow your leg off or words to that effect. I'll blow your leg off or kill you.

THE COURT: When did that happen?

MR. LITTLEFIELD: Summer of '99.

THE COURT: Was that testimony avoided in the trial in the case in chief?

MR. LITTLEFIELD: It was not presented.

THE COURT: I know it wasn't. Was it intentional?

MR. LITTLEFIELD: Not presented? Yes, sir.

THE COURT: Anything else?

MR. LITTLEFIELD: Because my thought was that would be relevant only as to a sentencing stage of danger and didn't have a bearing on his intention to kill a law enforcement officer.

THE COURT: Okay. Anything else?

MR. LITTLEFIELD: No, Your Honor.

THE COURT: Any response?

MR. HILFIGER: On the Philpot deal, I would anticipate Gelene Dotson will be here to testify. She can respond to that. On the -- and I do think that, you know, she'll probably say that she was concerned about

4473

Kenny because of the drug issue.  The Phyllis Crawford, the Travis Crawford, about Abby Crawford, I mean, just seems like it's too far removed.  Phyllis Crawford, my intention is she's going to be here also.  But, you know, I think it's a little bit -- (Interrupted)

THE COURT:  Tell me who she is again.

MR. HILFIGER:  She is the aunt.  I mean, she's the aunt of Kenny Barrett.  She lives two houses away from where Kenny Barrett lives.

MR. LITTLEFIELD:  She lives immediately west of Gelene in mama's trailer.

THE COURT:  Abby Crawford is the -- (Interrupted)

MR. HILFIGER:  Is the wife, ex-wife.

THE COURT:  Ex-wife who was allegedly beaten?

MR. HILFIGER:  Yes.  My understanding from talking to all of them about -- is that Abby was sort of a -- she did some beating herself, what I get from them. But anyway, my understanding -- (Interrupted)

THE COURT:  Beating of -- (Interrupted)

MR. HILFIGER:  Kenny.  I mean, there were some pretty tough fights there going on.  Both of them were pretty bad.  But I really thought that they got a divorce in '95 or '96.  I'm not positive about that.

MR. LITTLEFIELD:  I think this may have been

4474

right after the divorce or clearly after the break up. And at that point she was seeing somebody else and that's part of what precipitated that particular incident.

MR. HILFIGER:  She's -- I mean, to me if they wanted to get to that, Abby's available.  On Cindy Crawford, we did understand about that.  We heard about that.  We don't have the same take on it that the prosecutors have.  We understand that.  And my understanding that Shannon Smith is also going to testify about an incident with Abby Crawford at some time when he was 18 years old?

MR. SPERLING:  Well, we'll see.  I offered that in part because I wanted the Court to know that this isn't something that's just plucked out of thin air.

THE COURT:  Shannon Smith saw Abby Crawford, the wife being beaten?

MR. SPERLING:  Abby Barrett.  Then Barrett at that time.

MR. HILFIGER:  Was Abby Barrett, yes.  I'm sorry.  Abby Barrett.

THE COURT:  Is she related to the Crawfords?

MR. HILFIGER:  No, she's not.  I don't think she is.

THE COURT:  I was confused about that.

MR. HILFIGER:  I don't know when Shannon Smith

4475

was 18.   I don't know how long before that that would be.

MR. SPERLING:  He's 35 now, 17 years ago.

MR. HILFIGER:  So that would be --

MR. LITTLEFIELD:  Eleven years prior to the incident.

MR. HILFIGER:  That seems awfully far removed.

MR. LITTLEFIELD:  It was a pattern of beating.

THE COURT:  Anything further?  I plan to take that issue under advisement for a short period of time.

MR. SMITH:  Judge, I do.  It relates to the victim impact statements.  After having looked at the case law that we talked about earlier, Miami versus State of Indiana, it appears that we probably need to object to the introduction of those victim impact statements.  I don't know if it's going -- as far as the Court's concerned sufficient to do it in here, but I would like to object to just to their inclusion.  It appears all those people will be here to testify.  And if the Court saw fit to admit them, I think there are a couple of things that were identified in there -- (Interrupted)

THE COURT:  Talking about the impact statements that are set forth in -- (Interrupted)

MR. SMITH:  Yes, sir.  Starting with Government's Exhibit 324 is the first one and they concluded with 329.  324 was the first one.

4476

MR. SPERLING: Remind me to take the relevant factors five and 16.

MR. SMITH: I don't want not to belabor it, Judge. We spoke about them yesterday and took out some language that we thought was objectionable. But if they are going to come in, I think there are a couple of things that we still need to address that was pointed out specifically in Lambert.

MR. SPERLING: We're not using the kids who are the authors of 324, 325 and 326. We're not going to call the kids.

MR. SMITH: Not going to call the kids but you want to sponsor the statement?

MR. SPERLING: Through mom.

MR. SMITH: Right.

THE COURT: So your objecting to --?

MR. SMITH: 324, 325, 326 327, 328.

THE COURT: What do you make reference to? You said since you looked at the case. What does it say that caused you concern?

MR. SMITH: Just their conversation about Payne and limitations on the victim impact testimony. And the more I read this, Judge, it just -- in one statement on page five of the last full paragraph says we determine that the brief 12 line victim impact statement is

irrelevant and that it was error to admit it.  I guess that's where --

MR. SPERLING:  Where is that, page five?

MR. SMITH:  Page five, last full paragraph midway down where is says we determined.  It certainly raised my awareness about it, Judge.  I would point out that it appears that all the other witnesses are here to testify other than the two children that 324 and 325 are authored by, and 326.

THE COURT:  325 is --

MR. SMITH:  Some sort of a sketch.

THE COURT:  324 is a statement by Allison?

MR. SPERLING:  Yes.

THE COURT:  That was she did on 6-18-02?

MR. SPERLING:  Right.

THE COURT:  And 325 is a sketch of some sort that I take somebody -- (Interrupted)

MR. SPERLING:  It's Mackey's and it will take mom to decipher.  He was very young when he did this.

THE COURT:  And then 326.

MR. SPERLING:  Is Allison's -- it's a short statement.  It's actually a theme that she wrote, an essay that she wrote.

THE COURT:  327 is not coming in or is it?

MR. SPERLING:  She will be here to testify.  I

4478

don't know that we will need to actually introduce the statement itself.

THE COURT:  327 I'm going to exclude and then, Nancy, talk about the sister.

MR. SPERLING:  I expect her to be here.

THE COURT:  If she's going to be here I won't admit that statement.

COURTROOM DEPUTY:  Is that 328?

THE COURT:  Yes.  329 is his mother.

MR. SPERLING:  I'm not sure how much she's going to be able to do, Your Honor.  She may need more than read the statement.

THE COURT:  We'll wait and see.

MR. SMITH:  324, Judge, I might draw your attention to.  It looks like the last sentence that's specifically addressing Kenneth Barrett.  I wish Kenneth Barrett would had just gone to jail with my dad rather than shooting my dad because now he's in jail and I don't have my dad.

MR. SPERLING:  That's not the typical wish.  I mean, that's different than saying I want you to, you know, strap him down to the gurney kind of a comment.  That's a child saying I wish he had gone to jail with my dad rather than shooting my dad.

MR. LITTLEFIELD:  I wish he would have

4479

surrendered.

MR. SPERLING:  I wish he had gone with him. It's almost like she was expressing remorse for him, too, because now he's in jail and I don't have my dad.

THE COURT:  I'll overrule the objection to 324. I'm a little concerned about 325.  Is the mother going to explain what that is?

MR. SPERLING:  Yes, Your Honor.

THE COURT:  Is there objection to 325?

MR. SMITH:  Yes, sir.

THE COURT:  Sustained.

MR. SPERLING:  Judge, can she talk about it but it not come in?

THE COURT:  She can talk about it subject to objection during the course of it.  I don't know what she's going to say.

MR. HILFIGER:  You mean mother talk about it?

MR. SPERLING:  Yes.

THE COURT:  Still have 326 which is -- I guess, this was when she was six and a half and the other one was obviously when she younger.  Is that the justification for having two?

MR. SPERLING:  Yes, Your Honor -- (Interrupted)

MR. LITTLEFIELD:  This is an essay she wrote within the last year.

4480

THE COURT: It's a victim impact statement recently. The other one was when she was smaller?

MR. SPERLING: Yes.

MR. SMITH: Seems like that would be cumulative, Judge.

THE COURT: I'm going to let them both in.

COURTROOM DEPUTY: What are you going to let in?

THE COURT: 327, 326 and 324. 325 is out. 328 is out. 329 is out.

COURTROOM DEPUTY: Is it in or are you going to wait and see -- (Interrupted)

MR. HILFIGER: 327 is out, isn't it?

THE COURT: 327 is out and then --

MR. SPERLING: Wait and see how 329 goes -- (Interrupted)

THE COURT: Yes. 320, Nancy is not going to testify?

MR. HILFIGER: I thought she was.

MR. SPERLING: I expect her to testify.

THE COURT: Okay. Then 328 is out unless because -- the reason it's out is because she's going to testify. She can't do both. And Bobbie Eales, 329 is taken under advisement to see if she reads it or testifies. Okay. Let's go release the jury to come back

at a quarter to one for lunch.  We'll continue here, but you'll go do that.  Off the record.

(Whereupon, an off the discussion was held after which the following record was made.)

MR. SPERLING:  18 U.S. Code 3593(d) talks about aggravating factor or factors set forth in 3592 found to exist and any other aggravating factor for which notice -- (Interrupted)

THE COURT:  What I want to talk about is Title 21.

MR. SPERLING:  Okay.  The authority for what we did, Your Honor, first is in the notice of intent.  And the notice of intent to seek the death penalty as to the Defendant with regard to Section -- what's the problem that the Court addressed with regard to Title 21?

THE COURT:  Well -- (Interrupted)

MR. SPERLING:  Are you talking about the first four?

THE COURT:  The Kansas case I brought to your attention yesterday.  That's the --

MR. LITTLEFIELD:  Is that the duplicity between the intended killing and the -- the notice we filed specifically says he intended to kill two people, Rocky Eales and Buddy Hamilton.  The risk of injury to others specifically excludes.

4482

MR. SPERLING:  You're talking about the Title 18, not the 21.

THE COURT:  We're talking about Title 21.

MR. LITTLEFIELD:  Okay.

MR. SPERLING:  The Court's concern on Title 21, though, has to do with the intent factors and whether or not we should strike any of them.

THE COURT:  Yes.

MR. SPERLING:  And our response to that is the jury should only find one, but it may elect from among them.  Then the Court also indicated, as I understood it, that sub-feature four is subsumed in three and both should not be submit to the jury.  And that was a separate issue, I think, that the Court raised.  As to whether or not intentionally engaging in conduct --

(Interrupted)

MR. HILFIGER:  That was my understanding what we talked about yesterday, is that instead of submitting four, it's going to be actually submitting three and they only find one of the three under Title 21.

MR. LITTLEFIELD:  I understand.  C says intending to kill, and D is creating a grave risk of death.  Those are two different --

MR. SPERLING:  Well, except if you look at Glover, Judge Buchanan said otherwise.

4483

THE COURT:  You've got all four of them and you can only have one.

MR. LITTLEFIELD:  I understand that but -- (Interrupted)

MR. SPERLING:  That doesn't mean that the jury -- (Interrupted)

MR. LITTLEFIELD:  The jury can consider all four and elect and be advised and instructed as we have submitted in our proposed instructions that they be advised as to Title 21 you may only find one and that -- (Interrupted)

THE COURT:  Aren't you asking to choose four that are so overlapping it's the same -- the one is sufficient?  I mean, that's what Buchanan was saying.

MR. LITTLEFIELD:  It's a gradation and a variance of degrees.  Congress specifically identified four separate levels of intent.  These are the factors that Congress set out in statute.  And are they close and is it hard to draw a line from one to another?  Yes.  But can it be done?

MR. SPERLING:  How we avoid the Kansas judge in McVeigh's problem is by instructing the jury.  I'll tell them in the opening statement that with regard -- these are eligibility factors.  And although there may be three or four depending on how you rule that are going to be

4484

submitted to you, you are only allowed to find one and this isn't a numerical contest.  Even if you were to think that more than one of these apply, you may only apply one.

MR. LITTLEFIELD:  As to Count Three.

MR. SPERLING:  As to Count Three.

THE COURT:  Off the record.

(Whereupon, an off the record discussion was held.)

THE COURT:  Tell me why in Title 21 that you still contend -- I know you say that you're going to tell the jury you only need to find one, but in the instructions and in the verdict form they're going to have to answer yes or no as to all four of them.  They can only find one.  They find yes, yes, yes, four times, that looks like that's the very definition of --
(Interrupted)

MR. SPERLING:  I'm sorry, Your Honor.  But your instructions should find no more than one.

MR. LITTLEFIELD:  You may find only one.

THE COURT:  You may choose from these, but you may choose no more than one.

MR. LITTLEFIELD:  You may find only one.

MR. SPERLING:  That's typical multiple choice. This is one where you've got these three or four choices,

4485

but you may only select one and you may only weigh one.

THE COURT: What's your concern about leaving all four of them in? You look at number one, that's all over and you're taking a chance at least on someone other than this Court recognizing it's a possibility of duplicity.

MR. LITTLEFIELD: For example, he intentionally killed -- and I eavesdropped. But, I mean, I understand that the jury found he -- this was an intentional killing and that he knew he was a law enforcement officer. The first threshold factor is he killed the victim and I think the way the instructions -- at least the proposed instructions we submitted says he intentionally killed David Eales. It is possible one of those people could say, well, he didn't know he was David Eales.

MR. SPERLING: To which there was a suggestion yesterday.

MR. HILFIGER: Didn't we already have that in the original instructions? Wasn't there one you said -- he didn't -- seemed like we respond to -- (Interrupted)

THE COURT: We're in the sentencing stage now.

MR. LITTLEFIELD: I understand that, Judge. And am I going to tell you I think that it all makes sense? Not necessarily. But I know how the statute is written and in my conversations with the capital

4486

litigation section. You know, they pointed out the distinct difference between these two sentencing schemes and because of the fact that the gateway factors are not under Title 18 in the weighing process, they can consider and select all. Because at that point they're out. They just then move on to the statutory and non-statutory aggravating factors and that's all they can weigh under the Title 18 sentence.

THE COURT: We're not there yet. We're still 21.

MR. LITTLEFIELD: But under 21, it's written differently and they weren't written at the same time. Congress was aware when they wrote one of these sentencing schemes what the other one was. And I think Title 18 was first and they wrote them different because they specifically allowed the jury to consider the gateway factors in the weighing process. And to avoid -- but to avoid the problem of multiplicity and overemphasizing that, they can only be allowed to find one. And they are two different statutes. They were -- (Interrupted)

THE COURT: You're aware in this Kansas case the court directed the Government to choose?

MR. SPERLING: That's one way to do it. The other way is for the Court to direct the jury only to

4487

find one.  The fact that he did it that way doesn't mean that's the only way to skin this cat.  If the objective is to keep from a McVeigh -- or from a McCullough error to keep the jury from putting the thumb on the scale of death by finding aggravating factors that overlap, that problem can be avoided by the Court directing the jury that they may only find one and weigh one of those factors.

THE COURT:  Or it can be by the Court ordering the Government to select one.

MR. SPERLING:  And the reason we're arguing that that should not be done, Judge, is that that limits us in our ability to factually argue this case.

MR. LITTLEFIELD:  When did they make the election to is the other question?  I can see -- and I don't know that it's going to happen in this case because of the way it's been presented.  But I can see potentially at the conclusion of the evidence, at that point making the election would be appropriate.  Right now it wouldn't be.

MR. SPERLING:  The Court wants to know now so it knows how to instruct the jury as a preliminary matter.

THE COURT:  Well, I mean, you're right to the extent talking about this now may be premature unless --

4488

I mean, what you're saying is we put on our case and then we talk about instructions depending on what the evidence is.

MR. SPERLING: This jury knows how to do that, though. Look at their questionnaire. They were asked to pick on -- page ten, I believe it was -- from among various scenarios that have some overlap to them. In that case they were told that they need not select one, I believe. But I'm confident that the jury -- the Court instructs the jury in reserve and says, okay, select one. You may only weigh one.

THE COURT: What says the defense?

MR. HILFIGER: Well, my immediate thing on this -- and just about every time -- I'm just saying that every time I read this thing I read something different into it or a different way. It appears to me that B, C and D of the gateway factors or the -- factors are to take other factual circumstances that don't even apply to this case. I mean, in reality, the charge is that he -- and that they've already found on the guilt phase that he intentionally killed Rocky Eales. And it just seems like why are going back to asking them to determine whether he intentionally killed Rocky Eales or whether he intentionally inflicted serious bodily injury which resulted in the death of the victim? To me, that's seems

4489

like something where the person languished for a while and then died as opposed to a killing immediately. The C, if they've already found under the guilt phase that he's intentionally killed a victim under 848, I don't see why C or D even applies. It seems like it's more of a confusion issue.

MR. LITTLEFIELD: If it revolves the way -- away.

THE COURT: It does.

MR. SPERLING: We'll elect one.

THE COURT: Okay. I've got the motion in limine under advisement. I'll give you my ruling on that shortly before we start in about an hour. I'll ask you to come back in here and I'll tell you what the ruling is and then we'll start.

MR. SPERLING: Last item of the overlapping on five and 16 on Title 18?

THE COURT: Yes.

MR. SPERLING: I think that is resolved, Your Honor, by the specific pleading and the notice that we filed on February 15th of this year. We have excluded the conduct is separate. As to the grave risk of death to additional persons, we said, to wit, the other law enforcement officers involved in the tactical entry except for Trooper John Mark Hamilton, Jr. So this

relates to the other tact teamers, but not to Buddy Hamilton.  Whereas, the multiple killing or attempted killings, the Defendant killed or attempted to kill more than one person, to wit, John Mark Hamilton, Jr. and Trooper David Eales in a single criminal episode.

THE COURT:  Okay.  See you in about an hour.

(Whereupon, the noon recess was held after which the following record was made in chambers.)

THE COURT:  Let the record reflect counsel for the Government is present, counsel for the Defendant is present.  Before the issue, Mr. Hilfiger, in passing -- before I get to the motion in limine relates indirectly, at least for the motion in limine, you indicated in some of your arguments before lunch that because of the Defendant's nature of his conviction he was not getting good time credits and he was virtually going to be required to serve all the time that he's been sentenced to in state court.  Do you -- apparently you're going to argue that.  My question I have:  Is there evidence of that in the record or do you intend to put that in the record?

MR. HILFIGER:  The DOC case manager or appropriate deals -- of course, we have just received his -- (Interrupted)

THE COURT:  You answered my question.

4491

MR. LITTLEFIELD:  We'll get a copy of it.

THE COURT:  Now, in regard to the motion in limine, the motion in limine filed by the Defendant, the Court would enter the following order.  The defense counsel previously moved this Court for an order limiting the nature of the evidence the Government may present regarding Defendant's future dangerousness and Simmons versus South Carolina 512 U.S. 154, 1994 the Supreme Court held that the Court must instruct or allow the defendant to inform the jury that the defendant will spend his natural life imprisonment.  Further, the defendant's release is legally possible but actually improbable such as under a sentence to a term of years. Here the court may limit the discussion of the defendant's future dangerousness.  See U.S. versus Flores, 63 F. 3rd, 1342 Fifth Circuit 1995.  In answer to defense counsel's earlier motion, the court ordered the government to confine its discussion of defendant's future dangerousness to any threat the defendant may present in the prison setting.  The government is reminded these limitations still apply.

The proposed testimony of Larry Lane and Shannon Smith is in this Court's mind a close call.  The Court will allow such testimony only to the extent that it is used to show Defendant's attitude for law

4492

enforcement which may be relevant to the threat he might impose in prison. Defendant's motion in limine is therefore overruled as to Larry Lane and Shannon Smith.

The Court does not find, however, that the same relevance could extend to the proposed testimony of Sheldon Fair. The un-adjudicated conduct alleged in this incident may not even amount to a criminal offense, thus Defendant's motion is granted with regard to the Sheldon Fair testimony.

Extending the logic that probable versus possible future dangerousness a bit further, the Court also holds that the availability of drugs in prison of possible is not persuasive in discussing Defendant's future dangerousness. To the extent that evidence regarding Defendant's drug trafficking business could be relevant to show future dangerousness, the Court finds that such evidence would be redundant as these circumstances were described in abundant detail in the guilt phase of this trial. Defendant's motion in limine is therefore granted with regard to Kevin Ottwell's testimony or Ottwell's testimony.

As to the proposed hearsay testimony of Travis Crawford and Johnny Philpot, the Court notes that although hearsay testimony is allowable in the sentencing phase, more reliable evidence is still preferred and

apparently available in this case. The events Crawford and Philpot are supposed to describe are admissible through the testimony. I'm not sure that Abby Barrett, the wife of the Defendant, and Gelene Dotson, who I believe is his mother, in the event they denied these events, the witnesses proposed by the Government may testify to impeach them if necessary.

May the clerk direct the marshal to bring the Defendant up and I'm prepared to read preliminary instructions. And how much time for opening? I said you could have as little as 20 and as much as 40.

MR. SPERLING: It will be somewhere in there, I think.

MR. LITTLEFIELD: Your Honor, there was one incident that we intended to have testimony regarding which was in the discovery that is not included in the motion in limine. But based upon the Court's ruling, Stanley Philpot met Mr. Barrett at a four way stop sign north and west of Sallisaw. There was an outstanding warrant for him for the '87 drug charge and he had not yet been arrested. He stopped Mr. Barrett. Mr. Barrett -- he advised him he had a felony warrant --
(Interrupted)

THE COURT: '97 or '87?

MR. LITTLEFIELD: 1997.

4494

THE COURT:  You said '87.

MR. LITTLEFIELD:  I apologize.  It was the '97 drug case.  He had a felony arrest warrant and advised him of it and said I'm going to take in.  And Mr. Barrett said, man, it will cost me an arm and a leg to tow my car.  Will you follow me home and I'll surrender.  He followed him.  When he got to the dirt road he got dusted.  Barrett sped up, created a cloud of dust and Philpot couldn't stay right on his tail.  He went to his house.  When he got there, the front gate had been locked.  Mr. Barrett's vehicle was inside.  He went down to the drive that the troopers used and turned around. And when he got out of his vehicle, he looked over at the door and Mr. Barrett was holding a long handled pistol or a long barreled pistol.  And so, Stanley Philpot drove up and called for backup because he didn't want to be involved in a shootout.  When he got back --
(Interrupted)

THE COURT:  You say when he drove on up, you mean -- (Interrupted)

MR. LITTLEFIELD:  Drove back west and there's a slight elevation -- or an elevation.  When he got back up there, they returned to the residence, went into the yard and tried to call him out.  No response.  Went into the residence, found .44 -- a tray of .44 Magnum rounds in

4495

that east living room.

THE COURT:  You lost me.  Last time I was with you, you said Philpot saw him on the front door with a long handled pistol and then he backed off?

MR. LITTLEFIELD:  Philpot backed off and went a little bit west outside of -- outside the direct side of the cabin and called for backup.  When the backup arrived, they returned to the cabin, tried to call Barrett out, got no response, moved up cautiously to the cabin.  It was -- in the front room was a tray of .44 Magnum ammunition which would be appropriate to the revolver that was seen being held by Barrett and empty slugs sitting on the -- in that room as well as if the cylinder of a revolver had been unloaded.  Barrett wasn't in the house.  He fled.

THE COURT:  Counsel for the defense.

MR. LITTLEFIELD:  And while there was not a direct threat if the firearm, this was in response to the advice that I have a warrant for you, I'm going to arrest you.

MR. HILFIGER:  The only -- I was aware of everything except the description of the pistol and the .44 Magnum shells and unloaded shells and all that stuff. I was aware that Stanley Philpot had gone out there on occasion, and when they came back to search the house he

4496

was not there. But I never saw anything about any kind of weaponry or ammunition was found and --

MR. LITTLEFIELD: The gun wasn't in there when they searched, the gun he was seen holding was not in his place, what he is testifying to. There were the rounds on a tray, there were the empty hulls in that same room. They did not find a long barreled pistol in the house nor did they -- (Interrupted)

THE COURT: How close is Philpot going to say he got to the house?

MR. LITTLEFIELD: Out by the gate.

MR. HILFIGER: He never got into the -- he never came in the yard -- (Interrupted)

MR. LITTLEFIELD: I don't believe he did. I believe he saw him at the gate and did not want to confront him at that point in time.

THE COURT: He was at the gate of -- (Interrupted)

MR. LITTLEFIELD: In front of Mr. Barrett's house. The metal gate that was knocked down.

MR. HILFIGER: That didn't result in any charges or anything?

MR. LITTLEFIELD: No. Didn't charge him.

MR. HILFIGER: How much later was it that he turned himself in? Didn't he turn himself in?

4497

MR. LITTLEFIELD:  Within days.  That's why they didn't have a booking photo.  He went in with Bill Ed Rogers and immediately had bond made before he ever got booked into jail.  He self-surrendered with his attorney and immediately bonded back out.

MR. HILFIGER:  I think what -- just seems like it's the same kind of conduct we talked about on Sheldon Fair.

MR. LITTLEFIELD:  Except it's in response to a lawful warrant that he knew was in existence.  He was advised of it.

MR. HILFIGER:  And he turned himself in.

MR. LITTLEFIELD:  No, he fled.  He eluded officers and confronted him with a gun.

MR. HILFIGER:  I object to it just on the same basis as Sheldon Fair and that also that he turned himself in.

MR. LITTLEFIELD:  And I didn't want to -- that's why I addressed it.

THE COURT:  To the extent the Defendant objects, I'll allow the testimony.  I think it shows dangerousness to law enforcement.

MR. SMITH:  Is the Rule still going to be invoked?

THE COURT:  You mean Rule of Sequestration?

4498

MR. SMITH:  Yes.

THE COURT:  You can request it.

MR. SMITH:  We do.  The only reason I bring that up is Gene Hise was in the courtroom this morning.

MR. SPERLING:  I told him.

THE COURT:  I'll make that announcement before we start.

MR. SMITH:  We understand as it relates to Mrs. Eales?

MR. SPERLING:  I need a couple of minutes to rearrange witnesses.

THE COURT:  It will take a few minutes.  What does it usually take the marshal to get the Defendant up here?

MR. HILFIGER:  Just a few minutes.

THE COURT:  How much time do you need, 15 minutes?

MR. SPERLING:  No.  I just need to arrange some things and get some other people up here.

THE COURT:  Ten minutes?

MR. SPERLING:  That's fine.

THE COURT:  We'll start at 1:30 by that clock.

(Whereupon, a short recess was held after which the following record was made in open court in the presence of the jury.)

4499

THE COURT:  First, let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.

Members of the jury: Let the record reflect that the Court and parties appreciate your patience.  I know that we asked you to be here earlier.  We anticipated starting earlier, but there were issues that the Court and the parties needed to deal with before we started, so we are starting later than we anticipated.

Let me at this time give you what I call my preliminary penalty instructions.  You will then hear opening statements first from the Government and then the Defendant.  Counsel has requested that the Rule of Sequestration be imposed so I'll announce for the record that if there are persons in the courtroom who would anticipate testifying in the penalty phase of this matter, that they should remove themselves from the courtroom until they are called as a witness by whichever party has designated them as witnesses.  So if there are those who are present who anticipate testifying, you should leave the courtroom now.  I'll require that counsel for each party be cognizant of the spectators so that if you do have witnesses in the courtroom, you should be responsible for notifying them as soon as these come into the courtroom.

4500

MR. SPERLING:  Will the Court grant the exception with regard -- the statutory exception for Mrs. Eales and family members?

THE COURT:  Let me see counsel at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  I thought we had already said that.

MR. SPERLING:  I just wanted to --

(Interrupted)

MR. HILFIGER:  That was for the wife and sister.

MR. SPERLING:  And mother.

MR. HILFIGER:  I thought she wasn't here.

THE COURT:  Just the spouses and the --

(Interrupted)

MR. SPERLING:  Family members.

THE COURT:  While we're all up here, I'm going to stop at 3:45 today.  Conduct yourself accordingly.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury: You have unanimously found the Defendant Kenneth Eugene Barrett guilty of the offenses related to the killing of David Eales as charged in Counts One, Two and Three of the Superseding Indictment.  You must now consider for Counts

4501

One and Two whether imposition of a sentence of death is justified or whether the Defendant should be sentenced to imprisonment for any terms of years to be decided by the Court or whether the Defendant should be sentenced to life without the possibility of release.  You also must consider for Count Three whether the imposition of a sentence of death is justified or whether the Defendant should be sentenced to life imprisonment without the possibility of release or any term of imprisonment not less than 20 years to be decided by the Court.  The law leaves this decision exclusively to you, the jury.  If you return a verdict of death or life imprisonment without the possibility of release, the Court is required to impose that sentence.  You are only authorized to return a verdict of death if after this hearing you unanimously find the Government has proved each of the following beyond a reasonable doubt.

As to Counts One and Two, first, the Defendant was at least 18 years of age at the time he committed the offenses; and second, the Government has proved beyond a reasonable doubt the existence of at least one threshold eligibility factor; and third, the existence of at least one statutory aggravating factory; and fourth, that the aggravating factor or factors which you found to exist sufficiently outweigh any mitigating factor or factors

4502

which you find to exist to justify imposition of a sentence of death or in the absence of a mitigating factor or factors you find that the aggravating factor or factors alone are sufficient to justify imposition of a sentence of death.

As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are in the absence of the mitigating factor or factors you find that the aggravating factor or factors alone are sufficient to justify imposition of a sentence of death.

Again, whether or not the circumstances in this case justify a sentence of death is a decision that the law leaves entirely to you.  You should not take anything I may say or do during this phase of the trial as indicating what I think of the evidence or what I think the verdict should be.

Three terms that you already heard and will

hear throughout this phase of the case are threshold eligibility factors, aggravating factors and mitigating factors. These factors have to do with the Defendant's intent and role in the offenses. The circumstances of the crime are the personal traits, character or background of the Defendant and the victim.

I will now briefly explain these three special terms. First, a threshold eligibility factor is one or more of four factors listed in the statute dealing with Counts One and Two. In relation to Count Three, there is only one threshold eligibility factor. In other words, the threshold eligibility factors are identical for Counts One and Two but are different for Count Three. The threshold eligibility factors relate to the Defendant's intent and role in committing the offense for which he was convicted. Before you consider the imposition of a sentence of death as it relates to each count, you must unanimously find one or more threshold eligibility factors to exist beyond a reasonable doubt depending upon the individual count involved. You will be instructed much more fully on this issue at the conclusion of the evidence during this stage of the trial.

Second, an aggravating factor is a fact or circumstance which would tend to support imposition of

4504

the death penalty.  In the death penalty statute several aggravating factors are listed.  These are called statutory aggravating factors.  As I instructed you earlier, before you may consider imposition of the death penalty, you must find that the Government proved at least one of these aggravating factors as specified in the death penalty statute for either 18 USC Section 3591(a)(2) for Counts One and Two or 21 USC Section 848(n)(1) for Count Three.  The Government has the burden of proving any statutory aggravating factor to your unanimous satisfaction and beyond a reasonable doubt. There also may be non-statutory aggravating factors which are those not specifically set out in the respective death penalty statute but which are permitted by such statute.  The Government has the burden of proving any non-statutory aggravating factor to your unanimous satisfaction and beyond a reasonable doubt.  Third, a mitigating factor is any aspect of a defendant's character or background, any circumstance of the offenses or any other relevant fact or circumstance which might indicate that the Defendant should not be sentenced to death.  The Defendant has the burden of proving any mitigating factors.  However, there is a different standard of proof as to mitigating factors.  You need not be convinced beyond a reasonable doubt about the

4505

existence of a mitigating factor, rather a mitigating factor needs only to be proved by a preponderance of the evidence.  In other words, you need only be convinced that a mitigating factor is move likely true than not true in order to find that it exists.  Furthermore, a unanimous finding is not required.  Any one of you may find the existence of a mitigating factor.

As to Counts One and Two, if you have found that at least one threshold eligibility factor and at least one statutory aggravating factor exists, you then must weigh the aggravating factors against any mitigating factors you found to exist to determine the appropriate sentence.  In determining the appropriate sentence, you do not weigh the threshold eligibility factors you found to exist against any mitigating factors you found to exist.  In the weighing process, you are to consider only statutory and non-statutory aggravating factors found to exist and any mitigating factors you found to exist.  I will give you detailed instructions regarding the weighing of aggravating and mitigating factors before you begin your deliberations.  However, I instruct you now that you must not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater.  Rather, you must consider the weight and value of each factor.

4506

As to Count Three if you have found the threshold eligibility factor and at least one statutory aggravating factor exists, you may then consider both the threshold eligibility factor plus the statutory aggravating factor or factors and weigh all of those factors against any mitigating factors you found to exist to determine the appropriate sentence.  Unlike Counts One and Two, when considering Count Three, you may weigh the threshold eligibility factor and the statutory aggravating factors which you found to exist against any mitigating factors you found to exist.  Again, I will give you detailed instructions regarding the weighing process before you begin your deliberations.

Just remember that you must not simply count the number of threshold eligibility aggravating and mitigating factors in reaching a decision based on which number is greater.  Rather, you must consider the weight and value of each factor.

In making all of the determinations you are required to make this phase of the trial, you may consider any evidence that was presented during the guilt phase of the trial as well as evidence that is presented at this sentencing phase of the trial.  At the conclusion of sentencing phase, I will give you further instructions concerning the manner in which the law guides your

4507

deliberations. At this time, however, please turn your attention to counsel as they provide their opening statements.

First I will call the Government to make their opening statement.

MR. SPERLING: Thank you, Your Honor. May it please the Court. Ladies and gentlemen of the jury: No one who watched you as you listened could pick up on the circumstantial, very minute detail that is afforded us by virtue of your verdict, by virtue of the limited question that you asked, could come away from that proceeding and that experience with any conclusion other than that you have taken your roles as jurors in this case exceedingly seriously. You know, I think back to the time when in voir dire you were asked questions about aggravating factors and mitigating factors and I must say that that must have seemed like almost a foreign language, much as if any of us were to enter your daily lives and go to your place of business. I would not be at all home in the cafeteria or cement plant or wherever you work. You have made yourselves as comfortable as possible as you attended this trial, as you listened carefully to the witnesses. And as you listened in your own individual ways, some of you taking lots of notes and others of you taking fewer notes and watching, we all listened in

4508

different ways and we reminded you then and I remind you now something that really goes without saying and that is you have been generous with your time and your attention.

We're going to give you a glimpse during the next stage of Rocky Eales' life. But we're going to do that in the context of a formula. A formula that is going to ask you to weigh evidence, to weigh factors. It's not a numerical game. It's not like a football or basketball or baseball game where the person with the most runs or the most points scores in that sense numerically. You're not going to at the end of the day examine the aggravating circumstances and the mitigating evidence and come up with a numerical determination as to who had more. But as the Court instructed to you, you are going to weigh aggravating factors. That is the reason why death penalty we will advocate is an appropriate sentence in this case against mitigating factors, reasons why it will be urged that the death penalty should not be imposed in this case.

The Court used a term call threshold factors. And if we can liken this to anything that perhaps we are familiar with, think of the threshold of a house. You know that location where your bride either literally or figuratively is first carried over after you get married and you move to that apartment or that house. That's

4509

really what this threshold idea is about. You're going to be asked to examine the Defendant's intent as a matter of threshold consideration. Even if you are given more than one threshold factor, threshold aggravating factor, we ask you only to find one, and I'm confident the Court will tell you only to find one and only to consider one. Even if you could say, well, some of these may otherwise apply. But we only ask you to find one. Just as we would be very uncomfortable carrying more than one woman across the threshold at the same time, only find one aggravating factor. Well, where are we? You the jury duly empanelled and sworn in this case have found the Defendant guilty of two counts of malice aforethought murder and a third count of intentionally killing a law enforcement officer engaged in or in the performance of his duties. And you went even further as instructed by the Court to give serious considering to Special Interrogatory Number One. You were instructed that murder means the unlawful killing of a human being with malice aforethought. You were told that the term with malice aforethought means to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life. You were told that the deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act

4510

is committed.  You were further instructed that no particular length of time is required for formation of this deliberate intent.  And that to find malice aforethought, you need not be convinced that the Defendant hated the person killed or felt ill-will toward the victim at the time.

You were further asked by the Court to consider all of the facts and circumstances in arriving at that decision.  And then in response to those interrogatories, the jury foreman marked the answer yes on behalf of each one of you, signed and dated the special interrogatories. Now what?  Remember in voir dire when we were analogizing to a circumstance and I hate to analogize to a lesser circumstance, but a circumstance in which a child perhaps had misbehaved and we determine first whether or not the child has misbehaved and then second what is the appropriate punishment given that circumstance.  That's really our circumstance now, but in so much more serious a manner.

We are now to consider the aggravating factors. I would like to briefly review with you the aggravating factors that are alleged in pleading form by the United States for your consideration.  I also remind you as did the Court that we are obligated to prove each of these aggravating factors if they are to be found by you beyond

4511

a reasonable doubt.  So you have to be convinced beyond a reasonable doubt and unanimously in order to consider one of the aggravating factors.  As to Counts One and Two, the aggravating factor primarily that you were asked to consider as a threshold matter is the intentional killing of a human being.  I would respectfully submit to you that there is no doubt based on the evidence, testimony and information at the first stage that the Defendant intentionally killed a human being.  You may also be permitted to consider that same feature in various other wording, but the long and the short of it as we urged before is that the Defendant now stands before you as a convicted malice aforethought murderer.  We believe that the evidence and testimony and information that has been presented to you thus far also evinces that he comitted in short form an intentional killing.  Once you find that, then you are permitted to consider other aggravating factors.  And the other aggravating factors include the following.  And if I may, I'm going to read from the pleading.  This is not evidence, by the way. Pleadings are not evidence either indictment form or in the form of a notice of intention to request a death penalty.  But in this case there are certain statutory aggravating factors that are alleged.  The first one in summary form is grave risk of death to additional

4512

persons.  Grave risk of death to additional persons.  And we have been very careful to outline for you that the grave risk of death to additional persons relates to the other law enforcement officers involved in the tactical team.  The other tac team members, but not Buddy Hamilton, okay.  This relates to creating a grave risk of death to additional persons, but not to Buddy Hamilton.  The reason we did that is because Buddy Hamilton is considered in another aggravating factor that I'll mention to you next.  But it's very important that we not assign more weight than should be assigned to any factor should it overlap.  Factors can't overlap.  They need to be distinct.  They need to be different.  And this aggravating factor is grave risk of death to additional persons.

Ladies and gentlemen, I'm going to ask the Court respectfully in a few moments after opening statements to adopt and incorporate herein the evidence, testimony and exhibits that were admitted in stage one. Based on that testimonial information, I respectfully submit to you that if you went no farther than the sideline down the porch as the Defendant saw the first vehicle approaching him, the second one offset to his left and the third one behind those two, but they were all virtually in a relative line.  A little by offset,

4513

but in a relative line.  And that by firing at one of them he would have endangered the others.  Remember the evidence of the .223?  Do you remember the evidence that those things don't stop by glass?  Now, glass may cause them to shatter, may cause them to disintegrate or form into pieces.  But you remember the testimony and the information of the .223 shells don't evaporate into thin air.  They still can infiltrate, can perforate, things that are behind them.  So the grave risk of death to additional persons, even when the Defendant was firing at the Bronco that was near his porch or right next to his porch, still then there were people in the firing line.  Darst, Hise and Poe were three highway patrolmen that were directly behind them at the gate level, at the gate area.  So the Defendant created a grave risk of death to additional persons.  He also engaged in either multiple killings -- we know he only killed one person -- or attempted killings.  And here look at the sequence of events.  We'll examine this in just a moment.  But if you look at the sequence of events, you know that this Defendant with precision was firing bullets through the windshield of the victim's car.  You know this Defendant with precision was endeavoring to shoot the driver of the car.  You know that then when the car was near as Rocky was endeavoring really to seek refuge, had never

4514

unholstered his weapon and was seeking to withdraw from the circumstance, that as Rocky was getting out of the car that he was shot in the flank and then in the upper trunk area on the left side of his body, the bullet perforating or penetrating and breaking ribs, puncturing a lung and perforating his aorta, as a result of which he died and died very -- well, within a minute or two afterwards.  But you know that that was not the end of the Defendant's murderous intent.  That at that point the flash bang was emitted by Buddy Hamilton somewhere to the left or to the west of the house.  That after the flash bang went off, that Buddy Hamilton got out of his car and that as he did he was shot as well.  You remember the information from Iris Dalley, perhaps one of those shots even went through the open door.  There was evidence and testimony that the doors were open at the time that certain of the gunshots were fired.  This Defendant intended and attempted multiple killings.

And the Defendant engaged also in substantial planning and premeditation.  You know, here we're going to refer you back to much of the evidence and testimony that you have heard and seen so far.  You know, if repeatedly firing a high velocity assault rifle at a moving motor vehicle required really that he make a malicious, malice aforethought, conscious, deliberated

4515

and cold-blooded choice, and he made many of them.  He made 19 of those choices at least on this day.  And shooting that same firearm at a person who had retreated to with intent to kill him is further evidence of what he had intended.

Now, how did he substantially plan or premeditate what he had done?  First, remember some of the Government's exhibits as to his status.  He was a man who had been charged by information in CF-97-86, had been charged with distributing methamphetamine.  He's a man concerning whom an affidavit was submitted along with that charging document that essentially charged that on December 19, 1996 at approximately 13:10 hours an agent purchased one quarter gram of methamphetamine from Kenneth Eugene Barrett of McKee, Sequoyah County Oklahoma.  This agent used $25 of Oklahoma State Bureau of Narcotics official advanced funds during the buy.  Surveillance during the buy was made by this officer and another agent of OBN and it was signed by Detective Larry Plum.

MR. HILFIGER:  Your Honor, I object to that part of the opening statement based on the ruling that you made earlier.

THE COURT:  See counsel.

(Whereupon, the following record was made at

4516

the bench outside the hearing of the jury.)

MR. SPERLING:  These documents are in evidence.

MR. HILFIGER:  I thought you weren't going to -- based on the documents already in evidence.

(Whereupon, the following record was made in open court within the hearing of the jury.)

MR. SPERLING:  Is that exhibit -- is Government's Exhibit 203.  And then there is a following exhibit, Government's Exhibit No. 204.  It is a warrant for the Defendant's arrest for unlawful delivery of controlled drug.  That was his status for a significant period of time before he committed the murders that he has been convicted of committing.  But what we are going to do with regard to substantial planning and premeditation, we're going to point you in the direction of a significant amount of evidence in this case that evinces the Defendant's premeditation.  You know, if you thought about certain things such as his substantial planning, the gate sign -- remember the gate sign.  That fence is substantial planning and premeditation.  The lock, the chain, the mechanism by with which the Defendant required that if you were going to enter his property when that gate was locked and secured, you had to come through one location and one location only.  And that location was through the ditch where the highway

4517

patrolmen entered.  That was through the ditch where the Defendant had a scope trained from the second floor of his house on that particular area.  That was an area that the Defendant gave substantial planning and premeditation to.  But the Defendant substantially planned and premeditated with regard to the instrument of death. Remember Government's Exhibit 128, the rifle.  Recall that the Defendant didn't merely have a rifle.  He had a loaded rifle.  He gave conscious thought to the preparation of that firearm.  He gave conscious thought not merely to having one, one 30 round clip attached to it, but to having three 30 round clips taped together with the electrical tape.  And even though this may have not been something that took rocket science, but merely as one wraps tape around those three clips what must have been going through the Defendant's mind?  It certainly wasn't to shoot skunks off the back porch.  We would suggest also that the evidence of the hidey hole is an indication of substantial planning and premeditation. The loaded pistol in the Defendant's belt that he carried with him that night was further evidence of substantial planning and premeditation.  Things that happened before any of the highway patrolmen put one of their tires on the Defendant's property.  But in short, the Defendant engaged in substantial planning and premeditation.

4518

We believe that the evidence will also prove to you beyond a reasonable doubt that the Defendant is a future danger.  We will call certain witnesses to the stand with regard to a limited number of prior occurrences.  But let me say just at the outset that what the Defendant did on September 24, 1999 clearly supports a finding that the Defendant is a future danger.  What he did with regard to law enforcement officers that were apparent and that were approaching his property was clear and established as a matter of his future dangerousness.

Then you will be asked also to consider victim impact evidence.  And we are going to call a limited number of witnesses that will tell you and share with you what the Defendant's murderous actions caused in the way of victim impact and suffering.  And the Defendant took away a man who was a son, a friend, a co-worker, a husband and a father.  We're not going to use kids as props, we're not going to call the children to the stand.  But we are going to call his mother, Bobbie Eales.  We are going to call his best friend from the marines, Bill DeWeese.  We will call a co-worker, Gene Hise.  We will call his wife, Kelli Eales.  And we will call through Kelli Eales a number -- we'll actually introduce a number of statements with regard to the children and the impact that the Defendant's murder has had upon this collective

4519

and extended family.

We, in short, will prove to you that David Eales was a loving and devoted father and husband and a caring father for two small children and that the family of the victim has suffered injury, harm and loss as the result of the victim's death including but not limited to the loss of a life companion to Kelli Eales and a loving, caring father to Allison Eales and Mackey Eales. In short, we will supply evidence, we believe, that will prove beyond a reasonable doubt that the Defendant's murderous actions had victim impact.

We're going to introduce a limited number of photographs in this case. One of Rocky when he was a marine. One of Rocky with his parents together, Hook and Bobbie Eales from McAlester. You will hear at least a limited background with regard to his relationship with his parents as a loving son. You will see a photograph of Rocky as a skydiver and leaning down to kiss his little girl. You will see a photograph, I expect, of Rocky with his daughter Alli and his new-born baby, his son Mackey. I expect that you will see a photograph of Rocky with his kids out four-wheeling. Another photograph of Rocky in his workplace in his trooper unit. And finally a shot, a photograph, of Rocky with his immediate family.

4520

We don't ask you and we will not ask you to make a decision based on emotion in this case.  But we will ask you to give fair and serious consideration to the loss that the Defendant occasioned with regard to the victims in this case.

We'll also talk further about substantial planning and premeditation.  I want to remind you of some things that will be re-urged -- we're not going to revisit all of these things.  You listened so attentively -- and you're very kind -- during the presentation of this testimony at first stage.  But you listen to the testimony of Randy Turman.  A man who said that the Defendant wouldn't leave his property.  A man who said that the Defendant knew he had a warrant for his arrest.  The Defendant expected the law every day, said there was going to be a shootout, carried his pistol in his belt every day virtually everywhere.  A man who related an incident.  Remember the old man that came into the property -- he called him an old man -- and said that the man drove his vehicle very quickly in and said that the law was after him?  And what was the Defendant's reaction?  His reaction was to go for the murder weapon.  Randy Turman knew that the Defendant was serious and after that incident did not go back to the Defendant's house.

4521

In those events the Defendant substantially planned and premeditated. You heard the testimony of Travis Crawford, the Defendant's first cousin. He quoted the Defendant as saying after he had made the surveillance vehicle DGF, all hell is going to break loose. Late in the afternoon the day the trooper was shot the Defendant saw a white SUV -- I think they may have even referred to it as a Blazer -- go by, saw the Defendant go to the gate, thought that the Defendant closed the gate, walked over to the Defendant's house and then talked to him. And Travis quotes the Defendant as saying that he recognized the motor vehicle as the law. That he had a warrant out for his arrest. That they were going to come and get him and arrest him and he said that I don't care, I'm going out in a blaze of glory.

We respectfully will submit to you that the evidence will establish that that was not frivolity, that that was something that was ingrained in the Defendant's mind. You heard the testimony of Charles Sanders. The Defendant had a warrant and wouldn't leave his home. He anticipated that Johnny Philpot was going to come for him and that the police came -- if the police came, he'd shoot the first one through the door. The Defendant substantially planned and premeditated when he said those things. We know that also that Charles Sanders had told

4522

his investigator, Clint Johnson, about killing Johnny Philpot.  You heard Randall Weaver.  Randall Weaver said the Defendant admitted that he had missed a court date and knew that he had a warrant out for his arrest.  The Defendant premeditated as he shared that information with his friend Randall Weaver.  The Defendant was the subject of testimony by Brandie Price.  You remember that she quoted the Defendant as saying that if we were there when the law came in, either grab a gun or get down.  There's an arrest warrant outstanding for him.  That he was going to open up on them to take as many of those bastards with him as he could.  And she noted that the Defendant kept his gun against the shelf cabinet loaded with several taped clips.  You heard the testimony of Cindy Crawford and she said basically if the police came out the Defendant said he was going to go out in a blaze of glory.  The Defendant substantially planned and premeditated in each of those statements.  You also had the planned and premeditation with regard to what he was protecting out there.  It wasn't merely the fact that he was going to be taken to jail, that he was going to be arrested, although that was a very determining feature, but he was also protecting his drug activity out there.  And Karen Real said when she recognized, she said, a similar sign to the one that was in evidence here that he

would shoot.  But when people came up, the Defendant got his gun until he knew who they were.

In all of those examples with all of those witnesses, the Defendant substantially planned and premeditated.  We're going to call to the stand, I expect, Shannon Smith and Larry Lane.  They were involved on January 3rd, 1998 in a vehicle checkpoint a couple of miles from where the Defendant lived.  And as they were checking vehicles, a seemingly hopped up pickup loped along in their direction and slowed down before the vehicle approached them, before it reached their checkpoint.  I believe that they will tell you that one of them saw the vehicle on its way to the checkpoint, that's Larry Lane, and he will say that he saw the vehicle approach the checkpoint, and as the vehicle approached the checkpoint, it slowed down, that he looked in, that he had seen -- he saw who it was, it was the Defendant.  The Defendant had a big smile on his face before he accelerated very quickly, stomped and took off. I expect that Shannon Smith will tell you the rest of the story.  And the rest of the story is that there were two other officers, Micah Arrisa and Cindy Ridenour and Micah and Cindy were helping to facilitate to serve this traffic stop area, this vehicle checkpoint, and they had to literally jump out of the way to avoid being struck

4524

and run over by the Defendant.  We present that evidence and testimony as an indication of his future dangerousness, his attitude toward law enforcement officers.

I expect also that we will present evidence concerning an event in about April of 1997 wherein Stanley Philpot, and you've seen him previously on the stand.  Stanley Philpot was a game ranger and he was also serving as a reserve deputy for the Sequoyah County Sheriff's Office and the brother of the sheriff, stopped the Defendant.  The Defendant prevailed on him to permit him to drive his pickup to his house so as not to have his pickup towed.  Stanley, in some, well, stroke of largess, shall we say, being kind, said he could.  But when he left, the Defendant all of a sudden tromped on the food feed and the chase was on.  Threw dust and the Defendant ultimately lost Stanley Philpot in that particular event.

I wish I could say that I've covered absolutely everything.  But we're going to call, I expect, Stanley Philpot, Bill DeWeese and Johnny Philpot, Cindy Crawford.  Cindy is going to talk to you about an episode where she was at the Defendant's house and she had an exchange with the Defendant and the upshot of the exchange is that the Defendant wanted something that she was unwilling to give

4525

and the Defendant put a shotgun against her leg and told her that if she ever came back to his property, he would shoot.

I expect that Charles Sanders will be called to testify and Charles Sanders will tell you that he overheard a conversation in which the Defendant uttered threatening comment with regard to a cooperating witness, the informant that had provided information that served as the basis for the search warrant that was to be served that led to the September 24, 1999 event with regard to the highway patrolman.

Here's what we ultimately ask:  We will ultimately ask that according to the Court's instructions in this case, according to the law and the evidence, that you weigh the evidence, that you make determinations with regard to aggravating factors, that you listen carefully to the evidence and testimony, that you reconsider the testimony and information and evidence that you've already heard, and that you weigh the aggravating factors and determine whether or not the death penalty is appropriate.  Or, if there are mitigating factors, that you weigh the aggravating factors against the mitigating factors to determine whether the death penalty should be imposed in this case.

Ladies and gentlemen, as respectfully and as

4526

reverently as I can request, I ask you to do that and I anticipate that at the end when you weigh the Defendant according to the law he will be found wanting.  Thank you.

THE COURT:  Defense.

MR. SMITH:  Your Honor, we intend to reserve our opening until presentation of our case.

THE COURT:  You may.  Before the Government calls their first witness, and before we hear testimony, I want to remind the spectators present today as I did just before the verdict was returned in this case that through the testimony we're about to hear, I anticipate that some of it may be sensitive and could elict emotional reaction.  However, as I requested before the verdict, I require the spectators present to remain dignified in honor of this jury's responsibilities in this case and simply remind you if you cannot control your emotions, that I will ask you to leave the courtroom.  With that admonition now, I would ask the Government to call their first witness.

MR. SPERLING:  Before we do so, Your Honor, we respectfully move this honorable Court to adopt and incorporate herein the evidence, testimony and exhibits that were admitted during stage one.

THE COURT:  Comment from the defense?

4527

MR. HILFIGER:  No objection.

THE COURT:  That will be the order of the Court.  You may call your first witness.

MR. SPERLING:  Bill DeWeese.

WILLIAM DeWEESE, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Please state your last name and first name, sir, and spell your last name.

A    DeWeese, William.  D-e-W-e-e-s-e.

Q    What is your business or profession, sir?

A    I'm the minority leader of the Pennsylvania Legislature.

Q    For how long have you been so employed?

A    Thirty years as a legislator, 15 in the leadership.

Q    Do you have employment outside of your leadership role in the Pennsylvania Congress?

A    No, I do not.

Q    What's your educational background?

A    I was a C student at Alma Mater, Wake Forrest University.  Joined the Marine Corp graduation day.  Went to Marine Corp schools.

Q    What was your major in college?

4528

A    History.

Q    Do you know a man by the name of Rocky Eales?

A    Sir, yes.

Q    How did you get to know him?

A    I met him at 3:00 o'clock in the morning one night in September 1972.  We had our heads shaved a couple days earlier.  It was a fire watch effort at three or four in the morning and we were in the squad base days supposedly guarding the squad base.  Since we were in Virginia it wasn't very arduous so we had time to sneak off in the corner and shoot the breeze for a few moments before the next watch came on.

Q    Did you -- (Interrupted)

A    -- boot camp.

Q    Did you find out where he was from?

A    I could tell almost from the minute he opened his mouth he was from either Texas or Oklahoma.

Q    A fire watch.  What's a fire watch?

A    With all due respect to the United States Marine Corps, boot training wasn't all that substantial.  But we were ostensibly learning to do perimeter patrol.  We were only there a week or two or three and we were making certain that the barracks were secure.

Q    How would you describe or contrast yourself with Rocky?

4529

A    He was a jock macho type and I was the literary type.  He probably wondered what the heck I was doing in the U.S. Marines because I was certainly not the traditional mold.  So, he was rough-hewed, passionate and athletic.  And although I'm not shy, I certainly had not thought much about joining the marines until my academic work was somewhat arrested and I joined on my graduation day from Wake Forrest and just ended up in the Marine Corp and met him within the first few days of my experience.

Q    How did you compare with Rocky in terms of fitness?

A    When I got there I was quite inferior.  He was right out of athletic setting there in collegiate football and I had been more casual.  And he was the dominant force within the 253 people that we trained with.  He was probably in the top 50 or 20 for physical fitness and he would max the single run in the old course, the double run in the old course.  His PFD score was 300 points out of 300 points.  When I first arrived, I'm sure that mine was around 200 points.  But by the time I left, I was about 285, 290, primarily because weekends with not much to do in the 1970s with the military wasn't all that well received on the outskirts of the base area, so we would go to the course and we kept working out and he was almost an inspiration to me to get in better shape.

4530

Q   Did he have occasion to remind you in the differences in your physical prowess?

A   Yes.  On no uncertain terms.  He was jocular, he was having a good time.  But he could never pronounce my name DeWeese.  He would say DeWeese and then he would give me a hard time.  You better get those skinny little arms of yours around that chin-up bar and give me five more, give me 10 more, give me 15 more.  He was very aggressive.  He would have been a great coach just like his father hoped.

Q   What was the nature of your relationship in terms of chemistry?

A   Best friend I had during the three years I was in the Marine Corp, and it was chemical.  I think, counselor, that it's almost something from within.  We just met and we melded and we were almost like Oscar and Felix.  We were an odd couple because he was the jock and I wanted to read the life of George Washington or U.S. Grant.  I was in biography, still am.  He was not certainly bereft of those motivations.  He enjoyed those things, too.  But he wouldn't let people know it.  You had no know him a little bit better.  He was the rough-hewed western prototype.  He was a great character. We had the John Wayne image in Marine Corp boot camp. Anybody that's ever been in the Marine Corp, at least back when I was in for the '70s on back through the '60s

4531

and '50s, don't give me any John Wayne stuff the drill instructor would say.  But there's no doubt that Rocky had a lot of John Wayne and it was hard -- it was almost irrepressible.

Q    Did you have a commanding officer who was well known in the United States public?

A    Coincidentally we did.  His name was Oliver North. He was our commanding officer for tactic instructions. We were not with him in a tactical setting, but with instructional settings both within the classroom and in the field.  But we met Oliver North, a young -- actually captain at that time decided that he was going to do some really theatrical -- (Interrupted)

MR. SMITH:  Your Honor, I'm going to object.  I think it's gone beyond relevance and we're in some other area.  We're not addressing Mr. Eales.

THE COURT:  Counsel?

MR. SPERLING:  I'll move on.

Q    (By Mr. Sperling)  Did you ever have occasion to rappel with Rocky?

A    We had instruction one day and literally the next morning which was a Saturday he got me to go to Fort Belvoir in Virginia and jumping off a big tower.  We only had a little bit of instruction, with about 253 people and 15 or 20 minutes worth of instruction and I said

4532

you're crazy. We're not going to go up there. I'm not going to do that. He said, aw come on, you can go up and just watch me. Well, I watched him and then he taught me to go on off myself. I was scared to death, of course, but we were able to negotiate. His audacity is unremitting aggression. The way he attacked life is almost typified in that setting. Just jumping off that rappelling tower at Fort Belvoir with about 15 minutes of instruction.

Q   Did he express to you early on what he wished to do vocationally?

A   Oh, yeah. He said I want to be a marine, but I want to be a marine for three years. I want to be an Oklahoma Highway Patrol officer. I mean, that was an intrinsic and inviolate element within his whole soul, his whole being, his whole perspective. He wanted to be a member of the Oklahoma Highway Patrol.

Q   Do you have a brother?

A   The closest thing I ever had to a brother is Rocky Eales. I have a sister. My sister -- in fact, my sister's name is Nancy, his is Debby, his is Nancy. My dad's name is Vick, his dad's name is Hook. My mom's name is Dotty, his mom's name is Bobbie. We were -- it was a crazy, chemical -- surreal. It was a bond and that night three or four in the morning we couldn't talk for

4533

more than a couple minutes and then three months later when we graduated we put those bars on as second lieutenants in the Marine Corp, then we went away for Christmas, came back and we were given the chance to be roommates with anybody in our platoon.  There were about 40 people in the platoon and, boom, we were roommates.

Q    Is there such a thing as requesting mast?

A    In the Marine Corp and probably the entire naval service requesting mast is a process where one makes a complaint through the chain of command.  And, yes, there is a thing called request mast.

Q    Do you recall a circumstance that comes to mind with respect to that?

A    Yes, sir.  During the last days of our experience as officer training lieutenants, we were already commissioned at that point.  So this was our ninth month in the mud and in the classroom and we were put on a 27-mile forced march in a condition called black flag.  Black flag is when the temperature and the humidity are at such a high level that we are not allowed to go out on maneuvers.  The Marine Corp expressly prohibits this in peace time.  1972 Quantico, Virginia, 1973 Quantico, Virginia, we felt that on the last march 27 miles in full gear with mortars and machine guns, flak jackets, we had a terrible time and only 55 people in our company --

4534

approximately 55 people made the march and Eales and DeWeese were two of them.  And the whole company was raising the devil about it because we had Annapolis graduates, we had all kinds of college athletes that were falling over from heat stroke and heat exhaustion and I said I'm going to request mast and he thought I was kidding and all of a sudden I said I'm not kidding and he said go ahead and do it, you're not going to be a career officer.  You want three years and you want to go be a politician.

Q    All right.

A    And I did.  We were successful.  The major was reprimanded.

Q    Where were you when you received notice concerning Rocky Eales' death?

A    I'd just come back from a bicycling trip oversees and I walked in the door at my home and Kelli had just called a short time before and I immediately returned the call.  I was in my home in Harrisburg or in my home away from home which is where I go three or four days a week.

Q    Were you informed of the circumstances surrounding his death?

A    Yes.  Yes.  By Kelli.

Q    After you were informed of the circumstances, what impact did that have on you?

4535

A    Well, I was, of course, devastated.  But my immediate thought was Quantico and California and Hawaii and the Caribbean and Fort Bellvoir and that crazy tower and the march, and the march, and this -- this splendid manifestation of American manhood, this exemplary marine and law enforcement officer.  As we say in Pennsylvania and as you have embraced that wonderful phrase in the Pennsylvania State Police, soldiers of the law.  I had written for state troopers in my early career in Harrisburg and Rocky was the paradigm.  He was the absolute paradigm.  I just kept thinking -- well, I was devastated.

Q    Would you describe your last contact with Rocky?

A    It was telephone and it was course and salty and vernacular of boys who were no longer boys but had served in the marines.  And it was leveled a little bit though by this wonderful love that he had for his new bride -- it was in August before he was killed in September -- and his youngsters.  And he was admonishing me to some day grow up and he would say et cetera, et cetera.  And again, there's never been a conversation with Rocky Eales, at least on my recollection, that wasn't heavily, heavily salted with humor and light-heartedness.  And that was a happy conversation, so naturally I'm very, very gratified by that.  But it was only about a week --

4536

excuse me -- about a month and a half before his death.

Q   Did you think back to the time when you both left the Marine Corp together?

A   I did.  We were sworn in the same day and we were discharged the same day.  And -- (Interrupted)

Q   Where did you go?

A   We were at Camp Pendleton, California.  And within a few minutes of being discharged, we went downtown to Oceanside to have our pictures taken.  The navy said that every marine carried a photographer with him.  We had to go downtown to find ours.  So we had our pictures taken and in a sepia-tone setting to put in an oval frame so it would look like something that Matthew Brady had done in the Civil War.  In the Pennsylvania capitol, the majority leader's house, the minority leader's house and the speaker's house, wherever I serve, whatever capacity I served, that oval picture of me and Rocky in our lieutenant uniforms on the last day of our Marine Corp service, May 29th, 1972 is enshrined in my office.

Q   What did he state his aspiration to be when you left the Marine Corp together?

A   Oklahoma Highway Patrol.  I said I was going to go see Bryce Canyon and camp out on the glacier and meander throughout the west and I couldn't go with a lot of panache because I had a Dodge Dart rather than a Mercedes

4537

Benz.  But he said not me, DeWeese, I'm going back to Oklahoma.  And obviously he wanted to be a state trooper and he wanted to make sure that he crossed the I's and dotted the T's.  But his whole life was transfixed by the unyielding focus of becoming a member of the highway patrol and he didn't want to see anything, do anything.  He wanted to come back.  He was an Oklahoma boy all the way through.  This is where he wanted to be.

Q    Would you please describe the efforts that you made to find out what happened to Rocky?

A    Well, I called Kelli, of course, and she was remarkable under the circumstances.  I had to speculate that she was still in the state of shock because I couldn't believe that she could be so cogent and so coherent and so dignified under these very terrible circumstances.  And then I called a few other people that I knew through Rocky and through Kelli's assistance and got more of the details.  And then I believe some of the newspaper articles were forwarded to me.

Q    Did you make arrangements to travel to Oklahoma?

A    That night.

Q    All right.  And by the way, did you speak at the funeral?

A    I have never had a finer moment.  I have given innumerable speeches.  I've given innumerable speeches.

4538

I spoke in front of 10,000 people.  I've spoken in front of little Lions Clubs with ten or 20 people.  I've never been more honored than I was that day to speak and give a eulogy on behalf of that happy, crazy, well-rounded, All American, passionate, U.S. Marine, Oklahoma Highway Patrol, dad, brother, friend, son.  Never.  It's the -- it's the epoch moment I'll ever have.

Q   Would you describe, sir, please, the physical and the emotional feelings that you experienced when you heard of Rocky's death?

A   Just pain and sadness.  That's all.

Q   What's your sense today?

A   I think it's human nature, we go on with our lives. But when everything is crystallized like it is in a setting like this, it's revived.  And it's very, very challenging.

Q   Can you think of your favorite recollection, your favorite memory, of Rocky and his family?

A   Well, since I never had the familial good fortune of Kelli and the youngsters, the talk that we had and the focus on family, that this wasn't the Rocky that I had known.  He was so -- he was a carefree bachelor like it was 20 years earlier.  I knew him 20 years earlier.  So, when we were together, that was -- I can't remember who said it, but he was a wild part of life.  And now

although still in a wild part of life and he parachutes in Poland and El Salvador and Israel, he was going back to Kelli, going back to his kids.  It was a brand new chapter in his life and it was just commencing.  So I was thinking that the best memory was the last memory, but maybe that's just normal, not unusual.

Q   Have you maintained memorabilia or photographs with regard to Rocky?

A   I have three pictures, the one that I described, the sepia tone photograph of us that looks like it was taken in 1860 -- really it looks like it was taken in 1914. The marine uniforms have altered very little in the last century, at least our dress have altered very little. And then I have the formal portrait that Frank Atkins sent me, the portrait of Rocky in his highway patrol uniform.  And then I have a small picture.  These are all right there on my desk of Rocky in his -- next to his patrol unit and he has an M-60 with a Bandelier.  It looks like Sylvester Eales rather than Rocky Eales and he's almost --

Q   What is the impact on each day some years after his murder?

A   I guess the impact today is just that I find it a rare privilege to have been associated with him, and now with his family.

4540

Q    What will you miss most?

A    The laugh.

Q    At the close of your address at the funeral, what did you say?

A    I probably was saying something.  And I only took these notes on a napkin, not in front of Bobbie's house.  But I am privileged to be somewhat exposed in the public speaking world.  And for me it's much easier to say something off the cuff with three or four notes than it is to read something.  But the mighty monarch of the English stage, the father of English -- William Shakespeare once observed and now I've observed about Rocky.  He was man, take him for all and all, we'll never see his like again.

Q    How did you sign off?

A    Semper Fi, Rocky.

            MR. SPERLING:  Thank you, sir.  Nothing further, Your Honor.

            THE WITNESS:  Your Honor.

            THE COURT:  Just one moment.  Any cross examination?

            MR. SMITH:  I don't have any questions, Your Honor.

            THE COURT:  Sir, thank you for your testimony.  You may step down.

4541

THE WITNESS:  May I remain in the courtroom?

MR. SPERLING:  May he be excused, Your Honor?

THE COURT:  You may be excused and you may remain in the courtroom.  Call your next witness.

MR. LITTLEFIELD:  Stanley Philpot.

STANLEY PHILPOT,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name, sir.

A    Stanley Philpot.

Q    And you previously testified in this matter?

A    Yes, sir.

Q    And I think you indicated you work where now?

A    I'm a State Park Ranger for the State of Oklahoma.

Q    How were you employed in April of 1997, sir?

A    I was a reserve deputy and I was an officer with the Sallisaw Police Department.

Q    If you can, speak a little more directly into the microphone.  I'm having a little trouble picking -- I may be getting old.  I hate to admit it.  Let me direct your attention to that month.  Did you have an occasion to come into contact with Kenneth Eugene Barrett north of Sallisaw, sir?

4542

A    Yes, I did.

Q    And where was the location at which you came in contact with Mr. Barrett?

A    State Highway 101 and 17 Highway north of Sallisaw.

Q    Was there anything that would have caused you interest in Mr. Barrett at that point in time, sir?

A    I had a felony warrant served on him for his arrest.

Q    Was that the warrant in regards to the distribution or delivery of controlled substances?

A    Best of my recollection, yes.

Q    What was Mr. Barrett in?

A    An old Chevrolet four-wheel drive pickup.

Q    You were in what, sir, what kind of vehicle were you in?

A    I was in an '88 Dodge --

Q    When you observed Mr. Barrett, was there any control at the intersection, any stop signs or anything such as that?

A    Yes.  He was at a stop sign.

Q    When you saw Mr. Barrett at the stop sign, knowing that there was a felony arrest warrant for his arrest, what did you do, sir?

A    I waited until he pulled some -- stop sign over across the highway and I made contact with him at that time.

4543

Q     How did you make contact?

A     I stopped him.

Q     And when you stopped Mr. Barrett, what did you do?

A     I made contact with him and advised him I had a felony warrant for his arrest.

Q     Did you get out of your vehicle to do so?

A     Yes.  Yes, sir.

Q     Did he remain in his?

A     No, he got out.

Q     And when you told him you had a felony arrest warrant for his arrest, did Mr. Barrett have any request of you, sir?

A     He didn't want me to tow his vehicle, so I let him drive home.

Q     Now, in order to drive a home, how would you -- what were you going to do to make sure that the person for whom you had an arrest warrant still ended up being in custody of law enforcement?

A     I followed him.  Followed him home.

Q     What was the road condition -- what kind of road was it that you first were on?

A     We were on paved roads first.

Q     And how far behind Mr. Barrett were you traveling?

A     Not far.

Q     How was he driving on the paved road?

4544

A     Just normal driving on the paved road.

Q     Did you have any difficulty in staying up with him at that point?

A     Not at that point, no.

Q     Did the road remain paved the entire way to Mr. Barrett's residence?

A     No, sir.

Q     And what happened to the paved road; what did it become?  I mean, did it become a dirt bog or what?

A     It turned into a dirt gravel road.

Q     How far is it from Barrett's -- Mr. Barrett's house did it become a gravel road?

A     I would say probably a mile and a half and turned back into chip and seal.

Q     Turned back what?

A     Chip and seal.

Q     What happened when you got to the gravel road?

A     Mr. Barrett accelerated and dusted me out and I had to fall way behind.  At that time I knew I had a problem.

Q     Where did you go?  Did you lose total sight of him?

A     At that time I did, yes.

Q     Where did you go to?

A     I went to his residence.

Q     And when you got to his residence, do you recollect the gate in the front of his drive?

4545

A     Yeah.   The gate was locked.

Q     It was locked?

A     Yes.

Q     And where was his vehicle?

A     He had driven around the other driveway across the ditch in the yard in the front of the house.

Q     What did you do when you arrived there and the gate was locked?

A     I pulled up to the same road he was in and turned around and came back in front of the residence.

Q     In the model, Government Exhibit No. 1, do you recall seeing it up there in the trial during the guilt stage of the trial?

A     I don't recall that.

          MR. LITTLEFIELD:   Judge, I would ask that Government's Exhibit No. 184 be displayed.

          THE COURT:   You may.

          MR. LITTLEFIELD:   May I approach?

          THE COURT:   You may.

Q     (By Mr. Littlefield) And this is Mr. Barrett's residence there?

A     Yeah.   Small one, yeah.

Q     And do you have a laser pointer to your right up there?   Can you take that and show where you turned around?

4546

A    The gravel road's right beside his residence if I can point it out here.  There's a driveway right here.  I backed up -- pulled in here and backed up and went back --

Q    And, where did you go in front of his residence, sir, after you turned around and went back to the west?

A    There at the locked gate.

Q    What happened when you got to the locked gate?

A    I looked toward the house and Mr. Barrett was standing in the door with a handgun.

Q    He was standing in the door with what?

A    With a handgun.

Q    Describe the handgun.

A    It was a -- I would say six-eight inch barrel with either stainless or chrome-plated revolver.

Q    Could you tell from the gate if it was an automatic or if it was a revolver?

A    It was a -- a revolver.

Q    When you observed Mr. Barrett standing with the long barreled handgun in the door of his residence, what did you do, sir?

A    I drove around the corner and called backup.

Q    When you say around the corner, can you take your laser and show where you drove to?

A    There close -- I drove around the corner that got

4547

back out the key road.

Q   Why did you choose to go up to the corner and turn to the right as opposed to staying there in front of his house when you called for backup?

A   I didn't believe -- gunfight if I didn't.

Q   Did backup arrive?

A   Yes.

Q   When backup arrived -- who was the backup?

A   Sheriff Philpot and Undersheriff Walter Robbins was the first two.

Q   Okay.

A   -- back troopers arrived.

Q   What happened when the backup arrived, sir?

A   Trooper Bill James got out his PA system to try to talk him out of the house and he wasn't there.

Q   No response?

A   No response.

Q   Did you all go to the residence?

A   Yes.

Q   And what did you observe in the front room, the living room, of the residence in regards to the firearm that you had seen?

A   We had found a tray, ammunition tray, with .44 Magnum shells in it.

Q   What kind of weapon would a .44 Magnum shell be

4548

consistent with?

A    I don't understand your question.

Q    What kind of weapon would you be inserting a .44 Magnum shell in?

A    You can insert it in a .44 caliber revolver or a .44 Magnum rifle.

Q    Do you have an opinion as to what kind of handgun Mr. Barrett was standing in the door holding?

A    It was a large revolver.  I would guess it was probably a .44, but I can't say that for sure.

Q    You said there is a tray with .44 cartridges in it?

A    Yes.

Q    Was there any evidence of reloading a revolver found in the house?

A    There was a little bowel or a little container on one of the tables just inside the door that had the .44 Magnums --

Q    Empty hulls?

A    Empty hulls.

Q    Was there -- did you all look to see if Mr. Barrett was in the house?

A    Yes.

Q    Was he?

A    No.

Q    Was there a .44 Magnum revolver, that long-barreled

4549

revolver, that you had seen Mr. Barrett holding anywhere inside the residence?

A   We did not find one, no.

Q   No pistol, nor him?

A   No.

Q   When you followed Mr. Barrett home, and he dusted you, was he aware that you had a felony arrest warrant for him?

A   Yes.

Q   You advised him of that?

A   Yes.

MR. LITTLEFIELD:   May I have a second, Your Honor?

THE COURT:   You may.

Q   (By Mr. Littlefield) At the time you first came in contain with Mr. Barrett at Highway 101 and 17, did you have any body armor on?

A   No.

Q   At the time you went into the residence, did you?

A   Yes.

Q   And how did you manage to get the body armor that you wore inside the residence?

A   I had the secretary at the sheriff's office bring it out.

Q   Who delivered it to you?

A     She did.

Q     Why did you put on a vest, a bullet proof vest?

A     For my own protection.

MR. LITTLEFIELD:  Pass the witness, Your Honor.

THE COURT:  You may cross examination.

MR. SPERLING:  May I retrieve the material?

THE COURT:  You may.

CROSS EXAMINATION

BY MR. HILFIGER:

Q     Mr. Philpot, what is your -- at that time what were your duties as a reserve deputy?

A     To do whatever they needed me to do.

Q     Were you -- what kind of hours would you serve as a reserve deputy?

A     I was -- several hours as a reserve.

Q     Well, did you have set times?

A     No.

Q     On this particular day were you operating as a reserve deputy or were you operating as a police officer for Sallisaw?

A     I was a reserve deputy that day.

Q     And this was outside the city limits of Sallisaw, right?

A     Yes.

Q     So you really had no authority as a Sallisaw police

4551

officer, is that right?

A    Correct.

Q    Did you have some reserve deputy uniform on?

A    I had a sheriff's department uniform on, yes.

Q    And this '88 Dodge that you're driving, was that a sheriff's car?

A    That was my personal vehicle with all the emergency equipment on it.

Q    Now, was it -- this 117 and what's the other highway?

A    Highway 17 and 101.

Q    Highway 17 and 101.  Where is that located in relation to between Sallisaw and the McKee area?

A    Quite a ways.  It's three miles north of Sallisaw and then McKee was probably another three, three and a half mile west.

Q    So would it be safe to say that at this particular time you weren't actually just out looking for Kenneth Barrett, is that right?

A    I was filling in helping the sheriff department that day.

Q    What was your duty -- at that particular time prior to seeing Kenneth Barrett what were you doing?

A    Normal deputy sheriff duties.

Q    What was that normal deputy sheriff duties?

4552

A   Answering calls, serving subpoenas, whatever that -- (Interrupted)

Q   So you weren't actually looking for Kenneth Barrett at that time, is that right?

A   No.  I wasn't looking for him, no.

Q   Had you had some previous contact with Kenneth Barrett concerning an arrest for failure to pay fines or something like that a week or so before that?

A   It was sometime before that.  I don't recall how long.  It was -- I believe I had a city warrant -- (Interrupted)

Q   -- whole city warrant -- (Interrupted)

A   Yes, he was driving for speed.

Q   But it was one for failure pay fines, wasn't it?

A   I don't recall.

Q   You arrested him, didn't you?

A   I arrested him for driving under suspension.

Q   And it turned out he was released because he was paying his fines, wasn't he?

A   I think -- best I recall, he had already paid his fines and the warrant hadn't been removed.

Q   So, it was sort of an arrest that shouldn't have happened, isn't that right?

A   Not necessarily.  It was a good faith arrest.

Q   Well, it was good faith on your part?

4553

A     Exactly.

Q     Right?

A     Yeah.

Q     But the warrant wasn't a good warrant?

A     No.

Q     Because he had paid his fines?

A     He paid his fines.

Q     But it caused him to get stopped, locked up, for a short period of time?

A     I don't recall the stop, we'll say that.

Q     And then, after this occurrence -- in fact, are you aware Kenneth Barrett turned himself in on this same warrant?

A     What warrant are you talking about -- (Interrupted)

Q     I'm talking about the felony warrant, the one for CF-97-86.

A     Best of my recollection, yes, he did turn himself in.

Q     And so, he went ahead and submitted to the jurisdiction of the court on his own, didn't he -- (Interrupted)

A     -- I didn't witness it.  They said he did.

Q     When you say -- well, when you guys came back, did you make any contacts with any of his relatives out there?

4554

A   Which time?

Q   Well, you just said at that time you said you looked toward the house.  You were out there, turned around in the private drive and went to the gate, you saw Kenneth and then you left?

A   Uh huh.

Q   And called for backup?

A   Right.

Q   During that time before you called for backup, did you make any contacts with any of the relatives out there?

A   No.

Q   When you and the backup came back did you make any contacts with any of the relatives?

A   Sometime later we made contact with the mother.

Q   That same day?

A   That same day.

Q   Did you tell them something like they'd better watch out, you're going to do some shooting out here?

A   I don't recall saying anything like that, no.  I didn't visit with him myself, no.

Q   Was one of the other people out there?

A   I don't know.

Q   Did you hear anything like that?

A   I don't recall anything like that.

4555

Q    How many people came out as backup?

A    Probably five or six.

Q    And the five or six that came out, did all of them go in the house?

A    I don't recall who all went in the house.

Q    Did you go in the house?

A    I went in the front part of it.

Q    Okay.  In the front part of Kenneth Barrett's house?

A    Yes.

Q    How rooms did you go in?

A    That's the only one.

Q    Just that -- (Interrupted)

A    -- real small.  Wasn't --

Q    So, when you say you didn't see Kenny Barrett, you only looked in that one room or did the other people look in the other rooms?

A    The other officers were looking in the other rooms. I stayed in the front.

Q    So as far as saying anything about a revolver, the only thing you can say about a revolver wasn't in that front room, is that right?

A    If you want to say that.

Q    Well, you didn't go in any other rooms?

A    No.

Q    Did you look in any other rooms?

4556

A    No.

Q    Did you look in any other place?

A    No.

Q    So when you say you couldn't find the revolver, what you're basically saying you couldn't find the revolver in that front room?

A    I believe I testified we didn't recover one out of the house.

Q    So, were other people looking?

A    Yes.

Q    Do you know whether they looked in the hidey hole?

A    I don't know what you're talking about, hidey hole.

Q    Do you whether they looked under any stairs?

A    I don't know.

Q    You know whether they looked at the gun cabinet?

A    Don't know.

Q    Do you know whether they looked upstairs?

A    I recall them looking upstairs, one of them looking up there.  No revolver.

Q    So as far as you can say, you didn't see it and do you know what extent they actually looked for the revolver?

A    I don't know what the --

Q    Now, in that front room, I didn't understand.  Are you saying there were cartridges or shells or hulls?

4557

What was in that front room that you say you saw?

A    There was a tray of .44 magazine shells, loaded shells.

Q    Okay.

A    Hulls, they were empty casings.  Hulls is what we saw that had already been fired.  That's what I was talking about.

Q    There were shells in one bowl?

A    No -- (Interrupted)

Q    What?

A    In a tray, an ammunition tray.

Q    And in an ammunition tray there were shells.  In another -- was it a bowl?

A    It was a bowl or just a little object.  They were loose in there and they had already been spent.

Q    You don't have any idea how long they had been there?

A    I have no idea.

Q    They weren't thrown around any place, they were in a bowl?  They weren't on the floor or anything like that?

A    No.  Not that I recall, no.

Q    You don't have any idea whether it was that -- something was reloaded right there or not, do you?

A    No.

          MR. HILFIGER:  I have no further questions.

4558

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    What salary did you receive as a reserve deputy?

A    None.

Q    Who paid for the car?

A    I did.

Q    Who paid for the insurance on it?

A    I did.

Q    Who bought the gas for it when you were serving as a reserve deputy?

A    I did.

Q    In regards to the previous situation, was there a warrant when you arrested him previously?

A    Yes.

Q    And somebody had failed to remove that from the books?

A    Yes.

Q    And as a consequence did you know that that had been satisfied, that his fines had been paid and the provisions or the issue had been satisfied?

A    His girlfriend at that time had brought me a receipt.

Q    At the time you made the arrest -- (Interrupted)

A    At the time I made the arrest the warrant was as far

as I was concerned was still active.

Q   And in regards to the time you attempted to make the arrest in April of '97, any indication that he had paid the fine for the delivery of the control substances?

A   No.

Q   Any indication that he had already gone into court and entered a plea and disposed of that charge?

A   No.

Q   Was it still a valid charge when he dusted you on the road?

A   Yes.

Q   In fact, Mr. Hilfiger asked if he turned himself in within a couple of days.  Do you recall that he did?

A   He did turn himself in.

Q   And wasn't this the same charge where he jumped -- where he refused to show up for trial and a bench warrant was issued?

A   I believe so.

Q   You were asked about seeing -- about contact with relatives?

A   Yes.

Q   Was there an attempt to contact his mother after the backup arrived?

A   She came out of the house, yes.

Q   Did anyone ask her if they could look and check and

4560

see if he was at her house?

A    Someone did.  But, I don't recall who.  I didn't.

Q    Did you hear her response when asked?

A    Yes.

Q    What did she say?

A    No, he wasn't in there.

Q    I'm sorry.  What?

A    He wasn't in there.  Nobody was living.

Q    Was the revolver found in the house?

A    No.

Q    Was there a revolver in Kenny Barrett's hands when you drove up to his front door or to the front gate?

A    Yes.

           MR. LITTLEFIELD:  Pass the witness.

           THE COURT:  Further cross examination?

           MR. HILFIGER:  Yes.

                    RECROSS EXAMINATION

BY MR. HILFIGER:

Q    You felt the warrant that you arrested Kenny on previously was a valid warrant, didn't you?

A    Yes.

Q    And you didn't stop even though the girlfriend told you that the fine had been paid?

A    That came later.

Q    That came later.  But, he was still arrested, wasn't

4561

he?

A    Yes.

Q    And he still had to go in, didn't he?

A    Yes.

Q    And even though you may have thought it was a valid warrant it wasn't, was it?

A    No.

MR. HILFIGER:  I have nothing further.

THE COURT:  Anything further from this witness?

MR. LITTLEFIELD:  No, Your Honor.  Your Honor, he may -- depending upon how things develop, there may be a reason to recall him.  But, I don't have anything additional at this time.

THE COURT:  Sir, you're subject to recall but you may step down now.  You may call your next witness.

MR. LITTLEFIELD:  Johnny Philpot.

THE COURT:  Will you raise your right hand.

JOHNNY PHILPOT,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record please, sir.

A    Johnny Philpot.

Q    Mr. Philpot, are you still there in Sequoyah County?

4562

A     Yes, sir, I am.

Q     In 1999 what kind of vehicle did you drive?

A     From a 1992 SUV.

Q     What kind of SUV?

A     Oldsmobile.

Q     And how long had you had that?

A     I purchased it in January of 1997.

Q     You need to pull the microphone up.  I'm having trouble hearing you.

A     I purchased the vehicle in January of 1997.

Q     Did you have that vehicle in July of 1998, the white SUV, when you went to Kenneth Barrett's residence -- and you testified about that incident?

A     Yes.

Q     Was that the same vehicle you had?

A     Yes, it was.

Q     And did you drive that vehicle to Mr. Barrett's residence in January of 1998?

A     Yes, sir.

        MR. HILFIGER:  Your Honor, I'm sorry.  You said January of -- (Interrupted)

        MR. LITTLEFIELD:  I'm sorry.  July of 1998. Thank you.

Q     (By Mr. Littlefield) Let me direct your attention to April of 1997.  Did you have an occasion to be called out

4563

there with your -- in regards to a call from a reserved deputy with Stan Philpot?

A    Yes, sir.

Q    And who arrived out there to back up Mr. Philpot, Stanley Philpot?

A    Myself and the undersheriff at the time.  There was two highway patrol troopers, I believe, that responded also.  I'm sure there was another deputy or two probably. I don't remember exactly.

Q    After the backup arrived where did you all go?

A    Mr. Barrett's residence.

Q    Was there an attempt to talk Kenneth Barrett out the residence?

A    Yes.  Trooper Bill James was one the troopers that, I think, attempted to get a hold with the PA system equipped in his vehicle.  Tried to, yes.

Q    Why was that -- why was there an effort to remove Kenneth Barrett from that residence in April of '97?

A    It was an active warrant on him at that time and he had -- Stan Philpot had stopped him on the road and to get a few warrants that allowed him to drive his vehicle to the -- this on the road.

Q    Was that the same case for which the bench warrant was pending in September of 1999?

A    Yes, sir.

4564

Q    In September of 1999, was Kenneth Barrett over the age of 18?

A    Yes.

Q    Was Mr. Barrett home back in April of '97 after Bill James called -- Trooper Bill James called to try and talk Mr. Barrett out, did Barrett respond from his residence and come outside?

A    No.

Q    What effort was made to determine whether or not he was in his residence so that that felony arrest warrant could be served?

A    Other than Bill James on the -- (Interrupted)

Q    Was their entry -- (Interrupted)

A    They did make entry, yes.

Q    Who went inside the residence?

A    Myself and Trooper James and probably, I believe, Trooper Bucanon at the time.  He's retired right now but I believe it was he and maybe another one -- I don't remember who the other officers were.

Q    Had you received information about any type of firearm that Mr. Barrett reportedly had in his possession by Stanley Philpot?

A    Yes.

Q    And what was that description?

A    Described it as a revolver, long barrel revolver, a

.44 Magnum as he described it.  It was a .44 Magnum revolver.

Q    Was there any ammunition consistent with a .44 Magnum revolver found in the residence?

A    Yes.

Q    Where?

A    As I recall the living room, the residence, the front room, living room.

Q    And describe what was observed there in regards to ammunition consistent with the .44 Magnum revolver?

A    It was a -- as I recall a box -- not a box.  But, the insert from the box that holds the individual bullets and hole.  And it was on a piece of furniture.  I don't recall whether if it was on a television or just a shelf or what but it was -- and there was also some loose or empty cartridges for a .44 Magnum.

Q    Was there an effort to find Mr. Barrett in the residence?

A    Yes.

Q    Did you look in the residence to see if Mr. Barrett was there?

A    Yes, we did.

Q    Where all did you look?

A    Everywhere.

Q    Anyone go off in the loft area?

4566

A     Yes.

Q     Was Mr. Barrett there?

A     No.

Q     While you were looking for Mr. Barrett, did anyone find the .44 Magnum revolver or the long barrel revolver?

A     No.

MR. LITTLEFIELD:  May I have a second, Judge?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

CROSS EXAMINATION

BY MR. HILFIGER:

Q     Sheriff, do you know whether or not after this incident that Kenneth Barrett turned himself in?

A     Yes, he did.

Q     Came in on his own, didn't he?

A     Yes.

Q     Submitted to the jurisdiction of the court of that bench warrant, didn't he?

A     That's correct.

Q     You mentioned whether or not you knew Kenneth Barrett was over the age of 18.  Have you ever had any contact with Kenneth Barrett while he was still a juvenile?

A     Yes, I did.

Q     Back then did you arrest him?

A    I did.

Q    Didn't the arrest have something to do with him squealing his tires -- some neighbor said he was squealing his tires and so you arrested him?

A    The arrest was on a warrant.  I don't remember what it was.

Q    As a juvenile you took him into custody, didn't you?

A    I did.

Q    And that sort of resulted in a problem between you and Kenneth Barrett, didn't it?

A    It did.

Q    He was trying to talk to his mother.  He was 17 years old and trying to talk to his mother and you wanted him off the phone, didn't you?

A    No.

Q    Well, what happened?

A    He had called his mother.  The phone call had been completed and it was time to go upstairs and he didn't want to go.  He refused and he resisted.

Q    Did you hit him?

A    I did.

Q    Did that cause -- did that result in some kind of civil suit by Kenneth Barrett and his mother against you?

A    A civil suit?

Q    Yes.

4568

A   I don't remember a civil suit.

Q   Was there any kind of civil action?

A   There was a civil rights complaint about it from the FBI.

Q   And that was based on this arrest and you hitting Kenneth Barrett; is that correct?

A   That's correct.

MR. HILFIGER:  May I have just a moment?

Q   (By Mr. Hilfiger) Now, back again, there was a time somewhere around '98, summer of '98, that you came out to Kenneth Barrett's house at the request of another deputy and did a check on the Colt Sporter, didn't you?

A   I was out there in July of '98.  I did not examine the Colt Sporter, no.

Q   Did you check any weapons for whether or not there were automatic weapons?

A   I did not myself, no -- (Interrupted)

Q   Did you have somebody?

A   Some of the deputies were there prior to my arrival and there was --

Q   They were doing that before you even got there?

A   Yes.

Q   Whatever their inspection did, you were satisfied that there was not an automatic weapon out there?

A   Yes.

Q   As I understood when you were testifying before, even when they first brought this up about having the search warrant executed by the highway patrol, your initial reaction to it was you didn't want to have the -- involved -- (Interrupted)

MR. LITTLEFIELD:  Objection.  The question was the first time you testified you testified about.

THE COURT:  Objection overruled.  You may answer.

Q   (By Mr. Hilfiger) Is that true?

A   That's true.

MR. HILFIGER:  I have no further questions.

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q   Did you likewise testify you changed your mind and didn't have an objection to the OHP serving this warrant?

A   Yes.

Q   Let's talk about the end of the summer of '98.  Why was a deputy out there to begin with?

A   We received a complaint by phone through the dispatch that Mr. Barrett was out there shooting in the neighborhood.

Q   And that wasn't the first time that kind of complaint was coming through, was it?

A   No.

4570

Q    And in '99, were you able to respond to those kind of complaints by sending deputies to Kenneth Barrett's house?

A    Were we ever?

Q    If you got those kind of complaints in '99 did the deputies continue to respond to Mr. Barrett's house?

A    They would respond to the area other than -- they were instructed not to respond alone.  They could respond but to not to respond alone and to see if they could hear any gunfire or see if Mr. Barrett was actually firing the weapon before approaching his residence.

Q    Let's talk about the incident when Mr. Barrett was a juvenile.  There was a warrant outstanding?

A    Yes.

Q    What was the nature of the warrant?

A    I don't remember the charge.  I really don't.

Q    Okay.  And what position did you occupy at the time, sir, of law enforcement?

A    A patrolman with the -- a patrol officer with the City of Sallisaw.

Q    And you took Mr. Barrett into the police department or were the jail was; is that correct?

A    Yes, sir.  The courthouse, sheriff's department.

Q    And in regards to making a telephone call, what was policy of why a juvenile would make phone calls?

4571

A    To contact a district judge and he would advise you whether to arrest the person in jail or release them to a parent or whatever.

Q    And did you contact the district judge in this case?

A    Yes, I did.

Q    What were you directed by the district judge to do with Kenneth Barrett back when he was a juvenile in this incident?

A    Place him in jail.

Q    You said Mr. Barrett had been allowed to make a phone call?

A    Yes.

Q    And what was the status of the phone service at the jail at that time, how was it set up?

A    You make the call on a pay phone.

Q    Was there difficulty with the sheriff's office at the jail being able to take calls back at that time?  How many phone lines did they have?

A    Very few, maybe two.

Q    After Mr. Barrett made the phone call, where were you going to take him?

A    To jail.

Q    What did he do when you started to take him to jail, sir?

A    He resisted.  He just tried to jerk away.  We were

4572

on a narrow stairway at the time.  The courthouse is completely different now then it was then.

Q    I understand.

A    There was a short stairway leading up to a small landing and another stairway with a banister on the side. He was kicking on that and kicking the bannisters to come back downstairs and he was just trying to jerk away.

Q    He was what?

A    Trying to jerk away to get loose.

Q    Did you get injured?

A    Yes, I guess.

Q    What was the nature of your injury?

A    Fractures in the bones of my hands.

Q    Was there any fall during the incident?

A    Against the -- against the banister when I was -- it's just a two by four that served as a banister, I guess.  But, yeah.

Q    In regards to the complaint to the FBI, do you know -- was that resolved?

A    Yes.

Q    Did the FBI report to you the resolution?

A    Yes.  Yes.

Q    What was the resolution?

A    There was no action taken.

Q    If the FBI finds that there is sufficient evidence

4573

to support a violation of civil rights against an officer for their handling of an inmate or a prisoner, do they have a reaction or what do they do?

MR. HILFIGER:  I object.  That calls for a conclusion.  What the FBI does not --

Q    (By Mr. Littlefield) Are you aware of what they do if they find that there is a foundation?

MR. LITTLEFIELD:  Wait a minute.  I'll withdraw that question.

THE COURT:  Question withdrawn.

Q    (By Mr. Littlefield) Are you aware of what the FBI will do if they find that officer did violate the prisoner --

MR. HILFIGER:  Im going to object.  Calls for supposition of -- (Interrupted)

THE COURT:  Sustained.

Q    (By Mr. Littlefield) Have you seen the FBI take action on civil rights complaints?

A    Yes.

Q    Did the action that they took in your case consistent with one where they believed in their investigations that there were violations or not?

MR. HILFIGER:  Your Honor, I object.  Again, that calls for -- (Interrupted)

THE COURT:  Sustained.

4574

Q    (By Mr. Littlefield) Any further action taken against you or any action at all taken against you at a result of the civil rights complaint?

A    No.

MR. LITTLEFIELD:  Pass the witness.

RECROSS EXAMINATION

BY MR. HILFIGER:

Q    Back on this juvenile action, do you know whether Kenny Barrett was released the next morning?

A    I know he was released.  I don't know exactly when.

Q    And you said that your injury, you fractured the bones in your hand.  Was that when you hit him in the face, was that when your bones in your hand were fractured?

A    That's correct.

Q    So, it was as a result of you hitting him that you got this fracture?

A    Yes.

Q    By hitting -- where in the face did you hit him?

A    The nose if I remember right.

MR. HILFIGER:  I have no further questions.

THE COURT:  Any further questions from the Government?

MR. LITTLEFIELD:  No.

MR. HILFIGER:  No further questions.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Under the same circumstances as --

THE COURT:  Sir, you are subject to recall but you may step down.  You may call your next witness.

MR. LITTLEFIELD:  Cindy Crawford.

THE COURT:  Ma'am, please raise your right hand and be sworn.

CINDY CRAWFORD,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Good afternoon.  State your name, please.

A    Cindy Crawford.

Q    Ms. Crawford, are you married to Travis?

A    Yes.

Q    And Travis is what kin to Kenneth Barrett?

A    First cousin.

Q    Speak up.

A    First cousin.

Q    When did you and Travis get married?

A    January 1st.

Q    Of?

A    2002.

4576

Q    What was your relationship with Travis in the summer of '99?

A    We were dating.

Q    Let me direct your attention to the month or so prior to September the 24th, 1999.  Did you ever go to Kenny Barrett's without Travis during that period of time?

A    Yes.

Q    And when you were over there, did you have any contact with Kenny Barrett in the month prior to September?  How long prior to September 24th was the last time you were over there?

A    Probably two weeks to a month.

Q    And who did you go over there with on this last occasion, do you recall?

A    Myself.

Q    How were you and Travis getting along at that time?

A    Not too well.  We were having difficulties.

Q    You were dating then, weren't married?

A    Uh huh.

Q    How did Kenny behave to you when you were over there on the last occasion?

A    He was in a way of making passes.  You know, kind of a --

Q    What did you think he wanted from you?

A    To sleep with him.

Q    Did anyone use any drugs on this occasion at Mr. Barrett's residence?

A    Yes.

Q    Who?

A    Kenny and I.

Q    Do you recall you testified on the guilt stage of the trial that you didn't receive any drugs over there?

A    Yes, sir.

Q    Why did you say that on the first stage?

A    I was so nervous that day.  I just -- I didn't even realize the questions and everything.  I just needed to slow down.  Wasn't listening right.

Q    Okay.  Who provided you the drugs on this last occasion over there?

A    Kenny.

Q    And who besides yourself and Kenny used drugs on this occasion?

A    No one that I know of.

Q    Did you sleep with Kenny?

A    No.

Q    What was his reaction to your not being pliable to his advances?

A    Just kept trying.  He just kept making other moves.

Q    Did you leave that night?

4578

A    Yes.

Q    With whom?

A    Ernie Barrett.

Q    And who is Ernie?

A    Kenny's brother.

Q    Anything happen that scared you before you left?

A    Uh huh.

Q    What?

A    I told Kenny that I had to go use the restroom and when I went over to Rich's house to see if he could give me a ride home and he did, we were in the vehicle getting ready to leave and Kenny runs at me and opens the door and shotgun and -- (Interrupted)

Q    Where were you sitting?

A    I was sitting in the truck.

Q    Go ahead.

A    And put the shotgun to my leg and was cussing me and I was -- and Kenny had a gun to my leg and cussing at me and told me to never come back out there again and that was it.

        MR. LITTLEFIELD:  Your Honor, I ask that Government's Exhibit 127 be shown to the witness.

        THE COURT:  You may.  That's in evidence?

        MR. LITTLEFIELD:  Yes, sir.

Q    (By Mr. Littlefield) And do you recognize -- go

ahead and pull it out of the box.  Go ahead and lift it up out of the box.  Do you recognize that?  Go ahead and put it back in the box.

A     It looks to be.

Q     Okay.  Where did he put it against your leg?

A     On the side on the femur bone.

Q     Your thigh area?

A     Top side of the --

Q     And what did he say he would do, if anything, if you came back?

A     Exact words?  He would fucking kill me.

        MR. LITTLEFIELD:  Pass the witness.

        THE COURT:  You may proceed.

        MR. SMITH:  Thank you, Your Honor.

                CROSS EXAMINATION

BY MR. SMITH:

Q     Ma'am, if I understood your testimony just a little bit ago, you said that what you told us just a few weeks ago wasn't the truth, fair enough?

A     It was a -- no.  I guess, no.  It wasn't the truth. It went past my line I couldn't know.

Q     You weren't lying to us a couple weeks ago.  It's just you -- (Interrupted)

A     Not purposefully.  Not purposefully.

Q     You were lying to us though?

4580

A   Well, obviously if I answered the question wrong then I guess it was mistake.  I wasn't thinking.  I was nervous.

Q   And you understand that there's quite a bit of difference between I never got any drugs from Kenny Barrett's house and Kenny Barrett?  Which was your story couple weeks ago.

A   I never got any drugs.  I did drugs out there.  I thought you meant buying.

Q   No, ma'am, I'm talking about -- (Interrupted)

A   Not used drugs.

Q   Hold on a second.  We're going to have a hard time with keeping a clear record here.  I believe the questions were put to you from the prosecution as to whether or not Kenny Barrett had supplied drugs to you out of his house.  The question was asked of you a couple weeks ago and your response then was Kenny Barrett had never given me drugs at his house.

A   Right.

Q   That's what you told us?

A   Right.

Q   And you were clear-minded then.  You told us you were a little bit -- (Interrupted)

A   Well, I have a Post-Traumatic Stress Disorder.  And I don't really handle stress very well.  So, if I'm not,

4581

you know -- I was not evening thinking.

Q    Does this Post-traumatic Stress Disorder affect your ability to recall events?

A    No.  But, maybe.  Not for sure.

Q    When you were diagnosed with post traumatic stress disorder, ma'am?

A    About six years ago.

Q    Prior to September of '99 or afterwards?

A    Prior.

Q    Excuse me?

A    Prior.

Q    Okay.  And who diagnosed you with that, ma'am?

A    A psychiatrist.

Q    And you still continue under the care of a psychiatrist, do you not, ma'am?

A    Right now, yes.  Social Security disability is I have a case --

Q    You are -- (Interrupted)

A    See my psychiatrist.

Q    You are currently receiving Social Security benefits -- (Interrupted)

A    No.

Q    Hold on one second, ma'am.  Let me ask my question. Are you currently receiving Social Security benefits as a result of any mental disorder that you may have?

4582

A    No.

Q    Are you receiving Social Security benefits?

A    No.

Q    Now, have you ever been in a situation where you have accused others of misconduct?

A    As in, you mean -- give me an example of what you're trying to say.

Q    I'm going to get to some specific instances.  But just for the general purpose of the question, have you ever accused others of misconduct?

A    What kind of misconduct?

Q    Let's just get to the heart of the matter.  You accused your father of molestation?

A    No.  I told on my father, yes.

Q    And he was not successfully prosecuted, was he?

A    Yes, he was.

Q    He disagreed with your contentions that this never happened?

A    He pled no contest.

Q    Did you ever accuse Travis Crawford's sister, Gwen Hope, of blowing marijuana smoke in her young child's face?

A    No.

Q    You never reported her to DHS?

A    No.

4583

Q    Did you ever report Gelene Dotson to DHS over the care of that same young child?

A    No.  I don't know what you're taking about.

Q    So, if they come up here and tell us something different, you won't know what they're referencing; is that true?

A    That's true.

Q    Now, let's go back to the day where you said that you were out there at Mr. Barrett's home when he wanted to sleep with you.

A    It was a night, not a day.  And, yes.

Q    At that time you were seeing Travis?

A    Uh huh.

Q    Things were a little bit strained with you and Travis?

A    Uh huh.

Q    And you were down at a single man's home?

A    No.  Travis told me to come out there and Travis had -- well, I guess, basically, he stood me up that night.  And Kenny was putting things in my mind to convince me that Travis was cheating on me.

Q    Were you or were you not at a single man's home, Kenny Barrett's home, while you and Travis were in a dating relationship?

A    I was at my husband's -- house waiting for him.

Q    And did you go down to Kenny Barrett's home?

A    Yes, I did.

Q    A single man's home, Kenny Barrett?

A    I don't know if he's married of not.  I guess he's single.

Q    Didn't stop you from going though, did it?

A    No.

Q    Okay.  Now, when you were down there you knew that he had that shotgun because he went outside and killed a skunk while you were there, didn't he?

A    I don't remember anything like that.

Q    And do you also remember, ma'am, that you were in the house and Kenny Barrett came back inside and propped that shotgun up against the wall after having killed the skunk, that the shotgun fell over and you got scared and you jumped?

A    No.  I don't remember that even happening.

Q    But, that grew into this situation to where you were in the truck with Richie and he holds the shotgun to your leg because he was pressuring you for sex and you wouldn't give him any?

A    There was no skunk.  There was no incident where it fell over.  There was like six other people there asleep in the house.

Q    And, ma'am, there is no police report of this

4585

activity?

A    No.

Q    You didn't go down to any police officer which you said you were living with Richie?  So, you're getting -- (Interrupted)

A    No, I wasn't living with Richie.  I was leaving.

Q    You were in the pickup leaving with Richie is what you told us, right?

A    Uh huh.

Q    So, you clearly had the ability, ma'am, to go anywhere, to go to a phone, to go to a police station, to anyone -- (Interrupted)

A    (Inaudible.)

Q    -- and say I just had someone threaten to blow my leg off?

A    Yes, I did.

Q    But, you didn't do that, did you, ma'am?

A    No, I did not.

Q    But, you come in here today after you've already admitted that you lied to us two weeks ago and now you come up with this grandiose story about -- (Interrupted)

        MR. LITTLEFIELD:  Objection, Your Honor.  I object to the argumentative form of the question, grandiose story.

        MR. SMITH:  Strike that last question and pass

4586

the witness.

THE COURT:  Further direct examination?

MR. LITTLEFIELD:  May I have just a second?

THE COURT:  You may.

MR. LITTLEFIELD:  No.  Pass the witness.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes.

THE COURT:  Ma'am, thank you for your testimony.  You may step down and you may be excused. Call you next witness.

MR. LITTLEFIELD:  Charles Sanders.

THE COURT:  Sir, if you would raise your right hand and be sworn.

CHARLES SANDERS,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for record.

A    Charles Sanders.

Q    Mr. Sanders, let me direct your attention to November/December of 1999.  Do you recall those months?

A    November/December 1999 I was in Sequoyah County Jail.

Q    And did you -- (Interrupted)

THE COURT: Just a moment. If you'll please speak right into the microphone. You're leaning back a little bit and I'm having trouble hearing you.

Q    (By Mr. Littlefield) You were in the Sequoyah County Jail in those months?

A    Yes, sir.

Q    Did you have occasion to see Kenneth Barrett in the Sequoyah County Jail during those months?

A    Yes, sir.

Q    Was there ever any commentary on the part of Kenny Barrett in regards to the informant on the search warrant which had been served at his residence on September the 24th, 1999 that you overheard in the jail in those times?

A    Yes. There was -- he was talking on the phone one day and he was saying he had -- he wouldn't have -- when he came out and informed me that he didn't either -- (Interrupted)

Q    Did you leave -- (Interrupted)

A    The person he was talking to he was talking to someone on the phone.

Q    What did he say?

A    He said that we need to find the son of a bitch that come in to have me arrested or get me busted or something to that effect.

Q    Did he indicate what should be done if they found

4588

the son of a bitch that caused him in to be busted?

A    We need to kill that son of a bitch.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examination.

CROSS EXAMINATION

BY MR. HILFIGER:

Q    Mr. Sanders, when did you say this occurred?

A    November/December of 1999.

Q    At that particular time were you in the same cell as Kenny Barrett?

A    Yes, sir, I was.

Q    You were?  And were you -- where was the phone located?

A    In the jail -- in the cell block.

Q    In the main -- in the big block?

A    Yes, I believe so.  If you go in the bull pen that's inside of the jail.

Q    You were in the same bull pen or the same cell block?

A    It's the same bull pen inside the jail.

Q    And where were you when this phone -- when you're saying this phone call was made?

A    Well, it isn't very big.  It was probably, I'm going to guess, from six feet wide by 12 feet to 14 feet long. So, there's not much room to -- and the phone is right in

4589

the middle, so --

Q    How many people were in there?

A    Well, it holds 12.

Q    How many people were in there?

A    Probably ten or 12.

Q    And who do you know if -- do you even have any idea who he was talking to?

A    No, sir.

Q    Did he make the call going out or was it a call coming in?

A    It's only outgoing calls, so --

Q    It's only an outgoing phone.  You can't tell us anymore of a date, just November/December?

A    That's it.

Q    And how long were you in the same cell block with Kenny Barrett?

A    That particular time?  I don't recall exactly how long.  I've been in the cell block with Kenny several times.

Q    Well, during that period from his arrest in September of '99 until you came in -- when did you come in?  You were in August, weren't you?

A    August.

Q    When did you come into the jail?

A    I was -- probably got there in maybe

4590

October/November.

Q   Okay.  From the time you were in, you first came in, were you in the same cell block?

A   Yes.

Q   With Kenny?

A   Yes.

Q   Were you in the same cell block with Kenny the whole time you were there?

A   During November/December stay?

Q   Yes.

A   Yes.

Q   And you left in December?

A   Yes.

Q   Where did you go?

A   Probably made bond.

Q   What now?

A   Probably made bond.

Q   Probably made bond, you can't remember?

A   Can't remember.

Q   You can't tell us anymore about this phone call other than say it was in a two month period and you don't know who he's calling, is that right?

A   That's correct.

          MR. HILFIGER:  I have nothing further.

          THE COURT:  Further direct?

MR. LITTLEFIELD: Nothing further.

THE COURT: May this witness be excused?

MR. LITTLEFIELD: Yes, Your Honor.

THE COURT: You may step down. Call in your next witness.

MR. SPERLING: Larry Lane.

(Whereupon, the witness was administered the oath.)

THE COURT: You may proceed.

LARRY LANE,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q   Please state your name, sir, and spell your last name.

A   Larry Lane, L-a-n-e.

Q   What is your business or occupation, sir?

A   Deputy for the Sequoyah County Sheriff's Office.

Q   For how long have you served as a deputy sheriff for the Sequoyah County Sheriff's Office?

A   Eight years.

Q   Were you serving in that capacity on or about January 3rd, 1998?

A   Yes.

4592

Q    Did you have occasion on that day to participate in a traffic checkpoint with regard to other officers?

A    Yes.

Q    Do you recall who the other officers were?

A    Deputy Shannon Smith and reserve officer Sheldon Fair and police officer Cindy Smith and city officer Mike --

Q    If you will just talk directly into that microphone because that will pick you up.  What time of day or night were you out there on this checkpoint?

A    Around midnight.

Q    Do you know a man by the name Kenny Eugene Barrett?

A    Yes.

Q    Do you know where he lived at that time?

A    Yes.

Q    Do you know where he lived with respect to where the traffic stop area was located?

A    Yes.

Q    About how far away?

A    About two miles.

Q    Do you see the Defendant Kenneth Eugene Barrett in the courtroom today?

A    Yes.

Q    Where is he seated and what is he wearing?

A    At this table, blue shirt.

4593

MR. SPERLING:  May the record reflect the witness has identified the Defendant, Your Honor?

THE COURT:  The record will so reflect.

Q    (By Mr. Sperling) Had you known of the Defendant prior to January 3rd, 1998?

A    Yes.

Q    Had you endeavored by virtue of your duties as a Sequoyah County Deputy to obtain certain information on him?

A    Yes, I did.

Q    Had you endeavored to have people visit him undercover?

A    Yes.

Q    Have you been successful in that arrangement?

A    Yes, I have.

Q    You have been?  Have you been successful in running anyone into his house?

A    No, I had not.

Q    Why not?

A    They were -- they feared him.  They were scared of him.

Q    On this date on January 3rd, 1998, did you have occasion to see a vehicle approach the checkpoint?

A    Yes, I did.

Q    What kind of vehicle was it that you recall?

4594

A    It was an older model Chevy pickup.

Q    Where were you situated as the older model Chevy pickup approached the checkpoint?

A    I was standing in the roadway.

Q    And at that time were you checking various basic documents to include driver's licenses and also to include at that time inspection stickers?

A    Yes.

Q    And when you were standing in that area, what if anything did you see with regard to the pickup?

A    As the vehicle approached?

Q    Yes, sir.

A    I observed the vehicle slow down before he arrived at my location.

Q    To about what rate of speed did the vehicle slow?

A    Probably ten miles an hour, very slow.

Q    What did you do as the vehicle slowed?

A    I shined my flashlight to motion for them to stop.

Q    Did you recognize the person at whom you were shining the flashlight motioning to stop?

A    Yes.  When he arrived where I was standing.

Q    What kind of roadway were you on; what was the nature of the roadway, gravel, paved?

A    Pavement.  Pavement.

Q    And do you know what roadway it was; does it have a

4595

name?

A    McCoy Ford -- the intersection of McCoy Ford and Dwight Mission Road.

Q    The intersection of McCoy Ford and --

A    Dwight Mission Road.

Q    Okay.  Dwight Mission Road, how does that run with regard to Interstate 40?

A    At that point where we were can run parallel.  It's a winding road.

Q    Where was this location from the city of Sallisaw?

A    How far?

Q    Yes, sir.  And in what direction, please?

A    Northwest about five miles.

THE COURT:  Mr. Sperling, let's take a break. Members of the jury, remember my admonition not to discuss this during your recess.  I would ask everyone please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the room after which the following record was made.)

THE COURT:  Be in recess.  I instructed the marshal and what I'm trying to do is the 15 maximum 20-minute turn around.  So, I'll be hurrying the jury back in.  So, keep that in mind.

(Whereupon, a short recess was held after which the following record was made.)

4596

THE COURT: Let the record reflect the jury is in the box. Counsel for the Government is present. The Defendant and counsel are present. You may continue.

Q    (By Mr. Sperling) Mr. Lane, as you saw the vehicle approaching the area where you were standing, how near to you did the vehicle come?

A    Right up to me. I was standing right by the driver's side door.

Q    Was it close enough to you that you could reach out and touch the vehicle?

A    Yes.

Q    As the vehicle approached you, did you see the person inside?

A    Yes.

Q    Would did you see inside?

A    Kenny Barrett.

Q    Do you see Kenny Barrett in the courtroom?

A    Yes.

Q    Do you see Kenny Barrett here in the courtroom?

A    Yes.

Q    Where is he?

A    He's seated at this table here, blue shirt.

MR. LITTLEFIELD: May the record reflect the witness has identified the Defendant, Your Honor?

THE COURT: Record so reflects.

Q     (By Mr. Sperling) What did you see the Defendant do as he approached you?

A     He looked at me and smiled and then accelerated.

Q     All right.  When you say smiled, please describe the smile.

A     More of a smirk.

Q     As he did so, what did he then do?

A     He accelerated the truck and fled from us.

Q     When you say accelerated the truck, at what rate of speed did he accelerate away from you?

A     Very high rate.  I would say he floor boarded the truck.

Q     Did you see where the other officers were when he floor boarded his truck?

A     No, I was trying to get out of the way.

Q     All right.  You said you were trying to get out of the way, why did you do so?

A     The truck started fish tailing a little bit in the front tires and I was getting away from the truck and back to my vehicle.

Q     Was the truck fish tailing before it got up to where you were?

A     No.

Q     And as it was where you were where with regard to you standing, was the vehicle when the Defendant floor

4598

boarded the truck?

A    Directly in front of me.

Q    How near did the vehicle get to hitting you?

A    The back end was just a few feet away.

Q    What did you do then?

A    I went back to my vehicle and started pursuing his vehicle.

Q    Did anyone get in your vehicle with you?

A    Yes.

Q    Who was in with you?

A    Reverse Officer Fair.

Q    And what other vehicles, if any, participated in the chase?

A    Deputy Smith and -- Officer Ridenger.

Q    Are you able to approximate for the jury the speed at which the chase was commenced?

A    It was over a hundred miles an hour.

Q    What was the nature of the roadway on which the high speed chase continued?

A    It was hills and curves, not very good pavement.

Q    About how long was the chase?

A    A little over a --

Q    From where to where, sir?

A    I mean two miles.

Q    Two miles.  From where to where, sir?

4599

A    It was on north on the Dwight Mission Road just about two miles from where we were.

Q    Just a second, one moment. How did you indicate, if at all, that the Defendant should stop his truck?

A    By lighting a flashlight up and approaching the vehicle in the roadway.

Q    What, if anything, did you do with your hands?

A    I remember doing this with my hands.

Q    The record can't reflect what you just did with the flashlight so you need to speak to us, if you would please, to tell us what you did with your hand and the flashlight?

A    I held the flashlight up and pointed --

(Interrupted)

Q    You're indicating now about shoulder length, shoulder height.

A    Yes. About shoulder height.

Q    Where was the flashlight pointed at that point?

A    Toward the driver of the vehicle.

Q    And was the flashlight on?

A    Yes.

Q    Good batteries?

A    Yes.

Q    Pretty good batteries?

A    Yes.

4600

Q    Where was your vehicle at the time that the Defendant approached the checkpoint?

A    It was sitting on the side the road right behind me.

Q    Was the roadway blocked or open?

A    Open.

Q    Were there any other officers that were standing in the roadway?

A    Yes.

Q    What other officers were standing in the roadway?

A    I believe all of us were in the roadway.

Q    How were you dressed on that evening?

A    In my normal uniform, police uniform.

Q    Describe your normal uniform, do you remember what color your uniform was?

A    Tan shirt, dark brown pants, badges, patches --

Q    Patches for the Sequoyah County Sheriff's Office on the shoulders?

A    Yes.

Q    The badge, where was the badge featured?

A    On my chest.

Q    And were you armed?

A    Yes.

Q    How were you armed, sir?

A    With my Glock 40-caliber pistol.

Q    That's a pistol that you carry as a matter of

4601

routine?

A     Yes.

Q     Did you ever unholster your Glock?

A     No, I didn't.

Q     Were the other officers -- how were the other officers dressed?

A     They were in their uniform as well.

Q     Did they also display badges prominently?

A     Yes.

Q     How was your vehicle marked?

A     In large letters Sequoyah County Sheriff.

Q     Was there any lighting on your vehicle?

A     Yes, there's a light on it.

Q     What was -- what kind of light bar was on it, what colors and how far did it extend?

A     Blue and red with a clear tint on top of the vehicle.

Q     At the point that you got into your vehicle, did you turn on the headlights in order to drive?

A     Yes.

Q     As the car was parked at the side or near the roadway, were any of your lights activated?

A     Parking lights were on.

Q     How about the other officers at that time?

A     No.

4602

Q    So, a total of how many police vehicles were there on that night?

A    Three.

Q    Were the other vehicles marked or unmarked?

A    They were marked.

Q    When the Defendant sped away, who was first in line chasing him?

A    I was.

Q    How did the chase end?

A    The Defendant's truck went off the roadway on the adjoining road and crashed in the ditch.

Q    When you say crashed in the ditch, was it disabled, did it appear to be disabled?

A    It didn't appear it be.  Front tire was off in the ditch.

Q    When you got to the vehicle was anyone in or near it?

A    No.

Q    What did you do?

A    I searched the wooded area right there in front of the truck.

Q    Did you find anyone?

A    No.

Q    When you say the wooded area near the roadway, how far was the woods?

4603

A    Just directly right there at the roadway.

Q    Heavily forested or lightly?

A    Heavy.

Q    Did you ultimately impound the truck?

A    We didn't.  Devin Smith actually did it.

Q    Was an inventory done of the contents of the truck?

A    Yes.

Q    Do you remember what was found, if anything?

A    I don't remember the entire inventory.  I remember there was a smoking device that got some substance in it and tested positive for marijuana.

Q    Where was it located?

A    It was in the glove box.

Q    Did you have occasion to talk with any of the other officers after this incident?

A    At the time while we were there?

Q    Yes, sir.

A    Yes.

         MR. SPERLING:  May I have a moment, Your Honor?

         THE COURT:  You may.

Q    (By Mr. Sperling) When you got into your unit what kind of thing did you do with the emergency lighting?

A    I turned on my emergency lights and my siren.

Q    When you say emergency lighting, what, if anything, is there to the emergency lighting on your vehicle other

4604

than the light bar up on the top of the vehicle?

A     The -- will make the emergency lights alternate and blink.

Q     And when you say alternate or blink, do you know whether or not they blink at low or high beams?

A     Both low and high, from high to low.

Q     How about the rear taillights, as well, are they activated and do they indicate emergency lighting when they are activated in that manner?

A     On that vehicle they do.  They're just on.

Q     So, you had full light bar and you had wig wags?

A     Yes.

Q     How close did you get to the pickup that you were chasing?

A     I'd say about 100 yards or more behind, 150 yards behind him.

Q     Did you have training with regard to high speed chases as well?

A     Yes.

Q     In a nutshell will you share with the jury what that is, in summary, what kind of training do you have with regard to high speed chases?

A     We just --

Q     Are they permitted?

A     Oh, yes.

4605

Q    And are you to exercise care with regard to your driving?

A    Yes.

Q    When the Defendant passed the checkpoint was his window up or down?

A    Down.

Q    The siren that you had, if you were to activate it in this room, would you want to cover your ears?

A    Definitely.

Q    How would you describe the sound of the siren when you activate it?

A    Very loud, high pitched.

Q    What kind of noise does it make, is it high pitch, does it vary, what does it do?

A    Yeah.  It's varies.

Q    I mean, I've heard some like the European ones that are different than the typical American siren.  What kind of siren was it?

A    Probably higher than that -- varies.

Q    So, it has a varying speed that you can control?

A    Yes.

Q    You had it on the fastest?

A    Yes.

Q    Did any of the other vehicles have their emergency lighting activated during the chase?

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

A    Yes, they did.

Q    Had you been in the lead vehicle, the vehicle that you were chasing, would you have able to hear the siren that you activated?

MR. HILFIGER:  Objection.  That calls for speculation on his part.

THE COURT:  Sustained.

Q    (By Mr. Sperling) Was your siren clearly audible from 100 yards away?

A    Yes.

Q    Were your lights clearly visible from 100 yards away?

A    Yes.

Q    Was there anything between your vehicle and the vehicle that you were chasing that would have blocked the driver's view?

A    No.

Q    And the other vehicles, did they activate their emergency lighting?

A    Yes, they did.

Q    Both of them?

A    Yes.

Q    And the general nature of their emergency lighting, sir, would you explain that to us?

A    It was the same as mine, highlight bars and wig wag.

4607

MR. SPERLING:  I have nothing further, Your Honor.

THE COURT:  You may cross examination.

CROSS EXAMINATION

BY MR. HILFIGER:

Q    Mr. Lane, I don't know for sure where McCoy Ford Road is in relation to -- it crosses Dwight Mission, is that right?

A    Ends with it.

Q    The intersection of Dwight Mission.  Where does it intersect with Dwight Mission in relation to I-40?

A    How far?  Is that what you're asking?

Q    South of I-40 or north of I-40?

A    North.

Q    North of I-40.  How far north of I-40 is it?

A    About four or five miles -- the point that you're talking about where we were at?

Q    Yes.

A    About four or five miles.

Q    Does McCoy Ford Road intersect with Dwight Mission in more than one place?

A    No.

Q    And so, when you're saying four to five miles north of I-40 out, that'd be north of U.S. 64, is that right?

A    That's correct.

4608

Q   And in which direction you say the pickup was traveling, was it traveling on the Dwight Mission Road or the McCoy Ford Road?

A   Dwight Mission Road.

Q   In which direction?

A   At the time there were winding roads -- roads at that point, Dwight Mission Road is east or west road.  He was traveling east.

Q   Okay.  And then, was this a lighted traffic stop?  Did you have your lights going so people could recognize your vehicle when it came up there?  Did you have -- or was everything dark?

A   We didn't have emergency lights on.

Q   Did you have headlights on?

A   No.

Q   It was at night, right?

A   That's correct.

Q   What did you have to light your cars up so people could -- are your flashlights, is that what you relied on?

A   Where my vehicle's position is perpendicular to the road so when they approach their headlights lit up my car.

Q   Was your car in the roadway?

A   No.  It was right on the side of the road in the

4609

driveway.

Q    And where were the other police officers?

A    On the opposite side of the road, opposite side -- (Interrupted)

Q    Off the road?

A    Yes.

Q    Now, I assume that you made a report of this, is that right?

A    No.  Deputy Smith made the report.

Q    And did you and -- you know whether or not that report was given to the District Attorney's Office of Sequoyah County?

A    I don't remember.  I'm not sure.

Q    Did you ever talk to anybody in Sequoyah County District Attorney's Office about this incident?

A    I don't recall if I did or not.

Q    Were you aware that from this incident only the charges of attempting to allude and possession of marijuana and possession of paraphernalia were filed?`

A    I didn't know that, no.

Q    You didn't follow up on this incident?

A    I didn't.  Deputy Smith handled the report and case.

Q    Okay.  You never talked to the D.A. about this case?

A    No, not that I recall.

Q    When you say that the speed of the chase was over

Case 6:04-cr-00115-RAW  Document 350  Filed 05/22/06  Page 185 of 202

4610

100 miles per hour, you're saying that's how fast you were going?

A    Yes.

Q    You don't want how fast the car in front of the pickup was going, do you?  It was a two mile --
(Interrupted)

A    I was not gaining on him.

Q    But you didn't start until after he was already past you, right?

A    Correct.

Q    And were you consistently going 100 miles per hour or did you just peak at 100 miles an hour?

A    It was consistent for over a mile.

Q    For over a mile?

A    Yes.

Q    And as I understand from what you're saying, at one point I thought -- were you by the driver's window or were you in front of car when the car was floor boarded?

A    It was floor boarded when I was right at the driver's window.

Q    So, you weren't in front of the car?

A    No.

Q    You didn't see any people there when the pickup was in the ditch, there wasn't anybody there around the pickup, is that right?

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

4550

4611

A    No.

Q    And was more than one person in the car?

A    In the truck?

Q    Yes.

A    Yes, there was a passenger.

Q    Did they get identified?

A    No.

MR. HILFIGER:  I have no further questions.

THE COURT:  Further direct?

MR. SPERLING:  Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. SPERLING:

Q    By the way, as the Defendant approached the checkpoint area, were his headlights activated or not?

A    They were.

Q    They were on?

A    Yes.

Q    Do you recall whether or not they were bright?

A    Yes, they were bright.

Q    Did you see those lights from a considerable distance away?

A    Yes.

Q    And were the headlights pointed such that he was assuming normal vision if he had been able to see you?

A    Yes.

4612

MR. SPERLING:  Nothing further, Your Honor.

THE COURT:  Further cross?

MR. HILFIGER:  No further questions.

THE COURT:  May this witness be excused?

MR. SPERLING:  He may, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down.  Call your next witness.

MR. SPERLING:  Shannon Smith.

SHANNON SMITH, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Sir, please state your name.

A    Shannon Smith.

Q    Common spelling for Smith, S-m-i-t-h?

A    Yes.

Q    What is your business or occupation, Mr. Smith?

A    I am a maintenance man for -- manufacturing.

Q    Where is that located?

A    Fort Smith, Arkansas.

Q    For how long have you been so employed?

A    Four years.

Q    Prior to that time were you in law enforcement?

A    Yes.

4613

Q    Where?

A    Sequoyah County.

Q    In what capacity, sir?

A    I was a sheriff's deputy.

Q    For how long did you serve as a sheriff's deputy?

A    Two years, I think.

Q    During the time that you served as a sheriff's deputy, did you have occasion on or about January 3rd, 1998 to participate in a vehicle checkpoint?

A    Yes, I did.

Q    And what sorts of items did you check when you participated in such an endeavor?

A    I would -- the vehicle, make sure everybody had their driver's license and insurance, wearing their seat belts, inspection sticker at the time after that.

Q    Who was with you on that occasion?

A    Myself, a local police officer, Cindy Smith, Micah -- an Oklahoma City police officer, Larry Lane and Sheldon Fair from the Sequoyah County Sheriff's Office.

Q    Cindy is your wife now?

A    Yes.

Q    Were you then married to her?

A    No, I was not.

Q    What was her name then?

A    Ridenger.

Q    And she was employed by the Rowland Police Department?

A    Yes.

Q    In what capacity?

A    She was -- I don't know if she was still a patrolman or she was an investigator.  I think she was an investigator at the time.

Q    And Micah, he was employed by the Barber City Police Department?

A    Yes.  He was the chief of police.

Q    Where was the checkpoint located?

A    At the intersection of McCoy Ford Road and 101, I call it.

Q    The locals may know the precise location of old Highway 17, are you familiar with that designation?

A    Yes.

Q    All right.  Is that now 101?

A    No.

Q    That's in the area?

A    In the same area as Highway 101.

Q    Thank you, sir.  So, about how far would that be west of McCoy Ford Road?

A    Would what be west?

Q    The area of the checkpoint.

A    It was on McCoy Ford Road.

4615

Q    Thank you, sir.  Did you have occasion to see a pickup truck approach that location?

A    Yes.

Q    After the midnight hour?

A    Yes, I did.

Q    As the pickup approached, did you recognize the pickup?

A    I didn't recognize the pickup.  I did not.

Q    Did you have occasion to determine who the driver of the pickup was?

A    Yes, I did.

Q    As the pickup approached you, what if anything did it do?

A    At first it was driving about two miles an hour.

Q    And can you describe it's rate of speed in terms of the sound that the engine made?

A    It was making a real slow loping noise like well-built motor does.

Q    You say he was approaching at a couple miles an hour?

A    Yes.

Q    How far away from your checkpoint area was it when you first noticed it approximately?

A    One hundred and fifty to 200 yards.

Q    About how close to you did the vehicle get when it

4616

was traveling slowly?

A   About -- traveling slowly?

Q   Yes, sir.

A   Probably ten feet.

Q   Did there come a point when you were able to identify the person who was driving that vehicle?

A   Yes, I was.

Q   Who was driving the vehicle?

A   Kenny Barrett.

Q   How do you know that?

A   I've known Kenny Barrett since I was probably seven years old.

Q   You are how old now?

A   Thirty five.

Q   In what capacity did you know Kenneth Barrett?

A   My sister is married to Kenny's ex-wife's brother.

Q   All right.  You say you knew him, sir?

A   Yes.

Q   How close to you did he get to you when he passed by you?

A   Within a foot.

Q   What was the rate of travel of the vehicle that was driven by Kenny Barrett when he passed by?

A   It was a high speed of traveling.  He was fishing tailing.

4617

Q    Do you see Kenny Barrett in the courtroom?

A    Yes, I do.

Q    Where is he seated and what is he wearing?

A    He's wearing a plaid looking shirt, blue in color. He's sitting to my right.

            MR. SPERLING:  May the record reflect the witness has identified the Defendant, Your Honor?

            THE COURT:  The record will so reflect.

Q    (By Mr. Sperling) I may be able to hear better if you'll just lean up just a little bit and speak directly into that microphone.  We'll be able to hear you a little bit better, sir.

            About how far away from you was he when he sped up?

A    Probably a couple feet when he started to speed up.

Q    What was the nature of the roadway in that area?

A    It was pavement.  Rough pavement that was taken care of.

Q    You say he was fish tailing as he came by you?

A    Yes.

Q    What was your thought as he accelerated and then fish tailed as he went by?

A    I asked if he thought he was going to hit my wife.

Q    Where was she?

A    Standing -- I was standing furthest more and she was

4618

standing right next to me.

Q    What, if anything, did she do to avoid being hit by the truck?

A    She jumped over a ditch, across the ditch.

Q    What did the Defendant do in the pickup when she jumped out of the way?

A    He just -- he kept on going.  He never slowed down.

Q    How close to her did he get?

A    Probably within -- within a foot to five inches.

Q    Were there any other officers in the vicinity or in the area where the Defendant accelerated?

A    Yes.  Micah Reasoner was also in there.

Q    What, if anything, did Micah do in response to the Defendant's acceleration?

A    He had to -- basically, the same thing.  Backed up and jumped the ditch.

Q    Why did he do so?

A    He thought he was going to get hit.

Q    Did you have a clear vantage point from where you were of the jeopardy that you have described with regard to Cindy and Micah?

A    Yes, I do.

Q    At this time, sir, were you in full uniform?

A    Yes.

Q    What was the nature of your uniform?

A    At the time, brown Wrangler's, a uniform shirt tan in color, badge, sheriff's department patch, sheriff's department badge or United States flag, duty holster, belt, handgun.

Q    A handgun?

A    Yes.

Q    What kind of handgun did you carry?

A    I carried a Glock.

Q    By the way, were Cindy and Micah also in uniform?

A    Yes, they were.

Q    And was it the standard issue uniform?

A    Yes, as far as I can remember.

Q    Can you give us your best recollection as to the nature of the uniforms, both from Marble City and from Roland?

A    Both of them came in black, I believe, with white reflective police across the back, patches on the front, special duty officer -- flashlight.

Q    Were you carrying a flashlight -- (Interrupted)

A    Yes, I was.

Q    -- on that evening?

A    Yes.

Q    Did you do anything with regard to the vehicle as it approached and then came in your direction?

A    I shined it at the driver as he came by me.

4620

Q    What was the nature of the marking on the vehicle that you had there that night, was it marked or unmarked?

A    My vehicle was marked.

Q    And how so?

A    It had a light bar and Sequoyah County Sheriff's Department on the side, reflected, as far as I can remember.

Q    Where was your vehicle parked?

A    To the southeast of where we were at.

Q    How about the vehicle of Micah?

A    I think he was parked right behind mine.  I think.

Q    You indicated the car loped along.  How would you describe this loping sound?

A    I don't know.  Sounded like a muscle car, a race car.

Q    As the car approached, did you see anyone make a reported or an excited statement to you or hear anybody?

A    I didn't.  I did not hear anything.  I don't remember.

Q    Did Cindy make any forecast?

A    Cindy made the statement of, boys, you got to run.

Q    Was that before the vehicle came by you?

A    Yeah.  It was about when we first saw him and you could hear his truck.

Q    At what rate of speed -- and I know you didn't have

4621

a radar gun.  But, approximately -- would you describe what the vehicle did after it accelerated through the checkpoint?

A     He never slowed down for a minute.  He continued on north for approximately two miles.

Q     Was there a passenger in the vehicle?

A     I don't remember.

Q     If there was you were unaware?

A     Yeah.  I would have to say I was unaware because I do not remember.

Q     What did you do in response to the vehicle's acceleration?

A     We ran to our vehicles and began pursuing him.

Q     When you got in your vehicles did you activate the emergency lighting?

A     Yes.  Lighting and siren.

Q     Lighting and siren?

A     Yes.

Q     And what lighting did you have other than an overhead light bar?

A     That's my headlights.

Q     Wig wags?

A     No.

Q     Overhead light?

A     Overhead light.

4622

Q   What was the nature of the siren that you activated?

A   It was just a normal emergency vehicle siren.

Q   As the vehicle approached Cindy, what did you think was going to happen?

A   I thought she was going to get hit.

Q   As the vehicle approached Micah what did you think was going to happen?

A   Well, it approached them all the same.  I thought they were going to get hit.

Q   Did you give chase?

A   Yes.

Q   How far?

A   Approximately two miles.

Q   And at about what speed, sir?

A   I was driving at about 95 to 100 miles per hour.

Q   To what location?

A   To a side road driveway that he pulled off on.

Q   As you got to the vehicle, did you look inside?

A   Yes, we did.

Q   Was anyone there?

A   No.  There was not.

Q   Were you close enough to see the vehicle when it stopped?

A   No.

Q   Were you the first, second or third in line?

4623

A    I was the second in line.

Q    Do you know who the third was in line?

A    Micah.

Q    When you got to the vehicle what was it's circumstance, where was it located?

A    It was off in a ditch where he had wrecked it.

Q    Did it appear to be drivable?

A    Yes, it was.

Q    Was the vehicle still running when you got to it?

A    I don't remember.

Q    What did you do with regard to trying to determine where the driver had gone?

A    We searched the woods.

Q    Did you find anyone?

A    No, we did not.

Q    Were certain citations issued?

A    Yes, it was, I believe.

Q    Do you know what the nature of the citations that were issued were?

A    I believe I wrote -- no, I don't.  I believe I wrote a ticket or filed charges for possession of marijuana and possession of paraphernalia and no license on -- because there was no tag on the vehicle and no inspection sticker.

Q    Did you recommend the filing of any other charges

4624

with regard to what you have described concerning the vehicle that the Defendant drove nearly hitting the officers?

A    Yes, I did.

Q    What did you recommend?

A    I don't remember the exact charges but I wanted something filed for him trying to run over two police officers.

Q    Are you aware that charges were not filed with regard to assault with a dangerous weapon?

A    Yes, I am.

Q    What do you think about that?

A    I was not happy about that.

Q    Why not?

A    Because he deserved to go to jail for that.

Q    As the vehicle approached you, other than to indicate that the vehicle should stop by virtue of your flashlight, did you give any verbal order?

A    Yes, I did.  I screamed to the vehicle to stop.

Q    You used the word screamed.  What tone of voice did you use?

A    I screamed at the top of my lungs for the vehicle to stop.

Q    Were you on the driver's side or the passenger's side door as the vehicle came by you?

4625

A   I was on the driver's side door.

THE COURT:  Mr. Sperling, we'll recess for the evening.  Members of the jury, remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you.  Do not allow yourself to view any news coverage.  I'll ask you to be here in the morning at 8:30 and try to get started fairly early.  For your planning purposes, I'm anticipating this case will go into next week.  Friday is a federal holiday and we will not be in session on Friday.

MR. SPERLING:  May we approach very briefly, Your Honor?

THE COURT:  Very briefly.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. SPERLING:  I'm down to four witnesses. We'll be finished -- if we start at 8:30, I can't imagine it will take more than two hours.  I just want to -- (Interrupted)

THE COURT:  That's fine -- (Interrupted)

MR. SPERLING:  I'm sorry.

MR. HILFIGER:  We're not going to be responsible until we start Monday?

THE COURT:  No.  When they quit we'll quit.

MR. SPERLING:  If you want to start later,

4626

that's fine.

THE COURT:  No.  That's fine.

MR. SPERLING:  If this starts at 9:30 or 10:00, we'll be done by noon.

THE COURT:  That's a good plan.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Let me withdraw my 8:30 call. We've been working with the attorneys and I don't know that we can trust them or not.  But, they tell me there's no need for that.  And that should be -- I anticipate from what I've been just told that the Government will rest sometime tomorrow maybe around noon.  And then, we'll be in recess until the following Monday and that's when the defense will start.  I'll ask everyone to please remain seated as the jury leaves.  9:00 o'clock.  I said 8:30, but with the information I just received, it's not necessary.  We will start at nine.  I'll ask everyone to please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom and the Proceedings were continued to November 10, 2005.)

4627

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 9, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 4427 through 4626.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

351

55

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 22 2006

WILLIAM ~
Clerk, U.S. District Court
By_____
Deputy Clerk

UNITED STATES OF AMERICA, )
                            )
      Plaintiff,    )
                            )
-vs-               )  No. CR-04-115-P
                            )
KENNETH EUGENE BARRETT,  )
                            )
      Defendant.   )

VOLUME 23 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 10, 2005.

A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                       United States Attorney
                       and
                       Mr. D. Michael Littlefield
                       Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                       Mr. Bret A. Smith
                       Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 4629-4708

4629

W I T N E S S E S

PAGE

SHANNON SMITH
(Continued from November 9, 2005.)
Continued Direct Examination by Mr. Sperling  .  4630
Cross Examination by Mr. Hilfiger . . . . . . .  4634
Redirect Examination by Mr. Sperling. . . . . .  4638

NANCY EALES STALCUP
Direct Examination by Mr. Sperling  . . . . . .  4641
Cross Examination by Mr. Hilfiger . . . . . . .  4649

BOBBIE EALES
Direct Examination by Mr. Sperling  . . . . . .  4650

GENE HISE
Direct Examination by Mr. Sperling  . . . . . .  4663

KELLI EALES
Direct Examination by Mr. Sperling  . . . . . .  4666
Cross Examination by Mr. Smith  . . . . . . . .  4687

E X H I B I T S

|  | OFFERED | REC'D |
|---|---|---|
| Government's Exhibit No. 302 . . . . | 4652 | 4652 |
| Government's Exhibit No. 306 . . . . | 4655 | 4655 |
| Government's Exhibit No. 309 . . . . | 4677 | 4677 |
| Government's Exhibit No. 316 . . . . | 4679 | 4679 |
| Government's Exhibit No. 318 . . . . | 4678 | 4679 |
| Government's Exhibit No. 326 . . . . | 4683 | -- |
| Government's Exhibit No. 329 . . . . | 4655 | 4655 |

P R O C E E D I N G S

THE COURT: Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel. You may continue your examination.

MR. SPERLING:  Thank you, Your Honor.

4630

CONTINUED DIRECT EXAMINATION

BY MR. SPERLING:

Q    Yesterday, I believe, Mr. Smith, you indicated that you are employed now; is that correct?

A    Yes.

Q    And you are employed as --?

A    I'm a maintenance man.

Q    And your presence here -- some sacrifice financially, has it not?

A    Yes.

Q    And you have -- are you being required to take vacation days for the days that you appear here?

A    Yes, I am.

Q    There are perhaps some others in our midst who are sharing that same hardship.  I'm sorry for that.

Yesterday when we left off, I believe we were talking about the point at which the chase had stopped and you were in the vicinity of the vehicle, the pickup, that had driven through the road block; do you recall that, sir?

A    Yes.

Q    Was an inventory conducted of the contents of the vehicle?

A    Yes, it was.

Q    Were certain charges filed?

4631

A    Yes, there were.

Q    By the way, with regard to how charges are filed, officers such as yourself do not actually file the charges, do they?

A    No, we submit the paperwork.

Q    All right.  And even though you may advocate in favor of a particular position as to what should prosecuted, who makes that ultimate decision?

A    The district attorney's office.

Q    Okay.  After the vehicle was processed, was it removed from the scene?

A    Yes, it was.

Q    How was the removal of the vehicle done?

A    We took it to Shockey's Wrecker Service and had it --

Q    When you say we took it, was it driven there or was it -- (Interrupted)

A    No, it was towed there by Homer Shockey.

Q    All right, sir.  I want to go back a number of years.  Did you have occasion when you were about 18 years of age to be in the vicinity of South Wheeler in Sallisaw?

A    Yes, I did.

Q    And did you on that date and on that occasion have an opportunity to see the Defendant Kenneth Barrett?

4632

A    Yes, I did.

Q    What was he doing?

A    He was slapping his wife at the time.

Q    Who was his wife at the time?

A    Abby Keyes.

Q    What is the nature of the area where that occurred?

A    It was a house.

Q    How were you dressed on that day if you remember?

A    I was wearing shorts and a tank top.

Q    Do you remember what season of the year it was?

A    It was summer.

Q    As you drove by, what was the Defendant's position with regard to Abby?

A    He had a hold of one of her arms.

Q    What was he doing?

A    He was slapping her.

Q    With an open or closed hand?

A    Open.

Q    Did you stop?

A    Yes, I did.

Q    Did you get out of your vehicle?

A    Yes, I did.

Q    Where did you go?

A    I went to where Abby was.

Q    What did you do?

4633

A    I told him he needed to stop what he was doing.

Q    Did he respond?

A    Yes, he did.

Q    What did he say to you, sir?

A    He said he was going to go in his house and get his gun and shoot me.

Q    Do you remember the specific words that he used?

A    Yes.

Q    What were they?

A    That he was going to get his gun and kill me.

Q    What was Abby's condition at that time?

A    She was crying.

Q    Did she give you any instruction?

A    Yes.  She told me I needed to get in my truck and leave.

Q    What did you do, sir?

A    I got in my truck and left.

Q    What tone of voice did the Defendant use to you when he said what you have indicated to the Court and jury?

A    He was angry.  He was yelling.

Q    Was there any question in your mind but that he was serious?

A    I knew he was very serious.

         MR. SPERLING:  One moment, please, Your Honor. Nothing further, Your Honor.

4634

THE COURT:  You may cross examination.

CROSS EXAMINATION

BY MR. HILFIGER:

Q    Mr. Smith, in 1997 when you made this chase on the pickup that you said was driven by Kenneth Barrett, you were a police officer, weren't you?

A    Yes.

Q    And as a police officer you have certain duties, don't you?

A    Yes.

Q    And that's to investigate crimes, isn't it?

A    Yes.

Q    And to stop crimes?

A    Yes.

Q    And to report crimes?

A    Yes.

Q    But as far as making a determination of whether a crime should be charged, that's not yours, is it?

A    No.

Q    And at this time it was the Sequoyah County District Attorney's Office, wasn't it?

A    Yes.

Q    And you informed them of everything you had, didn't you?

A    Yes.

4635

Q     And they decided not to file what you wanted filed; isn't that true?

A     Yes.

Q     Now, is that the first time that's ever happened to you?

A     I don't recall.

Q     Isn't it true that the district attorney makes a lot of decisions on whether they think you have enough evidence or that your evidence is proper or that your charges are right?

A     Yes.

Q     Okay.  So, they made a determination based on what you told them; isn't that right?

A     Yes.

Q     Because you signed the report, didn't you?

A     Yes.

Q     And they decided based on your report the charges they filed were improper charges?

A     I assume.  I guess.

Q     Did you talk to them?

A     No, I have not.

Q     Did you talk to them when you filed -- when you brought the report to them?

A     Yes, I did.

Q     Okay.  Did you inform them of basically what you

4636

told the jury here?

A    Yes, I did.

Q    Based on what you told the district attorney, did they file any kind of assault charge?

A    No, they did not.

Q    They filed strictly attempting to elude, is that right?

A    I have -- I don't know.  I left the sheriff's department in March.

Q    This was in when?

A    January.

Q    Okay.  Were you aware of what the charges were filed or did you even -- (Interrupted)

A    No, I wasn't aware of what was filed.

Q    Well, I understood that you told Mr. Sperling that you were upset that they didn't file charges?

A    I was upset that they did not file the charges.

Q    Well, how did you know what they filed?

A    Well, I was told that they did not file it.

Q    Okay.

A    I was not told what they filed.

Q    Okay.  So you were informed.  But that's part of the justice system, isn't it?

A    Sure is.

Q    You have a limitation on what you do, the D.A.s have

4637

a determination on what they do?

A    Yes.

Q    This incident when you were 18 years old, how long ago was that incident?

A    I'm thirty five now.

Q    So it was 17 years ago?

A    Yes.

Q    Do you know whether at that time Abby and Kenneth Barrett were married?

A    No.

Q    You don't know or they weren't married?

A    I don't know.

Q    Do you know at this particular place at South Wheeler -- do you know whose house that was?

A    I think it was Kenny's mother's house.

Q    How much did you see prior to coming up there?

A    That's all I saw.

Q    You don't know what the argument was about, do you?

A    No.

Q    You don't know what occurred before, do you?

A    No.

Q    And Abby told you to leave, didn't she?

A    Yes.

Q    And you left, right?

A    Yes.

4638

Q    You don't know anything about what happened before?

A    No.

Q    You don't know where they were before?

A    No.

Q    You don't know what Abby had said or Kenneth had said before you got there, is that right?

A    No.

Q    And you don't even know if they were married at the time?

A .   No.

Q    But -- and you just jumped right into it, didn't you?

A    Yes.

Q    Abby told you to get out, didn't she?

A    Yes.  For my safety.

Q    What?

A    For my safety.

Q    She told you to leave?

A    Yes.

          MR. HILFIGER:  I have no further questions.

                    REDIRECT EXAMINATION

BY MR. SPERLING:

Q    Based on your observation of that incident, sir, was there anything that you saw Abby do that warranted her being hit?

4639

A    No.

Q    Abby told you to leave.  Was that before or after the Defendant threatened to shoot you?

A    After.

Q    Did Abby indicate to you why you should leave?

A    I don't recall.  I think she did, but I don't recall exactly what was said.

Q    Did she say something, though, in that vein?

MR. HILFIGER:  I object.  He just said he didn't recall.  Now he's trying to lead him into something else.

THE COURT:  Sustained.

Q    (By Mr. Sperling) Counsel, asked you about the Sequoyah County D.A.'s Office.  Do you know whether the ADA or the assistant district attorney or district attorneys decided not to file additional charges due to the pendency of a drug distribution charge?

A    That's what I had heard, but I can't say that.

Q    Do you know whether the D.A.'s office had a significant caseload at that time?

A    Yes, they did.

Q    And did you ever have a conversation with an ADA who told you why charges were filed as they were as opposed to how you would recommend them?

A    I don't recall.  It's been so long ago.

4640

Q    All right, sir.  During the incident in which -- the incident on South Wheeler that we have referred to, as you recall, were there any other witnesses to that incident, the portion that you saw, other than you, the Defendant and Abby?

A    Kenny's little brother Steve.

Q    How old was he at the time?

A    Steve is a year older than me, so he would be 36.

Q    So he would have been about 17 at the time?

A    Eighteen or nineteen.

Q    I'm sorry.  You said a year older than you?

A    Yes.

Q    So, he'd be about 18 or 19 at the time?

A    Yes.

MR. SPERLING:  Thank you very much.  Nothing further, Your Honor.

THE COURT:  Further cross.

MR. HILFIGER:  Nothing further, Your Honor.

THE COURT:  May this witness be excused?

MR. SPERLING:  He may, Your Honor.  Thank you.

THE COURT:  Sir, thank you for your testimony. You may step down and be excused.

You may call your next witness.

MR. SPERLING:  Nancy Eales.

4641

NANCY EALES STALCUP,

being first duly sworn to testify the truth, the whole

truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q      Good morning, ma'am.

A      Good morning.

Q      Please state your name and spell your last name for the record.

A      Nancy Eales Stalcup.

Q      Your last name is spelled --?

A      S-t-a-l-c-u-p.

Q      Thank you, ma'am.  Where do you live?

A      I live in Lubbock, Texas right now.

Q      For how long have you lived in Lubbock?

A      I lived there ten years.

Q      What is your educational background, please?

A      I have a degree from the University of Oklahoma in public relations and then I attended graduate school at Texas Tech University.

Q      What year did you receive your degree from OU?

A      1979.

Q      Was is your occupation now?

A      I teach English, fourth grade in Lubbock, Texas.

Q      What's the name of the school where you teach?

4642

A   Rush Elementary.

Q   For how long have you been an English teach at Rush?

A   Nine years.

Q   Are you married?

A   Yes.

Q   What's your husband's name?

A   Brandon Stalcup.

Q   Do you have children?

A   I have twins, yes.

Q   How old are they?  Actually, what's their date of birth?

A   11-15-82 and 11-16-82.

Q   How did that happen?

A   Midnight.  One was born nine minutes before midnight and after midnight.

Q   Thank you.  Where are they located now?

A   I have a daughter at the University of Oklahoma and my son is at Texas Tech University.

Q   Did you have a brother?

A   Yes.

Q   What was his name?

A   David Eales, Rocky.

Q   Do you know about how long he had that nickname, Rocky?

A   As long as I can remember.

4643

Q    Do you know how he got it?

A    Yes.  It was -- my mother said had -- birthday being on the 4th of July.  He thought that was his birthday was celebrated for him, Independence Day.

Q    Did Rocky ever have occasion to remind you about the notion that life isn't fair?

A    Yes.  I would -- Rocky was my confidant.  I would go to him for everything and I would complain about life not being fair and he would just -- Nancy, life is not fair.  You're going to have to deal with some things.

Q    What is your relative age with regard to your brother?

A    He was six and a half years older than me.

Q    Did you ever have a chance to tell you brother goodbye?

A    No.  My regret I wanted to tell him.

Q    How would you describe your brother?

A    Well, he was a handsome man.  Very intelligent, very bright, very brave, very honest.  I would like to go to him and tell him tales and he'd say, Nancy, I don't deal in gossip.  I don't believe in idle gossip and he never said anything bad about anybody.

Q    Did he enjoy other people?

A    He enjoyed everyone and everyone that met him enjoyed him.  Little children, older people, all flocked

4644

to him.

Q   As an older brother, what was your relationship when you were growing up?

A   I looked up to him.  I wanted to emulate him.  I wanted to be like him.

Q   Were you able to do that?

A   No.  No, I tried.

Q   What was his reaction to your effort to live up to him?

A   He would laugh.  He never thought he was -- he wasn't a -- he was very intelligent, but he never let anyone know that he was intelligent.  And he'd always say why would you want to be like me.  And, a younger sister, I thought the world of him.

Q   Did he let you know how he cared for you?

A   Oh, yes.  We talked all the time by saying I love you at the end of every conversation.  I never doubted he loved me.  You just know he loved me.

Q   In thinking back now, is there kind of a longing that you had had with regard to your brother?

A   So many things have happened since his death.  My children's graduation, my daughter's -- holidays that I wanted to be with him.  I wanted him there.  I'd look out in the audience and he's not there.  For a minute I think he's going to be there because he would have been.

Q   Did your parents instill in you any thought with regard to the prospect that they may pass on?

A   Well, my father always said that never argue with your brother because once we're gone, that's all you'll have left. And my parents always told us to be very close to each other because that's the -- family. And when Rocky died, I didn't have anyone left anymore.

Q   Could you share with us, ma'am, the relationship that you had with your brother as you were growing up?

A   Well, as I say, we were very close. He was always a listening ear for me. We kept in close contact. As and older brother, I just thought he was the most wonderful thing in the world, most handsome, most intelligent. Even when after I had the children, he treated my children like his own. Holidays together.

Q   As an uncle, how was he?

A   He was their typical, wonderful uncle that my children would have lived with him if they could have. They wanted to go see Uncle Rocky. He would babysit for me as a bachelor. He thought he would never have children of his own and he babysat my children. And he's had fun things to do. He was just your stereotypical fun uncle. Good man.

Q   And you have in part alluded to this, ma'am, but how would you describe the feelings of your children for

Rocky?

A   It -- when I had to tell them of his death, that was the worst thing I've done in my life is to have to tell those two that their uncle had died.

Q   Does your son have an intention to go into a particular field?

A   Bittersweet.  He wants to be a Texas Ranger.

Q   All right.  Do you credit that to certain impacts?

A   Definitely.  He has agriculture background.  But once my brother died and he wants to make things right.  He wants to be a Texas Ranger.  He wants to grow up like his uncle.

Q   What kind of role model was Rocky -- (Interrupted)

A   An excellent role model.  You couldn't ask for a better role model or a more honest man.  A kind, gentle, funny, humorous, everything rolled up into one person.

Q   Have you ever wished for the impossible?

A   I want him back.

Q   Would you describe Rocky's laughter?

A   He had the most robust laugh.  I could be in the worst mood and he would laugh and I forgot everything.  He had one of those laughs that were contagious.

Q   Can you describe the look that he had on his face that you have retained as a memory when he would laugh?

A   His eyes would twinkle.  He had beautiful blue eyes

4647

and they would sparkle and it -- just twinkle -- eyes. They were beautiful.

Q    Does the pain of his loss diminish over time?

A    No.  Doesn't.  A wound like this doesn't heal.  You just get through each day.  It never heals.  It will never heal.

Q    What was your reaction to hearing of Rocky's death?

A    Well, when Kelli first called, she told me.  I dropped.  Disbelief.  I dropped to my knees and I fell to the floor screaming and crying.

Q    How did his death affect you physically?

A    For several months I was very sick.  I couldn't eat. Just hard to put one foot in the front of the other basically.

Q    Did your health deteriorate for a period of time?

A    Three months.

Q    Did you seek physical care as a result?

A    Yes, I did.

Q    Do you remember the last time you saw Rocky?

A    Yes.

Q    Where was that?

A    I was leaving to go back to Lubbock with my children and he'd been playing football with my son and I looked in the rear view mirror and that's the last I saw my brother tossing a football up in the air.

4648

Q    Who was he tossing the football with?

A    My son and daughter.  They were playing.  Tossing the ball back and forth in my parents' front yard.  And for some reason I looked in the rear view mirror and that's all I remember.

Q    Do you remember the last discussion of consequence that you had with your brother?

A    Yes.  We had talked on the phone about two or three weeks before his death and we were talking about he was wanting to go to Europe and he was wanting my -- me to go and my children to go with him.  He wanted me to babysit the children while up there.

Q    Did you have occasion not long before he died to talk about your shared religious beliefs?

A    Yes.  We sat out one night after everybody had gone to bed and we talked about religion and our faith in God and how we thought -- and how we thought -- reared by our parents to have a strong faith in God.

Q    Mrs. Stalcup, what did you admire most about your brother?

A    His character.  He was honest and -- he's a good man.

Q    How do you feel now some six years later about his loss?

A    There are times when you get overwhelmed about his

4649

loss. I wished I had -- I wish I could have told him goodbye. I wish he could be here with me. I wish I could touch him and hold him. I wish my children -- I wish my parents could.

MR. SPERLING: Thank you, ma'am. No further questions, Your Honor.

THE COURT: Cross examination.

CROSS EXAMINATION

BY MR. SMITH:

Q    Ma'am, the loss of a loved one can be very difficult, can it not?

A    Yes.

Q    I understand, ma'am, that your brother was very special to you?

A    Very.

Q    He was very special to your children?

A    Yes.

Q    Very special to your mom and dad?

A    Yes.

Q    Very special to his wife. I assume, ma'am, what you're hanging on to all those precious memories that you have with your loved brother?

A    Of course.

MR. SMITH: Ma'am, we appreciate your attendance here today and the time that you devoted to

this matter.

THE WITNESS:  Thank you.

THE COURT:  May this witness be excused?

MR. SPERLING:  Yes, Your Honor.

THE COURT:  Ma'am, thank you for your testimony.  You may step down and be excused.  Call your next witness.

MR. SPERLING:  Bobbie Eales.

BOBBIE EALES,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Good morning, ma'am.

A    Morning.

Q    If you would, please, state your name and spell your last name.

A    Bobbie Eales, E-a-l-e-s.

Q    Thank you, ma'am.  I'm going to ask you a few preliminary questions before I ask you to read a statement that you have previously prepared in the record, okay?  Are you married, ma'am?

A    Yes.

Q    What's your husband's name?

A    Warner Eales.

4651

Q     Does he have a nickname?

A     Hook.

Q     How long has he had that nickname?

A     Since he was in high school.

Q     And if I may ask, what is his date of birth?

A     7-31-21.

Q     Your date of birth, ma'am.

A     1-19-29.

Q     I want to refer you back for just a moment as a preliminary matter to the date of September 24th, 1999 about 2:30 in the morning.  Did you have occasion to receive a telephone call from Kelli?

A     Yes, sir.

Q     What did she tell you?

A     She told me there had been an accident and I asked her was Rocky injured she said he's been killed and he's never coming home.

Q     Did you make inquiry as to whether you should go out to her house?

A     Yes.

Q     What did she tell you?

A     She said to wait until Allison was awake.

        MR. SPERLING:  Government's Exhibit No. 302, may it be handed the witness, please?

        THE COURT:  You may.

4652

MR. SPERLING:  And also Number 306, please.

Q    (By Mr. Sperling) Government Exhibit No. 302. Ma'am, do you recognize what is shown in that photograph?

A    It's our son, Rocky.

Q    All right.  And does it show him in his marine uniform?

A    First Lieutenant Marine Corp.

MR. SPERLING:  Thank you, ma'am.  Your Honor, we move the admission of Government's Exhibit No. 302.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

Q    (By Mr. Sperling) Government's Exhibit No. 306, would you examine that, please, ma'am.  Do you know where that photograph was taken?

A    It was made on my front porch.

Q    And who is shown in that photograph, ma'am?

A    On the left is my husband and then with Rocky and I'm on the right.

Q    Do you know about how long before his death that photograph was taken roughly?

A    Probably three years, maybe.  I'm guessing.

Q    Did you used to attend church?

A    Yes.

Q    Do you still?

4653

A    I have difficulty.

Q    Why?

A    I become too emotional.  I don't like to people --

Q    How do hymns affect you now?

A    That's what bothers me.

Q    Did Rocky sing?

A    He had a beautiful voice but if he heard you listening he would stop.

Q    If he heard you listening --?

A    He would stop, but he had a beautiful voice.

Q    Do you recall the last time you saw him?

A    Yes.

Q    What were the circumstances?

A    Well, he had the children at our house because Kelli had a play on and he brought the children home and we visited and had a nice long visit.

Q    Do you recall him leaving?

A    Yes.  He was going home to take the children to bathe and put them to bed.

Q    Did you watch him drive out of sight?

A    Well, it was nighttime and that night I didn't.

Q    Typically when we came to visit you and your husband --

A    Pardon me.

Q    Typically when he came to visit you and your

4654

husband, did you watch him as he left?

A    Yes.  Always.

Q    Do you recall your last contact with him the last time you talked with Rocky?

A    Well, it would be the night before he was killed.

Q    And did he indicate to you where he was going?

A    He -- Hook, my husband, asked him to go to a ball game with him in Okmulgee.

Q    What kind of game?

A    This was on Thursday evening.

Q    What kind of game?

A    Football.  I'm sorry.  And Rocky says, no, he usually didn't mention things like that.  He didn't want to worry us.  And he said, no, as a matter of fact, I have a problem that I have to take care of, raid, whatever you call them.  And that's all he said.  We wouldn't have asked any more because we're not supposed to.

Q    I believe this is also a matter not covered by your statement, ma'am, but what was your husband's occupation before he retired?

A    Football coach.

Q    And where did he coach football?

A    In McAlester.

Q    Did Rocky play for him?

4655

A    Yes.

Q    When Rocky left on that occasion when he indicated that he couldn't go to the high school football game with his dad, did you watch him as he left?

A    The next morning.  I just visited with him the night before and then he left our house or his house.  I left where Rocky lived and we have a place there also.  And normally they stop and talk, but Rocky just waved and they waved at each till they both were out of sight.  That's the last time.

Q    Have you maintained his room at your house?

A    Pretty much, yes.

Q    For a time after his death, did you go to his grave site as a matter of regularity?

A    I go almost every day.

          MR. SPERLING:  Thank you.  Government Exhibit No. 329, may it be handed the witness, please.

          THE COURT:  You may.

          MR. SPERLING:  Your Honor, we move to admit Government's Exhibit Nos. 306 and 329 for purposes of reading 329.

          THE COURT:  Any objection?

          MR. SMITH:  No objection, Your Honor.

          THE COURT:  Admitted without objection.

Q    (By Mr. Sperling) Did you have occasion, ma'am, to

prepare a written statement with regard to your loss?

A    Yes.

Q    And what has been marked as Government's Exhibit No. 329 has been handed you.  Do you see that there, ma'am?

A    Yes.

Q    With the Court's permission, would you, please, read that into the record?

A    I want to tell you about our son, David Rocky Eales, about what he meant to us and still means to us.  To use past tense is foolish.  We see him everywhere because he was so much a part of our lives.  Our searching to see him has been a pain that is unrelenting.  We are truly seeing through a glass darkening.  Which way then will we now choose to endure our hurting?  It's the most challenging task, one that we cannot lessen by any measure or logic.  We simply want him in our lives as we once enjoyed.  The emptiness best described would be as a gaping hollow space.  This space and height like the tallest mountain you could every climb.  This then covers a wide range of emotions that we are now experiencing.  Hopefully, we may be going in the direction of so many wonderful memories of Rocky to relieve a part, just a pittance, of this gnawing and agonizing hurt.  We have been blessed by so many memories, certainly enough to

4657

nothing consume our thoughts of him or -- never in our lifetime will we hear Rocky's voice. And it's -- contagious laughter, yes, but his serious discussions about life. His -- Rocky can never teach Allison and Mackey the childhood verse we once enjoyed teaching him when he was a little boy. I see the moon and the moon sees me and the moon sees the one I long to see. God bless the moon and God bless me and God bless the one I long to see. I -- Allison when he was -- when the moon is full outstandingly beautiful. She and I were emptying the trash, a not too glamorous task, and I tried to make it fun. She was only six years old and hurled into adjusting to a premature loss of her dad. They were incredibly close and pals and so much fun. Now, to my utter surprise Allison replied my dad hangs that moon. My heart was now pounding. I was desperately trying to remain calm and unshaken. This was to be only one of the bittersweet moments we'd share with these two precious children. It's our sweet pleasure, but yet we feel pain and bitterness that Rocky never heard these remarks. Wouldn't he have loved to hear her ask him, dad, did you hang the moon? I attempted to rush to another subject -- possibly see me brush away the tears. I'm grateful it was night and even a full beautiful moon allowed us this conversation, but it helped me guard my secret of

4658

sadness. Mackey will soon be ready for reciting poetry. He will observe his ninth birthday and I think Allison will be as she can now fall heir and do a much better job than her grandmother Bobbie did. Kelli has prayer time each night with the children, and we love her so much for feeling a need for spiritual directions in all their lives. Now a condensed family attending church every Sunday. On Father's Day they attended and Allison helped pass cookies as gifts to all the fathers in attendance. How can you improve on the training of the children? We say you can't. We know Rocky looked and smiled with approval. This was a way they were saying happy Father's Day. Rocky was our first born. Our only son. He was born on the 4th of July, 1950. The nickname Rocky inherited from his birth date. It was so appropriate and right for him because Rocky was involved in life. He lived his life intensely. His philosophy seemed to be that life is real and good and rewarding. Treat life fairly and you'll surely be treated fairly in return. He was earnest in his belief. His honor, too, was important to him, more important than his very own life. I believe his partners and friends in his profession will attest to this. He was allowed to experience life until September the 24th, 1999. His convictions were strong about life, yet he was never was granted the full fruition. He was

4659

anticipating many more years of creating memories and all-inclusive of a life and future as a husband of Kelli and father of Allision and Mackey.  Our daughter Nancy filled our lives and Rocky's when he was six and a half years old.  They were extremely close.  And Nancy lives in Texas and added two grandchildren, twins.  I know they feel the pain.  Rocky could make them laugh.  Our joyous holidays and family are just not complete now.  Friends and acquaintances still share their support.  Almost six years have passed and nobody allowed the time factor to slow down their caring for us.  They are our net to catch us when we falter.  Their expressions of sorrow about our loss is appreciated.  But you know, we didn't lose him.  He was taken from our lives without our permission.  We didn't relinquish him to death.  We just can't accept letting him go.  And before us?  No.  It's just isn't fair.  Parents are supposed to go first.  How can time possibly heal what reason cannot?  A bright lamp in our life has been dimmed, but now as long as we have our memories, we only wish we could relive yesterday and make shiny new tomorrows.  We just didn't know we were experiencing tomorrow on September 23rd, as Rocky's final day.  I know he'd choose to go in slow motion.  Live as full and fulfilling each others' time.  Maybe plead with fate.  Please give us more time, a day, a week or

certainly more.  We didn't have this golden opportunity. I did have a nice visit the day before and his dad waved at him as he left for work on the 24th.  They waved until neither was in sight, never to see or wave again. We will not attempt to tell you the disbelief we felt when Kelli called us at 2:30 a.m. with the shocking news that Rocky has been killed and he's just never coming home again.  Imagine the shock, the despair she felt when two highway patrolmen knocked on her door.  Imagine waiting for Allison to awaken and then go upstairs alone and telling a six year old the tragic news.  Mackey was only two years old then, so explanations at this age can wait a little longer.  Allow us as parents of Rocky to ask of you, to implore you, promise and consider our loss.  Thank you.  Bobbie Eales.

MR. SPERLING:  Thank you, ma'am.  No further questions, Your Honor.

THE COURT:  Cross examination.

MR. SMITH:  No questions, Your Honor.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.

MR. SMITH:  Your Honor, may we approach?

THE COURT:  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

4661

MR. SMITH: Your Honor, it was my understanding that it was that -- what is that exhibit number, Shelly? That 329 was going to be admitted into evidence in the event that Ms. Bobbie Eales was not going to be able to give her statement. Now that she has read that, I think that the statement should not go to the jury. I think the testimony is there.

MR. SPERLING: That's what we did, Your Honor. We just used it for demonstrative purposes, but we did not move its admission.

THE COURT: It was -- (Interrupted)

MR. SMITH: It was admitted.

MR. SPERLING: I'm sorry.

THE COURT: We'll strike it from the record.

MR. SPERLING: I'm sorry. It need not go to the jury. That was our intent, Your Honor.

MR. SMITH: Additionally, Your Honor, I'm concerned that we are going beyond a brief glimpse of the life of Rocky Eales and the impact he's had on his loved ones. I think that it is going past the point of being probative and it is prejudicial to the Defendant. I'm going to object to the testimony as has been presented and would ask that the Government limit their remarks with Kelli. And what I'm talking about, Judge, is basically a lot of information was elicited in that

4662

statement from Bobbie Eales and then it was read to the jury. There's been duplication and a lot of this testimony, it was done with Nancy Stalcup. And I understand that victim impact evidence is important, but I do think that it needs to be limited.

THE COURT: Comment from the Government.

MR. SPERLING: I didn't see duplication in Nancy Stalcup's testimony because we didn't admit her statement. She testified.

THE COURT: Well, the written statement is not coming in.

MR. SMITH: What I'm getting at, Judge, there were things that were asked twice and asked about the effect and then come back again and tell us about the effect it had in our last conversation. And just things are being asked twice and they are being talked about twice.

THE COURT: You mean from the perspective of the same witness is talking about twice?

MR. SMITH: Yes, sir.

THE COURT: The Court would only note that so far we've had the sister and the mother. I would acknowledge for the record that they have different perspectives that are helpful to the jury. Any redundancy is going over the same thing I would caution

4663

the Government to avoid.  I'm not suggesting that the wife is not an appropriate perspective, a mother is an appropriate perspective and the sister because they all have different experiences with him.  But within that testimony, I just caution the Government to be careful about going over the same thing, same issues, the same loss.  Call your next witness.

MR. SPERLING:  Thank you.

(Whereupon, the following record was made in open court within the hearing of the jury.)

MR. SPERLING:  May I have just a moment, Your Honor?

THE COURT:  You may.

MR. SPERLING:  Gene Hise, Your Honor.

GENE HISE,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Please state your name, sir, and spell your last name for the record.

A    My name is Gene Hise, H-i-s-e.

Q    How long did you know Rocky Eales?

A    Almost eight or nine years.

Q    In what capacity did you know him, sir?

4664

A    He was a friend.

Q    How would you describe him to the jury?

A    Rocky was an honorable and distinguished trooper. Rocky was an instructor. Loving man. He lived for the most honorable, highest traditions keeping with the Oklahoma Highway Patrol and as a marine we shared those core values. Once a marine, always a marine. We carried those values throughout our job as troopers.

Q    Did the Oklahoma Highway Patrol always provide you on the tactical team with a place to train or a place to stay after a day of training?

A    No, sir.

Q    Did Rocky accommodate that shortfall?

A    Yes, sir, he did.

Q    How did he do so?

A    Rocky would -- he'd open up -- he opened up the doors to his house and his land so that we'd have a place to train, a place to lay or head to rest at night. He provided us with food and a plate to eat off of. We were able to share and he shared and invited us to his home and he gave us a great opportunity to come to know his family and his children.

Q    Have you ever had occasion to talk with Kelli Eales about your efforts to save Rocky?

A    Yes, I have.

4665

Q    How did that affect you, sir?

A    It's one of the hardest things I've ever had to do in my life -- Kelli Eales at night and tell her that I did everything I could to save her husband.

Q    My final question to you, sir, is this:  What did you lose when Rocky Eales was murdered?

A    I lost a part of me.  I lost a brother.  Somebody I trusted.  Somebody I had to put more trust in than I would somebody in my own family.  Almost lost my wife and my son because I suffered for three years with Post-Traumatic Stress Syndrome.  Our team fell apart.  Almost half of the men in the team are divorced.  And it literally crushed my world.

MR. SPERLING:  Thank you, sir.  I have nothing further, Your Honor.

THE COURT:  Cross examination.

MR. SMITH:  We have nothing further.

THE COURT:  Sir, thank you for your testimony. You may step down and be excused.

THE WITNESS:  Your Honor, may I remain in the courtroom?

THE COURT:  You may.  You may call your next witness.

MR. SPERLING:  Kelli Eales, Your Honor.

4666

KELLI EALES,

being first duly sworn to testify the truth, the whole

truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Please state your name, ma'am, and spell your last
name.

A    Kelli Eales, E-a-l-e-s.

Q    Where do you live?

A    McAlester.

Q    And what area of McAlester?

A    I live on -- about five miles north of McAlester.

Q    What's your educational background?

A    I went to junior college, went back in the fall and
graduated and then I graduated with my bachelors.

Q    From where?

A    East Central University in Ada.

Q    What was your major?

A    Elementary education with a minor in physical
education.

Q    By the way, what was Rocky's educational background
as an undergraduate?

A    Psychology and sociology.

Q    From where?

A    Durant.  Southeastern.

4667

Q    Did he obtain a degree?

A    Yes.

Q    All right.  And did he attend grad school?

A    Yes, he did.  From East Central he got his masters in criminal justice.

Q    Did you attend graduate school as well?

A    Yes, I did.

Q    Did you get a masters?

A    Yes, I did.

Q    What was it in?

A    Counseling.

Q    Who got their degree first?

A    I did.

Q    Was that some subject of conversation between the two of you?

A    Yes.  We started our -- well, I decided I wanted to change schools.  I wasn't going to be coaching.  And so, I decided I was going to get my masters and he said, well, you're going to go get yours, I'm going to get mine.  And we started at the same time, but I finished a semester before him -- (Interrupted)

Q    You reminded him of that occasion?

A    Yes.  He said it was because of his hours at work and I had my response was, well, I had a baby in there, too.  But I completed mine one semester before he did.

4668

Q    Did you have -- do you have children?

A    Yes.

Q    And what are their names and dates of birth?

A    Allison is 12 now.  She was born March 1st of '93. And Mackey is eight.  He was born June 20th of '97.

Q    I'm going to briefly ask you a question about their births.  Did he attend -- did Rocky attend you during their births?

A    Yes, he did.

Q    All right.

A    He was the cameraman.

Q    He was what?

A    The cameraman afterwards.

Q    Thank you, ma'am.  How old were you when Rocky -- when you and Rocky got married?

A    He was -- just turned 40 a couple weeks.

Q    And for the record, how old were you when you got married?

A    I was 22.

Q    First or second marriage for you first?

A    First.

Q    For both?

A    Yes.  He said he was a late bloomer.

Q    Did he build a home?

A    Yes.  He had a log house on Lake McAlester and it

4669

was a bachelor pad.

Q    Did it become a family home?

A    Yes, it did.  After Allison was born, we decided we didn't have enough room with one bedroom, so we added on and then later on we added on a bedroom and later we added on more than doubled the house and the garage and people gave us a hard time that we had big house and we drove a Suburban and only had one child.  Sure enough the next thing you know, along comes Mackey.

Q    Where had you met?

A    We met -- we used to workout at the same gym and he used to come in to the restaurant and ate where I worked -- and I worked there and come in and that's where he first asked me out.  My response was how old are you. I knew him, but we didn't know each other well then --

Q    Did he ever have occasion to issue you a traffic citation?

A    Yes.

Q    For what?

A    My brother had been in the army and so we had gone to celebrate him being in and he had been drinking and, you know -- so I been driving.  I hadn't been drinking, but I was just getting -- just driven my brother's vehicle home and I had a wreck.

Q    Did he ticket you?

4670

A     Yes, he did.

Q     For what?

A     Careless driving.  I didn't know that, though, until I -- laying in my gurney.  My family gave him a hard time after we were married that now he had to pay for my insurance because it was raised.

Q     Where did you get married?

A     Lake -- (Inaudible)

Q     Did you travel with Rocky in Europe during -- at about the time of your marriage and then afterwards?

A     Yes.  Once we decided we were going to get married, we wanted to go to Europe for our honeymoon.  I'd never been on an airplane -- and pretty much hadn't been out of Oklahoma.  But we were planning on going to Europe on our honeymoon and -- had friends there from parachuting in Germany and Italy and England.  So he contacted them and he arranged for us to be married in Italy and then we toured Europe for a month.  We were married and had an interpreter and we just hoped we were married at the end because we didn't know what they were saying.

Q     The last time you saw him, what were the circumstances?

A     The morning of the 23rd he went ahead and stayed home -- I was at school and I was going down the hallway and all of a sudden I saw him standing in Allison's

4671

doorway of her classroom.  She was in the first grade. And they were doing an impromptu show and tell.  All the children in her class had known Rocky and that he was a trooper, but she took advantage of showing him off, I guess.  So he just kind of waved and winked at me and he asked where I was going and I told him I was going to take my class to go walking for PE that day and we were -- my school was in a rural community so we just walked sometimes.  Well, when I got back he was standing outside and the kids -- he asked the kids if they wanted to see his car.  So he showed them around and seeing the lights and all that.  And he was on his way to Camp Gruber to meet the other guys.  So I had this habit of watching him leave and he -- still that earlier.  I was just watching him and I couldn't see him in the car and I was -- just watched the car until I didn't see him any more.

Q    Did you see him say goodbye to Allison?

A    Yeah.  He was holding her and he -- hug and she scrambled down and went back to enter her classroom --

Q    Did you see her reaction?

A    She was so proud of him.  Because I guess it was -- show and tell and -- stop by and he just decided to when he had to go by our school to go to Camp Gruber.  It was kind of a shortcut so he just stopped by.

4672

Q    Did you watch him as he left?

A    Yes, I did because they were walking -- walking that direction and just watched him until he turned the corner and I couldn't see him anymore.

Q    Do you recall being met by troopers in the early morning hours of September 24th, 1999 at your home?

A    Yes.  Our bedrooms are upstairs in our house and I was awoken to knocking or banging on the door.  And it startled me because I always -- we have a lot of land and always lock the gate because -- the house and just startled me.  So I went across the upstairs to look out of the window to where I could see the driveway and there were two patrol cars.  I didn't think anything of it.  My first thought was he must have forgotten his keys.  And I noticed the patrol cars, there were two, and I instantly just thought he must have brought one of them home because maybe they were tired and would sleep at our house before they would go home.  Even though -- now that I look back, there were -- they just came up our driveway and stopped and not pulled in like he normally would have.  But that wasn't -- so I just scratched my head, put a wrap around me and when I was walking to my front door, there was a window right next to the door and I saw just from here over a shoulder, a brown shirt shoulder.  Once again, looking back, I probably should have thought

4673

something was up because Rocky didn't have a brown shirt on. But I couldn't see their face. The shoulders -- I thought it was him, so I just opened the door and there stood two troopers. And, you know, they didn't say anything. They just started crying and so I said where's Rocky and he couldn't say anything. I came to find out that they were just coming to get me because they knew he was injured. And one of them had brought his wife and to stay with the kids. But I just -- where's Rocky and shaking my head because I knew and just sometime when I married Rocky had told me if there's ever two troopers at the door and I'm not one of them, I'm not coming back. And finally, one of them just -- I mean, just said seemed like forever he just said he's gone. That's all he could say because they were crying and I was crying.

Q     What did you do then?

A     Well, there's this trooper that lives in McAlester that -- Rocky and I tried to say are you sure and looking back I was really silly because of course they were sure. But I tried to talk to them -- because Rocky really favored. And then they said, no, no, it was him. And they didn't say anything else. They didn't know what to say and I had them come sit down and they said I needed to call somebody to come and meet with me. And then I needed to call Bobbie and Hook.

4674

Q    Did you have occasion to inform your daughter as to what had happened?

A    Well, we had a lot of company that morning.  And I didn't want to wake Allison up because I didn't know what to tell her.  So I made -- I mean, it was kind of -- wake her up -- so I have time to think about it -- we haven't had anybody die.  We had real good friends -- Allison was about four, but we never talked about dying.  There wasn't ever any need to --

Q    Did you tell her what had happened?

A    Well, sometime in the morning I heard her call for me at the top of the stairs, so I hurried up and -- by there -- what I'm going to say.  But she said why are all these people here.  So I just -- I hurried upstairs and motioned for her and I had to lay in my bed.  I was laying -- I was laying on my side when she was on the back -- she was staring up at the ceiling and I said do you remember how dad had to go to tact team and she said -- she said yeah.  And I said, well, he was shot and he has to go to heaven and she said, well, when is he coming home.  And I said he can't.  And she said, well, when is he coming back.  And I just wanted her to understand he wasn't going to come back.  We would have to wait until we got to heaven to see him.

Q    Did you also have occasion later to explain to

Mackey what had happened?

A    I never really sat him down and told him.  I mean, at one point because he was -- he just turned two and I don't really know how -- he always -- he lives in heaven now.  And when he got a little bit older, about four, when we were going to bed he started crying and I asked what was wrong and he said, mommy, I want to die.

Q    Did you ask him why?

A    Yes.  I said, Mackey, why.  And he said I miss daddy so much I want to go to heaven so I can see him.  I said, Mackey, you can't do that because I would miss you too much.  I couldn't take it.  And he said, well, I know daddy misses us too.  I could go to heaven and be with him and Alli can stay here and live with you.

Q    What were would you say the highlights of your life with Rocky?

A    Beside the birth of our children, we didn't really have a highlight.  We generally lived every day to the fullest.  We had so much fun together.  We played, we were together most all the time.  We just ran around and had fun and we always had the kids with us.  That was our fun, each other.  We didn't have to spend any money and do anything particular.  We just ran around with us -- with each other.

Q    Have you retained his personal items of clothing and

4676

the like?

A    His clothes are still in his closet, his folding clothes are still in the drawers.  We separated closets, walk in closets, and I can't move them.  I'm not going to give them away.  I'm not going to throw them away.  We still refer to it as daddy's closet.  It's a big closet and we keep some other things there so -- and if something was needed and the kids -- in daddy's closet.

Q    Do personal items regularly remind you of him?

A    Yes, but in a good way.  I wouldn't have it any other way.  The boots are still at the back door and outside in the garage, I can't move them.  I know he's not coming back, but he was my life.  He was -- I can't just erase it.  I can't just pack it all up.  His -- Nancy told me this summer, she said, Kelli, you've got to get a grip.  She said Rocky's -- bottles are still above his -- you got to move them.  It's time for you to move on.  I have moved on.  I put on my best smile every day for my kids.  I want them to be healthy.  I don't want them to have this depressed mother.  But I hurt so bad inside.  I have -- there are no words that can express. Every day just the little things like studying for spelling tests on Thursday nights, learning multiplication tables, the ball games.  Just adult conversation.  When I'm having a bad day somebody to hold

4677

me and tell me they love me.

MR. SPERLING: May I ask, Your Honor, that the witness be handed Government's Exhibit Number 309?

THE COURT: You may.

MR. SPERLING: We will ask next, Your Honor, for Exhibit Numbers 316, 318, 324 and 326.

Q   (By Mr. Sperling) First, Government's Exhibit No. 309. Do you recognize what's in that photograph, ma'am?

A   Yes, I do.

Q   When was that photograph taken?

A   This was the day Mackey was going to come home from the hospital and -- playing in my hospital bed with me. I was taking the picture.

Q   Does that photograph accurately depict Rocky and your two children on that day?

A   Yes.

MR. SPERLING: Move it's admission, Your Honor.

THE COURT: Any objection?

MR. SMITH: No objection, Your Honor.

THE COURT: Admitted without objection. What number was that?

MR. SPERLING: 309, Your Honor.

Q   (By Mr. Sperling) I would like for you to look at Governments' Exhibit Number 312. Government's Exhibit

Number 312, ma'am, is that a photo of you?

A    Yes.

Q    Did your family engage in outings?

A    Yes.

Q    You live next to or near Lake Eufaula, do you not, ma'am?

A    Yes.  I live on -- Lake Eufaula --

Q    And is one of those activities that your family go four-wheeling together?

A    Yes.  We load up the four-wheelers and -- all except Mackey, two big ones and a little one.  We would go riding the sand dunes at Lake Eufaula, Eufaula Dam.

Q    Government's Exhibit No. 318, would you turn over to that?

A    318?

Q    Yes, ma'am.  Do you recognize that portrait?

A    Yes.

Q    When was that taken?

A    This was taken Christmas of '98.  We have our picture taken every year at Christmas and our Christmas card.

          MR. SPERLING:  Your Honor, we move its admission.

          THE COURT:  Any objection?

          MR. SMITH:  No objection, Your Honor.

4679

THE COURT:  Admitted without objection.

Q   (By Mr. Sperling) Government's Exhibit No. 316, would you examine that, please, ma'am.  Do you recognize what is shown in Government's Exhibit No. 316?

A   Yes.  It's a picture of Rocky in his patrol car.

Q   Do you know about when that was taken?

A   Probably about '97-98.

MR. SPERLING:  Your Honor, we move its admission.

THE COURT:  Any objection?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q   (By Mr. Sperling) Government's Exhibit No. 324, I believe, is also in that book.  Do you recognize what is shown in Government's Exhibit No. 324?

A   Yes, I do.

Q   And does that less than one page handwritten note appear in your daughter's handwriting?

A   Yes.

Q   With the Court's permission, would you read that into the record, please?

THE COURT:  You may.

A   May I explain why she wrote this?

MR. SPERLING:  Hold on.  Your Honor, I would move it's admission for purposes of demonstration.

4680

THE COURT:  You do not want it in evidence?

MR. SPERLING:  No.  Just for purposes of demonstration.

THE COURT:  You may.

Q   (By Mr. Sperling) Do you know what the circumstances were under which this was written?

A   Yes.  I was in my room when I was writing my victim impact statement and she walked through and she -- crying and I said, yes, because -- put on this paper why I miss daddy so much.  She said can I write one too.  Sure, Allie.

Q   So she wrote hers?

A   She sat down by me and wrote hers.

Q   Please read this into the record.

A   I miss my daddy because we used to play softball together and we used to go walking together.  And once it rained on us.  I know he'll miss not be spending Christmas with us and not taking walks together.  I know he'll miss watching my basketball games and softball games because he used to always tell me.  I love my daddy so much and I miss him so much and I wish he was still here.

Q   Okay.  The rest -- stop right there if you would. Did you also have occasion -- I believe it's on Government Exhibit No. 325.  Did you have occasion also

to examine a document that your son had written, handwritten?

A    Yes.  When I was in my room writing my statement, Allison came in and wrote hers.  Well, of course, he had to be in there too.  And he said he could do one, too. He could write a victim impact statement.  So he drew a picture because he was only about three.

Q    Could you with regard to that drawing identify certain features of it that he explained to you?

A    Well, no.  Because of all little kids, you don't what's that.  You say tell me about the picture.  So he proceeded to tell me.  He pointed out everything.  So when he did this, I just drew arrows and told me what he said it was.

Q    What did he indicate the items were?

A    Well, he would draw a picture of our house and our driveway to our house because we live on top of a really big hill, really big hill.  So he -- drive really long and drew the stairs in our house and there's three people on the stairs and he said those are mommy, me and Alli and we have a swimming pool and he drew our swimming pool with the deck around it and Alli's basketball court outside.  And he drew some grass and then he drew a little stick figure at the very top with beams and he said that was daddy watching over us at the top of the

4682

house.

Q    Did he also draw certain features of the house that included you -- (Interrupted)

A    Uh huh.  He drew the window in his bedroom.  The only thing in the house is the stairs and the window.

Q    Finally, ma'am, Government Exhibit No. 326.  Would you look at that?

A    Yes.

Q    Did your daughter have occasion to write an essay as exhibited in Government's Exhibit No. 326?

A    Yes.  The last year before Thanksgiving her Four H teacher, she had wanted -- writing contest.  So, her Four H teacher was encouraging her to do more and she saw an ad in the Tulsa World or Daily Oklahoman about a writing contest in conjunction with Thanksgiving, what I'm most thankful for.  So she told me she had to write this letter or had to write this paper.  I said what are you going to write about.  I think I'll write about daddy.  I said okay.  So I went to get -- take a shower, get back and she was sitting at the bar getting ready for it and I wasn't even out of the bathtub yet and she finished.

Q    Government's Exhibit No. 326 an accurate rendition of her essay?

A    Yes.

MR. SPERLING:  Your Honor, we move its

4683

admission, 326.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, same announcement as we previously made in regards to this exhibit.

THE COURT:  Let me see you at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. SMITH:  Your Honor, it was my understanding that exhibit had been thrown out, that it was not going to come to the jury.

MR. SPERLING:  I thought 326 was in.

MR. SMITH:  It's my understanding it was out.

COURTROOM DEPUTY:  I show that it was admitted yesterday in the conference room.

MR. SPERLING:  This is her essay.

MR. SMITH:  And I may be -- I don't have my book, but that was my understanding.

THE COURT:  Are you going to put it in evidence or read it?

MR. SPERLING:  I'm going to have her read it. But it does want need to go back to the jury -- (Interrupted)

THE COURT: -- that's consistent with what we --

MR. SMITH:  That would be -- I don't have any objection to that, Judge.  But I do have an objection to

4684

324. That was, my understanding, redacted version -- (Interrupted)

MR. SPERLING: It's not going back to the jury.

MR. SMITH: I know. But it was displayed to the jury. The comments where it says I wish Kenneth Barrett would have just gone to jail with my dad rather than -- something marked out -- shooting my dad because now he's in jail and I don't have my dad. It's also my understanding that portion if this was going to come in was bracketed out. But that was displayed to the jury. I'm just going to note that for the record that we object to that.

MR. SPERLING: It wasn't read and I stopped her and we immediately took it off at that point, Your Honor.

MR. SMITH: I agree with that. I do. But the whole statement was displayed on the big screen for them to observe.

THE COURT: Okay. Then the Court's observation is that the record should reflect the exhibits have been put up there in fairly rapid succession. I don't remember reading it. Whether or not the jury could see it from where they are or not I'm not sure. It was not made a part of the emphasis of the testimony. I don't think it would be helpful to draw it to the jury's attention and tell them to disregard it. I think that

4685

would do more harm than good.  I think the likelihood of them having read it is remote.

MR. SPERLING:  We would also urge, Your Honor, that it's relatively innocuous.  I mean, although she says I wish Kenneth Barrett would have gone to jail with my dad rather than shooting my dad because now he's in jail and I don't have my dad.  It's almost -- in part there's an expression of almost sympathy for him because he's in jail as well.

THE COURT:  I remember discussing that, but the danger is still there.

COURTROOM DEPUTY:  May I ask a question while we're up here?  312 -- (Interrupted)

MR. SPERLING:  I'm not moving its admission.

THE COURT:  I think we admitted it, did we not?

MR. SPERLING:  No, we did not.

THE COURT:  I have a circle around it and I didn't know what we had done with it.

(Whereupon, the following record was made in open court within the hearing of the jury.)

MR. SPERLING:  Government's Exhibit No. 326, may it be displayed as she reads it, Your Honor?

THE COURT:  You may.

Q    (By Mr. Sperling) Please read it.

A    Although I have many things in my life to be

4686

appreciative of, I am most thankful for my dad.  He was killed when I was six and a half years old, but in that short time, he made enough memories to last a lifetime. When it was storming outside, I -- crawl in his lap and snuggle with me until the storm was over.  Looking back he was teaching me that even when something is scary, being around those you love helps me get through it.  Our house is located on a big hill.  For exercise we'd walk up and down it while talking.  I am thankful for the conversations we had and will always remember them in my head.  My dad used to always tell me when I was playing basketball he would get really excited cheering for me and losing his camera.  I am thankful that I can always watch those movies and hear him cheering for me with all his heart.  Lastly, I am thankful that even in death my dad taught me courage.  He knew the difference between right and wrong.  In fact, he gave the ultimate sacrifice trying to do what was right.  He was trying to arrest a man when that man shot him.  Some kids go through their entire life not having a good father.  I am thankful that my dad showed me how to love in six and a half short years to last me my whole life.  I am so very thankful to have had him.

MR. SPERLING:  Thank you very much, ma'am.  No further questions.

4687

THE COURT:  Cross examination.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q    Good morning, ma'am.  I understand that Mr. Eales really had a zest for life, did he not?

A    Yes, he did.

Q    Whenever I got involved in this case, I was told the story about him working out in the gym in Tulsa.  Did he ever relay any stories to you about him working out in Tulsa?

A    In -- with weights working out?

Q    Yes, ma'am.

A    He lived in Tulsa for some time.

Q    Worked out with a fellow by the name of Pat Coyle. Do you know Pat?

A    No.

Q    And something along the story about his gun went off when he was in the gym.  Did he ever tell you that story?

A    No.

Q    Nobody got hurt, but it was kind of humorous.  They all kind of got a kick -- I think they used to kid him a lot about it up there.  He was a fun-loving guy, wasn't he?

A    Yes.  I hadn't heard that story, I don't guess.

4688

Q    And you described to the jury how you and him would live your lives to the fullest.

A    Yes, we did.

Q    Take life day by day.

A    Yes.

Q    We never know what's going to happen, do we?

A    No.

Q    And Rocky in living his life to the fullest engaged in some activities that could have caused his death?

A    Could have what?

Q    Such as sky driving, somewhat of a dangerous activity.

A    Yes.

Q    That's what he was about, he liked that.  He liked to get the extra zeal or that extra adrenalin or what have you; would that be true?

A    He lived life to the extreme fullest.

Q    Has to do with his service in the Marines Corps and his service on the tact team, a voluntary duty?

A    For 18 years.

Q    And he really loved that sort of duty, didn't he?

A    Yes, he did.  He loved the comradery.  He loved --

Q    I'm sorry, ma'am.

A    He loved his friends on the tact team.  It was a -- gave him the opportunity to get off work and spend time

4689

with him.

Q    And a great group of guys they are, aren't they?

A    Uh huh.  They've been good to me.

Q    Excuse me, ma'am.

A    I said they've been good to me.

Q    And he would be proud of them, wouldn't he?

A    Yes, he would.

Q    Yes, ma'am.  And because of the dangerous association and some of the activities that Rocky was engaged in, patrol duties -- tact team duties, parachuting, he had discussed with you such as if two troopers show up and I'm not one of them?

A    He made that comment.

Q    So, I mean, he was realistic about what life may bring?

A    Yes, he was.

Q    And I don't think, ma'am, there's any doubt the love that he had for you and for your two children.

A    No doubt.

Q    He loved his mother and father very dearly, didn't he?

A    Yes, he did.

Q    They were a great part of his life and him a great part of theirs?

A    Yes.

4690

Q    And Ms. Stalcup was a very loving sister to Rocky, was she not?

A    Yes, she was.

Q    And those two children, that nephew they had, that niece that he had, very proud of them, wasn't he?

A    Yes.  But that was all taken away.

Q    Yes, ma'am.

A    By that person.

Q    Ma'am, as relates to that, you've been present here every day during this proceeding, haven't you?

A    Every time he's in the courtroom I want to be here.

Q    That's tough duty, isn't it?

A    Very hard.

Q    For six years and you come to court and you've got to relive this stuff.  I'm sure it just churns inside of you all over again, doesn't it?

A    Sickening --

Q    Yes, ma'am.

A    Sickening feeling.

Q    I mean, it's kind of hard to let things rest until we get to the end of proceedings such as this, right?

A    I mean, I won't be any more -- but it will never be at rest but, yes.

Q    Things will never be the same, will they?

A    Never.

4691

Q    It's just something to you'll have to eventually --

A    -- live with him.

Q    We have to come to terms with it, don't we?

A    Don't have a choice.

Q    Ma'am, you were also present every day in another proceeding, weren't you?

A    Every time he's been in the courtroom -- and I have been here.

Q    And when Mr. Barrett was convicted for the death of Mr. Eales in another proceeding, you weren't happy with that result, were you?

A    I'm not happy.  I don't think he's remorseful.  He's never told me he's sorry through his mouth, through a letter, through his family.  He has never gotten up on the stand and said he didn't mean to.  He has never said I'm sorry.  I don't think he is.

Q    Mr. Barrett has never been on the stand, has he, ma'am?

A    No.

Q    He's never had an opportunity in an official proceeding to say anything to you?

A    He's had the opportunity.  He's chose in my opinion to be a coward and not stand up and say why he did what he did.

Q    But you understand, ma'am, that if a suspect, a

4692

defendant, makes contact with a victim that there are very harsh penalties that the court can impose on that person?  In other words, contact isn't appropriate. You've been told that before, haven't you, ma'am?

A   No, I haven't.  Well, I assuming he wouldn't speak to me.  But I'm assuming that he would have wanted to tell me that, what happened.

Q   I guess what you're saying is his lawyers have never told you, correct?  They've never said Mr. Barrett would like to express this to you?

A   No, he hasn't.

Q   These are two new lawyers that he has.  Not the same lawyers that he's had in the past speak.  I'm speaking of me and Mr. Hilfiger; is that true, ma'am?

A   No one's ever said anything.

Q   Ma'am, this is the first time, the first opportunity, that you have had to address the jury with your thoughts, your feelings, your love for Mr. Eales; is that true?

A   Yes.

MR. SMITH:  Again, ma'am, there is no doubt in my mind that your love for Mr. Eales was very great -- surprise me to find that the loss is very great as you suffer as well.  We do appreciate your time and services. And on behalf of Mr. Barrett, Mr. Hilfiger and I would

like to express that we are sorrow for the loss that you have suffered and your family continues to suffer.

No more questions, Your Honor.

THE COURT:  Further direct?

MR. SPERLING:  Nothing further, Your Honor.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.  Members the jury, let's take a recess.  I'll ask that everyone in the courtroom please remain seated and the jury remember my previous admonition.  Everyone please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Anything to discuss outside the hearing of the jury on part of the Government?

MR. SPERLING:  No, Your Honor.

THE COURT:  For the defense?

MR. SMITH:  Your Honor, briefly.  As we had discussed previously about the anticipated testimony they'd be presenting during this phase of the trial by the Government, we would respectfully urge a mistrial on this matter, Judge, that the testimony as related to the other incidents such as the road block incident, the deputies coming to the drive of Mr. Barrett's residence,

4694

we think all that is overly prejudicial and not probative. Additionally, the victim impact statements went far beyond the mere glimpse into the loss of the family has suffered due to loss of Mr. Eales. We think, Judge, that Mr. Barrett has been prejudiced.

THE COURT: Response.

MR. SPERLING: I'll first note, Your Honor, that our presentation with regard to victim impact was redacted from even that that we would have been permitted under the Court's order. We didn't admit certain photographs. We did not admit certain of the statements but rather merely read them. And this has been a relatively short glimpse this morning into the victim impact. We limited our presentation to the unique perspectives of a wife, of a mother, a sister, a friend and a co-worker. We believe that's appropriate within the bounds the Court established, as well as within the bounds of the law. We appreciate the Court's indulgence.

With regard to the other items -- by the way, that's been -- those items have been previously read, Your Honor, and we believe the record is clear as to the probative value.

THE COURT: Anything further?

MR. SMITH: No further comments, Your Honor.

THE COURT: In regard to the Defendant's

renewal of their objection to the testimony on future dangerousness that had to do with the roadblock testimony, the Court entered a relatively extensive ruling and I would just re-urge or restate that ruling for the record or remind the record of that ruling.  And I'm not -- although based on the previous communication with the counsel on the record, I anticipate that the Government is near the end of the presentation of victim impact.  I would say for the record that the Court has researched the law to the fullest extent of its capabilities on the issue of victim impact and would state for the record that has led to this Court's conclusion.  First, there is not a great deal of direction in the case law as to victim impact.  There are very few federal cases that discuss the breadth and depth of what's appropriate for the Government to present in the way of victim impact.  There are state cases that originate in the state system that I have reviewed in addition to the federal cases.  As a result of that review, the Court goes back to the base case law found in Payne versus Tennessee that allows the prosecution to put on a glimpse of the life of the victim of the crime.  And the cases that I examined on the extreme, some that were criticized, some judges allowed what amounted to a full montage of photographs.  In my terms, the replay the

4696

funeral, if you will, and found that -- that's been found to be inappropriate presentation of a montage of several photographs of the deceased and family and other remembrances was criticized.  In this case -- and then ultimately, this Court came to the conclusion that it's very difficult for the attorneys and for the judge making the rulings on the victim impact to separate the analysis from the case.  I think in this Court's humble opinion, it is a case by case decision that has to be weighed by the judge based on the facts of the case before the judge.  That is each incident, each family's loss, is not the same.  It has an individual character.  And so, the Court and the attorneys have the responsibility -- I started to say burden -- but have the responsibility then to develop something that's fair to the Defendant and is fair to the victims of the crime.  And in this instance, I would say for the record the Court looked at this entire case, looked at the victims of this crime and determined that the presentation was made by the Government today was fair and reasonable.  The photographs were reduced, I thought, to a reasonable number to give this jury a glimpse, as the Supreme Court said, of the loss of the spouse, the children, the parents, the sisters and those that worked with the deceased.  That was the purpose of the impact evidence as

the Court views it.  I make those statements for the purpose of this record.

We'll be in recess.

(Whereupon, a brief recess was held after which the following record was made in open court in the presence of the jury.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  You may call your next witness.

MR. SPERLING:  Your Honor, the United States of America rests.

THE COURT:  Members of the jury, as I suggested to you yesterday, after consulting with counsel, I anticipated that the Government would rest somewhere, I thought, closer to the noon hour than we are.  But we're going to be in recess now until Monday morning at 9:00 o'clock at which time you'll hear from the defense.  You should remember my previous admonition to not discuss this among yourselves, allow anyone else to discuss it with you, avoid all news coverage that there may be of this matter, whether it by print, television or radio.  And keep your minds free and open.  As I sometimes say, I know it's impossible, but if you can just not think about this matter until you come back Monday morning, it would

4698

be an appropriate posture for your mind to be in during this recess.  So I'll ask now that you'll be back shortly before 9:00 o'clock.  I anticipate the defense will present evidence at that time.

So you'll please remain seated.  Everyone in the courtroom please remain seated as the jury leaves the courtroom.

(Whereupon, the jury left the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Does the defense have any other comments in regard to your motion for mistrial?

MR. SMITH:  Nothing additional, Your Honor.

THE COURT:  Then in that regard, the Court would make the following observation and further observation and ruling.  The record clearly reflects that the trial of this matter consumed a little more than 20 days, and the aggravation or the impact testimony put on by the Government took a little over two hours.  And I would conclude my comments before the break as to the effort the Court engaged in in trying to set the parameters of the impact evidence, and for those reasons overrule this motion for mistrial.

9:00 o'clock, is that satisfactory starting time for the defense?

4699

MR. SMITH:  It is, Judge.  We had witnesses planned to be here at that time.

THE COURT:  Any estimation of how many days or hours this might take?

MR. SMITH:  Two days, Your Honor, we think. Maybe go into Wednesday morning at most, but we don't anticipate that.

THE COURT:  Anything further from the Government before we recess until Monday?

MR. SPERLING:  No, Your Honor.

THE COURT:  We'll be in recess.

(Whereupon, the Proceedings were continue to November 14th, 2005.)

4700

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 10, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 4629 through 4699.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

56

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 22 2006

Clerk, U.S. District Court
By
Deputy Clerk

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
-vs-                         )   No. CR-04-115-P
                             )
KENNETH EUGENE BARRETT,      )
                             )
          Defendant.         )

VOLUME 24 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 14, 2005.


A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law


**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 4702 - 4944

4702

W I T N E S S E S

PAGE

MAUDEEN VANN
Direct Examination by Mr. Smith . . . . . . . . 4715
Cross Examination by Mr. Littlefield . . . . . . 4739
Redirect Examination by Mr. Smith . . . . . . . 4768
Recross Examination by Mr. Littlefield . . . . . 4780

KATHY TROTTER
Direct Examination by Mr. Hilfiger . . . . . . . 4783
Cross Examination by Mr. Sperling . . . . . . . 4788

JIMMY WILSON
Direct Examination by Mr. Smith. . . . . . . . . 4794
Cross Examination by Mr. Sperling . . . . . . . 4846
Redirect Examination by Mr. Smith . . . . . . . 4870
Recross Examination by Mr. Sperling . . . . . . 4874
Further Redirect Examination by Mr. Smith . . . 4876

ABBY STITES
Direct Examination by Mr. Hilfiger . . . . . . . 4877
Cross Examination by Mr. Littlefield . . . . . . 4894
Redirect Examination by Mr. Smith . . . . . . . 4917

CRAIG EDGMON
Direct Examination by Mr. Hilfiger . . . . . . . 4920
Cross Examination by Mr. Littlefield . . . . . . 4925

CLYDE EDGMON
Direct Examination by Mr. Hilfiger . . . . . . . 4929
Cross Examination by Mr. Sperling . . . . . . . 4934

E X H I B I T S

| | OFFERED | REC'D |
|---|---|---|
| Government's Exhibit Number 330 . . . . | 4741 | 4742 |
| Government's Exhibit Number 331 . . . . | 4746 | 4746 |
| Government's Exhibit Number 332 . . . . | 4747 | 4747 |
| Government's Exhibit Number 334 . . . . | 4750 | 4750 |
| Government's Exhibit Number 335 . . . . | 4752 | 4752 |
| Government's Exhibit Number 336 . . . . | 4754 | 4754 |
| Government's Exhibit Number 337 . . . . | 4755 | 4755 |
| Government's Exhibit Number 338 . . . . | 4758 | 4758 |
| Government's Exhibit Number 339 . . . . | 4760 | 4760 |
| Government's Exhibit Number 340 . . . . | 4761 | 4761 |
| Government's Exhibit Number 341 . . . . | 4764 | 4764 |

(Exhibits continued . . .)

4703

(Exhibits continued . . .)                          OFFERED   REC'D

Defendant's Exhibit Number 230 . . . .     4719      4719
Defendant's Exhibit Number 231 . . . .     4731      4731
Defendant's Exhibit Number 232 . . . .     4732      4732
Defendant's Exhibit Number 233 . . . .     4733      4733
Defendant's Exhibit Number 234 . . . .     4734      4734
Defendant's Exhibit Number 235 . . . .     4736      4737
Defendant's Exhibit Number 240 . . . .     4796      4796
Defendant's Exhibit Number 241 . . . .     4798      4798
Defendant's Exhibit Number 242 . . . .     4804      4804
Defendant's Exhibit Number 243 . . . .     4806      4806
Defendant's Exhibit Number 244 . . . .     4810      4810
Defendant's Exhibit Number 245 . . . .     4815      4816
Defendant's Exhibit Number 246 . . . .     4817      4817
Defendant's Exhibit Number 247 . . . .     4828      4828
Defendant's Exhibit Number 248 . . . .     4837      4837
Defendant's Exhibit Number 249 . . . .     4840      4840

P R O C E E D I N G S

THE COURT:  Let the record reflect the jury is in box.  Good morning.  Counsel for the Government is present, Defendant is present with counsel.  We will now hear opening statement from the -- you reserved, as I recall; is that correct.

MR. SMITH:  That's correct, Your Honor.

THE COURT:  You may proceed.

MR. SMITH:  May it please the Court.  Ladies and gentlemen, again, I want to take this opportunity on behalf of Mr. Hilfiger and Mr. Barrett to commend you all for your service so far.  It's been a long time since we initiated this process.  We're getting to the tail end of

4704

it.  And from our standpoint, this is probably some of the most important stuff as it relates to Mr. Barrett. You've been hard working, you've been very patient and you've been attentive.  You've taken your role seriously as jurors and we appreciate the time that you have given us.

This is our opportunity to discuss with you mitigation.  In doing so, I want to break my opening remarks down into four different categories.  First that I'm going to discuss with you are sentencing options that you're going to have to decide between.  The next is going to be -- we're going to have a discussion about Kenny Barrett's felony conviction.  We're going to discuss Kenny Barrett's incarceration.  Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999.

I want to do just a bit of review for you because the material that you've been -- that the Judge has gone over with you as it relates to this stage of the proceedings is complicated.  It's difficult for the lawyers to sift through this stuff.  And so, I want to kind of break it down into a little bit of a review for you.

Then I want to talk about Counts One and Two

4705

because there was a finding of murder in this case by you, the jury. That determination of murder was that there was an unlawful killing with malice aforethought. Malice aforethought means a deliberate or intentional killing or it is a killing that is with callous and wanton disregard for life. Count Three you found intentional killing of a law enforcement officer, David Eales. There has not been a determination in either of those three charges as to premeditation.

Now, Counts One and Two because they are similar in terms of the statutes allow for three different sentencing options. One is a term of years that would be decided by the Court. The other one would be life imprisonment without the possibility of release. The third option would be the death penalty.

Count Three allows for a term of years to be decided by the Court of not less than 20 years. It allows for life imprisonment without the possibility of release. It allows for the imposition of the death penalty should you so find.

Premeditation is what is required for you as a jury to make a determination between life or death. If no premeditation, then you're to the term of years or life in prison. So as it relates to Kenny Barrett, premeditation is the key to do justice for him.

4706

Ladies and gentlemen, we're going to call some witnesses here during today and it's probably going to extend into tomorrow and we imagine we're going to be done tomorrow.  Now, one of the witnesses that you're going to hear from, and it should be early this morning, is going to be a court clerk from Sequoyah County.  That court clerk is going to bring some records from their office, the official file from the state prosecution of Kenny Barrett.  They're going to tell you that he was sentenced on the 19th of April of 2004 for the death of Mr. Eales and for the shooting of Buddy Hamilton.  They're going to tell you that's a final conviction, has not been appealed from.  They're going to tell you that Mr. Barrett received 20 years on a manslaughter conviction for the death of Mr. Eales.  She is going to tell you that he has received ten years for the shooting of Buddy Hamilton, that both of those -- that Count Two, the shooting of Buddy Hamilton, is what we call stacked or consecutive to Count One, which means that he does a 20 year sentence for the shooting of Mr. Eales.  When that sentence is over, then he starts a ten-year sentence.  So he has a combined of 30 years that he is currently in the Oklahoma State Penitentiary for as it relates to the killing that was the subject of this proceeding.

4707

The court clerk is also going to tell you that they have searched the records over there in Sequoyah County, that Kenny Barrett had no prior felony convictions prior to the event on September the 24th of '99, and the only conviction that he has to date for a felony is as it's related to the two counts that I just discussed with you, Mr. Eales and Mr. Hamilton.

There's going to be a fellow that's going to come up from Oklahoma State Penitentiary in McAlester. He is a case manager. He has the jacket on Mr. Barrett where he's been in Oklahoma State Penitentiary. This fellow is going to tell you that Mr. Barrett was housed at the Oklahoma State Penitentiary in McAlester and that whenever you come into the system, they score you. They give you what they call a custody level. It's kind of like a security level. And they're going to tell you that they have several different criteria that they look at whenever they evaluate these inmates and that Kenny Barrett was determined to be a level five; that a level five would entitle somebody in Mr. Barrett's situation to reside in a minimum security facility. But this individual is going to tell that there was an administrative special management notice, an administrative override. And this administrative override said Mr. Barrett is not going to go to a minimum

security prison, he's going to go to a maximum security prison. And he's not going to be housed in a medium facility within a maximum security facility, that he's going to go to H unit. And they're going to tell you that H unit is where the death row prisoners are kept. They're going to tell you that Mr. Barrett was segregated, that he was kept to himself. Then he's going to explain to you that there were no misconducts while he served time in Oklahoma State Penitentiary. They're going to tell you there's been no fights, there's been no assaults on other inmates, there's been no assaults on staff. And what you're going to learn, ladies and gentlemen, that the administrative system within the Department of Corrections has punished Kenny Barrett for the death of Mr. Eales on top of what that jury did in Sequoyah County.

We're going to bring a representative from the Muskogee County Jail. Mr. Barrett was -- had lawyers from Tulsa on this case in -- the Sequoyah County proceedings, and for a matter of convenience they moved him to Muskogee County so it would be easier for his lawyers to visit with him. During this proceeding he's been in the Muskogee County Jail since these charges were filed in the past year. So, they've had quite a bit of contact with him. And they're going to tell you that

4709

there was an incident over there in the Muskogee County Jail where he dropped his tray because he didn't like the food they were serving. That's it. No threats, no fights. Just being a regular inmate. A representative from the Sequoyah County Jail is going to tell you the same thing. He spent quite a bit of time there before he was removed to DOC. That as an inmate, Kenneth Barrett posed no problems. You're going to hear from some neighbors of Kenny Barrett's. One of them is an older gentleman, a farmer. He's going to tell you that he misses Kenny Barrett. He's going to tell you that he lived out there by him, that if he were home he'd put him to work today. That Kenny Barrett kept his farm equipment operating, that he wasn't scared of him. He had no problems with him. We'll talk to family members. These are people out there in this McKee community.

You're going to learn that Kenny Barrett has two brothers, that his mother and father were divorced when he was about 12 years old and that he probably didn't have the best upbringing; that his mother, Gelene Dotson as she's known now, lived next door to him when this incident occurred. And that -- you'll learn Kenny had frequent contact with her. You've already heard about he had no plumbing in his house and so he had to go over there to use the restroom and to get water to cook

with or what have you, and so they had a lot of contact. And she's going to tell you about the relationship that they had while he was growing up and she's going to discuss with you the relationship that they've maintained since he's been locked up.

His father, Ernie, is going to tell you a little bit about his upbringing, going to tell you what he thinks the effect of the divorce had on Kenny. He's going to tell you that Kenny came to live with him when he was 15 or 16 and that Kenny went back to live with Gelene and basically went out on his own and got married at a young age and had a baby.

Doris Barrett, which is Kenny's step-mother, she's been in attendance an awful lot of this trial. She's going to tell you that she didn't have much of a relationship with Kenny until the incident occurred in September of '99. But she's going to tell you what she knows of him and what she thinks of Kenny and some of the redeeming qualities that he has.

He's got an aunt and uncle, Roger and Phyllis Crawford. We expect both of them to testify. You've heard from Travis, which is their son. You've heard from Cindy, which is their daughter-in-law. They live two houses to the west. They live next door to Gelene. And they're going to tell you about Kenny Barrett. Roger is

4711

going to tell you that they're not scared of him.  Tell you that Kenny worked on vehicles.  And again, he's just going to kind of tell you a little different picture of a person other than what you've probably heard so far.

There's a cousin by the name of Kathy Trotter. Kathy Trotter is a process server that works in Sequoyah County.  She moved away for a period in the early '90s, came back in '97.  As a process server, these folks tend to have their ear pretty close to the street.  In other words, if there's something going on, they generally know about it.  They deal with people that are in the system. They're out there giving them papers when there's a lawsuit filed or something of that nature.

She's going to tell you that as a person growing up within that family -- and I'm talking about kind of the extended family -- that guns were something that were -- that you were taught to use, taught to respect, but that they had them.  Wasn't something to be feared, wasn't anything unusual.  And I think it's something we discussed earlier.  Most of the jurors raised their hand during voir dire that most everybody here owns guns.  And she's going to say it was the case with the Barrett's, that Ernie taught Kenny how to shoot, she knows how to shoot.  And that's just -- it really wasn't unusual.

4712

She's going to tell you that Kenny had a rocky marriage, a stormy marriage, with Abby Barrett, his wife, and that there are probably some things that happened during that marriage that Kenny's not proud of. And I'm sure some of the things you're not going to be too proud to hear of. But that you have to take into consideration, she'll tell you, that the age of this young couple and that they were divorced in '94, and that that is the only times that she has heard that she knows of, of Kenny Barrett committing any sort of acts of violence. And even those, we're going to contend, are acts of violence of a marital relations in nature and nothing that has ever risen to the level of criminal charges and nothing that has really been that serious. She's going to tell you what you hear about are threats, which is very similar to what you've already heard so far, but there have never been any charges for violence or anything of that nature. So she's going to kind of tell you a little bit about what she knows about Kenny as they're growing up.

There's going to be a bondsman by the name of Marty Daggs. Marty Daggs was the individual who had Mr. Barrett out on bond at the time of this event in September of '99. Mr. Daggs is going to explain to you that he knew that Kenny Barrett missed his court date,

4713

that he wasn't too worried about Mr. Barrett missing his court date because until the court clerk's office notifies him that they intend to forfeit his bond, it's really of no consequence to him.  The other's a bond forfeiture.  But till they actually seek to forfeit it, then he wasn't too worried.

But he's going to tell you that he never contacted Kenny, never told him that there was a warrant outstanding.  But he's also going tell you that if he would have been told they're going to forfeit the bond, he'd a been out there to pick him up.  That he wouldn't have had any question or problem in his mind about doing that.

Well, ladies and gentlemen, that's pretty much what you're going to hear during this second stage. We're going to paint a picture of Kenny Barrett that we believe is an accurate representation of him.  A little different, like I said, from what you've heard.  We ask you to consider the evidence that has previously been given to you in addition to the evidence that you're going to hear from today.  And, yes, some of these witnesses are family members.  And do they have a stake in this?  They do as it relates to their son, to their brother, to their cousin, to their nephew.  Do they have any other stake in this?  I don't think any other than

just what we do as humans.

We do appreciate your consideration. And like I say, we're going to move through this as quick as possible and thank you for your time.

THE COURT: Before the defense begins with their first witness, I want to remind the parties, counsel and those present -- and remind counsel of those folks that you may have entered the courtroom, if you'll remind them at the first opportunity those that are not here, the Court's admonition about showing emotion during the -- any testimony during this phase of the trial. I just renew the admonition that I made before the beginning of the aggravation portion by the Government.

Defense may call your first witness.

MR. SMITH: Your Honor, can we check to see if the witness has arrived?

THE COURT: You may.

MR. SMITH: Just one minute, Your Honor. Your Honor, we're going to call a representative from the Sequoyah County Court Clerk's Office. Her name is Maudeen Vann.

THE COURT: What was that name again?

MR. SMITH: Maudeen Vann.

MR. LITTLEFIELD: Your Honor, I'm sorry. I still did not understand the name.

4715

MR. SMITH:  Maudeen Vann.

THE COURT:  Vann, V-a-n-n?

MR. SMITH:  Yes, sir.

(Whereupon, the witness was administered the oath.)

THE COURT:  You may proceed.

MR. SMITH:  Thank you, Your Honor.

MAUDEEN VANN,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q   Ma'am, would you state your name, please.

A   Maudeen Vann.

Q   Okay.  And would you spell your first name for the clerk, please.

A   M-a-u-d-e-e-n.

Q   And Vann is V-a-n-n?

A   Yes, sir.

Q   And, ma'am, would you state your occupation.

A   I'm First Deputy Court Clerk, Sequoyah County, Oklahoma.

Q   And how long have you been so employed, ma'am?

A   Seventeen years.

Q   And in your duties as being employed by the court

clerk's office, do you have an occasion to come into the records of individuals who are convicted in your county?

A   Yes, sir.

Q   And I issued you a subpoena on behalf of Mr. Barrett; is that true, ma'am?

A   Yes, sir.

Q   Are you appearing here as a friend of Kenny Barrett's?

A   No, sir.

Q   And I also asked you to bring certain records from your office; isn't that true, ma'am?

A   Yes, sir.

Q   And did you also search some records in your office in addition to those that I asked you to bring?

A   Yes, sir.

Q   And do you feel like you're able to testify from the records that not only that you brought, but that you searched in the Sequoyah County Courthouse?

A   Yes, sir.

Q   I'm going to show you some exhibits that we have marked and I'm going to ask that you -- if you can identify them, okay?  The first one is marked for identification as Defendant's Exhibit Number 230.  It's going to come up right next to you, ma'am, on the little monitor.  May take just a minute to pop up.  Ma'am, where

4717

do you reside?

A    Sallisaw, Oklahoma.

Q    So you reside in the county?

A    Yes, sir.

Q    While this is warming up, again, in September of '99 that's where you were employed?

A    Yes, sir.

Q    And have been continuous ever since; is that true?

A    Yes, sir.

        MR. SMITH:  We're having technical difficulties, Your Honor.

        THE COURT:  You may have a moment to see them.

        MR. SMITH:  Excuse me, sir?

        THE COURT:  What's the diagnosis?

        MR. SMITH:  We're still trying.

        THE COURT:  Okay.

        MR. SMITH:  Your Honor, what I may do is go ahead and discuss some of these documents with the clerk and then as the machine comes online then we can go back through them and display them if that would be --
(Interrupted)

        THE COURT:  You may.

        MR. LITTLEFIELD:  Do we have copies?

        MR. SMITH:  If I can visit with counsel a second, Your Honor.

4718

Your Honor, may I approach?

THE COURT:  You may.

Q     (By Mr. Smith) Again, ma'am, we're going to keep working on this and see if we can get the monitor to come up.  But in the meantime, we'll just plug ahead, here, okay?

A     Okay.

Q     Now, I would ask you, ma'am, if you can identify Defendant's Exhibit Number 230 for me.

A     That is a felony information.

Q     And who is the Defendant identified in that document?

A     Kenneth Eugene Barrett.

Q     Okay.  You're going to have to lean forward a little bit.

A     Kenneth Eugene Barrett.

Q     Hold on one second.  I think we've lost our audio. Let's try it again.

A     Kenneth Eugene Barrett.

Q     There we go.  Okay.  And, ma'am, the charges that are related in that -- excuse me -- in that information are for what?  Can you tell me what the counts are, just briefly, just run through what they are?

A     Murder, shooting with intent, shooting with intent, shooting with intent.

4719

Q    Okay.  And as it relates to Count One, murder, does it say who the decedent was within that county?

A    Yes, sir.

Q    And who is that, ma'am?

A    David Eales.

Q    Okay.  And then in count two does it indicate who the person was that was wrongfully, intentionally and feloniously shot?

A    Yes, sir.

Q    And who is that, ma'am?

A    John Hamilton.

MR. SMITH:  Move for the introduction of 230.

MR. LITTLEFIELD:  No objection.

THE COURT:  Admitted without objection.

MR. SMITH:  And, Your Honor, what I may do on these others is hold them, because I know they need to look at them and be displayed and I'll go ahead and identify the others.

THE COURT:  You may.

MR. SMITH:  If I can approach, Your Honor.

THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, I've handed you Defendant's Exhibit Number 231 marked for identification.  Can you identify that document for me?

A    Yes, sir.  It's the first amended information.

4720

Q   And again, is the Count One in that document a charge for murder?

A   Yes, sir.

Q   Okay.  And is it the decedent the same as it was in the previous document?

A   Yes, sir.

Q   David Eales; is that correct?

A   Yes, sir.

Q   And does it charge in Count Two, shooting with intent to kill?

A   Yes, sir.

Q   Okay.  And the name on that as far as it relates to the victim?

A   John Hamilton.

Q   And when was that filed, ma'am?

A   January 19th of 2000.

Q   And let's go back to Defendant's Number 230.  When was that document filed?

A   September 24th, 1999.

        MR. SMITH:  May I approach, Your Honor?

        THE COURT:  You may.

Q   (By Mr. Smith) I've handed you Defendant's Exhibit Number 232.  Can you identify that document for me, please?

A   Yes, sir.  It's a second amended information.

4721

Q    And the Defendant?

A    Kenneth Eugene Barrett.

Q    And the Counts One and Two, can you identify what those were for?

A    Count One, murder in the first degree.  Count Two, shooting with intent.

Q    And when was that document filed?

A    April 12th of 2000.

Q    And that's an accurate record -- that's the record you provided me from your office; is that correct, ma'am?

A    Yes, sir.

MR. SMITH:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, I've shown you Defendant's Exhibit Number 233.  Can you identify that document for me?

A    Yes, sir.  It's the third amended information.

Q    Relates to the same Defendant?

A    Yes, sir.

Q    And the same two victims as previously identified in the other informations?

A    Yes, sir.

Q    And when was that filed, ma'am?

A    September 20th, 2000.

MR. SMITH:  May I approach, Your Honor?

4722

THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, I've handed you for identification purposes Defendant's Exhibit Number 234 and I believe that is a packet of five pages; is that correct, ma'am?

A    Yes, sir.

Q    And can you tell me what those are?

A    Verdict forms.

Q    And to what case do they relate?

A    The Kenneth Eugene Barrett case, CF-99-493, Sequoyah County.

Q    And would you examine those verdict forms for me, ma'am, and tell me what was on that first page?

A    Count One, murder in the first degree.  He was found guilty, sentenced to 20 years.

Q    And was there a date when that verdict was rendered?

A    February the 6th, 2004.

Q    Okay.  Second page, ma'am.  They're going to continue to work on this, ma'am.  We'll see if we can get it -- now let me back up one second to go to page one. Did I hear you say murder in the first degree?

A    Count One, yes.

Q    Okay.  We'll come back to that in just a second. Let's look at the second page.  And what does that identify, ma'am?

4723

A    That says Count One, murder in the first degree.

Q    Any other identification on that, any other findings?

A    It's marked guilty of the crime of manslaughter in the first degree and punishment is set at 20 years.

Q    Okay.  So the finding was actually for manslaughter in the first degree; is that true?

A    Yes, sir.

Q    Okay.  And then you told us about the 20 years. Would you go to page three, please.  What is on page three?

A    Count Two, shooting with intent to kill.

Q    And what was the finding?

A    Guilty of the crime of assault and battery with a dangerous weapon and punishment is set at ten years.

Q    Any other findings on that page?

A    No, sir.

Q    Would you go to the next, please.  All right, ma'am, tell us what's on that page.

A    Count Three, discharge of a firearm with intent to kill, found not guilty.

Q    And any other findings?

A    No, sir.

Q    Okay.  And now how about the last one?

A    Count Four, discharge of a firearm with intent to

4724

kill, found not guilty.

Q    And does that conclude those packet of verdict forms?

A    Yes, sir.

MR. SMITH:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, I've handed you what's been marked as Defendant's Exhibit Number 235 for purposes of identification.  Can you identify that document for me?

A    Yes, sir.  That is a judgment and sentence.

Q    And does it indicate the date -- which Defendant does that relate?

A    April the 19th, 2004.

Q    To which Defendant does that relate, ma'am?

A    Kenneth Eugene Barrett.

Q    And as relates to that sentencing, Count One he was sentenced to what charge?

A    Manslaughter in the first degree.

Q    Count Two?

A    Assault and battery with a dangerous weapon.

Q    Do you see down there about midway on that page where it says term of imprisonment?

A    Yes, sir.

Q    For Count One what was the sentence?

A    Twenty years.

4725

Q    Count Two?

A    Ten years.

Q    And do you see where -- right below Count Two, where it starts with the word with?

A    Yes, sir.

Q    Does that indicate the nature of the counts as to how time is to be computed as far as what you understand?

A    Yes, sir.

Q    Tell me what it says, ma'am.

A    With Count Two to run consecutive to Count One.

Q    Okay.  And what does that mean, ma'am?

A    They are to run at the same time.

Q    Do you know -- there are two different terms that are used when we compute time; is that correct, ma'am?

A    Yes.  I'm sorry, I was incorrect.  It means to run one term and then begin the second term after the first one is completed.

Q    If they were to run together at the same time, what term would be on that form?

A    Concurrent.

Q    And that's not what's on there.  The term that's on there is --

A    Consecutive.

Q    And is that also something that defense lawyers and people in the business sometimes refer to as being

4726

stacked?

A    Yes, sir.

Q    Is there any comment on there as it relates to the county jail time?

A    Yes, sir.

Q    And tell us what that is, ma'am.

A    Determination of Defendant's eligibility for credit for time served in the county jail pending trial is left to the discretion of the Department of Corrections.

Q    Ma'am, do you know whether or not that judgment and sentence was ever appealed from by Mr. Kenny Barrett?

A    No, sir.

Q    You do know or you don't know?

A    I do know and it was not.

Q    So would that be what we would call a final judgment and sentence?

A    Yes, sir.

Q    Now, I asked you also, ma'am, to look at the records contained within the Sequoyah County Court Clerk's Office; is that true?

A    Yes, sir.

Q    And, ma'am, can you tell the jury, prior to September 24th of 1999, whether or not Mr. Barrett had ever been convicted of a felony in Sequoyah County?

A    No, he has not.

4727

Q    And other than the two counts that are described in the documents that you have before you, has Mr. Barrett subsequently been convicted of any felony in Sequoyah County?

A    No, he has not.

Q    Ma'am, there was a '97 case that was pending in September of '99.  Did you look at those records?

A    Yes, sir.

Q    And what is the status of that case if you can tell us?

A    It is pending at this time.

Q    Do you know when the last time there was any action taken on that case?

A    I cannot recall that date.

Q    Are there any misdemeanors that are currently outstanding with Mr. Barrett?

A    No, sir, not that I could locate.

          MR. SMITH:  One second, Your Honor.  Your Honor, I'm kind of in a quandary as it relates to our technical difficulties.  I'd like to introduce those documents.  I know counsel and we were just provided to -- with them just moments ago, even though they have been in discovery.  I don't know if we want to do it the old-fashioned way or if we want to wait and see if we can get the problem squared away here but --

4728

THE COURT:  Doesn't look like -- I don't see much progress with our equipment.  So, we may have to go the old-fashioned way.

MR. SMITH:  Your Honor, then, if I may pick up those documents, hand them to the U.S. Attorney and let him review them prior to moving of their admission.

THE COURT:  You may.  Mr. Smith and the jury, I'm talking with my technical consultant, here, and the advice that I'm receiving is that if we will turn off the equipment in the equipment closet in my office for a minute and then turn it back on in the space of three minutes, it's maybe the last diagnostic test that we know of that may resolve it.  So, we'll just sit here while she does that.  So you can't talk among yourselves, but you can sit quietly, class.

MR. SMITH:  May I stand down, Your Honor?

THE COURT:  You may.  You have technically inclined that -- audience I say I was just advised also that our staff was here over the weekend and shut down our whole system.  We're moving toward Electronic Case Filing, that is, we're turning to file your cases by computer without being in the courtroom and that may be part of what the problem is.  To the extent that you're curious about it, I'll tell you that.  As the attorneys are perhaps suggested by their reaction that we don't

4729

have to have the system to proceed with this trial.  We can go back to the old methodology and keep moving.  But, I thought it was worth two or three minutes here to see if we can get it back up.  Let's take about a 15 minute recess.

(Whereupon, a short recess was held after which the following record was made in the presence of the jury.)

THE COURT:  Let the record reflect the jury is in the box.  Counsel for the Government is present.  Defendant is present with counsel.  I think we're ready to go.  You may proceed.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  Witness will -- ask her to step back in.  I understand, because we have the equipment in place you're going to revisit some of the issues for clarification for the jury; is that correct?

MR. SMITH:  If I can, Your Honor -- (Interrupted)

THE COURT:  You may.

MR. SMITH:  -- and I'll try to be brief because I know some of it we've covered.

Q     (By Mr. Smith) Ma'am, I want to show you what has been introduced into evidence which is Defendant's 230.

MR. SMITH:  And I'm going to ask that it be

4730

displayed to the jury, if I may, Your Honor.

THE COURT: You may.

Q   (By Mr. Smith) And again, ma'am, these documents are ones that we talked about a little bit ago but if we can just go ahead and point out a few things, okay?

A   Okay.

Q   You have a laser pointer that's right in front of you or you can tap your screen with your finger, whichever you would want to do. It doesn't matter to me. If you're going to use the laser pointer, of course, you'll need to point to the big screen and if you want to tap that's fine. But, show me on there briefly where the Defendant is listed?

A   Right here.

Q   Okay. Then show me where Count One is?

A   Right here.

Q   And can you show where it identifies the decedent?

A   Right here.

Q   Now, we've got a strobe effect here. But maybe it will settle down just a second. All right. There we go. Then in Count Two, ma'am, can you identify where the victim is in that case?

A   Right here.

Q   Okay. Again, as we identified earlier, is Mr. Barrett the Defendant, Count One, Mr. Eales, Count Two,

Mr. Hamilton; is that true?

A    Yes, sir.

Q    Okay.  Now I'm going to show you what --

MR. SMITH:  I'm going to move for admission of 231, Your Honor.  And probably what I ought to still do is display it to the Government, first, so they'll know what I'm talking about.  I will do that.  I'd like to -- for purpose of identification, show 231 and move for its admission.

THE COURT:  Any objection?

MR. LITTLEFIELD:  No objection.

THE COURT:  Be admitted without objection.

MR. SMITH:  Ask that it be displayed, Your Honor.

THE COURT:  You may.

Q    (By Mr. Smith) Ma'am, the title of this document?

A    First Amended Petition -- I mean Information.

Q    The Defendant is the same, Mr. Barrett; is that true?

A    Yes, sir.

Q    Okay.  And the filing date on this one, again -- or show us where the filing date is?

A    Right here.

Q    Okay.  Then the victim for Count One?

A    Right here.

4732

Q    Okay.  And then Count Two?

A    Right here.

Q    Okay.  And those didn't changed from Defendant's Exhibit 230; is that correct?

A    Correct.

Q    I'd like to show you, ma'am, what's been mark as Defendant's 232 for identification.  Do you see that, ma'am?

A    Yes, sir.

Q    Can you identify that for me?

A    It is the second amended information.

Q    Relates to Mr. Barrett?

A    Yes, sir.

        MR. SMITH:  Your Honor, I move for the introduction of 232.

        THE COURT:  Any objection?

        MR. LITTLEFIELD:  No objection.

        THE COURT:  Admitted without objection.

        MR. SMITH:  Ask that it be displayed.

        THE COURT:  You may.

Q    (By Mr. Smith) Again, ma'am, if we would do the same thing, show me the filing date.

A    Right here.

Q    And that indicates the county?

A    Yes, sir.

4733

Q    Sequoyah County; is that true?

A    Yes, sir.

Q    Okay.  And then indicate the Defendant.

A    Right here.

Q    And then for Counts One and Two, the subjects of those counts?

A    Right there and right there.

Q    Okay.  And again, they are the same, Mr. Eales and Mr. Hamilton; is that true?

A    Yes, sir.

Q    Okay.  I want to show you what's been marked for identification Defendant's 233.  Can you identify that, ma'am?

A    That is the third amended information.

        MR. SMITH:  Move for its admission, Your Honor.

        MR. LITTLEFIELD:  No objection.

        THE COURT:  Admitted without objection.

        MR. SMITH:  Ask that it be displayed.

Q    (By Mr. Smith) Ma'am, if you would identify the filing.

A    Right here.

Q    Okay.  The Defendant?

A    Right here.

Q    Then for Count One, the decedent.

A    Right here.

4734

Q   And for Count Two?

A   Right here.

Q   All right, ma'am.  Then I would like to show you what's been marked for identification Defendant's 234. Is this the packet of five that we previously identified that were labeled as verdict forms, ma'am?

A   Yes, sir.

MR. SMITH:  I would move for their introduction, Your Honor.

MR. LITTLEFIELD:  No objection.

THE COURT:  Admitted without objection.

MR. SMITH:  Ask that they be displayed.

Q   (By Mr. Smith) Ma'am, on this first page of 234, when I asked you previously about the verdict?

A   Yes, sir.

Q   And I'm pointing -- using my pointer up here.  It says Count One, that was the charge, murder in the first degree; is that correct?

A   Yes, sir.

Q   Then down here where the X is, is that the finding by the jury?

A   Yes, sir.

Q   And the finding was for what crime, ma'am?

A   Manslaughter.

Q   Okay.  In the first degree?

4735

A    Yes, sir.

Q    Okay.  And then right below it, the 20 years, is that what we identified as the penalty?

A    Yes, sir.

Q    Now, I'm going to show you page two of this packet that you gave me and I'm going to ask you, ma'am, is that the same copy from what we previously looked at?

A    Yes, sir.

Q    So, with your permission can I remove that from 234, that we've listed as five pages and call it now four pages, since we have a duplication?

A    Yes, sir.

Q    Because that is the same thing as page one; is that correct?

A    Yes, sir.

         MR. SMITH:  With Your Honor's permission, I would like to amend 234 to state that it includes four pages of documents and not five as previously identified.

         THE COURT:  Based on the testimony of the witness that will be the order of the Court.

Q    (By Mr. Smith) Ma'am, I want to show you what then would be the second page.  Again, underneath verdict Count Two, shooting with intent to kill, that was the charge; is that true, ma'am?

A    Yes, sir.

4736

Q    Okay.  And then the finding was what, ma'am, by the jury?

A    Assault and battery with a dangerous weapon.

Q    Okay.  And the punishment, ma'am?

A    Ten years.

Q    Okay.  And then page three, ma'am.  Again, that's for a charge on Count Three, is that right?

A    Yes, sir.

Q    And the finding for that was --?

A    Not guilty.

Q    Okay.  And then page four.  Again, Count Four was the charge?

A    Discharge of a firearm with intent to kill.

Q    And the finding on that Count Four charge was --?

A    Not guilty.

Q    Okay.  Thank you, ma'am.  And, ma'am, I'm going to show you what's been marked for identification Defendant's 235.  Can you identify that again for us, ma'am?

A    That is a judgment and sentence.

MR. SMITH:  Move for its introduction, Your Honor.

MR. LITTLEFIELD:  No objection, Your Honor.

THE COURT:  Admitted without objection.  Number on that was --?

4737

MR. SMITH: 235, Your Honor.

THE COURT: Be admitted.

MR. SMITH: Ask that it be displayed.

Q (By Mr. Smith) Ma'am, the title of this document, again, is judgment and sentence; is that correct?

A Yes, sir.

Q Relates to the Defendant Kenneth Barrett?

A Yes, sir.

Q And the 19th of April, what date does that reference?

A April 19th of 2004.

Q What does that reference, ma'am?

A The date the judgment is signed -- the date the judgment and sentence was signed before the judge.

Q Okay. The date that he was actually sentenced; is that true?

A Yes, sir.

Q And this relates to the February conviction; would that be true?

A Yes, sir.

Q All right. Now, we have an X amongst four choices and that X identifies what, ma'am?

A Found guilty by jury.

Q Okay. For Counts One and Two which, again, were the manslaughter and the assault and battery with a dangerous

4738

weapon; is that true?

A    Yes, sir.

Q    Okay.  And then, ma'am, I'm going to refer you down to where it says term of imprisonment.  For Count One sentenced to a term of --?

A    Twenty years.

Q    Count Two?

A    Ten years.

Q    And then, beginning with the word with, would you read that for me?

A    With Count Two to run consecutive to Count One.

Q    And continue, ma'am.

A    Determination of Defendant's eligibility for credit for time served in the county jail preceding time is left to the discretion of the Department of Corrections.

Q    Now again, the word consecutive as it relates to Count Two means what, ma'am?

A    It is to begin after Count One is completed.

        MR. SMITH:  Your Honor, I pass the witness.

        THE COURT:  You may cross examine.

        MR. LITTLEFIELD:  Your Honor, may I approach the witness or the clerk?

        THE COURT:  You may.

4739

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    Ms. Vann, you're the Deputy Court Clerk for Sequoyah County?

A    Yes, sir.

Q    And how long have you been working with the clerk's office in Sequoyah County, ma'am?

A    Around 17 years.

Q    So that would be back to -- when did you start?

A    '89.

Q    '89.   You're familiar with the practices of Sequoyah County and the keeping of documents and records in Sequoyah County, aren't you?

A    Yes, sir.

Q    And in fact, you were requested to bring a number of documents to court by the defense, weren't you?

A    Yes, sir.

Q    And you've identified the exhibits that we've just looked at.   Is that all the documents that you produced, ma'am, for the defense?

A    Yes, sir.

Q    Okay.   The records that they requested that you search were restricted, though, only to felonies, weren't they?

A    Yes, sir.

4740

Q     There -- in fact, were records reflective of whether or not Mr. Barrett has a violent past that appear in the court clerk's documents, that you weren't asked to bring up here by the defense, weren't there?

A     No, sir.

Q     Were you asked to look for misdemeanor records?

A     No, sir.

Q     Are there records -- there are records in regards to misdemeanors that reflect violence on the part of Mr. Barrett that the defense didn't ask you about, aren't there?

A     Yes, sir.

Q     What's a protective order?

A     It is when someone is trying to physically harm you or verbally abuse you and you need protection from them, for them to be ordered to stay away from you.

Q     And if someone's spouse is violent towards an individual -- if my spouse was regularly abusing me I can go to the court clerk and seek protection through the court from violence on the part of my spouse, couldn't I?

A     Yes, sir.

Q     And records would be kept in the clerk's office reflecting violence in that regard, wouldn't they, ma'am?

A     Yes, sir.

Q     Are there records reflecting violence on the part of

4741

Mr. Barrett towards a spouse kept in the court clerk's office at Sequoyah County?

A     Yes, sir.

Q     Okay.  Do you have in front of you Government Exhibit Number 330?  We're going to go ahead and display it also.  It's not in evidence, yet.  So -- but we're going to also put it on the screen.  Do you recognize that document, ma'am?

A     Yes, sir.

Q     And is that a document that's kept in the normal course of business of Sequoyah County in the clerk's office?

A     Yes.  That is a docket appearance book.

Q     And does that docket appearance book reflect that one of the individuals in which a case was assigned was Kenneth Barrett?

A     Yes, sir.

Q     Is this document -- criminal appearance docket, kept in the normal course of business of Sequoyah County, ma'am, in the clerk's office?

A     Yes, sir.

        MR. LITTLEFIELD:  Move admission of Government Exhibit Number 330.

        THE COURT:  Any objection?

        MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  I would ask it be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) And if we could focus.  There are three -- when you do the docket appearance, there may by multiple individuals reflected on a document; isn't that true?

A   Yes, sir.

Q   And which one is Mr. Barrett on this page, on this docket sheet page?

A   At the very top, CRM-86-562.

Q   Now, the copy that we have just says RM.  Can you see where I'm talking about at the very top left of the docket -- the document, the C is cut off?

A   Yes.

Q   What's the CRM stand for, ma'am?

A   Criminal misdemeanor.

Q   And the 86 stands for what?

A   The year.

Q   And the 562 would be what?

A   The case number that it was assigned for that particular year.

Q   Do you see the center column talking about the nature of the offense, ma'am?

A   Yes, sir.

4743

Q    And what does it show the offense, the criminal offense, the misdemeanor criminal offense is for?

A    Violation of protective order.

Q    And who is the Defendant?

A    Kenneth Barrett.

Q    For there to have been a violation of a protective order, there would have had to have been a protective order on file, wouldn't there?

A    Yes, sir.

Q    Okay.  Now, in regards to the protective orders that were kept in Sequoyah County, do you know how far back those records are maintained?

A    To statehood, 1907.

Q    Are some records -- some documents purged or destroyed in the court's office after -- in the court clerk's office after a period of time?

A    Yes, sir.

Q    And what kind of records are destroyed or purged?

A    We have some traffic, we have some misdemeanor and we have small claims.

Q    When you talk about misdemeanor records being destroyed, would the file itself for this still be available or not, being a 1986 case?

A    No, sir, it's not available.

Q    And on protective orders, sometimes if a period of

time passes and it's -- are all protective -- how long do protective orders last for, ma'am?

A    A maximum of three years as of today.

Q    And so, if a case -- if there's a protective order and it's over three years old, are those records always maintained by the court clerk's office?

A    No.

Q    In order to violate a protective order, to get one, what kind of information has to be provided to the court?

A    An application is made and it's a brief statement of the happenings, an example that he may have hit her or something and is asking for protection.

Q    Okay.  If I just walk -- (Interrupted)

MR. SMITH:  I'm going to object to the extent that this doesn't identify who -- was under the protective order was.  So, when you say he may have hit her, that's -- that's not indicated on this document.

MR. LITTLEFIELD:  I think that was for illustrious purposes rather than absolutely identifying what was on the order.  I don't have a problem with that being stricken.

MR. SMITH:  And if that's pointed out, I have no problem.

THE COURT:  Okay.  Answer is stricken.

Q    (By Mr. Littlefield)  Information has to be provided

4745

to a court before a protective order can be issued, doesn't it?

A    Yes.

Q    In regards to the -- if somebody is charged with violation of a protective order there has to be an initial behavior to seek the protective order and then there has to be behavior which caused a violation of it; is that not true?

A    Yes, sir.

Q    And in this particular case, Kenneth Barrett entered a plea of guilty on -- what's the 687, do you see the third entry from the bottom in his case?

A    The 2686?

Q    Yes.  Do you see the columns going down below that?

A    Yes, sir.

Q    The 2686 shows that he appeared for arraignment; is that true?

A    Yes, sir.

Q    Okay.  And the entry two below that, you see 687?

A    Yes.

Q    And the records reflect that Mr. Barrett entered a plea of guilty to violating a protective order in this particular incident, doesn't it, ma'am?

A    Yes.

Q    And would you look to Government Exhibit Number 331.

4746

Do you have that in front of you?

A    Yes, sir.

Q    And is that, in fact, the judgment and sentence on a plea of guilty for violation of protective order by Mr. Barrett?

A    Yes, sir.

MR. LITTLEFIELD:  Move for admission of 331.

MR. SMITH:  I have the same objection, Your Honor.

MR. LITTLEFIELD:  It was provided this morning.

MR. HILFIGER:  You didn't put the numbers up.

MR. SMITH:  If it's displayed on the screen, I can review it.

MR. LITTLEFIELD:  And I think it's on the screen as well.

THE COURT:  Are you moving for its admission?

MR. LITTLEFIELD:  Yes, sir.

MR. SMITH:  No objection, Your Honor.

THE COURT:  Be admitted without objection.  331 admitted without objection.

Q    (By Mr. Littlefield) And is this, in fact, the judgment and sentence showing that on March the 4th of 1987 Mr. Barrett entered a plea of guilty to that violation of protective order in Case Number CRM-86-562?

A    No, he pled guilty February 6th of 1987.

4747

Q    Okay.  Yeah.  I see that.  It was filed on March the -- (Interrupted)

A    Yes.

Q    That's not the only case that Mr. Barrett had for violating protective orders, is it?

A    No, sir.

Q    Would you look at what's been marked as Government Exhibit Number 332, please?  And do you recognize Government Exhibit Number 332?

A    Yes, sir.

Q    And what is that?

A    A copy of a -- the criminal appearance docket.

Q    And does it identify the Defendant as Mr. Barrett?

A    Yes, sir.

Q    And is this document kept as a part of the normal course of business of the records of Sequoyah County Court Clerk?

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of Government Exhibit Number 332.

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And again, there's more than one case that appears on this docket sheet; is that correct?

4748

A    Yes, sir.

Q    Okay.  And what is displayed now on the screen, is that portion of the case which relates to Mr. Barrett; is that also true?

A    Yes, sir.

Q    Okay.  And the case number is what?

A    CM-95-496.

Q    The other said CRM.  What's the CM stand for?

A    Criminal misdemeanor.

Q    And the 95 stands for what?

A    The year that it occurred.

Q    And 496 indicates what, ma'am?

A    The case number assigned to that case.

Q    And the Defendant you can see below the State of Oklahoma is who?

A    Kenneth Barrett.

Q    And the charge or the nature of the offense?

A    Violation of protective order.

Q    Does this document reflect whether or not Mr. Barrett pled guilty to violating a protective order in '95 as well?

A    Yes, sir.

Q    And where is that, ma'am?  And I direct --

(Interrupted)

A    On the ninth line.

4749

Q   On what?

A   The ninth nine.

Q   What date?

A   10-4-96.

Q   Where you touched it?

A   Yes, sir.

Q   Okay.  And what sentence did he receive, ma'am?

A   One year suspended.

Q   Anything additional?

A   A hundred dollar fine in court costs and $25 to victim witness fund, suspended to run concurrent with other cases.

Q   You say concurrent.  Is that that CC?

A   Yes.

Q   And it's concurrent with other cases.  Where -- does that document reflect the other cases that Mr. Barrett had pending against him in addition to this case back in October of '96?  Do you see the numbers on the other cases?

A   No, sir.

Q   The line you marked -- look one line down.  And there's something about a rule eight hearing.

A   Okay.

Q   Do you see that?

A   Yes.

4750

Q   And at the end of the second line what does it say on that entry?

A   Defendant has two other cases CRM-96-64, CM-96-258.

Q   Are those also criminal misdemeanor cases, ma'am?

A   Yes, sir.

MR. LITTLEFIELD:   I'd ask that the witness look at Government Exhibit -- what's been marked as Government Exhibit Number 334.

Q   (By Mr. Littlefield) And do you recognize that document, ma'am?

A   Yes.  It is a docket to domestic abuse.

Q   And is that a docket that's kept -- or a domestic abuse docket kept in the normal course of business of the court in Sequoyah County, Oklahoma?

A   Yes, sir.

Q   Is that an official court record?

A   Yes, sir.

MR. LITTLEFIELD:   Move admission of Government Exhibit 334.

MR. SMITH:   No objection, Your Honor.

THE COURT:   Be admitted without objection.

Q   (By Mr. Littlefield) Says at the top domestic abuse docket.  Does it have a case number, ma'am?

A   Yes, sir.

Q   What is that?

4751

A    DA-86-130.

Q    Who are the parties in this domestic abuse case, ma'am?

A    Abby Barrett versus Kenneth Barrett.

Q    Note the first entry.  What is that?

A    Petition.

Q    And is that what you were talking about earlier when you said somebody had to go before the judge and reflect that there's problems of a nature of abuse, domestic abuse, to get a domestic abuse case on the domestic abuse docket?

A    Yes, sir.

Q    Does it show whether or not the protective order in case DA -- I guess that's stands for --?

A    Domestic abuse.

Q    Okay.  Domestic Abuse Case 86-130.  Does it show that the order was issued in this particular case?

A    Yes, it does.

Q    Can you tap where that is?  Okay.  Now, that's the alias order.  Is there a final order issued?  What's the last entry show, on that particular case, on 11-2-86?

A    The court minute?

Q    Yes, ma'am.

A    Case set this date for hearing on protective order. Defendant failing to appear.  Protective order issued and

4752

made permanent.

Q    And there's initials BER.  Is that Judge Bill Ed Rogers?

A    Yes, sir.

Q    Okay.  Now, are there occasions when someone files an application for protective order and it's not made permanent because of the parties' failure to appear for the hearings?

A    Yes, sir.

Q    Okay.  Would you look to Government Exhibit 335.  Do you recognize what Government Exhibit 335 is?

A    Yes.  It's a domestic abuse docket page.

Q    And is that kept in the normal course of business for Sequoyah County District Court?

A    Yes, sir.

Q    Kept in the clerk's office, the one where you're the first deputy assistant?

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of Government Exhibit 335.

MR. SMITH:  No objection.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) And who are the parties in this case?

A    Abby Barrett and/or Toby Barrett versus Kenneth

Barrett.

Q   And this is case number what?

A   DA-86-15.

Q   And the first entry, the 2-3-86, do you see that first entry where it says PET?

A   That is petition.

Q   Was this case ever final?  There was a petition filed, but was this case ever finally -- filed and a protective order entered?

A   No, sir.

Q   Why?

A   Because the plaintiff -- case dismissed for failure to present.

Q   Now, this is in '86.  You've got two petitions filed, and in fact, one protective order entered in '86. Do you know if this is the only domestic abuse petition? That that was the only year that Abby Barrett had to seek a protective order against Kenny Barrett?

A   I believe so.

Q   Okay.  Well, would you look to Government Exhibit 336.  Do you recognize that document, ma'am?

A   Yes.

Q   What is that?

A   A domestic abuse docket page.

Q   Kept within the normal business of Sequoyah County?

4754

A    Yes, sir.

MR. LITTLEFIELD:  Move for Government Exhibit Number 336 to be admitted into evidence, Your Honor.

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. LITTLEFIELD:  And I'd ask it be displayed.

Q    (By Mr. Littlefield) A minute ago you said you didn't know of any other or you believed there weren't any other domestic abuse petitions other than '86.  What year is this docket for, ma'am?

A    DA-84-20.

Q    Parties are whom?

A    Abby Barrett versus Kenny Barrett.

Q    And was there a petition filed and if so when?

A    Petition was filed 3-29 of '84.

Q    And was there an order filed?

A    Yes.

Q    What date was a protective order filed against Kenny Barrett in '84?

A    4-5-84.

Q    Okay.  That's the emergency protective order that remains in effect.  When does it -- what does the next entry show on the 18th?

A    Order filed.

Q    I'm sorry?

A      Order filed.

Q      Okay.  Look to Government Exhibit 337.  Do you recognize what that document is, ma'am?

A      That is a petition for protective order.

Q      And is this petition for a protective order kept in the normal business for Sequoyah County in the court clerk's office?

A      Yes, sir.

Q      Okay.  And this one is still in your records and has still been preserved; is that correct?

A      Yes, sir.

        MR. LITTLEFIELD:  Move admission of Government Exhibit Number 337, Your Honor.

        MR. SMITH:  No objection, Your Honor.

        THE COURT:  Admitted without objection.

        MR. LITTLEFIELD:  And I would ask that it be displayed.

Q      (By Mr. Littlefield) Who are the parties?

A      Abby Barrett versus Kenny Barrett.

Q      And the other said DA, domestic abuse case numbers.  In '95, 1995, how were those cases delineated?

A      They were relabeled as PO for protective order.

Q      Okay.  You mentioned in the -- that to file a petition, a party has to reflect some kind of threats of a physical nature to seek and get a petition issued.  Do

4756

you recall testifying to that effect?

A    Yes, sir.

Q    Does this document reflect that there have been threats of eminent physical harm?

A    Yes, sir.

Q    And what does the first check mark reflect?

A    That the defendant was threatened.

Q    The defendant was?

A    Threatened Abby, I mean.

Q    Okay.  And what does it show that the Defendant threatened Abby with?

A    To blow off her head.

Q    I'm sorry?

A    To blow off her head.

Q    And where do you see that he threatened Abby with blowing off her head, ma'am?

A    On the description of what happened, the last line.

Q    This also -- and do you see that the second check mark -- and what does that reflect that the Defendant has done to Abby?

A    Stalked or harassed Abby.

Q    In the third -- do you see there's a one, two, three?

A    Uh huh.

Q    Does it show their marital status at the time?

4757

A    Yes.   They were separated is what she wrote.

Q    Okay.   And when this document is filed, if you could look to the second page, on item number eight which is not currently being displayed down at the bottom.   When the plaintiff, who in this case is Abby Barrett, files this document, does she have to do anything to get this document filed?

A    She has to agree that she has wrote down the truth and signed her name to that and we notarize her signature.

Q    And on what date did Abby Barrett sign this petition, ma'am?

A    January 17th of 1995.

Q    Who is Kathy Reed?

A    She was the court clerk at that time.

Q    So Abby would have signed this in front of the Court Clerk of Sequoyah County when she sought this petition?

A    Yes.

Q    This was filed in January of '95; is that correct?

A    Yes, sir.

      MR. LITTLEFIELD:   And I would ask that Government Exhibit 338 be presented.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit 338?

A    Yes, sir.

4758

Q   What is that, ma'am?

A   It's a protective order that was signed by the judge.

Q   And is this a final protective order showing that the request made in January of '95 became a final protective order for Abby Barrett on her behalf against Kenny Barrett.

A   Yes, sir.

Q   Is this an official document of the court clerk's office in Sequoyah County?

A   Yes.

        MR. LITTLEFIELD:  Move admission of Government Exhibit 338 please.

        MR. SMITH:  No objection, Your Honor.

        THE COURT:  Admitted without objection.

Q   (By Mr. Littlefield) And what is the Defendant ordered not to do?

A   He's ordered not to do any of the places that are marked with an X.

Q   And what -- and specifically what's marked with an X, ma'am?

A   Defendant ordered not to abuse or injure the victim. Defendant ordered not to assault, molest, harass or otherwise interfere with the victims, wherever they may be, to include but not to be limited to home, school or

4759

place of employment.  Defendant ordered not to threaten the victim.  Defendant ordered to remain away from the victim and the resident of the victim, wherever it may be.  Defendant ordered to cease stalking the victim.  Defendant ordered to cease harassing the victim.

Q    Okay.  And that order is temporary or permanent?

A    Permanent.

Q    And that order was issued when?

A    The 6th day of March, 1995.

Q    And if we go back to Government Exhibit Number 332, the bottom part, did Mr. Barrett abide by that March order in 1995?

A    No, sir.

Q    Does that criminal misdemeanor docket sheet reflect where he violated that '95 order?

A    Yes, sir.

Q    Okay.  And do the records of the court clerk for Sequoyah County also include divorce records?

A    Yes, sir.

MR. LITTLEFIELD:  I would ask that Government Exhibit 339 be displayed to this witness.

Q    (By Mr. Littlefield) Do you recognize Government Exhibit 339?

A    Yes, sir.

Q    Is that a record kept in the normal course of

4760

business for the Sequoyah County District Court Clerk's Office?

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of Government Exhibit 339.

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) What is that?

A    It's a petition for a divorce.

Q    And who is trying to get divorced from whom?

A    Abby Gail Barrett versus Kenneth Eugene Barrett.

Q    When was that filed?

A    May 4th of 1995.

Q    And, ma'am, if you could go to the second page, do you see the verification?

A    Yes, sir.

Q    Who signed that verification?

A    Abby Gail Barrett.

Q    And what does she say about the facts of the petition for divorce in that verification in regards to the truthfulness of those facts that are alleged?

A    That they are true and correct to the best of her knowledge.

Q    Okay.  Go back to page one.  And when one files for divorce, do you have to list grounds or a basis for which

4761

you seek a divorce from the other party?

A    Yes, sir.

Q    What's the typical ground in the state of Oklahoma?

A    Incompatibility.

Q    Is that one of the listed grounds in Government Exhibit 339?  If you look at the third paragraph.

A    It states incompatibility and physical abuse.

Q    Do you see physical abuse very often in your divorce petitions?

A    No, sir.

Q    Do you know if the divorce was granted as to Abby Gail Barrett and Kenneth Eugene Barrett, ma'am?

A    Yes, sir.

Q    Okay.  Would you look to Government Exhibit Number 340?  Do you see Government Exhibit 340?

A    Yes, sir.

Q    And is that -- is Government Exhibit 340 a document kept in the normal course of business?

A    Yes, sir.

Q    What is it?

A    It's a decree of divorce.

        MR. LITTLEFIELD:  Move admission of Government Exhibit 340.

        MR. SMITH:  No objection, Your Honor.

        THE COURT:  Admitted.

4762

Q      (By Mr. Littlefield) And is that the divorce between Abby Barrett and Kenneth Eugene Barrett filed on September the 12th, 1995?

A      Yes, sir.

Q      Okay.  And in fact, if we look to the third page, Abby Barrett messed up and elevated her position to a judge, didn't she?

A      It looks like that.

Q      But do you recognize the signature above Abby Barrett's signature on the judge of the district court line?

A      Yes, sir.

Q      Who is -- who signed off on their divorce?  Who approved it?

A      A.J. Henshaw, Jr.

Q      Okay.  And did Abby Barrett eventually sign in the appropriate place?

A      Yes, sir.

Q      And did Kenneth Eugene Barrett approve of this divorce?

A      Yes, sir.

Q      And can you tap where his signature appears, ma'am?  Okay.  In regards -- let's go back to page one.  Abby Barrett listed in the petition the grounds of incompatibility and physical abuse.  Why was the divorce

4763

granted, ma'am?  About the fifth paragraph down.

MR. SMITH:  Your Honor, I'm going to object if that's what he's referring to, because that is not the recital -- the same recital where it's ordered, adjudged and decreed, as is reflected later on in that document.

Q   (By Mr. Littlefield) What does the decree reflect that the plaintiff is entitled to a divorce for, ma'am, on the first page?

A   On the grounds of incompatibility and physical abuse.

THE COURT:  Is there an objection?

MR. SMITH:  He asked the question of what was the grounds for the divorce and then he asked in title two.

THE COURT:  Okay.  Objection -- first objection is sustained -- or that objection is sustained.  Answer is stricken.

MR. LITTLEFIELD:  Your Honor, I would ask to approach the witness -- or I'll just display it from back here.

Q   (By Mr. Littlefield) Are you aware of whether there were other misdemeanor cases in which Mr. Barrett is a defendant pending in Sequoyah County?

A   Yes.

MR. LITTLEFIELD:  And this is not in evidence

4764

and I would ask it be displayed.  It doesn't have a mark on it, but I would ask that it be included as Government Exhibit Number 341.

Q    (By Mr. Littlefield)  And do you recognize this document, ma'am?

A    Yes.  That is an appearance docket page.

Q    Okay.  And does it reflect a -- the misdemeanor case that is currently pending in Sequoyah County for Mr. Kenneth Eugene Barrett as the defendant?

A    Yes, sir.

MR. LITTLEFIELD:  Move admission of Government Exhibit 341 -- what has been marked as 341.

MR. SMITH:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Littlefield) What's the case number?

A    CRM-86-488.

Q    Defendant being whom?

A    Kenny Barrett.

Q    Nature of the offense or misdemeanor charge?

A    Assault and battery.

Q    And when was this filed?

A    I cannot make out the month, but the date is three -- the third day, 1986.

Q    This case has not yet been disposed of, has it, ma'am?

A    No, sir, it has not.

MR. LITTLEFIELD:  And that's all with that exhibit, Your Honor.  And may I approach the clerk with the one copy we have, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?

A    No, sir.

Q    Put the government to the task of proving its case, didn't he?

A    Yes, sir.

Q    And ultimately Mr. Barrett was convicted of manslaughter and given a 20 year sentence in that case?

A    Yes, sir.

Q    You're familiar with the Department of Corrections -- and I don't mean intimately familiar with all the rules and regulations.  But you have some experience, having worked in the court clerk's office, with sentences with the Oklahoma State Department of Corrections, haven't you, ma'am?

A    Yes, sir.

Q    And it's not uncommon for somebody to have a 20 year sentence and yet be back in Sequoyah County within a

4766

matter of two, three or four years, is it, ma'am?

A    That's correct.

Q    Twenty years doesn't necessarily mean 20 years in the State of Oklahoma prison system does it, ma'am?

MR. SMITH:  Your Honor, I'm going to object.  I think that's the DOC's area of expertise and we have a fellow here to testify now.

MR. LITTLEFIELD:  She can certainly testify from her experience.

MR. SMITH:  He's asking about the policy and what she can do at DOC.

MR. LITTLEFIELD:  I'm not asking about the policy.  I'm asking that 20 years -- does a 20 year sentence mean that a person's going to be 20 years in prison.

THE COURT:  She answered that question.  She's already answered that.  Objection sustained.

Q    (By Mr. Littlefield) In regards to the conviction, you were asked about Mr. Barrett -- that being final, it wasn't appealed.  Do you recall being asked about that, ma'am?

A    Yes, sir.

Q    Okay.  And he got a 20 year sentence, didn't he?

A    Yes, sir.

Q    What is the maximum punishment for manslaughter,

4767

ma'am?

A    Life in prison.

Q    You didn't hear the trial, did you?

A    No, sir.

Q    You don't know what evidence the jury heard in Sequoyah County, do you?

A    No, sir.

Q    Okay.  You don't know if individuals testified before the Sequoyah County jury about the threats that Mr. Barrett had made to law -- about law enforcement officers, do you?

A    No, sir.

Q    And you aren't familiar with whether or not --
(Interrupted)

        MR. SMITH:  Your Honor, I'm going to object to this line of questioning.  She said she didn't hear the evidence.  He just wants to recite this whole case before this witness.  We think that's improper.

        THE COURT:  Counsel.

        MR. LITTLEFIELD:  I'm not going to recite the whole case, but there are a couple of areas that I want to ask -- (Interrupted)

        THE COURT:  You may proceed.  Objection overruled.

Q    (By Mr. Littlefield) To your knowledge -- or you

4768

don't know if the jury heard anything about the drug activities of Kenneth Barrett in the trial in Sequoyah County, do you, ma'am?

A   No, sir.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  Further direct.

MR. SMITH:  Yes, sir.  Thank you.

REDIRECT EXAMINATION

BY MR. SMITH:

Q   Ma'am, I want to go back through a few of these just briefly, if I may, okay?

A   Okay.

Q   I would like to display for you Government's Number 330.  Now, ma'am, it said that the -- let me get my laser from Mr. Hilfiger.  There was a warrant issued whenever this case was filed, correct?

A   Correct.

Q   And what does it say where I'm displaying with my laser, here?

A   Defendant appeared pro se for arraignment.

Q   Okay.  Does that mean he turned himself in?

A   It means he appeared without an attorney.

4769

Q   Does that mean he turned himself in?

A   Yes.

Q   Okay.   Now right down here about the plea.

A   Yes.

Q   He admitted to what?

A   Guilty.

Q   To the charge, right?

A   Yes, sir.

Q   Okay.   And you don't know on here what it was that he admitted to other than there was a disposition of a hundred dollar fine?

A   Yes, sir.

Q   And would it be usual, ma'am, for people whenever they're confronted with a case where there's a monetary penalty, to take that and plead guilty and go on down the road and not contest the charge?

A   Yes, sir.

Q   That is unusual or not unusual?

A   Not unusual.

Q   Okay.   I would like to take that down and show you 332, ma'am.   332, again there was a warrant issued and this was in '95, correct?

A   Yes, sir.

Q   Okay.   And then you show that there was a censure with Daggs.   Who was Daggs?

4770

A    A bondsman.

Q    Okay.  So there's a bond set in February some, what, four months after the filing?

A    Yes, sir.

Q    And then something happened, there was a bench warrant in September; is that true?  Is that what B slash -- (Interrupted)

A    Yes, sir.

Q    That's what B slash W means?

A    Bench warrant, yes, sir.

Q    Okay.  And then that same day it indicates what, ma'am, happened?

A    That he made an appearance before the judge -- or that he made bond.

Q    Okay.  And who was Merrill?

A    That is another bondsman.

Q    Okay.  So he turned himself in and posted bond again; is that true?

A    Yes, sir.

Q    The same day that the warrant was filed?

A    Yes, sir.

Q    Now, again where it has on October the 4th of '96, it doesn't indicate what he pled -- he pled guilty to this case, but it doesn't have any recital of the plea of guilty, right?

4771

A      Correct.

Q      In other words, the words that he may have said to the judge or what he pled guilty to, right?

A      Right.

Q      But it says again a hundred dollar fine and court costs?

A      Yes.

Q      I'd like to show you 334.  Now, by the way, these violations of protective order, you can get jail time on them, can't you?

A      Yes, sir.

Q      Okay.  So you don't just have to get a hundred dollar fine?

A      Correct.

Q      Is that kind of a minimum type penalty for somebody who's -- who pleads guilty or is found guilty?

A      That is up to the judge.  I cannot say.

Q      Down here on this domestic abuse docket, refers again to 1986; is that true?

A      Yes, sir.

Q      Okay.  And read what this last entry says, ma'am.

A      Court minute.  Case set this date for hearing on protective order.  Defendant failing to appear, protective order issued and made permanent.

Q      So that indicates to you what, ma'am?

4772

A    He did not appear and she got granted the protective order.

Q    So he did not contest the issuance of the protective order?

A    No, sir, he did not.

Q    So if you don't appear for a protective order, does the sheriff come out and pick you up and put you in jail?

A    No, sir.

Q    They just enter the order, is that right?

A    Yes, sir.

Q    Kind of like a default judgment?

A    Yes, sir.

Q    If you don't show up, then we're going to enter it against you?

A    Yes, sir.

Q    And that's what happened here?

A    Yes, sir.

Q    335, ma'am, I want to show you.  A person can file a protective order and those allegations are what, ma'am?

A    Allegations.

Q    Mere allegations, correct?

A    Yes, sir.

Q    And if they don't come to court and prosecute their case, then what happens to the case?

A    The case gets dismissed.

4773

Q   Okay.   And on this, ma'am, this is 335, the minute from 1986 indicates what?

A   Case was dismissed.

Q   Show you 336.   I've got something highlighted here, ma'am, that -- can you read what that entry for April the 5th of '84 says?

A   Court minute.   Emergency protective order to remain in effect from one year from date of issuance.

Q   Okay.   And then what's the entry on April 18th?

A   Order filed.

Q   Okay.   Now, the law has changed as it relates to protective orders, has it?

A   Yes, sir.

Q   Okay.   And back in '84, whenever you used to get a protective order issued, could the judge issue an emergency order right then?

A   Yes, sir.

Q   And on here, it doesn't show whether or not this case was ultimately set for hearing and whether or not the defendant appeared or anything like that, does it?

A   No, sir.

Q   So we can't really tell much from this, other than the order was filed.   But it doesn't say under what circumstances?

A   Correct.

4774

Q    Now, also back in '84, could a judge enter a protective order on a permanent basis?

A    Yes, sir.

Q    And that law has changed to where they're -- how long are they valid now for?

A    Three years is the maximum amount of time.

Q    Do you know if the law was changed in relation to protective order because of the abuse of that system?

A    I cannot say.

Q    Okay.  I want to show you 337 right quick, ma'am. And this is the petition for protective order, correct?

A    Yes, sir.

Q    Okay.  And again, you mentioned that the parties were separated; is that true?

A    That's what it states on the application.

Q    Now, again, the items that are written like where it described what happened, those are what, ma'am?

A    I'm sorry?

Q    Allegations?

A    Yes.

Q    It's not proved conduct, right?

A    Correct.

Q    That's not a finding, that's just what somebody says about -- (Interrupted)

A    That's just what some -- one person is saying, yes,

4775

sir.

Q   Now, I want to introduce -- excuse me -- show you 338.  Does that indicate whether or not Mr. Barrett appeared on that protective order?  This is the one we just looked at.

A   Yes, it appears he did not appear.

Q   Okay.  And again, when you don't appear they issue the order, is that right?

A   Yes, sir.

Q   Didn't contest it?

A   Correct.

Q   Just go ahead and do it.  And that was in 1995?

A   Yes, sir.

Q   Okay.  Now, that was in March of '95, is that right?

A   Yes, sir.

Q   All right.  And then the divorce was filed in what year, ma'am, and what month?

A   May of 1995.

Q   Okay.  And again, as it relates to divorces, the filing -- the petition for divorce contains allegations by the petitioner; is that true?

A   Yes.

Q   And at the time they were called plaintiff.  Now they're called a petitioner, is that right?

A   Yes, sir.

4776

Q   Okay.  And then the decree, depending upon what happens in court, is the order that's issued by the judge, is that right?

A   Yes, sir.

Q   Okay.  I'm going to show you the decree in this matter, that was Defendant's 340, and I'm going to turn to the second page, okay?

MR. LITTLEFIELD:  I think that it's -- it's Government's Exhibit 340, not Defendant's Exhibit.

MR. SMITH:  I'm sorry.  I didn't even realize I said that.  Government's 340.

Q   (By Mr. Smith) Okay, ma'am.  Now I'm going to direct your attention to a couple of things, all right?

A   Okay.

Q   Now, are you familiar -- I know you're on the criminal side in the clerk's office.  But are you familiar with divorce petitions and divorce decrees?

A   Yes, sir.

Q   Okay.  And the language in a divorce decree, oftentimes there's some writing in the first page or page and a half, depending on how long the decree is and then there's a recital of that information; is that true?

A   That is true.

Q   Okay.  Do you know whether or not the recital is the controlling language or whether the language above that

4777

is controlling?

A    The one that's recited.

Q    Okay.  And so, when I'm talking about recital, would it be accurate for me to say that I'm referring to this where it says it is therefore ordered, adjudged and decreed by the court?

A    Yes, sir.

Q    Okay.  So that would be the finding of the judge as it relates to a divorce; is that true?

A    Yes, sir.

Q    Okay.  I want to take you down to the finding by the judge as it relates to the reasons why the divorce was granted between Mr. and Ms. Barrett, okay?  And that reason was what, ma'am?

A    Grounds of incapability.

Q    Incompatibility, is that right?

A    Yes, sir.

Q    And that means we don't get along?

A    Yes, sir.

Q    And that's what -- do you know percentage-wise of the divorces that are granted for that reason?

A    Possibly 99 percent.

Q    Almost every one of them, is that right?

A    Yes, sir.

Q    Okay.  And then are you familiar with custody

4778

arrangements whenever there's a child involved in a divorce?

A    Yes, sir.

Q    Okay.  And are you aware, back in -- what was it, 1995 -- what the law would have been or what was required in terms of the parties to have a joint custody relationship?

A    No, I would not.

Q    Okay.  Does this item indicate the custodial relationship of the parties' minor child when this divorce was reached?

A    Yes, sir.

Q    What does it say, ma'am?

A    Joint custody.

Q    Okay.  Do you know what that means in terms of the status of either parent as it relates to that child?

A    They both have input on his -- about on anything.

Q    Okay.  And then I want to turn to the third page. Well, I'm going to do this.  Strike that.  Back to the first page a second and then we'll go to the third page, okay.  On the first page at the top, second paragraph, what does it say as it relates to the Defendant?

A    The defendant has been notified of this motion for default hearing.

Q    Okay.  Now, does that indicate to you that he

4779

probably didn't show up -- well, it does.  Right above that it says he didn't show, right?

A    Right.

Q    Okay.  Then that language says but we notified him of it.  He had a choice to show up, right?

A    Yes, sir.

Q    Okay.  Now, I want to flip to the third page.  Now, the first page said he didn't show, said he was notified of it, but we have his signature down here on approval.  What does that indicate to you, ma'am?

A    He was aware of the decree being filed.

Q    He probably agreed to it?

A    And agreed to it.

Q    Okay.  We can take that down.  Now, let me ask you this, ma'am:  Did Mr. Littlefield or a representative of the Government come to your office and ask you to search for any and all records in that office as it relates to Kenneth Barrett?

A    Not myself, he has not.

Q    To anybody in your office that you know of?

A    Yes.

Q    Okay.  And those are the records that you brought?

A    Yes.

Q    Okay.  Now, I notice that there seems to be a gap between 1986 and 1995 with Mr. Barrett and Abby Barrett

or anybody else?

A   That is correct.

Q   Now, are those records missing or would it be your testimony that there are no records?

A   I would say there are no records.

MR. SMITH:   Thank you, ma'am.   Pass the witness.

RECROSS EXAMINATION

BY MR. LITTLEFIELD:

Q   The mere allegations in the petitions -- they're more than just mere allegations, aren't they, ma'am? They have to be made under oath, don't they?

A   Yes.

MR. LITTLEFIELD:   I would ask 332 be displayed again, Government Exhibit 332.

THE COURT:   You may.

Q   (By Mr. Littlefield) Do you recall Mr. Smith asking you -- that Mr. Barrett turned himself in?   Do you recall him making that statement -- (Interrupted)

A   Yes.

Q   In regards to this particular document?

A   Yes.

Q   We're looking back in September of '96.   A bench warrant was filed on September the 6th?

A   Yes.

4781

Q    There's nothing on that document that shows that Mr. Barrett turned himself in, is there, ma'am?

A    No, sir.

Q    And in fact, the bond previous to that was $1,500, wasn't it?

A    Yes, sir.

Q    And after the bench warrant was filed on September the 6th, when Mr. Barrett reappeared, that bond was increased to $5,000, more than three times greater, wasn't it, ma'am?

A    Yes, sir.

Q    Mr. Smith made the statement about incompatibility, reflecting that people don't get along.  The documents in the court clerk's office apparently reflect that Abby Barrett and Kenny Barrett didn't get along very well, did they?

A    Yes, sir.

Q    In regards to joint custody of Toby Barrett, what the decree states, do you know who -- you don't know who actually got custody and maintained Toby Barrett, do you?

A    No, sir.

MR. LITTLEFIELD:  Pass the witness.

MR. SMITH:  No further questions, Your Honor.

THE COURT:  May this witness be excused?

MR. SMITH:  She may as far as we're concerned.

4782

THE COURT:  Ma'am, thank you for your testimony.  You may step down.  You may be excused.  You may call your next witness.

MR. HILFIGER:  Kathy Trotter.

THE COURT:  What was that name, again?

MR. HILFIGER:  Kathy Trotter, T-r-o-t-t-e-r.

THE COURT:  Let's take the noon recess.  It's about five minutes till 12:00.  I'll ask you to be back at 1:15.  Remember my admonition not to discuss this matter among yourselves or allow anyone else to discuss it with you.  Everyone please remain seated as the jury leaves for the noon recess.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Anything outside the hearing of the jury for the Government?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  The defense?

MR. HILFIGER:  No, Your Honor.

(Whereupon, the noon recess was held after which the following record was made in the presence of the jury.)

THE COURT:  Let the record reflect the jury is in the box.  Counsel for the Government is present,

Defendant is present with counsel.  You may call your next witness.

MR. HILFIGER:  Kathy Trotter.

THE COURT:  Ma'am, if you would raise your right hand and be sworn, please.

KATHY TROTTER,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    State your name for the record, please.

A    Kathy Trotter.

Q    And is that Kathy spelled with a K or C?

A    K.

Q    And, Ms. Trotter, you are related to Kenny Barrett, aren't you?

A    Yes.  I'm his first cousin.

Q    Okay.  And are you about the same age as Kenny Barrett?

A    I'm a few years younger.  I'm 41.

Q    Okay.  You're going to need to speak up a little bit, so you might lean forward a little bit, just right into the microphone.  Did you live around in the Sallisaw area and grow up with Kenny Barrett?

A    Yes, we did.  We grew up together.

4784

Q    And about how long a period of time -- was there a time that you left Sallisaw?

A    Yes.  In the middle of my senior year in 1982 I left and then I came back a few years later, probably in 1986.

Q    Okay.  From -- up till 1982 did you have a regular occasion to be around Kenny Barrett?

A    For the most part, yes.  When I got up into high school I saw him very little.

Q    Okay.  So at that time he would -- would he be an adult, over 18?

A    Yes, he would have been.

Q    And during that -- at that time was he married to Abby Barrett?

A    I believe he was, yes.

Q    Now, and you left from 1982 to around 1986.  When you came back, what was the purpose in coming back to the Sallisaw area?

A    I had remarried someone from that area and moved back to live and had a daughter and was raising her.

Q    And did you also have a job or an occupation when you came back?

A    Yes.  I worked for an attorney as a legal secretary for several years and at that time I started doing process serving and I'm still doing that.  I've been doing it about 16 years.

4785

Q    What does a process server do?

A    I go -- I have a private license.  I'm licensed for the State of Oklahoma.  And I can go out and serve summons, subpoenas, things of civil nature.

Q    Okay.  So you're involved in the legal processes, is that right?

A    Yes.

Q    And you go to the courthouse and become involved in legal actions as far as keeping up with what's going on, is that -- (Interrupted)

A    Yes.  Almost on a daily basis, yes.

Q    And the -- and you've been doing that for the last 16 years?

A    Yes.

Q    And as part of that job of doing a process server, is it necessary for you to sort of keep in tune with what's going on in the county, as far as people getting in trouble and stuff like that?

A    Oh, yes.  It's a small community.  I'm very aware of pretty much what goes on all the time.

Q    Okay.  Now, you know Kenny Barrett as part of family?

A    Oh, yes.  Yes.

Q    Do you know of any -- other than anything with Abby Barrett, do you know of any violent actions that Kenny

4786

Barrett did in the last 16 years?

A    No.  No.

Q    Prior to 1999, the incident with the highway patrol?

A    No.  Aside from his marriage to Abby, no.

Q    Now, you were aware that there was -- that marriage was violent, volatile and -- between both of them, is that right?

A    That's -- from rumors, yes.  That's what I'd heard.

Q    When you were younger -- and as far as the family is set up, were guns part of your family at all?

A    Oh, definitely.  We all grew up with guns.  Every -- you know, everyone in our family -- our fathers hunted. As we got older we hunted.  We were taught to -- how to shoot and how to respect firearms and it was just part of our, you know, lifestyle.

Q    And you're a cousin through your father's -- your father and Kenny Barrett's father being brothers?

A    Yes, sir.  Yes, sir.

Q    And do you know -- what do you know about guns in the -- in his father's home, in Kenny Barrett's father's home?  Do they have guns, too?

A    Yes, they had several.  It was something that he had as a hobby.  His father traded guns and bought guns of different nature and it's just something that, like I said, we grew up with and they enjoyed doing that, for

4787

hunting purposes and just some for collection.

Q   Do you know whether or not -- do you know the name of Kenny Barrett's father?

A   Yes.  It's Ernie Barrett.

Q   Okay.  And Ernie Barrett, do you know whether he had a number of guns in his home?

A   Yes.  He always had guns, yes.

Q   And there -- how many brothers were in that -- how many sons of Ernie Barrett were in that home?

A   How many sons does Ernie have?

Q   Yes.

A   There were -- there're three sons, yes.

Q   Okay.  And while they were growing up, did they also have a lot of guns themselves?

A   I'm sure they did.  We all -- we all did.

Q   So it wasn't anything unusual having a number --

(Interrupted)

A   No, it was nothing to have them around.

Q   Now, I'm going to back up here and jump in here as a process server, were you ever aware of any rumors or anything floating around Sallisaw about violent offenses by Kenny Barrett prior to 1999, September 1999?

A   No, other than his marriage to Abby.  And like I said, that was rumored.  Nothing.

MR. HILFIGER:  I have no further questions.

4788

THE COURT:  Cross examination.

CROSS EXAMINATION

BY MR. SPERLING:

Q    Who is the attorney that you worked for as a legal secretary, ma'am?

A    Clark Wood.

Q    And during the time that you have served as a process server, are you independently employed or have you been employed by someone else?

A    I'm independently employed.

Q    And have been so employed for a long time now?

A    Sixteen years.

Q    All right.  Were you aware that there was a bench warrant issued for the Defendant's failure to appear for a jury trial?

A    No.

Q    All right.  Were you aware of his criminal charges for distribution of methamphetamine that were pending at the time of this shooting?

A    No.

Q    Do you know a man by the name of Randy Turman?

A    Only from rumors.  I don't know him personally.

Q    You've never met him?

A    No.

Q    Have you ever met Travis Crawford?

4789

A   Yes.

Q   Were you -- when's the last time you were at the Defendant's residence?

A   When he was a resident there?

Q   Uh huh.

A   I don't -- I couldn't tell you.

Q   Fair to say that you've never been at the house that was built where he was staying at the time of the shooting that led to these charges?

A   Other than driving by to do a service in that area, no, I have not.

Q   Never been inside, obviously, that residential area with the Defendant?

A   No.

Q   So you would have no way of knowing what's hidden in a camera in that residence?

A   No.

Q   Or what may have been in his pocket during the night that he was involved in this murder?

A   No.

Q   You wouldn't be aware if he had pseudoephedrine hidden in a ceiling above his bedroom?

A   No.

Q   Do you know a man by the name of Charles Sanders?

A   Yes, I do.

4790

Q    All right.  Do you know what his relationship was with the Defendant?

A    No, I do not.

Q    Do you know a man by the name of Randall Weaver?

A    Just rumored.

Q    Okay.  But do you know what his relationship, if any, was with the Defendant?

A    No, no.

Q    Do you know who Karen Real is?

A    No.  It was rumored to me that she used to be related in marriage in our family somewhere.  But those names and that information is just what I have read in the paper.

Q    Apart from that, are you aware of what relationship if any she had with the Defendant?

A    No.

Q    Cindy Crawford, do you know who she is?

A    She's Travis Crawford's wife.

Q    Yes.  And were you aware that she has had occasion to be at the Defendant's residence or would that be news to you?

A    No, I don't know Cindy.

Q    Do you know Brandie Price?

A    No.

Q    Okay.  So you wouldn't know what relationship, if

any, or what interaction she may have had with the Defendant?

A   No.

Q   Are you aware that there are some nine different case numbers that relate to domestic abuse as between the Defendant and Abby?

A   No.

Q   Have you ever personally witnessed any exchange between the Defendant and Abby that was volatile?

A   No, I have not.

Q   You don't use drugs, do you, ma'am?

A   Oh, no.

Q   And you don't use methamphetamine?

A   No, sir.

Q   You've never been around the Defendant when he was using methamphetamine?

A   No, sir.

Q   All right.  Or on drugs?

A   No, sir.

Q   Certainly never seen him manufacture or attempt to manufacture methamphetamine?

A   Absolutely not, no.

Q   You talked a little bit about guns being part of your family.  Have you ever seen the Defendant with a Colt Sporter?

4792

A   No, sir.

Q   All right.   In the time that your family maintained weaponry, did you ever see any of your family members tape together several clips?

A   No.

Q   All right.   Never saw them electrically taped together various clips in order to increase the magazine capacity?

A   No, sir.   No.

Q   In fact, the guns that you saw when they were presented to you and that you saw would have been for legitimate use, would they not?

A   Yes, sir.

Q   Ever seen the Defendant with a loaded -- chamber loaded nine millimeter pistol in his waistband?

A   No.

Q   To your knowledge, has he ever been armed when he was around you?

A   No.

Q   Do you know about when it was when the Defendant's parents got a divorce?   About what year that would have been?

A   I don't remember.   I really don't.

Q   I know that's going back sometime -- (Interrupted)

A   That's -- we were pretty young.

4793

Q   Can you remember about where you were in school, about what year you would have been in school?

A   My parents divorced when I was about 11.  And so, I'm guessing it was probably sometime prior to that.  So, as far as a year, I can't narrow it down, no.

Q   All right.

A   I guess a little over 30 years ago possibly.

Q   Okay.  Did you ever have occasion to talk to the Defendant about that divorce?

A   No.

MR. SPERLING:  May I have one moment, Your Honor?

THE COURT:  You may.

MR. SPERLING:  Nothing further, Your Honor.

THE COURT:  Further direct?

MR. HILFIGER:  No further.

THE COURT:  May this witness be excused?

MR. HILFIGER:  Yes, she may.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.  You may be excused.  You may call your next witness.

MR. SMITH:  Jimmy Wilson, Your Honor.

THE COURT:  Sir, if you'd raise your right hand and be sworn.

(Whereupon, the witness was administered the

4794

oath.)

THE COURT:   You may proceed.

MR. SMITH:   Thank you, Your Honor.

JIMMY WILSON,

being first duly sworn to testify the truth, the whole

truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q    Sir, would you state your name, please.

A    Jimmy Wilson.

Q    Where are you employed?

A    Oklahoma Department of Correction at Oklahoma State

Penitentiary.

Q    And for how long have you been so employed, sir?

A    Be 19 years January.

Q    And what are your job duties with the prison?

A    I'm a case manager.

Q    And what does that involve, sir?

A    Keeping a field file on inmates, custody

assessments, profiles, time.

Q    And in performing your duties, do you rely on their

jacket or their file?

A    Yes, sir.

Q    And you brought some documents with you here today;

is that true, sir?

4795

A    I brought his field file.

Q    Whose field file?

A    Mr. Barrett's.

Q    Sir, you didn't appear here voluntarily, did you?

A    No.

Q    You're here under subpoena?

A    Yes, sir.

Q    You are not here as a friend of Kenny Barrett's?

A    Don't know him.

Q    And he recently has been added to your caseload; is that true?

A    Yes, sir.

Q    So this is one of those individuals that you have a file on because he's assigned to you?

A    Yes, sir.

Q    But because he hasn't been there in the period of time that he's been assigned to you, you've never met him before?

A    Right.

Q    Sir, that is Mr. Barrett.  I would like to go through the file if we may and have you identify some documents for me.  Would you do that, sir?

A    Yes, sir.

Q    And the first that I'm going to show you that has been marked for identification is Defendant's Exhibit

4796

Number 240.  If you would, when this displays on your screen, take a look at it and see if you can identify that for me, sir.

A    That's a victim flash notification.

Q    And what does that mean?

A    That means any time he's moved, paroled, discharged or anything, we're to let the victim services know.

Q    You may have to lean up just a little bit.

A    Okay.

Q    Some of these jurors may have a hard time hearing you, okay?

A    Okay.

Q    Now, is this a record that's contained within the packet that you have with you there today?

A    Yes, sir.  It's kept on the first section, top of the first section.

Q    And Defendant's 240, is that identical to the record that is contained within your records?

A    Yes, sir.

MR. SMITH:  Move for the introduction of 240, Your Honor.

THE COURT:  Any objection?

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Be admitted without objection.

MR. SMITH:  Would ask that it be displayed,

4797

Your Honor.

THE COURT:   You may.

Q    (By Mr. Smith) Sir, this notice, this notification flash notes, how does that make it into the file?

A    It's sent to us by the victims -- victim services.

Q    Okay.  And in this case that would be a Robby Fullerton, is that right?

A    Yes.

Q    Okay.  Now, what is the purpose of this notice? What does it do?

A    We just -- they notify -- if an inmate is discharging, they have to notify them within 14 days of the discharge date.  Just letting the victims know that he's being released.  If he makes parole, we're to notify them as soon as we know that he's made parole.

Q    Now, I assume not every case that you have down there contains these notifications in them, is that right?  These flash notices?

A    Oh, about half.

Q    About half of them.  We're going to take that down, sir, and I'm going to show you what has been marked as Defendant's Exhibit 241 for identification.  Are you familiar with that document, sir?

A    Yes, sir.

Q    And can you tell me what it is, sir?

4798

A    It's a -- whenever they first come to OSP, they audit the field file for time and that's his time audit.

Q    And that is contained within your original record?

A    Yes, sir.

MR. SMITH:  Move for the introduction of 241.

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Admitted without objection.

Q    (By Mr. Smith) Now, sir, we've displayed this to the jury and I want to go through it a little bit.  It has the name of the Defendant Kenny Barrett at the top; is that true?

A    Yes, sir.

Q    Okay.  Now, the facility that it has OSP, tell me physically what facility is that?

A    Oklahoma State Penitentiary in McAlester.

Q    There's more than one penitentiary in McAlester, isn't there?

A    There's two.  Jackie Brannon and Oklahoma State Penitentiary.

Q    Okay.  And this is the old penitentiary, the big walls, the old traditional penitentiary?

A    Maximum security.

Q    Okay.  Now, this has some various information on there, but let's look at the date of sentencing.  It's got April 19th of '04; is that true?

A    Yes, sir.

Q    Okay.  Now, there's a release date conversion right next to it.  What is that, sir?

A    I really don't know exactly what that is.  That's just some numbers that they've put on there that I'm really not familiar -- that familiar with that part of it.

Q    Do you know whether or not that reflects the days -- that you would convert from years to days and that's what that -- (Interrupted)

A    It could be a possibly because it was a 20-year sentence.

Q    Okay.  And when you look over here at the date of reception, what does that mean to you?

A    That's the date that he came into LARC from county jail.

Q    · Okay.  And LARC is what, sir?

A    Reception area for the Oklahoma Department of Corrections.

Q    And that is located where?

A    At Lexington.

Q    And that's the -- where we get the acronym LARC, L-A-R-C?

A    Right.

Q    Lexington Area Reception Center?

4800

A   Correct.

Q   Is that right?  And it indicates it took him four days to get from the jail within the confines of the Department of Corrections; is that true?

A   By record, it is.

Q   And then there's a computation next to where it says jail time?

A   Yes, sir.

Q   Do you know what that reflects?

A   That's how many days he was in jail, in the county jail.

Q   That he was given credit for, is that --
(Interrupted)

A   Correct.

Q   And then again, we see the sentence length of 20 years?

A   Correct.

Q   Time served, it has plus eight.  Do you know when that was calculated from?

A   That would have probably been from the day he got to LARC -- from LARC to Oklahoma State Penitentiary.

Q   Okay.

A   It was eight days.

Q   The date of the audit, does that have anything to do with it?

4801

A   Yes, sir.

Q   And then you have on here where the beginning -- is that right?  Beginning release date, is that what that means, underneath the sentence length?

A   Correct.

Q   And what year does that have -- what date does that have on it?

A   4-23-2024.

Q   And that reflects the 20 years, is that right?

A   Correct.

Q   Okay.  Then right next to that you have earned credits of plus six.

A   Correct.

Q   Do you know what those credits mean?

A   That's extra earned credits that he -- whenever he came from county jail and went to LARC, he automatically went to a level two, which is 22 days a month, earned credits.  And that was the calculation of that.

Q   Okay.  So if there's a 30-day month, then what you're telling me he's going to get 22 days extra?

A   Extra, correct.

Q   So for every 30 days, he gains an extra 22 days?

A   Correct.

Q   Okay.  Then what is this plus three with the -- midway, just right in the middle of the page?

4802

A    It's the differential in received credits.  They miscalculated somewhere on his time and corrected it.

Q    Gave him three more days?

A    Yes, sir.

Q    So the net total is what is subtracted from the release date conversion?

A    Correct.

Q    And that's where you come up with days remaining?

A    Correct.  5619.

Q    Okay.  And that's five thousand; is that correct?

A    5,619 days.

Q    Now, does the 5,619 days take into consideration any other time that Mr. Barrett was sentenced to?

A    No, that's 20 years.

Q    Okay.  Was Mr. Barrett sentenced to additional time?

A    He got 20 years and a ten years running consecutive.

Q    Okay.  Which means what, sir?

A    That after he does the 20, then he does the ten.

Q    And is -- there's a notation -- there's some writing under notes?

A    That's the second count, ten years.

Q    Okay.  And does that just kind of alert somebody to the fact that there's some other time that's --

(Interrupted)

A    Correct.

4803

Q    That's going to be in addition to this?

A    Correct.

Q    So if I understand you correctly, what this form tells us, that he's got 5,619 days to do as of May of '04?

A    Correct.

Q    And that he's going to accumulate 53 days a month with good time?

A    Up to that, right.

Q    Okay.  Not anymore than that, but he could accumulate up to that, is that --

A    He could accumulate more than that, too.

Q    Okay.  Has he?

A    No.

Q    Since he's -- since May the 12th of '04, has he ever accumulated more than 53 days a month?

A    Not to my knowledge.

Q    Okay.  And then after this 5,000 days, this 5600 days are disposed of or he does them, then we're going to shift over to the other ten years?

A    Correct.

Q    Has there been -- well, strike that.

We're going to move on, sir.  I'm going to take that down and direct your attention to Defendant's Exhibit 242, marked for identification.  It looks like

4804

this may have been a carbon copy, so it's -- it may be hard to read. Your copy may be better. And when you've located that within your record, let me know, sir.

A   It's right here.

Q   You have it located?

A   Yes, I've got it.

Q   Okay. And tell me what is Defendant's Exhibit 242?

A   It -- they come out with a new law couple of years ago, two or three years ago, where they can get enhanced credits if they're nonviolent. They can get up to like 90-days earned credits on level three and four.

Q   And is this a notification of eligibility for those sort of credits?

A   Yes, but he's not eligible.

Q   Well, hold on, sir. Is that what this form is?

A   Yes, sir.

MR. SMITH:   I would move for the introduction of 242, Your Honor.

MR. SPERLING:   No objection, Your Honor.

THE COURT:   Be admitted without objection.

MR. SMITH:   Ask that it be displayed.

Q   (By Mr. Smith) Now, sir, as it deals with the current crime, and that's where you're talking about this eligibility for additional time credits, right?

A   Correct.

4805

Q    Okay.  And in section one, does that indicate whether or not Mr. Barrett is going to be eligible for this additional time credit?

A    That's the one that kicks him off of it, yes.

Q    Okay.  And what kicks him off of it, sir?

A    The charge of manslaughter.

Q    Okay.  And then number two, if Mr. Barrett had prior criminal history, would that be listed in that block?

A    Yes, sir.

Q    And the same way with juvenile convictions under number three?

A    Correct.

Q    And then I guess ultimately the conclusion is drawn in line four?

A    Correct.

Q    Where again, that's the eligibility for the enhanced level credits?

A    Right.

Q    Now, you said these are credits that are how much?

A    I think level three gets instead of 33 days that they normally give, we give like 60 and level four, instead of getting 44 days, they'd get like 90.

Q    Now, that's in what time frame?

A    In a month -- per month.

Q    Okay.  So he's not going to get those?

4806

A    No, sir.

Q    Okay.  Move to Defendant's Exhibit 243.  And I'm going to show you, sir, it's been marked for identification.  Have you seen that document before, sir?

A    Yes, sir.

Q    And can you identify it for me?

A    It's administrative special management inmate notice.

Q    Okay.  And is this identical to the document that's contained within your record?

A    Yes, sir.

        MR. SMITH:  Move for the introduction of 243, Your Honor.

        MR. SPERLING:  No objection, Your Honor.

        THE COURT:  Admitted without objection.

        MR. SMITH:  Ask that it be displayed.

        THE COURT:  You may.

Q    (By Mr. Smith) Can you explain this document to the jury, sir?

A    What it is, is we -- when we have an inmate with a high profile type case or certain circumstances or escapes, different situations, it alerts the administration of the inmate and we keep it documented in the file.

Q    Okay.  Does this indicate that Mr. Barrett, by way

of this notice, is going to be treated differently than some other inmates?  I mean, isn't that what this notice does?

A    Not necessarily -- we treat them differently, no. He may be housed differently because of it.

Q    Okay.  And maybe we're confusing terms.  I guess whenever I say treated differently, you're probably thinking about interaction with him on the floor?

A    Correct.

Q    Out there person to person?

A    Correct.

Q    And you're going to treat your prisoners -- you want to treat them the same way, as long as they give you that ability to do so?

A    Correct.

Q    Would that be fair?

A    Yes, sir.

Q    They treat you with respect, you're going to treat them with respect?

A    Correct.

Q    All right.  Okay.  But this does have a notice that has to do with how he may be treated within the facility in terms of credits or housing or those sort of things?

A    Wouldn't have nothing to do with credits.  Maybe housing, but not credits.

4808

Q    Let's talk about the housing then, okay.  First off, where it has the justification, what is listed on there?

A    Inmate was convicted of manslaughter, first degree and the highly publicized death of an Oklahoma Highway Patrol trooper in Sequoyah County, Case Number 99-493.

Q    Okay.  And the requestor, do you know who that fellow is?

A    Warden Mike Mullins.

Q    Warden at the Oklahoma State Penitentiary?

A    Yes, sir.

Q    And then the language at the bottom, what does it say about the transfer of the inmate?

A    You want me to just read that line to you?  This inmate identified as administration special management inmate.  The administrator of classification and consulted with the appropriate deputy director or administrator of private prison will approve transfer of this inmate.  In the event of an emergency medical transfer, the Department of Corrections duty officer will be notified of transfer.

Q    All right, sir.  So I guess what this is saying is the warden or somebody immediately under his control is going to be the one that's going to have to approve whether or not Mr. Barrett moves from the Oklahoma State Penitentiary?

4809

A    It probably be Deputy Director Bob Boone.

Q    Okay.  And this form is also indicated to be placed where within his jacket?

A    In section three, on top.

Q    On top of all other documents; is that true, sir?

A    Correct.

Q    Okay.  I would like to show you Defendant's Exhibit Number 244, sir.  And it's a two page document.

        MR. SMITH:  And I'm sorry.  It has been marked for identification, it's not in evidence.

Q    (By Mr. Smith)  It's two pages.  We'll look at the first page and then I'll have her flip it to the second page.  I want you first to tell me whether or not this document is identical as to what is contained within your records.

A    Yes, sir.

Q    The first page is?

A    Yes.

Q    Okay.  We'll look at the second page.

A    Yes.

Q    And can you tell me what this document is, sir?

A    It's a cell assessment form.

Q    And what does that mean?

A    Tells us whether or not an inmate is restricted or unrestricted about celling with certain inmates.

4810

Q   Okay.   And is there certain things that determine whether or not somebody is restricted or unrestricted?

A   There's several things.

Q   Okay.   And that's what this form does, is that right?

A   Correct.

MR. SMITH:   I want to move for the introduction of 244, Your Honor.

MR. SPERLING:   No objection, Your Honor.

THE COURT:   Be admitted without objection.

Q   (By Mr. Smith) Now, I would like to display it and we're going to talk about page one, sir.   It has security related criteria.   Do you see where I'm referring to? Actually, I tell you what let's do -- let's back up.   I'm going to strike that question.

The paragraph just above that, where it says every inmate, are you with me?

A   Yes, sir.

Q   Now, there's a determination within DOC that whenever you come in what is your status as an inmate, in terms of restriction or not restricted?

A   Usually unrestricted.

Q   Okay.   That's the status quo, is that right?

A   When you first come in.

Q   Unless there's something that tells us you need to

4811

be restricted?

A   Correct.

Q   Now, whenever we talk about restricted, again, what do we mean?

A   We're talking about maybe the possibility of housing black and white inmates together, Hispanic and whites, certain crimes, things like that.

Q   So if you have somebody who's a known gang member and you have somebody who has been obviously opposed to a group like that, you're not going to put them in the same cell together?

A   No.

Q   Because you don't want any turmoil?

A   That's right.

Q   Right.  And so we try to use our heads as to who we place with inmates in terms of keeping the old tempers at a minimum; is that true?

A   Correct.

Q   Okay.  And in this form there's various criteria that they look at in terms of determining whether or not somebody should be in a restricted status, is that right?

A   Correct.

Q   All right.  Let's look at the first one and it has yes beside the answer.  What was the question?

A   Has inmate ever been convicted of any offense, prior

4812

or current, which is against another. If so, list.

Q    And what is listed there?

A    Manslaughter, first degree, assault and battery with a dangerous weapon.

Q    And then number two, the question does the inmate have any separatees at the facility who are on his or her official separatee list. And it has yes.

A    Correct.

Q    Now, what does it have for the answer?

A    Administrative separatee.

Q    Now normally, I guess, what this is saying is if me and Mr. Littlefield were in prison together and we'd been in a fight before, then he might be one of those who'd be on my separatee list, is that right?

A    Correct.

Q    Okay. And here, instead of having the name of a particular individual we've got administrative?

A    Correct.

Q    So what does that mean to you as case manager?

A    It'd probably be because of his crime against a police officer. You put him in the cell with certain type of inmates, you're going to have a conflict. Like if we were putting somebody with rape in with somebody who's against that. It'd be the same thing.

Q    So this was -- this determination was made from the

4813

top -- (Interrupted)

A    Correct.

Q    Would that be fair?  Okay.  Then let's look at some of these other questions.  Number three was has the inmate ever been involved in any of the following.  And it has various different criteria?

A    Correct.

Q    And it wants you to note whether or not there's a race crime, right?

A    Right.

Q    The first one, assaulted another inmate.  What's the answer?

A    No.

Q    Been assaulted by another inmate?

A    No.

Q    Involved in a fight?

A    No.

Q    Pressured for commissary or sexual favors?

A    No.

Q    Involved in homosexual acts or sexual assault?

A    No.

Q    Involved in group disturbances between inmates?

A    No.

Q    Found in possession of a weapon?

A    No.

4814

Q     Has the inmate ever requested placement in or been assigned to safekeeping, protective custody, segregation housing or detention during prior or current incarcerations?

A     No.

Q     Is the inmate suspected or confirmed as a member of any disruptive or security threat group?

A     No.

Q     Then on number eight it has inmate statement.  And it has yes.  But there is no statement attached, is that right?

A     I haven't seen one.

Q     You have not seen one?

A     No, I haven't.

Q     Okay.  Then if we look over on number -- on page two, if we can flip it over.  Down at the bottom where it has the checkmark for restricted, again what does that mean?

A     Means he restricted on what -- where he can cell, where he can be placed in cell.

         MR. SMITH:  Your Honor, if I can ask Mr. Hilfiger a question just a second?

         THE COURT:  You may.

Q     (By Mr. Smith) And, sir, this question is going to relate back to 243 and 244, the document that we just

4815

looked at.  And again, it has to do with administrative classification, basically, is that right?

A    Correct.

Q    Neither of those classifications that are done administratively had anything to do with Mr. Barrett's conduct while he was at the Oklahoma State Penitentiary?

A    That was prior to him coming to Oklahoma State Penitentiary.  This was made up from LARC.

Q    But the determination didn't have anything to do with his conduct?

A    No.

Q    It all had to do about the nature of the crime that he was convicted of?

A    Correct.

Q    Now, I'd like to show you what has been marked, sir, for identification as Defendant's 245.  Have you seen that document before, sir?

A    Yes, sir.

Q    Okay.  Again, what is that?

A    It's same as the other administrative special management.  This one was done at LARC before he come to OSP.

Q    So this is another administrative notice?

A    Correct.

         MR. SMITH:  Move for the introduction of 245.

4816

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Admitted without objection.

MR. SMITH:  Ask that it be displayed.

THE COURT:  You may.

Q    (By Mr. Smith) It is different from the one we looked at previously in that this was an earlier notice, is that right?

A    Correct.

Q    Okay.  And again, if you would read the justification?

A    Inmate Barrett will be transferred to Oklahoma -- OSP.  He will not be transferred from OSP without the director approval, Debbie Mahaffey, or Patty Davis approval.

Q    I would like to show you what has been marked for identification purposes, sir, Defendant's Exhibit Number 246.  And this is a three page document.  I want to take you through the first, second and third, just to make sure they're the same document.  Is the first the same as contained in your file?

A    Yes, sir.

Q    The second page, sir.  We'll look at that briefly.

A    Yes, sir.

Q    And page three?

A    Yes, sir.

4817

MR. SMITH:  Move for the introduction, Your Honor.

MR. SPERLING:  No objection, Your Honor.

MR. SMITH:  And ask that it be displayed.

THE COURT:  Admitted without objection.  You may display it.

Q   (By Mr. Smith) Sir, tell me what this document does.

A   It's a custody assessment scale that tells how many points an inmate has.

Q   Okay.  And what is the purpose of that scale within the Department of Corrections?

A   To figure out where to place an inmate in the security level of the penitentiaries.

Q   So it is a classification system?

A   Yes, sir.

Q   And that classification is based on several factors?

A   Yes, sir.

Q   Is that true, sir?  All right.  And that's what this form does.  You go through it, you answer the questions and you come up with a number?

A   Correct.

Q   All right.  Can we go through this form for the jury and then we'll show them how the Department of Corrections arrived at a number for his security level?

A   Correct.

4818

Q   Now, security level, that is the proper term that we should be using?

A   Yes.

Q   Okay, sir.  And again, I realize this is your language.  So if I get the terms turned around a little bit, you correct me, okay?

A   Okay.

Q   All right, sir.  Now, number one is the identification of Kenneth Barrett.  There's nothing unusual up there, correct?

A   No.

Q   That's just the identifier?

A   Right.

Q   All right.  Let's move down to number two and that -- actually, is that B?  That's A and B, isn't it?

A   Correct.

Q   All right.  Let's go to B under custody evaluation.  And what level is indicated Mr. Barrett in that category?

A   Highest crime category.

Q   Okay.  And is that because of the nature of this crime?

A   Correct.

Q   And so, he's got the most points that you could assess an individual?

A   Correct.

4819

Q    And how many points did he get?  It's kind of hard to see on there.

A    Six points.

Q    Now, then you go down to the next block which is number two and that's where you look at the offense history; is that true?

A    Correct.  That's for priors.

Q    Okay.  And what did you find as related to Mr. Barrett's priors?

A    Zero.

Q    Okay.  So there are no points assessed for that, correct?

A    Correct.

Q    All right.  Then we go to number three, which has to do with what sort of category?

A    Escape history.

Q    Was there a history?

A    No.  No escapes.

Q    And so there's no points; is that correct?

A    Correct.

Q    Let's move to number four.  That just adds them up, is that right?

A    Adds up the top three.

Q    Okay.  And so since we just found the one category as six, that's where we wound up with?

4820

A   Correct.

Q   All right.   Now, it says score of 12 or higher assigned to maximum custody?

A   Correct.   If they have more than 12 points in that top section it's automatically max.

Q   We don't have to go any farther?

A   No.

Q   Okay.   I'm going to ask that we look at number five. It says number of active disciplinary convictions?

A   Correct.

Q   Is that within the Department of Corrections?

A   Correct.

Q   And there were none; is that true?

A   None.

Q   Okay.   And then we're going to look at number six. And again, there were no disciplinary convictions?

A   Correct.   That's for the most serious.

Q   And if there was, that would categorize them and determine how many points -- (Interrupted)

A   Correct.

Q   -- that should be assessed?   Okay.   So if we can turn to page two.   Now, this has something to do about program participation?

A   Correct.

Q   And what does it say as relates to Mr. Barrett?

4821

A    Zero.

Q    Okay.  And what's checked -- read what is next to the box that's checked.

A    Just says none, waiting list, enrolled, participation or has points in escape section.  If he'd had points in escape section, it's automatically be zero --

Q    Okay.  So that doesn't apply to him -- (Interrupted)

A    No.

Q    -- the escape section part of it doesn't?

A    No.

Q    But this other, none, waiting list or enrolled or participating, we don't really know, do we?  Because nothing else is identified?

A    Right.

Q    Other than we know that he wasn't in a program -- (Interrupted)

A    Right.

Q    -- that would entitle him to a reduction in his point level?

A    Correct.

Q    Okay.

A    Well, he would have to complete a program before he would get a reduction anyway.  Even if he was in school, he wouldn't get a point deducted unless he completed the

4822

program within the past two years.

Q   Okay.  So when it says participating up here, that doesn't actually give you credit.  Oh, it's a zero point if -- (Interrupted)

A   Yeah.

Q   -- you're just participating?

A   Correct.

Q   That's what you're telling me.  Okay.  All right, sir, thank you.  And we'll move down here to number eight for adjustment.  And they've got level two?

A   Correct.

Q   Do you know why that's checked?

A   Because he on level two.  He gets 22 days a month for earned credit.  That's his level.

Q   Okay.  And again, where it says or has points in the escape section, that doesn't apply here?

A   Correct.

Q   All right.  Number nine is a classification based upon age, is that right?

A   Correct.

Q   And Mr. Barrett gets the benefit of his age?

A   Correct.

Q   And I guess you're going to tell me that your experience with prisoners is the older they get, how do they react in a prison setting?

4823

A    Well, the older they get, as far as being incarcerated -- you know, somebody new come in, you really don't know much about them until they've been there, because they have to adjust.

Q    Right.

A    But the longer they've been incarcerated, the older they get, the less problems they are most usual.

Q    All right.  You can take -- (Interrupted)

A    Of course, you always have them special cases where nothing does them any good.

Q    That's right.  We're all individuals.

A    Yeah.

Q    But if you were going to try to classify certain groups of inmates, which ones do you typically have the most problems with?

A    Younger.

Q    Okay.  The younger they are, the more agitated they become?

A    More gang related they are.

Q    Okay.  So Mr. Barrett because of his age and the experience that the prison has found in dealing with inmates gives him a one level reduction?

A    One minus one point.

Q    So he's at a total score of five; is that correct?

A    Correct.

4824

Q    Okay.  Now let's go down to the next column.  This has what we call scale summary and recommendations, is that right?

A    Correct.

Q    Okay.  So the recommendation, based on the criteria that the Department of Corrections uses and a person having a level of five, what would be the recommendation?

A    Minimum security.

Q    And when you say -- (Interrupted)

A    Minimum security.

Q    Now, are you aware of minimum security facilities in Oklahoma?

A    Somewhat.

Q    Okay.  Is there one near Muskogee?

A    Yes.

Q    Which facility is that?

A    I think that -- I think have like a CTC or something here in town that's a minimum -- that may be community, I'm not real sure.

Q    You're aware of the facility out at Taft?

A    Yes.  Two of them.

Q    One is a women's and one's a --?

A    Men's.

Q    Okay.  And the men's is what security?

A    It may be minimum.  I'm not real sure about that

4825

one.

Q   And again, if you have 12 or more points, the recommendation is going to be --?

A   Maximum security, 12 or more.

Q   And seven to 12 would land you in a --?

A   Medium.

Q   Stringtown.  It's got a prison?

A   Correct.

Q   What's the security level -- (Interrupted)

A   There's two security levels there.  Medium and minimum.

Q   Okay.  So it has both?

A   Correct.

Q   How many maximum security prisons for male offenders are there in Oklahoma?

A   OSP is the only one.  LARC is considered max when they first get there.  But as far as maximum security housing inmates is OSP.

Q   And LARC is because everybody that comes into the prison system in Oklahoma goes there to get processed?

A   Correct.

Q   And then they -- from there, they assign you some place?

A   Correct.

Q   Okay.  So it has to be because that can contain any

4826

and everybody within OSP?

A    Correct.

Q    Okay.  Now, there are no overrides; is that true?

A    There's none checked.

Q    Okay.  And then I want to move down to where it says recommended custody level.

A    Okay.

Q    Now, on here where it says about community placement, he's not eligible for that?

A    No.

Q    And is that because of the amount of days that he has to do still?

A    Correct.

Q    More than 2920?

A    Correct.

Q    But then it has custody level assignment and what was he assigned to?

A    Maximum.

Q    And the comments right below that?

A    High profile crime, transfer only with director approval.

Q    Do you know why Mr. Barrett was assigned maximum custody level?

A    No, sir.

Q    Whenever his security level was such that would

4827

entitle him according to the Department of Corrections' policy to be placed in a minimum security facility?

A    No, sir, I don't.  Except for his crime is all I know.

Q    And when you say except for his crime?

A    High profile crime.

Q    The fact that it's a manslaughter conviction wouldn't knock him out of a minimum security --

(Interrupted)

A    No.

Q    -- facility?  Okay.  I would like to show you what has been marked as Defendant's Exhibit 247 for identification purposes.  This is a three page document, sir, so I want you to look at the first page.  Is that what's contained in your record?

A    Correct.

Q    Second page?

A    Correct.

Q    And the third page?

A    Correct.

Q    And what is this document, sir?

A    It's a profile screening form.

Q    For?

A    Used to profile inmates.

Q    Okay.  And is it based on any particular conduct?

4828

A    All of it's based on conduct.

Q    Okay.  It has on there inmate profile misconduct screening form.  What does that mean?

A    It also shows misconducts.

Q    That's what I'm getting at.

A    Right.

Q    If there's something that had happened, it would be noted on this form, is that -- (Interrupted)

A    Correct.

Q    Okay -- (Interrupted)

A    There's a section for it.

Q    I'm sorry, sir?

A    There's a section for misconducts in this form.

Q    Okay.  And we're going to get to that.

        MR. SMITH:  If I could move for the introduction of 247, Your Honor.

        THE COURT:  Any objection?

        MR. SPERLING:  No, Your Honor.

        THE COURT:  Admitted without objection.

Q    (By Mr. Smith) Sir, I'd like to display this and look at the first page.

        THE COURT:  You may.

Q    (By Mr. Smith) Again this relates to Mr. Barrett, correct?

A    Correct.

4829

Q   Okay.   And then there's a comment section that talks about the crime for which he was convicted, is that right?

A   Correct.

Q   And looking just in the middle of that paragraph, it says per media and newspaper account.   Do you see that?

A   Correct.

Q   And it has some language in there about what happened in this particular case, is that right?

A   Correct.

Q   All right.   Now, in the last sentence, what -- read that for us.

A   Trooper Rocky Eales was slain and another trooper injured during this raid, which resulted in above charges.

Q   Then right under prior criminal record, what does that have typed in there?

A   First incarceration.

Q   I'd like to look at page two, sir, if we may.   Now, the information that is contained from -- excuse me -- within the alcohol and drug usage section, I assume a lot of that is self-reported by the inmate.   Is that --
(Interrupted)

A   All of it is.

Q   Okay.   So on there, on your form, it shows that Mr.

4830

Barrett first used cocaine at the age of 14?

A    Correct.

Q    Alcohol at the age of 12?

A    Correct.

Q    Heroin at 14?

A    Correct.

Q    And then it said inpatient Eastern State Hospital for a drug treatment center in '87, is that right?

A    Correct.

Q    Methamphetamine, what age did that start?

A    Twelve.  No, that's marijuana.  I'm sorry.  Twenty.

Q    Okay.  And then read the paragraph right below that.

A    Began using alcohol and marijuana at age 12, cocaine and heroin at age 14 and meth at age 20.  January 1st, 1987 to June 1st, 1987, inpatient at Eastern State Hospital Treatment Center.

Q    Now, something that -- I want to refer you back to page one just briefly, because it had a listing on there for mental health history.

A    Correct.

Q    It has none listed.

A    There was no mental health.

Q    Okay.  So -- (Interrupted)

A    It was drug health.  This was drug related.

Q    So that was -- (Interrupted)

4831

A   Inpatient.

Q   Excuse me, sir?

A   That was drug related treatment center.

Q   Okay.  So the fact that it's at Eastern State Hospital doesn't necessarily mean anything because you all have it identified here as drug and alcohol treatment?

A   Right.

Q   Now, where it has protest, what does protest mean as it relates to this form?

A   You want me to read what it says?

Q   Well, tell me what it means in your -- (Interrupted)

A   Well, if a D.A. protest, victims protest or anything like that -- if there's any type of protest against him, it would be listed.

Q   So I guess this says if somebody has a particular complaint or something that they want to note it for the record, then this would be one place where it would show up?

A   Correct.

Q   All right.  Read what's in that protest area.

A   Per administrative special management inmate notice to remain at OSP unless the director approves his transfer.

Q   All right, sir.  Now, let me ask you about that just

4832

a second.   What is the benefit to an individual from being in a minimum security facility as opposed to a maximum.

A    There's a lot of benefits.

Q    Tell me what some of them -- (Interrupted)

A    Freedom.   They're a lot more -- they're more free. At OSP we're locked down 23 hours a day.

Q    Let's talk about that for just a second.   Lock down 23 hours a day?

A    Correct.

Q    Locked down to their cell?

A    Correct.

Q    And they get out an hour to go exercise?

A    Exercise yard.

Q    Okay.

A    Then they get three showers a week.

Q    That's within a maximum?

A    Correct.

Q    Okay.   Tell me what other benefits you might obtain by being in a minimum facility.

A    More programs.

Q    Such as --?

A    Vo-techs, more vo-tech than anything.

Q    Life skills type programs?

A    We have life skills at OSP at regular security

4833

level.

Q   Okay.   Tell me what other benefits.   Do you get time -- do you get more time credits based on where you're at?

A   No.

Q   So you can make the same time in maximum that you can in minimum?

A   If you have a job.

Q   If you're able to participate in a job?

A   Correct.

Q   And I assume that there's some programs in a maximum that you can't take, that you could take in a minimum, that would give you the benefit of additional time credits?

A   That would be vo-tech.

Q   Okay.   So not only is there freedom but you have the benefit of shaving your time off quicker?

A   Correct.

Q   Now, where it has the alerts, what are those alerts about?

A   That's just another alert, like the victim notification alerts, administrative alerts.

Q   And you're going to have to lean just a little forward.

A   Okay.

Q   And again, that's saying Mr. Barrett is to be

4834

treated how?

A    At maximum security.

Q    Okay.  Now, on the next page where it has misconduct history, was there any?

A    No, sir.

Q    And employment.  Was Mr. Barrett ever able to work?

A    No.

Q    And this doesn't say whether he has to work and he couldn't?

A    No, it doesn't.

Q    Can you work whenever you're housed in a maximum security facility?

A    Yeah, we have probably 80 to 90 jobs for 1200 inmates or 1400 inmates.

Q    If Mr. Barrett had requested -- and do you get time credits for working?

A    Just your -- you can go up in your level.

Q    Excuse me?

A    You can go up in your level by working.

Q    Okay.  And do you also earn any money?

A    I don't know how much it is, but it's based on their level.

Q    But they can earn some money?

A    Yes.

Q    If Mr. Barrett had tried to work, would that be

4835

indicated on this form or do you know?

A    No, it would not.

Q    It would not be indicated?

A    No.

Q    Okay.  So -- (Interrupted)

A    If he had applied for a job, you mean?  No, it wouldn't be listed.

Q    So this just indicates that he hasn't worked while he was at OSP?

A    Correct.

Q    All right, sir.  But it does have his skills that he took inside of the penitentiary, does it not?

A    No.

Q    Okay.  If you would look right underneath that, jobs before or after incarceration?

A    Right.

Q    What does that tell us?

A    It tell us what he did before he came in the system.

Q    That's what I'm getting at -- (Interrupted)

A    Yeah.

Q    I mean, those are the skills that he brought -- (Interrupted)

A    Right.  Right.  I understand what you're saying now.

Q    Okay.  Then again, under security consideration comments, read what that says.

4836

A   Inmate has six points.  His crime is a high profile crime.  He can only be transferred with approval of the director.  Remain at OSP.

Q   Now earlier we looked at an exhibit that said five points and this says six points.

A   Correct.

Q   And you and I discussed that a little bit outside. Reconcile that for the jury.

A   Well, on down is a custody assessment from LARC and it assessed him at six points.  And I assume that's what they went by before they did this custody assessment here.

Q   So what is his current level?

A   He's five points.

Q   Okay.  I would like to show you what has been marked for identification Defendant's Exhibit Number 248, sir. It's a one page document.  Well, two page document.  It's a two page document.  We're going to look at the first page and see if that's identical to your records.

A   Yes, sir.

Q   And then we'll look at the second page.

A   Yes, sir.

Q   Let's flip back to the first and can you tell me what that document is, sir?

A   It's an initial male custody assessment from LARC.

4837

Q    And what is the purpose of this form?

A    For them placing them in the security level they need to be in from LARC.

Q    Kind of similar to what we went over before, but this is something that's done at Lexington?

A    Yes, sir.

          MR. SMITH:  Move for the introduction of 248, Your Honor.

          THE COURT:  Any objection?

          MR. SPERLING:  No, Your Honor.

          THE COURT:  Be admitted without objection.

Q    (By Mr. Smith) And, sir, I want to move through this kind of briefly, because I think some of it is what we identified as being somewhat similar.  But again, there are six points assessed because of the nature of the crime?

A    Correct.

Q    Then down in number four, maximum custody score is six?

A    Correct.

Q    Then if we flip to page two.  On number seven they didn't give Mr. Barrett on this form the benefit of his age, did they?

A    Correct.  No.  It's -- they don't use age there at LARC.

4838

Q   Okay.  So on this form, even though he -- the category he came into, there's just no credit like there is when he gets to OSP?

A   Correct.

Q   All right.  So he's left at six, but the recommendation for six or fewer points is what security level?

A   Minimum.

Q   And under number two with mandatory overrides?

A   None.

Q   What are checked?

A   None.

Q   Discretionary overrides for higher custody level, what is checked there?

A   It says other.

Q   Read what is typed.

A   Subject has administrative separatee filed, maximum security.

Q   Okay.  Again, that means something came down from the top, is that right?

A   Correct.

Q   Okay.  Discretionary overrides, number four?

A   None.

Q   And program needs?

A   Says emotional stability, substance abuse moderate

4839

and education.

Q    Okay.  These are the programs that he should get the benefit of?

A    The program at LARC assessed him with -- that he needs.

Q    Saying these are the areas you need to improve on?

A    Correct.

Q    Okay.  And then again, recommended custody level?

A    Maximum.

Q    And he doesn't qualify for community placement because of the number of days?

A    Correct.

Q    All right, sir.  Let me look at the review authority.  Again, that indicates about moving him, is that right?

A    Says no movement from OSP without administrative approval.

Q    Now, tell me how is somebody normally recommended to be moved to another facility?  In other words, you said Mr. Boone is somebody that probably would have looked at this?

A    They look at all transfers.

Q    Okay.

A    Doesn't matter who it is.

Q    He's the deputy director?

4840

A    He's the final approval.

Q    But this one says in order for him to be moved they've got to stamp it?

A    Correct.

Q    They've got to say I agree with this?

A    Correct.

Q    And if they don't agree with it, it ain't going to happen?

A    Right.

MR. SMITH:  I'd like to look at Defendant's Exhibit 249, which is marked for identification.

Q    (By Mr. Smith) Can you tell us what that document is, sir?

A    It's an adult substance abuse survey analysis.

Q    And is this identical to the record contained within yours?

A    Yes, sir.

MR. SMITH:  Move for the introduction, Your Honor.

THE COURT:  Any objection?

MR. SPERLING:  None, Your Honor.

MR. SMITH:  Ask that it be displayed, Your Honor.

THE COURT:  You may.  It will be admitted without objection.

4841

Q     (By Mr. Smith) Sir, this is one of those forms that is also based on inmate reporting; is that true?

A     Correct.

Q     And in there you have a list of the history that Mr. Barrett has indicated that he may have been familiar with or drugs that he has done; is that correct?

A     Correct.

Q     Okay.  And he hadn't indicated all of them, but he's indicated quite a few, right?

A     Yes, sir.

Q     Now, on that form it has under -- when it says lifetime, is that the amount of times that an individual may have used that substance or do you know?

A     Where are you at on it?

Q     Right here.

A     I'm not real sure what the lifetime is on that -- (Interrupted)

Q     Okay.

A     Being that his age is -- well, his age is 34 he says when he quit using it, so it wouldn't be 50.

Q     Right.  That's what I -- (Interrupted)

A     I mean, I'm not real sure.  That's the number that LARC -- that's the way they -- it's a somehow scale they put in there.

Q     Okay.  So you don't know what that means?

4842

A    Right.

Q    Now, how about the comments right next to it, last six months?

A    He says he never used in the last six months.

Q    Okay.

A    He hasn't used in the last six months when this was done.

Q    So that would indicate to you while Mr. Barrett was in incarceration whether it be the county jail, LARC or -- or where was he when this was done, do you know?

A    LARC.

Q    Okay.  So at the time that he was in confinement prior to going to LARC and while at LARC he hadn't used any drugs or alcohol?

A    According to him.

Q    Okay.  And there's no -- nothing else that you have contained within his jacket that indicates that to be in error?

A    No.

Q    Before or since then?

A    No.

Q    And this ASAS as we sometimes refer to it, or this Adult Substance Abuse Survey, what is the purpose of it?

A    To see what kind of substance abuse treatment they need.

4843

Q    And is there a recommendation on here -- do you know how to interpret these things?

A    They -- it's moderate.

Q    And what does that mean, sir?

A    It's low.

Q    So -- (Interrupted)

A    It's between low and high.  It would be moderate, in between low and high.

Q    Okay.  And an individual that comes within that classification based on this ASAS survey, does that indicate whether or not they would be amenable to treatment?

A    Yes.

Q    And for an individual that's in that moderate category what would you expect to find?

A    He would have a substance abuse treatment program.

Q    And that he would typically respond to that how?

A    He would have to go to classes and things like that.

Q    And what would be the benefit that he would get out of it?

A    Hopefully he won't use drugs again.

Q    So somebody that's in a moderate category, you would expect them to benefit and actually be able to improve themselves?

A    Correct.

4844

MR. SMITH: One minute, Your Honor?

THE COURT: You may.

MR. SMITH: Just one more thing that relates to that document, Your Honor.

Q   (By Mr. Smith) Sir, this does have a column where it indicates age of last use for these substances; is that true?

A   Yes.

Q   Okay.  And I want to go through those just very briefly.  Because on this form it indicates Mr. Barrett was what age whenever he was in LARC?

A   I think it was 41 or 42.

Q   Yeah.  This form has -- that second line at the very top.

A   Right, 42.

Q   Okay.  So on that form, at 42 -- if you take -- what is the oldest age self-reported use of drugs by Mr. Barrett on this ASAS form?

A   Thirty eight.

Q   And what drugs were indicated then?

A   Marijuana, meth, heroin, other obituates, tranquilizers -- sir?

Q   And that's it, right?

A   Yeah.

Q   I mean, there's no other indication of drug use four

4845

years prior to Mr. Barrett hitting LARC?

A    Right.

Q    Which would have put him about the time of this offense, or do you know that?

A    I don't know that.

Q    And again, there's nothing in there that indicates to the contrary as it relates to this previous self-reported conduct?

A    Correct.

Q    All right, sir.  And I guess another way to do it, too, sir, would be if you look at his date of birth, the very top line?

A    Yes.

Q    1961, right?

A    Correct.

Q    And if we add the latest year of 38 years of age when his last use of substances -- and if we add that to 1961 what year are we going to come up to?

A    Should be '99.

Q    1999, correct?

A    Correct.

        MR. SMITH:  Thank you, sir.  And I pass the witness, Your Honor.

        THE COURT:  You may cross examine.

4846

<center>CROSS EXAMINATION</center>

BY MR. SPERLING:

Q    Starting at the last document, sir, it was Defendant's Exhibit Number 249.  First at the top it indicates the Defendant's date of birth to be 6-29-61, does it not?

A    Correct, sir.

Q    And it indicates him, sir, to be 42 years old at the time of this survey?

A    Correct.

Q    Counsel asked you about substance abuse and said that you would expect that there would be -- that he would be amenable to substance abuse treatment.  Do you have any idea what the success ratio is for substance abuse treatment at the Department of Corrections?

A    No, sir, I don't.

Q    It's not very good, is it?

A    No.

Q    Especially for people who have -- are poly-drug users, people who have used a variety of drugs over the adult life, as this Defendant acknowledged, the likelihood of success in drug treatment is really, really small, isn't it?

A    Yes.

        MR. SMITH:  Your Honor, I'm going to object.

He said he didn't know in the first sentence and now Mr. Sperling is trying to lead him into an answer.

THE COURT:  What's the objection?

MR. SMITH:  That he doesn't know.  His first answer to the question was do you know what the success ratio is within DOC of individuals participating in drug treatment.  He said no.

THE COURT:  And then the next question was?

MR. SMITH:  About individuals and trying to get into various types of drugs, what the success rate would be for that particular drug and he really doesn't know. He doesn't know what the success rate is of anybody within treatment of DOC.

THE COURT:  Response -- argument?

MR. SPERLING:  Judge, this is cross examination.  I asked a question and I followed it up and the witness in a follow-up answer gave a more definitive answer to the follow-up question which is really standard on cross examination.  There's nothing inappropriate about the inquiry.

THE COURT:  The next question is -- I recall was a leading question.  You said it's not very good and he said that's right, it's not.  You may proceed.

MR. SPERLING:  Thank you, Your Honor.

Q   (By Mr. Sperling) By the way, as you indicated in

4848

your direct examination, information that appears on Defendant's Exhibit Number 249 is based on what the Defendant said?

A    Correct.

Q    There's no independent verification of that that appears of record, is there, sir?

A    No.

Q    And so, if the Defendant were telling the truth or if the Defendant were lying you would have no reason to know other than to resort to this record?

A    I wouldn't know.

Q    Okay.  And if we could move backward for just a moment to Defendant's Exhibit Number 248.  The focus, I believe, of the questions concerning this document related to review authority on the second page.  That is signed, is it not, sir?

A    I don't know which one you're on -- I have -- (Interrupted)

Q    Okay.  Do you have -- (Interrupted)

A    I don't have them listed on what document's what in here.

Q    You don't have -- all right.  That's the first page.

A    Okay.  That's the one from LARC.

Q    Okay.  And now the second page, do you see that under review authority?

4849

A    Yes.

Q    By the way, with regard to this review authority, that's not a matter of statutory law, is it?

A    What do you mean?

Q    There is no law that says that the review authority will be as it is indicated here, correct?  It's a matter of policy or practice.

A    Right.  Correct.

Q    Okay.  So this is a matter of a determination that was made administratively by the Department of Corrections, correct?

A    Correct.

Q    And if the Department of Corrections or the appropriate official decided tomorrow to revoke this authority, it could be revoked, couldn't it?

A    Correct.

Q    By the way, that's way above our pay grades too, isn't it?

A    Sure is.

Q    All right, sir.  Defendant's Exhibit -- well, I'm going to go in the order that counsel asked you questions if I can.  First, with regard to -- with regard to Defendant's Exhibit Number 240.  Do you see that document there, sir?

A    Yes, sir.

4850

Q    And that's a standard victim notification form, is it not?

A    Yes, sir, it is.

Q    And that's a form that indicates that if the Defendant is released or transferred or escapes, notification is supposed to be given to the victim, that is, to Kelli Eales and her family, correct?

A    Correct.

Q    Okay.  Now, this document doesn't assure the victim of any rights other than it's a notification, correct?

A    Correct.

Q    So it doesn't give the victim an opportunity to move or funding for a move?

A    No.

Q    It doesn't give the Defendant any -- or the victim or the victim's family any opportunity for protection; it doesn't accord them that right?

A    I really don't know what the victims' services do for them.  All I know is we handle, through the victim services and they notify the victims.

Q    All right.

A    So what services they provide, I couldn't tell you.

Q    This is merely a matter of notification, isn't it?

A    Correct.

Q    It provides no protective services, does it, sir?

4851

A    No.

Q    Defendant's Exhibit Number 241.  By the way, are you able to determine by reviewing this record how long the Defendant was at DOC in McAlester -- at OSP?

A    I can tell you exactly how long he was there.

Q    Could you, please?

A    He came into OSP on 5-11 of '04.  He went out witness on 10-22 of '04.

Q    He was there for five months?

A    Correct.

Q    Not a lot of time to accumulate all of these things. That's really not a very significant period of time insofar as OSP prisoners are concerned, is it?

A    Correct.  It's not very long.

Q    All right.  By the way, in DOC custody, 20 years doesn't mean 20 years, does it?

A    No, sir.

Q    Twenty years could mean lots less than that, correct?

A    Less than ten.

Q    And in fact, you have testified about the various rate at which the Defendant was accumulating credits at OSP, McAlester, correct?

A    Correct.

Q    That rate could be very significantly accelerated,

4852

couldn't it?

A   Yes, sir.  If he got a job, he'd be on level four, earning 44 days a month, plus the day he does.

Q   Okay.

A   And not for -- less than half.

Q   All right.  It's possible that the Defendant's custodial status could change, isn't it?

A   Correct.

Q   And if the Defendant's custodial status changes, if his employment circumstances changed, if he, for example, donates blood and does other things that prisoners may do to accumulate credits, he could accumulate many more credits than that, couldn't he?

A   Correct.

Q   In fact, you know, we could talk about the range of possibilities, but the long and the short of it is that the Defendant is eligible -- he's eligible for parole -- listen to my wording very carefully.  He is eligible for parole consideration today, isn't he?

A   Not today, he's not.

Q   But he could be brought up for parole consideration today, couldn't he?

A   That I don't know.  I just know his parole date -- his first parole date.

Q   Okay.  You know his preferred parole date, correct?

4853

A   Yeah, correct.

Q   Isn't it a fact, sir, that the day that someone hits the Lexington Acceptance and Reception Center, they are at least technically eligible for parole the date that they arrive?

A   I don't know that.

Q   Okay.  The Defendant's parole date could be accelerated substantially from whatever appears in the administrative record today, couldn't it?

MR. SMITH:  Your Honor, I'm going to object -- (Interrupted)

A   I can't -- I don't know --

MR. SMITH:  -- he's indicated he doesn't know the answers to these questions.

THE COURT:  I think that's what he's -- I think he's -- questions have been propounded and I think the witness has answered them to the best of his ability.  He does not know.

Q   (By Mr. Sperling) I wonder today, Mr. Wilson, but it may be I'm not being a bit unfair by asking you a lot of questions that really don't have to do with what a case manager is responsible to do.  And if I should do that, would you let me know that, because I understand as a case manager you are responsible to manage a case, correct?

4854

A    Correct.

Q    And so you are responsible, essentially, to supervise inmates?

A    Correct.

Q    You are the person closest to the inmate to be supervised in terms of official staff; would that be fair?

A    Correct.

Q    You don't perform guard service and so you don't perform guard or food service?

A    Actually, I do.

Q    Do you really?  Okay.  Do you perform food service as well?

A    I've fed a lot of inmates, being a case manager.

Q    Okay.  Thank you, sir.  I appreciate that.  In fact, your job -- I take it from your answer that you're not one of those guys who believes that his job description defines the absolute maximum that he will do?

A    Anything they ask me to do, I do -- or tell me to do.

Q    Thank you, sir.  You didn't recognize the Defendant today, did you?

A    No, sir, I don't know him.

Q    In fact, the defense attorney, I believe, pointed him out to you?

4855

A    Correct.

Q    So you have not had interaction with this Defendant of a significant degree, have you?

A    I haven't had any.

Q    So what you are testifying about today is based on the administrative record; would that be fair to say?

A    Correct.

Q    And he could be a terrible inmate, he could be a model inmate, but you are only testifying concerning the administrative record itself; fair enough?

A    Correct.

Q    All right, sir.  Defendant's Exhibit Number 242, let's look at that quickly.  This document indicates the current crime of the Defendant and it indicates that it's manslaughter in the first degree, correct?

A    Correct.

Q    So far as this document is concerned, are you aware of what he was originally charged with?

A    Yes, sir.

Q    All right.  Are you aware of what he stands convicted of in this court?

A    Yes, sir.

Q    All right.  Are you aware that he was also convicted in state court of assault and battery with a dangerous weapon?

4856

A   Correct.

Q   All right.  The prior criminal history, that would only reflect, would it not, serious felony convictions?

A   Prior criminal history would -- should -- let me see here.  Let me read and make sure.  It comes off of his OSBI report if he was convicted of a felony.

Q   All right.  So if this Defendant had a significant history of domestic violence in some seven differently numbered official court cases, you wouldn't be aware of that, would you, sir?

A   If it's not on the rap sheet I would not.

Q   All right, sir.

MR. SPERLING:  Defendant's Exhibit Number 241, please.

Q   (By Mr. Sperling) This is a processing and time calculation audit form, and I'm not going to try to -- I'm going to try not to belabor the record.  But long and short of it, the Defendant got credit for all of the jail time that he served before he was transferred to LARC, the Lexington Reception Center, as well as then on for about five months to OSP in McAlester?

A   Correct.

Q   And is that day for day coverage?  Is that day for day?

A   The jail time is.

Q    And you know when you are in jail awaiting trial, you don't get credit for the additional assessments -- (Interrupted)

A    Correct.

Q    Do you?

A    Correct.

Q    Thank you, sir.

MR. SPERLING:   Defendant's Exhibit Number 243, please.

Q    (By Mr. Sperling)   This is a provision that includes among other things the notation that inmate was convicted of manslaughter, first degree in a highly publicized death of an Oklahoma Highway Patrol trooper in Sequoyah County, Case Number 99 -- I believe that's dash 483.  And that is signed by both the requestor and the approving authority, yes?

A    Correct.

Q    And the persons who serve in those capacities both as a requestor and the approving authority are persons who come and go in Department of Corrections, don't they?

A    Yes, sir.

Q    And as they come and go, this authority could be followed or it could be revoked?

A    Correct.

MR. SPERLING:   Defendant's Exhibit Number 244,

please.

Q    (By Mr. Sperling)   There is information here that appears -- and I believe it indicates at the top, Mr. Wilson, that this is from LARC, correct?

A    Correct.

Q    And this is dated 4-26-04?

A    Correct.

Q    Would it be fair to say that this is information gleaned exclusively from the Defendant?

A    All except for his -- the crime on there that's listed.

Q    Other than item number one -- well, and item number two, which it indicates -- (Interrupted)

A    Correct.

Q    -- separatee status?

A    Correct.

Q    The rest of this is based exclusively on the information provided by the Defendant, correct?

A    Correct.

Q    And if he had ever assaulted another inmate or been assaulted by an inmate or been involved in a fight, unless he admitted it, you wouldn't know that, would you?

A    Well, that we would, because he would be an inmate at that time, as far as incarceration.

Q    All right.

4859

A     That part we would know about a fight.

Q     All right.  But if it were to have happened at a jail, you wouldn't know from this document, would you?

A     Not unless the jail reported it to us.

Q     All right.  And if there had been some pressure for commissary or sexual favors or some sexual impropriety, you wouldn't know about it, except for what appears on this document, would you?

A     Correct.

Q     Okay.  If I asked you the same questions with regard to the other acts here, is the long and the short of it that this is based on what the Defendant told the official at LARC?

A     Correct.

Q     Thank you, sir.

         MR. SPERLING:  Defendant's Exhibit Number 245.

Q     (By Mr. Sperling)  This is another document with regard to the Defendant's custodial and separatee status. Again, if the requestor or the approving authority were to change or to resign, transfer, go to another position, could a subsequent person as requestor or approving authority amend, alter or in any way change the directive of this document?

A     Yes, sir.

         MR. SPERLING:  Defendant's Exhibit Number 246.

4860

Q   (By Mr. Sperling)  And what I'd like to do here, sir, I'd like to turn to the second page of this document.  In sub-paragraph five there is an indication here, and I've highlighted in yellow, it says minimum 7300 days.  Can you tell the jury what that relates to?

A   If they've got less than -- they have to have at least -- less than 7300 days to go to minimum.

Q   To go to minimum?

A   Yes.

Q   Okay.  At that point, may your custodial status within the Oklahoma prison system, even if you are convicted of murder in the first degree be at a minimum security facility?

A   Medium?  Yes.

Q   Could your custodial status be at a minimum security facility?

A   It depends on whether he's doing life without parole or life sentence.  They can't go to a minimum with a life sentence.

Q   Okay.  If the sentence is something other than life without parole at state level, could a convicted murderer be doing his time at Taft, near Muskogee, in a minimum security prison?

A   Yes.

Q   In fact, there are convicted murders who are serving

4861

time at a minimum security prison, aren't there?

A    Yes.

Q    And at that minimum security prison, there are no fences to speak of, are there?

A    None.

Q    In fact, the ability to walk away is dependent on the Defendant's will or motive or interest in walking away, isn't it?

A    Correct.

Q    No guard towers?

A    None.

Q    No electrical fences?

A    No.

Q    No ankle bracelets around prisoners legs?

A    No, sir.

Q    Nothing that would indicate when a prisoner has strayed?

A    No.

Q    All right, sir.

        MR. SPERLING:  Government's Exhibit Number 247.

Q    (By Mr. Sperling)  I noted that during the discussion on direct examination under, I believe, it's subsection two where it says assault and battery with a dangerous weapon, then it has this portion per media and newspaper account.  Can you tell us what that means, sir?

4862

A     The case manager that wrote this is Sherry Allen. Now, I don't know what -- where she got the intake on this part of it.  What we usually put in this area is a D.A. narrative and an inmate's version.

Q     Okay.  So you don't -- I'm sorry.

A     I don't know where she got this information at.

Q     Okay.  This could have been, as it says there, according to media and a newspaper account, couldn't it?

A     Yes.

Q     All right.  And if this were inaccurate in that it represents that first it was a drug raid, if this were a search warrant, that is a court ordered search warrant, that does not appear in that wording -- doesn't appear here, does it, sir?

A     No.

Q     And if this court ordered search warrant had been attempted at the home of the Defendant in both marked and unmarked cars, that's not reflected here, is it?

A     No.

Q     And it certainly doesn't reflect here that certain of the vehicles were lit up with emergency lighting, does it?

A     It doesn't say.

Q     It also indicates that Barrett and his son were in the house at the time.  If the evidence is to the

4863

contrary, you would have no way of knowing other than to read this record, correct?

A    Correct.

Q    And if this says gunfire exchanged, if there is no evidence that indicates that gunfire was exchanged, that is, there was gunfire simultaneously from law enforcement officers and the Defendant, you would have no way of knowing that, would you sir?

A    No.

THE COURT:  Mr. Sperling, let's take a recess. Members of the jury, remember my admonition not to discuss it among yourselves or allow anyone to discuss it with you during the recess.  Everyone will please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Anything to take up outside the hearing of the jury for the Government?

MR. SPERLING:  No, Your Honor.

THE COURT:  Defense?

MR. SMITH:  No, Your Honor.

(Whereupon, a short recess was held after which the following record was made in the presence of the jury.)

THE COURT:  You may continue your examination. I would announce I'm frustrated about the air conditioning also.  I don't know whether we can blame that on the IT people or not.  The person that controls it is supposed to be here in the building checking it and I told him if he could not get it cooler, he could come sit in the courtroom with us until we finish the day.  So with that, you may continue.

MR. SPERLING:  Thank you, Your Honor.

Q    (By Mr. Sperling) Does the official record, that is, the file from which the defense has extracted certain documents that appear in the record today as Defendant's Exhibits, does it also include a book in sheet from Sequoyah County?

A    Yes, sir, it does.

Q    And does that book in sheet reflect charges that were brought against the Defendant in Sequoyah County, Oklahoma?

A    It's got three of them, I think.

Q    All right.  And what are those three charges?

A    Murder first degree, shooting with intent to kill, incitement of a -- to riot.

Q    Okay.  And on that third one, it indicates that it is a felony, does it not?

A    Correct.

4865

Q    It does not, though, indicate a disposition -- (Interrupted)

A    Correct.

Q    -- does it, sir?  All right.  And also does your official record include a chronological report with regard to the Defendant's circumstances at the Lexington Acceptance and Reception Center?

A    Which page are you at?

Q    Is there an entry on the chronological report dated 8-23-04?

A    That would be OSP.

Q    Okay.  That would be OSP?

A    Yes, sir.  He got to OSP in 5-13 of '04.

Q    All right.  And I know the record should be clear on this, but OSP, we're talking now McAlester?

A    Correct.

Q    And Lexington is where prisoners are first taken from a county jail?

A    Where they're assessed at.

Q    For assessment -- (Interrupted)

A    Correct.

Q    -- before they are sent to a penitentiary or a prison?

A    Correct.

Q    Thank you, sir.  Would you please read that entry on

4866

8-23-04, sir?

A    Gave inmate a TV and talked about visiting forms for his mother and father.  His mother called visiting control and stated she did not want to visit, just the father.  Both are at the major's office waiting for background checks -- that meant the visiting forms.  No other issues at this time.

Q    Thank you, sir.  Are you aware that the Defendant has a significant history of secret and illegal behavior?

A    No, sir.

Q    Do prisoners do things that go undetected in your experience?

A    A bunch.

Q    All right.  I mean, I guess that's kind of like asking a negative.  How do I know what is undetected unless, you know, I know about it?

A    Well, eventually we find out a lot of things that have been going on for awhile.

Q    All right, sir.  Do prisoners do things that are unreported?

A    It's hard to say on that issue.  Of course, we do get reports, sometimes, from what we would call a snitch.  They told us something happened and after we investigating it, it did happen.  So, yes, it does go on.

Q    By the way, how is a snitch viewed in prison?

4867

A    Just like any other inmate.  As far as inmate-wise or staff-wise?

Q    As far as staff-wise.

A    Just like any other inmate.

Q    How are snitches typically viewed by other prisoners?

A    They want to kill them.

Q    Do prisoners often do things that are unpunished?

A    Oh, yeah.

Q    Can you assure anyone that despite best efforts, contraband does not make it into even the most secure facilities?

A    We find drugs all the time.

Q    And I'm not meaning to demean anyone, sir, but can you assure us that despite your best efforts, that prison staffers will always be above reproach?

A    I can't assure you of that, no.

Q    All right, sir.  Can you assure us, sir, that prisoners will not creatively evade even the best surveillance?

A    Can't insure that.

Q    How serious must misconduct be by a prisoner to warrant discipline?

A    Depends on the staff member that catches them doing it.  I've seen them let them off for a lot of things that

myself would have wrote them up for.  But every staff member, I guess of his on conscious, whether or not he writes them up.

Q    Fair to say that case managers have a significant amount of discretion with regard to interaction with and handling inmates?

A    Everybody does as far as that goes.  Every staff member does.

Q    If a prisoner were, for example, to throw a solid food object at a guard and hit that guard in the groin area, how would you regard such behavior?

A    He'd get a misconduct for battery on staff with injury, because more than likely that would injure somebody.

Q    What impact would that have on his evaluation or the rating that you have talked about during your direct and -- (Interrupted)

A    Well, if an inmate gets an oh four eight, which is battery on staff with injury, he can't go above level two for the rest of his incarceration.  He gets four security points on his custody assessment scale.  So there's several point factors that we'd consider for that.

Q    You would treat certain behavior as that -- (Interrupted)

A    Correct.

Q    Throwing solid food object at a guard --
(Interrupted)

A    Correct.

Q    As serious?

A    Correct.

Q    All right, sir.  The scale that you have talked about that rates prisoners, is this scale something that is cast in stone that must be followed or is it a guide?

A    Oh, it's just a guide.  We have inmates with zero points in maximum security because of their behavior.

Q    Is it plausible, sir, that a prisoner could bide his time to await the opportunity to harm others?

A    It happens all the time.

Q    Would it be plausible, sir, that a prisoner could endeavor to put his best foot forward for a period of time while remaining eligible for parole?

A    Yes, sir.

Q    If a prisoner behaves well for a period of time, may his temporary good behavior be taken into consideration with regard to his custodial status?

A    It has a lot to do with it.

Q    And if he were to harbor some thought in the recesses of his mind -- last time I checked you are unable to read the minds of prisoners, fair enough?

A    I wish I could.

4870

Q    Thank you, sir.  Would you personally consider a lengthy history of domestic abuse as instructive as to an assessment of a prisoner's risk?

A    The only assessment I can give him is what assessment that he -- that happens in the system, unless it's documented in the rap sheet, such as prior felony convictions.  Other than that, I couldn't -- I wouldn't -- I couldn't even consider it because it's not there.

Q    All right.  Absent an official record, sir, do you have anything to assess in doing what you do as a case manager prior to a prisoner's arrival at your institution?

A    Just his OSBI report, report from county jails, things like that.

        MR. SPERLING:  Thank you, sir.  May I have a moment, Your Honor?

        THE COURT:  You may.

        MR. SPERLING:  Thank you, Your Honor.  Nothing further.

        THE COURT:  Redirect?

        MR. SMITH:  Briefly, Your Honor.

                REDIRECT EXAMINATION

BY MR. SMITH:

Q    Sir, I want to ask you about the parole information.

A    Okay.

4871

Q   Based on your experience and the notifications that have been placed in this file on Mr. Barrett since the time that he was at Lexington and continuing, he's not going to make parole, is he?

A   I couldn't answer that truthfully.

Q   Now, if a fellow does make parole, an inmate on a charge such as -- let's talk about Mr. Barrett -- then he's going to roll right over into that Count Two, that ten year sentence; is that correct?

A   Correct.

Q   So whenever and if ever he does make it, then he's going to start serving the balance of ten years?

A   Correct.

Q   And he has no time that's counted off against that ten-year sentence?

A   No.

Q   Now, there was some comment made a little bit ago about Mr. Barrett was only at OSP for five months?

A   Correct.

Q   And then he was moved?

A   Correct.

Q   Do you know why he was moved?

A   I guess for this trial.  I don't know.  I just know he went out witness is all it says.

Q   Wasn't at his request?

4872

A    I couldn't tell you.

Q    Okay.  I want to show you briefly Defendant's Exhibit 243.  This is the administrative special management notice and we're talking about people shift in and out of jobs and what have you and this status could change depending on who is in a particular job at the time.  Do you remember those series of questions?

A    Yes, sir.

Q    Okay.  Mike Mullins.  He is the warden at the Oklahoma State Penitentiary; is that correct?

A    Yes, sir.

Q    Bobby Boone is the assistant warden at the Oklahoma State Penitentiary, isn't he?

A    No.  He's deputy director at the regional office in McAlester.

Q    Okay.  At the Oklahoma State Prison?

A    No.  He's -- they got a office downtown.

Q    Okay.  How does he fit into this then?

A    He is over the warden.

Q    He's over the warden?

A    Yes, sir.

Q    And then briefly, sir, you were shown a document from the book in sheet of Sequoyah County Jail.  It wasn't put into evidence, but you were just asked about it because it was contained within your record.  And it

had something on there about an incitement to riot.  Do you remember that?

A    Yes, sir.

Q    Okay.  Now, you don't know anything about that, do you?

A    No, sir.

Q    And you don't know whether or not the court clerk from Sequoyah County was here and talked about all the felony cases that Mr. Barrett may have had?

A    No, sir.

Q    Because you weren't here for that portion of the testimony?

A    No, sir, I wasn't.

Q    So you don't know if this thing just came out of left field or what, do you?

A    I just know it's in the field file.

Q    But you know you don't have anything else in your file that relates to that?

A    No, sir.

Q    Okay.  And I guess that's an awful lot like -- and I want to show you Defendant's 247, the first page.  This has the language on it that per media and newspaper accounts that you were asked about earlier?

A    Yes, sir.

Q    About you don't know if there's errors in here about

4874

a raid and whether or not two people were in a house or not and I've got it displayed up here. This is a lot like that charged conduct, supposedly, from Sequoyah County, isn't it?

A    Yes, sir.

Q    I mean, it could be an error just like this is. You don't know, right?

A    Don't know.

MR. SMITH: Thank you for your time. Pass the witness, Judge.

RECROSS EXAMINATION

BY MR. SPERLING:

Q    To briefly follow-up, sir, you were asked about serving the 20 year sentence and then the 10 year sentence. After the Defendant serves the first sentence, would the second 10 year sentence be subject to the same credits as the 20 year sentence, prospective credits?

A    That automatically -- let's say he discharged tomorrow and he was getting level two, it'd automatically carry over into one. He'd be getting a level two on that one, also.

Q    All right. Would the fact that the Defendant would have satisfactorily discharged or served and become eligible for parole the sentence as to the first charge, would that put him in good standing to serve the second

4875

sentence at least as quickly as he served the first?

A   Oh, yeah.

Q   In fact probably faster, wouldn't it?

A   Probably.

Q   And given the fact that the second one does not involve homicide, but involves assault and battery with a dangerous -- not a deadly but a dangerous weapon, it could be served very quickly, couldn't it?

A   Well, his parole date would just be one-third of the sentence.  That'd be his first parole date would be one-third.

Q   Okay.  And as a matter of fact, is the Defendant's parole eligibility date for manslaughter in the first degree one-third of his sentence?

A   That's what's listed.

Q   You were also shown one of the documents that had, I believe, the warden's signature and the deputy -- (Interrupted)

A   Bob Boone.

Q   All right.  And by the way, there are persons in Department of Corrections authority who are over both of those men -- (Interrupted)

A   Yes, sir.

Q   -- are there not?  And they are?

A   Justin Jones just made director.  He's the big --

4876

the main boss.  And I don't know for sure how many the assistant -- his assistant and two or three under him.

Q    Okay.  And there is the director and two or three assistants to include the assistant in McAlester?

A    Correct.

Q    Thank you, sir.  Are you able to calculate whether the Defendant's parole eligibility date on that 20 year sentence is as early as next March, 2006?

A    I can tell you exactly when it is.  May of 2006.

Q    May, 2006.

A    Yes, sir.

MR. SPERLING:  Thank you, sir.  Nothing further, Your Honor.

MR. SMITH:  Briefly, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. SMITH:

Q    That is the first time that Mr. Barrett would come up for parole on the 20 year sentence; is that correct?

A    Yes, sir.

Q    Okay.  And do you know what percentage of inmates make parole the first time they come through?

A    No, sir, I don't.

Q    And how about those inmates that may have been administratively assigned from the top, from the warden, from this administrative director?

4877

A    I couldn't give you a number because I don't know.

Q    It's not likely though, is it?

A    I don't know.

MR. SMITH:  Okay.  Pass the witness.

MR. SPERLING:  Nothing further, Your Honor.

THE COURT:  May this witness be excused?

MR. SMITH:  Yes, sir.

MR. SPERLING:  Yes, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.  Call your next witness.

MR. HILFIGER:  Abby Stites.

MR. SMITH:  Abby Stites.  And may I approach the clerk, Your Honor?

THE COURT:  You may.  Ma'am, if you'd stand before the clerk and raise your right hand.

ABBY STITES,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    Your name, please.

A    Abby Stites.

Q    Is that how you go, by Abby or Abigail?

A    Yes, sir.

Q   Now, you're going to have to speak up into that microphone.  And I can tell you're a little bit nervous, aren't you -- or a lot nervous?

A   A lot.

Q   A lot nervous?

A   Yes.

Q   Ms. Stites, you were married at one time to Kenny Barrett, weren't you?

A   Yes.

Q   And do you know about when you got married?

A   In 1980, May the 10th.

Q   And how old were you when you got married?

A   Fifteen.

Q   How old was Kenny?

A   Eighteen.

Q   And you were 15 but you got -- (Interrupted)

A   I turned 16 nine days after we got married.

Q   How many days?

A   Nine days.

Q   Nine days?

A   My birthday is May the 19th.

Q   Now, and how long were you married, approximately?

A   Fourteen years.

Q   Fourteen years.  And during that 14 years that wasn't -- I mean even -- the marriage was not a regular

4879

domestic marriage in the sense of you getting along the whole 14 years; isn't that true?

A    Yes.  But we had our ups and downs, just like everybody else.

Q    Okay.  And did you have some confrontations between yourself and Kenny during the marriage?

A    Yes, we had a few confrontations.

Q    And did they result in some physical violence?

A    (Inaudible)

Q    You're going to have to speak up now.

A    Maybe a few occasions.

Q    Okay.  Was it one-sided or did some -- were there sometimes when both of you sort of got into the physical violence?

A    Both.

Q    And I think -- you know, we've discussed this a little bit and you had a tendency also to be a little upset and he'd have a tendency, is that right?

        MR. LITTLEFIELD:  Objection, leading.

        THE COURT:  Sustained.

Q    (By Mr. Hilfiger) Did both of you commit violent acts on the other?

A    Yes.

Q    Now, as a result of some of these, did you -- were there occasions that you were led to file charges?

4880

MR. LITTLEFIELD:  Objection, Judge, leading.

THE COURT:  Overruled.  You may answer that.

A    Could you ask me that again, please?

Q    (By Mr. Hilfiger) Because of some of the violence between the two of you, were you led to file charges?

A    Yes, on one occasion that I remember.  I don't -- like I say, it's been a long time.  I don't remember a lot of things -- (Interrupted)

Q    Okay.  That's why -- (Interrupted)

A    That happened.

Q    Do you know anything about some of these charges -- the earliest charges you filed?

A    I really can't remember the exact dates or --

Q    About when would you -- during your marriage -- you got married in 1980.  Was there a stormy period in your marriage?

A    Yes.

Q    In the mid-80s?

A    Yes.

Q    Okay.  And did that stormy period give rise to some violence and some domestic abuse between you and Kenny?

A    I can't really remember.  I know there was a couple of times maybe I called the cops on him or something. But it was -- like I said, we fought a lot.  I got a very bad temper and they just --

4881

Q   Okay.   In any of these instances that you can recall, was there anything used other than hands, fists or anything like that?   Was there any -- (Interrupted)

A   No.

Q   -- weapons used?

A   No.

Q   You've talked to Mr. Littlefield, haven't you?

A   Yes.

Q   And did Mr. Littlefield talk to you about certain domestic abuse charges or -- (Interrupted)

A   Yes.

Q   Protective order charges?

A   Yes.   He talked about a lot of things I guess people had told him that wasn't true.   A lot of things weren't. And like I said, a lot of -- it's been 20 years.   I don't remember a lot of things that's happened in my life.   I mean --

Q   You got divorced about when?

A   It's been almost 11 years.

Q   Be '90 --

A   Five.

Q   '95?   And in that divorce -- have you looked at the decree of divorce?   You know, with the divorce itself, the final paper?

A   Yes.   We got a divorce on compatibility.

4882

Q   Okay.

A   We just couldn't get along.

Q   Let me show you, display to you, what's already been admitted as the decree of divorce.  And do you recognize that?  That's just the first page.

A   Yes.

Q   I want to turn to the second page, please, and would you -- at the particular time this divorce was granted, I know you'd had some rough times, but was it basically you agreed to the divorce?

A   Yes.

Q   Okay.  Kenny didn't show up for the divorce, did he?

A   No.

Q   He'd signed off on the paperwork?

A   Yes.

Q   And in fact, I see in the divorce decree you made arrangements for your son, Toby Barrett, to be under joint custody?

A   We had joint custody, yes, sir.

Q   And you felt -- did you feel okay on doing joint custody?

A   Yes.  Just --

Q   And the -- how did you arrive at determining joint custody?

A   It just seemed fair for both of us.

4883

Q   Now -- well, you had filed charges of domestic violence and different things, protective orders against Kenny, were you concerned about his violence?

A   At times, sometimes, maybe.

Q   Were you concerned about his violence against anybody else other than you?

A   No.  I'm the only one he basically probably ever hurt or, you know, would get mad at.

Q   So -- I mean, prior to your marriage to him, how long had you known him?

A   Before we married?

Q   Right.

A   Six months.

Q   And from that period of time up until the time of the divorce, had you known him to be violent to anybody else other than you?

A   No.

Q   Had you known him to talk tough?  You know, sort of say things to other people?

A   Oh, yeah.  He's always -- (Interrupted)

Q   You're going to have to speak up.  I'm not --

A   Yes.  I said yes, he's always kind of, should I say, running his mouth and blowing, but he never went through with it.  I mean, follow through with them usually.

Q   Sort of mouthy?

4884

A    Yes.

Q    And was he mouthy to other people?

A    Mostly me.

Q    And with all the mouthiness, did you -- was there any -- did he ever threaten anybody with a weapon?

A    Not that I ever seen.

Q    Did he -- do you know whether he ever committed physical violence on anybody else during that time period that you were with him?

A    Not that I ever seen.

Q    Now, Ms. Stites, you're here by subpoena, aren't you?

A    Yes.

Q    I mean, you really don't want to testify, isn't that right?

A    Right.

Q    And you're not -- what's your attitude toward Kenny at this time?

A    Well, I'm -- I've moved on with my life and I've forgiven him for everything and I just --

Q    And that -- basically that you've got a new life?

A    Yes.

Q    And you just want to live, isn't that right?

A    Yes.  I've put everything in -- behind me and I've moved on with my life and I just -- I don't even think

about it anymore.

Q   Were there -- during your marriage were there times that you guys were separated for periods of time and then got back together?

A   We were probably separated more than we were together.

Q   You were separated more than you were together?

A   Yes.  We'd split up and we'd go back together quite a bit.

Q   Let me show you what has been introduced as a -- Government's Number 337.  Do you recognize that as a protective order that was filed in 1995?

A   Yes.

Q   And you've completed that protective -- you complete -- this is your writing in here, isn't it?

A   Yes, sir.

Q   Okay.  And this is a matter we talked about going to the convenience store?

A   Uh huh.

Q   And what convenience store was that?

A   I believe it was Sparks store.

Q   Sparks?  And where is Sparks located?

A   Up on 59 Highway North.

Q   About in -- around Sallisaw?

A   Yes.

4886

Q    And this date that this was filed was in early 1995. Was there some significance to that time as far as your relationship with Kenny?

A    I'm not understanding the question.

Q    Well, how was your relationship going with Kenny about the time you filed this, as far as your marriage?

A    Very rocky.  I was seeing somebody else and we were having a lot of problems.

Q    And were you in the process of terminating the marriage?

A    Yes.

Q    And -- (Interrupted)

A    I had filed for divorce.

Q    What now?

A    I think I had filed for divorce.  I'm not sure if that was before or after.

Q    But it was around that time though?

A    Yes.

Q    Do you know -- did he say anything to you about why he was chasing you or why he was trying to come after you?

A    He just -- always trying to get me to come back to him.

Q    He wanted you to come back and stay in the marriage with him, isn't that right?

4887

A    Yes.

Q    Now, I see down here you said that he said he was going to blow my head off, is that right?  And he made that statement to you, or something to that effect, is that right?

A    Yes.

Q    And when that statement was made, did he have anything in his hands or to -- (Interrupted)

A    No, he was just mouthing me.

Q    He was just mouthing off to you, is that right?

A    Yeah.

Q    And you had had that happen before, is that right?

A    Oh, yeah.

Q    And then you got mouthy with him?

A    Probably.

Q    There was -- let me see.  Was there a time when you and Kenny sort of had your final confrontation together and then after that Kenny left?

A    When?

Q    Well, around this time or around the divorce time. Can you remember anything like that?

A    You mean he left me alone after -- (Interrupted)

Q    Yes.

A    Yes.

Q    Yes.  That's when -- yeah.  When he left, he just

4888

left you alone?

A    Yes.

Q    And about when did that occur?

A    I really couldn't say.  I mean not definite date.

Q    Was it before the divorce was actually granted or after the divorce was granted?

A    After the divorce was granted.

Q    And prior to that, prior to the divorce being granted in this -- you know, in this -- when you finally had this confrontation with him and told him to leave, had he always been sort of trying to get you to come back with him?

A    Oh, yes.

Q    And was that probably the biggest part of your domestic abuse problem, that he was wanting you to come back?

A    Uh huh.

        MR. HILFIGER:  May I have just a moment?

        THE COURT:  You may.

Q    (By Mr. Hilfiger) And do you recall filing any charges in the '80s?

A    I could have.  I can't remember, it's been so long. I mean --

Q    And other than generalities can you remember why any one of them -- I mean, you know, why any of them would be

4889

filed?

A    Well, every time I got mad, I would go -- you know, if he wouldn't leave me alone or call me and aggravate me, I'd just call and tell them, you know.  But other than that, I can't tell you when or what dates.  I mean, like I said, that's been a long time ago.

Q    If I showed you docket sheets of charges that have your name on them and Kenny's Barrett's name, would you be able to recall any of that?

A    Yes, I guess if you have them.

Q    Okay.  Well, let me look -- let me show you what's been marked as Government's Exhibit Number -- let me get the first one.  Government's Exhibit Number 336.  Now this is just a docket sheet.  Can you see it on there on that screen?

A    What is it?

Q    What?

A    What is it?

Q    It's a docket sheet.  Can you see it up here better or can you see it on your screen?

A    I can see it, but I mean I don't know what it pertains to.

Q    That's your name right there, right?

A    Yes.

Q    And that's Kenny's name.

A    Yes.

Q    And this is a DA-84-20.  Do you recall anything in particular about why that particular domestic abuse was filed?

A    Honestly, no, I can't recall.  I mean, I don't remember.  In '84?

Q    In 1984.  Okay.  Let me show you -- (Interrupted)

A    Does it say why?

Q    What?

A    Does it say why?

Q    No.  It doesn't why.  And that's why I'm asking if you can recall any particular reason why -- what prompted that to be filed.

A    Honestly, I don't know.

Q    Let me show you what's been marked as Government's Number 335.  And that one shows a date of -- DA-86-15.  And that's your name right there and Toby's name, right?

A    Uh huh.

Q    And Kenny Barrett's name.  And this is in February of 1986 when it was filed.  Can you recall anything in particularly why that was filed?

A    No, sir.

Q    And I show -- it shows down here that it was dismissed for failure to present.

A    Maybe when I filed for divorce or something.  I

4891

don't know.

Q    You can't recall the reason why it was filed?

A    No.  Because I had filed for divorce and then I didn't go through with it.  Maybe that's what it was.  I don't know.

Q    And was that one of the times when you were split and then came back together?

A    Yes.

Q    Let me show you Government's Number 334.  And again, this is a DA-86-130.  And it shows it was filed in November of 1986.  And that's your name Abby Barrett and that's Kenneth Barrett's name, right?

A    Yes.

Q    Can you recall any particular reason why that was filed?

A    No.

Q    Okay.

A    Actually, I don't remember even filing it.

Q    You don't even remember filing that?  How old would you have been in 1986?

A    Gosh, I can't even think.  I wasn't even 20 yet.

Q    Okay.  So you were young?  Let me show you what's been marked as Government's Exhibit Number 341.  And this is a misdemeanor that was filed by the State of Oklahoma against Kenny Barrett.  Do you recall making any

4892

complaint against Kenny Barrett in 1986?

A    No.

Q    Do you recall anything that shows down here on March 9th, 1986, that the court was advised that the Defendant was sent to Eastern State?  Do you recall any --

(Interrupted)

A    Yes.  When he was in Eastern State Hospital?

Q    Yes.

A    Yes, I had him put there.

Q    You had -- you requested that he go to Eastern State, is that right?

A    Yes.

Q    But other than that, do you recall anything about what this case was about?

A    I just felt like that he needed mental help.

        MR. LITTLEFIELD:  Objection as not responsive to the question.

        THE COURT:  Sustained.

Q    (By Mr. Hilfiger) Okay.  My question was do you remember any -- what prompted this case, the filing of the case?

A    We got into a big fight and I just felt like he was never going to leave me alone because he just couldn't accept me not come back and just -- I'd talked to Mike Fry and asked him if he would help me get Kenny put in a

hospital because I felt like he was -- he was -- had mental problems and he needed some help and which we were -- I had filed for divorce and legally I couldn't have him committed, so his mother had to help me.

Q   Okay.  And then after that -- after this case was filed in 1986, you and Kenny got back together?

A   Yes.

Q   When he got out of Eastern State, is that right?

A   Yes, because he -- he did pretty good when he got out -- they got him on some meditation and he did pretty good for awhile.  Then he quit taking it.

Q   And when -- after the divorce -- and you remarried after the divorce, is that right?

A   Yes, sir.

Q   And after the divorce, you all had joint custody between you and Kenny?

A   Yes.

Q   And did that work out okay?

A   Yes.

Q   Did you have any big problems or major problems or confrontations after the divorce and after that time that you told him to leave you alone?

A   No, not after that, not after the divorce was final. I never heard from him no more.

MR. HILFIGER:  I have no further questions.

4894

THE COURT:  You may cross examine.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q     In regards to the commitment order, you had to get Mr. Barrett's mother to assist you in getting him committed to Eastern State Hospital; isn't that correct?

A     Yes, sir, because I was in the process of -- I had filed for divorce so Mr. Fry told me that I didn't have legal rights to, because it -- I can't really remember what the deal was, but his mom would have to do it.

Q     Okay.  And his mother, in fact did it, didn't she?

A     Yes.

Q     Mr. Hilfiger asked about me visiting and I spoke to you on the telephone last week, didn't I?

A     Yes, sir.

Q     And in fact, you told me that you didn't want to talk to me, didn't you?

A     I didn't want no part of this at all.

Q     Well, okay.  My question is you told me you didn't want to talk to me, didn't you?

A     Exactly.

Q     And you don't want a part of this, do you?

A     No, sir.  I'm not for the death penalty, number one.

Q     Well, did I ask you that?

A     Huh?

4895

Q    I didn't ask you your death -- what your opinion on the death penalty, did I?

A    No.

Q    Okay.  My question is -- (Interrupted)

A    You said -- (Interrupted)

Q    My question is you didn't want to be involved in this, did you?

A    No.

Q    And part of that's because you're Toby's mother, isn't it?

A    Yes.

Q    And you really don't want to see Toby hurt any more than he has been out of this anyway, do you?

A    No.

Q    Okay.  And you -- because of that concern, a mother's concern for her son, you don't really want to be involved in this, do you?

A    Who would?

Q    I understand that.  Does that mean -- is the answer to my question yes?

A    Yes.

Q    Okay.  In regards to these incidents, you indicated that you were not aware of anyone else that Mr. Barrett had threatened?

A    Not that I remember.

4896

Q    Okay.   Do you recall where Wheeler Street is in Sallisaw?

A    No.

Q    Do you remember an -- do you know an individual by the name of Shannon Smith?

A    Yes.

Q    Do you recall on one occasion Mr. Barrett had you by the arm, grabbing you outside, that he slapped you, that Shannon Smith stopped and advised Mr. Barrett not to do that?

A    I don't remember.

Q    Okay.   Do you recall that Mr. Barrett told Mr. Smith that he was going to go inside and get a gun and blow him away if he was there when Mr. Barrett came outside and that you told Shannon Smith that he better leave?   Do you recall that incident?

A    I don't remember.

Q    Okay.   So, when you say that Mr. Barrett hadn't threatened anyone else, you did not recall that particular incident; is that correct?

A    I know on one particular day, he said that he beat me with a metal lead pipe -- (Interrupted)

Q    Now, that's not my question, ma'am -- (Interrupted)

A    But that wasn't true.

Q    My question is do -- you do not recall the incident

4897

with Mr. Smith?

A   No.

Q   Okay.  And you filed for protective orders, didn't you, ma'am?

A   Yes.

Q   And when Mr. Hilfiger showed you Government Exhibit Number 336, that's a court docket sheet, you don't know anything about court docket sheets, do you?

A   No.

Q   Okay.  But you do know that there was a case in 1984 of Abby Barrett versus Kenny Barrett in which you filed a domestic abuse petition; do you recall that?

A   I don't know what for.  I mean, I -- like I said, you must remember it's been a long time.

Q   I understand.

A   I don't remember a lot of things.  I've had a lot to deal with in the last few years.  I've lost my father. I've lost a sister and I've been under a lot of stress myself and I had to deal with a lot and I don't remember a lot of things.

Q   Okay.  And I'm not asking you to recite song and verse what was filed in a petition.  But you had enough cause in 1984 to go to the court clerk's office in Sequoyah County and file a domestic abuse petition, didn't you?

4898

A    Yes.

Q    And during that period of time there was physical abuse in your marriage, wasn't there?

A    We fought a lot, yes.  I will not deny it.

Q    I'm sorry, what?

A    I said yes, we did fight a lot.

Q    And the fighting was physical, wasn't it?

A    I'm just as guilty.

Q    Okay.  I'm sure that -- by the way, how many domestic abuse petitions did Mr. Barrett file against you?

A    None.  But I've never seen very many men that do.

Q    And in 1986, you filed two petitions.  Do you recall that?

A    No.

Q    Okay.  Well, let's look at Government Exhibit Number 335.

A    Is this the ones that he just showed me?  Or are these different?

Q    No, it's the same ones.  And I'm asking questions about them.  And do you see that this is Case Number DA-86-15?  I mean, you don't remember docket sheets; is that correct?

A    I told him I didn't remember.  And I'm not going to remember now.

Q     That's fine.  And I'm just asking you to answer my questions, if you would.  You would not dispute that on February the 3rd of 1986, if the docket sheet shows you filed a domestic abuse petition, that you did so?  You aren't going -- wouldn't dispute that, would you?

A     No.  If it says I did, I did.

Q     Okay.  And in fact, this is the one, if you remember Mr. Hilfiger asking, that this was dismissed for failure of either party to appear.  That was in February.  Let's look to Government Exhibit Number 334.  And again, this is Abby Barrett versus Kenneth Barrett, and this is 86-130.  And it shows a petition was filed in November of 1986.  You wouldn't dispute that you had to file a second petition in 1986, would you?

A     I do not remember.

Q     You wouldn't dispute the record that you had to file a second petition?

A     If it's on record, no.

Q     Okay.  And in fact, it didn't stop with filing petitions, did it?

A     No.

Q     There were criminal cases filed against Mr. Barrett for violating those protective orders, weren't there?

A     A criminal case?

Q     Misdemeanor case.

4900

A    I don't know what you're talking about.

Q    Did you call the police when he violated the domestic abuse orders?

A    I don't remember.

Q    Okay.  If the records reflect that Mr. Barrett, in fact, entered pleas of guilty in multiple cases for violation of the protective orders, you wouldn't dispute those records either, would you, ma'am?

A    Would you repeat that?

Q    If the records reflect -- if the records show that Mr. Barrett -- (Interrupted)

          MR. HILFIGER:  Your Honor, I question show the records so she can know what he's talking about.

          THE COURT:  You may respond to that inquiry.

          THE WITNESS:  Sir -- (Interrupted)

          THE COURT:  Wait.  Just -- ma'am, ma'am, wait.  There's no question.  You don't speak until there's a question.

          MR. LITTLEFIELD:  Judge, it was a question.  If records reflected -- the records are in evidence.  I can certainly show them.  I have no problem with that.

Q    (By Mr. Littlefield) Show you Government Exhibit Number 330 and if that reflects -- and there has been testimony that in 1987 Mr. Barrett appeared and entered a plea of guilty to violating a protective order, you

4901

wouldn't have any reason to dispute that, would you ma'am?

A    I don't even know what it's about or --

Q    Did you have to go back to -- you had to go back to court, didn't you?

A    I don't ever remember going back to court.

Q    You had to call police, didn't you, when he violated protective orders that you got?

A    I may have called them, yes, but I don't remember ever remember going to court.

Q    Okay.  But you would get protective orders and Mr. Barrett would violate them and you would have to call the police, wouldn't you?

A    I have a couple of times that I remember.

Q    Okay.

        MR. LITTLEFIELD:  May I approach, Your Honor?

        THE COURT:  Approach?

        MR. LITTLEFIELD:  Well, no, never mind.  Yeah. I need a couple of evidence stickers.

        THE COURT:  Approach the clerk?  You may approach the clerk.

Q    (By Mr. Littlefield)  You really don't want to testify against Kenny Barrett, do you, ma'am?

A    I really don't want to be here at all.

        MR. LITTLEFIELD:  This is not evidence, Your

4902

Honor.

A    You are expecting me to remember things that has happened so long ago and I just don't think it's fair that you're expecting me to remember all this stuff when there's so many things I have forgotten.

MR. LITTLEFIELD:  Ma'am, I didn't call you as a witness.

A    You subpoenaed me --

MR. LITTLEFIELD:  I would ask -- (Interrupted)

THE COURT:  Okay.  Listen.  Listen.  Listen. Mr. Littlefield, you ask a question.  Ma'am, you answer the question if you can.

THE WITNESS:  Yes, sir.

MR. LITTLEFIELD:  Your Honor, I would ask that -- and it's not in evidence and I -- display Government Exhibit Number 342.

Q    (By Mr. Littlefield) Ma'am, you had -- you called the police in 1995, didn't you, in regards to the destruction of your personal property?  Do you recall that?

A    In when?

Q    '95.

A    Yes.

Q    Okay.  And in fact, in 1995 you were in the process of divorcing Mr. Barrett, weren't you?

4903

A    Yes.

Q    And you were staying with someone.  You actually were living in a location other than Kenneth Barrett. You were separated at the time, weren't you?

A    I was living with my supervisor, Lynn Morris.

Q    Lynn Morris?

A    Uh huh.

Q    Okay.  And at the time you had a trailer -- you had -- you had your own place, separate and apart from Kenny Barrett, didn't you?

A    Yes.

Q    Okay.  But you weren't living in that trailer, were you?

A    No.

Q    You were living with Lynn Morris because you were afraid that Kenny Barrett would find you?

A    I didn't feel like fighting with him.

Q    So, to avoid fighting with him you were staying with Lynn Morris?

A    Yes.

Q    And Mr. Barrett knew where your trailer was, didn't he?

A    Yes, he lived there too.

Q    Okay.  And he called you and told you that you ought to go check your trailer because everything in it was

destroyed; do you recall that?

A   Yes.

Q   And you went over to your trailer, didn't you?

A   Yes.

Q   You had an aquarium, pretty good sized aquarium, full of exotic fish, didn't you?  You need to answer out loud.  He can't get a head nod.

A   Yes.

Q   What happened to that aquarium, ma'am?

A   It was busted.

Q   What happened to the fish?

A   They were dead.

Q   Was it full of water prior to it being busted?

A   Yes.

Q   And you had a bunch of new furniture, didn't you?

A   Yes.

Q   What happened to your new furniture?

A   It was tore up.

Q   You filed a -- is this police report what you filed as a consequence of that incident, ma'am?

A   Yes.  But they never did find who did it.

Q   Prior to that, Kenny Barrett called you and told you who had done it, didn't he?

A   I really -- I think so, yes.

Q   Okay.  Would you look at the exhibit -- it's on the

4905

screen just to your left.

A    Yes.

Q    Is that first page -- do you recognize that as being the first page of that report, ma'am?

A    Yes.

Q    And do you see you're signature on the bottom?

A    Yes, sir.

Q    Okay.  And if we look at the second page.  Do you see at the bottom the description?

A    I really can't read the writing.

Q    Does it indicate Mr. Barrett called you and told you that all your property at the trailer had been torn up?

A    Does it say that?

Q    You have trouble reading the writing -- that's not your writing?

A    I was going to say that doesn't look like my writing.

Q    Is that what you told the officers, that Mr. Barrett called you and told you if you return to the trailer that all your property -- you would see that all the property had been torn up?

A    I really don't remember what I said.

Q    My question -- (Interrupted)

A    And I'm being honest with you.

Q    I understand -- (Interrupted)

4906

A    I really don't remember.

Q    My question is did Mr. Barrett call you and tell you that you needed to return to your trailer, that all your property was torn up?

A    I really don't know.  I'm just going on what you're saying.  I don't -- I can't honestly say.  I don't know what I said.

Q    My question is:  Did Mr. Barrett called you and tell you that if you went to your trailer, you'd find that all your property was torn up?

A    Like I said, I really don't remember what I said.  If it says it on the report, yes, I did.  But I don't know what I said.

Q    My question is:  Did Mr. Barrett call you and tell you that you had nothing left at the trailer, that he had torn it all up?

A    Honestly, I do not remember.  I'm just going on what you're saying.  I mean, if you say I said it then -- or he did, I don't know.  But if it says so on the report, like I said I don't remember.  It has been so long.

Q    Did you have any dispute with anyone else at that time who would have destroyed your aquarium, killed your fish and turned up -- tore up -- torn up all of your furniture other than Kenny Barrett?

A    As far as I know I don't have no enemies.  I would

4907

like to think I don't.

Q    And when you were staying with Lynn Morris, the only person you were hiding from was Kenny Barrett, wasn't it?

A    I just tried to stay away from him because I didn't want to talk to him.

Q    Do you recall an incident in September '95 when you were at the IGA store in Vian when Mr. Barrett came in?

A    That wasn't in Vian.

Q    Okay.  Where was it?

A    Sallisaw.  He came in the store and wanted to talk to me and I told him I didn't want to talk to him.

Q    Okay.

A    And I asked him to leave and then the -- I don't even recall -- all I remember is somebody telling him -- I told him if he didn't leave I was calling the cops and he left.

Q    Do you recall that the store manager ended up having to call the cops?

A    She may have.  I don't know.  I remember somebody did.  I told him I was going to.  But I don't -- I remember the incident but I don't remember everything word for word.

Q    Okay.  And that was in September of '95.  About the time, just a little prior to you getting the divorce, isn't that right?

4908

A    Yes.

Q    Okay.  In your divorce decree there was joint custody of Toby?

A    Yes.

Q    And you agreed with that?

A    Yes.

Q    However, Toby stayed with you, didn't he?

A    No.  When we first got a divorce he stayed a month with his dad and then he came to stay with me.

Q    So he stayed one month with his father?

A    Yes.

Q    And then came and stayed with you and after that did he continue to stay with you?

A    Yes.

Q    And through September of 1999 he stayed with you virtually the entire time; isn't that true?

A    Of when?

Q    September of 1999, when the shooting happened.

A    When all this happened he wasn't staying -- he had been staying at his dad's.

Q    I understand that.  My question is from the time he came back and stayed with you after that first month with his father, up until just before the shooting incident occurred, during that entire time Toby stayed with you, didn't he?

4909

A   Yes.

Q   So while the decree says joint custody, in actuality custody was with Abby, wasn't it?

A   Well, he could -- he had his choice to stay with whoever he wanted.

Q   And he stayed with you, didn't he?

A   Yes.

Q   You and Lynn -- Lynn Morris was abused also, wasn't she?

A   Yes.  She had told me some things, that her and her husband fought a lot.

Q   And in fact, you and she visited, didn't you, about abusive relationships?

A   Yes.

Q   And you told Lynn Morris that Kenny Barrett had physically abused you throughout the marriage?

A   Well, we physically abused each other basically.

Q   How many protective orders did he file against you, ma'am?

A   None.  But that doesn't mean I didn't hit him and I'm not going to sit here and lie and say I didn't.

Q   I didn't ask you if you hit him.  He hit you, didn't he?

A   Yes.

Q   A bunch, didn't he?

4910

A    When we were fighting, yes.

Q    He hit you hard, didn't he?

A    Yes.

Q    And in fact, you had to get medical attention on occasion, didn't you?

A    No.

Q    Never got any -- did you have any bloody noses?

A    Well, yes, I take that back.  I had a fractured nose.

Q    Who is --

MR. LITTLEFIELD:  May I return to the desk just a second, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) Do you know Becky Peek?

A    Yes.

Q    It's Becky Stout now, right?

A    Yes.

Q    And do you know Donna Hines?

A    Yes.

Q    She's now Donna Owens?

A    Yes.

Q    And you visited with both of these ladies about the abuse that you were the recipient of from Mr. Barrett, didn't you?

A    On occasions.

4911

Q   Was there an incident in which you were left naked in the woods?

A   No.

Q   Was there an incident?

A   No.

Q   You answered before I even finished.

A   Because you was going to ask me again and I was just repeating it.

Q   Was there an incident involving your current husband's automobile at a car wash?

A   Yes.

Q   And you were taken from the car wash?

A   No.

Q   You left the car wash, didn't you?

A   Yes.

Q   Okay.  And were keys removed from the vehicle that you -- whose vehicle were you in when you went to the car wash?

A   My husband's that I'm married to now.

Q   Okay.  That's Mike Stites, right?

A   Yes.

Q   And you had his pickup?

A   Yes, I was washing it.

Q   And Mr. Barrett came down there, didn't he?

A   Yes.

4912

Q    And you left the car wash, didn't you?

A    Yes.

Q    With whom?

A    Roger Pentz.

Q    Who's Roger Pentz?

A    He's a guy from Sallisaw.  He give me a ride to Mike's house where I got in my truck because I thought he had taken the keys and I went to his house.

Q    Okay.  You thought who -- (Interrupted)

A    To get them back from him.

Q    You thought who had taken the keys?

A    Kenny.

Q    Keys were missing out of the truck?

A    Yes.

Q    And you went to Kenny's house to get the keys?

A    Because I thought he took them and I wanted to get them back.

Q    Okay.  What happened when you got to Kenny's house?

A    We got into a fight.

Q    Did you go anywhere from there?

A    Yes.

Q    Where to?

A    He got me in the truck with him and we went to Webber Falls and that's where we got into it again and I got out of the truck and called the police on him.

4913

Q   Why was he taking you to Webbers Falls?

A   Cause he wanted to discuss us getting back together and I told him that we were not getting back together and he begged me to just get a motel and just talk to him and just try to discuss things and work things out and I told him no.

Q   Was it easy to get away from him in Webbers?

A   Yeah, because when he went in to get the room I left.

Q   Where did you go?

A   I went to somebody's door, knocked on the door and called the cops.

Q   Did you ever tell anyone that you were concerned you were going to be raped at that motel?

A   Not that I recall.

Q   You don't recall telling Donna Hines?

A   No.

Q   Lynn hid you out from Mr. Barrett, didn't he?

A   Do what, sir?

Q   Lynn hid you out from Mr. Barrett, didn't he -- didn't she?  I'm sorry.

A   He knew I was living there.

Q   My question is:  Lynn hid you out from Mr. Barrett, didn't she?

A   I answered your question.  I said he knew I was

4914

living there.  I wouldn't say that was hiding out.

Q    Wasn't successful?

A    I wouldn't think so, no.

Q    Did he ever call over and threaten people that you were staying with?

A    If so, Lynn never said so.

Q    Did you?

A    No.

Q    Are you afraid of him?

A    Am I afraid of him?

Q    Were you afraid of him?

A    No.

Q    That's why you went to the police?

A    Just my way of showing him I didn't have to put up with him.  I mean, just -- like I say, we were young and we fought from the time we got married until we got a divorce.

Q    By the way, how many times did he have to go to the doctor?

A    Me?

Q    Him.

A    Him?

Q    Uh huh.

A    I don't know.

Q    Ma'am, there were several domestic abuse petitions

4915

filed over the years, not keeping count but --

(Interrupted)

A     I really didn't realize.

Q     I'm sorry?

A     I said I hadn't realized there was until they showed them to me.

Q     And those weren't the only incidents in which you were abused, were they?

A     Well, yes.  I mean, those were probably the times that we got into it.  I mean, those were the times, probably, when we were fighting.

Q     So you're telling this jury that each and every time there was a fight and you got hit you filed one of those domestic abuse petitions?

A     Yes.

Q     And there weren't any other times that you were hit that you didn't?

A     Right.

Q     Okay.  When Shannon Smith observed you getting slapped in the front yard on the yard on Wheeler Street, did you file a domestic abuse petition then?

A     I don't even remember that.  I mean, and I know Shannon Smith.  That's my sister-in-law's stepbrother, or was.

Q     Does that mean that you didn't file a domestic abuse

-- (Interrupted)

A    And I think I would remember it because, like I say, I do know him, but I don't -- (Interrupted)

Q    Don't recall that incident?

A    No, sir.

Q    And you don't recall the domestic abuse petitions in '84 or '85 or the two in '86?

A    Like I said, I don't remember.  It's been a long time.  I mean, there's a lot of times passed.

Q    A lot of water under the bridge?

A    Exactly.  And I just -- (Interrupted)

Q    But you don't remember what's in the petitions?

A    No.  I don't remember -- (Interrupted)

Q    But you do remember that -- (Interrupted)

MR. HILFIGER:  Your Honor, she's trying to answer and he's trying to ask a second question.  I'd appreciate it if she could make her answer.

THE COURT:  Okay.  Well, let's -- (Interrupted)

MR. LITTLEFIELD:  Do you have anything else you want to add -- (Interrupted)

THE COURT:  Wait just a minute.  Wait just a minute.  Let's ask a direct question and, ma'am, wait for the question before you answer.

Q    (By Mr. Littlefield) You don't remember all the petitions?

4917

A    No, sir.

Q    Okay.  But you do remember that every time you got hit you filed one?

A    Well, it wasn't every time he hit me.  I just filed just to get away from him, just for him to leave me alone.

MR. LITTLEFIELD:  May I have just a second, Judge?

THE COURT:  You may.

Q    (By Mr. Littlefield) Did he ever hit you with any items, any objects?

A    No.

Q    No pipes or anything like that?

A    Not that I remember.  Usually slap me.

MR. LITTLEFIELD:  May I have just a second?  Pass the witness.

THE COURT:  Further direct.

MR. HILFIGER:  Yes.

REDIRECT EXAMINATION

BY MR. HILFIGER:

Q    Ms. Stites, I'm just going to ask you a couple more. In response to Mr. Littlefield, he asked you part of the reasons for not wanting to testify and you gave a couple of reasons.  You know, that you're Toby's mother and you got -- and your life's gone on?

4918

A    Yes.

Q    Is that right?  And did any of your reasons for not wanting to testify have anything to do with your fear of Kenny Barrett?

A    No.  No, sir.

Q    Nobody has talked to you or threatened you or said don't testify or we don't want you up there, do we -- have they?

A    No, no.

Q    In fact, I persuaded you to testify?

MR. LITTLEFIELD:  Objection as leading her, Judge.

THE COURT:  Overruled.

A    Yes.

Q    (By Mr. Hilfiger) And in a lot of your responses to what Mr. Littlefield refers to, you know, abuse and domestic abuse, you have responded we fought a lot, we -- the fighting was physical.  We fought.  And does that mean that you're a part of that?

A    Yes.

Q    I mean, you just weren't being beaten, were you?

A    No, I mean not without, you know, hitting back.

Q    You hit back?

A    Yes.

Q    You were the one that filed the domestic abuse

4919

stuff, though, when it was filed?

A   Yes.

Q   Another question -- Mr. Littlefield asked you until just before the September incident Toby had lived with you.  Can you define for us a little bit about what until just before means?  How long had Toby been living out there at Kenny Barrett's house?

A   Like I said, he lived with him for a month and then he came and lived with me -- (Interrupted)

Q   Okay.

A   Until prior to the incident that happened and then he was living with his dad then.

Q   Okay.  And that's what I'm trying to -- until prior to the incident.  I'm trying to find out how much prior to that incident had he been living out there.

A   From June until it happened.

Q   Okay.  So Toby Barrett was living out at the residence there in McKee since June of '99, is that right?

A   Yes.

Q   Do you know where he was living?

A   He was living, as far as I know, in a little trailer.

Q   In the trailer?

A   That's what he said.  I really don't -- I was never

4920

there.  I don't know.

Q    Okay.  You don't know.

MR. LITTLEFIELD:  Objection.  Her answer should be stricken.  It's hearsay.

THE COURT:  The answer is she doesn't know and every -- the rest of her answer should be stricken.

MR. HILFIGER:  I have no further questions.  Thank you.

MR. LITTLEFIELD:  No additional questions.

THE COURT:  May this witness be excused?

MR. HILFIGER:  Yes, she may.

THE COURT:  Ma'am, thank you for your testimony.  You may be excused.  Call your next witness.

MR. HILFIGER:  Clyde Edgmon.

THE COURT:  Sir, if you will please raise your right hand and stand before the clerk and be sworn.

CRAIG EDGMON,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    Well, you are Craig Edgmon, isn't that right?

A    Yes, sir.

Q    Okay.  We got the wrong one, but we'll start.  How do you spell your last name?

4921

A    E-d-g-m-o-n.

Q    Mr. Edgmon, where do you live?

A    McKee, Oklahoma.

Q    And, McKee, Oklahoma, is that -- is that an area that's in Sequoyah County?

A    Yes, sir.

Q    And is that an area that's around where the Barretts and the Dotsons live and everything?

A    Yes, sir.

Q    And how long have you lived in that area?

A    All my life.

Q    And do you have a business or occupation?

A    Well, I was a welder and pipe fitter and I hurt my back and I'm not doing nothing right now.

Q    You're on disability?

A    No, sir.

Q    You became disabled?

A    Well, I'm disabled but -- (Interrupted)

Q    But not on disability?

A    Yeah.

Q    Do you know Kenneth Barrett?

A    Yes, sir.

Q    And how long have you known him?

A    Several years.

Q    How far away does he live from where you live or how

4922

far away did he live prior -- (Interrupted)

A   Probably half a mile, three quarters of a mile.

Q   Okay.  And did you ever have contact with Mr. Barrett, business contacts with Mr. Barrett, to do work for you?

A   Yes, sir.  He's worked on my truck, car and stuff for me.

Q   And did he have a garage out there, you know where he did car work or car repair work?

A   I think he just done it out in the wide open.  I think he just done it out in the wide open.

Q   Okay.  And did you use him on a regular occasion to fix your car?

A   Well, when it would mess up, yes, sir.  I say when it would messed up -- (Interrupted)

Q   Okay.

A   You know, some way or something.

Q   And what -- how often was -- how often did you have contact with Kenny Barrett doing mechanic work?

A   Probably every three or four months.

Q   Did you have -- was it on more than one car or just one car?

A   Well, I had two cars.  Had a truck and a car.

Q   Did you have any farm equipment that you had Kenny work on?

4923

A    No.

Q    And you have a dad named Clyde Edgmon, is that right?

A    Yes, sir.

Q    Okay.  And does he live out there close to where you live?

A    Yes, sir.

Q    Now, on the work that was done, did you -- how did you make arrangements for him to do mechanic work for you?

A    Well, sometimes I would go to his house and see if he was working on something or anything, had time to work on it, you know.  And sometimes if it was messed up to where I couldn't drive it to his house, he might come to my house and get it and take it down there and work on it.

Q    When you would go to his house, did he have a -- I mean, was he working there at his house?

A    He had several cars there, yes, sir.

Q    Okay.  And did you see him doing mechanic work on other cars?

A    Well, a time or two, yes.

Q    What period of time was this that you'd -- that he worked, you know, on your cars?  Was it early '90s, late '90s, mid-'90s, what?

4924

A    Probably the late '90s.

Q    Okay.  And had you ever -- you had sort of this little business relationship with him, where he worked on your cars, is that right?

A    Yes, sir.

Q    Over and above that, did you have any kind of personal relationship with Kenny?

A    Well, we talked some.

Q    Had you ever known Kenny to do any violence to anybody?

A    Not that I know of.

Q    Have you ever known him to be in any fights?

A    No, sir.

Q    Had you ever known him to shoot anybody -- other than this 1999 incident, have you ever known him to shoot anybody or to shoot at anybody?

A    No, sir.

Q    Had you ever known any kind of threats that he has made to anybody?

A    No, sir.

Q    How often were you around him during the year?

A    Probably half a dozen times.

Q    And these times that he worked on your car, did stuff for you, did he -- what kind of quality was the work?

4925

A   It was good.

Q   Was that the reason you went back to him?

A   Yes, sir.  Well, a lot of times I didn't have the money to fix it and a lot of times he wouldn't never take no money for it.  So he was good on fixing my carburetor. That's what it was on my truck.

Q   So he just -- he did a lot for work for you without even charging you?

A   Yeah.

      MR. HILFIGER:  I have no further questions. Thank you.

      THE COURT:  Cross examination.

              CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q   You don't know Karen Lynnington, do you?  Or Karen Real?

A   Yes, sir.

Q   She a good -- she a good lady?

A   Do what?

Q   She honest person?

A   As far as I know.  I've never had no dealings with her.

Q   Okay.  How about Travis Crawford?  Do you know Travis?

A   Yes, sir.

4926

Q    Okay.  Travis a straight up guy?

A    I've never had no dealings with him.  He was raised out there.  I just, you know, I know him.

Q    You know Randy Turman?

A    Who?

Q    Randy Turman?

A    No, sir.

Q    Do you know Brandie Price?

A    No, sir.

Q    Essentially, all you can tell the jury is you took a vehicle by Kenny's maybe two, three, four times a year?

A    Yes, sir.

Q    Dropped it off, maybe stayed out there and visited with him for an hour or two while he fixed it and then you left?

A    Well, sometimes he come to my house and got it.

Q    Okay.

A    And took it and worked on it.

Q    And then you'd go pick it up and visit with him for a short period of time?

A    Yes, sir.  And sometimes he would bring it back home.

Q    In which case you'd visit with him there for a short period of time?

A    If I was there, yes, sir.

4927

Q     So the sum total of your visiting with him, half dozen times a year, may have been six hours or so?

A     Maybe.

Q     Max?  Okay.

MR. LITTLEFIELD:  Pass the witness.

MR. HILFIGER:  No further questions.

THE COURT:  May this witness be excused?

MR. HILFIGER:  Yes, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.  Call your next witness.

MR. HILFIGER:  Mr. Clyde Edgmon.  And I have just -- he may need to help his dad come in here.  I don't know.

THE COURT:  Let me see counsel at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  Apparently a juror thinks they need to use the restroom.  I know it's five minutes to five. Do you want to take a 20 minute break and come back?

MR. HILFIGER:  This guy is going to be just like the last one.  This guy's just going to be a few minutes.

THE COURT:  Yeah, I know.  I've got a juror that wants to go now.

4928

MR. HILFIGER: Well, okay. I don't know whether it's worth -- because I don't think I can get him to come back. That's my concern.

MR. SPERLING: We'll accommodate them, Judge. I mean, if you want to let the jurors go out for five or ten minutes and say we're going to come back for just a few minutes before we recess. But if he's got to go.

THE COURT: Yeah, I know, we got to do that -- then that involves my marshal taking the -- (Interrupted)

MR. SPERLING: Let them keep him here.

MR. HILFIGER: Let me talk to Brad and to my client and see whether we're going to -- whether we even call him or not.

THE COURT: Okay.

MR. HILFIGER: Well, they do want him as a witness, so let's -- (Interrupted)

THE COURT: Well, the marshal can keep the Defendant in here, so let's try to do a quick turnaround.

MR. HILFIGER: Okay.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT: Members of the jury, we're going to take a recess. Normally when we leave and I say it's 15 minutes, it's 20. Now, it's ten and I mean ten. So we're going to be -- we're going to be ready to go in ten

4929

minutes, so keep that in mind.  So we'll be in recess for ten minutes.

(Whereupon, a short recess was held after which the following record was made in the presence of the jury.)

THE COURT:  Let the record reflect jury is in the box, counsel for the Government is present, Defendant is present with counsel.  Sir, if you'll raise your right hand and be sworn.

CLYDE EDGMON,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    State your name, please.

A    Clyde Edgmon.

Q    Mr. Edgmon, you're the father of Craig Edgmon, is that right?

A    Yes, sir.

Q    Well, the way you had it before is just fine. You're talking big and bold, there.

A    Okay.

Q    Where do you live Mr. Edgmon?

A    I live in the community of McKee, Oklahoma.

Q    Is McKee, Oklahoma the area that's around where

4930

Gelene Dotson and the Crawfords and Kenny Barrett used to live?

A    Yes, sir.

Q    Okay.  But the Dotsons and the Crawfords still live there, right?

A    Yes, sir.

Q    And do you know Kenny Barrett?

A    Yes, sir.

Q    And how long have you known Kenny Barrett?

A    Oh, for a long time.  I remember Kenny for a long time.

Q    How long have you lived out in the McKee area?

A    I've lived there for most of my life.

Q    Have you had any contacts with Kenny Barrett?

A    Yes, sir.

Q    Out there in the McKee area?

A    Yes, sir, I have.

Q    And what was the purpose of the contacts with Kenny Barrett?

A    Well, Kenny worked on automobiles that I've had and an old truck or two.  And he'd done a lot of mechanic work for me.

Q    Do you know whether Kenneth Barrett had some kind of a garage out there or maintenance place where he did work?

4931

A    Yes, he had a little garage.

Q    And was it -- was it an equipped garage for doing auto repair work?

A    I would say so, yes.  He had quite a few tools in it, looked like to me.

Q    And did you go there to the garage on occasion?

A    Yeah, right -- yeah, we drove up right in front of his garage and he'd usually go in and get his tools and bring them out and work on my car.

Q    And did he also go to your house to do --
(Interrupted)

A    Yes, sir, he has.

Q    Just sort of whatever you needed done, he'd do it, is that right?

A    That's right.

Q    And how often did you have him work on cars for you?

A    Well, you know I can't say exactly right about that, but it'd be just when something get wrong with the automobile, maybe every three or four months or two months.

Q    And did you have more than one car that he worked on?

A    Yes.  Yes, I've had a truck and a car and my wife and I had a car -- my wife had a car and I had a truck and I --  well, he's worked on two different old trucks

4932

for me.

Q   Okay.  And then any kind of farm vehicles?

A   I was thinking about that.  I believe I had an old Ford tractor, I believe he worked some on it.

Q   Now, how was his job?  I mean, how did he do on his mechanic work for you?

A   He was a real good mechanic.

Q   Now, at any time did you have any -- did you know of him having any violence, do any violence to anybody?

A   No, sir, I didn't.

Q   Did you ever know of him to -- was there any kind of incident when he was down at your place and law enforcement came out?

A   Well, he was working on my truck there at my house one day and -- (Interrupted)

Q   Okay.  Now, let me -- let's try to get a time to that.  About when was that in relation to this incident of the Highway Patrolman in September '99?

A   Well, I can't put exact date, but I'd say something between three and six months.

Q   Okay.  And what occurred?

A   Beg your pardon.

Q   What occurred?

A   Well, these people drove up in a law enforcement car and they wanted to talk to him, Kenny Barrett.  And I

4933

told them I said, well, he working on my truck there.  I went over there and told Kenny and Kenny went over and talked to them.  He went over and asked them what they wanted.  And I walked on off, but he talked to them for quite a while.  I don't really know what they wanted.

Q   Okay.  Did he give them any problems that you could see?

A   Not any that I'd seen.

Q   Do you know who the people were that he talked to?

A   Well, one of them was John Owens and I think the lady might have been Sandy Gerdner.

Q   Do you know what law enforcement branch they were with or what they worked for?

A   I think they worked for the drug task force.  I know John Owens does now.

Q   And was there any problems that you could see that occurred at that time?

A   No, sir, I didn't see any problems at all.

Q   Now, have you ever known Kenny Barrett to be violent to anyone?

A   No, I haven't.

Q   Were you aware that he had any guns?

A   Well, I knew he had some guns, yes, once in awhile.

Q   How often would you say that you'd -- you know, you would either go to his house or he would come to your

4934

house to do work?

A    Well, like I say, I couldn't put a definite date on that, but it'd be probably two or three months.  You know, just when there was something would happen to one of my old cars.

Q    And would you -- you live on the road that's sort of on the way to Kenny Barrett's house?

A    About a half mile from Kenny's house on the same road, Dwight Mission Road.

Q    How would you classify Kenny Barrett as a neighbor to you?

A    I'd say Kenny was a good neighbor to me.

        MR. HILFIGER:  I have no further questions.

        THE COURT:  Cross examination.

        MR. SPERLING:  Yes, Your Honor.

                CROSS EXAMINATION

BY MR. SPERLING:

Q    Thank you, Mr. Edgmon, for appearing here as a witness today.

A    You're welcome.

Q    Would you be so kind as to tell us what your date of birth is, sir?

A    My what?

Q    Date of birth?

A    The 12th to 17 to '31.

4935

Q    Thank you, sir.   What was your occupation when you were employed?

A    Well, I was -- I worked at a wood preserving plant in Sallisaw there for about 28 years and I've done a lot of pipelining and stuff of that nature.

Q    Thank you, sir.   If you were to tell us just in your own words where you live from where Kenny Barrett lived, how would you explain that to us?

A    Well, I live on Dwight Mission Road and from my house going east, it'd be about a half a mile to Kenny Barrett's house.

Q    As best as I understand Dwight Mission Road, Dwight Mission Road would run pretty much north and south, but to the west of where Kenny lived.   Would that be fair to say?

A    Well, you come off of 64 Highway, the old 64 Highway and you go north two miles, then you turn back east and you go a mile to Kenny's house from the highway.

Q    Thank you, sir.   Is that a hilly area?   Are there some hills in the area?

A    Yes, sir.

Q    And also some woods, some trees in that?

A    Yes, there's some woods.

Q    And would it be fair to say, sir, that from your house to Kenny's house, you can't just see his house from

4936

your house?

A    I wouldn't think so.  I don't think you could.

Q    Okay.  And really to be fair, you didn't nose into his business, did you?

A    Know him in his business?

Q    No.  You didn't nose into his business?  You weren't nosey with regard to his, were you?

A    No, no.

Q    So if there had been people that came and went from the Defendant's house, you wouldn't know that, would you, sir?

A    No, I probably wouldn't be able to see them from my place.

Q    Would it also be fair to say, sir, that you minded your own business?

A    Yes, sir.

Q    All right, sir.  The mechanic work that the Defendant did for you, sir, what's the largest bill you ever paid?  The most money you ever paid the Defendant to do mechanic work?

A    You know I can't remember that offhand.  But my wife had a steering sector, a complete steering sector put in and Kenny Barrett put it in.  And I don't remember what he charged, but it wasn't -- you know, it wasn't really a high price.  It was a reasonable price.

4937

Q     Is your -- I understand what you've just said, sir. But is your best recollection is that it was more than or less than $100?

A     I think it was less than a hundred dollars, quite a bit less.

Q     Okay.  Did he ever do mechanic work for you that he did not charge you for?

A     He probably has.  I think I, you know, had something wrong with a wiper or something like that and he'd fix that and wouldn't charge me for it.

Q     All right, sir.  I believe you indicated that there was some law enforcement presence at the Defendant's residence and you referred to John Owens.  Do you remember referring to John Owens?

A     John Owens, yes, but that wasn't at Kenny's residence, it was at my residence.  Kenny was at my residence working on a pickup for me.

Q     Okay.  So the contact that John Owens -- by the way, John Owens is a detective with the Sallisaw Police Department, isn't he?

A     Right.

Q     And the contact that John Owens had with the Defendant would have been at your house, correct?

A     Right.

Q     Okay.  Could that have been as much as nine months,

4938

maybe even a year, before the highway patrolman was shot?

A    You know, I can't remember that that well.  But it was something like -- like I told the other lawyer, that it was something like six months or something to that effect.  I wouldn't swear a date on that now.

Q    Okay.  So it could have been longer or maybe even shorter?

A    Yeah, it could have been a little longer.  I don't know for sure.

Q    Okay.  Have you ever seen -- well, have you ever been to the Defendant's house, that is, been inside his house?

A    No.  No, I don't believe I've ever been in his house.

Q    So whatever he may have had in his house would not be known to you; would that be fair?

A    That's correct.

Q    All right, sir.  And you indicated something about guns.  What kind of guns did the Defendant have?

A    Oh, I don't know.  He -- you know, he used guns just to practice with, you know, putting up a spot out there and probably sighting in a sights, he'd shoot them once in a while, you know.

Q    Okay.

A    And I don't know how many guns he had, but he's had

a few along through the years.

Q    All right.  Did he -- so far as you know, was he a good shot?

A    Well, I couldn't say about that.  I never have really seen what he shot at.

Q    Okay.  And would it be fair also, to say, sir, that you really didn't know what kinds of guns he had?

A    That would be fair, yes.

Q    Would he shoot both daytime and nighttime?

A    I don't remember hearing him ever shoot any in the nighttime.

MR. SPERLING:  Thank you very much, sir.  I have nothing further, Your Honor.

MR. HILFIGER:  I have nothing further.  He may be excused.

THE COURT:  Sir, thank you for your testimony.  You may step down.  You may be excused.

THE WITNESS:  Thank you.

THE COURT:  Members of the jury, we'll recess for the evening.  I'll ask you to be back in the morning at nine o'clock.  Remember my admonition not to discuss this matter among yourselves or allow anyone else to discuss it with you, avoid all news coverage.  If everyone in the courtroom would please remain seated as the jury exits the courtroom.

4940

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:   Let the record reflect the jury has departed the courtroom.   Anything to take up outside the hearing of the jury first for the Government?

MR. SPERLING:   No, Your Honor.

THE COURT:   Defense?

MR. HILFIGER:   Your Honor, the only thing just to inform you on timing.   I think we looked at -- counted up ten witnesses for tomorrow.   There's probably a good -- there's a pretty good chance we can finish tomorrow. But just kind of depending on how long cross examination is whether we're going to finish.   It'll probably be a pretty full day tomorrow, Your Honor.

THE COURT:   Okay.   Thank you.

(Whereupon, the Proceedings were continued to November 15th, 2005.)

4941

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 14, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 4702 through 4940.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

_____
GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,  )
                           )
          Plaintiff,       )
                           )
-vs-                       )   No. CR-04-115-P
                           )
KENNETH EUGENE BARRETT,    )
                           )
          Defendant.       )

VOLUME 25 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 15, 2005.

A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                        United States Attorney
                        and
                        Mr. D. Michael Littlefield
                        Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                        Mr. Bret A. Smith
                        Attorneys at Law

**EUSTICE REPORTING SERVICE**
CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 4943 - 5152

4943

W I T N E S S E S

PAGE

ROBERT GUDE
Direct Examination by Mr. Smith . . . . . . . . 4960
Cross Examination by Mr. Littlefield . . . . . 4972
Redirect Examination by Mr. Smith . . . . . . . 4981
Recross Examination by Mr. Littlefield . . . . 4984

COURTNEY BURK
Direct Examination by Mr. Smith . . . . . . . . 4985
Cross Examination by Mr. Sperling . . . . . . . 4995
Redirect Examination by Mr. Smith . . . . . . . 5007

MARTIN DAGGS
Direct Examination by Mr. Hilfiger . . . . . . 5008
Cross Examination by Mr. Sperling . . . . . . . 5013
Redirect Examination by Mr. Hilfiger . . . . . 5026
Recross Examination by Mr. Sperling . . . . . . 5028

STEVEN WAYNE BARRETT
Direct Examination by Mr. Hilfiger . . . . . . 5030
Cross Examination by Mr. Littlefield . . . . . 5040

ROGER CRAWFORD
Direct Examination by Mr. Smith . . . . . . . . 5052
Cross Examination by Mr. Sperling . . . . . . . 5066

GELENE DOTSON
Direct Examination by Mr. Hilfiger . . . . . . 5071
Cross Examination by Mr. Littlefield . . . . . 5092

ERNEST BARRETT
Direct Examination by Mr. Hilfiger . . . . . . 5105
Cross Examination by Mr. Sperling . . . . . . . 5116

DORIS BARRETT
Direct Examination by Mr. Hilfiger . . . . . . 5119
Cross Examination by Mr. Sperling . . . . . . . 5122
Redirect Examination by Mr. Hilfiger . . . . . 5125

E X H I B I T S

OFFERED   REC'D

Government's Exhibit Number 344 . . . . . 4996      4996
Government's Exhibit Number 345 . . . . . 4996      4996

4944

P R O C E E D I N G S

THE COURT: Let the record reflect counsel for the Government is present, Defendant is present with counsel. Jury is not present. The Defendant's filed a motion in limine regarding the testimony of Robert Gude -- is that how you pronounce his name?

MR. SMITH: Yes, Your Honor.

THE COURT: I'll hear your argument.

MR. SMITH: Your Honor, I don't have a whole lot more to add other than what's in the motion, other than I would tell the Court this: That I have interviewed Mr. Gude and he has no knowledge of the three instances that are list in our motion. And while we understand that there is a lessened requirement in terms of hearsay testimony and what have you at this stage of the proceedings, we feel that the Government's attempt to illicit this testimony from Mr. Gude when he has no direct knowledge of it -- didn't even occur while he was employed, if it incurred at all. And we think it would be overly prejudicial and not probative. And for that reason we would ask in advance that Government be prohibited from inquiring of him these areas that they've already asked him about and he has indicated he has no knowledge of them.

THE COURT: Response?

4945

MR. LITTLEFIELD: Mr. Gude is testifying for the purpose of revealing that Mr. Barrett, while a prisoner, was acting appropriately and properly and behaving in a fashion that -- consistent with how a prisoner should behave. If Mr. Gude has any knowledge about these incidents or utilized information received about these incidents in regards to the means with which he was treated, the care in which his custody was controlled, based upon this information, it would certainly have a bearing. However, Your Honor, I don't intent to ask him specifically about his knowledge in regards to these incidents. But I do want -- I do anticipate that I will ask him about the time period within which he was responsible for guarding Mr. Barrett and reflect that -- or ask him about the fact that there was a period of time, prior to his becoming responsible for the jail in which Mr. Barrett was in custody and ask would it be appropriate to throw food at a guard, would it be appropriate to ask a guard to provide preferential opportunity to have sexual contact with prisoners of the opposite sex, would it be appropriate to threaten physical harm to a guard. Questions of that nature. And potentially go into these issues on rebuttal, since the issue of Mr. Barrett's behavior as a prisoner has been raised by the defense.

4946

I don't each intend to ask him specifically what you know about. So I think really it's going -- the issue raised in the motion in limine's going to be moot as to asking him about his specific knowledge in regards to the incidents. I think it will be appropriate, based upon their concern about Mr. Barrett's behavior as a prisoner, to ask would that kind of conduct be appropriate for a prisoner. Would that be misbehavior on a prisoner's part.

THE COURT: Am I to assume by your -- that there is -- you have evidence of that through some other source?

MR. LITTLEFIELD: Absolutely. I have spoken to an individual who was a jailer at Sequoyah County who did have food thrown at him. I've spoken to a jailer who was employed at Sequoyah County who Mr. Barrett prevailed upon to allow contact of a sexual nature with a female prisoner. And ultimately this individual did so. And was fired and was prosecuted for it.

THE COURT: Say that again?

MR. LITTLEFIELD: Mr. Barrett prevailed upon a jailer in Sequoyah County Jail to allow him to have contact with a female prisoner of a sexual nature. Essentially, I believe Mr. Barrett manipulated this jailer. The jailer ultimately did so. The jailer, in

4947

fact, after that also had contact with a female prisoner, was prosecuted, was fired, has pled guilty and was convicted of that offense.  I also have received -- (Interrupted)

THE COURT:  So as to this -- (Interrupted)

MR. LITTLEFIELD:  Didn't happen on Gude's watch.

THE COURT:  Okay.  That's what I'm concerned about at this point.  I don't think there's any question but that you could bring that up in rebuttal and the question I think the defense is attempting to insulate this witness from questions concerning those activities.

MR. LITTLEFIELD:  I don't intend to ask him specifically did you hear about.  I do intend to ask him would it be appropriate conduct for an inmate to throw food at a guard.  Would it be appropriate conduct for an inmate to threaten a guard with physical harm.  Would it be appropriate conduct for an inmate to solicit from a guard the opportunity to have sexual contact with female prisoners while being an inmate.

THE COURT:  See what the defense has to say.

MR. SMITH:  I don't think those areas of inquiry are improper, Judge.  I don't think they'd be a problem.

THE COURT:  Okay.  And I know you know the

4948

rules.  There has to be a factual basis for your inquiry. You can't just throw harpoons out there and hope to hit something.

MR. LITTLEFIELD:  And I have spoken to the individual or at least two of these individuals -- I have spoken to two of the individuals -- (Interrupted)

THE COURT:  Here's -- my follow up is if you're tell the Court because this witness is introducing the subject of his behavior while incarcerated in Sequoyah County, that is if the defense is opening that up -- in that later you're going to come back with rebuttal to verify the factual basis for your question, the general question, then I think you may proceed with those questions.

MR. LITTLEFIELD:  And that is the case, Your Honor.  I've spoken directly to two of the guards and have receive information as to the physical threats. That information is contained -- I have been advised it is contained in a written report of this guard who I have not yet spoken to.  But it's in writing.

MR. SMITH:  Judge, if I can address that a moment?

THE COURT:  You may.

MR. SMITH:  Your Honor, we subpoenaed the Sequoyah County Jail records and last Thursday evening I

4949

went to the county jail to obtain those records and the jail administrator had given them to Sheriff Philpot. This was probably 10:00 o'clock at night on this past Thursday. I found Mr. Philpot in his office and he had a box of records there at his feet at his desk that all related to Kenneth Barrett. There was a banker's box, probably four packets of information, five -- four-five inches thick, each one of them. I searched through all of those records and there were commissary records. None of them had to do anything about any reports of misconduct, anything at all to do with Mr. Barrett's activities while in the jail, other than receiving medication and receiving commissary. So when Mr. Littlefield brings up that there's a written report, that causes me concern, specifically with the conversation I had with Sheriff Philpot that those records don't exist. He thought that they were given to the district attorney's office in Sequoyah County and during the first trial and according to him he hadn't seen them since then. So I bring this to the Court's attention. We're plowing forward with the understanding that these records don't exist. They've been lost somewhere. But I do think that they've been provided somewhere, I just want the Court to know we've been searching and we don't have any and we have been told that they don't exist.

4950

MR. LITTLEFIELD:  If I may respond?

THE COURT:  You may.

MR. LITTLEFIELD:  Mr. Philpot advised me last night that he started looking -- the records as -- according to Mr. Philpot, the records that he subpoenaed in regards to jail records have not been discovered.  Mr. Philpot extended a search looking into personnel files of various jailers and found those yesterday.  The one incident about the threats to the jailer in a personnel file, not in jail records.  And the records that were subpoenaed in regards to jail records, they couldn't find them.

THE COURT:  Well, I guess I'm still -- I'm not clear now.  So, is there records of the negative conduct that you've talked about earlier?  Do you have records of that?

MR. LITTLEFIELD:  I have been advised that a report of the incident was written by an individual and he placed it in his personnel file rather than in jail records.

THE COURT:  Personnel file of the --?

MR. LITTLEFIELD:  Of the individual.  He had some personal records and he placed it in his own personal records rather -- (Interrupted)

THE COURT:  We're talking about the former

4951

jailer?

MR. LITTLEFIELD:  A former jailer.

THE COURT:  Does Philpot have that?

MR. LITTLEFIELD:  He has that and I have not had an opportunity to meet with him in regards to obtaining it but he advised me of that.  The --
(Interrupted)

THE COURT:  The source -- so you don't have a written report that verifies the alleged conduct that you want to ask general information or general questions to Mr. Gude about.  So that's not in a written report?

MR. LITTLEFIELD:  I don't have it.  I have been advised that the incident was written by the jailer and Mr. Philpot obtained that, I believe, yesterday looking through that individual jailer's personnel file.

THE COURT:  Okay.  Well, what is in that report?

MR. LITTLEFIELD:  That Mr. Barrett -- and I'm going to describe it generally.  That Mr. Barrett and the jailer had words.  That Mr. Barrett advised the jailer that he was going to kick his rear and the jailer said, you know, be my guest or whatever.  And Barrett said, well, I'll get you when I get out, or words to that effect.

THE COURT:  Okay.  Well -- (Interrupted)

4952

MR. LITTLEFIELD:  And my question as to Mr. Gude will be very general in nature of would it be appropriate to threaten a guard with physical harm.

THE COURT:  Is that the -- let me go back to the motion in limine.  The motion in limine asked that the Court limit the testimony regarding an incident throwing a baked potato, sexual misconduct and a purported attempt to incite a riot.

MR. LITTLEFIELD:  Mr. Philpot has advised me he has not found a record, other than the booking, which was in the pen pack that was introduced yesterday in regards to the incitement to riot charge.  He hasn't found a document in any of the files yet as to that.  He's still trying to find the jailer.  And he doesn't have the record because those were, according to him, turned over to the D.A.'s office and were lost.  If we can find the jailer who recalls the incident and who can testify about it, then I intend to call that jailer as well.  So far I haven't found the jailer who specifically recalls the incident that led to the booking for incitement to riot. And I'm not going to ask about that either.

THE COURT:  And then going -- then the sexual misconduct?

MR. LITTLEFIELD:  Sexual misconduct is a part of the records.  Those were discovered to the defense

4953

last summer or whenever the general discovery took place.

THE COURT:  And the baked potato throwing incident?

MR. LITTLEFIELD:  I've spoken to the guard.  I don't think there's a record of it.  I've spoken directly to the guard who -- Mr. Barrett complained of stomach problems, was placed on a bland diet.  Part of the orders were no butter.  One of his meals contained a baked potato, didn't have any butter in it, he complained to the jailer about not having any butter.  The jailer told him it's doctor's orders, man.  You're restricted diet, you can't have butter on the potato.  I'm not going to violate doctor's orders.  Mr. Barrett took the potato and threw it at him.  And that's what this jailer -- former jailer advised me.

THE COURT:  And you plan on putting that on in rebuttal?

MR. LITTLEFIELD:  Yes.

THE COURT:  Anything else?

MR. SMITH:  Your Honor, just briefly about the discovery.  And the reason I bring it to the Court's attention is because we subpoenaed the records from the Sequoyah County Jail, which is run by a jail authority, not run by Sheriff Philpot.  Whenever I went to that authority, they said, well, we gave them to the sheriff.

4954

And I go over to his office and there's -- these records are at his feet. On top of his desk on a corner is an article cut out, Barrett convicted in federal court of murder. This is not an impartial witness. And what I want to bring to the Court's attention my concern is that at the last minute, on the last day of trial, that some record's going to pop up from somewhere, from Sheriff Philpot, that says, oh, yeah, here's what we found about Kenny Barrett and misconduct. And I know we can't deal with it unless and until that happens. But I do feel that at this time it's appropriate to bring it to the Court's attention. That is my concern about what I observed Thursday and then Mr. Littlefield instructing that some record was found -- I couldn't tell if it was in a personnel file or a personal file of the jailer. Either one of those is not what you would expect. You'd expect them to be contained within the inmate's file.

THE COURT: Are you familiar with the -- I assume you are, because you have in your motion in limine about the baked potato incident?

MR. LITTLEFIELD: Mr. Philpot indicated that to me Thursday evening whenever I was over there visiting with him, Judge. And then whenever Mr. Littlefield asked the fellow at DOC yesterday about somebody throwing food, it was obvious that -- that that is the subject of some

4955

scuttlebutt. There's no record of it. We don't have a statement of any jailer. I mean, that's the first that we learned of it. The incident involving the jailer and letting two female inmates out and sexual misconduct with the jailer and Barrett and the two female inmates, that was discovered because that deputy was prosecuted. But that's it. Incitement of the riot was something that was brought out by Sheriff Philpot Thursday evening as well as the baked potato incident. And the -- the only thing -- I wasn't even aware of the booking information, having that incitement of a riot on it until -- I guess it was Sperling found it yesterday in the DOC record that came from the Sequoyah County Jail.

MR. SPERLING: Just for the record, Your Honor, that I discovered in the packet of information that the defense gave us.

MR. SMITH: And I don't -- (Interrupted)

MR. SPERLING: And they have this information.

MR. SMITH: Yeah, and I'm not indicating that anything improper was there. I mean he found it. I didn't see it in there. But it looked to me to be almost a stray entry. But that's the only thing -- that's the first time we had any knowledge of that as anything on paper and it was just a one line entry, other than Sheriff Philpot saying Thursday evening that, yeah, there

4956

was something about this riot business, which, you know, from our perspective it's all inflammatory and they know what's at stake here. Sheriff Philpot knows what the Government needs.

THE COURT: Well, I think the term inciting a riot is inflammatory and I don't know whether or not, based on what I've heard from the attorneys who have been working with this case for a long time, I don't know -- I guess as the defense suggests -- and I don't know the Government suggesting anything any stronger that this term incite a riot was buried in a record. And I don't know whether it was an inappropriate entry based on insufficient facts or it was an entry that was supported by some factual occurrence.

And so far, I can't tell from either one of you whether -- the concern I have now is in regard to motion in limine whether there -- whether there is in the hands of the Government a sufficient factual basis to bring that issue up on cross examination or rebuttal, either one. If there is, I feel comfortable with what the Government said. But I don't know that we've discussed it enough. I don't know whether the Government thinks there was an incident significant enough to support cross examination of that issue and if you do, I assume it comes up in rebuttal.

4957

If it's just a passing remark unsupported by any facts that you know of, you know, my suggestion it isn't something, because that term incite a riot is -- I mean I think in my mind it means something significant. I think it would mean something significant to the jury and I'm not sure it's just a couple of words you can pass by if there are not facts to support it.

MR. LITTLEFIELD:  Inciting a riot is a state charge and what is necessary -- and I don't know the elements off the top of my head.  But what would be necessary would be to cause a group of individuals to begin disruptive behavior.

I have spoken to several guards who had to go upstairs in the Sequoyah County Jail to quell a substantial disturbance amongst prisoners.  There was, I believe, information that Mr. Barrett was responsible for causing that circumstance which resulted in the booking. No charges were ever filed.

At this point an individual not yet been located who provides the basis for the determination that Mr. Barrett was responsible.  Sheriff Philpot could testify that, well, he received the information that the person responsible for that major disruption was Kenneth Barrett.  That's why the booking.  But I'm not doing that.  I'm not going to call him to get hearsay that

4958

somebody else reported it.  If we don't find the individual who would identify that Barrett was responsible for causing that disturbance amongst the prisoners, then we're not going to put it on.  If we do, then it depends on how it develops because I have not spoken to that person yet.  If that person advises that Barrett disrupted, caused a bunch of prisoners to fight, that may be how it comes out.  If it's that Barrett started calling somebody a snitch and saying that he needs to be punished within the jail system by the inmates for being a snitch, and that's what Mr. Barrett's behavior was, it may just be that.  And I --
(Interrupted)

THE COURT:  So at this stage you're not going into that issue?

MR. LITTLEFIELD:  At this stage we're not going into it because we haven't -- I haven't discovered the witness who would be appropriate to even testify about it.  And I'm not going to ask Mr. Gude about that -- or Gude about that.  What I am going to ask him about is, is it appropriate conduct to throw food at a guard.  Is it appropriate conduct to -- for an inmate to prevail upon a jailer to allow him sexual contact with a prisoner of the opposite sex while in custody.  Is it appropriate conduct for an inmate to threaten another individual, a guard.

4959

And that's as far as I'm going to go.

THE COURT:  Okay.

MR. SMITH:  Again, Judge, I think that's appropriate if that is as far as he goes.

THE COURT:  Okay.

MR. SMITH:  But the other -- I mean, it's just lurking in the back of my mind that tomorrow all of a sudden we're going to be up here fighting a riot charge.

THE COURT:  Well, we may be.

MR. SMITH:  Yeah.

THE COURT:  We'll try to do -- we've got enough work for this day to do and we'll take up tomorrow when it happens.

MR. HILFIGER:  Judge, if we could have about five minutes, based on what just happened here, so we can discuss what to do?

THE COURT:  Five minutes.

(Whereupon, a short recess was held after which the following record was made in the presence of the jury.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  You may call your next witness.

MR. SMITH:  Thank you, Your Honor.  Robert

4960

Gude.

(Whereupon, the witness was administered the oath.)

THE COURT:  You may proceed.

MR. SMITH:  Thank you, Your Honor.

ROBERT GUDE,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q    State your name, please.

A    Robert Gude.

Q    Okay.  And you may need to lean up a little bit, sir.

A    Robert Gude.

Q    All right.  Thank you.  Where are you employed?

A    Muldrow Police Department.

Q    And what is your occupation there?

A    Police officer.

Q    And for how long have you been employed there?

A    Full time, roughly six months.

Q    Were you previously employed at the Sequoyah County Jail?

A    Yes, sir.

Q    During what period of time, sir?

4961

A     Late November of '02 until about six months ago.

Q     So that would be until what?  May?

A     Approximately, late May, early June.

Q     Sir, you've been subpoenaed to testify here on behalf of Kenneth Barrett; is that correct?

A     Yes, sir.

Q     You're not appearing here voluntarily?

A     No, sir.

Q     Not appearing here as a friendly witness to Mr. Barrett?

A     No, sir.

Q     And you and I visited.  You were kind enough to call me last Thursday evening about 11:00 o'clock or so; is that true?

A     Yes, sir.

Q     And we visited about Mr. Barrett a little bit, didn't we?

A     Yes, sir.

Q     All right.  I want to go over some of the things that we talked about and specifically the conduct of Mr. Barrett there at the Sequoyah County Jail while you were working?

A     Okay.

Q     First off, sir, let's talk a little bit about that jail.  Was there ever a -- while you were working there,

4962

did they ever change from one jail and go to another jail? Did you ever work in the old jail at Sequoyah County?

A    Trained briefly. As far as when the transition took effect, I was actually employed by the trust authority. The sheriff still controlled the old jail. We went up a few days and trained.

Q    So there's a jail authority that administers the new jail, is that what you're telling us?

A    Yes, sir.

Q    And that you were hired by that authority but through part of your training you had contact and dealings with the old facility?

A    Yes, sir.

Q    And the prisoners were still in that old facility when you were going through your training?

A    Yes, sir.

Q    And that was in November of '02?

A    Yes, sir.

Q    Can you describe that facility for us?

A    It was old. Dark, needed updated.

Q    Where was it located, sir?

A    Above the courthouse.

Q    On the top floor?

A    Yes, sir.

4963

Q    Okay.  What about sanitary conditions there?

A    Sanitary conditions -- I know they cleaned.  I know, personally, I made them clean a couple of times.  Like I said, it was old.  I'm not going to say it was filthy but paint was peeling, what not.  But I know they did clean.

Q    Okay.  When they moved into the new jail that's whenever you took over?

A    I took over two months after.

Q    Okay.  And you had contact with Mr. Barrett?

A    Yes, sir.

Q    And one of the things that we talked about is you wanted to know about your inmates; is that true?

A    Yes, sir.

Q    And you wanted to know what they were charged with so you would be aware of a security risk, per se, is that right?

A    Yes, sir.

Q    And I guess it would matter to you as a jailer whether somebody was in jail for a bogus check or whether somebody was in jail on a murder charge?

A    Yes.

Q    And that's just for your personal safety, is that right?

A    My safety and also other inmates' safety.

Q    Might want to kind of segregate the inmates

4964

according to what you perceive to be security; is that true?

A   Yes, sir.

Q   Okay.   Now, you're aware of why Mr. Barrett was in jail?

A   Yes.

Q   And incidentally, do you recognize Mr. Barrett here today?

A   Yes, sir.

Q   And would you identify him for us?

A   Sitting right there.

Q   Tell us what he's wearing, sir.

A   A gray pair of pants, gray shirt.

        MR. SMITH:   May the record reflect, Your Honor, he's identified Mr. Barrett?

        THE COURT:   Record so reflect.

Q   (By Mr. Smith) And you had a lot of contact with him over -- what was it, two and a half years, I guess?

A   Roughly.

Q   And generally, I assume as a jailer that -- depends on how the jailer acts as to how some of the inmates act; would that be a fair statement?

A   Yes, at times.

Q   And that's not true in every instance.   But a jailer who's cordial to inmates is likely to get or may get a

4965

cordial response back; is that true?

A    True.

Q    You go at somebody just like in any setting whether it's in jail or on the street, and treat somebody in a harsh or hateful manner, then you're liable to get addressed in that same manner?

A    True.

Q    And what was your personal style while you were a jailer in the Sequoyah County Jail?

A    If they gave me respect, they would receive respect back.

Q    And how did you tend to treat Mr. Barrett?

A    With respect.  Like I said, I never befriended him, but I'd tell him to do something, usually he would go about it and do what he was told.

Q    Now, we're going to get to some of those things that he would need to do, but tell us how you would address him.

A    Usually as Kenny.

Q    And how would you -- how would you like to be addressed?

A    Most people would just call me by my first name.

Q    You didn't require them to call you Mr. Gude?

A    No, sir.

Q    And did you expect them to call you Mr. Gude?

4966

A    No, sir.

Q    So you liked that first name contact?

A    Yes.

Q    And is that how Mr. Barrett dealt with you?

A    Yes, sir.

Q    Okay.  Now, tell us some of the things that you would ask Mr. Barrett to do?

A    Usually the only thing that I required was cleaning. I guess you'd say I was a neat freak.  Every once in a while if I had contraband come into the jail, sometimes Kenny would -- to maintain order in one of the pods instead getting group punishment, sometimes he would make some of the other inmates give up any contraband they may have.

Q    What type of contraband are you talking about, sir?

A    Usually tobacco.  That was about -- that's what I battled more than anything.

Q    Cigarettes or snuff?

A    Yes.

Q    And how many times did Mr. Barrett help you find that in order to keep peace on the pod?

A    I couldn't give an accurate number.

Q    Would it be more than once or twice?

A    Possibly.

Q    Probably less than ten?

4967

A    Yes.

Q    But he was cooperative nonetheless?

A    Yes.

Q    All right.  Let's talk about those pods.  There's a -- let's talk about the smallest area of confinement that Mr. Barrett was in.

A    Okay.

Q    How many people would be in that area?

A    I believe that one pod could house up to 36 people and each cell had four six-man cells.  Mr. Barrett was always in a four man cell.

Q    And then the cell opened into this pod?

A    Yes.

Q    So, the most contact that you'd have would be with up to say 36 people?

A    Yes.

Q    Okay.  Was it an area the size of this or quite a bit smaller?

A    Smaller.

Q    And while you were there during your two and a half years, Mr. Barrett get in any fights?

A    Not that I can recall.

Q    Did he ever give you any problems?

A    No, sir.

Q    The jails aren't really equipped to offer

educational programs; is that true?

A    At that time, no.

Q    Were they -- was the jail during that period of time equipped to offer drug rehabilitation?

A    No.

Q    Was it designed or did they offer programs in what we may call life skills?

A    No.

Q    What was there for the prisoners to do?

A    They had their dayroom.  A lot of them would exercise.  We had church programs that come in on a regular basis.  A lot of them would make homemade games out of stuff out of their cells.

Q    They'd make what, sir?

A    Homemade board games.  They had cards.  They could order little radios on commissary.

Q    Did they get a chance to go -- well, let's talk about Mr. Barrett.  Did he ever have an opportunity to go outside?

A    No.

Q    In the old jail did it have any windows?

A    In the area that he was at, no.

Q    How about the new jail?

A    It had a skylight.

Q    How about -- you said they'd exercise.  Would that

be in the dayroom area?

A    Yes.

Q    What is the longest stay of any inmate while you were there that you were aware of at the Sequoyah County Jail?

A    In the new jail, maybe 16 to 18 months.

Q    So it would be pretty unusual for an individual to be there, say, four years?

A    Yes, sir.

Q    And I don't guess you -- or I'll ask you, have you ever worked in a prison?

A    No, sir.

Q    As a jailer, would you get concerned about an individual who continued to be locked up in the county jail in terms of -- for lack of a better word, them going stir crazy?

A    Can you repeat it?

Q    Well, would it be a concern of yours that the longer that an individual would be confined in that situation that you just described, because it sounds like a real confining situation.  Limited room, no chance to go outside, you know, you're just right there.  Would it concern you as a jailer that the longer that you have an individual in that environment, that at some point you might start having concerns about that individual?

4970

A     Well, the new jail -- they had a lot more freedom than they did in the old jail.  I couldn't speak -- like I said, the most that I've had was up to 18 months and I never did -- I couldn't condone -- if anybody did have a problem with being cooped up that long, because they did have quite a bit of freedom in the new jail.

Q     And when you say freedom in the new jail, tell me what you're speaking of.

A     Usually on the side that Mr. Barrett was on, we tried to keep the numbers down as few as we could.  In the general population area, we'd only let top or bottom floor out at a time.

Q     You might need to lean up just a little bit.

A     On the general population side, we'd only let the top or bottom out at one time, usually on the protective custody side, we'd let them all out at the same time. So, usually there may have been 15 people, 20 people, on that one side.

Q     Now, you're talking about letting them out, letting them out into the dayroom?

A     Letting them out to the dayroom.  Very seldom were they on lockdown where they were confined to their cell.

Q     Okay.  So when you're talking about freedom, you're talking about that they come out of the real small -- their sleeping quarters?

4971

A    Yes.

Q    And they get to mingle around in the larger area?

A    Yes.

Q    But they're still not going outside, getting fresh air, looking at the sky or the birds or what have you?

A    Right.

Q    Are you aware of at the time that the move was made from the old jail to the new jail that the old jail was condemned or not?

A    I had heard that it had been.  I believe I'd heard they had a fine.

Q    Excuse me?

A    I believe I heard that they'd been threatened with a fine, something of that nature.

        MR. SMITH:  One second, Your Honor.

Q    (By Mr. Smith) Are you able to comment on the freedom that inmates had while they were confined in the old jail?

A    Very little freedom.

Q    And what did you observe while you were training?

A    The PC area that they had at the time was very cramped.  It was about the equivalent to one cell.

Q    How many people were in that one cell area?

A    I'd hate to give you an exact number.  I can recall four to five that I knew of.

4972

Q    And when you say one cell area, do you have an idea about space?

A    Possibly ten by ten.  Maybe a little bit bigger.

Q    And how long would they be confined to that space?

A    As far as I knew, they -- the only time they were -- got to come out was on shower night.

Q    And how often did they have shower night?

A    Three days a week.

Q    So that's what you say there's quite a bit of difference between the old and the new?

A    Yes.

Q    And then the move was accomplished when, sir?

A    I believe it was late November in 2002.

MR. SMITH:  All right, sir.  Thank you for your testimony.

THE COURT:  Cross examination?

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    Jail's not a pleasant place, is it?

A    No, sir.

Q    However, there's certain freedoms that are provided or certain luxuries that are provided even to inmates, aren't there?

A    Yes, sir.

Q    They can have visitors on a regular basis, can't

4973

they?

A    Yes, sir.

Q    Mr. Barrett was allowed access to visitors and was allowed to have them, wasn't he?

A    Yes, sir.

Q    They receive mail, don't they?

A    Yes, sir.

Q    Incoming mail and outgoing mail, don't they?

A    Yes, sir.  Matter of fact, on Mondays they even have access to free mail.

Q    I'm sorry?

A    On Mondays they have access to free mail.  They can mail out one -- (Interrupted)

Q    Lean forward again.  I can't -- (Interrupted)

A    On Mondays they had access to free mail.  They can mail out one free letter if they were indigent.

Q    Okay.  Television available in jail?

A    Yes, sir.

Q    Radios?

A    Yes, sir.

Q    Exercise privileges?

A    Yes, sir.

Q    Three squares a day?

A    Yes, sir.

Q    There's a commissary?

4974

A     Yes, sir.

Q     And if they have access to -- if one of their family members places money in a commissary fund, they're able to buy things out of the commissary, aren't they?

A     Yes, sir.

Q     They can buy candies or snacks?

A     Yes, sir.

Q     They get pop?

A     No, sir.

Q     Don't get pop?

A     No pop.

Q     Cards?

A     Yes, sir.

Q     Access to certain kinds of games?

A     Most of them were homemade games.  I'm not familiar with any that they could order off of commissary.

Q     Okay.  What other kind of items would be available from the commissary?

A     Clothing, hygiene, candy bars, chips, coffee, basically like going into a small convenience story.

Q     Don't get no beer or pop in there, though, do they?

A     No beer or pop.

Q     And that's what Mr. Barrett was housed in from the time you became responsible in -- was it 2002 when you became responsible for it?

4975

A    No, sir. I actually became administrator, I believe it was, January 9th of '03.

Q    Okay. And the period from November of '02 to January of '03 was when the old jail was still in operation?

A    No, sir.

Q    When was that?

A    November of '02 to January of '03 they were in the new jail but at that time I was just a jailer.

Q    You were not responsible for running it?

A    No, sir.

Q    And you aren't personally familiar with Mr. Barrett's behavior prior to your becoming involved in November of '02, are you?

A    No, sir.

Q    So whatever Mr. Barrett did from September of '99 through November of '02, you can't vouch for?

A    No, sir.

Q    You can't tell these jurors that he was a model prisoner during that period of time?

A    No, sir.

Q    When he was in the new jail, speaking of three squares a day, are there occasions when an individual inmate or prisoner has restrictions for diet?

A    Yes.

4976

Q    If an individual complains of stomach issues and -- aren't there occasions where special kinds of dietary restrictions need to be in place to deal with those medical issues?

A    If there was a letter from their doctor.

Q    And Mr. Barrett didn't have those when you were in the new jail?

A    Not that I can recall.

Q    You indicated Mr. Barrett was respectful to you.  He called you by your first name and you called him by his first name?

A    Yes, sir.

Q    Mr. Barrett always cordial?

A    Yeah.

Q    Did he show any signs of -- what was his attitude in jail?

A    He was -- he was polite but he was -- he was arrogant.

Q    Arrogant?

A    Yes, sir.  I mean he was polite.  He never said anything out of the way, but he was bold.

Q    Okay.  You got to see a lot of him?

A    Yes, sir.

Q    He's convicted of -- he has been found guilty of murder?

4977

A    Yes, sir.

Q    Did he ever indicate in his behavior any sign or did you see any sign of remorse on his part?

A    No, sir.

Q    Is it important that an individual be truthful?

A    Yes, sir.

Q    When he was -- when you -- and that deals with dealing with authorities?

A    Yes, sir.

Q    Would it be appropriate for an inmate to throw food at a jailer?

A    No, sir.

Q    Would it be appropriate for an inmate to threaten a jailer?

A    No, sir.

Q    Would it be -- were there female prisoners housed in the -- or in the -- I keep saying Muskogee County, Sequoyah County Jail?

A    Yes, sir.

Q    And would it be appropriate for a prisoner to attempt to convince a guard or a jailer to allow physical access to female prisoners?

A    No, sir.

Q    You didn't see any of that when you were there, did you?

4978

A    No, sir.

Q    Is it -- and I think you said that it would be appropriate for a prisoner to be truthful with authorities?

A    Yes, sir.

Q    Okay.  When Mr. Barrett was in the old jail, you were talking about a cell that was ten by ten or a little larger and the size of -- an area -- I think you said the PC area was cramped?

A    Yes, sir.

Q    And the significance of that is that Mr. Barrett in the old jail was housed in the PC area, wasn't he?

A    Yes, sir.

Q    And I think you talked about in the general population of the new jail, that they'd let half of the inmates out into the dayroom at one point.  The upstairs inmates out and then at other times, they'd let the downstairs inmates out while the upstairs inmates were still housed in their individual cells?

A    Yes, sir.

Q    And Mr. Barrett, during the entire time that you knew him as a prisoner in the Sequoyah County Jail, the old jail and the new jail, wasn't in the general population, was he?

A    No, sir.

4979

Q   He was in the PC area, right?

A   Yes, sir.

Q   And tell the jury what PC stands for.

A   Protective custody.

Q   Protective custody?

A   Yes, sir.

Q   So Mr. Barrett was housed in the protective custody area of the jail?

A   Yes, sir.

MR. LITTLEFIELD:  I'd ask that Government's Exhibit -- Defendant's Exhibit 244 be displayed.

Q   (By Mr. Littlefield)  And you'll be able to see it up there and you'll be able to see it on the screen.  And it's in evidence.  And do you see this questionnaire that was filled out by Kenneth Eugene Barrett, self-reported when he was -- when he was first received at the Lexington Assessment and Reception Center?

A   Yes, sir.

Q   I direct your attention to question number four. And it says has the inmate ever requested placement in or been assigned to safekeeping, protective custody, segregation housing or detention during prior or current incarcerations?  It says include city or county jail or other correctional institutions, I think.  It's kind of fuzzy.  Can you see that question?

4980

A    Yes, sir.

Q    In regards to Mr. Barrett, the correct and truthful answer to that question would have been yes, wouldn't it?

A    Yes, sir.

Q    He was in fact kept in protective custody for the entire time, wasn't he?

A    Yes, sir.

Q    The response to question four on this form was not truthful, was it?

A    No, sir.

MR. SMITH:  Your Honor, I'm going to object to that in that there's no indication that response was filled out by Kenny Barrett.

MR. LITTLEFIELD:  The testimony --
(Interrupted)

MR. SMITH:  He can indicate or ask the question whether or not that statement would be a correct statement.  But to try to attribute Kenny Barrett filling it out is a misstatement of the testimony.

MR. LITTLEFIELD:  Testimony was that that was self-reported, Your Honor.

THE COURT:  Let's move on.

MR. LITTLEFIELD:  Pass the witness.

4981

REDIRECT EXAMINATION

BY MR. SMITH:

Q    Sir, just briefly, at that jail, what kind of gym do they have?

A    They didn't have a gym.

Q    They don't have treadmills, workout equipment, all that stuff?

A    No, sir.

Q    So when you say they get a chance to workout, are we talking about doing pushups, sit-ups?

A    Generally calisthenics.

Q    Okay.  So it's an area where they have a little bit of room where they can move a little bit?

A    Yes, sir.

Q    Now, in the meals that were served out there, was there ever a problem with cockroaches in them?

A    Not that I was ever aware of.

Q    And let me ask you about the protective custody area.  You said some inmates are segregated based on the crimes that they're accused of?

A    Yes, sir.

Q    And the practice in the Sequoyah County Jail, both in the old and in the new, was to segregate those persons that were accused of crimes such as murder?

A    Yes, sir.

4982

Q    So protective custody can involve somebody who may be a confidential informant, that is needing protection from the other inmates, right?

A    Yes, sir.

Q    It could be somebody that says Mr. Gude, I'm concerned that somebody over there's going to do something bad to me, would you lock me up by myself. That's protective custody?

A    Yes.

Q    Mr. Barrett was put in an area called PC, protective custody, because of the nature of his crime?

A    Yes, sir.

Q    Not because of a request from him?

A    As far as the old jail, I couldn't tell you.  And the new jail I never heard him request it.

          MR. SMITH:  Thank you, sir.  Pass the witness.

          MR. LITTLEFIELD:  May I approach?

          THE COURT:  You may.

          (Whereupon, the following record was made at the bench outside the hearing of the jury.)

          MR. LITTLEFIELD:  Mr. Smith's last question or next to last question was Mr. Barrett was placed in PC, protective custody, because of the nature of his crime. That is not entirely true.  He was placed in there because of problems caused by other inmates.  And at this

4983

point I think I can explore with this witness, if he knows of -- (Interrupted)

THE COURT:  I don't know watch from this guy was -- (Interrupted)

MR. LITTLEFIELD:  No.  But if this guy -- Mr. Smith knew that when he asked that question.

MR. SMITH:  No, I don't, Judge.  I don't know what he's talking about right now.  But I -- (Interrupted)

MR. LITTLEFIELD:  Your question was Mr. Barrett was placed in PC because of the nature of his crime.

MR. SMITH:  Right.  And that's what -- (Interrupted)

MR. LITTLEFIELD:  You asked him why he was placed in PC.  That happened before he got there.  You're asking the reason why and you're opening the door for the reason why.

MR. SMITH:  Judge, when I interviewed Mr. Gude, he told me that they segregated people based on the nature of their crimes.  That they -- just the same thing we went into at the first part of direct.  That -- and that's what I was referring to here.  I don't know of nothing else that Mr. Littlefield's -- there's nothing in the records we have as to what he may be referring to.  And I don't know what it is, but -- (Interrupted)

4984

MR. LITTLEFIELD:  This witness may well know that there are other reasons why Mr. Barrett was placed in PC, because of problems he caused when he was in the general population.

THE COURT:  You can ask him that question.

(Whereupon, the following record was made in open court within the hearing of the jury.)

RECROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    I think you indicated on redirect that Mr. Barrett was placed in PC because of the nature of his crimes?

A    Yes, sir.

Q    Were there other reasons why -- that you're aware of why he was in PC?

A    In the old jail, no, sir.  In the new jail because of his crimes.

Q    So the reason he was in protective custody in the old jail is beyond your knowledge?

A    Yes, sir.

Q    You don't know if it was because of the nature of the crimes or other issues?

A    No, sir.

Q    Did the other prisoners look up to Mr. Barrett?

A    I believe some did.

Q    And was he somewhat elevated in the -- in his status

4985

with the other prisoners in the institution?

MR. SMITH:  Your Honor, I do think we've gone outside the area of redirect.

THE COURT:  Sustained.

MR. LITTLEFIELD:  Pass the witness.

MR. SMITH:  Nothing further, Your Honor.

THE COURT:  May this witness be excused?

MR. SMITH:  Yes, sir.

THE COURT:  Government have any objection?

MR. LITTLEFIELD:  No, Your Honor.

THE COURT:  Mr. Gude, thank you for your testimony.  You may step down.  You may be excused.

THE WITNESS:  Yes, sir.

THE COURT:  Call your next witness.

MR. SMITH:  Courtney Burke, Your Honor.

(Whereupon, the witness was administered the oath.)

THE COURT:  You may proceed.

MR. SMITH:  Thank you, Your Honor.

COURTNEY BURKE,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q    Would you state your name, please.

4986

A    Courtney Burke.

Q    And, ma'am, you may need to lean up a little bit and speak right into that microphone.  Where are you employed, ma'am?

A    Muskogee County Jail.

Q    And for how long have you been so employed?

A    Three and a half years.

Q    What are your job duties there now?

A    I'm the booking supervisor and assistant administrator.

Q    Do you know Kenneth Barrett?

A    Yes, sir, I do.

Q    Is he seated in the courtroom today?

A    Yes, he is.

Q    Describe him for us.

A    He's sitting right here at the defense table in a green shirt and green pants -- slacks.

        MR. SMITH:  May the record reflect she's identified Mr. Barrett, Your Honor?

        THE COURT:  Record so reflect.

Q    (By Mr. Smith) Ma'am, are you friends with Mr. Barrett?

A    No, I'm not friend with him.

Q    You're here in a professional capacity; is that true?

4987

A   Yes, sir.

Q   Been subpoenaed to be here?

A   Yes, sir.

Q   And you've retrieved some records about Mr. Barrett?

A   Yes, I did.

Q   Are you aware of how long he's been confined in the Muskogee County Jail?

A   I believe since October of 2004.

Q   And I want to talk a little bit about the Muskogee County Jail in terms of where Mr. Barrett has been housed.

A   Okay.

Q   Can you describe the facility that he's in?  In other words, he has a cell?

A   Yes, sir, he does.

Q   And how many people are housed in that cell?

A   Anywhere from two to three people depending on how many bed space we have in the cell.

Q   How many beds are in that cell?

A   The normal bed space is two.

Q   So if you put three people in a cell, then somebody has to come in and do what?

A   Well, we have some cells that are in the corner cells that have three beds.

Q   You put three in a two bed cell?

4988

A    We have before, yes.

Q    And what do they do?  Put a mat down on the floor or something?

A    Yes.

Q    Now, that opens up into another area?

A    Yes, which is our dayroom.

Q    And how big is that?

A    It depends on what pod they're in.  The biggest dayrooms are maybe from this wall to that table or to that -- about as far as where the juror box is.

Q    From you this way?

A    Probably from this lady to you.

Q    Okay.  This bar back here being the back wall?

A    Yes.

Q    And I assume that prisoners can come out of their cell and go into the day area quite a bit of the time?

A    Yes, they can.

Q    And if they want to go into their cell and be locked in there, then they can do that too?

A    Yes, they can.

Q    Tell me what sort of programs are offered in the Muskogee County Jail in terms of alcohol or drug rehabilitation.

A    We have none.

Q    What kind of programs are offered in what we may

4989

call daily life skills?

A     We have none.

Q     Any moral recognition therapy or any of that attitude type programs?

A     No, sir.

Q     Are there any programs that are offered other than religious-type programs?

A     No.

Q     In your three and a half years, what's the longest stay anybody's been in the Muskogee County Jail?

A     I'm not positive, but I would say probably around two years would be around the longest.

Q     Okay.  Now, do the inmates get to go outside at Muskogee jail?

A     If it's warm outside, if it's not raining or snowing, yes, we do allow them to go.  They have certain times to go to the yard.

Q     Mr. Barrett, did he ever get a chance to go outside there?

A     I believe so, yes.

Q     And how long do they go outside?

A     I believe the longest they're allowed out is an hour a day.

Q     And how often would they do that?

A     I'm not positive on that.  I think twice a week, but

4990

I can't be positive.

Q   How often do they get a chance to take a shower?

A   Every day.

Q   So it's a pretty good facility in terms of jail, I guess?

A   Yes.

Q   Now, you had contact with Mr. Barrett up on the pod, up on the cell area?

A   I've had to go up there once and pass out commissary and had contact with him then.  But on a regular daily basis, no, I do not.

Q   If there were problems with Mr. Barrett while you worked at the jail, would you know about them?

A   Most of them, yes.

Q   And I guess it would take something significant for it to make it to a record, to come to your attention?

A   Yes.

Q   So if somebody makes an offhand comment, one inmate to another, that's probably not going to be documented?

A   No.

Q   If somebody grabbed a jailer and threw him against a wall, well, that would be?

A   Yes.

Q   Okay.  So would it be fair to say that significant issues make it to paper?

A     Yes.

Q     And you searched the records at the Muskogee County Jail, didn't you?

A     Yes, I did.

Q     And you found two records for me that concerned Mr. Barrett?

A     Yes, I did.

Q     I want to talk about those.  I want to talk about the incident that you're aware of that involved Adam Satterfield.

A     Okay.

Q     Are you aware of that incident?

A     Yes, I am.

Q     And you've seen the report?

A     Yes, I have.

Q     Tell us when that occurred.

A     I believe it was last December.

Q     Of '04?

A     Yes, sir.

Q     And what happened?

A     Mr. Barrett was getting his food tray.  He did not have his jumpsuit pulled up all the way, which is required when they come to the slider or get their food tray, they ought to have their jumpsuit completely pulled up and buttoned.  He didn't have.  The guard asked him to

please pull his side of his jumpsuit up.  As he was walking off, he turned around and threw the food tray at the guard and said fuck you.

Q   Okay.  And you say threw it at the guard.  Where did the tray land?

A   At his -- at the guard's feet.

Q   There wasn't any indication that it hit him or there was?

A   No, there was no indication that it hit the guard.

Q   Okay.  And so they wrote a report up about that?

A   Yes, they did.

Q   And what action was taken?

A   I believe Mr. Barrett was locked down for three days.

Q   Okay.  Is that the extent of that incident as far as you recall?

A   Yes.

Q   Is there another incident involving a Shirley Shores?

A   Yes.

Q   Okay.  What happened with that?

A   Mr. Barrett came down to take his medication.  He came to the slider.  When they come to the slider, they're to have a cup with water in it.  The nurse has to make sure that they do swallow their meds and they're not

holding it.  Mr. Barrett turned around and walked up the steps, said he needed to get more water.  The nurse told him to come back and he -- and for him to leave the meds with her until he could get more water.

Q    I guess he had some in a cup and one in his mouth?

A    He had one in his mouth and was holding one in his hand.

Q    Okay.

A    And from what I understand, he put the one in his hand back on her cart and then spit the one in his mouth out, at her or on the cart, I'm not sure.

Q    Spit it out?

A    Yes.

Q    Okay.  That the extent of Mr. Barrett and what I'm going to call misconduct in the Muskogee County Jail?

A    To my knowledge, yes.

Q    Whenever you would deal with Mr. Barrett, how would you address him?

A    Usually during the day, unless our jail superintendent wasn't there, I wasn't the one that dealt with him.  Our jail superintendent, Raymond Barnes, would.  But usually the guard that locked him down is the only one that would address him.  He would be locked down by that guard that did the incident report.

Q    I'm talking about whenever you would -- you said you

4994

handed out commissary or something?

A    Yes.

Q    How do you address inmates generally?

A    Call them by their last name.

Q    Okay.  And how do you like for them to address you?

A    They can call my Courtney if they'd like.  It doesn't matter as long as there's nothing vulgar.

Q    And Mr. Barrett ever have anything vulgar to say to you?

A    No, not to me.

Q    Okay.  How would he address you?

A    Either Courtney or Ms. Burke.

Q    How would you term the way that he would address you?

A    Ms. Burke usually.

Q    And I guess if you had a label to put on Kenny Barrett in terms of an inmate, and I know you got to kind of compare him to -- with your experience and to -- let me ask it this way, I guess you got inmates that are good inmates?

A    Uh huh.

Q    You got inmates that are bad inmates?

A    Yes.

Q    And what kind of inmate's Kenny Barrett?

A    To my knowledge he's been a good inmate.

4995

MR. SMITH:  Pass the witness.

THE COURT:  You may cross examine.

MR. SPERLING:  May I approach the clerk, Your Honor?

THE COURT:  You may.

CROSS EXAMINATION

BY MR. SPERLING:

Q   Ma'am, I just placed in front of you and would ask .with the Court's permission if you would please tell the Court what Government's Exhibits Numbers 334 and 335 are?

A   345 would be the incident report with Adam Satterfield, 345 would be the incident report with Shirley Shores.

Q   344 is the Satterfield report?

A   Yes, sir.

Q   And 345 is the Shores report; is that correct?

A   Yes.

Q   And do these appear to be accurate reproductions, that is, photo copies of the jail records that you keep in your care and custody at the Muskogee County Jail?

A   Yes, they do.

Q   Would it be fair to say, ma'am, that before you testified today you reviewed these documents?

A   Yes, I did.

Q   And is your recollection, that is, is your knowledge

4996

of these incidents based on these incident reports?

A    Yes, they are.

Q    Did you have direct personal contact with Adam Satterfield or Shirley Shores concerning these instances?

A    No, I did not.

Q    Okay.  And as a matter of course in Muskogee County Jail, if something like this were to occur, the jailer or the jail personnel who is involved would fill out this official report, this incident report, and this incident report ultimately would make it to you for safekeeping in your official business; would that be fair?

A    That is correct.

MR. SPERLING:  Your Honor, we move for the admission of Government's Exhibits Numbers 344 and 345, please.

MR. SMITH:  No objection.

THE COURT:  Be admitted without objection.

MR. SPERLING:  344.  First, may I exchange my copy for hers so that we may -- (Interrupted)

THE COURT:  You may.

MR. SPERLING:  -- use the official one for demonstration, Your Honor?

Q    (By Mr. Sperling) First of all, with regard to what has previously been marked for identification as Government's Exhibit Number 344.  Do you know what

position Adam Satterfield had with the Muskogee County Jail at the time of this occurrence, ma'am?

A    At the time he was a guard.

Q    Has he since then been promoted with regard to the jail?

A    Yes, he has.

Q    Do you know what his position is now?

A    He's a shift supervisor now.

Q    Okay.  And so far as you are aware, ma'am, do you have any reason to question the accuracy of the information that is contained in the description of this incident here?

A    No, I don't.

Q    Are you aware or -- well, it says action taken at the bottom, after the description of the incident which is substantially as you described it, there is action taken.  Are you aware of that, ma'am?

A    Yes, I am.

Q    And here the action taken reveals subject took to cell 115.  What's cell 115?

A    It's a cell down in our detox area.  It's where we put our problem inmates that we can lock down.

Q    And no other action taken till head of security comes in at eight o'clock?

A    Yes, sir.

4998

Q    And is that an appropriate response from a jailer to misconduct such as this?

A    No.

Q    It is?

A    It isn't.

Q    What should a jailer typically do?

A    He should have written down exactly what punishment he gave Mr. Barrett.

Q    Okay.  Would it be inappropriate, however, for a jailer to consult with a supervisor before administering punishment?

A    No, that's not inappropriate.

Q    So it would be appropriate -- (Interrupted)

A    Right.

Q    -- for a jailer to do this as well, and rather than to administer the punishment immediately, to take a moment to reflect, to consult with his supervisor before deciding what punishment if any -- (Interrupted)

A    You're correct.

Q    Okay.  So I want to make sure that I got your answer correctly.  Was the response that he took here then appropriate, that is, to consult with his supervisor?

A    Yes.  Yes.

Q    Okay.  Now these trays, the tray that was -- that this report indicates was thrown in the direction of the

4999

jailer?

A     Uh huh.

Q     Would you describe that tray for the jury, please? And maybe you can compare it, say, to a Furrs' tray or to a cafeteria tray, a typical cafeteria tray.

A     It's about the size of a typical cafeteria tray. It's thicker.  It's probably about this thick.  It's hollow.  They're brown, they're about the same as a normal cafeteria tray, same size.

Q     Would it be -- I'm sorry.

A     The same size.

Q     All right.  Same size as a normal cafeteria tray. Would it be fair to say that it has a lot more bulk than a normal cafeteria tray?

A     Yes.

Q     And would it be fair also to say that if that tray were to hit an individual, that that tray could cause injury?

A     Yes, it could.

Q     And in fact, are you aware of a circumstance in which a deputy by the name of Joe had his nose actually broken by a tray?

A     Yes, he did.

Q     Okay.  So this could be, depending on how employed, a dangerous device, couldn't it?

5000

A    Yes, it could.

Q    And in the state of Oklahoma there is something called assault with a dangerous weapon.  Depending on how it's used, that tray could be considered a dangerous weapon, couldn't it?

A    I would think so, yes.

Q    Okay.  Are you aware, by the way, of the fact that the Defendant also was here in the Muskogee County Jail for a period of time with regard to -- well, as having been transferred from Sequoyah County?

A    I believe so, yes, but I'm not positive on when it was.

Q    Okay.  And I'm not trying to be unfair.  I know you deal with lots of jailed inmates, don't you?

A    Yes.

Q    And on the average day -- well, do you know about how many are in the Muskogee County Jail today?

A    On an average daily basis around 260 inmates.

Q    Would it be -- well, how consistent has that number been over the past three or four years, let's say?

A    I would say fairly consistent.

Q    By the way, how old is the Muskogee County Jail?

A    Oh, gosh.  I think 1986 was when it was built.

Q    Okay.  But about 20 years old, relatively modern, is it not?

5001

A    Yes.

Q    Okay. Thank you. And also Government's Exhibit Number 345. Let's examine this for a moment, please. Shirley Shores, who is she?

A    She is the supervisor of our medical department.

Q    I'm sorry to jump back to the other incident, but would it be out of the ordinary if concerning the tray throwing incident, if after that misconduct the Defendant were placed in handcuffs and then escorted down to the cell where inmates who engage in this conduct are kept; would that be inappropriate?

A    No.

Q    And is that fairly routine?

A    Yes, it is.

Q    And also with regard to the incident concerning the tray, did it appear from your review of the records that the tray was thrown at, that is, in the direction of the jailer, but did not strike him directly?

A    That is what I took it as, yes.

Q    And did you also understand from your review of the records that food from the tray did splash up and hit the jailer?

A    Yes.

Q    Now, with regard to this matter, this is Shirley Shores. Who is Shirley Shores?

5002

A    She's a supervisor of our medical department.

Q    And as a medical supervisor, is she also a trained medical aid technician?

A    Yes, she is.

Q    Does she facilitate the distribution of medicines -- medication that has been prescribed by a doctor for a jailed inmate?

A    Yes, she does.

Q    By the way, how old is she?

A    Shirley's -- I would say close to 70, probably in her 60s.

Q    Okay.  And -- I'm sorry.

A    I'm not positive how old she is.

Q    Okay.  But you would think close to 70?

A    Yes.

Q    Do you have any sense as to her approximate height and weight?

A    Oh, gosh.  Maybe five five, about 170 pounds, 160 pounds.

Q    Thank you very much, ma'am.  And she is essentially there to help the inmates by distributing medication, isn't she?

A    Yes, she is.

Q    She doesn't prescribe medication for a jailed inmate, though, does she?

5003

A    No, she doesn't.

Q    That's done by a doctor, correct?

A    Yes.

Q    And a doctor -- I'm sorry?

A    Go ahead.  I'm sorry.

Q    Is that correct?

A    Yes, it is.  Dr. Bumgardner is our doctor.

Q    And the doctor makes regular trips to the jail, doesn't he?

A    Yes, she does.

Q    And she attends the various ailments of the jailed inmates, doesn't she?

A    Yes, she does.

Q    In fact, it would probably be fair to say that many of the jailed inmates get much better medical care in jail than they did on the outside, don't they?

A    I would think so, yes.

Q    And they also have access to dental work?

A    Yes, they do.

Q    They also have access to hospitalizations should that become necessary?

A    Yes.

Q    Even surgeries?

A    Yes.

Q    But with regard to Shirley Shores, are you aware

5004

that there was a medical tray -- that the only thing that separated her in her interaction with the Defendant was a medical tray?

A    It's a cart that rolls, yes.

Q    Okay.  And that at the time of this incident, that what the Defendant did is that he -- actually he was about to walk away with her -- with medication, correct?

A    Yes.

Q    And that's against jail rules, isn't it?

A    Yes, it is.

Q    And one of the reasons that that's against jail rules is because of people tongue medications, that is, they collect it over a period of time?

A    Right.

Q    Medication can become a commodity in jail, can't it?

A    Yes, it can.

Q    It can be traded for things or other -- well, it could be traded?

A    Yes, it can.

Q    For something of value?

A    Right.

Q    Okay.  And so as a result, Shirley instructed the Defendant to return, correct?

A    Yes, she did.

Q    And his response was not to comply, wasn't it?

5005

A    I believe he did turn around and walk back to Shirley, but he spit the medicine out at her or on the cart.

Q    He also took the medication that he had -- or certain medication and threw it at her, didn't he?

A    He threw it on the cart, at her, I guess.

Q    Okay.  Or in the direction.  But he took medication and tossed it, didn't he?

A    Yes, he did.

Q    And then in addition to that, he took a pill that had been given to him that was in his mouth and spit it at her, according to the report, didn't he?

A    Yes.

Q    And as a result of this misconduct, Ms. Shores recommended certain punishment.  Are you aware of that?

A    Yes, she did.

Q    And are you aware that her recommendation was for three days without commissary, without visitation and without phone calls?

A    Well, we don't allow to take their phone privileges away from them unless it's been asked by the superintendent, so probably it was just the three days in lockdown, no commissary and no visitation.  And then they're allowed one hour out a day when they're on lockdown, so he could have used the phone then.

5006

Q    By the way, is there any danger in dealing with the bodily fluids of inmates?

A    Yes, there is.

Q    And is there a substantial incident -- incidents of Hep C, Hepatitis C, with regard to inmates?

A    Yes.

Q    Is there some significant incidents of AIDS with regard to inmates?

A    That I would say, yes, but I mean, there's certain things they're not allowed to do when they're HIV positive.

Q    And I'm not suggesting you necessarily know with regard to Mr. Barrett whether or not he has any transmittable disease like that, do you know?

A    I have no idea.

Q    Given the fact that there are 260 inmates at any given point in time, would you expect that Shirley Shores would have absolute recall as to who has what in terms of communicable diseases?

A    No, she wouldn't know at all times.

MR. SPERLING:   I have nothing further.   Thank you very much.

THE COURT:   Redirect?

MR. SMITH:   Briefly, Your Honor.

5007

REDIRECT EXAMINATION

BY MR. SMITH:

Q    Ma'am, you deal with all sorts of misconduct -- or see it over there at that jail, don't you?

A    Yes, I do.

Q    And whenever we talk about putting this -- first off, let's go back to that pill spitting incident. Didn't -- no indication he spit on her, was there?

A    No, not that he spit on her, just that he spit -- that she put in it that he spit it at her.

Q    And in the scope of things -- I mean, let's not make it more than what it is or make it less than what it is. In the scope of things, for as long as Mr. Barrett's being confined over there, and these two things that are in his file, does it change your opinion about the type of inmate that you said Mr. Barrett is?

A    No, it doesn't.

           MR. SMITH:   Pass the witness.

           THE COURT:   Further cross?

           MR. SPERLING:   Nothing further, Your Honor.

           THE COURT:   May this witness be excused?

           MR. SMITH:   Yes, sir.

           THE COURT:   Ma'am, thank you for your testimony.  You may step down, you may be excused.  You can call your next witness.

5008

MR. HILFIGER:  Martin Daggs.

MARTIN DAGGS,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    State your name, please.

A    Martin Daggs.

Q    Mr. Daggs, how are you employed?

A    I'm a bail bondsman for Charles Bail Bonds in Sequoyah County.

Q    You're going to have to speak up a little bit or get a little closer to that microphone.

A    I'm a bail bondsman for Charles Bail Bonds in Sequoyah County.

Q    And how long have you been doing that?

A    About 15 years.

Q    Do you know -- in your business have you come across Kenneth Barrett?

A    Yes, sir.

Q    And how have you come across Mr. Barrett?

A    I have bonded him out of jail before.

Q    You bonded him out of jail?

A    Yes.

Q    On more than one occasion?

5009

A    Well, just once that I ever -- can recall.

Q    Okay.  And would that one be in regard to a drug case, possession?

A    Yes.

Q    Would that be in regard to a '97 case?

A    Yes, sir.

Q    And you can recall that?

A    Uh huh.

Q    And in that case you were on his bond the whole time?

A    Yes.

Q    He was out, is that right?

A    That's correct.

Q    And did you maintain contact with him?

A    Just saw him on occasion.  Not deliberately contact him, no, I didn't.

Q    How did it occur -- on that particular case, how did it occur that you happened to write the bond for him?

A    He was in the courtroom or in the courthouse in the hallway and said he was going to need a bail bondsman and asked us if we'd write his bail.  He had been talking to Charles and Charles told me to go write his bond.

Q    Well, was he under arrest when he came in or did he come in on his on?

A    He was there on his own free will.

5010

Q   And -- and I'm not asking you necessarily to -- if you know the date, can you tell me the date that he came in.  But if you don't, would you have written the bond on the same day that he came into court?

A   Yes.

Q   Okay.  And that would be the day that you -- when you saw him, had he appeared before the judge yet?

A   Yes.

Q   Okay.

A   Yes, I believe he appeared to get a bond set.

Q   Okay.  And he was not under arrest at that time; isn't that correct?

A   No.

Q   Was he in civilian clothes?

A   Yes.

Q   And he wasn't with the sheriff or his deputies or anything like that?

A   No.  I believe that they had called for a deputy but he had not made it there, I don't think, at that time.

Q   And then after that, he remained on that same bond, is that right?

A   That's correct.

Q   And did there come a time when you became aware that there was a bench warrant issued in that case?

A   Yes, I did.

5011

Q    And do you know about when that was?

A    Oh, it was shortly after that.  I'm not -- the dates I don't remember, no.

Q    Okay.  Would it have been on a regular disposition docket day?

A    Yes.

Q    And what is the disposition docket?

A    That's when they -- the Defendant appears to work out a plea bargain and enter a plea and go from there.

Q    Okay.  And on that particular disposition docket, when you became aware that there was a bench warrant out, I mean the bench warrant was issued, right?

A    That's correct.

Q    And that was because Kenny Barrett didn't show up, is that right?

A    That's right.

Q    Now did that give you any concern at that time?

A    No.

Q    And why not?

A    He's lived in the same place for as long as I've ever known him.

Q    And when that announcement was made did you do anything to make Kenny Barrett aware of that bench warrant?

A    No.

5012

Q   At any time did you make Kenny Barrett aware of that bench warrant?

A   No, I did not.

Q   And why not?

A   I was never notified.

Q   You were never notified by who?

A   By the court clerk's office.

Q   Okay.  You were aware of it?

A   I was aware of it but not notified.

Q   Okay.  And what would the court clerk do to notify you?

A   She would send me an order and judgment of forfeiture.

Q   Slow down and say that again now.

A   She would send me an order and judgment of forfeiture.

Q   Okay.

A   That's notification.

Q   And when that would occur, what would you do?

A   That's when I would have contacted Kenny and went and talked to him about the situation, brought him back into court.

Q   Did you have any concern about him being out with that bench warrant issued?

A   No.

5013

Q    You knew where to get him if you needed him, right?

A    Yes.

Q    Did you -- and at any time did you make contact with him and inform him that he needed to do something on that bench warrant?

A    No, I did not.

Q    Did you ever know Kenny Barrett -- now, let me ask you this:  Were you aware of the marriage between Kenny Barrett and Abby Barrett?

A    I was aware of it, yes.

Q    Did you ever know -- other than with Abby Barrett, did you ever know of any violent offenses or violent charges that were made against -- or accusations even -- that were made against Kenny Barrett?

A    No, I was not.

            MR. SMITH:  I have no further questions.

            THE COURT:  You may cross examination.

                     CROSS EXAMINATION

BY MR. SPERLING:

Q    Mr. Daggs, how long have you been in the bonding business?

A    Since '91.

Q    Have you been continuously employed by the same bonding company during that period of time, sir?

A    Yes, sir, I have.

5014

Q    All right.  And during the time that you served as a bondsman for the Defendant Barrett, did you ever have occasion to go out to his residence?

A    No, I did not.

Q    You have never been in his residence -- (Interrupted)

A    Not inside it.

Q    Would that be fair as well?

A    That's correct.  I have been by it -- by it, but never in it.

Q    You have driven by?

A    Yes.

Q    Okay.  And do you live anywhere in that area?

A    About two miles from there.

Q    Did you ever have occasion to drive by in your official capacity or why did you drive by?

A    I drove by going to his neighbor's house.  He lives on a dead end street so it's not just a drive-by situation.

Q    Okay.  And do you remember anything about that drive-by, having driven by the property on that date?

A    It's just a very small house that he lives in is all I recall.

MR. SPERLING:  Government's Exhibit Number 87, may it be displayed to the witness, please, Your Honor?

5015

THE COURT:  You may.

Q    (By Mr. Sperling) There have been two terms that have been used in your direct examination, sir.  And one is bench warrant and another is bond forfeiture.

A    That's correct.

Q    Those aren't the same thing, are they, sir?

A    No, they're not.

Q    In fact, the bench warrant is what it's name applies.  That is a warrant issued by the bench, issued by the judge, for some failure to comply with a court order, right?

A    That's correct.

Q    Are you familiar with preliminary hearings in Sequoyah County?

A    Yes, I am.

Q    And are you aware that at the end of preliminary hearings, judges as a matter of routine if they bind a defendant over, bind them over for district court arraignment?

A    Yes, that is correct.

Q    In fact, a lot of folks -- assistant D.A.s, maybe even bondspeople use almost an acronym, BODCA, bound over for district court arraignment, at the end of a preliminary hearing, don't they?

A    Yes, they do.

5016

Q    And do you know who the special district judge is in Sequoyah County?

A    Yes, I do.

Q    Who is that special district judge?

A    Dennis Sprouse.

Q    Is Judge Sprouse meticulous with regard to binding defendants over for district court arraignments on dates certain?

A    He's very particular most of the time, that's correct.

Q    And as a matter of practice, he would then give a defendant a date on which to appear for a district court arraignment, right?

A    That his normal procedure.

Q    And at the district court arraignment, a defendant would appear in front of the judge at which time the defendant would formally arraigned, that is, he would be told what the nature of the charges is and the range of punishment, correct?

A    That's correct.

Q    And at that district court arraignment, the defendant then would also enter a plea, either guilty, not guilty or nolo contendre, correct?

A    That's correct.

Q    And at that time, the judge would either continue

5017

the defendant on his same bond or make some adjustment either up or down on the bond that has been made?

A     Normally he remands them back on the same one.

Q     That's usually what happens?

A     That's normal procedure.

Q     Okay.  And it would be fair to say that in a county such as Sequoyah County there is sometimes a preference stated for paying the attorney fee for making sure that someone can pay an attorney fee rather than jacking up a bond, correct?

A     That's correct.  Now, there's one other step that you've left out.  In the normal procedures of Sequoyah County, they also have a disposition docket.

Q     Okay.  And that disposition docket is a docket or a time for a defendant to appear and it's really an opportunity for the district attorney and the defense attorneys to kind of get together.  Sometimes cases settle, sometimes they don't, right?

A     Correct.  That's correct.

Q     Okay.  And are defendants typically required in felony cases to appear at the disposition docket?

A     From what I'm aware of, of the law, they're supposed to be there any time he has a court appearance, period.

Q     Okay.  Then after the preliminary hearing and the binding over for district court arraignment, the district

5018

-- or the disposition docket and then the district court arraignment, after that at the district court arraignment, the judge, whether Judge Henshaw or the district judge, John Garrett, would assign a specific day for trial, correct?

A    That's normal, yes.

Q    And that's done as an ordinary course of business, isn't it?

A    That's correct.

Q    And so it's no secret.  It's done right there in open court for everyone to hear, correct?

A    That's correct.

Q    And if a defendant is told to appear on a date certain for trial and he doesn't, he's in violation of a court order, isn't he?

A    That's correct.

Q    That's what happened in this case, isn't it?

A    I would say so.

Q    Okay.  Now, when we talk about bond forfeitures versus bench warrants, bench warrant would be a warrant issued by a judge for noncompliance with a court order or a court requirement, right?

A    That's correct.

Q    In this case failure to appear for jury trial for a felony, right?

5019

A    Right.

Q    And in this case the felony was distribution of methamphetamine, wasn't it?

A    Yes, it was.

Q    You would as the bondsperson have had access to the affidavit, wouldn't you?  That underlie or underlay the charge itself, wouldn't you?

A    No, I would not.

Q    You wouldn't have access, if you had chosen to do so, to go to the court clerk's office?

A    Yes, I could if I went to search it out.  But, no, I don't normally do that.

Q    Okay.  And typically it's enough for you to know what the nature of the charge is and what the bond that has been set by the court, correct?

A    That's correct.

Q    Okay.  Now, we get to that second term, that term bond forfeiture.  I mean, I guess if I really cut to the chase, a bondsperson doesn't get terribly excited about a defendant's failure to appear until judges start talking about digging into your pocket, right?

A    That's correct.

Q    And that's the bond forfeiture part, isn't it?

A    That's correct.

Q    Okay.  So the fact that the Defendant hadn't

5020

appeared, the fact that the Defendant may have had chosen, if he did, knowing that court date not to appear, that's really not a lot of skin off the bondsman's nose until the judge issues something called a bond forfeiture or an order to show cause, right?

A    That's correct.

Q    And at that point you know it's -- that you got to do one of two things.  You've either got to bring the body of the defendant before the court or you're going to be out 1500 bucks that you promised to pay the court if he didn't show, right?

A    That's correct.

Q    Okay.  And Government's Exhibit Number 80 -- I believe this is 87, yes.  Are you familiar with this document, sir?

A    Yes, I am.

Q    And this document is the bench warrant that was issued by the court for the Defendant's failure to appear before Judge A.J. Henshaw in Sequoyah County, right?

A    That's correct.

Q    And Judge A.J. Henshaw is an associate district judge, isn't he?

A    That's correct.

Q    And he's an associate district judge with jurisdiction over felony crimes and he can try jury

5021

trials, felony jury trials, in Sequoyah County, can't he?

A     That's correct.

Q     Okay.  Thank you, sir.  Then Government's Exhibit Number 332, please.  Let me ask you just a couple of questions, Mr. Daggs, as a prelude to -- just a question or two about this document.  Typically why do judges increase the amount of bond that must be posted for a defendant after a bond has been originally set?  What's the single most important reason?

A     Because they have failed to appear.

Q     And in this case if you will look at the entry -- I believe it's under -- it says 2-20-96.  Do you see that one?  It says bond Daggs $1,500.

A     Yes, I do.

Q     And in the ordinary course of business, if a defendant were required to make a $1500 bond how much money do you require that they put down on the bond?

A     Usually require 15 percent.

Q     Fifteen percent?

A     Yes.

Q     Okay.  So what, $225?

A     Yes.

Q     If he put down $225, what would you ordinarily require the defendant in order to secure the remainder of the $1,500?

5022

A     In this situation I didn't because he's lived in Sequoyah County his whole life.

Q     Okay.

A     The risk factor is not great enough that I required a lot of security on this situation.

Q     All right.  So $225 and his signature got him out on a $1500 bond?

A     That's correct.

Q     Okay.  If you look below that, 9-6-96 there is B/warrant.  That's bench warrant filed, correct?

A     That's correct.

Q     And after that bench warrant was filed there's a notation 9-6-96, it says bond Merrill $5,000.  What does that indicate to you?

A     That he re-bonded on it.

Q     Okay.  If he showed up again he could be bonded out, but this time his bond would be tripled roughly from $1,500 to $5,000, right?

A     That's correct.

Q     Okay.  And is this something of which you were made aware or is this something that happens by the courts -- by the court that may not have come to your attention?

A     That happened by the court and it did -- because there's no bond forfeiture to go along with that bench warrant.

5023

Q    Okay.  And again just to be frank about this, unless you have money at risk, you have no interest in this, right?

A    That's correct.

Q    Do associate district judges and district judges run for political office?

A    Yes, they do.

Q    And they run -- although it's a nonpartisan race, that is they don't run as Democrats, Republicans, independents or otherwise, it's a nonpartisan race, correct?

A    That's correct.

Q    But they sometimes attract opponents?

A    Yes.

Q    And bondspersons do their best to maintain good relationships with judges at state level, right?

A    Yes, they do.

Q    Because he's the guy that can say bond forfeited or not, right?

A    Under normal circumstances they always state the bond forfeiture, which is the law.

Q    Sure.

A    And I do not have any regret or remorse toward them at any time because they forfeited my bond.  They're doing their job.

5024

Q    It's favored -- it's preferable, though, to be on good terms with the judge such that you can go to him and say, judge, give me a few moments or give me a little time, I think that I can locate this guy.  I think I can bring him in, right?

A    And that's correct.

Q    Do you keep up on criminality in Sequoyah County that does not concern you unless it's really notorious?

A    No.

Q    So if the Defendant would have been the subject of repeated domestic violence complaints, protective orders or the like, is that something that you would think would escape your attention rather than come to your attention?

A    Unless he went to jail for it, no, I wouldn't have no business in it.

Q    And if we were to run through a series of case numbers that relate to violation of protective orders, criminal misdemeanor, domestic violence cases, domestic abuse dockets and the like, protective orders violations, would that all be news to you with regard to this Defendant?

A    I'm not aware of them unless I have -- like this one, I did write his bail on this one.  But outside that, no.

Q    Okay.  I'm not going to belabor the record by going

5025

through them individually.

A     Okay.

MR. SPERLING:  Thank you very much, sir.  Thank you, Your Honor.

THE COURT:  Any further direct?

MR. SPERLING:  Excuse me.  Just one moment, Your Honor.

Q     (By Mr. Sperling) I take it given your response in direct examination that you were not aware of accusations of prior violence with regard to the Defendant?

A     No, I am not.

Q     That if the Defendant were to have threatened in the context of domestic violence to go inside a house to retrieve a gun and come back and shoot someone who tried to intervene, that person being Shannon Smith, you would not be aware of that?

A     No, I sure wouldn't.

Q     And if the Defendant were to have spoken to trusted associates of his and were to have threatened a cooperating witness or an informant, that would be news to you, wouldn't it?

A     Absolutely.

Q     And if the Defendant were to have stated to friends and associates of his that he hoped that the first person through the door were to be the sheriff, Johnny Philpot,

5026

or the D.A. investigator Frank Loyd, that would also be news to you, sir, wouldn't it?

A     Yes, it would be.

        MR. SPERLING:  Thank you.  I have nothing further.

                    REDIRECT EXAMINATION

BY MR. HILFIGER:

Q     Mr. Daggs, when did you say you became a bondsman?

A     In 1991.

Q     1991.  So any incidents involving bonding on anything prior to 1991 you would not be aware of; is that correct?

A     That's correct.

Q     Can we see this Government's Number 87 again?  And without belaboring it, but just -- Mr. Sperling kept asking about a bench warrant issued by the judge.  Issued by a judge.  And referred to the bench warrant issued by a judge.  An on Number 87, which judge issued that bench warrant?  Amanda Woody; is that a judge?

A     No, sir, she's not.

Q     So this bench warrant really wasn't issued by a judge, was it?

A     No.

Q     That's sort of their practice down there, isn't it?

A     That's correct.

5027

Q    That the court clerk does it?

A    The judge will probably make a minute to the effect of that and then the deputy clerk would actually issue the warrant.

Q    But the warrant is issued by the court clerk?

A    That's correct.

Q    In this case the deputy court clerk, is that right?

A    That's correct.

Q    And as to this warrant, your concern about the bench warrant about is -- you don't get concerned about it in this case because you knew where Kenny Barrett was; isn't that true?

A    That's correct.

Q    If you needed him you knew you could go get him?

A    That's correct.

Q    And just like Mr. Sperling says, you know, it doesn't really concern you greatly until it hits your pocketbook?

A    That's correct.

Q    And if you know where the person is and you know how to get him, you don't care about doing anything until it hits your pocketbook?

A    That's correct.

Q    Now, you might get concerned if you didn't know who the person was or where he was, isn't that right?

5028

A    That's correct.

Q    But in this case you knew where Kenny Barrett was?

A    Yes, I did.

Q    And you didn't see any reason to go after him, not even to notify him about it?

A    No.

MR. SMITH:  I have no further questions.

MR. SPERLING:  Briefly, Your Honor.

RECROSS EXAMINATION

BY MR. SPERLING:

Q    With regard to Government's Exhibit Number 86, the record can correct me, but I believe that what I was indicating is that the bench warrant was issued by the court; do you understand that?

A    Yes.

MR. HILFIGER:  Your Honor, that's not what he said.  He said issued by -- (Interrupted)

MR. SPERLING:  Can I ask my questions?

THE COURT:  Well, I think it's real clear to the jury what's going on.  I mean, I don't know why either one of you is spending this much time with this issue, but I'll indulge you a little further.

Q    (By Mr. Sperling) Typically, do court clerks do the bidding of a judge?

A    Yes, they do.

5029

Q    And you know that the deputy court clerk here is the person who signed this bench warrant?

A    Yes.

Q    And is it a routine ordinary course of business that court clerks sign bench warrants as the result of the court's, that is, the judge's direction?

A    That's not always correct because under new information, when there's a new warrant, the judges always sign those warrants.

Q    But on bench warrants, typically this is the way things were handled?

A    That's correct.

        MR. SPERLING:  Thank you, sir.  I have nothing further.

        MR. HILFIGER:  I have nothing further.

        THE COURT:  May this witness be excused?

        MR. SPERLING:  Yes, Your Honor.

        THE COURT:  Sir, you may step down.  Thank you for your testimony.  You may call your next witness.

        MR. HILFIGER:  Steven Barrett.


        STEVEN WAYNE BARRETT,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

5030

DIRECT EXAMINATION

BY MR. SMITH:

Q    State your name, please.

A    Steven Wayne Barrett.

Q    And, Mr. Barrett, you're related to Kenneth Barrett, aren't you?

A    Yes, sir.

Q    And how are you related?

A    He's my brother.

Q    And are you younger or older?

A    Younger.

Q    And how many years?

A    Approximately seven.

Q    Where do you live now?

A    I live in Norman, Oklahoma.

Q    You know, you might move a little bit forward and speak into the microphone.

A    Norman, Oklahoma.

Q    And what's your business or occupation there?

A    I'm a principal, high school principal.

Q    At what school?

A    At Noble High School in Noble, Oklahoma.

Q    Mr. Barrett, did you grow up in the same home with Kenneth Barrett?

A    Yes.

5031

Q    And what kind of relationship did you have with Kenneth Barrett growing up?

A    I think it would be described as a normal relationship, older brother.  Got picked on a little bit, but I would consider it normal.

Q    A normal type of sibling?

A    Yes.

Q    I mean, were there fights?

A    Of course.

Q    The -- did you have another brother?

A    Richard, yes.

Q    And where was Richard in this?

A    He's in the middle.  I believe he's two years younger than Kenny.

Q    While you were growing up, can you recall about what age it was that you -- that your parents separated?

A    No.  I believe I was two when it took place, so I don't remember anything about it.  I do remember when we first moved to Sallisaw.  That's about the first memories I have.

Q    Okay.  About when did you first move to Sallisaw? What year?  Or how old were you?

A    I'm guessing around '73 so it would have put me around four years of age.

Q    Okay.  In '73?

5032

A    Somewhere around in there.

Q    And did you become -- while you were growing up -- let me ask you this:  Other than your sibling rivalry between you and your brother and Kenny, can you recall any kind of violent actions that Kenny had toward outsiders, outside the family?

A    Yes, one.

Q    And when was that?

A    I don't remember what year it was.  It would have been late '70s, maybe early '80s. No, I would say late '70s.

Q    And what occurred at that?

A    I just remember Kenny and another young man getting in a scuffle over some automotive parts.

Q    And was it a fist type fight, physical fight, or were there weapons involved?

A    No, it was just a hand to hand type, you know, quarrel.

Q    Other than that, were you aware of kind of violent actions?

A    No.

Q    Now, did you know Abby, who became his wife?

A    Yes.

Q    And what was your -- when they were married, where did they live in relation to where you lived?

5033

A    I believe they originally lived with us at the beginning, should have been somewhere around 1980.

Q    Okay.  When you say with us, who would that be?

A    That would be my mother and my brother, Richard.

Q    And how long did they live there with you?

A    I'm not for sure.  I would guesstimate maybe 12 to 14 months maybe, somewhere around there.

Q    Okay.  And then they -- after that they moved out on their own?

A    Yes.

Q    Can you remember the kind of relationship that he had with Abby during the marriage?

A    Yes.

Q    What kind of relationship was that?

A    It was good at times and they struggled at times.

Q    And when you say struggled at times, was there some violent actions?

A    Not necessarily.  Mainly verbal disagreements, just general fighting, argumentative type stuff.

Q    Can you recall any physical fights that they had?

A    Yes.

Q    And was this just things that you heard about or did you see them?

A    I only had one instance where I physically saw them.

Q    And during that, was it -- you know, was it a

5034

regular marital-type fight or was it something --
(Interrupted)

A    I believe they were arguing about financial matters.

Q    And what occurred at that -- in that instance?

A    I just remember Kenny coming -- he was in the living room, Abby was at the dining room table with us eating and they kept arguing back and forth and then he came after her and grabbed her from the back and pulled her to the ground.

Q    And did any of that result in any kind of hospitalization or any kind of injuries that required medical care?

A    Not that I'm aware of, no.

Q    But it wasn't a physical fight?

A    Yes.

Q    Okay.  Did she do anything?

A    No.

Q    Other than that instance can you recall any other instances?

A    No.

Q    How long were they together that you recall?  Did they live together up till the time of the divorce or were there times that they split up?

A    No, there were times that they split up.  They were away from the house.  I don't know the particulars, but

5035

it was a together then not together relationship.  I would categorize it as that.

Q    When did you sort of leave the area?

A    Probably somewhere around 1989.

Q    And where did you go?

A    I went to Tulsa for a year and then I moved to Norman, Oklahoma where I went to school and I stayed there ever since.

Q    Have you had regular contact back here with him, you know, like for holidays or anything like that?

A    No, sir.  Probably on the average of maybe one to two per year.

Q    As far as guns, were there guns in the house when you were growing up?

A    No.  No, I mean we may have had one, maybe two, but not a regular collection.  No.

Q    What are your dad, Ernie?

A    Yes.

Q    Did he keep guns?

A    Yes.

Q    And did you go visit with Ernie?

A    Yes.

Q    And when you went over to visit with Ernie -- and where was he living at that time?

A    He was living in Prattville, which is right by Sand

5036

Springs, Oklahoma?

Q    In Creek County area?

A    Yes.

Q    And when you went to visit with Ernie -- now did he have a number of guns at his house?

A    Yes.

Q    And was that sort of a common deal to have -- for him to have guns?

A    Yes.

Q    Was he an avid hunter?

A    Yes.

Q    What about Kenny and guns when you were growing up? Did Kenny have guns himself?

A    No.

Q    Did he hunt and fish?

A    He's a deer hunter.

Q    Deer hunter?

A    Through the '80s, so I recall him doing a lot of deer hunting.

Q    Other than with Abby, were you ever aware of any kind of violent actions that Kenny took toward anybody -- and you've talked about this one for the car parts?

A    Right.

Q    Can you recall any others?

A    Just -- nothing I witnessed.  Just things I had

5037

heard from other individuals.

Q    Okay.  Were there fights or what?

A    I never heard any particulars about any physical violence, at least not towards, you know, like hand-to-hand type or knives or guns or anything like that.

Q    So you never heard anything like that?

A    No.

Q    Do you know a Shannon Smith?

A    Yes, I do.

Q    Do you -- was there -- do you recall any kind of occasion in which Shannon Smith and Kenny Barrett had some kind of confrontation?

A    The only thing that took place at least from my perspective on that occurred -- occasion was I was actually in the house.  I don't know what took place between Kenny and Mr. Smith.  Kenny came into the house, asked me to go outside to talk to Mr. Smith and upon which time I did.

Q    I didn't understand you.

A    I went outside to talk to Mr. Smith.

Q    Right.

A    I don't know exactly, but it wasn't a heated conversation and then Shannon left and that was the extent of it.

Q    Was Abby there at the time?

5038

A    I don't believe she was there.

Q    And where did that occur?

A    I believe we were living in town on South Wheeler Street.

Q    And Kenny came in at was -- what did Kenny ask you? What was his purpose in coming in?

A    I think maybe he felt threatened in some aspect and asked me to go out -- (Interrupted)

MR. SMITH:  Judge, I'm going to object as speculative as to what Kenny would have felt.

THE COURT:  Sustained.

Q    (By Mr. Hilfiger)  Was there any expression -- did Kenny tell you any reason why he wanted you to go out?

A    I believe it was in defense of him.

Q    In defense of Kenny?

A    Yes.

Q    And what did you do?

A    I went outside and talked to Shannon and then Shannon left.

Q    What was Shannon saying -- I mean, what was Shannon's purpose of even being there in the first place, did he say?

A    No.

Q    Did he say anything about Abby, Shannon Smith?

A    Not to me.

5039

Q    Was there any discussion about Abby?

A    No.

Q    Did you even see Abby around there at all?

A    No.

Q    Is that the only incident you recall involving Shannon Smith?

A    Yes.

Q    Up until the time of 1990, were you aware of any kind of drug problems that Kenneth Barrett had?

A    I knew he smoked marijuana, but I was not aware of any other things.

Q    Now, and I didn't ask you about after 1990.  Did you have enough contact between '90 and '99 to know whether or not there were any drug problems?

A    Just basic conversations with my mother or my father.

Q    Okay.  And was there concern from them?

A    There was a slight concern, yes.

Q    And was there anything that you could do or did on that concern?

A    No.

Q    Did you ever have any discussions with Kenny about drug problems?

A    No.

Q    Did you see any -- and this would be at any time,

5040

did you see any changes in his behavior because of drug problems?

A    No.

Q    After --

MR. HILFIGER:  May I have just a moment, Your Honor?

THE COURT:  You may.

Q    (By Mr. Hilfiger) Prior to -- while you were growing up and living in the area of Sallisaw, you know, during that time, what kind of person was Kenny Barrett as far as getting along with other people?

A    Kenny and I've always gotten along fairly well.

Q    What about with other people?  With outsiders?

A    I would say that he's fairly antisocial.

Q    Antisocial -- he's a loner?

A    Yes.

Q    Wants to be by himself, isn't that right?

A    Yes.

MR. SMITH:  I have no further questions.  Thank you.

THE COURT:  You may cross examination.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    Mr. Barrett, you're a high school principal in Noble?

5041

A    That's correct.

Q    And you're Mr. Barrett's brother?

A    Yes, sir.

Q    He is seven years older than you?

A    Yes.

Q    And I assume that you didn't run around together?

A    No.

Q    And you didn't have the same friends?

A    No.

Q    You didn't have the same associates?

A    No.

Q    With that kind of age difference, siblings normally aren't particularly close.  Would you describe your relationship with Kenny as being not particularly close to him?

A    I would say it would lie somewhere in the middle, yes.

Q    As you all grew up did you play together very often?

A    Yes.

Q    What kind of games would a nine-year old play with a two-year old?

A    We were in road together like motocross, bicycles, cars and I was -- I tagged along a lot, yes.

Q    Okay.  He took you along on occasion?

A    Yes.

5042

Q    And how old was Richie?  How much older than you was your brother Richie?

A    Five years.

Q    Okay.  So you got Kenny seven years old, Richie five years older and then you're down there at the bottom?

A    Yes.

Q    So when you were two, Kenny was nine, Richie was seven?

A    Yes, sir.

Q    And you were four when you moved to Sallisaw?

A    Approximately, yes.

Q    Well, I mean, that's -- and that would have made Kenny 11?

A    Yes.

Q    And when Kenny was 14, how old would you have been?

A    Seven.

Q    So you were in the second grade, Kenny would have been what age, what grade school when he was 14?

A    Approximately eighth grade.

Q    Shortly after that, Kenny made choices in his life that took him in a different direction than the choices you made in your life?

A    Yes.

Q    You all grew up in the same household?

A    Yes.

5043

Q    Same parents?

A    Yes.

Q    Kenny dropped out of school when he was in the 9th grade, didn't he?

A    Yes.

Q    And you didn't make that same decision, did you?

A    No.

Q    You completed high school?

A    Yes.

Q    And then went to Tulsa after the completion of high school?

A    Yes.

Q    And you went to Tulsa in 1989?

A    Yes.

Q    What did you do in Tulsa, sir?

A    I worked for a year and went to junior college.

Q    Didn't get your associate's degree in junior college, did you?

A    I think I got somewhere around 36 hours and then transferred to OU.

Q    Okay.  And then you transferred to OU and actually went to school at OU and got your degree at University of Oklahoma?

A    That's correct.

Q    And what was your course of study at OU?

5044

A    Science education.

Q    And when did you graduate?

A    May of 1993.

Q    So you made it in a four-year period that one would take to go through school -- through college?

A    Yes.

Q    Kenny didn't go back to school during that period, did he?

A    No.

Q    And after you moved to Tulsa, your contact with Kenny Barrett was pretty scanty at best, wasn't it?

A    Yes.

Q    And then after you completed your college education at OU is that when you got the job with the Noble school systems?

A    I worked for Norman for ten years.

Q    For ten years?

A    Yes.

Q    And did you get a further education beyond that?

A    Yes, I have a master's degree.

Q    What was your master's in, sir?

A    Educational administration.

Q    Did you begin your school administration career at Norman or did you get that at Noble?

A    Noble.

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965 .

4985

5045

Q    So you'd been a teacher at Norman for awhile, a principal's job opened up, you applied for it and received it?

A    I was actually a head football coach at Noble for the last three years, and then I took the assistant principal's job.

Q    How come is it that coaches are the ones that become administrators all the time?

A    I don't know.  Know how to deal with people, I guess.

Q    Okay.  You only saw one fight between Kenny and Abby, physical fight?

A    Yes.

Q    And in that one, Kenny attacked Abby?

A    Yes.

Q    And Abby threw no blows?

A    No.

Q    Are you aware that Kenneth broke Abby's nose on an occasion?

A    No.

Q    And a good portion of the fights were after you left, weren't they?  I mean, went to Tulsa and then on down to Norman?

A    I don't know.

Q    You don't know -- you really don't know much about

5046

their relationship at all?

A     Past that point, no.

Q     And in fact, other than the time, the 12 to 14 months that they lived in the residence, they were living in another location in Sallisaw and you don't really know what happened behind their closed doors on those occasions, did you?

A     No.

Q     You wouldn't know how many times they fought?

A     No.

Q     Or how many times Abby was physically abused by Kenny?

A     No.

Q     The incident about which Mr. Hilfiger spoke, Shannon Smith, where Kenny came in the house and asked you to go outside and talk to Shannon Smith?

A     Yes, sir.

Q     Shannon -- Abby wasn't even there on that occasion, was she?

A     I don't believe so.

Q     So, if Mr. Smith spoke about an incident in which he saw or testified about an incident in which he saw Kenny Barrett grab Abby by the arm and slap her with an open hand and then go into the house to retrieve a gun and telling Shannon Smith that he would kill him or blow his

5047

head off if he was there when he came back out, that wouldn't be the same incident about which you were speaking, would it?

A    I don't believe so.  I don't recall that.

Q    You indicated that -- how old was Kenny Barrett in 1990?

A    I'm guessing around 27.

Q    And you said something on direct about up until 1990 Kenny Barrett smoked marijuana, but you knew of nothing else?

A    Correct.

Q    When did Kenny Barrett move out of the house?  What year would that have been, sir?

A    I don't recall.

Q    Well, you were -- when you left to go to Tulsa in 1989, you would have been 18 at that time, right?

A    I think I'd turned 19 -- (Interrupted)

Q    Eighteen or nineteen?

A    Yes.

Q    Okay.  And Mr. Barrett would have been seven years older than that so he would have been 27 -- 26, 27, somewhere in that range?

A    Yes, sir.

Q    Five years, maybe 25?

A    Yes.

5048

Q    He had moved out of the residence a long time previous to that, hadn't he?

A    Yes.

Q    And in fact, he was 18 when he married Abby; is that correct?

A    I believe so.

Q    Okay.  So he would have moved out somewhere in the age -- around 18 or 19?

A    Yes.

Q    And in regards to Mr. Barrett's drug use, you really don't know for certain what drugs he was using from the time he moved out of his residence up until 1990?

A    No.

Q    If he advised authorities at Lexington when he was received at the Lexington Assessment and Reception Center, LARC, that he had used cocaine since he was 14, you wouldn't have known about that?

A    I was not aware of that.

Q    Well, let's -- I'm going to display the second page of Defendant's Exhibit Number 244.  You'll be able to see it on the screen on that monitor to the left of you and it will also be displayed up here.  If he told the authorities that he had first used alcohol at age 12, you wouldn't have any knowledge of that?

A    No.

5049

Q    And if he told authorities that he used cocaine at age 14 and heroin at age 14, you wouldn't have known of that, would you?

A    No.

Q    And if he told them that he'd used marijuana from the age of 12, you wouldn't really know of that either, would you?

A    Possibly.

Q    Okay.  What about methamphetamine first used at age 20?

A    No.

Q    He was living somewhere else, he was married.  You need to answer out loud.  He can't get a head nod.

A    Yes.

Q    Okay.  And I understand, but I'm -- and the jury can see it, but for the record he needs to be able to put down the affirmative response.  Your age separation, his being married, his moving out, you all really didn't have a whole lot in common, did you, sir?

A    I wouldn't say that.

Q    Well, you had parents in common.

A    Yes.

Q    And a brother in common.

A    Yes.

Q    But you chose an entirely different direction in

5050

which to take your life?

A   Yes.

Q   When you tagged along, he didn't provide any drugs to you, did he?

A   No.

MR. LITTLEFIELD:  May I have just a second, Your Honor?

THE COURT:  You may.

Q   (By Mr. Littlefield) You saw your mom occasionally in Sallisaw?

A   Yes.

Q   I think you said you went back maybe once or twice a year?

A   Correct.

Q   Okay.  That trailer that she lived in?

A   Yes.

Q   How many times were you in Mr. Barrett's -- the shack out beside it?

A   Maybe once or twice.

Q   When would that have been?

A   Just after he started construction on it.

Q   Didn't see drugs in there, did you?

A   No, sir.

Q   Didn't see pseudoephedrine up in the ceiling or anything such as that?

5051

A    No.

Q    Did you play sports when you were in high school?

A    Yes, sir.

Q    Play football?

A    Yes, sir.

Q    The Black Diamonds?

A    Yeah.

Q    What position?

A    Defensive end.

Q    How good were the Black Diamonds when you were playing there?

A    I think we lost six or seven games my entire high school career.

Q    Make the playoffs?

A    Every year.

Q    What's the farthest you all went?

A    Second round.

Q    He didn't play high school sports, did he?

A    No, sir.

          MR. LITTLEFIELD:  Pass the witness.

          MR. HILFIGER:  No questions.

          THE COURT:  May this witness be excused?

          MR. HILFIGER:  Yes.

          THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.  Call your next

5052

witness.

MR. SMITH:  Roger Crawford.

THE COURT:  Sir, if you would stand before the clerk and raise your right hand and be sworn.

(Whereupon, the witness was administered the oath.)

THE COURT:  You may proceed.

MR. SMITH:  Thank you, Your Honor.

ROGER CRAWFORD,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q    State your name, please.

A    Roger Crawford.

Q    You know Kenny Barrett?

A    Yes, I do.

Q    What's your relation to him?

A    He's my nephew by marriage.

Q    And who are you married to?

A    His aunt, Phyllis.

Q    And what's Aunt Phyllis -- and I've answered the question.  What's Phyllis Crawford's relation to Kenny?

A    She's his aunt.

Q    Her sister is who?

5053

A    Kenny's mother.

Q    Name, please?

A    Gelene Dotson.

Q    And where do you live in relation to Kenny's home?

A    I live west of Kenneth's house.

Q    How far west -- how many houses west?

A    There's one house in between -- his mother's house is between his and mine.

Q    So you're due west of Gelene Dotson's home; is that correct?

A    Yes, sir.

Q    How long have you lived in that area, sir?

A    Approximately 22 years.

Q    What's your occupation or employment?

A    I'm a manager of a smoke shop.

Q    And how long have you been doing that?

A    About two years.

Q    What was your occupation prior to that?

A    I worked for a factory in Fort Smith, Arkansas for 20 years.

Q    Retired from there?

A    Yes, sir.

Q    What sort of work were you doing for them?

A    Machinery.  I run the rotary kiln for most of the time.

5054

Q   How long have you been married to Phyllis Crawford?

A   Forty-six years.

Q   I'm not going to ask you the date because I don't want to get you in trouble.  She's in the courtroom here today?

A   Yes, sir, she is.

Q   She was listed as a witness previously?

A   Yes, sir.

Q   Is listed as a witness, is that right?  She's -- (Interrupted)

A   She was listed, yes.

Q   Did she have a problem testifying?

A   Yes, sir.

Q   What is that?

A   Her nerves.

Q   Now, how long have you been around Kenny Barrett?

A   I don't know.  Approximately the last 15 years maybe.

Q   You feel like you know quite a bit about him?

A   Not a whole lot, but some.

Q   When did he start building that house out there by you?

A   I don't recall the exact date.

Q   Do you know how many years prior to the incident involving the highway patrolman at his residence?

5055

A    No.  I'd estimate probably four years, four, five years.

Q    Okay.  And whose land is his home constructed on?

A    His mother's, Gelene's.

Q    So you were there during the period of time that home was being built?

A    Yes, sir.

Q    Okay.  What contractor came out and built that?

A    Kenneth Barrett built it himself.

Q    And did you have occasion to visit him while he was building that house?

A    No, sir, I don't think I went over there.

Q    You got a son by the name of Travis; is that correct?

A    Yes, sir.

Q    And who's Travis married to?

A    Cindy Crawford.

Q    Do you have much to do with Travis?

A    Not a whole lot.

Q    How about Cindy?

A    Not a whole lot either.

Q    Why don't you have much to do with her?

A    I don't care much for her.

Q    How about Travis?  Why don't you have much to do with him?

5056

A   He's just -- does other things.

Q   Okay.  People -- (Interrupted)

A   Got different ideas, different friends that I have.

Q   People get older and go about their own -- (Interrupted)

A   Yes, sir.

Q   Their own things.  All right.  Let's talk a little bit about Kenny as a neighbor out there.

A   Okay.

Q   Kenny keep that road hot coming in and out of his house?

A   No, sir.

Q   What was Kenny's pattern if he had one in terms of leaving or staying?

A   I don't know that he had a pattern.

Q   Did he appear to come and go like a normal person would?

A   Yes, sir.

Q   He had a sign that he put on his gate?

A   Yes, sir, he had one on there.

Q   Okay.  Wasn't a very nice sign, was it?

A   No.

Q   By the way, are there other signs out in that area regarding no trespassing or don't come on my property?

A   There's no trespassing signs, yes.

5057

Q    And more than one in that area?

A    Yes, sir.

Q    Why?  Do you have one on your property?

A    No, sir.  I did but I don't any more.

Q    Why did you put one on your property?

A    I don't know.  Mainly just to keep people away that -- maybe soliciting or something.  I just --

Q    You don't belong there, you're not welcome?

A    More or less.

Q    Now, Travis and Kenny, did they spend any time together while they were growing up?

A    Yes, sir.

Q    What sort of things did they engage in?

A    They hunted and fished.

Q    Used guns, I guess, to hunt with?

A    Yes, sir.

Q    What type of guns would they use?

A    .22s, shotguns, high powered rifles.

Q    Okay.  And would they hunt out there in that area where your house is?

A    Yes, sir.

Q    Go down there on the bottoms and run up and down the creek?

A    Right.

Q    Did you ever have any concern about their use of the

5058

guns?

A    No, sir.

Q    Was that a pretty common occurrence amongst the people out there to hunt and shoot?

A    Yes, sir.

Q    Kenny Barrett shoot around his house?

A    I've heard a few shots, yes.

Q    Is he the only one that would shoot out in that area?

A    No, sir.

Q    Some point you became concerned about Travis and his drug use; is that true?

A    Yes, sir.

Q    And did you ever confront Travis about his drug usage?

A    Several times.

Q    And Travis would hang out with Kenny during that period of time?

A    Yes, some.

Q    Do you know whether or not Kenny was doing drugs?

A    No, sir, I did not know it.

Q    Now, you're not naive?

A    No.

Q    So would it be fair to say you probably had your suspicions about Kenny using drugs?

5059

A   Yes, sir.  Probably did, yes.

Q   Did you ever go to Kenny's house?

A   Several times.

Q   Is that gate always locked?

A   No, sir.

Q   If it was in the middle of the night that gate was locked?

A   Well, I couldn't tell you.  I worked nights, so I wouldn't know.

Q   Well, let me ask you -- strike that.  Did you ever enter Kenny's property from that east entrance?

A   From the east side, no, sir.

Q   Whenever you go up to Kenny's did you ever feel threatened?

A   No, sir.

Q   Did he ever approach you carrying a Colt Sporter?

A   No, sir, I don't think so.

Q   Was Kenny known to carry a pistol in my waistband?

A   Not that I know of.  I might have seen him carry it once, but it wasn't a regular thing, no.

Q   Did you ever feel threatened by Kenny?

A   No, sir.

Q   Did you ever have any concerns about Kenny as it relates to violence?

A   No, sir, none at all.

5060

Q    Are you a violent person?

A    No, sir.

Q    Are you a back shooter?

A    No, sir.

Q    Are people out in that community?

A    No, sir.

Q    Are violent type people?

A    No, sir.

Q    It is on a dead end road where Kenny lives, isn't it?

A    Yes, sir.

Q    How would you characterize the relationship that you and Kenny have?

A    I think we had a good relationship.

Q    What sort of things would you and Kenny do?

A    We didn't do anything, but Kenny was always there. When I needed him for any kind of work I had to have done on an automobile or lawnmower or anything, Kenny was always there.  Had tools if I wanted to borrow tools.

Q    Let's talk about that, that tool situation.  Where did he keep his tools?

A    In the garage, the shed that he had his -- work shed, I guess.

Q    It wasn't an important building, was it?

A    No.

5061

Q    Was it sufficient to work on vehicles?

A    Yes, sir.

Q    Did you ever go into that cabin -- into that shop?

A    Yes, sir.

Q    And do you have an opinion as to the adequacy of the tools there to perform automobile repairs?

A    Yes, sir.  He had plenty of them.

Q    What sort of repairs on your vehicles would he do?

A    I've had him overhaul motors.  I've had him change motors.  I've had him do body work.

Q    So I guess overhauling a motor is a pretty major repair?

A    Yes, sir.

Q    Did you pay him?

A    Yes, sir.

Q    Okay.  Can you tell me when he overhauled a motor for you?

A    I can't remember the exact date.

Q    Tell me what type of vehicle it was.

A    It was a Ford Bronco.

Q    And how much money did you pay him, if you recall?

A    I think it was $300.

Q    Okay.  And I'm going to bet you weren't able to use your credit card out there, were you?

A    No, sir.

5062

Q    What other sort of work did Kenny Barrett do for you as it relates to vehicles or lawnmowers or anything like that?

A    Kenny was a good framer, carpenter.

Q    Would he help you with anything like that?

A    I never had asked him.

Q    Were you there the night of the incident involving the Highway Patrol?

A    Yes, sir.

Q    Did you work that day?

A    I don't recall if I had or not.

Q    And anything unusual in your mind about Kenny's behavior around that period of time?

A    No, sir, not that I knew of.

Q    Anything that caused you concern about Kenny in terms of violence or anything like that?

A    No, sir.

Q    Does Kenny have redeeming qualities?

A    Yes, sir, I'm sure he has.

Q    Do you think that he has?

A    Yes, sir.

Q    What are those?

A    I do.

Q    What are they, sir?  Can you tell me some of them?

A    I'm not sure I -- I know what you --

5063

Q   What sort of qualities do you think in Kenny are admirable?

A   I think Kenny's a good person.  He could help people if they needed help.  He's always been good at that. He's got a wife -- I mean, a son and an ex-wife that need him.

Q   Have you seen him interact with his mother, Gelene?

A   Yes, sir.

Q   Is he helpful to Gelene?

A   Yes, sir.

Q   Have you seen him interact with his son, Toby?

A   Yes, sir.

Q   What sort of relationship do they have?

A   They had a good relationship.

Q   Would you -- how would you characterize in terms of father/son relationship?

A   I think it was good.

Q   Spend a lot of time with him?

A   Not a lot of time, but some.

Q   The time that they would spend together, was it quality time?

A   I think so, yes.

Q   The group of people out there, do you all get together on occasion?  Any reunions or fish fries or anything like that?

5064

A   As a group we do, but not there but in other places, yes.

Q   Might go some place and gather?

A   Yes.

Q   Kenny ever participate in those sort of activities?

A   I'm sure that he did.  I don't recall, but I'm sure that he did.

Q   Let's talk about the traffic up and down that roadway whenever Kenny lived there.

A   Okay.

Q   A lot of traffic going in and out of Kenny's house?

A   Not a lot, no.

Q   Was there traffic that'd go up and down that road?

A   Up and down the road, not necessarily to his house.

Q   You live in the country?

A   Yes.

Q   Have you ever lived in town?

A   Yes, sir.

Q   Is there a difference in your awareness between living in town and living out in the country in terms of traffic that goes past your house?

A   Yes, sir.

Q   Are you more aware or less aware when you live in the country as to who's going by?

A   I think you're less aware in the country than are in

5065

town.

Q    Okay.  And why do you say that?

A    Well, there's several houses down there that --
beyond my house and there's a lot of vehicles down there.
A lot of -- we'll have a lot of friends.  There's a lot
of -- you expect a lot of traffic there.

Q    Because it's a one way in and out or what?

A    Yes.

Q    How many houses are past Kenny's house?

A    Seven or eight.

Q    And a lot of vehicles?

A    Yes.

Q    Associated with those?  In terms of Kenny's mechanic
work, did he know what he was doing?

A    Yes, sir.

Q    Did you have to take that Ford Bronco back to him
and tell him you didn't fix this right?

A    No, sir.

Q    Kenny ever do work for you that he didn't charge you
for?

A    Yes, he has.

Q    What sort of things did he do for you for free?

A    He done some -- took some dents out of the car one
time that he didn't charge me nothing for it.

Q    Did you offer to pay him?

5066

A    Yes.

MR. SMITH:  One second, Your Honor.  Pass the witness.

THE COURT:  You may cross examination.  Mr. Sperling, just one moment for the court reporter.  You may proceed.

CROSS EXAMINATION

BY MR. SPERLING:

Q    Mr. Crawford, during the time that the Defendant was married to Abby, did you see them more than very occasionally?

A    Very seldom did I see them.

Q    Would it be fair to say, Mr. Crawford, that you aren't familiar with their interaction?

A    That would be correct.

Q    And if there were some seven different case numbers that relate to domestic violence, protective orders or the violent -- violation of protective orders, sir, would you be aware of those?

A    No, sir, probably not.

Q    Were you aware generally speaking of the discord, shall we say, in the marriage between the Defendant and Abby?

A    I guess that would be fair to say, yes.

Q    Okay.  And were you aware that there was domestic

5067

violence in that relationship?

A    No, sir.

Q    Fair to say that that's kind of something that as an uncle you would want to avert your eyes from?

A    Yes.

Q    During Kenneth Eugene Barrett's adult life, what's the longest period of time in which he was continuously employed?

A    I don't know, sir.

Q    Are you familiar with any full time continuous employment that he had?

A    Yes, sir, I knew that he worked for a framer as a framer for a carpenter -- I mean, for a house builder.

Q    Thank you, sir.  Do you know about how long ago that was?

A    No, sir.

Q    More than ten years ago?

A    Yes, sir.

Q    And during the '90s would it be fair to say that so far as you were aware the Defendant had no gainful continuous employment?

A    Other than working on automobiles, sir.

Q    You indicated that you had also heard, I think you said, a few shots coming from the Defendant's property.  Did I hear you correctly, sir?

5068

A    Yes, sir.

Q    Would it be fair to say that on a somewhat regular basis you heard gunshots in the vicinity or coming from the vicinity of where the Defendant lived?

A    No, sir.

Q    Okay.  How often?

A    I don't know, sir.  Just every once in awhile.

Q    All right.  And fair to say that your employment when you were employed full time, going to work virtually every day to and from Fort Smith for over 20 years, right?

A    Not every day, sir.

Q    But nearly every day?

A    Oh, probably four days a week.

Q    Okay.  Was that generally daytime work, sir?

A    The majority of it was nighttime.

Q    And by nighttime, you're talking about the midnight shift?

A    I'm talking about seven at night till seven in the morning.

Q    All right.  Thank you very much, sir.  And so, when you worked seven to seven and then you would do that four days a week?

A    Yes, sir.

Q    You indicated that the Defendant's ex-wife needs

5069

him.  Are you aware, sir, that she has remarried?

A    Yes, sir.  I didn't -- that was a slip.  I meant his son.

Q    All right, sir.  Would it be news to you if the Defendant had ever run a roadblock and nearly ran over two officers?  Is that something you ever heard about?

A    I heard something about that, yes.

Q    And do you know how that came to your knowledge?

A    No, sir, I don't.

Q    But are you aware that two officers had to jump out of the way to avoid being hit by him?

A    I don't remember that.

Q    Are you aware of any circumstances under which the Defendant has confronted law enforcement officers while he, Mr. Barrett, was carrying a firearm?

A    No, sir.

Q    Are you aware of whether or not he ever threatened to shoot a man who intervened when he slapped his wife?

A    No, sir.

Q    Has Gelene ever complained to you that the Defendant came over to her house unannounced and without her permission?

A    No, sir.

Q    Has she ever -- she had problems with the Defendant, didn't she?

5070

A    I wasn't aware of it.

Q    You were not aware of that.  Okay.  So if she had ever made a complaint to the law to ask for help concerning her son, would that be news to you, sir?

A    Yes, sir.

Q    And so far as the Defendant's drug use, other than what you suspected, are you personally aware of what drugs, if any, he has used and at what ages?

A    No, sir.

MR. SPERLING:  Thank you, sir.  I have nothing further.

THE COURT:  Any further?

MR. SMITH:  No further questions and he may be excused.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.

Members of the jury, we'll take the noon recess now.  I'll ask you to be back at 1:15.  Remember my admonition not to discuss this matter.  Ask everyone to please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Anything to take up outside the hearing of the jury on behalf of the Government?

5071

MR. SPERLING:  No, Your Honor.

THE COURT:  Defense?

MR. SMITH:  Just that, Judge, we will be able to finish today.

(Whereupon, the noon recess was held after which the following record was made in the presence of the jury.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.  You may call your next witness.

MR. HILFIGER:  Gelene Dotson.

GELENE DOTSON,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    State your name, please.

A    Gelene Dotson.

Q    And, Ms. Dotson, you're the mother of Kenny Barrett, is that right?

A    Yes, I am.

Q    And, Ms. Dotson, where do you live?

A    At Route 2, Box 92-6, Vian, Oklahoma.

Q    Is that sort of the McKee area?

5072

A    Yes.

Q    McKee community?

A    Yes.

Q    And you've testified previously in the first stage of this hearing, that's right?

A    Right.

Q    Now prior to that, had you been involved in either of the first two trials in this case?

A    No.  I was subpoenaed as a witness and I didn't -- I couldn't go.

Q    Because you were subpoenaed as a witness?

A    Right.

Q    And in this case you didn't attend as far as listening to -- (Interrupted)

A    No, I wasn't subpoenaed.  But you said you may have to use me so I didn't come in case you did need me.

Q    And I just want to talk to you a little bit.  You understand this is -- this is sort of the mitigation stage.  This is a sentencing stage of this trial.  You understand that?

A    Yes, I do.

Q    We're not talking about -- it's a punishment stage. We're not talking about whether he's guilty or not guilty, you understand that?

A    Right.

5073

Q    When was Kenneth born?

A    June the 29th, 1961.

Q    And where?

A    Joliet, Illinois.

Q    Joliet, Illinois?

A    Yes.

Q    And you were married to who at the time?

A    Ernest Barrett.

Q    Ernest Barrett.  And what was going on in Joliet that you were there?

A    Ernie -- I moved there when I was 18 with my aunt and uncle and went to work and then Ernie and I got married when he got out of the Marines.  And he moved back there with me and worked at the glass factory.

Q    In Joliet?

A    Yeah.  In Plainville, outside of Joliet.

Q    And then from Joliet, how long did you lived there?

A    About 12 years after that.

Q    And then where did you go?

A    Pardon?

Q    Where did you go after that?

A    Lake Apacon, New Jersey.

Q    And was that because of business or --

A    Ernie went to work for a different glass company.

Q    What's the name of the city?

5074

A     Lake Apacon.

Q     Okay.  And then how long were you there in New Jersey?

A     About three years.

Q     And Kenny was there with you?

A     Yes.

Q     And you had -- did you have your other two children at that time?

A     Yes.

Q     And then how did you happen to get to Oklahoma?

A     Ernie and I got a divorce and I came home.

Q     Okay.  You got a divorce while you were in New Jersey then?

A     No.  I left and then I got a divorce after I came back to Oklahoma.

Q     But you're leaving -- (Interrupted)

A     Right.  Leaving, yeah.

Q     The separation and -- (Interrupted)

A     Yes.

Q     Get the divorce?  Okay.  And you brought all three kids with you?

A     Yes, I did.

Q     And where did you live here in Oklahoma?

A     In Sallisaw.

Q     Is that your home?

5075

A    My home -- (Interrupted)

Q    Is that your original homestead?

A    Well, where I live now is my original home, but it's halfway between Vian and Sallisaw.

Q    How old was Kenny when you got the divorce?

A    Twelve.

Q    And when you came back here, did you -- did he get enrolled in school and get in school and everything?

A    Yes.

Q    And where did he go to school?

A    Sallisaw.

Q    Up to that time, at the time of the divorce, what was -- how was Kenny as far as a child and youth and everything?  Was he normal, have normal relations with him as far as you know?

A    Yes, he was just an average boy.  He was always very hyper.

Q    And by hyper you mean -- what do you mean?

A    Always having to do something.

Q    And when you got back here was there any big change in his life, lifestyle or anything like that that you can recall?

A    No.  Still basically the same.

Q    And how long did he stay in school?

A    I can't remember exactly what grade he was in when

5076

we did move here.  Then in the 9th grade he moved to Indiana and lived with his dad for one year and he came back to live with me.  He was 16 and he went to school for a little while that year and then quit.

Q   Okay.  So he lived in Indiana with his dad for one year?

A   Yes.

Q   And then he was back here with you and when he came back here he quit or did he go to school any?

A   He went to school for awhile.

Q   And was there any big reason for quitting school? Was he having problems in school, problems at home, what?

A   He just didn't get along with the superintendent. Superintendent wanted to make him cut his hair and Kenny didn't want to cut his hair.

Q   And did he get expelled or anything for not having -- was it long hair?  How long was it?

A   It was longer than the regulations.

Q   Okay.  They had regulations at the school for haircuts?

A   Yes.

Q   And then what did he do after he quit school?

A   He went to work at the Blue Ribbon Downs, at a barn for Leo Craighead, taking care of his horses.

Q   And how long did he work there?

5077

A    Oh, I think about a year.

Q    What did he do after that?

A    After he turned 18, he went to work on -- I don't know exactly which came first.  During that time he worked pipeline and oil rigs in western Oklahoma.

Q    And was that a job where he was -- he left home, basically?

A    Yes.  Even at one time he lived in Idaho working on a pipeline.

Q    Okay.  And at those -- at that kind of job was he over 18 or do you know?

A    Yes, he was over 18.

Q    Had he met Abby yet, at that time?

A    Oh, about that time.  He was working on a pipeline when they got married.  He came home and they got married and she went back out to western Oklahoma with him for awhile and then he went to Idaho and she lived with me.  When Toby was born Kenny was living in -- working in Idaho.

Q    Okay.  And how was that marriage while they were living with you?

A    They had just gotten married, I'd say, within the first few years.  I don't know exactly how many years.

Q    That they lived with you?

A    Yes.

5078

Q    What kind -- I mean, how was the marriage, itself, though, that first part?

A    They had their arguments just like newlyweds do but they always made up in a short period of time.

Q    Did there come a time when they -- in the mid-'80s when they had more than just regular arguments?

A    I never saw anything any more than just -- really they just kind of fought a lot, but always verbal.

Q    Did you become aware of any kind of domestic abuse actions or assault and batteries or anything like that?

A    No, I don't recall anything like that.

Q    Were you -- they weren't living in your house during the mid-'80s though, were they?

A    In the mid-'80s?

Q    Right.

A    No.

Q    How long were they together that you recall?  I mean, were they -- not married, but how long were they actually living together?

A    That would be kind of hard to say because they were married for about 13 years and actually they lived together most of that time, outside of maybe a few months here and there.

Q    Okay.  So they did have some break-ups where they were -- (Interrupted)

5079

A    Yes.

Q    Do you know about when the marriage ended?

A    No, I couldn't put a year on it.  I'd say it was in the '90s. I know that it was before my father died and he died in 1995.

Q    Okay.  Was there anything that you can recall as far as after the divorce, what Ken did after the divorce as far as coming out to your place?

A    He came to my house and he stayed with me for awhile.  He was working for Thomas Hines Construction Company in -- most of their work was in northwest Arkansas around Fayetteville.  And he would go -- he'd be gone all week and then he would stay with me on the weekends and that was when he started building the cabin next door.

Q    Okay.  And that cabin next door, how did it happen that he got that place next door?

A    He wanted to have his own home instead of living with me or going and renting something and he talked about it and at that time that land did not belong to me. Only what belonged to me was the acre where my home is now.  I told him he would have to go talk to my father because it -- and he went and talked to my dad and my dad told him that he could build a house there because when he -- that was going to be my land anyway.

5080

Q    Okay.  And so he -- do you know about when he started building that house?

A    No.  Like I said, it was before my -- my father was bad for quite a long time before he died and he died in March of 1995.  And I would say it was probably in '94 that he started building the house.  It could have been even earlier than that.

Q    And after the house was built did he stay there?

A    At his house, yes.

Q    And what kind of work -- now, you told us about him working at Blue Ribbon and then on pipeline and oil rigs while he was married to Abby.  What other kind of work did he do?

A    He's worked as a mechanic at garages.  He worked for Doug Cross for awhile.

Q    What's Doug -- who's Doug Cross?

A    He has Doug's Automotive in Sallisaw.

Q    And were these regular eight to five or nine to five type jobs?

A    Yes.

Q    And how long did he work there?

A    I'm not sure.

Q    Was it all in Sallisaw?

A    Yes.

Q    And then you said something about construction.

5081

When did he work?

A   He worked for Thomas Hines Construction but -- quite awhile.   And I think off and on for quite a few years.   I couldn't tell you exactly the years or how long he did. It would depend on Thomas had jobs going or not.   They built condominiums and apartment buildings.

Q   What kind of job was he doing for Thomas Hines? What type work?

A   They did framing and just everything.

Q   Do you know whether or not he was working for Thomas Hines when the cabin was being built?

A   Yes, he was.

Q   Did he work for Thomas Hines after the cabin had been built?

A   Yes.

Q   Okay.   But you don't know how long a period of time?

A   No.

Q   Did you ever have a concern in the '90s about any kind of drug problems?

A   There were people that came to Kenny's house to see him that I suspected that they were -- and some of them I knew had been in trouble for drugs.   But that was the only thing that I recall.

Q   What about Kenny's own use of drugs?

A   I've never seen Kenny use drugs.

5082

Q    Were there ever indications that he had been using drugs by his actions or anything like that that you could tell?

A    It was kind of hard to tell.  I told you that Kenny was always a real, real hyper person and sometimes kind of moody -- his moods changed.  But I couldn't really say -- pinpoint that there was a difference at that time.

Q    Okay.  Did you ever go to his house -- his cabin?

A    When he first built the house I used to go over there like when he would get a phone call or something and then there were so many people calling wanting car parts or wanting to know if he'd do some work for them or would I go get him so they could talk to him and I just made it a rule that I wasn't running a message service.  I didn't have time.  I worked 10 and 12 hours a day, six days a week.  I didn't have time to go running over there and I just made the rule that I don't go over there.  I will tell Kenny that you called.  He can call you back when he comes over because he ate his meals at my house, he took showers at my house.

Q    Okay.  And you were mentioning something about car parts and stuff, but was there some other business that he got into?

A    Well, he kind of got into the salvage business for awhile with a neighbor.

5083

Q    What neighbor was that?

A    They only lived for a -- down the road for a short time and right now I can't recall the man's name.  Him and Kenny decided to go together and start a salvage business.

Q    And what did that entail?

A    Pardon?

Q    What did that entail?  What was involved in that?

A    They just got some junk cars and would sell parts off of them.

Q    Where were the junk cars kept?

A    They were over there by Kenny's house.

Q    Okay.  And did that -- what did you do about that or what did you have to say?

A    I said -- I tried to put a stop to it.  I said you're not going to do it.  I don't like junk cars. They're just a place for rats and mice to collect and snakes and Kenny and I did have a few arguments about that.  I just said you're just not going to do it. That's all there is to it.

Q    And what occurred as a result of that?  Junk with --

(Interrupted)

A    I don't know.  About that time the neighbor's house burned and they moved away.

Q    So, what about the junk cars?

5084

A    Oh, there were still some of them there.

Q    Were they eventually taken care of -- taken off?

A    I still got some of them there.

Q    Was there any kind -- did he do any kind of other work there at the -- (Interrupted)

A    Yes, he worked on people's cars.  He did mechanic work.

Q    And was -- this would be after the cabin was built or the house was built, is that right?

A    Yeah.  And he built a garage out between my house and his house.

Q    Who would bring cars out to him?  I mean, generally, just the people in the neighborhood there or -- (Interrupted)

A    People in the neighborhood and people that would -- the word would spread.  It was people that couldn't afford to go to a big auto shop and have it put on a computer to figure out what was wrong with it and pay a big mechanical bill.  It was people who didn't have much money.

Q    And he worked on their -- (Interrupted)

A    And he'd work on their cars for them.

Q    But he didn't have any signs or anything like that any -- (Interrupted)

A    No signs saying that it was a mechanic shop or

5085

anything like that.

Q    Could you tell whether or not he kept fairly busy doing that?

A    Yes.  Very busy.  In fact, he would have to turn some away.

Q    During 1999 leading up to this incident, was there any big difference on what was going on out there as far as type of people coming out or anything like that?

A    No.  Just the regular people.

Q    And could you -- was there a lot of traffic going in and out that was unusual looking traffic?

A    No.  No more than now.  There are about ten families who live on that road.  And some of them have teenage children.  There's traffic on that road right now.

Q    But not -- but not going to Kenny's house?

A    No.  Huh uh, no.

Q    Do you know whether there was -- there's been testimony that there was a gate out there that had a sign on it.  Were you aware of the sign?

A    I knew there was a sign there.  I didn't really pay very much attention to it.

Q    Do you know how long that sign had been up?

A    No, I don't.  I think there was about three different signs there at one time.  Once there was just a keep out sign.  Once there was a no trespassing sign.

5086

Now, I don't know exactly when that sign was put up.

Q   And was there a reason for the signs that you are aware of?

A   There were quite a few people that would come there that weren't welcome there and Kenny put that sign up to get rid of them.  But I just felt that he had that right.  That's what makes your home different than a place of business.  You have the right to say who comes in and who doesn't.

Q   Did you ever pay attention to the sign as far as reading it and what it said -- (Interrupted)

A   No, I didn't.

Q   Do you know -- do you know Travis Crawford?

A   Yes, he's my nephew.

Q   And during the summer of '99 was he living out there?

A   I think he was staying with his mother.

Q   And do you know Cindy Crawford?

A   Yes, I know her.

Q   Now, at that time she wasn't known as Cindy Crawford though, right?

A   No.  She was Cindy Lucas or Maddox.

Q   Did you see her out there?

A   She had been there off and on when she was dating Roger -- I mean, Travis.  I'm sorry.  Roger's Travis's

5087

brother.

Q    During the summer of 1999 do you know anything about Toby Barrett?  Was he living out there?

A    He had moved out there and was staying in a camper behind Kenny's house for awhile.  He hadn't been there very long, but I couldn't tell you exactly when he did move there.

Q    Leading up to the incident on September 24th, 1999 was there anything, you know, immediately prior to that? Were you concerned?  Did you make any -- make known any concern you had for Kenny or what was going on out there to anybody?

A    No.

Q    Did you ever make any contact with Sheriff Philpot?

A    No.  Excuse me.  I did call the sheriff's office one time and asked to speak to him because there was a certain person that I didn't care for that was coming to Kenny's house during the day while I was at work and she was running in and out of my house and I wanted to get rid of her.  And I did call the sheriff's office and left a message and my call was never returned.

Q    And you're saying a person.  It's sounds -- you said it was a her.  It was a woman?

A    Yes, it was.

Q    And you didn't want her there?

5088

A     Right.

Q     Was there a reason you just couldn't tell Kenny about that?

A     I did.  But he'd kind of take up for her.

Q     What was she doing coming in and out of your house?

A     I guess she was over there using the bathroom or something.  I don't know what she was doing.  But she knew that I did not like her and knew that she was not to be there and she never came to my house while I was home, always when I was gone.

Q     And we talked to you earlier about September 24th, 1999 so I'm not going to ask you about that.  But after that incident did you continue to maintain a relationship with Kenny?

A     Yes, I did.

Q     And after that incident, has there been any change in Kenny as far as his attitude, how he acts and stuff like that?

A     Well, yes.  He's more settled down, calmer.

Q     Well, do you have -- do you know any reason why he's more settled, more calmer, than he was before?

A     No.  I'm not a psychiatrist or anything.  But I would say it was because he doesn't have anything to do. You know, because he's always been busy, busy, busy doing something and because of things that did happen.

5089

Q    Have you ever discussed the incident with Kenny, the -- what happened on September 24th?

A    Yes, we have.

Q    And has he ever -- well, let's talk about your visitations with him.  Have you visited with him in the Sequoyah jail?

A    Yes.

Q    And how often would you do that?

A    Every Saturday.  I'd miss a Saturday once in awhile.

Q    And then after -- was he in Muskogee jail for awhile before he went to -- back to Sequoyah jail?

A    He's been in Muskogee jail since -- about ever since last January or sometime, that period until now.

Q    And have you visited with him -- (Interrupted)

A    Yeah, I visit every other Friday night.  His dad comes one Friday night and I come the next Friday night.

Q    And during those visitations have you ever discussed this incident with Kenny Barrett?

A    We have talked about it.

Q    And has he ever expressed anything concerning what happened that night?

A    Yes.  He knows that he made the wrong decision of how to react that night.  If he could do it different he would do it different now.

Q    What is -- since this incident what -- do you feel

5090

that there's -- your relationship is any different than it was before this incident, with Kenny?

A    Well, I don't know about different.  We get along better now.  But there's nothing to disagree about.

Q    Okay.  What kind of disagreements did you have before?

A    The junk cars and the people coming in my house.

Q    Did that kind of -- did you ever have any disagreements on any other things?

A    No, not really.

Q    Did you ever have any concern for your safety from Kenny?

A    Oh, definitely not.

Q    Did he ever express -- act violent toward you in any way?

A    He probably -- we have had words and he said a lot of things -- may have even called me names, but he has never ever touched me physically and I've never ever feared that he would.

Q    Okay.  And when you say that he's called you names, has he threatened you in any way?

A    Well, threats.  Just -- not exactly saying he was going to do something to me, just yelling at me, you know, maybe calling me names because he didn't like what I was saying.  But never ever -- he's never touched me

5091

physically.  He's never hit me or anything ever.

Q    Have you ever been concerned that he had a violent nature toward you?

A    Not really, no.

Q    Did you ever have any -- other than -- were you ever aware of any kind of violence coming out of that marriage between he and Abby?

A    I think sometimes they had some fights where it actually came to -- (Interrupted)

Q    Blows?

A    Blows.

Q    Other than that, the violence in that marriage or the blows or the fights in that marriage, have you ever been aware of any other kind of violence?

A    No.  Him and his brother Richard fought when they were teenagers.

Q    They were within a couple years of each other?

A    They were three years apart.

Q    Has he ever expressed remorse to you about what happened to Mr. Eales?

A    Yes.

Q    And what has he said about that?

A    Just that he -- it was -- that a man was dead when he didn't have to be, you know, if things had been done different.

5092

MR. SMITH:  I have no further questions.

THE COURT:  Cross examination.

CROSS EXAMINATION

BY MR. LITTLEFIELD:

Q    How much time did Ernest Barrett spend in the Sallisaw area with Kenny?

A    When Ernie and I got a divorce when Kenny was 12 years old, Ernie lived -- we lived in New Jersey and he stayed in New Jersey for awhile and then moved to Huntington, West Virginia and then to, I think, Delaware and then to Indiana.  I don't know exactly how many years this was.  He came home on vacations and spent time with his boys during the summer when he was on vacation and they would go to his home.

Q    Okay.  So, he didn't live in the Sallisaw area while Kenny was growing up?

A    No.

Q    And so, if somebody's come in and talked about seeing guns around the house, his father having guns, that couldn't have been in the Sallisaw area, could it?

A    That was when we lived in Illinois and we lived in New Jersey and then when he -- (Interrupted)

Q    Could not have been around Sallisaw, could it?

A    No.  But when he did go to his dad's, though -- his dad collects guns.  There have always been guns.

5093

Q    Okay.  And that was out of state?  That would have been -- (Interrupted)

A    No.  Not all of it out of the state.  He lives in Sand Springs.

Q    Now, during -- (Interrupted)

A    He did -- he moved to Sand Springs.  I don't remember how old Kenny was when he moved to Sand Springs, but probably 15, 16, somewhere around in there.

Q    Kenny quit school because he didn't want to get a haircut?

A    Well, that wasn't the only thing.  It was just --

Q    Just what?

A    You would -- you would have to talk to his -- the superintendent to find out what all the reasons were.  We tried and we tried to get him to go and it wouldn't work.

Q    Kenny have other difficulties at school?

A    No.

Q    So the only difficulty you can point to at school that caused him to quit was because he refused to get a haircut?

A    That was the excuse that he -- that he gave at that time but there were other things.

Q    Got married to Abby in the mid-'80s?

A    Yes.

Q    Early '80s?  When?

5094

A    I'm not -- I don't recall the year of his marriage. I'd say it was probably around '80.

Q    Okay.  And during the first twelve months or so Abby and Kenny lived with you?

A    Yes.  At least Abby did.

Q    And Kenny wasn't there.  He was out doing pipeline jobs?

A    Pipeline.

Q    And then he moved back and they got their own place?

A    They moved -- she moved to western Oklahoma with him when he was working on oil rigs.

Q    Okay.  And as far as physical abuse in the marriage, you didn't see it during the early part of the marriage?

A    No, not physical abuse.  Just fights and --

(Interrupted)

Q    When you say fights, you mean?

A    I mean verbal.

Q    Spats, talking back and forth?  But you didn't see any violence?

A    No.

Q    You are aware that Abby filed domestic abuse complaints against Kenny on multiple occasions, aren't you?

A    Yes.

Q    And you are aware that Kenny violated protective

5095

orders?

A    Yes.

Q    On multiple occasions?

A    Yes.

Q    You were aware that Kenny broke Abby's nose?

A    No.

Q    Are you aware that Kenny abducted Abby from a car wash, took her to Webbers Falls?

A    Yes.  And then brought her back.

Q    Brought her back?  Is that after she went to the police and complained about it?

A    No.

Q    You didn't know about her complaining -- going to the police in Webbers -- (Interrupted)

A    Yes, because Raymond Martin came to the house.  He was there when Kenny brought her back.

Q    Was she hurt there?

A    Pardon?

Q    Was she hurt on that occasion?

A    No.

Q    What kind of person is Travis?

A    Pardon?

Q    What kind of person is Travis?

A    I don't know.  He kind of gets carried away sometimes when he's telling things.  And basically, I

guess he's a pretty good person.

Q    Okay.

A    Got a good heart.  He'll help you if you need help.

Q    And he's your sister's son?

A    Yes.

Q    And grew up as -- about the same age as Kenny?  A little younger?

A    He's the same age as my some Richard, about three years younger.

Q    Okay.  And so, he knew Kenny growing up, didn't he?

A    After we moved here when Kenny was 12 years old.

Q    Okay.

A    We didn't live here the first 12 years of Kenny's life.

Q    I understand that.  You lived in Illinois and New Jersey and ultimately came back here when you were 12 -- or when he was 12 and you got the divorce and Kenny and Travis were essentially the same age?

A    Pardon?

Q    Kenny and Travis were three years difference in age?

A    Right.

Q    Travis would have been about nine at that time?

A    Uh huh.

Q    And Travis has known Kenny ever since then?

A    Yeah.  But I couldn't say that they've really spent

5097

a whole lot of time together.

Q    Were you living at the same place when you moved back that you're living now?

A    No.

Q    When did you move out there?

A    I'm going to say probably about '87.

Q    Was Kenny already out of the -- out of the house by then?

A    Oh, yes.

Q    Did you visit over at -- pardon me.  Did you visit over at your sister, Phyllis's, very often when you moved back?

A    Did he?

Q    Did you?

A    No, I don't visit anywhere very often.  I worked at Borg Warner for 23 years.  I worked 10 and 12 hours a day, six days a week.

Q    Okay.  Pretty heavy shift?

A    But we stay in contact on the telephone.

Q    The place that Kenny built next door to your trailer house, was that built by him before or after the divorce?

A    After he and Abby divorced -- or during the time that they were getting a divorce.

Q    Okay.  And so, if the divorce decree signed in '95, then that would have been about the time he built the

5098

cabin?

A   He had to have built the cabin or was building it before March of '95, because my father was still alive when he was building it, because my dad would come over and watch him work.

Q   Okay.  So, and sometime in the late '94, early '95 is the best that you can say that the cabin would have been built?

A   Somewhere around in there -- or started.  I don't know exactly when it was finished.  He was always working on it.

Q   Did he move into it as he was constructing it?

A   Oh, when it got to where he could.

Q   When it was habitable?

A   Uh huh.

Q   Doesn't have running water, does it?

A   No, it does not.

Q   Okay.  Didn't have electricity other than what he -- (Interrupted)

A   Extension cord.

Q   An extension -- an outdoor extension cord he pulled over from your residence?

A   Uh huh.

Q   Did he help pay the electric bills?

A   Pardon?

5099

Q    Did he help pay your electric bills?

A    Yes.

Q    Okay.  How often did you go in that cabin?

A    How have did I?

Q    Yes.

A    When he first built it, I'd go over and see what he had done to it.  But I didn't -- after he got it finished, I didn't.

Q    Prior to September of 1999, when the incident happened we're here about, when prior to that was the last time you believe you were in his cabin?

A    Probably -- I don't know.  It'd been a long time.  Quite a few months, may have been a year.

Q    Okay.  He had a number of visitors at his place, didn't he?

A    Yeah.

Q    And there was quite a bit of traffic into his place on occasion, wasn't there?

A    Not that I noticed.

Q    Didn't notice people going over there, two or three -- two or three different people going a day by his house?

A    Two or three a day, no.  And Kenny is a night person.  He stays up at night.  I'm a day person.  I get up when the sun comes up.  Or at that time I was having

5100

to get up at three o'clock every morning.  I went to bed and I went to sleep.

Q    Okay.  Do you know Karen Real?

A    Yes, I do.  Her and I were friends even before she became friends with Kenny.  Kenny and Abby got married in her dad's house.

Q    And Karen Real stayed over there on occasion in '97 and '98, didn't she?

A    She was there one time.

Q    Just once?

A    Once is all that I ever know of.

Q    Well, would you say Karen's a pretty honest person, from your knowledge of her?

A    Karen?

Q    Yes.

A    No, she likes to do things just for the fun of it, just so she can laugh about it.

Q    What's that got to do with honesty?

A    It's that you're not an honest person when you do things like that.  Things that are not true just to do it, just so you can laugh about it.

Q    I don't understand, ma'am.

A    That was -- you'd have to know Karen.

Q    How many times do you think -- did Karen come over to your house on a regular basis when she stayed at

5101

Kenny's?

A   She would come over there, yes.  Kenny was putting a shower in my house at that time and she came over to help him.

Q   Do you think that -- do you think that Karen -- Karen's not the person that you had problems coming over to your house, is she?

A   Oh, no.  Karen and I worked together at Colt.

Q   Do you know Randy Turman?

A   No, I do not.  Have never seen the man.

Q   Do you know Randall Weaver?

A   No.  I've never seen him.

Q   If these people are at Kenny's trailer -- or at his cabin, you wouldn't know about it, would you?

A   I didn't see them or if they were there and I did see them, I did not know who they were.

MR. LITTLEFIELD:  Judge, may I go to the counsel table for a second?

THE COURT:  You may.

MR. LITTLEFIELD:  I would ask that Government Exhibit 69 be displayed.

THE COURT:  You may.

Q   (By Mr. Littlefield) Do you recognize the photo, ma'am.

A   Yes.

5102

Q    Do you see the little bitty trailer out there, behind this storage building?

A    Yeah.

Q    That's where Toby stayed occasionally?

A    That's where he was staying when this happened.

Q    And you don't know how long he'd been there, prior to -- (Interrupted)

A    It hadn't been very long because a girl named Debbie Thompson had been living in -- staying out there prior to that.

Q    The dumpster in the back, whose was that?

A    I don't know.

Q    You didn't use it?

A    Sometimes, if I had stuff over there that I didn't want to burn or anything, I'd throw stuff over there. Just like right now we have a trailer sitting back there that I'm putting stuff in that needs to be taken to the dump.

Q    Kenny used it too, didn't he, ma'am?

A    I guess he did.

Q    You were concerned about the people at Kenny's place, weren't you?

A    I wasn't concerned about the people at Kenny's place. That was his business who he had there. I was concerned about the people that came into my house.

5103

Q    You called Johnny Philpot and complained about the people at his place, didn't you?

A    I called him to complain about one person.  He never answered -- I just talked to a dispatcher, I said to have him call me.  He never returned my call.  So I never made the complaint.

Q    You told Johnny Philpot that you were concerned about Kenny coming over there?

A    I never had a conversation with Johnny Philpot.

Q    Did you tell Johnny Philpot that you were afraid of Kenny?

A    No, sir.  I did not.  I have never been afraid of Kenny.  There would be no reason for me to say that.  And if I ever had been concerned about it, I would have talked to Kenny's dad and not Johnny Philpot.  Johnny Philpot and another policeman beat Kenny up when he was 17 years old, broke his nose and his collarbone.  But I have never -- I have had one conversation with Johnny Philpot in my life and that's been within the last six years.

Q    Okay.  You know that Kenny came to blows with Abby, don't you?

A    I have heard that he did.

Q    And they got into fights and yelled and called each other names; isn't that true?

5104

A   Yes.

Q   And you got into fights with Kenny?

A   I never had a -- you mean a physical fight or come to blows?

Q   An argument, a spat?

A   Arguments only.

Q   Okay.  And he called you names, didn't he?

A   Probably did.  I don't recall exactly what names he would have called me, but I probably did.

Q   He cursed you, didn't he?

A   He did what?

Q   He cursed you.  Never used curse words with you?

A   He may have.

Q   Threaten you?

A   He'd never threatened me.

Q   Never threatened you at all?

A   No.

Q   You proud of Steve?

A   Pardon?

Q   Are you proud of your son, Steve?

A   Yes, I am.

Q   College graduate?

A   Yes.

Q   Has a good job?

A   Yes.

5105

Q    Have you any grandkids?

A    Do I have any grandkids?

Q    Yes.

A    Yes, I have -- Kenny has one son, my son Richie has three and Steven has two.  And then I have two great-grandchildren.

MR. LITTLEFIELD:  I understand.  May I have a second, Judge?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

MR. HILFIGER:  No further questions.

THE COURT:  May this witness be excused?

MR. HILFIGER:  Yes.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.  You may call your next witness.

MR. SMITH:  Ernie Barrett.

ERNEST BARRETT, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q    State your name, please.

A    My name is Ernest Barrett.

Q    Now, you're going to have to -- you can't lean back,

5106

you got sit forward.  And I've noticed that you have some hearing aids, is that right?

A    Two of them.

Q    Do you have problems, will the hearing aids assist you enough that you can hear okay?

A    I'm okay.

Q    You're going to have to speak up, Mr. Barrett, okay? You're the father of Kenny Barrett, is that right?

A    Yes.

Q    And what do you -- what kind of livelihood did you have, Mr. Barrett?

A    What kind of what?

Q    Livelihood.  What was your job, occupation?

A    I was a production superintendent for Kerr Glass, made Kerr home canning jars and other type of glass containers.

Q    Okay.  You're going to have to speak up, get a little closer to this microphone, speak up.  It's hard to hear you.

A    When you sound loud to yourself, you get to lower your voice.

Q    Okay.  And that's fine, just the way you're talking now.  Where were you living when Kenny was born?

A    Where was I what?

Q    Where were you living when Kenny was born?

5107

A    Joliet, Illinois.

Q    And from there you moved to New Jersey, is that right?

A    Moved to New Jersey, yes.

Q    And at New Jersey did your family split up?

A    That's correct.

Q    How long did you stay in New Jersey?

A    Three and a half years.

Q    And then where did you go from New Jersey?

A    West Virginia.

Q    And then?

A    Indiana.

Q    Is this -- (Interrupted)

A    Delaware, Texas, Oklahoma, Louisiana.

Q    Okay.  And this is all working for the Kerr McGee glass or Kerr Glass?

A    Correct.

Q    When did you move to Oklahoma on a permanent basis to stay?

A    1978, September.

Q    Now, from the time you got divorced -- which would be about 1973, is that right?

A    When we finally got divorced, yes.  That's correct. '72 or '73.

Q    In 1978, did you see -- were you with Kenny on a

5108

regular basis?

A    Not a regular basis, no.

Q    Did you see -- (Interrupted)

A    Repeat your question.

Q    I'm talking about from the time in 1973 after the divorce until 1978 when you moved to Oklahoma.  Did you see the boys, Kenny and Steven and Richard, on a regular basis?

A    Yeah, probably at least -- at least once a year, sometimes more.

Q    Okay.

A    I would take a vacation from wherever I was working, come down and spend a week at my mom and dad's and spend time with the boys.

Q    And what kind of things would you do with the boys then?

A    Fish, hunt, shoot bow and arrows, shoot guns.  Same things we did when he was just little.

Q    Okay.  Now, you may have gone just the other way.  You're a little too close to the microphone and -- there you go.  Are you -- how would you characterize yourself as far as hunting and fishing?  Is that something you like to do?

A    It's just something I grew up doing.  I've done all my life.

5109

Q     And in order to hunt you have to have guns, is that right?

A     Correct.

Q     And do you have a number of guns?

A     I do.

Q     And do you -- did you share those guns with your sons as far as how to use them and take care of them and stuff like that?

A     Very much so.

Q     And was it -- would it be unusual for your sons to shoot the guns even at a young age?

A     No, not at all.

Q     What about Kenny?  Did you show him how to use -- hunt and fish and do whatever those things you wanted to do?

A     I did.

Q     Now, when you moved here in 1978 was Kenny still in school at the time?

A     I do not believe so.

Q     What was he doing at that time?

A     I think he was working on a pipeline.

Q     And do you know whether or not at the time -- when you moved here, was Kenny married or not married?

A     Pardon?

Q     Was Kenny married when you moved here?

5110

A     I don't think so.

Q     Did you -- when you moved here, where did you move to?

A     Sand Springs.

Q     Sand Springs.  Is that basically where you've lived since 1978?

A     Yes.

Q     Did you have Kenny come to your house in Sand Springs?

A     He did.

Q     Tell us about that.  When did that occur?

A     The first time was probably in '78 or '79.  He came and stayed at my house for probably two or three months. He went to work for me in the factory.  He was too young to handle the machinery so we put him to stacking boxes down at the end of the line where the bottles come off. And he worked probably two or three months and then he decided to go back to Sallisaw.

Q     And was this in the Kerr canning factory or the glass factory that you're talking about that he worked?

A     Yeah.

Q     And then when was the next time that he came there?

A     Oh, probably sometime in the early '80s, mid-'80s, somewhere along in there.

Q     Okay.  And the early to mid-'80s, do you know

whether or not at that time was he married?

A    He was married but separated at the time.

Q    And what occurred then?  How long did he stay with you at that time?

A    Oh, a couple, three months.  We put him on the machine -- operated the machine, glass machine, to make bottles and we had some plans for him because he had a fairly good mechanical aptitude.  We intended to make a troubleshooter out of him.  And he -- I think he was talking to Abby on the phone and they decided they were going to get back together, something of that nature, and he decided to go back to Sallisaw.

Q    Okay.  So, he had this job -- now you had -- what was your position with the company there in Sand Springs?

A    I was production superintendent over all four shifts doing about four or five department, hundred people.

Q    And so, was he doing a good job there at Sand Springs?

A    Yes, real good.

Q    But he was still married and wanted to get back in that marriage?

A    That's correct.

Q    So, after that did you have any more contact with him on a regular basis?

A    Not on a regular basis, just periodically.

5112

Sometimes I would go to his house, if I could find it. He usually lived back in the boonies some place. And I can remember a couple of times we went fishing. I remember one time we went deer hunting. But it was not very often that we saw each other.

Q    So from the mid-'80s until -- was there sometime that the -- from the mid-'80s till this incident that you guys got together again and, you know, sort of renewed your relationship?

A    Well, probably after the last couple of years I hadn't seen him for a couple of years before this happened. I mean, outside of seeing him at Wal-Mart one time in Sallisaw.

Q    Now, you say a couple of years. Do you mean a couple of years before the -- (Interrupted)

A    A couple of years before this incident. I hadn't saw much of him. I think he was working in Arkansas or somewhere.

Q    After this incident, have you been with him on a regular basis or seen him on a regular basis?

A    I have.

Q    And where's that been?

A    For about five years at Sallisaw. I go every other week, visit with him.

Q    And visit with him there in the jail at Sallisaw?

5113

A    Yes.

Q    Did you ever come to Muskogee and visit with him?

A    I have and do.

Q    What now?

A    I said I have and I still do.

Q    You visit with him at McAlester?  Have you ever been down there to visit with him?

A    Not quite.  Seems like they lost my paperwork so we sent it return receipt requested and they say they'd probably take two or three months to get it processed.  So I never visited in McAlester.

Q    Okay.  Were you ever down there to visit with him?

A    No.  I communicated with him by phone and by letter.

Q    Did you know anything about this relationship between Kenny and Abby about what kind of relationship they had together?  You knew they were married, but anything about -- anything else about their relationship?

A    I didn't know any of the details of what it was about or anything, but I did know that they had a pretty stormy relationship.

Q    The -- did you ever know -- did you and Kenny ever get into fights, arguments?

A    No.

Q    Did you ever know Kenny to be violent to anybody?

A    No.  I remember one time reprimanding him for

5114

running from a fight.

Q    How old was -- (Interrupted)

A    When he was just little, probably eight or ten years old.

Q    And what would you say your relationship with Kenny has been -- I mean, how is it after this incident as compared to before the incident?

A    Well, it probably been a lot more close since the incident.

Q    A lot more what?

A    A lot closer.

Q    A lot closer?

A    Yeah.

Q    Have you been able to talk about -- talk to each other a little better?

A    I assure you in the last six years we've talked about everything.

Q    Have you talked about the incident itself?

A    We did.

Q    Have you talked about how he feels about what happened?

A    We have.

Q    Has he ever expressed anything to you about how he feels about what happened?

A    Yes.

5115

Q    And what has he said?

A    He's said that -- you know, that he said he was sorry it happened.  He was sorry that there were two children that had to go without a daddy, and spoke along that line.  And he told me he never really intentionally shot anybody.  That all he ever saw was headlight.  He said behind the headlights you couldn't see anything.

Q    And how often do you visit Kenny here in Muskogee?  How often have you been visiting him here?

A    Well, it varies.  I'll give you an example.  Two weeks ago I was here in court and I went down to the jail at noontime and asked the deputy if he would arrange for me a time to visit after court, because you know, a person 70 years old, I'm tired after sitting here all day, asked him if he could set me up a time to visit after court was out at five o'clock.  So he called the jail administrator and they set me up a visit for six o'clock.  I went there at 20 minutes till six and told the guy that I was there, I had an appointment.  He said, okay, he said I'll send you up to him in a little bit.  And I stood right there in front of that window -- and I'm kind of hard to miss -- for about 25 or 30 minutes.  And finally they took me upstairs.  I visited for about five minutes and he said you got to go.

Q    But you do try to visit, though?

5116

A    I have visited with him several times, had nice visits.  But it just -- sometimes you get a jailer that doesn't like Kenny Barrett or he doesn't like me or whatever and they treat you however they want to.

MR. SMITH:  I have no further questions.  Thank you.

CROSS EXAMINATION

BY MR. SPERLING:

Q    Mr. Barrett, I'm going to try to be brief and I will do my best to speak as clearly as I can, okay?

A    Fine.

Q    Thank you, sir.  Did I understand you correctly to say that you hadn't seen Kenny for about two years before this incident?

A    I would say that that was close.

Q    So, you would not have been at his cabin for at least two years before this incident?

A    No.

Q    And in fairness to you, sir, you wouldn't know what activity had gone on there or what was inside that cabin for a number of years prior to this incident; would that be fair?

A    If it had been there that long.  I don't think it had been there that long.  I'm not sure, but I don't think it had been built but a year or so.  I may be

5117

wrong.

Q    Had you ever been in that cabin?

A    No, I have not.

Q    As a father, sir, did you try to treat your sons the same?

A    Of course.

Q    I know each son is probably different as they are growing up.  But as a father, did you do your best to be fair and to treat each of your sons the same?

A    Well, it's hard to do when you have great deal of age difference.  Like Kenny would go hunting and fishing with me.  The other ones would go wandering around in diapers and one was a baby.  So it's kind of hard to treat them the same.

Q    Were you pretty much the same dad, as best you can be though, to each of your sons?

A    Probably not.

Q    Well, circumstances changed a little bit?

A    We all change with age.

Q    You helped your son Kenny get employment at the glass plant, didn't you?

A    I did.

Q    And you were a very respected supervisor at that plant, weren't you, sir?

A    I was.

5118

Q    And just briefly, how many years all tolled did you work for Kerr or the Kerr McGee entity?

A    It was not Kerr McGee.

Q    It was Kerr?

A    Just Kerr.  Okay.  I worked for them up until 1992, I believe, when they sold out to Ball.  And Ball kept the plant for approximately a year and a half.  And they decided they were going to consolidate plants in California and Oklahoma and Louisiana into one big factory in Louisiana.  So they packed me up and shipped me to Louisiana.  And I retired after 34 years of total service in the glass industry.

Q    Thank you, sir.  Did I understand you correctly that your son Kenny worked for the glass plant on two different occasions?

A    That's correct.

Q    The first time for about two or three months?

A    I think he was 17 at the time.

Q    Okay.  And then he left and went back to Sallisaw; is that correct?

A    Correct.

Q    And then the second time he again worked there and you had hoped to put his mechanical ability to work there; is that correct?

A    Correct.

5119

Q   And he only worked for about two or three months on that occasion as well?

A   That's correct.

Q   Would he have had the opportunity, had he chosen to do so, to remain in the employment of the glass plant?

A   Yes.

MR. SPERLING:  Nothing further, Your Honor. Thank you, sir.

THE COURT:  Any further questions?

MR. HILFIGER:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. HILFIGER:  Yes, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may call your next witness.

MR. HILFIGER:  Doris Barrett.

DORIS BARRETT, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. HILFIGER:

Q   You're Doris Barrett, is that right?

A   Yes, I am.

Q   And how are you related to Kenny Barrett?

A   He's my stepson.

Q   Okay.  Now, you're going to have speak more into the

5120

microphone, okay?  When did you -- and you're married to Ernie Barrett, who just testified, is that right?

A    Yes, I am.

Q    When did you marry Ernie Barrett?

A    In 1985.

Q    How much of a relationship did you have with Kenny Barrett before this September 1999 incident?

A    Not a lot.  I mean, we seen each other at reunions. We didn't have a bad relationship, we just didn't have the opportunity to spend a lot of time together.

Q    After the incident, have you sort of developed a relationship?

A    Oh, yes.

Q    And how so?

A    He's like my own son.  We talk two or three times a week.  I've went to every one of his hearings, most of the trials.  I attended both the trials.

Q    You have to speak up a little bit.

A    I attended all the trials, every day.  Anything he's needed I've tried to be there for him.

Q    And you're very concerned about Kenny Barrett, is that right?

A    Yes, I am.

Q    And you're very concerned about what happens in this case?

A     Yes, I am.

Q     Do you care for him as a son?

A     Yes, I do.

Q     And have you been able to talk with Kenny Barrett -- you visited him in jail?

A     In Sallisaw I did and here in Muskogee and in McAlester.  At Muskogee they've only allowed one person at a time to see him and in McAlester we never were allowed to see him because somehow they lost our paperwork the first time and the second time all of our paperwork kind of got pushed aside.  So until he was moved to Muskogee this last year we hadn't got to visit him.

Q     Okay.  But not visiting --  you didn't visit him in McAlester but were you able to keep in contact with him on the phone?

A     Oh, yes, two and three times a week.

Q     And do you intend to keep that relationship?

A     Yes, I do.

Q     And do you think that relationship is one that is worth keeping going?

A     Yes, I do.  It's very important to us.

          MR. SMITH:  I have no further questions.

5122

CROSS EXAMINATION

BY MR. SPERLING:

Q   Mrs. Barrett, would it be fair to say that you had not been at the Defendant's cabin for at least a year before this incident?

A   Yes, that's fair.

Q   Okay.  Do you recall ever being there after it was built?

A   No.

Q   So the only time you would have been there was during the time it was being built?

A   No.  I wasn't there until a lot later than that.

Q   After the incident?

A   Yes.

Q   So you had never been at that cabin or at that area prior to this incident -- (Interrupted)

A   I've been in that area, just not in the cabin.

Q   Not in the cabin.  You indicated that you attended other proceedings; is that fair?

A   That's true.

Q   At any of those proceedings was Randy Turman called as a witness?

A   Here, yes, sir.

Q   But other than here was he ever previously called as a witness?

5123

A    No, sir.

Q    And it would be fair also to say that Travis Crawford had never previously been called as a witness, had he?

A    No, he hadn't.

Q    Charles Sanders had never been called as a witness, had he?

A    No, sir.

Q    Randall Weaver had never been called as a witness, had he?

A    No, sir.

Q    Karen Real had never been called as a witness, had she?

A    No, sir.

Q    Cindy Crawford had never been called as a witness, had she, ma'am?

A    No, sir.

Q    Brandie Price was never called as a witness, had she, ma'am?

A    No, sir.

Q    And the three DEA agents, do you remember Juan Beal, the Hispanic gentleman?

A    Yes.

Q    Who testified?  Okay.  He never testified in the state proceedings, did he?

5124

A    No, sir.

Q    Do you remember Kevin Wilson, a tall Anglo guy?

A    Yes.

Q    He didn't testify in the state proceedings either, did he?

A    No, sir.

Q    And, Craig Nixon, the special agent for DEA did not testify in state proceedings either, did he?

A    No, sir.

Q    Nor did any of the DEA chemists who were called to testify here, they didn't testify in the state proceedings, did they?

A    No, sir.

Q    During the first stage of this trial, ma'am, you had an opportunity to see what was referred to as Government's Exhibit Number 1 over and over, didn't you, ma'am?

A    Yes, sir.

Q    And you remember that to be the model of the residence, ma'am?

A    Yes, sir.

Q    That model was not available either at the state proceedings or the state trial?

A    No, sir, it wasn't.

Q    And in fairness, the evidence as it was presented

5125

was considerably different here than at state proceedings, wasn't it?

A    Most of it.

MR. SPERLING:  Thank you very much for your patience, ma'am.  I have nothing further.

THE COURT:  Further examination?

REDIRECT EXAMINATION

BY MR. HILFIGER:

Q    Just one question as to the evidence that he's talking about.  Was there any difference in the evidence as to the shooting between this trial and the previous trials?

A    No, sir.

MR. HILFIGER:  Thank you.  I have no further questions.

MR. SPERLING:  Nothing further, Your Honor.

THE COURT:  May this witness be excused?

MR. SPERLING:  Yes, Judge.

MR. HILFIGER:  Yes.

THE COURT:  Ma'am, thank you for your testimony.  You may step down.

MR. SMITH:  May we have a minute?

THE COURT:  You may.  Members of the jury, let's take a recess at this point.  I'll ask you to remember my admonition not to discuss the matter and ask

5126

everyone in the courtroom to please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT: Let the record reflect the jury has departed the courtroom and the witness has stepped down. Anything to take up outside the hearing of the jury for the Government?

MR. SPERLING: No, Your Honor.

THE COURT: Defense?

MR. HILFIGER: Yes, Your Honor. At this time we want -- we want the Defendant to -- talked to Mr. Barrett about testifying. And Mr. Barrett does not want to testify and we want to make a record on that.

THE COURT: Are you prepared to make that record now?

MR. HILFIGER: We can make it now. If the Court desires to do it now or before the jury comes back in.

THE COURT: I'll come back in about 15 minutes.

(Whereupon, a short recess was held after which the following record was made outside the hearing of the jury.)

THE COURT: Let the record reflect counsel for the Government is present, the Defendant is present with

5127

counsel, the jury is not present.  Mr. Hilfiger, you indicated you wanted to make a record.

MR. HILFIGER:  Yes, Your Honor.  At this point in time we have called all of the witnesses that we intend to call with the exception of our client, Kenneth Barrett.  We have been in conversation with Kenneth Barrett concerning this stage and was fully anticipating Mr. Barrett would testify and he informed me -- I guess he informed Mr. Smith first that over the lunch hour and then informed me later on during the lunch hour, when I went down and talked to him that he did not want to testify and we tried to work out some agreement as to whether he would -- you know, that would limit his testimony.  But Mr. Barrett does not want to testify and that's what we want on the record, that we are -- we've asked him, talked to him about it, told him he didn't have to if he doesn't want to.  Also that I think it is against his best interest not to testify, but he thinks -- he has made that decision; is that true, Mr. Barrett?

MR. BARRETT:  Yes, that's true, Your Honor.

THE COURT:  We had, Mr. Barrett, a similar conversation in the first portion of the trial.  And of course, now we are dealing with the penalty stage and your absolute right to choose not to testify is still in effect and I want you to understand.  I mean, you have a

Constitutional right to remain silent if you choose to. And I think Mr. Hilfiger has covered the points that I want to be sure are clear, but I think it's important that you and I have a conversation. Do you feel comfortable that your -- and have your attorneys explained the significance of you not taking the stand in this matter? And are you comfortable with that?

MR. BARRETT: Yes, they have explained to me, Your Honor. But I feel that due to appellate reasons, it would be in my best interest not to take the stand.

THE COURT: So you've had a full discussion with them, you feel comfortable with the advice you've gotten?

MR. BARRETT: Yes, Your Honor.

THE COURT: And it's your decision, then -- I started to say in spite of their advice, but you feel like you've had an opportunity to fully consult with them about this decision and you've decided not to testify; is that correct?

MR. BARRETT: Yes, Your Honor.

THE COURT: And is it my understanding that -- now, that the defense will rest?

MR. HILFIGER: Yes, Your Honor.

THE COURT: Is the Government going to present rebuttal?

5129

MR. SPERLING:  We are, Your Honor.  And we really do need a little time to discuss how many and for what purposes.  But my best estimate, Your Honor, is that there will be not more than eight rebuttal witnesses that should not take more than two hours.

THE COURT:  When you say a little bit of time, how much -- I'm planning on proceeding today.

MR. SPERLING:  They're not here today.  We anticipated the defense would take the day.

THE COURT:  You don't have any witnesses you can get here?

MR. SPERLING:  Well, they're an hour away.

MR. HILFIGER:  May we address on this issue of rebuttal, Judge?

THE COURT:  I don't know that there is an issue.  I mean, the Government has a right to present rebuttal, but I don't know -- but I'll hear what you -- (Interrupted)

MR. SMITH:  Well, my problem -- my concern is if it's true rebuttal.  If it's stuff that they're aware of and they say just to come back with, that's not really true rebuttal.  And some of the information that I'm concerned about is not true rebuttal, it's information that's presented to us in discovery and they had every opportunity to present it during their stage.  Because we

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

5130

informed them that we were going to call, you know, jailers and they had opportunities to present some of this evidence.

Now some of the evidence, like they just showed us right now, we just got. It was faxed to us on November 15th. This is stuff that Mr. Smith was talking about when he was talking to Sheriff Philpot and Sheriff Philpot says there's nothing exists. That was last Thursday. And now they come in with these papers from the sheriff -- Sequoyah County Jail.

But I'm talking, you know, I think that -- I would request to be sort of allowed to know what their rebuttal is to make sure that it is true rebuttal and not just simply stuff that they've held back in order to get the last word in, which they've done this -- you know, this whole trial, they seem to want to get the last word in. But they -- we do cross examine, they always want to do a redirect. If we do a recross, they always want to do a re-redirect. If we do direct, they want to do cross and we do redirect, they want to do recross. It has been a consistent pattern on their part to get the last word in. And if it's true rebuttal, that's a different thing. But if it's stuff that they've held back simply to get the last word in, I don't think that's true rebuttal and I don't think it should be allowed.

5131

MR. LITTLEFIELD:  Your Honor, we didn't get mitigating factors until they were prepared to start the second stage.  And they're purporting that -- we got it on Thursday.

THE COURT:  Well, I've heard the aggravating and mitigating factors.  So I think I have them fairly well outlined in my mind.  So, what is the -- give me a general flavor of what the rebuttal is.

MR. LITTLEFIELD:  The information I provided this morning about a physical assault on a guard, a threat on guards, potential -- or information contrary to Gelene Dotson about her contacting Johnny Philpot and expressing fear of Kenny Barrett.  Information potentially countering testimony of one of the witnesses, Clyde Edgmon.  Information potentially countering part of the testimony of Abby Barrett.

THE COURT:  And that's eight witnesses?

MR. LITTLEFIELD:  Could be as many as eight. We've got to talk to them to verify for certain what every one of them could say, as to whether it would be rebuttal as to the threats of guards.  Part of what they've put in is his cooperating with jail rules and being as close as possible a model prisoner.

There's assaultive behavior on guards, threats towards guards, certainly that would be appropriate.  If

5132

there were sexual favors sought when their exhibit, which they introduced, made statements that there have been no attempts for preferential sexual treatment, that would be appropriate rebuttal. If his family says I've never had any reason to fear him, then that would be some appropriate rebuttal if they have expressed otherwise to officials.

MR. HILFIGER: Your Honor, if I may address a couple of those.

THE COURT: You may.

MR. HILFIGER: First, on contact with Johnny Philpot, Mr. Philpot already has been up here and testified. He was the one that started off, he's the one that said Gelene contacted me and wanted me to help and she said that she was afraid of -- or not afraid, she thought that if Kenny found out about it that he would kill her. Johnny Philpot said that first. So, to get him back here to re-say that, that's not rebuttal, he's already responded to it.

The next thing is these sexual favors. Sexual favors -- we never brought up anything about sexual favors. That's stuff that they have had in their discovery that they gave to us back in August. So they knew it was there. And to come forward now and use it as rebuttal is not -- it's not rebuttal. That's something

5133

they knew about.  It's not something that they all of a sudden found out about.  So those two items I think are not proper rebuttal.  Now without -- I can't really respond to Clyde Edgmon because I don't know what he said.  He just said something about Clyde Edgmon.  But I mean I don't know what the rebuttal would be on Clyde Edgmon.

And these -- the items they brought to us today are things that were sent -- they look like they were sent in -- faxed in at 7:50 this morning to the Government.  And we just got -- like I said, we just got right before the break on the other items.  So I don't really -- I can't really address those too much at this point.  I haven't had a chance to really look at them.

MR. LITTLEFIELD:  Defendant's exhibits lists in response to his type of behavior in jail.  He may have been involved in any of the following:  Assault on another inmate, yes or no; assaulted by another inmate, no; involved in a fight, no; pressure for commissary or sexual favor, no.  This is their exhibit.  Certainly if we have testimony available that that's not true in response to what they offer, in response to what they bring into the courtroom, that's appropriate rebuttal.

THE COURT:  But how long have you had that information?

5134

MR. LITTLEFIELD: We got it when they presented the witness from the Department of Corrections.

THE COURT: It's not something you had before? You didn't -- (Interrupted)

MR. LITTLEFIELD: We knew previously of the fact that Kenny Barrett sought sexual favors.

THE COURT: No. But I mean, you didn't have that -- you didn't have that information from the -- (Interrupted)

MR. LITTLEFIELD: No. This was brought in by their witness when he came to testify and they offered the exhibit.

THE COURT: But the U.S. Attorney didn't have the intake at Lexington?

MR. LITTLEFIELD: No.

THE COURT: Information?

MR. LITTLEFIELD: No.

THE COURT: That surprises me, I guess, that you didn't.

MR. LITTLEFIELD: It may be, Judge. My focus primarily was preparing for the first stage of the trial. What he told them at Lexington didn't have anything to do with that. There has been certainly preparation for the second stage. We did not get his intake from Lexington.

MR. HILFIGER: And, Your Honor, I do -- one of

5135

the -- on this particular exhibit, Number 244, one of the things that I know that the Government's going to say, well, that's not the way it occurred, but Mr. Wilson did say that as to question three that the responses were on. They were not responses from the Defendant.  And that is not that, Mr. Littlefield, because Mr. Wilson said particularly -- we asked him the questions three were things that came from the record and question three has he been involved in a fight verified by documentation, assaulted other inmate.  Those were not self responsive questions.

THE COURT:  Well, what were -- I mean, where did the information come from?

MR. HILFIGER:  It came from -- well, as Mr. Wilson said, the question was were these things that came from the Defendant.  Mr. Wilson first answered yes, and then said but except for questions on number three. Those came from the records from the jail, you know, from wherever he had been.  He backed up and said on questions on -- the answers on three were not.

MR. LITTLEFIELD:  Well, Mr. Hilfiger, I choose to disagree with what he specifically said.  I think he said those were self-reported.  He said if there was information from the jail, it would be included.  He didn't say it was documentation from the jail on this

particular case. That's my take on it. Obviously, it's different from his. But regardless of that, it still goes to the issue of is he going to be a model prisoner? Is he going to be the kind of prisoner -- one of the things that the defense is stressing at this point is that this Defendant is a good prisoner. They put testimony on in that regard today. One of the issues they're trying to present to this jury in regards to the second stage is this prisoner is going to be a prisoner for the rest of his life. He's a good prisoner, therefore he's not a future danger. It certainly rebuts and is appropriate to rebut that issue and that which they have presented before this jury. The nature of him as a prisoner and the nature of him as far as his threat to future danger.

THE COURT: Well, what's that going -- what is that going to amount to in the way of testimony and how many witnesses -- (Interrupted)

MR. LITTLEFIELD: In regards to the sexual preference?

THE COURT: Yes.

MR. LITTLEFIELD: One.

THE COURT: And who is that?

MR. LITTLEFIELD: Josh Harmon.

THE COURT: And who is he?

5137

MR. LITTLEFIELD:  He was a jailer in Sequoyah County, he was a jailer who Mr. Barrett prevailed upon, asked, cajoled, and I think, manipulated into allowing him to have contact with a female inmate for the purpose of having -- receiving sexual favors.  And he was convinced by Mr. Barrett to do it and he did it.

THE COURT:  He is -- is he the one that was convicted of -- (Interrupted)

MR. LITTLEFIELD:  He was convicted.  He -- ultimately, he did it too.  And he was convicted of second degree rape.  But he was talked into allowing that contact.

THE COURT:  What says the defense in regard to that issue?

MR. HILFIGER:  Well, I'm not denying that contact occurred.  But prevail, cajole, he was the one that had the keys.  The way I understand what happened, the girls were the one that wanted to have the sex and he was the one that allowed it to happen.  There was no prevailing, there was no cajoling, there was no promising, there was no making or anything like that. He's the one that set it up.

MR. LITTLEFIELD:  And that would be for cross, Your Honor, and that's for argument, but certainly the evidence should be allowed.

5138

MR. HILFIGER: But that evidence and that stuff, though, was available. I mean, the Government has had that stuff -- gave it to us, gave copy to us in July or August or something like that. That's not something new to them. That's my read on that issue.

MR. LITTLEFIELD: When would we have chosen to introduce it? Part of stage one? It certainly wouldn't have been appropriate then. And as to future danger, I don't think so, not at least as part of our case in chief, because our case in chief was talking about his dangerous, violent acts. We're not the ones who introduced it into this case -- (Interrupted)

THE COURT: Of course, I'm not familiar -- I'm not familiar with the facts of that matter, but if -- it sounds like it could have been a violent act to the Court. I don't know the facts.

MR. LITTLEFIELD: I understand that. And -- (Interrupted)

THE COURT: And I guess if it was, it's something that could have been a part of the first case. If it wasn't, then the question is why should it be in rebuttal.

MR. HILFIGER: We didn't introduce whether or not he was a good prisoner. It was a consensual sexual activity between the prisoner and the two prisoners.

5139

Wouldn't have shown physical violence on his part.  But the defense is seeking to show this jury that this prisoner, in a prison setting, will abide by rules.  And as a consequence of that, since he's spending the rest of his life there, will not constitute a threat to other individuals.  They chose to introduce documents that said it.

THE COURT:  Are you prepared to tell the defense the names of the eight witnesses?

MR. LITTLEFIELD:  Yes.

THE COURT:  You may.

MR. LITTLEFIELD:  John Horn, Donna Owens, Stanley Philpot, John Philpot, Josh Arnold.

THE COURT:  What's John -- which one is the sheriff?

MR. LITTLEFIELD:  John -- Johnny.

THE COURT:  You gave both Philpots?

MR. LITTLEFIELD:  Stanley took the call and passed it on to Johnny from Gelene Dotson.  George Borman.

MR. HILFIGER:  George who?

MR. LITTLEFIELD:  Borman, Michael Hendricks, Rick Carter, Tommy Burger.

THE COURT:  I didn't get the last name.

MR. LITTLEFIELD:  Rick Carter and/or Tommy

5140

Burger.

THE COURT:  How do you spell the last name?

MR. LITTLEFIELD:  B, Burger.

THE COURT:  Burger, okay.

MR. LITTLEFIELD:  Like hamburger, B-u-r-g-e-r. And Rick Fargo.  He was hit with potatoes.

THE COURT:  My clerk says that's nine.

MR. LITTLEFIELD:  I think that -- (Interrupted)

THE COURT:  Is there an either/or there?

MR. LITTLEFIELD:  There would be an either/or on Burger or Carter.

THE COURT:  Is the Government's position that those names should be sufficient for the defense to know who they are?  Are there any names that would not -- that are new to this case?

MR. LITTLEFIELD:  We provided documents to them, the documents that Mr. Hilfiger was referring to. I've got them right before we started Court this afternoon and the first break I gave it to them.  Philpot -- the Philpots, I think that they're aware of them. Josh Harmon was previously discovered, he's the jailer who allowed the sexual contact.  Donna Hines was mentioned during the examination of Abby Barrett -- Abby Stites.

MR. HILFIGER:  Who is that?

5141

MR. LITTLEFIELD:  Donna Hines.

THE COURT:  Is that a witness?

MR. HILFIGER:  You didn't name Donna Hines.

THE COURT:  We counted 11 now.  I don't know how many -- you said eight, now we have 11.

MR. LITTLEFIELD:  I don't know that -- the additional three.

THE COURT:  Well, there was ten.  There was nine and -- let's go over them one more time, then, if there's just eight, we'll be sure who they are.

MR. LITTLEFIELD:  May I -- I'd ask who -- to write allow to speaker I want -- she got them written down.

THE COURT:  You may.

MR. LITTLEFIELD:  Don Owens, Rick Fargo, Josh Harmon, Rick Carter, Mike Hendricks, Stan and Johnny Philpot.  How many do we have now?  Donna Hines is Donna Owens, the same person.

THE COURT:  That's seven.

MR. LITTLEFIELD:  George Borman.

THE COURT:  That's eight.

MR. LITTLEFIELD:  And then I mentioned either Burger or Carter, one or the other.  And, Judge, that's at the outer limit.

THE COURT:  You're going to do that in two

5142

hours?  It's taken us about -- so far, our average has been about six or seven.  I think we did better today, but the witnesses have been six, seven a day.

MR. LITTLEFIELD:  And part of that -- (Interrupted)

THE COURT:  Is that what you think it will take for the direct or are you anticipating cross also?

MR. LITTLEFIELD:  It could be beyond that. But, Your Honor, the -- with the exception -- Fargo might take longer because -- Fargo's going to be real limited. I mean, it's going to be one incident of an assault. Arnold may take longer.

THE COURT:  Who is Arnold?  What's that -- (Interrupted)

MR. LITTLEFIELD:  He's the one who provided sexual --  allowed the sexual contact.  As to the other guards.

THE COURT:  Is he the one who's -- was convicted?

MR. LITTLEFIELD:  Yes, sir.

THE COURT:  Was it a trial?

MR. LITTLEFIELD:  Pled guilty.

THE COURT:  Sentenced?

MR. LITTLEFIELD:  Has been sentenced, five years suspended.  Two counts.

5143

THE COURT:  What?

MR. LITTLEFIELD:  Two counts, running concurrent.  Two counts of rape in the second degree.

THE COURT:  Comment from the defense?

MR. HILFIGER:  Judge, I don't know.  It just seems like they're just -- they keep continuing to try to get the last word in on their cases.  They're just starting these cases all over again.  If it's now saying that on the Philpots, they're now saying that Stanley Philpot's the one that received the phone call, then I guess Johnny Philpot maybe didn't tell the truth when he said he received the phone call.  And, you know, this Philpot situation, I don't know why that's rebuttal if they're saying now Stanley received that phone call, that's what she said, she's never talked to Johnny.  She left a message with a -- (Interrupted)

THE COURT:  It is already before the jury that Philpot said that he got the call and she said he didn't get the call.  Is he going to come back now and say he didn't get the call?

MR. LITTLEFIELD:  Stanley receives the call and transfers it to Johnny Philpot.

THE COURT:  Oh, okay.  I stand corrected.

MR. LITTLEFIELD:  And that -- Stanley Philpot would only -- Gelene Dotson's testimony was that she

5144

talked to a dispatcher who said Johnny Philpot wasn't available, to call back. No call back. Stanley Philpot received the call, Johnny Philpot was there and he transferred it. That's what Stanley would testify to.

MR. HILFIGER: Judge, I guess -- I mean, that's already been in there. You know, she said that it was transferred, Johnny never called, didn't call back. You know, Philpot said, you know, I got the call and I talked to her. Both sides are already there. You know, why do we need to come back to those two again to make the same statements?

MR. LITTLEFIELD: Judge, I'm not trying to belabor the record. I don't recall Johnny Philpot testifying that Gelene Dotson called him, said that he's bothering me all the time, he's over here taking showers, I'm afraid of him, afraid of his friends, is there anything I can do.

THE COURT: No, he didn't. I sustained the -- I'm aware of that testimony, but I sustained the motion in limine earlier. And now, it's -- and I'd say this -- I say this to both of you, that you're straining at some -- what I think is minutia issues. Trying to establish whether the Defendant's -- what his future conduct is going to be based on what his past conduct has been. And I think the Philpot example is the best one for me to

point to.  That that's close to being -- telephone calls five or six years ago between a mother and a sheriff and she admits she made the call.  Her concern was not with my son but who was coming over.  And is he going to testify that she was desperately -- that she called saying she was desperately afraid of her son, I need help.  I don't think so.

MR. LITTLEFIELD:  The essence of the testimony would be that it was not just the people, it was the complaints about Kenny Barrett coming into her house.

THE COURT:  I know that's going to be -- but that's going to be disputed.

MR. LITTLEFIELD:  And -- well -- (Interrupted)

THE COURT:  I mean it is disputed.

MR. LITTLEFIELD:  I understand.  That's credibility for the jury.  And that Mr. Philpot said have you told him that he is not to come over there.  Tell him that if he comes back he'll be trespassing and she said -- (Interrupted)

THE COURT:  Well, I guess my observation is this information compared to the heinous crime he's been convicted of seems to be -- the Court's grasping with we're just adding to the insignificant -- the significant -- and I'm just questioning whether it's necessary.  I'm not -- (Interrupted)

5146

MR. HILFIGER: Your Honor, I agree with you, that the minutia of what this argument about is really very small compared to what the crime is about. My problem is I just don't see that we can continue to be run over by the Government in wanting to throw in everything they want to throw in. I mean, I think that they're stretching by trying to say that these domestic violence acts -- (Interrupted)

THE COURT: No, I'm not -- I'm not criticizing either one. I'm criticizing both of you that I think we're dealing with minutia in that -- you know, there are some really important issues in aggravation and mitigation and I think you both have made those points and I don't know how much there is left to talk about.

MR. LITTLEFIELD: Well, when Mr. Philpot advised Gelene Dotson to tell him not to come back, she said I'll kill her, he said file a protective order, we've got to have something before we can do something. She said, no, he'd kill me. What we're talking about is killing. When you're talking about future conduct, when you're talking about him being in an incarceration situation, when he's telling the jailer if I ever get out of here, I'm going to kick your ass, or words to that effect. I'm going to kick -- I'm going to thump you, whatever the exact words are, I think that's important.

5147

Because when the defense is saying that this man is not going to be a danger, he's not going to be a threat because he's going to be in a controlled environment, he's assaulting guards, threatening guards, prevailing upon guards to allow illegal conduct and behavior, I think that has a real bearing on whether or not he's a danger even in a prison environment.

THE COURT:  Well, as I -- in regard to that -- the issue in the Sequoyah County Jail with the witness that's pled guilty to two felonies and received suspended sentences, that issue as far as lengthening this trial concerns me, because I don't know -- you say it's one short witness, but it's introducing a very broad area of cross examination for the Defendant, I assume.  Because you mentioned consensual sex and there's the plea of guilty and it looks a lot like ancillary litigation that this jury is going to have to deal with.  I'm not questioning that the subject matter is not worthy of bringing to the jury's attention.  It's just an issue -- I think it's an issue of discretion with the prosecution. If you choose to approach that subject, that's your discretion.  I think I've made my comment that I think it's -- that's the most difficult issue I see for the Court to deal with.  And I'm questioning the timing, now, as to whether -- and it may take us into next week to --

5148

and that's -- if it does, it does.  But I'm not so positive that we can deal with it in two hours.  And I'm somewhat -- I think I've expressed my concern about -- I would have thought the Government would have had some of your rebuttal ready to go.

MR. LITTLEFIELD:  We had a witness list, Judge.  Kenny Barrett's name is on it.  I didn't know until 3:00 o'clock he wasn't going to testify -- or after lunch.

THE COURT:  But you knew you had rebuttal.  Already -- you knew, based on what you've heard there was rebuttal.

MR. LITTLEFIELD:  Yes -- (Interrupted)

THE COURT:  And you know from past experience in federal court you should have those witnesses ready to go whether we stopped at four o'clock or 4:30 or whatever you could have been called on to bring those witnesses -- to stop here, again with this jury in the middle of the day when we have at least two and a half, three hours we could have gone, I'm not sure that that's something I clearly understand.  I think it is imposing on this jury another half a day that was not necessary.

And I anticipate -- although I haven't received it yet, but having dealt with this case for the last six months, I anticipate perhaps -- I received a motion in limine this morning, before we started, caused a

5149

45-minute delay.  I anticipate, perhaps based on the revelations this afternoon, a further motion in limine. Maybe not.  I'm not sure.  But that's also a delay that we hadn't anticipated.  So, I'm not suggesting -- I mean, I'll leave it up to the counsel for the defense as to whether it's necessary, based on this hearing this afternoon.

We'll recess until 9:00 o'clock in the morning. I'll ask the jury to come in, then we'll recess.

MR. HILFIGER:  Judge, do you want me to rest in front of the jury?

THE COURT:  Yes.

(Whereupon, the jury entered the courtroom and was seated in the box after which the following record was made.)

THE COURT:  Let the record reflect that the jury's in the box, counsel for the Government is present, Defendant is present with counsel.  The Defendant may call your next witness.

MR. HILFIGER:  Your Honor, at this time we'd rest.

THE COURT:  Members of the jury, you've heard the Defendant announce rest.  Does the Government have rebuttal?

MR. LITTLEFIELD:  We do, Your Honor, but the

5150

witnesses are not here.

THE COURT:  And when do you anticipate they will be here?

MR. LITTLEFIELD:  I would ask until tomorrow morning, Your Honor.  The nearest one is an hour away.

THE COURT:  Many of these are the same witness who've testified previously?

MR. LITTLEFIELD:  Only two would be -- at most two would be witnesses who have previously testified.

THE COURT:  So I take it you're not ready to proceed at this time?

MR. LITTLEFIELD:  Not at this time.

THE COURT:  Members of the jury, we'll be in recess until in the morning at 9:00 o'clock.  I'll ask you to remember my admonition not to discuss this among yourselves or allow anyone else to discuss it with you, avoid all news coverage, if there is any, involving this matter and keep your minds free and open and I'll see you in the morning at 9:00 o'clock.  And I'll ask everybody in the courtroom to please remain seated as the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Anything further from the

5151

Government outside the hearing of the jury?

MR. LITTLEFIELD: No, Your Honor.

MR. HILFIGER: Not for the defense.

(Whereupon, the Proceedings were continued to November 16th, 2005.)

5152

CERTIFICATE

STATE OF OKLAHOMA   )
                    ) SS.
COUNTY OF TULSA      )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 15, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 4943 through 5151.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,  )
                      )
       Plaintiff,    )
                      )
-vs-                )  No. CR-04-115-P
                      )
KENNETH EUGENE BARRETT,  )
                      )
       Defendant.    )

VOLUME 26 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 16, 2005.

A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                      United States Attorney
                      and
                      Mr. D. Michael Littlefield
                      Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                      Mr. Bret A. Smith
                      Attorneys at Law

**EUSTICE REPORTING SERVICE**

CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

Pages 5154 - 5283

5154

W I T N E S S E S

PAGE

JOSHUA ARNOLD
Direct Examination by Mr. Littlefield . . . . . 5167
Cross Examination by Mr. Hilfiger . . . . . . . 5177

LLOYD VELLEK
Direct Examination by Mr. Sperling . . . . . . 5212

RICK FARGO
Direct Examination by Mr. Littlefield . . . . . 5215
Cross Examination by Mr. Smith . . . . . . . . 5221
Redirect Examination by Mr. Littlefield . . . . 5228

RICHARD CARTER
Direct Examination by Mr. Sperling . . . . . . 5229
Cross Examination by Mr. Smith . . . . . . . . 5235

GEORGE BORMAN
Direct Examination by Mr. Littlefield . . . . . 5247
Cross Examination by Mr. Smith . . . . . . . . 5252

MICHAEL HENDRICKS
Direct Examination by Mr. Sperling . . . . . . 5260
Cross Examination by Mr. Smith . . . . . . . . 5268

P R O C E E D I N G S

THE COURT:  Let the record reflect counsel for the Government is present, Defendant is present with counsel.  I've received Defendant's motion in limine regarding Government's rebuttal witnesses Joshua Arnold, Stan Philpot, John Philpot, George Borman, Michael Hendricks, Rick Carter, Tommy Burger and Rick Fargo.

I've just received this.  At 8:45 is when it was filed and a few minutes after that the clerk brought it to me to review.  And my review convinces me that as

5155

to the testimony of Joshua Arnold that the Court should conduct a hearing outside the hearing of the jury to determine.  I have no way of knowing what his testimony is and it is potentially testimony that's either relative to this matter or not relevant to this matter.  Until I've heard it I don't know.  And I don't what to take -- I'm not convinced and I'm not confident that counsel knows what he's going to say.  And so, give the Government an opportunity to call him now so the Court will be aware of what the testimony is before I rule.

MR. LITTLEFIELD:  Immediately?

THE COURT:  Yes.

MR. LITTLEFIELD:  Your Honor, I think he's outside.  Josh -- Joshua Arnold.

MR. SPERLING:  Your Honor, if I may?

THE COURT:  You may.

MR. SPERLING:  After looking over -- will we have an opportunity -- to share with the Court that not only did we listen to your admonition yesterday, but we gave serious consideration to it.  We had discussions with defense counsel.  To let you know where that is and perhaps assist the Court in determining the motion before the Court.  Will we have an opportunity to do that --

(Interrupted)

THE COURT:  Yes.  You can have an opportunity

now, if you'll ask the witness to -- just hold the witness.

MR. SPERLING:  It might be -- it might be of some assistance to the Court if could give a background of what's happened since we left here yesterday.

THE COURT:  Well, as you're aware, in response to that most recent thing I've received was at 8:45, which sounds -- which appears to the Court to be that the Government's prepared to go forward with all of the witnesses that you had made known to the Court yesterday and the Defendant's filed a motion in limine to suggest that none of the witnesses should testify.  That's where I am until you advise me differently.

MR. SPERLING:  I understand that, Your Honor. One of the things that we're doing in preparing rebuttal is looking forward and we understand the defense objection.  We in fact engaged in certain discussions with the defense.  And I don't want to put closing argument in -- I don't want to suggest closing argument that perhaps won't be made, but I must say that one of the things that we do in assessing rebuttal, Your Honor, is we look forward.  And if we think -- part of our equation is what we expect that the defense will argue. If in rebuttal the defense were to argue that Abby's minimization of the Defendant's violence and abuse is

5157

substantial, that is, if they minimize it in closing argument, we will regret not having responded.

We have, however, elected not to call Mrs. Owens with regard to that rebuttal. In significant part because that is substantially a he said she said, and I believe that anyone with eyes and ears that saw Abby Barrett testify understands that she was very clearly a battered woman. The defense may object, as they have, if we were to call John Owens to say that Mr. Edgmon was wrong about him being out there, he being a detective from Sallisaw. And if the defense argues that law enforcement officers were out there without incident, I want the Court to know that we could have rebutted that testimony. That may not be considered by the defense later to be ancillary. But we are withdrawing from our -- from an intention to call John Owens in rebuttal. That's two witnesses that we have gone -- we have walked away from. If the defense should later argue that the Defendant's mother never complained about the Defendant's presence in her trailer or feared him, Johnny Philpot did take a telephone call from her and she expressed fear of the Defendant for what he would do if she tried to keep him away from her.

I understand that if I were in the position of the Court, I suspect or the jury, I would not want to

5158

hear a lot of he said she said. That really is one person saying it happened and another person saying it didn't. And as defense counsel offers, they would have perhaps Mrs. Dotson take the stand to say that conversation never occurred. I would simply suggest that if Johnny Philpot were going to make up something about that -- I would think that if you're going to make something up, you would make up something far more direct. That is that he pointed a gun at me or there was some very clear and present danger.

But we have elected, Your Honor, given the Court's admonition to the prosecution yesterday about not having rebuttal witnesses here, I'm -- I would suggest in part -- and I don't want to just go on an ancillary issue, Your Honor, but I would submit to you that the delay first allowed the defense to give additional thought to rebuttal, allowed us to give thought to additional rebuttal and the hour and a half delay yesterday was substantially occasioned by the fact that we anticipated that the amended witness list, which was the second witness list that we had, which included witnesses that were not on the first one, would be called and that we would take the remainder of the day.

I would say, Your Honor, we expected the defense to last through the day and while this trial has

5159

been lengthy, no delay has been caused by our failure to have witnesses ready.  We have required, in fact, many witnesses to wait, sometimes several days here before testifying.  The defense had represented to us and to the Court, I believe, that they expected their case would take two to two and a half days.  They amplified their witness list.  And we understand that there may have been reassessed decisions, but the amplified witness list gave us reason to believe that the defense case would last through Tuesday and into Wednesday.

As brief backdrop as well, Your Honor, in stage one we rested at 4:55 in the afternoon on 10-27-05.  Friday was a day off.  The defense had one work day and two weekend days before the defense case was required to begin.  In stage two, we rested at 11:03 on 11-10-05.  The trial was recessed until Monday, 11-14-05.  The defense then had one half working day, a holiday and two weekend days before beginning.  We then got list one of their witness lists.  Seven witnesses listed on list one were not called.  Thirteen witnesses listed on an amended list were not listed on the first list.  Although the defense did not call Toby and Kenneth Barrett, nor Mark Dotson nor Phyllis Crawford nor Janice Sanders, we were obligated to be ready for such cross examination.

Then yesterday the defense rested after a 308

5160

hearing as to the Defendant's declination to take the stand. The jury was so informed at about 3:30 in the afternoon. The Court informed us then that there were two to three hours left for witnesses. We needed, Your Honor, to assess who to call and whether to call certain rebuttal witnesses. We did that. We exchanged telephone calls with Bret Smith. I awaited the defense response last night until 10:00 p.m. I received a voice message from him at 6:30 this morning. I contemplated. And effectively -- I must say that in terms of the number of rebuttal witnesses, we are not all that far apart in terms of what we propose now to do and what the defense proposes. But we're apart on some important issues and I'm not trying just to mince words or to swat at gnats here, Your Honor.

The defense proposes that we not rebut Abby's testimony, that we not rebut the testimony of -- I've forgotten the man's name -- of Mr. Edgmon, that we not call the witness that will be called in a moment. By the way, Your Honor, I would respectfully submit to you that although we do not have a precise transcript as to what this witness will testify, I would respectfully submit to you that we have a very good notion as to the substance of his testimony. I understand, though, the Court has not been favored with that and I think it entirely

appropriate that the Court is going to engage in additional inquiry. But they propose that we also walk away from that. That we walk away from any notion or argument that the Defendant is not remorseful. That we not call the United States Marshal Service officer, Lloyd Vellek, who could have testified to the effect that after Gene Hise testified, they were in the prisoner area with the Defendant and that the Defendant said he, Gene Hise, acted the same way six years ago. He needs to quit being a baby. He needs to grow up and be a man. He needs to quit whining. That was not in response to questioning, Your Honor, and they propose that we walk away from that as well.

They also -- well, effectively, what they submit that we should be permitted to do in these discussions is to call a selected limited number of jailers. The motion by and large is a two-sided argument. I mean, on the one hand, if we stay our hand and we don't present every witness that is known to us in our case-in-chief, somehow we must just sit on our hands if they present witnesses and evidence and testimony concerning mitigating factors. And I will tell the Court also, that as to the mitigating factors, we got them late in the day before the opening statements were made with regard to the penalty phase. One of those mitigating

5162

factors, Your Honor, is the Defendant will not pose a future danger to society by being imprisoned for life without the possibility of release as demonstrated by his incarceration since September 24th, 1999.  The defense has explicitly brought his conduct into question with regard to his incarceration since September 24th, 1999.  And it was that mitigating factor, Your Honor, that did prompt additional inquiry that is in the form of the witnesses that we would intend to sponsor in this case.

I mean, the notion that we should have to fire every bullet early or not at all would be to permit the defense to determine how we are going to try our case and what witnesses we are going to try.  I would also point out, Your Honor, that in opening statement the defense attorney explicitly urged that the Defendant had not made any threats nor been involved in any fights in jail.  And part of the rebuttal that we intend to present will explicitly rebut what they have contended in that regard.

And finally, with regard to the complaints about notice, Your Honor, all testimony that we proposed to present concerns actions about which the Defendant has the primary advantage of personal observation.  All of them, Your Honor, and all of the information that we have disclosed to the defense, has been disclosed consistent with the Jencks Act, prior to the time that the witnesses

5163

have testified.  And it all relates to the Defendant's proffered mitigation.

I am reminded also, Your Honor, that with regard to the item of notice, that the defense didn't present an opening statement at the beginning of the punishment phase, but elected -- I guess they would say if we had done that, someone had been lying in wait.  But they were properly permitted to do that.  But they didn't give us a preview as to what they were going to do in mitigation until after we had presented our case in aggravation.

THE COURT:  Response?

MR. SMITH:  Just briefly, Your Honor.  I will note that there were phone calls exchanged last night.  And I was at the office late.  And what happened with me and Mr. Sperling and him waiting till ten or me waiting until I went home, I don't know.  It was probably poor communication between the two of us.  But I know both of us were working late trying to resolve this matter.

Sounds like we've got a partial agreement, not a full agreement.  And I'm not going to recite the negotiation that we had, Judge.  I appreciate Mr. Sperling telling us a couple of witnesses that he doesn't intend to call.  But I think, Judge, and the tenor of my motion is this is a fundamental fairness issue as it

5164

relates to Mr. Barrett. Specifically as it relates to that information that the Government had in its possession, witnesses that they could have presented during their case in chief. They want to upset the order of the trial. And essentially, they want to go last in this matter. And that's where it involves prejudice to Mr. Barrett. Now, Your Honor, if there's newly discovered evidence, then that doesn't come in as rebuttal. That's not proper rebuttal evidence. And whenever we prepare our case, yes, Mr. Barrett may know of something, he may have been a participant in something. But that doesn't necessarily mean that he has shared that with me and Mr. Hilfiger or that we have an ability to discover it.

The very thing that I alerted the Court to yesterday morning that I was concerned about as it related to discovery of documents transpired just like I had predicted it would, Judge. And at 3:00 o'clock we were handed a -- discovery from the Sequoyah County -- not the jail, from the Sequoyah County Sheriff. I didn't subpoena records from the Sequoyah County Sheriff, Johnny Philpot. I subpoenaed them from the jail authority. They gave the documents to Johnny Philpot. And again, as I walk in his office and I see a cutout of an article of Kenny Barrett, his records at his feet, and then on the

5165

eve of the Government opening their rebuttal case, oh, by the way here are some documents, now I've got a problem with that. A case this significant of this magnitude, I don't think that's right, Judge. It's improper. It's not proper rebuttal evidence.

THE COURT: What are those documents now?

MR. SPERLING: May I approach the Court?

THE COURT: You may.

MR. SMITH: And Your Honor, part of what I included in my motion, there was a question asked of Mr. Wilson, the DOC employee about confidential informants, about throwing the food item at somebody as it relates to disciplinary action and threats. And it's our contention the Government must have known the subject of these reports or they wouldn't have known to ask Mr. Wilson those questions. And whenever we prepare our case, we prepare our case based on those documents that we're able to discover, not only from the Government but those documents we're able to discover on our own, which we attempted and none of these were provide to us.

The only other thing I would add, Judge, as it relates to the caption, Marshal Val Lee, I think that's correct, he should have been added to the caption. The information regarding his proposed testimony was the subject of a conversation that we had last evening,

probably seven o'clock in the evening.  The first we've heard anything about that.  I don't know when the Government found out about it, but I would tend to think something that is that significant, from a marshal, would probably been made known to the Government sometime prior to seven o'clock yesterday evening.

MR. SPERLING:  Your Honor, we gave them that notice that we don't intend to call Marshal Vallery.  We are staying our hand with regard to that.  Fundamental fairness, he says.  We gave the defense this discovery before the defense rested.  That's in advance of when we're obligated to do so, Your Honor, under the Jencks Act.  Second, they have the last word.  I've heard repeatedly we always want the last word.  They have the last word with surrebuttal.  That's clearly the rules, that's clearly the process of the court.

You know, if we had to anticipate every conceivable defense argument or witness, our case would last even longer than I know that it has burdened the Court with at this point and our burden would be really undue.  The defense in this case didn't give us a witness list until just before they started.  Then they amended it and then they omitted certain witnesses.  Now this is really the pot calling the kettle black.  But with regard to witness Vellek, Your Honor, we intend not to call him.

5167

I think that's probative. I believe that given the defense argument that the Defendant is remorseful, that someone who walks away from the witness stand after hearing emotional testimony from a trooper who has been harmed as the result of his murderous action, and then laughs about it, says something about his lack of remorse. We are going to stay our hand, though, with regard to that witness. We're also staying our hand with a number of other witnesses and I appreciate the Court's indulgence and we look forward to presenting the testimony that the Court has requested in this case.

THE COURT: Let's call -- anything further? Let's call the witness.

Sir, if you would raise your right hand and be sworn.

JOSHUA ARNOLD,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    Good morning.

A    Morning.

Q    State your name, please.

A    Joshua Arnold.

Q    Mr. Arnold, have you ever previously been employed

5168

by the Sheriff's Department, Sequoyah County?

A    Yes, sir.

Q    And when was that, sir?

A    From the month of November 2000 to July 2001.

Q    And what was your employment with the Sequoyah County Sheriff's Department, sir?

A    I was a jailer.

Q    During the time as a jailer did you have contact with an individual by the name of Kenneth Eugene Barrett?

A    Yes, sir.

Q    And where was Mr. Barrett housed in the Sequoyah County Jail?

A    In the PC cell.

Q    PC stands for --?

A    Protective custody.

Q    Are there trustees in the Sequoyah County Jail?

A    Yes, sir.

Q    And where do the trustees generally stay?  And this is the old jail that was over the courthouse; is that correct?

A    Yes, sir.

Q    Where did the trustees normally stay?

A    In a room adjacent to the kitchen directly behind PC -- protective custody cell.

Q    Did you ever have breaks?

5169

A    Yes.

Q    And during your breaks what would you do to pass the time on occasion?

A    Play cards.

Q    With whom?

A    With the trustees.

Q    What area did you -- where did you all have the card games?

A    Usually directly in front of the PC cell.

Q    In hindsight, was that appropriate conduct on your part as a jailer?

A    No, sir.

Q    When you played cards with the trustees did anyone in PC participate and if so, whom?

A    Yes, they did.

Q    Did Mr. Barrett occasionally participate?

A    Yes.

Q    Did you strike up any kind of relationship with Mr. Barrett?

A    Yes, sir.

Q    Tell the Court about that.

A    The relationship I developed with Mr. Barrett was one of -- I'd say somewhat friendly.  There was a rapport trying to be built there.

Q    Between whom?

5170

A    Between Mr. Barrett and myself.

Q    Okay.  Mr. Barrett ever talked about what he anticipated was going to happen to him with you?

A    As far as the outcome of his --

Q    Of his case.

A    Yes.

Q    What did he say?

A    Yeah.  There were several times I was -- our conversation would lead to what he thought might happen or -- (Interrupted)

Q    What did he say?

A    There were times when he seemed like he was going to be convicted and there were times when he seemed like he was going to be released.

Q    Did he ever ask favors of you?

A    Yes, sir.

Q    What -- advise the Court of the nature of the favors that he asked of you?

A    I was asked for tobacco, I was asked for telephone calls outside of the allowed telephone calls or showers outside of the allowed showers.

Q    Did you allow those; did you provide tobacco and the phone calls and the extra showers?

A    Yes, sir.

Q    Is that appropriate?

5171

A    No, sir.

Q    Were any other favors asked of you?

A    Yes, sir.

Q    What?

A    I was asked to allow him to have sexual contact with a female inmate.

Q    And how did Mr. Barrett -- did he tell you how he knew that the sexual contact was possible?  I mean, that there was a female inmate that was interested in having sexual contact with him?

A    Well, there was notes and the proximity of the protective custody cell to the female cell -- the only divider was a wall so it was not allowed, but often talked -- screamed back and forth or I would say yelled back and forth, whatever either person wanted or proposition or --

Q    Did you -- did Mr. Barrett have notes from female prisoners?

A    Yes, sir.

Q    And how do you know that?

A    Because I confiscated several and I was given several.

Q    When you say given several, what do you mean?

A    I was showed notes.

Q    By whom?

5172

A    By Mr. Barrett.

Q    And what did Mr. Barrett ask in regards to sexual contact, sir?

A    He asked to be allowed to be in the same room with a female inmate.

Q    Was there any effort on his part to persuade or convince you to allow that?

A    Yeah.

Q    What kind of -- what kind of items did he tell you in an attempt to persuade you to allow the contact to take place?  What kind of things did he say?

A    I'd say that it was more along the lines of what he thought was imminent, that he would not be in contact with anybody or that he would never see a woman again. You know, kind of put yourself in my shoes situation.

Q    Did he ever talk about physical damage or problems he had in an attempt to persuade you to allow him to have contact?

A    The only injury that he ever mentioned to me was gunshot wounds to the legs.

Q    What did he say about the gunshot wounds to the legs?

A    He showed me several marks and lines that he would say was from the gunshot wounds or as a result of the gunshot wounds.

5173

Q     What did he say about those lines?

A     That they were lead poisoning, or that they were caused from the lead.

Q     Did you allow him to have sexual contact with a female prisoner?

A     Yes, sir, I did.

Q     And how long a period of time did this occur?  How long was the contact, approximately?

A     Maybe five minutes.

Q     When this happened, when you allowed Mr. Barrett to have sexual contact with a female prisoner, did you ultimately also have sexual contact with a female prisoner?

A     Yes, sir, I did.

Q     And when did it happen -- your contact and Mr. Barrett's contact?  I mean, was it the middle of the week or what?

A     It was on a weekend.

Q     Was there any other time that you allowed Mr. Barrett to have sexual contact?

A     No, sir, there was not.

Q     And your sexual contact, was it on the same weekend that you allowed Mr. Barrett to have sexual contact?

A     Yes, sir.

Q     Had you ever been propositioned before?

5174

A    Yes, sir.

Q    Did you ever do anything with a female prisoner before?

A    No, sir.

Q    Why did you do it this weekend?

A    Lack of boundaries and restraint and I was put in a situation I'd -- closer to the situation I'd never been in before.

Q    What happened to you as a consequence of this weekend?

A    I was convicted of two counts of second degree rape.

Q    What happened to your job?

A    I lost it.

Q    When did you get in trouble?

A    When?

Q    Yes, sir.

A    It was July.

Q    No, I don't mean the date.  But I mean in relation to the weekend, when did you find out, oops, boy, I messed up, I'm in trouble?

A    The following Monday.

Q    Where were you?

A    CLEET.

Q    Received training?

A    Yes, sir.

5175

Q    And what happened when you were at CLEET?

A    They -- I was in the middle of a test, a final test and deputies that -- from the Sequoyah County Jail along with the head jailer came in and presented me with a warrant and arrested me and took me to jail.

Q    Lose your job as a consequence?

A    Yes, sir.

Q    And you were convicted -- you were convicted of two counts of rape?

A    Second degree rape, yes, sir.

Q    Plead guilty or go to trial?

A    I pled guilty.

Q    What sentence did you receive?

A    I received two five year suspended sentences, five year probation.

Q    Running concurrent or consecutive?  Same time or --
(Interrupted)

A    Same time.

Q    Any financial?

A    Yes, sir.  I had to pay $1,200 in fines.  I'm mandated to no less than two years sex offender therapy, which is $30 a week and I have to pay $40 a month to probation for five years.

Q    Is there another restriction that is placed upon you -- or requirement that is placed upon you as a

5176

consequence of your errors on that weekend and the crimes you committed?

A    Several.

Q    How about are you now classified as a sex offender?

A    Yes, sir, I am.

Q    What do you have to do as a consequence of that?

A    I have to register as a sex offender every 90 days. I cannot present my house within 2,000 feet of a school, 300 feet of a park.  I'm not allowed by therapy -- as a part of therapy treatment not to be within children, including my own, without adult supervision.  I cannot leave town for more than two days at once without reporting to that other town that I'm there.  That's basically -- that's what I -- those are the main ones that really --

Q    Will those consequences follow you for the rest of your life?

A    Yes, sir.

Q    Had you ever done anything like that before with any other prisoners?

A    No, sir.

MR. LITTLEFIELD:  May I have a second, Your Honor?

THE COURT:  You may.

Q    (By Mr. Littlefield) What was it about what Mr.

5177

Barrett said to you that convinced you to allow him to have that sexual contact?

A    I felt like -- (Interrupted)

MR. HILFIGER:  Your Honor, I object.  He's not being responsive.  The question was what did he say.  He said I felt like.

MR. LITTLEFIELD:  That's not what the question was.  The question was what did -- what part of -- what part of what Mr. Barrett said to you was it that caused you.  I think he's being responsive to it.

THE COURT:  You may answer.

A    I felt like I felt sorry for him.  That everything that he had to say to me was about his future and what it entailed.  And every time this conversation came to be, I felt like he might not ever get to talk to somebody again.  You know, the more the conversation came to be, the more I understood what he was trying to ask of me.

MR. LITTLEFIELD:  Pass the witness.

CROSS EXAMINATION

BY MR. SMITH:

Q    Mr. Arnold, I understand you got convicted of two counts of rape, second degree?

A    Yes, sir.

Q    Were the two counts involving the same or different women?

5178

A   Two counts were involving the same woman.

Q   Were they two counts involving two separate sexual acts?

A   Yes, sir.

Q   And what two separate sexual acts?

A   I'm sorry.  I don't --

Q   Well, you said -- you've got two counts, right?

A   Uh huh.

Q   With the same woman, you're saying.  Is that woman Shannon Smith?

A   I believe at the time her name was Shannon Cummings.

Q   Okay.  Shannon Cummings.  And what two acts?

A   The first act was located in the same corridor and the second act was on my own, when I went back in the same night.

Q   Oh, okay.  So you did this on your own, didn't you?

A   The second time.

Q   The second time.  Now -- and do you know a Crystal Cates?

A   No.

Q   You don't know a Crystal Cates?  Were there other people that you also let have -- let them have sex that were inmates?

A   No.

Q   Do you know a Doug Hughes?

5179

A     No, not that I recall.

Q     If a Doug Hughes said that he was let out to have sex by you to the female cell, would that be untruthful?

A     I never let anyone else into the female cell.

Q     If there's -- there's statements that says that Josh brought Kenny Barrett and Doug Hughes out to the female cell and while Kenny and I was having sex on the bed, Josh and Shannon were on the end of the bed doing the same and after Kenny was taken out, Doug was brought in and had sex with Tara Barrett on the bed, that would a lie?

A     I don't ever recall letting Kenny Barrett into the cell.  I led him up to the door of the cell.

Q     Okay.  And what date was that?

A     I'm not for certain.  I know in the beginning of July.

Q     In the beginning of July -- is that what you're saying?

A     That's what I seem to remember.

Q     Of 2001?

A     Yes, sir.

Q     If the statement is it's on -- one occurrence was on April 27th at 2:00 a.m. that's when Doug Hughes, Kenny Barrett and you had sex with Shannon, then that would not be true, is that right?  Is that what you're telling us?

5180

A   I can't be sure of the date, to be honest with you.

Q   Is there a time on May 5th that you came and pulled Josh out -- that Josh came and pulled me and Tara and Shannon out of our cells and pulled us into the trustee's bathroom and Shannon and Josh remained in the laundry room and Kenny had sex with somebody and Doug had sex with Tara Barrett, that would be a lie?

A   I believe that to be untrue.

Q   Okay.  Were there -- so you're saying that the only person that you allowed out to have any kind of sexual contact was Kenny Barrett; is that true?

A   Sir, I really don't recall.

Q   You don't recall.  You don't recall letting other people out to have sex?

A   Sir, that weekend was very, very -- an unstable weekend.

Q   Why was that an unstable weekend, sir?

A   Because I lost all my control.

Q   Was it because you were unstable on that weekend?

A   Partially, yes.

Q   Nobody cajoled you, nobody forced you to do anything, you were the one in control, weren't you?

A   I was the one in control.

Q   In fact, you were so in control that -- who was your female partner that was there in the jail with you?

5181

A     I believe her name was Christy -- Kristen.

Q     And did you tell that female -- Kristen Calvert, would that be who that would be?

A     I think so.

Q     And did you make arrangement with Kristen Calvert to specifically set the TV monitors so that it would only be on the large room and not on the PC cell so you could go back there and do what you needed to do?

A     No, sir.

Q     You didn't do that?

A     No.

Q     So Kristen Calvert, if she says that, she would be lying, is that right?

A     As I recall the TV monitor is on an oscillating type system where it goes to one to the other.

Q     But if Kristen Calvert made the statement that on the above date, May 29th, '01, I was instructed by my partner, Joshua Arnold, to put the monitor on the large male population side while we went into the PC -- while he went into the PC side.  He brought a deck of playing cards with him.  I was properly trained by Lalani, Jenny and somebody else on the subject of watching my partner on this monitor while he is in back with the inmates.  But I was following what my partner told me to do.  He has done this on several occasions, playing cards.  I

5182

asked him if he was allowed to play cards with a male PC

and he told me yes.  When he goes into the male PC to

play cards, he always told me to put the monitor on the

large male population side.  Is that something you told

Kristin Calvert?

A     No, sir.

Q     So she's lying about that?

A     That's untrue statement.

Q     And on May 27th -- you don't know what day it was

that you're saying, then, that this occurred?

A     No, sir.

Q     Could it have been May 27th of 2001?

A     It's a possibility.  I may be being confused dates

with what happened and when I first went to court or --

Q     And you're saying you did not have sex with Crystal

Cates, is that right?

A     I do not know that name.

Q     Did you have sex with any other inmate?

A     I was accused, but I did not.

Q     Crystal Hutchins?

A     I do know that name.

Q     And did -- were you accused by her saying on

May 27th, Josh pulled me out and took me in the trustee

restroom to talk.  After we got in there, he said he was

impressed by my writing and wanted to know if I was

5183

willing.  I said yes and we had sexual contact with each other.  Afterwards I was taken back into my cell.  Would that be a lie?

A     That was an untrue statement.

Q     That's an untrue statement.  So your testimony is that the only person you had sex with was who?

A     Shannon Cummings.

Q     And you did this on your own, didn't you?

A     I will not lay blame on anyone but myself for my acts.

Q     And as far as Mr. Barrett -- letting Mr. Barrett go any place, nobody forced you to do that; isn't that true?

A     No, I wasn't forced.

Q     Nobody said anything -- you're saying that you just -- you felt sorry for him and you did that, isn't that right?

A     I did feel sorry for -- for everything that I had been told I felt sorry.

Q     And nobody cajoled you, nobody, you know, made you do this.  It was your own decision; isn't that true?

A     In the ultimate end it was my decision.

Q     And in fact, you set it up for yourself to do it. You set it up by telling your partner, Christine, to set those monitors over so she couldn't see you go back there and get the people out; isn't that true?

5184

A     Our protocol was that no matter where the other jailer went, you followed them with the monitors or if they were going back and forth like they were always, you always kept your eye on where that person was, where the other jailer was.

Q     So you're saying that you kept the monitor going even while you were having sex in there with Shannon Cummings?  The monitor was on you?

A     Yes, sir.

Q     And yet, nobody else saw it, is that right?

A     No, sir.

Q     Did you let females out of their cells to have contact with males -- sexual contact?

A     Not sexual contact.

Q     Not sexual contact?  Did you -- but you're saying that you let the males go to the female cell, is that right?

A     Yes, sir.

Q     And you didn't let Doug Hughes?

A     Sir, I don't recall the name and I don't recall letting another man in there.

Q     So, any of the statements by any of those people you're saying is wrong?

A     To my knowledge.  To my recollect.

MR. SMITH:  I have no further questions.

MR. LITTLEFIELD:  No redirect.

THE COURT:  Sir, you may step down.  Any arguments from the Government?

MR. LITTLEFIELD:  Your Honor, it's clear Barrett persuaded him to do something that was inappropriate and improper.

THE COURT:  It's clear what?

MR. LITTLEFIELD:  Mr. Barrett persuaded him to do something that was inappropriate and improper.

THE COURT:  Based on that testimony?

MR. LITTLEFIELD:  Yes.  Wasn't his idea.  Mr. Barrett showed him notes, told him that I'm never going to have contact with a female again.

THE COURT:  What I want to know is that you -- I've heard that testimony.  What is it that you want to rebut?

MR. LITTLEFIELD:  Barrett's -- Mr. Barrett's a good prisoner.  Mr. Barrett never had improper contact -- sexual contact in jail or attempted to obtain sexual favors, commissary privileges.

THE COURT:  You're rebutting the Lexington intake sheet?

MR. LITTLEFIELD:  The Lexington intake sheet as well as the testimony that they elicited from Courtney and I don't remember her last name, Mr. Barrett is a good

5186

prisoner.

THE COURT: Well, okay. What says the defense?

MR. HILFIGER: Basically, Judge, yesterday we were led to believe that -- and I'm not sure I got all the words right but Mr. Barrett persuaded, cajoled, enticed and prevailed upon this man to have him go get sex with another inmate. And the closest that this man comes to is by what he said I felt like -- I felt like I felt sorry for him. That's none of that. I just -- as far as anything that we elicited from Courtney Burke didn't have anything to do with sexual favors or attempts to have sexual favors. And as far as the Lexington deal, my recollection on Mr. Wilson's was on those questions there -- that those questions were from the jail records and previous records. Now, some of the other stuff was self reporting, but those things were from the jail records. And part of it is real clear because it says in that -- like three one or something like that, it says previous -- previous contacts or previous trouble in jail and it has verified by documentation. Well, it's almost, you know, impossible that the prisoner coming in is going to have documentation. Has the inmate ever been involved in any of the following? And then parenthesis verified by documentation. Note that the incident involved other races. That's not going to be self reporting. That's

5187

going to be from the jail, from whatever prison he came from, from wherever he was incarcerated, that verified by documentation. And that's not self reporting. Those assaulted another inmate, been assaulted, involved in a fight. That's -- we think that that is not proper rebuttal.

THE COURT: Now that we've heard testimony from Joshua Arnold, and it's my understanding that neither Stan Philpot or John Philpot is going to testify?

MR. SPERLING: That was our stated intention so long as this witness were permitted to testify, Your Honor. I'm not trying to put you -- we're going and I'll try to help.

THE COURT: Well, I don't need your help.

MR. SPERLING: I didn't mean it that way, Judge.

THE COURT: Well, I mean I don't need the help. I'm just trying to understand what it is that the Government's trying to present in rebuttal. And earlier I thought -- I may have misunderstood what the U.S. Attorney said, that the decision had been made -- I can't remember your term -- to withhold or to stand back or to not call Philpot or -- and I just was trying to be sure that I understood what the position was while we're here in this hearing.

5188

MR. SPERLING:  That's our position, Your Honor.

THE COURT:  And the reason I bring that up is because they're the names mentioned in the motion in limine, Joshua Arnold, Stan Philpot, John Philpot, George Borman, Michael Hendricks, Rick Carter, Tommy Burger and Rick Fargo.  And my intention was to ask the Government which of those witnesses you still plan to proceed with.  And I remembered Philpots were out.  Are there any others that are out?  And I'm going to ask the defense the same thing.  If they are still of the opinion that none of those witnesses should be allowed to testify.

MR. LITTLEFIELD:  Philpots, the two Philpots are out.  Owens and Owens, which isn't named in the caption, but it's mentioned in the body, as we've previously advised those are out.  Additionally, Vallery is out.  We're not going to offer the testimony of Tommy Burger, which leaves -- the Court's determination Joshua Arnold, George Borman, Mike Hendricks and Rick Harger and Rick Fargo.

THE COURT:  Any comment from the defense in -- (Interrupted)

MR. SMITH:  Can we have just a minute, Judge?

THE COURT:  You may.

MR. SMITH:  Your Honor, may I?

THE COURT:  You may.

5189

MR. SMITH:  Your Honor, I think we stand on our motion as it exists.  Other than I think the incident with Rick Fargo, the baked potato incident, that was brought out.  I think that's something we discovered and the Government -- there's no report about it.  But with these other individuals that came yesterday evening that are still listed on there, those are the ones we will continue to object to -- is that right?  So that'd specifically be Arnold, Your Honor, Borman, Hendricks and Carter.

THE COURT:  And your position on Borman, Hendricks and Carter is that that information which is the subject of this 11-15-05 fax was not made known to you until -- and I don't know that I've heard the Government's response to this, but you subpoenaed -- your subpoena went to -- you might go over that with me, again.  Your subpoena on this matter went to whom?

MR. SMITH:  The Sequoyah County Jail Authority which would be the -- they would've had possession of the records.  They then turned those records over to Sheriff Philpot.  And that was last Thursday whenever Mr. Philpot and I had the conversation.  And he let me look at the records that he had at his feet.  But none of them contained anything of a disciplinary nature.  They were all commissary and medical records.  So I -- it goes a

couple of ways, Judge.  That may be newly discovered evidence.  I don't know.  If it is, they've rested.  It doesn't come in as rebuttal.  Otherwise -- and the thing that caused me some question, the specific inquiry of the DOC individual, Mr. Wilson, was about confidential informants, throwing of food and threats to staff.  So it's almost like this subject matter was known.  Now, they might not have had the report, but it's almost like the Government knew.  Here's what we expect to, you know, that's in the pipe, so to speak, that's coming down.  But none of that's disclosed to us.  So whenever we make our opening, we don't know about that sort of thing.  And then all of a sudden at the last minute, oh, by the way, here are the reports that Sheriff Philpot found at the last minute.  So if it is newly discovered evidence, Judge, it came after they closed their case and it is not proper rebuttal.

THE COURT:  For the Government?

MR. LITTLEFIELD:  When we rested Thursday, I beat Mr. Smith to Sequoyah County.  I was there in the afternoon, talked with Mr. Philpot.  He didn't have any records.  They were looking.  He had individuals with the court clerk's office looking for records.  He had individuals with the jail trust authority looking for records.  All he could find was the records that I didn't

5191

even look at because he advised me they were hospital records and some other type -- the same records Mr. Smith mentioned. And I didn't think that they were relevant to any issue in regards to whether or not he was a good prisoner or not. I visited with some of the individuals. I said -- essentially asked if there are any individuals who would talk about misconduct, visited with Mr. Fargo, who is the potato incident.

There's not a record that I've seen and don't think anyone was ever written up. It's certainly not in any files that he has. Mr. Philpot advised me that he had those records, discovered them to the district attorney's office before the first state trial. They were never returned and that they were never relocated by the district attorney's office. That prior to the second trial they couldn't find them and apparently were lost by the D.A.'s office. Mr. Philpot didn't maintain a copy. He gave them those records. Over the weekend I spoke to Mr. Philpot on several occasions. Your Honor recalls the reference to the incitement to riot and Mr. Philpot was looking through personnel files and other records that were not related to the jail records, but personnel records of officers, also attempting to contact with individuals who had been jailers during that time, to find out if we could find a witness to the incitement to

5192

riot which was booked.  None was found.  And any other records of misconduct as is evidenced by what was faxed to our office yesterday.  I spoke with Mr. Philpot on -- (Interrupted)

THE COURT:  Did Mr. Philpot know the subject of these reports?  I mean, did he have a memory of them that he revealed?

MR. LITTLEFIELD:  Judge, as to every one of them, no.  Because there were a number of incidents that involved a number of prisoners over the years.  He knew the specifics of the Fargo potato incident.  I don't think he knew all of them, but he spent the weekend and into Monday digging through personnel files, attempting to retrieve those items.  When he got those items, they were faxed to our office sometime yesterday.  I was over here.  I don't -- if it -- it says 7:50 at the top of the fax.  I don't know when our office received it.  I received it yesterday afternoon as we started up on the after-lunch session.  At the first break -- I didn't even have a chance to look at it because we were involved with witnesses.  At the first break we made that available to the defense.  Judge, you know the question is -- (Interrupted)

THE COURT:  What I'm getting at is -- the question I have of you -- the nature of the report would

5193

appear to be something you would have made an effort to get in during your case in chief on the issue of future dangerousness.

MR. LITTLEFIELD:  I did not know of those incidents in our case in chief until the issue -- (Interrupted)

THE COURT:  This is something you discovered after the case in chief is over but between then and -- (Interrupted)

MR. LITTLEFIELD:  Yes.

THE COURT:  The issue of -- (Interrupted)

MR. LITTLEFIELD:  When the issue -- when the defense presented their defense to future danger as being appropriate conduct in an institution, my response was I want to see what his behavior has been in an institution.

THE COURT:  Let me ask you this:  Do these -- (Interrupted)

MR. LITTLEFIELD:  And by the way, Judge, I've been informed that the fax time on our machine is incorrect and those documents did not come into our office until afternoon.

THE COURT:  Let me ask you this:  These incidents covered by this fax and these other witnesses who I believe are deputies or jailers in Sequoyah County -- (Interrupted)

5194

MR. LITTLEFIELD:  Were.

THE COURT:  Were.  Former.

MR. LITTLEFIELD:  Yes, sir.

THE COURT:  Now, is this an incident that took place in the old jail or the new jail or both?

MR. LITTLEFIELD:  Old jail.  To my knowledge, old jail.  I think they are all old jail.  Mr. Hilfiger tells me one of them occurred in the new jail.  I'm not positive.  And I'm not trying to incorrectly advise the Court.

Your Honor, even if those items were -- and they weren't -- known to the Government prior to presenting our case, the fact that we don't present every item of future danger does not indicate that it's not -- the question is does that rebut.

THE COURT:  That's what we're -- that's what I'm struggling with.  What does it rebut?

MR. LITTLEFIELD:  The defense presents -- (Interrupted)

THE COURT:  I guess what I want -- (Interrupted)

MR. LITTLEFIELD:  You got two issues.

THE COURT:  Well, let me tell you what I remember the case that was put on as far as rebuttal. There was rebuttal from the young man who trained for a

5195

few days in the old jail, the jail -- Sequoyah County Jail on the fourth floor or fifth floor of the courthouse. And then he testified about activities at the new jail. To -- I assume from the Defendant's point of view, to demonstrate to the jury what the Defendant's conduct was in that facility.

MR. LITTLEFIELD: That's correct.

THE COURT: That was -- my clerk has reminded me it was witness Gude. As far as I know he didn't say anything. In fact, he said he didn't know anything about the old jail. So, he trained there a couple of days -- (Interrupted)

MR. LITTLEFIELD: Yeah, I understand that, Judge -- (Interrupted)

THE COURT: But as it relates to this Defendant, he didn't say anything about -- well, he said in fact he didn't know anything about that.

MR. LITTLEFIELD: That is correct. But what they are talking about is not conduct like -- or involved in a jail facility. They're trying to talk about conduct as a prisoner, because he's not going to be held in the Sequoyah County Jail. If that's the case, then it's irrelevant.

THE COURT: But what we're talking about now is rebuttal.

5196

MR. LITTLEFIELD:  That is correct.

THE COURT:  And what I heard the -- what I heard was is that this young man said I don't know what happened before.  I can't testify about his conduct there.  And then the young woman from the Muskogee County/City/Federal jail testified about his conduct there.

MR. LITTLEFIELD:  I understand.  And there was also someone from OSP.

THE COURT:  Yes.

MR. LITTLEFIELD:  And, Judge -- (Interrupted)

THE COURT:  And the point I'm trying to make is do any of these witnesses have any information about those three facilities?

MR. LITTLEFIELD:  One may.  I haven't asked them specifically that.  But the issue -- but, Your Honor, that so narrowly focuses the issue and the position, I mean, that they aren't arguing --  the defense is not arguing, well, he's not a future danger because he will be in the Sequoyah County Jail, the new jail.  They're not arguing that he's not a danger because he'll be in the Muskogee County detention facility.  They are not arguing that he will be -- not be a danger because he will be in the Oklahoma State Prison.  They are arguing that he will not be a danger because his

behavior as a prisoner is one that does not demonstrate danger.  They are telling this jury, in their mitigating factors, that we are -- you're going to have to make a determination of future dangerousness based upon what kind of prisoner he is because he's going to be a prisoner for the rest of his life.

And to say that, well, if they don't talk about his conduct at the old Sequoyah County Jail then you can't talk about it on rebuttal doesn't really address the issue and the argument they're making.  The argument they're making is -- (Interrupted)

THE COURT:  I haven't come to that conclusion. I'm just trying to get it straight in my mind.

MR. LITTLEFIELD:  Yeah.  No. They -- (Interrupted)

THE COURT:  I understand your argument.  But you agree that there was no evidence near that period of time from the defense about the old jail.

MR. LITTLEFIELD:  That is correct.  They presented Mr. Gude who was only the supervisor at the new jail facility and was just a trainee for, I think, a few short weeks.

THE COURT:  And what you're telling me is the reason you did not put this on as future dangerousness evidence is that you didn't know about it?

5198

MR. LITTLEFIELD:  That's correct.  And, Judge, you know, we also didn't talk about he didn't have a religious conversion.  We also didn't talk about, well, he detoxified.  You know, what we talked about as future dangerousness is look at his past, look what he has done. And whether or not we incorporated a specific item in our presentation of future danger doesn't mean it is not rebuttal to another issue.

THE COURT:  Okay.  Well -- (Interrupted)

MR. LITTLEFIELD:  -- or an issue raised on -- (Interrupted)

THE COURT:  Let me hear what the defense has to say and then we'll --

MR. SMITH:  Your Honor, as you know, this case has involved a ton of work in a lot of different areas. And we did our work as it relates to Mr. Barrett's incarceration.  And we attempted to discover what we could.  And we talked to what witnesses we could find and we presented those witnesses that we felt like would give a favorable impression of Mr. Barrett's incarceration. We did not address his stay at the old Sequoyah County Jail.  We did talk about that facility in terms of it being cramped, in terms of it being dark, in terms of you not having the opportunities for exercise or opportunities for programs.  We did talk about the

5199

difference with the new facility at the Sequoyah County Jail, the Muskogee County Jail and then the programs that are offered within prison.

These issues that the Government wants to now blindside us with all originate from the sheriff. The sheriff who has had a personal problem with this Defendant until he's -- since he was 17 years old. Broke his hand on his face when the Defendant was 17 years old. That's why, Judge, I brought it up yesterday. It wasn't any surprise that we're having this exchange today. I'm not saying the Government did anything improper. I mean, I think these guys have integrity and I'll always maintain that. But, Judge, the subject matter that is before us today was certainly something that they were able to discover. These are -- Mr. Philpot is their witness. He's not going to tell us anything favorable for Mr. Barrett. He also is able to tell the Government here are some jailers that work for me, you probably ought to go talk to these folks. That sort of stuff we don't have the ability to know who are good or who's good or who's bad. We just have to go out there and hit the street and find out for ourselves. So I think the Court, as you have looked at it, Judge, this is not proper rebuttal testimony for what has been presented to this jury from the defense's standpoint.

5200

THE COURT:  Court will be in recess.

(Whereupon, a short recess was held after which the following record was made outside the hearing of the jury.)

THE COURT:  Let the record reflect counsel for the Government is present, Defendant is present with counsel.

First, in regard to the motion in limine as it relates to the testimony of Joshua Arnold, the Court finds after hearing his testimony there is no evidence that the Defendant used any force or threatened Mr. Arnold or that -- the way this Court interpreted the testimony was that the Defendant even cajoled Mr. Arnold. Mr. Arnold's testimony would indicate that he was the one who is responsible for the incident involving the sexual activities in the Sequoyah County Jail.  My observation of the witness, Mr. Arnold, when he was on the witness stand under cross examination did not encourage the Court as to his credibility as it related to other sexual activity that may have gone on other than that that he admitted.  I thought it was telling that on cross examination he didn't develop the two counts of the charges that he pled guilty to until questioned by counsel.  And ultimately, the Court finds that that testimony would be more prejudicial than probative.

5201

With the announcement of that ruling, the motion as to Mr. George Borman, Michael Hendricks, Rick Carter and Tommy Burger and Rick Fargo is overruled. And as perhaps the Government suggested in argument, they couldn't anticipate what my ruling might be as to Mr. Arnold. Perhaps the Court misinterpreted the statement of counsel on reconsideration. I can perhaps understand the Government's position may be changed after hearing the Court's ruling on the testimony of Joshua Arnold. So to the extent the Government wishes to reurge any of the witnesses that they've announced they've withdrawn, they're free to do that. I'm not suggesting they should or shouldn't. But on reflection, having now thoroughly considered the testimony of Mr. Arnold in trying to review the impact of that ruling at the time that the Government made their offer to withdraw certain witnesses, I can understand how they may have cause to reconsider.

I have instructed the jury to take the lunch recess now and ask them to be back at 12:30. So I'll begin hearing testimony at 12:30. Anything further from the Government at this point?

MR. LITTLEFIELD: May we have just a second, Your Honor?

THE COURT: You may.

5202

MR. SPERLING: Well, the questions that we have -- and we are giving consideration to the testimony of Johnny Philpot and perhaps Stanley Philpot. And if the Court is saying that that is admissible if we choose to present -- or is the Court withholding the ruling depending on our announcement?

THE COURT: Of course, I haven't heard the testimony. And that was the reason for having the hearing in regard to Joshua Arnold. And I think it served the Court well to have that hearing. I'm not -- I guess what I'm telling you -- or what I am telling you is I'm not sustaining the Defendant's motion in limine as to any witness other than Joshua Arnold.

MR. SPERLING: I would proffer to the Court that the testimony of Johnny Philpot, if we elected to present it, would rebut the testimony of Gelene Dotson to the effect that she had not talked to him nor made a complaint about her son. His testimony would be --
(Interrupted)

THE COURT: No. I understand. You made that clear. You have made reference to it when there's no reason to dwell on it any further. It's that he said she said that invites a surrebuttal for perhaps her to come back and testify no, that's not what I said. But that's a discretionary call for the Government and the defense.

5203

MR. SPERLING:  Thank you, Your Honor.  We have nothing further, Your Honor.

THE COURT:  Defense?

MR. SMITH:  We have nothing further.

THE COURT:  12:30.

(Whereupon, the noon recess was held after which the following record was made outside the hearing of the jury.)

THE COURT:  Let the record reflect counsel for the Government is present, Defendant is present with counsel.  My clerk advised me the U.S. Attorney requested to address the Court before we bring the jury in.  You may.

MR. SPERLING:  I have two brief announcements, Your Honor, and Mr. Littlefield will handle the third announcement.  The first announcement relates to the testimony of Lloyd Vellek.  The defense has proffered Mitigating Factor Number Ten.  The Defendant has expressed remorse for the crimes.  The defense elicited in direct examination of Gelene Dotson a statement of purported remorse to the effect that if things had been different, and a man was dead, he made the wrong decision and would do it differently.  And from Ernie Barrett when asked how he feels said something about he was sorry it happened, sorry two children are growing up without a

5204

father.  In response to that, Your Honor, we believe it appropriate to establish Defendant's lack of remorse as evidenced by his statements after the testimony of Gene Hise as we have previously proffered and we would respectfully request permission to present that testimony.  We also announce -- my second announcement -- (Interrupted)

THE COURT:  You may.

MR. SPERLING:  Thank you.  My second announcement to the Court, Your Honor, is that we will not call either Johnny Philpot or Stanley Philpot.

MR. LITTLEFIELD:  Your Honor, as soon as we broke for lunch Mr. Barrett was being escorted out by the marshals and the witnesses that we had here were sitting outside.  One of those individuals is George Borman who was a jailer in Sequoyah County.  He witnessed -- (Interrupted)

THE COURT:  Was a jailer?

MR. LITTLEFIELD:  He was a jailer in Sequoyah County.  He was with another jailer by the name of Brad Boyd and resembles Mr. Boyd.  As Mr. Barrett was being escorted out by the marshal, Mr. Barrett looked directly at Mr. Boyd and said it's going through like I said it would, and smirked.  Mr. Boyd -- or Mr. Borman was with Mr. Boyd when Mr. Barrett confronted Mr. Boyd in the

5205

jail, was -- became combative and was being taken to a caged area and Barrett told Mr. Boyd in Mr. Borman's presence that he would not be in jail forever and that he would find him when he got out of there.  That's the statement that Mr. Borman recollects Mr. Barrett making and he gets the statement today it's going through like I said it would.  It was overheard by Mr. Borman and Mike Hendricks.  Both of them perceived it as a direct threat upon the witness, Borman, today.  And we intend to elicit that testimony as well and will make -- and we're providing notice to the Court and to the defense of that behavior, that statement that was made by this Defendant less than -- a little more than an hour ago.

THE COURT:  Response from the Defendant?

MR. LITTLEFIELD:  Oh, one other thing, Your Honor, when asked -- the marshals who were escorting him did not know the witness, were concerned as to who it had been, who he was, heard the statement but couldn't hear it clearly, thought it was to the effect of you can go through with it now, or words to that effect.  Sounded very much like, didn't hear it exactly.  Asked Mr. Barrett what he said.  He said I didn't say anything. Who were you talking to?  Because they didn't know they were witnesses, they didn't know if they were members of Mr. Barrett's family, friends, associates, so they were

5206

concerned about an escape.  When they asked Mr. Barrett, well, who were you talking to, he said, oh, I was talking to my -- I was talking to my lawyers.  His lawyers were in the courtroom.

THE COURT:  Is the defense prepared to respond or do you want to talk to your client?

MR. LITTLEFIELD:  And we did advise of the nature of the statement prior to coming in.

MR. SMITH:  As to the -- Mr. Hise -- the statement after Mr. Hise, I don't think that shows any thing of remorse or lack of remorse.  I think it's just a factual statement that, hey, you know, after six years you'll get over it.  I don't know whether that is rebuttal for anything.  The next, I guess the third deal that Mr. Littlefield just talked about, I guess we'll probably need to have some kind of interpretation there of what that means.  It's going through like I said it would.  Without knowing more in the sense that I know -- you know, they have a statement that apparently Mr. Borman wrote on behalf of an incident with Brad Boyd.  I don't know whether that is the particular incident that is being referred to when he says it's going through like I said it would.  You know, I don't know whether that's rebuttal or not rebuttal because I -- the problem I see is what does that statement mean?  And, you know, if the

5207

Government's saying, well, we're characterizing that as a threat, you know, I guess maybe they can characterize that as a threat. If there were more than one statement made to Mr. Boyd or to Mr. Borman then we probably are going to have to go into, you know, what are they talking about all the time they're in the jail? Did he talk about how the case was going to go back in 2003 or 2002 and he's saying, hey, the case is going just like I said it would? I don't know what it means. Now I know what they -- what characterization they want to put on it. But I really don't know what it means as far as rebuttal.

THE COURT: Let me inquire of the Government. The recent incidents you reported -- go over that again because I'm a little -- you made reference back to a time in the past.

MR. LITTLEFIELD: May I do it here?

THE COURT: Yes.

MR. LITTLEFIELD: Mr. Boyd was the guard who was threatened.

THE COURT: Who is now deceased?

MR. LITTLEFIELD: Who is now deceased. Mr. Borman was with him. And if you look at the statement which has been provided, it is Borman's -- or it is Boyd's statement. There was more threatening language in the statement than what Mr. Borman heard. I mean,

5208

there's also a statement that was made to Mr. Boyd about I have ways of getting to you while I'm in here.  Mr. Boyd did not hear that part of the statement.  All Mr. Boyd -- or Mr. Borman heard was I'm not going to be -- and I don't have it in front of me, but I'm not going to be here forever and I'll find you when I get out.

THE COURT:  Is that in the statement you provided me?

MR. LITTLEFIELD:  That is in the statement. It's right down here.  He also stated -- or, no, right above it.  He told me that he would not be in jail forever, that he would find me out there.  And Mr. Borman heard that statement and is prepared to testify as to it.

THE COURT:  And that was a statement that took place on February the 22nd, '03?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  And -- (Interrupted)

MR. LITTLEFIELD:  Today -- (Interrupted)

THE COURT:  Let me be sure I'm -- this statement that you've provided -- at the bottom of my statement, it says involved Brad Boyd, now deceased, witnessed by George Borman.  So Borman witnessed Mr. Barrett and heard Mr. Barrett make these remarks to Mr. Boyd, who's now deceased?

MR. LITTLEFIELD:  That is correct.  And the

5209

remark that Mr. Borman recalls is the one that I referenced.  He did not recall and does not recall and cannot testify to -- I had -- what the second statement about ways of getting to him from in here.

THE COURT:  He remembers the one about he would not be in jail forever?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  And then an hour or so ago as the Defendant was leaving here, your information is that he said what to whom?

MR. LITTLEFIELD:  It'll go through like I said it would, and was looking directly at Mr. Borman.

THE COURT:  But he never -- but, if I understand this, he didn't ever -- he had never threatened Mr. Borman?

MR. LITTLEFIELD:  No.  But according to Mr. Borman, he resembles Mr. Boyd and looks like him.  He -- Mr. Borman -- (Interrupted)

THE COURT:  So Mr. Borman thinks the Defendant thinks that he is Boyd?

MR. LITTLEFIELD:  That's what he -- that what he is assuming.  Both Mr. Borman and Mr. Hendricks observed the Defendant make the statement.

THE COURT:  So, okay -- (Interrupted)

MR. LITTLEFIELD:  Both of them perceived that

5210

Mr. Borman was threatened today.

THE COURT: So you propose to have Mr. Borman testify about the Boyd experience and then tell the jury that he thinks that the Defendant thought that he was Boyd?

MR. LITTLEFIELD: Advised -- would ask him do you look any -- do you look any like Boyd? He'd say, yeah, I resemble him. And what happened when you were sitting outside the courtroom today. As Mr. Barrett walked by, he looked at me directly and said it will go through just like I said it would. And Mr. Hendricks also observed Mr. Barrett make that statement and both of them absolutely perceived that Mr. Borman was threatened today.

MR. HILFIGER: I do have a little bit of a response to that.

THE COURT: Okay.

MR. HILFIGER: Number one, I am a little concerned because of this -- the date of 2-23-03, when I saw that I thought it was a new jail incident. I've been informed that, no, this is an old jail incident, number one. So that date -- it wouldn't be of '03 -- something that -- '03 is not the correct date. And that I don't know who wrote this statement and I'm sort of thinking that George Borman wrote the statement. My understanding

5211

is that Brad Boyd died while Kenny Barrett was in the old jail and Kenny Barrett new Brad Boyd died. Because it was -- it was not a -- it was sort of an accidental death that was well known, because Brad Boyd worked for the jail at the time and he died, and Mr. Barrett knew that. So he's not mistaking anybody for anybody.

THE COURT: Can we proceed with the other evidence and I'll then recess?

MR. LITTLEFIELD: We would have three witnesses that we could put on unrelated to this particular incident.

THE COURT: Let's proceed. Bring the jury in. Everyone, please remain seated as the jury comes in.

(Whereupon, the jury entered the courtroom and was seated in the box after which the following record was made.)

THE COURT: Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel. Government may call your first rebuttal witness.

MR. SPERLING: Lloyd Vellek, Your Honor.


LLOYD VELLEK,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

5212

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Please state your name, sir, and spell your last name.

A    Lloyd Vellek, V-e-l-l-e-k.

Q    What is your business or profession, sir?

A    I'm a Deputy United States Marshal.

Q    For how long have you been so employed, sir?

A    Just over two, two and a half years.

Q    In your capacity as a Deputy U.S. Marshal have you attended this trial?

A    Yes, I have.

Q    And have you been responsible for assuring -- or for certain security with regard to this trial?

A    Yes, I have.

Q    And as a matter of fact, the United States Marshal's Service provides security in every trial?

A    Yes, we do.

Q    And so, this is not something that you did specifically with regard to this case, but that's something that you do as a matter of routine in other jury trials in federal court; fair to say?

A    That's correct.

Q    You're educational background, please?

A    I attended the University of South Dakota in South

5213

Dakota, Vermillion, have a four year degree in criminal justice, bachelor of science.

Q    Do you have law enforcement experience prior to joining the marshal's service?

A    I was a state parole agent for the State of South Dakota, considered somewhat law enforcement, but probably more in regard to lines of counseling.

Q    And, Mr. Velleck, how long did you serve in that capacity?

A    Almost seven years.

Q    Thank you, sir.  Did you have occasion to be serving in your capacity as a Deputy United States Marshal on Wednesday, October 5, 2005 in this courthouse?

A    Yes.

Q    Did you have occasion to be present during the testimony of Oklahoma Highway Patrolman Gene Hise?

A    Yes.

Q    Did you later have occasion to be in the company of the Defendant in an elevator area on this floor?

A    Yes.

Q    Did you hear what, if anything, the Defendant said on that occasion?

A    Yes.

Q    And by the way, as a matter of policy, did you engage the Defendant in conversation?

5214

A   No.

Q   Did you ask him any questions?

A   No.

Q   Are you familiar with the concept known as the functional equivalent of questioning?

A   Yes.

Q   Did you do anything intending to elict a response from him?

A   No.

Q   Is what he said something that he volunteered?

A   Yes.

Q   What did he say, sir?

A   It was something along the lines of -- and he was referring to Trooper Hise, that he had acted same way six years ago in a state court, at the state trial.  That he needs to grow up and be a man and quit his whining and crying.

Q   What was the Defendant's attitude or demeanor when he made those statements to you -- or made those statements in your presence?

A   Kind of said it chuckle -- with a chuckle.

Q   Did you take his statements to be serious based on his demeanor?

A   Yes.

MR. SPERLING:  Nothing further, Your Honor.

5215

THE COURT: You may cross examine.

MR. SMITH: No questions.

THE COURT: May this witness be excused from the Government?

MR. SPERLING: Yes, Your Honor.

THE COURT: Defense?

MR. SMITH: Yes, Your Honor.

THE COURT: Sir, thank you for your testimony. You may step down and you may be excused.

MR. LITTLEFIELD: Your Honor, we call Rick Fargo.

RICK FARGO,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name, please.

A    Fred Fargo.

Q    And, Mr. Fargo, you need to lean into the microphone, okay?

A    Yes, sir.

Q    Lean in -- what?

A    Yes, sir.

Q    Okay. That's better. How are you employed, sir?

A    I'm a presently employed by the Choctaw Nation

5216

Tribal Police.

Q    Choctaw -- back up just a little bit.

A    I'm presently employed at Choctaw Nation Tribal Police.

Q    That will work.  And how long have you been employed with the Choctaw Nation Tribal Police, sir?

A    About a year and a half.

Q    Just work patrol as a regular police officer for the tribe?

A    Yes, sir.

Q    And what counties is the Choctaw Nation's jurisdiction in?  Where does it go from?

A    Basically from Pocola, Oklahoma to the Texas border.

Q    Okay.  And how far west?

A    McCurtain County, I believe.

Q    I'm sorry?

A    McCurtain County.

Q    How far west?  Cover Durant?

A    Yes, sir.  It covers Durant, Atoka, I believe it stops just the other side of Durant, just right before you get into Texas.

Q    And what area are you primarily responsible for, sir?

A    LeFlore County.

Q    Have you previously been employed by the Sequoyah

5217

County Sheriff's Office?

A    Yes, sir.

Q    And when was your employment with the Sequoyah County Sheriff's Office, sir?

A    2002.

Q    2002?

A    Yes, sir.

Q    How long were you employed by the Sequoyah County Sheriff's Office?

A    Approximately five to six months.

Q    And what were your duties with the Sequoyah County Sheriff's Office, sir?

A    I was a correction officer.

Q    As a correctional officer, what facility were you working in?

A    Sequoyah County Jail.

Q    New jail or old jail?

A    The old jail.

Q    Did you know an individual by the name of Kenneth Eugene Barrett, sir?

A    Yes, sir, I did.

Q    Was he an inmate in the jail at the time you were a correctional officer at the Sequoyah County Jail?

A    Yes, sir.

Q    Do you recognize him in court today?

5218

A    Yes, sir.

Q    Can you point him out and tell what he's wearing?

A    He's wearing the blue shirt right here in the middle.

MR. LITTLEFIELD:  I would ask the record to reflect that the witness has identified the Defendant, Kenneth Eugene Barrett, Your Honor.

THE COURT:  The record will so reflect.

Q    (By Mr. Littlefield) As a -- can I say jailer rather than correctional officer?  It's quicker.

A    Yes, sir.

Q    As a jailer, what kind of responsibilities did you have, sir?

A    We had to feed the inmates.  If they needed any medication, we're responsible for giving them the medication.

Q    And did I -- I didn't pick up -- what about food service and the providing food to the inmates?

A    Yes, sir.

Q    During the time you were a jailer, did Mr. Barrett have any restrictions on his diet?

A    Yes, sir.

Q    What was the nature of the restrictions on his diet, sir?

A    He was on a bland diet.

5219

Q    And who made the determination that Mr. Barrett should be on a bland diet?

A    His doctor did.

Q    Were there medical requirements for a bland diet as to the type of foods he could eat?

A    Yes, sir.

Q    Do you recall an incident with a baked potato, sir?

A    Yes, sir, I do.

Q    And did you have occasion on one of these meals to attempt to serve a baked potato to Kenneth Eugene Barrett?

A    Yes, sir, I did.

Q    When that -- was there something different from the baked potato that you served or attempted to serve to Mr. Barrett from the way most people eat baked potatoes?

A    No, sir, nothing with the exception of he couldn't have butter.

Q    And why couldn't he have butter?

A    Because of his doctor's orders.

Q    Did Mr. Barrett have a reaction -- (Interrupted)

A    Yes, sir.

Q    -- when you served him a baked potato that didn't have butter on it?

A    Yes, sir.

Q    What was his reaction?

5220

A    He wanted butter.

Q    What did he say?

A    He wanted the butter.  I refused to give it to him.

Q    What did you tell him?

A    I told him due to doctor's orders I could not give it to him.

Q    After you told him because of the doctor's orders you couldn't give him butter, what did he say or do?

A    He threw the baked potato and struck me with it.

Q    How did he throw it?

A    Overhanded.

Q    Like one would throw a baseball?

A    Yes, sir.

Q    Was it a little toss or was it a good throw?

A    It was a pretty good throw.

Q    And where did it hit?

A    It struck me in the groin area.

Q    When it hit you in the groin area, just fall down or what?

A    It exploded.

Q    Burst into pieces?

A    Yes, sir.

Q    Is that appropriate behavior for a prisoner?

A    No, sir, it's not.

Q    What did you do then, sir?

5221

A    I did nothing.  I just asked him why he did it.  And he said because he couldn't have his butter, he didn't want the potato.

Q    Did he receive any kind of disciplinary -- any kind of discipline for that particular situation, sir?

A    No, sir, not to my knowledge.

Q    Did you report it?

A    Yes, sir, I reported it to the supervisor.

Q    How do you get along with prisoners?

A    Not real well.

Q    Why?

A    Well, Kenny had been there the longest and he kind of felt like that things should be his way.

Q    If it didn't go his way, how would he react?

A    He would get upset with them.

Q    What did he do?

A    Most generally would cuss them.

Q    You never saw any physical fights with him?

A    No, sir.

        MR. LITTLEFIELD:  Pass the witness.

        THE COURT:  You may cross examine.

        MR. SMITH:  Thank you, Your Honor.

                CROSS EXAMINATION

BY MR. SMITH:

Q    Mr. Fargo, where is your report about this incident?

5222

A    I don't know, sir.

Q    What day was it?

A    I can't recall.

Q    What month was it?

A    I worked there from the first part of January --
(Interrupted)

Q    Sir, I didn't ask you when you worked there, I asked you what month this was.

A    I don't recall.

Q    So this is just something that happened but you can't tell us when, right?

A    Yes, sir.

Q    Now, this Sequoyah County Jail -- this was the old jail?

A    That's correct.

Q    It was a dump, wasn't it?

A    Well, it's the first jail I've ever worked in.  I really can't comment whether it was or wasn't.

Q    Well, were you aware that they were being fined because it was unhealthy?

        MR. LITTLEFIELD:  Objection.  Assumes facts not in evidence.

        THE COURT:  Sustained.

Q    (By Mr. Smith) This food that you prepared was a baked potato.  Was it wrapped in foil?

5223

A   I don't recall whether it was.

Q   Was it a hard baked potato or was it a soft baked potato?

A   It was soft baked.

Q   Big baked potato or small baked potato?

A   About the size of your fist.

Q   Okay.  Well, my fist or your fist?

A   Well, just average fist.

Q   Okay.  Now, you would agree with me somebody in jail, particularly a dump, food's about the only thing they had to look forward to, isn't it?  That's the highlight of their day?

A   Well, they had TV and other things that they could do.

Q   Talk on the telephone on occasion?

A   Yes, sir.

Q   Mr. Barrett didn't get to go outside or anything, so really that's about it is looking forward to those meals coming around, right?

A   Yes, sir.

Q   Okay.  Now, we talked about the diet incident, remember having a conversation with Mr. Barrett about the fact that his diet was restricted to tomato goods and didn't have a thing to do about butter?

A   No, sir.

5224

Q    Do you remember any of that?

A    I don't recall that.

Q    Okay.  Tell me how you were serving the other baked potatoes for the other inmates.

A    They would get a side dish of butter, just a small portion of butter, to put on their potato.

Q    What else were they getting?

A    On that particular day?

Q    Yeah.

A    I don't recall.

Q    Well, now, we recall the incident.  You recall there was no butter, but you don't recall what else; is that true?

A    Yes, sir.

Q    Okay.  Would it be fair to say that you can't remember giving Mr. Barrett anything but a potato?  No salt, no pepper, nothing?

A    No, sir, he had a full plate.  He had other things in there in his plate, but I just don't recall what all there were.

Q    I'm talking about to accompany the baked potato.

A    I don't recall if he salt and butter or not, sir.

Q    Now, he was in a jail cell?

A    Yes, sir.

Q    That had bars?

5225

A    Yes, sir.

Q    It's not like the new ones that sometimes have a solid door and a slot in it, what they call a bean hole. Do you know what I'm talking about with those?

A    Yes, sir.

Q    Okay.  This wasn't one of those, was it?

A    No, sir.

Q    This was a deal where it was pretty wide area with individual bars, kind of what we think about an old-fashioned cell?

A    Yes, sir.

Q    And so, whenever you say that this baked potato hit you and it exploded --

A    Yes, sir.

Q    You don't know whether or not this thing hits the bars and it's already in pieces before it's coming at you or not?

A    No, sir, it didn't strike the bars.

Q    Well, it's going to hit you, you're a solid person, kind of like throwing it up against the wall and it hits you and just goes into -- explodes, goes into several pieces?

A    Yes, sir.

Q    Okay.  Now, it's my understanding that there was an incident about a baked potato and afterwards there was

5226

some -- (Interrupted)

MR. LITTLEFIELD:  I object to Mr. Smith's understanding.  He can ask the question -- (Interrupted)

MR. SMITH:  I'll rephrase the question, Judge.

Q    (By Mr. Smith) Is it true after this incident that the other inmates in that jail referred to you as Spuds?

A    No, sir, I don't recall that.

Q    Is it true that you and Mr. Barrett had a conversation the day after this incident, because his TV had been taken away -- or the TV had been taken out of that cell and it was given back to him by you?

A    I recall an incident when they lost their TV, but I don't believe I was the one that took the TV away.

Q    Was it over this incident or not?

A    No, sir.

Q    Or can you not remember?

A    No, sir, it was not over this incident.

Q    So you're saying it doesn't have anything to do with this incident?

A    No, sir.  I wasn't the one that took the TV away.  I don't recall that.

Q    Well, is there a difference in not recalling or it didn't happen?

A    I recall an incident over the TV being taken away, but I wasn't the officer that did it.  I don't recall

5227

what the incident was that led up to the TV being removed.

Q    Okay.  I guess -- how long did you work in the jail?

A    Four or five months.

Q    And it's not always the best place to work, is it?

A    Not always.

Q    All right.  I mean, people in there, sometimes they act out a little bit, name calling isn't that unusual?

A    Yes, sir, they act up some.

Q    Sometimes they holler a little bit, right?

A    Yes, sir.

Q    Shout a little bit and just carry on, just kind of yeah, yeah business, right?

A    Yes, sir.

Q    Kind of comes with the territory?

A    Yes, sir.

Q    You don't expect to be struck with anything?

A    No, sir.

Q    You don't expect to be hit?

A    No, sir.

Q    Did this put you in any fear?

A    No, sir.  I was in no fear for my life.

Q    You weren't in any danger?

A    No, sir.

Q    Probably upset you a little bit?

5228

A    No, sir, it really hurt, to be truthful for you.  It really didn't make me mad.  I didn't jump on to him or anything.

Q    It's not something you appreciated; would that be true?

A    Well, no, sir, I didn't appreciate it.

MR. SMITH:  Okay.  Thank you, sir.

THE COURT:  Further direct?

REDIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    You were asked about food being the highlight of the day.  Is that the only thing prisoners had to look forward to in the jail?

A    No, sir.

Q    Have a TV?

A    Yes, sir, they did.

Q    Did they have access to phone calls?

A    Yes, sir.

Q    Have visitors?

A    Yes, sir.

Q    Have opportunity to play games?

A    Yes, sir.

Q    Whole lot to do besides just eat food, wasn't there?

A    Yes, sir.

MR. LITTLEFIELD:  Pass the witness.

5229

THE COURT:  Anything further?

MR. SMITH:  No questions, Judge.

THE COURT:  May this witness be excused?

MR. LITTLEFIELD:  Yes, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.  You may call your next witness.

MR. SPERLING:  Rick Carter.

RICHARD CARTER, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Please state your name, sir, and spell your last name for the jury.

A    Richard Carter, C-a-r-t-e-r.

Q    What's your business or occupation, sir?

A    Right now I'm a deputy sheriff, Sequoyah County Sheriff's Office.

Q    For how long have you been a deputy sheriff?

A    Going on two years now.

Q    Prior to serving as a deputy sheriff, were you also employed by the Sequoyah County Sheriff's Office?

A    Yes, sir.

Q    In what capacity?

5230

A    I was a jailer.

Q    And did you have occasion to serve as a jailer in both the old or the new?

A    Both.

Q    All right.  And I would like to address your attention to an incident which purported to occur on or about January 5 of 2001.  Do you know what I'm referring to?

A    I believe so, sir.

Q    Did you have occasion to have interaction with the Defendant?

A    Yes, sir.

Q    And do you know a man by the name of Kenneth Eugene Barrett?

A    Yes, sir.

Q    Do you see him here in the courtroom?

A    Yes, sir.

Q    Where is he?

A    Right here.

        MR. SPERLING:  May the record reflect the witness pointed to the Defendant, Your Honor?

        THE COURT:  Record so reflect.

Q    (By Mr. Sperling) Where was he housed during the time that you served as a jailer?

A    He was in the PC area.

5231

Q    And the PC area stands for what?

A    Protective custody.

Q    All right.  Do you know why he was in protective custody?

A    All I assumed was for a violent crime.

Q    All right.  He was charged with a violent crime; is that correct?

A    Yes, sir.

Q    And at that time was he in that facility -- or in that area, protective custody, with certain other inmates?

A    Yes, sir.

Q    Do you recall who they were?

A    I remember last names, sir.

Q    All right.  And what last names do you recall at that time?

A    I remember Scarborough, Kibby, Fears, him and I cannot remember the other one.

Q    All right, sir.  So it was about five of them?

A    Yes, sir.

Q    Do you recall an exchange that you had with the Defendant?

A    On --?

Q    On or about January 5, 2001.

A    Yes, sir.  Yes, sir, I do.

5232

Q    Can you tell the Court and jury how that exchange began?

A    I was -- I was doing population showers and the population -- general population was separated from the PC area.  There's a concrete wall between the general population and PC.  And while I was out there giving showers, I heard a couple thumps on the wall.

Q    And what, if anything, do you recall doing in response to hearing those thumps?

A    Well, at that time I had to lock up general population, go back and I asked what was going on back there.

Q    All right.  And who were the persons in the area at which you addressed that comment?

A    That was the PC area.  That was -- Scarborough was there, Kibby was there, Daniel Fears and Mr. Barrett.

Q    All right.  In response to that very general inquiry, did anyone say anything?

A    Yes, sir.

Q    And did you address that at any individual in particular?

A    No, sir.

Q    All right.  Who spoke?

A    Kenny Barrett.

Q    What did he say to you?

5233

A    He told me he was tired of Mr. Fears clipping his fingernails and toenails, falling on the floor and he told him a -- evidently he'd told him a couple times to stop, didn't happen.  And at that time it was -- I cannot recall, honestly, if he had either punched him or kicked him in the head, but it was Mr. Fears' head that bounced off the wall.

Q    All right.  And did you examine Mr. Fears' head?

A    Yes, sir.

Q    And what did you find?

A    There was a knot on the back of his head.

Q    This thump that you heard, can you demonstrate for the jury the sound that you heard?  Don't bang your head against any cement here.

A    How would you like for me to demonstrate that?

Q    Even -- if the Court will permit, by pounding on the desk in front of you?

         THE COURT:  You may.

A    (Witness makes two banging noises.)

Q    And you say that the sound -- or that the nature of the wall that you were on the opposite side of was --?

A    It was -- it was concrete.

Q    By the way, this Fears, about how old was he at the time?

A    Sir, I can't recall that.  I don't -- I'm not sure

5234

exactly how old he was.

Q    Do you recall that the nature of his offense was that he shotgunned some people to death?

A    Yes, sir.

Q    And it was an indiscriminate act, wasn't it?

A    Correct.

Q    Did you also have occasion on or about a time when a man by the name of McCrary was in a hospital to have a discussion with the Defendant?

A    No, sir.

Q    Did the Defendant ever threaten you?

A    No, sir.

Q    Did you ever hear him threaten anyone else?

A    No, sir, I did not.

Q    What, if anything, did you observe with regard to the Defendant's behavior as an inmate?

A    Are you referring to his demeanor?

Q    Yes, sir.

A    Well, his demeanor was -- back in the PC he -- evidently he looked at it as he'd been there the longest, he controlled the PC.  It was more or less his house.

Q    All right, sir.  How did he interact with others with regard to your observation?  How did he act with regard to others?

A    Jailers or --?

5235

Q   With regard to prisoners.

A   It was more of a tolerated and sometimes -- I mean, every once in a while he'd get a little upset with other inmates.

Q   How did he interact with you as a jailer?

A   We never had a problem.

Q   Did you ever have occasion to see him transferred to the city?

A   No, sir.

MR. SPERLING:  May I have just one moment, Your Honor?

THE COURT:  You may.

MR. SPERLING:  I have nothing further, Your Honor.

THE COURT:  Cross examination.

CROSS EXAMINATION

BY MR. SMITH:

Q   Mr. Carter, how do you -- this was in the old jail, is that right?

A   Yes, sir.

Q   How would you describe those conditions in that PC cell?

A   Cramped.

Q   How many people were in there with Mr. Barrett on the time of this incident?

5236

A    I believe there was five.

Q    How cramped was it?  Do you know the dimensions of that cell?

A    I don't know the dimensions exactly, no sir.

Q    How many beds were in there?

A    There were five beds in there.

Q    Okay.  And that cell was reserved for individuals at that time in Sequoyah County who were charged with murder, is that right?

A    Yes, sir.

Q    Wanted to kind of keep them all together?

A    Correct.

Q    Segregated from the other population?

A    I guess so, sir.

Q    I mean, that's what they did there, right?  They were segregated?

A    Yeah.  Yes, sir.

Q    Let's talk about this Daniel Fears a minute.  You said this was the individual that got (two banging sounds), right?

A    Yes, sir.

Q    Daniel Fears, do you recall, was the individual who shotgunned a woman in cold blood outside of his father's house that he had broken into and stole a shotgun?

A    Yes, sir.

5237

Q    And then Daniel Fears hopped in his car and went speeding through the neighborhood and stopped at a car lot, Blue Ribbon -- no, it wasn't Blue Ribbon.  It was -- do you remember the name of it?  It was a Pontiac store right there in Sallisaw?

A    I believe it was called Hastings at that time.

Q    Okay.  Jumped out and shotgunned a woman in cold blood that was shopping for a vehicle.  Do you remember that?

A    Yes, sir.

Q    And then turned the gun on Jimmy Nunn, my client, shot him in the back.  Do you remember that?

A    I'm sorry.  Who?

Q    Jimmy Nunn.  Didn't kill him, but shot him.  Then took off out of the parking lot and then finally got apprehended -- (Interrupted)

A    Correct.

Q    Down the road quite a ways?

A    Correct.

Q    Not a very nice guy?

A    No, sir.

Q    Okay.  Now, you didn't witness this incident with somebody getting (two banging noises), right?

A    No, sir.

Q    But when you go back there, you got Kenny Barrett

5238

saying I got tired of him clipping his old nails and hitting me with them so I took care of it, right?

A    He never -- he didn't say he was hitting him with them.  He was clipping them and dropping them on the floor.

Q    Okay.  There wasn't a report that was generated from that incident?

A    Yes, sir, I do remember doing a report on that.

Q    Do you know what happened to it?

A    No, sir, I do not.

Q    Do you know that we have subpoenaed the records from the Sequoyah County Jail and as late as yesterday we were received some records.  As a matter of fact, yesterday was the only time we received records.

A    Okay.

Q    But that's not in this packet.  Were you aware of that?

A    No, sir.

Q    Do you know why it wouldn't be in this packet?

A    No, sir, I do not.

Q    Let's talk about Kenny a little bit.  You're aware -- how long were you in that capacity as a jailer?

A    About a year, year and a half.

Q    Quite a bit?

A    Yes, sir.

5239

Q    And you're aware that individuals who are facing murder charges, death penalty, kind of a stressful situation for them, isn't it?

A    Yes, sir.

Q    I mean, that's a little different than a guy in there for a bogus check that knows he's probably going to get out next week?

A    Correct.

Q    And stress levels can get pretty high at times?

A    That was throughout the whole jail, sir.

Q    And part of your duties as a jailer, I would assume -- me never having been a jailer, but I'd assume part of what you want to do is kind of keep things cool in there?

A    Correct.

Q    Kind of keep people levelheaded, not let things get out of hand?

A    Yes, sir.

Q    And so, that goes as to how you address people. Now, you seem like a people person to me. Do you feel like you get along with folks?

A    Yes, sir, I do.

Q    I mean, that's kind of how you come across. And in fact, you got along with Mr. Barrett, didn't you?

A    Correct.

5240

Q    And he got along with you?

A    Correct.

Q    And this was during the entire time that you were there in your capacity as a jailer?

A    Correct.

Q    Didn't give you any problems?

A    No, sir.

Q    And I've never talked to you before today, have I?

A    No, sir.

Q    But I assume that if you're in a confinement situation, you wouldn't have any problem if you had a hundred Kenny Barrett's in there that you were having to watch over, would you?

A    No.  I don't guess so, no.

Q    And there wasn't a problem, right?

A    No.

Q    He knows how to do his time, right?

A    I guess.

Q    Well, that's what you observed, wasn't it?

A    I mean, I can't answer that.  I don't -- I'm not -- I'm not him.

Q    No, no, no, no, no, no.  I want you to answer based on what you saw, what you observed for that year and a half while you were in that jail.  Did Kenny Barrett know how to do his time?

5241

A    I would assume so, yes, sir.

Q    I mean, he got along with you.  There wasn't any threats, wasn't any fights, got along with you, right?

A    Not on my shift.

MR. SMITH:  Yes, sir.  Thank you, sir.  Pass the witness, Your Honor.

MR. SPERLING:  No further questions, Your Honor.

THE COURT:  May this witness be excused?

MR. SPERLING:  Yes, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.  You may call your next witness.

MR. SPERLING:  May we approach, Your Honor?

THE COURT:  Sure.  You may.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

MR. SPERLING:  We're at the point where we need to call Hendricks and Borman and they are the two witnesses who observed the incident that happened as the Defendant headed out.

THE COURT:  Oh, this morning's deal?

MR. SPERLING:  Yeah.

THE COURT:  What's your response to that?

MR. HILFIGER:  Well, I don't have any more

5242

response.  I say I don't have any more response and then I'm going to go turn around and tell you what it is.

THE COURT:  That's all right.

MR. HILFIGER:  My response is the same thing. I don't really know what that means.  I mean, if he says I was going -- I'll kick your ass, I know what that means.  But this has come along just like I said it would.  What does that mean?  Does it mean the case is going like I thought it would?  I just don't understand what that response is.  The next thing is where Mr. Littlefield says he thought that was Boyd.  How does he know what he didn't think it was Borman?  I don't know what he talked to Boyd about.  You know, if we are to believe or to think that the only -- that the only statements ever made to Boyd are what's in that one written page, then maybe they can work that in there. But if Boyd was a jailer, how do we know what they talked about for whatever period of time they're there?  How do -- I mean, it's just an assumption that what that statement had to do with is only what's in that piece of paper.  And that's not necessarily the only time that Boyd and Kenny Barrett talked, or Boyd and Borman talked. I don't -- I mean, the problem with just reading that statement, I don't understand what it means.  Well, and that's what makes it -- yeah.  Because it's not -- to me

5243

that doesn't come out as a threat or anything like that. It's just this case is going along just like I said it would or this is going along.

MR. LITTLEFIELD:  It'll -- it'll -- I think I made a misstatement.  I think he said it'll -- it will go -- whatever the words were, and I don't have it with me -- go through -- like I said it would.  It will as opposed to it is.

MR. HILFIGER:  Okay.  It will go through -- I don't know what that means.  I don't see that as a threat.

MR. LITTLEFIELD:  That's all I know is that these two individuals who heard it both perceived it as a threat as -- (Interrupted)

THE COURT:  As a threat to the guy who's deceased?

MR. LITTLEFIELD:  No.  It was stated -- he looked directly at Borman.

THE COURT:  I know, but -- (Interrupted)

MR. LITTLEFIELD:  And made the statement -- (Interrupted)

THE COURT:  -- he has to be convinced that that person was Boyd, I mean that mistake.

MR. LITTLEFIELD:  He says they resemble each other.

5244

THE COURT: I know. But for your position to have any probative value someway, it's got to be communicated to the jury that in the mind of the Defendant that that person was Boyd, not Borman. I don't know how you do that.

MR. LITTLEFIELD: And there is the possibility that Borman was thinking that he's -- that he's sitting there thinking I know Barrett said I'm going to get out of here some day to Boyd. And now I'm up here and it can be -- (Interrupted)

THE COURT: I'm not going to let it in. It's too -- it's too far removed. It's too much speculation as to what the Defendant thought versus what this witness thought and when you throw in -- I think we're talking about an incident to tie this together, we're talking about the incident that happened in 2003.

MR. LITTLEFIELD: I believe that's the date. Mr. Hilfiger indicates he doesn't think that's the correct date. It may not be.

THE COURT: Yeah -- (Interrupted)

MR. HILFIGER: -- that's what I -- that's when I first noticed that date. But then when I talked to Mr. Barrett he says that happened at the old jail.

MR. LITTLEFIELD: And I don't know that the incident -- (Interrupted)

5245

THE COURT:  Was '03 after the old jail?

MR. HILFIGER:  '03, yeah, because they moved in 2002 -- (Interrupted)

MR. LITTLEFIELD:  I think -- (Interrupted)

MR. HILFIGER:  -- or late November of '02 is when they moved to the new jail.

THE COURT:  For all of those reasons, because of the complicated factual basis for the objected testimony, I'm not going to let it in -- (Interrupted)

MR. LITTLEFIELD:  Okay.  -- (Interrupted)

THE COURT:  -- more prejudicial than probative.

MR. LITTLEFIELD:  We won't push that.  But still -- I mean, the fact that, or the assumption that, or our belief that the date of that incident may be wrong as in the report, I don't think changes what happened in whichever -- (Interrupted)

THE COURT:  No.  I don't think it changes -- (Interrupted)

MR. HILFIGER:  As to that.

THE COURT:  Right.

MR. HILFIGER:  Okay.  I understand that.  Yeah.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  You may call your next witness.

MR. LITTLEFIELD:  George Borman.  Your Honor,

may I approach the witness and advise him of something?

THE COURT:  You may.  You can approach him and -- (Interrupted)

MR. SMITH:  May I go with him, Judge?

THE COURT:  Just something -- yes.  Let me -- let's see.  Ask them to wait just a minute, we'll send the court reporter.  I'm going to send the court reporter out there to take this.

Tell them if they want to step in my office, they can.

(Whereupon, the following record was made in the judge's chambers outside the hearing of the jury.)

MR. LITTLEFIELD:  Just to let you all know we advised the Court of what happened right at the tail end of lunch and the Judge is not making any determination or whether there was or wasn't a threat or whether you all properly or improperly perceived it as such.  But he says from the basis of possibilities, it's too remote to present to the jury.  So when we talk to you about -- when Mr. Sperling asks you questions or when I ask you questions, we're not going to talk about the incident that occurred immediately before the lunch hour.  So I wanted to make sure that you all knew we weren't looking for it and sought an opportunity to try and interject that.  So, don't refer to the -- it's going to go through

5247

or it will go through just like I said it would, okay?

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Give us a couple of minutes here to get rearranged.

GEORGE BORMAN,

being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. LITTLEFIELD:

Q    State your name for the record, please, sir.

A    George Borman.

Q    Mr. Borman, how are you employed?

A    I'm presently employed with the Cherokee Casino in Roland, Oklahoma.

Q    What do you do for the Cherokee Casino, sir?

A    I'm a security officer, security safety officer.

Q    Have you ever been employed by the Sequoyah County Sheriff's office?

A    Yes, sir, I have.

Q    And when was that, sir?

A    My first day was September 1st, 2001 until January 31st of 2005.

Q    And what employment did you have with the Sequoyah County Sheriff's Office?

5248

A    I started off as a dispatcher.  When I was old enough I moved to reserve deputy, then full time deputy before I quit.

Q    As a reserve deputy did you ever have occasion to assist individuals in the jail?

A    Yes.  There was a time when the sheriff's office had control over the jail and we oversaw the jail from time to time.

Q    Do you know an individual by the name of Brad Boyd?

A    Yes, sir, I do.

Q    Okay.  Or did?

A    I did.

Q    And I understand Mr. Boyd is now deceased?

A    That is correct.

Q    And didn't have anything to do with it -- did it have anything to do with his being a deputy at all, sir?

A    No, nothing to do with that.

Q    Do you recall an occasion when you assisted Mr. Boyd in attempting to find some potential contraband in the protective custody or the PC cell?

A    Yes, sir, I do.

Q    And do you recall who the prisoners were in the PC cell when that occurred when you all were going in there?

A    Off the -- it'll be off my head, but I know Mr. Barrett was there.

5249

Q   Okay.   Were there other prisoners besides Mr. Barrett in PC?

A   Yes, sir, there were.

Q   Okay.   And you nodded in the direction of an individual.   Do you recognize Kenny -- Kenneth Eugene Barrett?

A   Yes, sir, I do.

Q   And can you point to him and tell what color shirt he's got on?

A   The gentleman sitting right there with a blue checkered shirt on.

MR. LITTLEFIELD:   I'd ask the record reflect that the witness has identified the Defendant.

THE COURT:   Record will so reflect.

Q   (By Mr. Littlefield) You and Mr. Boyd were looking for contraband inside the PC cell, weren't you?

A   Yes, sir, that is correct.

Q   And was any found?

A   Yes, sir, there was.

Q   What?

A   We found razor blades.   Also, I believe -- they had some ink pens in the cell.

Q   Were those items removed?

A   Yes, they were.

Q   Was anything else removed from the PC cell?

A   Mr. Boyd decided because they had items they were not supposed to have in the cell, to remove visitations. I know that's not a physical item, but he removed visitations and also their television privileges.

Q   And there was a TV in the PC cell at the time, is that right?

A   That is correct.

Q   So Mr. Boyd was taking that out in part because of the contraband that had been found?

A   That is correct.

Q   Now, in regards to contraband, there was more than one prisoner in the PC cell?

A   Yes.  There was more than one prisoner?

Q   Yes.

A   Is that your question?  Yes, sir, there was.

Q   Okay.  And so, we aren't trying to tell the jury -- just so it's clear, we're not saying these -- this was Kenny Barrett's items that were in there.  They were just in there?

A   That is correct.

Q   When Mr. Boyd began to remove the television, did any of the prisoners have a response?

A   Yes, sir.  One of them did.

Q   Who?

A   Mr. Barrett.

5251

Q    And how did Mr. Barrett respond to Mr. Boyd's removing the TV?

A    Would you like me to quote him and use the language he used or would you like -- (Interrupted)

Q    You can.

A    Okay.  Mr. Barrett responded by telling Mr. Boyd to go fuck his dad and to leave him alone.

Q    At that point was Mr. Boyd particularly pleased with -- (Interrupted)

A    No, he was not pleased at all.

Q    When Mr. Barrett made that statement to Mr. Boyd, did Mr. Boyd attempt to do anything in regards to restraining or anything with Mr. Barrett?

A    As far as a physical restraint, no.  Mr. Barrett was removed from the cell though.

Q    Okay.  And when Mr. Boyd began to remove Mr. Barrett from the cell, did Mr. Barrett have a response to Mr. Boyd?

A    There was a heated argument between the two at the time.

Q    What did Mr. Barrett say?

A    There were several cuss words thrown around.  I couldn't quote either one of them to be honest with you.

Q    Did you ever hear anything from Mr. Barrett that was stated as a threat to Mr. Boyd?

5252

A     Yes, sir, I did.

Q     What did he say that was a threat?

A     Okay.  He stated that he's not going to be incarcerated forever and he would get him when he got out.

MR. LITTLEFIELD:  May I have a second, Your Honor?

THE COURT:  You may.

MR. LITTLEFIELD:  Pass the witness.

THE COURT:  You may cross examine.

MR. SMITH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SMITH:

Q     Sir, when did this incident take place?

A     I'm not particularly sure on the day.  I believe it was February of 2003, though.

Q     Old jail or new jail?

A     It would have been the old jail.

Q     Okay.  Now, I thought we moved into the new jail in November of '02.

A     I don't believe that to be accurate.

Q     There was testimony to that effect yesterday.

A     Well, I believe that incident to have occurred February of 2003.

Q     But you're certain that it was in the old jail?

5253

A    Yes, sir.

Q    And this was in the PC area?

A    Yes, sir.

Q    But you could be wrong about the date.

A    About what?

Q    The date.

A    Possibly.

Q    You didn't fill out a report?

A    No, sir, I did not.

Q    Was this a significant event?

A    Yes, sir.

Q    Why didn't you fill out a report?

A    It would have been the jailer on duty -- it would have been his duty to fill out the report.

Q    But weren't you a witness to it?

A    Yes, sir.

Q    And did you witness anything?

A    Yes, sir, I did.

Q    A report?

A    Excuse me?

Q    A report that you filled out?

A    Did I fill out a report?  No, I did not.

Q    In this old jail this is in the PC area, is that right?

A    Once again, yes, that's correct.

5254

Q    And how many were in that area?

A    I'm not particularly sure.

Q    Do you got any idea?  Was there more than one?  You told me -- (Interrupted)

A    Yes, sir.  Yes, sir, there was more than one.

Q    Okay.  More than five?

A    I couldn't be entirely sure.  Like I said, I was -- at that time I was -- I was acting as a reserve deputy. I was there for visitation and, you know, to assist with the jailer should any incidents arise.

Q    Are you kind of fuzzy about some details about this incident?

A    Well, it happened three years ago.

Q    I understand that.  That's why I'm asking.

A    I'm fuzzy on the details I haven't given.  I mean, on all the details I've given, I'm positive on.

Q    Well, you quoted some language.

A    Yes, sir.  When someone uses that kind of language, it's kind of hard to forget.

Q    And that's not the same language Mr. Boyd wrote in a report.

A    Okay.  Well, that's the language that I heard.

Q    That's what you remember?

A    Yes, sir.

Q    So he could have remembered it a little differently?

5255

MR. LITTLEFIELD: Objection. Assumes facts not in evidence, Judge.

Q     (By Mr. Smith)  Well, let me ask --

MR. SMITH:  I'll rephrase the question, Judge.

THE COURT:  Question withdrawn.

Q     (By Mr. Smith) Do you know why Mr. Boyd in his report didn't say anything about his dad?

MR. LITTLEFIELD: Objection. Assumes facts not in evidence, Judge.  If he wants to introduce the report, that's fine.  But it's not in evidence.

THE COURT:  Sustained.

Q     (By Mr. Smith) Have you read what Mr. Boyd wrote?

A     I have never seen the statement, no.

Q     So you don't know what Mr. Boyd said there?

A     This is correct.

Q     You do recall that whenever there was some contraband that was found, the TV was removed?

A     Yes, sir.  I do remember -- (Interrupted)

Q     And what you told us is that Mr. Barrett became upset?

A     Yes, sir.

Q     And you're aware and that's why the TV was removed because that's one of the few things somebody in jail has to do, right?  They eat, look at the TV and they talk on the phone, right?

5256

A     Okay.  Ask your question again, please.

Q     One of the three things that you do in jail, when you're in the old Sequoyah County Jail, in that PC area -- I mean, there's not a whole lot to do, is there?

A     I was never a jailer, sir.  Like I said, I just assisted.

Q     Weren't you in that area?

A     From time to time.  I never -- (Interrupted)

Q     So you're not aware of what the inmates in the PC area in the Sequoyah -- old Sequoyah County Jail had to do?

A     Sir, it wasn't my duty to oversee the jail.

Q     No -- (Interrupted)

A     I don't -- I don't.

Q     -- you're telling us that you were inside that area?

A     Well, you're asking me if there was three things they were able to do.  I don't know if they were able to do more than that or not.

Q     Okay.  So you don't know much about it?

A     You asked me if there were three things they were allowed to do.  I'm not sure if they were allowed to do more than that or not.  Like I said, I didn't work in the jail.

Q     Let me ask you this:  Do you think that TV'd be important to an inmate that's in a cramped area and

5257

that's about all's he's got to do is watch TV?

A    Would it be important?  Yes, sir.  I think it would be.

Q    And that's what Mr. Barrett was expressing to Mr. Boyd, wasn't it?

A    I think he was expressing his unhappiness with it, yeah.

Q    Was unhappy.  That'd be an understatement probably, wouldn't it?

A    Probably so.

Q    Okay.  And you didn't have to put him in restraints?

A    No, sir.

Q    Didn't you have to thump his head?

A    No, sir.

Q    And he didn't thump your head?

A    No, sir.

Q    He didn't thump Mr. Boyd's head?

A    No, sir.

Q    There was a bunch of yeah, yeah going on?

A    Quite a bit, yes, sir.

Q    And I talked with you yesterday about this a little bit, probably yesterday evening, right?

A    Yes, sir.

Q    And from what I can gather from what you told me yesterday, that it'd seem like it was Boyd and Barrett

that were having this yeah, yeah deal going back and forth, right?

A    Yes, sir, I just witnessed the conversation.  I wasn't involved.

Q    And there were something about Boyd wanting you to jump on him.  Do you remember that?

A    Mr. Boyd -- it was back and forth between the two.  I think they were both trying to provoke one another.

Q    Flashlight in one hand, can of mace in the other.  Remember that?

A    No, sir, I don't.

Q    Okay.  In any event, Mr. Barrett was removed to another area and you told me yesterday about a verbal coercion?

A    Yes, sir.

Q    In other words Barrett get over here, right?

A    After being asked several times, yes, he did comply.

Q    Okay.  And he did.  He went where he's supposed to go?

A    Yes, sir.

Q    He wasn't going to go quiet, though, was he?

A    No, sir.

Q    And neither was Boyd, was he?

A    No, sir.

Q    Okay.  Let me ask you this:  Did you ever hear Mr.

5259

Boyd tell Barrett if you ever come looking for me, we'll never have to deal with you again?

A    Yes, sir, I do remember that.

Q    Okay.  Now, is that a threat?

A    I would perceive that to be a threat, yes, sir.

Q    So what Boyd's telling him -- and that's how you took it, just like two kids sitting there arguing back and forth.  I'm going to get you.  No, I'm going to get you, right?

A    Yes, sir.

Q    Okay.  So whatever terms or words we want to use, it's just jawing back and forth.  It's a bunch of nonsense, right?

A    It was one trying to provoke the other into a physical confrontation.  That's what I perceived it to be.

Q    Okay.  And Mr. Boyd was in control.  He was in charge?

A    Yes, sir.

Q    And that's why he said get over here, you're going in here and he puts him in another area, correct?

A    That's correct.

Q    No physical contact between anybody at all?

A    That's correct.

           MR. SMITH:  One second, sir.  Pass the witness,

5260

Judge.

MR. LITTLEFIELD:  Pass the witness.  We're done.

THE COURT:  May this witness be excused?

MR. SMITH:  Yes, sir.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Call your next witness.

MR. SPERLING:  Mike Hendricks.

(Whereupon, the witness was administered the oath.)

MR. SPERLING:  May I approach the clerk, Your Honor?

THE COURT:  You may.

MICHAEL HENDRICKS, being first duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q    Please state your name, sir, and spell your last name.

A    Michael Hendricks, H-e-n-d-r-i-c-k-s.

Q    What is your occupation, sir?

A    Right now I'm unemployed in college.

5261

Q   All right.  And where are you going to school?

A   Carl Albert.

Q   What are you studying?

A   Dual major in criminal justice and psychology.

Q   What year are you in school?

A   Be the first of my second year in spring semester.

Q   Where were employed before you went to school at Carl Albert?

A   Moffett Police Department.

Q   In what capacity?

A   Police officer.

Q   For how long were you employed there?

A   Approximately two months.

Q   Where else were you employed as a police officer or in law enforcement?

A   Vian Police Department.

Q   For how long?

A   Two years.

Q   In what capacity?

A   As a police officer.

Q   And before that?

A   Sequoyah County Sheriff's Office.

Q   In what capacity?

A   I was a jailer.

Q   All right.  And a jailer?  Do you remember what

5262

years or what time you served as a jailer in Sequoyah County?

A     Approximately October 2001 to -- no October 2000 to about May 2001.

Q     Thank you, sir.  I have just placed in front of you, sir, an item that is, I believe, marked Government's Exhibit Number 346; is that correct?

A     Yes, sir.

Q     All right.  Do you recognize that to be an incident report that you had previously prepared?

A     Yes, sir.

Q     All right, sir.  And on that date, January 5, 2001, did you have occasion to be serving in the capacity as a jailer in Sequoyah County?

A     Yes, sir.

Q     What were you doing at or about the time of the incident that prompted this report?

A     Feeding the male inmate population.

Q     Was that the old or new jail?

A     Old jail, sir.

Q     And when you fed the male population, did you have a practice with regard to who you fed first in the male side?

A     I went from south tank to north tank.

Q     And did you have occasion on this date, January 5,

5263

2001, to the start with the male PC?

A   Not that I recall.

Q   Would your recollection be refreshed if you were to read that report?

A   No, sir.  I believe I always fed PC last, but like I said, it's been awhile.  I don't recall.

Q   Look at the second line.  Do you see where -- what the second line of the details of incident says?

A   Yes, sir.

Q   All right.  And what does that say, sir?

A   I started with male PC.

Q   All right.  And do you recall an exchange that you had with a man by the name of Kenneth Barrett?

A   Vaguely.

Q   All right.  Do you see him here in the courtroom today?

A   Yes, sir.

Q   Where is he seated and what is he wearing?

A   Right here, blue checkered shirt.

        MR. SPERLING:  May the record reflect the witness has pointed to and identified the Defendant, Your Honor?

        THE COURT:  Record will so reflect.

Q   (By Mr. Littlefield) What, if anything, did the Defendant say to you?

5264

A     May I take a look at my report?

Q     Please.

A     When I handed him the tray with his dinner, he asked me what it was.  I explained to him what was on the tray and he declined.  He didn't wish to eat it.

Q     All right.  Did he use -- (Interrupted)

A     A derogatory statement, yes, sir.

Q     What did he say?

A     What the fuck is this shit.

Q     What did you say?

A     It's your dinner.

Q     And did he have anything else to say about what he had been served?

A     I don't remember him not wanting to eat it.  I don't remember him saying anything.

Q     Okay.  Well, did you open what is known as the bean hole?

A     Yes, sir.

Q     What happened then?

A     He went to slide his tray through and he did it quite fast.  I put my hand up to stop it and I said, you know, you need to watch out.  I said you almost threw that tray at me.

Q     What did he say, if anything, at that point?

A     He said you're lucky that I'm in this cage because

5265

if I wasn't, I'd whup your ass.

Q    What was your response?

A    I said really.

Q    What else did he say, if anything?

A    He said, yeah, and you can put that in your fucking computer, too.

Q    Did you have a practice at that point with regard to recording certain instances?

A    Yes, sir.

Q    And did you follow that practice with regard to this report?

A    Yes, sir.

Q    Did you also have a later exchange with the Defendant when he was in the area of his cell?  An interaction with him?

A    I don't recall.

Q    Did he ever try to grab you?

A    Yes, sir.

Q    All right.  Was that before or after this incident with the food tray?

A    I believe it was before, because this is referring to male PC and the incidence he tried to grab ahold of me was when he was in the population on the south tank.

Q    When he stated what you quoted him as saying, that if you ever let him out -- and what were the words?

5266

A    If I ever -- if I wasn't in this cage I'd whup your ass.

Q    All right.  What was his tone of voice when he said that to you?

A    Hostile.

Q    Did he appear to be serious?

A    Yes.

Q    All right.  The other incident, about where was that in the jail?

A    The PC?

Q    Yes, sir.

A    It's separated from the population by a brick wall and another door.  There's a cage as you walk into the door, to your left, with approximately four beds.

Q    What happened?

A    It's -- the PC's sectioned off, away from everybody.

Q    What happened as between you and the Defendant Barrett on that occasion?

A    When he tried to grab hold of me?

Q    Yes, sir.

A    That was out in male population.  I was just walking -- walking through doing my normal head counts and he -- I don't know why, what preempted it, but he tried grabbing hold of me.

Q    Did he touch you?

5267

A   Not that I recall.

Q   All right.  What happened then?

A   I said what's your problem and I don't recall exact words or exchanges that were made.  I know that there were -- we went back and forth at each other.

Q   Was he in a cell or out of a cell when he tried to grab you?

A   In the cell.

Q   Okay.  So there was something between you and he?

A   Apparently so.

Q   What did you see coming from the cell?

A   Aggression.

Q   Okay.  And in what form?  What part of his body did you see?

A   Well, it was like he was trying to come at me.  I mean, if he would have got ahold of me, I believe that he could have done some damage.

Q   And did you see his hand and his arm?

A   Yes.

Q   How much of his arm was extended outside the bar?

A   Approximately that much.

Q   And you're indicating to about your elbow?

A   Yes, sir.

Q   All right.  What did you do as you saw his arm come towards you?

5268

A     I come back.

Q     If you had proceeded in the manner close to the bars as you had, would he have been able to grab you?

A     Yes.

Q     Did you have enough room, though, to get out of the way?

A     Yes, sir.

Q     Did he say anything to you at the time that he reached for you?  Did you have any warning that he was going to reach, that is?

A     Not that I recall.  It's been five years.  It's hard to remember in back and what I do remember, I can't remember exact words or exchanges.

Q     Do you recall whether he said anything?

A     Yes, but again, I don't know exactly what was said.

MR. SPERLING:  Thank you, sir.  I have nothing further, Your Honor.

THE COURT:  You may cross examination.

CROSS EXAMINATION

BY MR. SMITH:

Q     Mr. Hendricks, this incident involving the dinner?

A     Yes, sir.

Q     What were you feeding him, do you remember?

A     It says here two egg sandwiches, cole slaw, one dinner roll and water.

5269

Q   Okay.  I guess -- let me go about it this way.  You don't remember what happened without looking at a piece of paper, right?

A   Vaguely I do.  But exact detail, no, sir.

Q   And the bottom line of the incident that you wrote a report on was he didn't want to eat his dinner?

A   Basically.

Q   Did you eat dinner that night?

A   No, sir.

Q   You didn't eat that stuff, did you?

A   It wasn't prescribed to me.

Q   You were working there, it was available for you if you wanted to?

A   I never ate with the inmates.

Q   I didn't say with the inmates.  I'm talking about while you were working, the food that was available?

A   I never ate at work.

Q   Okay.  Food wasn't very good there, was it?

A   I never tried it.

Q   Why didn't you try it?

A   Because I was working.

Q   Don't you get breaks at work?

A   Not at the jail.

Q   You just work straight through?

A   Yes, sir.

5270

Q    Okay.  And what you were feeding him was an egg sandwich at night, according to your report, is that right?

A    Yes, sir.  Two eggs.

Q    And he got a little upset with you and he's shoving it out that hole in the -- where you slide your trays through?

A    Yes, sir.

Q    And then you said something to him about you almost hit me?

A    Uh huh.

Q    You could have hit me with that tray.  And when you're talking about, tray could have fallen down on the floor and splashed on you or something, right?

A    Okay.

Q    It's not deal he could take that tray and do that to you, can he?

A    No.

Q    No.  So I mean, when it's going to come through that deal there's not much -- you just stop it with your hand to keep from falling out there and making a mess on the floor?

A    Yes, sir.

Q    Right?  Okay.  And then there's an exchange because, I mean, you kind of started the exchange about you could

5271

have hit me with that?

A     Yes, sir.

Q     Then you say he did the deal about, well, let me out of here and I'll do something to you?

A     Yes, sir.

Q     Pretty common language in a jail, isn't it?

A     Not normally.

Q     It's not?

A     I never had anybody except for Mr. Barrett threaten to kick the shit out of me.

Q     Really?

A     Yes, sir.

Q     You mean all these guys in this jail act like kids at a day care?

A     Basically.

Q     That's what you want us to believe?

A     You can believe what you want, sir.

Q     No, I'm asking you.  That's what you want us to believe?

A     I don't want you to believe anything.

Q     But Kenny Barrett's the only one that ever said anything in the jail that -- (Interrupted)

A     Kenny Barrett is the only one that threatened to whup my ass, yes, sir.

Q     Okay.  And you never heard anybody raise their voice

5272

or cuss or anything like that in the jail?

A    I heard quite a few people raise their voice and cuss.

Q    Okay.  That's what I would expect to be going on. They're locked up, right?

A    Yes, sir.

Q    Various people from various walks of life, correct?

A    Yes, sir.

Q    Under stressful situations?

A    Yes, sir.

Q    But in any event, you felt it so important on this incident with this two egg sandwich, cole slaw and a dinner roll and water to fill out a report about it?

A    Yes, sir.

Q    And you did?

A    Yes, sir.

Q    Where did you put that report?

A    Into the computer.

Q    Okay.  And then where did you put it?  Was it printed out or does it just stay in the computer or what?

A    It stays in the computer system, I believe.

Q    Okay.  It's never printed out and goes to a personnel file, it goes to a jail file, goes to an inmate file?

A    At that time the jail administrator was handling all

5273

that.

Q   Who was the jail administer?

A   Lelani Letcher.

Q   Okay.  So you don't know what she did with them?

A   No, sir.

Q   Okay.  These records, ordinarily would they be pretty easy to obtain?

A   No, sir.

Q   Why not?

A   You had to have a password -- a name and a password to get into the system.

Q   How about if you subpoena a record over there?  Be pretty easy for the jail administrator to pull it out of the computer and print it out?

A   Yes, sir.

Q   Okay.  Just in a normal course of business, right?

A   I guess.  I'm not a jail administrator.

Q   You know why they had problems finding this report?

A   No, sir.

        MR. SPERLING:  Objection, Your Honor.  The answer's already been given, but I object to that question.

        MR. SMITH:  Your Honor, he opened the area when he asked about the report in general.  I think we're entitled to find out how they keep them, where they're

5274

kept and circumstances.

MR. SPERLING:  I'll withdraw as to that, Your Honor.

THE COURT:  You may proceed.

Q   (By Mr. Smith) So you don't know why, sir, whenever these records have been subpoenaed that they don't get turned over to us until late yesterday afternoon?

A   I no longer work for Sequoyah County, sir.  So, no, I don't.

Q   You have no idea, right?

A   No idea.

Q   Now, this other incident that you talked about where he tried to grab you, was that more serious than this incident about the not wanting the egg sandwiches?

A   An incident is an incident.

Q   Okay.  How do you rank one, a little more -- one more important than the other one?

A   It -- can you rephrase the question?  You kind of confused me.

Q   Well, you kind of confused me, because whenever you were testifying about this egg sandwich, you were saying that he almost hit me with the tray and he said I'm going to do something to you and you said, oh, really.

A   Uh huh.

Q   Kind of like what are you going to do, you're locked

up, right?  I mean, that's what you meant by it, right?

A    Basically.

Q    How are you going to get to me.  But then you talk about the other one, he's got his hand stuck through there and he almost grabs you and he -- and I think you said he could have done some damage to me?

A    He could have.

Q    Right?  Okay.  So now between those two, which of those are the more important to you in terms of your safety?

A    They're both the same.

Q    Okay.  So you would have filled out a report on that second incident?

A    Yes, sir.

Q    Where's it at?

A    I don't know, sir.

Q    Okay.  Had no idea, huh?

A    I'm not in charge of the records, sir.

Q    When was it filled out?

A    On the date it happened.

Q    What day did it happen?

A    I can't recall.

Q    So this is just something that you're coming in here to tell us about but you don't have any documentation of it.  Who witnessed it?

5276

A     Nobody.  It was one male jailer and a room full of inmates.

Q     What inmates?

A     I don't recall their names.

Q     So you can't tell us when, you can't tell us who was there.  Can you tell what year it was?

A     2000.

Q     When in 2000?

A     Approximately October to December.

Q     Okay.  Now when did you start?  I thought you started in October?

A     Yes, sir.

Q     So is this when you first started?

A     Roughly.

Q     Okay.  But you don't have a report of it?

A     No, sir.  I don't tend to keep records with me at all times.

Q     Did you get along with inmates in that jail?

A     Meaning --?

Q     In general.  Some jailers get along with inmates a little better than others, don't they?

A     It was my job.  I did my job.

Q     I know it's your job when you're a jailer to work. I'm talking about -- (Interrupted)

          MR. SPERLING:  Judge, I object to the form of

5277

the question.

MR. SMITH:  I'll rephrase the question, Judge.

THE COURT:  Question withdrawn.

Q    (By Mr. Smith) In terms of your interaction with inmates, how would you characterize how you got along with them?  Did they like you?

A    I don't know.  It was a working relationship.  I went to work.  I did what I had to do and I went home.

Q    Did you have any problems with other inmates?

A    On occasion.

Q    Who else?

A    I can't name names.

Q    What sort of problems did you have?

A    Various problems, people screaming, people complaining about different things that happened at the jail.

Q    Let's talk about that food situation.  Did you ever see cockroaches climbing over food?

A    No, sir.

Q    Over the trays and all that?

A    No, sir.

Q    Never saw that?

A    No, sir.

Q    When you were there, was that jail condemned?

A    Not that I'm aware of.

5278

Q    You had no knowledge of that either?

A    No, sir.

MR. SMITH:  Pass the witness, Judge.

THE COURT:  Further direct?

MR. SPERLING:  No further questions.  Thank you.

THE COURT:  May this witness be excused?

MR. SPERLING:  He may, Your Honor.

THE COURT:  Sir, thank you for your testimony. You may step down.  You may be excused.  You may call your next witness.

MR. SPERLING:  We rest, Your Honor.

THE COURT:  Surrebuttal.

MR. SMITH:  We have none.

THE COURT:  Let me see counsel at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  I have the proposed instructions. It's two o'clock.  I'm thinking about sending the jury out to come back in the morning.  However, next question is what time do we have them come back in the morning?  I know you haven't seen my proposed instructions, but I'm just generally wanting to get your thoughts and feelings about -- I'm thinking it's two o'clock now, if we work the rest of the afternoon, unless you all know of some

5279

issue that you can anticipate now.  I don't expect you to be able to clairvoyant and there may be issues that you -- after you see my proposed instructions that would cause it to go on.  But what I mean is as of now, do you see anything that would cause us not to be able to start at 9:00 o'clock in the morning?  I'm trying to determine whether or not I need an hour or two in the morning before.  I don't want to have this jury sitting around. Better to come at ten than nine.

MR. HILFIGER:  Well, I mean -- may have them come at ten -- 9:30 and actually start at ten and that would give us time if there is -- I don't know if there's going to be -- (Interrupted)

THE COURT:  No, I know.  I mean, sometimes you know -- (Interrupted)

MR. HILFIGER:  I hate to have them here at 9:00 o'clock and have to wait, but I don't anticipate that -- I mean, they ought to be able to get everything done and closing and do their verdict tomorrow -- (Interrupted)

THE COURT:  What do you -- what are all you thinking about in the way of closing remarks?  How much time?

MR. HILFIGER:  Mine's going to be all relied on what they want to do.  I mean, I don't think -- we won't want any more time than they'll want.  I mean, whatever

5280

is -- going to be up to you.

MR. SPERLING: I really have not given -- put a specific number to it, but I would think not longer than first stage, even though we've incorporated that and will need to make reference to it. I don't think we need more time than we needed then.

MR. HILFIGER: That's way more time than I even anticipated, I mean, an hour and 45 minutes.

MR. SPERLING: I mean, I was thinking maybe 90, but I may not take that long.

MR. HILFIGER: I mean, I really don't anticipate that long. But I'm not trying to cut you down. I'm just saying I won't take just about anything, you know --

THE COURT: I'd like to have -- (Interrupted)

MR. HILFIGER: I mean, Bret and I were sort of thinking about somewhere in the hour range altogether. But that doesn't mean I'm asking you to cut down. I'm just saying that's sort of what I was thinking about.

THE COURT: Based on the amount of time we had involved in this, it would look like it should be shorter than the first stage. This stage hasn't been near as many days and there hasn't been as much evidence. I'm not -- there's no protocol, so if you're thinking about no more than an hour regardless of what they do, I don't

5281

want to limit you.  I mean, I'm not going to say an hour. If it takes an hour and 30 minutes, well, it just takes an hour and 30 minutes.  But that that's the outside of the amount of time you would -- (Interrupted)

MR. SPERLING:  That's my sense.  I will talk to Mr. Littlefield and we can give you a sense, Your Honor.

THE COURT:  So between the two of you, two and a half hours?

MR. HILFIGER:  I think so.

THE COURT:  Probably -- my instructions are probably 30 minutes and two hours to get it to the jury. If we get here at 9:30 and we get started at ten.  I'd like to get started at 9:30, but worst case scenario ten, we can have it to them by lunch.  We can spend -- we'll take a few minutes break and ask you to come in and meet with law clerks and take a look at the instructions.

MR. SPERLING:  Yes, sir.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, both the Government -- and that's correct, the Government's rested in this second phase of the trial; is that correct?

MR. SPERLING:  Yes, Your Honor.

THE COURT:  And the defense has rested; is that correct?

5282

MR. HILFIGER:  Yes, Your Honor.

THE COURT:  Members of the jury, I'm going to recess until 9:30 in the morning.  At 9:30 then you will hear instructions first from the Court, much as we did in the first stage of these proceedings and then closing arguments from counsel and then the case will be submitted to you for purposes of sentencing.

I'll ask that everyone remain seated as the jury exits the courtroom for the recess until tomorrow morning at 9:30.

You are to remember my admonition not to discuss it among yourselves or allow anyone else to discuss it with you, avoid any news reports that there may be in regards to this matter.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury has departed the courtroom.  Any record to be made by the Government outside the hearing of the jury at this time?

MR. SPERLING:  No, Your Honor.

THE COURT:  Defense?

MR. SMITH:  No, Your Honor.

THE COURT:  We'll be in recess.

(Whereupon, the Proceedings were continued to November 17, 2005.)

5283

CERTIFICATE

STATE OF OKLAHOMA )
                  ) SS.
COUNTY OF TULSA   )

I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 16, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 5154 through 5282.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

WITNESS my hand this 20th day of May, 2006.

GREG EUSTICE
Certified Shorthand Reporter

Greg Eustice
Oklahoma Certified Shorthand Reporter
Certificate No. 0176
Exp. Date: December 31, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED

MAY 2 2 2006

WIL... ...UTHRIE
Clerk U.S. District Court
By _____
Deputy Clerk

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
-vs-                         )   No. CR-04-115-P
                             )
KENNETH EUGENE BARRETT,      )
                             )
            Defendant.       )

VOLUME 27 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 17, 2005.


A P P E A R A N C E S

For the Plaintiff:      Mr. Sheldon J. Sperling
                        United States Attorney
                        and
                        Mr. D. Michael Littlefield
                        Assistant U.S. Attorney

For the Defendant:      Mr. Roger Hilfiger and
                        Mr. Bret A. Smith
                        Attorneys at Law


**EUSTICE REPORTING SERVICE**

CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965    Pages 5285 - 5458   5225

5285

PROCEEDINGS

THE COURT:  Let the record reflect counsel for the Government is present, Defendant is present with counsel.  For the record, counsel for the Government and Defendant have been provided with the Court's proposed instructions and special penalty phase verdict forms and special interrogatories for Counts One, Two and Three; is that correct from the Government's perspective?

MR. SPERLING:  That's correct, Your Honor.

THE COURT:  From the Defendant?

MR. HILFIGER:  Yes, Your Honor, that's correct.

THE COURT:  It's my understanding from the Government and the Defendant there are for objection to these Instructions, however, I want to go over them individually for the record.

First, the jury instructions, the introduction, any objection from the Government?

MR. SPERLING:  No, Your Honor.  May we remain standing while you go through these?

THE COURT:  You may.  Or you can remain seated, whichever is most comfortable for you.

MR. SPERLING:  How about the second?  Thank you.

MR. HILFIGER:  No objection.

THE COURT:  Instruction Number One, death

5286

penalty generally.

MR. SPERLING: No objection.

MR. HILFIGER: No objection.

THE COURT: Instruction Number Two, burden of proof.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Instruction Number Three, reasonable doubt defined.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Instruction Number Four, unanimity required for death sentence.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Number Five, age at the time of the offense.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Number Six, threshold eligibility factors.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Number Seven, summary of deliberative process.

5287

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Eight, aggravating and mitigating factors generally.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Nine, statutory aggravating factors.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Ten, grave risk of death to additional persons.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Number Eleven, multiple killings or attempted killings.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Instruction Number 12, substantial planning and premeditation.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Number 13, non-statutory aggravating factors.

MR. SPERLING:  No objection, Your Honor.

5288

MR. HILFIGER:  No objection.

THE COURT:  Number 14, mitigating factor, burden of proof.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 15, mitigating factors.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 16, unanimity not required as to mitigating factors.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 17, failure of Defendant to testify.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.  Judge, I think on that particular, we have requested that step up instruction as part of the defense.

THE COURT:  That was my about to be inquiry. Court notes the Defendant requested Instruction Number 17.  Number 18, dual prosecutions.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 19, mitigating circumstances do not include residual doubt.

5289

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 20, weighing the various factors.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Instruction 21, consequences of deliberation.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 22 is duty to deliberate.

MR. SPERLING:  No objection, Your Honor.

THE COURT:  Number 23, judging the evidence.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.  And on 22, I think I --

THE COURT:  I skipped --

MR. HILFIGER:  I didn't say -- I have no objection.

THE COURT:  I'm going too fast.  22.

MR. HILFIGER:  I believe that was the one I missed.

THE COURT:  Duty to deliberate, number 22, no objection from the defense; is that correct?

MR. HILFIGER:  Correct.

5290

THE COURT:  Number 23, judging the evidence.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Twenty Four is penalty phase special verdict form.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Twenty Five is special interrogatories.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 26, right to justice without discrimination.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  And Number 27 is the concluding instruction that I'll read after you finished your closing arguments.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  I think there is a penalty phase verdict form that is 41 pages long.  I understand there's no objection to the penalty phase and the special verdict form.

MR. SPERLING:  That's correct, Your Honor.

5291

MR. HILFIGER:  That's correct.

THE COURT:  And then there are three special interrogatories.  One as to Count One, Two and Three. Government have any objections?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  We have no objection.

THE COURT:  I'll advise that I have prepared copies of the instructions for each member of the jury that I plan to give to them after the Court's instruction -- read the instructions, and that the decision from the Court is based on the first phase of the trial the jury requested the instructions and then also because of the length of these instructions and the -- I've made arrangements so they could each have a copy during their deliberations.  The Government have any objection to that?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  Defense does not have any.

THE COURT:  Now, has the Government determined how much time for closing?

MR. SPERLING:  We have, Your Honor.  Ninety.

THE COURT:  And I'll then -- the defense, you desire to split your arguments between counsel?

MR. HILFIGER:  We do, Your Honor.  I think I'll do the first and Mr. Smith will do the next.

5292

THE COURT:  You can live with the 90?

MR. HILFIGER:  Yes, sir, we can.

THE COURT: It's 10:00 o'clock.  If I get the jury, I'm not sure how long it will take for me to read these instructions.  They're a little bit longer, I think, than the first phase.  So perhaps we should take a break so that counsel for the Government will know -- plan for me to take a break after your first argument, so the defense will know also.  So that will be the plan. Government ready for the jury to be brought in?

MR. LITTLEFIELD:  May we take five?  Not ten, five.

THE COURT:  Okay.  We'll take a five minute recess.  Except for the five minutes, is the defense ready?

MR. HILFIGER:  Yes.

(Whereupon, a short recess as held after which the following record was made in the presence the jury.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.

Members of the jury, as I informed you yesterday, both the Government and the Defendant have rested during this penalty phase of the trial and it's now appropriate that the Court give you instructions and

5293

that you hear closing arguments from first the Government then the Defendant and then the Government closes as they did in the first phase, and that's because the Government has the burden of proof.  That's the rules that we developed in our criminal jury trial process.

Now the instructions.  Now that you heard all of the evidence in this case and the arguments of each side, it is my duty to give you instructions as to the law applicable to the very serious question of whether the Defendant, Kenneth Eugene Barrett, should be sentenced for his convictions on Count One and Two to death, to imprisonment for life without the possibility of release, or some other lesser sentence.  You must also determine whether the Defendant, Kenneth Eugene Barrett, should be sentenced for his conviction on Count Three to any term of imprisonment which shall not be less than 20 years and which may be up to life imprisonment, or to death.  Your unanimous decision that the Defendant should be sentenced to death or life imprisonment without possibility of release will be binding upon the Court, and I will impose such sentence on the Defendant according to your verdict.

If you cannot unanimously agree on the appropriate punishment, I will sentence the Defendant in accordance with the law.  Regardless of any opinion you

5294

may have as to what the law may be or should be, it would be a violation of your oaths as jurors to base your verdict upon any other view of the law than that given to you in these instructions.

Some of the legal principles that you must apply to this sentencing decision duplicate those you followed in reaching your verdict in the first stage of this trial. Others are different. You are to consider all the evidence received during the first stage of the trial as well as evidence received at this second stage of the trial with respect to the Defendant, Kenneth Eugene Barrett.

In resolving the issues regarding the appropriate punishment of the Defendant, you must not be persuaded by bias, prejudice or sympathy for or against any of the parties or victims or by any public opinion. I have prepared a full set of instructions on the applicable law in order to ensure that you are clear in your duty at this stage of the case. I have also prepared a Penalty Phase Special Verdict Form which contains not only Verdict Forms for each count, but also space for you to record findings which are required in this case.

Instruction Number One, Death Penalty Generally. In Count One, you found the Defendant,

5295

Kenneth Eugene Barrett, guilty of committing murder through the use of a firearm during or in relation to a drug trafficking crime, or possessing a firearm in furtherance of such crime.  By law, Congress has expressly provided that any person who commits murder through the use of a firearm during or in relation to a drug trafficking crime shall "be punished by death or by imprisonment for a term -- for any term of years or for life."  In Count Two, you found the Defendant, Kenneth Eugene Barrett, guilty of committing a murder through the use of a firearm during or in relation to any crime of violence, or possessing a firearm in furtherance of such crime.  Congress has also expressly provided that any person who commits murder through the use of a firearm during or in relation to a crime of violence shall "be punished by death or by imprisonment for any term of years or for life."  In Count Three, you found the Defendant, Kenneth Eugene Barrett, guilty of intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties. Congress has expressly provided that any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony drug violation, who intentionally

5296

kills or counsels, commands, induces, procures, or causes the intentional killing of any federal, state, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties "shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death."

Because you have found the Defendant, Kenneth Eugene Barrett, guilty beyond a reasonable doubt of these three capital crimes, you must now decide whether the appropriate sentence for each count individually is (1) death; (2) life in prison without the possibility of release; or (3) in the case of Counts One and Two, some lesser sentence to be decided by the Court; and (4) in the case of Count Three, some other sentence not less than 20 years to be decided by the Court. Your recommendation that the Defendant be sentenced either to death or to life in prison without possibility of release will be binding on the Court and I will sentence the Defendant according to your recommendation. In the event you choose the third option for Count One or Two, or the fourth option for Count Three, and recommend that the Defendant receive some lesser sentence, I will impose a sentence other than death as authorized by law. I again stress the importance of your giving careful and thorough

5297

consideration to all evidence before you.  I also remind you of your obligation to follow strictly the applicable law.

Instruction Number Two, Burden of Proof.  The burden of proving that Kenneth Eugene Barrett should be sentenced to death rests at all times with the Government.  If, after fair and impartial consideration of all the evidence in this case, all twelve of you are not persuaded that a sentence of death is justified, then you must return a decision against capital punishment.

In that event, the jury must next consider whether the Defendant should be sentenced to life in prison without the possibility of release.  Again, should all twelve members of the jury so determine, I will impose a sentence of life imprisonment without the possibility of release.

As I have previously stated, for Counts One and Two, Congress has provided additional sentencing options: Life imprisonment without the possibility of release, or some lesser sentence to be determined by the Court; and, for Count Three, Congress has provided additional sentencing options:

Life imprisonment without the possibility of release, or any term of imprisonment which shall not be less than 20 years.  Your verdict on each of these

5298

options, like a death verdict, must be rendered by unanimous vote.

Instruction Number Three, Reasonable Doubt.  A reasonable doubt is a doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act.  Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.  There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.

The Government must prove aggravating factors beyond a reasonable doubt.  It is not necessary that the Government prove an aggravating factor beyond all possible doubt; it is only required that the Government's proof exclude any reasonable doubt.

If, based on your consideration of all the evidence, you are convinced that an aggravating factor has been proved beyond a reasonable doubt, you must find that aggravating factor to exist.  If, on the other hand, you are not convinced that an aggravating factor has been proved beyond a reasonable doubt, you must give the Defendant the benefit of the doubt and find that the

5299

aggravating factor has not been proved beyond a reasonable doubt.

Unanimity Required For Death Sentence, Instruction Number Four.  Again, I want to emphasize that unanimity is required for you to sentence the Defendant, Kenneth Eugene Barrett, to death.  That is, the death penalty may not be imposed under our law unless all twelve jurors agree.  If after due deliberation any of you -- even a single juror -- is not persuaded that the death penalty should be imposed in this case, then the jury may not sentence the Defendant, Kenneth Eugene Barrett, to death.

As I have previously explained, each count also allows for a sentence of life in prison without the possibility of release and for an alternative sentence of a term of years to be imposed by the Court as authorized by the law.  Again, your verdict regarding punishment on each of these options, like a death verdict, must be rendered by unanimous vote.

Instruction Number Five, Age At The Time Of Offense.  Before you may consider whether the death penalty is an appropriate sentence in this case, you must unanimously find beyond a reasonable doubt that the Government has proved the Defendant was at least eighteen years old at the time of the offense.  If you do so find,

5300

answer yes on the appropriate page of the Special Verdict Form and continue your deliberations. If you do not find, answer no on the Form, and your deliberations as to the death penalty are complete. However, you will then need to consider whether to impose a sentence of life imprisonment without the possibility of release or some lesser sentence.

Instruction Number Six, Threshold Eligibility Factors. Before you begin your deliberation of aggravating and mitigating factors and the sentence to be imposed in this case, you must first consider whether you are unanimously persuaded, beyond a reasonable doubt, that the Government has proven at least one threshold eligibility factor for each of the counts. For Counts One and Two, there are four possible threshold eligibility factors which deal with the Defendant's intent and role in committing the offenses. In relation to Count Three, there is only one possible threshold eligibility factor.

You will be required to make independent findings for each of the counts. If you find none of the possible threshold eligibility factors present as to a particular count, your deliberations as to the death penalty on that count are over. You should then go to the appropriate count in Section Six of the Special

5301

Verdict Form and indicate that you have not found a threshold eligibility factor.  You will then need to consider whether to impose a sentence of life imprisonment without the possibility of release or some lesser sentence.

As to Counts One and Two the Government alleges four possible threshold eligibility factors.  Before you may consider whether the death penalty is an appropriate sentence on either of these two counts, you must unanimously find beyond a reasonable doubt that the Government proved the Defendant committed at least one of the following acts:

One, intentionally killed the victim;

Two, intentionally inflicted serious bodily injury that resulted in the death of the victim;

Three, intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

Four, intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in

5302

the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

These alternatives are set out in the Special Verdict Form, and you must consider and resolve them separately. For each one, you must decide whether you unanimously agree that it has been proved beyond a reasonable doubt, and indicate your answer on the Form, and then continue with the next until you have finished. If you answer no to all four alternatives, your deliberations regarding the death penalty are over and you should proceed to consider whether to impose life in prison without the possibility of release or imprisonment for any term of years authorized by the law. Your verdict on either of these options, like a death penalty, must be rendered by unanimous vote. Sign the appropriate verdict form, and certify your decision as described in Section Seven of the Form. If you answer yes to one or more of these threshold eligibility factors, proceed to the next step in your deliberations.

As to Count Three, before you may consider whether the death penalty is an appropriate sentence on this count, you must unanimously find beyond a reasonable doubt that the Government has proved the following threshold eligibility factors, to-wit: The Defendant intentionally killed the victim, David Eales.

5303

As previously indicated, the threshold eligibility factor or factors for each of these counts are to guide you in assessing the Defendant's intent and role in committing each of these offenses.  You must unanimously find beyond a reasonable doubt, as to Counts One and Two, that at least one of these factors is proven by the Government in order to further consider imposition of the death penalty with respect to those counts.  In relation to Count Three, you must find that the Government has proven beyond a reasonable doubt the threshold eligibility factor to further consider imposition of the death penalty with respect to that count.

Instruction Number Seven, Summary Of The Deliberative Process.  Let me now discuss with you the deliberative process you should follow in considering the very serious issue before you.

First, before you consider aggravating or mitigating factors, you must make a determination concerning the age of the Defendant and the threshold eligibility factors in regard to each of the three counts for which the Defendant has been convicted.  If you unanimously resolve the preliminary factors of the Defendant's age and the threshold eligibility factor inquiry in favor of the Government, you must then take up

5304

the question of the Defendant's sentence. As I told you earlier, if you have not resolved these preliminary matters in favor of the Government, you may not consider imposition of the death penalty, but you will be required to consider life in prison without the possibility of release or the alternative lesser sentence. You are reminded that you will be required to make independent findings for each of Counts One, Two, and Three.

Second, you must consider whether the Government has proven beyond a reasonable doubt and to your unanimous satisfaction at least one statutory aggravating factor established by Congress. (If you do not unanimously find beyond a reasonable doubt that the Government has proven a statutory aggravating factor, your consideration of the death penalty as to that count or counts is complete.)

Third, you must consider whether any non-statutory aggravating factor or factors alleged by the Government are proven to your unanimous satisfaction beyond a reasonable doubt.

Fourth, you must consider whether any of you think that mitigating factors have been established by a preponderance of the evidence.

Fifth, as to Counts One and Two, you must each decide whether the statutory and non-statutory

5305

aggravating factors found to exist sufficiently outweigh the mitigating factors found to exist to justify a sentence of death.

Whereas, in relation to Count Three, you must decide whether the threshold eligibility factor and the statutory and non-statutory aggravating factor or factors found to exist sufficiently outweigh the mitigating factors found to exist to justify a sentence of death.

Even if you determine that no mitigating factors have been proven to exist, you must consider whether, in the case of Counts One and Two, the aggravating factors that have been proven are themselves sufficient to impose the death penalty. In the case of Count Three, even if you determine that no mitigating factors have been proven to exist, you must consider whether the threshold eligibility factor plus the aggravating factor or factors that have been proven are themselves sufficient to impose the death penalty. Whether any given amount of aggravation, once proven, is sufficient to warrant actually sentencing this Defendant to death is a question that the law leaves entirely to you.

Sixth, you must individually decide for yourselves whether you choose not to impose the death penalty in this case as to each of the three

5306

Counts.  Remember that absent unanimous findings as to certain aggravating factors for Count One and Two or absent unanimous findings as to the threshold eligibility factor plus at least one aggravating factor for Count Three, you cannot vote to impose the death penalty. However, even if you make all of the above findings relating to these matters adverse to the Defendant, as I have previously instructed, you are never required to impose a sentence of death upon the Defendant.

Instruction Number Eight, Aggravating And Mitigating Factors Generally.  Although it is left solely to you to decide whether the death penalty should be imposed, Congress has narrowed and channeled your discretion in specific ways, particularly by directing you to consider and weigh aggravating and mitigating factors presented by this case.  These factors guide your deliberations by focusing on certain circumstances surrounding the crime and on the personal traits, character and background of the Defendant.

Aggravating factors are facts or circumstances which would tend to support imposition of the death penalty.  The Government is required to specify the factors it relies on, and your deliberations are constrained by its choice.  Even if you believe that the evidence reveals other aggravating factors, you may not

5307

consider them.

Mitigating factors are considerations that suggest that a sentence of death should not be imposed. They do not justify or excuse the Defendant's conduct, but they do suggest that a punishment less than death may be sufficient to do justice in the case. Any aspect of Defendant's character or background, any circumstance of the offense, or any other relevant consideration may be a mitigating factor. You are not limited to those factors identified by the Defendant.

Aside from the condition that the Government prove at least one statutory aggravating factor, your task is not simply to decide whether, which, or how many aggravating and mitigating factors are present in the case. You also must evaluate and weigh such factors as previously instructed and, ultimately, make a unique individualized judgment about the justification for the appropriateness of the death penalty as a punishment for the Defendant.

Instruction Number Nine, Statutory Aggravating Factors. Before you may consider whether the death penalty is an appropriate sentence for the Defendant, you must unanimously find beyond a reasonable doubt that the Government has proved at least one of the following aggravating factors prescribed by Congress and alleged by

5308

the Government in this case.  The statutory aggravating factors for which the Government has offered proof are the same for Counts One and Two.  Keep in mind, however, that you must make a separate finding for each count independently.  Those statutory aggravating factors are:

One, the Defendant in the commission of the offense charged in Counts One and Two of the Superseding Indictment, or in escaping apprehension for the violation of these offenses, knowingly created a grave risk of death to one or more persons, to-wit:  The other law enforcement officers involved in the tactical entry, except for John Mark Hamilton, Jr., in addition to the victim of the offenses, David Eales.  18 U.S.C. Section 3592(c)(5).

Two, the Defendant killed or attempted to kill more than one person, to-wit:  John Mark Hamilton, Jr., and David Eales, in a single criminal episode.  18 U.S.C. Section 3592(c)(16).

Three, the Defendant committed the offenses as charged in Counts One and Two of the Superseding Indictment after substantial planning and premeditation to cause the death of a person.  18 U.S.C. Section 3592(c)(9).

If after considering all of the evidence you are left with a reasonable doubt as to whether any of

5309

these statutory aggravating factors have been proven for each count with respect to the murder and the Defendant's role in it, you must resolve that doubt in Defendant's favor, and you may not find the statutory aggravating factor to have been established.  If you do not find beyond a reasonable doubt that any of these statutory aggravating factors have been established for a particular count, report such to the Court in Section Six of the Special Verdict Form.

The statutory aggravating factors for which the Government has offered proof under Count Three of the Superseding Indictment are:

One, the Defendant, Kenneth Eugene Barrett, in the commission of the offense alleged in Count Three, or in escaping apprehension for a violation of said offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense, David Eales.  21 U.S.C. Section 848(n)(5).

Two, the Defendant, Kenneth Eugene Barrett, committed the offense as alleged in Count Three of the Superseding Indictment after substantial planning and premeditation.  21 U.S.C. Section 848(n)(8).

If after considering all of the evidence you are left with a reasonable doubt as to whether at least one of these statutory aggravating factors have been

5310

proven for Count Three, you must resolve that doubt in the Defendant's favor, and you may not find a statutory aggravating factor to have been established.  If you do not find that the threshold eligibility factor plus the aggravating factor or factors are sufficient to impose the death penalty, report such to the Court in Section Six of the Special Verdict Form.

Instruction Number Ten, Grave Risk Of Death To Additional Persons.  To find this factor, you must be convinced beyond a reasonable doubt that the Defendant in committing the offense, or in escaping apprehension -- in escaping apprehension for committing the offense, knowingly created a grave risk of death to one or more persons, other than John Mark Hamilton, Jr. and David Eales.  This aggravating factor requires you to find that the Defendant's conduct not only resulted in death, but also posed a significant risk of death to other persons who were in close proximity to those who died, in terms of time and location.  The Defendant must have knowingly in creating this grave risk of death to other persons, which means that he must have been conscious and aware of the grave risk of death to other persons, must have realized what he was doing, and must not have acted because of ignorance, mistake, or accident.

Instruction Number Eleven, Multiple Killings Or

5311

Attempted Killings. This statutory aggravating factor requires proof beyond a reasonable doubt that the Defendant intentionally killed or attempted to kill more than one person in a single criminal episode, to-wit: John Mark Hamilton, Jr. and David Eales.

Instruction Number Twelve, Substantial Planning And Premeditation. This statutory aggravating factor requires proof beyond a reasonable doubt that the murder/killing of David Eales was committed after substantial planning and premeditation by the Defendant, Kenneth Eugene Barrett. A premeditated murder/killing is one committed upon deliberation and prior design. In short, the Government must prove that the Defendant committed the murder/killing offense only after thinking the matter over and deliberating whether to act.

There is no requirement that the Government prove that the Defendant deliberated for any particular period of time in order to show premeditation. It must, however, show that the Defendant had some period of time to become fully aware, fully aware, of what he intended to do and to think it over before he acted.

The Government must also prove beyond a reasonable doubt that the killing was committed after substantial planning by the Defendant for you to find this factor proved. In this regard, planning refers to

5312

the creation or development of a method of doing something or achieving some end. Substantial planning means planning that is ample or considerable for the commission of the crime at issue.

Instruction Number Thirteen, Non-statutory Aggravating Factors. If you find at least one of the statutory aggravating factors alleged to Counts One, Two and Three has been proven beyond a reasonable doubt and to your unanimous satisfaction, you must next consider whether any other non-statutory aggravating factor alleged by the Government have been proven to your unanimous satisfaction beyond a reasonable doubt. These factors tend to support imposition of the death penalty, though they have not been specifically listed by Congress.

You are instructed that the law permits you to consider and discuss only those non-statutory aggravating factors specifically alleged by the Government, and no others. The jury is not free to consider any other factors in aggravation which the Government may have argued in closing or which you conceive on your own. You may consider only the following non-statutory aggravating factors alleged by the Government, if proven as to the Defendant to your unanimous satisfaction and beyond a reasonable doubt. Because the Government seeks to prove

5313

the same two non-statutory aggravating factors for each of Counts One, Two, and Three, the Court will not repeat the explanation of the alleged non-statutory aggravating factors for each count. Keep in mind, however, that you must make a separate finding for each count independently. The non-statutory aggravating factors alleged by the Government are:

One, future dangerousness. The Defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives or safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting as evidenced by the offenses charged in the Superseding Indictment and the statutory and non-statutory aggravating factors. The circumstances that demonstrate the Defendant's future dangerousness include but are not limited to the capital offense charged in the Superseding Indictment and the statutory and non-statutory aggravating factors alleged by the Government.

In addition, the Defendant's future dangerousness is demonstrated by his making non-specific and specific threats of violence; his non-verbal threats of violence directed toward others; his plans to commit acts of violence against others and his encouragement and

5314

solicitation of the commission of acts of violence against others. These include, but are not limited to:

A, Barrett advised others that he intended to kill law enforcement officers if they came upon his property.

B, Barrett posted a sign upon his property which stated "Keep out. I don't give a shit who you are. If you cross my gate or come on my property I'll shoot."

C, Barrett would obtain and carry a firearm when a vehicle which he did not recognize came onto his property.

D, Barrett in, on or about January, 2000, communicated with certain individuals that the identity of the confidential informant should be learned and that the confidential informant should be taken care of.

E, Barrett in about January, 1998, did intentionally accelerate through a vehicle check point in Sequoyah County, Oklahoma, endangering multiple law enforcement officers.

F, Barrett committed other acts of violence or potential violence and threatened violence to others.

Because of the available sentencing options in this case, any consideration of the Defendant's future dangerousness must be confined solely to the prison setting. In other words, you may only consider whether

5315

the Defendant is likely to pose a threat to the safety of other inmates or the prison staff.  If the Defendant is sentenced to life in prison without the possibility of release, he will spend the remainder of his natural life in prison.  If you sentence the Defendant to a term of years to be determined by the Court, he will more probably than not also spend the remainder of his natural life in prison.

Two, victim impact evidence.  The Defendant caused injury, harm, and loss to the victim, the victim's family, and the victim's friends as demonstrated by the victim's personal characteristics as an individual human being and the impact of the death on the victim's family and friends.

Section Four of the Special Verdict Form asks whether you are unanimously persuaded that the Government has proven either or both of these non-statutory aggravating factors beyond a reasonable doubt.  Even if you are not so persuaded, remember that a unanimous jury finding that the Government has proven, beyond a reasonable doubt, at least one statutory aggravating factor relating to Counts One and Two, or as it relates to Count Three, a unanimous jury finding that the Government has proven, beyond a reasonable doubt, the threshold eligibility factor plus at least one statutory

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

Case 6:04-cr-00115-RAW Document 355 Filed 05/22/06 Page 33 of 175

aggravating factor, permits you to consider the death penalty, as well as the options of life imprisonment without any possibility of release or imprisonment for a term of years.

In short, in relation to Counts One and Two, you may consider the death penalty if at least one statutory aggravating factor has been unanimously proven beyond a reasonable doubt. You may still consider the death penalty, as well as life imprisonment without any possibility of release or imprisonment for a term of years, even in the absence of any finding of a non-statutory aggravating factor. Likewise, as it relates to Count Three, you may consider the death penalty, as well as life imprisonment without any possibility of release or any term of imprisonment for not less than 20 years, if the threshold eligibility factor plus at least one statutory aggravating factor has been proven beyond a reasonable doubt, even in the absence of any finding of a non-statutory aggravating factor.

Instruction Number Fourteen, Mitigating Factors, Burden Of Proof. Next, consider any mitigating factors that may be present in this case. The law never assumes or presumes that a defendant should be sentenced to death. As previously indicated, a mitigating factor

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

5317

is not offered to justify or excuse a defendant's conduct. A mitigating factor is intended to present extenuating facts about the Defendant's life or character, or the circumstances surrounding the murder/killing for which he has been convicted, that would suggest that a sentence of death is not appropriate.

It is the Defendant's burden to establish any mitigating factors by a preponderance of the evidence. This is a lesser standard of proof under the law than beyond a reasonable doubt. A factor is established by a preponderance of the evidence if its existence is shown to be more likely so than not. In other words, a preponderance of the evidence means such evidence as, when considered and compared with that opposed to it, produced in your minds the belief that what is sought to be established is, more likely than not, true. If the Defendant fails to meet his burden, he has not proven a mitigating factor.

Note, however, that the Defendant at this hearing does not have to present any evidence. He does not have to prove to you that he should be permitted to live. He was, however, entitled to present any mitigating evidence to you, that is, evidence that favor a lesser punishment than death. You should evaluate that

5318

evidence in the manner just described.

Instruction Number Fifteen, Mitigating Factors. The mitigating factors relied upon by the Defendant in this case are:

One, the Defendant has accepted responsibility for the death of David Eales from his previous conviction.

The Defendant has been convicted and punished for the death of David Eales.

Three, the Defendant, at the time of this incident, had no prior felony convictions.

Four, the Defendant is a father.

Five, the Defendant is a loved son and stepson.

Six, The Defendant is a good neighbor and friend.

Seven, the Defendant's death will impact his child, family and friends.

Eight, the Defendant has expressed remorse for the crimes.

Nine, the Defendant will not present a future danger to society by being imprisoned for life without the possibility of release as demonstrated by his incarceration since September 24, 1999.

In addition to these specific mitigating factors relied upon by the Defendant, the law also

5319

permits you to consider whether other factors in the Defendant's background, record, or character or any other circumstance of the offense mitigates against the imposition of a death sentence. Indeed, you may consider any other factor, whether specifically argued by defense counsel or not, that you believe to be mitigating, if such factor has been established by a preponderance of the evidence. In short, your discretion in considering mitigating factors is much broader than your discretion in considering aggravating factors.

Section Five of the Special Verdict Form relates to mitigating factors.

Instruction Number Sixteen, Unanimity Not Required As To Mitigating Factors. Any evidence relating to mitigating factors should be fully discussed by all of you to ensure that each of you considers the matter carefully. It is important to note, however, that unlike aggravating factors, which you must unanimously find proven beyond a reasonable doubt in order for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. If any one of you is persuaded of the existence of a mitigating factor by a preponderance of the evidence, even if the rest of you disagree, that juror may still consider it in reaching his or her individual decision in

5320

this case.

Instruction Number Seventeen, Failure Of Defendant To Testify.  As I have previously instructed you, the law does not compel a defendant to take the witness stand and testify, and no presumption of guilt may be raised, and no inference of any kind may be drawn from the failure of a defendant to testify.

The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Instruction Number Eighteen, Dual Prosecutions. You are instructed that it is not a violation of the Double Jeopardy Clause of the United States Constitution for a state government and a federal government to prosecute a criminal defendant for the same or similar acts made illegal by both governments.  Rather, the Double Jeopardy Clause only prohibits the same sovereign from prosecuting a second time for the same offense. While the Defendant was previously tried by the District Court of Sequoyah County, State of Oklahoma, this case involves both different charges than those brought within the state court system and a different sovereign, the United States of America.

Instruction Number Nineteen, Mitigating Circumstances Do Not Include Residual Doubt.  You have

5321

found the Defendant guilty of three capital crimes.  Your consideration of guilt or innocence has, therefore, been completed.  You must now determine an appropriate punishment.  In considering the appropriate punishment to impose, you are not to revisit the issue of guilt or innocence.  All twelve jurors are bound by your verdict in the first portion of this case.

Additionally, you are instructed that you must not speculate about the reasons for the jury's verdict or sentences in the Sequoyah County District Court case.  Only the charges and the evidence presented in this Court are relevant to the task now before you.  The sentences in the Sequoyah County District Court may, therefore, only be considered with regard to their mitigating effect, if any, on the Defendant's sentence for the charges at issue in this federal court case.

You must consider any mitigating circumstances you find to exist.  Mitigating circumstances are facts about the Defendant's character, background, or record, or the circumstances of the particular offenses, or other similar relevant factors, that may call for a penalty less than death.  However, any lingering doubt that you may have about the Defendant's guilt is not a mitigating circumstance and cannot be considered by you in determining the appropriate punishment.

5322

Instruction Number Twenty, Weighing The Various Factors. Once you have decided upon the aggravating and mitigating factors present in this case in relation to Counts One and Two, the law requires you to evaluate these factors and decide whether you are unanimously persuaded that the aggravating factors sufficiently outweigh any mitigating factors to justify a sentence of death. Even if you determine that no mitigating factors have been proven to exist, you must consider whether the aggravating factors that you have proven -- you must consider whether the aggravating factors that have proven are themselves sufficient to justify a sentence of death.

Further, once you have decided upon the threshold eligibility, aggravating and mitigating factors present in this case in relation to Count Three, the law requires you to evaluate these factors and decide whether you are unanimously persuaded that the threshold eligibility factor plus the aggravating factor or factors sufficiently outweigh any mitigating factors to justify a sentence of death. Even if you determine that no mitigating factors have been proven to exist, you must consider whether the threshold eligibility factor and the aggravating factor or factors that have been proven are themselves sufficient to justify a sentence of death.

5323

Passion, prejudice, sympathy and any arbitrary consideration have no role to play in your effort to reach a just result in this case.  In carefully weighing the various factors at issue in this case, you are called upon to make a unique, individualized judgment about the appropriateness of sentencing the Defendant to death. This is not a mechanical process.  Neither is it determined by raw numbers.  You do not simply count factors.  Instead, you must consider the quality and value of the factors.

Any one aggravating factor proven by the Government, if sufficiently serious in your mind, may outweigh several mitigating factors.  Thus, on Counts One and Two, even if you were to find only one statutory aggravating factor proven as to the Defendant, and no statutory aggravating -- and no non-statutory aggravating factor -- let me read that again because I maybe left out a word.  Start over.

Thus, on Counts One and Two, even if you were to find only one statutory aggravating factor proven as to the Defendant, and no non-statutory aggravating factor, you would still have to consider it carefully against the mitigating factors.  On the other hand, you must recognize that a single mitigating factor may outweigh several aggravating factors.  Similarly, on

5324

Count Three, if you were to find the threshold eligibility factor and only one statutory aggravating factor and no non-statutory aggravating factor, you would still have to consider those factors against the mitigating factors.  Again, a single mitigating factor may outweigh the threshold eligibility and several aggravating factors.

In short, what is called for in weighing the various factors is not mathematical skills, but your careful, considered and mature judgment.  As to this stage in the process, you are not called upon simply to find relevant factors.  You are called upon to decide whether the Defendant shall live or die.

If you are unanimously persuaded that, in the case of Counts One and Two, the aggravating factors outweigh the mitigating factors sufficiently that a sentence of death is justified; or in the case of Count Three, the threshold eligibility factor plus the aggravating factors outweigh the mitigating factors sufficiently that a sentence of death is justified, only then may you return a decision in favor of the death penalty.  Each individual juror must decide whether the law requires that the Defendant be put to death.  If even one juror finds a mitigating factor present which, in that juror's mind, is not outweighed by the various

5325

factors that you have agreed were proven, then the jury may not sentence the Defendant to death.  If even one juror finds that a sentence of death is not justified, the jury cannot return a decision in favor of the death penalty.

You are also reminded again that, whatever the findings you make with respect to these various factors, you are never required to impose a death sentence.  For example, there may be something about this case or about the Defendant that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless causes you to believe that the death penalty is not justified.  In such a case, the jury must render a decision against the death penalty.

Instruction Number Twenty One, Consequences Of Deliberation.  If, after weighing the various factors, you unanimously find that a sentence of death shall be imposed, then the Court is required to sentence the Defendant to death.  If you unanimously find that a sentence of life imprisonment without the possibility of release shall be imposed, then the Court is required to sentence the Defendant to life imprisonment without the possibility of release.  If you unanimously find that a lesser sentence for the Defendant is appropriate, the Court is required to impose a sentence as authorized by

5326

law.  In reaching your verdicts, you are not to speculate about the particular sentence the Defendant might receive in the event you do not recommend a sentence of death or life imprisonment without the possibility of release. That is a matter for the Court to decide.

Instruction Number Twenty Two, Duty To Deliberate.  It is your duty as jurors to discuss the issue of punishment with one another in an effort to reach an agreement.  Each of you must decide this remaining question for yourselves, but only after full consideration of the evidence with the other members of the jury.  While you are discussing this matter, do not hesitate to re-examine your own opinion, and to change your mind if you become convinced that you are wrong. But do not give up your honest beliefs as to the weight or the effect of the evidence solely because others think differently or simply to get the case over with.

Instruction Number Twenty Three, Judging Evidence.  As in the guilt phase of the trial, you the jury are the sole judges of the facts in this part of the case.  You may decide issues of the credibility of witnesses and whether or not to accept any piece of evidence as true or what amount of weight to give it, if any.  At this phase of the trial, the evidence consists of all the evidence received at the guilt phase of this

5327

trial to the extent it is relevant to your inquiry regarding the existence of any threshold eligibility, aggravating or mitigating factors.

You may also consider any evidence received at the penalty phase of the trial, including testimony, documents and stipulations between the parties.  You may only consider evidence received in this courtroom in making your determination.  As in the guilt phase, the arguments of the attorneys and the comments and rulings of the Court are not evidence.  You may consider both direct and circumstantial evidence at this phase of the trial and you may use your common sense in determining whether aggravating or mitigating factors are established.

The weighing process you are called upon to undertake in this portion of the trial is different from the fact finding process.  Once you have found the threshold eligibility, aggravating and mitigating factors, if any, you must use your own experience, judgment, and sense of judgment in weighing the aggravating and mitigating factors to arrive at your ultimate verdicts in this case.

Instruction Number Twenty Four, Penalty Phase Special Verdict Form.  As you retire to begin your deliberations, you will be provided with a form entitled

5328

Penalty Phase Special Verdict Form to record your determinations. You should consider each count separately. You are required to record your determinations as to the existence or non-existence -- I'll start this instruction again.

This is Penalty Phase Special Verdict Form. As you retire to begin your deliberations, you will be provided with a form entitled Penalty Phase Special Verdict Form to record your determinations. You should consider each count separately. You are required to record your determinations as to the existence or non-existence of each threshold eligibility factor and aggravating factor. Section One of the Special Verdict Form requires you to record your findings with respect to the Defendant's age. Section Two of the Special Verdict Form contains space to record your written findings on threshold eligibility factors. Section Three of the Special Verdict Form will be where you will record your written findings on statutory aggravating factors. On Section Four of the Special Verdict Form you will record your written findings on non-statutory aggravating factors. Remember that you must be unanimous as to the existence of any aggravating factor that you determine to have been established beyond a reasonable doubt.

In addition, you have the option to return

5329

written findings as to the existence or non-existence of each mitigating factor, if you choose -- if you so choose, but you are not required to return such findings. Section Five of the Special Verdict Form contains a space to record written findings on mitigating factors if you choose to do so. Because any one juror may find the existence of any mitigating factor, space is provided for you to note how many jurors find any particular mitigating factor. If you choose not to record written findings, cross out each page of Section Five with a large X. Section Six is where you should record your ultimate verdicts as to what penalty should be imposed as to each of the counts and each juror should sign and date the form.

Instruction Number Twenty Five, Special Interrogatories. If after consideration of all of the evidence in this case you do not unanimously find, beyond a reasonable doubt, that the Government has proven that the Defendant committed the offenses as charged in Counts One, Two or Three of the Superseding Indictment after substantial planning and premeditation, you must then answer the question posed in the Special Interrogatory which relates to those specific counts.

Instruction Number Twenty Six, Right To Justice Without Discrimination. Finally, in your consideration

5330

of whether the sentence of death is justified as to the Defendant, you shall not consider the race, color, religious beliefs, national origin, or sex of the Defendant or the victim.  These facts are completely irrelevant to the important issues you must consider at this phase of the proceedings.

You are not to impose a sentence of death unless you have concluded that you would have rendered a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of either the Defendant or the victim might have been.

Whatever decision you return, each of you is required by law to sign a certification attesting to the fact that you have followed this instruction.  Section Seven of the Special Verdict Form contains a certificate that must be signed by each juror.

Before I give my Concluding Instruction, you will hear closing arguments.  First you will hear from the Government.

MR. LITTLEFIELD:  May it please the Court. Ladies and gentlemen of the jury:  Before I begin the specifics of the closing argument, I want to -- and they may sound like empty words, but I want to tell you I thank you.  Nearly been here two months.  It has been a

5331

lengthy and extended process and you all have given a great deal of service, a great deal of care, attention and concern throughout this trial. And again, thank you.

You are about to begin a process of deciding what is the appropriate sentence for Kenneth Eugene Barrett. Should his sentence be death, life imprisonment without parole or a term of years to be decided by the Court. And to reach that, to make that determination for his sentence, you are required to go through a process, a series of steps.

The first step will be determining his age at the time of the commission of the offense. Once that's out of the way you have a five step process through which you will proceed. The first step in that process is determination of whether there are threshold factors, threshold eligibility factors. Step two will be statutory aggravating factors. Step three will be nonstatutory aggravating factors. After you make those determinations you go to step four which is the existence or determination of the existence of mitigating factors. And then step five will be the weighing or deliberative process.

As you move from step one to step two to step three to step four, if you answer -- and I'm telling you the -- the forms are thick and look to be confusing. But

5332

actually they're fairly simple. As you go from threshold to statutory to nonstatutory aggravating factors, if you answer the question yes, yes, the threshold's been met, yes, statutory aggravating factors are met, yes, the nonstatutory aggravating factors are met -- as long as the Government has proven those steps and you move through answering affirmatively, you keep on going. And that's really all there is to it.

I'm going to talk about those four steps. The first four are facts finding. Just like you've done to this point. You will act as a factfinding jury. Does the Government prove those steps, those factors, beyond a reasonable doubt? The fifth takes a different approach. In that final stage, the weighing stage, you will be acting not as factfinders but as judges. As judges weighing the aggravating factors you've found beyond a reasonable doubt versus the mitigating factors, if any you find, beyond a preponderance of the evidence and you will make the determination as to whether or not the statutory and nonstatutory aggravating factors sufficiently outweigh the -- any found mitigating factors to warrant a death penalty. And you will pronounce a sentence.

If you consider the process, consider the steps which you will follow in your deliberations, then I

5333

believe that the evidence establishes beyond a reasonable doubt the existence of all of those steps to reach the determination then of the mitigating factors and the weighing stage.

The first -- first thing you got to do is what was Kenneth Barrett's age at the time of the commission of the offense?  This happened in September -- September 24, 1999.  His mother testified he was born in 1961.  He was 38 years old.  The first question you have to answer:  Yes, he was 18.

Second step -- or actually step one as I've identified it are the threshold factors.  On Counts One and Two you are given four threshold factors.  On Count Three you are given one threshold factor.  And it is only necessary to find yes to one of those threshold factors before you proceed to the second step, the statutory aggravating factors.

The first threshold factor given in each one of those three counts, the first one is did the Defendant intentionally kill the victim?  And I submit you have already made that finding beyond a reasonable doubt. Your verdict was that Kenneth Eugene Barrett murdered Rocky Eales on Counts One and Two.  Your verdict on Count Three was that the Defendant intentionally killed, intentionally killed, the victim knowing he was a police

5334

officer.  You have already answered that first step beyond a reasonable doubt as guilty.  The answer to that question is yes on all three counts.

As to the three other factors in Count One, they are consumed by that first aggravating factor or that first threshold question.  He is -- beyond a reasonable doubt, yes, he did intend to kill the victim in this offense.  That takes you then with an affirmative answer on step one to step two.  The statutory aggravating factors.  And there are two statutory -- two different statutory processes or schemes in these counts.  Counts One and Two fall under Title 18, murder.  Count Three falls under Title 21, which is an intentional killing.  And so, there is some variation between the statutory aggravating factors which can be alleged for Counts One and Two as opposed to Count Three.  But there is commonality.  There are three statutory aggravating factors alleged for Counts One and Two.  There are two for Count Three.  And both of those in Count Three are listed for Counts One and Two.  Those are, one, was there a grave risk of death to more than one person.  A grave risk of death to more than one person or additional persons other than -- and this refers to persons other than Rocky, and other than Buddy Hamilton.  The Judge read you in your instructions, Instruction Ten, what a

5335

grave risk of death is.  And it refers to a significant risk of death to other persons who were in close proximity to those who died in terms of time and location.  A grave risk of death other than those who died, that being Rocky and in this case Buddy, in terms of time and location.  And if you examine the evidence beyond a reasonable doubt there was a grave risk of death -- enough for the instruction.

Consider first the firearm itself, the .223 Sporter.  And consider how it was set up and utilized. Three magazines taped together, fully loaded, 91 rounds. It was a powerful weapon fully prepared, a lethal range -- and you heard this evidence in the first stage -- of 500 meters, five and a half football fields in length. You saw the power of those rounds that were fired in this particular case.  They were powerful enough to pass through glass.  They were powerful enough to pass through metal, through the door of that automobile.  They were powerful enough to pass through the body armor worn through troopers on that night.  And you saw what the impact of those rounds could do to a human body.  Exhibit Number 85.  Under the armpit, that is not a wound caused by the shot.  That was the explosion of that shot back out of the body as Dr. Distefano testified.  Those rounds were powerful.  Those rounds were deadly.  The firearm

5336

shows the danger.  This firearm was no deer rifle for hunting season.  This firearm was for one thing and that was to kill human beings.  A substantial danger was imposed when you consider the power of that firearm which was used to multiple individuals.

Consider first the officers on the scene.  You recall the approximate location of where the first shots were fired.  And you also recall, as to Government Exhibit Number 1, the location of the other two vehicles.  Behind Rocky and Buddy's vehicle was Raymond Greninger and Rick Manion, the second automobile.  Behind that was Steve Hash and Danny Oliver.  They were in the line of fire.  Greninger, Manion, Hash and Oliver were in the line of fire.  They were in proximity and time close to a grave and deadly danger.  Passed through the glass, they could have been hit.  Slightly off in aim, they could have been hit.  They could have been killed and they were in danger.

But even after the initial shots were fired, consider the location at the porch and where Kenneth Eugene Barrett would have fired from.  As he shot into that Bronco, Rick Manion testified he went to the rear to provide assistance to Rocky.  Gene Hise went to the rear to provide assistance to Rocky.  And even after the flash bang was thrown, firing still continued.  They were

5337

exposed.  Billy Poe was right in that line of fire at the gate.  Robert Darst and Gene Hise were crossing across by that gate when the shots were going.  A shot goes through that window, a shot misses and they are in proximity both in time and location to that lethal fire.  Those officers were in danger.

And consider also that when Mr. Barrett was taken into custody he didn't stop with the -- this firearm, he reached for this firearm which was in his waistband of his pants.  He still continued to pose a grave risk to Robert -- or Trooper Manion, to Trooper Hise who was at that location, Steve Hash, to Billy Poe to Raymond Greninger, to Buddy Hamilton, by his continued assaultive behavior.

But it wasn't just the troopers.  It wasn't just the troopers who were exposed and placed in grave danger for their lives.  Government Exhibit 184, Mr. Barrett's residence.  He fired across this line at the vehicle.  Cousin Gwen lived in that trailer and you've heard the testimony that round could have passed through that trailer and injured an individual inside that trailer.  As the Bronco moved through here Tommy Sanders and Janice Sanders lived -- his aunt and uncle -- lived within that five hundred meter lethal range.  A round from that weapon could have passed through the window.

5338

Had they been awakened and looked out they would have been exposed to a line of fire. In that trailer, his cousin Alvin Hahn, just like Gwen, a round could have passed if fired from this porch in this direction into that trailer. And cousin Alvin Hahn was placed in grave danger. And as he is shooting out this way, in this house his aunt Ada Blount lived, within that five hundred meter lethal range. Had she looked out a window, had she stepped outdoors to see what was happening, a round from that weapon could have passed through the glass, could have passed over the Bronco had he missed, and exposed her to danger. Not only were the troopers exposed to a grave risk, civilians, his relatives in the area were exposed to a grave risk of danger.

As to all three counts, because this statutory aggravating factor is listed as to all three counts. Beyond a reasonable doubt the evidence you have heard in this trial establishes that it exists and you should answer yes for the statutory aggravating factor.

The second statutory aggravating factor that exists as to all three counts is substantial planning and premeditation. And those two items, substantial planning and premeditation, while similar, are different. And the Court tells you what they are in the instructions. Substantial planning lasts for an extended period or a

5339

longer period than premeditation. The Court tells you in Instruction Number 12 that premeditation is one committed upon deliberation or prior design. The Government must prove that it committed it only after thinking over the matter or deliberating whether to act.

In the special verdict form, the special interrogatory, the Court tells you how long one must think -- go ahead and put the special interrogatory up. At the bottom it says it must be long enough for the Defendant to have formed the -- go to the second page -- specific intent to kill, to be fully conscious of that intent and to have considered the killing. It can be formed in an instant before the killing or it can be planned or deliberated for days, months or years.

Premeditation can you formed in an instant and I submit you already have found that this was a premeditated killing because you have found beyond a reasonable doubt that he intended to kill Trooper Eales and he intended to do so knowing, with full knowledge that, he was a law enforcement officer. There was premeditation without question.

What about substantial planning? Go back to Instruction 12 and the Court tell you that -- tells you that at the bottom of Instruction 12, on the first page -- it can be -- planning refers to the creation -- go to

5340

next page -- or development of a method of doing something or achieving some end.  Substantial planning means that -- means planning that is ample or considerable for the commission of the crime at issue. And if you look at what was done, considering the nature of this crime, the evidence is beyond a reasonable doubt that also there was substantial planning.

Look to the steps.  He planned for the incident.  And I'm not going to just beat it to death because we talked about it early on in this trial in the other closing arguments.  But he intended this.  He planned it, he announced it.  He told his friends they're going to come and when they do here's what I'm going to do.  He had been planning for this offense for weeks and months and even years.

Look at what he did.  He locked the front gate consistently, forcing entry from the east side of that property.  And he prepares for the entry from the east side of the property.  Remember in the loft, the spotting scope?  Vicki Lyons testified -- and we showed the photograph, I'm not going to do it again.  But Vicki Lyons testified I looked through that scope and it was trained right on that entry.  He forced entry there and he prepared for entry there.  But he didn't just do that. He prepared the firearm.  91 rounds, ready to be used.  9

5341

millimeter in his waistband ready to be used. He left the Colt Sporter at all times in an accessible location. You remember the testimony of Karen Real, Charles Sanders, Brandie Price, Randy Turman. This firearm was leaning again the door or the desk. If he went out to that storage building he took this with him. He took this 9 millimeter, which was chambered and ten rounds in it, he kept it in his waistband at all times. And I submit to you it wasn't to keep his pants up, it was to be prepared for what he knew was coming and knew what was inevitable.

And he also prepared himself mentally. I submit to you that when he talked to his friends and associates and when he exerted is bravado about what he was going to do -- I'm going to take those bastards out, as many of them as I can. I'm going to kill the first one through the door. He was hyping himself up, building himself up mentally to be prepared for what he wanted to do. That was substantial planning.

When he was -- when the incident went down he immediately had access to that rifle and shortly after they got onto the property he began firing. He continued to and backed into the room and when he went into that east room, not only did he have that firearm with still 72 rounds and this pistol with ten rounds in it, in that

5342

same room into which he retreated he had his Browning .22 also fully loaded in a drawer.  He went to the room where he had his firearms loaded and ready.  And I submit to you that wasn't an accident.  That was planning.

He knew that night they were coming.  He saw the Bronco drive by and he told his cousin, Travis Crawford, it's a Bronco, I think it's a cop car.  There's a warrant, they're coming back and when they do all hell will break loose.  That was planning.  He was ready.  He was prepared physically and mentally and he acted upon his plans.

Folks, for what was necessary to commit this crime he had it fully planned out.  And I submit to you beyond a reasonable doubt he premeditated and he substantially planned this crime.  And you should find that factor as to all three counts again, yes, beyond a reasonable doubt and be ready to move on.

The third factor is listed only into counts -- as to Counts One and Two.  And that is that he intended to kill more than one person.  You have already found he intended to kill Rocky beyond a reasonable doubt.  The question here is isolated and unique only as to John Mark Buddy Hamilton.  Did he intend to kill Buddy Hamilton beyond a reasonable doubt?  And if you look to Government Exhibit Number 67, the shots are aimed primarily at the

5343

driver.  Iris Dalley testified that both of the shots were directed at the driver.  There were the four shots through the door at the passenger.  He primarily intended to kill -- to take out the driver of that vehicle.  When it stopped and parked at the porch, his attention shifted to Rocky.  And once Rocky was injured, when Buddy threw out the flash bang to exit the vehicle, he again returned his focus and intent to Buddy.

Buddy had an injury in the eye, in the cheek and in the front of the left shoulder.  And as he was exiting, he was shot in the back of the left shoulder. The distance was the same for the shooting at Buddy at the front porch as it was for the shooting at Rocky. Remember the testimony of Loyd Cobb.  Less than 15 feet. With that rifle I just dropped and I'm not going to pick up, from a distance of less than from me to you.  He aimed and he shot Rocky and he aimed and he shot Buddy. With that rifle, with that impact and with that power. And I submit to you he intended to kill not only Rocky, he intended to kill Buddy as well.  And beyond a reasonable doubt, that third statutory aggravating factor which applies only as to Counts One and Two is proven beyond a reasonable doubt.  He was not successful in his intent to both, but it was still his intent.

Once the three statutory aggravating factors as

5344

to Counts One and Two and the two as to Count Three are answered yes affirmatively -- if any one is answered yes, you go to the next step. But I submit all three should be answered yes.

The next step is the non-statutory aggravating factors -- the non-statutory aggravating factors. And they're different in a way from the statutory aggravating factors. Because the Court tells you for you to reach -- for you to have to go to the mitigating factors and determine their existence and weigh, it is only necessary that you find one statutory aggravating factor. Only have to find a statutory aggravating factor and only have to find one.

If you find one or two or all three, as I submit you should, then you may find the non-statutory aggravating factors as well. And if you do find them as well, beyond a reasonable doubt, then you may utilize these in conjunction or combination with the statutory -- step two, the statutory aggravating factors in your weighing process.

And I submit to you when you examine the non-statutory aggravating factors you will find that they exist as well beyond a reasonable doubt. There are two identified by the Government in this case. And they are common to all three counts. They are the same as to all

5345

three counts.  And so, I'm going to only talk about them one time, each one of them one time.  But remember that they exist in all three counts.  There are two, future dangerousness and the victim impact.  What about future dangerousness?  It's been said that he who fails to learn from history is deemed to repeat or make the mistakes of the past.  In Cherokee County we say fool me once, shame on you, fool me twice shame on me.  The best predictor of human behavior is past human conduct.  And I submit to you that when you examine past human behavior as it relates to that man he is a future danger.

Consider first, 17 years old and Johnny Philpot arrests him and he's ordered by a judge to take him to jail.  A judge orders him to take the juvenile to jail.  And as they do, this man is fighting and struggling as they're going up a narrow stairway with a wooden banister and Johnny Philpot pops him in the nose.  Hard enough to break his hand.  Is it an overreaction?  Don't know.  I do know that Mr. Philpot testified the FBI examined it and cleared him of it.  He cleared him of it.  We hear from the defense well Mr. Philpot held a grudge.  Wait a minute, folks.  Who held the grudge?  Who -- 18 -- no, 21 years -- pardon my math -- who, 21 years later wanted to kill Johnny Philpot?  Who said to two different people Randy Turman and Charles Sanders I hope the first one

5346

through the door is Johnny Philpot so I can kill him? And who bore the grudge? Kenneth Eugene Barrett. He is a danger in the future based upon his past history.

His marriage to Abby Stites, then Abby Barrett, was a marriage filled with violence. Seventeen years ago, Stanley -- or Shannon Smith observed this man in the front yard of the residence holding her by the arm, slapping her around with an open hand. Seven different cases of domestic abuse or violation of domestic abuse in the court of Sequoyah County as to this man against his former wife.

He broke into her trailer and destroyed -- broke her aquarium, flooded the trailer, killed her exotic fish and slashed up her furniture. He abducted her, took her to Webbers Falls. He broke her nose. And what was their response? On redirect they got Abby to admit that, yeah, after he hit me I hit him back. After he struck me, I returned blows. This man's history establishes violence is how he responds to someone who does not do as he wishes.

Look to Shannon Smith himself and we hear, well, those are just threats, those are empty words, they're just talk, it's easy to talk. But remember Shannon Smith, I stopped in the yard and told him, hey, quit slapping her around. And Kenneth Barrett said I'm

5347

getting my gun, you better not be here when I get back and went into the house. Were those empty words? Abby Barrett, then, didn't think so, because she knew him better than anybody. And what did she tell Shannon Smith? You better get out of here. Kenneth Barrett may threaten and not follow through, but he also threatens and follows through. And Abby Barrett was concerned enough for Shannon Smith that she told him get out of here when he said I'm getting a gun.

Consider his recent behavior. The road block incident. He slows down and then floors it, just missing Cindy Smith and Michael Readner, who have to jump over a ditch to avoid being hit. And then goes through the county at speeds in excess of 100 miles an hour for a couple of miles until he ditches the car in a ditch to escape. Stanley Philpot -- he -- boy, the Philpots have a grudge. Rather than towing his car and costing Kenneth Barrett money, Stanley, to get him, said, yeah, I'll follow you home and save you the money. And what was the response from this man? What was the appreciation he showed Stanley Philpot? He dusted him and when he got home, he met him at the front door with a long barrel pistol. .44 magnum shells empty in the living room and a .44 magnum tray in the house. Stanley Philpot backed off because he didn't want to be involved in a shootout. He

5348

called backup. Is this man just idle threats? Certainly law enforcement didn't think so. Johnny Philpot told his deputies don't go out there by yourself because I fear a shootout, a gunfight and he proved him right.

Consider Karen Real. When unknown persons came up he would retrieve his gun until he knew who they were. Cindy Crawford testified that when she refused his sexual advances -- when she wouldn't put out and started to leave with his brother Richie, he grabbed the shotgun, stuck it to her leg and said never come back here, I'll blow your leg off.

Consider his conduct towards the police on September 24th. He told everybody what he was going to do and he did it. Idle threats or one who has shown danger in his past? He'll do it again. He endangered Rocky, Buddy, the officers, had no concern for the civilians, his relatives. He endangered them. He will remain a danger. He will remain a danger to others who prevent him from getting his way as long as he lives. There has been no evidence of any sudden conversion in Kenneth Barrett's life.

What we hear, that this will be in a jail setting, it will be non-threatening. He cannot threaten anyone from there. He told Charles Sanders -- or he called when Charles Sanders heard him, we need to find

5349

the CI -- and that was from jail.  We need to find the CI and kill the son of a bitch.

He thumped a prisoner, Donald Fair, and Donald Fair -- or Fear, I guess -- is characterized as a cold blooded killer.  And, yeah, he was.  But Kenneth Barrett thumped him, popped his head against the wall hard enough that a jailer on the other side heard it.  And why?  Because he was a cold blooded -- because Donald Fear was a cold blooded killer?  Was it because of Kenneth Barrett's repulsion at his acts?  No.  He cut his toenails one too many times.  We got to beat him up.

Even in a jail setting he is a threat.  George Borman heard Kenneth Barrett threaten Brad Boyd.  I'll get out of here and I'll get you.  Michael Hendricks, if I'm not -- if I wasn't in here I'd kick your ass.  And he told him on a second occasion that he tried to grab him through the bars.  These two are guards.  Remember Mr. Hendricks was asked?  Well, that's not the only prisoner who threatened you, was it?  And his response.  Yeah. Kenny Barrett is the only prisoner in the time I was in the jail who threatened to kick my ass.  He was the only prisoner who threatened me.

Kenny Barrett assaulted a guard while in the Muskogee County Jail, Mr. Satterfield.  Threw the tray of food at him.  And Rick Fargo.  He hit him in the

5350

testicles with a potato.  Doesn't sound like a big deal, not a deadly weapon, not a dangerous weapon, but it's what he had access to and it shows his willingness to commit assaultive behavior upon authorities in a correctional setting.

Don't be naive.  Do not think that the only weapons available in a prison setting are baked potatoes. Mr. Borman told you that the day that there was the confrontation between Brad Boyd and Kenny Barrett they were looking for razor blades and pens, weapons.  Didn't say they were Mr. Barrett's.  But they were found in that cell.

Do not think that throughout his time in an institution, if that's where he ends up, Mr. Barrett will not have access to shanks, shives, razors and other items that can be made into weapons.  And guards and prisoners will be endangered as demonstrated by his response.

You heard his witness, Brad Gude, say that he was bold and arrogant.  You heard the guard say Kenny thought he ought to run it.  He wanted it to be his way. And the evidence demonstrates what he will do when he does not get his way.  Kenneth Barrett is a danger in the future wherever he is.  He is a future danger.  And the first non-statutory aggravating factor is established beyond a reasonable doubt.  Answer it yes and move on.

5351

The second statutory -- non-statutory, pardon me -- aggravating factor is victim impact. And you heard the testimony of his family and friends. You heard Bill DeWeese, the minority leader of the Pennsylvania house of representatives. He met Rocky -- pardon me, it's DeWeese. He met Rocky in the Marines. And Rocky soon became his best friend. He described Rocky as an epitome of American manhood. He -- Rocky helped Mr. DeWeese through physical training. Rocky achieved what he wanted. His desire was to return to Oklahoma and become a Highway Patrol trooper and that's what he did.

And Mr. DeWeese told you about the phone call a month before Rocky's death. Rocky had achieved more than what he wanted. More than just being a trooper. Because Rocky was truly living his dream. And he told Bill DeWeese that in his own way. He told Mr. DeWeese -- he was still a bachelor -- you need to get you a family and settle down. Because Rocky had done that and Rocky knew the true value of living the life he was living.

You heard the testimony of Nancy Stalcup, his sister. Rocky was honest, bright, brave, her confidant. People flocked to him. They gravitated to him. His eyes twinkled. He had a robust laugh. She never got to say goodbye. She will miss him. Every day she dies. The hardest thing she's ever done in her life was having to

5352

tell her children what happened to Rocky.  She spoke with him about the religious faith.  She rests with that comfort.  The pain in her has not diminished and it never will.

You heard the testimony of Bobbie Eales, his mother.  She can no longer go to church because the hymns cause her to break down.  She goes to his grave daily.  She told you of the love she felt at seeing him for the last time as he drove off, not knowing it was the last time.  And she told you of what a parent feels when their child dies too early.  No parent should live longer than their child.  You heard Gene Hise, a brother Marine and trooper who said I lost part of myself.  He was my friend, my best friend.  Six years later Trooper Hise still can't talk about it without crying.  And this man says he ought to grow up.  The hardest thing Mr. Hise ever did -- Trooper Hise ever did was tell Rocky -- or tell Kelli about his efforts to save Rocky's life.  He told about the team falling apart.  A large percentage of that team -- marriage is breaking up.  How he almost, because of his own personal PTSD -- Post Traumatic Stress Disorder from this incident -- how he almost lost his wife and child.

And Kelli.  A brave woman.  She had to be.  She fell in love with a trooper who gave her a traffic

5353

citation.  She fell in love with a trooper and found a life partner and a lover and a friend who was violently torn from her.  She told of the two troopers coming to the porch and her opening the door and seeing the tears.  And her remembering what Rocky had said.  If you ever have two troopers on the porch and I'm not one of them I'm not coming back.

She told about their love, their life, the birth of their children.  She described Allison -- trying to tell Allison, at six and a half, that Daddy's in heaven.  He's not -- he got killed.  And Allison's question, when's he coming back.  You heard Allison's award winning essay written last year, this time.  I'm thankful for the six and a half years of love I had with my daddy.  It was enough to fill a lifetime.  And I wouldn't ever want anyone else.  Two year old Mackey -- telling him.  When he was four he said, Mommy, I want to die.  I want to go to heaven and be angel with Daddy because he's lonesome.  You'll have Allie.  I want to be with my Daddy.

You got a brief glimpse of a life that's beyond measure.  A life too full and cut down too soon.  A life that was shamelessly -- shamefully ended.  Senselessly ended by this man over $25.  Look at Government Exhibit 203.  203 is the affidavit of the charges.  Get the

5354

middle -- right -- the type line.  It tells you, that area right there.  Bought a quarter gram of meth for $25.  That's the price this man put on the head of Rocky Eales.  Because he was unwilling to go to court and face the charges.  $25 is the value this man put on that life that you heard about.  The victim impact is established beyond a reasonable doubt.

Once these factors are established -- and I submit they all are beyond a reasonable doubt -- consider the mitigating factors.  One, accepted responsibility.  How?  The only evidence that he accepted responsibility is he didn't appeal his conviction.  Twenty years for manslaughter.  And you heard the evidence.  Manslaughter carries up to life.  If he'd have appealed, he could have been retried and faced a life sentence.  He made a calculated choice.  I'd rather take the 20 than risk life again.  Ain't no mitigating factor there.  Two, convicted and punished.  He got 20 years for this act, for killing Rocky Eales.  And you heard Jimmy Wilson from OSP, 20 years is not 20 years.  He gets 52 days for every month he's down there.  Basically, two for one.  He's already served six years.  He's only got 14 left.  He doesn't have another seven years for Rocky.  He is up for parole next May for killing Rocky.  Put them all together.  Give the extra ten years for killing Rocky and for wounding

5355

Buddy Hamilton. Is that 30 years, which is going to be a whole lot less than that in the Oklahoma prison system, an appropriate punishment? And does that show he accepted responsibility? I submit not. No felony convictions. Why not? Because he jumped bond. He didn't show up for trial. There was a bench warrant.

He is -- number four. He is a father. And do you know what's missing? There's no adjective. He's not described as a loving father, a carrying father, a nurturing father, a good father. He is a father. That, folks, describes nothing more than a biological process. He is also breeds. But there's more to being a father than just making a baby. And that's the only thing that's offered. And I submit that's not a mitigating factor.

A loved son and stepson. That is their feelings for Kenneth Barrett. Notice what's missing? Any feelings they receive back. His father says I hadn't spoken to him for two years prior to this incident. His step mom said I didn't even know him before this. But I started going to jail. If he gets a life sentence he's going to be some place off who knows where. And how strong do you think that relationship is?

His mother? She fights with him and threat -- and they have threats. And she cared about him so much

5356

that she thought he was hyper as opposed to being hyped up. Living right next door she didn't even know of the drug activity. How close can that be? Good neighbor, good friend? The only testimony there is he fixed cars cheap. Death would impact his child, his friends and his family. And there was no testimony of impact upon his child. No testimony of what impact his death would have upon his friends. And the only impact coming from his family was his stepmother who said that I could no longer have my relationship with him in jail. I'm sorry. I submit that that mitigating factor does not exist. Or to the extent it does, it comes nowhere near the aggravating factors in this case.

He expressed remorse. How? When? Well, he told his mom he wished it could have been different. Yeah, like not get caught. Yeah, like kill more of the bastards like I intended to. Where's the remorse? He told his dad that, well, I'm sorry that two children had lost their daddy. What are you going to say to your dad? Damn, Dad, I wanted to kill more than that. I didn't do a good enough job. Come on.

Nine, no danger because he's in prison. And we've already dealt with that. Ten, other factors in his background which mitigate against the death penalty. What factors? What factors? One, he didn't get his

5357

haircut so he dropped out of school?  Two, he voluntarily chose to use and sell and make methamphetamine?  Three, he beat his wife.  Four, on the night in question he left his son at the residence knowing the cops were going to come back and he was going to have a shootout?  What factors weigh against the death penalty that are not mentioned?  And I submit when you look at all of them there are no mitigating factors which exist or to the extent they do, they pale in significance to the aggravating factors the Government has established beyond a reasonable doubt in this case.  When you reach that last step, whatever mitigating factors you have to compare to the aggravating factors that the Government has proven all of them beyond a reasonable doubt, when you make that comparison, compare the lives involved. You are going to sit in judgment to see if the aggravating factors substantially outweigh the mitigating factors.  And I submit they do.  You will sit as judges.

And when you compare the lives -- and that should be in evidence.  Compare the life and the loss of Rocky Eales with the life of Kenneth Barrett.  But I think there's another comparison.  Actually, the word is contrast because comparison is how there are alike. Contrast is how they are different.  And I submit there is another contrast that is stark in this case.  That is

5358

Kenneth Barrett with his brother, the defense witness Steven Barrett. Kenneth Barrett dropped out of school because he didn't want to get a haircut. Steven Barrett chose to remain in school and graduated and go to college and get a masters. Kenneth Barrett chose drugs. Steven Barrett chose football and an education. Kenneth Barrett's life revolved around cooking, making and using dope. Steven Barrett's life revolved around educating and nurturing our children. Same house, same circumstances, same parents, same conditions. The difference is choices made. Choices made by Steven Barrett versus choices made by Kenneth Eugene Barrett. And you saw where Steve Barrett's choices have taken him. And you have seen in this trial the choices Kenneth Barrett continually made through his lifetime and where it has taken him.

When you look at the mitigating factors they either fail -- they fail totally as far as the weighing process against the aggravating factors. The death penalty is an appropriate, correct and just punishment for this crime and it should be your verdict. Two months of trial is a long, long time. But it's nothing in comparison to the six years for which Rocky Eales has been awaiting justice. Today is the day and the wait should end. Thank you.

5359

THE COURT:  For the defense.

MR. HILFIGER:  Your Honor, should we take a break at this time?

THE COURT:  Approach.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  I was thinking about going to 12:30.  I guess we got about another hour -- got a good hour and a half.  We've been going about two hours.  I don't know.  If you're not ready.

MR. HILFIGER:  No.  I'm ready.  I just -- I thought you said that we were going to take --

(Interrupted)

THE COURT:  You're going to take about 30 minutes or an hour?

MR. HILFIGER:  No.  I was going to go longer than that though.

THE COURT:  Well, how much time do you plan now?

MR. HILFIGER:  About 45-50 minutes, something like that.

THE COURT:  Then we better take a break.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, we'll take --

5360

try to hold this to a 15 minute recess.  Remember my admonition not to discuss this matter among yourselves.  It's not yet been submitted to you.  Remember all my previous admonitions about discussing the matter.  I'll ask that everyone in the courtroom please remain seated as the jury leaves the courtroom.

(Whereupon, a brief recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the government is present, Defendant is present with counsel.  Counsel for the Defendant may now address the jury.

MR. HILFIGER:  Thank you, Your Honor.

May it please the Court.  Ladies and gentlemen of the jury, you know, as Mr. Littlefield said, I think everybody here agrees this has been an extremely long trial.  I have been in practice for about 33 years now and this is longest continuous trial that I've ever been involved with.  It's -- been in some others that go a little bit and stop, go a little bit and stop.  But this is the longest continuous trial and I sure appreciate the attention that you've given, the diligence that you've -- just coming here every day, which is a big deal.  So I do appreciate that.  Along with the prosecution and defense, we think you've done a very good job on being here and

5361

paying attention.

Without going into a lot of detail on the first stage evidence, there are some things I'd like to point out because there's some interpretations that -- of evidence that the prosecution and that we have a real strong disagreement on. And I'm not going to go back through all of them. But I'm just doing this for you to consider in your sentencing deliberations rather than accepting what the prosecution's version is just right off the top.

Both the prosecutors in this case have stated in either openings or closings or, you know, some point in time that Kenny Barrett stood out on the porch looking east and firing easterly into the line of cars. And they've contended that. And yet, there's no evidence that any one person saw anybody on that porch firing in an easterly direction. But they've contended this all the way down and they've said it all the way down to support Buddy Hamilton when he says that he was out there at the top of the yellow flowers when he first got hit.

You'll recall that not one of the troopers in the entry vehicles saw anybody on the porch or even saw anybody at all until after Hamilton's vehicle was up against the porch. And then Hamilton saw somebody, Ricky Manion saw somebody. But until that time nobody saw

anybody on the porch. The troopers in the yard that were around Toby Barrett, they didn't see anybody on the porch at all either. The only testimony that came close to seeing a person on the porch was from the two troopers in Gelene Dotson's yard. And I went back and looked and reviewed my notes for that testimony. You know, I'm not telling you what they said. I'm telling you what my notes reveal. And I want you to think about it too. Because it's your memories that count.

Mr. Pettingill says he saw a muzzle flash from the door, that fire was coming out, that brass was being ejected and smoke and silhouette of a person and the silhouette was partially in or out, and the silhouette was facing out shooting towards the south. And this was only recalled, if you'll remember, three years after the incident. And I'll remind you it was after the second trial and after McBride, the other person, had already made a statement two years before about seeing a silhouette.

And then we have McBride who says he saw firing as he was looking at the house that was left to right as he was looking at this house, and that would be in a southerly direction. He saw a full silhouette on the porch the first time and the second time he saw more muzzle but no full silhouette, just head and arms. All

5363

the weapon was outside and firing in a southerly direction.  And yet, the prosecution contends that there was a person out there shooting on the -- out there in an easterly direction towards that line.  But there's no evidence to that.  Pettingill even went further and described seeing the brass ejecting in an arc because I had him -- I had him come up and go around and say now how was this -- where did you see the brass coming out and where was it going and he stood out there and he said it was going this way, going in a westerly direction.  In order to go in a westerly direction the gun has to be facing south.  There was no evidence found of any brass -- brass found immediately south of the house which would indicate a person firing easterly.  And you -- I want you to consider this evidence when considering the statutory aggravating factor of creating a brave risk -- a grave risk of death to persons other than Hamilton and Eales.  The shots that were fired were directed at and hit the Bronco which Hamilton and Eales were in.  And no other shots were fired or endangered other people because Hamilton's vehicle was out southerly -- to the southeast corner of that house when the shots were fired.

Now, another -- of course, the prosecution uses whatever evidence they want and takes it for that particular purpose.  At one point they're saying he's got

5364

to be out there firing easterly and because he is, he's firing down that line.  And because he's firing down that line he creates a grave risk of death to other people other than Hamilton and Eales.  That's one purpose they want to use it.  But then for another aggravator they say he attempted to kill more than one person and virtually all the shots were shot at the car and shot at Hamilton and at Eales when it was up against the porch.  But you can't have both ways.  Because virtually everybody that testified as to hearing shots said that they were -- once they started it was just bam bam bam bam bam bam and you can't have the shots starting out to the yellow flowers and going bam bam bam bam bam all the way up to the porch.  There's not enough time.  There's too much -- too much space there.  Nobody said they shot a couple times and then waited till they come to the porch.  But the prosecution says, well, for this purpose all the shots were right here at the front of the porch.  But for this purpose the guy was facing east down the porch.  You can't have it both ways, ladies and gentlemen.

One of the things -- another thing that the evidence and I'm going to move on is, you know, they say all the shots at Rocky and Eales were within 15 feet. One of the contentions that I have in this is that the shots were -- occurred at a different time than what they

5365

say. John Hamilton said he pulls the pin out of the flash bang and drops the pin in the car. Now, if you'll recall from the evidence of the picture that was drawn by Vicki Jones, that pin was found, but which would be on the right side -- outside of the car. And the only way that pin could be out there, if John Hamilton is telling the truth and says he dropped it in the car, is if he dropped it on Rocky Eales and as Rocky Eales exited that pin came out. Which means that not only do you have Rocky Eales exiting, but you have John Hamilton throwing a flash bang at the same time. There's no doubt that al those shots occurred within that 15 feet. But those were reactionary shots. They were not premeditated shots. They were shots reacting to somebody unknown getting out of the car, somebody throwing something out of the car while it was at the porch.

Now, you've also found by your verdicts and your special interrogatories that this was done -- this action was done with malice aforethought. We disagree that there was premeditation. However, under the law we agree that there was -- that there is malice aforethought -- there could be malice aforethought based on your verdict and everything. But not only was there not premeditation under the law, but there was also much less substantial planning and premeditation as alleged in the

5366

statutory aggravators saying special -- substantial premeditation.

The shooting started as a reaction to an unidentified Bronco coming onto the property without warning and the continuation of the shots did not amount to any conscious thought or premeditation or action, but those actions could be seen as done with callous and wanton disregard.  We can see that.  Callous and wanton disregard for human life, but not premeditation.  Your finding on substantial planning and premeditation should be no, with a similar finding on the special interrogatories for no premeditation.

I will back up and use a little bit of the analogy that has been used a number of times in this case by the Government, because I think it really is applicable here.  The Government -- prosecution has given you an analogy of a parent punishing his child, his or her child.  First you determine what the child did, and then you fit the punishment to what happened.  Well, let's take the analogy a step further.  Let's say one parent has already punished that child for a certain incident.  And then another parent comes along and says, hey, I don't agree with that punishment.  Is it then fair for the second parent to re-punish that child for the very same incident or should that parent lessen the

5367

punishment?  Even if he doesn't agree with the punishment that was given, should he lessen it because punishment has already been inflicted and received for the very same act?

We contend that a second punishment is basically unfair unless that punishment takes into consideration the first punishment and tempers the second punishment to fit with the first punishment.  And how is that done?  Kenneth Barrett has been punished for causing the death of Rocky Eales by receiving a sentence of 20 years in prison for manslaughter, first degree.  Would you show Defendant's Exhibit Number 235, please?  235.  It' one of the long ones.  This is the judgment and sentence.  And you can see for manslaughter in the first degree he's been sentenced to a term of 20 years imprisonment.  That's punishment for the killing of Rocky David Eales.

Now, the federal government's coming to you and they're saying we want additional punishment for violation of our law, of our federal laws.  Well, one of the things that their asking for is as to Count Three is they're saying we want punishment for the killing of a law enforcement officer.  Well, Kenny Barrett's already being punished for the killing of David Eales because of manslaughter in first degree.  But now -- would you put

5368

on Defendant's 241? I'm sorry. I got the wrong -- 243. But now you see -- and as part of that punishment, the DOC is punishing Kenneth Barrett because they're making a special case of him because they're putting him in administrative special management inmate notice saying that certain things can't happen to him unless the top people in DOC make notice of it or are notified of it. And why are they doing it? Because of the highly publicized death of an Oklahoma Highway Patrol officer.

Look at -- this is 244. Okay. Look at 244. 244 again is showing -- look at the top of it, please. This is a cell assessment form and based on this cell assessment form, again, he is being given administrative -- considered as an administrative separatee based on the killing of a Highway Patrol officer. So DOC is already punishing him for that. And look at 246. Because he is in prison they come in and they figure out an assessment of where he should go. And the assessment on manslaughter for a person who does not have a previous conviction, that assessment would come up and show that he would have a -- six points. In six points he will be -- because of his age, he would be at five points and that would put him in a minimum security prison. But that's overridden. And why is it overridden? Because -- go to the second. See, he's got six points right there.

5369

Go to the second page.  Is there another -- one more page to it?  It's at the bottom of that page.  It's overridden because -- here it is right here.  The custody level -- not the minimum that he would be entitled to, if -- on a regular manslaughter, this is being overridden because the killing involved a highway patrolman.  And so, he goes to the maximum security prison.  So punishment for Count Three has already been inflicted on him because of the killing of a law enforcement officer.

Based on his criminal history, his jail record, his escape risk and his state conviction, he would normally be assessed to a minimum security prison, but because of this case, high profile and the fact that it is Rocky David Eales, a Highway Patrol trooper that was killed, all that is overridden and he's serving his time in a maximum prison facility at McAlester.  Not only that, but he's serving it as an administrative separatee in the Oklahoma State Penitentiary.  In a 23-hour a day lock down with no contact with others.  He's being punished for the fact that the person that was killed was a highway patrolman.

Now, let's look at Count One.  Kenneth Barrett has already been punished for the death, because you've seen the judgment and sentence.  He's received 20 years for the death -- of killing Rocky David Eales.  Should it

5370

be fair that you should add additional punishment, saying okay, let's punish you one more time for the same death? Or should your punishment deal with what this case is dealing with, that was not dealt with in the state court. And that's drugs, that's the federal charge on Count One. Count One, if you'll look, it's use of a firearm during a drug felony, a drug offense, which caused the death. They've already determined the cause of death in Sallisaw.  So you should focus on use of a firearm during the drug offense for Count One.

As to Count Two, Kenny Barrett has already been punished for causing the death during a crime of violence.  And why is that?  Look at 235 again.  That's the long one.  He's already been sentenced, found guilty of assault and battery with a dangerous weapon.  And he's received a sentence of ten years and that sentence is ten years consecutive.  So as far as Count Two, the crime of violence, he's already been assessed a ten year sentence for the assault and battery to Buddy Hamilton.  That's the crime of violence and that's the sentence that that sentence is consecutive to the death of Rocky Eales.  So that sentence hadn't even started yet and it will not start until the completion of Count One.

So in considering your punishment for Counts One and Two, do not assess additional punishment for the

5371

death of Rocky Eales.  That punishment has been invoked and Kenneth Barrett has accepted that.  He hasn't appealed.  He's accepted that sentence.  The essence of those crimes, along with the portion -- unpunished portion of those crimes is the use of a firearm during either the crime of violence or the drug offense.  And we acknowledge that that punishment, the use of a firearm during a drug offense or during the crime of violence, has not been inflicted for the violation of those crimes. And as was stated and sung in an opera Machado, my object all sublime, I shall achieve in time, to make the punishment fit the crime.  Therefore, to make this second punishment for the same incident and the acts that Kenneth Barrett has previously been convicted of and punished and sentenced, you should sentence Kenneth Barrett to a lesser term of years.

Now, let's talk about fairness.  In fairness both to the Government and in fairness to Kenneth Barrett, is it fair for you as a second jury to sentence again, and more harshly like they're asking you to, than another jury has done for virtually the same act?  The death of Kenneth Eales.  Just because another government has come up with a violation of its laws, most people would say that's double jeopardy.  But as Instruction 18 will show you, that's not double jeopardy.  It's not.

5372

But the real question that comes to you, ladies and gentlemen, is, is it fair?  You know, the Government has the authority to do whatever it wants to do, even to kill people.  You have seen that the Government can come on another person's property, without even showing authority to come on that property, and arrest and search its citizens.

Now the prosecution has stated many times in this trial that, oh, yeah, the Highway Patrol had court authority to be there, and they didn't have to announce their authority because they had a warrant issued by the court to allow them to do a no knock at any time they wanted to.

But you've also heard even from the troopers and from other law enforcement people is, yeah, while we do have that authority and we don't have the obligation to announce law enforcement when entering the property, be it a house or someone else's land, they should do it and announce their authority and announce they're a Highway Patrol to let the subject that they're looking for know that they are law enforcement.  The Government has the authority to do what it wants to do, whatever it wants.  But you need to make sure that what they do is fair.  And let's go back to that analogy.  You wouldn't tolerate a second parent punishing his child for the same

5373

act that the first parent has already punished that child for, without considering that punishment has already be meted out.  And that's what we would want you to do. Consider that punishment and what it was for.

So why should you allow a second government to do the same thing just because it's not satisfied with the punishment previously received?  And that's the only reason we're here.  Or because an aggrieved person or an organization such as Oklahoma Highway Patrol continues to want more punishment, or what that victim or that organization considers as the only just punishment.  And they consider the death penalty in this case is the only just punishment.  It just isn't fair.

But the federal government may -- can say or contend that shouldn't we be allowed to enforce our own laws and seek our own punishments independently of the state government?  Is that fair to the federal government to be locked into punishments based on what the state government has already done?  Well, let's use the same analogy as the two parents.  Is it fair for the child or for the citizens of those governments to be punished twice and more harshly for the same act?  We contend that it is not.  But the federal government wants to enforce its laws and it should be allowed to.  But is it fair for the federal government to lay and wait for five years, in

5374

excess of five years, after September 24th, 1999 to November of 2004 before it decides to enforce its laws? And then it only comes to this decision to enforce its own laws after the state government has received a conviction and invoked punishment, but that punishment doesn't satisfy the victims, doesn't satisfy the Highway Patrol or it doesn't satisfy the federal prosecutors.

It is lawful, I'll grant you that. The question is, is it fair? The federal government has been on this case since the very beginning. You heard the testimony, the federal -- the Drug Enforcement Agency -- Administration, which is the arm of the federal government were out -- they were out there on September 24th, 1999 doing their investigation. They were there. They knew what was going on. They could have filed their charges, but they didn't. They waited. They laid in wait. They did their drug analysis shortly thereafter. The federal government, they waited. They waited for more than five years for the state government to complete its case before they even brought its charges. And now it's going for its pound of flesh because they're not happy with the state's request, with the state's results.

Now, you know, again I get back to is it legal? Yeah. But the question is, is it fair? The federal

5375

government cannot say in good faith that this is an independent federal prosecution, that, oh, we're doing this -- all -- this is all by ourselves. We don't care what the state did. Because who is here? Who is here at the Government's table this whole time? Ben Rosser. And who does Ben Rosser represent? The Oklahoma State Bureau of Investigation. The state agency. He's the case agent from the state government and he's here. The same person, Ben Rosser, that sat at the government's table in Sequoyah County during the trials there in state court.

Virtually all of the people that were dealing with the death of Rocky Eales -- not the drug stuff I'm talking about, I'm talking about the death of Rocky Eales -- were state investigators. Vicki Lyons, April Marcangeli -- I never can pronounce her name. But all these people were state investigators and they were here. The Highway Patrol itself, they were here. This is not an independent federal prosecution. This is a concerted effort by Sequoyah County government, by state government and by the federal government to join in and to continue to prosecute Kenneth Barrett for the sole reason that the state, the victim or more likely the Highway Patrol didn't get the result they wanted in state court. As a citizen, do you think that's fair? How many times?

You were reminded by the prosecution about

5376

certain inscriptions up here. And I sort of want to look at one right over here. It is impossible to be just if one is not generous. As a juror, in order to be just in this case we're asking that you be generous. You have given the federal government the convictions they want. Now be generous and give Kenneth Barrett the proper sentence to a term of years on each count. Not life imprisonment, not the death penalty, but a term of years. The previous conviction and punishment is a mitigator and that one mitigator can outweigh all the statutory aggravators, and this one does.

Now, let me talk a little bit about future dangerousness and scare tactics. This area deals with a little bit of the evidence and the testimony from the past and into the future. As to the past, the Government contends that there are previous acts of violence that show that Kenneth Barrett will be a danger even in a prison setting. This is not so, but look at the evidence of it. The earliest evidence is really biased. And we look -- for that we look to Kenneth Barrett's nemesis, Johnny Philpot. He arrested a 17 year old. How many times have you ever heard of a 17 year old being arrested for a traffic violation? He was taking him back to his cell and there was a scuffle that occurred. Now, there's nothing been shown in that whole scuffle that showed that

Kenneth Barrett did any violent act toward Philpot.  But the implication sure was there when the prosecution asked Philpot if he received any injuries after the arrest of Kenneth Barrett as a juvenile, while he was taking him back to his cell.  Sheriff Philpot said, yeah, I received broken bones in my hands -- in my hand, and he left it at that.  What's that implication to you?  Somehow Kenneth Barrett did something to Sheriff Philpot.  But it was -- it was left up to us to come up and say how did you get those broken bones?  And the Policeman Philpot, he was a police officer at the time, had to admit, well, I received those broken bones in my hand when I hit Kenneth Barrett in the face.  Now, probably in the context that the Government wants to make this, that that was a violent act on the part of Kenneth Barrett because he stuck his face in front of the fist of the policeman.  But ladies and gentlemen, who did commit that violent act?  That sure wasn't Kenneth Barrett.

Now let's talk about the domestic violence and the marital relation with Abby.  We acknowledge, just like Abby did, that both of them fought.  And Kenneth probably more than her.  She admits she's mouthy.  She admits Kenneth's mouthy.  I'll admit Kenneth's mouthy.  They both hit each other.  He probably hit her more and there were domestic abuse actions filed.  But I've heard

5378

the characterization of lengthy history. That's a label they put onto -- a lengthy history of domestic abuse. But let's look at that lengthy history. What it was -- there are instances of actions filed in 1984 and 1986 when they were -- marriage -- young marriage, four to five years old, young couple, he was 23 or 24 and she was 20 to 21. And the marriage was rocky and divorce was considered and finally it ended up in his commitment to Eastern State for drug abuse and other treatment. And then they got back together. And there wasn't -- there wasn't another act of violence, you know, another charge or anything like that from that time until 1995.

In one action, when again she was ready to and later did file for divorce. And after the divorce there was no more. Now, ladies and gentlemen, I agree, that, you know, that there were problems in that marriage. That marriage was rocky. It happens all the time. That doesn't mean that a person has this tremendous dangerousness.

You know, I've dealt in marital relationships as a private attorney. I've seen it turn too many times to problems in the marriage when it gets rocky. That doesn't mean a person's a bad person. That doesn't mean that they have this tremendous dangerousness toward violence or anything like that. You've got to look at it

in the context of the marital relationship. That's a special relationship where there is so much tension, there is so much -- there's so much intenseness in the relationship, especially when it's breaking up. Don't rely just on that relationship and those instances to determine if there's future dangerousness.

Practically all of the other accusations of so called violence deal with threats, and I'll agree with that. Admittedly, Kenneth Barrett is mouthy. He's made statements that many consider as threats. But what violence other than the September 24th, 1999 incident have you seen from those threats? And you really haven't seen anything. Now he does put on a bold face and he threatens, but he doesn't carry out those threats.

And I'll guarantee you this: As much money, time, effort and investigation that the federal government has put into this thing, if there were actions of actual violence you would see them here today. Anybody that's going to go back and pick up domestic abuse 20 years ago, if they can find something else they would have brought it here and there's not any. If there was true violence that -- the Government would have found it and you'd be aware of it. But it doesn't exist. And they want to scare you with -- you know, with this idea that, well, because of this domestic violence that he's

5380

going to be violent in prison and yet there's no evidence for that.

Let's discuss the future.  As Instruction Number 13 says, consideration of future dangerousness must be confined solely to a prison setting.  You can only consider whether he will pose -- Kenneth Barrett will pose a threat to the safety of other inmates or other prison staff while in prison.  Any sentence he receives here doesn't -- and it's Instruction 13 says this:  Any sentence -- any sentence he receives here, death, life imprisonment or even a term of years, in addition to the sentences he has already received means that he will probably, more probably than not, spend the remainder of his natural life in prison.  That's instruction -- you look at Instruction 13.  More probably than not -- no matter what you do here, he's going to spend the rest of his life in prison.

There's not the real probabilities, so don't listen to the scare tactics, but there's not the real probability that Kenneth Barrett will be released, at least not until he's an old, old man, if at all.  We can only live day by day.  We can plan for the future.  We can't guaranty what the future will bring.  But questions about what can happen on credits, jail time, administrative separatee status or parole eligibility are

5381

merely scare tactics to make you think that Kenneth Barrett will be released any time. And that's not true. Not only that, but you've heard scare tactics as to what can happen, what can possibly happen with Kenneth Barrett in the future, because he's made threats in jail. Yet the jailers for the most part really say he's mouthy, but he's not physical and that's true. There's not sufficient evidence to show that the statutory aggravator of future dangerousness is proven. And because it is not true, you should so find for each count.

In conversations I had the other day with Ernie Barrett, the father of Kenneth Barrett, he expressed to me his concern that the death of Rocky Eales devastated one family and that's true. Devastated his friends and devastated his co-workers. But he also said to me -- Ernie Barrett said, you know, imprisonment is punishment for Kenneth Barrett. The death penalty is punishment for the entire family.

You know, at the end, the prosecutor said that the Eales family has waited six years for this and I go back to what I said right at the first. Whose fault is that? If they felt justice -- justice according to the federal prosecutors, which they translate as being the death penalty could only occur here, then why did they wait to prosecute this case for five years? This was a

calculated premeditated concerted effort and decision on the part of the federal government to let the state government do this and then follow up, to go again if the state government didn't get what they wanted. The state government didn't get that death penalty and so the federal government took it over and said we're going to do it now.

It is impossible to be just if one is not generous. Be just and generous, ladies and gentlemen. Sentence Kenneth Barrett to a term of imprisonment for the federal portion of the crimes that he has not already been punished for. Thank you. Bret Smith will now give you some further remarks.

MR. SMITH: May it please the Court, Mr. Barrett, Mr. Hilfiger, I think you all know and I've expressed it before but I'm going to here again briefly, how much we do appreciate your attention and devotion that you've had to this case. And I can tell by the expressions that you've been making that this is weighing on your mind heavily now, like it should. And that is what it should be doing.

I have to start a little bit with what Mr. Hilfiger reiterated and that is about this fundamental fairness idea because, ladies and gentlemen, this does strike me as being fundamentally unfair as to what has

5383

gone on in this courtroom.

Now, I will assure you Judge Payne would not allow anything to happen in here that was illegal. But what has happened in here over the past two months has not been fair, it has not been proper and I will assure you that it offends also sense of justice that you carried with you ever since you were in a civics class. You've always learned that there will not be twice you'll be subject to jeopardy for the same offense. And that's exactly what the Government is asking you to do here today. They're asking you to be an instrument of death for the Government. That, ladies and gentlemen, is fundamentally unfair. And the way that they're -- or trying to achieve that goal is to bring in what they've call the friends and associates of Kenny Barrett. And they bring them in all under the similar idea that, yeah, we're out there doing dope. Kenny knew he had a warrant and he was going to kill the cops whenever they come out to get me.

Every one of those people have something to gain from the federal government. Everyone of those people didn't appear until six years after this event. We brought that up in the first stage and I want you to revisit again in your mind why did they come up here? Were they friends of Kenny Barrett? Now I will tell you

5384

something that you can gather from some of those and you think about Karen Real, the gal who was cooking dope on the other side of Lake Tenkiller. Whenever she would get put out of her house, who would she turn to that would put her up and give her a place to lay her head? Kenny Barrett.

Whenever Randy Weaver came over to Kenny Barrett's to talk about some vehicles, to talk about car parts and somebody's at Kenny Barrett's house that was going to jump on him and do something to him and Kenny Barrett ran that fellow off. That's the type of person that Kenny Barrett is.

Now, you had Cindy Crawford come in here. She admitted she lied to you the first time around and then she wanted to come in and bring up that incident about the shotgun up against the leg because she wouldn't perform sex. Now, didn't she say there was five or six people inside of Kenny's house? A 20 by 20 cabin, but yet he's pressuring her to have sex inside of there? She didn't lie to you once, ladies and gentlemen, she lied to you twice.

But yet, they want to scare you with his threats, with his acts of violence. If Kenny Barrett would have spit on the sidewalk you would have heard about it. Everything that he has ever done in his life,

5385

this government was out there trying to uncover and what is the most that they could come up with? He engaged in domestic violence as a young married couple. It's not right. A man should never put his hands on a woman. A woman should never put her hands on a man. But we always expect the man to have a little more restraint. It's not right that he ever struck Abby Barrett. She's a nice woman, a pretty woman. And I'm sure she stuck by him in times when a lot of us would have said, you know, it's probably not worth it, but she did. They had a child together and they tried to make the work. But that is the instance of violence that they want to bring in to you and say this is a dangerous guy over here. That's a bunch of hog wash.

Protective order violations. You all aren't expected nor required to check in your common sense at the door. You know people that have been in divorces. You know people that have brought protective orders. You know people who have been accused of protective order violations. Put that evidence in the context in which it should be.

Now, they want to talk about the road block. He comes speeding through a road block. Well, that's really not what happened. The evidence was Kenny approaches this area where there is a road block at night

5386

with the officers' vehicles off the road with no lights on, they have flashlights. And that he slows down and he's moving about five miles an hour. And as he's -- the officer is walking to his door, that he accelerates and goes on. Now, they said, well, two deputies had to jump out of the way. I don't doubt that there were deputies out there. But, ladies and gentlemen, why was there not any felonies charged if somebody was in fear that Kenny Barrett was going to injure them with his vehicle? Why was there not? Because the prosecutor has discretion and they look at that stuff and if they think it has merit they file it. But yet, you hear about it because that is some sort of violence, a violent act that Kenny Barrett committed.

Or this sign -- this is some sort of premeditation and substantial planning that Kenny Barrett has engaged in, so alleges the Government, because he put this sign on his gate. And they want you to believe that by locking his gate that he is trying to direct traffic through the east edge of his drive. The only person you have heard, other than the troopers that has testified that they came through that drive was a woman that says she was in a Mazda or a Mitsubishi. The other fellow's with her, he described the vehicle as different and said that never happened. A little vehicle going through a

5387

two and a half foot ditch, one that disabled a trooper's vehicle as they came through the ditch, that's the only person that you heard during this trial that says they came through the ditch. But yet, he's directing traffic through there.

This sign wasn't over there. This sign was at his front gate. That's a stupid sign. And the reason that's a stupid sign is because whenever something like this happens and they want to prosecute him, that just gives the Government something to argue about. But you know what? That is a trumped up no trespassing sign, stay off my property, you're not welcome. There's nothing improper about that. It's not very smart, but there's nothing improper about it. We don't appreciate the wording that's written on there. It's just not very smart. There's nothing illegal about it.

Substantial planning and design. Because we've got some clips taped together. He says this gun can only be used for one thing. They're only bought for one thing, killing a person. They didn't bring the individual in here to tell you that the reason I'm buying this gun is because I want to kill somebody. That's not what was brought before you. But they want to talk about these clips because we got them taped together. What over purpose is there for killing? You heard about the

bottoms down there to the east of the Barrett property. People walk up and down creeks shooting. Troopers had mechanical clips for their magazines to attach two of them together, so that you can carry more rounds with you. But yet, Kenny Barrett is sinister because he has his duct taped together. That's the sort of stuff that when you look at it, there's a whole lot of fluff here, not a whole lot of substance. And that's what Mr. Hilfiger was talking to you about. Don't you think that if there were fights, if there was guns that were being shot at people, that if this guy was so bad, that you would have heard a little bit more than him and his wife got into some slapping incidents? And that is all that's before you. But yet, because of that they want you all to take this case and sentence this man to death. They want you to be their instrument of death.

Now, I want to talk about the jailers a little bit. Rick Fargo, and you know it's hard to not make light of a baked potato incident. But ladies and gentlemen, throwing a baked potato from a fellow that's locked up in a cell with five or six people that is a dump, when you are facing prosecution for the death penalty, and you don't let those people out, you don't give them any programs, there's nothing for them to do but to sit in there and go stir crazy? Would you expect

5389

that you might have heard a little bit more than he threw a baked potato? I mean, is that not somewhat insignificant whenever we're talking about I want you to be an instrument of death? And what I want to talk about whenever I say this person is violent, he threw a baked potato?

Michael Hendricks, he almost grabbed me. Well, my gosh, almost grabbed you. Does that show violence? He didn't think it was significant enough to write a report. Or if he did, the sheriff's office hadn't found it yet. Almost grabbed me. Then they want to talk about Daniel Fears. Nobody saw Kenny Barrett (banging noise) but when Kenny Barrett -- whenever the jailer came around there Kenny Barrett said I did it. You don't know if he just took up for somebody. There was no -- nothing said that Daniel Fears received any medical attention. Nothing said he's even hurt. They want you to believe that. In this PC where everybody in there was accused of murder. (Two banging noises) Death penalty, that's what they want you to do.

Ladies and gentlemen, this case is death penalty eligible. And whenever I sit here and I try to weigh what is an appropriate punishment, what punishment fits the crime, what punishment -- if I'm on that side of the rail would I be thinking is significant, what conduct

5390

is significant enough to warrant the ultimate sanction? One that if I'm a juror and I were called on by the Government to be their instrument of death, that I can live with myself for the rest of my life knowing that I made the right decision, what sort of cases require that sanction? I don't know. Blowing up a building and killing 160 people, maybe. A terrorist act? I mean, that seems like something that seems pretty outrageous, seems like that might fit the crime if you have in your mind that you can impose the death penalty under some circumstances. How about like those guys that blew up the trains in London? Terrorists, bombers. You know, think about those. Those were terrible nasty people. Those were people that there is no purpose for them in this life.

You think about somebody like Daniel Fears, multiple, indiscriminate killings. Now, you all don't know about the facts of that case and I'm not going to tell you about them. We talked about it with the jailer a little bit, but you know that he killed two women that had no relation to anything, just shot Jimmy Nung in the parking lot of the dealership as he's showing a woman a car that gets killed. Is that a death penalty case? I don't know. I guess you'd have to be on that jury to know.

5391

How about crimes committed against children? Well, that seems like most of the jurors, whenever they were questioned early on, those type of crimes are those that strike that passion.  You know, that fellow down in Florida that abducts a child and kills her.  Those are horrible type crimes.  What about two guys that are sitting around carrying on and pretty soon it gets into a heated argument.  One of them says, well, I'm going to kill you.  They get in a fight and one of them is dead. Is that a death penalty crime?  I don't know.  What about two inmates who get into a disturbance and one of them dies?  Is that inmate that dies, is his life worth less than somebody else's?  And we say, well, it's two inmates and they got -- one got what he deserved?  How about a love quarrel?  Woman comes home, finds her husband in bed with a neighbor, shoots him.  Is that a death penalty case?

Those are the sort the things that you're called upon to weigh in this case.  That's whenever we say fundamental fairness.  Is this the type of case that should cause you to wrestle your conscience for the rest of your life because somebody is not happy with what another jury did?  Because they didn't get what they thought was due and just punishment?  And so, let's do it again.  Let's do it harder.  Let's do it more.  Let's

5392

invoke a little more passion.  That's what you're being asked to do.  So don't ignore what you are being asked to do in a circumstance that it's my perception fundamentally unfair.

In your instructions, the Judge has told you that the status of the victim is not to be considered.  Now, I'm going to be the first to tell you Rocky Eales was a quality guy and I never knew him.  But I can tell from the things that the family has said about him this was a good guy.  There's no doubt about that.  But you know that doesn't have anything to do with what you're called upon to decide here now.  You're not to be persuaded by sympathy.  You're not to be persuade by public opinion.  Your role is to decide this case as to the appropriate punishment Mr. Barrett should get, the appropriate additional punishment Mr. Barrett should get.

Now, ladies and gentlemen, like we said before, lawyers are trained somewhat in picking up what we call nonverbal clues.  Whenever you make an expression, if we see it, then we're trying to interpret it.  And we see those things and we're not always right when we read them.  But you know whenever you all came back from your first stage deliberation, there were some of you that were visibly upset.  So here we are again.  You're fixing to go into a second stage of deliberation.  Whenever you

5393

spend ten hours in deliberation on a first stage murder case and you come back in visibly upset, tells me somebody compromised.  Somebody wavered.  Somebody backed off of their position and you rendered a conviction.  And I don't criticize that conviction.  I respect the jury's work.

But, ladies and gentlemen, as the Judge has told you, now is not the time to compromise and it just takes one.  It just takes one person to stand on their own two feet and to tell the Government I will not be your instrument of death.  That's what we're asking several of you to do.  Because I know several of you feel that something just isn't quite right about this prosecution.

Now, ladies and gentlemen.  I want to show you how to get to that process.  But I know when you're making a decision about the extreme, ultimate punishment you want to be deliberate, but you also want to have peace and you want to be calm in your heart and in your mind.  Because regardless of the decision that you render here today, it's not over yet.  You're going to live it.  You're going to think about this case for the rest of your life.  You know, you all have made friends amongst yourselves.  I know that just from being around juries.  This is the longest, like Mr. Hilfiger, that I've ever

5394

been in trial. But I've seen you out and about several times. And you all get together and you've exchanged a lot of stories. I'm going to bet there's been recipes exchanged. How many times have you shown pictures of your kids and grand kids to one another? That's what you do when you're together in a group like this for as long as you all have been. This is going to have a profound impact upon you. And we trust that you're going to make the right decision.

Ladies and gentlemen, the decision that you make here today will be final. If there's any golfers in the jury, there aren't any mulligans. We don't get any do-overs. This is it. It's not for somebody else to decide, well, let's do it again. This is it as it relates to Mr. Barrett. And we trust that you all are going to get it right.

I don't want you to misinterpret what I'm fixing to tell you, because there's a message here. But I'm not saying it to be smart, I'm not staying it to be coy and I'm not saying it to be disrespectful. But there's a fellow that owns a boat. The boat is called the Senile. That Senile is docked south of Houston and its owned by Captain Bob Burns. Bob Burns likes to fish and he likes to go offshore and sometimes he'll go more than a hundred miles offshore. And Bob Burns will tell

5395

you that life is cheap.  He will tell you if you step off at the back of that boat at night and if there's a rough sea and you go overboard and there's not somebody there with you, we're not going to find you.  His point is if you go to the back of the boat, you better have somebody with you that can alert, because when you're out there on the high sea you're taking risks.

Well, ladies and gentlemen, when you get on a motorcycle and start riding, you're taking a risk.  When you hop in the cockpit of an airplane you're taking a risk.  When you jump out of an airplane with a parachute you're taking risk.  And whenever you approach somebody's house in the middle of the night with no lights on, no warning equipment, approach unannounced, you are taking risks.  Whenever you fill out an application for life insurance, they ask you about qualifications.  Are you a pilot?  Do you scuba dive?  Do you sky dive?  And why do they do that?  Because they understand that that involves an increased risk of death.

Now, ladies and gentlemen, the flip side of that coin is life is precious.  Life is special.  Now, we all hope that we can maintain a quality of life such that we can enjoy to its fullest.  And you have heard that Mr. Eales was enjoying his life to his fullest.  He did a lot of activities, had a wonderful family and seemed to enjoy

5396

them.  Oftentimes we don't realize, we tend to take things for granted.  And sometimes we don't realize just how precious life is.  When there's a birth in your family, then you tend the realize how precious life is.  When there's a death in your family, then you tend to realize how precious life is.

Ladies and gentlemen, not a thing we can do to bring back Mr. Eales.  That was a tragic event that happened out there.  And it was a tragic event for several reasons.  One is cause he can't be with his family.  Another because Mr. Hamilton carries scars from that incident with him and will for the rest of his life.  And Mr. Hise, the impact that its had on him and the other members of that tact team.  I don't doubt that that's real.  That's their buddy.  That was their friend.  That was their comrade.  Sure, it's impacted, but you know what, you become an instrument of death, take away that life that is precious.  And just like Mr. Hilfiger said, penitentiary is punishment.  The death penalty is punishment for the Defendant, the death penalty is punishment for the family.  Do we want to extend this case any farther?  Do we want to continue this fundamental unfairness any father?  Do we want to keep on this road and continue to hurt more and more people because somebody else can't accept 12 jurors' verdict in

5397

Sequoyah County?  That's what were being asked to do. That's what you're being asked to do.

Ladies and gentlemen, what it takes is at least one of you and maybe more to turn to those other jurors and say I've listened to this, I've deliberated but I am not going to do it.  Because this isn't right.  It just takes one of you.

The Judge told you, regardless of what happens here, he's never getting out of prison.  He's going to spend the rest of his natural life in the penitentiary. Now, was he going to if the federal government did not bring their prosecution?  Probably not.  That 30-year sentence, if Mr. Littlefield -- he says he's getting 58 days.  Say if he did it in 15 years, he was 38 when the incident happened.  What's that, 53?  So they bring their prosecution.  At a minimum, without you doing nothing, because of the federal prosecution and we're now in the sentencing phase, he will never get out of the penitentiary.  Question is, is that enough?  Well, I guess not, because again, you're being asked to be an instrument of death.  And is that what you want to be a participant in?

The mitigating factors -- and there's several of them and it was pointed out that reasons why you shouldn't give them heed.  Well, I want to go back

5398

through a couple of them and one is the very first one about acceptance of responsibility from the previous conviction.  They say, well, if he appealed it and its overturned and he come back for trial and he might get life for manslaughter.  Yeah, he could get death.  Yeah, he could get acquitted.  There's all sorts of things that could happen.  You weren't told whether or not there were any appealable issues in that case.  You don't know.  But what you do know is that Mr. Barrett accepted that verdict and was doing his time.  And because of him doing his time, it's time that the Government decided wasn't enough, they bring this action.

The Defendant has been convicted and punished for David Eales.  Ladies and Gentlemen, that's a mitigating factor that have proved.  And let me explain this to you.  The mitigating factors are beyond -- with a preponderance of the evidence, which is it more believable than not.  You know, 51-49 type situation. It's not the burden of proof that the Government's held to beyond a reasonable doubt.  The mitigating factors are just right there.  If you believe it's more probably true than not, then it's found established.  It just takes one of you to find mitigating factors.  All of you can, but it just takes one for you to consider that in your deliberation.

5399

How about the no prior felony convictions? They say, well, he ran from that case. He didn't stand prosecution. Oh, he stood prosecution. He had a lawyer. The lawyer withdrew. The bondsman knew that there was a bench warrant, but he never came out to get him, never notified him of it. That was Marty Daggs that told you that.

The bottom line is whatever the circumstances of that '97 case is, that the question is not did he run from prosecution. The question is had he ever been convicted of a felony. Well, ladies and gentlemen, that's a slam dunk. Because you know if he had, you'd have heard about it. The Defendant is a father. There's no question about that, a loved son and a stepson. All these mitigating factors you can find. And I suggest that you will find.

Ladies and gentlemen, regardless of the heart strings that they've pulled, regardless of the acts of violence that they want you believe in that's a bunch of smoke and mirrors, you never have to impose a sentence of death. Just takes one person to say I'm not going to do it. It's a lot easier when there's more than one of you.

Now, I've got to ask you to not give up your honest beliefs, those that you hold. You got to deliberate, that's the nature of this process. And we

want you to do that.  We don't want you to check in your common sense at the door.  We don't want you to give up your deeply held beliefs whether it's to reach a decision or whether it's just to get this case over with.  You carried conviction with you all your life before you came in here and we want you to carry that conviction with you as you go into that jury room.  And when you come out of that jury room, we want you all to be able to live with this decision that you've made.

And, ladies and gentlemen, the answer to your solution, to not be an instrument of death for the Government is found in three places on your verdict form. It's found on page 31, verdict of lesser sentence. Verdict lesser sentence says he's never going to get out of the penitentiary.  Even if you can't agree -- if you can't agree, you come in and say, Judge, we're locked, he's going to sentence this man according to the law. And he's told you he will never get out of the penitentiary.  Page 31 accomplishes that, if you all are able to reach it by agreement.  It's for Count One.  Page 35 accomplishes that result for Count Two, same thing. Count Three, because it's a little different -- the statute is worded a little different, says a term of years not less than 20 years.  But the judge has told you that he will never hit the street.

5401

So, ladies and gentlemen, we rely upon your life experience, we rely upon your common sense, we rely upon your memory to render a verdict in this case. I feel confident on behalf of Mr. Barrett that you're going to do the right thing. And just because the Government has brought this case six years later, spent no told how many thousands of dollars and uncovered every stone that was ever existed in Sequoyah County, that they have not shown this to be the type of case that is deserving of you being an instrument of death. Thank you for your time and attention.

THE COURT: Final remarks from the Government.

MR. SPERLING: May it please the Court. You've been thanked repeatedly. I must admit that I had a different take when I saw you return your first verdict than did Mr. Smith. I didn't see anger. I saw people who took their oaths very seriously, who rendered their verdict very carefully, who obviously examined each piece of evidence, who consulted with each other and who reached a just verdict.

What you've heard for the last 70-80 minutes or so is an emotional plea to ignore the primary evidence in this case. I'm going to ask you to be the agents of justice in this case. There has been a prior prosecution. We're going to examine it in this closing

5402

argument.  But I ask you in the final analysis, each one of you, to be the agents of justice and fairness in this case.  Last evening I sat down at my computer and I began to write and early this morning I reached this conclusion and that's that words cannot do justice to this extraordinary case.

I want to ask you two preliminary questions.  The first is this:  What kept the Defendant from being a multiple murderer in this case?  Some may say the hand of God, Providence, fate, dumb luck.  The Defendant in this case intended to be a multiple murderer.  We'll examine the facts.  But the second question I want to ask you is this:  If 19 rounds -- and I'm going to be careful not to point this at anyone.  If 19 rounds from this firearm -- and I admit it, it could be used to shoot skunks.  We heard that from his mom.  I'll tell you that tells you one thing, he know something about shooting black and whites.  But if this gun and 19 shots at highway patrolman, at officers of the law, at soldiers of the law, if 19 shots from this gun at point blank range, but extending farther out to begin, if that's not over the capital line, what is?  Must it have been 30 or 60 or the 91 that he had at the ready?

Ladies and gentlemen, I submit to you that when you carefully and you honestly and you dispassionately

5403

look at this evidence in this case -- this may be a very difficult case and a very difficult decision.  Mr. Smith tugs at your heart strings.  This is a decision that you will live with, yes.  It is a difficult decision to sentence someone to death.  But, ladies and gentlemen, under this evidence this is not a close call.  This is not a close call.  Months ago we looked each other in the eye and considered the prospect that this day would come, didn't we?  And you looked me, each of you, directly in the eye and asked each of you this question:  If the law permits it and the evidence justifies it, are you capable of signing your name to the bottom line of a jury verdict form knowing that the result will be the death by execution of another human being, the Defendant in this case?  Each of you reverently and respectfully answered that question in the affirmative.  That day has come. The law permits it and the evidence resoundingly justifies a capital sentence in this case based on what you heard as to this Defendant.  And I am confident that you will take this decision very seriously.  You each fully understand the gravity of the verdict that you're asked to enter.  This isn't an easy decision, but it's not a close call.  Nineteen shots are way over the capital verdict line.  And the Defendant's crimes deserve the death penalty not because we want to impose it, not

5404

because it's easy.

You know, they are really kind of like those sirens in mythology when you hear this defense argument, they're tugging at one or two of you saying bolt from the rest.  You know, it's kind of an enticing entreaty, isn't it?  But ladies and gentlemen, we are not asking that you do this because you want to or because it will make you feel really good.  It won't.  But because it's the right thing to do.

The evidence, the testimony and the information in this case warrant and dramatically outweigh the aggravating factors, dramatically outweigh the mitigating factors in this case.  What the Defendant chose to do is way over the balancing line under the Court's instructions.  As I listened to the defense lawyers the thought occurred to me that I wonder if it sometimes takes longer to attack individual facts of the case rather than to look at the entire case, all of the case and all of the facts together.  They'd isolate one piece.  They'd talk about Abby.  They'd talk about a potato.  But did you ever say -- hear them say look at all of this together, put it all together?  Now what do we have?  Oh, they looked at the sign.  This is just a no trespassing sign?  Not like any that I've seen.  This is a threatening prediction of what he was willing to do.  But

5405

I'm not saying base this decision on this. I wouldn't ask you for a moment to base your decision in this case based on what Abby Barrett said or suffered. What I do ask you to do is to consider it as one piece of the puzzle. Put it all together. This conduct is way over the capital line. The 19 rounds fired by the Defendant with precise targeting is way over the capital verdict line.

This Defendant substantially planned, he premeditated, he calculated a murderous rampage that only ended not because he voluntarily decided to stop it. It only ended because of Rick Manion's -- and we're going to look at his PowerPoint now -- because of Rick Manion's accuracy. He couldn't be with us. He was killed in a motorcycle wreck some time ago. But Rick Manion -- he testified, he was under oath and he shared his version of what happened. You know, what we have here is the Defendant who fired at a vehicle that was some distance. And the evidence according to the troopers was that they were as far away as from the reach of this courtroom from one end to another. Ladies and gentlemen, that's way too far away to be firing with impunity at someone who is merely an agent of the law, ordered to serve a no-knock warrant at that time.

But here what we have is the Defendant who even

5406

after he had fired many of those shots -- let's go to this now.  Remember Manion said that he -- he activated red and blue visor strobe just before he turned in off the drive.  He said that Hash's -- Steve Hash's marked unit's emergency light bar was fully activated.  He said that we were directly behind the lead vehicle, less than a car length behind when we turned off.  He said that he didn't know whether the troopers in the lead Bronco even had time to activate emergency lights before they took gunfire.

He continue by saying the second Bronco was offset to the right of the lead motor vehicle upon our approach and could see past the lead motor vehicle to the home.  He continued.  Gunfire at the Bronco occurred when the Bronco was far away.  The gunfire intensified upon approach.  The gunfire came from the front door area. The gunfire was from the house occupant's rifle.  Rocky was mortally wounded and then said I'm hit bad.  Gunfire continued as Rocky and Manion were at the rear of the Bronco.  Rocky then went to his knees and went down.  A commotion attended Toby's detention.  And then a flash bang went off, then Buddy came to the rear of the Bronco. Buddy had already been shot.  Gunfire from the house continued.  Grave risk, yeah.  Gunfire from the house continued.  The Defendant, holding his -- well,

5407

essentially an AR-15 stepped sideways into the east room on the east side of the house.  That's the testimony that you heard in transcripted form from Rick Manion.  But the Defendant had slipped into the southeast room.  Seventy two rounds remained in his chosen weapon of choice, ready for further murder.  He continued to grip his murder weapon, he had peppered the lead Bronco with eight lethal rounds through the windshield at the driver, continued to fire at the unarmored vehicle.  He observed the Bronco approach his front porch, he saw Rocky get out of the passenger door, he took aim at Rocky and he fired.  The blast pierced Rocky's flank.  He continued his aim. Another blast penetrated Rocky's side, broke ribs, punctured a lung and perforated Rocky's life -- lifeline, aorta.  And then complaining about fairness?

The Defendant maintained his aim at the man the Defendant had already shot twice.  He staggered away from the Defendant in desperate, halting steps, in a futile search for safety.  The Defendant took aim again at the man who retreated.  The Defendant fired again at Rocky while Rocky's back was fully exposed.  The bullet struck Rocky's un-holstered pistol, damaged the butt plate as you recall, and relieved the unused weapon of its contents.

The Defendant who committed these crimes isn't

5408

a child.  He was a fully conscious adult who substantially planned, who premeditated in a number of ways in the weeks and months prior to this murder.  He expected, he watched, he surveilled and he slaughtered an absolutely innocent man who had done nothing to him.  And they ask for increased leniency or fairness?

This was game day for the murderer.  He clearly tried to murder at least two human beings, shots at the Bronco, the intentional killing of the passenger.  But he wasn't finished.  He saw the driver, Buddy Hamilton, getting out of the vehicle, didn't he?  Buddy was wounded.  He fired at him, too.  Buddy was wounded in the front, the face, in the front and back, and back, and back, of his shoulder.  And they claim unfairness.

The Defendant still wasn't finished.  He was waiting, rifle at the ready, chamber loaded pistol in his waistband, for law enforcement officers to walk onto his porch.  Fortunately, two bursts from Rick Manion's MP-5 put a halt to his killing field.  Still, the Defendant's substantial plan and premeditation continued.  He reaches for a weapon as he's being subdued.  Let's not get distracted from the real issues in this case.  My judgment is that you have this Defendant figured out.  He talked for a long time about what he was going to do, about what he wanted to do.  He talked about it long

5409

before he stepped over the death penalty line.  He hoped that Johnny Philpot or Frank Loyd would be the first ones through the door.  Please keep that in mind as we consider what the Defendant planned for approaching law enforcement officers, had Rick Manion's fire not been accurate.  Defendant new the law was going to come for him.  He could have easily turned himself in.  Rather he did what he wanted to do.  Were his crimes out of character?  No.  They were consistent with the character he had become.  The Defendant tragically tried to murder two human beings.  He succeeded tragically with regard to Rocky Eales.  And it's not as if he didn't know that a murdered victim would have a mother and a father, sister, a wife or a husband and children and friends and coworkers.  This Defendant did not care.  He gave no thought to the suffering of others.  We have a mother and father who lost their only son.  A sister who lost her only brother and nephew and niece, twins, who lost their favorite uncle.  A wife, Kelli, who lost the love of her life and must reckon with a situation that even she can't fully comprehend.  A daughter, Allie, who when told by her mom dad wouldn't be coming home asked tearfully, well, when will he be coming home?  A young son who longed to be with his father in heaven.  A good friend from the Marines who will never be able to share those

5410

memories again.  Coworkers like Buddy Hamilton, who survived the murderous hail of gunfire and Ray Greninger and Rick Manion who rushed to Rocky's aid.  Steve Hash, who would have been the ram trooper, Danny Oliver who heard perhaps Rocky's last audible sound, a scream in pain as Danny tried to render him aid.  Billy Poe who moved forward to suppress gunfire from the Defendant who had come too soon.  Doc Darst who moved into the yard to eliminate the danger to or from the Defendant's son. Tactical team supervisors Pettingill and McFry, and last but not least protégé Gene Hise whose CPR, in a desperate race to buy Rocky a few more moments of life, produced mouthfuls of frothy last breath blood.

The suffering of each of these wonderful people who graced our courtroom in this presence, this chamber of justice, was foreseeable to this Defendant.  But he cared not about the consequences.  He scoffed at the emotional scarring and the psychological suffering of others, at the agonizing pain he so carefully had planned and premeditated to inflict.  And what did you hear from Deputy United States Marshal Lloyd Valleck?  The Defendant remorsefully reflects after hearing Gene Hise's compelling testimony about how Gene frantically tried to save his mentor's life and raced Rocky to the emergency room.  Without a tinge of regret, the Defendant

5411

heartlessly responded: He acted the same way six years ago. He needs to grow up and be a man. He needs to stop whining. This from the Defendant whose lawyers now plead for fairness?

The Defendant elected to suppress his conscience. He chose a criminal path in this case. His murderous actions were conscious, knowing, intentional, deliberate and a premeditative result of thoughtful choice. You know, he lacked an essentially ingredient of the community of people. He doesn't have empathy for other people.

You know, for others -- over six years the Defendant has been preparing for the prospect of parole. Might he have been pretty well behaved in jail, generally speaking, given the prospect that he may be paroled one of these days? Might he be so motivated? Might that motivation now be gone? And jail rewards good behavior, commissary and reading and visitors and television association. Okay, he hasn't killed anyone in jail. But he showed us the tip of the iceberg. He hurls solid food at a jailer, he threatens other jailers, even tries to grab one through the bars. He thumps a cellmate, himself a murderer. Why? Not because he murdered innocent people but because he clipped his toenails. The Defendant's sense of justice, utter, utter selfish.

5412

That's a telling forecast of what is to come if the Defendant is just sent back to his room.

You know, in the days, weeks and months before this killing, the Defendant had the idea of murder germinating in his mind. The Defendant was on a trajectory, a chosen path. This evidence is unmistakable. Instead of surrendering to arrest, the Defendant took everything Rocky had. And they now complain about unfairness? He took Rocky's hopes and his dreams and his time and his life. This was cold blooded murder. And the question that we asked you originally, why wasn't this a double murder or a triple or quadruple murder? Only because the Defendant was stopped. Before that night and after, the Defendant behaved the way he wanted to. He did what he wanted.

You've heard the defense attorneys ask you to do something other than to render a capital sentence. The Defendant wants to be sentenced to his room as punishment. Justice cannot be served in the case by allowing the Defendant to live in prison. If he's allowed to live in prison, he will have perks like workouts and visitors and phone calls and mail, TV and recreation. Don't let this Defendant -- the evidence may reasonably infer and you may reasonably conclude -- be a hero to his fellow inmates, to his fellow incarcerated

5413

criminals. All with a civilized core must have revulsion at what the Defendant did to have acted as the executioner of the innocent. Don't give this Defendant what he wants. In the name of justice give this Defendant what he deserves. Don't just send him to his room.

The Defendant wants to choose his sentence. He now wants to live. And how unjust is that? What opportunity did he give Rocky Eales to live? How unjust is that? The Defendant made Rocky Eales do something he would never ever do in life, but for the desperation of his moment. Rocky would never have done what the Defendant made him do, but for the fact that he believed there was absolutely nothing he could further do to defend himself or others. His life was ebbing away, he could do nothing for others because he was mortally wounded, bleeding and dying, he retreated for what was left of his life.

This disturbing criminal conduct is way over the capital line. The Defendant didn't need to commit this murder. He wanted the thrill of the kill. And now his lawyer complains because he has been brought to the federal bar of justice, to our doorstep. He has not been placed in double jeopardy. The Court's instructions tell you there is no legal bar to this trial. But let's just

5414

go farther and practically.  Let's say I get in trouble at school and that doesn't mean that there wasn't going to be a more serious reckoning when I got home and dad found out about what I had done.  If the punishment was insufficient at school, I can assure you that dad had punishment waiting later.  That's not unfair, that's just.  Let's say, for example, that I had misbehaved and my mother had caught me and she furrowed her brow and she'd scolded me and may have swatted me a couple of times and told me not to leave the house.  And then she told dad.  And because of disrespect or some other reason, Dad said that original punishment is not enough, it's not just.  You know, I could have complained about fairness, say, oh, whoa.  Whoa, whoa, mom swatted me, the school tried to punishment me.  I can guarantee you that my pleas would have been drowned out by the whack of the belt on the place God made for that appropriate punishment.  That's their claim.  They're asking you, ladies and gentlemen, not for fairness but for leniency for a man who offered Rocky no leniency, who offered Buddy no leniency, who was ready to kill at will.  Ladies and gentlemen, don't let a cop killer get leniency.

So much for analogies, though.  Let's talk about the difference in the cases.  You heard witnesses testify here that in the state proceeding they didn't --

5415

they were really grossly under-evidenced.  Randy Turman didn't testify, nor did Travis Crawford, nor Charles Sanders nor Karen Real nor Brandie Price, Cindy Crawford, Randall Weaver.  No small effort was involved in getting them brave enough to hit the stand.  They didn't want to testify.  We required their testimony.

His friends and associates didn't want to testify against him.  But then there was Juan Beal, Kevin -- remember Kevin, no small potatoes, Wilson?  Craig Nixon and an array of drug evidence, lab equipment, chemical and proof of the Defendant's serial drug manufacturing, distribution and use.  Chemist David Love, Lyndell Griffin and Gerald Skowronski.  All of these witnesses were presented to you never set foot in that prosecution down there.

Ladies and gentlemen, this is the time for justice.  This is not the time for the leniency that the defense asks.  All of those witnesses were presented to you not at the abridged state proceedings.  The state jury just got a small glimpse at the wide screen feature length film that you have very patiently experienced in this case.  And you heard from Kelli Eales and Bobbie Eales and Nancy Stalcup and Bill DeWeese and Gene Hise.  They didn't testify in state court.  We need not belabor their testimony, but you also heard from Stanley Philpot.

5416

Here's a man on donated law enforcement officer time and equipment who put his life on the line after giving the Defendant a gracious opportunity.  They have already been generous.  Oh, go ahead and drive your car home, we -- or truck home, we won't impound it.  And what does he do?  He takes advantage of the generosity.  But now he asks for more?  Here's the Defendant with a cloud of dust who then confronts them with an arm, with a gun, with a big pistol.  And what did Stanley do?  Rather than to be involved in a gunfight, he first called for a bullet proof vest and then he repaired and basically retreated.

Johnny Philpot drove a white SUV, he said. What was he shooting at?  The Defendant was shooting at a white SUV.  No wonder he shot so many times at the lead white Bronco.  He tried to locate, Johnny did, the Defendant to bring him in.  Did he thump him, did he do anything to him in the adult experience?  No, he just merely tried to bring him in.  Didn't arrest him, didn't harass him other than to check a gun and let him go early.  That's not the man who has a vendetta out for this Defendant.

And, yes, you heard from Cindy Crawford.  No, not that Cindy Crawford, the one who had the Defendant put a shotgun to her leg and threaten to shoot her. Well, actually he said he'd F-ing kill her if she came

back.  Charles Sanders -- the Defendant said we need to find that SOB to have him -- that came in and had me arrested and we need to kill him.  Larry Lane, the Defendant slows down, grins, then runs through a traffic checkpoint, ignored lights and sirens and led a hundred mile chase.  Shannon Smith, Micah Reasoner and Cindy Smith had to jump out of the way to keep from getting run over by this man.  Past behavior indicative of what he will do in the future.

And years ago the Defendant was slapping his wife around in broad daylight and Shannon sought to intervene and what's the Defendant's response?  To threaten Shannon that he was going to go inside, get a gun and shoot him.  A crying Abby asked Shannon to leave, obviously for Shannon's safety.  And the defense mitigation in this case?  Let's see.  Maudeen Vann, seven -- count them, seven filed cases of domestic abuse in this case, seven of them.  An affidavit says, quote, he was going to blow my head off.  Oh, mere talk?  Ultimately this Defendant lived out his fantasy.  The Defendant stalked, going to a restaurant, like the abused -- I mean, she was pathetic, like the abused wife she is.  Yeah, it was mutual combat.  Yeah, right.  And Kathy Trotter, a real ear to the ground, who knows all the goings on in the Sallisaw area, never been in the

5418

Defendant's house, never seen him armed, unaware of the seven cooperating witnesses testified about the threats that he had made, unaware of any domestic violence, she didn't know anything of consequence. And Jimmy Wilson, from the prison, the Defendant's parole hearing is next May. An administrative assignment can be changed with a stroke of a pen.

Clyde and Craig Edgmon, okay, the Defendant occasionally fixed their cars for little, if any money. But they didn't know the other Kenneth Eugene Barrett. Jailer Robert Gude. The Defendant was arrogant, bold and showed no signs of remorse. Courtney Burke, when called not to tongue meds, he throws his medication and spit a pill at a 70-year old lady. Adam Satterfield, Defendant throws a large tray at him. Brother Steven, the Defendant came up to Abby from the back, grabbed her and took her to the ground. Oh, that's the Defendant's style, attacking from behind. The Defendant is fairly anti-social, huh uh. Steven pretty much stayed away from family in Sallisaw. Steven took -- selected an entirely different direction. Roger Crawford, well, he really didn't know the Defendant that well. Asked about redeeming qualities -- remember how he stalled. He was asked, well, what about his redeeming qualities? Do you remember that pause, that pregnant pause? And then he

5419

limped.  He said, well, a good person, helps people, son and ex-wife need him.  Ex-wife, I asked.  Maybe not.  Gelene Dotson.  Doesn't remember when the Defendant got married or divorced.  They fought a lot.  Doesn't remember any domestic abuse allegations?  And she wasn't going to run his messenger service and didn't want a salvage yard next door.  She says Defendant knows he made a wrong decision as to how to react that night.  If he could do it different, he would.  Now, that's big of him.  That's about as weak as his reason for leaving school.

Ernie Barrett gave the Defendant several time -- chances to succeed at work.  The Defendant basically blew them.  Mother-in-law, Doris, I got to respect her loyalty.  She's been in court when he's been in court.  But the state trial, as she admitted, was nothing like you heard here.  The jailers -- he chunks a potato at one, curses others, he's in a cell with dangerous contraband weapons, he threatens yet another one, he reaches out from a cell and tries to grab another, he thumps a younger cellmate, a cowardly killer himself, I might add, not out of injustice but because of the way he cuts his toenails?

Sympathy.  If we're tempted to feel sorry for the Defendant or his relatives, we should remember this.  He abandoned them through his conduct.  How he must envy

5420

his hard-working, highly achieving bother's success. Abby, every pore of her body oozed that she had been abused, physically and emotionally.  The Defendant had sporadic contact, pretty much unwanted, particularly with his mother, until he committed murder and got arrested. They didn't visit him at his house.  They hadn't seen the inside of his house by and large.  And remember this, hear in court, the Defendant victimizes his own family by making them serve as props, as witnesses on his behalf. Remember, Rocky didn't get this similar chance to plead for his life.

Defendant's parents visit him.  Well, whatever he does for them or anyone else is largely undefined and far outweighed by the crimes he committed.  The Defendant has paid for his membership into the worst of the worst groups of criminals.  He's a murderer.  He killed remorselessly, wantonly, senselessly and had no empathy, no sympathy, no thought, no feeling and no emotion for a wonderful man whose life he extinguished like that with semi-automatic gunshots.

There is no proof that this Defendant lost one wink of sleep over what he did.  It's almost as if he had done nothing, like nothing happened.  And now he says give me leniency.  His mother quoted him as saying he made a wrong decision and would do it differently.  You

5421

know, it's almost an oops. It's kind of like, well, Derek Jeter may have bobbled a ball in a preseason spring training game that's meaningless. His dad says, well, he's sorry it happened. Sorry two kids are without a father. Boy, that's pathetically understated, even if it's accurately relayed.

MR. BARRETT: Get off my family, Sperling. This is about murder, not my family. You didn't mention the fact that I made two statements to OSBI Internal Affairs that you wouldn't let this jury hear, would you? I've heard enough of him talking about my family. Take me out of the courtroom. Take me out.

THE MARSHAL: We'll take you -- do you want him removed, Your Honor?

THE COURT: Yes.

(Whereupon, Mr. Barrett was escorted out of the courtroom after which the following record was made.)

MR. SPERLING: And he never intentionally shot anybody? Every bullet he fired was in the direction of the man and men he shot. The final shots were deadly accurate. All he saw was headlights. He saw lots of emergency lights, too. Remember the real victims. It is not our job here to forgive. We are not the victims of the Defendant's brutality. It's not our job to feel guilty. The murderer who mercilessly killed in this case

5422

as a matter of conscious, premeditation and planning ought to feel guilt and remorse, but he doesn't.  He is the one who put us all here.  What a sense of power he must feel, the narcissistic, selfish collection of reality that he is.  He's the one that put us all here.

But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole.  Remember that the Defendant employed the machinery of death as Rocky sought only to enable a court ordered search of the Defendant's house and then to go home to his family.  This tactical team had never fired their weapons or been fired upon.  There was only one difference here, the Defendant.  The Defendant chose when Rocky would breathe his last breath.  This Defendant substantially planned and premeditated and deliberated.  His aggravating factor laden murder was unprovoked, it was predatory, it was deliberate and it was premeditated.  He had taken steps to get where he was heavily armed that night.  He selected the means, the instrument, the place, the victim's pathway.  He struck without warning.  He killed from a distance and then killed close-up as he cowered in the cover of his house.

They say that the Defendant accepted responsibility by declining to appeal his state conviction for mere manslaughter.  Hardly.  He made a

5423

strategic choice.  If retried, he could have been sentenced up to life in prison.  The defense lawyer says the Defendant has people who care for him.  But he's manipulative, he's a taker, a narcissistic personality.  To him it's all about him.  If only they had done things differently.  This Defendant chose to be the person that he was before and on September 24th, 1999.  Remorse?  The evidence indicates that this Defendant has not only not seen the light, he hasn't even felt the heat.  The defense lawyer says that the Defendant is not a future danger.  Ask yourselves, would any of us want to be in a prison cell next to a man who is capable of coldly attacking law enforcement officers?  So he's a good prisoner, to those he can't manipulate or selectively attack.

You did hear an emotional appeal from his lawyers.  We predicted -- they asked for fairness.  We ask, ladies and gentlemen in this venue, for justice.  If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters.  He will have committed cold blooded murder, yet will have escaped the capital noose.  This Defendant will have slaughtered an innocent soldier of the law and merely be given more time.  Don't make him a hero.

5424

The aggravating factors in this case have been proved beyond a reasonable doubt.  Mike Littlefield -- and I'm very thankful for his work in this case -- did a wonderful job of setting forth the evidence and testimony in support of each of the aggravating factors.  The mitigating factors, even if accepted as fully proved, cannot outweigh the substantially planned and premeditated murder of 49 year old Rocky Eales.  The mitigating factors cannot begin to outweigh one of the tortured steps Rocky took as he stumbled into darkness.  This Defendant has earned and deserves the death penalty.

Thousands of years ago, the king of the world's most powerful empire held a great feast for thousands of the rulers of his nation.  They ate and they drank from golden and silver cups which had been stolen from the temple of a subdued and now enslaved nation.  They drank wine and they worshipped idols.  All of a sudden, the fingers of a hand appeared and began to write on the palace wall.  The king saw the hand and the writing and he was frightened.  He was so scared that his clothes actually loosened and his knees knocked together.  He cried out bring the astrologers, bring the wise men of the nation.  Whoever interprets this writing will have great wealth and be named the third highest ruler in the country.  The wise men came in and they studied and they

5425

thought and they consulted, they conferred, they thought. But they couldn't read, much less interpret the writing. The king's face turned ashen. The queen remembered a forgotten foreigner. The king made the man the same offer. The man declined all of the riches and all of the honor and then he bravely read and interpreted the writing on the wall. His interpretation was that you're kingdom is at an end. Your kingdom will be divided -- and divided and given to your neighboring enemies and then the prophet said you have been weighed in the balance and found wanting. That night the king was killed and his kingdom was divided.

Ladies and gentlemen, under this evidence, under this testimony, the Defendant has been weighed in the balance and found wanting. We've heard a lot about re-punishment. We've heard a lot about the prosecution in closing argument. But you know that there was very modest punishment handed out in his prior prosecution. You know that Counts One and Two were essentially never brought in the state prosecution. There was virtually -- there was no drug evidence in the trial -- the one that last occurred. That trial did not do justice to the Defendant's criminality or to the Defendant's lethality. You know, he was found guilty of assault and battery with a dangerous weapon. You know, at least it should have

5426

been shooting with intent to kill.  That's dramatically inadequate.  But there's no evidence that the loss of Kelli and Hook and Bobbie and Nancy and Ally and Mackey and the troopers and Bill DeWeese has ever been considered by a jury.

Ladies and gentlemen, the punishment should fit the crime.  The punishment should fit the crime.  You know they asked for generosity.  They point to this quotation as we did earlier, as you've been generous with your time.  How generous was the Defendant to Rocky Eales?

I'm thankful for the opportunity and I ask you to do this.  Under the standards of the law and the instructions by the Court, the Defendant should be as it were, weighed in the balance and found wanting.  This is a difficult decision.  But I submit to you it's not a close call.  Justice demands a capital sentence.  We respectfully and reverently ask you to return a death penalty against the Defendant.  Thank you.

THE COURT:  Let me see counsel at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  Any requested instructions from the defense in regard to the incident that just took place?

MR. HILFIGER:  No, I really haven't, you know,

5427

thought of anything. Do you have anything?

THE COURT: My thought was, I can't -- I could ask them to disregard what they saw. I think the verbiage, verbal statement, to the extent they heard anything should be disregarded.

MR. HILFIGER: They were unsworn. I mean, that doesn't --

THE COURT: I'm listening, Government.

MR. SPERLING: I'm still shaking.

MR. LITTLEFIELD: I don't think he -- consciously chose to do what he did in the presence of the jury.

THE COURT: I could. The other thing -- instruction you should.

MR. LITTLEFIELD: No, I think it should be -
(Interrupted)

THE COURT: Well, there's nothing on the record. That's why I'm making this record.

MR. SPERLING: Are you going to take a break for a minute to allow us to consult?

MR. LITTLEFIELD: Judge, I think one of your jurors was squirming real hard -- to get somebody's. Just -- that you should know.

THE COURT: Obviously, I've got two minutes of instructions to finish. Any requested instruction from

5428

the defense?

MR. HILFIGER:  I don't have anything.

THE COURT:  Any requested instruction from the Government?

MR. SPERLING:  I'm very hesitant to suggest that they ignore what was in front of them.  On the other hand -- I don't have a requested instruction at this time, Your Honor.

THE COURT:  Do you think we should recess and consider drafting an instruction?

MR. LITTLEFIELD:  Probably have an answer -- problems that arise -- (Interrupted)

MR. HILFIGER:  That may be an idea.  Then you would have -- (Interrupted)

MR. SPERLING:  I'd like just to have just a little time first.

THE COURT:  Let's recess.  I still have the concluding instruction.

MR. HILFIGER:  Well, I mean, he's -- he needs to go to the bathroom, is that right?

MR. LITTLEFIELD:  I don't know if I could get the --

THE COURT:  I'm going to recess.  What my plan is to give that some consideration, that issue some consideration.  Then come back and give this concluding

5429

instruction or whatever instruction, if any, we come up with.  The instructions as given by the Court to this point, any objection from the Government?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  No, Your Honor.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, we'll be in recess.  You should not discuss this matter among yourselves.  It's not yet been submitted to you. Remember my previous admonitions that are all still in effect.  I'll ask that everyone in the courtroom please remain seated until the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  The clerk provided me -- go ahead and proceed with lunch if it's in there.

We'll be in recess.  Let the record reflect the jury has left the courtroom.  At this point I understand the Government had no proposed instruction to deal with the occurrence in the courtroom.  At this time the defense had nothing to offer.  And part of the purpose for this recess at this point is to give both parties an opportunity contemplate that issue before we proceed with the concluding instruction.

5430

(Whereupon, a short recess was held after which the following record was made outside the hearing of the jury.)

THE COURT:  Let the record reflect the jury is not present.  Counsel for the Government is present, counsel for the Defendant is present.  The Defendant is not present.  For the record, I would recite the Court's observations.  Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this.  He said something other than that that I could not detect.  And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up.  I can't say that he was attempting to come out across the table, but he did attempt to get up and take a step.  As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom.  I will say that once the marshals made contact with the Defendant, he ceased -- there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.  I've instructed counsel for the Government and the Defendant to advise the Court as to what if any instructions they would request or suggest I give the jury as a result of the incident that I've just

5431

described.  First from the Government.

MR. SPERLING:  I know this isn't football and this is not a coin toss, Your Honor, but I think it might be appropriate for us to defer.  The reason I say that is because I understand that there have been discussions and that the defense may not wish a cautionary instruction so as to avoid highlighting the incident.  If that is their position, we would agree.

MR. HILFIGER:  Yes, Your Honor.  If I may take a couple of steps with what your observations were?

THE COURT:  Well, I would say the Government -- let me before you speak -- well, I want to be sure that you've had an opportunity to illustrate for the record what you saw versus what the Court saw and I'll give the Government -- I don't know.  I started to speak for the U.S. Attorney.  I think he could hear, but his back was to the Defendant.  Between him and Mr. Littlefield, perhaps they can come up with their factual version of what they observed.  You may.

MR. HILFIGER:  After he said leave my family out of this, there was -- the additional comment was something about statements that he had made.  Why didn't you allow statements that had been made to agents into evidence.  That wasn't word-for-word, but it was something like that, something referring to that.  But

5432

the main thing I wanted to comment on was when he came out of chair, at that point he was not making an aggressive move toward anybody.  What he was saying is I want to get out of courtroom.  Take me out of the courtroom.  I don't want to be here.  And then the marshals, you know, asked you if they could take him out.  Before that they were trying to put him back down in the chair.  His move as I saw at that point was he was saying, you know, take me out of the courtroom.  I want to get out of here.  It wasn't an aggressive move towards anybody, just he wanted to get out.

I didn't answer your the question.  Yes, we have talked to Mr. Barrett after this incident and he said he just -- he didn't want anything further.  We talked about having instructions and he said he did not desire -- didn't want to have any instructions and he didn't want to participate in the court proceeding now.  How much longer that will be I don't know, but I mean, his indication was he didn't want to be in the courtroom.

THE COURT:  So, you're advising the Court on his behalf at least at this point he does not -- of course, what I have left to do is give the closing instruction and then the case will be submitted to the jury.  Is it was my understanding what you said is he does not desire to be present for that?

5433

MR. HILFIGER: That's right. That he made that -- I don't know if we got as far as the verdict. Mr. Smith said he did. But, I mean, I can tell you right now from -- (Interrupted)

THE COURT: If he changes his mind, please advise the Court. I want to have a hearing with counsel to determine what if any initial measures to take.

MR. SPERLING: My notes reflect that during the closing argument the Defendant rose and spoke. I didn't interrupt him. In fact, Judge, I only turned slightly so I could see him peripherally. He said get off the backs of my family, Sperling. This isn't about my family, it's about me. I made two statements to the OSBI. I don't remember the words to the effect. He said you did -- I don't know exactly what words he used. There was then an exchange between the Marshal's Service deputies, the Court and the Defendant. And as I recall, the deputy U.S. Marshal -- I don't know which one because I didn't turn -- indicated or asked the Court do you want us to take him out and you said yes. And at about that same time, the Defendant indicated he also wanted to leave. One thing -- (Interrupted)

THE COURT: Let me just inject. I think that's an accurate description of what happened and Danny David did speak to me and asked me if I wanted him to take the

5434

Defendant out of the courtroom and my response was yes, and he did.  And then he was removed from the courtroom by two or three deputy marshals.

MR. SPERLING:  I'd like to compliment the restraint of the deputy U.S. Marshals.  And even though I did not turn around to watch them, at least there was not a lot of sound so they took apparently appropriate and very quick action.  I concur with the Court's sentiment that if the Defendant is not to be here, I believe the Court should make specific inquiry of the Defendant. It's not that we should not -- I think it appropriate for the Court to make specific inquiry with regard to the Defendant.  I'm kind of thinking analogous to -- those kinds of issues but --

THE COURT:  Let me think about that for a moment.  Does the Defendant request any instructions to the jury?

MR. HILFIGER:  No, Your Honor, no instruction.

THE COURT:  No instruction.  My clerks have done some research and I'm looking at the case law that they've submitted.  I note no glaring Tenth Circuit -- the cases I've look at speak in terms of the court did not err by not giving the instruction.  And as you lawyers know, that can be interpreted two ways.  The court did not err, but perhaps they should have given

5435

instruction. That's the way I tend to lean. I've proposed instructions something like this, or not something like this, exactly like this. Members of the jury: You are instructed that neither the Defendant's conduct nor his statements during closing argument are evidence in this case and you should not consider them when rendering your verdict herein.

MR. HILFIGER: I think I share the same opinion. Mr. Smith is sort of ambivalent to the instruction. It highlights it to an extent, but then it also, you know, cautions the jury. I don't really care one way or the other. I don't object, I don't approve. I just --

MR. SPERLING: We don't object if the defense acquiesces. I think we -- (Interrupted)

THE COURT: I'm inclined to give the instruction, so let me hear what you have to say. Defense, anything further to add to what you said?

MR. HILFIGER: No, Your Honor.

MR. SPERLING: Again, I think my sense is that if the defense does not object and the defense does not believe having seen the incident, having engaged in this inquiry, that it draws undue attention to this incident and they're satisfied with the instruction, I think the record is -- should operate in favor of giving the

5436

instruction.  We don't object to the instruction.

THE COURT:  Now, the issue of whether the Defendant should be brought to the courtroom for the Court to inquire as to whether or not he wants to be here, Mr. Hilfiger do you wish to speak to that issue?

MR. HILFIGER:  Well, the only problem, I'd say, on that is he has specifically told us he doesn't want to be in court.  Now, whether he's saying I don't want to be in court when the jury is there or whether he's saying I don't want to be in court at all, I'm just telling you what he told us.  He did not want to be in court.  He wanted to go back to jail.

THE COURT:  Mr. Smith, just for the sake of verification, is that your understanding also?

MR. SMITH:  That is, Judge.  And it's my understanding he didn't wish to participate in the verdict either.  Like I say, some time may go by and he might have a change of heart.  I think we ought to re-address that, Mr. Hilfiger and I ought to re-address that, with him at the appropriate time.

THE COURT:  At the time of the verdict?

MR. HILFIGER:  Just to give the Court a little bit of idea, he does get hot.  Just like we were telling all along, he does get hot and calms down.  And you know, I would -- it may be a little time that we -- before we

went down and talked to him after this incident, he had sort of calmed down then.  He just said I couldn't take it anymore.

THE COURT:  That was how long ago?

MR. HILFIGER:  It was within ten or 15 minutes after the incident.  Well, it was after -- before that because whatever amount of time Mr. Sperling had to finish closing and then the jury went and then we went five or ten minutes after the jury left we went down.

THE COURT: It's been less than an hour ago?

MR. HILFIGER:  Yes.

THE COURT:  Do you feel any necessity to go talk to him again about that subject?

MR. HILFIGER:  Not at this point.  I do agree with Mr. Smith, maybe with the verdict -- you know, when we get close on the verdict or something, talk to him again and see if he still has that same --

THE COURT:  Was anyone -- in your discussions, any representative of the marshal's office present during those discussions?

MR. HILFIGER:  Yes.  There was somebody there. I don't know.  I can't -- that may have been.  I'm not positive.  Somebody from the marshal's office was there.

THE COURT:  I have some concerns to the extent that I think he should be brought here and tell me that

5438

in open court.  The next issue is, because of the outburst, I have some concerns about whether he should be in restraints.  I'm going to ask the marshal to put him in minimum restraints, of course, not in front of the jury.  And let him come up and address.  And the marshal has also brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems.  So, I'll have to wait and see when he comes.

MR. HILFIGER:  Well, if that's the case, maybe we should go down there and tell him.

THE COURT:  Yes, I think that -- (Interrupted)

MR. HILFIGER -- that may help out to do that. He's not dressed out.  Back in his orange.  Is that going to make any difference?

THE COURT:  There's no jury here.

MR. HILFIGER:  They'll stay in there?

THE COURT:  Yes.

MR. HILFIGER:  Well, let us go down.

THE COURT:  I'll send the marshal with you and you can explain what's going on.

(Whereupon, a short recess was held after which the following record was made outside the hearing of the jury.

THE COURT:  Let the record reflect counsel for

the Government is present and the Defendant is present with counsel. Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?

MR. BARRETT: Yes, Your Honor.

THE COURT: Do you have any questions of the Court about that?

MR. BARRETT: No, sir.

THE COURT: Any questions of your attorneys?

MR. BARRETT: No, sir.

THE COURT: I'll ask the marshal to return --

(Interrupted)

MR. HILFIGER: One more. Does that include the verdict?

MR. BARRETT: Yes, Your Honor.

THE COURT: Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

MR. BARRETT: Yes, sir.

THE COURT: We'll be in recess.

(Whereupon, a short recess was held after which the following record was made in open court in the presence of the jury.)

5440

THE COURT: Let the record reflect the jury is in the box, counsel for the Government is present, counsel for the Defendant is present. The Defendant is not present.

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing argument are evidence in this case and you should not consider them in rendering your verdict herein. I'll ask the clerk to mark that instruction as Court Exhibit 24 for the record.

You have now heard the closing arguments from both counsel for the Government and counsel for the Defendant, and it's appropriate that you hear this concluding instruction.

I have outlined for you the rules of law applicable to your consideration of the death penalty and the processes by which you should determine the facts and weigh the evidence. You should consider the instructions as a whole, and not single out some instruction and ignore the others. In a few minutes you will retire to the jury room for your deliberations. Once again, Juror Number 10 should act as foreperson to ensure that your deliberations proceed in an orderly manner. Of course, his or her vote is not entitled to any greater weight than that of any other juror.

5441

The importance of your deliberations should be obvious.  If after due deliberation even one juror is not persuaded that the appropriate sentence in this case is death, then you must return a verdict against the death penalty.

When you are in the jury room, please discuss all aspects of the sentencing issues among yourselves with candor, frankness, and a due regard for the opinions of one another.  Each of you must decide this question for yourself and not merely acquiesce in the conclusion of your fellow jurors.  In the course of your deliberations, no juror should surrender conscientious beliefs of what the truth is and what the weight or effect of the evidence is.  Remember that the parties and the Court are relying upon you to give full consideration to this sentencing issue.  By so doing, you carry out to the fullest your oaths as jurors, well and truly to try the issues of this case, and to render a just result.

If it becomes necessary during your deliberations to communicate with me for any reason, simply send me a note signed by your foreperson.  Do not attempt to communicate with the Court or any other court personnel by any means other than a signed writing.  I will not communicate with any member of the jury on any subject touching on your sentencing decision other than

5442

in writing or orally here in open court.

When you have reached a decision as to what sentence to impose, send me a note signed by your foreperson that you have reached a decision.  Do not indicate in the note what the decision is.  In no communication with the Court should you ever give a numerical count of where the jury stands in its deliberations.

You must be prepared to report to the Court both your findings as to the aggravating and mitigating factors listed on your Special Verdict Form and then one of the decisions provided in the Special Verdict Form as to each of the three counts.

Let me remind you that nothing that I have said in these instructions and nothing that I have said or done during the trial has been said or done to suggest to you what I think your decision should be.  The decision is your exclusive responsibility.

Now, that concludes what I call the formal instructions.  I have had the clerk prepare copies of these instructions so you'll each have one in addition to the ones that I've signed that will be the Court's instructions.  In the front part of the instruction booklet you'll find the verdict forms and special interrogatory forms for your use.

5443

I would also remind you of the smoking instruction I gave you during the first phase.  Now that the case is being submitted to you, it's important to remember that there are to be no deliberations unless all of the jurors are present, so that brings to the smoking procedure.  If there are those who desire to take a smoking break during deliberations, then you must give to the foreperson the name of those persons who desire to take a smoke break, knock on the door, give it to the bailiff and I've instructed the bailiff to tell you -- you know that drill by now -- take you to the smoking place.  Those of you who break for a smoke break are not to talk among yourselves about anything.  Those left in the deliberation room should cease your discussions about the case, that is, cease your deliberations.  You can talk about other things, but not about this case until those who have taken the break return.  Once they return, you can continue your deliberation.

I know that our schedule has not been -- we're not on a normal schedule for lunch and breakfast and those things, and that's the Court's fault.  But it's now 4:00 o'clock.  If you decide as we go forward this evening that you would desire dinner at sometime, you'll have to let me know about it in writing.  That's simply done with a note.  The foreperson will send that note and

5444

say we'd like to have dinner and sign it and then I'll see orders are taken.  I don't know.  It may not take you long enough that you want to eat another meal.  It may take only some minutes to make your decision, it may take an hour, it may take several hours, it may take longer than that.  Of course, the parties, including the Court, has no idea how long it may take.  But however long it takes, we'll obviously be here waiting for you.

If for some reason you should deliberate into the evening hours and determine at some point that you want to recess until tomorrow and come back and complete your deliberations at that time, all you have to do is tell me that's what you want to do, again with a note in writing.  These are just a few things I try to anticipate in advance that may be helpful to you as we go forward.  I'll ask now that the bailiff come forward.  I think the alternates know who they are.  You should remain seated.  You'll be taken to the alternate waiting area.

(Whereupon, the bailiff was administered the oath.)

THE COURT:  I'll instruct the jury to further notify the bailiff when you have reached your verdict so that you may return it in open court.  The jury is now placed in charge of the bailiff and will be taken to the jury room.

5445

(Whereupon, the jury left the courtroom to deliberate after which the following record was made.)

THE COURT:  I'll ask the alternates to go with my clerk.  She'll show you to the deliberation room.  If you'll leave those in your seats, I'll have the clerk pick them up.

(Whereupon, the alternate jurors exited the courtroom after which the following record was made.)

THE COURT:  Let the record reflect the jury, including the alternates, have departed the courtroom.  Now, is there anything further from the Government at this time?

MR. SPERLING:  No, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  No, Your Honor.

THE COURT:  With the parties' attorneys' permission, I'm going to allow the clerk to take the exhibits into the jury room.  If you desire to come forward, examine the exhibits to be sure she has everything that you want for the jury room, please feel free to do so.  Otherwise, I'm going to instruct her once we close to take those exhibits into the jury room.  Any objection from the Government?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  No, Your Honor.

5446

THE COURT: If you will leave your cell phones with the clerk so that we can contact you, you can be here ten or 15 minutes, that's satisfactory.

MR. LITTLEFIELD: Only thing, Judge, I have a concern. I don't think it will happen at this stage, but I think they should be advised that if they want to look at Government's Exhibit 1, it would be available for them to use in the courtroom.

THE COURT: Mr. Littlefield, you come with these ideas after I send the jury in. Okay. How do you propose that we communicate that to the jury?

MR. LITTLEFIELD: I have no problem with whoever takes the exhibits in advising them of that fact.

THE COURT: The issue, of course, is the jury is in the jury deliberation room. For them to come over here and have to be escorted by a bailiff.

MR. LITTLEFIELD: The courtroom would need to be cleared.

THE COURT: And we'll lock the courtroom down for that purpose. And I'll have the clerk advise them if they do desire, to send a note to let the bailiff know and if they do, then they can come over.

MR. HILFIGER: Judge, I would request it be -- that all of them do it instead of just one or two. If one or two want to see it, they should all be able to

5447

come over and see it.

THE COURT:  You mean if one wants to come they all have to come, is that the -- (Interrupted)

MR. HILFIGER:  Yes.

THE COURT:  Are you giving me permission to leave that instruction to the clerk?

MR. LITTLEFIELD:  Yes.

THE COURT:  That's Government's Exhibit 1, if they desire to observe Government's Exhibit 1, they're permitted to do so.  If one wants to come, they all have to come and they'll be with the bailiff when they come.

MR. HILFIGER:  Right.

THE COURT:  They'll stay and observe it until they all are prepared to return.

Anything further from the Government?

MR. SPERLING:  No, Your Honor.

THE COURT:  Defense?

MR. HILFIGER:  No, Your Honor.

THE COURT:  The marshal, for the record, inquired of the Court as to whether to take the Defendant back to the city/federal lock up or leave him here.  I've instructed him to leave him here in case you want to communicate with him or he wants to communicate with you.

(Whereupon, the Court was in recess while the jury deliberated after which the following record was

5448

made outside the hearing of the jury.)

THE COURT: Let the record reflect counsel for the Government is present, counsel for the Defendant is present. I'd inquire first of -- well, let me advise that I've received a note from the foreperson indicating the jury has reached a verdict. It reads: We have reached a verdict. I'll ask the clerk to mark this as Court Exhibit 28. Then, I'd inquire counsel for the Defendant when the Defendant was here earlier he announced in open court that he did not desire to be present for the verdict. And I instructed him if he had a change of heart to advise defense counsel. Does counsel for the defense have anything to report in that regard?

MR. SMITH: Judge, I visited with him through the hour and he didn't wish to come up here anymore.

THE COURT: I'll then ask the clerk to bring the jury in.

(Whereupon, the jury entered the courtroom and was seated in the box after which the following record was made.)

THE COURT: Let the record reflect the jury is in the box, counsel for the Government is present, counsel for the defense is present. Mr. Foreman, I've received a note indicating that the jury has reached a

5449

verdict; is that correct?

JUROR:  Yes, we have.

THE COURT:  If you would please hand the verdict to the bailiff and I'll ask the bailiff to hand it to the clerk.

The record should reflect that the Court has reviewed the verdict and I find it to be in order.  I'm now going to ask the clerk to publish the verdict.  Now, again, before we heard testimony in some there have been several potential emotional -- there's none more emotional than reading the verdict.  I speak to all involved.  And the same rule.  I'm interested in this jury being protected because of the very difficult work they've had to do the past three months and they're emotionally involved.  So, if you cannot control your emotions, then I'd ask you to leave the courtroom now.  If you cannot control your emotions, I don't want you to be embarrassed by one of the court security officers or the marshals taking you out of the courtroom because that just will not happen in my courtroom.  So with that admonition, I'll ask the clerk to publish the verdict.

COURT CLERK:  In the United States District Court for the Eastern District of Oklahoma, United States of America, Plaintiff versus Kenneth Eugene Barrett, Defendant, Case Number CR-04-115-P. Verdict.  Count one,

5450

committing a murder through the use of a firearm during or in relation to a drug trafficking crime or possession of a firearm in furtherance of such crime.  Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a sentence of life imprisonment without possibility of release shall be imposed upon the Defendant for the murder of David Eales as described in Count One of The Superseding Indictment.  Dated 11-17-05 signed by all 12 jurors.

Verdict.  Count Two, committing a murder through the use of a firearm during or in relation to a crime of violence or possessing a firearm in furtherance of such crime.  Verdict.  Based upon our consideration of the evidence and in accordance with the Court's instructions we find by unanimous vote that a sentence of life imprisonment without possibility of release shall be imposed upon the Defendant for the murder of David Eales as described in Count Two of the Superseding Indictment. Dated 11-17-05.  Signed by all 12 jurors.

Count Three, intentionally killing during the commission of a drug trafficking crime a state law enforcement officer engaged in the performance of his official duties.  Verdict.  Based upon our consideration of the evidence and in accordance with the Court's

5451

instructions, we find by unanimous vote that a sentence of death shall be imposed upon the Defendant for the murder of David Eales as described in Count Three of the Superseding Indictment.  Dated 11-17-05.  Signed by all 12 jurors.

Certification.  By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin or gender of the Defendant or the victim was not involved in reaching his or her individual decision and that the individual juror would have made the same decision regarding the appropriate sentence for the offense in question regardless of the race, color, religious beliefs, national origin or gender of the Defendant or the victim. Dated 11-17-05.  Signed by all 12 jurors.

THE COURT:  Members of the jury, you heard the clerk publish your verdict in regard to the penalty phase of this trial.  If this is, in fact, your verdict, would you please signify by raising your right hand?  The record should reflect that all 12 jurors have raised their right hand.  Any further polling of the jury requested by the Government?

MR. SPERLING:  No, Your Honor.

THE COURT:  Any further polling of the jury?

MR. HILFIGER:  I think we need to, Your Honor.

5452

THE COURT: I'll start on the top row. Juror number 84, you heard the verdict read by the clerk. Is this in fact your verdict?

JUROR 84: Yes, sir.

THE COURT: Juror number 213, you heard the clerk read the verdict of the jury. Is this in fact your verdict?

JUROR 213: Yes, sir.

THE COURT: Juror number 30, you heard the clerk publish the verdict. Is this in fact your verdict?

JUROR 30: Yes, sir.

THE COURT: Juror number 10, you heard the clerk publish the verdict of the jury. Is this in fact your verdict?

JUROR 10: Yes, sir.

THE COURT: Juror number 239, you heard the clerk publish the verdict in open court. Is this in fact your verdict?

JUROR 239: Yes, sir.

THE COURT: Juror number 44, you heard the clerk read, publish, your verdict in open court. Is this in fact your verdict?

JUROR 44: Yes, sir.

THE COURT: Juror number 157, you heard the clerk read and publish the verdict of the jury in open

5453

court.   Is this in fact your verdict?

JUROR 157:  Yes, sir.

THE COURT:  Juror number 57, you heard the clerk read the verdict.  Is this in fact your verdict?

JUROR 57:  Yes, sir.

THE COURT:  Jury number 49, you heard the clerk read the verdict.  Is this in fact your verdict?

JUROR 49:  Yes, it is.

THE COURT:  Juror number 73, in open court the clerk has read the verdict of the jury.  Is this in fact your verdict?

JUROR 73:  Yes, sir.

THE COURT:  Juror number 169, you've been present and heard the reading of the verdict by the clerk.  Is this in fact your verdict?

JUROR 169:  Yes, Your Honor.

THE COURT:  Juror number 55, you've been present in the court and heard the reading of the verdict.  Is this in fact your verdict?

JUROR 55:  Yes, sir.

THE COURT:  Any further polling of the jury?

MR. HILFIGER:  No, Your Honor.

THE COURT:  Do you find that the polling -- now, while the jury is still present and before I excuse them, I'm going to present the verdict form first and ask

5454

the special interrogatories and give counsel for the Government and the Defendant the opportunity to review them and then make any record you choose to make while the jury is still here.

Counsel for the Government, having reviewed the verdict form, do you have any record to make while the jury is still here?

MR. SPERLING:  No, Your Honor.

THE COURT:  For the Defendant?

MR. HILFIGER:  No, Your Honor.

THE COURT:  If there's nothing further, then I'll ask the clerk to file the verdict.

Members of the jury, before I excuse you, I have for the last three months that we've been together told you you could not discuss this matter with anyone. You couldn't discuss it among yourselves even before the case was submitted to you.  Now you're relieved of that admonition.  You may discuss this with anyone you choose to.  That's up to you.  You can discuss it with no one. You can discuss it with anyone you choose to with one exception that I'll alert you to is the parties, that is, counsel for the Government or any of their representatives, counsel for the Defendant or any of their representatives cannot talk with you about it unless they have an order of the Court allowing them to

5455

do so.  And those orders are not frequently given.  But the press, friends, family, anyone else you desire to discuss this matter with, you may.

What you have done for our system of justice these past three months is impossible for me to explain to you how important you've been in the process.  You've been instrumental in the preservation of individual rights while at the same time asserting the interest of society in general.  Your service as a jury during the three months has been a remarkable demonstration of your willingness to accept and use the responsibility to treat it greatly to your country and your community.  I know how much time you've devoted to your jury service and how much of a sacrifice it's been for you and your family.  And on behalf of the Government, on behalf of counsel, the Defendant and all of us involved, we thank you.  I feel confident that you've learned perhaps more than you wanted to learn about the court system and our system of justice in this three months that you've been here.  But I want to take this opportunity to publicly acknowledge your dedicated service to this Court and personally thank you for your service to this Court.

I'll now tell you that you're dismissed from any further service in this matter and I'll one last time ask everyone in the courtroom please remain seated as

5456

this jury leaves the courtroom.  If you'll leave your badges with the clerk.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT:  Let me enter this minute order. It's directed -- each party is to withdraw their respective trial exhibits.  The same should be kept and maintained for any possible appeal.  If you'll recall at the beginning of this trial, I allowed these jurors to take notes.  Those notes have been accumulated and I've instructed the clerk to shred those notes.

Now that the jury has been excused, any record to be made outside the hearing of the jury from the Government?

MR. SPERLING:  May we pick up the exhibits tomorrow, Your Honor, or should we take them --
(Interrupted)

THE COURT:  No, you may.

MR. SPERLING:  Thank you, Your Honor.

THE COURT:  We'll lock the courtroom.

MR. SPERLING:  Thank you.

THE COURT:  Any record to be made on behalf of the Defendant outside the hearing of the jury?

MR. HILFIGER:  No, Your Honor.

THE COURT:  It will be the order of the Court

5457

the Defendant to remain in the custody of the U.S. Marshal.  I'll set the sentencing date December the 7th at 10:00 a.m.  The Court will be in recess.

(END OF PROCEEDING)

5458

C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF TULSA      )

          I, Greg Eustice, Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that on November 17, 2005 the above Proceedings were held before the Honorable James H. Payne, Judge in the United States District Court for the Eastern District of Oklahoma, and that the same was reduced to writing by me in stenograph, and thereafter transcribed under my supervision, and is fully and accurately set forth in pages numbered 5285 through 5457.

          I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in said action.

          WITNESS my hand this 20th day of May, 2006.

                              _____
                              GREG EUSTICE
                              Certified Shorthand Reporter

                              Greg Eustice
                    Oklahoma Certified Shorthand Reporter
                          Certificate No. 0176
                       Exp. Date: December 31, 2006