# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

No. 19-7049

## UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

**v.**

## KENNETH EUGENE BARRETT,
*Defendant/Appellant*.

APPEAL FROM U.S. DISTRICT COURT, EASTERN DISTRICT OF OKLAHOMA
THE HONORABLE RONALD A. WHITE, CHIEF UNITED STATES DISTRICT JUDGE
CASE NO. CIV-09-105-RAW

## RESPONDENT/APPELLEE'S BRIEF

## ORAL ARGUMENT IS REQUESTED

Respectfully submitted,

BRIAN A. BENCZKOWSKI
Assistant Attorney General
United States Department of Justice

Jeffrey B. Kahan
Deputy Chief, Capital Case Section
U.S. Department of Justice
1331 F Street, N.W.; 6th Fl.
Washington, D.C. 20530
Tel: (202) 305-8910
Jeffrey.Kahan@usdoj.gov

BRIAN J. KUESTER
United States Attorney
Eastern District of Oklahoma

Christopher J. Wilson
Linda Epperley
Assistant United States Attorneys
Eastern District of Oklahoma
520 Denison Avenue
Muskogee, OK 74401
Tel: (918) 684-5100
Chris.Wilson@usdoj.gov
Linda.Epperley@usdoj.gov

# TABLE OF CONTENTS

ISSUES PRESENTED FOR REVIEW ...................................................................1

STATEMENT OF THE CASE............................................................................1

    A.  Procedural History and Ruling Presented for Review...................................1

    B.  Statement of Facts.......................................................................................3

        1.   The Guilt Phase Evidence ....................................................................3

        2.   The Penalty Phase Evidence .................................................................8

        3.   Section 2255 Motion ...........................................................................11

SUMMARY OF ARGUMENT .........................................................................19

STANDARD OF REVIEW ...............................................................................22

ARGUMENT ...................................................................................................23

TRIAL COUNSEL SELECTED APPROPRIATE MENTAL HEALTH
EVIDENCE FOR PRESENTATION TO THE JURY ..........................................23

    A.  The District Court Properly Assessed the Evidence ...................................23

        1.   Barrett's Procedural Challenge is Barred by the COA Requirement ......24

        2.   The District Court Fulfilled its Procedural Duties .................................25

    B.  The District Court Issued a Complete Order..............................................27

    C.  The District Court Appropriately Considered Barrett's Mental Health
Evidence .........................................................................................................29

    D.  The District Court Appropriately Considered and Rejected Barrett's Mental
Health Evidence..............................................................................................32

        1.   Brain Damage Evidence.......................................................................33

        2.   Psychiatric Evidence ...........................................................................36

    E.  The Aggravated Nature of the Crime Outweighs any Mitigation Attendant in
the Omitted Mental Health Evidence ...............................................................43

    F.  The District Court Considered the Full Ambit of Permissible Mitigation....50

    G.  Relief in this Case Should Only Reach Barrett's Death Sentence ................54

STATEMENT REGARDING ORAL ARGUMENT ...........................................57

CONCLUSION................................................................................................57

TABLE OF AUTHORITIES

Supreme Court

*Dusky v. United States*, 362 U.S. 402 (1960) ..................................................31

*Gonzalez v. Thaler*, 565 U.S. 134 (2012) ......................................................24

*Harrington v. Richter*, 562 U.S. 86 (2011)....................................................44

*Porter v. McCollum*, 558 U.S. 30 (2009) ......................................................44

*Rompilla v. Beard*, 545 U.S. 374 (2005) .......................................................47

*Slack v. McDaniel*, 529 U.S. 473 (2000)................................................. 24, 56

*Standefer v. United States*, 447 U.S. 10 (1980)...............................................50

*Strickland v. Washington*, 466 U.S. 668 (1984)...................................... 26, 32

*Tennard v. Dretke*, 542 U.S. 274, 288 (2004) ................................................51

*United States v. Raddatz*, 447 U.S. 667 (1980)...................................... 25, 26

*Wiggins v. Smith*, 539 U.S. 510 (2007) .........................................................47

*Williams v. Taylor*, 529 U.S. 362 (2000)................................................ 32, 44

U.S. Courts of Appeals

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007)...................................47

*Barrett v. United States*, 797 F.3d 1207 (10th Cir. 2015) .........................2, 22

*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) .................................47

*Duplan v. Harper*, 188 F.3d 1195 (10th Cir. 1999) ......................................33

*Grant v. Trammell*, 727 F.3d 1006 (10th Cir. 2013) .............................. 44, 52

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) ....................... 33, 47, 51

*In re: Barrett*, 840 F.3d 1223 (10th Cir. 2016) .........................................2, 48

*Johnson v. Rodgers*, 756 F.2d 79 (10th Cir. 1985) .......................................26

*Neece v. IRS*, 42 F.3d 1396, 1399 (10th Cir. 1994)......................................33

*Pisciotta v. Astrue*, 500 F.3d 1074 (10th Cir. 2007) .....................................33

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) ..............................................47

*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) .................. 1, 2, 8, 9

*United States v. Driscoll*, 892 F.3d 1127 (10th Cir. 2018)...........................22

*United States v. Espinoza*, 338 F.3d 1140 (10th Cir. 2003) ..........................50

*United States v. Flood*, 713 F.3d 1281 (10th Cir. 2013) ..............................22

*United States v. Gabrion*, 719 F.3d 511 (6th Cir. 2013) (en banc) ...............51

*United States v. Gordon*, 172 F.3d 753 (10th Cir. 1999) ..............................24

*United States v. Guerrero*, 488 F.3d 1313 (10th Cir. 2007) ........................55

*United States v. Hicks*, 146 F.3d 1198 (10th Cir. 1998)...............................56

*United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009)............................50

*United States v. Orrego-Fernandez*, 78 F.3d 1497 (10th Cir. 1996) ............26

*United States v. Rushin*, 642 F.3d 1299 (10th Cir. 2011)..............................22

*United States v. Snyder*, 793 F.3d 1241 (10th Cir. 2015) ............................22

*United States v. Taylor*, 454 F.3d 1075 (10th Cir. 2006).................. 24, 25, 28

*United States v. Willis*, 202 F.3d 1279 (10th Cir. 2000) ..............................55

*Wilson v. Trammell*, 706 F.3d 1286 (10th Cir. 2013) ...................................44

*Wynn Oil Co. v. Purolator Chemical Corp.*, 536 F.2d 84 (5th Cir. 1976)....28

U.S. District Courts

*United States v. Kee*, no. S1 98 CR 778(DLC), 2000 WL 863119 (S.D.N.Y. June 27, 2000) .........................................................................................56

Constitutional Provisions

*United States v. Harrison*, 469 F.3d 1216 (8th Cir. 2006)...........................54

Statutes

18 U.S.C. § 3592..........................................................................................8

18 U.S.C. § 3593......................................................................................56

18 U.S.C. § 3594......................................................................................56

18 U.S.C. § 924...................................................................................1, 56

21 U.S.C. § 848...................................................................................1, 54

28 U.S.C. § 2253............................................................................... 24, 56

28 U.S.C. § 2255................................................................................ passim

28 U.S.C. § 636........................................................................... 24, 25, 27

Other Authorities

Appellant's Opening Brief, *Barrett II*, 797 F.3d 1207 (No. 12-7086)... 52, 55

Fed. R. Civ. Proc. 15..................................................................................54

Fed. R. Civ. Proc. R. 52(a) .......................................................................28

Rules foll. 28 U.S.C. § 2255, R. 8 ....................................................... 26, 27

## ISSUES PRESENTED FOR REVIEW

On March 28, 2019, the district court granted a certificate of appealability ("COA") for the following issue: Whether Barrett was prejudiced by trial counsel's failure to develop certain mental health and social history evidence during the penalty phase of Barrett's capital trial.

## STATEMENT OF THE CASE

A. Procedural History and Ruling Presented for Review

Following the murder of Oklahoma Highway Patrol Officer David Eales, a federal grand jury in the Eastern District of Oklahoma returned an indictment charging Appellant Kenneth Eugene Barrett with one count of using a firearm to commit murder during and in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c) & (j) (Count One); one count of using a firearm to commit murder during and in relation to a crime of violence, in violation for 18 U.S.C. § 924(c) and (j) (Count Two); and one count of intentionally killing a state law enforcement officer in furtherance of a drug-trafficking crime, in violation of 21 U.S.C. § 848(e) (Count Three). *United States v. Barrett*, 496 F.3d 1079, 1082 (10th Cir. 2007) (*Barrett I*). A jury found Barrett guilty on all counts. *Id.* Following a penalty phase trial, the jury recommended, and the trial court imposed, a death sentence on Count Three and life sentences on Counts One and Two. *Id.* On direct review, this

1

Court affirmed the judgment, and the Supreme Court denied certiorari. *Id., cert. denied*, 552 U.S. 1260 (2008).

In 2009, Barrett moved for relief under 28 U.S.C. § 2255, which the district court denied. ROA 2:1768-1958. On appeal, this Court affirmed in part and reversed in part, remanding for an evidentiary hearing on a claim that trial counsel rendered ineffective assistance during the penalty phase hearing. *Barrett v. United States*, 797 F.3d 1207, 1208 (10th Cir. 2015) (*Barrett II*). Barrett sought rehearing and certiorari from those aspects of the opinion with which he disagreed, but this Court and Supreme Court denied further review. *Id.*, *reh'g denied* Oct. 16, 2015, *cert. denied,* 137 S. Ct. 36 (2016). On remand, the district court conducted an evidentiary hearing, denied relief in an unpublished order, and granted a certificate of appealability. ROA 4:2129-52. The court limited the COA as follows: "While this court strongly believes petitioner was not prejudiced by counsel's failure to develop the evidence at trial which was admitted at the evidentiary hearing herein, this court hereby grants a certificate of appealability thereby allowing further consideration of this issue." *Id*.

Since this Court remanded the case in *Barrett II*, Barrett has moved three times for permission to file a successive § 2255 motion. This Court denied two such requests, *see In re: Barrett*, No. 19-7028 (10th Cir. June 11, 2019); *In re: Barrett*, 840 F.3d 1223 (10th Cir. 2016) (*Barrett III*), and granted one, *see In re:*

2

*Barrett*, No. 16-7039 (10th Cir. Nov. 29, 2019). The authorized successive § 2255 motion remains pending.

B. Statement of Facts

1. The Guilt Phase Evidence

Barrett was a methamphetamine cook and dealer. SROA 291-92, 302, 304-05, 323, 1764-65, 3024-29, 3037-33.[1] One of Barrett's associates, Charles Sanders, was a confidential informant for the local district attorney's drug task force and told law enforcement that he had seen methamphetamine in Barrett's residence and had observed Barrett selling the drug there. SROA 2443, 2447, 2452, 2564-66. Barrett owned a .223 caliber Colt Sporter rifle that he kept at hand when he thought law enforcement officers were near. SROA 332-35, 340-42.

On January 28, 1999, after Barrett failed to appear for a court hearing, a warrant issued for his arrest. SROA 230. Barrett knew of the warrant and threatened to kill the police if they attempted to serve it. SROA 2447. Barrett specifically expressed his hope that Sequoyah County Sheriff Johnny Philpot or Drug Agent Frank Lloyd would serve the warrant so he could shoot them. *Id*. In late summer 1999, Barrett told a visitor to his home that if she saw the police enter, she should grab a gun or hit the floor. SROA 3423, 3429-31. Barrett told Cindy

---

[1] The government refers to the record by volume and page number, separated by a colon. "ROA" refers to Record on Appeal, received December 4, 2019; "SROA" refers to the Supplemental Record on Appeal, filed May 12, 2020.

Crawford, the wife of his cousin, Travis Crawford, that he intended to go out in a "blaze of glory" if the police came.  SROA 2994, 3004-05.

On September 20, 1999, based on information received from Sanders, Drug Task Force Investigator Clint Johnson obtained a warrant that authorized police to search Barrett's residence at night without first knocking or announcing their presence.  SROA 229-33.  Concerned about the risks attendant in a search of Barrett's home, Johnson requested assistance from the Oklahoma Highway Patrol ("OHP") tactical team.  SROA 234-39, 422-28, 631-35.  The tactical team agreed to conduct the entry to Barrett's home.  SROA 1395-97.

On September 23, 1999, eleven members of the OHP tactical team met to discuss their plan for entry.  They had initially intended to insert a surveillance team near Barrett's residence.  SROA 430-48, 639-46.  As daylight waned, three troopers from the team drove by Barrett's home in an unmarked Ford Bronco to obtain a ground-level view.  They found a locked metal gate blocking the driveway, neighboring homes closer to Barrett's residence than anticipated, and surrounding land that lacked cover for a surveillance team.  SROA 441-48, 646-53. Barrett's gate bore a sign that warned, "Keep Out.  I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot."  SROA 326.

From a house near Barrett's residence, Travis Crawford observed the Bronco pass Barrett's home. SROA 390-91.  Seeing Barrett at his front gate, Crawford

4

approached. SROA 392-93. Barrett opined that the Bronco might have contained police, and Crawford agreed. When Crawford mentioned the bench warrant, Barrett stated that he "[did]n't give a fuck," and threatened that if the police came back, "all hell would break loose." SROA 393.

Based on the troopers' observations, the tactical team changed its entry plan. SROA 447. Under the revised plan, three vehicles—a Bronco driven by Trooper John Hamilton, a Bronco driven by Trooper Raymond Greninger, and a marked Crown Victoria driven by Trooper Steve Hash—would travel to a driveway immediately east of Barrett's home. Led by Trooper Hamilton's Bronco, the vehicles would turn west and cross a ditch to enter Barrett's property. SROA 450-52. Trooper Hash would then breach the door to Barrett's residence, and Troopers Hamilton and Greninger—along with the Broncos' passengers, Troopers Eales and Ricky Manion–would enter the house. The Crown Victoria's passenger, Trooper Danny Oliver, would provide security at the northeast corner of the house. SROA 440-41, 450-52. Two other officers, Troopers Robert Darst and Billy Poe, would park a marked OHP unit on the road fronting Barrett's home to provide additional security. SROA 451, 1166-69. The tactical team's commanders, Lieutenants Kerry Pettingill and Jim McBride, would park their Chevrolet Suburban in the driveway of the trailer west of Barrett's home. SROA 420, 431-32, 1415. After

the tactical team had secured the property, local law enforcement would perform the search. SROA 428.

As he proceeded down the road in front of Barrett's home, Trooper Hamilton observed an individual (appellant's son, Toby Barrett) standing in the front yard. Attempting to watch the road and Toby Barrett, Trooper Hamilton overshot the entry to the driveway. He reversed and turned left onto the driveway, forgetting to activate the vehicle's emergency lighting. SROA 452, 459-62. But Troopers Greninger and Hash activated the emergency lights in their vehicles, which were immediately behind Trooper Hamilton's Bronco. SROA 659, 912.

As Trooper Hamilton emerged from the ditch east of Barrett's home, his vehicle began receiving gunfire. SROA 464, 663, 916, 1023-24, 1083. Eighteen shots struck the vehicle, most of which were fired at its driver. SROA 3105, 3173. Trooper Hamilton suffered fragment wounds to his eye, face and shoulder. SROA 466, 471, 483-84. He initially drove toward Toby Barrett, assuming he was the source of the gunfire. SROA 465. As the gunfire continued, Trooper Hamilton turned north and stopped just south of Barrett's porch. SROA 490. Trooper Greninger's Bronco stopped to the east and south of the porch (SROA 288, 663-65, 916-24, 1023-28, 1085-87), and Trooper Hash's vehicle parked to the east (SROA 1212).

Trooper Eales exited the passenger side of the lead Bronco. SROA 924-25, 1028-29. As he did so, he was shot in his right arm, left flank, and chest. SROA 1525-26, 1532-34, 1537-42. One bullet severed Eales' aorta, killing him. From the fatal wound, investigators later recovered jacketing from a .223 caliber bullet that matched to Barrett's Colt rifle. SROA 1542-46, 3640-44.

Trooper Eales stumbled to the rear of the Bronco as the gunfire continued. SROA 916-17, 1023-28, 1085-87. As a diversion, Trooper Hamilton tossed a flash-bang device out his Bronco's window. Its explosion prompted a brief cessation of fire, during which Trooper Hamilton exited his vehicle, only to suffer a gunshot wound to his left shoulder. SROA 470-71. Trooper Hamilton moved to the front left fender of his Bronco, firing into the residence where he saw man standing in the interior doorway holding a rifle, and Trooper Manion moved east and fired two bursts from a submachine gun through a window of the house, wounding Barrett in the lower body. SROA 473-75, 1031-33. Trooper Hamilton entered the house and dragged Barrett outside. SROA 475-77. Barrett reached for a loaded nine-millimeter pistol in his waistband, but the troopers restrained him. SROA 1039-40.

During a pat down search of Barrett's pants, Trooper Hash felt an apparent pill bottle (SROA 1036), which Sheriff Philpot retrieved from Barrett's pocket. SROA 1727. The bottle, as determined by subsequent testing, contained red

phosphorous. SROA 3559-64, 3566, 3593-97. On Barrett's property, investigators recovered items consistent with the use, manufacture, and distribution of methamphetamine including scales, glassware, solvents, and tubing (the latter of which contained methamphetamine residue). SROA 2413, 2603, 2892. Apart from two locally available products (SROA 2413, 2667-70), Barrett had sufficient supplies to manufacture about 55 grams of methamphetamine. SROA 2966-70.

2. The Penalty Phase Evidence

a. *Aggravation Case-in Chief*

During Barrett's capital sentencing proceeding, the government sought to prove three statutory aggravating factors: that the murder of Trooper Eales was the result of substantial planning and premeditation (18 U.S.C. § 3592(c)(9)), that Barrett's offense created a grave risk of death to others (18 U.S.C. § 3592(c)(5)), and that Barrett killed or attempted to kill more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)). *See Barrett I*, 496 F.3d at 1087. The government also introduced evidence of victim impact and future dangerousness as non-statutory aggravating factors. *Id.* The victim impact evidence included testimony from Trooper Eales's wife, mother, sister, and two close friends about the effect Eales's death had on them and on his two young children. *See* SROA 4467-78, 4581-4616. The future dangerousness evidence included testimony about Barrett's repeated attempts to escape from the police during traffic stops, SROA

4481-4506; Barrett's history of violence, including slapping his wife, threatening to shoot a man who tried to intervene, and threatening to shoot his cousin's girlfriend when she rebuffed his sexual advances, SROA 4515-19, 4572-78; and Barrett's stated desire to kill a government informant, SROA 4526-28.

The jury found that, of the statutory aggravating factors, the government had proved substantial planning and premeditation for all counts; multiple killings or attempted killings for Counts One and Two; and a grave risk of death for Count Three. *Barrett I*, 496 F.3d at 1087. The jury further found that the government had proved the victim impact non-statutory aggravating factor, but that it failed to prove future dangerousness. *Id.*

b. *Mitigation Case-in-Chief*

During the mitigation phase of Barrett's sentencing proceeding, the defense put on an extensive case that aimed at establishing a variety of mitigating factors, almost all of which some or all jurors found established. *See Barrett I*, 496 F.3d at 1087-1088 & n.4 (listing factors and noting that the only factor the jury unanimously rejected was remorse). The defense introduced evidence, for example, that Barrett had little contact with his father, following his parents' divorce, and was a "normal" but "very hyper" child who quit school at age 16. *See* SROA 5012-17, 5034, 5046, 5048-49. After turning 18, Barrett moved out of state to work on oil rigs, during which time he met and married Abby Stites. SROA

5017-18.  Barrett married Ms. Stites when he was 18 and she was 15 years old, and they remained married for 14 years.  SROA 4818-19.  Ms. Stites admitted to having "a very bad temper" and said the couple fought often, occasionally engaging in fist fights.  SROA 4820-22, 4893.  In one such encounter, Barrett broke his wife's nose.  SROA 4851.

After seeking a divorce in the 1990s, Ms. Stites concluded Barrett had "mental problems" and testified that she worked with Barrett's mother to have him placed in a mental hospital.  SROA 4833-34.  Barrett's mother, however, did not testify to any mental health issues.  Indeed, she allowed Barrett to live with her after the divorce and testified that he did not scare her and never behaved violently or used drugs around her.  SROA 5020-22, 5031-32.  Barrett's father, uncle, and neighbors likewise testified that they did not consider Barrett violent.  SROA 4861-65, 4870-74, 4994-94, 4999-5000, 5054-55.  Witnesses also testified that Barrett worked at a construction company and was a skilled mechanic and framing carpenter capable of complex tasks like overhauling an engine, doing body work on cars, and building his own house.  *See* SROA 5002-03, 5006, 5020-21.

Barrett's mother testified that, after the murder, he told her that "[h]e made the wrong decision of how to react that night.  If he could do it different he would do it different."  SROA 5030.  Barrett's mother and father also both testified that

Barrett had expressed remorse about the murder and sympathy for the victim's children.  SROA 5032, 5056.

In 2004, an Oklahoma state court convicted Barrett of first-degree manslaughter and assault and battery with a dangerous weapon in connection with the killing of Trooper Eales.  SROA 4658-66.  While in prison for that offense, Barrett reported his history of substance abuse to correctional officials, which included alcohol, marijuana, cocaine, heroin, and methamphetamine.  SROA 4770-71.  He did not, however, admit to any mental health history.  SROA 4771-72.  While in custody awaiting his federal trial, Barrett held down a job cleaning the Sequoyah County jail and sometimes collecting contraband from other inmates.  SROA 4901-07.  One of the jailers described Barrett as polite but arrogant and unremorseful.  SROA 4917-18.

### c. *Rebuttal Case*

In rebuttal, the government introduced evidence that Barrett had a history of violent outbursts in jail, including throwing food and a food tray at guards when meals were not to his liking, threatening to assault a guard, and beating a fellow inmate whose grooming habits annoyed him.  SROA 5156-61, 5169, 5173-74, 5201-06.

### 3. Section 2255 Motion

In his 2009 motion for postconviction relief under § 2255, Barrett alleged his trial counsel were constitutionally ineffective in failing to introduce mitigation evidence about Barrett's mental health. The district court referred the motion to a magistrate judge, who held an evidentiary hearing at which Barrett and the government presented testimony on that issue.

a. *Evidentiary Hearing*

At the evidentiary hearing, the defense presented testimony from Barrett's trial attorneys, Barrett's relatives, and doctors who had evaluated Barrett.

John Echols represented Barrett in his two state trials for killing Trooper Eales, neither of which resulted in a murder conviction. Though he never had an opportunity to present such evidence, Echols investigated Barrett's mental health and social history. ROA 4:777-83, 827-28. Mr. Echols briefly served as Barrett's attorney in federal court. ROA 4:787-88, 811-12, 838. Roger Hilfiger also represented Barrett in federal court, overlapping with Mr. Echols. ROA 4:1086-87. Based on his interactions with Barrett, Mr. Hilfiger did not believe the defense required input from an expert in organic brain disorders. ROA 4:1105, 1112, 1136, 1166-68. Mr. Hilfiger's co-counsel at trial, Bret Smith, found Barrett higher functioning than most criminal defendants. ROA 4:981-83, 995-97, 1031.

While preparing for Barrett's federal trial, Mr. Smith contacted Dr. Jeanne Russell and arranged for her to update an earlier mental health assessment of

Barrett. ROA 4:969, 1203-04. Dr. Russell observed that Barrett did not exhibit any symptoms of a major mental illness. ROA 4:1227-29; Gov't Ex. 35. She reported that another expert, Dr. Bill Sharp, had likewise found no symptoms of a major mental illness. ROA 4:1228, 1237.

Barrett's younger brother, Stephen, testified that Barrett was a "hyper" child. ROA 4:396-97, 406-07, 418. He also testified that their mother experienced mood swings, drank heavily, and reputedly had men "in and out" of her home. ROA 4:397, 404-06, 433-38, 447-48. Stephen further stated that his mother and Barrett argued frequently and sometimes got into physical fights, and that Barrett had attacked him twice when they were children—once causing a permanent scar and once causing injuries that required stitches. ROA 4:409-12, 426, 432-33, 445-46. Stephen acknowledged, however, that he had a successful life despite a lack of encouragement or effective parenting,[2] and agreed that he had succeeded through his own hard work, as compared to his brother's failures. ROA 4:442-43, 459-61, 468.

Dr. George Woods, a neuropsychiatrist retained by Barrett's postconviction defense team, twice evaluated Barrett. ROA 4:527-36. He diagnosed Barrett with bipolar disorder. ROA 4:539-41, 543-44, 546-48, 612-14, 618-19. Dr. Woods also

---

[2] Stephen was a high school principal who served in the National Guard and had degrees from the University of Oklahoma. ROA 4:429-30.

13

opined that Barrett exhibited symptoms consistent with post-traumatic stress disorder. ROA 4:557, 646-51; Gov't Exs. 34 & 37. Based on his review of neuropsychological testing, Dr. Woods further stated that Barrett suffered impairments in executive functioning. ROA 4:558-60, 563. He believed Barrett's disorders interacted with one another and impaired his ability to perceive events and to deliberate when the police raided his property. ROA 4: 569-71. Dr. Woods found that Barrett could not have rationally assisted his trial attorneys, even though the attorneys themselves did not experience such difficulties. ROA 4:665-66, 822-25, 860, 961-62, 980-81, 1032-33, 1081-82, 1093-94, 1182-83; Gov't Ex. 38.

Dr. Woods also asserted that methamphetamine could not induce symptoms of bipolar disorder. ROA 4:681-82, 690, 711; Gov't Ex. 9. He acknowledged that the *Diagnostic and Statistical Manual of Mental Disorders* prohibited a diagnosis for bipolar disorder when symptoms were attributable to substances. But he disputed the reliability of information concerning Barrett's drug use. ROA 4:657-64, 675-77.

Dr. Deborah Miora, a neuropsychologist, rescored testing performed on Barrett by one of her predecessors, who had since died. ROA 4:1647-1660. She found that Barrett had strengths in verbal comprehension, expression and memory, but weaknesses that were consistent with organic brain damage in problem solving, abstract reasoning, attention, planning, and alternating between stimuli. ROA

14

4:1707-08, 1722-26, 1743-46, 1756-57. She predicted that Barrett would have difficulty under stress if he had to pay visual attention and quickly switch between activities. ROA 4:1748. Dr. Miora also testified that Barrett had an impaired score on the Wisconsin Card Sorting Test that suggested he could not perform daily functions like driving. ROA 4:1748-49, 1831-32. Dr. Miora did not testify about the crime and had not reviewed reports about it. ROA 4:1835.

In rebuttal, the government introduced testimony from two professionals who had also evaluated Barrett and disagreed with the defense experts' belief that Barrett suffered from bipolar disorder, post-traumatic stress disorder, or brain damage.

In 2005, Dr. J. Randall Price, a neuropsychologist, evaluated Barrett under a contract with the government. ROA 4:1241-44, 1250, 1261-64; Gov't Ex. 53. Dr. Price reviewed records detailing the murder and Barrett's history of mental health treatment. ROA 4:1255-60. Although Barrett told Dr. Price that he had suffered a lengthy loss of consciousness following a childhood injury, he did not display the types of deficits that would normally be associated with such an event. ROA 4:1289-92, 1294-97. Dr. Price found that Barrett performed in the overall average range on an assessment of neuropsychological functioning—a result inconsistent with traumatic brain injury—and determined that Barrett's performance did not merit further testing for brain damage. ROA 4:1297-1304, 1331-32, 1356. Dr.

15

Price diagnosed Barrett with a learning disorder; drug dependence; depression; and a personality disorder with antisocial and paranoid traits and features.  ROA 4:1318-19.

Dr. Steven Pitt, a forensic psychiatrist, evaluated Barrett and memorialized his findings in a written report.  ROA 4:1439-52; Gov't Ex. 52.  Dr. Pitt elicited Barrett's admission to regular, long-term drug use, primarily marijuana and methamphetamine.  Barrett did not endorse the symptoms of a mood disorder (such as bipolar disorder), instead attributing his mood changes to drug use.  ROA 4:1457-58, 1484-86.

Dr. Pitt explained that bipolar disorder is a lifelong illness: the symptoms cannot be hidden for protracted periods of time, especially in stressful environments.  Dr. Pitt noted that Barrett's Bureau of Prisons records did not reflect diagnoses for bipolar disorder or post-traumatic stress disorder.  Dr. Pitt also explained that drugs – especially cocaine and methamphetamine – can mimic the effects of a mood disorder, and that Barrett's history of substance abuse therefore precluded a reliable diagnosis for bipolar disorder.  ROA 4:1471, 1478-79, 1379-81, 1486-92, 1499-1509.

Dr. Pitt also considered Barrett's family history, but he explained that mental health professionals do not diagnose mental illness on that basis alone.  ROA 4:1540; *see* ROA 4:1403-04.  He noted that no mental health professional had ever

treated Barrett for bipolar disorder. ROA 4:1399, 1532-33. Dr. Pitt also concluded

that, despite a dysfunctional upbringing, Barrett did not suffer from post-traumatic

stress disorder: Barrett himself did not endorse the symptoms, and Dr. Pitt could

not identify a threshold event that met the initial criteria for it. ROA 4:1492-93,

1532-33. Dr. Pitt also did not find evidence of brain damage that affected Barrett

on the night of the murder, and explained that Barrett's verbal, social and

mechanical competence foreclosed such a diagnosis. ROA 4:1495-96. Instead,

Dr. Pitt found that on the night of the murder Barrett suffered from drug

dependence, features of an antisocial personality disorder, and a possible learning

disorder. ROA 4:1498, 1519-21.

b. *Magistrate Judge's Report and Recommendation*

In his report and recommendation, the magistrate judge found that trial

counsel provided deficient performance, in that they failed to investigate Barrett's

mental health history or family background. ROA 4:2001. Counsel received

records indicating that Barrett had suffered head injuries, attempted suicide,

received mental health treatment, and experienced a dysfunctional upbringing.

ROA 4:2008. Those facts, the magistrate judge found, should have alerted counsel

to the need to investigate even though they did not perceive that Barrett suffered

from a mental illness. ROA 4:2008-11. In the absence of such investigation, the

17

magistrate judge rejected any presumption of reasonability for counsel's choice of mitigation strategies. ROA 4:2014.

The magistrate judge further held that omitted evidence of mental health issues, specifically organic brain damage and bipolar disorder, would have had a powerful mitigating effect if presented to a jury. ROA 4:2017-23. The magistrate judge determined that the government's rebuttal evidence would not have added substantially to its case in aggravation. ROA 4:2024-31. As such, he held that counsel's performance prejudiced Barrett, because it likely affected the outcome of the penalty phase.

c. *District Court Decision*

Following objections filed by both parties, the district court issued an opinion and order concurring in the magistrate judge's finding that trial counsel's lack of investigation amounted to constitutionally deficient performance. ROA 4:2129-36. The court held, however, that counsel's actions did not prejudice Barrett, notwithstanding evidence that he had severe mental health issues. ROA 4:2138. It found that Barrett had decided to kill a police officer long before the tactical team entered his property, a fact that blunted the mitigating effect of evidence that Barrett had difficulty processing information under pressure. ROA 4:2141. The court also catalogued evidence that would likely have caused a jury to reject the mental health findings offered by the defense. It noted that Barrett's

18

drug use precluded a diagnosis of bipolar disorder, that evidence in the record was inconsistent with his claims of head injuries, and that deficits identified in testing were inconsistent with his demonstrated abilities. ROA 4:2141-43.

The court determined that the government's witnesses offered a more rational explanation of Barrett's conduct, one centered on his admitted drug use and antisocial personality disorder. ROA 4:2144-46. Moreover, it held that any forgone evidence about Barrett's family life was susceptible to rebuttal centered on his violent tendencies. ROA 4:2147-50. The court therefore denied Barrett's § 2255 motion. ROA 4:2129-52.

## SUMMARY OF ARGUMENT

A. Without obtaining a COA on the issue, Barrett claims the district court improperly rejected some of the facts found by the magistrate judge who presided over the evidentiary hearing. According to Barrett, the district court could not reassess witness credibility without rehearing their live testimony. Barrett's claim lacks constitutional dimension, and therefore would not merit a COA. It also lacks merit. The district court properly concluded, based on facts established in the record, that the omission of mitigating evidence did not prejudice Barrett, irrespective of the individual truthfulness of any witness.

B. Again, without a COA to raise his claim, Barrett asserts the district court issued an incomplete opinion, failing to address allegedly mitigating family

19

history evidence.  Barrett could not obtain a COA to raise this issue because it does not involve an error of constitutional magnitude.  In any event, the district court addressed the issue Barrett claims it omitted and otherwise met its obligation to issue an opinion adequate to permit appellate review.

C.      In its opinion denying the § 2255 motion, the district court referred to a defense expert's testimony that characterized Barrett's mental illness as so profound that it prevented him from rationally assisting his lawyers.  The court's observation merely conveyed the extent to which Barrett's own evidence purported to predict his functional failings; the court did not suggest that Barrett's claim of ineffective assistance of counsel required him to prove that he was incompetent to stand trial.

D.      The district court properly concluded that evidence that Barrett suffered from brain damage and psychiatric disorders would not likely have changed the jury's verdict given the wealth of contradictory information in the record.  Barrett's psychiatrist predicted Barrett could not rationally assist his counsel, even though his trial attorneys contradicted that assertion. Neuropsychological testing indicated that Barrett was too compromised to drive a car—a conclusion at odds with the record.  The evidence also failed to explain Barrett's criminal behavior in a fashion that diminished his moral culpability.  In fact, the defense's mental health experts had no familiarity with the facts of

Barrett's crime and did not explain why he committed a premeditated ambush on a police tactical team.

E.     The district court properly considered Barrett's substantial planning and premeditation of the murder in determining whether the defense's mental health evidence meaningfully mitigated the crime.  The evidence Barrett offered appeared to presume that he killed in response to a threat he arguably misperceived.  But as reflected in the finding of substantial planning and premeditation and other evidence offered at trial, Barrett attacked the police *because* he recognized them.  Because that aspect of Barrett's ideation went unaddressed by the mental health evidence, the district court appropriately determined that the jury would not likely have afforded it significant mitigating weight.

F.     Although the district court considered the fact that Barrett's forgone mitigation evidence failed to explain his crime, it did not rule on that basis alone.  The court appropriately discounted the potential weight attributable to Barrett's supposed mitigation evidence because that evidence did not speak to the crime, but it never concluded that such a nexus was required.  The court further explained why the evidence was not entitled to mitigating weight, observing that it was inconsistent with other evidence and that the government could have rebutted it with information about Barrett's habitual violence and remorselessness.

G.  Barrett claims that, if this Court finds his trial counsel were ineffective, its remedy should encompass both his life and death sentences. Because Barrett has not demonstrated error, this Court need not consider the scope of its remedy.  In any event, Barrett's effort to secure relief from his life sentence is untimely.  The claim also erroneously implies that the jury's penalty phase sentencing recommendation could have bound the trial court to impose less-than-life sentences.  Because the court could have imposed a life sentence despite a more lenient recommendation, the mitigating evidence heard by the jury did not prejudice the judgment.

## STANDARD OF REVIEW

On appeal from the denial of § 2255 relief, this Court ordinarily reviews "the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Driscoll*, 892 F.3d 1127, 1130 (10th Cir. 2018) (internal quotes omitted) (quoting *Barrett II*, 797 at 1213 and *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011)).  The Court "can, of course, affirm a lower court's ruling on any grounds adequately supported by the record, even grounds not relied upon by the district court." *United States v. Snyder*, 793 F.3d 1241, 1243 (10th Cir. 2015) (internal quotation marks omitted).  It reviews the denial of an evidentiary hearing for abuse of discretion. *United States v. Flood*, 713 F.3d 1281, 1290 (10th Cir. 2013).

# ARGUMENT

## TRIAL COUNSEL SELECTED APPROPRIATE MENTAL HEALTH EVIDENCE FOR PRESENTATION TO THE JURY

In a series of claims attacking the procedure and reasoning of the district court, Barrett contends that his trial attorneys were ineffective because they did not present certain mitigating evidence related to his mental health and family history. Br. 22-53. Barrett fails to show that the district court erred, in its procedure or its rejection of his claim of ineffective assistance of counsel. The mental health evidence omitted at trial carried little mitigating weight because it posited that Barrett killed Trooper Eales in a confused and mentally compromised state. But other evidence established that Barrett murdered the officer in accordance with a long-standing plan, demonstrating in so doing a considerable ability to perceive, select, and engage targets. The omission of family history evidence likewise had little effect, as it may have generated some sympathy for Barrett but would have also underscored his long-standing penchant for drugs and violence.

A. The District Court Properly Assessed the Evidence

In view of the evidentiary hearing conducted by the magistrate judge, Barrett claims that the district court improperly decided factual matters without rehearing the testimony as required by statute. Br. 30-33. Barrett did not obtain a certificate of appealability ("COA") to raise this issue, nor could he, since it concerns an alleged violation of a statute, not a constitutional right. Regardless, the district

23

court did not make new credibility assessments that would have required a new hearing.

1.  Barrett's Procedural Challenge is Barred by the COA Requirement

In order to appeal from a "final order in a proceeding under [§] 2255," a federal prisoner must obtain a COA.  28 U.S.C. § 2253(c)(1)(B).  A COA may issue "only if" the prisoner makes "a substantial showing of the denial of a constitutional right," and it must "indicate which specific issue or issues satisfy that requirement."  28 U.S.C. § 2253(c)(2) & (3).  A COA may not issue to address claims that are based solely on alleged violations of statutory requirements.  *United States v. Taylor*, 454 F.3d 1075, 1079 (10th Cir. 2006); *United States v. Gordon*, 172 F.3d 753, 755 (10th Cir. 1999).[3]

The district court granted a COA that permits review of the finding that Barrett did not suffer prejudice from his trial counsel's failure to develop certain mitigating evidence.  It did not grant a COA to address any perceived violations of the procedural requirements of the Federal Magistrates Act, 28 U.S.C. § 636, nor

---

[3] An exception exists when a court denies § 2255 relief on procedural grounds without reaching an underlying constitutional claim, in which case a prisoner may obtain a COA by making a substantial showing of both a procedural and constitutional violation.  *See Gonzalez v. Thaler*, 565 U.S. 134, 140-41 (2012). That exception does not apply here:  the district court "rejected [Barrett's] constitutional claims on the merits," and thus Barrett's only avenue for obtaining appellate review is to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

did Barrett request a COA on that issue.  And Barrett could not have obtained a

COA to raise that statutory question, which exceeds the ambit of any permissible

appeal in a § 2255 case.  *See Taylor*, 454 F.3d at 1079.  Barrett's procedural

challenge is thus foreclosed.

2.  The District Court Fulfilled its Procedural Duties

Barrett's claim further fails because the district court complied with the

relevant procedural requirements.  Section 636 provides that, if a party objects to a

magistrate judge's findings or recommendations, the district court "shall make a de

novo determination" on the disputed issues and "may accept, reject, or modify, in

whole or in part, the findings or recommendations made by the magistrate judge."

§ 636(b)(1).  In making its determination, a district court "may also receive further

evidence or recommit the matter to the magistrate judge with instructions."  *Id.*

Holding a new evidentiary hearing is discretionary:  "the statute calls for a *de novo*

determination, not a *de novo* hearing," and contains no requirement that a district

court "rehear the contested testimony in order to carry out the statutory command

to make the required 'determination.'"  *United States v. Raddatz*, 447 U.S. 667,

674 (1980).  The rules governing § 2255 motions similarly provide that a district

court reviewing a magistrate judge's proposed findings and recommendations

"must determine de novo" any disputed issues, Rules foll. 28 U.S.C. § 2255, R.

8(b), but do not require the court to conduct a new hearing, *Johnson v. Rodgers*, 756 F.2d 79, 81 (10th Cir. 1985).

An evidentiary hearing may be necessary only when the district court rejects a magistrate judge's "dispositive" determinations of witness credibility. *See United States v. Orrego-Fernandez*, 78 F.3d 1497, 1501-02 (10th Cir. 1996). Even then, neither this Court nor the Supreme Court has definitively stated that a new hearing is always required. *See Raddatz*, 447 U.S. at 681 n.7 (observing "serious questions" might arise if a district court "reject[ed] a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal," but noting that such a situation was "unlikely" and need not be resolved); *Orrego-Fernandez*, 78 F.3d at 1501-02 (declining to resolve issue "[b]ecause the magistrate's credibility findings were not material to the district court's ultimate determination").

In this case, the district court reassessed the magistrate judge's finding that counsel's actions had prejudiced Barrett by analyzing whether the evidence presented at the evidentiary hearing would likely have led to a more favorable penalty verdict for the defense—without analyzing or questioning the credibility of the witnesses who presented that evidence. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The district court presumed the witnesses had truthfully and accurately related their findings, never once rejecting the verity of any testimony or

disagreeing with the magistrate judge's findings in that regard. *See* ROA 4:2141-51. Instead, as required by § 636 and Rule 8, the court considered the likely effect of that testimony on the jury, as informed by the balance of the evidence introduced at trial and the evidentiary hearing. *See, e.g.*, ROA 4:2141 (holding that, based on aspects of the testimony from the evidentiary hearing, the jury would likely have rejected diagnoses offered by Barrett's experts in light of other evidence); 2142-44 (comparing findings by a defense expert about Barrett's mental abilities with his proven capacity), 2145-46 (finding the record supported a finding that Barrett had a drug problem, not a mental disorder). As the court explained, expert testimony describing Barrett as mentally ill, even if credited, did not necessarily command mitigating weight, given the inconsistent and contradictory trial evidence. ROA 4:2138.

The district court's de novo assessment of the evidence, devoid of credibility assessments, did not require an evidentiary hearing.

B. The District Court Issued a Complete Order

Barrett claims that the district court's order denying his motion for postconviction relief failed to address evidence that he had experienced an abusive and traumatic family life. Br. 33-35. Once again, Barrett asserts a claim for which he has not secured, and could not obtain, a COA. In any event, his contention

lacks factual support, as the district court expressly rejected the notion that the family history evidence justified collateral relief.

Like Barrett's prior claim, his argument that the district court failed to address a species of evidence falls outside the COA. Moreover, it relies upon an unstated assumption that the court had a duty to specifically refute every contrary finding of the magistrate judge in order to enter a legally valid judgment that differed from the magistrate judge's report and recommendation. At most, the court had an obligation under the rules to issue an opinion sufficiently clear in its findings of fact and conclusions of law to permit appellate review. *See* Fed. R. Civ. Proc. R. 52(a); *Wynn Oil Co. v. Purolator Chemical Corp.*, 536 F.2d 84, 85-86 (5th Cir. 1976). Of course, a violation of such rules will not sustain a COA. *See Taylor*, 454 F.3d at 1079.

Moreover, Barrett cannot show that the district court fell short of its obligations to address the family history evidence. It dedicated approximately three pages of its opinion to a refutation of the claim that the omitted evidence prejudiced Barrett. *See* ROA 4:2147-49. It noted that Barrett had presented testimony about his multi-generational family history of mental health issues, including parents who were violent, unfaithful alcoholics. ROA 4:2147. The court likewise recognized "additional witnesses who discussed petitioner's less than ideal childhood." ROA 4:2148. And, in summarizing its findings, the Court made

clear that it had weighed "all of the mitigating evidence adduced at trial and the evidentiary hearing against the aggravating factors found by the jury." ROA 4:2149.

On this record, Barrett has failed to state a cognizable or meritorious claim that the district court omitted any significant fact from its reasoning.

C. <u>The District Court Appropriately Considered Barrett's Mental Health Evidence</u>

Barrett claims the district court mischaracterized his mental health evidence when it referred to an opinion that Barrett lacked the capacity to rationally assist his trial attorneys in the preparation of his defense. Barrett asserts his competence was not in issue, and the court should have only considered the value of this evidence as it related to penalty phase mitigation. Br. 35-36. The court's accurate, albeit rhetorical, observation implied that if the defense experts had persuasively identified mental conditions so profound as to have prevented Barrett from rationally assisting his lawyers, their findings would have merited great weight in mitigation. Its observation went no further and never led the court to analyze the evidence under an inappropriate legal standard.

The record before the district court supported its finding. At the evidentiary hearing, Barrett called Dr. George Woods to offer his expert opinion as a neuropsychiatrist. In 2009, Dr. Woods authored, and Barrett filed, a declaration that stated, "Mr. Barrett's functioning at the time of the offense was compromised

by multiple neurological and neuropsychiatric symptoms, none of which was addressed . . . . Barrett was suffering profound neurocognitive deficits that impaired his ability to rationally assist his attorney in the preparation of his defense." ROA 1:1324. Barrett embraced that finding, repeatedly asserting that he "was tried while incompetent" as a basis for § 2255 relief. *See* ROA 1:135-39, 376-80, 674-78, 915-19, 1431-36, 1703-08; 2:498-501, 771-74, 923-29, 1057-62, 1177-78, 1311-17; *see also* ROA 2:1851-58 (rejecting a competency claim based on the "proffer of Dr. George W. Woods' opinion"). During the evidentiary hearing, held eight years after Barrett filed his first § 2255 motion, Dr. Woods engaged in the following colloquy with government counsel:

> Q. Question again: Do you still stand by your 2009 report that the defendant was unable to rationally assist his attorneys in the preparation of his defense?
> A. Yes, that's my belief.

ROA 4:666.

For nearly a decade, Dr. Woods—by his own testimony—maintained that Barrett could not rationally assist his trial attorneys. Though Barrett never expressed doubt about Dr. Woods' finding, he now complains the judge relied upon it, thereby oversimplifying evidence of several alleged mental health afflictions that he intended to offer as proof of mitigation, not incompetence. *See* Br. 36. But the court clearly bore in mind all of Barrett's allegations in its opinion

30

rejecting relief, using the assertion of incompetency as a barometer for the severity of the allegations,[4] not as a rubric for analyzing the evidence.

Consistent with Barrett's arguments, the court expressly analyzed whether the evidence supported a finding that trial counsel was ineffective in "developing a mitigation strategy." ROA 4:2132. It cited the *Strickland* standard and noted the importance of mitigation evidence. ROA 4:2133-35. Not once did it analyze the mental health evidence using the competency standard set forth in *Dusky v. United States*, 362 U.S. 402 (1960).

With that legal backdrop, the court rejected Barrett's allegations in detail. The court determined that a diagnosis of bipolar disorder would not likely have persuaded the jury in light of competing evidence that Barrett abused drugs. ROA 4:2141. It reached a similar conclusion concerning Barrett's claims of traumatic head injury, which were contradicted by other evidence. ROA 4:2142. It also determined that the jury would have likely been persuaded that neuropsychological test results reflected malingering, given the vast inconsistencies between his diagnosed handicaps and demonstrated abilities. ROA 4:2142-44. In short, the court found that the jury would likely have rejected the opinions of Barrett's experts and found those of the government more plausible. ROA 4:2144-46.

---

[4] The court noted that, despite Dr. Woods' belief, trial counsel found Barrett "very helpful during the trial." ROA 4:2138 n.8.

Viewing the totality of the evidence, the court properly determined that trial counsel's failure to develop the mental health evidence did not prejudice Barrett. ROA 4:2150; *see Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (holding a court considering the prejudice prong of *Strickland* must "evaluate the totality of the available mitigation evidence . . . reweighing it against the evidence in aggravation"). In short, the court properly performed a prejudice analysis as required by *Strickland* and did not mischaracterize the significance of the mental health testimony.

D. The District Court Appropriately Considered and Rejected Barrett's Mental Health Evidence

Barrett claims the district court failed to give sufficient weight to evidence that he suffered from organic brain damage and bipolar disorder. Because the government did not present an expert in neuropsychology, Barrett argues the court had an obligation to credit his brain damage evidence and find it mitigating. Barrett further contends that the district court should have credited a psychiatric opinion that he suffered from bipolar disorder. Br. 36-43. The district court had no obligation to find that the experts' opinions were entitled to mitigating weight, much less to find that they probably would have altered the outcome of the trial.[5]

---

[5] As a subtext, Barrett implies that the district court's opinion denying relief lacked sufficient detail to properly reject contrary findings by the magistrate judge. As noted, Barrett cannot raise such a procedural claim on appeal, nor can he show that the district court issued a legally insufficient order. *See, supra*, Arg. I, B.

1. <u>Brain Damage Evidence</u>

Although brain damage evidence can have a powerful mitigating effect, *see Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012), its impact turns on its believability and relationship to the crime: "[T]he involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *Id.* But a court need not reflexively attribute mitigating weight to brain damage evidence, as it "is not obligated to accept uncontradicted expert testimony." *Duplan v. Harper*, 188 F.3d 1195, 1202-03 (10th Cir. 1999) (citing *Neece v. IRS*, 42 F.3d 1396, 1399 (10th Cir. 1994)). "Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) (applying rule in review an administrative law judge's findings).

In this case, the district court had ample basis for determining that the brain damage evidence offered by Barrett through Dr. Deborah Miora would not likely have persuaded the jury, as it simultaneously promised too much and delivered too little to merit weight in mitigation. Dr. Miora partially premised her diagnosis on the Wisconsin Card Sorting Test. ROA 4:1725-29, 1867. Barrett performed so terribly on the test that Dr. Miora's predecessor, Dr. Myla Young, concluded that Barrett would have lacked the ability to drive a car. ROA 4:1830. Dr. Miora did

not know whether Barrett could drive a car, though the trial evidence demonstrated he could. *Compare* ROA 4:1831; *with* SROA 4535-37; *see also* EH Gov't Ex. 36 (Barrett's driving record). Not only could Barrett drive, he was a skilled car repairman. *See* SROA 4870. The disparity between reality and the expert's findings provided a sound basis for rejecting the diagnosis.

Even if Barrett had persuasively demonstrated the profound handicaps forecast by Dr. Miora, she never established a nexus between his supposed brain damage and his crime. Dr. Miora rejected any suggestion that she could relate her findings to the murder: "I am not called in, as far as I know, to make any—to develop any opinion about what was going on with him at the time of the crime." ROA 4:1834-35. She could not even correlate Barrett's supposed deficits with his daily functioning. ROA 4:1746-47. She predicted only that Barrett would have difficulty under stress if he had to pay visual attention and quickly switch between different kinds of activities. ROA 4:1748. That predication was inconsistent with the evidence at trial and lacked mitigating weight.

Dr. Miora's findings were highly unlikely to have affected the sentencing verdict because they did not relate to Barrett's moral choice to kill. When he ultimately determined to shoot Trooper Eales, Barrett had no need to switch between visual tasks. To appreciate that he had no right to use deadly force, Barrett need only have recognized the eleven uniformed police officers traveling in

a convoy of vehicles (SROA 450-52, 1166-69, 1415), two of which had illuminated emergency lights (SROA 659, 912).  But Barrett had determined to fire on the police long before they appeared and presented visual information for him to process.  He erected a sign to announce as much (*see* SROA 326, 2276), he told a guest to grab a gun or hit the floor if she saw the police enter, (SROA 3423, 3429-31), and he separately mentioned his intent to go out in a "blaze of glory" if the police came (SROA 2994, 3005-06).  Barrett did not commit murder because a flaw in his neurocircuitry failed to inhibit his conduct: he did so because he had long wanted to shoot police officers, and no flaw in his attention span or visual processing prevented him from satisfying that desire.

Indeed, Barrett's conduct during the shooting demonstrates that he could, in fact, process visual information under pressure.  Having announced his homicidal intentions and prepared an AR-15 rifle with and 91 rounds of ammunition (SROA 332-34, 1814), Barrett expertly utilized his advantages on the night the police entered his property.  He surprised the tactical team before it could exit its vehicles, but after it left the drainage ditch (SROA 464, 663, 916, 1023-24, 1083), leaving the team with no cover, no means of escape, and no opportunity to return fire.  Barrett shot from the elevated platform of his home (SROA 191).  He tactically retreated from his porch to his home's interior to maximize concealment. *Compare* SROA 473-74 (Barrett in interior of home); *with* SROA 974-76 (Barrett

35

on porch).  And he continuously aimed at and struck the nearest and most threatening targets—first the convoy's lead vehicle and then the individual troopers who exited from it, in the order they did so.

Barrett effectively attended to the complex visual tasks of target selection, weapon aiming, and tactical concealment despite darkness, flashing emergency lights, and the presence of his son in the front yard.  Given the inconsistency between Barrett's alleged shortfalls and his demonstrated ability to perform feats of low-light, small arms combat, the district court appropriately determined that the jury would not likely have accepted Dr. Miora's expert findings.  As such, the lower court correctly concluded, as Dr. Pitt opined, that "to the extent that [brain damage] exists, I don't believe it affects the totality of his behavior in the choices that he made around the time of the offense."  ROA 4:1496.  The evidence is not persuasive or mitigating and its omission caused Barrett no prejudice.

2. Psychiatric Evidence

The district court also appropriately determined that the jury would not likely have accepted opinions offered by Dr. Woods that Barrett suffered from bipolar disorder and post-traumatic stress disorder, particularly in light of the powerful evidence that drug abuse explained any symptoms of mental illness.

The government's psychiatric expert, Dr. Pitt, found that Barrett experienced psychiatric symptoms "as a byproduct of substance use and not the result of a

mental disease or defect." EH Gov't Ex. 52 at 69. As Dr. Pitt testified, Barrett's substance abuse history *precluded* a diagnosis for bipolar disorder. ROA 4:1471 ("[I]f his symptoms can be better explained through the physiological effects of a substance, it's incumbent upon you to have substance use diagnosis first."). Under the diagnostic manual of the mental health profession ("*DSM-5*"), "[Y]ou don't make a diagnosis of something like bipolar disorder if the symptoms can be better explained by the physiological effects of a medical condition or a substance. It would be just irresponsible to do that." ROA 4:1477; *see* ROA 4:1488-89 (acknowledging a consensus in the *DSM-5* that drug use can mimic mania). Even Dr. Woods conceded, "*DSM-5* says a primary diagnosis of bipolar disorder must be established based on symptoms that remain once substances are no longer being used." ROA 4:657.

To avoid *DSM-5*'s command, Dr. Woods denied known facts. First, he asserted the effects of methamphetamine could not mimic symptoms of bipolar disorder (ROA 4:681-82, 690), although the *DSM-5* reflects a contrary professional consensus. ROA 4:1488-89. Second, Dr. Woods maintained in the face of overwhelming evidence that Barrett did not use drugs.[6] *Compare* ROA 4:658-59

---

[6] Dr. Woods also contradicted observable facts when he testified that Barrett exhibited pressured speech, attentional deficits, and "flight of ideas." *See* ROA 4:551, 575. As Dr. Pitt's videotaped interview demonstrates, Barrett can converse in a logical, paced fashion. EH Gov't Ex. 52 video.

("his toxicology screens were negative for methamphetamines"), 661 (testifying medical records did not reflect daily methamphetamine use in 1999); *with* EH Gov't Ex. 7 at 2, 7 (Barrett's admission to methamphetamine and marijuana use on the night of the murder and confirming blood test results); EH Gov't Ex. 8 (1995 medical record noting amphetamine dependence).

In fact, Barrett told Dr. Pitt, "there was no absence of drug use . . . . I've always used drugs . . . there was never a day that went by I wasn't [using]." EH Gov't Ex. 52 at 59; ROA 4:1457. Barrett attributed any history of manic episodes to his own abuse of intoxicants. EH Gov't Ex. 52 at 65. Barrett even implied his 1986 suicide attempt, involving a shotgun wound to the chest, stemmed from substance abuse. *See* ROA 4:55 (Barrett's self-report that, although he did not know why he attempted suicide, "[h]e was intoxicated at the time and tended to have a very depressed type of anger when he drank"), 707, 1476-77, 1542.

Unsurprisingly, not a single clinical mental health provider has ever made a final diagnosis of bipolar disorder for Barrett. ROA 4:1491. When Barrett received treatment following a suicide attempt, the treating psychiatrist diagnosed him with probable antisocial personality, drug abuse, alcohol abuse, and probable major depressive disorder. ROA 4:1458-60. At Eastern State Hospital, the staff admitted Barrett, based on reports from his wife and mother, with a diagnosis of marital problems, mixed substance abuse, alcohol abuse, and mixed personality

disorder. ROA 4:1461-63; Gov't Exs, 3, 4, 5 & 6. On discharge, he received diagnoses of marital problems, mixed substance abuse, and mixed personality disorder, but not bipolar disorder. ROA 4:1463-64. At Sequoyah Memorial Hospital, Barrett reported "losing his mind," but a urine screen was positive for amphetamines and THC. ROA 4:1466-67; EH Gov't Ex. 11. Consistent with the clinical findings, the Social Security Administration rejected a benefits application, finding Barrett exhibited no signs of a severe mental illness. ROA 4:1465; EH Gov't Ex. 10. Indeed, Barrett has received no diagnosis of bipolar disorder in federal custody, despite the stresses of incarceration. *See* ROA 4:1479, 1491-92.

Asymptomatic in custody and a drug abuser outside of it, Barrett strains to demonstrate the validity of his expert's diagnosis of bipolar disorder. He complains the district court should have relied on evidence that his relatives suffered from the disorder. But genetic history is not dispositive—it merely provides additional data to consider in diagnosis. *See* ROA 4:1403-04 (noting by analogy that a family history of diabetes does not guarantee offspring with the illness). Barrett cannot conflate a genetic predisposition with a diagnosis, and he offers no scientific basis for concluding that, by dint of family history, he suffers from bipolar disorder.

Similarly, Barrett makes an inappropriate attempt to substantiate the bipolar disorder by drawing the Court's attention to drugs he had received. Br. 42. Mental

health professionals do not rely solely on prior prescriptions to draw diagnostic inferences. *See* ROA 4:1405-06 (calling diagnosis based on medication alone "completely unprofessional and inappropriate"). For instance, one of the medications Barrett received, Haldol, is used to treat Tourette's Syndrome and agitation. ROA 4:1468-69. When he received Haldol, Barrett appeared "very agitated." EH Ex. 11. Barrett makes no effort to deduce from the evidence that he has Tourette's Syndrome and his efforts to rely on it as proof of bipolar disorder appear similarly misplaced, given his immediate symptoms. The inference is especially strained here, as none of the clinicians believed they were treating bipolar disorder. *See* ROA 4:678. To the extent Barrett received antidepressants, Asendin and Elavil (ROA 4:1542), his own expert indicated such drugs can exacerbate bipolar disorder. ROA 4:552-53. The prescription for those drugs thus indicates a *rejection* of bipolar disorder.

Barrett fares no better in relying on his relatives' lay mental health opinions, arguing they could attribute his behavior to mental disease rather than drug use. In support of this position, he cites three portions of the evidentiary hearing transcript (ROA 4:677-80, 1422, 1548-49 (*sic*: non-existent Dkt. 453 at 1065-66; *but correctly*: Dkt. 454 at 121-22)). The first excerpt (ROA 4:677-80) includes no lay opinion; rather, it reflects Dr. Woods' claim that other physicians had not diagnosed Barrett with bipolar disorder, as he had done, because they "didn't have

the data." If that assertion implies Dr. Woods alone possessed the opinions of Barrett's relatives, it likewise suggests they offered their unschooled views only in response to inquiries by a forensic expert, not a clinical one. That circumstance begs important questions about the relatives' biases and their understanding of the reasons for eliciting their opinions, as well as Dr Woods' techniques for doing so. But Barrett sheds no light on these important issues or the reasons why his relatives might have remained silent when he was receiving medical care for mental health issues.

In the remaining excerpts, Dr. Pitt discussed Barrett's moodiness as observed by his relatives. ROA 4:1422,1548-49. Dr. Pitt, however, never testified that the relatives' lay opinion excluded the effect of recreational drugs. He acknowledged that Barrett's relatives did not specifically attribute his mood swings to drug use. ROA 4:1422. But Dr. Pitt went on to explain that Barrett's relatives "readily acknowledged" his drug use and noted "most importantly of all, Mr. Barrett is the one that says he's using substances all the time. So why can't we believe him who said he said he was honest with me?" ROA 4:1423. When further questioned about the existence of opinions offered by relatives attributing moodiness to something other than drug use, Dr. Pitt demurred: "[Y]ou'd have to show me where they say that. I don't know that they gave attribution." *Id*.

41

Barrett's silence on that point provides telling evidence of his unsupported position.

De minimis historical support exists for a diagnosis of bipolar disorder—a non-physician noted a provisional finding of the condition when an agitated Barrett sought care in 1995. ROA 4:1469-70; Gov't Ex. 9. Upon discharge from that treatment, three days later, however, the attending physician diagnosed Barrett with organic affective disorder, polysubstance abuse, amphetamine dependence, urine drug screen positive for cannabis, and marital conflicts. ROA 4:1471. Given Barrett's history of substance abuse, the organic affective disorder diagnosis likely reflected the effect of drugs on his behavior, rather than some unarticulated conclusion that he suffered from bipolar disorder. *See* ROA 4:1471-73.

Dr. Woods' diagnosis of post-traumatic stress disorder was similarly unsupported. ROA 4:647-48. Barrett never endorsed the symptoms of post-traumatic stress disorder. *See* ROA 4:1359-60; Gov't EH Ex. 37. Moreover, he could offer no insight into the condition, admitting in 2017 that he did not even know the symptoms. Gov't EH Ex. 37, § 3 at 99-100, 117. Indeed, Dr. Woods conceded the existence of testing that suggested Barrett did not suffer from PTSD. ROA 4:646-48, 697-98; Gov't Ex. 37. At the time of trial, Barrett reported his commission of the murder as the life event causing him the most distress, which hardly supports a finding that he was already suffering from post-traumatic stress

disorder when he killed Trooper Eales. ROA 4:1360-62. And as Dr. Pitt explained, even if Barrett had exhibited symptoms of post-traumatic stress disorder at the time of the murder, his drug use would, once again, explain them. *See* ROA 4:1383.

If faced with the competing conclusions of Dr. Woods and the government's experts, the jury would almost certainly have concluded the latter's determinations were more persuasive because they were consistent with the views of every prior treating physician, abundant evidence of drug abuse, and a custodial history devoid of symptoms. Accordingly, Barrett cannot succeed in demonstrating that the omission of the mental health evidence caused him prejudice.

E. <u>The Aggravated Nature of the Crime Outweighs any Mitigation Attendant in the Omitted Mental Health Evidence</u>

Barrett claims that the district court, in assessing prejudice, erroneously relied on the case in aggravation, especially the jury's finding of substantial planning and premeditation, to find that the forgone mental health evidence would not have affected the verdict. He goes on to make an extended attack on the strength of the government's case, especially its evidence of substantial planning and premeditation, upon which he contends the court placed too much reliance. Br. 44-49. The district court appropriately assessed the mental health evidence in view of the government's case, including the facts of the crime, the aggravating factors, and the available rebuttal.

To assess the likelihood that a defendant would have received a more favorable verdict had counsel adduced additional mitigation, courts consider "'both [the evidence] adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams*, 529 U.S. at 397-398). Apart from forgone mitigation evidence, the courts also review the prosecution's response to that evidence. *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013). For purposes of the analysis, a reasonable probability of prejudice "is one that is 'substantial, not just conceivable.'" *Grant v. Trammell*, 727 F.3d 1006, 1019 (10th Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

Barrett's forgone mitigation evidence does not outweigh the case in aggravation. As discussed above (*see, supra*, Arg. I, D), Barrett's experts provided diagnoses that contradicted other evidence in the record. Even assuming the jury was willing to overlook some of those glaring inconsistencies—finding, for example, that Barrett was too brain damaged to drive cars despite being able to repair them and was too incompetent to assist the attorneys who found him helpful—neither Dr. Miora nor Dr. Woods could relate their diagnoses to the facts of Barrett's crime. And they could not have done so, given that they were unfamiliar with the circumstances surrounding the murder.

As noted, Dr. Miora conceded that she knew nothing of the murder. ROA 4:1835-36. She also conceded that Barrett did not exhibit in his daily life the deficits he supposedly exhibited on a neuropsychological test. ROA 4:1746-47. She predicted only that Barrett would experience difficulties with visual attention and quickly switching between different kinds of activities. ROA 4:1748. As fully explored above, however, Barrett had no difficulty conceiving of or executing his attack, despite his supposed limitations. *See, supra*, Arg. I, D.

Dr. Woods attempted to relate his findings to the murder but did not understand what had occurred. He suggested that Barrett killed Trooper Eales during an exchange of gunfire, rather than during an ambush. ROA 4:569. Barrett apparently misled Dr. Woods into this view, telling him that he only fired at the officers after suffering a gunshot wound to the leg and observing the lead Bronco strike his home. ROA 1:1318-19. But Barrett announced well ahead of the murder that he would violently confront the police if they entered his property. *See e.g.*, SROA 393, 3004-06, 3430. When he saw the tactical team convoy enter his land, he acted on his plan, repeatedly firing on a police vehicle and its occupants. SROA 463-64. He wounded the driver before the vehicle stopped. *Id*. And Barrett killed Trooper Eales before any member of the tactical team returned fire. SROA 470-75.

Given Dr. Woods' ignorance of these salient facts, he did not shed any mitigating light on Barrett's actions. Rather, in reliance on Barrett's account, Dr. Woods concluded Barrett misperceived the threat presented by the tactical team and felt justified in opening fire. ROA 4:571, 701-02; *see also* ROA 1:1325 ¶ 73 (noting Barrett's alleged inability to recognize the police as such). But the jury's verdicts under 21 U.S.C. § 848(e) (murder of a law enforcement officer during the course of a drug crime) and 18 U.S.C. § 3591(c)(9) (substantial planning and premeditation) reflect findings that Barrett knew who he was shooting and his illicit reasons for doing so.[7]

Accordingly, the district court appropriately determined that evidence about Barrett's sense of subjective justification would not likely have changed the jury's verdict. Unless Dr. Woods had identified a mental condition that explained a compulsion to scheme against the police and act upon long-standing homicidal plots, his findings would not bear on the crime committed. In this regard, the jury's substantial planning and premeditation finding provides critical insight into its understanding of the evidence and its likely rejection of Dr. Woods' theory.

---

[7] At the time of the murder, Barrett knew that shooting a police officer was illegal. *See* EH Gov't Ex. 52 at 70-71. Still, he fired on the tactical team though two its three approaching vehicles had illuminated emergency lights (SROA 659, 912), having remarked shortly beforehand that "all hell would break loose" if the police entered his property (SROA 393).

Ignoring the extent to which the substantial planning and premeditation verdict confounds his experts' opinions, Barrett cites multiple decisions for the proposition that the district court was obligated to rely on his mental health evidence. *See* Br. 46 (citing *Wiggins v. Smith*, 539 U.S. 510 (2007); *Rompilla v. Beard*, 545 U.S. 374, 391-93 (2005); *Hooks*, 689 F.3d at 1205; *Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007); *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004)). Barrett identifies cases in which courts have recognized that mental health evidence may, in some circumstances, mitigate premeditated murders. *See, e.g.*, *Smith*, 539 U.S. at 943. But Barrett fails to demonstrate on the facts of this case that the district court erred in holding that his mental health evidence would not likely have affected the jury's verdict.

The district court understood that capital defendants can offer weighty mitigation in the face of premeditated homicides. *See* ROA 4:2134 (citing *Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001) (noting the important role of mitigation)). And this Court has emphasized that mitigation "affords an opportunity to humanize and explain." *Smith*, 379 F.3d at 943 (emphasis and internal quotations omitted). But the opportunity to present a mitigation theory does not require the factfinder to deem it persuasive and afford it mitigating weight when viewed in light of all the facts. Here, the proffered mental health evidence failed to accurately describe the defendant's condition or clarify his reasons for

47

killing Trooper Eales, and the district court therefore correctly determined that the evidence had little mitigating weight.

The district court did not, as Barrett claims (*see* Br. 45), decide that no mitigating evidence could overcome premeditation or deliberate intent to kill. Rather, it held that the mitigation evidence Barrett presented in the § 2255 proceedings did not explain this crime or overcome the aggravating weight of the government's case. It found an overwhelming likelihood that the jury would have determined that Barrett had a drug problem, not a major mental health disorder. *See* ROA 4:2145-46. It found that Barrett's family history of mental health issues did not add anything of value to the evidence adduced at trial. *Id.* at 2147. And it found that any evidence of brain damage "was unconnected to the facts presented." ROA 4:2148-49 (further noting additional aggravating evidence developed on remand).

Saddled with his failure to have met the evidence against him, Barrett attacks the trial verdict, complaining about the credibility of the informant witnesses and the ethics of one prosecutor. Br. 47. None of those claims survived scrutiny when Barrett presented them in 2009 (*see* ROA 2:1807-33, 1839-40; *see also Barrett III*, 840 F.3d at 1238-39 (rejecting Barrett's actual innocence theory in view of inculpatory evidence presented to the jury)), nor did he have cause to

48

litigate them on remand.  At this juncture, Barrett has no COA and no procedural vehicle to revive the claims before this Court.

Barrett likewise fails in attacking the federal verdict based on supposedly inconsistent state court outcomes.  Br. 48.  He did not litigate these issues below and has no procedural basis for doing so now.  More to the point, Barrett has, himself, distinguished the state case based on the addition of informant witnesses in federal court.  ROA 2:559-60 (observing the testimony of the seven informants "was the main difference" between the state and federal cases); 3:337.  The prosecutions were distinguishable, and the verdict in state court has no bearing on the strength of the federal case.

Barrett also claims that evidence of his paranoia, developed years before the evidentiary hearing, would have explained his commission of the crime.  Br. 47.  He asserts, incorrectly, that his paranoia existed independent of his drug use as demonstrated by the observations of a mental health evaluator, Dr. Sharp.   In a 2009 declaration, Dr. Sharp remarked on Barrett's paranoia, as observed during evaluations in Sequoyah County jails.  Dr. Sharp expressly presumed that Barrett's years of pre-trial custody left him "relatively free" of the effects of illicit drugs.  The assumption was unfounded, however, as Barrett subsequently informed Dr. Pitt that "while in jail" and "before" his state trials he used Oxycontin, crank, and methamphetamine.  EH Ex. 52 at 32 n.7.

Finally, Barrett attempts to denigrate the government's case by asserting that the jury returned inconsistent penalty verdicts based on a single homicide. Once again, Barrett has no procedural vehicle to raise his claim. Moreover, juries are permitted "to acquit out of compassion or compromise or because of their assumption of a power which they had no right to exercise, but to which they were disposed through lenity." *Standefer v. United States*, 447 U.S. 10, 22 (1980) (internal quotes omitted). Speculation about the basis of inconsistent verdicts finds no support in the law and provides no basis for review. *United States v. Espinoza*, 338 F.3d 1140, 1147-48 (10th Cir. 2003); *see also United States v. Lawrence*, 555 F.3d 254, 268 (6th Cir. 2009) (refusing to speculate about the reason for inconsistent penalty verdicts).

The district court correctly held the evidence developed on remand failed to carry sufficient additional mitigating weight to overcome the aggravated nature of this premeditated murder. ROA 4:2149-50. Indeed, the court noted that the government's case had grown stronger on remand, revealing that Barrett denied responsibility for the murder, cast himself as a victim, had engaged in physical altercations with his mother, and had violently attacked his younger brother. ROA 4:2149. This Court should affirm the district court's considered judgment.

F. <u>The District Court Considered the Full Ambit of Permissible Mitigation</u>

Barrett claims that the district court erroneously imposed a "nexus requirement" on his mental health evidence, assessing it only in reference to its effect on his commission of the murder. He asserts that the court improperly required him to show that "but for" his alleged conditions, he would not have committed the murder. Br. 49-52. The court properly determined, however, that omission of the mitigation evidence did not prejudice Barrett, in part because its failure to explain the crime deprived it of meaningful mitigating weight when viewed in light of other evidence.

As Barrett asserts, mental health evidence need not have a nexus to the crime of conviction to have mitigating effect. *See Tennard v. Dretke*, 542 U.S. 274, 288 (2004). But mitigation evidence must be "relevant to the defendant's personal culpability for his crime," *United States v. Gabrion*, 719 F.3d 511, 521 (6th Cir. 2013) (en banc), and its mitigating weight naturally increases if the defendant is able to demonstrate a close connection between the mitigating evidence and the crime itself. As noted, mental health evidence may have powerful mitigating force if it "tends to diminish moral culpability" for a killing by "altering the causal relationship between impulse and action." *Hooks*, 689 F.3d at 1205. As this Court has observed, however, evidence of "'generalized personality disorders'" that fails to provide "'a compelling or sympathetic explanation for [the

defendant's] violent behavior'" does not carry the same weight. *Grant*, 727 F.3d at 1021 (collecting authority).

It appears Barrett has long understood that his alleged mental health issues would carry greater mitigating weight if he established some nexus between them and his actions on the night of the murder. As noted, Dr. Woods asserted from the outset that Barrett's alleged mental condition caused him to believe he was justified in killing Trooper Eales. ROA 1:1326, 2:423. Barrett frequently and extensively quoted Dr. Woods' declaration in his motion for § 2255 relief, which twice mentioned the theory that Barrett killed "as a function" of his mental illness. *See e.g.*, ROA 2:493-94, 680. When Barrett initially appealed, he asserted that he was "far less capable than the normal individual of understanding and forming a rational response to events, especially startling and rapidly unfolding events like the police raid on his property." Appellant's Opening Brief at 55-56, *Barrett II*, 797 F.3d 1207 (No. 12-7086). After this Court remanded the case, Barrett filed proposed findings of fact and conclusions of law, again quoting Dr. Woods' theory that "Mr. Barrett, as a function of a mental disorder, believed his actions [on the night of the murder] were right." ROA 3:985.

But having insisted for the better part of a decade that evidence of his alleged mental illness had mitigating weight *because* of its nexus to his crime, Barrett now complains that the district court erred in addressing that argument.

52

The court explained that, "[w]hile petitioner's experts identified issues at the evidentiary hearing that they opined might have compromised the petitioner's ability to process information under pressure, petitioner had clearly resolved to murder Trooper Eales or any other law enforcement officer long before this incident played out." ROA 4:2141. The court further determined that the evidence was less reliable than that presented by the government, which explained the defendant's conduct in light of his drug use. ROA 4:2144-46.

As discussed above, however, the court did not limit its analysis of Barrett's evidence to whether it directly explained his crime. The court also holistically analyzed the evidence adduced at trial and the evidentiary hearing and determined that the newly presented material did not alter the weight of the defense's case:

> [P]etitioner has failed to establish that there is a reasonable probability that even one juror's decision would have been different. This is especially true when the court considers the totality of the mitigating evidence adduced at trial and that adduced at the evidentiary hearing from petitioner's witnesses regarding organic brain disorder, which was unconnected to the facts presented to the jury and included symptoms of mood swings described as "reactive violence" and/or "chronic irritability," and the additional witnesses who discussed petitioner's less than ideal childhood.

ROA 4:2148. The court also observed that the evidence presented at the hearing revealed Barrett's lack of remorse, his misplaced sense of victimhood, his evident disdain for custodial rules, his physical altercations with his mother, and his attacks

on his younger brother, all of which tended to add weight in aggravation.  ROA 4:2149.

Barrett cannot demonstrate that the court's broad analysis imposed an improper nexus requirement on the evidence, though it appropriately addressed his claim that one existed.

G.  Relief in this Case Should Only Reach Barrett's Death Sentence

Reasoning that his trial counsel's alleged ineffectiveness infected the jury's penalty verdict as to all three counts of conviction, Barrett claims that this Court should order resentencing as to all charges, rather than the offense for which he received the death penalty.   Br. 52-53.  Because Barrett has failed to demonstrate any error in the district court's reasoning and resolution of his ineffectiveness claim regarding his death sentence, this Court need not consider whether any remedy should encompass his life sentence.  But even assuming the Court was inclined to order a new penalty phase as to the § 848 offense, Barrett has not timely raised his objections regarding his life terms.

After the filing of an answer, a § 2255 movant may amend the motion for relief only with the government's written consent or leave of court.  Fed. R. Civ. Proc. 15(a)(2); *see United States v. Harrison*, 469 F.3d 1216, 1217 (8th Cir. 2006). The discretion to provide leave is constrained by the one-year period of limitations in which federal prisoners may seek collateral relief.  *See* § 2255(f); *United States*

*v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000).  The limitation period bars

untimely amendments that do not relate back to existing claims and add new

contentions to an initial § 2255 motion.  *See United States v. Guerrero*, 488 F.3d

1313, 1316 (10th Cir. 2007).

Barrett's conviction became final on March 17, 2008, when the Supreme

Court denied certiorari from his direct appeal.  Thereafter, he consistently alleged

that counsel's penalty-phase ineffectiveness resulted in an undeserved death

sentence.  *See* ROA 1:300; ROA 2:687, 1265.  Consistent with that approach,

Barrett sought, in his initial § 2255 appeal, to persuade this Court of "a reasonable

probability that at least one juror would have refused to vote for the death penalty."

Appellant's Opening Brief at 54, *Barrett II*, 797 F.3d 1207 (No. 12-7086).  On

remand, he continued to assert that counsel's alleged ineffectiveness prejudiced

him only as to his death sentence.  *See, e.g.*, ROA 3:207.  Barrett first revealed his

theory that counsel's alleged ineffectiveness prejudiced his life sentences in his

2018 objections to the magistrate's report and recommendation.  ROA 4:2040-49;

*see also* ROA 4:2150 (finding the argument moot for want of prejudice).

Given his considered decision to attack only his death sentence in his § 2255

motion, Barrett cannot assert at the eleventh hour that counsel's performance also

infected his life sentences on other counts.  He did not allege as much in his § 2255

motion, he did not amend his motion to include that theory, and he did not obtain a

COA to raise the issue.  *See* § 2253(c)(3); *Slack*, 529 U.S at 481-84.

In any event, the issue lacks merit.  Barrett cannot demonstrate a likelihood

that the omitted mitigation evidence would have likely persuaded the jury to

recommended sentences less than life or his § 924 offenses.  First, such verdicts

are non-binding.  *See* 18 U.S.C. § 3594; *United States v. Kee*, no. S1 98 CR

778(DLC), 2000 WL 863119, *8 (S.D.N.Y. June 27, 2000).  The advisory nature

of such verdicts upends the applicability of Barrett's sole cited authority for

resentencing on all counts, a case concerning remand for non-capital sentencing by

a judge, rather than a penalty phase trial under 18 U.S.C. § 3593.  *Cf.* Br. 52 (citing

*United States v. Hicks*, 146 F.3d 1198 (10th Cir. 1998)).  Second, as fully

discussed above, the omitted evidence did not have meaningful weight in

mitigation given the circumstances of the crime and the new aggravation

developed at the evidentiary hearing.

Barrett's belated effort to smuggle into this case a new and unsupported

theory of prejudice should fail.  He did not timely raise this issue below, and he has

provided no basis for concluding his claim could succeed even if he had satisfied

the relevant procedural requirements.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Government asserts that oral argument is necessary given the gravity of the issues and the size and complexity of the record.

## <u>CONCLUSION</u>

Based on the foregoing reasoning and authority, the government respectfully urges this Court to affirm the judgment of the court below.

Dated:  May 13, 2020:

Respectfully submitted,

BRIAN A. BENCZKOWSKI
Assistant Attorney General
United States Department of Justice

*/S/Jeffrey B. Kahan*
Jeffrey B. Kahan
Deputy Chief, Capital Case Section
U.S. Department of Justice
1331 F Street, N.W.; 6th Fl.
Washington, D.C. 20530
Tel: (202) 305-8910
Jeffrey.Kahan@usdoj.gov

BRIAN J. KUESTER
United States Attorney
Eastern District of Oklahoma

*/S/Christopher J. Wilson*
Christopher J. Wilson

*/S/Linda Epperley*
Linda Epperley
Assistant United States Attorneys
Eastern District of Oklahoma
520 Denison Avenue
Muskogee, OK 74401
Tel: (918) 684-5100
Chris.Wilson@usdoj.gov
Linda.Epperley@usdoj.gov

## Certificate of Word Count Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). According to MS Office 365, this brief contains 12,894 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

*/s/Jeffrey B. Kahan*

## Certificate of Digital Submission

I certify that:

- all required privacy redactions have been made;
- that with the exception of those redactions, every document submitted in digital form or scanned PDF format is an exact copy of the written document the government is prepared to file with the Clerk;
- that the ECF submission was scanned for viruses using McAfee Endpoint Security, updated May 13, 2020, and according to the program is free of viruses.

*/s/Jeffrey B. Kahan*

## Certificate of ECF Filing & Delivery

I hereby certify that on May 13, 2020, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's CM-ECF system to the following counsel of record:

- Mr. David B. Autry dbautry44@hotmail.com
- Ms. Joan M. Fisher Joan_Fisher@fd.org
- Carrie Ward Carrie_Ward@fd.org
- Ms. Heather E. Williams heather_williams@fd.org

*/s/Jeffrey B. Kahan*