**Case No. 19-7049**

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 19-7049 |
| Plaintiff-Appellee, | (D.C. No. 6:04-00115-RAW/ |
| | 6:09-cv-00105-RAW) |
| v. | |
| KENNETH EUGENE BARRETT | |
| Defendant-Appellant. | |

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
Honorable Ronald A. White

ORAL ARGUMENT REQUESTED

**APPELLANT'S CORRECTED OPENING BRIEF**

**HEATHER E. WILLIAMS**, CA Bar No. 122664
Federal Defender
**JOAN M. FISHER**, ID Bar No. 2854
Assistant Federal Defender
**CARRIE L. WARD**, MO Bar No. 57581
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  (916) 498-5700
Facsimile:   (916) 498-6666
E-Mail:     Joan_Fisher@fd.org
            Carrie_Ward@fd.org

**DAVID B. AUTRY**, OBA Bar No. 11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106
Telephone: (405) 521-9600
Facsimile:   (405) 521-9669
E-Mail:     dbautry77@gmail.com

# TABLE OF CONTENTS

I. PRIOR OR RELATED APPEALS ................................................................1

II. STATEMENT OF JURISDICTION .........................................................1

III. ISSUE PRESENTED ON APPEAL ........................................................2

IV. STATEMENT OF THE CASE .................................................................2

    A. Procedural History ...........................................................................2

    B. Statement of Facts ...........................................................................5

        1. The Offense ..............................................................................5

        2. Trial Counsels' Strategy and Argument. ..............................7

        3. Evidence During the Penalty Phase of the Federal Trial....................8

        4. Evidence Proffered in Support of the § 2255 Motion. ......................9

        5. The Evidentiary Hearing..................................................................10

V. SUMMARY OF THE ARGUMENT .............................................................17

VI. ARGUMENT ..............................................................................................21

PROPOSITION: THE MAGISTRATE JUDGE RULED CORRECTLY
THAT TRIAL COUNSELS' ADMITTED DEFICIENT PERFORMANCE
IN THE PENALTY PHASE PREJUDICED MR. BARRETT, REQUIRING
A NEW SENTENCING TRIAL.  THE DISTRICT COURT ERRED IN
REVERSING THE MAGISTRATE JUDGE'S PREJUDICE
DETERMINATION, AND COMMITTED OTHER ERRORS. ..........................21

    A. Standard of Review: ..........................................................................21

    B. Portions of the Record Where the Claim was Raised and
       Ruled Upon: .......................................................................................22

    C. Argument ...........................................................................................24

        1. Introduction......................................................................................24

        2. Deficient performance ...................................................................28

        3. Prejudice ..........................................................................................29

           a. The district court's rejection of the magistrate's finding
             of prejudice without hearing further evidence violates
             the Federal Magistrates Act .......................................................29

i

b. The district court ignored an entire class of mitigating evidence in wrongly rejecting Judge Shreder's finding of prejudice..................................................................33

c. The district court completely mischaracterized Mr. Barrett's mental health evidence. .......................................35

d. The district court took no account of why the mental health evidence introduced by Mr. Barrett was more compelling than that introduced by the government..................36

    i. Neuropsychological evidence/organic brain damage ...........36

    ii. Psychiatric evidence .........................................................41

e. The "substantial planning and premeditation" aggravating circumstance does not defeat the magistrate judge's finding of prejudice. The district court failed to take into account the fact that this was not an overly strong case for the death penalty, making prejudice from trial counsels' errors and omissions far more evident. ......................44

4. The district court improperly assigned a causal nexus requirement between the evidence of mental illness and the criminal act..........................................................................49

VII. CONCLUSION .................................................................................53

VIII. ORAL ARGUMENT .........................................................................53

ATTACHMENT 1: Doc. 478 Opinion and Order: 03/28/2019

ATTACHMENT 2: Doc. 479 Judgment: 03/28/2019

**Federal Cases**

*Anderson v. Sirmons*,
476 F.3d 1131 (10th Cir. 2007) ............................................................... 35, 37, 47

*Boyde v. California*,
494 U.S. 370 (1990) .................................................................. 37, 43, 44

*Carter v. Bigelow*,
787 F.3d 1269 (10th Cir. 2015) ..................................................................... 4

*Elzour v. Ashcroft*,
378 F.3d 1143 (10th Cir. 2004) .................................................................. 31, 33

*Hooks v. Workman*,
689 F.3d 1148 (10th Cir. 2012) ............................................................... *passim*

*Littlejohn v. Trammell*,
704 F.3d 817 (10th Cir. 2013) ................................................................ 35, 37

*Mathews v. Weber*,
423 U.S. 261 (1976) ..................................................................... 32

*Porter v. McCollum*,
558 U.S. 30 (2009) ...................................................................... 17, 18

*Rompilla v. Beard*
545 U.S. 374, 125 S. Ct. 2456 (2005) .................................................. 35, 46, 50

*Smith v. Mullin*,
379 F.3d 919 (10th Cir. 2004) ...................................................... 37, 45, 46, 51

*Smith v. Texas*,
543 U.S. 37 (2004) ........................................................................ 50

*Strickland v. Washington*,
104 S. Ct. 2052 (1984) ................................................................... 2, 3

*Strickland v. Washington*,
466 U.S. 668 (1984) .................................................................. 2, 5, 29

*Tennard v. Dretke*,
542 U.S. 274 (2004) ...................................................................... 50

*United States v. Barrett*,
496 F.3d 1079 (10th Cir. 2007) ............................................................ *passim*

*United States v. Barrett*,
797 F.3d 1207 (10th Cir. 2015) ............................................................ *passim*

*United States v. Hicks*,
146 F.3d 1198 (10th Cir. 1998) .................................................................. 52

*United States v. Orrego-Fernandez*,
  78 F.3d 1497 (10th Cir. 1996) ...................................................................... 32

*United States v. Raddatz*,
  447 U.S. 667, 100 S. Ct. 2406 (1980) ................................................. 21, 31, 32

*United States v. Rushin*,
  642 F.3d 1299 (10th Cir. 2011) .............................................................. 22, 36

*Wessel v. City of Albuquerque*,
  463 F.3d 1138 (10th Cir. 2006) .................................................................... 31

*Wiggins v. Smith*,
  539 U.S. 510 (2003) ............................................................................. 35, 46

*Williams v. Taylor*,
  529 U.S. 362 (2000) ............................................................................. 45, 51

*Wilson v. Sirmons*,
  536 F.3d 1064 (10th Cir. 2008) ............................................................. 35, 37

*Wilson v. Workman*,
  577 F.3d 1284 (10th Cir. 2009) .................................................................... 35

**Federal Statutes**

18 U.S.C. § 848 (2018) ...................................................................................... 3

18 U.S.C. § 924 (2018) ...................................................................................... 3

18 U.S.C. § 1291 (2018) .................................................................................... 2

18 U.S.C. § 3592 (2018) .................................................................................. 49

28 U.S.C. § 636 (2018) ............................................................................... 20, 31

28 U.S.C. § 2255 ............................................................................................... 2

## I.  PRIOR OR RELATED APPEALS

On direct appeal, this Court affirmed the judgment in Mr. Barrett's criminal case. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) (*Barrett I*). Petitioner sought collateral relief pursuant to 28 U.S.C. § 2255, which was denied by the district court on August 16, 2012.  (Case NO. CIV-09-105-RAW; ROA, Vol. 2, at 1768.).  On August 19, 2015, this Court affirmed in part and reversed in part, remanding:

> . . . Defendant's death sentence for the district court to hold an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial. In all other respects we AFFIRM.

*United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015) (*Barrett II*).

## II.  STATEMENT OF JURISDICTION

Petitioner/Appellant Kenneth Eugene Barrett appeals pursuant to 28 U.S.C. § 2255, 18 U.S.C. §1291 and Rule 4(a) of the Federal Rules of Appellate Procedure, the district court's March 28, 2019 Opinion and Order and Judgment, accepting in part and rejecting in part the Magistrate Judge's Report and Recommendation denying Mr. Barrett's § 2255 Motion on remand from this Court. (ROA, Vol. 4, at 1998; ROA, Vol. 4, at 2129; ROA, Vol. 4, at 2129.) On August 13, 2019, the district court denied Mr. Barrett's timely filed a Motion to Alter

1

Pursuant to Federal Rule of Civil Procedure 59(e) (ROA, Vol. 4, at 2161; ROA, Vol. 5, at 52).

Mr. Barrett filed a timely Notice of Appeal on October 7, 2019. (ROA, Vol. 5, at 54.)

### III.      ISSUE PRESENTED ON APPEAL

Given the district court's finding that Mr. Barrett's counsels' trial performance fell below the constitutional minimum required by the Sixth Amendment to the United States Constitution, as established in *Strickland v. Washington*, 466 U.S. 668 (1984), 104 S. Ct. 2052 (1984) the only issue presented here is whether trial counsels' failure to adequately develop and present mitigation evidence at sentencing prejudiced Mr. Barrett.

### IV.      STATEMENT OF THE CASE

**A.    Procedural History**

On January 28, 1999, the District Court of Sequoyah County, Oklahoma issued a warrant for Mr. Barrett's arrest, on charges of unlawful delivery of a controlled substance. (ROA, Vol. 2, at 86.) Eight months later, that court issued a "no knock" search warrant for Mr. Barrett's residence. (SROA, Vol. 1, at 233-234). On September 23, 1999, law enforcement executed the warrants, a shoot-out ensued, and Trooper David Eales was killed. (*Id*. at SROA, Vol. 1, at 244, 247).

In 1999, Mr. Barrett was convicted in state court, *State v. Barrett*, Sequoyah County District Court Case No. CF-99-493. The first trial ended in a hung jury. SROA, Vol 1, 4664-4666. (Docket entry, 10/21/02) Barrett I, 496 F.3rd at 1086. The second trial ended with the jury rejecting the first degree murder and shooting with intent to kill and convicting him of manslaughter and assault and battery with a dangerous weapon. He was sentenced to consecutive prison terms of 20 and 10 years, respectively. (*Id*. [Verdicts, 2/6/04]).

On September 23, 2004, the government filed a criminal complaint against Mr. Barrett. Barrett I, 496 F.3rd at 1086. Mr. Barrett was charged with two violations of 18 U.S.C § 924 firearms provisions, and one count in violation of 18 U.S.C. § 848, killing a law enforcement officer.). *Barrett II*, 797 F.3d at 1087. The government sought the death penalty on all three counts. *Id*.

A jury found Mr. Barrett guilty on all three counts and recommended life on Counts One and Two and death on Count Three. *Id*. This Court affirmed the judgment and sentence. *Barrett I*, 496 F.3d 1079 (10th Cir. 2007).

Mr. Barrett filed his first 28 U.S.C. Section 2255 Motion to Vacate the Judgment and Sentence on March 16, 2009 and later amended the same. (ROA, Vol. 1, at 46, 585, 1336, ROA, Vol. 2, at 441). On August 16, 2012, the district court denied Mr. Barrett's § 2255 Motion (as amended). No certificate of appealability was issued. ROA, Vol. 2, at 1959.

This Court granted consideration of seven issues related to ineffective assistance of counsel. *United States v. Barrett*, Case No. 12-7086, Dkt. No. 01019047087 (10th Cir. May 2, 2013).[1] This Court affirmed the district court opinion and denied relief on all the claims save the question of ineffective of assistance of counsel at the penalty phase, and remanded the same for an evidentiary hearing. (*Barrett II*, 797 F.3d at 1232).

The Magistrate Judge issued his Report and Recommendation (R&R), finding that Mr. Barrett was entitled to relief under *Strickland v. Washington,* 466 U.S. 668 (1984) and recommended a new sentencing. ROA, Vol. 4, at 2031.

---

[1] A Motion to Expand the Certificate of Appealability on claims related to the guilt phase and violations of the Fifth and Sixth Amendment guarantees of Due Process and the Ineffective assistance of counsel related to the issuance and execution of the underlying search warrant and prosecutorial misconduct related to the government's late disclosed, drug addicted "informants" was denied. *Id*. Dkt. 01019053403.

On June 15, 2015 Mr. Barrett filed a Motion for issuance of a Certificate of Appealability in light of *Carter v. Bigelow*, 787 F.3d 1269 (10th Cir. 2015) and based upon the confidential informant's recantation. *Id*. Dkt. 10279130. This Court denied the motion. *Barrett II*, 797 F.3d 1218-1219 (making no findings on performance, but *Barrett* failed to show requisite prejudice).

On July 6, 2015, while pending appeal and after briefing, Mr. Barrett filed a Motion to Remand based in significant part on newly discovered evidence of egregious prosecutorial misconduct. *i.e.,* procuring, permitting and presenting perjured testimony to secure the search warrant, the service of which resulted in the botched raid that resulted in the unfortunate death of the Highway Patrol Trooper. (*Id*. Dkt. No.10284187). The motion was denied on July 29, 2015. (*Id*. Dkt. 10290404).

On March 28, 2019, the district court accepted the finding of deficient performance but rejected the magistrate judge's finding of prejudice, denied relief, and issued a certificate of appealability. (ROA, Vol. 4, at 2150).

On October 12, 2018, Mr. Barrett objected in part to the recommendations, requesting the recommended relief apply to all three counts under the sentencing packaging doctrine, since they were factually interwoven and death eligible at the time of counsels' deficient performance," (ROA, Vol. 4, at 2040). The district court declared the issue moot, in light of his finding of no prejudice. (ROA, Vol. 4, at 2150).

## B. Statement of Facts

### 1. The Offense

In 1999, a state-federal joint task force ("Tact Team") executed a "no knock" "no announce" warrant at Mr. Barrett's residence, based on allegations of a non-violent drug distribution charge. (SROA, Vol. 1, at 229-234; SROA, Vol. 1, at 537) *See, Barrett I*, 496 F.3d at 1084. Five vehicles were to surround the home and breach without announcing law enforcement credentials, to execute the state search warrant. *Id*. SROA, Vol. 1, at 428. Trooper Eales was to be the first person to make entry through the front door. *Id*. SROA, Vol. 1, at 456.

The Tact Team arrived on the rural property shortly after midnight as Mr. Barrett's teenage son, Toby, was crossing the yard.

Trooper Hamilton drove the lead vehicle, an unmarked Bronco, with Trooper Eales as passenger.  SROA, Vol. 1, at 496.  The trial record is inconsistent as to who fired the first shots.  *See, e.g.*, SROA, Vol. 1, at 496, 464, 543.  Trooper Hamilton denied shooting his weapon until he was confronted months later with a ballistics report that showed his handgun was fired.  SROA, Vol. 1, at 562.  Lieutenant Pettingill stated that "it was his men who started shooting at the Barrett cabin as they rolled up on it."  ROA, Vol. 2, at 1413.  Toby shouted, "Dad!" from the yard.  Hamilton drove towards Toby, whom he believed to be Kenneth Barrett.  SROA, Vol. 1, at 465.

The participating officers gave multiple inconsistent statements regarding, *i.e.,* who shot their weapons, the use or non-use of emergency lighting on the vehicles, and the sequence of gunfire.  *E.g.*, ROA, Vol. 2, at 583-589; ROA, Vol. 2, at 1410.  At a minimum, Hamilton, Manion and Mr. Barrett fired weapons, and Trooper Hamilton threw a "flash bang" grenade from his vehicle. SROA, Vol. 1, at 471.  The federal trial testimony indicates that Eales had emerged from his vehicle and was positioned between the three known shooters.  *Id*.

Trooper Eales died from his wounds. Mr. Barrett was shot four times, dragged from his home, arrested and searched.  *Id*. SROA, Vol. 1, at 476.  No drugs were found on him or at his home, though possible precursor items were

found at his residence and outlying buildings, and allegedly on his person. *Barrett*, 496 F.3d at 1085.[2]

### 2. Trial Counsels' Strategy and Argument.

Mr. Barrett's trial team proceeded on a theory of self-defense, or defense of others, which had proven successful in the state trial. However, they did not present evidence to support this theory. Trial counsel approached the jury in opening statements and stated, "the Government cannot disprove that Kenny Barrett acted in self defense." SROA, Vol. 1, at 146. "Kenny Barrett may have been guilty of other things, but he's not guilty of murder." SROA, Vol. 1, at 165.[3]

Trial counsel knew that Mr. Barrett's teenage son Toby was in the yard and present for the raid but did not call him to testify. They did not use any of the evidence that had proven effective at the state trial. Mr. Barrett's federal trial counsel did not use any lay or expert witnesses to challenge or rebut the government's theory of what happened at the scene. In closing arguments, Mr. Barrett's attorney argued his "known paranoia" to explain "what he did next and what occurred next may not have been reasonable, I'm not saying it's reasonable, but it was not done with malice aforethought." SROA, Vol. 1, at 4271. His

---

[2] Although Mr. Barrett was searched incident to his arrest, these precursor items were not found until Mr. Barrett's clothing had been twice searched and transferred into evidence with the local sheriff. SROA, Vol. 1, at 1688, 1697.

[3] *U.S. v. Barrett,* 797 F.3d 1207 (10th Cir. 2015).

counsel did not present any expert or clinical provider to testify as to the "paranoia." Trial counsel did not request an instruction on self-defense. The jury did not determine whether Mr. Barrett knew or should have known of the warrants, nor were they required to find an element of specific intent to kill or premeditation. SROA, Vol 1, at 4190 – 4214. (Instructions).

### 3. Evidence During the Penalty Phase of the Federal Trial.

The government called multiple officers, who testified as to their personal trauma and loss. *See* SROA, Vol. 1, at 4366 and 4568. Family members testified as victim impact and community loss. The government introduced a series of personal photos, as well as emotional unsworn letters, providing insight into Trooper Eales' overall character. SROA, Vol. 1, at 4568, 4951-4952, 4618-4620, 4623-4627.

Mr. Barrett's attorneys called approximately eight family members and friends, who testified generally that Mr. Barrett was a good neighbor, a good mechanic, a good and beloved son/brother/father. *See* SROA, Vol. 1, at 4701 and 4883. They did not submit any personal documentation or photographs, and did not provide any insight into Mr. Barrett's character. Trial counsel did not call any expert witnesses and offered no evidence in mitigation regarding his social history, family history, or his physical or mental health. *See* SROA, Vol. 1, at 4701. The

government's argument that Mr. Barrett was a cold-blooded killer went unchallenged before his jury sentenced him to death.[4]

**4. Evidence Proffered in Support of the § 2255 Motion.**

Mr. Barrett's lead trial counsel continued his representation through the direct appeal. As such, significant relevant evidence, that was available and would have been admissible at trial as mitigating evidence was not discovered until Mr. Barrett's § 2255 Motion to Vacate and subsequent briefings, when he had new counsel.

Therein, Mr. Barrett proffered numerous declarations and documents showing law enforcement knew of his paranoid tendencies, manipulated confidential informant statements to evidence a propensity for violence, and the willful destruction, alteration, or manufacture of evidence in the years before his federal trial. *See, e.g.*, ROA, Vol. 2, at 1410 (Declaration of Paul Gordon, OHP Internal Affairs Investigator). Despite the severe limitations imposed on admissible evidence at the evidentiary hearing Mr. Barrett proffered powerful mitigation evidence sufficient to convince the Magistrate Judge that Mr. Barrett had met the requisite show of prejudice. *See* Magistrate's Report and Recommendation; *see also U.S. v. Barrett*, 797 F. 3d at 1229-1232 (discussing in

---

[4] *U.S. v. Barrett,* 496 F.3d 1079, 1112 (10th Cir. 2007).

detail the potential mitigating impact of the evidence produced prior to the remand).

## 5. The Evidentiary Hearing.

The hearing illustrated in great detail that, at the time of his trial, substantial evidence supported this Court's prima facie finding that Mr. Barrett's counsel were deficient in failing to investigate and present mental health and other mitigation evidence. Trial counsel did not employ any experts to assist in a mitigation investigation and did not investigate readily discernible signs of potential mental health issues. This "powerful mitigating" value was not presented to the sentencing jury. *See, e.g.,* ROA, Vol. 4, at 2150.

Mr. Barrett's family history of mental illness and substance abuse, his own genetic predisposition for mental illness, his personal childhood trauma, including documented physical and emotional abuse, and his objective symptoms indicative of mental disease or defect were readily available to his counsel through even a cursory review of medical and school records and social history witness interviews. As noted by the magistrate,

> "[t]he record before the Tenth Circuit as well as the evidence presented at the evidentiary hearing before this Court is consistent with the Tenth Circuit's observations that the Defendant's attorneys apparently never hired an expert on the issue of mitigation or otherwise themselves investigated the Defendant's mental health history or family background.

ROA, Vol. 4, at 2001.

Experts found that Mr. Barrett suffered from organic brain injury. His psychiatric and psychological make-up included, but was not limited to, the development and presence of bipolar disorder, post-traumatic stress disorder, multiple head injuries, and other mental deficits and impairments, which Mr. Barrett long treated by self-medication as was evidenced by his undisputed substance abuse. At the hearing, Mr. Barrett called eleven witnesses[5] and introduced forty-four exhibits. The Government called three witnesses[6] and introduced forty-three exhibits.

The mental health evidence and expert witnesses proved:

a.    Mr. Barrett's family had a long history of suicidal behavior, actual suicides, a family history of bipolar disorder and depression. At least, two family members had been hospitalized for behaviors and mental disorders consistent with Mr. Barrett's. ROA, Vol. 4, at 539-560, 543, 556, 577-578; ROA, Vol. 4, at 612

---

[5] In addition to the listed mental health experts, Mr. Barrett presented the lay testimony of Ruth Harris, Mark Dotson, Stephen Barrett, and Doris Barrett as to Mr. Barrett's upbringing by a neglectful and alcoholic mother and an absent unloving father. Jack Gordon and John Echols,' Mr. Barrett's prior defense attorneys, Steve Leedy, state defense investigator, and trial counsel Brett Smith testified for Mr. Barrett.

[6] Mr. Roger Hilfiger, lead defense counsel, and two mental health experts testified on behalf of the government.

(Dr. George Woods); Govt. Exh. 19-25, 34. ROA, Vol. 4, at 1490, 1499-1506 (Dr. Stephen Pitt).[7] Pet. Exh. 1, 3, 50, 5, 45,-49, 54, 58, 50, 56, 57.

b.    At the time of trial, evidence that Mr. Barrett's mother was a promiscuous alcoholic who encouraged Mr. Barrett, a minor, to abuse alcohol and drugs with her paramours, was readily available. ROA, Vol. 4, at 545-546 (Dr. Woods); Doc. 454 at 82, ROA, Vol. 4, at 1509 (Dr. Pitt). Mr. Barrett was severely beaten by the police as a teenager and suffered a related head injury. ROA, Vol. 4, at 500-502 (Jack Gordon); ROA, Vol. 2, at 292-293, (Declaration of Gelene Dotson); ROA, Vol. 2 at 406 (Declaration of Dr. George Woods). Mr. Barrett has a documented pre-offense history of head trauma, including at least two occasions where he lost consciousness. *See* Pet. Exh. 25; Govt. Exh. 19, 56. ROA, Vol. 4, at 564; ROA, Vol. 4, at 627-630; ROA, Vol. 4, at 1480-1481, 1513-1515. Mr. Barrett had a long history of substance abuse that was self-medicating in nature. *Id.* ROA, Vol. 4, at 556, 577-578 (Dr. Woods). The government expert, Dr. Pitt, agreed he was genetically predisposed to developing a substance abuse disorder, which he characterized as a disease. *E.g.*, ROA, Vol. 4, at 1386.

c.    Mr. Barrett had a history of mental illness, well documented, if not well treated, by repeated and extended hospitalizations. ROA, Vol. 4, at 547-572

---

[7] Government exhibits admitted at the evidentiary hearing are referred to as "Govt. Exh." Petitioner's are referred to as "Pet. Exh."

(Dr. Woods). Mr. Barrett had a history of chronic suicidality which began in childhood and acted out multiple other suicidal attempts, including a self-inflicted gunshot wound to the chest. ROA, Vol. 4, at 546-552 (Dr. Woods); ROA, Vol. 4, at 1542-1543, 1544-1545 (Dr. Pitt); Govt. Exh. 52.

d. Mr. Barrett's mother drank heavily during her pregnancies. ROA, Vol. 4, at 545-546. Dr. Woods and Dr. Pitt agreed Mr. Barrett's abusive and dysfunctional upbringing had or could well have had a negative impact on his neurocognitive development. *E.g.*, ROA, Vol. 4, at 1511.

e. <u>Dr. Bill Sharp</u>. A licensed clinical psychologist conducted an evaluation of Mr. Barrett for the defense in 2002. The Government admitted Dr. Sharp's 2002 report of that evaluation. ROA, Vol. 4, at 788-790 (Attorney John Echols); Govt. Exh. 16. Prior to trial, Dr. Sharp found that Mr. Barrett had avoidant personality disorder and paranoid personality disorder. He recommended that Mr. Barrett be assessed regarding the possibility of organic neurological damage. Govt. Exh. at 7-8.

f. <u>Dr. Myla Young (now deceased).</u> A neuropsychologist, retained by Mr. Barrett's § 2255 counsel, administered a battery of brain functioning tests on Mr. Barrett in 2009. Mr. Barrett's subsequent experts reviewed these results.

g. <u>Dr. Deborah Miora</u>. A neuropsychologist retained by Mr. Barrett's § 2255 counsel, confirmed that Dr. Young's testing indicated that the dorsal lateral

13

and orbitofrontal areas of Mr. Barrett's brain were damaged. ROA, Vol. 4, at 1742.

h.      Dr. George Woods.  A specialist in psychiatry and neuropsychiatry who examined Mr. Barrett in 2009 and again in 2017, he testified on behalf of Mr. Barrett. ROA, Vol. 4, at 352, 602. Dr. Woods diagnosed Mr. Barrett with bipolar and post-traumatic stress disorder, and noted that about 65% of people who carry a diagnosis of chemical dependency also meet the criteria for bipolar disorder. ROA, Vol. 4, at 542-544, 570. In confirming Dr. Young's test results, Dr. Woods testified that they demonstrated significant damage to the left side of Mr. Barrett's brain, which is the seat of executing functioning and showed significant impairments. Mr. Barrett has dysexecutive syndrome, which impairs his ability to reason, plan, control impulses, weigh and deliberate actions, accurately perceive and process incoming information and alter behavior accordingly. ROA, Vol. 4, at 560-567, 570; ROA, Vol. 4, at 686. Dr. Woods acknowledged that Mr. Barrett was not previously diagnosed with bipolar disorder, but in 1995, Mr. Barrett was diagnosed with "organic affective disorder", which Dr. Woods called "an excellent diagnosis" and characterized this diagnosis as a "more accurate diagnosis than even bipolar." ROA, Vol. 4, at 711-712.

The government expressly denied that its expert witnesses provided evidence in support of any theory of aggravation, and were proffered simply to

rebut the reliability and credibility of petitioner's expert witnesses, Dr. Woods and Dr. Miora. ROA, Vol. 4, at 2054 (Objections).

The evidence offered by the government experts included:

i.  Dr. Randall Price. A forensic psychologist, retained by the Government in 2005, ROA, Vol. 4, at 1242-1244, he testified at the hearing that he had the opportunity to interview Mr. Barrett while in custody in 2005. ROA, Vol. 4, at 1261. Dr. Price diagnosed Mr. Barrett with a long-standing learning disorder, not otherwise specified; polysubstance dependence; dysthymic disorder; and personality disorder with antisocial and paranoid traits and features. ROA, Vol. 4, at 1318-1319. It was upon an excerpt from this document that this Court surmised a possible government rebuttal to trial counsel's failure to develop the evidence in mitigation. *Barrett II*, 797 F.3d at 1232.

j.  Dr. Steven Pitt. A forensic psychiatrist was granted access and interviewed Mr. Barrett in 2017. He testified on behalf of the government. ROA, Vol. 4, at 1428, 1375.[8] Dr. Pitt was reluctant to make a diagnosis due to the intervening impact of the undisputed substance abuse. In his report, Dr. Pitt stated that "given the depth and breadth of the defendant's substance use, if you believe that at the time of the instant offenses, he had a mood disorder, his condition, to the

---

[8] Lodged out of order, Dkt. 454, ROA, Vol. 4, at 1428 reflecting the evidentiary hearing transcript, Vol. VI pp. 945-10834, Dkt. 453, ROA, Vol. 4, at 1375 reflecting Vol. VII pp. 1085-1136.

extent it existed, was a byproduct of his substance use. Using today's psychiatric nomenclature… he would have met the DSM-5 criteria for a substance induced bipolar or depressive disorder." Govt. Exh. 52 at 67. He testified that "the most honest diagnosis would be amphetamine abuse or dependence, first and foremost." ROA, Vol. 4, at 1749. Dr. Pitt conceded that it is unknown whether Mr. Barrett had symptoms of mental illness that would predate his substance abuse, and that it is common for people with untreated mental illness to self-medicate. ROA, Vol. 4, at 1752-1753.

After a careful review of the record, the testimonial and documentary evidence admitted at the hearing and the rebuttal, the Magistrate Judge found that there was,

> … no merit in any of the reasons offered by the government as justification for the failure of defense counsel to investigate the Defendant's mental health history or family background (whether by professionals or otherwise). The undersigned Magistrate Judge therefore concludes that the defense team rendered constitutionally deficient performance in developing a mitigation strategy.

ROA, Vol. 4, at 2015. Significantly, Mr. Barrett's jury "*did hear* extensive testimony regarding the Defendant's drug use and his relationship with his ex-wife during both stages of the trial. (ROA, Vol. 4, at 2014, citing *Barrett II*, 797 F.3d at 1232) (emphasis in original). The Magistrate Judge concluded:

16

> The evidence potentially available to the Defendant regarding his mental health history and his family background would in all likelihood have aided substantially in mitigation, and the rebuttal evidence provided by the Government would not appear to have added substantially to the calculus of aggravation.

(ROA, Vol. 4, at 2030, citing *Porter v. McCollum*, 558 U.S. 30, 41(2009)).

The district court accepted the government's concession and the finding that counsel were constitutionally deficient in their performance for failing to investigate, develop and present any evidence in mitigation at the trial. ROA, Vol. 4, at 2138. However, the court found that "petitioner's extensive history of substance abuse precluded a diagnosis for bipolar disorder…" (*Id*. ROA, Vol. 4, at 2141); and "the government's experts offered a more rational explanation of the petitioner's conduct to the jury, 'it's drugs, drugs, and more drugs." *Id*. at 16 (citing ROA, Vol. 4, at 1411-1412 (Dr. Pitt).

## V.     SUMMARY OF THE ARGUMENT

Kenneth Barrett was tried and convicted on three capital charges all arising out of a single incident. A federal-state joint task force executed a no-knock warrant in the middle of the night, utilizing a convoy of unmarked vehicles outfitted with militarized weapons, flash grenades, and engaging in tactics designed to surprise and disorient Mr. Barrett. Trooper Eales lost his life in the ensuing firefight. The incident lasted mere moments. Mr. Barrett's response to the onslaught was neither cold-blooded nor premeditated.

It is undisputed that Mr. Barrett's trial counsel failed to investigate and present evidence of his mental health, family and social history. Such an investigation would have shown that he had a dysfunctional, physically and mentally abusive and tumultuous upbringing; that he suffered from organic brain damage and paranoia; that he was unable to rapidly process visual information, which is ironically the purpose of the "no knock" disorientation tactics utilized in the raid. Government experts admitted they had no reason to doubt these facts. The distinction in testimony merely debated a diagnosis, but all agreed to the powerfully mitigating circumstances that would justify any diagnosis. This is just the kind of evidence that juries find most compelling when choosing a sentence other than death.

The Magistrate Judge found that Mr. Barrett's family and social history, mental illnesses and organic brain damage, would have shed a bright and mitigating light on his actions and intent. The evidence would have shown that Mr. Barrett was simply not the cold-blooded killer that went unchallenged at his trial.

It is undisputed that significant mitigation evidence was readily available to trial counsel and they were deficient in failing to investigate and present it to the jury. Had counsel conducted even a minimal investigation, they would have known that Mr. Barrett's friends and family could testify to his long family history

18

of mental health issues, physical abuse, substance abuse, and multi-generational commitments to mental institutions. Friends and family would have been available to testify to Mr. Barrett's personal history, riddled with behaviors that were often perceived as symptoms of mental illness, his physical and emotional abuse, a history of head injuries, his mother's abuse and neglect, and multiple suicide attempts. Documentation was readily available to corroborate the testimony.

At the evidentiary hearing, multiple experts provided evidence of significant mental impairments, including bipolar disorder, post-traumatic stress disorder, organic brain injury, and a litany of other issues. Based on all of the testimony and documentary evidence presented, the Magistrate Judge found that counsels' failure to present the evidence of mental and psychological impairments together with his personal and family history was prejudicial and there is a reasonable probability that the result of the penalty phase would have been different under a *Strickland* analysis. ROA, Vol. 4, at 1998.

In violation of the Federal Magistrates Act, § 28 U.S.C. 636(b)(1)(B) ("Magistrates Act") and the Due Process Clause of the United States Constitution, the newly assigned district judge,[9] having heard not a word of testimony at trial or evidentiary hearing, summarily rejected the well-reasoned and factually supported

---

[9] Judge Payne served as the trial judge and presided over the §2255 proceedings. In a minute order, he was recused and replaced by Judge White on, January 31, 2019. (ROA, Vol. 4, at 2127).

recommendations that Mr. Barrett was prejudiced and entitled to relief. Based thereon, the district court unreasonably found "no value" in the evidence cited by this Court in its decision to remand this case nor in the newly discovered evidence.

The actions of the district court violated the Magistrate Act, Mr. Barrett's constitutional due process rights, this Court's own controlling precedent in *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012), and the long-held presumptions of the Supreme Court, which could not fathom such an action by a district court, as articulated in *Raddatz v. United States,* 447 U.S. 667, 100 S. Ct. 2406 (1980). The district court erred by rejecting the recommendations. The district erred by making false and unsupported factual findings, such as asserting that Mr. Barrett was malingering during psychological testing when, on the contrary, experts on both sides testified that Mr. Barrett gave his best efforts. The district court erred in misapplying the law to the purported facts. The court simply failed to seek truth in this matter. The district court's arbitrary and capricious rejection of the recommendations denied Mr. Barrett his constitutional due process rights to be fairly tried and zealously represented by constitutionally effective counsel. This matter must be reversed and remanded for a new sentencing trial. The district court clearly erred in rejecting the magistrate's finding of prejudice. This matter must be reversed and remanded for a new sentencing trial.

Beyond its constitutional violation of the Magistrates Act, the district court

ignored the personal and social history of Mr. Barrett's tumultuous childhood, mischaracterized the mental health evidence and failed to account its more compelling nature. The district court's finding that the jury finding of "substantial planning and premeditation" trumped all of the mitigation available flies in the face of the jury verdict on Counts One and Two and fails to appreciate that the mitigation available undermines that finding. Finally the district court unconstitutionally imposed a requirement of a causal nexus between the mitigation and the offense.

## VI. ARGUMENT

**PROPOSITION:**
**THE MAGISTRATE JUDGE RULED CORRECTLY THAT TRIAL COUNSELS' ADMITTED DEFICIENT PERFORMANCE IN THE PENALTY PHASE PREJUDICED MR. BARRETT, REQUIRING A NEW SENTENCING TRIAL. THE DISTRICT COURT ERRED IN REVERSING THE MAGISTRATE JUDGE'S PREJUDICE DETERMINATION, AND COMMITTED OTHER ERRORS.**

**A. Standard of Review:**

In 28 U.S.C. §2255 cases, the district court's factual findings are reviewed for clear error and its conclusions of law are reviewed *de novo*. *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011). An ineffective assistance of counsel claim presents a mixed question of fact and law, which is reviewed *de novo*. *Rushin*, 642 F.3d at 1302.

**B. Portions of the Record Where the Claim was Raised and Ruled Upon:**

Mr. Barrett raised the claim of ineffective assistance of trial counsel in the penalty phase in his original and amended §2255 motions and his reply. (ROA, Vol. 1, at 226-281; ROA, Vol. 1, at 765-820; ROA, Vol. 1, at 1540-1602; ROA, Vol. 2, at 625-689; ROA, Vol. 2, at 405-968; ROA, Vol. 2, at 1203-1246). He requested an evidentiary hearing. (ROA, Vol. 1, at 422; ROA, Vol. 1, at 861; ROA, Vol. 1, at 1766; ROA, Vol. 2, at 841; ROA, Vol. 2, at 881-882; ROA, Vol. 2, at 1203). As an initial matter, the district court denied relief and an evidentiary hearing. (ROA, Vol. 2, at 1787-1788, 1943-1956, 1957).

On appeal, this Court vacated Mr. Barrett's death sentence on Count Three and remanded the case for an evidentiary hearing on his claim of ineffective assistance of counsel in the penalty phase. *United States v. Barrett*, 797 F.3d 1207, 1211, 1232 (2015)(*Barrett II*).

After a number of pleadings were filed in advance of the evidentiary hearing, the hearing was conducted over a period of 7 days in 2017 by United States Magistrate Judge Steven Shreder, who had been assigned to conduct the evidentiary hearing by the district judge then presiding over the case, James H. Payne. (ROA, Vol. 4, at 352, 602, 943, 1071, 1192, 1375, 1428, 1644).

Following the completion of the evidentiary hearing, the parties submitted proposed findings of fact and conclusions of law. (ROA, Vol. 4, at 1874, 1965).

Judge Shreder issued a report and recommendation finding that counsels' penalty phase performance was professionally unreasonable, that counsels' errors prejudiced Mr. Barrett, and recommended that he "be granted relief under 28 U.S.C. § 2255 and given a new sentencing hearing." (ROA, Vol. 4, at 2031).

Mr. Barrett objected to the report and recommendation only to the extent that it was ambiguous whether the recommendation included sentencing as to Counts One and Two, for which he received life sentences. (ROA, Vol. 4, at 2040). The government conceded that trial counsels' penalty phase performance fell below constitutional standards, but objected to the magistrate judge's finding of prejudice and order for a new sentencing trial. (ROA, Vol. 4, at 2050). Responses and replies were filed by the parties to the objections raised. (ROA, Vol. 4, at 2069, 2078, 2106, 2111).

District Judge Ronald A. White, to whom Petitioner's case was transferred after District Judge James H. Payne was recused on his own motion (ROA, Vol. 4, at 2127), issued an opinion and order finding, in accordance with part of the magistrate judge's reasoning and the government's concession, that trial counsels' penalty phase performance was constitutionally deficient, but reversing the magistrate judge's determination that Mr. Barrett was prejudiced. (ROA, Vol. 4, at 2129). Judgment was entered in favor of the government. (ROA, Vol. 4, at 2152).

Judge White declared the argument regarding Counts 1 and 2. ROA, Vol. 4, at 2150.

Mr. Barrett filed a motion to correct and amend the judgment under Fed.R.Civ.P. 59(e).  (ROA, Vol. 4, at 2161).  The government filed a response, and Petitioner filed a reply.  (ROA, Vol. 4, at 2167, Vol. 5 at 46).  The district court made a correction as to one factual matter but otherwise denied the motion.  (ROA, Vol. 5, at 52).  Mr. Barrett filed a timely notice of appeal.  (ROA, Vol. 5, at 54).

**C.** **Argument**

**1. Introduction**

Based on a careful review of the trial record, the evidence and testimony admitted at the hearing, and the government's rebuttal evidence, the magistrate judge found there was,

> … no merit in any of the reasons offered by the government as justification for the failure of defense counsel to investigate the Defendant's mental health history or family background (whether by professionals or otherwise).  The undersigned Magistrate Judge therefore concludes that the defense team rendered constitutionally deficient performance in developing a mitigation strategy.

(ROA, Vol. 4, at 2015).

The magistrate found Mr. Barrett's jury "*did hear* extensive evidence regarding the Defendant's drug use and his relationship with his ex-wife during

both stages of the trial." (ROA, Vol. 4, at 2014 (citing *Barrett II*, 797 F.3d at 1232, emphasis in original).

In this passage of the report and recommendation, the magistrate judge directly addressed an issue raised by this Court in *Barrett II*, namely, whether the government's evidence of Petitioner's drug use and his tumultuous and sometimes violent relationship with his ex-wife could blunt or overcome the omitted mitigating evidence of his mental illness and organic brain damage. The magistrate judge, who heard the evidence first hand at the evidentiary hearing, concluded that it did not. As suggested by this Court in *Barrett II*, it could well be the case – as Judge Shreder ultimately determined – that there was only an upside to providing a mitigating context or explanation for Mr. Barrett's drug use and volatile relationship with his ex-wife, since the jury was already inundated with evidence concerning Petitioner's drug involvement and instances of domestic violence in his marriage. Carefully weighing the evidence, the magistrate judge found Mr. Barrett was prejudiced by trial counsel's unreasonable failure to introduce the mitigating evidence developed in these post-conviction proceedings and at the evidentiary hearing. (ROA, Vol. 4, at 2024).

Judge Shreder also addressed directly this Court's observation in *Barrett II*, 767 F.3d at 1232 that in all likelihood, no prejudice would result from the omission of mental health evidence from Petitioner's trial if Dr. Randall Price, the

government's psychologist who examined Mr. Barrett at the time of the federal trial and whose report was still under seal at the time *Barrett II* was decided, would opine that Petitioner "was a psychopath, and at high risk of committing violent offenses if freed, which admittedly could have been a powerful counterpoint to the mitigation evidence." (ROA, Vol. 4, at 2024). This did not come to pass. As Judge Shreder wrote, "such testimony and evidence was not presented before the undersigned Magistrate Judge at the evidentiary hearing, although both Dr. Price and another expert psychiatrist testified." (ROA, Vol. 4, at 2024).

In fact, neither Dr. Price nor the government's expert psychiatrist, Dr. Steven Pitt, diagnosed Mr. Barrett as a "psychopath," a sociopath, or someone with antisocial personality disorder. Among other findings, Dr. Price diagnosed Mr. Barrett with an unspecified personality disorder with both paranoid and antisocial features, but he did not diagnose Petitioner with antisocial personality disorder. (ROA, Vol. 4, at 1319, 1368).

The failure of government experts to find that Mr. Barrett was a "psychopath" or suffered from antisocial personality disorder was consistent with the findings of the defense psychiatrist, Dr. George Woods, who said that Mr. Barrett did not suffer from this personality disorder and that, in fact, no mental health professional who had seen Mr. Barrett before the offense had made such a diagnosis. (ROA, Vol. 4, at 552, 584-585).

Having addressed specifically the concerns raised by this Court in *Barrett II*, which might have defeated a finding of prejudice, the magistrate judge therefore concluded that,

> The evidence potentially available to the Defendant regarding his mental health history and family background would in all likelihood have aided substantially in mitigation, and the rebuttal evidence provided by the Government would not appear to have added substantially to the calculus of aggravation.

(ROA, Vol. 4, at 2030 citing *Porter v. McCollum*, 558 U.S. at 41).

The district court begrudgingly accepted the government's concession and the magistrate judge's findings that trial counsel were constitutionally deficient in their performance, to wit, failing to investigate, develop and present any evidence in mitigation concerning Mr. Barrett's mental illnesses, organic brain damage, and traumatic and dysfunctional upbringing. (ROA, Vol. 4, at 2138). However, the district court found that "petitioner's extensive history of substance abuse precluded a diagnosis for bipolar disorder…" (*Id*. at 13), and "the government's experts offered a more rational explanation of the petitioner's conduct to the jury, 'it's drugs, drugs, and more drugs'". (*Id*., citing ROA, Vol. 4, at 1411-1412, testimony of Dr. Pitt). The district court concluded the omitted mitigating evidence did not add anything of value when,

> …weighed against the evidence that the jury heard regarding petitioner's cold-blooded and *premeditated* killing of a state

> law enforcement officer engaged in the performance of his official duties.
>
> In other words, the court finds the petitioner has failed to establish that there is a reasonable probability that even one juror's decision would have been different. This is especially true when the court considers the totality of the mitigating evidence adduced at trial and that adduced at the evidentiary hearing from petitioner's witnesses regarding organic brain disorder, *which was unconnected to the facts presented to the jury.*

(ROA, Vol. 4, at 2147-2148, emphasis added).

The district court's rejection of the magistrate judge's finding that Mr. Barrett was prejudiced by trial counsels' admitted deficient performance in failing to investigate and introduce powerful mitigating evidence of Mr. Barrett's organic brain damage or neuropsychological impairments, his mental illnesses, and his dysfunctional and abusive background and upbringing is seriously flawed for a number of procedural and substantive reasons, each of which is discussed below. The magistrate judge's conclusion of prejudice was correct, and Mr. Barrett is entitled to a new sentencing trial.

## 2. Deficient performance

There is no need to waste the Court's time with an extended discussion of the "performance prong" of the *Strickland v. Washington*, 466 U.S. 668, 687 (1984) test. This Court strongly hinted in *Barrett II*, 797 F.3d at 1225-28 that, based on the record developed in these post-conviction proceedings and the

excuses offered by the government for counsels' failings, it appeared counsels' penalty phase performance was deficient. As directed by this Court, the magistrate judge examined the reasons given by the government for counsels' errors and omissions and found them wanting. (ROA, Vol. 4, at 2000-2015).

The government did not object on this score, and therefore conceded that counsels' second stage performance was constitutionally deficient. (ROA, Vol. 4, at 2050). The district court noted the government's concession, and held, though for fewer reasons than the magistrate judge, that trial counsels' performance was constitutionally deficient. (ROA, Vol. 4, at 2135, 2138). The only remaining issue is whether trial counsels' already-established deficient performance prejudiced Mr. Barrett in the penalty phase proceedings. Counsel would simply note that, as with its treatment of the question of prejudice, the magistrate judge's discussion of the question of deficient performance is much more compelling and detailed than the district court's. (Compare ROA, Vol. 4, at 2000-2015 with ROA, Vol. 4, at 2135-3138).

### 3. Prejudice

#### a. The district court's rejection of the magistrate's finding of prejudice without hearing further evidence violates the Federal Magistrates Act

The district court erred in overturning the magistrate judge's conclusion that Mr. Barrett was prejudiced by trial counsel's constitutionally deficient

performance.  The district judge also committed a serious procedural error.  It improperly vacated the magistrate judge's finding of prejudice without, at a minimum, conducting a new evidentiary hearing, since he rejected, based on nothing more than the cold print of the record, the credibility determinations and findings of fact made by the magistrate who actually heard the testimony and evidence.  (ROA, Vol. 4, at 2131-2132).

The district court's review of Judge Shreder's report and recommendation was governed by The Federal Magistrates Act.  28 U.S.C. §636(b)(1).  That review must comport with due process.  The Magistrates Act "authorizes the district court to determine and decide the motion based on the record developed before the magistrate, including the magistrate's proposed findings of fact and recommendations."  *Id*.  Section 636(b)(1) also provides that the district judge shall make a "de novo determination" of those portions of the magistrate's report, findings, or recommendations to which objection is made, and that the judge may accept, reject, or modify, in whole or in part, the magistrate's findings or recommendations.  Alternatively, the judge may receive additional evidence or recommit the matter to the magistrate with instructions.  *Raddatz v. United States*, 447 U.S. 667, 675 (1980).  Since the magistrate judge presiding over an evidentiary hearing sees and hears the testimony and evidence first hand, a district

court's failure to adopt the magistrate's findings of credibility could result in serious due process concerns. *Raddatz*, 447 U.S. at 681 n.7.

This Court has made clear that findings of fact such as Judge Shreder made with respect to the testimony and evidence presented at the evidentiary hearing are credibility determinations, and that great deference is due to them. *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004); *Wessel v. City of Albuquerque,* 463 F.3d 1138, 1145 (10th Cir. 2006). When, as here, the magistrate's factual and credibility findings are material and inform the result, the district court is required to rehear the testimony before it rejects the magistrate's findings. Such did not occur in Petitioner's case, and this was error. *E.g., United States v. Orrego-Fernandez*, 78 F.3d 1497, 1501 (10th Cir. 1996), citing *Raddatz*, 447 U.S. at 681 n.7 (clarifying that §636(b)(1) requires "a *de novo* determination, not a *de novo* hearing" where, unlike here with respect to prejudice, a district court *adopts* the recommendation of the magistrate).

Judge Shreder's credibility and factual findings were entitled to deference they did not receive from the district judge. *Mathews v. Weber*, 423 U.S. 261, 275 (1976). In overturning the magistrate's factual and related legal determinations based only on its review of the record, and without conducting another evidentiary hearing or reopening the hearing based on the objections lodged by the government, the district court in effect denied Mr. Barrett the evidentiary hearing

31

this Court ordered in *Barrett II*.  This is one of the rare and "unlikely" cases which raises due process concerns, because a district judge rejected "a magistrate's proposed findings on credibility when those findings are dispositive and substitute[d] the judge's own appraisal … without seeing and hearing the witness or witnesses whose credibility is in question."  *Raddatz*, 447 U.S. at 681 n.7.

Relatedly, the district court seemed to adopt the government's baseless argument that Judge Shreder failed to make credibility determinations of Mr. Barrett's witnesses (particularly the experts), vis a vis those called by the government, and simply adopted what they had to say wholesale.  (ROA, Vol. 4, at 2051-2052; ROA, Vol. 4, at 2132).

This criticism is entirely misplaced and does nothing to upset Judge Shreder's conclusions; his findings of fact *are* credibility determinations.  *Elzour, supra*.  Moreover, Judge Shreder made explicit credibility determinations by addressing the concerns raised by this Court in *Barrett II*, 797 F.3d at 1231-32, as to the arguments the government would make in response to the omitted mental health and neuropsychological mitigating evidence, and how, on balance, the testimony of the government expert witnesses, Drs. Pitt and Price, did not overcome the evidence presented by Drs. Woods and Miora, and the results of Dr. Young's tests.  (ROA, Vol. 4, at 2023-2030).

**b. The district court ignored an entire class of mitigating evidence in wrongly rejecting Judge Shreder's finding of prejudice.**

The government argued that, in finding counsels' deficient performance prejudiced Mr. Barrett, the magistrate judge relied exclusively on the psychiatric and neuropsychological testimony presented by Dr. Woods and Dr. Miora. Dr. Miora rescored and interpreted the neuropsychological battery of tests given to Petitioner by Dr. Young. According to the government, the extensive testimony regarding Mr. Barrett's dysfunctional and abusive upbringing and family history played no role in the magistrate judge's finding of prejudice. (ROA, Vol. 4, at 2051, n. 2). The district court apparently agreed, although without elaboration. (ROA, Vol. 4, at 2132).

This is incorrect. Judge Shreder stated explicitly that his finding of prejudice was based on trial counsels' inexcusable failure to develop and introduce both evidence relating to Petitioner's background and upbringing *and* the evidence of his psychiatric illnesses and neurological impairments. (ROA, Vol. 4, at 2001, 2007-2010, 2015-2016, 2029-2030). ("Based on all of the evidence and testimony presented, the undersigned Magistrate Judge thus finds that counsel's failure to put forth the previously-described evidence, *in combination with his personal and family history*, caused the Defendant prejudice.")(ROA, Vol. 4, at 2029, emphasis added). Mr. Barrett's experts as well as Dr. Pitt, the government's expert psychiatrist, spoke of the mitigating facts of his upbringing and personal history

33

and how the trauma and abuse he suffered affected his mental health and neuropsychological makeup. (ROA, Vol. 4, at 545-546, 557, 577-578, 586, 589). Indeed, Dr. Pitt testified he had no reason to dispute the mitigating facts of Mr. Barrett's personal history. (ROA, Vol. 4, at 1509, 1511-1512; *see also*, ROA, Vol. 4, at 1911-1912).

Because the district court ignored an entire category of mitigating evidence, the district court's prejudice analysis was deeply flawed and cannot be sustained. This Court has held repeatedly that, along with evidence of psychiatric illnesses and/or organic brain damage/neuropsychological impairments, mitigating evidence that a defendant had a dysfunctional, traumatic and tumultuous family history and childhood is the most persuasive in leading juries to reject the death penalty. *E.g., Littlejohn v. Trammell*, 704 F.3d 817, 860-61 (10th Cir. 2013); *Hooks (Victor) v. Workman*, 689 F.3d 1148, 1201-02, 1204-07 (10th Cir. 2012); *Wilson v. Sirmons*, F.3d 1064, 1074, 1083-85 (10th Cir. 2008), *aff'd on rehearing en banc, Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009); *Anderson v. Sirmons*, 476 F.3d 1131, 1141-48 (10th Cir. 2007). The Supreme Court has held likewise. *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003).

### c. The district court completely mischaracterized Mr. Barrett's mental health evidence.

Judge White misstated the nature of the psychiatric and neuropsychological testimony presented by Petitioner at the evidentiary hearing. The district court wrongly described Mr. Barrett's mental health evidence as simply going to whether he was competent to stand trial. ("Simply because petitioner was able to obtain experts who described the petitioner as having mental health disorders so severe that he could not have rationally assisted his attorneys in the preparation of his defense [footnote omitted] does not mean the jury would have given much weight to that testimony in light of the evidence it heard over the course of the entire trial.") (ROA, Vol. 4, at 2138).

This is incorrect. Dr. Woods's testimony that Mr. Barrett suffered from bipolar disorder, PTSD, and dysexecutive syndrome, and Dr. Miora's testimony that Mr. Barrett had significant organic damage to different areas of his brain, was not introduced at the evidentiary hearing to show that Petitioner was incompetent to stand trial, but as evidence which was mitigating in its own right. It placed Mr. Barrett's conduct on the night of the offense in a mitigating light, showing him to be different than the cold-blooded, remorseless killer portrayed by the prosecution. (E.g., ROA, Vol. 4, at 2017-2024, Report and Recommendation describing the testimony from Petitioner's mental health experts).

35

The district court's mischaracterization of Mr. Barrett's mental health evidence shows that its findings of fact are clearly erroneous, *United States v. Rushin*, 642 F.3d at 1302, and that its conclusion Mr. Barrett suffered no prejudice from trial counsels' admitted unprofessional failings is highly suspect, and should be overturned.

### d. The district court took no account of why the mental health evidence introduced by Mr. Barrett was more compelling than that introduced by the government.

#### i. Neuropsychological evidence/organic brain damage

This Court has held repeatedly that evidence of mental illness, and especially evidence of organic brain damage or neurological impairments, is among the most powerful mitigating evidence in persuading juries to sentence capital defendants to life rather than death. *Littlejohn*, 704 F.3d at 860-61; *Hooks* (*Victor*), 689 F.3d at 1201-02, 1204-07; *Wilson*, 536 F.3d at 1074, 1083-85, 1095, *Anderson*, 476 F.3d at 1141-48; *Smith v. Mullin*, 379 F.3d 919, 938-44 (10th Cir. 2004). *See also, e.g., Boyd v. California*, 494 U.S. 370, 382 (1990).

The Magistrate Judge analyzed in detail the evidence of organic impairments offered by Mr. Barrett, as described more fully in the statement of facts; how this evidence mitigated the offense; and how the failure to develop and introduce this evidence at trial resulted in prejudice. (ROA, Vol. 4, at 2017-2031). In some measure, Petitioner's neurological deficits could be traced to the fact that his

mother drank heavily while she was pregnant with him and to a series of head injuries, one of which rendered Mr. Barrett unconscious when he was a child. (ROA, Vol. 4, at 2016-2017). As a child, Mr. Barrett was developmentally delayed. He suffered from learning disabilities. His tumultuous upbringing could also have caused problems with his neuropsychological development. *Id.*

The district court failed to mention that Dr. Pitt, the government's expert psychiatrist, did nothing to undercut the neuropsychological findings of Dr. Young or the interpretation of her results by Dr. Miora. Dr. Pitt conducted no neuropsychological testing. (ROA, Vol. 4, at 2028-2029). Dr. Pitt did not dispute that Petitioner's mother drank heavily while she was pregnant with him. (ROA, Vol. 4, at 1509). He stated it would be "intellectually dishonest" to dismiss Dr. Young's and Dr. Miora's findings. (ROA, Vol. 4, at 1494-1495). He did not attribute Mr. Barrett's organic brain damage solely or exclusively to drug use; the "drugs, drugs, and more drugs" mantra invoked by the government and the district court does little to diminish the impact of the defense testimony on organic brain damage or neurological impairments. (ROA, Vol. 4, at 1494-1495, 1515, 1517; ROA, Vol. 4, at 1386).

Dr. Pitt said that regardless of Mr. Barrett's organic brain damage, he could still distinguish between right and wrong and could "make choices." (ROA, Vol. 4, at 1494-1495). This was beside the point, due to the limited scope of the

hearing. Petitioner's neuropsychological testimony was not introduced in aid of an insanity defense, but as evidence in mitigation of punishment.

Not only did Dr. Pitt fail to contradict or undermine the defense neuropsychological testimony, he had no reasons to doubt the mitigating circumstances of Mr. Barrett's troubled and dysfunctional upbringing. (ROA, Vol. 4, at 1509, 1511-1512, 1513-1515).

Likewise, it went unmentioned in the district court's opinion and order that Dr. Price did not contradict, and in fact supported, the findings of Drs. Young and Miora. He did no testing on executive functioning, so the testimony from Mr. Barrett's experts on his dysexecutive syndrome, and its relevance to his conduct on the night of the offense, went unchallenged. (ROA, Vol. 4, at 1322, 1365-1366). Unlike Dr. Young, Dr. Price did not conduct a full battery of neuropsychological tests, but only a neuropsychological screening test (the RBANS test). (ROA, Vol. 4, at 1298, 1327). The results of that testing were largely consistent with the testing conducted by Dr. Young, because they showed a severe deficit in attention and other unusual impairments and weaknesses, as compared to areas of strength. ("However, he agreed on cross-examination that 'his strength is very strong and his weakness is very weak,' which was 'out of the ordinary' and 'abnormal.'" [ROA, Vol. 4, at 2026; ROA, Vol. 4, at 1334]). Consistent with Mr. Barrett's school

history, Dr. Price also found that Petitioner suffered from a learning disorder. (ROA, Vol. 4, at 2026).

In response to the defense neuropsychological evidence, the government argued, and the district court agreed, that none of it mattered because there was no "nexus" between Mr. Barrett's organic brain damage and actions on the night of the offense, and because the evidence of substantial planning and premeditation, or deliberate intent, was strong. These arguments, and the district court's findings in support of them, are addressed below, and are shown to be unfounded and unpersuasive in refuting the magistrate's finding of prejudice.

The district court also focused on irrelevancies and assertions unsupported by the record in attempting to dismiss the neuropsychological testimony. The district court pointed to the fact that Mr. Barrett could drive a car, was a good mechanic, and had built the small cabin he lived in, as if these things invalidated Dr. Miora's testimony and Dr. Young's test results. (ROA, Vol. 4, at 2142-2143). But, as pointed out by Dr. Woods, Mr. Barrett has no neuropsychological abnormalities on the right side of his brain, which controls the type of mechanical aptitude to which the district court referred. (ROA, Vol. 4, at 561).

The district court's reliance on a one page affidavit from psychologist Faust Bianco is misplaced. Bianco gave Mr. Barrett some neuropsychological tests in connection with the state proceeding, and opined that further testing was

unnecessary.  (ROA, Vol. 4, at 2138, n. 7).  The government elected not to call Bianco as a witness if the magistrate judge was willing to have his testing or scoring methods scrutinized by a defense expert.  (ROA, Vol. 4, at 1870-1871).  Had he testified, Bianco would have been impeached with the fact that at least one of the tests he gave Mr. Barrett relied on outdated normative data.  It was unclear what normative data he utilized for other tests, and whether his testing was in any sense reliable.  Bianco did not complete his testing of Mr. Barrett, and never produced a report.  (ROA, Vol. 4, at 1670-1671, 1783-1784, 1786-1789, 1848-1849).  The magistrate judge, correctly, gave the "Bianco affidavit" little or no weight.

Based on Mr. Barrett's shockingly poor results on some of the neuropsychological testing administered by Dr. Young, the district court suggested the he was malingering.  (ROA, Vol. 4, at ).  However, no expert from either side testified Petitioner malingered during any testing.  Rather, he gave his best efforts. (ROA, Vol. 4, at 1761- 1827; ROA, Vol. 4, at 1261-1264).  The district court also attempted to discount Mr. Barrett's history of head injuries because of his failure to self-report (ROA, Vol. 4, at 2142), but no expert who testified doubted that they occurred.

### ii. Psychiatric evidence

As noted in the statement of facts, Dr. George Woods diagnosed Mr. Barrett with serious mental illness, bipolar disorder and post-traumatic stress disorder. The government's psychiatrist, Dr. Pitt, opined that Mr. Barrett had neither, and that his problems stemmed from his long-standing drug addiction. The magistrate judge believed Dr. Pitt's testimony did not seriously undermine Dr. Wood's findings. (ROA, Vol. 4, at 2018-2020, 2026-2031). The district court rejected the magistrate's conclusion, believing Dr. Pitt's diagnosis of "drugs, drugs and more drugs" carried more weight. (ROA, Vol. 4, at 2144-2148).

The district court overlooked substantial evidence in the record showing that one or more jurors could have easily credited Dr. Woods's diagnoses over Dr. Pitt's, despite the fact no mental health professional who had previously seen Mr. Barrett had given a definitive diagnosis of bipolar disorder. Dr. Woods was the first mental health professional to have given Mr. Barrett a comprehensive psychiatric examination. (ROA, Vol. 4, at 2018). Bipolar disorder is a mood disorder that often has a genetic component. Dr. Pitt agreed with what the records showed, as testified to by Dr. Woods: Mr. Barrett had a multi-generational history, on both side of the family, including in his immediate family (his mother), of mood disorders, mental illness, suicidality, and commitments to mental hospitals. Because of this pedigree, Dr. Pitt agreed that Mr. Barrett was more likely to

develop a mood disorder than an individual without such a family history. (ROA, Vol. 4, at 1490, 1499-1507; ROA, Vol. 4, at 1386).

As a child and an adult, Mr. Barrett was described as extremely "hyper" and subject to irritability and mood swings. He was described by his family not simply as a drug user, but as a mentally ill person. (ROA, Vol. 4, at 677-680; ROA, Vol. 4, at 1547-1548; ROA, Vol. 4, at 1422). Early on, Mr. Barrett exhibited suicidal ideation, and he had a serious suicide attempt in 1986 when he shot himself in the chest. (ROA, Vol. 4, at 796, 801-802; ROA, Vol. 4, at 1476, 1542-1543, 1545-1546).

During his past contacts with the mental health system and hospitalizations in 1986 and 1995, Mr. Barrett was not simply treated as a drug addict, although he certainly was one, but as someone who had an underlying mental illness. The records were replete with references to underlying mental illness or mood disorder. (ROA, Vol. 4, at 677-680). Dr. Pitt acknowledged this. (ROA, Vol. 4, at 1540-1541, 1555-1558). Mr. Barrett was court-committed for treatment as a mentally ill person for a period of 28 days, which Dr. Pitt admitted was unusual for someone who was simply suffering from a drug addiction. (ROA, Vol. 4, at 1552-1554). As acknowledged by Dr. Pitt, Mr. Barrett was given psychotropic drugs, which are not administered to those simply suffering from drug problems. (ROA, Vol. 4, at 1556, 1559). When Mr. Barrett was discharged from Eastern State Hospital in

1986, he was referred to a mental health center, not a drug rehabilitation facility. (ROA, Vol. 4, at 1558). In 1995, he was given a provisional diagnosis of bipolar disorder, which was later changed to organic affective disorder. (ROA, Vol. 4, at 650, 710; ROA, Vol. 4, at 1563-1564; Gov't Exh. 9). Dr. Woods stated this was an "excellent diagnosis" and was indicative of a mood disorder, although Dr. Pitt disagreed. *Id.* Dr. Woods testified that many people diagnosed with bipolar disorder also have drug involvement, and that illicit drug use is commonly a form of self-medication. Dr. Pitt could not disagree. (ROA, Vol. 4, at 1537-1538).

With respect to Dr. Woods's diagnosis of PTSD, Dr. Pitt said he could not agree because he could not identify a "triggering event," although he acknowledged that Mr. Barrett's abusive and dysfunctional upbringing, as well as his beating by the police, could be considered precipitating events. (ROA, Vol. 4, at 1493-1494; ROA, Vol. 4, at 1382-1384). More significantly, in Dr. Price's testing, he found that Mr. Barrett scored high on indicators of traumatic stress, although he omitted that significant fact from his report. (ROA, Vol. 4, at 2026).

In sum, the Magistrate Judge's findings with respect to the psychiatric testimony were imminently reasonable and were improperly dismissed by the district court.

**e. The "substantial planning and premeditation" aggravating circumstance does not defeat the magistrate judge's finding of prejudice. The district court failed to take into account the fact that this was not an overly strong case for the death penalty, making prejudice from trial counsels' errors and omissions far more evident.**

In large measure, Judge White rejected the magistrate's finding of prejudice because none of Mr. Barrett's mitigating evidence could have overcome the "substantial planning and premeditation" aggravating circumstance, or evidence showing a deliberate and premeditated intent to kill. (ROA, Vol. 4, at 2132, 2138-2141). To this end, the district court quoted at length from this Court's *direct appeal opinion*, which, in rejecting a *guilt stage* attack on the sufficiency of the evidence, noted there was evidence Mr. Barrett was aware he had an outstanding warrant for a relatively minor, non-violent drug offense; expected the warrant to be served; and had vowed to go out in a "blaze of glory" and to meet any law enforcement attempt to arrest him with violence. The circumstances of the offense, including the number of shots fired, showed an intent to kill. *Id. See Barrett I*, 496 F.3d at 1113-15.

The district court's analysis is seriously flawed for a number of reasons. At this point, Petitioner is not arguing that the evidence was insufficient to sustain his convictions. The question is whether the omitted mitigating evidence, particularly that related to Mr. Barrett's mental illnesses and organic brain damage, would have put a different, mitigating light on his intent and his actions, and shown that he was

not simply a cold-blooded killer. As the Magistrate Judge found, the answer to this question is yes. (ROA, Vol. 4, at 2015-2031). The omitted mitigating evidence "connected the dots" between his organic brain damage, his mental illnesses, and the events of September 24, 1999. *Williams v. Taylor*, 529 U.S. 362, 398 (2000); *Hooks*, 689 F.3d at 1204-07; *Smith*, 379 F.3d at 942-44; *Anderson*, 476 F.3d at 1145-48.

That the "substantial planning and premeditation" aggravating circumstance, or, couched another way, Mr. Barrett's purported deliberate intent to kill, was not an insurmountable hurdle to a persuasive mitigation case is proved by the fact that the jury rejected the death penalty on counts 1 and 2, even though this aggravating circumstance was also found in connection with those two convictions. *Barrett I,* 496 F.3d at 1087.

The district court's reasoning on this score also flies in the face of this Court's order remanding Mr. Barrett's case for an evidentiary hearing. The *Barrett II* panel was aware of the direct appeal opinion, and the underlying facts of the case. If the district court was correct that no mitigating evidence could overcome a finding of deliberate intent to kill or premeditation, there would have been no point in remanding the case for an evidentiary hearing.

Taken to its logical conclusion, the district court's reasoning amounts to this: Where, on the prosecution's side of the scale, there is "strong evidence" of

premeditation or an intent to kill, no amount of mitigating evidence of whatever

types, even mitigating evidence which places a defendant's intent and actions in a

different light that would tend to lessen his or her moral culpability, is sufficient to

raise even a "reasonable probability" of a different sentencing outcome.  This is

plainly untrue.  The cases are legion where the Supreme Court and this Court have

found, in cases of deliberate, premeditated and intentional murder, that trial

counsel's constitutionally inadequate penalty phase performance in failing to

marshal the precise types of mitigating evidence that were developed in Mr.

Barrett's post-conviction proceedings prejudiced the defendant in the selection of

punishment. *Wiggins v. Smith*, 539 U.S. 510, 537-38 (2007)(after painting the

victim's apartment two days previously, the defendant returned to the apartment,

where he sexually assaulted and murdered the victim, and ransacked the apartment

looking for valuables); *Rompilla v. Beard*, 545 U.S. 374, 391-93 (2005)(defendant

stabbed victim 16 times in the head and neck, beat the victim repeatedly with a

blunt object, and set the defendant on fire); *Hooks* (*Victor*), *supra* (defendant

deliberately beat his pregnant wife to death); *Anderson*, *supra* (defendant convicted

of three deliberate murders, shooting with intent to kill, kidnaping, and arson);

*Smith, supra* (defendant was convicted of five deliberate murders, and children

were four of the victims).

The strength of the evidence for "substantial planning" outlined in *Barrett I* and quoted at length by the district court is suspect. As argued in Mr. Barrett's post-convictions filings, this evidence lacked credibility because it came from 7 late-coming informant witnesses, none of whom testified in the two state trials, and all of whom were cultivated by Assistant United States Attorney Mike Littlefield, who left the U.S. Attorney's Office under the cloud of his own criminal conduct. At least two of these informant witnesses have recanted their accounts, and it was apparent they and the other eleventh hour informant witnesses were pressured into giving their belated and problematic "testimony." (*E.g.*, ROA, Vol. 4, at 501-560)

Based on the evidence presented at the evidentiary hearing, a mitigating, alternative explanation for Mr. Barrett's vows to meet any law enforcement raid with violence could have been advanced. Assuming for the sake of argument the truth of the informant testimony on Petitioner's mindset and "intent," his statements could be seen not as a product of indifferent cold-bloodedness, but of his bipolar disorder and paranoia. Both Dr. Sharp, who examined Mr. Barrett in connection with the state case in 2002, and Dr. Price, who examined Petitioner for the government in connection with the federal trial and testified for the government at the evidentiary hearing, opined that Mr. Barrett had marked paranoid features to his personality. (*E.g.*, ROA, Vol. 4, at 2018; Govt. Hrg. Exh 16 at 7; ROA, Vol. 4, at 2025; ROA, Vol. 4, at 1264-1267). The paranoia evident in Mr. Barrett's

thinking was noted by Sharp and Price well after he had been incarcerated and was free of drugs.

Also undercutting the district court's analysis of the strength of the "substantial planning" evidence is the result of the state court prosecution. The first trial ended in a hung jury. In the second trial, Mr. Barrett was acquitted of first degree, malice aforethought murder (an intentional killing), convicted of the lesser offense of first degree heat of passion manslaughter, and given a mid-range prison term of 20 years, even though the statutory maximum for first degree manslaughter in Oklahoma is life imprisonment.

Finally, it is clear that the case for the death penalty in Mr. Barrett's case was not especially strong. The jury declined to impose the death penalty on Counts One and Two, even though it found, as noted, the substantial planning and premeditation aggravator. The jury rejected the future dangerousness aggravating circumstance and declined to find that the murder was especially heinous, atrocious, or cruel. Mr. Barrett had no previous felony convictions of any kind, let alone convictions for violent crime. The aggravating circumstances the jury did find stemmed exclusively from the facts surrounding the homicide itself. *Barrett I,* 496 F.3d at 1087. A state court jury failed to reach a verdict in the first trial and acquitted Mr. Barrett of first degree murder at the retrial. It was shown that Mr. Barrett was a good inmate in a prison environment.

Contrary to the district court's findings, the omitted mental health mitigating evidence would have undermined the substantial planning and premeditation aggravator, and would have supported the finding of mitigating circumstances that are recognized in the federal death penalty statute. 18 U.S.C. § 3592(a)(1)(6)(impaired capacity not amounting to insanity, and that the defendant committed the offense under severe mental or emotional disturbance). As illustrated by the cases cited above, the district court completely ignored the fact that both the Supreme Court and this Court have granted relief on ineffective assistance of counsel claims similar to Mr. Barrett's in far more aggravated cases, involving defendants with serious previous criminal records, including records of violent convictions, as well as defendants who committed multiple murders.

> **f. The district court improperly assigned a causal nexus requirement between the evidence of mental illness and the criminal act.**

Adopting one of the government's arguments (ROA, Vol. 4, at 2061-2066), the district court wrongly concluded that Mr. Barrett's mental health evidence must be causally connected to the criminal act in order to have any mitigating weight. (ROA, Vol. 4, at 2147-2148). This imposes a "nexus" requirement between Mr. Barrett's mental illnesses, organic brain damage, and the commission of the offense, requiring him to show that "but for" these conditions, the crime would not have been committed.

49

A "nexus" requirement between mitigating evidence and the criminal act was disavowed by the Supreme Court in *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004)(rejecting nexus requirement that Petitioner's "criminal act was attributable to [his] severe permanent [mental] condition;" a determination of the appropriate weight to be given mitigating evidence is not whether that evidence can provide a causal basis or excuse for the crime of conviction; instead, "[t]he question is simply whether the [neglected] evidence is of such a character that it might serve as a basis for a sentence less than death."). *See also, Smith v. Texas*, 543 U.S. 37, 43-45 (2004). The government itself conceded that its "nexus" argument was contrary to *Tennard*, but pressed it anyway, and its untenable position was wrongly adopted by the district court. (ROA, Vol. 4, at 2065).

The Supreme Court has found that evidence of organic brain damage and mental illness, as well as evidence of a troubled and abusive upbringing, is inherently mitigating and can outweigh evidence in aggravation, even in cases far more aggravated than Mr. Barrett's. *E.g., Rompilla,* 545 U.S. at 391-93 (three aggravators of murder while perpetrating a felony, murder by means of torture, and significant history of violent felony convictions outweighed by omitted mitigating evidence of brain damage stemming in part from fetal alcohol syndrome, which impaired several of the defendant's cognitive functions).

50

As the Magistrate Judge correctly recognized, under *Williams*, 529 U.S. at 397-98, a finding of prejudice is required if omitted mitigating evidence provides an alternative view or possible explanation that Mr. Barrett's behavior may not have been the result of cold-blooded premeditation. This standard is embodied in cases from this circuit. *Hooks*, 689 F.3d at 1204-07; *Anderson*, 476 F.3d at 1145-48; *Smith*, 379 F.3d at 942-44.

Judge Shreder explained in detail why Mr. Barrett's mental illness and organic brain damage provided an alternative explanation, other than simple cold-blooded intent, for his conduct. His abilities to plan, deliberate, react appropriately, modify his actions in response to external stimuli and to appreciate the consequences of his actions in real time were compromised by his organic brain damage and dysexecutive syndrome. Mr. Barrett's organic brain damage or neuropsychological impairments adversely affected his attentional ability and his ability to process rapidly unfolding visual information such as he was confronted with at the time of the police raid, and to formulate a reasoned, appropriate response. Mr. Barrett's ability to "think on his feet" and react rationally in the moment is significantly compromised. All this was exacerbated by drug use. In short, Mr. Barrett was placed in a position of having to react to a rapidly unfolding situation that played havoc with his most significant neuropsychological deficits. (ROA, Vol. 4, at 2016-2031).

No "nexus" is required. The mental health evidence introduced by Mr. Barrett was mitigating in itself and assisted in explaining the conduct and lessened his degree of moral culpability. Likewise, the evidence of Mr. Barrett's fraught personal history is mitigating in its own right and need not have "caused" his conduct at the time of the offense. The district court's reasoning in finding no prejudice due to a plainly unconstitutional "nexus" requirement should be rejected, and its denial of sentencing relief should be reversed.

### g. Mr. Barrett is entitled to a resentencing on all three counts.

This Court's mandate reversed and remanded Mr. Barrett's case to determine "whether the performance of trial counsel was deficient…. And whether Defendant suffered prejudice from any deficiency during the *penalty phase of his trial.*" *Barrett*, 797 F.3d at 1231 (Emphasis added). The mandate vacated "the death sentence." *Id*. Pursuant to *United States v. Hicks*, 146 F.3d 1198 (10th Cir. 1998)(granting a full re-sentencing on a mandate with nearly identical language), Mr. Barrett requested the magistrate judge's findings include a recommendation that he be re-sentenced on all three counts. ROA, Vol. 4, at 2040. The district court denied the request as moot. ROA, Vol. 4, at 2150. Mr. Barrett's case mirrors the facts in *Hicks*, in that both defendants were subject to a single penalty proceeding. A jury was called upon to sentence on all three counts of a multi-count indictment. In Mr. Barrett's case, the multi-count indictment included three separate charges

regarding a single criminal act, all subject to capital punishment. The defense counsel was thus obligated to investigate and present evidence in mitigation equally for each count. Therefore, Mr. Barrett respectfully renews his request, that appropriate relief for the penalty phase ineffective assistance of his counsel is a full re-hearing as to penalty on all counts.

## VII. CONCLUSION

For the foregoing reasons and authorities, the district court's denial of a new sentencing trial should be reversed and this matter remanded for a new sentencing hearing.

## VIII. ORAL ARGUMENT

Oral argument is requested. This is a capital case involving a meritorious claim of ineffective assistance of counsel in the penalty phase of trial. The fact that the magistrate judge granted relief and ordered a new sentencing trial, but was reversed by the district judge, is an unusual circumstance which also suggests oral argument is appropriate.

DATED this 18th day of June, 2020.

/s/ Joan M. Fisher
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
E-mail:       Joan_Fisher@fd.org

/s/ Carrie L. Ward
**CARRIE L. WARD**, MO Bar #57581
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
E-mail:       carrie_ward@fd.org

/s/ David Autry
**DAVID AUTRY**, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:  (405) 521-9600
Facsimile:  (405) 521-9669
E-mail:       dbautry77@gmail.com

Attorneys for Petitioner/Appellant,
Kenneth Eugene Barrett

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

On this 18th day of June, 2020, I caused the foregoing Corrected Opening Brief of Appellant to be filed with the Clerk of the Court using the ECF System for filing, with electronic service via CM/ECF to be made to Christopher J. Wilson, AUSA, Chris.Wilson@usdoj.gov, Jeffrey B. Kahan, U.S. Department of Justice, Jeffrey.kahan@usdoj.gov, Linda Epperley, U.S. Department of Justice, Linda.Epperley@usdoj.gov, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ Joan M. Fisher
JOAN M. FISHER

# CERTIFICATE OF COMPLIANCE

This brief's size and type face comply with Fed.R.App.P. 32(a)(5) and (6).

This brief contains 12,118 words, excluding the portions exempted by

Fed.R.App.P. 32(a)(7)(B)(iii), if applicable.

*/s/ Joan M. Fisher*
JOAN M. FISHER

## ADDITIONAL CERTIFICATIONS

I hereby certify as follows,

1. There are no privacy redactions in this document required to be made per 10th Cir. Rule 25.5;

2. The ECF submission is an exact copy of the seven (7) hard copies required to be filed;

3. The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Malwarebytes Anti-Exploit, last updated June 17, 2020, and according to the program is free of viruses.

**DATED** June 18, 2020

*/s/ Joan M. Fisher*
JOAN M. FISHER

ATTACHMENT 1

Doc. 478 Opinion and Order: 03/28/2019

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,              )
                                     )
            Petitioner/Defendant,    )
                                     )
vs.                                  )          Case No. CIV-09-105-RAW
                                     )
UNITED STATES OF AMERICA,            )
                                     )
            Respondent/Plaintiff.    )

## OPINION AND ORDER

Before this court is the Report and Recommendation of the magistrate judge in which the magistrate judge found that petitioner's counsel were deficient in their performance, which ultimately prejudiced petitioner.  As a result, the magistrate judge recommended that the petitioner be given a new sentencing hearing on Count III, intentionally killing a state law enforcement officer in the commission of a drug trafficking crime.  Both the petitioner and the government have filed objections to the report and recommendation.  *See*, Dkt. #s 470 and 471.

## Statement of the Case

On November 17, 2005, petitioner was convicted of three counts, including: Count I: using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); Count II: using and carrying a firearm during

1

and in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); and Count III, intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). The jury returned verdicts of life in prison without the possibility of release on Counts I and II and a death sentence on Count III.   Petitioner was sentenced, on December 15, 2005, in accordance with the jury verdicts.   The court ordered the sentences to run consecutively. Additionally, petitioner was ordered to pay a special assessment of $100 on each count for a total assessment of $300.

Petitioner filed a direct appeal and the Tenth Circuit Court of Appeals affirmed the judgment.   *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) (*Barrett I*). Thereafter, petitioner sought collateral relief pursuant to 28 U.S.C. § 2255, which was denied by this court on August 16, 2012.  Dkt. # 214.  On August 19, 2015, the Tenth Circuit affirmed in part and reversed in part, holding:

> We REVERSE and REMAND Defendant's death sentence for the district court to hold an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial.   In all other respects we AFFIRM.

*United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015) (*Barrett II*).

On March 8, 2017, the case was referred to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) for an evidentiary hearing and for findings and recommendation.

2

The assigned magistrate judge heard evidence on March 27-30, 2017, June 12-13, 2017, and June 26, 2017.[1]   At the hearing, petitioner called eleven (11) witnesses and introduced forty-four (44) exhibits.   The respondent called three (3) witnesses and introduced forty-three (43) exhibits.   Thereafter, the parties were given until July 31, 2017 to file proposed findings of fact and conclusions of law.   On August 10, 2018, the magistrate judge issued a report and recommendation that concluded ". . . [trial] counsel were deficient in their performance, which ultimately prejudiced the Defendant, and that the Defendant is therefore entitled to relief under 28 U.S.C. § 2255 and to a new sentencing hearing."   Dkt. # 467 at 34.   The court granted an extension of time to file objections and objections were timely filed.   *See*, Dkt. #s 470 and 471.

## Standard of Review

Because this matter was referred to the magistrate judge to conduct an evidentiary hearing, Rule 72(b) of the Federal Rules of Civil Procedure required any party that disagreed with the magistrate judge's report and recommendation to file "specific written objections" to the report.   Under Rule 72(b)(3), this court must make a de novo determination of any part of the report or specified proposed findings or recommendations

---

[1]Transcripts of the evidentiary hearing were filed as Dkt. #s 429, 430, 446, 447, 450, 453, 454, and 464.   The magistrate judge's report utilized the actual page numbers of the evidentiary hearing transcript itself as opposed to the CM/ECF docket #s and the page numbers contained in the CM/ECF headers.   For ease of reference and because the transcript is filed as eight different documents, this court will refer to the evidentiary transcript by Dkt. # and the page number contained on the CM/ECF headers.

3

to which an objection was made.  *See also*, 28 U.S.C. § 636(b)(1)(C).  This court is not required to conduct another hearing to review the magistrate judge's findings or credibility determinations.  *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995) (citing *United States v. Raddatz,* 447 U.S. 667, 675 (1980)).  Rather, the district court  "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C);  Fed.R.Civ.P. 72(b)(3).  Thus, it is clear that "[t]he authority─and the responsibility─to make an informed, final determination . . . remains with the [district court] judge."  *Raddatz*, 447 U.S. at 681 (citing *Mathews v. Weber*, 423 U.S. 261, 271 (1976)).

## Government's objections to magistrate's findings

The government does not object to the magistrate judge's finding regarding counsel's deficient performance in developing a mitigation strategy.  Rather, the government objects to the prejudice analysis arguing that the magistrate judge failed to evaluate the credibility of petitioner's mental health evidence.  Dkt. # 471.  The government argues that the magistrate judge premised its prejudice finding solely on trial counsel's failure to present mental health evidence, as opposed to the absence of testimony by the petitioner's relatives.  *Id*., at n. 2.  Based upon the petitioner's substantial planning and premeditation of the murder, the government argues the evidence presented by petitioner at the evidentiary hearing would not have had an impact on the outcome of the trial.  Thus, the government is actually arguing that the foregone mitigating evidence did

4

not tip the scale in favor of a sentence less than death.   In his response, petitioner argues the government's objections are fatally flawed because they are not specific enough.

### Legal Principles applicable to claims of ineffective assistance of counsel during penalty phase of trial

Counsel's performance at the sentencing stage of a capital trial is governed by the principles enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).   Thus, in order to prevail on this claim, petitioner must establish both deficient performance and prejudice. In order to establish that counsel's performance was deficient, the petitioner must establish that  counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment.   *Id*., 466 U.S. at 687.   During the second stage of trial, counsel's role is "to ensure that the adversarial testing process works to produce a just result under the standards governing the decision."   *Id*., 466 U.S. at 686.   The focus of the deficient prong is "not what is prudent or appropriate, but only what is constitutionally compelled."   *Breechen v. Reynolds*, 41 F.3d 1343, 1365 (10th Cir. 1994).

As recognized in this case by the Tenth Circuit, trial counsel's penalty-phase performance is evaluated "under the prevailing professional norms at the time of . . . trial [September 2005 in this case]."   *Barrett II,* 797 F.3d at 1223.   Counsel's duty is to undertake a reasonable investigation or make a reasonable decision that a particular investigation is unnecessary.   *Walker v. Gibson,* 228 F.3d 1217, 1233 (10th Cir. 2000); *Brecheen,* 41 F.3d at 1366.   In light of the extremely important role that mitigating

5

evidence plays in the "just imposition of the death penalty,"[2] this court is required to apply close scrutiny when reviewing the performance of counsel at the sentencing stage. *Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001). At the same time, the "failure to present available mitigating evidence is not per se ineffective assistance." *Hale v. Gibson*, 227 F.3d 1298, 1315 (10th Cir. 2000) (quoting *Brecheen*, 41 F.3d at 1368). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Thus, an attorney "'is not required to investigate all leads' as long as the decision not to pursue a particular lead, or to pursue a particular lead only so far, is reasonable under the circumstances." *Breechen*, 41 F.3d at 1366; *see also Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.") Moreover, "the reasonableness of an attorney's investigation is dependent on the circumstances of the case." *Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008) (citing *Walker*, 228 F.3d at 1233).

Petitioner must also establish that any deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. During the second stage of trial, a petitioner must show there is a reasonable probability that, absent the errors, the sentencer would have concluded, after balancing the aggravating and mitigating factors, that the death penalty was not warranted.

---

[2]*Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000).

*Id*., at 694. Put another way, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different." *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996). Thus, deficient performance in a capital sentencing proceeding prejudices the defendant if "there is a reasonable probability that one juror would have chosen a sentence other than death." *Wood v. Carpenter*, 907 F.3d 1279, 1290 (10th Cir. 2018) (quoting *Matthews v. Workman*, 577 F.3d 1175, 1190 (10th Cir. 2009)). "To assess that probability, [this court] must consider 'the totality of available mitigation evidence—both that adduced at trial, and the evidence adduced [at the evidentiary hearing]'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000). *See also*, *Littlejohn v. Royal*, 875 F.3d 548, 552 (10th Cir. 2017).

## Legal Analysis

### A.   Performance of counsel

Since the government has not objected to the magistrate judge's finding that counsel's performance was deficient, this court adopts the magistrate judge's conclusion that trial counsel rendered constitutionally deficient performance in developing a mitigation strategy. In determining that trial counsel's performance was deficient, however, the magistrate judge stated that "federal trial counsel neither hired a mitigation or mental-health professional nor  attempted to investigate themselves in any depth the [petitioner's] mental health or family background." Dkt. # 467 at p. 10. This court would

7

like to correct this finding by noting that trial counsel did hire Jeanne Russell, Ed.D. (a

licensed psychologist).   While the scope of Russell's work for the federal trial was

apparently limited to completing an updated risk assessment, based upon the information

contained within Russell's 2003 report,[3] there can be no question that petitioner's federal

trial counsel was, in fact, aware of the very information which petitioner has been relying

upon to establish that counsel's investigation of his mental health and/or family history was

not comprehensive and/or in-depth enough to uncover important mitigating evidence.[4]

According to Russell's psychological evaluation, the petitioner was "not exhibiting

symptoms of a major mental illness (*i.e.*, Schizophrenia, Schizoaffective Disorder, Bi-

---

[3]*See* Govt. Exh. # 34.

[4]At the evidentiary hearing, trial counsel's recollections of exactly what they knew and when they learned the information was sketchy at best.  For instance, Brett Smith recalled various things that occurred during his representation of the petitioner only when those things were pointed out to him and at one point during his testimony he stated that his "recollection has probably been tainted by my recent work because . . . I have read some materials recently, which has probably contaminated my memory as it relates to 2005." Dkt. # 446, at p. 28 and 56 (Smith again indicates his memory has been tainted by recent readings).   Smith did remember, however, having discussed with Roger Hilfiger, shortly after his appointment to the case, hiring a mitigation specialist but based upon their discussions they did not hire one.

Hilfiger also had difficulty remembering details concerning his time representing the petitioner, but stated he did not hire a mitigation opinion expert because "We just didn't feel like that a mitigation opinion expert would do us any good when we could -- when we used the information we had from previous reports and talked to those people and had them testify."   Dkt. # 447 at p. 97.    It is inconceivable that trial counsel would have known to call Russell to update her report if they were not aware of her report and the information that was contained within that report.

Polar Disorder, or Major Depression)"[5] and while acknowledging that persons close to the petitioner had described symptoms they associated with mental illness and other records indicated a history of paranoia and impulsiveness, Russell opined these "behaviors appear exacerbated by drug use."[6]   Moreover, in compiling this report, Russell reviewed all of the petitioner's mental health records and her report contained, among other information, a list of all of the records she had reviewed, a summary of petitioner's legal history, family history, education, relationships, employment history, medical and mental health history/treatment, and a significant substance abuse history.   *See* Govt. Exh. # 34.

In considering the reasonableness of counsel's actions, this court cannot rely on "hindsight;" but must examine the reasonableness of counsel's actions from "'counsel's perspective at the time' the investigative decisions [were] made."   *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689).   It seems axiomatic that an attorney should be able to rely on a mental health expert's prior opinion in determining the significance of a defendant's mental health records, including whether or not that defendant has a major mental illness; and then, based upon that opinion, decide to forego further mental health testing of that defendant.   While none of the mental health professionals who had examined the petitioner prior to 2005 had ever diagnosed the petitioner with a major mental illness, *see* Govt. Exh. #s 4-6, 8-9, 11, 16, 34 and 35, petitioner's counsel did

---

[5]Govt. Exh. # 34 at p. 9.

[6]*Id.*

9

not actually  consult with Russell prior to deciding to forgo any further mental health evaluations.[7]   For this reason alone, this court agrees with the magistrate judge's conclusion that trial counsel's performance was deficient.

## B.  <u>Lack of prejudice</u>

This court finds, however, based upon the evidence presented at the evidentiary hearing, that petitioner was not prejudiced by counsels' performance.  Simply because petitioner was able to obtain experts who described the petitioner as having mental health disorders so severe that he could not have rationally assisted his attorneys in the preparation of his defense,[8] does not mean the jury would have given much weight to that testimony in light of the evidence it heard over the course of the entire trial.  That evidence was summarized by the Tenth Circuit Court of Appeals as follows:

> Barrett had been aware for some time of the outstanding warrant for his arrest, and anticipated that law enforcement officials would come to his house to arrest him at some point.  Tr. at 400-01.  Despite that awareness, or perhaps because of it, Barrett exhibited a defiant attitude towards law enforcement officials.   On the front gate leading to his residence, Barrett had

---

[7]If counsel had consulted with Russell, they would have learned that she had not conducted a "comprehensive" mental health evaluation.  *But see* Govt. Exh. 12 (affidavit Faust Bianco, Ph.D., a psychologist licensed in Oklahoma, who performed a neuropsychological evaluation of the petitioner prior to the federal court trial, opining that further neurological testing was unwarranted).   Counsel also did not consult with Bianco prior to deciding to forgo any further mental health evaluations.

[8] *Contra* Govt. Exh. # 52 at 71-72; Dkt. # 446, at p. 33 (defense counsel acknowledged that the petitioner was "among the most cooperative criminal . . . defense clients I've ever had" and "[h]e was very helpful during the trial to me.   He knew as much about it as I did."; and Govt. Exh. # 38-40 (defendant's notes to counsel).  *See also*, Govt. Exh. # 34.

installed a sign reading: "Keep Out. I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot." *Id.* at 399. Further, in the months and weeks leading up to the date of the shooting, Barrett regularly told friends and family that if law enforcement officers came to his house, "[t]here was going to be a shootout," *id.* at 412, "he would shoot the first police that came through his door," *id.* at 2515, and "he was going to take out as many [law enforcement officers] as he could before they got him." *Id.* at 412-13; *see id.* at 3068-69, 3106, 3493. Indeed, on the evening of September 23, 1999, Barrett observed three of the Tact Team members drive by his residence in an unmarked vehicle, and subsequently stated to his cousin, Travis Crawford, that he knew the vehicle belonged to law enforcement officials, that he didn't "give a fuck" if they came back to serve the arrest warrant, and that "he was going out in a blaze of glory" if they did so. *Id.* at 466.

Barrett's conduct in the months, weeks, and days leading up to the shooting incident suggests his threats were far from idle. Barrett possessed multiple firearms at his residence, including five rifles, three shotguns, and two pistols. *Id.* at 401, 1862-63, 1882-83, 1888, 1895, 1899-1901. During the day, Barrett typically kept a rifle nearby. *Id.* at 461-62, 3086, 3493-94. He also carried a nine millimeter pistol in his pants at all times. *Id.* at 409-10, 3106, 3496.

As for the night of the shooting incident, the evidence presented at trial was more than sufficient to have allowed the jury to reasonably find that Barrett knew it was law enforcement officials who were approaching his residence en masse. At the time the Tact Team approached Barrett's property, there was a full moon and no clouds in the sky. *Id.* at 993. The two lead Tact Team vehicles that approached Barrett's residence from the east were white Ford Broncos. *Id.* at 984. Although the Broncos were unmarked, Barrett had observed one of these vehicles on the afternoon prior to the shooting (it was used in the drive-by performed by Tact Team members), and suspected that it belonged to law enforcement officials. Further, although the lead Bronco did not exhibit any flashing lights (because Barrett began shooting at it before the two officers inside had an opportunity to turn on the lights), *id.* at 610, the second Bronco did. *Id.* at 732. More specifically, the second Bronco had a flashing strobe-type light on the sun visor and "wig-wag" headlights, all of which had been activated. *Id.* at 732, 1094. The third vehicle to enter Barrett's property, immediately following the two lead Broncos, was a marked Oklahoma Highway Patrol car with its emergency lights activated (including a standard light bar on top and "wig-wag" headlights). *Id.* at 760, 987, 991. The lights from this third vehicle

11

were described by witnesses as sufficient to illuminate the scene in front of Barrett's residence. *Id.* at 1101 (testimony from Trooper Steve Hash, the driver of the second Bronco, that he observed red and blue strobe lights reflecting off of Trooper Eales as he got out of the lead Bronco), 1158-59 (indicating the lights of marked unit lit up the whole area), 1343 (indicating that light bar on top of marked unit was very visible), 1496 (indicating that red and blue lights from marked unit were reflecting off the shards of glass coming from the lead Bronco), 1797-98 (indicating that lights from marked unit illuminated a wide area around the vehicle).

Finally, and perhaps most significantly, Barrett's conduct in shooting at the officers that night clearly would have allowed the jury to reasonably find that he intended to kill one or more of those officers, including Eales. Barrett began shooting at the lead vehicle, a Ford Bronco driven by Trooper Hamilton, as soon as the vehicle cleared a ditch that ran between Barrett's house and a property to the east. *Id.* at 537.   According to Hamilton, Barrett's shots were hitting in the middle of the windshield of the Bronco, at approximately "head level." *Id.*   As Hamilton continued driving the Bronco westward towards Barrett's residence, the gunfire intensified and the windshield of the Bronco began to disappear. *Id.* at 539.   The gunfire continued after Hamilton stopped the Bronco near the edge of the front porch of Barrett's residence. *Id.* at 540.   Eales, who was a passenger in the lead Bronco driven by Hamilton, opened the passenger side door (which was closest to the front porch of Barrett's house), got out, and began heading towards the rear of the Bronco (presumably to obtain cover).   As he did so, Eales was struck by three separate rounds of gunfire from Barrett. *Id.* at 1687 (testimony from pathologist opining that Eales' wounds were sustained while facing away from Barrett).   One round struck the handgun that Eales carried on his right hip and then ricocheted and struck Eales' right elbow. *Id.* at 1661.   A second round struck Eales' left flank region, entering approximately twenty-five inches from the top of Eales' head, down from the area on the back of his left arm pit where the skin is folded. *Id.* at 1605.   A third, and fatal, round entered Eales' chest on the left side of his upper back. *Id.* at 1611.   After shooting Eales, Barrett continued firing rounds at the Tact Team members, stopping only after he himself was shot in the legs by a Tact Team member. *Id.* at 545, 548.   Even after being shot and dragged outside of his residence by Tact Team members, Barrett made movements as if reaching for a pistol he had concealed in the waistband of his jeans. *Id.* at 1113.   Subsequent investigation of the crime scene by law enforcement officials revealed that Barrett used a Colt Sporter .223 rifle, equipped with three loaded magazines taped together (with a total of ninety-one rounds of

ammunition), to fire at least nineteen shots at Tact Team members, including the three shots that hit Eales.   *Id.* at 1884, 3256.   The Colt Sporter rifle had a lethal range of approximately 541 to 595 yards, and was capable of penetrating the metal of an automobile.   *Id.* at 3573, 3586.   At the time Barrett fired the three shots that wounded Eales, he was no more than ten to fifteen feet away from Eales.   *Id.* at 4304-05.

In sum, although Barrett's defense during the first-stage proceedings was that he was unaware that the persons entering his property were law enforcement officials, and that he was simply reacting in defense of himself and his son, the above-described evidence was more than sufficient to allow the jury to reasonably find that Barrett knew that Eales and the other persons approaching his residence were law enforcement officers and that he intended to kill Eales.

*Barrett I*, 496 F.3d at 1113-15 (footnotes omitted).

While petitioner's experts identified issues at the evidentiary hearing that they opined might have compromised the petitioner's ability to process information under pressure, petitioner had clearly resolved to murder Trooper Eales or any other law enforcement officer long before this incident played out.   Moreover, several aspects of the testimony presented at the evidentiary hearing convince this court that the jury would have rejected the mental health diagnosis provided by petitioner's expert witnesses.   First, according to the government's expert witness, Steven Pitt, D.O. (psychologist licensed in Texas, Oklahoma and Arkansas and a board-certified neuropsychologist) petitioner's extensive history of substance abuse precluded a diagnosis for bipolar disorder and petitioner admitted to numerous mental health professionals that there was never a time when he was not abusing drugs, even attributing any history of manic episodes to his own abuse of intoxicants.   Dkt. # 454 at p. 30.   *See also* Govt. Exh. # 52 at p. 59 and 65.

Second, petitioner's recollections of his prior head injuries differed over the years including whether, and for how long, petitioner had lost consciousness.   Dkt. # 430 at p. 271-81.   In fact, some of petitioner's medical records revealed that the petitioner denied a history of head injury.   *See* Govt. Exh. #s 5 (Eastern State Hospital record dated October of 1986 which indicates petitioner "denies head injuries")   and 66 at p. 3 (personal health history completed sometime after 2004 and signed by the petitioner which indicated that he had never had any periods of unconsciousness, blurred vision, double vision, depression or excessive worry, frequent thoughts of suicide, paralysis, etc.).   Additionally, despite George Woods, M.D. (board certified psychiatrist and a neuropsychiatrist licensed in California) testifying that petitioner's left lobe injury would impact him being able to do math effectively, Woods admitted that petitioner's educational records showed that petitioner had made an "A" in the first semester and a "B" in the second semester of ninth grade in math.   Dkt. # 430 at 33-36. *See also*, Pet. Exh. # 41 at p. 1, Pet. Exh. # 55 at p. 3.

Further, despite petitioner's experts denying any malingering by the petitioner on the neuropsychological tests which were administered by Mila Young, Ph.D. (clinical psychologist licensed in California and a board-certified neuropsychologist), petitioner's performance on the Wisconsin Card Sorting Test (WCST) (a test which measures ones ability to develop a simple concept and then to carry out that simple concept) was in the severe range.   According to Young, petitioner's performance on the WCST correlated to one's ability/inability to grasp and consistently carry out daily functions such as driving an

14

automobile.  Pet. Exh. # 25 at p. 22.[9]  The evidence heard by the jury at trial, however, demonstrated the petitioner was not only capable of driving a car, [10] but also was considered by one witness, in his criminal trial, as "a real good mechanic."  Dkt. # 352 at p. 230-32 in Case No. CR-04-115-RAW (J.T. Tr., Vol. 24 at p. 4930-32).  This evidence was consistent with evidence from the petitioner's maternal uncle at the evidentiary hearing.[11]  Additionally, petitioner was employed as a carpenter for approximately three years[12] and testimony in the jury trial revealed that the petitioner had personally built the cabin/home where he lived.[13]  *See also* Govt. Exh. # 52, § 3 at p. 158 (petitioner told Pitt he was good at working on motors).  Furthermore, and perhaps most significant (as demonstrated by the facts set out above regarding the petitioner's conduct in the months, weeks, and days leading up to the shooting), the petitioner was able to make plans, grasp weapons and carry out his long term threats to kill any law enforcement officers who

---

[9] Deborah Miora, Ph.D. (clinical psychologist and neuropsychologist from California) testified she partially premised her diagnosis of dysexecutive syndrome on the WCST administered by Young.   Dkt. # 464 at p. 187-92.

[10]*See* Govt. Exh. # 34 at pp. 4-5 (petitioner's employment history which included a job as a truck driver "until he lost his license due to accumulating too many points because of traffic violations").

[11]Mark Dotson testified that the petitioner was a good mechanic, having a natural talent for it.   Dkt. # 429 at p. 64.  *See also* Pet. Exh. # 16 (declaration of maternal great aunt stating that the   petitioner "tried to make a living fixing cars").

[12]*See* Govt. Exh. # 34 at 5.

[13]Dkt. # 325 at p. 477 in Case No. CR-04-115-RAW (J.T. Tr., Vol. III at p. 477).

15

entered his property.   More specifically, the petitioner was able to perform functions including the taping together of three loaded magazines with a total of ninety-one rounds of ammunition, concealing a gun in his waist band (just in case he needed more firepower), and aiming a rifle "at approximately head level, middle of the windshield of the lead vehicle."[14]   As a result, this court finds the jury would not have been impressed by the petitioner's experts' opinions and, therefore, would have given little, if any weight to those opinions.

Moreover, the government's experts offered a more rational explanation of the petitioner's conduct to the jury, "it's drugs, drugs, and more drugs."   Dkt. # 453 at pp. 37-38.   Specifically, Randall Price, Ph.D. (psychologist licensed in Dallas, Texas) testified that while the neuropsychological testing did not reveal evidence of a severe brain injury, petitioner did have a long-standing learning disorder, not otherwise specified; polysubstance dependence; dysthymic disorder (a form of depression) that is long-standing and chronic, but not a major depressive disorder; and a personality disorder[15] with antisocial and paranoid traits and features.   Dkt. # 450 at p. 127-28.

---

[14]*Barrett I*, 496 F.3d at 1114 (petitioner began shooting at lead vehicle hitting the middle of the windshield at head level).   *See also* Govt. Exh. # 52 at p. 72.

[15]According to Price, "[a] personality disorder is not a mental disorder, rather it is more of a long-term characerological condition that is either a source of distress for that person that it interferes with their functioning and it's always been there, at least since adolescence, early adulthood, or it may not be a source of distress for that person but it is for other people."   Dkt. # 450, at p. 128.

16

Pitt testified that the petitioner "had a serious problem with drug addiction"[16] and he attributed petitioner's changes in mood to his drug usage.   Dkt. # 454 at p. 59.   Pitt also testified that, in his opinion, the petitioner does not and did not, at the time of the offense, have bipolar disorder.   *Id.* at p. 64.   Moreover, the records reveal that none of the health professionals who treated the petitioner prior to this offense ever diagnosed him with bipolar disorder.   *See*, Govt. Exh. # 6 at p. 2; Govt Exh. #s 7-11; and Govt. Exh. # 102 at p. 17.   Furthermore, Pitt testified that the petitioner was not suffering from posttraumatic stress disorder at the time of the shooting.   Dkt. # 454 at p. 65.   While admitting that Bill Sharp, Ph.D. (licensed clinical psychologist) had diagnosed the petitioner with avoidant and paranoid personality disorder, Pitt indicated that, in his opinion, petitioner's paranoia was caused by his drug use.[17]   *Id*. at 103.   Finally, Pitt diagnosed the petitioner with "amphetamine dependence with physiologic dependence, features of an antisocial personality disorder, cannabis dependence;" but stated that he did not know if the petitioner had a learning disorder.   *Id*. at 71.

In light of the significant amount of evidence that the Tenth Circuit found the jury heard at trial about the petitioner's drug use, this court finds it much more likely that the

---

[16]Dkt. # 454 at p. 58.   *See also* Govt. Exh. # 52, § 3 at p. 91, lines 12-27 and p. 154-57.

[17]This opinion was consistent with Russell's personality assessment which trial counsel apparently relied upon in forgoing additional mental health testing.   *See* Govt. Exh. 34.   According to Russell, petitioner's behaviors "appear to be exacerbated by drug use."   *Id*. at p. 9.

17

jury would have found that the defendant did, in fact, have a significant drug problem as opposed to a major mental health disorder.[18]   In fact, the testimony at the evidentiary hearing revealed that the petitioner had such a significant problem with narcotics, that within a year of this incident, petitioner's maternal aunt, Ruth Harris, had made contact with the petitioner in an unsuccessful effort to convince him to make a lifestyle change by getting off of illegal drugs.[19]   *See also* Pet. Exh. # 16 (petitioner's maternal great aunt acknowledged that the petitioner had a drug problem) and Dkt. # 429 at 74 (testimony from Mark Dotson, petitioner's uncle and a podiatrist, regarding the effects which methamphetamine has on the human body, including significant dental problems, paranoia, and trouble sleeping).

---

[18]According to the Tenth Circuit,

> The jury was also presented with significant evidence of [petitioner's] drug use, including the testimony of a drug addict that he took methamphetamine with [petitioner] and the testimony of a state prison employee that [petitioner] self-reported first using alcohol at age 12, cocaine and heroin at age 14, and methamphetamine at age 20, and had been using marijuana, methamphetamine, heroin, tranquilizers, and other drugs up until the time of the shooting.   And, of course, there was the guilt-phase evidence of [petitioner's] outstanding warrant for failure to appear in state court on drug charges and the drug paraphernalia found on [petitioner's] person and property after the shooting.

*Barrett II*, 797 F.3d at 1232.

[19]*See* Dkt. # 429 at p. 70-73.

18

While the magistrate judge found that the petitioner had a "long family history including mental health problems going back to great-great grandparents, and that the [petitioner's] own immediate family included parents who were violent with each other, and whose relationship was characterized by infidelity and ultimately divorce, as well as both engaging in alcohol abuse,"[20] even if true, this evidence did not add anything of value to the personal and family history[21] of the petitioner that was actually heard by the jury at trial nor did it offer any compelling mitigation evidence when weighed against the evidence

---

[20]Dkt. # 467 at p. 19.   The generational history evidence included things such as the petitioner's grandfather and father had a tendency to drink heavily; petitioner's mother was an alcoholic but was able to function and always maintained employment; petitioner's father did not provide a lot of guidance to the petitioner and was not around a lot when the petitioner was growing up; and some of his relatives had mood swings, including a cousin who has been diagnosed with bipolar disorder and another cousin, Travis Crawford, who has experienced   anxiety and panic attacks.   *See* Pet. Exh. #s 16, 20, 27, and 36.   The jury heard testimony at trial from Travis Crawford, however, that indicated Crawford had used methamphetamine for fifteen years, including around the time of this incident, some of which he obtained while he was inside the petitioner's house.   *See* Dkt. # 325 at p. 64-65 in Case No. CR-04-115-RAW (Vol. III of Jury Trial Transcript at p. 457-58).

[21]This is not a case where no mitigation investigation regarding petitioner's family was ever conducted.   Rather, records at the evidentiary hearing revealed that a mitigation investigator, Roseanne Schaye, had interviewed numerous family members, some of them more than one time during the course of the state court proceedings.   *See* Govt. Exh. #s 19-25 and 54-62.   Additionally, during the state court trials an investigator for the Oklahoma Indigent Defense System ("OIDS") collected those interview summaries and documentation from facilities, hospitals, and schools.   Dkt. # 430 at p. 141.   Boxes of files from the state court cases were delivered to Hilfiger by OIDS and additional paper files were picked up from John Echols after he was allowed to withdraw from the federal case.   Dkt. # 447 at 45-46.

that the jury heard regarding petitioner's cold-blooded and premeditated killing of a state law enforcement officer engaged in the performance of his official duties.

In other words, this court finds the petitioner has failed to establish that there is a reasonable probability that even one juror's decision would have been different.  This is especially true when the court considers the totality of the mitigating evidence adduced at trial[22] and that adduced at the evidentiary hearing from petitioner's witnesses regarding organic brain disorder, which was unconnected to the facts presented to the jury and included symptoms of mood swings described as "reactive violence" and/or "chronic irritability," and the additional witnesses who discussed petitioner's less than ideal childhood.[23]   This additional mitigating evidence was countered by the government with

---

[22]Evidence summarized by the Tenth Circuit included:

> The jury did not find unanimously that the government had proved beyond a reasonable doubt that [petitioner] would pose a continuing and serious danger to others in prison, and unanimously found that [petitioner] was a father and a loved son and stepson, and that his death would have an impact on his family and friends.  Seven jurors found that he was a good neighbor and friend; five found that he had accepted responsibility for Eales's death from his state-court conviction and that he had been convicted and punished for the killing; and two found that he would not be a danger to society if imprisoned for life without parole.

*Barrett II*, 797 F.3d at 1224.

[23]While similar to testimony heard by the jury at trial, the government would have been able, through these witnesses, to again emphasize the petitioner's substance abuse.

20

testimony which included that described above, as well as statements by the petitioner that: 1) revealed the petitioner has not accepted responsibility for Eales's death; rather, he maintains that he was shot in the act of retrieving a weapon to defend his son and that he had no idea that the vehicles entering his property were police vehicles;[24] 2) petitioner maintains that he and his son were the victims in this case;[25] 3) the jury might have found that the petitioner was a continuing danger to others in prison and/or to society since he was not afraid to violate the rules;[26] 4) petitioner's brother recalled having seen his mother and the petitioner in physical altercations;[27] and 5) petitioner violently attacked his younger brother on at least two separate occasions.[28]   Weighing all of the mitigating evidence adduced at trial and the evidentiary hearing against the aggravating factors found by the jury, *i.e.,* 1) knowingly creating a grave risk of death to one or more persons in addition to the victim of the offense; 2) commission of the offense after substantial planning and

---

[24]*Compare* Dkt. # 429 at p. 220 (Woods testimony that the petitioner believed his actions were justified on the night of the shooting) and Dkt. # 72-66 (petitioner's description of the events leading to his arrest) *with* Govt. Exh. # 52, § 3 at pp. 7-17, 71-72 (petitioner states that he did not shoot Eales) and p. 281.

[25]Govt. Exh. # 52, § 3 at p. 56-57.

[26]Petitioner admitted to having obtained and using drugs while in jail.  *See* Govt. Exh. # 52, § 3 at p. 154 and 157.  Petitioner also admitted to having talked a jailer into letting him out of his cell for the purpose of engaging in sexual activity with another inmate. *See* Govt. Exh. # 52, § 3 at p. 254-257.

[27]Dkt. # 429 at p. 94-95.

[28]Dkt. # 429 at p. 117.

21

premeditation; and 3) that petitioner caused injury, harm, and loss to the victim's family because of the victim's personal characteristics as an individual human being and the impact of the death on the victim's family and friends[29] and the evidence the government produced at the evidentiary hearing to counter the additional mitigating evidence, convinces this court that there is no reasonable probability that even one juror would have voted for a sentence less than death.   Accordingly, this court rejects the magistrate judge's conclusion that the petitioner was prejudiced by counsel's performance.

## Conclusion

In light of the facts of this case, and for the reasons set forth herein, the Report and Recommendation (Dkt. # 467) is accepted in part and rejected in part; the report and recommendation is accepted as to the magistrate judge's conclusion that trial counsel's performance was deficient; but the report and recommendation is rejected as to the magistrate judge's conclusion that petitioner was prejudiced by counsel's performance. Accordingly, the court denies petitioner's § 2255 motion as it relates to his claim of ineffective assistance of counsel during the penalty phase of trial.

Furthermore, in light of this order, Petitioner's Objection to the Magistrate Judge's Report and Recommendation (Dkt. # 470), requesting to be resentenced on all three counts of the indictment, is denied as moot.

---

[29]*See* Penalty Phase Special Verdict Form, Dkt. # 258, in *United States v. Barrett*, Case No. CR-04-0115-RAW.

22

Finally, Rule 11 of the Rules Governing Section 2255 Proceedings, requires this court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   This court recognizes that "review of a death sentence is among the most serious examinations any court of law ever undertakes."   *Brecheen*, 41 F.3d at 1370.   A certificate of appealability, however, may only be granted if petitioner has made "a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   This standard can be met by demonstrating that the issues raised are debatable among jurists of reason or that the questions deserve further proceedings.   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).   While this court strongly believes petitioner was not prejudiced by counsel's failure to develop the evidence at trial which was admitted at the evidentiary hearing herein, this court hereby grants a certificate of appealability thereby allowing further consideration of this issue.

It is so ordered on this 28th day of March, 2019.

Ronald A. White
United States District Judge
Eastern District of Oklahoma

# ATTACHMENT 2

Doc. 479 Judgment: 03/28/2019

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**


KENNETH EUGENE BARRETT,      )
                               )
         Petitioner/Defendant,     )
                               )
vs.                            )        Case No. CIV-09-105-RAW
                               )
UNITED STATES OF AMERICA,    )
                               )
         Respondent/Plaintiff.    )


**JUDGMENT**


This matter came before the Court for consideration of defendant's motion to vacate, set aside, or correct sentence, pursuant to 18 U.S.C. § 2255. The issues having been duly considered and a decision having been rendered in accordance with the Order filed simultaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered for respondent, United States of America, and against petitioner, Kenneth Eugene Barrett, on his challenge to the legality of his sentence.

IT IS SO ORDERED this 28th day of March, 2019.


_____
Ronald A. White
United States District Judge
Eastern District of Oklahoma