**Case No. 19-7049**

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

KENNETH EUGENE BARRETT

       Defendant-Appellant.

No. 19-7049
(D.C. No. 6:04-00115-RAW/
6:09-cv-00105-RAW)

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
Honorable Ronald A. White

ORAL ARGUMENT REQUESTED

**REPLY TO RESPONDENT/APPELLEE'S ANSWERING BRIEF**

**HEATHER E. WILLIAMS**, CA Bar No. 122664
Federal Defender
**JOAN M. FISHER**, ID Bar No. 2854
Assistant Federal Defender
**CARRIE L. WARD**, MO Bar No. 57581
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  (916) 498-5700
Facsimile:  (916) 498-6666
E-Mail:      Joan_Fisher@fd.org
           Carrie_Ward@fd.org

**DAVID B. AUTRY**, OBA Bar No. 11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106
Telephone: (405) 521-9600
Facsimile:  (405) 521-9669
E-Mail:      dbautry77@gmail.com

# TABLE OF CONTENTS

I.  FACTS ...................................................................................................1

    1.  The Evidentiary Hearing ...................................................................... 1

    2.  The Trial ........................................................................................... 4

II.  ARGUMENT .........................................................................................9

    1.  An inaccurate heading. ...................................................................... 9

    2.  Erroneous legal standard. ................................................................... 9

    3.  Failure to consider the mitigating evidence of Mr. Barrett's background and upbringing. ............................................................................................... 10

    4.  Mischaracterization of the mental health evidence. ........................................ 12

    5.  The district court's rejection of Mr. Barrett's expert testimony in favor of that presented by the government was unfounded. ................................................ 13

        a.  Psychiatric evidence ................................................................ 14

        b.  Neuropsychological evidence...................................................... 16

    6.  "Connection" between the mental illness and neuropsychological evidence and the "facts" of the case; substantial planning and premeditation. ........................ 17

    7.  Reweighing evidence in aggravation and mitigation. ....................................... 19

    8.  Resentencing Relief on Counts 1 and 2 is warranted. ...................................... 21

III.  CONCLUSION .................................................................................23

# TABLE OF AUTHORITIES

**Supreme Court Opinions**

*Rompilla v. Beard*,
545 U.S. 374 (2005) ........................................................................ 21

*Strickland v. Washington*,
466 U.S. 668 (1984) ................................................................... 20-21

*Tennard v. Dretke*,
542 U.S. 274 (2004) .......................................................................... 9

*Wiggins v. Smith*,
539 U.S. 510 (2003) ........................................................................ 21

**Federal Court Opinions**

*Anderson v. Sirmons*,
476 F.3d 1131 (10th Cir. 2007) ...................................................... 21

*In re Barrett*,
840 F.3d 1223 (10th Cir. 2016) ........................................................ 5

*Duplan v. Harper*,
188 F.3d 1195 (10th Cir. 1999) ...................................................... 17

*Hooks v. Workman*,
689 F.3d 1148 (10th Cir. 2012) ...................................................... 21

*Littlejohn v. Trammell*,
704 F.3d 817 (10th Cir. 2013) ........................................................ 21

*Smith v. Mullin*,
379 F.3d 919 (10th Cir. 2004) ........................................................ 21

*United States v. Barrett*,
496 F.3d 1079 (10th Cir. 2007) ........................................................ 4

*United States v. Barrett*,
797 F.3d 1207 (10th Cir. 2015) ................................... 3, 12, 18, 20

**Rules**

10th Cir. R. 25.5 ............................................................................. 27

Fed. R. App. P. 32 ......................................................................... 26

§ 2255 ....................................................................................... 21, 22

Mr. Barrett, KENNETH EUGENE BARRETT, by and through his counsel of record, files this Reply to Respondent/Appellee's Answering Brief ["RAB"] (Document#0101103471230).

## I.    FACTS

The only question before this Court is whether trial counsels' concededly deficient performance prejudiced Mr. Barrett. Thus, the facts developed at the evidentiary hearing compelled by this Court's remand are addressed first.

### 1.  The Evidentiary Hearing

Although the government expressly did not offer its experts for purposes of any theory of aggravation (ROA Vol. 4 at 2054), the government conflates the testimony and reports of two rebuttal experts to argue that Mr. Barrett was not prejudiced by his counsels' admittedly deficient performance. The government's experts relied on material that was excluded from consideration or was otherwise unavailable at the time of his 2005 trial. (*See, e.g.*, ROA Vol. 4 at 1478).

The government misrepresents the testimony of Mr. Barrett's brother, Stephen. RAB at 13. In discussing his volatile relationship with their alcoholic mother, Gelene Dotson, Stephen indicated that Gelene was the aggressor; she often targeted young Kenny Barrett and lost control. A cousin, Mark Dotson corroborated Stephen's testimony. ROA Vol. 4 at 426-430. When discussing two childhood fights he had with Mr. Barrett, Stephen, a high school principal, offered

1

his opinion that these were signs of his brother's mental illness for which he received no treatment during "the most critical years where I think he could have got some intervention that might have worked." *Id.* The notion that Stephen was injured in a sibling disagreement does not support the inference that Kenny Barrett was violent as a youth.

The government's attempts to malign Dr. Woods' expert opinion are likewise without merit. Dr. Woods' did agree on cross-examination that methamphetamine abuse could not induce the symptoms of bipolar disorder. (RAB at 14). However, when placed in context, that very opinion supports his ultimate diagnoses. Mr. Barrett's mood swings and behaviors could not be explained away by simple substance abuse. ROA Vol. 4 at 690. When asked whether Dr. Woods considered the documented substance abuse, he indicated that the medical and toxicology reports were negative for methamphetamine in 1986, which serves to undermine government expert Dr. Pitt's belief that substance abuse disallows a diagnosis of a mood disorder. Dr. Woods did not "dispute the reliability of information" related to drug use. (RAB at 14). Rather, he assessed the escalation of substance abuse in various time periods from Mr. Barrett's early adolescence through 1999, and compared it to other data points provided from available genealogical, social and medical histories, culminating in his expert opinion and diagnoses, undoubtedly mitigating and never heard by the jury.

2

The government relies heavily on its expert, Dr. Price, who testified to testing conducted in preparation for trial in 2005. RAB at 15. The government had previously speculated about Dr. Price's potentially "devastating" testimony. *Barrett II,* 797 F.3d 1207, 1232 (10th Cir. 2015). However, Dr. Price did not testify as to any testing, finding, or diagnosis that was inconsistent or "devastating" to the mental health evidence that has been discovered since the time of trial.

Notably, the government continues to regurgitate the incorrect findings of the district court that their expert opined substance abuse precludes a diagnosis of mental illness. RAB at 16. In fact, experts on both sides agreed that there is often a co-morbidity with mood disorders such as bipolar disorder, PTSD and substance abuse due to self-medication. ROA Vol. 4 at 1521. Dr. Pitt opined in his written report that, "given the depth and breadth of the D's substance use, if you believe that at the time of the instant offenses, he had a mood disorder, his condition, to the extent it existed, was a byproduct of his substance use." Using today's psychiatric nomenclature… he would have met the DSM-5 criteria for a substance induced bipolar or depressive disorder." ROA Box 3 (1), Govt. Exh. 52 at 67.

Dr. Pitt also testified that Mr. Barrett "could have had a [pre-existing condition], unknown whether his emotional complaints predate his substance abuse." *See* ROA Vol. 4 at 1922; see also, *id.,* at 2026- 2029. (Magistrate's extensive assessment of Dr. Pitt's testimony.)

3

### 2. The Trial

The government's revision of the narrative injects extraneous facts that it then misinterprets, and omits extensive mitigating evidence that belies the false narrative. (RAB at 2-12). *See* Case No. 16-7035 Document No. 01019619073.

The parties urge dramatically different scenarios. The evidence now in the record supports Mr. Barrett's continued assertion that he acted in self-defense and that there exists a very real possibility that Trooper Eales was killed by friendly fire. *In re Barrett,* Case No. 16-7035 Document No. 01019619073 at 83-87.

Since the tragic death of Oklahoma Highway Patrol East Tact Team David Eales in a 10 -15 second firefight, initiated by law enforcement, Mr. Barrett has endured three trials under both state and federal sovereignties. *See United States v. Barrett,* 496 F.3d 1079, 1086 (10th Cir. 2007).  The raid was comprised of state and federal agents, armed with military style weaponry,[1] during a botched execution of an illegal no-knock warrant.  While the consecutive prosecutions both involved informants' testimony on Mr. Barrett's drug activity, in state court the informant admitted to perjury induced by law enforcement;[2] while the informant used in federal court, Charles "Monk" Sanders was bullied by AUSA Littlefield

---

[1] *E.g.,* HK-53s,grenade launchers, flashbangs, SROA 470, 1056, 1135-1136, 1488, 1501, 2237-2245.

[2] *State v. Barrett,* Sequoyah County Case No. CF-99-043, (1st Trial,Tr. Vol. 17, pp. 2848-2857 (Steven Carl Smith)).

into adhering to the prosecution's lies until after conviction and appeal.  See *In re Barrett,* 840 F. 3d 1223, 1229 (10th Cir. 2016).

Mr. Barrett reiterates the facts of the offense as set out in Mr. Barrett's proposed Successive Motion to Vacate,  *In re Barrett,* No. 16-7035 (10th Cir.) Document No. 01019619073 and relies on the evidence submitted therein, much of which is in the record here;[3] as well.

The government insists on presenting  Mr. Barrett as a cold-blooded premeditated murderer.[4]  RAB at 8-9, 21, 43-48.  The evidence on premeditation is scant, at best.

- A no trespassing sign (RAB at 4, 35) phrased in commonplace vernacular without specific threat of harm.[5]  It is hardly evidence of more than Mr. Barrett's Oklahoma roots, the then-existing stand your

---

[3] Including but not limited to: ROA, Vol. 2, at 1410 (Internal Affairs Investigator Paul Gordon); Case No. 12-7086 (10th Circuit), Doc. 01019455016 (Monk Sanders), Document#1019455032 (Hon. John Garrett), Document#01019619105 (Hon. Dennis Sprouse).

[4] It is worth noting that in its response to Mr. Barrett's original claim of ineffective assistance, the government insisted that evidence of premeditation was never at issue, and relied on a theory of felony-murder to request this Court deny relief as to counsel's merits' phase performance. Dkt. 174 at 32, 36, 37.

[5] The sign was far less threatening than commercial signs of the same tenor: *See, e.g.,* https://www.amazon.com/no-trespassing-signs/s?k=no+trespassing+signs (*E.g.,* "WARNING NO TRESPASSING. VIOLATORS WILL BE SHOT. SURVIVORS WILL BE SHOT AGAIN.")

ground law, and the right to bear his lawfully owned arms and protect his family, self and property. *See* 21 OK Stat. §1289.25 [6]

- The testimony of Charles Sanders, confidential informant [CI] to DTFO Clint Johnson, affiant on the fatally executed no-knock warrant. RAB at 3-4. Sanders subsequently recanted his testimony and averred threats and intimidation by both Johnson and AUSA Littlefield before and during his testimony. See Declaration of Charles Sanders, Case No. 12-7086, Doc. 01019455016.

- The testimony of Cindy Crawford, a drug addicted, well-known thief, liar and police informant who secured an undisclosed lenient sentence following her testimony in which she affirmed the government's allegation that Mr. Barrett knew of the outstanding warrant and threatened to go out in a "blaze of glory." RAB at 4, 35. Crawford admitted the "threat" was common slang among drug addicts, meant little, and was not directed at police specifically. SROA 3011-3012.

Beyond that, the government's theory of premeditation is weakened by a visit to Mr. Barrett by Sheriff Philpot near the time of the raid. Case No. CR-

---

[6] *See* No Knock Warrants vs. 'Stand Your Ground' laws: A deadly duo in Breonna Taylor shooting, Louisville Courier Journal, May 17, 2020.

00115, Doc. 432, Exh. 7 (Sheriff Johnny Philpot). Mr. Barrett permitted the sheriff

to inspect his guns after which the sheriff left without incident, and without

executing the outstanding arrest warrant. *Id.*

The jury was never made aware of the government's poor judgment in

petitioning for a purposeless no-knock warrant to execute a warrant for a non-

violent offense;[7] its misconduct including pressing lies and intimidating

witnesses;[8] the weaknesses of its purported forensics which was nothing more than

opinion testimony unsupported by verifiable testing procedures or results;[9] or, its

failure to process potential relevant exculpatory evidence.[10] Nor did the jury know

of the inconsistencies, or lies by law enforcement witnesses,[11] evidence

---

[7] ROA, Vol. 3, at 1534-1538 (Police expert George Kirkham Report); Case No. CR-00115, Doc. 432, Exh. 7 (Sheriff Johnny Philpot), Exh. 8 (Police Chief Gary Philpot), SROA at 3829-3852 (Federal Testimony of FBI Tactics Team Leader Cloyce Choney).

[8] ROA, Vol 2, at 1419 ¶23; 1436 ¶¶73, 84 (re: OHP initiating gunfight; the failure to activate emergency lights); ROA, Vol. 2, at 1433 (witness intimidation).

[9] *See e.g.,* ROA, Vol. 2, at 352-357 (Criminalist Edward Hueske); Case No. CR-00115, Doc. 432, Exh. 52 (State trial juror Ron Sullivan); ROA, Vol. 2, at 174-175 (State Defense Counsel Jack Gordon); ROA, Vol. 3, at 762, 1040 () (Ballistics Expert William Tobin); Case No. CR-00115, Doc. 432, Exh. 55 (re: movement of the Bronco before scene processing).

[10] Case No. 16-7035, Doc. 01019619073 at 77, 87 (Front door, DNA on porch and steps, removal of OHP AR15 from scene, and Trooper Eales' turtle vest.).

[11] ROA, Vol. 2, at 1424, para. 42; Case No. 16-7035, Doc. 01019619073 at 74-78.

destroyed,[12] and/or altered[13] or planted evidence.[14] This is too often the case; militarized executions of no-knock warrants, just as the one at Mr. Barrett's home, result in the tragic but foreseeable loss of life, and often result in law enforcement lies to justify bad results.[15]

Mr. Barrett objects to the government's factual narrative in full, as cherry-picked, improper, and irrelevant in tone and purpose to the question of whether his counsel's deficient performance prejudiced Mr. Barrett at his sentencing proceeding.

---

[12] SROA at 3996-3998.

[13] ROA Vol. 2, at 1423, para. 37.

[14] ROA Vol. 2, at 1425, para. 45-47 (*e.g.,* red phosphorous).

[15] When the Police Lie, The New York Times, June 8, 2020.

## II. ARGUMENT

**THE GOVERNMENT'S ARGUMENT THAT MR. BARRETT SUFFERED NO PREJUDICE FROM TRIAL COUNSELS' CONCEDED DEFICIENT PERFORMANCE SHOULD BE REJECTED, AND THE DISTRICT COURT'S DENIAL OF A NEW SENTENCING TRIAL SHOULD BE REVERSED.**

### 1. An inaccurate heading.

Even the heading in the government's brief for its substantive arguments is inaccurate. It states, "Trial Counsel Selected Appropriate Mental Health Evidence for Presentation to the Jury." RAB at 23. But trial counsel presented no mental health evidence to the jury. That was one of the points upon which Mr. Barrett has argued counsel were ineffective in the penalty phase. The government has conceded, and the district court found, that trial counsel's performance was constitutionally deficient. RAB at 17-18; ROA Vol. 4 at 2001, 2129-2136.

### 2. Erroneous legal standard.

The government still seeks to impose the wrong legal standard, *i.e.,* a "nexus" or "but for" test, in assessing prejudice from trial counsels' unreasonable failings. The district court did the same. RAB at 34; ROA Vol. 4, at 2061-66, 2147-2148. This is inappropriate, as Mr. Barrett showed in his opening brief. CAOB at 49-52. See *Tennard v. Dretke,* 542 U.S. 274, 287-88 (2004).

### 3. Failure to consider the mitigating evidence of Mr. Barrett's background and upbringing.

Against Mr. Barrett's claim that the district court's prejudice analysis is fatally flawed because it did not take into account the mitigating evidence of Mr. Barrett's abusive, dysfunctional and traumatic background, the government argues: 1) this aspect of Mr. Barrett's argument is not subject to review because he failed to secure a certificate of appealability on this particular aspect of the district court's ruling, or 2) the district court did in fact consider this category of mitigating evidence, or 3) failing that, the district court was not required to consider every facet of the magistrate judge's findings in order to issue a valid ruling overturning the magistrate's conclusion that Mr. Barrett was prejudiced by counsels' deficient performance. RAB at 27-29.

The district court granted Mr. Barrett a broad certificate of appealability to challenge its finding that trial counsels' deficient penalty phase performance did not prejudice him. ROA, Vol. 4, at 2150. One of the several flaws in the district court's prejudice analysis was failing to take into adequate account the mitigating evidence dealing with Mr. Barrett's personal background. CAOB at 33-35. Mr. Barrett is not required to get a separate certificate of appealability on every discrete portion of the district court's ruling of "no prejudice," when he was granted a certificate of appealability to challenge that very finding. The government cites no pertinent authority. Its argument is frivolous.

10

That the district court did not give due consideration to the omitted mitigating evidence of Mr. Barrett's background and upbringing is demonstrated by its endorsement of the government's baseless argument that the magistrate judge did not rely on this evidence (and its persuasiveness) in concluding Mr. Barrett had been prejudiced. ROA Vol. 4, at 2032, 2051, n.2. The district court's unadorned reference to Mr. Barrett's "less than ideal upbringing" (CAOB Attachment 1, at 20, n.23, RAB at 28, ROA Vol. 4, at 2148) is devoid of analysis and does not begin to fairly describe the extensive evidence of his dysfunctional and abusive personal history.

The government, in essence, concedes the argument, maintaining the district court's denial of relief is "adequate" even if it omitted any real discussion of this category of mitigating evidence. RAB at 28. If the district court in fact considered this background evidence in its opinion, there would be no need for the government to make this argument.

The government says the district court spent "three pages" refuting the claim that Mr. Barrett was prejudiced by counsel's deficient performance, but this focused on the mental health evidence in general and the evidence of multi-generational mental health disorders in Mr. Barrett's extended family and among his ancestors. RAB at 28, ROA Vol. 4, at 2148.

11

For the rest, the district court relied on the same discredited argument made by the government when this case was last before the Court: that introducing evidence of Mr. Barrett's abusive background would have highlighted past episodes of domestic violence and his addiction to drugs. CAOB Attachment 1, at 20-21, n.23. But the jury already knew all this. What was missing was a mitigating explanation for Mr. Barrett's conduct and his drug addiction. *Barrett II*, 797 F.3d at 1231-32. The magistrate judge made the same point in his report and recommendation. ROA Vol. 4, at 2026-2031.

### 4. Mischaracterization of the mental health evidence.

The government argues the district court did not mischaracterize the mental health and neuropsychological evidence as going to his competency to stand trial, but the language used in the opinion is unambiguous. RAB at 29. "Simply because Petitioner was able to obtain experts who described the Petitioner as having mental health disorders so severe that he could not have rationally assisted his attorneys in the preparation of his defense [footnote omitted] does not mean the jury would have given much weight to that testimony in light of the evidence it heard over the course of the entire trial." CAOB at 35, ROA Vol. 4, at 2138)

To say, as the government does, that had there been overwhelming evidence that Mr. Barrett had been incompetent would have had a powerful mitigating effect, is wholly beside the point. RAB at 29. If Mr. Barrett were incompetent,

12

there would have been no trial at all. The issue here is mitigation of punishment, not competency to stand trial.

The government concentrates on the fact Dr. George Woods opined in 2009 that Mr. Barrett lacked competency. Dr. Woods opined that Mr. Barrett's belief that he had done nothing wrong prevented him from having a truly rational understanding of the charges against him. RAB at 29-31. As Dr. Woods's report and his extensive testimony at the evidentiary hearing demonstrated, competency, however, was not the focus of his testimony. The focus was the mitigating effect of Mr. Barrett's bipolar disorder, post-traumatic stress disorder, and neurological deficits and dysexecutive syndrome. *E.g*., ROA Vol. 4, at 352, 542,-44, 560-67, 570, 602, 686, 711-12.

### 5. The district court's rejection of Mr. Barrett's expert testimony in favor of that presented by the government was unfounded.

Particularly because it did so without conducting a new evidentiary hearing, the district court's finding that the government's experts were more credible than the defense experts and witnesses, (CAOB A-1 at 13, 16) and therefore the absence of such defense testimony at trial resulted in no prejudice, is flawed. There were no proper grounds upon which to reverse the recommendation of the magistrate judge that a new sentencing trial is required.

### a. Psychiatric evidence

The government says the district court rightly concluded the jury would have given little credence to Dr. Woods' diagnosis of bipolar disorder, because his behavioral and mental problems could better be explained, as Dr. Pitt stated, by drug use. RAB at 36-43. The magistrate judge reasonably found that Dr. Pitt's counter-testimony to Dr. Woods was not particularly persuasive. ROA Vol. 4, at 2018-20, 2026-31. Both the government and the district court overlook the many areas of agreement between Dr. Woods and Dr. Pitt, which strengthened the effect of much of the mitigating evidence. CAOB at 41-43.

The explanation that Mr. Barrett's mental problems stemmed exclusively from drug use, and Dr. Pitt's observations supposedly supporting this view, were effectively addressed in Dr. Woods's testimony before Dr. Pitt even appeared as a witness. *E.g.,* ROA Vol. 4, at 677-80, 690,710. During his examination of Mr. Barrett, Dr. Pitt remarked it was "unusual" for Mr. Barrett to have been committed to the state hospital for a period of 28 days simply for a drug problem. CAOB at 43, ROA Vol. 4, at 1552-54. On that occasion, Mr. Barrett was civilly committed as a mentally ill person, not a drug addict. CAOB at 42, ROA Vol. 4, at 1552-54.

Along these lines, as Dr. Woods pointed out, and as the magistrate judge found, Mr. Barrett's past significant contacts with the mental health system showed him being treated for things other than drug addiction, and treated with

14

medications for a disorder or disorders other than drug use. Dr. Pitt could not contest many of these facts. CAOB at 41-43, ROA Vol. 4, at 650, 677-80, 710, 796, 801-02, 1422, 1476, 1537-38, 1540-43, 1545-48, 1552-58, 1563-64.

While no other mental health professional besides Dr. Woods had diagnosed Mr. Barrett with bipolar disorder, no other mental health professional other than Dr. Woods had performed a complete psychiatric examination augmented by a complete neuropsychological battery. CAOB at 37, 41, ROA Vol. 4, at 2018. Dr. Pitt did not consult with a neuropsychologist or have Mr. Barrett evaluated by one in connection with his examination, and could not and did not contest the findings of Drs. Young and Miora. CAOB at 37, ROA Vol. 4, at 1386, 1494-95, 1509, 1515, 1517, 2028-29.

According to the government, the district court rightly dismissed the evidence of extensive mental illness, including mood disorders, suicidality, substance abuse, and schizophrenia, in Mr. Barrett's immediate and extended family, as well as his ancestors on both sides of the family, because it does not "prove" he suffered from a mood disorder, specifically, bipolar disorder. RAB at 39. The government misapprehends the relevancy of the mental illnesses at play and the evidence supporting it, including the strong genetic component and the integral role substance abuse can play in bipolar disorder. It may not "prove" the bipolar disorder by itself, but, as Dr. Pitt agreed (CAOB at 41-42, ROA Vol. 4, at

15

1386, 1490, 1499-1507), it does corroborate it, is not inconsistent with it and is mitigating in its own right. The court may not simply ignore its relevancy because it goes beyond Dr. Woods' ultimate diagnoses.

The district court's substitution of its credibility determination for that of the magistrate judge on the question of the believability and the weight of the psychiatric evidence should not stand, substantively or as a matter of procedure.

### b. Neuropsychological evidence.

Both the government and the district court tried to dismiss the unrefuted evidence of Mr. Barrett's serious neuropsychological impairments by claiming he "malingered" on one or more tests given to him by Dr. Young. RAB at 23, 33-34. This is flatly contradicted by the record. Every expert who examined Mr. Barrett, both defense and prosecution, said that he gave his best efforts during testing or examination and was not malingering. CAOB at 40, ROA Vol. 4, at 1761-1827, 1261-64.

As "proof" of this nonexistent malingering, the government cites the fact that Mr. Barrett could drive a car and was a skilled mechanic. Whether Mr. Barrett could drive a car does not invalidate the serious neurocognitive damage found in Dr. Young's testing, as testified to by Dr. Miora. The fact that Mr. Barrett was a good mechanic does not "invalidate" the neuropsychological findings. As was pointed out by Dr. Woods, the damage to Mr. Barrett's brain does not affect the

part of the brain responsible for mechanical aptitude.  CAOB at 39-40, ROA Vol. 4, at 561, 2142-43.

The government concedes it did not contest the neuropsychological findings of Mr. Barrett's experts with an expert of their own, but argues the district court was not compelled to accept the defense testimony.  RAB at 33, citing *Duplan v. Harper,* 188 F. 3d 1195, 1202-03 (10th Cir. 1999).  In *Duplan*, this Court examined the reasons for rejecting the medical evidence and, unlike here found them to be sufficient.  *Id.* at 1203.  The district court's rejection of the defense expert medical evidence here rests on no inconsistency, internally or with other evidence.  Indeed as noted, it is consistent with the government's evidence.  The neuropsychological screening test given by Dr. Price, one of the government's experts, showed significant deficits and was consistent with the findings of the defense neuropsychologists.  CAOB at 38, ROA Vol. 4, at 1298, 1322, 1327, 1334, 1365-66, 2026.  The consistency with the government's expert evidence with Mr. Barrett's experts enhances credence in the evidence.  It was wrongly ignored by the court and government.  The district court erred in the rejection of the evidence.

### 6.  "Connection" between the mental illness and neuropsychological evidence and the "facts" of the case; substantial planning and premeditation.

The government argues Mr. Barrett's experts never "connected" their diagnoses to the underlying facts of the case, and that this evidence does not

explain Mr. Barrett's behavior.  RAB at 51-52.  This is incorrect.  It was explained in *Barrett II* 797 F.3d at 1226-30 the significance of this evidence to mitigating punishment.  It was explained again at the evidentiary hearing and in Mr. Barrett's proposed findings of fact and conclusions of law.  ROA 1874-1964.  It was explained again in Mr. Barrett's opening brief.  CAOB at 36-43.  It was explained again in the magistrate judge's report and recommendation.  ROA Vol. 4, at 2016-2031.

The mitigating evidence showed or tended to show that Mr. Barrett reacted impulsively to the police raid, was not able to accurately process what was going on, and was not able to inhibit his actions due to the skewed manner in which he perceived the unfolding events.  In short, this evidence blunted the government's evidence of intent because it showed his conduct was poorly reactive as opposed to diabolically "premeditated."  Evidence of mental illness and neurological impairments is also mitigating in its own right.

The government argues the mental health and neuropsychological evidence would have had no impact on the jury because it was "contradicted" by the evidence of intent and the jury's finding of substantial planning and premeditation.  (Gov't Br. 43-50)  But the very purpose of this evidence was to call into question or mitigate the evidence of intent and premeditation.  See n.4 hereinabove.  The magistrate judge correctly found that it did.

It also bears pointing out yet again that the government's evidence of premeditation and intent rested on the testimony of witnesses of highly questionable credibility, some of whom have recanted, and many of whom testified in exchange for official favor or the hope of it. These witnesses were cultivated exclusively for the federal case, and at the eleventh hour. They did not testify in the two state trials. The evidence of premeditation and planning could hardly be called overwhelming, based on its origin and quality.

**7. Reweighing evidence in aggravation and mitigation.**

In line with the finding of the district court, the government asserts that Mr. Barrett's mental health, neuropsychological, and psycho-social history evidence would not have resulted in a different penalty verdict because the evidence in aggravation, particularly the substantial planning and premeditation factor, was so strong. RAB at 43-50, 50-52.

Mr. Barrett has shown in his opening brief and here that the district court's characterization of the nature and strength of the mitigating evidence omitted from trial is clearly erroneous and that the magistrate judge correctly assessed the evidence and found its omission prejudicial. Not only was the omitted evidence mitigating in its own right, the mental health and neuropsychological evidence mitigated or called into question Mr. Barrett's state of mind and intent at the time

19

of the shooting.  Contrary to the governments assertion, this is a strength, not a weakness.

The government cannot elude the fact that the case for the death penalty here was never overly strong, and certainly was not overwhelming.  Nor can it escape the fact that its experts did not diagnose Mr. Barrett as a psychopath or a sociopath, which this Court signaled would have likely obviated the prejudicial impact of any failure to introduce mental health evidence.  *Barrett II,* 797 F.3d at 1232.  CAOB at 26, ROA Vol. 4, at 1319, 1368, 2024.

The aggravating circumstances all centered on the facts of the offense(s) as laid in the reply to the Facts § 2 above, the substantial planning and premeditation factor was supported by very problematic evidence, and could have been effectively countered with the credible evidence of Mr. Barrett's mental illness and organic brain damage.  Mr. Barrett had no previous felony convictions.  The jury rejected the continuing threat non-statutory aggravating circumstance.  The police raid on Mr. Barrett's property was flawed, and a previous state prosecution had resulted in an acquittal of murder and a manslaughter conviction.

In this light, there is a reasonable probability, as the magistrate judge found, that had the evidence of mental illness, organic brain damage, and Mr. Barrett's abusive and dysfunctional background been presented, the jury's sentencing stage verdict would have been different.  *Strickland v. Washington,* 466 U.S. 668, 687,

694 (1984).  *See particularly, e.g., Rompilla v. Beard,* 545 U.S. 374, 391-93 (2005) and *Wiggins v. Smith,* 539 U.S. 510, 537-38 (2007).

As argued in the court below and in Mr. Barrett's opening brief, his case compares favorably to others from this Court where penalty phase relief due to ineffective assistance of counsel was granted, even in cases which were far more aggravated, involving multiple murders or defendants with significant criminal histories.  *E.g., Littlejohn v. Trammell,* 704 F.3d 817, 860-61 (10th Cir. 2013); *Hooks (Victor) v. Workman,* 689 F.3d 1148, 1201-02, 1204-07 (10th Cir. 2012); *Anderson v. Sirmons,* 476 F.3d 1131, 1141-48 (10th Cir. 2007); *Smith v. Mullin,* 379 F.3d 919, 938-44 (10th Cir. 2004).

## 8.  Resentencing Relief on Counts 1 and 2 is warranted.

The government's assertion that Mr. Barrett is time-barred for relief as to Counts I and II is groundless.  RAB at 54.  The government parses out snippets of argument from Mr. Barrett's original § 2255 petition, ignoring the overall arguments presented therein, and in nearly every pleading filed thereafter, which clearly delineates a challenge to his convictions and each sentence.

On March 16, 2009, Mr. Barrett filed his first motion for collateral relief. ROA Vol. 1 at 46.  From the outset of his appeals, Mr. Barrett stressed the interrelated counts, all stemming from a single incident and resulting in the death of Trooper Eales.  His trial counsels' concededly dismal performance lost evidence

that was interrelated as to any specific intent for all counts, any intent to commit a criminal act, and would have served to mitigate his sentence, each of which was presented to his jury for death eligibility.  Mr. Barrett asked he "be granted relief from his convictions and sentences."

On September 25, 2009, Mr. Barrett filed an amended § 2255 motion (ROA Vol. 1 at 1336). Again, Mr. Barrett recited the interrelated nature of his charges and the consequences of his counsels' deficient performance and failure to investigate or present a case in mitigation.  *See e.g.,* ROA Vol. 1, at 1406, 1407, 1537, 1552, 1600, 1620, 1628, 1406-1408, 1538, 1552-1554, 1637.  See also, ROA Vol. 2 at 879, 884, 1018, 1032 (Mr. Barrett's Amended Petition and Brief in Support).  Specifically, in addressing Ground 2, Part A(2), in his amended petition and brief in support thereof, Mr. Barrett challenges the failure to investigate and present evidence of mental impairment at both stages of his trial, directly challenging the specific intent for all three convictions and the resulting sentences. *Id.,* at 914-922.  And in a direct and unambiguous statement, Mr. Barrett concluded, as he has done in nearly every pleading for relief, that this Court should "vacate Mr. Barrett's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted."  *Id*. at 1119.

It is telling that the government does not challenge *United States v. Hicks*, other than to distinguish it as somehow lesser authority since it was a non-capital

sentencing by a judge rather than a capital penalty phase. RAB at 56. The government provides no authority to support its position. Further, it is disingenuous to allege that the mitigation evidence adduced at the hearing was not meaningful, "given the circumstances of the crime and the new aggravation developed at the hearing." RAB at 56. There was no new evidence in aggravation.

## III. CONCLUSION

Accordingly, the government's arguments should be rejected. The district court's ruling that trial counsels' deficient performance did not prejudice Mr. Barrett in the determination of penalty should be reversed.

**DATED** this 24th date of June, 2020.

> */s/ Joan M. Fisher*
> **JOAN M. FISHER**, ID Bar #2854
> Assistant Federal Defender
>
> */s/ Carrie L. Ward,*
> **CARRIE L. WARD**, MO Bar #57581
> Assistant Federal Defender
>
> */s/ David Autry*
> **DAVID AUTRY**, OBA #11600
>
> Attorneys for Mr. Barrett/Appellant,
> Kenneth Eugene Barrett

# CERTIFICATE OF ELECTRONIC FILING AND SERVICE

On this 24th day of June, 2020, I caused the foregoing Reply to Respondent/Appellee's Answering Brief to be filed with the Clerk of the Court using the ECF System for filing, with electronic service via CM/ECF to be made to Christopher J. Wilson, AUSA, Chris.Wilson@usdoj.gov, Jeffrey B. Kahan, U.S. Department of Justice, Jeffrey.kahan@usdoj.gov, Linda Epperley, U.S. Department of Justice, Linda.Epperley@usdoj.gov, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

*/s/ Joan M. Fisher*
JOAN M. FISHER

## CERTIFICATE OF COMPLIANCE

This brief's size and type face comply with Fed.R.App.P. 32(a)(5) and (6).

This brief contains 5,051 words, excluding the portions exempted by Fed.R.App.P. 32(a)(7)(B)(iii), if applicable.

*/s/ Joan M. Fisher*
JOAN M. FISHER

# ADDITIONAL CERTIFICATIONS

I hereby certify as follows,

1. There are no privacy redactions in this document required to be made per 10th Cir. Rule 25.5;

2. The ECF submission is an exact copy of the seven (7) hard copies required to be filed;

3. The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Malwarebytes Anti-Exploit, last updated June 24, 2020, and according to the program is free of viruses.

**DATED** June 24, 2020

*/s/ Joan M. Fisher*
JOAN M. FISHER
